1  STROOCK & STROOCK & LAVAN LLP
   Lewis Kruger (admitted *pro hac vice*)
2  Kenneth Pasquale (admitted *pro hac vice*)
   180 Maiden Lane
3  New York, NY  10038-4982
   Telephone: (212) 806-5400
4  Facsimile:  (212) 806-6006

5  STROOCK & STROOCK & LAVAN LLP
   Alan Z. Yudkowsky (State Bar No. 194994)
6  2029 Century Park East, Suite 1800
   Los Angeles, California 90067
7  Telephone: (310) 556-5800
   Facsimile:  (310) 556-5959
8
   Counsel for Portside Growth & Opportunity Fund,
9  Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.

10 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Van C. Durrer II (State Bar No. 226693)
11 Glenn Walter (State Bar No. 220015)
   300 South Grand Avenue, Suite 3400
12 Los Angeles, California 90071
   Telephone: (213) 687-5000
13 Facsimile:  (213) 687-5600

14 Counsel for Citadel Equity Fund Ltd.

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17                          SAN JOSE DIVISION

18

19 In re                                  ) Case No. C-07-02553 RMW
                                          )
20 SONICBLUE INCORPORATED, a Delaware     )
   corporation; DIAMOND MULTIMEDIA SYS-   ) **MEMORANDUM OF POINTS AND AU-**
21 TEMS, INC., a Delaware corporation; RE- ) **THORITIES IN SUPPORT OF SENIOR**
   PLAYTV, INC., a Delaware corporation; and ) **NOTEHOLDERS' OPPOSITION TO MO-**
22                                         ) **TION TO DISMISS APPEAL AND**
   SENSORY SCIENCE CORPORATION, a         ) **CROSS-MOTIONS FOR LIMITED STAY**
23 Delaware corporation,                   ) **OF PROCEEDINGS AND/OR TO WITH-**
                                          ) **DRAW REFERENCE OF CHAPTER 11**
24            Debtors and Debtors in Possession. ) **CASES**
                                          )
25                                         )
                                          )
26

27

28

─────────────────────────────────────────────────────────
Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

# TABLE OF CONTENTS

Page No.

I.      INTRODUCTION ............................................................................................1

II.     STATEMENT OF FACTS ..............................................................................4

        A.      The Senior Noteholders And The Debtor..........................................4

        B.      The Bankruptcy Cases ......................................................................4

                1.      The Initial Creditors Committee ...........................................5

                2.      The VIA Litigation And The Intel Motion.............................6

                3.      The VIA Settlement Negotiations ..........................................6

                4.      The Original Issue Discount And The 2002 Opinion Letter ........................10

                5.      The Initial Disclosure Statement .........................................11

                6.      The Orders ...........................................................................12

                        a)      The First Opinion ......................................................13

                        b)      The Clarification Denial Order.................................13

                        c)      The Notice Of Appeal ...............................................14

                7.      The Adversary Proceeding ...................................................15

                8.      The Chapter 11 Trustee's Proposed Plan And Disclosure Statement ...........16

                9.      The Motion To Reconstitute The Initial Creditors Committee ....................16

                10.     The Motions To Partially Vacate The Settlement Order.............................17

        C.      The Motion To Dismiss The Appeal ...............................................18

III.    RELIEF REQUESTED ...................................................................................18

IV.     DISCUSSION..................................................................................................19

        A.      The Court Possesses Jurisdiction Over The Appeal........................19

                1.      "Route One":  Reformation Of A Favorable Judgment ...............................20

                2.      "Route Three":  Collateral Estoppel.....................................22

        B.      The Court Should Stay The Motions To Vacate Or, Alternatively, Withdraw
                The Reference Of The Bankruptcy Cases From The Bankruptcy Court To
                The District Court..............................................................................24

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

1                  1.      The Senior Noteholders Meet the Standard For Granting A Stay ................28

2                  2.      Granting a Stay Will Not Prejudice SB Claims And Public Policy
                            Favors A Stay ...................................................................................30

          C.      The Reference To The Bankruptcy Court Should Be Withdrawn............................31

V.      CONCLUSION ................................................................................................36

1

# TABLE OF AUTHORITIES

2

## CASES

3    Am. Cmty. Servs., Inc. v. Wright Mktg., Inc. (In re Am. Cmty. Servs., Inc.),
4        86 B.R. 681 (D. Utah 1988) ........................................................................31

Bass v. Quittner, Stutman & Treister,
5        381 F.2d 54 (9th Cir. 1967) ........................................................................31

6    Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau),
7        135 B.R. 209 (Bankr. N.D.N.Y. 1992).........................................................27

Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human
8        Resources,
9        532 U.S. 598 (2001) ....................................................................................19

Chem. Weapons Working Group (CWWG) v. Dept. of the Army,
10       101 F.3d 1360 (10th Cir. 1996)..............................................................27, 28

11   In re City of Bridgeport,
12       132 B.R. 81 (Bankr. D. Conn. 1991)...........................................................29

Daewoo Motor Am. v. Gulf Ins. Co. (In re Daewoo Motor Am.),
13       302 B.R. 308 (C.D. Cal. 2003)..............................................................32, 35

14   Davis v. United States,
15       667 F.2d 822 (9th Cir. 1982) .....................................................................25

Deposit Guar. Nat'l. Bank v. Roper,
16       445 U.S. 326 (1980) ....................................................................................19

17   Dixon v. Wallowa County,
18       336 F.3d 1013 (9th Cir. 2003) ...................................................................23

In re Dudley,
19       2006 WL 862932 (N.D. Cal. 2006).............................................................28

20   In re Duro Industries,
21       293 B.R. 271 (B.A.P. 1st Cir. 2003)......................................................21, 22

Elec. Fittings Corp. v. Thomas & Betts Co.,
22       307 U.S. 241 (1939) ............................................................................20, 21, 24

23   Envtl. Prot. Info. Ctr., Inc. v. Pacific Lumber Co.,
24       257 F.3d 1071 (9th Cir. 2001) ...............................................19, 20, 21, 24

In re Garland,
25       295 B.R. 347 (B.A.P. 9th Cir. 2003) ..........................................................21

26   Griggs v. Provident Consumer Discount Co.,
27       459 U.S. 56 (1982) ......................................................................................25

28

Hill & Sandford, LLP v. Mirzai (In re Mirzai),
    236 B.R. 8 (B.A.P. 9th Cir. 1999) ...................................................................25, 26

Kennilworth Partners II LP v. Crisman,
    2001 WL 30534 (N.D. Cal. 2001) ...........................................................................35

Lopez v. Heckler,
    713 F.2d 1432 (9th Cir. 1983) .................................................................................28

In re Mader,
    100 B.R. 989 (N.D. Ill. 1989) ..................................................................................29

In re Martech USA, Inc.,
    188 B.R. 847 (B.A.P 9th Cir. 1995) .........................................................................19

McClatchy Newspapers v. Cent. Valley Typographical Union No. 46,
    686 F.2d 731 (9th Cir. 1982) ...................................................................................25

Mohawk Indus., Inc. v. Robinson Indus., Inc.,
    46 B.R. 464 (D. Mass. 1985) ...................................................................................34

Neary v. Padilla (In re Padilla),
    222 F.3d 1184 (9th Cir. 2000) ...........................................................25, 27, 31, 32, 33

Newton v. Consolidated Gas Co.,
    258 U.S. 165 (1922) .................................................................................................25

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
    4 F.3d 1095 (2d Cir. 1993) ......................................................................................32

Pan Am Corp. v. Delta Air Lines, Inc. (In re Pan Am Corp.),
    163 B.R. 41 (S.D.N.Y. 1993) .............................................................................33, 34

Parklane Hosiery Co., Inc. v. Parklane/Atlanta Venture (In re Parklane/Atlanta
    Joint Venture),
    927 F.2d 532 (11th Cir. 1991) .................................................................................31

Pimbo Corp. v. Castlerock Props. (In re Castlerock Props.),
    781 F.2d 159 (9th Cir. 1986) ...................................................................................34

Roe v. Anderson,
    134 F.3d 1400 (9th Cir. 1998) .................................................................................28

Deposit Guar. Nat'l Bank v. Roper,
    445 U.S. 326 (1980) .................................................................................................20

Ruvalcaba v. City of Los Angeles,
    167 F.3d 514 (9th Cir. 1999) ...................................................................................22

Sec. Farms v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers,
    124 F.3d 999 (9th Cir. 1997) ..............................................................................32, 35

State of New York v. Nuclear Regulatory Comm'n,
    550 F.2d 745 (2d Cir. 1977) ....................................................................................25

1

Sumida v. Yumen,
    409 F.2d 654 (9th Cir. 1969), cert. denied, 405 U.S. 964 (1972)....................25

Sw. Voter Registration Educ. Project v. Shelley,
    344 F.3d 914 (9th Cir. 2003) ...........................................................................28

Taylor v. Wood,
    458 F.2d 15 (9th Cir. 1972) .............................................................................25

United States v. El-O-Pathic Pharmacy,
    192 F.2d 62 (9th Cir. 1951) .............................................................................25

United States v. Good Samaritan Church,
    29 F.3d 487 (9th Cir. 1994) ......................................................................20, 23

United States v. Rogers,
    722 F.2d 557 (9th Cir. 1983) ...........................................................................31

United States v. Thorp (In re Thorp),
    655 F.2d 997 (9th Cir. 1981) ...........................................................................31

Universal Life Church, Inc. v. United States (In the Matter of Universal Life Church, Inc.),
    191 B.R. 433 (E.D. Cal. 1995) ........................................................................29

Walker v. Lockhart,
    678 F.2d 68 (8th Cir. 1982) .............................................................................28

In re Williams,
    156 F.3d 86 (1st Cir. 1998) .............................................................................19

World Solar Corp. v. Steinbaum (In re World Solar Corp.),
    81 B.R. 603 (Bankr. S.D. Cal. 1988)...............................................................34

In re Wymer,
    5 B.R. 802 (B.A.P. 9th Cir. 1980) ..............................................................28, 29

**STATUTES**

11 U.S.C. § 502(b)(2) ..............................................................................................10

28 U.S.C. § 157(d)...........................................................................................31, 36

**MISCELLANEOUS**

Blacks Law Dictionary 11445 (7th ed. 1999) .........................................................20

Federal Rules of Appellate Procedure
    8(a)(2) ..............................................................................................................27
    10 .....................................................................................................................27

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

Federal Rules of Bankruptcy Procedure
    157(b)(2)(A) .................................................................................34
    157(b)(2)(B) through (N) ..............................................................34
    157(b)(2)(O) ..................................................................................34
    8003(c)............................................................................................19
    8005 ........................................................................................26, 27
    9021 ................................................................................................21

Federal Rule of Civil Procedure
    58 ....................................................................................................21

10 Collier on Bankruptcy ¶ 8005.10 (15th ed. Rev. 2006)........................................27

# I.    INTRODUCTION

Appellants Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders") hereby oppose (the "Opposition") the Motion to Dismiss Appeal (the "Motion") filed by the Chapter 11 Trustee and submit this memo-randum of points and authorities in support of the Opposition as well as their Cross-Motions for a Limited Stay of Proceedings and/or to Withdraw the Reference of Chapter 11 Cases (the "Cross-Motions").

Principally at issue is a March 26, 2007 opinion and order of the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") that, among other things, appointed a Chapter 11 Trustee in an effort to correct what the Bankruptcy Court termed "the com-plete breakdown of creditor confidence" stemming from a conflict of interest suffered by the debt-ors' attorneys, Pillsbury, Winthrop, Shaw Pittman LLP f/k/a Pillsbury Winthrop LLP ("Pillsbury") (the "First Opinion").   (Appellants Designation of Record ("ADR"), Ex. 49 at 1 [Docket No. 2220];[1] Request for Judicial Notice ("RJN"), Ex. 7 at 1.)  At the time the Chapter 11 Trustee was appointed, it was suggested that this conflict of interest caused Pillsbury to assist in brokering a set-tlement agreement containing a term that was favorable to the Senior Noteholders.

In essence then, the "breakdown" arose in connection with the manner in which the settle-ment was negotiated, proposed, and ultimately approved in the Bankruptcy Court.  Importantly, however, no party-in-interest has claimed that the settlement was not in the best interests of the es-tates.  The only party claiming to be harmed by the settlement is a party who had the benefit of full disclosure and representation by counsel in connection with the allegedly offending settlement pro-vision, and the allegedly offending settlement provision did not cost the debtors' estates anything as it was in the nature of an agreed clarification of a pre-petition agreement.

