# EXHIBIT 1

**The following constitutes**
**the order of the court. Signed October 31, 2006**

*Marilyn Morgan*

**Marilyn Morgan**
**U.S. Bankruptcy Judge**

_____

1  PILLSBURY WINTHROP
    SHAW PITTMAN LLP
2  THOMAS V. LORAN III  #95255
    CRAIG A. BARBAROSH  #160224
3  ALBERT J. BORO, JR.  #126657
    WILLIAM B. FREEMAN  #137276
4  ANA N. DAMONTE  #215504
    JASON A. CATZ  #224205
5  50 Fremont Street
    Post Office Box 7880
6  San Francisco, CA  94120-7880
    Telephone: (415) 983-1000
7  Facsimile: (415) 983-1200

8  Attorneys for Debtors and
    Debtors-In-Possession
9
    SUZZANNE S. UHLAND (CA Bar No. 136852)
10  DAVID R. EBERHART (CA Bar No. 195474)
    AUSTIN K. BARRON (CA Bar No. 204452)
11  O'MELVENY & MYERS LLP
    Embarcadero Center West
12  275 Battery Street
    San Francisco, CA  94111-3305
13  Telephone     (415) 984-8700
    Facsimile:     (415) 984-8701
14
    Special Litigation Counsel for Debtors and
15  Debtors in Possession

16

17              UNITED STATES BANKRUPTCY COURT

18              NORTHERN DISTRICT OF CALIFORNIA

                     SAN JOSE DIVISION
19

20  IN RE:                                  Chapter 11 Cases

21  SONICBLUE INCORPORATED, a                Case Nos. 03-51775
    Delaware corporation, DIAMOND            through 51778 MJS
22  MULTIMEDIA SYSTEMS, INC., a
    Delaware corporation, REPLAYTV,          [Jointly Administered]
23  INC., a Delaware corporation, and
    SENSORY SCIENCE                          ORDER GRANTING DEBTORS'
24  CORPORATION, a Delaware                  MOTION FOR APPROVAL OF
    corporation,                             SETTLEMENT OF VIA AND INTEL
25                                           LITIGATION
    Debtors and Debtors-in-Possession.
26
                                             Hon. Marilyn Morgan
27

28

1    The Motion for Approval of Settlement of VIA and Intel Litigation ("Motion") filed

2    by SONICBLUE INCORPORATED ("SONICblue"), DIAMOND MULTIMEDIA

3    SYSTEMS, INC., REPLAY TV, INC., and SENSORY SCIENCE CORPORATION

4    (collectively, "Debtors") came on regularly for hearing before the Honorable Marilyn

5    Morgan in Department 3070 of the above entitled court on October 27, 2006.   All

6    appearances are as noted in the record.

7    The Court, having reviewed the Motion and the papers filed in support of it; and

8    having heard the arguments of counsel at the hearing on the Motion; and it appearing that

9    there is good cause for granting the Motion,

10    IT IS HEREBY FOUND AND DETERMINED THAT:[1]

11    (1)    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

12    1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C),

13    (G) and/or (O), with venue of the above-captioned bankruptcy cases in this district being

14    proper under 28 U.S.C. §§ 1408 and 1409;

15    (2)    The Debtors served the Motion and notice of the Motion on the parties

16    entitled to notice thereof pursuant to the April 2, 2003 order limiting notice;

17    (3)    Notice of the Motion was appropriate under the circumstances;

18    (4)    The Debtors have shown that the Proposed Settlement described in the

19    Motion and supporting papers, including, without limitation, the Proposed Settlement

20    Agreement, a copy of which is attached as Exhibit B to the Motion, is a fair and reasonable

21    compromise of claims and is in the best interests of the Debtors' estates; and

22    (5)    The Debtors have shown that the Motion should be granted;

23    IT IS HEREBY ORDERED:

24    1.    The Motion is granted as set forth herein.   Capitalized terms not defined

25    herein shall have the meanings attributed thereto in the Motion and in the memorandum of

26    

27    [1]    Findings of fact shall be construed as conclusions of law and conclusions of law

28    shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

1    points and authorities filed by SONICblue in support of the Motion (the "Memorandum").

2        2.    SONICblue and the Debtors are hereby authorized to settle the VIA and Intel

3    Litigation on the terms and conditions set forth in the Settlement Agreement.

4        3.    Without limiting the foregoing, both (i) the agreements set forth in

5    Paragraph III.7. of the Settlement Agreement and its subsections modifying, extinguishing,

6    terminating and preserving rights under the contracts specified therein and (ii) the releases

7    set forth in Paragraphs III.11. through III.19. of the Settlement Agreement are hereby

8    authorized and approved according to their terms.

9        4.    Without limiting the foregoing, SONICblue is authorized to execute the

10    Settlement Agreement.

11        5.    Without limiting the foregoing, the Settlement Agreement and each of the

12    terms and provisions contained therein is approved in its entirety.

13        6.    As approved herein, the Settlement Agreement is and shall be binding on

14    SONICblue and any Bankruptcy Successor (as that term is defined in the Settlement

15    Agreement) and enforceable according to the terms of the Settlement Agreement.

16        7.    SONICblue and the Debtors are authorized to take all actions necessary or

17    appropriate to effectuate the terms of the Settlement Agreement and to perform their

18    obligations under the Settlement Agreement.

19        8.    Without limiting the foregoing, and subject to the occurrence of the

20    Effective Date, as that term is defined in the Settlement Agreement, SONICblue and the

21    other Debtors are hereby authorized, without the need or requirement of further Bankruptcy

22    Court order, to take the following actions:

23        a.    Entering into one or more stipulations dismissing, withdrawing,

24            waiving and or taking off calendar the Adversary Proceeding, the Stay Motion,

25            and/or the Assumption Motion (as those terms are defined in the Settlement

26            Agreement).

27        b.    Executing and delivering, at any time after the Effective Date of the

28            Settlement Agreement, documentation reasonably necessary and appropriate to

transfer the intellectual property related to or used in the Graphics Chip Business in SONICblue's possession to S3G Co. or its designee and otherwise perform SONICblue's obligations under Paragraph III.5. of the Settlement Agreement, including without limitation: (i) execution and delivery of the documents referred to in Paragraph III.5. of the Settlement Agreement and its subsections; (ii) delivery and transfer of the files, data tapes, customer and vendor non-disclosure agreements referred to in Paragraph III.5. of the Settlement Agreement and its subsections; and (iii) delivery of the technology, licenses and lists described in Paragraph III.5. of the Settlement Agreement and its subsections; and

        c.     SONICblue's transferring its Class A shares of S3G Co. as provided in Paragraph III.9. of the Settlement Agreement and executing and delivering any documents necessary or appropriate to effectuate such transfer.

9.    The stipulations and orders referenced in Paragraph 8.a. of this Order may be submitted to this Court for approval without further notice thereof to creditors and/or parties in interest.

10.    The Parties' obligations under the Settlement Agreement shall be enforceable by motion filed in this Court. The Settlement Agreement is hereby incorporated herein by this reference.

11.    The Court retains jurisdiction to interpret, implement and enforce the provisions of this Order and the Settlement Agreement.

12.    Nothing in this Order shall preclude or impair the Debtors' rights to seek conversion or substantive consolidation of their estates. This Order shall be binding notwithstanding the conversion and/or substantive consolidation of any or all of the Debtors' Chapter 11 Cases.

**END OF ORDER**

<u>COURT SERVICE LIST</u>

1

2

3

4

Matthew S. Walker
Pillsbury Winthrop Shaw Pittman LLP
11682 El Camino Real, Suite 200
San Diego, CA 92130-2092

5

6

7

Suzzanne S. Uhland
O'Melveny & Myers LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA  94111-3305

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

1  EDWINA E. DOWELL, #149059
   Assistant U.S. Trustee
2  NANETTE DUMAS, #148261
   JOHN S. WESOLOWSKI, #127007
3  SHANNON L. MOUNGER-LUM, #208071
   Office of the United States Trustee
4  280 S. First Street, Suite 268
   San Jose, CA 95113-0002
5  Telephone:   (408) 535-5525
   Fax:         (408) 535-5532
6
   Attorneys for Sara L. Kistler
7  Acting United States Trustee for Region 17

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10 In re:

11 SONICBLUE, INCORPORATED, a Delaware          Case No. 03-51775 MM
   Corporation, DIAMOND MULTIMEDIA
12 SYSTEMS, INC., a Delaware Corporation,        Chapter 11
   REPLAY TV, INC., a Delaware Corporation,
13 and SENSORY SCIENCE CORPORATION,             Date: _____
   a Delaware Corporation,                       Time: _____
14                                                Place: Courtroom 3070
                    Debtors.
15

16
              MOTION BY UNITED STATES TRUSTEE FOR APPOINTMENT
17    OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, AN EXAMINER

18         PLEASE TAKE NOTICE that at the date and time specified above, at the United

19 States Bankruptcy Court, 280 S. First Street, San Jose CA 95113, the United States

20 Trustee (the "UST") will, and hereby does, move the Court for the entry of an order to

21 appoint a Chapter 11 trustee pursuant to 11 U.S.C. Section 1104(a), or, in the

22 alternative, an examiner pursuant to Section 1104(c).

23         In support of this motion the UST requests the Court to take judicial notice of its

24 own records in this case.  Fed. R. Evid. 201, made applicable to bankruptcy

25 proceedings pursuant  to Fed. R. Bankr. P. 9017.

26

27
   Motion By UST For Appointment Of A Chapter 11
28 Trustee, Or, In The Alternative, An Examiner

# I.  **INTRODUCTION**

This motion is based on the failure by Pillsbury Winthrop ("PW"), counsel for the above-captioned debtors (the "Debtors") to disclose what appears to be a disqualifying conflict of interest, in dereliction of PW's duties under the Bankruptcy Code and Rules. The genesis of the alleged PW conflict is an opinion letter issued by PW to three creditors of the Debtors less than a year prior to the filing of these cases.  PW's potential exposure to these creditors is in the tens of millions of dollars.

PW should have known that its opinion letter was a serious issue when this case was filed in March 2003.  It has now been established that at the very latest, the opinion letter was brought to PW's attention in late August 2006 when the three creditors demanded indemnification from PW and threatened to sue PW.   Five and one half months later, however, PW has still failed to disclose this conflict.  The conflict itself, if proven, would be sufficient to disqualify PW from serving as Debtors' counsel.  That fact, coupled with PW's failure to disclose the conflict, is a fundamental offense to the integrity of the bankruptcy system.  PW's conduct is cause for the appointment of a trustee or, at a minimum, an examiner.  In addition, the interests of creditors and the system would be best served by the immediate appointment of a trustee or, in the alternative, an examiner.

# II.  **DISCUSSION**

## A.  **Factual Background**

These chapter 11 cases were filed on March 21, 2003.  On April 2, 2003, PW filed its employment application. The application was accompanied by a Rule 2014 declaration.  The court filed its order granting PW's employment application on April 11, 2003.  Thereafter, PW filed supplemental Rule 2014 disclosures on May 30, 2003, October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006.

In or around August 2006, three creditors (hereinafter referred to as the "Senior

Motion By UST For Appointment Of A Chapter 11
Trustee, Or, In The Alternative, An Examiner

1   Noteholders") who are members of the Official Committee Of Creditors Holding

2   Unsecured Claims ("Committee") and who collectively hold $75 million in Senior Notes

3   pursuant to a 2002 indenture entered into with debtor SonicBlue, asserted to PW

4   through their separate counsel that PW had a conflict of interest in connection with

5   PW's proposed objection to the claim of the Senior Noteholders.  See Declaration Of

6   Ron Bender, Esq. In Support Of His Submission Of Preliminary Status Report And

7   Request For Continuance Of Deadline For Submission Of Final Status Report And Of

8   Disclosure Statement Hearing filed February 12, 2007 ("Bender Decl."), paragraph 16.

9   The basis of PW's alleged conflict was an opinion letter issued by PW to the Senior

10  Noteholders in April 2002.  Id.  A copy of the April 2002 opinion letter is attached as

11  Exhibit 2(A) to the Declaration Of K. John Shaffer In Support Of Sonicblue Claims,

12  LLC's Supplemental Response To Preliminary Status Report filed February 14, 2007

13  ("Shaffer Declaration").

14      Further, on September 5, 2006 counsel for the Senior Noteholders wrote a letter

15  to the managing partner of PW in which counsel demanded that PW indemnify the

16  Senior Noteholders based on the April 2002 opinion letter.  In the September 5, 2006

17  letter, counsel for the Senior Noteholders also threatened to sue PW for negligence and

18  negligent misrepresentation if PW failed to indemnify the Senior Noteholders.  A copy

19  of the September 5, 2006 letter is attached to the Shaffer Declaration as Exhibit 2(B).

20      Based on these allegations by the Senior Noteholders of a conflict on the part of

21  PW, in early September 2006 PW contacted Ron Bender of Levene, Neale, Bender,

22  Rankin & Brill, L.L.P ("LNBRB"), counsel for the Committee and transferred its files to

23  LNBRB.  From that point onward LNBRB took over the prosecution of the objection to

24  the Senior Noteholders' claim.  Bender Decl., paragraph 17.

25      As stated above, PW has filed Rule 2014 disclosures on seven separate

26  occasions.  At no time, however, has PW ever disclosed to the Court, parties in interest

27

28  Motion By UST For Appointment Of A Chapter 11
    Trustee, Or, In The Alternative, An Examiner

1   or the UST that:

2       • PW issued an opinion letter in April 2002 to the Senior Noteholders;

3       • PW may have significant exposure to the Senior Noteholders based on

4           the April 2002 letter;

5       • the Senior Noteholders threatened to sue PW for any shortfall on their

6           collective claim in the above-referenced letter dated September 5, 2006;

7           and

8       • as a result of the allegations and threats made by the Senior Noteholders

9           based on the April 2002 opinion letter, PW ceased all work on the

10          objection to the Senior Noteholders' claim and transferred its files on the

11          matter to LNBRB.

12      In summary, at the very latest PW was made aware of an alleged disqualifying

13  conflict of interest in late August or early September 2006.  Interpreting what is known

14  thus far in the light most favorable to PW, that still means that *at least five and one half*

15  *months* have elapsed since PW knew of the conflict, yet PW failed to publicly disclose

16  it.

17      **B.  There Is Cause To Appoint A Chapter 11 Trustee.**

18      Section 1104(a)(1) of the Bankruptcy Code permits the Court, at any time after

19  the commencement of the case, on request of a party in interest or the UST, to order

20  the appointment of a trustee for cause, "including fraud, dishonesty, incompetence, or

21  gross mismanagement of the affairs of the debtor by current management, either

22  before or after the commencement of the case, or similar cause . . . ."

23      The nature and extent of PW's apparent conflict goes to PW's very ability to

24  adequately represent the Debtors and act as a fiduciary, because PW could be sued for

25  tens of millions of dollars by the Senior Noteholders who are owed a significant amount

26  of the debt in this case.  What is even more egregious is PW's failure to disclose this

27

28  Motion By UST For Appointment Of A Chapter 11
    Trustee, Or, In The Alternative, An Examiner

conflict, even though PW apparently believed that the matter was serious enough to transfer its objection to the claim of the Senior Noteholders to another law firm.

PW's conduct constitutes cause for appointment of a chapter 11 trustee, who will be in a position to waive the attorney client privilege between the Debtors and PW, and who can conduct a full investigation of PW.

**C.  Appointment Of A Chapter 11 Trustee Is In The Best Interests Of Creditors And The Estate.**

Section 1104(a)(2) of the Bankruptcy Code provides that the Court shall order the appointment of a trustee "if such appointment is in the interests of creditors...and other interests of the estate...."  It will be in the best interests of creditors and the estate to have a neutral third party come in and take over these cases.  A trustee can simultaneously investigate PW while moving forward to make preliminary distributions under the plan, so that creditors will not suffer further unnecessary delays.

### III.  <u>CONCLUSION</u>

Based on the foregoing, the UST requests the Court to appoint a Chapter 11 trustee in this case, or, in the alternative, an examiner.

Dated: February 15, 2007                          Respectfully submitted,


                                    _____/s/ Nanette Dumas_____
                                    Nanette Dumas
                                    Attorney for United States Trustee

Motion By UST For Appointment Of A Chapter 11
Trustee, Or, In The Alternative, An Examiner

# EXHIBIT 3

1  EDWINA E. DOWELL, #149059
   Assistant U.S. Trustee
2  NANETTE DUMAS, #148261
   JOHN S. WESOLOWSKI, #127007
3  SHANNON L. MOUNGER-LUM, #208071
   Office of the United States Trustee
4  280 S. First Street, Suite 268
   San Jose, CA 95113-0002
5  Telephone:   (408) 535-5525
   Fax:            (408) 535-5532
6
7  Attorneys for Sara L. Kistler
   Acting United States Trustee for Region 17

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10  In re:

11  SONICBLUE, INCORPORATED, a Delaware          Case No. 03-51775 MM
    Corporation, DIAMOND MULTIMEDIA
12  SYSTEMS, INC., a Delaware Corporation,        Chapter 11
    REPLAY TV, INC., a Delaware Corporation,
13  and SENSORY SCIENCE CORPORATION,             Date:  March 19, 2007
    a Delaware Corporation,                      Time: 10:30 a.m.
14                                               Place: Courtroom 3070
                        Debtors.
15

16
17           **MOTION BY UNITED STATES TRUSTEE TO DISQUALIFY
             PILLSBURY WINTHROP SHAW PITTMAN LLP, TO VACATE
18        EMPLOYMENT ORDER, AND FOR DISGORGEMENT OF ATTORNEYS' FEES**

19           PLEASE TAKE NOTICE that at the date and time specified above, at the United

20  States Bankruptcy Court, 280 S. First Street, San Jose CA 95113, the United States

21  Trustee (the "UST") will, and hereby does, move the Court for the entry of an order to

22  disqualify the law firm Pillsbury Winthrop Shaw Pittman LLP ("PW"), counsel for the

23  above-captioned debtors (the "Debtors"), to vacate PW's employment order, and to

24  require PW to disgorge all fees that have been paid to PW in contemplation of and

25  since the filing of these cases.

26           This motion is made pursuant to 11 U.S.C. §§ 327(a), 328(c) and 329(b), Fed. R.

27  Motion By UST To Disqualify
    Pillsbury Winthrop Shaw Pittman LLP,
28  To Vacate Employment Order, And For
    Disgorgement Of Attorneys' Fees

1  Bankr. P. 2014 and 2016, and Fed. R. Civ. P. 60(b)(6), made applicable to bankruptcy

2  proceedings pursuant to Fed. R. Bankr. P. 9024.  In support of this motion, the UST

3  requests the Court to take judicial notice of its own records in this case pursuant to Fed.

4  R. Evid. 201, made applicable to bankruptcy proceedings pursuant  to Fed. R. Bankr. P.

5  9017.

## I. <u>INTRODUCTION</u>

7      At the time that these cases were filed in March 2003, PW had been the

8  Debtors' corporate and litigation counsel for the Debtors for fourteen years.  In that

9  capacity, in April 2002 PW wrote an opinion letter to three hedge funds (hereinafter

10 referred to as the "Senior Noteholders") in connection with the issuance of notes in the

11 amount of $75 million by debtor SonicBlue.  Less than a year later, PW filed these

12 cases and was employed as the Debtors' general bankruptcy counsel.

13     Unbeknownst to the court, creditors or the UST, PW had a powerful economic

14 incentive to maximize the recovery to the Senior Noteholders, because PW itself was

15 arguably "on the hook" for any shortfall to the Senior Noteholders based on the 2002

16 opinion letter.  To further deepen the conflict, the Senior Noteholders' claim was not a

17 straightforward undisputed, unliquidated claim, such as a claim for goods delivered or

18 services provided.  On the contrary, numerous parties in these cases have identified

19 several legal bases upon which the Senior Noteholders' claim could be challenged.  In

20 fact, PW's preliminary challenge to the Senior Noteholders' claim led to a blatant threat

21 by the Senior Noteholders to sue PW if PW failed to indemnify the Senior Noteholders

22 for the full amount of their claim.

23     The Senior Noteholders' threat to PW was simply a formal recognition of the

24 reality that had existed from the commencement of these cases:  PW's economic

25 interests and the economic interests of the non-Senior Noteholder creditors were

27 Motion By UST To Disqualify
   Pillsbury Winthrop Shaw Pittman LLP,
   To Vacate Employment Order, And For
28 Disgorgement Of Attorneys' Fees                                              2

1  directly at odds, because for every dollar the the Senior Noteholders' claim was

2  reduced, PW's corresponding exposure would increase.

3      While this is an unusually dramatic set of facts, the law is well settled and is very

4  clear:  had PW disclosed its fundamental conflict at the very outset of the case as it was

5  required to do, PW could have never been employed as Debtors' counsel.

6      PW has never been in a position to play the role of an honest fiduciary in these

7  cases.  PW should be disqualified as Debtors' counsel retroactive to March 21, 2003,

8  PW's employment order should be vacated, and PW and should be required to

9  disgorge all estate funds that it has received as compensation for services rendered in

10  connection with these cases.

## II.  DISCUSSION

### A.  Factual Background

13     The debtors in these separate but jointly administered Chapter 11 cases[1] were

14  filed on March 21, 2003.  On April 2, 2003, PW filed its application for authority to

15  represent the debtors. The application was accompanied by a Rule 2014 declaration.

16  The Rule 2014 declaration included the following statement:  "*[PW] will continue to*

17  *monitor its relationship with the creditors and other parties in interest in these cases,*

18  *and, as it discovers additional information requiring disclosure, will promptly supplement*

19  *this application with any appropriate disclosures.*"

20     The court entered its Order granting PW's employment application on April 11,

21  2003.

22     PW subsequently filed supplemental Rule 2014 disclosures on May 30, 2003,

23  October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006.

---

[1]      The debtors are SonicBlue Incorporated, Diamond Multimedia Systems, Inc., ReplayTV, Inc., and Sensory Science Corporation.  All of the debtors are Delaware Corporations.

Motion By UST To Disqualify
Pillsbury Winthrop Shaw Pittman LLP,
To Vacate Employment Order, And For
Disgorgement Of Attorneys' Fees

3

1   Every declaration filed by PW included the statement, "*[PW] will continue to monitor its*

2   *relationship with the creditors and other parties in interest in these cases, and, as it*

3   *discovers additional information requiring disclosure, will promptly supplement this*

4   *application with any appropriate disclosures.*"

5       On or about August 2006, separate counsel for the Senior Noteholders[2], who are

6   members of the Official Committee Of Creditors Holding Unsecured Claims

7   ("Committee") and who collectively hold $75 million in Senior Notes pursuant to a 2002

8   indenture entered into with debtor SonicBlue, contacted PW, asserting that PW had a

9   conflict of interest in connection with PW's proposed objection to the claim of the Senior

10  Noteholders.  See Declaration Of Ron Bender, Esq. In Support Of His Submission Of

11  Preliminary Status Report And Request For Continuance Of Deadline For Submission

12  Of Final Status Report And Of Disclosure Statement Hearing filed February 12, 2007

13  ("Bender Decl."), paragraph 16.  Specifically, separate counsel for the Senior

14  Noteholders contended that PW's representation of the debtors created a conflict of

15  interest for PW, because PW had issued an opinion letter to the Senior Noteholders in

16  April 2002 ("PW Opinion Letter").  Id.  A copy of the PW Opinion Letter is attached as

17  Exhibit 2(A) to the Declaration Of K. John Shaffer In Support Of Sonicblue Claims,

18  LLC's Supplemental Response To Preliminary Status Report filed February 14, 2007

19  ("Shaffer Declaration").

20      On September 5, 2006, counsel for the Senior Noteholders wrote a letter to the

21  managing partner of PW, demanding that PW indemnify the Senior Noteholders based

22  on the PW Opinion Letter.  In the September 5, 2006 letter, counsel for the Senior

23  Noteholders also threatened to sue PW for negligence and negligent misrepresentation

24

25      [2]     The Senior Noteholders are Smithfield Fiduciary LLC, Portside Growth and Opportunity
            Fund, and Citadel Equity Fund, Ltd.

26

27  Motion By UST To Disqualify
    Pillsbury Winthrop Shaw Pittman LLP,
    To Vacate Employment Order, And For
28  Disgorgement Of Attorneys' Fees                                                    4

1  if PW failed to indemnify the Senior Noteholders.  A copy of the September 5, 2006

2  letter is attached to the Shaffer Declaration as Exhibit 2(B).

3      In early September 2006, PW contacted Ron Bender of Levene, Neale, Bender,

4  Rankin & Brill, L.L.P. ("LNBRB"), counsel for the Committee.  Because of the

5  allegations that PW was conflicted vis-a-vis the Senior Noteholders, PW transferred its

6  files regarding the objection to the Senior Noteholders' claim, and requested that

7  LNBRB continue with the prosecution of the objection.  From that point forward, LNBRB

8  took over the prosecution of the objection to the Senior Noteholders' claim.  Bender

9  Decl., paragraph 17.

10     As stated above, PW has filed Rule 2014 disclosures on seven separate

11  occasions.  At no time, however, did PW ever disclose to the Court, parties in interest

12  or the UST that:

13         •    PW issued the PW Opinion Letter to the Senior Noteholders in April 2002,
                prior to the filing of debtors' bankruptcy cases;
14
15         •    PW faced significant exposure to the Senior Noteholders based on the
                PW Opinion Letter;

16         •    The Senior Noteholders threatened to sue PW for any shortfall on their
                collective claim in the September 5, 2006 letter referenced above; and
17
18         •    As a result of the allegations and threats made by the Senior Noteholders
                based upon the PW Opinion Letter, PW ceased all work on the objection
19              to the Senior Noteholders' claim and transferred its files on the matter to
                LNBRB, counsel for the creditors committee of which the Senior
                Noteholders are the controlling members.
20
21     In short, PW knew or should have known that it suffered from an actual conflict

22  of interest that disqualified PW from undertaking representation of the debtors on

23  March 21, 2003, the day that these cases were filed.  By late August or early

24  September 2006 at the very latest, PW had actual knowledge of allegations by the

25  Senior Noteholders that a conflict of interest existed sufficient to disqualify PW from

26  representing the debtors – yet PW never filed a Rule 2014 statement regarding what is

27  Motion By UST To Disqualify
    Pillsbury Winthrop Shaw Pittman LLP,
    To Vacate Employment Order, And For
28  Disgorgement Of Attorneys' Fees                                              5

far and away its most serious conflict of interest.  In fact, due to PW's lack of disclosure,

the PW conflict only began to come to light in late January 2007.

### B.  The Applicable Statutory Framework

The Bankruptcy Code contains a comprehensive statutory framework that grants

bankruptcy courts broad authority to monitor employment arrangements between

debtors and professionals employed by debtors, and to scrutinize the reasonableness

of fees paid to professionals.  *See generally*, 11 U.S.C. §§ 327 - 330 *and* Fed. R.

Bankr. P. 2014 - 2017.  The same framework places affirmative duties on debtors and

their professionals to disclose fully the terms of employment arrangements and to seek

court approval of retention and compensation.  Id.  "Full disclosure is an essential

prerequisite for both employment and compensation."  Movitz v. Baker (*In re* Triple Star

Welding, Inc.), 324 B.R. 778, 788-89 (9th Cir. BAP 2005).

### 1.    Retention Arrangements for Debtors' Counsel

Pursuant to 11 U.S.C. § 327, a chapter 11 debtor in possession[3]

must obtain court approval prior to employing counsel.  More particularly, section 327(a)

provides in pertinent part:

§ 327.  Employment of professional persons

(a)    Except as otherwise provided in this section, the
trustee, with the court's approval, may employ one or
more attorneys [. . .] that do not hold or represent an
interest adverse to the estate, and that are
disinterested persons, to represent or assist the
trustee in carrying out the trustee's duties under this
title.

11 U.S.C. Section 327(a) (Thomson West 2007).

Pursuant to section 327(a), as implemented by Fed. R. Bankr. P.

---

[3]    Although the text of 11 U.S.C. § 327(a) refers to the "trustee", § 327(a) is also applicable
to chapter 11 debtors in possession by operation of 11 U.S.C. § 1107(a).

1   2014, an attorney seeking authority to represent a chapter 11 debtor in possession

2   must make various disclosures. Bankruptcy Rule 2014(a) requires, for example, that

3   applications for employment contain disclosures of "all of the [applicant's] connections

4   with the debtor, creditor, [or] other party in interest . . . ." Additionally, pursuant to

5   Bankruptcy Rule 2014(a), an applicant must disclose "any proposed arrangement for

6   compensation . . . ." In the Ninth Circuit, disclosure requirements under 11 U.S.C.

7   § 327(a) as implemented by Bankruptcy Rule 2014(a) are strictly applied. "Pursuant to

8   § 327, a professional has a duty to make *full, candid and complete disclosure* of all

9   facts concerning his transactions with the debtor. Professionals must disclose all

10  connections with the debtor, creditors, and parties in interest, *no matter how irrelevant*

11  *or trivial those connections may seem*. The disclosure rules are not discretionary."

12  Triple Star, 324 B.R. at 789 (emphasis in original), *quoting* Mehdipour v. Marcus &

13  Millichap (*In re* Mehdipour), 202 B.R. 474, 480 (9th Cir. BAP 1996), *aff'd*, 139 F. 3d 1303

14  (9th Cir. 1998). The text of 11 U.S.C. § 328(c) expressly provides that the court may

15  deny allowance of compensation for services and reimbursement of expenses of a

16  professional person employed under Section 327 if at any time during such professional

17  person's employment the professional represents or holds an interest adverse to the

18  interest of the estate with respect to the matter on which such professional person is

19  employed.

20  **2.    Fee Applications by Debtors' Counsel**

21          Applications for compensation filed by counsel for debtors in possession

22  in chapter 11 cases are governed by the provisions of 11 U.S.C. § 329. That section

23  provides:

24                  § 329. Debtor's transactions with attorneys

25                          (a)    Any attorney representing a debtor in a case under this title,
                                   or in connection with such a case, whether or not such
26

attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b)    If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to - -

(1)    the estate, if the property transferred - -

(A)    would have been property of the estate; or

(B)    was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2)    the entity that made such payment.

11 U.S.C. Section 329 (Thomson West 2007).

The provisions of Section 329 are implemented by Fed. R. Bankr. P. 2016, which generally requires the attorney seeking payment to disclosure a number of material facts, designed to protect the debtor from the debtor's attorney, in a manner similar to Bankruptcy Rule 2014.  *See* Law Office of Nicholas A. Franke v. Tiffany (*In re Lewis*), 113 F. 3d 1040, 1044-45 (9th Cir. 1997).  In general, Bankruptcy Rule 2016 requires a  debtor's attorney to disclose to the court the compensation paid and the source of the compensation for services rendered or to be rendered in contemplation of or in connection with the case under the Bankruptcy Code.

## C.    Consequences of Failing to Comply with Disclosure Requirements

In the Ninth Circuit, the disclosure provisions discussed above "are applied literally, even if the results are sometimes harsh."  In re Jore Corp., 298 B.R. 703, 724-25 (Bankr. D. Mont. 2003), *quoting* Neben & Starrett, Inc. v. Chartwell Financial Corp. (*In re* Park-Helena Corp.), 63 F.3d 877, 881 (9th Cir. 1995), *cert. denied,* 516 U.S. 1049,

1   116 S. Ct. 712, 133 L. Ed. 2d 667 (1996).  The disclosure requirements of 11 U.S.C.

2   § 327(a) and Bankruptcy Rule 2014 "are applied as strictly as the requirements of Rule

3   2016 and section 329, and do not give the attorney the right to withhold information

4   because it is not apparent to him or her that a conflict exists."  Jore, 298 B.R. at 725,

5   *citing* Park-Helena, 63 F.3d at 881.

6        As a result, "[a]ll facts that may be pertinent to a court's determination of whether

7   an attorney is disinterested or holds an adverse interest to the estate must be

8   disclosed."  Jore at 725, *citing* Park-Helena at 882 *and* In re Hathaway Ranch

9   Partnership, 116 B.R. 208, 219 (Bankr. C.D. Cal. 1990).  "The duty of professionals is

10  to disclose all connections with the debtor, debtor-in-possession, insiders, creditors,

11  and parties in interest . . . . They cannot pick and choose which connections are

12  irrelevant or trivial . . . . No matter how old the connection, no matter how trivial it

13  appears, the professional seeking employment must disclose it."  Jore at 725, *quoting*

14  In re EWC, Inc., 138 B.R. 276, 280-81 (Bankr. W.D. Okla. 1992).

15       The Ninth Circuit Court of Appeals has recognized that bankruptcy courts have

16  inherent authority over debtors' attorneys' compensation, and explained that attorneys

17  who fail to comply with the disclosure requirements governing their retention and

18  compensation face denial of fee requests and, in appropriate cases, disgorgement of

19  fees previously paid:

20           [S]everal courts have recognized that the bankruptcy court has broad and
             inherent authority to deny any and all compensation when an attorney
21           fails to meet the requirements of these provisions.  *See, e.g.,* In re Downs,
             103 F.3d 472, 479 (6th Cir. 1996)("[T]he bankruptcy court should deny all
22           compensation to an attorney who exhibits a willful disregard of his
             fiduciary obligations to fully disclose the nature and circumstances of his
23           fee arrangement under § 329 and Rule 2016.  The authority to do so is
             inherent, and in the face of such infractions should be wielded
24           forcefully."); Matter of Prudhomme, 43 F.3d 1000, 1003 (5th Cir.
             1995)("Additionally, the court's broad discretion in awarding and denying
25           fees paid in connection with bankruptcy proceedings empowers the
             bankruptcy court to order disgorgement as a sanction to debtors' counsel
26

for nondisclosure."); In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 575 (Bankr. N.D. Tex. 1986)(Indeed, a failure of counsel to obey the mandate of § 329 and Rule 2016 concerning disclosure, and by implication review by the Court, is a basis for entry of an order denying compensation and requiring the return of sums already paid.")

In re Lewis, 113 F.3d 1040, 1045 (9th Cir. 1997).  "Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees." Lewis at 1045, quoting  Park-Helena, 63 F.3d at 882.  Ultimately:

> The professional bears the burden of proving entitlement to the requested fees, as well as the reasonableness of the amount of such fees. [. . .] Violation of Code, Rule or other precedent governing professional compensation in bankruptcy cases supports sanction up to and including total disallowance of compensation and disgorgement of fees previously received, even if received under prior Court order.

In re A.W. Logging, Inc., ___ B.R. ___, 2006 WL 3438590 (Bankr. D. Idaho 2006)(citations omitted).  "A disclosure violation may result in sanctions 'regardless of actual harm to the estate.'"  Jore, 298 B.R. at 727, *citing* Park-Helena at 881 *and* In re Maui 14K, Ltd., 133 B.R. 657, 660 (Bankr. D. Haw. 1991).  The egregiousness of the conduct of PW in failing to disclose the conflict of interest attendant to the PW Opinion Letter warrants both denial of future fees sought by PW, and disgorgement of all fees paid to PW in contemplation of and since the filing of these cases.

### D. PW Should Be Disqualified, And Should Be Ordered To Disgorge All Of Its Attorneys' Fees Based On Its Interest Adverse To The Estate.

The text of 11 U.S.C. § 327(a) expressly provides that a debtor may only employ professionals who do not hold or represent an interest adverse to the estate.  PW holds an interest that is directly adverse to the estate based on the PW Opinion Letter issued to the Senior Noteholders.  On the one hand, PW represents debtors-in-possession that have a fiduciary duty to maximize the recovery to all creditors, and in that role PW is required to zealously represent the interests of the bankruptcy estate.  See Park-Helena, 63 F.3d at 880 ("[A]ttorneys who represent the debtor [must] do so in the

Motion By UST To Disqualify
Pillsbury Winthrop Shaw Pittman LLP,
To Vacate Employment Order, And For
Disgorgement Of Attorneys' Fees

10

1   best interests of the bankruptcy estate."). On the other hand, prior to the filing of the

2   bankruptcy case, in the PW Opinion Letter, PW assured the Senior Noteholders that

3   debtor SonicBlue would repay a $75M obligation in full. If true, this meant that PW had

4   significant exposure – possibly in the tens of millions – for any shortfall in the

5   repayment of the Senior Notes. Thus, PW's loyalties to the estate and the creditor

6   body may have been seriously compromised by its desire to protect itself from that

7   exposure.

8        If possible, PW's conflict became even more material and even more untenable

9   when the Senior Noteholders overtly threatened PW with a lawsuit if PW did not

10   indemnify them. At that point, when the conflict had assumed the proportions of a

11   major crisis, one or more persons at PW finally took action and ceased working on the

12   objection to the claims of the Senior Noteholders. Significantly, however, PW did not

13   make the required disclosures under Rule 2014, which raises the suspicion of a cover-

14   up.

15        PW's adverse interest in this case goes directly to the matter on which PW is

16   employed, i.e., its fiduciary duties pursuant to its representation of the debtors-in-

17   possession. There is no way that PW could possibly dispel the perception that its

18   decisions in this case might have been colored by its fear of reprisals by a powerful

19   group of creditors. Because PW's conflict is so fundamental, and because PW's ability

20   to represent the debtors-in-possession may therefore have been significantly hampered

21   by the conflict, full disgorgement of all of PW's fees under Section 328(c) is an

22   appropriate sanction and sends the right message about the consequences of a

23   professional's failure to abide by the Bankruptcy Code and Rules.

24

25

26

27   Motion By UST To Disqualify
Pillsbury Winthrop Shaw Pittman LLP,
To Vacate Employment Order, And For

28   Disgorgement Of Attorneys' Fees                          11

**E.  PW Should Be Ordered To Disgorge All Of Its Attorneys' Fees On The Separate Ground Of Its Failure To Disclose Its Interest Adverse To The Estate.**

An independent ground for full disgorgement by PW of all of its fees is its dereliction of its duty to promptly and fully disclose its adverse interest.  As noted above, on seven different occasions over the past several years PW dutifully disclosed its numerous potential conflicts with the estate by filing sworn Rule 2014 statements, and repeatedly promised in those statements to continue to disclose conflicts on an ongoing basis.  Yet PW never disclosed the existence of the PW Opinion Letter, even when it received the direct threat of a lawsuit in September 2006 from the Senior Noteholders.  PW's silence with respect to a conflict of this magnitude deserves the maximum sanctions that the Court can impose: the full disgorgement of all fees paid to PW in this case.

In the Park-Helena case, debtor's counsel failed to accurately disclose the true source of its pre-petition retainer.  As a sanction the bankruptcy court denied the law firm's entire fee request based on its violations of Section 329 of the Bankruptcy Code and Fed. R. Bankr. P. 2014 and 2016.  The Ninth Circuit affirmed, stating:

> The disclosure rules are applied literally, even if the result are sometimes harsh. . . .Negligent or inadvertent omissions 'do not vitiate the failure to disclose.'

63 F.3d at 881 (citation omitted).

The court's holding in Park-Helena rested in part on counsel's failure to fully disclose its connections with a party in interest, as required by Rule 2014.  The court, citing In re EWC, Inc., 138 B.R. 276, 280-81 (Bankr. W.D. Okla. 1992) stated:

> 'The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest. . . . They cannot pick and choose with connections are irrelevant or trivial . . . . No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it.'

Motion By UST To Disqualify
Pillsbury Winthrop Shaw Pittman LLP,
To Vacate Employment Order, And For
Disgorgement Of Attorneys' Fees

12

1    63 F. 3d at 882.

2        In Lewis, the Ninth Circuit further clarified and expanded its ruling in Park-

3    Helena, holding that the bankruptcy court's authority to completely deny attorneys' fees

4    was grounded in the court's inherent authority over the debtor's attorney's

5    compensation.  Lewis, 113 F. 3d at 1045.  The court stated, "The Bankruptcy Code

6    contains a number of provisions (e.g. Sections 327, 329, 330, 331) designed to protect

7    the debtor from the debtor's attorney. . . . As a result, several courts have recognized

8    that the bankruptcy court has broad and inherent authority to deny any and all

9    compensation when an attorney fails to meet the requirements of these provisions."  Id.

10   (citations omitted).

11       Due to the gravity of PW's conflict in this case, its failure to disclose is far more

12   egregious than the omissions and misstatements of the law firms involved in the Park-

13   Helena and Lewis cases.  If there ever were a case that called for the denial of all

14   compensation based on a law firm's failure to disclose a material conflict, this is it.

15                    **III.  CONCLUSION**

16       Based on the foregoing, the UST requests that the Court enter an order

17   disqualifying PW as counsel for the Debtors in these jointly administered Chapter 11

18   cases, vacating PW's employment order, directing PW to disgorge all fees that have

19   been paid to PW in contemplation of and since the filing of these cases, and granting

20   such other and additional relief as is just and equitable.

21   Dated:  February 20, 2007

22                            Respectfully submitted,

23

24                            _____/s/ Nanette Dumas_____
                              Nanette Dumas
25                            Attorney for United States Trustee

26

27   Motion By UST To Disqualify
     Pillsbury Winthrop Shaw Pittman LLP,
     To Vacate Employment Order, And For
28   Disgorgement Of Attorneys' Fees                                    13

# EXHIBIT 4

EDWINA E. DOWELL, #149059
Assistant U.S. Trustee
NANETTE DUMAS, #148261
SHANNON L. MOUNGER-LUM, #208071
Office of the United States Trustee
280 S. First Street, Suite 268
San Jose, CA 95113-0002
Telephone:   (408) 535-5525
Fax:         (408) 535-5532

Attorneys for Sara L. Kistler
Acting United States Trustee for Region 17

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA

In re:

SONICBLUE, INCORPORATED, a Delaware
Corporation, DIAMOND MULTIMEDIA
SYSTEMS, INC., a Delaware Corporation,
REPLAY TV, INC., a Delaware Corporation,
and SENSORY SCIENCE CORPORATION,
a Delaware Corporation,

                                    Debtors.

Case No. 03-51775 MM

Chapter 11

Date: March 19, 2007
Time: 10:30 a.m.
Place: Courtroom 3070

## AMENDED MOTION OF UNITED STATES TRUSTEE
## FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

PLEASE TAKE NOTICE that on the date and time specified above, at the United

States Bankruptcy Court, 280 S. First Street, San Jose CA 95113, the United States

Trustee (the "UST") will move the Court for the entry of an order directing the

appointment of  a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a).

In support of this motion the UST requests the Court to take judicial notice of its

own records in these cases.  Fed. R. Evid. 201, made applicable to bankruptcy

proceedings pursuant  to Fed. R. Bankr. P. 9017.

# I.  INTRODUCTION

While SonicBlue, Inc., and its three related entities ("Debtors") have been in chapter 11 for almost four years, circumstances and events that have only recently come to light mandate the immediate appointment of a chapter 11 trustee to investigate and complete the administration of these estates.  The Debtors' estates were liquidated early in the administration of the cases; since then, virtually all activity in the cases has involved the determination, through litigation and negotiation, of how a finite but large sum of money will be distributed among several constituencies of unsecured creditors.  It has now become clear that, because of a combination of absentee part-time management and seriously conflicted Debtors' counsel, only the appointment of a trustee can assure that the results of these cases are fairly reached.

The Debtors' sole representative has been Marcus Smith, the designated responsible individual in these cases.  During his tenure as responsible individual, Mr. Smith has served as the Vice President of Finance for one operating company and as the CFO for two additional operating companies.  Mr. Smith has worked only part time for the Debtors since 2003.  Mr. Smith does not appear to answer to or to take guidance from a board of directors or any other governing body.  Mr. Smith must seek guidance and advice from the experienced bankruptcy and corporate attorneys of the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP ("PW").  While nothing is inherently wrong with corporate management relying heavily on counsel for advice, counsel must be free of all taint of actual or potential conflicts of interest.

Within the last 30 days has it come to light that PW has been operating under a disqualifying and previously undisclosed conflict of interest.  PW's material conflict may have compromised its representation of the Debtors.  Either Mr. Smith was not aware of PW's conflict, or he at some point became aware of it and failed to act.  Either scenario is troubling.

1    The statutory grounds for appointment of a chapter 11 trustee are "cause" under

2  § 1104(a)(1) of the Bankruptcy Code, and "the interests of creditors" under

3  § 1104(a)(2).  Cause exists for the appointment of a trustee in these cases because Mr.

4  Smith, acting as a solitary part-time functionary without the support of untainted

5  counsel, cannot fulfill the fiduciary responsibilities required of management of a debtor

6  in possession.  Because Mr. Smith's administration of these estates has been so tied to

7  PW's representation of the Debtors, the belated engagement of new Debtors' counsel

8  would not alone remedy the situation.  In addition, it is in the interests of creditors for a

9  completely neutral party to conduct a thorough investigation of the prior administration

10  of these estates and to be empowered to act on the findings of that investigation.  Only

11  the appointment of a trustee will ensure that parties are treated with the honesty and

12  fair dealing which should inhere in the bankruptcy system.

13

14                              **II.  DISCUSSION**

15       **A.  Factual Background**

16    These cases were filed on March 21, 2003.  Attached to the petition were

17  corporate resolutions of the Debtors' Board of Directors dated March 18, 2003

18  authorizing the filing of the cases.

19    The Debtors' chapter 11 petitions and the Consent To Corporate Petition were

20  signed by Marcus Smith as the Debtors' Chief Financial Officer.  On April 4, 2003, this

21  Court entered an order appointing Mr. Smith as the Debtors' "responsible individual"

22  ("RI").

23    On the petition date, the Debtors employed approximately 197 persons and

24  utilized the services of approximately 31 independent contractors.  Disclosure

25  Statement Describing First Amended Liquidating Plan Of Reorganization Dated As Of

26  January 18, 2007 Proposed Jointly By Debtors And Creditors' Committee, filed January

27

28  Amended Motion By UST For
    Appointment Of  Ch. 11 Tee                3

1  18, 2007 ("Amended Disclosure Statement"), p. 23, ll. 5 - 6.   By mid-2003, however,

2  most these employees had left the Debtors.  Currently, the Debtors' only remaining

3  employees are Mr. Smith and Nanci Salvucci, the Debtors' former controller.   Mr. Smith

4  and Ms. Salvucci have been working for the Debtors on a part time hourly basis since

5  2003.  Id., p. 23, ll. 9 - 18; p. 24, ll. 1 - 4.

6         On September 5, 2006, counsel for three creditors (the "Senior Noteholders")

7  who are members of the Official Committee Of Creditors Holding Unsecured Claims

8  ("Committee") and who collectively hold the $75 million in Senior Notes issued pursuant

9  to a 2002 indenture entered into with debtor SonicBlue, notified PW's managing partner

10 that PW had a conflict of interest in representing the Debtors in connection with the

11 Debtors' proposed objection to the claim of the Senior Noteholders.  See Declaration Of

12 Ron Bender, Esq. In Support Of His Submission Of Preliminary Status Report And

13 Request For Continuance Of Deadline For Submission Of Final Status Report And Of

14 Disclosure Statement Hearing filed February 12, 2007 ("Bender Decl."), paragraph 16.

15 The basis of PW's alleged conflict was an opinion letter issued by PW to the Senior

16 Noteholders in April 2002.  Id.  A copy of the April 2002 opinion letter is attached as

17 Exhibit 2(A) to the Declaration Of K. John Shaffer In Support Of Sonicblue Claims,

18 LLC's Supplemental Response To Preliminary Status Report filed February 14, 2007

19 ("Shaffer Declaration").  In the September 5 letter, counsel for the Senior Noteholders

20 demanded that PW indemnify the Senior Noteholders and threatened to sue PW for

21 negligence and negligent misrepresentation if the Senior Noteholders were not made

22 whole on the debenture obligations they held.  The demand was based on the 2002

23 opinion letter.  A copy of the September 5, 2006 letter is attached to the Shaffer

24 Declaration as Exhibit 2(B).

25        In response to these allegations by the Senior Noteholders that it had a conflict

26 of interest, PW contacted Ron Bender of Levene, Neale, Bender, Rankin & Brill, L.L.P.

27

28 Amended Motion By UST For
   Appointment Of  Ch. 11 Tee          4

1  ("LNBRB"), counsel for the Committee in early September 2006.  PW also transferred

2  its files relating to a discrete issue of the validity of the Senior Noteholders' claims to

3  LNBRB.  From that point onward the Committee, through counsel, assumed

4  responsibility for the prosecution of the objection to the Senior Noteholders' claim.

5  Bender Decl., paragraph 17. No notice of this action was filed with this Court.

6      At least from the date that the Senior Noteholders asserted an actual claim

7  against PW, PW had a duty to disclose this conflict pursuant to Fed. R. Bankr. P. 2014.

8  No such disclosure was made.  Had PW timely disclosed this conflict, PW would almost

9  certainly have been the subject of motions to disqualify it from further service as

10  counsel for the Debtors.  After becoming fully aware of the circumstances surrounding

11  PW's conflict and its failure to disclose, on February 20, 2007 the UST filed the Motion

12  By United States Trustee To Disqualify Pillsbury Winthrop Shaw Pittman LLP, To

13  Vacate Employment Order, And For Disgorgement Of Attorneys' Fees.

14
15  **B. Cause exists requiring the appointment of a chapter 11 trustees in these cases.**

16      11 U.S.C. § 1104(a)(1) of the Bankruptcy Code requires the Court, at any time

17  after the commencement of the case, on request of a party in interest or the UST, to

18  order the appointment of a trustee for cause, "including fraud, dishonesty,

19  incompetence, or gross mismanagement of the affairs of the debtor by current

20  management, either before or after the commencement of the case, or similar cause

21  . . . ."

22      "Cause" to appoint a trustee under § 1104(a)(1) has been found in many

23  different types of situations beyond the specific grounds enumerated in the statute.  For

24  example, in In re Marvel Entertainment, Inc., 140 F. 3d, 463 (3rd Cir. 1998), the court,

25  citing In re Cajun Elec. Power Coop., Inc., 74 F. 3d 599 (5th Cir. 1996) (adopting on

26  rehearing the opinion of dissent in 69 F 3d. 746, 751 (5th Cir. 1995)), cert. denied, 519

27
28

1    U.S. 808 (1996), found cause based on the level of acrimony between the debtor and

2    its creditors.  In In re Lowenschuss, 202 B.R. 305 (Bankr. D. Nev. 1996), aff'd., 171 F.

3    3d 673 (9th Cir. 1999), cert. denied, 528 U.S. 877 (1999), the court directed the

4    appointment of a trustee based on the debtor's pre-petition transfer of assets and

5    personal flight to Nevada to avoid the jurisdiction of Pennsylvania state courts.  In In re

6    Intercat, Inc., 247 B.R. 911 (Bankr. S.D. Ga. 2000) the court provided a laundry list of

7    situations in which chapter 11 trustees had been appointed for cause:  material

8    misconduct, lack of evenhandedness in dealings with insiders or affiliates vis-a-vis other

9    creditors or customers, the existence of pre-petition voidable transfers or fraudulent

10   transfers, unwillingness or inability of management to pursue estate causes of action,

11   conflicts of interest on the part of management that interfered with its ability to fulfill its

12   fiduciary duties to the debtor, and self-dealing by management or waste or squandering

13   of corporate assets.  247 B.R. at 920 -21.

14        While the facts of these cases are possibly unique, those facts do mandate the

15   appointment of a trustee for cause.  There is "cause" for appointment of a trustee in

16   these cases because:

17   •    Marcus Smith, the RI, is the CFO of another operating company and has

18        been employed by the Debtors on only a part time basis since 2003,

19        leaving at least a partial vacuum in fiduciary management for the Debtors'

20        as debtors-in-possession; to perform his duties, Mr. Smith had to rely

21        heavily on the advice and counsel of PW;

22   •    PW has a fundamental conflict of interest in this case, so PW's advice to

23        Mr. Smith has been potentially or actually tainted by PW's self-interest;

24   •    If Mr. Smith has been fully aware of PW's conflict since the summer of

25        2006, has continued to work with PW notwithstanding PW's conflict, and

26

27

28

has failed to disclose the conflict to the Court or to direct PW to do so, Mr. Smith has seriously failed to perform his fiduciary duties to these estates;

- It is possible that Mr. Smith only recently became fully aware of the PW conflict and of the possibility that PW's legal advice to the Debtors could be tainted by PW's self-interest; if this is the case, his failure to know of such an important development in the cases calls into serious question whether he has been sufficiently engaged in the administration of the cases or whether he has instead abdicated his management of the Debtors to PW attorneys.

When the assets of the Debtors' operating companies were sold in 2003, these cases became liquidating cases. The significant delay in distributing cash to the creditors has been attributed to the estates' involvement in contentious and complex litigation which only settled in late 2006. Thereafter, on December 15, 2006 the Debtors and the Committee filed a joint plan and disclosure statement. The Amended Disclosure Statement was filed on January 18, 2007.

In the Amended Disclosure Statement, the RI's continuing role in these cases is described as follows:

> [The RI's] employment responsibilities include those which he has performed in the past for the Debtors and those which are regularly performed by a Chief Financial Officer and "Responsible Individual" in his position. In addition to his other job responsibilities, through the duration of his employment by the Debtors, he is required to assist the Debtors and Nanci Salvucci, as needed, to (i) maintain the Debtors' books and records, (ii) prepare the Debtors' monthly reports for filing with the Office of the United States Trustee, (iii) prepare all other reports (with the assistance of counsel as needed required by the Bankruptcy Court and/or the Office of the United States Trustee, (iv) assist the Debtor and/or the Creditors' Committee with objecting to Claims, including analyzing proofs of claims filed by Creditors and providing the Debtors and/or the Creditors' Committee with the data and documents, to the extent available, and to enable them to file objections to objectionable Claims, and (v) providing the Debtors and/or the Creditors' Committee with the information and documents, to the extent, available, necessary for them to file and prosecute Rights of Action.

1    Amended Disclosure Statement, p. 23, ll. 18 - 24.

2        While the Amended Disclosure Statement states that Mr. Smith is to "assist" the

3    Debtors with various tasks and to provide the Debtors with necessary information, it

4    seems clear that, to the extent anyone is actually managing the Debtors, it should in

5    fact be Mr. Smith.  The Debtors are corporations, and can act only through their agents.

6    To the best of the UST's knowledge, the Debtors have no acting board of directors to

7    whom Mr. Smith reports or from whom Mr. Smith takes direction.

8        Mr. Smith has held at least three high ranking positions at other companies while

9    serving as the RI in this case.  Since October 30, 2006, he has been the Chief Financial

10   Officer of Nominum.  According to the website for Nomimum (Nominum.com), Mr.

11   Smith was the Chief Financial Officer of FaceTime Communications from January,

12   2005 until October, 2006.  While at FaceTime, he developed financial policies and

13   infrastructure and led acquisition and integration efforts.  Before that, from late 2003 or

14   early 2004, he served as Vice President of Finance at NetScreen, where he managed

15   SEC compliance, led the company's acquisition of Neoteris, and helped guide the

16   company during its acquisition by Juniper Networks.

17       Based on the nature and scope of Mr. Smith's responsibilities with Nominum,

18   FaceTime, and NetScreen, it would appear that Mr. Smith's time and energy have been

19   primarily devoted to fulfilling his duties in these outside positions over the past several

20   years.  In addition, because Mr. Smith only works part-time for the Debtors, and

21   because he is one of only two remaining part time employees of the Debtors, an

22   inference can be drawn that there has been a significant power vacuum in these cases.

23       Given his status as a solitary and part-time officer, Mr. Smith undoubtedly had to

24   rely even more heavily on advice and counsel he received from PW than management

25   of debtors in possession traditionally rely upon their counsel and other professionals.

26   As long as Mr. Smith could rely on PW attorneys to give him proactive advice untainted

27

28   Amended Motion By UST For
     Appointment Of  Ch. 11 Tee                    8

by any conflict of interest of PW, this situation, while not ideal, was perhaps not sufficiently troubling to warrant a change in the fiduciary management of the Debtor's estates.  The disclosure of PW's potential liability to the Senior Noteholders radically changed this picture.

Once Mr. Smith became aware of PW's conflict of interest, he, as the acting fiduciary charged by this Court with exercising the powers and performing the duties of a debtor-in-possession, was obligated to take appropriate steps to remedy the situation. The UST does not know when Mr. Smith became aware of PW's conflict of interest.  He certainly should have been notified by PW of the Senior Noteholders' assertion of a right against PW immediately upon PW's receipt of the September 5, 2006 indemnity demand from the Senior Noteholders' counsel.

If Mr. Smith was in fact notified by PW and participated in the decision to quietly shift the Senior Noteholders' claims objection over to the Committee, he failed to fulfill his fiduciary obligations.  He certainly could not reasonably rely on PW's advice regarding an appropriate course of action, because PW could not be expected to give untainted advice on the issues of whether it had a conflict and whether that conflict could be resolved simply by letting the Committee handle a single discrete issue.

These cases have for some time constituted a zero-sum game.  The estates have a finite amount of money, and how that money is allocated among the various constituencies of unsecured creditors will result in some creditors benefitting to the detriment of others.  If, as appears likely, one group of creditors has a colorable claim against PW as counsel for the Debtors,[1] PW could not continue to help resolve any

---

[1]   The UST takes no position on whether PW does in fact have an obligation to indemnify the Senior Noteholders or on whether PW might be liable to the Senior Noteholders for any shortfall in their recovery on their debentures.  But the plain language of the April 22, 2002 PW  opinion letter does not lend itself to the ready conclusion that the claims Senior Noteholders can be dismissed out of hand.

1   issues regarding this allocation without directly or indirectly increasing or decreasing its

2   potential liability to the Senior Noteholders.[2]  Furthermore, while the UST does not

3   question the bona fides and efforts of Committee counsel, the fact remains that the

4   Committee itself is made up of members of the very constituencies among whom the

5   funds must be allocated.  So the transfer of an issue that might have a fundamental

6   bearing on the fund allocation to the Committee seems singularly inappropriate,

7   particularly as this transfer occurred without notice to the Court or to other parties in

8   interest.  If Mr. Smith participated in these stop-gap and ultimately unsatisfactory

9   decisions, he failed to perform his fiduciary duties to ensure that fundamental advice

10  about the administration of the cases was rendered by professionals free of the taint of

11  personal conflicts of interest.

12          If, on the other hand, Mr. Smith remained unaware of the assertion by the Senior

13  Noteholders of the claim against PW until only recently, this only serves to raise further

14  concerns about whether these cases have been administered by a corporate officer

15  who has been sufficiently engaged to perform the fiduciary duties of a debtor in

16  possession.  Whether Mr. Smith knew or did not know, the fact remains that these

17  cases have been derailed as a consequence of the assertion by the Senior Noteholders

18  of the claim against PW and the failure of the Debtors to timely disclose that assertion.

19

20

21          [2]      For instance, PW was actively engaged in negotiating the settlement of the VIA
        litigation.  It was this settlement that finally paved the way for the filing of a
22      proposed plan and disclosure statement.  The settlement was finalized and
        approved by the Court after PW received the September 5, 2006 demand letter
23      from counsel for the Senior Noteholders.  One term of that settlement was
        apparently the agreement by VIA not to advance an argument that would have
24      resulted in its claim receiving priority over the claims of the Senior Noteholders.
        While the UST does not know if VIA's argument for priority would ultimately
25      have been successful, PW clearly should not have been negotiating settlement
        terms that could affect the scope of its potential liability to the Senior
26      Noteholders.

27

28  Amended Motion By UST For
    Appointment Of  Ch. 11 Tee                    10

1   Mr. Smith had the responsibility as RI to ensure the proper administration of these

2   cases,  even if he had to insist that PW withdraw from representing the Debtors.  He

3   has failed to fulfill that fundamental responsibility.  This failure constitutes cause for the

4   appointment of a trustee under 11 U.S.C. § 1104(a)(1).

5       In addition, the uproar among certain stakeholders occasioned by the belated

6   disclosure of the PW conflict is evidence of a loss of creditor confidence in the Debtors'

7   part-time management.  This loss of confidence also constitutes cause for the

8   appointment of a trustee under § 1104(a)(1).  Unless administration of these cases and

9   the investigation of the prior administration of these cases is turned over to an

10  independent fiduciary who is empowered to act on his or her findings, parties in interest

11  are likely to continue to harbor questions regarding whether these cases have been

12  properly administered.

13

14          **C.  The appointment of a chapter 11 trustee is in the best interests of
           creditors and the estate.**

15      Section 1104(a)(2) of the Bankruptcy Code provides that the Court shall order

16  the appointment of a trustee "if such appointment is in the interests of creditors...and

17  other interests of the estate...."  This subsection of § 1104 is a flexible standard that

18  emphasizes the court's broad equity powers to engage in a cost-benefit analysis in

19  making the decision whether to appoint a trustee based on what is in the best interests

20  of creditors and other interests of the estate.

21      The benefits of a trustee appointment in this case are obvious.  A trustee will

22  clear the air by conducting an independent, fair, thorough and expeditious investigation

23  of the prior administration of these cases.  If it appears that the estates has causes of

24  action arising from that administration, those causes of action could be assigned to a

25  litigation trust so that confirmation of a plan and distributions to creditors will not be

26  unnecessarily delayed.

27

28  Amended Motion By UST For
    Appointment Of  Ch. 11 Tee                    11

1    Certain parties have suggested that another law firm could take over for PW, and

2    that the proposed plan of reorganization could be confirmed.  Unfortunately, however,

3    this quick fix will not work in these cases.  Even if new counsel were engaged, this

4    Court could not now approve a disclosure statement until a thorough investigation of all

5    allegations – presumably by an examiner – had been concluded.  If the examiner found

6    compelling evidence of debtor misconduct or other grounds for appointment of a

7    trustee, the process would be even longer, more drawn out, and more expensive.

8    While the cost of a trustee appointment is not irrelevant to the analysis under

9    § 1104(a)(2), this issue should not receive great weight in these cases.  First, if a new

10    law firm replaces PW, that firm will have a learning curve whether it represents the

11    Debtors in the guise of Mr. Smith or a trustee.  Second, a trustee could certainly choose

12    to continue to employ Mr. Smith or Ms. Salvucci on mutually agreeable terms to assure

13    that the Debtors' books and records are preserved to provide the trustee with necessary

14    information.  Third, the circumstances of this case require an independent investigation,

15    and the appointment of an examiner to perform such an investigation would be

16    mandatory under 11 U.S.C. § 1104(c)(2).[3]  Finally, while Committee counsel has acted

17    expeditiously, and aggressively in seeking to perform the investigation ordered by this

18    Court, his investigation is still preliminary, and he could easily bring a trustee and

19    trustee counsel up to date so that the benefits of his investigation and insights would

20    not be lost to the estates.

21    Therefore, based on the interests of creditors and the other interests of the

22    estate, including the paramount interest of ensuring the integrity of the system, this

23    Court should order the appointment of a chapter 11 trustee.

24

25

26    [3]    The appointment of an examiner is mandatory because the Debtors have more
       than five million dollars in unsecured bond debt.  11 U.S.C. § 1104(c)(2).

27

28

1

### III.  CONCLUSION

2      Based on the foregoing, the UST requests this Court order the appointment of a

3  chapter 11 trustee in these cases pursuant to 11 U.S.C. § 1104(a).

4

Dated:  February 27, 2007                    Respectfully submitted,

5

6                                              _____/s/ Nanette Dumas_____
                                               Nanette Dumas
7                                              Attorney for United States Trustee

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Motion By UST For
Appointment Of  Ch. 11 Tee                    13

# EXHIBIT 5

1  FRANK A. MEROLA (136934)
   K. JOHN SHAFFER (153729)
2  GINA NAJOLIA (222067)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:    (310) 228-5600
   Facsimile:    (310) 228-5788
5
   WILLIAM McGRANE (057767)
6  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
7  One Ferry Building, Suite 220
   San Francisco, CA 94111
8  Telephone:    (415) 283-1776
   Facsimile:    (415) 283-1777
9
   Counsel for SonicBlue Claims, LLC
10

11              UNITED STATES BANKRUPTCY COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                      SAN JOSE DIVISION

14
   In re:                                  | Case No. 03-51775
15
   SONICBLUE INCORPORATED, a               | Chapter 11
16 Delaware corporation; DIAMOND
   MULTIMEDIA SYSTEMS, INC., a             | SONICBLUE CLAIMS, LLC'S MOTION
17 Delaware corporation; REPLAYTV, INC.,   | TO CONVERT TO CHAPTER 7
   a Delaware corporation, and SENSORY
18 SCIENCE CORPORATION, a Delaware         | Date:   March 19, 2007
   corporation,                            | Time:   10:30 a.m.
19                                         | Place:  Courtroom 3070
20         Debtors and Debtors-in-Possession|         280 South First Street
21                                         |         San Jose, CA 95113
                                           |         Hon.  Marilyn Morgan
22

23

24

25

26

**STATEMENT OF THE CASE**

1

2          SonicBlue Claims, LLC ("SBC") concurs with the United States Trustee

3   that the Debtors can no longer remain chapter 11 debtors in possession.  The

4   appropriate action at this time, however, is not the appointment of a chapter 11

5   trustee.  Rather, this case should be converted to a chapter 7.  By this Motion, SBC

6   seeks the immediate conversion of this case to chapter 7 under Bankruptcy Code

7   section 1112(b).[1]

8          The chapter 11 process has failed in this case.  The Debtors, the Creditors'

9   Committee, and their professionals have failed to protect the interests of the

10  estates.  They have failed to put the interests of creditors above their own, and they

11  have failed to fulfill their fiduciary obligations.

12         It cannot be disputed that Pillsbury has a material, actual conflict of interest

13  vis-à-vis the three "senior" noteholders (the "Three Noteholder Committee

14  Members"), a conflict which it failed to disclose at the beginning of the case, and

15  which it failed to disclose again when counsel for the Three Noteholder

16  Committee Members demanded to be indemnified and made clear their intention

17  to sue Pillsbury if the Debtors objected to their claims.  The Three Noteholder

18  Committee Members stand to receive nearly 2/3 of all consideration to be

19  distributed under the plan jointly proposed by the Creditors' Committee and the

20  Debtors, and they control a majority of the votes of the active Committee

21  members.  Pillsbury's failure to disclose is, to say the least, absolutely shocking.

22

23

---

[1]    In the interests of brevity, SBC will not repeat all of the points raised in its prior submissions with the Court, including its Response to the Preliminary Status Report filed by Mr. Bender [Docket Number 2144] and its Supplemental Response to the Preliminary Status Report filed by Mr. Bender [Docket Number 2146].  SBC incorporates those points herein by reference.  SBC hereby requests that the Court take judicial notice of all references to the Court's docket made herein.

1    No one is willing to admit, however, that **Pillsbury did not act alone**.

2  Counsel for the Creditors' Committee knew all about Pillsbury's debilitating

3  conflict for many months, and yet said nothing to this Court or creditors.  Counsel

4  for the Committee personally signed a disclosure statement on December 15, 2006

5  (three months after the Three Noteholder Committee Members wrote their letter),

6  and yet provided no meaningful disclosure of the extent or nature of Pillsbury's

7  conflict.[2]  The simple fact is that Pillsbury could not have concealed its conflict for

8  so long, but for its willing accomplices on – and representing – the Creditors'

9  Committee.  It wasn't just Pillsbury that failed the chapter 11 process – it is every

10  so-called "fiduciary" who failed to speak up and disclose the inconvenient truth

11  that Pillsbury had to go.  How can the Court or creditors ever rely upon these

12  "fiduciaries" again in this case?  They cannot.

13    The appointment of a trustee is essential in this case.  The only question is

14  which kind – a chapter 7 trustee, or a chapter 11 trustee.  SBC submits that a

15  chapter 7 trustee is by far the best alternative for creditors because:

16  1.    **There is nothing to reorganize in chapter 11.**  The Debtors admit that

17    "Substantially all of the Debtors' Assets have already been sold and

18    reduced to Cash."[3]  The Debtors have had no business operations or

19

20

---

21  [2]  The sole "disclosure" – buried on page 22 of the single-spaced Disclosure
    Statement, was that "as a result of a conflict that has been asserted by the
22    Senior Noteholders with respect to counsel to the Debtors, the Creditors'
    Committee is now in charge of analyzing the Senior Notes Claims."
23    Disclosure Statement Describing Liquidating Plan of Reorganization Dated as
    of December 15, 2006 Proposed Jointly by Debtors and Creditors' Committee
24    [Docket Number 2047] at 22.

25  [3]  Disclosure Statement Describing First Amended Liquidating Plan of
    Reorganization Dated as of January 18, 2007 Proposed Jointly by Debtors and
26    Creditors' Committee [Docket Number 2101] ("First Amended Disclosure
    Statement") at 5.

---

1    employees since April, 2003 – nearly four years ago.[4]  There are no jobs to

2    save, customers to protect, or reorganization value to preserve.  There is

3    only a pot of money and litigation claims.  This is a liquidation, and chapter

4    7 is best designed for most liquidations, including this one.

5    2.    **There is no need for a chapter 11 plan.**  The plan proposed jointly by the

6    Creditors' Committee and the Debtors is "a plan of liquidation for the

7    Debtors."[5]  It purports to distribute assets to creditors in the same priority as

8    they would receive distributions in a chapter 7 liquidation.  Yet, it is also

9    loaded with other, highly questionable provisions, including

10    indemnifications, exculpations, and releases for, among others, insiders,

11    professionals, and the Three Noteholder Committee Members.[6]  It would be

12    far more efficient to avoid litigation over these controversial plan

13    provisions, and to simply distribute the estate's assets pursuant to

14    Bankruptcy Code section 726.

15    3.    **The Creditors' Committee must be disbanded.**  The appointment of a

16    chapter 11 trustee would not guaranty the disbanding of the current

17    Creditors' Committee.  That would be a tragic mistake.  The Creditors'

18    Committee has failed in its obligations to protect the interests of creditors.

19    Counsel for the Committee admits that the only members of the Committee

20    _____

21    [4]    First Amended Disclosure Statement at 20, 23.

22    [5]    First Amended Disclosure Statement at 5.

23    [6]    *See, e.g.*, First Amended Disclosure Statement at 58 (limiting the liability of
24    the Debtors, the Creditors' Committee, their members and professionals, the
       Three Noteholder Committee Members, U.S. Bank, and others); *id.*
25    (indemnifying the same parties); *id.* at 51 (limiting the liability of the
       Reorganized Debtor and the so-called "Plan Oversight Committee"); *id.* at 36
26    (releasing the Three Noteholder Committee Members from any future
       liabilities on account of their contractual subordination agreement).

1    who have been actively participating during the last four years are the

2    Three Noteholder Committee Members and a lawyer who represents two

3    other members.[7]  When asked by this Court, Mr. Bender could not even

4    name his other Committee members, and he represented that he "was

5    essentially a client" in evaluating the merits of the Intel/Via settlement.[8]

6    And, as discussed above, the Creditors' Committee was fully aware of

7    Pillsbury's debilitating conflict, and yet it failed to bring the conflict to the

8    attention of the Court.

9    4.    **There are no "clients" representing the interests of the estate.**  This case

10        is being run for the benefit of professionals, not the estate.  More than ***$9***

11        ***million*** already have been paid to chapter 11 professionals in this case.[9]

12        The Debtor's "responsible individual," Marcus Smith, has had three other,

13        full-time jobs as officers of different companies during the last four years,

14        as detailed in the U.S. Trustee's trustee motion.  The Creditors' Committee,

15        likewise, is being driven by three members whose primary interest is

16        thwarting any effort to object to their disputed claims, and who are the

17        direct beneficiaries of the undisclosed release in the Via/Intel settlement.

18            If Mr. Smith has important information that a trustee would need to

19        complete the administration of the estate, then a trustee could choose to hire

20        Mr. Smith on some form of consulting basis.  Mr. Smith, however, has not

21        been – and should not be – the ultimate decision maker in an estate with

22

23    _____

24    [7]  Transcript of January 23, 2007 [Docket Number 2136] ("January 23
         Transcript") at 5-6.

25    [8]  January 23 Transcript at 10.

26    [9]  *See* First Amended Disclosure Statement at 44-45.

_____

1     more than $70 million in cash, and in a case where serious breaches of duty

2     have already occurred.

3   5.     **Serious breaches of duty have occurred in this case.**  Full and complete

4          disclosure is one of the most essential duties of any chapter 11 fiduciary.

5          The Debtors, the Creditors' Committee, and their professionals have failed

6          in fulfilling that duty.  In addition to the extremely serious failures by

7          Pillsbury and the Creditors' Committee to disclose Pillsbury's debilitating

8          conflict, the following, additional failures raise very serious concerns:

9          a.     The Creditors' Committee and the Debtors failed to disclose

10         anywhere in their joint Disclosure Statement that Marcus Smith – the

11         "responsible individual" – is being sued by creditors for breach of

12         fiduciary duty for his role in the Debtors' issuance of the notes to the

13         Three Noteholder Committee Members.[10]  As alleged in the creditors'

14         complaint, Mr. Smith and the other defendants "violated their fiduciary

15         duties of care, loyalty, candor and independence" owed to the creditors

16         by, among other things, entering into the financing transaction with the

17         Three Noteholder Committee Members "without regard to the fairness of

18         the emergency debt financing" and "without a responsible plan for the

19         repayment of plaintiffs' debt."[11]  Regardless of what the merits of this suit

20         may be, no one could honestly argue that the suit's existence did not have

21         to be disclosed when Mr. Smith is the sole, "responsible individual" for

22         the Debtors.  Yet, there is not a mention of this suit anywhere in the

23

24

25

26

[10]   *WM Trust High Yield Fund, et al. v. Potashner, et al*, Adv. No. 05-5338-MM.

[11]   Adv. No. 05-5338-MM, Docket No. 1, Exhibit "A" at 8.

411903v.2

1    Creditors' Committee's and Debtors' joint Disclosure Statement.  Why

2    isn't there?

3    b.    Moreover, Pillsbury deceived the Court and creditors by

4    representing in its fee application that the lawsuit against Mr. Smith was

5    only against "certain former directors and officers of SONICblue."[12]

6    Pillsbury failed to mention that Marcus Smith was a named defendant in

7    the suit.  Moreover, Mr. Smith executed a Declaration in support of this

8    Pillsbury fee application, in which he identified himself as the Debtor's

9    "Chief Financial Officer."  He did not, however, correct Pillsbury's

10   misstatement about the nature of the litigation.  Pillsbury – in its role as

11   counsel to the *estate* – has already incurred more than $100,000 in fees,

12   by, among other things, objecting to a subpoena for documents by the

13   plaintiffs in that action.[13]  Finally, nowhere has it been disclosed that Mr.

14   Smith's personal counsel in this litigation is the Palo Alto office of

15   Gibson, Dunn & Crutcher, the same office of the same firm that

16   represents Intel in its litigation against the estate.

17   c.    The Disclosure Statement does acknowledge that the Creditors'

18   Committee had taken over the task of objecting to the Three Noteholder

19   Committee Members' claims.  Nowhere in the Disclosure Statement,

20   however, is there any disclosure of the fact that the Three Noteholder

21

22   ───────────────

[12]   Seventh Interim Application of Pillsbury Winthrop Shaw Pittman LLP for

23   Allowance of Compensation for Services Rendered and Reimbursement of
     Expenses Incurred from October 1, 2005 Through and Including March 31,

24   2006 [Docket No. 1777] ("Seventh Pillsbury Application") at 21.

25   [13]   *See* Seventh Pillsbury Application; Eighth Interim Application of Pillsbury
     Winthrop Shaw Pittman LLP for Allowance of Compensation for Services

26   Rendered and Reimbursement of Expenses Incurred from April 1, 2006
     Through and Including September 30, 2006 [Docket No. 1966].

1    Committee Members were, in fact, members of the Creditors' Committee

2    (not to mention the fact that their three votes constituted an ***effective***

3    ***majority*** of the Committee).  Surely, any reasonable person would

4    consider the fact that Levene Neale was employed by the Creditors'

5    Committee by a vote of the Three Noteholder Committee Members, and

6    that Levene Neale had worked closely with the Three Noteholder

7    Committee Members for nearly four years, to be highly relevant to

8    whether Levene Neale should be the firm entrusted with objecting to the

9    Three Noteholder Committee Members' claims.

10        d.     Neither the Debtors nor the Creditors' Committee disclosed that the

11    Via/Intel settlement contained a release of any obligations that the Three

12    Noteholder Committee Members might have to Via pursuant to the terms

13    of the 2002 Indenture.  The 2002 Indenture provides that the claims of the

14    Three Noteholder Committee Members are subordinated to "all

15    indebtedness of the Company due and owing to Via Technologies, Inc. in

16    an aggregate principal amount not to exceed $15,000,000."[14]  Some

17    parties have contended that Via's claims would not qualify as

18    "indebtedness" under this definition.  SBC disputes that contention, but

19    what is most significant now is why did no one disclose this provision to

20    the Court or creditors.

21        The Via/Intel settlement was executed less than a month after the

22    Three Noteholder Committee Members threatened to sue Pillsbury,

23    asserting that Pillsbury would have to pay to the Three Noteholder

24    Committee Members every cent that they did not get paid in this case.

25    _____

26    [14]  *See* Objection to Joint Disclosure Statement filed by Riverside Contracting,
        LLC and Riverside Claims, LLC [Docket Number 2091] at 3-4.

1   Both Pillsbury and the Creditors' Committee were aware of that threat, so

2   both should have been particularly concerned about the effects of any

3   provisions in the settlement that could affect the noteholders' ultimate

4   recovery in this case.  Most certainly, they should have disclosed that

5   those provisions existed.

6   Counsel for the Creditors' Committee represented to this Court at

7   the January 23, 2007 hearing that his firm had played a very "limited

8   role" in the negotiation and drafting of the Via/Intel settlement

9   agreement.[15]  Levene Neale's fee application, however, says something

10   very different – "LNBRB played a material role in negotiating and

11   documenting the settlement."[16]  The truth, unfortunately, may never be

12   known.  However, Mr. Bender admits that he read the settlement

13   agreement and approved it, but he has failed to explain why he did not

14   inquire as to what benefit his own Three Noteholder Committee Members

15   were getting from the provision that referred directly to a waiver of

16   "senior indebtedness" status under the 2002 Indenture.

17   The chapter 11 process has failed in this case.  Immediate conversion is

18   necessary to protect creditors' rights, to investigate the failures of the four years

19   that this case languished in chapter 11, and to bring this case to a timely

20   conclusion.

21

22

23

24   [15]   January 23 Transcript at 9.

25   [16]   Seventh Interim Application of Levene, Neale, Bender, Rankin & Brill L.L.P.
        for Approval of Fees and Reimbursement of Expenses [Docket Number 1969],

26        at 3.

1

**ARGUMENT**

2     Bankruptcy Code section 1112(b) provides that "the court may convert a

3  case under [chapter 11] to a case under chapter 7 or may dismiss a case under

4  [chapter 11], whichever is in the best interest of creditors and the estate, for cause .

5  . . ." "Cause" includes, among other things, a "continuing loss to or diminution of

6  the estate and absence of a reasonable likelihood of rehabilitation" and

7  "unreasonable delay by the debtor that is prejudicial to creditors."  Moreover,

8  "cause" may include any other reason that makes conversion to chapter 7 more

9  beneficial to creditors than remaining in chapter 11.  *See Wiersma v. O.H. Kruse*

10  *Grain & Milling (In re Wiersma)*, 324 B.R. 92, 114 (9th Cir. BAP 2005) (holding

11  that "cause" as used in section 1112(b) is "nonexclusive").

12     Cause in this case includes breach of fiduciary duty by both the Debtors

13  and the Creditors' Committee – both of which have stood silent while Pillsbury

14  failed to disclose its own, material conflicts, and which also failed to insist upon

15  disclosure of the litigation against Marcus Smith or of the improper release of the

16  Three Noteholder Committee Members in the Via/Intel settlement.  *See In re Sal*

17  *Caruso Cheese, Inc.*, 107 B.R. 808, 818 (Bankr. N.D.N.Y. 1989) (conversion is

18  warranted where debtor's pre and postpetition misconduct convinced court that the

19  appointment of an independent trustee was warranted to objectively determine the

20  "affairs of the estate" and to "begin to maximize its value for the benefit of [the

21  debtor's creditors]") (citation omitted); *In re W.J. Rewoldt Co.*, 22 B.R. 459, 462

22  (Bankr. E.D. Mich. 1982) (conversion warranted where debtor had failed to

23  properly perform fiduciary duties) (citation omitted).

24     Moreover, the fact that the Debtors have "nothing to reorganize" constitutes

25  "cause" for conversion.  *In re Blue Mountain Invest., Inc.*, 1991 U.S. Dist. LEXIS

26  4324  *8 (D. Kansas March 21, 1991).  "The existence of an ongoing business is

1   an inherent requirement for relief under chapter 11." *Id.* (citing *In re Winshall*

2   *Settlor's Trust*, 758 F.2d 1126, 1137 (6th Cir. 1985):

3        the estate will be needlessly diminished in value if the case continues
    in chapter 11.  By its nature, chapter 11 is administratively more
4        expensive and less efficient than chapter 7.  In this case, there is no
    evidence whatever [that the debtors] have a business with any
5        prospect of a positive cash flow.  There is, in other words, simply
    nothing here to reorganize.  Creditors, meanwhile, will be paid more
6        quickly with less expense if the estate is quickly liquidated.

7   *In re Del Monico*, 2005 Bankr. LEXIS 840 *9-10 (Bankr. N.D. Ill. May 13, 2005);

8   *see also In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993) (holding

9   that "where there is not continuing revenue-generating activity the best interests of

10  creditors and the estate favor conversion").

11  **CONCLUSION**

12       Momentous changes are both necessary and already underway in this

13  bankruptcy case.  Losing Pillsbury, for example, though made inescapable for the

14  sake of the system by virtue of their egregious misconduct, will be devastating

15  from a learning curve/transition standpoint for Pillsbury's replacement counsel.

16       This bankruptcy case needs no Creditors' Committees, Plans of

17  Reorganization or other fancy paraphernalia.  None of them have benefitted

18  anybody but the various defalcating professionals who have caused this mess.  The

19  best that can be done under such difficult circumstances is to have "a new broom

20  sweep clean", appoint a Chapter 7 trustee and let the ordinary processes of the

21  bankruptcy system do their job.

22  Dated:  February 27, 2007.       STUTMAN, TREISTER & GLATT PC
23                      McGRANE GREENFIELD LLP

24

25                      By    /s/ K. John Shaffer
26                          K. John Shaffer
                        Attorneys for SonicBlue Claims, LLC

EXHIBIT 6

1   FRANK A. MEROLA (136934)
    K. JOHN SHAFFER (153729)
2   GINA NAJOLIA (222067)
    STUTMAN, TREISTER & GLATT PC
3   1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
4   Telephone:   (310) 228-5600
    Facsimile:    (310) 228-5788
5
    WILLIAM McGRANE (057767)
6   BERNARD S. GREENFIELD (066017)
    McGRANE GREENFIELD LLP
7   One Ferry Building, Suite 220
    San Francisco, CA 94111
8   Telephone:   (415) 283-1776
    Facsimile:    (415) 283-1777
9
    Counsel for SonicBlue Claims, LLC
10

11           UNITED STATES BANKRUPTCY COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13               SAN JOSE DIVISION

14

| | |
|---|---|
| In re: | Case No. 03-51775 |
| SONICBLUE INCORPORATED, a Delaware corporation; DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation; REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, | Chapter 11 |
| | [AMENDED] SONICBLUE CLAIMS, LLC'S MOTION TO CONVERT TO CHAPTER 7 |
| Debtors and Debtors-in-Possession | Date:  March 19, 2007<br>Time:  10:30 a.m.<br>Place:  Courtroom 3070<br>       280 South First Street<br>       San Jose, CA 95113<br>       Hon.  Marilyn Morgan |

1

# TABLE OF CONTENTS

2

3

STATEMENT OF THE CASE ................................................................ 1

ARGUMENT .................................................................................. 10

CONCLUSION ............................................................................... 12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

## TABLE OF AUTHORITIES

2

3

4

**Cases**

5

*In re Blue Mountain Invest., Inc.*, 1991 U.S. Dist. LEXIS 4324 *8 (D. Kansas
6     March 21, 1991) ................................................. 11

*In re Del Monico*, 2005 Bankr. LEXIS 840 *9-10 (Bankr. N.D. Ill. May 13, 2005)
7     ............................................................. 12

8    *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 818 (Bankr. N.D.N.Y. 1989) ......... 11

9    *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993) ........... 12

10   *In re W.J. Rewoldt Co.*, 22 B.R. 459, 462 (Bankr. E.D. Mich. 1982).................... 11

*Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma)*, 324 B.R. 92, 114 (9th
11     Cir. BAP 2005) ................................................ 10

12   *WM Trust High Yield Fund, et al. v. Potashner, et al*, Adv. No. 05-5338-MM. ..... 6

13   **Statutes**

14   11 U.S.C. section 726 .................................................... 3

15   11 U.S.C. section 1112(b) ............................................ 1, 10

16

17

18

19

20

21

22

23

24

25

26

# STATEMENT OF THE CASE

1

2     SonicBlue Claims, LLC ("SBC") concurs with the United States Trustee

3  that the Debtors can no longer remain chapter 11 debtors in possession.  The

4  appropriate action at this time, however, is not the appointment of a chapter 11

5  trustee.  Rather, this case should be converted to a chapter 7.  By this Motion, SBC

6  seeks the immediate conversion of this case to chapter 7 under Bankruptcy Code

7  section 1112(b).[1]

8     The chapter 11 process has failed in this case.  The Debtors, the Creditors'

9  Committee, and their professionals have failed to protect the interests of the

10  estates.  They have failed to put the interests of creditors above their own, and they

11  have failed to fulfill their fiduciary obligations.

12     It cannot be disputed that Pillsbury has a material, actual conflict of interest

13  vis-à-vis the three "senior" noteholders (the "Three Noteholder Committee

14  Members"), a conflict which it failed to disclose at the beginning of the case, and

15  which it failed to disclose again when counsel for the Three Noteholder

16  Committee Members demanded to be indemnified and made clear their intention

17  to sue Pillsbury if the Debtors objected to their claims.  The Three Noteholder

18  Committee Members stand to receive nearly 2/3 of all consideration to be

19  distributed under the plan jointly proposed by the Creditors' Committee and the

20  Debtors, and they control a majority of the votes of the active Committee

21  members.  Pillsbury's failure to disclose is, to say the least, absolutely shocking.

22

23  _____

24  [1]    In the interests of brevity, SBC will not repeat all of the points raised in its
    prior submissions with the Court, including its Response to the Preliminary
    Status Report filed by Mr. Bender [Docket Number 2144] and its Supplemental

25  Response to the Preliminary Status Report filed by Mr. Bender [Docket
    Number 2146].  SBC incorporates those points herein by reference.  SBC

26  hereby requests that the Court take judicial notice of all references to the
    Court's docket made herein.

1    No one is willing to admit, however, that **Pillsbury did not act alone**.

2    Counsel for the Creditors' Committee knew all about Pillsbury's debilitating

3    conflict for many months, and yet said nothing to this Court or creditors.  Counsel

4    for the Committee personally signed a disclosure statement on December 15, 2006

5    (three months after the Three Noteholder Committee Members wrote their letter),

6    and yet provided no meaningful disclosure of the extent or nature of Pillsbury's

7    conflict.[2]  The simple fact is that Pillsbury could not have concealed its conflict for

8    so long, but for its willing accomplices on – and representing – the Creditors'

9    Committee.  It wasn't just Pillsbury that failed the chapter 11 process – it is every

10   so-called "fiduciary" who failed to speak up and disclose the inconvenient truth

11   that Pillsbury had to go.  How can the Court or creditors ever rely upon these

12   "fiduciaries" again in this case?  They cannot.

13   The appointment of a trustee is essential in this case.  The only question is

14   which kind – a chapter 7 trustee, or a chapter 11 trustee.  SBC submits that a

15   chapter 7 trustee is by far the best alternative for creditors because:

16   1.    **There is nothing to reorganize in chapter 11.**  The Debtors and the

17   Creditors' Committee both admit that "Substantially all of the Debtors'

18   Assets have already been sold and reduced to Cash."[3]  The Debtors have

19   had no business operations or employees since April, 2003 – nearly four

20

21   [2]   The sole "disclosure" – buried on page 22 of the single-spaced Disclosure
     Statement – was that "as a result of a conflict that has been asserted by the

22   Senior Noteholders with respect to counsel to the Debtors, the Creditors'
     Committee is now in charge of analyzing the Senior Notes Claims."

23   Disclosure Statement Describing Liquidating Plan of Reorganization Dated as
     of December 15, 2006 Proposed Jointly by Debtors and Creditors' Committee

24   [Docket Number 2047] at 22.

25   [3]   Disclosure Statement Describing First Amended Liquidating Plan of
     Reorganization Dated as of January 18, 2007 Proposed Jointly by Debtors and

26   Creditors' Committee [Docket Number 2101] ("First Amended Disclosure
     Statement") at 5.

1    years ago.[4]  There are no jobs to save, customers to protect, or

2    reorganization value to preserve.  There is only a pot of money and

3    litigation claims.  This is a liquidation, and chapter 7 is best designed for

4    most liquidations, including this one.

5    2.    **There is no need for a chapter 11 plan.**  The plan proposed jointly by the

6    Creditors' Committee and the Debtors is "a plan of liquidation for the

7    Debtors."[5]  It purports to distribute assets to creditors in the same priority as

8    they would receive distributions in a chapter 7 liquidation.  Yet, it is also

9    loaded with other, highly questionable provisions, including

10   indemnifications, exculpations, and releases for, among others, insiders,

11   professionals, and the Three Noteholder Committee Members.[6]  It would be

12   far more efficient to avoid litigation over these controversial plan

13   provisions, and to simply distribute the estate's assets pursuant to

14   Bankruptcy Code section 726.

15   3.    **The Creditors' Committee must be disbanded.**  The appointment of a

16   chapter 11 trustee would not guaranty the disbanding of the current

17   Creditors' Committee.  That would be a tragic mistake.  The Creditors'

18   Committee has failed in its obligations to protect the interests of creditors.

19   Counsel for the Committee admits that the only members of the Committee

20

---

21   [4]  First Amended Disclosure Statement at 20, 23.

22   [5]  First Amended Disclosure Statement at 5.

23   [6]  *See, e.g.*, First Amended Disclosure Statement at 58 (limiting the liability of
24   the Debtors, the Creditors' Committee, their members and professionals, the
     Three Noteholder Committee Members, U.S. Bank, and others); *id.*
25   (indemnifying the same parties); *id.* at 51 (limiting the liability of the
     Reorganized Debtor and the so-called "Plan Oversight Committee"); *id.* at 36
26   (releasing the Three Noteholder Committee Members from any future
     liabilities on account of their contractual subordination agreement).

1  who have been actively participating during the last four years are the

2  Three Noteholder Committee Members and a lawyer who represents two

3  other members.[7]  When asked by this Court, Mr. Bender could not even

4  name his other Committee members, and he represented that he "was

5  essentially a client" in evaluating the merits of the Intel/Via settlement.[8]

6  Moreover, the Creditors' Committee was fully aware of Pillsbury's

7  debilitating conflict for many months, and yet it failed to bring the conflict

8  to the attention of the Court.[9]  Why would the Committee – a fiduciary

9  representing the interests of creditors in this case – not blow the whistle on

10  Pillsbury when Pillsbury failed to acknowledge its own conflict?  The

11  answer is simple – Pillsbury was sharing hundreds of thousands of dollars

12  of work in this case with Committee counsel.  As acknowledged by

13  Committee counsel at the January 23 hearing, "my firm and the Pillsbury

14  firm split [the preference] work up."[10]  Moreover, Pillsbury gave

15  Committee counsel "the lead role in preparing a joint plan of reorganization

16  and disclosure statement."[11]  And, when Pillsbury turned over the task of

17  investigating the Three Noteholder Committee Members' claims to Levene

18

19  _____

20  [7]  Transcript of January 23, 2007 [Docket Number 2136] ("January 23 Transcript") at 5-6.

21

22  [8]  January 23 Transcript at 10.

23  [9]  Declaration of Ron Bender, Esq. in Support of his Submission of Preliminary Status Report [etc.] [Docket Number 2138] ("Bender Declaration") at 6 (stating that Bruce Bennett, counsel for the Three Noteholder Committee

24  Members, had personally informed Mr. Bender of his clients' threats to sue Pillsbury).

25

26  [10]  January 23 Transcript at 6.

[11]  Bender Declaration at 4.

1    Neale, it enabled Committee counsel to bill "an enormous amount of time"

2    to that task.[12]  In short, Pillsbury has been very, very good to Committee

3    counsel.

4    4.    **There are no "clients" representing the interests of the estate.**  This case

5    is being run for the benefit of professionals, not the estate.  More than ***$9***

6    ***million*** already have been paid to chapter 11 professionals in this case.[13]

7    The Debtor's "responsible individual," Marcus Smith, has had three other,

8    full-time jobs as officers of different companies during the last four years,

9    as detailed in the U.S. Trustee's trustee motion.  The Creditors' Committee,

10    likewise, is being driven by three members whose primary interest is

11    thwarting any effort to object to their disputed claims, and who are the

12    direct beneficiaries of the undisclosed release in the Via/Intel settlement.

13    If Mr. Smith has important information that a trustee would need to

14    complete the administration of the estate, then a trustee could choose to hire

15    Mr. Smith on some form of consulting basis.  Mr. Smith, however, has not

16    been – and should not be – the ultimate decision maker in an estate with

17    more than $70 million in cash, and in a case where serious breaches of duty

18    have already occurred.

19    The term "responsible individual" is not just some catchy title you

20    can put on a resume or business card.  It means a person who is, in fact,

21    "responsible" for the administration of the chapter 11 estate.  It is the price

22    of being a debtor-in-possession – an enormous privilege and an even more

23    enormous responsibility.  The buck must stop with Mr. Smith, and he must

24

25    _____

26    [12]  Bender Declaration at 11.

[13]  *See* First Amended Disclosure Statement at 44-45.

1    accept responsibility for the breaches of duty in this case by his own

2    professionals, as well as the other failures to disclose material facts in the

3    Disclosure Statement that he signed, as discussed further below.

4    5.    **Serious breaches of duty have occurred in this case.**  Full and complete

5    disclosure is one of the most essential duties of any chapter 11 fiduciary.

6    The Debtors, the Creditors' Committee, and their professionals have failed

7    in fulfilling that duty.  In addition to the extremely serious failures by

8    Pillsbury and the Creditors' Committee to disclose Pillsbury's debilitating

9    conflict, the following, additional failures raise very serious concerns:

10    a.    The Creditors' Committee and the Debtors failed to disclose

11    anywhere in their joint Disclosure Statement that Marcus Smith – the

12    "responsible individual" – is being sued by creditors for breach of

13    fiduciary duty for his role in the Debtors' issuance of the notes to the

14    Three Noteholder Committee Members.[14]  As alleged in the creditors'

15    complaint, Mr. Smith and the other defendants "violated their fiduciary

16    duties of care, loyalty, candor and independence" owed to the creditors

17    by, among other things, entering into the financing transaction with the

18    Three Noteholder Committee Members "without regard to the fairness of

19    the emergency debt financing" and "without a responsible plan for the

20    repayment of plaintiffs' debt."[15]  Regardless of what the merits of this suit

21    may be, no one could honestly argue that the suit's existence did not have

22    to be disclosed when Mr. Smith is the sole, "responsible individual" for

23    the Debtors.  Yet, there is not a mention of this suit anywhere in the

24

25    _____

26    [14]  *WM Trust High Yield Fund, et al. v. Potashner, et al*, Adv. No. 05-5338-MM.

[15]  Adv. No. 05-5338-MM, Docket No. 1, Exhibit "A" at 8.

1    Creditors' Committee's and Debtors' joint Disclosure Statement.  Why

2    isn't there?  Why didn't Mr. Smith, who personally signed the Disclosure

3    Statement, insist on this disclosure?

4    b.    Moreover, Pillsbury deceived the Court and creditors by

5    representing in its fee application that the lawsuit against Mr. Smith was

6    only against "certain former directors and officers of SONICblue."[16]

7    Pillsbury failed to mention that Marcus Smith was a named defendant in

8    the suit.  Moreover, Mr. Smith executed a Declaration in support of this

9    Pillsbury fee application, in which he identified himself as the Debtor's

10   "Chief Financial Officer."  He did not, however, correct Pillsbury's

11   misstatement about the nature of the litigation.  Pillsbury – in its role as

12   counsel to the *estate* – has already incurred more than $100,000 in fees,

13   by, among other things, objecting to a subpoena for documents by the

14   plaintiffs in that action.[17]  Finally, nowhere has it been disclosed that Mr.

15   Smith's personal counsel in this litigation is the Palo Alto office of

16   Gibson, Dunn & Crutcher, the same office of the same firm that

17   represents Intel in its litigation against the estate.

18   c.    The Disclosure Statement does acknowledge that the Creditors'

19   Committee had taken over the task of objecting to the Three Noteholder

20   Committee Members' claims.  Nowhere in the Disclosure Statement,

21

22   ――――――――――――――

[16]  Seventh Interim Application of Pillsbury Winthrop Shaw Pittman LLP for
23   Allowance of Compensation for Services Rendered and Reimbursement of
     Expenses Incurred from October 1, 2005 Through and Including March 31,
24   2006 [Docket No. 1777] ("Seventh Pillsbury Application") at 21.

25   [17]  *See* Seventh Pillsbury Application; Eighth Interim Application of Pillsbury
     Winthrop Shaw Pittman LLP for Allowance of Compensation for Services
26   Rendered and Reimbursement of Expenses Incurred from April 1, 2006
     Through and Including September 30, 2006 [Docket No. 1966].

1  however, is there any disclosure of the fact that the Three Noteholder

2  Committee Members were, in fact, members of the Creditors' Committee

3  (not to mention the fact that their three votes constituted an *effective*

4  *majority* of the Committee).  Surely, any reasonable person would

5  consider the fact that Levene Neale was employed by the Creditors'

6  Committee by a vote of the Three Noteholder Committee Members, and

7  that Levene Neale had worked closely with the Three Noteholder

8  Committee Members for nearly four years, to be highly relevant to

9  whether Levene Neale should be the firm entrusted with objecting to the

10  Three Noteholder Committee Members' claims.

11  d.  Neither the Debtors nor the Creditors' Committee disclosed that the

12  Via/Intel settlement contained a release of any obligations that the Three

13  Noteholder Committee Members might have to Via pursuant to the terms

14  of the 2002 Indenture.  The 2002 Indenture provides that the claims of the

15  Three Noteholder Committee Members are subordinated to "all

16  indebtedness of the Company due and owing to Via Technologies, Inc. in

17  an aggregate principal amount not to exceed $15,000,000."[18]  Some

18  parties have contended that Via's claims would not qualify as

19  "indebtedness" under this definition.  SBC disputes that contention, but

20  what is most significant now is why did no one disclose this provision to

21  the Court or creditors.

22  e.  The Via/Intel settlement was executed less than a month after the

23  Three Noteholder Committee Members threatened to sue Pillsbury,

24  asserting that Pillsbury would have to pay to the Three Noteholder

25  _____

26  [18] *See* Objection to Joint Disclosure Statement filed by Riverside Contracting, LLC and Riverside Claims, LLC [Docket Number 2091] at 3-4.

1    Committee Members every cent that they did not get paid in this case.

2    Both Pillsbury and the Creditors' Committee were aware of that threat, so

3    both should have been particularly concerned about the effects of any

4    provisions in the settlement that could affect the noteholders' ultimate

5    recovery in this case. Most certainly, they should have disclosed that

6    those provisions existed.

7    f.    In explaining to the Court why he did not insist on disclosure of the

8    release in the Via settlement agreement, counsel for the Creditors'

9    Committee represented that his firm had played a very "limited role" in

10    the negotiation and drafting of the Via/Intel settlement agreement.[19] In

11    his declaration, Mr. Bender stated "We [Levene Neale] were not privy to

12    the settlement discussions which resulted in the final settlement and when

13    we were first provided with a draft of the VIA/S3 settlement agreement, it

14    was presented as essentially a final document which had been thoroughly

15    negotiated by all of the parties."[20] Levene Neale's most recent fee

16    application, however, says something very different – "LNBRB played a

17    material role in negotiating and documenting the settlement."[21] Mr.

18    Bender, likewise, executed a declaration in support of that fee application

19    saying that it was truthful. Did Levene Neale play a "limited role" in

20    documenting the settlement, or a "material role"? The truth,

21    unfortunately, may never be known. However, Mr. Bender at least now

22

23    [19] January 23 Transcript at 9.

24    [20] Bender Declaration at 4.

25    [21] Seventh Interim Application of Levene, Neale, Bender, Rankin & Brill L.L.P.

26    for Approval of Fees and Reimbursement of Expenses [Docket Number 1969], at 3.

1    admits that he read the settlement agreement and approved it.[22]  He has

2    failed to explain, however, why he did not inquire as to what benefit his

3    own Three Noteholder Committee Members were getting from the

4    provision that referred directly to a waiver of "senior indebtedness" status

5    under the 2002 Indenture.  In light of the Three Noteholder Committee

6    Members' litigation threats, this should have been the first thing on his

7    mind.

8        The chapter 11 process has failed in this case.  Immediate conversion is

9    necessary to protect creditors' rights, to investigate the failures of the four years

10   that this case languished in chapter 11, and to bring this case to a timely

11   conclusion.

12                              **ARGUMENT**

13       Bankruptcy Code section 1112(b) provides that "the court may convert a

14   case under [chapter 11] to a case under chapter 7 or may dismiss a case under

15   [chapter 11], whichever is in the best interest of creditors and the estate, for cause .

16   . . ."  "Cause" includes, among other things, a "continuing loss to or diminution of

17   the estate and absence of a reasonable likelihood of rehabilitation" and

18   "unreasonable delay by the debtor that is prejudicial to creditors."  Moreover,

19   "cause" may include any other reason that makes conversion to chapter 7 more

20   beneficial to creditors than remaining in chapter 11.  *See Wiersma v. O.H. Kruse*

21   *Grain & Milling (In re Wiersma)*, 324 B.R. 92, 114 (9th Cir. BAP 2005) (holding

22   that "cause" as used in section 1112(b) is "nonexclusive").

23       Cause in this case includes breach of fiduciary duty by both the Debtors

24   and the Creditors' Committee – both of which stood silent while Pillsbury failed to

25

26   _____

[22]  January 23 Transcript at 13.

_____

1   disclose its own, material conflicts, and both which also failed to insist upon

2   disclosure of the litigation against Marcus Smith or of the improper release of the

3   Three Noteholder Committee Members in the Via/Intel settlement.  *See In re Sal*

4   *Caruso Cheese, Inc.*, 107 B.R. 808, 818 (Bankr. N.D.N.Y. 1989) (conversion is

5   warranted where debtor's pre and postpetition misconduct convinced court that the

6   appointment of an independent trustee was warranted to objectively determine the

7   "affairs of the estate" and to "begin to maximize its value for the benefit of [the

8   debtor's creditors]") (citation omitted); *In re W.J. Rewoldt Co.*, 22 B.R. 459, 462

9   (Bankr. E.D. Mich. 1982) (conversion warranted where debtor had failed to

10  properly perform fiduciary duties) (citation omitted).

11      Moreover, the fact that the Debtors have "nothing to reorganize" constitutes

12  "cause" for conversion.  *In re Blue Mountain Invest., Inc.*, 1991 U.S. Dist. LEXIS

13  4324  *8 (D. Kansas March 21, 1991).  As admitted by the Debtors and the

14  Creditors' Committee, "[s]ubstantially all of the Debtors' Assets have already

15  been sold and reduced to Cash."[23]

16      "The existence of an ongoing business is an inherent requirement for relief

17  under chapter 11."  *Id.*  Although there can be "liquidating chapter 11 cases,"

18  chapter 7 usually is a far more efficient way of dealing with a true liquidation.

19  The administrative costs of the plan confirmation process typically outweigh any

20  benefit that a plan would give in a straight liquidation, as is now the case here.  As

21  one court correctly notes:

22          the estate will be needlessly diminished in value if the case continues
            in chapter 11.  By its nature, chapter 11 is administratively more
23          expensive and less efficient than chapter 7.  In this case, there is no
            evidence whatever [that the debtors] have a business with any
24          prospect of a positive cash flow.  There is, in other words, simply

25

26  [23]  First Amended Disclosure Statement at 5.

1        nothing here to reorganize.  Creditors, meanwhile, will be paid more
         quickly with less expense if the estate is quickly liquidated.
2
*In re Del Monico*, 2005 Bankr. LEXIS 840 *9-10 (Bankr. N.D. Ill. May 13, 2005);
3
*see also In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993) (holding
4
that "where there is not continuing revenue-generating activity the best interests of
5
creditors and the estate favor conversion").
6
## CONCLUSION
7
         This Court undoubtedly will hear arguments at the March 19 hearing about
8
how "disruptive" or "expensive" appointing a trustee or converting the case might
9
be.  Any "disruption" or "expense," however, will be far less than what was
10
caused by Pillsbury operating in the face of a material, undisclosed conflict for
11
four years, or the Creditors' Committee and Mr. Smith failing to report that
12
conflict when Pillsbury failed to do so.  The Court cannot allow the chapter 11
13
professionals who created this mess to hide behind the costs of cleaning the mess
14
up.
15
         This bankruptcy case doesn't need any more of the same – a part time
16
"responsible individual" and a Creditors' Committee that have failed to act to
17
protect the integrity of the bankruptcy process.  This case doesn't need a fifty-
18
page, single-spaced plan, a "plan oversight committee," or releases and
19
exculpations for professionals and insiders.  And, the professionals who caused
20
this mess are not entitled to a mulligan – "oops, it won't happen again" doesn't
21
work here.
22

23

24

25

26

---

1    The best that can be done under such difficult circumstances is to have "a

2    new broom sweep clean," appoint a chapter 7 trustee, and complete this

3    liquidation under the provisions of chapter 7.

4    Dated:  February 27, 2007.                  STUTMAN, TREISTER & GLATT PC
                                                McGRANE GREENFIELD LLP
5

6

7                                               By    /s/ K. John Shaffer
                                                      K. John Shaffer
8                                               Attorneys for SonicBlue Claims, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT 7

Entered on Docket
March 26, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**The following constitutes
the order of the court. Signed March 26, 2007**

_Marilyn Morgan_
**Marilyn Morgan
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>**SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC., and SENSORY SCIENCE CORPORATION,**<br><br>Debtors. | Cases No. 03-51775, 03-51776, 03-51777, and 03-51778-MM<br><br>Chapter 11 cases<br>Jointly administered<br><br><br>**MEMORANDUM DECISION AND ORDER ON MOTION TO APPOINT A CHAPTER 11 TRUSTEE, MOTION TO CONVERT CASE, AND MOTION TO DISQUALIFY PILLSBURY WINTHROP SHAW PITTMAN LLP AND FOR DISGORGEMENT OF ATTORNEYS' FEES** |

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

## INTRODUCTION

When claims traders entered this case and started asking hard questions, circumstances came to light that implicated at least debtor's counsel, committee counsel and certain members of the committee, and resulted in the complete breakdown of creditor confidence. The genesis of the problem arose from the pre-petition issuance of an opinion letter, undisclosed by debtor's counsel, assuring payment to certain bondholders who effectively controlled the creditors' committee. Years later, when debtor's counsel objected to these bondholders' claims because of an original issue discount approximating $43

1

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   million, the bondholders demanded indemnification from the law firm.  The problem was compounded

2   when debtor's counsel attempted to solve its disabling conflict by "handing off" these claims objections

3   to committee counsel, who accepted the awkward assignment.  Incredibly, these same bondholders

4   somehow were also able to insert a provision in the settlement of estate litigation without disclosing that

5   it arguably may provide them with millions more in distributions, at the expense of general unsecured

6   creditors.

7       A more complete statement of the background is set forth below in the analysis of the motions

8   by the United States Trustee to disqualify Pillsbury Winthrop Shaw Pittman LLC as counsel for the

9   debtor and for disgorgement of attorneys' fees, its motion for the appointment of a chapter 11 trustee,

10  and the motion of SONICblue Claims, LLC for conversion of the case to one under chapter 7.  For the

11  reasons explained, the motion for disqualification is granted, and the court finds that the appointment

12  of a chapter 11 trustee is warranted as being in the best interests of the creditors and other interested

13  parties.

14

15                          **FACTUAL BACKGROUND**

16                          *Formation of Joint Venture*

17      SONICblue Incorporated and three operating subsidiaries, Diamond Multimedia Systems, Inc.,

18  ReplayTV, Inc., and Sensory Science Corporation (collectively, SONICblue), designed and marketed

19  consumer electronic products.  Pillsbury Winthrop Shaw Pittman LLP ("PWSP") served as

20  SONICblue's longtime general corporate and litigation counsel.  On January 3, 2001, SONICblue

21  formed S3 Graphics Co., Ltd., a joint venture with VIA Technologies, Inc., to operate SONICblue's

22  graphics chip business.  Among the assets that SONICblue contributed to the joint venture was its

23  graphics intellectual property, specifically including rights under a 1998 patent cross-license with Intel

24  Corporation.  The rights to use Intel's graphics patents were so important that the joint venture

25  agreement included a liquidated damages clause at article 5.6 entitling the joint venture and VIA each

26  to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-

27  license.  From the inception of the joint venture, there were serious disputes, including the threat of

28  litigation, between SONICblue and VIA.  In the context of settlement proposals in 2002, the parties

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  negotiated a $15 million loan from VIA to SONICblue.  However, neither a settlement nor the loan were

2  consummated pre-petition.

3  *Issuance of Senior Debentures and Related Opinion Letter by PWSP*

4  In April 2002, SONICblue  raised financing in a private placement issuance of $75 million  in

5  7¾% senior secured subordinated convertible debentures.  Three institutional bondholders, Portside

6  Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd., acquired

7  the senior debentures at a discount for $62.5 million.  The senior debentures were also partially secured

8  by SONICblue's interest in shares of United Microelectronic Corporation ("UMC"), a Taiwanese

9  company.  Importantly, the indenture provided for the subordination of the senior debentures to certain

10  obligations at Section 4.1:

11  The payment of the principal of, premium, if any, and interest on all Debentures
   . . . issued hereunder shall, to the extent and in the manner hereinafter set forth, be
12  subordinated and subject in right of payment to the prior payment in full of all Senior
   Indebtedness, whether outstanding at the date of this <u>Indenture</u> or thereafter incurred.

13

14  "Senior Indebtedness" was defined in Section 1.1 of the indenture:

15  "Senior Indebtedness" shall  mean the principal of, premium, if any, interest on
   . . . and any other payment due pursuant to any of the following, whether outstanding on
16  the date of this <u>Indenture</u> or thereafter incurred or created:

17  *   *   *

18  (g)    All indebtedness of <u>the Company</u> due and owing to Via Technologies,
   Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent
19  thereof in any other currency of composite currency (the "Via Indebtedness");

20  Existing debentures in the amount of $100 million issued in 1996 were also subordinated to the senior

21  debentures.  PWSP partner Jorge del Calvo was designated for notice purposes on the indenture on

22  behalf of SONICblue.

23  In its capacity as counsel to SONICblue, on April 22, 2002, PWSP issued to the senior

24  bondholders a written opinion as to the enforceability of the debentures.  This opinion letter reads in

25  pertinent part:

26  2.    . . . Each of . . . the Purchase Agreement, the Registration Rights Agreement, the
   Indenture, the Pledge and Security Agreement and the Option Agreement, when duly
27  executed and delivered by the Buyers, will each constitute a valid and binding agreement
   of the Company, enforceable against the Company in accordance with its terms.

28

3

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

* * *

3.     The issuance and sale of the Debentures have been duly authorized.  Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

* * *

9.     . . . (b)  Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally. . . .

In what may have been a scrivener's error, the bankruptcy limitation in paragraph 9 referenced only paragraph 2 and not paragraph 3 of the opinion letter.

### Chapter 11 Filing and PWSP's Bankruptcy Rule 2014 Disclosures

Just six months after the issuance of the senior debentures, SONICblue was unable to meet its maturing financial obligations and entered into a retainer agreement for PWSP to "represent it in its effort to restructure its obligations to certain of its existing . . . debt . . . .  The Firm's engagement will also include representation of SONICblue in . . . any case prosecuted under Title 11 of the United States Code . . . ."  PWSP partner Jorge Del Calvo was copied on the retainer letter.  SONICblue and the subsidiaries filed chapter 11 petitions on March 21, 2003.  While the cases are jointly administered, they have not been substantively consolidated.

On April 11, 2003, PWSP filed an employment application accompanied by a verified statement pursuant to Bankruptcy Rule 2014, which disclosed:

3.     The Firm has been engaged as the Debtors' corporate and litigation counsel since approximately 1989.  During that time, the Firm has provided legal representation to the Debtors in a variety of areas, including corporate and securities matters, mergers and acquisitions, litigation, and intellectual property matters.  The Firm has been working with the Debtors in connection with their restructuring since approximately October 25, 2002 when the Firm was retained to provide advice concerning the restructuring of the Debtor's liabilities and business operations.

The disclosure continued as follows:

6.     As discussed below, I, the Firm, and certain of its partners, counsel, and associates may have in the past represented, and may presently and likely in the future will represent creditors or stockholders of the Debtors in matters unrelated

4

> to these Chapter 11 Cases. A preliminary conflicts search performed at my direction discloses that the Firm may have represented or represents entities that are involved in some capacity with one or more of the Debtors, or may have some other relationships with these entities, in matters unrelated to the Debtors. To the best of my knowledge, the Firm's relationships with these entities is as follows. . . .

However, PWSP failed to disclose its connection resulting from the issuance of the opinion letter to the senior bondholders one year earlier. It added, "The Firm will continue to monitor its relationship with the creditors and other parties in interest in these cases and, as it discovers additional information requiring disclosure, will promptly supplement this application with any appropriate disclosures." The court appointed PWSP as counsel for the debtors. Marcus Smith, the Chief Financial Officer of SONICblue, was designated its responsible individual. PWSP diligently filed supplemental disclosures on May 30, 2003, January 23, 2004, October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006, none of which mentioned the opinion letter.

The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 21, 2003. The court authorized the employment of Ron Bender of the law firm Levene, Neale, Bender, Rankin & Brill LLP ("LNBRB") as counsel for the committee on April 11, 2003. As originally constituted, the committee was comprised of eight members: Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "senior bondholders"), represented by Bruce Bennett of Hennigan, Bennett & Dorman, Matsushita Kotobuki Electronics Sales of America LLC and Matsushita Kotobuki Electronics Industries, A-Max Technology Co. Ltd., Manufacturers' Service Limited, and Maxtor Corporation. In October 2003, Baltrans Logistics Inc. replaced Maxtor Corporation on the committee. After the initial months of the case, however, only the three senior bondholders and the two Matsushita companies remained active in the cases, making the senior bondholders the majority voice on the committee. Including the anticipated distribution collectable from the junior bondholders, the senior bondholders effectively control approximately two-thirds of the claims in these cases.

Projecting that they would exhaust their cash reserves by April 20, 2003, the debtors immediately sought and obtained court approval of the sales of their three operating businesses, the Go Video, ReplayTV, and Rio product lines. Thereafter, these became liquidating chapter 11 cases.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Notably, there is no functioning board of directors to whom Smith reports. The debtor holds nearly $80

2   million in funds for distribution and anticipates receiving an additional $6 million from preference

3   settlements. Secured claims have been paid in full from the proceeds of sale, and a distribution of 33%

4   to unsecured creditors is anticipated.

5   *Breach of Fiduciary Action in Connection with Issuance of the Senior Debentures*

6   On April 21, 2005, some of the junior bondholders filed a complaint in the Superior Court for

7   Santa Clara County against Smith and former officers and directors of SONICblue, Kenneth Potashner,

8   John Todd, Terry Holdt, Edward Esber, Robert Lee and James Schraith. The junior bondholder

9   plaintiffs assert claims for breach of fiduciary duty and constructive fraud in connection with the

10  issuance of the senior debentures in 2002. They assert that the defendants improperly authorized and

11  entered into the financing arrangement while SONICblue was in the zone of insolvency and hopelessly

12  unable to honor its long-term bond obligations. They further assert that by pledging its UMC stock in

13  the transaction, SONICblue rendered a significant asset unavailable to junior bondholders in a

14  liquidation. The defendants removed the complaint to this court on June 14, 2005 on the basis that they

15  may have substantial claims for contribution and indemnification against the debtor. That adversary

16  proceeding, Adv. No. 05-5338, remains pending, though inactive.

17  *VIA Litigation and Settlement Negotiations*

18  VIA and S3 Graphics filed duplicate proofs of claim for $70 million each on July 17, 2003 based

19  on a breach of the joint venture agreement. They assert the breach was caused by the failure to pay

20  certain accounts payable, offering non-ordinary course discounts to accelerate the collection of

21  receivables, wrongful retention of receivables collected on behalf of the joint venture, and the failure

22  to contribute certain assets to the joint venture, and they assert they are also entitled to liquidated

23  damages if enjoined prospectively from the use of the Intel cross-license. SONICblue objected to the

24  claims and filed an adversary complaint for affirmative relief on December 21, 2004 asserting that VIA

25  and S3 breached the joint venture agreement by failing to pay assumed obligations, that VIA breached

26  its fiduciary duty in the operations of the joint venture and the settlement of patent litigation with Intel,

27  and that S3 aided and abetted the breach of fiduciary duty. It sought compensatory and punitive

28  damages, equitable subordination of VIA's and S3's claims, restitution, and an accounting. PWSP

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1    represented SONICblue in the VIA/S3 litigation.

2        SONICblue engaged in concurrent litigation with Intel Corporation concerning the termination

3    or assumption of the patent cross-license and the parties' respective rights.  This litigation was also

4    significant because termination of the license would arguably trigger the liquidated damages provision

5    of the joint venture agreement.  Because of PWSP's prior representation of Intel, the debtor retained

6    O'Melveny & Myers LLP as special litigation counsel to represent it in the dispute with Intel.

7        The various claims in the litigation with VIA and S3 and with Intel reportedly involved complex,

8    disputed facts.  The declaration of Albert Boro, a PWSP partner, sets out the following chronology

9    concerning the litigation and related settlement negotiations.  Settlement discussions between

10    SONICblue and VIA and S3 began in earnest on August 11, 2005 when the parties and their counsel

11    met to discuss a proposed structure for settlement.  Following the initial meeting, counsel for

12    SONICblue participated in conference calls with special litigation counsel, LNBRB as committee

13    counsel, and Bennett as counsel for the senior bondholders.  Based on those discussions, Boro concluded

14    that a global settlement that included Intel was necessary and that a settlement amount of less than $25

15    million would be acceptable to the committee.  Committee counsel authorized the debtor to counter with

16    a settlement offer of $6 million. Bennett, as counsel for the senior bondholders, confirmed on August

17    30, 2005 that his clients would support a $6 million counteroffer.  Boro believed that the consent of the

18    senior bondholders to the terms of a settlement was essential to court approval.

19        On September 12, 2005, counsel for VIA sent to PWSP a draft settlement term sheet proposing

20    that VIA be allowed a general unsecured claim in the amount of $27.5 million.  In a subsequent

21    settlement meeting among counsel held on September 15, 2005, VIA and S3 reduced their settlement

22    demand to $19 million.  Bennett indicated that the senior bondholders would support a settlement of

23    only $10 million.  The debtor, through Smith, authorized a $10 million counteroffer.  It is unclear

24    whether the committee at large was consulted at this juncture or why debtor's counsel consulted only

25    Bennett.  Counsel ultimately reached a tentative agreement as to a settlement amount of $12.5 million,

26    subject to the approval of the respective clients and of creditors.  The debtor, VIA, and S3 agreed

27    immediately to the settlement amount.

28        On September 20, 2005, Bennett confirmed the senior bondholders' agreement to a $12.5 million

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  allowed claim, provided the settlement included, *inter alia*, that the allowed claim be neither senior nor

2  junior to other general unsecured claims.  The allowed amount of the defendants' claim appears to have

3  been fixed by September 20, 2005.  Again, the record is unclear whether the committee  participated at

4  this stage other than through the senior bondholders.  In a conference call among counsel that same day,

5  SONICblue accepted the settlement terms but requested language that the allowed claim be neither

6  senior nor junior to other general unsecured claims.   There were further discussions that the allowed

7  claim of the defendants would be a general unsecured claim, would receive an anticipated distribution

8  in the bankruptcy case of approximately 25%, and would not have priority, yet would not be

9  subordinated relative to other general unsecured claims.  Boro reports that counsel for VIA and S3

10  "posed questions about subordination of the claims of the Senior Noteholders and other creditors, and

11  expressed concern that other creditors not unduly benefit at their clients' expense, but they nevertheless

12  agreed that their [allowed] claim was neither senior nor junior to other general unsecured claims."

13      Boro's declaration reflects that at the time of the September 15, 2005 settlement meeting, he was

14  aware that the senior bondholders were subordinated to VIA Indebtedness under the terms of the

15  indenture.  His declaration also reflects that, prior to September 20, 2005, he had formed the belief that

16  the VIA Indebtedness referred only to the proposed $15 million loan to SONICblue that was never

17  made.  On September 26, 2005, counsel for SONICblue and the defendants finalized a draft of the

18  proposed settlement term sheet, which included the following provision:

19      Claimants shall jointly hold a single, allowed general unsecured claim in the Chapter 11
       case of SONICblue Inc., which claim shall be afforded the benefits and priority of
20      SONICblue's other allowed general unsecured claims and shall be neither senior nor
       junior to any other allowed general unsecured claim, in the amount of $12.5 million. .
21      . .

22  Boro sent the proposed term sheet to Bennett and to LNBRB on September 27, 2005.  In a conference

23  call held later that day, the committee approved the settlement terms.  Bender stated in a declaration that

24  this proposed term sheet was the only document concerning the settlement terms that was provided to

25  committee counsel before it received the final settlement agreement.

26      Finalizing the settlement between SONICblue, VIA, and S3 was delayed and made complicated

27  by the difficulty in reaching a resolution with Intel over the parties' respective rights under the patent

28

8

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

cross-license. For that reason, the initial draft of a settlement agreement was not prepared until January 25, 2006, when SONICblue's special litigation counsel, O'Melveny & Myers, circulated a draft that contained a provision dealing with VIA's allowed claim that read substantially the same as the one in the September 26, 2005 term sheet. Boro stated in his declaration that, in April or early May 2006, he and PWSP partner Thomas Loran proposed that the settlement agreement include language specifically stating that the defendants' allowed claim was not "Senior Indebtedness" under the indenture for the senior debentures. Purportedly, the reason the PWSP attorneys made the suggestion was to foreclose future litigation over the priority of VIA and S3's allowed claim. They also believed that "VIA Indebtedness" referred to the $15 million loan that was never made.

On May 12, 2006, O'Melveny & Myers circulated a revised draft of the settlement agreement with the following language added:

> Claimants and the Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of the Debtor's Indenture, dated as of April 22, 2002, for the 7-¾ Secured Senior Subordinated Convertible Debentures due 2005.

VIA agreed to the language waiving "Senior Indebtedness" status on June 1, 2006. Substantially the same language was included in a later revised draft circulated on June 16, 2006 and in the final settlement agreement.

### *Objection to Claim of Senior Bondholders*

Since substantially all assets have been liquidated, PWSP has been prosecuting avoidance actions and objections to claims. It has divided and shared the work with LNBRB, however, PWSP retained the more complex litigation or litigation requiring some knowledge of the background of the debtor's operations. PWSP initially examined the claims of the senior bondholders and the junior bondholders. It expended 49.50 hours, incurring $23,237.50 in legal fees, to complete its analysis of the senior bondholders' claims, including research on the applicability of fraudulent transfer law and usury law to the transaction. Based on its analysis, it identified a significant problem with the original issue discount granted the bondholders, the difference between the face amount and the amount actually paid for the debentures. The senior bondholders also received other consideration in the transaction, including the UMC stock, that rendered the valuation of the original issue discount more complex.

9

1   SONICblue asserts that the original issue discount constituted unamortized interest as of the petition

2   date that is subject to disallowance under Bankruptcy Code § 502(b)(2).    On July 20, 2006, PWSP

3   attorney Matthew Walker sent an email to Bennett setting forth his analysis of the original issue

4   discount and asserting that the bondholders' claim may be subject to partial disallowance under

5   § 502(b)(2) to the extent of any unmatured interest as of the petition date.  Walker's analysis showed

6   an original issue discount of $43 million.  He closed with an invitation to engage in a dialogue to resolve

7   the matter short of formal litigation.

8         Bennett contacted PWSP partner Craig Barbarosh on August 24, 2006 to discuss SONICblue's

9   challenge to the bondholders' claim.  He also brought to Barbarosh's attention that PWSP had issued

10  the opinion letter to the bondholders in connection with the issuance of the debentures.  Bennett asserted

11  that the bondholders had relied on the opinion letter, which they interpreted as assuring that their claims

12  were allowable in a subsequent bankruptcy case.  He further indicated that the bondholders would

13  demand that PWSP defend and indemnify them for any losses resulting from SONICblue's challenge

14  to their claim.  Bennett's  partner followed up on September 5, 2006 with a letter to the managing

15  partner of PWSP demanding indemnification from PWSP for any shortfall to which the senior

16  bondholders may be subjected as a result of SONICblue's objection to their claim.  In the letter, he

17  indicated that to the extent the bondholders are unable to recover in the bankruptcy case the full

18  principal amount of the debentures, they intended to pursue PWSP for negligent misrepresentation and

19  negligence, among other claims.

20        Barbarosh asserts in his declaration that the telephone call on August 24, 2006 was the first time

21  he became aware of the April 22, 2002 opinion letter.  PWSP immediately contacted counsel for the

22  committee, informed Bender of the bondholders' indemnification demand, and turned over to the

23  committee the task of prosecution of the objection to the claims of the senior bondholders.   On

24  September 6, 2006, it forwarded its work file containing its analysis to LNBRB.  PWSP did not,

25  however, file a supplemental Bankruptcy Rule 2014 disclosure to address the claim of the senior

26  bondholders.  When it filed its eighth interim application for compensation with the court on October

27  18, 2006, PWSP did address the analysis of and potential objection to the claim of the senior

28  bondholders.  However, it simply disclosed, "The matter was turned over to the Creditors' Committee

10

1    for prosecution." PWSP partner Boro asserts in his declaration that he was unaware of any potential

2    or actual claim by the senior bondholders at the time he negotiated the language concerning the priority

3    and treatment of VIA's allowed claim under the settlement between September 2005 and June 2006.

4                                *Approval of VIA Settlement*

5            The VIA settlement agreement was filed under seal on October 10, 2006 with the debtor's

6    motion to approve the settlement. Bender asserts that LNBRB first received the settlement agreement

7    a few days before it was filed with the court. Because the settlement agreement was lengthy and

8    complex and because LNBRB had not seen any prior drafts, it requested that debtor's counsel verbally

9    walk LNBRB through the settlement agreement. In a conference call on October 4, 2006, Suzanne

10   Uhland of O'Melveny & Myers reviewed the document and the terms of the settlement agreement with

11   LNBRB partners Ron Bender and Craig Rankin. In a declaration, Bender states that there was no

12   discussion of the waiver in the settlement agreement of VIA's "Senior Indebtedness" status under the

13   indenture. He also indicated that the committee was very pleased with the settlement because it had

14   been willing to settle the litigation for $25 million. The court approved the VIA settlement on October

15   31, 2006.

16   *Joint Disclosure Statement and Plan and Disclosure of Indemnification Demand Against PWSP*

17           The debtors, in consultation with the committee, had determined for strategic reasons to defer

18   efforts in these cases to propose and confirm a plan of reorganization. The reasons included the

19   uncertainty posed by the significant claims of VIA and S3 on the confirmability of and distributions

20   under a plan, the potential rejection of the Intel cross-license at confirmation, giving rise to up to $70

21   million in liquidated damages, and the desire to substantively consolidate the estates under a plan after

22   the VIA litigation was settled. The committee assumed the lead role in preparing the joint disclosure

23   statement and plan. The initial disclosure statement filed on December 15, 2006 disclosed PWSP's

24   conflict as follows:

25           However, as a result of a conflict that has been asserted by the Senior Noteholders with
             respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing
26           the Senior Notes Claims.

27           Upon the objection of creditors Riverside Contracting, LLC and Riverside Claims, LLC, the

28   disclosure statement was amended on January 18, 2007, elaborating on the description of the conflict

11

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  as follows:

2      [U]ntil recently, counsel to the Debtors was in charge of analyzing the Senior Notes
       Claims.  As a result of the Senior Noteholders' contention that counsel to the Debtors
3      had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the
       Senior Notes were enforceable against the Debtors in accordance with their terms,
4      counsel to the Debtors requested the Creditors' Committee to assume the role of
       analyzing the Senior Notes Claims.
5

6  Neither the first amended disclosure statement nor the prior version disclosed that the senior

7  bondholders are members of the creditors' committee, which has been charged with objecting to the

8  bondholders' claims.  They also failed to disclose that Smith, who would continue to serve as Chief

9  Financial Officer and Responsible Individual, was a defendant in the junior bondholders' litigation.

10      On January 22, 2007, creditors Riverside Contracting, LLC, Riverside Claims, LLC, and Argo

11 Partners, Inc. objected to the first amended disclosure statement, raising for the first time before the

12 court the waiver in the VIA settlement agreement of the "Senior Indebtedness" status to which the VIA

13 allowed claim was arguably entitled pursuant to the senior indenture.  The objecting creditors asserted

14 that the waiver effectively diluted the distribution to unsecured creditors because VIA otherwise would

15 have accepted an allowed claim in a lower amount.  SONICblue Claims LLC ("SB Claims") is a claims

16 trader that has acquired at least $160,000 of the claims in this case and is the successor in interest to

17 Argo Partners.  It admittedly has been interested in acquiring the VIA claim since 2006 to profit from

18 the "Senior Indebtedness" provision of the indenture.

19      Bender states that the committee first learned of the issue from the objections to the disclosure

20 statement.  He, at least, had previously been unaware of the connection between the waiver of status in

21 the VIA settlement agreement and the "Senior Indebtedness" provision in the senior indenture.  With

22 respect to the committee's involvement in the negotiation of the VIA settlement, Bender explained to

23 the court at the disclosure statement hearing on January 23, 2007:

24      The Creditors' Committee was not a party to that litigation.  And there were so many
       complicated confidentiality agreements that the Committee wasn't even privy to the top-
25     level of confidentiality.   So all I would do and Mr. Rankin would do is we would
       periodically call primarily the O'Melveny lawyers . . . to get updates from her. . . .  We
26     saw that as our limited role, which is why our fees with respect to that litigation are
       minuscule compared to the fee in the case. . . .  [T]he Committee . . . was essentially a
27     client – we were advised that really we were likely to lose on at least the $70 million
       part."
28

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

This statement appears to be consistent with Bender's declaration in opposition to the motions presently before the court:

> While counsel to the Debtors (primarily Ms. Uhland of OMM) would periodically provide general status reports to LNBRB (primarily to Mr. Rankin and Ms. Wells who were the partners at LNBRB principally in charge of dealing with the VIA/S3/Intel litigation) and communicate with LNBRB, and did obtain the authority of the Committee (whose active participants at that time were the three Senior Noteholders and the two Matsushita entities) to settle with VIA/S3 by giving them an allowed general unsecured claim of not more than $25 million, to the best of my knowledge, LNBRB was not a party to any of the confidential settlement discussions that ensued, and LNBRB was not provided with any drafts of the actual VIA/S3 settlement agreement.

However, this characterization appears markedly at odds with the following statement in the Seventh Interim Application of LNBRB for Approval of Fees and Reimbursement of Expenses filed October 18, 2006: "LNBRB played a material role in negotiating and documenting the settlement." LNBRB has also requested that the court approve $102,027.50 in legal fees incurred for services in connection with the VIA litigation.

More than six months after the senior bondholders first asserted their claims against PWSP, and only after the United States Trustee filed the motion for disqualification, PWSP filed a supplemental Bankruptcy Rule 2014 disclosure on March 5, 2007 that states:

> Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders"), are holders of the 7¾% Senior Secured Subordinated Convertible Debentures due 2005 (the "Senior Notes"). The Debtors scheduled the claim of the Senior Noteholders for in excess of $77 million, and each of the three Senior Noteholders filed its own proofs of claim in unspecified amounts related to the Senior Notes. In connection with its Application, the Firm previously disclosed its substantial pre-petition representation of the Debtors, including for corporate and securities matters. As part of that representation, the Firm represented SONICblue in issuing the Senior Notes. As is typical in such financing transactions, the Firm issued a legal opinion to the Senior Noteholders. Pursuant to letter dated September 5, 2006, counsel to the Senior Noteholders sought indemnity from the Firm related to the Senior Notes (the "Demand"). The Firm has rejected the Demand and declined to provide any indemnity to the Senior Noteholders, and immediately upon receipt of the Demand the Firm informed counsel for the Creditors' Committee of the Demand and turned over the analysis of all issues regarding the allowance of the Senior Noteholders' claims to the Committee. No lawyer in the firm who handled the financing transaction was involved in the firm's analysis regarding the Senior Noteholders' claims. Whether the Demand creates any disabling conflict or renders the Firm not "disinterested" is presently before the Court on motions filed by the U.S. Trustee.

PWSP submits that its failure to file this supplemental disclosure earlier was inadvertent.

MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

2

### LEGAL DISCUSSION

3

**I.    The Best Interests of Creditors Mandate the Disqualification of PWSP from its Representation in the Case and the Appointment of a Chapter 11 Trustee.**

Under § 327(a) of the Bankruptcy Code, a debtor in possession may employ attorneys that do not hold an interest adverse to the estate and that are disinterested persons.  Thus, to serve as debtor's counsel, counsel must be free of all conflicting interests that might impair the impartiality and neutral judgment that they are expected to exercise.  *In re Bellevue Place Associates,* 171 B.R. 615, 626 (N.D. Ill. 1994).  "Conflicting loyalties produce inadequate representation, which threatens the interests of the debtor, the trustee and the creditors, and compromises the ability of courts to mete out justice."  *In re Tevis,* 347 B.R. 679, 689 (9th Cir. B.A.P. 2006)(discussing California state law to define "adverse interest" under § 327(a)).  *See also In re Wheatfield Business Park LLC*, 286 B.R. 412, 417-418 (Bankr. C.D. Cal. 2002).  The presence of an actual conflict of interest renders counsel ineligible and constitutes grounds for disqualification from further service.  *See In re Plaza Hotel Corp.*, 111 B.R. 882, 889-91 (Bankr. E.D. Cal.)(chapter 11 debtor's counsel disqualified for failing to disclose dual representation of the debtor and of debtor's owner/guarantors), *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990).  Section 1104(a)(2) of the Bankruptcy Code creates a flexible standard for appointing a trustee when it is in "the interests of the creditors, equity security holders, and other interests of the estate."  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).  It requires the court to weigh competing interests and, under appropriate circumstances, to appoint a trustee regardless of whether "cause" exists within the meaning of § 1104(a)(1).  *Id.*  Although the United States Trustee has moved for the appointment of a trustee both for cause under § 1104(a)(1) and in the best interests of creditors under § 1104(a)(2), it need only prove one of these two statutory bases.  *Id.*

The undisputed facts establish that in April 2002, PWSP issued an opinion letter to SONICblue's senior bondholders.  Six months later, SONICblue a retained PWSP as its bankruptcy counsel.  In March 2003, when SONICblue filed its chapter 11 petition,  PWSP submitted its statement pursuant to Fed. R. Bankr. P. 2014 to disclose its connections to "the debtor, creditors and any other interested parties."  The statement did not note any connection with the senior bondholders.  Aware of its ongoing duty to

14

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  disclose any conflicts and connections, PWSP filed seven supplemental Rule 2014 disclosure statements

2  through June 2006. None of these supplemental statements mentioned the 2002 opinion letter or any

3  other connection between PWSP and the three senior bondholders. Then, in late August 2006, the three

4  senior bondholders demanded indemnification from PWSP based on the 2002 opinion letter in the event

5  that objections to the bondholders' claims resulted in any losses to the bondholders. This verbal demand

6  was followed with a written demand on September 5, 2006. The next day PWSP transferred its files

7  concerning SONICblue's objections to the bondholders' claims to LNBRB. Six months later, on March

8  5, 2007, after the United States Trustee had filed motions both to appoint a trustee and to disqualify

9  PWSP, PWSP filed its eighth supplemental Rule 2014 disclosure statement that provided a detailed

10  explanation of PWSP's conflict of interest with the senior bondholders.

11  　　　　From these facts it is clear that PWSP knew it had a continuing duty to update its Rule 2014

12  disclosures upon learning of any undisclosed connections or conflicts. It is also apparent that as of late

13  August 2006, PWSP knew it had a disabling conflict of interest because it immediately sought the aid

14  of LNBRB in an attempt to resolve the conflict. Yet, PWSP failed to apprise the court of these facts.

15  PWSP's attempt to characterize its failure as inadvertent oversight rings hollow in the face of its

16  previous history of supplemental disclosures. PWSP argued in court that the partner in charge

17  "assumed" a supplemental disclosure had been made, but the firm has not offered any evidentiary

18  foundation for that assumption. The declaration of PWSP partner William Freeman indicates that

19  Freeman had signed several of the earlier supplements and that he typically delegated responsibility for

20  drafting the disclosures. There is no indication, however, that Freeman or any other PWSP partner

21  undertook responsibility, or asked someone else to assume responsibility, for preparing a supplemental

22  disclosure when the actual conflict of interest concerning the senior bondholders arose. PWSP has

23  neither offered proof of any time spent drafting the disclosure nor produced a draft of a disclosure that

24  the firm somehow failed to file. In the end, however, whether intentional or inadvertent, PWSP's failure

25  to disclose this significant and disabling conflict in any reasonable fashion mandates immediate

26  disqualification of PWSP from its representation in this case. Estate professionals must make full,

27  candid and complete disclosures of all facts affecting their eligibility for employment. *In re Plaza Hotel*

28  *Corp.*, 111 B.R. at 883, *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990). *See also Neben & Starrett, Inc. v.*

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    *Chartwell Financial Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995), *cert. denied*, 516

2    U.S. 1049 (1996)(affirming denial of all fees after debtor's counsel failed to fully disclose circumstances

3    surrounding payment of firm's retainer).  The Rule 2014 disclosure requirements are strictly enforced.

4    *Park-Helena*, 63 F.3d at 881-82.  Negligent omissions do not excuse failures to disclose.  *Plaza Hotel*,

5    111 B.R. at 883.  Although PWSP has offered its future service in some more limited capacity, it would

6    not be helpful because the firm's motives in this case would remain subject to attack.

7          The entirety of the undisputed facts also provides clear and convincing evidence that the

8    appointment of a chapter 11 trustee is necessary to restore creditor confidence in the bankruptcy system

9    and to assure that there is no lingering taint from PWSP's representation of the debtor.  Neither the court

10   nor the creditors may ever learn why PWSP or Smith, as debtor's responsible individual, failed to bring

11   PWSP's conflict to the court's attention.  But, that unanswered question is less important with the

12   appointment of a strong, neutral trustee, who has no connections to any interested party.

13         The presence of a trustee will also alleviate any doubts regarding Smith's role as SONICblue's

14   responsible individual.  Both the United States Trustee and SB Claims have questioned whether Smith

15   has relinquished his management responsibilities to PWSP.  As the United States Trustee pointed out,

16   Smith's services are part-time at best and SONICblue has no Board of Directors to whom Smith is

17   required to report.  Additionally, it is troubling that the Disclosure Statement filed with the court failed

18   to divulge that Smith is a defendant in a lawsuit by SONICblue's junior bondholders that alleges that

19   Smith and SONICblues' former officer and directors breached their fiduciary duties to the company

20   when they authorized the issuance of the senior debentures in 2002.  In light of these substantial

21   concerns, the appointment of a trustee is warranted.

22   **II.      It is Not in the Best Interest of Creditors to Convert This Case to Chapter 7.**

23         SB Claims has asserted that conversion to chapter 7 is preferable to the appointment of a chapter

24   11 trustee.  Althoughs SB Claims relies on several justifications for conversion, in the court's view, the

25   primary reason to convert would be to remove the influence of the creditors' committee from this case.

26   The committee and LNBRB in its filings with the court, support as its "first choice" the retention of

27   PWSP as debtor's counsel while an examiner reviews the pending allegations.  Because the facts

28   indicate at least the appearance of impropriety by the committee and LNBRB, SB Claims's concerns

16

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    in this regard are substantial.

2         During the past year and a half, SONICblue's litigation against VIA and S3 has been the main

3    roadblock to the proposal of a plan and the conclusion of this case. The three senior bondholders were

4    actively represented in the settlement negotiations by Bennett. At the same time, these same senior

5    bondholders were both members and an effective majority of the committee. As committee members,

6    the senior bondholders were and are fiduciaries that bear a duty of undivided loyalty to provide impartial

7    service in the interests of the creditors that they represent. *In re Caldor, Inc*., 193 BR 165, 169 (Bankr.

8    S.D.N.Y. 1996)*; In re Microboard Processing, Inc.*, 95 B.R. 283, 284 (Bankr. D. Conn 1989); *In re*

9    *Mesta Machine Co*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Because the bondholders appear to have

10   used their position on the committee to insert themselves into the settlement negotiations without

11   revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body.

12   Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over

13   the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not

14   known. In fact, as Bennett noted, he had never personally appeared in court until March 19, 2007.

15   During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was

16   not generally known to this court or the creditor body that the three senior bondholders were serving

17   on the committee.

18        SB Claims also expresses concern that LNBRB may have failed to fulfill its role as a watchdog

19   on behalf of the unsecured creditors. First, it appears that LNBRB failed to independently review the

20   settlement agreement between VIA and SONICblue. Although LNBRB asserted in its fee application

21   that it was "intimately" involved in the VIA settlement, in court it has acknowledged that it was

22   essentially a "client" with respect to the settlement negotiations. Similarly, in his declaration on these

23   motions, Bender states that LNBRB received the VIA settlement agreement after it was a "done deal."

24   Rather than review the lengthy document with fresh eyes, Bender called upon O'Melveny & Myers,

25   SONICblue's special litigation counsel, to verbally walk through the settlement's main points. Second,

26   when the actual conflict arose between PWSP and the senior bondholders, SB Claims points out that

27   LNBRB accepted responsibility for prosecuting the objections to the bondholders' claims without

28   considering its own connections to the bondholders and the fact, or at least appearance, that it might also

17

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

be conflicted. Professionals retained by an official committee of unsecured creditors owe fiduciary duties to the committee and its constituency. *Caldor*, 193 B.R. at 170; *Matter of Celotex Corp.*, 123 B.R. 917, 920 (M.D. Fla. 1991); *Mesta Machine Co*, 67 B.R. at 156. This includes an obligation to represent fairly the interest of the entire creditor class, not just the committee members. *In re General Homes Corp.*, 181 B.R. 870 (Bankr. S.D. Tex. 1994); *In re EBP, Inc.*, 171 B. R. 601 (Bankr. N.D. Ohio 1994); *Mesta Machine Co*, 67 B.R. at 156; *Pension Benefit Guaranty Corporation v. Pincus, Verlin, Hahn Reich & Goldstein Professional Corp.*, 42 B.R. 960, (E.D. Pa. 1984). It is not clear at this juncture whether LNBRB's handling of the objections of the bondholders was an actual conflict of interest, however, it is worth noting that under § 328(c), unless adequate disclosure is made and prior approval of the court is obtained, committee counsel can be denied compensation if at any time during the representation counsel is not a disinterested person. *Mesta Machine*, 67 B.R. at 157-158. No disclosures were made and no court approval was obtained with respect to LNBRB's acceptance of the claims objections referred from PWSP. Finally, SB Claims suggests, and the record does not dispel, the belief that LNBRB's conduct was a self-interested act to protect its referral sources. A committee controlled by the three senior bondholders hired LNBRB and, of course, has the continuing ability to fire LNBRB. If not an actual conflict, these facts certainly raise questions regarding LNBRB's suitability to vigorously pursue the claims objections on behalf of the estate. Moreover, the protective atmosphere surrounding this close-knit referral circle is reminiscent of the "opprobrious" bankruptcy ring and the cronyism that Congress decried in the legislative history of the Bankruptcy Reform Act of 1978. H. Rep. No. 95-595, at 6011 (Sept. 8, 1977).

The fact that counsel for claims traders flagged the concerns over potential improprieties or that the claims traders' may be acting in their own self-interest does not detract from the troublesome nature of their arguments. Nevertheless, these very significant concerns are outweighed in this case by the need for the appointment of a strong and disinterested trustee.

There have been serious allegations that the case is being run by and for the benefit of counsel. As a result, an active trustee who will formulate an independent strategy and direct its own counsel is critical. It is important to this court that the United State Trustee can tap into a large pool of possible trustees by conducting a nationwide search. In this way, the United States Trustee will have a far

18

greater opportunity to locate a strong trustee with the appropriate qualifications and without connections to this case and this legal community. Additionally, if the case remains in chapter 11, the Bankruptcy Rules require, as a safeguard, that the United States Trustee's application for an order approving either the appointment or the election of a trustee must include a disclosure of all the proposed trustee's connections to the debtor, creditors and other parties in interest. Fed. R. Bankr. P. Rule 2007.1(c). There is no similar disclosure requirement in chapter 7.

## CONCLUSION

After careful review of the evidence, consideration of both oral and written argument, the court concludes that the United States Trustee has satisfied its burden of establishing that PWSP must be disqualified from its representation in this case and that the appointment of a chapter 11 trustee is in the best interests of "creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). The issue of disgorgement of fees is reserved for a later hearing after review by the appointed trustee.

Good cause appearing, IT IS SO ORDERED.

**\* \* \* END OF ORDER \* \* \***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

19

MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

Case No. 03-51775-MM

**SERVICE LIST**

CRAIG A BARBAROSH
PILLSBURY WINTHROP LLP
650 TOWN CENTER DRIVE 7TH FLOOR
COSTA MESA CA 92626-7122

SUZZANNE S UHLAND
O'MELVENY & MYERS LLP
EMBARCADERO CANTER WEST
275 BATTERY STREET
SAN FRANCISCO CA 94111-3305

RON BENDER
LEVENE NEALE BENDER RANKIN &
BRILL LLP
1801 AVENUE OF THE STARS STE 1120
LOS ANGELES CA 90067

NANETTE DUMAS
OFFICE OF THE UNITED STATES
TRUSTEE
280 SOUTH FIRST ST SUITE 268
SAN JOSE CA 95113-0002

K JOHN SHAFFER
STUTMAN TRIESTER & GLATT PC
1901 AVENUE OF THE STARS 12TH FL
LOS ANGELES CA 90067

HENRY KEVANE
PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP
150 CALIFORNIA STREET 15TH FLOOR
SAN FRANCISCO CA 94111-4500

BRUCE BENNETT
HENNIGAN BENNETT & DORMAN LLP
865 SOUTH FIGUEROA ST SUITE 2900
LOS ANGELES CA 90017

BERNARD BURK
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
3 EMBARCADERO CENTER 7TH FLOOR
SAN FRANCISCO CA 94111-4024

PATRICK M COSTELLO
BIALSON BERGEN & SCHWAB
2600 EL CAMINO REAL SUITE 300
PALO ALTO CA 94306

ROBERT A FRANKLIN
MURRAY & MURRAY
19400 STEVENS CREEK BLVD SUITE 200
CUPERTINO CA 95014-2548

WILLIAM MCGRANE
BERNARD S GREENFIELD
MCGRANE & GREENFIELD LLP
ONE FERRY BUILDING SUITE 220
SAN FRANCISCO CA 94111

SCOTT MCNUTT
MCNUTT & LITTENEKER LLP
188 THE EMBARCADERO SUITE 800
SAN FRANCISCO CA 94105

RICHARD A ROGAN
JEFFER MANGELS BUTLER &
MARMARO LLP
TWO EMBARCADERO CENTER 5TH FL
SAN FRANCISCO CA 94111-3824

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

EXHIBIT 8

1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT  (SBN 105430)
2  THOMAS B. WATSON  (SBN 181546)
   JOSHUA M. MESTER  (SBN 194783)
3  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
4  Telephone      (213) 694-1200
   Facsimile      (213) 694-1234
5
6  Counsel for Portside Growth & Opportunity Fund,
   Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.
7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11  In re                                    ) Case Nos.  03-51775, 03-51776, 03-51777 and
                                             ) 03-51778 MM
12  SONICBLUE INCORPORATED, a Delaware       )
    corporation; DIAMOND MULTIMEDIA          ) Chapter 11 Cases, Jointly Administered
13  SYSTEMS, INC., a Delaware corporation;   )
    REPLAYTV, INC., a Delaware corporation;  )
14  and SENSORY SCIENCE CORPORATION,         ) **MOTION FOR CLARIFICATION, OR IN
    a Delaware corporation                   ) THE ALTERNATIVE, LEAVE TO FILE A
15                                           ) MOTION FOR RECONSIDERATION;
           Debtors and Debtors-in-Possession. ) MEMORANDUM OF POINTS AND
16                                           ) AUTHORITIES**
                                             )
17                                           ) [FRCP 52 and FRBP 7052; FRCP 54(b) and
                                             ) FRBP 7054; FRCP 59(e) and FRBP 9023;
18                                           ) FRCP 60(b) and FRBP 9024]
                                             )
19                                           ) Date:       May 4, 2007
                                             ) Time:       11:00 a.m.
20                                           ) Judge:      Hon. Marilyn Morgan
                                             ) Location:   Courtroom 3070
21                                           )             180 South First Street
                                             )             San Jose, CA 95113
22                                           )
                                             )
23  ─────────────────────────────────────── )

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

(Page)

I.      INTRODUCTION ....................................................................................................... 1

II.     THE COURT HAS AUTHORITY TO CLARIFY THE OPINION........................... 2

III.    ARTICLE 5.6 OF THE JOINT VENTURE AGREEMENT DOES NOT
        PROVIDE FOR LIQUIDATED DAMAGES TO VIA. ............................................... 3

IV.     THE OPINION INACCURATELY CHARACTERIZES THE SENIOR
        NOTEHOLDERS' PARTICIPATION IN THIS CASE. ............................................. 6

V.      CONCLUSION ......................................................................................................... 11

MOTION FOR CLARIFICATION

# TABLE OF AUTHORITIES

<u>**(Page)**</u>

**Cases**

*Balla v. Idaho State Bd. of Corrections,*
    869 F.2d 461 (9th Cir. 1989) ................................................................. 3

*City of L.A. v. Santa Monica BayKeeper,*
    254 F.3d 882 (9th Cir. 2001) ................................................................. 2

*In re Airport Assocs.,*
    1980 Bankr. LEXIS 4096 (Bankr. D. Haw. 1980) ................................ 3

*In re C & P Auto Transport, Inc.,*
    94 B.R. 682 (Bankr. E.D. Cal. 1988) .................................................... 2

*In re Dutta,*
    175 B.R. 41 (B.A.P. 9th Cir. 1994) ....................................................... 2

*In re Kealoha,*
    1980 Bankr. LEXIS 5252 (Bankr. D. Haw. 1980) ................................ 3

*In re Neil Properties, Inc.,*
    360 F. Supp. 914 (S.D. Cal. 1966) ..................................................... 11

*Souza v. Ashcroft,*
    2001 U.S. Dist. LEXIS 10219 (N.D. Cal. 2001) ................................... 2

*United States v. Vittaly,*
    2006 U.S. Dist. LEXIS 93541 (N.D. Cal. 2006) ................................... 2

**Statutes**

11 U.S.C. § 502(a) ......................................................................................... 8

**Rules**

Federal Rule of Bankruptcy Procedure 2008 ................................................. 8

Federal Rule of Bankruptcy Procedure 7052 ................................................. 3

Federal Rule of Bankruptcy Procedure 7054 ................................................. 3

Federal Rule of Bankruptcy Procedure 9017 ............................................... 11

Federal Rule of Bankruptcy Procedure 9023 ................................................. 3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

MOTION FOR CLARIFICATION

1

**TABLE OF AUTHORITIES (cont'd)**

2

<u>(Page)</u>

3    Federal Rule of Bankruptcy Procedure 9024 ........................................................................ 3

4    Federal Rule of Civil Procedure 52 ...................................................................................... 3

5    Federal Rule of Civil Procedure 54(b) ................................................................................. 3

6    Federal Rule of Civil Procedure 59(e) ................................................................................. 3

7    Federal Rule of Civil Procedure 60(b) ................................................................................. 3

8    Federal Rule of Evidence 201 ............................................................................................ 11

9    Local Rule 7-9 ..................................................................................................................... 3

10   Local Rule 1001-2(b) ........................................................................................................... 3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

MOTION FOR CLARIFICATION

## I.    INTRODUCTION

The Memorandum Decision and Order on Motion to Appoint a Chapter 11 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP and for Disgorgement of Attorneys' Fees (the "Opinion") would benefit from clarification.  Clarification is necessary to eliminate the chance that certain statements in the Opinion could be misconstrued as deciding factual issues that are not supported by the evidence, that are not necessary to the Court's decision, and that are subject to investigation by the new trustee whom the Court will appoint.

The Senior Noteholders do not challenge the result reached in the Opinion.  Indeed, the Senior Noteholders welcome the addition of an additional officer who is completely disinterested and not connected with any party.  And the Senior Noteholders look forward to a thorough and objective investigation conducted by a truly disinterested and independent trustee.

Rather, the Senior Noteholders respectfully bring this motion for the sole purpose of requesting clarification or reconsideration of certain statements in the Opinion, which could be misconstrued as suggesting that the Court made certain factual findings or conclusions unnecessary to the decision of the motions before the Court and unsupported by the record.  The specific statements that could be misconstrued in this manner are:

- The second to last full sentence in the first paragraph of the factual background on page 2, which states:  "The rights to use Intel's graphics patents were so important that the joint venture agreement included a liquidated damages clause at article 5.6 entitling the joint venture *and VIA* each to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-license."  (Opinion at p. 2, lines 24-27) (emphasis added).

- The last portion of the first full paragraph on page 17, which states:  "Because the bondholders appear to have used their position on the committee to insert themselves into the settlement negotiations without revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body.  Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not known.  In fact, as Bennett noted, he had never personally appeared in court until March 19, 2007.  During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was not generally known to this court or the creditor body that the three senior bondholders were serving on the committee."  (Opinion at p. 17, lines 9-17).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    These statements leave the impression that the Court made factual determinations concerning the

2    SonicBlue/Via Joint Venture and the settlement of the VIA claim.  Although the moving parties

3    may have argued in favor of the statements quoted above, these statements are unsupported by any

4    evidence before the Court and are, in fact, inconsistent with the record already accumulated in

5    this case.

6        The Senior Noteholders assume that the Court's statements were not intended to influence or

7    predetermine the results of the trustee's investigation that has not yet commenced.  Nevertheless, the

8    Opinion should not contain statements that appear to decide such issues, and the Senior Noteholders

9    are concerned that parties in this case will cite this language as binding in future proceedings.  These

10   issues should be left for resolution in the trustee's investigation and in any future litigation

11   concerning the claims asserted by S3G and VIA.

12       Accordingly, the Senior Noteholders request that the Court: (i) confirm and clarify that the

13   statements identified above were included only in the context of identifying various parties'

14   contentions and not to make any factual determinations, or (ii) correct or delete these statements.

15   **II.    THE COURT HAS AUTHORITY TO CLARIFY THE OPINION.**

16       The Court has the inherent authority to reconsider or revise its orders.  *City of L.A. v. Santa*

17   *Monica BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("The general rule regarding the power of a

18   district court to rescind an interlocutory order is as follows: As long as a district court has

19   jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or

20   modify an interlocutory order for cause seen by it to be sufficient."); *United States v. Vittaly*, 2006

21   U.S. Dist. LEXIS 93541, *4-5 (N.D. Cal. 2006) ("A district court also has the power to reconsider

22   sua sponte its orders prior to the entry of judgment").

23       Numerous Ninth Circuit cases confirm this Court's ability to clarify the Opinion.  *E.g. In re*

24   *Dutta*, 175 B.R. 41, 47 (B.A.P. 9th Cir. 1994) (vacating order denying motion for clarification and

25   finding that "motion for clarification was well taken given the lack of specificity"); *Souza v.*

26   *Ashcroft*, 2001 U.S. Dist. LEXIS 10219, *9 n. 2 (N.D. Cal. 2001) ("The Court may revise its

27   interlocutory rulings prior to entry of judgment."); *In re C & P Auto Transport, Inc.*, 94 B.R. 682,

28   683 (Bankr. E.D. Cal. 1988) ("It will, however, be clarified so that there is no misunderstanding

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    about its meaning."); *In re Airport Assocs.*, 1980 Bankr. LEXIS 4096, *1-9 (Bankr. D. Haw. 1980)

2    (granting motion for clarification of findings of fact and conclusions of law); *In re Kealoha*, 1980

3    Bankr. LEXIS 5252, *2-6, 9-14 (Bankr. D. Haw. 1980) (granting motion for clarification of findings

4    of fact and conclusions of law).

5         To the extent that the Opinion is an appealable interlocutory order, the Court also has the

6    authority to reconsider it pursuant to Federal Rule of Civil Procedure 59(e), made applicable to this

7    proceeding by Bankruptcy Rule 9023.[1]  Rule 59(e) provides for the filing of a "motion to alter or

8    amend a judgment" within ten days after entry of the judgment, and the word judgment in Rule

9    59(e) "encompasses final judgments and ***appealable interlocutory orders***."  *Balla v. Idaho State Bd.*

10   *of Corrections,* 869 F.2d 461, 466 (9th Cir. 1989) (emphasis added).

11        Finally, the Court has the authority to direct that Local Rule 7-9, addressing motions for

12   reconsideration, apply here.  Amended Bankruptcy Local Rule 1001-2(b) ("Any Judge may, in any

13   case or adversary proceeding, direct that additional Local Rules from other Chapters apply.").  Local

14   Rule 7-9(a) provides: "any party may make a motion before a Judge requesting that the Judge grant

15   the party leave to file a motion for reconsideration of any interlocutory order made by that Judge…"

16   And Local Rule 7-9(b) sets out the standard for granting leave for reconsideration:  "The moving

17   party must specifically show: … (3) A manifest failure by the Court to consider material facts or

18   dispositive legal arguments which were presented to the Court before such interlocutory order."

19   **III.    ARTICLE 5.6 OF THE JOINT VENTURE AGREEMENT DOES NOT PROVIDE**

20   **FOR LIQUIDATED DAMAGES TO VIA.**

21        The Opinion states:

22

23

24   [1]      The Federal Rules of Civil Procedure provide additional authority for the Court to clarify its
25   order:  (i) Federal Rule of Civil Procedure 52, made applicable to adversary proceedings by
     Bankruptcy Rule 7052, provides that, on a "party's motion filed no later than 10 days after entry of
26   judgment," "the court may amend its [factual] findings…"; (ii) Federal Rule of Civil Procedure
     54(b), made applicable to adversary proceedings by Bankruptcy Rule 7054, provides that any order
27   that does not adjudicate all the claims of all the parties "is subject to revision at any time before the
     entry of judgment..."; and (iii) Federal Rule of Civil Procedure 60(b), made applicable to this
28   proceeding by Bankruptcy Rule 9024, states that "the Court may relieve a party" "from a final
     judgment, order, or proceeding for" "any other reason justifying relief…"

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

> The rights to use Intel's graphics patents were so important that the joint venture agreement included a liquidated damages clause at article 5.6 entitling the joint venture **and VIA** each to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-license.

Opinion at p. 2, lines 24-27 (emphasis added).  The Senior Noteholders request that the Court either (i) confirm and clarify that this statement was included only in the context of identifying parties' contentions and not to make any factual determinations; or (ii) delete the words "*and VIA* each" from this sentence.  This clarification should be made for the following reasons:

Article 5.6 of the Investment Agreement among SonicBlue, VIA and S3 Graphics Co, Ltd. (called the "joint venture agreement" in the Opinion, and hereinafter, we adopt the Court's terminology) actually provides that the liquidated damages are payable **only** to S3G, the joint venture ("S3G" or "JV") formed by S3 and VIA, **not to VIA**.  And no contrary evidence is before the Court.

Article 5.6 of the joint venture agreement contains numerous provisions that potentially award liquidated damages **to the joint venture**.  *See* Senior Noteholders' Response to Motion to Convert Chapter 11 Case to a Case under Chapter 7 (the "Response to Motion") at p. 8, ftnt. 6. These provisions set out the circumstances under which liquidated damages would be paid.  Each provision provides that any liquidated damages required to be paid are payable **solely** to the JV. **None is payable to VIA**.

The first provision of Article 5.6 sets out liquidated damages payable in the event that the JV was enjoined from using the Intel license because of the acts of SonicBlue (defined in the joint venture agreement as "S3"):

> (a) If JV is Enjoined from Utilizing the Intel License…, because on or after the Closing Date S3 (i) engaged in transactions or conduct effecting a "Merge" (sic) or "Change of Control" of S3…, or (ii) affirmatively engaged in acts or conduct whether by commission or omission…, ***then the following liquidated damages shall apply***…
>
> (i) If JV is Enjoined from Utilizing the Intel License Agreement commencing during the first 5 years following the Closing Date, then following the conclusion of said period, for each day of such 365 day period that occurred during the 5-year period following

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

the Closing Date, ***S3 shall pay JV $191,780.82***, within 30 days of written demand by JV, as liquidated damages; and

      (ii) If such 365 day period commences or ends during the sixth year following the Closing Date, then following the conclusion of said 365 day period, for each day of such 365 day period that occurred during the sixth year period following the Closing Date, ***S3 shall pay JV $123,287.67***, within 30 days of written demand by JV, as liquidated damages.

Exhibit A to the Response to Motion, Joint Venture Agreement, Article 5.6(a) (emphasis added).

The second provision of Article 5.6 sets out liquidated damages in the event that S3 entered

into a settlement agreement with Intel:

      (b) If during the first 5 years after the Closing Date (i) S3 entered into a settlement agreement with Intel such that JV can no longer operate under the Intel License, ***then the following liquidated damages shall apply***…

      (i) If as a result of entering into a settlement agreement with Intel, S3 loses the Intel License, then ***S3 shall pay JV $35 million*** within 30 days after the date that S3 enters into such settlement agreement, …

      (ii) If S3 does not lose the Intel License as a result of entering into a settlement agreement with Intel, then: (A) if such settlement is a Settlement With Release (as defined below), ***S3 shall pay JV $45 Million*** within 30 days after the date that S3 enters into such settlement agreement…, or (B) if such settlement is not a Settlement With Release, ***S3 shall pay JV $70 million*** within 30 days after the date that S3 enters into such settlement.

Exhibit A to the Response to Motion, Joint Venture Agreement, Article 5.6(b) (emphasis added).

The third provision of Article 5.6 sets out liquidated damages in the event that JV was

enjoined from using the Intel license because of the acts or omissions of either or both of the parties:

      (c) If JV is Enjoined from Utilizing the Intel License (as defined in Section 5.6(h) below) because of the acts or omissions of either or both of the parties prior to, or associated with, entering into or consummating the transactions contemplated by this Agreement and the JV Transaction Agreements, ***then the following liquidated damages shall apply***…

      (i) If such 365 day period commences or ends during the first 5 years following the Closing Date, then following the conclusion of said 365 day period, for each day of such 365 day period that occurred during the 5 year period following the Closing Date, ***S3 shall pay JV***

MOTION FOR CLARIFICATION

1    **$95,895.41** within 30 days of written demand by JV, as liquidated
2    damages; and

3          (ii) No liquidated damages will be due under this Section 5.6(c)
     with respect to days outside the five (5) year period that commences
4    on the Closing Date.

5    Exhibit A to the Response to Motion, Joint Venture Agreement, Article 5.6(c) (emphasis added).

6        Nothing in Article 5.6 – or any other provision of the joint venture agreement – grants

7    liquidated damages to VIA.[2]  This was at all times a distinction with a meaningful difference to both

8    SonicBlue and VIA.  Both SonicBlue and VIA owned interests in S3G.  Therefore, both would share

9    through their joint ownership in S3G in any liquidated damages paid to S3G.  If liquidated damages

10   were payable to VIA, only VIA – and not SonicBlue – would have an interest in the amounts paid.

11       The only evidence before the Court concerning the terms of the joint venture agreement is

12   the joint venture agreement itself.  Its terms are clear and unambiguous.  The only entity that can

13   claim liquidated damages under Article 5.6 of the joint venture agreement is S3G, the joint venture.

14   Accordingly, the Court should confirm and clarify that this statement was not a factual

15   determination or the statement should be revised as stated above.

16   **IV.    THE OPINION INACCURATELY CHARACTERIZES THE SENIOR**

17             **NOTEHOLDERS' PARTICIPATION IN THIS CASE.**

18       The Opinion states:

19           Because the bondholders appear to have used their position on the
20           committee to insert themselves into the settlement negotiations
             without revealing a hidden agenda, they may have breached their
21           fiduciary duty to the unsecured creditor body.  Whether their motive
             was simply to save litigation costs for the estate by avoiding future
22           litigation over the priority of VIA's claim, or, instead, to assure a
             larger return on their individual investments is not known.  In fact, as
23           Bennett noted, he had never personally appeared in court until
             March 19, 2007.  During the four years of this case, he has operated in
24           the shadows and, until January 23, 2007, it was not generally known
             to this court or the creditor body that the three senior bondholders
25           were serving on the committee.

---

26
27   [2]    In their Response to Motion, the Senior Noteholders pointed out that, at times in this case,
     VIA has mischaracterized Article 5.6 of the joint venture agreement.  Response to Motion at pp. 6-7.
     This periodic mischaracterization was an important reason why the Senior Noteholders closely
28   monitored proceedings relating to the S3G and VIA claims.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Opinion at p. 17, lines 9-17.  The Senior Noteholders request that the Court either (i) confirm and

2    clarify that these statements were included only in the context of identifying various parties'

3    contentions and not to make any factual determinations; or (ii) delete these statements.  This

4    clarification should be made for the following reasons:

5        There is absolutely no evidence that the Senior Noteholders used their position on the

6    Creditors' Committee to insert themselves into the VIA settlement negotiations or that they had a

7    "hidden agenda."  Although SonicBlue Claims LLC ("SB Claims") has alleged (or would allege)

8    that the Senior Noteholders "used their position on the Committee to insert themselves into the

9    settlement negotiations without revealing a hidden agenda," this is not supported by any evidence in

10   the record and, in fact, is a contention that will be subject to investigation by the chapter 11 trustee.

11       Indeed, the only evidence on this point shows – without any contrary evidence – that (1) the

12   Senior Noteholders participated in the VIA negotiation in their capacity as Senior Noteholders (and

13   hence the largest creditors of the estate) and not as members of the Creditor's Committee; (2) the

14   Senior Noteholders' participation in the VIA settlement negotiation was open and disclosed in

15   pleadings filed with the Court; (3) no portion of the Senior Noteholders' "agenda" was ever

16   "hidden"; (4) the Senior Noteholders did not operate in the "shadows"; and (5) the fact of the Senior

17   Noteholders' service as members of the Creditors' Committee was public, as disclosed throughout

18   the record in this case.

19       First, the Senior Noteholders participated in the S3G and VIA settlement negotiations as

20   Senior Noteholders and not as representatives of the Creditors' Committee.  This fact is confirmed

21   in the record of this case and there is no contrary evidence in the record.  The Stipulated Protective

22   Order relating to the Intel and VIA litigation specifically shows that it was signed by counsel for the

23   Senior Noteholders in its capacity as "Attorneys for the Senior Debtholders."  Stipulated Protective

24   Order, Docket # 529 (the "Protective Order"), at p. 12.  The Creditors' Committee was separately

25   represented in those negotiations and its participation is noted separately and distinctly in the

26   Protective Order.  Protective Order at pp. 2, 3, 4, 12.  This Court approved the Protective Order on

27   October 17, 2003, and it was entered on the docket on October 20, 2003.  The Senior Noteholders

28   are unaware of any other evidence before the Court discussing or describing the capacity in which

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

LOS ANGELES, CALIFORNIA

-7-

MOTION FOR CLARIFICATION

Hennigan, Bennett & Dorman LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    the Senior Noteholders or their counsel participated in the Intel/VIA settlement negotiations.

2        The Senior Noteholders clearly had the right to participate.  As pointed out at the hearing on

3    these matters, the Bankruptcy Code specifically grants every party in interest, including every

4    creditor, standing to object to any claim filed against a debtor.  11 U.S.C. § 502(a).  Indeed, any

5    party in interest, including any creditor, may even move for reconsideration of the allowance or

6    disallowance of any claim.  Fed. R. Bankr. P. 2008.  Clearly, any party authorized to file an

7    objection to a claim has the right to participate in discussions to settle the claim.  Accordingly, the

8    Senior Noteholders did not need to use a position on any committee to participate in settlement

9    negotiations relating to the allowance or disallowance of a proof of claim filed in this bankruptcy

10   case.  Moreover, no evidence in the record even suggests that the Senior Noteholders, in fact, used

11   their position on the Committee to insert themselves into the Intel/VIA settlement negotiations.

12       The Senior Noteholders fully expect that the chapter 11 trustee will thoroughly investigate

13   the Senior Noteholders' participation in the objection to the proofs of claim filed by VIA and S3G

14   and the related settlement negotiations.  The Senior Noteholders are confident that the investigation

15   will demonstrate that they acted properly and did not breach any duty arising from their service as

16   members of a Creditors' Committee or otherwise.  Yet, given that the investigation has not even

17   begun, much less been concluded, and given that the current record includes no evidence whatsoever

18   suggesting that the Senior Noteholders used their position on the Creditors' Committee to insert

19   themselves into the settlement negotiations, this Court's statement that "the bondholders appeared to

20   have used their position on the committee to insert themselves into the settlement negotiations"

21   should be deleted from the Opinion.  There is no evidence whatsoever to support this statement.

22       The Court's statement that the Senior Noteholders had a "hidden agenda" in connection with

23   their participation in the VIA settlement negotiations is prejudicial and similarly unsupported by

24   anything in the record.  The record accumulated to date in fact demonstrates that the Senior

25   Noteholders' "agenda" was fully consistent with the goals and objectives of the estates – it included

26   minimization of claims against the estates and ensuring that the ownership of the claims asserted in

27   duplicate by VIA and S3G was not distorted or manipulated for improper or illegal purposes.  *See,*

28   *e.g.,* Response to Motion at pp. 6-10, and Boro Declaration at ¶¶ 10-24.  Further, that "agenda" was

1    not "hidden" in any sense of the word.  Pillsbury Winthrop and O'Melveny & Myers, two sets of

2    counsel for the Debtors, both understood that the Senior Noteholders were concerned that the claims

3    asserted by VIA and S3G were not awarded to an improper party.

4          Indeed, at other points in the Opinion, the Court acknowledges that the Senior Noteholders'

5    concerns that any claim allowed in respect of duplicate claims filed by VIA and S3G be assigned to

6    the proper Debtor or that any effort to assign the claim to an improper party did not prejudice the

7    Senior Noteholders were not hidden at all.  The Opinion notes:  "on September 20, 2005, Bennett

8    confirmed the Senior Bondholders' agreement to a $12.5 million allowed claims, provided the

9    settlement included, *inter alia*, that the allowed claim be neither senior nor junior to other general

10   unsecured claims."  Opinion at p. 7-8.  The Opinion also notes:  "Boro's Declaration reflects that at

11   the time of the September 15, 2005 settlement meeting, he was aware that the Senior Bondholders

12   were subordinated to VIA indebtedness under the terms of the Indenture."  Opinion at p. 8.  Each of

13   these statements reveal that no one involved in the S3G and VIA settlement discussions was

14   unaware of the Senior Noteholders' concerns.

15         Consequently, this Court's statement that the Senior Noteholders had a "hidden agenda" that

16   was not revealed to anyone should be deleted from the Opinion.

17         The Court's statement that counsel for Senior Noteholders "operated in the shadows" is

18   similarly not supported by any evidence in the record in the case.[3]  Indeed, the record before the

19   Court contains substantial evidence to the contrary.  To begin, Hennigan, Bennett & Dorman LLP

20   ("HBD") publicly appeared in this Court on behalf of Senior Noteholders on a number of occasions,

21   starting with the very first hearing in this case:

22

23   _____

24   [3]      The Senior Noteholders also note that there is no evidence in the record to support the
     Court's giving credibility to the other unsupported assertions by SB Claims regarding counsel in this

25   matter.  The Court states that "SB Claims suggests, and the record does not dispel, the belief that
     LNBRB's conduct was a self-interested act to protect its referral sources."  Opinion, at p. 18.

26   Mr. Bennett did not refer the representation of the Committee to Bender or LNBRB, and in fact has
     never at any time referred any business to Mr. Bender or LNBRB.  (Mr. Bennett has not checked

27   with his entire firm as to whether any referrals have ever been made from HBD to Bender or
     LNBRB, but the counsel on this pleading are unaware of any such referrals.)  Indeed, prior to this

28   case, Mr. Bennett did not even know Mr. Bender.  More importantly, for current purposes, there is
     no evidence in the record to support the Court's assertion and it should be deleted.

MOTION FOR CLARIFICATION

Hennigan, Bennett & Dorman llp
LAWYERS
LOS ANGELES, CALIFORNIA

- HBD appeared before the Court on March 25, 2003 for the first day hearings;

- HBD appeared before the Court on April 15, 2003 for the Rio/Replay TV sale hearing; and

- HBD appeared before the Court on September 24, 2004 for the hearing on Debtors' motion to compel production of documents and Intel's renewed motion for relief from stay.

Further, even before the first hearing in the case, Bruce Bennett of HBD filed a declaration in which he identified himself and each of the Senior Noteholders, and stated that he represented the "Senior Noteholders" who "together hold $75 million in principal amount of the 7 ¾ % Secured Senior Subordinated Convertible Debentures due 2005."  Docket # 28 – Filed 3/24/2003 – Declaration of Bruce Bennett, ¶ 1.  HBD thereafter filed or executed a number of pleadings in the case, clearly identifying itself and its clients.[4]

Thus, the statement in the Opinion that Mr. Bennett "has operated in the shadows" should be deleted from the Opinion.

Finally, the Court's statement that "until January 23, 2007, it was not generally known to this Court or the Creditor body that three Senior Bondholders were serving on the Committee" is simply inaccurate.  The fact that the Senior Noteholders served as members of the Creditors' Committee is disclosed in numerous filings with the Court, including:

- United States Trustee's Notice of Appointment of Creditors' Committee (Docket # 26 – 3/21/2003, entered 3/27/2003) (identifying the members of the Creditors' Committee including all three Senior Noteholders);

- Application of Official Committee of Unsecured Creditors to Employ Levene, Neale, Bender & Rankin(Docket # 63 – 3/31/2003) (stating at ¶ 10 that the Committee is "comprised of eight members" including "all three of the Debtors' senior bondholders");

- Declaration of Ron Bender, Esq. in Support of Application of Official Committee of Unsecured Creditors to Employ Levene, Neale, Bender &

---

[4]    The pleadings include (i) Docket #43 – Filed 3/28/03 – Notice of Appearance and Request for Notices and Services of Papers; (ii) Docket #334 – Filed 7/14/03 – Stipulation Providing Relief from the Automatic Stay to Senior Noteholders; Order Thereon (Entered 7/16/03); and (iii) Docket #545 – Filed 10/16/03 – Stipulation Providing Relief from the Automatic Stay to Senior Noteholders; Order Thereon (Entered 10/27/03).

Hennigan, Bennett & Dorman LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Rankin (Docket # 64 – 3/31/2003) (stating at ¶ 6 that the Committee is "comprised of eight members" including "all three of the Debtors' senior bondholders");

- United States Trustee's First Amended Appointment of Committee of Unsecured Creditors (Docket # 119 – 4/7/2003, entered 4/9/2003) (identifying the members of the Creditors' Committee including all three Senior Noteholders ); and

- United States Trustee's Second Amended Appointment of Committee of Unsecured Creditors (Docket # 528 – 10/6/2003, entered 10/15/2003) (identifying each of the members of the Creditors' Committee including all three Senior Noteholders).

The Court should not ignore the contents of the files of this case that make this fact plain.[5]

Accordingly, the Court should delete its statement that "until January 23, 2007, it was not generally known to this court or the creditor body that the three senior bondholders were serving on the Committee."

## V.    CONCLUSION

For the foregoing reasons and based upon the authority set forth herein, this Court should clarify the Opinion as set forth above or grant leave for reconsideration.

DATED:  April 4, 2007                    HENNIGAN, BENNETT & DORMAN LLP
                                         865 South Figueroa Street, Suite 2900
                                         Los Angeles, California 90017

                                         By  /s/ Bruce Bennett
                                                  Bruce Bennett
                                         Counsel for Portside Growth & Opportunity
                                         Fund, Smithfield Fiduciary LLC, and Citadel
                                         Equity Fund Ltd.

---

[5]     "That the Court may take judicial notice of its own files and records is so deeply imbedded in the law that it needs no citation of authority."  *In re Neil Properties, Inc.*, 360 F. Supp. 914, 914-915 (S.D. Cal. 1966).  *See also* Federal Rule of Evidence 201 (judicial notice is appropriate where the facts are "generally known" within the Court's jurisdiction and "capable of accurate and ready determination") (made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9017).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# EXHIBIT 9

1  EDWINA E. DOWELL, #149059
   Assistant U.S. Trustee
2  NANETTE DUMAS, #148261
   SHANNON L. MOUNGER-LUM, #208071
3  Office of the United States Trustee
   280 S. First Street, Suite 268
4  San Jose, CA 95113-0002
   Telephone:   (408) 535-5525
5  Fax:         (408) 535-5532

6  Attorneys for Sara L. Kistler
   Acting United States Trustee for Region 17
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10 In re:

11 SONICBLUE, INCORPORATED, a Delaware          Case No. 03-51775 MM
   Corporation, DIAMOND MULTIMEDIA
12 SYSTEMS, INC., a Delaware Corporation,        Chapter 11
   REPLAY TV, INC., a Delaware Corporation,
13 and SENSORY SCIENCE CORPORATION,
   a Delaware Corporation,                       [NO HEARING NECESSARY]
14
                      Debtors.
15

16            **APPLICATION FOR ORDER APPROVING**
17         **THE APPOINTMENT OF CHAPTER 11 TRUSTEE**

18         Pursuant to 11 U.S.C. § 1104(d) and Fed. R. Bankr. P. 2007.1(c), the Acting

19 United States Trustee hereby applies to this Court for an Order approving the

20 appointment of Dennis J. Connolly, Esquire, of the law firm Alston & Bird LLP, as

21 Chapter 11 trustee in the above-captioned case and in support thereof, states the

22 following:

23         1.      By an order of this Court dated March 26, 2007, the Acting United States

24 Trustee has been directed to appoint a Chapter 11 Trustee in the above-captioned

25 case.

26         2.      Pursuant to Fed. R. Bankr. P. 2007.1(c), the Acting United States Trustee

27

28 Application For Order Approving The
   Appointment Of Chapter 11 Trustee

has conferred with the following parties regarding this appointment:  Robert A. Franklin of Murray & Murray, counsel for Riverside Claims and Riverside Contracting; Ron Bender of Levene, Neale, Bender, Rankin & Brill, counsel for the Official Committee of Unsecured Creditors; Glenn P. Zwang of Bartko, Zankel, Tarrant & Miller, counsel for WM Trust High Yield Fund, et al.; Bruce Bennett of Hennigan, Bennett & Dorman, counsel for Citadel Equity Fund, Ltd., et al.; Patrick M. Costello of Bialson, Bergen & Schwab, counsel for Maxtor Corporation; Henry C. Kevane of Pachulski Stang Ziehl Young Jones & Weintraub, counsel for VIA Technologies, Inc.; John Shaffer of Stutman Triester & Glatt, counsel for SonicBlue Claims, LLC; Dana P. Kane, counsel for Liquidity Solutions, Inc.; James J. Williams of Hain Capital Group, LLC; and Jeannette Schirtzinger, counsel for Peery-Arrillaga.

      3.      Pursuant to the Order directing the appointment of a Chapter 11 Trustee and after consultation with the parties-in-interest, the Acting United States Trustee has selected Dennis J. Connolly as Chapter 11 Trustee in this case.

      4.      This application is supported by the declaration of Connolly filed concurrently herewith as required by Fed. R. Bankr. P. 2007.1(c).  To the best of the Acting United States Trustee's knowledge, Dennis J. Connolly has no connection with the above-captioned debtors (the "Debtors"), the creditors, or any parties in interest in these cases, their respective attorneys or accountants, the United States Trustee or any employee of the Office of the United States Trustee, except to the extent set forth in his declaration.

      WHEREFORE, the Acting United States Trustee requests that the Court enter an order approving the appointment of Dennis J. Connolly as Chapter 11 Trustee,

Application For Order Approving The
Appointment Of Chapter 11 Trustee

2

1  pursuant to 11 U.S.C. § 1104(d) and for such other and further relief as may be

2  deemed just.

3                                        Sara L. Kistler

4                                        Acting United States Trustee

5  Dated:  April 16, 2007          By:     /s/ Nanette Dumas
                                        Attorney for United States Trustee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  Application For Order Approving The
    Appointment Of Chapter 11 Trustee                                        3

1   Dennis J. Connolly
    ALSTON & BIRD LLP
2   1201 West Peachtree Street
3   Atlanta, Georgia 30309
    Atlanta, GA 30309-3424
4   Telephone: (404) 881-7000
5   dennis.connolly@alston.com

6

7                   UNITED STATES BANKRUPTCY COURT
                    NORTHERN DISTRICT OF CALIFORNIA
8                          SAN JOSE DIVISION

9   In re:                          )    Chapter 11 Cases
                                     )
10                                   )
    SONICBLUE INCORPORATED, a        )    Case Nos.: 03-51775
11  Delaware corporation, DIAMOND    )    through 03-51778
    MULTIMEDIA SYSTEMS, INC., a      )
12  Delaware corporation, REPLAYTV,  )    Jointly Administered
13  INC., a Delaware corporation, and )
    SENSORY SCIENCE CORPORATION,     )    DECLARATION OF DENNIS J.
14  a Delaware corporation,          )    CONNOLLY IN SUPPORT OF
15                                   )    APPOINTMENT OF
    Debtors and Debtors-in-Possession. )    DENNIS J. CONNOLLY AS
16                                   )    CHAPTER 11 TRUSTEE FOR THE
17                                   )    BANKRUPTCY ESTATE OF
                                     )    SONICBLUE INCORPORATED
18                                   )    ET AL.
19  _____ )    Honorable Marilyn Morgan
20

21          I, Dennis J. Connolly, state the following under penalty of perjury:

22          1.      I am admitted to practice in the State of New York and the State of

23  Georgia and am a partner in the law firm of Alston & Bird LLP ("A&B"), which

24  maintains an office at 1201 West Peachtree Street, Atlanta, Georgia 30309-3424.  A&B

25  also maintains offices in Raleigh, North Carolina, Charlotte, North Carolina, Washington,

26  D.C., and New York, New York.

27          2.      I submit this declaration in support of the Application of the United States

28  Trustee (the "UST") seeking Court approval of my appointment as Chapter 11 trustee

("Trustee") in the Chapter 11 cases of SONICblue Incorporated and its three operating subsidiaries, Diamond Multimedia Systems, Inc., ReplayTV, Inc., and Sensory Science Corporation (collectively, "Debtors") pursuant to 11 U.S.C. § 1104 and 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.[1]

4. I make the following disclosures: (i) to establish that I am qualified to act as Trustee in these cases and do not have any relationship with the Office of the UST, the Bankruptcy Judge presiding over the Debtors' Bankruptcy Cases, or any other person that would disqualify me from being appointed as Trustee in these cases; (ii) to establish that I am a "disinterested person" as that term is defined in Section 101(14) of title 11 of the United States Code (the "Bankruptcy Code"); and (iii) to set forth all of my connections with the Debtors, their creditors, any other parties in interest in these cases, their respective attorneys and accountants, the UST, and persons employed in the Office of the UST.[2]

5. To the best of my knowledge, information and belief formed after reasonable inquiry, except as otherwise set forth herein, I: (a) do not have any connection with the Debtors or their affiliates, their creditors, the UST or any attorney employed in the Office of the UST, or any other party in interest, or their respective attorneys and accountants, (b) am a "disinterested person" as that term is defined in Section 101(14) of

---

[1] Certain of the disclosures set forth herein relate to matters within the knowledge of other attorneys at A&B and are based on information provided by them.

[2] To the extent appropriate, I have included disclosures relative to the connections of A&B to the Debtors, their affiliates, creditors, other parties in interest, the UST or any attorney employed in the Office of the UST.

the Bankruptcy Code, and (c) do not hold or represent any interest materially adverse to

the estates.

## My Qualifications and the Qualifications of A&B

6.     I am the leader of A&B's Bankruptcy Workouts and Reorganization

practice group.   My practice focuses on the representation of debtors, examiners,

creditors' committees and other parties in commercial bankruptcy cases.   At A&B, I have,

among other things, represented the Enron Corporation Examiner in all respects of the

examination including, without limitation, litigation involving discovery, disputes relating

to the scope of the examination, fee applications, and other matters involving the

investigation.  Attached hereto as Exhibit "A" is my resume.

7.     To assist me in the performance of my duties as Trustee, I intend to retain

A&B as my principal counsel.   A&B is one of the nation's largest law firms, with more

than 750 attorneys -- of whom approximately 450 are based in Atlanta.   A&B currently

has nineteen (19) attorneys in its bankruptcy and financial restructuring group, having

extensive experience handling all matters arising in large and complex representations,

including Chapter 11 cases, and representing various parties, including debtors,

examiners, trustees, creditors' committees, institutional lenders, other critical creditors and

parties-in-interest, and potential acquirers of businesses and large assets.   The A&B

bankruptcy partners who will principally be involved with this matter are Neal Batson,

Steve Collins and Grant Stein.

8.     I may also engage additional counsel, consultants and subject matter

experts, and will work with A&B and such other counsel, consultants and subject matter

experts to allocate responsibility for various tasks in order to avoid duplication of effort

and to move the investigation and case administration forward as quickly, harmoniously and efficiently as possible.

### Connection with Interested Parties

9.     A&B utilizes a number of procedures (the "Firm Procedures") to determine its relationships, if any, to parties that may have connections to a debtor.  A&B maintains records of all of its clients, the matters on which it represents its clients, and the other parties which have a substantial role in such matters.  A&B has also inquired of its attorneys whether they have any independent (i.e., non-A&B) relationships with the Debtors, their directors, any of their significant creditors, and any other significant parties in interest.  I have utilized the A&B conflict system and the Firm Procedures to determine any relationships with the referenced persons and entities.

10.     In implementing the Firm Procedures in connection with my appointment as Trustee in these cases, I took the following actions to identify parties that may have connections to the Debtors, and my relationship with such parties:

> a.     I compiled, from information provided by the UST and/or publicly available information, a list of interested parties and creditors (the "Interested Parties"), attached hereto as Schedule 1.  The Interested Parties include Debtors and their non-debtor subsidiaries and affiliates, creditors and certain parties in interest, including professionals identified by the Office of the UST, creditors and parties in interest shown on Exhibit "C" to the First Amended Disclosure Statement filed by the Debtors and the Official Committee of Unsecured Creditors (the "Committee"), and other

parties in interest identified in that certain Memorandum Opinion dated March 26, 2007.

b.    I then caused the employees of A&B to compare each of the names on the Interested Parties list to the names in its master electronic database of current and former clients (the "Conflicts Database"). The Conflicts Database generally includes the name of each client of the firm, the name of each party who is or was known to be adverse to such client of the firm, the name of each party that has or had a substantial role with regard to the subject matter of A&B's retention, and the names of the A&B attorneys who are or were primarily responsible for matters for such clients. I also sent an email inquiry to A&B attorneys inquiring of any known connections between A&B and certain of the interested parties (including Debtor's primary bankruptcy counsel) and UST and attorneys with the Office of the UST in Region 17.

c.    If an Interested Party produced a match with a known party in the Conflicts Database, I reviewed a report for that specific party to determine whether I or A&B: (i) had or have in the past or is currently representing the party and/or (ii) whether the matter is active or closed.

11.    Schedule 2 hereto identifies those Interested Parties (or their affiliates) that A&B is representing. If attorneys at A&B are currently representing the Interested Party (or its affiliate), the A&B representation is identified on Schedule 2 as "Active".

12.    Based on my due diligence and review of the appropriate records, the representations listed on Schedule 2 and described below are in connection with matters wholly unrelated to the Debtors and these chapter 11 cases:

a.    A&B represents Matsushita Electric Industrial Co., Ltd. and Matsushita Electric Corporation of America in tax matters and certain intellectual property matters that are unrelated to SONICblue.    I understand that Matsushita Kotobuki Electronic Sales of America LLC and Matsushita Kotobuki Electronics Industries are creditors that presently sit on the Committee.    A&B is informed that Matsushita Kotobuki Electric Sales and Matsushita Kotobuki Electronics Industries are subsidiaries of Matsushita Electric Industrial Co., Limited.    A&B is not aware of any challenge to the claims filed by the Matsushita entities.

b.    A&B represents U.S. Bank, N.A. in financings unrelated to SONICblue.    I understand U.S. Bank, N.A. is the successor indenture trustee for the Junior Notes (as defined in the Disclosure Statement).

c.    Two partners of A&B's Washington, D.C. and New York offices are formerly partners with the predecessor firm to Debtor's counsel.    A&B has served as counsel to parties in litigation that may have interest coincident with parties represented by Pillsbury and A&B has been adverse to Pillsbury on other matters.    Since 1991, either Pillsbury or certain of its predecessor firms (including the Shaw Pittman firm) has referred 12 matters to A&B.    The fees for the matters aggregate

approximately $580,000 over the past 16 years, which is less than 2/100 of 1% of the total revenues for A&B over the past 16 years.

d. A&B represents Houlihan, Lokey, Howard & Zukin ("HLHZ") in connection with certain fairness opinions and related issues in respect of transactions and matters wholly unrelated to SONICblue. I understand that HLHZ is a financial advisor/investment banker to the Debtors although it appears that the engagement is largely at an end by virtue of the fact that the transactions for which HLHZ had been engaged have now closed.

e. A&B represents the Coca-Cola Company on tax matters and property matters all in which are wholly unrelated to SONICblue.

f. A&B represents Wells Fargo, NA, and certain of its affiliates with respect to certain financial transactions (as an asset-based lender) in respect of transactions that are wholly unrelated to SONICblue.

13. Based on information obtained from the Inquiry and my own personal knowledge, I am a "disinterested person" as that term is defined in Section 101(4) of the Bankruptcy Code, in that, to the best of my knowledge, A&B, its partners, counsel, and associates, including myself:

a. are not creditors, equity security holders, or insiders of the Debtors;

b. are not and were not, within two years before the date of the filing of the petition, a director, officer or employee of the Debtors; and

c.      do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

14.      Neither I nor any member of A&B is related to the Bankruptcy Judge in these Bankruptcy Cases, the Honorable Marilyn Morgan.

15.      Neither I nor any member of A&B is related to the UST in the region in which these bankruptcy cases are pending.  Other than as set forth above, neither I nor A&B have had any connection with the UST, or with members of the UST.

16.      In addition to the foregoing, some of A&B's lawyers may have had some personal or professional relationships with attorneys, accountants, employees, or other parties in interest of the Debtors.  The undersigned does not have knowledge of any such relationship that is material.

17.      I believe that neither my proposed employment as Trustee nor the proposed  employment of A&B is prohibited by or improper under Bankruptcy Rule 5002. I am qualified to act as Trustee and A&B and the professionals it employs are qualified to represent me in this matter.

### Compensation

18.      I am willing to act as Trustee, and A&B as my counsel, at my and A&B's normal and customary rates for matters of this type, together with reimbursement of all costs and expenses incurred by me and A&B in connection with these cases, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local

1    Rules, the UST Guidelines, and orders of this Court.  My current standard hourly rate is

2    $625.00 per hour.

3          19.    No agreement or understanding in any form or guise exists between A&B

4    and any other person, including me, for a division of compensation for services rendered

5    in or in connection with these cases, and no such division of compensation prohibited by

6    Section 504 of the Bankruptcy Code will be made, except among members of A&B.

7    Neither I nor A&B have shared or agreed to share any compensation received in this case

8    with any entity other than its partners, counsel and associates.

9          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

10   is true and correct.

Dennis J. Connolly

Sworn to and subscribed before me
this 16th day of April, 2007.

NOTARY PUBLIC

Commission Expires:

July 19, 2008

- 9 -

## SCHEDULE 1

E-Services Private Sub LLC
Grey Ventures, Inc.
William Morris Agency, Inc.
The Interpublic Group of Companies, Inc.
S3, Inc. Litigation Plaintiffs
SONICblue Incorporated
SONICblue International Limited
S3 Asia Pacific Limited
Diamond Multimedia Systems, Inc.
Frontpath, Inc.
Replay TV, Inc.
S3 Ventures, Ltd.
S3 Japan, K.K.
SONICblue Singapore Pte Ltd.
S3 International
S3 Singapore Pte, Ltd.
SONICblue Holdings (PTY), Ltd.
Sensory Science Corporation
Sonica3, Inc.
S3 Graphics Co., Ltd.
S3 Graphics, Inc.
S3 – VIA, Inc.
S3 Europe Ltd.
Micronics Computers, Inc.
Microniche Info Systems, Inc.
Binar Graphics, Inc.
Khahn Trading, Inc.
Avia Technology
Supra Corporation
SONICblue GmbH
Diamond Multimedia Systems International, Inc.
Diamond Multimedia Services Co., Ltd.
Diamond Multimedia Systems Hong Kong, Ltd.
Orchid Technology
Orchid France S.A.R.L.
Orchid Technology Group
Orchid (Europe) Limited
Diamond Computer Systems Japan K.K.
DSI Technology Escrow Services
Eakins Open Systems
Ed Esber
Elevator Service Company, Inc.
ENG Electronic Enterprise

RioPort, Inc.
DigitalCast, Inc.
SPEA Software AG
California Audio Labs, LLC
Go-Video Productions, Inc.
SONICblue Holding LLC
Sonic Holdings LLC
Empeg Limited
Pillsbury Winthrop Shaw Pittman LLP
Levene, Neale, Bender, Rankin & Brill
Hennigan, Bennett & Dorman
O'Melveny & Myers
Pachulski, Stang, Ziehl, Younger & Jones
Stutman, Triester
McGrane, Greenfield
Murray & Murray
Howard, Rice
Jeffer, Mangels & Butler
McNutt & Littneker
James Williams
Dana Kane
Bialson, Bergen & Schwab
Marcus Smith
3 DFX
ABT TV
Actebis Distribution
Advance Service/Advance TV
Alpha Electronics
American Alliance Insurance Co.
American Express Travel Related Services
Andrew Wolfe
Apple Computer
Audio Wizard
Avaya, Inc.
Avaya fka Lucent Technologies
AVC Corp
Avocon
Bankvest
BDI Leguna Distributors
Bergerson Eliopoulos
Bowne of Los Angeles
California Franchise Tax Board
Central Transport International

ESL, Inc.
Familycare, Inc.
Federal Express
Fenwick & west
Fidelity Investments Institutional Operations
Fuller, Glenn
Good Guys
Greenleaf Compaction
Folger Levin
GE Capital/General Electric Capital
Gleason Associates
HD Electronics
Terry Holdt
Hotjobs.com
HR Audio Video, Inc.
HSN dba Home Shopping Network
In-House Service Co.
Inserv Company
Integnology
Intertan Technical Services
Jeffrey Berg
John Kovacs
Joseph Kincaid/Raymond Leasing
Kenneth Potashner
Kevin Bohren
Kintetsu World Express
K O Electronics
Larry Kenswil
Larson Pallet Co.
Lee and Li
Marger Johnson & McCollom
Maricopa County

Tai Tien Electronics
Target
Tech Search
Tech Data
Teletron Service
Televentions, L.L.C.
The Coca-Cola Company
The Electronics Shop
TV Data Technologies
Tweeter Home Ent. Group
United Radio
Universal Electronics
Varta The Battery Experts

Christie Parker & Hale
CIT Communications Finance Corp.
City of Santa Clara
City Video Electronics Repair
Continental Promotion Group
Continental Resources
Cornerstone Research
Corporate Transport. 'n Tours
Costello Communications
Daniel Rhodes
Dash Electronics
David Gershon
DDB Worldwide
Decision One Corporation
Digital Commerce
Dolphin Capital
Donald V. Biase/Tops Appliance City
Drinker Biddle & Reath
Metropolitan Graphics (Riverside Contracting
Michelle Miller
Nasdaq
Nationwide Gourmets
Naumann Hobbs Material Handling
Neopost
Nike
Off Site Record Management
Office Depot
Orion Advanced Marketing
Palmetto Electronics
Posh Bagel
Print, Inc.
PSC
PTI Global
Puglisi
QVC, Inc.
Recall Total Information MGM
Reigncom
Reliable Richard Service Co.
Rentokil Tropical Plant Service
Retail Services
Schiff Hardin & Waite
Schraith, James T.
Scott Morris Enterprises
Sharon Taylor
Shred-it
Sodexho Marriott Services

Verisign, Inc.
Visions Electronics
Walter Amaral
Warren Communications
Webside Story
Wells Fargo
Westronix
Wist Office Products
Zodiac Trading
Portside Growth & Opportunity Fund Ltd.
Smithfield Fiduciary LLC
United Microelectronic Corporation
Manufacturers' Service Limited
Maxtor Corporation
A-Max Technology Co. Ltd.
Baltrans Logistics Inc.
John Todd
Robert Lee

Southwest Incentives
Southeastern Sales
Splash Studios
Squire, Sanders & Demsey
Staples Credit Plan
State of Michigan/
  Michigan Department of Treasury
State of Tennessee/
  Tennessee Department of Revenue
Stereo & Video Repair
Sterling Electronics
Synnex

## SCHEDULE 2

Matsushita Electric Industrial Co., Ltd and
  Matsushita Electric Corporation of America -- IP and tax work unrelated to SONICblue

Coca-Cola -- Corporate and tax matters unrelated to SONICblue

Wells Fargo -- Finance and related matters unrelated to SONICblue

QVC, Inc. -- Tax matters unrelated to SONICblue

U.S. Bank, N.A. -- Financing matters unrelated to SONICblue

Houlihan, Lokey, Howard & Zukin -- Matters unrelated to SONICblue

# EXHIBIT "A"

# ALSTON+BIRD LLP



**Dennis J. Connolly**
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7269
dennis.connolly@alston.com

90 Park Avenue
New York, NY 10016-1387

**Practice Areas**
Bankruptcy, Workouts & Reorg

**Education**
University of South Carolina
(J.D., 1986)

University of Michigan
(B.A., 1982)

**Admitted to Practice**
Georgia
New York

# Dennis J. Connolly

Dennis J. Connolly is the leader of Alston & Bird's Bankruptcy, Workouts and Reorganization practice group.  His practice has focused on the representation of debtors, creditors' committees and other parties in commercial bankruptcy cases.  Mr. Connolly has represented parties in interest in major chapter 11 cases for industries including commercial airlines, financial services, energy, food service, and retail jewelers, grocery stores, and restaurant chains. Mr. Connolly is a Fellow of the American College of Bankruptcy.  He is also a director of the Southeastern Bankruptcy Law Institute.  In 2003, 2004, 2005 and 2006 he was selected as a leading insolvency practitioner by Chambers & Partners USA, and he is listed in the *Best Lawyers in America* and the *Georgia Super Lawyers.* Mr. Connolly is also listed in the *Guide to the World's Leading Insolvency and Restructuring Lawyers, Who's Who Legal: USA* and *Georgia Trend's Legal Elite.*  Mr. Connolly is a past Chair of the Board of the Bankruptcy Section of the Atlanta Bar Association and a member of the American Bankruptcy Institute.

Mr. Connolly has been a frequent lecturer on creditors' rights and bankruptcy issues nationally.  He has been a speaker at various conferences and seminars in New York, Chicago, Dallas and other venues on bankruptcy issues relating to prepackaged plans of reorganization, bankruptcy litigation and other matters.  Mr. Connolly has also published widely including articles in the *National Law Journal*, *Legal Times*, the *Bankruptcy Strategist* and the *Norton Annual Survey of Bankruptcy Law.*

### Representative Experience

- Currently representing a competitor with a significant patent claim against Delphi.

- Presently representing certain hedge funds and other entities that deposited assets with affiliates of a global financial services company in that company's bankruptcy case.

- Currently involved in Alston & Bird's representation of a major commercial airline as special counsel, relative to pension plan and employee benefit issues.

- Served as co-counsel for a global textile supplier and its affiliates in their bankruptcy cases pending in the United States Bankruptcy Court for the Northern District of Georgia.

- Served as co-counsel to the Ad Hoc Committee of the Holders of Senior Secured Notes in the Chapter 11 bankruptcy case of a major manufacturer of ready-to-assemble furniture.

Exhibit A-1

# ALSTON+BIRD LLP

- Served as co-counsel for the Official Committee of Unsecured Creditors in the cases of a leading manufacturer of textile products and its affiliates, pending in the United States Bankruptcy Court for the Northern District of Georgia.

- Served as co-counsel to the debtor in the bankruptcy case of a leading manufacturer of private label disposable diapers, in the United States Bankruptcy Court for the Northern District of Georgia.

- Served as counsel for the Official Committee of Unsecured Creditors in the bankruptcy cases of the number one chain of retail bagel stores and its affiliated debtors in the United States Bankruptcy Court for the District of Arizona.

- Currently serves as counsel to the Official Committee of Unsecured Creditors in the bankruptcy case of a major regional transportation company and its affiliated debtors in the United States Bankruptcy Court for the Northern District of Georgia.

- Represented the Enron Corp. Examiner in all aspects of the examination including, but not limited to, litigation involving discovery, disputes relating to the scope of the examination, fee applications, and other matters involving the investigation.

- Represented creditors, purchasers and other parties in interest in a number of additional cases throughout the United States including companies in the grocery, food services, air transportation, electronics and automotive supply industries.

- Involved in representing parties with claims against the FDIC and/or the RTC as receiver for insolvent financial institutions throughout the Southeast.

### Publications/Presentations

- "Current Issues Involving the Application of Exculpation and the Business Judgment Rule to Creditors' Suits Against Directors of Insolvent Corporations," *Annual Survey of Bankruptcy Law*, 2006 edition.

- "Current Issues in Auction Sales," *Annual Survey of Bankruptcy Law*, 2005 edition.

- "Second Circuit Says Exculpation Provisions Apply to Trustee Claims Against Directors," *American Bankruptcy Institute Journal*, Vol. 24, No. 7, September 2005.

- "BAPCPA to Change Committee Make-up and Practice," *American*

# ALSTON+BIRD LLP

*Bankruptcy Institute Journal*, Vol. 24, No. 6, July/August 2005.

- "Delaware Case Protects Directors," *The National Law Journal*, March 7, 2005.

- "Current Issues Involved in Prepackaged and Prenegotiated Plans," *Annual Survey of Bankruptcy Law*, 2004 edition.

- Author, "High Court Cram-Down Decision Will Have Big Impact," *The National Law Journal*, Vol. 26, No. 49, August 9, 2004.

- "Pitfalls for the Locked-Up," *The Legal Times,* January 27, 2003.

- "The Impact of Bankruptcy on the Exercise of Corporate Governance Rights," *Annual Survey of Bankruptcy Law*, 2003 edition.

- "The Use of the Section 1145 Exemption to Reorganize or Acquire a Chapter 11 Debtor," *Annual Survey of Bankruptcy Law*, 2002 edition.

- "Executory Contracts" and "Avoidance Actions," 21st Annual Norton Bankruptcy Litigation Institute I, Park City, Utah, February 24-27, 2007.

- "Selected Practical Problems in Addressing Sovereign Immunity Pre- and Post-Katz," St. John's University Seminar, LL.M. in Bankruptcy Program, New York, New York, February 9, 2007.

- "Selected Provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act," The 2007 U. S. Turnaround Managemet and Distressed Investing Forum, New York, New York, February 6-7. 2007

- "Checkered Flag: Taking the Documents to Task or Can Creditor Remedies be Enforced?" and "Avoidance Actions," Mid-South Commercial Law Institute, Nashville, Tennessee, November 2006.

- "Expert Witnesses," ABI Bankruptcy Litigation Skills Program, Atlanta, Georgia, May 2006.

- "Investigating the Investigations," 8th Annual New York City Bankruptcy Conference, American Bankruptcy Institute, New York, New York, May 2006.

- "Bankruptcy Trustees and Examiners in Chapter 11," William J. O'Neill Great Lakes Regional Bankruptcy Institute, Cleveland, Ohio, May 2006.

- "Automatic Stay" and "Avoidance Actions," 20th Annual Norton Bankruptcy Litigation Institute I, Park City, Utah, March 2006.

# ALSTON+BIRD LLP

- "Employee Issues in Bankruptcy – Issues Arising Under Sections 1113 and 1114 of the Bankruptcy Code," Georgia Bar Association Bankruptcy Law Update Seminar, Atlanta, Georgia, February 2006.

- "Current Issues involving the Application of Exculpation and the Business Judgment Rule," St. John's University Seminar, LL.M. in Bankruptcy Program, New York, New York, January 2006.

- "Chapter 11 Under the New Bankruptcy Reform Act," Atlanta Bar Association, Bankruptcy Section Seminar, Atlanta, Georgia, November 2005.

- "Bankruptcy Fraud," AICPA Conference on Fraud and Litigation Services, Dallas, Texas, September 2005.

- "The Turnaround Plan as the Basis for Building and Maintaining the Syndicate," 8th Annual Loan Markets & Syndication Summit, New York, New York, June 2005.

- "Expert Witnesses," ABI Bankruptcy Litigation Skills Program, New Orleans, Louisiana (Tulane Law School), May 2005.

- "Executory Contracts" and "Litigating Avoidance Actions,"19th Annual Norton Bankruptcy Litigation Institute I, Park City, Utah, February 2005.

- "Unraveling the Complexities of the Bankruptcy Process and Managing the Associated Pitfalls and Challenges for all Parties Involved," The Third U.S. Forum, Turnaround Management & Distressed Investing, New York, New York, February 2005.

- "Current Issues in Auction Sales," St. John's University Seminar, LL.M. in Bankruptcy Program, New York, New York, January 2005.

- "Drafting Work-out Agreements," Mid-South Commercial Law Institute, Nashville, Tennessee, December 2004.

- "Avoidance Action Theory and Practice," National Conference of Bankruptcy Judges, Nashville, Tennessee, October 2004.

- "Lessons Learned from Enron Regarding Derivatives, True Sale Analysis and Substantive Consolidation" and "Bankruptcy Issues from the Enron Examination," ABA Business Law Section Spring Meeting, Seattle, Washington, April 2004.

- "Enron Examination," University of Michigan Law School, Ann Arbor, Michigan, March 2004.

- "Executory Contracts" and "Litigating Avoidance Actions," 18th Annual Norton Bankruptcy Litigation Institute I, Park City, Utah,

# ALSTON+BIRD LLP

February 2004.

- "Prepackaged Bankruptcy Plans," St. John's University Seminar, LL.M. in Bankruptcy Program, New York, New York, January 2004.

- "Expert Witnesses," ABI/Emory University School of Law Bankruptcy Litigation Skills Program, Atlanta, Georgia, November 2003.

- "Late Breaking Issues," Sixth Annual Conference on Corporate Reorganizations, Chicago, Illinois, June 2003.

- "Executory Contracts" and "Litigating Avoidance Actions," 17th Annual Norton Bankruptcy Litigation Institute I, Park City, Utah, February 2003.

- "Prepackaged Bankruptcy Plans," St. John's University Seminar, LL.M. in Bankruptcy Program, New York, New York, November 2002.

- "Prepackaged Bankruptcy Plans," Norton Institutes on Bankruptcy Law, Western Mountains Bankruptcy Law Seminar, Jackson Hole, Wyoming, June 2002.

- "First Day Orders," AIRA 18th Annual Bankruptcy & Restructuring Conference, Atlanta, Georgia, May 2002.

- "Case Study of LaRoche Industries," Distressed Debt Conference, Institute for International Research, New York, New York, February 2002.

- "Asset Sales in Bankruptcy," National Continuing Legal Education Conference, Steamboat Springs, Colorado, January 2002.

# EXHIBIT 11

Entered on Docket
May 04, 2007

GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed May 04, 2007

_Marilyn Morgan_

**Marilyn Morgan**
**U.S. Bankruptcy Judge**

_____

1

2

3

4

5

6

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  In re:                                    Cases No. 03-51775, 03-51776,
                                              03-51777, and 03-51778-MM
12  **SONICBLUE INCORPORATED,**
    **DIAMOND MULTIMEDIA SYSTEMS,**           Chapter 11 cases
13  **INC., REPLAYTV, INC., and SENSORY**     Jointly administered
    **SCIENCE CORPORATION,**
14
                 Debtors.
15
                                              **MEMORANDUM DECISION AND**
16                                            **ORDER ON MOTION OF**
                                              **SENIOR NOTEHOLDERS FOR**
17                                            **CLARIFICATION, OR IN THE**
                                              **ALTERNATIVE, RECONSIDERATION**
18

19

20          Let there be no doubt that the words and findings of my Memorandum Decision of March 26,

21  2007 were carefully selected to respond to the issues then before the court, which were whether to

22  appoint a chapter 11 trustee pursuant to § 1104, whether to convert the case to chapter 7, and whether

23  to disqualify counsel for the debtor.  The findings made in support or denial of those motions must be

24  understood in context.  After considering the argument of counsel and the record before me, the motion

25  for clarification, or in the alternative, reconsideration by Portside Growth & Opportunity Fund Ltd.,

26  Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (previously described as the "senior

27  debtholders," "senior bondholders" or "senior noteholders," but hereinafter "senior noteholders") is

28  denied as explained below.

                                              1

1.    **Noting a Distinction Between a Right to Payment and a Claim for Compensation, the Joint Venture Agreement Expressly Grants VIA a Claim for Compensation Upon Breach**.

Article 5.6(a) of the joint venture agreement expressly provides that both VIA and the joint venture are entitled to be compensated for damages resulting from loss of the Intel license.  The preamble to Article 5.6(a) reads in pertinent part that:  "If JV is Enjoined from Utilizing the Intel License . . . , then the following liquidated damages shall apply *to compensate JV and VIA for any and all losses they may suffer as a result thereof*. . . .  (Emphasis added.)  The senior noteholders conveniently omitted in their motion the phrase "to compensate JV and VIA for any and all losses they may suffer as a result thereof . . . ," replacing it with ellipses in a manner that is misleading to the reader.

Article 5.6(a) makes a distinction between the right to be compensated for losses suffered and the right to receive a distribution of damages for those losses.  While it provides that damages are *payable* to the joint venture, it states unambiguously that VIA, as well as the joint venture, is entitled to compensation for losses resulting from an inability to use the Intel cross-license.  As noted, the distinction is meaningful because the determination whether VIA is entitled to priority turns on whether it has a claim against SONICblue.  More importantly, whether VIA has a claim may affect the amount of the distributions to the senior noteholders absent subordination by VIA.

The term "claim" is broadly defined in § 101(5), is not limited to rights to payment, but includes rights to an equitable remedy for breach of performance.  In fact, VIA asserted a claim in this case.  Modification of the decision at the senior noteholders' request for purposes of clarification on this point is unwarranted.

2.    **The Senior Noteholders Appear Not to Have Disclosed Significant Information to the Committee Notwithstanding its Unusually High Level of Involvement**.

The senior noteholders object to the characterization that they inserted themselves into the VIA litigation, that they had a hidden agenda, and that their counsel, Bruce Bennett,  operated in the shadows.  However, it was not apparent until SONICblue's litigation counsel, Albert J. Boro, Jr., filed his declaration on March 5, 2007 that the senior noteholders were involved at the highest levels of strategy development and settlement negotiations in the VIA litigation.  Bennett was consulted with

2

1  respect to proposed settlement terms even when committee counsel was not contacted.  Yet, the senior

2  noteholders were not a party to the VIA adversary proceeding and did not file their own objections to

3  the claims of VIA and S3 Graphics.  While standing to participate is not at issue, it is unusual for non-

4  parties to be involved to the degree that the senior noteholders were.

5      At the disclosure statement hearing held January 23, 2007, it became apparent that the senior

6  noteholders had not revealed to committee counsel, Ron Bender, that the VIA settlement contained a

7  waiver by VIA of senior indebtedness status or that the waiver would directly benefit the senior

8  noteholders, who were members of the committee.  Based on the concerns of a taint raised by the claims

9  traders, I directed Bender to conduct an investigation of the settlement negotiations and how the waiver

10  provision was inserted into the VIA settlement.  The following exchange highlights the problem:

11      The Court:    So you're saying that even at the time that the agreement was approved,
                  the Committee was not aware of this provision?

12

13      Mr. Bender:   Not aware, not focused, or any of the like.  Now I don't want to mislead
                  the Court.  It's my responsibility to read a document.  The document does
                  say that Via agrees that its claim is not senior indebtedness, but I would
14                have no reason to focus on it being an important point.

15  Bennett, as counsel for the senior noteholders, attended the January 23 hearing by telephone.

16  Thereafter, Bender filed a twenty-three page Preliminary Status Report on February 12, 2007 regarding

17  his investigation.  From reviewing that report, it does not appear that Bennett ever volunteered relevant

18  information despite the ongoing investigation and Bender's active efforts to pursue answers.  At a time

19  when Bender was seeking transparency and making inquiries of other parties as to their motivations,

20  Bennett and his clients did not come forward.

21      When further facts came to light on February 15, 2007 prompting the motions to appoint a

22  chapter 11 trustee, to convert the case, and to disqualify debtor's general bankruptcy counsel, I set these

23  motions for hearing on March 19, 2007.  Bennett himself acknowledged on March 19 that the hearing

24  was the first time that he had personally addressed the court in this case.  Even then, however, Bennett

25  did not reveal his role in securing the waiver provision that arguably benefitted his clients' interests at

26  the expense of the unsecured creditor class.  More significantly, Bennett apparently never disclosed to

27  the committee or Bender the senior noteholders' potential conflict in connection with the subordination

28  provisions of the senior indenture, of which Bennett was acutely aware.  That debtor's counsel may have

3

**MEMO.  DECISION AND ORDER ON MOTION FOR CLARIFICATION**

1   been aware of the subordination provision in the senior indenture and the waiver of senior status in the

2   VIA settlement is of no moment for purposes of this motion for clarification.  The appearance of

3   concealment by the senior noteholders and Bennett was one of the grounds for the appointment of a

4   trustee.  For the reasons stated, the motion for clarification or reconsideration on this point is also

5   denied.

6         At the hearing on this motion, much emphasis was placed on who knew what when, posturing

7   for the benefit of the trustee, and putting spin on a bad situation.  However, it is incumbent on all

8   interested parties not to lose sight of the big issues necessary to move this case forward:  what to do

9   about the fact that there was no meaningful disclosure of the effect of VIA's waiver of priority, and how

10  to revise the disclosure statement and plan in order to provide a reasonably prompt distribution to

11  creditors.  There will be time later to focus attention on the conduct of the attorneys and fiduciaries

12  involved.

13        Good cause appearing, IT IS SO ORDERED.

14

15                      **\* \* \* END OF ORDER \* \* \***

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

4

**MEMO.  DECISION AND ORDER ON MOTION FOR CLARIFICATION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Case No. 03-51775-MM

2                                **SERVICE LIST**

3

4  CRAIG A BARBAROSH                     BRUCE BENNETT
   PILLSBURY WINTHROP LLP                HENNIGAN BENNETT & DORMAN LLP
5  650 TOWN CENTER DRIVE 7TH FLOOR       865 SOUTH FIGUEROA ST SUITE 2900
   COSTA MESA CA 92626-7122              LOS ANGELES CA 90017
6

7

8  RON BENDER                           NANETTE DUMAS
   LEVENE NEALE BENDER RANKIN &         OFFICE OF THE UNITED STATES
9  BRILL LLP                            TRUSTEE
   1801 AVENUE OF THE STARS STE 1120    280 SOUTH FIRST ST SUITE 268
10 LOS ANGELES CA 90067                 SAN JOSE CA 95113-0002

11 K JOHN SHAFFER                       BERNARD BURK
   STUTMAN TRIESTER & GLATT PC          HOWARD RICE NEMEROVSKI CANADY
12 1901 AVENUE OF THE STARS 12TH FL     FALK & RABKIN
   LOS ANGELES CA 90067                 3 EMBARCADERO CENTER 7TH FLOOR
13                                      SAN FRANCISCO CA 94111-4024

14
   DENNIS J CONNOLLY                    GRANT STEIN
15 ALSTON& BIRD LLP                     ALSTON& BIRD LLP
   1201 WEST PEACHTREE STREET           1201 WEST PEACHTREE STREET
16 ATLANTA GA 30309                     ATLANTA GA 30309

17
   CECILY A DUMAS
18 FRIEDMAN DUMAS & SPRINGWATER
   LLP
19 150 SPEAR STREET SUITE 1600
   SAN FRANCISCO CA 94105

20

21

22

23

24

25

26

27

28

                                     5
MEMO.  DECISION AND ORDER ON MOTION FOR CLARIFICATION

# EXHIBIT 12

1  HENNIGAN, BENNETT & DORMAN LLP
   J. MICHAEL HENNIGAN (SBN 59491)
2  THOMAS B. WATSON  (SBN 181546)
   JOSHUA M. MESTER  (SBN 194783)
3  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
4  Telephone     (213) 694-1200
   Facsimile     (213) 694-1234
5
6  Counsel for Portside Growth & Opportunity Fund, Smithfield
   Fiduciary LLC, and Citadel Equity Fund Ltd.
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11 | In re                                    ) Case No.  03-51775 MM
                                              )
12 | SONICBLUE INCORPORATED, a Delaware       ) Chapter 11
     corporation; DIAMOND MULTIMEDIA          )
13 | SYSTEMS, INC., a Delaware corporation;   ) (Case Nos.  03-51775; 03-51776, 03-51777 and
     REPLAYTV, INC., a Delaware corporation;  ) 03-51778 MM (Jointly Administered)
14 | and SENSORY SCIENCE CORPORATION,         )
     a Delaware corporation                   )
15 |                                          ) **NOTICE OF APPEAL**
            Debtors and Debtors in Possession. )
16 |                                          )
                                              )
17 |_____)

18

19         **NOTICE IS HEREBY GIVEN** that Portside Growth & Opportunity Fund, Smithfield

20 Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively, the "**Senior Noteholders**" or the

21 "**Appellants**"), holders of the 7 3/4 % Senior Subordinated Debentures Due 2005 issued by the

22 above-captioned Debtor and Debtor in Possession SonicBlue Incorporated, hereby appeal under 28

23 U.S.C. § 158(a) from the Memorandum Decision and Order on Motion to Appoint a Chapter 11

24 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP

25 and for Disgorgement of Attorneys' Fees (the "**Order**," Docket No. 2220), entered on March 26,

26 2007 in the above-captioned proceeding by the Honorable Marilyn Morgan, United States

27 Bankruptcy Judge , and the related Memorandum Decision and Order on Motion of the Senior

28

- 1 -

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  Noteholders for Clarification, or in the Alternative, Reconsideration (the "**Order Denying**

2  **Clarification**," Docket No. 2279) , entered on May 4, 2007.[1]

3      The names of all parties to the order appealed from and the names, addresses, and facsimile

4  numbers of their respective attorneys, are attached hereto as **Exhibit A**.

5      Pursuant to 28 U.S.C. § 158(c)(1)(A), Appellants elect to have this appeal heard by the

6  United States District Court for the Northern District of California, and are concurrently filing and

7  serving a Statement of Election on all parties served with this Notice of Appeal.

8

9

10

11

12  DATED:  May 11, 2007              HENNIGAN, BENNETT & DORMAN LLP
                          865 South Figueroa Street, Suite 2900

13                            Los Angeles, California 90017

14

15                            By:      */s/ J. Michael Hennigan*

16                                 J. Michael Hennigan
                          Counsel for Portside Growth & Opportunity

17                            Fund, Smithfield Fiduciary LLC, and Citadel
                          Equity Fund Ltd.

18

19

20

21

22

23

24

25

26  _____

27  [1]  The Senior Noteholders filed a timely motion for clarification, or in the alternative, for leave to
file a motion for reconsideration of the Order on April 4, 2007 (Docket No. 2231), which motion

28  was denied by this Court on May 4, 2007 (Docket No. 2279).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# EXHIBIT A

| | |
|---|---|
| Counsel for Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. | J. Michael Hennigan<br>Thomas B. Watson<br>Joshua M. Mester<br>Hennigan, Bennett & Dorman LLP<br>865 S. Figueroa Street, Suite 2900<br>Los Angeles, CA 90017<br>Fax: 213-694-1234 |
| Counsel for Debtors and Debtors-in-Possession | Craig A. Barbarosh<br>Mark D. Houle<br>Pillsbury Winthrop Shaw Pittman LLP<br>650 Town Center Drive, 7th Floor<br>Costa Mesa, CA 92626<br>Fax: 714-436-2800<br><br>Sue J. Hodges<br>Pillsbury Winthrop Shaw Pittman LLP<br>12255 El Camino Real, Suite 300<br>San Diego, CA 92130<br>Fax: 858-509-4010<br><br>Albert Boro<br>Pillsbury Winthrop Shaw Pittman LLP<br>50 Fremont Street<br>San Francisco, CA 94105<br>Fax: 415-983-1200<br><br>William B. Freeman<br>Pillsbury Winthrop Shaw Pittman LLP<br>725 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017<br>Fax: 213-629-1033 |
| Counsel for Sara L. Kistler Acting United States Trustee for Region 17 | Edwina E. Dowell, Assistant U.S. Trustee<br>Nanette Dumas<br>Shannon L. Mounger-Lum<br>Office of the United States Trustee<br>280 S. First Street, Suite 268<br>San Jose, CA 95113<br>Fax: 408-535-5532 |

| Counsel for SonicBlue Claims, LLC | Frank A. Merola<br>K. John Shaffer<br>Gina Najolia<br>Stutman, Treister & Glatt PC<br>1901 Avenue of the Stars, 12th Floor<br>Los Angeles, CA 90067<br>Fax: 310-228-5788<br><br>William McGrane<br>Bernard S. Greenfield<br>McGrane Greenfield LLP<br>One Ferry Building, Suite 220<br>San Francisco, CA 94111<br>Fax: 415-283-1777 |
|---|---|
| Counsel for Official Committee of Creditors Holding Unsecured Claims | Ron Bender<br>Craig M. Rankin<br>Todd M. Arnold<br>Levene, Neale, Bender, Rankin & Brill LLP<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, CA 90067<br>Fax: 310-229-1244 |
| Counsel for Pillsbury Winthrop Shaw Pittman LLP | James L. Lopes<br>Steven E. Schon<br>Bernard A. Burk<br>Howard Rice Nemerovski Canady Falk & Rabkin<br>A Professional Corporation<br>Three Embarcadero Center, 7th Floor<br>San Francisco, CA 94111<br>Fax: 415-217-5910<br><br>John M. Grenfell<br>Ana N. Damonte<br>Pillsbury Winthrop Shaw Pittman LLP<br>50 Fremont Street<br>San Francisco, CA 94105<br>Fax: 415-983-1200 |

| | |
|---|---|
| Proposed Counsel for Dennis J. Connolly, Chapter 11 Trustee for SONICblue Incorporated, et al. | Cecily A. Dumas<br>Friedman Dumas & Springwater LLP<br>150 Spear Street, Suite 1600<br>San Francisco, CA 94105<br>Fax: 415-834-1044<br><br>Grant T. Stein<br>Alston & Bird LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309<br>Fax: 404-881-7777 |
| Special Counsel for Debtors and Debtors-in-Possession | Richard A. Rogan<br>Nicholas De Lancie<br>Jennifer S. Coleman<br>Jeffer, Mangels, Butler & Marmaro LLP<br>Two Embarcadero Center, Fifth Floor<br>San Francisco, CA 94111<br>Fax: 415-398-5584 |
| Counsel for VIA Technologies, Inc. | Henry C. Kevane<br>Kenneth H. Brown<br>Pachulski Stang Ziehl Young Jones & Weintraub LLP<br>150 California Street, 15th Floor<br>San Francisco, CA 94111<br>Fax: 415-263-7010 |
| Counsel for Riverside Contracting, LLC and Riverside Claims, LLC | Robert A. Franklin<br>Murray & Murray<br>A Professional Corporation<br>19400 Stevens Creek Boulevard, Suite 200<br>Cupertino, CA 95014<br>Fax: 650-852-9244 |
| Counsel for Maxtor Corp. | Lawrence M. Schwab<br>Patrick M. Costello<br>Bialson, Bergen & Schwab<br>2600 El Camino Real, Suite 300<br>Palo Alto, CA 94306<br>Fax: 650-494-2738 |

| | |
|---|---|
| Special Litigation Counsel for Debtors and Debtors-in-Possession | Suzzanne S. Uhland<br>David R. Eberhart<br>O'Melveny & Myers LLP<br>Embarcadero Center West<br>275 Battery Street<br>San Francisco, CA 94111<br>Fax: 415-984-8701<br><br>Austin K. Barron<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Fax: 213-430-6407 |
| Counsel for Intel Corporation | Steven J. Johnson<br>Gibson, Dunn & Crutcher LLP<br>1881 Page Mill Road<br>Palo Alto, CA  94304<br>Fax: 650-849-5333 |
| Counsel for Argo Partners | Scott H. McNutt<br>McNutt & Litteneker LLP<br>188 The Embarcadero, Suite 800<br>San Francisco, CA 94105<br>Fax: 415-995-8487 |
| Counsel for Perkins Coie LLP | Bruce MacIntyre<br>Perkins Coie LLP<br>1201 Third Avenue, Suite 4800<br>Seattle, WA 98101<br>Fax: 206-359-9000 |

# EXHIBIT 13

# United States Bankruptcy Court

## Northern District of California, San Jose Division
### In re: **SONICblue Incorporated,** Case No. **03-51775**

Court ID (Court use only)_____

# NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives notice pursuant to Rule 3001(e)(1), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this notice.

Name of Transferee
**SonicBlue Claims LLC**

Name and Address where notices and payments
to transferee should be sent
**SonicBlue Claims LLC**
**12 West 37th Street, 9th Floor**
**New York, NY 10018**
Phone:
**(212) 643-5445**

Name of Transferor
**VIA Technologies, Inc.**

Court Record Address of Transferor
(Court Use Only)

Last Four Digits of Acct #: _____

Name and Current Address of Transferor
**VIA Technologies, Inc.**
**1F, 531 Cung-Chen Road**
**Hsin-Tien, Taipei, 213**
**Taiwan, ROC**
Phone:

Court Claim # (if known):

Date Claim Filed:

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: /s/ Matthew A. Gold                                      Date: 6/1/2007
Transferee/Transferee's Agent
*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571

---

### ~~DEADLINE TO OBJECT TO TRANSFER~~

The transferor of claim named above is advised that this Notice of Transfer of Claim Other Than for Security has been filed in the clerk's office of this court as evidence of the transfer. Objections must be filed with the court within twenty (20) days of the mailing of this notice. If no objection is timely received by the court, the transferee will be substituted as the original claimant without further order of the court.

Date:_____

                                              **CLERK OF THE COURT**
                                              _____

Per the attached Claim Transfer Agreement, the transferor already has consented to the transfer. In addition, per the Settlement Agreement referenced in the Claim Transfer Agreement, the proof of claim filed by the transferor has been superceded by an allowed claim in the amount of $12,500,000.

## CLAIM TRANSFER AGREEMENT

This Claim Transfer Agreement (the "Agreement") dated as of April 24, 2007, is among SONICBLUE CLAIMS, LLC, a Delaware limited liability company ("SBC"), on the one hand, and VIA TECHNOLOGIES, INC., a Taiwan corporation ("VIA"), and S3 GRAPHICS CO., LTD., a Cayman Islands corporation ("S3", and with VIA, the "Claimants"), on the other hand.

### Recitals

A.     On or about April 22, 2002, SONICblue Incorporated, formerly known as S3 Incorporated ("Debtor"), entered into an "INDENTURE DATED AS OF APRIL 22, 2002 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2005" (the "Indenture") with Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (together, the "Noteholders"). The Indenture generally provides that the claims of the Noteholders thereunder are subordinated to "Senior Indebtedness," as that term is defined in the Indenture.

B.     On March 21, 2003, the Debtor and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (San Jose Division) ("Bankruptcy Court"). The petitions commenced the jointly administered chapter 11 bankruptcy cases now pending in the Bankruptcy Court titled *In re SONICblue Incorporated et al.*, Case Numbers 03-51775 through 03-51778 MM (Jointly Administered) (the "Bankruptcy Cases").

1

C.    On July 17, 2003, the Claimants filed duplicate proofs of claim in the Bankruptcy Cases asserting claims in excess of $100 million.

D.    On October 31, 2006, the Bankruptcy Court entered its "ORDER GRANTING DEBTORS' MOTION FOR APPROVAL OF SETTLEMENT OF VIA AND INTEL LITIGATION" [Docket No. 1981], which approved a "Settlement Agreement" (the "Settlement Agreement") among the Debtor, the Claimants, Intel Corporation ("Intel"), S3 Graphics, Inc., and S3-VIA, Inc. in the Bankruptcy Cases.

E.    Section III, Paragraph 3 of the Settlement Agreement provides:

Claimants shall jointly hold a single, allowed general unsecured claim in Debtor's Bankruptcy Case, which claim shall be afforded the benefits of, and shall be pari passu with, the other allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case, in the amount of $12.5 million ($12,500,000), representing a compromise of the claims that have been asserted by the Claimants for damages and other relief based, inter alia, on alleged breaches of the Amended and Restated Investment Agreement, including without limitation liquidated damages for the alleged breach of section 5.6 thereof (the "Allowed Claim"). Claimants and Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005. The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants. The Allowed Claim shall not

2

be subject to reconsideration, objection, reduction, increase, counterclaim,

subordination, offset or recoupment, and shall be allowed without necessity

of any further filings or amendments, including without limitation any

proof of claim.

(underlining added for purposes of identifying the "Underlined Recital E Language," as

defined below).

     F.     A dispute has arisen in the Bankruptcy Cases as to the propriety of

including the language in Section III, Paragraph 3 of the Settlement Agreement that has

been underlined in Recital E above (the "Underlined Recital E Language") relating to the

relative priority of the Allowed Claim (as otherwise defined in Section III, Paragraph 3 of

the Settlement Agreement) vis-à-vis any claims arising under or relating to the Indenture,

and as to whether such Allowed Claim is, or is not, "Senior Indebtedness" under the

Indenture. A dispute also has arisen as to whether the provisions in the Underlined

Recital E Language relating to the relative priority of the Allowed Claim vis-à-vis the

claims arising under or relating to the Indenture were adequately disclosed to the

Bankruptcy Court and other parties in interest. The disputes identified in this Recital F

respecting the Underlined Recital E Language are hereafter collectively referred to as the

"Senior Debt Disputes".

     NOW, THEREFORE, in consideration of the promises and the mutual agreements

and covenants set forth herein, the parties to this Agreement agree as follows:

409357v7

## Agreement

1.    <u>Assignment</u>. At the "Closing" (as defined in Section 4 of this Agreement), and in exchange for the consideration set forth in Sections 2 and 3 of this Agreement, the Claimants shall unconditionally sell, convey, assign, transfer, and deliver to SBC the "Transferred Rights," consisting solely of, and subject to the second sentence of this Section 1 (which sentence begins with the words "Other than the Transferred Rights …"), the following: (a) the Claimants' rights to payment with respect to the Allowed Claim and any related rights the Claimants may have as creditor(s) in the Bankruptcy Cases, and (b) any and all rights the Claimants may have under or relating to the Indenture. Other than the Transferred Rights, the Claimants shall retain all other rights and obligations they have under the Settlement Agreement (including, without limitation, all rights and obligations under Section III, Paragraphs 5 through 19 of the Settlement Agreement, the releases provided to and granted by the "Parties" (as defined in the Settlement Agreement), and all rights to the "Transferred Intellectual Property" (as defined in the Settlement Agreement)), which other rights and obligations shall not be sold, conveyed, assigned, transferred, or delivered to SBC. For the avoidance of doubt, nothing in this Agreement shall affect, or entitle SBC to assert any rights or benefits with respect to, (i) the "Intel-VIA Settlement Agreement" (as defined in the Settlement Agreement), (ii) the "Intel PCL Retained Rights" (as defined in the Settlement Agreement), or (iii) the continued implementation under Section III, Paragraph 5 of the Settlement Agreement of the transfer of the Transferred Intellectual Property to the Claimants by the Debtor or any "Bankruptcy Successor" (as defined in the Settlement Agreement) to the Debtor.

4

409357v7

2.     <u>Cash Consideration at Closing</u>. At the Closing (as defined below), SBC shall pay, by wire transfer, the sum of four million dollars ($4,000,000) in lawful money of the United States to VIA.

3.     <u>Break Even Amount.</u> SBC shall be entitled to retain all consideration that it receives on account of the Transferred Rights until SBC shall have received cash in an amount equal to the "Break Even Amount," which Break Even Amount shall equal the sum of four million dollars ($4,000,000).

4.     <u>Payment of Expenses.</u>

(a)     <u>Recoverable Costs.</u> Any consideration that SBC shall receive on account of the Transferred Rights over and above the Break Even Amount shall first be divided *pari passu* among SBC and the Claimants to cover the "SBC Recoverable Costs" (which shall consist of the reasonable attorneys' fees, costs, and other reasonable expenses incurred by SBC after the Closing relating to or arising from the prosecution or collection of the Transferred Rights) as well as the "VIA Recoverable Costs" (which shall consist of the reasonable attorneys' fees, costs, and other reasonable expenses incurred by the Claimants after the Closing relating to or arising from the prosecution or collection by SBC of the Transferred Rights, whether as a witness or otherwise). As examples (and for illustration purposes only), if SBC receives on account of the Transferred Rights more than the sum of (i) the Break Even Amount, (ii) the SBC Recoverable Costs, and (iii) the VIA Recoverable Costs, then the SBC Recoverable Costs and the VIA Recoverable Costs shall be paid in full. If SBC receives on account of the Transferred Rights more than the Break Even Amount, but less than the sum of (i) the Break Even Amount, (ii) the SBC

409357v7

Recoverable Costs, and (iii) the VIA Recoverable Costs, then only a portion of the SBC

Recoverable Costs and the VIA Recoverable Costs will be paid, pro rata, from the

amount received by SBC in excess of the Break Even Amount.

      (b)   Arbitration. Any dispute by any party to this Agreement as to the

reasonableness of either the SBC Recoverable Costs or the VIA Recoverable Costs shall

be resolved by binding arbitration administered by JAMS San Francisco, California

office pursuant to JAMS' Streamlined Arbitration Rules and Procedures then in effect.

Any amount that is undisputed may be reimbursed pending such resolution.

      5.    Division of Excess Cash. Once all of the SBC Recoverable Costs and the

VIA Recoverable Costs are repaid to either SBC or VIA, as their interests may appear,

then the balance of any consideration thereafter received by SBC ("Excess Cash"), if any,

shall then be distributed in the following percentage amounts to SBC and VIA: 75% of

any Excess Cash to SBC and 25% of any Excess Cash to VIA.

      6.    The Closing. The transactions contemplated by Sections 1 and 2 of this

Agreement (the "Closing") shall occur simultaneously on the first day that is not a

Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006) following the

satisfaction and/or written waiver of the conditions set forth in Section 7 of this

Agreement, and on which no stay preventing such Closing is in effect.

      7.    Conditions.

      (a)   Claim Allocation. Prior to the Closing, the Claimants shall allocate all of

the Allowed Claim to VIA, and none to S3, in accordance with the Claimants' rights

under Section III, Paragraph 3 of the Settlement Agreement, by providing to SBC a letter

6

409357v7

(addressed to the Debtor and any trustee(s) appointed in the Bankruptcy Cases) making such allocation, for delivery by SBC to the Debtor.

(b)      Notice of Intended Action.  Prior to the Closing, but promptly after the execution of this Agreement by the parties, SBC shall prepare and file in the Bankruptcy Cases a notice of its intended action ("NIA"), which notice shall afford any party in interest in the Bankruptcy Cases an adequate and sufficient opportunity to object and be heard with respect to the planned acquisition by SBC of the Transferred Rights.  The NIA shall describe this Agreement in detail, or shall include this Agreement as an attachment, and shall be served on parties in interest in the Bankruptcy Cases.  In the event that, following an objection filed in response to the NIA, the Bankruptcy Court determines both that (i) it has jurisdiction to approve or disapprove the proposed acquisition of the Transferred Rights, and (ii) the proposed acquisition of the Transferred Rights should not be approved on the terms set forth in this Agreement, then this Agreement shall be null and void, and the parties hereto shall have no further or other obligations related thereto each to the other.  Absent such determinations by the Bankruptcy Court, however, this Agreement shall remain in full force and effect.

8.      SBC's Right to Resolve Senior Debt Disputes.  Notwithstanding anything to the contrary in this Agreement, this Agreement shall not be construed as limiting SBC's post-Closing rights—and Claimants acknowledge that SBC has the post-Closing right—to, in SBC's sole and only discretion, obtain a resolution of the Senior Debt Disputes (including, but not limited to, though negotiations with any other person or entity or through litigation), so as to maximize recovery on the Transferred Rights and, as

7

part of such resolution, to obtain an order, or to make a binding agreement, to delete,

nullify, or otherwise modify the language of the Underlined Recital E Language, in

whole or in part, for such maximization of recovery purposes. Notwithstanding the

foregoing, SBC agrees that neither SBC nor anyone acting at its instigation or in concert

with it will do anything (including taking any action or filing any pleading or motion) to

impair the validity or enforceability of (i) the order of the Bankruptcy Court approving

the Settlement Agreement (provided, however, that SBC may seek or otherwise support

the deletion, nullification, or other modification of the Underlined Recital E Language),

(ii) the releases exchanged by the "Parties" to the Settlement Agreement (as such Parties

are defined in the Settlement Agreement), or (iii) the transfer to the Claimants of the

Transferred Intellectual Property (as defined in the Settlement Agreement). SBC further

agrees that it will not request, or support any request by (or cause or instigate any other

person or party to request), any trustee(s) appointed for the Debtor in any of the

Bankruptcy Cases, or any other Bankruptcy Successor (as defined in the Settlement

Agreement) to challenge or seek to set aside the Settlement Agreement or the order

approving the Settlement Agreement (provided, however, that SBC may seek or

otherwise support the deletion, nullification, or other modification of the Underlined

Recital E Language).

   9.   Claim Status. SBC acknowledges that neither the Claimants nor any agent

or representative of the Claimants have made any representation whatsoever to SBC or its

agents and representatives regarding whether the Allowed Claim is "Senior

8

Indebtedness" under the Indenture, the status of the Bankruptcy Cases, the condition of the Debtor (financial or otherwise), or any other matter relating to the Bankruptcy Cases.

10.    SBC's Acknowledgments and Warranties. SBC represents, warrants, and acknowledges to the Claimants that: (i) the consideration being paid by SBC hereunder may differ both in kind and amount from the amount ultimately distributed with respect to the Transferred Rights; (ii) SBC has adequate information concerning the financial condition of the Debtor and the status of the Bankruptcy Cases to make an informed decision regarding the sale/purchase of the Transferred Rights and that it has independently and without reliance on the Claimants, and based on such information as it deems appropriate, made its own decision to enter into this Agreement; (iii) SBC understands and acknowledges that the Claimants have had a business relationship with the Debtor and, therefore, the Claimants may have non-public information about the Allowed Claim and the Debtor that has not been provided to SBC; (iv) SBC has full authority to enter into this Agreement; (v) SBC is aware that information that may be pertinent to its decision to purchase the Transferred Rights is available and can be obtained from, among other public sources, the Bankruptcy Court's files; and (vi) SBC is aware that the Noteholders may assert that the Allowed Claim might not qualify as "Senior Indebtedness" under the Indenture and that it is assuming the risk that the Allowed Claim, or any portion thereof, might not be "Senior Indebtedness" under the Indenture. Other than the limited warranties and representations provided by the Claimants under Section 11 of this Agreement, SBC is acquiring the Transferred Rights "as is" without warranty or representation.

9

409357v7

11.   Claimants' Acknowledgements and Warranties. The Claimants represent, warrant, and acknowledge to SBC that (i) the Claimants are the present sole owners of, and have good legal and beneficial title to, the Transferred Rights; (ii) from and after the date the Transferred Rights first arose, the Claimants have not created any liens, claims, or security interests on the Transferred Rights and are not aware of any liens, claims, or security interests on the Transferred Rights, nor (except as provided in Section III, Paragraph 3 of the Settlement Agreement) have the Claimants assigned, sold, hypothecated, or otherwise transferred all or any portion of the Claimants' interest in the Transferred Rights; (iii) the Claimants have full authority to enter into this Agreement; (iv) the Claimants have received no payment, distribution, or other consideration (except for the Settlement Agreement) with respect to or relating to the Transferred Rights from any entity; (v) except for the Settlement Agreement, the Claimants have not taken any action to waive, settle, or compromise any of their rights relating to the Transferred Rights; (vi) the Claimants are aware the consideration being paid by SBC hereunder may differ both in kind and amount from the amount ultimately distributed with respect to the Transferred Rights; (vii) the Claimants have adequate information concerning the financial condition of the Debtor and the status of the Bankruptcy Cases to make an informed decision regarding the sale/purchase of the Transferred Rights and that they have independently and without reliance on SBC, and based on such information as they deem appropriate, made their own decision to enter into this Agreement; and (viii) the Claimants are aware that information that may be pertinent to their decision to sell the Transferred Rights is available and can be obtained from, among other public sources, the

10

409357v7

Bankruptcy Court's files. Although the Claimants will be exercising the right to allocate the Allowed Claim between them in their sole discretion, as permitted under Section III, Paragraph 3 of the Settlement Agreement, the Claimants make no representation whatsoever as to the amount, basis, or effect of such allocation in any subsequent litigation.

     12.   <u>Claim Distributions</u>. The Claimants agree that, assuming the Closing occurs, in the event the Claimants, or either of them, shall receive any payments, distributions, or other consideration with respect to or relating to the Transferred Rights after the date hereof (except consideration that is owing to the Claimants under Sections 2, 4, or 5 of this Agreement), the Claimants shall accept the same as SBC's agent and shall hold the same in trust on behalf of and for the sole benefit of SBC, and shall promptly deliver the same forthwith to SBC in the same form received (free of any withholding, set-off, claim, or deduction of any kind), within 5 business days in the case of cash and within 10 business days in the case of securities, which are in good deliverable form with the endorsement of the Claimants when necessary or appropriate. The Claimants also agree to promptly forward to SBC any and all notices they may receive with respect to the Transferred Rights (other than pleadings filed in the Bankruptcy Cases or documents disseminated generally to creditors in the Bankruptcy Cases).

     13.   <u>Further Assurances</u>. Subject to compliance with the terms and conditions of this Agreement, the Claimants hereby appoint SBC as their true and lawful attorney and authorize SBC solely to act in the Claimants' stead (but not in the Claimants' name)

11

409357v7

to demand, sue for, compromise, and recover all amounts as now are, or may hereafter become, due and payable for or on account of the Transferred Rights.

14.    SBC's Warranty Respecting Provisions in Settlement Agreement Not Related to Transferred Rights.  SBC hereby warrants and agrees it will not do anything in the course of enforcing any aspect of the Transferred Rights that affects any provisions in the Settlement Agreement that are unrelated to the Transferred Rights.

15    Claimants' Execution of Necessary Further Documents.  The Claimants further agree to take or cause to be taken such further action to execute, deliver, and file or cause to be executed, delivered, and filed, such further documents and instruments as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms, and conditions of this Agreement.

16.    General Mutual Indemnity between SBC and Claimants.  SBC and the Claimants each agree to defend, indemnify, and hold the other harmless from all losses, damages, and liabilities, including reasonable attorney's fees and expenses, that result from breach of any of their respective representations, warranties, or covenants or any other obligations set forth herein.

17.    Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties in respect of the subject matter of this Agreement and supersedes all prior agreements, arrangements, and understandings among the parties with respect to the subject matter of this Agreement.  This Agreement cannot be amended or supplemented or modified except by a subsequent written agreement by and among the parties.

12

409357v7

18.    Other Provisions. All representations and warranties contained herein shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This Agreement shall be governed and construed in accordance with the laws of the State of California, without giving effect to any choice of law principles. Except as provided in Section 4(b) of this Agreement, each party hereto irrevocably and unconditionally consents to the jurisdiction of the Bankruptcy Court and the state and/or federal courts in the City of San Francisco, California in any action to enforce, interpret, or construe any provision of this Agreement, and also hereby irrevocably waives any defense of improper venue or forum non conveniens to any such action brought in such courts. Each party hereto consents to service of process by certified mail at its address set forth below. Each party further irrevocably agrees that any action to enforce, interpret, or construe any provision of this Agreement will be brought only in those courts and not in any other court. This Agreement may be executed by facsimile or electronic signature. This Agreement may be executed in counterparts, and all such counterparts taken together shall be deemed to constitute a single agreement.

19.    Waiver of Right to Jury Trial. The parties waive any right to a jury trial with respect to any claims or defenses that they may assert against the other in any manner relating to the subject matter of this Agreement.

20.    Rule 3001. The Claimants hereby waive any notice requirement imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure and any applicable local bankruptcy rules, and, upon the Closing, consent to the substitution of SBC for the Claimants for those purposes in the Bankruptcy Cases relating to the Transferred Rights,

13

409357v7

including, without limitation, for purposes of voting and receipt of distributions with respect to the Transferred Rights. SBC shall file any notices of evidence of transfer of the Allowed Claim as may be necessary or appropriate under applicable rules. SBC shall not act or sue in respect of the Transferred Rights in the name of the Claimants or VIA, but rather, at all times, SBC shall act in its own name. The Claimants hereby waive any objection to the transfer of the Transferred Rights, and stipulate and agree that an order may be entered recognizing this Agreement as an assignment according to its terms and SBC herein as the valid owner of the Transferred Rights as specifically set forth herein.

21. <u>Notices</u>. All notices given in relation to this Agreement shall be given to the parties at the following addresses:

To SBC:

SONICBLUE CLAIMS, LLC

c/o Michael Singer
Argo Partners
12 W. 37th Street, 9th Floor
New York, NY 10018

With a copy to:

K. John Shaffer
Stutman, Treister & Glatt P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

14

To the Claimants:

VIA TECHNOLOGIES, INC.

Attention: Legal Department
1F, 531 Cung-Chen Road
Hsin-Tien, Taipei, 213
Taiwan, ROC

S3 GRAPHICS CO. LTD

c/o Mr. Jonathan Chang
S3 Graphics Inc.
1045 Mission Court
Fremont, CA 94539

With copies to:

William P. Weintraub
Pachulski Stang Ziehl Young Jones & Weintraub LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024


-- And --

Henry C. Kevane
Pachulski Stang Ziehl Young Jones & Weintraub LLP
150 California Street, 15th Floor
San Francisco, CA 94111-4500

-- And --

Luther Orton
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104

409357v7

22.     No Third Party Beneficiaries.  Nothing contained in this Agreement shall be construed to confer any right to or benefit on any entity that is not a party to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized

"SBC"

SONICBLUE CLAIMS, LLC,
a Delaware limited liability company

By: _____
        Michael Singer, its Co-Manager

"Claimants"

VIA TECHNOLOGIES, INC.,
a Taiwan corporation

By: _____
Its _____VP_____

S3 GRAPHICS CO., LTD.,
a Cayman Islands corporation

By: _____
Its _____CFO_____

16

April 27, 2007

Dennis J. Connolly, Esq.
Chapter 11 Trustee
c/o Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309

Mr. Marcus Smith
SONICblue, Inc.
7 West 41st Avenue #74
San Mateo, CA 94403

Albert J. Boro, Jr., Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105

Dear Messrs. Connolly, Smith and Boro:

This letter shall serve as notice to SONICblue, Inc. ("SONICblue") that, pursuant to Section 3 of the Settlement Agreement entered into among SONICblue, VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., and Intel Corporation, and approved by the United States Bankruptcy Court for the Northern District of California on October 31, 2006 ("Settlement Agreement"), the Claimants (as defined in the Settlement Agreement) hereby allocate, as of the date hereof, the entirety of the Allowed Claim (as defined in the Settlement Agreement) to VIA Technologies, Inc.


**VIA Technologies, Inc.**                    **S3 Graphics Co. Ltd.**

Name: JOHN K. LEE                              Name: JONATHAN CHANG
Title: V.P.                                    Title: CFO

# EXHIBIT 14

1  FRANK A. MEROLA (136934)
   K. JOHN SHAFFER (153729)
2  GINA NAJOLIA (222067)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:    (310) 228-5600
   Facsimile:    (310) 228-5788
5
   WILLIAM McGRANE (057767)
6  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
7  One Ferry Building, Suite 220
   San Francisco, CA 94111
8  Telephone:    (415) 283-1776
   Facsimile:    (415) 283-1777
9
   Counsel for SonicBlue Claims, LLC
10

11              UNITED STATES BANKRUPTCY COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14  In re:                            Case No. 03-51775
                                      Chapter 11
15  SONICBLUE INCORPORATED, a
    Delaware corporation; DIAMOND
16  MULTIMEDIA SYSTEMS, INC., a       MOTION FOR ORDER (1) DIRECTING
    Delaware corporation; REPLAYTV, INC.,  UNITED STATES TRUSTEE TO
17  a Delaware corporation, and SENSORY  CHANGE THE MEMBERSHIP OF
                                      OFFICIAL COMMITTEE OF
    SCIENCE CORPORATION, a Delaware   CREDITORS HOLDING UNSECURED
18  corporation,                      CLAIMS, OR (2) DIRECTING THE
                                      APPOINTMENT OF A NEW TRADE
19                                    CREDITOR COMMITTEE
20           Debtors
21                                    Date:  Friday, August 3, 2007
                                      Time: 11:00 AM
22                                    Place: Courtroom 3070
                                            280 South First Street
23                                            San Jose, CA 95113
24
25
26
                                      1
   Motion For Order (1) Directing United States Trustee To Change The Membership Of Official Committee Of SB
   Claims Holding Unsecured Claims, Or (2) Directing The Appointment Of A New Trade Creditor Committee

1    SonicBlue Claims, LLC ("SB Claims") hereby requests that this Court

2    enter an order either (1) directing the United States Trustee to change the

3    membership of the existing Official Committee of SB Claims' Holding Unsecured

4    Claims (the "Committee") in these jointly administered cases, pursuant to

5    Bankruptcy Code section 105(a) and Bankruptcy Rule 2020, or (2) if the Court

6    concludes that the foregoing relief is not available under applicable law, directing

7    the appointment of a new, trade creditor committee, pursuant to Bankruptcy Code

8    section 1102(a)(2).

9                              **BACKGROUND**

10    The Committee "officially" consists of eight members.[1]  In reality, there

11    have only been five Committee members during nearly all of the last three years –

12    the three 2002 Noteholders, and two related Matsushita entities.[2]  Two other

13    members of the Committee – Beltran and Manufacturers' Service Limited –

14    stopped participating on the Committee years ago, and only returned *after* the

15    Pillsbury Winthrop conflict and the previously undisclosed release of the 2002

16

17

18

19    ————————————

20

21    [1]    *See* Second Amended Appointment of Committee of Unsecured SB

22    Claims dated October 6, 2003 [Docket Number 528].

23    [2]    *See* Memorandum Decision and Order on Motion to Appoint a

24    Chapter 11 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury

25    Winthrop Shaw Pittman LLP and for Disgorgement of Attorneys' Fees [Docket

26    No. 2220] (the "Trustee Order") at 5.

2

Motion For Order (1) Directing United States Trustee To Change The Membership Of Official Committee Of SB
Claims Holding Unsecured Claims, Or (2) Directing The Appointment Of A New Trade Creditor Committee

1   Noteholders in the VIA/Intel settlement agreement came to light.[3]  Another

2   Committee member, A-Max, was still "AWOL" when the trustee was appointed.[4]

3   Thus, for three years, the 2002 Noteholders held an effective majority of the

4   Committee positions and, even to this day, they continue to hold a significant

5   position on the Committee.

6        The Committee approved the filing of the December 15, 2006 Disclosure

7   Statement, which was signed by Committee counsel.[5]  In ordering the appointment

8   of a chapter 11 trustee, the Court noted that the Disclosure Statement failed to

9   adequately disclose (i) the nature and extent of the Pillsbury Winthrop conflict,

10  (ii) the fact that the 2002 Noteholders were members of the Committee, which had

11  been charged with objecting to the noteholders' claims, and (iii) the fact that the

12  Debtor's "responsible individual" was a defendant in litigation over whether he

13  had breached fiduciary duties to the creditors.[6]

14       The Court's decision appointing the chapter 11 trustee in this case

15  identified significant issues regarding the roles of the 2002 Noteholders and the

16  Committee itself.  More issues arose at the May 4 hearing on the 2002

17  Noteholders' motion for reconsideration, during which the 2002 Noteholders

18  effectively accused Committee counsel of misleading this Court as to what

19

20  _____

21

22       [3]    *See* Declaration of Ron Bender [etc.] dated March 5, 2007 [Docket

23  No. 2185] at 12-13.

24       [4]    *See id.*

25       [5]    *See* Docket No. 2047.

26       [6]    *See* Trustee Order at 11-12.

1    counsel knew about the undisclosed release of the subordination provisions (after

2    the 2002 Noteholders fully agreed with the representations of Committee counsel

3    on this very subject at the January 23 hearing).[7]  As this Court has recognized,

4    these issues contributed to a "complete breakdown of creditor confidence" in this

5    case.[8]

6         The Court's order directing the appointment of a chapter 11 trustee was a

7    significant step in restoring creditor confidence.  The appointment of a trustee,

8    however, was only the first step in returning this case to normalcy.  We are still

9    faced with the bizarre situation in which the Committee is populated largely by

10   members who are either at the center of the controversy in this case (the three

11   2002 Noteholders), or who simply failed to participate in Committee deliberations

12   for three years.

13        It is obvious that none of the existing eight members of the Committee

14   should continue to serve.  The three 2002 Noteholders stand accused of misusing

15   their positions as the working majority to get the undisclosed release of the VIA

16   subordination provisions.  A-Max, Baltrans, and Manufacturers' Services "ceased

17   to participate in these cases" long ago, and only returned after the damage had

18   been done.  The two other members, the Matsushita entities, are likely to be at the

19

20   ───────────────

21

22        [7]    See Transcript of May 4, 2007 Hearing [Docket No. 2303] at 19-20;

23   see also Memorandum Decision and Order on Motion of Senior Noteholders for

24   Clarification, or in the Alternative, Reconsideration entered May 4, 2007 [Docket

25   No. 2279].

26        [8]    See Trustee Order at 1.

1   center of the trustee's investigation of what the full Committee knew, or did not

2   know, about the Pillsbury Winthrop conflict and the release of the VIA

3   subordination provisions.  They also presumably participated in the Committee's

4   decision to approve the deficient December 15, 2006 Disclosure Statement.

5       Representatives of SB Claims have raised their concerns about the

6   composition of the existing Committee with the United States Trustee's office.

7   They have made clear their concern that the 2002 Noteholders should no longer

8   participate on the Committee, and that the Committee as a whole needs to be

9   reconstituted to include creditors who are not only "members" in name, but rather

10  who actually attend meetings and represent the interests of creditors.  The United

11  States Trustee, however, has declined to act.

12                              **DISCUSSION**

13      The role of a creditors' committee and its members is to "represent the

14  various classes of creditors and equity security holders from which they are

15  selected."  H.R. No. 95-595, 95th Cong., 1st Sess. 401 (1977).  "They also will

16  provide supervision of the debtor in possession and of the trustee, and will protect

17  their constitutents' interests."  *Id.*  "[I]n essence, the function of a creditors'

18  committee is to act as a watchdog on behalf of the larger body of creditors which it

19  represents."  *Matter of Advisory Committee of Major Funding Corp.*, 109 F.3d

20  219, 224 (5th Cir. 1997) (internal quotations omitted).

21      The existing Committee has not fulfilled its statutory role.  During most of

22  the last three years, the Committee was dominated by the three 2002 Noteholders,

23  while three other members simply did not bother to show up.  The Committee and

24  its individual members owe fiduciary duties to the creditors whose interests they

25  represent.  *In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr.

26

5

Motion For Order (1) Directing United States Trustee To Change The Membership Of Official Committee Of SB
Claims Holding Unsecured Claims, Or (2) Directing The Appointment Of A New Trade Creditor Committee

1    E.D. Va. 2001) (holding that committee members owe "a fiduciary duty to all

2    creditors represented by the committee"); *In re ABC Automotive Products Corp.*,

3    210 B.R. 437, 441 (Bankr. E.D. Pa. 1997) ("SB Claims who serve on the

4    committee owe a fiduciary duty to the constituents whom they represent."); *In re*

5    *County of Orange*, 179 B.R. 195, 202-03 (Bankr. C.D. Cal. 1995) (holding that

6    one becomes a committee member "with the understanding that it has a fiduciary

7    duty of undivided loyalty and impartial service to all creditors").  The Committee

8    members could not possibly fulfill their fiduciary duties by not participating in

9    Committee deliberations, and by abrogating an effective majority of the

10   Committee seats to the 2002 Noteholders.

11        BAPCPA has added to the Bankruptcy Code a provision that expressly

12   authorizes the Court to direct the United States Trustee to change the membership

13   of an official committee.  Section 1102(a)(4) now provides that, among other

14   things:

15        On the request of a party in interest and after notice and a hearing,

16        the court may order the United States trustee to change the

17        membership of a committee appointed under this subsection, if the

18        court determines that the change is necessary to ensure adequate

19        representation of creditors or equity security holders.

20        Section 1102(a)(4) does not apply to this case, because it was commenced

21   prior to October 2005.  However, the majority view before BAPCPA was that the

22   Court had authority to direct the United States Trustee to alter the composition of

23   the Committee, at least when the United States Trustee's failure to act on its own

24   amounted to an abuse of discretion.  *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d

25   1305, 1317 (1st Cir. 1992) (holding that "[i]f the unsecured creditors' committee

26

1    fails to be properly representative of the unsecured creditors, any party in interest

2    can move to have the committee reconstituted"); *Fas Mart Convenience Stores*,

3    265 B.R. at 431; *Bodenstein v. Lentz (In re Mercury Fin., Corp.)*, 240 B.R. 270,

4    276 (N.D. Ill. 1999) (holding that the "majority view is that" the bankruptcy courts

5    have the "equitable power to review the United States Trustee's decisions about

6    committee membership"); *In re Pierce*, 237 B.R. 748 (Bankr. E.D. Cal. 1999);[9]

7    *Masters, Mates & Pilots Plans v. Lykes Bros. S.S. Co. (In re Lykes Bros. S.S. Co.)*,

8    200 B.R. 933, 939-40 (N.D. Fla. 1996) (relying upon the "strong presumption that

9

10

11    ————————————

12

13        [9]    In *Pierce*, Judge Rimel considered the effect of a prior BAP opinion,

14    *In re Wheeler*, 139 B.R. 235 (B.A.P. 9th Cir. 1992), which the United States

15    Trustee contended stood for the proposition that "decisions on committee

16    composition are entrusted solely to the United States Trustee and are

17    unreviewable." 237 B.R. at 754. Judge Rimel noted that the issue in *Wheeler* was

18    whether a committee member could be removed from the committee as a sanction

19    for violating the automatic stay – "[w]hether the court could review the UST's

20    choice of committee membership was not before the *Wheeler* court." *Id.* at 755.

21    Thus, to the extent the BAP discussed the authority of the bankruptcy courts

22    generally to order changes to committee composition, the BAP's decision was

23    dicta. *Id.* In any event, the *Wheeler* case was submitted to the BAP before

24    Bankruptcy Rule 2020 became effective. As discussed herein, Rule 2020

25    recognizes the Court's authority to hear as a contested matter "[a] proceeding to

26    contest any act or failure to act by the United States trustee."

1    Congress intends judicial review of administrative action"); *In re Columbia Gas*

2    *Sys. Inc.*, 133 B.R. 174, 175-76 (Bankr. D. Del. 1991).

3          The United States Trustee abuses its discretion not only when it fails to

4    remove a committee member who has breached a fiduciary duty to creditors, but

5    also when it fails to remove a member who *appears* to have breached such duty.

6    As held by the court in *In re Venturelink Holdings, Inc.*, 299 B.R. 420 (Bankr.

7    N.D. Tex. 2003):

8          a committee member owes a fiduciary duty to all creditors

9          represented by the committee.  This court has held that a conflict of

10         interest that amounts to a breach of that fiduciary duty constitutes the

11         type of conflict that would mandate removal of the creditor from the

12         committee. . . .  *The court adds that the appearance of a breach of*

13         *that fiduciary duty should likewise mandate the removal.*  The

14         bankruptcy process must both be fair and appear fair.  *In re Allied*

15         *Texas Invs., Inc.*, 1989 Bankr. LEXIS 2785, no. 389-30056-SAF-11,

16         1989 WL 265432, at *1 (Bankr. N.D. Tex. Oct. 16, 1989).  A

17         creditor on a committee who exudes the appearance of a breach of

18         fiduciary duty undermines that basic bankruptcy tenet, thereby

19         corrupting the process.  The United States Trustee would act

20         arbitrarily and capriciously if he refused to remove a committee

21         member who held a conflict of interest amounting to a breach of the

22         fiduciary duty owed by the creditor to the creditors represented by

23         the committee *or who appeared to hold such a conflict*.

24   299 B.R. at 423 (emphasis added).

25

26

1    Bankruptcy Code section 105(a) grants the Court authority to "issue any

2    order, process, or judgment that is necessary or appropriate to carry out the

3    provisions of" the Bankruptcy Code.  Issuing an order that ensures a Committee

4    that is looking out for the interests of creditors surely would be an appropriate

5    exercise of this Court's authority.

6    Bankruptcy Rule 2020 further provides that "[a] proceeding to contest any

7    act or failure to act by the United States trustee" is a contested matter governed by

8    Rule 9014.  The Advisory Committee Note to Rule 2020 provides that it is "a

9    procedure for judicial review of the United States trustee's acts or failure to act in

10    connection with the administration of the case."  It is thus appropriate for this

11    Court, by contested matter, to review the United States Trustee's failure to

12    reconstitute the Committee, notwithstanding the very serious questions that have

13    arisen regarding the role of the Committee and its members in this case.

14    Moreover, even if this Court were to conclude that it lacked authority to

15    order the United States Trustee to change the composition of the existing

16    Committee, the Court unquestionably has authority to order the appointment of a

17    new, trade creditor committee.  Bankruptcy Code section 1102(a)(2) provides that:

18    On request of a party in interest, the court may order the

19    appointment of additional committees of creditors . . . if necessary

20    to assure adequate representation of creditors . . . .

21    SB Claims submits that it would be far better to simply reconstitute the

22    existing Committee, rather than to appoint a new, second committee and to leave

23    the existing Committee in place.  A second committee, however, would be a far

24    better alternative than the *status quo*.  If nothing else, the fact that the Court has

25    the authority to order the appointment of a wholly new committee makes any

26

1  suggestion that the Court lacks authority to direct the reconstitution of the existing

2  Committee nonsensical.

3                              **CONCLUSION**

4           The Committee as presently constituted provides the community of

5  unsecured creditors with no effective representation at all.  After inquiry, SB

6  Claims believes there are multiple unsecured creditors—other than itself, as, given

7  the controversy surrounding subordination issues presently embroiling it and the

8  2002 Noteholders, it does not believe it should serve—who now ready, willing,

9  and able to serve as replacement members of the Committee.  Accordingly, this

10 motion should be granted.

11 Dated:  June 11, 2007              McGRANE GREENFIELD LLP and
12                                    STUTMAN, TREISTER & GLATT P.C.

13

14                                    By:_____/s/_____
15                                          K. John Shaffer
                                          Attorneys for SB Claims

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 15

FRIEDMAN DUMAS & SPRINGWATER LLP
CECILY A. DUMAS (S.B. NO. 111449)
150 Spear Street, Suite 1600
San Francisco, CA 94105
Telephone Number: (415) 834-3800
Facsimile Number: (415) 834-1044

ALSTON & BIRD LLP
GRANT T. STEIN (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia  30309
Telephone: 404-881-7000
Facsimile: 404-881-7777

Attorneys for Dennis J. Connolly,
Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br>          Debtors. | Case No. 03-51775 MM<br><br>Chapter 11 Cases<br>(Case Numbers 03-51775 through 03-51778)<br>(Jointly Administered)<br><br>JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE<br><br><u>Plan Confirmation Hearing</u>:<br>Date: [To Be Scheduled]<br>Time: [To Be Scheduled]<br><br>Dept: Courtroom 3070<br>280 South First St.<br>San Jose, CA 95113<br><br>Hon. Marilyn Morgan |

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

{00304513.DOC v 1}

**Table of Contents**

INTRODUCTION ................................................................................................................ 1

ARTICLE I ......................................................................................................................... 1

DEFINED TERMS, RULES OF INTERPRETATION, ..................................................... 1

COMPUTATION OF TIME AND GOVERNING LAW .................................................... 1
    A.    Defined Terms. ................................................................................................ 1
    B.    Rules of Interpretation, Computation of Time and Governing Law. ............... 9

ARTICLE II TREATMENT OF UNCLASSIFIED ADMINISTRATIVE AND
PRIORITY TAX CLAMS ................................................................................ 10
    A.    Introduction. ................................................................................................... 10
    B.    Administrative Claims.................................................................................... 10
    C.    Statutory Fees. ............................................................................................... 11
    D.    Priority Tax Claims. ....................................................................................... 11

ARTICLE III CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ............................................................................................ 11
    A.    Introduction. ................................................................................................... 11
    B.    Intercreditor Provisions. ................................................................................ 11
    C.    Classification and Treatment of Claims. ....................................................... 12

ARTICLE IV ACCEPTANCE OR REJECTION OF THIS PLAN; CRAMDOWN ................... 17
    A.    Voting Classes. .............................................................................................. 17
    B.    Ballot Instructions. ........................................................................................ 17
    C.    Cramdown. ..................................................................................................... 17

ARTICLE V EFFECT OF CONFIRMATION OF THIS PLAN ........................................ 17
    A.    Assets to Remain in the Debtors Estates; No Revesting of Assets. ............... 17
    B.    Authority to Effectuate this Plan. .................................................................. 18
    C.    The Non-Debtor Subsidiaries. ....................................................................... 18
    D.    Dissolution of the Creditors' Committee. ...................................................... 18
    E.    Prosecution of Claim Objections and Avoidance Actions. ........................... 18
    F.    Termination of the Debtors' Public Entities on the Effective Date................ 19

ARTICLE VI IMPLEMENTATION AND MEANS OF EXECUTION OF THIS PLAN .......... 19
    A.    Plan Administrator for the Debtors; Repeal of Bylaws and Amendments to
           Articles of Incorporation. .............................................................................. 19
    B.    Compensation of the Plan Administrator. ..................................................... 19
    C.    Funding of this Plan....................................................................................... 19
    D.    The Estate Litigation Claims. ........................................................................ 20
    E.    Post-Effective Date Employment of Professionals By the Plan Administrator and
           Payment of Fees and Expenses Incurred By Such Professionals. .................. 20
    F.    Dissolution of the Debtors.............................................................................. 20
    G.    Corporate Action. .......................................................................................... 21
    H.    Substantive Consolidation. ............................................................................ 21

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

ARTICLE VII CLAIMS RESOLUTION AND DISTRIBUTIONS ........................................... 21
   A.   Late Claims Void.............................................................................................. 21
   B.   Prosecution of Objections to Claims. .............................................................. 21
   C.   Estimation of Claims. ...................................................................................... 22
   D.   Allowed and Disputed Claims.......................................................................... 22
   E.   Provisions Regarding Distributions.................................................................. 23

ARTICLE VIII SATISFACTION OF CLAIMS AND INJUNCTION..................................... 26
   A.   Satisfaction of Claims. ..................................................................................... 26
   B.   Injunction......................................................................................................... 26

ARTICLE IX OTHER PLAN MATTERS ............................................................................... 27
   A.   Executory Contracts and Unexpired Leases. ................................................... 27
   B.   Conditions Precedent....................................................................................... 27
   C.   Retention of Jurisdiction.................................................................................. 28
   D.   Chapter 11 Postconfirmation Reports And Final Decree ............................... 30
   E.   Modification of Plan; Revocation or Withdrawal. .......................................... 30
   F.   Terms of Existing Injunctions or Stays. .......................................................... 30
   G.   Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities. ..... 30
   H.   Section 1146 Exception.................................................................................... 31
   I.   Severability...................................................................................................... 31
   J.   Governing Law. ............................................................................................... 31
   K.   Notices............................................................................................................. 31
   L.   Closing of Cases. ............................................................................................. 32

ARTICLE X MISCELLANEOUS PROVISIONS ................................................................... 32
   A.   Waiver of Final Order. ..................................................................................... 32
   B.   Business Days................................................................................................... 32
   C.   No Attorneys' Fees........................................................................................... 32
   D.   No Injunctive Relief. ....................................................................................... 32
   E.   Operations Between the Confirmation Date and the Effective Date............... 32
   F.   Approval of Agreements................................................................................... 32
   G.   No Admissions or Waivers............................................................................... 33
   H.   Continuing Viability of Other Orders/Agreements. ........................................ 33

ARTICLE XI CONCLUSION AND RECOMMENDATION................................................... 33

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

## INTRODUCTION

This Chapter 11 Plan of Liquidation is proposed pursuant to 11 U.S.C. §§ 1121 et. seq. by DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE (the "**Chapter 11 Trustee**") for the bankruptcy estates of SONICBLUE INCORPORATED, a Delaware corporation ("**SONICblue**"), DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation ("**Diamond**"), REPLAYTV, INC., a Delaware corporation ("**ReplayTV**"), and SENSORY SCIENCE CORPORATION, a Delaware corporation ("**Sensory Science**"), the debtors in these jointly administered Chapter 11 Cases (collectively, the "**Debtors**").

Reference is made to the Disclosure Statement accompanying this Plan for a discussion of the Debtors' history, business, results of operations, historical financial information, properties, circumstances surrounding the appointment of the Chapter 11 Trustee, a summary and analysis of this Plan, and certain related matters.

CREDITORS SHOULD READ THIS PLAN AND THE DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE SECTION 1127, BANKRUPTCY RULE 3019 AND IN THIS PLAN, THE CHAPTER 11 TRUSTEE MAY ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN AT ANY TIME PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

Capitalized terms not otherwise defined herein have the meanings set forth in Section I.A, below.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

**A.    Defined Terms.**

(a)    As used in this Plan, the following terms have the meanings specified below, which meanings are equally applicable to both the singular and plural forms of the terms defined:

1996 Notes: The 5-3/4% Convertible Subordinated Notes issued in 1996 and due 2003, in an aggregate principal amount not to exceed $103,500,000.

1996 Notes Claims: The Claims of the Holders of the 1996 Notes.

1996 Notes Indenture: The indenture agreement pertaining to the 1996 Notes.

1996 Notes Indenture Trustee: The trustee from time to time under the 1996 Notes Indenture, which presently is U.S. Bank, National Association.

1996 Noteholders: The Holders of 1996 Notes, whose Claims are classified in Class 5.

2002 Notes: The 7¾% Secured Senior Subordinated Convertible Debentures issued in 2002 and due 2005, in an aggregate principal amount not to exceed $75,000,000.

2002 Notes Claims: The Claims of the Holders of the 2002 Notes.

2002 Notes Indenture: The indenture agreement pertaining to the 2002 Notes.

2002 Noteholders: Holders of 2002 Notes, whose Claims are classified in Class 3.

Administrative Bar Date: The Bar Date for Administrative Claims specified in Article II.B of this Plan.

Administrative Claim: Any Claim for any cost or expense of administration (including, without limitation, the fees and expenses of Professionals, including Avoidance Action Professional Fees and Chapter 11 Trustee Fees) of the Chapter 11 Cases asserted or arising under Bankruptcy Code Sections 503, 507(a)(2) or 1114(e)(2) including: (i) any actual and necessary post-Petition Date cost or expense of preserving the Debtors' respective estates or operating the Debtors' businesses, (ii) any payment to be made under this Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any post-Petition Date cost, indebtedness, or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation and reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under Bankruptcy Code Sections 328, 330(a) or 331 (including Avoidance Action Professional Fees), (v) Chapter 11 Trustee Fees, and (vi) any fees or charges assessed against the Debtors' respective estates under Section 1930 of the title 28 of the United States Code.

Allowance:  Entry of a Final Order wholly or partly allowing a Claim or Interest.

Allowed: With respect to any Claim: (a) a Claim that is not a Disputed Claim and either (i) such Claim has been scheduled by the Debtors in their Schedules as most recently amended as undisputed, non-contingent and liquidated; or (ii) a proof of claim has been filed by the applicable Bar Date or has otherwise been deemed timely filed under applicable law; or (b) has been allowed by a Final Order.  Nothing in this definition or this Plan limits the rights of the Chapter 11 Trustee or the Plan Administrator to object to or to seek to subordinate or estimate an Allowed Claim within the time periods specified under applicable law or an order of the Bankruptcy Court; provided however, that the Chapter 11 Trustee, the Plan Administrator and all other parties in interest may not seek reconsideration of, object to, seek reduction of, counterclaim to, seek subordination of, or seek offset or recoupment as to any Allowed Claim allowed by a Final Order that provides that such Allowed Claim is not subject to such actions. For purposes of determining the amount of an Allowed Claim, the Plan Administrator will deduct (a) all payments made on or after the Petition Date on account of such Claim, and (b) an amount equal to the amount of any claim which the Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to Bankruptcy Code Section 553 or other applicable law, except as otherwise provided in this Plan.  No interest will be paid on any Allowed Claim, except as required by applicable law.

Allowed Amount: Where a Claim or Interest is Allowed, the amount in which such Claim or Interest has been Allowed, as determined under this Plan, the Bankruptcy Code and the Bankruptcy Rules.  No interest will be paid on the Allowed Amount of any Claim, except as required by applicable law.

Allowed Claim: A Claim that is Allowed.

Allowed Interest: An Interest that is Allowed.

Assets: Any and all real and personal Property of the Debtors of any kind or nature, including any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual Property rights, claims, Estate Litigation Claims and any other general intangibles, and all proceeds and products of the foregoing, including, without limitation, all Property of the Debtors' estates pursuant to Bankruptcy Code Section 541.

Avoidance Action Professional Fees: Any and all Professional Fees arising out of or earned in connection with the Avoidance Actions, including all Professional Fees authorized pursuant to the Bankruptcy Court's "Order Approving Stipulation Among Debtors, Creditors' Committee and Office of the United States Trustee Clarifying Order Approving Modification to the Application of the Official Committee of Unsecured Creditors to Employ Levene, Neale, Bender, Rankin & Brill L.L.P. as Bankruptcy Counsel and to the Application of the Debtors and Debtors-in-Possession to Employ Pillsbury Winthrop LLP as Counsel" (Docket No. 1178).

Avoidance Actions: Any and all claims and causes of action which the Debtors, the Chapter 11 Trustee, debtor-in-possession, the estate, the Creditor's Committee or other appropriate party in interest has asserted or may assert under Bankruptcy Code Sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, 724(a) or other applicable law, including the Debtors' rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted.  The Avoidance Actions include the Preference Actions.

Ballot: The ballot accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote on this Plan may indicate their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

Ballot Deadline: The deadline set by the Bankruptcy Court by which Creditors entitled to vote on this Plan must vote.

Bankruptcy Code: Title 11 of the United States Code, as amended, as applicable to the Chapter 11 Cases.

Bankruptcy Court: The United States Bankruptcy Court for the Northern District of California (San Jose Division).

- 3 -

<u>Bankruptcy Rules</u>: The Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases and any Local Rules of the Bankruptcy Court.

<u>Bar Date</u>: The Unsecured Claims Bar Date, the Administrative Bar Date, and the Rejection Claim Bar Date, as applicable.

<u>Business Day</u>: Any day that is not a Saturday, Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006, or a day on which banking institutions in the State of California are authorized or obligated by law, executive order or governmental decree to be closed.

<u>Cash</u>: Cash and cash equivalents, including bank deposits, wire transfers, checks, and readily marketable securities, instruments and obligations of the United States of America or instrumentalities thereof.

<u>Chapter 11 Cases</u>: The cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court, being jointly administered under Case Nos. 03-51775 through 03-51778.

<u>Chapter 11 Trustee Fees</u>: Fees payable to the Chapter 11 Trustee under Bankruptcy Code Section 326 and 330.

<u>Claim</u>: Any right to payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, including, without limitation, any claim against any of the Debtors as defined in Bankruptcy Code Section 101(5).

<u>Class</u>: A category of Holders of Claims or Interests as set forth in Article III of this Plan.

<u>Confirmation Date</u>: The date upon which the Plan Confirmation Order is entered by the Bankruptcy Court in its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

<u>Convenience Class Claims</u>: Claims that would otherwise be Claims in Class 4, but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $500.00; or (b) such Claim is in an amount greater than $500.00 but the Holder of such Claim has elected to have such Claim be treated in its entirety as a Class 7 Claim in the amount of $500.00 by so indicating on the Ballot submitted to vote such Claim.

<u>Creditor</u>: A Holder of a Claim against any of the Debtors.

<u>Creditors' Committee</u>: The Official Committee of Creditors Holding Unsecured Claims appointed in the Chapter 11 Cases pursuant to Bankruptcy Code Section 1102 on or about March 21, 2003, which appointment was amended on or about April 3, 2003, and as may be

- 4 -

reconstituted from time to time by the U.S. Trustee.

Debtors: SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, the debtors in the Chapter 11 Cases.

Deficiency Claim: The remaining unsecured Claim of any secured Creditor after realization by the secured Creditor of all collateral (or the value of such collateral) securing the Creditor's Claim.

Disallowed: Any Claim or Interest, or portion thereof that: (a) has been withdrawn, in whole or in part; or (b) is scheduled by the Debtors in their Schedules as most recently amended as contingent, disputed or unliquidated and the Holder of such Claim or Interest has not filed a proof of Claim or Interest by the applicable Bar Date; or (c) has been disallowed, in whole or in part, by Final Order of a court of competent jurisdiction.

Disallowed Claim: A Claim, or any portion thereof, that is Disallowed.

Disclosure Statement: The disclosure statement for this Plan approved by the Bankruptcy Court.

Disputed: Any Claim or Interest as to which the Chapter 11 Trustee, the Plan Administrator or any other party in interest has, within the time permitted under applicable law, filed an objection or request for estimation or subordination or is otherwise disputed by the Debtors, the Creditors' Committee, the Chapter 11 Trustee, or any other party in interest with standing in accordance with applicable law, which objection, request for estimation or subordination or dispute has not been withdrawn or determined by a Final Order.

Disputed Claim: A Claim that is Disputed.

Disputed Claims' Reserve: The reserve established under Article VII.E.1 of this Plan to fund payment of any Disputed Claim.

Effective Date: The date that this Plan becomes effective, which date will be the first business day which is at least eleven days following the date of entry of the Plan Confirmation Order, assuming there has been no order entered staying the effectiveness of the Plan Confirmation Order. If there has been an order entered staying the effectiveness of the Plan Confirmation Order, the Effective Date will be the first business day after the stay is no longer in effect with respect to the Plan Confirmation Order.

Entity: An entity as defined in Bankruptcy Code Section 101(15), including, but not limited to, an individual, corporation, partnership or governmental unit.

Estates: The bankruptcy estates in the Debtors' Chapter 11 Cases.

- 5 -

Estate Litigation Claims: All actions, causes of action, suits, counterclaims, cross-claims, rights of setoff, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments arising under any theory of law or equity, including, without limitation, the Bankruptcy Code, all claims against Holders of Claims or Interests, parties having dealings, relationships or transactions with or related to the Debtors, any party named or identified in the Schedules or any pleadings filed in the Chapter 11 Cases (including, but not limited to, officers directors, and attorneys for the Debtors and members and attorneys for the Creditors' Committee), in each case held by or in favor of any of the Debtors or their estates whether or not commenced as of the Effective Date.  The Estate Litigation Claims include, but are not limited to, the Avoidance Actions and the Preference Actions.

Estate Reserve: The meaning specified in Article VII.E.3 of this Plan.

File: Duly filing a document, notice, claim, pleading or other paper with the Bankruptcy Court, including service of such document, notice, claim, pleading or other paper as prescribed by this Plan or the Bankruptcy Rules.

Final Decree: The decree contemplated under Bankruptcy Rule 3022.

Final Order: An order, ruling, or judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or amended and as to which: (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending; or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken or granted.

Holder: An Entity holding an Interest or Claim.

Impaired: A Claim or Class of Claims that is impaired within the meaning of Bankruptcy Code Section 1124.

Indentures: The 1996 Notes Indenture and the 2002 Notes Indenture.

Intercompany Claims: Any Claim held by any of the Debtors against any other Debtor.

Interest: Any equity interest in one or more of the Debtors, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase or acquire such interests at anytime.

Lien: Any charge against or interest in Property to secure payment or performance of a claim, debt or obligation.

- 6 -

**Liquidation Amount**: All Assets of the Debtors' estates remaining after (i) payment in full of all Allowed Administrative Claims, all Allowed Priority Tax Claims, and all Allowed Claims in Classes 1, 2 and 7; (ii) payment in full of all fees owing to the Clerk of the Bankruptcy Court, and fees owing to the United States Trustee; (iii) payment of all post-Effective Date fees and expenses, including, without limitation, such fees and expenses incurred or to be incurred by Professionals employed by the Plan Administrator through the closing of these Chapter 11 Cases and entry of a Final Decree; and (iv) funding of the Estate Reserve.

**Noteholder Claims**: The Claims of Noteholders.

**Noteholders**: 1996 Noteholders, 2002 Noteholders, and the Indenture Trustee under the 1996 Note Indenture.

**Petition Date**: March 21, 2003.

**Plan**: This Chapter 11 Plan of Liquidation proposed by the Chapter 11 Trustee, including all exhibits, appendices, schedules and annexes attached hereto, as submitted by the Chapter 11 Trustee, as such Plan may be altered, amended, supplemented or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Plan Confirmation Order and the terms and conditions of this Plan.

**Plan Administrator**: Dennis J. Connolly, in his capacity as plan administrator for the Debtors after the Effective Date of this Plan.

**Plan Confirmation Order**: The order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code Section 1129.

**Preference Actions**: The approximately 208 preference and fraudulent conveyance avoidance and recovery actions, including one un-filed claim where the defendant executed a tolling agreement and later settled without the need for litigation, commenced by the Debtors and Creditors' Committee in or around March 2005.

**Priority Claims**: Those Claims, if any, afforded priority under Bankruptcy Code Sections 507(a) and (b), excluding Administrative Claims and Priority Tax Claims.

**Priority Tax Claims**: Those Claims, if any, afforded priority under Bankruptcy Code Section 507(a)(8).

**Professional**: An Entity: (a) employed in the Chapter 11 Cases prior to the Effective Date pursuant to a Final Order in accordance with Bankruptcy Code Sections 327, 328 or 1103; or (b) employed by the Plan Administrator after the Effective Date.

**Professional Fees**: Fees and expenses incurred by a Professional, including Avoidance Action Professional Fees.

Property: All Assets or property of the Debtors' respective estates of any nature whatsoever, real or personal, tangible or intangible, including, but not limited to, contract rights, accounts and Estate Litigation Claims, previously or now owned by the Debtors, or acquired by the Debtors' respective estates, as defined in Bankruptcy Code Section 541.

Pro-Rata Share: When used with respect to the Holder of any Claim in any of Classes 3, 4 5, or 6, the Holder's Allowed Claim divided by the total amount of all Allowed Claims in that Class. When used with respect to a Class of Claims, the amount of Allowed Claims in that Class divided by the aggregate Allowed Claims in Classes 3, 4, 5, and 6; provided, however, in respect of the calculation and setting of the Disputed Claims Reserve, the Plan Administrator shall use the face amount of claims as described and set forth in Article VII.E.

Schedules: The Debtors' schedules of assets and liabilities, statements of financial affairs, and such other schedules filed with the Bankruptcy Court by the Debtors in accordance with Bankruptcy Code Section 521, the Official Bankruptcy Forms, and the Bankruptcy Rules, as amended from time to time.

SEC: The U.S. Securities and Exchange Commission.

Secured Claim: Any Claim arising before the Petition Date that is: (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law on Property in which any of the Debtors has an interest and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Bankruptcy Code Section 553; provided however, with respect to both (a) and (b), only to the extent of each such Debtor's interest in the value of the assets or Property securing any such Claim or the amount subject to setoff, as the case may be.

Seller Subsidiaries: Micronics Computers, Inc., Frontpath, Inc., and Binar Graphics, Inc.

Senior Indebtedness: The meaning given to the term "Senior Indebtedness" in Article I of the 1996 Notes Indenture and Article I of the 2002 Notes Indenture.

Subordination Payment Amount: All amounts payable by the 1996 Noteholders to the 2002 Noteholders pursuant to Article IV of the 1996 Notes Indenture, which provides that the 1996 Notes will be subordinated to all Senior Indebtedness.

Subordination Provisions: The subordination provisions in the Indentures, including, without limitation, the subordination provisions in Article IV and any applicable definitions in Article I of the 1996 Note Indenture and the subordination provisions in Article IV and any applicable definitions in Article I of the 2002 Note Indenture.

Unsecured Claim: Any Claim that is classified in any of Class 3, 4, 5, 6, 7, or 8, but only to the extent such Claim is not a Secured Claim.

Unsecured Claims Bar Date: The July 22, 2003 Bar Date pertaining to nongovernmental unsecured claims established by the Bankruptcy Court.

<u>U.S. Trustee</u>: The United States Trustee for the Northern District of California.

(b)    <u>Other Definitions</u>: Any capitalized term used and not defined herein or elsewhere in this Plan but that is defined in the Bankruptcy Code will have the meaning assigned to that term in the Bankruptcy Code.  Unless otherwise specified, all section, schedule or exhibit references in this Plan are to the respective section in, article of, or schedule or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

## B.    Rules of Interpretation, Computation of Time and Governing Law.

(a)    For purposes of this Plan: (a) each term will include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, will include the masculine, feminine and the neuter gender; (b) any reference in this Plan to a contract, instrument, release, Indenture or other agreement or document being in a particular form or on particular terms and conditions means that the document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or exhibit filed, or to be filed, will mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (e) the rules of construction set forth in Bankruptcy Code Section 102 will apply; and (f) any undefined capitalized term used in this Plan that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules.

(b)    In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

(c)    Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the laws of the State of California.

(d)    If there is any inconsistency between the terms of the Plan Confirmation Order and the terms of this Plan or any other document or agreement submitted, prepared or approved in connection with this Plan, the Plan Confirmation Order will prevail.  If there is any inconsistency between the terms of this Plan and any other document or agreement submitted, prepared or approved in connection with this Plan, this Plan will prevail.

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

## ARTICLE II
## TREATMENT OF UNCLASSIFIED ADMINISTRATIVE
## AND PRIORITY TAX CLAMS

**A.    Introduction.**

Certain types of Claims are not placed into voting Classes pursuant to the Bankruptcy Code.  These unclassified, non-voting Claims and their treatment are described in this Article II.

**B.    Administrative Claims.**

Holders of Administrative Claims, including Holders of Claims for Professional Fees and Chapter 11 Trustee Fees and any Holder of a post-Petition Tax Claim, that have not been paid as of the Effective Date must File a request for payment of the Administrative Claims with the Bankruptcy Court and serve the same upon the Plan Administrator no later than thirty (30) days after the Effective Date (the "**Administrative Bar Date**").  If an Administrative Claim that has not been paid as of the Effective Date is not timely Filed by the Administrative Bar Date, then the Administrative Claim will not be Allowed and the Holder of the Administrative Claim will be forever barred from asserting or enforcing the Administrative Claim against any of the Estates or the Assets.

Any Professional requesting Professional Fees, including Avoidance Action Professional Fees, for services rendered prior to the Effective Date, including any Professional Fees paid to a Professional under any interim fee order, must File and serve an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.  Professionals who do not File such requests by that date will be forever barred from seeking payment for such Professional Fees and must disgorge any Professional Fees paid pursuant to any interim fee order of the Court.  This thirty day period may be extended by the Court upon application prior to the expiration of the thirty day period.

Any objection to a timely filed Administrative Claim must be filed by the later of: (i) one hundred twenty (120) days after the date such Administrative Claim is Filed and properly served, or (ii) one hundred twenty (120) days after the Effective Date.  The Plan Administrator may seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Administrative Claim.  The filing of a motion by the Plan Administrator to extend the time to File an objection to a timely filed Administrative Claim will automatically extend the date by which the Plan Administrator must file objections to a timely filed Administrative Claim until a Final Order is entered on the motion.  The Plan Administrator will pay any timely filed Administrative Claim only after the deadline to object to the Administrative Claim has passed with no objection having been filed, or the Administrative Claim is allowed by Final Order of the Bankruptcy Court.

**C.        Statutory Fees.**

All fees due and payable under 28 U.S.C. § 1930 that have not been paid will be paid on or before the Effective Date.  The Plan Administrator will make all payments required after the Effective Date.

**D.        Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim will receive Cash on the later of the Effective Date and the date of Allowance of such Priority Tax Claim equal to the Allowed Amount of such Priority Tax Claim.

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND INTERESTS**

**A.        Introduction.**

This Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which are not classified).  This Plan further classifies Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in that Class. A Claim or Interest will be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and will be classified in a different Class if any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

**B.        Intercreditor Provisions.**

This Plan gives effect to certain "Subordination Provisions" in the Indentures (the "**Subordination Provisions**").  The Chapter 11 Trustee anticipates that all payments that would otherwise be made to Holders of Class 5 Allowed Claims will instead be paid to Holders of Class 3 Claims pursuant to the Subordination Provisions.  Nothing in this Plan precludes a Holder of a Claim from seeking to enforce a contractual subordination provision before a Court of competent jurisdiction whether or not explicitly addressed in this Plan, provided however, that the Bankruptcy Court will have exclusive jurisdiction over any claim for contractual subordination that was brought by any creditor prior to the Effective Date of this Plan.

If a Holder of a Class 5 Claim disputes the application of the Subordination Provisions provided herein, the Holder must object to confirmation of this Plan **and** file an adversary proceeding prior to confirmation seeking a determination from the Bankruptcy Court that amounts subject to the Subordination Provisions should be paid first to Holders of Class 5 Allowed Claims.  If no Holder of a Class 5 Claim objects to confirmation of this Plan and files an adversary proceeding, or if the Bankruptcy Court confirms this Plan notwithstanding any

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

objection or adversary proceeding, Holders of Class 5 Allowed Claims will not receive any payment under this Plan until Holders of Class 3 Claims receive the Subordination Payment Amount. If a Holder of a Class 5 Claim objects to confirmation of this Plan and files an adversary proceeding as set forth in this paragraph, the amount needed to fund the 1996 Notes Indenture Trustee's fees, costs, and expenses, including attorneys fees, will be reserved and the balance of any payments due under the Subordination Provisions to Holders of Class 5 Allowed Claims will be paid to Holders of Class 3 Claims.

## C.    Classification and Treatment of Claims.

### 1.    Class 1 - Priority Claims.

(a)    <u>Classification</u>: This Class consists of all Unsecured Priority Claims specified under Bankruptcy Code Section 507(a), but excluding Priority Tax Claims and Administrative Claims.

(b)    <u>Treatment</u>: Each Holder of a Class 1 Allowed Claim will receive Cash on the later of the Effective Date and the date of Allowance of such Priority Claim equal to the Allowed Amount of such Class 1 Allowed Claim.

(c)    <u>Estimated Amount of Claims</u>: There are approximately fifteen (15) Claims in this Class totaling approximately $302,000. To estimate payments to Holders of Class 1 Allowed Claims and establish the Estate Reserve (defined below), the Chapter 11 Trustee calculates the total Class 1 Allowed Claims at $302,000, which is the face amount of all Class 1 Claims. This estimate is without prejudice to the ability of the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise disallow any Class 1 Claims.

(d)    <u>Projected distributions</u>: The Chapter 11 Trustee anticipates that all Class 1 Allowed Claims will be paid in full under this Plan.

(e)    <u>Voting</u>: Claims in this Class are unimpaired, and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject this Plan.

### 2.    Class 2 - Secured Claims.

(a)    <u>Classification</u>: This Class consists of Claims secured by valid and perfected Liens or security interests against the Debtors' Assets, to the extent of the value of the Holder's interest in the Debtors' Assets.

(b)    <u>Treatment</u>: Each Holder of a Class 2 Allowed Claim will receive Cash on the later of the Effective Date and the date of Allowance of such Secured Claim equal to the Allowed Amount of such Class 2 Allowed Claim, including interest, plus fees, costs and expenses as may be allowed by the contract, if any, underlying such secured claim.

- 12 -

(c)      Estimated Amount of Claims: There are approximately twenty-seven (27) scheduled Claims or filed proofs of Claim in this Class totaling approximately $91.975 million. Most of these Claims relate to the 2002 Notes, which are no longer secured as a result of the prior sale and payment of the UMC Stock which served as collateral for the 2002 Notes.  To estimate payments to Holders of Class 2 Allowed Claims and establish the Estate Reserve (defined below), the Chapter 11 Trustee calculates total Class 2 Allowed Claims at $380,000, which is the face amount of all Class 2 Claims other than Class 2 Claims related to the 2002 Notes.  This estimate is without prejudice to the ability of the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise Disallow any Class 2 Claim.

(d)      Projected distributions: The Chapter 11 Trustee anticipates that all Class 2 Allowed Claims will be satisfied in full under this Plan.

(e)      Voting: Claims in this Class are impaired, and Holders of Allowed Claims in this Class are therefore entitled to vote to accept or reject this Plan.

**3.      Class 3 - 2002 Notes Claims.**

(a)      Classification: This Class consists of all Unsecured Claims arising out of the 2002 Notes (the 7-3/4% Senior Secured Subordinated Convertible Debentures due 2005).

(b)      Treatment: Each Holder of a Class 3 Allowed Claim will receive Cash equal to the Holder's Pro-Rata Share of the Liquidation Amount.  Additionally, pursuant to the Subordination Provisions in the Indentures, all distributions that would otherwise be made to the Holders of Class 5 Allowed Claims on account of the 1996 Notes Claims up to the Subordination Payment Amount will be paid directly to Holders of Class 3 Claims on a Pro-Rata Share basis. After Holders of Class 3 Claims recover (whether by distributions under this Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims will thereafter be paid to Holders of Class 5 Allowed Claims.  The timing of payments is described below in Article VII, Section E below.

(c)      Estimated Amount of Claims: There are three known Holders of Class 3 Claims: Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.  The total amount of these Claims, after crediting amounts these Creditors received on account of the sale of the UMC stock that collateralized their Claims, is approximately $60.6 million.  This estimate is without prejudice to the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise Disallow any or all Class 3 Claim.

(d)      Voting: Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

4.    **Class 4 - General Unsecured Claims.**

(a)    <u>Classification</u>: This Class consists of all Unsecured Claims (including any Deficiency Claim) other than Claims in Classes 3, 5, 6, 7, and 8.

(b)    <u>Treatment</u>: Each Holder of a Class 4 Allowed Claim will receive Cash equal to the Holder's Pro-Rata Share of the Liquidation Amount. The timing of payments is described below in Article VII, Section E below.

(c)    <u>Estimated Amount of Claims</u>: As of July 1, 2007, there are a total of approximately $64.7 million of Class 4 Allowed Claims. In addition, there are a total of approximately $52.7 million of additional Class 4 Claims that are (i) subject to pending Claim objections or Preference Actions, or (ii) subject to continuing investigation by the Chapter 11 Trustee and may be objected to in the future. The Chapter 11 Trustee estimates total Class 4 Allowed Claims at $117.4 million, the face amount of all Class 4 Claims that have not been Disallowed. This calculation is an estimate and is without prejudice to the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise disallow any Class 4 Claim that has not been Allowed.

(d)    <u>Voting</u>: Claims in Class 4 are impaired, and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject this Plan.

5.    **Class 5 - 1996 Notes Claims.**

(a)    <u>Classification</u>: This Class consists of all Unsecured Claims arising out of the 1996 Notes (the 5-3/4% Convertible Subordinated Notes due 2003), including, without limitation, all Claims of U.S. Bank, National Association.

(b)    <u>Treatment</u>: Holders of Class 5 Allowed Claims will receive Cash equal to the Holder's Pro-Rata Share of the Liquidation Amount. However, pursuant to the Subordination Provisions, Distributions that would be made to Holders of Class 5 Allowed Claims will be paid to the Holders of Class 3 Claims on a Pro-Rata Share basis until the Holders of Class 3 Claims receive the Subordination Payment Amount. After Holders of Class 3 Claims have recovered (whether by distributions under this Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims will thereafter be paid to Holders of Class 5 Allowed Claims. The timing of payments is described below in Article VII, Section E below.

(c)    <u>Estimated Amount of Claims</u>: U.S. Bank, National Association is the only known Holder of a Class 5 Claim. This Holder filed a proof of Claim in the approximate estimated amount of $106.1 million. This estimate is without prejudice to the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise Disallow the Class 5 Claim.

(e)    <u>Voting</u>: Claims in this Class are impaired, and Holders of Allowed Claims in this Class are therefore entitled to vote to accept or reject this Plan.

- 14 -

6.      **Class 6 – Intercompany Claims.**

(a)      <u>Classification</u>: This Class is comprised of all Claims filed or scheduled by any of the Debtors against any of other Debtor.

(b)      <u>Treatment</u>:  All Class 6 Claims will be Allowed in full by operation of the Plan; however, by way of compromise and settlement, the only Holder of a Class 6 Claim, SONICblue, will waive its right to receive a distribution in respect of its Class 6 Allowed Claims to the extent necessary in an effort to pay non-insider Allowed Unsecured Claims in each of the Cases other than SONICblue's case a distribution approximately equal to the percentage distribution calculated to be received by the Holders of Allowed Unsecured Claims against SONICblue.

(c)      <u>Estimated Amount of Claims</u>:  There are three Class 6 Claims, one filed by SONICblue against each of the other Debtors totaling approximately $49.75 million.

(d)      <u>Voting</u>: Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

7.      **Class 7 - Convenience Class Claims.**

(a)      <u>Classification</u>: This Class is comprised of all Claims that would otherwise be Class 4 Claims but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $500; or (b) such Claim is in an amount greater than $500, but the Holder of such Claim has elected to have such Claim treated in its entirety as a Class 7 Convenience Class Claim in the amount of $500 by so indicating on the Ballot submitted to vote such Claim.

(b)      <u>Treatment</u>: Each Holder of a Class 7 Allowed Claim will receive Cash within thirty days following the later of the Effective Date and the date of Allowance of such Class 7 Allowed Claim equal to 50% of the Allowed Amount of such Class 7 Allowed Claim; provided, however, that under any circumstance the maximum Cash distribution to a Class 7 Claim Holder will be $250.

(c)      <u>Estimated Amount of Claims</u>: There are over 275 Claims in this Class totaling approximately $57,000.  Taking into account Creditors with Class 4 Allowed Claims exceeding $500 who opt to reduce their Claims to $500 and participate in the Class 7 Convenience Class to expedite receipt of their distributions, the Chapter 11 Trustee estimates that the ultimate amount of Claims in this Class will be approximately $75,000.

(d)      <u>Projected distributions</u>: Each Holder of a Class 7 Allowed Claim will receive a single distribution equal to the lesser of fifty percent (50%) of such Holder's Class 7 Allowed Claim or $250.

(e)      <u>Voting</u>: Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

**8.    Class 8 - Subordinated Unsecured Claims.**

(a)    <u>Classification</u>: This Class consists of all Claims: (i) that have been or are subject to subordination under Bankruptcy Code Section 510(b), including, without limitation, all Claims identified in Schedule 1 to this Plan and which are not expressly included in any other Class; and (ii) all Claims described in any other Bankruptcy Code provision that subordinates Claims.

(b)    <u>Treatment</u>: Holders of Allowed Class 8 Claims will receive no distributions on account of their Class 8 Claims.

(c)    <u>Estimated Amount of Claims</u>: Seven (7) Claims, comprising approximately $14.6 million, have previously been subordinated pursuant to Bankruptcy Court order.  Exhibit "C" identifies any additional claims that the Chapter 11 Trustee may seek to have subordinated.

(d)    <u>Projected distributions</u>: Holders of Class 8 Claims will receive no distributions on account of their Class 8 Claims.

(e)    <u>Voting</u>: Claims in this Class are impaired but are deemed to have rejected this Plan.  As such, Holders of Allowed Claims in this Class are not entitled to vote to accept or reject this Plan.

**9.    Class 9 - Interests.**

(a)    <u>Classification</u>: This Class consists of all Interests in any of the Debtors and any rights and Claims related thereto, including, but not limited to, all stock, equities, securities, warrants, conversion rights, options and other legal and contractual rights to acquire stock.

(b)    <u>Treatment</u>: Holders of Interests will not receive or retain any Property or distributions under this Plan on account of such Interests.  Holders of Interests will have no power or role in the administration of the Debtors.  On the Effective Date, all such power will be vested in the Plan Administrator in accordance with the terms of this Plan.  On the Effective Date, any and all equity interests in the Debtors, including all common stock, preferred stock, stock options, warrants, and any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any other right, contractual or otherwise, to acquire any such ownership interest (collectively, the "**Equity Interests**") will be cancelled and extinguished and of no further force or effect, without the need for the Chapter 11 Trustee, the Plan Administrator, the Debtors or the holders of the Equity Interests to take any further action.

(c)    <u>Projected distributions</u>: Interest Holders will receive no distributions on account of their Interests.

(d)    <u>Voting</u>: Holders of Interests are impaired but are deemed to have rejected this Plan.  As such, Holders of Interests are not entitled to vote to accept or reject this Plan.

- 16 -

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THIS PLAN; CRAMDOWN

**A.    Voting Classes.**

Except as otherwise provided by the Bankruptcy Code or the Bankruptcy Rules or order of the Bankruptcy Court, each Holder of a Claim in Classes 2, 3, 4, 5, 6, and 7 may vote to accept or reject this Plan. Only those votes cast timely by Holders of Allowed Claims in these Classes will be counted in determining whether acceptances have been received in sufficient number and amount to obtain Class acceptance and to confirm this Plan. Holders of Claims or Interests in Classes 8 and 9 are deemed to have rejected this Plan and are therefore not entitled to vote on this Plan. Holders of Claims in Class 1 are unimpaired and therefore are not entitled to vote on this Plan.

**B.    Ballot Instructions.**

To have a vote count towards Plan confirmation, each Holder of a Claim entitled to vote on this Plan must complete and timely return a Ballot to the Voting Agent, which will compile the votes received. All questions as to the validity, form, and eligibility (including time of receipt) of Ballots will be resolved by the Bankruptcy Court at the Plan confirmation hearing.

**C.    Cramdown.**

If all applicable requirements for confirmation of this Plan are met as set forth in Bankruptcy Code Sections 1129(a)(1) through (13), except subsection (8), the Chapter 11 Trustee will request that the Bankruptcy Court confirm this Plan in accordance with Bankruptcy Code Section 1129(b), notwithstanding the failure to satisfy the requirements of Section 1129(a)(8), on the basis that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims that is impaired under, and has not accepted, this Plan.

## ARTICLE V
## EFFECT OF CONFIRMATION OF THIS PLAN

**A.    Assets to Remain in the Debtors Estates; No Revesting of Assets.**

Other than as set forth herein, the Assets of the Estates will not revest in the Debtors, but will remain property of their respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan and the Plan Confirmation Order. The Estates will remain open until entry of a Final Decree closing the Chapter 11 Cases. The Plan Administrator (who is the Chapter 11 Trustee and proponent of the Plan) will oversee and control all operations of the Debtors. The Plan Administrator will manage and use the Debtors and the Assets for the sole purposes of carrying out and effectuating the distributions provided for in the Plan.

**B.      Authority to Effectuate this Plan.**

On the Effective Date, all matters provided under this Plan will be authorized and approved without further approval or order from the Bankruptcy Court.  The Plan Administrator may take all necessary actions to carry out this Plan and to effectuate the distributions provided for under this Plan, without further authorization by or notice to the Bankruptcy Court.  The Plan Administrator may sell or dispose of any and all Assets and pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court; provided, however, that any sale, settlement, distribution or transaction where the amount received, paid or distributed exceeds $100,000 will be subject to the approval of the Bankruptcy Court.

**C.      The Non-Debtor Subsidiaries.**

Except as set forth below, this Plan will have no effect on the Debtors' subsidiaries.  The Plan Administrator may operate, wind up, dissolve, or otherwise dispose of the Seller Subsidiaries.  The Plan Administrator may operate, wind up, dissolve, or otherwise dispose of any of the Debtors' other subsidiaries (including subsidiaries of subsidiaries).

**D.      Dissolution of the Creditors' Committee.**

On the Effective Date, the Creditors' Committee will be dissolved.  Neither members of the Creditors' Committee nor counsel to the Creditors' Committee will receive any release or discharge of liability under this Plan.  Claims of all parties in interest will survive confirmation of this Plan and those parties in interest may pursue those claims, rights, causes of action or rights to an equitable remedy after the Confirmation Date and Effective Date of the Plan, to the extent allowed by applicable law.

**E.      Prosecution of Claim Objections and Avoidance Actions.**

The Plan Administrator will prosecute disputed, contingent or unliquidated Claims that have been objected to prior to the Effective Date by the Debtors, the Chapter 11 Trustee, and the Creditors' Committee but that have not been liquidated to Final Order by the Effective Date.  The Bankruptcy Court will retain jurisdiction over the Plan Administrator, the Debtors and the Claims objections for this purpose.  Similarly, the Plan Administrator will prosecute Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Debtors, the Chapter 11 Trustee or the Creditors' Committee but that have not been resolved to Final Order by the Effective Date.  The Bankruptcy Court will retain jurisdiction over the Plan Administrator, the Debtors and the Avoidance Actions for this purpose.  The Plan Administrator will have standing and authority to commence any objections to Claims after the Effective Date that have not been commenced prior to the Effective Date.

The Plan Administrator will File any objections to Claims that are not subject to a pending objection on the Effective Date not later than one hundred twenty (120) days after the Effective Date.  The Plan Administrator may seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Claim.  The filing of a motion by the Plan Administrator to extend the time to File an objection to a timely filed Claim will automatically

- 18 -

extend the date by which the Plan Administrator must file objections to a timely filed Claim until a Final Order is entered on the motion.

**F.    Termination of the Debtors' Public Entities on the Effective Date.**

On the Effective Date, the Debtors will cease to exist as public companies.  On the Effective Date, the Plan Administrator and the Debtors will not be required to file any further documents or papers with the SEC or otherwise regarding any further securities related matters.

**ARTICLE VI**
**IMPLEMENTATION AND MEANS OF EXECUTION OF THIS PLAN**

**A.    Plan Administrator for the Debtors; Repeal of Bylaws and Amendments to Articles of Incorporation.**

Dennis J. Connolly will appointed Plan Administrator for the Debtors on the Effective Date.  The Plan Administrator may employ additional employees for the Debtors, retain counsel for the Debtors, and generally manage the affairs of the Debtors in accordance with the terms of this Plan.  The Plan Administrator may retain counsel that was approved under Section 327 of the Bankruptcy Code.

By operation of this Plan, on the Effective Date, all bylaws of the Debtors will be repealed and the articles of incorporation of the Debtors will be amended to provide that the Plan Administrator will displace the Boards of Directors, any Responsible Individual or any other person or persons responsible for each of the Debtors.  The Plan Administrator will file appropriate notices with the Secretary of State for the State of Delaware as required by Sections 103 and 303 of Delaware General Corporation Law (the "**Delaware Corporate Code**") or other applicable law.

**B.    Compensation of the Plan Administrator.**

The Plan Administrator will be compensated at the hourly rate otherwise ordinarily charged by the Plan Administrator.  The Plan Administrator will be paid his fees on a monthly basis from the Debtors' estates, provided however, that in any month when the Plan Administrator's fees exceed $20,000, the Plan Administrator will provide notice of the amount and nature of such fees to the U.S. Trustee and any Creditor requesting notice of such fees, and provided further however that all fees paid to the Plan Administrator will be subject to review and approval of the Bankruptcy Court prior to a Final Decree closing the Chapter 11 Cases.

**C.    Funding of this Plan.**

This Plan will be funded with the Assets, including the Cash, and the net recovery (after payment of all fees and expenses) from the pursuit of the Estate Litigation Claims and the proceeds thereof.

- 19 -

### D.    The Estate Litigation Claims.

The Plan Administrator will prosecute Estate Litigation Claims that the Debtors, the Chapter 11 Trustee or the Creditors' Committee commenced prior to the Effective Date but which are not resolved to Final Order by the Effective Date.  The Bankruptcy Court will retain jurisdiction over all pending Estate Litigation Claims following the Effective Date.  Any settlement of any pending Estate Litigation Claims will continue to be subject to the approval of the Bankruptcy Court even if the settlements are finalized after the Effective Date.  The Plan Administrator may pursue and prosecute, settle, or decline to pursue, any Estate Litigation Claims not commenced prior to the Effective Date.  The Bankruptcy Court will retain jurisdiction over all Estate Litigation Claims that are commenced after the Effective Date.

The Plan Administrator, on behalf of the Debtors, may set-off against any Claim and the distributions to be made pursuant to this Plan in respect of such Claim, any Estate Litigation Claims the Plan Administrator or the Debtors may have against the Holder of the Claim, except as otherwise expressly provided in this Plan.  Neither the failure to do so nor the Allowance of any Claim will constitute a waiver or release by the Plan Administrator or the Debtors of any such Estate Litigation Claims, set-off or recoupment which the Plan Administrator or the Debtors may have against such Holder, except as otherwise expressly provided in this Plan.

Except as expressly provided in this Plan, nothing in the Disclosure Statement, this Plan, the Plan Confirmation Order or any other order or document will waive or release any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors, the Chapter 11 Trustee, the Creditors' Committee or any other party in interest had prior to the Effective Date.  On the Effective Date, all claims, causes of action, rights, defenses held by the Debtors, the Estates, the Chapter 11 Trustee, or the Creditors' Committee will continue to be vested in the Estates and the Plan Administrator will be the representative of the Estates in respect of all Estate Litigation Claims that were, could have been or could be asserted on or after the Effective Date, for all purposes, including, but not limited to, 11 U.S.C.§ 1123(b)(3)(B).

### E.    Post-Effective Date Employment of Professionals By the Plan Administrator and Payment of Fees and Expenses Incurred By Such Professionals.

The Plan Administrator will select Professionals to be employed by the Plan Administrator after the Effective Date.  Professionals will be compensated from the Assets on a timely basis for fees and expenses incurred by the Professionals after the Effective Date in accordance with the terms of this Plan.  The Plan Administrator may retain counsel that was approved under Section 327 of the Bankruptcy Code to provide services to the Plan Administrator.  Professionals retained by the Chapter 11 Trustee, the Debtors, and the Creditors' Committee in these Cases under Section 327 and Section 1103 will not be retained after the Effective Date unless that retention is approved by the Plan Administrator in writing.

### F.    Dissolution of the Debtors.

Unless the Plan Administrator determines otherwise, upon entry of a Final Decree closing these Chapter 11 Cases, the Debtors will be dissolve.  The entry of a Final Decree closing these

Chapter 11 Cases will authorize the dissolution of the Debtors pursuant to Sections 303 of the Delaware Corporate Code, unless the Plan Administrator determines that dissolution of the Debtors is not in the best interests of Creditors.  If the Plan Administrator determines that dissolution of the Debtors is in the best interests of Creditors, upon entry of a Final Decree closing these Chapter 11 Cases, the Plan Administrator will make all necessary filings under with the Delaware Secretary of State to evidence the dissolution of the Debtors.

**G.**    **Corporate Action.**

Each of the matters provided for under this Plan involving any corporate action to be taken or required by the Chapter 11 Trustee or any Debtor will, as of the Effective Date, have occurred and be effective, and will be authorized and approved in all respects without any further action by the Chapter 11 Trustee, stockholders, officers or directors of the Debtors.

**H.**    **Substantive Consolidation.**

The Chapter 11 Trustee may elect to seek substantive consolidation of the Debtors' Estates on notice to creditors and parties in interest not less than ten days before the Ballot Deadline.  In the event that the Chapter 11 Trustee seeks substantive consolidation of the Debtors' Estates, and the Court orders the substantive consolidation of the Debtors' Estates as a part of confirmation of the Plan, the following provisions will apply:

**1.**    The Debtors' Assets and liabilities will be consolidated such that the Allowed Class 6 Claims will be cancelled and will receive no distribution or other consideration under this Plan or otherwise.

**2.**    Any Claims based on guaranties, surety agreements or otherwise will be cancelled and a Creditor holding any such Claim against multiple Debtors will be entitled only to a single distribution in respect of that Claim.

**3.**    For all purposes on or after the Effective Date, the Debtors' Estates will be consolidated and the Debtors shall be treated as but one legal entity.

**ARTICLE VII**
**CLAIMS RESOLUTION AND DISTRIBUTIONS**

**A.**    **Late Claims Void.**

Unless otherwise expressly ordered by the Bankruptcy Court or otherwise provided by this Plan, any Claim filed after the applicable Claims Bar Date will be void and of no force or effect, and will receive no distributions under this Plan.

**B.**    **Prosecution of Objections to Claims.**

The Plan Administrator will prosecute those Claim objections that were commenced by the Chapter 11 Trustee, the Debtors, or Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date until all such Claim objections have

- 21 -

been resolved to Final Order.  The Bankruptcy Court will retain jurisdiction over all pending Claim objections following the Effective Date.  Except as set forth below with respect to the Claim Order, any settlement of any Claim objections, whether initiated before or after the Effective Date, will continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.  The Plan Administrator may pursue and prosecute, settle, or decline to pursue, any and all Claim objections that were not commenced prior to the Effective Date.  The Bankruptcy Court will retain jurisdiction over all such Claim objections commenced after the Effective Date.

Nothing in the Disclosure Statement, this Plan, the Plan Confirmation Order or any other order or document waives or releases any claim, cause of action, right of setoff, or other legal or equitable defense that the Chapter 11 Trustee, the Debtors or the Creditors' Committee had prior to the Effective Date provided however, that the Chapter 11 Trustee, the Plan Administrator and all other parties in interest may not seek reconsideration of, object to, seek reduction of, counterclaim to, seek subordination of, or seek offset or recoupment as to any Allowed Claim allowed by a Final Order that provides that such Allowed Claim is not subject to such actions. On the Effective Date, all such claims, causes of action, rights and defenses will be transferred and conveyed to the Plan Administrator and the Debtors as successors in interest.

On March 14, 2006, the Bankruptcy Court entered an order (the "**Claim Order**") entitled "Order Granting Motion Waiving Notice of Claim Settlements." The Claim Order authorized the Debtors or the Creditors' Committee to settle Claim disputes without notice to Creditors so long as the Creditors' Committee and the Debtors, or their respective counsel, both sign a written settlement agreement or stipulation. The terms of the Claim Order will be amended by operation of this Plan to provide that, after the Effective Date, the Plan Administrator may settle Claim disputes without notice to Creditors and without further authorization of the Bankruptcy Court or, in the Plan Administrator's discretion, he may seek Bankruptcy Court authorization, except that the settlement of any claim in excess of $3 million will be on notice.

## C.    Estimation of Claims.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtors, the Chapter 11 Trustee, the Creditors' Committee or any other party in interest previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection, except as otherwise provided in this Plan.  The Bankruptcy Court will retain jurisdiction over the Debtors' estates and these Chapter 11 Cases to estimate any Claim at any time prior to the entry of a Final Decree closing these Chapter 11 Cases.  If the Bankruptcy Court estimates any Claim, that estimated amount will constitute the Allowed amount of such Claim for Plan voting, but will not constitute a maximum limitation on such Claim for distribution purposes unless the parties agree to allow the estimation to serve as such a maximum.

## D.    Allowed and Disputed Claims.

A Disputed Claim is any Claim that is subject to (i) an objection, or (ii) a motion or adversary proceeding which seeks to estimate, disallow, or subordinate the Claim, and also as to

- 22 -

which a Final Order has not been entered that Allows or Disallows the Claim. A Claim that is allowed by operation of law under Section 502 of the Bankruptcy Code because no objection has been filed to such Claim may become a Disputed Claim upon the filing of an objection that that Claim or a motion or adversary proceeding which seeks to estimate, disallow, or subordinate the Claim.

**E.    Provisions Regarding Distributions.**

    **1.    No Distributions on Disputed or Disallowed Claims; Establishment of Disputed Claims' Reserve.**

No distribution will be made to the Holder of a Disputed Claim until the Disputed Claim becomes an Allowed Claim. The Plan Administrator will not make distributions to Holders of Disallowed Claims.

On and after the Effective Date, the Plan Administrator will establish and maintain a reserve (the "**Disputed Claims' Reserve**") to fund the payment of Disputed Claims. The amount of the Disputed Claims' Reserve will be equal to the sum of the following: (i) the face amount of all Disputed Priority Tax Claims, (ii) the face amount of all Disputed Administrative Claims, (iii) the face amount of all Class 1 Disputed Claims, (iv) the face amount of all Class 2 Disputed Claims, (v) the face amount of all Class 3 Disputed Claims multiplied by the Pro-Rata Share of the Liquidation Amount calculated to be paid to Holders of Class 3 Allowed Claims, (vi) the face amount of all Class 4 Disputed Claims multiplied by the Pro-Rata Share of the Liquidation Amount calculated to be paid to Holders of Class 4 Allowed Claims, (vii) the face amount of all Class 5 Disputed Claims multiplied by the Pro-Rata Share of the Liquidation Amount calculated to be paid to Holders of Class 5 Allowed Claims (or, pursuant to the Subordination Provisions, calculated to be paid to Holders of Class 3 Claims), and (viii) the amount that would be paid to all Class 7 Disputed Claims if they were Class 7 Allowed Claims. The Plan Administrator will, from time to time, recalculate the amount of the Disputed Claims Reserve. The Plan Administrator may use any Assets withdrawn from the Disputed Claims Reserve for distributions in accordance with the terms of this Plan.

    **2.    Distributions on Account of Allowed Claims.**

The Plan Administrator will pay Cash to each Holder of an Allowed Claim on the later of the Effective Date or the date on which the Claim is Allowed by Final Order, or as otherwise provided in this Plan. The Plan Administrator may make interim or partial distributions, except as provided in this Plan or as limited by the Bankruptcy Code. The Plan Administrator will make distributions to Holders of Class 3, 4, 5, 6, and 7 Allowed Claims as soon as a practicable after the Effective Date.

    **3.    Estate Reserve.**

On the Effective Date, the Plan Administrator will establish and maintain a reserve (the "**Estate Reserve**") to fund the payments required to be made under this Plan on account of Class 1 Allowed Claims, Class 2 Allowed Claims, Class 7 Allowed Claims, Allowed Priority Tax

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Plan Administrator to pay post-Effective Date fees and expenses, including, without limitation, those incurred or to be incurred by professionals employed by the Plan Administrator through the closing of these Chapter 11 Cases and entry of a Final Decree. The Plan Administrator will determine the amount of the Estate Reserve. If a Creditor files an objection to the amount of the Estate Reserve with the Bankruptcy Court which sets forth in detail the grounds for such objection, the Bankruptcy Court will resolve any such dispute after notice and a hearing. The Plan Administrator will not be liable if the Estate Reserve is inadequate, unless such inadequacy was the result of gross negligence, recklessness or willful malfeasance. All recoveries obtained from the pursuit of Avoidance Actions will remain in a segregated account(s) until the Bankruptcy Court has ruled upon the fee application of the Professionals.

### 4.    Effectuation of Distributions.

The Plan Administrator will serve as the disbursing agent and will make all distributions in accordance with the terms of this Plan. The Plan Administrator will make all distributions without any requirement for bond or surety with respect thereto. At the request of the Plan Administrator, the Claims Agent in these Cases, Administar, will assist in making distributions under this Plan and will be entitled to reasonable compensation for providing such services.

### 5.    Distributions on Later-Allowed Claims.

When a Disputed Claim becomes an Allowed Claim (in whole or in part), the Plan Administrator will make a distribution from the Disputed Claims Reserve to the Holder of the Allowed Claim in an amount equal to the distribution the Holder of such Claim would have received if the Holder's Claim had been Allowed in such amount on the Effective Date. No Holder of a Disputed Claim will receive any post-Petition Date or post-Effective Date interest or other accruals of any kind based upon the delay in receipt of the payment.

### 6.    Manner of Payments; Delivery of Distributions.

The Plan Administrator will make all distributions under this Plan in Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank. Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under this Plan, the Plan Administrator will make distributions to Holders of Allowed Claims at each Holder's address set forth on the Schedules filed with the Bankruptcy Court unless superseded by a different address set forth in a timely filed proof of claim filed by the Holder or if the Plan Administrator has been notified in writing of a change of address.

### 7.    Undeliverable Distributions.

(a)    <u>Holding of Undeliverable Distributions</u>: If any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions will be made to such Holder unless and until the Plan Administrator is notified, in writing, of such Holder's then-current address. The Plan Administrator will hold undeliverable distributions until the

distribution becomes deliverable.  Holders ultimately receiving previously undeliverable distributions will not receive interest or other accruals of any kind based upon the delay in receipt.  The Plan Administrator is not required to locate the Holder of an Allowed Claim.

(b)    <u>Uncashed Checks</u>. The Plan Administrator is not required to locate the Holder of an Allowed Claim that does not cash any check representing a distribution payment.  If a distribution check has not been cashed for three (3) months from the date of mailing of such check to the Creditor, the Plan Administrator may: (a) stop payment on the check, (b) treat the distribution as undeliverable, or (c) refuse to re-issue the check if the Plan Administrator determines that reissuing such check may adversely affect the distribution to any other Creditor or if re-issuing such check may cause the Plan Administrator to incur expense or inconvenience that is unwarranted in light of the amount of the distribution.

(c)    <u>Failure to Claim Undeliverable Distributions</u>: The Plan Administrator may from time to time file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been attempted and have been returned as undeliverable as of the date thereof.  Any Holder of a Claim identified in such list that does not assert its rights pursuant to this Plan to receive a distribution within two (2) months from and after the filing of such list will not be entitled to any distributions under this Plan and will be forever barred from asserting any such Claim against the Debtors or the Plan Administrator.  In such case, any consideration held for distribution on account of such Claim will revert to the Plan Administrator for distribution to other Creditors or payment of expenses in accordance with the terms of this Plan. Notwithstanding the foregoing, the Plan Administrator may pay distributions to a Holder of a Claim where distributions to the Holder had previously been determined to be undeliverable.

(d)    <u>Fractional Amounts</u>: Payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

## 8.    Compliance with Tax Requirements/Allocation.

The Plan Administrator will comply with tax withholding and reporting requirements imposed by any governmental unit in making distributions under this Plan.  All distributions pursuant to this Plan will be subject to withholding and reporting requirements.  The Plan Administrator may withhold distributions due to any Holder of an Allowed Claim until the Holder provides the Plan Administrator with the necessary information to comply with withholding requirements of any governmental unit.  The Plan Administrator will pay any withheld distributions to the appropriate authority.  If the Holder of an Allowed Claim fails to provide to the Plan Administrator with the information necessary to comply with withholding requirements of any governmental unit within sixty days after the date of first notification by the Plan Administrator to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's distributions will be treated as undeliverable.  For tax purposes, distributions received in respect of an Allowed Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest.

- 25 -

**9.      Set-Offs.**

The Plan Administrator may set-off against any Allowed Claim (and distributions to be made thereto), the claims, rights and causes of action of any nature that the Debtors or the Estates may hold against the Holder of such Allowed Claim, consistent with applicable law, except if the Allowed Claim is Allowed by a Final Order which provides by its terms that such Allowed Claim will not be subject to any right of set-off.  The Holder of a Claim may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set off any Allowed Claim such Holder possesses against any claim, rights or causes of action of any nature that the Debtors may hold against such Holder except if the Allowed Claim is Allowed by a Final Order which provides by its terms that the Holder may not set-off such claims against the Debtors against such Allowed Claim.  Neither the failure to effect such a set-off nor the allowance of any Claim under this Plan will waive or release the Plan Administrator or the Debtors or such Holders of any such Claims, rights and causes of action that such parties may possess under Bankruptcy Code Section 553 or applicable non-bankruptcy law.

## ARTICLE VIII
## SATISFACTION OF CLAIMS AND INJUNCTION

**A.      Satisfaction of Claims.**

This Plan does not grant the Debtors a discharge.  However, except as otherwise provided in this Plan: (1) the rights afforded in this Plan and the treatment of all Claims and Interests is in exchange for and in complete satisfaction of Claims and Interests; and (2) no Entity may assert any further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date against the Debtors, the Plan Administrator, or the Assets, except as otherwise provided in this Plan.

**B.      Injunction.**

Except as otherwise expressly provided in the Plan, Entities who held, hold or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their Estates, the Chapter 11 Trustee, or the Plan Administrator; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their Estates, the Chapter 11 Trustee, or the Plan Administrator; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their Estates, the Chapter 11 Trustee, or the Plan Administrator, or against the Property or interests in Property of any of the foregoing.  Nothing in the Plan or the Plan Confirmation Order prohibits or restrains any party from prosecuting any actions or controversies against the Debtors' present or former directors and officers or Holders of Interests based on acts, events or omissions occurring before the Petition Date.  With respect to all Claims or Estate Litigation Claims, all Entities shall be and are permanently enjoined from commencing or continuing any such matter except in the Bankruptcy Court, and the Bankruptcy Court will retain exclusive jurisdiction over all such matters.

CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE{00304513.DOC v 1}

**ARTICLE IX**
**OTHER PLAN MATTERS**

**A.    Executory Contracts and Unexpired Leases.**

**1.    Rejection of Executory Contracts and Unexpired Leases.**

Any pre-petition executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, or which has not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume the same pending as of the Effective Date, is rejected on the Effective Date or as otherwise agreed upon by the parties.   The entry of the Plan Confirmation Order by the Bankruptcy Court constitutes approval of such rejections pursuant to Bankruptcy Code Sections 365(a) and 1123, effective as of the Effective Date of this Plan.

**2.    Rejection Damage Claims Bar Date and Resolution.**

Claims arising out of the rejection of executory contracts or unexpired leases rejected as of the Effective Date pursuant to this Plan must be filed and served on counsel to the Plan Administrator pursuant to the procedures specified in the Plan Confirmation Order no later than thirty (30) days after the Effective Date (the "**Final Rejection Claims Bar Date**").  Claims arising out of the rejection of executory contracts or unexpired leases rejected as of a date prior to the Effective Date must be filed and served not later than the deadline, if any, established in the order approving rejection of such executory contract or unexpired lease or other court order establishing a bar date for rejection Claims ("**Applicable Rejection Claims Bar Date**") or, if there is no such Applicable Rejection Claims Bar Date, by the Final Rejection Claims Bar Date. Claims arising out of rejection of executory contracts or unexpired leases that are the subject of a motion to assume pending on the Effective Date must be filed within thirty (30) days after entry of an order either rejecting such executory contract or unexpired lease or denying such motion to assume such executory contract or unexpired lease.  Holders of any Claim not filed within such times will be barred from asserting such Claim against the Debtors and their Estates, or the Plan Administrator.  Unless otherwise ordered by the Bankruptcy Court prior to the Confirmation Date, or such later date as may be ordered by the Bankruptcy Court prior to the Confirmation Date, all Claims arising from the rejection of executory contracts and unexpired leases will be treated as Class 4 Claims under this Plan.

**B.    Conditions Precedent.**

**1.    Conditions Precedent to Effective Date of this Plan.**

The Effective Date will be the date all of the following conditions precedent are satisfied:

a.    <u>Plan Confirmation Order</u>: The Plan Confirmation Order is in form and substance acceptable to the Chapter 11 Trustee and, except as otherwise agreed by the Chapter 11 Trustee, is a Final Order in full force and effect that is not stayed or reversed; and

- 27 -

b.    Execution of Documents Other Actions: All other actions and documents determined by the Chapter 11 Trustee to be necessary to implement this Plan will have been effected or executed.

## 2.    Waiver of Conditions.

The Chapter 11 Trustee may waive the requirement that the Plan Confirmation Order be a Final Order prior to this Plan becoming effective, but the Chapter 11 Trustee may not waive the requirement of an entered Bankruptcy Court order confirming this Plan that has not been stayed or reversed.  Any waiver of a condition precedent to the Effective Date may be effected at any time, in writing, without notice or leave or order of the Bankruptcy Court.

## C.    Retention of Jurisdiction.

Except as provided in this Plan, the Bankruptcy Court will retain exclusive jurisdiction over any matter arising under the Bankruptcy Code or arising in or related to the Chapter 11 Cases and this Plan.  The Bankruptcy Court will also have exclusive jurisdiction:

(a)    to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any of the Debtors was or is a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(b)    to enter such orders as may be necessary or appropriate to implement, interpret or enforce the provisions of this Plan and any contracts, instruments, transactions and other agreements or documents created in connection with this Plan;

(c)    to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Debtors after the Effective Date (to the extent such venue is selected by the Debtors);

(d)    to ensure that distributions to Holders of Allowed Claims are accomplished as provided in this Plan;

(e)    to hear and determine any timely objections to Priority Claims, Priority Tax Claims, Administrative Claims or to other proofs of Claims and Interests filed both before and after the Effective Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, reduce, modify, determine, liquidate, classify, estimate, subordinate or establish the priority of or secured or unsecured status of any Claim, in whole or in part, which will be in full preclusion of any contractual arbitration provision which is abrogated under this Plan;

(f)    to enter and implement such orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

- 28 -

(g)    to issue orders in aid of execution of this Plan;

(h)    to consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Plan Confirmation Order;

(i)    to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals prior to the Effective Date (including Avoidance Action Professional Fees), and to hear and determine all issues pertaining to return or disallowance of any interim fees or expenses that may have been awarded or funded;

(j)    to hear and determine disputes arising in connection with or relating to this Plan, the interpretation, implementation or enforcement of this Plan, or the extent of any Entity's obligations incurred in connection with or released under this Plan;

(k)    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation or enforcement of this Plan;

(l)    to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Plan Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Disclosure Statement;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146;

(n)    to hear any other matter or for any purpose specified in the Plan Confirmation Order that is not inconsistent with the Bankruptcy Code, including the allowance or disallowance and classification of late-filed proofs of claim in accordance with Bankruptcy Rule 9006(b);

(o)    to enter a Final Decree closing the Chapter 11 Cases;

(p)    to hear and determine any matters that may arise in connection with the sales of the Debtors' Assets or any order of the Bankruptcy Court with respect thereto;

(q)    to hear and determine any actions or controversies by or against the Debtors; and

(r)    to hear and determine any matter relating to or arising out of any action or act taken or omission in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including, without limitation, any act or omission taken or to be taken in connection with the Chapter 11 Cases commenced against any party in the Chapter 11 Cases, including, without limitation, the Debtors, the Creditors' Committee, the Chapter 11

- 29 -

Trustee, and their respective current and former directors and officers, members, agents, advisors, attorneys, advisors and other Professionals.

**D.    Chapter 11 Postconfirmation Reports And Final Decree**

(a)    <u>Postconfirmation Reports</u>.  Within 30 days following the end of the calendar quarter in which the Plan was confirmed, the Plan Administrator will file a postconfirmation report (a "**Quarterly Report**") in a format provided by the United States Trustee.  The Plan Administrator will file further Quarterly Reports within 30 days following the end of each subsequent calendar quarter until entry of a Final Decree, or unless otherwise ordered by the Bankruptcy Court.

(b)    <u>Service Of Reports</u>.  The Plan Administrator will serve a copy of each Quarterly Report upon the United States Trustee and any Creditor requesting notice of the Quarterly Report filed no later than the day upon which it is Filed with the Bankruptcy Court.

(c)    <u>Final Decree</u>.  After the Debtors' estates are fully administered, the Plan Administrator will file an application for a Final Decree, and shall serve the application on the United States Trustee, together with a proposed Final Decree.

**E.    Modification of Plan; Revocation or Withdrawal.**

The Chapter 11 Trustee may amend or modify this Plan at any time.  The Chapter 11 Trustee may revoke or withdraw this Plan prior to the Confirmation Date, in which case this Plan will be null and void.  In such event, nothing contained in this Plan, the Disclosure Statement or other document filed in connection with this Plan will waive or release any claims by the Debtors, the Chapter 11 Trustee, or the Plan Administrator or any other entity or prejudice in any manner the rights of the Debtors, the Chapter 11 Trustee, or the Plan Administrator or any other entity in any further proceedings involving the Debtors, the Chapter 11 Trustee, or the Plan Administrator.

**F.    Terms of Existing Injunctions or Stays.**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date, and thereafter will be annulled without any action being taken by any party.

**G.    Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities.**

On the Effective Date, except to the extent provided otherwise in this Plan, all notes, instruments, certificates and other documents evidencing Claims against or Interests in any of the Debtors will be canceled and terminated, without any further act or action under any applicable agreement, law, regulations, order or rule.  On the Effective Date, any Indenture relating to any of the foregoing, including the 1996 Notes Indenture and the 2002 Notes Indenture, will be canceled; provided, however, that the Indentures will continue in effect solely for the purposes of

- 30 -

allowing the 2002 Noteholders and the 1996 Notes Indenture Trustee to make any distributions to be made on account of the Indentures.  Notwithstanding any of the foregoing, all charging lien rights of the 1996 Notes Indenture Trustee are preserved and survive Plan confirmation, and provided further that nothing in this Plan will eliminate, impair or otherwise affect any charging lien of the 2002 Noteholders or the 1996 Notes Indenture Trustee under the 2002 Notes Indenture or the 1996 Notes Indenture to secure all pre-Effective Date and post-Effective Date amounts provided for therein.  The Bankruptcy Court will be the only forum with jurisdiction to resolve any disputes between or among the 2002 Noteholders and the 1996 Notes Indenture Trustee, subject to the parties' appellate rights with respect to any Bankruptcy Court order.  The Bankruptcy Court will retain jurisdiction over the 2002 Noteholders and the 1996 Notes Indenture Trustee to resolve any dispute which is commenced but not completed to Final Order before the Effective Date, or which is commenced after the Effective Date.  Nothing contained in this Article IX.G or otherwise contained in this Plan limits the right of any Creditor to enforce any Subordination Provision contained in the Indentures.

**H.      Section 1146 Exception.**

Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer, or exchange of any security under this Plan, or the making or delivery of an instrument of transfer under this Plan, may not be taxed under any law imposing a stamp tax or similar tax.

**I.      Severability.**

The provisions of this Plan may not be severed unless such severance is agreed to by the Chapter 11 Trustee and such severance would constitute a permissible modification of this Plan pursuant to Bankruptcy Code Section 1127.

**J.      Governing Law.**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the Bankruptcy Code and other Federal Law and, to the extent not inconsistent therewith, the laws of the State of California.

**K.      Notices.**

All notices, requests and demands to or upon the Chapter 11 Trustee must be in writing, including by facsimile transmission, and delivered to counsel for the Chapter 11 Trustee at the following address:

> Grant T. Stein, Esq.
> Alston & Bird LLP
> 1201 West Peachtree Street
> Atlanta, GA 30309
> Telephone: (404) 881-7000
> Facsimile: (404) 881-7777

**L.    Closing of Cases.**

The Plan Administrator will, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

**A.    Waiver of Final Order.**

Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the Chapter 11 Trustee or, after the Effective Date, the Debtors or the Plan Administrator.  No such waiver will preclude any party in interest from seeking a stay pending appeal of any order that is not a Final Order.

**B.    Business Days.**

If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

**C.    No Attorneys' Fees.**

No attorneys' fees will be paid by the Debtors with respect to any Claim or Interest except as expressly specified herein or Allowed by a Final Order of the Bankruptcy Court.

**D.    No Injunctive Relief.**

No Claim or Interest will under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**E.    Operations Between the Confirmation Date and the Effective Date.**

The Chapter 11 Trustee will continue to operate the Debtors, subject to the supervision of the Bankruptcy Court, during the period from the Confirmation Date through and until the Effective Date.

**F.    Approval of Agreements.**

The solicitation of votes on this Plan is a solicitation of the Holders of Allowed Claims and Interests for the approval of all other agreements and transactions contemplated by this Plan. Entry of the Plan Confirmation Order will constitute approval of such agreement and transactions and the Plan Confirmation Order must so provide.

- 32 -

**G.    No Admissions or Waivers.**

Notwithstanding anything herein to the contrary, nothing contained in this Plan will constitute an admission or waiver by the Chapter 11 Trustee, the Debtors, or the Plan Administrator with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest, provided however, that the Chapter 11 Trustee, the Plan Administrator and all other parties in interest may not seek reconsideration of, object to, seek reduction of, counterclaim to, seek subordination of, or seek offset or recoupment as to any Allowed Claim allowed by a Final Order that provides that such Allowed Claim is not subject to such actions.

**H.    Continuing Viability of Other Orders/Agreements.**

Except to the extent expressly modified by this Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between Creditors or between the Debtors and their Creditors will continue in full force and effect.

**ARTICLE XI**
**CONCLUSION AND RECOMMENDATION**

The Chapter 11 Trustee believes that this Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 2, 3, 4, 5, 6, and 7 to vote to accept this Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth in the Disclosure Statement and on the ballot so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [_____], 2007.

Dated: July 20, 2007

Respectfully Submitted:


By:    /s/ Dennis J Connolly
        Dennis J. Connolly
        Chapter 11 Trustee

- 33 -

# EXHIBIT 16

FRIEDMAN DUMAS & SPRINGWATER LLP
CECILY A. DUMAS (S.B. NO. 111449)
150 Spear Street, Suite 1600
San Francisco, CA 94105
Telephone Number:  (415) 834-3800
Facsimile Number:  (415) 834-1044

ALSTON & BIRD LLP
GRANT T. STEIN (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777

Attorneys for Dennis J. Connolly,
Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br>               Debtors. | Case No. 03-51775 MM<br><br>Chapter 11 Cases<br><br>(Case Numbers 03-51775 through 03-5 1778) (Jointly Administered)<br><br>DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE<br><br><u>Disclosure Statement Hearing</u>:<br>Date:   September 20, 2007<br>Time:  11:00 a.m.<br>Dept:  Courtroom 3070<br>          280 South First St.<br>          San Jose, CA 95113<br><br>Hon. Marilyn Morgan |

# Table of Contents

Page

EXHIBIT LIST ................................................................................................................... i

INTRODUCTION .............................................................................................................. ii

VOTING PROCEDURES ................................................................................................. iii

DISCLAIMER .................................................................................................................. iv

ARTICLE I OVERVIEW OF THE PLAN ......................................................................... 1
   **A.**   Plan Structure. ........................................................................................................ 1
   **B.**   Summary of Classification and Treatment of Claims and Interests Under the Plan. ........... 2

ARTICLE II PLAN VOTING PROCEDURES AND REQUIREMENTS ................................... 4
   **A.**   Notice to Holders of Claims and Interests. ............................................................. 4
   **B.**   Holders of Claims In Classes 2, 3, 4, 5, 6, and 7 are Entitled to Vote on the Plan. ............. 5

ARTICLE III DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESSES ................. 6
   **A.**   Basis of Presentation. ........................................................................................... 6
   **B.**   The Debtors. ........................................................................................................ 6
   **C.**   The Debtors' Other Affiliates. ............................................................................. 6
   **D.**   Products. .............................................................................................................. 7
   **E.**   Pre-Petition Asset Sales and Acquisitions. ........................................................... 7
   **F.**   UMC Stock. ......................................................................................................... 8
   **G.**   Patents. ................................................................................................................ 8
   **H.**   Petition Date Capital Structure. ............................................................................ 8

ARTICLE IV PRE-BANKRUPTCY EVENTS ..................................................................... 9
   **A.**   Basis of Presentation. ........................................................................................... 9
   **B.**   The Debtors' Pre-Bankruptcy Losses. .................................................................. 9
   **C.**   Copyright Litigation. ............................................................................................ 9
   **D.**   Retention Of Financial Advisor and Pre-Bankruptcy Restructuring Alternatives. ............. 9

ARTICLE V SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ........................ 10
   **A.**   Basis of Presentation. ......................................................................................... 10
   **B.**   The Bankruptcy Petitions; First Day Orders; Cash Collateral. ............................ 10
   **C.**   Retention Of Professionals by the Debtors. ......................................................... 10
   **D.**   Appointment of the Creditors' Committee. ......................................................... 11
   **E.**   Disqualification of Pillsbury and Appointment of the Chapter 11 Trustee. ................ 11
   **F.**   Retention of Counsel by the Chapter 11 Trustee. ................................................ 13
   **G.**   SBC's Motion to Reconstitute the Creditors' Committee. .................................... 13
   **H.**   Sale of Substantially All of the Debtors' Assets. ................................................. 13
       **1.**   Sale of the Rio, ReplayTV and Go-Video Product Lines. ............................ 13
       **2.**   U.K. Affiliate Participation in the Rio Product Line Sale. ........................... 14
       **3.**   Patent Sales; Modem and Computer Inventory Sales; Proposed Sale of Epic Technology Stock. ................................................................................... 14
       **4.**   Post-Petition Date UMC Stock Sales. ....................................................... 15
       **5.**   Payment of Certain Secured Claims. ......................................................... 15
       **6.**   Funds Held. .............................................................................................. 15
   **I.**   Employee Matters. .............................................................................................. 16
       **1.**   Employees. ............................................................................................... 16
       **2.**   Employee Retention and Incentive Plans. .................................................. 16

**3.** The Debtors' Retirement Plans ............................................................. 16
**J.** Claims Process and Bar Dates. ............................................................... 17
    **1.** Schedules and Statements. .............................................................. 17
    **2.** Previously Established Claims Bar Dates. ....................................... 17
    **3.** Claims Objections and Subordination. ............................................ 18
    **4.** The 1996 and 2002 Notes Claims. .................................................. 18
**K.** Post-Petition Date Litigation. ................................................................ 20
    **1.** VIA Litigation. ................................................................................ 20
    **2.** The 1996 Notes Litigation and the Insurance Litigation. ............... 20
    **3.** Avoidance Actions. ......................................................................... 21
    **4.** Sonicblue LLC's Subordination Action Against the 2002 Noteholders. .................. 22
**L.** Investigation by the Chapter 11 Trustee. ............................................... 22

ARTICLE VI THE PLAN OF LIQUIDATION ................................................... 23
**A.** General Plan Description. ....................................................................... 23
**B.** The Plan's Intercreditor Provisions. ...................................................... 24
**C.** Other Procedural Issues Concerning Subordination and Seniority of Claims. ............. 25
**D.** Classification and Treatment of Claims. ................................................ 25
    **1.** Class 1 – Priority Claims. ............................................................... 26
    **2.** Class 2 – Secured Claims. ............................................................... 26
    **3.** Class 3 – 2002 Notes Claims. ......................................................... 27
    **4.** Class 4 – General Unsecured Claims. .............................................. 27
    **5.** Class 5 – 1996 Notes Claims. ......................................................... 28
    **6.** Class 6 – Intercompany Claims. ...................................................... 28
    **7.** Class 7 – Convenience Class Claims. .............................................. 29
    **8.** Class 8 – Subordinated Unsecured Claims. ..................................... 29
    **9.** Class 9 – Interests. .......................................................................... 30
**E.** Treatment of Unclassified Administrative and Priority Tax Claims. ....... 30
    **1.** Administrative Claims other than Post-Petition Taxes). .................. 30
    **2.** Statutory Fees. ................................................................................ 31
    **3.** Professional Fees. ........................................................................... 31
    **4.** Priority Tax Claims and Post-Petition Taxes. .................................. 32
**F.** Effect of Confirmation of the Plan. ....................................................... 32
    **1.** Assets to Remain in Debtors' Estates; No Revesting of Assets. ...... 32
    **2.** Authority to Effectuate the Plan. ..................................................... 32
    **3.** The Non-Debtor Subsidiaries. ......................................................... 33
    **4.** Dissolution of the Creditors' Committee. ........................................ 33
    **5.** Prosecution of Claim Objections and Avoidance Actions. ............. 33
    **6.** Termination of the Debtors' Public Entities on the Effective Date. .. 33
**G.** Implementation and Means of Execution of the Plan. ............................ 34
    **1.** Plan Administrator for the Debtors; Repeal of Bylaws and Amendments to Articles of Incorporation. ............................................................... 34
    **2.** Compensation of the Plan Administrator. ....................................... 34
    **3.** Funding of the Plan. ....................................................................... 34
    **4.** The Estate Litigation Claims. ......................................................... 34
    **5.** Post-Effective Date Employment of Professionals By the Plan Administrator and Payment of Fees and Expenses Incurred By Such Professionals. .......... 35
    **6.** Dissolution of the Debtors. ............................................................. 35
    **7.** Corporate Action. ........................................................................... 36

-ii-

ARTICLE VII CLAIMS RESOLUTION AND DISTRIBUTIONS ............................................ 36
  **A.**  Late Claims Void. ......................................................................................... 36
  **B.**  Prosecution of Objections to Claims. ........................................................... 36
  **C.**  Estimation of Claims. .................................................................................... 37
  **D.**  Allowed and Disputed Claims. ...................................................................... 37
  **E.**  Provisions Regarding Distributions. ............................................................. 38
      **1.**  No Distributions on Disputed or Disallowed Claims; Establishment of Disputed Claims' Reserve. .......................................................................................... 38
      **2.**  Distributions on Account of Allowed Claims. ............................................ 38
      **3.**  Estate Reserve. ........................................................................................... 38
      **4.**  Effectuation of Distributions. ...................................................................... 39
      **5.**  Distributions on Later-Allowed Claims. ...................................................... 39
      **6.**  Manner of Payments; Delivery of Distributions. ......................................... 39
      **7.**  Undeliverable Distributions. ....................................................................... 39
      **8.**  Compliance with Tax Requirements/Allocation. ......................................... 40
      **9.**  Set-Offs. ..................................................................................................... 41

ARTICLE VIII SATISFACTION OF CLAIMS AND INJUNCTION .................................... 41
  **A.**  Satisfaction of Claims. .................................................................................. 41
  **B.**  Injunction. ..................................................................................................... 41

ARTICLE IX OTHER PLAN EFFECTUATION MATTERS ................................................ 42
  **A.**  Executory Contracts and Unexpired Leases. ................................................. 42
      **1.**  Rejection of Executory Contracts and Unexpired Leases. ........................... 42
      **2.**  Rejection Damage Claims Bar Date and Resolution. ................................... 42
  **B.**  Conditions Precedent. ................................................................................... 42
      **1.**  Conditions Precedent to Effective Date of the Plan. ................................... 42
      **2.**  Waiver of Conditions. ................................................................................. 43
  **C.**  Retention of Jurisdiction. .............................................................................. 43
  **D.**  Chapter 11 Postconfirmation Reports And Final Decree. .............................. 43
  **E.**  Modification of Plan; Revocation or Withdrawal. ......................................... 44
  **F.**  Terms of Existing Injunctions or Stays. ........................................................ 44
  **G.**  Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities. ......... 44
  **H.**  Section 1146 Exception. ................................................................................ 45
  **I.**  Severability. .................................................................................................. 45
  **J.**  Governing Law. ............................................................................................. 45
  **K.**  Notices. ......................................................................................................... 45
  **L.**  Closing of Cases. .......................................................................................... 45
  **M.**  Continuing Viability of Other Orders/Agreements. ...................................... 45

ARTICLE X CONFIRMATION OF THE PLAN .................................................................... 46
  **A.**  Confirmation Hearing. .................................................................................. 46
  **B.**  Requirements for Confirmation of the Plan. .................................................. 46

ARTICLE XI FINANCIAL INFORMATION .......................................................................... 46

ARTICLE XII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................................................................... 47

ARTICLE XIII CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .... 47

ARTICLE XIV CONCLUSION AND RECOMMENDATION ................................................. 47

-iii-

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

**EXHIBIT LIST**

Exhibit "A" –   Chapter 11 Plan of Liquidation

Exhibit "B" –   Corporate Structure Chart

Exhibit "C" –   A list of all known Claims that were included in the Schedules or were asserted in proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Chapter 11 Trustee (or by the Liquidating Trust after the Effective Date) as the Chapter 11 Trustee is continuing with his investigation of Claims.  This list does not include Claims held by any of the defendants in Avoidance Actions.

Exhibit "D" –   A list of potential Estate Causes of Action.  This list is not exclusive and the Trustee reserves all claims and causes of action whether or not included in this list.

Exhibit "E" – An aggregate list of the Assets of and Claims against each of the Debtors.

## INTRODUCTION

This disclosure statement (the "**Disclosure Statement**") is furnished by DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE (the "**Chapter 11 Trustee**") of SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, Chapter 11 Debtors in the above-captioned jointly administered Chapter 11 Cases (collectively, the "**Debtors**"), in connection with the Chapter 11 Trustee's solicitation of votes to confirm the Chapter 11 Plan of Liquidation (the "**Plan**") Proposed by the Chapter 11 Trustee. A copy of the Plan is attached hereto as Exhibit "A".[1]

This Disclosure Statement sets forth information regarding the Debtors' pre-petition operating and financial history, the reasons for their Chapter 11 bankruptcy filings, and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By an order entered on _____, 2007, the Bankruptcy Court has: (a) approved this Disclosure Statement as containing "adequate information" in accordance with Bankruptcy Code Section 1125 to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (b) authorized use of this Disclosure Statement in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and Bankruptcy Code Section 1125. In voting on the Plan, Holders of Claims entitled to vote on the Plan should not rely on any information other than that contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only certain classes of Claims are entitled to vote on the Plan. If you are entitled to vote to accept or reject the Plan, a "**Ballot**" and pre-addressed envelope for the return of the Ballot are enclosed. If you are a creditor in Classes 2, 3, 4, 5, 6, or 7 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, please contact the Balloting Agent.[2]

**THE CHAPTER 11 TRUSTEE RECOMMENDS THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.**

---

[1]   All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan. To the extent of any inconsistency between the definitions in the Plan and herein, the definitions in the Plan govern.

[2]   Creditors and Interest Holders in Classes 8 and 9, which receive nothing under the Plan, are deemed to have rejected the Plan and are therefore not entitled to vote on the Plan.

## VOTING PROCEDURES

After reviewing this Disclosure Statement and the Exhibits hereto, please indicate your vote on the enclosed Ballot and return it either by overnight courier or regular mail to the Balloting Agent at the address specified in the ballot and below. Holders of Claims in Classes entitled to vote should read the Ballot carefully and follow the instructions contained therein.  BALLOTS SUBMITTED TO THE BALLOTING AGENT BY FAX OR OTHER ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED AND WILL BE VOID.

Please vote and return your ballot to the Balloting Agent at the following address:

| If by U.S. Mail: | If by Overnight Carrier or Hand-delivery: |
|---|---|
| SONICblue, Inc., et. al. | SONICblue, Inc., et. al. |
| co/ JPMorgan Bankruptcy | co/ JPMorgan Bankruptcy |
|  and Settlement Services |  and Settlement Services |
| P.O. Box 56636 | 8475 Western Way, Suite 110 |
| Jacksonville, FL 32241-6636 | Jacksonville, FL 32256 |

FOR YOUR VOTE TO COUNT, YOUR BALLOT MUST ACTUALLY BE RECEIVED BY THE BALLOTING AGENT DESIGNATED ABOVE AT THE SPECIFIED ADDRESS NO LATER THAN 5:00 P.M. PREVAILING EASTERN TIME ON _____, 2007.

IF YOU MUST RETURN YOUR BALLOT TO A TRUSTEE, BANK, BROKER OR AGENT, YOU MUST RETURN YOUR BALLOT TO IT IN SUFFICIENT TIME FOR IT TO PROCESS THE BALLOT AND RETURN IT TO THE BALLOTING AGENT BY THE VOTING DEADLINE.

To obtain additional ballots, you may contact the Balloting Agent at the addresses specified above.  You may also obtain copies of the Plan, this Disclosure Statement and other plan documents at: http://www.administar.net/SonicBlue.

The Chapter 11 Trustee believes that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all Holders of Claims and the Debtors' estates.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED TO SOLICIT ACCEPTANCES OF THE PLAN.  THE INFORMATION IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ANY PARTY WHO DOES NOT OBJECT TO THE DISCLOSURE STATEMENT IS NOT DEEMED TO WAIVE ANY RIGHTS TO OBJECT TO THE CONFIRMATION OF THE PLAN ON ANY BASIS OTHER THAN LACK OF ADEQUATE DISCLOSURE UNDER BANKRUPTCY CODE SECTION 1125.

ALL CREDITORS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS TO THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE CHAPTER 11 TRUSTEE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE.  THE CHAPTER 11 TRUSTEE HAS PREPARED THIS DISCLOSURE STATEMENT, BUT DOES NOT WARRANT REPRESENT THAT THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN AND CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SEC, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST ANY OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

NOTHING IN THIS DISCLOSURE STATEMENT IS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY NOR DOES THIS DISCLOSURE STATEMENT PROVIDE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS.   YOU SHOULD CONSULT YOUR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN CONTROL.   CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING FORECASTS AND ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

**IRS CIRCULAR 230 NOTICE**

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND OTHER MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# ARTICLE I
# OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan, which is attached hereto as Exhibit "A." For a more detailed description of the terms and provisions of the Plan, see Article VI below, entitled "The Plan of Liquidation."

## A.    Plan Structure.

The Plan is a plan of liquidation.  Substantially all of the Assets have already reduced to Cash.  If any Assets have not been liquidated by the Effective Date, the Plan Administrator will liquidate those Assets.  The Plan Administrator will distribute the Cash and the proceeds of the Assets (net of expenses) to Creditors in accordance with the terms of the Plan.

The Plan does not provide for the substantive consolidation of the Debtors, but permits the Chapter 11 Trustee to file a motion to substantively consolidate the Debtors not less than ten (10) days prior to the Ballot Deadline (a "**Consolidation Motion**").  Instead of substantive consolidation, the Plan contains a compromise and settlement of Intercompany Claims between and among the Debtors through which Debtor SONICblue will settle its claims against the other Debtors as further described in Article VI.D.6 of this Disclosure Statement such that the Holders of Class 6 Allowed Claims other than Debtor SONICblue will waive their right to receive a distribution on account of their Class 6 Allowed Claim, and SONICblue will waive the distribution on its claim to the extent necessary in an effort to pay the non-insider unsecured claims in the cases of each affiliate of SONICblue a distribution approximately equal to the percentage distribution calculated to be received by the Holders of Allowed Unsecured Claims of SONICblue.  Creditors of each of the Debtors will receive distributions in respect of their Claims based upon the Assets available for distribution for each respective Debtor.  The Claims against and Assets of each of the Debtors are summarized in Exhibit "E" attached hereto.

The Chapter 11 Trustee is investigating the basis for substantive consolidation of the Debtors.  The Chapter 11 Trustee will file a motion to substantive consolidate the Debtors not less than ten (10) days prior to the Ballot Deadline if he determines that a substantial legal basis exists for substantive consolidation and that substantive consolidation is in the best interests of Creditors and the Debtor's Estates.  If the Chapter 11 Trustee files a Consolidation Motion that is granted, the Assets of each of the Debtors will be pooled and Creditors holding Claims against any of the Debtors will receive distributions from the pooled Assets of all of the Debtors.  Additionally, if the Debtors' Estates are substantively consolidated, (1) all Intercompany Allowed Claims (Class 6 Claims) will be cancelled and will receive no distribution or other consideration under this Plan or otherwise, (2) any Claims based on guaranties, surety agreements or otherwise will be cancelled and a Creditor holding any such Claim against multiple Debtors will be entitled only to a single distribution in respect of that Claim, and (3) for all purposes on or after the Effective Date, the Debtors' Estates will be consolidated and the Debtors will be treated as one legal entity.

-1-

If the Chapter 11 Trustee files a Consolidation Motion, the Consolidation will request that the Plan be converted from a joint plan to a consolidated plan, both for purposes of distribution and voting.  If the Consolidation Motion is granted, votes by Creditors of different Debtors that are included in the same Class will be counted in a consolidated fashion, as each of the Debtors' will be treated as a single entity for all purposes, including for distribution and voting.

The Plan will become effective on the Effective Date, which is the first business day that is at least eleven days following the date the Bankruptcy Court enters the Plan Confirmation Order, unless there is a stay in effect, in which case the Effective Date shall be the first business day after the stay is no longer in effect with respect to the Plan Confirmation Order.  The Chapter 11 Trustee estimates that the Effective Date will be on or about [ ], 2007.  Reference is made to Article IX.B of this Disclosure Statement for a discussion of conditions to the Effective Date.

**B.    Summary of Classification and Treatment of Claims and Interests Under the Plan.**

The Plan classifies all pre-petition Claims against and Interests in the Debtors into separate Classes, except for Administrative Claims and Priority Tax Claims, which are not classified.  The following chart identifies the classified and unclassified Claims specified in the Plan, estimates the amount of unclassified and classified Claims, and summarizes the treatment of the classified and unclassified Claims under the Plan.

The estimated amount of Claims is based on the Chapter 11 Trustee's review of the Debtors' schedules, Claims filed, and the outcome of objections that have been filed to Disputed Claims and includes Claims that are contingent, disputed, or unliquidated.  Not all objections to Disputed Claims have been filed or completed, and there still remain some pending Preference Actions, the outcome of which will have some impact upon the ultimate amount of Allowed Claims.  The Chapter 11 Trustee's basis for the estimated amount of Claims in each Class is set forth further below in Article VI.D.  Because the amounts set forth herein are estimates, the actual amounts of Allowed Claims could be different than the estimated amounts shown in the chart that follows.

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|-----------|----------------|------------------------------|------------------------------------------|---------------|
| N/A | Administrative Claims | Full payment in Cash on the later of the Effective Date or when Allowed. | Est. Amt: Not estimated.  See Article VI.E for further explanation and treatment. <br><br> Proj. Rec. 100% | Non-voting class |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| N/A | Priority Tax Claims | Full payment in Cash on the later of the Effective Date or when Allowed. | Est. Amt: Approx. $146,000<br><br>Proj. Rec.: 100% | Non-voting class |
| 1 | Priority Claims | Full payment in Cash on the later of the Effective Date or when Allowed. | Est. Amt: Approx. $30,000<br><br>Proj. Rec.: 100% | Non-voting class |
| 2 | Secured Claims | Full payment in Cash on the later of the Effective Date or when Allowed. | Est. Amt: Approx. $380,000<br><br>Proj. Rec.: 100% | Entitled to vote (impaired) |
| 3 | 2002 Notes Claims | Cash equal to a Pro-Rata Share of the Liquidation Amount plus all amounts to be paid to Holders of Class 5 Allowed Claims until Holders of Class 3 Claim receive the Subordination Payment Amount. | Est. Amt.: Approx. $60.6 million<br><br>Proj. Rec.: The Trustee estimates that Class 3's Pro-Rata Share will be [ %] of the Allowed Claims. Because of the Subordination Provisions, Holders of Class 3 Claims will be paid all amounts that would otherwise be paid to Holders of Class 5 Allowed Claims until Holders of Class 3 Claims receive the Subordination Payment Amount. This will occur notwithstanding any disallowance or subordination of any Class 3 Claims. | Entitled to vote (impaired) |
| 4 | General Unsecured Claims Not Included in Any Other Class | Cash equal to a Pro-Rata Share of Liquidation Amount. | Est. Amt.: Approx. $117.4 million<br><br>Proj. Rec.: Approx. [ %] | Entitled to vote (impaired) |
| 5 | 1996 Notes Claims | Cash equal to a Pro-Rata Share of the Liquidation Amount. Because of the Subordination Provisions of the 1996 Notes, the amount that would otherwise be paid to the Class 5 Allowed Claims will be paid to the Holders of Class 3 Claims until Holders of Class 3 Claims receive the Subordination Payment Amount.<br><br>After Class 3 Claims receive the Subordination Payment Amount (whether by distributions under the Plan or otherwise), all further distributions on account of the Class 3 and Class 5 Allowed Claims will | Est. Amt.: $106.1 million<br><br>Proj. Rec.: The Trustee estimates that Class 5's Pro-Rata Share will be [ %]. Because of the Subordination Provisions, amounts that would otherwise be paid to Holders of Class 5 Allowed Claims will be paid to Holders of Class 3 Claims until the Holders of Class 3 Claims receive the Subordination Payment Amount. This will occur notwithstanding any disallowance of a Class 3 | Entitled to vote (impaired) |

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | be paid to Holders of Class 5 Allowed Claims. | Claim. | |
| 6 | Intercompany Claims | Holders of Class 6 Allowed Claims other than Debtor SONICblue will waive their right to receive a distribution on account of such Class 6 Allowed Claim, and SONICblue will waive the distribution on its Claim to the extent necessary in an effort to pay the non-insider unsecured claims in the cases of each affiliate of SONICblue a distribution approximately equal to the percentage distribution calculated to be received by the holders of unsecured claims of SONICblue. | Est. Amt.: Approx $9.75 million against Sensory Science, $20 million against ReplayTV, and $20 million against Diamond Multimedia | Entitled to vote (impaired) |
| 7 | Convenience Class | Cash equal to 50% of Allowed Claim with a maximum payment of $250. Members of this Class will include all holders of Allowed Unsecured Claims which are $500 or less, plus all holders of Allowed Unsecured Claims which are greater than $500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $500 to participate in this Class. | Est. Amt.: Approx. $75,000

Proj. Rec. 50% (except for holders of Allowed Unsecured Claims which are greater than $500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $500 to participate in this Class) | Entitled to vote (impaired) |
| 8 | Subordinated Unsecured Claims | No distribution. | Est. Amt.: $14.6 million Proj. Rec. 0% | Not entitled to vote (deemed to reject) |
| 9 | Interests | No distribution. | Est. Amt.: N/A Proj. Rec. 0% | Not entitled to vote (deemed to reject) |

THE TRUSTEE RECOMMENDS THAT HOLDER OF CLAIMS ENTITLED TO VOTE SHOULD VOTE TO ACCEPT THE PLAN.

## ARTICLE II
## PLAN VOTING PROCEDURES AND REQUIREMENTS

### A.    Notice to Holders of Claims and Interests.

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.    THE BANKRUPTCY COURT'S

-4-

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN IT WILL BE BINDING ON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN, AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN AND ANY EXHIBITS THERETO ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  No solicitation of votes for the Plan may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Plan other than the information contained herein.

**B.      Holders of Claims In Classes 2, 3, 4, 5, 6, and 7 are Entitled to Vote on the Plan.**

Holders of Claims in Classes 2, 3, 4, 5, 6, and 7 may vote to accept or reject the Plan if: (i) the Holder's Claim has been included by the Debtors in the Schedules as undisputed, non-contingent and liquidated in an amount more than $0.00, or (ii) the Holder has filed a proof of claim on or before the applicable Bar Date, unless the Claim is subject to a pending objection or has been Disallowed in its entirety by an order of the Bankruptcy Court.

Unless otherwise permitted, the Holder of any Disputed Claim may not vote with respect to a Disputed Claim unless the Bankruptcy Court temporarily allows the Disputed Claim for the purpose of voting to accept or reject the Plan.  The Chapter 11 Trustee may stipulate with Holders of Disputed Claims for provisional allowance of their Claims for voting purposes.  Alternatively, the Holder of a Disputed Claim may seek a Bankruptcy Court order provisionally allowing that Holder's Claim for voting purposes prior to the Confirmation Hearing or such earlier date as may be established by the Bankruptcy Court.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Balloting Agent has sent a Ballot together with this Disclosure Statement to all known Holders of Claims entitled to vote on the Plan.  If you are a Creditor in Class 2, 3, 4, 5, 6, or 7 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure

Statement, any Exhibits, the Plan or the voting procedures, please contact the Balloting Agent.

## ARTICLE III
## DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESSES

### A.    Basis of Presentation.

The description and history of the Debtors' businesses in this Article III is based upon representations made to the Chapter 11 Trustee by former employees of the Debtors, former counsel to the Debtors, and other agents and representatives of the Debtors.  The Chapter 11 Trustee believes the information described below to be true and accurate, however the Chapter 11 Trustee has not undertaken an independent audit of the facts and circumstances presented in this Article III.

### B.    The Debtors.

Debtor SONICblue Incorporated ("**SONICblue**") was incorporated as S3 Incorporated ("**S3**") on January 9, 1989 as a Delaware corporation, and changed its name to SONICblue Incorporated in November, 2000.  Prior to January 2001, SONICblue's primary business was to supply graphics and multimedia accelerator subsystems for personal computers.  From January 2001 until the Petition Date, SONICblue was a consumer electronics company.  Debtor ReplayTV, Inc. ("**ReplayTV**") is a wholly-owned subsidiary of SONICblue.  SONICblue completed the acquisition of ReplayTV, Inc., a developer of personal television technology, on August 1, 2001.  Debtor Sensory Science Corporation ("**Sensory Science**") is a wholly-owned subsidiary of SONICblue.  SONICblue completed the acquisition of Sensory Science, a developer of consumer electronics products, including dual deck videocassette player/recorders and DVD players, on June 27, 2001.  Debtor Diamond Multimedia Systems Inc. ("**Diamond**") has been a wholly-owned subsidiary of SONICblue since September 1999.  Diamond was an established PC original equipment manufacturer and retail provider of communications and home networking solutions, PC graphics and audio add-in boards and digital audio players.

### C.    The Debtors' Other Affiliates.

The four Debtors directly or indirectly owned thirty-one (31) subsidiaries on the Petition Date.  A chart illustrating the Debtors' corporate structure as of the Petition Date is attached hereto as Exhibit "B".  The Chapter 11 Trustee believes that none of the Debtors' subsidiaries is actively doing business at this time.  At least one of the Debtors' foreign subsidiaries, Diamond Multimedia Systems, Limited, is in the process of winding up its business.  Other subsidiaries are dormant.

Four of the Debtors' subsidiaries conveyed certain of their assets in sales approved by the Bankruptcy Court.  These sales are discussed in Section V.F, below.  Except for the subsidiaries referenced above, the Chapter 11 Trustee does not believe that any of the Debtors' subsidiaries have remaining assets which exceed their liabilities.

**D.    Products.**

Prior to filing for bankruptcy, the Debtors and their affiliates designed, developed and marketed Internet, digital media, entertainment and consumer electronics products.  The Debtors, together with their affiliates, had three primary consumer electronic product lines: (1) the Rio Digital Audio Player, a portable MP3 player (the "**Rio Product Line**"), (2) the Go-Video dual deck VCRs and integrated DVD/VCRs (the "**Go-Video Product Line**"), and (3) ReplayTV, which designed, developed, and marketed DVR products and services (the "**ReplayTV Product Line**").  The Debtors also developed and marketed analog modems under the Supra/Diamond brand name.

**E.    Pre-Petition Asset Sales and Acquisitions.**

Prior to filing for bankruptcy, SONICblue made the following major acquisitions and divestitures.

- SONICblue acquired Diamond in September 1999.  Prior to closing the acquisition, SONICblue made loans to Diamond in the total amount of $20 million.  These loans were secured by security interests in most or all of Diamond's assets. Financing statements were filed in 1999.

- In October 1999, SONICblue caused RioPort, Inc. (formerly RioPort.com, Inc.), a wholly owned subsidiary of SONICblue, to sell shares of its preferred stock to third party investors.  Thereafter SONICblue retained a minority investment in RioPort.

- In November 1999, SONICblue established a corporate joint venture, S3-VIA, Inc. ("**S3-VIA**"), with VIA Technologies, Inc. ("**VIA**").  S3-VIA had exclusive access to both companies' technology and distribution rights for certain products.  In the fourth quarter of 2001, SONICblue terminated its participation in S3-VIA.

- In August 2000, SONICblue shut down its Diamond branded graphics add-in board business.

- In November 2000, SONICblue acquired United Kingdom digital audio equipment manufacturer, Empeg Limited, for $3 million.

- In January 2001, SONICblue completed the transfer of its graphics chips net assets, other than its shares of common stock of S3-VIA, to S3 Graphics Co., Ltd., a joint venture between VIA and a subsidiary of SONICblue.

- In March 2001, SONICblue completed the sale to ATI Technologies, Inc. of its professional graphics division, based in Starnberg, Germany, which produced the Fire GL line of graphics accelerators.  SONICblue received $7.9 million in cash through December 31, 2001, and was eligible to receive further financial consideration.

- On June 27, 2001, SONICblue completed the acquisition of Sensory Science.  Prior to closing the acquisition, SONICblue made loans to Sensory Science in the amount of $9.75 million.  These loans were secured by security interests in most or all of Sensory

Science's assets.  Financing statements were filed in 2001.

- On August 1, 2001, SONICblue acquired ReplayTV, Inc.  Prior to closing the acquisition, SONICblue made loans to ReplayTV in the amount of $20 million.  These loans were secured by security interests in most or all of ReplayTV's assets.  Financing statements were filed in 2001.

### F.    UMC Stock.

In 1995, SONICblue (then S3) entered into a joint venture with United Microelectronics Corporation ("**UMC**") to build United Semiconductor Corporation ("**USC**"), a semiconductor manufacturing facility in Taiwan, R.O.C.  In January 2000, USC merged with UMC and SONICblue received approximately 252 million UMC shares in exchange for its USC shares.  SONICblue later sold much of its UMC stock.  As of the Petition Date, SONICblue held 75,010,073 UMC shares.  Approximately 24.6 million of those shares were pledged as security for repayment of the 2002 Notes.

### G.    Patents.

SONICblue filed patent applications for its technology and built a patent portfolio through acquisitions.  As of the Petition Date, the Debtors and three of their affiliates, Micronics Computers, Inc., Binar Graphics, Inc. and Frontpath, Inc., owned approximately 100 graphics patents and patent applications, in addition to other patents.

### H.    Petition Date Capital Structure.

As of the Petition Date, the Debtors' debt structure included the following:

- Approximately $5.9 million owing on a revolving loan facility (the "**Congress Facility**") provided by Congress Financial Corporation (Western) ("**Congress**"), which was secured by a blanket security interest in substantially all assets of both Sensory Science and non-debtor subsidiary California Audio Labs, LLC, and was also guaranteed by SONICblue on an unsecured basis.

- Approximately $77.9 million in principal and accrued interest[3] due on the 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "**2002 Notes**").  On the Petition Date, the 2002 Notes were secured by a pledge of approximately 24.6 million shares of UMC stock.

- Approximately $106.1 million in principal and interest due on the 5¾% Convertible Subordinated Notes due 2003 (the "**1996 Notes**").  The 1996 Notes are contractually subordinated to the Senior Notes and certain other obligations.

- Miscellaneous trade, litigation and other payable Claims in an aggregate amount estimated to be in the range of $80 million to $120 million.

---

[3]  The principal and interest amounts stated for the 2002 and 1996 Notes include certain original issue discount, a portion of which may be disallowed as unmatured interest as further described below.

## ARTICLE IV
## PRE-BANKRUPTCY EVENTS

### A.    Basis of Presentation.

The description of pre-bankruptcy events of the Debtors' contained in this Article IV is based upon representations made to the Chapter 11 Trustee by former employees of the Debtors, former counsel to the Debtors, and other agents and representatives of the Debtors. The Chapter 11 Trustee believes the information described below to be true and accurate, however the Chapter 11 Trustee has not undertaken an independent audit of the facts and circumstances presented in this Article IV.

### B.    The Debtors' Pre-Bankruptcy Losses.

During the three years prior to the Petition Date, SONICblue transitioned from a semiconductor company to a consumer electronics company, in part through its acquisitions of Diamond, Sensory Science and ReplayTV.  During this period, SONICblue liquidated approximately 273.6 million shares of UMC stock and entered into debt financing agreements.  The Debtors experienced significant operating losses during this time.  From 1999 through 2001, the Debtors reported operating losses of approximately $721 million.  It was projected pre-petition that the Debtors would only have sufficient liquidity to fund their operations through the end of April 2003.  In addition, due to the payment priority provisions in the 2002 Note Indenture, the 2002 Notes were due to mature thirty (30) days before the 1996 Notes matured on October 1, 2003.  The Debtors projected that they would have insufficient cash to pay the Congress Facility, the 1996 Notes and the 2002 Notes.

### C.    Copyright Litigation.

In late 2001, a number of entertainment industry entities (the "**Copyright Plaintiffs**") commenced litigation against the Debtors, which litigation was subsequently consolidated in the litigation entitled Paramount Pictures Corporation, et al. v. ReplayTV, Inc., et al., Case No. CV 01-09358 FMC (Ex), in the United States District Court for the Central District of California (the "**Copyright Litigation**").  The Copyright Plaintiffs sought injunctive and declaratory relief with respect to the Debtors' DVR products.  The Copyright Litigation represented an impediment to a successful turnaround of the Debtors' businesses, and was stated to be another factor in the Debtors' decision to file bankruptcies.

### D.    Retention Of Financial Advisor and Pre-Bankruptcy Restructuring Alternatives.

In September, 2002, the Debtors engaged Houlihan Lokey Howard & Zukin Capital ("**Houlihan**"), a financial advisor and investment banker, as the Debtors' financial consultant.  From September 2002 to November 2002, Houlihan and the Debtors considered restructuring alternatives for the Debtors and ultimately decided to attempt to sell the Debtors' businesses as a going concern.

The Debtors negotiated a non-binding letter of intent with an affiliate of D&M Holdings, Inc. ("**D&M**"), which allowed D&M to execute an asset purchase agreement for the sale of the ReplayTV and Rio Product Lines by March 31, 2003; however this sale did not close.  On March 20, 2003, the Debtors and Opta Systems, LLC ("**Opta**") executed an asset purchase agreement for the sale of the Go-Video Product Line.

## ARTICLE V
## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A.    Basis of Presentation.

The description of significant events during the Chapter 11 Cases prior to the appointment of the Chapter 11 Trustee contained in this Article V is based upon representations made to the Chapter 11 Trustee by former employees of the Debtors, former counsel to the Debtors, and other agents and representatives of the Debtors and the Creditors' Committee.  The Chapter 11 Trustee believes the information related to events described below that transpired prior to his appointment to be true and accurate, however the Chapter 11 Trustee has not undertaken an independent audit of the facts and circumstances presented in this Article IV.

### B.    The Bankruptcy Petitions; First Day Orders; Cash Collateral.

On March 21, 2003 (the "**Petition Date**"), each of the Debtors commenced a Chapter 11 case (collectively, the "**Chapter 11 Cases**") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Chapter 11 Cases were procedurally consolidated for administrative purposes.  On the Petition Date, the Debtors filed numerous, "first day motions," which were largely granted after hearings before the Bankruptcy Court on March 25, 2003 and thereafter.  At the outset of the Chapter 11 Cases, the Debtors negotiated a cash collateral stipulation with Congress.  The Debtors were able to continue operations through use of cash collateral pursuant to this stipulation.

### C.    Retention Of Professionals by the Debtors.

The Debtors employed Pillsbury Winthrop Shaw Pittman LLP f/k/a Pillsbury Winthrop LLP ("**Pillsbury**") as their bankruptcy counsel.  Pillsbury had served as outside general counsel to SONICblue since 1989.  As further described below in Article V.D, on March 26, 2007, the Bankruptcy Court disqualified Pillsbury as the Debtors' bankruptcy counsel and ordered the appointment of a chapter 11 trustee for the Debtors.  Since March 26, 2007, Pillsbury has not acted as bankruptcy counsel for the Debtors.

The Debtors employed Houlihan as their financial advisors.  Prior to the Petition Date, the Debtors agreed to compensate Houlihan for its services by paying a monthly fee of $135,000, reimbursing certain expenses and providing certain indemnification.  In addition, the Debtors agreed to pay Houlihan a "Transaction Fee" of $2 million upon the closing of a sale of all or substantially all of the Debtors' assets.  Houlihan later agreed to eliminate the monthly fee (retaining payments made up to that time) and to reduce the Transaction Fee to a

minimum of $1 million, increasing to $1,550,000 if the gross assets sale consideration was between $40 million and $52.5 million.  On April 17, 2003, the Bankruptcy Court approved Houlihan's employment, as modified, effective as of the Petition Date.

The Bankruptcy Court approved the Debtors' employment of Fenwick & West ("**Fenwick**") as special counsel for the sale of certain graphics patents.  With Bankruptcy Court approval, the Debtors agreed to pay Fenwick a contingent fee.

By an order entered August 29, 2005, the Bankruptcy Court granted a joint application by the Debtors and the Creditors' Committee to employ Grobstein, Horwath & Company LLP ("**GHC**") as accounting and litigation consultants.  GHC was authorized to assist the Debtors and the Creditors' Committee in evaluating and objecting to Claims and prosecuting Preference Actions and providing tax and financial analysis.,  The Chapter 11 Trustee has continued to consult periodically with GHC since his appointment.

The Debtors also employed the following Professionals: (1) Davis & Associates, as accountant and taxation consultant; (2) Syzygy Consulting Group, as employment and compensation consultant and advisor; (3) O'Melveny & Myers LLP, as special counsel for matters related to Intel Corporation and VIA; (4) Ding & Ding Law Offices, as special Taiwanese securities counsel; and (5) Stuart, Maue, Mitchell & James, Ltd., as fee auditor.

The Debtors and the Creditors' Committee also employed Perisho Tombor Ramirez Filler & Brown PC ("**PTRF&B**") to audit the Debtors' 401(k) plan for the year 2003 through 2005.  The Chapter 11 Trustee intends to apply for entry of a Bankruptcy Court order authorizing the retention and employment of PTRF&B as the Debtors' 401(k) plan auditors for calendar year 2006 (and 2007, if necessary).

### D.    Appointment of the Creditors' Committee.

On the Petition Date, the U.S. Trustee appointed the Creditors' Committee to represent the interests of SONICblue's unsecured creditors in the Chapter 11 Cases.  The U.S. Trustee amended the appointment on April 3, 2003 to enlarge the Creditors' Committee.  As described below in Article V.F, on June 18, 2007, creditor Sonicblue Claims, LLC ("**SBC**") filed a motion to reconstitute the Creditors' Committee.

The Creditors' Committee retained: (1) the firm of Levene, Neale, Bender, Rankin & Brill LLP ("**LNBRB**"), as bankruptcy counsel; (2) Alliant Partners, as financial advisors; (3) Krieg, Keller, Sloan, Reilley & Roman LLP, as special intellectual property litigation counsel; and (4) J&J Attorneys At Law, as special counsel related to disposition of the Debtors' UMC stock and to assist the estates in the Preference Action against ATLM.

### E.    Disqualification of Pillsbury and Appointment of the Chapter 11 Trustee.

On February 15, 2007, the U.S. Trustee filed a motion to appoint a chapter 11 trustee for the Debtors, or in the alternative to appoint an examiner (the "**February 15 Motion**").  The U.S. Trustee later filed an amended motion to appoint a chapter 11 trustee on February 27, 2007 (the "**February 27 Motion**" and together with the February 15 Motion, the

"**Trustee Motion**").  On February 20, 2007, the U.S. Trustee filed a motion to disqualify Pillsbury, vacate the order to employ Pillsbury, and disgorge attorneys' fees paid to Pillsbury (the "**Disqualification Motion**").  On February 27, 2007, SBC filed a motion to convert these Cases to cases under chapter 7 of the Bankruptcy Code, which was subsequently amended on February 28, 2007 (collectively, these are referred to as the "**Conversion Motion**").

The Trustee, Disqualification, and Conversion Motions arise out of facts and circumstances related to Pillsbury's issuance of an opinion letter to the 2002 Noteholders on April 22, 2002 (the "**Opinion Letter**").  The Opinion Letter stated, among other things, that the 2002 Notes were enforceable according their terms.  Furthermore, this opinion in the Opinion Letter was not qualified by any limitation in the event the Debtors filed bankruptcy petitions.  At the time of Pillsbury's retention, Pillsbury did not disclose the Opinion Letter to the U.S. Trustee or the Bankruptcy Court.

In August 2006, counsel to the Debtors contacted counsel to the 2002 Noteholders asserting that the 2002 Notes Claims should be disallowed, in part, under section 502(b)(2) of the Bankruptcy Code because a portion of the 2002 Notes Claims relate to disallowable "original issue discount" (*see* Article V.J.4 *infra* for a further discussion of original issue discount with respect to the 1996 Notes Claims and 2002 Notes Claims).  Based on the Opinion Letter, in August and September 2002, counsel to the 2002 Noteholders demanded that Pillsbury indemnify the 2002 Noteholders in connection with its defense of the 2002 Notes Claims and also asserted that Pillsbury may be liable to the 2002 Noteholders in the event that the 2002 Notes Claims were disallowed or otherwise not paid in full (the "**Noteholders' Demand**").  Pillsbury did not disclose the Noteholders' Demand to the U.S. Trustee or the Bankruptcy Court at the time of the Noteholders' Demand.  At that time Pillsbury transferred the issues related to the objection to the 2002 Note Claims and the 1996 Note Claims to Creditors' Committee counsel, LNBRB.

Based on partial disclosures of the Noteholders' Demand in a disclosure statement and first amended disclosure statement filed by Pillsbury and counsel to the Creditors' Committee on December 15, 2006 and January 18, 2007, the Court requested that counsel to the Creditors' Committee investigate the circumstances surrounding the Noteholders' Demand.  Thereafter the U.S. Trustee filed the Trustee Motion and the Conversion Motion and SBC filed the Conversion Motion.  These Motions collectively asserted that Pillsbury was not "disinterested" under section 327(a) of the Bankruptcy Code based on the Noteholders' Demand and had failed to disclose conflicts related to the Opinion Letter and the Noteholders' Demand.  Thereafter, on March 5, 2007, Pillsbury disclosed the existence of the Demand Letter.

On March 26, 2007, the Court issued a memorandum opinion and order (the "**Trustee Order**") disqualifying Pillsbury as counsel to the Debtors and ordered the appointment of a chapter 11 trustee.  The Court denied the motion to convert these cases to cases under chapter 7 of the Bankruptcy Code and reserved the issue of whether to disgorge Pillsbury's fees.  On April 16, 2007, the U.S. Trustee filed a motion to appoint Dennis J. Connolly, Esq. as the

Chapter 11 Trustee. On April 17, 2007, the Court granted the motion to appoint Dennis J. Connolly, Esq. as Chapter 11 Trustee. The appointment of the Chapter 11 Trustee displaced Marcus Smith, the Debtors' former Chief Financial Officer, who had been acting as the Debtors' Responsible Individual.

On April 4, 2007, the Holders of the 2002 Notes filed a motion for clarification of the Trustee Order, or in the alternative for leave to file a motion for reconsideration of the Trustee Order (the "**Clarification Motion**"). The Court denied the Clarification Motion on May 4, 2007. On May 11, 2007, the 2002 Noteholders appealed the Trustee Order and the order denying the Clarification Motion to the United States District Court for the Northern District of California. As of the date of the filing of this Disclosure Statement, the appeal is pending before that court. New counsel for the 2002 Noteholders was substituted on June 7, 2007.

**F.      Retention of Counsel by the Chapter 11 Trustee.**

On May 2, 2007 the Chapter 11 Trustee filed an application to employ Alston & Bird LLP ("**A&B**"), the law firm in which he is a partner, as counsel to the Chapter 11 Trustee and Friedman, Dumas & Springwater LLP ("**FDS**") as local counsel to the Chapter 11 Trustee (collectively, the "**Retention Applications**"). The Court granted the Retention Applications on an interim basis on May 8, 2007 and on a final basis at a hearing on June 14, 2007 and by an order dated June 21, 2007. On July 2, 2007, York Credit Opportunity Funds L.P. ("**York**") filed a motion for leave to appeal the Bankruptcy Court's approval of the Retention Applications (the "**York Motion**"). On July 12, 2007, both the U.S. Trustee and the Chapter 11 Trustee filed responses in opposition to the York Motion. The York Motion has not yet been ruled upon.

On July 12, 2007, the Chapter 11 Trustee filed an application to retain GHC as accountants to the Chapter 11 Trustee.

**G.      SBC's Motion to Reconstitute the Creditors' Committee.**

SBC filed a motion to reconstitute the Creditors' Committee on June 18, 2007. The motion is presently scheduled for hearing on September 9, 2007.

**H.      Sale of Substantially All of the Debtors' Assets.**

**1.      Sale of the Rio, ReplayTV and Go-Video Product Lines.**

On the Petition Date, the Debtors filed a "Sales Procedures Motion" with the Bankruptcy Court seeking an order establishing notice and bidding procedures for the sale of the Debtors' primary product lines, and for an order authorizing the assumption and assignment or rejection of certain executory contracts and unexpired leases in connection with such sales. The Debtors also filed a motion requesting the Bankruptcy Court to hear the matter on shortened notice. The Bankruptcy Court heard and granted the Sales Procedures Motion on March 25, 2003.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

The Bankruptcy Court held a hearing on the Debtors' motion to sell the Go-Video product line to Opta, subject to overbidding, on April 4, 2003. Opta was the successful buyer at the hearing, and the sale closed on April 18, 2003. Opta paid SONICblue approximately $6.2 million as the purchase price calculated at the time of closing. Thereafter, a dispute arose concerning certain post-closing adjustments to the purchase price, the allocation of post-closing payments received from vendors, and the assumption of liabilities under the asset purchase agreement. To resolve this dispute, SONICblue paid Opta approximately $1.3 million pursuant to a stipulation approved by the Bankruptcy Court.

The Debtors' Rio and ReplayTV product lines were scheduled for sale on April 15, 2003. Because D&M did not execute an asset purchase agreement by March 31, 2003, the Bankruptcy Court conducted an auction sale of the Rio and ReplayTV product line assets on April 15, 2003. The Rio and ReplayTV product lines were sold for $36.2 million to Digital Networks North America, Inc. ("**DNNA**"), an affiliate of D&M. The sale closed on April 25, 2003.

### 2.    U.K. Affiliate Participation in the Rio Product Line Sale.

To consummate the Rio Product Line sale to DNNA, the Debtors requested that a United Kingdom subsidiary of Diamond, Diamond Multimedia Systems Limited ("**DMSL**"), transfer (i) certain assets directly to DNNA, and (ii) certain other intellectual property rights directly to SONICblue, which were then transferred to DNNA. These DMSL assets and intellectual property are referred to as the "**U.K. Assets**." DMSL complied with the request.

In April 2005, DMSL was in the process of winding down its operations in anticipation of a dissolution, and requested allowance and payment of an administrative claim in the amount of $300,000 for the value of the U.K. Assets. On April 11, 2005, the Debtors and DMSL entered into a stipulation allowing DMSL an administrative claim in the amount of $300,000. The Bankruptcy Court approved this stipulation and the Debtors paid DMSL.

### 3.    Patent Sales; Modem and Computer Inventory Sales; Proposed Sale of Epic Technology Stock.

After the closing of the sales of the Debtors' three primary product lines, the Debtors either directly or through subsidiaries owned approximately 100 graphics patents and pending patent applications (the "**Patents**"). The Debtors retained Fenwick as special counsel to sell the Patents. The following subsidiaries of the Debtors who are not in bankruptcy owned certain of these Patents: Micronics Computers, Inc., ("**Micronics**"), Frontpath, Inc., ("**Frontpath**") and Binar Graphics, Inc. ("**Binar Graphics**") (collectively, the "**Seller Subsidiaries**"). On September 6, 2003, the Debtors sold the Patents to Trepton Research Group for $1,970,000. The Patents sale closed on October 9, 2003.

On the Petition Date, the Debtors held a small amount of computer component inventory with America II Electronics, Inc. ("**America II**") for sale on a consignment basis. On February 13, 2004, the Bankruptcy Court approved a sale of the computer component

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

inventory to America II for $300,000. The modem assets were offered for sale pursuant to a Bankruptcy Court conducted auction on June 6, 2003. The modem assets were sold to Best Data Products for approximately $634,000.

The Chapter 11 Trustee is currently in negotiations with a proposed buyer regarding a sale of the Debtors' stock interests in Epic Technologies, Inc.

### 4.    Post-Petition Date UMC Stock Sales.

On the Petition Date, SONICblue owned 75,010,073 UMC shares. The UMC stock was subject to sale restrictions that lapsed as to approximately 50 million shares on July 10, 2003, and as to the balance of the UMC stock on January 10, 2004. The 2002 Noteholders held a lien on 24,640,573 shares of the UMC stock as of the Petition Date. On July 17, 2003, the Bankruptcy Court approved a stipulation granting the 2002 Noteholder relief from the automatic stay to foreclose on the UMC stock collateral and the 2002 Noteholders later sold these shares.

On July 28, 2003, UMC declared a stock dividend entitling SONICblue to 3,007,903 additional UMC shares. 988,087 of these shares were subject to the 2002 Noteholders' liens. By an order entered on October 24, 2003, the 2002 Noteholders sold their remaining UMC stock collateral.[4] The 2002 Noteholders received a net of $17,313,671.13 from the sale of their UMC stock collateral (after payment of costs of $44,844), which has been credited to the 2002 Notes Claims.

In September 2003 the Debtors decided to sell the unencumbered, unrestricted UMC stock. The Bankruptcy Court approved this sale. The Debtors liquidated 27,203,816 UMC shares in October, 2003, realizing net proceeds of approximately $24.4 million. In February, 2004, after the final transfer restrictions lapsed, the Debtors liquidated their remaining UMC stock holdings. The Debtors realized net proceeds of approximately $21.5 million from the sale of the remaining 25.185 million shares of stock.

### 5.    Payment of Certain Secured Claims.

The Debtors received permission to pay and paid Congress approximately $5.9 million in satisfaction of its Claim. The Debtors, with Bankruptcy Court approval, allowed the 2002 Noteholders to liquidate their UMC collateral stock, which liquidation resulted in a partial payment of the 2002 Notes Claims as described above.

### 6.    Funds Held.

As of July 1, 2007, the Chapter 11 Trustee held approximately $85 million in Cash.

---

[4]    The Debtors paid certain taxes (in the amount of approximately $56,430), which were required to be paid in order to have the UMC shares released to the Debtors, including taxes on the approximately 1/3 portion of the stock dividend which was delivered to the 2002 Noteholders as part of the collateral securing the 2002 Noteholders' Claims. The Chapter 11 Trustee reserves his right to recover from the 2002 Noteholders the taxes paid on the 2002 Noteholders' portion of the UMC stock dividend.

## I.     Employee Matters.

### 1.     Employees.

On the Petition Date, SONICblue had approximately 197 employees and utilized the services of approximately 31 independent contractors.  No Debtor other than SONICblue had any employees on the Petition Date or during the year preceding the Petition Date.  None of the employees were represented by a labor union or were subject to a collective bargaining agreement.

Most of SONICblue's employees were hired by Opta and DNNA in 2003.  Since then, SONICblue has had no employees.  Marcus Smith, the Debtors' former Chief Financial Officer, and Nanci Salvucci, the Debtors' former Controller, continued to provide assistance to the Debtors (and, after the appointment of the Chapter 11 Trustee, to the Chapter 11 Trustee) on a part-time, consulting basis.  Until the appointment of the Chapter 11 Trustee, Marcus Smith was the Debtors' Bankruptcy Court-appointed Responsible Individual.  The appointment of the Chapter 11 Trustee displaced Marcus Smith as the Debtors' Responsible Individual.

### 2.     Employee Retention and Incentive Plans.

In November, 2002, SONICblue engaged Syzygy Consulting Group ("**Syzygy**") to develop key employee retention programs.  SONICblue adopted a Key Employee Retention Bonus Plan ("**KERP**") and a Performance Based Employee Retention Bonus Plan ("**PBRB**", and with the KERP, the "**Retention Plans**") on March 13, 2003.  The Debtors and Creditors' Committee entered into a "Stipulated Order Approving Payment Of Accrued Paid Time Off (PTO) And Severance And Payment Of Retention Bonuses."  Under this "**Incentive Stipulation,**" the Debtors' PTO and KERP plans were partially and conditionally assumed and partially rejected, and the PBRB was rejected.

As a result of the sale of the Debtors' product lines and other assets, all of SONICblue's Employees have been released or hired by DNNA or Opta, and the benefits due under the Incentive Stipulation have been paid.  As such, all or most of the Debtors' liability for priority pre-petition Employee Claims has been satisfied.

### 3.     The Debtors' Retirement Plans.

On the Petition Date, SONICblue maintained three retirement plans for its employees: (1) the SONICblue Incorporated Executive Deferred Compensation Plan (the "**Executive Plan**"); (2) the Diamond Multimedia Systems, Inc. 401(k) Plan (the "**Diamond Plan**"); and (3) the SONICblue Incorporated 401(k) Savings Plan (the "**SONICblue Plan**").  On the Petition Date, the Diamond Plan had already been terminated, an IRS determination letter approving the termination had been issued, and SONICblue had been distributing the plan assets to the participants.  The Bankruptcy Court later authorized SONICblue to terminate its remaining retirement plans.  In accordance with the Bankruptcy Court's order: (a) the account balances from the Executive Plan were made available for distribution to the

creditors of SONICblue; (b) the funds remaining in the Diamond Plan, consisting of accrued interest on plan funds that had not yet been allocated to participant accounts, were allocated and distributed; and (c) the SONICblue Plan was terminated, a favorable determination letter was obtained from the IRS, and distributions to the participants of their account balances has commenced.  The SONICblue Plan will continue to prepare and file annual reports pending completion of the distribution process.

### J.    Claims Process and Bar Dates.

#### 1.    Schedules and Statements.

On March 25, 2003, the Debtors filed their respective schedules of assets and liabilities, ("**Schedules**") and statements of financial affairs ("**SOFAs**") with the Bankruptcy Court.  On May 7, 2003, the Debtors filed amended Schedules and SOFAs.  All references to the Debtors' Schedules or SOFAs mean the Schedules or SOFAs as amended from time to time.

SONICblue's Schedules included employee wage, vacation pay and severance Claims totaling over $1.7 million.  As a result of the three product line sales and payments under the Incentive Stipulation, all or nearly all of SONICblue's liability for unpaid wages and severance and vacation benefits was satisfied or eliminated.  On February 9, 2006, SONICblue amended its Schedule E to eliminate the scheduled wage and employment related Claims.

#### 2.    Previously Established Claims Bar Dates.

##### (a)    Unsecured Claims Bar Date.

On March 29, 2003, the Bankruptcy Court gave notice to creditors and parties in interest that July 22, 2003 had been established as the deadline for filing non-governmental proofs of claim against the Debtors (the "**Unsecured Claims Bar Date**").  In addition, on June 25, 2003, the Claims Administrator sent a "Notice of Deadline to File Proofs of Claim" (the "**Second Bar Date Notice**") to a portion of the creditor matrix; and, on June 30, 2003, the Claims Administrator sent the Second Bar Date Notice to the balance of creditors and interested parties.

##### (b)    Rejection Claim Bar Date.

In connection with the sales of the Rio, ReplayTV and Go-Video Product Lines, the Debtors rejected certain executory contracts and unexpired leases.  The Second Bar Date Notice provides that Claims arising from the rejection of an executory contract or unexpired lease must be filed by the later of (i) the Unsecured Claims Bar Date or (ii) the time set by the Bankruptcy Court in the order approving the Debtors' rejection of such executory contract or unexpired lease.  The Bankruptcy Court approved additional motions to reject executory contracts and unexpired leases on August 1, 2003, November 13, 2003, May 25, 2004, and July 29, 2004.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

### 3.    Claims Objections and Subordination.

During the course of the Chapter 11 Cases, Creditors filed 750 Claims totaling more than $331 million against the Debtors. Many of these Claims duplicated scheduled liabilities. To date more than $290 million in Claims have been disallowed or subordinated.

Since the appointment of the Chapter 11 Trustee, the Chapter 11 Trustee has assumed responsibility for objecting to and resolving Claims filed against the Debtors. After the Effective Date, the Plan Administrator will file objections to Claims. Set forth in Exhibit "C" is a list of all known Claims that were included in the Schedules or were asserted in filed proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Chapter 11 Trustee (or by the Plan Administrator after the Effective Date). Exhibit "C" is being provided for notification purposes only. The Chapter 11 Trustee, the Plan Administrator or some other party in interest may file an objection to a Claim not included in Exhibit "C." The fact that a Claim is not included in Exhibit "C" is without prejudice to the rights of any party in interest to file any objection to the Claim. These Claims are in addition to the Claims which are held by parties who are the subject of a pending Avoidance Action, and the Claims of the 1996 Noteholders and the 2002 Noteholders that are discussed further below. Holders of Claims (whether or not identified in Exhibit "C") should not rely on the fact that no objection has been filed to date on their Claim in voting on whether to accept or reject the Plan. Holders of Claims (whether or not identified in Exhibit "C") should make their decision on whether to vote to accept or reject the Plan independent of the fact that an objection may still be filed to their Claim.

### 4.    The 1996 and 2002 Notes Claims.

In 1996, SONICblue issued the 1996 Notes in an aggregate original principal amount of $103.5 million. SONICblue also issues certain stock conversion rights in connection with the issuance of the 1996 Notes. The 1996 Notes and associated rights were sold for $100.3 million, approximately $3.2 million less than their face amount. The 1996 Notes Indenture Trustee filed a proof of claim against the Debtors in the amount of $106.1 million.

The difference between the face amount of the 1996 Notes and the actual price paid for them is unmatured interest, disallowable under Section 502(b)(2) of the Bankruptcy Code to the extent that it has not been amortized as of the Petition Date. Additionally, value attributable to the stock conversion rights may further reduce any Allowed amount of the 1996 Notes Claims. The Chapter 11 Trustee anticipates that he will object to the 1996 Notes Claims on these and other grounds prior to or after the Effective Date. Furthermore, as described in Article V.J.2 below, a settlement agreement has been reached resolving portions of the 1996 Notes Litigation and the Insurance Litigation (defined below in Article V.J.2). If the 1996 Noteholders receive consideration from the 1996 Notes Litigation or the Insurance Litigation, the Chapter 11 Trustee reserves his right to seek to reduce distributions in respect of the 1996 Notes Claims (Class 5) accordingly. This estimate is without prejudice to the Chapter 11 Trustee, the Plan Administrator, or any other party in interest to object to the 1996 Notes Claims for any reason.

-18-

In 2002, SONICblue issued the 2002 Notes in a private placement to three investors (the 2002 Noteholders) in an aggregate original principal amount of $75 million. As part of this transaction, the 2002 Noteholders were also given certain stock conversion rights, warrants to purchase 7.5 million of SONICblue stock, options to purchase 21,426,586 shares of UMC stock, and a pledge of UMC stock. This investment package was sold for an aggregate net price of $62.25 million to Portside Growth & Opportunity Fund, Smithfield Fiduciary, LLC, and Citadel Equity Fund, Ltd., all of which have been members of the Creditors' Committee.

The Debtors scheduled the 2002 Notes Claims for approximately $77.9 million. Each of the three 2002 Noteholders filed its own proof of Claim in unspecified amounts relating to the 2002 Notes. The Chapter 11 Trustee believes that there are a number of respects in which the 2002 Notes Claims can be Disallowed, either in part or in whole. As with the 1996 Notes, the difference between the face amount of the 2002 Notes and the actual price paid for them is unmatured interest, disallowable under Section 502(b)(2) of the Bankruptcy Code to the extent that it has not been amortized as of the Petition Date. Additionally, value attributable to the other consideration the 2002 Noteholders received will further reduce the Allowed Amount of the 2002 Notes Claims.

The Chapter 11 Trustee is also investigating whether there are grounds to contractually or equitably subordinate some or all of the 2002 Notes Claims on the grounds that the 2002 Noteholders breached their fiduciary duty as members of the Creditors' Committee in connection with the negotiation and settlement of the VIA Litigation (described in Article V.J.1 *infra*). SBC has also filed a complaint seeking the contractual or equitable subordination of the 2002 Note Claims to the Allowed Claim of VIA (certain rights to which SBC has purchased). By Motion dated July 11, 2007, the 2002 Noteholders have sought to dismiss the Subordination Adversary (defined below). The SBC Litigation is described more fully below in Article V.J.4. The Chapter 11 Trustee anticipates that he will object to the 2002 Notes Claims on any of the grounds set forth herein (or any other grounds) prior to or after the Effective Date.

During the course of the Chapter 11 Cases, the 2002 Noteholders received approximately $17.3 million from the proceeds of the UMC stock that collateralized the 2002 Notes. The receipt of these proceeds reduced the amount of any Allowed Claims, such that the Chapter 11 Trustee estimates that the maximum Allowed Amount of the 2002 Notes Claim cannot be greater than $60.6 million. This estimate is without prejudice to the Chapter 11 Trustee, the Plan Administrator, or any other party in interest to object to the 2002 Notes Claims for any reason.

After the Effective Date, the Bankruptcy Court will retain jurisdiction with respect to the 1996 and 2002 Notes Claims, including any objections to these claims and the Subordination Adversary, which, as set forth below, is not impacted by the Plan.

**K.      Post-Petition Date Litigation.**

**1.      VIA Litigation.**

VIA Technologies, Inc. ("**VIA**") and S3 Graphics Co., Ltd. ("**JV**") filed duplicate $105 million proofs of claim related to an August 28, 2000 Amended Investment Agreement between SONICblue and VIA and other related agreements.  VIA and JV also claimed that JV may be enjoined from using an intellectual property license between SONICblue and Intel Corporation ("**Intel**") and that JV was therefore entitled to damages under the Amended Investment Agreement in an amount of up to $70 million.

In December 2004, the Debtors commenced litigation (the "**VIA Litigation**") by filing a complaint against VIA, JV and S3 Graphics, Inc. ("**JV Sub**") for affirmative relief, objecting to the aforementioned Claims, and asserting numerous counterclaims.  In 2006 the parties to the VIA Litigation agreed to settle the VIA Litigation (the "**VIA Settlement**").  Under the VIA Settlement: (i) the Debtors granted VIA and JV a single Allowed Claim in the amount of $12.5 million (the "**Allowed VIA Claim**"); (ii) the parties agreed that the Allowed VIA Claim would not be treated as "Senior Indebtedness" under the 2002 Note Indenture (the "**Senior Indebtedness Provision**"); (iii) VIA and JV agreed that their filed proofs of claim would be Disallowed; and (iv) SONICblue agreed to transfer intellectual property, records, and files relating to its graphic chips business to JV or its designee.  The motion to settle the VIA Litigation was filed under seal on October 10, 2006 and the Court approved the motion to settle on October 31.

Subsequent to Bankruptcy Court approval of the VIA Settlement, SBC, the transferee of certain of VIA's rights in respect of the Allowed VIA Claim, asserted that the Senior Indebtedness Provision was improperly procured by counsel to the 2002 Noteholders, was inadequately disclosed to the Court, and is unenforceable.  As further discussed in Article V.J.4, SBC commenced the Subordination Proceeding to subordinate the 2002 Notes Claims to the Allowed VIA Claim.

**2.      The 1996 Notes Litigation and the Insurance Litigation.**

On April 21, 2005, WM Trust High Yield Fund, WM Trust Income Fund, WM Variable Trust Income Fund, Tonga Partners, L.P., Anegada Master Fund, Ltd., Cuttyhunk Fund, Ltd., GS Cannell Portfolio, L.L.C., Pleiades Investment Partners-CC, L.P., and Nebo Investment Fund (collectively, the "**1996 Notes Plaintiffs**") filed an action against certain pre-bankruptcy directors and officers of SONICblue, including Kenneth Potashner, John Todd, Marcus Smith, Terry N. Holt, Edward Esber, Robert P. Lee, James T. Schraith, and Does 1-25 (collectively, the "**1996 Notes Defendants**") in the Superior Court for the State of California in and for the County of Santa Clara (the "**1996 Notes Litigation**").  The 1996 Notes Plaintiffs allege claims for breach of fiduciary duty and constructive fraud in connection with the issuance of the 2002 Notes.  On June 14, 2005, the 1996 Notes Defendants filed a notice of removal, removing the 1996 Notes Litigation to the Bankruptcy Court.  On May 4, 2007, the 1996 Notes Plaintiff filed a Notice of Dismissal, dismissing the 1996 Notes Litigation with prejudice.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

On December 23, 2005, Admiral Insurance Company and Old Republic Insurance Company (collectively the "**Insurance Plaintiffs**") filed an adversary proceeding (the "**Insurance Litigation**") before the Bankruptcy Court against SONICblue Incorporated, Kenneth Potashner, John Todd, Marcus Smith, Terry N. Holdt, Edward Esber, Robert P. Lee, and James T. Schraith (the "**Insurance Defendants**"). Prior to the Petition Date, the Insurance Plaintiffs issued certain directors' and officers' liability insurance policies to the Insurance Defendants (the "**Policies**"). In the Insurance Litigation, the Insurance Plaintiffs allege that the 1996 Noteholders made claims against the Insurance Defendants for breach of fiduciary duty related to the issuance of the 2002 Notes prior to the issuance of the Policies, but did not disclose these claims to the Insurance Plaintiffs. These claims allegedly made by the 1996 Noteholders also form the basis for the 1996 Noteholders Litigation. The Insurance Plaintiffs seek a determination of the Bankruptcy Court that they have no obligations to the Insurance Defendants under the Policies, including any liability of the 1996 Notes Defendants in the 1996 Noteholders Litigation.

The parties to the 1996 Notes Litigation and the Insurance Litigation have agreed to settle both of those litigations. The terms of the settlement agreement are confidential. The Chapter 11 Trustee is continuing to review the facts and circumstances surrounding the 1996 Notes Litigation and the Insurance Litigation. The Chapter 11 Trustee may determine to take an active position in one or both of those litigations, the results of that active participation may include additional funds made available for Creditors. The Chapter 11 Trustee is not in a position at the time of the filing of this Disclosure Statement to estimate the amount of any such additional funds.

### 3.    Avoidance Actions.

In the ninety days prior to the Petition Date, the Debtors made approximately 982 transfers totaling approximately $63.1 million to approximately 348 recipients. Between March 11, 2005 and March 20, 2005, the Debtors and the Creditors' Committee filed approximately 208 preference and fraudulent conveyance avoidance and recovery actions (including one un-filed claim where the defendant executed a tolling agreement, and later settled without the need for litigation, collectively, the "**Preference Actions**"). Prior to the commencement of the Preference Actions, on March 4, 2005, the Bankruptcy Court approved a contingent fee arrangement (the "**Contingent Fee Arrangement**"), whereby counsel to the Debtors and the Creditors' Committee acted as counsel in prosecuting the Preference Actions. Under the Contingent Fee Arrangement, Pillsbury and LNBRB agreed to split the contingent fee evenly between themselves (i) based upon the amount recovered from the defendants, plus (ii) an amount equal to the distributions that would be received on 27% of the Claims disallowed in the Preference Actions.[5] Awards of fees to Professionals in

---

[5]    The contingency formula is 35% of the first $50,000 recovered; 25% of the next $50,000 recovered; 20% of the next $200,000 recovered; and 15% of all recoveries in excess of $300,000, with these percentages to remain unchanged if the recoveries are received after a judgment is obtained; except that the overall contingency fee may not exceed 27% of the total amount of Preference Action recoveries. The contingency fee percentages are computed on a per-defendant basis, not on a per-preferential transfer basis.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

these Cases, including fees pursuant to the Contingent Fee Arrangement, are subject to final approval by the Court.

As of July 1, 2007, more than 145 of the Preference Actions have been settled, litigated to a judgment or dismissed; defendants have paid approximately $4.5 million in settlements or otherwise; the Chapter 11 Trustee anticipates collecting another approximately $1.7 million in settlement proceeds from distributions defendants would otherwise be entitled to receive as Creditors of the Debtors; and (c) approximately $10.6 million in Claims have thus far been disallowed.

The Chapter 11 Trustee is reviewing the Contingent Fee Arrangement, as well as retention of counsel under that arrangement. All fees earned under the Contingent Fee Arrangement (which are the Avoidance Action Professional Fees) are subject to final review and approval by the Bankruptcy Court in accordance with the provisions for Allowance of Administrative Claims described in Article VI.E of this Disclosure Statement.

### 4.  Sonicblue LLC's Subordination Action Against the 2002 Noteholders.

On May 30, 2007, SBC commenced an adversary proceeding against the 2002 Noteholders seeking to contractually or equitably subordinate the 2002 Notes Claims to the Allowed VIA Claim (the "**Subordination Adversary**"). SBC is the transferee of certain rights of the Allowed VIA Claim. In the Subordination Adversary, SBC asserts that the 2002 Noteholders improperly used their position as members of the Creditors' Committee to obtain a waiver of the Senior Indebtedness Provision in the VIA Settlement Agreement. Furthermore, SBC asserts that the Senior Indebtedness Provision is unenforceable because it was not adequately disclosed to the Court in the Settlement Agreement and was procured in breach of the 2002 Noteholders' fiduciary duty to creditors. The Subordination Adversary seeks a declaration that the Allowed VIA Claim is Senior Indebtedness under the 2002 Indenture, that the Senior Indebtedness Provision in the VIA Settlement Agreement (which waived treatment of the Allowed VIA Claim as senior indebtedness) is unenforceable, or in the alternative that the 2002 Notes Claims should be equitably subordinated to the Allowed VIA Claim (but not to the Claims of other general unsecured creditors). On July 11, 2007, the 2002 Noteholders filed a motion to dismiss the Subordination Adversary. As of the filing of this Disclosure Statement, the Subordination Adversary is pending and has not been resolved. Nothing in the Plan or this Disclosure Statement affects the Subordination Adversary. The Chapter 11 Trustee (and the Plan Administrator) reserves his right to intervene in, seek to stay, or take any other action in connection with Subordination Adversary.

### L.  Investigation by the Chapter 11 Trustee.

Since his appointment, the Chapter 11 Trustee has undertaken a comprehensive investigation into the conduct of Professionals and other fiduciaries in these Cases prior to his appointment. This includes an investigation into the conduct of counsel to Debtors and Creditors' Committee, the 2002 Noteholders and their counsel, post-Petition Date management of the Debtors, and others concerning all aspects of their participation in the

Cases (and, where appropriate, conduct prior to the Petition Date).  This investigation is ongoing and the Chapter 11 Trustee anticipates that this investigation will continue after the Effective Date.  The Chapter 11 Trustee (and the Plan Administrator after the Effective Date) reserves his right to seek disgorgement of Professional Fees paid to Professionals in these cases (including Avoidance Action Professional Fees) and affirmative relief from any and all parties in these Cases, including those referenced above.

## ARTICLE VI
## THE PLAN OF LIQUIDATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED BY THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR A FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, REGARDLESS OF WHETHER THE CLAIM HOLDERS AND INTEREST HOLDERS VOTED ON THE PLAN AND, IF THEY VOTED ON THE PLAN, WHETHER THEY VOTED TO ACCEPT OR REJECT THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

A.      **General Plan Description.**

The Plan is a plan of liquidation.  The Estates will remain open pending a Final Decree and the Assets will remain with the Estates and not revest in the Debtors.  Nearly all of the Assets have already been liquidated.  If non-Cash Assets remain on the Effective Date, the Plan Administrator (who is the Chapter 11 Trustee) will liquidate all non-Cash Assets. The Plan Administrator will prosecute disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Debtors or the Creditors' Committee but that have not been liquidated to Final Order by the Effective Date.  The Bankruptcy Court will retain jurisdiction over the Plan Administrator and the Claims objections for this purpose, regardless of whether the Claims objections were commenced prior to or subsequent to the Effective Date.  The Plan Administrator will also prosecute Avoidance Actions, including Preference Actions, that were commenced prior to the Effective Date by the Debtors or the Creditors' Committee but which have not been resolved to Final Order by the

-23-

Effective Date.  The Bankruptcy Court will retain jurisdiction over the Plan Administrator and the Avoidance Actions for this purpose, regardless of whether the Avoidance Actions were commenced prior to or subsequent to the Effective Date.  The Plan Administrator will have standing and authority to commence objections to Claims after the Effective Date which he deems appropriate that were not commenced prior to the Effective Date.  On the Effective Date, the Creditors' Committee will be dissolved.

The Plan Administrator will distribute the proceeds of the Avoidance Actions and the Debtors' other Assets to Holders of Allowed Claims according to the priorities established in the Plan.

## B.    The Plan's Intercreditor Provisions.

The Plan gives effect to the "**Subordination Provisions**" in the 1996 Notes Indenture and 2002 Notes Indenture (together, the "**Indentures**") according to their terms.  The Plan reallocates the distributions that would have been paid to Holders of Class 5 Allowed Claims absent the Subordination Provisions to Holders of Class 3 Claims who benefit from the Subordination Provisions.

Under the Subordination Provisions, the parties entitled to priority are not limited to recovering the Allowed Amounts of their Claims.  Under bankruptcy law generally, an unsecured or under-secured creditor is not entitled to collect post-petition interest.  Under the Indentures, however, the parties benefiting from the Subordination Provisions may collect all principal and interest owing under the prioritized obligations, including post-petition interest, from the distributions that would otherwise be received by the subordinated creditor.  This is so even if the beneficiary of a Subordination Provision does not have an Allowed Claim or that Holder's Allowed Claim in the Bankruptcy Case is otherwise subordinated.

Under the Plan, creditors benefiting from the Subordination Provisions may receive up to the "**Subordination Payment Amount**," which is defined as all amounts payable by the 1996 Noteholders to the 2002 Noteholders pursuant to Article IV of the 1996 Notes Indenture.  Article IV of the 1996 Notes Indenture provides that the 1996 Notes will be subordinated to all "Senior Indebtedness." The Subordination Payment Amount includes all principal and interest (including post-petition interest) due on account of amounts owed to the 2002 Noteholders under the 2002 Notes Indenture, without regard to any limitation that may be placed on the amount of the 2002 Noteholders Allowed Claim (such as, for example, if some or all of the 2002 Notes Claim as Disallowed).

If a Holder of a Class 5 Claim disputes the application of the Subordination Provisions provided herein, the Holder must object to confirmation of the Plan **and** file an adversary proceeding prior to confirmation seeking a determination from the Bankruptcy Court that amounts subject to the Subordination Provisions should be paid first to Holders of Class 5 Allowed Claims.  If no Holder of a Class 5 Claim objects to confirmation of the Plan and files an adversary proceeding, or if the Bankruptcy Court confirms the Plan notwithstanding any objection or adversary proceeding, Holders of Class 5 Allowed Claims will not receive any payment under the Plan until Holders of Class 3 Claims receive the

Subordination Payment Amount.  If a Holder of a Class 5 Claim objects to confirmation of the Plan and files an adversary proceeding as set forth in this paragraph, the amount needed to fund the 1996 Notes Indenture Trustee's fees, costs, and expenses, including attorneys fees, will be reserved and the balance of any payments due under the Subordination Provisions to Holders of Class 5 Allowed Claims will be paid to Holders of Class 3 Claims.

## C.    Other Procedural Issues Concerning Subordination and Seniority of Claims.

The Chapter 11 Trustee is not aware of any Claims that benefit from the Subordination Provisions under the 1996 Notes Indenture other than the 2002 Notes.  Any Creditor that contends that it is a beneficiary of the Subordination Provisions of the 1996 Notes Indenture or that the 2002 Notes are not entitled to benefit from the Subordination Provisions under the 1996 Notes Indenture must file an objection to the Plan Intercreditor Provisions with the Bankruptcy Court.  An objection must set forth the basis upon which the creditor contends that its Claim is entitled to benefit from the Subordination Provisions under the 1996 Indenture or that the 2002 Notes are not entitled to such treatment.

Other than the claims of SBC asserted in the Subordination Adversary, the Chapter 11 Trustee is not aware of any other Creditors that assert that they are beneficiaries of the Senior Indebtedness under the 2002 Notes Indenture.  Any party that contends that it is a beneficiary of the Senior Indebtedness Provisions of the 2002 Notes Indenture (other than SBC) must file an objection to the Plan Intercreditor Provisions with the Bankruptcy Court.  The objection must set forth the basis upon which the creditor contends that its Claim is entitled to be treated as Senior Indebtedness under the 2002 Notes Indenture.

## D.    Classification and Treatment of Claims.

The amount of any Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed Amount of that Claim and, accordingly, the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Class. Thus, the value of the Property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests of each Class is summarized below. Because Classes 8 and 9 are deemed to have rejected the Plan, the Chapter 11 Trustee will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class.  Subject to the foregoing, the following describes the classification and treatment of classified Claims and Interests under the Plan.  Administrative Claims and Priority Tax Claims are not classified under the Plan.  It should be noted that the Debtors last filed federal corporate income tax returns for the 2001 tax year.  Thus, a determination of the actual amount of unpaid pre-petition taxes must still be determined.

1.      **Class 1 – Priority Claims.**

(a)      Classification:  This Class consists of all Unsecured Priority Claims specified under Bankruptcy Code Section 507(a), but excluding Priority Tax Claims and Administrative Claims.

(b)      Treatment:  Each Holder of a Class 1 Allowed Claim will receive Cash on the later of the Effective Date and the date of Allowance of such Priority Claim equal to the Allowed Amount of such Class 1 Allowed Claim.

(c)      Estimated Amount of Claims:  There are approximately fifteen (15) Claims in this Class totaling approximately $302,000.  To estimate payments to Holders of Class 1 Allowed Claims and establish the Estate Reserve (defined below), the Chapter 11 Trustee calculates the total Class 1 Allowed Claims at $302,000, which is the face amount of all Class 1 Claims.  This estimate is without prejudice to the ability of the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise disallow any Class 1 Claims.

(d)      Projected distributions:  The Chapter 11 Trustee anticipates that all Class 1 Allowed Claims will be paid in full under the Plan.

(e)      Voting:  Claims in this Class are unimpaired, and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject the Plan.

2.      **Class 2 – Secured Claims.**

(a)      Classification:  This Class consists of Claims secured by valid and perfected Liens or security interests against the Debtors' Assets, to the extent of the value of the Holder's interest in the Debtors' Assets.

(b)      Treatment:  Each Holder of a Class 2 Allowed Claim will receive Cash on the later of the Effective Date and the date of Allowance of such Secured Claim equal to the Allowed Amount of such Class 2 Allowed Claim, including interest, plus fees, costs and expenses as may be allowed by the contract, if any, underlying such secured claim.

(c)      Estimated Amount of Claims:  There are approximately twenty-seven (27) scheduled Claims or filed proofs of Claim in this Class totaling approximately $91.975 million.  Most of these Claims relate to the 2002 Notes, which are no longer secured as a result of the prior sale and payment of the UMC Stock, which served as collateral for the 2002 Notes.  To estimate payments to Holders of Class 2 Allowed Claims and establish the Estate Reserve (defined below), the Chapter 11 Trustee calculates total Class 2 Allowed Claims at $380,000, which is the face amount of all Class 2 Claims other than Class 2 Claims related to the 2002 Notes.  This estimate is without prejudice to the ability of the Chapter 11 Trustee, the Plan Administrator, or any other party in interest to object to, seek to subordinate or otherwise Disallow any Class 2 Claim.

-26-

(d)    Projected distributions:  The Chapter 11 Trustee anticipates that all Class 2 Allowed Claims will be satisfied in full under the Plan.

(e)    Voting:  Claims in this Class are impaired, and Holders of Allowed Claims in this Class are therefore entitled to vote to accept or reject the Plan.

3.    **Class 3 – 2002 Notes Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims arising out of the 2002 Notes (the 7-3/4% Senior Secured Subordinated Convertible Debentures due 2005).

(b)    Treatment:  Each Holder of a Class 3 Allowed Claim will receive Cash equal to the Holder's Pro-Rata Share of the Liquidation Amount.  Additionally, pursuant to the Subordination Provisions in the Indentures, all distributions that would otherwise be made to the Holders of Class 5 Allowed Claims on account of the 1996 Notes Claims up to the Subordination Payment Amount will be paid directly to Holders of Class 3 Claims on a Pro-Rata Share basis.  After Holders of Class 3 Claims recover (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims will thereafter be paid to Holders of Class 5 Allowed Claims.  The timing of payments is described below in Article VII, Section E below.

(c)    Estimated Amount of Claims:  There are three known Holders of Class 3 Claims: Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.  The total amount of these Claims, after crediting amounts these Creditors received on account of the sale of the UMC stock that collateralized their Claims, is approximately $60.6 million.  This estimate is without prejudice to the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise Disallow any or all Class 3 Claim.

(d)    Voting:  Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

4.    **Class 4 – General Unsecured Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims (including Deficiency Claim) other than Claims in Classes 3, 5, 6, 7, and 8.

(b)    Treatment:  Each Holder of a Class 4 Allowed Claim will receive Cash equal to the Holder's Pro-Rata Share of the Liquidation Amount.  The timing of payments is described below in Article VII, Section E below.

(c)    Estimated Amount of Claims:  As of July 1, 2007, there are a total of approximately $64.7 million of Class 4 Allowed Claims.  In addition, there are a total of approximately $52.7 million of additional Class 4 Claims that are (i) subject to pending Claim objections or Preference Actions, or (ii) subject to continuing investigation by the

-27-

Chapter 11 Trustee and may be objected to in the future. The Chapter 11 Trustee estimates total Class 4 Allowed Claims at $117.4 million, the face amount of all Class 4 Claims that have not been Disallowed. This calculation is an estimate and is without prejudice to the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise Disallow any Class 4 Claim that has not been Allowed.

      (d)    <u>Voting</u>: Claims in Class 4 are impaired, and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

**5.      Class 5 – 1996 Notes Claims.**

      (a)    <u>Classification</u>: This Class consists of all Unsecured Claims arising out of the 1996 Notes (the 5-3/4% Convertible Subordinated Notes due 2003), including, without limitation, all Claims of U.S. Bank, National Association.

      (b)    <u>Treatment</u>: Holders of Class 5 Allowed Claims will receive Cash equal to the Holder's Pro-Rata Share of the Liquidation Amount. However, pursuant to the Subordination Provisions, Distributions that would be made to Holders of Class 5 Allowed Claims will be paid to the Holders of Class 3 Claims on a Pro-Rata Share basis until the Holders of Class 3 Claims receive the Subordination Payment Amount. After Holders of Class 3 Claims have recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims will thereafter be paid to Holders of Class 5 Allowed Claims. The timing of payments is described below in Article VII, Section E below.

      (c)    <u>Estimated Amount of Claims</u>: U.S. Bank, National Association is the only known Holder of a Class 5 Claim. This Holder filed a proof of Claim in the approximate estimated amount of $106.1 million. This estimate is without prejudice to the Chapter 11 Trustee, the Plan Administrator or any other party in interest to object to, seek to subordinate or otherwise Disallow the Class 5 Claim.

      (d)    <u>Voting</u>: Claims in this Class are impaired, and Holders of Allowed Claims in this Class are therefore entitled to vote to accept or reject the Plan.

**6.      Class 6 – Intercompany Claims.**

      (a)    <u>Classification</u>: This Class is comprised of all Claims filed or scheduled by any of the Debtors against any of other Debtor.

      (b)    <u>Treatment</u>: All Class 6 Claims will be Allowed in full by operation of the Plan; however, by way of compromise and settlement, the only Holder of a Class 6 Claim, SONICblue, will waive its right to receive a distribution in respect of its Class 6 Allowed Claims to the extent necessary in an effort to pay non-insider Allowed Unsecured Claims in each of the Cases other than SONICblue's case a percentage distribution approximately equal to the distribution calculated to be received by the Holders of Allowed

Unsecured Claims against SONICblue.

(c)    <u>Estimated Amount of Claims</u>:  There are three Class 6 Claims, one filed by SONICblue against each of the other Debtors totaling approximately $49.75 million.

(d)    <u>Voting</u>:  Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**7.    Class 7 – Convenience Class Claims.**

(a)    <u>Classification</u>:  This Class is comprised of all Claims that would otherwise be Class 4 Claims but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $500; or (b) such Claim is in an amount greater than $500, but the Holder of such Claim has elected to have such Claim treated in its entirety as a Class 7 Convenience Class Claim in the amount of $500 by so indicating on the Ballot submitted to vote such Claim.

(b)    <u>Treatment</u>:  Each Holder of a Class 7 Allowed Claim will receive Cash within thirty days following the later of the Effective Date and the date of Allowance of such Class 7 Allowed Claim equal to 50% of the Allowed Amount of such Class 7 Allowed Claim; provided, however, that under any circumstance the maximum Cash distribution to a Class 7 Claim Holder will be $250.

(c)    <u>Estimated Amount of Claims</u>:  There are over 275 Claims in this Class totaling approximately $57,000.  Taking into account Creditors with Class 4 Allowed Claims exceeding $500 who opt to reduce their Claims to $500 and participate in the Class 7 Convenience Class to expedite receipt of their distributions, the Chapter 11 Trustee estimates that the ultimate amount of Claims in this Class will be approximately $75,000.

(d)    <u>Projected distributions</u>:  Each Holder of a Class 7 Allowed Claim will receive a single distribution equal to the lesser of fifty percent (50%) of such Holder's Class 6 Allowed Claim or $250.

(e)    <u>Voting</u>:  Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**8.    Class 8 – Subordinated Unsecured Claims.**

(a)    <u>Classification</u>:  This Class consists of all Claims: (i) that have been or are subject to subordination under Bankruptcy Code Section 510(b), including, without limitation, all Claims identified in Schedule 1 to the Plan and which are not expressly included in any other Class; and (ii) all Claims described in any other Bankruptcy Code provision that subordinates Claims.

(b)    <u>Treatment</u>:  Holders of Allowed Class 8 Claims will receive no distributions on account of their Class 8 Claims.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

(c)    <u>Estimated Amount of Claims</u>:    Seven (7) Claims, comprising approximately $14.6 million, have previously been subordinated pursuant to Bankruptcy Court order.  Exhibit "C" identifies any additional claims that the Chapter 11 Trustee may seek to have subordinated.

(d)    <u>Projected distributions</u>:  Holders of Class 8 Claims will receive no distributions on account of their Class 8 Claims.

(e)    <u>Voting</u>:  Claims in this Class are impaired but are deemed to have rejected the Plan.  As such, Holders of Allowed Claims in this Class are not entitled to vote to accept or reject the Plan.

**9.    Class 9 – Interests.**

(a)    <u>Classification</u>:    This Class consists of all Interests in any of the Debtors and any rights and Claims related thereto, including, but not limited to, all stock, equities, securities, warrants, conversion rights, options and other legal and contractual rights to acquire stock.

(b)    <u>Treatment</u>:  Holders of Interests will not receive or retain any Property or distributions under the Plan on account of such Interests.  Holders of Interests will have no power or role in the administration of the Debtors.  On the Effective Date, all such power will be vested in the Plan Administrator in accordance with the terms of the Plan.  On the Effective Date, any and all equity interests in the Debtors, including all common stock, preferred stock, stock options, warrants, and any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any other right, contractual or otherwise, to acquire any such ownership interest (collectively, the "**Equity Interests**") will be cancelled and extinguished and of no further force or effect, without the need for the Chapter 11 Trustee, the Plan Administrator, the Debtors or the holders of the Equity Interests to take any further action.

(c)    <u>Projected distributions</u>:  Interest Holders will receive no distributions on account of their Interests.

(d)    <u>Voting</u>: Holders of Interests are impaired but are deemed to have rejected the Plan.  As such, Holders of Interests are not entitled to vote to accept or reject the Plan.

**E.    Treatment of Unclassified Administrative and Priority Tax Claims.**

**1.    Administrative Claims other than Post-Petition Taxes.**

Holders of Administrative Claims, including Holders of Claims for Professional Fees and Chapter 11 Trustee Fees and any Holder of a post-Petition Tax Claim, that have not been paid as of the Effective Date must File a request for payment of the Administrative Claims with the Bankruptcy Court and serve the same upon the Plan Administrator no later than thirty (30) days after the Effective Date (the "**Administrative Bar Date**").    If an

-30-

Administrative Claim that has not been paid as of the Effective Date is not timely Filed by the Administrative Bar Date, then the Administrative Claim will not be Allowed and the Holder of the Administrative Claim will be forever barred from asserting or enforcing the Administrative Claim against any of the Estates or the Assets.

Any Professional requesting Professional Fees, including Avoidance Action Professional Fees, for services rendered prior to the Effective Date, including any Professional Fees paid to a Professional under any interim fee order, must File and serve an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date. Professionals who do not File such requests by that date will be forever barred from seeking payment for such Professional Fees and must disgorge any Professional Fees paid pursuant to any interim fee order of the Court. This thirty day period may be extended by the Court upon application prior to the expiration of the thirty day period.

Any objection to a timely filed Administrative Claim must be filed by the later of: (i) one hundred twenty (120) days after the date such Administrative Claim is Filed and properly served, or (ii) one hundred twenty (120) days after the Effective Date. The Plan Administrator may seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Administrative Claim. The filing of a motion by the Plan Administrator to extend the time to File an objection to a timely filed Administrative Claim will automatically extend the date by which the Plan Administrator must file objections to a timely filed Administrative Claim until a Final Order is entered on the motion. The Plan Administrator will pay any timely filed Administrative Claim only after the deadline to object to the Administrative Claim has passed with no objection having been filed, or the Administrative Claim is allowed by Final Order of the Bankruptcy Court.

Regular recurring administrative expenses, other than Professional Fees and Chapter 11 Trustee Fees, primarily consist of fees paid to the employees of the Debtor who have been retained by the Chapter 11 Trustee, transfer agent fees and charges, Bowne (printers who file 8-Ks) fees, the Claims Administrator's fees, storage expenses for the Debtors' records, Delaware taxes, U.S. Trustee fees, and expenses of the Debtors' payroll service, ADP, Inc. These regular recurring administrative expenses approximate $35,000 to $50,000 on a monthly basis and are generally paid within 30 days of becoming due.

### 2. Statutory Fees.

All fees due and payable under 28 U.S.C. § 1930 that have not been paid will be paid on or before the Effective Date. Payments required after the Effective Date will be made as required by statute.

### 3. Professional Fees.

The Plan treats Professional Fees incurred during the course of the Chapter 11 Cases identical to other Administrative Claims against the Estates. Holders of Administrative Claims related to Professional Fees must file a request for payment of those Professional

Fees as set forth above.  The Plan Administrator will investigate, and if necessary, object to requests for Professional Fees, as part of his overall investigation described above in Article V.L.  This Disclosure Statement does not estimate Professional Fees that may be payable to Professionals employed by the Debtors or the Creditors' Committee prior to the Chapter 11 Trustee's appointment.  Professional Fees that may ultimately be paid on a final basis will be subject to the Chapter 11 Trustee's overall investigation.

Since the Chapter 11 Trustee's appointment, he has retained Alston & Bird LLP and Friedman Dumas & Springwater LLP as his counsel.  Between the time of the Chapter 11 Trustee's appointment and the time of approval of this Disclosure Statement, Alston & Bird incurred approximately $_____ and Friedman, Dumas & Springwater incurred approximately $_____ in Professional Fees and other expenses in their representation of the Chapter 11 Trustee.  These fees, along with all other fees billed by these or any other Professionals employed by the Debtors, the Committee, the Chapter 11 Trustee, or (after the Effective Date) the Plan Administrator will be subject to review and approval of the Bankruptcy Court.

### 4.    Priority Tax Claims and Post-Petition Taxes.

The Debtors last filed federal corporate income tax returns for the 2001 tax year, and have not filed tax returns for any years during their bankruptcy.  The Chapter 11 Trustee is in the process of determining the Debtors' tax liability for the year 2002 and all subsequent years.  Based on the information presently available to the Chapter 11 Trustee, the Chapter 11 Trustee will set a reserve in the approximate amount of $_____ to address tax claims that may be characterized as Priority Tax Claims and Post-Petition Tax Claims.  Holders of Priority Tax Claims and Post-Petition Tax Claims will receive Cash on the later of the Effective Date and the date of Allowance the Claim equal to the Allowed amount of the Claim.

### F.    Effect of Confirmation of the Plan.

### 1.    Assets to Remain in Debtors' Estates; No Revesting of Assets.

Other than as set forth in this Disclosure Statement and in the Plan, the Assets of the Estates will not revest in the Debtors, but will remain property of their respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan and the Plan Confirmation Order.  The Estates will remain open until entry of a Final Decree closing the Chapter 11 Cases.  The Plan Administrator (who is the Chapter 11 Trustee and proponent of the Plan) will oversee and control all operations of the Debtors.  The Plan Administrator will manage and use the Debtors and the Assets for the sole purposes of carrying out and effectuating the distributions provided for in the Plan.

### 2.    Authority to Effectuate the Plan.

On the Effective Date, all matters provided under the Plan will be authorized and

approved without further approval or order from the Bankruptcy Court. The Plan Administrator may take all necessary actions to carry out the Plan and to effectuate the distributions provided for under the Plan, without further authorization by or notice to the Bankruptcy Court. The Plan Administrator may sell or dispose of any and all Assets and pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court; provided, however, that any sale, settlement, distribution or transaction where the amount received, paid or distributed exceeds $100,000 will be subject to the approval of the Bankruptcy Court.

### 3.    The Non-Debtor Subsidiaries.

Except as set forth below, the Plan will have no effect on the Debtors' subsidiaries. The Plan Administrator may operate, wind up, dissolve, or otherwise dispose of the Seller Subsidiaries. The Plan Administrator may operate, wind up, dissolve or otherwise dispose of any of the Debtors' other subsidiaries (including subsidiaries of subsidiaries).

### 4.    Dissolution of the Creditors' Committee.

On the Effective Date, the Creditors' Committee will be dissolved. Neither members of the Creditors' Committee nor counsel to the Creditors' Committee will receive any release or discharge of liability under the Plan. Claims of all parties in interest will survive confirmation of the Plan and those parties in interest may pursue those claims, rights, causes of action or rights to an equitable remedy after the Confirmation Date and Effective Date of the Plan, to the extent allowed by applicable law.

### 5.    Prosecution of Claim Objections and Avoidance Actions.

The Plan Administrator will prosecute disputed, contingent or unliquidated Claims that have been objected to prior to the Effective Date by the Debtors, the Chapter 11 Trustee, and the Creditors' Committee but that have not been liquidated to Final Order by the Effective Date. The Bankruptcy Court will retain jurisdiction over the Plan Administrator, the Debtors and the Claims objections for this purpose. Similarly, the Plan Administrator will prosecute Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Debtors, the Chapter 11 Trustee or the Creditors' Committee but that have not been resolved to Final Order by the Effective Date. The Bankruptcy Court will retain jurisdiction over the Plan Administrator, the Debtors and the Avoidance Actions for this purpose. The Plan Administrator will have standing and authority to commence any objections to Claims after the Effective Date that have not been commenced prior to the Effective Date.

### 6.    Termination of the Debtors' Public Entities on the Effective Date.

On the Effective Date, the Debtors will cease to exist as public companies. On the Effective Date, the Plan Administrator and the Debtors will not be required to file any further documents or papers with the SEC or otherwise regarding any further securities related matters.

G.     **Implementation and Means of Execution of the Plan.**

1.     **Plan Administrator for the Debtors; Repeal of Bylaws and Amendments to Articles of Incorporation.**

Dennis J. Connolly will be appointed Plan Administrator for the Debtors on the Effective Date. The Plan Administrator may employ additional employees for the Debtors, retain counsel for the Debtors, and manage the affairs of the Debtors in accordance with the terms of the Plan. The Plan Administrator may retain counsel that was approved under Section 327 of the Bankruptcy Code.

By operation of the Plan, on the Effective Date, all bylaws of the Debtors will be repealed and the articles of incorporation of the Debtors will be amended to provide that the Plan Administrator will displace the Boards of Directors, any Responsible Individual or any other person or persons responsible for each of the Debtors. The Plan Administrator will file appropriate notices with the Secretary of State for the State of Delaware as required by Sections 103 and 303 of Delaware General Corporation Law (the "**Delaware Corporate Code**") or other applicable law.

2.     **Compensation of the Plan Administrator.**

The Plan Administrator will be compensated at the hourly rate otherwise ordinarily charged by the Plan Administrator. The Plan Administrator will be paid his fees on a monthly basis from the Debtors' estates, provided however, that in any month when the Plan Administrator's fees exceed $20,000, the Plan Administrator will provide notice of the amount and nature of such fees to the U.S. Trustee and any Creditor requesting notice of such fees, and provided further however that all fees paid to the Plan Administrator will be subject to review and approval of the Bankruptcy Court prior to a Final Decree closing the Chapter 11 Cases.

3.     **Funding of the Plan.**

The Plan will be funded with the Assets, including the Cash, and the net recovery (after payment of all fees and expenses) from the pursuit of the Estate Litigation Claims and the proceeds thereof.

4.     **The Estate Litigation Claims.**

The Plan Administrator will prosecute Estate Litigation Claims that the Debtors, the Chapter 11 Trustee or the Creditors' Committee commenced prior to the Effective Date but which are not resolved to Final Order by the Effective Date. The Bankruptcy Court will retain jurisdiction over all pending Estate Litigation Claims following the Effective Date. Any settlement of any pending Estate Litigation Claims will continue to be subject to the approval of the Bankruptcy Court even if the settlements are finalized after the Effective Date. The Plan Administrator may pursue and prosecute, settle, or decline to pursue, any Estate Litigation Claims not commenced prior to the Effective Date. The Bankruptcy Court

will retain jurisdiction over all Estate Litigation Claims that are commenced after the Effective Date.

The Plan Administrator, on behalf of the Debtors, may set-off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any Estate Litigation Claims the Plan Administrator or the Debtors may have against the Holder of the Claim, except as otherwise expressly provided in the Plan. Neither the failure to do so nor the Allowance of any Claim will constitute a waiver or release by the Plan Administrator or the Debtors of any such Estate Litigation Claims, set-off or recoupment which the Plan Administrator or the Debtors may have against such Holder, except as otherwise expressly provided in the Plan.

Except as expressly provided in the Plan, nothing in this Disclosure Statement, the Plan, the Plan Confirmation Order or any other order or document will waive or release any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors, the Chapter 11 Trustee, the Creditors' Committee or any other party in interest had prior to the Effective Date. On the Effective Date, all claims, causes of action, rights, defenses held by the Debtors, the Estates, the Chapter 11 Trustee or the Creditors' Committee will continue to be vested in the Estates and the Plan Administrator will be the representative of the Estates in respect of all Estate Litigation Claims that were, could have been or could be asserted on or after the Effective Date for all purposes, including, but not limited to, 11 U.S.C.§ 1123(b)(3)(B).

## 5. Post-Effective Date Employment of Professionals By the Plan Administrator and Payment of Fees and Expenses Incurred By Such Professionals.

The Plan Administrator will select Professionals to be employed by the Plan Administrator after the Effective Date. Professionals will be compensated from the Assets on a timely basis for fees and expenses incurred by the Professionals after the Effective Date in accordance with the terms of the Plan. The Plan Administrator may retain counsel that was approved under Section 327 of the Bankruptcy Code to provide services to the Plan Administrator. Professionals retained by the Chapter 11 Trustee, the Debtors, and the Creditors' Committee in these Cases under Section 327 and Section 1103 will not be retained after the Effective Date unless that retention is approved by the Plan Administrator in writing.

## 6. Dissolution of the Debtors.

Unless the Plan Administrator determines otherwise, upon entry of a Final Decree closing these Chapter 11 Cases, the Debtors will be dissolve. The entry of a Final Decree closing these Chapter 11 Cases will authorize the dissolution of the Debtors pursuant to Sections 303 of the Delaware Corporate Code, unless the Plan Administrator determines that dissolution of the Debtors is not in the best interests of Creditors. If the Plan Administrator determines that dissolution of the Debtors is in the best interests of Creditors, upon entry of a Final Decree closing these Chapter 11 Cases, the Plan Administrator will make all necessary

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

filings under with the Delaware Secretary of State to evidence the dissolution of the Debtors.

### 7. Corporate Action.

Each of the matters provided for under the Plan involving any corporate action to be taken or required by the Chapter 11 Trustee or any Debtor will, as of the Effective Date, have occurred and be effective, and will be authorized and approved in all respects without any further action by the Chapter 11 Trustee, stockholders, officers or directors of the Debtors.

## ARTICLE VII
## CLAIMS RESOLUTION AND DISTRIBUTIONS

### A. Late Claims Void.

Unless otherwise expressly ordered by the Bankruptcy Court or otherwise provided by the Plan, any Claim filed after the applicable Claims Bar Date will be void and of no force or effect, and will receive no distributions under the Plan.

### B. Prosecution of Objections to Claims.

The Plan Administrator will prosecute those Claim objections that were commenced by the Chapter 11 Trustee, the Debtors, or Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date until all such Claim objections have been resolved to Final Order. The Bankruptcy Court will retain jurisdiction over all pending Claim objections following the Effective Date.

The Plan Administrator will File any objections to Claims that are not subject to a pending objection on the Effective Date not later than one hundred twenty (120) days after the Effective Date. The Plan Administrator may seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Claim. The filing of a motion by the Plan Administrator to extend the time to File an objection to a timely filed Claim will automatically extend the date by which the Plan Administrator must file objections to a timely filed Claim until a Final Order is entered on the motion.

Except as set forth below with respect to the Claim Order, any settlement of any Claim objections, whether the Claim objection was initiated before or after the Effective Date, will continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date. The Plan Administrator may pursue and prosecute, settle, or decline to pursue, any and all Claim objections that were not commenced prior to the Effective Date. The Bankruptcy Court will retain jurisdiction over all such Claim objections commenced after the Effective Date.

Nothing in this Disclosure Statement, the Plan, the Plan Confirmation Order or any other order or document waives or releases any claim, cause of action, right of setoff, or other legal or equitable defense that the Chapter 11 Trustee, the Debtors or the Creditors' Committee had prior to the Effective Date provided however, that the Chapter 11 Trustee, the

Plan Administrator and all other parties in interest may not seek reconsideration of, object to, seek reduction of, counterclaim to, seek subordination of, or seek offset or recoupment as to any Allowed Claim allowed by a Final Order that provides that such Allowed Claim is not subject to such actions.  On the Effective Date, all such claims, causes of action, rights and defenses will be transferred and conveyed to the Plan Administrator and the Debtors as successors in interest.

On March 14, 2006, the Bankruptcy Court entered an order (the "**Claim Order**") entitled "Order Granting Motion Waiving Notice of Claim Settlements."  The Claim Order authorized the Debtors or the Creditors' Committee to settle Claim disputes without notice to Creditors so long as the Creditors' Committee and the Debtors, or their respective counsel, both sign a written settlement agreement or stipulation.  The terms of the Claim Order will be amended by operation of the Plan to provide that, after the Effective Date, the Plan Administrator may settle Claim disputes without notice to Creditors and without further authorization of the Bankruptcy Court or, in the Plan Administrator's discretion, he may seek Bankruptcy Court authorization, except that the settlement of any claim in excess of $3 million will be on notice.

### C.      Estimation of Claims.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtors, the Chapter 11 Trustee, the Creditors' Committee or any other party in interest previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection, except as otherwise provided in this Plan.  The Bankruptcy Court will retain jurisdiction over the Debtors' estates and these Chapter 11 Cases to estimate any Claim at any time prior to the entry of a Final Decree closing these Chapter 11 Cases.  If the Bankruptcy Court estimates any Claim, that estimated amount will constitute the Allowed amount of such Claim for Plan voting, but will not constitute a maximum limitation on such Claim for distribution purposes unless the parties agree to allow the estimation to serve as such a maximum.

### D.      Allowed and Disputed Claims.

A Disputed Claim is any Claim that is subject to (i) an objection, or (ii) a motion or adversary proceeding which seeks to estimate, disallow, or subordinate the Claim, and also as to which a Final Order has not been entered that Allows or Disallows the Claim.  A Claim that is allowed by operation of law under Section 502 of the Bankruptcy Code because no objection has been filed to such Claim may become a Disputed Claim upon the filing of an objection that that Claim or a motion or adversary proceeding which seeks to estimate, disallow, or subordinate the Claim.

E.    **Provisions Regarding Distributions.**

1.    **No Distributions on Disputed or Disallowed Claims; Establishment of Disputed Claims' Reserve.**

No distribution will be made to the Holder of a Disputed Claim until the Disputed Claim becomes an Allowed Claim.  The Plan Administrator will not make distributions to Holders of Disallowed Claims.

On and after the Effective Date, the Plan Administrator will establish and maintain a reserve (the "**Disputed Claims' Reserve**") to fund the payment of Disputed Claims.  The amount of the Disputed Claims' Reserve will be equal to the sum of the following: (i) the face amount of all Disputed Priority Tax Claims, (ii) the face amount of all Disputed Administrative Claims, (iii) the face amount of all Class 1 Disputed Claims, (iv) the face amount of all Class 2 Disputed Claims, (v) the face amount of all Class 3 Disputed Claims multiplied by the Pro-Rata Share of the Liquidation Amount calculated to be paid to Holders of Class 3 Allowed Claims, (vi) the face amount of all Class 4 Disputed Claims multiplied by the Pro-Rata Share of the Liquidation Amount calculated to be paid to Holders of Class 4 Allowed Claims, (vii) the face amount of all Class 5 Disputed Claims multiplied by the Pro-Rata Share of the Liquidation Amount calculated to be paid to Holders of Class 5 Allowed Claims (or, pursuant to the Subordination Provisions, calculated to be paid to Holders of Class 3 Claims), and (viii) the amount that would be paid to all Class 7 Disputed Claims if they were Class 7 Allowed Claims.  The Plan Administrator will, from time to time, recalculate the amount of the Disputed Claims Reserve.  The Plan Administrator may use any Assets withdrawn from the Disputed Claims Reserve for distributions in accordance with the terms of the Plan.

2.    **Distributions on Account of Allowed Claims.**

The Plan Administrator will pay Cash to each Holder of an Allowed Claim on the later of the Effective Date or the date on which the Claim is Allowed by Final Order, or as otherwise provided in the Plan.  The Plan Administrator may make interim or partial distributions, except as provided in the Plan or as limited by the Bankruptcy Code.  The Plan Administrator will make distributions to Holders of Class 3, 4, 5, 6, and 7 Allowed Claims as soon as a practicable after the Effective Date.

3.    **Estate Reserve.**

On the Effective Date, the Plan Administrator will establish and maintain a reserve (the "**Estate Reserve**") to fund the payments required to be made under the Plan on account of Class 1 Allowed Claims, Class 2 Allowed Claims, Class 7 Allowed Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Plan Administrator to pay post-Effective Date fees and expenses, including, without limitation, those incurred or to be incurred by professionals employed by the Plan Administrator through the closing of these Chapter 11 Cases and entry of a Final Decree.  The Plan Administrator will determine the

amount of the Estate Reserve. If a Creditor files an objection to the amount of the Estate Reserve with the Bankruptcy Court which sets forth in detail the grounds for such objection, the Bankruptcy Court will resolve any such dispute after notice and a hearing. The Plan Administrator will not be liable if the Estate Reserve is inadequate, unless such inadequacy was the result of gross negligence, recklessness or willful malfeasance. All recoveries obtained from the pursuit of Avoidance Actions will remain in a segregated account(s) until the Bankruptcy Court has ruled upon the fee application of the Professionals.

### 4. Effectuation of Distributions.

The Plan Administrator will serve as the disbursing agent and will make all distributions in accordance with the terms of the Plan. The Plan Administrator will make all distributions without any requirement for bond or surety with respect thereto. At the request of the Plan Administrator, the Claims Agent in these Cases, Administar, will assist in making distributions under the Plan and will be entitled to reasonable compensation for providing such services.

### 5. Distributions on Later-Allowed Claims.

When a Disputed Claim becomes an Allowed Claim (in whole or in part), the Plan Administrator will make a distribution from the Disputed Claims Reserve to the Holder of the Allowed Claim in an amount equal to the distribution the Holder of such Claim would have received if the Holder's Claim had been Allowed in such amount on the Effective Date. No Holder of a Disputed Claim will receive any post-Petition Date or post-Effective Date interest or other accruals of any kind based upon the delay in receipt of the payment.

### 6. Manner of Payments; Delivery of Distributions.

The Plan Administrator will make all disbursements under the Plan in Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank. Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under the Plan, the Plan Administrator will make distributions to Holders of Allowed Claims at each Holder's address as set forth on the Schedules filed with the Bankruptcy Court unless superseded by a different address set forth in a timely filed proof of claim filed by the Holder or if the Plan Administrator has been notified in writing of a change of address.

### 7. Undeliverable Distributions.

(a)     Holding of Undeliverable Distributions: If any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions will be made to such Holder unless and until the Plan Administrator is notified, in writing, of such Holder's then-current address. The Plan Administrator will hold undeliverable distributions until the distribution becomes deliverable. Holders ultimately receiving previously undeliverable distributions will not receive any interest or other accruals of any kind based upon the delay in receipt. The Plan Administrator is not required to locate the Holder of an Allowed Claim.

-39-

(b)    Uncashed Checks. The Plan Administrator is not required to locate the Holder of an Allowed Claim that does not cash any check representing a distribution payment.  If a distribution check has not been cashed for three (3) months from the date of mailing of such check to the Creditor, the Plan Administrator may: (a) stop payment on the check, (b) treat the distribution as undeliverable, or (c) refuse to re-issue the check if the Plan Administrator determines that reissuing the check may adversely affect the distribution to any other Creditor or if re-issuing the check may cause the Plan Administrator to incur expense or inconvenience that is unwarranted in light of the amount of the distribution.

(c)    Failure to Claim Undeliverable Distributions: The Plan Administrator may from time to time file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been attempted and have been returned as undeliverable as of the date thereof.  Any Holder of a Claim identified in such list that does not assert its rights pursuant to the Plan to receive a distribution within two (2) months from and after the filing of such list will not be entitled to any distributions under the Plan and will be forever barred from asserting any such Claim against the Debtors or the Plan Administrator.  In such case, any consideration held for distribution on account of such Claim will revert to the Plan Administrator for distribution to other Creditors or payment of expenses in accordance with the terms of the Plan.  Notwithstanding the foregoing, the Plan Administrator may pay distributions to a Holder of a Claim where distributions to the Holder had previously been determined to be undeliverable.

(d)    Fractional Amounts: Payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

**8.    Compliance with Tax Requirements/Allocation.**

The Plan Administrator will comply with tax withholding and reporting requirements imposed by any governmental unit in making distributions under the Plan.  All distributions pursuant to the Plan will be subject to withholding and reporting requirements.  The Plan Administrator may withhold distributions due to any Holder of an Allowed Claim until the Holder provides the Plan Administrator with the necessary information to comply with any withholding requirements of any governmental unit.  The Plan Administrator will pay withheld distributions to the appropriate authority.  If the Holder of an Allowed Claim fails to provide to the Plan Administrator with the information necessary to comply with withholding requirements of any governmental unit within sixty days after the date of first notification by the Plan Administrator to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's distributions will be treated as undeliverable.  For tax purposes, distributions received in respect of an Allowed Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest.

9.    **Set-Offs.**

The Plan Administrator may set-off against any Allowed Claim (and distributions to be made thereto), the claims, rights and causes of action of any nature that the Debtors or the Estates may hold against the Holder of such Allowed Claim, consistent with applicable law, except if the Allowed Claim is Allowed by a Final Order which provides by its terms that such Allowed Claim will not be subject to any right of set-off.  The Holder of a Claim may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set off any Allowed Claim such Holder possesses against any claim, rights or causes of action of any nature that the Debtors may hold against such Holder except if the Allowed Claim is Allowed by a Final Order which provides by its terms that the Holder may not set-off such claims against the Debtors against such Allowed Claim.  Neither the failure to effect such a set-off nor the allowance of any Claim under the Plan will waive or release the Plan Administrator or the Debtors or such Holders of any such Claims, rights and causes of action that such parties may possess under Bankruptcy Code Section 553 or applicable non-bankruptcy law.

# ARTICLE VIII
# SATISFACTION OF CLAIMS AND INJUNCTION

A.    **Satisfaction of Claims.**

The Plan does not grant the Debtors a discharge.  However, except as otherwise provided in the Plan: (1) the rights afforded in the Plan and the treatment of all Claims and Interests is in exchange for and in complete satisfaction of the Claims and Interests; and (2) no Entity may assert any further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date against the Debtors, the Plan Administrator, or the Assets, except as otherwise provided in the Plan.

B.    **Injunction.**

Except as otherwise expressly provided in the Plan, Entities who held, hold or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their Estates, the Chapter 11 Trustee, or the Plan Administrator; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their Estates, the Chapter 11 Trustee, or the Plan Administrator; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their Estates, the Chapter 11 Trustee, or the Plan Administrator, or against the Property or interests in Property of any of the foregoing.  Nothing in the Plan or the Plan Confirmation Order prohibits or restrains any party from prosecuting any actions or controversies against the Debtors' present or former directors and officers or Holders of Interests based on acts, events or omissions occurring before the Petition Date.  With respect to all Claims or Estate Litigation Claims, all Entities shall be and are permanently enjoined from commencing or continuing any such matter except in the

-41-

Bankruptcy Court, and the Bankruptcy Court will retain exclusive jurisdiction over all such matters.

## ARTICLE IX
## OTHER PLAN EFFECTUATION MATTERS

### A.    Executory Contracts and Unexpired Leases.

#### 1.    Rejection of Executory Contracts and Unexpired Leases.

Any pre-petition executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, or which has not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume the same pending as of the Effective Date, is rejected on the Effective Date or as otherwise agreed upon by the parties.  The entry of the Plan Confirmation Order by the Bankruptcy Court constitutes approval of such rejections pursuant to Bankruptcy Code Sections 365(a) and 1123, effective as of the Effective Date of the Plan.

#### 2.    Rejection Damage Claims Bar Date and Resolution.

Claims arising out of the rejection of executory contracts or unexpired leases rejected as of the Effective Date pursuant to the Plan must be filed and served on counsel to the Plan Administrator pursuant to the procedures specified in the Plan Confirmation Order no later than thirty (30) days after the Effective Date (the "**Final Rejection Claims Bar Date**"). Claims arising out of the rejection of executory contracts or unexpired leases rejected as of a date prior to the Effective Date must be filed and served not later than the deadline, if any, established in the order approving rejection of such executory contract or unexpired lease or other court order establishing a bar date for rejection Claims ("**Applicable Rejection Claims Bar Date**") or, if there is no such Applicable Rejection Claims Bar Date, by the Final Rejection Claims Bar Date.  Claims arising out of rejection of executory contracts or unexpired leases that are the subject of a motion to assume pending on the Effective Date must be filed within thirty (30) days after entry of an order either rejecting such executory contract or unexpired lease or denying such motion to assume such executory contract or unexpired lease.  Holders of any Claim not filed within such times will be barred from asserting the Claim against the Debtors, their Estates, or the Plan Administrator.  Unless otherwise ordered by the Bankruptcy Court prior to the Confirmation Date, or such later date as may be ordered by the Bankruptcy Court prior to the Confirmation Date, all Claims arising from the rejection of executory contracts and unexpired leases will be treated as Class 4 Claims under the Plan.

### B.    Conditions Precedent.

#### 1.    Conditions Precedent to Effective Date of the Plan.

The Effective Date will be the date all of the following conditions precedent are satisfied:

-42-

(a)    <u>Plan Confirmation Order</u>:  The Plan Confirmation Order is in form and substance acceptable to the Chapter 11 Trustee and, except as otherwise agreed by the Chapter 11 Trustee, is a Final Order in full force and effect that is not stayed or reversed; and

(b)    <u>Execution of Documents; Other Actions</u>:    All other actions and documents determined by the Chapter 11 Trustee to be necessary to implement the Plan will have been effected or executed.

### 2.    Waiver of Conditions.

The Chapter 11 Trustee may waive the requirement that the Plan Confirmation Order be a Final Order prior to the Plan becoming effective, but the Chapter 11 Trustee may not waive the requirement of an entered Bankruptcy Court order confirming the Plan that has not been stayed or reversed.  Any waiver of a condition precedent to the Effective Date may be effected at any time, in writing, without notice or leave or order of the Bankruptcy Court.

### C.    Retention of Jurisdiction.

The Plan provides for a broad retention of jurisdiction by the Bankruptcy Court including, the following: (i) interpretation, implementation and enforcement of the Plan, and any contracts, instruments, releases, transactions and other agreements or documents created in connection therewith; (ii) determination of any and all motions, adversary proceedings (including Estate Litigation Claims), applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trust or any other party in interest after the Effective Date (to the extent such venue is selected by the moving party); (iii) to hear and determine any objections to Claims or motions for estimation or subordination thereof; (iv) to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146; (v) to hear and determine any matters that may arise in connection with the sales of the Debtors' Assets or any order of the Bankruptcy Court with respect thereto; and (vi) to hear and determine any actions or controversies by or against the Chapter 11 Trustee, the Debtors, the Plan Administrator, or the Creditors' Committee.

### D.    Chapter 11 Postconfirmation Reports And Final Decree.

(a)    <u>Postconfirmation Reports</u>.  Within 30 days following the end of the calendar quarter in which the Plan was confirmed, the Plan Administrator will file a postconfirmation report (a "**Quarterly Report**") in a format provided by the United States Trustee.  The Plan Administrator will file further Quarterly Reports within 30 days following the end of each subsequent calendar quarter until entry of a Final Decree, or unless otherwise ordered by the Bankruptcy Court.

(b)    <u>Service Of Reports</u>.  The Plan Administrator will serve a copy of each Quarterly Report upon the United States Trustee and any Creditor requesting notice of the Quarterly Report filed no later than the day upon which it is Filed with the Bankruptcy Court.

(c)    <u>Final Decree</u>.  After the Debtors' estates are fully administered, the Plan Administrator will file an application for a Final Decree, and shall serve the application on the United States Trustee, together with a proposed Final Decree.

## E.    Modification of Plan; Revocation or Withdrawal.

The Chapter 11 Trustee may amend or modify the Plan at any time.  The Chapter 11 Trustee may revoke or withdraw the Plan prior to the Confirmation Date, in which case the Plan will be null and void.  In such event, nothing contained in the Plan, this Disclosure Statement or other document filed in connection with the Plan will waive or release any claims by the Debtors, the Chapter 11 Trustee, or the Plan Administrator or any other entity or prejudice in any manner the rights of the Debtors, the Chapter 11 Trustee, or the Plan Administrator or any other entity in any further proceedings involving the Debtors, the Chapter 11 Trustee, or the Plan Administrator.

## F.    Terms of Existing Injunctions or Stays.

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date, and thereafter will be annulled without any action being taken by any party.

## G.    Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities.

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, certificates and other documents evidencing Claims against or Interests in any of the Debtors will be canceled and terminated, without any further act or action under any applicable agreement, law, regulations, order or rule.  On the Effective Date, any Indenture relating to any of the foregoing, including the 1996 Notes Indenture and the 2002 Notes Indenture, will be canceled; provided, however, that the Indentures will continue in effect solely for the purposes of allowing the 2002 Noteholders and the 1996 Notes Indenture Trustee to make any distributions to be made on account of the Indentures.  Notwithstanding any of the foregoing, all charging lien rights of the 1996 Notes Indenture Trustee are preserved and survive Plan confirmation, and provided further that nothing in the Plan will eliminate, impair or otherwise affect any charging lien of the 2002 Noteholders or the 1996 Notes Indenture Trustee under the 2002 Notes Indenture or the 1996 Notes Indenture to secure all pre-Effective Date and post-Effective Date amounts provided for therein.  The Bankruptcy Court will be the only forum with jurisdiction to resolve any disputes between or among the 2002 Noteholders and the 1996 Notes Indenture Trustee, subject to the parties' appellate rights with respect to any Bankruptcy Court order.  The Bankruptcy Court will retain jurisdiction over the 2002 Noteholders and the 1996 Notes Indenture Trustee to resolve any dispute which is commenced but not completed to Final Order before the Effective Date, or which is commenced after the Effective Date.  Nothing contained in this Article IX.G or otherwise contained in the Plan limits the right of any Creditor to enforce any Subordination Provision contained in the Indentures.

**H.    Section 1146 Exception.**

Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer, or exchange of any security under the Plan, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

**I.    Severability.**

The provisions of the Plan may not be severed unless such severance is agreed to by the Chapter 11 Trustee and such severance would constitute a permissible modification of the Plan pursuant to Bankruptcy Code Section 1127.

**J.    Governing Law.**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the Bankruptcy Code and other Federal Law and, to the extent not inconsistent therewith, the laws of the State of California.

**K.    Notices.**

All notices, requests and demands to or upon the Chapter 11 Trustee must be in writing, including by facsimile transmission, and delivered to counsel for the Chapter 11 Trustee at the following address.

Grant T. Stein, Esq.
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

**L.    Closing of Cases.**

The Plan Administrator will, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

**M.    Continuing Viability of Other Orders/Agreements.**

Except to the extent expressly modified by the Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the Debtors and their creditors shall continue in full force and effect.

DISCLOSURE STATEMENT DESCRIBING CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY
DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE

## ARTICLE X
## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

### A.    Confirmation Hearing.

By order of the Bankruptcy Court, the Plan confirmation hearing has been scheduled for [_____,] 2007 at [__:00 _.m.] (prevailing Pacific Time) before the Hon. Marilyn Morgan in the United States Bankruptcy Court for the Northern District of California, Courtroom 3070, 280 South First Street, San Jose, California.   The Plan confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Plan confirmation hearing or any adjournment thereof.

### B.    Requirements for Confirmation of the Plan.

At the Plan confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code Section 1129 are met.  Among the requirements for confirmation are that the Plan: (a) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of Holders of Claims and Interests impaired under the Plan.

THE CHAPTER 11 TRUSTEE BELIEVES THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN).  ACCORDINGLY, THE CHAPTER 11 TRUSTEE WILL DEMONSTRATE AT THE PLAN CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129(b) AS TO ANY NON-ACCEPTING CLASS.

## ARTICLE XI
## FINANCIAL INFORMATION

The Debtors (until appointment of the Chapter 11 Trustee, and the Chapter 11 Trustee after his appointment) have filed Statements of Financial Affairs and Schedules of Assets and Liabilities with the Bankruptcy Court as required by the Bankruptcy Code, some of which documents have been amended as described above.  Prior to the appointment of the Chapter 11 Trustee, the Debtors filed monthly operating reports required by the United States Trustee's operating guidelines.  Since the appointment of the Chapter 11 Trustee, the Chapter 11 Trustee has filed these monthly operating reports.  This financial information may be examined in the Bankruptcy Court Clerk's Office.

## ARTICLE XII
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include: (a) development of an alternative plan of liquidation; or (b) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

## ARTICLE XIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Interests. The Chapter 11 Trustee does not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Interests as a result of the confirmation of the Plan. All Holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

## ARTICLE XIV
## CONCLUSION AND RECOMMENDATION

The Chapter 11 Trustee believes that the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 2, 3, 4, 5, 6, and 7 to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth above so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [_____], 2007.

Dated: July 20, 2007

Respectfully Submitted:

By:  /s/ Dennis J. Connolly
     Dennis J. Connolly, Esq.
     Chapter 11 Trustee

# EXHIBIT 17

1   ROBERT A. GREENFIELD (039648)
    FRANK A. MEROLA (136934)
2   K. JOHN SHAFFER (153729)
    STUTMAN, TREISTER & GLATT PC
3   1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
4   Telephone:   (310) 228-5600
    Facsimile:    (310) 228-5788
5
    WILLIAM McGRANE (057767)
6   BERNARD S. GREENFIELD (066017)
    McGRANE GREENFIELD LLP
7   40 South Market Street, 7th Floor
    San Jose, CA 95113
8   Telephone:   (408) 995-5600
    Facsimile:    (408) 995-0308
9
    Counsel for SonicBlue Claims LLC
10

11          UNITED STATES BANKRUPTCY COURT
           NORTHERN DISTRICT OF CALIFORNIA
12                SAN JOSE DIVISION

| | |
|---|---|
| 13   In re: | Case No. 03-51775 |
| | Chapter 11 |
| 14   SONICBLUE INCORPORATED, a | |
| 15   Delaware corporation; DIAMOND | (Case Nos. 03-51775 through 03-51778 |
|      MULTIMEDIA SYSTEMS, INC., a | MM) (Jointly Administered) |
| 16   Delaware corporation; REPLAYTV, | |
|      INC., a Delaware corporation, and | OBJECTION OF SONICBLUE |
| 17   SENSORY SCIENCE | CLAIMS LLC TO DISCLOSURE |
|      CORPORATION, a Delaware | STATEMENT DESCRIBING JOINT |
| 18   corporation, | CHAPTER 11 PLAN OF |
| 19 | LIQUIDATION PROPOSED BY |
|      Debtors. | DENNIS J. CONNOLLY, |
| 20 | CHAPTER 11 TRUSTEE |
| 21 | |
| 22 | Date:       September 20, 2007 |
| | Time:      11:00 a.m. |
| 23 | Judge:     Hon. Marilyn Morgan |
| | Location: Courtroom 3070 |
| 24 |             280 South First Street |
| 25 |             San Jose, CA 95113 |

26

1

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     OBJECTIONS TO THE DISCLOSURE STATEMENT ............................. 1

    A.   The Disclosure Statement Fails To Provide Adequate Information
    About What Creditors Can Expect To Receive Under The Plan, And
    When Those Distributions Will Be Made. ............................................................. 1

    B.   The Plan Cannot Be Confirmed Because It Fails To Protect SB
    Claims' Rights As A Holder Of Senior Indebtedness. ........................................... 3

        1.   The VIA Claim Is Senior To The Claims Of The 2002 Noteholders ........ 3

        2.   The Plan Violates SB Claims' Rights As A Holder Of Senior
        Indebtedness, And Thus Is Unconfirmable On Its Face. ................................... 5

        3.   The 2002 Noteholders' Contentions That The VIA Claim Is Not Senior
        Indebtedness Are Without Merit ........................................................................ 7

            a.   The VIA Claim Is Senior Indebtedness Under The Terms Of The 2002
            Indenture. ..................................................................................................... 8

            b.   The Senior Status Of The VIA Claim Was Not Affected By Its
            Assignment To SB Claims ........................................................................ 16

            c.   The Purported Waiver Of Senior Indebtedness Status Is Of No Effect ..
            …......……………………………………………………………..19

                i.   The Purported Waiver Language Is Invalid Under The Terms of
                the 2002 Indenture Because VIA Acted In Good Faith. ........................... 22

                ii.   The Purported Waiver Language Is Invalid Under The Terms of
                the 2002 Indenture Because The Debtor Had No Power To Request It From
                VIA.………………………………………………..…………………..30

                iii.   The Purported Waiver Language In The Settlement Agreement Is
                Unenforceable Because It Was Obtained Without Proper Disclosure To The
                Court And Creditors. .................................................................................... 31

i

429961v1

1

iv.     This Court Is Free To Disregard The Invalid, Purported Waiver Language In The Settlement Agreement While Not Upsetting The Remainder Of The Agreement. ................................................................ 36

III.     CONCLUSION ........................................................................... 39

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

# TABLE OF AUTHORITIES

## Cases

*Accord Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286-89 (7th Cir. 2005) ..... 19

*Allhusen v. Caristo Const. Corp.*, 303 N.Y. 446, 452 (1952) ......................... 16, 18

*Armendariz v. Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 124 (2000) ........ 37

*Atkinson v. Sheet Metal Workers' Trust Funds*, 833 F.2d 864, 866 (9th Cir. 1987) .................................................................................................................. 13

*Broadfoot v. United Furniture Indus. (In re Nationwide Warehouse & Storage, LLC)*, 2005 Bankr. LEXIS 2690 (Bankr. N.D. Ga. July 29, 2005) .................... 35

*Cardarelli v. Scodek Constr. Corp.*, 304 A.D.2d 894, 895 (N.Y. App. Div. 2003) .................................................................................................................. 17

*Carnegia v. Ga. Higher Educ. Assistance Corp.*, 691 F.2d 482, 483 (11th Cir. 1982) ............................................................................................................... 19

*Chemical Bank v. Haskell*, 51 N.Y.2d 85, 91 (1980) ........................................... 24

*Derry Fin. N.V. v. Christiana Companies*, 797 F.2d 1210, 1214 (3d Cir. 1986) ... 13

*Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172-73 (9th Cir. 2004) ............................................................................................................... 34

*First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.*, 262 A.D.2d 106, 107 (N.Y. App. Div. 1999) ................................................................................................ 24

*George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 218 (1978) .. 13

*Hensley v. Caiettei*, 13 Cal. App. 4th 1165, 1175 (1993) ..................................... 23

*IMO Development Corp. v. Dow Corning Corp.*, 135 Cal. App. 3d 451, 458 (1982) .................................................................................................................. 36

*In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997) ........... 20

*In re County of Orange*, 179 B.R. 195, 202-03 (Bankr. C.D. Cal. 1995) .............. 20

*In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr. E.D. Va. 2001) ............................................................................................................... 20

*In re Frost Bros., Inc.*, 1992 U.S. Dist. LEXIS 18301, at *4 n.3 (S.D.N.Y. Dec. 2, 1992) ............................................................................................................... 30

*In re Lenox*, 902 F.2d 737, 740 (9th Cir. 1990) ................................................... 34

*In re Lintz W. Side Lumber, Inc.*, 655 F.2d 786, 789 (7th Cir. 1981) .................... 35

*In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ..................... 3

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

*In re Maxwell Newspaper, Inc.,* 179 B.R. 549 (S.D.N.Y. 1994) ........................... 35

*In re Stralem*, 303 A.D.2d 120, 122 (N.Y. App. Div. 2003) ................................... 17

*In re UAL Corp.*, 299 B.R. 509, 522 (Bankr. N.D. Ill. 2003) ............................... 34

*In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003) ..... 32

*Keene v. Harling*, 61 Cal. 2d 318, 320-21 (1964) ................................................... 37

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ............................................................................................................... 4

*Latimer v. Veader*, 20 A.D. 418, 427-28  (N.Y. App. Div. 1897) ........................... 4

*Levander v. Prober (In re Levander),* 180 F.3d 1114, 1119 (9th Cir. 1999) ......... 35

*Marrama v. Citizens Bank,* 127 S. Ct. 1105, 1111-12 (2007)................................. 34

*Martinez v. Master Protection Corp.*, 118 Cal. App. 4th 107, 116 (2004) ........... 38

*New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138 (B.A.P. 9th Cir. 2007) ....................................................................................................................... 18

*People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 56 (Ill. 1991)........... 4

*Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997) ............................................................................................................. 16, 18

*Public Utility Dist. No. 1 v. FERC*, 471 F.3d 1053, 1078 n.23 (9th Cir. 2006) ..... 12

*Ruehle v. Educ. Credit Mgmt. Corp. (In re Ruehle)*, 307 B.R. 28, 33 (B.A.P. 6th Cir. 2004) ............................................................................................................. 34

*Sallie Mae Servicing Corp. v. Ransom (In re Ransom)*, 336 B.R. 790 (B.A.P. 9th Cir. 2005) ............................................................................................................. 34

*Simmons v. Cal. Inst. of Tech.*, 34 Cal. 2d 264, 275 (1949)................................... 37

*Waldman v. Riedinger*, 423 F.3d 145 (2d Cir. 2005) ............................................. 14

iv

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1

**Statutes**

2    Bankruptcy Code Section 105..................................................................................34

3    Bankruptcy Code section 510(a)..............................................................................6

4    Bankruptcy Code Section 1125...............................................................................3

5    Bankruptcy Rule 3001(e)(2)....................................................................................19

     Cal. Civil Code § 1599...........................................................................................37

6    Cal. Civil Code § 1856(a).......................................................................................38

7    Federal Rules of Civil Procedure 60(b)..................................................................34

8    N.Y. U.C.C. Law § 1-201(19).................................................................................23

9

**Other Authorities**

10    7 Collier on Bankruptcy ¶ 1125.02[1] (15th ed. rev. 2005)....................................2

11    Black's Law Dictionary 24 (7th ed. 1999)..............................................................23

12    Black's Law Dictionary 691 (5th ed. 1979).............................................................4

13    Black's Law Dictionary 771 (7th ed. 1999).............................................................4

      Federal Rule of Civil Procedure 60.......................................................................33

14    Uniform Commercial Code section 5-108(i)(1).....................................................16

15    Webster's Third International Dictionary (Unabridged) (Merriam-Webster Inc.

16       1993 ed.) ............................................................................................................4, 13

17    Witkin, Summary of California Law (10th ed. 2005), Contracts § 694 at pp. 781-
         82 ..........................................................................................................................31

18

19

20

21

22

23

24

25

26

v

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

# I.    INTRODUCTION

The Chapter 11 Trustee is generally to be commended for having moved quickly to propose his "Joint Chapter 11 Plan of Liquidation [etc.]" (the "Plan"). SonicBlue Claims LLC ("SB Claims") respectfully submits, however, that the Plan's treatment of its claim violates Bankruptcy Code section 510(a), in that the Plan fails properly to recognize – or even to reserve for – SB Claims' rights as the holder of "Senior Indebtedness" vis-à-vis the holders of the 2002 Notes: Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively, the "2002 Noteholders").  SB Claims also is concerned that the proposed Disclosure Statement does not provide sufficient information as to what distribution amounts creditors can expect to receive, and when they might receive them.

## II.    OBJECTIONS TO THE DISCLOSURE STATEMENT

**A.    The Disclosure Statement Fails To Provide Adequate Information About What Creditors Can Expect To Receive Under The Plan, And When Those Distributions Will Be Made.**

The Trustee currently has in his possession more than $80 million in cash. Under these circumstances, there should be a significant amount of cash available for distribution to creditors immediately upon confirmation of a plan.  This is true even if large reserves are maintained for disputed claims and future litigation.

The problem is that the Trustee's proposed Disclosure Statement tells creditors very little about how much cash they will receive, and when they will receive it.  In particular, the Disclosure Statement says that creditors will receive their pro rata share of the "Liquidation Amount."[1]  The phrase "Liquidation Amount," however, is not even defined in the Disclosure Statement.  The definition in the Plan does not provide much insight either, since "Liquidation

---

[1]    *See, e.g.*, the summary distribution chart in Article I.B of the Disclosure Statement.

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1   Amount" is defined as all assets of the estate less priority and administrative

2   expenses and *further less the "funding of the Estate Reserve."[2]*

3        The "Estate Reserve" is a complete unknown.  Although the Disclosure

4   Statement summarizes it in Article VII.E.3, the Disclosure Statement says nothing

5   about (a) how big the Estate Reserve is expected to be, (b) how the amount will be

6   calculated, and (c) how the amount will be reduced over time.  All that is said is

7   that the Plan Administrator (who will be the current Trustee) will determine the

8   amount of the Estate Reserve *after* the Plan is confirmed.  Obviously, the amount

9   of the Estate Reserve is going to have a significant impact upon what creditors

10  receive, and how quickly they receive that amount.

11       A "disclosure statement must clearly and succinctly inform the average

12  unsecured creditor what it is going to get, when it is going to get it, and what

13  contingencies there are to getting its distribution."  7 Collier on Bankruptcy

14  ¶ 1125.02[1] (15th ed. rev. 2005).  The draft Disclosure Statement contains blank

15  spaces in the summary table at its beginning, which, when filled in, presumably

16  will provide creditors with the Trustee's estimate as to what they ultimately may

17  receive sometime in the future.  Even that, however, will not provide creditors

18  with sufficient information as to how much of that distribution they can expect to

19  receive now, and how much they will receive in the future (and how long they will

20  have to wait).  At the least, the Trustee should provide creditors with some

21  estimate as to what the post-effective date interim distribution will be, and a firm

22  date as to by when that interim distribution will occur.

23       Given the complete uncertainty as to what the Estate Reserve will be

24  following the Plan's effective date, and how that Estate Reserve may be reduced

25

26  ─────────────────────

   [2]   *See* Plan Article I.A (definition of "Liquidation Amount") (emphasis added).

2

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    over time, the Disclosure Statement as currently drafted does not provide the

2    "adequate information" required by section 1125 of the Bankruptcy Code.

3    **B.    The Plan Cannot Be Confirmed Because It Fails To Protect SB**
     **Claims' Rights As A Holder Of Senior Indebtedness.**
4

5        Although confirmation-related objections are normally not resolved at a

6    disclosure statement hearing, there is an important exception – when a plan of

7    reorganization cannot be confirmed on its face.  "It is now well accepted that a

8    court may disapprove of a disclosure statement, even if it provides adequate

9    information about a proposed plan, if the plan could not possibly be confirmed."

10   *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999).

11       SB Claims is the assignee of a $12.5 million claim (the "VIA Claim")

12   previously held by VIA Technologies, Inc. ("VIA").  The VIA Claim constitutes

13   "Senior Indebtedness" under the Indenture that governs the 2002 Notes (the "2002

14   Indenture").[3]  The Plan, however, violates SB Claims' rights as a holder of Senior

15   Indebtedness by permitting millions of dollars in distributions to be made to the

16   subordinated 2002 Noteholders *before* the senior VIA Claim has been paid in full.

17   Bankruptcy Code section 510(a) requires that subordination rights be preserved

18   and enforced in bankruptcy.  The Plan thus cannot be confirmed, because it fails to

19   enforce SB Claims' rights as a holder of Senior Indebtedness under the plain terms

20   of the 2002 Indenture.

21       **1.    The VIA Claim Is Senior To The Claims Of The 2002 Noteholders.**

22       The 2002 Indenture provides that the 2002 Noteholders' claims are

23   "subordinated and subject in right of payment to the prior payment in full of all

24   _____

25   [3]   A copy of the April 22, 2002 Indenture among the 2002 Noteholders and the Debtor,
          SONICBlue, Inc., was previously attached to the 2002 Noteholders' Motion to
26        Dismiss the adversary proceeding [Docket No. 12 in Adversary Proceeding No. 07-
          05082] as Exhibit "C."

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    Senior Indebtedness, whether outstanding at the date of this Indenture or thereafter

2    incurred."  2002 Indenture at § 4.1.  "Senior Indebtedness" includes "All

3    indebtedness of the Company due and owing to Via Technologies, Inc. in an

4    aggregate principal amount not to exceed $15,000,000 or the equivalent

5    thereof . . . (the 'Via Indebtedness')," plus interest thereon.  2002 Indenture at § 1.1

6    (subsection (g) of the definition of "Senior Indebtedness").

7        The word "indebtedness" (with a lower-case "i") is not defined in the 2002

8    Indenture.  Thus, under New York law (which governs the 2002 Indenture),[4] the

9    ordinary, plain language meaning of "indebtedness" must be used.  *LaSalle Bank*

10   *Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In

11   interpreting a contract under New York law, words and phrases . . . should be

12   given their plain meaning . . . ") (quotations omitted).  The ordinary, plain

13   language meaning of "indebtedness" is "something that is owed."  *See* Webster's

14   Third International Dictionary (Unabridged) (Merriam-Webster Inc. 1993 ed.); *see*

15   *also, e.g.*, *People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 56 (Ill.

16   1991) ("'[I]n a broad sense and in common understanding,' the term 'indebtedness'

17   may mean 'anything that is due and owing.'") (quoting Black's Law Dictionary 691

18   (5th ed. 1979)); *Latimer v. Veader*, 20 A.D. 418, 427-28  (N.Y. App. Div. 1897)

19   ("indebtedness" as "used in its ordinary significance" means "any liability");

20   Black's Law Dictionary 771 (7th ed. 1999) (defining "indebtedness" as "**1.** The

21   condition or state of owing money.  **2.** Something owed; a debt.").[5]  Accordingly,

22   under the plain terms of the 2002 Indenture, any amount owed to VIA, in a

23

---

24   [4]   2002 Indenture § 15.4.

25   [5]   The Bankruptcy Code similarly defines "debt" broadly as "liability on a claim," and
     "claim" as including any "right to payment, whether or not such right is reduced to
26   judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
     undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. §§ 101(12) & (5)(A).

4

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1   principal amount not to exceed $15 million, plus interest thereon, is "Senior

2   Indebtedness."

3        **2.      The Plan Violates SB Claims' Rights As A Holder Of Senior
               Indebtedness, And Thus Is Unconfirmable On Its Face.**
4

5        The Trustee's Plan presumes that there are no claims senior to those of the

6   2002 Noteholders, notwithstanding SB Claims' position as the assignee of the VIA

7   Claim.  Among other things, the Trustee's Plan proposes that all distributions that

8   would otherwise be made to the 1996 Noteholders[6] (who are themselves

9   subordinated to the 2002 Noteholders) be turned over to the 2002 Noteholders,

10  until the 2002 Noteholders are paid in full.  *See* Plan Art. III.C.3(b) ("all

11  distributions that would otherwise be made to the Holders of Class 5 Allowed

12  Claims on account of the 1996 Note Claims up to the Subordination Payment

13  Amount will be paid directly to Holders of Class 3 Claims [the 2002 Noteholders]

14  . . . ."); *see also* Art. III.C.5(b) (providing the same in the treatment section for the

15  1996 Noteholders in Class 5).

16       The Trustee's Plan is in direct contravention of SB Claims' rights as a

17  holder of "Senior Indebtedness" under the 2002 Indenture.  Section 4.2 of the 2002

18  Indenture makes clear that "no payment shall be made by the Company [the

19  Debtor], ***directly or indirectly***, with respect to principal of, premium, if any, or

20  interest on the [2002] Debentures," until the Senior Indebtedness is paid in full

21  (emphasis added).  Moreover:

22       ***Upon any payment by the Company, or distribution of assets of the
         Company*** *of any kind or character*, whether in cash, property or
23       securities, ***to creditors upon any dissolution or winding-up or total
         or partial liquidation or reorganization of the Company***, whether
24       voluntary or involuntary ***or in bankruptcy***, insolvency, receivership

25

26  _____
    [6]  The 1996 Noteholders are the holders of the 5-3/4% Convertible Subordinated Notes
         due 2003, which are treated in Class 5 under the Trustee's proposed Plan.

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1
2
3
4

> or other proceedings (other than as permitted in Article XI), ***all amounts due or to become due upon all Senior Indebtedness shall first be paid in full***, or payment thereof provided for in money in accordance with its terms, ***before any payment is made on account of the principal (and premium, if any) or interest on the [2002] Debentures;***

5

(emphasis added).  Section 4.2 further provides (with emphasis again added):

6
7
8
9
10
11
12
13
14
15

> and upon any such dissolution or winding-up or liquidation or reorganization or bankruptcy, insolvency, receivership or other such proceedings, ***any payment by the Company, or distribution of assets of the Company of any kind or character***, whether in cash, property or securities, ***to which the holders of the Debentures under this Indenture would be entitled***, except for the provision of this Article IV, ***shall*** (except as aforesaid) ***be paid by the*** Company or by any receiver, ***trustee in bankruptcy***, liquidating trustee, agent or other person making such payment or distribution, or by the holders of the Debentures under this Indenture if received by them, ***directly to the holders of Senior Indebtedness*** . . . . to the extent necessary to pay all Senior Indebtedness in full after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness, ***before any payment or distribution is made to the holders of the Debentures under this Indenture.***

16
17
18

In short, paying the 2002 Noteholders, even indirectly through payments that would otherwise go to the 1996 Noteholders, is prohibited by the 2002 Indenture, unless and until all Senior Indebtedness (including the VIA Claim) is paid in full.

19
20
21
22
23

The Trustee's proposed Plan separately classifies and treats the 2002 Noteholders and the 1996 Noteholders, for the simple reason that their respective rights are distinct.  The 1996 Noteholders' claims are subordinated to those of the 2002 Noteholders.  Under this same reasoning, however, the Trustee's Plan should also recognize SB Claims' senior rights to those of the 2002 Noteholders.

24
25
26

Bankruptcy Code section 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable law."  Congress has made clear that section 510(a) "requires the court to enforce subordination agreements."  H.R. No. 95-595, 95th

6

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1  Cong., 1st Sess. 359 (1977).  Accordingly, the Trustee's Plan cannot be confirmed,

2  because it fails to respect SB Claims' rights as a holder of Senior Indebtedness

3  under the 2002 Indenture.

4      3.      **The 2002 Noteholders' Contentions That The VIA Claim Is Not**
            **Senior Indebtedness Are Without Merit.**

5

6      The 2002 Noteholders strenuously dispute that the VIA Claim is "Senior

7  Indebtedness."  Accordingly, on May 30, 2007, SB Claims commenced an

8  adversary proceeding to refute the 2002 Noteholders' assertions, and to establish

9  definitively that the VIA Claim is Senior Indebtedness.[7]  The 2002 Noteholders

10  have moved to dismiss that adversary proceeding, and a hearing on the 2002

11  Noteholders' motion has been scheduled for September 24, 2007.  The Trustee's

12  filing of his Plan, however, has brought this issue directly before the Court now,

13  because the Plan violates SB Claims' rights as a holder of Senior Indebtedness.

14      The 2002 Noteholders have raised three principal arguments as to why they

15  contend that the VIA Claim is not Senior Indebtedness: (1) the VIA Claim is not

16  Senior Indebtedness under the terms of the 2002 Indenture; (2) even if the VIA

17  Claim was Senior Indebtedness when held by VIA, it ceased to be Senior

18  Indebtedness when VIA assigned its claim to SB Claims; and (3) even if the VIA

19  Claim was Senior Indebtedness, the Settlement Agreement entered into among

20  VIA, the Debtor, and Intel Corporation ("Intel") prevents VIA (and its successor,

21  SB Claims) from asserting Senior Indebtedness status.

22      The sections that follow show that each of the 2002 Noteholders'

23  contentions is wholly without merit.[8]

24  ───────────────────────
    [7]   Adversary Proceeding No. 07-05082.

25  [8]   SB Claims addresses here only the three principal arguments made by the 2002
26      Noteholders in support of their contention the VIA Claim is not Senior Indebtedness,
        as set forth in their arguments in support of the Motion to Dismiss the Second and
        Third Claims for Relief in the adversary proceeding.  SB Claims offers these

7

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1          **a.**    **The VIA Claim Is Senior Indebtedness Under The Terms**
2                 **Of The 2002 Indenture.**

3        The 2002 Noteholders have asserted that the VIA Claim is not "Senior

4  Indebtedness" because, they contend, "Senior Indebtedness" can only consist of

5  obligations "for borrowed money or evidenced by bonds, debentures, notes or

6  other similar instruments."  The basis for the 2002 Noteholders' assertion is the

7  definition of "Indebtedness" (with a capital "I") in section 1.1 of the 2002

8  Indenture, which provides that "'Indebtedness' shall have the meaning specified in

9  Section 7.1(e)" of the 2002 Indenture.  Section 7.1(e), in turn, governs the Debtor's

10  "Events of Default" under the 2002 Indenture, and provides that it would be an

11  Event of Default if there were a:

12          (e)     failure by the Company or any Significant Subsidiary
13  to make any payment when due and payable, including any
applicable grace period, in respect of indebtedness, which term as
14  used herein means obligations (other than the Debentures or non-
recourse obligations) of, or guaranteed or assumed by, the Company,
15  or any Significant Subsidiary, for borrowed money or evidenced by
bonds, debentures, notes or other similar instruments
16  ("Indebtedness") in an amount in excess of $15,000,000 or the
equivalent thereof in any other currency or composite currency and
17  such failure shall have continued for thirty (30) days after written
notice thereof shall have been given to the Company by any holder
18  of Debentures . . . .

19

20  Thus, according to the 2002 Noteholders, "Senior Indebtedness" can only consist

21  of obligations for "borrowed money" or otherwise "evidenced by bonds,

22  debentures, notes or other similar instruments."

23

24  _____

25      responses for illustrative purposes only, without prejudice, and with a full reservation
of all rights to advance additional arguments supporting the claims pled in the
26  adversary proceeding.  Most notably, in the interest of brevity, SB Claims does not
outline here its arguments in support of its First Claim for Relief for Equitable
Subordination.

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    The fundamental problem with the 2002 Noteholders' argument is that the

2    VIA Senior Indebtedness provision does not incorporate the defined term

3    "Indebtedness."  Rather, it uses the generic, lower case "indebtedness", which is

4    not a defined term in the 2002 Indenture.  As discussed above, section 1.1 of the

5    2002 Indenture defines "Senior Indebtedness" as including "All **indebtedness** of

6    the Company due and owing to Via Technologies, Inc. in an aggregate principal

7    amount not to exceed $15,000,000 or the equivalent thereof . . . (the 'Via

8    Indebtedness')," plus interest thereon.  2002 Indenture at § 1.1 (subsection (g) of

9    the definition of "Senior Indebtedness") (emphasis added).

10    *Is this just a typographical error?*  No, it is not.  Both the text of the 2002

11    Indenture and the applicable law show that it is not – the 2002 Indenture

12    purposefully distinguishes between capitalized and lower case terms.

13    For example, section 7.1(e) – the precise section upon which all of the 2002

14    Noteholders' arguments rest – provides that "Indebtedness" (with a capital "I")

15    means:

16    obligations (other than the **_Debentures_** or non-recourse obligations)
    of, or guaranteed or assumed by, the Company, or any Significant
17    Subsidiary, for borrowed money or evidenced by bonds, **_debentures_**,
    notes or other similar instruments . . .  (emphasis added).
18

19    The term "Debentures" (with a capital "D") means the Debentures issued

20    pursuant to the 2002 Indenture.  *See* 2002 Indenture § 1.1 ("'Debenture' or

21    'Debentures' shall mean any debenture or debentures, as the case may be, issued

22    and delivered under this Indenture.").  The reference to "debentures" (with a lower

23    case "d") in section 7.1(e), however, clearly means something different than

24    "Debentures" (with a capital "D").  Otherwise, the definition of "Indebtedness" in

25    section 7.1(e) would be circular and nonsensical – it would be "Indebtedness"

26    means "obligations (other than the [Debentures/debentures] . . . ) . . . evidenced by

9

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    . . . [Debentures/debentures] . . . ."  Thus clearly, "debentures" (lower case "d") is a

2    broader term under the 2002 Indenture than "Debentures" (with a capital "D").

3         Moreover, the definition of "Senior Indebtedness" expressly excludes

4    "indebtedness [with a lower case 'i'] of the Company evidenced by the Debentures

5    . . . ."  2002 Indenture § 1.1 (subsection (h)(iii) of the definition).  As noted in the

6    preceding paragraph, however, the term "Indebtedness" (with a capital "I") does

7    not include the Debentures.  *Id.* § 7.1(e) ("Indebtedness" (with a capital "I")

8    "means obligations (other than the Debentures . . . ) . . . ").  Thus, the term

9    "indebtedness" (with a lower case "i") *must* be a broader term than "Indebtedness"

10   (with a capital "I"), since there is no such thing as "Indebtedness [with a capital 'I']

11   of the Company evidenced by the Debentures."

12        The same issue arises in section 12.1 of the 2002 Indenture, which also

13   refers to "indebtedness" (with a lower case "i") represented by the Debentures.

14   Since "Indebtedness" (with a capital "I") expressly excludes the Debentures,

15   "indebtedness" (with a lower case "i") must mean something more.  The term

16   "indebtedness" can only be given its ordinary, plain meaning – any debt.

17        By comparison, the capitalized, defined term "Indebtedness" is used  in the

18   definitions of "Congress Facility" and "Subordinated Indebtedness."  *See id.* § 1.1.

19   Indeed, both the Congress Facility and the Subordinated Indebtedness are, in fact,

20   "Indebtedness" as that capitalized term is defined (they both were obligations for

21   borrowed money and/or evidenced by notes or other similar instruments).  The

22   capitalized term "Indebtedness" is not used, however, in the definition of "Via

23   Indebtedness" – the lower case term "indebtedness" is.

24        There are a number of other terms that, when capitalized, are defined terms

25   in the 2002 Indenture, but when in the lower case the terms clearly are used in the

26   broader, generic sense:

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1     1.    The capitalized term "Securities" has a very limited definition in sections 1.1 and 13.5(d) of the 2002 Indenture – specifically, "Securities" are limited to certain types of distributions that might be made to "all holders of its Common Stock shares of any class of capital stock of the Company . . . ."  The lower case term "securities," however, is used in the generic sense throughout the 2002 Indenture, including in, among other places, (a) the definitions of "Affiliate," "Change of Control," "Senior Indebtedness," and "Termination of Trading"; (b) the subordination provisions in sections 4.2, 4.3, and 4.6; (c) the redemption provisions in section 5.7; and (d) the default provisions in section 7.2.  The terms "Securities" and "securities" clearly do not mean the same thing, with the lower case term "securities" being the broader, generic term.

2.    Section 1.1 of the 2002 Indenture defines "Maturity Date" as September 1, 2005, the date upon which the 2002 Indenture was to mature.  Sections 8.1 and 8.2, however, refer to the "maturity date" (lower case "m" and "d") of the 1996 Notes, which was in 2003 and obviously not the same as the capitalized "Maturity Date" (in 2005) of the 2002 Notes.

3.    Section 1.1 of the 2002 Indenture defines the word "Company" to mean "SONICBLUE, Incorporated," yet the lower case term "company" is used in the 2002 Indenture to refer to companies generally.  *See* 2002 Indenture § 1.1 (defining "Person or person" to include, among other things, a "limited liability company" or a "joint stock company").  The terms "Company" and "company" clearly do not mean the same thing, with the lower case term "company" being the broader, generic term.

4.    Section 1.1 of the 2002 Indenture defines "Indenture" as, specifically, the 2002 Indenture.  Section 4.2, however, refers generically to "any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued . . . ."  Again, the terms "Indenture" and "indenture" do not mean the same thing, since an "indenture" evidencing indebtedness that is senior to the 2002 Notes obviously could not include the 2002 Indenture.

---

11

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

5.  Sections 1.1 and 7.1(i) of the 2002 Indenture define "Option Agreement" as the option that was granted to the 2002 Noteholders contemporaneously with the issuance of the 2002 Indenture, while section 5.7 refers generically to any "option agreement" that may have been granted to an employee or management to acquire stock.

A review of section 1.1 of the 2002 Indenture (titled "DEFINITIONS") further shows that in most instances, when the drafters of the document wanted a particular word to serve as a defined term, they capitalized that word.  There are, however, three definitions in section 1.1 that are not capitalized – "beneficial owner," "fair market value," and "non-electing shares."  When these same, lower case definitions are used throughout the 2002 Indenture, they indeed are *never* capitalized.  It is thus clear that the drafters of the 2002 Indenture knew how to distinguish between capitalized and lower case letters.

There are also three other definitions for which the drafters decided that either the capitalized or lower case term would suffice – "'Debenture holder' or 'holder'", "'Default' or 'default'", and "'Person' or 'person'".  The fact that the drafters decided with respect to three – and only three – out of sixty-nine definitions that either the upper or lower case term would apply further shows that the drafters understood the distinction between other upper and lower case terms. Moreover, it clearly shows that, when the drafters wanted either the upper or lower case term to be defined, they knew how to so draft the indenture.  As the 2002 Noteholders point out themselves in their pending Motion to Dismiss in the adversary proceeding, "the inclusion of one thing implies the exclusion of all others."  *Public Utility Dist. No. 1 v. FERC*, 471 F.3d 1053, 1078 n.23 (9th Cir. 2006) (cited in 2002 Noteholders' Motion to Dismiss at 22).[9]  Had it been the

---

[9]  *See* Motion to Dismiss [Docket No. 12] in Adversary Proceeding No. 07-05082.

12

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1  intention of the drafters that, in all other cases, capitalized and lower case terms

2  could be used interchangeably, "surely no problem of draftsmanship would have

3  stood in the way of its being spelled out."  *George Backer Mgmt. Corp. v. Acme*

4  *Quilting Co.*, 46 N.Y.2d 211, 218 (1978).

5      It is also significant that ***all*** defined terms in the 2002 Indenture are in

6  quotation marks.  This indicates that they had to be used exactly as quoted in order

7  to be presumed to have been used exactly as previously defined.

8      The courts likewise have recognized the significance of capitalizing

9  definitions in agreements, and that lower case, undefined terms should generally

10  be given their ordinary, dictionary meanings.  *See, e.g., Atkinson v. Sheet Metal*

11  *Workers' Trust Funds*, 833 F.2d 864, 866 (9th Cir. 1987) (rejecting interpretation

12  of benefit plan "because it does not distinguish the special definitions given by the

13  Plan to 'Individual Employer' and 'Employee' (capital I and E) from the Plan's

14  traditional use of the terms 'employer' and 'employee' (lower case e)"); *Derry Fin.*

15  *N.V. v. Christiana Companies*, 797 F.2d 1210, 1214 (3d Cir. 1986) (citing the

16  "***obvious distinction***" ***between*** "the word 'default' in the exculpatory clause in

17  **lower case letters** whereas the term 'Event of Default', which is clearly a term of

18  art, is always ***capitalized***") (emphasis added).

19      In *Derry*, the Third Circuit held that it was "clear that when the parties

20  intended to create a term of art or to incorporate specific definitions from other

21  documents, they capitalized the referencing term and then utilized the same term

22  in the referenced document. . . .  ***The incorporation could not be clearer***."  797

23  F.2d at 1214 (emphasis added).  Here, by using the lower case term "indebtedness"

24  in the definition of VIA Senior Indebtedness, the 2002 Indenture used that term in

25  the common English language sense, which is "something that is owed."  *See*

26  Webster's Third International Dictionary (Unabridged) (Merriam-Webster Inc.

1993 ed.).

---

13

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    Similarly, in *Waldman v. Riedinger*, 423 F.3d 145 (2d Cir. 2005), the

2  Second Circuit – applying New York law, which governs the 2002 Indenture –

3  held that a settlement agreement's use of the lower case term "common stock"

4  should be read as incorporating the ordinary, dictionary definition of that word.  In

5  rejecting an argument that "common stock" should be limited to the narrower,

6  capitalized definition of "Common Stock" in a related document, the Second

7  Circuit held:

8       While the Settlement Agreement consistently refers to "common
        stock" in lower-case letters, the class of securities known as
9       "Common Stock," as distinguished from "Class B Common Stock,"
        is capitalized throughout the corporate documents.  In giving weight
10      to the corporate documents, the district court overlooked this
        disparity . . . . .
11

12  423 F.3d at 150; *see also id*. at 151 (applying "the general rubric of lower-case

13  'common stock,' the precise capitalization used in the Settlement Agreement").

14      The interpretation of the 2002 Indenture proposed by the 2002 Noteholders

15  would greatly strain – if not break altogether – the definition of "Senior

16  Indebtedness."  Subsection (h) of the definition, for example, makes clear that:

17      "Senior Indebtedness" shall not include . . . indebtedness, other than
        the Via Indebtedness, for trade payables or constituting the deferred
18      purchase price of assets or services incurred in the ordinary course of
        business . . . .
19

20  This exclusion would make no sense unless "indebtedness" (with a lower case "i")

21  – and in particular Via Indebtedness – could include ordinary course obligations

22  for either (or both) "trade payables" or "the deferred purchase price of assets or

23  services."  As noted, however, the 2002 Noteholders insist that "indebtedness"

24  means only obligations "for money borrowed or evidenced by bonds, debentures,

25  notes or other similar instruments."  It strains the imagination to believe that the

26  drafters of the 2002 Indenture intended the definition of "indebtedness" to be as

---

14

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    narrow as the 2002 Noteholders say, and yet felt the need to draft an exception for

2    those rare instances in which an ordinary course trade payable might be evidenced

3    by a note.[10]

4         Furthermore, what would be the purpose of carving out "Via Indebtedness"

5    from subsection (h) unless ordinary course trade payables owed to VIA would, in

6    fact, be Senior Indebtedness?   The 2002 Noteholders contend that "Via

7    Indebtedness" was supposed to refer only to a loan that VIA never actually made

8    to the Debtor.[11]  If so, then why would subsection (h) have to carve out ordinary

9    course trade payables?  The 2002 Noteholders cannot seriously suggest that the

10   proposed loan from VIA would be considered an ordinary course trade payable or

11   deferred purchase price of assets or services.  The fact is that Via Indebtedness

12   included *any* indebtedness owing to VIA, of any kind, including ordinary course

13   obligations, which is why (i) the ordinary course exception in subsection (h) made

14   perfect sense when that exception was drafted, and (ii) the 2002 Noteholders'

15   after-the-fact attempt to redraft the meaning of the 2002 Indenture's terms makes

16   no sense today.

17        Subsection (b) of the definition of "Senior Indebtedness" also grants Senior

18   Indebtedness status to "All indebtedness of the Company due and owing with

19   respect to letters of credit (including, but not limited to, reimbursement obligations

20   with respect thereto) issued by Qualified Lenders."  Under the 2002 Noteholders'

21   construction of "indebtedness," however, this would limit this category of Senior

22   Indebtedness to letter of credit obligations "for borrowed money or evidenced by

23   bonds, debentures, notes or other similar instruments."  There simply is no logical

---

24   [10]  This Court can take judicial notice from its own experience in applying the "ordinary
25        course" defense in section 547(c)(2) of how rarely ordinary course trade payables are
          evidenced by a note (as opposed to by an invoice, contract, sales receipt, bill, journal
26        entry, or no paper at all).

     [11]  *See* pp. 23, 28-29, *infra*.

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    reason, however, why it should matter whether the letter of credit obligation was

2    evidenced by a bond, debenture, or note, as opposed to a standard reimbursement

3    agreement (or, for that matter, an issuer's statutory right to reimbursement under

4    Uniform Commercial Code section 5-108(i)(1)).

5           Finally, as discussed above, the definition of "Senior Indebtedness"

6    expressly refers to "indebtedness [with a lower case "i"] of the Company

7    evidenced by the Debentures . . . ."  Since "Indebtedness" (with a capital "I")

8    expressly excludes the Debentures, *see* 2002 Indenture § 7.1(e), "indebtedness"

9    with a lower case "i" *must* be a broader, generic term that refers to any type of debt

10   (including the Debentures).

11          Accordingly, the 2002 Indenture plainly uses the term "indebtedness" in the

12   ordinary sense of that word – any debt that is owing.  Because VIA's right to

13   Senior Indebtedness status is based upon "any indebtedness" owing to VIA up to

14   $15 million, plus interest, the VIA Claim is, and has always been, "Senior

15   Indebtedness" under the 2002 Indenture.

16         **b.**    **The Senior Status Of The VIA Claim Was Not Affected**
17                 **By Its Assignment To SB Claims.**

18          The 2002 Noteholders assert that VIA could not assign its Senior

19   Indebtedness status to SB Claims, since Senior Indebtedness only included

20   "indebtedness of the Company due and owing to [VIA]."  The 2002 Noteholders

21   ignore the fact, however, that contractual rights are freely assignable under New

22   York law (which governs the 2002 Indenture) absent an ***express prohibition*** to the

23   contrary.  *Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 856

24   (2d Cir. 1997) (holding that, "[u]nder New York law, only express limitations on

25   assignability are enforceable"); *see also Allhusen v. Caristo Const. Corp.*, 303

26   N.Y. 446, 452 (1952) (holding that "parties may limit the freedom of alienation of

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    rights and prohibit the assignment" only when "clear language is used, and the

2    "plainest words . . . have been chosen") (internal quotations omitted); *In re*

3    *Stralem*, 303 A.D.2d 120, 122 (N.Y. App. Div. 2003) ("Under New York law,

4    contracts are freely assignable absent language which expressly prohibits

5    assignment."); *Cardarelli v. Scodek Constr. Corp.*, 304 A.D.2d 894, 895 (N.Y.

6    App. Div. 2003) ("As a general rule, a guarantee is assignable absent express

7    language in the document to the contrary."); N.Y. Gen. Oblig. § 13-101 (2007)

8    (providing that "Any claim or demand can be transferred . . . ").[12]

9        The 2002 Noteholders cannot identify any express prohibition on the

10    assignment of VIA's rights under the 2002 Indenture – indeed, no such express

11    prohibition exists.  The section of the 2002 Indenture governing assignment –

12    section 15.12 – merely imposes certain conditions upon the 2002 Noteholders to

13    effectuate an assignment.  Section 15.12 imposes no restrictions whatsoever on

14    holders of Senior Indebtedness, however.  Given an absence of an express

15    prohibition on assignment, the 2002 Noteholders must try to rely upon a no-third-

16    party-beneficiaries provision, which states:

17        Benefits of Indenture.  Nothing in this Indenture or in the
         Debentures, expressed or implied, shall give to any person, other
18       than the parties hereto and their successors hereunder and the
         holders of Senior Indebtedness, any benefit or any legal or equitable
19       right, remedy or claim under this Indenture.

20

21    2002 Indenture § 15.9.

22        The 2002 Noteholders argue that the indenture recognizes the rights of

23    successors to the parties to the indenture, but gives no rights to successors of

24    holders of Senior Indebtedness.  Citing the doctrine of *expressio unius est exclusio*

25

26    [12]  There are limited statutory exceptions, such as personal injury claims, that are not
         relevant here.

17

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    *alterius* (the inclusion of one thing implies the exclusion of all others), the 2002

2    Noteholders contend that holders of Senior Indebtedness could not assign their

3    rights.

4         The 2002 Noteholders' argument is directly contrary to New York law

5    which, as noted, requires "clear language" and the "plainest words" in order to

6    "limit the freedom of alienation of rights and prohibit the assignment." *Allhusen*,

7    303 N.Y. at 452.  Nothing in this section (or anywhere else in the 2002 Indenture,

8    for that matter) provides that holders of Senior Indebtedness cannot assign their

9    rights, or that the population of Senior Indebtedness holders must remain fixed for

10   all time.  To the contrary, the 2002 Indenture expressly recognizes the rights of

11   both a "present or future holder of any Senior Indebtedness."  2002 Indenture

12   § 4.5.

13        Moreover, the 2002 Noteholders' precise argument was rejected by the

14   Second Circuit in *Pravin Banker Assocs.*, in which an agreement expressly

15   allowed assignments "to any financial institution," but said nothing about

16   assignments to other entities.  The Second Circuit held (applying New York law)

17   that "[t]his language fails to restrict the assignment expressly in any way.  While it

18   explicitly permits assignments to financial institutions, it does not limit

19   assignments only to these entities.  The assignment [to an entity other than a

20   financial institution] was therefore valid at the time it was made."  109 F.3d at

21   856.

22        While New York state law favoring assignment should be dispositive, the

23   2002 Noteholders' position is also at odds with broader principles governing the

24   assignability of claims in bankruptcy cases.  As the Ninth Circuit BAP recently

25   clarified in *New Falls Corp. v. Boyajian (In re Boyajian)*, 367 B.R. 138 (B.A.P.

26   9th Cir. 2007), "an assignee merely steps into the shoes of his assignor," and thus a

claims purchaser can pursue actions that are ostensibly "personal" to the original

18

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1  creditor, such as a section 523(a)(2)(B) exception to discharge.  *Accord Olvera v.*

2  *Blitt & Gaines, P.C.*, 431 F.3d 285, 286-89 (7th Cir. 2005) ("bad-debt buyers"

3  took their purchased claims subject to long-standing principle that "the common

4  law puts the assignee in the assignor's shoes, whatever the shoe size," and thus did

5  not need their own exception to state usury law).  This basic precept of assignment

6  law is further reflected in Bankruptcy Rule 3001(e)(2), which provides that "the

7  transferee [of a claim in bankruptcy] shall be substituted for the transferor."  Fed.

8  R. Bankr. Pro. 3001(e)(2); *see also, e.g.*, *Carnegia v. Ga. Higher Educ. Assistance*

9  *Corp.*, 691 F.2d 482, 483 (11th Cir. 1982) (*per curiam*) (noting how a post-

10  petition assignment of a claim "did not create a new claim.  Rather, it constituted a

11  substitution of parties with no change in the nature of the claim against

12  appellant.").  The 2002 Noteholders' novel suggestion that the assignment of the

13  VIA Claim from VIA to SB Claims somehow transmuted the core nature of that

14  claim, thereby stripping the claim of its status as Senior Indebtedness, does

15  extreme violence to these fundamental rules of assignment.

16      Accordingly, the assignment of the VIA Claim from VIA to SB Claims did

17  not change the fact that the 2002 Noteholders' claims are junior to the VIA Claim.

18      **c.    The Purported Waiver Of Senior Indebtedness Status Is
19          Of No Effect.**

20      The Court is now well aware of the fact that the Settlement Agreement

21  among the Debtor, VIA, and Intel contains the following language (the "Purported

22  Waiver Language"):

23      Claimants and Debtor agree that the Allowed Claim is not, and shall
24      not be treated as, "Senior Indebtedness" under the terms of Debtor's
        Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior
25      Subordinated Convertible Debentures due 2005.

26

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    Settlement Agreement section III.3.[13]

2          The Court also is aware of the fact that there are significant concerns about

3    how the Purported Waiver Language came to be included in the Settlement

4    Agreement, including that:

5          1.    The waiver was not mentioned anywhere in the notice,
6                motion, or other pleadings filed in support of the Settlement
                 Agreement.  *See* Docket Nos. 1950, 1952, 1953, 1954.[14]
7
8          2.    The fact that the 2002 Noteholders were (or even might be)
                 subordinated to VIA was never disclosed to the Court or
9                creditors.  *See id*.

10         3.    The entire Settlement Agreement was filed under seal on the
                 basis of the "highly confidential nature of the matters
11               addressed in the Motion and the Settlement Agreement," even
                 though the Purported Waiver Language should not have
12               implicated any of those concerns.  *See* Docket No. 1950, at 2.

13
           4.    The Purported Waiver Language was included at the
14               insistence of the 2002 Noteholders.  The 2002 Noteholders
                 have admitted that they "insisted that, no matter how VIA
15               allocated the Settlement Allowed Claim, it must not be
                 characterized as Senior Indebtedness."  2002 Noteholders'
16               Reply Brief in Support of Motion for Clarification [etc.] filed
17               April 27, 2007 [Docket No. 2265] at 10.

18         5.    The 2002 Noteholders were an effective majority of the
19               Creditors' Committee at the time the Settlement Agreement
                 was considered and approved by the Committee, and they
20               were fiduciaries of the unsecured creditors of the estate.  *See*
21               7 Collier on Bankruptcy  1103.05[2] (15th ed. rev. 2006).[15]

22    _____

      [13]   The Claimants are VIA and S3 Graphics Co., Ltd. ("S3 Graphics").

23    [14]   The **only** reference to the Purported Waiver Language was the language itself,

24         contained on page 5 of a single-spaced, 26-page document that was filed under seal.
           No effort whatsoever was made to bring this language to the attention of the Court or

25         anyone else.

26    [15]   *See also In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr. E.D.
           Va. 2001) (holding that committee members owe "a fiduciary duty to all creditors
           represented by the committee"); *In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441

                                              20

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1

6.  Notwithstanding their fiduciary duties, the 2002 Noteholders
    failed to disclose their conflicting self interests to the
    Committee, and in fact appear to have participated in the
    Committee's decision-making regarding the merits of the
    Settlement Agreement.[16]

2

3

4

5

7.  The 2002 Noteholders became parties to the October 17, 2003
    "Stipulated Protective Order" [Docket No. 529], which
    allowed their counsel access to confidential documents and
    analyses regarding VIA's claims.  No disclosure was made to
    the Court or creditors at that time that the 2002 Noteholders
    may be subordinated to millions of dollars in VIA claims, and
    thus had a direct (and undisclosed) interest in affecting the
    course of that litigation that differed from the interests of
    other creditors.  Because of the Stipulated Protective Order,
    counsel for the 2002 Noteholders was able to participate in
    confidential communications with counsel for the Debtor and
    the Creditors' Committee regarding, among other things, the
    nature and amount of the claims, negotiation strategies, and
    potential defenses that the Debtor might have to those
    claims.[17]

6

7

8

9

10

11

12

13

14

15

_____

16   (Bankr. E.D. Pa. 1997) ("Creditors who serve on the committee owe a fiduciary duty
     to the constituents whom they represent."); *In re County of Orange*, 179 B.R. 195,

17   202-03 (Bankr. C.D. Cal. 1995) (holding that one becomes a committee member
     "with the understanding that it has a fiduciary duty of undivided loyalty and impartial

18   service to all creditors").

19   [16] Counsel for the Creditors' Committee represented to this Court at the January 23,
     2007 hearing that he was not aware of the Senior Indebtedness issue until it became a

20   controversy just prior to that hearing.  Counsel for the 2002 Noteholders, who also
     appeared telephonically at that hearing, later told this Court that Committee counsel

21   had reported the facts "exactly accurately" to the Court.  January 23, 2007 Transcript
     [Docket No. 2136] at 12-14, 31.

22

23   [17] Among other things, counsel for the 2002 Noteholders received on or about October
     18, 2004 a document titled "SONICblue/VIA-JV CLAIMS ANALYSIS (FOR NON-

24   INTEL CLAIMS)" (the "October 18 Analysis"), which was labeled as "Joint Defense
     Privilege/Confidential Settlement Document."  *See* Declaration of Albert Boro, Jr.

25   dated March 5, 2007 [Docket No. 2182] at ¶ 7 & Exhibit 1 thereto.  It appears that the
     2002 Noteholders had made no disclosure of the VIA Senior Indebtedness issue at the

26   time the 2002 Noteholders received the October 18 Analysis, or at any time before
     then.

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

8.    The 2002 Noteholders provided no consideration to the estate
       or VIA in exchange for the Purported Waiver Language.

Moreover, SB Claims believes that the evidence will show that the

Purported Waiver Language was obtained based upon a phony story – concocted

by the 2002 Noteholders – regarding the supposed "purpose" of the VIA Senior

Indebtedness provision, which they claim was to apply solely to a loan that VIA

never made to the Debtor.  Counsel for the 2002 Noteholders personally recited

this story to the Court at the January 23, 2007 hearing on the Debtor's Disclosure

Statement, in a failed effort to convince this Court that there was nothing to be

concerned about.  *See* January 23, 2007 Hearing Transcript [Docket No. 2136], at

32-33.

Notwithstanding the serious questions that have been raised about the

Purported Waiver Language, the 2002 Noteholders insist that it is enough to

insulate them from any further liability on account of VIA's Senior Indebtedness.

The 2002 Noteholders, however, are incorrect.  As set forth below, the Purported

Waiver Language is invalid and of no effect under the terms of the 2002 Indenture

itself.  Moreover, in light of the 2002 Noteholders' undisclosed self-dealing with

respect to the Purported Waiver Language, and the Debtor's failure to disclose that

language to the Court and creditors, the language was and still is unenforceable as

a matter of law, or should now be treated as such.

**i.    The Purported Waiver Language Is Invalid Under
        The Terms of the 2002 Indenture Because VIA
        Acted In Good Faith.**

The first point that the 2002 Noteholders overlook is the language of the

2002 Indenture itself.  The 2002 Indenture makes clear that:

> ***No right** of any present or future holder of any Senior
> Indebtedness to enforce subordination as herein provided shall at
> any time in **any way** be prejudiced or impaired **by any act** or failure*

22

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

**to act on the part of the Company _or by any act_ or failure to act, in good faith, _by any such holder_,** or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, **_regardless of any knowledge thereof which any such holder may have or otherwise be charged with_.**

2002 Indenture § 4.5 (emphasis added).

The entry into the Settlement Agreement was an "act" by the Company (the Debtor) and VIA. _See Hensley v. Caiettei_, 13 Cal. App. 4th 1165, 1175 (1993) ("Entering into a contract is a jural act which alters the legal relations of the parties and creates an obligation."); _see also_ Black's Law Dictionary 24 (7th ed. 1999) (defining "act" as "Something done or performed, esp. voluntary; a deed.").   The unambiguous language of section 4.5, however, makes clear that **_no act_** by the Debtor, or by VIA in good faith, shall **_in any way prejudice or impair_** VIA's rights under the 2002 Indenture.  Thus, the "act" of entering into the Settlement Agreement cannot have altered VIA's rights "to enforce subordination" as set forth in the 2002 Indenture.

There is no evidence that VIA acted in any way other than in good faith. Under New York law, "good faith" means "honesty in fact in the conduct or transaction concerned."  N.Y. U.C.C. Law § 1-201(19).  It is a purely subjective standard, and one that imposes no duty of reasonable inquiry.  As explained by New York's highest court:

> Good faith under the code is defined as "honesty in fact in the conduct or transaction concerned" and it is clear that the draftsmen intended that this language set a subjective and not objective standard.  In fact, so that no confusion would persist on this score, a proposed draft of section 3-302 which explained good faith in terms related to commercial reasonableness was amended to delete the offending language.  Thus, **_the inquiry is not whether a reasonable banker in Chemical's position would have known, or would have inquired concerning the alleged breach by Stanndco of its partnership duties, but rather, the inquiry is what Chemical itself actually knew_**.  If Chemical did not have actual knowledge of some

23

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1   fact which would prevent a commercially honest individual from
2   taking up the instruments, then its good faith was sufficiently shown.

3   *Chemical Bank v. Haskell*, 51 N.Y.2d 85, 91 (1980) (citations omitted).[18]

4   A quick summary of the facts learned to date shows that there is simply no
5   evidence in the record that VIA acted dishonestly or in bad faith in connection
6   with the settlement.[19]  Thus, under New York law and the express terms of the
7   2002 Indenture, VIA's acts were in good faith, and they cannot affect the "right of
8   any present or future holder of any Senior Indebtedness to enforce subordination"
9   under the 2002 Indenture "in any way."

10   At the time the 2002 Indenture was executed, the Debtor and VIA already
11   were embroiled in a dispute over a joint venture that the two of them had formed,
12   S3 Graphics Co., Ltd. ("S3 Graphics").  Moreover, in September 2001, Intel
13   Corporation ("Intel") had filed a patent infringement lawsuit against VIA and S3
14   Graphics.  According to the Debtor's filings with the SEC, "SONICblue could be
15   required to pay VIA significant liquidated damages if [S3 Graphics] is enjoined
16   from utilizing SONICblue's patent cross license with Intel."  Debtor's amended
17   Form 10-Q for quarter ending September 30, 2001, at page 10.[20]

18

---

[18]   *See also First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.*, 262 A.D.2d 106, 107
19   (N.Y. App. Div. 1999) ("merely failing to investigate upon acquiring information that
       would give rise to reasonable suspicion, while perhaps an act of negligence, does not
20     constitute subjective bad faith or dishonesty").  *Cf.* N.Y. U.C.C. Law § 2-103(b),
       which is limited to "good faith" in the context of "merchants," and which adds for that
21     purpose only a requirement of "the observance of reasonable commercial standards of
       fair dealing in the trade."
22

[19]   The facts set forth herein were learned principally through the proceedings that
23     brought about the appointment of the Trustee and the disqualification of Debtor's
       chapter 11 counsel.  SB Claims intends to take its own discovery forthwith, as it has
24     the right to do, although both the 2002 Noteholders and the Trustee have indicated
       that they will oppose SB Claims' discovery efforts.  SB Claims fully reserves the right
25     to supplement or amend this statement as new facts come to light through discovery.
26
[20]   *See also id.* at page 19 ("under certain circumstances, SONICblue is required to pay
       VIA significant liquidated damages if a court enjoins S3 Graphics from utilizing

---

24

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    The Debtor and VIA did not resolve their disputes prior to the Debtor's

2  chapter 11 filing on March 21, 2003.  On July 17, 2003, VIA and S3 Graphics (the

3  "Claimants") filed proofs of claim in excess of $100 million each arising out of an

4  August 28, 2000 Amended Investment Agreement between the Debtor and VIA,

5  and various related agreements.  The claims led to significant litigation in this

6  case, for which the Debtor and the Creditors' Committee have told this Court that

7  the estate could have had substantial exposure.[21]  In December 2004, the Debtor

8  commenced an adversary proceeding against the Claimants and another related

9  entity, objecting to the validity of the proofs of claim filed by the Claimants and

10  asserting claims for affirmative relief (the "VIA Adversary Proceeding,"

11  Adversary Proceeding No. 04-05556).  Moreover, on June 6, 2003, Intel filed a

12  motion seeking, among other things, to terminate its license agreement with the

13  Debtor, which motion Intel renewed in 2004 (together, the "Intel Motion").

14    The 2002 Noteholders took an early and active interest in the VIA claim

15  litigation and the Intel Motion.  As noted above, they became parties to the

16  "Stipulated Protective Order" in the litigation (without any disclosure of their

17  unique interest in VIA's claims), and on that basis were able to participate directly

18  in strategy discussions with Debtor's counsel regarding the nature and amount of

19

20

21    SONICblue's patent cross-license with Intel or if SONICblue enters into a settlement
     agreement with Intel such that S3 Graphics can no longer operate under the patent
22    cross-license").  The Debtor repeated its disclosure of its potential indebtedness to
     VIA in filings with the SEC on April 1, 2002 (before entering into the 2002
23    Indenture), May 15, 2002, June 7, 2002, August 14, 2002, and November 14, 2002.

24    [21] *See* Boro Dec. [Docket No. 2182] ¶ 7 (stating that VIA had "substantial claims" that
     "had a potential value before set-offs and counterclaims of up to $42 million," ***in***
25    ***addition to*** the $70 million liquidated damages claim); Declaration of Ron Bender
     [etc.] dated March 5, 2007 [Docket No. 2185] ¶ 15 (citing "the significant risks to the
26    estate of VIA and/or S3 obtaining allowed general unsecured claims of well in excess
     of $12.5 million").

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    the claims, negotiation strategies, and potential defenses that the Debtor might

2    have to those claims.

3        The first in-person settlement meeting in the VIA Adversary Proceeding

4    occurred on August 11, 2005.  According to the Declaration of Albert J. Boro, Jr.,

5    former counsel to the Debtor, this settlement meeting was followed by an August

6    17, 2005 telephonic meeting among counsel for the Debtor, counsel for the

7    Creditors' Committee, and Mr. Bennett (lead counsel for the 2002 Noteholders).

8    Boro Dec. [Docket No. 2182] ¶¶ 9 & 10.  During the August 17 meeting, counsel

9    for the Creditors' Committee indicated their willingness to allow VIA and S3

10    Graphics a joint, $6 million allowed claim.  Mr. Bennett, however, stated that,

11    although the $6 million allowed claim should be acceptable, he needed to confer

12    with his clients about these developments.  This apparently made Mr. Boro

13    concerned that the 2002 Noteholders "might object to a settlement with [the

14    Claimants], threatening the prospects of Court approval of a proposed settlement

15    of the VIA Adversary Proceeding, unless their agreement to the proposed

16    settlement terms was obtained."  *See* Boro Dec. ¶¶ 10 & 11.

17        After further negotiations, on September 15, 2005 counsel for the

18    Claimants agreed to seek their clients' approval of a compromise $12.5 million

19    general unsecured allowed claim, if counsel for the Debtor agreed to seek the

20    Debtor's and the creditors' approval of such an allowed claim.

21        On September 16, the Claimants informed the Debtor that they would

22    accept a $12.5 million general unsecured allowed claim, but only if it was not

23    subject to further negotiation.  *See* Boro Dec. ¶ 14.  The Debtor's counsel

24    responded that the Debtor was "waiting for sign-off from the creditors to ensure

25    that the proposed settlement would not be objected to by the creditors."  Boro Dec.

26    ¶ 16.  In particular, the Debtor was "still awaiting approval from one member of

the Creditors' Committee," *id.*, who most likely was Mr. Bennett on behalf of the

26

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    2002 Noteholders.  Mr. Boro states that, "[o]n September 16 and 19, 2005, we

2    placed calls to Mr. Bennett to find out if the Senior Noteholders would support the

3    [proposal] of a $12.5 million allowed claim."  Boro Dec. ¶ 17.  "On September 20,

4    we learned that the Senior Noteholders were willing to support a settlement that

5    included a $12.5 million allowed claim for [the Claimants], ***provided that the***

6    ***settlement included certain terms, including that [the Claimants'] allowed claim***

7    ***be neither senior nor junior to any other general unsecured claim***."  *Id.*

8    (emphasis added).

9         It was at this time that the 2002 Noteholders insisted that, no matter how

10   the Claimants allocated the settlement claim among themselves, the claim must

11   not constitute Senior Indebtedness under the 2002 Indenture.

12       [W]hen ***the Senior Noteholders*** first saw VIA's effort to allocate the
         Settlement Allowed Claim between VIA and S3 in its discretion, the
13       Senior Noteholders were not supportive, and ***insisted that***, no matter
         how VIA allocated the Settlement Allowed Claim, ***it must not be***
14       ***characterized as Senior Indebtedness***.

15
16   2002 Noteholders' Reply Brief in Support of Motion for Clarification [etc.] filed

17   April 27, 2007 [Docket No. 2265] at 10 (emphasis added).  The 2002 Noteholders

     further have admitted that, if VIA had not purported to waive "Senior
18
     Indebtedness" status, then they would have objected to the settlement, *see id.*,
19
     which would have meant that the effective majority of the Creditors' Committee
20
     would have been against it.
21
          The evidence to date also shows that the 2002 Noteholders promoted a false
22
     story about the supposed "purpose" of the VIA Senior Indebtedness provision (i.e.,
23
     that it was to apply exclusively to a loan that was never made).  Mr. Boro's
24
     Declaration states:
25
         On September 16 and 19, 2005, we placed calls to Mr. Bennett to
26       find out if the Senior Noteholders would support the 'mediator's
         proposal' of a $12.5 million allowed claim.  ***During that time, I***

---

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    ***learned that the provision in the Senior Noteholder Indenture
2    referring to the $15 million indebtedness to VIA was for a loan
     that VIA was supposed to have made to SONICblue, but which
3    never occurred.***

4    Boro Dec. at ¶ 17 (emphasis added).  Counsel for the 2002 Noteholders personally

5    repeated this fable to this Court at the January 23, 2007 hearing.[22]

6    SB Claims believes that persons involved with the negotiation of the 2002

7    Indenture will contradict this story as to the alleged "purpose" of the VIA Senior

8    Indebtedness provision.  To date, however, the Trustee has made clear that he

9    would oppose SB Claims' efforts to depose these witnesses until the Trustee's full

10   investigation of all matters in this case has been completed, and the 2002

11   Noteholders have refused even to discuss discovery until after the September 24,

12   2007 hearing.  Thus, to the extent that extrinsic evidence is relevant to the

13   interpretation of the 2002 Indenture, SB Claims believes that such evidence will

14   show that the "purpose" of the VIA Senior Indebtedness provision was much

15   broader than just some loan that VIA never made to the Debtor.

16   On September 20, 2005, counsel for the Debtor for the first time

17   communicated to counsel for the Claimants the existence of the VIA Senior

18   Indebtedness provision in the 2002 Indenture.  Until such time, the Claimants and

19   their counsel were unaware of the existence of this provision.  Counsel for the

20   Debtor also told counsel for the Claimants that, unless the Claimants agreed that

21   their allowed claim under the proposed settlement would not be treated as senior

22   to the 2002 Noteholders' claims, the 2002 Noteholders would oppose the proposed

23   settlement of the VIA Adversary Proceeding, thus threatening the continuation of

24   litigation that had been going on for years.  Counsel for the Debtor also

25   represented to the Claimants' counsel that the purpose of the VIA Senior

26   ───────────────────
     [22]   *See* Transcript of January 23, 2007 Hearing [Docket No. 2136] at 31-33.

429961v1

1    Indebtedness provision was of limited scope, and that such provision would apply

2    only to a loan that VIA had contemplated making to the Debtor, but which loan

3    never was made.

4          Faced with the 2002 Noteholders' phony explanation of the "purpose" of

5    the provision, and the substantial risk that the 2002 Noteholders would block a

6    comprehensive settlement of years of litigation among VIA, Intel, and the Debtor,

7    VIA capitulated to the demand that the VIA Claim not be treated as "Senior

8    Indebtedness" under the 2002 Indenture.

9          Based upon the foregoing, there should be no question that VIA acted in

10   good faith when it agreed to the Purported Waiver Language in the Settlement

11   Agreement.  VIA was not even aware of the subordination provisions in the 2002

12   Indenture until the issue was raised at the 2002 Noteholders' insistence.  When

13   VIA was told of the provisions, it also was told a phony story regarding their

14   supposed purpose, which was to apply to a loan that VIA never made, in an effort

15   to convince VIA that it was not waiving any rights.  Moreover, VIA was told and

16   understood that approval of the Settlement Agreement was subject to creditors'

17   approval – specifically the Creditors' Committee, which the three 2002

18   Noteholders effectively controlled.  Under these circumstances, VIA acted in good

19   faith in agreeing to the Purported Waiver Language, because it had no other

20   reasonable alternative (other than to continue years of expensive litigation and risk

21   the loss of the Intel technology).

22         Although noted above, it is worth repeating that the 2002 Indenture makes

23   crystal clear that:

24       ***No right of any present or future holder of any Senior
25   Indebtedness to enforce subordination as herein provided shall at
     any time in any way be prejudiced or impaired by any act or failure
     to act on the part of the Company or by any act or failure to act, in
26   good faith, by any such holder***, or by any noncompliance by the

29

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

Company with the terms, provisions and covenants of this Indenture, *regardless of any knowledge thereof which any such holder may have or otherwise be charged with*.

2002 Indenture § 4.5 (emphasis added).  Thus, VIA's good faith act in accepting the Purported Waiver Language – measured under New York law by a subjective standard of honesty – cannot "in any way" prejudice or impair the status of the VIA Claim as Senior Indebtedness.

> ii.    **The Purported Waiver Language Is Invalid Under The Terms of the 2002 Indenture Because The Debtor Had No Power To Request It From VIA.**

Even if it could somehow be contended that VIA did not act in good faith, the fact remains that *any act by the Debtor itself* (whether or not in good faith) also could not in any way prejudice or impair VIA's Senior Indebtedness rights under the indenture.  The 2002 Indenture's terms are clear:

> *No right of any present or future holder of any Senior Indebtedness to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company . . . .*

2002 Indenture § 4.5 (emphasis added).  This provision "*guaranteed* the right of holders of Senior Indebtedness against any noncompliance by [the Debtor] with the terms of the indenture, 'regardless of any knowledge thereof which any such holder may have or be otherwise charged with.'"  *In re Frost Bros., Inc.*, 1992 U.S. Dist. LEXIS 18301, at *4 n.3 (S.D.N.Y. Dec. 2, 1992) (interpreting an indenture with nearly identical language) (emphasis added).

The Debtor made clear to VIA that there would be no settlement but for VIA's agreement to waive its Senior Indebtedness rights – a waiver that was extracted for no consideration from the 2002 Noteholders and with no benefit to the estate.  The Debtor's requirement that VIA capitulate to this term, or else face years of costly litigation and the possible loss of the Intel technology, cannot now

30

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1  be used to prejudice VIA's and SB Claims' rights as "any present or future holder

2  of any Senior Indebtedness to enforce subordination" under the 2002 Indenture.

3          The 2002 Noteholders are, at best, third party beneficiaries of the

4  Settlement Agreement.  And it is basic hornbook law in California (which governs

5  the Settlement Agreement[23]) that the rights of a third party beneficiary can be no

6  greater than the rights of a promisee.  *See* Witkin, Summary of California Law

7  (10th ed. 2005), Contracts § 694 at pp. 781-82; *see also id*. at § 695 at pp. 782-83

8  (a third party beneficiary is subject to all defenses of promisor as against promisee,

9  such as an unenforceable contract).

10         Here, the Debtor itself had no right under the 2002 Indenture to act to cause

11  VIA to waive its Senior Indebtedness rights.  Hence, the Debtor, as the purported

12  promisee of the Purported Waiver Language, also has no right now to enforce that

13  provision.  Accordingly, since the 2002 Noteholders' rights can be no greater than

14  those of the Debtor, they too have no right to enforce the Purported Waiver

15  Language.  This conclusion is further bolstered by the fact that the 2002

16  Noteholders gave absolutely no consideration whatsoever in exchange for the

17  waiver, other than perhaps their agreement not to use their position in the

18  bankruptcy case to block the settlement.

19                          **iii.    The Purported Waiver Language In The**
                                   **Settlement Agreement Is Unenforceable Because It**
20                                 **Was Obtained Without Proper Disclosure To The**
                                   **Court And Creditors.**
21

22         It cannot be disputed that the 2002 Noteholders were fiduciaries to creditors

23  in this case, given that they held an effective majority of the Creditors' Committee

24  positions.  It also cannot be disputed that, when fiduciaries receive special

25

26  [23]  *See* Settlement Agreement section III.29.  As noted previously, the 2002 Indenture is
         governed by New York law.

                                              31

429961v1

1    treatment in an agreement with the bankruptcy estate, there should be ample

2    disclosure of that treatment so that the Court and other creditors may judge its

3    fairness.  As one court recently recognized: "The bankruptcy process must both be

4    fair and appear fair.  A creditor on a committee who exudes the appearance of a

5    breach of fiduciary duty undermines that basic bankruptcy tenet, thereby

6    corrupting the process."  *In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423

7    (Bankr. N.D. Tex. 2003) (citation omitted).

8            Here, there was absolutely no meaningful disclosure to this Court, the other

9    members of the Creditors' Committee, or creditors generally regarding the facts

10   that: (1) the 2002 Noteholders were (or even might be) subordinated to VIA; and

11   (2) the 2002 Noteholders obtained, as their condition for not opposing the

12   settlement, a purported full release of their subordination obligations.  No

13   disclosure of the 2002 Noteholders' unique status was made when they became a

14   party to the Stipulated Protective Order.  Nor was any disclosure made when the

15   Debtor filed its October 6, 2006 motion to seal the proceedings regarding the

16   Settlement Agreement's approval [Docket No. 1950].  Even the Purported Waiver

17   Language itself was buried in a single sentence in the 26-page, single spaced

18   Settlement Agreement (which also was filed under seal), without any explanation

19   as to its significance.  There also was no disclosure of the fact that the 2002

20   Noteholders insisted that VIA purport to waive any right to Senior Indebtedness

21   status, or of their threat to oppose the Settlement Agreement if VIA did not

22   purport to waive such rights.[24]

23   _____

24   [24] The notice to creditors [Docket No. 1955] offered to make available to any creditor
       who requested it from the Debtor's counsel a redacted copy of the Settlement

25   Agreement.  Following its receipt of Docket No. 1955, another creditor, Riverside
       Claims, made such a request of Debtor's counsel over the telephone, but was then

26   told, again over the telephone, by Debtor's counsel that the process of redaction
       would be quite expensive for the Debtor and that there was no real reason for
       Riverside Claims to insist that this be done, as all that any of the unsecured creditors

                                                    32

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    Moreover, the Settlement Agreement itself provides that "each and every

2    covenant" in the agreement is "conditioned upon . . . the occurrence of the

3    Effective Date" of the settlement.  *See* Settlement Agreement section III.1.  The

4    Effective Date, in turn, was dependent upon entry of an "Approval Order" by this

5    Court, approving the Settlement Agreement, including the Purported Waiver

6    Language, "without change".  *Id*. section I (definitions of both "Approval Order"

7    and "Effective Date").

8    This Court, however, was never asked to rule upon the legal effect of any

9    purported waiver of Senior Indebtedness status; nor was it ever advised that any

10   such waiver even existed.  Given that the Purported Waiver Language was not

11   even discussed in the pleadings, the Court hardly could have been in a position to

12   consider and approve that language.  And, even if the Court had been asked to

13   evaluate the waiver language, SB Claims respectfully submits that the Court

14   would have, *sua sponte*, raised serious questions as to why three members of the

15   Creditors' Committee should receive this special treatment.

16   Thus, while the Court certainly did approve nearly every aspect of the

17   Settlement Agreement, it did not approve the Purported Waiver Language, and SB

18   Claims is free to, and does, object to the Purported Waiver Language on the

19   grounds, *inter alia*, that the Debtor's agreement to same was an *ultra vires* act

20   under the 2002 Indenture.

21   The federal courts have ample authority to revise portions of their own

22   orders if the orders are based upon fraud, inadequate notice, mistake, or other legal

23   or equitable infirmities.  For example, Federal Rule of Civil Procedure 60 allows a

24   _____

25   actually needed to know to evaluate the efficacy of the Settlement Agreement was
     that the amount of the settlement was for an allowed claim of $12,500,000.  Riverside

26   Claims accepted Debtor's counsel's oral representations and therefore dropped its
     demand for a redacted copy of the Settlement Agreement.

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    court to modify or vacate a prior order "upon such terms as are just" for reasons

2    including "mistake, inadvertence, surprise, or excusable neglect," as well as

3    "fraud" and "any other reason justifying relief from the operation of the

4    judgment."  Likewise, Bankruptcy Code section 105(a) gives the Court ample

5    authority to "issue any order, process, or judgment that is necessary or appropriate

6    to carry out the provisions of" the Bankruptcy Code, and the Court may act – even

7    *sua sponte* – "to prevent an abuse of process."  *See, e.g.*, *Marrama v. Citizens

8    Bank*, 127 S. Ct. 1105, 1111-12 (2007) (highlighting "the broad authority granted"

9    by section 105 "to bankruptcy judges to take any action that is necessary or

10    appropriate 'to prevent an abuse of process'"); *In re Lenox*, 902 F.2d 737, 740 (9th

11    Cir. 1990) ("Although FRCP 60(b) provides that a court may relieve a party from

12    a final order upon motion, it does not prohibit a bankruptcy judge from reviewing,

13    sua sponte, a previous order.  And although FRCP 60(b) refers to relief from final

14    orders, it does not restrict the bankruptcy court's power to reconsider any of its

15    previous orders when equity so requires." (citations omitted)).

16        Even without reliance on Rule 60 or section 105, bankruptcy courts also

17    have the inherent authority to disregard improperly noticed provisions of plans and

18    other documents that were approved by the court.  *See, e.g.¸ Enewally v. Wash.

19    Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172-73 (9th Cir. 2004) (refusing to

20    enforce lien stripping provisions of plan that were not properly noticed); *Sallie

21    Mae Servicing Corp. v. Ransom (In re Ransom)*, 336 B.R. 790 (B.A.P. 9th Cir.

22    2005) (refusing to enforce plan provisions that "discharged by declaration" student

23    loan obligations); *Ruehle v. Educ. Credit Mgmt. Corp. (In re Ruehle)*, 307 B.R. 28,

24    33 (B.A.P. 6th Cir. 2004) (describing such a provision as "an interloper in the

25    plan" that "can have no legal status") (internal quotations omitted); *see also In re

26    UAL Corp.*, 299 B.R. 509, 522 (Bankr. N.D. Ill. 2003) (noting "the inherent power

    of a bankruptcy judge 'to reexamine and revise an order which he entered during

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    the pendency of the bankruptcy proceedings'") (quoting *In re Lintz W. Side*

2    *Lumber, Inc.*, 655 F.2d 786, 789 (7th Cir. 1981)).

3        A court's inherent authority to revise portions of its prior orders also

4    extends to situations involving "fraud on the court" or other forms of non-

5    disclosure.  As cogently explained by the Court of Appeals for the Ninth Circuit:

6            Just as a court may use its inherent power to protect its
         integrity by vacating a judgment obtained by fraud, it also may
7        amend a judgment for the same purpose.  When a court vacates a
         judgment obtained by fraud, it not only rids itself of the defilement
8        caused by the fraud, but also restores balance and fairness between
         the parties by removing the benefit gained by the party that
9        committed the fraud.  Amending a judgment serves these same goals
         by removing the benefit - for example, the avoidance of a judgment
10       against itself - that the party gained by committing fraud on the
         court.
11

12           We therefore hold that a federal court may amend a judgment
13       or order under its inherent power when the original judgment or
         order was obtained through fraud on the court. . . .
14

15   *Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1119 (9th Cir. 1999); *see*

16   *also, e.g., In re Maxwell Newspaper, Inc.*, 179 B.R. 549 (S.D.N.Y. 1994)

17   (discussing how "bankruptcy courts, as courts of equity, have the power to

18   reconsider, modify, or vacate a previous order," and affirming bankruptcy court's

19   decision to vacate two year old stipulation on the grounds that there had been

20   inadequate disclosure regarding its effects); *Broadfoot v. United Furniture Indus.*

21   *(In re Nationwide Warehouse & Storage, LLC)*, 2005 Bankr. LEXIS 2690 (Bankr.

22   N.D. Ga. July 29, 2005) (vacating order approving settlement in case where full

23   effects of the settlement were not disclosed to the court; explaining that "[t]here

24   are times when silence and the failure to make a necessary disclosure is

25   tantamount to an affirmative misrepresentation.  The game of 'hiding the ball' or

26   'catch me if you can' cannot be played with the courts.").

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

1      Based upon the above authorities, and under these circumstances, the 2002

2  Noteholders cannot hide behind this Court's prior approval of the Settlement

3  Agreement.  If the 2002 Noteholders desired to get a substantial benefit from the

4  settlement, then they (especially as fiduciaries/Committee members) should have

5  insisted that the purported waiver of subordination be fully disclosed to, and vetted

6  by, the Court and creditors.  The 2002 Noteholders' failure to do so bars them from

7  now relying upon the Court's order.

8             **iv.**    **This Court Is Free To Disregard The Invalid,**

9                         **Purported Waiver Language In The Settlement**

                            **Agreement While Not Upsetting The Remainder Of**

10                      **The Agreement.**

11      The 2002 Noteholders contend in their Motion to Dismiss that what SB

12  Claims is seeking is a "partial rescission" of the Settlement Agreement, and that

13  partial rescission is not permitted under California law.  The 2002 Noteholders are

14  wrong, both as to the relief SB Claims is seeking and as to California's law of

15  rescission.  SB Claims is seeking a determination by this Court that the Purported

16  Waiver Language is void and unenforceable – and that the 2002 Noteholders

17  should be estopped from ever enforcing it – for a number of reasons, including (i)

18  its violation of the express, no waiver provisions of the 2002 Indenture; (ii) the

19  lack of full disclosure to the Court; and (iii) the 2002 Noteholders' misconduct in

20  using their position on the Creditors' Committee to obtain the waiver.

21      More importantly, though, *even if* the sole remedy SB Claims seeks is a

22  "partial rescission" of the Settlement Agreement, such a remedy remains available

23  under California law.

24      In their papers, the 2002 Noteholders quote extensively from *IMO*

25  *Development Corp. v. Dow Corning Corp.*, 135 Cal. App. 3d 451, 458 (1982).

26  They fail to quote, however, the following key sentence: ***"[T]otal rescission is not***

    ***required where a contract is divisible or severable."***  *Id*. at 458 (emphasis added).

1   The California Supreme Court likewise has held, ***"where a good cause for***

2   ***rescission exists as to one part of a divisible or separable contract, such portion***

3   ***may be rescinded in equity without disturbing the remainder."*** *Simmons v. Cal.*

4   *Inst. of Tech.*, 34 Cal. 2d 264, 275 (1949) (quotations omitted) (emphasis added).

5   The California Civil Code similarly explains that:

6       Where a contract has several distinct objects, of which one at least is
        lawful, and one at least is unlawful, in whole or in part, the contract
7       is void as to the latter and valid as to the rest.

8   Cal. Civil Code § 1599.  These authorities make clear that the 2002 Noteholders'

9   supposed rule of law, much like their story about the origin of the senior status of

10  the VIA indebtedness under the indenture, has no basis in reality.

11      The issue of whether a contract is divisible or severable turns on whether

12  the Court is able to determine what portion of the consideration is attributable to

13  the part of the contract to be rescinded.  In the California Supreme Court's words:

14      It has long been the rule in this state that [w]hen the transaction is of
15      such a nature that the good part of the consideration can be separated
        from that which is bad, the Courts will make the distinction, for the .
16      . . law . . . [divides] according to common reason; and having made
        that void that is against law, lets the rest stand. . . . .  Thus, the rule
17      relating to severability of partially illegal contracts is that a contract
        is severable if the court can, consistent with the intent of the parties,
18      reasonably relate the illegal consideration on one side to some
        specified or determinable portion of the consideration on the other
19      side.  This rule has been frequently applied in this state.
20

21  *Keene v. Harling*, 61 Cal. 2d 318, 320-21 (1964) (internal quotations omitted).

22  Moreover, "[i]f the illegality is collateral to the main purpose of the contract, and

23  the illegal provision can be extirpated from the contract by means of severance or

24  restriction, then such severance and restriction are appropriate." *Armendariz v.*

25  *Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 124 (2000).  The California

26  Supreme Court further made clear that, when considering whether to sever the

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    improper provisions from a contract, "[t]he overarching inquiry is whether the

2    interests of justice . . . would be furthered by severance."  *Id.* (internal quotations

3    omitted).  It is clear which way the "interests of justice" point in the instant case.

4         Furthermore, it is not necessary that an agreement, on its face, allocate

5    consideration between the proper and improper parts of the contract.[25]  Rather, the

6    California Supreme Court holds:

7         ***The argument that the court cannot apportion because the parties
8         did not expressly apportion is without merit.***   That argument exalts
          form over substance. (See *Haines v. Commercial Mortgage Co.*, . . .
9         200 Cal. 609 [1927], where . . . the court held that the fact that the
          interest and balance due were stated together did not prevent the
10        court from apportioning where other evidence delineated between
          the lawful and unlawful parts.)
11

12   *Keene v. Harling*, 61 Cal. 2d at 323 (footnote omitted) (emphasis added); *see also*

13   *Birbrower, Montalbano, Condon & Frank, P.C., v. Superior Court*, 17 Cal. 4th

14   119, 138-39 (1998) (holding that contract could be severed and the improper

15   portion invalidated if, "even though the entire contract was for a fixed sum, the

16   court was able to value the illegal portion of the contract and separate it from the

17   rest of the amount due under the agreement").

18

---

19   [25]  The 2002 Noteholders make the undeveloped assertion that the presence of a standard
20        integration clause in the Settlement Agreement impacts SB Claims' ability to
         challenge the Purported Waiver Language.  They cite only a section in the case of
21        *Martinez v. Master Protection Corp.*, 118 Cal. App. 4th 107, 116 (2004), stating that
         an integrated arbitration agreement cannot be unilaterally modified by one party's
22        decision to drop a contested term.  *Martinez* itself, though, later considers whether an
         unconscionable provision in the integrated arbitration agreement can be "severed to
23        avoid an illegal result," and employs the traditional tests to determine whether the
         contract is severable or divisible notwithstanding the presence of the integration
24        clause.  *See id*. at 119.  Indeed, the purpose of integration clauses is to prevent the
         terms of a written agreement from being contradicted by parol evidence under certain
25        circumstances.  *See* Cal. Code Civil Pro. § 1856(a).  By its terms, however, the parol
         evidence rule is not applicable where there is a challenge based on illegality, fraud, or
26        the very validity of an agreement.  *Id.* § 1856(f) & (g).

                                        38

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

1    In this case, the Settlement Agreement did not expressly apportion

2 consideration between the Purported Waiver Language and the other provisions of

3 the agreement.  There is, however, already evidence in the record as to what the

4 separate consideration for the Purported Waiver Language was – absolutely

5 nothing.  The 2002 Noteholders gave nothing to VIA, the Debtor's estate, or Intel

6 in exchange for the Purported Waiver Language.  Nor did the Debtor or Intel give,

7 or receive, any additional consideration for the language – from the standpoint of

8 the estate and Intel, it did not matter one bit whether the VIA Claim was senior to

9 or pari passu with the claims of the 2002 Noteholders.

10    Nor does the fact that the Settlement Agreement was approved by this

11 Court somehow validate the Purported Waiver Language.  As discussed above, the

12 Purported Waiver Language was not mentioned in any of the notices, motions, and

13 other pleadings filed in support of the Settlement Agreement.  Nor, for that matter,

14 was there ever any mention of the fact that the 2002 Noteholders were (or even

15 might be) contractually subordinated to VIA.  Thus, there was simply no reason

16 for anyone – including the Court – to have anticipated that, by approving the

17 Settlement Agreement, the Court would also be endorsing a special, undisclosed

18 benefit for three members of the Creditors' Committee.

19                    **III.    CONCLUSION**

20    SB Claims is hopeful that the Trustee can modify the Plan and Disclosure

21 Statement promptly to addressed the issues raised by this Objection.  Until such

22 time, however, the Court should not approve the Disclosure Statement.

23 DATED:  August 21, 2007                STUTMAN, TREISTER & GLATT P.C.
                                                        and
24                                                  McGRANE GREENFIELD LLP

25

26
                                              By    /s/ K. John Shaffer
                                                      K. John Shaffer

39

Objection Of SonicBlue Claims LLC To Disclosure Statement Describing Joint Chapter 11 Plan
Of Liquidation Proposed By Dennis J. Connolly, Chapter 11 Trustee

429961v1

# EXHIBIT 18

1   FRIEDMAN DUMAS & SPRINGWATER LLP
    CECILY A. DUMAS (S.B. NO. 111449)
2   150 Spear Street, Suite 1600
    San Francisco, CA 94105
3   Telephone Number:  (415) 834-3800
    Facsimile Number:  (415) 834-1044
4
5   ALSTON & BIRD LLP
    GRANT T. STEIN
6   1201 West Peachtree Street
    Atlanta, GA 30309
7   Telephone Number:  (404) 881-7000
    Facsimile Number:  (404) 881-7777
    (admitted *pro hac vice*)
8

9                 UNITED STATES BANKRUPTCY COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12
    In re                                    Case Nos. 03-51775 through 03-51778
13
    SONICBLUE INCORPORATED, a                Chapter 11 Cases
14  Delaware corporation, DIAMOND
    MULTIMEDIA SYSTEMS, INC., a              Jointly Administered
15  Delaware corporation, REPLAYTV, INC., a
    Delaware corporation, and SENSORY        **CHAPTER 11 TRUSTEE'S**
16  SCIENCE CORPORATION, a Delaware          **EMERGENCY MOTION FOR**
    corporation,                             **PROTECTIVE ORDER IN RESPECT**
17                                           **OF SONICBLUE CLAIMS' NOTICES**
    Debtors.                                 **OF DEPOSITION OF HENRY KEVANE,**
18                                           **JOHN J. TODD, ALBERT BORO,**
                                             **SUZZANNE UHLAND, AND BRUCE**
19                                           **BENNETT, ON SEPTEMBER 6, 10, 11,**
                                             **12 AND 13, 2007**
20
                                             Date:     TBD
21                                           Time:     TBD
                                             Place:    280 South First Street
22                                                      San Jose, CA 95113
                                             Judge:    Hon. Marilyn Morgan
23

24

25  TO  THE  HONORABLE  MARILYN  MORGAN,  UNITED  STATES  BANKRUPTCY
    JUDGE; SONICBLUE CLAIMS, LLC; HENRY KEVANE; JOHN J. TODD; ALBERT
26  BORO;  SUZZANNE  UHLAND;  BRUCE  BENNETT;  PORTSIDE  GROWTH  &
    OPPORTUNITY FUND; SMITHFIELD FIDUCIARY LLC; CITADEL EQUITY FUND
27  LTD.;  THE  OFFICIAL  COMMITTEE  OF  UNSECURED  CREDITORS;  AND  THE
    OFFICE OF THE UNITED STATES TRUSTEE:
28

    MOTION FOR PROTECTIVE ORDER IN RESPECT OF
    SONICBLUE CLAIMS' DISCOVERY REQUESTS
    {00309855.DOC v 1}

Dennis J. Connolly, the duly appointed Chapter 11 Chapter 11 Trustee (the "Chapter 11 Trustee") in the above-captioned bankruptcy case for SONICblue Incorporated and its three operating subsidiaries, Diamond Multimedia Systems, Inc.; ReplayTV, Inc.; and Sensory Science Corporation (collectively, the "Debtors"), hereby seeks (i) a protective order under Rule 26(c) of the Federal Rules of Civil Procedure (the "Federal Rules"),[1] in respect of the Notice of Depositions and Subpoenas Duces Tecum served by SonicBlue Claims LLC ("SBC") upon Henry Kevane, John Todd, Albert Boro, Suzzanne Uhland and Bruce Bennett (the "SBC Deposition Notices") that state they are submitted in connection with SBC's Objection to the Disclosure Statement describing the Debtors' Joint Chapter 11 Trustee's Plan of Liquidation (respectively, the "Trustee's Disclosure Statement" and the "Trustee's Plan") which disclosure statement is scheduled for hearing on September 20, 2007.

## RELIEF REQUESTED

The Chapter 11 Trustee respectfully seeks the entry of a protective order in respect of the SBC Deposition Notices because the information sought therein is wholly unrelated to SBC's objection to the Trustee's Disclosure Statement (the "Section 1125 Objection") and was, instead, interposed for the purpose of obtaining discovery in respect of SBC's adversary proceeding against the Debtors' 2002 Noteholders (the "Subordination Adversary Proceeding"[2]) in which discovery is not ripe for two reasons.

First, under Federal Rule 26(f) applicable to the Subordination Adversary Proceeding, until the Court rules on the pending Motion to Dismiss and a discovery conference is held, discovery in that case cannot and should not proceed.

Second, the Trustee has sought to intervene in, and requested a stay of, the Subordination Adversary Proceeding after the Court rules on certain important issues raised by the Defendants' Motion to Dismiss in that case. A hearing on the Motion to Dismiss and the Motion to Intervene

---

[1]    Rule 26(c) of the Federal Rules of Civil Procedure is made applicable to bankruptcy cases by Rule 7026 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"). Moreover, Bankruptcy Rule 7026 is applicable to this contested matter under Bankruptcy Rule 9014(c).

[2]    Adversary Proceeding No. 07-05082, pending in the United States Bankruptcy Court for the Central District of California, San Jose Division.

2

1    and to Stay are both scheduled for September 24, 2007.  The purported reason for discovery in

2    connection with the Disclosure Statement is a smoke screen.  The real purpose of SBC's

3    discovery requests in respect of the Trustee's Disclosure Statement and Plan is to obtain

4    discovery that it cannot yet obtain in the Subordination Adversary Proceeding.

5            The Chapter 11 Trustee recognizes that SBC raised legitimate objections to the Trustee's

6    Disclosure Statement on pages 1 through 3 of its Objection – *e.g.*, that the Trustee's Disclosure

7    Statement fails to tell creditors when and how much they might receive.  This objection will be

8    addressed and remedied by an amendment to the Trustee's Disclosure Statement which is

9    anticipated to reflect that within 30 days of the Effective Date, and before year end, there will be

10   an initial distribution of approximately $80 million to all creditors net of a $5 million reserve for

11   administrative expenses.[3]  This will not be fully distributed because some claims are Disputed

12   Claims for which reserves must be established.

13           SBC's primary objection – on which it spends 37 pages – is really a brief in opposition to

14   the Motion to Dismiss in the Subordination Adversary Proceeding.  It argues that the Chapter 11

15   Trustee has failed to properly recognize SBC's claimed right to Senior Indebtedness treatment

16   and that therefore the 2002 Noteholders, as holders of Class 3 Claim, cannot receive any

17   distribution that would otherwise be made to the 1996 Noteholders as holders of Class 5 Claims.[4]

18   Without regard to the merits of this claim, SBC has been advised that the 2002 Noteholders have

19   agreed to a request by the Chapter 11 Trustee to supplement the reserve that will exist for the

20   Class 3 Claims of the 2002 Noteholders with such sums as are necessary from the distribution

21   [3]    The Trustee notes that the initial cash distribution will be a percentage of this overall
22   initial distribution amount given the status of claims in Class 4 that have not become Allowed
     Claims, as well as potential objections to Class 3 and Class 5 claims.  Also, the amount of the tax
23   reserve has not yet been determined.   Nonetheless, significant cash will be available for
     distribution to unsecured creditors shortly after the confirmation date.

24   [4]    The Trustee also notes that in the Section 1125 Objection SBC apparently quibbles with
     the manner in which the Trustee has undertaken aspects of his investigation.  Of course, as noted
25   below and in the Chapter 11 Trustee's Reply Memorandum in Support of his Motion (i) for Entry
     of an Order Authorizing Intervention and (ii) to Stay the Adversary Proceeding Pending the
26   Conclusion of the Trustee's Investigation filed in this Court contemporaneously with the filing of
     this Motion for Protective Order, SBC fails to note the Trustee's proposal to consider and
27   coordinate discovery in the Trustee's investigation with SBC and other parties to enable
     appropriate witnesses to be examined by Rule 2004 examination in the Trustee's investigation
28   where other interested parties will be able to participate, exactly as is the case with the September
     6, 2007 Rule 2004 Examination of Henry Kevane.

1  they will receive under the subordination provisions applicable to the 1996 Noteholders in Class

2  5. This is more than enough for SBC because it effectively gives SBC a bond from Defendants in

3  litigation that SBC has not won. The reserve to pay SBC if its prevails in the Subordination

4  Adversary Proceeding curtails any need for any discovery on the issues that are raised by SBC

5  concerning the Subordination Adversary Proceeding, and therefore this Motion for Protective

6  Order should be granted. The economic analysis of the reserve is set forth in detail in the

7  Declaration of Howard Grobstein and the attachments thereto.

8        This Emergency Motion is filed without prejudice to objections to the discovery from

9  SBC that may be raised as to attorney-client or other privileges, the service, timing, or location of

10  the proposed discovery, including the need to establish agreed upon time and location where, for

11  example, a proposed witness lives in San Francisco but has been noticed for Los Angeles, and

12  any other ground that may be raised by a proposed witness or party. Ordinarily, those issues are

13  worked out between and among counsel. The issues raised in this Emergency Motion go to the

14  issue of whether this proposed discovery should go forward at all in the context of this case at this

15  time.

16  **STATEMENT OF FACTS**

17        In support of this motion, based on the Declarations of Dennis J. Connolly, Grant T. Stein

18  and Howard Grobstein, the Chapter 11 Trustee represents as follows:

19        1.    On April 17, 2007, Dennis J. Connolly was appointed Chapter 11 Chapter

20  11 Trustee in the SONICblue bankruptcy cases, pursuant to an order entered by the Court on

21  March 26, 2007.

22        2.    Since his appointment, the Chapter 11 Trustee has been actively pursing

23  (i) preparation and submission of a plan of liquidation, (ii) an investigation into the conduct of

24  professionals and other fiduciaries in the Debtors' bankruptcy cases, and (iii) an investigation into

25  the circumstances leading up to and surrounding that certain settlement agreement entered into by

26  SONICblue Incorporated, VIA Technologies, Inc., and S3 Graphics Co., Ltd. (the "VIA

27  Settlement"), which was approved by the Court on October 31, 2006. The Chapter 11 Trustee's

28  investigation is ongoing and is anticipated to continue for a moderate period beyond the

1  confirmation of the Trustee's Plan assuming confirmation occurs in November in anticipation of

2  making initial distributions to Allowed Claims before the end of this calendar year.

3         3.     SBC is the transferee of certain limited rights in connection with a single

4  allowed claim in the amount of $12.5 million that was recognized and allowed for VIA

5  Technologies, Inc. ("VIA") and S3 Graphics Co., Ltd. ("JV") pursuant to the VIA Settlement.[5]

6         4.     On May 30, 2007, SBC commenced the Subordination Adversary

7  Proceeding against the 2002 Noteholders.  In the Adversary Proceeding, SBC asserts that (i) the

8  2002 Noteholders improperly used their position as members of the Creditors' Committee to

9  obtain a waiver of VIA's alleged right to treat the Allowed VIA Claim as "Senior Indebtedness"

10  under the Debtors' 2002 Note Indenture, (ii) the Allowed VIA Claim is "Senior Indebtedness"

11  under the Debtors' 2002 Note Indenture, and (iii) the Allowed VIA Claim is entitled to the

12  benefits afforded to Senior Indebtedness under Article IV of the 2002 Indenture.

13         5.     On July 7, 2007, the 2002 Noteholders filed their Motion to Dismiss the

14  Subordination Adversary Proceeding.  In their Motion to Dismiss, the 2002 Noteholders contend,

15  among other things, that (i) SBC lacks the standing to seek the equitable subordination of their

16  claims, (ii) SBC may not revoke part of the VIA Settlement while maintaining the benefit of that

17  agreement, (iii) the VIA Settlement prohibits SBC from seeking Senior Indebtedness treatment,

18  and (iv) the Allowed VIA Claim is not and never was Senior Indebtedness.  The hearing on the

19  2002 Noteholders' Motion to Dismiss the Subordination Adversary Proceeding is set for

20  September 24, 2007.

21         6.     On July 20, 2007, the Chapter 11 Trustee filed the Trustee's Plan and the

22  Trustee's Disclosure Statement and, thereby, sought an order from the Court approving the

23

24  [5]     On October 31, 2006, the Court entered its order approving the VIA Settlement.  Under
    the terms of the Rule 3001 transfer agreement filed with the Court (Docket Entry 2316), VIA
25  retains an interest in the litigation against the 2002 Noteholders in the Subordination Adversary
    Proceeding, which asserts claims in direct contravention of the express terms of the Settlement
26  Agreement.  The claim transfer also severely restricted what SBC was allowed to claim,
    precluding, among other things, any effort to collaterally challenge the October 31, 2006 Order
27  other than to try to set aside the language acknowledging that the Allowed VIA Claim was not
    Senior Indebtedness.  See Assignment Agreement at ¶ 8.  It also provided a 25% economic
28  sharing of potential net recoveries by SBC with VIA.  See Assignment Agreement at ¶ 5.

1  Trustee's Disclosure Statement as containing "adequate information" in accordance with Section

2  1125 of the Bankruptcy Code.

3      7.    On August 21, 2007, SBC filed the Section 1125 Objection asserting that

4  the Trustee's Disclosure Statement (i) fails to provide sufficient information as to what

5  distribution amounts creditors can expect to receive and when those distributions may be made

6  and (ii) fails to recognize SBC's claimed right as Senior Indebtedness by allowing the 2002

7  Noteholders to receive a distribution that would otherwise be payable to the 1996 Noteholders.

8      8.    In connection with the submission of SBC's motion to expand the page

9  limit for its objection to the Trustee's Disclosure Statement, the Chapter 11 Trustee, through

10  counsel, proposed to SBC, through counsel, that an understanding with the 2002 Noteholders be

11  established whereby a reserve be established that would contain an amount sufficient to satisfy

12  SBC's Senior Indebtedness claim after resolution of the Subordination Adversary Proceeding.

13      9.    A reserve for payment of its potential recovery from the Subordination

14  Adversary Proceeding was not satisfactory to SBC.

15      10.    The Chapter 11 Trustee is authorized to represent that the 2002

16  Noteholders have agreed to the establishment of a reserve containing sufficient funds to satisfy

17  SBC's claimed Senior Indebtedness claim in connection with the Subordination Adversary

18  Proceeding.

19      11.    The calculation of the reserve amount and how it is funded is reflected in

20  the Declaration of Howard Grobstein.  As set forth therein, assuming that the Trustee were

21  successful in an objection to the claims of the 2002 Noteholders based on unmatured interest, the

22  supplemental reserve to be established would be $7,923,767 based on the amount that would

23  be paid to the 2002 Noteholders from the 1996 Noteholders.  This amount is in addition to the

24  funds held in abeyance pending the resolution of an objection to the 2002 Noteholders' claims.  In

25  this regard, it should be noted that the total reserve amount of $18,500,000 is for purposes of

26  establishing the nature and amount of the reserve for purposes of enabling the Disclosure

27  Statement to be approved without further delay, and also for purposes of the instant Emergency

28  Motion for Protective Order.  If the Court were to make a subsequent determination that the

6

1   reserve amount should be based on a potential maximum amount of the SBC claim acquired from

2   VIA of lower than $18,500,000, the amount of the reserve would be adjusted accordingly.  The

3   ability to make such a request to the Court is therefore intended to be preserved and not waived.

4                  **ARGUMENT AND CITATION OF AUTHORITY**

5        12.    Under Federal Rule 26(c), a protective order can be granted for good cause,

6   to protect a party of person from oppression, undue burden, or expense.

7        13.    Under Federal Rule 26(b)(1), a party may obtain discovery "that is relevant

8   to the claim or defense."  Federal Rule 26(b)(1).

9        14.    It is clear from the foregoing that the discovery sought by SBC is not for a

10   legitimate and proper purpose in the context of this case and that a protective order should be

11   granted.  *See LG Elecs. Inc. v. Q-Lity Computer Inc.*, 211 F.R.D. 360, 372 (N.D. Cal. 2002) ("For

12   the reason already stated, the Apple products have never been part of this litigation and have no

13   relevance to the products that are part of this litigation.  Accordingly, Apples' motion for

14   protective order and motion to quash is granted in its entirety."); *Nat'l Career College, Inc. v.*

15   *Spellings*, Civil No. 07-00075, 2007 WL 1771558 at *3 (D. Haw. June 15, 2007) ("In the instant

16   case, the information sought by Plaintiffs through various discovery devises is neither relevant

17   nor permitted.").

18        15.    While courts broadly construe the concept of "relevance," the breadth of

19   the term is not unlimited.  *See, e.g.*, *In re Muskogee Envtl. Conservation Co.*, 221 B.R. 526, 529-

20   30 (Bankr. N.D. Okla. 1998).  In fact, in 2000, Congress amended Federal Rule 26(b) to narrow

21   the scope of relevance and "'involve the court more actively in regulating the breadth of sweeping

22   or contentious discovery.'"  *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 967-68 (9th Cir.

23   2004) (quoting the advisory committee's notes to Federal Rule 26).  "Under Rule 26(b)(1), for

24   example, discovery must now relate more directly to a 'claim or defense' than it did previously

25   and, 'if there is an objection that discovery goes beyond material relevant to the parties' claims or

26   defenses, the court would become more involved.'"  *Id.* at 968; *see also Bernstein v. Travelers*

27   *Ins. Co.*, 447 F. Supp. 2d 1100, 1102 (N.D. Cal. 2006) ("Stated more crudely, the primary

28   purposes of the changes were to discourage lawyers from using discovery to 'fish' for new claims

7

1    or defenses and/or to run up unjustifiable litigation bills.").  Indeed, it is well recognized that this

2    amendment meant to narrow the scope of discovery so that "relevance is more closely tied to the

3    actual allegations contained in the complaint."  *Beauchem v. Rockford Prods. Corp.*, No. 01 C

4    50134, 2002 WL 100405, at *1 (N.D. Ill. Jan. 24, 2002); *see also Elvig*, 375 F.3d at 967-968.

5    Although courts recognize differences between civil actions and bankruptcy proceedings,

6    relevance rules apply with the same force and effect.  Accordingly, to the extent that a party seeks

7    discovery unrelated to matters presently before a bankruptcy court, discovery is not warranted.

8    *See Muskogee Envtl.*, 221 B.R. at 530.  In particular, in *Muskogee Environmental*, when the issue

9    before the court related to confirmation of a debtor's plan of reorganization, the court recognized

10   that the need for discovery was not relevant when it was unrelated to the matter presently before

11   the court.  *Id.* at 530.

> Under the terms of the proposed plan, the validity of the claims of
> Rocky and the Trust would be resolved post-confirmation through a
> claims adjudication process.  Therefore, the major dispute between
> these two parties is not presently before the Court.  This Court has
> already issued an order in this case refusing . . . to produce tax
> returns and other financial records on the basis that their relevance,
> if any, relates to the issue of claim validity, and not to any of the
> issues raised by the matters currently pending before the Court.

*Id.* at 530, n.5.

16.    In the Objection, SBC contends that (i) the Trustee's Disclosure Statement
fails to tell creditors when and how much they might receive and (ii) the Chapter 11 Trustee
failed to recognize SBC's claimed right as Senior Indebtedness.  The first issue is valid and is
easily resolved, and none of the discovery sought addresses it.  As set forth in the Declarations of
Dennis J. Connolly and Howard Grobstein, an amendment to the Disclosure Statement will be
filed which is anticipated to reflect that within 30 days of the Effective Date, and before year end,
there will be an initial distribution of approximately $80 million to all creditors net of a $5 million
reserve for administrative expenses.  This amount will not be fully distributed because some
claims are Disputed Claims for which reserves must be established.  The distribution percentage
is anticipated to be 26.87% of the amount of the Allowed Claims.

8

1           17.    The second issue is not really a disclosure statement or confirmation issue

2  either.  "The purpose of a disclosure statement is to give all creditors a source of information

3  which allows them to make an informed choice regarding the approval or rejection of a plan."

4  *Duff v. U.S. Tr. (In re Cal. Fid., Inc.)*, 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996); *see also* 7

5  *Collier on Bankruptcy*, ¶ 1125.01[2] (15th ed. rev.) ("It must be such information as would enable

6  a hypothetical reasonable investor (typical of the holders of claims and interest of the relevant

7  class) to make an informed judgment about the plan.").  Disclosure statements are not designed to

8  fully address and redress each and every issue involved in a debtor's bankruptcy case.  In this

9  instance, the only creditor that cares about the issues raised by SBC is SBC.  Because SBC is the

10  only creditor affected by the issues raised by SBC and it knows every aspect of its dispute and

11  further disclosure is unnecessary.[6]

12           18.    As a confirmation issue, SBC's objection to the Trustee's Disclosure

13  Statement is a red herring for two reasons.  First, the filing of a complaint does not entitle SBC to

14  a bond from the defendants in the Subordination Adversary Proceeding.  Second, the reserve will

15  ensure that SBC has a meaningful recovery if it prevails in the Subordination Adversary

16  Proceeding.  Thus, in addition to being legally irrelevant, the discovery sought by SBC is

17  unnecessary as a practical matter.

## CONCLUSION

18

19     WHEREFORE, for the reasons set forth above, the Chapter 11 Trustee respectfully

20  requests that this Court enter a protective order precluding SBC from taking the depositions it has

21  noticed or obtaining the documents it seeks to subpoena in connection therewith.

22

23  [6]     The purported discovery requests are nothing more than an attempt to create litigation leverage against the Chapter 11 Trustee and, apparently, the 2002 Noteholders.  The purely legal

24  question raised by SBC to the structure of the Plan does not require the submission of any evidence at the time of the disclosure statement hearing.  Indeed, in the Chapter 11 Trustee's

25  experience, it is the rare case where discovery is taken in the context of a disclosure statement hearing.  Notwithstanding SBC's position to the effect that a court may decline to approve a

26  disclosure statement hearing if the plan is patently unconfirmable, no evidence is necessary, rather SBC's position may be analyzed in light of the amendment proposed by the Chapter 11

27  Trustee and applicable law, and decided at or before the hearing on confirmation of the Chapter 11 Trustee's Plan as a matter as to which no other creditor or party in interest has an economic

28

9

MOTION FOR PROTECTIVE ORDER IN RESPECT OF
SONICBLUE CLAIMS'DISCOVERY REQUESTS
{00309855.DOC v 1}

1    Dated: August 27, 2007                      FRIEDMAN DUMAS & SPRINGWATER LLP

2

3

4                                               By:   /s/ Cecily A. Dumas
                                                     Cecily A. Dumas

5
                                                     -and-
6
                                                     ALSTON & BIRD LLP
7                                                    Grant T. Stein
                                                     1201 West Peachtree Street
8                                                    Atlanta, GA 30309-3424
                                                     (404) 881-7000
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   stake other than SBC  and the 2002 Noteholders.  Discovery is a hinderance, not a help to the
     Court's analysis, and can only result in increased delay and costs to the creditors in this case.

                                               10

# EXHIBIT 19

1   ROBERT A. GREENFIELD (039648)
    FRANK A. MEROLA (136934)
2   K. JOHN SHAFFER (153729)
    STUTMAN, TREISTER & GLATT PC
3   1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
4   Telephone:    (310) 228-5600
    Facsimile:    (310) 228-5788
5
    WILLIAM McGRANE (057767)
6   BERNARD S. GREENFIELD (066017)
    McGRANE GREENFIELD LLP
7   40 South Market Street, 7th Floor
    San Jose, CA 95113
8   Telephone:    (408) 995-5600
    Facsimile:    (408) 995-0308
9
    Counsel for SonicBlue Claims LLC
10
                    UNITED STATES BANKRUPTCY COURT
11                  NORTHERN DISTRICT OF CALIFORNIA
12                          SAN JOSE DIVISION

13  In re:                                  Case No. 03-51775

14  SONICBLUE INCORPORATED, a               Chapter 11
    Delaware corporation; DIAMOND           (Case Nos. 03-51775 through 03-51778
15  MULTIMEDIA SYSTEMS, INC., a             MM) (Jointly Administered)
    Delaware corporation; REPLAYTV,
16  INC., a Delaware corporation, and       RESPONSE TO MOTION FOR ORDER
    SENSORY SCIENCE                         SHORTENING TIME ON TRUSTEE'S
17  CORPORATION, a Delaware                 MOTION FOR A PROTECTIVE ORDER
    corporation,                            [Docket No. 2433]
18
                                                    [No Hearing Set]
19  Debtors
20                                          Judge:    Hon. Marilyn Morgan
                                            Location:  Courtroom 3070
21                                                     280 South First Street
22                                                     San Jose, CA  95113

23

24

25

26

                                    1
         Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

430461v1

1    The relief the Trustee seeks is nothing short of extraordinary – the Trustee

2  seeks to bar SonicBlue Claims LLC ("SB Claims") from taking **any** discovery in

3  support of its objection to confirmation of the Trustee's Plan until **after** his Plan is

4  confirmed.  This would be an unprecedented denial of due process, and one that

5  the Trustee has not even come close to justifying.

6    If and when the Trustee's Motion for a Protective Order is scheduled for

7  hearing, SB Claims will respond fully.  However, in light of the Trustee's

8  numerous misstatements of law and fact in his Motion for Shortening Time, SB

9  Claims is compelled at this juncture to set the record straight.

10    The 2002 Indenture makes crystal clear that all Senior Indebtedness "shall

11  first be paid in full" "before any payment or distribution is made to the holders of

12  the Debentures under this Indenture."  2002 Indenture at section 4.2.  This

13  restriction applies to distributions "of any kind or character," and whether the

14  distributions are made "directly or indirectly."  *Id.*  These provisions are fully

15  enforceable in bankruptcy, *see* Bankruptcy Code section 510(a), and thus a

16  subordinated creditor can "receive no payment until the [senior creditors] are paid

17  in full as per the Subordination Agreement."  *In re Chicago, S. Short & S. Bend*

18  *R.R.*, 146 B.R. 421, 429 (Bankr. N.D. Ill. 1992).  Senior Indebtedness must receive

19  "payment in full before [the subordinated creditor] receives any payment – no

20  more, no less."  *Id.*; *see also* Ganguin & Bilardello, Fundamentals of Corporate

21  Credit Analysis 211-12 (2005) ("The description and definition of the

22  subordination is eminently clear:  It states that the subordinated obligations rank

23  junior to other senior indebtedness in the event of insolvency, and hence will be

24  ***paid only after senior indebtedness has been repaid in full***" (emphasis added)).

25    According to the Trustee, however, SB Claims does not really have to be

26  "paid in full," so long as there is what he determines to be an "adequate" reserve.

1   According to the Trustee, he can distribute more than $17 million to the 2002

2   Noteholders immediately after the Plan goes effective, so long as he reserves an

3   "adequate" amount to pay SB Claims in full someday in the future.  The 2002

4   Indenture, however, clearly does not say that.  Moreover, what the Trustee deems

5   to be an "adequate" reserve is, in fact, wholly inadequate, and it would place a

6   significant risk of loss on SB Claims.  In any event, why the Trustee should be

7   getting into the middle of a dispute between the 2002 Noteholders and SB Claims

8   is very hard to understand – the Trustee should simply interplead the disputed

9   funds until SB Claims and the 2002 Noteholders have resolved their own dispute.

10  *See In re Bank of New England Corp.*, 359 B.R. 384, 388-89 (Bankr. D. Mass.

11  2007) (treating subordination dispute effectively as an interpleader action, with the

12  burden of proof rested on each creditor to prove its entitlement to the funds before

13  they were distributed).

14        The Trustee's proposed reserve assumes that, but for the original issue

15  discount dispute, the 2002 Noteholders' claims will be ***allowed in full*** in this case.

16  In other words, the Trustee is asking SB Claims and this Court to accept as an

17  unassailable fact that the 2002 Noteholders did nothing in this case to justify the

18  disallowance or equitable subordination of so much as a penny of their claims.

19  Otherwise, the "reserve" that the Trustee proposes to fund will be wholly

20  inadequate.

21        The Trustee seems to forget that it was the 2002 Noteholders who

22  controlled the Creditors' Committee during the period that Pillsbury's conflict was

23  not disclosed to this Court (including when the Committee itself co-sponsored a

24  woefully deficient Disclosure Statement in this regard).  Has the Trustee

25  concluded that no fiduciary duties were breached?  The Trustee seems to forget

26  that the 2002 Noteholders participated in Committee deliberations regarding the

Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

1  VIA/Intel settlement, without (according to lead Committee counsel) revealing

2  their conflicting interests regarding the VIA Senior Indebtedness issue.  Has the

3  Trustee concluded that the 2002 Noteholders acted properly in this regard?  How

4  can the Trustee have reached these conclusions, if he has yet to depose a single

5  witness in this case?  More importantly, how can the Court or any interested party

6  accept the Trustee's conclusions, when he has yet to produce a single shred of

7  evidence in support of them.

8        In ordering the appointment of a trustee in this case, this Court observed:

9          During the past year and a half, SONICblue's litigation against VIA

10       and S3 has been the main roadblock to the proposal of a plan and the

11       conclusion of this case.  The three senior bondholders were actively

12       represented in the settlement negotiations by Bennett. At the same time,

13       these same senior bondholders were both members and an effective

14       majority of the committee.  As committee members, the senior bondholders

15       were and are fiduciaries that bear a duty of undivided loyalty to provide

16       impartial service in the interests of the creditors that they represent. *In re*

17       *Caldor, Inc.*, 193 BR 165, 169 (Bankr. S.D.N.Y. 1996); *In re Microboard*

18       *Processing, Inc.*, 95 B.R. 283, 284 (Bankr. D. Conn 1989); *In re Mesta*

19       *Machine Co*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Because the

20       bondholders appear to have used their position on the committee to insert

21       themselves into the settlement negotiations without revealing a hidden

22       agenda, they may have breached their fiduciary duty to the unsecured

23       creditor body.  Whether their motive was simply to save litigation costs for

24       the estate by avoiding future litigation over the priority of VIA's claim, or,

25       instead, to assure a  larger return on their individual investments is not

26       known. In fact, as Bennett noted, he had never personally appeared in court

Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

430461v1

1    until March 19, 2007.  During the four years of this case, he has operated in

2    the shadows and, until January 23, 2007, it was not generally known to this

3    court or the creditor body that the three senior bondholders were serving on

4    the committee.

5  "Memorandum Decision and Order on Motion to Appoint a Chapter 11 Trustee,

6  Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw

7  Pittman LLP and for Disgorgement of Attorneys' Fees," dated March 26, 2007, at

8  17.

9        At this point in the case, the Trustee could not possibly tell this Court that

10  there was in fact nothing wrong with the 2002 Noteholders' conduct in this case.

11  The Trustee has yet to take a single deposition.  He has yet to deliver to the Court

12  any evidence.  And, he has to date sought to bar every other party (most notably,

13  SB Claims) from conducting their own discovery regarding the 2002 Noteholders,

14  even if limited to the undisclosed, purported waiver of the 2002 Noteholders'

15  Senior Indebtedness obligations.

16        Thus, the Trustee cannot assure the Court or SB Claims that his proposed

17  reserve is an any way adequate.  Unless the Trustee at this point is willing to

18  represent that under no circumstances will the 2002 Noteholders' claim be subject

19  to objection (other than with respect to original issue discount) – which the

20  Trustee cannot in either good faith or good conscience do – the Trustee's "reserve"

21  is just a phantom.

22        Moreover, it should be noted that the Trustee's proposed "reserve" did not

23  come voluntarily, as the Trustee seems to want this Court to believe.  For two

24  months, SB Claims was telling the Trustee that his Plan – which as drafted still

25  does not include *any* reserve – violated the plain language of the 2002 Indenture.

26  While the Trustee's counsel listened to SB Claims, he refused to make any changes

Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

430461v1

1  to the Plan (indeed, he did not even offer the reserve that he currently is

2  proposing).  It was not until SB Claims had to prepare and file its opposition to the

3  Trustee's Disclosure Statement and to the Trustee's request to stay SB Claims'

4  adversary proceeding that the Trustee contacted SB Claims with this "offer" to

5  "give" SB Claims only a portion of what it is entitled to under the 2002 Indenture.

6        Finally, the Trustee's characterization of his supposed willingness to allow

7  other parties to participate in his investigation is, to quote the Trustee's own words,

8  "incomplete at best, or intentional at worst."  *See* Trustee's Reply To The

9  Opposition Of SonicBlue Claims LLC To The Chapter 11 Trustee's Motion To

10  Stay The Adversary Proceeding Pending Conclusion Of The Trustee's

11  Investigation at 2 [Adv. Pro. 07-05082, Docket No. 34].  The truth is that SB

12  Claims has been asking the Trustee for nearly four months to examine various

13  witnesses, including those whom SB Claims has now noticed for deposition.  SB

14  Claims asked the Trustee to take these depositions, or, alternatively, to let SB

15  Claims take them.  To date, however, the Trustee has noticed a scant ***one***

16  deposition, and he has steadfastly opposed SB Claims' efforts to depose anyone

17  else.  Moreover, SB Claims has asked the Trustee for access to the documents that

18  various parties have been voluntarily producing to him.  The Trustee, however,

19  expressly rejected SB Claims' request, not only as to documents which potentially

20  could be privileged, but as to each and every document the Trustee has received.

21  *See* Bankruptcy Code sections 704(a)(7) & 1106(a)(1) (requiring trustee to

22  "furnish such information concerning the estate and the estate's administration as

23  is requested by a party in interest").[1]

24        The truth is that all the Trustee has "offered" is that SB Claims can make

25  "suggestions" to the Trustee as to whom the Trustee should depose.  The Trustee

26

_____

[1]      In spite of its requests, the only documents that SB Claims has received to date are those produced by VIA and its counsel in response to the Trustee's only scheduled Rule 2004 examination.

Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

430461v1

1   has not committed to accept any of these suggestions.  Nor has the Trustee

2   committed as to when, if ever, any particular party will be deposed.  And, when

3   the Trustee does decide to schedule a deposition, it apparently will be on his terms,

4   and at the time of his choosing.  In short, the Trustee's "offer" is no substitute for

5   SB Claims' rights as a party in this case to take its own discovery in accordance

6   with the Federal Rules of Civil Procedure.

7           Moreover, the Trustee's "offer" to permit SB Claims to suggest to the

8   Trustee how to proceed with his investigation was in the context of a prior

9   warning by Trustee's counsel – SB Claims should assume that everything it says to

10  the Trustee could or would be repeated to everyone, including the 2002

11  Noteholders.  In order to assist the Trustee in carrying out his investigation, SB

12  Claims offered to share with him its own litigation strategies, but subject to some

13  form of confidentiality agreement and/or joint privilege.  The Trustee declined to

14  do so.  In this context, SB Claims is not willing to have to present to the Trustee its

15  reasons for wanting to depose particular witnesses, or to seek particular

16  documents, only to have its litigation strategies to become a matter of public

17  record in this case.

18          SB Claims has not, and does not, doubt the importance of the Trustee's role

19  in this case.  At the end of the day, however, the Trustee is just a party, just as is

20  SB Claims.  The Trustee is not an "examiner," a "special master, " or a "court

21  appointed expert."  The Trustee is a party.  The Trustee is also a fiduciary, true

22  enough, but so is a debtor in possession or creditors' committee.  It would be

23  absurd, however, for either a DIP or committee tried to block all other parties from

24  taking discovery in a case.  It is no less absurd for the Trustee to do so here,

25  particularly when the Trustee is a plan proponent, and the discovery involves the

26  confirmation of his plan.

Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

430461v1

1    SB Claims can and will expand upon the points raised herein once this

2 matter is set for hearing.

3 DATED:  August 29, 2007                STUTMAN, TREISTER & GLATT P.C.
                                                             and
4                                                  McGRANE GREENFIELD LLP

5

6                                              By:_____/s/  K. John Shaffer_____

7                                                     K. John Shaffer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Response to Motion for Order Shortening Time on Trustee's Motion for a Protective Order

# EXHIBIT 20

1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:  (310) 228-5600
   Facsimile:   (310) 228-5788
5
   WILLIAM McGRANE (057767)
6  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
7  40 South Market Street, 7th Floor
   San Jose, CA 95113
8  Telephone:  (408) 995-5600
   Facsimile:   (408) 995-0308
9
   Counsel for SonicBlue Claims LLC
10
                    UNITED STATES BANKRUPTCY COURT
11
                    NORTHERN DISTRICT OF CALIFORNIA
12
                           SAN JOSE DIVISION

13  In re:                              Case No. 03-51775

14  SONICBLUE INCORPORATED, a           Chapter 11
    Delaware corporation; DIAMOND       (Case Nos. 03-51775 through 03-51778
15  MULTIMEDIA SYSTEMS, INC., a         MM) (Jointly Administered)
    Delaware corporation; REPLAYTV,
16  INC., a Delaware corporation, and   OPPOSITION TO TRUSTEE'S MOTION
    SENSORY SCIENCE               FOR A PROTECTIVE ORDER
17  CORPORATION, a Delaware
    corporation,                        Date:      September 5, 2005
18                                      Time:      2:00 p.m.
    Debtors                             Judge:     Hon. Marilyn Morgan
19                                      Location:  Courtroom 3070
                                                   280 South First Street
20                                                 San Jose, CA  95113

21

22

23

24

25

26

27

1  **I.    THE RELIEF THE TRUSTEE SEEKS IS EXTRAORDINARY AND**
2        **NOT AUTHORIZED BY ANY APPLICABLE LAW.**

3        The relief the Trustee seeks is extraordinary – a complete stay of all

4  discovery involving any issue or entity that may be the subject of the Trustee's

5  own investigation until such time as the Trustee has completed his investigation.

6  This includes any discovery that SB Claims may seek in connection with his Plan

7  (which the Trustee intends to confirm before his investigation is completed), and

8  any discovery that SB Claims may seek in its Adversary Proceeding.

9        The law in the Ninth Circuit is clear that:

10        *A party seeking a stay of discovery carries a heavy burden of*

11        *making a 'strong showing' why discovery should be denied.*

12        *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).

13        The moving party must show a particular and specific need for the

14        protective order, as opposed to making stereotyped or conclusory

15        statements.  *See* Wright & Miller, Federal Practice and Procedure, §

16        2035; A. W. Tashima & J. Wagstaffe, Federal Civil Procedure

17        Before Trial, § 11:88.

18  *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990) (emphasis

19  added); *see also White v. E-Loan, Inc.*, 2006 U.S. Dist. LEXIS 76051*5 (N.D. Cal.

20  Oct. 5, 2006) (holding that motions to stay discovery "are disfavored because

21  discovery stays may interfere with judicial efficiency and cause unnecessary

22  litigation in the future," and that the party seeking such a stay has the "heavy

23  burden of making a strong showing why discovery should be denied") (internal

24  quotations omitted); *Turner Broadcasting Sys. v. Tracinda Corp.,* 175 F.R.D. 554,

25  556 (D. Nev. 1997) ("A party seeking a stay of discovery carries the heavy burden

26  of making a strong showing why discovery should be denied.") (internal

27  quotations omitted).

1        It is significant that the Trustee has not cited a single case – in the entire

2    twenty-nine year history of the Bankruptcy Code – in which a trustee has been

3    granted (or has even asked for) the extraordinary relief he is requesting here.  To

4    the best of our knowledge, it has never happened, and it never should happen.  The

5    Trustee is not seeking to stay discovery just as to a particular issue, or just as to a

6    particular witness.  The Trustee is seeking a blanket stay of all discovery of every

7    issue that may affect his investigation.  His request is unprecedented.

8        When this Court instructed the United States Trustee to conduct a search

9    for a strong, disinterested trustee to take over this very troubled case, the idea was

10   simple.  Bring back transparency to the process, and avoid even the appearance

11   any possible wrongdoing was being swept under the rug.  What we have gotten

12   instead is a strong trustee alright, but one who, to date, has conducted almost his

13   entire investigation in secret, and who now is seeking to prevent another party –

14   SB Claims – from finding out facts that the Trustee may already know, at least

15   until after the Trustee confirms his Plan.  *Cf.* 11 U.S.C. §§ 704(a)(7) & 1106(a)(1)

16   (placing an affirmative duty on the Trustee to provide information regarding the

17   estate's affairs).  The Trustee seems to be running this case like a special

18   prosecutor conducting a grand jury investigation, rather than a trustee

19   administering a bankruptcy case.  At the same time, he seems willing to proceed

20   with a Plan that violates SB Claims' rights.  The Trustee seems to have forgotten

21   his actual place in this bankruptcy case.  He is not a special prosecutor, or a special

22   master, or an or an examiner.  The Trustee is a party, nothing more, nothing less.

23   And so is SB Claims a party, a party whose diligence and hard work, not to

24   mention honesty with the Bankruptcy Court – at a time when the estate's

25   fiduciaries were not being honest with the Court – was what got the Trustee

26   appointed in the first place.

27

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1    There is nothing in the Bankruptcy Code or Rules that gives any party –

2    even a trustee – the exclusive right to take all discovery in the case for what will

3    amount to a ten-month period from the date the Trustee was appointed (assuming

4    the Trustee does, in fact, finish his investigation in six more months).  Congress

5    certainly could have drafted such a provision in the Code (it did so for plan

6    exclusivity under section 1121),[1] but it did not.  Except for those express

7    provisions of the Code that give the Trustee exclusive authority (such as selling

8    assets under section 363), the Code gives every party in a chapter 11 case the right

9    to "raise and … appear and be heard on any issue in a case under this chapter."  11

10   U.S.C. § 1109(b).

11   The Trustee contends that his independent investigation is "paramount"

12   because he is a fiduciary.  *See* Chapter 11 Trustee's Reply Memorandum [etc.] at 1

13   [Docket No. 2457].  Again, the Trustee cites zero authority for this bold statement,

14   other than for the obvious point that he is, indeed, a fiduciary.  But what does this

15   prove?  *Every* debtor in possession or trustee is a fiduciary of its respective estate.

16   Pillsbury Winthrop was a fiduciary in this case.  The 2002 Noteholders were

17   fiduciaries in this case (and still are as Committee members) .  Even the

18   undersigned counsel has served many times as a "fiduciary" representing estates or

19   committees, but never once has presumed that the title gave him an exclusive right

20   to investigate the estate's affairs.  The fact that one is a fiduciary does not place

21   one on a legal pedestal; nor does it exempt one from the requirements of fair

22   judicial process.

23   The Trustee also seems to believe that this Court has empowered him with

24   special responsibilities that never before have been bestowed upon a chapter 11

25   trustee.  He refers back to his Declaration in support of Alston & Bird's retention,

26   _____

27   [1]   Indeed, plan exclusivity ***terminates*** upon the appointment of a chapter 11
        trustee.  11 U.S.C. § 1121(c)(1).

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1    in which he outlined his view of what his investigation is supposed to entail.  This

2    Court, however, made clear that it did not "presume to direct the trustee how to

3    independently exercise the trustee's judgment."  Transcript of June 14, 2007

4    Hearing at 8 [Docket No. 2375].  SB Claims respectfully submits that the Court

5    also did not intend to authorize the Trustee to act as anything other than a trustee –

6    not as a special master, not as a Court appointed expert, and certainly not as a

7    magistrate or judge himself.

8        The remainder of this brief addresses two fundamental issues:  (1) why SB

9    Claims needs to take discovery, and (2) why SB Claims would be severely

10   prejudiced if it were barred from taking discovery.  The discussion refers to the

11   2002 Indenture, which is attached to the 2002 Noteholders' Motion to Dismiss the

12   Adversary Proceeding [Adv. No. 07-05082, Docket No. 12], and to SB Claims'

13   Objection to the Trustee's Disclosure Statement [Docket No. 2429], and SB

14   Claims respectfully requests that the Court take judicial notice of both.

15   **II.    WHY SB CLAIMS NEEDS TO TAKE DISCOVERY.**

16       SB Claims seeks to take only that discovery that is directly related to the

17   issue of whether the VIA claim is senior to, or *pari passu* with, the 2002

18   Noteholders.  SB Claims is not seeking any other discovery, and it will allow the

19   Trustee to explore on his own the other issues in this case, including whether

20   Pillsbury Winthrop disclosed all of its conflicts, whether it or anyone else should

21   be required to disgorge its fees, and whether officers and directors breached any

22   fiduciary duties to the Debtors (as various other parties have alleged).  There is far

23   more to this case than just the Senior Indebtedness issue, but that does not mean

24   that resolution of the Senior Indebtedness issue must await the Trustee's

25   investigation of every other issue.

26       SB Claims has a real and legitimate need to take the discovery it seeks.  SB

27   Claims is seeking to enforce its rights under the 2002 Indenture – rights which are

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1  not to be affected by chapter 11.  *See* 11 U.S.C. § 510(a).  SB Claims commenced

2  its effort to establish its rights by filing its Adversary Proceeding in May.  The

3  Adversary Proceeding does not seek, in any way, to affect the amount of

4  distributions that are made from the estate.  Rather, the sole relief sought is a

5  determination – whether based on contract or equity – that SB Claims' rights are

6  senior to those of the 2002 Noteholders.

7      Moreover, following the commencement of the Adversary Proceeding, the

8  Trustee himself put the subordination question directly into issue by filing his

9  proposed Plan.  The Plan filed by the Trustee proposed to distribute approximately

10  $26 million to the 2002 Noteholders from monies that would otherwise go to the

11  Class 5, 1996 Noteholders ***before*** any resolution of the Senior Indebtedness issue.

12      This distribution would violate the plain language of the 2002 Indenture,

13  which clearly provides that no distribution whatsoever shall be made to the 2002

14  Noteholders until all Senior Indebtedness is paid in full.  ***The 2002 Indenture***

15  ***requires that all Senior Indebtedness "shall first be paid in full" "before any***

16  ***payment or distribution is made to the holders of the Debentures under this***

17  ***Indenture."*** 2002 Indenture at § 4.2 (emphasis added).  This restriction applies to

18  distributions "of any kind or character," and whether the distributions are made

19  "directly or indirectly."  *Id.*  These provisions are fully enforceable in bankruptcy,

20  *see* 11 U.S.C. § 510(a), and thus a subordinated creditor can "receive no payment

21  until the [senior creditors] are paid in full as per the Subordination Agreement."  *In*

22  *re Chicago, S. Shore & S. Bend R.R.*, 146 B.R. 421, 429 (Bankr. N.D. Ill. 1992).[2]

23  _____

24  [2]  Senior Indebtedness must receive "payment in full before [the subordinated
25  creditor] receives any payment – no more, no less."  146 B.R. at 429; *see also*
    Ganguin & Bilardello, Fundamentals of Corporate Credit Analysis 211-12
26  (2005) ("The description and definition of the subordination is eminently clear:
    It states that the subordinated obligations rank junior to other senior
27  indebtedness in the event of insolvency, and hence ***will be paid only after***
    ***senior indebtedness has been repaid in full***" (emphasis added)).

6

430613v1

1    SB Claims advised the Trustee of this fact in writing no less than four times

2    between June 19 and mid-August, but the Trustee refused to amend the Plan in

3    this regard.

4    SB Claims lodged its objection to the Trustee's Disclosure Statement on

5    August 16 [Docket No. 2422].[3] The next day (August 17), the Trustee proposed

6    through his counsel that he would amend his Plan to "reserve" a portion of the

7    distribution to the 2002 Noteholders to "protect" SB Claims' interests.  The

8    Trustee later clarified that the "reserve" would equal $7.9 million, thus still

9    *allowing the 2002 Noteholders to receive at least $18 million from the first*

10   *distribution under the Plan – no questions asked*.  SB Claims objected to this

11   proposal, because it (a) would violate the plain terms of the 2002 Indenture, which

12   prohibit any distribution before Senior Indebtedness is paid in full, (b) would

13   enable the 2002 Noteholders to realize a substantial recovery on their claim before

14   any resolution of the dispute, thus giving them incentive them to litigate, rather

15   than attempt to reach a consensual resolution of the matter, and (c) would, in any

16   event, be wholly inadequate to protect SB Claims' rights, because the Trustee's

17   proposal presumed that the 2002 Noteholders' claims would be allowed without

18   any objection, offset, or subordination, other than with respect to the substantial

19   original issue discount ("OID") associated with the 2002 Noteholders' claims.

20   The Trustee does not dispute the fact that, unless the 2002 Noteholders'

21   claims are not subject to any objection, offset, or subordination (other than with

22   respect to OID), *the "reserve" will not be adequate to pay SB Claims' Senior*

23   *Indebtedness in full*.  Thus, even assuming that a "reserve" were permitted under

24   the 2002 Indenture (which it is not), the Trustee's proposed reserve is wholly

25   

26   [3]    SB Claims' Disclosure Statement Objection was lodged as an exhibit to its
         request to file an over-sized brief on August 16, 2007.  It was formally "filed"
27       on August 21, 2007, after this Court granted SB Claims' request [Docket No.
         2429].

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

430613v1

1    inadequate, and it squarely places the risk of nonpayment on SB Claims.  In any

2    event, the plain language of the 2002 Indenture does not provide for any "reserve"

3    – it says that no payment whatsoever shall be made to the 2002 Noteholders until

4    all Senior Indebtedness is paid in full.[4]

5         The Trustee's stated rationale for allowing the 2002 Noteholders to receive

6    $18 million under his Plan – no questions asked – is that, until SB Claims proves

7    otherwise, SB Claims is not senior to the 2002 Noteholders.  But why is that so?

8    Why is not equally true that, until the 2002 Noteholders prove they are *pari passu*,

9    they should not receive any distribution?   When faced with a similar situation

10   _____

11   [4]   In their Joinder in the Trustee's Motion, the 2002 Noteholders question SB
     Claims' entitlement to subordinate the 2002 Noteholders' claim to postpetition

12   interest, in addition to the $12.5 million allowed claim.  The answer is in the
     2002 Indenture, which provides that the VIA claim is entitled to Senior

13   Indebtedness status up to $15 million in *principal*, plus all interest thereon
     "*including any interest accruing after the filing of a petition by or against the*

14   *Company under any bankruptcy law, whether or not allowed as a claim after*
     *such filing in any proceeding.*"  See 2002 Indenture § 1.1, at 6 (emphasis

15   added).  Such provisions subordinating post-petition interest (even interest that
     is not otherwise allowed in the bankruptcy case) are common place in

16   indentures, and are fully enforceable, particularly when, as here, the
     authorization is explicit.  *See HSBC Bank USA v. Branch (In re Bank of New*

17   *Engl. Corp.)*, 364 F.3d 355 (1st Cir. 2004).

18
     Although the principal amount of the VIA claim is $12.5 million, interest on

19   the claim may total $6 million, or more if the Senior Indebtedness issue is not
     resolved promptly.  Under applicable Delaware law (which governed the

20   underlying agreements between VIA and the Debtors), "interest shall be 5%
     over the Federal Reserve discount rate including any surcharge as of the time

21   from which interest is due." 6 Del. Code § 2301(a) (specifying the statutory
     rate of interest, unless the contract provides for a different rate, which in this

22   case it does not).  This would be 11.25%, per annum, if one uses the date of the
     Settlement Agreement, or 7.25% per annum, if one uses the petition date in this

23   case.  Furthermore, under Delaware law, interest would extend back at least as
     far as the petition date, and perhaps as far back as the first date upon which

24   VIA could have asserted claims against the Debtors.  *See, e.g., Stephenson v.*
     *Capano Dev. Co.*, No. 81-C-JA-83, 1985 Del. Super. LEXIS 1021, at *9 (Del.

25   Super. Ct. July 10, 1985) (concluding that interest under section 2301(a)
     should be determined as of, and "commenced to run from[,] the time [the

26   plaintiff] was entitled to her damages, i.e., when her cause of action accrued,
     regardless of the fact that the precise amount of damages was determined

27   later").

8

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1    involving a disputed subordination provision in an indenture, the Court in the

2    *Bank of New England* case treated the matter effectively like an interpleader action

3    – no one gets the disputed funds until they prove their entitlement to it. *See In re*

4    *Bank of New England*, 359 B.R. 384, 388-89 (Bankr. D. Mass. 2007). That is

5    what the Trustee should do here – distribute none of the disputed Class 5 funds

6    until either SB Claims or the 2002 Noteholders demonstrate their entitlement to

7    the funds. The Trustee's desire to distribute more than $18 million to the 2002

8    Noteholders before the subordination dispute has been resolved – and even before

9    the Trustee himself has determined whether the estate has counterclaims against

10   the 2002 Noteholders – is reckless and inexplicable.

11        The Trustee's "explanation" for his Plan is a classic Catch-22. The Trustee

12   argues that SB Claims has yet to prove that it is senior, and therefore the Plan

13   treats SB Claims as if it is not senior. At the same time, the Trustee wants to stay

14   SB Claims' Adversary Proceeding (in which the seniority issue will be

15   determined), and further to bar SB Claims from taking any discovery that it needs

16   to establish its seniority.

17        There is simply no basis for the Trustee to presume that the 2002

18   Noteholders are not subordinated. It is an unassailable fact that the language in

19   the VIA/Intel Settlement Agreement purporting to waive the 2002 Noteholders'

20   subordination (the "Purported Waiver Language") was not properly disclosed to

21   this Court or creditors. It is equally unassailable that the 2002 Noteholders

22   obtained this plum for themselves while being an effective majority of the

23   Creditors' Committee, and while being parties to a "Protective Order" that gave

24   them direct access to the Debtors' confidential litigation strategies vis-à-vis VIA.

25   Why, under these circumstances, should anyone presume that the Purported

26   Waiver Language is valid? It is at least as reasonable to presume that it is invalid.

27

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1       As set forth in SB Claims' objection to the Trustee's Disclosure Statement,

2    there is ample authority for this Court to disregard those portions of its Order

3    approving the Settlement Agreement that were obtained based upon lack of notice,

4    fraud on the Court, breach of duty, or any other impropriety.  *See* Disclosure

5    Statement Objection at 31-39.  The Trustee, however, assumes all of this away.

6       Moreover, the Trustee completely ignores again the plain language of the

7    2002 Indenture, which provides:

8       ***<u>No right</u> of any present or future holder of any Senior Indebtedness
        to enforce subordination as herein provided shall at any time in <u>any</u>***

9       ***<u>way</u> be prejudiced or impaired <u>by any act</u> or failure to act on the part***

10      ***<u>of the Company</u> or by any act or failure to act, <u>in good faith</u>, <u>by any</u>***
        ***<u>such holder</u>***, or by any noncompliance by the Company with the terms,

11      provisions and covenants of this Indenture, ***regardless of any***
        ***knowledge thereof which any such holder may have or otherwise be***

12      ***charged with***.

13

14   2002 Indenture § 4.5 (emphasis added).  The entry into the Settlement Agreement

15   was an "act" by the Company (the Debtor) and VIA.  *See Hensley v. Caiettei*, 13

16   Cal. App. 4th 1165, 1175 (1993) ("Entering into a contract is a jural act which

17   alters the legal relations of the parties and creates an obligation."); *see also* Black's

18   Law Dictionary 24 (7th ed. 1999) (defining "act" as "Something done or

19   performed, esp. voluntary; a deed.").  The unambiguous language of section 4.5,

20   however, makes clear that ***no act*** by the Debtor, or by VIA in good faith, shall in

21   any way prejudice or impair VIA's rights under the 2002 Indenture.  Thus, the

22   "act" of entering into the Settlement Agreement cannot have altered VIA's rights

23   "to enforce subordination" as set forth in the 2002 Indenture.

24      There is no evidence that VIA acted in any way other than in good faith.

25   Under New York law, "good faith" means "honesty in fact in the conduct or

26   transaction concerned."  N.Y. U.C.C. Law § 1-201(19).  It is a purely subjective

27   standard, and one that imposes no duty of reasonable inquiry.  *Chemical Bank v.*

1    *Haskell*, 51 N.Y.2d 85, 91 (1980).  Thus, "the inquiry is not whether a reasonable

2    [creditor in VIA's] position would have known, or would have inquired . . . , but

3    rather, the inquiry is what [VIA] itself actually knew."  *Id.*

4         SB Claims thus has made, at the least, a very substantial case for why its

5    claim is "Senior Indebtedness" in its objection to the Trustee's Disclosure

6    Statement.  *See* Docket No. 2429.  SB Claims also has demonstrated that the Plan

7    violates its rights as a holder of Senior Indebtedness, because it proposes to

8    distribute approximately $18 million to the 2002 Noteholders before SB Claims is

9    paid in full, in violation of section 4.2 of the 2002 Indenture.

10        The Trustee nonetheless contends that all of the foregoing are "legal

11   issues," and that no discovery is necessary for SB Claims to establish its rights as a

12   holder of Senior Indebtedness.  It is indeed true that SB Claims could,

13   conceivably, prevail on all of its arguments as a matter of law.  It is also quite

14   possible, however, that the Court may want to consider some evidence in

15   connection with this matter – for example, what exactly did the 2002 Noteholders

16   tell the Debtors when they, to use their own words, "insisted" that any settlement

17   with VIA include the purported waiver of their subordination.  Reply Brief in

18   Support of Motion for Clarification, or in the Alternative, for Leave to File a

19   Motion for Clarification [Docket No. 2265, filed by the 2002 Noteholders on April

20   27, 2007] at 10.  Or, what did Mr. Boro mean by the following passage in his

21   Declaration filed in an attempt to keep Pillsbury Winthrop from being disqualified

22   in this case:

23   > On September 16 and 19, 2005, we placed calls to Mr. Bennett to
24   > find out if the Senior Noteholders would support the 'mediator's
     > proposal' of a $12.5 million allowed claim.  During that time, I
25   > learned that the provision in the Senior Noteholder Indenture
     > referring to the $15 million indebtedness to VIA was for a loan that
26   > VIA was supposed to have made to SONICblue, but which never
     > occurred.  On September 20, ***we learned that the Senior***
27   > ***Noteholders were willing to support a settlement that included a***
     > ***$12.5 million allowed claim for Defendants, provided that the***

---

11

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1    *settlement included certain terms, including that Defendants'
     allowed claim be neither senior nor junior to any other general*
2    *unsecured claim*.

3    Declaration of Albert J. Boro, Jr. (filed March 5, 2007) [Docket No. 2182] at ¶ 17

4    (emphasis added).

5    SB Claims has the right – and the need – to examine the truth of these and

6    other statements that are already in the record before the confirmation hearing.

7    The Trustee cannot possibly say at this time that the entire issue will be resolved

8    as a matter of law.  Nor is it an acceptable solution to get all the way to the

9    confirmation hearing and to determine that the parties, after all, should have taken

10   discovery.  The middle of a confirmation hearing is a very poor time to learn that

11   critical discovery was not taken.  If the Trustee wants to make distributions by

12   year end – which is certainly a laudable goal – then the Trustee should facilitate,

13   rather than oppose, the prompt discovery of the facts relating to the subordination

14   dispute.

15   Finally, the Trustee relies heavily on the fact that the 2002 Noteholders

16   have filed a Motion to Dismiss in the Adversary Proceeding.  As set forth above,

17   however, it is the Trustee's own Plan – filed after the Adversary Proceeding was

18   commenced – that requires SB Claims to take discovery now.  In any event, the

19   filing of a Motion to Dismiss does not – contrary to what the Trustee seems to

20   believe – automatically stay discovery, even in the Adversary Proceeding.  Indeed,

21   the law is to the contrary:

22   [O]ne argument that is usually deemed insufficient to support a stay
     of discovery is that a party intends to, or has already filed, a motion
23   to dismiss for failure to state a claim under Rule 12(b)(6).  As one
     court has observed,
24

25   The intention of a party to move for judgment on the
     pleadings is not ordinarily sufficient to justify a stay of
26   discovery.  4 J. Moore, *Federal Practice* § 26.70[2], at 461.
     Had the Federal Rules contemplated that a motion to dismiss
27   under Fed.R.Civ.Pro. 12(b)(6) would stay discovery, the
     Rules would contain a provision to that effect.  In fact, such a

12

1
2
3
4
5
6
7

> notion is directly at odds with the need for expeditious
> resolution of litigation …. Since motions to dismiss are a
> frequent part of federal practice, this provision only makes
> sense if discovery is not to be stayed pending resolution of
> such motions. Furthermore, a stay of the type requested by
> defendants, where a party asserts that dismissal is likely,
> would require the court to make a preliminary finding of the
> likelihood of success on the motion to dismiss. This would
> circumvent the procedures for resolution of such a motion.
> Although it is conceivable that a stay might be appropriate
> where the complaint was utterly frivolous, or filed merely in
> order to conduct a "fishing expedition" or for settlement value
> . . . , this is not such a case.

8

*Nabi Biopharmaceuticals v. Roxane Labs., Inc.*, 2006 WL 3007430 (S.D. Ohio

9

Oct. 20, 2006) (quoting *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D.

10

Cal. 1990)); *see also Turner Broadcasting Sys., Inc. v. Tracinda Corp.*, 175 F.R.D.

11

554, 556 (D. Nev. 1997) ("a pending Motion to Dismiss is not ordinarily a

12

situation that in and of itself would warrant a stay of discovery . . . ").

13

14

15

## III. WHY THE TRUSTEE'S "YOU CAN COME ALONG TO OUR RULE 2004 EXAMINATIONS" PROPOSAL IS GROSSLY UNFAIR AND PREJUDICIAL TO SB CLAIMS.

16
17
18
19
20
21
22
23
24
25

The Trustee's proposed "solution" to SB Claims' need to take discovery is grossly unfair and unworkable. According to the Trustee, he will schedule Rule 2004 examinations – if and when he decides to do so – and SB Claims can show up and ask questions at the end (assuming there is any time left). The Trustee will have complete control over the order of witnesses, which documents are requested, and even whether the particular examination takes place before or after the confirmation hearing. The Trustee leaves no doubt that, at most, SB Claims could make "suggestions" as to what the Trustee should or should not ask for, and the Trustee will exercise his sole "independent" discretion to accept or reject those suggestions.

26
27

The Trustee's approach fails for a number of reasons. First, as discussed above, the Trustee has concluded that, until SB Claims has proved that it is senior,

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1   it will be treated as *pari passu* with the 2002 Noteholders.  Although the Trustee

2   will reserve $7.9 million, he will distribute more than $18 million to the 2002

3   Noteholders, in direct violation of the plain language of the 2002 Indenture.

4   Moreover, his "reserve" will not be adequate unless he can guaranty that there will

5   be no objections, offsets, or subordination of the 2002 Noteholders' claims, other

6   than the OID issue.  The Trustee in fact is not willing to guaranty that (because he

7   can't before his investigation is completed), and thus all of the risk of loss will rest

8   upon SB Claims (other than SB Claims' ability to try to recover the funds from

9   three offshore, Cayman Islands hedge funds).

10        Second, it is not at all clear that the Trustee's proposal will permit SB

11   Claims to take any meaningful discovery.  A number of courts have held that a

12   Rule 2004 examination may not be used to obtain discovery when there is pending

13   an adversary proceeding or contested matter relating to the same subject.  *See, e.g.*,

14   *In re Bennett Funding Group, Inc.*, 203 B.R. 24 (Bankr. N.D.N.Y. 1996).  The

15   Trustee can provide no assurances that parties will not use this rule as a basis for

16   objecting to any questions that SB Claims might ask, or any documents that SB

17   Claims might seek.  The appropriate way to take discovery in a contested matter or

18   adversary proceeding is pursuant to the Federal Rules of Civil Procedure, which is

19   precisely what SB Claims is seeking to do.

20        Third, the Trustee to date has not engaged in any meaningful dialogue with

21   SB Claims regarding his discovery plan.  SB Claims first met with the Trustee on

22   ***April 19, 2007***, and requested at that time (having itself once noticed the relevant

23   deposition itself, and then having decided to wait for the Trustee's appointment on

24   a voluntary basis) that either the Trustee depose the former Chief Operating

25   Officer of Debtor, the man who had actually signed off on the 2002 Indenture (and

26   who had left the Debtors *before* the petition date), or that the Trustee agree that SB

27   Claims could do so itself.  SB Claims repeated this request on a number of

1  occasions, but to date the Trustee has failed to inform SB Claims of when, or if,

2  this person would ever be deposed.  If this is the Trustee's vision of the

3  "suggestion" process, then it has already failed and SB Claims wants no more of it.

4        Fourth, the Trustee admits that he already has received through "informal"

5  discovery a significant number of documents.  Undoubtedly, many of these

6  documents are not in any way privileged (having come from parties such as the

7  2002 Noteholders).  Yet, the Trustee is asserting that they are now all his "work

8  product" (even though neither the Trustee nor his counsel had anything to do with

9  preparing them).  Having already received these documents through "informal"

10  discovery, there is no assurance that the Trustee will request them again through

11  formal discovery.  Thus, the Trustee – a party in this case and a plan proponent –

12  already has a litigation advantage that no other party in this case has.

13        Fifth, the Trustee has made absolutely clear that anything said to him will

14  not be treated as confidential.  Thus, SB Claims is supposed to plead its case to the

15  Trustee about why it needs certain discovery, but has absolutely no assurances that

16  its legal theories or strategies for that discovery will not be publicly repeated,

17  including to the 2002 Noteholders themselves.

18        Sixth, even after the Trustee's discovery is noticed, the Trustee will retain

19  the sole and absolute right to decide which documents in fact need to be produced,

20  and which ones need not be.  Even with respect to the only examination that has

21  been scheduled to date – the examination of counsel for VIA – the Trustee has

22  made no effort to keep other parties informed as to what documents on his lengthy

23  list of requested documents he actually is requiring to be produced (SB Claims

24  first learned from VIA's counsel that the Trustee had agreed to limit the documents

25  he was receiving).  So, as SB Claims goes to the deposition of VIA's counsel this

26  Thursday, September 6, it will have no idea whether the document production is

27  truly complete.  One can only imagine how this will play out with other parties,

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

1  such as the 2002 Noteholders, who have no interest whatsoever in cooperating

2  with SB Claims.

3         The fact is that the Trustee's invitation to SB Claims to tag along to his

4  Rule 2004 exams, if and when he schedules them, is no substitute for SB Claims'

5  right to take its own discovery in accordance with the Federal Rules of Civil

6  Procedure.

7  **IV.    CONCLUSION**

8         Overall, the Trustee's desire to make distributions to general unsecured

9  creditors by year end is a laudable one.   There is no reason, however, for the

10  Trustee to couple those distributions with an $18 million distribution to the 2002

11  Noteholders.  While that certainly may make the noteholders less likely to object

12  to the Trustee's decision to declare himself as Plan Administrator under the Plan

13  (thus institutionalizing his role in this case to the bitter end), it does nothing to

14  further the resolution of this case.

15         SB Claims is willing to coordinate its discovery efforts with the Trustee, as

16  parties normally do in multi-party litigation.  SB Claims is not willing, however, to

17  have the entire discovery process in this case (including Plan-related discovery)

18  under the complete control of another party.  The Trustee may be a fiduciary, but

19  he must follow the rules that apply to all other parties.  This is particularly true

20  when it comes to his efforts to confirm a Plan that puts himself (and his large law

21  firm) in an economically advantageous situation, something that, in turn, does

22  make him a self-interested interested party in fact.

23  DATED:  September 5, 2007          STUTMAN, TREISTER & GLATT P.C.
                                                       and
24                                                 McGRANE GREENFIELD LLP

25

26                                          By _/s/ K. John Shaffer_____
                                                 K. John Shaffer
27

---

16

OPPOSITION TO TRUSTEE'S MOTION FOR A PROTECTIVE ORDER

430613v1

# EXHIBIT 21

1

```
 1                 UNITED STATES BANKRUPTCY COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                    (SAN JOSE DIVISION)

 4

 5   In re:

 6   SONIC BLUE, INC.,              Case No. 03-51775-MM
                                    Thru      03-51778-MM
 7                                  (Jointly Administered)

 8                                  Chapter 11

 9                                  San Jose, California
                                    September 5, 2007
10                                  2:03 p.m.
             Debtor.
11   _____/

12

13                    TRANSCRIPT OF PROCEEDINGS
          a) EMERGENCY MOTION FOR PROTECTIVE ORDER
14   IN RESPECT OF SONICBLUE CLAIMS' NOTICES OF DEPOSITION
         OF HENRY KEVANE, JOHN J. TODD, ALBERT BORO,
15         SUZANNE UHLAND, AND BRUCE BENNETT ON
         SEPTEMBER 6, 10, 11, 12 AND 13, 2007 BY
16                 DENNIS CONNOLLY, TRUSTEE
      b) JOINDER TO EMERGENCY MOTION BY PORTSIDE GROWTH &
17    OPPORTUNITY FUND, SMITHFIELD FIDUCIARY, LLC, AND
                  CITADEL EQUITY FUND, LTD.
18       c) JOINDER BY ALBERT J. BORO, JR. (NON-PARTY)
            d) OPPOSITION TO TRUSTEE'S MOTION FOR A
19         PROTECTIVE ORDER BY SONICBLUE CLAIMS, LLC

20

21            BEFORE THE HONORABLE MARILYN MORGAN
                UNITED STATES BANKRUPTCY JUDGE

22

23

24

25
```

2

```
 1   APPEARANCES:

 2
     For the Creditors'              LEVENE, NEALE, BENDER, RANKIN
 3   Committee:                      & BRILL, LLP
                                     BY: CRAIG RANKIN, ESQ.
 4                                   10250 Constellation Boulevard.
                                     Suite 1700
 5                                   Los Angeles, California 90067

 6                                   (APPEARING TELEPHONICALLY)

 7

 8   For Albert Boro and            HOWARD, RICE, NEMEROVSKI, CANADY,
     Pillsbury firm:                FALK & RABKIN, PC
 9                                   BY: BERNARD BURK, ESQ.
                                     Three Embarcadero Center, 7th Floor
10                                   San Francisco, California 94111

11                                   (APPEARING TELEPHONICALLY)

12

13   For the trustee:              FRIEDMAN, DUMAS & SPRINGWATER, LLP
                                    BY CECILY A. DUMAS, ESQ.
14                                   150 Spear Street, Suite 1600
                                     San Francisco, California 94105

15                                            -and-

16
                                     ALSTON & BIRD, LLP
17                                   BY: GRANT T. STEIN, ESQ.
                                     One Atlantic Center
18                                   1201 West Peachtree Street
                                     Atlanta, Georgia 30309

19

20   For the U.S. Trustee:         OFFICE OF THE U.S. TRUSTEE
                                    BY: NANETTE DUMAS, ESQ.
21                                   280 South First Street #268
                                     San Jose, California 95113

22

23   For Riverside:               MURRAY & MURRAY
                                    BY: ROBERT A. FRANKLIN, ESQ.
24                                   19400 Stevens Creek Boulevard
                                     Suite 200
25                                   Cupertino, California 95014
```

3

```
 1  APPEARANCES (CONTINUED):

 2
    For SB Claims:              STUTMAN, TREISTER & GLATT
 3                              BY: K. JOHN SCHAFFER, ESQ.
                                        -and-
 4                                  FRANK A, MEROLA, ESQ.
                                1901 Avenue of the Stars,
 5                              12th Floor
                                Los Angeles, California 90067
 6
                                        -and-
 7
                                McGRANE GREENFIELD, LLP
 8                              BY: BERNARD S. GREENFIELD, ESQ.
                                40 South Market Street, 7th Floor
 9                              San Jose, California 95113

10

11  For S3 Graphics and         MORRISON & FOERSTER, LLP
    Via Technologies:           BY: ADAM A. LEWIS, ESQ.
12                              425 Market Street
                                San Francisco, California 94105
13

14

15  For the senior             STROOK, STROOK & LAVAN, LLP
    note holders:              BY: KENNETH PASQUALE, ESQ.
16                             180 Maiden Lane
                                New York, New York 10038
17

18
    Special litigation         O'MELVENY & MYERS, LLP
19  counsel for Debtor:        BY: MATT POWERS, ESQ.
                                Embarcadero Center West
20                              275 Battery Street, Suite 2600
                                San Francisco, California 94111
21

22
    For Citadel:               SKADDEN, ARPS, SLATE, MEAGHER &
23                             FLOW, LLP
                                BY: VAN C. DURRER, II, ESQ.
24                              300 South Grand Avenue
                                Los Angeles, California 90071
25
```

4

1

2  Also Present:                    DENNIS CONNOLLY, Trustee

3

4  Court Recorder:                  LUPE BARRON
                                    UNITED STATES BANKRUPTCY COURT
5                                   280 South First Street
                                    San Jose, California 95113
6

7

8  Transcription Service:          Jo McCall
                                    Electronic Court
9                                   Recording/Transcribing
                                    2868 E. Clifton Court
10                                  Gilbert, Arizona 85297
                                    Telephone: (480) 361-3790
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    P R O C E E D I N G S

2    September 5, 2007                              2:03 p.m.

3                         ---oOo—

4            THE CLERK: All rise.

5            THE COURT: Please be seated.

6            THE CLERK: Item 1, <u>Sonic Blue, Incorporated.</u>

7            THE COURT: Could we have your appearances?

8            MR. STEIN: Your Honor, Grant Stein on behalf of

9    the trustee, Dennis Connolly.  With me is Cecily Dumas our

10   co-counsel, and the trustee, Mr. Connolly is also here,

11   Judge.

12           MR. CONNOLLY: Good afternoon, Your Honor.

13           MS. CECILY DUMAS: Good afternoon, Your Honor.

14           THE COURT: Okay.  Good afternoon.

15           MR. GREENFIELD: Good afternoon, Your Honor,

16   Bernard Greenfield on behalf of Sonicblue Claims.

17           MR. SCHAFFER: Yes, Your Honor, good afternoon.

18   John Schaffer and Frank Merola of Stutman, Treister & Glatt

19   on behalf of Sonicblue Claims.

20           MR. FRANKLIN: Good afternoon, Your Honor, Robert

21   Franklin of Murray & Murray on behalf of Riverside Claims,

22   a creditor.

23           MR. LEWIS: Good afternoon, Your Honor.  Adam

24   Lewis of Morrison & Foerster for S3 Graphics and Via

25   Technologies.

1          MS. NANETTE DUMAS: Good afternoon, Your Honor,

2   Nanette Dumas for the U.S. Trustee.

3          MR. PASQUALE: Good afternoon, Your Honor, Ken

4   Pasquale from Strook, Strook & Lavan for the senior note

5   holders.

6          MR. POWERS: Good afternoon, Your Honor, Matt

7   Powers from O'Melveny & Myers, special litigation counsel

8   for the Debtor, and I'm also here today on behalf of my

9   colleague, Suzanne Uhland, who was the target of one of the

10  subpoenas that's at issue here today.

11         MR. DURRER: Van Durrer of Skadden, Arps, Slate,

12  Meagher & Flor, on behalf of Citadel Investment Group I of

13  the senior note holder trust.

14         THE COURT: Okay.  Well, good afternoon to all of

15  you.

16         MR. RANKIN: Good afternoon, Your Honor, Craig

17  Rankin of Levene, Neale, Bender, Rankin and Brill on behalf

18  of the Committee.

19         MR. BURK: Good afternoon, Your Honor, Bernard

20  Burk for Albert Boro and the Pillsbury firm.  Sorry, I

21  couldn't be there in person.

22         THE COURT: Okay.  Well, good afternoon to you who

23  are appearing telephonically as well.

24         Mr. Stein, did you have the opportunity to read

25  Mr. Schaffer's brief?

7

1          MR. STEIN: Yes, Your Honor, I have.

2          THE COURT: It was just filed this morning.  I

3   want to tell you by way of tentative ruling that I found it

4   very compelling.  Okay?

5          MR. STEIN: Yes, Your Honor.  And I hope that I

6   can change your mind.

7          THE COURT: Okay.

8          MR. STEIN: That is my goal.  First, Your Honor,

9   thank you for scheduling this for an expedited hearing this

10  afternoon.  We appreciate that.  And what I will attempt to

11  do is answer any questions that you may have in my

12  presentation, and of course, I may not answer them all and

13  feel free to interrupt and ask any questions.  And Mr.

14  Connolly is here also if you would like to hear from him on

15  any issue.

16         The motion for protective order relates to five

17  deposition notices and subpoenas, some of which have

18  actually been issued; some of which have not been served,

19  for documents.  The witnesses that have been identified in

20  the subpoenas or in the notices of deposition are: Henry

21  Kevane.  Now Mr. Kevane was --

22         THE COURT: I've read all of it, so I'm familiar

23  with who's been subpoenaed.

24         MR. STEIN: Okay.  So you know who the parties

25  are.

1          THE COURT: Yes.

2          MR. STEIN: And you know from looking at the

3    subpoenas, what documents are requested.

4          THE COURT: Yes.

5          MR. STEIN: Okay.  Well the issue then goes to

6    this, and that is, the first basis of the relief that's

7    being requested is those witnesses and those issues go to

8    the very core of the trustee's investigation in this case.

9    And it's on that basis initially --

10          THE COURT: You know, let me just say, what

11    surprises me is that you are intending to go forward with

12    the Plan before you've completed your investigation.

13          MR. STEIN: Let me respond to that.

14          THE COURT: Okay.

15          MR. STEIN: From our perspective, there is 80

16    million dollars net that is available to distribute to the

17    unsecured creditors in the case.  There's 84.9 million

18    dollars, the detailed numbers are set forth in Mr.

19    Grubstein's --

20          THE COURT: But it's not going to a hundred

21    percent case.

22          MR. STEIN: No, it's not.  But the ability to make

23    a distribution and to get the money that is available,

24    there's 84 million almost 85 million, get that out to

25    unsecured creditors.  The goal that we have and that we

1   have had from the time that we came into the case is if we

2   go forward on this timetable, we can have an effective date

3   potentially by November 15.  That's very important to us.

4   That lets us get money out to allowed claims.

5         Now, if you look at the issue of who the allowed

6   claims are, there's three main classes of unsecured

7   creditors that are basically treated the same although they

8   have different rights.  There's 132 million dollars in

9   Class 4.  That's the general trade creditors.  It happens

10  to include the SonicBlue Claims claim in that class.  That

11  distribution can be made, and the calculation is that is

12  about 26.8 percent distribution.

13        The senior note holders, the 2002 note holders,

14  they won't be paid on their allowed unsecured claim.  Why?

15  It's disputed.  Why is it disputed?  Because there is a

16  lawsuit that has been filed against them seeking equitable

17  subordination.  The 1996 note holders, the junior note

18  holders, at some point, probably within four to six months,

19  the issues relating to the objection to their claim, and

20  it's only about nine million dollars on a 106 million

21  dollar claim -- there's an OID objection -- that should be

22  able to be resolved.  Those funds would then be able to be

23  distributed.

24        So the point, Your Honor, is as follows, in

25  answering your question.  There's money there.  There's

1   money there that can go into the pockets of unsecured

2   creditors.  The distribution of 26.8 percent will put --

3   well, 80 million dollars less whatever amounts are

4   reserved.  For example, there's a reserve that is a

5   substantial reserve that will exist.  It's about 16 million

6   dollars for the senior note holders.  That money stays

7   until the litigation with SonicBlue Claims is over.

8           THE COURT: I guess I'm still surprised that

9   you're trying to go forward with the Plan before you've

10  completed your investigation.

11          MR. STEIN: Well, the investigation -- in all

12  candor, our expectation, Judge, is that we will have

13  concluded the investigation by the end of the first quarter

14  of next year.  We've taken a lot of interviews.  We're

15  about to do a 2004 examination tomorrow.  But the idea is,

16  as long as this case has taken and from what we understand,

17  we've had a two-track strategy.

18          THE COURT: M-hm.

19          MR. STEIN: The two tracks have been investigate

20  and move forward to confirm a Plan because all the

21  litigation and the investigation shouldn't hold up the

22  distribution.  Let me explain.  If we end up, for example,

23  with Pillsbury, as an example, there's an objection that

24  results in fees coming back into the estate; that's a

25  possibility.  If ultimately that's what happens, those

1  funds will be available to distribute.

2         THE COURT: It's really you're talking a small

3  amount of money.

4         MR. STEIN: And that's the point is we've got 80

5  million here that we can get out to holders of allowed

6  claims.  We believe -- we'd like to -- we believe we can

7  get that out.  From our perspective, the investigation that

8  we're doing about subordination issues, about improprieties

9  associated with Via's settlement, about what the fee of

10 settlement does and how that impacts the relative

11 priorities between SonicBlue Claims and the senior note

12 holders, those are not issues that have to be resolved

13 before the other creditors --

14        THE COURT: I guess what bothers me is, I think

15 SonicBlue Claims can take care of themselves, but there are

16 other people maybe the trustee should be considering taking

17 care of.

18        MR. STEIN: We are, and that is why we want to get

19 the money -- for some reason I think I'm not connecting

20 with you, Judge.  I'm not getting the import of your

21 question.

22        THE COURT: I think that's true.

23        MR. STEIN: And I want to.  The concept being, all

24 the other folks in the case, the only way to take care of

25 them is get them paid.

1          THE COURT: Well, maybe all of the other multiple

2    folks in the case but not all of the other -- let's say

3    trade creditors who might desire more than twenty-six and a

4    half cents on the dollar.

5          MR. STEIN: Oh, they'll get more than twenty-six

6    and a half cents.  There will be an initial distribution of

7    the twenty-six and a half cents on the dollar this year.

8          THE COURT: Well, that's my concern, and that's

9    why I'm thinking that maybe you all should consider

10   completing your investigation before you go forward with

11   your Plan.

12         MR. STEIN: The practical consequence of that will

13   be, we would not be able to confirm a Plan this year.

14         THE COURT: M-hm.

15         MR. STEIN: And therefore we could not get a

16   distribution to those creditors this year, which is why we

17   put it on parallel tracks.

18         THE COURT: Right.

19         MR. STEIN: And I am -- I think I'm hearing what

20   you're saying is, that that's what you'd like to see us do.

21         THE COURT: Well, it's a concern that I have.

22   It's a concern that I have about confirmability.  So part

23   of me is thinking that perhaps you all should slow down

24   enough so that you can coordinate your discovery and

25   proceed on a little faster track now in your discovery.

13

1    You have moved very quickly and I admire that.  And yes,

2    I'm eager to see money go out to –- frankly, particularly,

3    trade creditors in this case.  I didn't know that you were

4    going to try to do a Plan that would take care of all

5    creditors, and I think that is part of the concern that I

6    have.

7              MR. STEIN: We don't know of any other way in an

8    11 --

9              THE COURT: I understand.  And there may not be

10   any other way.  But that might be why you might consider

11   slowing down confirmation a little bit so that you can get

12   along –- a little further in your discovery so that you

13   really know what kind of animal you're dealing with here.

14   It just may be that you haven't been able to share it with

15   me.  I don't know.  But those are the concerns that I have.

16             MR. STEIN: Let me speak briefly about the issue

17   of coordinating on discovery because that is an important

18   issue.

19             THE COURT: Yes, it is.

20             MR. STEIN: And the idea there in the coordinating

21   on discovery is, the trustee has quite a few people that

22   the trustee speaks with, will speak to during the

23   investigation, with whom the trustee shares a privilege.

24   There's attorney-client privilege.  That privilege the

25   trustee is not prepared to waive yet.  We have been

14

1   interviewing witnesses.  We have been talking to witnesses.

2   We've indicated in the pleadings, we've spoken to Ms.

3   Uhland.  There's a privilege there.

4        THE COURT: Right.  And I respect that privilege.

5   As I said, SonicBlue Claims can take care of themselves,

6   but they ought to have the opportunity to conduct their

7   discovery, so that they can take care of themselves.

8        MR. STEIN: Well, let's talk about exactly the

9   context in which that discovery would proceed, and I

10  understand what you're saying, Judge, and we have basically

11  two reasons why we don't think that's a legitimate issue.

12  It's not that it's not a legitimate issue; it's a very real

13  issue, why we would ask you to reconsider your thought

14  process on that.

15       The first point is that the discovery goes to

16  issues in the subordination adversary proceeding.

17       THE COURT: M-hm.  Maybe that becomes relevant in

18  your Plan.  I don't know, but it might be.

19       MR. STEIN: It won't, and here's why.

20       THE COURT: Okay.

21       MR. STEIN: The reason the subordination adversary

22  proceeding won't is that it only affects SonicBlue Claims

23  and the senior note holders.  What SonicBlue Claims is

24  seeking is to get whatever distribution would go to the

25  senior note holders and have that go to them.

1                    THE COURT: Right.

2                    MR. STEIN: There's nothing wrong with that.

3                    THE COURT: Maybe they'll find a conduct that you

4    ought to consider an equitable subordination through a

5    Plan.  You know, that's a -- you know, I just don't know

6    where you're coming from, and so I'm being really open with

7    you.

8                    MR. STEIN: Oh, and, Judge, there's nothing I

9    appreciate more, and the reason for that is because it lets

10   me respond.  Let me explain how the trustee views -- am I

11   getting too much feedback with this?

12                   THE COURT: No, you're fine with me.

13                   MR. STEIN: Let me explain how the trustee views

14   that issue.

15                   THE COURT: Okay.

16                   MR. STEIN: Okay.  In the subordination adversary

17   proceeding, there's going to be a determination made at

18   some point in time, and that point in time is going to be

19   either that SonicBlue Claims is entitled to get whatever

20   amount up to 12.5 million, 15 million, 18.5 million, that

21   would go otherwise go to the senior note holders.

22                   THE COURT: M-hm.

23                   MR. STEIN: Okay.  We understand that.  That

24   distribution and that determination doesn't impact what the

25   distribution is to other creditors.  It's only between

16

1    those two.

2              THE COURT: I understand that.

3              MR. STEIN: Let me go a little further.  Suppose

4    when we finish our investigation, which again, as I've

5    indicated, the first quarter of next year is our goal to be

6    concluded, the trustee says, boy, not only are there

7    equitable subordination issues, but there are affirmative

8    damage claims to bring against the senior note holders.  We

9    have analyzed that, and the analysis goes down two roads.

10   The first is, suppose it's equitable subordination.  All

11   right.  Equitable subordination here, what was the level of

12   injury?  The argument is that the 12.5 million dollar

13   allowed claim was trebled from what it should have been,

14   that the deal was cut to increase that claim so that

15   instead of having a four million dollar distribution, it

16   went up to 12.5.

17              THE COURT: Right.

18              MR. STEIN: Okay.  That's an 8.5 million dollar or

19   an 8.375 million dollar differential.  Equitable

20   subordination law says that you equitably subordinate to

21   the extent of the injury.  That's the injury.

22              THE COURT: Okay.

23              MR. STEIN:  That injury will be impacted in two

24   ways.  One, it will reduce the senior note holders' claim.

25   Now that reduction could be from a 20 million dollar claim

1   on down to a 12 million dollars claim, approximately, or if

2   they win the OID objection that we've indicated in Mr.

3   Grubstein's materials, we expect to object to the claim,

4   ordinary issue discount.

5          THE COURT: M-hm.

6          MR. STEIN: If the senior note holders win that,

7   then the claim is 60 million dollars.  You reduce it also

8   by that 8.37.  The other way to do that is to take that

9   out.  That's the top line.  You could take it off the

10  bottom line, because the percentage distribution would be

11  altered by the equitable subordination and I calculated

12  that earlier today; the number changes between 2.68 million

13  and 2.79 million dollars, 8.37 million at a reduction rate

14  of between 32 and 33 point –- it's in my notes –- percent.

15         The point being we know what the impact is of

16  equitable subordination, and in looking at the

17  quantification of that based on what we understand the law

18  to be and it's well established –- I mean, Judge Schinlan

19  (Phonetic) just addressed this again in her Enron decision.

20  You subordinate equitably to the extent of the harm.

21         THE COURT: M-hm.

22         MR. STEIN: That's the quantification of it.  Our

23  view is that doesn't change the fact that the 80 million

24  should go out.  The second point here is, that suppose the

25  trustee, at the conclusion of the investigation says, this

1  was heinous.  This rises to the level of not just equitable

2  subordination, but to another level, an affirmative damage

3  level.  At that point in time, the way the Plan is

4  structured, we have the following, and that is, there is

5  under the Plan a period in which the trustee can object to

6  a claim.  That's 120 days.  If we were able to go forward

7  on the 20th with a Disclosure Statement, if it were

8  approved, if we had confirmation beginning of November,

9  November 15 would be the effective date.  December 15,

10  we're in a position to make distributions.  We get them out

11  before the end of the year.  But not -- but not to the

12  Class 5 junior note holders' money that would flow to the

13  senior note holders under the provisions of those

14  documents, the subordination provisions there, because

15  that's what this fight is about.

16       THE COURT: M-hm.

17       MR. STEIN: What would happen in that situation is

18  the following.  All the money that the senior note holders

19  would be entitled to on their claim, that's frozen.

20       THE COURT: But you wouldn't have completed your

21  investigation.  You're still 90 days out -- you've still

22  got 90 more days of investigation that you project.

23       MR. STEIN: And that's the point that I'm making

24  is that the investigation and the consequences and the idea

25  of what we decide isn't going to change what that initial

19

1  distribution is to the trade creditors.  It's going to be

2  26.8 percent.  The point being that before any other money

3  can leave this bankruptcy estate, two things have to

4  happen.  One, SonicBlue Claims has to win or lose its

5  adversary proceeding.  Number two, the trustee, because of

6  the time period it has in which to object to the senior

7  note holders' claim and to the OID, that money is also

8  frozen.  Then we have to settle that OID objection with the

9  junior note holders, another 45 or 60 days.

10         I'm now at my six months.  If the trustee decides

11  at that point in time that he has to bring, or wants to

12  bring, an affirmative claim, no money has gone out, and

13  because of the way the Plan is structured, there is a

14  setoff right that the trustee has.  You don't distribute to

15  creditors that you have a claim against.  So whether it's

16  equitable subordination or affirmative claim, the senior

17  note holders don't get money.

18         The issue that we have looked at, at this point,

19  is why should we lock in now that if the SonicBlue Claims

20  litigation takes years and it may, why should we lock in

21  now to specific treatment in a Plan, and why should we

22  delay payment to trade creditors.

23         THE COURT: Okay.  So you think you're going to

24  have enough of your discovery completed by the end of the

25  year that you're going to know whether or not you're going

1 | to be filing an objection.

2 |        MR. STEIN: No, Your Honor, by the end of the

3 | first quarter of 2008, by the end of --

4 |        THE COURT: How are you going to withhold the

5 | money from distribution to those people?

6 |        MR. STEIN: We know that we will be -- that's a

7 | very good point.  Let me address.  SonicBlue Claims has an

8 | adversary proceeding pending.

9 |        THE COURT: Right.

10 |        MR. STEIN: That therefore makes the lawsuit

11 | against the senior note holders, that result since it seeks

12 | equitable subordination, it makes that claim disputed.  You

13 | don't pay disputed claims.  So that's 60 million dollars

14 | that's reserved that won't get distributed until that

15 | litigation is over.

16 |        The next piece of that puzzle is that the junior

17 | note holders, because their money would flow to the senior

18 | note holders, so what we looked at there was, they -- we

19 | have 120 days to file an objection to their claim.  We know

20 | we will file an objection to their claim.  We have 120 days

21 | to do it under the Plan from the effective date, November,

22 | December, January, February, March 15 maybe.  Once we file

23 | that objection, we have the ability to settle or not settle

24 | that claim.  We know that the timing on that will be such

25 | that we should be done with the investigation.  No money

1  will flow out relating to the junior note holders' claims

2  in Class 5.

3          THE COURT: Well, I guess if the junior note

4  holders didn't know it before, or the senior note holders

5  didn't know it before, they know it now.

6          MR. STEIN: Well, and that's been in the case in

7  the case the entire case.  The point being that we know

8  that we can make sure that no money goes to Class 5, Class

9  3, but the trade creditors in Class 4, the trade creditors

10  in Class 4, what happens to them is, they get paid because

11  that number, that 26.8 percent will not change until the

12  objection to the senior note holders' claim on the OID

13  issue is resolved.  That's a 60 million to a 20 million

14  swing.

15          THE COURT: M-hm.

16          MR. STEIN: We know we're going to bring that.

17  We're fairly confident.  That's in the Grubstein materials.

18  We quantified that.

19          The next piece of that puzzle is that no money is

20  going to go out on the senior note holder piece until the

21  litigation with SonicBlue Claims is completed.

22          THE COURT: Okay.

23          MR. STEIN: Now, there's a third piece to this

24  puzzle, and that is, well what happens if we get to that

25  point, and the trustee doesn't bring an objection to the

22

1   claim, and the trustee is ready to distribute money, and

2   that is why we tried to come up with a structure of

3   establishing a reserve, which is, what's the worst case

4   scenario.  What are the dollars that need to be set aside?

5   What if we win on the OID objection, and the senior note

6   holder claim goes from 60 to 20 million, number one?  What

7   if we win on that, and what if SonicBlue Claims wins?  What

8   then?  And if the number -- and we understand -- because

9   we've had discussions.  Counsel talked the way counsel are

10  supposed to in bankruptcy cases.  They might not agree all

11  the time, but we talk, and that's a good thing because

12  communication has to be open.

13          We know what the number is.  The number is 18.5

14  million that we want to reserve against.  So we asked the

15  senior note holders, we said look, if we win on the OID

16  objection, and if they win the lawsuit, then there has to

17  be a supplemental reserve so that money can't flow from the

18  junior note holders to you where SonicBlue Claims doesn't

19  have a remedy, that there's no money to pay them at the end

20  of the day if they win.  And we calculated that number.

21          We asked, as part of the Plan analysis that Mr.

22  Grubstein was doing for us -- you know who that is, he's

23  the accountant that was in the case -- we asked him,

24  calculate this for us too, please, based on your

25  percentages.  What would happen if, and what if, is as

23

1  follows:

2        You have 18.5 million less six million to get to

3  the 12.5 million dollar claim.  That claim, 26.8 percent

4  distribution, and that 26.8 percent distribution -- and I

5  can give you the numbers in detail; they're in Mr.

6  Grubstein's report -- is about 3.3 million dollar or so.

7  And that is the amount that SonicBlue Claims will get on

8  its claim as soon as the Plan is confirmed.  They're going

9  to get that distribution; it goes in their pocket.  That

10 leaves a net of about 15.1 million dollars.

11       Now, if the trustee is successful in its

12 objection on the OID issue to the senior note holders'

13 claim, the consequence of that is that the distribution on

14 the 60 million versus the 20 million drops down to about

15 six million something.  It leaves therefore a shortfall of

16 about 7.9 million dollars.  What do you mean a shortfall,

17 Mr. Stein?  The shortfall is the amount that comes out of

18 the senior note holders' claim that's available to pay

19 SonicBlue and the amount that comes out of what SonicBlue

20 already gets to get up to that 18.5 million, needed another

21 7.9 million.

22       Well, the way we see it is that if the money goes

23 from the junior note holders to the senior note holders,

24 that's 31 million dollars.  That's a nice -- that's a lot

25 of money.  And the senior note holders, at our request,

24

1   agreed that they would take eight million dollars out of

2   that and not get that as a distribution so that that money

3   would be there to make sure that the 18.5 could be paid to

4   SonicBlue Claims whenever that litigation is over.

5           Our view has been that we can put money in the

6   pockets of the trade creditors, that it's not going to be

7   more than 26.8 percent, even as we move the investigation

8   forward, because of all the litigation.  So let's get the

9   most money out today that we can, and then the litigation

10  remains and the dispute and the balance of the

11  investigation remain, and we know we want to move it

12  forward.

13          And I appreciate your comments, Your Honor, about

14  the diligence that we've shown in trying to move the case

15  forward in the four months we've been here, because we

16  have.  We have been working it, and we have been working it

17  with -- I know the bells will be here –- but the point is,

18  we can protect SonicBlue claims economically, and that's

19  where we're trying to go --

20          THE COURT: Who's protecting the trade creditors?

21  I guess that's part of what I'm concerned about.

22          MR. STEIN: Well, that's what the investigation is

23  about, if there are other funds to come in, but our view

24  of –- I didn't mean to interrupt you, Judge.

25          THE COURT: No, that's all right.  I've always

1  believed that money should be distributed quickly, and

2  that's certainly something that I value.  But I'm just

3  wondering who is protecting them.  I know we have many

4  interests here that are clamoring at your door, and I've

5  heard you talk about how you're going to protect SonicBlue

6  Claims.  But I'm not sure how we're protecting those trade

7  creditors.

8          MR. STEIN: The way we have done that -- and I

9  don't think there are a lot of trade creditors here -- we

10  have talked to some.

11          THE COURT: They're the quiet ones.

12          MR. STEIN: But the idea is get money to them.

13  The phone calls that Mr. Connolly has received from some of

14  the claims holders have been, how soon can you confirm a

15  Plan and get us money.

16          THE COURT: M-hm.

17          MR. STEIN: The inquiries that we have received

18  from people that I've spoken to, that haven't talked to Mr.

19  Connolly directly have been the same thing.  We understand

20  there's all this skirmishing.  How soon can you confirm a

21  Plan and get us money?  And our view has been we can do

22  that before the end of the year.  That is the goal or the

23  timetable we've been trying to follow, without causing

24  anybody else to lose any rights.

25          The other point, which got lost earlier, is that

26

1    in the adversary proceeding which is what the litigation is

2    that -- see, if we take off the Disclosure Statement

3    hearing and we roll that, then all that's left is the

4    adversary proceeding.  And the way that works is on

5    September 24th, Your Honor has before you the motion to

6    dismiss.

7            THE COURT: I know, the motion to dismiss.

8            MR. STEIN: And once you roll that hearing, the

9    parties will then be in a position, either the case will be

10   dismissed or the case will go forward.  We asked in that

11   case that Your Honor consider the motion to dismiss and

12   stay that case to let us do our investigation.  My point,

13   Your Honor, is that until you rule on the motion to dismiss

14   and until the parties had a Rule 26(f) conference, ordinary

15   procedure is, until you know what the issues are that are

16   in the case, until you decide that the parol evidence rule

17   doesn't apply and some other things, that case does not

18   proceed with discovery until that determination is made.

19           So whether that case will be in a position for a

20   Rule 26(f) conference starting on September 25, there's

21   some complex issues you're going to have to consider in the

22   motion to dismiss.  But that case is not primed for

23   discovery to go forward, and then how much discovery.  And

24   who's going to be taking it, and what are they going to

25   get, and the issues we have without privilege, we want to

27

1  do our investigation independently of that litigation.  I'm

2  not trying to take away any rights of SonicBlue Claims.

3  They're entitled to take discovery in that case, but that

4  discovery can be deferred, and that's why we asked that --

5       THE COURT: I sort of think that as these cases

6  get old, they don't smell any better, and I kind of like to

7  fast track this kind of a case, to tell you the truth.  So

8  I'm not sure that my instincts are consistent with your

9  instincts, Mr. Stein.

10       MR. STEIN: Well, and I understand where you come

11  from, Judge.  Part of the thought process that informs the

12  trustee's consideration here is the process that we did go

13  through, and I think one of the reasons we're in the case,

14  in the investigation that was done in Enron, and the idea

15  being that an independent investigation that makes the

16  determination and calls it like you see it -- and I'm not

17  saying we're an examiner.  We have an examinatory

18  function; we have an investigatory function statutorily

19  that when we do that -- I mean we don't have a dog in the

20  fight as they say where I come from -- the resolution of

21  the dispute, it doesn't affect the unsecured creditors,

22  except that it's making us deal with tangential issues

23  that's only between those two.  That when we complete our

24  investigation, that may help provide a road map to the

25  parties involved to be able to resolve issues that

28

1   otherwise would be difficult to resolve.  That's a

2   practical aspect of it.  Certainly that has been what we've

3   seen in the Enron case.

4          Every case is different; every party is

5   different.  But the idea is that we basically have said,

6   Judge, we understand that they want to take discovery.  We

7   want to move on with our investigation.  Let's see where we

8   are.  Let's see what the level of cooperation has been in

9   90 days, and if at 90 days it still looks like they're not

10  satisfied with the level that we're moving forward with,

11  that's one thing.  But if we're moving forward and they're

12  participating and we can get moved down the road the way we

13  plan to on the investigation with the 2004 examinations --

14  it's not as if we're not sharing documents with them, where

15  there are not privilege issues involved.

16         For example, Mr. Kevane's examination, Mr. Lewis

17  who's here, sent all the documents over that he got from

18  Via about ten, eleven days ago, in anticipation of the 2004

19  which was basically noticed back at the end of July.  We're

20  trying to move forward in a way that includes people when

21  we're doing things that are not structured so as to protect

22  the privilege that we may have, and that's been our goal.

23  And our goal is to talk with those folks and to come up

24  with our discovery plan.  No one is going to get cut out.

25  But, Judge, there's one other aspect of this, and I'm going

1   to briefly address it and then I'm going to sit down.

2              THE COURT: Okay.

3              MR. STEIN: And the brief aspect of it is, if

4   we're not going forward on a disclosure statement because

5   Your Honor's direction is put that on ice, then we don't

6   need a Disclosure Statement, discovery, on a fast track.

7   And that's a very --

8              THE COURT: I understand that.

9              MR. STEIN: And that's a very important issue

10  because while Mr. Kevane and his documents are all primed

11  for tomorrow --

12             THE COURT: This whole thing has come cart before

13  the horse, and so I haven't read your Disclosure Statement.

14  I haven't read the motion to dismiss.  I don't know what's

15  out there.  But I know that it's the cart before the horse.

16  And that's because you're working on a time frame.  You

17  know, on the one hand, I'm sympathetic with you.  On the

18  other hand, this is not Enron.  And I don't know that I

19  think that this litigation is as complex as many of you

20  think it is.  So let me just see if SBC has anything that

21  they want to say.

22             MR. SCHAFFER: Your Honor, I'll try to be brief

23  because I do appreciate that you read my pleading this

24  morning.

25             THE COURT: Oh my goodness, you know what?  I

30

1   squeezed you all in before my 2:30 calendar, and I'm sorry,

2   before I hear you, I'm going to have to take a recess

3   because I have 26 relief from stay motions on the calendar.

4   So I'm actually going to excuse you all.  Do you want to go

5   into a conference room?  I have a conference room available

6   for you.  It's going to take me about 30 or 45 minutes.

7           MR. SCHAFFER: If there's a conference room

8   available, that would be great, Your Honor.

9           THE COURT: Okay.  Actually I'm going to ask my

10  Law Clerks to escort you down to the conference room, and

11  it's going to be 30 or 45 minutes.

12          MR. SCHAFFER: Thank you very much, Your Honor.

13          THE COURT: Thank you.

14          MR. BURK: Pardon me, Your Honor, Bernie Burk on

15  the phone.  Can we be joined back in when the court

16  reconvenes?

17          THE COURT: Yes, we'll do that.  Okay, thank you.

18          MR. BURK: Will I expect a phone call or just

19  hold?

20          THE COURT: No, you should go ahead and

21  disconnect, and we'll contact you again when we reconvene.

22          MR. RANKIN: Thank you.

23          THE COURT: Thank you.

24          MR. BURK: Thank you very much.

25      (Whereupon, extraneous matters are heard and this

31

 1  matter is recalled at 3:05 p.m.)

 2          THE COURT: It looks like we don't have everyone

 3  present.

 4          THE CLERK: Yes, Your Honor.

 5          THE COURT: Okay.

 6          THE CLERK: Just collecting the last of them.

 7          THE COURT: Okay, thank you.  I hate to say this

 8  but I have another calendar at 3:30 so I've got you wedged

 9  in, and I know some of you probably have airplanes to catch

10  and I hate to do this to you.

11          Okay.  So we're back on the record.  Do we have

12  the telephone appearances back on live?

13          MR. BURK: Yes, Your Honor, Bernie Burk is here.

14          THE COURT: Okay, very good.

15          MR. RANKIN: Yes, Your Honor, Craig Rankin.

16          THE COURT: Thank you.  Okay, Mr. Schaffer.  I'm

17  sorry for interrupting you.

18          MR. SCHAFFER: Your Honor, excuse me just one

19  second.  I don't know if there's any reason for me to speak

20  at this point or have we resolved things with everybody?

21          THE COURT: Do you all need a little bit more

22  time?

23          MR. STEIN: Judge, that would be -- we just to

24  took a proposal --

25          THE COURT: That's fine.  You know what, I heard

32

1  that the two of you had been talking, and I'm very grateful

2  for that, and actually if you'd like a little bit more

3  time, that's fine with me.  I actually had put some people

4  on hold.  Mrs. McGowan, do you think we can get them back

5  on calendar?

6          THE CLERK: I can have the operator call them.

7          THE COURT: Okay.  So I'd like to leave you -- do

8  you all want to go into a separate conference room or do

9  you want to stay here?

10         MR. SCHAFFER: Your Honor, I've got things to say,

11 but if there is in fact a resolution here, why --

12         THE COURT: That's right.  Do you want to stay in

13 the courtroom is my question, or do you want to go and

14 speak to each other privately?

15         MR. SCHAFFER: The courtroom will be fine, Your

16 Honor.

17         MR. STEIN: The courtroom will be fine.  We only

18 need about ten minutes, Your Honor, no more than that.

19         THE COURT: Okay.  Then Mrs. McGowan, don't worry

20 about changing that yet.  Thank you all.

21         MR. STEIN: Thank you, Judge.

22         MR. SCHAFFER: Thank you, Your Honor.

23    (Whereupon, extraneous matters are heard and this

24 matter is reconvened at 3:41 p.m.)

25         THE COURT: All rise.

1          THE COURT: Please be seated.  Mr. Stein.

2          MR. STEIN: Thank you, Judge.  We have spoken, and

3    based on the discussion earlier in court, the parties, the

4    parties meaning the senior note holders, SB Claims, the

5    trustee, relating to the discovery issues, have an

6    understanding.  That understanding is as follows:

7          The hearing on the Disclosure Statement on

8    September 20 will be held in abeyance to be rescheduled.

9    The discovery, we will work together to come up with a

10   joint discovery plan by the 18th of September.  If we are

11   unable to reach an agreement on a joint discovery plan,

12   where we will combine the trustee's investigation, our

13   2004's, with whatever goes forward in the SonicBlue

14   adversary proceeding that we identify as the subordination

15   adversary proceeding, then we would be back in front of

16   Your Honor on the 20th to talk about those issues and to

17   work through any impasses that may have been reached, and

18   that's what we think is appropriate based on the discussion

19   earlier.

20          THE COURT: Okay.

21          MR. STEIN: And I would ask, with Your Honor's

22   permission, that any other counsel involved in that or that

23   otherwise is here that wants to be heard, be allowed to

24   clarify anything I've said if I didn't get it right.

25          THE COURT: Thank you, Mr. Stein.

1          MR. STEIN: Thank you.

2          THE COURT: Okay.  Mr. Merola.

3          MR. MEROLA: Thank you, Your Honor, Frank Merola

4    for SonicBlue Claims.  First of all, as a housekeeping

5    matter, if we need that discovery conference on the 20th,

6    we'd like to move it in at the same time that was currently

7    noticed for the Disclosure Statement hearing.

8          THE COURT: I just want to make sure.  What else

9    do I have on the 20th?

10        (The Court and the Clerk confer.)

11          I don't want to do that.

12          MR. MEROLA: That's fine, Your Honor.

13          THE COURT: I just would rather keep you all by

14    yourself.  Would 1:00 o'clock be a convenient time for you?

15          MR. MEROLA: 1:00 o'clock would be excellent for

16    us, Your Honor.  Thank you.

17          And just so there's no misunderstanding, Your

18    Honor, we have issued deposition notices and subpoenas.

19    The subject of the hearing today was to set aside.  We

20    trust that we'll be able to work out all of the disputes

21    with the various parties and advance on a coordinated

22    schedule.  If that's not possible, we have not withdrawn

23    any of our subpoenas or any of our deposition notices.

24    We'll continue to work with the parties to see that things

25    happen in a timely meaningful manner, but to the extent

35

1  this is not the intention of all the parties, we want to

2  reserve our rights to go forward with the scheduled

3  depositions.

4           THE COURT: Okay.  But they're going to be some

5  time after September 20th.

6           MR. MEROLA: We have agreed dates with some people

7  on a conditional basis already, Your Honor.

8           THE COURT: Okay.

9           MR. MEROLA: Thank you very much.

10          THE COURT: Thank you, Mr. Merola.

11          MR. BURK: Your Honor, might I add -- this is

12  Bernie Burk on the phone.  Might I add something to what

13  Mr. Merola just said?

14          THE COURT: I'm sorry, you faded out a little at

15  the end.  I couldn't hear what you --

16          MR. BURK: I asked whether I might add something

17  to what Mr. Merola just add.

18          THE COURT: Yes, sir.

19          MR. BURK: Everything that Mr. Merola said was

20  accurate, and in particular my client, Al Boro, is one of

21  the people with whom there is an understanding about a

22  deposition date.  But there are also issues that need not

23  be discussed with the Court now about disagreements we have

24  about timing and substance of document production, and I

25  simply want to be clear that the only agreement that we

1  currently have with Mr. Merola and his clients with regards

2  the date of Mr. Boro's deposition, just so there's no

3  misunderstanding here.  I'm sorry to weight the Court with

4  that.

5        THE COURT: Okay.  I'm sure there isn't.

6        MR. BURK: I'm sure everyone is going to work

7  together productively to come up with an alternative

8  schedule that works for all concerned.

9        THE COURT: Thank you, Mr. Burk.  Yes, sir.

10       MR. PASQUALE: Thank you, Your Honor.  Ken

11  Pasquale from Strook, Strook & Lavan for the senior note

12  holders.  First, Mr. Kruger sends his apologies for not

13  being here in person.

14       THE COURT: You can only be in one place at a

15  time.  I've learned that.

16       MR. PASQUALE: Exactly, Your Honor.  Just a couple

17  of points.  I'm sure we will be able to coordinate

18  discovery, but I am a little confused by Mr. Merola's last

19  comment.  The subpoenas and notices that were served were

20  not served in the adversary proceeding.  They were served

21  with respect to discovery on a Disclosure Statement that is

22  now being held in abeyance.  We have not agreed to any

23  dates yet.  We haven't had those discussions.  This has

24  just been agreed to in ten minutes.  So, Your Honor, I

25  don't see how those deposition -- they can -- Mr. Merola

37

1  can keep them --

2           THE COURT: I can give you a holding date for your

3  Disclosure Statement if that would make you feel more

4  comfortable.

5           MR. PASQUALE: My only point is, the discovery

6  we're now discussing is discovery in which we'll proceed in

7  the adversary proceeding, with the trustee having

8  intervened as a party.  That was our discussion.  And so

9  there will be depositions taken under the Federal Rules in

10  the adversary proceeding.

11           THE COURT: Okay.  That wasn't plain to me.  Is

12  that what you all are indicating?

13           MR. MEROLA: As we understand it --

14           THE COURT: Okay.

15           MR. MEROLA: -- the trustee will be withdrawing

16  the motion to stay discovery in the adversary proceeding.

17           THE COURT: Okay.

18           MR. MEROLA: But these deposition will be going on

19  in a coordinated manner.  The trustee is not withdrawing

20  the Disclosure Statement.  They've asked the date be held

21  in abeyance.  Whether they're taken in a contested matter

22  of the Disclosure Statement and the confirmation or in the

23  adversary proceeding, they're depositions under the Federal

24  Rules of Civil Procedure and are usable as depositions are

25  used rather than tagged under a specific event.

38

1          THE COURT: But basically you are treating them as

2     in the adversary proceeding.  Is that right?

3          MR. MEROLA: Yes, Your Honor.

4          THE COURT: Okay.  So, Mr. Pasquale, what's your

5     concern?

6          MR. PASQUALE: No, that helps.  I think what I'm

7     hearing is they're going to be taken for both purposes, and

8     so long as we understand that going in, that's fine.

9          THE COURT: Okay.

10          MR. PASQUALE: Thank you, Your Honor.

11          THE COURT: Okay.  Thank you.  Mr. Lewis.

12          MR. LEWIS: Thank you, Your Honor.  Just to remind

13     the Court, I represent Via and S3 and Mr. Kevane

14     essentially, whose deposition is set as a 2004 tomorrow, to

15     start tomorrow.  We've also produced documents at the

16     trustee's request, as many as we could so far, from Mr.

17     Kevane's files, from Mr. Weintraub's files, and from the

18     files of various people at the client, at Via, as well,

19     including other counsel, in-house counsel, stuff that's not

20     privileged.  But it's a lot of paper.

21          THE COURT: Right.

22          MR. LEWIS: I'm a little concerned -- I know my

23     client is -- Via considers itself to be a bystander here, a

24     witness, and we understand is a percipient witness. Our

25     testimony may be required and the fact is it is going to

39

1   be, I'm sure.  On the other hand, I don't want Mr. Kevane,

2   and the client doesn't want to have to pay for Mr. Kevane

3   to appear in eight different depositions over the period of

4   the next eight months and have to produce documents again

5   and again and search its files again and again.  And I'm a

6   little concerned here, and I'm hearing, well, the

7   deposition is for this purpose but not that purpose, and I

8   am reserving my rights to do this and not -- and I'd really

9   like to see some kind of a coordinated schedules that

10  spares --

11          THE COURT: I think that's what we're working on,

12  and I heard that they were for both purposes.

13          MR. LEWIS: Well, Mr. Pasquale has just told me in

14  court behind the scenes that he's reserving his rights to

15  take further discovery of Mr. Kevane.  If people are going

16  to show up at a 2004 which may last up to two days of Mr.

17  Kevane, I'd like to have that be it.

18          THE COURT: It was my belief that nothing was

19  going to go forward until after September 18th or 20th.

20          MR. LEWIS: That's not what I've been told today,

21  but Mr. Kevane is going on tomorrow and maybe even Friday,

22  and --

23          MR. STEIN: May I respond from here, Judge?

24          THE COURT: Yes, Mr. Stein.

25          MR. STEIN: We are prepared -- the lawyer that's

40

1  coming to take the examination arrives tonight.  This has

2  been noticed for Mr. Kevane since the end of July.

3          THE COURT: Okay.

4          MR. STEIN: All the documents have been

5  distributed.  Everybody else -- those were the ones we were

6  seeking to stay, but not Mr. Kevane tomorrow.

7          THE COURT: Okay.  Very well.

8          MR. STEIN: Thank you, Judge.

9          THE COURT: I think you're going to go forward

10  tomorrow, Mr. Lewis.

11          MR. LEWIS: That's fine, Your Honor.  I don't

12  mind -- I'm not suggesting we shouldn't.  What I'm

13  suggesting is I don't want to go forward tomorrow, have all

14  these people show up and ask questions as they apparently

15  plan to do, and then have them notice his deposition

16  separately in other proceedings over basically the same

17  issues.  I just don't --

18          THE COURT: You don't want to do that, but you

19  know what?  If you have an argument against it at the time,

20  I'm sure you'll bring it before me.

21          MR. LEWIS: Okay.  I understand, Your Honor.  And

22  I just want a sense of the Court, if I may at this point,

23  to -- since we're talking about coordinated discovery, and

24  we're talking about the same issues, and we're talking

25  about efficiency, it seems to me that's an appropriate

41

1   thing to be discussing this afternoon.

2           THE COURT: It's an admirable goal.

3           MR. LEWIS: Thank you, Your Honor.

4       (Laughter.)

5           And I will take that to the bank.

6           THE COURT: Okay.  Thank you very much.

7           MR. LEWIS: Thank you, Your Honor.

8           THE COURT: Mr. Pasquale.

9           MR. PASQUALE: Your Honor, just a housekeeping

10  matter.  There is a status conference scheduled, signed by

11  the Clerk I believe, when the summons was filed in the

12  adversary proceeding for September 11th.  It would seem to

13  me, and Mr. Merola and I spoke earlier, but in light of all

14  the events today, that I think I'd request if we could move

15  that to the 20th or the 24th when we would already be before

16  you, Your Honor.

17          THE COURT: You know, I can do that.  I don't know

18  that I think a status conference is valuable in this case

19  at this time, and typically what I ask attorneys to do is

20  just stipulate to some day that makes sense.  I also don't

21  think that the 20th makes sense either.

22          MR. MEROLA: In conjunction with working out the

23  discovery plan and/or resolving the motion to dismiss,

24  maybe Mr. Pasquale and I could sit down and come up with an

25  alternative date.

42

1          THE COURT: Okay.  And you may want to move it out

2    three or four months.

3          MR. MEROLA: We hope to be at trial by then, Your

4    Honor.

5          THE COURT: Okay.  Yes.

6          MR. SCHAFFER: There's one other housekeeping

7    measure, assuming we're all done with this issue.

8          THE COURT: Yes.

9          MR. SCHAFFER: We are.  I get nervous the more

10   people talk, Your Honor.

11      (Laughter.)

12          Anyway, Your Honor, we have requested the setting

13   of a hearing on a motion we've had pending for a fair

14   amount of time now, and this is our motion to reconstitute

15   the Committee.  Depending upon how the discussions go with

16   these other issues, maybe that will become less important,

17   but at least for now, we would like to keep that moving

18   along and we would ask that the Court schedule it for the

19   September 20th date.  Again, this is a motion we'd

20   originally filed --

21          THE COURT: 1:00 o'clock in the afternoon on the

22   20th.

23          MR. SCHAFFER: Yeah, 1:00 o'clock in the

24   afternoon.

25          THE COURT: Does anyone suggest a better date?

43

1  Does anyone wish to be heard on --

2          MR. RANKIN: The only alternative, Your Honor --

3  this is Craig Rankin -- would be the 24th.

4          MR. SCHAFFER: But that is the hearing on the

5  motion to dismiss, and we probably have enough to do that

6  day.

7          THE COURT: I think that's a true statement.

8          MR. RANKIN: We're fine with the 20th, Your Honor.

9          THE COURT: Okay.  And that would be at 1:00

10 o'clock.

11         MR. RANKIN: Just to clarify when response are

12 due, because we weren't sure that was going to go forward,

13 would Your Honor be amenable to a response deadline of

14 filing papers on Thursday so they're received by the movant

15 and all relevant parties on Thursday of next week?

16         MR. COURT: You're talking about the 13th of

17 September?

18         MR. RANKIN: Yes, Your Honor.

19         THE COURT: I think that's fine.

20         MR. SCHAFFER: That would be fine.  Is that okay

21 with the U.S. Trustee?

22         MS. NANETTE DUMAS: That's fine.  Since my date

23 was the 12th, I'll take the 13th.

24         MR. SCHAFFER: There you go.

25         THE COURT: I'm sorry, was there a concern, Mr.

44

1  Stein?

2         MR. STEIN: Oh, not a concern.  Our understanding

3  was that in accordance with local practice, they were due

4  on the 6th with the reply due on the 13th?

5         THE COURT: That would normally occur, because I

6  hadn't given the date of the 20th -- now that we have the

7  20th, it's unfair I think to ask people to file papers by

8  tomorrow.  So do you want to make sure -- well, normally

9  what I would do on something like this is say that you can

10 file your reply on the 13th, response on the 13th.  A reply

11 if any should be filed no later than the 18th.

12        ALL COUNSEL: Thank you, Your Honor.

13        THE COURT: Okay.  Is there anything further that

14 we can do today?  I just want to say that I very much

15 appreciate all of the efforts that you're putting into

16 this.  I thank you for being responsive to my concerns and

17 for working together in a harmonious atmosphere.  Thank you

18 very much.

19        We're adjourned.

20        ALL COUNSEL: Thank you, Your Honor.

21     (Whereupon, the proceeding are concluded at 3:53 p.m.)

22

23

24

25

45

1

2

3

4

5                       CERTIFICATE OF TRANSCRIBER

6

7          I certify that the foregoing is a correct

8   transcript from the digital sound recording of the

9   proceedings in the above-entitled matter.

10

11  DATED: September 27, 2007

12

13                       By:    /s/ Jo McCall

14

15

16

17

18

19

20

21

22

23

24

25