# EXHIBIT 22

1

1                 UNITED STATES BANKRUPTCY COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                  (SAN JOSE DIVISION)

4

5  In re:

6  SONIC BLUE, INC.,           Case No. 03-51775-MM
                           Thru     03-51778-MM
7                         (Jointly Administered)

8                        Chapter 11

9                        San Jose, California
                           September 20, 2007
10                       1:02 p.m.
          Debtor.
11  _____/

12

                TRANSCRIPT OF PROCEEDINGS
13         a) EMERGENCY MOTION FOR PROTECTIVE ORDER
   IN RESPECT OF SONICBLUE CLAIMS' NOTICES OF DEPOSITION
14       OF HENRY KEVANE, JOHN J. TODD, ALBERT BORO,
         SUZANNE UHLAND, AND BRUCE BENNETT ON
15     SEPTEMBER 6, 10, 11, 12 AND 13, 2007 BY
           DENNIS CONNOLLY, TRUSTEE
16  b) JOINDER TO EMERGENCY MOTION BY PORTSIDE GROWTH &
   OPPORTUNITY FUND, SMITHFIELD FIDUCIARY, LLC, AND
17           CITADEL EQUITY FUND, LTD.
    c) JOINDER BY ALBERT J. BORO, JR. (NON-PARTY)
18       d) OPPOSITION TO TRUSTEE'S MOTION FOR A
     PROTECTIVE ORDER BY SONICBLUE CLAIMS, LLC
19  e) MOTION FOR ORDER (1) DIRECTING THE UNITED STATES
   TRUSTEE TO CHANGE THE MEMBERSHIP OF THE OFFICIAL
20   COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS,
  (2) DIRECTING THE APPOINTMENT OF A NEW TRADE CREDITOR
21       COMMITTEE BY SONICBLUE CLAIMS, LLC
  f) JOINDER IN MOTION BY YORK CREDIT OPPORTUNITIES FUND
22  (g) RESPONSE AND OPPOSITION BY THE OFFICIAL COMMITTEE
    OF CREDITORS HOLDING UNSECURED CLAIMS
23       h) RESPONSE BY UNITED STATES TRUSTEE
         i) JOINDER BY MAXTOR CORP.
24

       BEFORE THE HONORABLE MARILYN MORGAN
25        UNITED STATES BANKRUPTCY JUDGE

2

```
 1   APPEARANCES:

 2
     For the Creditors'          LEVENE, NEALE, BENDER, RANKIN
 3   Committee:                  & BRILL, LLP
                                 BY: CRAIG RANKIN, ESQ.
 4                               10250 Constellation Boulevard.
                                 Suite 1700
 5                               Los Angeles, California 90067

 6

 7   For Albert Boro and        HOWARD, RICE, NEMEROVSKI, CANADY,
     Pillsbury firm:            FALK & RABKIN, PC
 8                               BY: BERNARD BURK, ESQ.
                                 Three Embarcadero Center, 7th Floor
 9                               San Francisco, California 94111

10

11   For the trustee:           FRIEDMAN, DUMAS & SPRINGWATER, LLP
                                 BY CECILY A. DUMAS, ESQ.
12                               150 Spear Street, Suite 1600
                                 San Francisco, California 94105
13
                                         -and-
14
                                 ALSTON & BIRD, LLP
15                               BY: GRANT T. STEIN, ESQ.
                                 One Atlantic Center
16                               1201 West Peachtree Street
                                 Atlanta, Georgia 30309
17

18
     For the U.S. Trustee:      OFFICE OF THE U.S. TRUSTEE
19                               BY: NANETTE DUMAS, ESQ.
                                 280 South First Street #268
20                               San Jose, California 95113

21
     For Riverside:             MURRAY & MURRAY
22                               BY: ROBERT A. FRANKLIN, ESQ.
                                 19400 Stevens Creek Boulevard
23                               Suite 200
                                 Cupertino, California 95014
24

25
```

3

```
 1   APPEARANCES (CONTINUED):

 2
     For SB Claims:            STUTMAN, TREISTER & GLATT
 3                             BY: K. JOHN SHAFFER, ESQ.
                                         -and-
 4                                 FRANK A, MEROLA, ESQ.
                               1901 Avenue of the Stars,
 5                             12th Floor
                               Los Angeles, California 90067
 6
                                         -and-
 7
                               McGRANE GREENFIELD, LLP
 8                             BY: BERNARD S. GREENFIELD, ESQ.
                               40 South Market Street, 7th Floor
 9                             San Jose, California 95113

10
     For S3 Graphics and       MORRISON & FOERSTER, LLP
11   Via Technologies:         BY: ADAM A. LEWIS, ESQ.
                               425 Market Street
12                             San Francisco, California 94105

13
     For the senior           STROOK, STROOK & LAVAN, LLP
14   note holders:            BY: KENNETH PASQUALE, ESQ.
                                  (APPEARING TELEPHONICALLY)
15                                      -and-
                                  LEWIS KRUGER, ESQ.
16                             180 Maiden Lane
                               New York, New York 10038
17

18   Special litigation       O'MELVENY & MYERS, LLP
     counsel for Debtor:      BY: MATT POWERS, ESQ.
19                             Embarcadero Center West
                               275 Battery Street, Suite 2600
20                             San Francisco, California 94111

21                                (APPEARING TELEPHONICALLY)

22
     For Citadel:             SKADDEN, ARPS, SLATE, MEAGHER &
23                            FLOW, LLP
                              BY: VAN C. DURRER, II, ESQ.
24                            300 South Grand Avenue
                              Los Angeles, California 90071
25
```

4

```
 1   APPEARANCES (CONTINUED):

 2   For Maxtor Corporation:   BIALSON, BERGEN & SCHWAB
                               BY: PATRICK M. COSTELLO, ESQ.
 3                             2600 El Camino Read, Suite 300
                               Palo Alto, California 94306
 4
                               (APPEARING TELEPHONICALLY)
 5

 6   For York Credit:          ST. JAMES LAW
                               BY: MICHAEL ST. JAMES, ESQ.
 7                             155 Montgomery Street, Suite 1004
                               San Francisco, California 94104
 8

 9
     For the U.S. Trustee:     OFFICE OF THE U.S. TRUSTEE
10                             BY: NANETTE DUMAS, ESQ.
                                        -and-
11                                 EDWINA DOWELL, ESQ.
                               280 South First Street #268
12                             San Jose, California 95113

13
     For Matsushita, et al.    PERKINS COIE
14                             BY: BRUCE MacINTYRE, ESQ.

15                             (APPEARING TELEPHONICALLY)

16

17   Also Present:            DENNIS CONNOLLY, Trustee

18

19   Court Recorder:           ERIN COYLE
                               UNITED STATES BANKRUPTCY COURT
20                             280 South First Street
                               San Jose, California 95113
21

22
     Transcription Service:    Jo McCall
23                             Electronic Court
                               Recording/Transcribing
24                             2868 E. Clifton Court
                               Gilbert, Arizona 85297
25                             Telephone: (480) 361-3790
```

5

1           P R O C E E D I N G S

2  September 20, 2007                        1:02 p.m.

3                      ---oOo—

4           THE CLERK: All rise.

5           THE COURT: Please be seated.

6           THE CLERK: Item 1, <u>Sonic Blue, Incorporated.</u>

7           THE COURT: Could we have your appearances?

8           MR. ST. JAMES: Good afternoon, Your Honor,

9  Michael St. James appearing behalf of York Capital, the

10  holder of about 8.2 million dollars in claims.

11           THE COURT: Mr. St. James.

12           MR. COSTELLO: Good afternoon, Your Honor, Patrick

13  Costello of Bialson, Bergen & Schwab appearing on behalf of

14  Maxtor Corporation.

15           THE COURT: Mr. Costello.

16           MR. SCHAFFER: Good afternoon, Your Honor.  John

17  Schaffer of Stutman, Treister & Glatt on behalf of SB

18  Claims.  With me is my partner Frank Merola and Bernie

19  Greenfield from the McGrane Greenfield firm.

20           THE COURT: Good afternoon, gentlemen.

21           MS. DUMAS: Good afternoon, Your Honor, Nanette

22  Dumas for the U.S. Trustee and with me in the courtroom is

23  Edwina Dowell, the Assistant U.S. Trustee for the San Jose

24  Division.

25           THE COURT: Good afternoon.

6

1          MR. FRANKLIN: Good afternoon, Your Honor, Robert

2   Franklin of Murray & Murray appearing on behalf of

3   Riverside Contracting and Riverside Claims.

4          THE COURT: Mr. Franklin.

5          MR. BURK: Good afternoon, Your Honor, Bernard

6   Burk for the Pillsbury firm and for Mr. Boro who has been

7   subpoenaed.

8          THE COURT: Good afternoon.

9          MR. KRUGER: Good afternoon, Your Honor, Lewis

10  Kruger appearing on behalf of the 2002 senior note holders.

11         THE COURT: Good afternoon, Mr. Kruger.

12         MR. KRUGER: My partner, Mr. Pasquale may be on

13  the phone as well.

14         MR. PASQUALE: I am, Your Honor.  Good afternoon.

15         THE COURT: Okay.  Good afternoon, Mr. Pasquale.

16         MR. DURRER: Good afternoon, Your Honor, Van

17  Durrer of Skadden, Arps, Slate, Meagher & Flor, on behalf

18  of Citadel Equity Fund, one of the 2002 note holders.

19         THE COURT: Very well.  Thank you.  Good

20  afternoon.

21         MS. CECILY DUMAS: Good afternoon, Your Honor,

22  Cecily Dumas on behalf of Dennis Connolly, the Chapter 11

23  trustee.

24         MR. STEIN: And Grant Stein, Alston & Bird on

25  behalf of Mr. Connolly.  Thank you.

7

1          THE COURT: Thank you, Mr. Stein.

2          I think we have two more telephonic appearances.

3          MR. MacINTYRE: Good afternoon, Your Honor, this

4  is Bruce MacIntyre of Perkins Coie in Seattle appearing on

5  behalf of two of the members of the Unsecured Creditors'

6  Committee, Matsushita Kotobuki Electronics and Matsushita

7  Kotobuki Electronics Sales of America.

8          THE COURT: Okay.  Good afternoon, Mr. MacIntyre.

9  Do we also have Mr. Powers on the lines?

10         THE OPERATOR: This is the Court Call Operator.  I

11 was not able to reach Mr. Powers, but I did leave him a

12 number where he could reach us and join the hearing.

13         THE COURT: Okay, Operator, if he is able to reach

14 us, would you please announce his presence to the Court?

15         THE OPERATOR: I will.

16         THE COURT: Thank you very much.

17         Now noticeably absent from today's hearing is any

18 representative from the Committee.  Has anyone heard from

19 Levene, Neale, Bender?

20         MR. MacINTYRE: Your Honor, this is Bruce

21 MacIntyre.  I understood that Committee counsel was going

22 to be there, and we spoke with him earlier today, so I'm

23 surprised that he's not there at the moment.

24         MR. DURRER: Your Honor, Van Durrer again for

25 Citadel Equity Fund.  I spoke to Mr. Rankin just a short

8

1   while ago, perhaps 25 minutes ago, and he advised that he

2   was having difficulty with a tire.  He does expect to be

3   here in advance of the motion to reconstitute the Committee

4   being heard.  I'm not sure if he has any specific

5   involvement in the discovery plan that I think is up first.

6   So I'll defer --

7            THE COURT: It looks like he's about to walk into

8   the courtroom.

9            MR. DURRER: There we are.

10           THE COURT: Very well.  Thank you very much.

11           MR. DURRER: You're welcome.

12           THE COURT: Mr. Rankin, you're the last one to

13  make your appearance.  We were just wondering if you were

14  going to make it here today.

15           MR. RANKIN: Thank you, Your Honor, for waiting.

16           THE COURT: No problem.

17           MR. RANKIN: Craig Rankin for the Committee.

18           THE COURT: Thank you, sir.

19           Okay.  How do you all wish to proceed?  Would you

20  like to deal with the issue of the Committee first?

21           MR. RANKIN: Certainly, Your Honor.

22           THE COURT: Is there anyone who would like to

23  proceed differently?

24           Okay.  We'll start with the Committee.  Let me

25  just give a few comments that might be of assistance to

9

1   you.  It's rare for me to see so many impassioned briefs

2   filed, and Mr. Rankin, the adjectives were quite

3   significant.  I picked up "paralyzed, disabled, needs a

4   warning label, self-interested."  I think that probably the

5   adjective that I would use at this stage is "lame duck."

6   And that may be the kindest term that the Court could use

7   for the status of the Committee at the present time.

8          So the issue is really what should the Court do

9   about this?  There are actually three choices, and I'd like

10  to go over them with you and maybe it'll help direct our

11  discussion.  And the Court could do nothing.  Maybe that

12  made sense to do nothing when we thought that the case was

13  fast tracked for a Plan.  But certainly at the last

14  hearing, it became very evident that creditors and the

15  Court would appreciate the benefit of a viable Committee.

16         So I'm going to say that that's probably not an

17  option for the Court, which leaves two remaining options

18  that I'm considering.  One option, and the option

19  recommended by SBC, was that the Court order that the

20  Committee be reconstituted.  The benefit to that is that it

21  avoids an additional layer of expense.  On the other hand,

22  I don't expect that there will be any further expense from

23  the Creditors' Committee because once the Court indicates

24  that you really are a lame duck, there's not much point in

25  additional work.

1          And it does avoid the problem of not having a

2   warning label on the Committee so that if anyone contacted

3   the Committee, they'd understand that it really is a

4   defunct entity.  The alternative that's been suggested is

5   that the Court consider appointing a Trade Creditors'

6   Committee.  Appointing a Trade Creditors' Committee does

7   have some attractiveness to the Court because it avoids

8   dealing with the issue of appeal of this very esoteric and

9   soon to be outdated issue.

10         So those are the things that I'm thinking about

11  and I would really appreciate your assistance in deciding

12  how to proceed.  I have to tell you that I frankly -- given

13  the things that are apparent to me and given the passion of

14  the briefs that have been filed, I'm somewhat surprised

15  that the U.S. Trustee's Office on its own hasn't decided to

16  reconstitute the Committee.  So if there are issues and

17  things that you would like me to consider, I'm going to ask

18  you to please address them.

19         And then as to the other two choices that the

20  Court has, I'd like your thoughts on whether the Court

21  should proceed in what I think is a pragmatic way or

22  whether we should actually reconstitute the Committee.  So

23  those are my thoughts and I'd appreciate hearing from any

24  of you.  Mr. Schaffer.

25         MR. SCHAFFER.  Thank you, Your Honor.  In light

1  of what I might consider as I guess the Court's tentative,

2  I'll try to be relatively brief here.  I have lots of

3  things I can say, but it seems like we're more heading

4  towards what should do we do as opposed to whether we

5  should do anything.  I would note though, Your Honor, that

6  it was on September 14th of this year that SB Claims filed

7  with this Court the opinion letter from the Pillsbury firm

8  to the note holders, and the note holders' threat to sue

9  Pillsbury.  So that was seven months and six days ago

10 today.

11          THE COURT: February 14th.

12          MR. SCHAFFER: February 14th, I'm sorry.  I

13 apologize.  February 14th, I think it was Valentine's Day to

14 be exact.  It's been a long time since then, Your Honor,

15 and yet we feel like we are still dealing with issues that

16 we would have thought would have been long, long behind us

17 by now.  And we are hopeful that a new Committee -- when I

18 say "new," either new or reconstituted -- can get us moving

19 again quickly.  This is not that big of a case.  This is

20 not as the Court noted the last time, this is not Enron.

21 The claims objections are mostly done other than the note

22 holders' claim.  There's 85 million dollars in cash.  This

23 is a case that can be done fairly quickly.

24          Your Honor will recall how much SB Claims was

25 able to accomplish in terms of bringing to the Court's

12

1   attention various problems in this case, just in a very

2   short period of time, from the time we filed our first

3   pleading which was either the first or second week of

4   February until the March 19th hearing where the trustee was

5   ordered appointed.  I mean this doesn't take a long time

6   provided that people are working diligently and

7   cooperatively to try to actually find out what happened

8   here as opposed to filing motions trying to prevent people

9   from taking discovery or staying adversary proceedings.  We

10  need to be moving forward, and the parties that are

11  supposed to be looking out for the interests of the

12  creditors, the trustee, the U.S. Trustee, and the

13  Creditors' Committee, need to be an active part of moving

14  forward.

15          And I think that what we've seen, not just from

16  my pleading but from the pleadings filed by three different

17  other creditors in this case, who with their own time and

18  money filed joinders in our motion, and they were all very

19  well thought out, and I think in particular, the reply at

20  the end really sort of crystallized things that I wish I

21  could have said that well, because it was really a message

22  of a complete lack of faith, not only in the system that

23  existed before the trustee was appointed, but unfortunately

24  a lack of faith in what's happening now for the last six

25  months since that March 19th order.  We need to move

13

1  forward.

2          And I think, Your Honor, of the two choices that

3  you have outlined that are in any way palatable from our

4  standpoint, which is either order that the existing

5  Committee be reconstituted or a new Trade Creditor

6  Committee.  By far, Your Honor, the better option, if it is

7  an acceptable option to the U.S. Trustee, is to

8  reconstitute the existing Committee, effectively as a trade

9  committee.

10          THE COURT: Okay.  Why don't you explain for all

11  of us why you think that's so.

12          MR. SCHAFFER: Well, Your Honor, it's a couple of

13  reasons.  First of all, it will eliminate whatever

14  uncertainty there is about the present Committee in terms

15  of what its positions are, does it have a position, does it

16  have standing, is its counsel paid by the estate.  It

17  concerns me, Your Honor -- and I'll just give a simple

18  example -- a few days ago at the very first deposition, the

19  declaration that Ron Bender had filed in connection with

20  the trustee motion was brought out as sort of, well, this

21  is Committee counsel's declaration.

22          Your Honor, I don't want there to be any

23  uncertainty about what happened in this case, in terms of

24  positions that were taken by an Official Committee which

25  should not be, in my view, the Official Committee.  I want

14

1   there to be clarity and so long as the existing Committee

2   continues to survive, how do you explain that to the world?

3   And like I say, we were the ones who used the warning label

4   in our pleading, and I think that there's just too much

5   uncertainty.  A Committee by statute is a fiduciary.  I

6   don't think this Court can have a Committee that doesn't

7   function as a fiduciary and yet still is an 1102 Committee.

8   It just -- it's misleading, and I think it is just not

9   authorized by statute.

10          There's another issue, Your Honor, that we'll get

11  to in a little bit when we talk about discovery, and that

12  has to do with an asserted joint privilege.

13  Notwithstanding the fact that, quote, unquote, "joint

14  privilege communications between the Creditors' Committee

15  and the Debtor" were filed with, for example, the Boro

16  declaration last March, we are now encountering claims of

17  joint privilege by the trustee on behalf of the estate and

18  the Creditors' Committee.  So long as this Creditors'

19  Committee continues to exist, it can be asserting this

20  alleged joint privilege.

21          A new Creditors' Committee -- well, a

22  reconstituted Creditors' Committee which really just steps

23  into the shoes of this Creditors Committee will control

24  that joint privilege.  And I have far more confidence that

25  that Committee will act in the interest of the estate in

15

1   getting information out.  There's absolutely no reason why

2   e-mails between the note holders and the Debtor and

3   Committee counsel should be declared privileged at this

4   point, in light of what has happened.

5          And so, Your Honor, reconstituting this Committee

6   will solve that problem.  Now, Your Honor, I do understand

7   that Congress in its infinite wisdom, because it always

8   does such a great job with the Bankruptcy Code, in 1986 in

9   making a National U.S. Trustee Program, took out a

10  provision which at least *Colliers* suggests they shouldn't

11  have taken out, that it was a mistake, but who knows, but

12  as a consequence, the express authority of the Court to

13  order the U.S. Trustee to reconstitute a Committee was

14  taken out, and it has only been restored -- it is perhaps

15  one of very few bright lights in the 2005 legislation, is

16  that that was restored.

17         And, Your Honor, I do recognize that in the

18  interim, there have been differing views.  I do believe

19  that Judge Rymils' (Phonetic) very well thought out opinion

20  in the Pierce decision is the correct view in terms of the

21  Court's authority, and I do believe that if there was ever

22  an example of a case where a Court should have authority

23  under whether it's 105 or whether it's under Rule 2020,

24  whether it's under the administrative procedures, that

25  whatever way a court reviews executive discretion, this is

1  the case for it.

2          It would be much easier, Your Honor, if the U.S.

3  Trustee's Office would, in light of the Court's views, in

4  light of three pleadings other than my own filed by other

5  creditors, it would be terrific if they would ease that

6  burden from the Court and agree to do that.  But if not,

7  Your Honor, my suggestion to the Court, notwithstanding the

8  possibility of an appeal -- and I recognize it's

9  possible -- is that of those options, the second option

10  ordering the reconstitution of the current Committee is

11  still the better of the options.

12          I understand that it has a risk, but it is what I

13  think we have to do.  It's difficult to be adverse to the

14  U.S. Trustee on this issue.  The U.S. Trustee stood by me

15  when pretty much we were the only two people in this

16  courtroom bringing to the attention of this Court what

17  happened with Pillsbury, and I respect the U.S. Trustee's

18  Office for doing that, but with all due respect, this time

19  they're just wrong.  They're just wrong.

20          Anyway, Your Honor, that's all I have.

21          THE COURT: Thank you, Mr. Schaffer.  Mr. St.

22  James.

23          MR. ST. JAMES: If I may just respond briefly to

24  the Court's question.  As I see it, if the Court orders the

25  reconstitution of the Committee, there are three things

1  that might happen, and because of that analysis, I think

2  that, you know, I can't quite agree with Mr. Schaffer.  One

3  thing that could happen and obviously I think almost

4  everyone in this courtroom hopes will happen is that the

5  U.S. Trustee will acquiesce.  But the U.S. Trustee is a

6  government official and is answerable to other government

7  officials.  She may not know today as she sits in this

8  courtroom what she will do, and she may not be able to do

9  what she chooses to do.  So she may not be able to

10  acquiesce.

11         The second possibility is that she will

12  reconstitute the Committee, but then take an appeal from

13  the Court's order.  In the ordinary case, I'd say that's

14  wasteful; that's expensive, let's not do that.  But I think

15  Mr. Schaffer has persuaded me that in view of the other

16  problems in this case, that expense may well be worth the

17  estate bearing it.

18         The third possibility -- and I don't know if it's

19  true or not is that the U.S. Trustee could say this order

20  is beyond the Court's authority and so I'm not going to do

21  it.  And presumably that would lead to some sort of

22  appellate process, but my concern is that if that's what

23  happens, then we wait some material period of time before

24  there is a viable Committee acting, and that I think is

25  much, much worse than the problems with reconstitution.

18

1          So what I guess I'd suggest is, to the extent the

2    U.S. Trustee can tell us to date what she would do, that

3    makes life a lot easier.  To the extent that she can't,

4    what I would suggest the Court consider is enter the order

5    reconstituting the Committee, but setting this for a status

6    conference 20 days out or something like that so that if

7    the U.S. Trustee has taken the third option of simply not

8    obeying the Court's order, the Court could appoint a Trade

9    Creditors' Committee so that there would be a functioning

10   committee while the appellate process went on.

11         Thank you.

12         THE COURT: Thank you, Mr. St. James.

13         Okay.  I want to see if there's anyone else who

14   wishes to be heard with respect to these arguments.  Mr.

15   Stein, do you wish to be heard?

16         MR. STEIN: Yes, Your Honor.  Thank you, Judge.

17   The purpose of being heard is to insure that there's a

18   clarification on a specific point, and that relates to the

19   privilege issue.  There is a joint defense agreement that

20   was entered into by the Creditors' Committee, by SonicBlue,

21   and by the, quote, "Unofficial ad hoc Committee of

22   Bondholders."  That joint defense agreement exists.  We

23   need to come before Your Honor, which we plan to do, to ask

24   for the trustee not to be bound by that agreement.  At this

25   point in time, the 2002 note holders have already said,

1   they're not asking that we be bound by that.

2        We also will be coming before the Court, plan to

3   file by the middle of next week, a motion to allow the

4   trustee on behalf of the bankruptcy estate to abrogate, to

5   weigh the privilege, but they have appropriate protective

6   order type provisions associated with that.  This is an

7   area where we had initial communications were blanket

8   waiver.  There's been good discussion to narrow down the

9   area where the privilege waiver has been requested.  We

10  plan to come before you on that and expect that to move

11  forward.

12       The point that I'm making is that the impression,

13  at least what I heard, was that somehow the trustee was

14  saying oh no, we're not going to make documents available,

15  and we're going to stand behind these things.  Quite to the

16  contrary, the trustee wants to move forward in the current

17  state --

18       THE COURT: I didn't hear that actually.  I was

19  not assuming that there was any roadblock from your

20  position.  What I was assuming was that there is a concern

21  that there may at some point be a roadblock from the

22  Committee, because of the Committee's constitution.  That

23  was what I was interpreting from that remark.  But I thank

24  you for that clarification, and it's helpful to me to know

25  how you are planning to proceed.

20

 1          MR. STEIN: Yeah, because you made it clear that

 2   you want things to move forward.  We heard that very

 3   clearly.

 4          THE COURT: Yes.  I know.

 5          MR. STEIN: We plan to do that, Judge.  Thank you.

 6          THE COURT: You're good listeners.  I've noticed

 7   that.

 8          MR. STEIN: Well, and sometimes I don't hear it

 9   all, but thank you.

10          THE COURT: Thank you.  Okay.  Mr. Rankin, would

11   you like to be heard now?

12          MR. RANKIN: I take the Court's comment to heart.

13   Thank you for making the comments.  It's important because

14   there hasn't been a lot that's been published, that the

15   Court know that in the five months since the trustee has

16   been appointed, the Committee has been doing what it thinks

17   it's supposed to do.  It's been open and honest with the

18   United States Trustee's Office.  It welcomed the

19   appointment of one or two of these creditors.  We work with

20   all these firms all the time.  There's nobody on the

21   Committee that's evil.  I mean I want to -- and Mr.

22   Schaffer files pleadings all the time.  He's a heck of a

23   good lawyer, but I think the personal attack on Bruce is

24   unfair, and it wasn't relevant to the issues.  I think Mr.

25   MacIntyre is on the phone.  He's been a great Committee

1  member, a very honest man throughout the process.

2       Importantly, two things: Just recently in the

3  last four days, we were asked as a Committee to waive

4  privilege with respect to the items being investigated by

5  the trustee and SBC.  We have agreed to do that this

6  morning.  So we just wanted to have a written agreement to

7  have the Committee be able to give away whatever

8  information anybody needs regarding this investigation.

9  We're the absolute opposite of blocking anything, which is

10 probably why there's not a lot of paper about what we're

11 doing before this Court.

12      But the approach we've taken, based on right

13 after the Court appointed the trustee, we thought this

14 motion would be brought five months ago.  Five months have

15 passed.  And in the five months what we've done is we've

16 decided as a Committee -- we've reached out to these

17 creditors; if they have comments that they don't want to

18 pass through the Committee, that's fine.  We've told the

19 trustee what we're doing, but we've encouraged the trustee

20 to put a Plan on the table.  And the one interesting good

21 thing about having the senior note holders on the

22 Committee, it's -- ironically, it's a very positive thing.

23 They have new lawyers; they know the position they're in.

24 They know they're being scrutinized, and they're being

25 extremely cooperative with both the trustee and the

22

1    Committee and doing whatever is necessary to allow the

2    trustee to confirm a Plan and pay out money as soon as

3    possible and have whatever reserve is necessary to cover

4    whatever claims might be against them, because they

5    understand how they're being looked at.

6            They're not dominating the Committee; they have

7    no objection to creditors being added.  And they're open to

8    waiving privilege and have agreed to do so this morning by

9    phone.  We just have to put the agreement together.  They

10   just asked us in the last four days.  So we just see the

11   role as, it's not a typical Chapter 11.  I mean this would

12   probably be a Chapter 7 in a similar case because there's

13   no more business.  There nothing to sell.

14           If there hadn't been confusion about the ability

15   to appoint a trustee in more than one case, it probably

16   would have been a 7.  So the Committee has taken a step

17   back, appointed a trustee to monitor things, look at what,

18   if anything, we did, do what you're going to do.  We want

19   to be completely cooperative.  Our focus is on, don't

20   forget about getting the money distributed.  And I agree.

21   Mr. St. James wrote a great reply.  That is one of the

22   issues.  The only thing that we disagree with is their

23   ability to participate on the Committee.  If they want to

24   get on the Committee and they want to fire our firm; it's

25   not about our firm at all.  But we disagree that they can

1  effectively change the Committee by being added to the

2  Committee, and whether members should be removed or

3  lessened --

4          THE COURT: You know, the truth is, Mr. Rankin,

5  you're in an impossible position.  It's just an impossible

6  position for you.  If you don't say anything, we wonder why

7  you're not saying anything.  If you do say something, then

8  you're viewed as all of those adjectives that I had to read

9  into the record earlier.  This is a no-win situation for

10  you and your firm.  Before anyone has decided any of the

11  issues, you are just in a no-win situation.

12          MR. RANKIN: You're right.  But it doesn't mean we

13  give up and lay down or just say, do whatever you're going

14  to do.  It's just --

15          THE COURT: No.  No.  You know, I'd like to think

16  that you are doing the responsible thing as counsel to the

17  Committee, but the Committee is a lame duck, and it makes

18  you a lame duck.

19          MR. RANKIN: Okay.  I just -- the last comment is

20  the -- because we solicited from these people to be on the

21  Committee when this first happened, as the Court may

22  recall.  And at that time, they weren't willing to do it,

23  but the three main people that are opposing are claims

24  buyers, who if they want to be on the Committee, we'd love

25  to have them.  I think part of the reason that the

1  trustee –– and I'll let the trustee to speak to this –– but

2  part of the reason they haven't gotten a creditor to just

3  on this Committee is, there aren't a whole lot of creditors

4  floating around wanting to participate because the case is

5  done.

6        THE COURT: As someone explained in their brief,

7  it's not an attractive option to be added as a minority on

8  the Committee that's been functioning for some time.  So I

9  don't really see that as being an effective option.

10        MR. RANKIN: Okay.  Thank you, Your Honor.

11        THE COURT: Thank you.  Okay.  Before we hear from

12  the U.S. Trustee, is there anyone else who wishes to be

13  heard?

14        MR. MacINTYRE: Your Honor, this is Bruce

15  MacIntyre.

16        THE COURT: Yes, sir.

17        MR. MacINTYRE: Just very briefly, and I

18  appreciate Mr. Rankin's comments, my clients on this are

19  two trade creditors.  They have substantial trade claims

20  due to business dealings with the Debtor going back from

21  time prior to the bankruptcy filing.  And whether we regard

22  them right now as Committee members or as simply trade

23  creditors, I recognize the Court's concerns on the many

24  issues that are floating about in this case, but I would

25  like to point out that as far as this being a pure capital

1  B Bankruptcy case, there is but one purpose remaining in

2  the case, and that is to distribute approximately 85

3  million dollars to creditors.

4          The concern I'd like to focus on is that we have

5  a trustee who appears to be very knowledgeable and

6  experienced.  He was appointed barely five months ago on

7  April 17th.  He appears to have moved expeditiously to take

8  control of the case and the assets and to conduct the

9  investigation as directed.  Until the trustee completes

10 that investigation, it seems to me that change for the sake

11 of change is merely for appearances because we don't know

12 what problem, if any, is being addressed by change.  And at

13 the same time -- we're incurring virtually by definition to

14 whether we appoint a new Committee or whether we

15 reconstitute this Committee that then goes out and hires

16 another counsel -- we're incurring substantial fees and

17 costs that are coming directly out of the pockets of the

18 creditors, and I would urge the Court not to lose sight of

19 that.

20          Even though we have 85 million dollars sitting

21 there, it's only about a 30 to 35 percent distribution.

22 And what I think -- I don't pretend to speak to all the

23 trade creditors, but what I think the trade creditors

24 really want out of this case is to get paid what they're

25 going to get paid so they can close their books, stop

1  paying their lawyers, and move on to other things.  And I'm

2  not sure that either reconstituting or reappointing or

3  appointing a separate committee at this point furthers

4  those goals.

5          Thank you.

6          THE COURT: Thank you, Mr. MacIntyre.  I

7  understand and appreciate your position.    Yes, sir.

8          MR. DURRER: Your Honor, Van Durrer of Skadden,

9  Arps on behalf of Citadel Equity Fund, one of the senior

10 note holders, and a member of the Committee.  Your Honor, I

11 respect the power that the Court exercised very responsibly

12 when Your Honor entered the order appointing the trustee to

13 address what the Court perceived as real issues.  And I

14 agree one hundred percent that there are real issues.

15          I will say that I'm genuinely surprised at the

16 Court's reaction today and the Court's comments that --

17 while I appreciate some of the comments Your Honor has made

18 about the status of the Committee, I want to address first

19 of all some things that the Court doesn't know perhaps

20 about what the Committee has been doing since the

21 appointment of the trustee and since, as Mr. Rankin

22 mentioned, the involvement of new counsel on behalf of the

23 senior note holders.

24          But also I just want to remind the Court that it

25 was -- I believe it was the last time that Mr. Kruger was

1    in the courtroom -- that Your Honor had said very

2    specifically, and we took it to heart, that Your Honor had

3    not predetermined issues in this case.  And maybe it's my

4    naivete or inability to parse this so finely, but from

5    where I sit, it seems like the Court has predetermined

6    issues today.

7            THE COURT: I'm sorry that's your perception, but

8    I can assure you that's not true.

9            MR. DURRER: That is very good to hear, Your

10   Honor, because in connection with this motion, the argument

11   that I was going to make was that this kind of a motion

12   requires evidence, and that there hasn't been any evidence,

13   but there's been innuendo.  At worst, the Court --

14           THE COURT: You know, I think -- and that is

15   something we were going to get into, is whether or not if

16   the Court orders reconstitution of the Committee, whether

17   that does require an evidentiary hearing in order to

18   determine whether or not there's been an abuse of

19   discretion.  So that's something that if we get that far,

20   I'd like your advice on how to proceed.  But what we're

21   really talking about is how to be effective, and the

22   problem is that because of the situation before the Court,

23   the Committee as it's presently constituted is not

24   effective.  It cannot be effective, and the briefs that

25   have been filed, are as I said, as passionate as any I have

28

1  seen from people who are owed substantial sums of money.

2  You know, it did cross my mind to do nothing, but clearly,

3  based on the briefs that were filed, these people feel that

4  it is important to have effective representation from a

5  Committee, and they don't feel that they're getting that.

6  Okay?  So that's what I'm responding to and I hope that

7  that clarifies my remarks.

8       MR. DURRER: I think it does, I think I want to

9  specifically hone in on something you just said.  First of

10  all, denying the motion at this time, without prejudice, I

11  don't think is doing nothing.  I think that denying the

12  motion at this time, in the absence of any evidence of

13  abuse of discretion by the U.S. Trustee, which I agree is

14  the standard, is respecting -- not doing nothing -- but

15  respecting the process that the Court put into motion.

16       You know, back in the spring, you know, late

17  winter, spring, when the Court appointed the trustee and

18  made that decision, the Court made it relatively clear I

19  believe that there were sort of two paramount goals.  One

20  is, investigate, get to the bottom of this, figure out

21  what's going on, if anything, and second is, let's figure

22  out a way to get distributions in the hands of creditors,

23  legitimate creditors, as promptly as possible.

24       The Committee, since that time, has been working

25  actively with the trustee to allow those two things to

29

1    happen.  One, the trustee filed a Plan that the Committee

2    did have input on and continued to have input on -- and

3    this is one of the things that Your Honor doesn't know and

4    I want to address specifically your comment about how can

5    the Committee be effective -- well, here's how.  One of the

6    things that the Committee was involved in -- and again,

7    this is sort of cart before the horse because the process

8    was derailed, but there was a Plan on the table and I have

9    copies of it to circulate and to admit into the record.

10   They're in the docket.  The Court can take judicial notice

11   of them.  But the Plan provided for immediate distributions

12   to creditors not involved in the disputes surrounding the

13   Creditors' Committee.

14           So, for example, York, Riverside, SB Claims even,

15   Maxtor, all those creditors would have received under the

16   Plan a distribution of approximately 26 cents on the dollar

17   immediately.  That's a substantial percentage of the

18   dividend.

19           THE COURT: I don't think this is something I

20   don't know.

21           MR. DURRER: Okay.  Well, Your Honor, at the last

22   hearing Your Honor commented that you hadn't read the Plan,

23   so I apologize.  I just --

24           THE COURT: Okay.  Well, that's a basic summary

25   that I was aware of.

30

1          MR. DURRER: Okay.  So in connection with that

2   process, the Committee was actually pursuing with the

3   trustee as a comment to the Plan that was going to be

4   raised in its objection to the Disclosure Statement, the

5   comment that there should be some post-confirmation

6   oversight.  The Committee had every intention of pursuing

7   the watchdog type role that Mr. St. James had alluded to in

8   his brief with respect to the Plan.  That's one example of

9   how the Committee was continuing to do its job in this

10  case, notwithstanding the controversy otherwise involved.

11         The second thing, the trustee filed a motion to

12  appoint its local counsel, its California counsel, as

13  counsel to handle preference actions in this case.  There's

14  not been any allegation or statement anywhere in the record

15  at any time by anyone that the firms involved in connection

16  with pursuing preference actions ever did anything wrong

17  with respect to anything involving a preference action.

18  Okay?

19         Your Honor took it upon the Court and actually

20  was very involved in implementing a contingent fee

21  structure, very unique, very creative, in connection with

22  the pursuit of preference actions in this case.  The

23  trustee, on the other hand, proposed a different fee

24  structure where a California counsel was going to be

25  charging by the hour for actions even though they were at

31

1  the very end of their life cycle.  They had settlements in

2  place.  All that needed to be done was file a settlement

3  motion and get that motion heard, noticed to all creditors,

4  and heard before this Court for approval.  Mr. Rankin's

5  firm was ready to do that for free on the contingent basis,

6  basically, as part of the services that the firm had

7  already agreed to do.

