# EXHIBIT 29

1  STROOCK & STROOCK & LAVAN LLP
   LEWIS KRUGER (admitted *pro hac vice*)
2  180 Maiden Lane
   New York, New York  10038
3  Telephone:  212-806-5400
   Facsimile:  212-806-6006
4
5  STROOCK & STROOCK & LAVAN LLP
   ALAN Z. YUDKOWSKY (State Bar No. 194994)
6  2029 Century Park East, Suite 1800
   Los Angeles, California  90067-3086
7  Telephone: 310-556-5800
   Facsimile: 310-556-5959
8
   *Counsel for Portside Growth & Opportunity Fund,*
9  *Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.*

10            **UNITED STATES BANKRUPTCY COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
11                    **SAN JOSE DIVISION**

12 In re                                    )
                                            )  Case Nos.  03-51775, 03-51776, 03-51777 and
13 SONICBLUE INCORPORATED, a Delaware       )  03-51778 MM (Jointly Administered)
   corporation; DIAMOND MULTIMEDIA         )
14 SYSTEMS, INC., a Delaware corporation;   )
   REPLAYTV, INC., a Delaware corporation;  )  Chapter 11
15 and SENSORY SCIENCE CORPORATION,         )
   a Delaware corporation                   )
16                                          )
            *Debtors.*                      )
17                                          )
                                            )
18 ─────────────────────────────────────    )
                                            )
19 SONICBLUE CLAIMS LLC, a Delaware         )  Adv. No. 07-05082
   Limited Liability Company,               )
20                                          )
            *Plaintiff,*                     )
21                                          )  **DEFENDANTS' MOTION TO DISMISS**
              vs.                           )
22                                          )
   PORTSIDE GROWTH & OPPORTUNITY            )
23 FUND, a Cayman Islands corporation;      )  Date:      To be determined
   SMITHFIELD FIDUCIARY LLC, a Cayman       )  Time:      To be determined
24 Islands corporation, and CITADEL EQUITY  )  Judge:     Hon. Marilyn Morgan
   FUND LTD., a Cayman Islands corporation, )  Location:  Courtroom 3070
25                                          )             280 South First Street
            *Defendants.*                    )             San Jose, CA  95113
26                                          )
                                            )
27                                          )
                                            )
28 ─────────────────────────────────────    )

Defendants Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, "Defendants"), hereby move pursuant to this motion and Federal Rule of Civil Procedure 12(b)(6), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012(b), for an order dismissing the Complaint on the grounds that it fails to state a claim upon which relief can be granted, and for such other and further relief as the Court deems just and proper.

By its Complaint, Plaintiff SonicBlue Claims LLC ("SB Claims") seeks to avoid a single provision of an integrated settlement agreement voluntarily entered into by its predecessors, VIA and S3, after several years of deliberation and arms-length negotiations. The Complaint should be dismissed in its entirety because SB Claims states no claim upon which relief can be granted. Specifically, the first claim for relief fails because SB Claims lacks standing to seek equitable subordination for harm to the bankruptcy estate and because SB Claims has alleged no actionable "particularized injury" to itself or its predecessors. The second and third claims for declaratory relief also fail because there are no grounds alleged sufficient to unwind the voluntary settlement agreement and, contrary to plaintiff's contentions, the $12.5 million claim allowed pursuant to the settlement agreement does not constitute "Senior Indebtedness" as a matter of law.

WHEREFORE, Defendants respectfully request that this Court enter an order dismissing the Complaint with prejudice, and granting such other and further relief as the Court deems just and proper.

DATED:  New York, New York
          July 11, 2007

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038
(212) 806-5400

By  _/s/ Lewis Kruger_____
       Lewis Kruger
       Alan Z. Yudkowksy

Counsel for Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.

STROOCK & STROOCK & LAVAN LLP
LEWIS KRUGER (admitted *pro hac vice*)
180 Maiden Lane
New York, New York 10038
Telephone: 212-806-5400
Facsimile: 212-806-6006

STROOCK & STROOCK & LAVAN LLP
ALAN Z. YUDKOWSKY (State Bar No. 194994)
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959

*Counsel for Portside Growth & Opportunity Fund,*
*Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re | ) |
| | ) Case Nos. 03-51775, 03-51776, 03-51777 and |
| SONICBLUE INCORPORATED, a Delaware | ) 03-51778 MM (Jointly Administered) |
| corporation; DIAMOND MULTIMEDIA | ) |
| SYSTEMS, INC., a Delaware corporation; | ) Chapter 11 |
| REPLAYTV, INC., a Delaware corporation; | ) |
| and SENSORY SCIENCE CORPORATION, | ) |
| a Delaware corporation | ) |
| | ) |
|     *Debtors.* | ) |
| | ) |
| _____ | ) |
| | ) |
| SONICBLUE CLAIMS LLC, a Delaware | ) Adv. No. 07-05082 |
| Limited Liability Company, | ) |
| | ) |
|     *Plaintiff*, | ) |
| | ) **DEFENDANTS' MEMORANDUM OF** |
|       vs. | ) **POINTS AND AUTHORITIES IN** |
| | ) **SUPPORT OF MOTION TO DISMISS** |
| PORTSIDE GROWTH & OPPORTUNITY | ) |
| FUND, a Cayman Islands corporation; | ) |
| SMITHFIELD FIDUCIARY LLC, a Cayman | ) Date: To be determined |
| Islands corporation, and CITADEL EQUITY | ) Time: To be determined |
| FUND LTD., a Cayman Islands corporation, | ) Judge: Hon. Marilyn Morgan |
| | ) Location: Courtroom 3070 |
|     *Defendants.* | )          280 South First Street |
| | )          San Jose, CA 95113 |
| | ) |
| _____ | ) |

# TABLE OF CONTENTS

**(Page)**

**TABLE OF AUTHORITIES** ..................................................................................................ii

**I.     PRELIMINARY STATEMENT** .................................................................. 1

**II.    THE FACTUAL CONTEXT** ........................................................................ 3

**III.   ARGUMENT** .................................................................................................. 7

   A.   The First Claim For Relief Fails........................................................ 7

        1.   *SB Claims Has No Standing To Seek Equitable Subordination For General Harm To The Estate.* ............................................. 7

        2.   *The Complaint Fails To Adequately Allege Any Particularized Harm.* ...................................................................................... 9

        3.   *SB Claims May Not Seek To Revoke Part Of The Settlement Agreement While Maintaining The Benefit Of Other Parts Of The Agreement.* ....................................................................... 13

   B.   The Second And Third Claims For Relief Fail.................................. 16

        1.   *The Settlement Agreement Prohibits SB Claims From Seeking A Declaration That The Allowed Claim Is Senior Indebtedness.* ............... 16

        2.   *The Allowed Claim Is Not Senior Indebtedness Because It Is Not A Claim For Borrowed Money Or Evidenced By Bonds, Debentures, Notes, Or Other Similar Instruments.* ................................. 17

        3.   *The Allowed Claim Is Not Senior Indebtedness Because It Is Not "Owing To" VIA.* ............................................................... 19

**IV.    CONCLUSION** ........................................................................................... 22

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1

# TABLE OF AUTHORITIES

2

**(Page)**

3

## CASES

4  In re Air Passenger Computer Reservations Systems Antitrust Litigation,
       724 F. Supp. 744 (C.D. Cal. 1989) ..................................................................................22
5

6  In re Applied Theory Corp.,
       --- F.3d ---, No. 06-3390-BK, 2007 WL 1965012 (2d Cir. July 9, 2007) ..........................9

7  Bankers Trust Co. v. Old Republic Insurance Co.,
       959 F.201 677 (7th Cir. 1992) ...............................................................................11, 12
8

9  Becker v. New Penn Development Corp.,
       56 N.Y.S.2d 1 (N.Y. App. Div. 1945)............................................................................21

10  Builder's Control Service of Northern California, Inc. v. North American Title Guaranty Co.,
       205 Cal. App. 2d 68 (1962) ..........................................................................................21
11

12  County of Santa Clara v. Astra United States, Inc.,
       428 F. Supp. 2d 1029 (N.D. Cal. 2006)..........................................................................12
13

14  In re Desmond,
       334 B.R. 78 (Bankr. D.N.H. 2005)................................................................................10

15  Hayutin v. Weintraub,
       207 Cal. App. 2d 497 (1962) ........................................................................................15
16

17  IMO Development Corp. v. Dow Corning Corp.,
       135 Cal. App. 3d 451 (1982) ..................................................................................15, 16
18

19  International Marble and Granite of Colorado, Inc. v. Congress Financial Corp.,
       465 F. Supp. 2d 993 (C.D. Cal. 2006) ...........................................................................15

20  James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.,
       61 N.Y.2d 836 (N.Y. 1984) .........................................................................................21
21

22  Johnson v. County of Fresno,
       111 Cal. App. 4th 1087 (2003) .....................................................................................21

23  Kalb Voorhis & Co. v. American Financial Corp.,
       8 F.3d 130 (2nd Cir.1993) ..............................................................................................9
24

25  In re Kling,
       44 Cal. App. 267 (1919) ...............................................................................................21
26

27  Lara v. Kern County Board of Supervisors,
       59 Cal. App. 3d 399 (1976) ..........................................................................................13

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Lee v. City of Los Angeles,
    250 F.3d 668 (9th Cir. 2001) ........................................................................ 3

Luce v. Edelstein,
    802 F.2d 49 (2d Cir. 1986) .......................................................................... 12

Martinez v. Master Protection Corp.,
    118 Cal. App. 4th 107 (2004) ..................................................................... 14

Moore v. Kayport Package Express, Inc.,
    885 F.2d 531 (9th Cir. 1989) ................................................................ 10, 11

In re Morpheus Lights, Inc.,
    228 B.R. 449 (Bankr. N.D. Cal. 1998) ................................................. 1, 8, 9

Neubronner v. Milken,
    6 F.3d 666 (9th Cir. 1993) .................................................................... 10, 11

Portland Web Pressman's Union Local No. 17 v. Oregonian Publishing Co.,
    188 F. Supp. 859 (D. Or. 1960) ................................................................. 22

Portland Web Pressman's Union Local No. 17 v. Oregonian Publishing Co.,
    286 F.2d 4 (9th Cir. 1960) .......................................................................... 22

Public Utility District No. 1 v. FERC,
    471 F.3d 1053 (9th Cir. 2006) .................................................................... 22

Purcell v. Colonial Insurance Co.,
    20 Cal. App. 3d 807 (1971) ........................................................................ 21

Roberts v. Carter & Potruch,
    140 Cal. App. 2d 370 (1956) ...................................................................... 21

Rosman v. Cuevas,
    176 Cal. App. 2d Supp. 867 (1959) ........................................................... 12

In re S.M. Acquisition Co.,
    No. 05-C-7076, 2006 WL. 2290990 (N.D. Ill. Aug. 7, 2006) ........................... 10

Salaman v. Bolt,
    74 Cal. App. 3d 907 (1977) ........................................................................ 13

Saret-Cook v. Gilbert, Kelly, Crowley & Jennett,
    74 Cal. App. 4th 1211 (1999) ..................................................................... 15

Simmons v. California Institute of Technology,
    34 Cal. 2d 264 (1949) ................................................................................. 15

Solow v. Stone,
    994 F. Supp. 173 (S.D.N.Y.1998) ................................................................ 9

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

St. Paul Fire and Marine Insurance Co. v. PepsiCo, Inc.,
        884 F.2d 688 (2d Cir.1989) ................................................................................. 9

United States v. Ritchie,
        342 F.3d 903 (9th Cir. 2003) ............................................................................. 3

In re Universal Foundry Co.,
        163 B.R. 528 (E.D. Wis. 1993) ........................................................................ 10

In re Universal Foundry Co.,
        30 F.3d 137 (7th Cir. 1994) ............................................................................. 10

Wool v. Tandem Computers Inc.,
        818 F.2d 1433 (9th Cir. 1987) ......................................................................... 11

## STATUTES

Cal. Civ. Code § 1459 ................................................................................................ 12

Cal. Civ. Code § 1589 ................................................................................................ 14

Cal. Civ. Code § 1691 ................................................................................................ 14

Cal. Civ. Proc. Code § 368 ........................................................................................ 12

Fed. R. Civ. P. 9(b) .................................................................................................... 10

1    **I.    PRELIMINARY STATEMENT**[1]

2    By its Complaint, Plaintiff SB Claims seeks to avoid a single provision of an integrated

3    settlement agreement voluntarily entered into by its predecessors, VIA and S3, after several years of

4    deliberation and arms-length negotiations.  The Complaint should be dismissed in its entirety with

5    prejudice because SB Claims states no claim upon which relief can be granted.

6    ***The first claim for relief fails because SB Claims has no standing to seek equitable***

7    ***subordination for harm to the bankruptcy estate and because SB Claims has alleged no***

8    ***actionable "particularized harm" to itself or its predecessors***.  The first claim for relief is for

9    equitable subordination.  Under *In re Morpheus Lights, Inc.*, 228 B.R. 449 (Bankr. N.D. Cal. 1998),

10   SB Claims lacks standing to assert a claim for equitable subordination based upon "general" harm to

11   the estate or creditors.  Rather, SB Claims may prosecute an equitable subordination claim only "[i]f

12   it could be shown that [SB Claims] has been particularly harmed by inequitable conduct of" the

13   Defendants, the 2002 Noteholders.  *Id.* at 453.

14   At best, SB Claims has alleged only one "particularized harm."  It asserts that ***the Debtor***

15   (not the 2002 Noteholders) misled VIA and S3 (the predecessors by assignment of SB Claims) into

16   agreeing that the $12.5 million claim allowed pursuant to the Settlement Agreement (the "Allowed

17   Claim") did not constitute Senior Indebtedness.  That alleged harm cannot serve as the basis for

18   equitable subordination because:

19   1.    In the Settlement Agreement itself, VIA and S3 expressly disclaimed reliance

20   on any representation by the Debtor.  SB Claims is bound by this agreement of its

21   predecessors.

22   2.    Even if the Settlement Agreement did not prohibit the very allegations that

23   SB Claims now makes, SB Claims has not satisfied the heightened standard of Rule 9(b) of

24   the Federal Rules of Civil Procedure, which prohibits the pleading of fraud or mistake on

25   "information and belief."  Rule 9(b) applies with particular force in this case, where SB

26   

27   _____

[1]   Capitalized terms not otherwise defined have the meanings given to them in the Complaint.

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1    Claims uses bare bones "information and belief" pleading to allege the reliance of its

2    predecessors (with whose knowledge SB Claims is imputed).

3              3.        The proper remedy for the conduct alleged by SB Claims, if proven, would be

4    rescission of the Settlement Agreement.  SB Claims, however, specifically is prohibited from

5    seeking this remedy by the terms of the contract with its predecessors.

6    ***The second and third claims for relief fail because the Allowed Claim does not constitute***

7    ***"Senior Indebtedness" under the Indenture***.  The second and third claims for relief are

8    substantively identical.  Each seeks a declaration that the Allowed Claim constitutes Senior

9    Indebtedness.  In addition to the dispositive fact that VIA and S3 expressly agreed in the Settlement

10   Agreement that the Allowed Claim does not constitute Senior Indebtedness, these claims should be

11   dismissed because:

12             1.        The Allowed Claim cannot constitute Senior Indebtedness because it is not a

13   claim "for borrowed money, or evidenced by bonds, debentures, notes, or other similar

14   instruments," a necessary precondition to status as Senior Indebtedness under the Indenture.

15   Rather, as set forth in the Settlement Agreement, the Allowed Claim is for breach of

16   contract.  It "represent[s] a compromise of the claims that have been asserted by the

17   Claimants [VIA and S3] for damages and for other relief based, *inter alia*, on alleged

18   breaches of the Amended and Restated Investment Agreement, including without limitation

19   liquidated damages for the alleged breach of section 5.6 thereof."  Settlement Agreement § 3.

20             2.        The Allowed Claim is not "due and owing" to VIA, also a necessary

21   precondition to status as Senior Indebtedness.  In fact, SB Claims has agreed that it "shall not

22   sue or act in respect of the Transferred Rights [which include the Allowed Claim] in the

23   name of the Claimants or VIA, but rather, at all times, [SB Claims] shall act in its own

24   name."  Claim Transfer Agreement § 20.

25   For the foregoing reasons, the Complaint should be dismissed.  As no amendment is capable

26   of curing the Complaint's flaws, the Complaint should be dismissed with prejudice.

27

28

## II.    THE FACTUAL CONTEXT

SB Claims is the successor to certain (but not all) rights of VIA and S3 under the Settlement Agreement.  Complaint ¶ 5.  Pursuant to the Settlement Agreement, VIA and S3 agreed to compromise breach of contract claims they had asserted against the Debtor in exchange for, among other things, the Allowed Claim in the amount of $12.5 million (Settlement Agreement § 3), the transfer of intellectual property from the Debtor to S3 (Settlement Agreement § 5), the transfer of the Debtor's shares in S3 to VIA (Settlement Agreement § 9), and releases from the Debtor (Settlement Agreement § 12).  A copy of the Settlement Agreement, in the redacted form previously filed by the Debtor, is attached as *Exhibit A*.[2]

In the Settlement Agreement, VIA and S3 agreed that (a) the Allowed Claim "shall be afforded the benefits of, and shall be pari passu with, the other allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case," and (b) "the Allowed Claim is not, and shall not be treated as, 'Senior Indebtedness' under the terms of the Debtors' Indenture, dated as of April 22, 2002, for the 7¾% Secured Senior Subordinated Convertible Debentures due 2005." Complaint ¶ 65; Settlement Agreement § 3.  SB Claims calls these provisions the "Purported Waiver Language," but there is nothing "purported" about them.  Significantly for purposes of this Motion, by these provisions VIA and S3 agreed that the very rights that SB Claims now seeks to assert as successor to VIA and S3 do not exist.

In this action, SB Claims does not seek to void or rescind the entire Settlement Agreement. In the Claim Transfer Agreement by which SB Claims was assigned rights to the Allowed Claim, SB Claims specifically agreed **not** to do anything that would impair any provision of the Settlement

---

[2]  On a motion to dismiss, a court may consider documents relied upon in the complaint or matters of public record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  The court may also treat certain documents as incorporated by reference into the plaintiff's complaint if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  The court may treat an incorporated document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Id.*  Here, the Settlement Agreement, the Claim Transfer Agreement, and the Indenture all are incorporated in the Complaint. Alternatively, the Court may take judicial notice of such documents as matters of record in this adversary proceeding and the underlying bankruptcy case.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1   Agreement other than the so-called "Purported Waiver Language." (A copy of the Claim Transfer

2   Agreement, which was filed on the docket in the bankruptcy case, is attached as *Exhibit B*.)[3]  While

3   purporting to reserve to SB Claims the ability "to obtain an order, or to make a binding agreement,

4   to delete, nullify, or otherwise modify the" Purported Waiver Language, the Claim Transfer

5   Agreement provides that –

6       • SB Claims "will not do anything in the course of enforcing any aspect of the

7       Transferred Rights that affects any provisions in the Settlement Agreement that are unrelated

8       to the Transferred Rights"; and

9       • "neither [SB Claims] nor anyone acting at its instigation or in concert with it

10      will do anything (including taking any action or filing any pleading or motion) to impair the

11      validity or enforceability of (i) the order of the Bankruptcy Court approving the Settlement

12      Agreement (provided, however, that [SB Claims] may seek or otherwise support the

13      deletion, nullification, or other modification of the Underlined Recital E Language [*i.e.*, the

14      so-called Purported Waiver Language]), (ii) the releases exchanged by the 'Parties' to the

15      Settlement Agreement (as such Parties are defined in the Settlement Agreement), or (iii) the

16      transfer to the Claimants [VIA and S3] of the Transferred Intellectual Property."

17  Claim Transfer Agreement §§ 8 and 14.  In other words, *SB Claims is forbidden from taking any*

18  *action resulting in disapproval of the Settlement Agreement or requiring VIA or S3 to return the*

19  *Debtor's intellectual property, return the Debtor's S3 shares, or relinquish the releases given by*

20  *the Debtor, all of which would be potential consequences of rescission*.

21      Given this disabling limitation, SB Claims focuses its Complaint on the one "right" that it

22  purportedly reserved to itself under the Claim Transfer Agreement.  While SB Claims is

23  contractually bound to preserve and honor the rest of the Settlement Agreement, it seeks to escape

24  from one aspect of its predecessors' agreement – the so-called "Purported Waiver Language."  SB

25  Claims, however, identifies no cognizable legal theory allowing it to maintain and enforce every

26

27  [3]   The Court may consider the terms of the Claim Transfer Agreement.  *See* note 2, *supra*.

28

1  aspect of the Settlement Agreement other than the one provision that it now wishes its predecessors

2  had not contractually accepted.  As demonstrated below, no such legal theory exists.

3  　　　In challenging the "Purported Waiver Language," SB Claims alleges, solely on information

4  and belief, that the Debtor misled VIA and S3 into agreeing to the "Purported Waiver Language," an

5  agreement that SB Claims asserts, also solely on information and belief, was reached only because

6  VIA and S3 (presumably after considering advice of their counsel) "believed in good faith the

7  representations of Debtor's counsel as to the supposed purpose of the VIA Senior Indebtedness

8  Provision."  Complaint ¶ 53; *id.* ¶ 60.d.  In making this allegation, SB Claims abandons the theory

9  pursued in the proceedings that led to the appointment of a trustee for the Debtor,[4] and it no longer

10  asserts that VIA and S3 participated in a conspiracy to inflate the amount of the Allowed Claim in

11  exchange for a "waiver" of senior status.  SB Claims, in fact, cannot take that position now because

12  doing so would violate the Claim Transfer Agreement.

13  　　　Thus, in the Complaint's detailed recitation of the history of the negotiations leading to the

14  Settlement Agreement, *see* Complaint ¶¶ 35-63, there is no allegation that VIA and S3 ever

15  contemplated that they could exchange a general unsecured claim of one amount for a smaller

16  "Senior Indebtedness" claim.  Rather, the Complaint establishes that VIA and S3 agreed on the

17  amount at which they would settle their claim ***before*** there was any discussion of the "Purported

18  Waiver Language" that SB Claims now seeks to challenge.  *Compare* Complaint ¶ 43.b ("a

19  proposed compromise was reached on the amount of the Claimants' allowed claim" on *September*

20  

21  [4]  In those proceedings, it was suggested (including by Argo Partners, an owner of SB Claims) that

22  unsecured creditors were harmed by the "Purported Waiver Language" because VIA and S3 had agreed to settle for a larger general unsecured claim rather than for an available, smaller "Senior

23  Indebtedness" claim.  The theory was that this purported trade had disadvantaged unsecured creditors by increasing the overall amount of allowed claims and thereby reducing the recovery

24  on account of unsecured claims or otherwise depriving the estate of "recompense" by the 2002 Noteholders.  *See* Objection to Proposed Disclosure Statement filed by Argo Partners, Inc.

25  [docket no. 2116] at 7 ("no neutral examiner or trustee appointed by this Bankruptcy Court would ever accept as the fact [sic] that Via did not have very valuable rights to Senior

26  Indebtedness status via a vis the Allowed $12,500,000 Via claim prior to Via's waiver of those rights as part of the settlement") and at 6 ("the Debtor might possibly have gotten recompense"

27  from the 2002 Noteholders in exchange for the agreement that the Allowed Claim was not Senior Indebtedness).

28

1  *15*, 2005) *with* Complaint ¶ 50.a. (on *September 20*, 2005, "counsel for the Debtor for the first time

2  communicated to counsel for the Claimants the existence of the VIA Senior Indebtedness Provision

3  in the Indenture").

4      SB Claims also does not allege that the 2002 Noteholders made any misrepresentations to

5  VIA and S3, or that the 2002 Noteholders ever asked the Debtor to make any statements whatsoever

6  (let alone false statements) to VIA and S3.  To the contrary, the only thread by which SB Claims

7  attempts to weave some connection between the 2002 Noteholders and the supposed

8  misapprehensions of VIA and S3 is found in Paragraph 52 of the Complaint, where SB Claims

9  alleges that the Debtor's counsel (Mr. Boro) erroneously determined (some time between

10  September 16 and 19, 2005) that the purpose of the VIA Senior Indebtedness Provision was to

11  address a potential loan by VIA to the Debtor that was never made, while during the same

12  approximate period Mr. Boro allegedly spoke to counsel for the 2002 Noteholders.  Based solely on

13  the allegation that counsel for the 2002 Noteholders talked to Mr. Boro at some point in or around

14  the four day period during which Mr. Boro allegedly ascertained the purpose and effect of the VIA

15  Senior Indebtedness Provision, SB Claims alleges (solely on information and belief) that the 2002

16  Noteholders were the source of Mr. Boro's information.  There is no allegation (nor any basis for an

17  allegation) that the 2002 Noteholders asked Mr. Boro to forward any information to SB Claims'

18  predecessors or that the 2002 Noteholders knew or should have known that any statements made by

19  Mr. Boro to VIA and S3 were inaccurate.

20      Furthermore, according to the Complaint, discussions and negotiations over the settlement

21  continued for an additional *year* after the alleged misrepresentation by Mr. Boro to VIA and S3.

22  Complaint ¶ 64 (motion to approve the Settlement Agreement not filed until October 2006).  In fact,

23  SB Claims alleges that, in June of 2006 (almost nine months after the alleged conversation between

24  counsel to the 2002 Noteholders and Mr. Boro), Mr. Boro had further discussions with VIA and S3

25  concerning the purpose of the Senior Indebtedness language.  Complaint ¶ 60.  There is no

26  allegation that the 2002 Noteholders participated in those discussions, in which Mr. Boro allegedly

27  represented that he had investigated the history of the VIA Senior Indebtedness Provision and

28

concluded that its purpose related to a possible $15 million loan by VIA to the Debtor that ultimately was never consummated.  The Complaint presents a litany of ways in which SB Claims contends that Mr. Boro's investigation was insufficient.  Complaint ¶ 61.  The Complaint, however, does not allege any manner in which those supposed inadequacies involve the 2002 Noteholders.

Finally, SB Claims further alleges, again solely on information and belief, that its predecessors VIA and S3 relied on Mr. Boro's representations regarding the purpose of the VIA Senior Indebtedness Provision.  Complaint ¶¶ 53 and 60.d.  The Complaint, however, does not contain any allegation that VIA and S3, who were represented by sophisticated counsel throughout the negotiations, took any steps themselves to confirm or test the information that SB Claims now asserts that VIA and S3 relied upon.  In particular, the Complaint does not indicate that VIA and S3 investigated whether VIA in fact contemplated making a $15 million loan to the Debtor during the time in which the Indenture was being negotiated, contacted any of the 2002 Noteholders or any current or former employee of the Debtor to discuss the origin of the VIA Senior Indebtedness Provision, asked the Debtor or the 2002 Noteholders for any documents relating to the VIA Senior Indebtedness Provision, or sought to take discovery on the issue.

## III.    ARGUMENT

### A.    The First Claim For Relief Fails.

The first claim for relief seeks equitable subordination of the claims of the 2002 Noteholders solely to the Allowed Claim purchased by SB Claims from VIA and S3.  Complaint ¶ 84.  Notably, SB Claims does not seek to subordinate those claims to *all* general unsecured claims.

#### 1.    SB Claims Has No Standing To Seek Equitable Subordination For General Harm To The Estate.

The Complaint alleges that, during the bankruptcy case, the 2002 Noteholders failed to disclose the existence of what SB Claims calls the "VIA Senior Indebtedness Provision" of the Indenture (a document that has been publicly available, including on the Internet,[5] since April 2002

---

[5]    http://www.secfilings.com/8-K-Current-Report/3030109/Sonicblue-Inc.aspx.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1    when it was filed with the Securities and Exchange Commission) and that the 2002 Noteholders and

2    the Debtor concealed from creditors and the Court the so-called "Purported Waiver Language" of

3    the Settlement Agreement (in which VIA and S3 agreed that the VIA Senior Indebtedness Provision

4    did not apply to the Allowed Claim awarded in the Settlement Agreement).  Complaint ¶¶ 28, 34,

5    58, 62, 64, 65, 66, 67, 71, 73.

6         As explained above, SB Claims does not now assert that this alleged nondisclosure resulted

7    in any actual harm to the estate or unsecured creditors.  This is evident by the relief sought in the

8    Complaint – subordination only to a single claim rather than to all unsecured claims in general.  All

9    of the allegations of purported misconduct by the 2002 Noteholders, however, are incorporated by

10   reference into the first claim for relief, and SB Claims summarily asserts that "[t]he 2002

11   Noteholders engaged in inequitable conduct in obtaining the Purported Waiver Language,"

12   Complaint ¶ 79, implying that the 2002 Noteholders' alleged nondisclosure to the general body of

13   creditors somehow supports equitable subordination solely for the benefit of SB Claims.

14        To the extent that the first claim for relief seeks redress for such alleged "inequitable

15   conduct," distinct from the alleged fraud upon VIA and S3 (discussed below), such claim fails as a

16   matter of law because SB Claims lacks standing to assert it.  Specifically, under *In re Morpheus*

17   *Lights, Inc.*, 228 B.R. 449 (Bankr. N.D. Cal. 1998), SB Claims has no standing to assert a claim for

18   equitable subordination based upon "general" harm to the estate or creditors, and instead may

19   prosecute such a claim only "[i]f it could be shown that [SB Claims] has been particularly harmed

20   by inequitable conduct of" the 2002 Noteholders.  *Id.* at 453.

21        In *Morpheus Lights*, Judge Grube held that a creditor can seek to equitably subordinate

22   another creditor's claim only if the complaining creditor can show that it, particularly, was harmed

23   by the other creditor's misconduct:

24             ***Whether an individual creditor can bring an equitable
               subordination claim against another creditor turns on whether the
25             creditor-plaintiff is the holder of the claim***.  If the creditor-plaintiff
               holds the claim, then the creditor-plaintiff has standing to pursue its
26             claim.  If, for example, the estate holds the claim, then a representative
               of the estate, such as the trustee or debtor in possession, is the proper
27             party to bring the claim.  Such an analysis is necessary to promote the
               orderly and equitable administration of the bankruptcy estate by

28
                                              -8-

preventing individual creditors from pursuing separate actions to the detriment of other creditors and of the estate as a whole.  *See Solow v. Stone*, 994 F. Supp. 173 (S.D.N.Y. 1998). . . .

Whether a claim is property of the estate or of an individual creditor depends on whether the claim is general or particular.  "***If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action***."  *Kalb Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2nd Cir.1993), *quoting St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700-01 (2d Cir.1989) (citations omitted).  . . . [A]ny generalized claims should be brought by the debtor in possession or creditor's committee.

If it could be shown that Variable [the complaining creditor] has been particularly harmed by inequitable conduct of Comerica [the defendant], Variable would have standing to assert a claim for equitable subordination.  However, Variable has not alleged any injury particular to it. . . .  Because Variable has not alleged a particularized injury, [the debtor] or the creditors' committee are the proper parties to assert a claim for equitable subordination.

*Id.* at 453 (emphasis added); *accord, e.g.*, *In re Applied Theory Corp.*, --- F.3d ---, 2007 WL 1965012, at *3 (2d Cir. July 9, 2007) ("[R]egardless of how the Committee characterizes it, any equitable subordination claim brought by the Committee would allege harm to the Debtor generally and would seek to subordinate the Lenders to other creditors.  Since the Committee is not itself a creditor, it does not have any rights held by any creditor to assert such a claim against another creditor.  In other words, the Committee has not sustained an injury for which a 'direct' claim might otherwise be available.").

Thus, the only alleged "inequitable conduct" about which SB Claims has standing to complain is the alleged fraud perpetrated upon its predecessors, VIA and S3.  SB Claims has no standing to pursue subordination based upon its other allegations of inequitable conduct, which in any event are the subject of an investigation currently being conducted for the benefit of all unsecured creditors by the chapter 11 trustee.

**2.      The Complaint Fails To Adequately Allege Any Particularized Harm.**

SB Claims' sole allegation of "particularized harm" is its claim that VIA and S3 were deceived **by the Debtor** into waiving rights under the Indenture because they did not understand that

-9-

1    those rights were meaningful.  As noted above, SB Claims alleges (a) on information and belief that

2    statements were made by the Debtor's counsel to counsel for SB Claims' predecessors, (b) on

3    information and belief that those statements were false, and (c) on information and belief that SB

4    Claims' predecessors did not know the statements were false and relied upon them in entering into

5    the Settlement Agreement.  Complaint ¶¶ 51, 52, 53, 60, 61.  The allegations against the 2002

6    Noteholders are even more tenuous.  As explained above, the **only** remotely relevant allegation, also

7    made on information and belief, is "that counsel for the 2002 Noteholders was a source [of counsel

8    to the Debtor] of this false information regarding the purported purpose of the VIA Senior

9    Indebtedness Provision."  Complaint ¶ 52.

10       These unsupported "information and belief" allegations are insufficient as a matter of law to

11   sustain a claim for equitable subordination.  First, VIA and S3 affirmatively represented that, "in

12   making [the] Settlement Agreement, they rely entirely upon their own judgment, beliefs and interest

13   and, where applicable, the advice of their own counsel and that they each have had a reasonable

14   period of time to consider [the] Settlement Agreement."  Settlement Agreement § 24.  This waiver

15   by SB Claims' assignors dooms the first claim for relief, which is premised specifically on the

16   "reliance" that VIA and S3 affirmatively disclaimed.

17       Second, SB Claims' allegations are deficient because they are premised solely upon SB

18   Claims' "information and belief."  Rule 9(b) of the Federal Rules of Civil Procedure, made

19   applicable by Rule 7009 of the Federal Rules of Bankruptcy Procedure, provides that, "[i]n all

20   averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

21   particularity."  Fed. R. Civ. P. 9(b).  Rule 9(b) applies to equitable subordination actions that are

22   premised on fraud or mistake.  *See, e.g.*, *In re Universal Foundry Co.*, 163 B.R. 528, 539-41 (E.D.

23   Wis. 1993) (affirming dismissal of equitable subordination claim for failure to plead fraud with

24   particularity), *aff'd*, 30 F.3d 137 (7th Cir. 1994); *In re S.M. Acquisition Co.*, No. 05-C-7076, 2006

25   WL 2290990, *3 n.3 (N.D. Ill. Aug. 7, 2006) ("Courts may require parties to satisfy Rule 9(b) *if*

26   they allege fraud or misrepresentation as the inequitable conduct underlying the equitable

27   subordination defense"); *In re Desmond,* 334 B.R. 78, 85-86 (Bankr. D.N.H. 2005).

28

1    Critically, it is not sufficient under Rule 9(b) to allege fraud or mistake on information and

2    belief.  *See, e.g.*, *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)

3    ("allegations of fraud based on information and belief usually do not satisfy the particularity

4    requirement"); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (same); *Wool v. Tandem*

5    *Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (same).  The only exception to this rule is with

6    respect to "matters peculiarly within the opposing party's knowledge."  *Id.*; *See e.g.*, *Moore*, 885

7    F.2d at 540.  Here, the allegedly fraudulent activities are not peculiarly within the knowledge of the

8    2002 Noteholders.  To the contrary, SB Claims' predecessors (VIA and S3) have direct, personal

9    knowledge about those activities (including what statements were made to them and what they relied

10   upon), and the 2002 Noteholders do not.  Moreover, even for matters peculiarly within the opposing

11   party's knowledge, the "allegations should include the misrepresentations themselves with

12   particularity and, where possible, the roles of the individual defendants in the misrepresentations."

13   *Moore*, 885 F.2d at 540; *see Neubronner*, 6 F.3d at 672.  SB Claims has not met this requirement.

14   Of particular importance here, SB Claims does ***not*** allege that the 2002 Noteholders ever

15   made any misrepresentations to VIA and S3.  While SB Claims would like the Court to embrace SB

16   Claims' "guess" that the 2002 Noteholders' counsel provided the Debtor's counsel with information

17   about the purpose of the VIA Senior Indebtedness Provision a year or more before VIA and S3

18   signed the Settlement Agreement, Complaint ¶ 52, its scant "information and belief" allegations fall

19   far short of anything that can be accepted as an allegation of fraud or deceit .  If Rule 9(b) means

20   anything, it surely stands for the proposition that the courts will not accept allegations of fraud by

21   insinuation.  *See Bankers Trust Co. v. Old Republic Insurance Co.*, 959 F.2d 677, 683-84 (7th Cir.

22   1992) ("The allegations of fraud that [the plaintiff] was required to make, however, are made in its

23   complaint 'on information and belief,' a clearly improper locution under the current federal rules,

24   which impose (in the amended Rule 11) ***a duty of reasonable precomplaint inquiry not satisfied by***

25   ***rumor or hunch***.  Even before Rule 11 was amended to require this, and *a fortiori* since, it was

26   understood that the duty to plead the circumstances constituting fraud with particularity could not be

27   fulfilled by pleading those circumstances on 'information and belief' unless they were facts

28

-11-

1   inaccessible to the plaintiff, in which event he had to plead the grounds for his suspicions.")

2   (emphasis added).

3        Further, a plaintiff may allege "on information and belief" only if it actually lacks knowledge

4   on point.  *See, e.g.*, *Bankers Trust*, 959 F.2d at 684 (no information and belief pleading with respect

5   to "a public fact" and "a matter of public record"); *Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir.

6   1986) ("Many of plaintiffs' allegations based upon information and belief fail to meet these

7   requirements.  Some indeed appear to relate to matters peculiarly within plaintiffs', rather than

8   defendants', knowledge."); *County of Santa Clara v. Astra United States, Inc.*, 428 F. Supp. 2d

9   1029, 1037 (N.D. Cal. 2006) (dismissing claim based on information and belief; "Given, however,

10  that plaintiff directly funded its 340B entities, plaintiff cannot fairly allege that defendants are in

11  sole possession of the facts that would support a CFCA claim.").

12       In this case, it is inconceivable that SB Claims meets this test with regard to matters plainly

13  within the knowledge of SB Claims' contractual predecessors (including what they were told,

14  whether they knew the "true" facts and what representations they "relied" upon), particularly when

15  those predecessors are incentivized to cooperate with SB Claims because the parties have agreed to

16  share in the proceeds of this action.  Claim Transfer Agreement §§ 4 and 5.  As assignee, SB Claims

17  in fact is charged with everything known by VIA and S3 relating to the transaction, whether or not

18  VIA and S3 disclosed that information to SB Claims:  "[T]he assignee stands in the shoes of his

19  assignor and takes subject to all equities and defenses existing in favor of the obligor prior to notice

20  of the assignment.  It is not material that the assignee had no notice or knowledge of the equities or

21  defenses."  *Rosman v. Cuevas*, 176 Cal. App. 2d Supp. 867, 870 (1959); *see, e.g.*, Cal. Civ. Proc.

22  Code § 368 ("In the case of an assignment of a thing in action, the action by the assignee is without

23  prejudice to any set-off, or other defense existing at the time of, or before, notice of the assignment

24  . . . ."); Cal. Civ. Code § 1459 ("A non-negotiable written contract for the payment of money or

25  personal property may be transferred by indorsement in like manner with negotiable instruments.

26  Such indorsement shall transfer all the rights of the assignor under the instrument to the assignee,

27  subject to all equities and defenses existing in favor of the maker at the time of the indorsement.");

28

1   *Salaman v. Bolt*, 74 Cal. App. 3d 907, 919 (1977) ("the assignee of a chose in action stands in the

2   shoes of his assignor, taking his rights and remedies subject to any right to setoff or other defenses

3   existing against the assignor prior to actual notice of the assignment"); *Lara v. Kern County Board*

4   *of Supervisors*, 59 Cal. App. 3d 399,407-08 (1976) ("Assignment carries with it all the rights of the

5   assignor, but the assignee of a nonnegotiable thing in action can acquire no greater right than that

6   possessed by his assignor, and takes subject to all equities and defenses existing in favor of the

7   obligor prior to notice of the assignment and whether or acquired before or after execution of the

8   assignment.") (quotations omitted).

9        Yet, VIA and S3 were not even willing to assert the truth of the supposedly "true" facts

10  concerning the Allowed Claim.  *See* Claim Transfer Agreement § 9 (SB Claims "acknowledges that

11  neither the Claimants nor any agent or representative of the Claimants have made any representation

12  whatsoever to [SB Claims] or its agents or representatives regarding whether the Allowed Claim is

13  'Senior Indebtedness' under the Indenture . . . .").  The Court should not countenance this artifice of

14  feigned ignorance, particularly in the context of allegations of fraud or mistake like those made by

15  SB Claims.

16
17       **3.      SB Claims May Not Seek To Revoke Part Of The Settlement Agreement
                    While Maintaining The Benefit Of Other Parts Of The Agreement.**

18       In seeking to subordinate the 2002 Noteholders to the Allowed Claim, SB Claims attempts to

19  invalidate and nullify the "Purported Waiver Language", which is just one of many provisions of the

20  Settlement Agreement, a fully-integrated document.  Settlement Agreement § 26.  Notably, SB

21  Claims does not seek to invalidate the entire Settlement Agreement.  To the contrary, it affirmatively

22  seeks to enforce it, particularly the provisions that allow the $12.5 million Allowed Claim and that

23  purportedly enable VIA and S3 to "allocate" the entire claim to VIA rather than S3, the party to

24  whom liability actually was owed.[6]  In fact, as explained above, SB Claims has promised not to take

25

26  [6]    The 2002 Noteholders dispute that any part of the liability compromised pursuant to the
27         Settlement Agreement is or ever was due to VIA.  The Investment Agreement that gave rise to
           the Allowed Claim imposes obligations on the Debtor to make payments and render
28         performance to S3, not VIA.  The notion that S3 could "allocate" to VIA a claim owed to S3

-13-

1    any action "that affects any provisions in the Settlement Agreement that are unrelated to the

2    Transferred Rights," Claim Transfer Agreement § 14, including the provisions by which VIA and

3    S3 received intellectual property, stock, and releases from the Debtor.

4        In other words, SB Claims substantively seeks to rescind part, but only part, of the

5    Settlement Agreement.  This it cannot do.  First, the Settlement Agreement itself forbids such

6    selective enforcement or modification.  It provides that "[t]his Settlement Agreement is an integrated

7    document that sets forth the entire agreement between the Parties" and that "[n]o modification or

8    amendment of this Settlement Agreement shall be binding or enforceable unless in writing and

9    signed by all of the Parties to the modification or amendment."  Settlement Agreement §§ 26 and 27;

10   *see Martinez v. Master Protection Corp.*, 118 Cal. App. 4th 107, 116 (2004) (party could not

11   unilaterally rescind or modify one provision of a fully integrated agreement).  Notably, the

12   Settlement Agreement does not have a severability provision.

13       Second, and equally important, there is no such thing as partial rescission under

14   circumstances like this.  Section 1691 of the California Civil Code specifically provides that a

15   contracting party may not seek rescission unless it "[r]estore[s] to the other party everything of value

16   which he has received from him under the contract or offer[s] to restore the same upon condition

17   that the other party do likewise, unless the latter is unable or positively refuses to do so."  Cal. Civ.

18   Code § 1691; *see also* Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a

19   transaction is equivalent to a consent of all the obligations arising from it, so far as the facts are

20   known, or ought to be known, by the person accepting.").

22       ***The settled rule is that one who would rescind for fraud or other reason cannot cling to the portion of the deal which he deems favorable and reject the balance***.  He must rescind the contract as a whole or not at all.

26   and, in the process, provide that claim with seniority over the Debentures where none previously existed finds no support in the Indenture or anywhere else.  The 2002 Noteholders reserve all rights in this regard.

-14-

1  *Hayutin v. Weintraub*, 207 Cal. App. 2d 497, 509 (1962) (emphasis added); *see, e.g.*, *International*

2  *Marble and Granite of Colorado, Inc. v. Congress Financial Corp.*, 465 F. Supp. 2d 993, 1004

3  (C.D. Cal. 2006) (quoting *Hayutin*); *Saret-Cook v. Gilbert, Kelly, Crowley & Jennett*, 74 Cal. App.

4  4th 1211, 1226 (1999) ("[A] party to a contract who wishes to rescind cannot play fast and loose.

5  He cannot conduct himself so as to derive all possible benefit from the transaction and then claim

6  the right to rescind.") (quoting *Neet v. Holmes*, 25 Cal. 2d 44, 457-58 (1944)).

7      As the California Supreme Court observed long ago, this basic rule is premised on avoiding

8  unjust enrichment to the party that claims to have been defrauded:

9          The general rule is that one must rescind all of his contract and may
           not retain rights under it which he deems desirable to have and to
10         repudiate the remainder of its provisions.  The theory underlying such

11         a rule is that retention of only the benefits of a transaction amounts to
           unjust enrichment and binds the parties a contract which they did not
12         contemplate.

13  *Simmons v. California Institute of Technology*, 34 Cal. 2d 264, 275 (1949) (citations omitted);

14  *accord, e.g.*, *IMO Development Corp. v. Dow Corning Corp.*, 135 Cal. App. 3d 451, 458 (1982)

15  ("The rationale underlying the rule is that retention of only the benefits constitutes unjust enrichment

16  and binds the parties to terms not contemplated within the agreement."); *International Marble*, 465

17  F. Supp. 2d at 1004 (same).

18      The *IMO Development* case is instructive.  In that case, the Plaintiff (IMO) sought a

19  declaratory judgment that one provision of a sales agreement, providing for a waiver of claims

20  arising under earlier agreements with the defendant, was invalid and unenforceable on the grounds

21  of economic duress.  *IMO Development*, 135 Cal. App. 3d at 456.  "The trial court granted the

22  motion for judgment on the pleadings on the ground that the law does not permit partial rescission of

23  a contract," *id.* at 457, and the Court of Appeal affirmed:

24          Here IMO sought a declaration only as to the unenforceability of the
           waiver provision in paragraph 9(c).  It did not seek to invalidate any
25         other portion of the sales agreement, nor did it offer to return the
           property or proceeds of the loan as restitution of the benefits obtained.
26         In its answer to the cross-complaint, IMO specifically admitted it held
           title to the property and accepted the proceeds of the loan.  Thus, IMO
27         alleged its entitlement to the benefits of the sales agreement and
           sought a declaration that it was free of the obligations contained in the

28

-15-

1

2

waiver of claims provision.  Furthermore, it is noteworthy that the fourth count expressly alleged that IMO's consent to the waiver provision was obtained through economic duress.  Generally, rescission is available as a remedy where consent to a transaction is given under duress.  (Civ. Code, § 1689, subd. (b)(1).)  In view of the allegations of the pleading, *we conclude that the trial court properly determined that IMO in effect sought a partial rescission of the contract, and, because no such remedy is recognizable, the fourth count failed to state a cause of action*.

3

4

5

6

*Id.* (emphasis added).

7

This reasoning fully applies to what SB Claims seeks to do in this case.  As in *IMO*

8

*Development*, SB Claims seeks to invalidate only a single provision of the Settlement Agreement;

9

indeed, to seek more would constitute a breach of the Claim Transfer Agreement.  SB Claims does

10

"not seek to invalidate any other portion of the" agreement; it has not "offer[ed] to return the

11

property or proceeds of the [settlement agreement] as restitution of the benefits obtained"; rather, it

12

"allege[s] its entitlement to the benefits of the [settlement] agreement and [seeks] a declaration that

13

it [is] free of the obligations contained in the waiver of claims provision."  Just as in *IMO*

14

*Development*, SB Claims "in effect [seeks] a partial rescission of the contract, and, because no such

15

remedy is recognizable, the [first] count fail[s] to state a cause of action."

16

\*                    \*                    \*

17

For all of the foregoing reasons, the first claim for relief fails to state a claim upon which

18

relief may be granted.

19

**B.      The Second And Third Claims For Relief Fail.**

20

The second and third claims for relief are substantively identical.  Each seeks a declaration

21

that the Allowed Claim constitutes Senior Indebtedness under the Indenture.  In addition to the fact

22

that VIA and S3 expressly agreed in the Settlement Agreement that the Allowed Claim does not

23

constitute Senior Indebtedness, each of the second and third claims for relief are defeated by the

24

plain terms of the Indenture, a copy of which is attached as *Exhibit C*.[7]

25

26

27

[7]    The Court may consider the terms of the Indenture.  *See* note 2, *supra*.

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1. **The Settlement Agreement Prohibits SB Claims From Seeking A Declaration That The Allowed Claim Is Senior Indebtedness.**

The Settlement Agreement unequivocally provides that (a) the Allowed Claim "shall be afforded the benefits of, and shall be pari passu with, the other allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case," and (b) "the Allowed Claim is not, and shall not be treated as, 'Senior Indebtedness' under the terms of the Debtors' Indenture, dated as of April 22, 2002, for the 7¾% Secured Senior Subordinated Convertible Debentures due 2005." Settlement Agreement § 3. As set forth above, by challenging only this provision of the Settlement Agreement, SB Claims is seeking a partial rescission of the Settlement Agreement. As no such remedy is available, SB Claims is bound by the clear unambiguous terms of the Settlement Agreement that provide that the Allowed Claim is not Senior Indebtedness.

2. **The Allowed Claim Is Not Senior Indebtedness Because It Is Not A Claim For Borrowed Money Or Evidenced By Bonds, Debentures, Notes, Or Other Similar Instruments.**

The Indenture provides that the Debentures are subordinated to "Senior Indebtedness." Complaint ¶ 12; Indenture § 4.1. SB Claims alleges that the Allowed Claim is Senior Indebtedness because it fits within subparagraph (g) of the Indenture's definition of "Senior Indebtedness," which states in pertinent part:

> *Senior Indebtedness* shall mean the principal of, premium, if any, interest on (including any interest accruing after the filing of a petition by or against the Company under any bankruptcy law, whether or not allowed as a claim after such filing in any proceeding under such bankruptcy law) and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture, or thereafter incurred or created: . . . .
>
> (g) *All indebtedness of the Company due and owing to Via Technologies, Inc., in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "VIA Indebtedness")*[.]

Indenture § 1.1, at 6-8 (emphasis added).

SB Claims assumes that, because the Allowed Claim allegedly was "allocated" to VIA,[8] Complaint ¶ 69, it constitutes "indebtedness of the Company due and owing to VIA" and thus falls within this "VIA Senior Indebtedness Provision." The Complaint, however, fails to mention that the Indenture specifically defines the words "indebtedness" and "Indebtedness" in a way that makes clear that the Allowed Claim does not constitute "indebtedness" and thus cannot constitute Senior Indebtedness.

Specifically, Section 1.1 of the Indenture provides that "'Indebtedness' shall have the meaning specified in Section 7.1(e)." Indenture § 1.1. Section 7.1(e) in turn defines both "indebtedness" and "Indebtedness" in the context of specifying an event of default under the Indenture:

> (e) failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of ***indebtedness, which term as used herein means obligations (other than the Debentures or non-recourse obligations) of, or guaranteed or assumed by, the Company, or any Significant Subsidiary, for borrowed money or evidenced by bonds, debentures, notes or other similar instruments ("Indebtedness")*** in an amount in excess of $15 million, or the equivalent thereof, in any other currency or composite currency, and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures[.]

Indenture § 7.1(e) (emphasis added).

The Allowed Claim asserted by SB Claims does not fit within this shared definition of "indebtedness" and "Indebtedness." As SB Claims admits, the Allowed Claim arises from the Settlement Agreement. The Settlement Agreement specifically provides that the Allowed Claim "represent[s] a compromise of the claims that have been asserted by the Claimants for damages and other relief based, *inter alia*, on alleged breaches of the Amended and Restated Investment Agreement, including without limitation liquidated damages for the alleged breach of section 5.6 thereof." Settlement Agreement § 3. In other words, the Allowed Claim is a claim for damages for breach of a contract and ***not*** a claim "for borrowed money or evidenced by bonds, debentures, notes or other similar instruments" within the definition of "indebtedness." Notably, nothing in the

---

[8] See note 6, *supra*, regarding this "allocation."

1    Complaint alleges that the Allowed Claim is "for borrowed money" or that it is "or evidenced by

2    bonds, debentures, notes, or other similar instruments."[9]

3        Accordingly, the Allowed Claim is not "indebtedness" and thus cannot be "VIA

4    Indebtedness" or "Senior Indebtedness" under the Indenture.

5

6        **3.    The Allowed Claim Is Not Senior Indebtedness Because It Is Not "Owing To" VIA.**

7        Neither SB Claims nor VIA nor S3 are or ever were parties to the Indenture, a fact admitted

8    in the Complaint.  Complaint ¶ 11.  Nevertheless, the Complaint is premised on the notion that SB

9    Claims has the right to assert entitlement to certain benefits – notably, priority over and above the

10   2002 Noteholders – purportedly contained in certain provisions of the Indenture.

11       Specifically, SB Claims asserts that it is the successor to rights of VIA and S3 under the

12   Allowed Claim.  SB Claims further contends that the Indenture bestows upon the Allowed Claim the

13   benefit of seniority over other claimants, *i.e.*, the 2002 Noteholders.  Consequently, SB Claims

14   argues that it must be the successor to any seniority benefit that might have been provided to VIA

15   under the Indenture.  As discussed above, the Allowed Claim would not be entitled to seniority

16   _____

17   [9]  SB Claims previously asserted that subparagraph (h)(ii) of the definition of Senior Indebtedness
         conflicts with Section 7.1(e)'s definition of "indebtedness."  Subparagraph (h)(ii) provides that
18       Senior Indebtedness "shall not include . . . indebtedness, other than the Via Indebtedness, for
         trade payables or constituting the deferred purchase price of assets or services incurred in the
19       ordinary course of business."  Indenture § 1.1.  The suggestion, apparently, is that the notion that
         there might exist "indebtedness . . . for trade payables or constituting a deferred purchase price
20       of assets or services" somehow conflicts with the requirement that "indebtedness" be "for
         borrowed money or evidenced by bonds, debentures, notes or other similar instruments."  The
21       two provisions, however, are entirely consistent.  It is possible, even probable, that "trade
         payables" or the "deferred purchase price of assets or services" would be "evidenced by bonds,
22       debentures, notes or other similar instruments."  It also is likely that some arrangements
         involving the "deferred purchase price of assets or services" involve the borrowing of money.  In
23       other words, there may exist "trade payables" or debt for the "deferred purchase price of assets
         or services" that fall within the definition of "indebtedness" and, without the exclusion provided
24       by subparagraph (h)(ii), would constitute Senior Indebtedness.  In any event, this ***exclusion*** does
         not create a new category of Senior Indebtedness or expand the kinds of indebtedness that might
25       be included in Senior Indebtedness.  It does the opposite.  It makes clear that certain types of
         amounts owed by the Debtor are excluded from the definition of "Senior Indebtedness" even if it
26       were to be asserted that they constituted "indebtedness".  This exclusion cannot and does not add
         any new category of debt to the definition of "indebtedness" or Senior Indebtedness.
27

28

1  under the Indenture even in VIA's hands but, even if it were, no such seniority would be passed

2  down to SB Claims as a consequence of the Claim Transfer Agreement.

3      To the contrary, Section 15.9 of the Indenture strictly limits those persons or entities who

4  may enjoy rights as successors under the Indenture:

5          SECTION 15.9.  Benefits of Indenture.  ***Nothing in the Indenture*** or
           in the Debentures, expressed or implied, ***shall give to any person***,
6          other than the parties hereto and their successors hereunder and the
           holders of Senior Indebtedness, ***any benefit*** or legal or equitable right,
7          remedy, or claim ***under this Indenture***.

8  Indenture § 15.9 (emphasis added).  Thus, the Indenture recognizes that there are only three

9  categories of persons who may enjoy ***any benefit*** under the Indenture:

10         (1)     the parties to the Indenture;

11         (2)     the successors of the parties to the Indenture; and

12         (3)     the holders of Senior Indebtedness.

13  SB Claims does not fall within any of those three categories.

14      First, it is not alleged (and it cannot be truthfully alleged) that SB Claims was a party to the

15  Indenture.  Second, SB Claims admits that "VIA was not a party to the Indenture."  Complaint ¶ 11.

16  Consequently, SB Claims is not a successor to a party to the Indenture, and cannot claim "any

17  benefit or legal or equitable right, remedy or claim" under the Indenture by reason of being the

18  successor to a party under the Indenture.  Third, SB Claims does not allege (and cannot truthfully

19  allege) that it is a holder (as opposed to a successor of a holder) of Senior Indebtedness.

20      In this regard, SB Claims asserts that the Allowed Claim is "Senior Indebtedness" because it

21  constitutes "VIA Indebtedness" within the meaning of subparagraph (g) of the definition of "Senior

22  Indebtedness."  However, even if the Allowed Claim fell within the definition of "indebtedness"–

23  which it does not – it does not fall within the definition of "VIA Indebtedness" now that the claim is

24  owned by, held by, and owing to SB Claims.  "VIA Indebtedness" is confined to indebtedness "due

25  and owing to Via Technologies, Inc."  Indenture § 1.1. (subparagraph (g) of the definition of "Senior

26  Indebtedness").  Thus, to constitute "VIA Indebtedness," a debt must be payable ***to VIA***.  Here, the

27

28

Allowed Claim no longer is payable to VIA because it has been assigned to SB Claims.[10]
Accordingly, the Allowed Claim is now "due and owing" to SB Claims, not VIA.[11]  However, under the terms of the Indenture, there can be no "holder" of VIA Indebtedness other than VIA.  Thus, even assuming *arguendo* that VIA could have been characterized as a holder of "Senior Indebtedness" before the Allowed Claim was assigned to SB Claims, SB Claims is, at most, a successor to a holder of Senior Indebtedness.[12]  Unlike successors of parties to the Indenture, nothing in Section 15.9 gives any rights to successors of holders of Senior Indebtedness.  Not having been included in the exceptions listed in Section 15.9, successors to the holders of Senior Indebtedness fall within the rubric of "any person" as that term is used in Section 15.9's pronouncement that "[n]othing in the Indenture . . . shall give to any person . . . any benefit or . . . right . . . under this Indenture."  Indenture § 15.9.

---

[10]  It is hornbook law that upon receiving notice of an assignment, the obligor can only discharge its obligation by making payment to the assignee.  *See, e.g.*, *Builder's Control Service of Northern California, Inc. v. North American Title Guaranty Co.*, 205 Cal. App. 2d 68, 74 (1962) ("in the face of the fact that the escrow agent had notice of the assignments, the agent could not have properly discharged its obligation by paying the assignor"); *Roberts v. Carter & Potruch*, 140 Cal. App. 2d 370 (1956).  Following notice of an assignment, the obligor is obligated to perform to the assignee even if it performs directly to the assignor, *see, e.g.*, *In re Kling*, 44 Cal. App. 267, 270 (1919) ("The circumstances were such that, conceding the assignment was made for collection, the legal title thereto passed to the assignee, and after notice thereof the debtors dealt with . . . the assignor, at their peril"), *Becker v. New Penn Development Corp.*, 56 N.Y.S.2d 1, 2-3 (N.Y. App. Div. 1945), and the assignor lacks standing to sue on the claim, *see, e.g.*, *Johnson v. County of Fresno*, 111 Cal. App. 4th 1087, 1096 (2003); *Purcell v. Colonial Ins. Co.*, 20 Cal. App. 3d 807, 814 (1971); *James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.*, 61 N.Y.2d 836, 838 (N.Y. 1984).

[11]  As noted above, the 2002 Noteholders dispute that the Allowed Claim is or ever was "due to" VIA.

[12]  SB Claims understands this.  The Claim Transfer Agreement itself specifically provides that SB Claims "shall not sue or act in respect of the Transferred Rights [which include the Allowed Claim] in the name of the Claimants or VIA, but rather, ***at all times, [SB Claims] shall act in its own name***."  Claim Transfer Agreement § 20 (emphasis added); *see id.* § 13 ("the Claimants hereby appoint [SB Claims] as their true and lawful attorney and authorize [SB Claims] solely to act in the Claimants' stead (***but not in the Claimants' name***) to demand, sue for, compromise, and recover all amounts as now are, or may hereafter become, due and payable for or on account of the Transferred Rights") (emphasis added).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1    The doctrine of *expressio unius est exclusio alterius* is instructive in this regard.  The

2  doctrine provides that the inclusion of one thing implies the exclusion of all others.  *Public Utility*

3  *District No. 1 v. FERC*, 471 F.3d 1053, 1078 n.23 (9th Cir. 2006).  Where a contract lists only one

4  exception, all exceptions not listed are to be excluded.  *In re Air Passenger Computer Reservations*

5  *Systems Antitrust Litigation*, 724 F. Supp. 744, 750 (C.D. Cal. 1989) ("Under the long accepted

6  maxim *expressio unius est exclusio alterius*, the presence of a specific list of exceptions implies that

7  the specific list is exclusive, and the Court should not imply another exception."); *Portland Web*

8  *Pressman's Union Local No. 17 v. Oregonian Publishing Co.*, 188 F. Supp. 859, 865 (D. Or.), *aff'd*,

9  286 F.2d 4 (9th Cir. 1960).  Section 15.9 of the Indenture specifically provides that the benefits of

10 the Indenture only inure to the parties and successors of the parties.  Under *expressio unius*, no other

11 successors, such as successors of VIA or other holders of Senior Indebtedness, are entitled to the

12 benefits of the Indenture.

13                     *                    *                    *

14    For all of the foregoing reasons, the Allowed Claim is not Senior Indebtedness under the

15 Indenture.  Accordingly, the second and third claims for relief fail to state a claim upon which relief

16 may be granted.

17

18 **IV.    CONCLUSION**

19    For the reasons and based upon the authorities presented above, the Complaint should be

20 dismissed in its entirety, with prejudice.

21 DATED:  New York, New York                STROOCK & STROOCK & LAVAN LLP
              July 11, 2007                           180 Maiden Lane
22                                                     New York, New York  10038
                                                       (212) 806-5400
23

24                                              By   */s/ Lewis Kruger*
                                                       Lewis Kruger
25                                                     Alan Z. Yudkowksy

26                                              Counsel for Portside Growth & Opportunity
                                                Fund, Smithfield Fiduciary LLC, and Citadel
27                                              Equity Fund Ltd.

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

**EXHIBIT "A"**

## SETTLEMENT AGREEMENT

This Settlement Agreement is made effective as of the Effective Date (as defined below) by and among VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation, and SONICblue, Inc.

### Section I – Definitions

1.   "Adversary Proceeding" as used herein shall mean the case entitled *SONICblue Incorporated v. VIA Technologies, Inc.* (case No. 04-5556) filed by Debtor against Claimants and S3G Inc., on or about December 21, 2004, including without limitation all counterclaims.

2.   "Amended and Restated Investment Agreement" as used herein shall mean the written agreement entitled "Amended and Restated Investment Agreement" between VIA and Debtor dated August 28, 2000, as amended and supplemented.  Amended and Restated Investment Agreement shall include all of the letters and other agreements executed as a part of the transaction contemplated in the Amended and Restated Investment Agreement, including without limitation the Joint Venture Agreement between Debtor, Sonica3, Inc., and VIA, dated as of January 3, 2001, the Class A Shares Option Agreement between Debtor and VIA, dated as of January 3, 2001, the Guaranty executed by VIA and dated as of January 3, 2001, and certain so-called side letters, dated as of January 3, 2001, executed by Debtor and Claimants amending the Amended and Restated Investment Agreement.

3.   "Approval Order" as used herein shall mean an order of the Bankruptcy Court, or another court of competent jurisdiction, approving this Settlement Agreement without change (unless such change is approved in writing by all Parties hereto) and authorizing Debtor's entry into and performance under this Settlement Agreement.

4.   "Assumption Motion" as used herein shall mean the motion filed by Debtor in Debtor's Bankruptcy Case on December 17, 2004, seeking to assume the PCL pursuant to 11 U.S.C. § 365.

5.   "Bankruptcy Cases" as used herein shall mean collectively the jointly-administered Chapter 11 cases captioned *In re SONICblue Incorporated*, et al., Nos. 03-51775 to 51778, and any other bankruptcy cases or entities substantively consolidated therewith; and "Debtor's Bankruptcy Case" shall mean the Chapter 11 case captioned *In re SONICblue Incorporated*, No. 03-51775, including without limitation any other bankruptcy cases or entities substantively consolidated therewith.

6.   "Bankruptcy Code" as used herein shall mean Title 11 of the United States Code, including without limitation Chapter 11 thereof, 11 U.S.C. §§ 101 et seq.

7.   "Bankruptcy Court" as used herein shall mean the United States Bankruptcy Court for the Northern District of California, San Jose Division.

8.  "Bankruptcy Successor" as used herein shall mean any trustee appointed in the Debtor's Bankruptcy Case, including without limitation any Chapter 11 or Chapter 7 trustee, any debtor entity in the Bankruptcy Cases with which the Debtor is substantively consolidated, and any trustee, plan agent, liquidating agent, liquidating trust, creditor trust, creditor's committee, or similar entity appointed in the Debtor's Bankruptcy Case, whether appointed by the Bankruptcy Court or pursuant to a Chapter 11 plan of reorganization confirmed in the Debtor's Bankruptcy Case, to administer assets of the Debtor's estate for the benefit of the holders of claims against the Debtor.  For the avoidance of doubt, "Bankruptcy Successor" does not include any third party purchaser of assets from the Debtor's estate, whether pursuant to Section 363(b) of the Bankruptcy Code or a Chapter 11 plan of reorganization confirmed in the Debtor's Bankruptcy Case, any third party purchaser of the Debtor's stock, or any third party with which the Debtor may merge, whether pursuant to a Chapter 11 plan of reorganization confirmed in the Debtor's Bankruptcy Case or otherwise.

9.  "Claimants" as used herein shall mean VIA Technologies, Inc., and S3 Graphics Co. Ltd.

10. "Claimants' Proofs of Claim" as used herein shall mean the proofs of claim filed by Claimants in Debtor's Bankruptcy Case on or about July 17, 2003.

11. "Debtor" as used herein shall mean SONICblue, Inc., formerly known as S3 Incorporated, as debtor and debtor-in-possession.

12. "Development Assistance Agreement" as used herein shall mean the written agreement entitled "Development Assistance Agreement" between Intel and Debtor dated December 16, 1998.

13. "Effective Date" as used herein shall mean the date eleven days after the entry of the Approval Order on the docket of the Bankruptcy Court, provided that no appeal has been filed prior to such time or, if an appeal has been filed prior to such time, then "Effective Date" shall mean such later date as the Approval Order is upheld on appeal or all appeals of the Approval Order are dismissed and all deadlines for further appeal have expired.

14. "Graphics Chip Business" as used herein shall have the same meaning as the term "Graphics Chip Business" defined in Article I of the Amended and Restated Investment Agreement.

15. "Intel" as used herein shall mean Intel Corporation.

16. "Intel REDACTED AS CONFIDENTIAL ' has the meaning given that term in paragraph 7(b) of Section III of this Settlement Agreement.

17. "Intel-VIA Settlement Agreement" as used herein shall mean the written agreement entitled "Litigation Settlement Agreement between VIA Technologies Inc. and Intel Corporation" between VIA and Intel dated as of April 7, 2003.

18.  "Investment Agreement" as used herein shall mean the written agreement entitled "Investment Agreement" between VIA and Debtor dated April 10, 2000, as amended and supplemented.

19.  "JV Entities" as used herein shall mean S3-VIA, S3G Co., and S3G Inc.

20.  "JV Entities Subsidiaries" as used herein shall mean any Subsidiaries (as defined in the PCL) of any of the JV Entities, applying the definition of Subsidiaries in the PCL, for this purpose, as though the JV Entities were Subsidiaries (as defined in the PCL) of the Debtor.

21.  "Party" as used herein shall refer to any of the parties to this Settlement Agreement (*e.g.*, VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation or SONICblue, Inc.), and "Parties" shall mean all of them (*i.e,* VIA Technologies, Inc., S3 Graphics Co. Ltd., S3 Graphics, Inc., S3-VIA, Inc., Intel Corporation and SONICblue, Inc.).

22.  "PCL" as used herein shall mean the written agreement entitled "Patent Cross License Agreement" between Intel and Debtor dated December 16, 1998.

23.  "Petition Date" as used herein shall mean March 21, 2003.

24.  "S3-VIA Investment Agreement" as used herein shall mean the written agreement entitled "Joint Venture Agreement" dated as of October 27, 1999, by and between VIA, Debtor and S3Ventures, Ltd., a Cayman Islands company which is a wholly-owned subsidiary of Debtor.

25.  "S3G Co." as used herein shall mean S3 Graphics Co. Ltd.

26.  "S3G Inc." as used herein shall mean S3 Graphics, Inc.

27.  "S3-VIA" as used herein shall mean S3-VIA, Inc.

28.  "Stay Motion" as used herein shall mean the motion for relief from the automatic stay imposed by 11 U.S.C. § 362 in order to terminate the PCL, originally filed by Intel in Debtor's Bankruptcy Case on or about June 6, 2003, and renewed on May 13, 2004.

29.  "Trade Secret Agreement" as used herein shall mean the written agreement entitled "Trade Secret Disclosure and License Agreement" between Intel and Debtor dated December 16, 1998.

30.  "VIA" as used herein shall mean VIA Technologies, Inc.

<u>**Section II – Recitals**</u>

WHEREAS, on March 21, 2003, Debtor and certain of its affiliates commenced the Bankruptcy Cases by filing voluntary petitions for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

WHEREAS, on or about June 6, 2003, Intel filed the Stay Motion seeking to terminate the PCL.

WHEREAS, on July 17, 2003, Claimants filed Claimants' Proofs of Claim seeking a claim in excess of $100 million.

WHEREAS, on December 17, 2004, Debtor filed the Assumption Motion seeking to assume the PCL.

WHEREAS, on December 21, 2004, Debtor commenced the Adversary Proceeding, challenging Claimants' Proofs of Claim and seeking unspecified compensatory and punitive damages, and Claimants thereafter filed answers denying liability and asserting counter-claims against Debtor.

WHEREAS, the Parties have engaged in good faith settlement negotiations to resolve actual and potential disputes relating to the foregoing and otherwise.

WHEREAS, given the breadth and complexity of the Parties' disputes, as well as the numerous and contested legal and factual issues that would be involved in resolving them, and in order to avoid the costs and risks of litigation, the Parties have agreed to enter into this global settlement.

WHEREAS, the Parties have carefully considered the terms of this Settlement Agreement and, after having had the opportunity to consult with their respective attorneys, are satisfied that it is fair and reasonable.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties agree as follows:

**Section III – Settlement Terms**

Subject in each case to the effectiveness of this Settlement Agreement on the terms and conditions set forth herein, the undersigned hereby agree as follows:

**Condition Precedent**

1.    Condition Precedent. This Settlement Agreement, and each and every covenant, release, reservation or other agreement herein, is subject to, and conditioned upon, the occurrence of the Effective Date. Upon execution of this Settlement Agreement by VIA, Intel and each of the JV Entities, Debtor shall file and prosecute a motion seeking approval of this Settlement Agreement by the Bankruptcy Court, and the Parties hereto shall cooperate in good faith to ensure (a) the Effective Date occurs, (b) the Approval Order is entered forthwith and (c) the Approval Order remains effective notwithstanding any challenge before or after the Effective Date.

## Administrative Matters

2.    <u>Proceedings Dismissed</u>.  Immediately upon satisfaction of the condition precedent in paragraph 1 of Section III of this Settlement Agreement, (a) the Stay Motion and the Assumption Motion shall be, and shall be deemed to be, withdrawn with prejudice, and (b) the Adversary Proceeding (including without limitation any motions or proceedings pending within the Adversary Proceeding) shall be, and shall be deemed to be, dismissed with prejudice and without costs to any Party.  The Parties each agree to file and shall file any additional notices, stipulations or other papers required by the Bankruptcy Court in order to confirm these withdrawals and dismissals.  The Parties agree that this Settlement Agreement shall remain effective notwithstanding any substantive consolidation of Debtor with another entity or entities, provided that Claimants reserve their rights to object to such consolidation as a holder of an allowed unsecured claim.

3.    <u>Allowed Claim</u>.  Claimants shall jointly hold a single, allowed general unsecured claim in Debtor's Bankruptcy Case, which claim shall be afforded the benefits of, and shall be pari passu with, the other allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case, in the amount of $12.5 million ($12,500,000), representing a compromise of the claims that have been asserted by the Claimants for damages and other relief based, *inter alia*, on alleged breaches of the Amended and Restated Investment Agreement, including without limitation liquidated damages for the alleged breach of section 5.6 thereof (the "Allowed Claim").  Claimants and Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005.  The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants.  The Allowed Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including without limitation any proof of claim.

4.    <u>Filed Proofs of Claim Disallowed</u>.  Subject to the allowance in full of the Allowed Claim as set forth in paragraph 3 of Section III of this Settlement Agreement, the Claimants' Proofs of Claim each shall be deemed withdrawn and disallowed with prejudice.

## Intellectual Property Matters

5.    <u>Transfer of Intellectual Property to S3G Co</u>.  Debtor shall use its commercially reasonable best efforts to transfer within ten business days after the Effective Date to S3G Co., or its designee, the intellectual property related to or used in the Graphics Chip Business that currently remains in Debtor's possession, is reasonably available, and was to be contributed pursuant to the Amended and Restated Investment Agreement (the "Transferred Intellectual Property"), and to execute within ten business days after the Effective Date any transfer documents related to the Transferred Intellectual Property.  To the extent Debtor subsequently identifies or locates any Transferred Intellectual Property that remains in its possession, Debtor shall transfer such property to S3G Co. or its designee promptly upon such location or identification, and Claimants shall continue to own all right, title and interest in the Transferred Intellectual Property, whether or not it has been transferred to S3G Co. or its designee before or after the Effective Date; provided, however, that, after the Effective Date, Debtor or its

Bankruptcy Successors shall have no liability to Claimants for the transfer, disposal or destruction of any documents, files, or intellectual property in the possession of Debtor or its Bankruptcy Successors, whether or not such relate to or constitute the Transferred Intellectual Property, except as provided herein. Subject to the foregoing, the Parties agree that Debtor's performance of the following actions with respect to the Transferred Intellectual Property shall extinguish and satisfy all of Debtor's obligations, of whatever kind or nature, with respect to the transfer to S3G Co., or its designee, of the Transferred Intellectual Property:

a.  Within ten business days after the Effective Date, execution by Debtor of transfer documents relating to all patents and patent applications listed on Schedule 1 to the Bill of Sale (as defined in the Amended and Restated Investment Agreement) and patents, trademarks, copyrights, and other items listed in Schedule 3.14(a)(ii) to the Amended and Restated Investment Agreement. Debtor's delivery and execution with the requisite formalities, within ten business days after the Effective Date, of the documents that are listed in Exhibit 1 to this Settlement Agreement (as well as any additional documents that, prior to the Effective Date, Debtor, VIA, and the JV Entities, acting reasonably and in good faith, agree are necessary to effectuate the transfer) and that have been prepared in accordance with the provisions of paragraph 6 of Section III of this Settlement Agreement shall be deemed to satisfy Debtor's obligations under this paragraph 5(a) of Section III of this Settlement Agreement. Notwithstanding the foregoing, if execution by Debtor of additional transfer documents relating to the patents or patent applications listed on Schedule 1 to the Bill of Sale, or patents, trademarks, copyrights or other items listed in Schedule 3.14(a)(ii) subsequently becomes necessary to effectuate the transfer, then, during the time period that any of the Bankruptcy Cases remain pending, Debtor shall promptly execute with the requisite formalities and deliver to the S3G Co. or its designee such additional transfer documents. Pursuant to paragraph 7(b) of Section III of this Settlement Agreement,

REDACTED AS
CONFIDENTIAL

b.  Within ten business days after the Effective Date, execution by Debtor of the various documents necessary to record the trademark assignments for the trademarks used in the Graphics Chip Business, including without limitation the S3 trademarks. Debtor's delivery and execution with the requisite formalities, within ten business days after the Effective Date, of the documents that are listed in Exhibit 2 to this Settlement Agreement (as well as any additional documents that, prior to the Effective Date, Debtor, VIA, and the JV Entities, acting reasonably and in good faith, agree are necessary to effectuate the transfer) and that have been prepared in accordance with the provisions of paragraph 6 of Section III of this Settlement Agreement shall be deemed to satisfy Debtor's obligations under this paragraph 5(b) of Section III of this Settlement Agreement. Notwithstanding the foregoing, if execution by Debtor of additional

6

documents subsequently becomes necessary to record the trademark assignments, then, during the time period that any of the Bankruptcy Cases remain pending, Debtor shall promptly execute with the requisite formalities and deliver to S3G Co. or its designee such additional documents.

c.    Within ten business days after the Effective Date, delivery by Debtor of all patent, trademark, and copyright files and other documents relating to the Transferred Intellectual Property to the extent that the same may be located after a reasonable search, which shall include any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents; provided, however, that any Intel Confidential Information (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) shall not be transferred to VIA, the JV Entities, or any other third party, but shall be subject to the restrictions with respect to return or destruction of Intel Confidential Information in paragraph 7(f) of Section III of this Settlement Agreement. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations under this paragraph 5(c) of Section III of this Settlement Agreement by delivery within ten business days after the Effective Date of such documents previously located and identified to VIA by Debtor, including any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents. Debtor, VIA, and the JV Entities further agree that the foregoing document review procedures shall be subject to paragraph 7(f) of Section III of this Settlement Agreement.

d.    Within ten business days after the Effective Date, and subject to paragraph 7(f) of Section III of this Settlement Agreement, delivery by Debtor of a list of all licensed technology and the underlying licenses that were being utilized in the Graphics Chip Business prior to the January 3, 2001 closing to the extent that such a list and/or such licenses may be located after a reasonable search. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations under this paragraph 5(d) of Section III of this Settlement Agreement by delivery within ten business days after the Effective Date of such licenses and related documents previously located and identified to VIA by Debtor, including any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents.

e.    Within ten business days after the Effective Date, delivery by Debtor of the complete employee files, located by Debtor following a reasonable search, for those relevant employees (*e.g.*, employees listed as inventor(s)

or author(s) on any patent, patent application, or copyright transferred or to be transferred to S3G Co. or its designee) that are listed on Exhibit 3 to this Settlement Agreement (as well as for other relevant employees that, prior to the Effective Date, Debtor, VIA, and the JV Entities, acting reasonably and in good faith, agree to add to Exhibit 3), including without limitation resumes, offer letters, employment agreements, performance reviews, benefits files, and immigration files, and any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to such employee. Except as the Court in Debtor's Bankruptcy Case may otherwise provide by order, which Debtor and Claimants agree to apply for jointly, Debtor, VIA, and the JV Entities further agree that Debtor is under no obligation to make any transfer or disclosure pursuant to this paragraph 5(e) of Section III of this Settlement Agreement that would violate employee privacy rights or paragraph 7(f) of Section III of this Settlement Agreement.

f.    Within ten business days after the Effective Date, delivery by Debtor of all original data tapes used in the Graphics Chip Business to the extent the same may be located after a reasonable search, including data tapes protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents; provided, however, that any Intel Confidential Information (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) shall not be transferred to VIA, the JV Entities, or any other third party, but shall be subject to the restrictions with respect to return or destruction of Intel Confidential Information in paragraph 7(f) of Section III of this Settlement Agreement. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations to use commercially reasonable best efforts in relation to this paragraph 5(f) of Section III of this Settlement Agreement, but despite such efforts Debtor has been unable to identify which, if any, of the data tapes that Debtor has located were used in the Graphics Chip Business, and no further action by Debtor is required prior to the Effective Date with respect to this paragraph 5(f) of Section III of this Settlement Agreement. Debtor, VIA, and the JV Entities further agree that the foregoing data tape review procedures shall be subject to paragraph 7(f) of Section III of this Settlement Agreement.

g.    Within ten business days after the Effective Date, delivery by Debtor of executed customer and vendor non-disclosure agreements related to the Graphics Chip Business to the extent the same may be located after a reasonable search and such disclosure is not prohibited by the terms of such non-disclosure agreements. Debtor, VIA, and the JV Entities agree that Debtor has satisfied its obligations under this paragraph 5(g) of Section III of this Settlement Agreement by delivery within ten business days after the Effective Date of such non-disclosure agreements and

8

related documents previously located and identified to VIA by Debtor, including any documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents.

h.    Debtor, VIA, and the JV Entities agree that following the Effective Date, S3G Co. or its designee shall have the right to review records that reasonably might be records of the Graphics Chip Business, namely (i) documents relating to the Transferred Intellectual Property, (ii) employee files, licenses, and non-disclosure agreements related to the Graphics Chip Business, and (iii) data tapes used in the Graphics Chip Business, including any such documents, files, agreements, or data tapes protected from disclosure by the attorney-client privilege, attorney work product doctrine, or similar privileges that relate solely to the Transferred Intellectual Property, but no other privileged or work product documents and no documents that the disclosure of which to S3G or its designee is prohibited by law or contractual rights; provided, however, that any Intel Confidential Information (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) shall not be transferred to VIA, the JV Entities, or any other third party, but shall be subject to the restrictions with respect to return or destruction of Intel Confidential Information in paragraph 7(f) of Section III of this Settlement Agreement. In respect to any review under this paragraph 5(h) of Section III of this Settlement Agreement, Debtor, VIA, and the JV Entities agree that such review shall be conducted in a manner calculated to preserve the Debtor's and its Bankruptcy Successors' attorney-client privilege, attorney work product protections, and similar privileges. S3G Co. or its designee shall identify independent contractor reviewers, subject to the approval of (which approval shall not unreasonably be withheld and which shall be granted to S3G Co. or its designee within 5 days of identification unless substantial reasons are provided for disapproval), and to be hired by and work under the direction of, attorneys for Debtor or its Bankruptcy Successors, and S3G Co. or its designee shall pay directly all charges of such independent contractor reviewers. In addition, S3G Co. or its designee shall reimburse Debtor or its Bankruptcy Successors for out-of-pocket expenses and attorneys' fees incurred by Debtor in connection with the locating, retrieval, review, delivery, and re-stocking of documents (as set forth in a written statement); provided, however, that S3G Co. or its designee shall not be obligated to reimburse Debtor or its Bankruptcy Successors for the first $50,000 of attorneys' fees incurred collectively by Debtor or its Bankruptcy Successors prior to January 1, 2008 in connection with such activities. The parties understand and acknowledge that Debtor or its Bankruptcy Successors will probably dispose of all records possessed by Debtor or its Bankruptcy Successors after the Effective Date, and they agree that this Settlement Agreement does not create any obligation on the part of Debtor or its Bankruptcy Successors to

preserve or retain after the Effective Date any of the records possessed by Debtor or its Bankruptcy Successors, including, but not limited to, records from the Graphics Chip Business. Debtor, VIA, and the JV Entities further agree that the foregoing records review procedures shall be subject to paragraph 7(f) of Section III of this Settlement Agreement.

i.    Debtor, VIA, and the JV Entities agree that if at any time in the future there ever exists a dispute between Debtor or its Bankruptcy Successors, on the one hand, and VIA and/or the JV Entities, on the other hand, arising from or relating to any of the parties' respective rights and/or obligations under this paragraph 5 of Section III of this Settlement Agreement, the exclusive remedy that shall be available to the parties shall be to request an order from the Bankruptcy Court compelling compliance with this paragraph 5 of Section III of this Settlement Agreement, and the parties hereby forever waive and release any other claims in law or equity and any other remedies that they otherwise may have with respect to such a future dispute. The parties shall bear their own attorneys' fees and costs incurred in any such future dispute.

6.    <u>Claimants' Expense</u>. Claimants shall (a) prior to the Effective Date, prepare drafts, subject to revisions by Debtor, of any documents needed to effectuate the transfer of the Transferred Intellectual Property, and (b) within ten business days after the Effective Date, reimburse Debtor for its third-party filing fees incurred after January 1, 2006 in perfecting, preserving, registering, or transferring the Transferred Intellectual Property.

7.    <u>PCL, Trade Secret Agreement, and Development Assistance Agreement</u>

REDACTED AS
CONFIDENTIAL        a.        REDACTED AS
CONFIDENTIAL

b.        REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

c.

d.

e.

REDACTED AS
CONFIDENTIAL

f.    Notwithstanding the foregoing provisions of this paragraph 7 of Section III of this Settlement Agreement or the survival of any provisions of the PCL, the Trade Secret Agreement or the Development Assistance Agreement, Intel agrees that the Debtor shall have complied with its obligations with respect to Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) and any surviving provisions relating to confidentiality if it complies with the provisions of this paragraph 7(f) of Section III of this Settlement Agreement. Debtor shall hold any information identified in writing as, or known to Debtor to be, Confidential Information of Intel (as defined in and provided under the

Trade Secret Agreement or the Development Assistance Agreement) in confidence and shall not use such Confidential Information or disclose such Confidential Information to any third parties; provided, however, that Debtor may make such Confidential Information available (i) to the extent requested by any government authority or to the extent otherwise required by applicable laws or regulations or by any subpoena or similar legal process, (ii) to any Bankruptcy Successor (it being understood that any such Bankruptcy Successor shall succeed to and be bound by the confidentiality obligations as imposed and limited by this paragraph 7(f) of Section III of this Settlement Agreement as if such Bankruptcy Successor were Debtor), (iii) with the prior written consent of Intel, and/or (iv) to the extent such information (A) becomes publicly available other than as a result of a breach of this paragraph 7(f) of Section III of this Settlement Agreement or (B) becomes available to Debtor on a nonconfidential basis from a source other than Intel that has not breached any confidentiality obligation owing to Intel or any other party in making such information available to Debtor. Debtor shall inform any Bankruptcy Successor coming into possession of any of Debtor's records that do or may contain Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) of such fact and obtain such Bankruptcy Successor's written acknowledgement of its obligations under this paragraph 7(f) of Section III of this Settlement Agreement. Debtor or its Bankruptcy Successors will not be in breach of its confidentiality obligations under this paragraph 7(f) of Section III of this Settlement Agreement solely by reason of any access to Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement) by the Debtor or its Bankruptcy Successors, their employees, contractors or professionals (including legal counsel) each to the extent acting at the direction of Debtor or its Bankruptcy Successors or their legal counsel in connection with reviewing the Debtor's books and records in the course of administering the assets of and claims against the Debtor's estate, provided that such employees, contractors and professionals acting at the direction of Debtor or its Bankruptcy Successors or their legal counsel agree in writing to abide and be bound by the confidentiality restrictions in this paragraph 7(f) of Section III of this Settlement Agreement, and provided further that the agreement of legal counsel need not be reduced to a writing. Unless specifically prohibited by applicable law or court order, Debtor or its Bankruptcy Successors shall notify Intel of (x) any request by any government authority or representative thereof for disclosure of any such Confidential Information, (y) any disclosure required by applicable laws or regulations or by any subpoena or similar legal process, prior to disclosure of such Confidential Information and (z) any Confidential Information discovered in Debtor's records by any employee, contractor or professional (including legal counsel), and in such event Debtor or its Bankruptcy Successors shall provide Intel the option of

13

having such Confidential Information returned or written certification of destruction. In the event Debtor or any Bankruptcy Successor is requested or required by any government authority or by applicable laws or regulations or by any subpoena or similar legal process to disclose any such Confidential Information, Debtor or its Bankruptcy Successor will provide Intel with prompt written notice of any such request or requirement so that Intel may seek an appropriate protective order or other appropriate remedy and/or waive compliance with the terms of this Settlement Agreement. In the event that such protective order or other remedy is not obtained, or that Intel waives compliance with the terms hereof, Debtor or its Bankruptcy Successor may disclose only that portion of such Confidential Information which is legally required and will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded to such Confidential Information. If and when Debtor or any Bankruptcy Successor is no longer under any legal obligation to retain Debtor's records that do or may contain Confidential Information of Intel (as defined in and provided under the Trade Secret Agreement or the Development Assistance Agreement), Debtor or any Bankruptcy Successor in possession or control of such records shall destroy them and provide Intel with written certification of destruction.

8.    Intel-VIA Settlement Agreement

REDACTED AS
CONFIDENTIAL

9.    Transfer of Class A Shares of S3G Co. Debtor shall transfer or cause to be transferred to VIA or its designee for no further consideration all Class A Common Shares of S3G Co. held by Sonica3, Inc. (or other party) within ten business days after the Effective Date. The "Class A Shares Option Agreement," between Debtor and VIA, dated as of January 3, 2001, shall be deemed terminated upon the Effective Date.

10.    [REDACTED AS CONFIDENTIAL] Subsidiaries. VIA, Intel and the JV Entities agree

REDACTED AS
CONFIDENTIAL

## Releases

11.    Releases by Debtor of VIA, S3G Co., S3G Inc. and S3-VIA.  As of the Effective Date, and excepting rights created or preserved by this Settlement Agreement, Debtor, on behalf of itself and its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of Debtor and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "Debtor-VIA Releasing Parties"), hereby releases, acquits, and forever discharges VIA and each of its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of VIA and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "Debtor-VIA Released Parties"), and the JV Entities, and each of their respective affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of the JV Entities and their affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "Debtor-JV Released Parties"), from and against any and all claims, counterclaims, demands, liabilities, causes of action, defenses, damages, expenses (including, but not limited to, attorneys' fees and costs), duties or obligations, whether asserted on an individual, representative, or derivative basis, whether known or unknown, suspected or unsuspected, fixed or contingent, accrued or not yet accrued, that any of the Debtor-VIA Releasing Parties now has, has had, or may at any time have against any of the Debtor-VIA Released Parties or the Debtor-JV Released Parties based on events or acts or omissions occurring on or before the Effective Date, including, but not limited to (a) the Bankruptcy Cases, (b) the Adversary Proceeding, (c) the PCL, (d) the creation, operation or activities of the JV Entities, (e) any and all surety claims or claims for indemnity or contribution arising from or based on events or acts or omissions occurring on or before the Effective Date, and/or (f) any and all claims or interests arising under or relating to any and all agreements between or among each group of the parties to this paragraph, including without limitation the S3-VIA Investment Agreement, the Investment Agreement, the Amended and Restated Investment Agreement, and the Class A Shares Option Agreement.

12.    Releases by VIA, S3G Co., S3G Inc. and S3-VIA of Debtor.  As of the Effective Date, and excepting rights created or preserved by this Settlement Agreement, VIA, on behalf of

itself and its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of VIA and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "VIA-Debtor Releasing Parties"), and the JV Entities, each on behalf of themselves and each of their respective affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of the JV Entities and their affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "JV-Debtor Releasing Parties"), hereby release, acquit, and forever discharge Debtor, and each of its affiliates, subsidiaries, predecessors, successors, and assigns (solely in their capacities as affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity), and each of their respective officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders (solely in their capacities as officers, directors, employees, agents, partners, insurers, accountants, attorneys and shareholders of Debtor and its affiliates, subsidiaries, predecessors, successors, and assigns, and not in any other capacity) (collectively, but solely in such capacities, the "VIA-Debtor Released Parties"), from and against any and all claims, counterclaims, demands, liabilities, causes of action, defenses, damages, expenses (including, but not limited to, attorneys' fees and costs), duties or obligations, whether asserted on an individual, representative, or derivative basis, whether known or unknown, suspected or unsuspected, fixed or contingent, accrued or not yet accrued, that any of the VIA-Debtor Releasing Parties or the JV-Debtor Releasing Parties now has, has had, or may at any time have against any of the VIA-Debtor Released Parties based on events or acts or omissions occurring on or before the Effective Date, including, but not limited to (a) the Bankruptcy Cases, (b) the Adversary Proceeding, (c) the PCL, (d) the creation, operation or activities of the JV Entities, (e) any and all surety claims or claims for indemnity or contribution arising from or based on events or acts or omissions occurring on or before the Effective Date, and/or (f) any and all claims or interests arising under or relating to any and all agreements between or among each group of the parties to this paragraph, including without limitation the S3-VIA Investment Agreement, the Investment Agreement, the Amended and Restated Investment Agreement, and the Class A Shares Option Agreement.

13.    Release by Intel of Debtor.

REDACTED AS<br>CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

14.    <u>Release by Intel of Intel-Debtor-Released Parties</u>.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

15.    Release by Debtor of Intel.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

16.     Release by Debtor of Debtor-Intel Released Parties.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

17.    <u>Release by Intel</u>         REDACTED AS
                                       CONFIDENTIAL


                                       REDACTED AS
                                       CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

18.    Release by Intel

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

19.   <u>Release</u>   REDACTED AS CONFIDENTIAL   __ of Intel.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

## Miscellaneous

20.    Each Party to Bear Own Costs.  Except as provided for in paragraphs 5 and 6 of Section III of this Settlement Agreement, each Party hereto shall bear its own costs and expenses (including, but not limited to, attorneys' fees) in connection with the negotiation, execution, and obtaining of Court approval of this Settlement Agreement, and all matters addressed, settled or released hereby.

21.    Waiver of Statutory Limitation on General Releases.  With respect to the matters released hereby, each of the Parties hereto, for itself and on behalf of any other releasing party on whose behalf it gives a release hereunder, hereby waives and relinquishes any and all rights which they or any of them may have under the provisions of § 1542 of the Civil Code of the State of California, or any analogous provision under state or federal law, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,

WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

22.     No Admission of Liability.   The Parties hereto each acknowledge that this Settlement Agreement is a compromise of disputed rights and claims among the Parties and that it shall not be construed as an admission of any liability by any Party hereto.

23.     Due Authority. Each person signing this Settlement Agreement, including but not limited to any person signing as counsel for a Party, hereby represents and warrants that he or she has been duly authorized and has the requisite authority to execute and deliver this Settlement Agreement on behalf of such Party and to bind his or her employer, principal or respective client to the terms and conditions of this Settlement Agreement.

24.     Due Investigation.   The Parties acknowledge that, in making this Settlement Agreement, they rely entirely upon their own judgment, beliefs and interest and, where applicable, the advice of their own counsel and that they each have had a reasonable period of time to consider this Settlement Agreement.

25.     Drafting of Settlement Agreement.  The Parties agree that each Party and, where applicable, its counsel have reviewed this Settlement Agreement, and that each fully understands and voluntarily accepts all the provisions contained in this Settlement Agreement.  The Parties further agree that this Settlement Agreement was the product of negotiations between the Parties and that any rule of construction requiring that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Settlement Agreement.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

26.     Integrated Agreement. This Settlement Agreement is an integrated document that sets forth the entire agreement between the Parties, and it supersedes any and all prior agreements, promises, representations and understandings, whether written or oral, between or among the Parties pertaining to the subject matter hereof.

27.     Amendments.  No modification or amendment of this Settlement Agreement shall be binding or enforceable unless in writing and signed by all of the Parties to the modification or amendment.

28.     Binding on Bankruptcy Successors.   This Settlement Agreement shall remain in force and be binding upon any Bankruptcy Successor of the Debtor.

29.     Choice of Law, Jurisdiction.  This Settlement Agreement shall be interpreted and construed in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of the State of California, without giving effect to California's rules regarding conflict of laws.  The Bankruptcy Court shall have jurisdiction over any and all disputes, controversies, claims or other matters arising under or otherwise relating to this Settlement Agreement.

30.     Headings.  The headings of sections and paragraphs in this Settlement Agreement have been included only for convenience, and shall not be deemed in any manner to modify or

limit any of the provisions of this Settlement Agreement, or be used in any manner in the interpretation of this Settlement Agreement.

31.     Counterparts.    This Settlement Agreement may be executed in one or more counterparts and in original or by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

32.     Further Assurances.    The Parties shall execute and deliver all documents and perform all further acts that may reasonably be necessary to effectuate the provisions and purpose of this Settlement Agreement.

| SONICblue, Inc. | Dated: September 26, 2006<br><br>By: _____ |
| Intel Corporation | Dated: September___, 2006<br><br><br>By: _____ |
| VIA Technologies, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics Co. Ltd. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3-VIA, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |

| SONICblue, Inc. | Dated: September___, 2006<br><br><br>By: _____ |
| Intel Corporation<br><br>Bruce Sewell<br>SVP & Gen. Counsel | Dated: ~~September~~ 6th 2006<br>October<br><br>By: _Bruce Sewell_____ |
| VIA Technologies, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics Co. Ltd. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3 Graphics, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |
| S3-VIA, Inc. | Dated: September ___, 2006<br><br><br>By: _____ |

LEGAL OK

| SONICblue, Inc. | Dated: September___, 2006<br><br><br><br>By: _____ |
| --- | --- |
| Intel Corporation | Dated: September___, 2006<br><br><br><br>By: _____ |
| VIA Technologies, Inc. | Dated: September ___, 2006<br><br><br>By: _____ JOHN K. LEE _____ |
| S3 Graphics Co. Ltd. | Dated: September ___, 2006<br><br><br>By: _____ JONATHAN CHANG ____ |
| S3 Graphics, Inc. | Dated: September ___, 2006<br><br><br>By: _____ JONATHAN CHANG ____ |
| S3-VIA, Inc. | Dated: September ___, 2006<br><br><br>By: _____ JONATHAN CHANG ____ |

**EXHIBIT "B"**

1   FRANK A. MEROLA (136934)
    K. JOHN SHAFFER (153729)
2   GINA NAJOLIA (222067)
    STUTMAN, TREISTER & GLATT PC
3   1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
4   Telephone:     (310) 228-5600
    Facsimile:     (310) 228-5788
5
    WILLIAM McGRANE (057767)
6   BERNARD S. GREENFIELD (066017)
    McGRANE GREENFIELD LLP
7   One Ferry Building, Suite 220
    San Francisco, CA 94111
8   Telephone:     (415) 283-1776
    Facsimile:     (415) 283-1777
9
    Counsel for SonicBlue Claims, LLC
10

11              UNITED STATES BANKRUPTCY COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                       SAN JOSE DIVISION

14
    In re:                              Case No. 03-51775
15
    SONICBLUE INCORPORATED, a           Chapter 11
16  Delaware corporation; DIAMOND
    MULTIMEDIA SYSTEMS, INC., a
17  Delaware corporation; REPLAYTV, INC.,   NOTICE OF INTENDED ACTION
    a Delaware corporation, and SENSORY     REGARDING CLAIM TRANSFER
18  SCIENCE CORPORATION, a Delaware         AGREEMENT AMONG VIA
    corporation,                            TECHNOLOGIES, INC., S3 GRAPHICS
19                                          CO., LTD., AND SONICBLUE CLAIMS,
                                            LLC
20       Debtors and Debtors in Possession

21
                                        No Hearing Unless Requested Per Local
22                                      Bankruptcy Rule 9013-1(g) On Or Before
                                        May 17, 2007
23

24

25

26

    NOTICE OF INTENDED ACTION REGARDING CLAIM TRANSFER AGREEMENT AMONG VIA
    TECHNOLOGIES, INC., S3 GRAPHICS CO., LTD., AND SONICBLUE CLAIMS, LLC
                                        1

414589v.1

1

2 **PLEASE TAKE NOTICE** that, pursuant to the attached "Claim Transfer

3 Agreement" ("Agreement"), SonicBlue Claims, LLC ("SB Claims") has agreed to

4 purchase from VIA Technologies, Inc. and S3 Graphics Co., Ltd. (together, the

5 "VIA Claimants") all of the "Transferred Rights" (as defined in the Agreement).[1]

6 The Transferred Rights include the following:

7     (a) the VIA Claimants' rights to payment with respect to the $12.5 million

8 "Allowed Claim" (allowed in the Settlement Agreement among the Debtor, the

9 VIA Claimants, Intel Corporation, S3 Graphics, Inc., and S3-VIA, Inc., that was

10 approved by the Bankruptcy Court on October 31, 2006), and any related rights

11 that the VIA Claimants may have as creditor(s) in the above-captioned bankruptcy

12 cases; and

13     (b) any and all rights the VIA Claimants may have under or relating to the

14 Indenture dated as of April 22, 2002 for the 7-3/4% Secured Senior Subordinated

15 Convertible Debentures Due 2005 among the Debtor and Portside Growth and

16 Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.

17 ("Indenture").

18     A copy of the Agreement is attached hereto as Exhibit "1".

19     Pursuant to section 7(b) of the Agreement, SB Claims is required to file this

20 notice of intended action, which notice shall afford parties in interest in the above-

21 captioned bankruptcy cases an opportunity to object and be heard with respect to

22 the planned acquisition by SB Claims of the Transferred Rights.  In the event that,

23 following an objection filed in response to this notice, the Bankruptcy Court

24

25
---
[1]    Any description of the Agreement herein is for convenience only.  The actual
26    terms of the Agreement shall govern the parties' respective rights.
---

NOTICE OF INTENDED ACTION REGARDING CLAIM TRANSFER AGREEMENT AMONG VIA
TECHNOLOGIES, INC., S3 GRAPHICS CO., LTD., AND SONICBLUE CLAIMS, LLC

2

1   determines both that (i) it has jurisdiction to approve or disapprove the proposed

2   acquisition of the Transferred Rights, and (ii) the proposed acquisition of the

3   Transferred Rights should not be approved on the terms set forth in the

4   Agreement, then the Agreement shall be null and void.  Absent such

5   determinations by the Bankruptcy Court, the Agreement shall remain in full force

6   and effect.

7       **PLEASE TAKE FURTHER NOTICE** that, by this notice, SB Claims is

8   not seeking at this time any determination as to whether the "Allowed Claim" is

9   entitled to priority under the Indenture.  SB Claims intends to seek such a

10  determination after the closing of the transfer, as contemplated in the Agreement.

11  The purpose of this notice is to afford parties in interest an opportunity to object

12  and be heard with respect to the planned acquisition by SB Claims of the

13  Transferred Rights.

14      **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy

15  Rule 9013-1(g), any response and request for hearing with respect to this notice

16  shall be due within 15 days of the date hereof.  Pursuant to subsection (M) of that

17  rule and Bankruptcy Code sections 105(a) and 102(1)(B), SB Claims respectfully

18  submits that this procedure is appropriate, in that it will give parties in interest an

19  opportunity to be heard with respect to this transfer.  Because only the transferor

20  of a claim ordinarily may be heard under Bankruptcy Rule 3001(e)(2), SB Claims

21  respectfully submits that this notice gives parties in interest greater opportunity to

22  present possible objections to the Court than they normally would have with

23  respect to the transfer.

24

25

26

NOTICE OF INTENDED ACTION REGARDING CLAIM TRANSFER AGREEMENT AMONG VIA
TECHNOLOGIES, INC., S3 GRAPHICS CO., LTD., AND SONICBLUE CLAIMS, LLC

3

414589v.1

1  Dated May 2, 2007

Stutman, Treister & Glatt P.C.
McGrane Greenfield LLP

By_____/s/_____.
   K. John Shaffer

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTICE OF INTENDED ACTION REGARDING CLAIM TRANSFER AGREEMENT AMONG VIA
TECHNOLOGIES, INC., S3 GRAPHICS CO., LTD., AND SONICBLUE CLAIMS, LLC

4

414589v.1

EXHIBIT "1"

## CLAIM TRANSFER AGREEMENT

This Claim Transfer Agreement (the "Agreement") dated as of April 24, 2007, is among SONICBLUE CLAIMS, LLC, a Delaware limited liability company ("SBC"), on the one hand, and VIA TECHNOLOGIES, INC., a Taiwan corporation ("VIA"), and S3 GRAPHICS CO., LTD., a Cayman Islands corporation ("S3", and with VIA, the "Claimants"), on the other hand.

### Recitals

A.     On or about April 22, 2002, SONICblue Incorporated, formerly known as S3 Incorporated ("Debtor"), entered into an "INDENTURE DATED AS OF APRIL 22, 2002 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2005" (the "Indenture") with Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (together, the "Noteholders").  The Indenture generally provides that the claims of the Noteholders thereunder are subordinated to "Senior Indebtedness," as that term is defined in the Indenture.

B.     On March 21, 2003, the Debtor and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (San Jose Division) ("Bankruptcy Court").  The petitions commenced the jointly administered chapter 11 bankruptcy cases now pending in the Bankruptcy Court titled *In re SONICblue Incorporated et al.*, Case Numbers 03-51775 through 03-51778 MM (Jointly Administered) (the "Bankruptcy Cases").

1

C.    On July 17, 2003, the Claimants filed duplicate proofs of claim in the Bankruptcy Cases asserting claims in excess of $100 million.

D.    On October 31, 2006, the Bankruptcy Court entered its "ORDER GRANTING DEBTORS' MOTION FOR APPROVAL OF SETTLEMENT OF VIA AND INTEL LITIGATION" [Docket No. 1981], which approved a "Settlement Agreement" (the "Settlement Agreement") among the Debtor, the Claimants, Intel Corporation ("Intel"), S3 Graphics, Inc., and S3-VIA, Inc. in the Bankruptcy Cases.

E.    Section III, Paragraph 3 of the Settlement Agreement provides:

Claimants shall jointly hold a single, allowed general unsecured claim in Debtor's Bankruptcy Case, <u>which claim shall be afforded the benefits of, and shall be pari passu with, the other allowed general unsecured claims against Debtor in Debtor's Bankruptcy Case,</u> in the amount of $12.5 million ($12,500,000), representing a compromise of the claims that have been asserted by the Claimants for damages and other relief based, inter alia, on alleged breaches of the Amended and Restated Investment Agreement, including without limitation liquidated damages for the alleged breach of section 5.6 thereof (the "Allowed Claim"). <u>Claimants and Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005.</u> The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants. The Allowed Claim shall not

2

be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including without limitation any proof of claim.

(underlining added for purposes of identifying the "Underlined Recital E Language," as defined below).

F.    A dispute has arisen in the Bankruptcy Cases as to the propriety of including the language in Section III, Paragraph 3 of the Settlement Agreement that has been underlined in Recital E above (the "Underlined Recital E Language") relating to the relative priority of the Allowed Claim (as otherwise defined in Section III, Paragraph 3 of the Settlement Agreement) vis-à-vis any claims arising under or relating to the Indenture, and as to whether such Allowed Claim is, or is not, "Senior Indebtedness" under the Indenture. A dispute also has arisen as to whether the provisions in the Underlined Recital E Language relating to the relative priority of the Allowed Claim vis-à-vis the claims arising under or relating to the Indenture were adequately disclosed to the Bankruptcy Court and other parties in interest. The disputes identified in this Recital F respecting the Underlined Recital E Language are hereafter collectively referred to as the "Senior Debt Disputes".

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants set forth herein, the parties to this Agreement agree as follows:

409357v7

**Agreement**

1.    Assignment.  At the "Closing" (as defined in Section 4 of this Agreement),

and in exchange for the consideration set forth in Sections 2 and 3 of this Agreement, the

Claimants shall unconditionally sell, convey, assign, transfer, and deliver to SBC the

"Transferred Rights," consisting solely of, and subject to the second sentence of this

Section 1 (which sentence begins with the words "Other than the Transferred Rights ..."),

the following: (a) the Claimants' rights to payment with respect to the Allowed Claim

and any related rights the Claimants may have as creditor(s) in the Bankruptcy Cases, and

(b) any and all rights the Claimants may have under or relating to the Indenture.  Other

than the Transferred Rights, the Claimants shall retain all other rights and obligations

they have under the Settlement Agreement (including, without limitation, all rights and

obligations under Section III, Paragraphs 5 through 19 of the Settlement Agreement, the

releases provided to and granted by the "Parties" (as defined in the Settlement

Agreement), and all rights to the "Transferred Intellectual Property" (as defined in the

Settlement Agreement)), which other rights and obligations shall not be sold, conveyed,

assigned, transferred, or delivered to SBC.  For the avoidance of doubt, nothing in this

Agreement shall affect, or entitle SBC to assert any rights or benefits with respect to,

(i) the "Intel-VIA Settlement Agreement" (as defined in the Settlement Agreement),

(ii) the "Intel PCL Retained Rights" (as defined in the Settlement Agreement), or (iii) the

continued implementation under Section III, Paragraph 5 of the Settlement Agreement of

the transfer of the Transferred Intellectual Property to the Claimants by the Debtor or any

"Bankruptcy Successor" (as defined in the Settlement Agreement) to the Debtor.

4

2. <u>Cash Consideration at Closing.</u>  At the Closing (as defined below), SBC shall pay, by wire transfer, the sum of four million dollars ($4,000,000) in lawful money of the United States to VIA.

3. <u>Break Even Amount.</u>  SBC shall be entitled to retain all consideration that it receives on account of the Transferred Rights until SBC shall have received cash in an amount equal to the "Break Even Amount," which Break Even Amount shall equal the sum of four million dollars ($4,000,000).

4. <u>Payment of Expenses.</u>

(a) <u>Recoverable Costs.</u>  Any consideration that SBC shall receive on account of the Transferred Rights over and above the Break Even Amount shall first be divided *pari passu* among SBC and the Claimants to cover the "SBC Recoverable Costs" (which shall consist of the reasonable attorneys' fees, costs, and other reasonable expenses incurred by SBC after the Closing relating to or arising from the prosecution or collection of the Transferred Rights) as well as the "VIA Recoverable Costs" (which shall consist of the reasonable attorneys' fees, costs, and other reasonable expenses incurred by the Claimants after the Closing relating to or arising from the prosecution or collection by SBC of the Transferred Rights, whether as a witness or otherwise).  As examples (and for illustration purposes only), if SBC receives on account of the Transferred Rights more than the sum of (i) the Break Even Amount, (ii) the SBC Recoverable Costs, and (iii) the VIA Recoverable Costs, then the SBC Recoverable Costs and the VIA Recoverable Costs shall be paid in full.  If SBC receives on account of the Transferred Rights more than the Break Even Amount, but less than the sum of (i) the Break Even Amount, (ii) the SBC

5

Recoverable Costs, and (iii) the VIA Recoverable Costs, then only a portion of the SBC

Recoverable Costs and the VIA Recoverable Costs will be paid, pro rata, from the

amount received by SBC in excess of the Break Even Amount.

(b)    Arbitration.  Any dispute by any party to this Agreement as to the

reasonableness of either the SBC Recoverable Costs or the VIA Recoverable Costs shall

be resolved by binding arbitration administered by JAMS San Francisco, California

office pursuant to JAMS' Streamlined Arbitration Rules and Procedures then in effect.

Any amount that is undisputed may be reimbursed pending such resolution.

5.    Division of Excess Cash.  Once all of the SBC Recoverable Costs and the

VIA Recoverable Costs are repaid to either SBC or VIA, as their interests may appear,

then the balance of any consideration thereafter received by SBC ("Excess Cash"), if any,

shall then be distributed in the following percentage amounts to SBC and VIA: 75% of

any Excess Cash to SBC and 25% of any Excess Cash to VIA.

6.    The Closing.  The transactions contemplated by Sections 1 and 2 of this

Agreement (the "Closing") shall occur simultaneously on the first day that is not a

Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006) following the

satisfaction and/or written waiver of the conditions set forth in Section 7 of this

Agreement, and on which no stay preventing such Closing is in effect.

7.    Conditions.

(a)    Claim Allocation.  Prior to the Closing, the Claimants shall allocate all of

the Allowed Claim to VIA, and none to S3, in accordance with the Claimants' rights

under Section III, Paragraph 3 of the Settlement Agreement, by providing to SBC a letter

409357v7

(addressed to the Debtor and any trustee(s) appointed in the Bankruptcy Cases) making such allocation, for delivery by SBC to the Debtor.

(b)    Notice of Intended Action.  Prior to the Closing, but promptly after the execution of this Agreement by the parties, SBC shall prepare and file in the Bankruptcy Cases a notice of its intended action ("NIA"), which notice shall afford any party in interest in the Bankruptcy Cases an adequate and sufficient opportunity to object and be heard with respect to the planned acquisition by SBC of the Transferred Rights.  The NIA shall describe this Agreement in detail, or shall include this Agreement as an attachment, and shall be served on parties in interest in the Bankruptcy Cases.  In the event that, following an objection filed in response to the NIA, the Bankruptcy Court determines **both** that (i) it has jurisdiction to approve or disapprove the proposed acquisition of the Transferred Rights, and (ii) the proposed acquisition of the Transferred Rights should not be approved on the terms set forth in this Agreement, then this Agreement shall be null and void, and the parties hereto shall have no further or other obligations related thereto each to the other.  Absent such determinations by the Bankruptcy Court, however, this Agreement shall remain in full force and effect.

8.    SBC's Right to Resolve Senior Debt Disputes.  Notwithstanding anything to the contrary in this Agreement, this Agreement shall not be construed as limiting SBC's post-Closing rights—and Claimants acknowledge that SBC has the post-Closing right—to, in SBC's sole and only discretion, obtain a resolution of the Senior Debt Disputes (including, but not limited to, though negotiations with any other person or entity or through litigation), so as to maximize recovery on the Transferred Rights and, as

7

part of such resolution, to obtain an order, or to make a binding agreement, to delete,

nullify, or otherwise modify the language of the Underlined Recital E Language, in

whole or in part, for such maximization of recovery purposes.  Notwithstanding the

foregoing, SBC agrees that neither SBC nor anyone acting at its instigation or in concert

with it will do anything (including taking any action or filing any pleading or motion) to

impair the validity or enforceability of (i) the order of the Bankruptcy Court approving

the Settlement Agreement (provided, however, that SBC may seek or otherwise support

the deletion, nullification, or other modification of the Underlined Recital E Language),

(ii) the releases exchanged by the "Parties" to the Settlement Agreement (as such Parties

are defined in the Settlement Agreement), or (iii) the transfer to the Claimants of the

Transferred Intellectual Property (as defined in the Settlement Agreement).  SBC further

agrees that it will not request, or support any request by (or cause or instigate any other

person or party to request), any trustee(s) appointed for the Debtor in any of the

Bankruptcy Cases, or any other Bankruptcy Successor (as defined in the Settlement

Agreement) to challenge or seek to set aside the Settlement Agreement or the order

approving the Settlement Agreement (provided, however, that SBC may seek or

otherwise support the deletion, nullification, or other modification of the Underlined

Recital E Language).

      9.    <u>Claim Status</u>.  SBC acknowledges that neither the Claimants nor any agent

or representative of the Claimants have made any representation whatsoever to SBC or its

agents and representatives regarding whether the Allowed Claim is "Senior

8

Indebtedness" under the Indenture, the status of the Bankruptcy Cases, the condition of the Debtor (financial or otherwise), or any other matter relating to the Bankruptcy Cases.

10.    <u>SBC's Acknowledgments and Warranties</u>.  SBC represents, warrants, and acknowledges to the Claimants that: (i) the consideration being paid by SBC hereunder may differ both in kind and amount from the amount ultimately distributed with respect to the Transferred Rights; (ii) SBC has adequate information concerning the financial condition of the Debtor and the status of the Bankruptcy Cases to make an informed decision regarding the sale/purchase of the Transferred Rights and that it has independently and without reliance on the Claimants, and based on such information as it deems appropriate, made its own decision to enter into this Agreement; (iii) SBC understands and acknowledges that the Claimants have had a business relationship with the Debtor and, therefore, the Claimants may have non-public information about the Allowed Claim and the Debtor that has not been provided to SBC; (iv) SBC has full authority to enter into this Agreement; (v) SBC is aware that information that may be pertinent to its decision to purchase the Transferred Rights is available and can be obtained from, among other public sources, the Bankruptcy Court's files; and (vi) SBC is aware that the Noteholders may assert that the Allowed Claim might not qualify as "Senior Indebtedness" under the Indenture and that it is assuming the risk that the Allowed Claim, or any portion thereof, might not be "Senior Indebtedness" under the Indenture.  Other than the limited warranties and representations provided by the Claimants under Section 11 of this Agreement, SBC is acquiring the Transferred Rights "as is" without warranty or representation.

9

409357v7

11.    <u>Claimants' Acknowledgements and Warranties</u>.  The Claimants represent,

warrant, and acknowledge to SBC that (i) the Claimants are the present sole owners of,

and have good legal and beneficial title to, the Transferred Rights; (ii) from and after the

date the Transferred Rights first arose, the Claimants have not created any liens, claims,

or security interests on the Transferred Rights and are not aware of any liens, claims, or

security interests on the Transferred Rights, nor (except as provided in Section III,

Paragraph 3 of the Settlement Agreement) have the Claimants assigned, sold,

hypothecated, or otherwise transferred all or any portion of the Claimants' interest in the

Transferred Rights; (iii) the Claimants have full authority to enter into this Agreement;

(iv) the Claimants have received no payment, distribution, or other consideration (except

for the Settlement Agreement) with respect to or relating to the Transferred Rights from

any entity; (v) except for the Settlement Agreement, the Claimants have not taken any

action to waive, settle, or compromise any of their rights relating to the Transferred

Rights; (vi) the Claimants are aware the consideration being paid by SBC hereunder may

differ both in kind and amount from the amount ultimately distributed with respect to the

Transferred Rights; (vii) the Claimants have adequate information concerning the

financial condition of the Debtor and the status of the Bankruptcy Cases to make an

informed decision regarding the sale/purchase of the Transferred Rights and that they

have independently and without reliance on SBC, and based on such information as they

deem appropriate, made their own decision to enter into this Agreement; and (viii) the

Claimants are aware that information that may be pertinent to their decision to sell the

Transferred Rights is available and can be obtained from, among other public sources, the

10

409357v7

Bankruptcy Court's files.  Although the Claimants will be exercising the right to allocate

the Allowed Claim between them in their sole discretion, as permitted under Section III,

Paragraph 3 of the Settlement Agreement, the Claimants make no representation

whatsoever as to the amount, basis, or effect of such allocation in any subsequent

litigation.

12.    Claim Distributions.  The Claimants agree that, assuming the Closing

occurs, in the event the Claimants, or either of them, shall receive any payments,

distributions, or other consideration with respect to or relating to the Transferred Rights

after the date hereof (except consideration that is owing to the Claimants under Sections

2, 4, or 5 of this Agreement), the Claimants shall accept the same as SBC's agent and

shall hold the same in trust on behalf of and for the sole benefit of SBC, and shall

promptly deliver the same forthwith to SBC in the same form received (free of any

withholding, set-off, claim, or deduction of any kind), within 5 business days in the case

of cash and within 10 business days in the case of securities, which are in good

deliverable form with the endorsement of the Claimants when necessary or appropriate.

The Claimants also agree to promptly forward to SBC any and all notices they may

receive with respect to the Transferred Rights (other than pleadings filed in the

Bankruptcy Cases or documents disseminated generally to creditors in the Bankruptcy

Cases).

13.    Further Assurances.  Subject to compliance with the terms and conditions

of this Agreement, the Claimants hereby appoint SBC as their true and lawful attorney

and authorize SBC solely to act in the Claimants' stead (but not in the Claimants' name)

to demand, sue for, compromise, and recover all amounts as now are, or may hereafter become, due and payable for or on account of the Transferred Rights.

14.    SBC's Warranty Respecting Provisions in Settlement Agreement Not Related to Transferred Rights. SBC hereby warrants and agrees it will not do anything in the course of enforcing any aspect of the Transferred Rights that affects any provisions in the Settlement Agreement that are unrelated to the Transferred Rights.

15.    Claimants' Execution of Necessary Further Documents. The Claimants further agree to take or cause to be taken such further action to execute, deliver, and file or cause to be executed, delivered, and filed, such further documents and instruments as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms, and conditions of this Agreement.

16.    General Mutual Indemnity between SBC and Claimants. SBC and the Claimants each agree to defend, indemnify, and hold the other harmless from all losses, damages, and liabilities, including reasonable attorney's fees and expenses, that result from breach of any of their respective representations, warranties, or covenants or any other obligations set forth herein.

17.    Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties in respect of the subject matter of this Agreement and supersedes all prior agreements, arrangements, and understandings among the parties with respect to the subject matter of this Agreement. This Agreement cannot be amended or supplemented or modified except by a subsequent written agreement by and among the parties.

12

409357v7

18.    <u>Other Provisions</u>.  All representations and warranties contained herein shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.  This Agreement shall be governed and construed in accordance with the laws of the State of California, without giving effect to any choice of law principles.  Except as provided in Section 4(b) of this Agreement, each party hereto irrevocably and unconditionally consents to the jurisdiction of the Bankruptcy Court and the state and/or federal courts in the City of San Francisco, California in any action to enforce, interpret, or construe any provision of this Agreement, and also hereby irrevocably waives any defense of improper venue or forum non conveniens to any such action brought in such courts.  Each party hereto consents to service of process by certified mail at its address set forth below.  Each party further irrevocably agrees that any action to enforce, interpret, or construe any provision of this Agreement will be brought only in those courts and not in any other court.  This Agreement may be executed by facsimile or electronic signature.  This Agreement may be executed in counterparts, and all such counterparts taken together shall be deemed to constitute a single agreement.

19.    <u>Waiver of Right to Jury Trial</u>.  The parties waive any right to a jury trial with respect to any claims or defenses that they may assert against the other in any manner relating to the subject matter of this Agreement.

20.    <u>Rule 3001</u>.  The Claimants hereby waive any notice requirement imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure and any applicable local bankruptcy rules, and, upon the Closing, consent to the substitution of SBC for the Claimants for those purposes in the Bankruptcy Cases relating to the Transferred Rights,

13

409357v7

including, without limitation, for purposes of voting and receipt of distributions with respect to the Transferred Rights. SBC shall file any notices of evidence of transfer of the Allowed Claim as may be necessary or appropriate under applicable rules. SBC shall not act or sue in respect of the Transferred Rights in the name of the Claimants or VIA, but rather, at all times, SBC shall act in its own name. The Claimants hereby waive any objection to the transfer of the Transferred Rights, and stipulate and agree that an order may be entered recognizing this Agreement as an assignment according to its terms and SBC herein as the valid owner of the Transferred Rights as specifically set forth herein.

    21.    <u>Notices</u>. All notices given in relation to this Agreement shall be given to the parties at the following addresses:

    To SBC:

    SONICBLUE CLAIMS, LLC

        c/o Michael Singer
        Argo Partners
        12 W. 37th Street, 9th Floor
        New York, NY 10018

With a copy to:

        K. John Shaffer
        Stutman, Treister & Glatt P.C.
        1901 Avenue of the Stars, 12th Floor
        Los Angeles, CA 90067

409357v7

To the Claimants:

VIA TECHNOLOGIES, INC.

Attention: Legal Department
1F, 531 Cung-Chen Road
Hsin-Tien, Taipei, 213
Taiwan, ROC

S3 GRAPHICS CO. LTD

c/o Mr. Jonathan Chang
S3 Graphics Inc.
1045 Mission Court
Fremont, CA  94539

With copies to:

William P. Weintraub
Pachulski Stang Ziehl Young Jones & Weintraub LLP
780 Third Avenue, 36th Floor
New York, NY  10017-2024


-- And --

Henry C. Kevane
Pachulski Stang Ziehl Young Jones & Weintraub LLP
150 California Street, 15th Floor
San Francisco, CA  94111-4500

-- And --

Luther Orton
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA  94104

409357v7

22.    <u>No Third Party Beneficiaries</u>.  Nothing contained in this Agreement shall be construed to confer any right to or benefit on any entity that is not a party to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

"SBC"

SONICBLUE CLAIMS, LLC,
a Delaware limited liability company

By: _____
Michael Singer, its Co-Manager

"Claimants"

VIA TECHNOLOGIES, INC.,
a Taiwan corporation

By: _____
Its _____ V.P.

S3 GRAPHICS CO., LTD.,
a Cayman Islands corporation

By: _____
Its _____ CFO

16

**EXHIBIT "C"**

**EXECUTION VERSION**

SONICBLUE INCORPORATED

AND

THE INITIAL PURCHASERS OF 7-3/4% SECURED SENIOR SUBORDINATED
CONVERTIBLE DEBENTURES DUE 2005

INDENTURE

DATED AS OF APRIL 22, 2002

7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2005

9213905.13

**PWSP 00483**

THIS INDENTURE, dated as of April 22, 2002, is entered into by and between SONICBLUE INCORPORATED, a Delaware corporation (the "Company"), and the Initial Purchasers of Debentures identified on the signature pages hereto.

WITNESSETH:

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issue of its 7-3/4% Secured Senior Subordinated Debentures due 2005 (the "Debentures"), in an aggregate principal amount of $75,000,000 and, to provide the terms and conditions upon which the Debentures are to be issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, all acts and things necessary to make the Debentures, when executed and delivered by the Company to the Debenture holders, the valid, binding and legal obligations of the Company, and to constitute these presents a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issue hereunder of the Debentures have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Debentures are, and are to be, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Debentures by the holders thereof, the Company covenants and agrees with the Initial Purchasers and all holders of Debentures, as follows:

ARTICLE 1

DEFINITIONS

SECTION 1.1     Definitions.  The terms defined in this Section 1.1 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.1.  All other terms used in this Indenture, which are defined in the Securities Act (except as herein otherwise expressly provided or unless the context otherwise requires) shall have the meanings assigned to such terms in said Securities Act as in force at the date of execution of this Indenture.  The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other Subdivision.  The terms defined in this Article include the plural as well as the singular.

"1996 Indenture" means the Indenture dated as of September 12, 1996 between the Company and State Street Bank and Trust Company of California, N.A., as trustee, pursuant to which the Subordinated Notes were issued.

"Affiliate" of any specified person shall mean any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person.  For the purposes of this definition, "control," when used with respect to any specified person means the power to direct or cause the direction of the management and policies

9213905.13

of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"All Cash Interest Option" has the meaning specified in Section 2.3(b).

"beneficial owner" shall be determined in accordance with Rule 13d-3 and 13d-5, as in effect on the date of the original execution of this Indenture, promulgated by the Commission pursuant to the Exchange Act.

"Board of Directors" shall mean the Board of Directors of the Company or a committee of such Board duly authorized to act for it hereunder. "Board Resolution" shall mean a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to each Debenture holder.

"Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which the banking institutions in The City of New York are authorized or obligated by law or executive order to close or be closed.

"Cap Allocation Amount" shall have the meaning specified in Section 15.8.

"Change of Control" means an event or series of events as a result of which (i) any person or group is or becomes the beneficial owner of shares representing more than 50% of the combined voting power of the then outstanding securities entitled to vote generally in elections of directors of the Company (the "Voting Stock"), (ii) the Company consolidates with or merges into any other corporation, or conveys, transfers or leases all or substantially all of its assets to any person, or any other corporation merges into the Company, and, in the case of any such transaction, the outstanding common stock of the Company is changed or exchanged into or for other assets or securities as a result, unless the stockholders of the Company immediately before such transaction own, directly or indirectly immediately following such transaction, at least a majority of the combined voting power of the outstanding voting securities of the corporation resulting from such transaction in substantially the same proportion as their ownership of the Voting Stock immediately before such transaction, or (iii) any time Continuing Directors do not constitute a majority of the Board of Directors of the Company (or, if applicable, a successor corporation to the Company); provided, however, that a Change of Control shall not be deemed to have occurred if either (x) the Closing Price (as defined in Section 13.5) of the Common Stock for any five (5) Trading Days within a period of ten (10) Trading Days ending immediately before the Change of Control is at least equal to 105% of the Conversion Price of the Debentures in effect on each such Trading Day or (y) at least 90% of the consideration (excluding cash payments for dissenting and fractional shares) in the transaction or transactions constituting the Change of Control consists of common stock traded on a United States national securities exchange or quoted on The Nasdaq Stock Market (or which will be so traded or quoted when issued or exchanged in connection with such Change of Control) and as a result of such transaction or transactions such Debentures become convertible solely into such common stock.

9213905.13

-2-

PWSP 00485

"Closing Price" has the meaning specified in Section 13.5(g)(1).

"Commission" shall mean the Securities and Exchange Commission.

"Common Stock" shall mean any capital stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which is not subject to redemption by the Company. Subject to the provisions of Section 13.6, however, shares issuable on conversion of Debentures shall include only shares of the class designated as common stock of the Company at the date of this Indenture or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company; provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

"Company" shall mean SONICblue Incorporated, a Delaware corporation, and subject to the provisions of Article XI, shall include its successors and assigns.

"Company Notice" shall have the meaning specified in Section 14.3(a).

"Complete Restructuring" shall have the meaning specified in Section 8.1.

"Complete Restructuring Notice" shall have the meaning specified in Section 8.1.

"Congress Facility" shall mean the Indebtedness represented by the Second Amended and Restated Loan and Security Agreement, dated as of August 19, 1998 among Congress Financial Corporation (Western), on the one hand, and Sensory Science Corporation and California Audio Labs, LLC, on the other hand, as such agreement may be amended and modified from time to time.

"Continuing Director" means at any date a member of the Company's Board of Directors (i) who was a member of such board on April 22, 2002 or (ii) who was nominated or elected by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or whose election to the Company's Board of Directors was recommended or endorsed by at least a majority of the directors who were Continuing Directors at the time of such nomination or election. (Under this definition, if the current Board of Directors of the Company were to approve a new director or directors and then resign, no Change in Control would occur even though the current Board of Directors would thereafter cease to be in office).

"Conversion Price" shall have the meaning specified in Section 13.4.

"Current Market Price" has the meaning specified in Section 13.5(g)(2).

9213905.13

PWSP 00486

"Debenture" or "Debentures" shall mean any debenture or debentures. as the case may be, issued and delivered under this Indenture.

"Debenture holder" or "holder" as applied to any Debenture. or other similar terms (but excluding the term "beneficial holder"), shall mean any person in whose name at the time a particular Debenture is registered on the Debenture register.

"Debenture register" shall have the meaning specified in Section 2.5.

"Default" or "default" shall mean any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"Designated Event" shall mean a Change of Control or a Termination of Trading.

"Event of Default" shall mean any event specified in Section 7.1(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k) or (l) continued for the period of time, if any, and after the giving of notice, if any, therein designated.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exchange Cap" shall have the meaning specified in Section 15.8.

"Expiration Time" shall have the meaning specified in Section 13.5(d).

"fair market value" has the meaning specified in Section 13.5(g)(3).

"Indebtedness" shall have the meaning specified in Section 7.1(e).

"Indenture" shall mean this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"Initial Purchasers" shall mean Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd., as Buyers under the Purchase Agreement.

"Interest Shares" has the meaning specified in Section 2.3(b).

"Interest Share Conversion Ratio" has the meaning specified in Section 2.3(b).

"Maturity Date" shall mean September 1, 2005, as the same may be extended pursuant to a supplemental indenture executed and delivered in accordance with Article X hereof.

"Mixed Interest Option" has the meaning specified in Section 2.3(b).

"Mixed Interest Option Election Notice" has the meaning specified in Section 2.3(b).

"non-electing shares" shall have the meaning specified in Section 13.6.

9213905.13

-4-

PWSP 00487

"Officers' Certificate" shall mean a certificate signed by (a) one of the President, the Chief Executive Officer, Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word added before or after the title "Vice President") and (b) one of the Chief Financial Officer, Treasurer or any Assistant Treasurer, Secretary or any Assistant Secretary or Controller of the Company, which is delivered to each Debenture holder.

"Opinion of Counsel" shall mean an opinion in writing signed by legal counsel, who may be an employee of or counsel to the Company or any Subsidiary, or other counsel acceptable to holders of a majority in aggregate principal amount of the Debentures then outstanding, which is delivered to each holder of Debentures.

"Option Agreement" shall have the meaning specified in Section 7.1(i).

"Outstanding," when used with reference to Debentures, shall, subject to the provisions of Section 9.4, mean, as of any particular time, all Debentures executed and delivered by the Company under this Indenture, except:

(a)    Debentures theretofore canceled by any holder of Debentures or delivered to the Company for cancellation;

(b)    Debentures, or portions thereof, for the payment, or redemption of which monies in the necessary amount shall have been set aside and segregated in trust by the Company; provided that if such Debentures are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as provided in Section 3.2;

(c)    Debentures in lieu of which, or in substitution for which, other Debentures shall have been delivered pursuant to the terms of Section 2.5(b); and

(d)    Debentures converted into Common Stock pursuant to Article XIII; and

(e)    Debentures deemed not outstanding pursuant to Section 3.2.

"Partial Restructuring" shall have the meaning specified in Section 8.2.

"Partial Restructuring Notice" shall have the meaning specified in Section 8.2.

"Partial Restructuring Option" shall have the meaning specified in Section 8.2.

"Partial Restructuring Option Exercise Notice" shall have the meaning specified in Section 8.2.

"Pledge Agreement" has the meaning specified in Section 4.6.

"Person" or "person" shall, except as to references in Article XIV, mean a corporation, an association, a partnership, a limited liability company, an individual, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

9213905.13

PWSP 00488

"person" or "group", for purposes of Article XIV only, shall include any syndicate or group which would be deemed to be a "person" under Section 13(d)(3) and 14(d) of the Exchange Act as in effect on the date of the original execution of this Indenture;

"Predecessor Debenture" of any particular Debenture shall mean every previous Debenture evidencing all or a portion of the same debt as that evidenced by such particular Debenture; and, for the purposes of this definition, any Debenture delivered under Section 2.5(b) in lieu of a lost, destroyed or stolen Debenture shall be deemed to evidence the same debt as the lost, destroyed or stolen Debenture that it replaces.

"Purchase Agreement" shall mean the Securities Purchase Agreement dated as of April 19, 2002 by and among the Company and the Initial Purchasers.

"Purchased Shares" shall have the meaning specified in Section 13.5(f).

"Record Date" shall have the meaning specified in Section 13.5(g)(4).

"Reference Period" shall have the meaning specified in Section 13.5(d).

"Registration Rights Agreement" shall mean that certain registration rights agreement between the Company and the Initial Purchasers relating to the filing of a registration statement covering the resale of the (i) shares of Common Stock issuable upon conversion of the Debentures; (ii) Interest Shares and (iii) shares of Common Stock issuable upon exercise of the Warrants to purchase Common Stock issued to the Initial Purchasers pursuant to the Purchase Agreement.

"Registrable Securities" has the meaning specified in the Registration Rights Agreement.

"Registration Statement" has the meaning specified in the Registration Rights Agreement.

"Repurchase Price" has the meaning specified in Section 14.1.

"Securities" shall have the meaning specified in Section 13.5(d).

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Default Notice" has the meaning specified in Section 4.2.

"Senior Indebtedness" shall mean the principal of, premium, if any, interest on (including any interest accruing after the filing of a petition by or against the Company under any bankruptcy law, whether or not allowed as a claim after such filing in any proceeding under such bankruptcy law) and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture or thereafter incurred or created:

PWSP 00489

(a)     All indebtedness of the Company for monies borrowed (i) from banks, trust companies, insurance companies, equipment leasing companies or other financial institutions that in the ordinary course of business make loans (each, a "Qualified Lender"), including without limitation, all indebtedness represented by the Congress Facility or (ii) as evidenced by debt securities that are not exercisable or convertible into or exchangeable for capital stock of the Company and that are sold in a registered public offering or in one or more transactions in connection with resales of such debt securities pursuant to Rule 144A under the Securities Act;

(b)     All indebtedness of the Company due and owing with respect to letters of credit (including, but not limited to, reimbursement obligations with respect thereto) issued by Qualified Lenders;

(c)     All indebtedness or other obligations of the Company due and owing with respect to interest rate and currency swap agreements, cap, floor and collar agreements, currency spot and forward contracts and other similar agreements and arrangements entered into with Qualified Lenders;

(d)     All indebtedness consisting of commitment or standby fees due and payable to Qualified Lenders with respect to credit facilities or letters of credit available to the Company;

(e)     All obligations of the Company under leases required or permitted to be capitalized under generally accepted accounting principles and entered into with Qualified Lenders;

(f)     All indebtedness or obligations of others of the kinds described in any of the preceding clauses (a), (b), (c), (d) or (e) due or owing to Qualified Lenders assumed by or guaranteed in any manner by the Company or in effect guaranteed (directly or indirectly) by the Company through an agreement to purchase, contingent or otherwise, and all obligations of the Company under any such guarantee or other arrangements;

(g)     All indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "Via Indebtedness"); and

(h)     All renewals, extensions, refunds, deferrals, amendments or modifications of indebtedness or obligations of the kinds described in any of the preceding clauses (a), (b), (c), (d), (e) or (f) above entered into with Qualified Lenders and, in the case of (g) above, subject to the $15,000,000 limitation set forth therein; unless in the case of any particular indebtedness, obligation, renewal, extension, refunding, amendment, modification or supplement, the instrument or other document creating or evidencing the same or the assumption or guarantee of the same expressly provides that such Indebtedness, obligation, renewal, extension, refunding, amendment, modification or supplement is subordinate to, or is not superior to, or is pari passu with, the Debentures; provided that "Senior Indebtedness" shall not include (i) any indebtedness of any kind of the Company to any Subsidiary, (ii) indebtedness, other than the Via Indebtedness, for trade payables or constituting the deferred purchase price of assets or services

9213905.13

PWSP 00490

incurred in the ordinary course of business, (iii) indebtedness of the Company evidenced by the Debentures, which shall rank equally and ratably with each other and (iv) Subordinated Indebtedness, including, without limitation, the Subordinated Notes.

"Significant Subsidiary" shall mean, with respect to any person, a Subsidiary of such person organized under the laws of the United States of America, any state thereof, or the District of Columbia that would constitute a "significant subsidiary" as such term is defined under Rule 1-02 of Regulation S-X of the Commission (as such Regulation is in effect on the date hereof).

"Subordinated Indebtedness" means any Indebtedness of the Company that is expressly subordinated in right of payment to the Debentures, including, without limitation, the Subordinated Notes.

"Subordinated Notes" shall mean the Company's 5 ¾% Subordinated Convertible Notes due 2003 (CUSIP No. 784849AA9) issued pursuant to the 1996 Indenture.

"Subsidiary" shall mean a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries. For the purposes of this definition, "voting stock" means capital stock which ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of capital stock has such voting power by reason of any contingency.

"Termination of Trading" shall have occurred if the Common Stock of the Company (or other common stock into which the Debentures are then convertible) is neither listed for trading on a United States national securities exchange nor approved for trading on an established automated over-the-counter trading market in the United States.

"Trading Day" has the meaning specified in Section 13.5(g)(5).

"Trigger Event" shall have the meaning specified in Section 13.5(d).

"UMC" has the meaning specified in Section 4.6.

## ARTICLE II

### ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF DEBENTURES

SECTION 2.1    <u>Designation, Amount and Issue of Debentures</u>. The Debentures shall be designated as "7-3/4% Secured Senior Subordinated Convertible Debentures due 2005". Debentures not to exceed the aggregate principal amount of $75,000,000 upon the execution of this Indenture, or from time to time thereafter, may be executed by an officer of the Company authorized by the Board of Directors and delivered to the holders of Debentures.

SECTION 2.2    <u>Form of Debentures</u>. The Debentures shall be substantially in the form set forth in Exhibit A, which is incorporated in and made a part of this Indenture.

9213905.13

PWSP 00491

On the date hereof, Debentures shall be issued directly to the Initial Purchasers.

The terms and provisions contained in the form of Debenture attached as Exhibit A hereto shall constitute, and are hereby expressly made, a part of this Indenture and to the extent applicable, the Company and the holders of Debentures, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

SECTION 2.3    Date and Denomination of Debentures: Payments of Interest.

(a)    The Debentures shall be issuable in certificated form without coupons in minimum denominations of $250,000 principal amount and integral multiples of $1,000 in excess thereof. Every Debenture shall be dated the date hereof, shall bear interest from the date hereof and shall be payable on the dates specified on the face of the form of Debenture, attached as Exhibit A hereto. Interest on the Debentures shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

(b)    Notwithstanding anything herein or in the Debentures to the contrary, payments of interest on the Debentures shall be payable either in all cash (the "All Cash Interest Option") or, at the option of the Company, subject to the limitations set forth in this Section 2.3(b) and in Sections 15.7 and 15.8 hereof, 50% of each interest payment may be made in shares of Common Stock ("Interest Shares") and 50% of each interest payment may be made in cash (the "Mixed Interest Option"), provided; however; that the Company may not select the Mixed Interest Option and interest payments which accrued during any period shall be payable only in cash unless the Company provides written notice ("Mixed Interest Option Election Notice") to each holder of Debentures at least five (5) Trading Days prior to the applicable interest payment date; provided, further; that in no event may the Company deliver to any holder more than 200,000 Interest Shares in respect of any payment of interest due hereunder to such holder, in which case the balance of such interest payment shall be made only in cash. Interest Shares shall be paid in a number of fully paid and nonassessable shares (rounded up or down to the nearest whole share) of Common Stock equal to the quotient of (i) 50% of the amount of the interest payment due on the applicable interest payment date divided by (ii) 95% of the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on and including the third Trading Day immediately preceding the applicable interest payment date (the "Interest Share Conversion Rate"). Notwithstanding the foregoing, the Company shall be required to make interest payments in cash only if (x) any event constituting a default or an Event of Default has occurred and is continuing on the applicable interest payment date or any date which is within 10 Trading Days prior to the applicable interest payment date, unless otherwise consented to in writing by the holder of the Debenture entitled to receive such interest payment or (y) from and after the time that any Registration Statement is required to be effective, such Registration Statement is not effective and available for the resale of all of the Registrable Securities on the applicable interest payment date or each date which is within 10 Trading Days prior to the applicable interest payment date.

(c)    The person in whose name any Debenture (or its Predecessor Debenture) is registered at the close of business on any record date with respect to any interest payment date (including any Debenture that is converted after the record date and on or before the interest payment date) shall be entitled to receive the interest payable on such interest

9213905.13

-9-

payment date notwithstanding the cancellation of such Debenture upon any transfer, exchange or conversion subsequent to the record date and on or prior to such interest payment date: provided that in the case of any Debenture, or portion thereof, called for redemption pursuant to Article III on a redemption date or repurchased by the Company pursuant to Article XIV on a repurchase date during the period from the close of business on the record date to the close of business on the Business Day next preceding the following interest payment date, interest shall not be paid to the person in whose name the Debenture, or portion thereof, is registered on the close of business on such record date, and the Company shall have no obligation to pay interest on such Debenture or portion thereof except to the extent required to be paid upon such redemption or repurchase in accordance with Article III or Article XIV. The term "record date" with respect to any interest payment date shall mean the February 15 or August 15 (whether or not a Business Day) next preceding the March 1 or September 1 interest payment date, respectively.

SECTION 2.4    Execution of Debentures.  The Debentures shall be signed in the name and on behalf of the Company by the manual or facsimile signature of its Chairman of the Board, its President and Chief Executive Officer, any of its Senior Vice Presidents, or any of its Vice Presidents (whether or not designated by a number or numbers or word or words added before or after the title "Vice President") and attested by the manual or facsimile signature of its Secretary or any of its Assistant Secretaries.  The holders of all Debentures shall be entitled to the benefits of this Indenture.

SECTION 2.5    Exchange and Registration of Transfer of Debentures; Restrictions on Transfer.

(a)    The Company shall cause to be kept at its principal place of business a register (the register maintained in such office referred to as the "Debenture register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Debentures and of transfers of Debentures.  Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time.

Upon surrender for registration of transfer of any Debenture to the Company, and satisfaction of the requirements for such transfer set forth in this Section 2.5, the Company shall execute and deliver in the name of the designated transferee or transferees, one or more new Debentures of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

Subject to the other provisions of this Section 2.5(a), Debentures may be exchanged for other Debentures of any authorized denominations and of a like aggregate principal amount, upon surrender of the Debentures to be exchanged at the Company's principal place of business.  Whenever any Debentures are so surrendered for exchange, the Company shall execute and deliver the Debentures which the Debenture holder making the exchange is entitled to receive.

All Debentures presented or surrendered for registration of transfer or for exchange shall be duly endorsed, or be accompanied by a written instrument or instruments of

9213905.13

-10-

PWSP 00493

transfer in form reasonably satisfactory to the Company and duly executed by the Debenture holder thereof or its attorney duly authorized in writing.

No service charge shall be charged to the Debenture holder for any exchange or registration of transfer of Debentures, but the Company may require payment of a sum sufficient to cover any tax, assessments or other governmental charges that may be imposed in connection therewith.

The Company shall not be required to exchange or register a transfer of (a) any Debentures for a period of fifteen (15) days next preceding any selection of Debentures to be redeemed or (b) subject to Section 3.2, any Debentures called for redemption or, if a portion of any Debenture is selected or called for redemption, such portion thereof selected or called for redemption or (c) subject to Article XIII, any Debentures surrendered for conversion or, if a portion of any Debenture is surrendered for conversion, such portion thereof surrendered for conversion.

All Debentures issued upon any transfer or exchange of Debentures in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Debentures surrendered upon such registration of transfer or exchange.

(b)     Mutilated, Destroyed, Lost or Stolen Debentures.  In the event that any holder of Debentures notifies the Company that its Debenture(s) have been lost, stolen or destroyed, replacement Debenture(s) identical in all respects to the original Debenture(s) (except for registration number and outstanding principal amount, if different than that shown on the original Debenture(s)) shall be issued by the Company to such holder, provided that the holder of such Debenture executes and delivers to the Company an agreement reasonably satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such Debenture(s).

## ARTICLE III

## REDEMPTION OF DEBENTURES

SECTION 3.1     Redemption Price.  The Company may, at its option at any time and from time to time, redeem all or any part of the Debentures on any date prior to maturity, upon notice as set forth in Section 3.2, at 100% of the principal amount, together with accrued interest, if any, to, but excluding, the date fixed for redemption.

SECTION 3.2     Notice of Redemption; Selection of Debentures.  In case the Company shall desire to exercise the right to redeem all or, as the case may be, any part of the Debentures pursuant to Section 3.1, it shall fix a date for redemption, and it shall deliver to each holder of Debentures a written notice of such redemption at least twenty (20) and not more than sixty (60) days prior to the date fixed for redemption to the holders of Debentures so to be redeemed as a whole or in part at their last addresses as the same appear on the Debenture register.  Such delivery shall be made by fax and overnight courier in accordance with Section 15.3 hereof.

9213905.13

-11-

PWSP 00494

Each such notice of redemption shall specify the aggregate principal amount of Debentures to be redeemed, the date fixed for redemption, the redemption price at which Debentures are to be redeemed, the place or places of payment, that payment will be made upon presentation and surrender of such Debentures, that interest accrued to, but excluding, the date fixed for redemption will be paid as specified in said notice, and that on and after said date interest thereon or on the portion thereof to be redeemed will cease to accrue unless the Company fails to make such redemption, in which case interest shall continue to accrue as provided in Section 2.3(a) and principal and interest shall continue to be payable in accordance with the terms hereof. Such notice shall also state the current Conversion Price and the date on which the right to convert such Debentures or portions thereof into Common Stock will expire. If fewer than all the Debentures are to be redeemed, the notice of redemption shall identify the Debentures to be redeemed. In case any Debenture is to be redeemed in part only, the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that on and after the date fixed for redemption, upon surrender of such Debenture, a new Debenture or Debentures in principal amount equal to the unredeemed portion thereof will be issued.

On or prior to the redemption date specified in the notice of redemption given as provided in this Section, the Company will pay in immediately available funds to an account designated on the Schedule of Buyers attached hereto (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment) an amount of money sufficient to redeem on the redemption date all the Debentures (or portions thereof) so called for redemption (other than those theretofore surrendered for conversion into Common Stock) at the redemption price provided above, together with accrued interest to, but excluding, the date fixed for redemption; provided that if such payment is made on the redemption date it must be received by the holder by 10:00 a.m. New York City time, on such date.

Notwithstanding anything herein to the contrary, any redemption effected by the Company pursuant to this Section 3.2 shall be made, on a pro rata basis, among all holders of Debentures.

If any Debenture selected for partial redemption is converted in part after such selection, the converted portion of such Debenture shall be deemed (so far as may be) to be the portion to be selected for redemption. The Debentures (or portions thereof) so selected shall be deemed duly selected for redemption for all purposes hereof, notwithstanding that any such Debenture is converted as a whole or in part before the delivery of the notice of redemption. If any Debenture is to be redeemed in part only, a new Debenture or Debentures in principal amount equal to the unredeemed principal portion thereof shall be issued.

Upon any redemption of less than all Debentures, the Company may (but need not) treat as outstanding any Debentures surrendered for conversion during the period of fifteen (15) days next preceding the delivery of a notice of redemption and may (but need not) treat as not outstanding any Debenture delivered during such period in exchange for the unconverted portion of any Debenture converted in part during such period.

PWSP 00495

SECTION 3.3    <u>Payment of Debentures Called for Redemption</u>.  If notice of redemption has been given as above provided, the Debentures or portion of Debentures with respect to which such notice has been given shall, unless converted into Common Stock pursuant to the terms hereof, become due and payable on the date and at the place or places stated in such notice at the applicable redemption price, together with interest accrued to, but excluding, the date fixed for redemption, and on and after said date interest on the Debentures or portion of Debentures so called for redemption shall cease to accrue and such Debentures shall cease after the close of business on the Business Day next preceding the date fixed for redemption to be convertible into Common Stock and to be entitled to any benefit or security under this Indenture. On presentation and surrender of such Debentures at a place of payment in said notice specified, the said Debentures or the specified portions thereof to be redeemed shall be paid and redeemed by the Company at the applicable redemption price, together with interest accrued thereon to, but excluding, the date fixed for redemption; provided that, if the applicable redemption date is an interest payment date, the semi-annual payment of interest becoming due on such date shall be payable to the holders of such Debentures registered as such on the relevant record date subject to the terms and provisions of Section 2.3 hereof.

Upon presentation of any Debenture redeemed in part only, the Company shall execute and deliver to the holder thereof, at the expense of the Company, a new Debenture or Debentures, of authorized denominations, in principal amount equal to the unredeemed portion of the Debentures so presented.

ARTICLE IV

SUBORDINATION OF DEBENTURES

SECTION 4.1    <u>Agreement of Subordination</u>.  The Company covenants and agrees, and each holder of Debentures issued hereunder by its acceptance thereof likewise covenants and agrees, that all Debentures shall be issued subject to the provisions of this Article IV; and each person holding any Debenture, whether upon original issue or upon transfer, assignment or exchange thereof, accepts and agrees to be bound by such provisions.

The payment of the principal of, premium, if any, and interest on all Debentures (including, but not limited to, the redemption price or repurchase price with respect to the Debentures to be redeemed or repurchased, as provided in this Indenture) issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness, whether outstanding at the date of this Indenture or thereafter incurred.

The Company and the holders of Debentures agree that the Debentures constitute "Senior Indebtedness" under the 1996 Indenture and that the holders of Debentures are entitled to the rights and benefits of a holder of "Senior Indebtedness" under the 1996 Indenture.

No provision of this Article IV shall prevent the occurrence of any default or Event of Default hereunder.

9213905.13

-13-

PWSP 00496

SECTION 4.2    <u>Payments to Debenture Holders</u>. In the event and during the continuation of any default in the payment of principal, premium, interest or any other payment due on any Senior Indebtedness (or, in the case of Senior Indebtedness for which there is a period of grace, in the event of such a default that continues beyond the period of grace, if any, specified in the instrument or lease evidencing such Senior Indebtedness), then, unless and until such default shall have been cured or waived or shall have ceased to exist, no payment shall be made by the Company with respect to the principal of, or premium, if any, or interest on, the Debentures (including, but not limited to, the redemption price or repurchase price with respect to the Debentures to be redeemed or repurchased, as provided in this Indenture).

In the event (i) any event of default with respect to any Senior Indebtedness shall have occurred and be continuing which permits the holders of such Senior Indebtedness (or a trustee or other representative on behalf of the holders thereof) to declare such Senior Indebtedness due and payable prior to the date on which it would otherwise have become due and payable, upon written notice thereof to the Company and each holder of Debentures by any holders of Senior Indebtedness to which such event of default relates (or a trustee or other representative on behalf of the holders thereof) (a "Senior Default Notice"), unless and until such event of default shall have been cured or waived or shall have ceased to exist and such acceleration shall have been rescinded or annulled, or (ii) any judicial proceeding shall be pending with respect to any such event of default, then no payment shall be made by the Company, directly or indirectly, with respect to principal of, premium, if any, or interest on the Debentures, provided, however, that clause (i) of this paragraph shall not prevent the making of any such payment for more than 179 days after a Senior Default Notice shall have been received by each holder of Debentures unless the Senior Indebtedness in respect of which such event of default exists has been declared due and payable in its entirety, in which case no such payment may be made until such acceleration has been rescinded or annulled or such Senior Indebtedness has been paid in full. Notwithstanding the foregoing, no event of default which existed or was continuing on the date of any Senior Default Notice shall be made the basis for the giving of a second Senior Default Notice; and, provided, further, that only one such Senior Default Notice may be given during any period of 360 consecutive days, regardless of the number of defaults with respect to Senior Indebtedness during such 360-day period. Notwithstanding the foregoing, the Company may make and the holders of Debentures may receive and apply any payment in respect of the Debentures (for principal, and premium, if any, or interest) if such payment was made prior to the occurrence of any of the contingencies specified in clauses (i) and (ii) above. In addition, nothing in this paragraph shall prevent the Company from making or the holders of Debentures from receiving or applying any payment in connection with the redemption of the Debentures if the first publication of notice of redemption (whether by mail or otherwise in accordance with this Indenture) has been made prior to the occurrence of any of the contingencies specified in clauses (i) and (ii) above.

Upon any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings (other than as permitted in Article XI), all amounts due or to become due upon all Senior Indebtedness shall first be paid in full, or payment thereof provided for in money in accordance with its terms, before any payment is made on account of the principal (and premium, if any) or interest on the

9213905.13

-14-

Debentures; and upon any such dissolution or winding-up or liquidation or reorganization or bankruptcy, insolvency, receivership or other such proceedings, any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the holders of the Debentures under this Indenture would be entitled, except for the provision of this Article IV, shall (except as aforesaid) be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, or by the holders of the Debentures under this Indenture if received by them, directly to the holders of Senior Indebtedness (pro rata to such holders on the basis of the respective amounts of Senior Indebtedness held by such holders, or as otherwise required by law or a court order) or their respective representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, to the extent necessary to pay all Senior Indebtedness in full after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness, before any payment or distribution is made to the holders of the Debentures under this Indenture.

In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities (including, without limitation, by way of setoff or otherwise), prohibited by the foregoing, shall be received by any holders of the Debentures before all Senior Indebtedness is paid in full, or provision is made for such payment in accordance with its terms, such payment or distribution shall be held by the recipient or recipients in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness or their respective representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, as calculated by the Company, for application to the payment of all Senior Indebtedness remaining unpaid to the extent necessary to pay all Senior Indebtedness in full in accordance with its terms, after giving effect to any concurrent payment or distribution (or provision therefor) to or for the holders of such Senior Indebtedness.

For purposes of this Article IV, the words "cash, property or securities" shall not be deemed to include shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated (at least to the extent provided in this Article IV with respect to the Debentures) to the payment of all Senior Indebtedness which may at the time be outstanding; provided that (i) the Senior Indebtedness is assumed by the new corporation, if any, resulting from such reorganization or adjustment and (ii) the rights of the holders of Senior Indebtedness (other than leases which are not assumed by the Company or by the new corporation, as the case may be) are not, without the consent of such holders, altered by such reorganization or readjustment. The consolidation of the Company with, or the merger of the Company into, another corporation or the liquidation or dissolution of the Company following the conveyance or transfer of all or substantially all its property to another corporation upon the terms and conditions provided for in Article XI shall not be deemed a dissolution, winding-up, liquidation or reorganization for the purposes of this Section 4.2 if such other corporation shall, as a part of such consolidation, merger, conveyance or transfer, comply with the conditions stated in Article XI. This Section 4.2 shall be subject to the further provisions of Section 4.5.

9213905.13

-15-

PWSP 00498

SECTION 4.3    Subrogation of Debentures.  Subject to the payment in full of all Senior Indebtedness, the rights of the holders of the Debentures shall be subrogated to the extent of the payments or distributions made to the holders of such Senior Indebtedness pursuant to the provisions of this Article IV to the rights of the holders of Senior Indebtedness to receive payments or distributions of cash, property or securities of the Company applicable to the Senior Indebtedness until the principal of (and premium, if any) and interest on the Debentures shall be paid in full; and, for the purposes of such subrogation, no payments or distributions to the holders of the Senior Indebtedness of any cash, property or securities to which the holders of the Debentures would be entitled except for the provisions of this Article IV, and no payment over pursuant to the provisions of this Article IV, to or for the benefit of the holders of Senior Indebtedness by holders of the Debentures, shall, as between the Company, its creditors other than holders of Senior Indebtedness, and the holders of the Debentures, be deemed to be a payment by the Company to or on account of the Senior Indebtedness; and no payments or distributions of cash, property or securities to or for the benefit of the holders of the Debentures pursuant to the subrogation provisions of this Article IV, which would otherwise have been paid to the holders of Senior Indebtedness shall be deemed to be a payment by the Company to or for the account of the Debentures.  It is understood that the provisions of this Article IV are and are intended solely for the purposes of defining the relative rights of the holders of the Debentures, on the one hand, and the holders of the Senior Indebtedness, on the other hand.

Nothing contained in this Article IV or elsewhere in this Indenture or in the Debentures is intended to or shall impair, as among the Company, its creditors other than holders of Senior Indebtedness, and the holders of the Debentures, the obligation of the Company, which is absolute and unconditional, to pay to the holders of the Debentures the principal of (and premium, if any) and interest on the Debentures as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the holders of the Debentures and creditors of the Company other than holders of the Senior Indebtedness, nor shall anything herein or therein prevent any holder of any Debenture from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, subject to the rights, if any, under this Article IV of the holders of Senior Indebtedness in respect of cash, property or securities of the Company received upon the exercise of any such remedy.

Upon any payment or distribution of assets of the Company referred to in this Article IV, the holders of the Debentures shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such bankruptcy, dissolution, winding-up, liquidation or reorganization proceedings are pending, or a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, delivered to the holders of the Debentures, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article IV.

SECTION 4.4    Notice to Debenture Holders.  The Company shall give prompt written notice in the form of an Officers' Certificate to each holder of Debentures of any fact known to the Company which would prohibit the making of any payment of monies in respect of the Debentures pursuant to the provisions of this Article IV.  Notwithstanding the provisions of

9213905.13

PWSP 00499

this Article IV or any other provision of this Indenture, no holder of Debentures shall be charged with knowledge of the existence of any default or event of default with respect to any Senior Indebtedness or of any other facts which would prohibit the making of any payment of monies in respect of the Debentures pursuant to the provisions of this Article IV, unless and until such holder of Debenture(s) shall have received written notice thereof from the Company (in the form of an Officers' Certificate) or a holder or holders of Senior Indebtedness or from any trustee thereof who shall have been certified by the Company or otherwise established to the reasonable satisfaction of the Debenture holder to be such holder or trustee; and before the receipt of any such written notice, the holders of Debentures shall be entitled in all respects to assume that no such facts exist. Nothing contained in this Section 4.4 shall limit the right of the holders of Senior Indebtedness to recover payments as contemplated by Section 4.2.

Notwithstanding anything to the contrary hereinbefore set forth, nothing shall prevent (a) any payment by the Company to the Debenture holders of amounts in connection with a redemption of Debentures if (i) notice of such redemption has been given pursuant to Section 3.2 prior to the receipt by the Debenture holders of written notice under this Section 4.4, and (ii) such notice of redemption is given not earlier than sixty (60) days before the redemption date or (b) any payment by the Company to the Debenture holders of amounts in connection with a repurchase of Debentures if (i) notice of such repurchase has been given pursuant to Article XIV prior to the receipt by the Debenture holders of written notice under this Section 4.4 and (ii) such notice of repurchase is given not earlier than forty (40) days before the repurchase date.

SECTION 4.5    No Impairment of Subordination.  No right of any present or future holder of any Senior Indebtedness to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof which any such holder may have or otherwise be charged with.

SECTION 4.6    Certain Conversions Deemed Payment.  For the purposes of this Article only, (1) the issuance and delivery of junior securities upon conversion of Debentures in accordance with Article XIII or in respect of payments of interest pursuant to Section 2.3 hereof and the pledge, issuance and delivery of common shares of United Microelectronics Corporation, a corporation duly organized and validly existing under the laws of the Republic of China and having its principal place of business at 300 No. 3, Li-hsin Rd. II, Science-Based Industrial Park, Hsinchu, Taiwan, R.O.C. ("UMC") pursuant to the Pledge and Security Agreement dated the date hereof among the Company and the Initial Purchasers (the "Pledge Agreement") shall not be deemed to constitute a payment or distribution on account of the principal of (or premium, if any) or interest on Debentures or on account of the purchase or other acquisition of Debentures, and (2) the payment, issuance or delivery of cash (except in satisfaction of fractional shares pursuant to Section 13.3), property or securities (other than junior securities) upon conversion of a Debenture shall be deemed to constitute payment on account of the principal of such Debenture. For the purposes of this Section, the term "junior securities" means (a) shares of any capital stock of any class of the Company and (b) securities of the Company which are subordinated in right of payment to all Senior Indebtedness which may be outstanding at the time of issuance or delivery of such securities to substantially the same extent as, or to a greater extent than, the Debentures are so subordinated and provided in this

9213905.13

-17-

Article. Nothing contained in this Article or elsewhere in this Indenture or in the Debentures is intended to or shall impair, as among the Company, its creditors other than holders of Senior Indebtedness and the holders of the Debentures, the right, which is absolute and unconditional, of the holder of any Debenture to convert such Debenture in accordance with Article XIII.

SECTION 4.7    No Impairment to Rights to Collateral.  Notwithstanding anything to the contrary in this Article IV or otherwise in this Indenture, nothing shall impair, delay, limit or prohibit any holder of Debentures from exercising or enforcing any rights or remedies available to such holder under the Pledge Agreement (and without notice to any holder of Senior Indebtedness), whether or not otherwise prohibited by this Indenture and whether or not such exercise or enforcement occurs in connection with any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings, and no holder of Debentures shall have any obligation to hold, set aside or pay over to or for the benefit of any of the Company or any holder of Senior Indebtedness any of the collateral secured under the Pledge Agreement or proceeds therefrom.

## ARTICLE V

## PARTICULAR COVENANTS OF THE COMPANY

SECTION 5.1    Payment of Principal. Premium and Interest.  The Company covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and premium, if any, and interest on each of the Debentures at the places, at the respective times and in the manner provided herein and in the Debentures.  Each installment of interest on the Debentures due on any semi-annual interest payment date shall be paid (a) by wire transfer in immediately available funds in accordance with the wire transfer instructions designated on the Schedule of Buyers attached hereto (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment) and (b) in the case of interest payments made in Interest Shares, in shares of Common Stock, as provided in Section 2.3(b).

SECTION 5.2    Deliveries.  In all instances under this Indenture, the Debentures may be surrendered for registration of transfer or exchange or for presentation for payment or for conversion, redemption or repurchase and notices and demands to or upon the Company in respect of the Debentures and this Indenture may be served to the Company in accordance with the notice provisions of Section 15.3.

SECTION 5.3    Existence.  Subject to Article XI, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

SECTION 5.4    Stay, Extension and Usury Laws.  The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of (and premium, if any) or interest on the Debentures as contemplated herein,

9213905.13

PWSP 00501

wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Debenture holders, but will suffer and permit the execution of every such power as though no such law has been enacted.

        SECTION 5.5   <u>Compliance Certificate</u>. The Company shall deliver to each Debenture holder within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2002) an Officers' Certificate stating whether or not the signers know of any Event of Default that occurred during such period. If the signers have knowledge of any such Event of Default, such Officers' Certificate shall describe the Event of Default and its status.

        SECTION 5.6   <u>Further Instruments and Acts</u>. Upon the reasonable request of any Debenture holder, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

        SECTION 5.7   <u>Restriction on Redemption. Repayments, Stock Repurchases</u>. The Company shall not, and the Company shall not permit any of the Subsidiaries, its Affiliates, or any agent, broker, dealer or other Person by or on behalf of the Company to, directly or indirectly, (a) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or marketable securities, including, without limitation, common shares of UMC (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise) (i) all or any portion of any Subordinated Indebtedness of the Company, including, without limitation, the Subordinated Notes, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Subordinated Indebtedness or otherwise, or (ii) any capital stock of the Company, including, without limitation, by way of the payment of any dividends or other distributions thereon (other than such dividends or distributions by the Company made in Common Stock or of rights pursuant to any stockholders' rights plan adopted by the Company as of the date hereof); <u>provided</u>, <u>however</u>, that, so long as no event constituting a default or an Event of Default has occurred and is continuing on the date any of the following payments is due or is otherwise made, the Company may, without regard to the foregoing limitation (A) pay in cash scheduled interest payments, in each case in the manner set forth in the original documentation governing such Subordinated Indebtedness at an annual rate not to exceed 15% per annum on the principal amount of such Subordinated Indebtedness, (B) pay in cash regularly scheduled dividends in respect of any capital stock of the Company, other than Common Stock, in the manner set forth in the constituent document of the Company governing the rights, preferences and limitations of such preferred capital stock at an annual rate not to exceed 15% per annum on the stated value of such preferred capital stock, (C) redeem, repurchase or otherwise acquire for value any Common Stock held by any employee, consultant or director of the Company or any of its Subsidiaries pursuant to any stock option plan or restricted stock plan, or any employee, consultant, director or management equity subscription agreement or stock option agreement, approved by the Board of Directors; <u>provided</u>, that such redemption, repurchase or acquisition is expressly required of the Company or any Subsidiary by the terms of the plan or agreement pursuant to which such Common Stock was originally issued;

9213905.13

PWSP 00502

provided, further, that in no event shall redemptions, repurchases or other acquisitions of Common Stock pursuant to this Section 5(a)(ii)(C) require expenditures of cash or other value that exceeds in the aggregate $1,000,000 in any twelve-month period and (D) issue Common Stock and/or warrants to purchase Common Stock (provided that such warrants do not require or permit any payment of cash by or on behalf of the Company in respect of such warrants, other than payments in respect of fractional shares) to holders of Subordinated Notes in connection with a Complete Restructuring or any Partial Restructuring pursuant to Article VIII hereof or (b) announce or effect any redemption of all or any portion of the Subordinated Notes until not less than thirty (30) days following the redemption of all Debentures in accordance with Article III hereof or other payment in full of the Debentures.

SECTION 5.8     Anti-Layering.  The Company shall not, and the Company shall not permit any of the Subsidiaries to, directly or indirectly, incur or suffer to exist any Indebtedness that is both (a) subordinate or junior in right of payment to any Senior Indebtedness and (b) senior or pari passu in any respect in right of payment to the Debentures; provided, that notwithstanding the foregoing limitation, the Company and/or any of the Subsidiaries may incur indebtedness that is pari passu in right of payment to the Debentures up to an aggregate amount not to exceed $25,000,000 at any time.

## ARTICLE VI

## REPORTS BY THE COMPANY

SECTION 6.1     Reports by Company.  The Company shall deliver to each Debenture holder (a) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Company (i) a consolidated balance sheet of the Company and its subsidiaries as of the end of such fiscal year and the related consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all reported on by an independent public accountant of nationally recognized standing and (ii) a report containing a management's discussion and analysis of the financial condition and results of operations and a description of the business and properties of the Company and (b) as soon as available and in any event within forty five (45) days after the end of each of the first three quarters of each fiscal year of the Company (i) an unaudited consolidated balance sheet of the Company and its subsidiaries as of the end of each such quarter and the related consolidated statements of operations and cash flows for such fiscal quarter and (ii) a report containing a management's discussion and analysis of the financial condition and results of operations of the Company for such quarter.

## ARTICLE VII

## DEFAULTS AND REMEDIES

SECTION 7.1     Events of Default.  In case one or more of the following Events of Default (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) shall have occurred and be continuing:

9213905.13

-20-

(a)    default in the payment of the principal of and premium, if any, on any of the Debentures as and when the same shall become due and payable, either at maturity or in connection with any redemption or repurchase, by declaration or otherwise, whether or not such payment is prohibited by the provisions of Article IV; or

(b)    default in the payment of any installment of interest upon any of the Debentures as and when the same shall become due and payable, and continuance of such default for a period of thirty (30) days, whether or not such payment is prohibited by the provisions of Article IV; or

(c)    a default in the payment of the Repurchase Price in respect of any Debenture on the repurchase date therefor in accordance with the provisions of Article XIV, whether or not such payment is prohibited by the provisions of Article IV; or

(d)    failure on the part of the Company duly to observe or perform any other of the covenants or agreements on the part of the Company in the Debentures or in this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with) and, if such failure is capable of cure, such failure continues for a period of sixty (60) days after the date on which written notice of such failure, requiring the Company to remedy the same, shall have been given to the Company by any holder of Debentures; or

(e)    failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of indebtedness, which term as used herein means obligations (other than the Debentures or non-recourse obligations) of, or guaranteed or assumed by, the Company, or any Significant Subsidiary, for borrowed money or evidenced by bonds, debentures, notes or other similar instruments ("Indebtedness") in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures; or

(f)    a default by the Company or any Significant Subsidiary with respect to any Indebtedness, which default results in the acceleration of Indebtedness in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency without such Indebtedness having been discharged or such acceleration having been cured, waived, rescinded or annulled for a period of thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures; or

(g)    the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

9213905.13

-21-

PWSP 00504

(h)    an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of ninety (90) consecutive days; or

(i)    (A) the failure on the part of the Company duly to observe or perform any of the covenants or agreements on the part of the Company in the Pledge Agreement or the Option Agreement dated the date of this Indenture among the Company and the Initial Purchasers (the "Option Agreement") or (B) the failure of the Company to make any cash payment when due and payable under any of the Registration Rights Agreement, the Purchase Agreement or the Warrants issued to the Initial Purchasers pursuant to the Purchase Agreement; and, in the case of any such failure, such failure, if capable of cure, continues for a period of thirty (30) days after the date on which written notice of such failure, requiring the Company to remedy the same, shall have been given to the Company by any holder of Debentures;

(j)    the failure on the part of the Company duly to observe or perform the covenants set forth in Section 4(o) of the Purchase Agreement;

(k)    failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of Indebtedness, other than Senior Indebtedness, in an amount in excess of $10,000,000, individually or in the aggregate, or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures; or

(l)    failure by the Company to make any payment when due and payable, including any applicable grace period, in respect of any of the Subordinated Notes,

then, and in each and every such case (other than an Event of Default specified in Section 7.1(g) or (h)), unless the principal of all of the Debentures shall have already become due and payable, the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding hereunder determined in accordance with Section 9.3, by notice in writing to the Company may declare the principal of and premium, if any, on all the Debentures and the interest accrued thereon to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Debentures contained to the contrary notwithstanding. If an Event of Default specified in Section 7.1(g) or (h) occurs and is continuing, the principal of all the Debentures and the interest accrued thereon shall be immediately due and payable. This provision, however, is subject to the conditions that if, at any time after the principal of the Debentures shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay a sum sufficient to pay all matured installments of interest upon all Debentures and the principal of, and premium, if any, on, any and all Debentures which shall have become due otherwise than by acceleration (with interest on overdue installments of interest (to the extent that payment of such interest is

9213905.13

-22-

PWSP 00505

enforceable under applicable law) and on such principal and premium, if any, at the rate borne by the Debentures, to the date of such payment or deposit) and the reasonable expenses, disbursements and advances reasonably incurred or made by any Debenture holder to enforce its rights under this Section 7.1 or any of the other provisions of this Indenture, then and in every such case the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding, by written notice to the Company, may waive all defaults or Events of Default and rescind and annul such declaration and its consequences; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon. The Company shall notify each Debenture holder, promptly upon becoming aware thereof, of any Event of Default. The Company shall also notify each Debenture holder, promptly upon becoming aware thereof, of any of the following: (i) any failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of Indebtedness in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency, (ii) any default by the Company or any Significant Subsidiary with respect to any Indebtedness, which default results in the acceleration of Indebtedness in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency, (iii) failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of Indebtedness, other than Senior Indebtedness, in an amount in excess of $10,000,000, individually or in the aggregate, or the equivalent thereof in any other currency or composite currency and (iv) failure by the Company to make any payment when due and payable, including any applicable grace period, in respect of the Subordinated Notes.

In case any Debenture holder shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of such waiver or rescission and annulment or for any other reason or shall have been determined adversely to such Debenture holder, then and in every such case the Company and the holders of Debentures shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company and the holders of Debentures shall continue as though no such proceeding had been instituted.

SECTION 7.2    Payments of Debentures on Default; Suit Therefor. The Company covenants that (a) in case default shall be made in the payment by the Company of any installment of interest upon any of the Debentures as and when the same shall become due and payable, and such default shall have continued for a period of thirty (30) days, or (b) in case default shall be made in the payment of the principal of or premium, if any, on any of the Debentures as and when the same shall have become due and payable, either at maturity or in connection with any redemption or repurchase, by declaration under this Indenture or otherwise, then, upon demand of holders of not less than a majority of the then outstanding principal amount of Debentures, the Company will pay to the holders of the Debentures, the whole amount that then shall have become due and payable on all such Debentures for principal and premium, if any, or interest, or both, as the case may be, with interest upon the overdue principal and premium, if any, and (to the extent that payment of such interest is enforceable under applicable law) upon the overdue installments of interest at the rate borne by the Debentures; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable expenses of the Debenture holders and a single counsel incurred by the Debenture holders hereunder. Until such demand by such holders, the Company may pay

PWSP 00506

the principal of (premium, if any) and interest on the Debentures to the registered holders, whether or not the Debentures are overdue.

In case the Company shall fail forthwith to pay such amounts upon such demand, each Debenture holder shall be entitled and empowered to institute any actions or proceedings at law or in equity for the collection of the sums so due and unpaid to such Debenture holder, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Company or any other obligor on the Debentures and collect in the manner provided by law out of the property of the Company or any other obligor on the Debentures wherever situated the monies adjudged or decreed to be payable.

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Debentures under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the case of any other judicial proceedings relative to the Company or such other obligor upon the Debentures, or to the creditors or property of the Company or such other obligor, each Debenture holder, irrespective of whether the principal of the Debentures shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether such Debenture holder shall have made any demand pursuant to the provisions of this Section 7.2, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal, premium, if any, and interest owing and unpaid in respect of such Debenture holder's Debentures, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of such Debenture holder allowed in such judicial proceedings relative to the Company or any other obligor on the Debentures, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, including the reasonable expenses and counsel fees referred to above. To the extent that such payment of reasonable expenses and fees out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property which the holders of the Debentures may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

All rights of action and of asserting claims under this Indenture, or under any of the Debentures, may be enforced by any Debenture holder without the possession of any of the Debentures or the production thereof at any trial or other proceeding relative thereto.

SECTION 7.3    Application of Monies Collected by Debenture Holders. Any monies collected by any Debenture holder pursuant to this Article VII shall be applied in the order following, upon presentation of the Debenture(s) of such Debenture holder, and the notation thereon of the payment, if only partially paid, and upon surrender thereof, if fully paid:

First: Subject to the provisions of Article IV, in case the principal of the outstanding Debentures shall not have become due and be unpaid, to the payment of interest on

9213905.13

-24-

PWSP 00507

the Debentures in default in the order of the maturity of the installments of such interest, with interest upon the overdue installments of interest at the rate borne by the Debentures;

Second: Subject to the provisions of Article IV, in case the principal of the outstanding Debentures shall have become due, either at maturity or in connection with any redemption or repurchase, by declaration or otherwise, and be unpaid, to the payment of the whole amount then owing and unpaid upon the Debentures for principal and premium, if any, and interest, with interest on the overdue principal and premium, if any, and upon overdue installments of interest at the rate borne by the Debentures; and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Debentures, then to the payment of such principal and premium, if any, and interest without preference or priority of principal and premium, if any, over interest, or of interest over principal and premium, if any, or of any installment of interest over any other installment of interest, or of any Debenture over any other Debenture; and

Third: Subject to the provisions of Article IV, to the payment of the remainder, if any, to the Company or any other person lawfully entitled thereto.

SECTION 7.4      No Impairment. Notwithstanding any other provision of this Indenture and any provision of any Debenture, the right of any holder of any Debenture to receive payment of the principal of (and premium, if any) and interest on such Debenture, on or after the respective due dates expressed in such Debenture, or to institute suit for the enforcement of any such payment on or after such respective dates against the Company shall not be impaired or affected without the consent of such holder. Anything in this Indenture or the Debentures to the contrary notwithstanding, the holder of any Debenture, without the consent of any other holder of Debentures, in its own behalf and for its own benefit, may enforce, and may institute and maintain any proceeding suitable to enforce, its rights of conversion as provided herein.

SECTION 7.5      Remedies Cumulative and Continuing. All powers and remedies given by this Article VII to the Debenture holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the holders of the Debentures, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of any holder of any of the Debentures to exercise any right or power accruing upon any default or Event of Default occurring and continuing as aforesaid shall impair any such right or power, or shall be construed to be a waiver of any such default or any acquiescence therein; and, subject to the provisions of Section 7.4, every power and remedy given by this Article VII or by law to the Debenture holders may be exercised from time to time, and as often as shall be deemed expedient, by the Debenture holders.

SECTION 7.6      Undertaking to Pay Costs. All parties to this Indenture agree that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided that the provisions of this Section 7.6 shall not apply to any suit instituted by any Debenture holder, or group of

9213905.13

-25-

PWSP 00508

Debenture holders, holding in the aggregate more than 10% in principal amount of the Debentures at the time outstanding determined in accordance with Section 9.3, or to any suit instituted by any Debenture holder for the enforcement of the payment of the principal of (or premium, if any) or interest on any Debenture (including, but not limited to, the redemption price or repurchase price with respect to the Debentures being redeemed or repurchased as provided in this Indenture) on or after the due date expressed in such Debenture or to any suit for the enforcement of the right to convert any Debenture in accordance with the provisions of Article XIII.

        SECTION 7.7    <u>Delay Or Omission Not Waiver</u>.  No delay or omission of any holder of any Debenture to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or any acquiescence therein.  Every right and remedy given by this Article or by law to the holders of Debentures may be exercised from time to time, and as often as may be deemed expedient, by the holders of Debentures.

ARTICLE VIII

ACTIONS WITH RESPECT TO SUBORDINATED NOTES

        SECTION 8.1    <u>Complete Restructuring</u>.  In connection with the first time, and only the first time, the Company, directly or indirectly, shall enter into agreement(s) to effectuate in any manner a modification to the terms of all, but not less than all, of the Subordinated Notes outstanding on the date of this Indenture (a "Complete Restructuring"), the Company shall (a) deliver written notice to each holder of Debentures (a "Complete Restructuring Notice") at the same time such notice is delivered to all holders of outstanding Subordinated Notes, but in no event prior to the public announcement of the Complete Restructuring, which shall state: (i) the date on which the Complete Restructuring is to be effective and (ii) all of the terms and conditions on which the Complete Restructuring is to be effected and (b) deliver a copy of all agreements, certificates, instruments and other documents to be entered into in connection with the Complete Restructuring.  Contemporaneous with the effectiveness of the Complete Restructuring, the Company and each holder of Debentures shall execute and deliver to the others a supplemental indenture in accordance with Article X hereof (but without regard to the requirement of written consent of the holders of not less than a majority in aggregate principal amount of the Debentures at the time outstanding required by Section 9.1), which supplemental indenture shall provide for a modification of the terms of this Indenture and the Debentures to conform in all material respects with the modifications made to the 1996 Indenture and the Subordinated Notes, shall provide for the receipt by each holder of Debentures of a pro rata portion of any payments or other benefits given to the holders of the Subordinated Notes in connection with the Complete Restructuring at the same time such payments and/or benefits are paid or given to the holders of Subordinated Notes and shall provide for each holder of Debentures to have the continuing right after the Complete Restructuring to participate in all future full or partial restructurings of modifications or amendments to the Subordinated Notes (or such other securities, instruments and agreements issued or entered into in connection with the Complete Restructuring) on the same basis that the holders of Debentures are permitted to participate in Partial Restructurings under Section 8.2 hereof ; <u>provided</u>, <u>however</u>, that in no event shall any such supplemental indenture (x) provide for an extension of the Maturity Date

9213905.13

**PWSP 00509**

beyond the earlier of (A) 30 days prior to the maturity date of the Subordinated Notes, as the same may be extended and (B) September 1, 2005 or (y) result in a change or modification to Sections 4.1, 4.7 or 5.8 of the Indenture that would adversely affect in any way the rights and ranking of the Debentures.

SECTION 8.2    Partial Restructurings.  If at any time and from time to time after the date hereof, the Company, directly or indirectly, shall enter into agreement(s) to effectuate in any manner a modification to the terms of the outstanding Subordinated Notes, other than by way of a Complete Restructuring (each, a "Partial Restructuring"), the Company shall (i) deliver written notice to each holder of Debentures (a "Partial Restructuring Notice") at the same time such notice is delivered to all holders of outstanding Subordinated Notes participating in the Partial Restructuring but in no event prior to the public announcement of the Partial Restructuring, which shall state: (x) the date on which the Partial Restructuring is to be effective and (y) all of the terms and conditions on which the Partial Restructuring is to be effected and (ii) deliver a copy of all agreements, certificates, instruments and other documents to be entered into in connection with the Partial Restructuring.  Each holder shall have the option, but not the obligation, to accept a modification of the terms of this Indenture (solely as to the portion of such holder's Debentures being modified) and the portion of such holder's Debentures that are being modified as determined below (if a modification to the form of Debenture is deemed appropriate by the Company and the affected holder(s) of Debentures) up to such holder's pro rata portion of its Debentures outstanding immediately prior to the effectiveness of the Partial Restructuring that is equal to the proportion of the original outstanding principal amount of Subordinated Notes that are restructured in the Partial Restructuring; provided, that if the Partial Restructuring will result in all of the original principal amount of Subordinated Notes being restructured, each holder of Debentures shall have the right, but not the obligation, to accept such a modification as aforesaid as to all or any portion of such holder's Debentures; in each case consistent in all material respects with the modifications made to the 1996 Indenture and the Subordinated Notes in the Partial Restructuring, at the same time that the Partial Restructuring is effected (the "Partial Restructuring Option"), including, without limitation, the right to receive a pro rata portion of any payments or other benefits given to the holders of the Subordinated Notes in connection with such Partial Restructuring at the same time such payments and/or benefits are paid or given to the holders of Subordinated Notes, by delivering to the Company a notice (the "Partial Restructuring Option Exercise Notice") to such effect within five (5) Business Days of the holder's receipt of the Partial Restructuring Notice.  Contemporaneous with the effectiveness of any Partial Restructuring, the Company and the holder(s) delivering the Partial Restructuring Option Exercise Notice shall execute and deliver to each other a supplemental indenture in accordance with Article X hereof (but without regard to the requirement of written consent of the holders of not less than a majority in aggregate principal amount of the Debentures at the time outstanding required by Section 9.1), which supplemental indenture shall provide for a modification of the terms of this Indenture (solely as it relates to the portion of such holder's Debentures being restructured) and the pro rata portion of such holder's Debentures being restructured to conform in all material respects with the modifications made to the 1996 Indenture and the Subordinated Notes; provided, however, that in no event shall any such supplemental indenture (x) provide for an extension of the Maturity Date beyond the earlier of (A) 30 days prior to the maturity date of the Subordinated Notes, as the same may be extended and (B) September 1, 2005 or (y) result in a change or modification to Sections 4.1, 4.7 or 5.8 of the Indenture that would adversely affect in any way the rights and

9213905.13

-27-

PWSP 00510

ranking of the Debentures. Notwithstanding anything in this Section 8.2 to the contrary, if the Company engages in a Partial Restructuring (the Subordinated Notes so restructured being referred to herein as the "Restructured Notes"), then such holder shall have the right, but not the obligation, in connection with each subsequent Partial Restructuring of the Restructured Notes (or any other securities, instruments and agreements issued or entered into in connection with the Partial Restructuring) to participate in such subsequent Partial Restructuring up to its pro rata portion of outstanding principal amount of Debentures in accordance with the procedures set forth in this Section 8.2 and in connection with such subsequent participation such holder shall have the right in accordance with this Section 8.2 to accept all previous modifications made to the Restructured Notes (and any other securities, instruments and agreements issued or entered into in connection with all prior Partial Restructurings of the Restructured Notes) in all previous Partial Restructurings, whether or not such holder participated with respect to all or any portion of the outstanding principal amount of its Debentures in any such prior Partial Restructuring.

SECTION 8.3    Announcements Regarding Restructurings.  The Company shall within one Business Day of the effectiveness of a Complete Restructuring and any Partial Restructuring pursuant to Sections 8.1 and 8.2 hereof file a Current Report on Form 8-K describing all material terms of each such transaction and filing as exhibits thereto each material agreement, instrument and supplemental indenture entered into in connection with such transaction.

ARTICLE IX

CONCERNING THE DEBENTURE HOLDERS

SECTION 9.1    Action by Debenture Holders.  Whenever in this Indenture it is provided that the holders of a specified percentage in aggregate principal amount of the Debentures may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the holders of such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Debenture holders in person or by agent or proxy appointed in writing.

SECTION 9.2    Who are Deemed Absolute Owners.  The Company may deem the person in whose name such Debenture shall be registered upon the Debenture register to be, and may treat such person as, the absolute owner of such Debenture (whether or not such Debenture shall be overdue and notwithstanding any notation of ownership or other writing thereon) for the purpose of receiving payment of or on account of the principal of, premium, if any, and interest on such Debenture, for conversion of such Debenture and for all other purposes; and the Company shall not be affected by any notice to the contrary.  All such payments so made to any holder for the time being, or upon its order, shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for monies payable upon any such Debenture.

SECTION 9.3    Company-Owned Debentures Disregarded.  In determining whether the holders of the requisite aggregate principal amount of Debentures have concurred in any direction, consent, waiver or other action under this Indenture, Debentures which are owned

9213905.13

-28-

by the Company or any other obligor on the Debentures or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any other obligor on the Debentures shall be disregarded and deemed not to be outstanding for the purpose of any such determination. Debentures so owned which have been pledged in good faith may be regarded as outstanding for the purposes of this Section 9.3 if the pledgee shall establish to the reasonable satisfaction of the Company the pledgee's right to vote such Debentures and that the pledgee is not the Company, any other obligor on the Debentures or a person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any such other obligor. .

SECTION 9.4    Revocation of Consents: Future Holders Bound. At any time prior to (but not after) the taking of any action by the holders of the percentage in aggregate principal amount of the Debentures specified in this Indenture in connection with such action, any holder of a Debenture which is shown by the evidence to be included in the Debentures the holders of which have consented to such action may, by filing written notice with the Company revoke such action so far as concerns such Debenture. Except as aforesaid, any such action taken by the holder of any Debenture shall be conclusive and binding upon such holder and upon all future holders and owners of such Debenture and of any Debentures issued in exchange or substitution therefor, irrespective of whether any notation in regard thereto is made upon such Debenture or any Debenture issued in exchange or substitution therefor.

ARTICLE X

SUPPLEMENTAL INDENTURES

SECTION 10.1    Supplemental Indentures. With the consent (evidenced as provided in Article IX) of the holders of not less than a majority in aggregate principal amount of the Debentures at the time outstanding (determined in accordance with Section 9.3), the Company, when authorized by the resolutions of the Board of Directors, and such holders may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the holders of the Debentures; provided, however, that no such supplemental indenture shall (i) extend the fixed maturity of any Debenture, or reduce the rate or extend the time of payment of interest thereon, or reduce the principal amount thereof or premium, if any, thereon, or reduce any amount payable on redemption or repurchase thereof, impair, or change in any respect adverse to the holder of Debentures, the obligation of the Company to repurchase any Debenture at the option of the holder upon the happening of a Designated Event, or impair or adversely affect the right of any Debenture holder to institute suit for the payment thereof, or make the principal thereof, or interest or premium, if any, thereon, payable in any coin or currency other than that provided in the Debentures, or change or impair the right to convert the Debentures into Common Stock subject to the terms set forth herein, including Section 13.6, or modify the provisions of this Indenture with respect to the subordination of the Debentures in a manner adverse to the Debenture holders, without the consent of the holder of each Debenture so affected, or (ii) reduce the aforesaid percentage of Debentures, the holders of which are required

9213905.13

-29-

PWSP 00512

to consent to any such supplemental indenture, without the consent of the holders of all Debentures then outstanding.

Upon the request of the Company, accompanied by a copy of the resolutions of the Board of Directors certified by its Secretary or Assistant Secretary authorizing the execution of any such supplemental indenture, the consenting holders shall join with the Company in the execution of such supplemental indenture and the Company shall promptly after the execution thereof deliver a fully executed copy of such supplemental indenture to each Debenture holder.

SECTION 10.2    Effect of Supplemental Indentures.  Upon the execution of any supplemental indenture pursuant to the provisions of this Article X, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Company and the holders of Debentures shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

## ARTICLE XI

## CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

SECTION 11.1    Company May Consolidate, Etc. on Certain Terms.  Subject to the provisions of Section 11.2, nothing contained in this Indenture or in any of the Debentures shall prevent any consolidation or merger of the Company with or into any other corporation or corporations (whether or not affiliated with the Company), or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale, conveyance or lease (or successive sales, conveyances or leases) of all or substantially all of the property of the Company, to any other corporation (whether or not affiliated with the Company), authorized to acquire and operate the same and which shall be organized under the laws of the United States of America, any state thereof or the District of Columbia; provided, however, and the Company hereby covenants and agrees, that (i) upon any such consolidation with, merger into, or sale, conveyance or lease to another corporation, the due and punctual payment of the principal of, and premium, if any, and interest on, all of the Debentures, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Company, shall be expressly assumed, by supplemental indenture satisfactory in form to the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding, executed and delivered to each Debenture holder by the corporation (if other than the Company) formed by such consolidation, or into which the Company shall have been merged, or by the corporation which shall have acquired or leased such property, (ii) such supplemental indenture shall provide for the applicable conversion rights set forth in Section 13.6 and the repurchase rights set forth in Article XIV; and (iii) the said consolidation, merger, sale, conveyance or lease shall not result in the occurrence of an Event of Default or, after notice or lapse of time result in an Event of Default.

9213905.13

-30-

SECTION 11.2    <u>Successor Corporation to be Substituted</u>.  In case of any such consolidation with, merger into, or sale, conveyance or lease to another corporation in accordance with Section 11.1 and upon the assumption by the successor corporation, by supplemental indenture, executed and delivered to each Debenture holder and satisfactory in form to the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding, of the due and punctual payment of the principal of, and premium, if any, and interest on, all of the Debentures and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such successor corporation shall succeed to and be substituted for the Company, with the same effect as if it had been named herein as the party of the first part.  Such successor corporation thereupon may cause to be signed, and may issue either in its own name or in the name of SONICblue Incorporated any or all of the Debentures issuable hereunder which theretofore shall not have been signed by the Company and delivered to each Debenture holder; and, upon the order of such successor corporation instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Company shall deliver any Debentures which previously shall have been signed and delivered by the officers of the Company to the Debenture holder and any Debentures which such successor corporation thereafter shall cause to be signed and delivered to the Debenture holder for that purpose.  All the Debentures so issued shall in all respects have the same legal rank and benefit under this Indenture as the Debentures theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Debentures had been issued at the date of the execution hereof.  In the event of any such consolidation, merger, sale, conveyance or lease, the person named as the "Company" in the first paragraph of this Indenture or any successor which shall thereafter have become such in the manner prescribed in this Article XI may be dissolved, wound up and liquidated at any time thereafter and such person shall be released from its liabilities as obligor and maker of the Debentures and from its obligations under this Indenture.

In case of any such consolidation, merger, sale, conveyance or lease, such changes in phraseology and form (but not in substance) may be made in the Debentures thereafter to be issued as may be appropriate.

SECTION 11.3    <u>Opinion of Counsel to be Given Debenture Holders</u>.  Each Debenture holder shall receive an Officers' Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance or lease and any such assumption complies with the provisions of this Article XI.

## ARTICLE XII

## IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

SECTION 12.1    <u>Indenture and Debentures Solely Corporate Obligations</u>.  No recourse for the payment of the principal of (or premium, if any) or interest on any Debenture, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Debenture, or because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, officer or director

9213905.13

PWSP 00514

or subsidiary, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Debentures.

## ARTICLE XIII

## CONVERSION OF DEBENTURES

SECTION 13.1     <u>Right To Convert</u>.  Subject to and upon compliance with the provisions of this Indenture, the holder of any Debenture shall have the right, at its option, at any time prior to the close of business on the Maturity Date (except that, with respect to any Debenture or portion of a Debenture which shall be called for redemption, such right shall terminate, except as provided in Section 3.2 and the fourth paragraph of Section 13.2, at the close of business on the third Business Day prior to the date fixed for redemption of such Debenture or portion of a Debenture unless the Company shall default in payment due upon redemption thereof) to convert the principal amount of any such Debenture, or any portion of such principal amount which is $1,000 or an integral multiple thereof, into that number of fully paid and non-assessable shares of Common Stock (as such shares shall then be constituted) obtained by dividing the principal amount of the Debenture or portion thereof surrendered for conversion by the Conversion Price in effect at such time, by surrender of the Debenture so to be converted in whole or in part in the manner provided in Section 13.2.  A holder of Debentures is not entitled to any rights of a holder of Common Stock until such holder has converted its Debentures to Common Stock, and only to the extent such Debentures are deemed to have been converted to Common Stock under this Article XIII.

SECTION 13.2     <u>Exercise of Conversion Privilege; Issuance of Common Stock on Conversion; No Adjustment for Interest or Dividends</u>.  In order to exercise the conversion privilege with respect to any Debenture, the holder of any such Debenture to be converted in whole or in part shall surrender such Debenture, duly endorsed, to the Company in accordance with Section 15.3, accompanied by the funds, if any, required by the final paragraph of this Section 13.2, and shall give written notice of conversion in the form provided on the Debentures (or such other notice which is acceptable to the Company) to the office or agency that the holder elects to convert such Debenture or such portion thereof specified in said notice.  Such notice shall also state the name or names (with address) in which the certificate or certificates for shares of Common Stock which shall be issuable on such conversion shall be issued, and shall be accompanied by transfer taxes, if required pursuant to Section 13.7.  Each such Debenture surrendered for conversion shall, unless the shares issuable on conversion are to be issued in the same name as the registration of such Debenture, be duly endorsed by, or be accompanied by instruments of transfer in form satisfactory to the Company duly executed by, the holder or its duly authorized attorney.

As promptly as practicable after satisfaction of the requirements for conversion set forth above, subject to compliance with any restrictions on transfer if shares issuable on conversion are to be issued in a name other than that of the Debenture holder (as if such transfer

9213905.13

PWSP 00515

were a transfer of the Debenture or Debentures (or portion thereof) so converted), the Company shall issue and shall deliver to such holder in accordance with Section 15.3 hereof, a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such Debenture or portion thereof in accordance with the provisions of this Article and a check or cash in respect of any fractional interest in respect of a share of Common Stock arising upon such conversion, as provided in Section 13.3. In case any Debenture of a denomination greater than $1,000 shall be surrendered for partial conversion, and subject to Section 2.3, the Company shall execute and deliver to the holder of the Debenture so surrendered, without charge to such holder, a new Debenture or Debentures in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Debenture.

Each conversion shall be deemed to have been effected as to any such Debenture (or portion thereof) on the date on which the requirements set forth above in this Section 13.2 have been satisfied as to such Debenture (or portion thereof), and the person in whose name any certificate or certificates for shares of Common Stock shall be issuable upon such conversion shall be deemed to have become on said date the holder of record of the shares represented thereby; provided, however, that any such surrender on any date when the stock transfer books of the Company shall be closed shall constitute the person in whose name the certificates are to be issued as the record holder thereof for all purposes on the next succeeding day on which such stock transfer books are open, but such conversion shall be at the Conversion Price in effect on the date upon which such Debenture shall be surrendered.

Any Debenture or portion thereof surrendered for conversion during the period from the close of business on the record date for any interest payment date through the close of business on the Business Day next preceding such interest payment date shall (unless such Debenture or portion thereof being converted shall have been called for redemption during the period from the close of business on such record date to the close of business on the Business Day next preceding such interest payment date) be accompanied by payment, in New York Clearing House funds or other funds acceptable to the Company, of an amount equal to the interest otherwise payable on such interest payment date on the principal amount being converted; provided, however, that no such payment need be made if there shall exist at the time of conversion a default in the payment of interest on the Debentures. An amount equal to such payment shall be paid by the Company on such interest payment date to the holder of such Debenture at the close of business on such record date; provided, however, that if the Company shall default in the payment of interest on such interest payment date, such amount shall be paid to the person who made such required payment. Except as provided above in this Section 13.2, no adjustment shall be made for interest accrued on any Debenture converted or for dividends on any shares issued upon the conversion of such Debenture as provided in this Article.

SECTION 13.3   <u>Cash Payments in Lieu of Fractional Shares</u>. No fractional shares of Common Stock or scrip representing fractional shares shall be issued upon conversion of Debentures. If more than one Debenture shall be surrendered for conversion at one time by the same holder, the number of full shares which shall be issuable upon conversion shall be computed on the basis of the aggregate principal amount of the Debentures (or specified portions thereof to the extent permitted hereby) so surrendered for conversion. If any fractional share of stock otherwise would be issuable upon the conversion of any Debenture or Debentures, the Company shall make an adjustment therefor in cash at the current market value thereof to the

9213905.13

-33-

holder of Debentures. For these purposes, the current market value of a share of Common Stock shall be the Closing Price on the first Trading Day immediately preceding the day on which the Debentures (or specified portions thereof) are deemed to have been converted and such Closing Price shall be determined as provided in Section 13.5(g).

SECTION 13.4    Conversion Price. The conversion price shall be as specified in the form of Debenture (herein called the "Conversion Price") attached as Exhibit A hereto, subject to adjustment as provided in this Article XIII.

SECTION 13.5    Adjustment of Conversion Price. The Conversion Price shall be adjusted from time to time by the Company as follows:

(a)    In case the Company shall hereafter pay a dividend or make a distribution to all holders of the outstanding Common Stock in shares of Common Stock, the Conversion Price in effect at the opening of business on the date following the date fixed for the determination of stockholders entitled to receive such dividend or other distribution shall be reduced by multiplying such Conversion Price by a fraction of which the numerator shall be the number of shares of Common Stock outstanding at the close of business on the Record Date (as defined in Section 13.5(g)) fixed for such determination and the denominator shall be the sum of such number of shares and the total number of shares constituting such dividend or other distribution, such reduction to become effective immediately after the opening of business on the day following the Record Date. If any dividend or distribution of the type described in this Section 13.5(a) is declared but not so paid or made, the Conversion Price shall again be adjusted to the Conversion Price which would then be in effect if such dividend or distribution had not been declared.

(b)    In case the Company shall issue rights or warrants to all holders of its outstanding shares of Common Stock entitling them (for a period expiring within forty-five (45) days after the date fixed for the determination of stockholders entitled to receive such rights or warrants) to subscribe for or purchase shares of Common Stock at a price per share less than the Current Market Price (as defined in Section 13.5(g)) on the Record Date fixed for the determination of stockholders entitled to receive such rights or warrants, the Conversion Price shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Price in effect at the opening of business on the date after such Record Date by a fraction of which the numerator shall be the number of shares of Common Stock outstanding at the close of business on the Record Date plus the number of shares which the aggregate offering price of the total number of shares so offered would purchase at such Current Market Price, and of which the denominator shall be the number of shares of Common Stock outstanding on the close of business on the Record Date plus the total number of additional shares of Common Stock so offered for subscription or purchase. Such adjustment shall become effective immediately after the opening of business on the day following the Record Date fixed for determination of stockholders entitled to receive such rights or warrants. To the extent that shares of Common Stock are not delivered pursuant to such rights or warrants, upon the expiration or termination of such rights or warrants the Conversion Price shall be readjusted to the Conversion Price which would then be in effect had the adjustments made upon the issuance of such rights or warrants been made on the basis of delivery of only the number of shares of Common Stock actually delivered. In the event that such rights or warrants are not so issued, the Conversion Price shall

9213905.13

-34-

again be adjusted to be the Conversion Price which would then be in effect if such date fixed for the determination of stockholders entitled to receive such rights or warrants had not been fixed. In determining whether any rights or warrants entitle the holders to subscribe for or purchase shares of Common Stock at less than such Current Market Price, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, the value of such consideration if other than cash, to be determined by the Board of Directors.

(c)     In case the outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such subdivision becomes effective shall be proportionately reduced, and conversely, in case outstanding shares of Common Stock shall be combined into a smaller number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately increased, such reduction or increase, as the case may be, to become effective immediately after the opening of business on the day following the day upon which such subdivision or combination becomes effective.

(d)     In case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock shares of any class of capital stock of the Company (other than any dividends or distributions to which Section 13.5(a) applies) or evidences of its indebtedness, cash or other assets (including securities, but excluding (1) any rights or warrants referred to in Section 13.5(b), (2) dividends and distributions paid exclusively in cash and (3) any capital stock, evidences of indebtedness, cash or assets distributed upon a merger or consolidation to which Section 13.6 applies) (the foregoing hereinafter in this Section 13.5(d) called the "Securities")) (unless the Company elects to reserve such Securities for distribution to the Debenture holders upon conversion of the Debentures so that any such holder converting Debentures will receive upon such conversion, in addition to the shares of Common Stock to which such holder is entitled, the amount and kind of such Securities which such holder would have received if such holder had converted its Debentures into Common Stock immediately prior to the Record Date (as defined in Section 13.5(g) for such distribution of the Securities)), then, in each such case, the Conversion Price shall be reduced so that the same shall be equal to the price determined by multiplying the Conversion Price in effect immediately prior to the close of business on the Record Date with respect to such distribution by a fraction of which the numerator shall be the Current Market Price (determined as provided in Section 13.5(g)) on such date less the fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) on such date of the portion of the Securities so distributed applicable to one share of Common Stock and the denominator shall be such Current Market Price, such reduction to become effective immediately prior to the opening of business on the day following the Record Date; provided, however, that in the event the then fair market value (as so determined) of the portion of the Securities so distributed applicable to one share of Common Stock is equal to or greater than the Current Market Price on the Record Date, in lieu of the foregoing adjustment, adequate provision shall be made so that each Debenture holder shall have the right to receive upon conversion of a Debenture (or any portion thereof) the amount of Securities such holder would have received had such holder converted such Debenture (or portion thereof) immediately prior to such Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted

9213905.13

-35-

to be the Conversion Price which would then be in effect if such dividend or distribution had not been declared. If the Board of Directors determines the fair market value of any distribution for purposes of this Section 13.5(d) by reference to the actual or when issued trading market for any securities comprising all or part of such distribution, it must in doing so consider the prices in such market over the same period (the "Reference Period") used in computing the Current Market Price pursuant to Section 13.5(g) to the extent possible, unless the Board of Directors in a board resolution determines in good faith that determining the fair market value during the Reference Period would not be in the best interest of the Debenture holder.

Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's capital stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events ("Trigger Event"): (i) are deemed to be transferred with such shares of Common Stock; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of Common Stock, shall be deemed not to have been distributed for purposes of this Section 13.5(d) (and no adjustment to the Conversion Price under this Section 13.5(d) will be required) until the occurrence of the earliest Trigger Event. If such right or warrant is subject to subsequent events, upon the occurrence of which such right or warrant shall become exercisable to purchase different securities, evidences of indebtedness or other assets or entitle the holder to purchase a different number or amount of the foregoing or to purchase any of the foregoing at a different purchase price, then the occurrence of each such event shall be deemed to be the date of issuance and record date with respect to a new right or warrant (and a termination or expiration of the existing right or warrant without exercise by the holder thereof). In addition, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in the preceding sentence) with respect thereto, that resulted in an adjustment to the Conversion Price under this Section 13.5(d), (1) in the case of any such rights or warrants which shall all have been redeemed or repurchased without exercise by any holders thereof, the Conversion Price shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase price received by a holder of Common Stock with respect to such rights or warrant, (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase, and (2) in the case of such rights or warrants all of which shall have expired or been terminated without exercise, the Conversion Price shall be readjusted as if such rights and warrants had never been issued.

For purposes of this Section 13.5(d) and Sections 13.5(a) and (b), any dividend or distribution to which this Section 13.5(d) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock to which Section 13.5(b) applies (or both), shall be deemed instead to be (1) a dividend or distribution of the evidences of indebtedness, assets, shares of capital stock, rights or warrants other than such shares of Common Stock or rights or warrants to which Section 13.5(b) applies (and any Conversion Price reduction required by this Section 13.5(d) with respect to such dividend or distribution shall then be made) immediately followed by (2) a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Conversion Price reduction required by Sections 13.5(a) and (b) with respect to such dividend or distribution shall then be made, except (A) the Record Date of such dividend or distribution shall be substituted as "the

9213905.13

-36-

date fixed for the determination of stockholders entitled to receive such dividend or other distribution", "Record Date fixed for such determinations" and "Record Date" within the meaning of Section 13.5(a) and as "the date fixed for the determination of stockholders entitled to receive such rights or warrants", "the Record Date fixed for the determination of the stockholders entitled to receive such rights or warrants" and "such Record Date" within the meaning of Section 13.5(b) and (B) any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the close of business on the date fixed for such determination" within the meaning of Section 13.5(a).

      (e)    In case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock cash (excluding any cash that is distributed upon a merger or consolidation to which Section 13.6 applies or as part of a distribution referred to in Section 13.5(d)), in an aggregate amount that, combined together with (1) the aggregate amount of any other such distributions to all holders of Common Stock made exclusively in cash within the twelve (12) months preceding the date of payment of such distribution, and in respect of which no adjustment pursuant to this Section 13.5(e) has been made, and (2) the aggregate of any cash plus the fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) of consideration payable in respect of any tender offer by the Company or any of its subsidiaries for all or any portion of the Common Stock concluded within the twelve (12) months preceding the date of payment of such distribution, and in respect of which no adjustment pursuant to Section 13.5(f) has been made, exceeds 10.0% of the product of the Current Market Price (determined as provided in Section 13.5(g)) on the Record Date with respect to such distribution times the number of shares of Common Stock outstanding on such date, then and in each such case, immediately after the close of business on such date. The Conversion Price shall be reduced so that the same shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the close of business on such Record Date by a fraction (i) the numerator of which shall be equal to the Current Market Price on the Record Date less an amount equal to the quotient of (x) the excess of such combined amount over such 10.0% and (y) the number of shares of Common Stock outstanding on the Record Date and (ii) the denominator of which shall be equal to the Current Market Price on such date, provided, however, that in the event the portion of the cash so distributed applicable to one share of Common Stock is equal to or greater than the Current Market Price of the Common Stock on the Record Date, in lieu of the foregoing adjustment, adequate provision shall be made so that each Debenture holder shall have the right to receive upon conversion of a Debenture (or any portion thereof) the amount of cash such holder would have received had such holder converted such Debenture (or portion thereof) immediately prior to such Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not been declared. Any cash distribution to all holders of Debentures as to which the Company makes the election permitted by Section 13.5(m) and as to which the Company has complied with the requirements of such Section shall be treated as not having been made for all purposes of this Section 13.5(e).

      (f)    In case a tender offer made by the Company or any of its subsidiaries for all or any portion of the Common Stock shall expire and such tender offer (as amended upon the expiration thereof) shall require the payment to stockholders (based on the acceptance (up to any maximum specified in the terms of the tender offer) of Purchased Shares

9213905.13

-37-

PWSP 00520

(as defined below)) of an aggregate consideration having a fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) that combined together with (1) the aggregate of the cash plus the fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution), as of the expiration of such tender offer, of consideration payable in respect of any other tender offers, by the Company or any of its subsidiaries for all or any portion of the Common Stock expiring within the twelve (12) months preceding the expiration of such tender offer and in respect of which no adjustment pursuant to this Section 13.5(f) has been made and (2) the aggregate amount of any distributions to all holders of the Company's Common Stock made exclusively in cash within twelve (12) months preceding the expiration of such tender offer and in respect of which no adjustment pursuant to Section 13.5(e) has been made, exceeds 10.0% of the product of the Current Market Price (determined as provided in Section 13.5(g)) as of the last time (the "Expiration Time") tenders could have been made pursuant to such tender offer (as it may be amended) times the number of shares of Common Stock outstanding (including any tendered shares) on the Expiration Time, then, and in each such case, immediately prior to the opening of business on the day after the date of the Expiration Time, the Conversion Price shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Price in effect immediately prior to close of business on the date of the Expiration Time by a fraction of which the numerator shall be the number of shares of Common Stock outstanding (including any tendered shares) on the Expiration Time multiplied by the Current Market Price of the Common Stock on the Trading Day next succeeding the Expiration Time and the denominator shall be the sum of (x) the fair market value (determined as aforesaid) of the aggregate consideration payable to stockholders based on the acceptance (up to any maximum specified in the terms of the tender offer) of all shares validly tendered and not withdrawn as of the Expiration Time (the shares deemed so accepted, up to any such maximum, being referred to as the "Purchased Shares") and (y) the product of the number of shares of Common Stock outstanding (less any Purchased Shares) on the Expiration Time and the Current Market Price of the Common Stock on the Trading Day next succeeding the Expiration Time, such reduction (if any) to become effective immediately prior to the opening of business on the day following the Expiration Time. In the event that the Company is obligated to purchase shares pursuant to any such tender offer, but the Company is permanently prevented by applicable law from effecting any such purchases or all such purchases are rescinded, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such tender offer had not been made. If the application of this Section 13.5(f) to any tender offer would result in an increase in the Conversion Price, no adjustment shall be made for such tender offer under this Section 13.5(f). Any cash distribution to all holders of Debentures as to which the Company makes the election permitted by Section 13.5(m) and as to which the Company has complied with the requirements of such Section shall be treated as not having been made for all purposes of this Section 13.5(e).

(g)    For purposes of this Section 13.5, the following terms shall have the meaning indicated:

(1)    "Closing Price" with respect to any securities on any day shall mean the closing sale price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in each case on the Nasdaq National Market or New York Stock

PWSP 00521

Exchange, as applicable, or, if such security is not listed or admitted to trading on such National Market or Exchange, on the principal national security exchange or quotation system on which such security is listed or quoted or admitted to trading, or, if not listed or quoted or admitted to trading on any national securities exchange or quotation system, the average of the closing bid and asked prices of such security on the over-the-counter market on the day in question as reported by the National Quotation Bureau Incorporated, or a similar generally accepted reporting service, or if not so available, in such manner as furnished by any New York Stock Exchange member firm selected from time to time by the Board of Directors for that purpose, or a price determined in good faith by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution.

        (2)     "Current Market Price" shall mean the average of the daily Closing Prices per share of Common Stock for the ten (10) consecutive Trading Days immediately prior to the date in question; provided, however, that (1) if the "ex" date (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 13.5(a), (b), (c), (d), (e) or (f) occurs during such ten (10) consecutive Trading Days, the Closing Price for each Trading Day prior to the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the same fraction by which the Conversion Price is so required to be adjusted as a result of such other event, (2) if the "ex" date for any event (other than the issuance or distribution requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 13.5(a), (b), (c), (d), (e) or (f) occurs on or after the "ex" date for the issuance or distribution requiring such computation and prior to the day in question, the Closing Price for each Trading Day on and after the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the reciprocal of the fraction by which the Conversion Price is so required to be adjusted as a result of such other event, and (3) if the "ex" date for the issuance, distribution requiring such computation is prior to the day in question, after taking into account any adjustment required pursuant to clause (1) or (2) of this proviso, the Closing Price for each Trading Day on or after such "ex" date shall be adjusted by adding thereto the amount of any cash and the fair market value (as determined by the Board of Directors in a manner consistent with any determination of such value for purposes of Section 13.5(d) or (f), whose determination shall be conclusive and described in a Board Resolution) of the evidences of indebtedness, shares of capital stock or assets being distributed applicable to one share of Common Stock as of the close of business on the day before such "ex" date. For purposes of any computation under Section 13.5(f), the Current Market Price of the Common Stock on any date shall be deemed to be the average of the daily Closing Prices per share of Common Stock for such day and the next two succeeding Trading Days; provided, however, that if the "ex" date for any event (other than the tender offer requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 13.5(a), (b), (c), (d), (e) or (f) occurs on or after the Expiration Time for the tender or exchange offer requiring such computation and prior to the

PWSP 00522

day in question, the Closing Price for each Trading Day on and after the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the reciprocal of the fraction by which the Conversion Price is so required to be adjusted as a result of such other event. For purposes of this paragraph, the term "ex" date, (1) when used with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution, (2) when used with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective, and (3) when used with respect to any tender or exchange offer means the first date on which the Common Stock trades regular way on such exchange or in such market after the Expiration Time of such offer. Notwithstanding the foregoing, whenever successive adjustments to the Conversion Price are called for pursuant to this Section 13.5, such adjustments shall be made to the Current Market Price as may be necessary or appropriate to effectuate the intent of this Section 13.5 and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

(3)    "fair market value" shall mean the amount which a willing buyer would pay a willing seller in an arm's length transaction.

(4)    "Record Date" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of stockholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

(5)    "Trading Day" shall mean (x) if the applicable security is listed or admitted for trading on the New York Stock Exchange or another national security exchange, a day on which the New York Stock Exchange or another national security exchange is open for business or (y) if the applicable security is quoted on the Nasdaq National Market, a day on which trades may be made thereon or (z) if the applicable security is not so listed, admitted for trading or quoted, any day other than a Saturday or Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

(h)    The Company may make such reductions in the Conversion Price, in addition to those required by Sections 13.5(a), (b), (c), (d), (e) or (f), as the Board of Directors considers to be advisable to avoid or diminish any income tax to holders of Common Stock or rights to purchase Common stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

9213905.13

-40-

PWSP 00523

To the extent permitted by applicable law. the Company from time to time may reduce the Conversion Price by any amount for any period of time if the period is at least twenty (20) days, the reduction is irrevocable during the period and the Board of Directors shall have made a determination that such reduction would be in the best interests of the Company. which determination shall be conclusive and described in a Board Resolution. Whenever the Conversion Price is reduced pursuant to the preceding sentence, the Company shall deliver to the holder of each Debenture at its last address appearing on the Debenture register provided for in Section 2.5 a notice of the reduction at least fifteen (15) days prior to the date the reduced Conversion Price takes effect, and such notice shall state the reduced Conversion Price and the period during which it will be in effect.

(i)    No adjustment in the Conversion Price shall be required unless such adjustment would require a decrease of at least 1% in such price; provided, however, that any adjustments which by reason of this Section 13.5(i) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Article XIII shall be made by the Company and shall be made to the nearest cent or to the nearest one hundredth of a share, as the case may be. No adjustment need be made for a change in the par value or no par value of the Common Stock.

(j)    Whenever the Conversion Price is adjusted as herein provided, the Company shall promptly deliver to each Debenture holder an Officers' Certificate setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Price setting forth the adjusted Conversion Price and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Conversion Price to the holder of each Debenture in accordance with Section 15.3, within twenty (20) days of the effective date of such adjustment. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(k)    In any case in which this Section 13.5 provides that an adjustment shall become effective immediately after a Record Date for an event, the Company may defer until the occurrence of such event (i) issuing to the holder of any Debenture converted after such Record Date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion by reason of the adjustment required by such event over and above the Common Stock issuable upon such conversion before giving effect to such adjustment and (ii) paying to such holder any amount in cash in lieu of any fraction pursuant to Section 13.3.

(l)    For purposes of this Section 13.5, the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock. The Company will not pay any dividend or make any distribution on shares of Common Stock held in the treasury of the Company.

(m)    In lieu of making any adjustment to the Conversion Price pursuant to Section 13.5(e), the Company may elect to pay to each holder of the Debentures within five (5) Business Days of the effective date of such adjustment the full amount of cash which such holder would have received if such holder had, immediately prior to the Record Date for such

PWSP 00524

distribution of cash, converted its Debentures into Common Stock. The Company may make such election by providing written notice to each holder of Debentures to such effect on or prior to the payment date for any such cash payment, which notice shall state the amount of cash per $1,000 principal amount of Debentures such holders shall be entitled to receive on the date of such payment. The Company agrees that if it elects to make any adjustment to the Conversion Price through the reservation and payment of cash to holders of Subordinated Notes pursuant to Section 15.5(m) of the 1996 Indenture that it shall make the same election with respect to the payment of cash to the holders of Debentures under this Section 13.5(m).

SECTION 13.6    Effect of Reclassification, Consolidation, Merger or Sale. If any of the following events occur, namely (i) any reclassification or change of the outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination), (ii) any consolidation, merger or combination of the Company with another corporation as a result of which holders of Common Stock shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock or (iii) any sale or conveyance of the properties and assets of the Company as, or substantially as, an entirety to any other corporation as a result of which holders of Common Stock shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock, then the Company or the successor or purchasing corporation, as the case may be, shall execute with the each holder a supplemental indenture in a form reasonably acceptable to holders of not less than a majority of the aggregate principal amount of Debentures then outstanding providing that such Debenture shall be convertible into the kind and amount of shares of stock and other securities or property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, combination, sale or conveyance by a holder of a number of shares of Common Stock issuable upon conversion of such Debentures (assuming, for such purposes, a sufficient number of authorized shares of Common Stock available to convert all such Debentures) immediately prior to such reclassification, change, consolidation, merger, combination, sale or conveyance assuming such holder of Common Stock did not exercise its rights of election, if any, as to the kind or amount of securities, cash or other property receivable upon such consolidation, merger, statutory exchange, sale or conveyance (provided that, if the kind or amount of securities, cash or other property receivable upon such consolidation, merger, statutory exchange, sale or conveyance is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("non-electing shares"), then for the purposes of this Section 13.6 the kind and amount of securities, cash or other property receivable upon such consolidation, merger, statutory exchange, sale or conveyance for each non-electing share shall be deemed to be the kind and amount so receivable per share by a plurality of the non-electing shares). Such supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article. If, in the case of any such reclassification, change, consolidation, merger, combination, sale or conveyance, the stock or other securities and assets receivable thereupon by a holder of shares of Common Stock includes shares of stock or other securities and assets of a corporation other than the successor or purchasing corporation, as the case may be, in such reclassification, change, consolidation, merger, combination, sale or conveyance, then such supplemental indenture shall also be executed by such other corporation and shall contain such additional provisions to protect the interests of the holders of the Debentures as the Board of Directors shall

9213905.13

PWSP 00525

reasonably consider necessary by reason of the foregoing, including to the extent practicable the provisions providing for the repurchase rights set forth in Article XIV herein.

The above provisions of this Section shall similarly apply to successive reclassifications, changes, consolidations, mergers, combinations, sales and conveyances.

If this Section 13.6 applies to any event or occurrence, Section 13.5 shall not apply.

SECTION 13.7    Taxes on Shares Issued.  The issue of stock certificates on conversions of Debentures shall be made without charge to the converting Debenture holder for any tax in respect of the issue thereof.  The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of stock in any name other than that of the holder of any Debenture converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

SECTION 13.8    Reservation of Shares: Shares to be Fully Paid; Listing of Common Stock.  The Company shall provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, sufficient shares to provide for the conversion of the Debentures from time to time as such Debentures are presented for conversion.

Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value, if any, of the shares of Common Stock issuable upon conversion of the Debentures, the Company will take all corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue shares of such Common Stock at such adjusted Conversion Price.

The Company covenants that all shares of Common Stock issued upon conversion of Debentures will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

The Company covenants that it shall promptly secure the listing of all of the shares of Common Stock issuable upon conversion of the Debentures upon each national securities exchange and automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and shall maintain, so long as any other shares of Common Stock shall be so listed, such listing of all shares of Common Stock issuable upon conversion of the Debentures from time to time issuable under the terms of the Debentures and this Indenture.

SECTION 13.9    Notice To Holders Prior To Certain Actions.  In case:

(a)    the Company shall declare a dividend (or any other distribution) on its Common Stock (that would require an adjustment in the Conversion Price pursuant to Section 13.5); or

9213905.13

-43-

PWSP 00526

(b)    the Company shall authorize the granting to all or substantially all of the holders of record of its Common Stock of rights or warrants to subscribe for or purchase any share of any class or any other rights or warrants; or

(c)    of any reclassification of the Common Stock of the Company (other than a subdivision or combination of its outstanding Common Stock, or a change in par value, or from par value to no par value, or from no par value to par value), or of any consolidation or merger to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

(d)    of the voluntary or involuntary dissolution, liquidation or winding-up of the Company; the Company shall deliver to each holder of Debentures in accordance with Section 15.3 hereof, as promptly as possible but in any event at least fifteen days prior to the applicable date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights or warrants, or, if a record is not to be taken, the date as of which the holders of Common Stock of record are to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.

ARTICLE XIV

REPURCHASE UPON A DESIGNATED EVENT

SECTION 14.1    Repurchase Right.

(a)    If, at any time prior to the Maturity Date there shall occur a Designated Event, then each Debenture holder shall have the right, at such holder's option, but subject to the provisions of Section 14.2, to require the Company to repurchase all of such holder's Debentures, or any portion thereof (in principal amounts of $1,000 or integral multiples thereof), on the repurchase date fixed by the Company that is not less than 30 days nor more than 45 days after the date of the Company Notice (as defined in Section 14.3 below) of such Designated Event (or, if such 45th day is not a Business Day, the next succeeding Business Day).  The repurchase price shall be equal to 100% of the principal amount of Debentures, together with accrued interest, if any, to, but excluding, the repurchase date (the "Repurchase Price"); provided that if such repurchase date is March 1 or September 1, then the interest payable on such date shall be paid to the holder of record of the Debenture on the next preceding February 15 or August 15, respectively.  At the option of any holder of Debentures exercising its right to repurchase its Debentures pursuant to this Section 14.1(a) upon a Designated Event, such holder's Debentures may not be repurchased if there has occurred and is continuing an Event of Default, other than a default in the payment of the Repurchase Price with respect to such

9213905.13

-44-

PWSP 00527

Debentures on the repurchase date. At the option of the Company, the Repurchase Price may be paid in cash or, subject to the fulfillment by the Company of the conditions set forth in Section 14.2, by delivery of shares of Common Stock having a fair market value equal to the Repurchase Price as described in Section 14.2(a). Whenever in this Indenture there is a reference, in any context, to the principal of any Debenture as of any time, such reference shall be deemed to include reference to the Repurchase Price payable in respect of such Debenture to the extent that such Repurchase Price is, was or would be so payable at such time, and express mention of the Repurchase Price in any provision of this Indenture shall not be construed as excluding the Repurchase Price in those provisions of this Indenture when such express mention is not made; provided, however, that for the purposes of Article IV, such reference shall be deemed to include reference to the Repurchase Price only if the Repurchase Price is payable in cash.

SECTION 14.2    Conditions to the Company's Election to Pay the Repurchase Price in Common Stock. The Company may elect to pay the Repurchase Price by delivery of shares of Common Stock pursuant to Section 14.1 if and only if the following conditions have been satisfied:

(a)    The shares of Common Stock deliverable in payment of the Repurchase Price shall have a fair market value as of the repurchase date of not less than the Repurchase Price. For purposes of this Section 14.2, the fair market value of shares of Common Stock shall be determined by the Company and shall be equal to 95% of the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on and including the third Trading Day immediately preceding the repurchase date;

(b)    In the event any shares of Common Stock to be issued upon repurchase of Debentures hereunder require registration under any Federal securities law before such shares may be freely transferable without being subject to any transfer restrictions under the Securities Act upon repurchase, such registration shall have been completed and shall be effective;

(c)    In the event any shares of Common Stock to be issued upon repurchase of Debentures hereunder require registration with or approval of any governmental authority under any State law or any other Federal law before such shares may be validly issued or delivered upon repurchase, such registration shall have been completed, have become effective and such approval shall have been obtained, in each case, prior to the repurchase date;

(d)    The shares of Common Stock deliverable in payment of the Repurchase Price shall have been quoted on the Nasdaq National Market or listed on a national securities exchange, in either case, prior to the repurchase date;

(e)    All shares of Common Stock deliverable in payment of the Repurchase Price shall be issued out of the Company's authorized but unissued Common Stock and will, upon issue, be duly and validly issued and fully paid and non-assessable and free of any preemptive rights; and

(f)    The delivery of shares of Common Stock as payment of the Repurchase Price would not cause or result in a violation of either Section 15.7 or Section 15.8

9213905.13

-45-

PWSP 00528

of this Indenture (assuming, solely in the case of Section 15.8. that all of the Warrants issued to the Initial Purchasers pursuant to the Purchase Agreement had been exercised in full): provided, that the Company may deliver to any holder of Debentures as partial payment of the Repurchase Price that number of shares of Common Stock (pro rata among the holders of Debentures based on the aggregate principal amount of Debentures purchased by such holder out of the total aggregate principal amount of Debentures purchased by all holders of Debentures) that would not result in a violation of Section 15.7 or Section 15.8 and the balance of the Repurchase Price shall be paid only in cash.

If all of the conditions set forth in this Section 14.2 are not satisfied in accordance with the terms thereof, the Repurchase Price shall be paid by the Company only in cash.

SECTION 14.3    Notices: Method of Exercising Repurchase Right. Etc.

(a)    Unless the Company shall have theretofore called for redemption all of the outstanding Debentures, on or before the fifteenth (15th) calendar day after the occurrence of a Designated Event, the Company shall deliver to all holders of Debentures a notice (the "Company Notice") of the occurrence of the Designated Event and of the repurchase right set forth herein arising as a result thereof.  The Company Notice shall contain the following information:

(1)    the repurchase date,

(2)    the date by which the repurchase right must be exercised,

(3)    the last date by which the election to require repurchase, if submitted, may be revoked,

(4)    the Repurchase Price. and whether the Repurchase Price shall be paid by the Company in cash or by delivery of shares of Common Stock,

(5)    a description of the procedure which a holder must follow to exercise a repurchase right, and

(6)    the Conversion Price then in effect, the date on which the right to convert the principal amount of the Debentures to be repurchased will terminate and the place or places where Debentures may be surrendered for conversion.

No failure of the Company to give the foregoing notices or defect therein shall limit any holder's right to exercise a repurchase right or affect the validity of the proceedings for the repurchase of Debentures.

If any of the foregoing provisions are inconsistent with applicable law, such law shall govern.

(b)    To exercise a repurchase right, a holder shall deliver to the Company on or before the close of business on the second Business Day preceding the

9213905.13

-46-

repurchase date (i) written notice to the Company (or agent designated by the Company for such purpose) of the holder's exercise of such right, which notice shall set forth the name of the holder, the principal amount of the Debentures to be repurchased, a statement that an election to exercise the repurchase right is being made thereby, and, in the event that the Repurchase Price shall be paid in shares of Common Stock, the name or names (with addresses) in which the certificate or certificates for shares of Common Stock shall be issued, and (ii) the Debentures with respect to which the repurchase right is being exercised, duly endorsed for transfer to the Company. Election of repurchase by a holder shall be revocable at any time prior to, but excluding, the repurchase date, by delivering written notice to that effect to the Company prior to the close of business on the second Business Day prior to the repurchase date.

(c)    In the event the repurchase right shall be exercised in accordance with the terms hereof, the Company shall pay or cause to be paid to such holder the Repurchase Price in cash or shares of Common Stock, as provided above, for payment to the holder on the repurchase date or, if shares of Common Stock are to be issued, as promptly after the repurchase date as practicable.

(d)    If the Company fails to repurchase on the repurchase date any Debentures (or portions thereof) as to which the repurchase right has been properly exercised, then the principal of such Debentures shall, until paid, bear interest to the extent permitted by applicable law from the repurchase date at the rate borne by the Debenture and each such Debenture shall be convertible into Common Stock in accordance with this Indenture (without giving effect to Section 14.2(b)) until the principal of such Debenture shall have been paid or duly provided for.

(e)    Any Debenture which is to be repurchased only in part shall be surrendered to the Company (with, if the Company so requires, due endorsement by, or a written instrument of transfer in form reasonably satisfactory to the Company duly executed by the holder thereof or its attorney duly authorized in writing) and the Company shall execute and deliver to the holder of such Debenture without service charge a new Debenture or Debentures, containing identical terms and conditions, of any authorized denomination as requested by such holder in aggregate principal amount equal to and in exchange for the unrepurchased portion of the principal of the Debenture so surrendered.

(f)    On or prior to the repurchase date, the Company shall deliver to the holder an amount of money sufficient to pay the Repurchase Price of the Debentures that are to be repaid on the repurchase date, provided that if such payment is made on the repurchase date it must be received by the holder on such date.

(g)    Any issuance of shares of Common Stock in respect of the Repurchase Price shall be deemed to have been effected immediately prior to the close of business on the repurchase date and the person or persons in whose name or names any certificate or certificates for shares of Common Stock shall be issuable upon such repurchase shall be deemed to have become on the repurchase date the holder or holders of record of the shares represented thereby; provided, however, that any surrender for repurchase on a date when the stock transfer books of the Company shall be closed shall constitute the person or persons in whose name or names the certificate or certificates for such shares are to be issued as the record

9213905.13

-47-

PWSP 00530

holder or holders thereof for all purposes at the opening of business on the next succeeding day on which such stock transfer books are open. No payment or adjustment shall be made for dividends or distributions on any Common Stock issued upon repurchase of any Debenture declared prior to the repurchase date.

(h)    No fractional shares of Common Stock or scrip representing fractional shares shall be issued upon repurchase of Debentures. If more than one Debenture shall be repurchased from the same holder and the Repurchase Price shall be payable in shares of Common Stock, the number of full shares which shall be issued upon repurchase shall be computed on the basis of the aggregate principal amount of the Debentures (or specified portions thereof to the extent permitted hereby) so repurchased. If any fractional share of stock otherwise would be issuable upon repurchase of any Debenture or Debentures, the Company shall make an adjustment therefor in cash at the current market value thereof to the holder of Debentures. For these purposes, the current market value of a share of Common Stock shall be the Closing Price on the first Trading Day immediately preceding the repurchase date and such Closing Price shall be determined as provided in Section 13.5(g).

(i)    The issue of stock certificates on repurchase of Debentures shall be made without charge to the holder of Debentures being repurchased for any tax in respect of the issue thereof. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of stock in any name other than that of the holder of any Debenture repurchased, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

## ARTICLE XV

## MISCELLANEOUS PROVISIONS

SECTION 15.1    <u>Provisions Binding on Company's Successors</u>. All the covenants, stipulations, promises and agreements of the Company in this Indenture contained shall bind its successors and assigns whether so expressed or not.

SECTION 15.2    <u>Official Acts by Successor Corporation</u>. Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation that shall at the time be the lawful sole successor of the Company.

SECTION 15.3    <u>Addresses for Notices etc</u>. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Indenture must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service, in each case

9213905.13

-48-

PWSP 00531

properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

SONICblue Incorporated
2841 Mission College Boulevard
Santa Clara, California 95054
Telephone:    (408) 588-8000
Facsimile:    (408) 980-5444
Attention:    General Counsel

With a copy to, which shall not constitute notice:

Pillsbury Winthrop LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone:    (650) 233-4500
Facsimile:    (650) 233-4545
Attention:    Jorge A. del Calvo

If to a holder of Debentures, to it at the address and facsimile number set forth on the Schedule of Purchasers, with copies to such Purchaser's representatives as set forth on the Schedule of Buyers, or at such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a nationally recognized overnight delivery service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

SECTION 15.4    Governing Law. This Indenture and each Debenture shall be deemed to be a contract made under the laws of New York, and for all purposes shall be construed in accordance with the laws of New York.

SECTION 15.5    Legal Holidays. In any case where the date of maturity of interest on or principal of the Debentures or the date fixed for redemption of any Debenture will not be a Business Day, then payment of such interest on or principal of the Debentures need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date of maturity or the date fixed for redemption, and no interest shall accrue for the period from and after such date.

SECTION 15.6    No Security Interest Created. Nothing in this Indenture or in the Debentures, expressed or implied, shall be construed to constitute a security interest under

9213905.13

-49-

PWSP 00532

the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

SECTION 15.7    Limitation on Beneficial Ownership. Notwithstanding anything herein to the contrary, the Company shall not effect and shall have no obligation to effect any conversion of any Debenture, and no holder of Debentures shall have the right to convert any Debentures, to the extent that after giving effect to such conversion, the beneficial owner of such shares (together with such Person's Affiliates) would have acquired, through conversion of Debentures or otherwise, beneficial ownership of a number of shares of Common Stock that exceeds 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by a Person and its affiliates shall include the number of shares of Common Stock issuable upon conversion of the Debentures with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted Debentures beneficially owned by such Person or any of its Affiliates and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by such Person or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 15.7, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. For purposes of this Section 15.7, in determining the number of outstanding shares of Common Stock, a holder of Debentures may rely on the number of outstanding shares of Common Stock as reflected in (1) the Company's most recent Form 10-Q, Form 10-K or other public filing with the Commission, as the case may be, (2) a more recent public announcement by the Company or (3) any other notice by the Company or its transfer agent setting forth the number of shares of Common Stock outstanding. Upon the written request of any holder, the Company shall promptly, but in no event later than one (1) Business Day following the receipt of such notice, confirm in writing to such holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to conversions of Debentures by the holder and its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported.

SECTION 15.8    Limitation on Number of Shares of Common Stock. Notwithstanding anything herein to the contrary, the Company shall not be obligated to issue shares of Common Stock upon conversion of this Debenture or in respect of the payment of interest in the form of Interest Shares only to the extent that any issuance of such shares of Common Stock would cause the Company to exceed that number of shares of Common Stock which the Company may issue upon conversion of the Debentures and the Warrants issued to the Initial Purchasers pursuant to the Purchase Agreement (the "Exchange Cap") without breaching the Company's obligations under the rules or regulations of the Principal Market (as defined in the Purchase Agreement), except that such limitation shall not apply in the event that the Company obtains the approval of its stockholders as required by the Principal Market (or any successor rule or regulation) for issuances of Common Stock in excess of such amount. Until such approval is obtained, the holders of Debentures shall not be issued, upon conversion of the Debentures or payments in the form of Interest Shares, shares of Common Stock in an amount greater than the product of (i) the Exchange Cap amount multiplied by (ii) a fraction, the

9213905.13

-50-

PWSP 00533

numerator of which is the aggregate principal amount of Debentures issued to such Initial Purchaser pursuant to the Purchase Agreement and the denominator of which is the aggregate principal amount of all the Debentures issued to the Initial Purchasers pursuant to the Purchase Agreement (the "Cap Allocation Amount").

SECTION 15.9     Benefits of Indenture.  Nothing in this Indenture or in the Debentures, expressed or implied, shall give to any person, other than the parties hereto and their successors hereunder and the holders of Senior Indebtedness, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 15.10    Table of Content, Headings, etc.  The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

SECTION 15.11    Execution in Counterparts.  This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

SECTION 15.12    Assignment, Etc.  Any holder of Debentures may, subject to compliance with the Purchase Agreement and to applicable federal and state securities laws and the legend set forth on the Debentures, transfer or assign its Debenture(s) or any interest therein and herein and may pledge, encumber or transfer any of its rights or interest in and to the Debenture and herein or any part hereof and thereof and, without limitation, each assignee, transferee and pledgee (which may include any Affiliate of the holder) shall have the right to transfer or assign its interest.  Each such assignee, transferee and pledgee shall have all of the rights of a holder of the Debenture and this Indenture.

9213905.13

-51-

PWSP 00534

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____
     Name:  John J. Todd
     Title:   Chief Operating Officer

Attest:



INITIAL PURCHASERS:


PORTSIDE GROWTH AND OPPORTUNITY FUND


By: _____
     Name: Jeffrey M. Solomon
     Title:  Managing Officer


SMITHFIELD FIDUCIARY LLC


By: _____
     Name:  Adam J. Chill
     Title:   Authorized Signatory


CITADEL EQUITY FUND LTD.


By: _____
     Name:  Kenneth A. Simpler
     Title:   Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____
          Name:   John J. Todd
          Title:    Chief Operating Officer

Attest:

INITIAL PURCHASERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
          Name:  Jeffrey M. Solomon
          Title:   Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
          Name:   Adam J. Chill
          Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
          Name:   Kenneth A. Simpler
          Title:    Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____
   Name: John J. Todd
   Title:  Chief Operating Officer

Attest:

INITIAL PURCHASERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
   Name: Jeffrey M. Solomon
   Title: Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
   Name: Adam J. Chill
   Title: Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
   Name: Kenneth A. Simpler
   Title: Vice President

**PWSP 00537**

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____

   Name: John J. Todd
   Title:  Chief Operating Officer

Attest:


INITIAL PURCHASERS:


PORTSIDE GROWTH AND OPPORTUNITY
FUND

By: _____

   Name: Jeffrey M. Solomon
   Title: Managing Officer


SMITHFIELD FIDUCIARY LLC

By: _____

   Name: Adam J. Chill
   Title: Authorized Signatory


CITADEL EQUITY FUND LTD.

By: _____

   Name: Kenneth A. Simpler
   Title: Vice President


**PWSP 00538**

SCHEDULE OF BUYERS

| Initial Purchaser Name | Initial Purchaser Address and Facsimile Number | Principal Amount of Debentures | Investor's Representatives' Address and Facsimile Number | Wire Instructions |
|---|---|---|---|---|
| Ponside Growth & Opporunity Fund, Ltd. | c/o Ramius Capital Group, L.L.C. 666 Third Avenue, 26th Floor New York, NY 10017 Attention: Jeffrey M. Solomon Andrew Strober Telephone: (212) 845-7917 Facsimile: (212) 845-7999 | $25,000,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein, Esq. Telephone: (212) 756-2000 Facsimile: (212) 593-5955 | Bank: Citibank, N.A. 20 Exchange Place New York, New York 10030 ABA No.: 021-000-089 Account: Bear Stearns Securities Corp. Account No.: 09253186 For Subaccount of:Ponside Growth & Opportunity Fund, Ltd. Subaccount No.: 102-24978-28 |
| Smithfield Fiduciary LLC | c/o Highbridge Capital Management, LLC 9 West 57th Street, 27th Floor New York, New York 10019 Attention: Ari J. Storch Adam J. Chill Telephone: 212-287-4720 Facsimile: 212-751-0755 | $25,000,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein, Esq. Telephone: (212) 756-2000 Facsimile: (212) 593-5955 | Citibank, N.A. ABA #: 021000089 A/C: Bear, Stearns Securities Corp. A/C#: 09253186 FBO: Smithfield Fiduciary LLC A/C#: 102-25642-2 |
| Citadel Equity Fund Ltd. | c/o Citadel Investment Group, L.L.C. 225 West Washington Street Chicago, Illinois 60606 Attention: Kenneth A. Simpler Facsimile: (312) 338-0780 Telephone: (312) 338-7801 | $25,000,000 | Katten Muchin Zavis Rosenman 525 W. Monroe Street Chicago, Illinois 60661-3693 Attention: Robert J. Brantman, Esq. Facsimile: (312) 902-1061 Telephone: (312) 902-5289 | |

9213905.13

PWSP 00539

# EXHIBIT 30

1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
   STUTMAN, TREISTER & GLATT PC
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone: (310) 228-5600
   Facsimile:(310) 228-5788
5
6  WILLIAM McGRANE (057767)
   BERNARD S. GREENFIELD (066017)
7  McGRANE GREENFIELD LLP
   40 South Market Street, 7th Floor
8  San Jose, CA 95113
   Telephone: (408) 995-5600
9  Facsimile:(408) 995-0308

10  Counsel for Plaintiff SonicBlue Claims, LLC

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                     SAN JOSE DIVISION
13

| 14  In re: | Case No. 03-51775 |
|---|---|
| 15  SONICBLUE INCORPORATED, *et al.* Debtors | Chapter 11 |
| 16  ─────────────────────────── | (Case Nos. 03-51775 through 03-51778 MM) (Jointly Administered) |
| 17  SONICBLUE CLAIMS LLC, a Delaware Limited Liability Company, Plaintiff, | |
| 18 | Adv. No. 07-05082 |
| 19 | |
| 20  vs. | OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| 21  PORTSIDE GROWTH & OPPORTUNITY FUND, a Cayman Islands corporation; | Date:      September 24, 2007 |
| 22  SMITHFIELD FIDUCIARY LLC, a Cayman Islands corporation; and CITADEL EQUITY | Time:      11:00 a.m. Judge:     Hon. Marilyn Morgan |
| 23  FUND LTD., a Cayman Islands corporation Defendants. | Location:  Courtroom 3070 280 South First Street |
| 24 | San Jose, CA  95113 |
| 25 | |

26

27

1

# **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION AND SUMMARY ......................................................... 1

II.     BACKGROUND......................................................................................... 5

III.    ARGUMENT ............................................................................................... 5

A.    The VIA Claim Is Senior Indebtedness Under The Terms Of The
2002 Indenture................................................................................................ 5

1.    The VIA Claim Is Senior Indebtedness Under The Terms Of  The 2002
Indenture. ................................................................................................ 7

a.    Senior Indebtedness Includes Any Liability That Is Owing To VIA. ... 7

b.    Any Ambiguity In The 2002 Indenture Must Be Construed  Against
The 2002 Noteholders. ................................................................... 16

2.    The Senior Status Of The VIA Claim Was Not Affected By Its
Assignment To SB Claims................................................................... 17

3.    The Purported Waiver Of Senior Indebtedness Status Is Of No Effect. . 20

a.    The Purported Waiver Language Is Invalid Under The Terms of  the
2002 Indenture. ............................................................................. 23

b.    The Purported Waiver Language Is Invalid Under The Terms of the
2002 Indenture Because The Debtor Had No  Power To Request It From
VIA. ……………………………………………………………..30

c.    The Purported Waiver Language In The Settlement Agreement Is
Unenforceable Because It Was Obtained Without Proper Disclosure To The
Court And Creditors...................................................................... 32

d.    This Court Is Free To Disregard The Invalid, Purported Waiver
Language In The Settlement Agreement While Not Upsetting The Remainder
Of The Agreement......................................................................... 36

B.    SB Claims Has Standing To Equitably Subordinate The 2002
Noteholders' Claim In Order To Remedy The Harm Caused To SB
Claims, And The Unfair Advantage Obtained By The 2002 Noteholders. ........ 40

1.    Individual Creditors Have Standing To Remedy Injuries To Their
Particularized Interests...................................................................................... 40

2.       SB Claims Meets The Particularized Injury Standing Test
Established By The Court In *Morpheus Lights*. .............................................. 41

C.    SB Claims Has Sufficiently Pleaded Its Claims So As To Survive
A Motion To Dismiss. ........................................................................................ 43

1.    The Motion To Dismiss Must Be Denied Unless It Appears "Beyond
Doubt" That SB Claims Can Prove No Set Of  Facts In Support Of Its Claims
For Relief. .......................................................................................................... 43

a.    The 2002 Noteholders' Claims May Be Equitably Subordinated On
Account Of Any Inequitable Conduct. .......................................................... 44

b.    SB Claims Has Pleaded The 2002 Noteholders' Misconduct With
Sufficient Particularity. .................................................................................. 46

III.       CONCLUSION.......................................................................................... 52

1

## **TABLE OF AUTHORITIES**

2

3   **Cases**

4   *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y. 2d 245, 249 (1975) ................... 16

5   *Allhusen v. Caristo Const. Corp.*, 303 N.Y. 446, 452 (1952) ......................... 17, 18

6   *Armendariz v. Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 124 (2000) ........ 38

    *Atkinson v. Sheet Metal Workers' Trust Funds*, 833 F.2d 864, 866 (9th Cir. 1987)
7   .................................................................................................. 11

8   *Birbrower, Montalbano, Condon & Frank, P.C., v. Superior Court*, 17 Cal. 4th
    119, 138-39 (1998) ................................................................................ 39
9
    *Broadfoot v. United Furniture Indus. (In re Nationwide Warehouse & Storage,*
10  *LLC),* 2005 Bankr. LEXIS 2690 .......................................................... 36

11  *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus*
    *Ave. Realty Trust)*, 968 F.2d 1332, 1361 (1st Cir. 1992) .................................... 45
12
    *Cardarelli v. Scodek Constr. Corp.*, 304 A.D.2d 894, 895 (N.Y. App. Div. 2003)
13  .................................................................................................. 17

14  *Carnegia v. Ga. Higher Educ. Assistance Corp.*, 691 F.2d 482, 483 (11th Cir.
    1982) .............................................................................................. 19
15
    *Chemical Bank v. Haskell*, 51 N.Y.2d 85, 91 (1980) ............................................ 24
16
    *Citicorp Venture Capital, Ltd. v. Committee Of Creditors Holding Unsecured*
17  *Claims (In re Papercraft Corp.)*, 323 F.3d 228, 234 (3d Cir. 2003) ................... 45

18  *Conley v. Gibson*, 355 U.S. 41, 45-46 . . . (1957) ................................................ 43

19  *Corsican Productions v. Pitchess*, 338 F.2d 441, 442 (9th Cir. 1964) ................ 43

    *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 99 (2d Cir. 2001) ............... 43, 44
20
    *Derry Fin. N.V. v. Christiana Companies*, 797 F.2d 1210, 1214 (3d Cir. 1986)... 12
21
    *DeWitt v. Pail*, 366 F.2d 682, 685 (9th Cir. 1966) ................................................ 43
22
    *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247-48 (2d Cir.
23  1987) .............................................................................................. 51

24  *Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172-73 (9th Cir.
    2004) .............................................................................................. 34
25
    *First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.*, 262 A.D.2d 106, 107 (N.Y.
26  App. Div. 1999) ................................................................................ 24

27  *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 218 (1978).. 11

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997)..........................43

*Haines v. Commercial Mortgage Co.*, . . . 200 Cal. 609 [1927] ............................38

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) ............................................................................................................................50

*Hensley v. Caiettei*, 13 Cal. App. 4th 1165, 1175 (1993) ....................................23

*Herby's Foods*, 2 F.3d at 131........................................................................45

*Holcomb v. Campbell,* 118 N.Y. 46, 52 (1889)..................................................23

*IMO Development Corp. v. Dow Corning Corp.*, 135 Cal. App. 3d 451, 458 (1982) ............................................................................................................................37

*In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997) ...........21

*In re County of Orange*, 179 B.R. 195, 202-03 (Bankr. C.D. Cal. 1995)..............21

*In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr. E.D. Va. 2001)........................................................................................................................21

*In re Frost Bros., Inc.*, 1992 U.S. Dist. LEXIS 18301 ..........................................31

*In re Lenox,* 902 F.2d 737, 740 (9th Cir. 1990) .....................................................34

*In re Lintz W. Side Lumber, Inc.*, 655 F.2d 786, 789 (7th Cir. 1981) ...................35

*In re Maxwell Newspaper, Inc.,* 179 B.R. 549 (S.D.N.Y. 1994) ..........................35

*In re Plitt Amusement Co*, 233 B.R. 837, 846 (Bankr. C.D. Cal. 1999) ...............38

*In re UAL Corp.*, 299 B.R. 509, 522 (Bankr. N.D. Ill. 2003) ...............................35

*In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003).....32

*In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990)...................40

*Jacobson v. Sassower*, 66 N.Y. 2d 991, 993 (1985) ..............................................16

*Keene v. Harling*, 61 Cal. 2d 318, 320-21 (1964)...........................................37, 39

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)..................................................................................................................5

*Latimer v. Veader*, 20 A.D. 418, 427-28  (N.Y. App. Div. 1897) .......................2, 6

*Levander v. Prober (In re Levander),* 180 F.3d 1114, 1119 (9th Cir. 1999).........35

*Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 720 (5th Cir. 1980)................................................................................................................45

*Marrama v. Citizens Bank,* 127 S. Ct. 1105, 1111-12 (2007)...............................34

*Martinez v. Master Protection Corp.*, 188 Cal. App. 4th 107, 116 (2004)............38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Opposition to Defendants' Motion to Dismiss

430802v.1

*Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. (In re S.M. Acquisition Co.)*, 46 Bankr. Ct. Dec. 279, 2006 U.S. Dist. LEXIS 58960 ............................................ 45

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ....... 51

*Morpheus Lights*, 228 B.R. at 453 ................................................................ 41, 42

*n re Stralem*, 303 A.D.2d 120, 122 (N.Y. App. Div. 2003) ................................... 17

*Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ................................... 51, 52

*New Falls Corp. v. Boyajian (In re Boyajian)*, 367 B.R. 138 (B.A.P. 9th Cir. 2007) ................................................................................................................ 19

*Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 662-63 (2d Cir. 1996) ................................................................................................................ 16

*Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286-89 (7th Cir. 2005) .................. 19

*Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998) ............................................. 43

*People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 56 (Ill. 1991) ........... 6

*Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997) ........................................................................................................... 17, 19

*Public Utility Dist. No. 1 v. FERC*, 471 F.3d 1053, 1078 n.23 (9th Cir. 2006) ..... 11

*Ruehle v. Educ. Credit Mgmt. Corp. (In re Ruehle)*, 307 B.R. 28, 33 (B.A.P. 6th Cir. 2004) ......................................................................................................... 35

*Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir. 1980) ................................... 43

*Sallie Mae Servicing Corp. v. Ransom (In re Ransom)*, 336 B.R. 790 (B.A.P. 9th Cir. 2005) ........................................................................................................ 35

*Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006 .......... 46

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ..................................................... 43

*Short Pump Entm't, L.L.C. v. Randall's Island Family Golf Ctrs. (In re Randall's Island Family Golf Ctrs.)*, 300 B.R. 590, 597 ................................................. 17

*Summit Coffee Co. v. Herby's Foods (In re Herby's Foods)*, 2 F.3d 128, 133 (5th Cir. 1993) ......................................................................................................... 45

*Trejos v. VW Credit, Inc. (In re Trejos)*, 2007 Bankr. LEXIS 2783 ...................... 19

*United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981) ...................... 43

*Variable-Parameter Fixture Dev. Corp. v. Comerica Bank-California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 452-53 ................................................. 40

*Variable-Parameter Fixture Dev. Corp. v. Comerica Bank-California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 452-53 (Bankr. N.D. Cal. 1998) ............. 3

v

1  *Waldman v. Riedinger*, 423 F.3d 145 (2d Cir. 2005) ............................................. 12

2  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) ............... 51

3  **Statutes**

4  Bankruptcy Code section 105 ................................................................. 34

5  Bankruptcy Code section 105(a) ............................................................. 34

6  Bankruptcy Code section 506(c) ............................................................. 40

7  Bankruptcy Code section 510(c) ....................................................... 3, 19, 40

   Bankruptcy Code section 523(a)(2)(B) ..................................................... 19

8  Bankruptcy Code section 547(c)(2) .......................................................... 13

9  Bankruptcy Code section 1109(b) ........................................................... 40

10  Bankruptcy Rule 9(b) ........................................................... 44, 46, 50, 51

11  Bankruptcy Rule 60 ........................................................................ 34

12  Bankruptcy Rule 3001(e)(2) ................................................................ 19

13  Cal. Civil Code § 1599 ..................................................................... 37

    Cal. Code Civil Pro. § 1856(a) ............................................................ 38

14  Cal. Jur. 3d § 367 ......................................................................... 38

15  Federal Rule of Civil Procedure 60 ........................................................ 34

16  Federal Rule of Civil Procedure 60(b) ..................................................... 34

17  N.Y. Gen. Oblig. § 13-101 (2007) ......................................................... 17

18  N.Y. U.C.C. Law § 1-201(19) ............................................................... 24

19  N.Y. U.C.C. Law § 2-103(b) ................................................................ 24

20  U.C.C. § 5-108(i)(1) ...................................................................... 14

21

22

23

24

25

26

27

Opposition to Defendants' Motion to Dismiss

430802v.1

1

**Other Authorities**

2    5 C. Wright & A. Miller, Federal Practice & Procedure § 1357, at 598 (1969) .... 43

3    5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 at 598 (1969) .. 43

4    Black's Law Dictionary 691 (5th ed. 1979)............................................................. 6

5    Black's Law Dictionary 771 (7th ed. 1999)....................................................... 6, 24

Federal Rule of Civil Procedure 9(b) ................................................................... 44

6

7    Webster's Third Int'l Dictionary (Unabridged) (Merriam-Webster Inc. 1993 ed.) . 6,
        12

8    Witkin, Summary of California Law (10th ed. 2005), Contracts § 694................. 31

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Defendants' Motion to Dismiss

430802v.1

# I.  INTRODUCTION AND SUMMARY

SonicBlue Claims LLC ("SB Claims") hereby opposes the "Defendants'
Motion to Dismiss" filed by Portside Growth & Opportunity Fund, Smithfield
Fiduciary LLC, and Citadel Equity Fund Ltd. (the "2002 Noteholders").

SB Claims is the successor in interest to VIA Technologies, Inc. and S3
Graphics Co., Ltd. (the "VIA Claimants") to (i) all of their rights to payment with
respect to a $12.5 million "Allowed Claim" under the Settlement Agreement
among the Debtor, the VIA Claimants, and Intel Corporation (the "VIA Claim"),
and (ii) any and all rights the VIA Claimants may have under or relating to the
Indenture dated as of April 22, 2002 among the Debtor and the 2002 Noteholders
(the "2002 Indenture").

SB Claims commenced this Adversary Proceeding on May 30, 2007 by
filing its Complaint seeking: (i) a declaration by this Court that the VIA Claim,
and all interest thereon, is "Senior Indebtedness" under the 2002 Indenture (Count
3), (ii) a determination pursuant to Bankruptcy Code sections 1122 and 1123(a),
and Bankruptcy Rule 3013, that the VIA Claim should be treated as senior to the
claims of the 2002 Noteholders pursuant to any plan of reorganization (Count 2),
and (iii) to the extent that the 2002 Noteholders' claims are not otherwise
subordinated to the VIA Claim as a matter of contract, law, or equity, the equitable
subordination of the 2002 Noteholders' claims to the VIA Claim to the extent
necessary to pay the VIA Claim in full with interest (Count 1).

The 2002 Noteholders contend that this Court should dismiss the Complaint
because the VIA Claim is not Senior Indebtedness "as a matter of law."  If
anything, however, the opposite is true – the VIA Claim is, and always has been,
Senior Indebtedness under the plain language of the 2002 Indenture.  As discussed
further in this Opposition, the 2002 Indenture provides that Senior Indebtedness
includes "All indebtedness of the [Debtor] due and owing to Via Technologies,

1   Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent

2   thereof," plus all interest thereon "whether or not allowed as a claim" in

3   bankruptcy.  2002 Indenture § 1.1 at 6, 7.  Contrary to the 2002 Noteholders'

4   assertion, the term "indebtedness" is **not** a defined term in the indenture, but rather

5   must be given its plain, ordinary meaning under New York law, which is anything

6   that is due and owing.  *See Latimer v. Veader*, 20 A.D. 418, 427-28  (N.Y. App.

7   Div. 1897) ("indebtedness" as "used in its ordinary significance" means "any

8   liability"); *see also* pp. 7-16, *infra*.  Nor did the assignment of the VIA Claim to

9   SB Claims affect its Senior Indebtedness status.  New York law is clear that

10  contractual rights are enforceable absent an **express prohibition** to the contrary.

11  *See* pp. 17-20, *infra*.

12      Nor does the fact that the Settlement Agreement purported to waive VIA's

13  Senior Indebtedness status change this result.  The 2002 Indenture contains broad,

14  anti-waiver language, providing that:

15      No right of any present or future holder of any Senior Indebtedness
        to enforce subordination as herein provided shall at any time in any
16      way be prejudiced or impaired by any act or failure to act on the part
        of the Company or by any act or failure to act, in good faith, by any
17      such holder . . . regardless of any knowledge thereof which any such
        holder may have or otherwise be charged with.
18

19  2002 Indenture § 4.5 at 17.  Thus, no act by the Debtor, and no act by VIA in good

20  faith, could affect the status of VIA's Senior Indebtedness.  *See* pp. 23-32, *infra*.

21      Moreover, even in the absence of this broad anti-waiver language in the

22  2002 Indenture, the circumstances surrounding the purported Senior Indebtedness

23  waiver compel that it not be enforced, including (a) the total lack of disclosure to

24  the Court and creditors of this special benefit for three members of the Creditors'

25  Committee, (b) the 2002 Noteholders' insertion of themselves into the settlement

26  process (again without disclosure of their unique, self interests) and use of that

27  position to "insist" that they be released from any subordination, and (c) the

1    evidence which, at the least, gives rise to the inference that the 2002 Noteholders'

2    are responsible for propagating the phony story that the "purpose" of the

3    subordination provisions in the 2002 Indenture was to apply solely to a loan that

4    VIA never made to the Debtor.

5        The 2002 Noteholders are wrong in asserting that this Court must enforce

6    the purported waiver language because it was approved as part of an "integrated"

7    settlement agreement.  California law (which governs the settlement) fully permits

8    a court to sever void, illegal, or improper contractual terms, so long as the

9    consideration for the improper term can be fairly apportioned.  *See* pp. 36-40,

10   *infra.*  Here, the apportionment of the consideration is easy – the noteholders gave

11   absolutely nothing to either VIA or the estate in exchange for purported waiver.

12   Moreover, this Court has the authority to refuse to enforce those provisions in its

13   prior orders that were obtained with inadequate notice or based upon a fiduciaries'

14   misconduct, both of which circumstances apply here.  *See* pp. 34-36, *infra.*

15       Even if this Court determines that it cannot alter the Settlement Agreement

16   itself, it has the equitable authority under Bankruptcy Code section 510(c) to

17   subordinate the 2002 Noteholders' claims to the extent necessary to undo the harm

18   caused, and unfair advantage obtained by, their inequitable conduct.  SB Claims

19   clearly has standing to seek to remedy the effects of the purported waiver on the

20   relative priority of its own claim.  *See Variable-Parameter Fixture Dev. Corp. v.*

21   *Comerica Bank-California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 452-53

22   (Bankr. N.D. Cal. 1998) (individual creditor has standing to seek equitable

23   subordination if it "has been particularly harmed by inequitable conduct"); *see also*

24   pp. 40-42, *infra.*

25       Finally, the 2002 Noteholders' arguments as to "pleading fraud with

26   particularity" in the Complaint are entirely without merit.  The Complaint contains

27   a detailed recitation of the events that have led up to the current dispute, and of the

1    theories upon which SB Claims asserts that the VIA Claim was, and still is, Senior

2    Indebtedness.

3        This Court has recognized the appearance of impropriety in connection

4    with how the 2002 Noteholders obtained the purported waiver of the "Senior

5    Indebtedness" provisions in connection with the Settlement Agreement, including

6    that the waiver was not disclosed to the Court and creditors, and that "the

7    bondholders appear to have used their position on the committee to insert

8    themselves into the settlement negotiations without revealing a hidden agenda."

9    Memorandum Decision and Order on Motion to Appoint a Chapter 11 Trustee

10   [etc.] [Docket No. 2220] at 17.  At the same time, this Court has made clear that it

11   has not predetermined any of these issues, and that the parties will, and should,

12   have the right to explore these issues fully through discovery:

13       Mr. Kruger, I want to make plain that I don't feel that I have
         predetermined any of the issues that are going to come before us.  I
14       want to say that the issues that I ruled on previously arose in a
         different context.  And you'll have since then and will be in the
15       future conducting discovery, so that you will be able to more fully
         flush out those issues for the future hearings that we'll have.
16

17

18   Transcript of June 14, 2007 Hearing [Docket No. 2375] at 23-24.

19       Through their Motion to Dismiss, the 2002 Noteholders seek to end all

20   inquiry and debate of the Senior Indebtedness issue, even before it has begun.

21   With the exception of a single, Rule 2004 examination on September 6, no

22   discovery has taken place.  Thus, the appearances of impropriety that the Court

23   observed last March still exist today.  This Adversary Proceeding is an appropriate

24   and effective way for the parties – and following his intervention, the Chapter 11

25   Trustee – to conduct discovery and ultimately to resolve the issues relating to the

26   purported waiver of the 2002 Noteholders' Senior Indebtedness obligations.

27

Opposition to Defendants' Motion to Dismiss

## II.  BACKGROUND

The Complaint sets forth in detail the relevant provisions of the 2002 Indenture, the Settlement Agreement, and the events that have led up to the present dispute.  SB Claims respectfully presumes that the Court is familiar with the Complaint and, in the interests of brevity, incorporates its contents herein.  In addition, the 2002 Noteholders have included copies of the Settlement Agreement and the 2002 Indenture with their Motion to Dismiss, and we will not burden the Court with additional copies of those documents.

## III.  ARGUMENT

**A.  The VIA Claim Is Senior Indebtedness Under The Terms Of The 2002 Indenture.**

The 2002 Indenture provides that the 2002 Noteholders' claims are "subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness, whether outstanding at the date of this Indenture or thereafter incurred."  2002 Indenture § 4.1 at 13.  "Senior Indebtedness" includes "All indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof . . . (the 'Via Indebtedness')," plus interest thereon.  2002 Indenture § 1.1 at 6, 7 (subsection (g) of the definition of "Senior Indebtedness").

The word "indebtedness" (with a lower-case "i") is not defined in the 2002 Indenture.  Thus, under New York law (which governs the 2002 Indenture),[1] the ordinary, plain language meaning of "indebtedness" must be used.  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases . . . should be

---

[1]    2002 Indenture § 15.4 at 49.

Opposition to Defendants' Motion to Dismiss

1  given their plain meaning . . . ") (quotations omitted).  As discussed above, the

2  ordinary, plain language meaning of "indebtedness" is "something that is owed."

3  *See* Webster's Third Int'l Dictionary (Unabridged) (Merriam-Webster Inc. 1993

4  ed.); *see also, e.g.*, *People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 56

5  (Ill. 1991) ("'[I]n a broad sense and in common understanding,' the term

6  'indebtedness' may mean 'anything that is due and owing.'") (quoting Black's Law

7  Dictionary 691 (5th ed. 1979)); *Latimer v. Veader*, 20 A.D. 418, 427-28  (N.Y.

8  App. Div. 1897) ("indebtedness" as "used in its ordinary significance" means "any

9  liability"); Black's Law Dictionary 771 (7th ed. 1999) (defining "indebtedness" as

10  "**1.** The condition or state of owing money.  **2.** Something owed; a debt.").[2]

11  Accordingly, under the plain terms of the 2002 Indenture, any amount owed to

12  VIA, in a principal amount not to exceed $15 million, plus interest thereon, is

13  "Senior Indebtedness."

14      The 2002 Noteholders have raised three principal arguments as to why they

15  contend that the VIA Claim is not Senior Indebtedness: (1) the VIA Claim is not

16  Senior Indebtedness under the terms of the 2002 Indenture; (2) even if the VIA

17  Claim was Senior Indebtedness when held by VIA, it ceased to be Senior

18  Indebtedness when VIA assigned its claim to SB Claims; and (3) even if the VIA

19  Claim was Senior Indebtedness, the Settlement Agreement prevents VIA (and its

20  successor, SB Claims) from asserting Senior Indebtedness status.

21      The sections that follow show that each of the 2002 Noteholders'

22  contentions is wholly without merit.[3]

23

24  [2]  The Bankruptcy Code similarly defines "debt" broadly as "liability on a claim," and

25      "claim" as including any "right to payment, whether or not such right is reduced to
       judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

26      undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. §§ 101(12) & (5)(A).

27  [3]  SB Claims addresses here only the three principal arguments made by the 2002
       Noteholders in contending that the VIA Claim is not Senior Indebtedness.  SB Claims

Opposition to Defendants' Motion to Dismiss

**1.  The VIA Claim Is Senior Indebtedness Under The Terms Of The 2002 Indenture.**

   **a.  Senior Indebtedness Includes Any Liability That Is Owing To VIA.**

The 2002 Noteholders assert that the VIA Claim is not "Senior Indebtedness" because, they contend, "Senior Indebtedness" can only consist of obligations "for borrowed money or evidenced by bonds, debentures, notes or other similar instruments."  The basis for the 2002 Noteholders' assertion is the definition of "Indebtedness" (with a capital "I") in section 1.1 of the 2002 Indenture, which provides that "'Indebtedness' shall have the meaning specified in Section 7.1(e)" of the 2002 Indenture.  Section 7.1(e), in turn, governs the Debtor's "Events of Default" under the 2002 Indenture, and provides that it would be an Event of Default if there were a:

> (e)failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of indebtedness, which term as used herein means obligations (other than the Debentures or non-recourse obligations) of, or guaranteed or assumed by, the Company, or any Significant Subsidiary, for borrowed money or evidenced by bonds, debentures, notes or other similar instruments ("Indebtedness") in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures . . . .

2002 Indenture § 7.1(e) at 21.  Thus, according to the 2002 Noteholders, "Senior Indebtedness" can only consist of obligations for "borrowed money" or otherwise "evidenced by bonds, debentures, notes or other similar instruments."

---

fully reserves all rights to advance additional arguments supporting the claims pleaded in this adversary proceeding.

1      The fundamental problem with the 2002 Noteholders' argument is that the

2  VIA Senior Indebtedness provision does not incorporate the defined term

3  "Indebtedness."  Rather, it uses the generic, lower case "indebtedness", which is

4  not a defined term in the 2002 Indenture.  As discussed above, section 1.1 of the

5  2002 Indenture defines "Senior Indebtedness" as including "All **_indebtedness_** of

6  the Company due and owing to Via Technologies, Inc. in an aggregate principal

7  amount not to exceed $15,000,000 or the equivalent thereof . . . (the 'Via

8  Indebtedness')," plus interest thereon.  2002 Indenture § 1.1 at 6, 7 (preamble and

9  subsection (g) of the definition of "Senior Indebtedness") (emphasis added).

10      *Is this just a typographical error?*  No, it is not.  Both the text of the 2002

11  Indenture and the applicable law show that it is not – the 2002 Indenture

12  purposefully distinguishes between capitalized and lower case terms.

13      For example, section 7.1(e) – the precise section upon which all of the 2002

14  Noteholders' arguments rest – provides that "Indebtedness" (with a capital "I")

15  means:

16      obligations (other than the **_Debentures_** or non-recourse obligations)
17      of, or guaranteed or assumed by, the Company, or any Significant
      Subsidiary, for borrowed money or evidenced by bonds, **_debentures_**,
18      notes or other similar instruments . . .  (emphasis added).

19      The term "Debentures" (with a capital "D") means the Debentures issued

20  pursuant to the 2002 Indenture.  *See* 2002 Indenture § 1.1 at 4 ("'Debenture' or

21  'Debentures' shall mean any debenture or debentures, as the case may be, issued

22  and delivered under this Indenture.").  The reference to "debentures" (with a lower

23  case "d") in section 7.1(e), however, clearly means something different than

24  "Debentures" (with a capital "D").  Otherwise, the definition of "Indebtedness" in

25  section 7.1(e) would be circular and nonsensical – it would be "Indebtedness"

26  means "obligations (other than the [Debentures/debentures] . . . ) . . . evidenced by

27  . . . [Debentures/debentures] . . . ."  Thus clearly, "debentures" (lower case "d") is a

1    broader term under the 2002 Indenture than "Debentures" (with a capital "D").

2        Moreover, the definition of "Senior Indebtedness" expressly excludes

3    "indebtedness [with a lower case 'i'] of the Company evidenced by the Debentures

4    . . . ." 2002 Indenture § 1.1 at 8 (subsection (h)(iii) of the definition). As noted in

5    the preceding paragraph, however, the term "Indebtedness" (with a capital "I")

6    does not include the Debentures. *Id.* § 7.1(e) at 21 ("Indebtedness" (with a capital

7    "I") "means obligations (other than the Debentures . . . ) . . . "). Thus, the term

8    "indebtedness" (with a lower case "i") *must* be a broader term than "Indebtedness"

9    (with a capital "I"), since there is no such thing as "Indebtedness [with a capital 'I']

10   of the Company evidenced by the Debentures."

11       The same issue arises in section 12.1 of the 2002 Indenture, which also

12   refers to "indebtedness" (with a lower case "i") represented by the Debentures.

13   Since "Indebtedness" (with a capital "I") expressly excludes the Debentures,

14   "indebtedness" (with a lower case "i") must mean something more. The term

15   "indebtedness" can only be given its ordinary, plain meaning – any debt.

16       By comparison, the capitalized, defined term "Indebtedness" is used  in the

17   definitions of "Congress Facility" and "Subordinated Indebtedness." *See id.* § 1.1

18   at 8. Indeed, both the Congress Facility and the Subordinated Indebtedness are, in

19   fact, "Indebtedness" as that capitalized term is defined (they both were obligations

20   for borrowed money and/or evidenced by notes or other similar instruments). The

21   capitalized term "Indebtedness" is not used, however, in the definition of "Via

22   Indebtedness" – the lower case term "indebtedness" is.

23       There are a number of other terms that, when capitalized, are defined terms

24   in the 2002 Indenture, but when in the lower case the terms clearly are used in the

25   broader, generic sense:

26   1.  The capitalized term "Securities" has a very limited definition in sections
27       1.1 and 13.5(d) of the 2002 Indenture – specifically, "Securities" are limited
         to certain types of distributions that might be made to "all holders of its

---

Opposition to Defendants' Motion to Dismiss

Common Stock shares of any class of capital stock of the Company . . . ." The lower case term "securities," however, is used in the generic sense throughout the 2002 Indenture, including in, among other places, (a) the definitions of "Affiliate," "Change of Control," "Senior Indebtedness," and "Termination of Trading"; (b) the subordination provisions in sections 4.2, 4.3, and 4.6; (c) the redemption provisions in section 5.7; and (d) the default provisions in section 7.2.  The terms "Securities" and "securities" clearly do not mean the same thing, with the lower case "securities" being the broader, generic term.

2.  Section 1.1 of the 2002 Indenture defines "Maturity Date" as September 1, 2005, the date upon which the 2002 Indenture was to mature.  Sections 8.1 and 8.2, however, refer to the "maturity date" (lower case "m" and "d") of the 1996 Notes, which was in 2003 and clearly not the same as the capitalized "Maturity Date" (in 2005) of the 2002 Notes.

3.  Section 1.1 of the 2002 Indenture defines the word "Company" to mean "SONICBLUE, Incorporated," yet the lower case term "company" is used in the 2002 Indenture to refer to companies generally.  *See* 2002 Indenture § 1.1 (defining "Person or person" to include, among other things, a "limited liability company" or a "joint stock company").  The terms "Company" and "company" clearly do not mean the same thing, with the lower case term "company" being the broader, generic term.

4.  Section 1.1 of the 2002 Indenture defines "Indenture" as, specifically, the 2002 Indenture.  Section 4.2, however, refers generically to "any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued . . . ."  Again, the terms "Indenture" and "indenture" do not mean the same thing, since an "indenture" evidencing indebtedness that is senior to the 2002 Notes obviously could not be the 2002 Indenture.

5.  Sections 1.1 and 7.1(i) of the 2002 Indenture define "Option Agreement" as the option that was granted to the 2002 Noteholders contemporaneously with the issuance of the 2002 Indenture, while section 5.7 refers generically to any "option agreement" that may have been granted to an employee or management to acquire stock.

A review of section 1.1 of the 2002 Indenture (titled "DEFINITIONS") further shows that in most instances, when the drafters of the document wanted a particular word to serve as a defined term, they capitalized that word.  There are, however, three definitions in section 1.1 that are not capitalized – "beneficial

1    owner," "fair market value," and "non-electing shares."  When these same, lower

2    case definitions are used throughout the 2002 Indenture, they indeed are ***never***

3    capitalized.  It is thus clear that the drafters of the 2002 Indenture knew how to

4    distinguish between capitalized and lower case letters.

5          There are also three other definitions for which the drafters decided that

6    either the capitalized or lower case term would suffice – "'Debenture holder' or

7    'holder'", "'Default' or 'default'", and "'Person' or 'person'".  *See* 2002 Indenture

8    § 1.1 at 4, 5.  The fact that the drafters decided with respect to three – and only

9    three – out of sixty-nine definitions that either the upper or lower case term would

10   apply further shows that the drafters understood the distinction between other

11   upper and lower case terms.  Moreover, it clearly shows that, when the drafters

12   wanted either the upper or lower case term to be defined, they knew how to so

13   draft the indenture.  As the 2002 Noteholders point out themselves in their Motion

14   to Dismiss, "the inclusion of one thing implies the exclusion of all others."  *Public*

15   *Utility Dist. No. 1 v. FERC*, 471 F.3d 1053, 1078 n.23 (9th Cir. 2006) (cited in the

16   Motion to Dismiss at 22).  Had it been the intention of the drafters that, in all other

17   cases, capitalized and lower case terms could be used interchangeably, "surely no

18   problem of draftsmanship would have stood in the way of its being spelled out."

19   *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 218 (1978).

20         It is also significant that ***all*** defined terms in the 2002 Indenture are in

21   quotation marks.  This indicates that they had to be used exactly as quoted in order

22   to be presumed to have been used exactly as previously defined.

23         The courts likewise have recognized the significance of capitalizing

24   definitions in agreements, and that lower case, undefined terms should generally

25   be given their ordinary, dictionary meanings.  *See, e.g.*, *Atkinson v. Sheet Metal*

26   *Workers' Trust Funds*, 833 F.2d 864, 866 (9th Cir. 1987) (rejecting interpretation

27   of benefit plan "because it does not distinguish the special definitions given by the

1    Plan to 'Individual Employer' and 'Employee' (capital I and E) from the Plan's

2    traditional use of the terms 'employer' and 'employee' (lower case e)"); *Derry Fin.*

3    *N.V. v. Christiana Companies*, 797 F.2d 1210, 1214 (3d Cir. 1986) (citing the

4    "***obvious distinction***" ***between*** "the word 'default' in the exculpatory clause in

5    **lower case letters** whereas the term 'Event of Default', which is clearly a term of

6    art, is always ***capitalized***") (emphasis added).

7         In *Derry*, the Third Circuit held that it was "clear that when the parties

8    intended to create a term of art or to incorporate specific definitions from other

9    documents, they capitalized the referencing term and then utilized the same term

10   in the referenced document. . . . ***The incorporation could not be clearer***."  797

11   F.2d at 1214 (emphasis added).  Here, by using the lower case term "indebtedness"

12   in the definition of VIA Senior Indebtedness, the 2002 Indenture used that term in

13   the common English language sense, which is "something that is owed."  *See*

14   Webster's Third Int'l Dictionary (Unabridged) (Merriam-Webster Inc. 1993 ed.).

15       Similarly, in *Waldman v. Riedinger*, 423 F.3d 145 (2d Cir. 2005), the

16   Second Circuit – applying New York law, which governs the 2002 Indenture –

17   held that a settlement agreement's use of the lower case term "common stock"

18   should be read as incorporating the ordinary, dictionary definition of that word.  In

19   rejecting an argument that "common stock" should be limited to the narrower,

20   capitalized definition of "Common Stock" in a related document, the Court held:

21       While the Settlement Agreement consistently refers to "common
22       stock" in lower-case letters, the class of securities known as "Common
         Stock," as distinguished from "Class B Common Stock," is capitalized
23       throughout the corporate documents.  In giving weight to the corporate
         documents, the district court overlooked this disparity . . . . .
24

25   423 F.3d at 150; *see also id*. at 151 (applying "the general rubric of lower-case

26   'common stock,' the precise capitalization used in the Settlement Agreement").

27       The interpretation of the 2002 Indenture proposed by the 2002 Noteholders

---

Opposition to Defendants' Motion to Dismiss

1    would greatly strain – if not break altogether – the definition of "Senior

2    Indebtedness."  Subsection (h) of the definition, for example, makes clear that:

3        "Senior Indebtedness" shall not include . . . indebtedness, other than
4        the Via Indebtedness, for trade payables or constituting the deferred
         purchase price of assets or services incurred in the ordinary course of
5        business . . . .

6    This exclusion would make no sense unless "indebtedness" (with a lower case "i")

7    – and in particular Via Indebtedness – could include ordinary course debts for

8    either (or both) "trade payables" or "the deferred purchase price of assets or

9    services."  The 2002 Noteholders insist, however, that "indebtedness" means only

10   obligations "for money borrowed or evidenced by bonds, debentures, notes or

11   other similar instruments."  It strains the imagination to believe that the drafters of

12   the 2002 Indenture intended the definition of "indebtedness" to be as narrow as the

13   noteholders say, and yet felt the need to draft an exception for those rare instances

14   in which an ordinary course trade payable might be evidenced by a note.[4]

15        Furthermore, what would be the purpose of carving out "Via Indebtedness"

16   from subsection (h) unless ordinary course trade payables owed to VIA would, in

17   fact, be Senior Indebtedness?   The 2002 Noteholders contend that "Via

18   Indebtedness" was supposed to refer only to a loan that VIA never actually made

19   to the Debtor.  If so, then why would subsection (h) have to carve out ordinary

20   course trade payables?  The 2002 Noteholders cannot seriously suggest that the

21   proposed loan from VIA would be considered an ordinary course trade payable or

22   deferred purchase price of assets or services.  The fact is that Via Indebtedness

23   included *any* indebtedness owing to VIA, of any kind, including ordinary course

24

25   _____

     [4]   This Court can take judicial notice from its own experience in applying the "ordinary
26   course" defense in section 547(c)(2) of how rarely ordinary course trade payables are
     evidenced by a note (as opposed to by an invoice, contract, sales receipt, bill, journal
27   entry, or no paper at all).

_____

13

430802v.1

1  obligations, which is why (i) the ordinary course exception in subsection (h) made

2  perfect sense when that exception was drafted, and (ii) the 2002 Noteholders'

3  after-the-fact attempt to redraft the meaning of the 2002 Indenture's terms makes

4  no sense today.

5       Subsection (b) of the definition of "Senior Indebtedness" also grants Senior

6  Indebtedness status to "All indebtedness of the Company due and owing with

7  respect to letters of credit (including, but not limited to, reimbursement obligations

8  with respect thereto) issued by Qualified Lenders."  The 2002 Noteholders'

9  construction of "indebtedness," however, would limit this category of Senior

10  Indebtedness to letter of credit obligations "for borrowed money or evidenced by

11  bonds, debentures, notes or other similar instruments."  There simply is no logical

12  reason why it should matter whether the letter of credit obligation was evidenced

13  by a bond, debenture, or note, as opposed to a standard reimbursement agreement

14  (or, for that matter, an issuer's right to reimbursement under U.C.C. § 5-108(i)(1)).

15       And, as noted, the definition of "Senior Indebtedness" expressly refers to

16  "indebtedness [lower case "i"] of the Company evidenced by the Debentures."

17  Since "Indebtedness" (capital "I") expressly excludes the Debentures, *see* 2002

18  Indenture § 7.1(e), "indebtedness" with a lower case "i" *must* be a broader, generic

19  term that refers to any type of debt (including the Debentures).

20       Notwithstanding the foregoing, the 2002 Noteholders still contend that

21  section 7.1(e) sets forth a "shared definition of 'indebtedness' and 'Indebtedness'",

22  Motion to Dismiss at 18, presumably based on the use of the word "herein" in

23  section 7.1(e).  However, although the preamble to section 1.1 provides that, in

24  ordinary usage, words such as "herein" are intended to refer to the "Indenture as a

25  whole," section 1.1 also makes clear that all definitions in the 2002 Indenture are

26  limited when "the context otherwise requires."  *See* 2002 Indenture § 1.1 at 1.

27       Here, the context of section 7.1(e) clearly requires that the two words

1  "indebtedness" and "Indebtedness" be construed separately.  This is because, if

2  one were to treat everything in section 7.1(e) coming after the word "herein" as

3  part of the definition of "indebtedness," then one would also have to assume that

4  the phrase "in an amount *in excess of $15,000,000* or the equivalent thereof in any

5  other currency or composite currency" is part of that definition.  *See* 2002

6  Indenture § 7.1(e) at 21 (emphasis added).  VIA Senior Indebtedness, however, is

7  expressly limited to amounts owing to VIA "in an aggregate principal amount *not*

8  *to exceed $15,000,000* or the equivalent thereof."  *Id.* § 1.1 at 7.  Thus, there could

9  be no such thing as "indebtedness" representing VIA Senior Indebtedness, since

10  "indebtedness" as used in section 7.1(e) applies only to amounts in excess of

11  $15,000,000.  Put another way, once one reads "herein" to mean that the definition

12  of "indebtedness" for purposes of the 2002 Indenture generally is what follows

13  after the word "means," there is no stopping that definition until one reaches the

14  end of section 7.1(e), and that definition, by its own terms, cannot possibly have

15  been intended to have covered the "Via Indebtedness."

16      Moreover, as discussed above, "indebtedness" and "Indebtedness" cannot

17  mean the same thing under the 2002 Indenture.  Among other things, the definition

18  of "Indebtedness" in section 7.1(e) expressly excludes the Debentures, and yet the

19  2002 Indenture refers twice (in section 12.1 and the definition of "Senior

20  Indebtedness") to "indebtedness" under or evidenced by the Debentures.  Thus, in

21  this context, the definition in section 7.1(e) cannot possibly be intended to make

22  "indebtedness" and "Indebtedness" the same thing throughout the 2002 Indenture.

23  Furthermore, as noted, when the drafters of the 2002 Indenture wanted lower-case

24  and capitalized terms to be used interchangeably, they expressly did so with

25  respect to three – and only three – of the sixty-nine definitions in section 1.1

26  ("'Debenture' holder' or 'holder'", "'Default' or 'default'", and "'Person' or 'person'").

27  The 2002 Noteholders simply cannot explain why, if the word "herein" made

---

Opposition to Defendants' Motion to Dismiss

1   lower-case "indebtedness" a defined term throughout the 2002 Indenture, the

2   drafters felt the need to specify the capitalized term "Indebtedness" (and only the

3   capitalized term) as the defined term in quotation marks, both in section 1.1 and in

4   section 7.1(e).

5       Accordingly, the 2002 Indenture plainly uses the term "indebtedness" in the

6   ordinary sense of that word – any debt that is owing.  Because VIA's right to

7   Senior Indebtedness status is based upon "any indebtedness" owing to VIA up to

8   $15 million, plus interest, the VIA Claim is, and has always been, "Senior

9   Indebtedness" under the 2002 Indenture.

10          **b.  Any Ambiguity In The 2002 Indenture Must Be Construed
11          Against The 2002 Noteholders.**

12      SB Claims respectfully submits that the 2002 Indenture provides that the

13  VIA Claim is "Senior Indebtedness."  To the extent there is any doubt, however,

14  that doubt also must be resolved in SB Claims' favor.  Under controlling New

15  York law:

16          in cases of doubt or ambiguity, a contract must be construed most
17          strongly against the party who prepared it and favorably to a party
            who had no voice in the selection of its language.

18  *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y. 2d 245, 249 (1975); *accord*

19  *Jacobson v. Sassower*, 66 N.Y. 2d 991, 993 (1985).  This rule applies with full

20  force in the case of a third party beneficiary (as VIA was under the 2002

21  Indenture).  *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 662-

22  63 (2d Cir. 1996) (applying New York law).

23

24      In this case, the 2002 Indenture was a private placement between the 2002

25  Noteholders and the Debtor.  VIA (and, of course, SB Claims) had absolutely

26  nothing to do with its drafting.  Thus, to the extent there is any ambiguity in the

27

Opposition to Defendants' Motion to Dismiss

430802v.1

1    2002 Indenture, it should be construed most favorably to VIA and SB Claims.  *See*

2    *Short Pump Entm't, L.L.C. v. Randall's Island Family Golf Ctrs. (In re Randall's*

3    *Island Family Golf Ctrs.)*, 300 B.R. 590, 597 (Bankr. S.D.N.Y. 2003 (construing

4    subordination provision "more strictly against the party that drafted it").

5

6    **2.  The Senior Status Of The VIA Claim Was Not Affected By Its Assignment To SB Claims.**

7

8    The 2002 Noteholders assert that VIA could not assign its Senior

9    Indebtedness status to SB Claims, since Senior Indebtedness only included

10   "indebtedness of the Company due and owing to [VIA]."  The 2002 Noteholders

11   ignore the fact, however, that contractual rights are freely assignable under New

12   York law (which governs the 2002 Indenture) absent an ***express prohibition*** to the

13   contrary.  *Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 856

14   (2d Cir. 1997) (holding that, "[u]nder New York law, only express limitations on

15   assignability are enforceable"); *see also Allhusen v. Caristo Const. Corp.*, 303

16   N.Y. 446, 452 (1952) (holding that "parties may limit the freedom of alienation of

17   rights and prohibit the assignment" only when "clear language is used, and the

18   "plainest words . . . have been chosen") (internal quotations omitted); *In re*

19   *Stralem*, 303 A.D.2d 120, 122 (N.Y. App. Div. 2003) ("Under New York law,

20   contracts are freely assignable absent language which expressly prohibits

21   assignment."); *Cardarelli v. Scodek Constr. Corp.*, 304 A.D.2d 894, 895 (N.Y.

22   App. Div. 2003) ("As a general rule, a guarantee is assignable absent express

23   language in the document to the contrary."); N.Y. Gen. Oblig. § 13-101 (2007)

24   (providing that "Any claim or demand can be transferred . . . ").[5]

25

26

27   [5]    There are limited exceptions, such as personal injury claims, not relevant here.

1    The 2002 Noteholders cannot identify any express prohibition on the

2    assignment of VIA's rights under the 2002 Indenture – indeed, no such express

3    prohibition exists.  The section of the 2002 Indenture governing assignment –

4    section 15.12 – merely imposes certain conditions upon the 2002 Noteholders to

5    effectuate an assignment.  Section 15.12 imposes no restrictions whatsoever on

6    holders of Senior Indebtedness, however.  Given an absence of an express

7    prohibition on assignment, the 2002 Noteholders must try to rely upon a no-third-

8    party-beneficiaries provision, which states:

9    Benefits of Indenture.  Nothing in this Indenture or in the Debentures,
     expressed or implied, shall give to any person, other than the parties
10   hereto and their successors hereunder and the holders of Senior
     Indebtedness, any benefit or any legal or equitable right, remedy or
11   claim under this Indenture.

12

13   2002 Indenture § 15.9 at 51.

14   The 2002 Noteholders argue that the indenture recognizes the rights of

15   successors to the parties to the indenture, but gives no rights to successors of

16   holders of Senior Indebtedness.  Citing the doctrine of *expressio unius est exclusio*

17   *alterius* (the inclusion of one thing implies the exclusion of all others), they

18   contend that holders of Senior Indebtedness could not assign their rights.

19   The 2002 Noteholders' argument is directly contrary to New York law

20   which requires "clear language" and the "plainest words" in order to "limit the

21   freedom of alienation of rights and prohibit the assignment."  *Allhusen*, 303 N.Y.

22   at 452.  Nothing in this section (or anywhere else in the 2002 Indenture) provides

23   that holders of Senior Indebtedness cannot assign their rights, or that the

24   population of Senior Indebtedness holders must remain fixed for all time.  To the

25   contrary, the 2002 Indenture expressly recognizes the rights of both a "present or

26   future holder of any Senior Indebtedness."  2002 Indenture § 4.5 at 17.

27   Moreover, the noteholders' precise argument was rejected by the Second

1    Circuit in *Pravin Banker Assocs.*, in which an agreement expressly allowed

2    assignments "to any financial institution," but said nothing about assignments to

3    other entities.  The Second Circuit held (applying New York law) that "[t]his

4    language fails to restrict the assignment expressly in any way.  While it explicitly

5    permits assignments to financial institutions, it does not limit assignments only to

6    these entities.  The assignment [to an entity other than a financial institution] was

7    therefore valid at the time it was made."  109 F.3d at 856.

8         While New York state law favoring assignment should be dispositive, the

9    2002 Noteholders' position is also at odds with broader principles governing the

10   assignability of claims in bankruptcy cases.  As the Ninth Circuit BAP recently

11   clarified in *New Falls Corp. v. Boyajian (In re Boyajian)*, 367 B.R. 138 (B.A.P.

12   9th Cir. 2007), "an assignee merely steps into the shoes of his assignor," and thus a

13   claims purchaser can pursue actions that are ostensibly "personal" to the original

14   creditor, such as a section 523(a)(2)(B) exception to discharge.  *See also Trejos v.*

15   *VW Credit, Inc. (In re Trejos)*, 2007 Bankr. LEXIS 2783 at *10-15 (B.A.P. 9th

16   Cir. July 30, 2007) (holding that the "purchase money" nature of a security interest

17   is not destroyed upon the assignment of the security interest to someone other than

18   the original seller); *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286-89 (7th Cir.

19   2005) ("bad-debt buyers" took their purchased claims subject to long-standing

20   principle that "the common law puts the assignee in the assignor's shoes, whatever

21   the shoe size," and thus did not need their own exception to state usury law).  This

22   basic precept of assignment law is further reflected in Bankruptcy Rule

23   3001(e)(2), which provides that "the transferee [of a claim in bankruptcy] shall be

24   substituted for the transferor."  Fed. R. Bankr. Pro. 3001(e)(2); *see also, e.g.*,

25   *Carnegia v. Ga. Higher Educ. Assistance Corp.*, 691 F.2d 482, 483 (11th Cir.

26   1982) (noting how a post-petition assignment of a claim "did not create a new

27   claim.  Rather, it constituted a substitution of parties with no change in the nature

of the claim against appellant.").  The noteholders' novel suggestion that the assignment of the VIA Claim from VIA to SB Claims somehow transmuted the core nature of that claim, thereby stripping the claim of its status as Senior Indebtedness, does extreme violence to these fundamental rules of assignment.

Accordingly, the assignment of the VIA Claim from VIA to SB Claims did not change the fact that the 2002 Noteholders' claims are junior to the VIA Claim.

### 3.  The Purported Waiver Of Senior Indebtedness Status Is Of No Effect.

The Court is now well aware of the fact that the Settlement Agreement among the Debtor, VIA, and Intel contains the following language (the "Purported Waiver Language"):

> Claimants and Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005.

Settlement Agreement section III.3.

The Court also is aware of the fact that there are significant concerns about how the Purported Waiver Language came to be included in the Settlement Agreement, including:

1.  The waiver was not mentioned anywhere in the notice, motion, or other pleadings filed in support of the Settlement Agreement.  *See* Docket Nos. 1950, 1952, 1953, 1954.[6]

2.  The fact that the 2002 Noteholders were (or even might be) subordinated to VIA was never disclosed to the Court or creditors.  *See id.*

---

[6]    The ***only*** reference to the Purported Waiver Language was the language itself, contained on page 5 of a single-spaced, 26-page document filed under seal.  No effort whatsoever was made to bring this language to the attention of the Court or anyone else, nor to explain that it benefited three members of the Creditors' Committee.

3. The entire Settlement Agreement was filed under seal on the basis of the "highly confidential nature of the matters addressed in the Motion and the Settlement Agreement," even though the Purported Waiver Language should not have implicated any of those concerns. *See* Docket No. 1950, at 2.

4. The Purported Waiver Language was included at the insistence of the 2002 Noteholders. The 2002 Noteholders have admitted that they "insisted that, no matter how VIA allocated the Settlement Allowed Claim, it must not be characterized as Senior Indebtedness." 2002 Noteholders' Reply Brief in Support of Motion for Clarification [etc.] filed April 27, 2007 [Docket No. 2265] ("Noteholders' Reply") at 10.

5. The 2002 Noteholders were an effective majority of the Creditors' Committee at the time the Settlement Agreement was considered and approved by the Committee, and they were fiduciaries of the unsecured creditors of the estate. *See* 7 Collier on Bankruptcy 1103.05[2] (15th ed. rev. 2006).[7]

6. Notwithstanding their fiduciary duties, the 2002 Noteholders failed to disclose their conflicting self interests to the Committee, and in fact appear to have participated in the Committee's decision-making regarding the merits of the Settlement Agreement.[8]

7. The 2002 Noteholders became parties to the October 17, 2003 "Stipulated Protective Order" [Docket No. 529], which allowed their counsel access to confidential documents and analyses regarding VIA's claims. No disclosure was made to the Court or creditors at that time that the 2002 Noteholders may be subordinated to millions of dollars in

---

[7] *See also In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr. E.D. Va. 2001) (committee members owe "a fiduciary duty to all creditors represented by the committee"); *In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997) ("Creditors who serve on the committee owe a fiduciary duty to the constituents whom they represent."); *In re County of Orange*, 179 B.R. 195, 202-03 (Bankr. C.D. Cal. 1995) (one becomes a committee member "with the understanding that it has a fiduciary duty of undivided loyalty and impartial service to all creditors").

[8] Counsel for the Creditors' Committee represented to this Court at the January 23, 2007 hearing that he was not aware of the Senior Indebtedness issue until it became a controversy just prior to that hearing. Counsel for the 2002 Noteholders, who also appeared telephonically at that hearing, later told this Court that Committee counsel had reported the facts "exactly accurately" to the Court. January 23, 2007 Transcript [Docket No. 2136] at 12-14, 31.

21

VIA claims, and thus had a direct (and undisclosed) interest in affecting the course of that litigation that differed from the interests of other creditors.  Because of the Stipulated Protective Order, counsel for the 2002 Noteholders was able to participate in confidential communications with counsel for the Debtor and the Creditors' Committee regarding, among other things, the nature and amount of the claims, negotiation strategies, and potential defenses that the Debtor might have to those claims.[9]

8.    The 2002 Noteholders provided no consideration to the estate or VIA in exchange for the Purported Waiver Language.

9.    The 2002 Noteholders have a history of using threats to get what they want vis-à-vis the Debtor and its counsel.  Even before the commencement of this case, their counsel sent letters to Pillsbury Winthrop threatening each of the Debtor's officers and directors with suit, unless their demands were met.  *See* Complaint at ¶¶ 24 & 25.  The letters ended with requests that they "kindly" be forwarded "to each of the Company's officers and directors."  The 2002 Noteholders similarly threatened Pillsbury Winthrop itself with suit if the Debtor objected to their claims.  Complaint at ¶¶ 21 & 22.  This letter, which was never brought to the Court's attention until SB Claims did so, was a major cause of Pillsbury Winthrop's disqualification in this case.

Moreover, SB Claims believes that the evidence will show that the Purported Waiver Language was obtained based upon a phony story – concocted by the 2002 Noteholders – regarding the supposed "purpose" of the VIA Senior Indebtedness provision, which they claim was to apply solely to a loan that VIA never made to the Debtor.  Counsel for the 2002 Noteholders personally recited this story to the Court at the January 23, 2007 hearing on the Debtor's Disclosure Statement, in a failed effort to convince this Court that there was nothing to be

---

[9]    Among other things, counsel for the 2002 Noteholders received in October 2004 a document titled "SONICblue/VIA-JV CLAIMS ANALYSIS (FOR NON-INTEL CLAIMS)" (the "Confidential Analysis"), which was labeled as "Joint Defense Privilege/Confidential Settlement Document."  *See* Declaration of Albert Boro, Jr. dated March 5, 2007 [Docket No. 2182] at ¶ 7 & Ex. 1 thereto.  It appears that the 2002 Noteholders had made no disclosure of the VIA Senior Indebtedness issue at the time they received the Confidential Analysis, or at any time before then.

Opposition to Defendants' Motion to Dismiss

1    concerned about.  *See* January 23, 2007 Hearing Transcript [Docket No. 2136], at

2    32-33; *see also* p. 49, *infra*.

3      Notwithstanding the serious questions that have been raised about the

4    Purported Waiver Language, the 2002 Noteholders insist that it is enough to

5    insulate them from any further liability on account of VIA's Senior Indebtedness.

6    The 2002 Noteholders, however, are incorrect.  As set forth below, the Purported

7    Waiver Language is invalid and of no effect under the terms of the 2002 Indenture

8    itself.  Moreover, in light of the 2002 Noteholders' undisclosed self-dealing with

9    respect to the Purported Waiver Language, and the Debtor's failure to disclose that

10   language to the Court and creditors, the language was and still is unenforceable as

11   a matter of law and equity, or should now be treated as such.

12      **a.  The Purported Waiver Language Is Invalid Under The**
13       **Terms of the 2002 Indenture.**

14     The first point that the 2002 Noteholders overlook is the language of the

15   2002 Indenture itself.  The 2002 Indenture makes clear that:

16      ***No right** of any present or future holder of any Senior*
   *Indebtedness to enforce subordination as herein provided shall at*
17      *any time in **any way** be prejudiced or impaired **by any act** or failure*
   *to act on the part **of the Company** **or by any act** or failure to act, in*
18      *good faith, **by any such holder**, or by any noncompliance by the*
19      Company with the terms, provisions and covenants of this Indenture,
   ***regardless of any knowledge thereof which any such holder may***
20      ***have or otherwise be charged with***.

21   2002 Indenture § 4.5 at 17 (emphasis added).

22     The entry into the Settlement Agreement was an "act" by the Company (the

23   Debtor) and VIA.  *See Holcomb v. Campbell,* 118 N.Y. 46, 52 (1889) ("An

24   agreement is an act done and thereby differs from a simple declaration.  It is

25   provable in like manner as a payment in money or property would be."); *Hensley*

26   *v. Caiettei*, 13 Cal. App. 4th 1165, 1175 (1993) ("Entering into a contract is a jural

27   act which alters the legal relations of the parties and creates an obligation."); *see*

1   *also* Black's Law Dictionary 24 (7th ed. 1999) (defining "act" as "Something done

2   or performed, esp. voluntary; a deed.").   The unambiguous language of section

3   4.5, however, makes clear that **no act** by the Debtor, or by VIA in good faith, shall

4   **in _any way_ prejudice or impair** VIA's rights under the 2002 Indenture.  Thus, the

5   "act" of entering into the Settlement Agreement cannot have altered VIA's rights

6   "to enforce subordination" as set forth in the 2002 Indenture.

7          There is no evidence that VIA acted in any way other than in good faith.

8   Under New York law, "good faith" means "honesty in fact in the conduct or

9   transaction concerned." N.Y. U.C.C. Law § 1-201(19).  It is a purely subjective

10  standard, and one that imposes no duty of reasonable inquiry.  As explained by

11  New York's highest court:

12         Good faith under the code is defined as "honesty in fact in the
           conduct or transaction concerned" and it is clear that the draftsmen
13         intended that this language set a subjective and not objective
           standard.  In fact, so that no confusion would persist on this score, a
14         proposed draft of section 3-302 which explained good faith in terms
           related to commercial reasonableness was amended to delete the
15         offending language.  Thus, ***the inquiry is not whether a reasonable
           banker in Chemical's position would have known, or would have
16         inquired concerning the alleged breach by Stanndco of its
           partnership duties, but rather, the inquiry is what Chemical itself
17         actually knew***.  If Chemical did not have actual knowledge of some
           fact which would prevent a commercially honest individual from
18         taking up the instruments, then its good faith was sufficiently shown.

19  *Chemical Bank v. Haskell*, 51 N.Y.2d 85, 91 (1980) (citations omitted).[10]

---

[10]   *See also First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.*, 262 A.D.2d 106, 107
       (N.Y. App. Div. 1999) ("merely failing to investigate upon acquiring information that
       would give rise to reasonable suspicion, while perhaps an act of negligence, does not
       constitute subjective bad faith or dishonesty").  *Cf.* N.Y. U.C.C. Law § 2-103(b),
       which is limited to "good faith" in the context of "merchants," and adds for that
       purpose only a requirement of "the observance of reasonable commercial standards of
       fair dealing in the trade."

1    A quick summary of the facts learned to date shows that there is simply no

2  evidence in the record that VIA acted dishonestly or in bad faith in connection

3  with the settlement.[11]  Thus, under New York law and the express terms of the

4  2002 Indenture, VIA's acts were in good faith, and they cannot affect the "right of

5  any present or future holder of any Senior Indebtedness to enforce subordination"

6  under the 2002 Indenture "in any way."

7    At the time the 2002 Indenture was executed, the Debtor and VIA already

8  were embroiled in a dispute over a joint venture that the two of them had formed,

9  S3 Graphics Co., Ltd. ("S3 Graphics").  Moreover, in September 2001, Intel had

10  filed a patent infringement lawsuit against VIA and S3 Graphics.  According to the

11  Debtor's filings with the SEC, "SONICblue could be required to pay VIA

12  significant liquidated damages if [S3 Graphics] is enjoined from utilizing

13  SONICblue's patent cross license with Intel."  Debtor's amended Form 10-Q for

14  quarter ending September 30, 2001, at page 10.[12]

15    The Debtor and VIA did not resolve their disputes prior to the Debtor's

16  chapter 11 filing on March 21, 2003.  On July 17, 2003, the VIA Claimants filed

17  proofs of claim in excess of $100 million each arising out of an August 28, 2000

18  Amended Investment Agreement between the Debtor and VIA, and various related

19  agreements.  The claims led to significant litigation in this case, for which the

20

21  [11]  The facts set forth herein were learned principally through the proceedings that
22       brought about the appointment of the Trustee and the disqualification of Debtor's
          chapter 11 counsel.  SB Claims fully reserves the right to supplement or amend this
23       summary as new facts come to light through discovery.

24  [12]  *See also id.* at page 19 ("under certain circumstances, SONICblue is required to pay
          VIA significant liquidated damages if a court enjoins S3 Graphics from utilizing
25       SONICblue's patent cross-license with Intel or if SONICblue enters into a settlement
          agreement with Intel such that S3 Graphics can no longer operate under the patent
26       cross-license").  The Debtor repeated its disclosure of its potential indebtedness to
          VIA in filings with the SEC on April 1, 2002 (before entering into the 2002
27       Indenture), May 15, 2002, June 7, 2002, August 14, 2002, and November 14, 2002.

Opposition to Defendants' Motion to Dismiss

1   Debtor and the Creditors' Committee have told this Court that the estate could

2   have had substantial exposure.[13]   In December 2004, the Debtor commenced an

3   adversary proceeding against the VIA Claimants and another related entity,

4   objecting to the validity of the proofs of claim filed by the VIA Claimants and

5   asserting claims for affirmative relief (the "VIA Adversary Proceeding,"

6   Adversary Proceeding No. 04-05556).  Moreover, on June 6, 2003, Intel filed a

7   motion seeking, among other things, to terminate its license agreement with the

8   Debtor, which motion Intel renewed in 2004 (together, the "Intel Motion").

9       The 2002 Noteholders took an early and active interest in the VIA claim

10  litigation and the Intel Motion.  As noted above, they became parties to the

11  "Stipulated Protective Order" in the litigation (without any disclosure of their

12  unique interest in VIA's claims), and on that basis were able to participate directly

13  in strategy discussions with Debtor's counsel regarding the nature and amount of

14  the claims, negotiation strategies, and potential defenses that the Debtor might

15  have to those claims.

16      The first in-person settlement meeting in the VIA Adversary Proceeding

17  occurred on August 11, 2005.  According to the Declaration of Albert J. Boro, Jr.,

18  former counsel to the Debtor, this settlement meeting was followed by an August

19  17, 2005 telephonic meeting among counsel for the Debtor, counsel for the

20  Creditors' Committee, and Mr. Bennett (lead counsel for the 2002 Noteholders).

21  Boro Dec. [Docket No. 2182] ¶¶ 9 & 10.  During the August 17 meeting, counsel

22  for the Creditors' Committee indicated their willingness to allow VIA and S3

23  Graphics a joint, $6 million allowed claim.  Mr. Bennett, however, stated that,

24

25  [13]  *See* Boro Declaration ¶ 7 (VIA had "substantial claims" that "had a potential value
      before set-offs and counterclaims of up to $42 million," ***in addition to*** the $70 million
26    liquidated damages claim); Declaration of Ron Bender [etc.] dated March 5, 2007
      [Docket No. 2185] ¶ 15 (citing "the significant risks to the estate of VIA and/or S3
27    obtaining allowed general unsecured claims of well in excess of $12.5 million").

Opposition to Defendants' Motion to Dismiss

430802v.1

1  although the $6 million allowed claim should be acceptable, he needed to confer

2  with his clients about these developments.  This apparently made Mr. Boro

3  concerned that the 2002 Noteholders "might object to a settlement with [the

4  Claimants], threatening the prospects of Court approval of a proposed settlement

5  of the VIA Adversary Proceeding, unless their agreement to the proposed

6  settlement terms was obtained."  *See* Boro Dec. ¶¶ 10 & 11.

7        After further negotiations, on September 15, 2005 counsel for the VIA

8  Claimants agreed to seek their clients' approval of a compromise $12.5 million

9  general unsecured allowed claim, if counsel for the Debtor agreed to seek the

10  Debtor's and the creditors' approval of such an allowed claim.

11        On September 16, the VIA Claimants informed the Debtor that they would

12  accept a $12.5 million general unsecured allowed claim, but only if it was not

13  subject to further negotiation.  *See* Boro Dec. ¶ 14.  The Debtor's counsel

14  responded that the Debtor was "waiting for sign-off from the creditors to ensure

15  that the proposed settlement would not be objected to by the creditors."  Boro Dec.

16  ¶ 16.  In particular, the Debtor was "still awaiting approval from one member of

17  the Creditors' Committee," *id.*, who most likely was Mr. Bennett on behalf of the

18  2002 Noteholders.  Mr. Boro states that, "[o]n September 16 and 19, 2005, we

19  placed calls to Mr. Bennett to find out if the Senior Noteholders would support the

20  [proposal] of a $12.5 million allowed claim."  *Id.* ¶ 17.  "On September 20, we

21  learned that the Senior Noteholders were willing to support a settlement that

22  included a $12.5 million allowed claim for [the Claimants], ***provided that the***

23  ***settlement included certain terms, including that [the Claimants'] allowed claim***

24  ***be neither senior nor junior to any other general unsecured claim***."  *Id.*

25  (emphasis added).

26        It was at this time that the 2002 Noteholders insisted that, no matter how

27  the VIA Claimants allocated the settlement claim among themselves, the claim

Opposition to Defendants' Motion to Dismiss

1   must not constitute Senior Indebtedness under the 2002 Indenture.

2       [W]hen *the Senior Noteholders* first saw VIA's effort to allocate the
3       Settlement Allowed Claim between VIA and S3 in its discretion, the
        Senior Noteholders were not supportive, and *insisted that*, no matter
4       how VIA allocated the Settlement Allowed Claim, *it must not be*
        *characterized as Senior Indebtedness*.
5

6   Noteholders' Reply filed April 27, 2007 [Docket No. 2265] at 10 (emphasis

7   added).  The 2002 Noteholders further have admitted that, if VIA had not

8   purported to waive "Senior Indebtedness" status, then they would have objected to

9   the settlement, *see id.*, which would have meant that the effective majority of the

10  Creditors' Committee would have been against it.

11      The evidence to date also shows that the 2002 Noteholders promoted a false

12  story about the supposed "purpose" of the VIA Senior Indebtedness provision (i.e.,

13  that it was to apply exclusively to a loan that was never made).  Mr. Boro's

14  Declaration states:

15      On September 16 and 19, 2005, we placed calls to Mr. Bennett to
        find out if the Senior Noteholders would support the 'mediator's
16      proposal' of a $12.5 million allowed claim.  *During that time, I*
        *learned that the provision in the Senior Noteholder Indenture*
17      *referring to the $15 million indebtedness to VIA was for a loan*
        *that VIA was supposed to have made to SONICblue, but which*
18      *never occurred.*

19

20  Boro Dec. at ¶ 17 (emphasis added).  Counsel for the 2002 Noteholders personally

21  repeated this fable to this Court at the January 23, 2007 hearing.[14]

22      SB Claims believes that persons involved with the negotiation of the 2002

23  Indenture will contradict this story as to the alleged "purpose" of the VIA Senior

24  Indebtedness provision.  Thus, to the extent that extrinsic evidence is relevant to

25  the interpretation of the 2002 Indenture, SB Claims believes that such evidence

26

27  _____
    [14]  *See* Transcript of January 23, 2007 Hearing [Docket No. 2136] at 31-33.

430802v.1

1    will show that the "purpose" of the VIA Senior Indebtedness provision was much

2    broader than just some loan that VIA never made to the Debtor.

3         On or about September 20, 2005, counsel for the Debtor for the first time

4    communicated to counsel for the VIA Claimants the existence of the VIA Senior

5    Indebtedness provision in the 2002 Indenture.  Until such time, the VIA Claimants

6    and their counsel were unaware of the existence of this provision.  Counsel for the

7    Debtor also told counsel for the VIA Claimants that, unless the VIA Claimants

8    agreed that their allowed claim under the proposed settlement would not be treated

9    as senior to the 2002 Noteholders' claims, the 2002 Noteholders would oppose the

10   proposed settlement of the VIA Adversary Proceeding, thus threatening the

11   continuation of litigation that had been going on for years.  Counsel for the Debtor

12   also represented to the VIA Claimants' counsel that the purpose of the VIA Senior

13   Indebtedness provision was of limited scope, and that such provision would apply

14   only to a loan that VIA had contemplated making to the Debtor, but which loan

15   never was made.

16        Faced with the 2002 Noteholders' phony explanation of the "purpose" of

17   the provision, and the substantial risk that the 2002 Noteholders would block a

18   comprehensive settlement of years of litigation among VIA, Intel, and the Debtor,

19   VIA capitulated to the demand that the VIA Claim not be treated as "Senior

20   Indebtedness" under the 2002 Indenture.

21        Based upon the foregoing, there should be no question that VIA acted in

22   good faith when it agreed to the Purported Waiver Language in the Settlement

23   Agreement.  VIA was not even aware of the subordination provisions in the 2002

24   Indenture until the issue was raised at the 2002 Noteholders' insistence.  When

25   VIA was told of the provisions, it also was told a phony story regarding their

26   supposed purpose, which was to apply to a loan that VIA never made, in an effort

27   to convince VIA that it was not waiving any rights.  Moreover, VIA was told and

Opposition to Defendants' Motion to Dismiss

1  understood that approval of the Settlement Agreement was subject to creditors'

2  approval – specifically the 2002 Noteholders who effectively controlled the

3  Creditors' Committee.  Under these circumstances, VIA acted in good faith in

4  agreeing to the Purported Waiver Language, because it had no other reasonable

5  alternative (other than to continue years of expensive litigation and risk the loss of

6  the Intel technology).

7         Although noted above, it is worth repeating that the 2002 Indenture makes

8  crystal clear that:

9         ***No right of any present or future holder of any Senior
10        Indebtedness to enforce subordination as herein provided shall be at
          any time in any way be prejudiced or impaired by any act or failure
11        to act on the part of the Company or by any act or failure to act, in
          good faith, by any such holder***, or by any noncompliance by the
12        Company with the terms, provisions and covenants of this Indenture,
          ***regardless of any knowledge thereof which any such holder may
13        have or otherwise be charged with***.

14 2002 Indenture § 4.5 at 17 (emphasis added).  Thus, VIA's good faith act in

15 accepting the Purported Waiver Language – measured under New York law by a

16 subjective standard of honesty – cannot "in any way" prejudice or impair the status

17 of the VIA Claim as Senior Indebtedness.

18        **b.  The Purported Waiver Language Is Invalid Under The
19        Terms of the 2002 Indenture Because The Debtor Had No Power
          To Request It From VIA.**

20

21        Even if it could somehow be contended that VIA did not act in good faith,

22 the fact remains that ***any act by the Debtor itself*** (whether or not in good faith)

23 also could not in any way prejudice or impair VIA's Senior Indebtedness rights

24 under the indenture.  The 2002 Indenture's terms are clear:

25        ***No right of any present or future holder of any Senior
26        Indebtedness to enforce subordination as herein provided shall be at
          any time in any way be prejudiced or impaired by any act or failure
27        to act on the part of the Company . . . .***

1   2002 Indenture § 4.5 at 17 (emphasis added).  This provision "***guaranteed*** the

2   right of holders of Senior Indebtedness against any noncompliance by [the Debtor]

3   with the terms of the indenture, 'regardless of any knowledge thereof which any

4   such holder may have or be otherwise charged with.'"  *In re Frost Bros., Inc.*, 1992

5   U.S. Dist. LEXIS 18301, at *4 n.3 (S.D.N.Y. Dec. 2, 1992) (interpreting an

6   indenture with nearly identical language) (emphasis added).

7       The Debtor made clear to VIA that there would be no settlement but for

8   VIA's agreement to waive its Senior Indebtedness rights – a waiver that was

9   extracted for no consideration from the 2002 Noteholders and with no benefit to

10   the estate.  The Debtor's requirement that VIA capitulate to this term, or else face

11   years of costly litigation and the possible loss of the Intel technology, cannot now

12   be used to prejudice VIA's and SB Claims' rights as "any present or future holder

13   of any Senior Indebtedness to enforce subordination" under the 2002 Indenture.

14       The 2002 Noteholders are, at best, third party beneficiaries of the

15   Settlement Agreement.  And it is basic hornbook law in California (which governs

16   the Settlement Agreement[15]) that the rights of a third party beneficiary can be no

17   greater than the rights of a promisee.  *See* Witkin, Summary of California Law

18   (10th ed. 2005), Contracts § 694 at pp. 781-82; *see also id*. at § 695 at pp. 782-83

19   (a third party beneficiary is subject to all defenses of promisor as against promisee,

20   such as an unenforceable contract).

21       Here, the Debtor itself had no right under the 2002 Indenture to act to cause

22   VIA to waive its Senior Indebtedness rights.  Hence, the Debtor, as the purported

23   promisee of the Purported Waiver Language, also has no right now to enforce that

24   provision.  Accordingly, since the 2002 Noteholders' rights can be no greater than

25   those of the Debtor, they too have no right to enforce the Purported Waiver

26

27   [15]  *See* Settlement Agreement section III.29.  As noted previously, the 2002 Indenture is governed by New York law.

Opposition to Defendants' Motion to Dismiss

1  Language.  This conclusion is further bolstered by the fact that the 2002

2  Noteholders gave absolutely no consideration whatsoever in exchange for the

3  waiver, other than perhaps their agreement not to use their position in the

4  bankruptcy case to block the settlement.

5         **c.  The Purported Waiver Language In The Settlement**

6            **Agreement Is Unenforceable Because It Was Obtained Without**
          **Proper Disclosure To The Court And Creditors.**

7

8       It cannot be disputed that the 2002 Noteholders were fiduciaries to creditors

9  in this case, given that they held an effective majority of the Creditors' Committee

10  positions.  It also cannot be disputed that, when fiduciaries receive special

11  treatment in an agreement with the bankruptcy estate, there should be ample

12  disclosure of that treatment so that the Court and other creditors may judge its

13  fairness.  As one court recently recognized: "The bankruptcy process must both be

14  fair and appear fair.  A creditor on a committee who exudes the appearance of a

15  breach of fiduciary duty undermines that basic bankruptcy tenet, thereby

16  corrupting the process."  *In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423

17  (Bankr. N.D. Tex. 2003) (citation omitted).

18       Here, there was absolutely no meaningful disclosure to this Court, the other

19  members of the Creditors' Committee, or creditors generally regarding the facts

20  that: (1) the 2002 Noteholders were (or even might be) subordinated to VIA; and

21  (2) the 2002 Noteholders obtained, as their condition for not opposing the

22  settlement, a purported full release of their subordination obligations.  No

23  disclosure of the 2002 Noteholders' unique status was made when they became a

24  party to the Stipulated Protective Order.  Nor was any disclosure made when the

25  Debtor filed its October 6, 2006 motion to seal the proceedings regarding the

26  Settlement Agreement's approval [Docket No. 1950].  Even the Purported Waiver

27  Language itself was buried in a single sentence in the 26-page, single spaced

Settlement Agreement (which also was filed under seal), without any explanation

Opposition to Defendants' Motion to Dismiss

1    as to its significance.  There also was no disclosure of the fact that the 2002

2    Noteholders insisted that VIA purport to waive any right to Senior Indebtedness

3    status, or of their threat to oppose the Settlement Agreement if VIA did not

4    purport to waive such rights.[16]

5          Moreover, the Settlement Agreement itself provides that "each and every

6    covenant" in the agreement is "conditioned upon . . . the occurrence of the

7    Effective Date" of the settlement.  *See* Settlement Agreement section III.1.  The

8    Effective Date, in turn, was dependent upon entry of an "Approval Order" by this

9    Court, approving the Settlement Agreement, including the Purported Waiver

10   Language, "without change".  *Id.* section I (definitions of both "Approval Order"

11   and "Effective Date").

12         This Court, however, was never asked to rule upon the legal effect of any

13   purported waiver of Senior Indebtedness status; nor was it ever advised that any

14   such waiver even existed.  Given that the Purported Waiver Language was not

15   even discussed in the pleadings, the Court hardly could have been in a position to

16   consider and approve that language.  And, even if the Court had been asked to

17   evaluate the waiver language, SB Claims respectfully submits that the Court

18   would have, *sua sponte*, raised serious questions as to why three members of the

19   Creditors' Committee should receive this special treatment.

20

21   _____

[16]  The notice to creditors [Docket No. 1955] offered to make available to any creditor
22   who requested it from the Debtor's counsel a redacted copy of the Settlement
     Agreement.  Following its receipt of Docket No. 1955, another creditor, Riverside
23   Claims, made such a request of Debtor's counsel over the telephone, but was then
     told, again over the telephone, by Debtor's counsel that the process of redaction
24   would be quite expensive for the Debtor and that there was no real reason for
     Riverside Claims to insist that this be done, as all that any of the unsecured creditors
25   actually needed to know to evaluate the efficacy of the Settlement Agreement was
     that the amount of the settlement was for an allowed claim of $12,500,000.  Riverside
26   Claims accepted Debtor's counsel's oral representations and therefore dropped its
     demand for a redacted copy of the Settlement Agreement.
27

Opposition to Defendants' Motion to Dismiss

430802v.1

1    Thus, while the Court certainly did approve nearly every aspect of the

2  Settlement Agreement, it did not approve the Purported Waiver Language, and SB

3  Claims is free to, and does, object to the Purported Waiver Language on the

4  grounds, *inter alia*, that the Debtor's agreement to same was an *ultra vires* act

5  under the 2002 Indenture.

6    The federal courts have ample authority to revise portions of their own

7  orders if the orders are based upon fraud, inadequate notice, mistake, or other legal

8  or equitable infirmities.  For example, Federal Rule of Civil Procedure 60 allows a

9  court to modify or vacate a prior order "upon such terms as are just" for reasons

10  including "mistake, inadvertence, surprise, or excusable neglect," as well as

11  "fraud" and "any other reason justifying relief from the operation of the

12  judgment."  Likewise, Bankruptcy Code section 105(a) gives the Court ample

13  authority to "issue any order, process, or judgment that is necessary or appropriate

14  to carry out the provisions of" the Bankruptcy Code, and the Court may act – even

15  *sua sponte* – "to prevent an abuse of process."  *See, e.g.*, *Marrama v. Citizens

16  Bank*, 127 S. Ct. 1105, 1111-12 (2007) (highlighting "the broad authority granted"

17  by section 105 "to bankruptcy judges to take any action that is necessary or

18  appropriate 'to prevent an abuse of process'"); *In re Lenox*, 902 F.2d 737, 740 (9th

19  Cir. 1990) ("Although FRCP 60(b) provides that a court may relieve a party from

20  a final order upon motion, it does not prohibit a bankruptcy judge from reviewing,

21  sua sponte, a previous order.  And although FRCP 60(b) refers to relief from final

22  orders, it does not restrict the bankruptcy court's power to reconsider any of its

23  previous orders when equity so requires." (citations omitted)).

24    Even without reliance on Rule 60 or section 105, bankruptcy courts also

25  have the inherent authority to disregard improperly noticed provisions of plans and

26  other documents that were approved by the court.  *See, e.g.¸ Enewally v. Wash.

27  Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172-73 (9th Cir. 2004) (refusing to

1  enforce lien stripping provisions of plan that were not properly noticed); *Sallie*

2  *Mae Servicing Corp. v. Ransom (In re Ransom)*, 336 B.R. 790 (B.A.P. 9th Cir.

3  2005) (refusing to enforce plan provisions that "discharged by declaration" student

4  loan obligations); *Ruehle v. Educ. Credit Mgmt. Corp. (In re Ruehle)*, 307 B.R. 28,

5  33 (B.A.P. 6th Cir. 2004) (describing such a provision as "an interloper in the

6  plan" that "can have no legal status") (internal quotations omitted); *see also In re*

7  *UAL Corp.*, 299 B.R. 509, 522 (Bankr. N.D. Ill. 2003) (noting "the inherent power

8  of a bankruptcy judge 'to reexamine and revise an order which he entered during

9  the pendency of the bankruptcy proceedings'") (quoting *In re Lintz W. Side*

10  *Lumber, Inc.*, 655 F.2d 786, 789 (7th Cir. 1981)).

11      A court's inherent authority to revise portions of its prior orders also

12  extends to situations involving "fraud on the court" or other forms of non-

13  disclosure.  As cogently explained by the Court of Appeals for the Ninth Circuit:

14      Just as a court may use its inherent power to protect its integrity by

15      vacating a judgment obtained by fraud, it also may amend a
        judgment for the same purpose.  When a court vacates a judgment

16      obtained by fraud, it not only rids itself of the defilement caused by
        the fraud, but also restores balance and fairness between the parties

17      by removing the benefit gained by the party that committed the
        fraud.  Amending a judgment serves these same goals by removing

18      the benefit - for example, the avoidance of a judgment against itself -

19      that the party gained by committing fraud on the court.

20      We therefore hold that a federal court may amend a judgment or

21      order under its inherent power when the original judgment or order
        was obtained through fraud on the court. . . .

22

23  *Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1119 (9th Cir. 1999); *see*

24  *also, e.g.*, *In re Maxwell Newspaper, Inc.*, 179 B.R. 549 (S.D.N.Y. 1994)

25  (discussing how "bankruptcy courts, as courts of equity, have the power to

26  reconsider, modify, or vacate a previous order," and affirming bankruptcy court's

27  decision to vacate two year old stipulation on the grounds that there had been

1    inadequate disclosure regarding its effects); *Broadfoot v. United Furniture Indus.*

2    *(In re Nationwide Warehouse & Storage, LLC)*, 2005 Bankr. LEXIS 2690 (Bankr.

3    N.D. Ga. July 29, 2005) (vacating order approving settlement in case where full

4    effects of the settlement were not disclosed to the court; explaining that "[t]here

5    are times when silence and the failure to make a necessary disclosure is

6    tantamount to an affirmative misrepresentation.  The game of 'hiding the ball' or

7    'catch me if you can' cannot be played with the courts.").

8        Based upon the above authorities, and under these circumstances, the 2002

9    Noteholders cannot hide behind this Court's prior approval of the Settlement

10   Agreement.  If the 2002 Noteholders desired to get a substantial benefit from the

11   settlement, then they (especially as fiduciaries/Committee members) should have

12   insisted that the purported waiver of subordination be fully disclosed to, and vetted

13   by, the Court and creditors.  The 2002 Noteholders' failure to do so bars them from

14   now relying upon the Court's order.

15       **d.  This Court Is Free To Disregard The Invalid, Purported**
16       **Waiver Language In The Settlement Agreement While Not**
         **Upsetting The Remainder Of The Agreement.**
17

18       The 2002 Noteholders contend in their Motion to Dismiss that what SB

19   Claims is seeking is a "partial rescission" of the Settlement Agreement, and that

20   partial rescission is not permitted under California law.  The 2002 Noteholders are

21   wrong, both as to the relief SB Claims is seeking and as to California's law of

22   rescission.  SB Claims is seeking a determination by this Court that the Purported

23   Waiver Language is void and unenforceable – and that the 2002 Noteholders

24   should be estopped from ever enforcing it – for a number of reasons, including (i)

25   its violation of the express, no waiver provisions of the 2002 Indenture; (ii) the

26   lack of full disclosure to the Court; and (iii) the 2002 Noteholders' misconduct in

27   using their position on the Creditors' Committee to obtain the waiver.

         More importantly, though, *even if* the sole remedy SB Claims seeks is a

Opposition to Defendants' Motion to Dismiss

1    "partial rescission" of the Settlement Agreement, such a remedy remains available

2    under California law.

3    In their papers, the 2002 Noteholders quote extensively from *IMO*

4    *Development Corp. v. Dow Corning Corp.*, 135 Cal. App. 3d 451, 458 (1982).

5    They fail to quote, however, the following key sentence: ***"[T]otal rescission is not***

6    ***required where a contract is divisible or severable."***  *Id.* at 458 (emphasis added).

7    The California Supreme Court likewise has held, ***"where a good cause for***

8    ***rescission exists as to one part of a divisible or separable contract, such portion***

9    ***may be rescinded in equity without disturbing the remainder."***  *Simmons v. Cal.*

10   *Inst. of Tech.*, 34 Cal. 2d 264, 275 (1949) (quotations omitted) (emphasis added).

11   The California Civil Code similarly explains that:

12   
13   > Where a contract has several distinct objects, of which one at least is
> lawful, and one at least is unlawful, in whole or in part, the contract
> is void as to the latter and valid as to the rest.

14   Cal. Civil Code § 1599.  These authorities make clear that the 2002 Noteholders'

15   supposed rule of law, much like their story about the origin of the senior status of

16   the VIA indebtedness under the indenture, has no basis in reality.

17   The issue of whether a contract is divisible or severable turns on whether

18   the Court is able to determine what portion of the consideration is attributable to

19   the part of the contract to be rescinded.  In the California Supreme Court's words:

20   
21   > It has long been the rule in this state that [w]hen the transaction is of
> such a nature that the good part of the consideration can be separated
> from that which is bad, the Courts will make the distinction, for the .
> . . law . . . [divides] according to common reason; and having made
> that void that is against law, lets the rest stand. . . . .  Thus, the rule
> relating to severability of partially illegal contracts is that a contract
> is severable if the court can, consistent with the intent of the parties,
> reasonably relate the illegal consideration on one side to some
> specified or determinable portion of the consideration on the other
> side.  This rule has been frequently applied in this state.

22   
23   
24   
25   
26   

27   *Keene v. Harling*, 61 Cal. 2d 318, 320-21 (1964) (internal quotations omitted).

37

1    Moreover, "[i]f the illegality is collateral to the main purpose of the contract, and

2    the illegal provision can be extirpated from the contract by means of severance or

3    restriction, then such severance and restriction are appropriate." *Armendariz v.*

4    *Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 124 (2000).  The California

5    Supreme Court further made clear that, when considering whether to sever the

6    improper provisions from a contract, "[t]he overarching inquiry is whether the

7    interests of justice . . . would be furthered by severance."  *Id.* (internal quotations

8    omitted).  It is clear which way the "interests of justice" point in the instant case.

9        Furthermore, it is not necessary that an agreement, on its face, allocate

10   consideration between the proper and improper parts of the contract.[17]  Rather, the

11   California Supreme Court holds:

12       ***The argument that the court cannot apportion because the parties
          did not expressly apportion is without merit.***   That argument exalts

13       form over substance. (See *Haines v. Commercial Mortgage Co.*, . . .
          200 Cal. 609 [1927], where . . . the court held that the fact that the

14       interest and balance due were stated together did not prevent the
          court from apportioning where other evidence delineated between

15       the lawful and unlawful parts.)

16

17   _____

18   [17]   The 2002 Noteholders make the undeveloped assertion that the presence of a standard
        integration clause in the Settlement Agreement impacts SB Claims' ability to

19      challenge the Purported Waiver Language.  Integration clauses, however, simply bar
        the introduction of parol evidence to interpret a contract.  *See* Cal. Jur. 3d § 367 at

20      540-41.  They do not prevent the contract from being treated as severable.  *In re Plitt
        Amusement Co*, 233 B.R. 837, 846 (Bankr. C.D. Cal. 1999).  The 2002 Noteholders

21      cite only a section in the case of  *Martinez v. Master Protection Corp.*, 188 Cal. App.
        4th 107, 116 (2004), stating that an integrated arbitration agreement cannot be

22      unilaterally modified by one party's decision to drop a contested term.  *Martinez*
        itself, though, later considers whether an unconscionable provision in the integrated

23      arbitration agreement can be "severed to avoid an illegal result," and employs the
        traditional tests to determine whether the contract is severable or divisible

24      notwithstanding the presence of the integration clause.  *See id.* at 119.  Indeed, the
        purpose of integration clauses is to prevent the terms of a written agreement from

25      being contradicted by parol evidence under certain circumstances.  *See* Cal. Code
        Civil Pro. § 1856(a).  By its terms, however, the parol evidence rule is not applicable

26      where there is a challenge based on illegality, fraud, or the very validity of an
        agreement.  *Id.* § 1856(f) & (g).

27

1    *Keene v. Harling*, 61 Cal. 2d at 323 (footnote omitted) (emphasis added); *see also*

2    *Birbrower, Montalbano, Condon & Frank, P.C., v. Superior Court*, 17 Cal. 4th

3    119, 138-39 (1998) (holding that contract could be severed and the improper

4    portion invalidated if, "even though the entire contract was for a fixed sum, the

5    court was able to value the illegal portion of the contract and separate it from the

6    rest of the amount due under the agreement").

7          In this case, the Settlement Agreement did not expressly apportion

8    consideration between the Purported Waiver Language and the other provisions of

9    the agreement.  There is, however, already evidence in the record as to what the

10   separate consideration for the Purported Waiver Language was – absolutely

11   nothing.  The 2002 Noteholders gave nothing to VIA, the Debtor's estate, or Intel

12   in exchange for the Purported Waiver Language.  Nor did the Debtor or Intel give,

13   or receive, any additional consideration for the language – from the standpoint of

14   the estate and Intel, it did not matter one bit whether the VIA Claim was senior to

15   or pari passu with the claims of the 2002 Noteholders.  It is thus ironic that the

16   2002 Noteholders argue that, in order to undo the Purported Waiver Language, SB

17   Claims and VIA must give back "everything of value" that they got in exchange

18   for the waiver.  Motion to Dismiss at 14.  VIA and SB Claims got nothing for the

19   waiver, and, equally significant, the 2002 Noteholders gave nothing for it.

20         Nor does the fact that the Settlement Agreement was approved by this

21   Court somehow validate the Purported Waiver Language.  As discussed above, the

22   Purported Waiver Language was not mentioned in any of the notices, motions, and

23   other pleadings filed in support of the Settlement Agreement.  Nor, for that matter,

24   was there ever any mention of the fact that the 2002 Noteholders were (or even

25   might be) contractually subordinated to VIA.  Thus, there was simply no reason

26   for anyone – including the Court – to have anticipated that, by approving the

27   Settlement Agreement, the Court would also be endorsing a special, undisclosed

Opposition to Defendants' Motion to Dismiss

430802v.1

1    benefit for three members of the Creditors' Committee.

2    **B. SB Claims Has Standing To Equitably Subordinate The 2002**
     **Noteholders' Claim In Order To Remedy The Harm Caused To SB**
3    **Claims, And The Unfair Advantage Obtained By The 2002**
     **Noteholders.**
4

5        **1.  Individual Creditors Have Standing To Remedy Injuries To Their**
             **Particularized Interests.**
6

7        The remedy of equitable subordination is available either to the estate as a

8    whole or to individual creditors.  As recognized by the Seventh Circuit,

9    "individual creditors have an interest in subordination separate and apart from the

10   interests of the estate as a whole.  The individual creditor should have an

11   opportunity to pursue its separate interest." *In re Vitreous Steel Prods. Co.*, 911

12   F.2d 1223, 1231 (7th Cir. 1990); *see also Variable-Parameter Fixture Dev. Corp.*

13   *v. Comerica Bank-California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 452-53

14   (Bankr. N.D. Cal. 1998) (individual creditor has standing if it "has been

15   particularly harmed by inequitable conduct").

16       That individual creditors have standing to pursue equitable subordination

17   actions on their own behalf is entirely consistent with the plain language of

18   Bankruptcy Code section 510(c), which makes clear that the Court may "under

19   principles of equitable subordination, subordinate for purposes of distribution all

20   or part of an allowed claim to ***all or part of another allowed claim***" (emphasis

21   added).  Thus, equitable subordination is not an "all or nothing" proposition – a

22   claim may be subordinated to a single, other claim, or to all other claims.

23   Moreover, unlike other sections of the Code that expressly authorize the trustee to

24   do something (*see, e.g.*, the avoiding power sections or the charging lien authority

25   under section 506(c)), there is no reference in section 510(c) to the trustee, the

26   debtor in possession, or the estate.  Bankruptcy Code section 1109(b) makes clear

27   that, in the absence of another statutory prohibition to the contrary, any "party in

Opposition to Defendants' Motion to Dismiss

1    interest" (including a creditor) "*may raise and may appear and be heard on any*

2    *issue in a case under this chapter*."

3    **2.  SB Claims Meets The Particularized Injury Standing Test
        Established By The Court In *Morpheus Lights*.**

4

5    The test for whether SB Claims has standing to equitably subordinate the

6    2002 Noteholders' claims is whether "it could be shown that [SB Claims] has been

7    particularly harmed by inequitable conduct of [the 2002 Noteholders.]."

8    *Morpheus Lights*, 228 B.R. at 453.  In other words, in order to survive a motion to

9    dismiss on standing grounds, all SB Claims must show is that it has "alleged a

10   particularized injury." *Id.*

11   The particularized injury to SB Claims is readily apparent – SB Claims, as

12   VIA's successor, is the only entity that is the beneficiary of the VIA Senior

13   Indebtedness provision in the 2002 Indenture.  The purported waiver of this

14   provision in the Settlement Agreement directly, and uniquely, affects SB Claims'

15   rights.

16   Through this Adversary Proceeding, SB Claims is seeking nothing more

17   than the invalidation of the purported waiver (assuming that the waiver was not

18   void *ab initio*).  SB Claims is not seeking to subordinate the 2002 Noteholders'

19   claims to all other creditors.  Nor is SB Claims seeking to remedy whatever other

20   harms that the 2002 Noteholders may have caused to the estate generally.  Rather,

21   all SB Claims is seeking to do is to restore its own rights, to the extent that the

22   purported seniority waiver caused SB Claims to be transmuted from being senior

23   to the 2002 Noteholder to being *pari passu* with them.

24   The Chapter 11 Trustee may have other remedies against the 2002

25   Noteholders – affirmative claims for damages, claims objections, or even equitable

26   subordination *if and to the extent that the 2002 Noteholders' conduct injured all*

27   *creditors generally*.  SB Claims, however, is not seeking any of these remedies

---

41

Opposition to Defendants' Motion to Dismiss

1   through this Adversary Proceeding.  Rather, all SB Claims is seeking to do is to

2   remedy the particularized injury caused to it – the purported waiver of a

3   subordination provisions under which VIA, as SB Claims' predecessor, was the

4   beneficiary.

5        This case is readily distinguished from *Morpheus Lights*, in which the

6   Court found an individual creditor to lack standing to bring an equitable

7   subordination action on the facts of that case.  There, the creditor's only allegation

8   of harm was "detriment of [the estate's] unsecured creditors."  228 B.R. at 453.

9   The creditor had "not alleged any injury particular to it."  *Id.*  On these facts, the

10  Court concluded that the individual creditor lacked standing because all that was at

11  issue were "generalized claims" that "should be brought by the debtor in

12  possession or creditor's committee."  *Id.*

13       By contrast, the Complaint makes clear that "The Claimants [S3 and VIA]

14  and SB Claims, as the Claimants' assignee, would be harmed were the 2002

15  Noteholders permitted to enforce, or to otherwise benefit from, the Purported

16  Waiver Language vis-à-vis the VIA Claim."  Complaint at ¶ 82.  The Complaint

17  further makes clear that SB Claims is seeking only subordination of the 2002

18  Noteholders' claims to SB Claims' claim – "The 2002 Noteholders' claims should

19  be equitably subordinated to the VIA Claim."  Complaint at ¶ 84.  Thus, SB

20  Claims has alleged an injury that clearly is particular to it – the purported waiver –

21  and it is seeking a remedy that clearly is particular to it – the subordination of the

22  2002 Noteholders' claims to SB Claims.

23  *///*

24  *///*

25  *///*

26  *///*

27

**C.  SB Claims Has Sufficiently Pleaded Its Claims So As To Survive A Motion To Dismiss.**

    **1.The Motion To Dismiss Must Be Denied Unless It Appears "Beyond Doubt" That SB Claims Can Prove No Set Of Facts In Support Of Its Claims For Relief.**

"It is axiomatic that 'the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'"  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quoting, *inter alia*, 5 C. Wright & A. Miller, Federal Practice & Procedure § 1357, at 598 (1969)).  "In reviewing the sufficiency of a complaint, "'the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)):

> [T]he accepted rule is that *a complaint is not to be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief*."  *Conley v. Gibson*, 355 U.S. 41, 45-46 . . . (1957); *Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir. 1980); *DeWitt v. Pail*, 366 F.2d 682, 685 (9th Cir. 1966).  Under this rule it is only the extraordinary case in which dismissal is proper.  *Corsican Productions v. Pitchess*, 338 F.2d 441, 442 (9th Cir. 1964); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 at 598 (1969).

*United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981) (emphasis added).

In reviewing a motion to dismiss, the Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them.  *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).  The complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 99 (2d Cir. 2001).

In this case, SB Claims has more than adequately pleaded its causes of action to survive a Motion to Dismiss.  The Complaint contains a detailed

Opposition to Defendants' Motion to Dismiss

430802v.1

1   statement of the events that led up to this present dispute, and of the legal and

2   factual theories upon which SB Claims seeks relief.  The 2002 Noteholders cannot

3   in any way claim not to understand what is at issue here.

4        Nor can the 2002 Noteholders honestly suggest that "it appears beyond

5   doubt that the plaintiff can prove no set of facts in support of his claim which

6   would entitle him to relief."  *D'Alessio v. N.Y. Stock Exch.*, 258 F.3d at 99.  This

7   Court itself has recognized the appearance of wrongdoing by the 2002

8   Noteholders, although the Court also has made clear (as it should) that all parties

9   will have the opportunity to explore the facts through fair and adequate discovery.

10  The 2002 Noteholders' Motion to Dismiss is nothing more than an effort to

11  squelch the very investigation that they repeatedly have said they would welcome,

12  even before it has barely begun.

13

14       **2.  SB Claims Has Alleged The 2002 Noteholders' Misconduct With
         Sufficient Particularity.**

15

16       The 2002 Noteholders assert that SB Claims' equitable subordination count

17  (Count 1 of the Complaint) is akin to fraud, and on that basis SB Claims must

18  satisfy the heightened pleading requirements of Federal Rule of Civil Procedure

19  9(b).  The 2002 Noteholders are wrong on for two reasons.  First, SB Claims does

20  not have to prove actual fraud in order to equitably subordinate the 2002

21  Noteholders' claims.  Rather, SB Claims need only prove that the 2002

22  Noteholders engaged in some form of inequitable conduct that caused SB Claims

23  and its predecessor, VIA, particularized harm.  Second, even if the Rule 9(b)

24  pleading standards did apply, SB Claims' Complaint meets those standards.

25       **a.  The 2002 Noteholders' Claims May Be Equitably
         Subordinated On Account Of Any Inequitable Conduct.**

26

27       "It is well established that actual fraud need not be shown for equitable

---

44

1  subordination." *Summit Coffee Co. v. Herby's Foods (In re Herby's Foods)*, 2 F.3d

2  128, 133 (5th Cir. 1993); *see also Machinery Rental, Inc. v. Herpel (In re*

3  *Multiponics, Inc.)*, 622 F.2d 709, 720 (5th Cir. 1980) (same); *Capitol Bank &*

4  *Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty*

5  *Trust)*, 968 F.2d 1332, 1361 (1st Cir. 1992) (holding that, even when a

6  noninsider's claim is to be subordinated, "[s]omething less than actual fraud . . .

7  will suffice").  Rather, "[t]he inequitable conduct may arise out of any unfair act

8  by the creditor as long as the conduct affects the bankruptcy results of the other

9  creditors." *Citicorp Venture Capital, Ltd. v. Committee Of Creditors Holding*

10  *Unsecured Claims (In re Papercraft Corp.)*, 323 F.3d 228, 234 (3d Cir. 2003).

11  Even the authority upon which the 2002 Noteholders rely acknowledges "that non-

12  fraudulent inequitable conduct need not be plead with specificity in support of an

13  equitable subordination claim." *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. (In*

14  *re S.M. Acquisition Co.)*, 46 Bankr. Ct. Dec. 279, 2006 U.S. Dist. LEXIS 58960

15  *10 n.3 (N.D. Ill. Aug. 7, 2006).

16      Moreover, it cannot be disputed that the 2002 Noteholders were, at all

17  relevant times, fiduciaries of the Debtors' creditors.  As Creditors' Committee

18  members, the 2002 Noteholders were (and still are) fiduciaries that bear a duty of

19  undivided loyalty to provide impartial service in the interests of the creditors that

20  they represent.  *See* footnote 9, *supra.*  And, not only were the 2002 Noteholders

21  Committee members – they were an effective majority of the active Committee.  It

22  is well established that the requirements for equitable subordination are not nearly

23  as rigorous when fiduciaries or insiders are involved.  *See Herby's Foods*, 2 F.3d

24  at 131.

25  \\

26  \\

27

Opposition to Defendants' Motion to Dismiss

**b. SB Claims Has Pleaded The 2002 Noteholders' Misconduct With Sufficient Particularity.**

Even assuming arguendo that the heightened pleading standards of Rule 9(b) apply to the Complaint, SB Claims has more than adequately met those standards. Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

When considering Rule 9(b), the Court also must keep in mind the standards for federal pleading generally. As recently explained by the Sixth Circuit:

> [W]hen deciding a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading, codified in the "short and plain statement of the claim" requirement of Federal Rule of Civil Procedure 8. As we have noted, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony.

*Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006) (internal quotations omitted).

In this case, SB Claims' Complaint sets forth, in great detail, the chain of events from the execution of the 2002 Indenture, through the litigation among VIA, Intel, and the Debtors, and culminating in the Settlement Agreement which contains the Purported Waiver Language. The Complaint in particular emphasizes in twenty-one paragraphs the period during August and September, 2005, during which the 2002 Noteholders "insisted" (their own word) that the Purported Waiver Language be inserted at the last minute into what was otherwise an essentially completed term sheet. Complaint at ¶¶ 38-58.

The Complaint is based largely on evidence that already has been submitted to the Court. Although this evidence clearly must (and should) be explored further

1    through discovery, it demonstrates, at the least, that a reasonable inference of

2    wrongdoing by the 2002 Noteholders can be made.

3        First, there is already in the record in this case evidence that it was the 2002

4    Noteholders who insisted upon the Purported Waiver Language in the Settlement

5    Agreement:

> [W]hen the Senior Noteholders first saw VIA's effort to allocate the
> Settlement Allowed Claim between VIA and S3 in its discretion, ***the
> Senior Noteholders were not supportive, and insisted that, no
> matter how VIA allocated the Settlement Allowed Claim, it must
> not be characterized as Senior Indebtedness***.

9    Noteholders' Reply [Docket No. 2265] at 10 (emphasis added).  Mr. Boro,

10   then counsel for the Debtors, confirmed this fact in his own Declaration:

> On September 16 and 19, 2005, we placed calls to Mr. Bennett to find
> out if the Senior Noteholders would support the 'mediator's proposal'
> of a $12.5 million allowed claim.  During that time, I learned that the
> provision in the Senior Noteholder Indenture referring to the $15
> million indebtedness to VIA was for a loan that VIA was supposed to
> have made to SONICblue, but which never occurred.  On September
> 20, ***we learned that the Senior Noteholders were willing to support a
> settlement that included a $12.5 million allowed claim for
> Defendants, provided that the settlement included certain terms,
> including that Defendants' allowed claim be neither senior nor
> junior to any other general unsecured claim***.

18   Declaration of Albert J. Boro, Jr. (filed March 5, 2007) [Docket No. 2182] ("Boro

19   Declaration") at ¶ 17 (emphasis added).

20       Thus, while it may not have yet been "proven" that the 2002 Noteholders

21   were the driving force behind the Purported Waiver Language, there certainly is

22   enough evidence in the record upon which SB Claims can plead, and has pleaded,

23   causes of action based upon that fact.

24       There is likewise evidence in the record that, if the 2002 Noteholders did

25   not get their way, they would have blocked (or, at least, tried to block) approval of

26   the Settlement Agreement.  As stated by Mr. Boro in his declaration:

> I believed that our client Mr. Smith [the Debtor's "Responsible
> Individual"] had a good sense of what settlement amount with VIA

1
2
3
4

would be acceptable to the members of the Creditors' Committee, with the possible exception of the Senior Noteholders who seemed to communicate exclusively through Mr. Bennett.  I believed that the Senior Noteholders might object to a settlement with Defendants, threatening the prospects of Court approval of a proposed settlement of the VIA Adversary Proceeding, unless their agreement to the proposed settlement terms was obtained.

5
6

Boro Declaration at ¶ 12; *see also* Noteholders' Reply at 10 (admitting that if the

7

Purported Waiver Language was not included in the Settlement Agreement, it

8

"would have resulted in an objection to the proposed settlement").  Thus, there is

9

further evidence that, to use Mr. Boro's own words, the 2002 Noteholders were

10

"threatening the prospects of Court approval" of the settlement.

11

        There is also evidence in the record that the 2002 Noteholders were

12

promoting a false story about the purported, limited purpose of the subordination

13

language in the 2002 Indenture.  Mr. Boro's Declaration states:

14
15
16
17
18
19

On September 16 and 19, 2005, we placed calls to Mr. Bennett to find out if the Senior Noteholders would support the 'mediator's proposal' of a $12.5 million allowed claim. ***During that time, I learned that the provision in the Senior Noteholder Indenture referring to the $15 million indebtedness to VIA was for a loan that VIA was supposed to have made to SONICblue, but which never occurred.***  On September 20, we learned that the Senior Noteholders were willing to support a settlement that included a $12.5 million allowed claim for Defendants, provided that the settlement included certain terms, including that Defendants' allowed claim be neither senior nor junior to any other general unsecured claim.

20

Boro Declaration at ¶ 17 (emphasis added).  Unfortunately, Mr. Boro's use of the

21

passive voice does not make clear from whom he learned about the "supposed"

22

purpose of the VIA Senior Indebtedness provision.  However, the context of the

23

sentence – sandwiched between discussions with counsel for the 2002

24

Noteholders' on September 16, 19, and 20 – gives rise to, at the least, a reasonable

25

basis to believe that the 2002 Noteholders were the source.

26

        This inference is further buttressed by the fact that Mr. Bennett represented

27

to this Court the same "supposed" purpose when the 2002 Noteholders were trying

Opposition to Defendants' Motion to Dismiss

1    to make this dispute "go away" at the first disclosure statement hearing:

2    Your Honor should know that at the time that the senior noteholders
3    were negotiating to purchase the senior notes and it was a time when
     the debtor was already in - having some difficulties - I don't think was
4    in extreme financial distress - the debtor was simultaneously
     negotiating with Via for a loan. And that was going to be a $15 million
5    loan. So the pocket that was inserted into the indenture - sometimes
     people call these things "baskets"; sometimes they call these things
6    "pockets" - was not just for a theoretical Via loan; it was for a
7    particular Via loan, which was then being discussed between Via and
     the debtors. And, as Mr. Bender and Freeman both pointed out, for
8    whatever reason - and here's where my knowledge - and Via never
9    made that loan. The - the litigation that was before Your Honor for so
     long, and that was the obstacle for resolving this case for so long,
10   ultimately boiled down to a damage claim against the company by Via
11   as a result of the failure of an intellectual property license that Via was
     counting on in connection with the operations of the joint venture.
12   That's what it is. It's a litigation damage claim. It's not a claim for
     borrowed money. It's not trade debt. It's not indebtedness. So I - if
13   there - if there has to be an investigation, that's fine. But what people
14   are going to find is that this was not regarded as a close call by the
     senior lenders - by the senior noteholders. The Via claim, as
15   articulated to the Court and as ultimately negotiated, was never
16   anything resembling indebtedness that was intended to be within the
     scope of anything in the senior noteholder documentation.

17

18   Transcript of January 23, 2007 Hearing [Docket No. 2136] at 31-33 (statement of

19   Mr. Bennett).

20       Thus, there is a reasonable basis for SB Claims to allege that the 2002

21   Noteholders wanted everyone (and most notably VIA) to believe that the sole

22   purpose of the VIA Senior Indebtedness provision was to apply to a loan that was

23   never made.

24       Rule 9(b) has four purposes:

25   First, the rule ensures that the defendant has sufficient information to
     formulate a defense by putting it on notice of the conduct
26   complained of. . . . Second, Rule 9(b) exists to protect defendants
     from frivolous suits. A third reason for the rule is to eliminate fraud
27   actions in which all the facts are learned after discovery. Finally,

---

49

Opposition to Defendants' Motion to Dismiss

1

   Rule 9(b) protects defendants from harm to their goodwill and
   reputation.

2

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)

3

(internal quotations and citations omitted). [18]  SB Claims respectfully submits that

4

the Complaint satisfies all four of these purposes.  First, the Complaint clearly

5

gives the 2002 Noteholders "sufficient information to formulate a defense by

6

putting [them] on notice of the conduct complained of."  Second, in light of the

7

evidence that has been submitted to the Court to date, there can be no reasonable

8

assertion that SB Claims' suit is "frivolous."  Third, it cannot be said that "all the

9

facts" will be "learned after discovery," since some very critical facts (including

10

those in the Boro Declaration) have already been learned.  Fourth, if the 2002

11

Noteholders are truly concerned about "their goodwill and reputation," then they

12

should welcome a prompt, judicial determination of the issues raised in the

13

Complaint.

14

   Finally, the 2002 Noteholders complain that a number of the allegations in

15

the Complaint are alleged "on information and belief."  These allegations,

16

however, were made in the context of the Court's own observations of, among

17

other things, an appearance that the 2002 Noteholders "used their position on the

18

committee to insert themselves into the settlement negotiations without revealing a

19

hidden agenda," and that "they may have breached their fiduciary duty" in the

20

process.  *See* March 26, 2007 Memorandum Decision at 17.  At the same time, the

21

Court has made it clear to all parties – including the 2002 Noteholders – that these

22

issues have not been resolved, and the parties will have the opportunity to explore

23

24

25

26

27

[18]  *Harrison* further holds that "[a] court should hesitate to dismiss a complaint under
Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the
particular circumstances for which she will have to prepare a defense at trial, and (2)
that plaintiff has substantial prediscovery evidence of those facts."  176 F.3d at 784.

Opposition to Defendants' Motion to Dismiss

430802v.1

1    these matters further through discovery.  Under these circumstances, the purposes

2    of Rule 9(b) have been fully satisfied.

3        Moreover, the Ninth Circuit has made clear that:

4        the general rule that allegations of fraud based on information and
5        belief do not satisfy Rule 9(b) may be relaxed with respect to matters
         within the opposing party's knowledge.  In such situations, plaintiffs
6        can not be expected to have personal knowledge of the relevant
         facts.  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th
7        Cir. 1987); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531,
         540 (9th Cir. 1989); *see DiVittorio v. Equidyne Extractive
8        Industries, Inc.*, 822 F.2d 1242, 1247-48 (2d Cir. 1987).

9

10    *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

11        In this case, the allegation on "information and belief" that the 2002

12    Noteholders take the greatest issue with is whether it was the 2002 Noteholders

13    who developed the false story about the supposed "purpose" of the VIA Senior

14    Indebtedness provisions.  What the 2002 Noteholders communicated to the Debtor

15    about this subject, however, clearly would be "matters within the opposing party's

16    [the 2002 Noteholders'] knowledge."  The 2002 Noteholders know what they did

17    or did not communicate to the Debtor.  At the same time, there is simply no way

18    that VIA (or SB Claims, as its successor) could know what was, or was not, said

19    between the 2002 Noteholders and the Debtor.  At this point, all SB Claims can do

20    is reasonably infer that such communications took place based upon (i) the Boro

21    Declaration, (ii) the 2002 Noteholders' own admission that they "insisted" upon

22    the Purported Waiver Language, and (iii) the 2002 Noteholders' own

23    representations to this Court about what the "supposed" purpose of the Senior

24    Indebtedness provision was.

25        In a circumstance such as this, the obligation on the plaintiff is not to

26    "know" what cannot possibly be known.  Rather, "a plaintiff who makes

27    allegations on information and belief must state the factual basis for the belief."

1  *Neubronner v. Milken*, 6 F.3d at 672.   Here, the Complaint makes clear that the

2  Boro Declaration is the basis for this allegation, as is the 2002 Noteholders' own,

3  self-proclaimed insistence that the Purported Waiver Language be included in the

4  Settlement Agreement.  SB Claims respectfully submits that each of the

5  allegations in the Complaint is based either on evidence that is already in the

6  record, or upon reasonable inferences that can be made from that evidence and

7  from the proceedings that led to the disqualification of Pillsbury Winthrop and the

8  appointment of the chapter 11 trustee.

9                                    **III.CONCLUSION**

10

11          The Court should deny the 2002 Noteholders' Motion to Dismiss.

12  DATED:  September 10, 2007              STUTMAN, TREISTER & GLATT P.C.
                                                      and
13                                             McGRANE GREENFIELD LLP

14

15                                        By: /s/ K. John Shaffer
                                               K. John Shaffer
16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Defendants' Motion to Dismiss

# EXHIBIT 31

**Entered on Docket**
**October 02, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



1   ROBERT A. GREENFIELD (039648)
    FRANK A. MEROLA (136934)
2   K. JOHN SHAFFER (153729)
    STUTMAN, TREISTER & GLATT PC
3   1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
4   Telephone:    (310) 228-5600
    Facsimile:    (310) 228-5788
5
6   WILLIAM McGRANE (057767)
    BERNARD S. GREENFIELD (066017)
7   McGRANE GREENFIELD LLP
    40 South Market Street, 7th Floor
8   San Jose, CA 95113
    Telephone:    (408) 995-5600
9   Facsimile:    (408) 995-0308

10  Counsel for Plaintiff SonicBlue Claims, LLC

**The following constitutes
the order of the court. Signed October 02, 2007**

**Marilyn Morgan
U.S. Bankruptcy Judge**

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                       SAN JOSE DIVISION
13

| | |
|---|---|
| 14  In re: | Case No. 03-51775 |
| 15  SONICBLUE INCORPORATED, *et al.* | Chapter 11 |
| 16       Debtors | (Case Nos. 03-51775 through 03-51778 |
| 17  SONICBLUE CLAIMS LLC, a Delaware | MM) (Jointly Administered) |
| 18  Limited Liability Company, | Adv. No. 07-05082 |
|          Plaintiff, | |
| 19 | ORDER DENYING DEFENDANTS' |
| 20       vs. | MOTION TO DISMISS |
| 21  PORTSIDE GROWTH & OPPORTUNITY | Date:        September 27, 2007 |
|     FUND, a Cayman Islands corporation; | Time:        2:00 p.m. |
| 22  SMITHFIELD FIDUCIARY LLC, a Cayman | Judge:       Hon. Marilyn Morgan |
|     Islands corporation; and CITADEL EQUITY | Location:   Courtroom 3070 |
| 23  FUND LTD., a Cayman Islands corporation | 280 South First Street |
| 24       Defendants. | San Jose, CA  95113 |

25

26

27

1      Upon consideration of "Defendants' Motion to Dismiss" filed by Portside

2  Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund,

3  Ltd. (the "Motion to Dismiss"), and of all of the pleadings, memoranda, and other

4  documents filed in support of, or opposition to, the Motion to Dismiss, and of the

5  "Complaint for Equitable Subordination, to Determine Proper Classification, and

6  for Declaratory Relief Regarding Senior Indebtedness Status," and of the

7  arguments of counsel at the September 27, 2007:

8      IT IS HEREBY ORDERED that the Motion to Dismiss is denied, for the

9  reasons stated on the record at the September 27, 2007 hearing.

10

11         ***    END OF ORDER    ***

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER DENYING DEFENDANTS' MOTION TO DISMISS

1    **<u>COURT SERVICE LIST</u>**

2

3    Lewis Kruger
     Stroock, Stroock and Lavan

4    180 Maiden Ln.
     New York, NY 10038

5

6    Cecily A. Dumas
     Friedman, Dumas and Springwater

7    150 Spear St. #1600
     San Francisco, CA 94104

8

9    Kurt E. Ramlo
     Skadden, Arps, Slate, Meagher & Flom

10   300 S Grand Ave. #3400
     Los Angeles, CA 90071-3144

11

12   Alan Z. Yudkowsky
     Stroock & Stroock & Lavan LLP

13   2029 Century Park East, Suite 1800
     Los Angeles, CA 90067

14

15

16

17

18

19

20

21

22

23

24

25

26

27

3

ORDER DENYING DEFENDANTS' MOTION TO DISMISS

EXHIBIT 32

1

```
1               UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  (SAN JOSE DIVISION)

4

5   In re:

6   SONICBLUE, INC.,              Case No. 03-51775-MM
                                  Thru      03-51778-MM
7                                 (Jointly Administered)

8                                 Chapter 11

9                                 San Jose, California
                                  September 27, 2007
10           Debtor.             2:03 p.m.

11  _____/

12

13                 TRANSCRIPT OF PROCEEDINGS
         (a) MOTION TO MODIFY OCTOBER 17, 2003 STIPULATED
14            PROTECTIVE ORDER BY SONICBLUE CLAIMS, LLC
                (b) OPPOSITION BY INTEL CORPORATION
15         (c) CROSS-MOTION TO MODIFY OCTOBER 17, 2003
           STIPULATED PROTECTIVE ORDER BY PORTSIDE GROWTH &
16     OPPORTUNITY FUND, SMITHFIELD FIDUCIARY, LLC, AND
                    CITADEL EQUITY FUND, LTD.
17             (d) OPPOSITION BY INTEL CORPORATION

18
    SONICBLUE CLAIMS, LLC,
19
              Plaintiff,
20
         v.                        A.P. No. 07-5082
21
    PORTSIDE GROWTH & OPPORTUNITY FUND,
22  SMITHFIELD FIDUCIARY, LLC, and
    CITADEL EQUITY FUND, LTD.,
23
              Defendants.
24  _____/

25
```

2

1                        TRANSCRIPT OF PROCEEDINGS
      (a) MOTION TO DISMISS BY PORTSIDE GROWTH & OPPORTUNITY
2              FUND, SMITHFIELD FIDUCIARY, LLC, and
                  CITADEL EQUITY FUND, LTD., DEFENDANTS
3              (b) OPPOSITION BY SONICBLUE CLAIMS, LLC
          (c) CORRECTED MOTION (1) FOR ENTRY OF AN ORDER
4       AUTHORIZING INTERVENTION AND (2) TO STAY THE ADVERSARY
        PROCEEDING PENDING THE CONCLUSION OF THE TRUSTEE'S
5     INVESTIGATION BY DENNIS J. CONNOLLY, CHAPTER 11 TRUSTEE
               (d) OPPOSITION BY SONICBLUE CLAIMS, LLC
6

7

                      BEFORE THE HONORABLE MARILYN MORGAN
8                     UNITED STATES BANKRUPTCY JUDGE

9

   APPEARANCES:
10

11  For Pillsbury Winthrop:   HOWARD, RICE, NEMEROVSKI, CANADY,
                              FALK & RABKIN, PC
12                            BY: BERNARD BURK, ESQ.
                              Three Embarcadero Center, 7th Floor
13                            San Francisco, California 94111

14

15  For the trustee:          FRIEDMAN, DUMAS & SPRINGWATER, LLP
                              BY CECILY A. DUMAS, ESQ.
16                            150 Spear Street, Suite 1600
                              San Francisco, California 94105
17

18
    For SB Claims:            STUTMAN, TREISTER & GLATT
19                            BY: K. JOHN SHAFFER, ESQ.
                                      -and-
20                                FRANK A. MEROLA, ESQ.
                              1901 Avenue of the Stars,
21                            12th Floor
                              Los Angeles, California 90067
22

23                                    -and-

                              McGRANE GREENFIELD, LLP
24                            BY: BERNARD S. GREENFIELD, ESQ.
                              40 South Market Street, 7th Floor
25                            San Jose, California 95113

3

```
 1   APPEARANCES (CONTINUED):

 2
     For the 2002 senior      STROOK, STROOK & LAVAN, LLP
 3   note holders:            BY: KENNETH PASQUALE, ESQ.
                              (APPEARING TELEPHONICALLY)
 4                                      -and-
                                 LEWIS KRUGER, ESQ.
 5                            180 Maiden Lane
                              New York, New York 10038
 6

 7
     For Intel Corporation:   GIBSON, DUNN & CRUTCHER, LLP
 8                            BY: STEVEN JAMES JOHNSON, ESQ.
                              1881 Page Mill Road
 9                            Palo Alto, California 94304

10

11   For Citadel:             SKADDEN, ARPS, SLATE, MEAGHER &
                              FLOW, LLP
12                            BY: GLEN S. WALTER, ESQ.
                              300 South Grand Avenue
13                            Los Angeles, California 90071

14

15   For U.S. Bank,           WEINSTEIN, WEISS & ORDUBEGIAN
     Indenture Trustee:       BY: DAVID R. WEINSTEIN, ESQ.
16
                              (APPEARING TELEPHONICALLY)
17

18
     Court Recorder:          JACKIE JARVIS
19                            UNITED STATES BANKRUPTCY COURT
                              280 South First Street
20                            San Jose, California 95113

21

22   Transcription Service:   Jo McCall
                              Electronic Court
23                            Recording/Transcribing
                              2868 E. Clifton Court
24                            Gilbert, Arizona 85297
                              Telephone: (480) 361-3790
25
```

4

1                    P R O C E E D I N G S

2   September 27, 2007                        2:03 p.m.

3                         ---oOo—

4              THE CLERK: Please  rise.  This is the United

5   States Bankruptcy Court for the Northern District of

6   California.  The Court is now in session.

7              THE COURT: Good afternoon.

8              ALL COUNSEL: Good afternoon, Your Honor.

9              THE CLERK: Item 1, SonicBlue Claims versus

10  Portside Growth, et al.

11             THE COURT: Okay.  Could we have your appearances,

12  please?

13             MR. SHAFFER: John Shaffer and Frank Merola of

14  Stutman, Treister & Glatt on behalf of SB Claims and here

15  with me also is Bernie Greenfield of the McGrane Greenfield

16  firm.

17             THE COURT: Thank you.

18             MR. KRUGER: Good afternoon, Your Honor, Lewis

19  Kruger, Stroock, Stroock and Lavan for Portside Growth and

20  the group sometimes called the 2002 Senior Note Holders.  I

21  think my partner, Mr. Pasquale may be on the phone as well.

22             THE COURT: We do have telephonic appearances as

23  well.

24             MR. PASQUALE: Yes, I'm here, Your Honor.  Good

25  afternoon.

5

1          MR. WALTER: Glenn Walter from Skadden Arps on

2    behalf of Citadel Equity Fund.

3          THE COURT: Okay.  And we have at least one other

4    telephonic appearance, I believe.

5          MR. WEINSTEIN: Yes.  Good afternoon, Your Honor,

6    David Weinstein in Los Angeles, Weinstein, Weiss &

7    Ordubegian, LLP appearing for the indenture trustee under

8    the 1996 indenture; that's U.S. Bank as indenture trustee.

9          THE COURT: Okay.  Well, good afternoon to all of

10   you, and I apologize for having to move this hearing.

11   Thank you for accommodating me.  Okay.  Which -- I show us

12   starting with the Motion to Dismiss.

13          MR. MEROLA: If possible, Your Honor, could we do

14   the discovery matter first?

15          THE COURT: Yes, we can.

16          MR. MEROLA: Because counsel for Intel is here.

17          THE COURT: Very well.

18          MR. MEROLA: Good morning, Your Honor, Frank

19   Merola, a member of Stutman, Treister & Glatt, a

20   professional corporation, on behalf of SonicBlue Claims.

21          THE COURT: Okay.  And we didn't get your

22   appearance earlier.

23          MR. JOHNSON: Good morning, Your Honor, Steven

24   Johnson with Gibson, Dunn & Crutcher on behalf of Intel.

25          THE COURT: I still think it's afternoon, but I'm

6

1  glad to see both of you.

2      (Laughter.)

3          MR. JOHNSON: Good afternoon, Your Honor.

4          MR. MEROLA: Your Honor, we're here on a motion to

5  make our client --

6          THE COURT: We have one more appearance, Mr.

7  Merola.

8          MR. MEROLA: Oh, I apologize.

9          THE COURT: No problem.

10         MS. DUMAS: I apologize, Mr. Merola.  I apologize,

11 Your Honor.  Cecily Dumas appearing for Dennis Connolly the

12 Chapter 11 trustee.  Mr. Connolly is also present.  We

13 hadn't appeared earlier because we thought the Court might

14 be calling the Motion to Dismiss in the adversary, so --

15         THE COURT: Okay, that's fine.  Thank you.  And I

16 see Mr. Burk as well.  Please come forward.

17         MR. BURK: Thank you, Your Honor.  Good afternoon.

18 Bernard Burk, Howard, Rice for Pillsbury Winthrop.  We're

19 here on the discovery matter because my client is a party

20 to the protective order.

21         THE COURT: Yes.

22         MR. KRUGER: Just to appear again, we also have a

23 cross-motion with respect to this matter as well, so again,

24 Lewis Kruger from Stroock.

25         THE COURT: Okay, that's fine.  Thank you.

7

1          MR. MEROLA: Your Honor, we're here on a motion

2    and a cross-motion to make both our clients and Mr.

3    Kruger's clients party to the restrictions in the

4    protective order, the reason being that this humble

5    protective order that started in a situation where there

6    was a relief from stay really got legs in this case.  It

7    covered the relief from stay matter; it covered the

8    settlement agreement; and according to some of the parties,

9    it implicates even the investigation conducted about what

10   happened vis-a-vis the settlement agreement.

11         THE COURT: Well, now you're getting into some

12   things that were really not plain from your papers, and so,

13   you know, I think this is where I'm going to have to talk

14   with you all about nuts and bolts, because really what I

15   was going to tell you is that the burden had shifted to you

16   all and the burden requires that you show that what you

17   need is relevant and necessary to the case, and from your

18   pleadings, I really can't tell whether what you're trying

19   to get is relevant and necessary to the case.  And it

20   struck me as really something more, why don't we just start

21   with a new protective order.

22         MR. MEROLA: We may eventually need a protective

23   order in this contested matter, Your Honor, to cover

24   broader matters.  That is not going to release the parties

25   to the original protective order from its obligations

8

1   thereunder.  So at best, we're going to have two protective

2   orders and we won't have access to information -- let me

3   just by way of example, Your Honor, we've not propounded

4   discovery yet.  In cooperation with the trustee, we're

5   talking about an initial document delivery.  And that

6   initial document delivery will cover matters that the

7   Committee gathered during its investigation and it turned

8   over to the trustee, and the trustee gathered during its

9   investigation and is holding.

10          Some of those matters are marked as being covered

11  by the protective order, for example, all of the drafts of

12  the settlement agreement, the correspondence --

13          THE COURT: Okay.  Mr. Johnson, is that true?

14          MR. JOHNSON: It is the case that the settlement

15  negotiations were covered by the protective order, so that

16  would include the drafts.

17          THE COURT: Yeah.

18          MR. JOHNSON: And with respect to whatever

19  investigation Mr. Bender did which as I recall the Court

20  put on hold at some point --

21          THE COURT: Right.

22          MR. JOHNSON: -- to the extent that any documents

23  requested by him were covered by the earlier protective

24  order, he raised them.

25          THE COURT: Right.  Now, they want access to

9

1  those, and I'm prepared to give them access to those.  Do

2  they have to do that under the old protective order or do

3  they need a new protective order?  That's -- you know, this

4  is sort of a nuts and bolts thing.  We're just trying to

5  figure out how we can get from Point A to Point B.

6          MR. JOHNSON: I understand, Your Honor.  I think

7  the issue has to do with what "that" is.

8          THE COURT: That's right.  That's exactly why I'm

9  in the dark here.

10          MR. JOHNSON: My suggestion to the Court would be

11  to analyze this with respect to two separate groups of

12  documents.  You have the discovery and the underlying

13  relief from stay litigation in which Intel produced

14  documents marked "confidential."  A lot of that discovery

15  had to do with Intel patent rights, and then you have the

16  settlement negotiations.

17          THE COURT: Now, I understood that in your brief.

18  I read that in your brief, and it made perfectly good sense

19  to me.  And I'm just getting confused whether we're talking

20  about apples and oranges here or apples and apples.  So

21  this is where I need help trying to understand what's

22  within each group.  Mr. Merola, do you want to speak on

23  this?

24          MR. MEROLA: Yes, Your Honor.  The problem is,

25  since we haven't seen any of those documents, we don't

1   know, and we don't know whether they'll be documents that

2   go across the two groups.  We're not interested in

3   conducting discovery into Intel's intellectual property.

4            THE COURT: Right.  I understand that.

5            MR. MEROLA: We're not interested in propounding

6   any discovery against Intel at all, but out of an abundance

7   of caution, the parties that have been asked for this

8   information have for example their communications to

9   document the settlement agreement they've contended are

10  covered by this order.

11           THE COURT: Okay.  See, this is where -- I don't

12  want you to sit down, Mr. Johnson, because I want you here

13  where I can say, how can they get access to that?

14           MR. JOHNSON: Okay.

15           MR. MEROLA: Your Honor, we're working to try to

16  make this as sensible as possible in light of the

17  timetable, because we would like to get these initial

18  document productions as soon as possible.  What I would

19  propose is making us parties -- one thing you've got to

20  understand is, no one wants to go through this stuff more

21  than once to separate out between Mr. Johnson's two

22  categories.

23           THE COURT: M-hm.

24           MR. MEROLA: I believe the most practical solution

25  is to make us subject to the protective order and put the

1  burden on us not to disclose the Intel confidential

2  information.  Otherwise, we're going to have two or three

3  passes to see what fits in what category and we're going to

4  have disputes about it.  I'm completely happy -- because I

5  don't intend to use any of that information -- I'm

6  completely happy to get the productions, subject to the

7  protective order, and to the extent it implicates any Intel

8  confidential information, intellectual property, pricing

9  information, things like that that Intel actually produced,

10  if I need to use any of that, and I don't see any need to

11  use any of that, but if I need to use any of that, I'm

12  happy to give Intel's counsel notice and allow them

13  adequate time to move for a protective order.

14        But as of right now, let's take, for example, if

15  there's an e-mail out there that says these are the issues

16  with the settlement agreement, one, on the subordination

17  issue, two, on the subordination issue, three -- and

18  Intel's worried about the following.  Someone has got to go

19  and pull that e-mail out per the protective -- first of

20  all, the top Nino says it's covered by the protective

21  order.  So no one will give me access to it at all right

22  now, and I'm happy to redact where I don't need the Intel

23  information.  I don't want to create additional expense or

24  inconvenience for Intel.

25        THE COURT: Okay.

1          MR. MEROLA: And the initial discussion I've had

2   with the trustee is any discovery we're going to do is

3   going to expressly exclude Intel intellectual property, so

4   the only issue would be a combined usage situation.

5          THE COURT: So it's the cross-over problems.  Mr.

6   Johnson, what's wrong with what Mr. Merola has suggested?

7          MR. JOHNSON: Let me begin by suggesting that it's

8   not complicated to divorce the settlement negotiations from

9   the underlying discovery.  I was a participant in that.  As

10  I recall, discovery was put on hold for a year or more

11  while we entered into settlement negotiations.

12         THE COURT: You know, I can understand why they

13  think that there might be documents that would combine

14  both, and why they might be nervous that if they don't have

15  access to everything, they might miss some things.

16         MR. JOHNSON: My suggestion would be this, Your

17  Honor.  If SB -- two lawyers representing SB Claims were

18  added to the protective order for the purposes of discovery

19  with respect to non-Intel confidential information, and

20  they sent discovery requests as they intend to do to the

21  trustee and perhaps others requesting documents but only to

22  the extent that they are non-Intel confidential

23  information, that would probably accommodate most of their

24  discovery, except with respect to drafts of the settlement

25  agreement, which could be taken care of in a different

13

1   manner.

2           If in the course of that discovery, there were a

3   hybrid document -- and I don't know that there is one --

4           THE COURT: I can't imagine there won't be,

5   truthfully.

6           MR. JOHNSON: Well, I would believe the settlement

7   negotiations and the e-mails and the exchange of drafts and

8   so forth would be the settlement negotiations.  But what I

9   wanted to inform the Court about is how this very subject,

10  I understand, was dealt with in a recent deposition of Mr.

11  Kevane.  The settlement agreement itself has an Intel

12  portion towards the end that deals with Intel patent

13  rights, and it has other provisions that deal with what was

14  really a settlement between Via and the Debtor.  A

15  provision within that portion of the agreement is being

16  litigated as I understand it in the SB Claims adversary

17  proceeding.

18          As I understand from the trustee at that

19  deposition, they simply attached the first few pages of the

20  drafts of the settlement agreement containing that

21  provision that didn't involve Intel and took a deposition

22  about that.  Intel and the Debtor many months ago created a

23  redacted version of the settlement agreement that redacted

24  out the ongoing Intel patent rights portion of the

25  settlement agreement.  We created a template that could

14

1   easily be used to redact other drafts of the settlement

2   agreement and then all of these depositions with respect to

3   the Debtor's Plan and Disclosure Statement, if there's

4   another Plan, or with respect to the adversary proceeding

5   could be using redacted versions of the settlement

6   agreement that don't involve Intel confidential information

7   at all.

8          And with respect to the underlying discovery

9   documents, my understanding is SB Claims doesn't need to

10  see them at the present time, and with respect to the

11  motion before the Court today, hasn't made a showing that

12  they need to see those documents.

13         THE COURT: They just don't know what's within

14  those documents.  I think that's the concern.

15         MR. JOHNSON: But if they were to create a reason

16  why they need to see something in the underlying discovery,

17  first, they would have to see whether that's Intel

18  confidential information or some other document that

19  doesn't involve Intel, for example, the indenture.  We've

20  seen deposition notices asking about all documents relating

21  to the indenture.  That has nothing to do with Intel.  It's

22  obvious from the face of the request it doesn't have to do

23  with Intel.

24         Under my proposal, they could proceed with that

25  discovery because it would be added to the protective order

15

1  for purposes of non-Intel confidential information.  There

2  would be no issue.  If someone did have an issue and

3  thought well maybe this document is Intel confidential,

4  they simply advise me or my client, and we work it out.

5  But they don't need carte blanche access to all of Intel's

6  confidential information in the underlying discovery and

7  with respect to the settlement negotiations, at the first

8  juncture, when they've already advised the Court they don't

9  need to see most of it.

10          THE COURT: Ms. Dumas, do you wish to be heard?

11          MS. DUMAS: Thank you, Your Honor.  The trustee

12  would oppose Intel's suggestion just made by Mr. Johnson

13  for two reasons, one, we think the Court is correct that it

14  is difficult for anyone to know what might be considered

15  Intel confidential information versus non-Intel

16  confidential information, particularly as someone in the

17  trustee's position, a third-party repository.  The trustee

18  has received documents from both parties who are directly

19  involved with Intel, such as the O'Melveny firm and the

20  Pillsbury firm on behalf of the estate, and not directly

21  involved as we understand it.  Mr. Bender conducted an

22  investigation in which he requested third parties to

23  provide him information that was then provided to the

24  trustee.

25          So we don't know how to make this bright line

16

1   distinction.  We would love to, if there were some way to

2   do it, but the estate should not bear the burden of going

3   through the hundred thousand plus pages of documents that

4   have been received from various areas to try to make a

5   distinguishment.  It's -- it may have been a problem that

6   we might have been able to anticipate when the trustee

7   asked to come under the umbrella and Mr. Burk asked to come

8   under the umbrella, and we did this all a couple of months

9   ago.  Maybe we should have thought ahead that this would

10  then become the issue it has become, but since we started

11  down this path, with all due respect to the extremely

12  sensitive nature and valid nature of Intel's concerns, it

13  makes sense to continue down this path and just including

14  people in the existing order.

15          Were the Court to adopt Intel's suggestion that a

16  new order be negotiated -- a perfectly reasonable

17  suggestion -- but the trustee would still be violating the

18  October 27, 2003 order.  So --

19          THE COURT: There's a practical aspect to this

20  that we have to keep in mind.

21          MS. DUMAS: There's a very practical aspect.

22          THE COURT: Okay.

23          MS. DUMAS: Yes.  Thank you, Your Honor.

24          THE COURT: Thank you.  Mr. Merola?

25          MR. MEROLA: Very briefly, Your Honor.  The

17

1   practical aspect is what's driving us, because these

2   documents have already been assembled.  It's important to

3   remember that we're asking to become subject to the

4   restrictions and protections of the protective order.  If I

5   got accidentally the most confidential piece of information

6   Intel is worried about, I am now subject to the

7   restrictions of the protective order regarding its usage,

8   regarding how it's handled, regarding notice to the other

9   parties.  That has got to be preferable than having that

10  inadvertent production governed by a third order.

11          Secondly, Your Honor, Mr. Kevane's deposition is

12  an example of the situation we can't be in.  We're in a

13  room taking a deposition where the witness has Document A,

14  the trustee has Document A, three or four other parties

15  have Document A, but the 2002 note holders and my client

16  don't have Document A.  And there's questions being asked

17  about it on the record that we have a partial or a

18  redacted.  It seems we've all got to be working off the

19  same set of documents if this discovery is going to be

20  reasonable.

21          Your Honor, one just nuance, I'm very happy on

22  behalf of my client -- I can't speak for the 2002 note

23  holders -- for a simple order to make us additional parties

24  and to provide, to the extent I get an Intel confidential

25  piece of information, I would give separate and different

18

1  notice than required under the protective order to Intel's

2  counsel before I'd do anything with it.  I don't want to do

3  anything that causes -- I don't want Intel to think they

4  have to be monitoring this process.  Quite frankly, Your

5  Honor, I think what most people are trying to do is to

6  shift the burden of compliance with the protective order to

7  Mr. Pasquale and to me, but they want to make sure that

8  we're subject to the restrictions in the order such that

9  there's no inadvertent usage that would harm Intel.  And

10  we're willing to accept that, and we're willing to give

11  additional notice to Intel.

12          I can't foresee a reason, other than a combined

13  document that I need to use Intel documents, but I can't

14  get the universe of the documents until I'm part of this

15  protective order.

16          Thank you.

17          THE COURT: Thank you very much.  Mr. Johnson, do

18  you have any other suggestions for how we can solve this

19  problem?

20          MR. JOHNSON: I do, Your Honor.  The suggestion of

21  a protective order in the adversary proceeding, if that

22  protective order contained a provision that treated Intel

23  as a third party such that when document requests were

24  served in the adversary proceeding, that included a request

25  for some confidential information of Intel; Intel was given

19

1  notice and an opportunity to object, that would be

2  appropriate.  As proposed to just add SB Claims to the old

3  protective order, that means SB Claims could undertake

4  discovery.  There will be depositions that occur,

5  transcripts and so forth where Intel is not present.  Intel

6  doesn't have an opportunity to object.  Intel doesn't know

7  what documents are being exchanged.  Intel doesn't know

8  what's happening with its confidential information in all

9  of those proceedings.  And this could very well continue to

10  mushroom after today.  So our suggestion --

11       THE COURT: But you're not excluded from attending

12  any of those hearings if you chose to, I suppose.

13       MR. JOHNSON: Not excluded, but Intel settled its

14  issue.

15       THE COURT: Right.

16       MR. JOHNSON:  Intel is not a creditor in the

17  case.  Intel shouldn't have to undergo the expense of

18  monitoring that discovery, so to speak.

19       THE COURT: I just don't know any other way, Mr.

20  Johnson.

21       MR. JOHNSON: Well, my suggestion, Your Honor, is

22  if they were added to the protective order for purposes of

23  discovery of non-Intel confidential information and they're

24  not seeking Intel confidential information, then if a

25  document arose, Intel would get notice and we would work it

20

1   out.  But the suggestion that Mr. Merola has made is, give

2   SB Claims access to all of Intel's confidential information

3   and I'll sort it out later.  And given that there's no

4   showing that they need to see any of it, we think they

5   can't meet the standard for being added to a protective

6   order in that fashion.

7          THE COURT: Well, I'm going to have to disagree

8   with you.  I think that we are going to have to do the

9   practical thing.  SBC does stand in the shoes of Via, and

10  the 2002 note holders are going to be also able to join in

11  that as well.  So I am going to allow them to be added to

12  the original protective order.

13         MR. JOHNSON: May I make one additional request of

14  the Court?

15         THE COURT: Certainly.

16         MR. JOHNSON: That that be limited to two outside

17  lawyers only from those two firms and not include the

18  clients?

19         THE COURT: I don't have any problem with that.

20  But let me hear what counsel says.

21    (Pause.)

22         MR. MEROLA: Sorry, Your Honor.  We have co-

23  counsel, Your Honor, and we have no problem with two people

24  from the Stutman firm and one person from the McGrane

25  Greenfield firm, if that's acceptable.

1          THE COURT: Okay.  Mr. Kruger?

2          MR. KRUGER: Your Honor, I think two persons are

3    okay with us as well.  I may need to check and ask perhaps

4    one of my Los Angeles partners to be a third person.

5          THE COURT: Okay.  So it sounds like three people

6    could be the limit.  And you ask for the exclusion of the

7    clients; is that what I understood?  Yes, sir.

8          MR. WALTER: Our firm would also need to be added,

9    so I think if there's going to be a three limit, it's going

10   to be per firm, and so that way we --

11         THE COURT: How many does your firm need?

12         MR. WALTER: We've requested as a joint motion for

13   three from each firm.  That way a junior level person could

14   be on it too to go through the initial round of documents.

15         THE COURT: Mr. Johnson, that will be the limit,

16   three per firm.  Okay.  Thank you.

17         MR. MEROLA: We'll circulate an order, Your Honor.

18         THE COURT: Thank you.

19         MR. WEINSTEIN: On the telephone, Your Honor?

20         THE COURT: Yes, sir.

21         MR. WEINSTEIN: This is David Weinstein in Los

22   Angeles.  I am admittedly by far the latest of some

23   latecomers to the party.  I would like to just raise the

24   following.  It was -- I am at the very beginning of a stage

25   of simply knocking on doors of friendly adversarial

22

1   colleagues and adversaries in the case to ask a variety of

2   questions and beginning to do an analysis on behalf of the

3   '96 indenture trustee.  I believe it was the trustee, the

4   bankruptcy trustee, who suggested to me last week that not

5   only should I listen in on the hearing but that it would be

6   in the interest of efficiency that we should ask and

7   hopefully be added to the protective order, I think is the

8   phrase that's come to be used, largely for practicality

9   purposes.  I certainly would not look to in any way modify

10  any of the terms of the changes.  I have not even had the

11  chance to make the acquaintance of Mr. Johnson, so this is

12  catching him admittedly off guard.

13          But the trustee, the bankruptcy trustee, did make

14  the practical suggestion.  It seemed logical to me based on

15  my very limited knowledge that if the motion prosecuted by

16  Mr. Merola was to be granted, as apparently it is, that it

17  would make sense for all concerned on a practicality level

18  to have us as counsel for the '96 indenture trustee to be

19  added.  I cannot, and won't pretend that I can, form

20  arguments or separate arguments, other than to say we will

21  certainly be doing an investigation of our client's rights

22  in terms of the priority issues and subordination issues.

23          THE COURT: Mr. Weinstein, I'm going to interrupt

24  you, because I'm not even sure I understand what your

25  involvement is going to be at this point.  I'm going to say

1  that we're dealing with some very sophisticated counsel.  I

2  think Mr. Johnson understands the concerns that the Court

3  has laid out and the principles that I've laid out, and if

4  you all can work it out, that would be wonderful, following

5  the same reasoning that we've discussed today.

6           MR. WEINSTEIN: That's fine.

7           THE COURT:  And if not, you'll need to bring a

8  motion.

9           MR. WEINSTEIN: That's fine.  I understand that.

10 Thank you, Your Honor.  That's fine.

11          THE COURT: Thank you.

12          Okay.  That brings us to the Motion to Dismiss.

13          MR. KRUGER: Your Honor, any preferences to how we

14 proceed?

15          THE COURT: This is your motion, so let's start

16 with you.

17          MR. KRUGER: Okay.  I'm happy to start.  Your

18 Honor, you obviously have received a couple hundred pages

19 at least of briefs and replies and oppositions and

20 memorandums of law and the like.  And I'll take the liberty

21 of assuming that the Court is familiar with those and has

22 read those and the like.  And obviously this is a motion

23 under Rule 12(b)(6), and we're obliged to take all the

24 allegations of the plaintiffs as true.  And at the same

25 time, I think the Court can take judicial notice of some of

24

1  the documents that are in the public domain, the indenture,

2  the settlement agreement, the claims transfer agreement, I

3  have in mind specifically.

4       And then with the Court's indulgence, I'd like to

5  sort of cast this, if I may, as a theater piece in reality

6  because it seems to me that when you go to the theater or

7  to a movie, you're asked these days to turn off your cell

8  phone, no different than coming to Your Honor's courtroom

9  perhaps.  If it were a movie theater, maybe there would be

10 some popcorn to buy in the entrance, but I don't think

11 there is any outside the court that I noticed.

12      And thirdly, you're also required in a way to

13 suspend disbelief.  You're obliged to, so to speak, treat

14 as true all the things you see on the screen or all the

15 things you see on the theater stage, at people who live

16 those lives, that all of those adventures do indeed take

17 place and the like.  And I think what we have here today is

18 a similar situation brought to us by SB Claims, because

19 when I think about what they've suggested, and I recognize

20 what I said about 12(b)(6) a moment ago, that what they

21 suggest is preposterous on its face as to the facts, not

22 applicable to themselves, and also misstates, as I

23 understand it, the law particularly in this circuit.

24      What they say essentially is this, that there is

25 a significant dispute between Via and the Debtors with

25

1   respect to the size of the claim that Via was seeking to

2   assert, and I say Via in that case, I use S3 as part of

3   that as well.  And in the course of the process of that,

4   the parties came to a settlement and to an agreement in

5   which Via received the transfer of intellectual property

6   rights, releases, and the right to file a general unsecured

7   claim in this estate, in the sum of $12,500,000 which was

8   going to be an allowed claim.

9           And then they say that Via also waived its rights

10  to have a senior claim as part of this settlement

11  agreement.  And as to that, what they would have us believe

12  is that allegedly the 2002 note holders or someone on their

13  behalf whispered in the Debtor's ear that they should not

14  have a senior claim and that the Debtor somehow whispered

15  that to Via's counsel or to Via and said you should not

16  have a senior claim.  And that having said those words, Via

17  said, oh Gee, that's right.  We shouldn't have a senior

18  claim.

19          Neither they nor their counsel or anybody else on

20  their side investigated that, so rather than believing, if

21  you would, that having somebody on an adversary raise an

22  issue with you and say you shouldn't be entitled to

23  something, might alert you and make you more eager to find

24  out why they raised that and suggested you shouldn't have

25  an issue for it, what they suggest is the contrary, that

26

1    you simply believe everything that you were told and accept

2    it on its face and never inquire further with respect to

3    it, even though you're in the midst of a heated

4    negotiation.

5              Beyond that, they say, Gee, the settlement

6    agreement which does indeed say that we specifically waive

7    those rights and will never seek to change the nature of

8    our claim, that that settlement agreement also goes on to

9    say, we consulted with our own counsel.  We had whatever

10   information we needed.  We entered into this agreement

11   based upon all of the knowledge that we had about our

12   situation, the facts and circumstances of the case, the

13   claims made by both sides.  We're content with that because

14   that was the settlement agreement that we entered into.

15             They say, even though they acknowledge that they

16   stand in Via's shoes because they purchased, as an

17   assignment, Via's claim in part and they bring that claim

18   to this Court and say the following:

19             They say, Gee, everything that about that

20   settlement agreement is okay from Via's perspective.  Via

21   in its transfer agreement of the claim says whatever you

22   do, SB Claims, don't for heaven's sake, rescind this

23   agreement because we want the benefit of this agreement,

24   except that if you think you can do something about the

25   waiver of our senior right position, God bless you.

1          And what is the argument on the senior right

2   position?  What they say is, that this Court and perhaps

3   the creditors were not informed that the 2002 note holders

4   maybe got some benefit from the waiver of a senior rights

5   position in the hands of Via.  There was no notice with

6   respect to that they say, and that was bad.  Well, I don't

7   think that actually it adversely affected the creditors or

8   this estate, but if it did, the trustee, the Chapter 11

9   trustee, is sitting here in the courtroom and is going to

10  be conducting an investigation and it seems to me that that

11  falls squarely in the plate of things that he will be

12  investigating.

13         On the other hand, the one person who surely knew

14  about the giving up of the senior rights position was Via.

15  They did it in writing.  They knew about it; they did it.

16  SB Claims comes along later on and buys the assignment of

17  that small piece of the claim in order to try to set aside

18  the senior right position, and they do that at a time when

19  all of the allegations of wrongdoing which have been rife

20  in this case are all present.  And to top it off, what they

21  then say is that -- not that we allege all of this stuff to

22  be true because certainly if anybody knows the facts, Via

23  knows the facts -- they allege everything upon information

24  and belief.

25         Now, as I understand the law ordinarily speaking,

28

1  when you're defrauded, what you want is rescission.  If Via

2  was defrauded, they should be here in this court, or SB

3  Claims should be here in this court saying, rescind the

4  settlement agreement.  But they don't say that.  What they

5  say is we really want the benefit of the bargain, and the

6  document itself says that this is one integrated

7  settlement.  We really want the benefit of the bargain for

8  everything that we've done, except this very small piece,

9  which is the waiver of our senior rights position.

10          And SB Claims would say, well, that's a

11 particular kind of claim that we have.  It doesn't go to

12 the general benefit of the estate.  It just goes to us.

13 Well, in my mind, the cases are quite clear that that does

14 not give them standing to pursue a claim for equitable

15 subordination, because the particular claim that they would

16 have, namely the absence of the senior -- the waiver of the

17 senior rights position based on this, quote, "phoney story"

18 about the fact that there was some 15 million dollar loan

19 that was supposed to be made and that's what got Via some

20 senior rights and they didn't make the loan and it went

21 away, the phoney story if you will.

22          The fact of the matter is that Via, if anybody,

23 knew full well all of the facts and circumstances and

24 wanted all of the things that they got under the overall

25 global settlement agreement.  They did indeed get the

29

1   return of the intellectual property.  They got releases.

2   They got a claim.  They wanted all of those, and you cannot

3   allocate among the things that they got any specific value,

4   if you will, to any one of them, in order to enable SB

5   Claims to now come forward and say, Gee, we just want to

6   contest the senior issue.  That simply doesn't work as a

7   matter of law.

8          And the cases are quite clear with respect to

9   that, whether it's the Morpheus case or the Enron case,

10  they all go to make the same proposition.  And that's why I

11  say, I think what we're looking at is a theater piece.

12  What they've done is they've put up as many smoke screens

13  as possible, said as much as they could say about all the

14  bad things that were done, but the one thing they can't get

15  away from is that they acknowledge there's no choice in the

16  matter, and Your Honor said it before yourself, they stand

17  in Via's shoes.  To the extent they stand in Via's shoes,

18  they know everything Via knows, and Via knew that it was

19  giving up its senior claim.  It did so in writing, fully

20  aware of what it was doing at the time that it did it.

21  Phoney argument or not, they did do it.

22          And I cannot believe that they were unaware when

23  they did it that maybe they might have had some claim.  It

24  seems to me that they were alerted to the fact that they

25  might have a claim by the very fact that they were asked to

30

1   give it up.  How could they have not understood when you're

2   asked to give something up that maybe it's something that

3   you have.

4          So I don't think there is a claim for equitable

5   subordination here, and the information and belief I

6   believe goes to the question of fraud.  Rule 9(b) it seems

7   to me says that if you're going to allege fraud -- and the

8   phoney arrangement if you will, is nothing more than an

9   allegation of fraud -- if you're going to make the fraud

10  allegation, the one thing that is clear is you can't do it

11  upon information and belief.  And in this particular case,

12  there's no reason why they would have to do it on

13  information and belief.  Via was there.  They weren't some

14  stranger to the settlement negotiations.  This was a year

15  or more in the making.  There was a long period of time in

16  which the parties were actively involved in settlement

17  discussions and negotiations.  How could they now say, oh,

18  no, no, no, we don't know; we don't understand.

19         And I also want to call to the Court's attention

20  that SB Claims says that the indenture provides that Via

21  could never give up its senior rights claim, but that

22  somehow or other, SB Claims in the transfer agreement says

23  that they have -- it's either going to be one of two

24  things, you're going to look to settle this claim, or

25  they're going to litigate.  Well, if Via can't give up its

31

1  rights to give up the senior position, how could SB Claims

2  ever do that?  Does that mean to say that if I now settle

3  with SB Claims and they say, oh we waive all of our rights

4  to a senior claim forever just like Via did, and the next

5  day they then sell their claim to someone else, they could

6  come along here again and say, oh, yes, they really

7  couldn't do that.  That's nonsense.  That cannot be what

8  the document really says or what they really mean to say.

9  Which again, goes back to my theory that this really

10  requires a suspension of disbelief that boggles the

11  imagination.

12       Now, they do have in front of them -- and I

13  recognize that it's a burden for them -- the fact that

14  their predecessor in title, Via, did indeed settle all of

15  these claims and all of these issues.  And they're trying

16  to find a way to overcome that settlement.  So what they

17  say again is that the 2002 note holders, the Creditors'

18  Committee, someone must have done something bad, and the

19  fact that they did something bad suddenly springs up and

20  give us rights.

21       The fact of the matter is that they bought their

22  claim after all of that was public knowledge, and they

23  bought their claim after the Chapter 11 trustee had been

24  appointed.  I come back again to the very, very narrow

25  issue, what they complain about is, the absence of notice

32

1  with respect to the waiver issue. But Via of course knew

2  full well about that.

3       I also want to assure the Court that if the Court

4  were to find in favor of the Motion to Dismiss, and I do

5  believe that the cases and the arguments are, in my mind at

6  least, compelling, Your Honor need not be concerned that

7  somehow or other you have just given a free pass to the

8  2002 note holders. The free pass is not here because Mr.

9  Connolly is sitting in the back of the courtroom, the

10 Chapter 11 trustee, and he is going to conduct an

11 investigation.

12      At the end of the day, although I think my

13 clients are innocent of anything that resembles wrongdoing,

14 that is yet to be established, and I assume that we're

15 going to have a full investigation and that we'll see what

16 the end result is. But the fact of the matter is that if

17 the Court approves the Motion to Dismiss today as I believe

18 Your Honor must do so, then there is no reason to

19 believe -- I assure Your Honor that the free pass is not

20 present. The 2002 note holders recognize that they still

21 have issues and they are still going to be before Your

22 Honor.

23      Thank you. For the rest, Your Honor, I think a

24 couple hundred pages of the documents are sufficient.

25      THE COURT: Okay. Thank you, Mr. Kruger. Mr.

33

1  Shaffer.

2          MR. SHAFFER: Thank you, Your Honor.  Excuse me,

3  just a moment here.  Mr. Merola says I need to get a bigger

4  bag, and he's probably right.

5          Good afternoon, Your Honor, John Shaffer of

6  Stutman, Treister & Glatt for SB Claims.  Mr. Kruger says

7  that you have to suspend belief to believe our complaint.

8  Well, Your Honor, if somebody had told me what had happened

9  in this case without me having actually seen it, what we've

10 all gone through in this case, I wouldn't believe it

11 either.  I wouldn't believe that there could have been this

12 Pillsbury conflict that was undisclosed, that there could

13 have been the letter from the note holders to Pillsbury

14 that was not disclosed.

15          There is much, Your Honor, in this case, that if

16 you didn't really see it, you'd have to say you couldn't

17 believe it.  So, Your Honor, it is unfortunately not

18 surprising that there may be more in this case.  Your

19 Honor, I want to paint just a little bit of a picture here,

20 because I think it's very important and I'd like to

21 approach the bench, if I can, with a couple of

22 correspondence that are referred to in our complaint that I

23 think frame the -- what this case is about.

24          Your Honor, if you excuse me, I'm a little

25 disorganized today.

34

1          THE COURT:   Have you shown counsel?

2          MR. SHAFFER: I'm going to.  In fact, Your Honor,

3   if you just give me a moment, thank you.  Let's get one

4   copy for the Judge and one copy of the first two letters.

5      (Counsel confer.)

6          I'm sorry, Your Honor.  May I approach?

7          THE COURT: That's fine.  It's a long reach

8   otherwise.  Thank you very much.

9          MR. SHAFFER: Your Honor, I'm very sorry.  Let me

10  just sort of set the framework here of this case.  The note

11  holders, even before this case was filed, took a very, very

12  aggressive position with this Debtor and with its counsel,

13  not just aggressive in terms of, we want to get paid, but

14  aggressive in terms of, we sue people who get in our way.

15  And, Your Honor, if you look -- and these are referred to

16  in our complaint, and these actually have been filed with

17  the court.  They were filed as exhibits to the insurance

18  coverage adversary which is before Your Honor.

19          Your Honor, the first letter dated November 14th,

20  2002, if you look at the second paragraph on the first

21  page, the last sentence says:

22          "That the directors and officers are permitting

23          this to occur, breaches their fiduciary duties to

24          Sonic and Sonic's creditors."

25  Two pages --

1          MR. KRUGER: Your Honor, does this have something

2   to do with the issue before the Court today?

3          MR. SHAFFER: Yes, Your Honor, it does, because,

4   Your Honor -- let me -- I will indulge Mr. Kruger on that

5   issue.  Your Honor, Mr. Kruger thinks it's preposterous --

6   I believe that was his word -- that the note holders could

7   have suggested a phoney story to Pillsbury and that

8   Pillsbury would have repeated that phoney story to Via in

9   order to get this settlement through.  I don't think it's

10  preposterous at all, Your Honor.  Now, after discovery, we

11  may find out whether it is true or not true, but that's not

12  what we're here for today.  We're here on a Motion to

13  Dismiss, and he is saying that our theory is preposterous.

14  And, Your Honor, I'm just giving you a little bit of

15  documentary evidence as to why this is not preposterous.

16          So if I may continue, on page 3, Your Honor, at

17  the first paragraph at the top of the page, the last

18  sentence says:

19               "Among other things, the senior note holders will

20               hold the company's officers and directors

21               responsible for the value of all UMC's shares

22               sold to facilitate, improve, additional

23               investments in the consumer electronic

24               businesses..."

25  And so on.  The footnote at the bottom says that it goes

36

1   without saying that the senior note holders reserve all

2   their claims and rights.   The next page, Your Honor, page

3   4, at the very bottom, the last sentence reads:

4           "Sonic's officers and directors cannot continue

5           to disregard the interest of its creditors while

6           dissipating corporate assets."

7   And so on and so forth, Your Honor.   I won't even go

8   through all of the allegations in here, other than to go to

9   the very last sentence on page 6, Your Honor -- or excuse

10  me, the very last paragraph:

11          "We respectfully request that you immediately

12          transmit copies of this letter to each of the

13          company's officers and directors."

14  This is a very threatening letter, Your Honor, and it was

15  followed January 15th, 2003, which was the second handout I

16  gave to you, Your Honor, and again, Your Honor, there are

17  allegations, for example, on page 2 at the bottom of the

18  text before you get to the footnote:

19          "Consequently, whether or not an event of default

20          has yet occurred under the senior notes, the

21          company and each of its officers and directors

22          have fiduciary duties to creditors, including the

23          senior note holders, as well as legal duties..."

24  Et cetera.   Your Honor, on the next page on page 3, the

25  first full paragraph, it says, in the middle of the

37

1  paragraph:

2  　　　　　　　"Thus each of SonicBlue's directors and officers

3  　　　　　　　are liable to the senior note holders for the

4  　　　　　　　full amount of the deterioration of SonicBlue's

5  　　　　　　　financial condition."

6  And so on and so forth.  And, Your Honor, again, there are

7  more threats in this letter.  It ends with, at the very end

8  of the letter, Mr. Bennett wrote:

9  　　　　　　　"In the meantime, kindly forward a copy of this

10 　　　　　　　letter to each director of the company."

11 And, Your Honor, I don't repeat the September 5th, 2006

12 letter which went to Pillsbury.  Your Honor is quite

13 familiar with that.  So, Your Honor, this is what we have

14 found without any discovery.  This was just things that we

15 found from the court record -- well, in the case of the

16 September letter to Pillsbury, from what came over in the

17 shorter investigation.

18 　　　　　But, Your Honor, it is not preposterous that this

19 Debtor -- and you will remember Marcus Smith, who was the

20 responsible officer, was the target of these two --

21 　　　　　MR. KRUGER: Your Honor, if I may, these letters,

22 to the best of my knowledge, were not part of any part of

23 the adversary complaint, first of all.  Secondly, these

24 were letters written by Hennigan Bennett to Pillsbury.  I'm

25 not sure how they relate to whether or not Via waived its

1  senior rights position.  That's Via -- we're looking at Via

2  standing here in the form of John Shaffer.

3         THE COURT: I'm going to allow you to respond to

4  Mr. Shaffer's comments at the conclusion.

5         MR. KRUGER: Thank you.

6         THE COURT: Okay.

7         MR. SHAFFER: Your Honor, first of all, just to

8  answer Mr. Kruger's question here, the letters are in fact

9  referenced in the complaint.  They are in paragraph --

10  excuse me one moment -- paragraph 24 of the complaint,

11  paragraph 25 of the complaint, and on the Motion to

12  Dismiss, the Court can take notice of these things again.

13  We're not -- this is not evidence.  We're not having a

14  trial here as to whether or not SonicBlue's officers

15  breached their fiduciary duties.  That's not the point

16  here.  The point here is whether there's any conceivable

17  factual basis for what we've alleged.

18         And, Your Honor, with that I will move on from

19  this because I think the Court has got the point.  Your

20  Honor, so there is a basis to allege that in fact the note

21  holders did pass on this phoney story to the Debtors, and

22  there's further basis for that in the Boro declaration, the

23  Boro declaration which was filed by the Pillsbury firm in

24  opposition to its disqualification.

25         Your Honor, in the Boro declaration, Mr. Boro,

1  first of all, makes clear that he didn't have personal

2  knowledge himself of the circumstances surrounding the

3  origin of the 2002 indenture.  So he obviously was learning

4  it from somebody else.  Now, it's possible, he learned it

5  from Marcus Smith, and again, disclosure -- discovery

6  during this case may demonstrate otherwise.  But, Your

7  Honor, we think that the Boro declaration at least gives a

8  good reasonable inference that the information came from

9  the note holders, and the reason why I say that, Your

10  Honor, is -- and again, this is in the record and it is

11  cited in our complaint, Your Honor -- it says that on --

12  this is paragraph 17 of the Boro declaration, Your Honor:

13           "On September 16th and 19th, 2005, we placed calls

14           to Mr. Bennett to find out if the senior note

15           holders would support the mediator's proposal of

16           a 12.5 million allowed claim.  During that time,

17           I learned that a provision in the senior note

18           holder indenture referring to the 15 million

19           dollar indebtedness to Via was for a loan that

20           Via was supposed to have made to Sonic Blue, but

21           which never occurred.  On September 20th, we

22           learned that the senior note holders were willing

23           to support a settlement that included a 12.5

24           million allowed claim for defendants, provided

25           that the settlement included certain terms,

40

1           including that defendants' allowed claim be

2           neither senior nor junior to any other general

3           unsecured claim."

4   And, Your Honor, Mr. Boro uses the passive voice there, and

5   so we don't know for certain whom he learned it from, and

6   he will be deposed, Your Honor, and that question I'm sure

7   will be asked in that deposition.  But at least for now, in

8   terms of making a reasonable inference for purposes of

9   supporting a complaint, we believe a reasonable inference

10  to be made based upon that paragraph, that the source of

11  the information was the note holders.

12          Now, Your Honor, Mr. Kruger says I can't allege

13  that on information and belief.  Yes, I can.  I can, Your

14  Honor, because Via, our predecessor, could not know any

15  better than I would what was said between the note holders

16  and the Debtor.  They cannot know that.  And the Ninth

17  Circuit law is clear that when there are facts that are

18  within the knowledge of the defendant, that those facts can

19  be pleaded on information and belief.

20          Now, Your Honor, I suppose I could have drafted

21  the complaint and said the Boro declaration says, but

22  there's been enough stuff in this case.  I'm not willing to

23  acknowledge that everything said in the Boro declaration is

24  true.  I don't know if it is.  Again, he has not been

25  cross-examined on this declaration yet.  No one has had the

41

1  opportunity, neither the note holders, nor we.  But for

2  now, it is what we have, and what we believe based upon

3  that, a reasonable inference can be made.

4       Now, Your Honor, I think the Boro declaration

5  also tells us a lot about how this settlement came to be.

6  Because, Your Honor, what the Boro declaration tell us is

7  that -- and this is, Your Honor, in paragraph 15 and 16 --

8  excuse me, 14, 15 and 16 of the Boro declaration.  What

9  this tell us, Your Honor, is that on September 15th and then

10 continuing over to September 16th, 2005, a deal was reached

11 between Via and the Debtor.  Both Via and the Debtor were

12 fine with a 12.5 million dollar allowed claim allocable

13 freely at Via's own discretion between Via and the joint

14 venture.

15      And all that was holding that up was the note

16 holders.  If the note holders had not been a part of this

17 settlement discussion, that would have been the end of it.

18 There would have been a 12.5 million dollar claim.  But the

19 note holders were a part of the settlement discussion.  The

20 note holders had put themselves in the settlement

21 negotiations long before and had become a party to the

22 protective order, for example.  And we know, for example,

23 from Exhibit 1 of the Boro declaration that they were

24 getting confidential analyses done by the Debtor of the Via

25 claim.  In fact in that Exhibit 1, the Debtor essentially

42

1    laid out that Via may have up to 42 million dollars in

2    claims in addition to the liquidated damages claim, actual

3    damage claims.

4         And that had been given to the note holders, and

5    Exhibit 1 to the Boro declaration has Mr. Bennett's e-mail

6    address right on the top of it.  So they had inserted

7    themselves in the settlement negotiations, and what

8    happens, Your Honor, when you read the Boro declaration,

9    paragraphs 16, 17, and on, particularly those paragraphs,

10   what you see, Your Honor, is that there was a holdup.  The

11   Debtor and Via were okay with the 12.5 million dollars, but

12   the note holders were not.  They insisted -- and this is

13   their own word -- they insisted that Via waive the

14   seniority.  It would have been the same deal otherwise from

15   the estate's standpoint, but this provision got stuck in.

16        Now, Your Honor, this takes me to an issue that

17   Mr. Kruger has raised, which is -- well, let me address a

18   couple of issues here, Your Honor.  How does Via or SB

19   Claims get out of this agreement?  It's a legitimate

20   question, and Mr. Kruger has said we can't.  Well, Your

21   Honor, there are a number of answers to that.  And some of

22   the answers we're going to continue to explore.  But as Mr.

23   Kruger has acknowledged, there is a provision in the

24   indenture itself that is very clear.  That provision reads,

25   Your Honor -- excuse me for just one moment -- this is

1    Section 4.5 of the indenture, Your Honor, and it reads:

2                    "No right of any present or future holder of any

3                    senior indebtedness to enforce subordination as

4                    herein provided, shall at any time and in any way

5                    be prejudiced or impaired by any act or failure

6                    to act on the part of the company or by any act

7                    or failure to act in good faith by such holders."

8    And it goes on to say, "regardless of knowledge."

9            Now, Your Honor, I don't believe it's the case

10   that if Via intending to defraud, for example, the note

11   holders, signed an agreement saying we're not going to

12   enforce subordination.  You pay us $500,000 or something.

13   And then, you know, with their fingers behind their back

14   saying, you know, we're actually not going to live by that

15   agreement.  That would not be good faith, Your Honor.  This

16   is not a blanket bar on waiver.  This is a bar on waiver

17   when somebody has acted in good faith.  As we have

18   illustrated in our briefing, Your Honor, New York continues

19   to apply the UCC basic definition of good faith which is

20   honesty and fact, not requiring due diligence.  It is

21   simply honesty and fact.

22           Now, Mr. Kruger still says, well, Geez, how could

23   you have a situation where Via was asked to waive this and

24   they accepted the explanation without doing their due

25   diligence, if you will.  Well, again, Your Honor, it's not

44

1  clear at all to me under the indenture, they had to do due

2  diligence.  But even assuming hypothetically that they did,

3  Your Honor, they were told this by the fiduciaries of the

4  estate, by Debtor's counsel.  What reason would Via have to

5  believe that Debtor's counsel would have some ulterior

6  motivation, unlike us now, who have seen these letters that

7  have been written to the Debtor and to Debtor's counsel.

8  Via didn't know that.

9         And, Your Honor, in fact the story that was told

10  to Via was a very plausible story, because the evidence

11  does appear to show that there was supposed to be a loan

12  made by Via to the Debtor before the bankruptcy.  So it is

13  not like the Debtor told Via, hey, this was going to be for

14  some loan and somebody at Via could have called up, well,

15  was there going to be a loan?  The answer was yes, there

16  was going to be a loan.  But what Via never knew about was

17  that there was an indenture that had this seniority

18  provision, and when Via was told about the indenture, it

19  was also told simultaneously, well, this was really just

20  intended only to apply to that loan.

21         And if you look at the Boro declaration, and you

22  figure out what is happening here, Your Honor, you had a

23  very heated negotiation, where Via had thought they were

24  done with this deal.  They had reached a deal with the

25  Debtor at 12.5 million, and all of a sudden, as you will

45

1  see in the Boro declaration -- and I think Via's

2  explanation of it will be even more stark, but you've seen

3  the Boro declaration, the circumstance where they got held

4  up, and at the last minute they said, well, we've got to

5  add this provision that you're not senior.  And they

6  accepted the explanation.

7         Your Honor, it's important to note, this is not a

8  common law fraud case.  Mr. Kruger keeps telling me I have

9  a fraud case.  I'm not suing the note holders for fraud.

10 What I am arguing, Your Honor, is that this provision of

11 the settlement agreement is not enforceable for various

12 equitable reasons, Your Honor.  You do not have to prove

13 fraud for equitable subordination, particularly, Your

14 Honor, in the case of insiders or other fiduciaries which

15 the 2002 note holders were in forming the Creditors'

16 Committee at the time.  They had access to confidential

17 information about these negotiations, Your Honor.  They

18 were in a fiduciary position during these negotiations, or

19 so we will prove if it hasn't been proven yet.  And, Your

20 Honor, under those circumstances, the standard for

21 equitable subordination is lower.

22        Your Honor, on top of that, we have the

23 circumstances of Section 4.5 of the indenture, which they

24 say doesn't mean what it says.  Well, if they're going to

25 argue it doesn't mean what it says, we're not going to do

46

1  that on a motion to dismiss, Your Honor.  And, Your Honor,

2  on top of all of that, I do think the notice issue was very

3  significant here, Your Honor, because, Your Honor, I'm not

4  even sure I need independent standing on the notice issue,

5  Your Honor, because this Court has the authority, sua

6  sponte, to correct violations of fiduciary duties.

7          Your Honor, if this was a settlement agreement

8  that was filed in this court that had a provision that

9  said, buried deep in it, and Debtor's counsel shall get a

10 million dollars of bonus, and no one sees it, Your Honor

11 would not enforce that, I respectfully submit.  Your Honor,

12 this is a circumstance where three members of the

13 Creditors' Committee, the controlling members of the

14 Creditors' Committee inserted at their insistence a special

15 benefit.  And Your Honor has the power, sua sponte,

16 separate and apart from anything I do in this court, not to

17 enforce that.

18          But for what it's worth, Your Honor, the

19 predecessor in interest to my client actually was a

20 creditor during that period, Argo held a hundred and some

21 thousand dollars of claims, so I think my client does have

22 standing.  But certainly this Court has standing to do

23 that.

24          In terms of equitable subordination, Your Honor,

25 we are not seeking a remedy on behalf of all the estate; we

47

1    are seeking simply putting the Via claim back where it was.

2    The trustee may have other remedies and the trustee is free

3    to pursue those remedies.  We don't purport to be acting on

4    behalf of the estate, Your Honor, but we have our own

5    separate remedy as was recognized in Morpheus Lights, and

6    we want to pursue it here.

7            Your honor, if there's anything further I can

8    help the Court with or any other issues that the Court has,

9    I would be happy to answer at this time.

10            THE COURT: Thank you, Mr. Shaffer.  I don't have

11   any questions for you, but I would like to hear Mr. Kruger.

12   I think he's eager to --

13            MR. SHAFFER: Thank you, Your Honor.

14            MR. KRUGER: Your Honor, thank you very much, for

15   the opportunity to respond.  It's hard to know quite where

16   to respond because so much of what has been said simply is

17   nothing that we've said.  Yes, it's true that I said there

18   was something preposterous, but what I said was

19   preposterous was not the chain of allegations that the

20   senior note holders told something to the Debtor, and the

21   Debtor then repeated it to Via, and Via believed whatever

22   was told to them and never inquired.  I think that's

23   preposterous.  And just to clarify that a little further,

24   you heard from Mr. Shaffer about Mr. Boro's deposition or

25   his document -- not his deposition, but his declaration --

48

1    and he read you part of it, but he didn't read you the part

2    that he would not want to read, which I'd like to read to

3    you as well.  It's on page 9 of our reply.  Mr. Boro says,

4    quote:

5              "My review of documents from the prior settlement

6              discussions between SonicBlue and Via confirm

7              that this provision was included in the

8              definition of senior indebtedness as a place

9              holder for a loan of 15 million dollars that Via

10             was to have made to SonicBlue as part of the

11             settlement of the books and records claims prior

12             to Sonic Blue filing for bankruptcy protection."

13   That loan by Via was never made because the dispute with

14   Via was never settled until the settlement was approved by

15   this Court in October 2006.  So as I read that, Your Honor,

16   what it says to me is, that Mr. Boro and Via did indeed

17   look to see whether they had any senior rights and they

18   waived those senior rights.

19             And now the suggestion by Mr. Shaffer is that

20   that waiver was procured somehow in bad faith, and not only

21   that, but the indenture specifically precluded Via from

22   waiving those rights.  I don't think they were obtained in

23   bad faith, when Mr. Boro says he did take a look at it and

24   concluded that the document was just as I described it.

25   And if Via couldn't settle its senior claim position and

49

1    waive it, how in heaven's name can SB Claims do that now?

2    They are not even Via.  Those provisions in the indenture

3    ran to Via, not to SB Claims, even though they both stand

4    in the shoes of Via.

5              SB Claims, it seems to me, in its usual fashion,

6    continues to suggest things that are simply not present and

7    not before the Court.  They suggest for example that I have

8    said that you need to show fraud in order to have equitable

9    subordination.  That's not what I said.  What I said was

10   that when you have a claim of the kind they assert here,

11   the phoney language that got to a waiver of the senior

12   position, that smacks to me of fraud.  And the remedy for

13   fraud is rescission.  The remedy for fraud is not, I get to

14   keep the parts of the settlement agreement that I like.  I

15   like my twelve and a half million dollar claim because I

16   don't want to lose that on that dividend, and I like the

17   intellectual property I got back, and I like the releases,

18   but the senior issue, I'm happy to have somebody else

19   litigate that.  That's not what the statute and the cases

20   say about how you need to deal with rescission.  You

21   need -- if you're going to try to rescind, and try to

22   rescind a portion of a settlement agreement, even one that

23   claims to be a global settlement, which surely this

24   settlement agreement does claim to be, if you want to try

25   to set aside a part of it, you need to be able to show that

50

1  the consideration is easily separatable for each of those

2  various parts.  There's no way to do that, and they haven't

3  even begun to attempt to do that, because they can't.  To

4  the extent that they can, they don't have a claim with

5  respect to the senior waiver, the waiver of the senior

6  position.

7           We also heard a lot about the threatening

8  letters.  Well, it seems to me quite clear that the

9  Hennigan Bennett firm wrote letters to Pillsbury pointing

10 out that the directors and officers of the SonicBlue

11 company were in the zone of insolvency and needed to take

12 special care for the rights of creditors, whether it's the

13 senior creditors or others.  I don't think there's anything

14 wrong with sending a letter that says that.  That seems to

15 me to be perfectly appropriate to do when you believe that

16 people are acting in a way that's not responsible to the

17 obligations that they have because of the positions that

18 they hold.  That does not make the writer of the letter

19 somehow a figure who's a thug walking around with a gun

20 threatening people.

21          Lawyers write letters all the time, and those

22 letters often contain the implied result that if we don't

23 do X, Y and Z, you may get sued for that.  That does not

24 mean that the letter writer somehow is a bad person or that

25 its clients are necessarily bad persons.  If there are bad

51

1  persons here, the Chapter 11 trustee is the person who's

2  going to find that out, not SB Claims through the back

3  door, if you will.

4       So far, I haven't really heard anything from Mr.

5  Shaffer that persuades me that other than the general

6  continued proposition that he offers, which is that since

7  this Court has found a need for a Chapter 11 trustee, that

8  must somehow or other inure to the benefit of SB Claims and

9  gives them the right to assert claims that they cannot

10 assert.  They cannot assert them because they have no

11 standing to assert them.  They cannot assert them because

12 the remedy that they seek is not available to them.  They

13 cannot assert them because they have not made a showing

14 that there is a particularization to the claim that they

15 have that is present in this case.

16      They just don't meet the requirements of the law,

17 and the fact of the matter is, if the 2002 note holders

18 have done something bad or Hennigan Bennet has done

19 something bad or the Creditors' Committee has done

20 something bad, that may all well be, and maybe the estate

21 has claims against all of them or some of them or none of

22 them, and we'll see about that in due course.  But that

23 does not empower SB Claims to say well, we're entitled to a

24 benefit from that for ourselves because look at all those

25 bad things that have happened.  That's not what this is

52

1    about.  A very sophisticated Via with very sophisticated

2    counsel entered into an agreement.  It did so knowingly on

3    its own terms, and it said that it had done so knowingly,

4    and now for SB Claims to come along and say, well, you

5    know, that's all upon information and belief.  The one

6    person who knew the facts, Via should be able to say they

7    were misled or they weren't misled.  SB Claims, you would

8    think, peculiarly is able to find out the answer to that

9    question, not to make allegations based on information and

10   belief, which undermine anything that they have to say

11   about the, quote, "phoney story," of fraud, anything else.

12   You can't have it every which way, which is what they are

13   seeking really to have.  On the one hand, they want the

14   benefit of whatever they can find.  On the other hand, they

15   also say to the Court all these bad things have happened;

16   there must be something in it for us.  I don't think that's

17   the standard.

18          But I'm happy to answer questions, Your Honor, if

19   you have some.

20          THE COURT: I have no questions at this time.

21   Thank you, Mr. Kruger.

22          MR. WALTER: Good morning, Your Honor, Glen Walter

23   from Skadden Arps on behalf of Citadel.  I just wanted to

24   explore the 9(b) issue again for a moment.  The standard is

25   that the facts have to be peculiarly in the knowledge of

53

1   the other person to get the exception to 9(b).  They could

2   conveniently leave that part out of their explanation of

3   the rule.  So the rule is they have to particularize the

4   fraud, the statement on the phoney story.  What they don't

5   do, however, they can't specifically say, the Debtor said

6   what to Via, that there's no allegation based other than on

7   information and belief that the story is in fact phoney.

8   That's just again a speculation that they hope to find out

9   in discovery, and they also cannot allege reliance.  So

10  none of the allegations are particularly pled with the one

11  alleged wrongdoing that is particular to them that would

12  give them standing.

13          Thank you, Your Honor.

14          THE COURT: Okay.  Is the matter submitted?

15          MR. SHAFFER: Your Honor, just extremely briefly,

16  Your Honor.  I just wanted to -- because I did not address

17  the severance issue, I just want to make clear to the

18  Court, Your Honor, that California law does allow

19  agreements to be severed, and this Court probably is

20  familiar with that when dealing with, for example, master

21  leases where you have to figure out which lease can be

22  assumed and which ones are to be rejected.  Your Honor, in

23  this case, I think the Boro declaration shows us how this

24  release was separate from the rest of the deal.

25          And, Your Honor, with that, it is submitted.

54

1          THE COURT: Is the matter submitted, Mr. Kruger?

2          MR. KRUGER: Yes, it is.

3          THE COURT: Okay.  I'd like to review my notes and

4   see if I can rule this afternoon, and so we'll take a short

5   recess.

6          ALL COUNSEL: Thank you, Your Honor.

7          THE CLERK: Please rise.

8       (Whereupon, a recess is taken at 3:10 p.m., and the

9   Court is reconvened at 3:17 p.m.)

10          THE CLERK: Please rise.

11          THE COURT: We didn't give any warning.

12          THE CLERK: Oops.

13          THE COURT: (Laughing.)

14          MR. KRUGER: We'll try to round up the usual

15   suspects, Your Honor.

16          THE COURT: Okay, thank you, Mr. Kruger.

17          We should have a way to dim the lights or

18   something like they do at the theater.

19          MR. KRUGER: I'm going to take the popcorn

20   concession.

21          THE COURT: Okay.  I think we've just about got

22   everybody back in here now, and once again, I want to thank

23   you all, because this was another very fine round of

24   briefing.  As usual, you all give me a lot to think about.

25          You're all familiar with the facts that are

55

1    alleged in the complaint, so I'm not going to repeat them

2    in detail today for the record.  As you know and as you've

3    mentioned, in reviewing the motion to dismiss, I must

4    assume the facts, the truth, of all the factual allegations

5    in the complaint, and I must construe all reasonable

6    inferences from those allegations in the light most

7    favorable to the plaintiff.  Before I can dismiss the

8    complaint, it must appear to a certainty or beyond doubt

9    that SB Claims would not be entitled to relief under any

10   set of facts that could be proved.

11          So in light of these standards and after careful

12   consideration of both your written submissions and your

13   arguments, I must conclude that the motion to dismiss SB

14   Claims' complaint should be denied.  And let me give you an

15   explanation and further detail.

16          First, I am not persuaded that SB Claims lacks

17   standing to request equitable subordination of the

18   defendants' claims as alleged in its first claim for

19   relief.  The courts have recognized that individual

20   creditors may have an interest in subordination, separate

21   and apart from the interests of the estate as a whole.  And

22   you all have cited to Morpheus Lights.  It stands for that

23   proposition.

24          The question for standing purposes is whether the

25   individual plaintiff creditor has alleged an injury that is

56

1    particular to it rather than a general injury to the

2    estate.  With respect to the complaint before me, the

3    answer to that question is yes.  As the holder of Via's

4    twelve and a half million dollar allowed claim, SB Claims,

5    placed in the distribution scheme relative to the

6    defendants, depends on whether the twelve and a half

7    million dollar claim constitutes senior indebtedness under

8    the 2002 indenture and whether there was an effective

9    waiver of that senior indebtedness status in the settlement

10    agreement.

11         Because this adversary proceeding will determine

12    whether the twelve and a half million dollar claim is

13    senior to the 2002 note holders' claims or vice versa, it

14    is essentially a two-party dispute that has little to do

15    with the interests of the estate in general.  While some of

16    the misconduct that is alleged may also have had some

17    harmful effects on the estate and the integrity of the

18    bankruptcy process, the injury that SB Claims has alleged

19    is unique and unlike any injury that may or may not have

20    been suffered by the estate or the other creditors.  As a

21    result, it satisfies the standard set forth in Morpheus

22    Lights.

23         Further, it's premature to conclude that SB

24    Claims suffered no injury, and therefore has no standing

25    because it acquired Via's claim at a discount after the

57

1   Debtor filed for bankruptcy protection and after SB Claims

2   was aware of the alleged inequitable conduct of the 2002

3   note holders.   Although defendants have cited cases from

4   other jurisdictions where the court found that the claims

5   buyers had not been injured, the facts alleged here suggest

6   that SB Claims has sufficient standing.   By virtue of the

7   assignment of the Via claim, SB Claims has stepped into the

8   shoes of Via.   As a result, SB Claims has the right and

9   ability to bring claims for the injury suffered by Via.

10   While the fact that SB Claims may have purchased the claim

11   at a discount may affect the extent of injury, it doesn't

12   eliminate the injury altogether.

13        Next, I also find that SB Claims has pled its

14   equitable subordination claim with sufficient

15   particularity.   Defendants urge that the equitable

16   subordination claim is premised on allegations of fraud and

17   therefore SB Claims is required to plead the circumstances

18   surrounding the fraud with particularity as required by

19   Rule 7009(b).

20        The particularity requirements of Rule 7009(b)

21   must be read together with Rule 7008's admonition that a

22   short and plain statement of a claim is enough.   And here

23   I'm citing directly from Basque (Phonetic) versus Dollar

24   Tree Stores, Inc., a case that you all hadn't included in

25   your briefs, 2007 *West Law* 2462150, a case from the

58

1    Northern District of California from August 29th, 2007.

2          As a result, pleadings under Rule 7009(b) --

3    excuse me -- pleading under 7009(b) is sufficient if it

4    identifies the circumstances constituting fraud so that the

5    defendants can prepare an adequate answer to the

6    allegations.  And here I'm citing to cases that were in

7    your briefs, the <u>Nubrunner</u> (Phonetic) case, <u>Wool versus</u>

8    <u>Tandem Computers</u> (Phonetic) and also <u>Semogen (Phonetic)</u>

9    <u>versus Wagner</u>.

10          Although mere conclusory allegations of fraud are

11    insufficient, statements made about the time, place and

12    nature for the alleged fraudulent conduct are sufficient to

13    satisfy the requirements of 7009(b).  Moreover with respect

14    to matters within the defendants' knowledge, Rule 7009(b)'s

15    requirements are relaxed and pleading on information and

16    belief is permissible as long as the factual basis of the

17    beliefs are provided.

18          Here, the complaint sets forth in great detail an

19    alleged scheme by which the 2002 note holders use their

20    position as Committee members to insert themselves into

21    Via's settlement negotiations without disclosing their self

22    interest to the agenda.  Further, it identifies the 2002

23    note holders as the likely source of alleged misinformation

24    regarding the intent behind the senior indebtedness

25    provision in the 2002 indenture.  The allegations

1   adequately apprise the defendants of the nature of the

2   fraud and other inequitable conduct of which they're

3   accused.

4          Although some allegations are based on

5   information and belief, these allegations concern matters

6   particularly within the knowledge of the 2002 note holders,

7   namely whether the note holders or their counsel advised

8   Debtor's counsel that the senior indebtedness provision

9   only related to a 15 million dollar loan that never took

10  place and what representations they made to Debtor's

11  counsel in that regard.  The complaint sets forth in

12  exacting detail the factual basis for these allegations and

13  they have been appropriately pled.

14         The defendants finally urge that the equitable

15  subordination claim must be dismissed because SB Claims is

16  trying to rescind a portion of the settlement agreement,

17  the clause that waives senior indebtedness status for the

18  twelve and a half million dollar allowed claim.  Defendants

19  argue that partial rescission of a contract is not a remedy

20  that's permitted under California law.  The short answer is

21  that the first claim for relief does not assert a State law

22  right of contractual rescission.  Rather, it's grounded on

23  the doctrine of equitable subordination that is codified in

24  Section 510(c) of the Bankruptcy Code.  This section is

25  intended to remedy or undo any inequality in the claim

60

1    position of a creditor that will produce injustice or

2    unfairness to other creditors in terms of the bankruptcy

3    results.

4           While the effect of equitably subordinating the

5    defendants' claims in this case may be the same as could be

6    achieved if California law permits partial rescission,

7    there's no need to decide that issue.  The legal basis for

8    the claim before me is Federal and not State law.  So for

9    all of the reasons that I've explained, the defendants'

10   motion to dismiss will be denied with respect to the first

11   claim for relief.

12          SB Claims' second and third claims for relief

13   asked this Court to classify the twelve and a half million

14   dollar allowed claim as senior to the 2002 note holders'

15   claims for purposes of any Plan of Reorganization, and it

16   declared that the twelve and a half million dollar allowed

17   claim is senior to senior indebtedness status and therefore

18   should be paid in full prior to any distributions on the

19   2002 note holders' claims.  The defendants argue that these

20   claims must be dismissed because as a matter of law the

21   twelve and a half million dollar allowed claim is not

22   entitled to senior status.  Defendants base this argument

23   on three separate contractual provisions.  First, Via

24   agreed in the settlement agreement that the allowed claim

25   did not constitute senior indebtedness.  Secondly, under

61

1  the indenture, the twelve and a half million dollar allowed

2  claim is not, quote, "Via indebtedness," end quote, because

3  it's not a claim based on an obligation for borrowed money

4  or evidenced by bonds, debentures, notes or other similar

5  instruments.  And third, under the claims transfer

6  agreement between Via and SB Claims, the allowed claim is

7  now owing to SB Claims, not Via, and therefore it cannot

8  be, quote, "Via indebtedness."

9          Although these arguments are based on the

10  language of various contractual documents before me, SB

11  Claims has presented an alternative interpretation of the

12  contract documents which supports SB Claims' theory of

13  recovery.  On this motion to dismiss, all inferences from

14  the alleged facts must be drawn in favor of SB Claims.  As

15  a result, it cannot be said with certainty that SB Claims

16  can prove no set of facts that would entitle it to relief.

17          So the motion to dismiss is also denied with

18  respect to the second and third claims for relief.

19          Thank you.  That will conclude our hearing.

20          THE CLERK: Please rise.

21      (Whereupon, the proceedings are concluded at 3:27

22  p.m.)

23

24

25

62

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7          I certify that the foregoing is a correct

8   transcript from the digital sound recording of the

9   proceedings in the above-entitled matter.

10

11  DATED: October 4, 2007

12

13                          By:    /s/ Jo McCall

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 33



**UNITED STATES BANKRUPTCY COURT**
**Northern District of California**
**U.S. Courthouse and Federal Building**
**280 South First Street Room 3035**
**San Jose, California 95113-3099**
**(408) 535-5118**

FILED

2007 MAY 14 P 3: 07

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

**Gloria L. Franklin**
**Clerk of Court**

Richard W. Wieking, Clerk
United States District Court
280 South First Street
San Jose, CA 95113

# C07  02553

RMW

Re:     *Case Name:  SONICblue, Inc.*
        *Case Number:  03-51775-MM*
        *Bankruptcy Judge Name:  Marilyn Morgan*

Dear Mr. Wieking:

[ ] Enclosed please find the notice of appeal, certified copy of the docket and order being appealed and related papers from BAP and designated items to form the record on appeal for assignment to a district court judge.

[X ] Enclosed please find a conformed copy of the notice of appeal, election to district court document, as well as a certified copy of the docket and order being appealed for assignment to a district court judge.

[ ] Enclosed please find the record of designated items and a certificate of record for an appeal that has been previously sent to the district court.

[ ] Enclosed please find a Bankruptcy Judge's Recommendation that Appeal Be Dismissed and the Notice of Appeal and associated documents filed with the Bankruptcy Court.

Please acknowledge receipt of this appeal by stamping the district court case number on a copy of this letter and return it to Janet Dustin .

                                Gloria L. Franklin, Clerk
                                United States Bankruptcy Court

Dated: <u>May 14, 2007</u>            By: _____/s/_____
                                Janet Dusin,  Deputy Clerk

1  HENNIGAN, BENNETT & DORMAN LLP
   J. MICHAEL HENNIGAN (SBN 59491)
2  THOMAS B. WATSON  (SBN 181546)
   JOSHUA M. MESTER  (SBN 194783)
3  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
4  Telephone      (213) 694-1200
   Facsimile      (213) 694-1234
5
6  Counsel for Portside Growth & Opportunity Fund, Smithfield
   Fiduciary LLC, and Citadel Equity Fund Ltd.
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11 In re                                )  Case No.  03-51775 MM
                                        )
12 SONICBLUE INCORPORATED, a Delaware   )  Chapter 11
   corporation; DIAMOND MULTIMEDIA      )
13 SYSTEMS, INC., a Delaware corporation; )
   REPLAYTV, INC., a Delaware corporation; )  (Case Nos.  03-51775; 03-51776, 03-51777 and
14 and SENSORY SCIENCE CORPORATION,     )  03-51778 MM (Jointly Administered)
   a Delaware corporation               )
15                                      )  NOTICE OF APPEAL
         Debtors and Debtors in Possession.  )
16                                      )
                                        )
17 ───────────────────────────────────── )

18

19     **NOTICE IS HEREBY GIVEN** that Portside Growth & Opportunity Fund, Smithfield

20 Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively, the "**Senior Noteholders**" or the

21 "**Appellants**"), holders of the 7 3/4 % Senior Subordinated Debentures Due 2005 issued by the

22 above-captioned Debtor and Debtor in Possession SonicBlue Incorporated, hereby appeal under 28

23 U.S.C. § 158(a) from the Memorandum Decision and Order on Motion to Appoint a Chapter 11

24 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP

25 and for Disgorgement of Attorneys' Fees (the "**Order**," Docket No. 2220), entered on March 26,

26 2007 in the above-captioned proceeding by the Honorable Marilyn Morgan, United States

27 Bankruptcy Judge , and the related Memorandum Decision and Order on Motion of the Senior

28

1    Noteholders for Clarification, or in the Alternative, Reconsideration (the "**Order Denying**

2    **Clarification**," Docket No. 2279) , entered on May 4, 2007.[1]

3          The names of all parties to the order appealed from and the names, addresses, and facsimile

4    numbers of their respective attorneys, are attached hereto as **Exhibit A**.

5          Pursuant to 28 U.S.C. § 158(c)(1)(A), Appellants elect to have this appeal heard by the

6    United States District Court for the Northern District of California, and are concurrently filing and

7    serving a Statement of Election on all parties served with this Notice of Appeal.

8

9

10

11

12   DATED:  May 11, 2007                    HENNIGAN, BENNETT & DORMAN LLP
                                              865 South Figueroa Street, Suite 2900
13                                            Los Angeles, California 90017

14

15                                           By: _____/s/ J. Michael Hennigan_____
                                                      J. Michael Hennigan
16                                           Counsel for Portside Growth & Opportunity
                                             Fund, Smithfield Fiduciary LLC, and Citadel
17                                           Equity Fund Ltd.

18

19

20

21

22

23

24

25

26   _____

27   [1]  The Senior Noteholders filed a timely motion for clarification, or in the alternative, for leave to
     file a motion for reconsideration of the Order on April 4, 2007 (Docket No. 2231), which motion
28   was denied by this Court on May 4, 2007 (Docket No. 2279).

- 2 -

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Re: SONICblue, Inc.
   03-51775-MM

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

    I, the undersigned, a regularly appointed and qualified clerk in the office of the Northern District of California, San Jose, California, hereby certify:

    That I, in the performance of my duties as such Clerk, served a copy of the **Notice of Appeal** by depositing it in the regular United States mail at San Jose, California on the date shown below, in a sealed envelope bearing the lawful frank of the United States Bankruptcy Court addressed as listed below.

US District Court
280 S First Street, 2nd Fl.
San Jose, CA 95113

US Trustee
280 S First Street Room 268
San Jose, CA 95113

See Attached Service List for the balance

Dated: May 14, 2007

/S/

Janet Dustin, Deputy Clerk

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

Certificate of Mailing.wpt

# SERVICE LIST

Craig A. Barbarosh
Mark D. Houle
Pillsbury Winthrop Shaw Pittman LLP
650 Town Center Drive, 7th Floor
Costa Mesa, CA 92626

Sue J. Hodges
Pillsbury Winthrop Shaw Pittman LLP
12255 El Camino Real, Suite 300
San Diego, CA 92130

Albert Boro
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105

William B. Freeman
Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017

Edwina E. Dowell, Assistant US Trustee
Nanette Dumas
Shannon L. Mounger-Lum
Office of the United States Trustee
280 S. First Street, Suite 268
San Jose, CA 95113

Frank A. Merola
K. John Shaffer
Gina Najolia
Stutman, Treister & Glatt PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

William McGrane
Bernard S. Greenfield
McGrane Greenfield LLP
One Ferry Building, Suite 220
San Francisco, CA 94111

Ron Bender
Craig M. Rankin
Todd M. Arnold
Levene, Neale, Bender, Rankin & Brill
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067

James L. Lopes
Steven E. Schon
Bernard A. Burk
Howard Rice Nemerovski Canady
    Falk & Rabkin
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

John M. Grenfell
Ana N. Damonte
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105

Cecily A. Dumas
Friedman Dumas & Springwater LLP
150 Spear Street, Suite 1600
San Francisco, CA 94105

Grant T. Stein
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309

Richard A. Rogan
Nicholas De Lancie
Jennifer S. Coleman
Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, Fifth Floor
San Francisco, CA 94111

Henry C. Kevane
Kenneth H. Brown
Pachulski Stang Ziehl Young Jones &
    Weintraub LLP
150 California Street, 15th Floor
San Francisco, CA 94111

Robert A. Franklin
Murray & Murray
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014

Lawrence M. Schwab
Patrick M. Costello
Bialson, Bergen & Schwab
2600 El Camino Real, Suite 300
Palo Alto, CA 94306

Suzzanne S. Uhland
David R. Eberhart
O'Melveny & Myers LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111

Austin K. Barron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

Steven J. Johnson
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304

Scott H. McNutt
McNutt & Litteneker LLP
188 The Embarcadero, Suite 800
San Francisco, CA 94105

Bruce MacIntyre
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101

HENNIGAN, BENNETT & DORMAN LLP
J. MICHAEL HENNIGAN (SBN 59491)
THOMAS B. WATSON  (SBN 181546)
JOSHUA M. MESTER  (SBN 194783)
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone     (213) 694-1200
Facsimile      (213) 694-1234

Counsel for Portside Growth & Opportunity Fund, Smithfield
Fiduciary LLC, and Citadel Equity Fund Ltd.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No.  03-51775 MM |
| SONICBLUE INCORPORATED, a Delaware corporation; DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation; REPLAYTV, INC., a Delaware corporation; and SENSORY SCIENCE CORPORATION, a Delaware corporation | Chapter 11 |
| | (Case Nos.  03-51775; 03-51776, 03-51777 and 03-51778 MM (Jointly Administered) |
| Debtors and Debtors in Possession. | **STATEMENT OF ELECTION** |

Pursuant to 28 U.S.C. § 158(c)(1)(A) and Rule 8001(e) of the Federal Rules of Bankruptcy Procedure, Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively, the "**Senior Noteholders**" or the "**Appellants**"), holders of the 7 3/4 % Senior Subordinated Debentures Due 2005 issued by the above-captioned Debtor and Debtor in Possession SonicBlue Incorporated, hereby elect to have the United States District Court for the Northern District of California hear the Senior Noteholders' appeal from the Memorandum Decision and Order on Motion to Appoint a Chapter 11 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP and for Disgorgement of Attorneys' Fees (the "**Order**," Docket No. 2220), entered on March 26, 2007 in the above-captioned proceeding by the Honorable Marilyn Morgan, United States Bankruptcy Judge, and the related Memorandum

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  Decision and Order on Motion of the Senior Noteholders for Clarification, or in the Alternative,

2  Reconsideration (the "**Order Denying Clarification**," Docket No. 2279) , entered on May 4, 2007.[1]

6  DATED:  May 11, 2007

7  HENNIGAN, BENNETT & DORMAN LLP
   865 South Figueroa Street, Suite 2900
8  Los Angeles, California 90017

10 By:  _____*/s/ J. Michael Hennigan*_____
           J. Michael Hennigan
11 Counsel for Portside Growth & Opportunity
   Fund, Smithfield Fiduciary LLC, and Citadel
12 Equity Fund Ltd.

---

27 [1]  The Senior Noteholders filed a timely motion for clarification, or in the alternative, for leave to
   file a motion for reconsideration of the Order on April 4, 2007 (Docket No. 2231), which motion
28 was denied by this Court on May 4, 2007 (Docket No. 2279).

- 2 -
STATEMENT OF ELECTION

Entered on Docket
May 04, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed May 04, 2007

*Marilyn Morgan*

Marilyn Morgan
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

**SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC., and SENSORY SCIENCE CORPORATION,**

        Debtors.

Cases No. 03-51775, 03-51776, 03-51777, and 03-51778-MM

Chapter 11 cases
Jointly administered

**MEMORANDUM DECISION AND ORDER ON MOTION OF SENIOR NOTEHOLDERS FOR CLARIFICATION, OR IN THE ALTERNATIVE, RECONSIDERATION**

      Let there be no doubt that the words and findings of my Memorandum Decision of March 26, 2007 were carefully selected to respond to the issues then before the court, which were whether to appoint a chapter 11 trustee pursuant to § 1104, whether to convert the case to chapter 7, and whether to disqualify counsel for the debtor. The findings made in support or denial of those motions must be understood in context. After considering the argument of counsel and the record before me, the motion for clarification, or in the alternative, reconsideration by Portside Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (previously described as the "senior debtholders," "senior bondholders" or "senior noteholders," but hereinafter "senior noteholders") is denied as explained below.

1

MEMO. DECISION AND ORDER ON MOTION FOR CLARIFICATION

1.    <u>Noting a Distinction Between a Right to Payment and a Claim for Compensation, the Joint Venture Agreement Expressly Grants VIA a Claim for Compensation Upon Breach</u>.

Article 5.6(a) of the joint venture agreement expressly provides that both VIA and the joint venture are entitled to be compensated for damages resulting from loss of the Intel license.  The preamble to Article 5.6(a) reads in pertinent part that:  "If JV is Enjoined from Utilizing the Intel License . . . , then the following liquidated damages shall apply *to compensate JV and VIA for any and all losses they may suffer as a result thereof*. . . .  (Emphasis added.)  The senior noteholders conveniently omitted in their motion the phrase "to compensate JV and VIA for any and all losses they may suffer as a result thereof . . . ," replacing it with ellipses in a manner that is misleading to the reader.

Article 5.6(a) makes a distinction between the right to be compensated for losses suffered and the right to receive a distribution of damages for those losses.  While it provides that damages are *payable* to the joint venture, it states unambiguously that VIA, as well as the joint venture, is entitled to compensation for losses resulting from an inability to use the Intel cross-license.  As noted, the distinction is meaningful because the determination whether VIA is entitled to priority turns on whether it has a claim against SONICblue.  More importantly, whether VIA has a claim may affect the amount of the distributions to the senior noteholders absent subordination by VIA.

The term "claim" is broadly defined in § 101(5), is not limited to rights to payment, but includes rights to an equitable remedy for breach of performance.  In fact, VIA asserted a claim in this case.  Modification of the decision at the senior noteholders' request for purposes of clarification on this point is unwarranted.

2.    <u>The Senior Noteholders Appear Not to Have Disclosed Significant Information to the Committee Notwithstanding its Unusually High Level of Involvement</u>.

The senior noteholders object to the characterization that they inserted themselves into the VIA litigation, that they had a hidden agenda, and that their counsel, Bruce Bennett,  operated in the shadows.  However, it was not apparent until SONICblue's litigation counsel, Albert J. Boro, Jr., filed his declaration on March 5, 2007 that the senior noteholders were involved at the highest levels of strategy development and settlement negotiations in the VIA litigation.  Bennett was consulted with

2

1  respect to proposed settlement terms even when committee counsel was not contacted. Yet, the senior

2  noteholders were not a party to the VIA adversary proceeding and did not file their own objections to

3  the claims of VIA and S3 Graphics. While standing to participate is not at issue, it is unusual for non-

4  parties to be involved to the degree that the senior noteholders were.

5     At the disclosure statement hearing held January 23, 2007, it became apparent that the senior

6  noteholders had not revealed to committee counsel, Ron Bender, that the VIA settlement contained a

7  waiver by VIA of senior indebtedness status or that the waiver would directly benefit the senior

8  noteholders, who were members of the committee. Based on the concerns of a taint raised by the claims

9  traders, I directed Bender to conduct an investigation of the settlement negotiations and how the waiver

10 provision was inserted into the VIA settlement. The following exchange highlights the problem:

11    The Court:    So you're saying that even at the time that the agreement was approved,
                     the Committee was not aware of this provision?
12
      Mr. Bender:   Not aware, not focused, or any of the like. Now I don't want to mislead
13                   the Court. It's my responsibility to read a document. The document does
                     say that Via agrees that its claim is not senior indebtedness, but I would
14                   have no reason to focus on it being an important point.

15 Bennett, as counsel for the senior noteholders, attended the January 23 hearing by telephone.

16 Thereafter, Bender filed a twenty-three page Preliminary Status Report on February 12, 2007 regarding

17 his investigation. From reviewing that report, it does not appear that Bennett ever volunteered relevant

18 information despite the ongoing investigation and Bender's active efforts to pursue answers. At a time

19 when Bender was seeking transparency and making inquiries of other parties as to their motivations,

20 Bennett and his clients did not come forward.

21     When further facts came to light on February 15, 2007 prompting the motions to appoint a

22 chapter 11 trustee, to convert the case, and to disqualify debtor's general bankruptcy counsel, I set these

23 motions for hearing on March 19, 2007. Bennett himself acknowledged on March 19 that the hearing

24 was the first time that he had personally addressed the court in this case. Even then, however, Bennett

25 did not reveal his role in securing the waiver provision that arguably benefitted his clients' interests at

26 the expense of the unsecured creditor class. More significantly, Bennett apparently never disclosed to

27 the committee or Bender the senior noteholders' potential conflict in connection with the subordination

28 provisions of the senior indenture, of which Bennett was acutely aware. That debtor's counsel may have

3

**MEMO. DECISION AND ORDER ON MOTION FOR CLARIFICATION**

1 been aware of the subordination provision in the senior indenture and the waiver of senior status in the

2 VIA settlement is of no moment for purposes of this motion for clarification. The appearance of

3 concealment by the senior noteholders and Bennett was one of the grounds for the appointment of a

4 trustee. For the reasons stated, the motion for clarification or reconsideration on this point is also

5 denied.

6       At the hearing on this motion, much emphasis was placed on who knew what when, posturing

7 for the benefit of the trustee, and putting spin on a bad situation. However, it is incumbent on all

8 interested parties not to lose sight of the big issues necessary to move this case forward: what to do

9 about the fact that there was no meaningful disclosure of the effect of VIA's waiver of priority, and how

10 to revise the disclosure statement and plan in order to provide a reasonably prompt distribution to

11 creditors. There will be time later to focus attention on the conduct of the attorneys and fiduciaries

12 involved.

13       Good cause appearing, IT IS SO ORDERED.

14

15                **\* \* \* END OF ORDER \* \* \***

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

4

**MEMO. DECISION AND ORDER ON MOTION FOR CLARIFICATION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Case No. 03-51775-MM

2  **SERVICE LIST**

3

4  CRAIG A BARBAROSH                    BRUCE BENNETT
5  PILLSBURY WINTHROP LLP               HENNIGAN BENNETT & DORMAN LLP
   650 TOWN CENTER DRIVE 7TH FLOOR     865 SOUTH FIGUEROA ST SUITE 2900
6  COSTA MESA CA 92626-7122             LOS ANGELES CA 90017

7

8  RON BENDER                          NANETTE DUMAS
   LEVENE NEALE BENDER RANKIN &         OFFICE OF THE UNITED STATES
9  BRILL LLP                           TRUSTEE
   1801 AVENUE OF THE STARS STE 1120    280 SOUTH FIRST ST SUITE 268
10 LOS ANGELES CA 90067                SAN JOSE CA 95113-0002

11 K JOHN SHAFFER                       BERNARD BURK
   STUTMAN TRIESTER & GLATT PC          HOWARD RICE NEMEROVSKI CANADY
12 1901 AVENUE OF THE STARS 12TH FL    FALK & RABKIN
   LOS ANGELES CA 90067                3 EMBARCADERO CENTER 7TH FLOOR
13                                      SAN FRANCISCO CA 94111-4024

14

15 DENNIS J CONNOLLY                    GRANT STEIN
   ALSTON& BIRD LLP                     ALSTON& BIRD LLP
   1201 WEST PEACHTREE STREET           1201 WEST PEACHTREE STREET
16 ATLANTA GA 30309                    ATLANTA GA 30309

17

18 CECILY A DUMAS
   FRIEDMAN DUMAS & SPRINGWATER
   LLP
19 150 SPEAR STREET SUITE 1600
   SAN FRANCISCO CA 94105

20

21

22

23

24

25

26

27

28

MEMO. DECISION AND ORDER ON MOTION FOR CLARIFICATION

Case 5:07-cv-02553-RMW Document 23-1 Filed 11/20/2007 Page 282 of 333

Entered on Docket
March 26, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed March 26, 2007

*Marilyn Morgan*

**Marilyn Morgan
U.S. Bankruptcy Judge**

1
2
3
4
5
6
7

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

In re:

**SONICBLUE INCORPORATED,
DIAMOND MULTIMEDIA SYSTEMS,
INC., REPLAYTV, INC., and SENSORY
SCIENCE CORPORATION,**

    Debtors.

</td><td>

Cases No. 03-51775, 03-51776,
03-51777, and 03-51778-MM

Chapter 11 cases
Jointly administered

**MEMORANDUM DECISION AND
ORDER ON MOTION TO APPOINT A
CHAPTER 11 TRUSTEE, MOTION TO
CONVERT CASE, AND MOTION TO
DISQUALIFY PILLSBURY WINTHROP
SHAW PITTMAN LLP AND FOR
DISGORGEMENT OF ATTORNEYS'
FEES**

</td></tr>
</table>

**UNITED STATES BANKRUPTCY COURT
For The Northern District Of California**

## INTRODUCTION

When claims traders entered this case and started asking hard questions, circumstances came to light that implicated at least debtor's counsel, committee counsel and certain members of the committee, and resulted in the complete breakdown of creditor confidence. The genesis of the problem arose from the pre-petition issuance of an opinion letter, undisclosed by debtor's counsel, assuring payment to certain bondholders who effectively controlled the creditors' committee. Years later, when debtor's counsel objected to these bondholders' claims because of an original issue discount approximating $43

1

1   million, the bondholders demanded indemnification from the law firm. The problem was compounded

2   when debtor's counsel attempted to solve its disabling conflict by "handing off" these claims objections

3   to committee counsel, who accepted the awkward assignment. Incredibly, these same bondholders

4   somehow were also able to insert a provision in the settlement of estate litigation without disclosing that

5   it arguably may provide them with millions more in distributions, at the expense of general unsecured

6   creditors.

7       A more complete statement of the background is set forth below in the analysis of the motions

8   by the United States Trustee to disqualify Pillsbury Winthrop Shaw Pittman LLC as counsel for the

9   debtor and for disgorgement of attorneys' fees, its motion for the appointment of a chapter 11 trustee,

10  and the motion of SONICblue Claims, LLC for conversion of the case to one under chapter 7. For the

11  reasons explained, the motion for disqualification is granted, and the court finds that the appointment

12  of a chapter 11 trustee is warranted as being in the best interests of the creditors and other interested

13  parties.

14

15              **FACTUAL BACKGROUND**

16              *Formation of Joint Venture*

17      SONICblue Incorporated and three operating subsidiaries, Diamond Multimedia Systems, Inc.,

18  ReplayTV, Inc., and Sensory Science Corporation (collectively, SONICblue), designed and marketed

19  consumer electronic products. Pillsbury Winthrop Shaw Pittman LLP ("PWSP") served as

20  SONICblue's longtime general corporate and litigation counsel. On January 3, 2001, SONICblue

21  formed S3 Graphics Co., Ltd., a joint venture with VIA Technologies, Inc., to operate SONICblue's

22  graphics chip business. Among the assets that SONICblue contributed to the joint venture was its

23  graphics intellectual property, specifically including rights under a 1998 patent cross-license with Intel

24  Corporation. The rights to use Intel's graphics patents were so important that the joint venture

25  agreement included a liquidated damages clause at article 5.6 entitling the joint venture and VIA each

26  to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-

27  license. From the inception of the joint venture, there were serious disputes, including the threat of

28  litigation, between SONICblue and VIA. In the context of settlement proposals in 2002, the parties

2

UNITED STATES BANKRUPTCY COURT<br>For The Northern District Of California

---

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   negotiated a $15 million loan from VIA to SONICblue. However, neither a settlement nor the loan were

2   consummated pre-petition.

3   *Issuance of Senior Debentures and Related Opinion Letter by PWSP*

4   In April 2002, SONICblue raised financing in a private placement issuance of $75 million in

5   7¾% senior secured subordinated convertible debentures. Three institutional bondholders, Portside

6   Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd., acquired

7   the senior debentures at a discount for $62.5 million. The senior debentures were also partially secured

8   by SONICblue's interest in shares of United Microelectronic Corporation ("UMC"), a Taiwanese

9   company. Importantly, the indenture provided for the subordination of the senior debentures to certain

10  obligations at Section 4.1:

11          The payment of the principal of, premium, if any, and interest on all Debentures
            . . . issued hereunder shall, to the extent and in the manner hereinafter set forth, be
12          subordinated and subject in right of payment to the prior payment in full of all Senior
            Indebtedness, whether outstanding at the date of this <u>Indenture</u> or thereafter incurred.
13

14  "Senior Indebtedness" was defined in Section 1.1 of the indenture:

15          "Senior Indebtedness" shall mean the principal of, premium, if any, interest on
            . . . and any other payment due pursuant to any of the following, whether outstanding on
16          the date of this <u>Indenture</u> or thereafter incurred or created:

17                              *   *   *

18          (g)     All indebtedness of <u>the Company</u> due and owing to Via Technologies,
            Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent
19          thereof in any other currency of composite currency (the "Via Indebtedness");

20  Existing debentures in the amount of $100 million issued in 1996 were also subordinated to the senior

21  debentures. PWSP partner Jorge del Calvo was designated for notice purposes on the indenture on

22  behalf of SONICblue.

23  In its capacity as counsel to SONICblue, on April 22, 2002, PWSP issued to the senior

24  bondholders a written opinion as to the enforceability of the debentures. This opinion letter reads in

25  pertinent part:

26          2.      . . . Each of . . . the Purchase Agreement, the Registration Rights Agreement, the
            Indenture, the Pledge and Security Agreement and the Option Agreement, when duly
27          executed and delivered by the Buyers, will each constitute a valid and binding agreement
            of the Company, enforceable against the Company in accordance with its terms.
28

---

3

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

* * *

3.      The issuance and sale of the Debentures have been duly authorized.  Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

* * *

9.      . . . (b)   Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally. . . .

In what may have been a scrivener's error, the bankruptcy limitation in paragraph 9 referenced only paragraph 2 and not paragraph 3 of the opinion letter.

### _Chapter 11 Filing and PWSP's Bankruptcy Rule 2014 Disclosures_

Just six months after the issuance of the senior debentures, SONICblue was unable to meet its maturing financial obligations and entered into a retainer agreement for PWSP to "represent it in its effort to restructure its obligations to certain of its existing . . . debt .. . .  The Firm's engagement will also include representation of SONICblue in . . . any case prosecuted under Title 11 of the United States Code . . . ."  PWSP partner Jorge Del Calvo was copied on the retainer letter.  SONICblue and the subsidiaries filed chapter 11 petitions on March 21, 2003.  While the cases are jointly administered, they have not been substantively consolidated.

On April 11, 2003, PWSP filed an employment application accompanied by a verified statement pursuant to Bankruptcy Rule 2014, which disclosed:

3.      The Firm has been engaged as the Debtors' corporate and litigation counsel since approximately 1989.   During that time, the Firm has provided legal representation to the Debtors in a variety of areas, including corporate and securities matters, mergers and acquisitions, litigation, and intellectual property matters.  The Firm has been working with the Debtors in connection with their restructuring since approximately October 25, 2002 when the Firm was retained to provide advice concerning the restructuring of the Debtor's liabilities and business operations.

The disclosure continued as follows:

6.      As discussed below, I, the Firm, and certain of its partners, counsel, and associates may have in the past represented, and may presently and likely in the future will represent creditors or stockholders of the Debtors in matters unrelated

4

to these Chapter 11 Cases. A preliminary conflicts search performed at my direction discloses that the Firm may have represented or represents entities that are involved in some capacity with one or more of the Debtors, or may have some other relationships with these entities, in matters unrelated to the Debtors. To the best of my knowledge, the Firm's relationships with these entities is as follows. . . .

However, PWSP failed to disclose its connection resulting from the issuance of the opinion letter to the senior bondholders one year earlier. It added, "The Firm will continue to monitor its relationship with the creditors and other parties in interest in these cases and, as it discovers additional information requiring disclosure, will promptly supplement this application with any appropriate disclosures." The court appointed PWSP as counsel for the debtors. Marcus Smith, the Chief Financial Officer of SONICblue, was designated its responsible individual. PWSP diligently filed supplemental disclosures on May 30, 2003, January 23, 2004, October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006, none of which mentioned the opinion letter.

The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 21, 2003. The court authorized the employment of Ron Bender of the law firm Levene, Neale, Bender, Rankin & Brill LLP ("LNBRB") as counsel for the committee on April 11, 2003. As originally constituted, the committee was comprised of eight members: Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "senior bondholders"), represented by Bruce Bennett of Hennigan, Bennett & Dorman, Matsushita Kotobuki Electronics Sales of America LLC and Matsushita Kotobuki Electronics Industries, A-Max Technology Co. Ltd., Manufacturers' Service Limited, and Maxtor Corporation. In October 2003, Baltrans Logistics Inc. replaced Maxtor Corporation on the committee. After the initial months of the case, however, only the three senior bondholders and the two Matsushita companies remained active in the cases, making the senior bondholders the majority voice on the committee. Including the anticipated distribution collectable from the junior bondholders, the senior bondholders effectively control approximately two-thirds of the claims in these cases.

Projecting that they would exhaust their cash reserves by April 20, 2003, the debtors immediately sought and obtained court approval of the sales of their three operating businesses, the Go Video, ReplayTV, and Rio product lines. Thereafter, these became liquidating chapter 11 cases.

5

MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

1   Notably, there is no functioning board of directors to whom Smith reports. The debtor holds nearly $80

2   million in funds for distribution and anticipates receiving an additional $6 million from preference

3   settlements. Secured claims have been paid in full from the proceeds of sale, and a distribution of 33%

4   to unsecured creditors is anticipated.

5   *Breach of Fiduciary Action in Connection with Issuance of the Senior Debentures*

6   On April 21, 2005, some of the junior bondholders filed a complaint in the Superior Court for

7   Santa Clara County against Smith and former officers and directors of SONICblue, Kenneth Potashner,

8   John Todd, Terry Holdt, Edward Esber, Robert Lee and James Schraith. The junior bondholder

9   plaintiffs assert claims for breach of fiduciary duty and constructive fraud in connection with the

10  issuance of the senior debentures in 2002. They assert that the defendants improperly authorized and

11  entered into the financing arrangement while SONICblue was in the zone of insolvency and hopelessly

12  unable to honor its long-term bond obligations. They further assert that by pledging its UMC stock in

13  the transaction, SONICblue rendered a significant asset unavailable to junior bondholders in a

14  liquidation. The defendants removed the complaint to this court on June 14, 2005 on the basis that they

15  may have substantial claims for contribution and indemnification against the debtor. That adversary

16  proceeding, Adv. No. 05-5338, remains pending, though inactive.

17  *VIA Litigation and Settlement Negotiations*

18  VIA and S3 Graphics filed duplicate proofs of claim for $70 million each on July 17, 2003 based

19  on a breach of the joint venture agreement. They assert the breach was caused by the failure to pay

20  certain accounts payable, offering non-ordinary course discounts to accelerate the collection of

21  receivables, wrongful retention of receivables collected on behalf of the joint venture, and the failure

22  to contribute certain assets to the joint venture, and they assert they are also entitled to liquidated

23  damages if enjoined prospectively from the use of the Intel cross-license. SONICblue objected to the

24  claims and filed an adversary complaint for affirmative relief on December 21, 2004 asserting that VIA

25  and S3 breached the joint venture agreement by failing to pay assumed obligations, that VIA breached

26  its fiduciary duty in the operations of the joint venture and the settlement of patent litigation with Intel,

27  and that S3 aided and abetted the breach of fiduciary duty. It sought compensatory and punitive

28  damages, equitable subordination of VIA's and S3's claims, restitution, and an accounting. PWSP

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

6

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   represented SONICblue in the VIA/S3 litigation.

2       SONICblue engaged in concurrent litigation with Intel Corporation concerning the termination

3   or assumption of the patent cross-license and the parties' respective rights. This litigation was also

4   significant because termination of the license would arguably trigger the liquidated damages provision

5   of the joint venture agreement. Because of PWSP's prior representation of Intel, the debtor retained

6   O'Melveny & Myers LLP as special litigation counsel to represent it in the dispute with Intel.

7       The various claims in the litigation with VIA and S3 and with Intel reportedly involved complex,

8   disputed facts. The declaration of Albert Boro, a PWSP partner, sets out the following chronology

9   concerning the litigation and related settlement negotiations. Settlement discussions between

10  SONICblue and VIA and S3 began in earnest on August 11, 2005 when the parties and their counsel

11  met to discuss a proposed structure for settlement. Following the initial meeting, counsel for

12  SONICblue participated in conference calls with special litigation counsel, LNBRB as committee

13  counsel, and Bennett as counsel for the senior bondholders. Based on those discussions, Boro concluded

14  that a global settlement that included Intel was necessary and that a settlement amount of less than $25

15  million would be acceptable to the committee. Committee counsel authorized the debtor to counter with

16  a settlement offer of $6 million. Bennett, as counsel for the senior bondholders, confirmed on August

17  30, 2005 that his clients would support a $6 million counteroffer. Boro believed that the consent of the

18  senior bondholders to the terms of a settlement was essential to court approval.

19      On September 12, 2005, counsel for VIA sent to PWSP a draft settlement term sheet proposing

20  that VIA be allowed a general unsecured claim in the amount of $27.5 million. In a subsequent

21  settlement meeting among counsel held on September 15, 2005, VIA and S3 reduced their settlement

22  demand to $19 million. Bennett indicated that the senior bondholders would support a settlement of

23  only $10 million. The debtor, through Smith, authorized a $10 million counteroffer. It is unclear

24  whether the committee at large was consulted at this juncture or why debtor's counsel consulted only

25  Bennett. Counsel ultimately reached a tentative agreement as to a settlement amount of $12.5 million,

26  subject to the approval of the respective clients and of creditors. The debtor, VIA, and S3 agreed

27  immediately to the settlement amount.

28      On September 20, 2005, Bennett confirmed the senior bondholders' agreement to a $12.5 million

---

7

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 allowed claim, provided the settlement included, *inter alia*, that the allowed claim be neither senior nor

2 junior to other general unsecured claims. The allowed amount of the defendants' claim appears to have

3 been fixed by September 20, 2005. Again, the record is unclear whether the committee participated at

4 this stage other than through the senior bondholders. In a conference call among counsel that same day,

5 SONICblue accepted the settlement terms but requested language that the allowed claim be neither

6 senior nor junior to other general unsecured claims. There were further discussions that the allowed

7 claim of the defendants would be a general unsecured claim, would receive an anticipated distribution

8 in the bankruptcy case of approximately 25%, and would not have priority, yet would not be

9 subordinated relative to other general unsecured claims. Boro reports that counsel for VIA and S3

10 "posed questions about subordination of the claims of the Senior Noteholders and other creditors, and

11 expressed concern that other creditors not unduly benefit at their clients' expense, but they nevertheless

12 agreed that their [allowed] claim was neither senior nor junior to other general unsecured claims."

13        Boro's declaration reflects that at the time of the September 15, 2005 settlement meeting, he was

14 aware that the senior bondholders were subordinated to VIA Indebtedness under the terms of the

15 indenture. His declaration also reflects that, prior to September 20, 2005, he had formed the belief that

16 the VIA Indebtedness referred only to the proposed $15 million loan to SONICblue that was never

17 made. On September 26, 2005, counsel for SONICblue and the defendants finalized a draft of the

18 proposed settlement term sheet, which included the following provision:

19        Claimants shall jointly hold a single, allowed general unsecured claim in the Chapter 11
case of SONICblue Inc., which claim shall be afforded the benefits and priority of
20        SONICblue's other allowed general unsecured claims and shall be neither senior nor
junior to any other allowed general unsecured claim, in the amount of $12.5 million. .
21        . .

22

23 Boro sent the proposed term sheet to Bennett and to LNBRB on September 27, 2005. In a conference

24 call held later that day, the committee approved the settlement terms. Bender stated in a declaration that

25 this proposed term sheet was the only document concerning the settlement terms that was provided to

26 committee counsel before it received the final settlement agreement.

27        Finalizing the settlement between SONICblue, VIA, and S3 was delayed and made complicated

28 by the difficulty in reaching a resolution with Intel over the parties' respective rights under the patent

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1  cross-license. For that reason, the initial draft of a settlement agreement was not prepared until January

2  25, 2006, when SONICblue's special litigation counsel, O'Melveny & Myers, circulated a draft that

3  contained a provision dealing with VIA's allowed claim that read substantially the same as the one in

4  the September 26, 2005 term sheet. Boro stated in his declaration that, in April or early May 2006, he

5  and PWSP partner Thomas Loran proposed that the settlement agreement include language specifically

6  stating that the defendants' allowed claim was not "Senior Indebtedness" under the indenture for the

7  senior debentures. Purportedly, the reason the PWSP attorneys made the suggestion was to foreclose

8  future litigation over the priority of VIA and S3's allowed claim. They also believed that "VIA

9  Indebtedness" referred to the $15 million loan that was never made.

10  On May 12, 2006, O'Melveny & Myers circulated a revised draft of the settlement agreement

11  with the following language added:

12  Claimants and the Debtor agree that the Allowed Claim is not, and shall not be treated
   as, "Senior Indebtedness" under the terms of the Debtor's Indenture, dated as of April

13  22, 2002, for the 7-¾ Secured Senior Subordinated Convertible Debentures due 2005.

14  VIA agreed to the language waiving "Senior Indebtedness" status on June 1, 2006. Substantially the

15  same language was included in a later revised draft circulated on June 16, 2006 and in the final

16  settlement agreement.

17

18  *Objection to Claim of Senior Bondholders*

19  Since substantially all assets have been liquidated, PWSP has been prosecuting avoidance

20  actions and objections to claims. It has divided and shared the work with LNBRB, however, PWSP

21  retained the more complex litigation or litigation requiring some knowledge of the background of the

22  debtor's operations. PWSP initially examined the claims of the senior bondholders and the junior

23  bondholders. It expended 49.50 hours, incurring $23,237.50 in legal fees, to complete its analysis of

24  the senior bondholders' claims, including research on the applicability of fraudulent transfer law and

25  usury law to the transaction. Based on its analysis, it identified a significant problem with the original

26  issue discount granted the bondholders, the difference between the face amount and the amount actually

27  paid for the debentures. The senior bondholders also received other consideration in the transaction,

28  including the UMC stock, that rendered the valuation of the original issue discount more complex.

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

SONICblue asserts that the original issue discount constituted unamortized interest as of the petition date that is subject to disallowance under Bankruptcy Code § 502(b)(2).   On July 20, 2006, PWSP attorney Matthew Walker sent an email to Bennett setting forth his analysis of the original issue discount and asserting that the bondholders' claim may be subject to partial disallowance under § 502(b)(2) to the extent of any unmatured interest as of the petition date. Walker's analysis showed an original issue discount of $43 million. He closed with an invitation to engage in a dialogue to resolve the matter short of formal litigation.

Bennett contacted PWSP partner Craig Barbarosh on August 24, 2006 to discuss SONICblue's challenge to the bondholders' claim. He also brought to Barbarosh's attention that PWSP had issued the opinion letter to the bondholders in connection with the issuance of the debentures. Bennett asserted that the bondholders had relied on the opinion letter, which they interpreted as assuring that their claims were allowable in a subsequent bankruptcy case. He further indicated that the bondholders would demand that PWSP defend and indemnify them for any losses resulting from SONICblue's challenge to their claim. Bennett's  partner followed up on September 5, 2006 with a letter to the managing partner of PWSP demanding indemnification from PWSP for any shortfall to which the senior bondholders may be subjected as a result of SONICblue's objection to their claim.  In the letter, he indicated that to the extent the bondholders are unable to recover in the bankruptcy case the full principal amount of the debentures, they intended to pursue PWSP for negligent misrepresentation and negligence, among other claims.

Barbarosh asserts in his declaration that the telephone call on August 24, 2006 was the first time he became aware of the April 22, 2002 opinion letter. PWSP immediately contacted counsel for the committee, informed Bender of the bondholders' indemnification demand, and turned over to the committee the task of prosecution of the objection to the claims of the senior bondholders.  On September 6, 2006, it forwarded its work file containing its analysis to LNBRB. PWSP did not, however, file a supplemental Bankruptcy Rule 2014 disclosure to address the claim of the senior bondholders. When it filed its eighth interim application for compensation with the court on October 18, 2006, PWSP did address the analysis of and potential objection to the claim of the senior bondholders. However, it simply disclosed, "The matter was turned over to the Creditors' Committee

10

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

1  for prosecution." PWSP partner Boro asserts in his declaration that he was unaware of any potential

2  or actual claim by the senior bondholders at the time he negotiated the language concerning the priority

3  and treatment of VIA's allowed claim under the settlement between September 2005 and June 2006.

### *Approval of VIA Settlement*

5      The VIA settlement agreement was filed under seal on October 10, 2006 with the debtor's

6  motion to approve the settlement. Bender asserts that LNBRB first received the settlement agreement

7  a few days before it was filed with the court. Because the settlement agreement was lengthy and

8  complex and because LNBRB had not seen any prior drafts, it requested that debtor's counsel verbally

9  walk LNBRB through the settlement agreement. In a conference call on October 4, 2006, Suzanne

10  Uhland of O'Melveny & Myers reviewed the document and the terms of the settlement agreement with

11  LNBRB partners Ron Bender and Craig Rankin. In a declaration, Bender states that there was no

12  discussion of the waiver in the settlement agreement of VIA's "Senior Indebtedness" status under the

13  indenture. He also indicated that the committee was very pleased with the settlement because it had

14  been willing to settle the litigation for $25 million. The court approved the VIA settlement on October

15  31, 2006.

### *Joint Disclosure Statement and Plan and Disclosure of Indemnification Demand Against PWSP*

17      The debtors, in consultation with the committee, had determined for strategic reasons to defer

18  efforts in these cases to propose and confirm a plan of reorganization. The reasons included the

19  uncertainty posed by the significant claims of VIA and S3 on the confirmability of and distributions

20  under a plan, the potential rejection of the Intel cross-license at confirmation, giving rise to up to $70

21  million in liquidated damages, and the desire to substantively consolidate the estates under a plan after

22  the VIA litigation was settled. The committee assumed the lead role in preparing the joint disclosure

23  statement and plan. The initial disclosure statement filed on December 15, 2006 disclosed PWSP's

24  conflict as follows:

> However, as a result of a conflict that has been asserted by the Senior Noteholders with
> respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing
> the Senior Notes Claims.

27      Upon the objection of creditors Riverside Contracting, LLC and Riverside Claims, LLC, the

28  disclosure statement was amended on January 18, 2007, elaborating on the description of the conflict

11

as follows:

> [U]ntil recently, counsel to the Debtors was in charge of analyzing the Senior Notes Claims. As a result of the Senior Noteholders' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee to assume the role of analyzing the Senior Notes Claims.

Neither the first amended disclosure statement nor the prior version disclosed that the senior bondholders are members of the creditors' committee, which has been charged with objecting to the bondholders' claims. They also failed to disclose that Smith, who would continue to serve as Chief Financial Officer and Responsible Individual, was a defendant in the junior bondholders' litigation.

On January 22, 2007, creditors Riverside Contracting, LLC, Riverside Claims, LLC, and Argo Partners, Inc. objected to the first amended disclosure statement, raising for the first time before the court the waiver in the VIA settlement agreement of the "Senior Indebtedness" status to which the VIA allowed claim was arguably entitled pursuant to the senior indenture. The objecting creditors asserted that the waiver effectively diluted the distribution to unsecured creditors because VIA otherwise would have accepted an allowed claim in a lower amount. SONICblue Claims LLC ("SB Claims") is a claims trader that has acquired at least $160,000 of the claims in this case and is the successor in interest to Argo Partners. It admittedly has been interested in acquiring the VIA claim since 2006 to profit from the "Senior Indebtedness" provision of the indenture.

Bender states that the committee first learned of the issue from the objections to the disclosure statement. He, at least, had previously been unaware of the connection between the waiver of status in the VIA settlement agreement and the "Senior Indebtedness" provision in the senior indenture. With respect to the committee's involvement in the negotiation of the VIA settlement, Bender explained to the court at the disclosure statement hearing on January 23, 2007:

> The Creditors' Committee was not a party to that litigation. And there were so many complicated confidentiality agreements that the Committee wasn't even privy to the top-level of confidentiality. So all I would do and Mr. Rankin would do is we would periodically call primarily the O'Melveny lawyers . . . to get updates from her. . . . We saw that as our limited role, which is why our fees with respect to that litigation are minuscule compared to the fee in the case. . . . [T]he Committee . . . was essentially a client – we were advised that really we were likely to lose on at least the $70 million part."

MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    This statement appears to be consistent with Bender's declaration in opposition to the motions

2    presently before the court:

3    While counsel to the Debtors (primarily Ms. Uhland of OMM) would periodically
     provide general status reports to LNBRB (primarily to Mr. Rankin and Ms. Wells who
4    were the partners at LNBRB principally in charge of dealing with the VIA/S3/Intel
     litigation) and communicate with LNBRB, and did obtain the authority of the Committee
5    (whose active participants at that time were the three Senior Noteholders and the two
     Matsushita entities) to settle with VIA/S3 by giving them an allowed general unsecured
6    claim of not more than $25 million, to the best of my knowledge, LNBRB was not a
     party to any of the confidential settlement discussions that ensued, and LNBRB was not
7    provided with any drafts of the actual VIA/S3 settlement agreement.

8    However, this characterization appears markedly at odds with the following statement in the

9    Seventh Interim Application of LNBRB for Approval of Fees and Reimbursement of Expenses filed

10   October 18, 2006: "LNBRB played a material role in negotiating and documenting the settlement."

11   LNBRB has also requested that the court approve $102,027.50 in legal fees incurred for services in

12   connection with the VIA litigation.

13   More than six months after the senior bondholders first asserted their claims against PWSP, and

14   only after the United States Trustee filed the motion for disqualification, PWSP filed a supplemental

15   Bankruptcy Rule 2014 disclosure on March 5, 2007 that states:

16   Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel
     Equity Fund Ltd. (collectively, the "Senior Noteholders"), are holders of the 7¾% Senior
17   Secured Subordinated Convertible Debentures due 2005 (the "Senior Notes"). The
     Debtors scheduled the claim of the Senior Noteholders for in excess of $77 million, and
18   each of the three Senior Noteholders filed its own proofs of claim in unspecified amounts
     related to the Senior Notes. In connection with its Application, the Firm previously
19   disclosed its substantial pre-petition representation of the Debtors, including for
     corporate and securities matters. As part of that representation, the Firm represented
20   SONICblue in issuing the Senior Notes. As is typical in such financing transactions, the
     Firm issued a legal opinion to the Senior Noteholders. Pursuant to letter dated
21   September 5, 2006, counsel to the Senior Noteholders sought indemnity from the Firm
     related to the Senior Notes (the "Demand"). The Firm has rejected the Demand and
22   declined to provide any indemnity to the Senior Noteholders, and immediately upon
     receipt of the Demand the Firm informed counsel for the Creditors' Committee of the
23   Demand and turned over the analysis of all issues regarding the allowance of the Senior
     Noteholders' claims to the Committee. No lawyer in the firm who handled the financing
24   transaction was involved in the firm's analysis regarding the Senior Noteholders' claims.
     Whether the Demand creates any disabling conflict or renders the Firm not
25   "disinterested" is presently before the Court on motions filed by the U.S. Trustee.

26   PWSP submits that its failure to file this supplemental disclosure earlier was inadvertent.

27

28

13

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

### LEGAL DISCUSSION

I.      **The Best Interests of Creditors Mandate the Disqualification of PWSP from its Representation in the Case and the Appointment of a Chapter 11 Trustee.**

Under § 327(a) of the Bankruptcy Code, a debtor in possession may employ attorneys that do not hold an interest adverse to the estate and that are disinterested persons. Thus, to serve as debtor's counsel, counsel must be free of all conflicting interests that might impair the impartiality and neutral judgment that they are expected to exercise. *In re Bellevue Place Associates,* 171 B.R. 615, 626 (N.D. Ill. 1994). "Conflicting loyalties produce inadequate representation, which threatens the interests of the debtor, the trustee and the creditors, and compromises the ability of courts to mete out justice." *In re Tevis*, 347 B.R. 679, 689 (9th Cir. B.A.P. 2006)(discussing California state law to define "adverse interest" under § 327(a)).  *See also In re Wheatfield Business Park LLC*, 286 B.R. 412, 417-418 (Bankr. C.D. Cal. 2002).  The presence of an actual conflict of interest renders counsel ineligible and constitutes grounds for disqualification from further service. *See In re Plaza Hotel Corp.*, 111 B.R. 882, 889-91 (Bankr. E.D. Cal.)(chapter 11 debtor's counsel disqualified for failing to disclose dual representation of the debtor and of debtor's owner/guarantors), *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990).  Section 1104(a)(2) of the Bankruptcy Code creates a flexible standard for appointing a trustee when it is in "the interests of the creditors, equity security holders, and other interests of the estate." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).  It requires the court to weigh competing interests and, under appropriate circumstances, to appoint a trustee regardless of whether "cause" exists within the meaning of § 1104(a)(1).  *Id.*  Although the United States Trustee has moved for the appointment of a trustee both for cause under § 1104(a)(1) and in the best interests of creditors under § 1104(a)(2), it need only prove one of these two statutory bases.  *Id.*

The undisputed facts establish that in April 2002, PWSP issued an opinion letter to SONICblue's senior bondholders. Six months later, SONICblue a retained PWSP as its bankruptcy counsel. In March 2003, when SONICblue filed its chapter 11 petition,  PWSP submitted its statement pursuant to Fed. R. Bankr. P. 2014 to disclose its connections to "the debtor, creditors and any other interested parties." The statement did not note any connection with the senior bondholders.  Aware of its ongoing duty to

14

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   disclose any conflicts and connections, PWSP filed seven supplemental Rule 2014 disclosure statements

2   through June 2006. None of these supplemental statements mentioned the 2002 opinion letter or any

3   other connection between PWSP and the three senior bondholders. Then, in late August 2006, the three

4   senior bondholders demanded indemnification from PWSP based on the 2002 opinion letter in the event

5   that objections to the bondholders' claims resulted in any losses to the bondholders. This verbal demand

6   was followed with a written demand on September 5, 2006. The next day PWSP transferred its files

7   concerning SONICblue's objections to the bondholders' claims to LNBRB. Six months later, on March

8   5, 2007, after the United States Trustee had filed motions both to appoint a trustee and to disqualify

9   PWSP, PWSP filed its eighth supplemental Rule 2014 disclosure statement that provided a detailed

10  explanation of PWSP's conflict of interest with the senior bondholders.

11          From these facts it is clear that PWSP knew it had a continuing duty to update its Rule 2014

12  disclosures upon learning of any undisclosed connections or conflicts. It is also apparent that as of late

13  August 2006, PWSP knew it had a disabling conflict of interest because it immediately sought the aid

14  of LNBRB in an attempt to resolve the conflict. Yet, PWSP failed to apprise the court of these facts.

15  PWSP's attempt to characterize its failure as inadvertent oversight rings hollow in the face of its

16  previous history of supplemental disclosures. PWSP argued in court that the partner in charge

17  "assumed" a supplemental disclosure had been made, but the firm has not offered any evidentiary

18  foundation for that assumption. The declaration of PWSP partner William Freeman indicates that

19  Freeman had signed several of the earlier supplements and that he typically delegated responsibility for

20  drafting the disclosures. There is no indication, however, that Freeman or any other PWSP partner

21  undertook responsibility, or asked someone else to assume responsibility, for preparing a supplemental

22  disclosure when the actual conflict of interest concerning the senior bondholders arose. PWSP has

23  neither offered proof of any time spent drafting the disclosure nor produced a draft of a disclosure that

24  the firm somehow failed to file. In the end, however, whether intentional or inadvertent, PWSP's failure

25  to disclose this significant and disabling conflict in any reasonable fashion mandates immediate

26  disqualification of PWSP from its representation in this case. Estate professionals must make full,

27  candid and complete disclosures of all facts affecting their eligibility for employment. *In re Plaza Hotel*

28  *Corp.*, 111 B.R. at 883, *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990). *See also Neben & Starrett, Inc. v.*

15

1   *Chartwell Financial Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995), *cert. denied*, 516

2   U.S. 1049 (1996)(affirming denial of all fees after debtor's counsel failed to fully disclose circumstances

3   surrounding payment of firm's retainer). The Rule 2014 disclosure requirements are strictly enforced.

4   *Park-Helena*, 63 F.3d at 881-82. Negligent omissions do not excuse failures to disclose. *Plaza Hotel*,

5   111 B.R. at 883. Although PWSP has offered its future service in some more limited capacity, it would

6   not be helpful because the firm's motives in this case would remain subject to attack.

7          The entirety of the undisputed facts also provides clear and convincing evidence that the

8   appointment of a chapter 11 trustee is necessary to restore creditor confidence in the bankruptcy system

9   and to assure that there is no lingering taint from PWSP's representation of the debtor. Neither the court

10  nor the creditors may ever learn why PWSP or Smith, as debtor's responsible individual, failed to bring

11  PWSP's conflict to the court's attention. But, that unanswered question is less important with the

12  appointment of a strong, neutral trustee, who has no connections to any interested party.

13         The presence of a trustee will also alleviate any doubts regarding Smith's role as SONICblue's

14  responsible individual. Both the United States Trustee and SB Claims have questioned whether Smith

15  has relinquished his management responsibilities to PWSP. As the United States Trustee pointed out,

16  Smith's services are part-time at best and SONICblue has no Board of Directors to whom Smith is

17  required to report. Additionally, it is troubling that the Disclosure Statement filed with the court failed

18  to divulge that Smith is a defendant in a lawsuit by SONICblue's junior bondholders that alleges that

19  Smith and SONICblues' former officer and directors breached their fiduciary duties to the company

20  when they authorized the issuance of the senior debentures in 2002. In light of these substantial

21  concerns, the appointment of a trustee is warranted.

22  **II.    It is Not in the Best Interest of Creditors to Convert This Case to Chapter 7.**

23         SB Claims has asserted that conversion to chapter 7 is preferable to the appointment of a chapter

24  11 trustee. Althoughs SB Claims relies on several justifications for conversion, in the court's view, the

25  primary reason to convert would be to remove the influence of the creditors' committee from this case.

26  The committee and LNBRB in its filings with the court, support as its "first choice" the retention of

27  PWSP as debtor's counsel while an examiner reviews the pending allegations. Because the facts

28  indicate at least the appearance of impropriety by the committee and LNBRB, SB Claims's concerns

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

16

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1   in this regard are substantial.

2       During the past year and a half, SONICblue's litigation against VIA and S3 has been the main

3   roadblock to the proposal of a plan and the conclusion of this case. The three senior bondholders were

4   actively represented in the settlement negotiations by Bennett. At the same time, these same senior

5   bondholders were both members and an effective majority of the committee. As committee members,

6   the senior bondholders were and are fiduciaries that bear a duty of undivided loyalty to provide impartial

7   service in the interests of the creditors that they represent. *In re Caldor, Inc.*, 193 BR 165, 169 (Bankr.

8   S.D.N.Y. 1996); *In re Microboard Processing, Inc.*, 95 B.R. 283, 284 (Bankr. D. Conn 1989); *In re*

9   *Mesta Machine Co*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Because the bondholders appear to have

10  used their position on the committee to insert themselves into the settlement negotiations without

11  revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body.

12  Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over

13  the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not

14  known. In fact, as Bennett noted, he had never personally appeared in court until March 19, 2007.

15  During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was

16  not generally known to this court or the creditor body that the three senior bondholders were serving

17  on the committee.

18      SB Claims also expresses concern that LNBRB may have failed to fulfill its role as a watchdog

19  on behalf of the unsecured creditors. First, it appears that LNBRB failed to independently review the

20  settlement agreement between VIA and SONICblue. Although LNBRB asserted in its fee application

21  that it was "intimately" involved in the VIA settlement, in court it has acknowledged that it was

22  essentially a "client" with respect to the settlement negotiations. Similarly, in his declaration on these

23  motions, Bender states that LNBRB received the VIA settlement agreement after it was a "done deal."

24  Rather than review the lengthy document with fresh eyes, Bender called upon O'Melveny & Myers,

25  SONICblue's special litigation counsel, to verbally walk through the settlement's main points. Second,

26  when the actual conflict arose between PWSP and the senior bondholders, SB Claims points out that

27  LNBRB accepted responsibility for prosecuting the objections to the bondholders' claims without

28  considering its own connections to the bondholders and the fact, or at least appearance, that it might also

17

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  be conflicted.  Professionals retained by an official committee of unsecured creditors owe fiduciary

2  duties to the committee and its constituency.  *Caldor,* 193 B.R. at 170; *Matter of Celotex Corp.,* 123

3  B.R. 917, 920 (M.D. Fla. 1991);  *Mesta Machine Co,* 67 B.R. at 156.  This includes an obligation to

4  represent fairly the interest of the entire creditor class, not just the committee members.  *In re General*

5  *Homes Corp.,* 181 B.R. 870 (Bankr. S.D. Tex. 1994); *In re EBP, Inc.,* 171 B. R. 601 (Bankr. N.D. Ohio

6  1994); *Mesta Machine Co,* 67 B.R. at 156; *Pension Benefit Guaranty Corporation v. Pincus, Verlin,*

7  *Hahn Reich & Goldstein Professional Corp.,* 42 B.R. 960,  (E.D. Pa. 1984).  It is not clear at this

8  juncture whether LNBRB's handling of the objections of the bondholders was an actual conflict of

9  interest, however, it is worth noting that under § 328(c), unless adequate disclosure is made and prior

10  approval of the court is obtained, committee counsel can be denied compensation if at any time during

11  the representation counsel is not a disinterested person.  *Mesta Machine,* 67 B.R. at 157-158.  No

12  disclosures were made and no court approval was obtained with respect to LNBRB's acceptance of the

13  claims objections referred from PWSP. Finally, SB Claims suggests, and the record does not dispel, the

14  belief that LNBRB's conduct was a self-interested act to protect its referral sources.  A committee

15  controlled by the three senior bondholders hired LNBRB and, of course, has the continuing ability to

16  fire LNBRB. If not an actual conflict, these facts certainly raise questions regarding LNBRB's

17  suitability to vigorously pursue the claims objections on behalf of the estate.  Moreover, the protective

18  atmosphere surrounding this close-knit referral circle is reminiscent of the "opprobrious" bankruptcy

19  ring and the cronyism that Congress decried in the legislative history of the Bankruptcy Reform Act of

20  1978. H. Rep. No. 95-595, at 6011 (Sept. 8, 1977).

21        The fact that counsel for claims traders flagged the concerns over potential improprieties or that

22  the claims traders' may be acting in their own self-interest does not detract from the troublesome nature

23  of their arguments.  Nevertheless, these very significant concerns are outweighed in this case by the

24  need for the appointment of a strong and disinterested trustee.

25        There have been serious allegations that the case is being run by and for the benefit of counsel.

26  As a result, an active trustee who will formulate an independent strategy and direct its own counsel is

27  critical.  It is important to this court that the United State Trustee can tap into a large pool of possible

28  trustees by conducting a nationwide search.  In this way, the United States Trustee will have a far

18

MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

1    greater opportunity to locate a strong trustee with the appropriate qualifications and without connections

2    to this case and this legal community.  Additionally, if the case remains in chapter 11, the Bankruptcy

3    Rules require, as a safeguard, that the United States Trustee's application for an order approving either

4    the appointment or the election of a trustee must include a disclosure of all the proposed trustee's

5    connections to the debtor, creditors and other parties in interest.  Fed. R. Bankr. P. Rule 2007.1(c).

6    There is no similar disclosure requirement in chapter 7.

7

8                                    CONCLUSION

9        After careful review of the evidence, consideration of both oral and written argument, the court

10   concludes that the United States Trustee has satisfied its burden of establishing that PWSP must be

11   disqualified from its representation in this case and that the appointment of a chapter 11 trustee is in the

12   best interests of "creditors, any equity security holders, and other interests of the estate."  11 U.S.C.

13   § 1104(a)(2).  The issue of disgorgement of fees is reserved for a later hearing after review by the

14   appointed trustee.

15       Good cause appearing, IT IS SO ORDERED.

16

17                        * * * END OF ORDER * * *

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

19

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

1  Case No. 03-51775-MM

2  <u>**SERVICE LIST**</u>

3

4  CRAIG A BARBAROSH                    SUZZANNE S UHLAND
5  PILLSBURY WINTHROP LLP               O'MELVENY & MYERS LLP
   650 TOWN CENTER DRIVE 7TH FLOOR      EMBARCADERO CANTER WEST
6  COSTA MESA CA 92626-7122             275 BATTERY STREET
                                        SAN FRANCISCO CA 94111-3305
7

8  RON BENDER                           NANETTE DUMAS
   LEVENE NEALE BENDER RANKIN &         OFFICE OF THE UNITED STATES
   BRILL LLP                            TRUSTEE
9  1801 AVENUE OF THE STARS STE 1120    280 SOUTH FIRST ST SUITE 268
10 LOS ANGELES CA 90067                 SAN JOSE CA 95113-0002

11 K JOHN SHAFFER                       HENRY KEVANE
   STUTMAN TRIESTER & GLATT PC          PACHULSKI STANG ZIEHL YOUNG
12 1901 AVENUE OF THE STARS 12TH FL     JONES & WEINTRAUB LLP
   LOS ANGELES CA 90067                 150 CALIFORNIA STREET 15TH FLOOR
13                                      SAN FRANCISCO CA 94111-4500

14
   BRUCE BENNETT                        BERNARD BURK
15 HENNIGAN BENNETT & DORMAN LLP        HOWARD RICE NEMEROVSKI CANADY
   865 SOUTH FIGUEROA ST SUITE 2900     FALK & RABKIN
16 LOS ANGELES CA 90017                 3 EMBARCADERO CENTER 7TH FLOOR
                                        SAN FRANCISCO CA 94111-4024
17

18 PATRICK M COSTELLO                   ROBERT A FRANKLIN
   BIALSON BERGEN & SCHWAB              MURRAY & MURRAY
19 2600 EL CAMINO REAL SUITE 300        19400 STEVENS CREEK BLVD SUITE 200
   PALO ALTO CA 94306                   CUPERTINO CA 95014-2548
20

21 WILLIAM MCGRANE                      SCOTT MCNUTT
   BERNARD S GREENFIELD                 MCNUTT & LITTENEKER LLP
22 MCGRANE & GREENFIELD LLP             188 THE EMBARCADERO SUITE 800
   ONE FERRY BUILDING SUITE 220         SAN FRANCISCO CA 94105
   SAN FRANCISCO CA 94111
23

24 RICHARD A ROGAN
   JEFFER MANGELS BUTLER &
25 MARMARO LLP
   TWO EMBARCADERO CENTER 5TH FL
26 SAN FRANCISCO CA 94111-3824

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

# U.S. Bankruptcy Court
## Northern District of California (San Jose)
### Bankruptcy Petition #: 03-51775

Assigned to: Judge Marilyn Morgan
Chapter 11
Voluntary
Asset

*Date Filed:* 03/21/2003

**Debtor**
**SONICblue Inc.**
2600 San Tomas Expwy.
Santa Clara, CA 95051
Tax id: 77-0204341
*dba*
**S3 Inc.**

represented by **Ana N. Damonte**
Pillsbury Winthrop Shaw Pittman
50 Fremont St. 5th Fl.
P.O. Box 7880
San Francisco, CA 94120-7880
(415) 983-1000
Email:
ana.damonte@pillsburylaw.com
*TERMINATED: 03/26/2007*

**Anne E. Wells**
Levene, Neale, Bender, Rankin and
Brill
10250 Constellation Blvd. #1700
Los Angeles, CA 90067
(310) 229-1234



UNITED STATES BANKRUPTCY COURT
Northern District of California
I certify that this is a true, correct and full copy
of the original document on file in my custody.
Dated _5/14/07_
by _Janet Austin_
Deputy Clerk

**Austin K. Barron**
Law Offices of O'Melveny and
Myers
400 S Hope St.
Los Angeles, CA 90071-2899
(213) 430-6000
Email: abarron@omm.com

**Craig A. Barbarosh**
Pillsbury Winthrop Shaw Pittman
650 Town Center Dr. 7th Fl.
Costa Mesa, CA 92626-7122
(714) 436-6800

**Craig A. Barbarosh**
(See above for address)
*TERMINATED: 03/26/2007*

**Elizabeth Gehlhar**

Heritage Law Group
99 Almaden Blvd. #710
San Jose, CA 95113
(408) 925-0144

**Mark D. Houle**
Pillsbury Winthrop Shaw Pittman
650 Town Center Dr. 7th Fl.
Costa Mesa, CA 92626
(714) 436-6800
Email:
mark.houle@pillsburylaw.com
*TERMINATED: 03/26/2007*

**Mark Porter**
Law Offices of Fenwick and West
275 Battery St. #1500
San Francisco, CA 94111
(415) 875-2300
Email: mporter@fenwick.com

**Matthew A. Gold**
Argo Partners
12 W 37th St. 9th Fl.
New York, NY 10018
(212) 643-5444
Email: Tanja@argopartners.net

**Matthew S. Walker**
Pillsbury Winthrop Shaw Pittman
12255 El Camino Real #300
San Diego, CA 92130
(619) 234-5000
Email:
matthew.walker@pillsburylaw.com
*TERMINATED: 03/26/2007*

**Richard A. Rogan**
Jeffer, Mangels, Butler and
Marmaro
2 Embarcadero Center 5th Fl.
San Francisco, CA 94111-3824
(415) 398-8080
Email: rrogan@jmbm.com

*Responsible Ind*
**Marcus Smith**
2841 Mission College Blvd.
Santa Clara, CA 95054-1838

(408) 997-2179

**Trustee**
**Dennis J. Connolly**
Alston & Bird, LLP
1201 W. Peachtree St.
Atlanta, GA 30309-3424
404-881-7269

represented by **Cecily A. Dumas**
Friedman, Dumas and Springwater
150 Spear St. #1600
San Francisco, CA 94104
(415) 834-3802
Email:
cdumas@friedumspring.com

**Grant T. Stein**
Alston and Bird
1201 W Peachtree St.
Atlanta, GA 30309-3424
(404) 881-7000

**U.S. Trustee**
**Office of the U.S. Trustee / SJ**
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004

represented by **Nanette Dumas**
Office of the U.S. Trustee
280 S 1st St. #268
San Jose, CA 95113
(408) 535-5525
Email: nanette.dumas@usdoj.gov

**Shannon L. Mounger-Lum**
Office of the U.S. Trustee
280 S 1st St. #268
San Jose, CA 95113-0002
(408) 535-5525
Email:
shannon.l.mounger-lum@usdoj.gov

**Todd M. Arnold**
Levene, Neale, Bender, Rankin,
and Brill
10250 Constellation Blvd. #1700
Los Angeles, CA 90067
(310) 229-1234
Email: TMA@lnbrb.com

**Creditor Committee**
**Official Committee of Unsecured Creditor**

represented by **Anne E. Wells**
(See above for address)

**Craig M. Rankin**
Levene, Neale, Bender, Rankin and
Brill
10250 Constellation Blvd. #1700
Los Angeles, CA 90067
(310) 229-1234

**Mark D. Houle**
(See above for address)

**Ron Bender**
Levine, Neale and Bender
1801 Ave. of the Stars #1120
Los Angeles, CA 90067
(310) 551-1010
Email: rb@lnbrb.com

**Todd M. Arnold**
(See above for address)

| Filing Date | # | Docket Text |
|---|---|---|
| 02/15/2007 | ●2153 | Motion to Appoint Trustee *Chapter 11 Trustee*, or in the alternative Motion to Appoint Examiner Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette) ERROR: SHOULD HAVE BEEN DOCKETED BEFORE DOCUMENT # 2152. FOR INFORMATIONAL PURPOSES ONLY. NOT ACTION TO BE TAKEN AT THIS TIME. Modified on 2/16/2007 (jd, ). (Entered: 02/15/2007) |
| 02/15/2007 | ●2154 | Certificate of Service (RE: related document(s)2153 Motion to Appoint Trustee, Motion to Appoint Examiner, 2152 Motion to Shorten Time). (Attachments: # 1 Notice of Electronic Filing) (Dumas, Nanette) (Entered: 02/15/2007) |
| 02/15/2007 | ●2155 | Order Not Signed Regarding Motion to Shorten Time (Related Doc # 2152) (be, ) (Entered: 02/15/2007) |
| 02/15/2007 | ●2167 | Hearing Held (RE: related document(s)2140 Motion for Authority to Disclose Confidential Information to People who are not Parties to the Via/Intel Confidentiality Agreement Filed by Creditor Committee Official Committee of Unsecured Creditor (Bender, Ron)). The motion will not be decided at this time. Any motions to be filed by counsel will be heard on 3/19/07 at 10:30 a.m. (mem, ) (Entered: 02/23/2007) |
| 02/16/2007 | ●2156 | Assignment of Claim #unknown To ESM Investors LTD. Filed by Creditor ESM Investors LTD . (jd, ) (Entered: 02/16/2007) |
| 02/16/2007 | ●2157 | Notice of Alleged Transfer of Claim (RE: related document(s)2156 Assignment of Claim). Objections to Assignment of Claim due by 3/8/2007. (jd, ) (Entered: 02/16/2007) |

| 02/16/2007 | ●2158 | Notice Regarding *Filing of: (I) Redacted Copy of Debtors' Motion for Approval of Settlement of VIA and Intel Litigation; (II) Declaration of Marcus Smith in Support of Debtors' Motion for Approval of Settlement of VIA and Intel Litigation; (III) Redacted Copy of Executed Settlement Agreement* (RE: related document(s)1952 DOCUMENT FILED UNDER SEAL: Motion for Approval of Settlement of VIA and INTEL Litigation Filed by Debtors Diamond Multimedia Systems, Inc., Multimedia Systems, Inc., REPLAYTV, Inc., SONICblue Inc., Sensory Science Corporation (tm, )). Filed by Debtor SONICblue Inc. (Attachments: # 1 Exhibit 1 - Redacted Motion# 2 Exhibit 2 - Smith Declaration# 3 Exhibit 3 - Redacted Executed Settlement# 4 Certificate of Service) (Damonte, Ana) (Entered: 02/16/2007) |
|---|---|---|
| 02/16/2007 | ●2159 | BNC Certificate of Mailing (RE: related document(s)2147 Order). Service Date 02/16/2007. (Admin.) (Entered: 02/16/2007) |
| 02/16/2007 | ●2160 | BNC Certificate of Mailing (RE: related document(s)2148 Order). Service Date 02/16/2007. (Admin.) (Entered: 02/16/2007) |
| 02/17/2007 | ●2161 | BNC Certificate of Mailing (RE: related document(s)2155 Order on Motion to Shorten Time). Service Date 02/17/2007. (Admin.) (Entered: 02/17/2007) |
| 02/18/2007 | ●2162 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2157 Notice of Alleged Transfer of Claim). Service Date 02/18/2007. (Admin.) (Entered: 02/18/2007) |
| 02/20/2007 | ●2163 | Motion *By United States Trustee to Disqualify Pillsbury Winthrop Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees* Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette) (Entered: 02/20/2007) |
| 02/20/2007 | ●2164 | Notice of Hearing (RE: related document(s)2163 Motion *By United States Trustee to Disqualify Pillsbury Winthrop Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees* Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette)). Hearing scheduled for 3/19/2007 at 10:30 AM at SanJose Courtroom 3070 - Morgan. Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette) (Entered: 02/20/2007) |
| 02/20/2007 | ●2165 | Certificate of Service *re Motion By United States Trustee to Disqualify Pillsbury Winthrop Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees* (RE: related document(s)2163 Motion Miscellaneous Relief). (Attachments: # 1 Notice of Electronic Filing) (Dumas, Nanette) (Entered: 02/20/2007) |

| | | |
|---|---|---|
| 02/20/2007 | 2166 | Certificate of Service *Notice of Hearing on the Motion By United States Trustee to Disqualify Pillsbury Winthrop Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees* (RE: related document(s)2164 Notice of Hearing, ). (Attachments: # 1 Notice of Electronic Filing) (Dumas, Nanette) (Entered: 02/20/2007) |
| 02/27/2007 | 2168 | Amended Motion to Appoint Trustee *(Chapter 11 Trustee)* Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette) (Entered: 02/27/2007) |
| 02/27/2007 | 2169 | Certificate of Service (RE: related document(s)2168 Motion to Appoint Trustee). (Attachments: # 1 Notice of Electronic Filing) (Dumas, Nanette) (Entered: 02/27/2007) |
| 02/27/2007 | 2170 | Hearing Held (RE: related document(s)2110 Sixth Interim Application for Compensation for Linda K. Cooper , Auditor, Fee: $21425.60, Expenses: $463.59. Filed by Auditor Linda K. Cooper (jd, ). Approved as submitted, fees of $21,425.60 and expenses of $463.59. (mem, ) (Entered: 02/27/2007) |
| 02/27/2007 | 2171 | Motion to Convert Case to Chapter 7 Fee Amount $15 Filed by Creditor SonicBlue Claims LLC (McGrane, William) (Entered: 02/27/2007) |
| 02/27/2007 | 2172 | Notice of Hearing (RE: related document(s)2171 Motion to Convert Case to Chapter 7 Fee Amount $15 Filed by Creditor SonicBlue Claims LLC (McGrane, William)). Hearing scheduled for 3/19/2007 at 10:30 AM at SanJose Courtroom 3070 - Morgan. Filed by Creditor SonicBlue Claims LLC (McGrane, William) (Entered: 02/27/2007) |
| 02/28/2007 | 2173 | First Amended Motion to Convert Case to Chapter 7 Fee Amount $15 Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Certificate of Service) (McGrane, William) (Entered: 02/28/2007) |
| 02/28/2007 | 2174 | Notice of Hearing *Re SonicBlue Claims, LLC's Amended Motion to Convert to Chapter 7* (RE: related document(s)2173 First Amended Motion to Convert Case to Chapter 7 Fee Amount $15 Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Certificate of Service) (McGrane, William)). Hearing scheduled for 3/19/2007 at 10:30 AM at SanJose Courtroom 3070 - Morgan. Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Certificate of Service) (McGrane, William) (Entered: 02/28/2007) |
| 03/01/2007 | 2175 | Joinder *in Motion by United States Trustee to Disqualify Pillsbury Winthorp Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees [Docket Number 2163]* (RE: related document(s)2163 Motion Miscellaneous Relief). Filed by Creditor SonicBlue Claims LLC (McGrane, William) (Entered: 03/01/2007) |

| 03/01/2007 | ⚫2176 | Transcript, Date of Hearing: 2-15-07 *a) Motion for Authority to Disclose Confidential Information to People Who are Not Parties to the VIA/Intel Confidentiality Agreement by Official Committee of Creditors Holding Unsecured Claims; b) Response by VIA Technologies, Inc..* (McCall, Jo) (Entered: 03/01/2007) |
|---|---|---|
| 03/01/2007 | ⚫2177 | Notice of Hearing (RE: related document(s)2168 Amended Motion to Appoint Trustee *(Chapter 11 Trustee)* Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette)). Hearing scheduled for 3/19/2007 at 10:30 AM at SanJose Courtroom 3070 - Morgan. Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Mounger-Lum, Shannon) (Entered: 03/01/2007) |
| 03/01/2007 | ⚫2178 | Certificate of Service *Notice of Hearing on Amended Motion of United States Trustee for Appointment of Chapter 11 Trustee* (RE: related document(s)2177 Notice of Hearing, ). (Attachments: # 1 Court Mailing Matrix) (Mounger-Lum, Shannon) (Entered: 03/01/2007) |
| 03/01/2007 | ⚫2179 | Order Granting Application For Compensation (Related Doc # 2110). fees awarded: $21425.60, expenses awarded: $463.59 for Linda K. Cooper (jd, ) (Entered: 03/02/2007) |
| 03/05/2007 | ⚫2180 | Supplemental Declaration of William B. Freeman in In Support of *Application for Order Pursuant to Bankruptcy Code Section 327(a) Authorizing the Employment and Retention of Pillsbury Winthrop LLP as General Insolvency Counsel to the Debtors* (RE: related document(s)[71] Application to Employ). Filed by Debtors Diamond Multimedia Systems, Inc., REPLAYTV, Inc., SONICblue Inc., Sensory Science Corporation (Attachments: # 1 Certificate of Service) (Houle, Mark) (Entered: 03/05/2007) |
| 03/05/2007 | ⚫2181 | Response to *Motion to Convert Chapter 11 Case to a Case Under Chapter 7* (RE: related document(s)2173 Motion to Convert Case to Chapter 7). Filed by Creditors Citadel Equity Fund Ltd., Smithfield Fiduciary LLC, Portside Growth and Opportunity Fund (Attachments: # 1 Exhibit A (Part 1)# 2 Exhibit A (Part 2)) (Mester, Joshua) (Entered: 03/05/2007) |
| 03/05/2007 | ⚫2182 | Brief/Memorandum in Opposition to *U.S. Trustee's Motion to Disqualify Pillsbury, Vacate Employment Order, and Require Disgorgement of Attorneys' Fees* (RE: related document(s)2163 Motion Miscellaneous Relief). Filed by DEBTOR SONICBLUE INC., DIAMOND MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC. AND SENSORY SCIENCE CORPORATION.(Attachments: # 1 Declaration of Ana N. Damonte# 2 Exhibit A to Damonte Declaration# 3 Exhibit B to Damonte Declaration# 4 Exhibit C to Damonte Declaration# 5 Exhibit D to the Damonte Declaration# 6 Exhibit E to the Damonte Declaration# 7 Exhibit E to the Damonte Declaration# 8 Exhibit G to the Damonte Declaration# 9 |

Exhibit H to the Damonte Declaration# <u>10</u> Exhibit I to the Damonte Declaration# <u>11</u> Declaration of William B. Freeman# <u>12</u> Exhibit 1 to the Freeman Declaration# <u>13</u> Exhibit 2 to the Freeman Declaration# <u>14</u> Declaration of Craig A. Barbarosh# <u>15</u> Exhibit 1 to Barbarosh Declaration# <u>16</u> Exhibit 2 to Barbarosh Declaration# <u>17</u> Exhibit 3 to the Barbarosh Declaration# <u>18</u> Exhibit 4 to the Barbarosh Declaration# <u>19</u> Declaration of Nancy B. Rapoport# <u>20</u> Exhibit 1 to Rapoport Declaration# <u>21</u> Exhibit 2 to Rapoport Declaration# <u>22</u> Exhibit 3 to Rapoport Declaration# <u>23</u> Exhibit 4 to Rapoport Declaration# <u>24</u> Exhibit 5 to Rapoport Declaration# <u>25</u> Exhibit 6 to Rapoport Declaration# <u>26</u> Exhibit 7 to Rapoport Declaration# <u>27</u> Exhibit 8 to Rapoport Declaration# <u>28</u> Declaration of Albert J. Boro, Jr.# <u>29</u> Exhibit 1 to Boro Declaration# <u>30</u> Exhibit 2 to Boro Declaration# <u>31</u> Exhibit 3 to Boro Declaration# <u>32</u> Exhibit 4 to Boro Declaration# <u>33</u> Declaration 5 to Boro Declaration# <u>34</u> Exhibit 6 to Boro Declaration# <u>35</u> Exhibit 7 to Boro Declaration# <u>36</u> Exhibit 8 to Boro Declaration# <u>37</u> Exhibit 9 to Boro Declaration# <u>38</u> Certificate of Service) (Damonte, Ana) ERROR: INCORRECT PARTY FILER SELECTED COURT CORRECTES. Modified on 3/6/2007 (jd, ). (Entered: 03/05/2007)

| 03/05/2007 | ● <u>2183</u> | Certificate of Service *by ECF Electronic Notification* (RE: related document(s)<u>2182</u> Opposition Brief/Memorandum,,,,,,, ). (Damonte, Ana) (Entered: 03/05/2007) |
| 03/05/2007 | ● <u>2184</u> | Response to *RESPONSE OF THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS TO (1) THE MOTION BY THE OFFICE OF THE UNITED STATES TRUSTEE SEEKING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE AND (2) THE MOTION BY SBC SEEKING TO CONVERT THESE CHAPTER 11 CASES TO CHAPTER 7* (RE: related document(s)<u>2173</u> Motion to Convert Case to Chapter 7, <u>2168</u> Motion to Appoint Trustee). Filed by Creditor Committee Official Committee of Unsecured Creditor (Attachments: # <u>1</u> Exhibit 1 through 5# <u>2</u> Certificate of Service) (Bender, Ron) (Entered: 03/05/2007) |
| 03/05/2007 | ● <u>2185</u> | Declaration of Ron Bender in In Support of *RESPONSE OF THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS TO (1) THE MOTION BY THE OFFICE OF THE UNITED STATES TRUSTEE SEEKING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE AND (2) THE MOTION BY SBC SEEKING TO CONVERT THESE CHAPTER 11 CASES TO CHAPTER 7* (RE: related document(s)<u>2173</u> Motion to Convert Case to Chapter 7, <u>2168</u> Motion to Appoint Trustee). Filed by Creditor Committee Official Committee of Unsecured Creditor (Attachments: # <u>1</u> Exhibit 1 through 5# <u>2</u> Certificate of Service) (Bender, Ron) (Entered: 03/05/2007) |
| 03/05/2007 | ● <u>2191</u> | Notice of Change of Address of attorney for creditor Filed by Creditors Glenn Fuller , Benjumin G. Fuller (jd, ) (Entered: 03/09/2007) |

| 03/06/2007 | 2186 | Certificate of Service (RE: related document(s)2181 Response, ). (Mester, Joshua) (Entered: 03/06/2007) |
| --- | --- | --- |
| 03/06/2007 | 2187 | Notice of Change of Address *of Counsel, Matthew S. Walker* Filed by Debtor SONICblue Inc. (Walker, Matthew) (Entered: 03/06/2007) |
| 03/07/2007 | 2188 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: CD LIT Digital To Argo Partners. Filed by Creditor Argo Partners. (Gold, Matthew) (Entered: 03/07/2007) |
| 03/07/2007 | 2189 | Order Granting Application to Compromise Controversy with (Related Doc # 2022) (jd, ) (Entered: 03/07/2007) |
| 03/08/2007 | 2190 | Reply to *Opposition to the US Trustee's Motion to Disqualify Pillsbury* (RE: related document(s)2182 Opposition Brief/Memorandum,,,,,,, ). Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Declaration of John Shaffer in Support of Reply to Opposition# 2 Declaration of Robert E. White in Support of Reply to Opposition) (McGrane, William) (Entered: 03/08/2007) |
| 03/09/2007 | 2192 | BNC Certificate of Mailing (RE: related document(s)2189 Order on Application to Compromise Controversy). Service Date 03/09/2007. (Admin.) (Entered: 03/09/2007) |
| 03/12/2007 | 2193 | Assignment of Claim # To ESM INVestors LTD. Filed by Creditor ESM Investors LTD . (jd, ) (Entered: 03/12/2007) |
| 03/12/2007 | 2194 | Notice of Alleged Transfer of Claim (RE: related document(s)2193 Assignment of Claim). Objections to Assignment of Claim due by 4/2/2007. (jd, ) (Entered: 03/12/2007) |
| 03/12/2007 | 2195 | Joinder (RE: related document(s)2168 Motion to Appoint Trustee). Filed by Creditors Riverside Claims, Riverside Contracting (Attachments: # 1 Certificate of Service) (Franklin, Robert) (Entered: 03/12/2007) |
| 03/12/2007 | 2196 | Motion *OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO APPROVE DISMISSAL OF AVOIDANCE ACTION AGAINST ISLAND DATA CORPORATION AND RIVERSIDE CONTRACTING, LLC* Filed by Creditor Committee Official Committee of Unsecured Creditor (Attachments: # 1 Memorandum of Points and Authorities # 2 Declaration of Marcus Smith in Support of Motion) (Arnold, Todd) (Entered: 03/12/2007) |
| 03/12/2007 | 2197 | Notice Regarding *OFFICIAL COMMITTEE OF UNSECURED CREDITORS' NOTICE AND OPPORTUNITY FOR HEARING RE:* |

| | | |
|---|---|---|
| | | *MOTION TO APPROVE DISMISSAL OF AVOIDANCE ACTION AGAINST ISLAND DATA CORPORATION AND RIVERSIDE CONTRACTING, LLC* (RE: related document(s)2196 Motion *OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO APPROVE DISMISSAL OF AVOIDANCE ACTION AGAINST ISLAND DATA CORPORATION AND RIVERSIDE CONTRACTING, LLC* Filed by Creditor Committee Official Committee of Unsecured Creditor (Attachments: # 1 Memorandum of Points and Authorities # (2) Declaration of Marcus Smith in Support of Motion) (Arnold, Todd)). Filed by Creditor Committee Official Committee of Unsecured Creditor (Attachments: # 1 Certificate of Service) (Arnold, Todd)ERROR: INCORRECT EVENT SELECTED (THE CORRECT EVENT IS NOTICE OF OPPORTUNITY FOR HEARING) - FOR INFORMATIONAL PURPOSES ONLY, NO ACTION TO BE TAKEN AT THIS TIME. Modified on 3/13/2007 (jd, ). (Entered: 03/12/2007) |
| 03/12/2007 | ◉2198 | Response to *Limited Response of Via Technologies to Pending Motions to Convert, Appoint Chapter 11 Trustee and/or Disqualify Debtor's Counsel* (RE: related document(s)2173 Motion to Convert Case to Chapter 7, 2163 Motion Miscellaneous Relief, 2168 Motion to Appoint Trustee). Filed by Creditor Via Technologies, Inc. (Attachments: # 1 Certificate of Service) (Kevane, Henry) (Entered: 03/12/2007) |
| 03/12/2007 | ◉2199 | Reply to *Responses of the Creditors' Committee and Noteholders to Motion to Convert to Chapter 7* (RE: related document(s)2198 Response, ). Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Declaration of John Shaffer in Support of SonicBlue Claims, LLC's Reply to Responses of the Creditors' Committee and Noteholders to Motion to Convert to Chapter 7) (McGrane, William) (Entered: 03/12/2007) |
| 03/12/2007 | ◉2200 | Reply to (RE: related document(s)2182 Opposition Brief/Memorandum,,,,,,,, ). Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Attachments: # 1 Declaration of Brian M. Martinson in Support of Reply by U. S. Trustee to Opposition of Pillsbury Winthrop Shaw Pittman LLP to UST's Motion to Disqualify Pillsbury, Vacate Employment Order, and Require Disgorgement of Attorney's Fees# 2 Exhibit A) (Dumas, Nanette) (Entered: 03/12/2007) |
| 03/12/2007 | ◉2201 | Certificate of Service *Reply by U. S. Trustee to Opposition of PWSP LLP to UST's Motion to Disqualify Pillsbury, Vacate Employment Order, and Require Disgorgement of Attorney's Fees* (RE: related document(s)2200 Reply, ). (Attachments: # 1 Notice of Electronic Filing) (Dumas, Nanette) (Entered: 03/12/2007) |
| 03/12/2007 | ◉2202 | Response to *Sonicblue Claims LLC's Reply to Opposition to the U.S. Trustee's Motion to Disqualify Pillsbury* (RE: related document(s)2190 Reply, ). Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and |

| | | Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) (Entered: 03/12/2007) |
|---|---|---|
| 03/13/2007 | 2203 | Certificate of Service (RE: related document(s)2202 Response, ). (Mester, Joshua) (Entered: 03/13/2007) |
| 03/13/2007 | 2204 | Joinder *to United States Trustee's Motion for Appointment of Chapter 11 Trustee* (RE: related document(s)2168 Motion to Appoint Trustee). Filed by Creditor Maxtor Corp. (Costello, Patrick) (Entered: 03/13/2007) |
| 03/13/2007 | 2205 | Certificate of Service *by Mail* (RE: related document(s)2204 Joinder). (Costello, Patrick) (Entered: 03/13/2007) |
| 03/13/2007 | 2206 | Notice Regarding *Association of Howard Rice Nemerovski Canady Falk & Rabkin, A Professional Corporation, as Counsel for Pillsbury Winthrop Shaw Pittman LLP* Filed by Attorney Pillsbury Winthrop Shaw Pittman LLP (Attachments: # 1 Certificate of Service) (Lafferty, William) (Entered: 03/13/2007) |
| 03/14/2007 | 2207 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: Argo Partners To SonicBlue Claims LLC. Filed by Debtor SONICblue Inc.. (Gold, Matthew) (Entered: 03/14/2007) |
| 03/14/2007 | 2208 | Notice of Change of Address */ Notice of Change of Firm Name and Address* Filed by Creditors Monster Cable Productions, Inc., Monster Cable Products, Inc. (Eisenbach, Robert) (Entered: 03/14/2007) |
| 03/14/2007 | 2209 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2194 Notice of Alleged Transfer of Claim). Service Date 03/14/2007. (Admin.) (Entered: 03/14/2007) |
| 03/15/2007 | 2210 | Assignment of Claim #11787 To Hain Capital Holdings, LLC From Cross Harbor Capital Partners LLC. Filed by Creditor Hain Capital Group, LLC. (Liberchuk, Ganna) (Entered: 03/15/2007) |
| 03/15/2007 | 2212 | Operating Report for Filing Period Feb. 2007 Filed by Debtor SONICblue Inc. (jd, ) (Entered: 03/16/2007) |
| 03/16/2007 | 2211 | Notice of Alleged Transfer of Claim (RE: related document(s)2210 Assignment of Claim). Objections to Assignment of Claim due by 4/5/2007. (jd, ) (Entered: 03/16/2007) |
| 03/16/2007 | 2213 | Declaration of Nanette Dumas in Support of *Amended Motion by U. S. Trustee for Appointment of Chapter 11 Trustee* (RE: related document(s)2168 Motion to Appoint Trustee). Filed by U.S. Trustee |

| | | Office of the U.S. Trustee / SJ (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Certificate of Service) (Dumas, Nanette) (Entered: 03/16/2007) |
|---|---|---|
| 03/16/2007 | 2214 | Application to Employ Jeffer, Mangels, Butler & Marmaro LLP as Special Counsel *to Debotrs and Debtors-In-Possession* Filed by Debtor SONICblue Inc. (Attachments: # 1 Verified Statement of Richard A. Rogan in Support of Application of Debtors and Debtors-In-Possession for an Order Authorizing the Rentention of Jeffer, Mangels, Butler & Marmaro LLP as Special Counsel# 2 Exhibit A to Verified Statement of Richard A. Rogan# 3 Certificate of Service) (Rogan, Richard) (Entered: 03/16/2007) |
| 03/18/2007 | 2215 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2211 Notice of Alleged Transfer of Claim). Service Date 03/18/2007. (Admin.) (Entered: 03/18/2007) |
| 03/19/2007 | 2218 | Hearing Held (RE: related document(s)2163 Motion By United States Trustee to Disqualify Pillsbury Winthrop Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette), 2173 First Amended Motion to Convert Case to Chapter 7 Fee Amount $15 Filed by Creditor SonicBlue Claims LLC (Attachments: # (1) Certificate of Service) (McGrane, William), 2168 Amended Motion to Appoint Trustee (Chapter 11 Trustee) Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Dumas, Nanette)). Motions are under submission. (mem, ) (Entered: 03/21/2007) |
| 03/20/2007 | 2216 | Joint Notice of Transfer of Claim (#58) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 2 Transferor: Radio Shack(Cl. # 58, Amt. $45,000.00) To Argo Partners. Filed by Creditor Argo Partners. (Gold, Matthew) (Entered: 03/20/2007) |
| 03/20/2007 | 2217 | Joint Notice of Transfer of Claim (#58) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 2 Transferor: Argo Partners To SonicBlue Claims LLC. Filed by Creditor SonicBlue Claims LLC. (Gold, Matthew) (Entered: 03/20/2007) |
| 03/22/2007 | 2219 | Document: *Request for Removal of Counsel, Sue J. Hodges from Master Mailing List.* Filed by Debtor SONICblue Inc. (Attachments: # 1 Certificate of Service) (Walker, Matthew) (Entered: 03/22/2007) |
| 03/26/2007 | 2220 | Memorandum Decision (RE: related document(s)2153 Motion to Appoint TrusteeMotion to Appoint Examiner filed by U.S. Trustee Office of the U.S. Trustee / SJ). (jd, ) (Entered: 03/26/2007) |
| 03/27/2007 | 2221 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: INTERGRAPH |

|  |  | CORPORATION (Amount $6,894.00) To Argo Partners. Filed by Creditor Argo Partners. (Gold, Matthew) ERROR: WRONG EVENT SELECTED (THE CORRECT EVENT IS ASSIGNMENT OF CLAIM) Modified on 3/28/2007 (jd, ). COURT ERROR: DISREGARD PREVIOUS ERROR MESSAGE. Modified on 3/28/2007 (jd, ). (Entered: 03/27/2007) |
|---|---|---|
| 03/27/2007 | ◉2222 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: Argo Partners To SonicBlue Claims LLC. Filed by Creditor SonicBlue Claims LLC. (Gold, Matthew) ERROR: WRONG EVENT SELECTED (THE CORRECT EVENT IS ASSIGNMENT OF CLAIM WHEN THERE IS NO SIGNED WAIVER) Modified on 3/28/2007 (jd, ). (Entered: 03/27/2007) |
| 03/28/2007 | ◉2223 | Notice of Alleged Transfer of Claim (RE: related document(s)2221 Joint Transfer of Claim, ). Objections to Assignment of Claim due by 4/17/2007. (jd, ) (Entered: 03/28/2007) |
| 03/28/2007 | ◉2224 | Notice of Alleged Transfer of Claim (RE: related document(s)2222 Joint Transfer of Claim, ). Objections to Assignment of Claim due by 4/17/2007. (jd, ) (Entered: 03/28/2007) |
| 03/28/2007 | ◉2225 | BNC Certificate of Mailing (RE: related document(s)2220 Memorandum Decision). Service Date 03/28/2007. (Admin.) (Entered: 03/28/2007) |
| 03/29/2007 | ◉2226 | Third Party Transcript, Date of Hearing: 3-19-07 *a) Amended Motion to Disqualify Pillsbury Winthrop Shaw Pittman, LLP, to Vacate Employment Order, and for Disgorgement of Attorney's Fees by United States Trustee; b) Joinder in Motion by United States Trustee by SonicBlue Claims, LLC; c) Joinder in Motion by Riverside Contracting, LLC and Riverside Claims, LLC; d) Opposition to Motion by Pillsbury Winthrop Shaw Pittman, LLP; e) Reply to Opposition to U.S. Trustee's Motion to Disqualify Pillsbury by SonicBlue Claims, LLC; f) Response to SonicBlue Claims, LLC's Reply to Opposition by Portside Growth & Opportunity Fund, Smithfield Fiduciary, LLC and Citadel Equity Fund, Ltd.; g) Amended Motion for Appointment of Chapter 11 Trustee; h) Joinder to Motion for Appointment of Chapter 11 Trustee by Maxtor Corp.; i) Opposition to Motion by Debtor; j) Amended Motion to Convert to Chapter 7 by SonicBlue Claims, LLC; k) Limited Response to Motion to Convert, Appoint Chapter 11 Trustee and/or Disqualify Debtor's Counsel by Via Technologies, Inc.; l) Response to Motion to Convert by Portside Growth & Opportunity Fund, Smithfield Fiduciary, LLC, and Citadel Equity Fund, Inc.; m) Response to (g) Motion for Appointment of Chapter 11 Trustee and (i) Motion to Convert to Chapter 7 by Official Committee of Creditors Holding Unsecured Claims; n) Response to Motion to Convert to Chapter 7 by SonicBlue Claims, LLC.* (McCall, Jo) (Entered: 03/29/2007) |

| 03/30/2007 | ●2227 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2223 Notice of Alleged Transfer of Claim). Service Date 03/30/2007. (Admin.) (Entered: 03/30/2007) |
| --- | --- | --- |
| 03/30/2007 | ●2228 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2224 Notice of Alleged Transfer of Claim). Service Date 03/30/2007. (Admin.) (Entered: 03/30/2007) |
| 04/02/2007 | ●2229 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 2 Transferor: Varallo Inc. To Revenue Management. Filed by Creditor Revenue Management. (Minkoff, Robert) **ERROR: WRONG EVENT SELECTED THE CORRECT EVENT IS ASSIGNMENT OF CLAIM LOCATED IN CLAIM ACTION CATEGORY.** Modified on 4/3/2007 (jd, ). (Entered: 04/02/2007) |
| 04/03/2007 | ●2230 | Notice of Alleged Transfer of Claim (RE: related document(s)2229 Joint Transfer of Claim, ). Objections to Assignment of Claim due by 4/23/2007. (jd, ) (Entered: 04/03/2007) |
| 04/04/2007 | ●2231 | Motion *for Clarification, or in the Alternative, Leave to File a Motion for Reconsideration; Memorandum of Points and Authorities* Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) (Entered: 04/04/2007) |
| 04/04/2007 | ●2232 | Notice of Hearing (RE: related document(s)2231 Motion *for Clarification, or in the Alternative, Leave to File a Motion for Reconsideration; Memorandum of Points and Authorities* Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua)). Hearing scheduled for 5/4/2007 at 11:00 AM at SanJose Courtroom 3070 - Morgan. Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) (Entered: 04/04/2007) |
| 04/04/2007 | ●2233 | Certificate of Service (RE: related document(s)2232 Notice of Hearing,,, 2231 Motion Miscellaneous Relief, ). (Mester, Joshua) (Entered: 04/04/2007) |
| 04/04/2007 | ●2234 | Amended Notice of Hearing (RE: related document(s)2232 Notice of Hearing (RE: related document(s)2231 Motion *for Clarification, or in the Alternative, Leave to File a Motion for Reconsideration; Memorandum of Points and Authorities* Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua)). Hearing scheduled for 5/4/2007 at 11:00 AM at SanJose Courtroom 3070 - Morgan. Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua), 2231 Motion *for Clarification, or in the Alternative,* |

| | | *Leave to File a Motion for Reconsideration; Memorandum of Points and Authorities* Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua)). Hearing scheduled for 5/4/2007 at 11:00 AM at SanJose Courtroom 3070 - Morgan. Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) (Entered: 04/04/2007) |
|---|---|---|
| 04/05/2007 | 2235 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2230 Notice of Alleged Transfer of Claim). Service Date 04/05/2007. (Admin.) (Entered: 04/05/2007) |
| 04/06/2007 | 2236 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: Davidson Mandell and Menkes To Revenue Management. Filed by Creditor Revenue Management. (Minkoff, Robert) (Entered: 04/06/2007) |
| 04/09/2007 | 2237 | Notice of Alleged Transfer of Claim (RE: related document(s)2236 Joint Transfer of Claim). Objections to Assignment of Claim due by 4/30/2007. (jd, ) (Entered: 04/09/2007) |
| 04/11/2007 | 2238 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2237 Notice of Alleged Transfer of Claim). Service Date 04/11/2007. (Admin.) (Entered: 04/11/2007) |
| 04/16/2007 | 2239 | Motion to Appoint Trustee *Application for Order Approving the Appointment of Chapter 11 Trustee* Filed by U.S. Trustee Office of the U.S. Trustee / SJ (Attachments: # 1 Declaration of Dennis J. Connolly in Support of Appointment of Dennis J. Connolly as Chapter 11 Trustee for the Bankruptcy Estate of Sonicblue Incorporated et al.# 2 Schedule 1# 3 Schedule 2# 4 Exhibit A) (Dumas, Nanette) (Entered: 04/16/2007) |
| 04/16/2007 | 2240 | Certificate of Service *Application for Order Approving the Appointment of Chapter 11 Trustee* (RE: related document(s)2239 Motion to Appoint Trustee, ). (Attachments: # 1 Notice of Electronic Filing) (Dumas, Nanette) (Entered: 04/16/2007) |
| 04/16/2007 | 2241 | Appointment of Trustee and Approval of Bond *Notice of Appointment of Chapter 11 Trustee.* (Dumas, Nanette) (Entered: 04/16/2007) |
| 04/17/2007 | 2242 | Order Granting Motion to Appoint Chapter 11 Trustee. Dennis J. Connolly added to the case. (jd, ) (Entered: 04/17/2007) |
| 04/19/2007 | 2243 | Brief/Memorandum in Opposition to *Senior Noteholders' Alternative Motions for Clarification or Reconsideration of March 26 Memorandum Opinion* (RE: related document(s)2231 Motion Miscellaneous Relief, ). |

Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Certificate of Service) (Najolia, Gina) ERROR: ATTACHMENT #3 THE CERTIFICATE OF SERVICE DOES NOT INCLUDE DEBTOR'S NAME AND CASE NUMBER. FOR INFORMATIONAL PURPOSES ONLY. Modified on 4/20/2007 (jd, ). (Entered: 04/19/2007)

| | | |
|---|---|---|
| 04/19/2007 | 2244 | BNC Certificate of Mailing (RE: related document(s)2242 Order on Motion to Appoint Trustee). Service Date 04/19/2007. (Admin.) (Entered: 04/19/2007) |
| 04/19/2007 | 2245 | Operating Report for Filing Period March 2007 Filed by Debtor SONICblue Inc. (jd, ) (Entered: 04/20/2007) |
| 04/20/2007 | 2246 | Report: *Unilateral Ninth Quarterly Report on Status of Avoidance Actions* Filed by Creditor Committee Official Committee of Unsecured Creditor (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Arnold, Todd) (Entered: 04/20/2007) |
| 04/20/2007 | 2247 | Notice Regarding *Errata re SonicBlue Claims, LLC's Opposition to Senior Noteholders' Alternative Motions for Clarification or Reconsideration of March 26 Memorandum Opinion* (RE: related document(s)2243 Brief/Memorandum in Opposition to *Senior Noteholders' Alternative Motions for Clarification or Reconsideration of March 26 Memorandum Opinion* (RE: related document(s)2231 Motion Miscellaneous Relief, ). Filed by Creditor SonicBlue Claims LLC (Attachments: # (1) Exhibit 1# (2) Exhibit 2# (3) Certificate of Service) (Najolia, Gina) ERROR: ATTACHMENT #3 THE CERTIFICATE OF SERVICE DOES NOT INCLUDE DEBTOR'S NAME AND CASE NUMBER. FOR INFORMATIONAL PURPOSES ONLY. Modified on 4/20/2007 (jd, ).). Filed by Creditor SonicBlue Claims LLC (Najolia, Gina) (Entered: 04/20/2007) |
| 04/20/2007 | 2248 | Amended Brief/Memorandum in Opposition to *Senior Noteholders' Alternative Motions for Clarification or Reconsideration of March 26 Memorandum Opinion* (RE: related document(s)2243 Opposition Brief/Memorandum,, ). Filed by Creditor SonicBlue Claims LLC (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Certificate of Service) (Najolia, Gina) (Entered: 04/20/2007) |
| 04/23/2007 | 2249 | Assignment of Claim #65 To WM Trust High Yield Fund, et al. Filed by Creditor WM Trust High Yield Fund, et al.. (Duffy, Kerry) ERROR: INCOMPLETE ADDRESS FOR CREDITOR ENTERED - INCORRECT FIELDS USED FOR CREDITOR WM TRUST'S ADDRESS. COURT CORRECTED. (WE DO NOT USE THE OFFICE FIELD ON THE CREDITOR'S ADDRESS - FOR INFORMATIONAL PURPOSES ONLY). Modified on 4/24/2007 (jd, ). COURT MODIFIED DOCKET |

TEXT TO READ TO WM TRUST. Modified on 4/24/2007 (jd, ). (Entered: 04/23/2007)

| 04/23/2007 | ◐2250 | Assignment of Claim #63 To WM Trust High Yield Fund, et al.. Filed by Creditor WM Trust High Yield Fund, et al.. (Duffy, Kerry)COURT MODIFIED DOCKET TEXT TO READ TO WM TRUST. Modified on 4/24/2007 (jd, ). (Entered: 04/23/2007) |
| --- | --- | --- |
| 04/23/2007 | ◐2251 | Assignment of Claim #62 To WM Trust High Yield Fund, et al.. Filed by Creditor WM Trust High Yield Fund, et al.. (Duffy, Kerry)COURT MODIFIED DOCKET TEXT TO READ TO WM TRUST Modified on 4/24/2007 (jd, ). (Entered: 04/23/2007) |
| 04/23/2007 | ◐2252 | Assignment of Claim #64 To WM Trust High Yield Fund, et al.. Filed by Creditor WM Trust High Yield Fund, et al.. (Duffy, Kerry) COURT MODIFIED DOCKET TEXT TO READ TO WM TRUST. Modified on 4/24/2007 (jd, ). (Entered: 04/23/2007) |
| 04/24/2007 | ◐2253 | Notice of Alleged Transfer of Claim (RE: related document(s)2249 Assignment of Claim). Objections to Assignment of Claim due by 5/14/2007. (jd, ) (Entered: 04/24/2007) |
| 04/24/2007 | ◐2254 | Notice of Alleged Transfer of Claim (RE: related document(s)2250 Assignment of Claim). Objections to Assignment of Claim due by 5/14/2007. (jd, ) (Entered: 04/24/2007) |
| 04/24/2007 | ◐2255 | Notice of Alleged Transfer of Claim (RE: related document(s)2251 Assignment of Claim). Objections to Assignment of Claim due by 5/14/2007. (jd, ) (Entered: 04/24/2007) |
| 04/24/2007 | ◐2256 | Notice of Alleged Transfer of Claim (RE: related document(s)2252 Assignment of Claim). Objections to Assignment of Claim due by 5/14/2007. (jd, ) (Entered: 04/24/2007) |
| 04/25/2007 | ◐2257 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: Major League Soccer LLC(Amount $5,000.00) To Argo Partners. Filed by Creditor Argo Partners. (Gold, Matthew) (Entered: 04/25/2007) |
| 04/25/2007 | ◐2258 | Joint Notice of Transfer of Claim (#) and Waiver of Opportunity To Object. Transfer Agreement 3001 (e) 1 Transferor: Argo Partners To SonicBlue Claims LLC. Filed by Creditor SonicBlue Claims LLC. (Gold, Matthew) (Entered: 04/25/2007) |
| 04/26/2007 | 2259 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2253 Notice of Alleged Transfer of Claim). Service Date |

04/26/2007. (Admin.) (Entered: 04/26/2007)

| 04/26/2007 | 2260 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2254 Notice of Alleged Transfer of Claim). Service Date 04/26/2007. (Admin.) (Entered: 04/26/2007) |
| --- | --- | --- |
| 04/26/2007 | 2261 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2255 Notice of Alleged Transfer of Claim). Service Date 04/26/2007. (Admin.) (Entered: 04/26/2007) |
| 04/26/2007 | 2262 | BNC Certificate of Mailing - Notice of Transfer of Claim. (RE: related document(s)2256 Notice of Alleged Transfer of Claim). Service Date 04/26/2007. (Admin.) (Entered: 04/26/2007) |
| 04/27/2007 | 2263 | Reply to *of Pillsbury Winthrop Shaw Pittman LLP to Claims Traders' Opposition to Motion for Clarification* (RE: related document(s)2231 Motion Miscellaneous Relief, ). Filed by Attorney Pillsbury Winthrop Shaw Pittman LLP (Damonte, Ana) (Entered: 04/27/2007) |
| 04/27/2007 | 2264 | Certificate of Service *of Reply of Pillsbury Winthrop Shaw Pittman LLP to Claims Traders' Opposition to Motion for Clarification* (RE: related document(s)2263 Reply). (Damonte, Ana) (Entered: 04/27/2007) |
| 04/27/2007 | 2265 | Reply to */ Reply Brief in Support of Motion for Clarification, or in the Alternative, for Leave to File a Motion for Reconsideration* (RE: related document(s) 2231 Motion Miscellaneous Relief, ). Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) Modified on 4/30/2007 CORRECTIVE ENTRY: COURT REMOVED LINK TO DOCUMENT #2248, OPPOSITION BRIEF/MEMORANDUM. (be, ). (Entered: 04/27/2007) |
| 04/27/2007 | 2266 | Declaration of Joshua M. Mester in Support of *Reply Brief in Support of Motion for Clarification, or in the Alternative, for Leave to File a Motion for Reconsideration* (RE: related document(s)2265 Reply, ). Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Attachments: # 1 Exhibit A) (Mester, Joshua) (Entered: 04/27/2007) |
| 04/28/2007 | 2267 | Certificate of Service (RE: related document(s)2265 Reply,, 2266 Declaration, ). (Mester, Joshua) (Entered: 04/28/2007) |
| 05/01/2007 | 2268 | Response to *Reply of Pillsbury Winthrop Shaw Pittman LLP* (RE: related document(s)2263 Reply). Filed by Creditor SonicBlue Claims LLC (Najolia, Gina) (Entered: 05/01/2007) |

5/14/2007 11:06 AM

| 05/01/2007 | ❷2269 | Certificate of Service (RE: related document(s)2268 Response). (Najolia, Gina) (Entered: 05/01/2007) |
|---|---|---|
| 05/02/2007 | ❷2270 | Stipulation to Continue Hearing *between Official Committee of Creditors Holding Unsecured Claims and Chapter 11 Trustee to Continue Disclosure Statement Hearing* Filed by Trustee Dennis J. Connolly (RE: related document(s)2047 Disclosure Statement,, filed by Creditor Committee Official Committee of Unsecured Creditor). (Dumas, Cecily) ERROR: INCORRECTLY LINKED - COURT CORRECTED. Modified on 5/3/2007 (jd, ). (Entered: 05/02/2007) |
| 05/02/2007 | ❷2271 | Application to Employ Alston & Bird LLP as Counsel to the Chapter 11 Trustee Filed by Trustee Dennis J. Connolly (Attachments: # 1 Declaration of Grant T. Stein in Support of Application for Employment of Alston & Bird LLP# 2 Statement of Attorney Compensation Pursuant to 11 U.S.C. Section 329 and Bankruptcy rule 2016(b)) (Dumas, Cecily) (Entered: 05/02/2007) |
| 05/02/2007 | ❷2272 | Application to Employ Friedman Dumas & Springwater LLP as Local Counsel to Chapter 11 Trustee Filed by Trustee Dennis J. Connolly (Attachments: # 1 Declaration of Cecily A. Dumas in Support of Application# 2 Statement of Attorney Compensation Pursuant to 11 U.S.C. Section 329 and Bankruptcy Rule 2016(b)) (Dumas, Cecily) (Entered: 05/02/2007) |
| 05/02/2007 | ❷2273 | Motion to Set Hearing *for Special Setting* (RE: related document(s)2271 Application to Employ, filed by Trustee Dennis J. Connolly, 2272 Application to Employ, filed by Trustee Dennis J. Connolly). Filed by Trustee Dennis J. Connolly (Dumas, Cecily) (Entered: 05/02/2007) |
| 05/02/2007 | ❷2274 | Notice Regarding *Intended Action Re Claim Transfer Agreement Among VIA Technologies, INC. S3 Graphics Co., LTD., and SonicBlue Claims, LLC* Filed by Creditor SonicBlue Claims LLC (Greenfield, Bernard) (Entered: 05/02/2007) |
| 05/02/2007 | ❷2275 | Certificate of Service (RE: related document(s)2274 Notice). (Greenfield, Bernard) (Entered: 05/02/2007) |
| 05/03/2007 | ❷2276 | Order To Continue Hearing (RE: related document(s)2103 Amended Disclosure Statement filed by Creditor Committee Official Committee of Unsecured Creditor, 2047 Disclosure Statement filed by Creditor Committee Official Committee of Unsecured Creditor). Hearing to be held on 8/9/2007 at 11:00 AM SanJose Courtroom 3070 - Morgan for 2047, (jd, ) (Entered: 05/03/2007) |
| 05/03/2007 | ❷2282 | Hearing Set On (RE: related document(s)2066 JOINT Motion to Approve Document (RE: related document(s)2047 Disclosure Statement, filed by |

| | | Creditor Committee Official Committee of Unsecured Creditor). Filed by Creditor Committee Official Committee of Unsecured Creditor (. Hearing scheduled for 8/9/2007 at 11:00 AM at SanJose Courtroom 3070 - Morgan. (mem, ) (Entered: 05/07/2007) |
|---|---|---|
| 05/04/2007 | ●2277 | Hearing Held (RE: related document(s)2231 Motion for Clarification, or in the Alternative, Leave to File a Motion for Reconsideration; Memorandum of Points and Authorities Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua). The court will issue a written ruling. (mem, ) (Entered: 05/04/2007) |
| 05/04/2007 | ●2278 | Order Granting Motion to Set Hearing (Related Doc # 2273, On motions 2272, and 2271) Hearing scheduled for 6/14/2007 at 01:30 AM at SanJose Courtroom 3070 - Morgan. (jd, ) (Entered: 05/04/2007) |
| 05/04/2007 | ●2279 | Memorandum Decision (RE: related document(s)2231 Motion for Clarification, or in the Alternative, Leave to File a Motion for Reconsideration filed by Creditor Portside Growth and Opportunity Fund, Creditor Smithfield Fiduciary LLC, Creditor Citadel Equity Fund Ltd.). (jd, ) (Entered: 05/04/2007) |
| 05/05/2007 | ●2280 | BNC Certificate of Mailing (RE: related document(s)2276 Order to Continued Hearing, ). Service Date 05/05/2007. (Admin.) (Entered: 05/05/2007) |
| 05/06/2007 | ●2281 | BNC Certificate of Mailing (RE: related document(s)2279 Memorandum Decision, ). Service Date 05/06/2007. (Admin.) (Entered: 05/06/2007) |
| 05/08/2007 | ●2283 | Order Granting Application to Employ Attorney Cecily A. Dumas for Trustee Dennis J. Connolly On an Interim Basis. Added to the Case (Related Doc # 2272) (jd, ) Modified on 5/9/2007 (jd, ). (Entered: 05/08/2007) |
| 05/08/2007 | ●2284 | Order Granting Application to Employ Attorney Grant T. Stein for the Trustee Dennis J. Connolly On an Interim Basis Added to the Case (Related Doc # 2271) (jd, ) (Entered: 05/09/2007) |
| 05/09/2007 | ●2285 | Hearing Set On (RE: related document(s)2271 Application to Employ Alston & Bird LLP as Counsel to the Chapter 11 Trustee ). Hearing scheduled for 6/14/2007 at 01:30 PM at SanJose Courtroom 3070 - Morgan. (jd, ) (Entered: 05/09/2007) |
| 05/09/2007 | ●2286 | Hearing Set On (RE: related document(s)2272 Application to Employ Friedman Dumas & Springwater LLP as Local Counsel to Chapter 11 Trustee ). Hearing scheduled for 6/14/2007 at 01:30 PM at SanJose |

Courtroom 3070 - Morgan. (jd, ) (Entered: 05/09/2007)

| 05/09/2007 | ●2287 | Notice of Hearing *on Trustee's Employment Applications* (RE: related document(s)2271 Application to Employ Alston & Bird LLP as Counsel to the Chapter 11 Trustee Filed by Trustee Dennis J. Connolly (Attachments: # 1 Declaration of Grant T. Stein in Support of Application for Employment of Alston & Bird LLP# (2) Statement of Attorney Compensation Pursuant to 11 U.S.C. Section 329 and Bankruptcy rule 2016(b)) (Dumas, Cecily), 2272 Application to Employ Friedman Dumas & Springwater LLP as Local Counsel to Chapter 11 Trustee Filed by Trustee Dennis J. Connolly (Attachments: # 1 Declaration of Cecily A. Dumas in Support of Application# (2) Statement of Attorney Compensation Pursuant to 11 U.S.C. Section 329 and Bankruptcy Rule 2016(b)) (Dumas, Cecily), 2283 Order Granting Application to Employ Attorney Cecily A. Dumas for Trustee Dennis J. Connolly On an Interim Basis. Added to the Case (Related Doc # 2272) (jd, ) Modified on 5/9/2007 (jd, )., 2284 Order Granting Application to Employ Attorney Grant T. Stein for the Trustee Dennis J. Connolly On an Interim Basis Added to the Case (Related Doc # 2271) (jd, )). Hearing scheduled for 6/14/2007 at 01:30 PM at SanJose Courtroom 3070 - Morgan. Filed by Trustee Dennis J. Connolly (Attachments: # 1 Certificate of Service) (Dumas, Cecily) (Entered: 05/09/2007) |
|---|---|---|
| 05/10/2007 | ●2288 | Notice Regarding *Erratum in Notice of Hearing on Trustee's Employment Applications* (RE: related document(s)2287 Notice of Hearing *on Trustee's Employment Applications* (RE: related document(s)2271 Application to Employ Alston & Bird LLP as Counsel to the Chapter 11 Trustee Filed by Trustee Dennis J. Connolly (Attachments: # 1 Declaration of Grant T. Stein in Support of Application for Employment of Alston & Bird LLP# (2) Statement of Attorney Compensation Pursuant to 11 U.S.C. Section 329 and Bankruptcy rule 2016(b)) (Dumas, Cecily), 2272 Application to Employ Friedman Dumas & Springwater LLP as Local Counsel to Chapter 11 Trustee Filed by Trustee Dennis J. Connolly (Attachments: # 1 Declaration of Cecily A. Dumas in Support of Application# (2) Statement of Attorney Compensation Pursuant to 11 U.S.C. Section 329 and Bankruptcy Rule 2016(b)) (Dumas, Cecily), 2283 Order Granting Application to Employ Attorney Cecily A. Dumas for Trustee Dennis J. Connolly On an Interim Basis. Added to the Case (Related Doc # 2272) (jd, ) Modified on 5/9/2007 (jd, )., 2284 Order Granting Application to Employ Attorney Grant T. Stein for the Trustee Dennis J. Connolly On an Interim Basis Added to the Case (Related Doc # 2271) (jd, )). Hearing scheduled for 6/14/2007 at 01:30 PM at SanJose Courtroom 3070 - Morgan. Filed by Trustee Dennis J. Connolly (Attachments: # 1 Certificate of Service) (Dumas, Cecily)). Filed by Trustee Dennis J. Connolly (Attachments: # 1 Certificate of Service) (Dumas, Cecily) ERROR: DEBTOR'S NAME AND CASE NUMBER ARE MISSING FROM ATTACHMENT #1 THE CERTIFICATE OF SERVICE. FOR INFORMATIONAL PURPOSES ONLY. Modified on 5/11/2007 (jd, ). |

| 05/10/2007 | 2289 | BNC Certificate of Mailing (RE: related document(s)2283 Order on Application to Employ). Service Date 05/10/2007. (Admin.) (Entered: 05/10/2007) |
| 05/10/2007 | 2290 | Motion to Appear Pro Hac Vice . (jd, ) (Entered: 05/11/2007) |
| 05/10/2007 | 2291 | Order Granting Motion To Appear Pro Hac Vice (Related Doc # 2290). Attorney Grant T. Stein for Dennis J. Connolly added to the case. (jd, ) (Entered: 05/11/2007) |
| 05/11/2007 | 2292 | Notice of Appeal to District Court , Fee Amount $ 255. (RE: related document(s)2220 Memorandum Decision, 2279 Memorandum Decision, ). Appellant Designation due by 5/21/2007. Transmission to District Court due by 6/11/2007. (Attachments: # 1 Exhibit A# 2 Certificate of Service) Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) ERROR: THERE SHOULD BE A SEPARATE NOTICE OF APPEAL FOR EACH ORDER TO BE APPEALED. Modified on 5/14/2007 (jd, ). (Entered: 05/11/2007) |
| 05/11/2007 | 2293 | Statement of Election to District Court, (RE: related document(s)2292 Notice of Appeal, filed by Creditor Portside Growth and Opportunity Fund, Creditor Smithfield Fiduciary LLC, Creditor Citadel Equity Fund Ltd.). (Attachments: # 1 Certificate of Service) Filed by Creditors Citadel Equity Fund Ltd., Portside Growth and Opportunity Fund, Smithfield Fiduciary LLC (Mester, Joshua) (Entered: 05/11/2007) |
| 05/11/2007 | 2294 | BNC Certificate of Mailing (RE: related document(s)2284 Order on Application to Employ). Service Date 05/11/2007. (Admin.) (Entered: 05/11/2007) |
| 05/14/2007 | 2295 | Courts Certificate of Mailing. Number of notices mailed: 23 (RE: related document(s)2292 Notice of Appeal). (jd, ) (Entered: 05/14/2007) |
| 05/14/2007 | 2296 | Transmittal of Record on Appeal to District Court (RE: related document(s)2292 Notice of Appeal). (jd, ) (Entered: 05/14/2007) |

EXHIBIT 34

1  FRIEDMAN DUMAS & SPRINGWATER LLP
   CECILY A. DUMAS (S.B. NO. 111449)
2  150 Spear Street, Suite 1600
   San Francisco, CA 94105
3  Telephone Number:  (415) 834-3800
   Facsimile Number:  (415) 834-1044
4  Email Address: cdumas@friedumspring.com

5  ALSTON & BIRD LLP
   GRANT T. STEIN
6  1201 West Peachtree Street
   Atlanta, GA 30309
7  Telephone Number:  (404) 881-7000
   Facsimile Number:  (404) 881-7777
8  Email Address: grant.stein@alston.com
   (admitted *pro hac vice*)

9
   *Attorneys for Dennis J. Connolly in His Capacity as*
10 *Chapter 11 Trustee for SONICblue Incorporated, et al.*

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14

15 PORTSIDE GROWTH &                    Case No. C-07-02553 RMW
   OPPORTUNITY FUND et al.,
16                                      **CHAPTER 11 TRUSTEE'S MOTION TO**
              Appellants,               **DISMISS APPEAL**
17
          vs.                           [No hearing requested]
18
   OFFICIAL COMMITTEE OF                Judge:  Hon. Ronald M. Whyte
19 UNSECURED CREDITORS et al.,

20            Appellees.

21 (Appeal from In re SONICblue,
   Incorporated et al., Bankr. N.D. Cal.
22 (San Jose), No. 03-51775 MM)

23

24 TO APPELLANTS PORTSIDE GROWTH & OPPORTUNITY FUND, SMITHFIELD

25 FIDUCIARY LLC, AND CITADEL EQUITY FUND LTD., AND THEIR ATTORNEYS

26 OF RECORD:

27              PLEASE TAKE NOTICE that Dennis J. Connolly, the duly-appointed

28 Chapter 11 Trustee in the chapter 11 cases of SONICblue Incorporated and its three operating

1   subsidiaries, Diamond Multimedia Systems, Inc.; ReplayTV, Inc; and Sensory Science

2   Corporation (collectively, "SONICblue"), does hereby move this Court, pursuant to Rule

3   8011(a) of the Federal Rules of Bankruptcy Procedure, for an order dismissing the above-

4   captioned appeal for lack of jurisdiction.

5           This motion is made on the grounds that the appeal does not challenge the

6   substance of the decision below, but only certain factual statements that are unnecessary to

7   the decision.  Such statements standing alone are not subject to appellate review.

8           This motion is based on this Motion, the supporting Memorandum of Points

9   and Authorities, the declaration of Cecily A. Dumas, the record on appeal, and any further

10  evidence or argument the court may consider.

11

12  **MEMORANDUM OF POINTS AND AUTHORITIES**

13

14  **I.  ISSUE TO BE DECIDED**

15          The bankruptcy court entered an order disqualifying debtor's counsel and

16  directing the appointment of a Chapter 11 trustee, based primarily on counsel's failure to

17  disclose a conflict of interest with respect to a particular group of creditors.  Those creditors

18  have appealed the court's order, but they do not challenge the substance of the court's

19  decision.  Rather, they dispute certain factual statements in the order, including statements

20  critical of them and their counsel.  Does this court have jurisdiction to review those factual

21  statements, which were not necessary to the bankruptcy court's decision?

22

23  **II.  RELEVANT FACTS**

24          The relevant facts are set forth in the bankruptcy court's Memorandum

25  Decision and Order on Motion to Appoint a Chapter 11 Trustee, Motion to Convert Case, and

26  Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP and for Disgorgement of

27  Attorneys' Fees, entered on March 26, 2007 [Bankruptcy Court Docket No. 2200]

28  (the "Memorandum Order"), beginning with two pre-bankruptcy events.  The first was a joint

1    venture agreement between SONICblue and VIA Technologies to make use of certain patents

2    SONICblue had cross-licensed from Intel Corporation.  The agreement provided for

3    liquidated damages of up to $70 million if the joint venture were ever enjoined from using the

4    cross-license.  Memorandum Order at 2.  The second event was a 2002 bond issue in the

5    amount of $75 million financed by the three appellants in this case (the "2002 Noteholders").

6    SONICblue's counsel, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), issued a written

7    opinion to the 2002 Noteholders concerning the notes' enforceability.  Memorandum Order

8    at 3–4.

9            On March 21, 2003, SONICblue filed for bankruptcy, retaining Pillsbury as

10   bankruptcy counsel.  Memorandum Order at 4.  Four months later, VIA and the joint venture

11   filed proofs of claim for breach of the joint venture agreement.  Lengthy settlement

12   negotiations ensued among VIA, the estate, the creditors' committee, Intel, and the

13   2002 Noteholders.  Memorandum Order at 6–7.  When a settlement was eventually reached,

14   it included a provision that the allowed claim ($12.5 million) is not and would not be "Senior

15   Indebtedness" under the indenture for the 2002 bond issue in the amount of $75 million

16   (the "2002 Indenture").  Memorandum Order at 8–9.

17           Around that time, Pillsbury communicated to the 2002 Noteholders the

18   substance of an objection to the claim of the 2002 Noteholders, based on an analysis

19   suggesting that the Noteholders had received an original-issue discount of $43 million.

20   Memorandum Order at 9–10.  After learning of this potential objection, counsel for the

21   Noteholders told Pillsbury that they would demand indemnification by Pillsbury for any

22   resulting losses, based on the opinion Pillsbury had given them in connection with the bond

23   issue.  Pillsbury transferred responsibility for the objection to counsel for the creditors'

24   committee, but it did not disclose its conflict with the Noteholders to the bankruptcy court.

25   Memorandum Order at 10.

26           After the court approved the VIA settlement, SONICblue and the creditors'

27   committee jointly filed a plan and disclosure statement.  The disclosure statement included

28   both a description of the terms of the VIA settlement and a brief reference to the conflict

{00317680.DOC v 3}

between Pillsbury and the 2002 Noteholders and Pillsbury's consequent transfer of

responsibility for prosecuting the claim objection, but no explanation of the nature of that

conflict.  Memorandum Order at 11.  Following an objection by creditors, the disclosure

statement was amended to contain a brief description of the pre-petition written opinion upon

which the conflict and transfer were based.  It did not mention, however, that the

2002 Noteholders themselves were members of the creditors' committee to whom

responsibility for objecting to the claim had been transferred.  Memorandum Order at 11–12.

On March 5, 2007, after the U.S. Trustee moved to disqualify Pillsbury from representing

SONICblue, the firm filed a supplemental Bankruptcy Rule 2014 disclosure of its relation to

the 2002 Noteholders and their demand for indemnification.  It asserted that its failure to file

the disclosure earlier was inadvertent.  Memorandum Order at 13.

The bankruptcy court granted the U.S. Trustee's motion to disqualify Pillsbury

and appoint a trustee.  The court found that Pillsbury's conflict with the 2002 Noteholders

was significant and disabling, and that the failure to disclose the conflict mandated immediate

disqualification, even if that failure was inadvertent.  Memorandum Order at 14–15.  The

court also found that appointment of a Chapter 11 trustee was needed to restore creditor

confidence in the bankruptcy system and to assure that there would be no lingering taint from

Pillsbury's representation.  Memorandum Order at 16.

The court also considered a motion by SonicBlue Claims, LLC ("SB Claims")

to convert the case to Chapter 7, in part to remove the influence of the creditors' committee

from the case.  Memorandum Order at 16.  The court acknowledged an appearance of

impropriety by the committee and its counsel.  Memorandum Order at 16–18.  The court

concluded, however, that it was preferable to keep the case in Chapter 11 in order to allow a

trustee to be chosen from a nationwide search and with the disclosure protections afforded

under Chapter 11.  Memorandum Order at 18–19.

None of these three decisions—to disqualify Pillsbury; to appoint a Chapter 11

trustee; and to keep the case in Chapter 11—has been challenged.   The appellants only

disagree with the inclusion of certain factual statements in the court's order.  The first

4

CHAPTER 11 TRUSTEE'S MOTION TO DISMISS APPEAL –
C-07-02553 RMW

statement comes from the first paragraph of the court's factual recitation, in which the court

describes the importance of the Intel patents to the VIA joint venture agreement:

> The rights to use Intel's graphics patents were so important that the joint venture agreement included a liquidated damages clause at article 5.6 entitling the joint venture and VIA each to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-license.

Memorandum Order at 2. In their "Statement of Issues on Appeal," the appellants

characterize this passage as "determining that VIA has a claim … against debtor SonicBlue

relating to the loss of use of technology by a joint venture in which VIA is a member,"

Appellants' Designation of Items To Be Included In the Record On Appeal and Statement of

Issues on Appeal [District Court Docket No. 3] ("Appellants' Statement of Issues") at 7,

though the order itself does not purport to adjudge any such claim.

A second set of challenged statements appears in the court's discussion of

SB Claims' motion to convert the case to Chapter 7, in which the court describes the role the

2002 Noteholders and their counsel played in negotiating the VIA settlement, particularly its

provision that the settled claim would not be "Senior Indebtedness" relative to the 2002

Indenture:

> Because the bondholders appear to have used their position on the committee to insert themselves into the settlement negotiations without revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body. Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not known. In fact, as [the 2002 Noteholders' counsel Bruce] Bennett noted, he had never personally appeared in court until March 19, 2007. During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was not generally known to this court or the creditor body that the three senior bondholders were serving on the committee.

Memorandum Order at 17. With respect to this passage, the appellants ask: "Did the

Bankruptcy Court make factual or legal errors in describing the role of the Senior Noteholders

and their counsel (as well as the role of various other involved professionals) in settlement

negotiations and the bankruptcy case?" Appellants' Statement of Issues at 7.

CHAPTER 11 TRUSTEE'S MOTION TO DISMISS APPEAL –
C-07-02553 RMW

{00317680.DOC v 3}

1    Before filing this appeal, the 2002 Noteholders challenged the inclusion of the

2    above-quoted statements in a "Motion for Clarification, Or In the Alternative, Leave to File a

3    Motion for Reconsideration" [Bankruptcy Court Docket No. 2231] ("Motion for

4    Clarification").  They emphasized that they were not attacking the substance of the court's

5    order: "The Senior Noteholders do not challenge the result reached in the Opinion."  Motion

6    for Clarification at 1.  They also insisted that the statements were not necessary to the court's

7    decision, and did not even amount to factual findings, though they might be misconstrued as

8    such: "Clarification is necessary to eliminate the chance that certain statements in the Opinion

9    could be misconstrued as deciding factual issues that are not supported by the evidence, that

10   are not necessary to the Court's decision, and that are subject to investigation by the new

11   trustee whom the Court will appoint."  Motion for Clarification at 1.  They asked the court to

12   remove or revise the statements, or at least clarify that they were not intended as factual

13   determinations.

14   The bankruptcy court denied the Motion for Clarification on May 4, 2007.[1]

15   The 2002 Noteholders have appealed both the March 26 and the May 4 orders.

16

17   ### III.  ARGUMENT

18   Under 28 U.S.C. § 158(a), the district court has jurisdiction to review final

19   orders of the bankruptcy court, and discretion to hear appeals from interlocutory orders.  The

20   bankruptcy court's March 26 order has both interlocutory and final aspects.  *See In re*

21   *Westwood Shake & Shingle, Inc.*, 941 F.2d 387, 389 (9th Cir. 1992) (decision disqualifying

22   counsel is interlocutory); *In re Martech USA, Inc.*, 188 B.R. 847, 849–50 (9th Cir. BAP 1995)

23   (decision to appoint a trustee is considered final for purposes of appeal).  But whether final or

24   interlocutory, none of the bankruptcy court's actual decisions in this case have been

25   _____

26   [1]  Although it denied the Motion for Clarification, the court subsequently explained in open court that it did not consider its rulings to have prejudged any of the issues still subject to investigation.  Speaking to counsel for the 2002 Noteholders, the court stated: "I want to make plain that I don't feel that I have predetermined any of the issues

27   that are going to come before us.  I want to say that the issues that I ruled on previously arose in a different context. And you'll have since then and will be in the future conducting discovery, so that you will be able to more fully flush

28   out those issues for the future hearings that we'll have."  Transcript of June 14, 2007 hearing [Bankruptcy Court Docket No. 2375, Exhibit A to Dumas declaration], at 23–24.

CHAPTER 11 TRUSTEE'S MOTION TO DISMISS APPEAL – C-07-02553 RMW

{00317680.DOC v 3}

1    challenged.  The appellants take issue only with certain factual statements in the court's

2    opinion.  Such an appeal is generally not permitted.  "[I]t is an abecedarian rule that federal

3    appellate courts review decisions, judgments, orders, and decrees—not opinions, factual

4    findings, reasoning, or explanations."  *In re Williams*, 156 F.3d 86, 90 (1st Cir. 1998).  That is

5    to say, "courts review judgments, not statements in opinions."  *Environmental Protection*

6    *Information Center, Inc. v. Pacific Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001) ("*EPIC,*

7    *Inc.*") (quoting *California v. Rooney*, 483 U.S. 307, 311 (1987)) (internal quotation marks

8    omitted).

9         This principle is illustrated in the case of *In re Duro Industries, Inc.*, 293 B.R.

10    271 (1st Cir. BAP 2003).  Following revelations of misleading conduct by the debtor, the

11    bankruptcy court entered a minute order dismissing the case, then issued a memorandum

12    opinion explaining its decision.  The debtor did not appeal the order of dismissal, but did ask

13    the court to reconsider or amend its explanation.  When the court refused, the debtor appealed

14    both the explanatory memorandum and the court's denial of its reconsideration motion.  The

15    bankruptcy appellate panel dismissed the appeal, finding that it had jurisdiction only to

16    review "judgments, orders, and decrees," and that "[n]othing of that ilk is before us," but only

17    "the bankruptcy court's unflattering 'findings'" concerning the debtor's behavior.  *Id.* at 276.

18    Because "[t]he memorandum is not a final order—or an order of any stripe," the appellate

19    panel had no jurisdiction to review its content, either directly or by way of the order denying

20    reconsideration.  *Id.* at 277.

21         In this case, we do have an order which in principle is subject to appeal.

22    Pillsbury might appropriately have sought leave to bring an interlocutory appeal of the

23    decision to disqualify them from representing the debtor, for example, or SONICblue could

24    have appealed the order appointing a trustee.  But since the appellants have expressed no

25    disagreement with the substance of the bankruptcy court's decision, all that is left for this

26    court to consider is a collection of "unflattering 'findings'" concerning the 2002 Noteholders'

27    behavior and some passing statements about the nature of the VIA claim.  As the above-cited

28    cases indicate, such findings and statements are not by themselves subject to review.

CHAPTER 11 TRUSTEE'S MOTION TO DISMISS APPEAL –
                                                             C-07-02553 RMW

{00317680.DOC v 3}

Some cases hold that, under certain circumstances, a party who has prevailed in the lower court may nevertheless maintain an appeal to challenge adverse collateral decisions that do not affect the ultimate outcome—if, for example, the collateral decision could have preclusive effect in subsequent litigation or will result in future economic loss (aside from the cost of relitigating the issue), or if the judgment itself unnecessarily decides a collateral issue. *See EPIC, Inc.*, 257 F.3d at 1075–76. Although the 2002 Noteholders are not presently challenging any collateral decision entered by the bankruptcy court, they may try to exploit a somewhat loose formulation of one of these principles in *EPIC, Inc.*: "[T]he Supreme Court has held that a party may seek reformation of a favorable decree—but not review of its merits—that contains discussion of issues 'immaterial to the disposition of the cause.'" *Id.* at 1075 (quoting *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939)).

In fact, *Electrical Fittings* does not permit review of the "discussion of issues" in a court's opinion, but rather is concerned with judgments that actually decide issues unnecessarily. A more complete quotation clarifies the point:

> A party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree. But here the decree itself purports to adjudge the validity of claim 1, and though the adjudication was immaterial to the disposition of the cause, it stands as an adjudication of one of the issues litigated. We think the petitioners were entitled to have this portion of the decree eliminated….

*Electrical Fittings Corp.*, 307 U.S. at 242. The *EPIC, Inc.* court itself goes on to draw effectively the same distinction: "We have … strictly interpreted 'decree' to mean 'judgment.'" *See also Deposit Guaranty National Bank, Jackson Mississippi v. Roper*, 445 U.S. 326, 334–35 & n.7 (1980) (discussing the holding of *Electrical Fittings*).

Here, the order does not purport to adjudge either the nature of the VIA claim or the role of the 2002 Noteholders in its settlement. The 2002 Noteholders do not claim otherwise—they have acknowledged, and have even asked the bankruptcy court to confirm, that the matters at issue have not yet been conclusively decided, but rather are still subject to investigation by the Chapter 11 trustee and final determination by the bankruptcy court. Once

8

1  such a decision has been made, an appeal may be appropriate, but until then, there is nothing

2  over which this court can assume appellate jurisdiction.

3

4                                    **IV.  CONCLUSION**

5              Courts review judgments, not statements in opinions.  The appellants do not

6  disagree with the judgment below; they only disagree with a handful of statements in the

7  opinion.  Those statements are not subject to review independent of the underlying decision.

8  The appeal should be dismissed.

9

10

11  Dated: October 22, 2007                    FRIEDMAN DUMAS & SPRINGWATER LLP

12

13                                    By:   /s/Cecily A. Dumas

14                                          Cecily A. Dumas

15                                          -and-

16                                          ALSTON & BIRD LLP
                                            Grant T. Stein
17                                          1201 West Peachtree Street
                                            Atlanta, GA 30309-3424
18                                          (404) 881-7000

19

20

21

22

23

24

25

26

27

28

                                             9

{00317680.DOC v 3}