# EXHIBIT 35

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   THOMAS V. LORAN III  95255
2  thomas.loran@pillsburylaw.com
   CRAIG A. BARBAROSH  160224
3  craig.barbarosh@pillsburylaw.com
   WILLIAM B. FREEMAN  137276
4  bill.freeman@pillsburylaw.com
   ALBERT J. BORO, JR.  126657
5  albert.boro@pillsburylaw.com
   ANA N. DAMONTE 215504
6  ana.damotne@pillsburylaw.com
   650 Town Center Drive, 7th Floor
7  Costa Mesa, CA  92626-7122
   Telephone: (714) 436-6800
8  Facsimile: (714) 436-2800

9  Attorneys for Debtors and Debtors-In-Possession

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13  _____
                                    )
14  IN RE:                          )   No. 03-51775, 03-51776, 03-51777 and
                                    )   03-51778 MM
15  SONICBLUE INCORPORATED, a       )
    Delaware corporation, DIAMOND   )   CHAPTER 11 Cases, Jointly Administered
16  MULTIMEDIA SYSTEMS, INC., a     )
    Delaware corporation, REPLAYTV, INC., a )  OPPOSITION OF PILLSBURY
17  Delaware corporation, and SENSORY )  WINTHROP SHAW PITTMAN LLP TO
    SCIENCE CORPORATION, a Delaware )  U.S. TRUSTEE'S MOTION TO
18  corporation                     )   DISQUALIFY PILLSBURY, VACATE
                                    )   EMPLOYMENT ORDER, AND
19          Debtors and Debtors-in-Possession. )  REQUIRE DISGORGEMENT OF
                                    )   ATTORNEYS' FEES
20                                  )
                                    )   Date:      March 19, 2007
21                                  )   Time:      10:30 a.m.
                                    )   Location:  Courtroom 3007
22                                  )              280 South First Street
                                    )              San Jose, CA 95113
23                                  )   Judge:     Marilyn Morgan
    _____)
24

25

26

27

28

OPPOSITION OF PILLSBURY WINTHROP SHAW
                                         PITTMAN LLP TO U.S. TRUSTEE'S MOTION

1    <u>TABLE OF CONTENTS</u>

2                                                                                    Page

3    INTRODUCTION ..................................................................................1

4    ARGUMENT .........................................................................................3

5    I.    PILLSBURY DID NOT GIVE THE SENIOR NOTEHOLDERS ANY
           "ASSURANCE" THAT THEIR DEBENTURES WOULD BE "REPAID IN
6          FULL." ........................................................................................3

7    II.   THE SENIOR NOTEHOLDERS' CLAIM AGAINST PILLSBURY IS
           NOT ONE THAT COULD HAVE BEEN FORESEEN BEFORE IT WAS
8          ASSERTED; IN FACT, IT IS FRIVOLOUS.............................................5

9    III.  PILLSBURY'S ORIGINAL RULE 2014 DISCLOSURES WERE PROPER.........7

10   IV.   IN RESPONSE TO THE SENIOR NOTEHOLDERS' DEMAND FOR
           INDEMNITY, PILLSBURY TOOK EFFECTIVE MEASURES TO AVOID
11         ANY PREJUDICE TO THE OTHER CREDITORS.................................12

12   V.    THE CHALLENGES TO THE VIA SETTLEMENT RAISED BY
           CERTAIN CLAIMS TRADERS ARE COMPLETELY BASELESS. ..................13
13
               1.    The negotiation of the VIA settlement. .......................................14
14
               2.    The meaning of "Senior Indebtedness".......................................15
15
               3.    The absence of any improper motive on Pillsbury's part............................17
16
     VI.   NO DISGORGEMENT OF ATTORNEYS' FEES IS WARRANTED. ................18
17
         A.    The Fees for Which the U.S. Trustee Seeks Disgorgement Were Incurred
18             in Good Faith Before Pillsbury Was Aware of the Senior Noteholders'
               Claim. ..................................................................................19
19
         B.    The Alleged Conflict Has Not Tainted Pillsbury's Representation of the
20             Debtors or Otherwise Caused Prejudice.............................................20

21       C.    Pillsbury's Failure to Disclose the Alleged Conflict Was Inadvertent, Not
               Willful, and Was an Isolated Incident. ...............................................21
22
         D.    Pillsbury's Work Has Provided Great Benefit to the Debtor's Estate................23
23
     CONCLUSION ........................................................................................23
24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Page

3

Cases

4  A.W. Logging, Inc., In re
      356 B.R. 506, 2006 WL 3438590 (Bankr. D. Idaho 2006) .................................... 10

5
6  Brouwer v. Ancel & Dunlap (In re Firstmark Corp.),
      46 F.3d 653 (7th Cir. 1995) .................................................................................. 22

7  EWC, Inc., In re
      138 B.R. 276 (Bankr. W.D. Okla. 1992) ............................................................... 11

8
9  First Interstate Bank v. CIC Investment Corp. (In re CIC Investment Corp.)
      192 B.R. 549 (B.A.P. 9th Cir. 1996) ................................................................ 19, 20

10 Firstmark Corp., In re
      132 F.3d 1179 (7th Cir. 1997) .............................................................................. 22

11
12 Gutterman, In re
      239 B.R. 828 (N.D. Cal. 1999) ......................................................................... 19, 22

13 Hathaway Ranch P'Ship, In re
      116 B.R. 208 (C.D. Cal. 1990) ............................................................................. 11

14
15 Jore Corp., In re
      298 B.R. 703 (Bankr. D. Mont. 2003) .............................................................. 10, 11

16 Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),
      134 F.3d 831 (7th Cir. 1998) ...................................................................... 18, 19, 22

17
18 Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis),
      113 F.3d 1040 (9th Cir. 1997) .............................................................................. 10

19 LTV Steel Co., In re
      288 B.R. 775 (N.D. Ohio 2002) ........................................................................... 18

20
21 Maui 14K, Ltd., In re
      133 B.R. 657 (Bankr. D. Haw. 1991) ................................................................... 11

22 Mehdipour v. Marcus & Millichap (In re Mehdipour),
      202 B.R. 474 (B.A.P. 9th Cir. 1996) .................................................................... 11

23
24 Moritz v. Baker (In re Triple Star Welding, Inc.),
      324 B.R. 778 (B.A.P. 9th Cir. 2005) .................................................................... 10

25 Neben & Starrett, Inc. v. Chartwell Financial Corp. (In re Park-Helena
      Corp.),
26    63 F.3d 877 (9th Cir. 1995), cert. denied, 516 U.S. 1049 (1996) ..................... 9, 10

27 O'Connor, In re
      52 B.R. 892 (Bankr. W.D. Okla 1985) ................................................................. 11

28

Pacific Express, Inc., In re
56 B.R. 859 (Bankr. E.D. Cal. 1985) ............................................... 19

S.S. Retail Stores Corp. v. Ekstrom (In re S.S. Retail Stores Corp.),
216 F.3d 882 (9th Cir. 2000) ......................................................... 19

XGW Excavating Co., In re
111 B.R. 469 (D.N.J. 1990).................................................. 18, 20

<u>Statutes and Codes</u>

United States Code
Title 11, section 327 ........................................................... 8
Title 11, section 327(a)................................................... 8, 10
Title 11, section 502(b)(1) ................................................. 5
Title 11, section 502(b)(2) ......................................... 4, 5, 13

<u>Rules and Regulations</u>

Bankruptcy Rules
Rule 2014............................................................... passim
Rule 2014(a) ............................................................... 8

<u>Other Authorities</u>

Restatement (Second) of Contracts § 8 (1979)............................... 5

1    Pursuant to the Court's orders at the hearing on February 15, 2007, Pillsbury

2    Winthrop Shaw Pittman LLP ("Pillsbury"), counsel to the Debtors and Debtors-In-

3    Possession, submits this response to the motion of the United States Trustee (the "U.S.

4    Trustee") to disqualify Pillsbury, vacate Pillsbury's employment order and require

5    disgorgement of attorneys' fees.[1]

6                                   <u>INTRODUCTION</u>

7    Pillsbury acknowledges that it should have filed a supplemental declaration under

8    Bankruptcy Rule 2014 when it received a demand for indemnification from the holders of

9    certain SONICblue debentures (the "Senior Noteholders") in September 2006.  Pillsbury

10   apologizes to the Court and the U.S. Trustee for that omission.

11   Pillsbury otherwise denies the U.S. Trustee's accusations of misconduct and denies

12   that it is subject to disqualification or an obligation to disgorge attorneys' fees.  Pillsbury

13   appreciates the opportunity afforded by the Court to set forth the relevant facts.

14   In its 2003 application to represent the Debtors, Pillsbury disclosed that it had been

15   "engaged as the Debtors' corporate and litigation counsel since approximately 1989" and

16   that it had represented the Debtors in "corporate and securities matters, mergers and

17   acquisitions, litigation, and intellectual property matters."  Pillsbury did not attempt to list

18   all such matters or to audit all its work over that 14-year period in search of latent claims

19   that might be asserted against Pillsbury.  Such an analysis is not required by bankruptcy law

20   and is not done as a matter of standard practice.

21   In any event, contrary to the U.S. Trustee's assertions, Pillsbury's pre-petition work

22   did ***not*** include an opinion that any obligation of the Debtors would be "repaid in full."

23   In the summer of 2006, Pillsbury informed the Senior Noteholders that it would

24   challenge their claims insofar as they were based on unamortized original issue discount

25   ("OID").  The Senior Noteholders responded by making a demand for indemnity from

26   _____

27   [1]  The Debtors may respond separately, in accordance with the Local Rules, to the U.S.
     Trustee's amended motion to appoint a Chapter 11 trustee and to certain creditors' motion
28   for conversion.

1    Pillsbury based on a legal opinion Pillsbury had issued, as counsel to SONICblue

2    Incorporated ("SONICblue"), in 2002.  Although Pillsbury viewed that demand as

3    frivolous, it nevertheless immediately transferred responsibility for the Senior Noteholders'

4    claims and any objections thereto to counsel for the Creditors' Committee.  In this way,

5    Pillsbury both identified and preserved the estate's right to object to those claims to the

6    extent of the OID.

7          Based on an incomplete understanding of the facts, the U.S. Trustee has also

8    suggested some invidious connection between the Senior Noteholders' demand on Pillsbury

9    and the terms of the settlement between the Debtors and VIA Technologies, Inc. ("VIA").

10   That settlement was for $12.5 million, payable as a general unsecured claim (*i.e.*, for

11   approximately $4 million cash from the estate).  In documenting the settlement, Pillsbury

12   had to secure VIA's unequivocal agreement that the nominal $12.5 million settlement

13   amount would be a general unsecured claim.  This was a prudent protection against some

14   later contention that VIA was entitled to a higher priority and, potentially, up to $12.5

15   million in cash -- a drastic departure from the economics of the settlement on which the

16   parties had agreed.  VIA, which had never regarded its breach-of-contract claims as

17   anything other than general unsecured claims, readily agreed.  The notion that Pillsbury

18   structured the settlement agreement to shield itself from the Senior Noteholders' demand

19   for indemnity is demonstrably incorrect, for two reasons.  First, the negotiations as to the

20   priority of the VIA settlement occurred, and agreement with VIA was reached, ***before*** the

21   Senior Noteholders asserted that demand.  Second, Pillsbury's 2002 opinion did not speak

22   to the priority of the Senior Noteholders vis-à-vis VIA, and accordingly Pillsbury had no

23   exposure to the Senior Noteholders tied to the resolution of this issue.

24

25

26

27

28

1              ARGUMENT

2    I.    PILLSBURY DID NOT GIVE THE SENIOR NOTEHOLDERS ANY

3          "ASSURANCE" THAT THEIR DEBENTURES WOULD BE "REPAID IN

4          FULL."

5          The basic premise of the U.S. Trustee's arguments is that, in a 2002 opinion,

6    Pillsbury "assured the Senior Noteholders that debtor SonicBlue would repay the $75M

7    obligation [represented by their debentures] in full." Motion to Disqualify at 11. The U.S.

8    Trustee never quotes the language of this supposed "assurance." That is because Pillsbury

9    never made it.

10         On April 21, 2002, SONICblue issued 7 ¾% Secured Senior Subordinated

11   Convertible Debentures (the "Debentures"), in the aggregate principal amount of $75

12   million, to the Senior Noteholders.[2] As part of the same private placement, the Senior

13   Noteholders acquired warrants to purchase up to 7.5 million shares of SONICblue common

14   stock. These transactions were effected though several elaborate, interrelated agreements,

15   including: a Securities Purchase Agreement (the "Purchase Agreement"); an Indenture; a

16   Pledge and Security Agreement (granting security interests in various SONICblue assets to

17   the Senior Noteholders); a Registration Rights Agreement (providing for registration of

18   shares to be issued upon conversion of the Debentures or exercise of the warrants); and an

19   Option Agreement (granting the Senior Noteholders an option to purchase shares in a

20   Taiwanese company). *See* Damonte Decl., Exs. A-E respectively.

21         Pillsbury, as counsel to SONICblue, gave a written opinion to the Senior

22   Noteholders pursuant to Section 7(iv) of the Purchase Agreement. Damonte Decl. Ex. I.

23   The opinion confirmed that SONICblue had the legal authority to enter into the above

24   agreements and transactions. Among other things, the opinion stated:

25         •       in Paragraph 2, that "the Purchase Agreement, the Registration
                   Rights Agreement, the Indenture, the Pledge and Security Agreement
26   _____

27   [2] *See* Declaration of Ana N. Damonte, filed herewith ("Damonte Decl."), Exs. F-H. The
         Senior Noteholders are Portside Growth and Opportunity Fund; Smithfield Fiduciary
28       LLC; and Citadel Equity Fund Ltd.

1      and the Option Agreement, when duly executed and delivered by the
       Buyers [i.e., the Senior Noteholders], will each constitute a valid and
2      binding agreement of the Company [i.e., SONICblue], enforceable
       against the Company in accordance with its terms"; and

3      •    in Paragraph 3, that the Debentures themselves, "[u]pon issuance and
4          delivery against payment therefor in accordance with the terms of the
           Indenture and the Purchase Agreement … will constitute valid and
5          binding obligations of the Company, enforceable against the
           Company in accordance with their terms."

6  *Id.*, p. 2.

7         The Pillsbury opinion said nothing about what might happen if SONICblue became

8  bankrupt.  Still less did it contain any "assurance" that the Debentures would be "repaid in

9  full," whether a bankruptcy ensued or not.  The opinion's only mention of bankruptcy is in

10  a long list of "assumptions, qualifications, limitations and exceptions," which states:

11      Our opinion in paragraph 2 above is subject to and limited by (i) the effect of
        applicable bankruptcy, insolvency, reorganization, fraudulent conveyance,
12      receivership, conservatorship, arrangement, moratorium or other laws
        affecting or relating to the rights of creditors generally . . . .
13

14  *Id.*, p. 4.  We will refer to this as "the bankruptcy proviso."

15         In the late summer of 2006, in response to Pillsbury's assertion that their claims

16  included OID subject to disallowance under 11 U.S.C. § 502(b)(2), the Senior Noteholders

17  claimed for the first time that the Pillsbury opinion was inaccurate.  *See infra*, Part IV.

18  Their theory was that, because the bankruptcy proviso cross-referenced only Paragraph 2 of

19  the opinion (which dealt with the enforceability of the Purchase Agreement, the Indenture,

20  and the other agreements), and not Paragraph 3 (which dealt with the enforceability of the

21  Debentures themselves), it gave rise to a negative inference that claims based on the

22  Debentures would be allowable without regard to the Bankruptcy Code.  In other words, the

23  Senior Noteholders' theory is that the Pillsbury opinion "***contains no caveat*** for the

24  possible application of bankruptcy law with regard to the representations in Paragraph 3."

25  Declaration of Craig A. Barbarosh, filed herewith ("Barbarosh Decl."), Ex. 2, p. 2

26  (emphasis added).

27         As discussed in the next section, the Senior Noteholders' theory has no merit.  But

28  even under that theory, the Pillsbury opinion was not a guarantee of payment.  As relevant

1    here, the opinion spoke only to the "enforceability" of the Debentures, and then only at the

2    time they were issued and delivered.  To say that an obligation is "enforceable" means only

3    that there is a legal or equitable remedy for its breach.  Restatement (Second) of Contracts

4    § 8 (1979).  Under bankruptcy law, the "enforceability" of a claim against the debtor and its

5    property is a condition of its allowance.  11 U.S.C. § 502(b)(1).[3]  Obviously, however, a

6    claim can be "enforceable" and "allowable" without being collectible, in whole or in part.

7    The Senior Noteholders themselves do not contend that Pillsbury's opinion contained any

8    "assurance" that SONICblue would not become insolvent or, if it did, that the Debentures

9    nevertheless would be paid "in full."  They contend only that the opinion is inconsistent

10   with disallowance of their OID under 11 U.S.C. § 502(b)(2).  *See* Barbarosh Decl. Ex.2,

11   p. 1.  As we now show, even that much more limited contention is unsupportable.

12   II.      THE SENIOR NOTEHOLDERS' CLAIM AGAINST PILLSBURY IS NOT ONE

13            THAT COULD HAVE BEEN FORESEEN BEFORE IT WAS ASSERTED; IN

14            FACT, IT IS FRIVOLOUS.

15            We recognize that the assertion of the Senior Bondholders' claim based on the

16   Pillsbury opinion had significance in these bankruptcy cases, regardless of whether

17   Pillsbury believed the claim had any merit.  The U.S. Trustee, however, also argues that

18   Pillsbury should have *foreseen* the Senior Bondholders' claim, and disclosed the

19   circumstances from which it might arise, three years *before* it was asserted.  Mot. to

20   Disqualify at 2-3, 5-6.  In this context, the merits of the claim clearly matter.  Bankruptcy

21   Rule 2014 requires only that the applicant's "connections" with interested parties be

22   disclosed "to the best of the applicant's knowledge."  The applicant cannot reasonably be

23   charged with knowledge of a creditor's latent, unasserted claim, especially one that is

24

25   _____

26   [3] Bankruptcy Code Section 502(b)(1) provides for disallowance of a claim that is
     "unenforceable against the debtor and property of the debtor, under any agreement or
     applicable law for a reason other than because such claim is contingent or unmatured."

27   Section 502(b)(2), under which Pillsbury challenged the Senior Noteholders' claims
     based on OID, provides for the disallowance of claims "for unmatured interest."

28

1   fanciful or frivolous.  In this case, Pillsbury had no actual knowledge of the Senior

2   Noteholders' potential claim based on the 2002 opinion, and that claim is frivolous indeed.

3        First, a legal opinion speaks to what the law requires or permits.  It is not a means

4   by which the recipient can obtain assurances that the law will not apply to him.  Yet that is

5   what the Senior Noteholders appear to contend:  that the opinion negated "the possible

6   application of bankruptcy law" to their Debentures.  No reasonable person, much less

7   highly sophisticated institutional investors like the Senior Noteholders, would have

8   believed this.[4]

9        Second, whatever might be the consequence if Pillsbury had affirmatively assured

10  the Senior Noteholders that OID would be allowable in bankruptcy, the opinion said

11  nothing of the kind.  That is merely the inference that the Senior Noteholders claim to have

12  drawn from the phrasing of a "caveat."  This makes the Senior Noteholders' claimed

13  reliance on the opinion all the more unreasonable (and unbelievable).

14        Third, the Purchase Agreement contained its own bankruptcy proviso.  That

15  Agreement included the following representation and warranty by SONICblue with respect

16  to the "Transactional Documents," which term was defined to include the Debentures:

17        The Transaction Documents constitute, or will constitute prior to Closing,
           the valid and binding obligations of the Company enforceable in accordance
18        with their terms, ***except as such enforceability may be limited by general***
           ***principles of equity or applicable bankruptcy, insolvency, reorganization,***
19        ***moratorium, liquidation or similar laws relating to, or affecting generally,***
           ***the enforcement of creditors' rights and remedies***.

20

21  Damonte Decl. Ex. A, p. 5-6, § 3(b) (emphasis added).  If the Senior Noteholders required a

22  "caveat" to put them on notice that their Debentures were subject to the bankruptcy laws,

23  this was more than sufficient.

24  _____

25  [4] This is especially clear where the Senior Noteholders negotiated elaborate contractual
     protections against the potential insolvency of SONICblue (*e.g.*, collateral under the
26    Pledge and Security Agreement, and subordination of other debt pursuant to the
     Indenture), as well as handsome compensation for running that risk (*e.g.*, the original
27    issue discount, the high interest rate, the warrants, the Registration Rights Agreement, and
     the Option Agreement).

28

1    Fourth, the bankruptcy proviso in Pillsbury's opinion unquestionably qualified

2    Paragraph 2 of that opinion, which dealt with the enforceability of the Purchase Agreement

3    and the Indenture. The Indenture, in turn, expressly incorporated the Debentures by

4    reference and was expressly incorporated by them. Thus, each Debenture states that it is

5    "issued under and pursuant to" the Indenture, to which "reference is hereby made for a

6    description of the rights, limitations of rights, obligations, duties and immunities" of

7    SONICblue and the Senior Noteholders. *E.g.*, Damonte Decl. Ex. F, pp. PWSP 00574-75.

8    The Indenture attaches the form of the Debentures as an exhibit and provides:

9        The terms and provisions contained in the form of Debentures attached as
         Exhibit A hereto shall constitute, and are hereby expressly made, a part of
10       this Indenture and to the extent applicable, [SONICblue] and [the Senior
         Noteholders], by their execution and delivery of this Indenture, expressly
11       agree to such terms and provisions and to be bound thereby.

12    Damonte Decl., Ex. B, pp. PWSP 00491-92, § 2.2. For this additional reason, the Senior

13    Noteholders could not reasonably have believed that the Debentures would be

14    "enforceable" differently from the Indenture.

15    In sum, the Senior Noteholders are suggesting that they relied on an implied

16    representation that their claims would somehow escape the normal operation of the

17    bankruptcy laws—even though the Pillsbury opinion didn't say that, and even though other

18    transactional documents signed by the Senior Noteholders contained directly contrary

19    provisions. "Knowledge" of such a specious claim cannot reasonably be imputed to

20    Pillsbury before the claim was actually asserted, and Pillsbury had no such prior knowledge

21    in fact. Barbarosh Decl. ¶ 12; Freeman Decl. ¶ 8.

22    III.    PILLSBURY'S ORIGINAL RULE 2014 DISCLOSURES WERE PROPER.

23    Pursuant to Bankruptcy Code Section 327 and Bankruptcy Rule 2014(a), Pillsbury's

24    application for employment as the Debtors' counsel was supported by the Declaration of

25    Craig A. Barbarosh dated April 1, 2003. Barbarosh Decl. Ex. 1. John Wesolowski, an

26    experienced bankruptcy attorney who then worked for Pillsbury and now represents

27    the U.S. Trustee on these very motions, performed the underlying conflicts analysis and

28    drafted the declaration. Barbarosh Decl. ¶¶ 2-3. We do not say this by way of "blaming"

1   Mr. Wesolowski for any deficiency in the disclosures or suggesting that he, rather than

2   Mr. Barbarosh, bears ultimately responsibility for the declaration.  To the contrary:  we

3   submit that the declaration, as prepared by Mr. Wesolowski and reviewed and signed by

4   Mr. Barbarosh, was thorough and complete.

5          The declaration stated that Pillsbury

6          has been engaged as the Debtors' corporate and litigation counsel since
           approximately 1989.  During this time, the Firm has provided legal
7          representation to the Debtors in a variety of areas, including corporate and
           securities matters, mergers and acquisitions, litigation, and intellectual
8          property matters.

9   *Id.* ¶ 5.  This is a standard form of disclosure where the applicant was the debtor's principal

10  outside counsel prior to bankruptcy.  See the Declaration of Nancy B. Rapoport, filed

11  herewith ("Rapoport Decl."), ¶¶ 17-27 (giving examples).  Typically, and in this case,

12  Section 327(a) applications focus on whether the law firm has separately represented

13  creditors of the estate, because such representation would create a conflict if the firm

14  challenged the creditor's claim.  *Id.* ¶ 27.  Pillsbury had no such attorney-client relationship

15  with the Senior Noteholders; it was adverse to them in the 2002 sale of the Debentures, just

16  as it expected to be adverse to them in the bankruptcy.

17         In contrast, it would have been a sharp departure from standard practice for

18  Pillsbury to have attempted to catalogue in its application all the legal work it had done for

19  SONICblue over the previous 14 years.  As Professor Rapoport explains, "Section 327(a)

20  applications for employment traditionally list by ***category*** -- rather than by ***individual***

21  ***matter*** -- the pertinent work that the applicant has performed."  *Id.* ¶ 19 (original emphasis).

22  In this case,

23         enumerating each and every pre-bankruptcy matter that Pillsbury had
           worked on for SONICblue since 1989 would have been a classic case of
24         "overkill."  Such an approach would create a danger of burying truly
           significant information amidst unnecessary detail.  More specifically,
25         although opinion letters are often provided by Company counsel in
           connection with corporate financing transactions, applicable standards of
26         professional conduct do not mandate their disclosure in a § 327(a)
           application for employment.

27

28  *Id.* ¶ 20; *see also* Barbarosh Decl. ¶ 9.

1    Moreover, even if Pillsbury had undertaken a detailed audit of all its prior work for

2  SONICblue, there is no reason to believe it would have identified the 2002 opinion as a

3  potential problem.  As Professor Rapoport states (and as we have explained in more detail

4  above), the opinion

5    did not affirmatively represent that the Debentures would somehow be
     unaffected by a bankruptcy of SONICblue, and Pillsbury could not
6    reasonably have anticipated that the Senior Noteholders would draw such an
     inference from the wording of the bankruptcy proviso in the Opinion Letter.
7    [¶]  Thus, in my opinion, nothing in the Opinion Letter would have triggered
     a particular duty for Pillsbury to have disclosed its work on the Opinion
8    Letter when submitting the Application.

9  Rapoport Decl. ¶¶ 28-29.

10    Further still, under the U.S. Trustee's theory, a law firm could not confine its review

11  of its prior work to opinions issued to third parties on the client's behalf.  *Any* latent error --

12  or something someone might later claim was an error -- might potentially give rise to a

13  malpractice claim *on the part of the debtor itself*, and thus would equally, or even more

14  clearly, give rise to a potential conflict and a corresponding disclosure obligation.  Law

15  firms cannot reasonably be expected, especially under the pressure of preparing first-day

16  motions in a Chapter 11 case (*see id.* ¶ 19), to anticipate any and all unasserted claims that

17  might arise from their prior representation of the debtor.

18    The cases cited by the U.S. Trustee involved completely different circumstances.  In

19  those cases, attorneys misrepresented or failed to disclose, at the time of their initial

20  applications for employment, the scope or terms of their retention by the debtor.  In each

21  case, the facts left undisclosed were fully known to counsel and were fully known to be

22  within the scope of counsel's disclosure obligations.  For example, in *Neben & Starrett,*

23  *Inc. v. Chartwell Financial Corp.* (*In re Park-Helena Corp.*), 63 F.3d 877 (9th Cir. 1995),

24  *cert. denied*, 516 U.S. 1049 (1996), the attorneys' application stated that they had received

25  a $150,000 retainer from the debtor, when in fact the retainer was paid by the debtor's

26  president, a "party in interest" who owed over $1 million to the debtor.  63 F.3d at 879,

27  881-82.  As the Ninth Circuit observed:  ***"Our holding does not impose any new or***

28  ***additional investigatory burden on firms that represent a debtor.***  A law firm must at least

1    disclose the facts of the transaction, as those facts were known to the firm." *Id.* at 881

2    (emphasis added). In contrast, the U.S. Trustee's theory here would impose a new and

3    extraordinary investigative burden on the applicant.

4        The other cases cited by the U.S. Trustee likewise involved misrepresentation or

5    non-disclosure of "the facts of the transaction, as those facts were known to the firm" at the

6    time of its initial Section 327(a) application:

7            *Law Offices of Nicholas A. Franke v. Tiffany* (*In re Lewis*), 113 F.3d

8            1040, 1041-42 (9th Cir. 1997): the attorney's belated employment

9            application stated that he had received a $40,000 pre-petition retainer, when

10           in fact $30,000 was paid to him after the petition was filed.

11           *Moritz v. Baker* (*In re Triple Star Welding, Inc.*), 324 B.R. 778,

12           782-84 (B.A.P. 9th Cir. 2005): the attorney filed no declaration under

13           Rule 2014 and his application failed to disclose that he had orchestrated pre-

14           petition fraudulent transfers of the debtor's assets and received preferential

15           payments from the debtor.

16           *In re A.W. Logging, Inc.*, 356 B.R. 506, 512-13, 2006 WL 3438590,

17           *4-5 (Bankr. D. Idaho 2006): the attorney failed to disclose, in his original

18           application, that he had represented the debtor during the year prior to the

19           petition and had received potentially preferential payments.

20           *In re Jore Corp.*, 298 B.R. 703, 708-12 (Bankr. D. Mont. 2003): the

21           law firm represented, in the initial application process, that it had obtained

22           an oral conflicts waiver from another client (Wells Fargo) which was the

23           largest creditor of the estate; in fact, Wells Fargo had signed a limited

24           written waiver which did not permit the law firm to represent the debtor in

25           litigation adverse to Wells Fargo.

26           *In re Maui 14K, Ltd.*, 133 B.R. 657, 658-59 (Bankr. D. Haw. 1991):

27           the attorney did not disclose his role in arranging a preferential set-off

28

1    between the debtor and its principal 60 days before the petition date, or his

2    receipt of a retainer and certain fees prior to or shortly after the petition date.

3        *In re Hathaway Ranch P'Ship*, 116 B.R. 208, 210-12 (C.D. Cal.

4    1990):  the law firm's application misrepresented the terms of its retainer

5    agreement with the debtor and failed to disclose that certain creditors were

6    paying the retainer and had also conveyed a house to the law firm.

7        *In re EWC, Inc.*, 138 B.R. 276, 278 (Bankr. W.D. Okla. 1992):  the

8    attorney's original application did not disclose that he had represented the

9    debtor prior to bankruptcy and had also represented its sole shareholder.[5]

10    None of these cases held that a Rule 2014 disclosure was inadequate because the

11    lawyer failed to predict that a claim might be asserted against him or that a conflict might

12    arise in the future.[6]  Moreover, insofar as these cases reflect concerns about conflicts of

13    interest, those conflicts resulted from the lawyer's concurrent representation of creditors,

14    not (as here) potential third-party claims arising from the lawyer's prior representation of

15    the debtor itself.

16    We found only one case presenting analogous facts, and it refutes the U.S. Trustee's

17    argument.  In *In re O'Connor*, 52 B.R. 892 (Bankr. W.D. Okla 1985), creditor Wells Fargo

18    sought to disqualify the law firm representing the debtors on the ground (among others) that

19    Wells Fargo had received an opinion letter from a shareholder in the firm.  *Id.* at 895.  The

20    subject of the opinion was "currently in litigation in district court," and Wells Fargo argued

21    that disqualification was required because "in order to resolve the district court litigation

22    Wells Fargo may be compelled to pursue counsel and/or the shareholder regarding the

23    shareholder's opinion letter."  *Id.* at 898.  The court rejected this argument, noting that

24    _____

25    [5] *See also Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 477, 481
       (B.A.P. 9th Cir. 1996) (real estate broker did not disclose that it had facilitated sale, on
26    which it sought a commission, by lending the deposit amount to the buyer).

27    [6] This includes *In re Jore Corp.*, where the law firm acknowledged an obvious, existing
       conflict resulting from its concurrent representation of the largest creditor, but falsely
28    represented that the conflict had been waived.  298 B.R. at 708-12.

1    "such a hypothesis appears to be one of 'disqualification on speculation,' a precept we have

2    not hereto seen articulated." *Id.*

3    IV.     IN RESPONSE TO THE SENIOR NOTEHOLDERS' DEMAND FOR

4             INDEMNITY, PILLSBURY TOOK EFFECTIVE MEASURES TO AVOID ANY

5             PREJUDICE TO THE OTHER CREDITORS.

6             In July 2006, Pillsbury wrote to counsel for the Senior Noteholders pointing out that

7    original issue discount ("OID") on the Debentures, to the extent not amortized on the

8    petition date, was not allowable under Section 502(b)(2) of the Bankruptcy Code.

9    Barbarosh Decl. ¶¶ 10-11.  The Senior Noteholders reacted by asserting, for the first time,

10   that if their claims for OID were disallowed, they would seek indemnification from

11   Pillsbury based on its 2002 opinion.  They made this assertion orally on August 24, 2006

12   and in writing on September 5, 2006.  Barbarosh Decl. ¶¶ 11-12, 14; *id.* Ex. 2.  This was the

13   first notice to Pillsbury that the Senior Noteholders thought they might have a claim based

14   on Pillsbury's 2002 opinion.  Barbarosh Decl. ¶ 12; Declaration of William B. Freeman,

15   filed herewith ("Freeman Decl."), ¶ 8.

16           This sequence of events bears emphasis.  Contrary to the notion that the Senior

17   Noteholders' potential claim caused Pillsbury to "go easy" on them, it was Pillsbury's

18   aggressive pursuit of the OID issue that caused the Senior Noteholders to concoct and assert

19   that claim in the first place.

20           In response to the Senior Noteholders' demand for indemnification, Pillsbury

21   immediately notified counsel for the Creditors' Committee that it had a conflict and

22   transferred to the Creditors' Committee responsibility for handling the Senior Noteholders'

23   claim.  Barbarosh Decl. ¶¶ 13, 15; Freeman Decl., ¶¶ 7-11.  Pillsbury and counsel for the

24   Creditors' Committee had shared responsibility for discrete issues throughout the course of

25   the bankruptcy, including in situations where one or the other had a conflict.  Barbarosh

26   Decl. ¶ 8; Freeman Decl. ¶ 4.  Thus, transferring the files on the OID issue to the Creditors'

27   Committee was a reasonable means of eliminating any conflict created by the Senior

28   Noteholders' demand for indemnity.  *See* Rapoport Decl. ¶ 34.

1    Through oversight, Pillsbury did not supplement its Rule 2014 declaration to

2    disclose the Senior Noteholders' demand for indemnity.  *See* Barbarosh Decl. ¶¶ 16-17;

3    Freeman Decl. ¶ 12.  However, without suggesting that compliance with Rule 2014 was

4    thereby excused, disclosure did occur in a variety of ways.  In August 2006, when asking

5    the Creditors' Committee to take responsibility for the OID and related issues, Pillsbury

6    explained to the Committee's counsel that the Senior Noteholders had asserted a claim

7    against Pillsbury.  Freeman Decl. ¶ 10.  In its eighth interim fee application, which was

8    filed on October 18, 2006, Pillsbury described its analysis of the OID issue and stated:

9    "The matter was turned over to the Creditors' Committee for prosecution" (p. 19).  A

10   disclosure statement filed with the Court and served on all creditors and interested parties

11   on the court-approved notice list on December 15, 2006, stated:  "until recently, the Debtors

12   were in charge of analyzing the Senior Notes Claims.  However, as a result of a conflict that

13   has been asserted by the Senior Noteholders with respect to counsel to the Debtors, the

14   Creditors' Committee is now in charge of analyzing the Senior Notes Claims."  Freeman

15   Decl. ¶ 13 & Ex. 1.  Another disclosure statement, which was filed and served on the same

16   creditors and interested parties on January 18, 2007, stated:

17           As a result of the Senior Noteholders' contention that counsel to the Debtors
             had pre-petition issued to the Senior Noteholders an unqualified legal
18           opinion that the Senior Notes were enforceable against the Debtors in
             accordance with their terms, counsel to the Debtors requested the Creditors'
19           Committee to assume the role of analyzing the Senior Notes Claims.

20   *Id.* ¶ 13 & Ex. 2.  Thus, the U.S. Trustee's purported "suspicion of a cover-up" (Mot. to

21   Disqualify at 11) is unfounded.

22   V.    <u>THE CHALLENGES TO THE VIA SETTLEMENT RAISED BY CERTAIN</u>

23         <u>CLAIMS TRADERS ARE COMPLETELY BASELESS.</u>

24           The Debentures issued to the Senior Noteholders in April 2002 were subordinated

25   by the Indenture to certain "Senior Indebtedness."  *See* Damonte Decl. Ex. B, § 1.1, pp. 6-8.

26   The definition of Senior Indebtedness included a subcategory of "Via Indebtedness,"

27   defined as "[a]ll indebtedness of [SONICblue] due and owing to Via Technologies, Inc. in

28   an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any

1  other currency or composite currency." *Id*. § 1.1, p. 7.  As both the express language of the

2  Indenture and extrinsic evidence make clear, these provisions referred to obligations of

3  SONICblue to repay borrowed money.  Nevertheless, certain creditors (the "Claims

4  Traders")[7] have argued that these Indenture provisions are implicated by the settlement

5  between the Debtors on the one hand, and VIA and S3 Graphics Co., Ltd. ("S3") on the

6  other.  These arguments are completely baseless.

7  1.    The negotiation of the VIA settlement.

8       S3 was a joint venture between SONICblue and VIA.  See Declaration of Albert J.

9  Boro, Jr., filed herewith ("Boro Decl.") ¶ 2.  The duplicate claims of VIA and S3 sought

10  more than $100 million in damages, including $70 million in liquidated damages.  *Id.*  The

11  claims involved alleged debts, obligations, and receivables of the joint venture; alleged

12  transfers of intellectual property and records; and the joint venture's loss of a patent license

13  from Intel Corporation ("Intel").  *Id.*  These disputes became the subject of an adversary

14  proceeding with VIA and S3 and contested motion proceedings with Intel.  *Id.* ¶¶ 3-4.

15      Face-to-face settlement negotiations with VIA began in August 2005.  *Id.* ¶ 9.  In

16  September 2005, the parties reached agreement in principle that VIA and S3 would release

17  their duplicate claims in exchange for a single allowed, general unsecured claim in the

18  amount of $12.5 million.  *Id.* ¶¶ 12-18.  The signed term sheet reflecting this agreement

19  provided that the settlement amount would be an "allowed general unsecured claim in the

20  Chapter 11 case of SONICblue Inc."  *Id.* ¶ 18 & Ex. 3.

21      Largely because of the continuing dispute with Intel, the drafting of the definitive

22  VIA settlement agreement was delayed until 2006, and the final settlement agreement was

23  not executed until September 2006.  *Id.* ¶ 19.  The initial drafts of the definitive settlement

24  agreement specified, consistent with the September 2005 negotiations and term sheet, that

25  VIA would have an

26

27  [7] SONICblue Claims, LLC: Argo Partners, Inc.; Riverside Contracting, LLC; Riverside
28  Claims, LLC; and Ferry Laws.

1    allowed general unsecured claim in the Bankruptcy Case, which claim shall
     be afforded the benefits and priority of Debtor's other allowed general
2    unsecured claims and shall be neither senior nor junior to any other allowed
     general unsecured claim, in the amount of $12.5 million . . . .
3
     *Id.* ¶ 19 & Ex. 4.
4
          In May 2006 -- months *before* Pillsbury raised the OID issue with the Senior
5
     Noteholders and they responded with their demand for indemnity -- Pillsbury proposed that
6
     language be added to the VIA settlement agreement specifically providing that VIA's
7
     allowed claim for $12.5 million would not be "Senior Indebtedness" within the meaning of
8
     the Indenture.  *Id.* ¶ 20.  Pillsbury proposed this language to eliminate any possible doubt as
9
     to the general unsecured status of the settlement amount, so that VIA could not later claim a
10
     higher priority and potentially receive the full $12.5 million in cash.  *Id.*  VIA readily
11
     agreed to the language Pillsbury proposed.  *Id.* ¶ 23.  ***All this occurred, and had been***
12
     ***confirmed in writing, by mid-June 2006 -- well before the Senior Noteholders first***
13
     ***asserted their claim against Pillsbury based on the April 2002 opinion***.  *Id.* ¶¶ 23-25.
14
          In sum, the provision of the definitive settlement agreement which the Claims
15
     Traders find so suspicious (a) merely reaffirmed the parties' intent, as abundantly
16
     documented in September 2005, that VIA would have a general unsecured claim and
17
     (b) was itself agreed months before Pillsbury had any intimation that the Senior
18
     Noteholders might assert a claim against Pillsbury.
19
     2.    The meaning of "Senior Indebtedness".
20
          The Claims Traders seem to have concluded that the amount of the VIA settlement
21
     would constitute "Senior Indebtedness" under the Indenture.  Their initial plan was to wait
22
     until the settlement had been concluded and then purchase VIA's rights under the
23
     settlement and assert a right to payment ahead of the Debentures.[8]
24
          The Claims Traders, however, misunderstood the Indenture.  Its reference to "VIA
25
     Indebtedness" in "an aggregate principal amount not to exceed $15,000,000" was not to any
26

27   [8] *See* Declaration of William McGrane in Support of Objection to Proposed Disclosure
        Statement, dated January 18, 2007.
28

1   amount up to $15 million that SONICblue later agreed, or was adjudged liable, to pay to

2   VIA.  Rather, the reference was to funded debt:  a $15 million loan from VIA to

3   SONICblue which was under negotiation in 2002, when the Indenture was executed, but

4   which VIA never made.  Boro Decl. ¶¶ 20-21.  It was a condition of VIA's obligation to

5   fund this $15 million loan that SONICblue and VIA agree on a settlement of the disputes

6   between them, and no such agreement was reached.  *Id.*[9]

7          This concept of a loan from VIA to SONICblue, which was under consideration in

8   2002, explains why the definition of "Via Indebtedness" in the Indenture refers to "an

9   aggregate *principal* amount not to exceed" $15 million (emphasis added).  It makes that

10  definition consistent with the Indenture's definition of "Indebtedness":

11         obligations (other than the Debentures or non-recourse obligations) of, or
           guaranteed or assumed by, [SONICblue], *for borrowed money or evidenced*
12         *by bonds, debentures, notes or other similar instrument …*

13  Damonte Decl. Ex. B, p. PWSP 00504, § 7.1(e) (emphasis added); *see also id.*, p. PWSP

14  00487.[10]

15         The Claims Traders' theory also ignores the fact that the Indenture was negotiated

16  with the Senior Noteholders.[11]  It makes sense that the Senior Noteholders would have

17  agreed to subordinate their Debentures to $15 million in new money that SONICblue was

18  expected to receive from VIA as part of a pre-petition settlement between VIA and

19  SONICblue.  It makes no sense at all that the Senior Noteholders would have agreed to

20  subordinate their claims to VIA's and S3's contingent and unsecured pre-petition claims for

21  liquidated and unliquidated damages for breach of contract.

22  _____

23  [9] In fact, the claims and counterclaims between SONICblue and VIA remained unsettled
       until 2005-2006, as described in the preceding section.

24  [10] The Claims Traders have argued that this definition of "Indebtedness" is not incorporated
25     into the definition of "Via Indebtedness" because, while the latter term uses an upper-case
       "I," the definition of it includes the word "indebtedness" with a lower-case "i."  The most
       that can be said for this argument is that it identifies an ambiguity which extrinsic
26     evidence may be consulted to resolve.  That evidence establishes, beyond dispute, that the
27     "Via Indebtedness" was the anticipated $15 million loan.

28

1    3.    The absence of any improper motive on Pillsbury's part.

2            The language in the settlement agreement specifically disclaiming "Senior

3    Indebtedness" status frustrated the Claims Traders' strategy, so they tried another gambit.

4    This was to characterize that language as a "giveaway" for the benefit of the Senior

5    Noteholders because it ensured that the settlement would be paid from funds allocated to

6    the general creditors.  In contrast, the Claims Traders theorized, if VIA had been accorded

7    Senior Indebtedness status, it might have accepted a lower amount, which would have been

8    paid from funds allocated to the Senior Noteholders.  Pillsbury's motive for the supposed

9    "giveaway," according to the Claims Traders, was to minimize its own exposure to the

10   Senior Noteholders by maximizing the latter's recovery.

11           This theory makes no sense.  First, as explained above, the provision of the

12   settlement agreement waiving "Senior Indebtedness" status was proposed, agreed, and

13   documented *before* the Senior Noteholders asserted their claim against Pillsbury, and hence

14   before Pillsbury became aware of any arguable exposure to the Senior Noteholders.

15   Pillsbury's negotiation of the VIA settlement could not have been influenced by a potential

16   claim of which it knew nothing.

17           Second, Pillsbury had no potential exposure to the Senior Noteholders that

18   depended on how the VIA settlement was paid.  As explained above, the Pillsbury opinion

19   spoke only to the "enforceability" of the Debentures; it did not warrant that SONICblue

20   would not become insolvent, and it did not speak to the priority of the Senior Noteholders'

21   claims in that event.  If the VIA settlement had been paid as Senior Indebtedness ahead of

22   the Senior Noteholders, that would have been the consequence of the Indenture which the

23   Senior Noteholders negotiated with SONICblue at arm's length; it would not have been the

24   consequence of anything in Pillsbury's opinion.

25

26   _____

27   (…continued)
     [11] The Indenture was signed by each of the Senior Noteholders, as well as by SONICblue.
28        Damonte Decl. Ex. B, pp. PWSP 00535-00538.

1    In sum, the VIA settlement, which eliminated a claim for more than $100 million

2    against the estate, was greatly to the benefit of the creditors, and it has nothing to do with

3    the Senior Noteholders' claim based on Pillsbury's 2002 opinion.

4    VI.     <u>NO DISGORGEMENT OF ATTORNEYS' FEES IS WARRANTED.</u>

5    The U.S. Trustee seeks disgorgement of all fees paid to Pillsbury in these

6    bankruptcy cases.  The U.S. Trustee does not contend that the fees paid to Pillsbury have

7    been excessive or that Pillsbury's work has not provided commensurate benefit and value to

8    the Debtors' estate.  Rather, the U.S. Trustee's motion for disgorgement proceeds from the

9    mistaken premise that Pillsbury had a duty to anticipate the Senior Noteholders' claim at

10   the outset of the cases.

11   While the Bankruptcy Code gives the Court discretion to deny attorneys' fees where

12   the debtor's law firm is not disinterested, "disgorgement is a harsh remedy that should only

13   be applied in extreme situations."  *In re LTV Steel Co.*, 288 B.R. 775, 779 (N.D. Ohio

14   2002).  The exercise of that discretion should be based on the facts of the case.  *Kravit,*

15   *Gass & Weber, S.C. v. Michel* (*In re Crivello*), 134 F.3d 831, 840 (7th Cir. 1998).  As

16   explained above, all of the cases on which the U.S. Trustee relies are inapposite, because

17   each involved a situation where the law firm failed to disclose known facts at the time of its

18   initial application for employment.

19   Factors relevant to the determination whether disgorgement of fees is appropriate

20   include the following:

21   •   Whether the fees were for work performed before or after the law

22       firm became aware of the alleged conflict.  *See In re XGW*

23       *Excavating Co.*, 111 B.R. 469, 472-73 (D.N.J. 1990).

24   •   Whether it appeared that the law firm's work was tainted by the

25       conflict or potential conflict.  *S.S. Retail Stores Corp. v. Ekstrom* (*In*

26       *re S.S. Retail Stores Corp.*), 216 F.3d 882, 885 (9th Cir. 2000); *First*

27       *Interstate Bank v. CIC Investment Corp.* (*In re CIC Investment*

28

1   *Corp.*), 192 B.R. 549, 553-54 (B.A.P. 9th Cir. 1996); *see In re*

2   *Gutterman*, 239 B.R. 828, 831 (N.D. Cal. 1999)

3   •   Whether there was a willful failure to disclose. *Kravit, Gass &*

4   *Weber, S.C. v. Michel*, 134 F.3d at 839.

5   •   Whether the failure to disclose was an isolated incident or reflected a

6   pattern of disregard for the disclosure requirements. *See In re*

7   *Gutterman*, 239 B.R. at 830-31.

8   •   The extent to which the law firm's work provided a benefit to the

9   bankruptcy estate. *Id.* at 830-31.

10  Each of these factors weighs against disgorgement in the present case.

11  A.   The Fees for Which the U.S. Trustee Seeks Disgorgement Were Incurred in Good

12       Faith Before Pillsbury Was Aware of the Senior Noteholders' Claim.

13       As shown above, any conflict arose no earlier than August 24, 2006, when the

14  Senior Noteholders first demanded indemnification from Pillsbury.  The amounts that have

15  been paid to Pillsbury to date are substantially less than Pillsbury's reasonable fees for work

16  performed prior to August 24, 2006.  Barbarosh Decl. ¶¶ 18, 26.  While Pillsbury's eighth

17  interim fee application includes fees for approximately one month after that date, the

18  amount approved by the Court for that application is less than the amount of fees incurred

19  by Pillsbury prior to August 24, 2006.  *Id.* ¶ 26 and Exhibit 4.

20       The fact that fees were incurred prior to the date on which a conflict arose is an

21  important consideration weighing against disgorgement.  For example, in *In re Pacific*

22  *Express, Inc.*, 56 B.R. 859 (Bankr. E.D. Cal. 1985), the debtors' counsel ("SSL") withdrew

23  when it learned that the Creditors' Committee intended to file an adversary proceeding

24  against (among others) certain SSL partners.  When SSL sought its fees the Creditors'

25  Committee objected, arguing that the fees should be disallowed because of the conflict and

26  because the fees requested were "grossly excessive."  *Id.* at 860.  The court disagreed:

27       This court believes that where the professional, without concealment, applies
         for appointment in good faith believing that it is disinterested and without
28       conflict of interest, the court should not impose a denial of allowances and

1   expense reimbursement on that basis alone, when after discovered facts
    reveal an interested person status or a conflict of interest with the debtor.
2

*Id.* at 861.
3
4       Similarly, in *In re XGW Excavating Co.*, the court allowed fees earned by counsel

for a creditors' committee before that firm was advised by the debtor's counsel of a
5

conflict, but disallowed fees earned afterwards.  111 B.R. at 472-73.  The court reasoned:
6
7       This court cannot, however, find that the initial action of the attorneys was
        clearly improper, for there was at least a reasonable position that adequate
        disclosure had been made.   As Judge Fox found in *In re Paolino*, 80 B.R.
8       341, 346 (Bankr.E.D.Pa.1987) there must be a balance struck between
        services rendered after the conflict became known and those rendered while
9       the professional proceeded in good faith.   See also, *In re BH & P*, 103 B.R.
        556 (Bankr.D.N.J.1989).   Any other approach would be draconian and
10      would have a chilling effect upon clients' rights to be represented by counsel
        of their choice.
11

12  *Id.* at 473.

13      As discussed above, at no time prior to August 24, 2006 was Pillsbury aware of any

14  potential conflict.  The Senior Noteholders have been actively involved in these bankruptcy

15  cases.  They did not oppose Pillsbury's appointment as counsel in this case, and at no time

16  prior to August 24, 2006 did they advise Pillsbury that they believed they had a claim

17  against it.  Thus, the draconian remedy of disgorgement of fees incurred prior to the date is

18  not warranted.

19  B.      The Alleged Conflict Has Not Tainted Pillsbury's Representation of the Debtors or

20          Otherwise Caused Prejudice.

21      Another important consideration in the determination whether fees should be

22  disgorged is whether the law firm's work for the debtor was tainted by reason of its lack of

23  disinterestedness.  For example, in *First Interstate Bank v. CIC Investment Corp.*, the

24  B.A.P. had reversed the bankruptcy court's order approving the employment application of

25  the debtor-in-possession's counsel because that law firm had a pre-petition claim against

26  the debtor.  192 B.R. at 549.  The bankruptcy court later allowed all of the law firm's fees.

27  On a subsequent appeal, a creditor argued that, because the order approving employment

28  was overturned, the debtor's counsel was not entitled to any fees.  The B.A.P. disagreed,

1    ruling that the bankruptcy court had discretion whether to allow fees, but remanded for

2    further consideration of whether the plan of reorganization drafted by the law firm gave

3    special treatment to its own prepetition claim.  Thus, the panel directed the bankruptcy

4    court to "determine whether [the law firm's] failure to be disinterested negatively interfered

5    with its efforts in representing the debtor in possession."  *Id.* at 554.

6         In the present case, Pillsbury had no knowledge of the Senior Noteholders' claim

7    prior to late August 2006, and when it received such notice it immediately transferred

8    responsibility for the Senior Noteholders' claims to counsel for the Creditors' Committee.

9    Indeed, rather than Pillsbury's awareness of a claim causing it to favor the Senior

10   Noteholders, it was Pillsbury's pursuit of the OID issue that caused the Senior Noteholders

11   to devise and assert their claim.  As explained above, the negotiation of the VIA settlement

12   likewise occurred **before** the Senior Noteholders had disclosed their purported belief that

13   they had a claim against Pillsbury.  That claim had no logical relationship to the structuring

14   of the VIA settlement, and in fact did not influence it.  In short, there is no evidence that

15   any of Pillsbury's work was influenced in any way by the assertion of the Senior

16   Noteholders' claim.

17   C.    Pillsbury's Failure to Disclose the Alleged Conflict Was Inadvertent, Not Willful,

18         and Was an Isolated Incident.

19         Throughout this case, Pillsbury filed updated Rule 2014 disclosures as new

20   information became known to it.  Barbarosh Decl. ¶ 7; Freeman Decl. ¶ 3.  As the U.S.

21   Trustee notes, we have done so at least seven times in the course of this case.  The failure to

22   file an updated disclosure concerning the Senior Bondholders' purported claim was

23   inadvertent, not willful.  Barbarosh Decl. ¶ 16; Freeman Decl. ¶ 12.  To the best of its

24   institutional knowledge, Pillsbury has not previously been charged with non-compliance

25   with Rule 2014 in any case.  Barbarosh Decl. ¶ 17.  Moreover, in this case, Pillsbury

26   promptly took other measures to avoid prejudice to the creditors.  While Pillsbury should

27   have brought the matter to the Court's attention more promptly, its inadvertent failure to do

28   so does not warrant the harsh remedy of fee disgorgement that the U.S. Trustee seeks.

1    A similar situation was presented in the *In re Firstmark Corp.* bankruptcy case.[12]

2    There, the law firm representing the creditors' committee did not disclose in its original

3    Rule 2014 declaration that Smith, the former president of the debtor, was a firm client.  The

4    attorney who submitted the Rule 2014 declaration was incorrectly told by one of his

5    partners that Smith was a former client, and therefore did not mention Smith in the

6    declaration.  *Firstmark II*, 132 F.3d at 1181.  Shortly afterward, the firm determined that

7    Smith was an existing client, terminated its representation of him, and advised the chairman

8    of the creditors' committee.  *Id.*  The firm did not report the newly discovered conflict to

9    the bankruptcy court, however.  *Id.* at 1183.  On a later motion to disqualify and for

10   disgorgement of fees, the bankruptcy court declined to disqualify the law firm and

11   determined that no sanction was warranted.  On appeal, the district court found that

12   "negligent failure to disclose a possible conflict of interest does not relieve an attorney of

13   the consequences of that failure" and ordered the firm to disgorge $2,250, or 10% of the

14   fees requested in the law firm's *eighth* interim fee application.  *See Firstmark I*, 46 F.3d at

15   656; *Firstmark II,* 132 F.3d at 1183.  The Seventh Circuit affirmed, finding that the district

16   judge's decision "was far from unreasonable."  *Id.*; *see also In re Gutterman*, 239 B.R. at

17   830, 833 (extraordinary circumstances warranted court's grant of nunc pro tunc

18   employment application where counsel's failure timely to file its employment application

19   was an isolated incidence and due to the inadvertence of a secretary); *Kravit, Gass &*

20   *Weber, S.C. v. Michel*, 134 F.3d at 840-41 (remand for new hearing on fees required where

21   district court found no support for the bankruptcy court's finding that law firm willfully

22   failed to disclose critical facts and connections with the debtor).

23

24

25

26   _____

27   [12] *See Brouwer v. Ancel & Dunlap* (*In re Firstmark Corp.*), 46 F.3d 653 (7th Cir. 1995)
     ("*Firstmark I*"), and *In re Firstmark Corp.,* 132 F.3d 1179 (7th Cir. 1997)

28   ("*Firstmark II*").

1   D.      <u>Pillsbury's Work Has Provided Great Benefit to the Debtor's Estate.</u>

2          Finally, the U.S. Trustee does not question, and would have no basis to question,

3   that Pillsbury's work over the past four years has conferred great benefit on the estate and

4   its creditors.  *See* Barbarosh Decl. ¶¶ 19-20, 24-27.

5                                    <u>CONCLUSION</u>

6          Pillsbury has no desire for these issues to create any unnecessary distraction or

7   delay in the well-advanced process of marshalling the assets and determining the claims

8   against these jointly administered estates.  Accordingly, Pillsbury will look to the Court, its

9   clients, and the creditors for guidance on its role going forward.  Pillsbury submits,

10  however, that motion to disqualify Pillsbury, vacate its employment order, and require

11  disgorgement of attorneys' fees should be denied.

12         Dated:  March 5, 2007.

13
                                        PILLSBURY WINTHROP SHAW PITTMAN LLP
14                                      THOMAS V. LORAN III
                                        CRAIG A. BARBAROSH
15                                      WILLIAM B. FREEMAN
                                        ALBERT J. BORO, JR.
16                                      ANA N. DAMONTE
                                        650 Town Center Drive, 7th Floor
17                                      Costa Mesa, CA  92626-7122

18

19                                      By /s/ Ana N. Damonte (215504)

20                                      Attorneys for Debtors and Debtors-In-Possession

21

22

23

24

25

26

27

28

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    THOMAS V. LORAN III  95255
2   thomas.loran@pillsburylaw.com
    CRAIG A. BARBAROSH  160224
3   craig.barbarosh@pillsburylaw.com
    WILLIAM B. FREEMAN  137276
4   bill.freeman@pillsburylaw.com
    ALBERT J. BORO, JR.  126657
5   albert.boro@pillsburylaw.com
    ANA N. DAMONTE 215504
6   ana.damonte@pillsburylaw.com
    650 Town Center Drive, 7th Floor
7   Costa Mesa, CA  92626-7122
    Telephone: (714) 436-6800
8   Facsimile: (714) 436-2800

9   Attorneys for Debtors and Debtors-In-Possession

10                     UNITED STATES BANKRUPTCY COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14  IN RE:                                  ) Case No. 03-51775
                                            )
15  SONICBLUE INCORPORATED, a               ) CHAPTER 11 Cases
    Delaware corporation, DIAMOND           )
16  MULTIMEDIA SYSTEMS, INC., a             ) (Case Nos. 03-51775 through 03-51778 MM)
    Delaware corporation, REPLAYTV, INC., a ) (Jointly Administered)
17  Delaware corporation, and SENSORY       )
    SCIENCE CORPORATION, a Delaware         )
18  corporation,                            )| DECLARATION OF ANA N. DAMONTE
                                            )
19                                          )
                                            ) Date:      March 19, 2007
20          Debtors and Debtors-in-Possession. ) Time:   10:30 a.m.
                                            ) Location:  Courtroom 3007
21                                          )            280 South First Street
                                            )            San Jose, CA 95113
22                                          )
                                            ) Judge:     Marilyn Morgan
23                                          )
                                            )
24  _____)

25  I, ANA N. DAMONTE, declare as follows:

26          1.      I am attorney duly admitted to practice before this Court, and am associated

27  with the law firm of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), counsel for Debtors

28  and Debtors-in-Possession SONICblue Incorporated, Diamond Multimedia Systems, Inc.,

1    REPLAYTV, Inc., and Sensory Science Corporation (collectively, the "Debtors").  I have

2    personal knowledge of the matters stated in this declaration and would provide competent

3    testimony thereto if called upon to do so.

4         2.        Attached hereto as <u>Exhibit A</u> is a true and correct copy of a document entitled,

5    "Securities Purchase Agreement by and among the Investors Listed Herein and SONICblue

6    Incorporated Dated as of April 21, 2002" (Bates numbered PWSP 00421 to PWSP 00455),

7    which I obtained from the Debtors' files maintained in the regular course of business.

8         3.        Attached hereto as <u>Exhibit B</u> is a true and correct copy of a document entitled,

9    "Indenture Dated as of April 22, 2002 7-3/4% Secured Senior Subordinated Convertible

10   Debentures Due 2005" by and among SONICblue Incorporated and Portside Growth and

11   Opportunity Fund, Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (Bates

12   numbered PWSP 00483 to PWSP 00539), which I obtained from the Debtors' files maintained

13   in the regular course of business.

14        4.        Attached hereto as <u>Exhibit C</u> is a true and correct copy of a document entitled,

15   "Pledge and Security Agreement" by and among SONICblue Incorporated and Portside

16   Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.

17   (Bates numbered PWSP 00541 to PWSP 00557) and dated April 22, 2002, which I obtained

18   from the Debtors' files maintained in the regular course of business.

19        5.        Attached hereto as <u>Exhibit D</u> is a true and correct copy of a document entitled

20   "Registration Rights Agreement" by and among SONICblue Incorporated and Portside

21   Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.

22   (Bates numbered PWSP 00457 to PWSP 00481) and dated as of April 22, 2002, which I

23   obtained from the Debtors' files maintained in the regular course of business.

24        6.        Attached hereto as <u>Exhibit E</u> is a true and correct copy of a document entitled

25   "Option Agreement" by and among SONICblue Incorporated and Portside Growth and

26   Opportunity Fund, Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. and dated

27   April 22, 2002 (Bates numbered PWSP 00559 to PWSP 00572), which I obtained from the

28   Debtors' files maintained in the regular course of business.

1    7.    Attached hereto as <u>Exhibit F</u> is a true and correct copy of a document entitled

2  "SONICblue Incorporated 7-3/4% Secured Senior Subordinated Convertible Debentures Due

3  2005 No.1 $25,000,000.00" (Bates numbered PWSP 00574 to PWSP 00579), which I

4  obtained from the Debtors' files maintained in the regular course of business.

5    8.    Attached hereto as <u>Exhibit G</u> is a true and correct copy of a document entitled

6  "SONICblue Incorporated 7-3/4% Secured Senior Subordinated Convertible Debentures Due

7  2005 No.2 $25,000,000.00" (Bates numbered PWSP 00581 to PWSP 00586), which I

8  obtained from the Debtors' files maintained in the regular course of business.

9    9.    Attached hereto as <u>Exhibit H</u> is a true and correct copy of a document entitled

10  "SONICblue Incorporated 7-3/4% Secured Senior Subordinated Convertible Debentures Due

11  2005 No.3 $25,000,000.00" (Bates numbered PWSP 00588 to PWSP 00593), which I

12  obtained from the Debtors' files maintained in the regular course of business.

13    10.    Attached hereto as <u>Exhibit I</u> is a true and correct copy of a letter dated April

14  22, 2002 from Pillsbury Winthrop LLP to Portside Growth and Opportunity Fund, Ltd.,

15  Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (Bates numbered PWSP 02620 to

16  PWSP 02625), which I obtained from Pillsbury's files maintained in the regular course of

17  business.

18    I declare under penalty of perjury that the foregoing is true and correct.  Executed at

19  San Francisco, California this 5th day of March, 2007.

20

21    <u>/s/ Ana N. Damonte (215504)   </u>

22    ANA N. DAMONTE

23

24

25

26

27

28

# **<u>EXHIBIT A</u>**

SECURITIES PURCHASE AGREEMENT

by and among

THE INVESTORS LISTED HEREIN

and

SONICBLUE INCORPORATED

Dated as of

April 21, 2002

9161902.12

PWSP 00421

TABLE OF CONTENTS

Page

1. PURCHASE AND SALE OF DEBENTURES AND WARRANTS ..................................2

2. BUYER'S REPRESENTATIONS AND WARRANTIES ................................................2

3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...........................5

4. COVENANTS .................................................................................................................14

5. TRANSFER AGENT INSTRUCTIONS ......................................................................17

6. CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL ..................................18

7. CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE ..........................18

8. INDEMNIFICATION ....................................................................................................20

9. MISCELLANEOUS .......................................................................................................21

SCHEDULES

Schedule 3(a)    -    Subsidiaries
Schedule 3(c)    -    Capitalization
Schedule 3(e)    -    Conflicts
Schedule 3(f)    -    SEC Documents
Schedule 3(m)    -    Title
Schedule 3(s)    -    Transactions with Affiliates
Schedule 9(m)    -    Placement Agent

EXHIBITS

Exhibit A-1 -    Form of Indenture
Exhibit A-2 -    Form of Debentures
Exhibit B    -    Form of Warrant
Exhibit C    -    Form of Registration Rights Agreement
Exhibit D    -    Form of Pledge and Security Agreement
Exhibit E    -    Form of Option Agreement
Exhibit F    -    Form of Irrevocable Transfer Agent Instructions
Exhibit G    -    Form of Opinion of Pillsbury Winthrop LLP
Exhibit H    -    Form of Opinion of Lee and Li

9161902.12

PWSP 00422

INDEX

| | Page |
|---|---|
| 1933 Act | 1 |
| 1934 Act | 1 |
| Agreement | 8 |
| Business Day | 1 |
| Buyer | 16 |
| By-laws | 1 |
| Certificate of Incorporation | 7 |
| Closing | 7 |
| Closing Date | 2 |
| Common Stock | 2 |
| Company | 1 |
| Conversion Shares | 1 |
| Environmental Laws | 1 |
| GAAP | 12 |
| Hazardous Materials | 9 |
| Indemnified Liabilities | 12 |
| Indemnitees | 20 |
| Irrevocable Transfer Agent Instructions | 20 |
| Material Adverse Effect | 17 |
| Permits | 5 |
| Principal Market | 12 |
| Registration Rights Agreement | 15 |
| Regulation D | 1 |
| Reporting Period | 1 |
| Resolutions | 15 |
| Rule 144 | 19 |
| SEC | 3 |
| SEC Documents | 1 |
| Securities | 8 |
| Subsidiaries | 2 |
| Transaction Documents | 5 |
| Warrant Shares | 5 |
| Warrants | 1 |
| | 1 |

9161902.12

PWSP 00423

## SECURITIES PURCHASE AGREEMENT

SECURITIES PURCHASE AGREEMENT (the "Agreement"), dated as of April 21, 2002, by and among SONICblue Incorporated, a Delaware corporation, with headquarters located at 2841 Mission College Boulevard, Santa Clara, California 95054 (the "Company"), and the investors listed on the Schedule of Buyers attached hereto (individually, a "Buyer" and collectively, the "Buyers").

## WHEREAS:

A.    The Company and the Buyers are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Rule 506 of Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act").

B.    The Company has authorized the issuance of up to $75 million principal amount of its 7¾% Secured Senior Subordinated Convertible Debentures due 2005, which shall be governed by the Indenture (the "Indenture"), dated as of the Closing Date and in the form attached hereto as Exhibit A-1, among the Company and the Buyers (collectively, the "Debentures"), which shall be convertible into shares of the Company's common stock, par value $0.0001 per share (the "Common Stock") (as converted, the "Conversion Shares"), in accordance with the terms of the Debentures.

C.    The Buyers severally wish to purchase, upon the terms and conditions stated in this Agreement, (i) an aggregate of $75 million principal amount of Debentures on the Closing Date (as defined below), such Debentures to be in the form attached hereto as Exhibit A-2 (the "Debentures") in the respective amounts set forth opposite each Buyer's name on the Schedule of Buyers for the purchase price set forth on the Schedule of Buyers and (ii) warrants (the "Warrants") to purchase one hundred thousand (100,000) shares of Common Stock (as exercised collectively, the "Warrant Shares") for each $1,000,000 principal amount of Debentures purchased by such Buyer on the Closing Date, such Warrants to be substantially in the form attached hereto as Exhibit B.

D.    Contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement substantially in the form attached hereto as Exhibit C (the "Registration Rights Agreement") pursuant to which the Company has agreed to provide certain registration rights under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws.

E.    The location of defined terms in this Agreement is set forth on the Index of Terms attached hereto.

NOW THEREFORE, the Company and the Buyers hereby agree as follows:

9161902.12

PWSP 00424

1.   <u>PURCHASE AND SALE OF DEBENTURES AND WARRANTS</u>.

  a. <u>Purchase of Debentures and Warrants</u>.  Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to each Buyer, and each Buyer severally agrees to purchase from the Company, the respective principal amount of Debentures, together with the related Warrants, set forth opposite such Buyer's name on the Schedule of Buyers (the "Closing").

  b. <u>The Closing</u>.  The date and time of the Closing (the "Closing Date") shall be no later than 10:00 a.m., New York City time, on April 22, 2002, unless otherwise extended by the Buyers in their sole discretion, subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 or, if requested by the Company, such later date as is agreed to by the Buyers in their sole discretion.  The Closing shall occur on the Closing Date at the offices of Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York  10022.

  c. <u>Form of Payment</u>.  On the Closing Date, (A) each Buyer shall pay the Company for the Debentures and the related Warrants to be issued and sold to such Buyer on the Closing Date, by wire transfer of immediately available funds in accordance with the Company's written wire instructions, less any amount withheld at the Closing for expenses pursuant to Section 4(k), and (B) the Company shall deliver to each Buyer Debentures (in the denominations as such Buyer shall request) representing the principal amount of Debentures which such Buyer is then purchasing hereunder, along with warrants representing the related Warrants, in each case, duly executed on behalf of the Company and registered in the name of such Buyer.

2.   <u>BUYER'S REPRESENTATIONS AND WARRANTIES</u>.

Each Buyer represents and warrants with respect to only itself that:

  a. <u>Investment Purpose</u>.  Such Buyer (i) is acquiring the Debentures and the Warrants, (ii) upon conversion of the Debentures owned by it, will acquire the Conversion Shares then issuable and (iii) upon exercise of the Warrants held by it, will acquire the Warrant Shares issuable upon exercise thereof (the Debentures, the Conversion Shares, the Warrants and the Warrant Shares collectively are referred to herein as the "Securities") for its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act; provided, however, that by making the representations herein, such Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time, provided further, however, that such disposition shall be in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

  b. <u>Accredited Investor Status</u>.  Such Buyer is an "accredited investor" as that term is defined in Rule 501(a)(3) of Regulation D under the 1933 Act, and at the time it exercises any Warrants or converts any Debentures issued to it, such Buyer will continue to be an "accredited investor".

  c. <u>Reliance on Exemptions</u>.  Such Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration

9161902.12

PWSP 00425

requirements of the United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and such Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of such Buyer to acquire the Securities.

d.    Information.  Such Buyer and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by such Buyer.  Such Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company.  Neither such inquiries nor any other due diligence investigations conducted by such Buyer or its advisors, if any, or its representatives shall modify, amend or affect such Buyer's right to rely on the Company's representations and warranties contained in this Agreement.

e.    No Governmental Review.  Such Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

f.    Transfer or Resale.  Such Buyer understands that except as provided in the Registration Rights Agreement: (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, (B) such Buyer shall have delivered to the Company an opinion of counsel, in a form reasonably acceptable to the Company and its counsel, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration, or (C) such Buyer provides the Company with reasonable assurance that such Securities can be sold, assigned or transferred pursuant to Rule 144 promulgated under the 1933 Act (or a successor rule thereto) ("Rule 144"); (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder. The Securities may be pledged in connection with a bona fide margin account or other loan secured by the Securities.

g.    Legends.  Such Buyer understands that the Debentures and Warrants and, until such time as the sale of the Conversion Shares and the Warrant Shares have been registered under the 1933 Act as contemplated by the Registration Rights Agreement, the stock certificates representing the Conversion Shares and the Warrant Shares, except as set forth below, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such Debentures, Warrants and stock certificates):

9161902.12

- 3 -

PWSP 00426

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

The legend set forth above shall be removed upon a request to the Company's transfer agent for removal and the Company shall issue the relevant securities without such legend to the holder of the Securities upon which it is stamped, if, (i) such Securities are registered for resale under the 1933 Act, (ii) in connection with a sale transaction, such holder provides the Company with an opinion of counsel, in a form reasonably acceptable to the Company and its counsel, to the effect that a public sale, assignment or transfer of the Securities may be made without registration under the 1933 Act, or (iii) such holder provides the Company with reasonable assurances that the Securities can be sold pursuant to Rule 144 without any restriction as to the number of securities acquired as of a particular date that can then be immediately sold.

h.    <u>Authorization; Enforcement; Validity</u>. This Agreement, the Pledge and Security Agreement (as defined in Section 3(b)) and the Registration Rights Agreement have been duly and validly authorized, executed and delivered on behalf of such Buyer and are valid and binding agreements of such Buyer enforceable against such Buyer in accordance with their terms, subject as to enforceability to general principles of equity and to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

i.    <u>Residency</u>. Such Buyer is a resident of that country or state specified in its address on the Schedule of Buyers.

j.    <u>No Conflicts</u>. The execution, delivery and performance of the Transaction Documents by the Buyers and the consummation by the Buyers of the transactions contemplated hereby and thereby will not result in a violation of the certificate of incorporation, by-laws or other governing document or instrument of the Buyers.

9161902.12

- 4 -

PWSP 00427

k.    Risk of Loss. Such Buyer can bear the economic risk of its investment in the Securities and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and the risks of the investment in the Securities.

3.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to each of the Buyers that:

a.    Organization and Qualification. The Company and its Subsidiaries are corporations or limited liability companies duly organized and validly existing in good standing under the laws of the jurisdiction in which they are incorporated or organized, and have the requisite corporate or other power and authorization to own their properties and to carry on their business as now being conducted. Each of the Company and its Subsidiaries is duly qualified as a foreign corporation or limited liability company to do business and is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect. As used in this Agreement, "Material Adverse Effect" means any material adverse effect on the business, properties, assets, operations, results of operations or financial condition of the Company and its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements and instruments to be entered into in connection herewith, or on the authority or ability of the Company to perform its obligations under the Transaction Documents (as defined below). As used in this Agreement, "Subsidiaries" means any entity in which the Company, directly or indirectly, owns a majority of the capital stock or other equity or similar interests or owns capital stock or holds an equity or similar interest which ownership entitles the Company to elect a majority of the board of directors or similar governing body of such entity, other than S3 – VIA, Inc. and S3 Graphics Co., Ltd. The Company owns or holds such capital stock or other equity or similar interests in the Subsidiaries free and clear of any lien, pledge, option, security interest, claim, charge, third party right or any other restriction or encumbrance of any nature whatsoever. A complete list of entities in which the Company, directly or indirectly, owns capital stock or holds an equity or similar interest is set forth on Schedule 3(a).

b.    Authorization; Enforcement; Validity. The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, dated as of the Closing Date, among the Company and the Buyers substantially in the form attached hereto as Exhibit D (the "Pledge and Security Agreement"), the Option Agreement, dated as of the Closing Date, among the Company and the Buyers substantially in the form attached hereto as Exhibit E, the Irrevocable Transfer Agent Instructions (as defined in Section 5) and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "Transaction Documents"), and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Debentures, the reservation for issuance and the issuance of the Conversion Shares issuable upon conversion thereof, the issuance of the Warrants and the reservation for issuance and the issuance of the Warrant Shares issuable upon exercise of the

9161902.12

- 5 -

PWSP 00428

Warrants, have been duly authorized by the Company's Board of Directors and no further consent or authorization is required by the Company, its Board of Directors or its stockholders. The Transaction Documents have been, or will be prior to Closing, duly executed and delivered by the Company. The Transaction Documents constitute, or will constitute prior to Closing, the valid and binding obligations of the Company enforceable against the Company in accordance with their terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies.

        c.    <u>Capitalization</u>. The authorized capital stock of the Company consists of: (a) 175,000,000 shares of Common Stock, par value $0.0001 per share, of which 95,545,225 shares are outstanding as of April 15, 2002 and there have been no material changes in such number since such date; and (b) 5,000,000 shares of Preferred Stock, par value $0.0001 per share, of which 500,000 shares have been designated Series A Participating Preferred Stock. No shares of Preferred Stock are outstanding, and 500,000 shares of Series A Participating Preferred Stock are reserved for issuance pursuant to the Rights Agreement dated as of May 14, 1997 between the Company and The First National Bank of Boston, as Rights Agent (the "Rights Plan"). Except as set forth above, and except for (i) options and warrants to purchase an aggregate of 21,127,326 shares of Common Stock outstanding as of April 15, 2002 (other than the Debentures, the Conversion Shares, the Warrants, the Warrant Shares, the Interest Shares (as defined in the Indenture) and the warrants issued to Gerard Klauer Mattison & Co., Inc ("GKM") as set forth in Schedule 9(m) (the "GKM Warrants"); (ii) 5,374,611 shares of Common Stock reserved for issuance upon conversion of the Company's 5¾% Convertible Subordinated Notes due 2003 (the "Subordinated Notes") issued pursuant to the Indenture dated as of September 12, 1996 (the "1996 Indenture") between the Company and State Street Bank and Trust Company, N.A.; and (iii) up to 2,800,000 shares of Common Stock reserved for issuance in connection with the settlement of litigation described in the Company's Annual Report on Form 10-K for the year ended December 31, 2001 (the "2001 Form 10-K") under Item 3 – Legal Proceedings, there are no other securities exercisable or exchangeable for, or convertible into, shares of Common Stock nor any agreements or understandings pursuant to which any securities exercisable or exchangeable for, or convertible into, shares of Common Stock may become outstanding. All of such outstanding shares have been, or upon issuance will be, validly issued and are fully paid and nonassessable. Except as disclosed in this Section 3(c) and in <u>Schedule 3(c)</u>, (A) no shares of the Company's capital stock are subject to preemptive rights or any other similar rights (arising under Delaware law, California law, the Company's Certificate of Incorporation or By-laws or any agreement or instrument to which the Company is a party) or are subject to any liens or encumbrances granted or created by the Company; (B) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its Subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its Subsidiaries; (C) there are no outstanding debt securities, notes, credit agreements, credit facilities or other agreements, documents or instruments evidencing indebtedness of the Company or any of its Subsidiaries or

9161902.12

PWSP 00429

by which the Company or any of its Subsidiaries is or may become bound: (D) there are no amounts outstanding under, and there will be no amounts due upon termination of, any credit agreement or credit facility: (E) there are no UCC financing statements filed in connection with the Company or any of its Subsidiaries: (F) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of their securities under the 1933 Act (except the Registration Rights Agreement): (G) there are no outstanding securities or instruments of the Company or any of its Subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to redeem a security of the Company or any of its Subsidiaries; (H) there are no securities or instruments containing anti-dilution or similar provisions related to the Common Stock that will be triggered by the transaction contemplated hereby; (I) the Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement: (J) since December 31, 2001, no officer, director or beneficial owner of 5% or more of the Company's outstanding capital stock has pledged shares of the Company's capital stock in connection with a margin account or other loan secured by such capital stock; and (K) the Company and its Subsidiaries have no liabilities or obligations required to be disclosed in the SEC Documents (as defined in Section 3(f)) but not so disclosed in the SEC Documents, other than those incurred in the ordinary course of the Company's or its Subsidiaries' respective businesses since December 31, 2001 and which, individually or in the aggregate, do not or would not have a Material Adverse Effect on the Company and its Subsidiaries taken as a whole. The Company has made available to each Buyer true and correct copies of the Company's Restated Certificate of Incorporation, as amended and as in effect on the date hereof (the "Certificate of Incorporation"), and the Company's By-laws, as amended and as in effect on the date hereof (the "By-laws"), and the terms of all securities convertible into or exercisable or exchangeable for Common Stock and the material rights of the holders thereof in respect thereto except for stock options granted under any benefit plan or stock option plan of the Company approved by the Board of Directors of the Company.

          d.     <u>Issuance of Securities</u>. The Securities are duly authorized and, upon issuance in accordance with the terms of the applicable Transaction Documents, shall be (i) validly issued, fully paid and non-assessable and (ii) free from all taxes, liens and charges with respect to the issuance thereof, (other than any such taxes, liens and charges created by any Buyer or assignee or transferee of a Buyer) and shall not be subject to pre-emptive rights or other similar rights of shareholders of the Company. As of the Closing, at least 11,792,404 shares of Common Stock (subject to adjustment pursuant to the Company's covenant set forth in Section 4(f) below) will have been duly authorized and reserved for issuance upon conversion of the Debentures, for Interest Shares and exercise of the Warrants and up to 293,805 shares of Common Stock will have been duly authorized and reserved for issuance upon exercise of the GKM Warrants. Upon conversion or issuance in accordance with the Debentures or the Warrants, as applicable, the Conversion Shares and the Warrant Shares, as the case may be, will be validly issued, fully paid and non-assessable and free from all taxes, liens and charges with respect to the issue thereof, (other than any such taxes, liens and charges created by any Buyer or assignee or transferee) with the holders being entitled to all rights accorded to a holder of Common Stock. Based, in part, on reliance on and the accuracy of the representations and warranties of each of the Buyers in the Transaction Documents, the issuance by the Company of the Securities is exempt from registration under the 1933 Act.

9161902.12

- 7 -

PWSP 00430

e.    No Conflicts.  The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the reservation for issuance and issuance of the Conversion Shares and the Warrant Shares) will not (i) result in a violation of the Certificate of Incorporation or the By-laws; (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any material agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not result, either individually or in the aggregate, in a Material Adverse Effect); or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and the rules and regulations of the Principal Market (as defined in Section 4(g))) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for any such violation that would not result, either individually or in the aggregate, in a Material Adverse Effect). Neither the Company nor its Subsidiaries is in violation of any term of or in default under its Certificate of Incorporation, By-laws or their organizational charter or by-laws, respectively. Neither the Company nor any of its Subsidiaries is in violation of any term of or in default under any contract, agreement, mortgage, indebtedness, indenture, instrument, judgment, decree or order or any statute, rule or regulation applicable to the Company or its Subsidiaries, except where such violations and defaults would result, either individually or in the aggregate, in a Material Adverse Effect. The business of the Company and its Subsidiaries is not being conducted in violation of any law, ordinance or regulation of any governmental entity, except where such violations would not result, either individually or in the aggregate, in a Material Adverse Effect. Except as specifically contemplated by this Agreement, as required under the 1933 Act or as required by Blue Sky filings, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency or any regulatory or self-regulatory agency in order for it to execute, deliver or perform any of its obligations under or contemplated by the Transaction Documents.  Except as disclosed in Schedule 3(e), all consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof.  The Company and its Subsidiaries have no actual knowledge of any facts or circumstances which might give rise to any of the foregoing. The Company is not in violation of the listing requirements of the Principal Market, and has no actual knowledge of any facts which would reasonably lead to delisting or suspension of the Common Stock by the Principal Market in the foreseeable future.

f.    SEC Documents; Financial Statements.  Since December 31, 2000, the Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "SEC Documents").  As of the respective dates of filing of such SEC Documents, such SEC Documents, as one or more may have been subsequently amended by filings made by the Company with the SEC prior to the date hereof, complied in all material respects with the requirements of the 1934 Act and the rules and

9161902.12

- 8 -

regulations of the SEC promulgated thereunder applicable to the SEC Documents. None of the SEC Documents, as of the date filed and as they may have been subsequently amended by filings made by the Company with the SEC prior to the date hereof, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, ("GAAP"), during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). No other information provided by or on behalf of the Company to the Buyers which is not included in the SEC Documents, including, without limitation, information referred to in Section 2(d), contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they are or were made, not misleading. Neither the Company nor any of its Subsidiaries nor any of their officers, directors, employees or agents has provided the Buyers with any material, nonpublic information. As of the date hereof, the Company meets, and as of the Closing Date, the Company will meet, the requirements for use of Form S-3 for registration of the resale of Registrable Securities (as defined in the Registration Rights Agreement). Except as set forth on Schedule 3(f), the Company is not required to file and will not be required to file any agreement, note, lease, mortgage, deed or other instrument entered into prior to the date hereof and to which the Company is a party or by which the Company is bound which has not been previously filed as an exhibit to its reports filed with the SEC under the 1934 Act. Except for the issuance of the Debentures and the Warrants contemplated by this Agreement, no event, liability, development or circumstance has occurred or exists with respect to the Company or its Subsidiaries or their respective business properties, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws and which has not been publicly disclosed.

        g.    <u>Absence of Certain Changes</u>. Except as disclosed in the 2001 Form 10-K, since December 31, 2001, there has been no change or development that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. The Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to any bankruptcy law nor does the Company or any of its Subsidiaries have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy proceedings or any actual knowledge of any fact which would reasonably lead a creditor to do so. Since December 31, 2001, the Company has not declared or paid any dividends, and, except for sales of equipment and inventory in an amount not in excess of $1,000,000 in the aggregate, as of the date hereof, the Company has not sold any assets, individually or in the aggregate, in excess of $100,000 outside of the ordinary course of business or had capital expenditures, individually or in the aggregate, in excess of $2,500,000.

9161902.12

PWSP 00432

h.    Absence of Litigation. Except as disclosed in the 2001 Form 10-K under Item 3 – Legal Proceedings or as reserved for as an accrued liability in the financial statements included in the 2001 Form 10-K, there is no action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company, the Common Stock or any of the Company's Subsidiaries or any of the Company's or the Company's Subsidiaries' officers or directors in their capacities as such or, with respect to the Company and its Subsidiaries, to the extent that any such action or threatened action does not set forth potential liability, claims or charges individually in excess of $1,000,000, or in the aggregate in excess of $5,000,000. To the knowledge of the Company, none of the directors or officers of the Company have been a party to any securities related litigation during the past five years other than as set forth in the 2001 Form 10-K under Item 3 – Legal Proceedings.

i.    No Undisclosed Events, Liabilities, Developments or Circumstances. Except for the issuance of the Debentures and the Warrants contemplated by this Agreement, no event, liability, development or circumstance has occurred or exists with respect to the Company or its Subsidiaries or their respective business, properties, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws and which has not been publicly disclosed.

j.    No Integrated Offering. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of the issuance by the Company of any of the Securities under the 1933 Act or cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated, nor will the Company or any of its Subsidiaries take any action or steps that would require registration of the issuance by the Company of any of the Securities under the 1933 Act or cause the offering of the Securities to be integrated with other offerings.

k.    Employment Matters; ERISA Matters. (i) Neither the Company nor any of its Subsidiaries is involved in any union labor dispute nor, to the knowledge of the Company or any of its Subsidiaries, is any such dispute threatened. None of the Company's or its Subsidiaries' employees is a member of a union which relates to such employee's relationship with the Company, neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relations with their employees are good. No executive officer (as defined in Rule 501(f) of the 1933 Act) has notified the Company that such officer intends to leave the Company or otherwise terminate such officer's employment with the Company.

(ii)    The Company and its Subsidiaries are in compliance with all federal, state, local and foreign laws and regulations respecting employment and employment practices, terms and conditions of employment and wages and hours and benefits, except where

9161902.12

- 10 -

PWSP 00433

failure to be in compliance would not, either individually or in the aggregate, have a Material Adverse Effect.

l.  Intellectual Property Rights. The Company and its Subsidiaries own or possess adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and other intellectual property rights necessary to conduct their respective businesses as now conducted, except where the failure to own or possess such rights would not result, either individually or in the aggregate, in a Material Adverse Effect. None of the Company's trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets or other intellectual property rights have expired or terminated, or are expected to expire or terminate (without being renewed) within two years from the date of this Agreement, except where such expiration or termination would not result, either individually or in the aggregate, in a Material Adverse Effect. Except as would not have a Material Adverse Effect, the Company and its Subsidiaries do not have any knowledge of any infringement by the Company or its Subsidiaries of trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, trade secrets or other intellectual property rights of others, and except as would not have a Material Adverse Effect, there is no claim, action or proceeding being made or brought against, or to the knowledge of the Company, being threatened against, the Company or its Subsidiaries regarding its trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, trade secrets, or infringement of other intellectual property rights. The Company and its Subsidiaries have taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties.

m.  Title. The Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(m) or such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and any of its Subsidiaries. Any real property and facilities held under lease by the Company and any of its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and facilities by the Company and its Subsidiaries.

n.  Environmental Laws. Except in each case where the failure of the Company and its Subsidiaries would not, either individually or in the aggregate, have a Material Adverse Effect, (i) the Company and its Subsidiaries (A) are in compliance with any and all Environmental Laws, (B) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses, and (C) are in compliance with all terms and conditions of any such permit, license or approval. Except as would not have a Material Adverse Effect, with respect to the Company and/or its Subsidiaries (1) there are no past or present releases of any material into the environment, actions, activities, circumstances, conditions, events, incidents, or contractual obligations which may give rise to

9161902.12

- 11 -

PWSP 00434

any common law environmental liability or any liability under any Environmental Law and (2) neither the Company nor any of its Subsidiaries has received any notice with respect to the foregoing, nor is any action pending or, to the knowledge of the Company, threatened in connection with the foregoing. The term "Environmental Laws" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(ii)      Other than those that are or were stored, used or disposed of in compliance with applicable law, to the knowledge of the Company, no Hazardous Materials are contained on or about any real property currently owned, leased or used by the Company or any of its Subsidiaries, and no Hazardous Materials were released on or about any real property previously owned, leased or used by the Company or any of its Subsidiaries during the period the property was owned, leased or used by the Company or any of its Subsidiaries.

(iii)      To the knowledge of the Company, there are no underground storage tanks on or under any real property owned, leased or used by the Company or any of its Subsidiaries that are not in compliance with applicable law.

o.      Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

p.      Regulatory Permits. Except for Permits (as defined below) the absence of which would not result, either individually or in the aggregate, in a Material Adverse Effect, the Company and its Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses (the "Permits"), and neither the Company nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such Permit.

q.      No Materially Adverse Contracts, Etc. Neither the Company nor any of its Subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's executive officers has or is expected in the future to have a Material Adverse Effect.

9161902.12

- 12 -

PWSP 00435

r.  <u>Tax Status</u>.  The Company and each of its Subsidiaries (i) has made or filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and for which the Company has made appropriate reserves for on its books, and (iii) has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations (referred to in clause (i) above) apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the executive officers of the Company know of no basis for any such claim.

s.  <u>Transactions With Affiliates</u>.  Except as set forth on <u>Schedule 3(s)</u> or in the SEC Documents, and other than the grant of stock options described on <u>Schedule 3(c)</u>, none of the officers, directors or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for services as employees, officers and directors) that would be required to be reported by Regulation S-K, Item 404, promulgated under the 1933 Act, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer, director or employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any such officer, director, or employee has a substantial interest or is an officer, director, trustee or partner.

t.  <u>Application of Takeover Protections</u>.  The Company and its board of directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Certificate of Incorporation, the laws of the state of its incorporation or the laws of any other state which is or could become applicable to the Buyers as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and the Buyers' ownership of the Securities.  The Company specifically represents, warrants and agrees that, in accordance with Section 1(a) of the Rights Plan, regardless of the number of Conversion Shares, Warrant Shares and Interest Shares of which each Buyer is deemed the Beneficial Owner (as defined in the Rights Plan), none of the Buyers is intended to be or will be deemed to be an Acquiring Person within the meaning of the Rights Plan because of the acquisition of the Securities (including the Conversion Shares, the Warrant Shares and the Interest Shares) pursuant to this Agreement, and the acquisition of the Securities (including the Conversion Shares, the Warrant Shares and the Interest Shares) pursuant to this Agreement, shall not, under any circumstances, trigger a Stock Acquisition Date within the meaning of the Rights Plan; provided, however, that only Securities (including the Conversion Shares, the Warrant Shares and the Interest Shares) acquired pursuant to this Agreement shall be deemed excluded from the number of shares of Common Stock deemed beneficially owned by each Buyer in determining whether such Buyer is an Acquiring Person within the meaning of the Rights Plan.

u.  <u>Rights Agreement</u>.  Except for the Rights Plan, the Company has not adopted a shareholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company.

9161902.12

- 13 -

PWSP 00436

v.      No Other Agreements. The Company has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents.

w.      Investment Company Status. The Company is not, and upon consummation of the sale of the Securities will not be, an "investment company," a company controlled by an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

x.      Foreign Corrupt Practices. Neither the Company nor any of its Subsidiaries, nor any director, executive officer, authorized agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company or any Subsidiary used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

y.      Indenture. The Company has delivered to the Buyers true, correct and complete copies of all notices, certificates, communications and other instruments that have been delivered by the Company, its affiliates or any of their respective officers, employees, agents or advisors pursuant to the 1996 Indenture with respect to the Subordinated Notes. The conversion price of the Subordinated Notes in effect as of the date hereof is $19.22. Neither the 1996 Indenture nor the Subordinated Notes have been amended or modified in any material manner since the original issuance of the Subordinated Notes. No redemption, repurchase or defeasance of any of the Subordinated Notes has occurred since the original issuance of the Subordinated Notes.

4.      COVENANTS.

a.      Reasonable Best Efforts. Each party shall use its reasonable best efforts to timely satisfy each of the conditions to be satisfied by it as provided in Sections 6 and 7 of this Agreement.

b.      Form D and Blue Sky. The Company agrees to file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof to each Buyer promptly after such filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Buyers at the Closing pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of any such action so taken to the Buyers on or prior to the Closing Date. The Company shall make all filings and reports relating to the offer and sale of the Securities required under applicable securities or "Blue Sky" laws of the states of the United States following the Closing Date.

9161902.12

- 14 -

c.    Reporting Status. Until the later of (i) the date which is one year after the date as of which the Investors (as that term is defined in the Registration Rights Agreement) may sell all of the Conversion Shares and the Warrant Shares without restriction pursuant to Rule 144(k) promulgated under the 1933 Act (or successor thereto) and (ii) the date on which (A) the Investors shall have sold all the Conversion Shares and the Warrant Shares and (B) none of the Debentures or Warrants is outstanding (the "Reporting Period"). the Company shall timely file all reports required to be filed with the SEC pursuant to the 1934 Act. and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would otherwise permit such termination.

d.    Use of Proceeds. The Company will use the proceeds from the sale of the Debentures and the Warrants for working capital purposes.

e.    Financial Information. The Company agrees to send the following to each Investor during the Reporting Period: (i) within ten (10) days after the filing thereof with the SEC, a copy of its Annual Reports on Form 10-K, its Quarterly Reports on Form 10-Q, any Current Reports on Form 8-K and any registration statements (other than on Form S-8) or amendments thereto filed pursuant to the 1933 Act, provided that if any such report is filed with the SEC through EDGAR and is available to the Investors via EDGAR then no such deliveries shall be required; and (ii) copies of any notices and other information made available or given to the stockholders of the Company generally, contemporaneously with the making available or giving thereof to the stockholders. The Company agrees to promptly include each Investor on the Company's distribution list for electronic and/or fax delivery of all press releases issued by the Company.

f.    Reservation of Shares. The Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, no less than 11,792,404 shares of Common Stock to provide for the issuance of the Conversion Shares upon conversion of all of the Debentures, the Interest Shares and the Warrant Shares upon exercise of all of the Warrants (without regard to any limitations on conversions or exercise) and up to 293,805 shares of Common Stock to provide for the exercise of GKM Warrants.

g.    Listing. The Company shall, in the time and manner required by the Principal Market, promptly secure the listing of all of the Registrable Securities (as defined in the Registration Rights Agreement) upon each national securities exchange and automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and shall use reasonable best efforts to maintain, so long as any other shares of Common Stock shall be so listed, such listing of all Registrable Securities from time to time issuable under the terms of the Transaction Documents. So long as any Securities are outstanding, the Company shall maintain the Common Stock's authorization for quotation on the Nasdaq National Market ("NASDAQ") or listing on the New York Stock Exchange ("NYSE") (as applicable, the "Principal Market"). Until six (6) years from the date of this Agreement and other than in connection with Organic Changes (as defined in the Warrants), neither the Company nor any of its Subsidiaries shall take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock from the Principal Market. The

PWSP 00438

Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(g).

        h.    <u>Filing of Form 8-K</u>.  On or before 8:30 a.m., New York City time, on the Business Day following the Closing Date, the Company shall file a Current Report on Form 8-K with the SEC describing the terms of the transactions contemplated by the Transaction Documents and including as exhibits to such Current Report on Form 8-K this Agreement, the form of Debenture, the form of Warrants, the form of Indenture, the form of Pledge and Security Agreement, the form of Option Agreement and the Registration Rights Agreement, and the schedules hereto and thereto in the form required by the 1934 Act.  For greater certainty and without limiting the foregoing, the Company acknowledges and agrees that it will not issue any press releases or make any public statement relating to the transactions contemplated by the Transaction Documents or the entering into of this Agreement prior to filing such Current Report on Form 8-K.  "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

        i.    <u>Corporate Existence</u>.  So long as a Buyer beneficially owns any Securities, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the Transaction Documents and (ii) such surviving or successor entity or its parent into whose stock the Debentures and Warrants will be convertible or exercisable is a publicly traded corporation whose common stock is listed for trading on or quoted on NYSE or NASDAQ.

        j.    <u>Pledge of Securities</u>.  The Company acknowledges and agrees that the Securities may be pledged by an Investor (as defined in the Registration Rights Agreement) in connection with a bona fide margin agreement or other loan or financing arrangement that is secured by the Securities.  The pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Investor effecting such a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document, including, without limitation, Section 2(f) of this Agreement; provided that an Investor and its pledgee shall be required to comply with the provisions of Section 2(f) hereof in order to effect a sale, transfer or assignment of Securities to such pledgee.  The Company hereby agrees to execute and deliver such reasonable documentation as a pledgee of the Securities may reasonably request in connection with a pledge of the Securities to such pledgee by an Investor.

        k.    <u>Expenses</u>.  Subject to Section 9(l) below, at the Closing, the Company shall pay an expense allowance of up to $115,000 (of which $30,000 has previously been paid to Portside Growth & Opportunity Fund (a Buyer)) which amount, less any amount paid prior to the Closing, shall be withheld by such Buyer from its Purchase Price to be paid at the Closing.

        l.    <u>Good Standing</u>.  At the Closing, the Company shall deliver a good standing certificate (or copy thereof) to each of the Buyers, certifying the Company's

9161902.12

- 16 -

qualification to do business and its good standing in the States of California and Delaware as certified by the Secretaries of State of the States of California and Delaware.

m.    Additional Debentures.  For so long as any Buyer beneficially owns any Securities, the Company will not issue any Debentures other than to the Buyers as contemplated hereby.

n.    Violations of Law.  The business of the Company and its Subsidiaries will not be conducted in violation of any law, ordinance or regulation of any governmental entities, except where such violations would not result, either individually or in the aggregate, in a Material Adverse Effect.

o.    Congress Facility.  On or before 8:00 p.m., New York City time, on April 26, 2002, either (a) the Company and Congress Financial Corporation (Western), Sensory Science Corporation and California Audio Labs, LLC shall have entered into Amendment Number Eight to the Second Amended and Restated Loan and Security Agreement dated as of August 19, 1998 (the "Congress Facility"), in a form reasonably satisfactory to the Buyers, or (b) the Company shall have delivered evidence, in a form reasonably satisfactory to the Buyers, that the Congress Facility has been terminated and that all obligations under the Congress Facility have been paid in full.

5.    TRANSFER AGENT INSTRUCTIONS.

The Company shall issue irrevocable instructions to its transfer agents, and any subsequent transfer agent, to issue certificates or credit shares to the applicable balance accounts at DTC, registered in the name of each Buyer or its respective nominee(s), for the Conversion Shares and the Warrant Shares in such amounts as specified from time to time by each Buyer to the Company upon conversion of the Debentures or exercise of the Warrants, as applicable (the "Irrevocable Transfer Agent Instructions"), a form of which is attached as Exhibit F hereto.  Prior to registration of the Conversion Shares and the Warrant Shares under the 1933 Act, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement.  The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5 and stop transfer instructions to give effect to Section 2(f) hereof (in the case of the Conversion Shares and the Warrant Shares, prior to registration of the Conversion Shares and the Warrant Shares under the 1933 Act) will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement, the Debentures, the Warrants and the Registration Rights Agreement.  If a Buyer provides the Company with an opinion of counsel, in a form reasonably acceptable to the Company and its counsel, to the effect that a public sale, assignment or transfer of Securities may be made without registration under the 1933 Act or the Buyer provides the Company with reasonable assurances that the Securities can be sold pursuant to Rule 144 without any restriction as to the number of securities acquired as of a particular date that can then be immediately sold, the Company shall permit the transfer, and, in the case of the Conversion Shares and the Warrant Shares, promptly instruct its transfer agent to issue one or more certificates, or credit shares to one or more balance accounts at DTC, in such name and in such denominations as specified by such Buyer and without any restrictive legend. The Company acknowledges that a breach by it of its obligations hereunder will cause

9161902.12

- 17 -

PWSP 00440

irreparable harm to the Buyers by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5, that the Buyers shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

6.    CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

The obligation of the Company to issue and sell the Debentures and the Warrants to each Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing each Buyer with prior written notice thereof:

(i)    Such Buyer shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Company.

(ii)    Such Buyer shall have delivered to the Company the purchase price (less, in the case of Portside Growth & Opportunity Fund, the amounts withheld by a Buyer pursuant to Section 4(k)) for the Debentures and the Warrants being purchased by such Buyer at the Closing, by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company.

(iii)    The representations and warranties of such Buyer shall be true and correct as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date (which shall be true and correct as of such date)), and such Buyer shall have performed, satisfied and complied with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by such Buyer at or prior to the Closing Date.

7.    CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE.

The obligation of each Buyer hereunder to purchase the Debentures and the Warrants from the Company at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for each Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(i)    The Company shall have executed each of the Transaction Documents and delivered the same to such Buyer.

(ii)    The Common Stock (x) shall be designated for quotation or listed on the Principal Market and (y) shall not have been suspended by the SEC or the Principal Market from trading on the Principal Market nor shall suspension by the SEC or the Principal Market have been threatened either (A) in writing by the SEC or the

PWSP 00441

Principal Market or (B) by falling below the minimum listing maintenance requirements of the Principal Market.

(iii)    The representations and warranties of the Company shall be true and correct as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date (which shall be true and correct as of such date)) and the Company shall have performed, satisfied and complied with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Closing Date.  Such Buyer shall have received a certificate, executed by the Chief Executive Officer, the Chief Financial Officer or the Chief Operating Officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by such Buyer, including, without limitation, an update as of the Closing Date regarding the representation contained in Section 3(c) above.

(iv)    Such Buyer shall have received the opinion of Pillsbury Winthrop LLP, dated as of the Closing Date, in the form of Exhibit G, attached hereto and the opinion of Lee and Li, dated as of the Closing Date, in the form of Exhibit H, attached hereto.

(v)    The Company shall have executed and delivered to such Buyer the Debentures and Warrants (in such denominations as such Buyer shall request) for the Debentures and the Warrants being purchased by such Buyer at the Closing.

(vi)    The Board of Directors of the Company shall have adopted resolutions consistent with Section 3(b) above (the "Resolutions").

(vii)    As of the Closing Date, the Company shall have reserved out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Debentures, payment of Interest Shares and the exercise of the Warrants, 11,792,404 shares of its Common Stock and shall have reserved out of its authorized and unissued Common Stock, solely for the purpose of effecting the exercise of the GKM Warrants, up to 293,805 shares of its Common Stock.

(viii)    The Irrevocable Transfer Agent Instructions, in the form of Exhibit E attached hereto, shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(ix)    The Company shall have delivered to such Buyer a certificate (or copy thereof) evidencing the incorporation and good standing of the Company and each Subsidiary in such entity's state of incorporation or organization issued by the Secretary of State of such state of incorporation or organization as of a date within ten days of the Closing Date.

(x)    The Company shall have delivered to such Buyer a certified copy (or copy thereof) of the Certificate of Incorporation as certified by the

9161902.12

- 19 -

Secretary of State of the State of Delaware as of a date within ten (10) days of the Closing Date.

(xi)    The Company shall have delivered to such Buyer a secretary's certificate, dated as of the Closing Date, certifying as to (A) the Resolutions, (B) the Certificate of Incorporation and (C) the By-laws, each as in effect at the Closing.

(xii)    The Company shall have made all filings required to be made prior to the Closing Date under all applicable federal and state securities laws necessary to consummate the issuance of the Securities pursuant to this Agreement in compliance with such laws.

(xiii)    The Company shall have delivered to such Buyer a letter from the Company's transfer agent certifying the number of shares of Common Stock outstanding as of a date within five (5) days of the Closing Date.

(xiv)    The Company shall have delivered to the Buyers such other documents relating to the transactions contemplated by the Transaction Documents as the Buyers or their counsel may reasonably request.

8.    INDEMNIFICATION. In consideration of each Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless each Buyer and each permitted assignee under the Transaction Documents and all of their stockholders, officers, directors, employees and direct or indirect investors and any of the foregoing persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (c) the exercise or enforcement of any of the rights of the Buyers under the Pledge Agreement and the enforcement of any rights under the Option Agreement, including, without limitation, in connection with the enforcement of any provision of any Investment Document (as defined in the Pledge Agreement) or the foreclosure, sale, liquidation or other disposition of, or realization upon, the Collateral (as defined in the Pledge Agreement), including, without limitation, the transfer of the Collateral to the Buyers or the realization upon the Option Shares (as defined in the Option Agreement); provided, however, that the parties agree that the foregoing shall not apply to incidental expenses incurred prior to actions relating to foreclosing on the pledge and the exercise of option, or (d) any cause of action, suit or claim brought or made against such Indemnitee (other than a cause of action, suit or claim which is (x) brought or made by the Company and (y) is not a shareholder derivative

PWSP 00443

suit) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities or (iii) the status of such Buyer or holder of the Securities as an investor in the Company. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. Except as otherwise set forth herein, the mechanics and procedures with respect to the rights and obligations under this Section 8 shall be the same as those set forth in Sections 6(a) and (d) of the Registration Rights Agreement, including, without limitation, those procedures with respect to the settlement of claims and the Company's rights to assume the defense of claims.

9.    MISCELLANEOUS.

a.    Governing Law: Jurisdiction; Jury Trial. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. Each party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

b.    Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

c.    Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

9161902.12

- 21 -

PWSP 00444

d.    Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

e.    Entire Agreement; Amendments. This Agreement supersedes all other prior oral or written agreements between each Buyer, the Company, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended or waived other than by an instrument in writing signed by the Company and the holders of at least a majority of the outstanding principal amount of the Debentures. No such amendment shall be effective to the extent that it applies to less than all of the holders of the Debentures then outstanding. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration also is offered to all of the parties to the Transaction Documents.

f.    Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

PWSP 00445

If to the Company:

> SONICblue Incorporated
> 2841 Mission College Boulevard
> Santa Clara, California 95054
> Telephone:    (408) 588-8000
> Facsimile:    (408) 980-5444
> Attention:    General Counsel

With a copy to, which shall not constitute notice:

> Pillsbury Winthrop LLP
> 2550 Hanover Street
> Palo Alto, California 94304
> Telephone:    (650) 233-4500
> Facsimile:    (650) 233-4545
> Attention:    Jorge A. del Calvo

If to the Transfer Agent:

> EquiServe Trust Company, N.A.
> Shareholder Services
> 150 Royall Street
> Canton, Massachusetts 02021
> Telephone:    (781) 575-3194
> Facsimile:    (781) 575-2420
> Attention:    Patti DeLuca

If to a Buyer, to it at the address and facsimile number set forth on the Schedule of Buyers, with copies to such Buyer's representatives as set forth on the Schedule of Buyers, or at such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a nationally recognized overnight delivery service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

g.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any purchasers of the Debentures and Warrants. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the holders of at least a majority of the outstanding principal amount of the Debentures including by merger or consolidation, except pursuant to a change of control in accordance with the terms of Section 13.6 of the Indenture with respect to which the Company is in compliance with the terms of the

PWSP 00446

Indenture and Section 4(i) of this Agreement. A Buyer may assign some or all of its rights hereunder without the consent of the Company; provided, however, that the transferee has agreed in writing to be bound by the applicable provisions of this Agreement. Any Buyer shall be entitled to pledge the Securities in connection with a bona fide margin account or other loan secured by the Securities.

h.    No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

i.    Survival. Unless this Agreement is terminated under Section 9(l), the representations and warranties of the Company and the Buyers contained in Sections 2 and 3, the agreements and covenants set forth in Sections 4, 5 and 9, and the indemnification provisions set forth in Section 8, shall survive the Closing. Each Buyer shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

j.    Publicity. The Company and each Buyer shall have the right to approve before issuance any press releases or any other public statements with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled, without the prior approval of any Buyer, to make any press release or other public disclosure with respect to such transactions in the from as is required by applicable law and regulations (although the Company shall use reasonable best efforts to consult with each Buyer in connection with any such press release or other public disclosure prior to its release and shall be provided with a copy thereof).

k.    Further Assurances. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

l.    Termination. In the event that the Closing shall not have occurred with respect to a Buyer on or before five (5) Business Days from the date hereof due to the Company's or such Buyer's failure to satisfy the conditions set forth in Sections 6 and 7 above (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party; provided, however, that if this Agreement is terminated pursuant to this Section 9(l), the Company shall remain obligated to reimburse any nonbreaching Buyer for the expenses described in Section 4(k) above.

m.    Placement Agent. The Company acknowledges that it has engaged GKM and Banc of America LLC to serve as a placement agent in connection with the sale of the Debentures and the Warrants for which the total compensation payable to such placement agent is set forth on Schedule 9(m). The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or brokers' commissions (other than for persons engaged by any Buyer or its investment advisor) relating to or arising out of the transactions

9161902.12

- 24 -

contemplated hereby. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, attorney's fees and out-of-pocket expenses) arising in connection with any such claim.

n.    No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

o.    Remedies. Each Buyer and each permitted assignee under the Transaction Documents shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

p.    Payment Set Aside. To the extent that the Company makes a payment or payments to any Buyer hereunder or pursuant to any of the other Transaction Documents, or the Buyers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

[Remainder of this page intentionally left blank]

PWSP 00448

IN WITNESS WHEREOF, the Buyers and the Company have caused this Securities Purchase Agreement to be duly executed as of the date first written above.

COMPANY:

SONICBLUE INCORPORATED

By: _____
    Name:  John U. Todd
    Title:    Chief Operating Officer

[Signatures of Buyers on the Following Page]

PWSP 00449

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY
FUND

By: _____
         Name: Jeffrey M. Solomon
         Title:   Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
         Name: Adam J. Chill
         Title:   Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
         Name: Kenneth A. Simpler
         Title:   Vice President

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY
FUND

By: _____
        Name: Jeffrey M. Solomon
        Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
        Name: Adam J. Chill
        Title:  Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
        Name: Kenneth A. Simpler
        Title:  Vice President

PWSP 00451

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY
FUND

By: _____
      Name: Jeffrey M. Solomon
      Title:   Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
      Name: Adam J. Chill
      Title:   Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
      Name: Kenneth A. Simpler
      Title:   Vice President

## SCHEDULE OF BUYERS

| Investor Name | Investor Address and Facsimile Number | Principal Amount of Debentures | Purchase Price of Debentures | Number of Warrants | Investor's Representatives' Address and Facsimile Number |
|---|---|---|---|---|---|
| Portside Growth & Opportunity Fund. Ltd. | c/o Ramius Capital Group, L.L.C. 666 Third Avenue, 26th Floor New York, NY 10017 Attention: Jeffrey M. Solomon Andrew Strober Telephone: (212) 845-7917 Facsimile: (212) 845-7999 Residence: Cayman Islands | $25.000,000 | $20.750,000 | 2,500,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein, Esq. Telephone: (212) 756-2000 Facsimile: (212) 593-5955 |
| Smithfield Fiduciary LLC | c/o Highbridge Capital Management, LLC 9 West 57th Street, 27th Floor New York, NY 10019 Attention: Ari J. Storch Adam J. Chill Telephone: (212) 287-4720 Facsimile: (212) 751-0755 Residence: Cayman Islands | $25.000,000 | $20.750,000 | 2,500,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein, Esq. Telephone: (212) 756-2000 Facsimile: (212) 593-5955 |
| Citadel Equity Fund Ltd. | c/o Citadel Investment Group. L.L.C. 225 West Washington Street Chicago, Illinois 60606 Attention: Kenneth A. Simpler Telephone: (312) 338-7801 Facsimile: (312) 338-0780 Residence: Cayman Islands | $25.000,000 | $20.750,00 | 2,500,000 | Katten Muchin Zavis Rosenman 525 W. Monroe Street Chicago, Illinois 60661-3693 Attention: Robert J. Brantman, Esq. Telephone: (312) 902-5289 Facsimile: (312) 902-1061 |

9161902.12

PWSP 00453

## SONICblue Incorporated

## Disclosure Schedules to the Purchase Agreement

### Schedule 3(a) – Entities List

Diamond Multimedia Systems, Inc.

Empeg Limited

frontpath, inc.

ReplayTV, Inc.

RioPort, Inc.

Sensory Science Corporation

S3 Asia Pacific Limited

S3 Europe Limited

S3 Graphics Co., Ltd.

S3 International Limited

S3 Japan K.K.

S3 Singapore Pte Ltd

S3-VIA, Inc.

United Microelectronics Corporation

### Schedule 3(c) – Capitalization

SONICblue Incorporated ("SONICblue") and VIABASE, Inc. (BVI) ("VIABASE"), a corporation organized under the laws of the British Virgin Islands and wholly owned subsidiary of VIA Technologies, Inc. ("VIA"), entered into an Amended and Restated Investor Rights Agreement, dated as of January 3, 2001 (the "Investor Rights Agreement"), to provide for the rights of VIABASE with respect to registration of any shares of common stock issued upon exercise of a warrant to purchase two million (2,000,000) shares in addition to certain shares of SONICblue common stock purchased by VIABASE in September 1999 and February 2000.

### Schedule 3(f) – SEC Documents

Second Amended and Restated Loan and Security Agreement, dated as of August 19, 1998, as amended by that certain Amendment Number Seven to Second Amended and Restated Loan and Security Agreement, entered into as of March 25, 2002, by and between **CONGRESS FINANCIAL CORPORATION (WESTERN),** a California corporation, on the one hand, and **SENSORY SCIENCE CORPORATION,** a Delaware corporation, and **CALIFORNIA AUDIO LABS, LLC,** a California limited liability company. SONICblue will file this agreement in the ordinary course with its quarterly report on Form 10-Q for the quarter ended March 31, 2002.

60268210v1

### Schedule 9(m) – Placement Agent

Gerald Klauer Mattison & Co., Inc.

- Cash fees of $1,660,000.00
- Warrant to purchase 293,805 shares of Common Stock at $3.39 per share

Banc of America Securities LLC

- The Company has agreed to pay Banc of America Securities LLC an advisory fee of up to $1,250,000.00 in connection with the participation in the transaction by Citadel Investments.

60268210v1

# **<u>EXHIBIT B</u>**

**EXECUTION VERSION**

SONICBLUE INCORPORATED

AND

THE INITIAL PURCHASERS OF 7-3/4% SECURED SENIOR SUBORDINATED
CONVERTIBLE DEBENTURES DUE 2005

INDENTURE

DATED AS OF APRIL 22, 2002

7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2005

9213905.13

**PWSP 00483**

THIS INDENTURE, dated as of April 22, 2002, is entered into by and between SONICBLUE INCORPORATED, a Delaware corporation (the "Company"), and the Initial Purchasers of Debentures identified on the signature pages hereto.

## W I T N E S S E T H :

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issue of its 7-3/4% Secured Senior Subordinated Debentures due 2005 (the "Debentures"), in an aggregate principal amount of $75,000,000 and, to provide the terms and conditions upon which the Debentures are to be issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, all acts and things necessary to make the Debentures, when executed and delivered by the Company to the Debenture holders, the valid, binding and legal obligations of the Company, and to constitute these presents a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issue hereunder of the Debentures have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Debentures are, and are to be, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Debentures by the holders thereof, the Company covenants and agrees with the Initial Purchasers and all holders of Debentures, as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.1     Definitions. The terms defined in this Section 1.1 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.1. All other terms used in this Indenture, which are defined in the Securities Act (except as herein otherwise expressly provided or unless the context otherwise requires) shall have the meanings assigned to such terms in said Securities Act as in force at the date of execution of this Indenture. The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other Subdivision. The terms defined in this Article include the plural as well as the singular.

"1996 Indenture" means the Indenture dated as of September 12, 1996 between the Company and State Street Bank and Trust Company of California, N.A., as trustee, pursuant to which the Subordinated Notes were issued.

"Affiliate" of any specified person shall mean any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control," when used with respect to any specified person means the power to direct or cause the direction of the management and policies

9213905.13

PWSP 00484

of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"All Cash Interest Option" has the meaning specified in Section 2.3(b).

"beneficial owner" shall be determined in accordance with Rule 13d-3 and 13d-5, as in effect on the date of the original execution of this Indenture, promulgated by the Commission pursuant to the Exchange Act.

"Board of Directors" shall mean the Board of Directors of the Company or a committee of such Board duly authorized to act for it hereunder. "Board Resolution" shall mean a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to each Debenture holder.

"Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which the banking institutions in The City of New York are authorized or obligated by law or executive order to close or be closed.

"Cap Allocation Amount" shall have the meaning specified in Section 15.8.

"Change of Control" means an event or series of events as a result of which (i) any person or group is or becomes the beneficial owner of shares representing more than 50% of the combined voting power of the then outstanding securities entitled to vote generally in elections of directors of the Company (the "Voting Stock"), (ii) the Company consolidates with or merges into any other corporation, or conveys, transfers or leases all or substantially all of its assets to any person, or any other corporation merges into the Company, and, in the case of any such transaction, the outstanding common stock of the Company is changed or exchanged into or for other assets or securities as a result, unless the stockholders of the Company immediately before such transaction own, directly or indirectly immediately following such transaction, at least a majority of the combined voting power of the outstanding voting securities of the corporation resulting from such transaction in substantially the same proportion as their ownership of the Voting Stock immediately before such transaction, or (iii) any time Continuing Directors do not constitute a majority of the Board of Directors of the Company (or, if applicable, a successor corporation to the Company); provided, however, that a Change of Control shall not be deemed to have occurred if either (x) the Closing Price (as defined in Section 13.5) of the Common Stock for any five (5) Trading Days within a period of ten (10) Trading Days ending immediately before the Change of Control is at least equal to 105% of the Conversion Price of the Debentures in effect on each such Trading Day or (y) at least 90% of the consideration (excluding cash payments for dissenting and fractional shares) in the transaction or transactions constituting the Change of Control consists of common stock traded on a United States national securities exchange or quoted on The Nasdaq Stock Market (or which will be so traded or quoted when issued or exchanged in connection with such Change of Control) and as a result of such transaction or transactions such Debentures become convertible solely into such common stock.

9213905.13

-2-

PWSP 00485

"Closing Price" has the meaning specified in Section 13.5(g)(1).

"Commission" shall mean the Securities and Exchange Commission.

"Common Stock" shall mean any capital stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which is not subject to redemption by the Company. Subject to the provisions of Section 13.6, however, shares issuable on conversion of Debentures shall include only shares of the class designated as common stock of the Company at the date of this Indenture or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company; provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

"Company" shall mean SONICblue Incorporated, a Delaware corporation, and subject to the provisions of Article XI, shall include its successors and assigns.

"Company Notice" shall have the meaning specified in Section 14.3(a).

"Complete Restructuring" shall have the meaning specified in Section 8.1.

"Complete Restructuring Notice" shall have the meaning specified in Section 8.1.

"Congress Facility" shall mean the Indebtedness represented by the Second Amended and Restated Loan and Security Agreement, dated as of August 19, 1998 among Congress Financial Corporation (Western), on the one hand, and Sensory Science Corporation and California Audio Labs, LLC, on the other hand, as such agreement may be amended and modified from time to time.

"Continuing Director" means at any date a member of the Company's Board of Directors (i) who was a member of such board on April 22, 2002 or (ii) who was nominated or elected by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or whose election to the Company's Board of Directors was recommended or endorsed by at least a majority of the directors who were Continuing Directors at the time of such nomination or election. (Under this definition, if the current Board of Directors of the Company were to approve a new director or directors and then resign, no Change in Control would occur even though the current Board of Directors would thereafter cease to be in office).

"Conversion Price" shall have the meaning specified in Section 13.4.

"Current Market Price" has the meaning specified in Section 13.5(g)(2).

9213905.13

PWSP 00486

"Debenture" or "Debentures" shall mean any debenture or debentures. as the case may be, issued and delivered under this Indenture.

"Debenture holder" or "holder" as applied to any Debenture. or other similar terms (but excluding the term "beneficial holder"), shall mean any person in whose name at the time a particular Debenture is registered on the Debenture register.

"Debenture register" shall have the meaning specified in Section 2.5.

"Default" or "default" shall mean any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"Designated Event" shall mean a Change of Control or a Termination of Trading.

"Event of Default" shall mean any event specified in Section 7.1(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k) or (l) continued for the period of time, if any, and after the giving of notice, if any, therein designated.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exchange Cap" shall have the meaning specified in Section 15.8.

"Expiration Time" shall have the meaning specified in Section 13.5(d).

"fair market value" has the meaning specified in Section 13.5(g)(3).

"Indebtedness" shall have the meaning specified in Section 7.1(e).

"Indenture" shall mean this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"Initial Purchasers" shall mean Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd., as Buyers under the Purchase Agreement.

"Interest Shares" has the meaning specified in Section 2.3(b).

"Interest Share Conversion Ratio" has the meaning specified in Section 2.3(b).

"Maturity Date" shall mean September 1, 2005, as the same may be extended pursuant to a supplemental indenture executed and delivered in accordance with Article X hereof.

"Mixed Interest Option" has the meaning specified in Section 2.3(b).

"Mixed Interest Option Election Notice" has the meaning specified in Section 2.3(b).

"non-electing shares" shall have the meaning specified in Section 13.6.

9213905.13

-4-

PWSP 00487

"Officers' Certificate" shall mean a certificate signed by (a) one of the President, the Chief Executive Officer, Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word added before or after the title "Vice President") and (b) one of the Chief Financial Officer, Treasurer or any Assistant Treasurer, Secretary or any Assistant Secretary or Controller of the Company, which is delivered to each Debenture holder.

"Opinion of Counsel" shall mean an opinion in writing signed by legal counsel, who may be an employee of or counsel to the Company or any Subsidiary, or other counsel acceptable to holders of a majority in aggregate principal amount of the Debentures then outstanding, which is delivered to each holder of Debentures.

"Option Agreement" shall have the meaning specified in Section 7.1(i).

"Outstanding," when used with reference to Debentures, shall, subject to the provisions of Section 9.4, mean, as of any particular time, all Debentures executed and delivered by the Company under this Indenture, except:

(a)     Debentures theretofore canceled by any holder of Debentures or delivered to the Company for cancellation;

(b)     Debentures, or portions thereof, for the payment, or redemption of which monies in the necessary amount shall have been set aside and segregated in trust by the Company; provided that if such Debentures are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as provided in Section 3.2;

(c)     Debentures in lieu of which, or in substitution for which, other Debentures shall have been delivered pursuant to the terms of Section 2.5(b); and

(d)     Debentures converted into Common Stock pursuant to Article XIII; and

(e)     Debentures deemed not outstanding pursuant to Section 3.2.

"Partial Restructuring" shall have the meaning specified in Section 8.2.

"Partial Restructuring Notice" shall have the meaning specified in Section 8.2.

"Partial Restructuring Option" shall have the meaning specified in Section 8.2.

"Partial Restructuring Option Exercise Notice" shall have the meaning specified in Section 8.2.

"Pledge Agreement" has the meaning specified in Section 4.6.

"Person" or "person" shall, except as to references in Article XIV, mean a corporation, an association, a partnership, a limited liability company, an individual, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

9213905.13

PWSP 00488

"person" or "group", for purposes of Article XIV only, shall include any syndicate or group which would be deemed to be a "person" under Section 13(d)(3) and 14(d) of the Exchange Act as in effect on the date of the original execution of this Indenture;

"Predecessor Debenture" of any particular Debenture shall mean every previous Debenture evidencing all or a portion of the same debt as that evidenced by such particular Debenture; and, for the purposes of this definition, any Debenture delivered under Section 2.5(b) in lieu of a lost, destroyed or stolen Debenture shall be deemed to evidence the same debt as the lost, destroyed or stolen Debenture that it replaces.

"Purchase Agreement" shall mean the Securities Purchase Agreement dated as of April 19, 2002 by and among the Company and the Initial Purchasers.

"Purchased Shares" shall have the meaning specified in Section 13.5(f).

"Record Date" shall have the meaning specified in Section 13.5(g)(4).

"Reference Period" shall have the meaning specified in Section 13.5(d).

"Registration Rights Agreement" shall mean that certain registration rights agreement between the Company and the Initial Purchasers relating to the filing of a registration statement covering the resale of the (i) shares of Common Stock issuable upon conversion of the Debentures; (ii) Interest Shares and (iii) shares of Common Stock issuable upon exercise of the Warrants to purchase Common Stock issued to the Initial Purchasers pursuant to the Purchase Agreement.

"Registrable Securities" has the meaning specified in the Registration Rights Agreement.

"Registration Statement" has the meaning specified in the Registration Rights Agreement.

"Repurchase Price" has the meaning specified in Section 14.1.

"Securities" shall have the meaning specified in Section 13.5(d).

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Default Notice" has the meaning specified in Section 4.2.

"Senior Indebtedness" shall mean the principal of, premium, if any, interest on (including any interest accruing after the filing of a petition by or against the Company under any bankruptcy law, whether or not allowed as a claim after such filing in any proceeding under such bankruptcy law) and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture or thereafter incurred or created:

PWSP 00489

(a)    All indebtedness of the Company for monies borrowed (i) from banks, trust companies, insurance companies, equipment leasing companies or other financial institutions that in the ordinary course of business make loans (each, a "Qualified Lender"), including without limitation, all indebtedness represented by the Congress Facility or (ii) as evidenced by debt securities that are not exercisable or convertible into or exchangeable for capital stock of the Company and that are sold in a registered public offering or in one or more transactions in connection with resales of such debt securities pursuant to Rule 144A under the Securities Act;

(b)    All indebtedness of the Company due and owing with respect to letters of credit (including, but not limited to, reimbursement obligations with respect thereto) issued by Qualified Lenders;

(c)    All indebtedness or other obligations of the Company due and owing with respect to interest rate and currency swap agreements, cap, floor and collar agreements, currency spot and forward contracts and other similar agreements and arrangements entered into with Qualified Lenders;

(d)    All indebtedness consisting of commitment or standby fees due and payable to Qualified Lenders with respect to credit facilities or letters of credit available to the Company;

(e)    All obligations of the Company under leases required or permitted to be capitalized under generally accepted accounting principles and entered into with Qualified Lenders;

(f)    All indebtedness or obligations of others of the kinds described in any of the preceding clauses (a), (b), (c), (d) or (e) due or owing to Qualified Lenders assumed by or guaranteed in any manner by the Company or in effect guaranteed (directly or indirectly) by the Company through an agreement to purchase, contingent or otherwise, and all obligations of the Company under any such guarantee or other arrangements;

(g)    All indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "Via Indebtedness"); and

(h)    All renewals, extensions, refunds, deferrals, amendments or modifications of indebtedness or obligations of the kinds described in any of the preceding clauses (a), (b), (c), (d), (e) or (f) above entered into with Qualified Lenders and, in the case of (g) above, subject to the $15,000,000 limitation set forth therein; unless in the case of any particular indebtedness, obligation, renewal, extension, refunding, amendment, modification or supplement, the instrument or other document creating or evidencing the same or the assumption or guarantee of the same expressly provides that such Indebtedness, obligation, renewal, extension, refunding, amendment, modification or supplement is subordinate to, or is not superior to, or is pari passu with, the Debentures; provided that "Senior Indebtedness" shall not include (i) any indebtedness of any kind of the Company to any Subsidiary, (ii) indebtedness, other than the Via Indebtedness, for trade payables or constituting the deferred purchase price of assets or services

PWSP 00490

incurred in the ordinary course of business, (iii) indebtedness of the Company evidenced by the Debentures, which shall rank equally and ratably with each other and (iv) Subordinated Indebtedness, including, without limitation, the Subordinated Notes.

"Significant Subsidiary" shall mean, with respect to any person, a Subsidiary of such person organized under the laws of the United States of America, any state thereof, or the District of Columbia that would constitute a "significant subsidiary" as such term is defined under Rule 1-02 of Regulation S-X of the Commission (as such Regulation is in effect on the date hereof).

"Subordinated Indebtedness" means any Indebtedness of the Company that is expressly subordinated in right of payment to the Debentures, including, without limitation, the Subordinated Notes.

"Subordinated Notes" shall mean the Company's 5 ¾% Subordinated Convertible Notes due 2003 (CUSIP No. 784849AA9) issued pursuant to the 1996 Indenture.

"Subsidiary" shall mean a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries. For the purposes of this definition, "voting stock" means capital stock which ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of capital stock has such voting power by reason of any contingency.

"Termination of Trading" shall have occurred if the Common Stock of the Company (or other common stock into which the Debentures are then convertible) is neither listed for trading on a United States national securities exchange nor approved for trading on an established automated over-the-counter trading market in the United States.

"Trading Day" has the meaning specified in Section 13.5(g)(5).

"Trigger Event" shall have the meaning specified in Section 13.5(d).

"UMC" has the meaning specified in Section 4.6.

ARTICLE II

ISSUE, DESCRIPTION, EXECUTION, REGISTRATION
AND EXCHANGE OF DEBENTURES

SECTION 2.1     Designation, Amount and Issue of Debentures. The Debentures shall be designated as "7-3/4% Secured Senior Subordinated Convertible Debentures due 2005". Debentures not to exceed the aggregate principal amount of $75,000,000 upon the execution of this Indenture, or from time to time thereafter, may be executed by an officer of the Company authorized by the Board of Directors and delivered to the holders of Debentures.

SECTION 2.2     Form of Debentures. The Debentures shall be substantially in the form set forth in Exhibit A, which is incorporated in and made a part of this Indenture.

9213905.13

-8-

On the date hereof, Debentures shall be issued directly to the Initial Purchasers.

The terms and provisions contained in the form of Debenture attached as Exhibit A hereto shall constitute, and are hereby expressly made, a part of this Indenture and to the extent applicable, the Company and the holders of Debentures, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

SECTION 2.3    Date and Denomination of Debentures; Payments of Interest.

(a)    The Debentures shall be issuable in certificated form without coupons in minimum denominations of $250,000 principal amount and integral multiples of $1,000 in excess thereof. Every Debenture shall be dated the date hereof, shall bear interest from the date hereof and shall be payable on the dates specified on the face of the form of Debenture, attached as Exhibit A hereto. Interest on the Debentures shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

(b)    Notwithstanding anything herein or in the Debentures to the contrary, payments of interest on the Debentures shall be payable either in all cash (the "All Cash Interest Option") or, at the option of the Company, subject to the limitations set forth in this Section 2.3(b) and in Sections 15.7 and 15.8 hereof, 50% of each interest payment may be made in shares of Common Stock ("Interest Shares") and 50% of each interest payment may be made in cash (the "Mixed Interest Option"), provided; however; that the Company may not select the Mixed Interest Option and interest payments which accrued during any period shall be payable only in cash unless the Company provides written notice ("Mixed Interest Option Election Notice") to each holder of Debentures at least five (5) Trading Days prior to the applicable interest payment date; provided, further, that in no event may the Company deliver to any holder more than 200,000 Interest Shares in respect of any payment of interest due hereunder to such holder, in which case the balance of such interest payment shall be made only in cash. Interest Shares shall be paid in a number of fully paid and nonassessable shares (rounded up or down to the nearest whole share) of Common Stock equal to the quotient of (i) 50% of the amount of the interest payment due on the applicable interest payment date divided by (ii) 95% of the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on and including the third Trading Day immediately preceding the applicable interest payment date (the "Interest Share Conversion Rate"). Notwithstanding the foregoing, the Company shall be required to make interest payments in cash only if (x) any event constituting a default or an Event of Default has occurred and is continuing on the applicable interest payment date or any date which is within 10 Trading Days prior to the applicable interest payment date, unless otherwise consented to in writing by the holder of the Debenture entitled to receive such interest payment or (y) from and after the time that any Registration Statement is required to be effective, such Registration Statement is not effective and available for the resale of all of the Registrable Securities on the applicable interest payment date or each date which is within 10 Trading Days prior to the applicable interest payment date.

(c)    The person in whose name any Debenture (or its Predecessor Debenture) is registered at the close of business on any record date with respect to any interest payment date (including any Debenture that is converted after the record date and on or before the interest payment date) shall be entitled to receive the interest payable on such interest

9213905.13

-9-

payment date notwithstanding the cancellation of such Debenture upon any transfer, exchange or conversion subsequent to the record date and on or prior to such interest payment date: provided that in the case of any Debenture, or portion thereof, called for redemption pursuant to Article III on a redemption date or repurchased by the Company pursuant to Article XIV on a repurchase date during the period from the close of business on the record date to the close of business on the Business Day next preceding the following interest payment date, interest shall not be paid to the person in whose name the Debenture, or portion thereof, is registered on the close of business on such record date, and the Company shall have no obligation to pay interest on such Debenture or portion thereof except to the extent required to be paid upon such redemption or repurchase in accordance with Article III or Article XIV. The term "record date" with respect to any interest payment date shall mean the February 15 or August 15 (whether or not a Business Day) next preceding the March 1 or September 1 interest payment date, respectively.

SECTION 2.4    Execution of Debentures.  The Debentures shall be signed in the name and on behalf of the Company by the manual or facsimile signature of its Chairman of the Board, its President and Chief Executive Officer, any of its Senior Vice Presidents, or any of its Vice Presidents (whether or not designated by a number or numbers or word or words added before or after the title "Vice President") and attested by the manual or facsimile signature of its Secretary or any of its Assistant Secretaries.  The holders of all Debentures shall be entitled to the benefits of this Indenture.

SECTION 2.5    Exchange and Registration of Transfer of Debentures; Restrictions on Transfer.

(a)    The Company shall cause to be kept at its principal place of business a register (the register maintained in such office referred to as the "Debenture register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Debentures and of transfers of Debentures.  Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time.

Upon surrender for registration of transfer of any Debenture to the Company, and satisfaction of the requirements for such transfer set forth in this Section 2.5, the Company shall execute and deliver in the name of the designated transferee or transferees, one or more new Debentures of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

Subject to the other provisions of this Section 2.5(a), Debentures may be exchanged for other Debentures of any authorized denominations and of a like aggregate principal amount, upon surrender of the Debentures to be exchanged at the Company's principal place of business.  Whenever any Debentures are so surrendered for exchange, the Company shall execute and deliver the Debentures which the Debenture holder making the exchange is entitled to receive.

All Debentures presented or surrendered for registration of transfer or for exchange shall be duly endorsed, or be accompanied by a written instrument or instruments of

9213905.13

-10-

PWSP 00493

transfer in form reasonably satisfactory to the Company and duly executed by the Debenture holder thereof or its attorney duly authorized in writing.

No service charge shall be charged to the Debenture holder for any exchange or registration of transfer of Debentures, but the Company may require payment of a sum sufficient to cover any tax, assessments or other governmental charges that may be imposed in connection therewith.

The Company shall not be required to exchange or register a transfer of (a) any Debentures for a period of fifteen (15) days next preceding any selection of Debentures to be redeemed or (b) subject to Section 3.2, any Debentures called for redemption or, if a portion of any Debenture is selected or called for redemption, such portion thereof selected or called for redemption or (c) subject to Article XIII, any Debentures surrendered for conversion or, if a portion of any Debenture is surrendered for conversion, such portion thereof surrendered for conversion.

All Debentures issued upon any transfer or exchange of Debentures in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Debentures surrendered upon such registration of transfer or exchange.

(b)    Mutilated, Destroyed, Lost or Stolen Debentures.  In the event that any holder of Debentures notifies the Company that its Debenture(s) have been lost, stolen or destroyed, replacement Debenture(s) identical in all respects to the original Debenture(s) (except for registration number and outstanding principal amount, if different than that shown on the original Debenture(s)) shall be issued by the Company to such holder, provided that the holder of such Debenture executes and delivers to the Company an agreement reasonably satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such Debenture(s).

## ARTICLE III

## REDEMPTION OF DEBENTURES

SECTION 3.1    Redemption Price.  The Company may, at its option at any time and from time to time, redeem all or any part of the Debentures on any date prior to maturity, upon notice as set forth in Section 3.2, at 100% of the principal amount, together with accrued interest, if any, to, but excluding, the date fixed for redemption.

SECTION 3.2    Notice of Redemption; Selection of Debentures.  In case the Company shall desire to exercise the right to redeem all or, as the case may be, any part of the Debentures pursuant to Section 3.1, it shall fix a date for redemption, and it shall deliver to each holder of Debentures a written notice of such redemption at least twenty (20) and not more than sixty (60) days prior to the date fixed for redemption to the holders of Debentures so to be redeemed as a whole or in part at their last addresses as the same appear on the Debenture register.  Such delivery shall be made by fax and overnight courier in accordance with Section 15.3 hereof.

9213905.13

-11-

PWSP 00494

Each such notice of redemption shall specify the aggregate principal amount of Debentures to be redeemed, the date fixed for redemption, the redemption price at which Debentures are to be redeemed, the place or places of payment, that payment will be made upon presentation and surrender of such Debentures, that interest accrued to, but excluding, the date fixed for redemption will be paid as specified in said notice, and that on and after said date interest thereon or on the portion thereof to be redeemed will cease to accrue unless the Company fails to make such redemption, in which case interest shall continue to accrue as provided in Section 2.3(a) and principal and interest shall continue to be payable in accordance with the terms hereof. Such notice shall also state the current Conversion Price and the date on which the right to convert such Debentures or portions thereof into Common Stock will expire. If fewer than all the Debentures are to be redeemed, the notice of redemption shall identify the Debentures to be redeemed. In case any Debenture is to be redeemed in part only, the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that on and after the date fixed for redemption, upon surrender of such Debenture, a new Debenture or Debentures in principal amount equal to the unredeemed portion thereof will be issued.

On or prior to the redemption date specified in the notice of redemption given as provided in this Section, the Company will pay in immediately available funds to an account designated on the Schedule of Buyers attached hereto (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment) an amount of money sufficient to redeem on the redemption date all the Debentures (or portions thereof) so called for redemption (other than those theretofore surrendered for conversion into Common Stock) at the redemption price provided above, together with accrued interest to, but excluding, the date fixed for redemption; provided that if such payment is made on the redemption date it must be received by the holder by 10:00 a.m. New York City time, on such date.

Notwithstanding anything herein to the contrary, any redemption effected by the Company pursuant to this Section 3.2 shall be made, on a pro rata basis, among all holders of Debentures.

If any Debenture selected for partial redemption is converted in part after such selection, the converted portion of such Debenture shall be deemed (so far as may be) to be the portion to be selected for redemption. The Debentures (or portions thereof) so selected shall be deemed duly selected for redemption for all purposes hereof, notwithstanding that any such Debenture is converted as a whole or in part before the delivery of the notice of redemption. If any Debenture is to be redeemed in part only, a new Debenture or Debentures in principal amount equal to the unredeemed principal portion thereof shall be issued.

Upon any redemption of less than all Debentures, the Company may (but need not) treat as outstanding any Debentures surrendered for conversion during the period of fifteen (15) days next preceding the delivery of a notice of redemption and may (but need not) treat as not outstanding any Debenture delivered during such period in exchange for the unconverted portion of any Debenture converted in part during such period.

9213905.13

-12-

PWSP 00495

SECTION 3.3    Payment of Debentures Called for Redemption.  If notice of redemption has been given as above provided, the Debentures or portion of Debentures with respect to which such notice has been given shall, unless converted into Common Stock pursuant to the terms hereof, become due and payable on the date and at the place or places stated in such notice at the applicable redemption price, together with interest accrued to, but excluding, the date fixed for redemption, and on and after said date interest on the Debentures or portion of Debentures so called for redemption shall cease to accrue and such Debentures shall cease after the close of business on the Business Day next preceding the date fixed for redemption to be convertible into Common Stock and to be entitled to any benefit or security under this Indenture. On presentation and surrender of such Debentures at a place of payment in said notice specified, the said Debentures or the specified portions thereof to be redeemed shall be paid and redeemed by the Company at the applicable redemption price, together with interest accrued thereon to, but excluding, the date fixed for redemption; provided that, if the applicable redemption date is an interest payment date, the semi-annual payment of interest becoming due on such date shall be payable to the holders of such Debentures registered as such on the relevant record date subject to the terms and provisions of Section 2.3 hereof.

Upon presentation of any Debenture redeemed in part only, the Company shall execute and deliver to the holder thereof, at the expense of the Company, a new Debenture or Debentures, of authorized denominations, in principal amount equal to the unredeemed portion of the Debentures so presented.

ARTICLE IV

SUBORDINATION OF DEBENTURES

SECTION 4.1    Agreement of Subordination.  The Company covenants and agrees, and each holder of Debentures issued hereunder by its acceptance thereof likewise covenants and agrees, that all Debentures shall be issued subject to the provisions of this Article IV; and each person holding any Debenture, whether upon original issue or upon transfer, assignment or exchange thereof, accepts and agrees to be bound by such provisions.

The payment of the principal of, premium, if any, and interest on all Debentures (including, but not limited to, the redemption price or repurchase price with respect to the Debentures to be redeemed or repurchased, as provided in this Indenture) issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness, whether outstanding at the date of this Indenture or thereafter incurred.

The Company and the holders of Debentures agree that the Debentures constitute "Senior Indebtedness" under the 1996 Indenture and that the holders of Debentures are entitled to the rights and benefits of a holder of "Senior Indebtedness" under the 1996 Indenture.

No provision of this Article IV shall prevent the occurrence of any default or Event of Default hereunder.

9213905.13

-13-

PWSP 00496

SECTION 4.2 <u>Payments to Debenture Holders</u>. In the event and during the continuation of any default in the payment of principal, premium, interest or any other payment due on any Senior Indebtedness (or, in the case of Senior Indebtedness for which there is a period of grace, in the event of such a default that continues beyond the period of grace, if any, specified in the instrument or lease evidencing such Senior Indebtedness), then, unless and until such default shall have been cured or waived or shall have ceased to exist, no payment shall be made by the Company with respect to the principal of, or premium, if any, or interest on, the Debentures (including, but not limited to, the redemption price or repurchase price with respect to the Debentures to be redeemed or repurchased, as provided in this Indenture).

In the event (i) any event of default with respect to any Senior Indebtedness shall have occurred and be continuing which permits the holders of such Senior Indebtedness (or a trustee or other representative on behalf of the holders thereof) to declare such Senior Indebtedness due and payable prior to the date on which it would otherwise have become due and payable, upon written notice thereof to the Company and each holder of Debentures by any holders of Senior Indebtedness to which such event of default relates (or a trustee or other representative on behalf of the holders thereof) (a "Senior Default Notice"), unless and until such event of default shall have been cured or waived or shall have ceased to exist and such acceleration shall have been rescinded or annulled, or (ii) any judicial proceeding shall be pending with respect to any such event of default, then no payment shall be made by the Company, directly or indirectly, with respect to principal of, premium, if any, or interest on the Debentures, provided, however, that clause (i) of this paragraph shall not prevent the making of any such payment for more than 179 days after a Senior Default Notice shall have been received by each holder of Debentures unless the Senior Indebtedness in respect of which such event of default exists has been declared due and payable in its entirety, in which case no such payment may be made until such acceleration has been rescinded or annulled or such Senior Indebtedness has been paid in full. Notwithstanding the foregoing, no event of default which existed or was continuing on the date of any Senior Default Notice shall be made the basis for the giving of a second Senior Default Notice; and, provided, further, that only one such Senior Default Notice may be given during any period of 360 consecutive days, regardless of the number of defaults with respect to Senior Indebtedness during such 360-day period. Notwithstanding the foregoing, the Company may make and the holders of Debentures may receive and apply any payment in respect of the Debentures (for principal, and premium, if any, or interest) if such payment was made prior to the occurrence of any of the contingencies specified in clauses (i) and (ii) above. In addition, nothing in this paragraph shall prevent the Company from making or the holders of Debentures from receiving or applying any payment in connection with the redemption of the Debentures if the first publication of notice of redemption (whether by mail or otherwise in accordance with this Indenture) has been made prior to the occurrence of any of the contingencies specified in clauses (i) and (ii) above.

Upon any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings (other than as permitted in Article XI), all amounts due or to become due upon all Senior Indebtedness shall first be paid in full, or payment thereof provided for in money in accordance with its terms, before any payment is made on account of the principal (and premium, if any) or interest on the

9213905.13

-14-

PWSP 00497

Debentures; and upon any such dissolution or winding-up or liquidation or reorganization or bankruptcy, insolvency, receivership or other such proceedings, any payment by the Company. or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the holders of the Debentures under this Indenture would be entitled, except for the provision of this Article IV, shall (except as aforesaid) be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, or by the holders of the Debentures under this Indenture if received by them. directly to the holders of Senior Indebtedness (pro rata to such holders on the basis of the respective amounts of Senior Indebtedness held by such holders, or as otherwise required by law or a court order) or their respective representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, to the extent necessary to pay all Senior Indebtedness in full after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness, before any payment or distribution is made to the holders of the Debentures under this Indenture.

In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities (including, without limitation, by way of setoff or otherwise), prohibited by the foregoing, shall be received by any holders of the Debentures before all Senior Indebtedness is paid in full, or provision is made for such payment in accordance with its terms, such payment or distribution shall be held by the recipient or recipients in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness or their respective representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, as calculated by the Company, for application to the payment of all Senior Indebtedness remaining unpaid to the extent necessary to pay all Senior Indebtedness in full in accordance with its terms, after giving effect to any concurrent payment or distribution (or provision therefor) to or for the holders of such Senior Indebtedness.

For purposes of this Article IV, the words "cash, property or securities" shall not be deemed to include shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated (at least to the extent provided in this Article IV with respect to the Debentures) to the payment of all Senior Indebtedness which may at the time be outstanding; provided that (i) the Senior Indebtedness is assumed by the new corporation, if any, resulting from such reorganization or adjustment and (ii) the rights of the holders of Senior Indebtedness (other than leases which are not assumed by the Company or by the new corporation, as the case may be) are not, without the consent of such holders, altered by such reorganization or readjustment. The consolidation of the Company with, or the merger of the Company into, another corporation or the liquidation or dissolution of the Company following the conveyance or transfer of all or substantially all its property to another corporation upon the terms and conditions provided for in Article XI shall not be deemed a dissolution, winding-up, liquidation or reorganization for the purposes of this Section 4.2 if such other corporation shall, as a part of such consolidation, merger, conveyance or transfer, comply with the conditions stated in Article XI. This Section 4.2 shall be subject to the further provisions of Section 4.5.

9213905.13

-15-

PWSP 00498

SECTION 4.3    Subrogation of Debentures. Subject to the payment in full of all Senior Indebtedness, the rights of the holders of the Debentures shall be subrogated to the extent of the payments or distributions made to the holders of such Senior Indebtedness pursuant to the provisions of this Article IV to the rights of the holders of Senior Indebtedness to receive payments or distributions of cash, property or securities of the Company applicable to the Senior Indebtedness until the principal of (and premium, if any) and interest on the Debentures shall be paid in full; and, for the purposes of such subrogation, no payments or distributions to the holders of the Senior Indebtedness of any cash, property or securities to which the holders of the Debentures would be entitled except for the provisions of this Article IV, and no payment over pursuant to the provisions of this Article IV, to or for the benefit of the holders of Senior Indebtedness by holders of the Debentures, shall, as between the Company, its creditors other than holders of Senior Indebtedness, and the holders of the Debentures, be deemed to be a payment by the Company to or on account of the Senior Indebtedness; and no payments or distributions of cash, property or securities to or for the benefit of the holders of the Debentures pursuant to the subrogation provisions of this Article IV, which would otherwise have been paid to the holders of Senior Indebtedness shall be deemed to be a payment by the Company to or for the account of the Debentures. It is understood that the provisions of this Article IV are and are intended solely for the purposes of defining the relative rights of the holders of the Debentures, on the one hand, and the holders of the Senior Indebtedness, on the other hand.

Nothing contained in this Article IV or elsewhere in this Indenture or in the Debentures is intended to or shall impair, as among the Company, its creditors other than holders of Senior Indebtedness, and the holders of the Debentures, the obligation of the Company, which is absolute and unconditional, to pay to the holders of the Debentures the principal of (and premium, if any) and interest on the Debentures as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the holders of the Debentures and creditors of the Company other than holders of the Senior Indebtedness, nor shall anything herein or therein prevent any holder of any Debenture from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, subject to the rights, if any, under this Article IV of the holders of Senior Indebtedness in respect of cash, property or securities of the Company received upon the exercise of any such remedy.

Upon any payment or distribution of assets of the Company referred to in this Article IV, the holders of the Debentures shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such bankruptcy, dissolution, winding-up, liquidation or reorganization proceedings are pending, or a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, delivered to the holders of the Debentures, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article IV.

SECTION 4.4    Notice to Debenture Holders. The Company shall give prompt written notice in the form of an Officers' Certificate to each holder of Debentures of any fact known to the Company which would prohibit the making of any payment of monies in respect of the Debentures pursuant to the provisions of this Article IV. Notwithstanding the provisions of

9213905.13

-16-

PWSP 00499

this Article IV or any other provision of this Indenture, no holder of Debentures shall be charged with knowledge of the existence of any default or event of default with respect to any Senior Indebtedness or of any other facts which would prohibit the making of any payment of monies in respect of the Debentures pursuant to the provisions of this Article IV, unless and until such holder of Debenture(s) shall have received written notice thereof from the Company (in the form of an Officers' Certificate) or a holder or holders of Senior Indebtedness or from any trustee thereof who shall have been certified by the Company or otherwise established to the reasonable satisfaction of the Debenture holder to be such holder or trustee; and before the receipt of any such written notice, the holders of Debentures shall be entitled in all respects to assume that no such facts exist. Nothing contained in this Section 4.4 shall limit the right of the holders of Senior Indebtedness to recover payments as contemplated by Section 4.2.

Notwithstanding anything to the contrary hereinbefore set forth, nothing shall prevent (a) any payment by the Company to the Debenture holders of amounts in connection with a redemption of Debentures if (i) notice of such redemption has been given pursuant to Section 3.2 prior to the receipt by the Debenture holders of written notice under this Section 4.4, and (ii) such notice of redemption is given not earlier than sixty (60) days before the redemption date or (b) any payment by the Company to the Debenture holders of amounts in connection with a repurchase of Debentures if (i) notice of such repurchase has been given pursuant to Article XIV prior to the receipt by the Debenture holders of written notice under this Section 4.4 and (ii) such notice of repurchase is given not earlier than forty (40) days before the repurchase date.

SECTION 4.5    No Impairment of Subordination.  No right of any present or future holder of any Senior Indebtedness to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof which any such holder may have or otherwise be charged with.

SECTION 4.6    Certain Conversions Deemed Payment.  For the purposes of this Article only, (1) the issuance and delivery of junior securities upon conversion of Debentures in accordance with Article XIII or in respect of payments of interest pursuant to Section 2.3 hereof and the pledge, issuance and delivery of common shares of United Microelectronics Corporation, a corporation duly organized and validly existing under the laws of the Republic of China and having its principal place of business at 300 No. 3, Li-hsin Rd. II, Science-Based Industrial Park, Hsinchu, Taiwan, R.O.C. ("UMC") pursuant to the Pledge and Security Agreement dated the date hereof among the Company and the Initial Purchasers (the "Pledge Agreement") shall not be deemed to constitute a payment or distribution on account of the principal of (or premium, if any) or interest on Debentures or on account of the purchase or other acquisition of Debentures, and (2) the payment, issuance or delivery of cash (except in satisfaction of fractional shares pursuant to Section 13.3), property or securities (other than junior securities) upon conversion of a Debenture shall be deemed to constitute payment on account of the principal of such Debenture. For the purposes of this Section, the term "junior securities" means (a) shares of any capital stock of any class of the Company and (b) securities of the Company which are subordinated in right of payment to all Senior Indebtedness which may be outstanding at the time of issuance or delivery of such securities to substantially the same extent as, or to a greater extent than, the Debentures are so subordinated and provided in this

9213905.13

-17-

PWSP 00500

Article. Nothing contained in this Article or elsewhere in this Indenture or in the Debentures is intended to or shall impair, as among the Company, its creditors other than holders of Senior Indebtedness and the holders of the Debentures, the right, which is absolute and unconditional, of the holder of any Debenture to convert such Debenture in accordance with Article XIII.

SECTION 4.7    No Impairment to Rights to Collateral. Notwithstanding anything to the contrary in this Article IV or otherwise in this Indenture, nothing shall impair, delay, limit or prohibit any holder of Debentures from exercising or enforcing any rights or remedies available to such holder under the Pledge Agreement (and without notice to any holder of Senior Indebtedness), whether or not otherwise prohibited by this Indenture and whether or not such exercise or enforcement occurs in connection with any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings, and no holder of Debentures shall have any obligation to hold, set aside or pay over to or for the benefit of any of the Company or any holder of Senior Indebtedness any of the collateral secured under the Pledge Agreement or proceeds therefrom.

ARTICLE V

PARTICULAR COVENANTS OF THE COMPANY

SECTION 5.1    Payment of Principal, Premium and Interest. The Company covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and premium, if any, and interest on each of the Debentures at the places, at the respective times and in the manner provided herein and in the Debentures. Each installment of interest on the Debentures due on any semi-annual interest payment date shall be paid (a) by wire transfer in immediately available funds in accordance with the wire transfer instructions designated on the Schedule of Buyers attached hereto (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment) and (b) in the case of interest payments made in Interest Shares, in shares of Common Stock, as provided in Section 2.3(b).

SECTION 5.2    Deliveries. In all instances under this Indenture, the Debentures may be surrendered for registration of transfer or exchange or for presentation for payment or for conversion, redemption or repurchase and notices and demands to or upon the Company in respect of the Debentures and this Indenture may be served to the Company in accordance with the notice provisions of Section 15.3.

SECTION 5.3    Existence. Subject to Article XI, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

SECTION 5.4    Stay, Extension and Usury Laws. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of (and premium, if any) or interest on the Debentures as contemplated herein,

9213905.13

PWSP 00501

wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Debenture holders, but will suffer and permit the execution of every such power as though no such law has been enacted.

SECTION 5.5    Compliance Certificate. The Company shall deliver to each Debenture holder within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2002) an Officers' Certificate stating whether or not the signers know of any Event of Default that occurred during such period. If the signers have knowledge of any such Event of Default, such Officers' Certificate shall describe the Event of Default and its status.

SECTION 5.6    Further Instruments and Acts. Upon the reasonable request of any Debenture holder, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

SECTION 5.7    Restriction on Redemption, Repayments, Stock Repurchases. The Company shall not, and the Company shall not permit any of the Subsidiaries, its Affiliates, or any agent, broker, dealer or other Person by or on behalf of the Company to, directly or indirectly, (a) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or marketable securities, including, without limitation, common shares of UMC (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise) (i) all or any portion of any Subordinated Indebtedness of the Company, including, without limitation, the Subordinated Notes, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Subordinated Indebtedness or otherwise, or (ii) any capital stock of the Company, including, without limitation, by way of the payment of any dividends or other distributions thereon (other than such dividends or distributions by the Company made in Common Stock or of rights pursuant to any stockholders' rights plan adopted by the Company as of the date hereof); provided, however, that, so long as no event constituting a default or an Event of Default has occurred and is continuing on the date any of the following payments is due or is otherwise made, the Company may, without regard to the foregoing limitation (A) pay in cash scheduled interest payments, in each case in the manner set forth in the original documentation governing such Subordinated Indebtedness at an annual rate not to exceed 15% per annum on the principal amount of such Subordinated Indebtedness, (B) pay in cash regularly scheduled dividends in respect of any capital stock of the Company, other than Common Stock, in the manner set forth in the constituent document of the Company governing the rights, preferences and limitations of such preferred capital stock at an annual rate not to exceed 15% per annum on the stated value of such preferred capital stock, (C) redeem, repurchase or otherwise acquire for value any Common Stock held by any employee, consultant or director of the Company or any of its Subsidiaries pursuant to any stock option plan or restricted stock plan, or any employee, consultant, director or management equity subscription agreement or stock option agreement, approved by the Board of Directors; provided, that such redemption, repurchase or acquisition is expressly required of the Company or any Subsidiary by the terms of the plan or agreement pursuant to which such Common Stock was originally issued;

9213905.13

-19-

provided, further, that in no event shall redemptions, repurchases or other acquisitions of Common Stock pursuant to this Section 5(a)(ii)(C) require expenditures of cash or other value that exceeds in the aggregate $1,000,000 in any twelve-month period and (D) issue Common Stock and/or warrants to purchase Common Stock (provided that such warrants do not require or permit any payment of cash by or on behalf of the Company in respect of such warrants, other than payments in respect of fractional shares) to holders of Subordinated Notes in connection with a Complete Restructuring or any Partial Restructuring pursuant to Article VIII hereof or (b) announce or effect any redemption of all or any portion of the Subordinated Notes until not less than thirty (30) days following the redemption of all Debentures in accordance with Article III hereof or other payment in full of the Debentures.

SECTION 5.8    Anti-Layering.  The Company shall not, and the Company shall not permit any of the Subsidiaries to, directly or indirectly, incur or suffer to exist any Indebtedness that is both (a) subordinate or junior in right of payment to any Senior Indebtedness and (b) senior or pari passu in any respect in right of payment to the Debentures; provided, that notwithstanding the foregoing limitation, the Company and/or any of the Subsidiaries may incur indebtedness that is pari passu in right of payment to the Debentures up to an aggregate amount not to exceed $25,000,000 at any time.

ARTICLE VI

REPORTS BY THE COMPANY

SECTION 6.1    Reports by Company.  The Company shall deliver to each Debenture holder (a) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Company (i) a consolidated balance sheet of the Company and its subsidiaries as of the end of such fiscal year and the related consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all reported on by an independent public accountant of nationally recognized standing and (ii) a report containing a management's discussion and analysis of the financial condition and results of operations and a description of the business and properties of the Company and (b) as soon as available and in any event within forty five (45) days after the end of each of the first three quarters of each fiscal year of the Company (i) an unaudited consolidated balance sheet of the Company and its subsidiaries as of the end of each such quarter and the related consolidated statements of operations and cash flows for such fiscal quarter and (ii) a report containing a management's discussion and analysis of the financial condition and results of operations of the Company for such quarter.

ARTICLE VII

DEFAULTS AND REMEDIES

SECTION 7.1    Events of Default.  In case one or more of the following Events of Default (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) shall have occurred and be continuing:

9213905.13

-20-

(a)    default in the payment of the principal of and premium, if any, on any of the Debentures as and when the same shall become due and payable, either at maturity or in connection with any redemption or repurchase, by declaration or otherwise, whether or not such payment is prohibited by the provisions of Article IV; or

(b)    default in the payment of any installment of interest upon any of the Debentures as and when the same shall become due and payable, and continuance of such default for a period of thirty (30) days, whether or not such payment is prohibited by the provisions of Article IV; or

(c)    a default in the payment of the Repurchase Price in respect of any Debenture on the repurchase date therefor in accordance with the provisions of Article XIV, whether or not such payment is prohibited by the provisions of Article IV; or

(d)    failure on the part of the Company duly to observe or perform any other of the covenants or agreements on the part of the Company in the Debentures or in this Indenture (other than a covenant or agreement a default in whose performance or whose breach is elsewhere in this Section specifically dealt with) and, if such failure is capable of cure, such failure continues for a period of sixty (60) days after the date on which written notice of such failure, requiring the Company to remedy the same, shall have been given to the Company by any holder of Debentures; or

(e)    failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of indebtedness, which term as used herein means obligations (other than the Debentures or non-recourse obligations) of, or guaranteed or assumed by, the Company, or any Significant Subsidiary, for borrowed money or evidenced by bonds, debentures, notes or other similar instruments ("Indebtedness") in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures; or

(f)    a default by the Company or any Significant Subsidiary with respect to any Indebtedness, which default results in the acceleration of Indebtedness in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency without such Indebtedness having been discharged or such acceleration having been cured, waived, rescinded or annulled for a period of thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures; or

(g)    the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

9213905.13

-21-

PWSP 00504

(h)     an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of ninety (90) consecutive days; or

(i)     (A) the failure on the part of the Company duly to observe or perform any of the covenants or agreements on the part of the Company in the Pledge Agreement or the Option Agreement dated the date of this Indenture among the Company and the Initial Purchasers (the "Option Agreement") or (B) the failure of the Company to make any cash payment when due and payable under any of the Registration Rights Agreement, the Purchase Agreement or the Warrants issued to the Initial Purchasers pursuant to the Purchase Agreement; and, in the case of any such failure, such failure, if capable of cure, continues for a period of thirty (30) days after the date on which written notice of such failure, requiring the Company to remedy the same, shall have been given to the Company by any holder of Debentures;

(j)     the failure on the part of the Company duly to observe or perform the covenants set forth in Section 4(o) of the Purchase Agreement;

(k)     failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of Indebtedness, other than Senior Indebtedness, in an amount in excess of $10,000,000, individually or in the aggregate, or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures; or

(l)     failure by the Company to make any payment when due and payable, including any applicable grace period, in respect of any of the Subordinated Notes,

then, and in each and every such case (other than an Event of Default specified in Section 7.1(g) or (h)), unless the principal of all of the Debentures shall have already become due and payable, the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding hereunder determined in accordance with Section 9.3, by notice in writing to the Company may declare the principal of and premium, if any, on all the Debentures and the interest accrued thereon to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Debentures contained to the contrary notwithstanding. If an Event of Default specified in Section 7.1(g) or (h) occurs and is continuing, the principal of all the Debentures and the interest accrued thereon shall be immediately due and payable. This provision, however, is subject to the conditions that if, at any time after the principal of the Debentures shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay a sum sufficient to pay all matured installments of interest upon all Debentures and the principal of, and premium, if any, on, any and all Debentures which shall have become due otherwise than by acceleration (with interest on overdue installments of interest (to the extent that payment of such interest is

9213905.13

PWSP 00505

enforceable under applicable law) and on such principal and premium, if any, at the rate borne by the Debentures, to the date of such payment or deposit) and the reasonable expenses, disbursements and advances reasonably incurred or made by any Debenture holder to enforce its rights under this Section 7.1 or any of the other provisions of this Indenture, then and in every such case the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding, by written notice to the Company, may waive all defaults or Events of Default and rescind and annul such declaration and its consequences; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon. The Company shall notify each Debenture holder, promptly upon becoming aware thereof, of any Event of Default. The Company shall also notify each Debenture holder, promptly upon becoming aware thereof, of any of the following: (i) any failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of Indebtedness in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency, (ii) any default by the Company or any Significant Subsidiary with respect to any Indebtedness, which default results in the acceleration of Indebtedness in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency, (iii) failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of Indebtedness, other than Senior Indebtedness, in an amount in excess of $10,000,000, individually or in the aggregate, or the equivalent thereof in any other currency or composite currency and (iv) failure by the Company to make any payment when due and payable, including any applicable grace period, in respect of the Subordinated Notes.

In case any Debenture holder shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of such waiver or rescission and annulment or for any other reason or shall have been determined adversely to such Debenture holder, then and in every such case the Company and the holders of Debentures shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company and the holders of Debentures shall continue as though no such proceeding had been instituted.

SECTION 7.2   Payments of Debentures on Default; Suit Therefor. The Company covenants that (a) in case default shall be made in the payment by the Company of any installment of interest upon any of the Debentures as and when the same shall become due and payable, and such default shall have continued for a period of thirty (30) days, or (b) in case default shall be made in the payment of the principal of or premium, if any, on any of the Debentures as and when the same shall have become due and payable, either at maturity or in connection with any redemption or repurchase, by declaration under this Indenture or otherwise, then, upon demand of holders of not less than a majority of the then outstanding principal amount of Debentures, the Company will pay to the holders of the Debentures, the whole amount that then shall have become due and payable on all such Debentures for principal and premium, if any, or interest, or both, as the case may be, with interest upon the overdue principal and premium, if any, and (to the extent that payment of such interest is enforceable under applicable law) upon the overdue installments of interest at the rate borne by the Debentures; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable expenses of the Debenture holders and a single counsel incurred by the Debenture holders hereunder. Until such demand by such holders, the Company may pay

9213905.13

-23-

the principal of (premium, if any) and interest on the Debentures to the registered holders, whether or not the Debentures are overdue.

In case the Company shall fail forthwith to pay such amounts upon such demand, each Debenture holder shall be entitled and empowered to institute any actions or proceedings at law or in equity for the collection of the sums so due and unpaid to such Debenture holder, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Company or any other obligor on the Debentures and collect in the manner provided by law out of the property of the Company or any other obligor on the Debentures wherever situated the monies adjudged or decreed to be payable.

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Debentures under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the case of any other judicial proceedings relative to the Company or such other obligor upon the Debentures, or to the creditors or property of the Company or such other obligor, each Debenture holder, irrespective of whether the principal of the Debentures shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether such Debenture holder shall have made any demand pursuant to the provisions of this Section 7.2, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal, premium, if any, and interest owing and unpaid in respect of such Debenture holder's Debentures, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of such Debenture holder allowed in such judicial proceedings relative to the Company or any other obligor on the Debentures, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, including the reasonable expenses and counsel fees referred to above. To the extent that such payment of reasonable expenses and fees out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property which the holders of the Debentures may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

All rights of action and of asserting claims under this Indenture, or under any of the Debentures, may be enforced by any Debenture holder without the possession of any of the Debentures or the production thereof at any trial or other proceeding relative thereto.

SECTION 7.3    Application of Monies Collected by Debenture Holders.  Any monies collected by any Debenture holder pursuant to this Article VII shall be applied in the order following, upon presentation of the Debenture(s) of such Debenture holder, and the notation thereon of the payment, if only partially paid, and upon surrender thereof, if fully paid:

First: Subject to the provisions of Article IV, in case the principal of the outstanding Debentures shall not have become due and be unpaid, to the payment of interest on

9213905.13

-24-

PWSP 00507

the Debentures in default in the order of the maturity of the installments of such interest, with interest upon the overdue installments of interest at the rate borne by the Debentures;

Second: Subject to the provisions of Article IV, in case the principal of the outstanding Debentures shall have become due, either at maturity or in connection with any redemption or repurchase, by declaration or otherwise, and be unpaid, to the payment of the whole amount then owing and unpaid upon the Debentures for principal and premium, if any, and interest, with interest on the overdue principal and premium, if any, and upon overdue installments of interest at the rate borne by the Debentures; and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Debentures, then to the payment of such principal and premium, if any, and interest without preference or priority of principal and premium, if any, over interest, or of interest over principal and premium, if any, or of any installment of interest over any other installment of interest, or of any Debenture over any other Debenture; and

Third: Subject to the provisions of Article IV, to the payment of the remainder, if any, to the Company or any other person lawfully entitled thereto.

SECTION 7.4    No Impairment. Notwithstanding any other provision of this Indenture and any provision of any Debenture, the right of any holder of any Debenture to receive payment of the principal of (and premium, if any) and interest on such Debenture, on or after the respective due dates expressed in such Debenture, or to institute suit for the enforcement of any such payment on or after such respective dates against the Company shall not be impaired or affected without the consent of such holder. Anything in this Indenture or the Debentures to the contrary notwithstanding, the holder of any Debenture, without the consent of any other holder of Debentures, in its own behalf and for its own benefit, may enforce, and may institute and maintain any proceeding suitable to enforce, its rights of conversion as provided herein.

SECTION 7.5    Remedies Cumulative and Continuing. All powers and remedies given by this Article VII to the Debenture holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the holders of the Debentures, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of any holder of any of the Debentures to exercise any right or power accruing upon any default or Event of Default occurring and continuing as aforesaid shall impair any such right or power, or shall be construed to be a waiver of any such default or any acquiescence therein; and, subject to the provisions of Section 7.4, every power and remedy given by this Article VII or by law to the Debenture holders may be exercised from time to time, and as often as shall be deemed expedient, by the Debenture holders.

SECTION 7.6    Undertaking to Pay Costs. All parties to this Indenture agree that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided that the provisions of this Section 7.6 shall not apply to any suit instituted by any Debenture holder, or group of

9213905.13

-25-

PWSP 00508

Debenture holders, holding in the aggregate more than 10% in principal amount of the Debentures at the time outstanding determined in accordance with Section 9.3, or to any suit instituted by any Debenture holder for the enforcement of the payment of the principal of (or premium, if any) or interest on any Debenture (including, but not limited to, the redemption price or repurchase price with respect to the Debentures being redeemed or repurchased as provided in this Indenture) on or after the due date expressed in such Debenture or to any suit for the enforcement of the right to convert any Debenture in accordance with the provisions of Article XIII.

> SECTION 7.7    Delay Or Omission Not Waiver. No delay or omission of any holder of any Debenture to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or any acquiescence therein. Every right and remedy given by this Article or by law to the holders of Debentures may be exercised from time to time, and as often as may be deemed expedient, by the holders of Debentures.

ARTICLE VIII

ACTIONS WITH RESPECT TO SUBORDINATED NOTES

> SECTION 8.1    Complete Restructuring. In connection with the first time, and only the first time, the Company, directly or indirectly, shall enter into agreement(s) to effectuate in any manner a modification to the terms of all, but not less than all, of the Subordinated Notes outstanding on the date of this Indenture (a "Complete Restructuring"), the Company shall (a) deliver written notice to each holder of Debentures (a "Complete Restructuring Notice") at the same time such notice is delivered to all holders of outstanding Subordinated Notes, but in no event prior to the public announcement of the Complete Restructuring, which shall state: (i) the date on which the Complete Restructuring is to be effective and (ii) all of the terms and conditions on which the Complete Restructuring is to be effected and (b) deliver a copy of all agreements, certificates, instruments and other documents to be entered into in connection with the Complete Restructuring. Contemporaneous with the effectiveness of the Complete Restructuring, the Company and each holder of Debentures shall execute and deliver to the others a supplemental indenture in accordance with Article X hereof (but without regard to the requirement of written consent of the holders of not less than a majority in aggregate principal amount of the Debentures at the time outstanding required by Section 9.1), which supplemental indenture shall provide for a modification of the terms of this Indenture and the Debentures to conform in all material respects with the modifications made to the 1996 Indenture and the Subordinated Notes, shall provide for the receipt by each holder of Debentures of a pro rata portion of any payments or other benefits given to the holders of the Subordinated Notes in connection with the Complete Restructuring at the same time such payments and/or benefits are paid or given to the holders of Subordinated Notes and shall provide for each holder of Debentures to have the continuing right after the Complete Restructuring to participate in all future full or partial restructurings of modifications or amendments to the Subordinated Notes (or such other securities, instruments and agreements issued or entered into in connection with the Complete Restructuring) on the same basis that the holders of Debentures are permitted to participate in Partial Restructurings under Section 8.2 hereof ; provided, however, that in no event shall any such supplemental indenture (x) provide for an extension of the Maturity Date

9213905.13

-26-

beyond the earlier of (A) 30 days prior to the maturity date of the Subordinated Notes, as the same may be extended and (B) September 1, 2005 or (y) result in a change or modification to Sections 4.1, 4.7 or 5.8 of the Indenture that would adversely affect in any way the rights and ranking of the Debentures.

SECTION 8.2    Partial Restructurings.  If at any time and from time to time after the date hereof, the Company, directly or indirectly, shall enter into agreement(s) to effectuate in any manner a modification to the terms of the outstanding Subordinated Notes, other than by way of a Complete Restructuring (each, a "Partial Restructuring"), the Company shall (i) deliver written notice to each holder of Debentures (a "Partial Restructuring Notice") at the same time such notice is delivered to all holders of outstanding Subordinated Notes participating in the Partial Restructuring but in no event prior to the public announcement of the Partial Restructuring, which shall state: (x) the date on which the Partial Restructuring is to be effective and (y) all of the terms and conditions on which the Partial Restructuring is to be effected and (ii) deliver a copy of all agreements, certificates, instruments and other documents to be entered into in connection with the Partial Restructuring. Each holder shall have the option, but not the obligation, to accept a modification of the terms of this Indenture (solely as to the portion of such holder's Debentures being modified) and the portion of such holder's Debentures that are being modified as determined below (if a modification to the form of Debenture is deemed appropriate by the Company and the affected holder(s) of Debentures) up to such holder's pro rata portion of its Debentures outstanding immediately prior to the effectiveness of the Partial Restructuring that is equal to the proportion of the original outstanding principal amount of Subordinated Notes that are restructured in the Partial Restructuring; provided, that if the Partial Restructuring will result in all of the original principal amount of Subordinated Notes being restructured, each holder of Debentures shall have the right, but not the obligation, to accept such a modification as aforesaid as to all or any portion of such holder's Debentures; in each case consistent in all material respects with the modifications made to the 1996 Indenture and the Subordinated Notes in the Partial Restructuring, at the same time that the Partial Restructuring is effected (the "Partial Restructuring Option"), including, without limitation, the right to receive a pro rata portion of any payments or other benefits given to the holders of the Subordinated Notes in connection with such Partial Restructuring at the same time such payments and/or benefits are paid or given to the holders of Subordinated Notes, by delivering to the Company a notice (the "Partial Restructuring Option Exercise Notice") to such effect within five (5) Business Days of the holder's receipt of the Partial Restructuring Notice. Contemporaneous with the effectiveness of any Partial Restructuring, the Company and the holder(s) delivering the Partial Restructuring Option Exercise Notice shall execute and deliver to each other a supplemental indenture in accordance with Article X hereof (but without regard to the requirement of written consent of the holders of not less than a majority in aggregate principal amount of the Debentures at the time outstanding required by Section 9.1), which supplemental indenture shall provide for a modification of the terms of this Indenture (solely as it relates to the portion of such holder's Debentures being restructured) and the pro rata portion of such holder's Debentures being restructured to conform in all material respects with the modifications made to the 1996 Indenture and the Subordinated Notes; provided, however, that in no event shall any such supplemental indenture (x) provide for an extension of the Maturity Date beyond the earlier of (A) 30 days prior to the maturity date of the Subordinated Notes, as the same may be extended and (B) September 1, 2005 or (y) result in a change or modification to Sections 4.1, 4.7 or 5.8 of the Indenture that would adversely affect in any way the rights and

9213905.13

-27-

PWSP 00510

ranking of the Debentures. Notwithstanding anything in this Section 8.2 to the contrary, if the Company engages in a Partial Restructuring (the Subordinated Notes so restructured being referred to herein as the "Restructured Notes"), then such holder shall have the right, but not the obligation, in connection with each subsequent Partial Restructuring of the Restructured Notes (or any other securities, instruments and agreements issued or entered into in connection with the Partial Restructuring) to participate in such subsequent Partial Restructuring up to its pro rata portion of outstanding principal amount of Debentures in accordance with the procedures set forth in this Section 8.2 and in connection with such subsequent participation such holder shall have the right in accordance with this Section 8.2 to accept all previous modifications made to the Restructured Notes (and any other securities, instruments and agreements issued or entered into in connection with all prior Partial Restructurings of the Restructured Notes) in all previous Partial Restructurings, whether or not such holder participated with respect to all or any portion of the outstanding principal amount of its Debentures in any such prior Partial Restructuring.

SECTION 8.3    Announcements Regarding Restructurings. The Company shall within one Business Day of the effectiveness of a Complete Restructuring and any Partial Restructuring pursuant to Sections 8.1 and 8.2 hereof file a Current Report on Form 8-K describing all material terms of each such transaction and filing as exhibits thereto each material agreement, instrument and supplemental indenture entered into in connection with such transaction.

ARTICLE IX

CONCERNING THE DEBENTURE HOLDERS

SECTION 9.1    Action by Debenture Holders. Whenever in this Indenture it is provided that the holders of a specified percentage in aggregate principal amount of the Debentures may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the holders of such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Debenture holders in person or by agent or proxy appointed in writing.

SECTION 9.2    Who are Deemed Absolute Owners. The Company may deem the person in whose name such Debenture shall be registered upon the Debenture register to be, and may treat such person as, the absolute owner of such Debenture (whether or not such Debenture shall be overdue and notwithstanding any notation of ownership or other writing thereon) for the purpose of receiving payment of or on account of the principal of, premium, if any, and interest on such Debenture, for conversion of such Debenture and for all other purposes; and the Company shall not be affected by any notice to the contrary. All such payments so made to any holder for the time being, or upon its order, shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for monies payable upon any such Debenture.

SECTION 9.3    Company-Owned Debentures Disregarded. In determining whether the holders of the requisite aggregate principal amount of Debentures have concurred in any direction, consent, waiver or other action under this Indenture, Debentures which are owned

PWSP 00511

by the Company or any other obligor on the Debentures or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any other obligor on the Debentures shall be disregarded and deemed not to be outstanding for the purpose of any such determination. Debentures so owned which have been pledged in good faith may be regarded as outstanding for the purposes of this Section 9.3 if the pledgee shall establish to the reasonable satisfaction of the Company the pledgee's right to vote such Debentures and that the pledgee is not the Company, any other obligor on the Debentures or a person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any such other obligor. .

SECTION 9.4    Revocation of Consents: Future Holders Bound. At any time prior to (but not after) the taking of any action by the holders of the percentage in aggregate principal amount of the Debentures specified in this Indenture in connection with such action, any holder of a Debenture which is shown by the evidence to be included in the Debentures holders of which have consented to such action may, by filing written notice with the Company revoke such action so far as concerns such Debenture. Except as aforesaid, any such action taken by the holder of any Debenture shall be conclusive and binding upon such holder and upon all future holders and owners of such Debenture and of any Debentures issued in exchange or substitution therefor, irrespective of whether any notation in regard thereto is made upon such Debenture or any Debenture issued in exchange or substitution therefor.

ARTICLE X

SUPPLEMENTAL INDENTURES

SECTION 10.1    Supplemental Indentures. With the consent (evidenced as provided in Article IX) of the holders of not less than a majority in aggregate principal amount of the Debentures at the time outstanding (determined in accordance with Section 9.3), the Company, when authorized by the resolutions of the Board of Directors, and such holders may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the holders of the Debentures; provided, however, that no such supplemental indenture shall (i) extend the fixed maturity of any Debenture, or reduce the rate or extend the time of payment of interest thereon, or reduce the principal amount thereof or premium, if any, thereon, or reduce any amount payable on redemption or repurchase thereof, impair, or change in any respect adverse to the holder of Debentures, the obligation of the Company to repurchase any Debenture at the option of the holder upon the happening of a Designated Event, or impair or adversely affect the right of any Debenture holder to institute suit for the payment thereof, or make the principal thereof, or interest or premium, if any, thereon, payable in any coin or currency other than that provided in the Debentures, or change or impair the right to convert the Debentures into Common Stock subject to the terms set forth herein, including Section 13.6, or modify the provisions of this Indenture with respect to the subordination of the Debentures in a manner adverse to the Debenture holders, without the consent of the holder of each Debenture so affected, or (ii) reduce the aforesaid percentage of Debentures, the holders of which are required

9213905.13

-29-

PWSP 00512

to consent to any such supplemental indenture, without the consent of the holders of all Debentures then outstanding.

Upon the request of the Company, accompanied by a copy of the resolutions of the Board of Directors certified by its Secretary or Assistant Secretary authorizing the execution of any such supplemental indenture, the consenting holders shall join with the Company in the execution of such supplemental indenture and the Company shall promptly after the execution thereof deliver a fully executed copy of such supplemental indenture to each Debenture holder.

SECTION 10.2    Effect of Supplemental Indentures.  Upon the execution of any supplemental indenture pursuant to the provisions of this Article X, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Company and the holders of Debentures shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

ARTICLE XI

CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

SECTION 11.1    Company May Consolidate, Etc. on Certain Terms.  Subject to the provisions of Section 11.2, nothing contained in this Indenture or in any of the Debentures shall prevent any consolidation or merger of the Company with or into any other corporation or corporations (whether or not affiliated with the Company), or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale, conveyance or lease (or successive sales, conveyances or leases) of all or substantially all of the property of the Company, to any other corporation (whether or not affiliated with the Company), authorized to acquire and operate the same and which shall be organized under the laws of the United States of America, any state thereof or the District of Columbia; provided, however, and the Company hereby covenants and agrees, that (i) upon any such consolidation with, merger into, or sale, conveyance or lease to another corporation, the due and punctual payment of the principal of, and premium, if any, and interest on, all of the Debentures, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Company, shall be expressly assumed, by supplemental indenture satisfactory in form to the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding, executed and delivered to each Debenture holder by the corporation (if other than the Company) formed by such consolidation, or into which the Company shall have been merged, or by the corporation which shall have acquired or leased such property, (ii) such supplemental indenture shall provide for the applicable conversion rights set forth in Section 13.6 and the repurchase rights set forth in Article XIV; and (iii) the said consolidation, merger, sale, conveyance or lease shall not result in the occurrence of an Event of Default or, after notice or lapse of time result in an Event of Default.

9213905.13

-30-

PWSP 00513

SECTION 11.2    <u>Successor Corporation to be Substituted</u>.  In case of any such consolidation with, merger into, or sale, conveyance or lease to another corporation in accordance with Section 11.1 and upon the assumption by the successor corporation, by supplemental indenture, executed and delivered to each Debenture holder and satisfactory in form to the holders of not less than a majority in aggregate principal amount of the Debentures then outstanding, of the due and punctual payment of the principal of, and premium, if any, and interest on, all of the Debentures and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such successor corporation shall succeed to and be substituted for the Company, with the same effect as if it had been named herein as the party of the first part.  Such successor corporation thereupon may cause to be signed, and may issue either in its own name or in the name of SONICblue Incorporated any or all of the Debentures issuable hereunder which theretofore shall not have been signed by the Company and delivered to each Debenture holder; and, upon the order of such successor corporation instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Company shall deliver any Debentures which previously shall have been signed and delivered by the officers of the Company to the Debenture holder and any Debentures which such successor corporation thereafter shall cause to be signed and delivered to the Debenture holder for that purpose.  All the Debentures so issued shall in all respects have the same legal rank and benefit under this Indenture as the Debentures theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Debentures had been issued at the date of the execution hereof.  In the event of any such consolidation, merger, sale, conveyance or lease, the person named as the "Company" in the first paragraph of this Indenture or any successor which shall thereafter have become such in the manner prescribed in this Article XI may be dissolved, wound up and liquidated at any time thereafter and such person shall be released from its liabilities as obligor and maker of the Debentures and from its obligations under this Indenture.

In case of any such consolidation, merger, sale, conveyance or lease, such changes in phraseology and form (but not in substance) may be made in the Debentures thereafter to be issued as may be appropriate.

SECTION 11.3    <u>Opinion of Counsel to be Given Debenture Holders</u>.  Each Debenture holder shall receive an Officers' Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance or lease and any such assumption complies with the provisions of this Article XI.

## ARTICLE XII

## IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

SECTION 12.1    <u>Indenture and Debentures Solely Corporate Obligations</u>.  No recourse for the payment of the principal of (or premium, if any) or interest on any Debenture, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Debenture, or because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, officer or director

9213905.13

PWSP 00514

or subsidiary, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Debentures.

ARTICLE XIII

CONVERSION OF DEBENTURES

SECTION 13.1    <u>Right To Convert</u>.  Subject to and upon compliance with the provisions of this Indenture, the holder of any Debenture shall have the right, at its option, at any time prior to the close of business on the Maturity Date (except that, with respect to any Debenture or portion of a Debenture which shall be called for redemption, such right shall terminate, except as provided in Section 3.2 and the fourth paragraph of Section 13.2, at the close of business on the third Business Day prior to the date fixed for redemption of such Debenture or portion of a Debenture unless the Company shall default in payment due upon redemption thereof) to convert the principal amount of any such Debenture, or any portion of such principal amount which is $1,000 or an integral multiple thereof, into that number of fully paid and non-assessable shares of Common Stock (as such shares shall then be constituted) obtained by dividing the principal amount of the Debenture or portion thereof surrendered for conversion by the Conversion Price in effect at such time, by surrender of the Debenture so to be converted in whole or in part in the manner provided in Section 13.2.  A holder of Debentures is not entitled to any rights of a holder of Common Stock until such holder has converted its Debentures to Common Stock, and only to the extent such Debentures are deemed to have been converted to Common Stock under this Article XIII.

SECTION 13.2    <u>Exercise of Conversion Privilege; Issuance of Common Stock on Conversion; No Adjustment for Interest or Dividends</u>.  In order to exercise the conversion privilege with respect to any Debenture, the holder of any such Debenture to be converted in whole or in part shall surrender such Debenture, duly endorsed, to the Company in accordance with Section 15.3, accompanied by the funds, if any, required by the final paragraph of this Section 13.2, and shall give written notice of conversion in the form provided on the Debentures (or such other notice which is acceptable to the Company) to the office or agency that the holder elects to convert such Debenture or such portion thereof specified in said notice.  Such notice shall also state the name or names (with address) in which the certificate or certificates for shares of Common Stock which shall be issuable on such conversion shall be issued, and shall be accompanied by transfer taxes, if required pursuant to Section 13.7.  Each such Debenture surrendered for conversion shall, unless the shares issuable on conversion are to be issued in the same name as the registration of such Debenture, be duly endorsed by, or be accompanied by instruments of transfer in form satisfactory to the Company duly executed by, the holder or its duly authorized attorney.

As promptly as practicable after satisfaction of the requirements for conversion set forth above, subject to compliance with any restrictions on transfer if shares issuable on conversion are to be issued in a name other than that of the Debenture holder (as if such transfer

9213905.13

-32-

were a transfer of the Debenture or Debentures (or portion thereof) so converted), the Company shall issue and shall deliver to such holder in accordance with Section 15.3 hereof, a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such Debenture or portion thereof in accordance with the provisions of this Article and a check or cash in respect of any fractional interest in respect of a share of Common Stock arising upon such conversion, as provided in Section 13.3. In case any Debenture of a denomination greater than $1,000 shall be surrendered for partial conversion, and subject to Section 2.3, the Company shall execute and deliver to the holder of the Debenture so surrendered, without charge to such holder, a new Debenture or Debentures in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Debenture.

Each conversion shall be deemed to have been effected as to any such Debenture (or portion thereof) on the date on which the requirements set forth above in this Section 13.2 have been satisfied as to such Debenture (or portion thereof), and the person in whose name any certificate or certificates for shares of Common Stock shall be issuable upon such conversion shall be deemed to have become on said date the holder of record of the shares represented thereby; provided, however, that any such surrender on any date when the stock transfer books of the Company shall be closed shall constitute the person in whose name the certificates are to be issued as the record holder thereof for all purposes on the next succeeding day on which such stock transfer books are open, but such conversion shall be at the Conversion Price in effect on the date upon which such Debenture shall be surrendered.

Any Debenture or portion thereof surrendered for conversion during the period from the close of business on the record date for any interest payment date through the close of business on the Business Day next preceding such interest payment date shall (unless such Debenture or portion thereof being converted shall have been called for redemption during the period from the close of business on such record date to the close of business on the Business Day next preceding such interest payment date) be accompanied by payment, in New York Clearing House funds or other funds acceptable to the Company, of an amount equal to the interest otherwise payable on such interest payment date on the principal amount being converted; provided, however, that no such payment need be made if there shall exist at the time of conversion a default in the payment of interest on the Debentures. An amount equal to such payment shall be paid by the Company on such interest payment date to the holder of such Debenture at the close of business on such record date; provided, however, that if the Company shall default in the payment of interest on such interest payment date, such amount shall be paid to the person who made such required payment. Except as provided above in this Section 13.2, no adjustment shall be made for interest accrued on any Debenture converted or for dividends on any shares issued upon the conversion of such Debenture as provided in this Article.

SECTION 13.3    Cash Payments in Lieu of Fractional Shares. No fractional shares of Common Stock or scrip representing fractional shares shall be issued upon conversion of Debentures. If more than one Debenture shall be surrendered for conversion at one time by the same holder, the number of full shares which shall be issuable upon conversion shall be computed on the basis of the aggregate principal amount of the Debentures (or specified portions thereof to the extent permitted hereby) so surrendered for conversion. If any fractional share of stock otherwise would be issuable upon the conversion of any Debenture or Debentures, the Company shall make an adjustment therefor in cash at the current market value thereof to the

PWSP 00516

holder of Debentures. For these purposes, the current market value of a share of Common Stock shall be the Closing Price on the first Trading Day immediately preceding the day on which the Debentures (or specified portions thereof) are deemed to have been converted and such Closing Price shall be determined as provided in Section 13.5(g).

SECTION 13.4   Conversion Price. The conversion price shall be as specified in the form of Debenture (herein called the "Conversion Price") attached as Exhibit A hereto, subject to adjustment as provided in this Article XIII.

SECTION 13.5   Adjustment of Conversion Price. The Conversion Price shall be adjusted from time to time by the Company as follows:

(a)   In case the Company shall hereafter pay a dividend or make a distribution to all holders of the outstanding Common Stock in shares of Common Stock, the Conversion Price in effect at the opening of business on the date following the date fixed for the determination of stockholders entitled to receive such dividend or other distribution shall be reduced by multiplying such Conversion Price by a fraction of which the numerator shall be the number of shares of Common Stock outstanding at the close of business on the Record Date (as defined in Section 13.5(g)) fixed for such determination and the denominator shall be the sum of such number of shares and the total number of shares constituting such dividend or other distribution, such reduction to become effective immediately after the opening of business on the day following the Record Date. If any dividend or distribution of the type described in this Section 13.5(a) is declared but not so paid or made, the Conversion Price shall again be adjusted to the Conversion Price which would then be in effect if such dividend or distribution had not been declared.

(b)   In case the Company shall issue rights or warrants to all holders of its outstanding shares of Common Stock entitling them (for a period expiring within forty-five (45) days after the date fixed for the determination of stockholders entitled to receive such rights or warrants) to subscribe for or purchase shares of Common Stock at a price per share less than the Current Market Price (as defined in Section 13.5(g)) on the Record Date fixed for the determination of stockholders entitled to receive such rights or warrants, the Conversion Price shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Price in effect at the opening of business on the date after such Record Date by a fraction of which the numerator shall be the number of shares of Common Stock outstanding at the close of business on the Record Date plus the number of shares which the aggregate offering price of the total number of shares so offered would purchase at such Current Market Price, and of which the denominator shall be the number of shares of Common Stock outstanding on the close of business on the Record Date plus the total number of additional shares of Common Stock so offered for subscription or purchase. Such adjustment shall become effective immediately after the opening of business on the day following the Record Date fixed for determination of stockholders entitled to receive such rights or warrants. To the extent that shares of Common Stock are not delivered pursuant to such rights or warrants, upon the expiration or termination of such rights or warrants the Conversion Price shall be readjusted to the Conversion Price which would then be in effect had the adjustments made upon the issuance of such rights or warrants been made on the basis of delivery of only the number of shares of Common Stock actually delivered. In the event that such rights or warrants are not so issued, the Conversion Price shall

9213905.13

-34-

PWSP 00517

again be adjusted to be the Conversion Price which would then be in effect if such date fixed for the determination of stockholders entitled to receive such rights or warrants had not been fixed. In determining whether any rights or warrants entitle the holders to subscribe for or purchase shares of Common Stock at less than such Current Market Price, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, the value of such consideration if other than cash, to be determined by the Board of Directors.

(c)    In case the outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such subdivision becomes effective shall be proportionately reduced, and conversely, in case outstanding shares of Common Stock shall be combined into a smaller number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately increased, such reduction or increase, as the case may be, to become effective immediately after the opening of business on the day following the day upon which such subdivision or combination becomes effective.

(d)    In case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock shares of any class of capital stock of the Company (other than any dividends or distributions to which Section 13.5(a) applies) or evidences of its indebtedness, cash or other assets (including securities, but excluding (1) any rights or warrants referred to in Section 13.5(b), (2) dividends and distributions paid exclusively in cash and (3) any capital stock, evidences of indebtedness, cash or assets distributed upon a merger or consolidation to which Section 13.6 applies) (the foregoing hereinafter in this Section 13.5(d) called the "Securities")) (unless the Company elects to reserve such Securities for distribution to the Debenture holders upon conversion of the Debentures so that any such holder converting Debentures will receive upon such conversion, in addition to the shares of Common Stock to which such holder is entitled, the amount and kind of such Securities which such holder would have received if such holder had converted its Debentures into Common Stock immediately prior to the Record Date (as defined in Section 13.5(g) for such distribution of the Securities)), then, in each such case, the Conversion Price shall be reduced so that the same shall be equal to the price determined by multiplying the Conversion Price in effect immediately prior to the close of business on the Record Date with respect to such distribution by a fraction of which the numerator shall be the Current Market Price (determined as provided in Section 13.5(g)) on such date less the fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) on such date of the portion of the Securities so distributed applicable to one share of Common Stock and the denominator shall be such Current Market Price, such reduction to become effective immediately prior to the opening of business on the day following the Record Date; provided, however, that in the event the then fair market value (as so determined) of the portion of the Securities so distributed applicable to one share of Common Stock is equal to or greater than the Current Market Price on the Record Date, in lieu of the foregoing adjustment, adequate provision shall be made so that each Debenture holder shall have the right to receive upon conversion of a Debenture (or any portion thereof) the amount of Securities such holder would have received had such holder converted such Debenture (or portion thereof) immediately prior to such Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted

PWSP 00518

to be the Conversion Price which would then be in effect if such dividend or distribution had not been declared. If the Board of Directors determines the fair market value of any distribution for purposes of this Section 13.5(d) by reference to the actual or when issued trading market for any securities comprising all or part of such distribution, it must in doing so consider the prices in such market over the same period (the "Reference Period") used in computing the Current Market Price pursuant to Section 13.5(g) to the extent possible, unless the Board of Directors in a board resolution determines in good faith that determining the fair market value during the Reference Period would not be in the best interest of the Debenture holder.

Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's capital stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events ("Trigger Event"): (i) are deemed to be transferred with such shares of Common Stock; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of Common Stock, shall be deemed not to have been distributed for purposes of this Section 13.5(d) (and no adjustment to the Conversion Price under this Section 13.5(d) will be required) until the occurrence of the earliest Trigger Event. If such right or warrant is subject to subsequent events, upon the occurrence of which such right or warrant shall become exercisable to purchase different securities, evidences of indebtedness or other assets or entitle the holder to purchase a different number or amount of the foregoing or to purchase any of the foregoing at a different purchase price, then the occurrence of each such event shall be deemed to be the date of issuance and record date with respect to a new right or warrant (and a termination or expiration of the existing right or warrant without exercise by the holder thereof). In addition, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in the preceding sentence) with respect thereto, that resulted in an adjustment to the Conversion Price under this Section 13.5(d), (1) in the case of any such rights or warrants which shall all have been redeemed or repurchased without exercise by any holders thereof, the Conversion Price shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase price received by a holder of Common Stock with respect to such rights or warrant, (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase, and (2) in the case of such rights or warrants all of which shall have expired or been terminated without exercise, the Conversion Price shall be readjusted as if such rights and warrants had never been issued.

For purposes of this Section 13.5(d) and Sections 13.5(a) and (b), any dividend or distribution to which this Section 13.5(d) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock to which Section 13.5(b) applies (or both), shall be deemed instead to be (1) a dividend or distribution of the evidences of indebtedness, assets, shares of capital stock, rights or warrants other than such shares of Common Stock or rights or warrants to which Section 13.5(b) applies (and any Conversion Price reduction required by this Section 13.5(d) with respect to such dividend or distribution shall then be made) immediately followed by (2) a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Conversion Price reduction required by Sections 13.5(a) and (b) with respect to such dividend or distribution shall then be made, except (A) the Record Date of such dividend or distribution shall be substituted as "the

9213905.13

-36-

date fixed for the determination of stockholders entitled to receive such dividend or other distribution", "Record Date fixed for such determinations" and "Record Date" within the meaning of Section 13.5(a) and as "the date fixed for the determination of stockholders entitled to receive such rights or warrants", "the Record Date fixed for the determination of the stockholders entitled to receive such rights or warrants" and "such Record Date" within the meaning of Section 13.5(b) and (B) any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the close of business on the date fixed for such determination" within the meaning of Section 13.5(a).

(e)    In case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock cash (excluding any cash that is distributed upon a merger or consolidation to which Section 13.6 applies or as part of a distribution referred to in Section 13.5(d)), in an aggregate amount that, combined together with (1) the aggregate amount of any other such distributions to all holders of Common Stock made exclusively in cash within the twelve (12) months preceding the date of payment of such distribution, and in respect of which no adjustment pursuant to this Section 13.5(e) has been made, and (2) the aggregate of any cash plus the fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) of consideration payable in respect of any tender offer by the Company or any of its subsidiaries for all or any portion of the Common Stock concluded within the twelve (12) months preceding the date of payment of such distribution, and in respect of which no adjustment pursuant to Section 13.5(f) has been made, exceeds 10.0% of the product of the Current Market Price (determined as provided in Section 13.5(g)) on the Record Date with respect to such distribution times the number of shares of Common Stock outstanding on such date, then and in each such case, immediately after the close of business on such date. The Conversion Price shall be reduced so that the same shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the close of business on such Record Date by a fraction (i) the numerator of which shall be equal to the Current Market Price on the Record Date less an amount equal to the quotient of (x) the excess of such combined amount over such 10.0% and (y) the number of shares of Common Stock outstanding on the Record Date and (ii) the denominator of which shall be equal to the Current Market Price on such date, provided, however, that in the event the portion of the cash so distributed applicable to one share of Common Stock is equal to or greater than the Current Market Price of the Common Stock on the Record Date, in lieu of the foregoing adjustment, adequate provision shall be made so that each Debenture holder shall have the right to receive upon conversion of a Debenture (or any portion thereof) the amount of cash such holder would have received had such holder converted such Debenture (or portion thereof) immediately prior to such Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not been declared. Any cash distribution to all holders of Debentures as to which the Company makes the election permitted by Section 13.5(m) and as to which the Company has complied with the requirements of such Section shall be treated as not having been made for all purposes of this Section 13.5(e).

(f)    In case a tender offer made by the Company or any of its subsidiaries for all or any portion of the Common Stock shall expire and such tender offer (as amended upon the expiration thereof) shall require the payment to stockholders (based on the acceptance (up to any maximum specified in the terms of the tender offer) of Purchased Shares

9213905.13

-37-

(as defined below)) of an aggregate consideration having a fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) that combined together with (1) the aggregate of the cash plus the fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution), as of the expiration of such tender offer, of consideration payable in respect of any other tender offers, by the Company or any of its subsidiaries for all or any portion of the Common Stock expiring within the twelve (12) months preceding the expiration of such tender offer and in respect of which no adjustment pursuant to this Section 13.5(f) has been made and (2) the aggregate amount of any distributions to all holders of the Company's Common Stock made exclusively in cash within twelve (12) months preceding the expiration of such tender offer and in respect of which no adjustment pursuant to Section 13.5(e) has been made, exceeds 10.0% of the product of the Current Market Price (determined as provided in Section 13.5(g)) as of the last time (the "Expiration Time") tenders could have been made pursuant to such tender offer (as it may be amended) times the number of shares of Common Stock outstanding (including any tendered shares) on the Expiration Time, then, and in each such case, immediately prior to the opening of business on the day after the date of the Expiration Time, the Conversion Price shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Price in effect immediately prior to close of business on the date of the Expiration Time by a fraction of which the numerator shall be the number of shares of Common Stock outstanding (including any tendered shares) on the Expiration Time multiplied by the Current Market Price of the Common Stock on the Trading Day next succeeding the Expiration Time and the denominator shall be the sum of (x) the fair market value (determined as aforesaid) of the aggregate consideration payable to stockholders based on the acceptance (up to any maximum specified in the terms of the tender offer) of all shares validly tendered and not withdrawn as of the Expiration Time (the shares deemed so accepted, up to any such maximum, being referred to as the "Purchased Shares") and (y) the product of the number of shares of Common Stock outstanding (less any Purchased Shares) on the Expiration Time and the Current Market Price of the Common Stock on the Trading Day next succeeding the Expiration Time, such reduction (if any) to become effective immediately prior to the opening of business on the day following the Expiration Time. In the event that the Company is obligated to purchase shares pursuant to any such tender offer, but the Company is permanently prevented by applicable law from effecting any such purchases or all such purchases are rescinded, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such tender offer had not been made. If the application of this Section 13.5(f) to any tender offer would result in an increase in the Conversion Price, no adjustment shall be made for such tender offer under this Section 13.5(f). Any cash distribution to all holders of Debentures as to which the Company makes the election permitted by Section 13.5(m) and as to which the Company has complied with the requirements of such Section shall be treated as not having been made for all purposes of this Section 13.5(e).

(g)    For purposes of this Section 13.5, the following terms shall have the meaning indicated:

(1)    "Closing Price" with respect to any securities on any day shall mean the closing sale price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in each case on the Nasdaq National Market or New York Stock

9213905.13

-38-

Exchange, as applicable, or, if such security is not listed or admitted to trading on such National Market or Exchange, on the principal national security exchange or quotation system on which such security is listed or quoted or admitted to trading, or, if not listed or quoted or admitted to trading on any national securities exchange or quotation system, the average of the closing bid and asked prices of such security on the over-the-counter market on the day in question as reported by the National Quotation Bureau Incorporated, or a similar generally accepted reporting service, or if not so available, in such manner as furnished by any New York Stock Exchange member firm selected from time to time by the Board of Directors for that purpose, or a price determined in good faith by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution.

(2)    "Current Market Price" shall mean the average of the daily Closing Prices per share of Common Stock for the ten (10) consecutive Trading Days immediately prior to the date in question; provided, however, that (1) if the "ex" date (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 13.5(a), (b), (c), (d), (e) or (f) occurs during such ten (10) consecutive Trading Days, the Closing Price for each Trading Day prior to the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the same fraction by which the Conversion Price is so required to be adjusted as a result of such other event, (2) if the "ex" date for any event (other than the issuance or distribution requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 13.5(a), (b), (c), (d), (e) or (f) occurs on or after the "ex" date for the issuance or distribution requiring such computation and prior to the day in question, the Closing Price for each Trading Day on and after the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the reciprocal of the fraction by which the Conversion Price is so required to be adjusted as a result of such other event, and (3) if the "ex" date for the issuance, distribution requiring such computation is prior to the day in question, after taking into account any adjustment required pursuant to clause (1) or (2) of this proviso, the Closing Price for each Trading Day on or after such "ex" date shall be adjusted by adding thereto the amount of any cash and the fair market value (as determined by the Board of Directors in a manner consistent with any determination of such value for purposes of Section 13.5(d) or (f), whose determination shall be conclusive and described in a Board Resolution) of the evidences of indebtedness, shares of capital stock or assets being distributed applicable to one share of Common Stock as of the close of business on the day before such "ex" date. For purposes of any computation under Section 13.5(f), the Current Market Price of the Common Stock on any date shall be deemed to be the average of the daily Closing Prices per share of Common Stock for such day and the next two succeeding Trading Days; provided, however, that if the "ex" date for any event (other than the tender offer requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 13.5(a), (b), (c), (d), (e) or (f) occurs on or after the Expiration Time for the tender or exchange offer requiring such computation and prior to the

PWSP 00522

day in question, the Closing Price for each Trading Day on and after the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the reciprocal of the fraction by which the Conversion Price is so required to be adjusted as a result of such other event. For purposes of this paragraph, the term "ex" date, (1) when used with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution, (2) when used with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective, and (3) when used with respect to any tender or exchange offer means the first date on which the Common Stock trades regular way on such exchange or in such market after the Expiration Time of such offer. Notwithstanding the foregoing, whenever successive adjustments to the Conversion Price are called for pursuant to this Section 13.5, such adjustments shall be made to the Current Market Price as may be necessary or appropriate to effectuate the intent of this Section 13.5 and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

(3)    "fair market value" shall mean the amount which a willing buyer would pay a willing seller in an arm's length transaction.

(4)    "Record Date" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of stockholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

(5)    "Trading Day" shall mean (x) if the applicable security is listed or admitted for trading on the New York Stock Exchange or another national security exchange, a day on which the New York Stock Exchange or another national security exchange is open for business or (y) if the applicable security is quoted on the Nasdaq National Market, a day on which trades may be made thereon or (z) if the applicable security is not so listed, admitted for trading or quoted, any day other than a Saturday or Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

(h)    The Company may make such reductions in the Conversion Price, in addition to those required by Sections 13.5(a), (b), (c), (d), (e) or (f), as the Board of Directors considers to be advisable to avoid or diminish any income tax to holders of Common Stock or rights to purchase Common stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

9213905.13

-40-

To the extent permitted by applicable law, the Company from time to time may reduce the Conversion Price by any amount for any period of time if the period is at least twenty (20) days, the reduction is irrevocable during the period and the Board of Directors shall have made a determination that such reduction would be in the best interests of the Company, which determination shall be conclusive and described in a Board Resolution. Whenever the Conversion Price is reduced pursuant to the preceding sentence, the Company shall deliver to the holder of each Debenture at its last address appearing on the Debenture register provided for in Section 2.5 a notice of the reduction at least fifteen (15) days prior to the date the reduced Conversion Price takes effect, and such notice shall state the reduced Conversion Price and the period during which it will be in effect.

(i)    No adjustment in the Conversion Price shall be required unless such adjustment would require a decrease of at least 1% in such price; provided, however, that any adjustments which by reason of this Section 13.5(i) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Article XIII shall be made by the Company and shall be made to the nearest cent or to the nearest one hundredth of a share, as the case may be. No adjustment need be made for a change in the par value or no par value of the Common Stock.

(j)    Whenever the Conversion Price is adjusted as herein provided, the Company shall promptly deliver to each Debenture holder an Officers' Certificate setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Price setting forth the adjusted Conversion Price and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Conversion Price to the holder of each Debenture in accordance with Section 15.3, within twenty (20) days of the effective date of such adjustment. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(k)    In any case in which this Section 13.5 provides that an adjustment shall become effective immediately after a Record Date for an event, the Company may defer until the occurrence of such event (i) issuing to the holder of any Debenture converted after such Record Date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion by reason of the adjustment required by such event over and above the Common Stock issuable upon such conversion before giving effect to such adjustment and (ii) paying to such holder any amount in cash in lieu of any fraction pursuant to Section 13.3.

(l)    For purposes of this Section 13.5, the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock. The Company will not pay any dividend or make any distribution on shares of Common Stock held in the treasury of the Company.

(m)    In lieu of making any adjustment to the Conversion Price pursuant to Section 13.5(e), the Company may elect to pay to each holder of the Debentures within five (5) Business Days of the effective date of such adjustment the full amount of cash which such holder would have received if such holder had, immediately prior to the Record Date for such

9213905.13

-41-

PWSP 00524

distribution of cash, converted its Debentures into Common Stock. The Company may make such election by providing written notice to each holder of Debentures to such effect on or prior to the payment date for any such cash payment, which notice shall state the amount of cash per $1,000 principal amount of Debentures such holders shall be entitled to receive on the date of such payment. The Company agrees that if it elects to make any adjustment to the Conversion Price through the reservation and payment of cash to holders of Subordinated Notes pursuant to Section 15.5(m) of the 1996 Indenture that it shall make the same election with respect to the payment of cash to the holders of Debentures under this Section 13.5(m).

SECTION 13.6    Effect of Reclassification, Consolidation, Merger or Sale. If any of the following events occur, namely (i) any reclassification or change of the outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination), (ii) any consolidation, merger or combination of the Company with another corporation as a result of which holders of Common Stock shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock or (iii) any sale or conveyance of the properties and assets of the Company as, or substantially as, an entirety to any other corporation as a result of which holders of Common Stock shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock, then the Company or the successor or purchasing corporation, as the case may be, shall execute with the each holder a supplemental indenture in a form reasonably acceptable to holders of not less than a majority of the aggregate principal amount of Debentures then outstanding providing that such Debenture shall be convertible into the kind and amount of shares of stock and other securities or property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, combination, sale or conveyance by a holder of a number of shares of Common Stock issuable upon conversion of such Debentures (assuming, for such purposes, a sufficient number of authorized shares of Common Stock available to convert all such Debentures) immediately prior to such reclassification, change, consolidation, merger, combination, sale or conveyance assuming such holder of Common Stock did not exercise its rights of election, if any, as to the kind or amount of securities, cash or other property receivable upon such consolidation, merger, statutory exchange, sale or conveyance (provided that, if the kind or amount of securities, cash or other property receivable upon such consolidation, merger, statutory exchange, sale or conveyance is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("non-electing shares"), then for the purposes of this Section 13.6 the kind and amount of securities, cash or other property receivable upon such consolidation, merger, statutory exchange, sale or conveyance for each non-electing share shall be deemed to be the kind and amount so receivable per share by a plurality of the non-electing shares). Such supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article. If, in the case of any such reclassification, change, consolidation, merger, combination, sale or conveyance, the stock or other securities and assets receivable thereupon by a holder of shares of Common Stock includes shares of stock or other securities and assets of a corporation other than the successor or purchasing corporation, as the case may be, in such reclassification, change, consolidation, merger, combination, sale or conveyance, then such supplemental indenture shall also be executed by such other corporation and shall contain such additional provisions to protect the interests of the holders of the Debentures as the Board of Directors shall

PWSP 00525

reasonably consider necessary by reason of the foregoing, including to the extent practicable the provisions providing for the repurchase rights set forth in Article XIV herein.

The above provisions of this Section shall similarly apply to successive reclassifications, changes, consolidations, mergers, combinations, sales and conveyances.

If this Section 13.6 applies to any event or occurrence, Section 13.5 shall not apply.

SECTION 13.7    Taxes on Shares Issued.  The issue of stock certificates on conversions of Debentures shall be made without charge to the converting Debenture holder for any tax in respect of the issue thereof.  The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of stock in any name other than that of the holder of any Debenture converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

SECTION 13.8    Reservation of Shares: Shares to be Fully Paid; Listing of Common Stock.  The Company shall provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, sufficient shares to provide for the conversion of the Debentures from time to time as such Debentures are presented for conversion.

Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value, if any, of the shares of Common Stock issuable upon conversion of the Debentures, the Company will take all corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue shares of such Common Stock at such adjusted Conversion Price.

The Company covenants that all shares of Common Stock issued upon conversion of Debentures will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

The Company covenants that it shall promptly secure the listing of all of the shares of Common Stock issuable upon conversion of the Debentures upon each national securities exchange and automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and shall maintain, so long as any other shares of Common Stock shall be so listed, such listing of all shares of Common Stock issuable upon conversion of the Debentures from time to time issuable under the terms of the Debentures and this Indenture.

SECTION 13.9    Notice To Holders Prior To Certain Actions.  In case:

(a)    the Company shall declare a dividend (or any other distribution) on its Common Stock (that would require an adjustment in the Conversion Price pursuant to Section 13.5); or

9213905.13

-43-

(b)     the Company shall authorize the granting to all or substantially all of the holders of record of its Common Stock of rights or warrants to subscribe for or purchase any share of any class or any other rights or warrants; or

(c)     of any reclassification of the Common Stock of the Company (other than a subdivision or combination of its outstanding Common Stock, or a change in par value, or from par value to no par value, or from no par value to par value), or of any consolidation or merger to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

(d)     of the voluntary or involuntary dissolution, liquidation or winding-up of the Company; the Company shall deliver to each holder of Debentures in accordance with Section 15.3 hereof, as promptly as possible but in any event at least fifteen days prior to the applicable date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights or warrants, or, if a record is not to be taken, the date as of which the holders of Common Stock of record are to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.

ARTICLE XIV

REPURCHASE UPON A DESIGNATED EVENT

SECTION 14.1     Repurchase Right.

(a)     If, at any time prior to the Maturity Date there shall occur a Designated Event, then each Debenture holder shall have the right, at such holder's option, but subject to the provisions of Section 14.2, to require the Company to repurchase all of such holder's Debentures, or any portion thereof (in principal amounts of $1,000 or integral multiples thereof), on the repurchase date fixed by the Company that is not less than 30 days nor more than 45 days after the date of the Company Notice (as defined in Section 14.3 below) of such Designated Event (or, if such 45th day is not a Business Day, the next succeeding Business Day). The repurchase price shall be equal to 100% of the principal amount of Debentures, together with accrued interest, if any, to, but excluding, the repurchase date (the "Repurchase Price"); provided that if such repurchase date is March 1 or September 1, then the interest payable on such date shall be paid to the holder of record of the Debenture on the next preceding February 15 or August 15, respectively.  At the option of any holder of Debentures exercising its right to repurchase its Debentures pursuant to this Section 14.1(a) upon a Designated Event, such holder's Debentures may not be repurchased if there has occurred and is continuing an Event of Default, other than a default in the payment of the Repurchase Price with respect to such

9213905.13

-44-

PWSP 00527

Debentures on the repurchase date. At the option of the Company, the Repurchase Price may be paid in cash or, subject to the fulfillment by the Company of the conditions set forth in Section 14.2, by delivery of shares of Common Stock having a fair market value equal to the Repurchase Price as described in Section 14.2(a). Whenever in this Indenture there is a reference, in any context, to the principal of any Debenture as of any time, such reference shall be deemed to include reference to the Repurchase Price payable in respect of such Debenture to the extent that such Repurchase Price is, was or would be so payable at such time, and express mention of the Repurchase Price in any provision of this Indenture shall not be construed as excluding the Repurchase Price in those provisions of this Indenture when such express mention is not made; provided, however, that for the purposes of Article IV, such reference shall be deemed to include reference to the Repurchase Price only if the Repurchase Price is payable in cash.

SECTION 14.2    Conditions to the Company's Election to Pay the Repurchase Price in Common Stock. The Company may elect to pay the Repurchase Price by delivery of shares of Common Stock pursuant to Section 14.1 if and only if the following conditions have been satisfied:

(a)    The shares of Common Stock deliverable in payment of the Repurchase Price shall have a fair market value as of the repurchase date of not less than the Repurchase Price. For purposes of this Section 14.2, the fair market value of shares of Common Stock shall be determined by the Company and shall be equal to 95% of the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on and including the third Trading Day immediately preceding the repurchase date;

(b)    In the event any shares of Common Stock to be issued upon repurchase of Debentures hereunder require registration under any Federal securities law before such shares may be freely transferable without being subject to any transfer restrictions under the Securities Act upon repurchase, such registration shall have been completed and shall be effective;

(c)    In the event any shares of Common Stock to be issued upon repurchase of Debentures hereunder require registration with or approval of any governmental authority under any State law or any other Federal law before such shares may be validly issued or delivered upon repurchase, such registration shall have been completed, have become effective and such approval shall have been obtained, in each case, prior to the repurchase date;

(d)    The shares of Common Stock deliverable in payment of the Repurchase Price shall have been quoted on the Nasdaq National Market or listed on a national securities exchange, in either case, prior to the repurchase date;

(e)    All shares of Common Stock deliverable in payment of the Repurchase Price shall be issued out of the Company's authorized but unissued Common Stock and will, upon issue, be duly and validly issued and fully paid and non-assessable and free of any preemptive rights; and

(f)    The delivery of shares of Common Stock as payment of the Repurchase Price would not cause or result in a violation of either Section 15.7 or Section 15.8

9213905.13

-45-

PWSP 00528

of this Indenture (assuming, solely in the case of Section 15.8. that all of the Warrants issued to the Initial Purchasers pursuant to the Purchase Agreement had been exercised in full): provided, that the Company may deliver to any holder of Debentures as partial payment of the Repurchase Price that number of shares of Common Stock (pro rata among the holders of Debentures based on the aggregate principal amount of Debentures purchased by such holder out of the total aggregate principal amount of Debentures purchased by all holders of Debentures) that would not result in a violation of Section 15.7 or Section 15.8 and the balance of the Repurchase Price shall be paid only in cash.

If all of the conditions set forth in this Section 14.2 are not satisfied in accordance with the terms thereof, the Repurchase Price shall be paid by the Company only in cash.

SECTION 14.3    Notices: Method of Exercising Repurchase Right. Etc.

(a)    Unless the Company shall have theretofore called for redemption all of the outstanding Debentures, on or before the fifteenth (15th) calendar day after the occurrence of a Designated Event, the Company shall deliver to all holders of Debentures a notice (the "Company Notice") of the occurrence of the Designated Event and of the repurchase right set forth herein arising as a result thereof.  The Company Notice shall contain the following information:

(1)    the repurchase date,

(2)    the date by which the repurchase right must be exercised,

(3)    the last date by which the election to require repurchase, if submitted, may be revoked,

(4)    the Repurchase Price. and whether the Repurchase Price shall be paid by the Company in cash or by delivery of shares of Common Stock,

(5)    a description of the procedure which a holder must follow to exercise a repurchase right, and

(6)    the Conversion Price then in effect, the date on which the right to convert the principal amount of the Debentures to be repurchased will terminate and the place or places where Debentures may be surrendered for conversion.

No failure of the Company to give the foregoing notices or defect therein shall limit any holder's right to exercise a repurchase right or affect the validity of the proceedings for the repurchase of Debentures.

If any of the foregoing provisions are inconsistent with applicable law, such law shall govern.

(b)    To exercise a repurchase right, a holder shall deliver to the Company on or before the close of business on the second Business Day preceding the

9213905.13

-46-

PWSP 00529

repurchase date (i) written notice to the Company (or agent designated by the Company for such purpose) of the holder's exercise of such right, which notice shall set forth the name of the holder, the principal amount of the Debentures to be repurchased, a statement that an election to exercise the repurchase right is being made thereby, and, in the event that the Repurchase Price shall be paid in shares of Common Stock, the name or names (with addresses) in which the certificate or certificates for shares of Common Stock shall be issued, and (ii) the Debentures with respect to which the repurchase right is being exercised, duly endorsed for transfer to the Company. Election of repurchase by a holder shall be revocable at any time prior to, but excluding, the repurchase date, by delivering written notice to that effect to the Company prior to the close of business on the second Business Day prior to the repurchase date.

(c)    In the event the repurchase right shall be exercised in accordance with the terms hereof, the Company shall pay or cause to be paid to such holder the Repurchase Price in cash or shares of Common Stock, as provided above, for payment to the holder on the repurchase date or, if shares of Common Stock are to be issued, as promptly after the repurchase date as practicable.

(d)    If the Company fails to repurchase on the repurchase date any Debentures (or portions thereof) as to which the repurchase right has been properly exercised, then the principal of such Debentures shall, until paid, bear interest to the extent permitted by applicable law from the repurchase date at the rate borne by the Debenture and each such Debenture shall be convertible into Common Stock in accordance with this Indenture (without giving effect to Section 14.2(b)) until the principal of such Debenture shall have been paid or duly provided for.

(e)    Any Debenture which is to be repurchased only in part shall be surrendered to the Company (with, if the Company so requires, due endorsement by, or a written instrument of transfer in form reasonably satisfactory to the Company duly executed by the holder thereof or its attorney duly authorized in writing) and the Company shall execute and deliver to the holder of such Debenture without service charge a new Debenture or Debentures, containing identical terms and conditions, of any authorized denomination as requested by such holder in aggregate principal amount equal to and in exchange for the unrepurchased portion of the principal of the Debenture so surrendered.

(f)    On or prior to the repurchase date, the Company shall deliver to the holder an amount of money sufficient to pay the Repurchase Price of the Debentures that are to be repaid on the repurchase date, provided that if such payment is made on the repurchase date it must be received by the holder on such date.

(g)    Any issuance of shares of Common Stock in respect of the Repurchase Price shall be deemed to have been effected immediately prior to the close of business on the repurchase date and the person or persons in whose name or names any certificate or certificates for shares of Common Stock shall be issuable upon such repurchase shall be deemed to have become on the repurchase date the holder or holders of record of the shares represented thereby; provided, however, that any surrender for repurchase on a date when the stock transfer books of the Company shall be closed shall constitute the person or persons in whose name or names the certificate or certificates for such shares are to be issued as the record

9213905.13

-47-

PWSP 00530

holder or holders thereof for all purposes at the opening of business on the next succeeding day on which such stock transfer books are open. No payment or adjustment shall be made for dividends or distributions on any Common Stock issued upon repurchase of any Debenture declared prior to the repurchase date.

(h)     No fractional shares of Common Stock or scrip representing fractional shares shall be issued upon repurchase of Debentures. If more than one Debenture shall be repurchased from the same holder and the Repurchase Price shall be payable in shares of Common Stock, the number of full shares which shall be issued upon repurchase shall be computed on the basis of the aggregate principal amount of the Debentures (or specified portions thereof to the extent permitted hereby) so repurchased. If any fractional share of stock otherwise would be issuable upon repurchase of any Debenture or Debentures, the Company shall make an adjustment therefor in cash at the current market value thereof to the holder of Debentures. For these purposes, the current market value of a share of Common Stock shall be the Closing Price on the first Trading Day immediately preceding the repurchase date and such Closing Price shall be determined as provided in Section 13.5(g).

(i)     The issue of stock certificates on repurchase of Debentures shall be made without charge to the holder of Debentures being repurchased for any tax in respect of the issue thereof. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of stock in any name other than that of the holder of any Debenture repurchased, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

ARTICLE XV

MISCELLANEOUS PROVISIONS

SECTION 15.1     Provisions Binding on Company's Successors. All the covenants, stipulations, promises and agreements of the Company in this Indenture contained shall bind its successors and assigns whether so expressed or not.

SECTION 15.2     Official Acts by Successor Corporation. Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation that shall at the time be the lawful sole successor of the Company.

SECTION 15.3     Addresses for Notices etc. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Indenture must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service, in each case

9213905.13

-48-

PWSP 00531

properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

SONICblue Incorporated
2841 Mission College Boulevard
Santa Clara, California 95054
Telephone:     (408) 588-8000
Facsimile:      (408) 980-5444
Attention:      General Counsel

With a copy to, which shall not constitute notice:

Pillsbury Winthrop LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone:     (650) 233-4500
Facsimile:      (650) 233-4545
Attention:      Jorge A. del Calvo

If to a holder of Debentures, to it at the address and facsimile number set forth on the Schedule of Purchasers, with copies to such Purchaser's representatives as set forth on the Schedule of Buyers, or at such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a nationally recognized overnight delivery service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

SECTION 15.4     Governing Law. This Indenture and each Debenture shall be deemed to be a contract made under the laws of New York, and for all purposes shall be construed in accordance with the laws of New York.

SECTION 15.5     Legal Holidays. In any case where the date of maturity of interest on or principal of the Debentures or the date fixed for redemption of any Debenture will not be a Business Day, then payment of such interest on or principal of the Debentures need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date of maturity or the date fixed for redemption, and no interest shall accrue for the period from and after such date.

SECTION 15.6     No Security Interest Created. Nothing in this Indenture or in the Debentures, expressed or implied, shall be construed to constitute a security interest under

9213905.13

-49-

the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

SECTION 15.7    <u>Limitation on Beneficial Ownership</u>.  Notwithstanding anything herein to the contrary, the Company shall not effect and shall have no obligation to effect any conversion of any Debenture, and no holder of Debentures shall have the right to convert any Debentures, to the extent that after giving effect to such conversion, the beneficial owner of such shares (together with such Person's Affiliates) would have acquired, through conversion of Debentures or otherwise, beneficial ownership of a number of shares of Common Stock that exceeds 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to such conversion.  For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by a Person and its affiliates shall include the number of shares of Common Stock issuable upon conversion of the Debentures with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted Debentures beneficially owned by such Person or any of its Affiliates and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by such Person or any of its affiliates.  Except as set forth in the preceding sentence, for purposes of this Section 15.7, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act.  For purposes of this Section 15.7, in determining the number of outstanding shares of Common Stock, a holder of Debentures may rely on the number of outstanding shares of Common Stock as reflected in (1) the Company's most recent Form 10-Q, Form 10-K or other public filing with the Commission, as the case may be, (2) a more recent public announcement by the Company or (3) any other notice by the Company or its transfer agent setting forth the number of shares of Common Stock outstanding. Upon the written request of any holder, the Company shall promptly, but in no event later than one (1) Business Day following the receipt of such notice, confirm in writing to such holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to conversions of Debentures by the holder and its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported.

SECTION 15.8    <u>Limitation on Number of Shares of Common Stock</u>.  Notwithstanding anything herein to the contrary, the Company shall not be obligated to issue shares of Common Stock upon conversion of this Debenture or in respect of the payment of interest in the form of Interest Shares only to the extent that any issuance of such shares of Common Stock would cause the Company to exceed that number of shares of Common Stock which the Company may issue upon conversion of the Debentures and the Warrants issued to the Initial Purchasers pursuant to the Purchase Agreement (the "Exchange Cap") without breaching the Company's obligations under the rules or regulations of the Principal Market (as defined in the Purchase Agreement), except that such limitation shall not apply in the event that the Company obtains the approval of its stockholders as required by the Principal Market (or any successor rule or regulation) for issuances of Common Stock in excess of such amount. Until such approval is obtained, the holders of Debentures shall not be issued, upon conversion of the Debentures or payments in the form of Interest Shares, shares of Common Stock in an amount greater than the product of (i) the Exchange Cap amount multiplied by (ii) a fraction, the

9213905.13

-50-

PWSP 00533

numerator of which is the aggregate principal amount of Debentures issued to such Initial Purchaser pursuant to the Purchase Agreement and the denominator of which is the aggregate principal amount of all the Debentures issued to the Initial Purchasers pursuant to the Purchase Agreement (the "Cap Allocation Amount").

SECTION 15.9    Benefits of Indenture.  Nothing in this Indenture or in the Debentures, expressed or implied, shall give to any person, other than the parties hereto and their successors hereunder and the holders of Senior Indebtedness, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 15.10    Table of Content, Headings, etc.  The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

SECTION 15.11    Execution in Counterparts.  This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

SECTION 15.12    Assignment, Etc.  Any holder of Debentures may, subject to compliance with the Purchase Agreement and to applicable federal and state securities laws and the legend set forth on the Debentures, transfer or assign its Debenture(s) or any interest therein and herein and may pledge, encumber or transfer any of its rights or interest in and to the Debenture and herein or any part hereof and thereof and, without limitation, each assignee, transferee and pledgee (which may include any Affiliate of the holder) shall have the right to transfer or assign its interest.  Each such assignee, transferee and pledgee shall have all of the rights of a holder of the Debenture and this Indenture.

9213905.13

-51-

PWSP 00534

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _John J Todd_____
    Name:  John J. Todd
    Title:    Chief Operating Officer

Attest:

INITIAL PURCHASERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
    Name: Jeffrey M. Solomon
    Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
    Name:  Adam J. Chill
    Title:   Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
    Name:  Kenneth A. Simpler
    Title:   Vice President

PWSP 00535

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____
    Name:  John J. Todd
    Title:   Chief Operating Officer

Attest:

INITIAL PURCHASERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
    Name: Jeffrey M. Solomon
    Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
    Name:  Adam J. Chill
    Title:   Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
    Name:  Kenneth A. Simpler
    Title:   Vice President

PWSP 00536

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____
      Name:   John J. Todd
      Title:    Chief Operating Officer

Attest:


INITIAL PURCHASERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
      Name: Jeffrey M. Solomon
      Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
      Name:   Adam J. Chill
      Title:    Authorized Signatory


CITADEL EQUITY FUND LTD.

By: _____
      Name:   Kenneth A. Simpler
      Title:    Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly signed and attested as of the date first written above.

SONICBLUE INCORPORATED

By: _____

        Name:   John J. Todd
        Title:    Chief Operating Officer

Attest:

INITIAL PURCHASERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____

        Name:  Jeffrey M. Solomon
        Title:   Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____

        Name:   Adam J. Chill
        Title:   Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____

        Name:   Kenneth A. Simpler
        Title:   Vice President

PWSP 00538

## SCHEDULE OF BUYERS

| Initial Purchaser Name | Initial Purchaser Address and Facsimile Number | Principal Amount of Debentures | Investor's Representatives' Address and Facsimile Number | Wire Instructions |
|---|---|---|---|---|
| Portside Growth & Opportunity Fund, Ltd. | c/o Ramius Capital Group, L.L.C. 666 Third Avenue, 26th Floor New York, NY 10017 Attention: Jeffrey M. Solomon Andrew Strober Telephone: (212) 845-7917 Facsimile: (212) 845-7999 | $25,000,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein, Esq. Telephone: (212) 756-2000 Facsimile: (212) 593-5955 | Bank: Citibank, N.A. 20 Exchange Place New York, New York 10030 ABA No.: 021-000-089 Account: Bear Stearns Securities Corp. Account No.: 09253186 For Subaccount of:Portside Growth & Opportunity Fund, Ltd. Subaccount No.: 102-24978-28 |
| Smithfield Fiduciary LLC | c/o Highbridge Capital Management, LLC 9 West 57th Street, 27th floor New York, New York 10019 Attention: Ari J. Storch Adam J. Chill Telephone: 212-287-4720 Facsimile: 212-751-0755 | $25,000,000 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein, Esq. Telephone: (212) 756-2000 Facsimile: (212) 593-5955 | Citibank, N.A. ABA #: 021000089 A/C: Bear, Stearns Securities Corp. A/C#: 09253186 FBO: Smithfield Fiduciary LLC A/C#: 102-25642-2 |
| Citadel Equity Fund Ltd. | c/o Citadel Investment Group, L.L.C. 225 West Washington Street Chicago, Illinois 60606 Attention: Kenneth A. Simpler Facsimile: (312) 338-0780 Telephone: (312) 338-7801 | $25,000,000 | Katten Muchin Zavis Rosenman 525 W. Monroe Street Chicago, Illinois 60661-3693 Attention: Robert J. Brantman, Esq. Facsimile: (312) 902-1061 Telephone: (312) 902-5289 | |

9213905.13

-53-

**PWSP 00539**

# EXHIBIT C

PLEDGE AND SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT, dated April 22, 2002, made by SONICblue Incorporated, a Delaware corporation (the "<u>Pledgor</u>"), in favor of the investors listed on Schedule I attached hereto (individually, a "<u>Investor</u>" and collectively, the "<u>Investors</u>").

W I T N E S S E T H:

WHEREAS, the Pledgor and the Investors have entered into a certain Securities Purchase Agreement, dated as of April 21, 2002 (as amended or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), pursuant to which the Pledgor is selling to the Investors an aggregate principal amount of $75,000,000 of its 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "<u>Debentures</u>") and Warrants (the "<u>Warrants</u>") to purchase an aggregate of up to 7,500,000 shares of Common Stock of the Pledgor, par value $0.0001 per share (the "<u>Common Stock</u>") (the transactions as contemplated by the Investment Documents (as defined herein), the "<u>Investment</u>");

WHEREAS, it is a condition precedent to the closing of the Investment that the Pledgor shall have executed and delivered to the Investors this pledge and security agreement (as amended, modified or otherwise supplemented from time to time, this "<u>Agreement</u>") to create a security interest, in favor of the Investors not later than July 17, 2002 (the date of the creation of such security interest being the "<u>Pledge Date</u>"), in the Collateral Shares;

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Investors to consummate the Investment, the Pledgor hereby agrees with the Investors as follows:

SECTION 1.    <u>Definitions</u>.

(a)    The location of certain defined terms used in this Agreement is cross-referenced in Appendix A attached hereto.

(b)    In addition, the following terms shall have the respective meanings indicated below, (such meanings to be applicable equally to both the singular and plural forms of the terms defined):

"<u>Bloomberg</u>" means Bloomberg Financial Markets.

"<u>Business Day</u>" means any day other than Saturday, Sunday or other day on which commercial banks in Taipei, Taiwan, R.O.C. are authorized or required by law to remain closed.

"<u>Collateral Agent</u>" means Ramius Capital Group, L.L.C.

"<u>Collateral Shares</u>" means, collectively 21,426,586 UMC Shares owned by the Pledgor subject to any adjustment for any stock split, stock dividend, recapitalization, stock

9163773.17

combination or similar transaction after the date of this Agreement, and including, with respect to each such Collateral Share, the right to receive, all other dividends and distributions (whether in cash, securities or otherwise) thereon and all other rights and interests currently existing with respect thereto, or otherwise vested in or granted to the owner or holder of such Collateral Shares from and after the date of this Agreement.

"Financial Assets", "Investment Property" and "Securities Entitlement" have the meanings specified therefor in the UCC.

"Indenture" means that certain indenture, dated as of the date hereof relating to the Debentures.

"Investment Documents" means the Purchase Agreement, the Registration Rights Agreement, this Agreement, the Debentures, the Indenture, the Warrants, the Option Agreement, each as amended from time to time, and any other documents, agreements, instruments, certificates, UCC or other financing statements and all other contracts in connection therewith.

"Investment Commission" means the Investment Commission of the Ministry of Economic Affairs of the R.O.C.

"New Taiwan Dollars" and "NT$" means the lawful currency for the time being of the R.O.C.

"Option Agreement" means that certain option agreement, by and among the Pledgor and the Investors, dated as of the date hereof.

"Pledge Termination Date" means the date of satisfaction in full of the Obligations.

"Principal Market" means, with respect to the UMC Shares, the Taiwan Stock Exchange or, if the UMC Shares are not listed on the Taiwan Stock Exchange, the principal securities exchange or market on which the UMC Shares are listed or to which the UMC Shares are admitted to trading.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and among the Pledgor and the Investors.

"Required Investors" means the Investors holding no less than 50% of the outstanding principal amount of the Debentures then outstanding.

"R.O.C." means the Republic of China.

"UCC" means the Uniform Commercial Code in effect from time to time in the State of New York.

"UMC" means United Microelectronics Corporation, a corporation duly organized and validly existing under the laws of the R.O.C. and having its principal place of business at 300 No. 3, Li-hsin RD. II, Science-Based Industrial Park, Hsinchu, Taiwan, R.O.C.

9163773.17

2

PWSP 00542

"UMC Shares" means the common shares, par value NT$10.00 per share, of UMC.

"Unrestricted Shares" means securities that are not restricted in any way with respect to disposition or transferability either by agreement, contract or other arrangement or by the applicable law of the R.O.C. or any other non-U.S. jurisdiction.

SECTION 2.  Pledge and Grant of Security Interest.

(a)     As collateral security for all of the Obligations (as defined in Section 3 hereof), the Pledgor shall, on the Pledge Date, pledge and assign, and grant a continuing first priority, valid and perfected security interest in, the following (the "Collateral") in favor of the Investors and shall deliver such Collateral to the Collateral Agent:

(i)     the Collateral Shares, which the parties specifically acknowledge and agree includes the certificates representing the Collateral Shares, all options and other rights, contractual or otherwise, in respect thereof (including, without limitation, any registration rights) and all dividends, cash, securities, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Collateral Shares (including, without limitation, pursuant to any spin-off or rights offering) from and after the date of this Agreement;

(ii)     all cash and cash equivalents, Investment Property, Financial Assets, capital stock or other equity interests, notes, debentures, bonds, promissory notes or other evidences of indebtedness and all other securities arising from or relating to the Collateral Shares or deposited from time to time with the Collateral Agent from and after the date of this Agreement;

(iii)     all general intangibles arising from or relating to the Collateral Shares;

(iv)     all investment earnings and proceeds of any and all of the foregoing; and

(v)     all Securities Entitlements of the Pledgor in any and all of the foregoing;

in each case, whether now owned or hereafter acquired by the Pledgor and howsoever such interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

SECTION 3.  Security for Obligations.  From and after the Pledge Date, the security interest created hereby in the Collateral will constitute continuing collateral security for (a) all of the obligations, whether now existing or hereafter incurred, of the Pledgor to pay, as and when due and payable, all amounts from time to time owing by it in respect of the Debentures or any other Investment Document, whether for principal, interest, fees, expenses, penalties or otherwise (including, without limitation, amounts that but for the operation of Section 362(a) of Title 11 of the United States Code (the "U.S. Bankruptcy Code") would

9163773.17

3

become due) (the "Payment Obligations") and (b) the due performance and observance by the Pledgor of all of its other obligations from time to time existing under any Investment Document (collectively together with the Payment Obligations, the "Obligations").

SECTION 4.    Delivery of the Collateral.

(a)    On or prior to the Pledge Date, the Pledgor shall cause the Collateral Shares to become certified in such denominations as specified by the Required Investors prior to the Pledge Date. On the Pledge Date, the Pledgor shall cause all certificates representing the Collateral Shares shall be duly endorsed in pledge and in blank to facilitate (i) the removal of the pledge and (ii) the title transfer under what is commonly referred to as a "triangle chop" endorsement, and shall be delivered to the Collateral Agent, together with evidence in form and substance satisfactory to the Collateral Agent of due registration of the pledge created hereunder with UMC's transfer agent. On or prior to the Pledge Date, if the Pledgor shall receive after the date hereof and prior to the Pledge Date, by virtue of the Pledgor's being or having been an owner of any Collateral, any (A) security, promissory note, chattel paper or other instrument or any other Financial Asset or any other property, whether as an addition to, substitution for, or in exchange for, any Collateral, or otherwise, (B) option or right, whether as an addition to, substitution for, or in exchange for, any Collateral, or otherwise, or (C) any dividends or distributions, including, without limitation, (i) by way of a stock-split, recapitalization or other similar event, (ii) dividends or other distributions in connection with a partial or total liquidation or dissolution, (iii) dividends payable in connection with a redemption of or exchange for any Collateral or (iv) dividends payable in connection with a reduction of capital, capital surplus or paid-in surplus, the Pledgor shall receive the same in trust for the benefit of the Investors, shall segregate the same from the Pledgor's other property and shall take all actions necessary to have the same pledged to the Investors and to have all instruments related thereto delivered to the Collateral Agent (in the case of any certificated security or promissory note, chattel paper, instrument or Financial Asset, in the exact form received, to the extent feasible, and, if not feasible, in as similar form as is possible, with any necessary endorsements affixed thereon), as Collateral for the Obligations. The Collateral Agent shall keep the Collateral segregated from its other property and may set up one or more bank or security accounts, as it deems appropriate, to maintain such segregation.

(b)    From and after the Pledge Date, if the Pledgor shall receive, by virtue of the Pledgor's being or having been an owner of any Collateral, any (A) security, promissory note, chattel paper or other instrument or any other Financial Asset or any other property, whether as an addition to, substitution for, or in exchange for, any Collateral, or otherwise, (B) option or right, whether as an addition to, substitution for, or in exchange for, any Collateral, or otherwise, or (C) any dividends or distributions, including, without limitation, (i) by way of a stock-split, recapitalization or other similar event, (ii) dividends or other distributions in connection with a partial or total liquidation or dissolution, (iii) dividends payable in connection with a redemption of or exchange for any Collateral or (iv) dividends payable in connection with a reduction of capital, capital surplus or paid-in surplus, the Pledgor shall receive the same in trust for the benefit of the Investors, shall segregate the same from the Pledgor's other property and shall take all actions necessary to have the same pledged to the Investors and to have all instruments related thereto delivered to the Collateral Agent (in the case of any certificated security or promissory

9163773.17

4

note, chattel paper, instrument or Financial Asset, in the exact form received, to the extent feasible, and, if not feasible, in as similar form as is possible, with any necessary endorsements affixed thereon), as Collateral for the Obligations. The Collateral Agent shall keep the Collateral segregated from its other property and may set up one or more bank or security accounts, as it deems appropriate, to maintain such segregation.

(c)    So long as no Default (as defined herein) shall have occurred and be continuing, the Pledgor may exercise any and all voting rights pertaining to the Collateral Shares in a manner not inconsistent with the terms of this Agreement.

SECTION 5.    Extraordinary Event or Delisting Event; Further Assurances.

(a)    Extraordinary Event or Delisting Event.  In the event (i) of (A) any merger, reorganization, consolidation or business combination of UMC into or with any other corporation or entity as a result of which the UMC Shares are no longer outstanding, (B) any sale, conveyance, mortgage, transfer, license, pledge, lease, abandonment or other disposition or transfer of all or substantially all of the assets of UMC; or (C) any liquidation, dissolution or winding up of UMC or (ii) that the UMC Shares are no longer listed or publicly trading on the Principal Market, the Pledgor shall immediately, but in any event within ten (10) Business Days, notify the Investors in writing of such event.

(b)    Further Assurances.  The Pledgor at its own cost and expense shall do, make, execute and deliver all such additional and further acts, documents, assurances, certificates and instruments as may be necessary or that the Required Investors may reasonably require to vest in and assure, convey, grant, assign, transfer and confirm unto the Investors their respective rights now or hereafter intended to be granted to the Investors under this Agreement or in any of the Collateral (or any substitution thereof), including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and continuation statements under the applicable provisions of the R.O.C. law and/or the UCC, (ii) take all actions reasonably necessary or advisable to vest in and assure, convey, grant, assign, transfer and confirm unto the Investors their respective rights to any Collateral arising after the Pledge Date, and (iii) to the extent requested by the Required Investors, delivering a legal opinion of Pledgor's Taiwan counsel to the effect that the actions taken pursuant to this Section 5(b) have been properly taken pursuant to the laws of the R.O.C., such legal opinion in form and substance reasonably satisfactory to the Required Investors, having regard to custom and practice in rendering opinions in the R.O.C..

SECTION 6.    Representations and Warranties.  The Pledgor represents and warrants as follows:

(a)    the Pledgor is and shall be at all times the legal and beneficial owner of the Collateral, free and clear of any lien, security interest, pledge, charge, option, right of first refusal, claim, mortgage, lease, easement or any other encumbrance whatsoever (the "Liens"), except for the Liens created by this Agreement and the other Investment Documents;

(b)    on the date hereof, the Pledgor is the legal, beneficial and record owner of at least 25,184,000 UMC Shares;

9163773.17

5

PWSP 00545

(c)     other than the lock-up required by applicable securities laws and regulations of the R.O.C. as a result of the merger of United Semiconductor Corporation and UMC, there are no lock-up agreements, pledge agreements, registration rights agreements and other agreements in respect of or otherwise affecting any of the UMC Shares held or beneficially owned by the Pledgor in existence on the date hereof;

(d)     on the Pledge Date and thereafter, the Collateral Shares shall be Unrestricted Shares;

(e)     the pledge created pursuant to this Agreement, upon satisfaction of the conditions required to be taken pursuant to Section 4(a) above, will constitute a valid and perfected first priority security interest over the Collateral, legally binding and enforceable against the Pledgor and subject to no prior Lien or to any agreement purporting to grant to any third party a Lien thereon, and the Investors are entitled to all the rights, priorities and benefits afforded by R.O.C. law, the UCC and any other relevant law as enacted in any relevant jurisdiction to perfect the security interests in respect of such Collateral;

(f)     all governmental (R.O.C. and non-R.O.C.) and other consents, approval or authorizations that are required to have been obtained by the Pledgor with respect to this Agreement and the grant of this pledge and security interest in the Collateral have been obtained and are, and will continue to be, in full force and effect and all conditions of any such consent, approval or authorization will have been complied with on or prior to the Pledge Date;

(g)     the Pledgor is not required to obtain any governmental or other consent or approval, including, without limitation, from any governmental authority or entity in Taiwan in connection with the execution and delivery of this Agreement or in connection with the creation of the security interest in the Collateral created by this Agreement;

(h)     the Pledgor's investment in the Collateral Shares has been approved by the Investment Commission under the Statute for Investments by Foreign Nationals ("SIFN") and the Collateral Shares are, and will at all times throughout the term hereof remain, fully eligible for all benefits associated with such approval; and

(i)     to the extent that any of the Collateral Shares were received by the Pledgor as a dividend on any UMC Shares, such Collateral Shares are not subject to deferred dividend tax upon any future sale thereof.

SECTION 7.   Covenants.  So long as any of the Obligations shall remain outstanding and so long as the Pledgor is not released from the obligations of this Agreement pursuant to Section 12(c), unless the Required Investors shall otherwise consent in writing:

(a)     Transfers Restrictions.  From and after the date hereof, other than to the Investors pursuant to the Option Agreement, the Pledgor shall not sell, transfer, assign or otherwise dispose of, or purport to sell, transfer, assign or otherwise dispose of, any of the Collateral or any rights in or to acquire the Collateral.

9163773.17

6

PWSP 00546

(b)    Liens and Other Restrictions. The Pledgor shall not create or suffer to exist any (i) Lien upon or with respect to any of the Collateral except the Liens created by this Agreement and the other Investment Documents or (ii) restriction on the transferability of any of the Collateral, except for the restrictions created by the Option Agreement (including, without limitation, any market standoff or other "lock up" agreement).

(c)    Attorney-in-fact: Control. The Pledgor hereby irrevocably appoints (i) the Collateral Agent with respect to the Collateral, the Pledgor's attorney-in-fact and proxy, with full authority in the place and stead of the Pledgor, to take any action and to execute any instrument (at the cost and expense of the Pledgor) that the Required Investors may deem advisable to accomplish the purposes of this Agreement, including, without limitation, to take any action set forth in Section 8 herein or to execute and file any financing statements or continuation statement under R.O.C. law and the UCC, any amendment thereto or other filing. The Pledgor hereby authorizes the Collateral Agent to file, without the signature of the Pledgor, where permitted by law, one or more financing statements or continuation statements, and amendments thereto, relating to the Collateral. The Pledgor also hereby authorizes and agrees that the Collateral Agent shall have "control" (as defined in Sections 9-104 and 9-106 of the UCC) over all Collateral with respect to which such "control" may be obtained in accordance with Sections 9-104 and 9-106 of the UCC.

(d)    Removal of Restrictions. On the Pledge Date, the Pledgor shall cause all Collateral Shares to become Unrestricted Shares not containing any legend.

(e)    Corporate Change. The Pledgor shall provide thirty (30) days advance written notice to the Investors of any change in (i) its legal name, (ii) the jurisdiction in which the Pledgor is organized or (ii) the form or type of business entity by which it is organized.

(f)    No Revocation of Approval. The Pledgor shall not take any actions which could be expected to cause the approval of the Investment Commission under the SIFN, with respect to the Pledgor's investment in the Collateral Shares, to be suspended or revoked.

(g)    SIFN Approval. The Pledgor shall take all actions reasonably necessary to cause the Collateral Shares to remain fully eligible for all benefits associated with SIFN approval set forth in Section 6(h).

(h)    Notice Received from UMC. From and after the date hereof, Pledgor shall promptly notify the Investors after the Pledgor receives any notice from UMC that could reasonably be expected to affect the value of the Collateral Shares, including, without limitation, a notice of corporate action or proposed corporate action, and shall deliver a copy of such notice each of the Investors, but in no event shall the Pledgor notify and deliver such notice to the Investors later than ten (10) Business Days after it has received such notice.

SECTION 8.    Remedies Upon Default. If any Event of Default (as defined in the Indenture) shall have occurred and be continuing (a "Default"):

(a)    The Required Investors, shall have the right immediately to (i) serve notice on UMC and demand and collect directly from UMC any and all dividends and

9163773.17

7

distributions payable on the Collateral Shares (whether in cash, shares or otherwise) and/or exercise any and all other rights then or thereafter vested, granted or allowed with the owners of the Collateral to the greatest extent permitted by applicable law, and (ii) dispose of the whole or any part of the Collateral or any interest therein either at public auction or by private sale in accordance with Article 14 of the Law of Application of the Book of Obligations of the Civil Code of the R.O.C. or in any other manner as may then be permitted by law (including, without limitation, pursuant to the UCC). At any such sale, the Investors may bid for or purchase the whole or part of the Collateral so sold without liability to account to the Pledgor with respect to any subsequent income arising from either Investor's ownership and/or disposal of any Collateral so purchased.

(b)     The Pledgor hereby further expressly agrees and consents that, after the occurrence of a Default, the Required Investors may, to the greatest extent permitted by applicable law, dispose of the Collateral by private sale at the then current market value thereof, as determined in good faith by the Investors. The Pledgor agrees to provide all consents required therefor and to (i) fully cooperate with the Investors and the party or parties which purchase the Collateral (the "Purchaser") by executing all documents and filing all applications necessary for the transfer of the Collateral and/or the registration of the Purchaser as the owner of the Collateral, including all such applications as may be required under the SIFN, and (ii) assume and fulfill any and all obligations arising from or in connection with the transfer of ownership of the Collateral Shares to the Purchaser. The amount of the Obligations then outstanding shall be reduced by the proceeds of any sale or disposal of the Collateral pursuant to subsection (a) above and this subsection (b).

(c)     The Pledgor agrees to act in good faith and use its best efforts to secure any requisite approvals of any regulatory agency having jurisdiction over the Collateral, shall execute and deliver, or cause to be executed and delivered, such agreements, documents, instruments and certificates, and shall do or cause to be done any and all acts and things deemed necessary or appropriate to give effect to such transfer in compliance with all applicable securities and other laws.

(d)     The Required Investors shall direct that any cash held by the Collateral Agent or any Investor then or at any time thereafter may be applied in the following manner:

(i)     first, to pay any amounts payable to the Investors pursuant to Section 8 of the Purchase Agreement;

(ii)     second, to apply, in whole or in part by the Collateral Agent on behalf of each Investor, against all or any part of the Obligations then outstanding;

(iii)     third, to pay any other amounts required by applicable law; and

(iv)     fourth, any surplus of such cash, if any, to be paid over to the Pledgor or to such person as may be lawfully entitled to receive such surplus.

(e)     No failure or delay by the Investors to exercise any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of

9163773.17

8

PWSP 00548

any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by any Investment Document or by law. The rights of the Investors and the Collateral Agent hereunder are not conditional or contingent on any attempt by the Investors or the Collateral Agent to exercise any of their rights under any other instrument or agreement against any party.

(f)    The Pledgor expressly acknowledges and confirms that the Obligations shall not be discharged or released unless and until satisfied in full in such currency as provided for under the Investment Documents. The Pledgor shall take all necessary actions to ensure that the proceeds arising from the Investor's foreclosure of the pledges hereunder shall be converted into such currency as the Required Investors shall require.

SECTION 9.  Collateral Agent.

(a)    Collateral Agent. The Collateral Agent shall act as the agent for the Investors for the purposes specified herein, including enforcing the rights and remedies of the Investors with respect to the Collateral and this Agreement and performing such other administrative duties and obligations with respect to the Collateral. The Collateral Agent shall have and may exercise such powers hereunder as are specified by the terms herein, together with such powers as are reasonably incidental thereto or as specifically delegated to the Collateral Agent by the Required Investors.

(b)    Discretionary Power. The Investors acknowledge that the right to manage, perform and enforce the terms of this Agreement with respect to the Collateral and to exercise and enforce all privileges and rights hereunder for the benefit of the Investors shall be determined by the Required Investors, according to their discretion and the exercise of their business judgment, including, without limitation, the exclusive right to take or retake control or possession of the Collateral and to hold, prepare for sale, process, sell, lease, dispose of, transfer or liquidate the Collateral.

(c)    Express Trust. If any Investor shall have received any payment or distribution out of any of the assets constituting a part of the Collateral from any foreclosure, sale, liquidation or other disposition of, or realization upon, the Collateral other than in accordance with Section 7, such Investor shall hold such payment or distribution in trust as trustee of an express trust, for the benefit of itself and the other Investors, shall not commingle such payment with its other assets, and shall promptly take all actions necessary to cause such payment to be shared in accordance with Section 7. As between the Pledgor and the Investors, any Investor making a payment to the other Investor pursuant to this Section 9(c) shall be deemed not to have received or realized on account of the Obligations held by such Investor all or any portion of the amount so paid over to the other Investors. If all or a portion of any amount paid by an Investor to the other Investors pursuant to this Section 9(c) must thereafter be repaid or restored (whether by court order or settlement of a claim), the payment shall, to such extent, be rescinded and repaid, without interest.

9163773.17

9

PWSP 00549

SECTION 10. Notices. Etc. All notices and other communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered pursuant to the terms of the Indenture.

SECTION 11. Miscellaneous.

(a)    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Pledgor and the Required Investors, and no waiver of any provision of this Agreement, and no consent to any departure by the Pledgor therefrom, shall be effective unless it is in writing and signed by the Required Investors, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)    This Agreement shall (i) remain in full force and effect until the Pledge Termination Date; and (ii) be binding on the Pledgor and its successors and assigns and shall inure, together with all rights and remedies of the Investors hereunder, to the benefit of the Investors and their successors, transferees and assigns. The Investors may assign or transfer, as collateral or otherwise, any or all of its interest hereunder and under the other Investment Documents. None of the rights or obligations of the Pledgor hereunder may be assigned or otherwise transferred without the prior written consent of the Required Investors.

(c)    Upon the Pledge Termination Date, unless on or before such date a Default shall have occurred, (i) this Agreement and the security interest created hereby shall terminate and all rights to the Collateral shall revert to the Pledgor, and (ii) the Required Investors shall instruct the Collateral Agent to, upon the Pledgor's request and at the Pledgor's expense, (A) return to the Pledgor such of the Collateral as shall not have been sold, transferred or otherwise disposed of or applied pursuant to the terms hereof and (B) execute and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence such termination.

(d)    This Agreement may be executed in counterparts, each of which, when so executed and delivered, shall be deemed to be an original and enforceable, but all of which counterparts, taken together, shall constitute one and the same instrument.

(e)    In the event that any one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the other remaining provisions, paragraphs, words, clauses, phrases or sentences hereof shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law; provided that this paragraph shall not cause this Agreement to differ materially from the intent of the parties as herein expressed.

(f)    The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

9163773.17

10

PWSP 00550

(g)    This Agreement supersedes all other prior oral or written agreements between the Pledgor and each Investor, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Pledgor nor any Investor makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended or waived other than by an instrument in writing signed by the Pledgor and the Required Investors. No such amendment shall be effective to the extent that it applies to less than all of the Investors. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

(h)    The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(i)    Each Investor and each permitted assignee under the Investment Documents shall have all rights and remedies set forth in the Investment Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

(j)    This Agreement shall be governed by the laws of the R.O.C., and to the extent not inconsistent therewith, the UCC, and any dispute relating to this Agreement shall be submitted to the jurisdiction of the Taipei District Court; provided, that such shall not in any way prevent any Investor from bringing any action against the Pledgor or its assets in any other jurisdiction.

[REMAINDER OF PAGE IS BLANK]

9163773.17

11

PWSP 00551

IN WITNESS WHEREOF, the Pledgor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By: _____
Name: John J. Todd
Title:   Chief Operating Officer


Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND


By:_____
    Name:   Jeffrey M. Solomon
    Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC


By:_____
    Name:   Adam J. Chill
    Title:    Authorized Signatory


CITADEL EQUITY FUND LTD.


By:_____
    Name:   Kenneth A. Simpler
    Title:    Vice President

IN WITNESS WHEREOF, the Pledgor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By:_____
Name: John J. Todd
Title:   Chief Operating Officer

Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By:_____
Name:   Jeffrey M. Solomon
Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC

By:_____
Name:   Adam J. Chill
Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By:_____
Name:   Kenneth A. Simpler
Title:    Vice President

PWSP 00553

IN WITNESS WHEREOF, the Pledgor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By:_____
Name: John J. Todd
Title:   Chief Operating Officer

Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By:_____
    Name:   Jeffrey M. Solomon
    Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC

By:_____
    Name:   Adam J. Chill
    Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By:_____
    Name:   Kenneth A. Simpler
    Title:    Vice President

PWSP 00554

IN WITNESS WHEREOF, the Pledgor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By:_____
Name: John J. Todd
Title:   Chief Operating Officer

Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By:_____
    Name:   Jeffrey M. Solomon
    Title:   Managing Officer

SMITHFIELD FIDUCIARY LLC

By:_____
    Name:   Adam J. Chill
    Title:   Authorized Signatory

CITADEL EQUITY FUND LTD.

By:_____
    Name:   Kenneth A. Simpler
    Title:   Vice President

PWSP 00555

## SCHEDULE I

## SCHEDULE OF INVESTORS

| Investor Name | Investor Address and Facsimile Number |
|---|---|
| Portside Growth & Opportunity Fund, Ltd. | c/o Ramius Capital Group, L.L.C.<br>666 Third Avenue, 26th Floor<br>New York, NY 10017<br>Attention:  Jeffrey M. Solomon<br>           Andrew Strober<br>Telephone:  (212) 845-7917<br>Facsimile:  (212) 845-7999 |
| Smithfield Fiduciary LLC | c/o Highbridge Capital Management, LLC<br>9 West 57th Street, 27th Floor<br>New York, NY 10019<br>Attention: Ari J. Storch<br>         Adam J. Chill<br>Telephone: (212) 287-4720<br>Facsimile: (212) 751-0755 |
| Citadel Equity Fund Ltd. | c/o Citadel Investment Group, L.L.C.<br>225 West Washington Street<br>Chicago, Illinois 60606<br>Attention:  Kenneth A. Simpler<br>Telephone: (312) 338-7801<br>Facsimile: (312) 338-0780 |

9163773.17

APPENDIX A

DEFINED TERMS

Page

Agreement ........................................................................................................................ 1
Collateral ......................................................................................................................... 3
Common Stock ................................................................................................................. 1
Debentures ....................................................................................................................... 1
Default .............................................................................................................................. 7
Investment ........................................................................................................................ 1
Investor ............................................................................................................................. 1
Investors ........................................................................................................................... 1
Liens ................................................................................................................................. 5
Obligations ....................................................................................................................... 4
Payment Obligations ........................................................................................................ 4
Pledge Date ....................................................................................................................... 1
Pledgor .............................................................................................................................. 1
Purchase Agreement ......................................................................................................... 1
Purchaser ........................................................................................................................... 1
Warrants ............................................................................................................................ 8
Warrants ............................................................................................................................ 1

9163773.17

PWSP 00557

# EXHIBIT D

REGISTRATION RIGHTS AGREEMENT

REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of April 22, 2002, by and among SONICblue Incorporated, a Delaware corporation, with headquarters located at 2842 Mission College Boulevard, Santa Clara, California 95054 (the "Company"), and the undersigned buyers (each, a "Buyer" and collectively, the "Buyers").

WHEREAS:

A.    In connection with the Securities Purchase Agreement by and among the parties dated April 21, 2002 (the "Securities Purchase Agreement"), the Company has agreed, upon the terms and subject to the conditions of the Securities Purchase Agreement, to issue and sell to the Buyers an aggregate of (i) $75,000,000 (the "Convertible Debentures") of the Company's 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Convertible Debentures"), which will be convertible into shares of the Company's common stock, par value $0.0001 per share (the "Common Stock") (as converted, the "Conversion Shares") and (ii) warrants (the "Warrants") to purchase up to 7,500,000 shares of Common Stock (as exercised collectively, the "Warrant Shares");

B.    To induce the Buyers to execute and deliver the Securities Purchase Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar successor statute (collectively, the "1933 Act"), and applicable state securities laws; and

C.    The location of defined terms in this Agreement is set forth on the Index of Terms attached hereto.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Buyers hereby agree as follows:

1.    Definitions.

As used in this Agreement, the following terms shall have the following meanings:

a.    "Business Day" means any day other than Saturday, Sunday or any other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

b.    "Investor" means a Buyer, any transferee or assignee thereof to whom a Buyer assigns its rights under this Agreement and who agrees to become bound by the provisions of this Agreement in accordance with Section 9 and any transferee or assignee thereof to whom a transferee or assignee assigns its rights under this Agreement and who agrees to become bound by the provisions of this Agreement in accordance with Section 9.

9161674.13

PWSP 00457

c.    "Penalty Amount" shall be equal to the sum of:

(i) the product of (I) the number of Warrant Shares issued and still held by such Buyer and (II) the Closing Sale Price (as defined in the Warrants) on the trading day prior to the Filing Deadline, the Effectiveness Deadline or the Selling Prohibition, as applicable;

(ii) the product of (I) the number of Warrant Shares issuable pursuant to the Warrants still held by such Buyer and (II) the difference (if a positive number) between the Closing Sale Price on the trading day prior to the Filing Deadline, the Effectiveness Deadline or the Selling Prohibition, as applicable, and the Warrant Exercise Price;

(iii) the product of (I) the number of Conversion Shares issued and still held by such Buyer and (II) the Closing Sale Price on the trading day prior to the Filing Deadline, the Effectiveness Deadline or the Selling Prohibition, as applicable; and

(iv) the product of (I) the number of Conversion Shares issuable pursuant to the Debentures still held by such Buyer and (II) the Closing Sale Price on the trading day prior to the Filing Deadline, the Effectiveness Deadline or the Selling Prohibition, as applicable.

d.    "Person" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and governmental or any department or agency thereof.

e.    "register," "registered," and "registration" refer to a registration effected by preparing and filing one or more Registration Statements (as defined below) in compliance with the 1933 Act and pursuant to Rule 415 under the 1933 Act or any successor rule providing for offering securities on a continuous or delayed basis ("Rule 415"), and the declaration or ordering of effectiveness of such Registration Statement(s) by the United States Securities and Exchange Commission (the "SEC").

f.    "Registrable Securities" means (i) the Conversion Shares issued or issuable upon conversion of the Convertible Debentures, (ii) the Warrant Shares issued or issuable upon exercise of the Warrants, (iii) any shares of capital stock issued or issuable as payment of interest under the Convertible Debentures (the "Interest Shares") and (iii) any shares of capital stock issued or issuable with respect to the Conversion Shares, the Convertible Debentures, the Warrant Shares, the Warrants or the Interest Shares as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise, without regard to any limitations on conversions of the Convertible Debentures or exercises of Warrants.

g.    "Registration Statement" means a registration statement or registration statements of the Company filed under the 1933 Act covering the Registrable Securities.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement.

9161674.13

2

PWSP 00458

2.    Registration.

a.    Mandatory Registration. The Company shall prepare. and. as soon as practicable but in no event later than May 22, 2002 (the "Filing Deadline"). file with the SEC the Registration Statement on Form S-3 covering the resale of all of the Registrable Securities. In the event that Form S-3 is unavailable for such a registration. the Company shall use such other form as is available for such a registration, subject to the provisions of Section 2(d). The Registration Statement prepared pursuant hereto shall register for resale at least 12.086.209 shares of Common Stock, subject to adjustment for any stock split, stock dividend, recapitalization, exchange or similar event. The Company shall use its reasonable best efforts to have the Registration Statement declared effective by the SEC as soon as practicable, but in no event later than September 4, 2002 (the "Effectiveness Deadline").

b.    Allocation of Registrable Securities. The initial number of Registrable Securities included in any Registration Statement and each increase in the number of Registrable Securities included therein shall be allocated pro rata among the Investors based on the number of Registrable Securities held by each Investor at the time the Registration Statement covering such initial number of Registrable Securities or increase thereof is declared effective by the SEC. In the event that an Investor sells or otherwise transfers any of such Investor's Registrable Securities then remaining unsold, each transferee shall be allocated a pro rata portion of the then remaining number of Registrable Securities included in such Registration Statement for such transferor. Any shares of Common Stock included in a Registration Statement and which remain allocated to any Person which ceases to hold any Registrable Securities covered by such Registration Statement shall be allocated to the remaining Investors, pro rata based on the number of Registrable Securities then held by such Investors which are covered by such Registration Statement. In no event shall the Company include any securities other than Registrable Securities on any Registration Statement without the prior written consent of Buyers holding at least a majority of the Registrable Securities; provided, however, that, notwithstanding the foregoing, the Company may include on any Registration Statement, without the prior written consent of the Buyers, shares of Common Stock issued to vendors of the Company in an amount not to exceed 2,000,000 shares.

c.    Legal Counsel. Subject to Section 5 hereof, the Buyers holding at least a majority of the Registrable Securities shall have the right to select one legal counsel to review and oversee any registration pursuant to this Section 2 ("Legal Counsel"), which shall be Schulte Roth & Zabel LLP or such other counsel as thereafter designated by the holders of at least a majority of the Registrable Securities. The Company and Legal Counsel shall reasonably cooperate with each other in performing the Company's obligations under this Agreement.

d.    Ineligibility for Form S-3. In the event that Form S-3 is not available for the registration of the resale of Registrable Securities hereunder, the Company shall (i) register the resale of the Registrable Securities on another appropriate form reasonably acceptable to the holders of at least a majority of the Registrable Securities and (ii) undertake to register the Registrable Securities on Form S-3 as soon as such form is available, provided that the Company shall maintain the effectiveness of the Registration Statement then in effect until such time as a Registration Statement on Form S-3 covering the Registrable Securities has been declared effective by the SEC.

9161674.13

PWSP 00459

e.    Sufficient Number of Shares Registered. In the event the number of shares available under a Registration Statement filed pursuant to Section 2(a) is insufficient to cover all of the Registrable Securities required to be covered by such Registration Statement or an Investor's allocated portion of the Registrable Securities pursuant to Section 2(b), the Company shall amend the applicable Registration Statement, or file a new Registration Statement (on the short form available therefor, if applicable), or both, so as to cover at least 125% of the number of such Registrable Securities as of the trading day immediately preceding the date of the filing of such amendment or new Registration Statement, in each case, as soon as practicable, but in any event not later than fifteen (15) business days after the necessity therefor arises. The Company shall use its reasonable best efforts to cause such amendment and/or new Registration Statement to become effective as soon as practicable following the filing thereof. For purposes of the foregoing provision, the number of shares available under a Registration Statement shall be deemed "insufficient to cover all of the Registrable Securities" if at any time the number of Registrable Securities issued or issuable upon conversion of the Convertible Debentures and upon exercise of the Warrants, if any, covered by such Registration Statement is greater than the quotient determined by dividing (i) number of shares of Common Stock available for resale under such Registration Statement by (ii) 1.1. The calculation set forth in the foregoing sentence shall be made without regard to any limitations on the conversion of the Convertible Debentures or the exercise of the Warrants and such calculation shall assume that the Convertible Debentures and the Warrants are then convertible into shares of Common Stock and are issuable at the then prevailing Conversion Rate (as defined in the Convertible Debentures) or Warrant Exercise Price, as applicable.

f.    Effect of Failure to File and Obtain and Maintain Effectiveness of Registration Statement. If (i) a Registration Statement covering all the Registrable Securities required to be covered thereby and required to be filed by the Company pursuant to this Agreement is (A) not filed with the SEC on or before the respective Filing Deadline or (B) not declared effective by the SEC on or before the respective Effectiveness Deadline or (ii) on any day after such Registration Statement has been declared effective by the SEC sales of all the Registrable Securities required to be included on such Registration Statement cannot be made (other than during an Allowable Grace Period (as defined in Section 3(r)) pursuant to such Registration Statement (including, without limitation, because of a failure to keep such Registration Statement effective, to disclose such information as is necessary for sales to be made pursuant to such Registration Statement or to register sufficient shares of Common Stock) (the "Selling Prohibition"), then, as partial relief for the damages to any holder by reason of any such delay in or reduction of its ability to sell the underlying shares of Common Stock (which remedy shall not be exclusive of any other remedies available at law or in equity), the Company shall pay to each holder of Convertible Debentures relating to such Registration Statement an amount in cash equal to the product of (i) the Penalty Amount applicable to such Investor multiplied by (ii) the product of (I) 0.0005 multiplied by (II) the sum of (x) the number of days after the applicable Filing Deadline that the Registration Statement is not filed with the SEC, plus (y) the number of days after the applicable Effectiveness Deadline that the Registration Statement is not declared effective by the SEC, plus (z) the number of days, in each instance, after the Registration Statement has been declared effective by the SEC that such Registration Statement is not available (other than during an Allowable Grace Period) for the sale of all the Registrable Securities required to be included on such Registration Statement. The payments to

9!61674.13

4

PWSP 00460

which a holder shall be entitled pursuant to this Section 2(f) are referred to herein as "Registration Delay Payments." Registration Delay Payments shall be paid on the earlier of (I) the last day of the calendar month during which such Registration Delay Payments are incurred and (II) the third Business Day after the event or failure giving rise to the Registration Delay Payments is cured. In the event the Company fails to make Registration Delay Payments in a timely manner, such Registration Delay Payments shall bear interest at the rate of 1.5% per month (prorated for partial months) until paid in full.

3.    Related Obligations.

At such time as the Company is obligated to file a Registration Statement with the SEC pursuant to Section 2(a), 2(d) or 2(e), the Company will use its reasonable best efforts to effect the registration of the Registrable Securities in accordance with the intended method of disposition thereof and, pursuant thereto, the Company shall have the following obligations:

a.    The Company shall promptly prepare and file with the SEC a Registration Statement with respect to the Registrable Securities (but in no event later than the applicable Filing Deadline) and use its reasonable best efforts to cause such Registration Statement relating to the Registrable Securities required to be covered thereby to become effective as soon as practicable after such filing (but in no event later than the applicable Effectiveness Deadline). The Company shall keep each Registration Statement effective pursuant to Rule 415 at all times until the earlier of (i) the date as of which the Investors may sell all of the Registrable Securities covered by such Registration Statement without restriction pursuant to Rule 144(k) (or successor thereto) promulgated under the 1933 Act or (ii) the date on which the Investors shall have sold all the Registrable Securities covered by such Registration Statement (the "Registration Period"), which Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading. The term "reasonable best efforts" as used in this Section 3(a) shall mean, among other things, that the Company shall submit to the SEC, within two (2) Business Days after the Company learns that no review of a particular Registration Statement will be made by the staff of the SEC or that the staff has no further comments on the Registration Statement, as the case may be, and the approval of Legal Counsel pursuant to Section 3(c), a request for acceleration of effectiveness of such Registration Statement to a time and date not later than 48 hours after the submission of such request.

b.    Subject to Section 3(r), the Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to a Registration Statement and the prospectus used in connection with such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the 1933 Act, as may be necessary to keep such Registration Statement effective at all times during the Registration Period, and, during such period, comply with the provisions of the 1933 Act with respect to the disposition of all Registrable Securities of the Company covered by such Registration Statement until the end of the Registration Period. In the case of amendments and supplements to a Registration Statement which are required to be filed pursuant to this Agreement (including pursuant to this Section 3(b)) by reason of the Company filing a report on Form 10-K, Form 10-

9161674.13

5

PWSP 00461

Q or Form 8-K or any analogous report under the Securities Exchange Act of 1934, as amended (the "1934 Act"), the Company shall have incorporated such report by reference into such Registration Statement, if applicable, or shall file such amendments or supplements with the SEC on the same day on which the 1934 Act report is filed which created the requirement for the Company to amend or supplement such Registration Statement.

c.    The Company shall (A) permit Legal Counsel to review and comment upon (i) a Registration Statement at least three (3) Business Days prior to its filing with the SEC and (ii) all amendments and supplements to all Registration Statements (except for Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and any similar or successor reports) within a reasonable number of days prior to their filing with the SEC. The Company shall furnish to Legal Counsel, without charge, (i) copies of any correspondence from the SEC or the staff of the SEC to the Company or its representatives relating to any Registration Statement, (ii) promptly after the same is prepared and filed with the SEC, one copy of any Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, and all exhibits, provided that if such Registration Statement and related documents are filed with the SEC through EDGAR and are available to the Investors via EDGAR then no such deliveries shall be required and (iii) upon the effectiveness of any Registration Statement, one copy of the prospectus included in such Registration Statement and all amendments and supplements thereto. The Company shall reasonably cooperate with Legal Counsel in performing the Company's obligations pursuant to this Section 3.

d.    The Company shall furnish to each Investor whose Registrable Securities are included in any Registration Statement, without charge, (i) promptly after the same is prepared and filed with the SEC, at least one copy of such Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, all exhibits and each preliminary prospectus, provided that if such Registration Statement and related documents are filed with the SEC through EDGAR and are available to the Investors via EDGAR then no such deliveries shall be required, (ii) upon the effectiveness of any Registration Statement, ten (10) copies of the prospectus included in such Registration Statement and all amendments and supplements thereto (or such other number of copies as such Investor may reasonably request) and (iii) such other documents, including copies of any preliminary or final prospectus, as such Investor may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities owned by such Investor.

e.    Subject to Section 3(r), the Company shall use its reasonable best efforts to (i) register and qualify, unless an exemption from registration and qualification applies, the resale by Investors of the Registrable Securities covered by a Registration Statement under such other securities or "blue sky" laws of all applicable jurisdictions in the United States, (ii) prepare and file in those jurisdictions, such amendments (including post-effective amendments) and supplements to such registrations and qualifications as may be necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify

9161674.13

6

the Registrable Securities for sale in such jurisdictions; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to (x) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(e), (y) subject itself to general taxation in any such jurisdiction, or (z) file a general consent to service of process in any such jurisdiction. The Company shall promptly notify Legal Counsel and each Investor who holds Registrable Securities of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction in the United States or its receipt of actual notice of the initiation or threatening of any proceeding for such purpose.

      f.     The Company shall notify Legal Counsel and each Investor in writing of the happening of any event, as promptly as practicable after becoming aware of such event, as a result of which the prospectus included in a Registration Statement, as then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (provided that in no event shall such notice contain any material, nonpublic information), and, subject to Section 3(r), promptly prepare a supplement or amendment to such Registration Statement to correct such untrue statement or omission, and deliver ten (10) copies of such supplement or amendment to Legal Counsel and each Investor (or such other number of copies as Legal Counsel or such Investor may reasonably request). The Company shall also promptly notify Legal Counsel and each Investor in writing (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when a Registration Statement or any post-effective amendment has become effective (notification of such effectiveness shall be delivered to Legal Counsel and each Investor by facsimile on the same day of such effectiveness and by overnight mail), (ii) of any request by the SEC for amendments or supplements to a Registration Statement or related prospectus or related information, and (iii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate (provided that in no event shall such notice contain any material, nonpublic information).

      g.     Subject to Section 3(r), the Company shall use its reasonable best efforts to prevent the issuance of any stop order or other suspension of effectiveness of a Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and to notify Legal Counsel and each Investor who holds Registrable Securities being sold of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

      h.     If an Investor has been deemed or may be deemed an underwriter under the 1933 Act and the Investor reasonably believes it needs to avail itself of the due diligence defense under the 1933 Act, at the reasonable request of any Investor, the Company shall furnish to such Investor, on the date of the effectiveness of the Registration Statement and thereafter from time to time on such dates as an Investor may reasonably request (i) a letter, dated such date, from the Company's independent certified public accountants in form and

9161674.13

7

substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the Investors, and (ii) an opinion, dated as of such date, of counsel representing the Company for purposes of such Registration Statement, in form, scope and substance as is customarily given in an underwritten public offering, addressed to the Investors.

        i.     The Company shall make available for inspection by (i) any Investor, (ii) Legal Counsel and (iii) one firm of accountants or other agents retained by the Investors (collectively, the "Inspectors"), after execution by the Investors or the Inspectors of a confidentiality agreement (with appropriate trading restrictions), all pertinent financial and other records, and pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall be reasonably deemed necessary by each Inspector, and cause the Company's officers, directors and employees to supply all information which any Inspector may reasonably request; provided, however, that each Inspector shall agree to hold in strict confidence and shall not make any disclosure (except to an Investor) or use of any Record or other information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, unless (a) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in any Registration Statement or is otherwise required under the 1933 Act, (b) the release of such Records is ordered pursuant to a final, non-appealable subpoena or order from a court or government body of competent jurisdiction, or (c) the information in such Records has been made generally available to the public other than by disclosure in violation of this or any other agreement of which the Inspector has knowledge. Each Investor agrees that it shall, upon learning that disclosure of such Records is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, the Records deemed confidential. Nothing herein (or in any other confidentiality agreement between the Company and any Investor) shall be deemed to limit the Investors' ability to sell Registrable Securities in a manner which is otherwise consistent with applicable laws and regulations.

        j.     The Company shall hold in confidence and not make any disclosure of information concerning an Investor provided to the Company unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement. The Company agrees that it shall, upon learning that disclosure of such information concerning an Investor is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to such Investor and allow such Investor, at the Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

        k.     The Company shall use its reasonable best efforts either to (i) cause all the Registrable Securities covered by a Registration Statement to be listed on each securities exchange on which securities of the same class or series issued by the Company are

9161674.13

8

PWSP 00464

then listed, if any, if the listing of such Registrable Securities is then permitted under the rules of such exchange, or (ii) secure designation and quotation of all the Registrable Securities covered by a Registration Statement on the Nasdaq National Market, or (iii) if, despite the Company's reasonable best efforts to satisfy the preceding clause (i) or (ii), the Company is unsuccessful in satisfying the preceding clause (i) or (ii), to secure the inclusion for quotation on The Nasdaq SmallCap Market for such Registrable Securities and, without limiting the generality of the foregoing, to use its reasonable best efforts to arrange for at least two market makers to register with the National Association of Securities Dealers, Inc. ("NASD") as such with respect to such Registrable Securities. The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3(k).

        l.    The Company shall cooperate with the Investors who hold Registrable Securities being offered and, to the extent applicable, facilitate the timely preparation and delivery of certificates (not bearing any restrictive legend) representing the Registrable Securities to be offered pursuant to a Registration Statement and enable such certificates to be in such denominations or amounts, as the case may be, as the Investors may reasonably request and registered in such names as the Investors may request.

        m.    If requested by an Investor, the Company shall (i) as soon as practicable incorporate in a prospectus supplement or post-effective amendment such information as an Investor reasonably requests to be included therein relating to the sale and distribution of Registrable Securities, including, without limitation, information with respect to the number of Registrable Securities being offered or sold, the purchase price being paid therefor and any other terms of the offering of the Registrable Securities to be sold in such offering; (ii) as soon as practicable make all required filings of such prospectus supplement or post-effective amendment after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and (iii) as soon as practicable, supplement or make amendments to any Registration Statement if reasonably requested by an Investor holding any Registrable Securities.

        n.    The Company shall use its reasonable best efforts to cause the Registrable Securities covered by a Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Registrable Securities.

        o.    The Company shall make generally available to its security holders as soon as practical, but not later than ninety (90) days after the close of the period covered thereby, an earnings statement (in form complying with, and in the manner provided by, the provisions of Rule 158 under the 1933 Act) covering a twelve-month period beginning not later than the first day of the Company's fiscal quarter next following the effective date of a Registration Statement.

        p.    The Company shall otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC in connection with any registration hereunder.

9161674.13

9

q.      Within two (2) Business Days after a Registration Statement which covers Registrable Securities is ordered effective by the SEC, the Company shall deliver, and shall cause legal counsel for the Company to deliver, to the transfer agent for such Registrable Securities (with copies to the Investors whose Registrable Securities are included in such Registration Statement) confirmation that such Registration Statement has been declared effective by the SEC in the form attached hereto as Exhibit A.

r.      Notwithstanding anything to the contrary herein, at any time after the Registration Statement has been declared effective by the SEC, the Company may delay the disclosure of material non-public information concerning the Company the disclosure of which at the time is not, in the good faith opinion of the Board of Directors of the Company and its counsel, in the best interest of the Company and, in the opinion of counsel to the Company, otherwise required (a "Grace Period"); provided, that the Company shall promptly (i) notify the Investors in writing of the existence of material non-public information giving rise to a Grace Period (provided that in each notice the Company will not disclose the content of such material non-public information to the Investors) and the date on which the Grace Period will begin (or has begun), and (ii) notify the Investors in writing of the date on which the Grace Period ends; and, provided further, that no Grace Period shall exceed twenty (20) consecutive days and during any three hundred sixty five (365) day period such Grace Periods shall not exceed an aggregate of forty-five (45) days and the first day of any Grace Period must be at least two (2) trading days after the last day of any prior Grace Period (an "Allowable Grace Period"). For purposes of determining the length of a Grace Period above, the Grace Period shall begin on and include the date the Investors receive the notice referred to in clause (i) and shall end on the date the date referred to in the notice referred to in clause (ii). The provisions of Section 3(g) hereof shall not be applicable during the period of any Allowable Grace Period. Upon expiration of the Grace Period, the Company shall again be bound by the first sentence of Section 3(f) with respect to the information giving rise thereto unless such material non-public information is no longer applicable.

4.      Obligations Of The Investors.

a.      At least seven (7) days prior to the first anticipated filing date of a Registration Statement, the Company shall notify each Investor in writing of the information the Company requires from each such Investor if such Investor elects to have any of such Investor's Registrable Securities included in such Registration Statement. It shall be a condition precedent to the obligations of the Company to complete the registration pursuant to this Agreement with respect to the Registrable Securities of a particular Investor that such Investor shall furnish to the Company such information regarding itself, the Registrable Securities held by it and the intended method of disposition of the Registrable Securities held by it as shall be reasonably required to effect the effectiveness of the registration of such Registrable Securities and shall execute such documents in connection with such registration as the Company may reasonably request.

b.      Each Investor, by such Investor's acceptance of the Registrable Securities, agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of any Registration Statement hereunder, unless such Investor has notified the Company in writing of such Investor's election to exclude all of such Investor's Registrable Securities from such Registration Statement.

9161674.13

10

PWSP 00466

c.    Each Investor agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(g) or the first sentence of 3(f), such Investor will immediately discontinue disposition of Registrable Securities pursuant to any Registration Statement(s) covering such Registrable Securities until such Investor's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(g) or the first sentence of 3(f) or receipt of notice that no supplement or amendment is required. Notwithstanding anything to the contrary, the Company shall cause its transfer agent to deliver unlegended shares of Common Stock to a transferee of an Investor in accordance with the terms of the Securities Purchase Agreement in connection with any sale of Registrable Securities with respect to which an Investor has entered into a contract for sale prior to the Investor's receipt of a notice from the Company of the happening of any event of the kind described in Section 3(g) or the first sentence of 3(f) and for which the Investor has not yet settled.

d.    Each Investor agrees that it will comply with any prospectus delivery requirements pursuant to the 1933 Act.

5.    Expenses Of Registration.

All reasonable expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Sections 2 and 3, including, without limitation, all registration, listing and qualifications fees, printers and accounting fees, and fees and disbursements of counsel for the Company shall be paid by the Company. The Company shall also reimburse the Investors for the fees and disbursements of Legal Counsel in connection with registration, filing or qualification pursuant to Sections 2 and 3 of this Agreement which amount shall be limited to $10,000 for the Registration Statement.

6.    Indemnification.

In the event any Registrable Securities are included in a Registration Statement under this Agreement:

a.    To the fullest extent permitted by law, the Company will, and hereby does, indemnify, hold harmless and defend each Investor, the directors, officers, partners, employees, agents, representatives of, and each Person, if any, who controls any Investor within the meaning of the 1933 Act or the 1934 Act (each, an "Indemnified Person"), against any losses, claims, damages, liabilities, judgments, fines, penalties, charges, costs, reasonable attorneys' fees, amounts paid in settlement or expenses, joint or several, (collectively, "Claims") incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnity party is or may be a party thereto ("Indemnified Damages"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon: (i) any untrue statement or alleged untrue statement of a material fact in a Registration Statement or any post-effective amendment thereto or in any filing made in connection with the qualification of the offering under the securities or other "blue sky" laws of any jurisdiction in which Registrable Securities are offered ("Blue Sky Filing"), or the omission or alleged omission to state a material fact required to be

9161674.13

11

PWSP 00467

stated therein or necessary to make the statements therein not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in any preliminary prospectus if used prior to the effective date of such Registration Statement, or contained in the final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in light of the circumstances under which the statements therein were made, not misleading, or (iii) any violation or alleged violation by the Company of the 1933 Act, the 1934 Act, any other law, including, without limitation, any state securities law, or any rule or regulation thereunder relating to the offer or sale of the Registrable Securities pursuant to a Registration Statement (the matters in the foregoing clauses (i) through (iii) being, collectively, "Violations"). Subject to Section 6(c), the Company shall reimburse the Indemnified Persons, promptly as such expenses are incurred and are due and payable, for any reasonable legal fees or other reasonable expenses incurred by them in connection with investigating or defending any such Claim. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(a): (i) shall not apply to a Claim by an Indemnified Person arising out of or based upon a Violation which occurs in reliance upon and in conformity with information furnished in writing to the Company by such Indemnified Person for such Indemnified Person expressly for use in connection with the preparation of the Registration Statement or any such amendment thereof or supplement thereto, if such prospectus was timely made available by the Company pursuant to Section 3(d); (ii) with respect to any preliminary prospectus, shall not inure to the benefit of any such person from whom the person asserting any such Claim purchased the Registrable Securities that are the subject thereof (or to the benefit of any person controlling such person) if the untrue statement or omission of material fact contained in the preliminary prospectus was corrected in the prospectus, as then amended or supplemented, if such prospectus was timely made available by the Company pursuant to Section 3(d), and the Indemnified Person was promptly advised in writing not to use the incorrect prospectus prior to the use giving rise to a violation and such Indemnified Person, notwithstanding such advice, used it or failed to deliver the correct prospectus as required by the 1933 Act and such correct prospectus was timely made available pursuant to Section 3(d); (iii) shall not be available to the extent such Claim is based on a failure of the Investor to deliver or to cause to be delivered the prospectus made available by the Company, including a corrected prospectus, if such prospectus or corrected prospectus was timely made available by the Company pursuant to Section 3(d); and (iv) shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnified Person and shall survive the transfer of the Registrable Securities by the Investors to permitted assignees under the Transaction Documents (as defined in the Securities Purchase Agreement) pursuant to Section 9 hereof.

b.    In connection with any Registration Statement in which an Investor is participating, each such Investor agrees to severally and not jointly indemnify, hold harmless and defend, to the same extent and in the same manner as is set forth in Section 6(a), the Company, each of its directors, each of its officers who signs the Registration Statement and each Person, if any, who controls the Company within the meaning of the 1933 Act or the 1934 Act (each, an "Indemnified Party"), against any Claim or Indemnified Damages to which any of

9161674.13

12

PWSP 00468

them may become subject, under the 1933 Act, the 1934 Act or otherwise, insofar as such Claim or Indemnified Damages arise out of or are based upon any Violation, in each case to the extent, and only to the extent, that such Violation occurs in reliance upon and in conformity with written information furnished to the Company by such Investor expressly for use in connection with such Registration Statement; and, subject to Section 6(c), such Investor will reimburse any legal or other expenses reasonably incurred by an Indemnified Party in connection with investigating or defending any such Claim; provided, however, that the indemnity agreement contained in this Section 6(b) and the agreement with respect to contribution contained in Section 7 shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of such Investor, which consent shall not be unreasonably withheld or delayed; provided, further, however, that the Investor shall be liable under this Section 6(b) for only that amount of a Claim or Indemnified Damages as does not exceed the net proceeds to such Investor as a result of the sale of Registrable Securities pursuant to such Registration Statement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Indemnified Party and shall survive the transfer of the Registrable Securities by the Investors pursuant to Section 9. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(b) with respect to any preliminary prospectus shall not inure to the benefit of any Indemnified Party if the untrue statement or omission of material fact contained in the preliminary prospectus was corrected on a timely basis in the prospectus, as then amended or supplemented.

c.    Promptly after receipt by an Indemnified Person or Indemnified Party under this Section 6 of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person or the Indemnified Party, as the case may be; provided, however, that an Indemnified Person or Indemnified Party shall have the right to retain its own counsel with the fees and expenses of not more than one counsel for such Indemnified Person or Indemnified Party to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the indemnifying party, the representation by such counsel of the Indemnified Person or Indemnified Party and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding. In the case of an Indemnified Person, legal counsel referred to in the immediately preceding sentence shall be selected by the Investors holding at least a majority in interest of the Registrable Securities included in the Registration Statement to which the Claim relates. The Indemnified Party or Indemnified Person shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or Claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or Claim. The indemnifying party shall keep the Indemnified Party or Indemnified Person fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any

9161674.13

13

PWSP 00469

settlement of any action, claim or proceeding effected without its prior written consent, provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the prior written consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in respect to such Claim or litigation. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties or Persons relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

        d.     The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

        e.     The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

        7.     Contribution.

      To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under Section 6 to the fullest extent permitted by law; provided, however, that: (i) no person involved in the sale of Registrable Securities which person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) in connection with such sale shall be entitled to contribution from any person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any seller of Registrable Securities shall be limited in amount to the net amount of proceeds received by such seller from the sale of such Registrable Securities pursuant to such Registration Statement.

        8.     Reports Under The 1934 Act.

      With a view to making available to the Investors the benefits of Rule 144 promulgated under the 1933 Act or any other similar rule or regulation of the SEC that may at any time permit the Investors to sell securities of the Company to the public without registration ("Rule 144"), the Company agrees to use reasonable best efforts to:

        a.     make and keep public information available, as those terms are understood and defined in Rule 144;

9161674.13

14

PWSP 00470

b.      file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act so long as the Company remains subject to such requirements (it being understood that nothing herein shall limit the Company's obligations under Section 4(c) of the Securities Purchase Agreement) and the filing of such reports and other documents is required for the applicable provisions of Rule 144; and

c.      furnish to each Investor so long as such Investor owns Registrable Securities, promptly upon request, (i) a written statement by the Company, if true, that it has complied with the reporting requirements of Rule 144, the 1933 Act and the 1934 Act, (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company (if such reports are not available on EDGAR), and (iii) such other information as may be reasonably requested to permit the Investors to sell such securities pursuant to Rule 144 without registration.

9.      Assignment of Registration Rights.

The rights under this Agreement shall be automatically assignable by the Investors to any transferee of all or any portion of such Investor's Registrable Securities if: (i) the Investor agrees in writing with the transferee or assignee to assign such rights, and a copy of such agreement is furnished to the Company within a reasonable time after such assignment; (ii) the Company is, within a reasonable time after such transfer or assignment, furnished with written notice of (a) the name and address of such transferee or assignee, and (b) the securities with respect to which such registration rights are being transferred or assigned; (iii) immediately following such transfer or assignment the further disposition of such securities by the transferee or assignee is restricted under the 1933 Act and applicable state securities laws; (iv) the transferee or assignee agrees in writing with the Company to be bound by all of the provisions contained herein; and (v) such transfer shall have been made in accordance with the applicable requirements of the Securities Purchase Agreement.

10.      Amendment of Registration Rights.

Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Investors who then hold at least a majority of the Registrable Securities then remaining unsold. Any amendment or waiver effected in accordance with this Section 10 shall be binding upon each Investor and the Company. No such amendment shall be effective to the extent that it applies to less than all of the holders of the Registrable Securities. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

11.      Miscellaneous.

a.      A Person is deemed to be a holder of Registrable Securities whenever such Person owns or is deemed to own of record such Registrable Securities. If the Company receives conflicting instructions, notices or elections from two or more Persons with

9161674.13

15

PWSP 00471

respect to the same Registrable Securities, the Company shall act upon the basis of instructions, notice or election received from the such record owner of such Registrable Securities.

b.    Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered:  (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same.  The addresses and facsimile numbers for such communications shall be:

If to the Company:

> SONICblue Incorporated
> 2842 Mission College Boulevard
> Santa Clara, California 95054
> Telephone:    (408) 588-8000
> Facsimile:    (408) 980-5444
> Attention:    General Counsel

With a copy to:

> Pillsbury Winthrop LLP
> 2550 Hanover Street
> Palo Alto, California 94304
> Telephone:    (650) 233-4500
> Facsimile:    (650) 233-4545
> Attention:    Jorge A. del Calvo

If to Legal Counsel:

> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Telephone:  (212) 756-2000
> Facsimile:  (212) 593-5955
> Attention:  Eleazer Klein, Esq.

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers attached hereto, with copies to such Buyer's representatives as set forth on the Schedule of Buyers, or to such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change.  Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a courier or overnight courier

9161674.13

16                                    **PWSP 00472**



service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

       c.     Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof.

       d.     All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the non- exclusive jurisdiction of the state and federal courts sitting the City of New York, borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

       e.     This Agreement, the Securities Purchase Agreement, the Warrants, the Pledge and Security Agreement and the Convertible Debentures constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein. This Agreement, the Securities Purchase Agreement, the Warrant, the Pledge and Security Agreement and the Convertible Debentures supersede all prior agreements and understandings among the parties hereto with respect to the subject matter hereof and thereof.

       f.     Subject to the requirements of Section 9, this Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of each of the parties hereto.

       g.     The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

9161674.13

17

PWSP 00473

h.     This Agreement may be executed in identical counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

i.     Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

j.     All consents and other determinations required to be made by the Investors pursuant to this Agreement shall be made, unless otherwise specified in this Agreement, by Investors holding at least a majority of the Registrable Securities then remaining unsold, determined as if all of the Convertible Debentures held by Investors then outstanding have been converted into Registrable Securities and all Warrants then outstanding have been exercised for Registrable Securities without regard to any limitations on conversion of the Convertible Debentures or on exercises of the Warrants.

k.     The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

l.     This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

* * * * * *

9161674.13

18

IN WITNESS WHEREOF, the parties have caused this Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:

SONICBLUE INCORPORATED

By: _____
      Name: John J. Todd
      Title:  Chief Operating Officer

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
      Name: Jeffrey M. Solomon
      Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
      Name: Adam J. Chill
      Title:  Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
      Name: Kenneth A. Simpler
      Title:  Vice President

PWSP 00475

IN WITNESS WHEREOF, the parties have caused this Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:

SONICBLUE INCORPORATED

By: _____
        Name: John J. Todd
        Title:  Chief Operating Officer

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
        Name: Jeffrey M. Solomon
        Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
        Name: Adam J. Chill
        Title:  Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
        Name: Kenneth A. Simpler
        Title:  Vice President

PWSP 00476

IN WITNESS WHEREOF, the parties have caused this Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:

SONICBLUE INCORPORATED

By: _____
          Name: John J. Todd
          Title: Chief Operating Officer

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
          Name: Jeffrey M. Solomon
          Title: Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
          Name: Adam J. Chill
          Title: Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
          Name: Kenneth A. Simpler
          Title: Vice President

PWSP 00477

IN WITNESS WHEREOF, the parties have caused this Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:

SONICBLUE INCORPORATED

By: _____
          Name: John J. Todd
          Title:  Chief Operating Officer

BUYERS:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
          Name: Jeffrey M. Solomon
          Title:  Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
          Name: Adam J. Chill
          Title:  Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
          Name: Kenneth A. Simpler
          Title:  Vice President

PWSP 00478

SCHEDULE OF BUYERS

| Investor | Investor Address and Facsimile Number | Investor's Representative's Address and Facsimile Number |
|---|---|---|
| Portside Growth & Opportunity Fund | c/o Ramius Capital Group, L.L.C. 666 Third Avenue, 26th Floor New York, NY 10017 Attention: Jeffrey M. Solomon Andrew Strober Telephone: (212) 845-7917 Facsimile: (212) 845-7999 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein Facsimile: (212) 593-5955 Telephone: (212) 756-2000 |
| Smithfield Fiduciary LLC | c/o Highbridge Capital Management, LLC 9 West 57th Street, 27th Floor New York, NY 10019 Attention: Ari J. Storch Adam J. Chill Telephone: (212) 287-4720 Facsimile: (212) 751-0755 | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Attn: Eleazer Klein Facsimile: (212) 593-5955 Telephone: (212) 756-2000 |
| Citadel Equity Fund Ltd. | c/o Citadel Investment Group, L.L.C. 225 West Washington Street Chicago, Illinois 60606 Attention: Kenneth A. Simpler Telephone: (312) 338-7801 Facsimile: (312) 338-0780 | Katten Muchin Zavis Rosenman 525 W. Monroe Street Chicago, Illinois 60661-3693 Attention: Robert J. Brantman, Esq. Telephone: (312) 902-5289 Facsimile: (312) 902-1061 |

9161674.13

PWSP 00479

EXHIBIT A

FORM OF NOTICE OF EFFECTIVENESS
OF REGISTRATION STATEMENT

[Transfer Agent]
Attn:

Re:   SONICblue Incorporated

Ladies and Gentlemen:

We are counsel to SONICblue Incorporated, a Delaware corporation (the "Company"), and have represented the Company in connection with that certain Securities Purchase Agreement (the "Purchase Agreement") entered into by and among the Company and the buyers named therein (collectively, the "Holders") pursuant to which the Company issued to the Holders its 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Convertible Debentures") convertible into shares of the Company's Common Stock, par value $0.0001 per share (the "Common Stock") and warrants exercisable for shares of its Common Stock (the "Warrants").  Pursuant to the Purchase Agreement, the Company also has entered into a Registration Rights Agreement with the Holders (the "Registration Rights Agreement") pursuant to which the Company agreed, among other things, to register the Registrable Securities (as defined in the Registration Rights Agreement), including the shares of Common Stock issuable upon conversion of the Convertible Debentures and exercise of the Warrants under the Securities Act of 1933, as amended (the "1933 Act").  In connection with the Company's obligations under the Registration Rights Agreement, on _____, 200_, the Company filed a Registration Statement on Form S-3 (File No. 333-_____) (the "Registration Statement") with the Securities and Exchange Commission (the "SEC") relating to the Registrable Securities which names each of the Holders as a selling stockholder thereunder.

In connection with the foregoing, we advise you that a member of the SEC's staff has advised us by telephone that the SEC has entered an order declaring the Registration Statement effective under the 1933 Act at [ENTER TIME OF EFFECTIVENESS] on [ENTER DATE OF EFFECTIVENESS] and we have no knowledge, after telephonic inquiry of a member of the SEC's staff, that as of [time] on [date] any stop order suspending its effectiveness has been issued or that any proceedings for that purpose are pending before, or threatened by, the SEC and the Registrable Securities are available for resale under the 1933 Act pursuant to the Registration Statement.

Very truly yours,

[ISSUER'S COUNSEL]

By:_____

CC:   [LIST NAMES OF HOLDERS]

9161674.13

**PWSP 00480**

# INDEX OF TERMS

Page

1933 Act................................................................................................................ 1
1934 Act................................................................................................................ 6
Agreement............................................................................................................ 1
Allowable Grace Period...................................................................................... 1
Blue Sky Filing.................................................................................................... 10
Business Day........................................................................................................ 11
Buyer..................................................................................................................... 1
Claims................................................................................................................... 1
Common Stock..................................................................................................... 11
Company............................................................................................................... 1
Conversion Shares............................................................................................... 1
Convertible Debentures...................................................................................... 1
Effectiveness Deadline........................................................................................ 1
Filing Deadline.................................................................................................... 3
Grace Period........................................................................................................ 3
Indemnified Damages......................................................................................... 10
Indemnified Party............................................................................................... 11
Indemnified Person............................................................................................. 12
Inspectors............................................................................................................. 11
Investor................................................................................................................ 8
Legal Counsel...................................................................................................... 1
NASD.................................................................................................................... 3
Person................................................................................................................... 9
Records................................................................................................................. 2
Register................................................................................................................ 8
Registrable Securities......................................................................................... 2
Registration Delay Payments............................................................................. 2
Registration Period............................................................................................. 5
Registration Statement....................................................................................... 5
Rule 144................................................................................................................ 2
Rule 415................................................................................................................ 14
SEC........................................................................................................................ 2
Securities Purchase Agreement......................................................................... 2
Violations.............................................................................................................. 1
Warrant Shares.................................................................................................... 12
Warrants............................................................................................................... 1

9161674.13

PWSP 00481

# EXHIBIT E

OPTION AGREEMENT

OPTION AGREEMENT, dated April 22, 2002, made by SONICblue Incorporated, a Delaware corporation (the "Grantor"), in favor of the grantees listed on Schedule I attached hereto (individually, a "Grantee" and collectively, the "Grantees").

W I T N E S S E T H:

WHEREAS, the Grantor and the Grantees have entered into a certain Securities Purchase Agreement, by and among the Grantor and the Grantees, dated as of April 21, 2002 (as amended or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which the Grantor is selling to the Grantees an aggregate principal amount of $75,000,000 of its 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Debentures") and Warrants (the "Warrants") to purchase an aggregate of up to 7,500,000 shares of Common Stock of the Grantor, par value $0.0001 per share (the "Common Stock") (the transactions as contemplated by the Investment Documents (as defined herein), the "Investment"); and

WHEREAS, it is a condition precedent to the closing (the "Closing") of the Investment that the Grantor shall have executed and delivered to the Grantees this option agreement (as amended, modified or otherwise supplemented from time to time, this "Agreement") to create a purchase option in favor of each Grantee not later than July 17, 2002 (the date of the creation of such purchase options being the "Option Date"), to purchase, from and after the Option Date, such Grantee's pro rata portion of the Option Shares.

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Grantees to consummate the Investment, the Grantor hereby agrees with the Grantees as follows:

SECTION 1.   Definitions.

(a)     The location of certain defined terms used in this Agreement is cross-referenced in Appendix A attached hereto.

(b)     In addition, the following terms shall have the respective meanings indicated below (such meanings to be applicable equally to both the singular and plural forms of the terms defined):

"Bloomberg" means Bloomberg Financial Markets.

"Business Day" means any day other than Saturday, Sunday or other day on which the banks in Taipei, Taiwan, R.O.C., are authorized or required by law to remain closed.

"Closing Price" means, for any security as of any date, the last closing trade price for such security on the Principal Market as reported by Bloomberg, or if the Principal Market begins to operate on an extended hours basis, and does not designate the closing trade price, then the last trade price at the close of the Principal Market, as reported by Bloomberg, or, if no last

9215769.7

**PWSP 00559**

closing trade price is reported for such security by Bloomberg, the last closing ask price of such security as reported by Bloomberg, or, if no last closing ask price is reported for such security by Bloomberg, the average of the highest bid price and the lowest ask price of any market makers for such security as reported by Bloomberg. If the Closing Price cannot be calculated for such security on such date on any of the foregoing bases, the Closing Price of such security on such date shall be the fair market value of such security as mutually determined by the Grantor and the Required Grantees. If the Grantor and the Required Grantees are unable to agree upon the fair market value of such security, the Closing Price shall be the fair market value as determined in good faith by an independent, reputable investment bank selected by the Grantor and approved by the Required Grantees. All fees and expenses of such determination shall be borne by the Grantor. All such determinations shall be appropriately adjusted for any stock dividend, stock split or other similar transaction during such period.

"Indenture" means that certain indenture, dated as of the date hereof, relating to the Debentures.

"Investment Commission" means the Investment Commission of the Ministry of Economic Affairs of the R.O.C.

"Investment Documents" means the Purchase Agreement, the Registration Rights Agreement, this Agreement, the Debentures, the Indenture, the Warrants, the Pledge Agreement and any other documents, agreements, instruments, certificates, UCC or other financing statements and all other contracts in connection therewith.

"New Taiwan Dollars" and "NT$" means lawful currency for the time being of the R.O.C.

"Option Shares" means, collectively up to 21,426,586 UMC Shares, subject to any adjustment for any stock split, stock dividend, recapitalization, stock combination or similar transaction after the date of this Agreement and including, with respect to each such Option Share, the right to receive all other dividends and distributions (whether in cash, securities or otherwise) thereon and all other rights and interests currently existing with respect thereto, or otherwise vested in or granted to the owner of such Option Shares from and after the date of this Agreement.

"Pledge Agreement" means that certain Pledge and Security Agreement, dated as of the date hereof, by and among the Grantor and the Grantees.

"Principal Market" means, with respect to the UMC Shares, the Taiwan Stock Exchange or, if the UMC Shares are not listed on the Taiwan Stock Exchange, the principal securities exchange on which the UMC Shares are listed or to which the UMC Shares are admitted to trading.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and among the Grantor and the Grantees.

9215769.7

2

PWSP 00560

"Required Grantees" means the Grantees with the right to exercise the Purchase Option for more than 50% of the remaining number of previously unexercised Option Shares.

"R.O.C." means the Republic of China.

"Spot Rate" means, in relation to any specific date, the United States Dollars to New Taiwan Dollars exchange rate indicated on the Bloomberg page, "TWD Currency HP" for the offer side on the Business Day immediately preceding such date.

"UMC" means United Microelectronics Corporation, a corporation organized under the laws of the R.O.C. and having its principal place of business at 300 No. 3, Li-hsin RD. II, Science-Based Industrial Park, Hsinchu, Taiwan, R.O.C.

"UMC Shares" means the common shares, par value NTS10.00, of UMC.

"Unrestricted Shares" means securities that are not restricted in any way with respect to disposition or transferability either by agreement, contract or other arrangement or by the applicable law of the R.O.C. or of any other non-U.S. jurisdiction.

SECTION 2.  Purchase Option.  (a) From and after the Option Date and expiring (the "Purchase Option Expiration Date") three (3) Business Days after the later of (i) the maturity date of the Debentures (as the same may be extended from time to time) and (ii) the date of satisfaction in full of the Obligations (as defined in the Pledge Agreement), each Grantee shall have the option, but not the obligation (the "Purchase Option"), to purchase from time to time up to its pro rata portion of the Option Shares (based on the ratio that the principal amount of the Debentures purchased by each such Grantee at Closing bears to the total principal amount of Debentures purchased by all Grantees at Closing).  The exercise price for each Option Share shall be NTS 62.15 (the "Exercise Price").  Each Grantee may, at any time and from time to time from and after the Option Date, exercise the Purchase Option by delivering written notice to the Grantor (a "Purchase Option Notice"), which notice shall state: (i) the number of Option Shares being purchased by such Grantee and (ii) the date on which such Grantee shall purchase such Option Shares, which date shall be five (5) Business Days after delivery of the Purchase Option Notice (such day, the "Purchase Option Date").  On the Purchase Option Date, the Grantor shall deliver or cause to be delivered to such Grantee (i) certificates representing the number of Option Shares set forth in the Purchase Option Notice without legends or other restrictions on their transferability, properly endorsed for transfer, together with all required documents and instruments necessary to effect the transfer of the Option Shares and the recordation of such transfer with UMC, (ii) any dividends and distributions (whether in cash, securities or otherwise) in respect of such Option Shares and any right and interest on such Option Shares arising after the date of this Agreement and prior to such delivery, (iii) evidence that all required Investment Commission and other approvals have been obtained and (iv) a written certificate certifying that the representations and warranties set forth in Section 3 below remain true and correct as if made on the Purchase Option Date, against payment of the purchase price for such Option Shares, which shall be paid (less applicable R.O.C. securities transfer tax) in immediately available funds by such Grantee to an account designated in writing by the Grantor.  Notwithstanding anything to the contrary contained in this Agreement, if any Grantee delivers to the Grantor a Purchase Option Notice prior to the Purchase Option Expiration Date, the Purchase Option Expiration

9215769.7

3

PWSP 00561

Date shall be extended, for such Grantee, until after the Grantee has purchased the number of Option Shares set forth in the Purchase Option Notice.

(b)    Inability to Deliver/Cash Settlement. If, upon any exercise of the Purchase Option hereunder, the Grantor does not or cannot on the applicable Purchase Option Date deliver to the applicable Grantee full complete, unencumbered and unrestricted title to the relevant Option Shares as contemplated by subsection (a), above, the Grantor shall, at the option of the applicable Grantee, instead pay to the applicable Grantee on the applicable Purchase Option Date, by wire transfer of immediately available funds to such bank account or bank accounts as the applicable Grantee shall designate in writing to the Grantor, an amount equal to the Market Price minus the Exercise Price times the number of Option Shares to have been delivered pursuant to Subsection (a) above. For purposes of the above, "Market Price" shall mean the US Dollar equivalent (calculated at the Spot Rate on the date of payment) of the average closing price of UMC Shares on the Principal Market on the three (3) trading days immediately preceding the applicable Purchase Option Date. Notwithstanding the foregoing, nothing herein shall preclude any Grantee from seeking specific performance and/or claming damage from the Grantor if such failure to deliver arises from the Grantor's breach of its obligations hereunder.

SECTION 3.    Representations and Warranties. The Grantor hereby represents and warrants to the Grantees that:

(a)    the Grantor is and shall be on the Purchase Option Date the legal and beneficial owner of the Option Shares, free and clear of any lien, security interest, pledge, charge, option, right of first refusal, claim, mortgage, lease, easement or any other encumbrance whatsoever ("Liens"), except for Liens in favor of the Grantees pursuant to the Investment Documents;

(b)    on the date hereof, the Grantor is the legal, beneficial and record owner of at least 25,184,000 UMC Shares;

(c)    the Grantor has furnished each Grantee with a true, correct and complete copy of each lock-up agreement, pledge agreement, registration rights agreement and other agreement in respect of or otherwise affecting any of the UMC Shares held or beneficially owned by the Grantor in existence on the date hereof;

(d)    on the Option Date and thereafter the Option Shares will be Unrestricted Shares;

(e)    except for those approvals referred to elsewhere herein, all governmental (R.O.C. and non-R.O.C.) and other consents, approval or authorizations that are required to have been obtained by the Grantor with respect to this Agreement and the grant of the Purchase Option hereunder have been obtained and are, and will continue to be, in full force and effect and all conditions of any such consent, approval or authorization will have been complied with on or prior to the Option Date;

9215769.7

4

PWSP 00562

(f)    except as expressly contemplated herein, the Grantor is not required to obtain any governmental or other consent or approval, including, without limitation, from any governmental authority or entity in the R.O.C. in connection with the execution, delivery and performance of this Agreement or the transfer of the Option Shares to the Grantees;

(g)    the Grantor's investment in the Option Shares has been approved by the Investment Commission under the Statute for Investments by Foreign Nationals and the Option Shares are, and will upon transfer to the Grantees, remain fully eligible for all benefits associated with such approval; and

(h)    to the extent that any of the Option Shares are dividend shares, such shares are not subject to deferred dividend tax upon any future sale thereof.

SECTION 4.    Covenants.

(a)    The Grantor hereby covenants (i) immediately after the Option Date, but in no event later than five (5) Business Days thereafter, to jointly file with the Grantees, for approval with the Investment Commission, for the Grantor to sell, and one or more Grantees to purchase, some or all of the Option Shares at the Exercise Price, and (ii) if, and each time the Required Grantees request that the Grantor file an extension to the approval referred to in clause (i) above, the Grantor shall file such extension in form and substance acceptable to the Required Grantees, within five (5) Business Days after such request.

(b)    The Grantor at its own cost and expense shall do, make, execute and deliver all such additional and further acts, documents, assurances, certificates and instruments as may be necessary or that the Required Grantees may reasonably require to exercise their rights under the Purchase Option, including, without limitation, (i) executing, delivering and, where appropriate, filing any documents with the Investment Commission or any other governmental authority and (iii) delivering any legal opinion of Grantor's R.O.C. counsel with respect to the validity of the Purchase Option, in each case in form and substance satisfactory to the Required Grantees.

(c)    Upon exercise of the Purchase Option by any Grantee, in whole or in part, the Grantor shall cause (i) the Option Shares subject to such exercise to be released from the pledge in favor of the Grantees as set forth in the Pledge Agreement, and (ii) the certificates representing such shares to be endorsed and delivered to the Grantees as contemplated by Section 2(a) above, and (iii) the transfer of such shares to be recorded with UMC's transfer agent.

(d)    Notice Received from UMC.  From and after the date hereof, Grantor shall promptly notify the Grantees after the Grantor receives any notice from UMC that may reasonably be expected to affect the value of the Option Shares, including, without limitation, a notice of corporate action or proposed corporate action, and shall deliver a copy of such notice to each of the Grantees, but in no event shall the Grantor notify and deliver such notice to the Grantees later than five (5) Business Days after it has received such notice.

(e)    Grantees' Payment for Rights Offering.  If there is an offering by UMC to its shareholders of any rights or options to subscribe for, purchase or receive any securities, cash

9215769.7

5

PWSP 00563

or any other items and the Grantor elects not to participate in such offering, then, if permitted by applicable law, the Grantor shall notify the Grantees of the Grantor's intention not to participate prior to the earlier of (i) ten (10) days prior to the expiration of the offering and (ii) the number of days prior to the expiration of the offering equal to one-half of the number of days that such offering is to remain open, and the Grantor shall grant the Grantees the opportunity to deliver to the Grantor the funds and any actual reasonable expenses of the Grantor, including, without limitation, any securities transfer taxes, necessary for the Grantor to participate in such offering. Upon receipt of such funds, the Grantor shall be obligated to participate in such offering and shall do all acts and execute all documents necessary or appropriate to transfer the securities, options, cash or other items that were issued, granted, purchased or received pursuant to such offering to the Grantees.

(f)      Release from Collateral.  Any Option Shares purchased by a Grantee pursuant to Section 2 shall be released from the Collateral (as defined in the Pledge Agreement) pledged pursuant to the Pledge Agreement.

SECTION 5.   Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered pursuant to the terms of the Indenture.

SECTION 6.   Miscellaneous.

(a)      No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Grantor and the Required Grantees, and no waiver of any provision of this Agreement, and no consent to any departure by the Grantor therefrom, shall be effective unless it is in writing and signed by the Required Grantees, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)      This Agreement shall (i) remain in full force and effect until the Purchase Option Expiration Date; and (ii) be binding on the Grantor and its successors and assigns and shall inure, together with all rights and remedies of the Grantees hereunder, to the benefit of the Grantees and their successors, transferees and assigns.  The Grantees may assign or transfer, as collateral or otherwise, any or all of its interest hereunder and under the other Investment Documents.  None of the rights or obligations of the Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Required Grantees.

(c)      Upon the Purchase Option Expiration Date, this Agreement and the Purchase Option shall terminate.

(d)      This Agreement may be executed in counterparts, each of which, when so executed and delivered, shall be deemed to be an original and enforceable, but all of which counterparts, taken together, shall constitute one and the same instrument.

(e)      In the event that any one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and

9215769.7

6

PWSP 00564

enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the other remaining provisions, paragraphs, words, clauses, phrases or sentences hereof shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law; provided that this paragraph shall not cause this Agreement to differ materially from the intent of the parties as herein expressed.

(f)     Each party hereto shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments and documents as any other party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(g)     The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(h)     This Agreement supersedes all other prior oral or written agreements between the Grantor and each Grantee, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Grantor nor any Grantee makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended or waived other than by an instrument in writing signed by the Grantor and the Required Grantees. No such amendment shall be effective to the extent that it applies to less than all of the Grantees. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

(i)     The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(j)     Each Grantee and each permitted assignee under the Investment Documents shall have all rights and remedies set forth in the Investment Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

(k)     All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any

9215769.7

7

PWSP 00565

transaction contemplated hereby or discussed herein. and hereby irrevocably waives. and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under the Indenture and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

[REMAINDER OF PAGE IS BLANK]

9215769.7

8

PWSP 00566

IN WITNESS WHEREOF, the Grantor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By: _____
Name: John J. Todd
Title:   Chief Operating Officer

Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
    Name:   Jeffrey M. Solomon
    Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
    Name:   Adam J. Chill
    Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By: _____
    Name:   Kenneth A. Simpler
    Title:    Vice President

PWSP 00567

IN WITNESS WHEREOF, the Grantor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By:_____
Name:   John J. Todd
Title:    Chief Operating Officer


Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _____
Name:   Jeffrey M. Solomon
Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
Name:   Adam J. Chill
Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By:_____
Name:   Kenneth A. Simpler
Title:    Vice President

PWSP 00568

IN WITNESS WHEREOF, the Grantor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By:_____
Name:  John J. Todd
Title:    Chief Operating Officer

Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By:_____
    Name:   Jeffrey M. Solomon
    Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC

By: _____
    Name:   Adam J. Chill
    Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By:_____
    Name:   Kenneth A. Simpler
    Title:    Vice President

PWSP 00569

IN WITNESS WHEREOF, the Grantor has executed and delivered this Agreement as of the date first above written.

SONICBLUE INCORPORATED

By:_____
Name:  John J. Todd
Title:    Chief Operating Officer

Acknowledged and Consented to:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By:_____
    Name:  Jeffrey M. Solomon
    Title:    Managing Officer

SMITHFIELD FIDUCIARY LLC

By:_____
    Name:  Adam J. Chill
    Title:    Authorized Signatory

CITADEL EQUITY FUND LTD.

By:_____
    Name:  Kenneth A. Simpler
    Title:    Vice President

**PWSP 00570**

## SCHEDULE I

### SCHEDULE OF GRANTEES

| Grantee Name | Grantee Address and Facsimile Number |
|---|---|
| Portside Growth & Opportunity Fund, Ltd. | c/o Ramius Capital Group, L.L.C.<br>666 Third Avenue, 26th Floor<br>New York, NY 10017<br>Attention: Jeffrey M. Solomon<br>Andrew Strober<br>Telephone: (212) 845-7917<br>Facsimile: (212) 845-7999 |
| Smithfield Fiduciary LLC | c/o Highbridge Capital Management, LLC<br>9 West 57th Street, 27th Floor<br>New York, NY 10019<br>Attention: Ari J. Storch<br>Adam J. Chill<br>Telephone: (212) 287-4720<br>Facsimile: (212) 751-0755 |
| Citadel Equity Fund Ltd. | c/o Citadel Investment Group, L.L.C.<br>225 West Washington Street<br>Chicago, Illinois 60606<br>Attention: Kenneth A. Simpler<br>Telephone: (312) 338-7801<br>Facsimile: (312) 338-0780 |

9215769.7

APPENDIX A

DEFINED TERMS

Page

Agreement ........................................................................................................................ 1
Closing ............................................................................................................................. 1
Common Stock .................................................................................................................. 1
Debentures ........................................................................................................................ 1
Exercise Price ................................................................................................................... 3
Grantee ............................................................................................................................. 1
Grantees ............................................................................................................................ 1
Grantor .............................................................................................................................. 1
Investment ........................................................................................................................ 1
Liens ................................................................................................................................. 4
Market Price ..................................................................................................................... 4
Option Date ...................................................................................................................... 1
Purchase Agreement ......................................................................................................... 1
Purchase Option ............................................................................................................... 3
Purchase Option Date ...................................................................................................... 3
Purchase Option Expiration Date .................................................................................... 3
Purchase Option Notice ................................................................................................... 3
Warrants ........................................................................................................................... 1

9215769.7

# **EXHIBIT F**

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

No. 01

$25,000,000.00

## SONICBLUE INCORPORATED

### 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURE DUE 2005

SONICBLUE INCORPORATED, a corporation duly organized and validly existing under the laws of the State of Delaware (herein called the "Company", which term includes any successor corporation under the Indenture referred to herein), for value received hereby promises to pay to Portside Growth and Opportunity Fund, Ltd., or registered assigns, the principal sum of Twenty-Five Million Dollars and 00/100 ($25,000,000.00) on September 1, 2005 and to pay interest on said principal sum semi-annually on March 1 and September 1 of each year, commencing September 1, 2002, at the rate per annum specified in the title of this Debenture, accrued from the date of this Debenture until payment of said principal sum has been made in accordance with the terms of the Indenture. The interest so payable on any March 1 or September 1 will be paid to the person in whose name this Debenture (or one or more Predecessor Debentures) is registered at the close of business on the record date, which shall be the February 15 or August 15 (whether or not a Business Day) next preceding such March 1 or September 1, respectively, all in accordance with the terms and conditions of the Indenture. Payment of the principal of and interest accrued on this Debenture shall be made to the holder of this Debenture by wire transfer of immediately available to an account designated in writing by the holder to the Company in the Schedule of Buyers attached to the Indenture (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment in accordance with the Indenture). Interest on the Debentures shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

This Debenture is one of a duly authorized issue of Debentures of the Company, designated as its 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005 (herein called the "Debentures"), in the aggregate principal amount of $75,000,000, all issued or to be issued under and pursuant to an Indenture dated as of April 22, 2002 (herein called the "Indenture"), between the Company and the Initial Purchasers of Debentures (herein called the "Initial Purchasers"), to which Indenture and all indentures supplemental thereto reference is

PWSP 00574

hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Company and the holders of the Debentures.

Subject to the provisions of the Indenture, the holder hereof has the right, at its option, at any time prior to the close of business on September 1, 2005, or, as to all or any portion hereof called for redemption, prior to the close of business on the third Business Day next preceding the date fixed for redemption (unless the Company shall default in payment due upon redemption), to convert the principal hereof or any portion of such principal which is $1,000 or an integral multiple thereof, into that number of fully paid and non-assessable shares of the Company's Common Stock, as said shares shall be constituted at the date of conversion, obtained by dividing the principal amount of this Debenture or portion thereof to be converted by the conversion price of $19.22 or such conversion price as adjusted from time to time as provided in the Indenture, upon surrender of this Debenture, together with a conversion notice as provided in the Indenture and this Debenture, to the Company in accordance with Section 15.3 of the Indenture and, unless the shares issuable on conversion are to be issued in the same name as this Debenture, duly endorsed by, or accompanied by instruments of transfer in form reasonably satisfactory to the Company duly executed by, the holder or by his duly authorized attorney.

Terms used in this Debenture and defined in the Indenture are used herein as therein defined.

This Debenture shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be construed in accordance with and governed by the laws of said State.

PWSP 00575

IN WITNESS WHEREOF, the Company has caused this Debenture to be duly executed.

SONICBLUE INCORPORATED

Dated: _4/22/02_                    By: _John Q Tho_____

                                    Title: _COO_
                                    Attest:

**PWSP 00576**

[FORM OF CONVERSION NOTICE]

## CONVERSION NOTICE
### FOR
### 7 ¾ % SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURE DUE 2005

The undersigned, as Holder of the 7 ¾ % Secured Senior Subordinated Convertible Debenture Due 2005 of SONICBLUE INCORPORATED (the "Company"), No. _, in the outstanding principal amount of $_____ (the "Debenture"), hereby elects to convert $_____ of the outstanding principal amount of the Debenture into shares of Common Stock, par value $0.0001 per share (the "Common Stock"), of the Company according to the conditions of the Debenture, as of the date written below. The undersigned confirms that the representations and warranties contained in Section 2 of the Securities Purchase Agreement entered into in connection with the initial issuance of the Debentures are true and correct as to the undersigned as of the date hereof.

Date of Conversion:_____

Principal Amount of Debentures to be converted:_____

Tax ID Number (If applicable): _____

Please confirm the following information:_____

Conversion Price:_____

Number of shares of Common Stock to be issued:_____

Please issue the Common Stock into which the Debentures are being converted and, if applicable, any check drawn on an account of the Company in the following name and to the following address:

Issue to:_____

_____

Address: _____

Telephone Number: _____

Facsimile Number:_____

Authorization:_____

By:_____

Title:_____

Dated:

Account Number (if electronic book entry transfer):_____

Transaction Code Number (if electronic book entry transfer):_____

[NOTE TO HOLDER -- THIS FORM MUST BE SENT CONCURRENTLY TO TRANSFER AGENT]

PWSP 00578

[FORM OF OPTION TO ELECT REPAYMENT
UPON A DESIGNATED EVENT]

TO:    SONICBLUE INCORPORATED

The undersigned registered owner of this Debenture hereby acknowledges receipt of a notice from SONICblue Incorporated (the "Company") as to the occurrence of a Designated Event with respect to the Company and requests and instructs the Company to repay the entire principal amount of this Debenture, or the portion thereof (which is $1,000 principal amount or an integral multiple thereof) below designated, in accordance with the terms of the Indenture referred to in this Debenture, together with accrued interest to, but excluding, such date, to the registered holder hereof, in cash or, at the Company's election and in accordance with the Indenture, in Common Stock.

Dated: _____        _____
                                                                        Signature(s)

Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid
(if less than all): $_____,000

NOTICE: The above signatures of the holder(s) hereof must correspond with the name as written upon the face of the Debenture in every particular without alteration or enlargement or any change whatever.

PWSP 00579

# **<u>EXHIBIT G</u>**

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

No. 02                                                      $25,000,000.00

## SONICBLUE INCORPORATED

### 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURE DUE 2005

SONICBLUE INCORPORATED, a corporation duly organized and validly existing under the laws of the State of Delaware (herein called the "Company", which term includes any successor corporation under the Indenture referred to herein), for value received hereby promises to pay to Smithfield Fiduciary LLC, or registered assigns, the principal sum of Twenty-Five Million Dollars and 00/100 ($25,000,000.00) on September 1, 2005 and to pay interest on said principal sum semi-annually on March 1 and September 1 of each year, commencing September 1, 2002, at the rate per annum specified in the title of this Debenture, accrued from the date of this Debenture until payment of said principal sum has been made in accordance with the terms of the Indenture. The interest so payable on any March 1 or September 1 will be paid to the person in whose name this Debenture (or one or more Predecessor Debentures) is registered at the close of business on the record date, which shall be the February 15 or August 15 (whether or not a Business Day) next preceding such March 1 or September 1, respectively, all in accordance with the terms and conditions of the Indenture. Payment of the principal of and interest accrued on this Debenture shall be made to the holder of this Debenture by wire transfer of immediately available to an account designated in writing by the holder to the Company in the Schedule of Buyers attached to the Indenture (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment in accordance with the Indenture). Interest on the Debentures shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

This Debenture is one of a duly authorized issue of Debentures of the Company, designated as its 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005 (herein called the "Debentures"), in the aggregate principal amount of $75,000,000, all issued or to be issued under and pursuant to an Indenture dated as of April 22, 2002 (herein called the "Indenture"), between the Company and the Initial Purchasers of Debentures (herein called the "Initial Purchasers"), to which Indenture and all indentures supplemental thereto reference is

PWSP 00581

hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Company and the holders of the Debentures.

Subject to the provisions of the Indenture, the holder hereof has the right, at its option, at any time prior to the close of business on September 1, 2005, or, as to all or any portion hereof called for redemption, prior to the close of business on the third Business Day next preceding the date fixed for redemption (unless the Company shall default in payment due upon redemption), to convert the principal hereof or any portion of such principal which is $1,000 or an integral multiple thereof, into that number of fully paid and non-assessable shares of the Company's Common Stock, as said shares shall be constituted at the date of conversion, obtained by dividing the principal amount of this Debenture or portion thereof to be converted by the conversion price of $19.22 or such conversion price as adjusted from time to time as provided in the Indenture, upon surrender of this Debenture, together with a conversion notice as provided in the Indenture and this Debenture, to the Company in accordance with Section 15.3 of the Indenture and, unless the shares issuable on conversion are to be issued in the same name as this Debenture, duly endorsed by, or accompanied by instruments of transfer in form reasonably satisfactory to the Company duly executed by, the holder or by his duly authorized attorney.

Terms used in this Debenture and defined in the Indenture are used herein as therein defined.

This Debenture shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be construed in accordance with and governed by the laws of said State.

PWSP 00582

IN WITNESS WHEREOF, the Company has caused this Debenture to be duly executed.

SONICBLUE INCORPORATED

Dated: _____4/22/02_____     By: _____

Title: _CEO_

Attest:

PWSP 00583

[FORM OF CONVERSION NOTICE]

**CONVERSION NOTICE**
**FOR**
**7 ¾ % SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURE DUE 2005**

The undersigned, as Holder of the 7 ¾ % Secured Senior Subordinated Convertible Debenture Due 2005 of SONICBLUE INCORPORATED (the "Company"), No. _, in the outstanding principal amount of $_____ (the "Debenture"), hereby elects to convert $_____ of the outstanding principal amount of the Debenture into shares of Common Stock, par value $0.0001 per share (the "Common Stock"), of the Company according to the conditions of the Debenture, as of the date written below.  The undersigned confirms that the representations and warranties contained in Section 2 of the Securities Purchase Agreement entered into in connection with the initial issuance of the Debentures are true and correct as to the undersigned as of the date hereof.

Date of Conversion:_____

Principal Amount of Debentures to be converted:_____

Tax ID Number (If applicable): _____

Please confirm the following information:_____

Conversion Price:_____

Number of shares of Common Stock to be issued:_____

PWSP 00584

Please issue the Common Stock into which the Debentures are being converted and, if applicable, any check drawn on an account of the Company in the following name and to the following address:

Issue to:_____

_____

Address: _____

Telephone Number: _____

Facsimile Number:_____

Authorization:_____

By:_____

Title:_____

Dated:

Account Number (if electronic book entry transfer):_____

Transaction Code Number (if electronic book entry transfer):_____

[NOTE TO HOLDER -- THIS FORM MUST BE SENT CONCURRENTLY TO TRANSFER AGENT]

[FORM OF OPTION TO ELECT REPAYMENT
UPON A DESIGNATED EVENT]

TO:    SONICBLUE INCORPORATED

The undersigned registered owner of this Debenture hereby acknowledges receipt of a notice from SONICblue Incorporated (the "Company") as to the occurrence of a Designated Event with respect to the Company and requests and instructs the Company to repay the entire principal amount of this Debenture, or the portion thereof (which is $1,000 principal amount or an integral multiple thereof) below designated, in accordance with the terms of the Indenture referred to in this Debenture, together with accrued interest to, but excluding, such date, to the registered holder hereof, in cash or, at the Company's election and in accordance with the Indenture, in Common Stock.

Dated: _____     _____
                                                                Signature(s)

                                    Social Security or Other Taxpayer
                                    Identification Number

                                    Principal amount to be repaid
                                    (if less than all): $_____,000

                                    NOTICE: The above signatures of the holder(s)
                                    hereof must correspond with the name as written
                                    upon the face of the Debenture in every particular
                                    without alteration or enlargement or any change
                                    whatever.

PWSP 00586

# EXHIBIT H

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR (B) AN OPINION OF COUNSEL, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

No. 03

$25,000,000.00

## SONICBLUE INCORPORATED

### 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURE DUE 2005

SONICBLUE INCORPORATED, a corporation duly organized and validly existing under the laws of the State of Delaware (herein called the "Company", which term includes any successor corporation under the Indenture referred to herein), for value received hereby promises to pay to Citadel Equity Fund Ltd., or registered assigns, the principal sum of Twenty-Five Million Dollars and 00/100 ($25,000,000.00) on September 1, 2005 and to pay interest on said principal sum semi-annually on March 1 and September 1 of each year, commencing September 1, 2002, at the rate per annum specified in the title of this Debenture, accrued from the date of this Debenture until payment of said principal sum has been made in accordance with the terms of the Indenture. The interest so payable on any March 1 or September 1 will be paid to the person in whose name this Debenture (or one or more Predecessor Debentures) is registered at the close of business on the record date, which shall be the February 15 or August 15 (whether or not a Business Day) next preceding such March 1 or September 1, respectively, all in accordance with the terms and conditions of the Indenture. Payment of the principal of and interest accrued on this Debenture shall be made to the holder of this Debenture by wire transfer of immediately available to an account designated in writing by the holder to the Company in the Schedule of Buyers attached to the Indenture (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment in accordance with the Indenture). Interest on the Debentures shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

This Debenture is one of a duly authorized issue of Debentures of the Company, designated as its 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005 (herein called the "Debentures"), in the aggregate principal amount of $75,000,000, all issued or to be issued under and pursuant to an Indenture dated as of April 22, 2002 (herein called the "Indenture"), between the Company and the Initial Purchasers of Debentures (herein called the "Initial Purchasers"), to which Indenture and all indentures supplemental thereto reference is

hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Company and the holders of the Debentures.

Subject to the provisions of the Indenture, the holder hereof has the right, at its option, at any time prior to the close of business on September 1, 2005, or, as to all or any portion hereof called for redemption, prior to the close of business on the third Business Day next preceding the date fixed for redemption (unless the Company shall default in payment due upon redemption), to convert the principal hereof or any portion of such principal which is $1,000 or an integral multiple thereof, into that number of fully paid and non-assessable shares of the Company's Common Stock, as said shares shall be constituted at the date of conversion, obtained by dividing the principal amount of this Debenture or portion thereof to be converted by the conversion price of $19.22 or such conversion price as adjusted from time to time as provided in the Indenture, upon surrender of this Debenture, together with a conversion notice as provided in the Indenture and this Debenture, to the Company in accordance with Section 15.3 of the Indenture and, unless the shares issuable on conversion are to be issued in the same name as this Debenture, duly endorsed by, or accompanied by instruments of transfer in form reasonably satisfactory to the Company duly executed by, the holder or by his duly authorized attorney.

Terms used in this Debenture and defined in the Indenture are used herein as therein defined.

This Debenture shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be construed in accordance with and governed by the laws of said State.

PWSP 00589

IN WITNESS WHEREOF, the Company has caused this Debenture to be duly executed.

SONICBLUE INCORPORATED

Dated: 4/22/02                    By: _____
                                  Title: COO
                                  Attest:

PWSP 00590

[FORM OF CONVERSION NOTICE]

## CONVERSION NOTICE
### FOR
### 7 ¾ % SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURE DUE 2005

The undersigned, as Holder of the 7 ¾ % Secured Senior Subordinated Convertible Debenture Due 2005 of SONICBLUE INCORPORATED (the "Company"), No. _, in the outstanding principal amount of $_____ (the "Debenture"), hereby elects to convert $_____ of the outstanding principal amount of the Debenture into shares of Common Stock, par value $0.0001 per share (the "Common Stock"), of the Company according to the conditions of the Debenture, as of the date written below. The undersigned confirms that the representations and warranties contained in Section 2 of the Securities Purchase Agreement entered into in connection with the initial issuance of the Debentures are true and correct as to the undersigned as of the date hereof.

Date of Conversion:_____

Principal Amount of Debentures to be converted:_____

Tax ID Number (If applicable): _____

Please confirm the following information:_____

Conversion Price:_____

Number of shares of Common Stock to be issued:_____

Please issue the Common Stock into which the Debentures are being converted and, if applicable, any check drawn on an account of the Company in the following name and to the following address:

Issue to:_____

_____

Address: _____

Telephone Number: _____

Facsimile Number:_____

Authorization:_____

By:_____

Title:_____

Dated:

Account Number (if electronic book entry transfer):_____

Transaction Code Number (if electronic book entry transfer):_____

[NOTE TO HOLDER -- THIS FORM MUST BE SENT CONCURRENTLY TO TRANSFER AGENT]

PWSP 00592

[FORM OF OPTION TO ELECT REPAYMENT
UPON A DESIGNATED EVENT]

TO:    SONICBLUE INCORPORATED

The undersigned registered owner of this Debenture hereby acknowledges receipt of a notice from SONICblue Incorporated (the "Company") as to the occurrence of a Designated Event with respect to the Company and requests and instructs the Company to repay the entire principal amount of this Debenture, or the portion thereof (which is $1,000 principal amount or an integral multiple thereof) below designated, in accordance with the terms of the Indenture referred to in this Debenture, together with accrued interest to, but excluding, such date, to the registered holder hereof, in cash or, at the Company's election and in accordance with the Indenture, in Common Stock.

Dated: _____        _____
                                                          Signature(s)

Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid
(if less than all): $_____,000

NOTICE: The above signatures of the holder(s) hereof must correspond with the name as written upon the face of the Debenture in every particular without alteration or enlargement or any change whatever.

PWSP 00593

# EXHIBIT I



**PILLSBURY WINTHROP**ᴸᴸᴾ

April 22, 2002

Portside Growth & Opportunity Fund, Ltd.
c/o Ramius Capital Group, L.L.C.
666 Third Avenue
26th Floor
New York, New York 10017

Smithfield Fiduciary LLC
c/o Highbridge Capital Management, LLC
9 West 57th Street, 27th Floor
New York, NY 10019

Citadel Equity Fund Ltd.
c/o Citadel Investment Group, L.L.C.
225 West Washington Street
Chicago, Illinois 60606

Re:     Securities Purchase Agreement

Ladies and Gentlemen:

We have acted as counsel to SONICblue Incorporated (the "Company") in connection
with the issuance and sale of $75,000,000 aggregate principal amount of 7 ¾% Secured
Senior Subordinated Convertible Debentures Due 2005 of the Company (collectively, the
"Debentures") and Warrants to purchase Common Stock of the Company (the
"Warrants") pursuant to the Securities Purchase Agreement (the "Purchase Agreement"),
dated as of April 21, 2002, by and among the Company and each of you.  This opinion is
delivered to you pursuant to the requirement set forth in Section 7(iv) of the Purchase
Agreement.  Capitalized terms used herein not otherwise defined herein shall have the
respective meanings assigned to such terms in the Purchase Agreement.

In connection with the foregoing, we have reviewed the Purchase Agreement, the
Schedules to the Purchase Agreement, the Registration Rights Agreement, the Indenture,
the Pledge and Security Agreement, the form of Debenture, the form of Warrant, the
Irrevocable Transfer Agent Instructions and the Option Agreement, each, other than the
Purchase Agreement, the form of Debenture and the form of Warrant, dated as of the date
hereof, the Company's Restated Certificate of Incorporation, as amended to date, and By-
laws, as amended to date, records of the proceedings of the Company's Board of
Directors, certificates of officers and such other documents and instruments as we have
deemed necessary or advisable in order to render the opinions expressed herein.  As to

60268396v5

20

21

22

23

24

25

April 22, 2002
Page 2



PILLSBURY WINTHROP LLP

questions of fact material to such opinions, we have, when relevant facts were not independently established, relied upon certificates of officers of the Company.

Based upon the foregoing and subject to the assumptions, qualifications, limitations and exceptions set forth below, it is our opinion that:

      1.  The Company has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Delaware with the requisite corporate power and authority to own and use its properties and assets and to carry on its business as currently conducted. The Company is duly qualified to transact business and is in good standing as a foreign corporation in the State of California.

      2.  The Company has the requisite corporate power and authority to execute and deliver each of the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions and to perform its obligations under the respective terms thereof. Each of the Purchase Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement, and the Irrevocable Transfer Agent Instructions has been duly executed and delivered by the Company and, in the case of the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers, will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

      3.  The issuance and sale of the Debentures have been duly authorized. Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. The Company has duly authorized and reserved for issuance upon conversion of the Debentures the Conversion Shares and such Conversion Shares will, when issued and delivered upon conversion of the Debentures in accordance with the terms thereof and the Indenture, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Debentures or the Conversion Shares.

      4.  The issuance and sale of the Warrants have been duly authorized. When issued in accordance with the terms of the Purchase Agreement, the Warrants will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. The Company has duly authorized and reserved for issuance upon exercise of the Warrants the Warrant Shares and such Warrant Shares will, upon issuance and delivery against payment therefor upon exercise of the Warrants in accordance with the terms of the Warrants, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Warrants or the Warrant Shares.

60268396v5

PWSP 02621

April 22, 2002
Page 3

**PILLSBURY WINTHROP** LLP

5.  The Company has duly authorized and reserved for issuance the
Interest Shares and such Interest Shares will, when issued and delivered in accordance
with the terms of the Debentures and the Indenture, be validly issued, fully paid and
nonassessable. There are no statutory preemptive or, to our knowledge, other similar
rights to subscribe for or to purchase the Interest Shares.

6.  Assuming the accuracy of the representations and warranties made by
the Buyers and the Company in the Purchase Agreement and due performance by the
Company of the covenant set forth in Section 4(b) of the Purchase Agreement, (i) the
offer and sale of the Debentures and the Warrants in the manner contemplated by the
Purchase Agreement, (ii) the offer and sale of the Warrant Shares in accordance with the
terms of the Purchase Agreement and the Warrants, and (iii) the issuance of the
Conversion Shares and the Interest Shares in accordance with the terms of the Purchase
Agreement, the Indenture and the Debentures, are exempt from the registration
requirements of Section 5 of the Securities Act of 1933, as amended.

7.  All authorizations, approvals, consents, permits or orders of, and all
qualifications, registrations, designations, declarations or filings with, any federal or New
York governmental authority on the part of the Company required to be made in
connection with the consummation of the transactions contemplated by the Purchase
Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights
Agreement, the Pledge and Security Agreement, the Option Agreement and the
Irrevocable Transfer Agent Instructions have been made or obtained, except for such
filings as are contemplated by the covenant of the Company set forth in Section 4(b) of
the Purchase Agreement that may be required to be filed pursuant to applicable federal
and state securities laws subsequent to the consummation of the transactions
contemplated by the Purchase Agreement, the Indenture, the Debentures, the Warrants,
the Registration Rights Agreement, the Pledge and Security Agreement, the Option
Agreement and the Irrevocable Transfer Agent Instructions.

8.  We are not aware of any action, suit, proceeding or investigation
pending against the Company before or by any court or administrative agency, or that the
Company has received any written threat thereof, that questions the validity of the
Purchase Agreement, the Registration Rights Agreement, the Irrevocable Transfer Agent
Instructions, the Indenture, the Debentures, the Warrants, the Pledge and Security
Agreement or the Option Agreement.

9.  The execution, delivery and performance by the Company of the
Purchase Agreement, the Indenture, the Registration Rights Agreement, the Pledge and
Security Agreement, the Option Agreement and the Irrevocable Transfer Agent
Instructions and the issuance of the Debentures and the Warrants pursuant to the
Purchase Agreement and the Indenture do not violate any provisions of the Company's
Restated Certificate of Incorporation or By-laws, and do not (i) violate, contravene or
constitute a default under (or an event which, with the giving of notice or lapse of time or

60268396v5

April 22, 2002
Page 4



PILLSBURY WINTHROP LLP

both, constitutes or would constitute a default under) the provisions of any of the contracts that are filed as an exhibit to the SEC Documents or (ii) violate or contravene any governmental statute, law, rule or regulation applicable to the Company.

The opinions set forth above are subject to the following assumptions, qualifications, limitations and exceptions:

(a)      Our opinion in the first sentence of paragraph 1 above as to the Company's good standing in the State of Delaware is based solely upon a review of a certificate of good standing from the State of Delaware (such certificate is dated as of a date within ten days of the Closing Date). Our opinion in the last sentence of paragraph 1 above is based solely upon a review of a certificate of good standing from the State of California (such certificate is dated as of a date within ten days of the Closing Date).

(b)      Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, (ii) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law, (iii) the effect of applicable court decisions, invoking statutes or principles of equity, which have held that certain covenants and provisions of agreements are unenforceable where the breach of such covenants or provision imposes restrictions or burdens upon a party, and it cannot be demonstrated that the enforcement of such restrictions or burdens is necessary for the protection of the other party or the enforcement of such covenants or provisions under the circumstances would violate the covenant of good faith and fair dealing implied under applicable law, and (iv) the effect of statutes and rules of law that cannot be waived prospectively by an obligor.  We also express no opinion as to the enforceability of the provisions of the Purchase Agreement or the Registration Rights Agreement purporting to provide for indemnification and contribution, to the extent that enforcement thereof may be limited by state or federal securities law, public policy or otherwise.

(c)      This opinion is limited in all respects to matters governed by the laws of the State of New York, the General Corporation Law of the State of Delaware and the federal laws of the United States, and we express no opinion concerning the application or effect of the laws or regulations of any other jurisdiction or jurisdictions or as to the interpretation of any agreements or instruments that would arise from the application or effect of the laws of any jurisdiction other than the law of the State of New York, the State of Delaware or the federal law of the United Stated of America.  Insofar as the opinions expressed herein relate to matters governed by laws other than those referred to in

April 22, 2002
Page 5

PILLSBURY WINTHROP☞

the preceding sentence, we have assumed, but without having made any independent investigation, that such laws do not affect this opinion. We express no opinion as to the effect of any provision in the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Debentures, the Warrants, the Irrevocable Transfer Agent Instructions, the Pledge and Security Agreement and the Option Agreement specifying that New York law governs any such agreement and the transactions contemplated thereby. We express no opinion as to the effect of any provision in the Pledge and Security Agreement specifying that the laws of the Republic of China govern the Pledge and Security Agreement and the transactions contemplated thereby or as to the meaning, interpretation, validity, binding nature or enforceability of the Pledge and Security Agreement under the laws of the Republic of China. We express no opinion as to federal or state antifraud or antitrust laws or regulations or, except as set forth in paragraph 6, as to the securities or blue sky law of any jurisdiction. We express no opinion in clause (ii) of paragraph 9 as to ordinances and regulations of New York or Delaware counties and political subdivisions thereof.

(d)    We have assumed the genuineness of all signatures, the authenticity and completeness of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies of originals, the legal capacity of all natural persons, and, as to documents executed by entities other than the Company, that each such entity had the power to enter into and perform its obligations under such documents, and that such documents have been duly authorized, executed and delivered by, and are valid and binding upon and enforceable against such entities. We have also assumed that the representations and warranties made by the Company in the Purchase Agreement are true and correct as to matters of fact and that the representations and warranties made by the Buyers in the Purchase Agreement are true and correct.

(e)    We have assumed for purposes of paragraph 6 that the terms of the Debentures will be the same on any Conversion Date or Interest Payment Date as they are on the date hereof, that the terms of the Warrants will be the same on any date of exercise of such Warrant as they are on the date hereof, that the representations and warranties made by the Buyers and the Company in the Purchase Agreement are true and correct at the time of exercise of any Warrant and the issuance of any Warrant Shares, and due performance by the Company of the covenant set forth in Section 4(b) of the Purchase Agreement at the time of any exercise of any Warrant and the issuance of any Warrant Shares.

(f)    We assume that you know of no agreements, understandings or negotiations between the parties not set forth in the the Purchase Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement and the Irrevocable

60268396v5

April 22, 2002
Page 6



PILLSBURY WINTHROP LLP

Transfer Agent Instructions that would modify the terms or rights and obligations of the parties thereunder that would affect this opinion.

(g)    Whenever a statement herein is qualified by "to our knowledge," or "we are not aware," or similar phrase, it indicates that in the course of our representation of the Company no information that would give us current actual knowledge of the inaccuracy of such statement has come to the attention of the attorneys in this firm who have rendered legal services in connection with this transaction. We have not made any independent investigation to determine the accuracy of such statement, except as we have deemed necessary or appropriate under the circumstances as expressly described herein. No inference as to our knowledge of any matters bearing on the accuracy of such statement should be drawn from the fact of our representation of the Company in other matters in which such attorneys are not involved.

This opinion is rendered solely for your information in connection with the transaction described above and may not be delivered to or relied upon by any other person without our prior written consent.

Very truly yours,

*Pillsbury Winthrop LLP*

E04942
E25996

6026839v5

**PWSP 02625**

1    PILLSBURY WINTHROP SHAW PITTMAN LLP
     THOMAS V. LORAN III # 95255
2    CRAIG A. BARBAROSH # 160224
     ALBERT J. BORO JR. # 126657
3    WILLIAM B. FREEMAN  # 137276
     650 Town Center Drive, 7th Floor
4    Costa Mesa, CA  92626-7122
     Telephone: (714) 436-6800
5    Facsimile:  (714) 436-2800

6    Attorneys for Debtors and Debtors-In-Possession

7

8

9

10

11           UNITED STATES BANKRUPTCY COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13             SAN JOSE DIVISION

| | |
|---|---|
| 14   IN RE:<br><br>15   SONICBLUE INCORPORATED, a<br>     Delaware corporation, DIAMOND<br>16   MULTIMEDIA SYSTEMS, INC., a<br>     Delaware corporation, REPLAYTV, INC.,<br>17   a Delaware corporation, and SENSORY<br>     SCIENCE CORPORATION, a Delaware<br>18   corporation,<br><br>19<br><br>20        Debtors and Debtors-in-Possession.<br><br>21<br><br>22<br><br>23<br><br>24 | Case Nos. 03-51775, 03-51776, 03-51777<br>and 03-51778 MM<br><br>CHAPTER 11 Cases, Jointly Administered<br><br>DECLARATION OF WILLIAM B.<br>FREEMAN RE MOTION FOR<br>APPOINTMENT OF TRUSTEE AND<br>MOTION TO DISQUALIFY PILLSBURY<br>WINTHROP SHAW PITTMAN LLP<br><br>Date:    March 19, 2007<br>Time:   10:30 a.m.<br>Place:   Courtroom 3070<br>        280 South First Street<br>        San Jose, CA 95113<br>Judge:   Hon. Marilyn Morgan |

25

26

27

28

700636328_1v (5)          - 1 -        DECLARATION OF WILLIAM B. FREEMAN RE
                                   MOTION FOR APPOINTMENT OF TRUSTEE AND TO
                                 DISQUALIFY PILLSBURY WINTHROP SHAW

1                           <u>DECLARATION OF WILLIAM B. FREEMAN</u>

2         I, William B. Freeman, hereby declare:

3   1.     I am an active member of the State Bar of California and am admitted to practice

4   before this Court. I am a member of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").

5   I have been involved in the representation of the Debtors throughout these bankruptcy

6   cases, and I am one of the attorneys at Pillsbury with principal responsibility for these

7   cases. I have personal knowledge of the facts set forth herein and, if called upon to do so,

8   would and could competently testify to the truth thereof.

9   2.     This bankruptcy case is a liquidating bankruptcy in which it is anticipated that no

10  equity holder will be receiving anything by reason of his, her or its equity interest in the

11  bankruptcy estate. Therefore, it is the unsecured creditors who stand to be primarily

12  affected by Pillsbury's work on the case. Accordingly, throughout this case, Pillsbury has

13  worked closely with the law firm of Levene, Neale, Bender, Rankin & Brill, L.L.P.

14  ("LNBRB"), counsel for the Official Committee of Creditors Holding Unsecured Claims

15  (the "Creditors' Committee").

16  3.     Pillsbury filed with the Court seven supplemental Bankruptcy Rule 2014

17  disclosures, as further information relating to potential or actual conflicts became known.

18  Of these, I executed the third through seventh supplemental disclosures, filed on or about

19  April 12, 2005, July 13, 2005, July 27, 2005, November 4, 2005 and June 5, 2006.

20  4.     In the third supplemental disclosure and each disclosure thereafter, Pillsbury stated:

21          If there is a dispute with any present or past client of the Firm in matters
        related to the Debtors or these cases requiring litigation or other action,
22          counsel to the Creditors' Committee or another firm will handle such action.

23  During the course of these cases, Pillsbury has turned over a number of matters to

24  LNBRB in its capacity as counsel for the Creditors' Committee.

25  5.     In August of 2006, I first became aware that Pillsbury had issued an opinion letter in

26  connection with the Debtors' sale of 7¾% Senior Secured Subordinated Convertible

27  Debentures due 2005. Corporate counsel often issue opinion letters in connection with

28

                                    - 2 -

700636328_1v (5)                              DECLARATION OF WILLIAM B. FREEMAN RE
                                      MOTION FOR APPOINTMENT OF TRUSTEE AND
                                      MOTION TO DISQUALIFY PILLSBURY WINTHROP

1  financing and other transactions. I do not recall ever having seen such an opinion of

2  counsel disclosed in a declaration filed under Bankruptcy Rule 2014.

3  6.    Among the creditors of the Debtors are Portside Growth and Opportunity Fund,

4  Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd., holders of the 7¾% Senior

5  Secured Subordinated Convertible Debentures due 2005 (the "Senior Noteholders"). In the

6  summer of 2006, Pillsbury analyzed whether the claims of the Senior Noteholders were

7  subject to disallowance under 11 U.S.C. § 502(b)(2) to the extent they included original

8  issue discount that was unamortized as of the petition date.

9  7.    On either August 24 or August 25, 2006, I learned from my partner Craig Barbarosh

10  that he had received a telephone call from Bruce Bennett, counsel for the Senior

11  Noteholders, indicating that, based on an opinion letter Pillsbury had issued in connection

12  with the Debtors' sale of debentures to the Senior Noteholders, the Senior Noteholders were

13  demanding that Pillsbury defend and indemnify them for any losses the Senior Noteholders

14  might incur as a result of the Debtors' objections to the Senior Noteholders' claims under

15  11 U.S.C. § 502(b)(2) to the extent they included unamortized original issue discount or

16  were avoidable as a fraudulent conveyance. Mr. Barbarosh indicated that we would be

17  receiving a letter formally presenting the Senior Noteholders' demand.

18  8.    To the best of my knowledge and belief, that conversation with Mr. Barbarosh was

19  the first time I had heard from any source that Pillsbury had issued an opinion letter in

20  connection with the Debtors' sale of debentures to the Senior Noteholders. That

21  conversation was the first time I had heard from any source that any such opinion letter was

22  claimed to give rise to any liability on Pillsbury's part.

23  9.    We immediately decided to turn over to LNBRB, counsel for the Creditors'

24  Committee, the handling of the Senior Noteholders' claim analysis and objection. Due to

25  the similarity of issues, and to avoid any appearance of impropriety, we also turned over to

26  LNBRB the analysis of claims asserted by the junior noteholders.

27  10.    On or before August 31, 2006, I spoke with Ron Bender of LNBRB and discussed

28  with him the transition from Pillsbury to LNBRB of the handling of the Senior

- 3 -

700636328_1v (5)

DECLARATION OF WILLIAM B. FREEMAN RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP

1    Noteholders' claim analysis and objection and analysis of claims asserted by junior

2    noteholders. During that conversation I explained to Mr. Bender that Pillsbury had

3    concluded it should not handle those issues because of the claim that Mr. Bennett had

4    asserted against Pillsbury on behalf of Senior Noteholders. I told Mr. Bender that we

5    would send LNBRB our draft objection and emails related to our investigation.

6    11.    I am aware, from having received a copy of Mr. Walker's September 6, 2006 email

7    to Ron Bender and Craig Rankin of LNBRB, that Pillsbury's electronic files relating to the

8    Senior Noteholders' claims and junior noteholders' claims were sent to LNBRB on

9    September 6, 2006. See Exhibit 3 to the Declaration Of Craig A. Barbarosh re Motion for

10   Appointment of Trustee and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP

11   ("Barbarosh Declaration").

12   12.    In addition to taking the steps described above, Pillsbury should have filed a

13   supplemental declaration under Bankruptcy Rule 2014 after we received Mr. Swartz's

14   letter, Exhibit 2 to the Barbarosh Declaration. Through oversight, we failed to do so in this

15   case. While I delegate the preparation of such declarations to other attorneys within the

16   firm, it is my practice to review and execute such declarations. I should have noticed, but

17   did not notice, that a supplemental declaration had not been presented to me for my review

18   and signature. Neither I nor, to the best of my knowledge and belief, anyone else at

19   Pillsbury, intended to conceal the issue from anyone.

20   13.    On December 15, 2006, the Disclosure Statement Describing Liquidating Plan of

21   Reorganization Dated as of December 15, 2006 Proposed Jointly by the Debtors and

22   Creditors' Committee ("December 15 Disclosure Statement") was filed with the Court and

23   served on all creditors and parties in interest entitled to such notice pursuant to the Court's

24   order limiting notice entered on or about April 2, 2003. The December 15 Disclosure

25   Statement states, at page 21-22:

26           Until recently, the Debtors were in charge of analyzing the Junior Notes
             Claims. *However, as a result of a conflict that has been asserted by the*
27           *Senior Noteholders with respect to counsel to the Debtors, the Creditors'*
             *Committee is now in charge of analyzing the Junior Notes Claims.* The

28

- 4 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Creditors' Committee has only performed a preliminary analysis of this
> issue. . . . .
>
> * * *
>
> As with the Junior Notes, the Proponents believe that an original issue
> discount also exists with respect to the Senior Notes, which would warrant
> some reduction in the amount of the Allowed Claims of the Senior
> Noteholders. As with the Junior Notes, until recently, the Debtors were in
> charge of analyzing the Senior Notes Claims. ***However, as a result of a
> conflict that has been asserted by the Senior Noteholders with respect to
> counsel to the Debtors, the Creditors' Committee is now in charge of
> analyzing the Senior Notes Claims.*** The Creditors' Committee has only
> performed a preliminary analysis of this issue.

(Emphasis added). A true and correct copy of an excerpt of from the December 15

Disclosure Statement is attached hereto as Exhibit 1. On January 18, 2007, the Disclosure

Statement Describing First Amended Liquidating Plan of Reorganization Dated as of

January 18, 2007 Proposed Jointly by the Debtors and Creditors' Committee ("January 18

Disclosure Statement") was filed with the Court and served on all creditors and parties in

interest entitled to such notice pursuant to the Court's order limiting notice entered on or

about April 2, 2003. The January 18 Disclosure Statement states, at page 28:

> Until recently, counsel to the Debtors was in charge of analyzing the Junior
> Notes Claims. ***As a result of the Senior Noteholders' contention that
> counsel to the Debtors had pre-petition issued to the Senior Noteholders
> an unqualified legal opinion that the Senior Notes were enforceable
> against the Debtors in accordance with their terms, counsel to the Debtors
> requested the Creditors' Committee to assume the role of analyzing the
> Junior Notes Claims.*** The Creditors' Committee has only performed a
> preliminary analysis of this issue. . . .
>
> * * *
>
> As with the Junior Notes, the Proponents believe that an original issue
> discount also exists with respect to the Senior Notes, which would warrant
> some reduction in the amount of the Allowed Claims of the Senior
> Noteholders. As with the Junior Notes, until recently, counsel to the Debtors
> was in charge of analyzing the Senior Notes Claims. ***As a result of the
> Senior Noteholders' contention that counsel to the Debtors had pre-
> petition issued to the Senior Noteholders an unqualified legal opinion that
> the Senior Notes were enforceable against the Debtors in accordance with
> their terms, counsel to the Debtors requested the Creditors' Committee to
> assume the role of analyzing the Senior Notes Claims.*** The Creditors'
> Committee has only performed a preliminary analysis of this issue.

(Emphasis added.) A true and correct copy of an excerpt of from the January 18 Disclosure

Statement is attached hereto as Exhibit 2.

- 5 -

DECLARATION OF WILLIAM B. FREEMAN RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP

1    I declare under penalty of perjury under the laws of the United States of America

2    and the State of California the foregoing is true and correct.

3    Executed this 5th day of March, 2007 in Los Angeles, California.

4

5                                    William B. Freeman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

DECLARATION OF WILLIAM B. FREEMAN RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP

# EXHIBIT 1

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   CRAIG A. BARBAROSH California Bar No. 160224
2  WILLIAM B. FREEMAN California Bar No. 137276
   MATTHEW S. WALKER California Bar No. 101470
3  650 Town Center Drive, 7th Floor
   Costa Mesa, CA  92626-7122
4  Telephone: (714) 436-6800
   Facsimile: (714) 436-2800
5
6  Attorneys for Debtors and Debtors-In-Possession

7  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   RON BENDER California Bar No. 143364
   CRAIG M. RANKIN California Bar No. 169844
8  TODD M. ARNOLD California Bar No. 221868
   10250 Constellation Blvd., Suite 1700
9  Los Angeles, CA  90067
   Telephone: (310) 229-1234
10 Facsimile: (310) 229-1244

11 Attorneys for the Official Committee of Creditors
   Holding Unsecured Claims
12
                   UNITED STATES BANKRUPTCY COURT
13                  NORTHERN DISTRICT OF CALIFORNIA
                         SAN JOSE DIVISION
14
15 IN RE:                              Case No. 03-51775 MM

16 SONICBLUE INCORPORATED, a           Chapter 11 Cases
   Delaware corporation, DIAMOND
17 MULTIMEDIA SYSTEMS, INC., a         (Case Numbers 03-51775 through
   Delaware corporation, REPLAYTV,     03-51778)
18 INC., a Delaware corporation, and
   SENSORY SCIENCE                     (Jointly Administered)
19 CORPORATION, a Delaware
   corporation,                        DISCLOSURE STATEMENT
20                                      DESCRIBING LIQUIDATING PLAN
              Debtors.                  OF REORGANIZATION DATED AS
21                                      OF DECEMBER 15, 2006 PROPOSED
                                        JOINTLY BY DEBTORS AND
22                                      CREDITORS' COMMITTEE

23                                      Disclosure Statement Hearing:
                                        Date:  January 18, 2007
24                                      Time: 11:00 a.m.
                                        Dept:  Courtroom 3070
25                                              280 South First St.
                                                San Jose, CA 95113
26
                                        Hon. Marilyn Morgan
27
28

                                    DISCLOSURE STATEMENT FOR
                          LIQUIDATING PLAN OF REORGANIZATION

                          Exhibit_____  1

1    In addition, as discussed below in connection with the Preference Actions, the Debtors and the Creditors' Committee have addressed and litigated objections to Claims in connection with the

2   Preference Actions, which process is still ongoing.

3    The Proponents anticipate that they will continue the Claims objection process up to the Effective Date, at which time the process will be taken over by the Reorganized Debtor and/or the Plan Oversight Committee. Other than with respect to possible objections to the Junior Notes

4   Claims and the Senior Notes Claims as described immediately below, nearly all of the more significant Claims objections have been filed. Set forth in Exhibit "C" hereto is a list of all known

5   Claims that were included in the Schedules or were asserted in filed proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Debtors and/or

6   the Creditors' Committee (or by the Reorganized Debtor and/or the Plan Oversight Committee after the Effective Date) as the Debtors and the Creditors' Committee are continuing with their

7   investigation of Claims. Exhibit "C" is being provided for notification purposes only. It is possible that the Debtors, the Creditors' Committee, the Reorganized Debtor, the Plan Oversight

8   Committee or some other party in interest may file an objection to a Claim which is not included in Exhibit "C". The fact that a claim is not included in Exhibit "C" is without prejudice to the rights

9   of any party in interest to file any objection to a Claim. These Claims are in addition to the Claims which are held by parties who are the subject of a pending Avoidance Action (and whose Claims

10  are therefore disputed until the Avoidance Action is resolved), and the Claims of the Junior Noteholders and the Senior Noteholders which are addressed below. Claim holders (whether or

11  not identified in Exhibit "C") should not rely on the fact that no objection has to date been filed to their Claim in voting on whether to accept or reject the Plan. Claim holders (whether or not

12  identified in Exhibit "C") should make their decision on whether to vote to accept or reject the Plan independent from the fact that an objection may still be filed to their Claim.

13

14       **4.    Claim Issues Involving the Junior Noteholders and the Senior Noteholders.**

    In 1996, Junior Notes were issued in the aggregate original principal amount of $103.5

15  million. The Junior Notes and associated rights were sold for $100.3 million. As a result, there was a discrepancy of approximately $3.2 million between the face amount of the Junior Notes and

16  the amount of money actually paid by the Junior Noteholders for the Junior Notes. The Junior Notes Indenture Trustee filed a proof of claim against the Debtors in the amount of $106.1 million,

17  which the Junior Notes Indenture Trustee contends does not include any post-Petition Date interest.

18       Under the Bankruptcy Code, interest that is not matured as of the petition date is disallowed under Section 502(b)(2). The Proponents believe that the original issue discount on the

19  Junior Notes, which is the difference between the face amount of the Junior Notes and the actual price paid for them, is considered unmatured interest and is to be disallowed under Section

20  502(b)(2) of the Bankruptcy Code to the extent that it has not been amortized as of the Petition Date.

21       Until recently, the Debtors were in charge of analyzing the Junior Notes Claims. However,

22  as a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing the Junior Notes Claims. The

23  Creditors' Committee has only performed a preliminary analysis of this issue. Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can be

24  reached, the Creditors' Committee will likely be filing an objection to the Junior Notes Claims based upon the unamortized portion of the approximately $3.2 million discrepancy between the

25  face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes. In addition, the Creditors' Committee believes that the Junior Noteholders

26  may have received additional consideration in exchange for their payment of $100.3 million (i.e., beyond the issuance of the Junior Notes), such as stock conversion rights, which may serve to

27  further reduce the appropriate Allowed Amount of the Junior Notes Claims. As described more below in the Plan summary treatment of Class 5 Claims (i.e., the Junior Notes Claims), for

28  purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are

1    assuming that the Junior Notes Claims will be Allowed in the amount of $103 million. However,
     this assumption is being made solely to enable the Proponents to provide an estimated distribution
2    to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors'
     Committee, the Reorganized Debtor (after the Effective Date) or any other party in interest to file
3    an objection to the Claims of the Junior Noteholders contending that the Allowed Amount of the
     Junior Notes Claims should be less than $103 million.

4          In 2002, Senior Notes in the aggregate original principal amount of $75 million (which also
5    had certain stock conversion rights) plus 7.5 million warrants for SONICblue stock and options to
     purchase 21,426,586 shares of UMC stock were sold as "Investments" in a private placement to
6    three investors, who are classified under the Plan as Class 3 Claims. This investment package was
     sold for an aggregate net price of $62.25 million. The UMC stock was also pledged as security for
7    the Senior Notes. The Debtors scheduled the Claim of the Senior Notes Indenture for in excess of
     $77 million, and each of the three Senior Noteholders filed its own proofs of Claim in unspecified
8    amounts relating to the Senior Notes. The Senior Noteholders never exercised any of their stock
     conversion rights and never exercised any of their warrants. However, during the course of the
9    Chapter 11 Cases, the Senior Noteholders received approximately $17.4 million from the proceeds
     of the UMC stock that collateralized the Senior Notes. The receipt of the sale proceeds of the
10   UMC stock serves to reduce the Allowed Claims of the Senior Noteholders.

11         As with the Junior Notes, the Proponents believe that an original issue discount also exists
     with respect to the Senior Notes, which would warrant some reduction in the amount of the
12   Allowed Claims of the Senior Noteholders. As with the Junior Notes, until recently, the Debtors
     were in charge of analyzing the Senior Notes Claims. However, as a result of a conflict that has
13   been asserted by the Senior Noteholders with respect to counsel to the Debtors, the Creditors'
     Committee is now in charge of analyzing the Senior Notes Claims. The Creditors' Committee has
14   only performed a preliminary analysis of this issue. Based upon this preliminary analysis, the
     Creditors' Committee believes that unless an amicable resolution can be reached, the Creditors'
15   Committee will likely be filing an objection to the Senior Notes Claims based upon the
     unamortized portion of the approximately $12.75 million discrepancy between the face amount of
16   the Senior Notes and the amount of money actually paid by the Senior Notes Holders for the
     Senior Notes. In addition, as described above, the Creditors' Committee believes that the Senior
17   Noteholders may have received additional consideration in exchange for their payment of $62.25
     million (i.e., beyond the issuance of the Senior Notes), which may serve to further reduce the
18   appropriate Allowed Amount of the Senior Notes Claims.

19         The Creditors' Committee is working with GHC to analyze the Junior Notes Claims and the
     Senior Notes Claims, and attempt to arrive at a mutually agreeable discount of the Junior Notes
20   Claims and the Senior Notes Claims without the expense and time delay that would be associated
     with litigating these disputes. Preliminarily, GHC believes that a substantial portion of the Senior
21   Notes Claims constitutes unamortized original issue discount, which may constitute disallowable
     unmatured interest. GHC believes that the percentage discount for the Junior Notes Claims may
22   be substantially lower because substantially more amortization of the original issue discount
     occurred with the longer passage of time since the issuance of the Junior Notes back in 1996.

23         As described more below in the Plan summary treatment of Class 3 Claims (i.e., the Senior
     Notes Claims), for purposes of projecting an estimated distribution to Unsecured Claim Holders,
24   the Proponents are assuming that the Senior Notes Claims will be Allowed in the amount of $47
     million. However, this assumption is being made solely to enable the Proponents to provide an
25   estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the
     Debtors, the Creditors' Committee, the Reorganized Debtor (after the Effective Date) or any other
26   party in interest to file an objection to the Claims of the Senior Notes Holders contending that the
     Allowed Amount of the Senior Notes Claims should be less than $47 million.

27         The Bankruptcy Court shall retain jurisdiction over these estates following the Effective
     Date to adjudicate any objections filed to the Senior Notes Claims and/or the Junior Notes Claim,
28   regardless of whether such objections were filed by the Creditors' Committee prior to the Effective

1  Date and continued by the Plan Oversight Committee after the Effective Date, or whether such objections are first filed by the Plan Oversight Committee or the Reorganized Debtor after the
2  Effective Date.

3  I.    **Post-Petition Date Litigation.**

       1.    **VIA Litigation.**

4
       VIA Technologies, Inc. ("VIA") and S3 Graphics Co., Ltd. ("JV") filed duplicate $105
5  million proofs of claim allegedly arising out of an August 28, 2000 Amended Investment Agreement between SONICblue and VIA and other related agreements.  VIA and JV alleged that
6  SONICblue breached the Amended Investment Agreement and related agreements by, among other things, not paying certain accounts payable, offering non-ordinary-course discounts to
7  accelerate collection of receivables, not contributing certain assets to JV, and retaining payments received for certain accounts receivable that allegedly were owed to JV.  Approximately $27
8  million of these claims were subject to a $5.5 million damages cap.  VIA and JV also claimed that JV may be enjoined from using an intellectual property license between SONICblue and Intel
9  Corporation ("Intel") and that JV was therefore entitled to damages under the Amended Investment Agreement in an amount of up to $70 million.  The Claims were based upon breach of
10 contract and related causes of action and involved very complex facts.

11     In December, 2004, the Debtors commenced litigation (the "VIA Litigation") by filing a complaint against VIA, JV and S3 Graphics, Inc. ("JV Sub") for affirmative relief and objecting to
   the aforementioned Claims and asserting numerous counterclaims.  The VIA Litigation was
12 vigorously disputed and protracted, and the Debtors incurred more than $2 million in legal expenses in the VIA Litigation and related matters.

13
       The VIA Litigation and the other litigation matters between the Debtors and Intel were
14 settled pursuant to an order entered after a Bankruptcy Court hearing on October 27, 2005.  Under the settlement, among other things, VIA and JV received a $12.5 million general unsecured claim
15 against SONICblue and the two $105 million duplicate claims were disallowed.  In addition, among other things, SONICblue agreed to and has commenced the process of transferring the
16 intellectual property and records and files relating to its graphic chips business to JV or its designee.  The Proponents believe that this was an extremely favorable result for the Debtors'
17 estates.

18     The Debtors and the Creditors' Committee jointly decided that Plan confirmation could not proceed until the VIA Litigation was resolved, which is the primary reason for the delay between
   the Petition Date and the filing of the Plan and this Disclosure Statement.  Among other things,
19 confirmation of a plan to the VIA settlement would have resulted in the Debtors' rejection of certain contracts with VIA that would likely have given VIA the right to claim certain liquidated
20 damages.  Thus, by deferring proposing a plan of reorganization, the Proponents minimized VIA's potential claims against the Debtors' estates.  The settlement of the VIA Litigation and the other
21 litigation matters between the Debtors and Intel was therefore monumentally significant towards the ability of the Debtors and the Creditors' Committee to bring these Chapter 11 Cases to
22 conclusion.

23     2.    **Avoidance Actions.**

       The Bankruptcy Code authorizes a debtor-in-possession or trustee to seek avoidance and
24 recovery of "preferential" and "fraudulent" transfers.  Generally, a preferential transfer is a transfer made during the ninety (90) days preceding commencement of a bankruptcy case on account of an
25 existing debt that enables a creditor to receive more than it would have received in a liquidation case.  Where the transfer is to an "insider", the ninety-day period is extended to one year.  Here,
26 because the Debtors will not be paying most classes of Claims in full, a transfer during the preference period to any party whose Claim, absent such payment, would have been included in
27 Classes 3-6 would enable such creditor to receive more than it would have received in a liquidation

28

1  and the Indentures substantially limit the options available to the proponent of a liquidating plan. As such, the Debtors do not believe there is a feasible, more favorable alternative to the Plan.

2  **ARTICLE XIII**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

3

4  The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Interests.  The Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Interests as a result of the confirmation of the

5  Plan.  All Holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan.   THIS DISCLOSURE

6  STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

7  **ARTICLE XIV**
**CONCLUSION AND RECOMMENDATION**

8

9  The Debtors and the Creditors' Committee believe that the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 3, 4, 5, and 6  to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the

10  address set forth above so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [ _____,] 2007.

11

12  Dated: December 15, 2006

13

14  Respectfully Submitted:

15  By:     /s/ Marcus Smith
16          Marcus Smith
         Debtors' Responsible Individual
17

18  By:     /s/ William B. Freeman
         Pillsbury Winthrop Shaw Pittman LLP
19          Attorneys for Debtors and Debtors-In-
         Possession and Co-Plan Proponent
20

21  By:     /s/ Ron Bender
         Levene, Neale, Bender, Rankin & Brill L.L.P.
22          Attorneys for the Official Committee of
         Creditors Holding Unsecured Claims and
23          Co-Plan Proponent

24

25

26

27

28

# EXHIBIT 2

PILLSBURY WINTHROP SHAW PITTMAN LLP
CRAIG A. BARBAROSH California Bar No. 160224
WILLIAM B. FREEMAN California Bar No. 137276
MATTHEW S. WALKER California Bar No. 101470
650 Town Center Drive, 7th Floor
Costa Mesa, CA 92626-7122
Telephone: (714) 436-6800
Facsimile: (714) 436-2800

Attorneys for Debtors and Debtors-In-Possession

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
RON BENDER California Bar No. 143364
CRAIG M. RANKIN California Bar. No. 169844
TODD M. ARNOLD California Bar No. 221868
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for the Official Committee of Creditors
Holding Unsecured Claims

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br>          Debtors. | Case No. 03-51775 MM<br><br>Chapter 11 Cases<br><br>(Case Numbers 03-51775 through 03-51778)<br>(Jointly Administered)<br><br>DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION DATED AS OF JANUARY 18, 2007 PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE<br><br><u>Disclosure Statement Hearing:</u><br>Date: January 23, 2007<br>Time: 11:00 a.m.<br>Dept: Courtroom 3070<br>      280 South First St.<br>      San Jose, CA 95113<br><br>Hon. Marilyn Morgan |

and many of these Claims: (i) are not substantiated by the Debtors' books and records, which are believed to accurately set forth the Debtors' debts and obligations; (ii) duplicate other filed Claims; (iii) are lacking in proper documentation; (iv) were not timely filed; (v) assert priority or secured status without a proper basis; and/or (vi) were filed by parties who received avoidable transfers.  The Bankruptcy Code authorizes the Debtors, the Creditors' Committee or any other party in interest to object to Claims on all these grounds, as well as any other justifiable grounds.

The Debtors and the Creditors' Committee have each filed and litigated a substantial number of objections to Claims.  The Debtors focused on larger Claims requiring a more detailed knowledge of the Debtors' business affairs, whereas the Creditors' Committee focused on smaller Claims and filing omnibus objections.  The Debtors and the Creditors' Committee filed not less than 25 Claims objections and motions to subordinate Claims.  In addition, the Creditors' Committee has filed three omnibus Claims objections.  As a result of these efforts, more than $290 million in Claims have been disallowed or subordinated.

In addition, as discussed below in connection with the Preference Actions, the Debtors and the Creditors' Committee have addressed and litigated objections to Claims in connection with the Preference Actions, which process is still ongoing.

The Proponents anticipate that they will continue the Claims objection process up to the Effective Date, at which time the process will be taken over by the Reorganized Debtor and/or the Plan Oversight Committee.  Other than with respect to possible objections to the Junior Notes Claims and the Senior Notes Claims as described immediately below, nearly all of the more significant Claims objections have been filed.  Set forth in Exhibit "C" hereto is a list of all known Claims that were included in the Schedules or were asserted in filed proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Debtors and/or the Creditors' Committee (or by the Reorganized Debtor and/or the Plan Oversight Committee after the Effective Date) as the Debtors and the Creditors' Committee are continuing with their investigation of Claims.  Exhibit "C" is being provided for notification purposes only.  It is possible that the Debtors, the Creditors' Committee, the Reorganized Debtor, the Plan Oversight Committee or some other party in interest may file an objection to a Claim which is not included in Exhibit "C".  The fact that a claim is not included in Exhibit "C" is without prejudice to the rights of any party in interest to file any objection to a Claim.  These Claims are in addition to the Claims which are held by parties who are the subject of a pending Avoidance Action (and whose Claims are therefore disputed until the Avoidance Action is resolved), and the Claims of the Junior Noteholders and the Senior Noteholders which are addressed below.  Claim holders (whether or not identified in Exhibit "C") should not rely on the fact that no objection has to date been filed to their Claim in voting on whether to accept or reject the Plan.  Claim holders (whether or not identified in Exhibit "C") should make their decision on whether to vote to accept or reject the Plan independent from the fact that an objection may still be filed to their Claim.

**4.    Claim Issues Involving the Junior Noteholders and the Senior Noteholders.**

In 1996, Junior Notes were issued in the aggregate original principal amount of $103.5 million.  The Junior Notes and associated rights were sold for $100.3 million.  As a result, there was a discrepancy of approximately $3.2 million between the face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes.  The Junior Notes Indenture Trustee filed a proof of claim against the Debtors in the amount of $106.1 million, which the Junior Notes Indenture Trustee contends does not include any post-Petition Date interest.

Under the Bankruptcy Code, interest that is not matured as of the petition date is disallowed under Section 502(b)(2).  The Proponents believe that the original issue discount on the Junior Notes, which is the difference between the face amount of the Junior Notes and the actual price paid for them, is considered unmatured interest and is to be disallowed under

DISCLOSURE STATEMENT DESCRIBING FIRST
AMENDED LIQUIDATING PLAN OF REORGANIZATION

Section 502(b)(2) of the Bankruptcy Code to the extent that it has not been amortized as of the Petition Date.

Until recently, counsel to the Debtors was in charge of analyzing the Junior Notes Claims. As a result of the Senior Noteholders' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee to assume the role of analyzing the Junior Notes Claims. The Creditors' Committee has only performed a preliminary analysis of this issue. Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can be reached, the Creditors' Committee will likely be filing an objection to the Junior Notes Claims based upon the unamortized portion of the approximately $3.2 million discrepancy between the face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes. In addition, the Creditors' Committee believes that the Junior Noteholders may have received additional consideration in exchange for their payment of $100.3 million (i.e., beyond the issuance of the Junior Notes), such as stock conversion rights, which may serve to further reduce the appropriate Allowed Amount of the Junior Notes Claims. As described more below in the Plan summary treatment of Class 5 Claims (i.e., the Junior Notes Claims), for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Junior Notes Claims will be Allowed in the amount of $103 million. However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor (after the Effective Date) or any other party in interest to file an objection to the Claims of the Junior Noteholders contending that the Allowed Amount of the Junior Notes Claims should be less than $103 million.

In 2002, Senior Notes in the aggregate original principal amount of $75 million (which also had certain stock conversion rights) plus 7.5 million warrants for SONICblue stock were sold in a private placement to three investors, who are classified under the Plan as Class 3 Claims. In addition, the documents provided that a condition to the closing of this transaction was the issuance of options to purchase 21,426,586 shares of UMC stock. This investment package was sold for an aggregate net price of $62.25 million. The UMC stock was also pledged as security for the Senior Notes. The Debtors scheduled the Claim of the Senior Notes Indenture for in excess of $77 million, and each of the three Senior Noteholders filed its own proofs of Claim in unspecified amounts relating to the Senior Notes. The Senior Noteholders never exercised any of their stock conversion rights and never exercised any of their warrants. However, during the course of the Chapter 11 Cases, the Senior Noteholders received approximately $17.4 million from the proceeds of the UMC stock that collateralized the Senior Notes. The receipt of the sale proceeds of the UMC stock serves to reduce the Allowed Claims of the Senior Noteholders.

As with the Junior Notes, the Proponents believe that an original issue discount also exists with respect to the Senior Notes, which would warrant some reduction in the amount of the Allowed Claims of the Senior Noteholders. As with the Junior Notes, until recently, counsel to the Debtors was in charge of analyzing the Senior Notes Claims. As a result of the Senior Noteholders' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee to assume the role of analyzing the Senior Notes Claims. The Creditors' Committee has only performed a preliminary analysis of this issue. Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can be reached, the Creditors' Committee will likely be filing an objection to the Senior Notes Claims based upon the unamortized portion of the approximately $12.75 million discrepancy between the face amount of the Senior Notes and the amount of money actually paid by the Senior Noteholders

DISCLOSURE STATEMENT DESCRIBING FIRST
AMENDED LIQUIDATING PLAN OF REORGANIZATION

relative to the Plan.

**B.     Alternative Chapter 11 Plan.**

If the Plan is not confirmed, the Debtors, the Creditors' Committee, or any of the parties in interest could attempt to formulate a different Chapter 11 plan. However, the Bankruptcy Code and the Indentures substantially limit the options available to the proponent of a liquidating plan. As such, the Debtors do not believe there is a feasible, more favorable alternative to the Plan.

**ARTICLE XIII**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Interests. The Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Interests as a result of the confirmation of the Plan. All Holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

**ARTICLE XIV**
**CONCLUSION AND RECOMMENDATION**

The Debtors and the Creditors' Committee believe that the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 3, 4 and 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth above so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [_____], 2007.

Dated: January 18, 2007

Respectfully Submitted:

By:     */s/ Marcus Smith*
        Marcus Smith
        Debtors' Responsible Individual

By:     */s/ William B. Freeman*
        Pillsbury Winthrop Shaw Pittman LLP
        Attorneys for Debtors and Debtors-In-
        Possession and Co-Plan Proponent

By:     */s/ Ron Bender*
        Levene, Neale, Bender, Rankin & Brill L.L.P.
        Attorneys for the Official Committee of
        Creditors Holding Unsecured Claims and
        Co-Plan Proponent

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    THOMAS V. LORAN III #95255
2   CRAIG A. BARBAROSH #160224
    ALBERT J. BORO JR. #126657
3   WILLIAM B. FREEMAN #137276
    650 Town Center Drive, 7th Floor
4   Costa Mesa, CA 92626-7122
    Telephone: (714) 436-6800
5   Facsimile: (714) 436-2800

6   Attorneys for Debtors and Debtors-In-Possession

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                           SAN JOSE DIVISION

11  | IN RE:                                    | Case Nos. 03-51775, 03-51776, 03-51777
    |                                           | and 03-51778 MM
12  | SONICBLUE INCORPORATED, a                 |
    | Delaware corporation, DIAMOND             | CHAPTER 11 Cases, Jointly Administered
13  | MULTIMEDIA SYSTEMS, INC., a               |
    | Delaware corporation, REPLAYTV, INC.,     | DECLARATION OF CRAIG A.
14  | a Delaware corporation, and SENSORY       | BARBAROSH RE MOTION FOR
    | SCIENCE CORPORATION, a Delaware           | APPOINTMENT OF TRUSTEE AND
15  | corporation,                              | MOTION TO DISQUALIFY PILLSBURY
    |                                           | WINTHROP SHAW PITTMAN LLP
16  |                                           |
    |                                           | Date:    March 19, 2007
17  | Debtors and Debtors-in-Possession.        | Time:    10:30 a.m.
    |                                           | Place:   Courtroom 3070
18  |                                           |          280 South First Street
    |                                           |          San Jose, CA 95113
19  |                                           |
    |                                           | Hon. Marilyn Morgan
20

21

22

23

24

25

26

27

28

700634774v1                    - 1 -        DECLARATION OF CRAIG A. BARBAROSH RE
                                            MOTION FOR APPOINTMENT OF TRUSTEE AND TO
                                            DISQUALIFY PILLSBURY WINTHROP SHAW
                                            PITTMAN LLP

1

## DECLARATION OF CRAIG A. BARBAROSH

2      I, Craig A. Barbarosh, hereby declare:

3   1.     I am an active member of the State Bar of California and am admitted to practice

4   before this Court. I am a member of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").

5   I was the partner with principal responsibility for representing the Debtors when these

6   bankruptcy cases were filed, although after the Debtors' principal assets were sold in 2003 I

7   ceased to be involved in the day-to-day handling of the cases. I have personal knowledge

8   of the facts set forth herein and, if called upon to do so, would and could competently

9   testify to the truth thereof.

10  2.     Attached as Exhibit 1 hereto is a true and correct copy of the Application for Order

11  Pursuant to Bankruptcy Code Section 327(a) Authorizing the Employment and Retention of

12  Pillsbury Winthrop LLP as General Insolvency Counsel to the Debtors; Declarations of

13  Craig A. Barbarosh and Marcus Smith in Support Thereof filed April 1, 2003. The

14  employment application and declarations were prepared by John Wesolowski, an attorney

15  who was then employed by Pillsbury. Mr. Wesolowski was responsible for reviewing,

16  analyzing and describing Pillsbury's connections with the Debtors' creditors and other

17  interested parties. From my review of Mr. Wesolowski's time records related to this case, it

18  appears that he devoted more than 16 hours to work related to Pillsbury's fee application.

19  3.     I reviewed and provided comments on the pleadings Mr. Wesolowski had drafted

20  and executed the application and my declaration. I take responsibility for the accuracy and

21  completeness of my declaration. I believed at the time I executed the declaration, and I still

22  believe today, that the declaration was accurate, complete and in compliance with

23  Bankruptcy Rule 2014 as of the date I executed it.

24  4.     Mr. Wesolowski resigned his employment with Pillsbury on or about May 2, 2003

25  and accepted a position with the Office of the U.S. Trustee.

26  5.     In my April 1, 2003 declaration, I stated:

27      The Firm has been engaged as the Debtors' corporate and litigation counsel
        since approximately 1989. During this time, the Firm has provided legal
28      representation to the Debtors in a variety of areas, including corporate and

- 2 -

700634774v1                          DECLARATION OF CRAIG A. BARBAROSH RE
                                     MOTION FOR APPOINTMENT OF TRUSTEE AND
                                     MOTION TO DISQUALIFY PILLSBURY WINTHROP
                                     SHAW PITTMAN LLP

securities matters, mergers and acquisitions, litigation, and intellectual property matters. The Firm has been working with the Debtors in connection with their restructuring since approximately October 25, 2002, when the Firm was retained to provide advice concerning the restructuring of the Debtors' liabilities and business operations.

6.      This bankruptcy case is a liquidating bankruptcy in which it is anticipated that no equity holder will be receiving anything by reason of his, her or its equity interest in the bankruptcy estate. Therefore, it is the unsecured creditors who stand to be primarily affected by Pillsbury's work on the case. Accordingly, I understand that Pillsbury has worked closely with the law firm of Levene, Neale, Bender, Rankin & Brill, L.L.P. ("LNBRB"), counsel for the Official Committee of Creditors Holding Unsecured Claims (the "Creditors' Committee").

7.      Pillsbury filed with the Court seven supplemental Bankruptcy Rule 2014 disclosures, as further information relating to potential or actual conflicts became known. Of these, I executed the first two supplemental declarations, filed on or about May 30, 2003 and January 23, 2004

8.      In the third supplemental disclosure and each disclosure thereafter, Pillsbury stated:

If there is a dispute with any present or past client of the Firm in matters related to the Debtors or these cases requiring litigation or other action, counsel to the Creditors' Committee or another firm will handle such action.

I understand that during the course of these cases, Pillsbury has turned over a number of matters to LNBRB.

9.      In August of 2006, I first became aware that Pillsbury had issued an opinion letter in connection with the Debtors' sale of 7 ¾% Senior Secured Subordinated Convertible Debentures due 2005. Corporate counsel often issue opinion letters in connection with financing and other transactions. I do not recall ever having seen such an opinion of counsel disclosed in a declaration filed under Bankruptcy Rule 2014.

10.     Among the creditors of the Debtors are Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd., holders of the 7 ¾% Senior Secured Subordinated Convertible Debentures due 2005 (the "Senior Noteholders"). I am aware that, in the summer of 2006, Pillsbury analyzed whether the claims of the Senior

- 3 -

DECLARATION OF CRAIG A. BARBAROSH RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP
SHAW PITTMAN LLP

1    Noteholders were subject to disallowance under 11 U.S.C. § 502(b)(2) to the extent they

2    included original issue discount that was unamortized as of the petition date.

3    11.    On August 24, 2006, I received a telephone call from Bruce Bennett, counsel for the

4    Senior Noteholders. Mr. Bennett indicated that he had been reviewing emails from

5    Matthew Walker, a senior associate with Pillsbury, which indicated that the Debtors

6    intended to object to the claims of the Senior Noteholders on the grounds that the notes

7    were subject to partial disallowance under 11 U.S.C. § 502(b)(2) to the extent they included

8    unamortized original issue discount or were avoidable as a fraudulent conveyance. During

9    that call, Mr. Bennett informed me that Pillsbury had issued an enforceability opinion at the

10   time the notes were issued, which he interpreted as stating that the claims of the Senior

11   Noteholders based on the notes would be allowable in a bankruptcy case. Mr. Bennett

12   further stated that his clients had relied on the opinion, and that he would be sending a letter

13   demanding that Pillsbury defend and indemnify the Senior Noteholders for any losses

14   relating to the § 502(b)(2) disallowance or the fraudulent conveyance claim.

15   12.    To the best of my knowledge and belief, my August 24, 2006 phone conversation

16   with Mr. Bennett was the first time I had heard from any source that Pillsbury had issued an

17   opinion letter in connection with the Debtors' sale of debentures to the Senior Noteholders.

18   That conversation was the first time I had heard from any source that any such opinion

19   letter was claimed to give rise to liability on Pillsbury's part.

20   13.    Within a day or so, I had obtained and reviewed a copy of the opinion letter issued

21   by Pillsbury. Although it appeared to me that Mr. Bennett's claim was frivolous, I

22   immediately instructed the Pillsbury attorneys working on the matter to turn over to

23   LNBRB, counsel for the Creditors' Committee, the handling of the Senior Noteholders'

24   claim analysis and objection. Due to the similarity of issues, and to avoid any appearance

25   of impropriety, we also turned over to LNBRB the analysis of claims asserted by the junior

26   noteholders.

27

28

-4-

DECLARATION OF CRAIG A. BARBAROSH RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP
SHAW PITTMAN LLP

14.    Attached as Exhibit 2 is a true and correct copy of a letter dated September 5, 2006, from Michael Swartz to Mary Cranston of Pillsbury, formally asserting the Senior Noteholders' claim.

15.    I am aware, from having received a copy of Mr. Walker's September 6, 2006 email to Ron Bender and Craig Rankin of LNBRB, that Pillsbury's electronic files relating to the Senior Noteholders' claims and junior noteholders' claims were sent to LNBRB on September 6, 2006. A true and correct copy of this email, excluding attachments, is attached hereto as Exhibit 3.

16.    In addition to taking the steps described above, Pillsbury should have filed a supplemental declaration under Bankruptcy Rule 2014 after we received Mr. Swartz's letter. I understand that, through oversight, no such supplemental declaration was filed. Neither I nor, to the best of my knowledge and belief, anyone else at Pillsbury intended to conceal the issue from anyone.

17.    To the best of my knowledge and belief, this was an isolated incident. It is now, and throughout my career has been, my practice, and the practice of the bankruptcy lawyers at Pillsbury, to file supplemental disclosures under Bankruptcy Rule 2014 as conflicts or potential conflicts become known. I have been with Pillsbury for nearly 15 years. I am informed and believe that, prior to the matter now before this Court, Pillsbury has never been found to have violated Bankruptcy Rule 2014, or been charged with doing so.

18.    I understand that the U.S. Trustee is seeking disqualification of Pillsbury as counsel for the Debtors in these cases and the disgorgement of all fees allowed to Pillsbury in the Court's orders granting Pillsbury's eight interim applications for allowance of compensation in these cases. Pillsbury submitted interim applications as follows:

| Application | Date Filed | Time Period Covered |
|---|---|---|
| First interim application | July 18, 2003 | March 21 – June 30, 2003 |
| Second interim application | Feb. 17, 2004 | July 1 – December 31, 2003 |
| Third interim | June 16, 2004 | January 1- May 31, 2004 |

- 5 -

| | | |
|---|---|---|
| application | | |
| Fourth interim application | Oct. 20, 2004 | June 1-September 30, 2004 |
| Fifth interim application | March 9, 2005 | October 1, 2004 – January 31, 2005 |
| Sixth interim application | Oct. 5, 2005 | February 1 – September 20, 2005 |
| Seventh interim application | April 19, 2006 | October 1, 2005 – March 31, 2006 |
| Eighth interim application | Oct. 18, 2006 | April 1 – September 30, 2006 |

19.    Houlihan Lokey Howard & Zukin Capital, the Debtors' financial advisors, determined that the net liquidation value of the Debtors' product lines as of March 19, 2003, excluding the Debtors' shares in United Microelectronics Corporation ("UMC"), was between $20.7 and $29 million. As explained below, Pillsbury's work in these cases has contributed to the bankruptcy estate's recovery of substantially higher values.

20.    Pillsbury has worked extensively with the Debtors to maximize the assets of the bankruptcy estate. Among other activities, Pillsbury's work included the following:

a.    Within weeks of the commencement of these cases, Pillsbury assisted in the sale of the Debtors' Rio, ReplayTV and Go-Video product lines, which were sold for $41.1 million. With Court approval, the Debtors sold their UMC stock for $45.9 million. The disposition of these assets created substantial benefit for the estate.

b.    Pillsbury has filed more than 25 claims objections and motions to subordinate claims. As a result, more than $160 million in claims has been disallowed or subordinated.

c.    Pillsbury also has assisted the Debtors in post-petition litigation. The Debtors reached a settlement with Intel Corporation, VIA Technologies, Inc., and S3 Graphics, Ltd. (the "VIA litigation"). Among the issues

- 6 -

DECLARATION OF CRAIG A. BARBAROSH RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP
SHAW PITTMAN LLP

1    resolved in the VIA litigation were two $105 million claims filed by VIA

2    Technologies, Inc. and S3 Graphics, Ltd. (collectively, the "VIA

3    claimants"). On October 27, 2006, this Court approved the settlement of

4    the VIA litigation, which resulted in the VIA Claimants being granted an

5    allowed, general unsecured claim in the amount of $12.5 million.

6        d.  Pursuant to this Court's order dated March 11, 2005, Pillsbury undertook

7    to prosecute approximately 100 preference actions on behalf of the

8    Debtors' estate on a contingent fee basis. So far, Pillsbury's work has

9    resulted in recoveries of more than $5.4 million, of which over $3.65

10    million has been paid (with most of the balance of the recoveries to be

11    paid from the defendants' claims distributions). In addition, Pillsbury

12    has succeeded in obtaining waivers of more than $9.6 million in claims.

13    21.    Each of Pillsbury's fee applications was properly noticed. Each was supported by

14    detailed time records and other backup. I submitted declarations in support of the first

15    through fifth interim applications. My partner William Freeman submitted declarations in

16    support of the sixth through eighth interim applications. In each of my declarations, I

17    certified:

18        To the best of my knowledge, information and belief, formed after
       reasonable inquiry, the compensation and expense reimbursement sought in
19    this Fourth Application is in conformity with the U.S. Trustee's Guidelines
       for Compensation and Expense Reimbursement of Professionals and
20    Trustee, except as specifically noted in the Application with respect to
       Westlaw research. As set forth in the Application, I believe that
21    reimbursement of Pillsbury for Westlaw research under Pillsbury's standard
       billing procedures results no greater charge than an attempted per-attorney or
22    per-billable hour allocation of the monthly fee Pillsbury pays Westlaw.

23    22.    In September 2003 this Court appointed Stuart, Maue, Mitchell & James, Ltd.,

24    ("Stuart Maue") to audit Pillsbury's fee applications and those of other professionals

25    employed by the Debtors. Stuart Maue has filed with the Court reports of its audits of the

26    first through seventh of Pillsbury's interim fee applications. It has not yet reported on the

27    audit of Pillsbury's eighth interim fee application.

28

- 7 -

DECLARATION OF CRAIG A. BARBAROSH RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP
SHAW PITTMAN LLP

23.     The Court entered orders approving the payment of interim fees to Pillsbury based on Pillsbury's first through seventh fee applications and supporting documentation, and informed by Stuart Maue's audit of those fee applications.

24.     As set forth above, the work Pillsbury has done has provided substantial benefit to the Debtors' bankruptcy estate. I believe that Pillsbury's fee applications are reasonable and fully justified by the nature and quality of services provided, and the results obtained.

25.     I believe that the interim fees previously allowed by this Court based on the first through seventh fee applications provided a direct and tangible benefit to the estate, and that none of these fees related in any way to the alleged conflict concerning the Senior Noteholders, which conflict had not even arisen at the time the fees were incurred.

26.     The time period covered by Pillsbury's eighth interim fee application is April 1, 2006 through September 30, 2006, a sixth month period. Most of the fees requested in that fee application were incurred prior to August 24, 2006. At the November 7, 2006 hearing on Pillsbury's eighth interim fee application, the Court allowed interim payment of $336,739.66, which represents 70% of the fees and expenses requested in that application, pending the outcome of the Stuart Maue audit of that application. Attached as Exhibit 4 hereto is a true and correct copy of the Pillsbury time records for the period April 1, 2006 through August 23, 2006, *i.e.,* the period covered by the eighth interim fee application but excluding entries after August 23, 2006. This reflects total fees and expenses of $391,515.18.

27.     As described in paragraph 19(d) above, Pillsbury has prosecuted preference actions on behalf of the Debtors under a contingent fee agreement approved by the Court. The Senior Noteholders were not parties to any of these actions, and most of the work performed by Pillsbury on these matters occurred prior to August 24, 2006. Pillsbury and LNBRB have not yet submitted fee applications for any fees in connection with these matters. As discussed above, Pillsbury's work on this matter has directly and substantially benefited the bankruptcy estate.

- 8 -

DECLARATION OF CRAIG A. BARBAROSH RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP
SHAW PITTMAN LLP

1        I declare under penalty of perjury under the laws of the United States of America

2    and the State of California the foregoing is true and correct.

3        Executed this ___ day of March, 2007 in Jerusalem, Israel.

4

5                    Craig A. Barbarosh

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -

700634774v1

DECLARATION OF CRAIG A. BARBAROSH RE
MOTION FOR APPOINTMENT OF TRUSTEE AND
MOTION TO DISQUALIFY PILLSBURY WINTHROP

# EXHIBIT 1

1   PILLSBURY WINTHROP LLP
    CRAIG A. BARBAROSH #160224
2   SUE J. HODGES #137080
    MARK D. HOULE #194861
3   650 Town Center Drive, 7th Floor
    Costa Mesa, CA 92626-7122
4   Telephone: (714) 436-6800
    Facsimile: (714) 436-2800
5
    PILLSBURY WINTHROP LLP
6   JOHN S. WESOLOWSKI #127007
    2550 Hanover Street
7   Palo Alto, California 94304-1115
    Telephone: (650) 233-4500
8   Facsimile: (650) 233-4545

9   Attorneys for Debtors and Debtors-In-Possession

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13

14  IN RE:                                Chapter 11 cases

15  SONICBLUE INCORPORATED,               Case Nos. 03-51775 through 03-51778
    DIAMOND MULTIMEDIA SYSTEMS,           MJS
    INC., a Delaware corporation, REPLAYTV,
16  INC., a Delaware corporation, and     [Jointly Administered]
    SENSORY SCIENCE CORPORATION, a
17  Delaware corporation                  APPLICATION FOR ORDER
                                          PURSUANT TO BANKRUPTCY
18                                        CODE SECTION 327(a)
                                          AUTHORIZING THE EMPLOYMENT
19          Debtors and Debtors-in-Possession.   AND RETENTION OF PILLSBURY
                                          WINTHROP LLP AS GENERAL
20                                        INSOLVENCY COUNSEL TO THE
                                          DEBTORS; DECLARATIONS OF
21                                        CRAIG A. BARBAROSH AND
                                          MARCUS SMITH IN SUPPORT
22                                        THEREOF

23                                        [No Hearing Required]

24

25

26

27

28

    60308231v1                           DEBTORS' APPLICATION TO EMPLOY PILLSBURY
                                         WINTHROP LLP AS BANKRUPTCY COUNSEL

                                    Exhibit_____1_____

1    TO THE UNITED STATES BANKRUPTCY COURT, THE OFFICE OF THE

2  UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

3    PLEASE TAKE NOTICE THAT SONICblue Incorporated, a Delaware corporation

4  ("SONICblue"), Diamond Multimedia Systems, Inc., a Delaware corporation ("Diamond"),

5  ReplayTV, Inc., a Delaware corporation ("ReplayTV"), and Sensory Science Corporation, a

6  Delaware corporation ("Sensory Science"), the debtors and debtors-in-possession in the

7  above captioned cases (collectively, the "Debtors"), hereby move the Court (the

8  "Application"), for entry of an order authorizing the retention and employment of Pillsbury

9  Winthrop LLP (the "Firm") as the Debtors' general bankruptcy counsel pursuant to

10  Sections 105(a) and 327(a) of Title 11 of the United States Code (the "Bankruptcy Code")

11  and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure ("Federal Bankruptcy

12  Rules")

13    The facts and circumstances supporting this Application are set forth in the attached

14  Declarations of Craig A. Barbarosh (the "Barbarosh Declaration") and Marcus Smith (the

15  "Smith Declaration"). In further support of this request, the Debtors state as follows:

16                          I. INTRODUCTION.

17    On March 21, 2003 (the "Petition Date"), the Debtors filed voluntary petitions in

18  this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to

19  operate their businesses and manage their properties as debtors-in-possession pursuant to

20  Sections 1107(a) and 1108 of the Bankruptcy Code.

21    On or about March 21, 2003, the official committee of unsecured creditors was

22  appointed in these cases. No trustee or examiner has been appointed in these cases.

23    This Court has jurisdiction over the Application pursuant to 28 U.S.C. Section 157

24  and 1334. Venue is proper pursuant to 28 U.S.C. Section 1408 and 1409. The subject

25  matter of the Application is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2).

26    The statutory predicate for the relief requested herein is Sections 105 (a) and 327(a)

27  of the Bankruptcy Code and Rule 2014(a) of the Federal Bankruptcy Rules.

28

1    II. RELIEF REQUESTED.

2    By this Application, the Debtors seek authority to employ and retain the Firm as

3    their bankruptcy counsel with regard to the filing and prosecution of these Chapter 11

4    cases, effective as of the Petition Date. Accordingly, the Debtors seek the entry of an order

5    pursuant to Section 327(a) of the Bankruptcy Code authorizing them to employ and retain

6    the Firm as their counsel in these cases to perform the legal services that will be necessary

7    during these Chapter 11 Cases.

8    III. BASIS FOR RELIEF REQUESTED.

9    The Firm has been engaged as the Debtors' corporate and litigation counsel since

10   approximately 1989. During this time, the Firm has provided legal representation to the

11   Debtors in a variety of areas, including corporate and securities matters, mergers and

12   acquisitions, litigation, and intellectual property matters. The Firm has been working with

13   the Debtors in connection with their restructuring since approximately October 25, 2002,

14   when the Firm was retained to provide advice concerning the restructuring of the Debtors'

15   liabilities and business operations.

16   During the course of its representation of the Debtors, the Firm has developed

17   extensive knowledge concerning the Debtors' businesses and financial affairs. The Debtors

18   believe that it would be in the best interests of their estates to continue to retain the Firm to

19   advise the Debtors throughout the bankruptcy and reorganization process. In addition to the

20   Firm's extensive knowledge of the Debtors and their businesses, the Firm has extensive

21   experience and knowledge in the field of debtors' and creditors' rights and business

22   reorganizations under Chapter 11 of the Bankruptcy Code, as well as intellectual property

23   matters, corporate matters, litigation, and the like. The Firm also has expertise, experience,

24   and knowledge practicing before this Court.

25   The professional services that the Firm will render to the Debtors include, but shall

26   not be limited to, the following:

27

28

1      a.     to provide legal advice with respect to the Debtors' powers and duties as

2               debtors-in-possession in the continued operation of their businesses and

3               management of their properties;

4      b.     to advise and assist the Debtors with corporate and securities matters;

5      c.     to advise and assist the Debtors in connection with its intellectual property

6               assets;

7      d.     to advise and represent the Debtors in various litigation matters;

8      e.     to assist in the formulation of a business plan or plans and the negotiation of

9               a resolution of these cases with the Debtors' various creditor constituencies;

10     f.     to negotiate and obtain debtor-in-possession financing, exit financing, and

11              any other form of financing the Debtors may require in these cases or in

12              connection with any plan or plans of reorganization;

13     g.     to assist the Debtors in obtaining the use of cash collateral;

14     h.     to advise and assist the Debtors with the sale of their assets;

15     i.     to render any requested pension, tax, or labor advice that may be required to

16              effectuate or formulate a plan of reorganization in these cases;

17     j.     to pursue confirmation of a plan or plans of reorganization and approval of a

18              disclosure statement or statements;

19     k.     to prepare, on behalf of the Debtors, any necessary applications, motions,

20              answers, orders, reports, and other legal papers related to the foregoing

21              duties;

22     l.     to appear in Court and to protect the interests of the Debtors before the Court

23              in connection with the foregoing duties; and

24     m.    to perform all other legal services for the Debtors which may be necessary

25              and proper in furtherance of the foregoing duties.

26        It is the intention of the Debtors that the functions to be performed by the Firm will

27 not be duplicative of those performed by the Debtors' other counsel, including without

28 limitation local bankruptcy counsel (if necessary), but the Firm will only perform those

1  functions necessary for the Debtors to be represented in these Chapter 11 Cases while

2  continuing to operate their businesses and manage their properties as debtors-in-possession.

3      Subject to court approval in accordance with Section 330(a) of the Bankruptcy

4  Code, compensation will be payable to the Firm on an hourly basis, plus reimbursement of

5  actual, necessary expenses incurred by the Firm.  The bankruptcy attorneys and paralegals

6  presently designated to represent the Debtors and their current hourly billing rates are:

7      a.   Craig A. Barbarosh        $480/hr        Partner

8      b.   Sue J. Hodges             $455/hr        Partner

9      c.   William B. Freeman        $455/hr        Partner

10     d.   David S. Rauch            $425/hr        Partner

11     e.   John S. Wesolowski        $410/hr        Counsel

12     f.   Matthew Walker            $405/hr        Senior Associate

13     g.   Mark D. Houle             $370/hr        Senior Associate

14     h.   Nadine J. Youssef         $285/hr        Associate

15     i.   Andre A. Khansari         $215/hr        Associate

16     j.   Jennifer A. Nelson        $180/hr        Senior Legal Analyst

17     k.   Pamela L. Breeden         $160/hr        Senior Legal Analyst

18     In addition, the Firm's corporate attorneys presently designated to represent the

19  Debtors and their current hourly billing rates are:

20     a.   Jorge A. Del Calvo        $600/hr        Partner

21     b.   Gabriella A. Lombardi     $455/hr        Partner

22     c.   Bradley Kohn              $415/hr        Partner

23     d.   Mary A. Helvey            $395/hr        Senior Associate

24     e.   Christine P. Lillquist    $370/hr        Senior Associate

25     f.   Heidi Peterson            $215/hr        Associate

26  The hourly rates set forth above are subject to periodic adjustments to reflect economic and

27  other conditions.  Other attorneys and paralegals may from time to time serve the Debtors

28  in connection with the matters herein described.

1    The hourly rates set forth above are the Firm's normal hourly rates for work of this

2  type. These rates are set at a level designed to fairly compensate the Firm for the work of

3  its attorneys and paralegals and to cover fixed and routine overhead expenses. In certain

4  circumstances, the Firm provides volume discounts to large institutional clients, which

5  circumstances are not present or applicable here. In addition, it is the Firm's policy to

6  charge its clients in all areas of practice for certain other expenses incurred in connection

7  with the client's case. The expenses charged to clients include, among other things, charges

8  for messenger services, air couriers, photocopying, court fees, travel expenses, working

9  meals, postage, materials for large mailings, computerized legal research facilities,

10  computerized document inventory and control, investigative searches, and other charges

11  customarily invoiced by law firms in addition to fees for legal services. The Firm will

12  charge the Debtors for these expenses in a manner and at rates consistent with charges

13  made generally to the Firm's other clients and in accordance with this Court's Guidelines

14  for Compensation and Expense Reimbursement of Professionals and Trustees

15  ("Compensation Guidelines").

16    To the best of the Debtors' knowledge, and except as disclosed in the Barbarosh

17  Declaration, the Firm has no current connection with the Debtors, their creditors, equity

18  security holders, or any other parties-in-interest, or their respective attorneys and

19  accountants, or the United States Trustee or any person employed in the Office of the

20  United States Trustee. The Debtors believe that the Firm and the attorneys in the Firm are

21  disinterested persons within the meaning of Bankruptcy Code Sections 101(14) and 327.

22    The Debtors desire to retain the Firm under a general retainer because of the

23  extensive legal services that may be required and the fact that the nature and extent of such

24  services are not known at this time. To the best of the Debtors' knowledge and except as

25  otherwise disclosed in the Barbarosh Declaration, the Firm does not hold or represent any

26  interest adverse to the Debtors' estates, and the Firm's employment is necessary and in the

27  best interests of the Debtors and their estates.

28

1    As disclosed in the Smith Declaration, the Debtors have consented to the Firm's

2    representation of a number of creditors and other entities in matters unrelated to this case,

3    and have waived any claim of conflict of interest in connection with that representation.

4    Prior to October 25, 2002, the Firm was owed approximately $1,277,319.77 for

5    legal services unrelated to the restructuring services provided by the Firm.  Since that date

6    and as of the Petition Date, the Firm received payments of approximately $2,118,837.41

7    from the Debtors in connection with the restructuring services provided by the Firm

8    through the Petition Date.  These amounts were paid on a bi-monthly basis, and no

9    payments were made on account of any antecedent debt.  The Firm has written off and

10   waived its prepetition claim of $1,277,319.77.  At the present time, the Firm holds a

11   retainer of approximately $518,878.09, received just prior to the Petition Date.

12   Notice of this Application has been given to the United States Trustee, counsel to

13   the Debtors' prepetition lender, counsel to the creditors committee and counsel to the

14   secured noteholders.  The Debtors submit that no further notice need be given.

15   IV. CONCLUSION. WHEREFORE, the Debtors respectfully request entry of an order, in

16   form of the Order submitted herewith, (i) authorizing the Debtors to employ and retain the

17   Firm to represent them as general bankruptcy, corporate and litigation counsel as of the

18   Petition Date in these Chapter 11 Cases pursuant to Bankruptcy Code section 327(a), (ii)

19   authorizing the Debtors to compensate the Firm pursuant to the Bankruptcy Code and any

20   additional procedures established by this Court; subject to approval by the Court pursuant

21   to Bankruptcy Code Sections 330 and 331, and (iii) granting such other and further relief as

22   the Court deems just and proper.

23   Dated: April ___, 2003

24                      PILLSBURY WINTHROP LLP

25

26                      By: _____
                           Craig A. Barbarosh
27                          Sue J. Hodges
                           Attorneys for Debtors and Debtors-In-Possession

28

60308231v11                          7          DEBTORS' APPLICATION TO EMPLOY PILLSBURY
                                                 WINTHROP LLP AS BANKRUPTCY COUNSEL

1

## DECLARATION OF CRAIG A. BARBAROSH

2     I, CRAIG A. BARBAROSH, hereby declare and state as follows:

3         1.     I am an attorney with and partner of the law firm of Pillsbury Winthrop LLP

4 ("Pillsbury" or the "Firm"), and am authorized to make this declaration on behalf of the

5 Firm. The Firm is proposed general insolvency counsel to SONICblue Incorporated. a

6 Delaware corporation, Diamond Multimedia Systems, Inc., a Delaware corporation,

7 ReplayTV, Inc., a Delaware corporation, and Sensory Science Corporation, a Delaware

8 corporation (collectively, the "Debtors"). In such capacity, and except as otherwise

9 indicated herein, I have personal knowledge of the facts set forth below, and if called as a

10 witness I could and would competently testify to the matters set forth in this declaration.

11         2.     I hereby submit this declaration in support of the Debtors' Application for

12 Order Pursuant to Bankruptcy Code Section 327(a) Authorizing the Employment and

13 Retention of Pillsbury Winthrop LLP as General Insolvency Counsel to the Debtors

14 ("Application").

15         3.     The Firm has been engaged as the Debtors' corporate and litigation counsel

16 since approximately 1989. During this time, the Firm has provided legal representation to

17 the Debtors in a variety of areas, including corporate and securities matters, mergers and

18 acquisitions, litigation, and intellectual property matters. The Firm has been working with

19 the Debtors in connection with their restructuring since approximately October 25, 2002,

20 when the Firm was retained to provide advice concerning the restructuring of the Debtors'

21 liabilities and business operations.

22         4.     During the course of this representation, the Firm has developed extensive

23 knowledge concerning the Debtors' businesses and financial affairs. In addition to the

24 Firm's extensive knowledge of the Debtors and their businesses. the Firm has extensive

25 experience and knowledge in the field of debtors' and creditors' rights and business

26 reorganizations under Chapter 11 of the Bankruptcy Code, as well as intellectual property

27 matters, corporate matters, litigation, and the like. The Firm also has expertise, experience,

28 and knowledge practicing before this Court.

1     5.    The professional services that the Firm will render to the Debtors include,
2   but shall not be limited to, the following:

3     a.    to provide legal advice with respect to the Debtors' powers and duties as
4           debtors-in-possession in the continued operation of their businesses and
5           management of their properties;

6     b.    to advise and assist the Debtors with corporate and securities matters;

7     c.    to advise and assist the Debtors in connection with its intellectual property
8           assets;

9     d.    to advise and represent the Debtors in various litigation matters;

10    e.    to assist in the formulation of a business plan or plans and the negotiation of
11          a resolution of these cases with the Debtors' various creditor constituencies;

12    f.    to negotiate and obtain debtor-in-possession financing, exit financing, and
13          any other form of financing the Debtors may require in these cases or in
14          connection with any plan or plans of reorganization;

15    g.    to assist the Debtors in obtaining the use of cash collateral;

16    h.    to advise and assist the Debtors with the sale of their assets;

17    i.    to render any requested pension, tax, or labor advice that may be required to
18          effectuate or formulate a plan of reorganization in these cases;

19    j.    to pursue confirmation of a plan or plans of reorganization and approval of a
20          disclosure statement or statements;

21    k.    to prepare, on behalf of the Debtors, any necessary applications, motions,
22          answers, orders, reports, and other legal papers related to the foregoing
23          duties;

24    l.    to appear in Court and to protect the interests of the Debtors before the Court
25          in connection with the foregoing duties; and

26    m.    to perform all other legal services for the Debtors which may be necessary
27          and proper in furtherance of the foregoing duties.

28

6.     As discussed below, I, the Firm, and certain of its partners, counsel, and associates may have in the past represented, and may presently and likely in the future will represent creditors or stockholders of the Debtors in matters unrelated to these Chapter 11 Cases. A preliminary conflicts search performed at my direction discloses that the Firm may have represented or represents entities that are involved in some capacity with one or more of the Debtors, or may have some other relationships with these entities, in matters unrelated to the Debtors. To the best of my knowledge, the Firm's relationships with these entities is as follows:

  a.   Houlihan Lokey Howard & Zukin Capital ("HLHZ"), proposed financial advisors to the Debtors, is a referral source for the Firm and the Firm refers business to HLHZ, however, HLHZ is not a referral source for this engagement. In addition, the Firm represents HLHZ in certain real estate matters unrelated to the Debtors' bankruptcy cases.

  b.   Pachulski, Stang, Ziehl, Young & Jones ("Pachulski"), counsel to certain of the holders of the Debtors' 5 ¾% Convertible Subordinated Debentures due October 1, 2003 (the "2003 Notes"). creditors in the Debtors' bankruptcy cases, is a referral source for the Firm and the Firm refers business to Pachulski, however, Pachulski is not a referral source for this engagement. In addition, Pachulski from time to time represents parties adverse to the Firm.

  c.   Wells Fargo Bank ("WFB") is the existing and proposed financial institution for managing the Debtors' cash management account. The Firm represents WFB in a variety of matters unrelated to the Debtors or these cases.

  d.   Bank One, N.A. (proposed claims and noticing agent). Bank One and its affiliates are clients of the Firm in various matters unrelated to the Debtors or these cases.

  e.   Ernst & Young ("E&Y"). E&Y is the proposed accounting consultant to the Debtors and has a prepetition claim scheduled in the amount of $372,229.

1    E&Y is a referral source for the Firm and the Firm refers business to E&Y,

2    however, E&Y is not a referral source for this engagement.

3    f.    American Arbitration Association. Claim of $3,572.68. Attorneys in the

4    Firm act as arbitrators for this creditor in matters unrelated to the Debtors or

5    these cases.

6    g.    California Chamber of Commerce. Scheduled claim of $345. The Firm

7    represents this creditor in environmental matters unrelated to the Debtors or

8    these cases.

9    h.    CBS Television Networks. Scheduled claim of $150,035. The Firm

10    represents this creditor in certain real estate matters unrelated to the Debtors

11    or these cases.

12    i.    Christie Parker & Hale. Scheduled claim of $5,955.76. The Firm is

13    representing this creditor in a lease transaction unrelated to the Debtors or

14    these cases.

15    j.    Digital 5, Inc. Scheduled claim of $4,625. The Firm represents this creditor

16    in a section 363 bankruptcy stock purchase unrelated to the Debtors or these

17    cases.

18    k.    Easylink Services. Claim of $365.55. The Firm is general counsel for

19    Easylink, and is currently defending this creditor in a litigation matter

20    against one of its prior workers unrelated to the Debtors or these cases.

21    l.    GE Capital. Scheduled claim of $1,308.84 for an equipment lease. The

22    Firm represents this creditor in a variety of matters unrelated to the Debtors

23    or these cases.

24    m.    Island Data Corporation. Scheduled claim of $30,169.80. The Firm

25    represents this creditor in a variety of matters unrelated to the Debtors or

26    these cases.

27    n.    Kinko's. Scheduled claim of $8,992.54. The Firm represents this creditor in

28    matters unrelated to the Debtors or these cases.

60308231v1

11    DEBTORS' APPLICATION TO EMPLOY PILLSBURY
WINTHROP LLP AS BANKRUPTCY COUNSEL

o.   Pitney Bowes. Scheduled claim Of UNKNOWN. The Firm has handled an acquisition for this creditor unrelated to the Debtors or these cases.

p.   PortalPlayer. Scheduled claim of $511.48. The Firm represents this creditor in general corporate and employment matters unrelated to the Debtors or these cases.

q.   Webex. Scheduled claim of $1,200. The Firm represents this creditor in general corporate matters unrelated to the Debtors or these cases.

r.   Yesmail. Scheduled claim of $14,332.35. The Firm represents an affililate of this creditor in leasing and licensing matters unrelated to the Debtors or these cases.

s.   Chevron. Scheduled claim of $UNKNOWN. The Firm represents this creditor in a variety of matters unrelated to the Debtors or these cases.

t.   DVD Patent Licensing/Toshiba. Scheduled claim of $1,024.71. The Firm represents this creditor in a variety of matters unrelated to the Debtors or these cases.

u.   Morgan Stanley. Scheduled claim of $3.2 million. The Firm represents this creditor in a variety of matters unrelated to the Debtors or these cases.

v.   Verizon. Scheduled claim of $UNKNOWN. The Firm represents this creditor in a variety of matters unrelated to the Debtors or these cases.

w.   Xerox. Scheduled claim of $20,172.62. The Firm represents this creditor in a variety of matters unrelated to the Debtors or these cases.

x.   Morris, Nichols, Arsht & Tunnell. Scheduled claim of $94,066.99. The Firm represents this creditor in trademark matters unrelated to the Debtors or these cases.

y.   Teralogic. Scheduled claim of $163,250. The Firm is corporate counsel to this creditor in matters unrelated to the Debtors or these cases.

z.   Citicorp Vendor Finance, Hewlett-Packard Company Finance, and Sanwa Bank. These entities are shown on various UCC searches, but the Debtors

1    have not been able as yet to verify their status as creditors. The Firm

2    represents these entities (or their affiliates) in a variety of matters unrelated

3    to the Debtors or these cases.

4    aa.    Synnex Information Technologies, Inc. I am informed that this entity is a

5          distributor that does business with one of SONICblue's subsidiaries in

6          Japan. The Firm represents this entity in matters unrelated to the Debtors or

7          these cases.

8    bb.    Michael Richman, an associate of the Firm, currently holds 600 shares of

9          Debtor SONICblue.

10    One of the Firm's attorneys, Brad Johnsen, has been working in the legal

11    department at SONICblue on a full-time contract basis since approximately October, 2002.

12    Mr. Johnson remains an employee of the Firm and the Firm is paid $11,667 per month by

13    SONICblue for his services (plus $100 for every hour in excess of 40 hours per week that

14    he works). This arrangement is currently scheduled to last through April 2003.

15    Two of the Debtors (SONICblue and ReplayTV) are defendants in certain litigation

16    pending in the United States District Court, Central District of California. The plaintiffs in

17    those consolidated cases seek injunctive relief against the defendants. The Firm does not

18    represent any party in that litigation, but represents several of the plaintiffs (or their

19    affiliates) in unrelated matters. These include National Broadcasting Corporation,

20    AOL/Time Warner, CBS Television Networks, and Metro-Goldman-Mayer. The Firm

21    does not and will not represent any of the plaintiffs in these Chapter 11 cases. We do not

22    represent any of these entities with respect to the matters for which the Firm is about to be

23    engaged as counsel pursuant to this Application. Also, I have been advised that an

24    associate of the Firm has a social relationship with an associate of one of the firms

25    representing certain of the plaintiffs in this litigation. I have been further advised that both

26    associates have at all times strictly adhered to the rules of professional responsibility with

27    respect to the keeping of client confidences, and that they fully intend to do so in the future.

28

1       The Firm, along with local counsel in Delaware, jointly represents ReplayTV and

2 certain of its former officers and directors in litigation arising out of the purchase of

3 ReplayTV by SONICblue. I am informed that written engagements have been obtained

4 from each of the individual defendants, consenting to the joint representation and

5 acknowledging the potential for a conflict of interest.

6

7       I have been advised that a newly-hired associate of the Firm formerly represented an

8 unsecured creditor (Michelle Miller) at his prior firm with respect to the creditor's claims

9 against the Debtors. This creditor is not a client of the Firm, and an ethical screen has been

10 imposed to screen the associate from any matters concerning the Debtors. In addition, the

11 creditor has signed a conflict waiver with respect to this situation.

12       7.     The Firm is a large international firm, and in the ordinary course of business,

13 the Firm and its attorneys may have in the past represented, currently represent, and may in

14 the future represent, entities that hold claims against or interests in the Debtors in matters

15 unrelated to these cases. As part of its practice, the Firm appears in cases, proceedings and

16 transactions involving many different attorneys and accountants, some of whom may

17 represent claimants and parties in interest in these cases. The Firm does represent any such

18 entity in connection with these Chapter 11 cases or, to the best of my knowledge,

19 information and belief, have any relationship with any such entity, attorneys or accountants

20 that would be adverse to the Debtors or their respective estates.

21       Further, given the size and nature of the Firm's practice, it is virtually impossible to

22 conceive of a major chapter 11 case in which at least some of the firm's current or former

23 clients would not have business relationships with or hold claims against the debtors. In my

24 experience, however, the fact that some current or former clients hold claims against a

25 debtor will not impair the Firm's ability to represent the Debtors in these chapter 11 cases.

26 First, the individual attorneys expected to perform the vast majority of the legal services for

27 the Debtors recognize and take very seriously their undivided duty of loyalty to the

28 Debtors. Moreover, because of the breadth of the Firm's practice and client base, the Firm

1    is not subject to the undue influence of any single client. I believe this creates a degree of

2    autonomy that permits the Firm to represent each of its clients zealously without any

3    appreciable danger that the Firm or its attorneys will be unduly influenced by a large or

4    influential client.

5           In the event that an actual conflict arises with any of the above entities, or any other

6    entity, as a result of the Firm's representation of the Debtors herein, the Firm will either

7    (a) obtain written waivers from both parties, or (b) will not represent either party, and the

8    Debtors will seek this Court's permission to engage special counsel in connection with such

9    matters, if necessary. The Firm will continue to monitor its relationship with the creditors

10   and other parties in interest in these cases and, as it discovers additional information

11   requiring disclosure, will promptly supplement this application with any appropriate

12   disclosures.

13          8.     The Firm intends to apply for compensation for professional services

14   rendered in connection with these Chapter 11 cases subject to the approval of this Court and

15   compliance with applicable provisions of the Bankruptcy Code and the Compensation

16   Guidelines, on an hourly basis, plus reimbursement of actual, necessary expenses and other

17   charges incurred by the Firm. The attorneys and paralegals presently designated to

18   represent the Debtors and their current hourly billing rates are:

19        a.    Craig A. Barbarosh    $480/hr    Partner

20        b.    Sue J. Hodges    $455/hr    Partner

21        c.    William B. Freeman    $455/hr    Partner

22        d.    David S. Rauch    $425/hr    Partner

23        e.    John S. Wesolowski    $410/hr    Counsel

24        f.    Matthew Walker    $405/hr    Senior Associate

25        g.    Mark D. Houle    $370/hr    Senior Associate

26        h.    Nadine J. Youssef    $285/hr    Associate

27        i.    Andre A. Khansari    $215/hr    Associate

28        j.    Jennifer A. Nelson    $180/hr    Senior Legal Analyst

| | k. | Pamela L. Breeden | $160/hr | Senior Legal Analyst |
|---|---|---|---|---|

In addition, the Firm's corporate attorneys presently designated to represent the Debtors and their current hourly rates are:

| | l. | Jorge A. Del Calvo | $600/hr | Partner |
|---|---|---|---|---|
| | m. | Gabriella A. Lombardi | $455/hr | Partner |
| | n. | Bradley Kohn | $415/hr | Partner |
| | o. | Mary A. Helvey | $395/hr | Senior Associate |
| | p. | Christine P. Lillquist | $370/hr | Senior Associate |
| | q. | Heidi Peterson | $215/hr | Associate |

9.    The hourly rates set forth above are subject to periodic adjustments to reflect economic and other conditions.  Other attorneys and paralegals may from time to time serve the Debtors in connection with the matters herein described.

10.    The hourly rates set forth above are the Firm's normal hourly rates for work of this type.  These rates are set at a level designed to fairly compensate the Firm for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.  In certain circumstances, the Firm provides volume discounts to large institutional clients, which circumstances are not present or applicable here.  In addition, it is the Firm's policy to charge its clients in all areas of practice for certain other expenses incurred in connection with the client's case.  The expenses charged to clients include, among other things, charges for messenger services, air couriers, photocopying, court fees, travel expenses, working meals, postage, materials for large mailings, computerized legal research facilities, computerized document inventory and control, investigative searches, and other charges customarily invoiced by law firms in addition to fees for legal services.  The Firm will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to the Firm's other clients and in accordance with the Compensation Guidelines.

11.    Prior to October 25, 2002, the Firm was owed approximately $1,277,319.77 for legal services unrelated to the restructuring services provided by the Firm.  Since that

04-01-03   08:12pm   From-                                                    T-644   P.003/003   F-545

1   date and as of the Petition Date, the Firm has received payments of approximately

2   $2,118,837.41 from the Debtors in connection with the restructuring services provided by

3   the Firm through the Petition Date. These amounts were paid on a bi-monthly basis, and no

4   payments were made on account of any antecedent debt. The Firm has written off and

5   waived its prepetition claim of $1,277,319.77. At the present time, the Firm holds a

6   retainer of approximately $518,878.09 which it received just prior to the Petition Date.

7        12.    To the best of my knowledge, the Firm is disinterested within the meaning of

8   Bankruptcy Code Section 101(14). Except as disclosed herein, the Firm, and its partners,

9   counsel, and associates, do not have any connection with the Debtors, creditors, any other

10  party in interest, their respective attorneys and accountants, or with the United States

11  Trustee for this region or any person employed in the Office of the United States Trustee

12  such as would render the employment of the Firm improper under Bankruptcy Rule 5002.

13  Except as disclosed herein, the Firm does not hold or represent an interest adverse to the

14  Debtors and their respective estates as to the matter in which the Firm is to be employed.

15       13.    No promises have been received by the Firm nor any partner, counsel, or

16  associate thereof as to compensation in connection with these Chapter 11 Cases other than

17  in accordance with the provisions of the Bankruptcy Code. The Firm has no agreement

18  with any other entity to share with such entity compensation from these Chapter 11 Cases.

19       14.    The foregoing constitutes the statement of the Firm pursuant to Sections 327

20  and 504 of the Bankruptcy Code and Rule 2014(a) of the Federal Rules of Bankruptcy

21  Procedure.

22       I declare under penalty of perjury that the foregoing is true and correct.

23  Executed this 1st day of April, 2003, at Costa Mesa, California.

24

25

26                                                       _____
                                                         Craig A. Barbarosh
27

28

60308231v11                              17        DEBTORS' APPLICATION TO EMPLOY PILLSBURY
                                                   WINTHROP LLP AS BANKRUPTCY COUNSEL

### DECLARATION OF MARCUS SMITH

I, Marcus Smith, declare and state as follows:

1. I am the Chief Financial Officer of SONICblue Incorporated and the other debtors herein (together "Debtors") and have held this position at all relevant times herein. I am authorized to make this declaration on behalf of the Debtors. I have personal knowledge of the facts contained in this declaration, and if called as a witness could testify competently to these facts.

2. I have read the foregoing Application, and am informed of its contents. The Debtors wish to employ Pillsbury Winthrop LLP (the "Firm") as their general bankruptcy, corporate and litigation counsel in accordance with the terms set forth in the foregoing Application.

3. I have reviewed the list of creditors and other entities set forth in paragraph 6 of the Declaration of Craig Barbarosh. On behalf of the Debtors, I hereby consent to the Firm's representation of those entities, and any other entities. in matters unrelated to the Debtors' bankruptcy cases, and waive any claim of conflict of interest related to such representation.

4. I have made careful and diligent inquiry into the qualifications of the Firm and its attorneys to represent the Debtors in this case, and have found said attorneys to be well qualified to represent the Debtors by reason of their ability, integrity and professional experience.

4. Except as disclosed in the Barbarosh Declaration, I believe that the Firm and its attorneys have no connection with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee, and do not hold or represent any interest adverse to the Debtors or their estates. The attorneys at the Firm are disinterested persons within the meaning of Bankruptcy Code section 101(14).

4/02/03  WED 10:30 FAX 408 980 5xx9    S3 FINANCE                              002

1    I declare under penalty of perjury that the foregoing is true and correct.  Executed

2    this 2ⁿᵈ day of April , 2003 at Santa Clara, California.

3

4

5                                                    Marcus Smith

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    PILLSBURY WINTHROP LLP
     CRAIG A. BARBAROSH #160224
2    SUE J. HODGES #137080
     MARK D. HOULE #194861
3    650 Town Center Drive, 7th Floor
     Costa Mesa, CA 92626-7122
4    Telephone: (714) 436-6800
     Facsimile:  (714) 436-2800
5
     PILLSBURY WINTHROP LLP
6    JOHN S. WESOLOWSKI #127007
     2550 Hanover Street
7    Palo Alto, CA  94304-1115
     Telephone: (650) 233-4500
8    Facsimile:  (650) 233-4545

9    Attorneys for Debtors and Debtors-In-Possession

10                UNITED STATES BANKRUPTCY COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14   IN RE:                              | Chapter 11 cases

15   SONICBLUE INCORPORATED, a           | Case Nos. 03-51775, 03-51776,
     Delaware corporation, DIAMOND       | 03-51777, 03-51778 (MM)
16   MULTIMEDIA SYSTEMS, INC., a         |
     Delaware corporation, REPLAYTV, INC., a | PROOF OF SERVICE
17   Delaware corporation, and SENSORY
     SCIENCE CORPORATION, a Delaware
18   corporation,

19        Debtors and Debtors-in-Possession.

20

21

22

23

24

25

26

27

28

FILED

APR 03 2003

CLERK
United States Bankruptcy Court
San Jose, California

1

## PROOF OF SERVICE

2          Case Name: In Re: SONICBLUE INCORPORATED, et al.
                    Case Nos: 03-51775-03-51778 (MM)

3

I, Rowena Renteria, declare as follows:

4

5    I am a citizen of the United States and a resident of the State of California. I am
employed in Santa Clara County, State of California, in the office of a member of the bar of
6    this Court, at whose direction the service was made. I am over the age of eighteen years,
and not a party to the within action. My business address is 2550 Hanover St., Palo Alto,
7    California 94304-1115. On April 2, 2003, I caused to be served:

8    1.    APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY
           CODE SECTION 327(a) AND 328 AUTHORIZING THE
9          EMPLOYMENT AND RETENTION OF HOULIHAN, LOKEY,
           HOWARD & ZUKIN CAPITAL AS FINANCIAL ADVISOR TO
10         THE DEBTORS;

11   2.    APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY
           CODE SECTION 327(a) AUTHORIZING THE EMPLOYMENT
12         AND RETENTION OF PILLSBURY WINTHROP LLP AS
           GENERAL COUNSEL TO THE DEBTORS;

13   3.    DEBTORS' AND OFFICIAL CREDITORS COMMITTEE'S
           REQUEST TO SPECIALLY SET HEARING ON APPLICATION
14         TO EMPLOY HOULIHAN, LOKEY, HOWARD & ZUKIN
           CAPITAL AS FINANCIAL ADVISOR;
15

16   4.    DECLARATION OF CRAIG G. BARBAROSH IN SUPPORT OF
           DEBTORS' MOTION FOR ORDER AUTHORIZING THE: (1)
17         SALE OF REPLYTV AND RIO PRODUCTS LINES FREE AND
           CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND
18         (2) ASSUMPTION AND ASSIGNMENT, OR REJECTION OF
           CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
19         LEASES; MEMORANDUM OF POINTS AND AUTHORITIES IN
           SUPPORT THEREOF;

20   5.    DECLARATION OF PETER S. FISHMAN IN SUPPORT OF
           DEBTORS' MOTION FOR ORDER AUTHORIZING THE: (1)
21         SALE OF REPLYTV AND RIO PRODUCTS LINES FREE AND
           CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND
22         (2) ASSUMPTION AND ASSIGNMENT, OR REJECTION OF
           CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
23         LEASES; MEMORANDUM OF POINTS AND AUTHORITIES IN
           SUPPORT THEREOF; and

24
25
26
27
28   60311556_1.DOC

– 2 –

1     6.     **DECLARATION OF MARCUS SMITH IN SUPPORT OF
             DEBTORS' MOTION FOR ORDER AUTHORIZING THE: (1)
2            SALE OF REPLYTV AND RIO PRODUCTS LINES FREE AND
             CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND
3            (2) ASSUMPTION AND ASSIGNMENT, OR REJECTION OF
             CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
4            LEASES; MEMORANDUM OF POINTS AND AUTHORITIES IN
             SUPPORT THEREOF**

5

6             By placing such a copy enclosed in a sealed envelope, postage thereon fully
             prepaid, in the United States Postal Service for collection and mailing this
7            day in accordance with ordinary business practices at Pillsbury Winthrop,
             LLP.

8      __     By consigning such a copy to a messenger for guaranteed hand delivery on
             this date only.
9
      X      By consigning such a copy to an overnight courier for guaranteed next day
10           delivery.

11     __     By consigning such a copy to a facsimile operator for transmittal on this date
             to the addressee(s) listed below.
12
      I served the above documents on the following persons:
13
      **SEE SERVICE LIST ATTACHED**
14
             I am readily familiar with Pillsbury Winthrop LLP's practice for collection and
15    processing of correspondence for delivery according to instructions indicated above.  In the
      ordinary course of business, correspondence would be handled accordingly.
16
             I declare under penalty of perjury that the foregoing is true and correct to the best of
17    my knowledge.

18    Executed this 3rd day of April, 2003, at Palo Alto, California.

19                                   _Rowena Renteria_
                                     Rowena Renteria
20

21

22

23

24

25

26

27

28    60311556_1.DOC
                                   - 3 -

Nanette Dumas, Esq.
280 South First Street
Room 268
San Jose, CA  95113

Ron Bender, Esq.
Levene, Neale, Bender, Rankin & Brill
1801 Avenue of the Stars, Suite 1120
Los Angeles, CA  90067

Ron M. Oliner, Esq.
Buchalter Nemer Fields & Younger
333 Market Street, 25th Floor
San Francisco, CA  94105

James Johnston, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street, Suite 3300
Los Angeles, CA  90017

Joshua D. Morse, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street, Suite 3300
Los Angeles, CA  90017

Bruce Bennett, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street, Suite 3300
Los Angeles, CA  90017

1 | PILLSBURY WINTHROP LLP
CRAIG A. BARBAROSH California Bar No. 160224
2 | SUE J. HODGES California Bar No. 137080
MARK D. HOULE California Bar No. 194861
3 | 650 Town Center Drive, 7th Floor
Costa Mesa, CA 92626-7122
4 | Telephone: (714) 436-6800
Facsimile: (714) 436-2800
5 |
PILLSBURY WINTHROP LLP
6 | JOHN S. WESOLOWSKI California Bar No. 127007
2550 Hanover Street
7 | Palo Alto, California 94304-1115
Telephone: (650) 233-4500
8 | Facsimile: (650) 233-4545
9 | Attorneys for Debtors and Debtors-In-Possession

10 | UNITED STATES BANKRUPTCY COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION
12 |

13 | IN RE:                              Chapter 11 cases

14 | SONICBLUE INCORPORATED, a         Case Nos. 03-51775
Delaware corporation, DIAMOND       through 03-51778 MJS
15 | MULTIMEDIA SYSTEMS, INC., a
Delaware corporation, REPLAYTV,     [Jointly Administered]
16 | Inc., a Delaware corporation, and
SENSORY SCIENCE                     REVISED ORDER PURSUANT TO
17 | CORPORATION, a Delaware           BANKRUPTCY CODE SECTION
corporation,                        327(a) AUTHORIZING THE
18 |                                   EMPLOYMENT AND RETENTION
                                     OF PILLSBURY WINTHROP LLP AS
19 |        Debtors and Debtors-in-   GENERAL INSOLVENCY COUNSEL
Possession.                         TO THE DEBTORS
20 |

21 |        The Court having reviewed and considered the Application for Order Pursuant to

22 | Bankruptcy Code Section 327(a) Authorizing the Employment and Retention of Pillsbury

23 | Winthrop LLP as General Insolvency Counsel to the Debtors ("Application"), and the

24 | Declarations of Craig Barbarosh and Marcus Smith filed in support thereof, praying for

25 | authority to employ the firm of Pillsbury Winthrop LLP ("Pillsbury") as general

26 | insolvency counsel to the Debtors herein, no disqualifying interest having been disclosed,

27 | and it appearing that neither Pillsbury nor any of its partners or attorneys holds or

28 |

-1-                REVISED ORDER AUTHORIZING EMPLOYMENT OF
                   PILLSBURY WINTHROP LLP AS
                   GENERAL INSOLVENCY COUNSEL

1 represents any interest adverse to the Debtors, that Pillsbury is a disinterested person, that

2 Pillsbury is qualified to represent the Debtors and that the employment of Pillsbury is in

3 the best interest of the Debtors and their estates, and good cause appearing,

4     IT IS HEREBY ORDERED:

5     1.    The Application is approved.

6     2.    The Debtors are authorized, pursuant to Bankruptcy Code section 327(a),

7 to employ Pillsbury as their general insolvency and bankruptcy counsel, effective as of

8 the Petition Date, for, among other things, the following purposes:

9     a.    to provide legal advice with respect to the Debtors' powers and

10 duties as debtors-in-possession in the continued operation of their businesses and

11 management of their properties;

12     b.    to advise and assist the Debtors with corporate and securities

13 matters;

14     c.    to advise and assist the Debtors in connection with its intellectual

15 property assets;

16     d.    to advise and represent the Debtors in various litigation matters;

17     e.    to assist in the formulation of a business plan or plans and the

18 negotiation of a resolution of these cases with the Debtors' various creditor

19 constituencies;

20     f.    to negotiate and obtain debtor-in-possession financing, exit

21 financing, and any other form of financing the Debtors may require in these cases or in

22 connection with any plan or plans of reorganization;

23     g.    to assist the Debtors in obtaining the use of cash collateral;

24     h.    to advise and assist the Debtors with the sale of their assets;

25     i.    to render any requested pension, tax, or labor advice that may be

26 required to effectuate or formulate a plan of reorganization in these cases;

27

28

60310856v1     -2-

REVISED ORDER AUTHORIZING EMPLOYMENT OF
PILLSBURY WINTHROP LLP AS
GENERAL INSOLVENCY COUNSEL

1     j.  to pursue confirmation of a plan or plans of reorganization and

2 approval of a disclosure statement or statements;

3     k.  to prepare, on behalf of the Debtors, any necessary applications,

4 motions, answers, orders, reports, and other legal papers related to the foregoing duties;

5     l.  to appear in Court and to protect the interests of the Debtors before

6 the Court in connection with the foregoing duties; and

7     m.  to perform all other legal services for the Debtors which may be

8 necessary and proper in furtherance of the foregoing duties.

9   3.  The material terms of Pillsbury's compensation are: (a) payment of the

10 fees of its attorneys and paralegals on an hourly basis, at such professionals' regular

11 hourly rates, subject to periodic adjustments, and (b) reimbursement of actual and

12 necessary expenses incurred by Pillsbury on behalf of the Debtors. These fees and

13 expenses shall be subject to the Court's Guidelines for Compensation and Expense

14 Reimbursement of Professionals and Trustees.

15   Dated: __APR 1 1 2003__ .

16

17             __MARILYN MORGAN__
              United States Bankruptcy Judge

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

Case Name: In Re: SONICBLUE INCORPORATED, et al.
Case Nos: 03-51775-03-51778 (MM)

3

4

I, Rowena Renteria, declare as follows:

5

I am a citizen of the United States and a resident of the State of California. I am employed in Santa Clara County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made. I am over the age of eighteen years, and not a party to the within action. My business address is 2550 Hanover St., Palo Alto, California 94304-1115. On April 10, 2003, I caused to be served:

6

7

8

**REVISED ORDER PURSUANT TO BANKRUPTCY CODE SECTION 327(A) AUTHORIZING THE EMPLOYMENT AND RETENTION OF PILLSBURY WINTHROP LLP AS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS**

9

10

___ By placing such a copy enclosed in a sealed envelope, postage thereon fully prepaid, in the United States Postal Service for collection and mailing this day in accordance with ordinary business practices at Pillsbury Winthrop, LLP.

11

12

13

___ By consigning such a copy to a messenger for guaranteed hand delivery on this date only.

14

_X_ By consigning such a copy to an overnight courier for guaranteed next day delivery.

15

16

___ By consigning such a copy to a facsimile operator for transmittal on this date to the addressee(s) listed below.

17

I served the above documents on the following persons:

18

**SEE SERVICE LIST ATTACHED**

19

I am readily familiar with Pillsbury Winthrop LLP's practice for collection and processing of correspondence for delivery according to instructions indicated above. In the ordinary course of business, correspondence would be handled accordingly.

20

21

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

22

Executed this 10th day of April, 2003, at Palo Alto, California.

23

24

Rowena Renteria

25

26

27

28

60313267v1

-1-

PROOF OF SERVICE
Case Nos. 03-51775, 03-51776, 03-51777, 03-51778 (MM)

# Official Committees

Oscar Garza, Esq.
Gibson Dunn & Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA 92614

Ron Bender, Esq.
Levene, Neale, Bender, Rankin &
Brill
1801 Avenue of the Stars
Suite 1120
Los Angeles, CA 90067

Lillian Stenfeldt, Esq.
Gray Cary
1755 Embarcadero Road
Palo Alto, CA 94303

Jim Coggburn
Maxtor Corporation
500 McCarthy Blvd.
Milpitas, CA 95035

William Sweeney
Maxtor Corporation
2452 Clover Basin Drive
Longmont, CO 80503

Toshiyuki Miyake
Matsushita Kotobuki Electronics Sales
of America, LLC
700 No. Hayden Island Drive
Suite 200
Portland, OR 97217

Koichi Kishimoto
Matsushita Kotobuki Electronics
Industries, Ltd.
247 Fukutake, Saijo
Ehime, Japan
793-8510

Bruce MacIntyre, Esq.
Dax J. Hansen, Esq.
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101

Adam J. Chill
Highbridge Capital Management,
LLC
9 West 57th Street
27th Floor
New York, NY 10019

Jeffrey Smith
Ramius Capital Group, LLC
666 Third Avenue
26th Floor
New York, NY 10017

Kenneth A. Simpler
Citadel Investment Group, LLC
225 W. Washington Street
9th Floor
Chicago, IL 60606

Gregg Colburn
Citadel Investment Group, LLC
225 W. Washington Street
9th Floor
Chicago, IL 60606

Bruce Bennett, Esq.
Joshua Morse, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street
Suite 3300
Los Angeles, CA 90017

Alan Cormier, Esq.
Michael F. Zullas, Esq.
Manufacturers' Service Ltd.
300 Baker Avenue
Suite 106
Concord, MA 01742

Paul P. Daley
Hale & Dorr LLP
60 State Street
Boston, MA 02109

Diana Chan
A-Max Technology Company, Ltd.
12/F Remington Centre
23 Hung To Road
Kwun Tong, Kowloon
Hong Kong

Nels Nelsen
Alliant Partners
435 Tasso Street
3rd Floor
Palo Alto, CA 94301

Peter Fishman, Esq.
Houlihan Lokey Howard & Zukin
Capital
One Sansome Street
CitiCorp Center
San Francisco, CA 94101

## U.S. TRUSTEE AND REGULATORY AGENCIES

Office of the U.S. Trustee
Nanette Dumas, Esq.
280 South First Street
Room 268
San Jose, CA  95113


## SPECIAL NOTICE


Ron M. Oliner, Esq.
Buchalter Nemer Fields & Younger
333 Market Street
25th Floor
San Francisco, CA  94105

Bruce Bennett, Esq.
Joshua D. Morse, Esq.
James Johnston, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street
Suite 3300
Los Angeles, CA  90017

60311225v1

# EXHIBIT 2

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

865 SOUTH FIGUEROA STREET

SUITE 2900

LOS ANGELES, CALIFORNIA 90017

TELEPHONE (213) 694-1200

FACSIMILE (213) 694-1234

DIRECT PHONE (213) 694-1068
SWARTZM@HBDLAWYERS.COM

September 5, 2006

**VIA FACSIMILE (415 983-1200) AND U.S. MAIL**

Mary B. Cranston, Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228

> Re:    **Pillsbury Winthrop's April 22, 2002 Opinion Letter With Regard To SONICblue Debentures**

Dear Ms. Cranston:

I write on behalf of Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (the "Debenture Holders"). On April 22, 2002, your firm (Pillsbury Winthrop) provided the Debenture Holders with an opinion letter (the "Opinion Letter") with regard to the issuance of Debentures by SONICblue Incorporated. The Opinion Letter is attached as Exhibit A to this letter. Under Paragraph 7(iv) of the Securities Purchase Agreement by which they acquired the Debentures, the Debenture Holders expressly conditioned their willingness to purchase the Debentures upon Pillsbury Winthrop's provision to them of the Opinion Letter.

In Paragraph 3 of its Opinion Letter, Pillsbury Winthrop represented that SONICblue's Debentures were "valid and binding obligations of the Company, enforceable against the Company in accordance with their terms." Under each Debenture, SONICblue agreed to pay the Debenture Holder "Twenty-Five Million Dollars and 00/100 ($25,000,000.00)," the full principal amount of each Debenture.

As you are likely aware, SONICblue has sought protection under Chapter 11 of the Bankruptcy Code. In SONICblue's Chapter 11 proceeding, my clients (the Debenture Holders) have sought to collect the full principal amount of the Debentures. In response, SONICblue's bankruptcy counsel has contended that Bankruptcy Code Section 502(b)(2) makes unenforceable SONICblue's obligation to pay the full principal amount of the Debentures. I note that SONICblue's bankruptcy counsel is your firm—the same firm that issued the Opinion Letter

Exhibit ___2___

HENNIGAN, BENNETT & DORMAN LLP

Mary B. Cranston, Esq.
September 5, 2006
Page 2

stating that SONICblue's obligations under the Debentures were "valid and binding obligations . . . , enforceable . . . in accordance with their terms." Pillsbury Winthrop's July 20, 2006 email contesting the accuracy of its own April 22, 2002 Opinion Letter is attached as Exhibit B.

Pillsbury Winthrop's recent contention that the Bankruptcy Code affects the enforceability of the Debentures in accordance with their terms is surprising. While Paragraph 9(b) of the Opinion Letter did expressly qualify *certain* of Pillsbury Winthrop's representations to the Debenture Holders based on the possible application of bankruptcy law, the Paragraph 9(b) qualification was expressly limited to the representations stated in *Paragraph 2* of the Opinion Letter. As noted above, Pillsbury Winthrop's representation about the enforceability of the Debentures was *not* in *Paragraph 2*, but was instead in *Paragraph 3*. Pillsbury Winthrop's Opinion Letter contains no caveat for the possible application of bankruptcy law with regard to the representations in Paragraph 3.

It appears that the Debenture Holders may have to litigate their claims against SONICblue to enforce the terms of the Debenture and to overcome SONICblue's erroneous assertion of the Bankruptcy Code issue. Accordingly, we ask that Pillsbury Winthrop agree to indemnify the Debenture Holders as they seek to enforce the agreement that Pillsbury Winthrop previously represented was enforceable. Please let us know promptly whether Pillsbury Winthrop will provide the requested indemnity.

If we are unable to obtain SONICblue's payment of the full principal amount, the Debenture Holders intend to pursue claims for, perhaps among other things, negligent misrepresentation and negligence against Pillsbury Winthrop in connection with the April 22, 2002 Opinion Letter.

Thank you in advance for your prompt attention to this matter.

Sincerely,

Michael Swartz

MS/ocs

564642



**PILLSBURY WINTHROP** LLP

April 22, 2002

Portside Growth & Opportunity Fund, Ltd.
c/o Ramius Capital Group, L.L.C.
666 Third Avenue
26th Floor
New York, New York 10017

Smithfield Fiduciary LLC
c/o Highbridge Capital Management, LLC
9 West 57th Street, 27th Floor
New York, NY 10019

Citadel Equity Fund Ltd.
c/o Citadel Investment Group, L.L.C.
225 West Washington Street
Chicago, Illinois 60606

Re:     Securities Purchase Agreement

Ladies and Gentlemen:

We have acted as counsel to SONICblue Incorporated (the "Company") in connection
with the issuance and sale of $75,000,000 aggregate principal amount of 7 ¾% Secured
Senior Subordinated Convertible Debentures Due 2005 of the Company (collectively, the
"Debentures") and Warrants to purchase Common Stock of the Company (the
"Warrants") pursuant to the Securities Purchase Agreement (the "Purchase Agreement"),
dated as of April 21, 2002, by and among the Company and each of you. This opinion is
delivered to you pursuant to the requirement set forth in Section 7(iv) of the Purchase
Agreement. Capitalized terms used herein not otherwise defined herein shall have the
respective meanings assigned to such terms in the Purchase Agreement.

In connection with the foregoing, we have reviewed the Purchase Agreement, the
Schedules to the Purchase Agreement, the Registration Rights Agreement, the Indenture,
the Pledge and Security Agreement, the form of Debenture, the form of Warrant, the
Irrevocable Transfer Agent Instructions and the Option Agreement, each, other than the
Purchase Agreement, the form of Debenture and the form of Warrant, dated as of the date
hereof, the Company's Restated Certificate of Incorporation, as amended to date, and By-
laws, as amended to date, records of the proceedings of the Company's Board of
Directors, certificates of officers and such other documents and instruments as we have
deemed necessary or advisable in order to render the opinions expressed herein. As to

60268396v5

*Exh. A*

April 22, 2002
Page 2



PILLSBURY WINTHROP LLP

questions of fact material to such opinions, we have, when relevant facts were not independently established, relied upon certificates of officers of the Company.

Based upon the foregoing and subject to the assumptions, qualifications, limitations and exceptions set forth below, it is our opinion that:

      1.  The Company has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Delaware with the requisite corporate power and authority to own and use its properties and assets and to carry on its business as currently conducted. The Company is duly qualified to transact business and is in good standing as a foreign corporation in the State of California.

      2.  The Company has the requisite corporate power and authority to execute and deliver each of the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions and to perform its obligations under the respective terms thereof. Each of the Purchase Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement, and the Irrevocable Transfer Agent Instructions has been duly executed and delivered by the Company and, in the case of the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers, will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

      3.  The issuance and sale of the Debentures have been duly authorized. Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. The Company has duly authorized and reserved for issuance upon conversion of the Debentures the Conversion Shares and such Conversion Shares will, when issued and delivered upon conversion of the Debentures in accordance with the terms thereof and the Indenture, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Debentures or the Conversion Shares.

      4.  The issuance and sale of the Warrants have been duly authorized. When issued in accordance with the terms of the Purchase Agreement, the Warrants will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms. The Company has duly authorized and reserved for issuance upon exercise of the Warrants the Warrant Shares and such Warrant Shares will, upon issuance and delivery against payment therefor upon exercise of the Warrants in accordance with the terms of the Warrants, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Warrants or the Warrant Shares.

April 22, 2002
Page 3



PILLSBURY WINTHROP⊔⊔

5.   The Company has duly authorized and reserved for issuance the Interest Shares and such Interest Shares will, when issued and delivered in accordance with the terms of the Debentures and the Indenture, be validly issued, fully paid and nonassessable. There are no statutory preemptive or, to our knowledge, other similar rights to subscribe for or to purchase the Interest Shares.

6.   Assuming the accuracy of the representations and warranties made by the Buyers and the Company in the Purchase Agreement and due performance by the Company of the covenant set forth in Section 4(b) of the Purchase Agreement, (i) the offer and sale of the Debentures and the Warrants in the manner contemplated by the Purchase Agreement, (ii) the offer and sale of the Warrant Shares in accordance with the terms of the Purchase Agreement and the Warrants, and (iii) the issuance of the Conversion Shares and the Interest Shares in accordance with the terms of the Purchase Agreement, the Indenture and the Debentures, are exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended.

7.   All authorizations, approvals, consents, permits or orders of, and all qualifications, registrations, designations, declarations or filings with, any federal or New York governmental authority on the part of the Company required to be made in connection with the consummation of the transactions contemplated by the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions have been made or obtained, except for such filings as are contemplated by the covenant of the Company set forth in Section 4(b) of the Purchase Agreement that may be required to be filed pursuant to applicable federal and state securities laws subsequent to the consummation of the transactions contemplated by the Purchase Agreement, the Indenture, the Debentures, the Warrants, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions.

8.   We are not aware of any action, suit, proceeding or investigation pending against the Company before or by any court or administrative agency, or that the Company has received any written threat thereof, that questions the validity of the Purchase Agreement, the Registration Rights Agreement, the Irrevocable Transfer Agent Instructions, the Indenture, the Debentures, the Warrants, the Pledge and Security Agreement or the Option Agreement.

9.   The execution, delivery and performance by the Company of the Purchase Agreement, the Indenture, the Registration Rights Agreement, the Pledge and Security Agreement, the Option Agreement and the Irrevocable Transfer Agent Instructions and the issuance of the Debentures and the Warrants pursuant to the Purchase Agreement and the Indenture do not violate any provisions of the Company's Restated Certificate of Incorporation or By-laws, and do not (i) violate, contravene or constitute a default under (or an event which, with the giving of notice or lapse of time or

April 22, 2002
Page 4



PILLSBURY WINTHROP℠

both, constitutes or would constitute a default under) the provisions of any of the contracts that are filed as an exhibit to the SEC Documents or (ii) violate or contravene any governmental statute, law, rule or regulation applicable to the Company.

The opinions set forth above are subject to the following assumptions, qualifications, limitations and exceptions:

(a)     Our opinion in the first sentence of paragraph 1 above as to the Company's good standing in the State of Delaware is based solely upon a review of a certificate of good standing from the State of Delaware (such certificate is dated as of a date within ten days of the Closing Date). Our opinion in the last sentence of paragraph 1 above is based solely upon a review of a certificate of good standing from the State of California (such certificate is dated as of a date within ten days of the Closing Date).

(b)     Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, (ii) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law, (iii) the effect of applicable court decisions, invoking statutes or principles of equity, which have held that certain covenants and provisions of agreements are unenforceable where the breach of such covenants or provision imposes restrictions or burdens upon a party, and it cannot be demonstrated that the enforcement of such restrictions or burdens is necessary for the protection of the other party or the enforcement of such covenants or provisions under the circumstances would violate the covenant of good faith and fair dealing implied under applicable law, and (iv) the effect of statutes and rules of law that cannot be waived prospectively by an obligor. We also express no opinion as to the enforceability of the provisions of the Purchase Agreement or the Registration Rights Agreement purporting to provide for indemnification and contribution, to the extent that enforcement thereof may be limited by state or federal securities law, public policy or otherwise.

(c)     This opinion is limited in all respects to matters governed by the laws of the State of New York, the General Corporation Law of the State of Delaware and the federal laws of the United States, and we express no opinion concerning the application or effect of the laws or regulations of any other jurisdiction or jurisdictions or as to the interpretation of any agreements or instruments that would arise from the application or effect of the laws of any jurisdiction other than the law of the State of New York, the State of Delaware or the federal law of the United Stated of America. Insofar as the opinions expressed herein relate to matters governed by laws other than those referred to in

April 22, 2002
Page 5



PILLSBURY WINTHROP⸤⸤

the preceding sentence, we have assumed, but without having made any independent investigation, that such laws do not affect this opinion. We express no opinion as to the effect of any provision in the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Debentures, the Warrants, the Irrevocable Transfer Agent Instructions, the Pledge and Security Agreement and the Option Agreement specifying that New York law governs any such agreement and the transactions contemplated thereby. We express no opinion as to the effect of any provision in the Pledge and Security Agreement specifying that the laws of the Republic of China govern the Pledge and Security Agreement and the transactions contemplated thereby or as to the meaning, interpretation, validity, binding nature or enforceability of the Pledge and Security Agreement under the laws of the Republic of China. We express no opinion as to federal or state antifraud or antitrust laws or regulations or, except as set forth in paragraph 6, as to the securities or blue sky law of any jurisdiction. We express no opinion in clause (ii) of paragraph 9 as to ordinances and regulations of New York or Delaware counties and political subdivisions thereof.

(d)      We have assumed the genuineness of all signatures, the authenticity and completeness of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies of originals, the legal capacity of all natural persons, and, as to documents executed by entities other than the Company, that each such entity had the power to enter into and perform its obligations under such documents, and that such documents have been duly authorized, executed and delivered by, and are valid and binding upon and enforceable against such entities. We have also assumed that the representations and warranties made by the Company in the Purchase Agreement are true and correct as to matters of fact and that the representations and warranties made by the Buyers in the Purchase Agreement are true and correct.

(e)      We have assumed for purposes of paragraph 6 that the terms of the Debentures will be the same on any Conversion Date or Interest Payment Date as they are on the date hereof, that the terms of the Warrants will be the same on any date of exercise of such Warrant as they are on the date hereof, that the representations and warranties made by the Buyers and the Company in the Purchase Agreement are true and correct at the time of exercise of any Warrant and the issuance of any Warrant Shares, and due performance by the Company of the covenant set forth in Section 4(b) of the Purchase Agreement at the time of any exercise of any Warrant and the issuance of any Warrant Shares.

(f)      We assume that you know of no agreements, understandings or negotiations between the parties not set forth in the the Purchase Agreement, the Debentures, the Warrants, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement, the Option Agreement and the Irrevocable

April 22, 2002
Page 6



PILLSBURY WINTHROP LLP

Transfer Agent Instructions that would modify the terms or rights and obligations of the parties thereunder that would affect this opinion.

     (g)    Whenever a statement herein is qualified by "to our knowledge," or "we are not aware," or similar phrase, it indicates that in the course of our representation of the Company no information that would give us current actual knowledge of the inaccuracy of such statement has come to the attention of the attorneys in this firm who have rendered legal services in connection with this transaction. We have not made any independent investigation to determine the accuracy of such statement, except as we have deemed necessary or appropriate under the circumstances as expressly described herein. No inference as to our knowledge of any matters bearing on the accuracy of such statement should be drawn from the fact of our representation of the Company in other matters in which such attorneys are not involved.

This opinion is rendered solely for your information in connection with the transaction described above and may not be delivered to or relied upon by any other person without our prior written consent.

Very truly yours,

Pillsbury Winthrop LLP

E04942
E25996

**From:** Walker, Matthew S. [mailto:matthew.walker@pillsburylaw.com]
**Sent:** Thursday, July 20, 2006 4:41 PM
**To:** Bruce Bennett
**Cc:** Eschenbruecher, Robin; Freeman, William; Barbarosh, Craig A.; Anne E. Wells
**Subject:** SONICblue - Claims - Senior Notes - CONFIDENTIAL SETTLEMENT COMMUNICATION

CONFIDENTIAL SETTLEMENT COMMUNICATION
Dear Bruce:
We have received the analysis on the Junior Notes mentioned in my email Tuesday.
As you know, Bankruptcy Code Section 502(b)(2) disallows unmatured interest, and both the
legislative history and the case law hold that original issue discount that is not "amortized" on
the petition date is unmatured interest within the meaning of Section 502(b)(2).

In this case, the Senior Notes were as part of a larger "Investment"; and were sold to your
lients along with warrants to purchase SONICblue stock and options to purchase UMC stock
for a total purchase price of $62.25 million. In addition, the Senior Notes were convertible to
SONICblue stock.

Our experts tell us that, according to GAAP, each of the components of the transaction must
be valued to determine the total amount of OID. The value of each non-debt component of the
transaction is set forth in the chart below. The chart also shows how much of the original issue
discount was amortized as of the petition date.

The chart below also has the same analysis for the Junior Notes. Please note that we were
required to make a few assumptions with respect to the Junior Notes. First, we do not know
the exact date the Junior Noteholders converted $200,000 of their notes to SONICblue stock.
We believe the conversion was in 2000, and have assumed June 30, 2000. Also, for the sake
of convenience, we have assumed the Junior Notes were sold in a single tranche, although
there were two tranches sold two days apart. (The difference in unamortized OID is not
significant.) Finally, for calculation purposes, we assumed the 2000 conversion was allocable
pro-rata to each tranche based on the initial funding.

As you know, we do not know how much your clients recovered when they sold the UMC stock
post-petition. We have assumed $17 million based on publicly available information. As part
of any settlement/litigation process we will need to confirm the actual amount of proceeds.

Finally, I should note that I personally prepared the interest calculations. I believe they are
close, but until we have the UMC stock sale proceeds amounts and dates of receipt, a more
refined interest accrual amount is unnecessary for settlement discussions.

$Exh. B$

**Senior Note OID Calculation**

| | | |
|---|---|---|
| | Note Amount | |
| Principal | $ | 75,000,000 |
| Interest to March 21, 2003 | $ | 3,229,167 |
| Subtotal | $ | 78,229,167 |
| | Gross OID | |
| Discount from Face Amt. | $ | 12,750,000 |
| Warrant Value | $ | 20,485,208 |
| UMC Options Value | $ | 14,777,695 |
| Conversion Feature Value | $ | 3,915,935 |
| Total OID | $ | 51,928,839 |
| | Amortization | |
| Amort. thru March 21, 2003 | $ | 8,789,046 |
| Unamortized OID | $ | 43,139,793 |
| Recovery on UMC Stock | $ | 17,000,000 |
| Net Claim Allowed Amount | $ | 18,089,374 |

**Junior Note OID Calculation**

| | | |
|---|---|---|
| | Note Amount | |
| Principal | $ | 103,300,000 |
| Interest to March 21, 2003 | $ | 2,804,882 |
| Subtotal | $ | 106,104,882 |
| | Gross OID | |
| Discount from Face Amt. | $ | 3,100,000 |
| Conversion Feature Value | $ | 70,345,232 |
| Total OID | $ | 73,445,232 |
| | Amortization | |
| Amort thru March 21, 2003 | $ | 64,693,586 |
| Unamortized OID | $ | 8,751,646 |
| Net Claim Allowed Amount | $ | 97,353,236 |

I should note that the disallowance of original issue discount does not affect your clients' rights under the subordination provisions of the Junior Note Indenture. However, in light of the anticipated distribution in these cases (in the range of 30-35% assuming substantive consolidation), disallowance of OID will result in your clients not receiving 100% of the principal and interest due on their claims.

Once you have reviewed this, please let me know how you would like to proceed. Our preference would be to commence a dialogue and resolve the matter without litigation. Of course, we reserve all our rights, including without limitation the right to file a claim objection at any time.

Regards,
Matt Walker

Matthew S. Walker
Pillsbury Winthrop Shaw Pittman LLP
 1682 El Camino Real, Suite 200
San Diego, CA 92130-2092
Phone: 858-847-4158  .
Cell: 619-807-8993
Direct Fax: 619-819-4276
Email: Matthew.Walker@pillsburylaw.com
(Please note my new address and telephone number)

============================================================
The contents of this message, together with any attachments, are intended only for t

****************
Internal Revenue Service regulations generally provide that, for the purpose of avoi
============================================================

# EXHIBIT 3

**Walker, Matthew S.**

| | |
|---|---|
| **From:** | Walker, Matthew S. |
| **Sent:** | Wednesday, September 06, 2006 2:02 PM |
| **To:** | RB; Craig Rankin |
| **Cc:** | Anne E. Wells; Eschenbruecher, Robin; Freeman, William; Barbarosh, Craig A. |
| **Subject:** | SONICblue - Claims - Senior Notes |
| **Attachments:** | RE: Sonic Blue - Amortization of Junior Notes - Net of Conversion Feature -Scenarios C,D, E; WestFind&Print Document - 170 br 585; WestFind&Print Document - 296 br 537; WestFind&Print Document - 539 F.2d 1205; RE: NY Obligation; NY Obligation; WestFind&Print Document - 213 f.3d 1301; WestFind&Print Document - 179 br 902; RE: Usury Question / SONICblue 044845-0000009; Please print these for me by 200; Accredited Investor - Regulation D - 17 CFR 230.501; WestFind&Print Document - 174 br 590; Fwd: Sonic Blue; Fwd: SonicBlue Solvency issue; reas eq value and fmv; reas eq value and fmv; Cal.Const. Art. 15,  1; Corp. Code 25117; reasonably eq value / bonds; reasonably eq value / bonds; RE: Usury Question; RE: SONICblue Plan; RE: Usury Question; RE: Usury Question; Usury Question; RE: SONICblue - Claims - Senior Notes; Fwd: Re: sonic blue - Revised Senior Note OID Amortization; Re: SONICblue - Claims - Senior Notes - CONFIDENTIAL SETTLEMENT COMMUNICATION; RE: Sonic Blue - revised debt analysis; Sonic Blue - Amortization of Junior Notes - Net of Conversion Feature; Sonic Blue; RE: Jr. note; Fax From: 4089972179; Jr. note; RE: Bond amortization; RE: Bond amortization / Sonicblue Claims Senior Notes; Bond amortization; RE: SONICblue - Claims - Senior Noteholders; RE: SONICblue - Claims - Senior Noteholders; Westlaw E-mail; RE: SONICblue - Claims - Senior Noteholders; senior notes 502b2; RE: SONICblue Plan; FW: SONICblue Plan; RE: SONICblue - Claims - Senior Noteholders - SETTLEMENT COMMUNICATION; FW:; RE: ; rule of explicitness; RE: Sonicblue - Claims - Senior Noteholders; Re: ; Re: ; FW: FW: SONICblue - Claims - Senior Notes / 05 Notes; RE: SONICblue - Claims - 05 Noteholders; Re: FW: SONICblue - Claims - Senior Notes / 05 Notes; FW: Constant Interest Calculation - Senior Notes  05 Notes; RE: SONICblue - Claims - Senior Notes / 05 Notes; Historical Prices.htm; Yahoo! Finance - 2303.TW.htm |

Ron:

Attached please find copies of all the emails that I saved in my working file pertaining to the Senior Notes and Junior Notes.

Matt Walker

Exhibit_____3____

| | | | | | | |
|---|---|---|---|---|---|---|
| RE: Sonic Blue - Amortization ... | WestFind&Print Document - 170 ... | WestFind&Print Document - 296 ... | WestFind&Print Document - 539 ... | RE: NY Obligation | NY Obligation | WestFind&Print Document - 213 ... |
| WestFind&Print Document - 179 ... | RE: Usury Question / SONICblue... | Please print these for me by 2... | Accredited Investor - Regulati... | WestFind&Print Document - 174 ... | Fwd: Sonic Blue | Fwd: SonicBlue Solvency issue |
| reas eq value and fmv | reas eq value and fmv | Cal.Const. Art. 15, 1 | Corp. Code 25117 | reasonably eq value / bonds | reasonably eq value / bonds | RE: Usury Question |
| RE: SONICblue Plan | RE: Usury Question | RE: Usury Question | RE: Usury Question | Usury Question | RE: SONICblue Claims - Seni... | Fwd: Re: sonic blue - Revised ... |
| Re: SONICblue - Claims - Senio... | RE: Sonic Blue - revised debt ... | Sonic Blue - Amortization of J... | Sonic Blue | RE: Jr. note | Fax From: 4089972179 | Jr. note |
| RE: Bond amortization | RE: Bond mortization / Sonicb | Bond amortization | RE: SONICblue Claims - Seni... | RE: SONICblue Claims - Seni... | Westlaw E-mail | RE: SONICblue Claims - Seni... |
| senior notes 502b2 | RE: SONICblue Plan | FW: SONICblue Plan | RE: SONICblue Claims - Seni... | FW: | RE: | rule of explicitness |
| RE: Sonicblue Claims - Senio... | Re: | Re: | FW: FW: NICblue - Claims - S | RE: SONICblue Claims - 05 N... | Re: FW: SONICblue - Claims - S... | FW: Constant Interest Calculat... |
| RE: SONICblue Claims - Senio... | Historical Prices.htm | Yahoo! Finance - 2303.TW.htm | | | | |

**Matthew Walker | Pillsbury Winthrop Shaw Pittman LLP**

Tel: 858.847.4158 | Fax: 619.819.4276 | Cell: 619.807.8993
11682 El Camino Real, Suite 200 | San Diego, CA 92130-2092

Email: Matthew.walker@pillsburylaw.com
Bio: www.pillsburylaw.com/matthew.walker
**www.pillsburylaw.com**

# EXHIBIT 4

Tax ID No. 94-1311126

Nancy G. Denison
Analyst
SONICblue, Inc. - Debtor-In-Possession
7 West 41st Avenue, #74
San Mateo, CA 94403

November 1, 2006
Invoice No. 7309937
Client No. 044845
Jorge A del Calvo
(650) 233-4500

**For Professional Services Rendered And Disbursements Incurred Through August 23, 2006**

| Matter Name | Services | Disbursements | Balance Due |
|---|---|---|---|
| Asset Sales - Section 363 | $589.00 | $0.00 | $589.00 |
| Business Operations | 2,509.00 | 0.00 | 2,509.00 |
| Case Administration | 10,493.50 | 461.25 | 10,954.75 |
| Claims Administration/Objections | 50,425.50 | 881.75 | 51,307.25 |
| Compensation of Professionals | 26,838.50 | 862.59 | 27,701.09 |
| Creditor Communications | 2,916.50 | 0.00 | 2,916.50 |
| Employee Benefits/Pension/KERP | 6,883.25 | 0.00 | 6,883.25 |
| Executory Contracts/Leases | 6,826.00 | 105.07 | 6,931.07 |
| Litigation | 7,700.00 | 18.01 | 7,718.01 |
| Plan and Disclosure Statement | 144,310.75 | 1,815.64 | 146,126.39 |
| Retention of Professionals | 2,144.00 | 674.88 | 2,818.88 |

Exhibit 4

### Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845

Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 2

| | | | |
|---|---|---|---|
| SEC Compliance | 1,116.00 | 0.00 | 1,116.00 |
| VIA/S3 Litigation | 118,769.75 | 5,174.24 | 123,943.99 |
| **Total This Invoice:** | **$381,521.75** | **$9,993.43** | **$391,515.18** |

REVISED - REPLACEMENT OF INVOICE 7271441

*Current charges only. Time and disbursements not yet recorded will be included in future invoices.*

**Totals by Timekeeper**

| Timekeeper | Hours | Rate | Value Billed |
|---|---|---|---|
| C. A. Barbarosh | 14.40 | $550.00 | $7,920.00 |
| A. J. Boro, Jr. | 103.50 | 500.00 | 51,750.00 |
| P. L. Breeden | 102.20 | 185.00 | 18,907.00 |
| R. B. Burlingame | 8.25 | 425.00 | 3,506.25 |
| R. B. Burlingame | 0.50 | 440.00 | 220.00 |
| J. A. Catz | 105.70 | 365.00 | 38,580.50 |
| P. L. Cotton | 3.25 | 440.00 | 1,430.00 |
| M. J. Danielson | 0.80 | 455.00 | 364.00 |
| K. B. Dine | 0.20 | 525.00 | 105.00 |
| M. P. Ellis | 1.90 | 420.00 | 798.00 |
| A. Elsholz | 0.20 | 110.00 | 22.00 |
| W. Freeman | 35.20 | 540.00 | 19,008.00 |
| G. P. Haley | 0.50 | 650.00 | 325.00 |
| D. Hodgkinson | 1.80 | 150.00 | 270.00 |
| M. D. Houle | 102.30 | 450.00 | 46,035.00 |
| M. D. Houle | 12.40 | 460.00 | 5,704.00 |
| J. D. Karceski | 1.10 | 445.00 | 489.50 |
| G. A. Lombardi | 3.00 | 550.00 | 1,650.00 |
| T. V. Loran | 23.00 | 550.00 | 12,650.00 |
| T. T. Mayfield | 0.25 | 180.00 | 45.00 |
| H. E. Mayon | 3.40 | 365.00 | 1,241.00 |
| H. E. Mayon | 1.30 | 400.00 | 520.00 |
| J. McAndrew | 0.25 | 170.00 | 42.50 |
| J. D. Monarrez | 4.50 | 105.00 | 472.50 |
| C. L. Morgan | 1.25 | 240.00 | 300.00 |
| L. L. Partrick | 18.00 | 225.00 | 4,050.00 |
| L. L. Partrick | 7.90 | 230.00 | 1,817.00 |
| J. C. Simons | 1.00 | 500.00 | 500.00 |
| M. W. Visconti | 39.40 | 140.00 | 5,516.00 |
| C. B. Wainwright | 1.50 | 675.00 | 1,012.50 |
| M. S. Walker | 258.40 | 465.00 | 120,156.00 |

### Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845

Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 3

| Timekeeper | Hours | Rate | Value Billed |
|---|---|---|---|
| M. S. Walker | 69.75 | 475.00 | 33,131.25 |
| J. H. Webster | 3.25 | 475.00 | 1,543.75 |
| E. Wood | 0.20 | 180.00 | 36.00 |
| N. J. Youssef | 2.10 | 420.00 | 882.00 |
| N. J. Youssef | 1.20 | 435.00 | 522.00 |
| **Total:** | **933.85** | | **$381,521.75** |

**Prior Invoices Outstanding**

| Invoice Number | Date | Invoice Amount | Payments/ Adjustments | Total Prior Outstanding |
|---|---|---|---|---|
| 7038566 | 06/14/04 | $486,089.02 | $419,596.93 | $66,492.09 |
| 7072320 | 10/19/04 | 228,344.73 | 206,012.30 | 22,332.43 |
| 7103625 | 03/08/05 | 316,789.34 | 221,752.54 | 95,036.80 |
| 7159299 | 09/30/05 | 646,086.51 | 563,715.11 | 82,371.40 |
| 7220844 | 04/17/06 | 302,835.04 | 208,122.28 | 94,712.76 |
| Total Prior Outstanding | | $1,980,144.64 | $1,619,199.16 | $360,945.48 |
| Total Amount Outstanding | | | | $752,460.66 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000004
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 4

**Asset Sales - Section 363**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 04/06/06 | Telephone conference with J. Kohl regarding sale of Epic Technologies stock. | 0.40 | 450.00 | $180.00 |
| M. D. Houle | 04/11/06 | File review and analysis regarding preparation motion to sell Epic Technology stock. | 0.50 | 450.00 | 225.00 |
| M. D. Houle | 08/17/06 | Draft correspondence to M. Bennett regarding revisions to Purchase Agreement for Epic Technology stock. | 0.40 | 460.00 | 184.00 |

|  |  |  | Total Hours: |  | 1.30 |
|---|---|---|---|---|---|
|  |  |  | **Total Fees:** |  | **$589.00** |

**Timekeeper Summary**

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| M. D. Houle | 0.90 | $450.00 | $405.00 |
| M. D. Houle | 0.40 | 460.00 | 184.00 |
| **Total:** | **1.30** |  | **$589.00** |

**Total Due For Matter 0000004:**          **$589.00**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000007
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 5

**Business Operations**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| H. E. Mayon | 04/04/06 | Conference with M. Houle regarding Singapore entity and research regarding Singapore entity. | 0.60 | 365.00 | $219.00 |
| M. D. Houle | 04/04/06 | Analysis of correspondence from receiver regarding windup of Singapore subsidiary. | 0.70 | 450.00 | 315.00 |
| M. D. Houle | 04/04/06 | Draft correspondence to M. Smith regarding windup of Singapore subsidiary. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 04/05/06 | Telephone conference with M. Smith regarding Singapore subsidiary wind down. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/05/06 | File review regarding expiration of M. Smith employment stipulation. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/06/06 | Review and revise correspondence to H. Tan regarding windup of Singapore subsidiary. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 04/12/06 | Telephone conference with M. Smith regarding wind down of Singapore subsidiary. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/12/06 | Draft correspondence to H. Tan regarding request for information on Singapore subsidiary. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/14/06 | Draft order regarding stipulation for unclaimed funds. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/19/06 | Review correspondence from H. Tan regarding Singapore wind down. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/19/06 | Draft correspondence to M. Smith regarding Singapore wind down. | 0.10 | 450.00 | 45.00 |
| G. A. Lombardi | 06/16/06 | Review contracts to determine whether they can be terminated. | 0.50 | 550.00 | 275.00 |
| G. A. Lombardi | 08/11/06 | Attention to corporate matters including tracking down CUSIP numbers and transfer agent contracts. | 0.25 | 550.00 | 137.50 |
| C. L. Morgan | 08/17/06 | Review audit request letter, compile information for response, draft response letter and due diligence re same (401(k) Savings Plan) | 1.25 | 240.00 | 300.00 |
| G. A. Lombardi | 08/18/06 | Attention to obtaining various corporate documents. | 0.25 | 550.00 | 137.50 |

Total Hours: 6.05
**Total Fees:** **$2,509.00**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000007
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 6

**Timekeeper Summary**

| Timekeeper | Hours | Rate | Value Billed |
|---|---|---|---|
| G. A. Lombardi | 1.00 | $550.00 | $550.00 |
| C. L. Morgan | 1.25 | 240.00 | 300.00 |
| M. D. Houle | 3.20 | 450.00 | 1,440.00 |
| H. E. Mayon | 0.60 | 365.00 | 219.00 |
| **Total:** | **6.05** | | **$2,509.00** |

**Total Due For Matter 0000007:**     **$2,509.00**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000008
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 7

**Case Administration**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| P. L. Breeden | 04/03/06 | Review e-mail request from creditor counsel and update Special Service List accordingly. | 0.60 | 185.00 | $111.00 |
| P. L. Breeden | 04/03/06 | Prepare e-mail to servicing agent, Administar, regarding updating of mailing lists. | 0.40 | 185.00 | 74.00 |
| P. L. Breeden | 04/03/06 | Research petition filing time of Debtors for M. Walker. | 0.40 | 185.00 | 74.00 |
| M. D. Houle | 04/10/06 | File review and draft stipulation regarding recovery of lost funds. | 1.20 | 450.00 | 540.00 |
| M. D. Houle | 04/12/06 | Exchange correspondence with A. Wells regarding stipulation to recover unclaimed funds. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/20/06 | Instruct P. Breeden regarding filing of stipulation for unclaimed funds. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 04/24/06 | Prepare proof of service, finalize pleadings, serve on limited service list and e-file stipulation and order for recovery of unclaimed funds to the Debtors and OCC. | 2.60 | 185.00 | 481.00 |
| M. D. Houle | 04/24/06 | Exchange correspondence with M. Sullivan regarding status of recovery of unclaimed funds. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/24/06 | Analysis regarding application of returned 401(K) funds. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/24/06 | Draft correspondence to M. Smith regarding unclaimed funds for California Audio Labs. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/25/06 | Exchange correspondence with M. Terry regarding status of unclaimed funds order. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/26/06 | Exchange correspondence with M. Terry regarding proposal to recover unclaimed funds. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/26/06 | Telephone conference with P. Vargas at US Trustees office regarding unclaimed funds. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/26/06 | Telephone conference with C.C. Yang regarding wind up of Singapore subsidiary. | 0.30 | 450.00 | 135.00 |
| P. L. Breeden | 04/27/06 | Research modem agreement for J. Catz. | 0.60 | 185.00 | 111.00 |
| M. D. Houle | 05/01/06 | Exchange correspondence with A. Wells regarding recovery of funds from Hercules estate. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/01/06 | Instruct P. Breeden regarding recovery of funds from Hercules estate. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 05/04/06 | Analyze and review pleadings and closing | 1.40 | 185.00 | 259.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000008
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 8

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | documents regarding sale of debtors' assets for J. Catz. | | | |
| E. Wood | 05/04/06 | Go over materials to be executed and notarized by our client; Confer regarding correct notary formats. | 0.20 | 180.00 | 36.00 |
| M. D. Houle | 05/08/06 | Exchange correspondence with J. Bettinger regarding recovery of unclaimed funds. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 05/08/06 | Assemble and forward electronic copies of fee application and supporting exhibits to Attorney Freeman for pending fee hearing. | 1.00 | 185.00 | 185.00 |
| M. D. Houle | 05/12/06 | Draft correspondence to M. Smith regarding payment of fees. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/12/06 | Draft correspondence to M. Smith regarding preparation of tax returns. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/15/06 | Exchange correspondence with M. Smith and H. Grobstein regarding preparation of tax returns. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 05/16/06 | Telephone conference with M. Smith re preparation of tax returns. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 05/16/06 | Conference call with M. Smith and H. Grobstein re preparation of tax returns. | 0.60 | 450.00 | 270.00 |
| M. D. Houle | 05/22/06 | Analyze correspondence re insiders of debtor subsidiaries. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/22/06 | Exchange correspondence with M. Smith re Singapore subsidiary trustee's request for documents. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/23/06 | Exchange correspondence with J. Bettinger re unclaimed funds. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 05/25/06 | Review e-mail request from M. Walker regarding removal of Merrill Lynch from SONICblue mailing lists and remove from all mailing lists. | 0.40 | 185.00 | 74.00 |
| W. Freeman | 05/25/06 | Analyze continued employment of Salvucci and Smith. | 0.40 | 540.00 | 216.00 |
| M. D. Houle | 05/25/06 | Analysis re continued employment of M. Smith and N. Salvucci. | 0.50 | 450.00 | 225.00 |
| M. D. Houle | 05/25/06 | Draft stipulations to continue employment of M. Smith and N. Salvucci. | 0.80 | 450.00 | 360.00 |
| M. D. Houle | 05/25/06 | Draft correspondence to A. Wells and C. Rankin re continued employment of N. Salvucci and M. Smith. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 05/26/06 | Research pleading files and LegalKey for asset purchase agreements relating to modem sale | 1.60 | 185.00 | 296.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000008
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 9

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | and report same to M. Walker. | | | |
| M. D. Houle | 05/30/06 | Draft correspondence to C. Rankin and A. Wells regarding M. Smith employment. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 05/31/06 | Correspond with SV office and records department regarding missing closing binders related to asset sales. | 0.50 | 185.00 | 92.50 |
| M. D. Houle | 06/01/06 | Instruct P. Breeden regarding recovery of funds from Hercules estate. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/02/06 | Telephone conference with P. Lomas regarding returned check for S3 Inc. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 06/02/06 | Research off-site files and SV records regarding closing binders for asset sales. | 2.00 | 185.00 | 370.00 |
| P. L. Breeden | 06/05/06 | Correspond with servicing agent, Administar regarding changes, updates and deletions to creditors' mailing lists. | 1.00 | 185.00 | 185.00 |
| M. D. Houle | 06/06/06 | Telephone conference with A. Wells regarding stipulation to employ M. Smith and N. Salvucci. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/09/06 | Telephone conference with A. Wells regarding stipulation to employ M. Smith. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/12/06 | Exchange correspondence with M. Smith regarding preparation of tax returns. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/13/06 | Telephone conference with A. Wells regarding employment stipulation. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/13/06 | Exchange correspondence with M. Smith regarding tax return issues and H. Grobstein involvement. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/16/06 | Telephone conference with M. Smith regarding Singapore Trustee request for documents (Sonicblue Singapore). | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 06/19/06 | Research Bar Date motion pleadings for M. Houle and forward same. | 1.80 | 185.00 | 333.00 |
| M. D. Houle | 06/19/06 | Analysis and exchange correspondence with N. Salvucci regarding employment stipulations. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 06/20/06 | Telephone conference with A. Wells regarding employment stipulations. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/20/06 | Telephone conference with M. Smith regarding employment stipulation for M. Smith and N. Salvucci. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/20/06 | Draft correspondence to N. Salvucci regarding payroll amounts. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 06/21/06 | Retrieve copies of signed orders and forward same to M. Walker. | 0.60 | 185.00 | 111.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000008                                           Invoice No. 7309937
Jorge. A. del Calvo                                                      Page 10

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 06/21/06 | Exchange correspondence with N. Salvucci regarding employment stipulation for N. Salvucci. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/21/06 | Draft correspondence to A. Wells regarding employment stipulation for N. Salvucci. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/22/06 | Telephone conference with A. Wells regarding stipulation to continue employment of N. Salvucci. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/26/06 | Telephone conference with A. Wells regarding employment stipulation for M. Smith and N. Salvucci. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/27/06 | Exchange correspondence with A. Wells regarding stipulation to continue employment of M. Smith and N. Salvucci. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/27/06 | Review and revise stipulations to continue employment of N. Salvucci and M. Smith regarding A. Wells comments. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/27/06 | Draft correspondence to M. Smith and N. Salvucci regarding employment stipulations. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/28/06 | Draft orders approving stipulations to continue M. Smith and N. Salvucci employment. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/28/06 | Draft correspondence to P. Breeden regarding filing and service of M. Smith and N. Salvucci employment. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 06/29/06 | Exchange correspondence with H. Grobstein regarding tax returns. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 07/07/06 | Pacer search regarding orders approving Smith and Saluucci continued employment | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 07/07/06 | Correspond with M. Houle regarding tax identification number for debtors. | 0.20 | 185.00 | 37.00 |
| M. D. Houle | 07/25/06 | Telephone conference with M. Bumett for Jim Kohl regarding location of Epic Technologies stock certificates. | 0.50 | 450.00 | 225.00 |
| M. D. Houle | 07/27/06 | Draft correspondence to H. Grobstein regarding status of preparation of tax returns. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 07/27/06 | Exchange multiple correspondence with A. Wells regarding preparation of tax returns. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 07/27/06 | Exchange correspondence with M. Smith regarding preparation of tax returns. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 07/31/06 | Telephone conference with H. Grobstein regarding preparation of tax returns. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 08/02/06 | Telephone conference with H. Grobstein regarding preparation of tax returns. | 0.30 | 460.00 | 138.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000008
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 11

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| P. L. Breeden | 08/03/06 | Update and revise recovery of funds letter and forward same to M. Houle. | 1.20 | 185.00 | 222.00 |
| M. D. Houle | 08/07/06 | Telephone conference with A. Wells regarding estimate for preparation of taxes. | 0.30 | 460.00 | 138.00 |
| C. A. Barbarosh | 08/08/06 | Update regarding tax return issues. | 0.10 | 550.00 | 55.00 |
| M. D. Houle | 08/14/06 | Draft correspondence to H. Grobstein regarding status of tax return preparation. | 0.20 | 460.00 | 92.00 |
| M. D. Houle | 08/14/06 | Telephone conference with H. Grobstein regarding preparation of tax returns. | 0.30 | 460.00 | 138.00 |
| P. L. Breeden | 08/14/06 | Research, obtain and prepare duplicate copy of Congress Financial load documents and forward to OCC on expedited basis. | 1.00 | 185.00 | 185.00 |

| | | |
|---|---|---|
| Total Hours: | | 33.50 |
| **Total Fees:** | | **$10,493.50** |

### Timekeeper Summary

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| W. Freeman | 0.40 | $540.00 | $216.00 |
| E. Wood | 0.20 | 180.00 | 36.00 |
| C. A. Barbarosh | 0.10 | 550.00 | 55.00 |
| P. L. Breeden | 17.30 | 185.00 | 3,200.50 |
| M. D. Houle | 14.40 | 450.00 | 6,480.00 |
| M. D. Houle | 1.10 | 460.00 | 506.00 |
| **Total:** | **33.50** | | **$10,493.50** |

### Disbursements Incurred

| Date | Type | Description | Amount |
|------|------|-------------|--------|
| 08/17/06 | Reproductions | Summary | $346.75 |
| 06/05/06 | Document Service | VENDOR: PLS Inc./Prof. Legal Svcs.  PO Box 28404; INVOICE#: 257194; DATE: 6/5/2006, Obtain Trustee's notice of unclaimed dividends form from U.S. Bankruptcy Court, 6/5/06, C. Barbarosh | 66.50 |
| 07/06/06 | Document Service | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/072006; DATE: 7/6/2006  -  Download documents from pacer, 04/01/06-06/30/06, J. | 23.68 |

**Pillsbury Winthrop Shaw Pittman** LLP

| | |
|---|---|
| Client No. 044845 | November 1, 2006 |
| Matter No. 0000008 | Invoice No. 7309937 |
| Jorge. A. del Calvo | Page 12 |

| Date | Type | Description | Amount |
|---|---|---|---|
| | | Monarrez | |
| 07/06/06 | Document Service | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/72006; DATE: 7/6/2006 - Download document from pacer, 4/1/06 - 6/30/06, J. Monarrez | 23.68 |
| 04/06/06 | Outside Search Firm | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/04062006; DATE: 4/6/2006 - Pacer search; Jan-March 2006, J. Monarrez | 0.64 |

**Total Disbursements:**     **$461.25**

**Disbursement Summary**

| Type | Amount |
|---|---|
| Document Service | 113.86 |
| Outside Search Firm | 0.64 |
| Reproductions | 346.75 |
| **Total:** | **$461.25** |

**Total Due For Matter 0000008:**     **$10,954.75**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 13

**Claims Administration/Objections**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 04/04/06 | Analyze methods for contacting TDK in Japan. | 0.30 | 465.00 | $139.50 |
| M. S. Walker | 04/04/06 | Email to Mr. Smith regarding options for contacting TDK in Japan. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/05/06 | Respond to M. Smith's email regarding TDK contact. | 0.20 | 465.00 | 93.00 |
| P. L. Breeden | 04/14/06 | Research Administar Claims Database relating to Eastech Group Member List for M. Walker. | 1.20 | 185.00 | 222.00 |
| M. S. Walker | 04/19/06 | Draft request for entry of default order sustaining state of Florida claim objection. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 04/19/06 | Analyze client's rights to order approving WDI claim objection. | 0.50 | 465.00 | 232.50 |
| M. D. Houle | 04/20/06 | Exchange correspondence with T. Arnold regarding order limiting notice on claim settlements. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 04/20/06 | Draft amended objection to WDI claim to provide more proof. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 04/20/06 | Revise application for default order disallowing state of Florida claims. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 04/20/06 | Draft default order disallowing state of Florida claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 04/20/06 | Email to N. Salvucci regarding amended WDI claim objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/21/06 | Email to OCC's counsel T. Arnold regarding objections to amended claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 04/21/06 | Email to firm personnel regarding OID on Junior Notes. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 04/21/06 | Email to N. Salvucci regarding Tweeter analysis. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 04/24/06 | Read facsimile from N. Salvucci regarding WDI objection. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 04/24/06 | Email to M. Smith regarding developing evidence for TDK objection. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 04/24/06 | Read and analyze list of all claims sent by Administar. | 1.10 | 465.00 | 511.50 |
| M. S. Walker | 04/24/06 | Email to Administar identifying and requesting correction of errors in spreadsheet itemizing all claims. | 0.30 | 465.00 | 139.50 |
| P. L. Breeden | 04/24/06 | Prepare exhibits, proof of service, finalize pleadings, serve and e-file amended objection | 0.90 | 185.00 | 166.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                      November 1, 2006
Matter No. 0000009                                                 Invoice No. 7309937
Jorge. A. del Calvo                                                              Page 14

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | to claim against WDI of Oregon. | | | |
| M. S. Walker | 04/25/06 | Read and analyze Mr. Smith's four emails regarding TDK Claim. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 04/25/06 | Call with Mr. Smith to discuss TDK claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/25/06 | Email to Mr. Smith seeking clarification of information in TDK emails. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 04/25/06 | Email to N. Salvucci regarding state of New Jersey claim against ReplayTV. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 04/25/06 | Analyze information needed for Techsearch objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/25/06 | Email to N. Salvucci regarding data needed for Techsearch objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/26/06 | Read and analyze D. Gershon's email regarding Techsearch and Reigncom claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/26/06 | Email to W. Abrams regarding information concerning alleged infringement claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 04/26/06 | Read and respond to M. Smith's emails regarding Techsearch claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/26/06 | Letter to TDK identifying issues with claim and requesting supporting documentation. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 04/27/06 | Read and analyze Mr. Smith's emails regarding TDK. | 0.20 | 465.00 | 93.00 |
| C. A. Barbarosh | 04/28/06 | Review and analyze order approving procedures to settle claims objections. | 0.20 | 550.00 | 110.00 |
| M. S. Walker | 04/28/06 | Analyze results of efforts to contact TDK and options for future efforts. | 0.30 | 465.00 | 139.50 |
| M. D. Houle | 05/01/06 | Analyze Coca Cola proof of claim. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 05/01/06 | Draft correspondence to A. Wells and C. Rankin regarding Coca Cola claim objection. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 05/04/06 | Meet with Mr. Smith to discuss projections for distributions and issues relating to 05 noteholder claims. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/04/06 | Meet with OCC counsel to address status of claims objections and objections to 05 noteholder claims. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/09/06 | Email to N. Salvucci regarding State of New Jersey claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/10/06 | Analyze open issues regarding Arise Solutions claims and overlap with IT&T claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/10/06 | Locate information via EDGAR on '05 notes original issue discount. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/10/06 | Locate information via EDGAR on '03 notes | 0.20 | 465.00 | 93.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                      November 1, 2006
Matter No. 0000009                                 Invoice No. 7309937
Jorge. A. del Calvo                                          Page 15

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | original issue discount. | | | |
| M. S. Walker | 05/10/06 | Read and analyze '05 note sale agreement and warrant agreement to evaluate amount of original issue discount on senior notes. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 05/10/06 | Read and analyze '03 note indenture to value amount of original issue discount on junior notes. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 05/10/06 | Email to U.S. Bank counsel seeking clarification of claim amount and his position on original issue discount. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/10/06 | Email to M. Smith seeking his input on valuation of warrants provided to senior Noteholders as part of original issue discount. | 0.20 | 465.00 | 93.00 |
| G. A. Lombardi | 05/10/06 | Research regarding pricing of 2003 and 2005 debentures. | 0.50 | 550.00 | 275.00 |
| M. S. Walker | 05/11/06 | Analyze SONICblue's 10-Q for information relevant to Original issue discount analysis relating to senior and junior notes. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 05/11/06 | Respond to M. Smith's email regarding analysis of original issue discount issue. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/11/06 | Email to M. Smith regarding valuation of warrant. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/12/06 | Read and respond to Mr. Smith's email regarding 05 Noteholders. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/12/06 | Begin drafting email to B. Bennett regarding securing an accounting of senior Noteholders' claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/15/06 | Email to OCC requesting data on claims status for analysis of needed claims objections. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/15/06 | Email to Administar regarding updating of database to show claim status. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/15/06 | Email to T. Arnold regarding Avaya claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/15/06 | Respond to Osvanna Tavorkian's email regarding Avaya claim. | 0.10 | 465.00 | 46.50 |
| P. L. Breeden | 05/15/06 | Research pleadings index, obtain and create pdfs of claim orders and forward to N. Weil at Administar. | 1.50 | 185.00 | 277.50 |
| M. S. Walker | 05/16/06 | Read and analyze spreadsheets prepared by N. Salvucci showing original issue discount on Senior Notes. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 05/16/06 | Email to Mr. Smith regarding original issue discount analysis. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/16/06 | Email to 05 Noteholders' counsel regarding | 0.20 | 465.00 | 93.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000009                                          Invoice No. 7309937
Jorge. A. del Calvo                                                      Page 16

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
|  |  | exchanging information concerning claim amount. |  |  |  |
| M. S. Walker | 05/16/06 | Email to OCC regarding analysis of 05 Noteholder claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/16/06 | Respond to N. Weil's email regarding Sensory Science priority claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/17/06 | Analyze strategy regarding developing evidence and case law for assessment of original issue discount issues on Senior Notes. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 05/17/06 | Review case law for direct authority regarding inclusion of warrant value in original issue discount analysis. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 05/17/06 | Call with U.S. Bank's counsel regarding original issue discount issues and pursuing objection to Senior Note claims. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 05/17/06 | Read M. Smith's email regarding original issue discount issues. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/17/06 | Report to client and OCC regarding original issue discount issues on Senior Note claims. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/18/06 | Email to H. Grobstein regarding 05 Noteholders claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/18/06 | Call with Mr. Smith to discuss Black-Schoales valuation of warrants and options delivered to Senior Noteholders. | 0.80 | 465.00 | 372.00 |
| M. D. Houle | 05/19/06 | Analyze Cypress Semiconductor proof of claim. | 0.30 | 450.00 | 135.00 |
| M. S. Walker | 05/22/06 | Analyze spreadsheet sent by M. Smith analyzing 05 debt costs. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/22/06 | Further analysis of whether option and warrant value are additional OID. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 05/22/06 | Call with H. Grobstein regarding analysis of 05 debt financing costs. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/22/06 | Email to H. Grobstein and A. wells describing debt analysis issues and spreadsheet with analysis. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/23/06 | Analyze information from B. Wainwright regarding analysis of OID on Senior Noteholders claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/23/06 | Read order granting state of Florida claim objection. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/23/06 | Revise claim analysis to reflect disallowance of Florida claim. | 0.10 | 465.00 | 46.50 |
| M. D. Houle | 05/23/06 | Analysis re disallowance of senior bond claims. | 0.40 | 450.00 | 180.00 |

### Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                          November 1, 2006
Matter No. 0000009                                      Invoice No. 7309937
Jorge. A. del Calvo                                                Page 17

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 05/24/06 | Analyze impact of subordination provisions on partial disallowance of Senior Noteholders claims. | 1.30 | 465.00 | 604.50 |
| M. S. Walker | 05/24/06 | Call with Junior Noteholders's counsel to discuss impact of subordination issues on their position regarding litigation against Senior Noteholders. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/24/06 | Email to Grobstein regarding meeting to discuss analysis of Senior Noteholders claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/25/06 | Email to N. Salvucci requesting response to open issues. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/25/06 | Email to OCC's counsel regarding status of CIT claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/25/06 | Instruct P. Breeden regarding analyzing IRS claim. | 0.10 | 465.00 | 46.50 |
| M. D. Houle | 05/30/06 | Analysis regarding potential claims distribution. | 0.30 | 450.00 | 135.00 |
| P. L. Breeden | 05/31/06 | Prepare and forward Zurich objection to claim order to Administar for processing. | 0.20 | 185.00 | 37.00 |
| M. S. Walker | 05/31/06 | Analyze spreadsheet showing allowed claims provided by Administar to identify inaccurate records and claims for objections. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 05/31/06 | Email to N. Weil at Administar regarding necessary changes to database. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/31/06 | Email to OCC's counsel regarding claims spreadsheet. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/01/06 | Analyze email from M. Smith with Senior Note sale metrics. | 0.20 | 465.00 | 93.00 |
| C. A. Barbarosh | 06/01/06 | Review and analyze updates re claims analysis. | 0.20 | 550.00 | 110.00 |
| M. S. Walker | 06/02/06 | Email to T. Arnold regarding handling of claims asserted by his firm's preference Defendants. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/02/06 | Draft request for entry of default order and default order disallowing WDI claim as secured. | 0.80 | 465.00 | 372.00 |
| P. L. Breeden | 06/05/06 | Prepare exhibits, download and e-file Request for Entry of Default Order to Objection to Claim of WDI of Oregon. | 1.20 | 185.00 | 222.00 |
| M. S. Walker | 06/06/06 | Analyze strategy regarding Senior Noteholders claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/06/06 | Call with Grobstein to discuss original issue discount issues relating to Senior Noteholders claims. | 0.40 | 465.00 | 186.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 18

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/07/06 | Draft email to Bennett outlining impact of OID issue on Senior Noteholders claims. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/08/06 | Call with OCC's counsel Takvorian regarding CIT/Avaya $284,000 claim. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/08/06 | Read U.S. Bank counsel's email regarding Senior Note objection. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/08/06 | Email to N. Salvucci regarding increasing responsiveness on claim objections. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/12/06 | Email to OCC regarding demand on Senior Noteholders. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/13/06 | Call with C. Rankin regarding objection to Senior Noteholders' claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/13/06 | Revise and finalize email to B. Bennett regarding objection to Senior Noteholders' claims. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/13/06 | Email to client articulating theory underlying Senior Note objection. | 0.20 | 465.00 | 93.00 |
| C. A. Barbarosh | 06/13/06 | Update regarding OID issue in senior noteholder claims. | 0.30 | 550.00 | 165.00 |
| M. S. Walker | 06/14/06 | Email to OCC regarding Senior Note issues. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Email to H. Grobstein regarding analysis of senior note issues. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/15/06 | Email to database administrator regarding identification of late filed claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/15/06 | Evaluate next step in serving TDK objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Respond to database administrator's email regarding timing for analysis. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/15/06 | Analyze next action on Arizona Department of Revenue claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Email to Administar seeking reasons why Drinker Biddle claim shown as priority. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Email to OCC regarding status of objection to Nike priority claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Read Administar's response regarding Drinker Biddle claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/15/06 | Email to T. Arnold regarding handling of NASDAQ priority claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Email to OCC regarding handling of Integnology priority claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/16/06 | Email to OCC regarding timing of objections to priority claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/16/06 | Analyze action for Rollings employee claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/16/06 | Analyze action for Stark employee claim. | 0.10 | 465.00 | 46.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 19

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/16/06 | Analyze action for Kovacs employee claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/16/06 | Email to Administar regarding scheduling of Kovacs, Stark and Rollins claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/16/06 | Email to database manager regarding status of Luckman claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/16/06 | Analyze Raymond Leasing, Dolphin Capital and Decision one claims for objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Respond to Administar's email regarding Luckman case. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Read and respond to Administar's emails regarding elimination of three scheduled employee claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Analyze action for Dash Electronics claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/19/06 | Read Luckman stipulation and order and analyze effect of Luckman stipulation on its claim. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/19/06 | Email to Administar regarding disposition of Luckman claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/19/06 | Analyze action for Marger secured claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Analyze duplicate Multiple zones claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Call with Multiple Zones' counsel regarding withdrawal of claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Review and analyze Raymond leasing claim for duplication of Kincaid claim. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/19/06 | Email to client regarding disposition of forklift leased by Raymond. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Analyze Wells Fargo letter of credit claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Email to OCC regarding issues with Wells Fargo claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/19/06 | Email to T. Arnold regarding disposition of Xerox claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/19/06 | Email to Multiple Zones's counsel regarding withdrawal of claim. | 0.20 | 465.00 | 93.00 |
| P. L. Breeden | 06/19/06 | Prepare Notice of Withdrawal of Multiple Zones claims for M. Walker. | 0.80 | 185.00 | 148.00 |
| M. D. Houle | 06/19/06 | Exchange correspondence with C. Kelly of Cypress regarding potential claims. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/19/06 | Analysis regarding supplemental rejection bar date notices. | 0.60 | 450.00 | 270.00 |
| M. D. Houle | 06/19/06 | Draft supplemental bar date notice. | 0.40 | 450.00 | 180.00 |
| M. S. Walker | 06/20/06 | Read email from OCC regarding disallowance of Xerox claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/20/06 | Read and respond to T. Arnold's email | 0.20 | 465.00 | 93.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 20

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | regarding Wells Fargo claim. | | | |
| M. S. Walker | 06/20/06 | Email to client regarding account securing Wells Fargo claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/20/06 | Read and analyze Mr. Smith's emails regarding Raymond leasing claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/20/06 | Analyze action for Raymond leasing claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/20/06 | Call to Raymond Leasing's counsel regarding claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/20/06 | Email to Administar regarding overlap of scheduled and filed claims for UPS. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/20/06 | Assess Miller, Potashner, UPS, Arise Solutions and Diamond Legacy for potential claim objections. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/20/06 | Email to OCC regarding confirming status of Pacific NW claim to Administar. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/20/06 | Call with D. MacConahy and P. Ente of HGC regarding original issue discount on senior notes. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 06/20/06 | Email to OCC regarding resolution of Potashner claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/20/06 | Begin drafting objection to Senior Note claim. | 1.00 | 465.00 | 465.00 |
| M. D. Houle | 06/20/06 | Analysis regarding Raymond Leasing claim forklift. | 0.30 | 450.00 | 135.00 |
| M. S. Walker | 06/21/06 | Read and respond to three emails from N. Salvucci and M. Smith regarding Wells Fargo claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/21/06 | Respond to A. Well's email regarding status of Potashner claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/21/06 | Email to client regarding information supporting Senior Note claim objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/21/06 | Continue drafting objection to Senior Note claims. | 3.30 | 465.00 | 1,534.50 |
| M. S. Walker | 06/22/06 | Read two emails from T. Arnold regarding Nike and order granting objection to WDI claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/22/06 | Read four emails from N. Salvucci and M. Smith regarding senior noteholder claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/22/06 | Respond to Ms. Salvucci's email requesting information regarding interest payment to Senior Noteholders. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/22/06 | Analyze spreadsheet sent by N. Salvucci showing possible payments to Senior Noteholders. | 0.30 | 465.00 | 139.50 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                             November 1, 2006
Matter No. 0000009                                        Invoice No. 7309937
Jorge. A. del Calvo                                                    Page 21

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/22/06 | Continue drafting objection to Senior Note claims. | 1.90 | 465.00 | 883.50 |
| J. D. Monarrez | 06/22/06 | Locate contact information for various individuals per P. Breeden. | 0.50 | 105.00 | 52.50 |
| M. S. Walker | 06/23/06 | Read email from M. Smith regarding junior note conversions. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/23/06 | Analyze N. Salvucci's email showing apparent interest payments to Senior Noteholders. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/23/06 | Analyze OCC spreadsheet of claims unaffected by preference cases for claims subject to objections. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 06/23/06 | Email to Administar identifying 6 claims exceeding $250,000 to be deleted from Allowed claims list. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/23/06 | Email to claims administrator regarding producing allowed claims spreadsheet. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/23/06 | Analyze history of junior notes relating to OID. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/23/06 | Email to GHC for analysis on Junior Note claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/23/06 | Email to OCC regarding Potashner claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/23/06 | Further analysis of payment of senior note interest payments. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/23/06 | Email to client regarding same. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/23/06 | Revise objection to senior note claims. | 1.10 | 465.00 | 511.50 |
| M. S. Walker | 06/23/06 | Analyze allowed claims spreadsheet from Administar to verify corrections made. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 06/23/06 | Exchange correspondence with T. Arnold regarding status of disallowed claims. | 0.40 | 450.00 | 180.00 |
| M. S. Walker | 06/26/06 | Read three emails from N. Salvucci and M. Smith regarding senior notes interest payments. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/26/06 | Call with D. McConaughy regarding Senior Note interest accruals. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/26/06 | Revise objection to Senior Note claims. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 06/26/06 | Email to client regarding payment of Sobrato claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/26/06 | Call to R. Stark regarding wage claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/26/06 | Email to Mr. Stark regarding his wage claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/26/06 | Calls to J. Kovacs and S. Taylor regarding their wage claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/26/06 | Analyze spreadsheet prepared by Administar showing late claims. | 0.40 | 465.00 | 186.00 |
| M. D. Houle | 06/26/06 | Analysis regarding payment of Sobrato administrative claim. | 0.60 | 450.00 | 270.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                    November 1, 2006
Matter No. 0000009                                              Invoice No. 7309937
Jorge. A. del Calvo                                                           Page 22

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/27/06 | Call to J. Kovacs regarding his claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/27/06 | Email to N. Salvucci regarding open claims information inquiries. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/27/06 | Read emails from client regarding Sobrato claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/27/06 | Email to Administar regarding disposition of Sobrato claim in light of information. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/27/06 | Call with Raymond Leasing's counsel regarding claims. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 06/27/06 | Analysis regarding disallowance of Locke Liddell secured claim. | 0.30 | 450.00 | 135.00 |
| M. J. Danielson | 06/28/06 | Investigate current status of Techsearch re-examination application and email correspondence regarding same. | 0.40 | 455.00 | 182.00 |
| M. S. Walker | 06/28/06 | Analyze D. McConaughy's calculation of Senior Note OID amortization. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/28/06 | Email to D. McConaughy regarding additional information needed for Senior Note objection. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/28/06 | Revise objection to Senior Notes based on information provided by D. McConaughy. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/28/06 | Respond to N. Weil's emails regarding Mary Claro and Sobrato claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/28/06 | Email to Mr. Smith explaining issues concerning Senior Note objection. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/28/06 | Review email from N. Salvucci regarding claim objections. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/28/06 | Analyze N. Salvucci's email regarding Techsearch damages. | 0.30 | 465.00 | 139.50 |
| M. J. Danielson | 06/29/06 | Attention to documents and PTO actions related to Techsearch claim and consider response and objection strategies | 0.40 | 455.00 | 182.00 |
| M. S. Walker | 06/29/06 | Analyze PTO decision on Techsearch patent and strategy for going forward with objection. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 06/29/06 | Read correspondence from Multiple Zones' counsel regarding withdrawal of claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/29/06 | Revise withdrawal form per counsel's request. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/29/06 | Call with J. Kovacs regarding his wage claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/29/06 | Email to J. Kovacs regarding his wage claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/29/06 | Revise letter to TDK regarding claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/29/06 | Read email from Administar regarding Drinker Biddle claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/29/06 | Read and respond to D. McConaughy's email regarding valuation of conversion option in | 0.20 | 465.00 | 93.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                                November 1, 2006
Matter No. 0000009                                                          Invoice No. 7309937
Jorge. A. del Calvo                                                                        Page 23

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | junior notes. | | | |
| M. S. Walker | 06/29/06 | Respond to P. Ente's email regarding note amortization. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/30/06 | Read M. Smith's email regarding objection to senior note claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/30/06 | Analyze action plan for Techsearch claim. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/30/06 | Email to client explaining action plan. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/30/06 | Respond to Mr. Kovac's email regarding wage claim. | 0.20 | 465.00 | 93.00 |
| T. T. Mayfield | 06/30/06 | Update database security to allow new end users. | 0.25 | 180.00 | 45.00 |
| M. S. Walker | 07/05/06 | Analyze strategy regarding objection to Junior note claims. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 07/05/06 | Email to P. Ente regarding OID on junior notes. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/05/06 | Email to Kovacs regarding his wage claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/05/06 | Email to Stark regarding his wage claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/05/06 | Call to S. Taylor regarding her wage claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/05/06 | Analyze tracking information on letter to TDK. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/05/06 | Email to Administar regarding elimination of Stark wage claim from database. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/06/06 | Emails to Administar regarding allowance of Sega claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Analyze Sega payable file for inconsistency with filed claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Call with Sega's counsel regarding errors in claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Email to Sega's Counsel regarding correcting errors in claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Respond to R. Stark's email regarding removal of wage claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Email to P. Ente regarding his analysis of OID on Junior Notes. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Respond to Sega's Counsel's further email regarding allowance of claim. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 07/07/06 | Call with A. Wells to discuss strategy regarding objection to Senior and Junior Notes claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/10/06 | Call with Mr. Smith regarding Kovacs' claim. | 0.10 | 465.00 | 46.50 |
| P. L. Breeden | 07/10/06 | Correspond with N. Weil regarding bar date notices and analyze claims database and complete spreadsheet of late filed claims who received bar date notice. | 2.20 | 185.00 | 407.00 |
| M. S. Walker | 07/11/06 | Evaluate strategy regarding debenture conversion valuation issues. | 0.30 | 465.00 | 139.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 24

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 07/11/06 | Call with P. Ente regarding valuation of debenture conversion feature. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/11/06 | Respond to WDI's counsel's email regarding claim. | 0.20 | 465.00 | 93.00 |
| P. L. Breeden | 07/11/06 | Correspond with N. Weil at Administar regarding copies of bar date notices relating to late filed claims. | 0.60 | 185.00 | 111.00 |
| M. S. Walker | 07/12/06 | Respond to WDI's further request for information regarding claim. | 0.20 | 465.00 | 93.00 |
| P. L. Breeden | 07/12/06 | Review original debtors' schedules and matrix and update late filed claims spreadsheet with additional information. | 1.20 | 185.00 | 222.00 |
| M. D. Houle | 07/13/06 | Analysis and draft correspondence to N. Weil regarding disallowance of Locke Liddell claim. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 07/13/06 | Review and revise Rejection Claims Bar Date Notice. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 07/13/06 | Draft correspondence to P. Breeder regarding filing and service of Bar Date Notice. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 07/14/06 | Email to Administar regarding failure to reflect American Alliance claims in database. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/14/06 | Read and respond to OCC's list of comments on subordinated claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/14/06 | Email to OCC regarding rejection bar date impact on claims. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/17/06 | Analyze email sent by Administar regarding American alliance claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/17/06 | Email to Administar regarding inconsistencies in database regarding American Alliance, Stuff software and High-Tech video claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/17/06 | Analyze P. Ente's email regarding original issue discount on junior notes. | 0.20 | 465.00 | 93.00 |
| P. L. Breeden | 07/17/06 | Research schedules regarding claims of American Alliance, Stuff Software and Hightech TV/Video and report same to M. Walker. | 0.80 | 185.00 | 148.00 |
| M. D. Houle | 07/17/06 | Exchange correspondence with E. Klein regarding proof of claim form. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 07/18/06 | Prepare analysis of unamortized OID on Senior Notes and Junior Notes. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 07/18/06 | Email to Senior Noteholders' counsel Bennett regarding settlement discussions. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/19/06 | Analyze T. Arnold's email regarding American Alliance. | 0.10 | 465.00 | 46.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 25

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 07/19/06 | Revise objection to Senior Note claims to include objection to Junior Note claims. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 07/20/06 | Analyze email sent by T. Hein at GHC regarding Junior Note OID amortization analysis. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 07/20/06 | Draft email to Senior Noteholders regarding objection to claim based on OID issues. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 07/21/06 | Respond to Sega's request for information regarding scheduled claim. | 0.30 | 465.00 | 139.50 |
| C. A. Barbarosh | 07/24/06 | Review and analyze correspondence to B. Bennett regarding OID issue. | 0.30 | 550.00 | 165.00 |
| M. S. Walker | 07/24/06 | Email to Junior Noteholders's counsel regarding disallowance of original issue discount on junior note claims. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 07/26/06 | Email to N Salvucci regarding unfulfilled requests for information. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/26/06 | Email to Mr. Smith seeking input on Kovacs claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/26/06 | Analyze strategy for dealing with Stark priority claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/26/06 | Email to Raymond Leasing's counsel regarding response to inquiry regarding claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/26/06 | Email to Multiple Zones' counsel regarding response to inquiry regarding claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/26/06 | Call to D. McConaughy regarding Senior Note original issue discount issues. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 07/27/06 | Read three emails from Mr. Smith and N. Salvucci regarding Kovacs claim. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/27/06 | Email to Mr. Kovacs providing claim payment data and requesting withdrawal of claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/27/06 | Email to client and OCC reporting on conversation with expert regarding Senior Note objection. | 0.30 | 465.00 | 139.50 |
| M. D. Houle | 07/28/06 | Conference with P. Breeden regarding instruction to send Proof of Claim to preference defendants. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 07/28/06 | Read Mr. Smiths' email regarding expert report. | 0.10 | 465.00 | 46.50 |
| M. D. Houle | 07/31/06 | Analysis regarding updated D & O claims. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 07/31/06 | Exchange multiple correspondence with A. Wells regarding D & O claims. | 0.30 | 450.00 | 135.00 |
| M. S. Walker | 07/31/06 | Email to Junior notes' counsel regarding response to objection. | 0.10 | 465.00 | 46.50 |
| M. D. Houle | 08/01/06 | Exchange correspondence with M. Smith | 0.20 | 460.00 | 92.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 26

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | regarding D & O claims. | | | |
| M. S. Walker | 08/01/06 | Read and respond to emails from M. Smith and A. Wells regarding director claims. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/01/06 | Analyze Sega's explanation of claim and settlement proposal. | 0.30 | 475.00 | 142.50 |
| M. S. Walker | 08/01/06 | Email to Sega's counsel identifying issues relating to claim. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/01/06 | Email to Senior Note's counsel regarding discussions to address original issue discount issues. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/02/06 | Analyze settlement agreement sent by Sega for information regarding interest accrual dates. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/02/06 | Email to Sega's counsel responding to interest calculation and purported justification of interest rate. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/02/06 | Email to client seeking information regarding disparity in Sega agreement terms and actual payment amounts and relating response to Sega settlement proposal. | 0.30 | 475.00 | 142.50 |
| M. S. Walker | 08/02/06 | Read letter from Multiple Zones' counsel regarding withdrawal of claim. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/03/06 | Read and analyze two emails regarding Sega forwarded by Mr. Smith. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/03/06 | Read and analyze 158 emails via concordance for evidence regarding Sega settlement. | 0.50 | 475.00 | 237.50 |
| P. L. Breeden | 08/04/06 | Prepare Withdrawal of Multiple Zones Claim and e-file with bankruptcy court. | 0.40 | 185.00 | 74.00 |
| P. L. Breeden | 08/04/06 | Prepare pdf and forward Notice of Withdrawal of Multiple Zones International claim to N. Weil at Administar. | 0.20 | 185.00 | 37.00 |
| C. A. Barbarosh | 08/08/06 | Update regarding senior notes OID negotiations/analysis. | 0.20 | 550.00 | 110.00 |
| C. A. Barbarosh | 08/08/06 | Review and analyze indemnity demands from officers and directs. | 0.20 | 550.00 | 110.00 |
| W. Freeman | 08/08/06 | Review e-mail regarding claims of senior bondholders. | 0.20 | 540.00 | 108.00 |
| M. S. Walker | 08/08/06 | Email to Multiples Zones' counsel regarding filing of withdrawal. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/08/06 | Read and analyze indemnification demand letters from five directors. | 0.60 | 475.00 | 285.00 |
| M. S. Walker | 08/08/06 | Email to OCC regarding handling of indemnification claims. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/09/06 | Read and analyze D. McConaughy's revised | 0.20 | 475.00 | 95.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                    November 1, 2006
Matter No. 0000009                                              Invoice No. 7309937
Jorge. A. del Calvo                                                        Page 27

---

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | OID analysis. | | | |
| M. S. Walker | 08/09/06 | Call with D. McConaughy regarding reasons for change in OID analysis. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/09/06 | Email to Senior Note's counsel regarding commencement of dialogue on claim objection. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/09/06 | Respond to B. Bennett's email regarding settlement discussions. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/10/06 | Read and analyze revised OID amortization provided by P. Ente. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/10/06 | Email to P. Ente and D. McConaughy regarding possible changes to Junior Note analysis based on information provided by Junior Note Indenture Trustee's counsel. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/10/06 | Email to Mr. Smith regarding possible usury issue on Senior Notes. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/11/06 | Analyze possible usury issue relating to senior and Junior notes. | 1.80 | 475.00 | 855.00 |
| M. S. Walker | 08/11/06 | Respond to D. McConaughy's email regarding restriction on Junior Note. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/11/06 | Call with D. McConaughy regarding impact of Junior Notes restrictions. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/11/06 | Email to Junior Note Indenture Trustee's counsel regarding source of restrictions. | 0.10 | 475.00 | 47.50 |
| J. C. Simons | 08/11/06 | Reviewed and researched usury question from M. Walker; sent copy of New York General Obligations Law Section 5-501 to M. Walker. | 1.00 | 500.00 | 500.00 |
| M. S. Walker | 08/14/06 | Read email from Junior Noteholders regarding restrictions on stock. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/14/06 | Email to D. McConaughy regarding restrictions on Junior Notes. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/14/06 | Call with C. Rankin regarding fraudulent transfers issues and Senior Notes. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/14/06 | Analyze fraudulent transfer issues relating to Senior Notes. | 1.25 | 475.00 | 593.75 |
| M. S. Walker | 08/14/06 | Review financial statements to address solvency in 2002 for fraudulent transfer issues. | 0.20 | 475.00 | 95.00 |
| M. D. Houle | 08/14/06 | Analysis regarding claim objection against Noteholders. | 0.30 | 460.00 | 138.00 |
| M. S. Walker | 08/15/06 | Analyze application of fraudulent conveyance principles to Senior Notes. | 0.40 | 475.00 | 190.00 |
| M. S. Walker | 08/15/06 | Analyze reasonably equivalent value as applied to notes issued with original issue discount. | 1.00 | 475.00 | 475.00 |
| M. S. Walker | 08/15/06 | Analyze new York usury law as regarding | 0.40 | 475.00 | 190.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000009                                          Invoice No. 7309937
Jorge. A. del Calvo                                                     Page 28

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | Senior Notes. | | | |
| M. S. Walker | 08/15/06 | Analyze application of Cal Corp Section 25118 to exempt Senior Notes from usury attack. | 0.70 | 475.00 | 332.50 |
| J. D. Monarrez | 08/15/06 | Locate and pull statutes per M. Walker. | 0.25 | 105.00 | 26.25 |
| M. S. Walker | 08/16/06 | Call with H. Grobstein regarding solvency issues relating to fraudulent transfer claims against Senior Noteholders. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/16/06 | Analyze fraudulent conveyance issues relating to senior notes. | 0.80 | 475.00 | 380.00 |
| M. D. Houle | 08/16/06 | Research and analysis regarding merits of objection to noteholder claim for fraudulent conveyance and usury. | 0.60 | 460.00 | 276.00 |
| M. S. Walker | 08/17/06 | Read and respond to Mr. Smith's email regarding unspecified claim against Sensory Science. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/17/06 | Respond to Mr. Arnold's email requesting information for claim analysis. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/18/06 | Call with T. Arnold regarding claims analysis. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/18/06 | Analyze T. Arnold's claim analysis. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/18/06 | Email to T. Arnold regarding discrepancies with claim analysis. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/18/06 | Email to Senior Note's counsel regarding additional theories concerning claims objections. | 0.30 | 475.00 | 142.50 |
| M. S. Walker | 08/18/06 | Email to M. Smith regarding accounting issues relating to solvency. | 0.30 | 475.00 | 142.50 |
| M. S. Walker | 08/18/06 | Read and analyze spreadsheets sent by Grobstein regarding solvency analysis. | 0.40 | 475.00 | 190.00 |
| M. S. Walker | 08/18/06 | Analyze whether less than 50% value is reasonably equivalent value. | 0.40 | 475.00 | 190.00 |
| M. S. Walker | 08/18/06 | Analyze whether Senior Note transaction qualified under Corp. Code § 25118 (e) & (f) for usury exemption. | 0.90 | 475.00 | 427.50 |
| A. Elsholz | 08/18/06 | Per Matthew Walker, locate definition of "accredited investor" as used in Regulation D of Securities Act of 1933. | 0.20 | 110.00 | 22.00 |
| G. P. Haley | 08/21/06 | Emails to Walker regarding usury issues. | 0.50 | 650.00 | 325.00 |
| M. S. Walker | 08/21/06 | Read and analyze Mr. Smith's email regarding accounting for Senior Notes. | 0.30 | 475.00 | 142.50 |
| M. S. Walker | 08/21/06 | Email to D. McConaughy regarding SONICblue's accounting for Senior Notes and impact on solvency. | 0.20 | 475.00 | 95.00 |
| M. S. Walker | 08/21/06 | Read emails from Mr. Smith and library with | 0.10 | 475.00 | 47.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                   November 1, 2006
Matter No. 0000009                                            Invoice No. 7309937
Jorge. A. del Calvo                                                        Page 29

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | information relevant to usury exemption analysis. | | | |
| M. S. Walker | 08/21/06 | Complete analysis of usury issues for Senior Notes. | 0.30 | 475.00 | 142.50 |
| M. S. Walker | 08/21/06 | Analyze Senior Noteholders' ability to assert good faith defense. | 0.90 | 475.00 | 427.50 |
| M. S. Walker | 08/21/06 | Respond to OCC's email regarding status of negotiations with Senior Noteholders. | 0.10 | 475.00 | 47.50 |
| M. S. Walker | 08/21/06 | Analyze scope of recovery in the event of a successful good faith defense. | 1.10 | 475.00 | 522.50 |
| M. S. Walker | 08/21/06 | Begin drafting amended objection to TDK claims. | 2.20 | 475.00 | 1,045.00 |
| M. S. Walker | 08/21/06 | Email to N. Salvucci regarding information needed for TDK objection. | 0.20 | 475.00 | 95.00 |
| P. L. Breeden | 08/21/06 | Prepare pdf of UPS Order Disallowing Claims and Dismissing Adversary Proceeding and forward to N. Weil at Administar. | 0.40 | 185.00 | 74.00 |
| P. L. Breeden | 08/21/06 | Prepare pdf of Thomson Licensing Order Disallowing Claims and Dismissing Adversary Proceeding and forward to N. Weil at Administar. | 0.40 | 185.00 | 74.00 |
| P. L. Breeden | 08/21/06 | Prepare pdf of PBB Global Order Disallowing Claims and Dismissing Adversary Proceeding and forward to N. Weil at Administar. | 0.40 | 185.00 | 74.00 |
| M. S. Walker | 08/22/06 | Continue drafting amended objection to TDK claim. | 2.50 | 475.00 | 1,187.50 |
| M. S. Walker | 08/23/06 | Finish drafting TDK claim objection. | 1.70 | 475.00 | 807.50 |

Total Hours:                  115.85
**Total Fees:**         **$50,425.50**

## Timekeeper Summary

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| G. P. Haley | 0.50 | $650.00 | $325.00 |
| G. A. Lombardi | 0.50 | 550.00 | 275.00 |
| W. Freeman | 0.20 | 540.00 | 108.00 |
| M. S. Walker | 65.10 | 465.00 | 30,271.50 |
| M. S. Walker | 24.95 | 475.00 | 11,851.25 |
| C. A. Barbarosh | 1.40 | 550.00 | 770.00 |
| T. T. Mayfield | 0.25 | 180.00 | 45.00 |

### Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845  
Matter No. 0000009  
Jorge. A. del Calvo

November 1, 2006  
Invoice No. 7309937  
Page 30

| Timekeeper | Hours | Rate | Value Billed |
|---|---|---|---|
| M. J. Danielson | 0.80 | 455.00 | 364.00 |
| P. L. Breeden | 12.40 | 185.00 | 2,294.00 |
| M. D. Houle | 6.70 | 450.00 | 3,015.00 |
| M. D. Houle | 1.10 | 460.00 | 506.00 |
| J. D. Monarrez | 0.75 | 105.00 | 78.75 |
| A. Elsholz | 0.20 | 110.00 | 22.00 |
| J. C. Simons | 1.00 | 500.00 | 500.00 |
| **Total:** | **115.85** | | **$50,425.50** |

**Disbursements Incurred**

| Date | Type | Description | Amount |
|---|---|---|---|
| 08/21/06 | Computer Research | Summary | $728.39 |
| 08/21/06 | Reproductions | Summary | 63.84 |
| 06/22/06 | Telephone Calls - International | Summary | 23.28 |
| 07/06/06 | Document Service | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/072006; DATE: 7/6/2006 - Download documents from pacer, 04/01/06-06/30/06, J. Monarrez | 14.08 |
| 07/06/06 | Document Service | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/72006; DATE: 7/6/2006 - Download document from pacer, 4/1/06 - 6/30/06, J. Monarrez | 14.08 |
| 04/06/06 | Outside Search Firm | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/04062006; DATE: 4/6/2006 - Pacer search; Jan-March 2006, J. Monarrez | 0.08 |
| 04/06/06 | Outside Search Firm | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/04062006; DATE: 4/6/2006 - Pacer search; Jan-March 2006, J. Monarrez | 38.00 |

**Total Disbursements:** **$881.75**

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000009
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 31

**Disbursement Summary**

| Type | Amount |
|------|--------|
| Computer Research | 728.39 |
| Document Service | 28.16 |
| Outside Search Firm | 38.08 |
| Reproductions | 63.84 |
| Telephone Calls - International | 23.28 |
| **Total:** | **$881.75** |

**Total Due For Matter 0000009:**          **$51,307.25**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000010
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 32

---

**Compensation of Professionals**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 04/06/06 | Conference with P. Breeden regarding preparation of response to Stuart Maue report. | 0.20 | 450.00 | $90.00 |
| M. D. Houle | 04/10/06 | Work regarding response to Stuart Maue report. | 0.60 | 450.00 | 270.00 |
| P. L. Breeden | 04/10/06 | Review Stuart Maue Report to Sixth Interim Fee Application of Pillsbury and commence drafting responses pleading. | 4.30 | 185.00 | 795.50 |
| P. L. Breeden | 04/11/06 | Edit time entries and prepare exhibit in support of response to Stuart Maue regarding sixth interim fee application. | 2.30 | 185.00 | 425.50 |
| M. D. Houle | 04/11/06 | Review and revise response to Stuart Maue report. | 0.70 | 450.00 | 315.00 |
| P. L. Breeden | 04/13/06 | Prepare e-mail to Fenwick Counsel and O'Melveny & Meyers regarding pending fee application and offer to joint notice. | 0.60 | 185.00 | 111.00 |
| M. D. Houle | 04/13/06 | Exchange correspondence with M. Smith regarding Perisho fee application. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/14/06 | Review and revise response to Stuart Maue report and exhibits. | 1.60 | 450.00 | 720.00 |
| L. L. Partrick | 04/17/06 | Review summary for inclusion in next interim fee application. | 0.20 | 225.00 | 45.00 |
| W. Freeman | 04/17/06 | Revise response to Stuart Maue report. | 0.40 | 540.00 | 216.00 |
| M. D. Houle | 04/17/06 | Analysis and review and revise response to Stuart Maue report and exhibits. | 2.60 | 450.00 | 1,170.00 |
| M. D. Houle | 04/17/06 | File review and analysis regarding preparation of 7th fee application. | 2.80 | 450.00 | 1,260.00 |
| M. D. Houle | 04/17/06 | Telephone conference with M. Choi regarding deadline to file Stuart Maue response. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/17/06 | Telephone conference with K. Filler regarding fee application. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/17/06 | Review and revise exhibits to 7th fee application. | 0.60 | 450.00 | 270.00 |
| P. L. Breeden | 04/17/06 | Review and revise time entries from October 2005 through January 2006 in preparation of seventh interim fee application. | 3.80 | 185.00 | 703.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845

Matter No. 0000010

Jorge. A. del Calvo

November 1, 2006

Invoice No. 7309937

Page 33

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| P. L. Breeden | 04/17/06 | Continue revising time entries to Invoice to Seventh Interim Fee Application through March 31, 2006 | 2.20 | 185.00 | 407.00 |
| P. L. Breeden | 04/17/06 | Draft seventh interim fee application. | 2.90 | 185.00 | 536.50 |
| P. L. Breeden | 04/17/06 | Numerous correspondence with N. Basco of Finance regarding edits to Invoice to Seventh Interim Fee Application. | 1.80 | 185.00 | 333.00 |
| P. L. Breeden | 04/17/06 | Correspond with M. Houle regarding timing and edits to Invoice to Seventh Interim fee application. | 1.30 | 185.00 | 240.50 |
| L. L. Partrick | 04/18/06 | Review time descriptions for fee application summary. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 04/18/06 | Draft and revise narrative for employee benefits section of fee application. | 0.60 | 225.00 | 135.00 |
| M. S. Walker | 04/18/06 | Draft fee application Section describing services in Claims administration/objections. | 2.70 | 465.00 | 1,255.50 |
| W. Freeman | 04/18/06 | Revise Seventh Interim Fee Application. | 1.10 | 540.00 | 594.00 |
| W. Freeman | 04/18/06 | Review and revise response to Stuart Maue report and exhibits. | 0.80 | 540.00 | 432.00 |
| M. D. Houle | 04/18/06 | Conference with P. Breeden regarding revisions to fee application. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/18/06 | Telephone conference with K. Filler regarding Perisho fee application. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/18/06 | Review and revise 7th fee application and exhibits. | 3.00 | 450.00 | 1,350.00 |
| M. D. Houle | 04/18/06 | Review and revise response to Stuart Maue audit report regarding B. Freeman comments. | 2.20 | 450.00 | 990.00 |
| M. D. Houle | 04/18/06 | Review and revise exhibits to Stuart Maue response. | 0.40 | 450.00 | 180.00 |
| P. L. Breeden | 04/18/06 | Edit and revise seventh interim fee application Invoice with attorneys requested changes. | 1.80 | 185.00 | 333.00 |
| P. L. Breeden | 04/18/06 | Prepare final expense exhibit to seventh interim fee application. | 1.80 | 185.00 | 333.00 |
| P. L. Breeden | 04/18/06 | Prepare attorney biographies exhibit to seventh interim fee application. | 1.90 | 185.00 | 351.50 |
| P. L. Breeden | 04/18/06 | Prepare exhibit D, letter to M. Smith forwarding copy of seventh interim fee application for review and comment. | 1.60 | 185.00 | 296.00 |
| P. L. Breeden | 04/18/06 | Prepare timekeeper summary exhibit to seventh interim fee application. | 1.90 | 185.00 | 351.50 |
| P. L. Breeden | 04/18/06 | Prepare fee notice and correspond with servicing agent regarding timing of service of same. | 0.80 | 185.00 | 148.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000010
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 34

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| A. J. Boro, Jr. | 04/18/06 | Draft and revise summaries of litigation projects in VIA adversary proceedings and 5-3/4% bondholders litigation in fee application to be filed with Court. | 2.30 | 500.00 | 1,150.00 |
| P. L. Breeden | 04/18/06 | Correspond with M. Houle regarding edits to Invoice. | 0.50 | 185.00 | 92.50 |
| P. L. Breeden | 04/18/06 | Finalize exhibits, pleading, serve and e-file Response to Stuart Maue to Report of Sixth Interim Fee Application of Pillsbury. | 1.20 | 185.00 | 222.00 |
| M. D. Houle | 04/19/06 | Review and revise 7th fee application regarding B. Freeman comments. | 2.80 | 450.00 | 1,260.00 |
| M. D. Houle | 04/19/06 | Instruct P. Breeden regarding filing and service of fee application and exhibits. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/19/06 | Review and revise fee application exhibits. | 2.20 | 450.00 | 990.00 |
| W. Freeman | 04/19/06 | Extensively revise 7th Interim Fee Application and exhibits and declaration. | 2.80 | 540.00 | 1,512.00 |
| P. L. Breeden | 04/19/06 | Revise and finalize Invoice to seventh interim fee application. | 2.80 | 185.00 | 518.00 |
| P. L. Breeden | 04/19/06 | Finalize Fee Notice and forward to servicing agent, Administar for service thereon. | 0.70 | 185.00 | 129.50 |
| P. L. Breeden | 04/19/06 | Revise and finalize seventh interim fee application pleading with revised invoice figures. | 2.90 | 185.00 | 536.50 |
| P. L. Breeden | 04/19/06 | Revise and finalize total fees and costs exhibit to seventh interim fee application. | 1.90 | 185.00 | 351.50 |
| P. L. Breeden | 04/19/06 | Prepare proof of service, serve and e-file seventh interim fee application, accompanying declarations and fee notice. | 2.70 | 185.00 | 499.50 |
| W. Freeman | 05/02/06 | Telephone conference with R. Bender regarding fee application. | 0.30 | 540.00 | 162.00 |
| W. Freeman | 05/08/06 | Prepare for hearing on Seventh Interim Fee Application. | 0.80 | 540.00 | 432.00 |
| W. Freeman | 05/08/06 | Review Committee Statement of Position. | 0.20 | 540.00 | 108.00 |
| M. D. Houle | 05/08/06 | Analysis regarding preparation of B. Freeman for hearing on fee application. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/09/06 | Draft seventh fee order. | 0.30 | 450.00 | 135.00 |
| W. Freeman | 05/09/06 | Participate in telephonic fee appearance. | 0.30 | 540.00 | 162.00 |
| W. Freeman | 05/10/06 | Review Fee Application order on Seventh Interim Fee Application. | 0.20 | 540.00 | 108.00 |
| P. L. Breeden | 05/10/06 | Finalize order on seventh interim fee application and e-file with bankruptcy court. | 0.40 | 185.00 | 74.00 |
| W. Freeman | 05/15/06 | Telephone conference with M. Smith regarding fee applications. | 0.20 | 540.00 | 108.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000010                                          Invoice No. 7309937
Jorge. A. del Calvo                                                     Page 35

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 05/15/06 | Review order approving Krieg Keller fees. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/15/06 | Draft correspondence to M. Smith regarding payment to Krieg Keller. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/22/06 | Exchange correspondence with K. Filler of Perisho Tombas re preparation of fee application. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 05/23/06 | Analysis re terms of order approving contingency fee employment. | 0.30 | 450.00 | 135.00 |
| W. Freeman | 05/24/06 | Telephone conference with M. Smith regarding payment of interim legal fees. | 0.20 | 540.00 | 108.00 |
| M. D. Houle | 05/24/06 | Exchange (multiple) correspondence with M. Smith re payment under fee orders. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 05/24/06 | Telephone conference with W. Kearns re request for payment of fees for Krieg Keller. | 0.20 | 450.00 | 90.00 |
| W. Freeman | 05/30/06 | Draft e-mail regarding payment of legal fees. | 0.20 | 540.00 | 108.00 |
| M. D. Houle | 05/30/06 | Analysis regarding payment of awarded professional fees. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 05/31/06 | Telephone conference with A. Wells regarding M. Smith and N. Salvucci employment. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 07/12/06 | Analysis regarding approval of Stuart Maue report and fee application. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 07/12/06 | Telephone conference with Court clerk regarding status of ruling on Stuart Maue report (2 calls). | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 07/25/06 | Analyze Decision on Sixth Interim Fee Application. | 0.60 | 450.00 | 270.00 |
| M. D. Houle | 07/27/06 | Analysis regarding amounts due under fee orders. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 07/27/06 | Draft correspondence to M. Smith regarding payment of fees under sixth fee application. | 0.20 | 450.00 | 90.00 |
| W. Freeman | 07/31/06 | Draft memorandum regarding status of fee application. | 0.20 | 540.00 | 108.00 |
| M. D. Houle | 08/01/06 | Analysis regarding timing of fee application. | 0.30 | 460.00 | 138.00 |
| M. D. Houle | 08/03/06 | Exchange correspondence with M. Smith regarding payment on fee application. | 0.20 | 460.00 | 92.00 |
| W. Freeman | 08/07/06 | Telephone conference with M. Houle regarding 6th fee application. | 0.20 | 540.00 | 108.00 |
| W. Freeman | 08/07/06 | Draft e-mail regarding 6th interim fee application. | 0.30 | 540.00 | 162.00 |
| M. D. Houle | 08/07/06 | Analysis regarding application of fee payment from M. Smith. | 0.30 | 460.00 | 138.00 |
| W. Freeman | 08/08/06 | Draft memorandum regarding 6th Interim Fee Application. | 0.40 | 540.00 | 216.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000010
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 36

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | | Total Hours: | | 82.90 |
| | | | **Total Fees:** | | **$26,838.50** |

### Timekeeper Summary

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| A. J. Boro, Jr. | 2.30 | $500.00 | $1,150.00 |
| W. Freeman | 8.60 | 540.00 | 4,644.00 |
| L. L. Partrick | 1.10 | 225.00 | 247.50 |
| M. S. Walker | 2.70 | 465.00 | 1,255.50 |
| P. L. Breeden | 42.10 | 185.00 | 7,788.50 |
| M. D. Houle | 25.30 | 450.00 | 11,385.00 |
| M. D. Houle | 0.80 | 460.00 | 368.00 |
| **Total:** | **82.90** | | **$26,838.50** |

### Disbursements Incurred

| Date | Type | Description | Amount |
|------|------|-------------|--------|
| 05/08/06 | Reproductions | Summary | $813.39 |
| 04/06/06 | Outside Search Firm | VENDOR: Pacer Service Center (SD); INVOICE#: PM0054/04062006; DATE: 4/6/2006 - Pacer search; Jan-March 2006, J. Monarrez | 8.00 |
| 05/05/06 | Telephone - Conference Calls | VENDOR: CourtCall, LLC/Telephonic Hearing Accoun; INVOICE#: 050506-044845; DATE: 5/5/2006 - Telephonic Appearance, 05/05/06, W. Freeman | 41.20 |
| | | **Total Disbursements:** | **$862.59** |

### Disbursement Summary

| Type | Amount |
|------|--------|
| Outside Search Firm | 8.00 |
| Reproductions | 813.39 |
| Telephone - Conference Calls | 41.20 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000010
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 37

| Type | Amount |
|------|--------|
| **Total:** | **$862.59** |

**Total Due For Matter 0000010:**    **$27,701.09**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                  November 1, 2006
Matter No. 0000024                                          Invoice No. 7309937
Jorge. A. del Calvo                                                        Page 38

**Creditor Communications**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 04/04/06 | Exchange correspondence with M. Morita for Marubeni Corporation regarding status of case. | 0.30 | 450.00 | $135.00 |
| M. D. Houle | 04/05/06 | Telephone conference with E. Hurskowitz regarding status of case and creditor inquiry. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/05/06 | Analysis regarding status of Via/Intel litigation for E. Hurskowitz inquiry. | 0.40 | 450.00 | 180.00 |
| M. S. Walker | 04/17/06 | Read and respond to Techlaw email regarding status of case. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 04/24/06 | Telephone conference with mailroom attendant at LeBouf Lamb regarding service address. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/26/06 | Review correspondence from P. Doepfner regarding service lists. | 0.10 | 450.00 | 45.00 |
| M. D. Houle | 04/26/06 | Instruct P. Breeden regarding removal of Tucker Group from service list. | 0.10 | 450.00 | 45.00 |
| M. D. Houle | 04/27/06 | Telephone conference with P. Sacony for Alcoff regarding status of case and creditor inquiry. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/02/06 | Telephone conference with S. Warren of S3 Graphics regarding change to service list. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/08/06 | Telephone conference with K. Filler regarding shareholder inquiry from C. Nighter. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 05/17/06 | Call with Celestica's counsel regarding prospects for distribution. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 05/17/06 | Analysis re correspondence from creditor Skyline Capital. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/19/06 | Exchange multiple correspondence from C. Kelly for Cypress re status of case and claim amount. | 0.40 | 450.00 | 180.00 |
| M. S. Walker | 05/23/06 | Call with M. Davis at Merrill Lynch regarding his receipt of motions. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/24/06 | Read and respond to email from Merrill Lynch regarding removal from claim database. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 05/24/06 | Telephone conference with R. Ordivan for waste management regarding status of case and creditor inquiry. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 05/30/06 | Telephone conference with D. Comstock of Prime shares regarding status of case. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/12/06 | Analysis and exchange correspondence with C. Kelly of Cypress Semiconductor. | 0.30 | 450.00 | 135.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                        November 1, 2006
Matter No. 0000024                                    Invoice No. 7309937
Jorge. A. del Calvo                                              Page 39

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/13/06 | Provide detail for response to Cypress Semiconductor regarding status of claim. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Email response to Maricopa county's inquiry regarding timing of distributions under plan. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 06/21/06 | Telephone conference with D. Wolfe of ASM Capital regarding status of case. | 0.30 | 450.00 | 135.00 |
| M. S. Walker | 07/19/06 | Respond to J. Yenzer's email regarding status of case. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/27/06 | Call with Morgan Stanley's counsel regarding status of case. | 0.10 | 465.00 | 46.50 |
| M. D. Houle | 08/08/06 | Telephone conference with D. Comstock for Primeshares regarding status of case and creditor inquiry. | 0.30 | 460.00 | 138.00 |
| M. D. Houle | 08/10/06 | Telephone conference with D. Comstock regarding status of case and claims against bondholders. | 0.30 | 460.00 | 138.00 |
| M. S. Walker | 08/15/06 | Call with D. Comstock of primeshares to address status of plan. | 0.20 | 475.00 | 95.00 |
| M. D. Houle | 08/17/06 | Telephone conference with P. Tolle regarding status of case and creditor inquiry. | 0.30 | 460.00 | 138.00 |

Total Hours: 6.40
**Total Fees:** **$2,916.50**

**Timekeeper Summary**

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| M. S. Walker | 1.50 | $465.00 | $697.50 |
| M. S. Walker | 0.20 | 475.00 | 95.00 |
| M. D. Houle | 3.80 | 450.00 | 1,710.00 |
| M. D. Houle | 0.90 | 460.00 | 414.00 |
| **Total:** | **6.40** | | **$2,916.50** |

**Total Due For Matter 0000024:**          **$2,916.50**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000011
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 40

---

**Employee Benefits/Pension/KERP**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| L. L. Partrick | 04/03/06 | Correspondence to M. Smith regarding plan beneficiary records. | 0.20 | 225.00 | $45.00 |
| L. L. Partrick | 04/03/06 | Correspondence to C. Tanner of Fidelity regarding tax notices to participants and missing participant IRA's. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/03/06 | Correspondence from C. Tanner regarding limitation on services provided by Fidelity in connection with plan termination. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/03/06 | Draft and revise special tax notice to participants in 401(k) plan. | 0.80 | 225.00 | 180.00 |
| L. L. Partrick | 04/03/06 | Correspondence to M. Smith regarding special tax notice and missing participant IRA's. | 0.30 | 225.00 | 67.50 |
| J. H. Webster | 04/03/06 | Analyze missing participant and final distributions. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 04/04/06 | Correspondence from M. Smith regarding contact information for participant notices. | 0.10 | 225.00 | 22.50 |
| L. L. Partrick | 04/04/06 | Revise special tax notice to plan participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/05/06 | Finalize Section 402(f) tax notice to 401(k) plan participants. | 0.20 | 225.00 | 45.00 |
| J. H. Webster | 04/05/06 | Attention to communicating with missing participants and related tax notices. | 0.30 | 475.00 | 142.50 |
| L. L. Partrick | 04/06/06 | Correspondence to M. Smith regarding missing participants. | 0.40 | 225.00 | 90.00 |
| L. L. Partrick | 04/17/06 | Correspondence from M. Smith and C. Tanner of Fidelity regarding missing 401(k) plan participants. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 04/17/06 | Review Department of Labor guidance regarding fiduciary aspects of methods used in attempting to locate missing 401(k) plan participants. and related fiduciary duties. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 04/18/06 | Review status regarding debtor's attempt to locate beneficiary records. | 0.20 | 225.00 | 45.00 |
| J. H. Webster | 04/19/06 | Analyze treatment of missing participants. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 04/21/06 | Correspondence to M. Smith regarding deceased participant records. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/21/06 | Correspondence to M. Smith regarding missing participants and fiduciary requirements. | 0.40 | 225.00 | 90.00 |
| L. L. Partrick | 04/21/06 | Correspondence to D. Avila and M. Smith regarding Investors Bank. | 0.20 | 225.00 | 45.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000011
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 41

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| J. H. Webster | 04/21/06 | Research issues to closing Diamond trust and related issues. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 04/24/06 | Correspondence from M. Smith regarding missing participants and distribution instructions for Diamond Plan balance. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/24/06 | Review amounts attributable to Diamond Plan to be covered in part by distribution of remaining account balance after distributions to plan participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/24/06 | Correspondence from C. Tanner regarding status of missing 401(k) plan participant | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/25/06 | Correspondence to M. Smith and C. Tanner regarding 401(k) plan participant notices. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 04/26/06 | Correspondence to M. Smith regarding final payment from Diamond Plan account balance. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/01/06 | Correspondence to IRS regarding 401(k) Plan determination letter process. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 05/16/06 | Correspondence from M. Smith regarding participant notices. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/16/06 | Review Fidelity letter to participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/16/06 | Review and summarize Section 402(f) requirements for M. Smith. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 05/16/06 | Correspondence to M. Smith regarding special tax notices to be mailed to participants.. | 0.40 | 225.00 | 90.00 |
| L. L. Partrick | 05/17/06 | Follow up correspondence to M. Smith regarding 401(k) plan distributions. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/19/06 | Correspondence from C. Tanner at Fidelity regarding special tax notice provided to participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/19/06 | Review earlier Fidelity correspondence relating to Section 402(f) notice to participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/19/06 | Correspondence to C. Tanner regarding 401(k) plan notices. | 0.10 | 225.00 | 22.50 |
| J. H. Webster | 05/19/06 | Attention to payment of plan expenses. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 05/22/06 | Correspondence from M. Smith regarding Diamond Plan distributions. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 05/22/06 | Review Diamond 401(k) Plan documents regarding expenses to be paid from plan assets. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 06/23/06 | Correspondence from M. Smith and related correspondence from D. Avila regarding Diamond Plan status. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/18/06 | Correspondence from M. Smith regarding 401(k) Plan missing participants. | 0.20 | 225.00 | 45.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                                        November 1, 2006
Matter No. 0000011                                                  Invoice No. 7309937
Jorge. A. del Calvo                                                              Page 42

---

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| L. L. Partrick | 07/18/06 | Correspondence to M. Smith regarding procedures for locating 401(k) Plan missing participants prior to establishment of missing participant IRAs. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 07/19/06 | Correspondence from M. Smith regarding non-responding 401(k) Plan participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/19/06 | Review 401(k) Plan documents and Fidelity correspondence to participants regarding distributions to non responding participants. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 07/19/06 | Review Fidelity summary regarding remaining 401(k) participants with balances. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/19/06 | Correspondence to M. Smith regarding disbursements to participants who have not responded to notices sent by Fidelity. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 07/21/06 | Correspondence to M. Smith regarding participants who have not yet specified a distribution option. | 0.30 | 225.00 | 67.50 |
| J. H. Webster | 07/21/06 | Analyze participant communications regarding distributions. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 07/23/06 | Correspondence from M. Smith regarding Fidelity letter to participants. | 0.10 | 225.00 | 22.50 |
| L. L. Partrick | 07/23/06 | Correspondence to C. Tanner at Fidelity regarding participant notices of distribution options and deadlines. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/24/06 | Review materials received from Fidelity in connection with participant notices. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/24/06 | Correspondence to C. Tanner at Fidelity regarding non-responding participants. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/25/06 | Attention to treatment of non-responding participants and research applicable guidance regarding same. | 0.80 | 225.00 | 180.00 |
| J. H. Webster | 07/25/06 | Prepare correspondence to participants regarding cash out distributions and related issues. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 07/26/06 | Correspondence from M. Smith regarding Fidelity documents. | 0.10 | 225.00 | 22.50 |
| L. L. Partrick | 07/26/06 | Review updated participant data provided by C. Tanner of Fidelity. | 0.20 | 225.00 | 45.00 |
| J. H. Webster | 07/26/06 | Analyze participant distributions. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 07/26/06 | Review guidance regarding missing and non-responding participants. | 0.40 | 225.00 | 90.00 |
| L. L. Partrick | 07/27/06 | Analysis of distribution data and applicable plan provisions. | 0.60 | 225.00 | 135.00 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000011
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 43

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| L. L. Partrick | 07/27/06 | Update J. Webster regarding 401(k) plan provisions and missing participant accounts. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/28/06 | Prepare letter to missing participants for IRS letter forwarding service. | 0.70 | 225.00 | 157.50 |
| L. L. Partrick | 07/28/06 | Prepare letter to IRS regarding missing 401(k) plan participants. | 0.50 | 225.00 | 112.50 |
| L. L. Partrick | 07/28/06 | Revise letter to participants and related letter to IRS. | 0.60 | 225.00 | 135.00 |
| L. L. Partrick | 07/28/06 | Correspondence to M. Smith regarding missing participants and IRS letter forwarding service. | 0.30 | 225.00 | 67.50 |
| L. L. Partrick | 07/31/06 | Correspondence from M. Smith regarding IRS letter forwarding service and distribution inquiries. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 08/01/06 | Review plan provisions in connection with distributions and establishment of IRAs. | 0.50 | 230.00 | 115.00 |
| L. L. Partrick | 08/01/06 | Research guidance regarding missing participants and mandatory distributions. | 0.90 | 230.00 | 207.00 |
| L. L. Partrick | 08/01/06 | Correspondence to M. Smith regarding distributions. | 0.40 | 230.00 | 92.00 |
| L. L. Partrick | 08/01/06 | Review 401(k) plan provisions with J. Webster. | 0.30 | 230.00 | 69.00 |
| J. H. Webster | 08/01/06 | Review automatic distributions, establishment of IRAs and related plan provisions. | 0.30 | 475.00 | 142.50 |
| L. L. Partrick | 08/02/06 | Analysis of additional plan provisions in connection with ability to roll over small accounts of nonresponding participants. | 0.30 | 230.00 | 69.00 |
| L. L. Partrick | 08/02/06 | Correspondence to C. Tanner at Fidelity regarding potential plan amendment in connection with account rollovers. | 0.30 | 230.00 | 69.00 |
| J. H. Webster | 08/02/06 | Research missing participants and forced distributions. | 0.25 | 475.00 | 118.75 |
| L. L. Partrick | 08/03/06 | Correspondence from M. Smith regarding transfer of missing participant accounts to Union Bank IRAs. | 0.20 | 230.00 | 46.00 |
| L. L. Partrick | 08/03/06 | Correspondence from C Tanner regarding Fidelity's interpretation of plan provisions. | 0.20 | 230.00 | 46.00 |
| J. H. Webster | 08/03/06 | Research proposed distribution of participant account balances and establishment of rollover IRAs. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 08/04/06 | Correspondence from C. Tanner at Fidelity regarding QDRO hold on participant account. | 0.20 | 230.00 | 46.00 |
| L. L. Partrick | 08/04/06 | Review plan records regarding Fidelity QDRO hold on account. | 0.30 | 230.00 | 69.00 |
| L. L. Partrick | 08/07/06 | Correspondence to C. Tanner at Fidelity | 0.20 | 230.00 | 46.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                      November 1, 2006
Matter No. 0000011                                              Invoice No. 7309937
Jorge. A. del Calvo                                                          Page 44

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | regarding documentation pertaining to qualified domestic relations order hold on participant's account. | | | |
| L. L. Partrick | 08/07/06 | Correspondence from C. Tanner at Fidelity regarding participant rollovers and follow up correspondence from C. Tanner regarding additional facts. | 0.40 | 230.00 | 92.00 |
| L. L. Partrick | 08/07/06 | Correspondence to C. Tanner regarding participant distributions and attention to response regarding same. | 0.30 | 230.00 | 69.00 |
| L. L. Partrick | 08/07/06 | Update J. Webster regarding Fidelity issues.. | 0.20 | 230.00 | 46.00 |
| L. L. Partrick | 08/07/06 | Review correspondence from M. Smith directing Fidelity regarding participant accounts and IRA transfers. | 0.20 | 230.00 | 46.00 |
| J. H. Webster | 08/07/06 | Analyze finalizing plan distributions and related issues. | 0.20 | 475.00 | 95.00 |
| L. L. Partrick | 08/08/06 | Follow up regarding participant account with QDRO hold at Fidelity and review of family law docket regarding same. | 0.40 | 230.00 | 92.00 |
| L. L. Partrick | 08/08/06 | Review plan disbursement issues with J. Webster. | 0.20 | 230.00 | 46.00 |
| J. H. Webster | 08/08/06 | Attention to plan distributions and related issues. | 0.20 | 475.00 | 95.00 |
| J. D. Monarrez | 08/08/06 | Research into case activity sheet for Wang case in Alameda Superior court per L. Partrick. | 0.75 | 105.00 | 78.75 |
| L. L. Partrick | 08/09/06 | Telephone call to attorney representing participant with QDRO hold on account. | 0.20 | 230.00 | 46.00 |
| L. L. Partrick | 08/10/06 | Review and respond to correspondence from M. Smith regarding the participant account subject to QDRO hold. | 0.30 | 230.00 | 69.00 |
| L. L. Partrick | 08/10/06 | Check family court records and further review court docket regarding active status of participant's divorce case. | 0.30 | 230.00 | 69.00 |
| J. D. Monarrez | 08/10/06 | Research regarding status of case per L. Partrick. | 0.25 | 105.00 | 26.25 |
| L. L. Partrick | 08/14/06 | Telephone call from C. Rugaard regarding divorce case of participant Wang. | 0.20 | 230.00 | 46.00 |
| J. McAndrew | 08/17/06 | Check for litigation, for use in response to audit letter | 0.25 | 170.00 | 42.50 |
| L. L. Partrick | 08/18/06 | Research regarding divorce proceeding joinder relating to missing participant. | 0.60 | 230.00 | 138.00 |
| L. L. Partrick | 08/22/06 | Correspondence to M. Smith regarding participant divorce case. | 0.30 | 230.00 | 69.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000011
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 45

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| L. L. Partrick | 08/22/06 | Correspondence to Union Bank regarding IRA accounts and possibility of potential hold on participant. | 0.30 | 230.00 | 69.00 |
| J. H. Webster | 08/22/06 | Analysis of participant's account due to receipt of domestic relations order correspondence and review California Family Code provisions regarding same. | 0.40 | 475.00 | 190.00 |
| L. L. Partrick | 08/23/06 | Follow up call to former attorney for participant J. Wang regarding status of divorce proceedings. | 0.20 | 230.00 | 46.00 |

|  |  |  | Total Hours: |  | 27.40 |
|  |  |  | **Total Fees:** |  | **$6,883.25** |

### Timekeeper Summary

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| L. L. Partrick | 15.00 | $225.00 | $3,375.00 |
| L. L. Partrick | 7.90 | 230.00 | 1,817.00 |
| J. McAndrew, Jr. | 0.25 | 170.00 | 42.50 |
| J. H. Webster | 3.25 | 475.00 | 1,543.75 |
| J. D. Monarrez | 1.00 | 105.00 | 105.00 |
| **Total:** | **27.40** | | **$6,883.25** |

**Total Due For Matter 0000011:**         **$6,883.25**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000012
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 46

**Executory Contracts/Leases**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| W. Freeman | 04/06/06 | Review and respond to e-mail regarding proposed objection to exclusivity motion. | 0.40 | 540.00 | $216.00 |
| W. Freeman | 04/13/06 | Analyze Debtor's response to objection of Riverside. | 0.40 | 540.00 | 216.00 |
| M. D. Houle | 05/31/06 | Analyze regarding rejection of remaining executory contracts. | 1.60 | 450.00 | 720.00 |
| M. D. Houle | 06/02/06 | Analysis and draft correspondence to M. Smith regarding remaining executory contracts. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 06/06/06 | Analysis regarding possible rejection of Via executory contracts. | 0.60 | 450.00 | 270.00 |
| M. D. Houle | 06/12/06 | Analysis regarding rejection of remaining executory contracts. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 06/13/06 | Analysis regarding rejection of Intel and via executory contracts. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/28/06 | Analysis regarding rejection of executory contracts relating to trading of shares. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 06/30/06 | Analysis regarding rejection of equiserve executory contracts. | 0.40 | 450.00 | 180.00 |
| W. Freeman | 07/11/06 | Analyze issues regarding extension of exclusivity. | 0.40 | 540.00 | 216.00 |
| W. Freeman | 07/12/06 | Review agreement with Riverside regarding exclusivity. | 0.40 | 540.00 | 216.00 |
| P. L. Breeden | 07/14/06 | Prepare service list and labels of counter parties to rejected executory contracts and unexpired leases. | 1.80 | 185.00 | 333.00 |
| P. L. Breeden | 07/14/06 | Finalize Notice of Rejection Claims Bar Date to rejected executory contracts and unexpired leases, serve and e-file with bankruptcy court. | 2.20 | 185.00 | 407.00 |
| W. Freeman | 07/21/06 | Review exclusivity stipulation and support pleadings. | 0.40 | 540.00 | 216.00 |
| P. L. Breeden | 07/31/06 | Research and obtain copies of notices of assumption and assignment of leases and executory contracts and forward to M. Houle on an expedited basis. | 2.20 | 185.00 | 407.00 |
| M. D. Houle | 07/31/06 | Analysis regarding contracts used for transfer of stock. | 0.40 | 450.00 | 180.00 |
| W. Freeman | 08/04/06 | Draft e-mail regarding stipulation exclusivity extension. | 0.20 | 540.00 | 108.00 |
| M. D. Houle | 08/08/06 | Analysis and research regarding rejection of | 0.60 | 460.00 | 276.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                    November 1, 2006
Matter No. 0000012                                              Invoice No. 7309937
Jorge. A. del Calvo                                                          Page 47

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | indemnity agreements with officers. | | | |
| M. D. Houle | 08/10/06 | Analysis regarding rejection of Equiserve contracts. | 0.60 | 460.00 | 276.00 |
| M. D. Houle | 08/17/06 | Analysis regarding status of resolution of remaining preference actions prosecuted by committee. | 0.30 | 460.00 | 138.00 |
| M. D. Houle | 08/17/06 | Analysis regarding rejection of Equiserve contracts. | 0.20 | 460.00 | 92.00 |
| M. D. Houle | 08/18/06 | Analysis regarding remaining executory contracts for rejection under plan. | 0.80 | 460.00 | 368.00 |
| N. J. Youssef | 08/21/06 | Research regarding Equiserve contracts. | 1.20 | 435.00 | 522.00 |
| W. Freeman | 08/22/06 | Review and analyze remaining list of executory contracts and unexpired leases. | 1.30 | 540.00 | 702.00 |
| M. D. Houle | 08/23/06 | Draft correspondence to M. Smith regarding Equiserve contracts. | 0.20 | 460.00 | 92.00 |

Total Hours:  18.10

**Total Fees:**  **$6,826.00**

**Timekeeper Summary**

| Timekeeper | Hours | Rate | Value Billed |
|------------|-------|------|--------------|
| W. Freeman | 3.50 | $540.00 | $1,890.00 |
| P. L. Breeden | 6.20 | 185.00 | 1,147.00 |
| M. D. Houle | 4.50 | 450.00 | 2,025.00 |
| M. D. Houle | 2.70 | 460.00 | 1,242.00 |
| N. J. Youssef | 1.20 | 435.00 | 522.00 |
| **Total:** | **18.10** | | **$6,826.00** |

**Disbursements Incurred**

| Date | Type | Description | Amount |
|------|------|-------------|--------|
| 07/14/06 | Reproductions | Summary | $105.07 |
| | | **Total Disbursements:** | **$105.07** |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845
Matter No. 0000012
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 48

**Disbursement Summary**

| Type | Amount |
|---|---|
| Reproductions | 105.07 |
| **Total:** | **$105.07** |

| | |
|---|---|
| **Total Due For Matter 0000012:** | **$6,931.07** |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000015
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 49

---

**Litigation**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 04/11/06 | Analysis regarding Admiral motion to advance defense costs. | 0.20 | 450.00 | $90.00 |
| A. J. Boro, Jr. | 06/01/06 | Review subpoena from Admiral Insurance Company, and analyze possible objections to same. | 0.40 | 500.00 | 200.00 |
| C. A. Barbarosh | 06/01/06 | Strategy regarding response to subpoena in D&O action. | 0.30 | 550.00 | 165.00 |
| C. A. Barbarosh | 06/02/06 | Telephone conference with O. Garza regarding D&O litigation issues. | 0.10 | 550.00 | 55.00 |
| J. A. Catz | 06/02/06 | Review document requests served on served on C. Barbarosh; begin to draft objections to subpoena. | 1.50 | 365.00 | 547.50 |
| T. V. Loran | 06/02/06 | Review email regarding subpoena served on PWSP in D&O litigation. | 0.20 | 550.00 | 110.00 |
| A. J. Boro, Jr. | 06/05/06 | Review and analyze subpoena request and possible objections to same, and formulate strategy for responding. | 0.50 | 500.00 | 250.00 |
| J. A. Catz | 06/05/06 | Draft objections to subpoena served on C. Barbarosh. | 2.50 | 365.00 | 912.50 |
| A. J. Boro, Jr. | 06/06/06 | Review voice mail and letter on withdrawal of subpoena by plaintiff Admiral Insurance Co., and draft letter to plaintiff's document service Quest Discovery Services confirming withdrawal of subpoena. | 0.60 | 500.00 | 300.00 |
| A. J. Boro, Jr. | 06/07/06 | Telephone conference with bondholders' counsel D. Saltzman regarding Admiral Insurance subpoena. | 0.10 | 500.00 | 50.00 |
| A. J. Boro, Jr. | 06/12/06 | Review emails on potential new subpoena for documents from plaintiff Admiral Insurance Co. | 0.20 | 500.00 | 100.00 |
| M. D. Houle | 06/13/06 | Analysis regarding complaint from Admiral Insurance Company and subpoena for documents. | 1.00 | 450.00 | 450.00 |
| M. D. Houle | 06/13/06 | Draft correspondence to A. Wells regarding Admiral complaint. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/13/06 | PACER search regarding Admiral adversary. | 0.20 | 450.00 | 90.00 |
| A. J. Boro, Jr. | 06/13/06 | Telephone conference with M. Houle regarding status of dispute with Admiral Insurance Company. | 0.10 | 500.00 | 50.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000015
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 50

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| A. J. Boro, Jr. | 06/16/06 | Review new subpoena served by Admiral Insurance Company and analyze dates for responses and objections and work needed on same. | 0.50 | 500.00 | 250.00 |
| A. J. Boro, Jr. | 06/16/06 | Telephone conference with K. Woodruff, attorney for directors and officers, regarding pending motion to quash subpoenas. | 0.20 | 500.00 | 100.00 |
| C. A. Barbarosh | 06/16/06 | Review and analyze Admiral Insurance document subpoena. | 0.10 | 550.00 | 55.00 |
| C. A. Barbarosh | 06/16/06 | Confer with O. Garza regarding Admiral Insurance issues. | 0.10 | 550.00 | 55.00 |
| J. A. Catz | 06/20/06 | Revise objections to be served on C. Barbarosh. | 0.50 | 365.00 | 182.50 |
| A. J. Boro, Jr. | 06/21/06 | Review and revise objections to subpoena of Admiral Insurance Co. | 1.70 | 500.00 | 850.00 |
| J. A. Catz | 06/21/06 | Research regarding Rule 45 objection, revise and edit objections to subpoena and finalize and serve objections to subpoena. | 4.50 | 365.00 | 1,642.50 |
| M. D. Houle | 06/21/06 | Analysis regarding response to Admiral subpoena for documents. | 0.30 | 450.00 | 135.00 |
| A. J. Boro, Jr. | 06/22/06 | Exchange messages with P. Thuy-Hong of Quest Discovery Services, agent for plaintiff Admiral Insurance Co., regarding status of subpoena response and objections to same. | 0.20 | 500.00 | 100.00 |
| A. J. Boro, Jr. | 06/22/06 | Analyze claims of plaintiff Admiral Insurance Company to prepare for telephone conference with its attorney regarding subpoena objections. | 0.60 | 500.00 | 300.00 |
| J. A. Catz | 06/22/06 | Follow up on subpoena with deposition custodian. | 0.50 | 365.00 | 182.50 |
| C. A. Barbarosh | 06/23/06 | Review and analyze objection to Admiral Insurance discovery negotiations. | 0.20 | 550.00 | 110.00 |
| J. A. Catz | 06/23/06 | Follow up on subpoena with deposition custodian. | 0.50 | 365.00 | 182.50 |
| A. J. Boro, Jr. | 06/26/06 | Review fax from document service for plaintiff Admiral Insurance on subpoena for documents. | 0.10 | 500.00 | 50.00 |

Total Hours: 18.20
**Total Fees:** **$7,700.00**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000015
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 51

**Timekeeper Summary**

| Timekeeper | Hours | Rate | Value Billed |
|---|---|---|---|
| A. J. Boro, Jr. | 5.20 | $500.00 | $2,600.00 |
| T. V. Loran, III | 0.20 | 550.00 | 110.00 |
| C. A. Barbarosh | 0.80 | 550.00 | 440.00 |
| M. D. Houle | 2.00 | 450.00 | 900.00 |
| J. A. Catz | 10.00 | 365.00 | 3,650.00 |
| **Total:** | **18.20** | | **$7,700.00** |

**Disbursements Incurred**

| Date | Type | Description | Amount |
|---|---|---|---|
| 06/22/06 | Reproductions | Summary | $15.01 |
| 07/06/06 | Telephone - Conference Calls | VENDOR: Pacer Service Center; INVOICE#: 080706; DATE: 7/6/2006, Searches for billing cycle 4/1/06 to 6/30/06, M. Houle | 3.00 |
| | | **Total Disbursements:** | **$18.01** |

**Disbursement Summary**

| Type | Amount |
|---|---|
| Reproductions | 15.01 |
| Telephone - Conference Calls | 3.00 |
| **Total:** | **$18.01** |

**Total Due For Matter 0000015:**     **$7,718.01**

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000017
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 52

**Plan and Disclosure Statement**

For Professional Services Rendered And Disbursements Incurred Through August 23, 2006

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 04/05/06 | Call with C. Rankin regarding substantive consolidation analysis before finalizing plan. | 0.20 | 465.00 | $93.00 |
| M. D. Houle | 04/05/06 | Telephone conference with T. Arnold regarding opposition to motion to extend exclusivity. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/06/06 | Telephone conference with C. Rankin regarding extension of exclusivity and objection to exclusivity stipulation. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/06/06 | Analyze response by Riverside contracting to exclusivity stipulation. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/10/06 | Draft correspondence to C. Rankin regarding Riverside opposition to exclusivity stipulation. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/11/06 | Telephone conference with A. Wells regarding objection to exclusivity stipulation. | 0.30 | 450.00 | 135.00 |
| M. S. Walker | 04/12/06 | Email to C. Rankin regarding substantive consolidation. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 04/12/06 | Exchange multiple correspondence with C. Rankin regarding status of plan. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/12/06 | Analysis regarding substantive consolidation memo. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/13/06 | Telephone conference with H. Rogers regarding opposition to exclusivity. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 04/13/06 | Exchange multiple correspondence with C. Rankin and A. Wells regarding objection to exclusivity stipulation. | 0.50 | 450.00 | 225.00 |
| M. S. Walker | 04/17/06 | Analyze substantive consolidation issues in preparation for conference call on plan. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 04/17/06 | Conference call with OCC counsel, Houle and Freeman regarding plan formulation and issues. | 0.50 | 465.00 | 232.50 |
| M. D. Houle | 04/17/06 | Participate in conference call with C. Rankin and A. Wells substantive consolidation. | 0.50 | 450.00 | 225.00 |
| M. D. Houle | 04/17/06 | Telephone conference with A. Wells regarding Riverside objection to exclusivity. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/17/06 | Participate in conference call with H. Rogers regarding Riverside objection. | 0.40 | 450.00 | 180.00 |
| M. D. Houle | 04/17/06 | Exchange correspondence of H. Rogers of Riverside regarding objection to exclusivity stipulation. | 0.30 | 450.00 | 135.00 |
| M. S. Walker | 04/18/06 | Respond to H. Grobstein's email regarding history of Debtors for his use in analysis. | 0.20 | 465.00 | 93.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                          November 1, 2006
Matter No. 0000017                                    Invoice No. 7309937
Jorge. A. del Calvo                                              Page 53

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 04/18/06 | Develop list of issues to address prior to plan preparation. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 04/18/06 | Email to M. Smith regarding plan formulation. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/18/06 | Respond to C. Rankin's email regarding plan meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/18/06 | Analyze case law regarding substantive consolidation for changes to test. | 0.80 | 465.00 | 372.00 |
| M. D. Houle | 04/20/06 | Review filed withdrawal of objection to exclusivity stipulation. | 0.10 | 450.00 | 45.00 |
| M. D. Houle | 04/20/06 | Draft pleadings to approve ninth exclusivity stipulation. | 1.20 | 450.00 | 540.00 |
| M. D. Houle | 04/20/06 | PACER search regarding objection to exclusivity stipulation. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 04/20/06 | Instruct P. Breeden regarding filing and service of exclusivity pleadings. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 04/20/06 | Email to OCC and expert regarding plan meeting. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 04/20/06 | Read and analyze recent case law regarding substantive consolidation. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 04/21/06 | Email to Administar requesting spreadsheet for substantive consolidation analysis. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/21/06 | Respond to Mr. Smith's email regarding meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/21/06 | Complete analysis of substantive consolidation caselaw. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 04/21/06 | Begin drafting email to H. Grobstein regarding economic analysis for substantive consolidation. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 04/24/06 | Finalize email to H. Grobstein regarding economic analysis for substantive consolidation. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 04/24/06 | Email to Mr. Smith regarding non-debtor subsidiary assets sold during bankruptcies. | 0.20 | 465.00 | 93.00 |
| P. L. Breeden | 04/24/06 | Prepare exhibits, proof of service, finalize pleadings, serve and e-file request for entry of default order relating ninth exclusivity motion. | 1.80 | 185.00 | 333.00 |
| M. S. Walker | 04/25/06 | Read and analyze M. Smith's email regarding asset commingling. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/25/06 | Call with Mr. Smith regarding plan meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/25/06 | Email to OCC's counsel regarding plan meeting. | 0.10 | 465.00 | 46.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                              November 1, 2006
Matter No. 0000017                                                          Invoice No. 7309937
Jorge. A. del Calvo                                                                   Page 54

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| C. A. Barbarosh | 04/28/06 | Review and analyze memorandum regarding substantive consideration. | 1.00 | 550.00 | 550.00 |
| M. S. Walker | 04/30/06 | Email to all meeting persons regarding moving meeting to Los Angeles to save travel expense. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 04/30/06 | Respond to M. Smith's email regarding plan meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/01/06 | Email to all parties regarding plan meeting time and place | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/01/06 | Respond to C. Rankin's email regarding plan meeting | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 05/01/06 | Review correspondence from Howard Grobstein and C. Rankin regarding meeting regarding plan terms. | 0.20 | 450.00 | 90.00 |
| M. S. Walker | 05/02/06 | Respond to M. Smith's email regarding meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/02/06 | Coordinate arrangements for meeting. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 05/02/06 | Telephone conference with C. Rankin regarding plan meeting. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 05/03/06 | Analysis regarding disclosure statement and substantive consolidation issues in preparation for meeting with Committee counsel. | 1.50 | 450.00 | 675.00 |
| M. D. Houle | 05/04/06 | Analysis regarding substantive consolidation and plan structure issues. | 1.60 | 450.00 | 720.00 |
| M. D. Houle | 05/04/06 | Participate in conference with Committee counsel and M. Smith regarding plan issues and substantive consolidation. | 3.70 | 450.00 | 1,665.00 |
| M. D. Houle | 05/04/06 | Travel time for meeting with Committee counsel regarding plan issues (half total travel time). | 1.40 | 450.00 | 630.00 |
| M. S. Walker | 05/04/06 | Analyze plan issues relating to substantive consolidation, treatment of subordinated claims and liquidating trust. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 05/04/06 | Meet with OCC to discuss plan issues including substantive consolidation, impact of VIA claim on plan process, disclosure of VIA claim in plan process and treatment of subordinated claims. | 3.90 | 465.00 | 1,813.50 |
| M. S. Walker | 05/04/06 | Meet with Mr. Smith to further discuss plan issues including substantive consolidation and treatment of affiliates. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 05/04/06 | Travel to Los Angeles to meet with OCC and Mr. Smith to discuss plan issues including substantive consolidation, impact of VIA claim | 2.30 | 465.00 | 1,069.50 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                                    November 1, 2006
Matter No. 0000017                                              Invoice No. 7309937
Jorge. A. del Calvo                                                       Page 55

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | on plan process, disclosure of VIA claim in plan process and treatment of subordinated claims. | | | |
| M. D. Houle | 05/05/06 | Analysis regarding Liquidating Trust structure for plan. | 1.20 | 450.00 | 540.00 |
| M. S. Walker | 05/08/06 | Analyze issues relating to substantive consolidation of non-debtor affiliates. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/08/06 | Email to M. Smith regarding possible issues in substantively consolidating affiliates. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/08/06 | Analyze claims against co-Debtors to develop list of open claims against affiliates for substantive consolidation purposes. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 05/09/06 | Continue detailed analysis of all claims against Debtors other than SONICblue for substantive consolidation analysis. | 2.30 | 465.00 | 1,069.50 |
| M. S. Walker | 05/10/06 | Analyze issues regarding advantages and disadvantages of substantively consolidating foreign and domestic affiliates. | 0.90 | 465.00 | 418.50 |
| G. A. Lombardi | 05/10/06 | Analysis of corporate structure and subsidiaries of SONICblue and telephone conference with M. Walker regarding potential liabilities of subsidiaries. | 0.50 | 550.00 | 275.00 |
| M. D. Houle | 05/10/06 | Analysis regarding substantive consolidation issues. | 0.80 | 450.00 | 360.00 |
| C. A. Barbarosh | 05/11/06 | Update regarding plan process and status. | 0.20 | 550.00 | 110.00 |
| M. S. Walker | 05/12/06 | Analyze risks of failing to close foreign subsidiaries. | 0.90 | 465.00 | 418.50 |
| H. E. Mayon | 05/12/06 | Telephone call with M. Walker re: foreign subsidiaries; research outstanding issues related to foreign subsidiaries. | 0.40 | 365.00 | 146.00 |
| M. S. Walker | 05/15/06 | Analyze corporate structure pertaining to affiliates and identify areas for addressing in substantive consolidation analysis. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 05/15/06 | Research ability to substantively consolidate foreign affiliates. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/15/06 | Email to M Smith describing possible substantive consolidation plan and requesting data regarding domestic affiliates for substantive consolidation analysis. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/15/06 | Email to T. Arnold regarding claim issues relating to substantive consolidation analysis. | 0.10 | 465.00 | 46.50 |
| W. Freeman | 05/15/06 | Review and analyze update regarding status of Plan and Disclosure Statement. | 0.40 | 540.00 | 216.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000017
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 56

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 05/15/06 | Analysis regarding substantive consolidation of foreign entities. | 0.80 | 450.00 | 360.00 |
| M. D. Houle | 05/15/06 | Draft correspondence to M. Smith regarding substantive consolidation of foreign subsidiaries. | 0.40 | 450.00 | 180.00 |
| M. S. Walker | 05/16/06 | Read Mr. Smith's email regarding substantive consolidation of foreign subsidiaries. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/16/06 | Email to client regarding identifying officers and directors of domestic subsidiaries. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/16/06 | Analyze amount and collateral for intercompany secured debt to assess effects of substantive consolidation. | 1.00 | 465.00 | 465.00 |
| J. D. Monarrez | 05/17/06 | Locate and pull UCC filings per M. Walker. | 0.25 | 105.00 | 26.25 |
| M. S. Walker | 05/18/06 | Begin drafting substantive consolidation analysis. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 05/18/06 | Analyze issues regarding substantive consolidation of domestic subsidiaries. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 05/18/06 | Analysis re officers and directors of subsidiaries for substantive consolidation purposes. | 0.60 | 450.00 | 270.00 |
| J. D. Monarrez | 05/19/06 | Locate and order corporate officer information per M. Walker. | 0.50 | 105.00 | 52.50 |
| M. S. Walker | 05/22/06 | Review email from M. Smith regarding officers and directors of subsidiaries. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/22/06 | Analyze issues regarding impact of secured loans on distributions. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/22/06 | Analyze impact of patent sale on distributions in light of secured loans. | 0.30 | 465.00 | 139.50 |
| C. B. Wainwright | 05/22/06 | Respond to M. Walker inquiries regarding OID computation on outstanding notes and review original OID calculations. | 1.50 | 675.00 | 1,012.50 |
| M. S. Walker | 05/23/06 | Read and respond to A. Wells' email regarding sale of residual assets to purchaser. | 0.20 | 465.00 | 93.00 |
| M. D. Houle | 05/23/06 | Analysis re structure of liquidating trust provision. | 0.70 | 450.00 | 315.00 |
| M. S. Walker | 05/24/06 | Analyze need for multiple Junior Noteholders classes in plan. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/24/06 | Analyze validity of SONICblue's liens in subsidiary Debtors' patents, trademarks and copyrights. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 05/24/06 | Analyze value of subsidiary Debtors' Rio-related patents, trademarks and copyrights. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/24/06 | Locate information regarding value of other | 0.20 | 465.00 | 93.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                       November 1, 2006
Matter No. 0000017                               Invoice No. 7309937
Jorge. A. del Calvo                                          Page 57

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | product line assets not covered by SONICblue's security interest. | | | |
| M. S. Walker | 05/24/06 | Analyzing overlap of officers and directors of various subsidiaries as affecting substantive consolidation. | 0.70 | 465.00 | 325.50 |
| M. S. Walker | 05/25/06 | Evaluate risks of not substantively consolidating domestic subsidiaries. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 05/25/06 | Email to Administar requesting revised claim analysis. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/25/06 | Detailed analysis of claims in connection with substantive consolidation analysis. | 2.40 | 465.00 | 1,116.00 |
| W. Freeman | 05/25/06 | Analyze Substantive Consolidation issues. | 0.50 | 540.00 | 270.00 |
| K. B. Dine | 05/25/06 | Telephone conference with M. Houle and M. Walker Sonic Blue. | 0.20 | 525.00 | 105.00 |
| M. D. Houle | 05/25/06 | Analysis re substantive consolidation of domestic subsidiaries. | 0.60 | 450.00 | 270.00 |
| M. S. Walker | 05/26/06 | Read and analyze Opta and Replay asset purchase agreements to evaluate impact of SONICblue liens on other creditors. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 05/26/06 | Analyze scope of SONICblue's liens in stock distributions to other Debtors. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 05/26/06 | Email to client regarding ownership of Samsung preference claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/26/06 | Analyze distribution to creditors in each debtor's case if there was no substantive consolidation. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 05/30/06 | Read and analyze M. Smith's email regarding sources of payments to Samsung. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/30/06 | Email to client regarding source of other preferential transfers potentially made by Sensory Science. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/30/06 | Analyze Korea Export's two $11 million claims to assess impact on substantive consolidation. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 05/30/06 | Analyze LG's secured claim possible impact on substantive consolidation. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/30/06 | Email to client explaining issues regarding LG claim and reducing potential liability. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/30/06 | Email to Mr. Smith regarding value of Sensory Science subsidiaries. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/30/06 | Email to Mr. Smith regarding value of Sensory Science's interest in product line sales. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/30/06 | Analyze factors affecting distributions absent substantive consolidation. | 0.60 | 465.00 | 279.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000017                                          Invoice No. 7309937
Jorge. A. del Calvo                                                      Page 58

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 05/30/06 | Analyze security interest in subsidiary distributions. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 05/30/06 | Begin drafting disclosure statement. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 05/31/06 | Reply to Grobstein's email regarding Plan analysis. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/31/06 | Respond to OCC email regarding status of plan. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 05/31/06 | Read six emails from N. Salvucci and M. Smith regarding ownership of estate assets. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 05/31/06 | Analyze creditors rights to priority under Senior Note Indenture. | 1.10 | 465.00 | 511.50 |
| M. S. Walker | 05/31/06 | Continue preparing disclosure statement. | 1.40 | 465.00 | 651.00 |
| M. S. Walker | 06/01/06 | Analyze priority provisions of Junior Note Indenture. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/01/06 | Email to clients and OCC regarding whether claims exist that benefit from subordination provisions. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/01/06 | Draft plan of reorganization. | 1.90 | 465.00 | 883.50 |
| M. S. Walker | 06/02/06 | Email to Grobstein requesting evaluation of leasing issues relating to subordination provisions in Junior Note Indenture. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/02/06 | Analyze M. Smith's response regarding borrowings that might have priority over Junior Noteholders. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/02/06 | Respond to T. Arnold's email regarding claims to be analyzed in substantive consolidation analysis. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/02/06 | Respond to Mr. Smith's email regarding substantive consolidation evidence. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/02/06 | Analyze benefits of administrative convenience class at different claim amounts and payment levels. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/02/06 | Email to OCC regarding benefits of administrative convenience class at different claim amounts and payment levels. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/02/06 | Continue drafting plan of reorganization. | 1.80 | 465.00 | 837.00 |
| M. S. Walker | 06/05/06 | Evaluate benefits of substantively consolidating domestic subsidiaries. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 06/05/06 | Email to OCC and clients seeking information regarding benefits of substantively consolidating domestic subsidiaries. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/05/06 | Analyze need for plan provisions to account for subordination provisions in both indentures. | 0.50 | 465.00 | 232.50 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                                      November 1, 2006
Matter No. 0000017                                              Invoice No. 7309937
Jorge. A. del Calvo                                                          Page 59

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/05/06 | Email to client and OCC regarding structure of plan regarding subordination provisions. | 0.30 | 465.00 | 139.50 |
| C. A. Barbarosh | 06/05/06 | Update regarding plan structure issues. | 0.30 | 550.00 | 165.00 |
| M. S. Walker | 06/06/06 | Email to H. Grobstein regarding tax issues relating to non-debtor subsidiaries. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/06/06 | Revise plan of reorganization. | 1.60 | 465.00 | 744.00 |
| M. S. Walker | 06/06/06 | Call with Grobstein regarding impact of tax obligations on prospects for substantive consolidation. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/06/06 | Call with Grobstein regarding capitalization of leases as pertaining to priority provisions in Junior Note Indenture. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/06/06 | Email to M. Smith regarding tax returns. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/07/06 | Read three emails from M. Smith, N. Salvucci and A. wells regarding records. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/07/06 | Email to N. Salvucci regarding process for locating records going forward. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/07/06 | Continue drafting plan. | 2.60 | 465.00 | 1,209.00 |
| M. S. Walker | 06/07/06 | Continue drafting disclosure statement. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 06/07/06 | Read and respond to two emails regarding tax returns coverage of non-debtor subsidiaries. | 0.20 | 465.00 | 93.00 |
| W. Freeman | 06/08/06 | Analysis of substantive consolidation issues and impact on distributions under Trustee's plan. | 1.30 | 540.00 | 702.00 |
| M. S. Walker | 06/08/06 | Email to Grobstein regarding need to substantively consolidate patent sellers and results of analysis regarding capitalized leases. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/08/06 | Revise plan of reorganization. | 4.50 | 465.00 | 2,092.50 |
| M. S. Walker | 06/09/06 | Review corporate reports for multiple subsidiaries and Debtors. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/09/06 | Revise plan of reorganization. | 1.50 | 465.00 | 697.50 |
| M. S. Walker | 06/09/06 | Respond to A. Wells' email regarding possible senior indebtedness. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/09/06 | Call with U.S. Bank's counsel regarding his client's position on subordination provisions in plan. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/09/06 | Draft disclosure statement. | 3.50 | 465.00 | 1,627.50 |
| M. S. Walker | 06/12/06 | Read emails from N. Salvucci and M. Smith regarding plan and tax returns. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/12/06 | Revise plan to provide for treatment of non-subordinated U.S. Bank claims. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 06/12/06 | Call with H. Grobstein regarding substantive consolidation analysis. | 0.10 | 465.00 | 46.50 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000017                                         Invoice No. 7309937
Jorge. A. del Calvo                                                       Page 60

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/12/06 | Continue drafting disclosure statement. | 2.70 | 465.00 | 1,255.50 |
| M. S. Walker | 06/13/06 | Call with C. Rankin to discuss plan preparation. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/13/06 | Email to A. Wells regarding plan. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/13/06 | Continue drafting disclosure statement. | 3.75 | 465.00 | 1,743.75 |
| W. Freeman | 06/14/06 | Review and revise most recent version of plan of reorganization to include status of VIA settlement. | 1.40 | 540.00 | 756.00 |
| M. S. Walker | 06/14/06 | Read and respond to three emails regarding plan meeting. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/14/06 | Revise plan. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/14/06 | Complete first revision of disclosure statement. | 3.75 | 465.00 | 1,743.75 |
| M. S. Walker | 06/14/06 | Email to A. Wells regarding revision of plan. | 0.10 | 465.00 | 46.50 |
| C. A. Barbarosh | 06/14/06 | Update regarding plan issues. | 0.20 | 550.00 | 110.00 |
| C. A. Barbarosh | 06/14/06 | Review and analyze draft joint liquidating plan. | 1.20 | 550.00 | 660.00 |
| M. S. Walker | 06/15/06 | Emails to M. Smith and N. Salvucci regarding plan meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/15/06 | Analyze requirements for balloting procedures motion. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 06/15/06 | Email to H. Grobstein regarding analysis of subordination issues. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/15/06 | Revise disclosure statement. | 2.40 | 465.00 | 1,116.00 |
| M. S. Walker | 06/16/06 | Read and respond to three emails regarding plan meeting. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/16/06 | Read emails from H. Grobstein and T. Parry regarding existence of capitalized leases (relevant to subordination provisions) and tax treatment of subsidiaries. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/16/06 | Analyze and respond to P. Ente's email regarding tax issues concerning substantive consolidation. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/16/06 | Analyze and respond to Mr. Ente's further email regarding tax returns. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/16/06 | Revise disclosure statement. | 1.60 | 465.00 | 744.00 |
| M. D. Houle | 06/16/06 | Exchange multiple correspondence with H. Grobstein regarding substantive consolidation conference call. | 0.30 | 450.00 | 135.00 |
| C. A. Barbarosh | 06/19/06 | Confer with M. Houle regarding plan issues and process. | 0.30 | 550.00 | 165.00 |
| C. A. Barbarosh | 06/19/06 | Review and analyze draft of disclosure statement. | 1.30 | 550.00 | 715.00 |
| M. S. Walker | 06/19/06 | Email to OCC regarding Wells Fargo claim impacts on plan. | 0.10 | 465.00 | 46.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000017
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 61

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. D. Houle | 06/19/06 | Analysis and revise disclosure statement. | 1.60 | 450.00 | 720.00 |
| M. S. Walker | 06/20/06 | Call with A. Wells regarding access to information for plan preparation and confirmation. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/20/06 | Email to client and OCC regarding disclosure statement. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/20/06 | Conference call with Grobstein, Salvucci and Smith to address developing evidence for substantive consolidation. | 0.80 | 465.00 | 372.00 |
| M. D. Houle | 06/20/06 | Analysis and research regarding trust mechanism for plan. | 1.20 | 450.00 | 540.00 |
| M. D. Houle | 06/20/06 | Participate in conference call with M. Walker, M. Smith, H. Gobstein, A. Wells and N. Salvucci regarding substantive consolidation. | 0.80 | 450.00 | 360.00 |
| M. S. Walker | 06/21/06 | Read five emails from N. Salvucci, M. Smith and H. Grobstein regarding substantive consolidation. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/21/06 | Email to client and Grobstein regarding scope of planned substantive consolidation. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/22/06 | Analyze requirements for expert's work product. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/22/06 | Read three emails from M. Smith, N. Salvucci and H. Grobstein regarding plan meeting. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/22/06 | Respond to Grobstein's email regarding work product. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/22/06 | Call with H. Grobstein regarding substantive consolidation issues. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/22/06 | Email to Grobstein regarding organizational chart. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/22/06 | Call with H Grobstein regarding developing substantive consolidation evidence. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/22/06 | Instruct P. Breeden regarding review of payable files for substantive consolidation evidence. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/22/06 | Analyze possible OID objection to junior note claim. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/23/06 | Respond to Mr. Smith's email regarding disclosure statement. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/23/06 | Analyze spreadsheet showing source of payment of Debtors' invoices. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/23/06 | Review payable files for information supporting substantive consolidation. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/23/06 | Email to Mr. Smith regarding benefit received | 0.30 | 465.00 | 139.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                                November 1, 2006
Matter No. 0000017                                          Invoice No. 7309937
Jorge. A. del Calvo                                                       Page 62

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/23/06 | from SONICblue payments to Baltrans. Email to Mr. Smith regarding benefit received from SONICblue payments to Global Fulfillment. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/26/06 | Read four emails from M. Smith and H. Grobstein regarding meeting to discuss substantive consolidation facts. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/26/06 | Analyze email from M. Smith regarding Global Fulfillment payment allocation. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/26/06 | Analyze email from M. Smith regarding Baltrans payment allocation. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/26/06 | Call with Mr. Smith to go over his comments to disclosure statement. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 06/26/06 | Revise disclosure statement per Mr. Smith's instructions. | 0.80 | 465.00 | 372.00 |
| M. D. Houle | 06/26/06 | Exchange correspondence with M. Smith regarding meeting with H. Gobstein regarding substantive consolidation. | 0.20 | 450.00 | 90.00 |
| L. L. Partrick | 06/27/06 | Review benefit plan status with M. Walker in connection with disclosure statement preparation. | 0.20 | 225.00 | 45.00 |
| M. S. Walker | 06/27/06 | Respond to H. Grobstein's email regarding Congress guaranty. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/27/06 | Develop methodology for addressing assertion of claims against multiple Debtors. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 06/27/06 | Draft spreadsheet identifying creditors who assert claims against multiple Debtors. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 06/27/06 | Analyze claims of creditors against multiple Debtors for impact on substantive consolidation analysis. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 06/27/06 | Email to H. Grobstein explaining spreadsheet with claim analysis. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/27/06 | Revise plan to address allowance of claims paid during bankruptcy case. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 06/27/06 | Analyze need for disclosure statement sections relating to 401k plans. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/27/06 | Analyze spreadsheets showing payment of claims against one debtor by other Debtors. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/27/06 | Email to H. Grobstein explaining spreadsheets showing cross-payment of debts by Debtors. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/27/06 | Prepare substantive consolidation analysis for claim payment for Sensory Science and ReplayTV. | 1.90 | 465.00 | 883.50 |

**Pillsbury Winthrop Shaw Pittman** LLP

Client No. 044845                                             November 1, 2006
Matter No. 0000017                                        Invoice No. 7309937
Jorge. A. del Calvo                                                      Page 63

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 06/28/06 | Revise substantive consolidation analysis for claim payment for Sensory Science and ReplayTV. | 0.50 | 465.00 | 232.50 |
| M. S. Walker | 06/28/06 | Prepare substantive consolidation analysis for claim payment for Diamond. | 1.40 | 465.00 | 651.00 |
| M. S. Walker | 06/28/06 | Email to Mr. Smith explaining substantive consolidation analysis and requesting information regarding issues identified in analysis. | 0.30 | 465.00 | 139.50 |
| M. D. Houle | 06/28/06 | Telephone conference with C. Rankin regarding status of plan and disclosure statement. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 06/28/06 | Review and analyze spreadsheet regarding substantive consolidation. | 0.80 | 450.00 | 360.00 |
| M. S. Walker | 06/29/06 | Respond to H. Grobstein's message regarding tax returns. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/29/06 | Email to H. Grobstein responding to his questions regarding substantive consolidation issues. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 06/29/06 | Email to Mr. Smith regarding intercompany transfers. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 06/29/06 | Call with OCC's counsel A. Wells regarding work plan for Grobstein. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/29/06 | Call with H. Grobstein regarding substantive consolidation issues. | 0.30 | 465.00 | 139.50 |
| M. S. Walker | 06/30/06 | Read M. Smith's emails regarding employees and financial analysis. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 06/30/06 | Begin drafting liquidating trust agreement. | 1.00 | 465.00 | 465.00 |
| M. S. Walker | 07/03/06 | Respond to Mr. Smith's email regarding claim analysis. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/03/06 | Analyze SONICblue emails for evidence relevant to substantive consolidation. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 07/03/06 | Continue drafting liquidating trust agreement. | 1.10 | 465.00 | 511.50 |
| M. D. Houle | 07/03/06 | Telephone conference with A. Wells regarding plan and disclosure statement issues. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 07/03/06 | Analysis regarding potential further extension of exclusivity. | 0.20 | 450.00 | 90.00 |
| M. D. Houle | 07/03/06 | Analysis regarding plan and disclosure statement revisions for VIA litigation and tax issues. | 0.60 | 450.00 | 270.00 |
| J. D. Monarrez | 07/03/06 | Pull regulations per M. Walker | 0.25 | 105.00 | 26.25 |
| M. S. Walker | 07/05/06 | Analyze revenue rulings and tax issues concerning liquidating trusts. | 1.30 | 465.00 | 604.50 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845
Matter No. 0000017
Jorge. A. del Calvo

November 1, 2006
Invoice No. 7309937
Page 64

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| M. S. Walker | 07/05/06 | Analyze strategy regarding options for liquidating trust. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/05/06 | Call with H. Grobstein regarding substantive consolidation issues and tax issues for liquidating trust. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 07/06/06 | Read and analyze spreadsheet with invoice analysis. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/06/06 | Respond to email from J. Teeple regarding invoice analysis. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/06/06 | Analyze OCC's comments on disclosure statement. | 0.90 | 465.00 | 418.50 |
| M. S. Walker | 07/06/06 | Revise analysis of impact of substantive consolidation on creditor constituencies. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 07/06/06 | Email to OCC explaining analysis of impact of substantive consolidation on creditor constituencies. | 0.40 | 465.00 | 186.00 |
| M. S. Walker | 07/06/06 | Analyze OCC comments on plan. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 07/06/06 | Continue drafting liquidating trust agreement. | 2.20 | 465.00 | 1,023.00 |
| J. D. Monarrez | 07/06/06 | Research regarding revenue procedure opinions per M. Walker. | 0.50 | 105.00 | 52.50 |
| M. S. Walker | 07/07/06 | Email to client reporting on H. Grobstein's analysis. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/07/06 | Revise disclosure statement to address OCC's comments and implement liquidating trust provisions. | 5.40 | 465.00 | 2,511.00 |
| M. S. Walker | 07/07/06 | Call with A. Wells to discuss her comments on disclosure statement. | 0.40 | 465.00 | 186.00 |
| M. D. Houle | 07/07/06 | Analysis regarding revisions to plan and disclosure statement. | 0.30 | 450.00 | 135.00 |
| L. L. Partrick | 07/10/06 | Review timing in connection with disclosure statement segment addressing 401(k) plans. | 0.20 | 225.00 | 45.00 |
| L. L. Partrick | 07/10/06 | Review documents in connection with disclosures to be included regarding employee benefit plans. | 0.30 | 225.00 | 67.50 |
| M. S. Walker | 07/10/06 | Call with Mr. Smith regarding allocation of value from product line sales. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/10/06 | Revise disclosure statement. | 2.30 | 465.00 | 1,069.50 |
| M. S. Walker | 07/10/06 | Revise plan of reorganization. | 2.40 | 465.00 | 1,116.00 |
| M. D. Houle | 07/10/06 | Work regarding revisions to Disclosure Statement. | 0.60 | 450.00 | 270.00 |
| M. D. Houle | 07/10/06 | Analysis regarding possible extension of exclusivity period. | 0.50 | 450.00 | 225.00 |
| M. D. Houle | 07/10/06 | Telephone conference with A. Wells regarding | 0.20 | 450.00 | 90.00 |

## Pillsbury Winthrop Shaw Pittman LLP

Client No. 044845                                          November 1, 2006
Matter No. 0000017                                    Invoice No. 7309937
Jorge. A. del Calvo                                              Page 65

| Name | Date | Service | Hours | Rate | Amount |
|------|------|---------|-------|------|--------|
| | | further extension of exclusivity periods. | | | |
| L. L. Partrick | 07/11/06 | Draft and revise insert for disclosure statement. | 0.70 | 225.00 | 157.50 |
| L. L. Partrick | 07/11/06 | Review disclosure statement insert with M. Walker. | 0.20 | 225.00 | 45.00 |
| M. S. Walker | 07/11/06 | Email to A. Wells regarding extending exclusivity. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/11/06 | Email to A. Wells regarding information needed for disclosure statement. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/11/06 | Develop fee information for disclosure statement. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/11/06 | Revise plan of reorganization. | 3.30 | 465.00 | 1,534.50 |
| M. D. Houle | 07/11/06 | Telephone conference with E. Hurgleowitz of Riverside Capital regarding status of exclusivity. | 0.30 | 450.00 | 135.00 |
| M. D. Houle | 07/11/06 | Exchange multiple correspondence with Preference defendants regarding status and comments on settlement documentation. | 1.50 | 450.00 | 675.00 |
| M. D. Houle | 07/11/06 | Telephone conference with J. Borg of Three-8 regarding settlement documents. | 0.20 | 450.00 | 90.00 |
| P. L. Breeden | 07/11/06 | PACER research fee applications of professionals and create spreadsheet reflecting fees requested and allowed. | 2.20 | 185.00 | 407.00 |
| M. S. Walker | 07/12/06 | Email to OCC regarding disclosure statement and plan revisions. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/12/06 | Prepare disclosure statement information regarding professional fees due. | 0.60 | 465.00 | 279.00 |
| M. S. Walker | 07/12/06 | Email to OCC regarding disclosure statement fee information. | 0.10 | 465.00 | 46.50 |
| M. S. Walker | 07/12/06 | Draft email to OCC requesting extension of exclusivity and explaining status of plan and disclosure statement. | 0.80 | 465.00 | 372.00 |
| M. S. Walker | 07/12/06 | Analyze spreadsheet showing late filed claims and issues concerning subordination of late filed claims. | 1.20 | 465.00 | 558.00 |
| M. S. Walker | 07/12/06 | Revise plan and disclosure statement. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/12/06 | Emails to OCC regarding revised plan and disclosure statement. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/12/06 | Call with potential asset buyer American Capital regarding sale of assets. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/12/06 | Analyze revised spreadsheet with additional information regarding late claims. | 0.20 | 465.00 | 93.00 |
| M. S. Walker | 07/12/06 | Email to OCC with inquiry regarding policies to be applied to late claims and OCC | 0.20 | 465.00 | 93.00 |