Also noteworthy is the uncontroverted circumstances of the conflict of interest:  it stemmed from a dispute between Pillsbury and the Senior Noteholders that arose more than three months *after* the allegedly offending settlement provision was proposed (and approximately one year after

---

[1]    Unless otherwise indicated, all docket entries referenced herein are on the record in the Chapter 11 cases pending before the Bankruptcy Court, Case No. 03-51775.

the provision was agreed to in principle) and almost three months *after* it was agreed to by the party allegedly harmed by it.  And the actual conflict of interest touched only *one* of the debtors' two law firms that advised the debtors in connection with the settlement.  No one has suggested, nor can they, that the second law firm ever suffered under any conflict of interest.

No party-in-interest – not the Senior Noteholders, the non-debtor party to the settlement, the debtors (through either law firm), or the initial official committee of unsecured creditors – affirmatively disclosed the allegedly offending settlement provision, which only affected the Senior Noteholders and the non-debtor party to the settlement, in a settlement that everyone still agrees was in the best interests of the estate.  While the allegedly offending settlement provision may not have been specifically highlighted or called to the Bankruptcy Court's attention, *it was included in papers submitted to the Bankruptcy Court*.  With perfect hindsight, of course, it would be foolish to dispute that this settlement term should have been affirmatively disclosed.  The fact that so many parties failed to make an affirmative disclosure, however, strongly suggests that the failure was inadvertent, and the fact that the settlement remains undisputedly a "good deal" confirms that no harm was done.

Against this backdrop (but without consideration of any of the foregoing undisputed circumstances), the Bankruptcy Court appointed a Chapter 11 Trustee to investigate the facts and circumstances surrounding the settlement, which appointment the Senior Noteholders did not oppose. In its opinion, the Bankruptcy Court conceded that the Senior Noteholders' motive in connection with the settlement was "not known."  (RJN, Ex. 7 at 17.)  Yet in the same opinion, the Bankruptcy Court purported to find facts regarding the alleged, but unsubstantiated, behavior of the Senior Noteholders' counsel that demonstrated improper motives.  (Id.)  And in the later, related clarification opinion, the Bankruptcy Court erroneously concluded that there was an "appearance of concealment" and that the participation by the largest creditors in the single most important settlement to the estates was "unusual" (the "Clarification Denial Order" and, collectively with the First Opinion, the "Orders").  (ADR, Ex. 57 at 3-4 [Docket No. 2279]; RJN, Ex. 11 at 3-4.)

- 2 -

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

1    Because these, and other, findings in the Orders were unnecessary to the motions before the

2    Bankruptcy Court, clearly erroneous, and unsupported by the record, the Senior Noteholders filed

3    this appeal (the "Appeal").  The Chapter 11 Trustee has moved to dismiss the Appeal on the

4    grounds that this Court does not possess jurisdiction to review factual findings contained in the Or-

5    ders where the Senior Noteholders have not challenged the results reached in the Orders.  (Mot. at

6    2, 6-7.)  Although the Chapter 11 Trustee correctly states the general rule that only a party "ag-

7    grieved" by a judgment or order may appeal therefrom, the Ninth Circuit has recognized prudential

8    exceptions to the "prevailing party" rule, and the Senior Noteholders satisfy those exceptions.

9    Therefore, the Senior Noteholders are deemed "aggrieved" by the Orders and have standing to ap-

10   peal.  Specifically, because the Orders contain discussions of issues that are immaterial to the mo-

11   tions that were before the Bankruptcy Court, the Senior Noteholders may seek reformation of the

12   Orders.  Furthermore, for the reasons set forth herein, the Orders may be appealed because they

13   could potentially serve as the basis for collateral estoppel in subsequent litigation.

14   Following entry of the Orders and the filing of this Appeal, the Bankruptcy Court again re-

15   lied upon the disputed findings of "fact," without any evidentiary hearing, to reconstitute the credi-

16   tors committee, and these same findings have recently spawned two separate motions for relief

17   from the order approving the settlement.  Because the Bankruptcy Court has more than once relied

18   on certain factual findings in granting relief, however, the Senior Noteholders also file concurrently

19   herewith the Cross-Motions.

20   The Senior Noteholders have no opposition to a full and fair investigation of their conduct

21   in these bankruptcy cases; however, to date, the Senior Noteholders have had no opportunity to be

22   heard.  The Senior Noteholders file the accompanying Cross-Motions, therefore, to ensure they

23   have the opportunity to present a full and accurate picture regarding their conduct and, perhaps

24   more importantly, to avoid the waste of estate resources in the underlying Chapter 11 cases.

25

26

27

28

## II.    STATEMENT OF FACTS

### A.    The Senior Noteholders And The Debtor

In April 2002, in the face of mounting economic pressure caused by faltering finances, SONICblue, Incorporated (the "Debtor" or "SONICblue"),[2] negotiated the issuance of senior secured subordinated convertible debentures (the "Senior Notes") with the Senior Noteholders in the amount of $75 million, pursuant to an indenture dated as of April 22, 2002 (the "Indenture").[3] (ADR, Exs. 20 at 32:3-11 [Docket No. 2136], 37, Declaration of Ana N. Damonte ("Damonte Declaration") at ¶¶ 2-9 [Docket No. 2182]; RJN, Exs. 53 at 32:3-11, 35 at ¶¶ 2-9.)  Significantly for this case, one provision of the Indenture provided that the Senior Notes were subordinate to certain other obligations ("Senior Indebtedness" and the "Senior Indebtedness Provision"), including "[a]ll indebtedness of [SONICblue] due and owing to Via Technologies, Inc. [("VIA")] in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency."[4]  (ADR, Ex. 37, Indenture, at Section 1.1 (g) [Docket No. 2182]; RJN, Ex. 35, Indenture, at Section 1.1(g).)

### B.    The Bankruptcy Cases

Just ten months after it issued the Senior Notes, due to the continued deterioration of the Debtors' businesses, it became necessary for the Debtors to file for bankruptcy protection.  On March 21, 2003 (the "Petition Date"), therefore, each of the Debtors commenced a Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court.  These Chapter 11 cases were procedurally consolidated for administrative purposes, and these petitions were assigned to United States Bankruptcy Judge Marilyn Morgan in case numbers 03-51775-035178-MM (the "Bankruptcy Cases").  That same day, the Office of the United States Trustee (the "U.S. Trustee") appointed the Senior Note-

---

[2]    The Debtor, a Delaware corporation formerly known as S3 Inc., is a consumer electronics company.  Debtors ReplayTV, Inc., Sensory Science Corp., and Diamond Multimedia Systems Inc. are wholly-owned subsidiaries of SONICblue.  Collectively, these entities are the debtors (the "Debtors") herein.

[3]    Pillsbury was the Debtor's counsel during these negotiations.  It had been the Debtor's general corporate and litigation counsel for many years.

[4]    In 2001, VIA and the Debtor formed a joint venture—S3 Graphics Co., Ltd. ("S3G").

1  holders to the initial Official Committee of Unsecured Creditors (the "Initial Creditors Commit-

2  tee").  (ADR, Ex. 1 [Docket No. 26]; RJN, Ex. 36.)  Each of the Senior Noteholders filed a proof of

3  claim (the "Indenture Claims") related to the Senior Notes.

4      Pillsbury again was retained by the Debtors, and Hennigan, Bennett & Dorman LLP

5  ("HBD") represented the Senior Noteholders in connection with the Bankruptcy Cases.  Levene,

6  Neale, Bender, Rankin & Brill LLP ("LNBRB") was appointed as counsel for the Initial Creditors

7  Committee.

8              **1.        The Initial Creditors Committee**

9      In addition to being appointed to the Initial Creditors Committee, the U.S. Trustee included

10  the Senior Noteholders in all subsequent amended appointments to the Initial Creditors Committee.

11  (ADR, Exs. 6 [Docket No. 119], 8 [Docket No. 528]; RJN. Exs. 36, 37, 38.)  At first, all eight

12  members of the Initial Creditors Committee participated actively, (ADR, Ex. 39, Declaration of

13  Ron Bender ("Bender Declaration") at ¶ 24 [Docket No. 2185]; RJN, Ex. 45 at ¶ 24), but after

14  2003, only the Senior Noteholders, Matsushita Kotobuki Electronics Sales of America LLC, and

15  Matsushita Kotbuki Electronics Industries were truly involved, (RJN, Exs. 45 at ¶¶ 24-27, 53 at

16  5:15-6:6).

17      From the time of their appointment through the filing of this appeal, the Senior Noteholders

18  were openly active members of the Initial Creditors Committee.  The other key actors in the Bank-

19  ruptcy Cases – including, for example, the Debtors, Pillsbury, VIA, and Ron Bender of LNBRB –

20  were well aware that the Senior Noteholders were members of the Initial Creditors Committee and

21  that Bruce Bennett of HBD represented the Senior Noteholders as such—*not the Initial Creditors*

22  *Committee*.  Every document contained in the record supports this view, and that they functioned as

23  separate and distinct parties.  (See, e.g., ADR, Exs. 2 at ¶ 4 [Docket No. 28]; 3 at 1-2 [Docket No.

24  43]; 4 at ¶¶ 11-12 [Docket No. 63]; 5 at ¶¶ 7-8 [Docket No. 64]; 7 at 1 [Docket No. 334]; 10 at 1

25  [Docket No. 545]; RJN, Ex. 35, Declaration of Albert J. Boro ("Boro Decl.") at ¶¶ 10, 14 ("Follow-

26  ing that, we spoke with Mr. Bennett, counsel for the Senior Noteholders …."), 17-18, 25; RJN,

27  Exs. 45, Bender Decl. at ¶ 4, 40 at 1-2, 41 at ¶¶ 11-12, 42 at ¶¶ 7-8, 43 at 1, 44 at 1, 45 at ¶¶ 13 n.1,

28

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

27.)[5]  What is more, as made clear by the Senior Noteholders, "[n]o issues put before the [Initial] Creditors' Committee have been determined by the Senior Noteholders alone." (ADR, Ex. 36 at 2 [Docket No. 2181]; RJN, Ex. 46 at 2.)  Finally, the Senior Noteholders never participated in an Initial Creditors Committee vote "relating to an issue in which the senior noteholders had a distinct interest …."  [ADR, Ex. 50 at 37:17-20 [Docket No. 2226]; RJN, Ex. 47 at 37:17-20.)

### 2.    The VIA Litigation And The Intel Motion

Since its formation, VIA and the Debtor have had a contentious relationship regarding S3G—their joint venture.  On June 6, 2003, Intel Corporation ("Intel") filed a motion seeking, *inter alia*, to terminate a patent licensing agreement with the Debtor related to its use by S3G (the "Intel Motion").  Since Pillsbury had previously represented Intel, the Debtor hired O'Melveny & Meyers LLP ("OMM") as independent, special litigation counsel respecting the Intel Motion.  (RJN, Ex. 35, Boro Decl. at ¶ 4.)  Then, on July 17, 2003, VIA and S3G filed duplicate proofs of claim for $70 million in the Bankruptcy Cases based on an alleged breach of their joint venture agreement, involving the patent licensing agreement that was the subject of the Intel Motion.  (RJN, Ex. 35, Boro Decl. at ¶ 2.)  The Debtor objected to these claims, and subsequently, on December 21, 2004, the Debtor filed an adversary complaint against VIA and S3G (the "VIA Litigation").  (Appellee's Designation of Record ("APDR"), Ex. 74 [Docket No. 42]; RJN, Ex. 48.)