8          The trustee had a different proposal in mind.

9  The Creditors' Committee filed an objection, and I can cite

10  those docket references to Your Honor, but the Committee

11  objected to that and said, hang on a second.  We're a

12  watchdog in this case.  The Judge was very much involved in

13  approving a fee structure here.  This doesn't make economic

14  sense.  Somebody should take a second look at that.  So

15  again, in terms of being effective, let's look at what's

16  really going on in this case, filing a plan; the Committee

17  is involved and doing its job.

18          You know, changing preference counsel, the

19  Committee is involved in doing its job, trying to get a

20  better economic deal for the estate.  Investigation - the

21  Committee is cooperating, waiving privilege, otherwise

22  being involved.  So I think that --

23          THE COURT: Mr. Durrer, first of all, I want to

24  say that you are relatively new to the case, and you're not

25  familiar with the Court's involvement with respect to the

1  contingent fee agreement that I ultimately and perhaps

2  begrudgingly approved.  Okay.  And it is a concern of mine

3  whether that is too much temptation or it was too much

4  temptation for the co-counsel.  So you are hitting on some

5  sore points, I'm sorry to say.  It's very difficult for you

6  when you were not there.

7          MR. DURRER: Your Honor is absolutely correct.

8  All I did was read the documents and the transcripts and my

9  interpretation of that was that Your Honor was involved in

10 coming up with that arrangement.

11         THE COURT: It was something -- what the Court did

12 was suggest that Committee counsel and Debtor's counsel

13 look outside at other counsel that was very experienced in

14 preference litigation and what the two did is ultimately

15 find out what the fee agreement was from the other

16 experienced attorney and adopted it and split it between

17 the two of them.  So I'm not going to tell you that I was

18 entirely comfortable with it, but there was at that point I

19 think no option for the Court.

20         MR. DURRER: Well, as I said, Your Honor, I wanted

21 to respond to your comments about what the Committee's role

22 has been and how it could be effective --

23         THE COURT: Well, a lot of people could argue that

24 the Committee is acting in its self interest, and you see,

25 there's just -- this is a no-win situation.  I really

1  looked at this from many different directions.  I don't see

2  this as being a situation that the Committee can win.

3          MR. DURRER: Well, I guess, Your Honor, though we

4  need to decide whether we should evidence on this point.  I

5  think that the case law is pretty clear that an evidentiary

6  hearing is required before Your Honor can make a finding of

7  abuse.

8          THE COURT: It may be.  It may be that we'll have

9  to appoint a Trade Creditors' Committee in the interim.

10  That would be another option.

11          MR. DURRER: Well, I think with respect to that

12  issue, Your Honor, I think the standard is that the Court

13  needs to find that creditors are not adequately

14  represented.  I think that -- it's interesting to me that

15  of all the creditors that filed papers in connection with

16  this motion, only one, Riverside, actually suggested that

17  it would sit on the Committee.  I didn't read anything in

18  the York paper to suggest that they would sit on any

19  Committee.  I didn't read anything in the SB Claims paper

20  that said that they would sit on any Committee, and I

21  didn't read anything in Maxtor's paper that suggested that

22  they would sit on any Committee.

23          The U.S. Trustee's paper said that no one has

24  asked to sit on a Committee since 2003, and I think -- you

25  know again, when I'm sort of examining the record, I have

34

1  to wonder where's the evidence that creditors aren't

2  adequately represented if no one wants to be

3  representative.  We do have -- you know, you've heard Mr.

4  MacIntyre.  We do have trade creditors --

5            THE COURT: First of all, people need to know what

6  the vehicle is going to be because if the vehicle is people

7  sitting on the existing Committee, I think they've

8  indicated that they are not interested.

9            MR. DURRER: Well, perhaps the U.S. Trustee can

10  speak to that directly, but my understanding is that they

11  haven't received any solicitations and I know that Mr.

12  Rankin spoke to this point as well, that the Committee

13  reached out to people to see if there was interest in

14  serving.

15            THE COURT: M-hm.

16            MR. DURRER: Thank you for your time, Your Honor.

17            THE COURT: Thank you.  Mr. Schaffer, did you wish

18  to be heard?

19            MR. SCHAFFER: Yes.  Maybe two things.  One is to

20  be heard briefly and the other is -- Your Honor, Citadel

21  did not file any papers, so I'm responding to this in the

22  form of a reply, so some of these arguments were new, but

23  that won't stop me.

24            Your Honor, first of all, there is -- well, let

25  me step back for a moment.  Your Honor made absolutely

1  clear to Mr. Kruger, quite correctly if I may add, at the

2  June 14th hearing that with respect to the matters in that

3  adversary proceeding issues, for example, whether or not

4  the Via debt was really senior indebtedness, whether or not

5  the waiver was improper, whether or not it was properly or

6  not properly disclosed.  These are issues that the Court

7  has not decided.   We haven't even had the first hearing on

8  them yet, Your Honor.  That's Monday.

9        Absolutely, Your Honor, there are many, many,

10  many issues that this Court has not decided, in fact have

11  not really even been presented to this Court yet.  However,

12  Your Honor, this Court has made some decisions, and I don't

13  think Your Honor meant to suggest in June that no decisions

14  had been made.  For example, the firm of Pillsbury Winthrop

15  was disqualified, obviously based upon many findings by the

16  Court in connection with the disqualification of Pillsbury

17  Winthrop.  A trustee was appointed, not without evidentiary

18  findings as to the need for a trustee.

19        So, Your Honor, I think there is an overstatement

20  to say that this Court has reserved everything in this case

21  for decision.  What this Court has reserved are some very

22  fundamental issues which the note holders have every right

23  to argue, defend themselves.  They wrote quite a brief;

24  I've read it, and I'm prepared to argue before you on

25  Monday.  But that's a decision you haven't made yet.

1        But, Your Honor, I want to just turn to our reply

2  brief, because it sort of summarizes what I believe is the

3  evidence, that is in the record, that this Court can rule

4  on today.  This Court -- starting on page 5 of our reply

5  brief:  This Court has already determined that there was a

6  breakdown of creditor confidences in this case.  To some

7  extent, Your Honor, why that happened doesn't really

8  matter.  A Committee can't function if the unsecured

9  creditors don't have confidence in it, and if their reasons

10 for not having confidence in it are this or that, or

11 something else, to some extent it really doesn't matter.

12 The fact of the matter is you have a lack of confidence.

13 And that lack of confidence, Your Honor, is no less today

14 than it was when the Court made that finding on March 19th

15 because we have pleadings from three other creditors

16 besides SB Claims that are clearly saying there's still a

17 lack of creditor confidence.  That is a reason -- there's

18 evidence of it in the form of the objections filed by,

19 together, the holders of nearly 24 million dollars of

20 claims in this case.  There is a lack of confidence.

21       Your Honor, we also know as a fact -- not as an

22 allegation, but as a fact because it was admitted by

23 Committee counsel -- that the Creditors' Committee was

24 aware of the Pillsbury conflict in either August or

25 September of 2005.  We also know as a fact that the note

1  holders who constituted a majority of the Committee and

2  still constitute very close to -- at least half of the

3  Committee -- knew as a fact that conflict.

4       We know, Your Honor, that as a fact, a proven

5  fact, that that conflict was not disclosed to creditors or

6  to this Court or to the U.S. Trustee properly until SB

7  Claims itself filed the letters as soon as they got them

8  through discovery.  We had a Pillsbury fee application.  We

9  had a Creditors' Committee fee application.  We had a

10 Disclosure Statement, which Mr. Bender told this Court he

11 personally was principally responsible for drafting, that

12 the Committee was a co-proponent of.  We had the first

13 hearing on the Disclosure Statement where everyone -- and I

14 daresay that I basically told this Court, it's no big deal,

15 nothing to worry about; let's just get the Disclosure

16 Statement approved.

17       That was this Committee.  It is the same

18 Committee, Your Honor.  We know as a fact that that

19 Disclosure Statement had no disclosure, the fact that

20 Marcus Smith was a defendant in a fiduciary duty action.

21 Your Honor, there are facts in the record.  It is the same

22 Committee.  They're the same facts.  My comment at the very

23 beginning today, well, it's been seven months.  The only

24 sad thing is that those facts have just stayed the same for

25 seven months.  There is a record right now today for this

38

1  Court to determine that it is appropriate to reconstitute

2  this Committee.

3          Your Honor, I also want to make just very briefly

4  a comment about the Plan, because we never got to that

5  because as you may know, we filed a lengthy objection to

6  the Disclosure Statement, but the Plan was taken off

7  calendar before that was argued.  We believe that that Plan

8  was illegal in terms of our rights as what we contend are

9  senior indebtedness, vis-a-vis the 2002 note holders.

10 Obviously they contend otherwise.  I'm not saying they

11 don't.  They clearly do.  But, Your Honor, this wasn't

12 simply a Plan that was going to make distributions to the

13 dog and cat trade creditors.  This Plan as originally

14 proposed by the trustee was going to pay 26 million dollars

15 to the note holders, and even after they set up their

16 reserve, which we believe is both inadequate and illegal

17 under the terms of the indenture –- I know they disagree

18 with me, but you haven't resolved it yet.  They still were

19 going to distribute 18 million dollars to the note holders.

20         Now, I know Mr. Stein at the last hearing

21 explained, well, if there was an objection to the 96's then

22 maybe it won't happen, but there are no assurance of

23 anything.  All we knew was that there was a chance that

24 millions and millions of dollars would go to the note

25 holders before there was any completion of the

39

1    investigation of what they did or didn't do in this case.

2    This was not a trade Plan; this was a Plan that benefitted

3    the note holders.  I am confident that if a reconstituted

4    Committee is formed, they will propose a Plan that will

5    distribute money to the trade creditors and only the trade

6    creditors until these issues are resolved.  That is a Plan

7    that SB Claims would not oppose; maybe the note holders

8    would oppose it.  But so long as we have a Committee in

9    which the note holders hold three positions, I don't think

10   that Committee is going to be proposing that.

11           Just as you said at the last hearing, Your Honor,

12   that SB Claims can take care of itself, the note holders

13   can take care of themselves too.  They do not need to be on

14   this Committee.

15           Thank you, Your Honor.

16           THE COURT: Thank you, Mr. Schaffer.  Okay, Mr.

17   Stein do you wish to be heard?

18           MR. STEIN: Thank you, Judge.  Very, very briefly.

19   Point one, if there is a reconstituted Committee or any

20   Trade Committee, we would expect to have discussions with

21   that Committee about what a Plan would say.  Two, I'm not

22   going to rehash what we talked about at the last hearing

23   about the Plan structure.  It is not, as Mr. Schaffer says

24   it was.  And three, that was the trustee's Plan that it

25   negotiated with various constituencies.  One of the

40

1    constituencies we didn't actually talk to ever was the

2    Creditors' Committee.

3              Thank you, Judge.

4              THE COURT: Thank you very much.  Okay.  I'm

5    inclined to take a recess now because I think that the U.S.

6    Trustee has heard a great deal, and I hope that you have

7    heard with it fresh ears, and will consider whether or not

8    you want to change your position.  Would that be helpful to

9    you?

10              MS. NANETTE DUMAS: Certainly, Your Honor.

11              THE COURT: Okay.  Please let Mrs. McGowan know

12    when you're ready to proceed.

13              THE CLERK: All rise.

14       (Whereupon, a recess is taken at 1:50 p.m., and the

15    court is reconvened at 2:48 p.m.)

16              THE CLERK: All rise.

17              THE COURT: Please be seated.  Ms. Dumas.

18              MS. NANETTE DUMAS: Your Honor, after conferring,

19    the U.S. Trustee's position has not changed.  I'd like to

20    make a record to explain to the Court and everybody that's

21    here the basis for the decision to the extent that it

22    wasn't clear in the opposition that was filed.

23              First of all, the Court laid out the three

24    alternatives, the three different ways that the Court could

25    go.  If the Court follows the Wheeler (Phonetic) case,

41

1  which is a BAP case, then only alternatives one and three

2  are possibilities, and alternative one is clearly off the

3  table.  Since the Court hasn't indicated whether the Court

4  will apply the <u>Wheeler</u> case or an abuse of discretion

5  standard, I'm just going to jump into my argument about the

6  abuse of discretion standard because it also will serve to

7  answer the question that is in everybody's mind which is,

8  why is the U.S. Trustee not reconstituting the Committee.

9  And I will endeavor to explain that the moving parties

10  haven't met their evidentiary burden to show that the U.S.

11  Trustee has abused her discretion or acted arbitrarily and

12  capriciously in deciding not to reconstitute the Committee.

13        There are two intertwining considerations that

14  underlie the U.S. Trustee's decision.  The first

15  consideration I mentioned at a hearing a few months ago,

16  and I'm going to call it -- just characterize it as the due

17  process consideration.  It's true that many parties have

18  filed many impassioned pleadings in connection with today's

19  hearing, but passion doesn't always carry the day.  There

20  are a lot of parties in this case, including but not

21  limited to, Committee members, certain Committee members

22  and Committee counsel that are under a pretty dark cloud.

23  However, the U.S. Trustee believes that to remove certain

24  Committee members or to disband the Committee would be seen

25  as legitimizing these unproven -- these as yet unproven

1  allegations before the proof has been developed.

2         Now -- right now, certain things are known and

3  certain things are still not known.  If you put a bunch of

4  people in a dark room with an elephant, everybody is

5  touching a different part of the elephant, and nobody

6  really knows what it is.  Before we really know, before we

7  turn the lights on and see the size and the scope of what

8  we're dealing with, to see who did what and who said what

9  and when and how, and until the trustee's investigation is

10  concluded, and he's been charged with running a fair and

11  unbiased investigation, until that happens, and all the

12  facts come to light, the U.S. Trustee still believes that

13  it's simply premature to rush to judgment about the

14  culpability of any party in this case.

15         And Mr. Schaffer mentioned clearly, I don't think

16  we're at the point of clarity yet.  I don't think we're

17  fully at the point of clarity, and the U.S. Trustee does

18  not believe we're fully at the point of clarity.  Now, it

19  would be politically expedient at this point to do

20  otherwise and to reconstitute the Committee, but it is the

21  U.S. Trustee's belief that the process should be fair to

22  everybody, and that everybody should have their chance to

23  tell their side of the story before conclusions are made

24  about the culpability of various parties.

25         And parenthetically, I would just like to say,

1  because it kind of fits in with this whole concern, I would

2  just like to urge everybody in this case to try to strive

3  for a higher level of discourse.  It's very troubling to

4  see people get impassioned to the point of making things

5  personal.  And the reason it's troubling is because it's

6  counterproductive.  It's totally counterproductive.  It

7  causes people to have to become unnecessarily hardened in

8  the positions that they take.  People cannot make

9  concessions if they've been accused of terrible things,

10  because then it looks like they're acquiescing.  It looks

11  like they're admitting that those accusations are true, and

12  it gives them no room to back down or to compromise.

13       So I would just like to say, this case is going

14  to have a better outcome if the heated rhetoric in this

15  case could get turned down a little bit and people go back

16  to looking at the facts and the law and making this

17  courtroom a place where again people are treated with

18  fairness.

19       The second intertwining consideration, and it's

20  equally important because it's sort of -- these two

21  considerations, you can't look at them independently; they

22  are intertwined.  The second consideration is the posture

23  of the case.  Now, this case imploded in the early part of

24  this year.  The U.S. Trustee moved for appointment of a

25  Chapter 11 trustee.  The Court granted the motion, and the

44

1  Court's direction -- and the U.S. Trustee was completely in

2  synch with this -- was to bring in an outside, independent,

3  neutral party, to conduct an investigation and somebody who

4  would have no connections with anybody in this case, no

5  connections, and at the same time to hand out the money to

6  unsecured creditors.

7          The trustee has done exactly what he was supposed

8  to do.  He's gotten the Plan on file.  The Plan provided

9  for interim distributions and I know you've heard this ad

10  nauseam, Your Honor, but I'm just going to say it one more

11  time, all the allowed claims, allowed undisputed claims,

12  were going to get a substantial distribution before the end

13  of the year.  So to me, the trustee's Plan does very -- not

14  just adequately represent the trade creditors; it is a Plan

15  that is designed to do the most and the soonest for trade

16  creditors, and it really pains me that it seems that that

17  Plan has gotten off track, because I would really like to

18  see the creditors in this 2003 case get paid sooner rather

19  than later.

20          The Plan also provided that the Committee was

21  going to be dissolved on the effective date of the Plan.

22  So under those circumstances, given the timing of

23  everything, given the late stage that we're at in this

24  case, the Committee does have -- even if the Committee were

25  not under a cloud, they would have an extremely limited

45

1  role to play.  They're not central to the outcome of the

2  case.

3           THE COURT: But the Plan is not before the Court

4  right now.

5           MS. NANETTE DUMAS: I understand.  I'm just trying

6  to explain the U.S. Trustee's reasons to show --

7           THE COURT: Okay.  But that was yesterday.  Now

8  we're talking about today, because the Plan is off of the

9  calendar.

10          MS. NANETTE DUMAS: Well, Your Honor, for today's

11 purposes, so the narrow question is, taking into account

12 the accusations that have been made against the parties in

13 this case and specifically here against Committee members

14 and Committee counsel, is it the right thing to do to

15 disband the Committee and reconstitute the committee.  And

16 I'm here to represent that the U.S. Trustee has not made

17 this decision lightly.  It's not an arbitrary and

18 capricious and whimsical decision.  It's a well thought out

19 and carefully considered decision.  The decision is that

20 based on the particular facts and the particular

21 circumstances of this case, it is not the U.S. Trustee's

22 view that it's the appropriate thing to do at this

23 juncture.

24          Now, reasonable minds can differ.  People can

25 think that the U.S. Trustee is wrong, but it is not a

46

1  decision that was made in a way that was abusive of her

2  discretion.  On the contrary, I think it's quite

3  courageous, given the clamor that's going on, that the U.S.

4  Trustee is saying, no, I believe in due process and I think

5  that outweighs the clamor of the crowd.

6      Now, as to the motion for a second Committee, I'm

7  just going to speak very briefly to that.  Again, I think

8  just about everybody, even the moving parties, the U.S.

9  Trustee's belief is that it adds an unnecessary layer of

10  expense for the estate.  There's nothing right now that

11  prevents the creditors from having their voices heard.

12  There's nothing to prevent a group of the creditors, if

13  they want to get together and form an unofficial committee,

14  to have their voices heard.  They have every right to do

15  that, but the only difference is that if a second Committee

16  is appointed, the professionals will get paid from the

17  estate.

18      And somebody mentioned there's -- and they can

19  always, if it were an unofficial committee, they can always

20  apply for a substantial contribution claim.  So somebody

21  mentioned the 85 million dollars that's sitting in the

22  trustee's bank account.  It's sitting there.  It's waiting

23  to be distributed.  I would be sorry to see that money I

24  think unnecessarily spent on a second Committee or a

25  reconstituted Committee for people to say, do we want to

47

1  get paid sooner rather than later, yes or no.  It just

2  again –- but it's a different legal standard so those are

3  just the U.S. Trustee's views.

4         The more important thing that I really wish to

5  convey and I hope that I've adequately conveyed it, is that

6  the U.S. Trustee is not abusing her discretion in terms of

7  not reconstituting the Committee because of the concern

8  that this process be fair to every party, no matter how bad

9  it looks for them, that they be given their due process.

10         Thank you, Your Honor.

11         THE COURT: You know, reconstituting the Committee

12  is not like we're convicting someone and sending them to

13  jail.  I'm really kind of interested in the perspective

14  that you have on this.

15         Is there anyone else who wishes to be heard?

16         MR. SCHAFFER: Your Honor, very briefly, to

17  respond, and again, because we may end up with an appeal on

18  this and I think it's important that the record be complete

19  for that.

20         First of all, Your Honor, I want to point the

21  Court's attention to the <u>Venture Link Holdings</u> case, which

22  was cited in our opening brief, 299 BR 420 out of Texas,

23  and I'll just read very briefly the pertinent section here

24  at page 423.

25         "A Committee member owes a fiduciary duty to all

48

1     creditors represented by the Committee.  This

2     court has held that a conflict of interest that

3     amounts to a breach of fiduciary duty constitutes

4     the type of conflict that would mandate removal

5     of the creditor from the Committee."

6 The court adds -- and I'm skipping citations:

7     "The court adds that the appearance of a breach

8     of that fiduciary duty should likewise mandate

9     the removal.  The bankruptcy process must both be

10     fair and appear fair.  A creditor on a Committee

11     who exudes the appearances of a breach of

12     fiduciary duty undermines the basic bankruptcy

13     tenet, thereby corrupting the process."

14 And then the punch line here, Your Honor, if you will:

15     "The United States Trustee would act arbitrarily

16     and capriciously if he refused to remove a

17     Committee member who held a conflict of interest

18     amounting to a breach of fiduciary duty owed by

19     the creditor to the creditors represented by the

20     Committee, or who appeared to hold such a

21     conflict."

22 Now, Your Honor, there's obviously, as I've said before, a

23 lot of appearances of breaches of duty, and Ms. Dumas is

24 absolutely correct that a lot of this has not been proven

25 yet.  But as I mentioned before, Your Honor, a lot has

49

 1  already been proven.  The U.S. Trustee stood next to me

 2  when Pillsbury Winthrop was disqualified on the exact same

 3  facts.  It seems to me to be arbitrary and capricious to

 4  say that Pillsbury should have been disqualified on those

 5  facts, and yet a fiduciary committee that knew the exact

 6  same facts and failed to tell the Court would not be

 7  removed.

 8          Your Honor, to quote -- I know you're fond of Mr.

 9  Linoln, Your Honor -- I believe he said in his speech in

10  Peoria in 1854 that -- and I'll mangle the words, I'm

11  sorry -- when someone is right, stand by him, stand by them

12  when they're right, but when they are wrong, stand apart.

13  And here, I stood by the U.S. Trustee through this case

14  because I felt that her decisions were absolutely right

15  with the Pillsbury disqualification.  But here, I must

16  stand apart, Your Honor.

17          Thank you.

18          THE COURT: Okay.  Thank you.

19          MS. NANETTE DUMAS: Your Honor, could I just say

20  that I believe that that court was absolutely wrong to say

21  that a party should be disqualified based on appearance

22  alone.  That would open the door to people making unfounded

23  accusations about anybody under any circumstance, and then

24  it becomes a self-fulfilling prophecy.  That person is bad

25  because we say they're bad.  This person is bad because

50

1   we've made them look bad.  Now they look bad; ergo, they

2   are bad; ergo, they should be removed from a Committee or

3   taken out and hanged.  I mean that's -- you know, we're

4   talking about fairness in the process, and I think that is

5   where Mr. Schaffer and I and the U.S. Trustee stand apart,

6   because I don't think that the Court should follow that

7   kind of reasoning.  I don't think appearances should govern

8   what the Court does.  I think evidence and application of

9   the law with proven facts should govern what the Court does

10  here.

11          Thank you.

12          THE COURT: Okay.  Is there anyone else who wishes

13  to be heard?

14          Okay.  Well, that's where I'm going to draw the

15  line against you also, Ms. Dumas.  Let me just say that

16  when we're talking about the integrity of the system,

17  appearances matter.  But we are dealing with much more than

18  appearances in this case.  A number of the facts -- I'm

19  going to say that what I'm going to do is I am going to

20  rule that the U.S. Trustee has abused her discretion in

21  failing to reconstitute the Committee.  And let me go ahead

22  and give you the basis of that ruling, which is part of the

23  record.

24          First, this is the same Committee that holds

25  three members, who either knew about the purported waiver

51

1    of the senior indebtedness status for the benefit of the

2    2002 note holder Committee members, who knew about it, but

3    failed to disclose that benefit to the Court and to

4    creditors.  This is the same Committee that had Committee

5    counsel that did not recognize that waiver and has led

6    other creditors to lose confidence in the system, wondering

7    whether this is something more than just negligence on the

8    part of Committee counsel.

9         This is the same Committee that took over from

10   Pillsbury the responsibility of objecting to the 2002 note

11   holder Committee members' claims without disclosing to the

12   Court and to creditors generally that the 2002 note holder

13   Committee members were the majority of the Committee's

14   active members, putting themselves in what I once called,

15   as tactfully as I could, an awkward position.  But

16   certainly that was a disclosure that needed to be made.

17        There are other facts that are important to my

18   decision today.  This is the same Committee that knew about

19   Pillsbury's undisclosed conflict of interest for at least

20   five months but never adequately disclosed that conflict to

21   this Court or to creditors generally.  That failure to

22   disclose is -- certainly leads to an appearance, the

23   perception, that the Committee is not doing its job.

24        The result is that we have creditors with 24

25   million dollars in claims who are before the Court today

1   asking for the appointment of a new Committee so that they

2   can be represented.  The failure to have a Committee that

3   is properly serving its responsibility as a fiduciary is

4   stymying the progress of this case.  It means that the

5   trustee doesn't have someone to negotiate with whose

6   integrity is unquestioned.

7           So for all of those reasons, what I am going to

8   do is order that the U.S. Trustee reconstitute this

9   Committee.  I'm going to follow Mr. St. James' advice,

10  however, and keep this matter on calendar so that in the

11  event that the U.S. Trustee does not proceed, we will

12  appoint a Trade Creditors' Committee.

13          When would you all like to hold a status

14  conference?  We have a status conference with the U.S.

15  Trustee I think October 25th is the date?

16          MR. STEIN: Yes, Your Honor.

17          THE COURT: Okay.

18          MR. SCHAFFER: We do, Your Honor, although I was

19  going to mention that that day is actually -- Mr. Merola is

20  in trial and I'm at the National Bankruptcy Conference that

21  day, so I was going to try to move that day.

22          THE COURT: Okay.  Well let's talk about

23  rescheduling that now.  I'm happy to reschedule it.  One

24  possibility is October 11th.  Am I right, Mrs. McGowan?

25          Okay.  So we could set you -- Mr. Stein?

1    MR. STEIN: Your Honor, I'm involved in the

2  National Conference of Bankruptcy Judges during that period

3  of time, and I actually think that Mr. Schaffer is also --

4    THE COURT: It's important to have both of you

5  present or I won't be here to learn from your words of

6  wisdom.

7    MR. SCHAFFER: Maybe we can have the status

8  conference in Orlando, Your Honor.

9    THE COURT: Only if I go.  Okay.  Are you all back

10  on the 15th?

11    MR. KRUGER: Your Honor, just for calendar

12  purposes, I believe the National Conference of Bankruptcy

13  Judges commences on or about October 10th.

14    MR. STEIN: As a matter of fact, Your Honor, the

15  15th might work from two perspectives.

16    THE COURT: Okay.

17    MR. STEIN: And I would like to double check, but

18  the two perspectives, is both for our status conference as

19  a conference with respect to this issue and that would be a

20  very good day for the motion that we anticipate filing on

21  the privilege waiver, because there is -- we were looking

22  at the 25th.  The 15th would be great if we can do it then.

23    THE COURT: Okay.

24    MR. STEIN: That will make some other folks in the

25  courtroom pleased.

54

1          THE COURT: Very well.  Mrs. McGowan, double check

2    that for me.  Is the 15th a good date?

3          THE CLERK: It is.

4          THE COURT: Okay.  Mr. Merola.

5          MR. MEROLA: Your Honor, until the 15th, I have the

6    unpleasant task of requesting on the record the U.S.

7    Trustee retain all records regarding this matter pending

8    the final resolution of this matter, including notes and

9    correspondence, phone logs, and electronic correspondence

10   with the national office.

11         THE COURT: Okay.  Which matter are you referring

12   to?

13         MR. MEROLA: The reappointment of the Committee.

14   It's just a precaution, Your Honor, but we don't know what

15   position they're going to take between now and then.

16         THE COURT: Okay.  Is that noted?

17         MS. NANETTE DUMAS: Duly noted.

18         THE COURT: Thank you.

19         MR. SCHAFFER: Your Honor, what time on the 15th?

20   I'm sorry.

21         THE COURT: How about 2:00 o'clock in the

22   afternoon?  Okay.  Is there any other business for us to

23   take care of today?

24         MR. MEROLA: Your Honor, briefly on discovery.

25   Frank Merola on behalf of SB Claims.  We don't have a

55

1   complete deal yet, but people are working in good faith and

2   consequently pieces of the deal are breaking ahead of the

3   completed deal, and so you're going to see pleadings, and I

4   wanted to give you an overview of what we're dealing with.

5              THE COURT: Okay.

6              MR. MEROLA:  My primary objective is to have this

7   case ready for trial in 90 to 120 days from when we can

8   commence discovery.  And we don't think this is a

9   complicated case.  We do think there's a lot of documents.

10  We are not going to allow the complexity of the history of

11  this case to become a per se stay of discovery.  We realize

12  that things have to be done in an orderly manner, but we're

13  not willing to agree to a timetable that doesn't allow us

14  to meet that 90 to 120-day timetable.

15             With that being said, there are two big broad

16  categories of discovery that are being conducted.  One

17  relates to the intention under the original indenture, what

18  senior indebtedness, what was meant at that time.  The

19  second is, at the time of the settlement agreement when the

20  waiver happened, to quote the Watergate Committee, "who

21  knew what, when."  And who was talking to whom and what was

22  happening.  I think we all agree on the areas, but we

23  stumbled across what I like to call the rock and the hard

24  place.

25             The first is, as part of the original relief from

1  stay motion, Intel created a protective order.  This

2  settlement agreement had Intel in it.  As near as we can

3  tell, almost everything that was ever exchanged related to

4  the settlement agreement purports to be exchanged pursuant

5  to this protective order.  We have a motion to be added to

6  the protective order on Monday.  I'm not pre-arguing that.

7  But that's what's on Monday just so you know.

8        The second issue we're tripping over is there's

9  all kinds of privilege issues.  So first, there's attorney-

10  client privilege between the Debtor and their counsel.

11  We've been in consultation with the trustee and we've made

12  substantial progress on that.  I understand they're filing

13  a motion for a partial waiver along the lines we're

14  requested.

15        Secondly, we have this very expansive concept of

16  joint privilege, that at the time of the settlement

17  agreement, everything we've seen that has been exchanged --

18  and by the way, we've seen a lot of it because Pillsbury

19  filed it with the Boro declaration regardless of the joint

20  privilege.  It was exchanged pursuant to this joint

21  privilege.  It is our understanding that the contractual

22  joint privilege is being waived, and that will be made

23  available to us.

24        Now, the trustee wants a comfort order on the

25  privilege issues.  We don't oppose giving a comfort order

1    and a large part of what we're going to talk about is the

2    timing.  You've already solved that.  At this point, Your

3    Honor, we're not in a position to agree to a global deal.

4    We believe there is no -- we're free to go forward and

5    conduct discovery as we see fit.  We're hoping we can get

6    the documents in an organized matter, but in the meantime,

7    we might be noticing one or two depositions that we think

8    can be taken without these initial document deliveries.

9        Thank you.

10        THE COURT: Okay.  I'm sure we'll hear more about

11   this later.  Is there any other issue that we need to

12   discuss today?

13        MR. BURK: Excuse me, Your Honor, may I --

14        THE COURT: Please come forward, Mr. Burk.

15        MR. BURK: I'm thinking about how efficiently to

16   raise Pillsbury Winthrop's and Mr. Boro's concerns here

17   without getting in the way of the agreement that I believe

18   is going to be worked out for --

19        THE COURT: What's the general subject matter

20   first?

21        MR. BURK: The general subject matter is the

22   documents that are currently in Pillsbury's possession,

23   although they are the Debtor's documents, and Pillsbury's

24   witnesses and the timing of making them available.  The

25   concern that Pillsbury and Mr. Boro have is quite simply

58

1   that there's absolutely an enormous cache of documents.

2   The parties I believe are working industriously in good

3   faith and I am hoping that Mr. Stein will stand up and tell

4   you the extraordinary amount of uncompensated effort that

5   the Pillsbury firm has gone to for the benefit of the

6   trustee and for the benefit of the estate and its creditors

7   in helping the trustee sort through those documents and

8   make the documents available to the trustee and make them

9   available to the trustee, both for his use in his

10   investigation, and also for his use in producing them to

11   the combatant parties that are fighting out these issues

12   that the Court has before it.

13         There are ten Pillsbury attorneys that have been

14   working for several months sorting through nearly a million

15   pages of e-mails and many millions of pages of --

16         THE COURT: Where is this going, Mr. Burk?

17         MR. BURK: Where this is going, Your Honor -- and

18   I'm sorry; I'm trying your patience, is at the moment I'm

19   not sure whether Mr. Merola intends to proceed now with the

20   deposition of Mr. Boro that is set for the 25th of

21   September.  The documents haven't yet been produced.  And

22   the concern about that is --

23         THE COURT: Well, it's best to ask him because I

24   don't know the answer to that question.

25         MR. BURK: Why we don't start there.

59

 1              MR. MEROLA: We haven't made a decision on that,

 2    Your Honor.

 3              THE COURT: Well, you know how to find me if you

 4    find that you're in a difficult position.  Okay?  I don't

 5    know that I can give you any answer or any comfort today.

 6              MR. BURK: Very well, Your Honor, I appreciate

 7    your attention.

 8              THE COURT: Okay.  Thank you.  That concludes our

 9    hearing.

10              ALL COUNSEL: Thank you, Your Honor.

11              THE CLERK: All rise.

12        (Whereupon, the proceedings are concluded at 3:14

13    p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

60

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6         I certify that the foregoing is a correct

7  transcript from the digital sound recording of the

8  proceedings in the above-entitled matter.

9

10  DATED: September 28, 2007

11

12                        By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 23

Entered on Docket
October 05, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:    (310) 228-5600
   Facsimile:    (310) 228-5788
5

6  WILLIAM McGRANE (057767)
   BERNARD S. GREENFIELD (066017)
7  McGRANE GREENFIELD LLP
   40 South Market Street, 7th Floor
8  San Jose, CA 95113
   Telephone:    (408) 995-5600
9  Facsimile:    (408) 995-0308

10 Counsel for SonicBlue Claims, LLC

**The following constitutes
the order of the court. Signed October 04, 2007**

_____
**Marilyn Morgan
U.S. Bankruptcy Judge**
_____

11            UNITED STATES BANKRUPTCY COURT
12             NORTHERN DISTRICT OF CALIFORNIA
                    SAN JOSE DIVISION
13
   In re:                              Case No. 03-51775
14                                      (Jointly Administered Case Nos. 03-51775
15                                      through 03-51778 MM)
                                        Chapter 11
16 SONICBLUE INCORPORATED, _et al._
        Debtors
17                                      ORDER GRANTING MOTION FOR ORDER
                                        (1) DIRECTING UNITED STATES
18                                      TRUSTEE TO CHANGE THE
                                        MEMBERSHIP OF OFFICIAL
19                                      COMMITTEE OF CREDITORS HOLDING
                                        UNSECURED CLAIMS, OR (2)
20                                      DIRECTING THE APPOINTMENT OF A
                                        NEW TRADE CREDITOR COMMITTEE
21
22                                      Date:       September 20, 2007
23                                      Time:       2:00 p.m.
                                        Judge:      Hon. Marilyn Morgan
24                                      Location:   Courtroom 3070
25                                                  280 South First Street
                                                    San Jose, CA  95113
26
27

                                       1
ORDER GRANTING MOTION FOR ORDER (1) DIRECTING UNITED STATES TRUSTEE TO
CHANGE THE MEMBERSHIP OF OFFICIAL COMMITTEE [etc.]

464955v.1

1    Upon consideration of the "Motion For Order (1) Directing United States

2    Trustee To Change The Membership Of Official Committee Of Creditors Holding

3    Unsecured Claims, Or (2) Directing The Appointment Of A New Trade Creditor

4    Committee" (the "Motion") filed by SonicBlue Claims, LLC, and of all of the

5    pleadings, memoranda, and other documents filed in support of, or opposition to,

6    the Motion, and of the record in this case, and of the arguments of counsel at the

7    September 20, 2007 hearing:

8    IT IS HEREBY ORDERED that the Motion be, and hereby is, granted, for

9    the reasons stated on the record at the September 20, 2007 hearing; and it is further

10    ORDERED that the Office of the United States Trustee is ordered to

11    reconstitute the Creditors' Committee; and it is further

12    ORDERED, that a continued hearing will be held on this matter on October

13    15, 2007 at 2:00 p.m. to determine if the Office of the United States Trustee has

14    proceeded to reconstitute the Creditors' Committee, and if the Office of the United

15    States Trustee has not so proceeded, or will not proceed, to reconstitute the

16    Creditors' Committee, the Court will appoint a trade creditors' committee.

17

18    ***    END OF ORDER    ***

19

20

21

22

23

24

25

26

27

ORDER GRANTING MOTION FOR ORDER (1) DIRECTING UNITED STATES TRUSTEE TO
CHANGE THE MEMBERSHIP OF OFFICIAL COMMITTEE [etc.]

464955v.1

1

**COURT SERVICE LIST**

2

3
Marcus Smith                          Craig Barbarosh
SONICblue, Inc.                       Sue J. Hodges
4
7 West 41st Avenue, #74               Pillsbury Winthrop LLP
San Mateo, CA 94403                   101 W. Broadway, Suite 1800
5
                                      San Diego, CA 92101-8219

6
Albert Boro                           William Freeman
7
Pillsbury Winthrop Shaw Pittman LLP   Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street                     725 South Figueroa Street
8
San Francisco, CA 94105               Suite 2800
                                      Los Angeles, CA 90017-5406
9

10
Suzzanne S. Uhland, Esq.              Steven J. Johnson, Esq.
O'Melveny & Myers LLP                 Gibson Dunn & Crutcher, LLP
11
275 Battery St 26th Fl                1530 Page Mill Road
12
San Francisco, CA 94111              Palo Alto, CA 94304

13
Robert A. Franklin                    Bruce MacIntyre, Esq.
14
Murray & Murray                       Perkins Coie LLP
19400 Stevens Creek Blvd, Suite 200   1201 Third Avenue, Suite 4800
15
Cupertino, CA 95014                   Seattle, WA 98101

16
Bruce Bennett, Esq.                   Henry C. Kevane/Ken Brown
17
Mike Schwartz                         Pachulski, Stang, Ziehl,
Hennigan Bennett & Dorman             Jones & Weintraub
18
865 So. Figueroa Street, Suite 2900   150 California St., 15th Floor
19
Los Angeles, CA 90017                 San Francisco, CA 94111-4500

20
Ronald Bender/Todd M. Arnold          Edwina E. Dowell
21
Levene Neale Bender Rankin & Brill    Nanette Dumas
LLP.                                  John S. Wesolowski
22
10250 Constellation Blvd., Suite 1700 Shannon L. Mounger-Lum
Los Angeles, CA 90067                 Office of the United States Trusttee
23
                                      280 S. First Street, Suite 268
                                      San Jose, CA 95113-0002
24

25

26

ORDER GRANTING MOTION FOR ORDER (1) DIRECTING UNITED STATES TRUSTEE TO
CHANGE THE MEMBERSHIP OF OFFICIAL COMMITTEE [etc.]