### 3.    The VIA Settlement Negotiations

According to the Bankruptcy Court, the resolution of the Intel Motion and the settlement of the duplicate claims were the major impediments towards bringing the Bankruptcy Cases to a con-

---

[5]    For example, on October 9, 2003, the parties involved in the VIA Litigation and Intel Motion described below entered into a Stipulated Protective Order (the "Protective Order") that was signed by the Bankruptcy Court on October 17, 2003.  It is clear from the face of the Protective Order that these parties viewed the Senior Noteholders and the Initial Creditors Committee as separate and distinct entities to be covered by the Protective Order.  Significantly, the attorneys from LNBRB and HBD were separately given designations to view documents under the Protective Order.  (ADR, Ex. 9 at 3-5[Docket No. 529]; RJN, Ex. 64 at 3-5.)  Finally, the Protective Order was signed by counsel for the Senior Noteholders as "Attorneys for the Senior Debtholders," and the Protective Order was separately executed by counsel for the Initial Creditors Committee.  (RJN, Ex. 64 at 12.)

clusion.[6]  (RJN, Ex. 7 at 17 ("During the past year and a half, SONICblue's litigation against VIA and [S3G] has been the main roadblock to the proposal of a plan and the conclusion of this case.").) Settlement negotiations between the parties began in August 2005 (the "VIA Settlement Negotiations").  HBD, and by extension Mr. Bennett, were involved in the VIA Settlement Negotiations solely as counsel for the Senior Noteholders.  (RJN, Ex. 35, Boro Decl. at ¶¶ 10, 14, 17-18, 25.) There is nothing in the record to indicate that any party involved in the VIA Settlement Negotiations somehow thought otherwise.  (See, e.g., RJN, Ex. 35, Boro Decl. at ¶ 10.)  Although an agreement was reached in principle in September 2005, it was not until late September 2006 that the VIA Settlement Negotiations produced a finalized agreement (the "VIA Settlement Agreement").  (APDR, Exs. 63 [Docket No. 1950], 64 [Docket No. 1951], 65 [Docket No. 1955], 67 [Docket No. 2057]; RJN, Exs. 49-52.)

The first settlement meeting occurred on August 11, 2005, and was attended by representatives of VIA and the Debtor.  (RJN, Ex. 35, Boro Decl. at ¶ 9.)  There, VIA contended that its allowed claim should be $42.5 million.  The Debtor countered that an allowed claim of $6 million might be acceptable, but that the Initial Creditors Committee needed to approve before a formal offer could be made.  (RJN, Ex. 35, Boro Decl. at ¶ 9.)  After the attorneys for the Initial Creditors Committee consulted with Mr. Bennett on behalf of the Senior Noteholders, they authorized the Debtor to counter with a settlement offer of $6 million.  (RJN, Ex. 35, Boro Decl. at ¶ 10.)  Pillsbury believed that the consent of the Senior Noteholders to the terms of any settlement was essential to court approval.[7]  (RJN, Ex. 35, Boro Decl. at ¶ 11.)  And Mr. Bennett confirmed on August 30, 2005 that the Senior Noteholders would support a $6 million counteroffer.  (RJN, Ex. 35, Boro Decl. at ¶ 10.)

---

[6]  According to the Bankruptcy Court, "[t]his litigation was also significant because termination of [the intellectual property rights] would arguably trigger the liquidated damages provision of the joint venture agreement [between VIA and the Debtor]."  (RJN, Ex. 7 at 7.)

[7]  At both the August and September 2005 settlement meetings, the parties discussed that VIA's claim would be given the same priority as other general unsecured creditors.  (RJN, Ex. 35, Boro Decl. at ¶ 15.)

Following this meeting, Pillsbury participated in settlement discussions with the Debtor's independent, special litigation counsel, OMM, LNBRB for the Initial Creditors Committee, and Mr. Bennett on behalf of the Senior Noteholders. (RJN, Ex. 35, Boro Decl. at ¶ 11.) Based on those discussions, Pillsbury concluded that a global settlement that included Intel was necessary and that a settlement amount of less than $25 million would be acceptable to the Initial Creditors Committee. (RJN, Ex. 35, Boro Decl. at ¶ 11.) On September 12, 2005, counsel for VIA sent Pillsbury a draft settlement term sheet proposing that VIA be allowed a general unsecured claim in the amount of $27.5 million. (RJN, Ex. 35, Boro Decl. at ¶ 12.)

In a subsequent settlement meeting held on September 15, 2005,[8] VIA and S3G reduced their settlement demand to $19 million. (RJN, Ex. 35, Boro Decl. at ¶ 14.) Following that meeting, Pillsbury spoke with Mr. Bennett who indicated that his clients would only support an allowed claim of $10 million. (RJN, Ex. 35, Boro Decl. at ¶ 14.) After consulting with the Debtor, it authorized a $10 million counteroffer. (RJN, Ex. 35, Boro Decl. at ¶ 14.) Later that day, counsel for the various parties tentatively agreed to a settlement amount of $12.5 million subject to client and creditor approval. (RJN, Ex. 35, Boro Decl. at ¶ 14.) On September 20, 2005, Mr. Bennett confirmed the Senior Noteholders' agreement to a $12.5 million allowed claim; provided that the settlement included, *inter alia*, a provision that the VIA/S3G allowed claim (the "VIA/S3G Allowed Claim") be neither senior nor junior to other general unsecured claims. (RJN, Ex. 35, Boro Decl. at ¶ 17.) And the Senior Noteholders did so, because, under the transactional facts fully known to everyone, the VIA/S3G Allowed Claim would not constitute Senior Indebtedness. (*See* RJN, Exs. 35, Boro Decl. at ¶¶ 15-17, 45 at ¶ 40.)

In a conference call that same day with VIA and S3G, the Debtor accepted the settlement terms so long as the VIA/S3G Allowed Claim be neither senior nor junior to other general unsecured claims. (RJN, Ex. 35, Boro Decl. at ¶ 17.) VIA and S3G did not object to this language and

---

[8] At the time of the September 15, 2005 settlement meeting, Mr. Boro was aware of the Senior Indebtedness Provision contained in the Senior Debenture, (RJN, Ex. 35, Boro Decl. at ¶ 15), and he came to the conclusion that the Senior Indebtedness Provision contemplated a loan that had never occurred, (RJN, Ex. 35, Boro Decl. at ¶ 17). This provision was not discussed at the September 15, 2005 meeting. (RJN, Ex. 35, Boro Decl. at ¶ 15.)

"wanted to include language that Defendants could decide how to allocate the allowed claim among Defendants." (RJN, Ex. 35, Boro Decl. at ¶ 17.) On September 22, 2005, the "neither senior nor junior" language again was discussed by Pillsbury with counsel for VIA and S3G. (RJN, Ex. 35, Boro Decl. at ¶ 17.) Counsel for VIA and S3G "posed questions about subordination of the claims of the Senior Noteholders and other creditors, and expressed concern that other creditors not unduly benefit at their clients' expense, but they nevertheless agreed that their [allowed] claim was neither senior nor junior to other general unsecured claims." (RJN, Ex. 35, Boro Decl. at ¶ 17.)

On September 26, 2005, counsel for the Debtor and VIA finalized a draft of the proposed settlement term sheet, which included the following provision:

> Claimants shall jointly hold a single, allowed general unsecured claim in the Chapter 11 case of SONICblue Inc., which claim shall be afforded the benefits and priority of SONICblue's other allowed general unsecured claims and shall be neither senior nor junior to any other allowed general unsecured claim, in the amount of $12.5 million.

(RJN, Ex. 35, Boro Decl. at ¶ 18.)

Mr. Boro sent the proposed term sheet to Mr. Bennett on behalf of the Senior Noteholders and to LNBRB on behalf of the Initial Creditors Committee on September 27, 2005. (RJN, Ex. 35, Boro Decl. at ¶ 18.) In a conference call held later that day, the Initial Creditors Committee approved the settlement terms. (RJN, Ex. 35, Boro Decl. at ¶ 18.) Apparently, finalizing the settlement between the Debtor, VIA, and S3G was delayed and made complicated by the difficulty in reaching a resolution with Intel. (RJN, Ex. 35, Boro Decl. at ¶ 19.) Thus, the initial draft of a settlement agreement was not prepared until January 25, 2006, when OMM circulated a draft that contained a provision dealing with the VIA/S3G Allowed Claim that read substantially the same as the one in the September 26, 2005 term sheet. (RJN, Ex. 35, Boro Decl. at ¶ 19.)

In April or early May 2006, Pillsbury proposed that the settlement agreement include language specifically stating that the VIA/S3G Allowed Claim was not "Senior Indebtedness" as set forth in the Senior Notes. (RJN, Ex. 35, Boro Decl. at ¶ 20.) Then, on May 12, 2006, OMM circulated a revised draft with the following language added:

> Claimants and the Debtor agree that the Allowed Claim is not, and
> shall not be treated as, "Senior Indebtedness" under the terms of the
> Debtor's Indenture, dated as of April 22, 2002, for the 7-¾ Secured
> Senior Subordinated Convertible Debentures due 2005.

(the "Waiver Provision") (RJN, Ex. 35, Boro Decl. at ¶ 17.)    At a June 1, 2006 settlement meeting,

the parties discussed proposed language waiving any claim that the settlement amount constituted

Senior Indebtedness under the Senior Notes.  (RJN, Ex. 35, Boro Decl. at ¶ 23.)  Stating that it was

aware of the Senior Indebtedness Provision and understood that it related to a loan that never oc-

curred, VIA agreed to that limitation.  (RJN, Ex. 35, Boro Decl. at ¶ 23.)  Substantially the same

language was included in a later revised draft circulated on June 16, 2006 and in the final VIA Set-

tlement Agreement.  (RJN, Ex. 35, Boro Decl. at ¶ 24.)

Therefore, pursuant to the VIA Settlement Agreement, VIA and S3G agreed, *inter alia*, to

settle in exchange for a general unsecured allowed claim of $12.5 million that was not "Senior In-

debtedness" as described in the Senior Notes.  (RJN Ex. 35, Settlement Agreement, at § 3.)  On Oc-

tober 10, 2006, the Debtor filed a motion to approve the VIA Settlement Agreement, which was

granted on October 31, 2006.  (APDR, Ex. 66 [Docket No. 1981]; RJN, Exs. 49-52.)

### 4.    The Original Issue Discount And The 2002 Opinion Letter

As counsel for the Debtor during the negotiations for the Senior Notes, Pillsbury issued an

opinion letter to the Senior Noteholders regarding the enforceability of the Senior Notes (the "2002

Opinion Letter").  (RJN, Ex. 35, Freeman Decl. at ¶ 5.)  Later, in its capacity as counsel for the

Debtor in the Bankruptcy Cases, Pillsbury was involved in evaluating possible objections to

claims—including those of the Senior Noteholders.  (RJN, Ex. 35, Declaration of William B.

Freeman ("Freeman Declaration") at ¶ 6.)  On July 20, 2006, Pillsbury informed the Senior Note-

holders that their claim would be challenged as it was based on unamortized original issue discount

and thus subject to disallowance under 11 U.S.C. § 502(b)(2) (the "OID Issue").  (RJN, Ex. 35,

Freeman Decl. at ¶¶ 6-7.)

Mr. Bennett contacted Pillsbury, on behalf of the Senior Noteholders, on August 24, 2006

to discuss the OID Issue and the 2002 Opinion Letter.  (RJN, Ex. 35, Freeman Decl. at ¶ 7.)  There-

after, on September 5, 2006, HBD sent a letter to Pillsbury that demanded indemnification from

Pillsbury for any possible loss due to the OID Issue (the "Indemnification Demand") based on the 2002 Opinion Letter.[9]  (RJN, Ex. 35, Declaration of Craig A Barbarosh ("Barbarosh Decl.") at ¶ 14.)  According to the Senior Noteholders, the 2002 Opinion Letter clearly took the position that the Senior Notes would not be affected or limited by applicable bankruptcy laws.  (RJN, Ex. 35, Barbarosh Decl. at ¶ 11.)  Pillsbury, in turn, maintained that the 2002 Opinion Letter did nothing of the sort.  (RJN, Ex. 35, Barbarosh Decl. at ¶ 11.)

In response to the Indemnification Demand, Pillsbury immediately notified Mr. Bender that Pillsbury had a conflict.  (RJN, Ex. 35, Barbarosh Decl. at ¶ 13.)  Pillsbury then transferred the responsibility for handling the Senior Noteholders' claims to Mr. Bender and the Initial Creditors Committee.  (ADR, Ex. 37, Freeman Decl. at ¶¶ 8-11.)  Regardless of the 2002 Opinion Letter's meaning, Pillsbury's failure to properly disclose the conflict caused by the 2002 Opinion Letter (the "Conflict of Interest") led to its eventual disqualification and the cloud that has been cast over these Bankruptcy Cases.  (RJN, Ex. 7 at 14-16.)