464955v.1

EXHIBIT 24

1   FRIEDMAN DUMAS & SPRINGWATER LLP
    CECILY A. DUMAS (S.B. NO. 111449)
2   150 Spear Street, Suite 1600
    San Francisco, CA 94105
3   Telephone Number:  (415) 834-3800
    Facsimile Number:  (415) 834-1044
4
5   ALSTON & BIRD LLP
    GRANT T. STEIN
6   1201 West Peachtree Street
    Atlanta, GA 30309
7   Telephone Number:  (404) 881-7000
    Facsimile Number:  (404) 881-7777
    (admitted *pro hac vice*)
8
9   *Attorneys for Dennis J. Connolly in His Capacity as*
    *Chapter 11 Trustee for SONICblue Incorporated, et al.*

10                  UNITED STATES BANKRUPTCY COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14   In re                              Case Nos. 03-51775 through 03-51778 MM

15   SONICBLUE INCORPORATED,            Chapter 11 Cases
     a Delaware corporation, DIAMOND
16   MULTIMEDIA SYSTEMS, INC.,          Jointly Administered
     a Delaware corporation, REPLAYTV,
17   INC., a Delaware corporation, and  **STATUS REPORT OF THE CHAPTER**
     SENSORY SCIENCE CORPORATION,       **11 TRUSTEE PURSUANT TO 11 U.S.C.**
18   a Delaware corporation,            **§§ 105(d), 1106(A)(3), (A)(4), AND (A)(5)**

19   Debtors.                           Hearing Date:        October 15, 2007
                                        Hearing Time:        2:00 p.m.
20

21

22
            Dennis J. Connolly, Chapter 11 Trustee (the "Trustee") in the above-captioned
23
    chapter 11 cases of SONICblue Incorporated ("SONICblue") and its three subsidiaries that
24
    are debtors in these jointly administered cases, Diamond Multimedia Systems, Inc.,
25
    ReplayTV, Inc., and Sensory Science Corporation (collectively, the "Debtors"), hereby files
26
    this status report (the "Status Report") pursuant to Sections 105(d), 1106(a)(3), (a)(4), and
27
    (a)(5) of Title 11 of the United States Code (the "Bankruptcy Code") to report on the status of
28

1    major activities in which the Trustee has been engaged since his appointment and to provide

2    this Court and parties in interest notice of the Trustee's expected future activities.

3    **I.    Introduction.**

4    Based upon his review of pleadings and orders filed in these bankruptcy cases,

5    documents provided to him by the Debtors and their advisers, his discussions with parties in

6    interest in these cases, and comments made by the Court at hearings in these cases, the

7    Trustee determined shortly after his appointment that these cases should proceed along two

8    parallel tracks: (i) preparation, negotiation, proposal and confirmation of a plan of liquidation

9    (the "Plan Confirmation Process") in an effort to make substantial distributions to creditors

10   with allowed claims, and (ii) investigation into the facts and circumstances surrounding the

11   disqualification of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") and the settlement

12   involving VIA Technologies, Inc. (the "VIA Settlement") that led to the appointment of the

13   Trustee (the "Investigation").  Counsel to the Trustee articulated this approach to the Court

14   and parties in interest at the hearing on June 14, 2007.  *See* Transcript of June 14, 2007

15   Hearing at 9:2-22 (Docket No. 2375).  The Trustee's view was that the pursuit of the dual

16   tracks would result in the most efficient administration of these cases and, in particular, would

17   move the Plan Confirmation Process forward in light of the multi-year delay in plan

18   confirmation.  The Trustee was (and is) aware of creditors' desires to receive a dividend in

19   these cases and has been working towards structuring a plan that would provide for such a

20   dividend and, at the same time, address the potential claims against various actors in these

21   cases.

22   The Trustee pursued this joint track until September 5, 2007.  In connection with the

23   hearing on the Trustee's Emergency Motion for a Protective Order (the "Protective Order

24   Motion") on September 5, 2007, the Court indicated that it would be appropriate to conduct

25   joint discovery on certain of the issues involving the Investigation and claims made by

26   Sonicblue Claims, LLC ("SBC") in the adversary proceeding it initiated against Portside

27   Growth and Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (the

28   "2002 Noteholders") (Adv. Pro. No. 07-05082) (the "SBC Subordination Adversary") prior to

1    moving forward with the Plan Confirmation Process.  Since that time, the Trustee has

2    undertaken to accelerate certain portions of the Investigation in response to the Court's

3    comments at the September 5 hearing.  *See* Transcript of September 20, 2007 Hearing at

4    18:16-20:7 (Docket No. 2505).

5         As set forth further below, the Trustee believes that: (i) the Investigation with respect

6    to claims brought by SBC against the 2002 Noteholders will be expedited and concluded in

7    the first quarter of 2008, with the investigation of issues relating to Pillsbury proceeding, but

8    not necessarily on the same track; (ii) confirmation of a plan of liquidation is appropriate and

9    in the best interests of the creditors of these estates; (iii) the Plan Confirmation Process can

10   move forward expeditiously after resolving certain issues in the SBC Subordination

11   Adversary; and (iv) conversion of these cases to cases under chapter 7 of the Bankruptcy

12   Code is not appropriate at this time.

13              **II.      Status of the Plan Confirmation Process.**

14                   *A.      Drafting and Filing of July 20, 2007 Plan.*

15        Shortly after his appointment, the Trustee undertook to draft a plan of liquidation (the

16   "Plan") and related disclosure statement (the "Disclosure Statement").  The Trustee's

17   objective was to make a substantial distribution to holders of allowed claims by the end of

18   calendar year 2007.  In connection with those efforts, the Trustee circulated a draft of the Plan

19   in mid-June 2007 to parties in interest in these cases that requested a draft.  Over the next

20   month, the Trustee solicited comments from these parties, made material alterations to the

21   Plan based on these comments, and filed the Plan and Disclosure Statement on July 20, 2007.

22                   *B.      Analysis of Substantive Consolidation and Interestate Dispute.*

23        In connection with the Plan Confirmation Process, the Trustee is reviewing the basis

24   for and consequences of substantive consolidation of the Debtors' estates (which had been

25   proposed by proponents of earlier plans in these cases).  Although this review has not been

26   finally concluded, at this time the Trustee believes that, while substantive consolidation of the

27   estates would be more administratively convenient and there are facts that would support

28

1 substantive consolidation, there also is a factual and legal basis that supports not substantively

2 consolidating the estates.

3      Assuming that the estates are not substantively consolidated, a substantial interstate

4 dispute (as described below, the "Interstate Dispute") exists between the SONICblue estate

5 and the other estates.  SONICblue was scheduled by each of the other Debtors as a secured

6 creditor.  Subsequent to the sale of the Debtors' assets, the financing statements evidencing

7 the security interests granted to SONICblue lapsed and no continuation statements were filed.

8 It is uncertain whether: (i) SONICblue was required to file continuation statements because

9 the Debtors sold all of the assets in which SONICblue had a security interest before the

10 security interests lapsed (with the proceeds of the liens of SONICblue attaching to those

11 proceeds); and (ii) if SONICblue was required to file continuation statements, the Trustee or

12 another party in interest could successfully avoid SONICblue's security interests under

13 applicable provisions of the Bankruptcy Code.

14      As set forth in the Declaration of Howard Grobstein (Docket No. 2439) filed

15 contemporaneously with the Chapter 11 Trustee's Emergency Motion for Protective Order in

16 Respect of Sonicblue Claims' Notices of Deposition of Henry Kevane, John J. Todd, Albert

17 Boro, Susan Uhland, and Bruce Bennett, on September 6, 10, 11, 12, and 13, 2007 (the

18 "Grobstein Declaration"), resolution of this Interstate Dispute materially impacts recoveries

19 to third party creditors of all of the estates.  Information about anticipated distribution

20 percentages and the timing of such distributions was not contained in the initial Disclosure

21 Statement filed on July 20, 2007, but will be contained in any subsequent Disclosure

22 Statement the Trustee files.

23      Proponents of earlier plans filed in these cases did not undertake a comprehensive

24 analysis of the issues relating to substantive consolidation.  In particular, prior disclosure

25 statements filed in these cases did not address the distributional effects of substantive

26 consolidation versus non-consolidation, nor did prior disclosure statements address the

27 Interstate Dispute.  The Trustee determined that the disclosure of this information to

28 creditors and parties in interest was important and would be necessary in light of any

proposed action through a plan to adequately disclose the distributional effects of the Interestate Dispute and the risks of consolidation or non-consolidation to various creditors and parties in interest.

A summary of the key calculations from the Grobstein Declaration reflects the following for percentage recoveries to the holders of allowed unsecured claims in the three scenarios:[1]

| | 03-51776 | 03-51777 | 03-51778 Sensory Science | 03-51775 |
|---|---|---|---|---|
| | Diamond/Rio | ReplayTV | | SONICBlue |
| Scenario One - Substantive Consolidation of All Related Debtors | 26.80% | 26.80% | 26.80% | 26.80% |
| Scenario Two - No Substantive Consolidation - SONICBlue Claims Allowed as Secured | 0.00% | 0.00% | 4.57% | 27.91% |
| Scenario Three - No Substantive Consolidation - SONICBlue Claims Allowed as Unsecured | 61.48% | 50.52% | 48.54% | 23.57% |

If the estates are not substantively consolidated, the Trustee believes that it is appropriate to propose a compromise and settlement of the Interestate Dispute through any plan filed in these cases. This settlement will likely propose to treat SONICblue's claims against the other estates as secured claims, but reduce the distributions on those claims against the other estates such that third party unsecured creditors of each of the estates other than SONICblue will receive a percentage distribution that is approximately equal to the estimated percentage distribution to be paid to third party unsecured creditors of SONICblue. The Trustee will continue to solicit input from parties in interest relative to these distributional issues. The Trustee recognizes the potential for litigation in this area and has

---

[1] The calculations set forth in the Grobstein Declaration will be adjusted as further information becomes known or definite, including, but not limited to resolution of avoidance actions and claim objections, determinations of taxes, and allowance and disallowance of administrative expense claims including professional fees. In that regard a bar date has been set of December 7, 2007, for administrative expense claims for periods prior to the Trustee's appointment.

1  concluded that a resolution of the potential litigation is in the best interest of the estates.  One

2  of the reasons to maintain the cases in chapter 11 is to utilize the more flexible provisions of

3  chapter 11 to resolve intercreditor and interestate issues in this manner.

4                              C.      Analysis of Taxes.

5          The Trustee is investigating the status of the Debtors' tax returns.   Prior to his

6  appointment, the Debtors had not filed tax returns since 2002.  The Trustee is investigating

7  what, if any, liability the estates may have in terms of unpaid taxes or penalties for failure to

8  file appropriate tax returns.  This investigation is ongoing and the Trustee intends to continue

9  his efforts to identify, and, where appropriate, minimize potential liabilities related to taxes.

10 The Trustee is also investigating any potential consequences to the estates by virtue of the

11 failure to file tax returns and the failure to address this issue in disclosure statements and

12 plans previously filed in these cases.

13                             D.      Present Status of the Plan Confirmation Process.

14         After the Court resolved the Protective Order Motion, the Trustee determined that it

15 was appropriate to defer the Plan and Disclosure Statement from consideration pending

16 resolution of certain aspects of the Investigation and the SBC Subordination Adversary.

17 Presently, the Trustee intends to resubmit a revised plan at the conclusion of his Investigation

18 and/or the SBC Subordination Adversary.  As set forth further below, the Trustee presently

19 believes that proposal and confirmation of a plan is the most efficient means of resolving

20 these cases.

21              III.     Status of the Trustee's Investigation.

22                       A.      Overview of Scope and Subject Matter of Investigation.

23         Shortly after his appointment, the Trustee began his Investigation.  The scope of the

24 Investigation includes an examination of many of the most significant fiduciaries in these

25 cases, including former counsel to the Debtors, officers of the Debtors, counsel to the

26 creditors committee (the "Committee"), and members of the Committee (including their

27 counsel), among others.  The subject matter of the Investigation includes, among other things:

28 (i) the so-called "Senior Indebtedness Acknowledgement" or the "Senior Indebtedness

Waiver" (the "Senior Indebtedness Dispute") in the VIA Settlement; (ii) Pillsbury's issuance of an opinion letter to the 2002 Noteholders related to the enforceability of the 2002 Notes (the "Pillsbury Opinion Letter"); (iii) Pillsbury's periodic disclosures to the Court, the U.S. Trustee, and parties in interest through its Rule 2014 filings in these cases; (iv) the demand letter sent by the 2002 Noteholders' to Pillsbury seeking indemnification and other relief from Pillsbury related to the Pillsbury Opinion Letter (the "Noteholders' Demand"); (v) the transfer of the objections to the claims of the 2002 Noteholders and the 1996 Noteholders from Pillsbury to counsel to the Committee as well as review of the substance of those potential objections; (vi) disclosure of the above matters in the disclosure statements jointly filed with this Court by the former debtors in possession and the Committee; and (vii) appropriate actions to be taken based on the conclusions reached in the Investigation.  Additionally, as set forth above, since his appointment, the scope of the Investigation has expanded in the context of preparing the Plan and Disclosure Statement to include, among other things, the status of the Debtors' tax returns and the status and relative priority of SONICblue's claims against the other Debtors, and the conduct of estate professionals and fiduciaries related thereto.

> B.    *Activities From Appointment to September 5, 2007.*

Soon after his appointment on April 17, 2007, the Trustee, through counsel, made informal document requests to various parties in these cases, including: (i) the 2002 Noteholders; (ii) Hennigan Bennett & Dorman LLP ("HBD"), former counsel to the 2002 Noteholders; (iii) Pillsbury, former counsel to the Debtors; (iv) O'Melveny & Meyers LLP ("O'Melveny"), Special Counsel to the Debtors; (v) VIA; (vi) Pachulski Stang Ziehl and Jones f/k/a Pachulski Stang Ziehl Young Jones & Weintraub LLP ("Pachulski"), former counsel to VIA;[2] and (vii) Levene, Neale, Bender, Rankin & Brill LLP ("LNBRB"), counsel to the Committee.  As a part of this document production process, the Trustee requested and this Court approved the Stipulation to Amend October 17, 2003 Stipulated Protective Order and to Add Trustee and Certain Attorneys for the Trustee (the "Protective Order

---

[2] As noted below, after consultation with VIA and Pachulski, the Trustee serve a Subpoena Duces Tecum  and Notice of Deposition on Henry Kevane in respect of Pachulski's representation of VIA.

1   Amendment") (Docket No. 2353) on June 14, 2007.[3]  The Protective Order Amendment

2   allows the Trustee access to documents gathered by LNBRB as well as the Trustee's own

3   documents (as successor to the privilege and estate management powers of the debtor in

4   possession), to which he did not previously have access.  In response to the Trustee's initial

5   informal request for the production of documents related, the Trustee received the following:

6         (1)  ***Pillsbury***:  Pillsbury's production of documents has followed two

7          distinct paths depending on whether the documents were maintained electronically or

8          in hard-copy form.

9             a.  <u>Hard-Copy Document Production</u>.  Pillsbury provided the

10             Trustee with a document describing approximately 4,500 boxes and files

11             that it maintained in its document storage facilities related to its

12             representation of the Debtors.  The Trustee identified in excess of 100

13             boxes (the "Responsive Boxes") that appeared to contain information

14             relating to the Investigation.  Three Alston & Bird LLP ("A&B") attorneys

15             reviewed these Responsive Boxes at Pillsbury's San Francisco Office.

16             Thereafter Pillsbury identified additional potentially responsive documents,

17             including: (i) approximately four boxes of additional hard-copy documents

18             from Pillsbury attorneys that participated in the firms representation of the

19             Debtors; (ii) approximately 60 Pillsbury boxes/files not maintained in their

20             storage facility; and (iii) in excess of 100 boxes of documents and data that

21             the Debtors provided to Pillsbury.  Counsel to the Trustee designated

22             17,027 pages of hard-copy documents relevant to the Investigation from

23             Pillsbury.  These documents have been reviewed, organized, and coded to

24             assist with the Investigation.

25

26

27   [3]  That process required negotiation of the modification of the Protective Order with

28   Intel.  Accordingly, prior to June 14, 2007, the Trustee did not have access to all of the relevant client files.  Thereafter, the Trustee has sought and obtained documents and data from various actors in these bankruptcy cases.

b.      Electronic Document Production: As A&B concluded its review of the hard-copy documents at Pillsbury's offices, Pillsbury produced its first set of electronic documents, which contained 16,774 pages of documents, primarily emails and attachments related to Pillsbury's representation of the Debtors.  These documents have been reviewed, organized, and coded to assist with the Investigation.  In late September 2007, Pillsbury produced its second and third sets of electronic documents, which contain an additional 170,000 pages of documents.  On October 5, 2007 Pillsbury produced its fourth and final set of electronic documents containing an additional 24,800 pages.[4]  These documents are being reviewed, organized, and coded to assist with the Investigation.

(2)      ***LNBRB***:  LNBRB produced 22,752 pages of documents in hard copy and electronically (the "LNBRB Documents") relating to its earlier investigation of: (i) the VIA Settlement; (ii) the 2002 Noteholders' participation in the negotiation of the VIA Settlement; and (iii) Pillsbury's role in that process.  The LNBRB Documents consisted primarily of non-privileged email correspondence relating to the negotiation, drafting, revision, and execution of the VIA Settlement.  These documents have been reviewed, organized, and coded to assist with the Investigation.

(3)      ***O'Melveny***:  O'Melveny produced three compact discs containing 10,690 pages of privileged and non-privileged documents (the "O'Melveny Documents") relating to O'Melveny's:

(i)      analysis of (a) VIA's claims against the Debtors, (b) the Debtors claims against VIA, and (c) Intel's Motion for Relief from the Automatic Stay to terminate the S3 cross license agreement;

(ii)     representation of the Debtors in respect of VIA's claims against the Debtors;

(iii)    representation of the Debtors in respect of Intel's Motion for Relief from the Automatic Stay to terminate the S3 cross license agreement;

---

[4]      The actual number of pages of electronic documents produced by Pillsbury is 211,599.

(iv)    negotiation of independent settlement agreements with VIA and Intel;

(v)    preparation of a short-form settlement agreement between VIA and the Debtors;

(vi)    decision to pursue a three-party settlement agreement involving the Debtors, VIA, and Intel; and

(vii)    negotiation, drafting, revision, and execution of a definitive/formal settlement agreement involving the Debtors, VIA, and Intel;

These documents have been reviewed, organized, and coded to assist with the Investigation.

In late September 2007, O'Melveny also produced a database containing 217,224 pages of documents that consisted of documents the Debtors provided to O'Melveny in respect of the Intel and VIA Litigation.  These documents are being reviewed, organized, and coded to assist with the Investigation.

(4)    ***2002 Noteholders:***  Strook & Strook & Lavan LLP, counsel to the 2002 Noteholders, produced 10,014 pages of documents (the "2002 Noteholder Documents") from the 2002 Noteholders and HBD relating to: (i) the 2002 Notes; (ii) the 2002 Noteholders' participation on the Committee; (iii) the VIA Settlement; and (iv) the 2002 Noteholders' participation in the negotiation, drafting, and approval of the VIA settlement.  These documents have been reviewed, organized, and coded to assist with the Investigation.  The 2002 Noteholders document production is not complete and they have additional documents they will be producing.

(5)    ***VIA***: The Trustee served a Notice of the Rule 2004 Examination of Henry Kevane, the Pachulski attorney principally involved in representing VIA during the VIA Settlement negotiations, and Subpoena Duces Tecum (the "Subpoena") as part of a formal request for production of documents from VIA and its counsel.  In response to the Subpoena, Morrison & Foerster LLP, counsel to VIA, produced 3,723 pages of documents (the "VIA Documents") relating to: (i) VIA's claims against the Debtors; (ii) the negotiation and execution of the VIA Settlement; and (iii) SonicBlue

1    Claims LLC's acquisition of certain "Transferred Rights" from VIA.    These

2    documents have been reviewed, organized, and coded to assist with the Investigation.

3    In addition to the documents the Trustee has obtained, as set forth above, counsel to

4    the Trustee has conducted interviews with: (i) Suzzanne Uhland, the O'Melveny attorney

5    principally involved in the representation of the Debtors, concerning the facts and

6    circumstances relating to the O'Melveny Documents and the negotiation, drafting, revision,

7    and execution of the VIA Settlement; (ii) Marcus Smith, former chief financial officer for the

8    Debtors; (iii) David Gershon, former general counsel for the Debtors; and (iv) Brad Kohn, a

9    former attorney with Pillsbury involved with the preparation of the 2002 Indenture.  Counsel

10    to the Trustee also conducted a Rule 2004 Examination of Mr. Kevane.  SBC, the 2002

11    Noteholders, and Pillsbury participated and asked questions at Mr. Kevane's Rule 2004

12    Examination.  The Trustee has also had meetings and discussions on various factual and

13    analytical issues relating to the Investigation with: (i) John Shaeffer and William McGrane,

14    counsel for SBC; (ii) Bruce Bennett of HBD; (iii) Ron Bender and Craig Rankin of LNBRB;

15    and (iv) Elliot Herskovitz, the principal of Riverside Claims, LLC.

16    While the focus of the Investigation during this period covered the entire scope

17    described above, the area of greatest focus during this time period concerned issues related to

18    the Senior Indebtedness Dispute.

19    In the Court's order disqualifying Pillsbury and appointing a chapter 11 trustee, the

20    Court emphasized the need for a "strong and independent trustee" who would "formulate an

21    independent strategy."    *See* Memorandum Decision and Order on Motion to Appoint a

22    Chapter 11 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop

23    Shaw Pittman LLP and for Disgorgement of Attorneys' Fees at 18 (Docket No. 2220).  In

24    connection with that, the Trustee, among other things, declined a request from one party in

25    interest to issue a general waiver of the estates' attorney/client privilege, and similarly

26    declined a request to enter into a joint defense arrangement with that party.  These requests

27    were made prior to June 14, 2007 when the Trustee did not have access to many of the

28    documents as a result of the terms of the Intel Protective Order.

1    To maintain the independence of the Investigation, the Trustee moved to intervene in

2  and stay the SBC Subordination Adversary with respect to certain issues that, in the Trustee's

3  view, would have compromised his ability to conduct the Investigation independently and

4  separately from that litigation.  Similarly, the Trustee filed the Protective Order Motion to

5  obtain a protective order with respect to depositions of certain parties noticed by SBC in

6  connection with its objection to the Disclosure Statement.  In the Trustee's judgment the

7  depositions noticed by SBC related principally to matters that were the subject of the

8  Investigation, and therefore the discovery sought by SBC would interfere with the

9  independence of the Investigation.

10                    *C.    Activities Since September 5, 2007.*

11    After the hearing on the Protective Order Motion, it was clear to the Trustee and other

12  parties in interest that it would be appropriate to conduct parallel discovery in the

13  Investigation and the SBC Subordination Adversary.  In connection with that, the Trustee has

14  withdrawn the motions to intervene and stay the SBC Subordination Adversary and has been

15  coordinating with various parties in interest in an attempt to unify and coordinate that

16  discovery with the Investigation.  The effort to develop a cooperative, timely, and practical

17  joint discovery schedule is in process at the time of the submission of this Status Report.

18    In furtherance of this joint discovery effort, the Trustee filed a motion to authorize him

19  to effect a limited waiver of the estates' attorney/client privilege (Docket No. 2496) (the

20  "Trustee's Privilege Waiver Motion"), which is set for hearing on October 15, 2007.  The

21  Trustee believes that, under present circumstances, granting the relief sought in the Trustee's

22  Privilege Waiver Motion is necessary to permit parties in interest who are outside of the

23  bankruptcy estates' attorney/client privilege reasonably prompt access to documents, both

24  privileged and non-privileged.  Were the Trustee required to conduct a privilege review of the

25  estates' documents, it would lead both to delay in producing documents to parties in interest

26  and to additional administrative costs for the bankruptcy estates.  This delay in discovery and

27  subsequent litigation would, in the Trustee's view, further delay the Plan Confirmation

28  Process, and therefore delay one of the most important remaining objectives in these cases –

1    prompt distributions to creditors.  In addition, the Trustee considered the impact of the delay

2    in discovery on the plan confirmation process.  In the Trustee's judgment, a significant delay

3    in the prosecution of the various litigations may have an impact on the plan process and, as a

4    result, delay distribution to creditors.  The Trustee's goal is to provide for the greatest

5    possible distribution to unsecured creditors holding allowed claims as soon as possible.

6         The Trustee has also been working with parties in interest to formulate a joint

7    discovery plan, which seeks to allow any party in interest to participate in discovery related to

8    the Investigation and discovery in the SBC Subordination Adversary.  To that end, in addition

9    to the 2002 Noteholders and SBC, the Trustee is coordinating with numerous other parties in

10   interest that have been active in these cases (including Riverside Claims and York) and

11   counsel to the 1996 Noteholders and counsel to U.S. Bank, the Indenture Trustee for the 1996

12   Noteholders.  The Trustee has encouraged any party in interest desiring to examine the facts

13   and circumstances presented in the Investigation and the SBC Subordination Adversary to

14   become a party to the appropriate protective orders such that they can fully participate in the

15   ongoing discovery efforts.  (For example, counsel for U.S. Bank appeared at the hearing on

16   the cross-motions by SBC and the 2002 Noteholders to amend the 2003 protective order.)

17   The Trustee intends for this process to be a unified process, so that the estates' resources do

18   not become unnecessarily depleted through multiple discovery efforts in multiple

19   proceedings, and so that witnesses are less likely to be subject to multiple examinations.

20              **IV.    Other Estate Administrative Matters Undertaken by the Trustee.**

21        In addition to the major activities outlined above, the Trustee has undertaken

22   numerous other estate administrative activities in an effort to: (i) secure and maximize the

23   value of the estates' assets; (ii) liquidate the estates' remaining non-cash assets; (iii) continue

24   the process of objecting to, resolving, and reducing claims against the estates; and (iv)

25   participate in other matters that have arisen in these cases when the Trustee has deemed it

26   appropriate to do so.

27

28

*A.      Securing the Estates' Cash Assets.*

Immediately after being appointed, the Trustee undertook to account for, secure, and maximize the value of the estates' assets.  These activities included, principally, identifying the accounts in which the estates' assets were held prior to the Trustee's appointment.  In the last monthly operating report filed by the debtors in possession, total cash assets were reported to be approximately $79.8 million.  The Trustee conducted interviews with various financial institutions in an effort to identify the institution that would pay the highest return on the estates' assets, which ultimately was JP Morgan Chase, which is where the estates' cash assets are currently held in a "blocked" account.  Additionally, the Trustee identified certain funds being held by Pillsbury and LNBRB and obtained from the Court an order authorizing and directing the transfer of those monies to JP Morgan Chase account.  Finally, the Trustee secured recovery of remaining settlement payments owed to the estates from the resolution of certain avoidance actions.  In the most recent monthly operating report the Trustee filed, the Trustee reported holding approximately $86 million in cash assets.

*B.      Liquidating the Estates' Non-Cash Assets.*

By the time of the Trustee's appointment, most of the estates' assets had been liquidated to cash.  However, certain non-cash assets remained and the Trustee has undertaken the process of liquidating these remaining non-cash assets.  The estates' primary non-cash assets (other than those that are the subject of the Investigation) are remaining avoidance actions that were unresolved as of the Trustee's appointment.  The Trustee filed an application to retain the Trustee's local counsel, Friedman Dumas & Springwater ("FDS"), to conclude litigation of the remaining avoidance actions.  The Committee has filed an objection to this retention.  This retention application remains outstanding.  The Trustee intends to communicate with any new or reconstituted committee that is appointed in these cases as to the Trustee's belief that it is appropriate and in the best interests of the estates that FDS be retained to resolve the remaining avoidance actions.  In addition to resolution of the remaining avoidance actions, the Trustee has also filed a motion to permit him to sell shares of stock that the SONICblue estate holds in EPIC Technologies, Inc.

1

*C.      Claim Resolution Process.*

2      Soon after the Trustee's appointment, he began the process of reviewing outstanding

3  claims against the estates.  By the Trustee's estimate, there are nearly $300 million of

4  unsecured claims filed by third party creditors that have not been disallowed.  Many of these

5  claims may not be subject to disallowance.  However, numerous claims will be subject to one

6  or more claim objections that the Trustee intends to bring in the coming months.  In addition

7  to potential claim objections of which the Court is already aware (objections to the 1996

8  Notes Claims and the 2002 Notes Claims on the grounds that they assert claims for

9  unmatured interest in the form of "original issue discount"),[5] there are other claim objections

10  the Trustee intends to bring, including that some of the remaining claims are duplicative, do

11  not assert a sufficient factual and evidentiary basis to be allowed and receive a distribution, or

12  otherwise are unsupported by the Debtors' books and records, among other reasons for

13  disallowance.  This claim review process is ongoing and the Trustee intends to bring his first

14  objection to claims in the next few weeks.

15

*D.      Other Matters of Involvement.*

16      In addition to the matters outlined above, the Trustee has participated in a number of

17  other matters in these cases, where he has deemed it appropriate.  These matters include,

18  among other things, the following:

19      1.    Reviewing and formulating a position with respect to the claims brought

20          by certain of the 1996 Noteholders against former directors and officers
          of SONICblue (Adv. Proc. No. 05-05338) and the action brought by

21          Admiral Insurance Company and Old Republic Insurance Company
          seeking a declaratory judgment that the policies that they had issued

22          were of no effect (Adv. Proc. No. 05-05624);

23      2.    Formulating a position with respect to the motion by SBC to reconstitute

24          the Committee or to form a new committee of trade creditors;

25      3.    Filing applications to retain A&B as counsel to the Trustee and FDS as

26          local counsel to the Trustee, including defending the appeal of this
          Court's order approving retention of those firms;

27

28  _____
   [5]      As reflected in the Grobstein Declaration, the potential reduction in the 2002 Notes
Claims based on original issue discount could be as much as $40 million.

4.    Considering issues arising out of the appeal by the 2002 Noteholders of the Order appointing the Trustee.

## V.    Conclusions.

### A.    *Conclusion of the Trustee's Investigation.*

As counsel to the Trustee has earlier indicated to the Court, the Trustee has planned to conclude the Investigation by the end of the first quarter 2008, and this is still the Trustee's intent, though it may be delayed in part pertaining to the investigation of issues relating to Pillsbury. Given the direction parties in interest received from the Court at the hearing on September 5, 2007, while all aspects of the Investigation will proceed simultaneously, the Trustee anticipates that those aspects of the Investigation related to the Senior Indebtedness Dispute will take precedence over other matters under investigation (for example, Pillsbury's non-disclosure to the Court, the U.S. Trustee and others of the Pillsbury Opinion Letter, the Noteholders' Demand, and circumstances related to the turnover of the objections to the 1996 Notes Claims and the 2002 Notes Claims to counsel for the Committee). Resolution of the SBC Subordination Adversary and the relative priorities of the claim of VIA and the claims of the 2002 Noteholders (and completion of the Investigation to determine whether the estates have claims for affirmative damages and/or grounds for equitable subordination of the claims of the 2002 Noteholders) is, at this juncture of these cases, a prerequisite to proceeding with the Plan Confirmation Process. The Trustee therefore intends to expedite these portions of the Investigation and to propose a plan of liquidation based on the results of the Investigation and the SBC Subordination Adversary.

The Trustee anticipates that certain matters that are the subject of the Investigation may not come before the Court prior to proposal of a new plan. For example, certain subjects of the Investigation, such as Pillsbury's conduct, may be more appropriately dealt with in a post-confirmation environment after creditors have received an initial distribution and in connection with hearings on final fee applications or otherwise. Similarly the Trustee may bring certain claim objections or claims for affirmative relief against creditors subsequent to plan confirmation. Other than with respect to the issues that are the subject of the SBC

1    Subordination Adversary, the Trustee will determine the precise timing for bringing other

2    actions as the Investigation continues based upon the results of the Investigation.

3                    B.    *Plan Proposal and Confirmation.*

4                        i.    <u>These Cases Should Remain in Chapter 11.</u>

5        The Trustee believes that it is appropriate and in the best interests of creditors and the

6    estates that these cases remain in chapter 11 at this time.  There are numerous benefits that

7    chapter 11 brings to these cases, relative to a conversion to chapter 7.  First, the Court, in

8    ordering the U.S. Trustee to reconstitute the Committee, focused on the benefits of an official

9    body to represent the interests of unsecured creditors, particularly trade creditors, which is

10   separate and distinct from the Trustee.  If these cases were converted, any appointed

11   committee would be dissolved.

12       It is also appropriate, in the Trustee's view, for these cases to remain in chapter 11

13   because, given the contentious and litigious history of these cases (and in particular the

14   intercreditor disputes between the 2002 Noteholders and SBC), it is likely that there would be

15   a protracted and contested vote over the identity of any chapter 7 trustee or trustees of the

16   estates, which would further delay distributions to creditors and add an additional layer of

17   administrative expenses to these cases, further diminishing returns to unsecured creditors.

18   Additionally, one or more chapter 7 trustees, after being appointed or elected, would have to

19   expend substantial resources getting up to speed on the status of the Investigation and

20   continuing and concluding the Investigation.

21       Finally, the Trustee believes that it is in creditors' and the estates' best interests for

22   these cases to remain in chapter 11 at this time because of the increased flexibility that the

23   chapter 11 process provides over a conversion to chapter 7.  For example, the chapter 11

24   process permits the Trustee and others to formulate a plan that allows for partial distributions

25   and appropriate holdbacks for undisputed portions of otherwise disputed claims.  This

26   flexibility may be particularly important with respect to the claims of the 1996 Noteholders

27   and the 2002 Noteholders, where distributions (or portions of distributions) may be delayed

28   through an extended appellate process of the SBC Subordination Adversary.  Additionally,

1   conversion of these cases to chapter 7 may make a resolution of the Interestate Dispute more

2   difficult.

3                           ii.      Plan Confirmation Should be Rapidly Pursued.

4        The Trustee shares the Court's view that creditors (particularly trade creditors who are

5   uninvolved in the Trustee's Investigation, the SBC Subordination Adversary, or other

6   matters) need to be protected in these cases.  The best protection creditors can receive is to

7   receive a substantial distribution in respect of their allowed claims.  In chapter 11 this can

8   only be accomplished through confirmation of a plan.  The Trustee recognizes the limitations

9   the Court articulated about the Plan Confirmation Process at the hearing on September 5, the

10  necessity of further investigation of the 2002 Noteholders by the Trustee, and the pendency of

11  the litigation against the 2002 Noteholders by SBC, which SBC has said it will be ready to try

12  in January 2008.  With these constraints in mind, the Trustee intends to begin the Plan

13  Confirmation Process again at the earliest appropriate opportunity, and believes that process

14  can proceed promptly once re-initiated.  Given the present status of discovery in the

15  Investigation and the SBC Subordination Adversary, the Trustee presently anticipates that the

16  Plan Confirmation Process can recommence sometime during the first or second quarter of

17  2008, with the objective of making a substantial initial distribution to creditors in the first half

18  of 2008.  The Trustee intends to continue discussions with parties in interest in these cases,

19  including any reconstituted or new committee to determine if the Plan Confirmation Process

20  can be accelerated.

21  Dated: October 8, 2007                    FRIEDMAN DUMAS & SPRINGWATER LLP

22
                                            By:   /s/ Cecily A. Dumas
23                                                Cecily A. Dumas

24                                               -and-

25                                          ALSTON & BIRD LLP
                                            Grant T. Stein
26                                          1201 West Peachtree Street
                                            Atlanta, GA 30309-3424
27                                          (404) 881-7000

28

# EXHIBIT 25

1  EDWINA E. DOWELL, #149059
   Assistant U.S. Trustee
2  NANETTE DUMAS, #148261
   SHANNON L. MOUNGER-LUM, #208071
3  Office of the United States Trustee
   280 S. First Street, Suite 268
4  San Jose, CA 95113-0002
   Telephone:   (408) 535-5525
5  Fax:          (408) 535-5532

6  Attorneys for Sara L. Kistler
   Acting United States Trustee for Region 17
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10
   In re:
11
   SONICBLUE, INCORPORATED, a Delaware          Case No. 03-51775 MM
12 Corporation, DIAMOND MULTIMEDIA
   SYSTEMS, INC., a Delaware Corporation,        Chapter 11
13 REPLAY TV, INC., a Delaware Corporation,
   and SENSORY SCIENCE CORPORATION,
14 a Delaware Corporation,
                             Debtors.
15

16
17       **NOTICE OF DISSOLUTION OF OFFICIAL COMMITTEE OF CREDITORS
                      HOLDING UNSECURED CLAIMS**

18       TO THE CHAPTER 11 TRUSTEE, CHAPTER 11 TRUSTEE'S COUNSEL,

19 DEBTOR, DEBTOR'S COUNSEL, MEMBERS OF THE OFFICIAL COMMITTEE OF

20 CREDITORS HOLDING UNSECURED CLAIMS, COMMITTEE COUNSEL, AND ALL

21 OTHER INTERESTED PARTIES:

22       The United States Trustee hereby dissolves the Official Committee of Creditors

23 Holding Unsecured Claims.  The dissolution is effective as of the filing of this notice.

24
   Date:   October 10, 2007              Respectfully submitted,
25

26                                        By:    / s /  Nanette Dumas
                                                 Attorney for the United States Trustee
27
   Notice of Dissolution Of Official Committee
28 Of Creditors Holding Unsecured Claims

EXHIBIT 26

1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:   (310) 228-5600
   Facsimile:   (310) 228-5788

5
   WILLIAM McGRANE (057767)
6  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
7  40 South Market Street, 7th Floor
   San Jose, CA 95113
8  Telephone:   (408) 995-5600
   Facsimile:   (408) 995-0308

9  Counsel for SonicBlue Claims LLC

10            UNITED STATES BANKRUPTCY COURT
              NORTHERN DISTRICT OF CALIFORNIA
11                   SAN JOSE DIVISION

12
   In re:                                    Case No. 03-51775
13
                                             Chapter 11 (Case Nos. 03-51775
   SONICBLUE INCORPORATED, a                 through 03-51778 MM) (Jointly
14 Delaware corporation; DIAMOND             Administered)
   MULTIMEDIA SYSTEMS, INC., a
15 Delaware corporation; REPLAYTV,           MOTION FOR PARTIAL RELIEF
   INC., a Delaware corporation, and         FROM ORDER GRANTING
16 SENSORY SCIENCE                           DEBTORS' MOTION FOR
   CORPORATION, a Delaware                   APPROVAL OF SETTLEMENT OF
17 corporation,                              VIA AND INTEL LITIGATION,
                                             ENTERED OCTOBER 31, 2006
18                                           [DOCKET NO. 1981]
   Debtors.
19
                                             [Fed. R. Bankr. 9024; Fed. R. Civ. P.
20                                           60(b); 11 U.S.C. §105]

21
                                             Hearing Date: To be determined
22                                           Time:         To be determined
                                             Judge:        Hon. Marilyn Morgan
23                                           Location:     Courtroom 3070
                                                           280 South First Street
24                                                         San Jose, CA  95113

25

26

                                    1

1    SonicBlue Claims LLC ("SB Claims") hereby moves pursuant to

2  (a) Federal Rule of Bankruptcy Procedure 9024; (b) Federal Rule of Civil

3  Procedure 60(b)(1) through (6)[1]; (c) 11 U.S.C § 105[2]; and (d) this Court's inherent

4  judicial powers, for partial relief from this Court's Order Granting Debtors'

5  Motion for Approval of Settlement of VIA and Intel Litigation, entered October

6  31, 2006 [Docket No. 1981] (the "VIA Settlement Order").