### 5.    The Initial Disclosure Statement

On December 15, 2006, the Debtor and the Initial Creditors Committee jointly filed a disclosure statement.  (ADR, Ex. 11 [Docket No. 2047]; RJN, Ex. 54.)  On, January 11, 2007, Riverside Contracting, LLC and Riverside Claims, LLC (collectively, "Riverside") filed objections to that disclosure statement.  (ADR, Exs. 13 [Docket No. 2091], 17 [Docket No. 2115]; RJN, Exs. 55-56.)  While most of Riverside's objections were addressed by the filing of a First Amended Disclosure Statement (the "Amended Disclosure Statement"), (ADR, Ex. 14 [Docket No. 2103]; RJN, Ex. 62), on January 17, 2007, Riverside filed a supplemental objection (collectively with the original objections, the "Riverside Objections") and continued to object to what it described as "inadequate information relating to the [VIA Settlement Agreement] ….  Without such information, creditors cannot make an intelligent and informed decision as to whether to accept or reject the Plan."  (RJN,

---

[9]    Thus, the language in the VIA Settlement that related to the Waiver Provision was a part of the VIA Settlement Agreement several months before the OID Issue arose and the Senior Noteholders sent Pillsbury the Indemnification Demand.

- 11 -

1   Ex. 56 at 1-2.)  On January 22, 2003, Argo Partners, Inc. ("Argo"),[10] a claims trader, also filed ob-

2   jections based on what it portrayed as inadequate disclosure related to the VIA Settlement Agree-

3   ment.  (ADR, Ex. 18 at 2-3 [Docket No. 2116]; RJN, Ex. 57.)

4        On January 23, 2007, the Bankruptcy Court held a hearing to approve the Amended Disclo-

5   sure Statement.  (RJN, Ex. 53.)  At this hearing, Mr. Bender addressed (among other issues) the

6   constitution of the Initial Creditors Committee and that, as far as he was aware, VIA had acknowl-

7   edged that the VIA/S3G Allowed Claim was not Senior Indebtedness under the Senior Notes.[11]

8   (ADR, Ex. 20 at 5:3-6:24, 24:2-24:6; RJN, Ex. 53 at 5:3-6:24, 24:2-24:6.)  Significantly, Mr.

9   Bender consistently has maintained that the Initial Creditors Committee was very pleased with the

10  VIA Settlement Agreement, (see, e.g., RJN, Exs. 45 at ¶ 45, 53 at 11:14-18), and that everyone

11  recognized that the VIA Settlement Agreement was a very good deal, (see, e.g., RJN, Ex. 53 at

12  11:14-18).  Based in large part on the issues raised in the Riverside Objections and by Argo, the

13  Bankruptcy Court directed Mr. Bender to investigate the circumstances surrounding the VIA Set-

14  tlement Negotiations and to file a status report, (RJN, Ex. 53 at 47:1-50:15), which he did on Feb-

15  ruary 14, 2007, (ADR, Ex. 21 [Docket No. 2138]; RJN Ex. 58).  At a February 15, 2007 hearing,

16  where Mr. Bennett appeared on behalf of the Senior Noteholders, the Bankruptcy Court directed

17  Mr. Bender to stop investigating the matter further.  (ADR, Ex. 34 at 12:14-19 [Docket No. 2176];

18  RJN, Ex. 59 at 12:14-19).

19            **6.    The Orders**

20        Various motions were filed in response to the questions raised by Pillsbury's failure to af-

21  firmatively disclose its conflict with the Senior Noteholders, the Waiver Provision, and the VIA

22  Settlement Negotiations.  The U.S. Trustee filed a Motion To Appoint Chapter 11 Trustee, Or In

23  The Alternative Motion To Appoint Examiner (the "Trustee Motion") (ADR, Exs. 28 [Docket No.

24

25  ---

    [10]  Argo owns a 50% interest in SonicBlue Claims, LLC ("SB Claims")—also a claims trader.
26  (ADR, Ex. 27 at 2 [Docket No. 2150]; RJN, Ex. 61.)  SB Claims did not exist at the time Argo filed
    its objections.  SB Claims, however, now is the successor-in-interest to certain rights of VIA and
    S3G under the VIA Settlement Agreement.  (RJN, Ex. 45 at ¶ 5.)

27  [11]  Mr. Bender was informed repeatedly by VIA that it knowingly waived any claim to Senior In-
28  debtedness when it entered into the VIA Settlement Agreement.  (RJN, Ex. 45 at ¶¶ 35, 45-47.)

2153], 30 [Docket No. 2168]; RJN, Exs. 2, 4), and a Motion To Disqualify Pillsbury Winthrop

Shaw Pittman LLP, To Vacate Employment Order, And For Disgorgement Of Attorneys' Fees (the

"Disqualification Motion"). (ADR, Ex. 29 [Docket No. 2163]; RJN, Ex. 3.) Not to be left out, SB

Claims filed a Motion To Convert Case To Chapter 7 (the "Chapter 7 Motion"). (ADR, Exs. 31

[Docket No. 2171], 32 [Docket No. 2173]; RJN, Exs. 5-6.)

<h3>a)      The First Opinion</h3>

The Bankruptcy Court held a hearing on March 19, 2007 to address these motions. (RJN,

Ex. 47.) Mr. Bennett again appeared on behalf of the Senior Noteholders. (RJN, Ex. 47 at 6:19-

21.) On March 26, 2007, the Bankruptcy Court issued the First Opinion, which appointed a Chap-

ter 11 Trustee, declined to convert the case from Chapter 11 to Chapter 7, and disqualified Pills-

bury. (RJN, Ex. 7.)

<h3>b)      The Clarification Denial Order</h3>

On April 4, 2007, the Senior Noteholders filed a Motion For Clarification, Or In The Alter-

native, Leave To File A Motion For Reconsideration (the "Clarification Motion"). (ADR, Ex. 51

[Docket No. 2231]; RJN, Ex. 8.) The Clarification Motion sought "clarification or reconsideration

of certain statements in the [First Opinion], which could be misconstrued as suggesting that the

Court made certain factual findings or conclusions unnecessary to the decision of the motions be-

fore the Court and unsupported by the record." (RJN, Ex. 8 at 1.) Specifically, the Senior Note-

holders were concerned that the following statements in the First Opinion could be misconstrued:

> 1. The rights to use Intel's graphics patents were so important that
> the joint venture agreement included a liquidated damages clause at
> article 5.6 entitling the joint venture and VIA each to damages of up
> to $70 million if the joint venture were ever enjoined from using the
> Intel cross-license; and

> 2. Because the bondholders appear to have used their position on the
> committee to insert themselves into the settlement negotiations with-
> out revealing a hidden agenda, they may have breached their fiduci-
> ary duty to the unsecured creditor body. Whether their motive was
> simply to save litigation costs for the estate by avoiding future litiga-
> tion over the priority of VIA's claim, or, instead, to assure a larger re-
> turn on their individual investments is not known. In fact, as Bennett
> noted, he had never personally appeared in court until March 19,
> 2007. During the four years of this case, he has operated in the shad-

ows and, until January 23, 2007, it was not generally known to this court or the creditor body that the three senior bondholders were serving on the Committee (collectively, the "Findings").

(RJN, Ex. 8 at 1.)

After a hearing respecting the Clarification Motion on May 4, 2007, (ADR, Ex. 61 [Docket No. 2303]; RJN, Ex. 60), the Bankruptcy Court immediately issued its Clarification Denial Order denying the Clarification Motion.  (ADR, Ex. 57 [Docket No. 2279]; RJN, Ex. 11.)  The Bankruptcy Court began the Clarification Denial Order by stating:  "Let there be no doubt that the words and findings of my [First Opinion] were carefully selected to respond to the issues then before the court …."  (RJN, Ex. 11 at 1.)  The Bankruptcy Court then provided additional facts to support its characterization of the Senior Noteholders and Mr. Bennett in the First Opinion.  Although Mr. Bennett was under no duty to volunteer information to Mr. Bender and Mr. Bender had described him as extremely cooperative during his investigation,[12] the Bankruptcy Court nonetheless found that "it does not appear that Bennett ever volunteered relevant information despite the ongoing investigation and Bender's active efforts to pursue answers."  (RJN, Ex. 11 at 3.)  The Bankruptcy Court concluded by stating that "[t]he appearance of concealment by the senior noteholders and Bennett was one of the grounds for the appointment of a trustee."  (RJN, Ex. 11 at 4.)

Since his appointment, the Chapter 11 Trustee has undertaken a comprehensive investigation into:  (1) the conduct of professionals and other fiduciaries in the Bankruptcy Proceedings prior to his appointment, including Pillsbury and LNBRB; and (2) the circumstances leading up to and surrounding the VIA Settlement Agreement (the "Trustee Investigation").

### c)    The Notice Of Appeal

In response to the Orders, the Senior Noteholders filed their Notice of Appeal on May 11, 2007.  (ADR, Ex. 58 [Docket No. 2292]; RJN, Ex. 33.)  The Senior Noteholders appeal the Orders

---

[12]    According to Mr. Bender, Mr. Bennett did everything he was asked in connection with Mr. Bender's investigation.  For example, Mr. Bender described Mr. Bennett as having "been extremely cooperative from the outset."  (ADR, Ex. 21, Declaration of Ron Bender in Support of His Submission of Preliminary Status Report ("Bender Status Report Decl.") at ¶ 25 [ Docket No. 2138]; RJN, Ex. 58 at ¶ 25.)  Mr. Bender also stated that Mr. Bennett had made a complete document production and was scheduled to be deposed before Mr. Bender continued it to allow for a ruling on confidential documents.  (RJN, Ex. 58 at ¶ 25.)

1    on the basis that the Bankruptcy Court:  (1) mistakenly determined that VIA has a claim against the

2    Debtor related to the loss of the use of the patent licensing agreement by S3G and the liquidated

3    damages remedy for that loss (the "VIA Claim Issue"); and (2) mistakenly made conclusions re-

4    garding the role of the Senior Noteholders and their counsel during the VIA Settlement Negotia-

5    tions (the "Senior Noteholders Issue," collectively with the VIA Claim Issue, the "Appellate Is-

6    sues").  (RJN, Ex. 66 at 7 [Docket No. 2308].)

7                        **7.        The Adversary Proceeding**

8           SB Claims acquired the VIA/S3G Allowed Claim on April 27, 2007.  This was, however,

9    *after* all of the alleged improper conduct by Pillsbury and the Senior Noteholders had occurred.

10   But it is this alleged conduct that forms the basis for the relief requested in the Adversary Proceed-

11   ing and the Motions for Partial Modification of the Settlement Order described below.  (RJN, Ex 28

12   at ¶ 5 [Adversary Proceeding Docket No. 1].)  At the time, SB Claims was fully aware of the al-

13   leged conduct, and, in fact, acquired the VIA/S3G Allowed Claim specifically with the intent of

14   seeking relief premised upon it.  Indeed, the Claim Transfer Agreement itself recites that "[a] dis-

15   pute has arisen in the Bankruptcy Cases as to the propriety of" VIA/[S3G's] acknowledgment that

16   the [VIA/S3G Allowed Claim] is not Senior Indebtedness "and as to whether such [VIA/S3G Al-

17   lowed Claim] is, or is not, 'Senior Indebtedness' under the Indenture," that "[a] dispute also

18   has arisen as to whether the provisions in the [VIA Settlement Agreement] were adequately dis-

19   closed to the Bankruptcy Court and other parties in interest."   (RJN, Ex. 13, Claims Transfer

20   Agreement, at 3 [Docket No. 2316].)[13]

21          On May 30, 2007, SB Claims filed an adversary proceeding, Case No. 07-05082, naming

22   the Senior Noteholders as defendants (the "Adversary Proceeding").  The complaint seeks an order

23   from the Bankruptcy Court: (1) equitably subordinating certain claims of senior indebtedness based

24   upon inequitable conduct by a number of different individuals and interests in the Chapter 11 cases;

---

25   [13] The Senior Noteholders dispute that any part of the liability compromised pursuant to the VIA
26   Settlement Agreement is or ever was due to VIA.  The agreement that gave rise to the VIA/S3G
     Allowed Claim imposes obligations on SONICblue to make payments and render performance to
27   S3G, not to VIA.  The notion that S3G could "allocate" to VIA a claim owed to S3G and, in the
     process, provide that claim with seniority where none previously existed finds no support in the
28   Indenture or anywhere else.  The 2002 Noteholders reserve all rights in this regard.

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

(2) classifying the VIA/S3G Allowed Claim as Senior Indebtedness; and (3) declaratory relief in connection with the same (the "Adversary Complaint"). (RJN, Ex. 28.) On July 11, 2007, the Senior Noteholders filed a Motion to Dismiss the Adversary Proceeding (the "Senior Noteholders' Motion to Dismiss"), (RJN, Ex. 29 [Adversary Proceeding Docket No. 12]), which was denied by the Bankruptcy Court on October 2, 2007. (RJN, Ex. 31 [Adversary Proceeding Docket No. 49].)