7    The VIA Settlement Order approved a "Settlement Agreement" among VIA

8  Technologies, Inc., S3 Graphics Co., Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel

9  Corporation, and SONICblue, Inc.  The relief requested herein is limited solely to

10  the extent that the VIA Settlement Order approved provisions in section III.3 of

11  the Settlement Agreement that purported to provide, with respect to an "Allowed

12  Claim" in the amount of $12.5 million, that (i) the Allowed Claim "shall be pari

13  passu with [] the other general unsecured claims against Debtor in Debtor's

14  Bankruptcy Case" and (ii) that "Claimants and the debtor agree that the Allowed

15  Claim is not, and shall not be treated as, 'Senior Indebtedness' under the terms of

16  the Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior

---

[1]  Federal Rule of Bankruptcy 9024 provides that "Rule 60 FR Civ P applies in cases under the Code." Federal Rule of Civil Procedure 60(b) authorizes "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:  (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

[2]  Bankruptcy Code section 105(a) provides, in part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  See, e.g., Marrama v. Citizens Bank, 127 S. Ct. 1105, 1111-12 (2007) (highlighting "the broad authority granted" by section 105 "to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process'").

2

1    Subordinated Convertible Debentures due 2005" (together, the "Purported Waiver

2    Language"). The Purported Waiver Language purported to relieve three entities

3    (the "2002 Noteholders")[3] that, at the time, were members of the Creditors'

4    Committee from any obligation they had to be subordinated to the claims of

5    another creditor in this case, VIA Technologies, Inc. ("VIA"). SB Claims is the

6    successor in interest to VIA with respect to its claims in this case and any rights it

7    may have to assert seniority vis-à-vis the 2002 Noteholders.

8        A modification and/or partial vacating of the VIA Settlement Order is

9    appropriate in order to invalidate the effect of the Purported Waiver Language.

10   *See, e.g., Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1119 (9th Cir.

11   1999) (holding that the court has the authority to amend a judgment obtained by

12   misconduct).

13       SB claims is entitled to the relief requested in this Motion for the reasons

14   set forth in the complaint (the "Complaint") filed in the related adversary

15   proceeding on May 30, 2007, *SonicBlue Claims LLC v. Portside Growth &*

16   *Opportunity Fund, et al.*, Adv. Pro. No. 07-5082, N.D. Cal. (the "Adversary

17   Action"), in the Opposition to Defendants' Motion to Dismiss filed by SB Claims

18   in the Adversary Action on September 10, 2007 [Docket No. 40 in the Adversary

19   Action] (the "Opposition"), and as stated by SB Claims' counsel, and as held by

20   the Court, at the September 27, 2007 hearing on the Defendants' Motion to

21   Dismiss in the Adversary Action.[4] As set forth in the Complaint and the

22   Opposition, among other things: (1) the Purported Waiver Language was obtained

23   _____

24   [3]  The 2002 Noteholders are Portside Growth & Opportunity Fund, Smithfield
        Fiduciary LLC, and Citadel Equity Fund Ltd.

25   [4]  SB Claims hereby incorporates the Complaint and the Opposition herein by
26       reference, as well as the arguments of SB Claims' counsel at the September 27,
        2007 hearing in the Adversary Action.

1    without any disclosure to the Court and creditors generally, (2) the Purported

2    Waiver Language was obtained without any consideration given to the estate by

3    the 2002 Noteholders, (3) the Purported Waiver Language was obtained by the

4    2002 Noteholders through the abuse of their position as members of the Creditors'

5    Committee and in derogation of their fiduciary duties as members of the Creditors'

6    Committee, (4) the Purported Waiver Language is void and of no effect, and

7    (5) the Purported Waiver Language was obtained based upon the propagation of a

8    phony story as to the supposed "purpose" of the provisions in the Indenture that

9    granted senior status to VIA vis-à-vis the 2002 Noteholders.  Moreover, as set

10   forth in the Opposition at pages 34 through 36 (and without otherwise limiting the

11   incorporation of the Opposition into this Motion in full):

12           The federal courts have ample authority to revise portions of
        their own orders if the orders are based upon fraud, inadequate
13      notice, mistake, or other legal or equitable infirmities.  For example,
        Federal Rule of Civil Procedure 60 allows a court to modify or
14      vacate a prior order "upon such terms as are just" for reasons
        including "mistake, inadvertence, surprise, or excusable neglect," as
15      well as "fraud" and "any other reason justifying relief from the
        operation of the judgment."  Likewise, Bankruptcy Code section
16      105(a) gives the Court ample authority to "issue any order, process,
        or judgment that is necessary or appropriate to carry out the
17      provisions of" the Bankruptcy Code, and the Court may act – even
        *sua sponte* – "to prevent an abuse of process."  *See, e.g., Marrama v.*
18      *Citizens Bank*, 127 S. Ct. 1105, 1111-12 (2007) (highlighting "the
        broad authority granted" by section 105 "to bankruptcy judges to
19      take any action that is necessary or appropriate 'to prevent an abuse
        of process'"); *In re Lenox*, 902 F.2d 737, 740 (9th Cir. 1990)
20      ("Although FRCP 60(b) provides that a court may relieve a party
        from a final order upon motion, it does not prohibit a bankruptcy
21      judge from reviewing, sua sponte, a previous order.  And although
        FRCP 60(b) refers to relief from final orders, it does not restrict the
22      bankruptcy court's power to reconsider any of its previous orders
        when equity so requires." (citations omitted)).
23

24           Even without reliance on Rule 60 or section 105, bankruptcy
        courts also have the inherent authority to disregard improperly
25      noticed provisions of plans and other documents that were approved
        by the court.  *See, e.g., Enewally v. Wash. Mut. Bank (In re*
26      *Enewally)*, 368 F.3d 1165, 1172-73 (9th Cir. 2004) (refusing to

4

enforce lien stripping provisions of plan that were not properly
noticed); *Sallie Mae Servicing Corp. v. Ransom (In re Ransom)*, 336
B.R. 790 (B.A.P. 9th Cir. 2005) (refusing to enforce plan provisions
that "discharged by declaration" student loan obligations); *Ruehle v.
Educ. Credit Mgmt. Corp. (In re Ruehle)*, 307 B.R. 28, 33 (B.A.P.
6th Cir. 2004) (describing such a provision as "an interloper in the
plan" that "can have no legal status") (internal quotations omitted);
*see also In re UAL Corp.*, 299 B.R. 509, 522 (Bankr. N.D. Ill. 2003)
(noting "the inherent power of a bankruptcy judge 'to reexamine and
revise an order which he entered during the pendency of the
bankruptcy proceedings'") (quoting *In re Lintz W. Side Lumber, Inc.*,
655 F.2d 786, 789 (7th Cir. 1981)).

A court's inherent authority to revise portions of its prior
orders also extends to situations involving "fraud on the court" or
other forms of non-disclosure. As cogently explained by the Court
of Appeals for the Ninth Circuit:

> Just as a court may use its inherent power to protect its
> integrity by vacating a judgment obtained by fraud, it also
> may amend a judgment for the same purpose. When a court
> vacates a judgment obtained by fraud, it not only rids itself of
> the defilement caused by the fraud, but also restores balance
> and fairness between the parties by removing the benefit
> gained by the party that committed the fraud. Amending a
> judgment serves these same goals by removing the benefit -
> for example, the avoidance of a judgment against itself - that
> the party gained by committing fraud on the court.

> We therefore hold that a federal court may amend a
> judgment or order under its inherent power when the original
> judgment or order was obtained through fraud on the court. . .

*Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1119 (9th Cir.
1999); *see also, e.g., In re Maxwell Newspaper, Inc.*, [170] B.R. 549
(S.D.N.Y. 1994) (discussing how "bankruptcy courts, as courts of
equity, have the power to reconsider, modify, or vacate a previous
order," and affirming bankruptcy court's decision to vacate two year
old stipulation on the grounds that there had been inadequate
disclosure regarding its effects); *Broadfoot v. United Furniture
Indus. (In re Nationwide Warehouse & Storage, LLC)*, 2005 Bankr.
LEXIS 2690 (Bankr. N.D. Ga. July 29, 2005) (vacating order
approving settlement in case where full effects of the settlement
were not disclosed to the court; explaining that "[t]here are times
when silence and the failure to make a necessary disclosure is
tantamount to an affirmative misrepresentation. The game of 'hiding
the ball' or 'catch me if you can' cannot be played with the courts."").
Based upon the above authorities, and under these circumstances, the
2002 Noteholders cannot hide behind this Court's prior approval of
the Settlement Agreement. If the 2002 Noteholders desired to get a

5

1  substantial benefit from the settlement, then they (especially as
   fiduciaries/Committee members) should have insisted that the
2  purported waiver of subordination be fully disclosed to, and vetted
   by, the Court and creditors. The 2002 Noteholders' failure to do so
3  bars them from now relying upon the Court's order.

4    SB Claims respectfully requests that the Court take judicial notice of all

5  pleadings filed in the Adversary Action.

6    This Motion is being filed at the present time because Federal Rule of Civil

7  Procedure 60 imposes a one-year limitations period on the filing of motions

8  pursuant to subsections (b)(1) through (b)(3). Although the relief requested in this

9  Motion already has been sought in SB Claims' pending Adversary Action, SB

10 Claims is filing this Motion in the Debtors' main bankruptcy case in order to avoid

11 any uncertainty as to the applicability of the one-year limitations period. It is SB

12 Claims' general intention at this time to proceed with resolution of the issues

13 raised by this Motion in the ongoing Adversary Action.

14   Notwithstanding the foregoing, contemporaneous with the filing of this

15 Motion, SB Claims is also filing its "Motion to Modify and/or Vacate in Part

16 Order Approving VIA Settlement Based Upon Fraud on the Court Due to

17 Counsel's Failure to Disclose a Material Conflict of Interest" (the "Conflict

18 Motion"). In the Conflict Motion, SB Claims is seeking relief based specifically

19 on the undisclosed conflicts of interest of prior counsel for the debtor in

20 possession, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). This Court

21 previously held that Pillsbury's failure "to disclose [its] significant and disabling

22 conflict in any reasonable fashion mandates disqualification of [Pillsbury] from its

23 representation in the case." Memorandum Decision and Order on Motion to

24 Appoint a Chapter 11 Trustee, Motion to Convert Case, and Motion to Disqualify

25 Pillsbury Winthrop Shaw Pittman LLP and for Disgorgement of Attorneys' Fees

26 dated March 26, 2007 [Docket No. 2220], at 15:24-26. As set forth in the Conflict

1  Motion, Pillsbury's undisclosed conflicts constituted a fraud on the court that

2  justifies modifying and/or vacating in part the VIA Settlement Order to the limited

3  extent described above, pursuant to the Court's inherent powers, Federal Rule of

4  Civil Procedure 60(b) and Bankruptcy Rule 9024, and 11 U.S.C. § 105.  *See, e.g.,*

5  *In re M.T.G., Inc.* 366 B.R. 730, 748-53 (Bankr. E.D. Mich. 2007) (vacating

6  orders obtained by fraud on the court due to bankruptcy counsel's failure to

7  disclose a conflict of interest).  SB Claims intends to set the Conflict Motion for

8  hearing forthwith.

9       WHEREFORE, SB Claims respectfully requests that this Court enter an

10  order granting partial relief from the VIA Settlement Order to the limited extent

11  requested, specifically, to the extent that the VIA Settlement Order approved the

12  Purported Waiver Language in the Settlement Agreement.

13

14  DATED:  October 31, 2007         STUTMAN, TREISTER & GLATT P.C.
                                                    and
15                                        McGRANE GREENFIELD LLP

16

17                                        By:___/s/ K. John Shaffer_____
                                               K. John Shaffer
18

19

20

21

22

23

24

25

26

EXHIBIT 27

1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:   (310) 228-5600
   Facsimile:    (310) 228-5788
5
   WILLIAM McGRANE (057767)
6  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
7  40 South Market Street, 7th Floor
   San Jose, CA 95113
8  Telephone:   (408) 995-5600
   Facsimile:    (408) 995-0308
9  Counsel for SonicBlue Claims LLC

10              UNITED STATES BANKRUPTCY COURT
11              NORTHERN DISTRICT OF CALIFORNIA
                     SAN JOSE DIVISION
12
   In re:                          | Case No. 03-51775
13                                 |
   SONICBLUE INCORPORATED, a       | Chapter 11 (Case Nos. 03-51775
14 Delaware corporation; DIAMOND   | through 03-51778 MM) (Jointly
   MULTIMEDIA SYSTEMS, INC., a     | Administered)
15 Delaware corporation; REPLAYTV, |
   INC., a Delaware corporation, and| MOTION TO MODIFY AND/OR
16 SENSORY SCIENCE               | VACATE IN PART ORDER
   CORPORATION, a Delaware         | APPROVING VIA SETTLEMENT
17 corporation,                    | BASED UPON FRAUD ON THE
                                   | COURT DUE TO COUNSEL'S
18 Debtors.                        | FAILURE TO DISCLOSE A
                                   | MATERIAL CONFLICT OF
19                                 | INTEREST
20
                                   | Date:     December 7, 2007
21                                 | Time:     11:00 a.m.
                                   | Judge:    Hon. Marilyn Morgan
22                                 | Location: Courtroom 3070
                                   |           280 South First Street
23                                 |           San Jose, CA 95113
24
25
26

                             1

1    SonicBlue Claims LLC ("SB Claims") hereby moves pursuant to

2    (a) Federal Rule of Bankruptcy Procedure 9024; (b) Federal Rule of Civil

3    Procedure 60(b)(1) through (6); (c) 11 U.S.C § 105; and (d) this Court's inherent

4    judicial powers, for partial relief from this Court's Order Granting Debtors' Motion

5    for Approval of Settlement of VIA and Intel Litigation, entered October 31, 2006

6    [Docket No. 1981] (the "Settlement Order").  The Settlement Order approved a

7    "Settlement Agreement" among VIA Technologies, Inc. ("VIA"), S3 Graphics

8    Co., Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation, and SONICblue,

9    Inc.[1]  SB Claims is the successor in interest to VIA's claims in this case.

10    The relief requested by SB Claims in this Motion is limited solely to the

11    extent that the Settlement Order approved provisions in section III.3 of the

12    Settlement Agreement that purported to provide for the waiver by VIA of its

13    seniority rights under an Indenture dated April 22, 2002 (the "2002 Indenture"),

14    between the Debtor and Portside Growth & Opportunity Fund, Smithfield

15    Fiduciary LLC, and Citadel Equity Fund Ltd. (the "2002 Noteholders").  The

16    provisions at issue are those that state that: (1) "Claimants and Debtor agree that

17    the [$12.5 million Allowed Claim that VIA received under the agreement] is not,

18    and shall not be treated as, 'Senior Indebtedness' under the terms of Debtor's

19    Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated

20    Convertible Debentures due 2005," and (2) the Allowed Claim "shall be pari passu

21    with [] the other general unsecured claims against Debtor in Debtor's Bankruptcy

22    Case" (together, the "Purported Waiver Language").  SB Claims does not seek any

23    other modification of the Settlement Order.

24

25    ────────────

26    [1]  For the convenience of the Court, a redacted copy of the Settlement Agreement
     is attached hereto as Exhibit 1.

2

1    As set forth herein and in the accompanying Memorandum of Points and

2  Authorities, the Settlement Order was procured while counsel for the Debtors,

3  Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), was operating under an

4  undisclosed, disabling conflict of interest vis-à-vis the 2002 Noteholders.  The

5  conflict consisted of a claim by the 2002 Noteholders against Pillsbury for, among

6  other things, professional negligence and indemnification based upon an opinion

7  letter that Pillsbury had provided to the 2002 Noteholders in April, 2002, with

8  respect to the validity and enforceability of the 2002 Noteholders' claims against

9  the Debtors.  The 2002 Noteholders threatened to sue Pillsbury unless they were

10  able "to obtain SONICblue's payment of the full principal amount" owing to

11  them.[2]  The 2002 Noteholders' assertions of Pillsbury's wrongdoing, if valid, may

12  cost Pillsbury between $13 million and $15 million, plus attorneys' fees, based

13  upon expected distributions from the Debtors' estate.

14    From the time that Pillsbury was aware of the 2002 Noteholders' assertions

15  (which, at the latest, was August 24, 2006), Pillsbury had a direct interest in

16  (i) ensuring that the 2002 Noteholders received the greatest possible recovery in

17  the cases, so as to minimize any loss that the 2002 Noteholders might assert

18  against Pillsbury, and (ii) avoiding the taking of any action that would in any way

19  antagonize the 2002 Noteholders or otherwise encourage them to assert their

20  claims against Pillsbury.  Pillsbury's interest in maximizing the 2002 Noteholders'

21  recovery and in avoiding further confrontation with the 2002 Noteholders was

22  inconsistent with Pillsbury's duties to the estate to maximize recovery for the

23  benefit of unsecured creditors generally.

24

25  _____

26  [2]  For the convenience of the Court, a copy of the 2002 Noteholders' September
     5, 2006 letter asserting claims against Pillsbury is attached hereto as Exhibit 2.

3

1    Without any disclosure whatsoever of this conflict, Pillsbury sought

2    approval of the Settlement Order, which purported to insulate the 2002

3    Noteholders from any contention that the Debtors' obligations to VIA constituted

4    "Senior Indebtedness" under the terms of the 2002 Indenture. If allowed to stand,

5    the net result of the offending portion of the Settlement Order will be that

6    Pillsbury will have been directly involved in protecting, if not significantly

7    enhancing, the 2002 Noteholders' recoveries in this case, and thus reducing the

8    chance that Pillsbury itself would someday be required to make the 2002

9    Noteholders whole. And, Pillsbury would have done so without any prior or

10   contemporaneous disclosure of its conflicting interests.

11       "Conflicting loyalties produce inadequate representation, which threatens

12   the interests of the debtor, the trustee and the creditors, and compromises the

13   ability of the courts to mete out justice." *In re Tevis*, 347 B.R. 679, 689 (9th Cir.

14   B.A.P. 2006). Indeed, Pillsbury's undisclosed conflicts and conflicting loyalties

15   were the basis for Pillsbury's own disqualification in this case. *See* Memorandum

16   Decision and Order on Motion to Appoint a Chapter 11 Trustee, Motion to

17   Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP

18   and for Disgorgement of Attorneys' Fees entered March 26, 2007 [Docket No.

19   2220].

20       SB Claims respectfully submits that this Court should exercise its statutory

21   and inherent judicial powers to remove the taint of Pillsbury's undisclosed conflict

22   from the Settlement Order. The Settlement Order should be modified, or, in the

23   alternative, vacated in part, to provide that the undisclosed benefit to Pillsbury and

24

25

26

4

1   the 2002 Noteholders that asserted claims against Pillsbury has not been approved

2   by this Court.[3]

3          Such relief will not in any way harm the estate or its general creditors, all of

4   whom (except for the 2002 Noteholders) received no benefit whatsoever from this

5   release of the subordination provisions. It will, however, help to restore the

6   integrity of the judicial process, and make clear that professionals acting under the

7   cloud of a material, undisclosed conflict must not take actions that give the

8   appearance, if not the fact, of benefitting their own conflicting interests. Although

9   SB Claims is requesting this relief by this Motion, this Court also has the authority

10  to grant this relief on its own, *sua sponte*, based upon its own inherent power to

11  protect the integrity of the judicial process and as provided in Bankruptcy Code

12  section 105(a). *See, e.g., Marrama v. Citizens Bank*, 127 S. Ct. 1105, 1111-12

13  (2007) (highlighting "the broad authority granted" by section 105 "to bankruptcy

14  judges to take any action that is necessary or appropriate 'to prevent an abuse of

15  process'").

16         Contemporaneous with the filing of this Motion, SB Claims also is filing its

17  "Motion For Partial Relief From Order Granting Debtors' Motion For Approval Of

18  Settlement Of VIA And Intel Litigation, Entered October 31, 2006 [Docket No.

19  [3] The Purported Waiver Language also constitutes a fraud upon the court based
20  upon the fact that the 2002 Noteholders were fully aware of Pillsbury's conflict
    at the time the Settlement Order was entered, but said nothing. The 2002
21  Noteholders controlled the Creditors' Committee at the time the Settlement
    Order was entered, and they used their position on the Creditors' Committee to
22  obtain the Purported Waiver Language and to otherwise advance their own self
    interests. As Creditors' Committee members, the 2002 Noteholders were
23  fiduciaries of the general unsecured creditors of the Debtors. *See, e.g., In re
    Caldor, Inc.*, 193 B.R. 165, 169 (Bankr. S.D.N.Y. 1996); *In re Microboard
24  Processing, Inc.*, 95 B.R. 283, 284 (Bankr. D. Conn. 1989); *In re Mesta
    Machine Co.*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Their misuse of their
25  fiduciary position and own failures to disclose were a fraud upon the court.
    *See, e.g., In re M.T.G., Inc.*, 366 B.R. 730, 748-53 (Bankr. E.D. Mich. 2007).
26  These issues are being addressed in the pending adversary proceeding, 07-
    05082.

5

1  1981]" (the "Omnibus Rule 60(b) Motion").  In the Omnibus Rule 60(b) Motion,

2  SB Claims is seeking partial relief from the effects of the Settlement Order based

3  upon the issues that currently are being litigated between SB Claims and the 2002

4  Noteholders in Adversary Proceeding No. 07-05082.  As set forth in the Omnibus

5  Rule 60(b) Motion, it is being filed at the present time because Federal Rule of

6  Civil Procedure 60 imposes a one-year limitations period on the filing of motions

7  pursuant to subsections (b)(1) through (b)(3).  Although the relief requested in the

8  Omnibus Rule 60(b) Motion already has been sought in SB Claims' pending

9  adversary proceeding, SB Claims is filing the Omnibus Rule 60(b) Motion in the

10  Debtors' main bankruptcy case in order to avoid any uncertainty as to the

11  applicability of the one-year limitations period.  It is SB Claims' general intention

12  at this time to proceed with resolution of the issues raised by the Omnibus Rule

13  60(b) Motion in the adversary proceeding.  By contrast, SB Claims intends to

14  proceed forthwith with the present Motion, based upon the effects of Pillsbury's

15  conflicts of interest.

16      WHEREFORE, SB Claims respectfully requests that this Court enter an

17  order granting partial relief from the Settlement Order to the limited extent

18  requested, specifically, to the extent that the Settlement Order approved the

19  Purported Waiver Language in the Settlement Agreement.

20

21  DATED:  October 31, 2007        STUTMAN, TREISTER & GLATT P.C.
                                                    and
22                                          McGRANE GREENFIELD LLP

23

24                                          By:___/s/ K. John Shaffer_____
                                                    K. John Shaffer
25

26

6

# Exhibit 1

**SETTLEMENT AGREEMENT**

This Settlement Agreement is made effective as of the Effective Date (as defined below) by and among VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation, and SONICblue, Inc.

**Section I – Definitions**

1. "Adversary Proceeding" as used herein shall mean the case entitled *SONICblue Incorporated v. VIA Technologies, Inc.* (case No. 04-5556) filed by Debtor against Claimants and S3G Inc., on or about December 21, 2004, including without limitation all counterclaims.

2. "Amended and Restated Investment Agreement" as used herein shall mean the written agreement entitled "Amended and Restated Investment Agreement" between VIA and Debtor dated August 28, 2000, as amended and supplemented. Amended and Restated Investment Agreement shall include all of the letters and other agreements executed as a part of the transaction contemplated in the Amended and Restated Investment Agreement, including without limitation the Joint Venture Agreement between Debtor, Sonica3, Inc., and VIA, dated as of January 3, 2001, the Class A Shares Option Agreement between Debtor and VIA, dated as of January 3, 2001, the Guaranty executed by VIA and dated as of January 3, 2001, and certain so-called side letters, dated as of January 3, 2001, executed by Debtor and Claimants amending the Amended and Restated Investment Agreement.

3. "Approval Order" as used herein shall mean an order of the Bankruptcy Court, or another court of competent jurisdiction, approving this Settlement Agreement without change (unless such change is approved in writing by all Parties hereto) and authorizing Debtor's entry into and performance under this Settlement Agreement.

4. "Assumption Motion" as used herein shall mean the motion filed by Debtor in Debtor's Bankruptcy Case on December 17, 2004, seeking to assume the PCL pursuant to 11 U.S.C. § 365.

5. "Bankruptcy Cases" as used herein shall mean collectively the jointly-administered Chapter 11 cases captioned *In re SONICblue Incorporated*, et al., Nos. 03-51775 to 51778, and any other bankruptcy cases or entities substantively consolidated therewith; and "Debtor's Bankruptcy Case" shall mean the Chapter 11 case captioned *In re SONICblue Incorporated*, No. 03-51775, including without limitation any other bankruptcy cases or entities substantively consolidated therewith.

6. "Bankruptcy Code" as used herein shall mean Title 11 of the United States Code, including without limitation Chapter 11 thereof, 11 U.S.C. §§ 101 et seq.

7. "Bankruptcy Court" as used herein shall mean the United States Bankruptcy Court for the Northern District of California, San Jose Division.

8.  "Bankruptcy Successor" as used herein shall mean any trustee appointed in the Debtor's Bankruptcy Case, including without limitation any Chapter 11 or Chapter 7 trustee, any debtor entity in the Bankruptcy Cases with which the Debtor is substantively consolidated, and any trustee, plan agent, liquidating agent, liquidating trust, creditor trust, creditor's committee, or similar entity appointed in the Debtor's Bankruptcy Case, whether appointed by the Bankruptcy Court or pursuant to a Chapter 11 plan of reorganization confirmed in the Debtor's Bankruptcy Case, to administer assets of the Debtor's estate for the benefit of the holders of claims against the Debtor.  For the avoidance of doubt, "Bankruptcy Successor" does not include any third party purchaser of assets from the Debtor's estate, whether pursuant to Section 363(b) of the Bankruptcy Code or a Chapter 11 plan of reorganization confirmed in the Debtor's Bankruptcy Case, any third party purchaser of the Debtor's stock, or any third party with which the Debtor may merge, whether pursuant to a Chapter 11 plan of reorganization confirmed in the Debtor's Bankruptcy Case or otherwise.

9.  "Claimants" as used herein shall mean VIA Technologies, Inc., and S3 Graphics Co. Ltd.

10. "Claimants' Proofs of Claim" as used herein shall mean the proofs of claim filed by Claimants in Debtor's Bankruptcy Case on or about July 17, 2003.

11. "Debtor" as used herein shall mean SONICblue, Inc., formerly known as S3 Incorporated, as debtor and debtor-in-possession.

12. "Development Assistance Agreement" as used herein shall mean the written agreement entitled "Development Assistance Agreement" between Intel and Debtor dated December 16, 1998.

13. "Effective Date" as used herein shall mean the date eleven days after the entry of the Approval Order on the docket of the Bankruptcy Court, provided that no appeal has been filed prior to such time or, if an appeal has been filed prior to such time, then "Effective Date" shall mean such later date as the Approval Order is upheld on appeal or all appeals of the Approval Order are dismissed and all deadlines for further appeal have expired.

14. "Graphics Chip Business" as used herein shall have the same meaning as the term "Graphics Chip Business" defined in Article I of the Amended and Restated Investment Agreement.

15. "Intel" as used herein shall mean Intel Corporation.

16. "Intel REDACTED AS CONFIDENTIAL ' has the meaning given that term in paragraph 7(b) of Section III of this Settlement Agreement.

17. "Intel-VIA Settlement Agreement" as used herein shall mean the written agreement entitled "Litigation Settlement Agreement between VIA Technologies Inc. and Intel Corporation" between VIA and Intel dated as of April 7, 2003.

18. "Investment Agreement" as used herein shall mean the written agreement entitled "Investment Agreement" between VIA and Debtor dated April 10, 2000, as amended and supplemented.

19. "JV Entities" as used herein shall mean S3-VIA, S3G Co., and S3G Inc.

20. "JV Entities Subsidiaries" as used herein shall mean any Subsidiaries (as defined in the PCL) of any of the JV Entities, applying the definition of Subsidiaries in the PCL, for this purpose, as though the JV Entities were Subsidiaries (as defined in the PCL) of the Debtor.

21. "Party" as used herein shall refer to any of the parties to this Settlement Agreement (*e.g.*, VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation or SONICblue, Inc.), and "Parties" shall mean all of them (*i.e,* VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation and SONICblue, Inc.).

22. "PCL" as used herein shall mean the written agreement entitled "Patent Cross License Agreement" between Intel and Debtor dated December 16, 1998.

23. "Petition Date" as used herein shall mean March 21, 2003.

24. "S3-VIA Investment Agreement" as used herein shall mean the written agreement entitled "Joint Venture Agreement" dated as of October 27, 1999, by and between VIA, Debtor and S3Ventures, Ltd., a Cayman Islands company which is a wholly-owned subsidiary of Debtor.

25. "S3G Co." as used herein shall mean S3 Graphics Co. Ltd.

26. "S3G Inc." as used herein shall mean S3 Graphics, Inc.

27. "S3-VIA" as used herein shall mean S3-VIA, Inc.

28. "Stay Motion" as used herein shall mean the motion for relief from the automatic stay imposed by 11 U.S.C. § 362 in order to terminate the PCL, originally filed by Intel in Debtor's Bankruptcy Case on or about June 6, 2003, and renewed on May 13, 2004.

29. "Trade Secret Agreement" as used herein shall mean the written agreement entitled "Trade Secret Disclosure and License Agreement" between Intel and Debtor dated December 16, 1998.

30. "VIA" as used herein shall mean VIA Technologies, Inc.

## Section II – Recitals

WHEREAS, on March 21, 2003, Debtor and certain of its affiliates commenced the Bankruptcy Cases by filing voluntary petitions for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

WHEREAS, on or about June 6, 2003, Intel filed the Stay Motion seeking to terminate the PCL.

WHEREAS, on July 17, 2003, Claimants filed Claimants' Proofs of Claim seeking a claim in excess of $100 million.

WHEREAS, on December 17, 2004, Debtor filed the Assumption Motion seeking to assume the PCL.

WHEREAS, on December 21, 2004, Debtor commenced the Adversary Proceeding, challenging Claimants' Proofs of Claim and seeking unspecified compensatory and punitive damages, and Claimants thereafter filed answers denying liability and asserting counter-claims against Debtor.

WHEREAS, the Parties have engaged in good faith settlement negotiations to resolve actual and potential disputes relating to the foregoing and otherwise.

WHEREAS, given the breadth and complexity of the Parties' disputes, as well as the numerous and contested legal and factual issues that would be involved in resolving them, and in order to avoid the costs and risks of litigation, the Parties have agreed to enter into this global settlement.

WHEREAS, the Parties have carefully considered the terms of this Settlement Agreement and, after having had the opportunity to consult with their respective attorneys, are satisfied that it is fair and reasonable.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties agree as follows:

### Section III – Settlement Terms

Subject in each case to the effectiveness of this Settlement Agreement on the terms and conditions set forth herein, the undersigned hereby agree as follows:

### Condition Precedent

1.     <u>Condition Precedent</u>. This Settlement Agreement, and each and every covenant, release, reservation or other agreement herein, is subject to, and conditioned upon, the occurrence of the Effective Date. Upon execution of this Settlement Agreement by VIA, Intel and each of the JV Entities, Debtor shall file and prosecute a motion seeking approval of this Settlement Agreement by the Bankruptcy Court, and the Parties hereto shall cooperate in good faith to ensure (a) the Effective Date occurs, (b) the Approval Order is entered forthwith and (c) the Approval Order remains effective notwithstanding any challenge before or after the Effective Date.

**Administrative Matters**

2.    <u>Proceedings Dismissed</u>.  Immediately upon satisfaction of the condition precedent in paragraph 1 of Section III of this Settlement Agreement, (a) the Stay Motion and the Assumption Motion shall be, and shall be deemed to be, withdrawn with prejudice, and (b) the Adversary Proceeding (including without limitation any motions or proceedings pending within the Adversary Proceeding) shall be, and shall be deemed to be, dismissed with prejudice and without costs to any Party.  The Parties each agree to file and shall file any additional notices, stipulations or other papers required by the Bankruptcy Court in order to confirm these withdrawals and dismissals.  The Parties agree that this Settlement Agreement shall remain effective notwithstanding any substantive consolidation of Debtor with another entity or entities, provided that Claimants reserve their rights to object to such consolidation as a holder of an allowed unsecured claim.

3.    <u>Allowed Claim</u>.  Claimants shall jointly hold a single, allowed general unsecured claim in Debtor's Bankruptcy Case, which claim shall be afforded the benefits of, and shall be pari passu with, the other allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case, in the amount of $12.5 million ($12,500,000), representing a compromise of the claims that have been asserted by the Claimants for damages and other relief based, *inter alia*, on alleged breaches of the Amended and Restated Investment Agreement, including without limitation liquidated damages for the alleged breach of section 5.6 thereof (the "Allowed Claim").  Claimants and Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005.  The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants.  The Allowed Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including without limitation any proof of claim.

4.    <u>Filed Proofs of Claim Disallowed</u>.  Subject to the allowance in full of the Allowed Claim as set forth in paragraph 3 of Section III of this Settlement Agreement, the Claimants' Proofs of Claim each shall be deemed withdrawn and disallowed with prejudice.