### 8. The Chapter 11 Trustee's Proposed Plan And Disclosure Statement

The Chapter 11 Trustee filed its proposed plan (the "Plan"), (RJN 15 [Docket No. 2391]), and disclosure statement (the "Trustee's Disclosure Statement"), (RJN, Ex. 16 [Docket No. 2392]), on July 20, 2007, and, thereafter, sought an order from the Bankruptcy Court approving the Trustee's Disclosure Statement as containing "adequate information" in accordance with Section 1125 of the Bankruptcy Code. On August 21, 2007, SB Claims filed an objection to the Trustee's Disclosure Statement (the "Section 1125 Objection"), (RJN, Ex. 17 [Docket No. 2429]), and subsequently served deposition notices on various parties purportedly in connection with its Section 1125 Objection.

On August 27, 2007, the Chapter 11 Trustee filed an emergency motion seeking entry of a protective order with respect to these deposition notices on the theory that the information sought therein is wholly unrelated to the Section 1125 Objection ("Protective Order Motion"), (RJN, Ex. 18 [Docket No. 2436]), which SB Claims opposed on September 5, 2007 ("Protective Order Opposition"), (RJN, Ex. 20 [Docket No. 2458]). At the hearing on the Protective Order Motion, the Bankruptcy Court made it clear that it did not want the Plan to go forward before the Chapter 11 Trustee completed the Trustee Investigation (as described below). (RJN, Ex. 21 at 12:8–13:15, 18:20-22 [Docket No. 2504].) Accordingly, the Chapter 11 Trustee voluntarily removed the Disclosure Statement from the calendar, thereby stopping the plan process from proceeding.

### 9. The Motion To Reconstitute The Initial Creditors Committee

On June 11, 2007, SB Claims filed a motion to reconstitute the Initial Creditors Committee (the "Motion to Reconstitute"). (RJN, Ex. 14 [Docket No. 2341].) In support of the Motion to Reconstitute, SB Claims merely regurgitated the Findings regarding the purported conduct of the Sen-

- 16 -

ior Noteholders and their counsel.  (See RJN, Exs. 7 at 17; 11 at 3.)  SB Claims, however, did not file any supporting declarations or offer any new evidence to support its allegations with respect to the actions of the Senior Noteholders or the Initial Creditors Committee.

The Bankruptcy Court relied on these very same facts in ordering the reconstitution of the Initial Creditors Committee, finding at the hearing that the Senior Noteholders had failed to disclose their involvement in the settlement negotiations, had failed to disclose the Conflict of Interest with Pillsbury, and had failed to disclose their role within the Initial Creditors Committee.  (RJN, Ex. 22 at 50:14–52:12 [Docket No. 2505].)  Notwithstanding that the facts and conclusions alleged by SB Claims were subject to the instant appeal, and that *no new evidence* was introduced at the hearing despite the Senior Noteholders' counsel's request for an evidentiary hearing, (RJN, Ex. 22 at 27:9-13, 33:3-7), and that the U.S. Trustee's position that there were no facts in the record to support the relief requested, (RJN, Ex. 22 at 45:19 – 46:5), the Bankruptcy Court ruled that the facts supported a ruling that the U.S. Trustee had abused her discretion in failing to reconstitute the Initial Creditors Committee, (RJN, Ex. 22 at 50:18-21).  The Bankruptcy Court granted the Motion to Reconstitute on October 4, 2007 (the "Reconstitution Order").  (RJN, Ex. 23 [Docket No. 2510].)  In accordance therewith, the U.S. Trustee dissolved the Initial Creditors Committee on October 10, 2007.  (RJN, Ex. 25 [Docket No. 2520].)

### 10.  The Motions To Partially Vacate The Settlement Order

On October 31, 2007, despite the ongoing Adversary Proceeding directed at the very same conduct, SB Claims filed two duplicative motions to modify or vacate in part the order approving the VIA Settlement (collectively, the "Motions for Partial Modification of the Settlement Order"). The first of these motions is directed at the conduct of the Senior Noteholders ("Motion for Partial Relief from Settlement Order").  (RJN, Ex. 26 [Docket No. 2545].)  The second of these motions seeks the same relief but is directed at Pillsbury's conduct, alleging that Pillsbury committed fraud on the Bankruptcy Court because of the undisclosed Conflict of Interest ("Motion to Vacate or Modify Settlement Order").  (RJN, Ex. 27 [Docket No. 2548]).[14]

---

[14]    SB Claims filed a Supplement to Motion to Modify and/or Vacate Settlement Order, (RJN, Ex. 63 [Docket No. 2558]), in which it contends that Pillsbury also committed a fraud on the court

C.     The Motion To Dismiss The Appeal

As discussed above, the Senior Noteholders have appealed the decisions of the Orders.  On October 11, 2007, the Chapter 11 Trustee filed his Motion that seeks to dismiss the Appeal for lack of jurisdiction.  As will be shown below, the Appellate Issues do indeed provide this Court with jurisdiction.

III.     RELIEF REQUESTED

As long as the Bankruptcy Court and the parties in these Bankruptcy Cases operate under the assumption that the Findings are etched in stone, the underlying bankruptcy estate (and inno- cent creditors) will continue to bleed from a thousand cuts as a result of the various contested mat- ters that have been filed based primarily on the Findings.  In opposition to the Motion (the "Oppo- sition"), the Senior Noteholders submit that they have standing to bring the Appeal, and that appel- late review is warranted.  Moreover, it is important that the Bankruptcy Court take no further action with respect to these matters while the Appellate Issues are subject to review.  Hence, the Senior Noteholders combine their Opposition with a cross-motion to stay matters below that relate to the Findings pending review.  Alternatively, or in conjunction with such a stay, cause exists to with- draw the reference to permit this Court to deal with all such matters in a single, judicially efficient forum.  Only then can the interests of justice prevail.

As revealed in the recent status report of the Chapter 11 Trustee, the Senior Noteholders were willing to consent to a reserve above and beyond the amount of the VIA/S3G Allowed Claim to protect the protagonists if they are successful on their theories.  (RJN, Ex. 24.)  Indeed, the Sen- ior Noteholders have no objection to resolving the pending litigation in a fair and prompt manner— without other creditors being held up with respect to their deserved distributions and without bleed- ing the estate dry with unnecessary litigation.  Thus, the Senior Noteholders request that this Court: (1) deny the Motion; (2) enter an order staying the pending Motions for Partial Modification of the Settlement Order and the Adversary Proceeding related to the same (except for discovery which

---

because Pillsbury failed to disclose a tolling agreement it reached with former officers of the Debtor after those directors sought indemnification from Pillsbury based on a suit filed by the jun- ior noteholders.  (RJN, Ex. 63 at 5.)

1  may continue in the Bankruptcy Court); and (3) withdraw the reference in these Bankruptcy Cases

2  (except for discovery which may continue in the Bankruptcy Court).

3  **IV.    DISCUSSION**

4      **A.    The Court Possesses Jurisdiction Over The Appeal**

5      The Court should deny the Motion because the Senior Noteholders possess standing to

6  bring their Appeal.  The Chapter 11 Trustee has moved to dismiss the Appeal on the grounds that

7  this Court does not have jurisdiction to review factual statements contained in the Orders where the

8  Senior Noteholders have not challenged the results reached in the Orders.  As a preliminary matter,

9  the Chapter 11 Trustee does not dispute that the Orders are, at least in part, "final" such that the

10  Orders are subject to appeal.  (Mot. at 6, 7 (citing In re Martech USA, Inc., 188 B.R. 847, 849-50

11  (B.A.P 9th Cir. 1995) (holding order appointing trustee is final)).[15]  As the Chapter 11 Trustee

12  notes, however, it is the general rule that "federal appellate courts review decisions, judgments, or-

13  ders, and decrees – not opinions, factual findings, reasonings or explanations."  In re Williams, 156

14  F.3d 86, 90 (1st Cir. 1998).  As a result, ordinarily only a party that is aggrieved by a judgment or

15  order may appeal therefrom.  See Envtl. Prot. Info. Ctr., Inc. v. Pacific Lumber Co., 257 F.3d 1071,

16  1075 (9th Cir. 2001) ("EPIC") (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 333

17  (1980) ("Roper")).

18      This rule, however, is one of federal appellate practice derived from the statutes granting

19  appellate jurisdiction and the historic practices of the appellate courts; it does not have its source in

20  the jurisdictional limitations of Article III.  Roper, 445 U.S. at 333.  Accordingly, the Ninth Circuit

21  has recognized three principal "routes" by which a prevailing party[16] may be deemed "aggrieved"

---

[15]  "If a party mistakenly believes the order appealed from is final and files only a notice of appeal, the appeal is not automatically dismissed.  The district court or bankruptcy appellate panel has the options to direct that a motion be filed, to decide exclusively on the papers already filed to grant leave to appeal, or to deny leave to appeal."  Fed. R. Bank. P. 8003(c) advisory committee note; see also Fed. R. Bank. P. 8003(c) ("If a required motion for leave to appeal is not filed, but a notice of appeal is timely filed, the district court or bankruptcy appellate panel may grant leave to appeal or direct that a motion for leave to appeal be filed.").

[16]  Because the Senior Noteholders are not challenging the result of the Orders, they are deemed a "prevailing" party for the purposes of standing.  This nomenclature, however, is misleading, as the Senior Noteholders were neither the moving party nor opposed the relief requested with respect to the First Opinion, and their Clarification Motion was denied.  Cf. Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598 (2001)

by a judgment, and thus have standing to appeal.  <u>EPIC</u>, 257 F.3d at 1075 (describing "established prudential routes" that provide a party with appellate standing even if they obtained a "favorable judgment" below).  First, a party may seek reformation of a favorable judgment that contains a discussion of issues immaterial to the judgment.  <u>Id.</u>  Second, although inapplicable here, a prevailing party "will be considered aggrieved by a favorable judgment if future economic loss will result to the party on account of adverse collateral rulings."  <u>Id.</u> at 1076.  Third, a prevailing party will have standing where "the adverse [collateral ruling] can serve as the basis for collateral estoppel in subsequent litigation."  <u>Id.</u>  Here, the Senior Noteholders are deemed aggrieved under both the first and third exceptions articulated in <u>EPIC</u> and, therefore, have standing to appeal.

### 1.    "Route One":  Reformation Of A Favorable Judgment

The Supreme Court has held that a party may seek reformation of a favorable decree that contains adjudication of issues "immaterial to the disposition of the cause."  <u>Elec. Fittings Corp. v. Thomas & Betts Co.</u>, 307 U.S. 241, 242 (1939) ("Electrical Fittings").  The Ninth Circuit has strictly interpreted "decree" to mean "judgment."  <u>EPIC</u>, 257 F.3d at 1075 (citing <u>United States v. Good Samaritan Church</u>, 29 F.3d 487 (9th Cir. 1994)).  Thus, a party that has obtained a favorable judgment "that contains discussion of issues" that are immaterial to the judgment possesses standing to reform the judgment to eliminate the discussion of those issues.  <u>EPIC</u>, 257 F.3d at 1075 (citing <u>Electrical Fittings</u>, 307 U.S. at 242).

The Findings qualify as immaterial to the disposition of the cause, because the Findings were not necessary to the Bankruptcy Court's decision and not supported by the evidence.  As the Senior Noteholders have consistently stated, the allegations against them were extraneous to the issues of whether Pillsbury should be disqualified, a Chapter 11 trustee appointed, or the bankruptcy case converted to Chapter 7.  (<u>See</u> ADR, Ex. 46 at 1 [Docket No. 2202]; RJN, Ex. 67 at 1.) ("SB Claims makes additional allegations against other parties here – extraneous to the issue of whether Pillsbury should be disqualified – that are neither accurate nor supported by law.").)  And,

(observing that  "prevailing party" is a legal term of art defined as a "'party in whose favor a judgment is rendered ….  Also termed *successful party*'") (quoting <u>Blacks Law Dictionary</u> 11445 (7th ed. 1999)).

1    what is more, the Chapter 11 Trustee agrees, because he too characterizes the Findings as "certain

2    factual statements that are *unnecessary to the decision*."  (Mot. at 2 (emphasis added).)

3          After the entry of the First Opinion, the Senior Noteholders filed the Clarification Motion to

4    "eliminate the chance that certain statements in the [First Order] could be misconstrued as deciding

5    factual issues that are not supported by the evidence, that are not necessary to the Court's decision,

6    and that are subject to the investigation by a new trustee whom the Court will appoint."  (RJN, Ex.