**Intellectual Property Matters**

5.    <u>Transfer of Intellectual Property to S3G Co</u>.  Debtor shall use its commercially reasonable best efforts to transfer within ten business days after the Effective Date to S3G Co., or its designee, the intellectual property related to or used in the Graphics Chip Business that currently remains in Debtor's possession, is reasonably available, and was to be contributed pursuant to the Amended and Restated Investment Agreement (the "Transferred Intellectual Property"), and to execute within ten business days after the Effective Date any transfer documents related to the Transferred Intellectual Property.  To the extent Debtor subsequently identifies or locates any Transferred Intellectual Property that remains in its possession, Debtor shall transfer such property to S3G Co. or its designee promptly upon such location or identification, and Claimants shall continue to own all right, title and interest in the Transferred Intellectual Property, whether or not it has been transferred to S3G Co. or its designee before or after the Effective Date; provided, however, that, after the Effective Date, Debtor or its

Bankruptcy Successors shall have no liability to Claimants for the transfer, disposal or destruction of any documents, files, or intellectual property in the possession of Debtor or its Bankruptcy Successors, whether or not such relate to or constitute the Transferred Intellectual Property, except as provided herein.   Subject to the foregoing, the Parties agree that Debtor's performance of the following actions with respect to the Transferred Intellectual Property shall extinguish and satisfy all of Debtor's obligations, of whatever kind or nature, with respect to the transfer to S3G Co., or its designee, of the Transferred Intellectual Property:

a.    Within ten business days after the Effective Date, execution by Debtor of transfer documents relating to all patents and patent applications listed on Schedule 1 to the Bill of Sale (as defined in the Amended and Restated Investment Agreement) and patents, trademarks, copyrights, and other items listed in Schedule 3.14(a)(ii) to the Amended and Restated Investment Agreement. Debtor's delivery and execution with the requisite formalities, within ten business days after the Effective Date, of the documents that are listed in Exhibit 1 to this Settlement Agreement (as well as any additional documents that, prior to the Effective Date, Debtor, VIA, and the JV Entities, acting reasonably and in good faith, agree are necessary to effectuate the transfer) and that have been prepared in accordance with the provisions of paragraph 6 of Section III of this Settlement Agreement shall be deemed to satisfy Debtor's obligations under this paragraph 5(a) of Section III of this Settlement Agreement. Notwithstanding the foregoing, if execution by Debtor of additional transfer documents relating to the patents or patent applications listed on Schedule 1 to the Bill of Sale, or patents, trademarks, copyrights or other items listed in Schedule 3.14(a)(ii) subsequently becomes necessary to effectuate the transfer, then, during the time period that any of the Bankruptcy Cases remain pending, Debtor shall promptly execute with the requisite formalities and deliver to the S3G Co. or its designee such additional transfer documents. Pursuant to paragraph 7(b) of Section III of this Settlement Agreement,

REDACTED AS
CONFIDENTIAL

b.    Within ten business days after the Effective Date, execution by Debtor of the various documents necessary to record the trademark assignments for the trademarks used in the Graphics Chip Business, including without limitation the S3 trademarks.  Debtor's delivery and execution with the requisite formalities, within ten business days after the Effective Date, of the documents that are listed in Exhibit 2 to this Settlement Agreement (as well as any additional documents that, prior to the Effective Date, Debtor, VIA, and the JV Entities, acting reasonably and in good faith, agree are necessary to effectuate the transfer) and that have been prepared in accordance with the provisions of paragraph 6 of Section III of this Settlement Agreement shall be deemed to satisfy Debtor's obligations under this paragraph 5(b) of Section III of this Settlement Agreement. Notwithstanding the foregoing, if execution by Debtor of additional

documents subsequently becomes necessary to record the trademark assignments, then, during the time period that any of the Bankruptcy Cases remain pending, Debtor shall promptly execute with the requisite formalities and deliver to S3G Co. or its designee such additional documents.

c.    Within ten business days after the Effective Date, delivery by Debtor of all patent, trademark, and copyright files and other documents relating to the Transferred Intellectual Property to the extent that the same may be located after a reasonable search, which shall include any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents; provided, however, that any Intel Confidential Information (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) shall not be transferred to VIA, the JV Entities, or any other third party, but shall be subject to the restrictions with respect to return or destruction of Intel Confidential Information in paragraph 7(f) of Section III of this Settlement Agreement. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations under this paragraph 5(c) of Section III of this Settlement Agreement by delivery within ten business days after the Effective Date of such documents previously located and identified to VIA by Debtor, including any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents. Debtor, VIA, and the JV Entities further agree that the foregoing document review procedures shall be subject to paragraph 7(f) of Section III of this Settlement Agreement.

d.    Within ten business days after the Effective Date, and subject to paragraph 7(f) of Section III of this Settlement Agreement, delivery by Debtor of a list of all licensed technology and the underlying licenses that were being utilized in the Graphics Chip Business prior to the January 3, 2001 closing to the extent that such a list and/or such licenses may be located after a reasonable search. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations under this paragraph 5(d) of Section III of this Settlement Agreement by delivery within ten business days after the Effective Date of such licenses and related documents previously located and identified to VIA by Debtor, including any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents.

e.    Within ten business days after the Effective Date, delivery by Debtor of the complete employee files, located by Debtor following a reasonable search, for those relevant employees (*e.g.*, employees listed as inventor(s)

or author(s) on any patent, patent application, or copyright transferred or to be transferred to S3G Co. or its designee) that are listed on Exhibit 3 to this Settlement Agreement (as well as for other relevant employees that, prior to the Effective Date, Debtor, VIA, and the JV Entities, acting reasonably and in good faith, agree to add to Exhibit 3), including without limitation resumes, offer letters, employment agreements, performance reviews, benefits files, and immigration files, and any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to such employee. Except as the Court in Debtor's Bankruptcy Case may otherwise provide by order, which Debtor and Claimants agree to apply for jointly, Debtor, VIA, and the JV Entities further agree that Debtor is under no obligation to make any transfer or disclosure pursuant to this paragraph 5(e) of Section III of this Settlement Agreement that would violate employee privacy rights or paragraph 7(f) of Section III of this Settlement Agreement.

f.      Within ten business days after the Effective Date, delivery by Debtor of all original data tapes used in the Graphics Chip Business to the extent the same may be located after a reasonable search, including data tapes protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents; provided, however, that any Intel Confidential Information (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) shall not be transferred to VIA, the JV Entities, or any other third party, but shall be subject to the restrictions with respect to return or destruction of Intel Confidential Information in paragraph 7(f) of Section III of this Settlement Agreement. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations to use commercially reasonable best efforts in relation to this paragraph 5(f) of Section III of this Settlement Agreement, but despite such efforts Debtor has been unable to identify which, if any, of the data tapes that Debtor has located were used in the Graphics Chip Business, and no further action by Debtor is required prior to the Effective Date with respect to this paragraph 5(f) of Section III of this Settlement Agreement. Debtor, VIA, and the JV Entities further agree that the foregoing data tape review procedures shall be subject to paragraph 7(f) of Section III of this Settlement Agreement.

g.      Within ten business days after the Effective Date, delivery by Debtor of executed customer and vendor non-disclosure agreements related to the Graphics Chip Business to the extent the same may be located after a reasonable search and such disclosure is not prohibited by the terms of such non-disclosure agreements. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations under this paragraph 5(g) of Section III of this Settlement Agreement by delivery within ten business days after the Effective Date of such non-disclosure agreements and

related documents previously located and identified to VIA by Debtor, including any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents.

h.    Debtor, VIA, and the JV Entities agree that following the Effective Date, S3G Co. or its designee shall have the right to review records that reasonably might be records of the Graphics Chip Business, namely (i) documents relating to the Transferred Intellectual Property, (ii) employee files, licenses, and non-disclosure agreements related to the Graphics Chip Business, and (iii) data tapes used in the Graphics Chip Business, including any such documents, files, agreements, or data tapes protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents and no documents that the disclosure of which to S3G or its designee is prohibited by law or contractual rights; provided, however, that any Intel Confidential Information (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) shall not be transferred to VIA, the JV Entities, or any other third party, but shall be subject to the restrictions with respect to return or destruction of Intel Confidential Information in paragraph 7(f) of Section III of this Settlement Agreement. In respect to any review under this paragraph 5(h) of Section III of this Settlement Agreement, Debtor, VIA, and the JV Entities agree that such review shall be conducted in a manner calculated to preserve the Debtor's and its Bankruptcy Successors' attorney-client privilege, attorney work product protections, and similar privileges. S3G Co. or its designee shall identify independent contractor reviewers, subject to the approval of (which approval shall not unreasonably be withheld and which shall be granted to S3G Co. or its designee within 5 days of identification unless substantial reasons are provided for disapproval), and to be hired by and work under the direction of, attorneys for Debtor or its Bankruptcy Successors, and S3G Co. or its designee shall pay directly all charges of such independent contractor reviewers. In addition, S3G Co. or its designee shall reimburse Debtor or its Bankruptcy Successors for out-of-pocket expenses and attorneys' fees incurred by Debtor in connection with the locating, retrieval, review, delivery, and re-stocking of documents (as set forth in a written statement); provided, however, that S3G Co. or its designee shall not be obligated to reimburse Debtor or its Bankruptcy Successors for the first $50,000 of attorneys' fees incurred collectively by Debtor or its Bankruptcy Successors prior to January 1, 2008 in connection with such activities. The parties understand and acknowledge that Debtor or its Bankruptcy Successors will probably dispose of all records possessed by Debtor or its Bankruptcy Successors after the Effective Date, and they agree that this Settlement Agreement does not create any obligation on the part of Debtor or its Bankruptcy Successors to

preserve or retain after the Effective Date any of the records possessed by Debtor or its Bankruptcy Successors, including, but not limited to, records from the Graphics Chip Business. Debtor, VIA, and the JV Entities further agree that the foregoing records review procedures shall be subject to paragraph 7(f) of Section III of this Settlement Agreement.

i.    Debtor, VIA, and the JV Entities agree that if at any time in the future there ever exists a dispute between Debtor or its Bankruptcy Successors, on the one hand, and VIA and/or the JV Entities, on the other hand, arising from or relating to any of the parties' respective rights and/or obligations under this paragraph 5 of Section III of this Settlement Agreement, the exclusive remedy that shall be available to the parties shall be to request an order from the Bankruptcy Court compelling compliance with this paragraph 5 of Section III of this Settlement Agreement, and the parties hereby forever waive and release any other claims in law or equity and any other remedies that they otherwise may have with respect to such a future dispute. The parties shall bear their own attorneys' fees and costs incurred in any such future dispute.

6.    <u>Claimants' Expense</u>.  Claimants shall (a) prior to the Effective Date, prepare drafts, subject to revisions by Debtor, of any documents needed to effectuate the transfer of the Transferred Intellectual Property, and (b) within ten business days after the Effective Date, reimburse Debtor for its third-party filing fees incurred after January 1, 2006 in perfecting, preserving, registering, or transferring the Transferred Intellectual Property.

7.    <u>PCL, Trade Secret Agreement, and Development Assistance Agreement</u>

REDACTED AS
CONFIDENTIAL    a.    REDACTED AS
CONFIDENTIAL

b.    REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

c.

d.

e.

REDACTED AS
CONFIDENTIAL

f.  Notwithstanding the foregoing provisions of this paragraph 7 of Section III of this Settlement Agreement or the survival of any provisions of the PCL, the Trade Secret Agreement or the Development Assistance Agreement, Intel agrees that the Debtor shall have complied with its obligations with respect to Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) and any surviving provisions relating to confidentiality if it complies with the provisions of this paragraph 7(f) of Section III of this Settlement Agreement. Debtor shall hold any information identified in writing as, or known to Debtor to be, Confidential Information of Intel (as defined in and provided under the

Trade Secret Agreement or the Development Assistance Agreement) in confidence and shall not use such Confidential Information or disclose such Confidential Information to any third parties; provided, however, that Debtor may make such Confidential Information available (i) to the extent requested by any government authority or to the extent otherwise required by applicable laws or regulations or by any subpoena or similar legal process, (ii) to any Bankruptcy Successor (it being understood that any such Bankruptcy Successor shall succeed to and be bound by the confidentiality obligations as imposed and limited by this paragraph 7(f) of Section III of this Settlement Agreement as if such Bankruptcy Successor were Debtor), (iii) with the prior written consent of Intel, and/or (iv) to the extent such information (A) becomes publicly available other than as a result of a breach of this paragraph 7(f) of Section III of this Settlement Agreement or (B) becomes available to Debtor on a nonconfidential basis from a source other than Intel that has not breached any confidentiality obligation owing to Intel or any other party in making such information available to Debtor. Debtor shall inform any Bankruptcy Successor coming into possession of any of Debtor's records that do or may contain Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) of such fact and obtain such Bankruptcy Successor's written acknowledgement of its obligations under this paragraph 7(f) of Section III of this Settlement Agreement. Debtor or its Bankruptcy Successors will not be in breach of its confidentiality obligations under this paragraph 7(f) of Section III of this Settlement Agreement solely by reason of any access to Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) by the Debtor or its Bankruptcy Successors, their employees, contractors or professionals (including legal counsel) each to the extent acting at the direction of Debtor or its Bankruptcy Successors or their legal counsel in connection with reviewing the Debtor's books and records in the course of administering the assets of and claims against the Debtor's estate, provided that such employees, contractors and professionals acting at the direction of Debtor or its Bankruptcy Successors or their legal counsel agree in writing to abide and be bound by the confidentiality restrictions in this paragraph 7(f) of Section III of this Settlement Agreement, and provided further that the agreement of legal counsel need not be reduced to a writing. Unless specifically prohibited by applicable law or court order, Debtor or its Bankruptcy Successors shall notify Intel of (x) any request by any government authority or representative thereof for disclosure of any such Confidential Information, (y) any disclosure required by applicable laws or regulations or by any subpoena or similar legal process, prior to disclosure of such Confidential Information and (z) any Confidential Information discovered in Debtor's records by any employee, contractor or professional (including legal counsel), and in such event Debtor or its Bankruptcy Successors shall provide Intel the option of

having such Confidential Information returned or written certification of destruction. In the event Debtor or any Bankruptcy Successor is requested or required by any government authority or by applicable laws or regulations or by any subpoena or similar legal process to disclose any such Confidential Information, Debtor or its Bankruptcy Successor will provide Intel with prompt written notice of any such request or requirement so that Intel may seek an appropriate protective order or other appropriate remedy and/or waive compliance with the terms of this Settlement Agreement. In the event that such protective order or other remedy is not obtained, or that Intel waives compliance with the terms hereof, Debtor or its Bankruptcy Successor may disclose only that portion of such Confidential Information which is legally required and will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded to such Confidential Information. If and when Debtor or any Bankruptcy Successor is no longer under any legal obligation to retain Debtor's records that do or may contain Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement), Debtor or any Bankruptcy Successor in possession or control of such records shall destroy them and provide Intel with written certification of destruction.

8.    Intel-VIA Settlement Agreement

REDACTED AS
CONFIDENTIAL

9.    Transfer of Class A Shares of S3G Co. Debtor shall transfer or cause to be transferred to VIA or its designee for no further consideration all Class A Common Shares of S3G Co. held by Sonica3, Inc. (or other party) within ten business days after the Effective Date. The "Class A Shares Option Agreement," between Debtor and VIA, dated as of January 3, 2001, shall be deemed terminated upon the Effective Date.

10.    Subsidiaries. VIA, Intel and the JV Entities agree

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

## Releases

11.    <u>Releases by Debtor of VIA, S3G Co., S3G Inc. and S3-VIA</u>. As of the Effective Date, and excepting rights created or preserved by this Settlement Agreement, Debtor, on behalf of itself and its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of Debtor and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "Debtor-VIA Releasing Parties"), hereby releases, acquits, and forever discharges VIA and each of its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of VIA and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "Debtor-VIA Released Parties"), and the JV Entities, and each of their respective affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of the JV Entities and their affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "Debtor-JV Released Parties"), from and against any and all claims, counterclaims, demands, liabilities, causes of action, defenses, damages, expenses (including, but not limited to, attorneys' fees and costs), duties or obligations, whether asserted on an individual, representative, or derivative basis, whether known or unknown, suspected or unsuspected, fixed or contingent, accrued or not yet accrued, that any of the Debtor-VIA Releasing Parties now has, has had, or may at any time have against any of the Debtor-VIA Released Parties or the Debtor-JV Released Parties based on events or acts or omissions occurring on or before the Effective Date, including, but not limited to (a) the Bankruptcy Cases, (b) the Adversary Proceeding, (c) the PCL, (d) the creation, operation or activities of the JV Entities, (e) any and all surety claims or claims for indemnity or contribution arising from or based on events or acts or omissions occurring on or before the Effective Date, and/or (f) any and all claims or interests arising under or relating to any and all agreements between or among each group of the parties to this paragraph, including without limitation the S3-VIA Investment Agreement, the Investment Agreement, the Amended and Restated Investment Agreement, and the Class A Shares Option Agreement.

12.    <u>Releases by VIA, S3G Co., S3G Inc. and S3-VIA of Debtor</u>. As of the Effective Date, and excepting rights created or preserved by this Settlement Agreement, VIA, on behalf of

itself and its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of VIA and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "VIA-Debtor Releasing Parties"), and the JV Entities, each on behalf of themselves and each of their respective affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of the JV Entities and their affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "JV-Debtor Releasing Parties"), hereby release, acquit, and forever discharge Debtor, and each of its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of Debtor and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "VIA-Debtor Released Parties"), from and against any and all claims, counterclaims, demands, liabilities, causes of action, defenses, damages, expenses (including, but not limited to, attorneys' fees and costs), duties or obligations, whether asserted on an individual, representative, or derivative basis, whether known or unknown, suspected or unsuspected, fixed or contingent, accrued or not yet accrued, that any of the VIA-Debtor Releasing Parties or the JV-Debtor Releasing Parties now has, has had, or may at any time have against any of the VIA-Debtor Released Parties based on events or acts or omissions occurring on or before the Effective Date, including, but not limited to (a) the Bankruptcy Cases, (b) the Adversary Proceeding, (c) the PCL, (d) the creation, operation or activities of the JV Entities, (e) any and all surety claims or claims for indemnity or contribution arising from or based on events or acts or omissions occurring on or before the Effective Date, and/or (f) any and all claims or interests arising under or relating to any and all agreements between or among each group of the parties to this paragraph, including without limitation the S3-VIA Investment Agreement, the Investment Agreement, the Amended and Restated Investment Agreement, and the Class A Shares Option Agreement.

     13.   <u>Release by Intel of Debtor.</u>

REDACTED AS<br>CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

14.    <u>Release by Intel of Intel-Debtor-Released Parties</u>.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

15.    <u>Release by Debtor of Intel</u>.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

16.     Release by Debtor of Debtor-Intel Released Parties.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

17.     Release by Intel        REDACTED AS
                                CONFIDENTIAL


                                REDACTED AS
                                CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

18.    Release by Intel

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

19.    <u>Release</u>    REDACTED AS CONFIDENTIAL    __ <u>of Intel</u>.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

## Miscellaneous

20.    <u>Each Party to Bear Own Costs</u>. Except as provided for in paragraphs 5 and 6 of Section III of this Settlement Agreement, each Party hereto shall bear its own costs and expenses (including, but not limited to, attorneys' fees) in connection with the negotiation, execution, and obtaining of Court approval of this Settlement Agreement, and all matters addressed, settled or released hereby.

21.    <u>Waiver of Statutory Limitation on General Releases</u>. With respect to the matters released hereby, each of the Parties hereto, for itself and on behalf of any other releasing party on whose behalf it gives a release hereunder, hereby waives and relinquishes any and all rights which they or any of them may have under the provisions of § 1542 of the Civil Code of the State of California, or any analogous provision under state or federal law, which provides as follows:

        "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
        THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
        OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,

WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

22.    No Admission of Liability.    The Parties hereto each acknowledge that this Settlement Agreement is a compromise of disputed rights and claims among the Parties and that it shall not be construed as an admission of any liability by any Party hereto.

23.    Due Authority. Each person signing this Settlement Agreement, including but not limited to any person signing as counsel for a Party, hereby represents and warrants that he or she has been duly authorized and has the requisite authority to execute and deliver this Settlement Agreement on behalf of such Party and to bind his or her employer, principal or respective client to the terms and conditions of this Settlement Agreement.

24.    Due Investigation.    The Parties acknowledge that, in making this Settlement Agreement, they rely entirely upon their own judgment, beliefs and interest and, where applicable, the advice of their own counsel and that they each have had a reasonable period of time to consider this Settlement Agreement.

25.    Drafting of Settlement Agreement.  The Parties agree that each Party and, where applicable, its counsel have reviewed this Settlement Agreement, and that each fully understands and voluntarily accepts all the provisions contained in this Settlement Agreement.  The Parties further agree that this Settlement Agreement was the product of negotiations between the Parties and that any rule of construction requiring that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Settlement Agreement.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

26.    Integrated Agreement.  This Settlement Agreement is an integrated document that sets forth the entire agreement between the Parties, and it supersedes any and all prior agreements, promises, representations and understandings, whether written or oral, between or among the Parties pertaining to the subject matter hereof.

27.    Amendments.  No modification or amendment of this Settlement Agreement shall be binding or enforceable unless in writing and signed by all of the Parties to the modification or amendment.

28.    Binding on Bankruptcy Successors.  This Settlement Agreement shall remain in force and be binding upon any Bankruptcy Successor of the Debtor.

29.    Choice of Law, Jurisdiction.  This Settlement Agreement shall be interpreted and construed in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of the State of California, without giving effect to California's rules regarding conflict of laws. The Bankruptcy Court shall have jurisdiction over any and all disputes, controversies, claims or other matters arising under or otherwise relating to this Settlement Agreement.

30.    Headings.  The headings of sections and paragraphs in this Settlement Agreement have been included only for convenience, and shall not be deemed in any manner to modify or

limit any of the provisions of this Settlement Agreement, or be used in any manner in the interpretation of this Settlement Agreement.

31.     <u>Counterparts</u>.  This Settlement Agreement may be executed in one or more counterparts and in original or by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

32.     <u>Further Assurances</u>.  The Parties shall execute and deliver all documents and perform all further acts that may reasonably be necessary to effectuate the provisions and purpose of this Settlement Agreement.

| SONICblue, Inc. | Dated: September 26, 2006<br><br>By: _____ |
|---|---|
| Intel Corporation | Dated: September ___, 2006<br><br><br>By: _____ |
| VIA Technologies, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics Co. Ltd. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3-VIA, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |

| SONICblue, Inc. | Dated: September___, 2006<br><br><br>By: _____ |
| Intel Corporation<br><br>*Bruce Sewell*<br>*SVP & Gen. Counsel* | Dated: ~~September~~ *6th*, 2006<br>*October*<br><br>By: *Bruce Se___* |
| VIA Technologies, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics Co. Ltd. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3-VIA, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |

LEGAL OK
*Vand*

| | |
|---|---|
| SONICblue, Inc. | Dated: September___, 2006<br><br><br>By: _____ |
| Intel Corporation | Dated: September___, 2006<br><br><br>By: _____ |
| VIA Technologies, Inc. | Dated: September ___, 2006<br><br>By:  JOHN K. LEE _____ |
| S3 Graphics Co. Ltd. | Dated: September ___, 2006<br><br>By:  JONATHAN CHANG _____ |
| S3 Graphics, Inc. | Dated: September ___, 2006<br><br>By:  JONATHAN CHANG _____ |
| S3-VIA, Inc. | Dated: September ___, 2006<br><br>By:  JONATHAN CHANG _____ |

## Chris Sullivan

**From:**    Chris Sullivan
**Sent:**    Wednesday, October 31, 2007 10:37 AM
**To:**    'john todd'
**Subject:** RE:

John,

You should plan on a full day – while four hours should be enough from our side I cannot responsibly tell you that other parties involved in these actions would not take additional time.

FYI, by rule the limit is 7 hours/one day.

The only day next week that won't work for me right now is 11/6.  The sooner we can get notice out to all the easier it will be.

Chris.

**From:** john todd [mailto:john1228@earthlink.net]
**Sent:** Wednesday, October 31, 2007 10:27 AM
**To:** Chris Sullivan
**Subject:** RE:

Chris I am going to try to fit in next week how much time do you need.  Is 4 hours enough do you think.

**From:** Chris Sullivan [mailto:csullivan@mcgranegreenfield.com]
**Sent:** Tuesday, October 30, 2007 11:22 AM
**To:** john todd
**Subject:**

## McGrane, Greenfield, LLP                                    **Chris Sullivan, Partner**

One Ferry Building, Suite 220
San Francisco, California 94111
(415) 283-1776 Fax (415) 283-1777
E-mail: csullivan@mcgranegreenfield.com
Internet: www.mcgranegreenfield.com

John,

I was glad to catch up with you the other day.  In terms of deposition dates that you said you anticipated would be clear here is out top preferences:

1.    11/5.

2.    11/6; 11/7; or 11/8.

10/31/2007

3.    11/19.

4.    11/16.

5.    11/23.

We would be able to find a location near you if you need us to or accommodate your pick if you have a place.  The sooner we can get a date nailed down the easier it will be to have everything run smoothly in terms of scheduling, etc.

Please call me when you can to confirm a time – I believe you indicated that you would know your schedule better later today.  I 'm available here at 415-283-1776 until alter this afternoon, than I am attending a Judge's dinner and will be available by cell 415-694-3753.

I will be at 415-283-1776 Wednesday, so please call or e-mail me letting me know how a number to reach you if we don't talk today.

I certainly hope that your house and family are safe and the fire danger firmly passed.

Thanks,
Chris.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document.

10/31/2007

# Exhibit 2

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS
865 SOUTH FIGUEROA STREET
SUITE 2900
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 694-1200
FACSIMILE (213) 694-1234

DIRECT PHONE (213) 694-1068
SWARTZM@HBDLAWYERS.COM

September 5, 2006

**VIA FACSIMILE (415 983-1200) AND U.S. MAIL**

Mary B. Cranston, Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228

Re:    **Pillsbury Winthrop's April 22, 2002 Opinion Letter With Regard To
       SONICblue Debentures**

Dear Ms. Cranston:

I write on behalf of Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary
LLC and Citadel Equity Fund Ltd. (the "Debenture Holders"). On April 22, 2002, your firm
(Pillsbury Winthrop) provided the Debenture Holders with an opinion letter (the "Opinion
Letter") with regard to the issuance of Debentures by SONICblue Incorporated. The Opinion
Letter is attached as Exhibit A to this letter. Under Paragraph 7(iv) of the Securities Purchase
Agreement by which they acquired the Debentures, the Debenture Holders expressly conditioned
their willingness to purchase the Debentures upon Pillsbury Winthrop's provision to them of the
Opinion Letter.

In Paragraph 3 of its Opinion Letter, Pillsbury Winthrop represented that SONICblue's
Debentures were "valid and binding obligations of the Company, enforceable against the
Company in accordance with their terms." Under each Debenture, SONICblue agreed to pay the
Debenture Holder "Twenty-Five Million Dollars and 00/100 ($25,000,000.00)," the full principal
amount of each Debenture.

As you are likely aware, SONICblue has sought protection under Chapter 11 of the
Bankruptcy Code. In SONICblue's Chapter 11 proceeding, my clients (the Debenture Holders)
have sought to collect the full principal amount of the Debentures. In response, SONICblue's
bankruptcy counsel has contended that Bankruptcy Code Section 502(b)(2) makes unenforceable
SONICblue's obligation to pay the full principal amount of the Debentures. I note that
SONICblue's bankruptcy counsel is your firm—the same firm that issued the Opinion Letter

HBD 0111
Confidential

HENNIGAN, BENNETT & DORMAN LLP

Mary B. Cranston, Esq.
September 5, 2006
Page 2

stating that SONICblue's obligations under the Debentures were "valid and binding obligations . . . , enforceable . . . in accordance with their terms." Pillsbury Winthrop's July 20, 2006 email contesting the accuracy of its own April 22, 2002 Opinion Letter is attached as Exhibit B.

Pillsbury Winthrop's recent contention that the Bankruptcy Code affects the enforceability of the Debentures in accordance with their terms is surprising. While Paragraph 9(b) of the Opinion Letter did expressly qualify *certain* of Pillsbury Winthrop's representations to the Debenture Holders based on the possible application of bankruptcy law, the Paragraph 9(b) qualification was expressly limited to the representations stated in *Paragraph 2* of the Opinion Letter. As noted above, Pillsbury Winthrop's representation about the enforceability of the Debentures was *not* in *Paragraph 2*, but was instead in *Paragraph 3*. Pillsbury Winthrop's Opinion Letter contains no caveat for the possible application of bankruptcy law with regard to the representations in Paragraph 3.

It appears that the Debenture Holders may have to litigate their claims against SONICblue to enforce the terms of the Debenture and to overcome SONICblue's erroneous assertion of the Bankruptcy Code issue. Accordingly, we ask that Pillsbury Winthrop agree to indemnify the Debenture Holders as they seek to enforce the agreement that Pillsbury Winthrop previously represented was enforceable. Please let us know promptly whether Pillsbury Winthrop will provide the requested indemnity.

If we are unable to obtain SONICblue's payment of the full principal amount, the Debenture Holders intend to pursue claims for, perhaps among other things, negligent misrepresentation and negligence against Pillsbury Winthrop in connection with the April 22, 2002 Opinion Letter.

Thank you in advance for your prompt attention to this matter.

Sincerely,

*Michael Swartz*

Michael Swartz

MS/ocs

564642

HBD 0112
Confidential



# EXHIBIT A

HBD 0113
Confidential



**PILLSBURY WINTHROP**LLP

April 22, 2002

Portside Growth & Opportunity Fund, Ltd.
c/o Ramius Capital Group, L.L.C.
666 Third Avenue
26th Floor
New York, New York 10017

Smithfield Fiduciary LLC
c/o Highbridge Capital Management, LLC
9 West 57th Street, 27th Floor
New York, NY 10019

Citadel Equity Fund Ltd.
c/o Citadel Investment Group, L.L.C.
225 West Washington Street
Chicago, Illinois 60606

Re:     Securities Purchase Agreement

Ladies and Gentlemen:

We have acted as counsel to SONICblue Incorporated (the "Company") in connection
with the issuance and sale of $75,000,000 aggregate principal amount of 7 ¼% Secured
Senior Subordinated Convertible Debentures Due 2005 of the Company (collectively, the
"Debentures") and Warrants to purchase Common Stock of the Company (the
"Warrants") pursuant to the Securities Purchase Agreement (the "Purchase Agreement"),
dated as of April 21, 2002, by and among the Company and each of you. This opinion is
delivered to you pursuant to the requirement set forth in Section 7(iv) of the Purchase
Agreement. Capitalized terms used herein not otherwise defined herein shall have the
respective meanings assigned to such terms in the Purchase Agreement.

In connection with the foregoing, we have reviewed the Purchase Agreement, the
Schedules to the Purchase Agreement, the Registration Rights Agreement, the Indenture,
the Pledge and Security Agreement, the form of Debenture, the form of Warrant, the
Irrevocable Transfer Agent Instructions and the Option Agreement, each, other than the
Purchase Agreement, the form of Debenture and the form of Warrant, dated as of the date
hereof, the Company's Restated Certificate of Incorporation, as amended to date, and By-
laws, as amended to date, records of the proceedings of the Company's Board of
Directors, certificates of officers and such other documents and instruments as we have
deemed necessary or advisable in order to render the opinions expressed herein. As to



20

21

22

23

24

25

60268396v5

HBD 0114
Confidential

April 22, 2002
Page 2


PILLSBURY WINTHROP LLP

questions of fact material to such opinions, we have, when relevant facts were not independently established, relied upon certificates of officers of the Company.

Based upon the foregoing and subject to the assumptions, qualifications, limitations and exceptions set forth below, it is our opinion that:

     1.  The Company has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Delaware with the requisite corporate power and authority to own and use its properties and assets and to carry on its business as currently conducted. The Company is duly qualified to transact business and is in good standing as a foreign corporation in the State of California.

     2.  The Company has the requisite corporate power and authority to execute and deliver each of the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions and to perform its obligations under the respective terms thereof. Each of the Purchase Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement, and the Irrevocable Transfer Agent Instructions has been duly executed and delivered by the Company and, in the case of the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers, will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

     3.  The issuance and sale of the Debentures have been duly authorized. Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. The Company has duly authorized and reserved for issuance upon conversion of the Debentures the Conversion Shares and such Conversion Shares will, when issued and delivered upon conversion of the Debentures in accordance with the terms thereof and the Indenture, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Debentures or the Conversion Shares.

     4.  The issuance and sale of the Warrants have been duly authorized. When issued in accordance with the terms of the Purchase Agreement, the Warrants will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. The Company has duly authorized and reserved for issuance upon exercise of the Warrants the Warrant Shares and such Warrant Shares will, upon issuance and delivery against payment therefor upon exercise of the Warrants in accordance with the terms of the Warrants, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Warrants or the Warrant Shares.

60268396v5

HBD 0115
Confidential

April 22, 2002
Page 3

PILLSBURY WINTHROP℠

5.  The Company has duly authorized and reserved for issuance the Interest Shares and such Interest Shares will, when issued and delivered in accordance with the terms of the Debentures and the Indenture, be validly issued, fully paid and nonassessable.  There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Interest Shares.

6.  Assuming the accuracy of the representations and warranties made by the Buyers and the Company in the Purchase Agreement and due performance by the Company of the covenant set forth in Section 4(b) of the Purchase Agreement, (i) the offer and sale of the Debentures and the Warrants in the manner contemplated by the Purchase Agreement, (ii) the offer and sale of the Warrant Shares in accordance with the terms of the Purchase Agreement and the Warrants, and (iii) the issuance of the Conversion Shares and the Interest Shares in accordance with the terms of the Purchase Agreement, the Indenture and the Debentures, are exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended.

7.  All authorizations, approvals, consents, permits or orders of, and all qualifications, registrations, designations, declarations or filings with, any federal or New York governmental authority on the part of the Company required to be made in connection with the consummation of the transactions contemplated by the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions have been made or obtained, except for such filings as are contemplated by the covenant of the Company set forth in Section 4(b) of the Purchase Agreement that may be required to be filed pursuant to applicable federal and state securities laws subsequent to the consummation of the transactions contemplated by the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions.

8.  We are not aware of any action, suit, proceeding or investigation pending against the Company before or by any court or administrative agency, or that the Company has received any written threat thereof, that questions the validity of the Purchase Agreement, the Registration Rights Agreement, the Irrevocable Transfer Agent Instructions, the Indenture, the Debentures, the Warrants, the Pledge and Security Agreement or the Option Agreement.

9.  The execution, delivery and performance by the Company of the Purchase Agreement, the Indenture, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions and the issuance of the Debentures and the Warrants pursuant to the Purchase Agreement and the Indenture do not violate any provisions of the Company's Restated Certificate of Incorporation or By-laws, and do not (i) violate, contravene or constitute a default under (or an event which, with the giving of notice or lapse of time or

60268396v5

20
21
2
2
2

HBD 0116
Confidential

April 22, 2002
Page 4



PILLSBURY WINTHROP

both, constitutes or would constitute a default under) the provisions of any of the contracts that are filed as an exhibit to the SEC Documents or (ii) violate or contravene any governmental statute, law, rule or regulation applicable to the Company.

The opinions set forth above are subject to the following assumptions, qualifications, limitations and exceptions:

    (a)    Our opinion in the first sentence of paragraph 1 above as to the Company's good standing in the State of Delaware is based solely upon a review of a certificate of good standing from the State of Delaware (such certificate is dated as of a date within ten days of the Closing Date). Our opinion in the last sentence of paragraph 1 above is based solely upon a review of a certificate of good standing from the State of California (such certificate is dated as of a date within ten days of the Closing Date).

    (b)    Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, (ii) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law, (iii) the effect of applicable court decisions, invoking statutes or principles of equity, which have held that certain covenants and provisions of agreements are unenforceable where the breach of such covenants or provision imposes restrictions or burdens upon a party, and it cannot be demonstrated that the enforcement of such restrictions or burdens is necessary for the protection of the other party or the enforcement of such covenants or provisions under the circumstances would violate the covenant of good faith and fair dealing implied under applicable law, and (iv) the effect of statutes and rules of law that cannot be waived prospectively by an obligor. We also express no opinion as to the enforceability of the provisions of the Purchase Agreement or the Registration Rights Agreement purporting to provide for indemnification and contribution, to the extent that enforcement thereof may be limited by state or federal securities law, public policy or otherwise.

    (c)    This opinion is limited in all respects to matters governed by the laws of the State of New York, the General Corporation Law of the State of Delaware and the federal laws of the United States, and we express no opinion concerning the application or effect of the laws or regulations of any other jurisdiction or jurisdictions or as to the interpretation of any agreements or instruments that would arise from the application or effect of the laws of any jurisdiction other than the law of the State of New York, the State of Delaware or the federal law of the United Stated of America. Insofar as the opinions expressed herein relate to matters governed by laws other than those referred to in

60268396v5

HBD 0117
Confidential

April 22, 2002
Page 5



PILLSBURY WINTHROP LLP

the preceding sentence, we have assumed, but without having made any independent investigation, that such laws do not affect this opinion. We express no opinion as to the effect of any provision in the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Debentures, the Warrants, the Irrevocable Transfer Agent Instructions, the Pledge and Security Agreement and the Option Agreement specifying that New York law governs any such agreement and the transactions contemplated thereby. We express no opinion as to the effect of any provision in the Pledge and Security Agreement specifying that the laws of the Republic of China govern the Pledge and Security Agreement and the transactions contemplated thereby or as to the meaning, interpretation, validity, binding nature or enforceability of the Pledge and Security Agreement under the laws of the Republic of China. We express no opinion as to federal or state antifraud or antitrust laws or regulations or, except as set forth in paragraph 6, as to the securities or blue sky law of any jurisdiction. We express no opinion in clause (ii) of paragraph 9 as to ordinances and regulations of New York or Delaware counties and political subdivisions thereof.

(d)　　We have assumed the genuineness of all signatures, the authenticity and completeness of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies of originals, the legal capacity of all natural persons, and, as to documents executed by entities other than the Company, that each such entity had the power to enter into and perform its obligations under such documents, and that such documents have been duly authorized, executed and delivered by, and are valid and binding upon and enforceable against such entities. We have also assumed that the representations and warranties made by the Company in the Purchase Agreement are true and correct as to matters of fact and that the representations and warranties made by the Buyers in the Purchase Agreement are true and correct.

(e)　　We have assumed for purposes of paragraph 6 that the terms of the Debentures will be the same on any Conversion Date or Interest Payment Date as they are on the date hereof, that the terms of the Warrants will be the same on any date of exercise of such Warrant as they are on the date hereof, that the representations and warranties made by the Buyers and the Company in the Purchase Agreement are true and correct at the time of exercise of any Warrant and the issuance of any Warrant Shares, and due performance by the Company of the covenant set forth in Section 4(b) of the Purchase Agreement at the time of any exercise of any Warrant and the issuance of any Warrant Shares.

(f)　　We assume that you know of no agreements, understandings or negotiations between the parties not set forth in the the Purchase Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement and the Irrevocable

60268396v5

HBD 0118
Confidential

April 22, 2002
Page 6


PILLSBURY WINTHROP LLP

Transfer Agent Instructions that would modify the terms or rights and obligations of the parties thereunder that would affect this opinion.

(g)     Whenever a statement herein is qualified by "to our knowledge," or "we are not aware," or similar phrase, it indicates that in the course of our representation of the Company no information that would give us current actual knowledge of the inaccuracy of such statement has come to the attention of the attorneys in this firm who have rendered legal services in connection with this transaction. We have not made any independent investigation to determine the accuracy of such statement, except as we have deemed necessary or appropriate under the circumstances as expressly described herein. No inference as to our knowledge of any matters bearing on the accuracy of such statement should be drawn from the fact of our representation of the Company in other matters in which such attorneys are not involved.

This opinion is rendered solely for your information in connection with the transaction described above and may not be delivered to or relied upon by any other person without our prior written consent.

Very truly yours,

*Pillsbury Winthrop LLP*

E04942
E25996

60268396v5

HBD 0119
Confidential



# EXHIBIT B

HBD 0120
Confidential

**From:** Walker, Matthew S. [mailto:matthew.walker@pillsburylaw.com]
**Sent:** Thursday, July 20, 2006 4:41 PM
**To:** Bruce Bennett
**Cc:** Eschenbruecher, Robin; Freeman, William; Barbarosh, Craig A.; Anne E. Wells
**Subject:** SONICblue - Claims - Senior Notes - CONFIDENTIAL SETTLEMENT COMMUNICATION

CONFIDENTIAL SETTLEMENT COMMUNICATION
Dear Bruce:
We have received the analysis on the Junior Notes mentioned in my email Tuesday.
As you know, Bankruptcy Code Section 502(b)(2) disallows unmatured interest, and both the legislative history and the case law hold that original issue discount that is not "amortized" on the petition date is unmatured interest within the meaning of Section 502(b)(2).