7    8 at 1.)  Rather than clarifying that the offending provisions of the First Opinion were mere non-

8    binding reasonings or explanations, the Clarification Denial Order reaffirms the inclusions of the

9    Findings in the First Opinion.  (RJN, Ex. 11 at 4.)  Accordingly, the Bankruptcy Court unnecessar-

10   ily decided issues that had no bearing on the motions before it.  The Orders therefore should be re-

11   formed accordingly.

12         The Chapter 11 Trustee nonetheless contends that neither <u>EPIC</u> nor <u>Electrical Fittings</u> per-

13   mits review of the Findings pursuant to this exception because they are not adjudications.  (Mot. at

14   8-9.)  More specifically, the Chapter 11 Trustee argues that the Findings cannot be reviewed be-

15   cause even though <u>EPIC</u> stated that "a party may seek reformation of a favorable decree," <u>Electri-</u>

16   <u>cal Fittings</u> was "concerned with judgments that actually decide issues unnecessarily."  (Mot. at 8.)

17         Unlike the cases cited by the Chapter 11 Trustee, however, the Findings are adjudications as

18   the Findings are all contained within the Orders.  If the Bankruptcy Court intended to make sepa-

19   rate findings of fact that were not part of the judgment, it needed to make these findings on a sepa-

20   rate document pursuant to Federal Rule of Civil Procedure 58, which is made applicable to bank-

21   ruptcy cases under Federal Rule of Bankruptcy Procedure 9021.  Fed. R. Bankr. P. 9021; <u>In re Gar-</u>

22   <u>land</u>, 295 B.R. 347 (B.A.P. 9th Cir. 2003).  In ruling on the Clarification Motion, the Bankruptcy

23   Court had a further opportunity to clarify that it was not purporting to adjudicate the Findings, but

24   it failed to do so.

25         The <u>In re Duro Industries</u>, 293 B.R. 271 (B.A.P. 1st Cir. 2003) case, cited by the Chapter 11

26   Trustee for the proposition that appeals of factual findings are generally not allowed, is inapposite.

27   (Mot. at 7.)  There, the bankruptcy court entered an order dismissing the case.  It then issued a

28

1    memorandum opinion explaining its decision.  <u>Id.</u> at 275.   The debtor asked the court to reconsider

2    or amend the memorandum.  <u>Id.</u>  When the court refused, the debtor did not appeal the order of dis-

3    missal, but did appeal the memorandum and denial of its reconsideration motion.  <u>Id.</u>  The bank-

4    ruptcy appellate panel dismissed the appeal, finding that the memorandum was not an order "of any

5    stripe."  <u>Id.</u> at 277.

6         Unlike the debtor in <u>Duro Industries</u>, the Senior Noteholders are appealing orders.  Specifi-

7    cally, they are appealing the Findings that are part and parcel of the Orders, and not findings con-

8    tained in ancillary documents.  Thus, unlike the debtor in <u>Duro Industries</u>, the Senior Noteholders

9    have standing to appeal the Orders.

10               **2.   "Route Three":  Collateral Estoppel**

11        Another recognized exception provides the Senior Noteholders with standing to appeal the

12   Senior Noteholders Issue.  A prevailing party has standing to appeal "if an adverse ruling can serve

13   as the basis for collateral estoppel in subsequent litigation."  <u>Ruvalcaba v. City of Los Angeles</u>, 167

14   F.3d 514, 520 (9th Cir. 1999).  Ironically, it is precisely because of the concern of the Senior Note-

15   holders that the Findings would be erroneously given collateral estoppel effect that they initially

16   filed the Clarification Motion and then this Appeal.  Specifically, the Clarification Motion states

17   that:

18               [The Findings] leave the impression that the Court made factual de-
                 terminations concerning the SonicBlue/Via Joint Venture and the set-
19               tlement of the Via claim…

20               The Senior Noteholders assume that the Court's statements were not
                 intended to influence or predetermine the results of the trustee's in-
21               vestigation that has not yet commenced.  Nevertheless, the [First
                 Opinion] should not contain statements that appear to decide such is-
22               sues, and the Senior Noteholders are concerned that parties in this
                 case will cite this language as binding in future proceedings.  These
23               issues should be left for resolution in the trustee's investigation and
                 in any future litigation concerning the claims asserted by S3G and
24               Via.

25   (RJN, Ex. 8 at 2.)  The Bankruptcy Court not only denied the Clarification Motion, but also re-

26   stated the Findings as the basis for denying it, explaining that they "were carefully selected to re-

27   spond to the issues then before the court."  (RJN, Ex. 11 at 1.)  Rather than alleviating the concerns

28

1    of the Senior Noteholders, therefore, the Bankruptcy Court enhanced the likelihood that the Find-

2    ings would later be found to be "necessary" to the Orders for purposes of collateral estoppel.

3    United States v. Good Samaritan Church, 29 F.3d at 489 (finding no standing because "[f]or issue

4    preclusion to operate, the alter ego determination would have to have been 'necessarily determined'

5    in the district court decision" and district court dismissed based solely on lack of proper notice);

6    Dixon v. Wallowa County, 336 F.3d 1013, 1020 (9th Cir. 2003) (finding no appellate standing be-

7    cause district court's determination that cross-appellant participated in constitutional violation was

8    immaterial to final judgment).

9        Indeed, the Senior Noteholders' fears were not unfounded.  In the First Opinion, the Bank-

10    ruptcy Court expressed concern that the Senior Noteholders had not made appropriate disclosure of

11    its knowledge of certain conflicts of interest to the Bankruptcy Court.  (RJN, Ex. 7 at 17-18.)  On

12    September 20, 2007, the Bankruptcy Court in effect supplemented its Orders (which are now on

13    Appeal) by granting the additional relief of reconstituting the Initial Creditors Committee.  In so

14    doing, the Bankruptcy Court relied exclusively on these same alleged failures of disclosure; it

15    could not have relied upon other "evidence" because it refused multiple requests to entertain an

16    evidentiary hearing:[17]

17           And let me go ahead and give you the basis of that ruling, *which is
              part of the record.*

18           First, this is the same Committee that holds three members, who ei-

19           ther knew about the purported waiver of the senior indebtedness
              status for the benefit of the 2002 note holder Committee members,

20           who knew about it, but failed to disclose that benefit to the Court and
              to creditors.

21                       *          *          *

22           There are other facts that are important to my decision today.  This is
              the same Committee that knew about Pillsbury's undisclosed conflict

23           of interest for at least five months but never adequate disclosed that
              conflict to this Court or to creditors generally.

24    (RJN, Ex. 22 at 50:21–51:21 (emphasis added).)

25    _____

26    [17]   See RJN, Ex. 22 at 27:9-13, 33:3-7 (counsel to Citadel Equity Fund Ltd. noting lack of eviden-
      tiary hearing, to which Bankruptcy Court responded that it recognized that an evidentiary hearing is

27    required); id. Ex. 22 at 41:23–42:1 (U.S. Trustee noting need for proof of allegations relied upon to
      order reconstitution of the committee); id. at 50:14–52:12 (Bankruptcy Court ruling U.S. Trustee

28    abused discretion in failing to reconstitute the Committee and ordering reconstitution).

- 23 -

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

Furthermore, the Bankruptcy Court stated in its First Opinion that "[b]ecause the [Senior Noteholders] appear to have used their position on the committee to insert themselves into the settlement negotiations without revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body." (RJN, Ex. 7 at 17.) Again, the Bankruptcy Court relied (at least in part) on these same Findings, including the alleged breach of fiduciary duty, to reconstitute the Initial Creditors Committee. (RJN, Ex. 22 at 52:2-6.) And SB Claims now seeks to yet again rely on the Findings to support its Motions for Partial Modification of the Settlement Order.

The Senior Noteholders would welcome a ruling by this Court that the Findings were immaterial and not necessary to the Orders, and, therefore, do not have any preclusive effect.[18] On the other hand, if the Findings can serve as the basis for collateral estoppel in subsequent litigation, then the Senior Noteholders have standing to pursue the Appeal to demonstrate that the Bankruptcy Court made factual or legal errors in making findings or conclusions unnecessary to the decision of the motions then before the Bankruptcy Court and unsupported by the record.

Based on the foregoing, the Senior Noteholders clearly have standing to prosecute the Appeal. Either the Findings are "immaterial" to the Orders and therefore reformation of the Orders is appropriate under Electric Fittings; or, the Findings were "necessary" to the Orders, and the Senior Noteholders have standing to appeal the Findings to prevent them from serving as the basis for collateral estoppel.

**B.     The Court Should Stay The Motions To Vacate Or, Alternatively, Withdraw The Reference Of The Bankruptcy Cases From The Bankruptcy Court To The District Court**

As the parties below continue to confront the Bankruptcy Court with the precise issues that are before the Court in the Appeal, this Court must take steps to protect its jurisdiction. The Supreme Court has held that "[t]he filing of a notice of appeal … confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the ap-

---

[18]  As the EPIC Court noted:  "argument from collateral estoppel consequences has elements of circularity.  As collateral estoppel does not apply to an unappealable determination, simply holding a ruling unappealable eliminates any prospect of preclusion."  EPIC, 257 F.3d at 1076 (citations omitted).

1  peal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 (1982); see also Davis v.

2  United States, 667 F.2d 822, 824 (9th Cir. 1982); Taylor v. Wood, 458 F.2d 15, 16 (9th Cir. 1972);

3  Sumida v. Yumen, 409 F.2d 654, 656-57 (9th Cir. 1969), cert. denied, 405 U.S. 964 (1972).

4        This rule similarly is applicable in the bankruptcy context.  Hill & Sandford, LLP v. Mirzai

5  (In re Mirzai), 236 B.R. 8, 10 (B.A.P. 9th Cir. 1999) ("[I]f a district court would be forbidden to act

6  because of an appeal pending before the court of appeals, then both the bankruptcy appellate panel

7  and the bankruptcy court would be similarly constrained.").  The rule divesting the lower court of

8  jurisdiction of aspects involved in an appeal is a "judge-made doctrine designed to avoid the confu-

9  sion and waste of time that might flow from putting the same issues before two courts at the same

10 time."  Neary v. Padilla (In re Padilla), 222 F.3d 1184, 1190 (9th Cir. 2000); see also Mirzai, 236

11 B.R. at 8 ("The principle . . . is designed to promote judicial economy and to avoid the confusion

12 and ineptitude resulting when two courts are dealing with the same issue at the same time.") (cita-

13 tions omitted).

14       Given the pendency of the Appeal, as and when issues arise in the Bankruptcy Court that

15 are properly before this Court, the Bankruptcy Court may at most exercise "narrowly limited" ju-

16 risdiction "to preserve the status quo while the case is pending in (an) appellate court."  United

17 States v. El-O-Pathic Pharmacy, 192 F.2d 62, 79 (9th Cir. 1951).  Thus, the Bankruptcy Court may

18 not "adjudicate substantial rights directly involved in the appeal."  Newton v. Consolidated Gas

19 Co., 258 U.S. 165, 177 (1922); Padilla, 222 F.3d at 1184.  Consistent with this limitation to pre-

20 serve the status quo, the lower court also "retains jurisdiction to implement or enforce the judgment

21 or order but may not alter or expand upon the judgment."  Id.; see McClatchy Newspapers v. Cent.

22 Valley Typographical Union No. 46, 686 F.2d 731, 735 (9th Cir. 1982) (finding lower court had no

23 jurisdiction to enter amended judgment giving new directives after notice of appeal filed); State of

24 New York v. Nuclear Regulatory Comm'n, 550 F.2d 745 (2d Cir. 1977) (finding second motion for

25 preliminary injunction accompanied by new affidavits after notice of appeal filed from denial of

26 first motion for preliminary injunction was "an attempt to reargue the district court's order denying

27 the first motion").  Under these circumstances, the Bankruptcy Court may not, for instance, sup-

28

1   plement any order that is the subject of the Appeal.  Mirzai, 236 B.R. at 8 ("Thus, a trial court can-

2   not enter an order that supplements the order on appeal because such supplementation would

3   change the status quo.")  As explained further below, this principle of appellate jurisdiction has

4   been violated, and absent intervention by this Court, there is a substantial risk that such violations

5   will continue.