In this case, the Senior Notes were as part of a larger "Investment"; and were sold to your clients along with warrants to purchase SONICblue stock and options to purchase UMC stock for a total purchase price of $62.25 million. In addition, the Senior Notes were convertible to SONICblue stock.

Our experts tell us that, according to GAAP, each of the components of the transaction must be valued to determine the total amount of OID. The value of each non-debt component of the transaction is set forth in the chart below. The chart also shows how much of the original issue discount was amortized as of the petition date.

The chart below also has the same analysis for the Junior Notes. Please note that we were required to make a few assumptions with respect to the Junior Notes. First, we do not know the exact date the Junior Noteholders converted $200,000 of their notes to SONICblue stock. We believe the conversion was in 2000, and have assumed June 30, 2000. Also, for the sake of convenience, we have assumed the Junior Notes were sold in a single tranche, although there were two tranches sold two days apart. (The difference in unamortized OID is not significant.) Finally, for calculation purposes, we assumed the 2000 conversion was allocable pro-rata to each tranche based on the initial funding.

As you know, we do not know how much your clients recovered when they sold the UMC stock post-petition. We have assumed $17 million based on publicly available information. As part of any settlement/litigation process we will need to confirm the actual amount of proceeds.

Finally, I should note that I personally prepared the interest calculations. I believe they are close, but until we have the UMC stock sale proceeds amounts and dates of receipt, a more refined interest accrual amount is unnecessary for settlement discussions.

HBD 0121
Confidential

### Senior Note OID Calculation

| Note Amount | | |
|---|---|---|
| Principal | $ | 75,000,000 |
| Interest to March 21, 2003 | $ | 3,229,167 |
| Subtotal | $ | 78,229,167 |

| Gross OID | | |
|---|---|---|
| Discount from Face Amt. | $ | 12,750,000 |
| Warrant Value | $ | 20,485,208 |
| UMC Options Value | $ | 14,777,695 |
| Conversion Feature Value | $ | 3,915,935 |
| Total OID | $ | 51,928,839 |

| Amortization | | |
|---|---|---|
| Amort. thru March 21, 2003 | $ | 8,789,046 |
| Unamortized OID | $ | 43,139,793 |
| Recovery on UMC Stock | $ | 17,000,000 |
| Net Claim Allowed Amount | $ | 18,089,374 |

### Junior Note OID Calculation

| Note Amount | | |
|---|---|---|
| Principal | $ | 103,300,000 |
| Interest to March 21, 2003 | $ | 2,804,882 |
| Subtotal | $ | 106,104,882 |

| Gross OID | | |
|---|---|---|
| Discount from Face Amt. | $ | 3,100,000 |
| Conversion Feature Value | $ | 70,345,232 |
| Total OID | $ | 73,445,232 |

| Amortization | | |
|---|---|---|
| Amort thru March 21, 2003 | $ | 64,693,586 |
| Unamortized OID | $ | 8,751,646 |
| Net Claim Allowed Amount | $ | 97,353,236 |

I should note that the disallowance of original issue discount does not affect your clients' rights under the subordination provisions of the Junior Note Indenture. However, in light of the anticipated distribution in these cases (in the range of 30-35% assuming substantive consolidation), disallowance of OID will result in your clients not receiving 100% of the principal and interest due on their claims.

Once you have reviewed this, please let me know how you would like to proceed. Our preference would be to commence a dialogue and resolve the matter without litigation. Of course, we reserve all our rights, including without limitation the right to file a claim objection at any time.

Regards,
Matt Walker

HBD 0122
Confidential

SONICblue - Claims - Senior Notes - CONFIDENTIAL SETTLEMENT COMMUNICA...    Page 3 of 3

Matthew S. Walker
Pillsbury Winthrop Shaw Pittman LLP
11682 El Camino Real, Suite 200
San Diego, CA 92130-2092
Phone: 858-847-4158   .
Cell: 619-807-8993
Direct Fax: 619-819-4276
Email: Matthew.Walker@pillsburylaw.com
(Please note my new address and telephone number)

==================================================================
The contents of this message, together with any attachments, are intended only for t

* * * * * * * * * * * * * * * *
Internal Revenue Service regulations generally provide that, for the purpose of avoi
==================================================================

HBD 0123
Confidential

1    ROBERT A. GREENFIELD (039648)
     FRANK A. MEROLA (136934)
2    K. JOHN SHAFFER (153729)
3    STUTMAN, TREISTER & GLATT PC
     1901 Avenue of the Stars, 12th Floor
4    Los Angeles, CA 90067
     Telephone:    (310) 228-5600
5    Facsimile:    (310) 228-5788

6
     WILLIAM McGRANE (057767)
7    BERNARD S. GREENFIELD (066017)
     McGRANE GREENFIELD LLP
8    40 South Market Street, 7th Floor
9    San Jose, CA 95113
     Telephone:    (408) 995-5600
10   Facsimile:    (408) 995-0308

11   Counsel for SonicBlue Claims LLC

12                  UNITED STATES BANKRUPTCY COURT
13                  NORTHERN DISTRICT OF CALIFORNIA
                            SAN JOSE DIVISION
14

15   In re:                              Case No. 03-51775 (Case Nos. 03-51775
                                         through 03-51778 MM) (Jointly
16   SONICBLUE INCORPORATED, a           Administered)  Chapter 11
     Delaware corporation; DIAMOND
17   MULTIMEDIA SYSTEMS, INC., a         MEMORANDUM OF POINTS AND
     Delaware corporation; REPLAYTV,     AUTHORITIES IN SUPPORT OF
18   INC., a Delaware corporation, and   MOTION TO MODIFY AND/OR
     SENSORY SCIENCE                     VACATE IN PART ORDER APPROVING
19   CORPORATION, a Delaware             VIA SETTLEMENT BASED UPON
     corporation,                        FRAUD ON THE COURT DUE TO
20                                       COUNSEL'S FAILURE TO DISCLOSE A
                                         MATERIAL CONFLICT OF INTEREST
21   Debtors

22                                       Hearing Date: December 7, 2007
                                         Time:        11:00 AM
23                                       Location: Courtroom 3070
                                                     280 South First Street
24                                                   San Jose, CA 95113

25

26
                                         1
─────────────────────────────────────────────────────────────
     MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
     VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
             TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST
     465822v2

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................1

II.  FACTUAL BACKGROUND ................................................................4

III. ARGUMENT ....................................................................................13

   A.   Bankruptcy Professionals Must Disclose All Connections They Have With Creditors. ..........................................................................13

   B.   Pillsbury Failed To Disclose Its Connections With The 2002 Noteholders....................................................................................15

   C.   Pillsbury's Direct Role In The Approval Of The Settlement Order Constitutes A Fraud On The Court................................................17

   D.   This Court Should Modify Or, In The Alternative, Vacate In Part The Order Approving The VIA Settlement In Order To Rectify Counsel's Failure To Disclose Its Material Conflict Of Interest...........................................22

IV.  CONCLUSION .................................................................................25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

# TABLE OF AUTHORITIES

**Cases**

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ......................................3, 22

*Donovan & Schuenke v. Sampsell*, 226 F.2d 804, 811 (9th Cir. 1955)..................21

*Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 249 (1976) ...........22

*In re Benjami's-Arnolds, Inc.*, 1997 Bankr. LEXIS 192 at *29 (Bankr. D. Minn. Feb. 28, 1997) ........................................................................................................17

*In re eToys, Inc.*, 331 B.R. 176, 188 (Bankr. D. Del. 2005)...................................17

*In re Intermagnetics America, Inc.*, 926 F.2d 912, 916 (9th Cir. 1991).................22

*In re Lenox, 902 F.2d 737, 740 (9th Cir. 1990)* ...............................................23, 24

*In re M.T.G., Inc.*, 366 B.R. 730, 748-53 (Bankr. E.D. Mich. 2007).............passim

*In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003) .....22

*Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1118 (9th Cir. 1999) ......3, 24

*Marrama v. Citizens Bank, 127 S. Ct. 1105, 1111-12 (2007)* ...............................23

*Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 480 (9th Cir. B.A.P. 1996) ......................................................................................................14

*Movitz v. Triple Star Welding, Inc. (In re Triple Star Welding, Inc.)*, 324 B.R. 778, 790 (9th Cir. B.A.P. 2005).................................................................................14

*Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 880-81 (9th Cir. 1995) ...............................................................14, 15, 16, 22

*Pearson v. First NH Mortgage Corp.*, 200 F.3d 30, 37 (1st Cir. 1999) .................17

*Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.)*, 98 B.R. 609 (Bankr. D. Mass. 1989) .....................................................................................................................20

*Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268 (1941).......................15

**Statutes**

Bankruptcy Code section 101(14) ...........................................................................13

Bankruptcy Code section 105.................................................................................24

Bankruptcy Code section 105(a) ............................................................................23

Bankruptcy Code section 327.................................................................................21

Bankruptcy Code section 327(a) ............................................................................13

Bankruptcy Rule 2014 ............................................................................................13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

Bankruptcy Rule 2014(a) ................................................................13

Bankruptcy Rule 9024 ...............................................................17, 23

Fed. Rules Civ. Proc. Rule 60(b) ...........................................20, 23, 24

**Other Authorities**

Rest. 1st Restitution § 191, com. a ....................................................21

Rest. 1st Restitution § 191, com. c ....................................................21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

## I.    INTRODUCTION

1      SonicBlue Claims LLC ("SB Claims") hereby moves this Court for an order

2  modifying or, in the alternative, vacating in part its order Order Granting Debtors'

3  Motion for Approval of Settlement of VIA and Intel Litigation (the "Settlement

4  Order"), Docket No. 1981, entered on October 31, 2006.[1]  As set forth herein, the

5  Settlement Order was procured while counsel for the Debtors, Pillsbury Winthrop

6  Shaw Pittman LLP ("Pillsbury"), was operating under an undisclosed, disabling

7  conflict of interest vis-à-vis Portside Growth & Opportunity Fund, Smithfield

8  Fiduciary LLC, and Citadel Equity Fund Ltd. (the "2002 Noteholders").

9      The conflict consisted of a claim by the 2002 Noteholders against Pillsbury

10  for, among other things, professional negligence and indemnification based upon

11  an opinion letter that Pillsbury had provided to the 2002 Noteholders in April,

12  2002, with respect to the validity and enforceability of the 2002 Noteholders'

13  claims against the Debtors.  The 2002 Noteholders threatened to sue Pillsbury

14  unless they were able "to obtain SONICblue's payment of the full principal

15  amount" owing to them.  The 2002 Noteholders' assertions of Pillsbury's

16  wrongdoing, if valid, may cost Pillsbury between $13 million and $15 million,

17  plus attorneys' fees, based upon expected distributions from the Debtors' estate.

18      From the time that Pillsbury was aware of the 2002 Noteholders' assertions

19  (which, at the latest, was August 24, 2006), Pillsbury had a direct interest in

20  (i) ensuring that the 2002 Noteholders received the greatest possible recovery in

21  the cases, so as to minimize any loss that the 2002 Noteholders might assert, and

22  (ii) avoiding the taking of any action that would in any way antagonize the 2002

23  Noteholders or otherwise encourage them to assert their claims against Pillsbury.

24  Pillsbury's interest in maximizing the 2002 Noteholders' recovery and in avoiding

---

[1]    The redacted Settlement Agreement is attached to the Motion as Exhibit 1.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1    further confrontation with the 2002 Noteholders was inconsistent with Pillsbury's

2    duties to the estate to maximize recovery for the benefit of creditors generally.

3        Without any disclosure whatsoever of this conflict, Pillsbury sought

4    approval of the Settlement Order, which purported to insulate the 2002

5    Noteholders from any contention that the Debtors' obligations to VIA

6    Technologies, Inc. ("VIA") constituted "Senior Indebtedness" under the terms of

7    an April 22, 2002 Indenture (the "2002 Indenture"). The provisions at issue are in

8    section III.3 of the Settlement Agreement, and provide that (1) "Claimants and

9    Debtor agree that the [$12.5 million Allowed Claim that VIA received under the

10   agreement] is not, and shall not be treated as, 'Senior Indebtedness' under the terms

11   of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior

12   Subordinated Convertible Debentures due 2005," and (2) the Allowed Claim "shall

13   be pari passu with [] the other general unsecured claims against Debtor in Debtor's

14   Bankruptcy Case" (together, the "Purported Waiver Language")

15       If allowed to stand, the net result of the offending portion of the order will

16   be that Pillsbury will have been directly involved in protecting, if not significantly

17   enhancing, the 2002 Noteholders' recoveries in this case, and thus reducing the

18   chance that Pillsbury itself would someday be required to make the noteholders

19   whole. Pillsbury would have done so without any prior disclosure of its

20   conflicting interests.

21       A chapter 11 professional's failure to disclose a material conflict of interest

22   amounts to a fraud on the court. This Court has the authority to rectify this fraud

23   by modifying or, in the alternative, vacating in part the Settlement Order pursuant

24   to Bankruptcy Rule 9024 (which incorporates Rule 60 of the Federal Rules of

25   Civil Procedure), Bankruptcy Code section 105, and this Court's inherent authority

26   "to vacate judgments on proof that a fraud upon the court has been committed."

1   *Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1118 (9th Cir. 1999) (citing

2   *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).

3       SB Claims respectfully submits that this Court should exercise its statutory

4   and inherent judicial powers to remove the taint of Pillsbury's undisclosed conflict

5   from the Settlement Order. The Settlement Order should be modified, or, in the

6   alternative, vacated in part, to provide that the undisclosed benefit to Pillsbury and

7   the noteholders that have asserted claims against Pillsbury has not been approved

8   by this Court. Such relief will not in any way harm the estate or its general

9   creditors, all of whom (except the noteholders) received no benefit whatsoever

10  from the Purported Waiver Language. It will, however, help to restore the

11  integrity of the judicial process, and make clear that professionals acting under the

12  cloud of a material, undisclosed conflict must not take actions that give the

13  appearance, if not the fact, of benefitting their own conflicting interests.

14      To be clear, SB Claims is *not* seeking a determination by this Motion that

15  VIA's claim is Senior Indebtedness. That issue will be resolved in the pending

16  adversary proceeding. For purposes of this Motion, it is sufficient that this Court

17  recognize that a material issue exists as to whether the VIA claim is senior.[2] SB

18  Claims seeks by this Motion a determination that Pillsbury should not have sought

19  this Court's approval of the settlement, knowing at the time (and without

20  _____

21  [2]  The 2002 Noteholders' admitted in their Defendants' Answer to Complaint for
       Equitable Subordination, to Determine Proper Classification, and for

22  Declaratory Relief Regarding Senior Indebtedness Status [Docket No. 52]
       ("Answer") ¶ 89 that "an actual controversy exists between the plaintiff and the

23  2002 Noteholders concerning the interpretation of the Indenture." SB Claims
       requests judicial notice of (i) the Answer, (ii) the Complaint for Equitable

24  Subordination, to Determine Proper Classification, and for Declaratory Relief
       Regarding Senior Indebtedness Status [Docket No. 1], (ii) the Defendants'

25  Motion to Dismiss [Docket No. 12], (iii) the Opposition to Defendants' Motion
       to Dismiss [Docket No. 40], (iv) the Defendants' Reply in Support of Motion to

26  Dismiss [Docket No. 45], and (v) this Court's Order Denying Defendants'
       Motion to Dismiss [Docket No. 49], all filed in Adv. Pro. No. 07-05082.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1    disclosing) that (i) the 2002 Noteholders were threatening suit for $13 million to

2    $15 million in potential liability unless they would "obtain SONICblue's payment

3    of the full principal amount," and (ii) the settlement contained an undisclosed

4    waiver of any subordination of the 2002 Noteholders' claims to VIA.  Based upon

5    the foregoing, SB Claims respectfully seeks an order of this Court modifying, or,

6    in the alternative, vacating in part, the Settlement Order so as to revoke this

7    Court's approval of the undisclosed subordination benefits conferred upon the

8    2002 Noteholders and their litigation target, Pillsbury.

9                        **II.    FACTUAL BACKGROUND**

10          1.       Pillsbury served as chapter 11 counsel for the Debtors and their

11   bankruptcy estates from the commencement of these chapter 11 cases on March

12   21, 2003, through Pillsbury's disqualification by order of this Court on March 26,

13   2007. *See* Memorandum Decision and Order on Motion to Appoint a Chapter 11

14   Trustee [etc.] ("Disqualification Order") [Docket No. 2220].

15          2.       Pillsbury also served as counsel for the Debtors in connection with

16   their prepetition issuance of $75 million in face amount of notes to the 2002

17   Noteholders pursuant to the 2002 Indenture.

18          3.       On April 22, 2002, Pillsbury issued an opinion letter (the "Opinion

19   Letter") to the 2002 Noteholders, representing that, among other things, their

20   claims against the Debtors were "valid and binding obligations of the Company,

21   enforceable against the Company in accordance with their terms."  Declaration of

22   Ana N. Damonte [Docket No. 2182] ("March 5 Damonte Declaration") Exhibit I.

23          4.       Pillsbury filed an application for authority to be employed as counsel

24   for the estate on April 2, 2003 [Docket No. 71].  Pillsbury failed to disclose the

25   Opinion Letter or any other connections with the 2002 Noteholders in the

26

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1    employment application or in its Bankruptcy Rule 2014 verification.  This Court

2    approved Pillsbury's retention on April 11, 2003 [Docket No. 156].

3        5.    Pillsbury filed six supplemental Rule 2014 disclosures between May

4    30, 2003 and June 5, 2006.[3]  None of these supplemental disclosures mentioned

5    the Opinion Letter or any other connections with the 2002 Noteholders.

6        6.    On July 20, 2006, a Pillsbury attorney advised counsel for the 2002

7    Noteholders, Mr. Bruce Bennett, that the 2002 Noteholders' claims were subject to

8    disallowance on the basis of unamortized original issue discount ("OID") in the

9    amount of *$43,139,793*.  Declaration of K. John Shaffer in Support of SonicBlue

10   Claims, LLC's Supplemental Response to Preliminary Status Report ("February 14

11   Shaffer Declaration") [Docket No. 2146] at Exhibit 2.  Assuming a 30% to 35%

12   distribution (as Pillsbury did on July 20, 2006), this would have amounted to a

13   reduction in the amount received by the 2002 Noteholders on account of their

14   claims of between approximately *$13 million and $15 million, cash*.

15       7.    On August 24, 2006, counsel for the 2002 Noteholders, Mr. Bennett,

16   contacted Mr. Craig Barbarosh, a Pillsbury bankruptcy partner.  During that call:

17       Mr. Bennett informed [Mr. Barbarosh] that Pillsbury had issued an
         enforceability opinion at the time the notes were issued, which he
18       interpreted as stating that the claims of the [2002] Noteholders based on the
         notes would be allowable in a bankruptcy case.  Mr. Bennett further stated
19       that his clients had relied on the opinion, and that he would be sending a
         letter demanding that Pillsbury defend and indemnify the [2002]
20       Noteholders for any losses relating to the [potential OID] disallowance or
         the fraudulent conveyance claim.

21

22   Declaration of Craig A. Barbarosh re Motion for Appointment of Trustee and

23   Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP [Docket No. 2182]

24   ("March 5 Barbarosh Declaration") at ¶ 11.

25   _____

26   [3]  A seventh supplemental Rule 2014 disclosure (which finally disclosed
         Pillsbury's conflict of interest) was filed on March 5, 2007 [Docket No. 2180].

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST
465822v2

1    8.    On September 5, 2006, counsel for the 2002 Noteholders wrote to

2    Ms. Mary B. Cranston, then the managing partner of Pillsbury, referring to the

3    Opinion Letter and to the fact that the 2002 Noteholders "expressly conditioned

4    their willingness to purchase the Debentures upon Pillsbury Winthrop's provision

5    to them of the Opinion Letter." February 14 Shaffer Declaration at Exhibit 2.[4]

6    Counsel further wrote on behalf of the 2002 Noteholders of their view that

7    "Pillsbury Winthrop's Opinion Letter contains no caveat for the possible

8    application of bankruptcy law with regard to the representations in Paragraph 3" of

9    the Opinion Letter, specifically that the 2002 Noteholders' obligations were "valid

10    and binding obligations of the Company, enforceable against the Company in

11    accordance with their terms." *Id.* According to the 2002 Noteholders:

12    It appears that the [2002 Noteholders] may have to litigate their claims
      against SONICblue to enforce the terms of the Debenture and to overcome
13    SONICblue's erroneous assertion of the Bankruptcy Code issue.
      Accordingly, *we ask that Pillsbury Winthrop agree to indemnify the [2002*
14    *Noteholders] as they seek to enforce the agreement that Pillsbury Winthrop*
      *previously represented was enforceable. Please let us know promptly*
15    *whether Pillsbury Winthrop will provide the requested indemnity.*

16    *If we are unable to obtain SONICblue's payment of the full principal*
      *amount, the [2002 Noteholders] intend to pursue claims for, perhaps*
17    *among other things, negligent misrepresentation and negligence against*
      *Pillsbury Winthrop in connection with the April 22, 2002 Opinion Letter.*
18    (emphasis added)

19    9.    Again assuming a 30% to 35% distribution in the case (as Pillsbury

20    did on July 20, 2006), Pillsbury could have been liable to the 2002 Noteholders for

21    between approximately $13 million and $15 million, plus attorneys' fees, if the

22    2002 Noteholders were correct in their interpretation of the Opinion Letter.

23    10.    To this day, the 2002 Noteholders have not withdrawn their threats

24    of suit against Pillsbury.  The 2002 Noteholders have advised this Court:

25    _____

26    [4]  A copy of September 5, 2006 letter (which includes Pillsbury's April 22, 2002
      Opinion Letter) is attached to the accompanying Motion as Exhibit 2.

6

1    Notwithstanding Pillsbury's assertion, the letter sent on behalf of the Senior
     Noteholders by their counsel Mr. Swartz [of Hennigan Bennett] to Pillsbury
2    is not "frivolous."  Although this will be adjudicated elsewhere, the letter
     correctly sets out Pillsbury's negligence and negligent misrepresentation,
3    among other things.

4    Response by Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC,

5    and Citadel Equity Fund Ltd. to SonicBlue Claims LLC's Reply to Opposition to

6    the U.S. Trustee's Motion to Disqualify Pillsbury [Docket No. 2020]

7    ("Noteholders' March 12 Reply") at 2.  Similarly, the Office of the United States

8    Trustee, while not deciding whether Pillsbury would in the end be required to pay

9    the 2002 Noteholders, nonetheless made clear its view that "the plain language of

10   the April 22, 2002 PW opinion letter does not lend itself to the ready conclusion

11   that the claims [of the] Senior Noteholders can be dismissed out of hand."

12   Amended Motion of United States Trustee for Appointment of Chapter 11 Trustee

13   [Docket No. 2169] at 9 n.1 (quoted in 2002 Noteholders' March 12 Reply at 3).

14         11.    In response to the 2002 Noteholders' threats, Pillsbury turned over

15   control of the OID issue to the Creditors' Committee.  See March 5 Barbarosh

16   Declaration at ¶ 13.  At the time, the 2002 Noteholders constituted three of the five

17   active members of the Creditors' Committee.  See Transcript of January 23, 2007

18   Hearing [Docket No. 2136] at 6 (statements of Creditors' Committee counsel, Mr.

19   Bender, that "the main actors on the Committee are the three senior noteholders

20   and [two related Matsushita entities] over the past couple of years," and "the other

21   three [members] take a very inactive role in the Committee").[5]

22         12.    On October 10, 2006, Pillsbury filed the Debtors' motion to approve

23   the settlement among VIA, the Debtors, and Intel Corporation [Docket No. 1952],

24   along with a supporting memorandum of points and authorities [Docket No.

25   _____

26   [5]  *See also* Declaration of Ron Bender [etc.] dated March 5, 2007 [Docket No.
     2185] ("March 5 Bender Declaration") at ¶ 27.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1  1953], and a supporting Declaration of Marcus Smith, the Debtors' "Responsible

2  Individual" [Docket No. 1954] (together, the "Settlement Pleadings").  The

3  Settlement Pleadings (and a copy of the Settlement Agreement itself) were filed

4  under seal, on the basis of the "highly confidential nature of the matters addressed

5  in the Motion and the Settlement Agreement."  *See* Ex Parte Application to File

6  Debtors' Motion for Approval of Settlement of VIA and Intel Litigation Under

7  Seal [Docket No. 1950] at 2.

8          13.    The Settlement Agreement included the Purported Waiver Language

9  on page 5 of a 26-page, single spaced agreement (in section III.3).  The Purported

10  Waiver Language purported to relieve the 2002 Noteholders from any obligation

11  they had to be subordinated to VIA under the 2002 Indenture.[6]

12          14.    None of the Settlement Pleadings disclosed in any way (i) the fact

13  that the 2002 Noteholders might be subordinated to claims held by VIA, (ii) the

14  fact that any such subordination purportedly would be waived pursuant to the

15  Settlement Agreement, and (iii) the fact that the 2002 Noteholders had threatened

16  Pillsbury with suit, stating that:

17      If [the 2002 Noteholders] are unable to obtain SONICblue's payment of the
        full principal amount, ***the [2002 Noteholders] intend to pursue claims for,***
18      ***perhaps among other things, negligent misrepresentation and negligence***
        ***against Pillsbury Winthrop in connection with the April 22, 2002 Opinion***
19      ***Letter.***  (emphasis added)

20  Nor did Pillsbury otherwise disclose these facts to this Court or to creditors

21  generally before the Court was asked to consider the Settlement Pleadings.

22          15.    This Court granted the relief requested in the Settlement Pleadings

23  by entering the Settlement Order on October 31, 2006 [Docket No. 1981].  At the

24  _____

25  [6]  SB Claims is the successor in interest to VIA with respect to its claims in this
26      case and any rights it may have to assert seniority vis-à-vis the 2002
        Noteholders.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1 time this Court entered the Settlement Order, it had no reason to believe that a

2 conflict of interest existed vis-à-vis Pillsbury and the 2002 Noteholders.

3   16. On October 18, 2006 – while the Settlement Pleadings were pending

4 – Pillsbury filed its Eighth Interim Application of Pillsbury Winthrop Shaw

5 Pittman LLP for Allowance of Compensation for Services Rendered and

6 Reimbursement of Expenses Incurred from April 1, 2006 Through and Including

7 September 30, 2006 (the "Pillsbury Fee Application") [Docket No. 1966]. Among

8 the services for which Pillsbury requested compensation were those relating to the

9 settlement with VIA, with respect to which Pillsbury represented:

10 Extensive services were performed by Pillsbury in connection with litigation
regarding the VIA/Intel litigation, involving claims filed in excess of $70

11 million, which services have recently resulted in a settlement of the VIA/Intel
matter (set for hearing before the Court on October 27, 2006), thereby paving

12 the way for the Debtors and Committee to file a disclosure statement and
plan prior to the current exclusivity deadline of November 10, 2006.

13             * * *

14 Of greatest importance, Pillsbury made significant progress in settling the
Intel/VIA litigation, which is presently set for hearing before the Court on

15 October 27, 2006, and which will enable the Debtors, in cooperation with the
Committee to propose a plan of reorganization.

16

17 Pillsbury Fee Application at 5, 14; *see also id.* at 8-9 (outlining settlement terms,

18 but providing no disclosure as to the benefits received by the 2002 Noteholders, or

19 as to Pillsbury's conflict); *id.* at 26-29 (describing Pillsbury's services in

20 connection with the VIA/Intel litigation).

21   17. The Pillsbury Fee Application also requested compensation in

22 connection with the OID dispute – the very heart of Pillsbury's undisclosed

23 conflict of interest. As described on page 19 of the Pillsbury Fee Application:

24  • Senior and Junior Notes – The Junior Notes and Senior Notes were
reportedly issued with over $15 million total original issue discount, which

25 is disallowed under Section 502(b)(2) to the extent not amortized as of the
petition date. In addition, the Senior Notes were sold along with UMC

26 stock options and warrants for SONICblue stock, and both the Senior Notes

1   and the Junior Notes were convertible to SONICblue stock on certain terms
    and conditions. Pillsbury evaluated whether the consideration sold along
2   with the Senior Notes and the conversion features of the notes could be
    characterized as additional original issue discount, and also engaged in
3   various analyses to value the consideration and conversion features for
    purposes of determining whether some portion of the claims based on the
4   notes should be disallowed. In addition, Pillsbury evaluated whether the
    Senior Notes could be avoided as a fraudulent transfer, and also addressed
5   whether any portion of the Junior Notes or Senior Notes could be subject to
    an attack under applicable usury law. *The matter was turned over to the
6   Creditors' Committee for prosecution.* (emphasis added)

7   There was no disclosure in the Pillsbury Fee Application as to why the OID matter

8   had been "turned over to the Creditors' Committee for prosecution," or that

9   Pillsbury had an undisclosed conflict of interest.

10       18.    The *first* time there was *any* mention of a conflict of interest was

11  when the Debtors and the Creditors' Committee filed their Disclosure Statement

12  Describing Liquidating Plan of Reorganization Dated as of December 15, 2006

13  Proposed Jointly by Debtors and Creditors' Committee [Docket No. 2047], filed

14  nearly four months after the 2002 Noteholders made their indemnification

15  demand, and a month-and-a-half after the Settlement Order was entered. The

16  Disclosure Statement provided within the text of longer paragraphs on pages 21

17  and 22 of a 52-page, single spaced document that:

18       Until recently, the Debtors were in charge of analyzing the Junior Notes
         Claims. However, as a result of a conflict that has been asserted by the
19       Senior Noteholders with respect to counsel to the Debtors, the Creditors'
         Committee is now in charge of analyzing the Junior Notes Claims.
20
                                    * * *
21
         As with the Junior Notes, until recently, the Debtors were in charge of
22       analyzing the Senior Notes Claims. However, as a result of a conflict that
         has been asserted by the Senior Noteholders with respect to counsel to the
23       Debtors, the Creditors' Committee is now in charge of analyzing the Senior
         Notes Claims.
24
25       19.    In January, 2007, another creditor (Riverside Claims) made inquiry

26  regarding the vague reference to the "conflict" in the draft Disclosure Statement,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1   and on that basis Pillsbury provided some additional disclosures in an amended

2   Disclosure Statement filed January 18, 2007 [Docket No. 2101] – nearly five

3   months after Mr. Barbarosh of Pillsbury received the threatening phone call from

4   counsel for the 2002 Noteholders (and two-and-one-half months after the

5   Settlement Order was entered).  The full extent of Pillsbury's conflict, however,

6   was not known by this Court and creditors generally until SB Claims obtained a

7   copy of the 2002 Noteholders' September 5, 2006 demand letter through discovery

8   and promptly filed it with this Court on February 14, 2007.  *See* February 14

9   Shaffer Declaration at Exhibit 2.

10          20.    Pillsbury did not file a supplemental Rule 2014 disclosure of its own

11  conflict with the 2002 Noteholders until March 5, 2007.  *See* Eighth Supplemental

12  Declaration in Support of Application for Order Pursuant to Bankruptcy Code

13  Section 327(a) Authorizing the Employment and Retention of Pillsbury Winthrop

14  LLP as General Insolvency Counsel to the Debtors [Docket No. 2180].

15          21.    This Court is aware that a dispute exists between SB Claims and the

16  2002 Noteholders as to whether VIA's claim is senior to that of the 2002

17  Noteholders under the terms of the 2002 Indenture.[7]  That issue will be resolved in

18  SB Claims' adversary proceeding against the 2002 Noteholders.  What is relevant

19  for purposes of this Motion, however, is not whether VIA's claim is, in fact, senior

20  to the 2002 Noteholders, but rather whether Pillsbury was aware of the fact that

21  _____

22  [7]  The 2002 Indenture provides that the 2002 Noteholders are subordinated to
     "Senior Indebtedness." *See* 2002 Indenture, Article IV, pp. 13-18 (a copy of

23  which is attached as Exhibit B to the March 5 Damonte Declaration).  The
     definition of "Senior Indebtedness" includes "All indebtedness of the Company

24  due and owing to Via Technologies, Inc. in an aggregate principal amount not
     to exceed $15,000,000 . . . . ." *Id.* pp. 7-8.  The 2002 Noteholders contend that

25  this provision is limited to a loan that VIA never made to the Debtors, and on
     that basis (among others) moved to dismiss SB Claims' adversary proceeding.

26  This Court denied the 2002 Noteholders' motion to dismiss on October 2, 2007.
     *See* Docket No. 49 in Adv. Pro. No. 07-05082.

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1   the "Senior Indebtedness" issue was of material importance to the 2002

2   Noteholders at the time the Settlement Pleadings were filed and the Settlement

3   Order was entered.

4         22.    The undisputed evidence in the record is that Pillsbury was, in fact,

5   fully aware that the "Senior Indebtedness" issue was of material importance to the

6   2002 Noteholders.  By their own admission, the 2002 Noteholders "insisted" that

7   VIA agree that its claim not be senior to the claims of the 2002 Noteholders as a

8   condition to the 2002 Noteholders' support for the settlement.  As admitted by the

9   2002 Noteholders in support of their motion for reconsideration of this Court's

10  order disqualifying Pillsbury and directing the appointment of a trustee, "when the

11  Senior Noteholders first saw VIA's effort to allocate the Settlement Allowed

12  Claim between VIA and S3G in its discretion, the Senior Noteholders were not

13  supportive, and insisted that, no matter how VIA allocated the Settlement Allowed

14  Claim, it must not be characterized as Senior Indebtedness."  Reply Brief in

15  Support of Motion for Clarification, or in the Alternative, for Leave to File a

16  Motion for Reconsideration [Docket No. 2265], at 10.  Similarly, Mr. Albert Boro

17  of Pillsbury in his March 5, 2007 declaration opposing Pillsbury's disqualification

18  admitted that "the Senior Noteholders were willing to support a settlement that

19  included a $12.5 million allowed claim for [VIA], provided that the settlement

20  included certain terms, including that [VIA's] allowed claim be neither senior nor

21  junior to any other general unsecured claim."  Declaration of Albert J. Boro Jr.

22  [Docket No. 2182] ("March 5 Boro Declaration") at ¶ 17.

23        23.    The record also shows that VIA and the Debtors had agreed upon a

24  $12.5 million settlement amount *before* the 2002 Noteholders made their demand

25  that the settlement amount not be treated as senior to their own claims.  March 5

26  Boro Declaration at ¶¶ 14-16.  The 2002 Noteholders would only accept that

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1  settlement, however, if they got the purported waiver of VIA's Senior

2  Indebtedness status. *Id.* ¶ 17.

3      24.    Nothing in the Settlement Pleadings disclosed to this Court and

4  creditors that the 2002 Noteholders conditioned their support of the settlement

5  upon a determination that VIA's claim would not be treated as "Senior

6  Indebtedness." There would have been no way for this Court or creditors

7  generally to know about this condition.

8                      **III.    ARGUMENT**

9  **A.    Bankruptcy Professionals Must Disclose All Connections They**
   **Have With Creditors.**

10

11      Bankruptcy Code section 327(a) requires that counsel for debtors in

12  possession be "disinterested persons." A "disinterested person" must "not have an

13  interest materially adverse to the interest of the estate or of any class of creditors

14  or equity security holders, by reason of any direct or indirect relationship to,

15  connection with, or interest in, the debtor . . . *or for any other reason*."

16  Bankruptcy Code section 101(14) (emphasis added).

17      In order to ensure compliance with the disinterestedness requirement,

18  Bankruptcy Rule 2014 and the case law applying it impose a strict duty of

19  disclosure on those who purport to represent the interests of the bankruptcy estate.

20  Bankruptcy Rule 2014(a) requires that a professional disclose "to the best of the

21  applicant's knowledge, *all of the person's connections with the . . . creditors . . .* "

22  (emphasis added). The Ninth Circuit has held:

23          The bankruptcy court must ensure that attorneys who represent the
            debtor do so in the best interests of the bankruptcy estate. The court must
24          ensure, for example, that the attorneys do not have interests adverse to
            those of the estate . . . . To facilitate the court's policing responsibilities, the
25          Bankruptcy Code and the Federal Rules of Bankruptcy Procedure impose
            several disclosure requirements on attorneys who seek to represent a debtor
26          and who seek to recover fees. The disclosure rules impose upon attorneys

1    an independent responsibility.  Thus, failure to comply with the disclosure
     rules is a sanctionable violation, even if proper disclosure would have
2    shown that the attorney had not actually violated any Bankruptcy Code
     provision or any Bankruptcy Rule.

3                                    * * *

4
         *The disclosure rules are applied literally, even if the results are*
5        *sometimes harsh.  Negligent or inadvertent omissions do not vitiate the*
         *failure to disclose.  Similarly, a disclosure violation may result in*
6        *sanctions regardless of actual harm to the estate.*

7    *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d

8    877, 880-81 (9th Cir. 1995) (citations and quotations omitted; emphasis added).

9        Pursuant to § 327, a professional has a duty to make *full, candid and*
         *complete disclosure* of all facts concerning his transactions with the debtor.
10       Professionals must disclose all connections with the debtor, creditors and
         parties in interest, *no matter how irrelevant or trivial those connections*
11       *may seem*.  The disclosure rules are not discretionary.

12   *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 480 (9th Cir.

13   B.A.P. 1996) (citations omitted, emphasis added).

14       Undisclosed conflicts of interest destroy the integrity of the bankruptcy

15   process, not only when they actually affect a professional's conduct, but also when

16   they *may* have affected such conduct.  When an estate professional acts under the

17   cloud of a conflict, the Court and creditors are always left to wonder "what might

18   have happened differently if the conflict had not existed."

19       Fortunately, the law recognizes that the burden is not on either the Court or

20   creditors to hypothesize over what a different world – one without conflicts of

21   interest – would have looked like.  That is because the Bankruptcy Rules impose a

22   *per se* requirement of disclosure.  "The Bankruptcy Rules do not give the

23   bankruptcy court any discretion to waive the requirement of a Rule 2014

24   Statement." *Movitz v. Triple Star Welding, Inc. (In re Triple Star Welding, Inc.)*,

25   324 B.R. 778, 790 (9th Cir. B.A.P. 2005).  "Full disclosure is an essential

26   prerequisite for both employment and compensation." *Id.* at 788-89.