6          In order to understand this interference with the Court's appellate jurisdiction, one need

7   only compare the Clarification Denial Order (which is the subject of the Appeal) and the Reconsti-

8   tution Order.  In the Clarification Denial Order, the Bankruptcy Court devoted an entire section to

9   the following issue: "The Senior Noteholders Appear Not to Have Disclosed Significant Informa-

10  tion to the Committee Notwithstanding its Unusually High Level of Involvement."  (RJN, Ex. 11 at

11  2-4.)  In the First Opinion, the Bankruptcy Court also expressed concern that the Senior Notehold-

12  ers had not made appropriate disclosure of its knowledge to the Bankruptcy Court.  (RJN, Ex. 7 at

13  17-18.)  By issuing the Reconstitution Order, in primary reliance on these same alleged failures of

14  disclosure – i.e., the Findings in the Orders – the Bankruptcy Court in effect supplemented the Or-

15  ders that are the subject of this Appeal.  In light of the Motions for Partial Modification of the Set-

16  tlement Order, there is a substantial risk that the Bankruptcy Court may further supplement these

17  Orders.  (See RJN, Exs. 26, 27.)  Simply put, there are multiple contested matters pending that are

18  all based on the same facts as those that are the subject of the Appeal.  Such interference with this

19  Court's appellate jurisdiction cannot be tolerated.

20         Since, as set forth above, the filing of the Appeal divested the Bankruptcy Court of jurisdic-

21  tion over those aspects of the case involving the Appeal, this Court could stay the Motions for Par-

22  tial Modification to the Settlement Order and the Adversary Proceeding (except for discovery

23  which may continue) pending the resolution of this Appeal.  Rule 8005 of the Federal Rules of

24  Bankruptcy Procedure ("Bankruptcy Rule 8005") provides that a party may move for a stay of a

25  bankruptcy court's judgment, order or decree.  Fed. R. Bankr. P. 8005.  Furthermore, this Court

26  may "suspend or order the continuation of other proceedings in the case under the Code or make

27

28

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

1  any other appropriate order during the pendency of an appeal on such terms as will protect the

2  rights of all parties in interest." Id.

3        As an initial matter, Bankruptcy Rule 8005 provides that a motion for a stay pending appeal

4  "must ordinarily be presented to the bankruptcy judge in the first instance." Fed. R. Bankr. P.

5  8005.  The reference here to "ordinarily" is important.  In Padilla, for instance, where the Ninth

6  Circuit Court of Appeals vacated orders issued by the bankruptcy court as interfering with appellate

7  jurisdiction, the Ninth Circuit ruled that it was "immaterial that the Trustee failed to obtain a stay

8  pending review since a stay is necessary only to halt actions that a court is empowered to take."

9  222 F.3d at 1190.  Under this reasoning, a motion, such as the instant one, to enforce the scope of

10  this Court's appellate jurisdiction need not be presented to the Bankruptcy Court in the first in-

11  stance.

12        Moreover, the third sentence of Bankruptcy Rule 8005 provides that "a motion for such re-

13  lief ... may be made to the district court, or the appellate panel, but the motion shall show why the

14  relief ... was not obtained from the bankruptcy judge." Fed. R. Bankr. P. 8005.  In determining

15  whether the Bankruptcy Rule 8005 threshold is satisfied, courts look to the analogous provision of

16  Rule 8(a)(2) of the Federal Rules of Appellate Procedure.  10 COLLIER ON BANKRUPTCY ¶ 8005.10

17  (15th ed. rev. 2006); see Fed. R. App. R. 8(a)(2) (requiring that motion for stay show that "moving

18  first in the district court would be impracticable" or that district court already denied the motion).

19  The appellant therefore must present its application for a stay to the bankruptcy court or a "tenable

20  explanation for why this application is not before the bankruptcy court." Beneficial Homeowner

21  Serv. Corp. v. Moreau (In re Moreau), 135 B.R. 209, 212 (Bankr. N.D.N.Y. 1992).  A "tenable ex-

22  planation" includes a showing that moving first in the lower court would be "impracticable" or "fu-

23  tile." Id.; see 10 COLLIER ON BANKRUPTCY ¶ 8005.10 ("The motion should set forth the circum-

24  stances that entitle the movant to apply to the district court or bankruptcy appellate panel, that is, a

25  statement that the bankruptcy court has refused relief sought or that application to it was impracti-

26  cable.").  If a lower court "demonstrates commitment to a particular resolution, application for a

27  stay from that same [lower] court may be futile and hence impracticable." Chem. Weapons Work-

28

1   ing Group (CWWG) v. Dept. of the Army, 101 F.3d 1360, 1362 (10th Cir. 1996); see Walker v.

2   Lockhart, 678 F.2d 68, 70 (8th Cir. 1982) (district court's prior findings made it unnecessary for

3   appellant to seek relief first from district court).

4          That said, the Senior Noteholders have filed a Motion for a Continuance of Motion for Par-

5   tial Modification of Settlement Order, or, Alternatively Limited Stay of Proceedings with the Bank-

6   ruptcy Court.  But the Senior Noteholders are not optimistic that it will be granted since they al-

7   ready have requested that the Bankruptcy Court not entertain new requests for relief based on the

8   facts alleged to exist as of May 4, 2007 (the Appellate Issues).  For example, at the hearing on the

9   Motion to Reconstitute, counsel to one of the Senior Noteholders requested that the Bankruptcy

10  Court not prejudge the matter and hold an evidentiary hearing on the motion.  (RJN, Ex. 22 at 27:9-

11  13, 33:3-7.)  This request was rebuked, however, and the Bankruptcy Court ruled that the facts

12  supported its ruling notwithstanding the fact that the Findings were subject to the Appeal and no

13  new evidence was introduced.  (Id. at 50:18-21.)  Therefore, these Cross-Motions are properly be-

14  fore this Court on this basis as well.

15                    **1.       The Senior Noteholders Meet The Standard For Granting A Stay**

16         The standard for granting a stay pursuant to Bankruptcy Rule 8005 is similar to that used

17  for a motion for a preliminary injunction: "Appellants must show: (1) a likelihood of probable suc-

18  cess on the merits and the possibility of irreparable injury; or (2) that serious questions going to the

19  merits are raised and the balance of hardships tips sharply in its favor." See In re Dudley, 2006 WL

20  862932 (N.D. Cal. 2006) (quoting Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914,

21  917 (9th Cir. 2003) and Roe v. Anderson, 134 F.3d 1400, 1401-02 (9th Cir. 1998)).  The relative

22  hardships to the parties are the "critical element" in deciding whether a stay is justified. See Lopez

23  v. Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983).

24         Under an alternative (though closely parallel) test, this Court may grant a discretionary stay

25  upon a showing that:  (1) the appellant is likely to succeed on the merits of the appeal; (2) the ap-

26  pellant will suffer irreparable injury; (3) no substantial harm will come to the appellee; and (4) the

27  stay will do no harm to the public interest.  Wymer v. Wymer (In re Wymer), 5 B.R. 802, 806

28

- 28 -

(B.A.P. 9th Cir. 1980); Universal Life Church, Inc. v. United States (In the Matter of Universal Life Church, Inc.), 191 B.R. 433 (E.D. Cal. 1995).  "Courts applying this four-part test impose upon the movant the burden of showing that these enumerated factors balance in the favor of the movant and warrant the issuance of the stay while appeal of the order of the Bankruptcy Court is pending."  In re Mader, 100 B.R. 989, 990 (N.D. Ill. 1989).  Rather than focusing on a single fac-tor, "the more common approach ... is to balance all factors" in determining whether a stay is war-ranted.  Id.; see also In re City of Bridgeport, 132 B.R. 81, 83 (Bankr. D. Conn. 1991) ("Each factor need not be given equal weight but rather should be used as guides.").

Here, the Senior Noteholders' burden is met under any formulation of the standard for a stay pending appeal.  First, as set forth above, in the Orders, the Bankruptcy Court erroneously made certain factual findings and conclusions.  Accordingly, the Senior Noteholders are likely to succeed on the merits of the appeal.  Second, the Senior Noteholders are likely to suffer irreparable harm if the requested stay is not granted.  Because the Bankruptcy Court did not hold an eviden-tiary hearing on the Motion to Reconstitute, or in connection with any of the motions that gave rise to the Orders, the Senior Noteholders have never been provided the opportunity to present evidence in their support.  And if the Motion to Vacate or Modify Settlement Order is heard prior to the rul-ing on the Appeal, SB Claims effectively will be given the opportunity to obtain partial summary judgment on a key issue in the Adversary Proceeding based on improper rulings and without the opportunity to have the facts truly determined.

For example, both the Motions for Partial Modification of the Settlement Order and the pleadings filed by SB Claims in the Adversary Proceeding rely on the Senior Noteholders Findings as the basis for relief.  In fact, in its Motion for Partial Relief from Settlement Order, SB Claims relies solely on the Adversary Complaint, its opposition to the Senior Noteholders' Motion to Dis-miss ("Opposition to Motion to Dismiss"), (RJN, Ex. 30 [Adversary Proceeding Docket No. 40]), and the findings at the hearing on the Senior Noteholders' Motion to Dismiss.  (RJN, Ex. 26 at 3.)  More specifically, the Adversary Complaint repeatedly alleges that the relief requested should be granted because the Senior Noteholders breached their fiduciary duties by:  (1) failing to disclose

the Senior Indebtedness Provision; (2) providing false and misleading information regarding the purpose of the Senior Indebtedness Provision; (3) threatening to oppose the Settlement Agreement in the absence of a waiver of the Senior Indebtedness Provision; and (4) using their position on the Initial Committee to obtain the Waiver Language in the VIA Settlement.  (RJN, Ex. 28 at ¶¶ 28, 34, 52, 62, 73, 76.)  In its Opposition to Motion to Dismiss, SB Claims trumpeted these same Findings.  (See RJN, Ex. 30 at 20-22, 29, 32, 47-49.)

Finally, although the Motion to Vacate or Modify Settlement Order seeks relief based on Pillsbury's conduct, it discusses such conduct in connection with the VIA Settlement and the Senior Noteholders' role in negotiating the VIA Settlement Agreement.  In other words, SB Claims' primary support for the motion is the Findings.  (See RJN, Ex. 27 at ¶ 22-23 (discussing Senior Noteholders' involvement in settlement negotiations).)  Simply stated, the Appellate Issues continue to be used in an attempt to obtain further relief from the Bankruptcy Court.  Staying the Motions for Partial Modification to the Settlement Order and the Adversary Proceeding – except for discovery –until this Appeal has been resolved and discovery in the Adversary Proceeding is complete is the *only* way to allow the Senior Noteholders a fair opportunity to defend the Adversary Proceeding and protect their substantive rights.

### 2.    Granting A Stay Will Not Prejudice SB Claims And Public Policy Favors A Stay

At the same time, SB Claims will not be prejudiced by a stay.  The Senior Noteholders are not seeking to impede the Trustee Investigation or the prompt litigation of the Adversary Proceeding, and are not requesting that discovery be stayed.  Furthermore, SB Claims is not seeking any affirmative recovery from the Senior Noteholders, but rather it is seeking an enhanced recovery under the Debtors' Plan to which it will not be entitled unless it is successful in the Adversary Proceeding and the Plan is confirmed.  Therefore, staying the Motions for Partial Modification to the Settlement Order and the Adversary Proceeding at this time does not prejudice SB Claims, which is free to continue discovery.

Furthermore, public policy favors a stay of proceedings in the instant case.  An overarching public policy concern exists for judicial economy in the administration of bankruptcy affairs.  See

1    Bass v. Quittner, Stutman & Treister, 381 F.2d 54, 60 (9th Cir. 1967); see also United States v.

2    Rogers, 722 F.2d 557, 561 (9th Cir. 1983) (noting a rule for joint trials because of a "substantial

3    public interest in efficient use of judicial resources").  As set forth above, the Bankruptcy Court

4    lacks jurisdiction to consider matters on appeal to the district court.  This doctrine exists for pur-

5    poses of judicial efficiency, as it is "designed to avoid confusion and waste of time that might flow

6    from putting the same issues before two courts at the same time."  Neary v. Padilla (In re Padilla),

7    222 F.3d 1184, 1190 (quoting United States v. Thorp (In re Thorp), 655 F.2d 997, 998 (9th Cir.

8    1981)).  Here, the Appellate Issues are fundamental to the proceedings in the Bankruptcy Court,

9    which seek to alter distributions from the estate.  Therefore, a stay would promote the expeditious

10   resolution of the Bankruptcy Cases by preventing unnecessary and duplicative proceedings that po-

11   tentially could alter the administration of the estate.  The cross-motion for a limited stay therefore

12   should be granted.