1    The Supreme Court made clear that an undisclosed conflict is unacceptable,

2  regardless of whether it has actually affected a professional's conduct:

3    It is no answer to say that fraud or unfairness were not shown to have
     resulted. *Cf. Jackson v. Smith*, 254 U.S. 586, 589. The principle enunciated

4    by Chief Justice Taft in a case involving a contract to split fees in violation
     of the bankruptcy rules, is apposite here: "What is struck at in the refusal to

5    enforce contracts of this kind is *not only actual evil results but their
     tendency to evil in other cases.*" *Weil v. Neary*, 278 U.S. 160, 173.

6    Furthermore, *the incidence of a particular conflict of interest can seldom
     be measured with any degree of certainty. The bankruptcy court need not

7    speculate as to whether the result of the conflict was to delay action where
     speed was essential, to close the record of past transactions where publicity

8    and investigation were needed, to compromise claims by inattention where
     vigilant assertion was necessary, or otherwise to dilute the undivided

9    loyalty owed to those whom the claimant purported to represent.*

10  *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268 (1941) (emphasis

11  added).

12  **B.    Pillsbury Failed To Disclose Its Connections With The 2002**

13          **Noteholders.**

14    Pillsbury should have disclosed its connections with the 2002 Noteholders

15  at the commencement of this case, when it first sought to be employed as counsel

16  for the estate. Ninth Circuit law requires that "***All facts that may be pertinent*** to a

17  court's determination of whether an attorney is disinterested or holds an adverse

18  interest to the estate must be disclosed." *Park-Helena*, 63 F.3d at 882 (quotations

19  omitted). The emphasis is not ours, but rather the Ninth Circuit's own, and it is

20  based upon the fact that:

21    The duty of professionals is to disclose all connections with the debtor,
      debtor-in-possession, insiders, creditors, and parties in interest . . . . They

22    cannot pick and choose which connections are irrelevant or trivial . . . . .
      No matter how old the connection, no matter how trivial it appears, the

23    professional seeking employment must disclose it.

24  *Park-Helena*, 63 F.3d at 882 (quotations omitted).

25    The fact is that Pillsbury should have disclosed its potential liability on

26  account of the Opinion Letter at the beginning of the case – long before the

1  negotiations of the Settlement Agreement began.  Whether Pillsbury failed to

2  recognize the conflict (if indeed that were the case) is not relevant – even "a

3  negligent or inadvertent failure to disclose fully relevant information may result in

4  a denial of all requested fees." *Park-Helena*, 63 F.3d at 882.

5      In any event, however, as of August 24, 2006, Pillsbury's conflict with the

6  2002 Noteholders was neither unknown nor uncertain to Pillsbury.  Pillsbury

7  received direct threat of suit, with a potential liability of $13 million to $15

8  million.  This threat was followed up by a confirming letter a few days latter.  At

9  this point (if not long before then), Pillsbury should have notified the Court and

10  creditors immediately.  Moreover, it should have taken no further action that in

11  any way could affect the rights of the 2002 Noteholders.

12      Handing off the OID objection to the Creditors' Committee was hardly

13  sufficient.  In addition to the fact that three of the five active Committee members

14  were the 2002 Noteholders themselves, Pillsbury's "corrective" action ignored the

15  fact that other proceedings in the case directly affected the 2002 Noteholders'

16  rights, including the filing of the Settlement Pleadings a month later.  Pillsbury

17  knew full well that the Settlement Order would approve a purported waiver of any

18  claim that the 2002 Noteholders would be liable to VIA on account of their

19  subordination obligations.  Pillsbury also knew that the 2002 Noteholders had

20  "insisted" upon that provision.  March 5 Boro Declaration ¶ 17.  Notwithstanding

21  full knowledge of these facts, Pillsbury proceeded to file the Settlement Pleadings,

22  with absolutely no disclosure whatsoever of either Pillsbury's own conflict, or of

23  the benefits that the 2002 Noteholders (and thus Pillsbury) would receive under

24  the settlement.  Nor did Pillsbury disclose these facts when, a few days later, it

25  filed a fee application seeking hundreds of thousands of dollars of compensation in

26  connection with the VIA and OID disputes.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1    **C.    Pillsbury's Direct Role In The Approval Of The Settlement**
2    **Order Constitutes A Fraud On The Court.**

3    A bankruptcy professional's failure to disclose a material conflict of interest

4    may constitute a "fraud on the court." *See, e.g. Pearson v. First NH Mortgage*

5    *Corp.*, 200 F.3d 30, 37 (1st Cir. 1999) (reversing and remanding for further

6    consideration a bankruptcy court's decision to deny relief under Bankruptcy Rule

7    9024 based upon a professional's undisclosed conflict of interest); *In re M.T.G.,*

8    *Inc.*, 366 B.R. 730, 748-53 (Bankr. E.D. Mich. 2007) (holding that trustee's failure

9    to disclose fee agreement with secured creditor constituted "fraud on the court");

10    *In re eToys, Inc.*, 331 B.R. 176, 188 (Bankr. D. Del. 2005) (holding that

11    professionals' failure to "disclose conflicts of interest that would have barred their

12    retention . . . would constitute a fraud on the Court"); *In re Benjami''s-Arnolds,*

13    *Inc.*, 1997 Bankr. LEXIS 192 at *29 (Bankr. D. Minn. Feb. 28, 1997) ("in light of

14    the importance of full disclosure to the integrity and fairness of the bankruptcy

15    process, the Court concludes that an attorney's intentional failure to disclose a

16    conflict of interest in violation of § 327 and Rule 2014 amounts to fraud upon the

17    bankruptcy court and an abuse of the judicial process").

18    Pillsbury's direct involvement in the approval of the Settlement Order has

19    tainted the judicial process. Regardless of the ultimate outcome of the "Senior

20    Indebtedness" issue, it cannot be denied that (i) the issue was important to the

21    2002 Noteholders, (ii) Pillsbury knew that the issue was important to the 2002

22    Noteholders, and (iii) Pillsbury knew that the 2002 Noteholders were threatening

23    to sue Pillsbury unless they were able "to obtain SONICBlue's payment of the full

24    principal amount" owed to them.  Clearly, were the 2002 Noteholders required to

25    pay VIA on account of the subordination provision, they would be much farther

26    from their stated demand of "payment of the full amount" owing to them.

1    Moreover, were Pillsbury to have raised any issue about the purported waiver of

2    the subordination provisions in the Settlement Pleadings, it is possible – if not

3    likely – that some creditor (such as Riverside Claims), the United States Trustee,

4    or this Court *sua sponte* would have asked:

5        why should three members of the Creditors' Committee get this benefit as

6        part of the settlement, for no consideration, when the Debtors and VIA

7        were perfectly content with a $12.5 million allowed claim that had no

8        limitation on VIA's rights to assert seniority under the 2002 Indenture?

9    Pillsbury, of course, did not want this question to be asked.  Asking this question

10   would expose Pillsbury's own conflict of interest, potentially decrease the 2002

11   Noteholders' recovery in the case, and increase the chances that the 2002

12   Noteholders would sue Pillsbury.

13       Pillsbury's role in the approval of the settlement, given its obvious and

14   material conflict of interest – tainted the judicial process and the very integrity of

15   the bankruptcy process.  As stated cogently by the United States Trustee in her

16   motion to disqualify Pillsbury as counsel to the estate:

17       Unbeknowst to the court, creditors or the UST, PW had a powerful
         economic incentive to maximize the recovery to the Senior Noteholders,
18       because PW itself was arguably "on the hook" for any shortfall to the
         Senior Noteholders based on the 2002 opinion letter.

19                                    * * *

20       The Senior Noteholders' threat to PW was simply a formal recognition

21       of the reality that had existed from the commencement of these cases:
         PW's economic interests and the economic interests of the non-Senior
22       Noteholder creditors were directly at odds, because for every dollar [that]
         the Senior Noteholders' claim was reduced, PW's corresponding exposure
23       would increase.

24   Motion by U.S. Trustee to Disqualify Pillsbury [etc.] [Docket No. 2163] at 2-3.

25       The recent *M.T.G.* decision is particularly relevant to what has occurred in

26   this case.  In *M.T.G.*, the chapter 7 trustee entered into a fee agreement with a

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST
465822v2

1    secured creditor of the estate ("Comerica"), pursuant to which Comerica agreed to

2    pay the trustee's law firm on an hourly basis for services rendered in connection

3    with the liquidation of the estate. 366 B.R. at 734. The trustee did not disclose the

4    existence of this fee agreement at the time he entered into it. *Id.*

5         Comerica then filed a motion for relief from the automatic stay, in response

6    to which the trustee filed a "limited objection," consenting to stay relief only with

7    respect to "specifically defined collateral." *Id.* at 735. The trustee, however,

8    failed to disclose the terms of his fee agreement with Comerica, although he did

9    disclose that estate assets were being liquidated "pursuant to the agreement

10   between the Trustee and Comerica." *Id.* The trustee also settled with Comerica as

11   to the amount of its claim, *id.* at 737-38, and settled potential causes of action that

12   the estate had against Comerica, *id.* at 738-39.

13        The bankruptcy court held that each of the foregoing orders was obtained

14   by fraud on the court because of the trustee's failure to disclose his fee agreement

15   with Comerica. 366 B.R. at 748. The bankruptcy court held:

16        Each of these orders benefited Comerica, and each order was entered at [the
          trustee's] request, or in the case of the Comerica Relief From Stay Order,
17        based on [the trustee's] written consent and with his assistance. Each order
          was entered after [the trustee] made his fee agreement with Comerica, and
18        without [the trustee] having properly disclosed that fee agreement to the
          Court. . . . [The trustee] clearly had a duty to disclose that fee agreement.
19        Because these orders were obtained by fraud upon the court, they will be
          vacated.
20

21   *Id.* at 748-49.

22        The *M.T.G.* court noted that the trustee was "an officer of the court," and

23   that his failure to disclose harmed not only creditors, but also the judicial process

24   itself. *Id.* at 749. The court assumed that the trustee's failure to disclose was not

25   intentional, but did conclude that the trustee's claims of being "disinterested"

26   showed a "reckless disregard for the truth" in light of the conflict created by the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST
465822v2

1  fee agreement with Comerica. *Id.* at 750. "In making these representations" of

2  disinterestedness, the trustee "and his attorneys disregarded the true state of

3  affairs, and created a substantial and unjustified risk of harm to the integrity of the

4  judicial process." *Id.*

5       The decision in *Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.)*, 98 B.R. 609

6  (Bankr. D. Mass. 1989), also is instructive. In that case, the bankruptcy court

7  vacated an order approving a sale upon a finding of collusion between the buyer

8  and the chapter 11 debtor and its counsel. The court held that the participation of

9  estate fiduciaries in the collusion amounted to a fraud on the court, thus justifying

10  vacating the sale order under Rule 60(b). The court recognized:

11       The list of persons against whom a cause of action for fraud on the court
         may be brought thus includes attorneys appearing before the court as
12       officers of the court. In a bankruptcy proceeding, that would include
         counsel for the debtor in possession. . . . In a bankruptcy proceeding, the
13       debtor in possession is a fiduciary not only to its creditors *but to the*
         *bankruptcy court.*

14

15  98 B.R. at 617 (internal quotations omitted, emphasis added).

16       It cannot be reasonably disputed that, *before filing the Settlement*

17  *Pleadings*, Pillsbury should have disclosed to this Court and creditors that:

18   *   Pillsbury issued the Opinion Letter to the 2002 Noteholders

19   *   If the 2002 Noteholders were unable to obtain SONICblue's payment of
         the full principal amount, the 2002 Noteholders intended to pursue claims
20       for, perhaps among other things, negligent misrepresentation and
         negligence against Pillsbury Winthrop in connection with the April 22,
21       2002 Opinion Letter.

22   *   As a result of the allegations and threats made by the 2002 Noteholders
         based upon the Opinion Letter, Pillsbury ceased all work on the objection
23       to the 2002 Noteholders' claim and transferred its files on the matter to the
         Creditors' Committee – the same Creditors' Committee on which the 2002
24       Noteholders were three of the five active members.

25

26

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1   That way, creditors and this Court would have known about Pillsbury's conflict

2   *before* the Settlement Pleadings were filed, and would have known whether

3   Pillsbury was even qualified at that point to continue to represent the estate.

4           Moreover, when Pillsbury filed the Settlement Pleadings, it should have

5   been acutely aware of the need to disclose any provision in the settlement that

6   could benefit the 2002 Noteholders.  This is particularly true with respect to

7   provisions that specifically referred to the 2002 Noteholders' obligations under the

8   2002 Indenture.  Pillsbury's championing of a settlement that specifically affected

9   the 2002 Noteholders' rights was a gross impropriety in light of the clear and

10  unambiguous threats the 2002 Noteholders had made to Pillsbury.  That Pillsbury

11  would do so without any disclosure of the conflict whatsoever is shocking.

12          As a court-approved professional under Bankruptcy Code section 327,

13  Pillsbury was both a fiduciary of the estate and an officer of the Court.  A

14  fiduciary "is under a duty not only to disclose the fact that he is dealing on his own

15  account but also to disclose all other facts which are material to the transaction.

16  He must disclose not only the facts he knows but facts which from his fiduciary

17  position he ought to know.  If he knows or should know that the beneficiary is not

18  aware of his rights, the fiduciary should inform him of his rights."  Restatement 1st

19  of Restitution § 191, comment c.  If a fiduciary fails to disclose the relevant facts,

20  then, "notwithstanding the beneficiary's consent, the transaction can be set aside

21  by him."  *Id.* comment a.

22          The Ninth Circuit also has long recognized the impropriety of bankruptcy

23  fiduciaries using their positions to advance their own interests.  *See, e.g. Donovan*

24  *& Schuenke v. Sampsell*, 226 F.2d 804, 811 (9th Cir. 1955):

25          It is elementary that a fiduciary cannot deal or receive a transfer of the
            property which is the subject of the trust. It makes no difference whether
26          the fiduciary be called an agent, custodian, trustee or officer. It makes no

1    difference whether it can be proved that the fiduciary profited by the
      transaction. The principle is established by general law and does not depend
2    upon the existence of a statute for enforcement. To affirm this sale would
      seem to place a premium on shady dealings in a court of bankruptcy.
3

4         In so holding, the Ninth Circuit reversed the lower court's refusal to set

5    aside a bankruptcy sale to a fiduciary of the estate.  Because of the effect that

6    fiduciary relationship may have had on the transaction, "the inference of fraud is

7    compelled as [a] matter of law." *Id.* n.6.

8    **D.    This Court Should Modify Or, In The Alternative, Vacate In Part The
            Order Approving The VIA Settlement In Order To Rectify Counsel's**
9    **Failure To Disclose Its Material Conflict Of Interest.**

10        The "inherent power" of the federal judiciary "allows a federal court to

11   vacate its own judgment upon proof that a fraud has been perpetrated upon the

12   court." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

13        This inherent power of equity to set aside fraudulently begotten judgments
          is necessary to the integrity of the courts, for tampering with the
14        administration of justice in [this] manner . . . involves far more than an
          injury to a single litigant.  It is a wrong against the institutions set up to
15        protect and safeguard the public.

16   501 U.S. at 44 (internal quotations and citations omitted).

17        The Ninth Circuit also has made clear that the focus of the fraud upon the

18   court inquiry is not only on "whether the alleged fraud prejudiced the opposing

19   party, [but is also] whether the alleged fraud harms the integrity of the judicial

20   process." *In re Intermagnetics America, Inc.*, 926 F.2d 912, 916 (9th Cir. 1991)

21   (citing *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 249 (1976)).

22   This is because "[t]he bankruptcy process must both be fair and appear fair." *In re*

23   *Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003) (citation

24   omitted).  "Appearances count.  Even conflicts more theoretical than real will be

25   scrutinized." *Park-Helena*, 63 F.3d at 882 (quotations omitted).

26

1    Moreover, Federal Rule of Civil Procedure 60(b), made applicable through

2  Bankruptcy Rule 9024, provides that:

3      On motion and upon such terms as are just, the court may relieve a party or a
        party's legal representative from a final judgment, order, or proceeding for the
4      following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;
        (2) newly discovered evidence which by due diligence could not have been
5      discovered in time to move for a new trial under Rule 59(b); (3) fraud
        (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or
6      other misconduct of an adverse party; (4) the judgment is void; (5) . . . it is no
        longer equitable that the judgment should have prospective application; or (6)
7      any other reason justifying relief from the operation of the judgment.

8      Finally, Bankruptcy Code section 105(a) gives the Court ample authority to

9  "issue any order, process, or judgment that is necessary or appropriate to carry out

10  the provisions of" the Bankruptcy Code, and the Court may act – even *sua sponte*

11  – "to prevent an abuse of process." *See, e.g., Marrama v. Citizens Bank*, 127 S.

12  Ct. 1105, 1111-12 (2007) (highlighting "the broad authority granted" by section

13  105 "to bankruptcy judges to take any action that is necessary or appropriate 'to

14  prevent an abuse of process'"); *In re Lenox*, 902 F.2d 737, 740 (9th Cir. 1990)

15  ("Although FRCP 60(b) provides that a court may relieve a party from a final

16  order upon motion, it does not prohibit a bankruptcy judge from reviewing, sua

17  sponte, a previous order. And although FRCP 60(b) refers to relief from final

18  orders, it does not restrict the bankruptcy court's power to reconsider any of its

19  previous orders when equity so requires." (citations omitted)).

20      Just as did the court in *M.T.G.*, this Court has both the statutory and

21  inherent power to remove the taint of Pillsbury's undisclosed conflict of interest on

22  the Settlement Order by removing the benefit that Pillsbury received. There is

23  simply no reason why a settlement resolving claims against the estate should have

24  also included an undisclosed benefit for three members of the Creditors'

25  Committee who were threatening to sue Pillsbury. Pillsbury's actions in the face

26  of its undisclosed conflict cannot be left to stand.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

1    The 2002 Noteholders previously have argued to this Court (in the

2    adversary proceeding) that this Court has only two choices – either (i) leave the

3    Settlement Order untouched, or (ii) vacate it in its entirety. The law does not

4    support the 2002 Noteholders' position. Relief under Rule 60(b), Bankruptcy

5    Code section 105, or the Court's "inherent powers" is not an "all or nothing"

6    proposition. In other words, this Court need not invalidate the entire Settlement

7    Order in order to rectify Pillsbury's conflict. As cogently explained by the Court

8    of Appeals for the Ninth Circuit:

9        Just as a court may use its inherent power to protect its
     integrity by vacating a judgment obtained by fraud, *it also may*
10    *amend a judgment for the same purpose.* When a court vacates a
     judgment obtained by fraud, it not only rids itself of the defilement
11    caused by the fraud, but also restores balance and fairness between
     the parties by removing the benefit gained by the party that
12    committed the fraud. *Amending a judgment serves these same*
     *goals by removing the benefit - for example, the avoidance of a*
13    *judgment against itself - that the party gained by committing fraud*
     *on the court.*
14
         *We therefore hold that a federal court may amend a*
15    *judgment or order under its inherent power when the original*
     *judgment or order was obtained through fraud on the court.* . . .
16

17    *Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1119 (9th Cir. 1999)

18    (emphasis added); *see also, e.g., In re Lenox*, 902 F.2d 737, 739-40 (9th Cir. 1990)

19    ("[B]ankruptcy courts, as courts of equity, have the power to reconsider, *modify* or

20    vacate their previous orders so long as no intervening rights have become vested

21    in reliance on the orders." (emphasis added)).

22    The evidence in the record is that, as a whole, the VIA/Intel settlement was

23    a good one for the estates. As explained by counsel for the Creditors' Committee

24    (the same Committee which the 2002 Noteholders controlled):

25    By any objective standard, the VIA/S3 settlement agreement was an absolutely
     excellent result for these estates . . . . As has now been repeatedly stated, the
26    VIA/S3 settlement agreement enabled these estates to conclude litigation that

1  would have significantly delayed the conclusion of these cases, cost these
estates millions of dollars of legal fees and expenses to take to trial (with
2  possible appeals to follow thereafter), and eliminated a very significant risk of
these estates being saddled with allowed claims in favor of VIA and/or S3
3  which could have been many multiples of the $12.5 million settlement amount.

4  March 5 Bender Declaration at ¶ 40(viii).

5      Thus, there is no basis in the record upon which the Court should vacate the

6  Settlement Order as a whole. On the other hand, there is no apparent benefit to the

7  estate from the purported waiver of the subordination provision in the 2002

8  Indenture. What did the 2002 Noteholders offer to the estate in exchange for the

9  provision? What did the estate get? Absolutely nothing. This Court could

10  remove the offending provision without any impact on the estate, Intel, or any of

11  the estate's other creditors. And, in so doing, the Court would remove the taint of

12  Pillsbury's conduct in advocating the Settlement Agreement in the face of, and

13  without disclosing, its material conflict of interest.

14      SB Claims is *not* seeking a determination by this Motion that VIA's claim

15  is, or is not, Senior Indebtedness. That issue will be resolved in the pending

16  adversary proceeding. Rather, what SB Claims is seeking by this Motion is a

17  determination that, as a consequence of Pillsbury's undisclosed conflict of interest,

18  the undisclosed purported waiver in the Settlement Agreement shall no longer

19  have the approval of this Court.

20              **IV.    CONCLUSION**

21      Pillsbury's actions amount to a fraud on this Court, and an affront to the

22  judicial process generally. SB Claims respectfully requests that this Court remedy

23  Pillsbury's actions by modifying the Settlement Order, or otherwise vacating it in

24  part, so as to rescind this Court's approval of the special, undisclosed benefit to the

25  2002 Noteholders and their litigation target, Pillsbury.

26

1    DATED:  October 31, 2007                    STUTMAN, TREISTER & GLATT P.C.

2                                                McGRANE GREENFIELD LLP

3

4                                                By:____/s/ K. John Shaffer_____
                                                      K. John Shaffer
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY AND/OR
VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE
TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST

465822v2

EXHIBIT 28

1   FRANK A. MEROLA (136934)
    K. JOHN SHAFFER (153729)
2   STUTMAN, TREISTER & GLATT PC
    1901 Avenue of the Stars, 12th Floor
3   Los Angeles, CA 90067
    Telephone:    (310) 228-5600
4   Facsimile:    (310) 228-5788

5   WILLIAM McGRANE (057767)
    BERNARD S. GREENFIELD (066017)
6   McGRANE GREENFIELD LLP
    40 South Market Street, 7th Floor
7   San Jose, CA 95113
    Telephone:    (408) 995-5600
8   Facsimile:    (408) 995-0308

9   Counsel for Plaintiff SonicBlue Claims, LLC

10              UNITED STATES BANKRUPTCY COURT
11              NORTHERN DISTRICT OF CALIFORNIA
                    SAN JOSE DIVISION
12

| | |
|---|---|
| 13  In re: | Case No. 03-51775 |
| 14  SONICBLUE INCORPORATED, a | Chapter 11 |
| 15  Delaware corporation; DIAMOND MULTIMEDIA SYSTEMS, INC., a | (Case Nos. 03-51775; 03-51776, 03-51777 and 03-51778 MM Cases) |
| 16  Delaware corporation; REPLAYTV, INC., a Delaware corporation, and SENSORY | (Jointly Administered) |
| 17  SCIENCE CORPORATION, a Delaware corporation, | |
| 18      Debtors | |
| 19  _____ | |
| 20  SONICBLUE CLAIMS LLC, a Delaware Limited Liability Company, | Adv. No. |
| 21      Plaintiff, | |
|     vs. | COMPLAINT FOR EQUITABLE SUBORDINATION, TO DETERMINE |
| 22  PORTSIDE GROWTH & OPPORTUNITY | PROPER CLASSIFICATION, AND FOR DECLARATORY RELIEF REGARDING |
| 23  FUND, a Cayman Islands corporation; SMITHFIELD FIDUCIARY LLC, a Cayman | SENIOR INDEBTEDNESS STATUS |
| 24  Islands corporation; and CITADEL EQUITY | |
| 25  FUND LTD., a Cayman Islands corporation Defendants. | |
| 26 | |

---

1

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    Plaintiff, SonicBlue Claims, LLC ("SB Claims"), alleges as follows:

2                              **PARTIES**

3    1.    Defendant Portside Growth & Opportunity Fund ("Portside") is a

4    Cayman Islands corporation.

5    2.    Defendant Smithfield Fiduciary LLC ("Smithfield") is a Cayman

6    Islands corporation.

7    3.    Defendant Citadel Equity Fund Ltd. ("Citadel") is a Cayman Islands

8    corporation.  Portside, Smithfield, and Citadel are hereafter sometimes collectively

9    referred to as the "2002 Noteholders".

10    4.    Plaintiff SB Claims is a Delaware limited liability company.

11    5.    SB Claims is the successor by assignment from VIA Technologies,

12    Inc. ("VIA"), a Taiwan corporation, and S3 Graphics Co., Ltd. ("S3", and with

13    VIA, the "Claimants"), a Cayman Islands corporation, with respect to certain

14    "Transferred Rights," as defined in the "Claim Transfer Agreement" dated as of

15    April 24, 2007 among SB Claims and the Claimants.  The Transferred Rights

16    consist of:

17    (a) the Claimants' rights to payment with respect to an "Allowed Claim" in

18    the amount of $12.5 million, recognized in a Settlement Agreement (the

19    "Settlement Agreement") among the Claimants, Intel Corporation, S3

20    Graphics, Inc., S3-VIA, Inc., and SONICblue, Incorporated (the "Debtor"),

21    one of the debtors in the above-captioned bankruptcy cases (the

22    "Bankruptcy Cases"), and any related rights the Claimants may have as

23    creditor(s) in the Bankruptcy Cases, and

24    (b) any and all rights the Claimants may have under or relating to an

25    Indenture dated as of April 22, 2002 7-3/4% Secured Senior Subordinated

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    Convertible Debentures Due 2005 among the Debtor and the 2002

2    Noteholders (the "Indenture").

3    **JURISDICTION AND VENUE**

4    6.    In this adversary proceeding SB Claims seeks a determination and

5    declaration that the Allowed Claim, and any interest thereon (whether or not

6    allowed as a claim under bankruptcy law), and any other payment due in

7    connection therewith (whether outstanding as of the date of the Indenture or

8    thereafter incurred or created) (together, the "VIA Claim"), is "Senior

9    Indebtedness" as that term is defined in the Indenture, or a judgment that the VIA

10   Claim otherwise should be treated as senior to the 2002 Noteholders' claims under

11   principles of equitable subordination.

12   7.    The United States Bankruptcy Court for the Northern District of

13   California ("Bankruptcy Court") has subject matter jurisdiction over civil

14   proceedings arising under title 11, or arising in or related to cases under title 11.

15   28 U.S.C. § 1334(b).  This proceeding arises under title 11, or arises in or relates

16   to a case under title 11, because:

17   a)    SB Claims seeks a determination, pursuant to 11 U.S.C. § 510(c),

18   that the 2002 Noteholders' claims should be subordinated to the VIA

19   Claim;

20   b)    the Senior Indebtedness provisions in the Indenture constitute a

21   subordination agreement, which "is enforceable in a case under" title 11 of

22   the United States Code, 11 U.S.C. § 510(a);

23   c)    the Senior Indebtedness provisions may affect the distribution of

24   property of and from the bankruptcy estate;

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1        d)     the Senior Indebtedness provisions in the Indenture may affect the

2  classification and treatment of claims under a plan of reorganization, 11

3  U.S.C. §§ 1122 & 1123(a);

4        e)     Rule 3013 of the Federal Rules of Bankruptcy Procedure provides

5  that the Bankruptcy Court "may, on motion after hearing on notice as the

6  court may direct, determine classes of creditors and equity security holders

7  pursuant to [§] 1122 . . . of the Code"; and

8        f)     this proceeding concerns whether the 2002 Noteholders should be

9  permitted to enforce, or otherwise to receive the benefit of, certain

10  provisions of the Settlement Agreement that were not adequately disclosed

11  to the Bankruptcy Court or creditors, that were obtained for no valid

12  consideration, that were obtained based on misrepresentations, and that

13  were obtained in derogation of fiduciary duties owing to the Debtor's

14  creditors.

15        8.     The Bankruptcy Court also has jurisdiction under 28 U.S.C.

16  § 2201(a), which provides, among other things, that "[i]n a case of actual

17  controversy within its jurisdiction . . . any court of the United States, upon the

18  filing of an appropriate pleading, may declare the rights and other legal relations

19  of any interested party seeking such declaration, whether or not further relief is or

20  could be sought," and 28 U.S.C. § 2202, which provides that "[f]urther necessary

21  or proper relief based on a declaratory judgment or decree may be granted, after

22  reasonable notice and hearing, against any adverse party whose rights have been

23  determined by such judgment."

24        9.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

25        10.    Venue is proper in the Bankruptcy Court under 28 U.S.C. § 1409.

26

# GENERAL ALLEGATIONS

11.    On or about April 22, 2002, the Debtor entered into the Indenture with the 2002 Noteholders.  Under the Indenture, the Debtor issued to the 2002 Noteholders the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005 (the "Debentures") in the original, aggregate principal face amount of $75,000,000.  VIA was not a party to the Indenture, and, upon information and belief, it did not participate in its preparation.  VIA was, however, a beneficiary of the subordination provisions contained in the Indenture.

12.    Section 4.1 of the Indenture provides that the Debentures are subordinated to "Senior Indebtedness," as that term is defined in the Indenture. Among other things, Section 4.1 of the Indenture provides:

> Agreement of Subordination.  The Company [the Debtor] covenants
> and agrees, and each holder of Debentures issued hereunder by its
> acceptance thereof likewise covenants and agrees, that all
> Debentures shall be issued subject to the provision of this Article IV;
> and each person holding any Debenture, whether upon original issue
> or upon transfer, assignment or exchange thereof, accepts and agrees
> to be bound by such provisions.
>
> The payment of the principal of, premium, if any, and interest
> on all Debentures . . . issued hereunder shall, to the extent and in the
> manner hereinafter set forth, be subordinated and subject in right of
> payment to the prior payment in full of all Senior Indebtedness,
> whether outstanding at the date of this Indenture or thereafter
> incurred.

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    13.    Section 4.2 of the Indenture provides, among other things, that in the

2 event of a bankruptcy of the Debtor, all payments or other distributions on account

3 of the Debentures shall be made to the holders of Senior Indebtedness, until such

4 Senior Indebtedness is paid in full.  Among other things, Section 4.2 of the

5 Indenture provides:

6         Upon any payment by the Company, or distribution of assets

7         of the Company of any kind or character, whether in cash, property

8         or securities, to creditors upon any dissolution or winding-up or total

9         or partial liquidation or reorganization of the Company, whether

10        voluntary or involuntary or in bankruptcy, insolvency, receivership

11        or other proceedings (other than as permitted in Article XI), all

12        amounts due or to become due upon all Senior Indebtedness shall

13        first be paid in full, or payment thereof provided for in money in

14        accordance with its terms, before any payment is made on account of

15        the principal (and premium, if any) or interest on the Debentures;

16        and upon any such dissolution or winding-up or liquidation or

17        reorganization or bankruptcy, insolvency, receivership or other such

18        proceedings, any payment by the Company, or distribution of assets

19        of the Company of any kind or character, whether in cash, property

20        or securities, to which the holders of the Debentures under this

21        Indenture would be entitled, except for the provision of this Article

22        IV, shall (except as aforesaid) be paid by the Company or by any

23        receiver, trustee in bankruptcy, liquidating trustee, agent or other

24        person making such payment or distribution, or by the holders of the

25        Debentures under this Indenture if received by them, directly to the

26

1   holders of Senior Indebtedness (pro rata to such holders on the basis

2   of the respective amounts of Senior Indebtedness held by such

3   holders, or as otherwise required by law or a court order) or their

4   respective representative or representatives, or to the trustee or

5   trustees under any indenture pursuant to which any instruments

6   evidencing any Senior Indebtedness may have been issued, as their

7   respective interests may appear, to the extent necessary to pay all

8   Senior Indebtedness in full after giving effect to any concurrent

9   payment or distribution to or for the holders of Senior Indebtedness,

10  before any payment or distribution is made to the holders of the

11  Debentures under this Indenture.

12       14.     Section 4.5 of the Indenture provides that the right to enforce the

13  subordination provisions of the Indenture shall not be impaired by any act, or

14  failure to act, in good faith by a holder of Senior Indebtedness.  Section 4.5 of the

15  Indenture provides:

16       No Impairment of Subordination.  No right of any present or

17  future holder of any Senior Indebtedness to enforce subordination as

18  herein provided shall at any time in any way be prejudiced or

19  impaired by any act or failure to act on the part of the Company or

20  by any act or failure to act, in good faith, by any such holder, or by

21  any noncompliance by the Company with the terms, provisions and

22  covenants of this Indenture, regardless of any knowledge thereof

23  which any such holder may have or otherwise be charged with.

24       15.     Section 1.1 of the Indenture defines "Senior Indebtedness" as

25  follows:

26

7

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1      "Senior Indebtedness" shall mean the principal of, premium, if any,

2      interest on (including any interest accruing after the filing of a

3      petition by or against the Company under any bankruptcy law,

4      whether or not allowed as a claim after such filing in any proceeding

5      under such bankruptcy law) and any other payment due pursuant to

6      any of the following, whether outstanding on the date of this

7      Indenture or thereafter incurred or created:

8                                           * * *

9           ***(g) All indebtedness of the Company due and owing to Via***

10          ***Technologies, Inc. in an aggregate principal amount not to***

11          ***exceed $15,000,000 or the equivalent thereof in any other***

12          ***currency or composite currency (the "Via Indebtedness")***

13                                          * * *

14   (emphasis added) (hereinafter, the "VIA Senior Indebtedness Provision").

15          16.    At the time that the Debtor entered into the Indenture with the 2002

16   Noteholders, the Debtor already had publicly acknowledged that it may be

17   indebted to VIA.  The Claimants and the Debtor were parties to, among other

18   things, an investment agreement.  According to the Debtor's amended 10-Q filed

19   with the Securities and Exchange Commission on February 6, 2002:

20          The Amended and Restated Investment Agreement, dated as of

21          August 28, 2000 between SONICblue, VIA and JV provides that,

22          under certain circumstances, ***SONICblue is required to pay VIA***

23          ***significant liquidated damages*** if a court enjoins JV from utilizing

24          SONICblue's patent cross-license with Intel or if SONICblue enters

25          into a settlement agreement with Intel such that JV can no longer

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   operate under the patent cross-license.  In September 2001, Intel

2   Corporation ("Intel") filed a patent infringement lawsuit against JV

3   and SONICblue's joint venture partner, VIA.  Although SONICblue

4   is not a party to the lawsuit, under certain circumstances ***SONICblue***

5   ***could be required to pay VIA significant liquidated damages*** if the

6   JV is enjoined from utilizing SONICblue's patent cross license with

7   Intel.

8   Debtor's amended Form 10-Q for the quarter ending September 30, 2001, at page

9   10 (emphasis added); *see also id.* at page 19 ("under certain circumstances,

10  SONICblue is ***required to pay VIA*** significant liquidated damages if a court

11  enjoins S3 Graphics from utilizing SONICblue's patent cross-license with Intel or

12  if SONICblue enters into a settlement agreement with Intel such that S3 Graphics

13  can no longer operate under the patent cross-license") (emphasis added).

14        17.    The Debtor repeated its disclosure of its potential indebtedness to

15  VIA on April 1, 2002, approximately three weeks before entering into the

16  Indenture with the 2002 Noteholders.  According to the Debtor's 10-K filed with

17  the Securities and Exchange Commission on April 1, 2002:

18        The investment agreement between SONICblue, VIA and S3

19        Graphics provides that under certain circumstances, ***SONICblue***

20        ***may be required to pay VIA significant liquidated damages*** if,

21        unless as a result of certain acts or omissions on the part of either

22        VIA or S3 Graphics, S3 Graphics is prevented by court order from

23        utilizing SONICblue's patent cross-license with Intel Corporation or

24        if SONICblue enters into a settlement agreement with Intel such that

25        S3 Graphics can no longer operate under the patent cross-license.  In

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    September 2001, Intel filed a patent infringement lawsuit against S3

2    Graphics and VIA.  SONICblue is not a party to the lawsuit.  The

3    lawsuit is in early stages.  ***Any liquidated damages that SONICblue***

4    ***might be required to pay to VIA*** under the investment agreement

5    may under certain circumstances be reduced by amounts paid by

6    SONICblue to Intel in connection with any lawsuit and amounts

7    owed to SONICblue by either VIA or S3 Graphics.  An adverse

8    result or settlement with regard to these proceedings could have a

9    material adverse effect on SONICblue's financial condition or

10   results of operations.

11   Debtor's 10-K for the fiscal year ending December 31, 2001, filed by the Debtor

12   April 1, 2002, at page 27 (emphasis added); *see also id.* at page 69.

13       18.    As of the date of the Indenture, April 22, 2002, the 2002 Noteholders

14   were on notice that the Debtor may owe indebtedness to VIA.

15       19.    The Debtor repeated its public disclosures that it "may be required to

16   pay VIA significant liquidated damages" in filings with the Securities and

17   Exchange Commission on May 15, 2002, June 7, 2002, August 14, 2002, and

18   November 14, 2002.  The June 7, 2002 filing was a prospectus, the purpose of

19   which was so that "[t]he selling stockholders identified in this prospectus may sell

20   up to 16,286,208 shares of our [the Debtor's] common stock."  Debtor's Form

21   424B3 – Prospectus [Rule 424(b)(3)], filed June 7, 2002.  The "selling

22   shareholders" referred to in the prospectus were the 2002 Noteholders and the firm

23   that acted as the "placement agent" in connection with the issuance of the

24   Debentures to them.

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

20.   Pillsbury Winthrop Shaw Pittman LLP ("PWSP") served as the Debtor's counsel in connection with the Indenture and the issuance of the Debentures thereunder.  On April 22, 2002, PWSP issued an opinion letter (the "Opinion Letter") as to the enforceability of the Debentures and related agreements.  The Opinion Letter provides, among other things, that:

2.  … Each of the Purchase Agreement, Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement, and the Irrevocable Transfer Agent Instructions has been duly executed and delivered by the Company [the Debtor] and, in the case of the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers [the 2002 Noteholders], will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

3.  The issuance and sale of the Debentures have been duly authorized.  Upon issuance and delivery against payment therefore in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. …

* * *

9.  …The opinions set forth above are subject to the following assumptions, qualifications, limitations and exceptions:

1                    * * *

2            (b) Our opinion in paragraph 2 above is subject to and

3            limited by (i) the effect of applicable bankruptcy, insolvency,

4            reorganization, fraudulent conveyance, receivership,

5            conservatorship, arrangement, moratorium or other laws

6            affecting or relating to the rights of creditors generally ….