13          **C.      The Reference To The Bankruptcy Court Should Be Withdrawn**

14          Alternatively, or even in conjunction with such a stay, this Court should withdraw the auto-

15   matic reference of these Bankruptcy Cases to the Bankruptcy Court.  This Court's authority for per-

16   missive withdrawal of the reference is governed by the first sentence of section 157(d) of title 28 of

17   the United States Code.  The first sentence of section 157(d) provides:

18                  The district court may withdraw, in whole or in part, any case or pro-
                    ceeding referred under this section, on its own motion or on timely
19                  motion of any party, for cause shown.

20   28 U.S.C. § 157(d).

21          The term "cause" is not defined within the statute; however, courts have held that discre-

22   tionary withdrawal is predicated upon "cause" shown on a case-by-case basis.  Parklane Hosiery

23   Co., Inc. v. Parklane/Atlanta Venture (In re Parklane/Atlanta Joint Venture), 927 F.2d 532, 536

24   (11th Cir. 1991) (citing Am. Cmty. Servs., Inc. v. Wright Mktg., Inc. (In re Am. Cmty. Servs.,

25   Inc.), 86 B.R. 681, 686 (D. Utah 1988)).  In determining whether cause exists, the Ninth Circuit has

26   held that a court should "consider the efficient use of judicial resources, delay and costs to the par-

27   ties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related

28

1  factors." Sec. Farms v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers, 124 F.3d

2  999, 1008 (9th Cir. 1997) (citing Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

3  Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993)).  These other related factors include: (1) whether

4  the underlying claims for which the reference is to be withdrawn are core or non-core; (2) whether

5  such claims are legal or equitable; and (3) whether they are triable by jury.  Daewoo Motor Am. v.

6  Gulf Ins. Co. (In re Daewoo Motor Am.), 302 B.R. 308, 310 (C.D. Cal. 2003).

7    Here, this Court has become the most appropriate forum for the resolution of the Bank-

8  ruptcy Cases, and withdrawal of the reference is necessary to ensure the efficient administration of

9  these cases.  First, the continuing jurisdiction of the Bankruptcy Court on important aspects of the

10  Bankruptcy Cases is at best unclear.  Rather than being relegated to the Trustee Investigation and

11  the Adversary Proceeding, the actions of the Senior Noteholders and their counsel have become the

12  central issue in the administration of these Bankruptcy Cases—so much so that the Plan may not go

13  forward until the Trustee Investigation is completed and the Adversary Proceeding is resolved.

14  (RJN, Ex. 24 at 6 [Docket No. 2515].)

15    Just as the bankruptcy court lacked jurisdiction to act as it did in Padilla, the Bankruptcy

16  Court lacks jurisdiction to act as it continues to do so in the instant case.  In Padilla, the U.S. Trus-

17  tee moved to dismiss the debtor's Chapter 7 case for bad faith.  222 F.3d at 1187.  The bankruptcy

18  court dismissed the bankruptcy petition, but on appeal the Ninth Circuit Bankruptcy Appellate

19  Panel (the "BAP") reversed and remanded.  Id.  The U.S. Trustee subsequently filed a notice of ap-

20  peal with the Ninth Circuit.  Id.  While the appeal to the Ninth Circuit was pending, the bankruptcy

21  court discharged the debtor's debts and closed the case.  Id.  The Ninth Circuit held that the bank-

22  ruptcy court's actions "amounted to a final adjudication of the substantial rights directly involved

23  in the appeal (and) did not constitute implementation or enforcement of the BAP's judgment re-

24  versing and remanding for reinstatement of Padilla's petition."  Id.  The Ninth Circuit therefore

25  concluded that the bankruptcy court lacked jurisdiction to proceed with Padilla's bankruptcy during

26  the pendency of the appeal.

27

28

1    Here, as in <u>Padilla</u>, once the Senior Noteholders filed the notice of appeal in the Bankruptcy

2    Court, the Bankruptcy Court retained jurisdiction only to implement and enforce, but not to expand

3    upon or alter, its Orders.  Yet SB Claims has made the subject matter of the Appeal (*i.e.,* the actions

4    of the Senior Noteholders and their counsel) the central focus in the administration of these Bank-

5    ruptcy Cases with the apparent approval of the Bankruptcy Court.[19]

6    The Senior Noteholders submit that this is a matter of judicial efficiency and protection of

7    substantive rights.  To the extent the Bankruptcy Court is divested of jurisdiction over the dominant

8    issues in these cases, it is not efficient for the Bankruptcy Court to take actions that may be void.

9    Cause therefore exists under the circumstances to withdraw the reference to avoid multiple appeals

10    and potential remands regarding the Bankruptcy Court's jurisdiction, and to avoid the costs and

11    delays associated therewith.  Withdrawal of the reference, furthermore, will not interfere with the

12    Trustee Investigation, delay confirmation of a plan or distributions to unsecured creditors, or preju-

13    dice the rights of SB Claims to try the Adversary Proceeding.[20]

14    And there can be no allegation of forum shopping here.  As a function of the Appeal, this

15    Court already is poised to and will necessarily consider how to resolve the factual findings in dis-

16    pute.  Whether in the context of a stay pending appeal or withdrawal of the reference, the Senior

17    Noteholders only seek to have those issues resolved in one court, rather than two (and in one proc-

18    ess as opposed to multiple contested matters).  <u>See</u> <u>Pan Am Corp. v. Delta Air Lines, Inc. (In re Pan</u>

19    <u>Am Corp.)</u>, 163 B.R. 41, 44 (S.D.N.Y. 1993) ("Rather than forum shopping it appears that Delta is

20    seeking to have the disputes which arise from the same factual context adjudicated in one forum

21    rather than two, promoting judicial economy and lessen[ing] duplicative efforts on the part of the

22    parties.")

23    [19]  <u>See, e.g.</u>, the Reconstitution Order in which the Bankruptcy Court held that the Findings sup-
ported the reconstitution of the Initial Creditors Committee, notwithstanding the lack of any sup-

24    porting declarations or offer any new evidence to support SB Claims' allegations.  (RJN, Ex. 22 at
50:18-21, 27:9-13, 33:3-7.)  Under the rule set forth in <u>Padilla</u>, the Bankruptcy Court lacked juris-

25    diction to do so.  Furthermore, the Motion to Reconstitute was not an isolated instance.  SB Claims
has repeated again and again the same Findings.  (<u>See, e.g.</u>, RJN, Exs. 19 at 3-5 [Docket No. 2445],

26    20 at 9-11; 28.)

27    [20]  To the extent this Court perceives that a stay would unnecessarily delay the Adversary Proceed-
ing except for discovery, withdrawal of the reference is an even more appropriate remedy that al-

28    lows this Court to maintain direct control over progress of that action.

1    Similarly, even assuming *arguendo,* that the matters raised in the Bankruptcy Court were

2    core (including the Adversary Complaint's claims for relief), withdrawal of the reference still is

3    warranted. Ordinarily, "there is a strong presumption against withdrawal of core bankruptcy pro-

4    ceedings from the Bankruptcy Court." Id. at 43. Such a presumption may be overcome, however,

5    "based on a finding by the [District] Court that the withdrawal of reference is essential to preserve a

6    higher interest." Id. (citations omitted). In Pan Am Corp., the district court specifically found that

7    "promoting judicial efficiency" was such a higher interest. Id. Here, the Senior Noteholders al-

8    ready have made the case for judicial efficiency. Moreover, it is entirely unclear that the issues in-

9    volve core matters for several reasons.

10    A careful examination of the Adversary Complaint and of the other contested matters dem-

11    onstrates how they are at best boot-strapped into matters that may customarily be considered

12    "core." When this thin veil is removed, it becomes clear that the disposition of several clearly

13    "non-core" issues in favor of the Senior Noteholders will eliminate any possibility that any court

14    would need to determine so-called "core" matters. For instance, the dispute ultimately is one of

15    contractual interpretation between two non-debtor parties; that is, the import of the Senior Indebt-

16    edness Provision in the Indenture and the VIA Settlement Agreement with respect to the relative

17    rights of VIA/S3G's successor and the Senior Noteholders. See Pimbo Corp. v. Castlerock Props.

18    (In re Castlerock Props.), 781 F.2d 159, 162 (9th Cir. 1986) ("State law and contract claims that do

19    not specifically fall within the categories of core proceedings enumerated under section

20    157(b)(2)(B) through (N) are not related proceedings even if they arguably fit within the literal

21    wording of the catch-all provisions of sections 157(b)(2)(A) and (O)."); World Solar Corp. v.

22    Steinbaum (In re World Solar Corp.), 81 B.R. 603, 607 (Bankr. S.D. Cal. 1988) (citing Mohawk

23    Indus., Inc. v. Robinson Indus., Inc., 46 B.R. 464 (D. Mass. 1985)) ("more well reasoned opinions"

24    have held contractual dispute not core proceeding).

25    In other words, if it is determined that VIA/S3G's claims against the bankruptcy estate did

26    not constitute "senior indebtedness," then the purported "waiver" of any senior rights by VIA/S3G

27    was, as the Senior Noteholders assert, a mere clarification and surplusage and the failure to disclose

28

1    it was harmless and inconsequential.  Second, the lynchpin of SB Claims' arguments below is that

2    VIA/S3G was misled into entering into the VIA Settlement Agreement.  Fraud claims between

3    non-debtor parties is another "non-core" matter.  <u>Kennilworth Partners II LP v. Crisman</u>, 2001 WL

4    30534, *3 (N.D. Cal. 2001).  So, if it is determined that VIA/S3G was represented by counsel, is

5    sophisticated and is bound by its voluntary acts (which is likely), and that the VIA Settlement

6    Agreement did not cost the bankruptcy estate one thin dime, then so-called "core" matters like eq-

7    uitable subordination clearly lose their teeth.  As the court in <u>Daewoo Motor</u> explained, "[a]ctions

8    that do not depend on bankruptcy laws for their existence and that could proceed in another court

9    are considered 'non-core.'" 302 B.R. at 311 (citations omitted).

10          Consideration of the other factors that courts look at in this context yields a similar conclu-

11   sion.  For example, although the ultimate causes of action alleged by SB Claims below are arguably

12   "equitable," its claim for declaratory judgment seeks the construction of the Senior Indebtedness

13   Provision—a legal determination.  Likewise, although the Senior Noteholders ordinarily are not

14   entitled to a jury trial on an equitable subordination claim, such a legal determination as well as

15   consideration of whether VIA/S3G entered into the VIA Settlement Agreement voluntarily are pre-

16   cisely the sorts of factual determinations customarily reserved for juries.  Where issues such as

17   these, non-core issues, predominate, courts readily conclude that judicial efficiency is served by

18   withdrawal of the reference.  <u>See</u> <u>Sec. Farms v. Int'l Brotherhood of Teamsters</u>, 124 F.3d 999, 1008

19   (9th Cir. 1997) ("In this case efficiency was enhanced by withdrawing the reference because non-

20   core issues predominate.").  In short, this Court should withdraw the reference of these Bankruptcy

21   Cases from the Bankruptcy Court to ensure their efficient administration.

22

23

24

25

26

27

28

Memo. of P&A's in Support of Senior Noteholders' Opposition to Motion to Dismiss Appeal and Cross-Motions for
Limited Stay of Proceedings and/or to Withdraw Reference of Chapter 11 Cases – Case No. C-07-02553 RMW

## V.    CONCLUSION

For the foregoing reasons, the Senior Noteholders respectfully request that this Court:  (1) deny the Motion; and (2) enter an order staying the Motions For Partial Modification of the Settlement Order and Adversary Proceeding (except for discovery); or, (3) alternatively (or in conjunction with such a stay) enter an order withdrawing the reference of the Bankruptcy Cases from the Bankruptcy Court for the Northern District of California to the District Court for the Northern District of California pursuant to 28 U.S.C. § 157(d).

Dated:  November 20, 2007                STROOCK & STROOCK & LAVAN LLP
                                         LEWIS KRUGER
                                         KENNETH PASQUALE
                                         ALAN Z. YUDKOWSKY


                                    By:    /s/ Alan Z. Yudkowsky
                                         Alan Z. Yudkowsky
                                         Attorneys for Portside Growth & Opportunity
                                         Fund, Smithfield Fiduciary LLC, and Citadel Eq-
                                         uity Fund Ltd.

                                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                         VAN C. DURRER II
                                         GLENN WALTER


                                    By:    /s/ Glenn Walter
                                         Glenn Walter
                                         Attorneys for Citadel Equity Fund Ltd.