7       21.      The 2002 Noteholders assert that the assumptions, qualifications,

8 limitations, and/or exceptions contained in paragraph 9(b) of the Opinion Letter do

9 not apply to the representations made by PWSP in paragraph 3 of the Opinion

10 Letter. The 2002 Noteholders further have threatened PWSP with suit for

11 negligence and negligent misrepresentation based upon the Opinion Letter. PWSP

12 has disputed the 2002 Noteholders' assertions with respect to the Opinion Letter.

13       22.      On or before November 14, 2002, the 2002 Noteholders retained the

14 law firm of Hennigan, Bennett & Dorman LLP ("HBD") to represent their

15 interests in connection with the Debtor.

16       23.      In or before July 2003, HBD added a description of the 2002

17 Noteholders to its website as "controlling bondholders of SONICblue

18 Incorporated." That description of the 2002 Noteholders is also on the HBD

19 website as of the date hereof.

20       24.      On November 14, 2002, Mr. Bruce Bennett of HBD wrote a letter to

21 PWSP and the Debtor's general counsel on behalf of the 2002 Noteholders, and

22 copied to representatives of each of the 2002 Noteholders (the "November 14,

23 2002 Letter"). The November 14, 2002 Letter asserted that the Debtor's officers

24 and directors had breached their fiduciary duties, and it threatened the Debtor's

25 officers and directors with suit. According to the November 14, 2002 Letter,

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   **"Sonic's officers and directors have breached their fiduciary duties to**

2   **creditors and cannot allow Sonic's insolvency to deepen."** November 14, 2002

3   Letter at page 5 (emphasis in original).  The 2002 Noteholders further asserted that

4   the Debtor's officers and directors had acted "[i]n complete disregard of their

5   fiduciary duties to the Company and its creditors." *Id.*  The 2002 Noteholders

6   asserted that the "financial deterioration of the Company and utter disregard for

7   fiduciary obligations support a claim by the Senior Noteholders for damages

8   incurred by the Company's deepening insolvency." *Id.*  With respect to sales of

9   the 2002 Noteholders' collateral (the "UMC Shares"), the 2002 Noteholders wrote

10  that (i) "[a]mong other things, the Senior Noteholders will hold the Company's

11  officers and directors responsible for the value of all UMC Shares sold to facilitate

12  imprudent additional investments in the Consumer Electronics Businesses,

13  including any subsequent increase in the value of UMC Shares that are sold," *id.* at

14  page 3, and (ii) "[i]t goes without saying that the Senior Noteholders reserve all of

15  their claims and rights with respect to the careless and inappropriate sales of UMC

16  Shares that have already occurred," *id.* at page 3 n.1.  Finally, page 6 of the

17  November 14, 2002 Letter "respectfully request[ed]" that counsel:

18          immediately transmit copies of this letter to each of the Company's

19          officers and directors.  We hope and expect that they will begin

20          performing their fiduciary duties to the Company and its creditors.

21          The failure to do so will constitute a separate breach of the fiduciary

22          duties owed to the Company and its constituents.

23          25.     On January 15, 2003, Mr. Bennett again wrote to PWSP on behalf of

24  the 2002 Noteholders (the "January 15, 2003 Letter").  In this letter, the 2002

25  Noteholders asserted that the Debtor's officers and directors had breached their

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   fiduciary duties, and the 2002 Noteholders contended that the Debtor's officers

2   and directors were liable for damages.  The January 15, 2003 Letter stated, among

3   other things, that:

4      The deterioration in the Senior Noteholder's [sic] prospects for

5      recovery on their claims is a direct and foreseeable consequence of

6      actions taken by SONICblue's directors and officers which breach

7      fiduciary duties to SONICblue's creditors and which deepen

8      SONICblue's insolvency.  Thus, each of SONICblue's directors and

9      officers are liable to the Senior Noteholders for the full amount of

10      the deterioration in SONICblue's financial condition that has

11      occurred to date and any continuing diminution in creditors' ultimate

12      recovery from SONICblue that results from any further delay in the

13      liquidation of the consumer electronics businesses.

14   January 15, 2003 Letter at page 3.  The 2002 Noteholders' January 15, 2003 Letter

15   ended with a request that Debtor's counsel "kindly forward a copy of this letter to

16   each director of the Company."  *Id*. at page 4.

17      26.    Mr. Marcus Smith was the Vice President and Chief Financial

18   Officer of the Debtor when the 2002 Noteholders sent the November 14, 2002

19   letter and the January 15, 2003 Letter.  The Debtor's public financial reporting

20   during this period listed Mr. Smith as the "Principal Financial and Accounting

21   Officer."

22      27.    The Debtor and certain of its affiliates filed voluntary petitions for

23   relief under chapter 11 of the United States Bankruptcy Code in the Bankruptcy

24   Court on March 21, 2003.  The same day, the Office of the United States Trustee

25   appointed all three of the 2002 Noteholders to the Official Committee of

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   Unsecured Creditors (the "Committee") in the above-captioned chapter 11 cases.

2   The Committee elected Mr. Jeffrey Smith of Portside as a co-chair of the

3   Committee.

4   28.    On information and belief, the 2002 Noteholders did not disclose to

5   the Office of the United States Trustee, the Bankruptcy Court, other members of

6   the Committee, or Committee counsel that their claims were subordinated to

7   Senior Indebtedness under the Indenture, and that such Senior Indebtedness would

8   include claims by VIA.

9   29.    As members of the Committee, the 2002 Noteholders owe fiduciary

10  duties to the creditors of the Debtor.

11  30.    The Debtor filed an application for an order designating Mr. Marcus

12  Smith as the "Responsible Individual" of the Debtor on April 4, 2003, which order

13  the Bankruptcy Court entered on April 8, 2003.  Mr. Marcus Smith was the

14  Debtor's "Responsible Individual" at all times thereafter through the entry of the

15  order directing the appointment of a chapter 11 trustee in the Bankruptcy Cases.

16  No disclosure of the 2002 Noteholders' assertions that the Debtor's "**officers and**

17  **directors have breached their fiduciary duties to creditors**" was made to the

18  Bankruptcy Court or creditors in connection with the application to designate Mr.

19  Smith as the "Responsible Individual."  *See* November 14, 2002 Letter at page 5

20  (emphasis in original).  On information and belief, the 2002 Noteholders did not

21  advise the other members of the Committee or Committee counsel of their belief

22  that Mr. Smith and the Debtor's other officers and directors had breached their

23  fiduciary duties to creditors.

24

25

26

1    31.    On June 6, 2003, Intel Corporation ("Intel") filed a motion seeking,

2    among other things, to terminate a license agreement with the Debtor, which

3    motion Intel renewed on May 13, 2004 (together, the "Intel Motion").

4    32.    On July 17, 2003, VIA and S3G each filed proofs of claim in the

5    Debtor's bankruptcy case (the "Claimants' Proofs of Claim").  Each Claimants'

6    Proof of Claim asserted claims in excess of $100 million arising from the Debtor's

7    and VIA's formation and operation of S3G.  The Claimants' Proofs of Claim

8    included claims for liquidated damages relating to the Intel license agreement, as

9    well as numerous other claims asserted by the Claimants.

10    33.    The Debtor served subpoenas *duces tecum* on Intel and VIA seeking

11    discovery in connection with the Intel Motion "or any litigation in the within

12    SONICblue bankruptcy case related to the subject matter of the Motion."  *See*

13    Stipulated Protective Order [Docket No. 529] at 1.  On October 17, 2003, a

14    "Stipulated Protective Order" was filed with the Bankruptcy Court.  Among other

15    things, the Stipulated Protective Order allowed certain, designated parties to see

16    confidential documents relating to the subject matter of the order, including "up to

17    two designated attorneys from the law firm of Hennigan, Bennett & Dorman LLP,

18    counsel for the Senior Debtholders."  *Id.* at 3.

19    34.    No disclosure of the VIA Senior Indebtedness Provision was made

20    to the Bankruptcy Court or creditors in connection with the Bankruptcy Court's

21    approval of the Stipulated Protective Order.  On information and belief, the 2002

22    Noteholders had made no disclosure of the VIA Senior Indebtedness Provision to

23    Committee counsel or the other Committee members at this time, or at any time

24    before then.

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1        35.    The Debtor commenced an adversary proceeding in the Bankruptcy

2  Court against VIA, S3G, and S3 Graphics, Inc. (the "VIA Adversary Proceeding,"

3  Adversary Proceeding No. 04-05556) by filing its "Objection of Debtor

4  SONICblue Incorporated to Duplicate Proofs of Claim of VIA Technologies, Inc.

5  and S3 Graphics Co., Ltd. and Debtor's Adversary Complaint for Affirmative

6  Relief" ("Debtor's Complaint") on December 21, 2004.  Following the resolution

7  of motions to dismiss filed by the Claimants, the Debtor filed its "Objection of

8  Debtor SONICblue Incorporated to Duplicate Proofs of Claim of VIA

9  Technologies, Inc. and S3 Graphics Co., Ltd. and Debtor's Second Amended

10  Adversary Complaint for Affirmative Relief" ("Debtor's Second Amended

11  Complaint") on July 15, 2005.

12        36.    Although the Debtor argued that VIA and S3G should not be

13  permitted to obtain a "double recovery" on account of their Claimants' Proofs of

14  Claim, the Debtor did not object to the Claimants' Proofs of Claim on the grounds

15  that S3G, rather than VIA, purportedly was the proper party to assert such claims.

16  To the contrary, the Debtor contended that, "if any of the nineteen enumerated

17  claims set forth in the [Claimants' Proofs of Claim] is allowed in whole or in part

18  (notwithstanding this Objection), any such claim ***should be allowed but once and***

19  ***in favor of both Claimants, jointly and severally***."  Debtor's Complaint at page 9

20  (emphasis added); Debtor's Second Amended Complaint at page 9 (emphasis

21  added).

22        37.    Counsel for the 2002 Noteholders participated in confidential

23  communications with counsel for the Debtor and the Creditors' Committee

24  regarding the VIA Adversary Proceeding and the Claimants' Proof of Claim,

25  including, but not limited to, confidential communications regarding the nature

26

1   and amount of the Claimants' claims, negotiation strategies, and potential defenses

2   that the Debtor might have to those claims.  Among other things, counsel for the

3   2002 Noteholders received on or about October 18, 2004 a document titled

4   "SONICblue/VIA-JV CLAIMS ANALYSIS (FOR NON-INTEL CLAIMS)" (the

5   "October 18 Analysis"), which was labeled as "Joint Defense

6   Privilege/Confidential Settlement Document."  On information and belief, the

7   2002 Noteholders had made no disclosure of the VIA Senior Indebtedness

8   Provision to Committee counsel or the other Committee members at the time the

9   2002 Noteholders received the October 18 Analysis, or at any time before then.

10          38.     SB Claims is informed and believes, and on that basis hereby

11   alleges, that:

12          a)      the first in-person settlement meeting in the VIA Adversary

13                  Proceeding occurred on August 11, 2005; and

14          b)      during the course of the August 11, 2005 meeting, VIA stated that its

15                  allowed claim should be $42.5 million, and the Debtor stated that an

16                  allowed claim in the amount of $6 million might be acceptable to the

17                  creditors, but the Debtor would need to ascertain whether the creditors

18                  would support a settlement in that amount before formally making that

19                  settlement offer.

20          39.     SB Claims is informed and believes, and on that basis hereby

21   alleges, that:

22          a)      on August 16, 2005, counsel for the Debtor contacted attorneys for

23                  the Creditors' Committee to set up a conference call to discuss settlement

24                  developments relating to the VIA Adversary Proceeding;

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1      b)     on August 17, 2005, counsel for the Debtor participated in a

2  telephone conference with Committee counsel and Mr. Bennett; and

3      c)     the attorneys for the Committee indicated their approval of the

4  counteroffer of a $6 million allowed claim suggested by the Debtor (subject

5  to creditor approval), but Mr. Bennett stated that, although the $6 million

6  allowed claim should be acceptable, he needed to confer with his clients

7  about these developments.

8      40.    SB Claims is informed and believes, and on that basis hereby

9  alleges, that:

10      a)     on or about August 30, 2005, counsel for the Debtor received

11  confirmation from Mr. Bennett that his clients would support a counteroffer

12  of a $6 million allowed claim; and

13      b)     following Mr. Bennett's confirmation, counsel for the Debtor

14  (i) confirmed to VIA's counsel the counteroffer of a $6 million allowed

15  claim, and (ii) made arrangements for a second in-person settlement

16  meeting to be held in mid-September 2005.

17      41.    Mr. Albert J. Boro, Jr. of PWSP was one of the lead attorneys for the

18  Debtor during the Bankruptcy Cases.  The Declaration of Albert J. Boro, Jr. dated

19  March 5, 2007 ("Boro Declaration") states, and on that basis SB Claims hereby

20  alleges, that Mr. Boro reached a number of conclusions as to how the VIA

21  Adversary Proceeding might be settled based on the August 11, 2005 settlement

22  meeting and the discussions with, among others, attorneys for the Creditors'

23  Committee, including:

24

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   a)  "the attorneys' for the Creditors' Committee viewed a settlement

2   that resulted in ***an allowed claim to VIA*** of less than $25 million as an

3   acceptable compromise to move forward with resolving the bankruptcy";

4   b)  the Debtor's "Responsible Individual", Mr. Smith, "had a good

5   sense of what settlement amount with VIA would be acceptable to the

6   members of the Creditors' Committee, with the possible exception of the

7   Senior Noteholders who seemed to communicate exclusively through Mr.

8   Bennett"; and

9   c)  Mr. Boro "believed that the Senior Noteholders might object to a

10   settlement with [the Claimants], threatening the prospects of Court approval

11   of a proposed settlement of the VIA Adversary Proceeding, unless their

12   agreement to the proposed settlement terms was obtained."

13 *See* Boro Declaration ¶ 11 (emphasis added).

14   42.  On September 12, 2005, counsel for the Claimants transmitted to

15 counsel for the Debtor a "Settlement Proposal from VIA Technologies, Inc. and

16 S3 Graphics Co., Ltd." (the "September 12 Proposal").  The September 12,

17 Proposal provided, in part, that:

18   Claimants shall hold an allowed, general unsecured claim in the

19   Chapter 11 case of SONICblue Inc. in the amount of $27.5 million

20   (the "Allowed Claim").  The allocation of the Allowed Claim as

21   between the Claimants shall be at the sole discretion of Claimants.

22   The Allowed Claim shall not be subject to reconsideration,

23   objection, reduction, increase, counterclaim, subordination, offset or

24   recoupment, and shall be allowed without necessity of any further

25   filings or amendments, including any proof of claim.

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   September 12 Proposal at ¶ 1; *see also* Boro Declaration at ¶ 12.

2       43.    SB Claims is informed and believes, and on that basis hereby

3   alleges, that:

4       a)    a meeting was held on September 15, 2005 among counsel for the

5   Debtor and the Claimants to discuss various elements of a proposed

6   settlement of the VIA Adversary Proceeding;

7       b)    at that settlement meeting a proposed compromise was reached on

8   the amount of the Claimants' allowed claim; and

9       c)    counsel for the Claimants agreed to seek their clients' approval of a

10   compromise $12.5 million general unsecured allowed claim, if counsel for

11   the Debtor agreed to seek the Debtor's and the creditors' approval of such

12   an allowed claim.

13       44.    SB Claims is informed and believes, and on that basis hereby

14   alleges, that:

15       a)    the Debtor gave its counsel authority to agree to the $12.5 million

16   allowed claim on September 15, 2005; and

17       b)    the Claimants informed the Debtor that they would accept a $12.5

18   million general unsecured allowed claim on September 16, 2005, but only

19   if it was not subject to further negotiation.

20       45.    The Boro Declaration states, and on that basis SB Claims hereby

21   alleges, that:

22       a)    on September 16, 2005, the Debtor's counsel informed the

23   Claimants' counsel that the Debtor was "waiting for sign-off from the

24   creditors to ensure that the proposed settlement would not be objected to by

25   the creditors," Boro Declaration at ¶ 16; and

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

b)    the Debtor was "still awaiting approval from one member of the Creditors' Committee," *id.*, whom SB Claims believes and hereby alleges was Mr. Bennett on behalf of the 2002 Noteholders.

46.    The Boro Declaration states, and on that basis SB Claims hereby alleges, that:

a)    "On September 16 and 19, 2005, we placed calls to Mr. Bennett to find out if the Senior Noteholders would support the [proposal] of a $12.5 million allowed claim", Boro Declaration at ¶ 17; and

b)    "On September 20, we learned that the Senior Noteholders were willing to support a settlement that included a $12.5 million allowed claim for [the Claimants], provided that the settlement included certain terms, including that [the Claimants'] allowed claim be neither senior nor junior to any other general unsecured claim." *Id.*

47.    It was at or about this time that the 2002 Noteholders insisted that, no matter how the Claimants allocated the Allowed Claim among themselves, the Claimants' Allowed Claim must not constitute Senior Indebtedness under the Indenture.

48.    The 2002 Noteholders offered no consideration to the bankruptcy estate or to any other party in exchange for an agreement that the Claimants' Allowed Claim not constitute Senior Indebtedness under the Indenture.  The 2002 Noteholders gave no such consideration to the bankruptcy estate or to any other party.

49.    SB Claims is informed and believes, and on that basis alleges, that, as of September 20, 2005, counsel for the Debtor believed that:

22

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    a)    the 2002 Noteholders would oppose a settlement that did not purport

2    to bar VIA from asserting that its claims were senior to those of the 2002

3    Noteholders; and

4    b)    if the 2002 Noteholders were to object to a settlement with the

5    Claimants, it would threaten the prospects of Court approval of the

6    settlement of the VIA Adversary Proceeding.

7    50.    SB Claims is informed and believes, and on that basis alleges, that

8    on September 20, 2005:

9    a)    counsel for the Debtor for the first time communicated to counsel for

10    the Claimants the existence of the VIA Senior Indebtedness Provision in

11    the Indenture;

12    b)    until such time, the Claimants and their counsel were unaware of the

13    existence of the VIA Senior Indebtedness Provision in the Indenture; and

14    c)    counsel for the Debtor informed counsel for the Claimants that,

15    unless the Claimants agreed that their Allowed Claim under the proposed

16    settlement would not be treated as senior to the 2002 Noteholders' claims,

17    the 2002 Noteholders would oppose the proposed settlement of the VIA

18    Adversary Proceeding, thus threatening continued litigation.

19    51.    SB Claims is informed and believes, and on that basis alleges, that:

20    a)    during a September 20, 2005 phone call or soon thereafter, counsel

21    for the Debtor, Mr. Boro, represented to the Claimants' counsel that the

22    purpose of the VIA Senior Indebtedness Provision was of limited scope,

23    and that such provisions would apply only to a loan that VIA had

24    contemplated making to the Debtor, but which loan never was made.

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1     b)    Mr. Boro had no personal knowledge of these matters, but rather was

2    relying upon the representations of others; and

3     c)    Mr. Boro's representation to Claimants' counsel as to the purpose of

4    the VIA Senior Indebtedness Provision was erroneous.

5     52.    The Boro Declaration states that, between September 16 and 19,

6  2005, Mr. Boro "learned that the provision in the Senior Noteholder Indenture

7  referring to the $15 million indebtedness to VIA was for a loan that VIA was

8  supposed to have made to SONICblue, but which never occurred."  Boro

9  Declaration at ¶ 17.  This was during the same period that Mr. Boro says he was

10  placing calls to counsel for the 2002 Noteholders regarding whether the 2002

11  Noteholders would support the proposed settlement and, on that basis, SB Claims

12  believes and hereby alleges that counsel for the 2002 Noteholders was a source of

13  this false information regarding the purported purpose of the VIA Senior

14  Indebtedness Provision.  SB Claims further is informed and believes, and on that

15  basis hereby alleges, that:

16     a)    assuming at this time the truthfulness of Mr. Boro's statement that,

17    between September 16 and 19, 2005, he "learned that the provision in the

18    Senior Noteholder Indenture referring to the $15 million indebtedness to

19    VIA was for a loan that VIA was supposed to have made to SONICblue,

20    but which never occurred," the information that Mr. Boro learned was

21    erroneous; and

22     b)    the intention of the parties who drafted the Indenture was to grant

23    Senior Indebtedness status to any indebtedness owing to VIA, in a principal

24    amount of up to $15 million, plus interest thereon.

25

26

1    53.    SB Claims is informed and believes, and on that basis hereby

2 alleges, that the Claimants believed in good faith the representations of Debtor's

3 counsel as to the supposed purpose of the VIA Senior Indebtedness Provision.

4    54.    SB Claims is informed and believes, and on that basis hereby

5 alleges, that the Debtor and the Claimants reached agreement on the final draft of

6 a proposed settlement term sheet on September 26, 2005 (the "September 26

7 Proposal").  The treatment of the Claimants' Allowed Claim under the September

8 26 Proposal differed from that under the September 12 Proposal as follows

9 (underlines show additions, and strikethroughs show deletions; emphasis added in

10 bold):

11    Claimants shall underline:jointly hold an~a single, allowed, general unsecured

12    claim in the Chapter 11 case of SONICblue Inc.., **which claim shall**

13    **be afforded the benefits and priority of SONICblue's other**

14    **allowed general unsecured claims and shall be neither senior nor**

15    **junior to any other allowed general unsecured claim,** in the

16    amount of $27.5 $12.5 million, representing a compromise of the

17    claims that have been asserted by the Claimants for damages and

18    other relief based, *inter alia*, on alleged breaches of the Agreements,

19    including, without limitation, liquidated damages for the alleged

20    breach of section 5.6 thereof (the "Allowed Claim").  The allocation

21    of the Allowed Claim as between the Claimants shall be at the sole

22    discretion of Claimants.  The Allowed Claim shall not be subject to

23    reconsideration, objection, reduction, increase, counterclaim,

24    subordination, offset or recoupment, and shall be allowed without

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    necessity of any further filings or amendments, including any proof

2    of claim.

3    55.    SB Claims is informed and believes, and on that basis alleges, that:

4    a)    the Debtor transmitted a copy of the September 26 Proposal to

5    counsel for the Committee and the 2002 Noteholders on September 27,

6    2005;

7    b)    a few hours later, counsel for the Committee expressed their

8    approval of the proposed settlement during a telephone conference; and

9    c)    following that telephone conference, counsel for the Debtor released

10    the Debtor's signature on the September 26 Proposal to counsel for the

11    Claimants.

12    56.    Counsel for the Committee represented to the Bankruptcy Court on

13    January 23, 2007, and on that basis SB Claims alleges, that:

14    a)    the "main actors on the Committee" have been since the early stages

15    of the Bankruptcy Cases the three 2002 Noteholders and two other entities

16    that are affiliated with each other, Matsushita Kotobuki Electronics Sales of

17    America, LLC, and Matsushita Kotobuki Electronics Industries, Ltd.

18    (together, "Matsushita"); and

19    b)    the other members of the Committee have taken "a very inactive role

20    in the Committee" since the early stages of the case.

21    57.    SB Claims is informed and believes, and on that basis alleges, that,

22    as of the date of the Committee's consideration of the September 26 Proposal, the

23    only active members of the Committee were the 2002 Noteholders and Matsushita.

24    Accordingly, as of the date of the Committee's consideration of the September 26

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   Proposal, the 2002 Noteholders formed a majority of the active members of the

2   Committee.

3        58.    Counsel for the Committee represented to the Bankruptcy Court on

4   January 23, 2007, and on that basis SB Claims alleges, that, as of the time the

5   Committee approved the September 26 Proposal, and at all times before then:

6        a)    neither the Committee nor its counsel were aware of the VIA Senior

7   Indebtedness Provision; and

8        b)    neither the Committee nor its counsel were aware of the 2002

9   Noteholders' threats to oppose the settlement unless language was added to

10  the description of the "Allowed Claim" that would purport to waive VIA's

11  right to assert Senior Indebtedness status under the VIA Senior

12  Indebtedness Provision of the Indenture.

13       59.    SB Claims is informed and believes, and on that basis alleges, that:

14       a)    a draft of the Settlement Agreement was provided to the Claimants'

15  counsel on January 25, 2006 (the "January 25 Draft");

16       b)    the description of the Claimants' Allowed Claim in the January 25

17  Draft was similar to that in the September 26 Proposal, including that the

18  "claim shall be afforded the benefits and priority of Debtor's other allowed

19  general unsecured claims and shall be neither senior nor junior to any other

20  allowed general unsecured claim";

21       c)    a revised draft of the Settlement Agreement was provided to the

22  Claimants' counsel on May 12, 2006 (the "May 12 Draft"); and

23       d)    the description of the Claimants' Allowed Claim in the May 12 Draft

24  was similar to that in the January 25 Draft, except that the following

25  sentence had been added:  "Claimants and the Debtor agree that the

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    Allowed Claim is not, and shall not be treated as, 'Senior Indebtedness'

2    under the terms of the Debtor's Indenture, dated as of April 22, 2002, for

3    the 7-3/4% Secured Senior Subordinated Convertible Debentures due

4    2005."

5    60.    SB Claims is informed and believes, and on that basis alleges, that:

6    a)    the Debtor and the Claimants met on June 1, 2006;

7    b)    prior to the June 1, 2006 meeting, the Debtor's counsel purportedly

8    "investigated the history of the 'Senior Indebtedness' language concerning

9    the indebtedness to VIA in the principal amount of $15 million," *see* Boro

10    Declaration at ¶ 20;

11    c)    at the June 1, 2006 meeting, the Debtor's counsel represented to the

12    Claimants and their counsel that he had concluded that the purported

13    purpose of the VIA Senior Indebtedness Provision was, according to the

14    Debtor's counsel, to refer "to the $15 million loan that VIA was going to

15    make to SONICblue as part of a settlement that never occurred;" *see* Boro

16    Declaration at ¶ 23; and

17    d)    the Claimants again relied, in good faith, upon the representations of

18    the Debtor's counsel with respect to the VIA Senior Indebtedness

19    Provision.

20    61.    SB Claims is informed and believes, and on that basis alleges that:

21    a)    despite the statement by the Debtor's counsel that he "investigated

22    the history of the 'Senior Indebtedness' language," the Debtor's counsel did

23    not contact the persons who were principally responsible for the negotiation

24    and drafting of the Indenture for the Debtor;

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    b)      nor did the Debtor's counsel find any document that purported to

2    state the purpose of the VIA Senior Indebtedness Provision as being to

3    apply solely "to the $15 million loan that VIA was going to make to

4    SONICblue as part of a settlement that never occurred"; and

5    c)      the representations by the Debtor's counsel regarding the purported

6    purpose of the VIA Senior Indebtedness Provision were erroneous.

7    62.     SB Claims is informed and believes that, following the September

8    26 Proposal, no drafts of the Settlement Agreement were provided to counsel for

9    the Committee, or to any member of the Committee other than the 2002

10   Noteholders, until in or around October, 2006.  Counsel for the Committee

11   represented to the Bankruptcy Court on January 23, 2007, and on that basis SB

12   Claims alleges, that neither the Committee nor its counsel were aware of the VIA

13   Senior Indebtedness Provision at the time that Committee counsel was provided

14   with the Settlement Agreement, or at any time before then.  Neither the Committee

15   nor its counsel were aware of the 2002 Noteholders' threats to oppose the

16   settlement unless language was added to the description of the "Allowed Claim"

17   that would purport to waive VIA's right to assert Senior Indebtedness status under

18   the VIA Senior Indebtedness Provision of the Indenture.

19   63.     SB Claims is informed and believes, and on that basis hereby

20   alleges, that at no point in time prior to 2007 did the 2002 Noteholders or their

21   counsel recuse themselves from the Committee's communications, discussions,

22   deliberations, or decision making with respect to the VIA Adversary Proceeding,

23   the Claimants' Proofs of Claim, the September 26 Proposal, or the Settlement

24   Agreement.

25

26

1      64.     On October 6, 2006, the Debtor filed its Ex Parte Application to File

2   Debtors' Motion for Approval of Settlement of VIA and Intel Litigation Under

3   Seal [Docket No. 1950].  In the motion, the Debtor contended that "[t]he

4   confidential information that the Debtors seek to file under seal contains sensitive

5   information relating to VIA's, Intel's and the Debtors' business and litigation

6   dealings and is or may be subject to the terms of the Protective Order."  The

7   Debtor sought authority to file the entire settlement agreement under seal, as well

8   as the motion to approve the settlement agreement and any supporting

9   declarations, on the grounds that the confidential information was "pervasive."

10  The Bankruptcy Court granted the Debtor's motion to seal on October 10, 2006

11  [Docket No. 1951].

12     65.     On October 10, 2006, the Debtor filed under seal its motion to

13  approve the settlement agreement, as well as the settlement agreement itself and

14  supporting memorandum of points and authorities and declaration of Marcus

15  Smith [Docket Nos. 1952, 1953 & 1954].  The pleadings and declaration merely

16  referred to the Claimants receiving a "general unsecured claim" in the amount of

17  $12.5 million.  Neither the pleadings nor the declaration stated that the Allowed

18  Claim (i) "shall be afforded the benefits of, and shall be pari passu with, the other

19  allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case, "

20  or (ii) that "Claimants and the Debtor agree that the Allowed Claim is not, and

21  shall not be treated as, 'Senior Indebtedness' under the terms of the Debtor's

22  Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated

23  Convertible Debentures due 2005" (together, the "Purported Waiver Language").

24  The only reference to the VIA Senior Indebtedness Provision was a single

25  sentence in the Settlement Agreement itself (which also was filed under seal),

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1   without any explanation as to its significance.  There was no disclosure of the fact

2   that the 2002 Noteholders insisted that VIA purport to waive any right to Senior

3   Indebtedness status, or of their threat to oppose the Settlement Agreement if VIA

4   did not purport to waive such rights.

5         66.    The Debtor filed and served a notice of the motion to approve the

6   Settlement Agreement on October 12, 2006 [Docket No. 1955].  The notice's sole

7   description of the Allowed Claim was that "[t]he Claimants will receive an

8   allowed general unsecured claim against SONICblue in the amount of

9   $12,500,000 and the two VIA Claims will be disallowed."  There was no

10   disclosure in the notice of the VIA Senior Indebtedness Provision, of the

11   Purported Waiver Language, or of the 2002 Noteholders' insistence upon the

12   Purported Waiver Language.

13         67.    Docket No. 1955 offered to make available to any creditor who

14   requested it from the Debtor's counsel a redacted copy of the Settlement

15   Agreement.  On information and belief, following its receipt of Docket No. 1955,

16   Riverside Claims made such a request of Debtor's counsel over the telephone, but

17   was then told, again over the telephone, by Debtor's counsel that the process of

18   redaction would be quite expensive for the Debtor and that there was no real

19   reason for Riverside Claims to insist that this be done, as all that any of the

20   unsecured creditors actually needed to know to evaluate the efficacy of the

21   Settlement Agreement was that the amount of the settlement was for an allowed

22   claim of $12,500,000.  Riverside Claims accepted Debtor's counsel's oral

23   representations and therefore dropped its demand for a redacted copy of the

24   Settlement Agreement.

25

26

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

68.    On October 31, 2006, the Bankruptcy Court entered its "Order Granting Debtors' Motion for Approval of Settlement of VIA and Intel Litigation" [Docket No. 1981] (the "VIA/Debtor Settlement Order") approving the "Settlement Agreement."  In addition to containing the Purported Waiver Language, the Settlement Agreement provides that the Claimants have an "Allowed Claim" against the Debtor in the amount of $12,500,000, the allocation of which "as between the Claimants shall be at the sole discretion of Claimants."

69.    The Claimants allocated the entirety of the Allowed Claim to VIA.

70.    The Purported Waiver Language in the Settlement Agreement is unenforceable against the Claimants, SB Claims, or any other entity.  The Purported Waiver Language in the Settlement Agreement has no force or effect.

71.    The Purported Waiver Language is unenforceable because it was not adequately disclosed to the Bankruptcy Court or creditors.

72.    The Purported Waiver Language is unenforceable because it was obtained by the 2002 Noteholders in exchange for no consideration.

73.    The Purported Waiver Language is unenforceable because it was obtained as a direct result of breaches of fiduciary duty by the 2002 Noteholders. The breaches of fiduciary duty of the 2002 Noteholders include, among other things:

a)    failing to disclose the existence and significance of the VIA Senior Indebtedness Provision to the Office of the United States Trustee, the Bankruptcy Court, the other Committee members, Committee counsel, and creditors generally, while at the same time (i) obtaining special access to confidential information and strategy meetings regarding the Claimants' Proofs of Claim and the VIA Adversary Proceeding, including pursuant to

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    the Stipulated Protective Order, and (ii) participating in Committee

2    communications, discussions, deliberations, and decision making regarding

3    the Claimants' Proof of Claim and the VIA Adversary Proceeding, without

4    recusing themselves or advising the Committee and its counsel of the 2002

5    Noteholders' conflicting interests;

6    b)    providing false and misleading information regarding the supposed

7    purpose of the VIA Senior Indebtedness Provision to other fiduciaries of

8    the estate, including the Debtor and the Committee;

9    c)    threatening to oppose the Settlement Agreement in the absence of a

10   purported waiver of the VIA Senior Indebtedness Provision; and

11   d)    using their position as "controlling bondholders of SONICblue, Inc."

12   to obtain the Purported Waiver Language.

13   74.    The Purported Waiver Language is unenforceable because Section

14   4.5 of the Indenture provides that the right to enforce the subordination provisions

15   of the Indenture shall not be impaired by any act, or failure to act, by the Debtor,

16   or in good faith by a holder of Senior Indebtedness.  The Claimants acted in good

17   faith with respect to the Purported Waiver Language.

18   75.    The Purported Waiver Language is unenforceable because it was

19   obtained through the provision of false and misleading information to the

20   Claimants.

21   76.    Based upon the conduct of the 2002 Noteholders, as set forth herein

22   and as shall be proven at trial, the 2002 Noteholders should be estopped from

23   enforcing the Purported Waiver Language.

24

25

26

# FIRST CLAIM FOR RELIEF

## (EQUITABLE SUBORDINATION)

77.    SB Claims incorporates by this reference paragraphs 1 through 76 hereof.

78.    Bankruptcy Code section 510(c)(1) provides that the Bankruptcy Court may:

> under principles of equitable subordination, subordinate for purposes
> of distribution all or part of an allowed claim to all or part of another
> allowed claim . . . .

79.    The 2002 Noteholders engaged in inequitable conduct in obtaining the Purported Waiver Language.

80.    It would be inequitable to permit the 2002 Noteholders to enforce, or to otherwise benefit from, the Purported Waiver Language vis-à-vis the VIA Claim.

81.    The 2002 Noteholders would obtain an unfair advantage were they permitted to enforce, or to otherwise benefit from, the Purported Waiver Language vis-à-vis the VIA Claim.

82.    The Claimants and SB Claims, as the Claimants' assignee, would be harmed were the 2002 Noteholders permitted to enforce, or to otherwise benefit from, the Purported Waiver Language vis-à-vis the VIA Claim.

83.    Equitable subordination of the 2002 Noteholders' claims to the VIA Claim would not be inconsistent with any provision of the Bankruptcy Code.

84.    The 2002 Noteholders' claims should be equitably subordinated to the VIA Claim.

**SECOND CLAIM FOR RELIEF**

**(CLASSIFICATION)**

85.    SB Claims incorporates by this reference paragraphs 1 through 84 hereof.

86.    The VIA Claim constitutes Senior Indebtedness under the Indenture.

87.    Pursuant to Bankruptcy Code sections 1122 and 1123(a), and Rule 3013 of the Federal Rules of Bankruptcy Procedure, the VIA Claim should be determined to be senior to the 2002 Noteholders' claims for purposes of any plan of reorganization in the Bankruptcy Cases.

**THIRD CLAIM FOR RELIEF**

**(DECLARATORY RELIEF)**

88.    SB Claims incorporates by this reference paragraphs 1 through 87 hereof.

89.    An actual controversy has arisen between SB Claims, on the one hand, and the 2002 Noteholders, on the other hand, that is in need of immediate judicial determination, in that:

a)    SB Claims contends that the VIA Claim is Senior Indebtedness and that the VIA Claim is entitled to the benefits afforded to Senior Indebtedness under Article IV of the Indenture, and that, as such, the VIA Claim must be paid, in full, before any distributions may be made to the 2002 Noteholders on account of the Debentures.

b)    SB Claims is informed and believes and on that basis alleges that the 2002 Noteholders contend that the VIA Claim is not Senior Indebtedness.

**REQUEST FOR RELIEF**

Wherefore SB Claims prays for judgment as follows:

Complaint for Equitable Subordination, to Determine Proper Classification, and for Declaratory Relief
Regarding Senior Indebtedness Status

1    A.    For an order equitably subordinating the 2002 Noteholders' claims to

2    the VIA Claim.

3    B.    For an order determining that the VIA Claim is senior to the 2002

4    Noteholders' claims for purposes of any plan of reorganization in the

5    Bankruptcy Cases.

6    C.    For a declaration that the VIA Claim is entitled to the benefits afforded

7    to Senior Indebtedness under Article IV of the Indenture, and that, as

8    such, the VIA Claim must be paid, in full, before any distributions may

9    be made to the 2002 Noteholders on account of the Debentures.

10    D.    For costs.

11    E.    For such other and further relief as the Bankruptcy Court may deem

12    just.

13    DATED: May 30, 2007        STUTMAN, TREISTER & GLATT P.C.

14        and<br>        MCGRANE GREENFIELD LLP

15

16        By_____/s/_____

17        K. John Shaffer

18

19

20

21

22

23

24

25

26