# EXHIBIT 8

# KMART CORP

## FORM 424B5
(Prospectus filed pursuant to Rule 424(b)(5))

## Filed 6/10/1996

| Address | 3100 W BIG BEAVER RD |
| --- | --- |
| | TROY, Michigan 48084 |
| Telephone | 248-643-1000 |
| CIK | 0000056824 |
| Industry | Retail (Department & Discount) |
| Sector | Services |
| Fiscal Year | 01/29 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

Pursuant to Rule 424(b)(5)
Registration No. 33-64905

**PROSPECTUS SUPPLEMENT**
(To Prospectus dated June 6, 1996)

**17,400,000 Trust Convertible Preferred Securities**

**Kmart Financing I**
**7 3/4% TRUST CONVERTIBLE PREFERRED SECURITIES**
(Liquidation Amount $50 Per Convertible Preferred Security)

**Guaranteed to the Extent Set Forth Herein by**

# Kmart Corporation

Of the 17,400,000 7 3/4% Trust Convertible Preferred Securities (the "Convertible Preferred Securities") being offered hereby, 15,150,000 are being offered initially in the United States and Canada by the U.S. Underwriters and 2,250,000 are being offered initially outside of the United States and Canada by the International Underwriters.

The Convertible Preferred Securities offered hereby represent preferred undivided beneficial interests in the assets of Kmart Financing I, a statutory business trust formed under the laws of the State of Delaware ("Kmart Financing" or the "Trust"). Kmart Corporation, a Michigan corporation ("Kmart" or the "Company"), will directly or indirectly own all the common securities (the "Common Securities" and, together with the Convertible Preferred Securities, the "Trust Securities") representing undivided beneficial interests in the assets of Kmart Financing. Kmart Financing exists for the sole purpose of issuing the Convertible Preferred Securities and Common Securities and investing the proceeds of the sale thereof in 7 3/4% Convertible Junior Subordinated Debentures (the "Convertible Debentures") of Kmart in an aggregate principal amount equal to the aggregate liquidation amount of the Trust Securities. The Convertible Debentures and the Convertible Preferred Securities in respect of which this Prospectus Supplement is being delivered shall be referred to herein as the "Offered Securities." The Convertible Debentures when issued will be unsecured obligations of Kmart and will be subordinate and junior in right of payment to certain other indebtedness of Kmart as described herein. Upon an event of default under the Declaration (as defined herein), the holders of Convertible Preferred Securities will have a preference over the holders of the Common Securities with respect to payments in respect of distributions and payments upon redemption, liquidation and otherwise.

(continued on next page)

**SEE "RISK FACTORS" BEGINNING ON PAGE S-13 OF THIS PROSPECTUS SUPPLEMENT FOR CERTAIN INFORMATION RELEVANT TO AN INVESTMENT IN THE**
**CONVERTIBLE PREFERRED**
**SECURITIES.**

The Convertible Preferred Securities have been approved for listing on the New York Stock Exchange, Inc. (the "New York Stock Exchange"), subject to official notice of issuance.

**THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS TO WHICH IT RELATES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**PRICE $50 PER CONVERTIBLE PREFERRED SECURITY**

| | Price to Public (1) | Underwriting Discounts and Commissions (2) | Proceeds to Trust (3)(4) |
|---|---|---|---|
| Per Convertible Preferred Security............ | $50 | (3) | $50 |
| Total (5)..................................... | $870,000,000 | (3) | $870,000,000 |

(1) Plus accrued distributions, if any, from June 17, 1996.

(2) Kmart Financing and Kmart have agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933. See "Underwriters."

(3) In view of the fact that the proceeds of the sale of the Convertible Preferred Securities will be invested in the Convertible Debentures, Kmart has agreed to pay to the Underwriters as compensation for their arranging the investment therein of such proceeds $1.40 per Convertible Preferred Security (or $24,360,000 in the aggregate).

(4) Before deducting expenses payable by Kmart estimated at $1,350,000.

(5) Kmart Financing and Kmart have granted the U.S. Underwriters an option, exercisable within 30 days of the date hereof, to purchase up to an aggregate of 2,600,000 additional Convertible Preferred Securities at the price to public less underwriting discounts and commissions for the purpose of covering over-allotments, if any. If the U.S. Underwriters exercise such option in full, the total price to public, underwriting discounts and commissions and proceeds to Kmart Financing will be $1,000,000,000, $28,000,000 and $1,000,000,000, respectively. See

## LEGAL MATTERS

The validity of the Convertible Preferred Securities, Convertible Debentures, the Guarantee and certain matters relating thereto and certain United States federal income taxation matters will be passed upon for Kmart and Kmart Financing by Skadden, Arps, Slate, Meagher & Flom, New York, New York, special counsel to the Company. The validity of the Kmart Common Stock issuable upon conversion will be passed upon for Kmart and Kmart Financing by A.N. Palizzi, Executive Vice President, General Counsel of the Company. Certain legal matters will be passed upon for the Underwriters by Davis Polk & Wardwell, New York, New York.

## EXPERTS

The consolidated financial statements of Kmart as of January 31, 1996 and January 25, 1995 and for each of the three years in the period ended January 31, 1996 included in this Prospectus Supplement have been so included in reliance on the report of Price Waterhouse LLP, independent accountants, given on the authority of said firm as experts in accounting and auditing.

S-86

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   THOMAS V. LORAN III #95255
2  CRAIG A. BARBAROSH #160224
   ALBERT J. BORO, JR. #126657
3  WILLIAM B. FREEMAN #137276
   ANA N. DAMONTE # 215504
4  50 Fremont Street
   San Francisco, CA  94105
5  Telephone: (415) 983-1000
   Facsimile: (415) 983-1200
6  Attorneys for Debtors and Debtors-In-Possession

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                   SAN JOSE DIVISION

11 IN RE:                              ) Case No. 03-51775
                                       )
12 SONICBLUE INCORPORATED, a           ) CHAPTER 11 Cases
   Delaware corporation, DIAMOND       )
13 MULTIMEDIA SYSTEMS, INC., a         ) (Case Nos. 03-51775 through 03-51778 MM)
   Delaware corporation, REPLAYTV, INC., a ) (Jointly Administered)
14 Delaware corporation, and SENSORY   )
   SCIENCE CORPORATION, a Delaware     )
15 corporation,                        )| **DECLARATION OF**
                                       ) **ALBERT J. BORO, JR.**
16                                     )
                                       ) Hearing Date: March 19, 2007
17        Debtors and Debtors-in-Possession. ) Hearing Time: 10:30 a.m.
                                       ) Location:     Courtroom 3070
18                                     )               280 South First Street
                                       )               San Jose, CA  95113
19                                     )
                                        Hon. Marilyn Morgan
20

21

22

23

24

25

26

27

28

                              DECLARATION OF ALBERT J. BORO, JR.
                              Case No.C-03-51775

1      I, Albert J. Boro, Jr., declare as follows:

2      1.    I am a partner with the law firm Pillsbury Winthrop Shaw Pittman LLP

3  ("Pillsbury"), which is counsel of record for Debtors in Possession SONICblue

4  Incorporated ("SONICblue"), Diamond Multimedia Systems, Inc., ReplayTV, Inc., and

5  Sensory Science Corporation (collectively, the "Debtors") in the above-captioned

6  bankruptcy proceedings.  I have been admitted to practice before the Supreme Court of

7  California since 1986, and am a member of the bar of the Northern District of California.  I

8  have personal knowledge of the matters stated in this Declaration, except for those matters

9  stated on information and belief, and as to those matters I believe them to be true.  I would

10  provide competent testimony upon the matters stated in this Declaration if called upon to do

11  so.

12      2.    Since August 2003, I (along with Thomas Loran and other attorneys at

13  Pillsbury) have represented SONICblue in opposing the duplicate Proofs of Claims filed in

14  the bankruptcy proceedings by VIA Technologies, Inc. ("VIA") and S3 Graphics Co., Ltd.

15  (the "Joint Venture"), on July 17, 2003 (the "Duplicate Proofs of Claim").  In the Duplicate

16  Proofs of Claims, VIA and the Joint Venture asserted claims in excess of $100 million

17  arising from SONICblue's and VIA's formation and operation of the Joint Venture to

18  operate the former Graphics Chip Business of SONICblue (the "GCB").  Seventeen of the

19  claims concerned alleged debts, obligations, and receivables of the Joint Venture, and the

20  transfer of alleged GCB intellectual property and records (called, the "Books and Records

21  Claims").  The eighteenth claim (called, the "Liquidated Damages Claim") was for

22  liquidated damages of up to $70 million for the Joint Venture's loss of use of the 1998

23  Patent Cross-License Agreement between Intel Corporation ("Intel") and SONICblue (the

24  "PCL"), based on the liquidated damages provisions in Section 5.6 of the Amended and

25  Restated Investment Agreement, entered between SONICblue and VIA in August 2000 (the

26  "Amended Investment Agreement").

27      3.    On December 21, 2004, SONICblue filed an Objection to the Duplicate

28  Claims and an Adversary Complaint for Affirmative Relief against VIA, the Joint Venture,

1   and its subsidiary S3 Graphics, Inc. (collectively, "Defendants"), and I have served as a

2   counsel of record for SONICblue in that adversary proceeding (the "VIA Adversary

3   Proceeding").  After prevailing on motions to dismiss filed by Defendants, SONICblue filed

4   an Objection and Second Amended Adversary Complaint, on July 15, 2005 (the "Second

5   Amended Complaint"), which became the operative complaint in the VIA Adversary

6   Proceeding, and Defendants answered that complaint.

7           4.      In addition to the VIA Adversary Proceeding, there were separate contested

8   motion proceedings between SONICblue and Intel concerning Intel's motion for relief from

9   the automatic stay in bankruptcy in order to terminate the PCL, and SONICblue's motion to

10  assume the PCL (the "Intel Contested Motions").  The potential termination of the PCL was

11  the premise of VIA's $70 million Liquidated Damages Claim.  Because of a conflict,

12  Pillsbury did not represent SONICblue on the Intel Contested Motions, and instead the law

13  firm of O'Melveny & Myers LLP ("O'Melveny") served as special litigation counsel for

14  SONICblue in that proceeding.

15          5.      In the course of my representation of SONICblue regarding the Duplicate

16  Proofs of Claims and the VIA Adversary Proceeding, I have investigated the circumstances

17  surrounding the negotiation, formation, and operation of the Joint Venture and the disputes

18  between the parties since the formation of the Joint Venture, and have reviewed thousands

19  of pages of documents and interviewed witnesses.  Based on my representation of

20  SONICblue during the last three and a half years, I have developed an understanding of the

21  issues involved and history of the disputes between SONICblue, on the one hand, and VIA

22  and the Joint Venture, on the other.

23          6.      As alleged in the Second Amended Complaint, the disputes between

24  SONICblue and Defendants have been ongoing since the closing, on or about January 3,

25  2001, of the Amended Investment Agreement.  As set forth in the Second Amended

26  Complaint, the Amended Investment Agreement was only able to close on that date, after

27  SONICblue and VIA entered a series of side letters, also dated January 3, 2001, that

28  reserved for later resolution or arbitration many of the claims that eventually became part of

3

1   the Books and Records Claims in the Duplicate Proofs of Claims.  I am informed and

2   believe that within weeks of the closing, VIA was threatening to bring litigation against

3   SONICblue and that the atmosphere of adversity continued largely unabated, except for

4   periodic settlement offers and counteroffers that never were consummated, until the

5   eventual settlement of the VIA Adversary Proceeding more than five years later in

6   September 2006.

7        7.      Based on our investigation of these matters, we believed that the claims in

8   the Duplicate Proofs of Claims were substantial claims, but that SONICblue also had

9   substantial defenses and counterclaims against Defendants.  As part of our representation of

10  SONICblue, I participated in the preparation of an analysis of the Books and Records

11  Claims, which showed that those claims had a potential value before set-offs and

12  counterclaims of up to $42 million.  This analysis was shared with members of the

13  Creditors' Committee in the SONICblue bankruptcy proceeding pursuant to a joint defense

14  privilege in defending against the Duplicate Proofs of Claims.  A true and correct copy of

15  that analysis, which was sent as an attachment to an email, dated October 18, 2004, from

16  Mr. Loran to me, our client Mr. Smith, attorneys for members of the Creditors' Committee,

17  and others, with Bates Numbers PWSP 08493 to PWSP 08502, is attached hereto as

18  Exhibit 1.  We also spent a significant amount of time analyzing the Liquidated Damages

19  Claim, and concluded that it was a substantial claim worth up to $70 million, but that

20  SONICblue also had substantial defenses to that claim.

21       8.      Following the filing of the Duplicate Proofs of Claims in 2003, I participated

22  in several telephone calls with Mr. Loran and attorneys for Defendants concerning the

23  Duplicate Proofs of Claims, the counterclaims that SONICblue had against Defendants, and

24  possible settlement of these disputes, but no significant progress on settlement of the

25  disputes was made until August 2005 after Defendants' motions to dismiss had been

26  defeated.

27       9.      The first in-person settlement meeting in the VIA adversary proceeding was

28  held on August 11, 2005, at Pillsbury's offices in Palo Alto, California.  It was attended by

4

1    attorneys for VIA and the Joint Venture, including Edward Slizewski, Henry Kevane, and

2    Luther Orton, and Johnny Lee of VIA from Taiwan, who I knew based on my investigation

3    of these disputes had been involved in the on-and-off settlement negotiations between

4    SONICblue and VIA since 2001.  On the Debtors' side, this meeting was attended by

5    Marcus Smith, the Responsible Person for the Debtors, and David Gershon and Andrew

6    Wolfe, former officers of SONICblue and consultants to the Debtors, and Mr. Loran and

7    me.  Although that meeting had been originally set up just to discuss the Books and

8    Records Claims, the settlement discussions quickly turned to resolution of all issues in the

9    case.  At that settlement meeting, we made a presentation to Defendants on SONICblue's

10    defenses and counterclaims, and VIA presented its proposed structure for settlement, which

11    included an allowed claim in the bankruptcy in an amount still to be negotiated.  During the

12    course of these discussions, VIA stated that its allowed claim should be $42.5 million, and

13    SONICblue stated that an allowed claim in the amount of $6 million might be acceptable to

14    the creditors, but SONICblue would need to ascertain whether the creditors would support a

15    settlement in that amount before formally making that settlement offer.

16          10.      The next day, we contacted attorneys for the Creditors' Committee to set up

17    a conference call to discuss these settlement developments.  On August 17, 2005, I

18    participated in a telephone conference with attorneys for members of the Creditors'

19    Committee, including Ann Wells, of the law firm Levene, Neale, Bender, Rankin & Brill

20    L.L.P. ("Levene"), which is counsel to the Creditors' Committee, Anne Kearns, Special IP

21    Counsel to the Creditors' Committee, and Bruce Bennett, attorney for three investors:

22    Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund

23    Ltd. (the "Senior Noteholders"), who are members of the Creditors' Committee.  Mr. Loran,

24    Suzzanne Uhland of O'Melveny, and others also participated in the conference call.  The

25    attorneys for the Creditors' Committee viewed Defendants' settlement proposal as a

26    positive movement but expressed concern over VIA's demands for a $42.5 million allowed

27    claim and for its suggested approach for addressing the issue of the Intel Contested

28    Motions.  The attorneys for the Creditors' Committee indicated their approval of the

DECLARATION OF ALBERT J. BORO, JR.
Case No.C-03-51775

1    counteroffer of a $6 million allowed claim that SONICblue had suggested (subject to

2    creditor approval), but Mr. Bennett stated that, although the $6 million allowed claim

3    should be acceptable, he needed to confer with his clients about these developments.  We

4    did not receive confirmation from Mr. Bennett until almost two weeks later, on or about

5    August 30, that his clients would support a counteroffer of a $6 million allowed claim.

6    Once we heard back from Mr. Bennett, we confirmed to VIA's counsel the counteroffer of a

7    $6 million allowed claim, and informed them of the Creditors' Committee request that VIA

8    provide more clarity on its proposal regarding the Intel Contested Motions.  We also made

9    arrangements for a second in-person settlement meeting to be held in mid-September 2005.

10           11.     Based on the August 11 settlement meeting and our discussions with

11   attorneys for the Creditors' Committee, with our client, and with our co-counsel at

12   O'Melveny, I reached a number of conclusions regarding how the VIA Adversary

13   Proceeding might be settled on terms favorable to the Debtors.  I believed that the VIA

14   Adversary Proceeding could be successfully settled only in conjunction with the settlement

15   of the Intel Contested Motions.  I understood that the attorneys for the Creditors' Committee

16   viewed a settlement that resulted in an allowed claim to VIA of less than $25 million as an

17   acceptable compromise to move forward with resolving the bankruptcy.  I believed that our

18   client Mr. Smith had a good sense of what settlement amount with VIA would be

19   acceptable to the members of the Creditors' Committee, with the possible exception of the

20   Senior Noteholders who seemed to communicate exclusively through Mr. Bennett.  I

21   believed that the Senior Noteholders might object to a settlement with Defendants,

22   threatening the prospects of Court approval of a proposed settlement of the VIA Adversary

23   Proceeding, unless their agreement to the proposed settlement terms was obtained.

24           12.     On September 12, 2005, Mr. Slizewski sent to Mr. Loran and me a proposed

25   settlement term sheet that set forth Defendants' proposed structure of the settlement that

26   included in paragraph 1 that "Claimants shall hold an allowed, general unsecured claim in

27   the Chapter 11 case of SONICblue Inc. in the amount of $27.5 million (the 'Allowed

28   Claim')."  A true and correct copy of the email (with Intel confidential information

DECLARATION OF ALBERT J. BORO, JR.
Case No.C-03-51775

1    redacted), with Bates Numbers PWSP 14395 to PWSP 14398, sent by Mr. Slizewski to

2    Mr. Loran and me with the attached settlement term sheet, on September 12, 2005, is

3    attached hereto as Exhibit 2.

4         13.    On September 15, 2005, we met a second time with counsel for VIA and the

5    Joint Venture.  The attorneys attending that meeting at Pillsbury's offices in San Francisco,

6    California were Mr. Loran and me, Ms. Uhland and David Eberhart of O'Melveny, and

7    Defendants' attorneys Messrs. Slizewski, Kevane, and Orton.  At the September 15

8    meeting, the parties discussed at length the various elements of a proposed settlement of the

9    VIA Adversary Proceeding.  For purposes of this Declaration, I focus only on the

10   discussions concerning Defendants' allowed claim because I understand that term is at issue

11   in this motion.  At that settlement meeting a proposed compromise was reached on the

12   amount of Defendants' allowed claim.

13        14.    At the September 15 meeting, following the parties' discussion of

14   Defendants' September 12 settlement offer, counsel for SONICblue held a break-out

15   conference.  Following that conference, we made a counteroffer of an allowed claim of

16   $7 million or $10 million, with the allowed claim being the lesser amount if the Intel

17   Contested Motions could also be resolved as part of a three-way settlement among

18   SONICblue, Defendants, and Intel.  Defendants responded by lowering their demand to a

19   $19 million allowed claim.  We spoke with Mr. Bennett about this $19 million counteroffer,

20   and he said that his clients would support a settlement involving only a $10 million allowed

21   claim.  We spoke with our client Mr. Smith about Defendants' $19 million counteroffer.

22   We received authority from him for a $10 million counteroffer.  We met with Defendants'

23   attorneys and presented the counteroffer of a $10 million allowed claim.  Following a

24   further break, we met with Mr. Kevane who presented to us a "mediator's proposal" that he

25   and Defendants' other attorneys would work on obtaining their clients' approval of a

26   compromise of a $12.5 million allowed claim, if we agreed that we would work on

27   obtaining the Debtors' and the creditors' approval of a $12.5 million general unsecured

28   allowed claim.  We then spoke with our client Mr. Smith to discuss this compromise, and

7

1  we received authority from him to agree to this compromise. Following that, we spoke

2  with Mr. Bennett, counsel for the Senior Noteholders, to determine if his clients would

3  support a settlement with Defendants that provided for a $12.5 million allowed claim, if

4  Defendants agreed to that compromise. Mr. Bennett stated that he needed to speak with his

5  clients the next day before he could commit their support of that compromise.

6        15.    At the time of the September 15, 2005 settlement meeting, I was aware of

7  the provision in the Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior

8  Subordinated Convertible Debentures Due 2005 (the "Senior Noteholder Indenture"), that

9  defined "Senior Indebtedness" to those senior notes as including, "All indebtedness of the

10  Company owing to VIA Technologies, Inc. in an aggregate principal amount not to exceed

11  $15,000,000." At the September 15 meeting, this provision was not discussed. However,

12  at both the August and September 2005 settlement meetings the parties discussed that

13  Defendants' allowed claim would be given the same priority as other general unsecured

14  claims, and no greater or lesser priority, and that it would ultimately result in an expected

15  payment to Defendants of about 25 to 28 cents on the dollar.

16        16.    On the next day, September 16, 2005, VIA's attorney Mr. Slizewski

17  informed us that Defendants approved of the "mediator's proposal" of a $12.5 million

18  general unsecured allowed claim. We informed him that our client had also approved of the

19  "mediator's proposal," but that we were waiting for sign-off from the creditors to ensure

20  that the proposed settlement would not be objected to by the creditors. Later that day, I

21  spoke with Mr. Slizewski to inform him that we were still awaiting approval from one

22  member of the Creditors' Committee. He indicated that defendants would not negotiate

23  language for a settlement term sheet until they knew that the $12.5 million settlement

24  amount was accepted and not subject to further negotiation. He further stated that the

25  failure to accept the "mediator's proposal" of a $12.5 million allowed claim after

26  Defendants had done so would cause his clients to withdraw from settlement discussions

27  and that it would not be possible to settle the VIA Adversary Proceeding for the foreseeable

28  future.

8

1      17.    On September 16 and 19, 2005, we placed calls to Mr. Bennett to find out if

2   the Senior Noteholders would support the "mediator's proposal" of a $12.5 million allowed

3   claim. During that time, I learned that the provision in the Senior Noteholder Indenture

4   referring to the $15 million indebtedness to VIA was for a loan that VIA was supposed to

5   have made to SONICblue, but which never occurred. On September 20, we learned that the

6   Senior Noteholders were willing to support a settlement that included a $12.5 million

7   allowed claim for Defendants, provided that the settlement included certain terms,

8   including that Defendants' allowed claim be neither senior nor junior to any other general

9   unsecured claim. Later that same day, September 20, 2005, the parties had a further

10  telephonic settlement negotiation to discuss proposed language for the term sheet that was

11  attended by Mr. Loran, Ms. Uhland, Mr. Eberhart, and me on behalf of the Debtors, and

12  attorneys Messrs. Slizewski, Kevane, and Orton and Maura Rees for Defendants. During

13  that telephone conference, we confirmed that the "mediator's proposal" was accepted, and

14  we told them that the settlement term sheet language should describe the $12.5 million

15  allowed claim as neither senior nor junior to other general unsecured claims. The attorneys

16  for Defendants did not object to that request, but stated that their clients wanted to include

17  language that Defendants could decide how to allocate the allowed claim among

18  Defendants. We held further telephonic settlement negotiations with counsel for

19  Defendants on September 21 and 22, 2005. On the September 22, 2005 telephonic

20  settlement negotiations, the "neither senior nor junior" language was discussed again. The

21  parties discussed that Defendants' allowed claim would be a general unsecured claim and

22  Defendants would receive about 25 cents on the dollar from the bankruptcy, and would not

23  have priority, nor would be disadvantaged, compared to other general unsecured claims.

24  Defendants' counsel posed questions about subordination of the Senior Noteholders and

25  other creditors, and expressed concern that other creditors not unduly benefit at their clients'

26  expense, but they nevertheless agreed that their claim was neither senior nor junior to other

27  general unsecured claims.

28

9

1        18.     The attorneys for SONICblue and the Defendants reached agreement on a

2  final draft of the proposed settlement term sheet late in the day on September 26, 2005.

3  That evening we obtained Mr. Smith's signature page to be held in escrow, so that we

4  would be in a position to exchange signature pages when the term sheet was ready to be

5  executed.  On September 27, 2005, I sent an email to the attorneys for the Creditors'

6  Committee in which we sent the proposed final version of the settlement term sheet to them

7  for their review and we proposed a conference call for later that afternoon to review it and

8  to answer any questions that they had.  A true and correct copy of the email (with Intel

9  confidential information redacted), with Bates Numbers PWSP 00001.253 to PWSP

10  00001.259, which I sent to Mr. Bennett, Mr. Rankin, Ms. Wells, Ms. Kearns, Mr. Holland,

11  as well as to Mr. Smith and others, that included a copy of the proposed settlement term

12  sheet is attached hereto as Exhibit 3.  That term sheet provided in paragraph 3.a. that

13  Defendants "shall jointly hold a single, allowed general unsecured claim in the Chapter 11

14  case of SONICblue Inc., which claim shall be afforded the benefits and priority of

15  SONICblue's other allowed general unsecured claims and shall be neither senior nor junior

16  to any other general unsecured claim, in the amount of $12.5 million . . ." (at Bates Number

17  PWSP 00001.254).  A few hours later, we held a conference call with the attorneys for the

18  Creditors' Committee to discuss the term sheet.  During that conference call, the attorneys

19  for the Creditors' Committee stated their approval of the proposed settlement and expressed

20  their views that the proposed settlement was a very good result for the estate.  Following

21  that conference call, we released SONICblue's signature page for the settlement term sheet

22  to Defendants' attorneys.

23        19.     The final settlement documents were not executed until approximately one

24  year after the execution of the September 2005 settlement term sheet.  This delay was

25  largely due to the difficulties of negotiating a resolution of the Intel Contested Motions in

26  the context of a three-way settlement involving SONICblue, Intel, and Defendants.

27  Because of the slow progress of the settlement discussions with Intel, a draft settlement

28  agreement was not circulated until January 25, 2006.  Attached hereto as Exhibit 4 is a true

1    and correct copy of the email (with Intel confidential information redacted), with Bates

2    Numbers PWSP 00001.297 to PWSP 00001.313, sent by Austin Barron of O'Melveny, on

3    January 25, 2006, to me, Mr. Slizewski, Intel's counsel Steve Johnson, and others attaching

4    the initial proposed draft settlement agreement.  That draft provided in Section 2, "Allowed

5    Claim," that Defendants would hold "a single, allowed general unsecured claim in the

6    Bankruptcy Case, which claim shall be afforded the benefits and priority of Debtor's other

7    allowed general unsecured claims and shall be neither senior nor junior to any other

8    allowed general unsecured claim, in the amount of $12.5 million . . ." (at Bates Number

9    PWSP 00001.301).

10           20.     In April and early May 2006, the parties exchanged comments on this draft

11   settlement agreement.  During that comment period, Mr. Loran and I suggested adding

12   language to the section on Defendants' allowed claim stating that it was not "Senior

13   Indebtedness" under the Senior Noteholder Indenture.  Our reason for doing so was that the

14   parties had agreed that Defendants' claim was not senior nor junior to any other general

15   unsecured claim, and we wanted to explicitly reference the "Senior Indebtedness" language

16   so that there could be no dispute in the future as to whether the parties meant to foreclose

17   later litigation over that language as part of the settlement agreement.  Because of the

18   history of litigation and failed settlement discussions, we believed that including this

19   language was prudent to ensure that Defendants did not bring new litigation against the

20   Debtors over the priority of their claim, thereby causing the Debtors to expend additional

21   attorneys' fees and potentially resulting in a windfall to Defendants of an additional

22   settlement payment from the estate due to claimed uncertainty as to the applicability or non-

23   applicability of the "Senior Indebtedness" provision of the Senior Note Indenture.  In

24   making this requested change to the settlement agreement, I investigated the history of the

25   "Senior Indebtedness" language concerning the indebtedness to VIA in the principal

26   amount of $15 million.  My review of documents from the prior settlement discussions

27   between SONICblue and VIA confirmed that this provision was included in the definition

28   of "Senior Indebtedness" as a placeholder for a loan of $15 million that VIA was to have

1   made to SONICblue as part of the settlement of the Books and Records Claims prior to

2   SONICblue filing for bankruptcy protection.  That loan by VIA was never made because

3   the dispute with VIA was never settled until the settlement that was approved by this Court

4   in October 2006.

5       21.     SONICblue documents that we have produced in this proceeding from the

6   time of the negotiation of the Senior Note Indenture corroborate that the provision referring

7   to VIA in the definition of "Senior Indebtedness" was for a $15 million loan that VIA was

8   going to make as part of a settlement with SONICblue that never occurred.

9       (a)     Attached hereto as Exhibit 5 is a true and correct copy of a settlement

10  term sheet, with Bates Numbers PWSP 00001.1 to PWSP 00001.2, that has in handwriting

11  the month "Oct" and the name "VIA" and is from Andrew Wolfe of SONICblue to Johnny

12  Lee of VIA.  That document sets forth the parties' discussion of the possible terms of a

13  settlement agreement, including the term, "VIA will arrange the $15M loan to SONICblue

14  under the agreed upon terms."

15      (b)     Attached hereto as Exhibit 6 is a true and correct copy of an email,

16  with Bates Numbers PWSP 00001.9 to PWSP 00001.13, sent on January 29, 2002, from

17  Mr. Wolfe to Marcus Smith of SONICblue, which includes as an attachment a document

18  entitled, "Johnny Settlement Proposal 10-8.doc," which was the same settlement term sheet

19  in Exhibit 5 that includes the settlement term of a $15 million loan by VIA.

20      (c)     Attached hereto as Exhibit 7 is a true and correct copy of an email,

21  with Bates Numbers PWSP 00001.17 to PWSP 00001.61, sent on March 20, 2002, by Ken

22  Potashner of SONICblue to John Todd of SONICblue, forwarding an email from Mr. Lee

23  of VIA to Mr. Potashner, dated March 15, 2002, which included a proposed draft settlement

24  agreement, including a draft loan agreement for the $15 million loan.  The draft settlement

25  agreement provided as its first term that "[a]n express condition precedent to the

26  effectiveness of paragraph 2 of this Agreement [providing for a settlement payment of

27  approximately $2.34 million] is the negotiation and execution of a loan to SONICblue by

28  VIA in the amount of US$15 million," and provided in paragraph 2 that VIA was

12

1    authorized to withhold the settlement amount from the proceeds of the $15 million loan (at

2    PWSP 00001.18).  This email of Mr. Lee of VIA with the proposed settlement agreement

3    and loan was sent about one month prior to the execution of the Senior Note Indenture in

4    April 2002.

5         22.    On May 12, 2006, Mr. Barron of O'Melveny sent a revised draft settlement

6    agreement that included our comments on adding language that explicitly resolved any

7    argument over the applicability of the "Senior Indebtedness" provision in the Senior Note

8    Indenture to Defendants' allowed claim.  The May 12 draft also reflected other comments

9    by SONICblue, as well as comments from Intel and Defendants.  Attached hereto as Exhibit

10   8 is a true and correct copy of the email (with Intel confidential information redacted), with

11   Bates Numbers PWSP 00001.263 to PWSP 00001.296, sent by Mr. Barron on May 12,

12   2006, to me, Mr. Kevane, Mr. Johnson, and others attaching the revised draft settlement

13   agreement.  That revised draft provided in Section 2, "Allowed Claim," that "Claimants and

14   the Debtor agree that the Allowed Claim is not, and shall not be treated as, 'Senior

15   Indebtedness' under the terms of the Debtor's Indenture, dated as of April 22, 2002, for the

16   7-3/4% Secured Senior Subordinated Convertible Debentures due 2005," (at PWSP

17   00001.268).  This language was also shown with underscoring in the redlined version in

18   order to indicate that this was new language being added to the draft settlement agreement

19   (at PWSP 00001.284).

20         23.    On June 1, 2006, an in-person settlement meeting among counsel for

21   SONICblue, Defendants, and Intel was held at O'Melveny's San Francisco office to resolve

22   settlement agreement language issues.  I attended that settlement meeting with Mr. Loran,

23   along with Ms. Uhland, Mr. Eberhart, and Mr. Barron of O'Melveny on behalf of the

24   Debtors.  Messrs. Kevane and Orton attended on behalf of Defendants, along with their

25   client Mr. Lee of VIA.  Counsel for Intel also attended.  In that meeting, the parties

26   discussed our proposed language waiving any claim by Defendants that the settlement

27   amount constituted Senior Indebtedness under the Senior Note Indenture.  I explained to

28   Defendants' counsel and Mr. Lee of VIA that the provision in the Senior Note Indenture

1    referred to the $15 million loan that VIA was going to make to SONICblue as part of a

2    settlement that never occurred.  As discussed in paragraph 21, Mr. Lee was the VIA officer

3    who made the settlement offer with the $15 million loan in the 2001 to 2002 period.  Mr.

4    Kevane stated at that meeting that they had seen the language from the Senior Note

5    Indenture defining "Senior Indebtedness" and they understood that it was for the proposed

6    $15 million loan that never occurred.  Accordingly, Defendants agreed at the June 1, 2006

7    meeting to include our language on "Senior Indebtedness" in the settlement agreement.

8        24.    Counsel for SONICblue, Defendants, and Intel met again on June 9 and June

9    16, 2006 to continue to negotiate language for the settlement agreement.  On June 16, 2006,

10   Mr. Barron of O'Melveny sent a revised redlined draft settlement agreement to the parties

11   that included as final language the parties' agreement that Defendants waived any argument

12   that their allowed claim should be treated as Senior Indebtedness under the Senior Note

13   Indenture.  Attached hereto as Exhibit 9 is a true and correct copy of the email (with Intel

14   confidential information redacted), with Bates Numbers PWSP 00001.337 to PWSP

15   00001.357, sent by Mr. Barron on June 16, 2006, to me, Mr. Kevane, Mr. Johnson, and

16   others attaching the June 16 redlined draft settlement agreement.  The June 16 redlined

17   draft settlement agreement included as final language in Section 2, "Allowed Claim," that

18   "Claimants and the Debtor agree that the Allowed Claim is not, and shall not be treated as,

19   'Senior Indebtedness' under the terms of Debtor's Indenture, dated as of April 22, 2002, for

20   the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005," (at PWSP

21   00001.341-342).  This language was no longer underscored in the redline draft indicating

22   that the parties had agreed to it at the June 1 meeting.

23       25.    Following the June 16, 2006 settlement meeting, the parties continued to

24   revise language in the settlement agreement concerning the releases and the transfer of the

25   GCB intellectual property and records, but not the language waiving treatment of the

26   allowed claim as "Senior Indebtedness."  Thus, this language on "Senior Indebtedness" was

27   finalized more than two months before the date on which I understand that Mr. Bennett

28   called Craig Barbarosh of Pillsbury to discuss a claim by the Senior Noteholders against

14

1    Pillsbury, which is August 24, 2006.  At the time that we negotiated the settlement

2    agreement language concerning Defendants' allowed claim and the waiver of treatment as

3    "Senior Indebtedness," I did not know of a possible or actual claim by the Senior

4    Noteholders against Pillsbury based on the opinion given by Pillsbury under the Senior

5    Note Indenture.  There is no merit to the claim that the language waiving treatment of

6    Defendants' allowed claim as "Senior Indebtedness" was included because of a concern

7    over a possible or actual claim by the Senior Noteholders against Pillsbury or possible

8    indemnity liability of Pillsbury to the Senior Noteholders for any shortfall in their recovery

9    in the bankruptcy.

10        I declare under penalty of perjury under the laws of the United States of America

11    that the foregoing is true and correct.

12        Executed this 5th day of March 2007, at San Francisco, California.

13

                                /s/ Albert J. Boro, Jr.

14                                Albert J. Boro, Jr.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALBERT J. BORO, JR.
Case No.C-03-51775

# EXHIBIT 1

| From: | Loran, Thomas V. |
|---|---|
| Sent: | Monday, October 18, 2004 4:09 PM |
| To: | 'Eberhart, David'; Uhland, Suzzanne; BennettB@hbdlawyers.com; MorseJ@hbdlawyers.com; CMR ; Marcus Smith; David Gershon; 'dgershon@yahoo.com'; Barron, Austin |
| Cc: | Boro, Albert J.; Catz, Jason A. |
| Subject: | SONICblue - VIA/JV Claims Analysis (Non-Intel Claims) |
| | |
| Attachments: | 10826987_1.XLS |

As discussed during the last conference call, we have undertaken an analysis of the VIA/JV claims other than those related to the Intel license. The analysis, which is attached, was based on all presently available documentation (apart from the electronic records, which we have obtained but have not yet been asked to review). We focused in particular, however, on the records retained by David Gershon in connection with the pre-bankruptcy negotiations with VIA.

Our analysis of the pre-bankruptcy settlement documents and our review of SONICblue documents to date shows that David's recollection was correct that the parties were discussing settlement numbers in the range of $5 million, not the $30 to $40 million number that the bankruptcy Claims filed by VIA and JV suggest. Also, there is substantial documentary evidence supporting counterclaims against VIA/JV in the amount of $16.5 million. When you net SB's counterclaims against the VIA/JV claims, you get a net valuation of $6.8 million, giving effect to the damages cap. If the Contributed Assets Claim (Claim 7) is completely bogus, then you get a net valuation of $3.3 million.

Please let me know if you have any questions.

Tom


10826987_1.XLS
(17 KB)

1



SONICblu

(Based on review of

| VIA/JV Claim No. | Short Name |
| --- | --- |
| *VIA/JV Claims Subject To Damages Cap* | Claims Entirely Subject to Damages Cap |
| 1 | Overdue Payables |
| 2 | Discounted Receivables |
| 3 | Wrong Bonded Parts |
| 5 | RMA Credits |
| **Subtotal** | |
| *VIA/JV Claims Also Affected By Damages Cap* | |
| 7 | Contributed Assets |
| **Subtotal** | |
| *VIA/JV Claims Not Subject To Damages Cap* | |
| 3 | Wrong Bonded Parts |

| | | |
|---|---|---|
| Joint Defense Privilege/Confidential Settlement Document | | |
| e/VIA-JV CLAIMS ANALYSIS (FOR NON-INTEL CLAI | | |
| SB documents to date and analysis of pre-bankruptcy settlement discuss | | |
| **VIA/JV Claim Valuation**\*\* | **Pre-BK Settlement Valuation** | **Current SB Valuation** |
| $11,198,560.00 | $11,198,560.00 | $11,198,560.00 |
| $2,220,621.35 | $2,220,621.35 | $2,220,621.35 |
| $933,380.00 | $0.00 | $0.00 |
| $1,139,680.08 | $1,139,680.08 | $1,139,680.08 |
| $15,492,241.43 | $5,554,544.00 | $5,554,544.00 |
| $12,686,270.45 | $7,131,726.45 | $3,565,863.23 |
| $12,686,270.45 | $7,131,726.45 | $3,565,863.23 |
| $907,416.74 | $907,416.74 | $907,416.74 |

| | F |
|---|---|
| 1 | |
| | MS)* |
| 2 | |
| 3 | ions with VIA) |
| 4 | **Notes** |
| 5 | |
| 6 | Entire Amount Subject to Cap |
| 7 | Entire Amount Subject to Cap |
| 8 | VIA admitted in its Sept. 20, 2002 Arbitration Demand that $933,308 of the $1,840,796.74 Claim 3 was subject to the damages cap because they involved some of the same invoices subject to the overdue payables claim.  Thus, VIA seems to have double counted these invoices. |
| 9 | Entire Amount Subject to Cap |
| 10 | Amount of Damages Cap |
| 11 | |
| 12 | Every dollar paid under the damages cap results in a dollar-for-dollar reduction of this claim.  See January 3, 2001 Side Letter at ¶ 8.  So, if we assume that SB  pays the full $5,554,544 amount of the damages cap, the maximum value of this claim is $7,131,726.45.  For the SB current valuation, we have reduced the net value of Claim 7 by 50 percent because we believe that SB has strong arguments that VIA and JV suffered no damages on account of this claim and the claimed damages are the result of accounting entries such as depreciation or are for assets that were no longer employed in the GCB at the time of closing. |
| 13 | |
| 14 | |
| 15 | VIA's alleged claim for the Wrong Bonded Parts is $1,840,796.74; however, because it has admitted that $933,380 of these charges are associated with invoices included in its Overdue Payables Claims, the value of the claim is at most $907,416.74. |

| | | |
|---|---|---|
| 16 | 4 | Non-inventory Parts (Sales Commissions and Marketing Development Funds) |
| 17 | 6 | Unapproved Purchase |
| 18 | 8 | Conversion of Accounts Receivable |
| 19 | 9 | Pre-Closing Employee Liabilities |
| 20 | | *Subtotal* |
| 21 | | TOTAL |
| 22 | **SONICblue Claims** | **Short Name** |
| 23 | | Samsung Assumed Liabilities |
| 24 | | UMC Assumed Liabilities |
| 25 | | Agilent Assumed Liabilities |

| | B | D | E |
|---|---|---|---|
| 16 | $625,988.00 | $625,988.00 | $625,988.00 |
| 17 | $423,300.00 | $0.00 | $0.00 |
| 18 | $12,837,595.93 | $12,624,851.24 | $12,624,851.24 |
| 19 | $82,637.00 | $82,637.00 | $82,637.00 |
| 20 | $13,969,520.93 | $14,240,892.98 | $14,240,892.98 |
| 21 | $42,148,032.81 | $26,927,163.43 | $23,361,300.21 |
| 22 | VIA Valuation | Pre-BK Settlement Valuation | Current SB Valuation |
| 23 | | $5,188,870.60 | $5,188,852.60 |
| 24 | | $7,604,435.00 | $2,016,460.00 |
| 25 | | $913,050.00 | $913,050.00 |

PWSP 08498

| | F |
|---|---|
| 16 | Represented in settlement related documents as "Sales Commission"; see January 3, 2001 side letter ¶ 6 where SB agrees to assume this amount for sales commission liabilities. |
| 17 | VIA has admitted in its bankruptcy claim that this purchase was cancelled, and it never paid any money due to this cancelled purchase. |
| 18 | It has not yet been determined what accounts for the difference between VIA's and SB's number on the accounts receivable. The accounts receivable claim is offset by payments made by SB to UMC and Samsung related in the GCB, as alleged in SB Claim No. 1 |
| 19 | |
| 20 | |
| 21 | |
| 22 | **Notes** |
| 23 | $5,188,852.60 of the Samsung payments were for invoices less than 30 days old at the time of closing. The other $18.00 was for an invoice less than 45 days old. Also, the Samsung and UMC assumed liabilities were mostly paid for with the accounts receivables withheld by SB and which VIA now seeks to recover in VIA Claim No. 8. Thus, the Samsung/UMC payments and VIA Claim No. 8 offset one another. However, the payments made to Samsung and UMC exceed SB's valuation of the accounts receivable withheld from VIA by $168,454.36. |
| 24 | $2,016,460.00 of the UMC payments were for invoices 30-45 days old at the time of closing. $3,198,050.00 of the UMC payments were for invoices 46-60 days old. $2,389,925.00 of the UMC payments were for invoices 61-75 days old. |
| 25 | We settled for this total amount. However, the amount reflected in the July 19, 2001 settlement memo to K. Potashner from VIA and confirmed by the 9/19/01 DeMera spreadsheet was $428,629. We are still investigating the discrepancy between the two numbers. |

| | | |
|---|---|---|
| 26 | | Safeco Assumed Liabilities |
| 27 | | Siliconware Assumed Liabilities |
| 28 | | Other Expenses Paid by SB for GCB |
| 29 | | Other Expenses Billed to but not paid by the GCB |
| 30 | | TOTAL |
| 31 | Net Value of VIA/JV and SB Claims | |
| 32 | | TOTAL |
| 33 | * This chart does not analyze the value of VIA Claims 10-17, which seek specific performance over information regarding the transfer of licenses (Claim 12), failure to provide audited finan trademarks (Claim 17). The chart also does not evaluate the Intel License Claim (Claim 18). | |
| 34 | ** The "VIA Valuations" column assumes that the damages cap is invalid and simply is the su | |

PWSP 08500

| | | D | E |
|---|---|---|---|
| | | $1,197,543.14 | $1,197,543.14 |
| 26 | | | |
| 27 | | $530,000.00 | $530,000.00 |
| 28 | | $5,751,166.57 | $5,751,166.57 |
| 29 | | $925,923.64 | $925,923.64 |
| 30 | | $22,110,988.95 | $16,522,995.95 |
| | **Assuming VIA Valuations** | **Assuming Pre-BK Settlement Valuations** | **Assuming Current SB Valuations** |
| 31 | | | |
| 32 | $20,037,043.86 | $4,816,174.48 | $6,838,304.26 |
| 33 | . The VIA claims seeking specific performance include: Failure to execu cial statements (Claim 13), failure to provide certain employee files (Clair | | |
| 34 | m of all of VIA's claims. | | |

| | F |
|---|---|
| 26 | We settled for this total amount. However, the amount reflected in the July 19, 2001 settlement memo to K. Potashner from VIA and confirmed by the 9/19/01 DeMera spreadsheet was $999,465.28.    We are still investigating the discrepancy between the two numbers. |
| 27 | We settled for this amount. The actual value of invoices reflected in the DeMera binders was $528,805. |
| 28 | Includes Rent ($1.4 million), sublet credits and expenses, payroll expenses, telephone charges, credit cards, other bills incurred by VIA/JV in 2001. |
| 29 | This figure includes the Mentor Graphics claim ($195,449) filed prior to and stayed by the bankruptcy proceeding, and other unpaid items billed to SB in DeMera spreadsheet and binders. |
| 30 | |
| 31 | |
| 32 | |
| 33 | ite patent assignments (Claim 10), failure to turn over IP files (Claim 11) failure to turn n 14), failure to turn over data tapes (Claim 15), and failure to assign certain |
| 34 | |

# EXHIBIT 2

| From: | Slizewski, Edward J. [Edward.Slizewski@hellerehrman.com] |
|---|---|
| Sent: | Monday, September 12, 2005 4:47 PM |
| To: | Loran, Thomas V.; Boro, Jr., Albert J. |
| Cc: | hkevane@pszyjw.com; Orton Luther (E-mail); MRees@wsgr.com; Moore, Alfred D.; Lawrence, Michael J |
| Subject: | VIA/SONICblue Bankruptcy Settlement Term Sheet (9/12/05 version ) |
| Attachments: | VIA/SONICblue Bankruptcy Settlement Term Sheet ( 9/12/05 version).DOC |

VIA_SONICblue
Bankruptcy Settl...
      Tom and Al:

Attached is the proposed settlement term sheet we have previously discussed, which is coming a bit later today than promised because of the power outages in LA. We hope to follow up with regard to the representative capacity issue (which is listed as item no. 4 on the attached Term Sheet) tomorrow

As this email and the attachment constitute an offer to compromise a disputed claim, they are confidential and privileged under applicable law. Until a mutually-agreeable settlement agreement is executed. VIA and S3 Graphics reserve all of their rights, remedies and defenses .

Henry, Luther and I look forward to seeing you Thursday at 1 pm at your offices in SF.

Regards

Ed

<<VIA/SONICblue Bankruptcy Settlement Term Sheet (9/12/05 version).DOC>>
**Edward J. Slizewski** | Attorney | **HellerEhrman**LLP | 601 South Figueroa Street, 40th Floor | Los Angeles, CA 90017
tel: +1.213.689.7570 | fax: +1.213.244.7670 | email: ed.slizewski@hellerehrman.com | web: www.hellerehrman.com

The information contained in this email message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please notify the sender by reply email and delete the message and any attachments.

PWSP 14395

*CONFIDENTIAL SETTLEMENT COMMUNICATION - F.R.E. 408*

## Settlement Proposal from VIA Technologies, Inc. and S3 Graphics Co., Ltd.

*SONICblue Inc. v. VIA Technologies, Inc., et al.*
U.S. Bankruptcy Court, N.D. Cal., Adv. Proc. No. 04-5556

*This settlement proposal is made pursuant to Rule 408 of the Federal Rules of Evidence. This proposal shall remain confidential, and is inadmissible to prove liability for or invalidity of the parties' claim or their amounts. In addition, all conduct or statements made as part of any settlement negotiations shall remain confidential and are inadmissible.*

### General Statement

The objective of the proposed settlement is to fully resolve any and all claims that now exist, or could in the future exist, based on, related to or arising out of the transaction contemplated in the Amended and Restated Investment Agreement and the various amendments and agreements made in furtherance of that transaction, *e.g.*, the Joint Venture Agreement (collectively, the "Agreements"). To use a crude analogy, the settlement represents a "divorce" that allows VIA Technologies, Inc. and S3 Graphics Co. Ltd. (collectively, "Claimants") to move on without any further obligation or liability to SONICblue, Inc. ("Debtor") and for the Debtor to complete its liquidation without any further obligation or liability to Claimants. Thus, the terms of the Settlement Agreement would supersede and be controlling over anything to the contrary in the Agreements.

The general framework is as follows, although any resolution would require court approval and a written settlement agreement that includes the following terms:

1.    Claimants shall hold an allowed, general unsecured claim in the Chapter 11 case of SONICblue Inc. in the amount of $27.5 million (the "Allowed Claim"). The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants. The Allowed Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including any proof of claim.

2.    Debtor, on its own behalf and on behalf of its subsidiaries and affiliates, on the one hand, and Claimants, on behalf of their subsidiaries and affiliates, on the other hand, shall execute a mutual, general release of any and all claims or interests – whether or not liquidated, vested, known or unknown – among each other arising under or relating to all agreements between the parties, including, without limitation, the Agreements, the Chapter 11 case, or this adversary proceeding. The release would include a waiver of California Civil Code Section 1542 and any similar provision under Delaware law. The adversary proceeding and pending AAA arbitration would be dismissed with prejudice.

3.     Debtor shall use its best efforts to transfer to S3 Graphics Co., Ltd ("S3G") or its designee, the IP transfer documents and other materials in Debtor's possession, custody or control. identified in the Agreements, including, *inter alia*:

- various patents and patent applications listed on Schedule 1 to the Amended Investment Agreement;

- all patents, trademarks, copyrights and other items listed in Schedule 3.14(a)(ii) to the Amended Investment Agreement;

- the various documents necessary to record the trademark assignments;

- all patent, trademark and copyright files and other documents relating to the intellectual property;

- a list of all licensed technology and the underlying licenses that were being utilized in the Graphics Chip Business prior to the January 3, 2001 closing;

- the complete employee files for relevant employees to be identified by VIA (*e.g.*, employees listed as inventor(s) or author(s) on any patent, patent application, or copyright transferred or to be transferred to S3G), including resumes, offer letters, employment agreements, performance reviews, benefits files and immigration files;

- all original data tapes; and

- the executed customer and vendor non-disclosure agreements.



4                                            Redacted as Confidential
Redacted as Confidential         Redacted as Confidential
Cross License ("PCL")                         1998 Intel-SONICblue Patent

Redacted as Confidential

Redacted as Confidential

Redacted as Confidential

2

PWSP 14397



Redacted as Confidential

Redacted as Confidential

3

PWSP 14398

# EXHIBIT 3

| From: | Boro, Albert J. |
|---|---|
| Sent: | Tuesday, September 27, 2005 12:41 PM |
| To: | 'Bruce Bennett'; 'CMR'; 'aew@lnbrb.com'; akearns@kksrr.com; cholland@kksrr.com |
| Cc: | msmith@sonicblue.com; dgershon@yahoo.com; Loran, Thomas V.; Uhland, Suzzanne; Eberhart, David; Barbarosh, Craig A.; Freeman, William |
| Subject: | SONICblue conference call |

| Importance: | High |

| Attachments: | DOC123.PDF |

Joint Defense Privilege/Attorney Work Product/Confidential Settlement Communication

There have been negotiations with VIA and the S3 Graphics entities on a possible settlement of the adversary proceeding, and those discussions have resulted in the attached proposed settlement term sheet. We would like to have a joint defense conference call at 3:30 pm this afternoon to review it and answer any questions. You may also call Tom (O: 415-983-1865), who will be in a meeting from 1 to 3 pm today but is otherwise available, or me (O: 415-983-1436), to go over the proposed term sheet. The call-in number for the 3:30 pm call is:

Dial-in: 1-866-844-4954; Passcode 9553021

Please let us know if you can participate in the call.

Al



DOC123.PDF (634 KB)

Albert J. Boro, Jr.| Pillsbury Winthrop Shaw Pittman LLP|50 Fremont Street | San Francisco | California 94105 | Direct: (415) 983-1436 | Fax: (415) 983-1200 | http://www.pillsburylaw.com | albert.boro@pillsburylaw.com

1

*CONFIDENTIAL SETTLEMENT COMMUNICATION – F.R.E. 408*

## Settlement Term Sheet

This Settlement Term Sheet ("Term Sheet") is entered into as of September 26, 2005, by and between VIA Technologies, Inc. and S3 Graphics Co. Ltd. (collectively, "Claimants"), on the one hand, and SONICblue, Inc. ("Debtor"), on the other hand.

WHEREAS, Claimants have submitted proofs of claim in Debtor's bankruptcy proceeding and whereas Claimants and Debtor are parties to an adversary proceeding entitled *SONICblue Inc. v. VIA Technologies, Inc., et al.* U.S. Bankruptcy Court, N.D. Cal., Adv. Proc. No. 04-5556;

WHEREAS, the parties have agreed to fully resolve any and all claims that now exist, or could in the future exist, based on, related to or arising out of the transaction contemplated in the Amended and Restated Investment Agreement and the various amendments and agreements made in furtherance of that transaction, *e.g.*, the Joint Venture Agreement (collectively, the "Agreements").

WHEREAS, the parties intend that the settlement allow Claimants to move on without any further obligation or liability to Debtor and for the Debtor to complete its liquidation without any further obligation or liability to Claimants.

IT IS AGREED as follows:

1.     This term sheet constitutes a settlement in principle among the parties and is a binding agreement to settle their disputes on the terms set forth herein upon the satisfaction of the conditions to the settlement. The parties intend, upon satisfying the conditions described below, that the settlement contained herein will be documented in the form of an agreement reasonably acceptable to the parties (the "Settlement Agreement"), the terms of which would supersede and be controlling over anything to the contrary in the Agreements.

2.     The validity and enforceability of the Settlement Agreement shall be subject to court approval.

3.     The Settlement Agreement shall include the following terms:

    a.     Claimants shall jointly hold a single, allowed general unsecured claim in the Chapter 11 case of SONICblue Inc., which claim shall be afforded the benefits and priority of SONICblue's other allowed general unsecured claims and shall be neither senior nor junior to any other allowed general unsecured claim, in the amount of $12.5 million, representing a compromise of the claims that have been asserted by the Claimants for damages and other relief based, *inter alia*, on alleged breaches of the Agreements, including, without

limitation, liquidated damages for the alleged breach of section 5.6 thereof (the "Allowed Claim"). The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants. The Allowed Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including any proof of claim.

b.  As of the effective date of the settlement, SONICblue, on behalf of itself and its affiliates, subsidiaries, successors, and assigns, on the one hand, and VIA, S3 Graphics Co., Ltd., and S3 Graphics, Inc., each on behalf of themselves and their respective affiliates, subsidiaries and affiliates, successors, and assigns, on the other hand, shall release, acquit and forever discharge the other group of parties, and each of their respective past and present representatives, officers, directors, employees, agents, partners, co-venturers, insurers, accountants, attorneys, affiliates, subsidiaries, predecessors, successors and assigns, from and against any and all claims, counterclaims, demands, liabilities, cause s of action, defenses, damages, duties or obligations -- whether asserted on an individual, representative, or derivative basis, whether known or unknown, suspected or unsuspected, fixed or contingent, accrued or not yet accrued -- that each now has, has had, or may have based on events and acts or omissions occurring on or before the effective date of the settlement, including, but not limited to, any and all claims or interests arising under or relating to all agreements between the parties, including, without limitation, the Agreements, the Chapter 11 case, this adversary proceeding or the PCL (as defined below). The release would include a waiver of California Civil Code Section 1542 and any similar provision under Delaware law. The adversary proceeding would be dismissed with prejudice and without costs to either party. To avoid confusion, the release shall include a mutual general release and waiver of any and all rights and obligations under the Class A Option Shares Agreement, which agreement shall be deemed terminated automatically upon court approval of the Settlement Agreement.

c.  The Debtor shall use its best efforts to transfer to S3 Graphics Co., Ltd. ("S3G") or its designee, the IP transfer documents and other IP materials that currently remain in the Debtor's possession, and are reasonably available, and were to be contributed pursuant to the Agreements and to execute any related IP transfer documents as

2

identified in a schedule to be prepared by Claimants and the Debtor, including, *inter alia*:

- various patents and patent applications listed on Schedule 1 to the Bill of Sale;

- all patents, trademarks, copyrights and other items listed in Schedule 3.14(a)(ii) to the Amended Investment Agreement (the "Transferred Intellectual Property");

- the various documents necessary to record the trademark assignments;

- all patent, trademark and copyright files and other documents relating to the Transferred Intellectual Property;

- a list of all licensed technology and the underlying licenses that were being utilized in the Graphics Chip Business prior to the January 3, 2001 closing;

- the complete employee files for relevant employees to be identified by VIA (*e.g.*, employees listed as inventor(s) or author(s) on any patent, patent application, or copyright transferred or to be transferred to S3G), including resumes, offer letters, employment agreements, performance reviews, benefits files and immigration files to the extent permitted by the Bankruptcy Court in light of employee privacy rights;

- all original data tapes to the extent the same may be located after a reasonable search; and

- the executed customer and vendor non-disclosure agreements to the extent the same may be located after a reasonable search.

4.    The parties agree that the settlement contained herein is conditioned on the satisfaction of the following regarding the 1998 Intel-SONICblue Patent Cross License ("PCL"):

a.

Redacted as Confidential

b.

3

c.



Redacted as Confidential

5.    The Debtor shall maintain its ownership of Sonica3, Inc., provided that Debtor shall transfer or cause to be transferred to VIA or its designee for no further

4

PWSP 00001.257

consideration all Class A shares of S3 Graphics Co., Ltd., held by Sonica3, Inc. (or other party) within ten business days of Court approval of the Settlement Agreement.

6.    The parties agree to proceed to attempt to satisfy the conditions of the settlement on the terms set forth herein in good faith. and upon reaching an agreement in principle with Intel that satisfies the conditions in Paragraph 4, to negotiate the definitive Settlement Agreement in good faith.

7.    This term sheet is a settlement communication pursuant to Rule 408 of the Federal Rules of Evidence. This term sheet shall remain confidential, and is inadmissible to prove liability for or invalidity of the parties' claim or their amounts. In addition, all conduct or statements made as part of any settlement negotiations shall remain confidential and are inadmissible; (a) provided that SONICblue may disclose the terms of this settlement term sheet to Intel in connection with its negotiations with Intel and (b) provided further (i) that SONICblue shall consult with Claimants before approaching Intel regarding Intel's providing the Release, (ii) that SONICblue shall report promptly to Claimants the substance of all communications with Intel concerning the Release, except that SONICblue shall have no such obligation under this subparagraph (ii) if Intel demands confidentiality of the parties' settlement discussions, which demand SONICblue shall neither solicit nor attempt to procure, and (iii) that SONICblue shall involve representatives of Claimants in such communications with Intel, if, in SONICblue's sole discretion exercised in good faith, SONICblue believes such involvement would assist in satisfaction of the conditions set forth in paragraph 4. Notwithstanding the foregoing, this Term Sheet remains a valid and binding agreement.

SONICblue, Inc.

By:    Marcus Smith
Its:    Responsible Person

VIA Technologies, Inc.

By:    _____
Its:    _____

5

PWSP 00001.258

S3 Graphics Co. Ltd.


By: _____
Its: _____



S3 Graphics, Inc.


By: _____
Its: _____

6

*PWSP* 00001.259

# EXHIBIT 4

**Boro, Jr., Albert J.**

| | |
|---|---|
| **From:** | Barron, Austin [Abarron@OMM.com] |
| **Sent:** | Wednesday, January 25, 2006 4:03 PM |
| **To:** | Boro, Jr., Albert J.; Johnson, Steven J.; Edward.Slizewski@hellerehrman.com |
| **Cc:** | Uhland, Suzzanne; Eberhart, David; Loran, Thomas V.; Marcus Smith; David Gershon |
| **Subject:** | SONICblue settlement agreement |

**Attachments:**    sonicblue intel via global settlement agreement_v4.DOC



sonicblue intel via
global set...
                All-

Attached please find a draft of the Intel/VIA Settlement Agreement.  We
have stepped it up from a term sheet form to a full settlement agreement
form to get this a little closer to moving across the line, and this draft
also reflects a few comments and clarifications developed in that process.
We look forward to your thoughts.

Austin K. Barron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071
Tel:  (213) 430-6425
Fax:  (213) 430-6407
abarron@omm.com

1

PWSP 00001.297

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is made effective as of the Effective Date (as defined below) by and among VIA Technologies, Inc. ("VIA"), S3 Graphics Co. Ltd. ("S3G Co." and, together with VIA, "Claimants"), S3 Graphics, Inc. ("S3G Inc."), S3-VIA, Inc. ("S3-VIA"), Intel Corporation ("Intel"), and SONICblue, Inc. ("Debtor").

## RECITALS

WHEREAS, on March 21, 2003 (the "Petition Date"), Debtor filed a voluntary petition for bankruptcy protection under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Bankruptcy Court"), Case No. 03-51775 (the "Bankruptcy Case").

WHEREAS, prior to the Petition Date, VIA and Debtor entered into a certain written agreement dated _____ (the "Initial Investment Agreement"), pursuant to which S3-VIA was formed.

WHEREAS, prior to the Petition Date, VIA and Debtor entered into a certain written investment agreement, dated April 10, 2000 (the "Investment Agreement"), and VIA and Debtor amended and restated their agreements and obligations in the Investment Agreement on the terms set forth in an Amended and Restated Investment Agreement, dated August 28, 2000 (together with the various amendments and agreements made in furtherance thereof collectively referred to herein as the "Amended and Restated Investment Agreement").

WHEREAS, pursuant to the Amended and Restated Investment Agreement, S3G Co. and S3G Inc. were formed and Debtor contributed specified assets of its computer graphics chip

1

business (the "Graphics Chip Business") to S3G Co., which assets were then further contributed to S3G Inc.

WHEREAS, S3G Inc. is a wholly-owned subsidiary of S3G Co.

WHEREAS, prior to the Petition Date, Intel and Debtor entered into an Agreement dated [December 16, 1998] (the "License Agreement"), pursuant to which each of Intel and Debtor licensed to the other certain intellectual property.

WHEREAS, VIA and Intel entered a written Settlement Agreement dated as of April __, 2003 (the "VIA/Intel Settlement Agreement")), pursuant to which VIA and Intel exchanged certain releases.

WHEREAS, on June 6, 2003, Intel filed a motion in the Bankruptcy Court seeking relief from the automatic stay imposed by 11 U.S.C. § 362 in order to terminate the License Agreement, and on May 13, 2004 Intel filed a renewed motion seeking the same relief (collectively, the "Stay Motion").

WHEREAS, on July 17, 2003, Claimants filed duplicate proofs of claim in the Bankruptcy Case (the "Claimants' Proofs of Claim").

[WHEREAS, on _____, Intel filed a proof of claim in the Bankruptcy Case (the "Intel Proof of Claim").]

WHEREAS, on December 17, 2004, Debtor filed a motion in the Bankruptcy Court seeking to assume the License Agreement pursuant to 11 U.S.C. § 365 (the "Assumption Motion").

WHEREAS, on December 21, 2004, Debtor commenced an adversary proceeding in the Bankruptcy Court against Claimants and S3G Inc., Case No. 04-05556 (the "Adversary Proceeding").

PWSP 00001.299

WHEREAS the parties have engaged in good faith settlement negotiations to resolve actual and potential disputes relating to the foregoing and otherwise.

WHEREAS, given the breadth and complexity of the parties' disputes, as well as the numerous and contested legal and factual issues that would be involved in resolving them, and in order to avoid the costs and risks of litigation, the parties have agreed to enter into this global settlement.

WHEREAS, the parties have carefully considered the terms of this Agreement and, after having had the opportunity to consult with their respective attorneys, are satisfied that it is fair and reasonable.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

Subject in each case to the effectiveness of this Agreement on the terms and conditions set forth herein, the undersigned hereby agree as follows:

## Administrative Matters

1.    Proceedings Dismissed.    Subject to entry of the Approval Order and the effectiveness of this Agreement, the Stay Motion and the Assumption Motion shall be, and shall be deemed to be, withdrawn with prejudice, and Debtor shall dismiss, with prejudice and without costs to any party, the Adversary Proceeding (including any motions or proceedings pending within the Adversary Proceeding).

3

2.    Allowed Claim.  Claimants shall jointly hold a single, allowed general unsecured claim in the Bankruptcy Case, which claim shall be afforded the benefits and priority of Debtor's other allowed general unsecured claims and shall be neither senior nor junior to any other allowed general unsecured claim, in the amount of $12.5 million ($12,500,000), representing a compromise of the claims that have been asserted by the Claimants for damages and other relief based, inter alia, on alleged breaches of the Amended and Restated Investment Agreement, including, without limitation, liquidated damages for the alleged breach of section 5.6 thereof (the "Allowed Claim").  The allocation of the Allowed Claim as between the Claimants shall be at the sole discretion of Claimants.  The Allowed Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including any proof of claim.

3.    Filed Proofs of Claim Disallowed.  Subject to the allowance in full of the Allowed Claim, the Claimants' Proofs of Claim shall be deemed withdrawn and disallowed with prejudice.    [[The Intel Proof of Claim    REDACTED AS
CONFIDENTIAL

## Intellectual Property Matters

4.    Transfer of Intellectual Property to S3G Co.  Debtor shall use its commercially reasonable best efforts (i) to transfer to S3G Co. or its designee, the intellectual property related to or used in the Graphics Chip Business that currently remains in Debtor's possession, is reasonably available and was to be contributed pursuant to the Amended and Restated Investment Agreement (the "Transferred Intellectual Property"), and (ii) to execute any transfer documents related to the Transferred Intellectual Property, as identified in the attached Schedule

4

of Transferred Intellectual Property prepared by Claimants and Debtor, including, without limitation, the following items:

a.　All patents and patent applications listed on Schedule 1 to the Bill of Sale (as defined in the Amended and Restated Investment Agreement) and patents, trademarks, copyrights and other items listed in Schedule 3.14(a)(ii) to the Amended and Restated Investment Agreement that remain in Debtor's possession and are reasonably available.  Pursuant to Section 6(b) of this Agreement, the

REDACTED AS
CONFIDENTIAL

b.　The various documents necessary to record the trademark assignments.

c.　All patent, trademark and copyright files and other documents relating to the Transferred Intellectual Property.

d.　A list of all licensed technology and the underlying licenses that were being utilized in the Graphics Chip Business prior to the January 3, 2001 closing.

e.　The complete employee files for relevant employees to be identified by VIA (*e.g.*, employees listed as inventor(s) or author(s) on any patent, patent application, or copyright transferred or to be transferred to S3G Co.), including resumes, offer letters, employment agreements, performance reviews, benefits files and immigration files to the extent permitted by the Bankruptcy Court in light of employee privacy rights.

PWSP 00001.302

    f.      All original data tapes to the extent the same may be located after a reasonable search.

    g.      The executed customer and vendor non-disclosure agreements to the extent the same may be located after a reasonable search.

    5.      <u>Claimants' Expense</u>.    Claimants shall reimburse Debtor for its reasonable expenses incurred in locating and transferring the Transferred Intellectual Property, shall prepare drafts of any documents needed to effectuate the transfer (subject to revisions by the parties), and shall reimburse Debtor for reasonable filing fees and costs incurred to preserve the status of the Transferred Intellectual Property pending its transfer or to transfer the Transferred Intellectual Property to S3G Co. or its designee.

    6.      <u>License Agreement</u>

    a.

REDACTED AS CONFIDENTIAL

**REDACTED AS
CONFIDENTIAL**

    b.

REDACTED AS
CONFIDENTIAL

7.    Consent

REDACTED AS
CONFIDENTIAL

License Agreement

8.    VIA/Intel Settlement Agreement

REDACTED AS
CONFIDENTIAL

9.    Transfer of Class A Shares of S3G Co..  Debtor shall transfer or cause to be transferred to VIA or its designee for no further consideration all Class A Common Shares of S3G Co. held by Sonica3, Inc. (or other party) within ten business days after the Effective Date. The "Class A Shares Option Agreement," between Debtor and VIA, dated as of January 3, 2001, shall be deemed terminated upon the Effective Date.

PWSP 00001.304

10.    REDACTED AS CONFIDENTIAL    Subsidiaries.

VIA/Intel Settlement Agreement

REDACTED AS
CONFIDENTIAL

## Releases

11.    Releases between Debtor and VIA, S3G Co., S3G Inc. and S3-VIA. As of the

Effective Date, Debtor, on behalf of itself and its affiliates, subsidiaries, successors, and assigns,

on the one hand, and VIA, S3G Co., S3G Inc. and S3-VIA, each on behalf of themselves and

their respective affiliates, subsidiaries and affiliates, successors, and assigns, on the other hand,

shall release, acquit and forever discharge the other group of parties, and each of their respective

past and present representatives, trustees, officers, directors, employees, agents, partners, co-

venturers, insurers, accountants, attorneys, affiliates, subsidiaries, predecessors, successors and

assigns, from and against any and all claims, counterclaims, demands, liabilities, causes of

action, defenses, damages, expenses (including, but not limited to, attorneys' fees and costs),

PWSP 00001.305

duties or obligations – whether asserted on an individual, representative, or derivative basis, whether known or unknown, suspected or unsuspected, fixed or contingent, accrued or not yet accrued – that each now has, has had, or may at any time have based on events and acts or omissions occurring on or before the Effective Date, including, but not limited to, the Chapter 11 Case, the Adversary Proceeding, any and all claims for indemnity or contribution arising from or based on acts occurring on or before the Effective Date, and/or any and all claims or interests arising under or relating to all agreements between each group of the parties, including, without limitation, the Initial Investment Agreement, the Investment Agreement, the Amended and Restated Investment Agreement, the Adversary Proceeding and/or License Agreement. To avoid confusion, the foregoing release shall include a mutual general release and waiver of any and all rights and obligations under the Class A Option Shares Agreement

    12.    <u>Releases between Debtor and Intel</u>.

REDACTED AS CONFIDENTIAL

PWSP 00001.306

REDACTED AS
CONFIDENTIAL

13.    <u>Release by Intel</u>

REDACTED AS
CONFIDENTIAL

PWSP 00001.307

REDACTED AS
CONFIDENTIAL

14.    Release ¯   REDACTED AS
         CONFIDENTIAL   of Intel.

REDACTED AS
CONFIDENTIAL

REDACTED AS
CONFIDENTIAL

## Miscellaneous

15.    <u>Motion to Approve</u>.  Debtor shall file and prosecute a motion seeking approval of this Agreement by the Bankruptcy Court, and the parties hereto shall cooperate in efforts to ensure that such motion is approved forthwith.

16.    <u>Each Party to Bear Own Costs</u>.  Except as provided for in Section 5 of this Agreement, each party hereto shall bear its own costs and expenses (including, but not limited to, attorneys' fees) in connection with the negotiation, execution, and obtaining of Court approval of this Agreement, and all matters addressed, settled or released hereby.

17.    Waiver of Statutory Limitation on General Releases.  With respect to the matters released hereby, each of the parties hereto, for itself and on behalf of any other party on whose behalf it acts hereunder, hereby waives and relinquishes any and all rights which they or any of them may have under the provisions of § 1542 of the Civil Code of the State of California, or any analogous provision under state or federal law, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

18.    Court Approval Required.  This Agreement, and each and every covenant and agreement herein, is subject to, and conditioned upon, the entry of a final and non-appealable order of the Bankruptcy Court, or another court of competent jurisdiction, approving the Agreement and Debtor's entry into and performance hereunder in its entirety (the "Approval Order").  If, for any reason, the Approval Order is not entered or the Approval Order is later overturned or vacated, this Agreement shall be deemed null and void and of no effect.  The date of entry of the Approval Order on the docket of the Bankruptcy Court is referred to herein is the "Effective Date."

19.    No Admission of Liability.  The parties hereto each acknowledge that this Agreement is a compromise of disputed rights and claims among the parties and that it shall not be construed as an admission of any liability by any party hereto.

20.    Due Authority.  Each person signing this Agreement, including but not limited to any person signing as counsel for a party, hereby represents and warrants that he or she has been duly authorized and has the requisite authority to execute and deliver this Agreement on behalf of such party and to bind his or her employer, principal or respective client to the terms and conditions of this Agreement.

21.    Due Investigation.  The parties acknowledge that, in making this Agreement, they rely entirely upon their own judgment, beliefs and interest and, where applicable, the advice of their own counsel and that they each have had a reasonable period of time to consider this Agreement.

22.    Drafting of Agreement.  The parties agree that each party and, where applicable, its counsel have reviewed this Agreement, and that each fully understands and voluntarily accepts all the provisions contained in this Agreement.  The parties further agree that this Agreement was the product of negotiations between the parties and that any rule of construction requiring that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement.  The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the parties.

23.    Integrated Agreement.  This Agreement is an integrated document that sets forth the entire agreement between the parties, and it supersedes any and all prior agreements, promises, representations and understandings, whether written or oral, between or among the parties pertaining to the subject matter hereof.

24.    Amendments.  No modification or amendment of this Agreement shall be binding or enforceable unless in writing and signed by all of the parties to the modification or amendment.

25.    Successors and Assigns.  This Agreement shall be binding only upon, and only inure to the benefit of, the parties and their respective heirs, executors, successors, administrators and assigns.

26.    Choice of Law, Jurisdiction.  This Agreement shall be interpreted and construed in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of the State of California, without giving effect to California's rules regarding conflict of laws. The Bankruptcy Court shall have jurisdiction over any and all disputes, controversies, claims or other matters arising under or otherwise relating to this Agreement.

27.    Headings.  The headings of sections and paragraphs in this Agreement have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Agreement, or be used in any manner in the interpretation of this Agreement.

28.    Counterparts.  This Agreement may be executed in one or more counterparts, including by facsimile, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

29.    Further Assurances.  The parties shall execute and deliver all documents and perform all further acts that may reasonably be necessary to effectuate the provisions and purpose of the Agreement

| SONICblue, Inc. | Dated: January ___, 2006<br><br><br><br>By: _____ |
| Intel Corporation | Dated: January ___, 2006<br><br><br><br>By: _____ |
| VIA Technologies, Inc. | Dated: January ___, 2006<br><br><br><br>By: _____ |
| S3 Graphics Co. Ltd. | Dated: January ___, 2006<br><br><br><br>By: _____ |
| S3 Graphics, Inc. | Dated: January ___, 2006<br><br><br><br>By: _____ |
| S3-VIA, Inc. | Dated: January ___, 2006<br><br><br><br>By: _____ |

# EXHIBIT 5

Johnny,

I want to make sure that we are on the same page in terms of the settlement agreement. This is what we believe we agreed to at the last meeting.

- SONICblue would waive all amounts due from S3G or Via with regard to the $6.1M in facility, payroll, communications, and other expenses from January through 9/9/01 that have been invoiced or presented.
- SONICblue would pay an additional $2.1M in liquidated damages.
- SONICblue will retain liability for the Safeco and Agilent leases. Any equipment related to those leases will be returned to us. SONICblue will also retain liability for NASSDA, Hypa Creative, and Concentric.
- The $12.7M in receivables that were used to pay outstanding payables will not be returned.
- Via and S3G will be released from any liability to the payables that have already been paid by SONICblue
- S3 Graphics or Via will pay or show that SONICblue's liability has been released for all remaining disputed liabilities including the remaining balance due to UMC, the amounts due to Cadence, Mentor, Simplex, Phoenix, SPIL, Compaq, Synnex, Sony, any RMA's and any other outstanding debts of the graphics business due after 12/3/00.
- Via will show it has paid the disputed sales commissions.
- Via will arrange the $15M loan to SONICblue under the agreed upon terms.
- S3G will continue to reimburse SONICblue for employee and facilities related expenses from September 2001 onward as long as required. Payroll expenses will be forwarded in advance. We believe this includes the following:
  - **Facilities** - Estimated monthly expenses going forward - $5,891
    Both WA and Orlando are assumed to be ongoing expenses. The estimated figure represents the August rent for WA = $1,398 + the August rent for Orlando = $4,493.

  - **Payroll** - Estimated monthly expenses going forward = $340,964
    The total payroll amount to date divided by the period of time (9 months) to arrive at the estimated monthly amount.

  - **Visa Administration** - Estimated monthly expenses going forward = $9,943
    Same method as in payroll. This should taper down however.

  - **Stock Option Exercises** - As incurred.
- This will be a complete and final settlement with full releases to all parties other than any future liability that may arise with regards to loss of IP rights or the continued monthly expenses related to employees.

Andy

| | Amount |
|---|---|
| SONICblue to S3G Settlement Payment for all damages | $8,206,485 |
| Additional Liabilities assumed by Sonicblue | |
| Wrong bonded parts | $1,840,797 |
| | |
| Total Settlement | $10,047,281 |

_doing his count mismatched - due to inspectimate ?_

| Liabilities to be assumed by SONICblue in liu of cash payment | |
|---|---|
| Concentric | ($7,395) |
| Hypa Creative | ($14,529) |
| NASSDA | ($110,000) |
| Safeco lease | ($999,465) |
| Agilent lease | ($428,629) |
| Subtotal | ($1,560,019) |

_qu ltr spm_   920

| Other S3G expenses | |
|---|---|
| Facilities Expenses | ($2,013,084) |
| Payroll Expenses through 8/17 | ($2,089,677) |
| Partial Payroll (U.S.) - 6/18-8/26 | ($661,334) |
| Est. Addl. Payroll - 6/18-9/9 | ($314,118) |
| Visa Admin | ($49,715) |
| Option Excercises | ($407,062) |
| Other Invoices (phone, freight, etc) | ($571,496) |
| Subtotal | ($6,106,485) |

| Net due to Via | $2,100,000 |
|---|---|

```
1,560
2,100
 500
-----
4,160
~(1,560)
-----
2,600  adt'l exposure
```

| Liabiliites to be paid by Via | |
|---|---|
| Sales Commission | $625,998 |
| Sony Rebate | $256,098 |
| Cadence | $205,496 |
| Simplex | $30,000 |
| Phoenix | $254,006 |
| Mentor | $153,000 |
| SPIL (shores) | $528,816 |
| UMC | $10,500,000 |

# **<u>EXHIBIT 6</u>**

**From:** Andrew Wolfe
**Sent:** Tuesday, January 29, 2002 1:40 PM
**To:** Marcus Smith
**Subject:** Johnny,

**Attachments:** Johnny Settlement Proposal 10-8.doc; Expense Tally.xls


Johnny Settlement
Proposal 10-...


Expense Tally.xls
(26 KB)

1

PWSP 00001.9

Johnny,

I want to make sure that we are on the same page in terms of the settlement agreement. This is what we believe we agreed to at the last meeting.

- SONICblue would waive all amounts due from S3G or Via with regard to the $6.1M in facility, payroll, communications, and other expenses from January through 9/9/01 that have been invoiced or presented.
- SONICblue would pay an additional $2.1M in liquidated damages.
- SONICblue will retain liability for the Safeco and Agilent leases. Any equipment related to those leases will be returned to us. SONICblue will also retain liability for NASSDA, Hypa Creative, and Concentric.
- The $12.7M in receivables that were used to pay outstanding payables will not be returned.
- Via and S3G will be released from any liability to the payables that have already been paid by SONICblue
- S3 Graphics or Via will pay or show that SONICblue's liability has been released for all remaining disputed liabilities including the remaining balance due to UMC, the amounts due to Cadence, Mentor, Simplex, Phoenix, SPIL, Compaq, Synnex, Sony, any RMA's and any other outstanding debts of the graphics business due after 12/3/00.
- Via will show it has paid the disputed sales commissions.
- Via will arrange the $15M loan to SONICblue under the agreed upon terms.
- S3G will continue to reimburse SONICblue for employee and facilities related expenses from September 2001 onward as long as required. Payroll expenses will be forwarded in advance. We believe this includes the following:
    - **Facilities** - Estimated monthly expenses going forward - $5,891
    Both WA and Orlando are assumed to be ongoing expenses. The estimated figure represents the August rent for WA = $1,398 + the August rent for Orlando = $4,493.

    - **Payroll -** Estimated monthly expenses going forward = $340,964
    The total payroll amount to date divided by the period of time (9 months) to arrive at the estimated monthly amount.

    - **Visa Administration -** Estimated monthly expenses going forward = $9,943
    Same method as in payroll. This should taper down however.

    - **Stock Option Exercises -** As incurred.
- This will be a complete and final settlement with full releases to all parties other than any future liability that may arise with regards to loss of IP rights or the continued monthly expenses related to employees.

Andy

| | A | B |
|---|---|---|
| 1 | | Amount |
| 2 | SONICblue to S3G Settlement Payment for all damages | $8,206,485 |
| 3 | Additional Liabilities assumed by Sonicblue | |
| 4 | Wrong bonded parts | $1,840,797 |
| 5 | | |
| 6 | Total Settlement | $10,047,281 |
| 7 | | |
| 8 | | |
| 9 | Liabilities to be assumed by SONICblue in liu of cash payment | |
| 10 | Concentric | ($7,395) |
| 11 | Hypa Creative | ($14,529) |
| 12 | NASSDA | ($110,000) |
| 13 | Safeco lease | ($999,465) |
| 14 | Agilent lease | ($428,629) |
| 15 | Subtotal | ($1,560,019) |
| 16 | | |
| 17 | Other S3G expenses | |
| 18 | Facilities Expenses | ($2,013,084) |
| 19 | Payroll Expenses through 8/17 | ($2,089,677) |
| 20 | Partial Payroll (U.S.) - 6/18-8/26 | ($661,334) |
| 21 | Est. Addl. Payroll - 6/18-9/9 | ($314,118) |
| 22 | Visa Admin | ($49,715) |
| 23 | Option Excercises | ($407,062) |
| 24 | Other Invoices (phone, freight, etc) | ($571,496) |
| 25 | Subtotal | ($6,106,485) |
| 26 | | |
| 27 | | |
| 28 | Net due to Via | $2,100,000 |
| 29 | | |
| 30 | | |
| 31 | Liabiliites to be paid by Via | |
| 32 | Sales Commission | $625,998 |
| 33 | Sony Rebate | $256,098 |
| 34 | Cadence | $205,496 |
| 35 | Simplex | $30,000 |
| 36 | Phoenix | $254,006 |
| 37 | Mentor | $153,000 |
| 38 | SPIL | $528,816 |
| 39 | UMC | $10,500,000 |

PWSP 00001.11

|  | A | B |
|---|---|---|
| 1 |  | Amount |
| 2 | SONICblue to S3G Settlement Payment for all damages | $6,000,000 |
| 3 | Additional Liabilities assumed by Sonicblue |  |
| 4 | Wrong bonded parts | $1,840,797 |
| 5 | Sales Commission | $625,998 |
| 6 | Total Settlement | $8,466,795 |
| 7 |  |  |
| 8 |  |  |
| 9 | Liabilities to be assumed by SONICblue in liu of cash payment |  |
| 10 | Concentric | ($7,395) |
| 11 | Hypa Creative | ($14,529) |
| 12 | NASSDA | ($110,000) |
| 13 | Safeco lease | ($999,465) |
| 14 | Agilent lease | ($428,629) |
| 15 | Subtotal | ($1,560,019) |
| 16 |  |  |
| 17 | Other S3G expenses |  |
| 18 | Facilities Expenses | ($2,013,084) |
| 19 | Payroll Expenses through 8/17 | ($2,089,677) |
| 20 | Partial Payroll (U.S.) - 6/18-8/26 | ($661,334) |
| 21 | Est. Addl. Payroll - 6/18-9/9 | ($314,118) |
| 22 | Visa Admin | ($49,715) |
| 23 | Option Excercises | ($407,062) |
| 24 | Other Invoices (phone, freight, etc) | ($571,496) |
| 25 | Subtotal | ($6,106,485) |
| 26 |  |  |
| 27 |  |  |
| 28 | Net due to SONICblue | $1,666,503 |
| 29 |  |  |
| 30 |  |  |
| 31 | Liabiliites to be paid by Via |  |
| 32 | Sony Rebate | $256,098 |
| 33 | Cadence | $205,496 |
| 34 | Simplex | $30,000 |
| 35 | Phoenix | $254,006 |
| 36 | Mentor | $153,000 |
| 37 | SPIL | $528,816 |
| 38 | UMC | $10,500,000 |

PWSP 00001.12

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | $22,566.60 | | | | |
| 2 | $5,695.00 | | | | |
| 3 | $5,695.00 | | | | |
| 4 | $5,695.00 | | | | |
| 5 | $5,695.00 | | | | |
| 6 | $878.59 | | | | |
| 7 | $1,451.00 | | $1,177,950.00 | $36,637.90 | $43,397.85 |
| 8 | $17,924.77 | | $3,000.00 | $188,445.97 | $4,802.69 |
| 9 | $756.67 | | $321,421.00 | $187,136.03 | $5,695.00 |
| 10 | $2,430.00 | | $381,155.00 | $170,147.08 | $19,236.66 |
| 11 | $6,237.00 | | $7,003.74 | $177,441.29 | $390.00 |
| 12 | $1,269.51 | | $870.00 | $166,768.40 | $209.93 |
| 13 | $612.50 | | $13,059.76 | $173,157.12 | $243.05 |
| 14 | $149.99 | | $39,838.82 | $178,148.85 | $2,579.71 |
| 15 | $3,400.00 | | $5,699.36 | $162,695.82 | $272.35 |
| 16 | $90.00 | | $50,000.00 | $124,331.83 | $58.77 |
| 17 | $35,156.25 | | $1,999,997.68 | $124,380.74 | $2,011.71 |
| 18 | $15,600.00 | | | $185,808.96 | $172.42 |
| 19 | $3,089.00 | | | $3,844.12 | $6,472.13 |
| 20 | $216.00 | | | $91,997.53 | $28,943.01 |
| 21 | $33.47 | | | $118,734.00 | $608.75 |
| 22 | $597.00 | | | $2,089,675.64 | $8,333.33 |
| 23 | $3,009.90 | | | | $13,773.00 |
| 24 | $225.15 | | | | $137,200.36 |
| 25 | $4,052.35 | | | | |
| 26 | $782.13 | | | | |
| 27 | $258.90 | | | | |
| 28 | $89.16 | | | | |
| 29 | $190.07 | | | | |
| 30 | $9,117.33 | | | | |
| 31 | $110,194.11 | | | | |
| 32 | $35,001.15 | | | | |
| 33 | $5,737.37 | | | | |
| 34 | $2,518.00 | | | | |
| 35 | $4,988.28 | | | | |
| 36 | $21,220.00 | | | | |
| 37 | $171.72 | | | | |
| 38 | $50,000.00 | | | | |
| 39 | $50,000.00 | | | | |
| 40 | $432,793.97 | | | | |

# EXHIBIT 7

**From:** Ken Potashner
**Sent:** Wednesday, March 20, 2002 6:01 PM
**To:** John Todd
**Subject:** FW: Settlement and Loan Documents

**Attachments:** SHORT FORM SETTLEMENT AGREEMENT.doc; W97 SONICblue Loan and Security.rtf; W97 VIA Reg Rights Agrm.rtf

SHORT FORM          W97 SONICblue          W97 VIA Reg
TLEMENT AGREEME   Loan and Securit...    Rights Agrm.rtf (4...

-----Original Message-----
**From:** Johnny Lee [mailto:johnnylee@viatech.com]
**Sent:** Friday, March 15, 2002 4:03 PM
**To:** Ken Potashner
**Cc:** Andrew Wolfe; Dave Sugishita
**Subject:** Settlement and Loan Documents


Ken,

I received these from VIA's outside counsel relating to the Settlement Agreement and the Loan Agreement.  I have not reviewed them nor has Taiwan seen them; but I thought I will send them to you for all of us to proceed in parallel.

Relating to the Loan are some documents being handled in Taiwan governing the pledge of the restricted UMC shares in Taiwan.  I believe there is a Pledge Agreement, UMC Agreement, and a Promissory Note.  I will forward them to you as soon as I get them.

Thanks.

Johnny

1

PWSP 00001.17

## SETTLEMENT AGREEMENT
### (VIA DRAFT 3/15/02)

This Settlement Agreement ("Agreement") is made as of this ___ day of March, 2002, by and between SONICblue Incorporated, formerly known as S3 Incorporated ("SONICblue"), on the one hand, and VIA Technologies, Inc. ("VIA"), S3 Graphics Co., Ltd. ("JV") and S3 Graphics, Inc. ("S3G") (VIA, JV and S3G are collectively referred to as the "VIA Parties"), on the other hand.

1. Validity of this Agreement

   1.1 An express condition precedent to the effectiveness of paragraph 2 of this Agreement is the negotiation and execution of a loan to SONICblue by VIA in the amount of US$15 million to be repaid within one year (herein the "Loan"). In all other respects, this Agreement is fully binding and enforceable upon execution by all Parties.

   1.2 The Parties shall negotiate the terms of the Loan in good faith, but this Agreement does not obligate SONICblue or VIA to enter into a Loan agreement.

   1.3 If SONICblue and VIA have not executed a Loan agreement and related documents within 30 days of the execution of this Agreement by all Parties, this Agreement shall have no further force and effect, and the Parties shall no longer be obligated to negotiate a Loan agreement.

   1.4 The Parties covenant not to sue for any alleged breach of this Agreement in the event that a Loan agreement is not entered into within the time set forth above.

2. Settlement Terms

   Upon satisfaction of the condition precedent set forth in paragraph 1, the Parties agree that all disputes between them shall be deemed resolved pursuant to the following terms:

   2.1 SONICblue shall pay VIA the sum of $2,340,768.22 (Two Million Three Hundred and Forty Thousand Seven Hundred Sixty Eight Dollars and Twenty Two Cents to JV (the "Payment") and herein authorizes VIA to withhold that amount from the proceeds of the Loan.

      2.1.1 Upon payment of the amounts set forth in paragraph 2.1 and satisfaction of the obligations to third parties as set forth in paragraph 2.2.2, the damages "cap" set forth in the January 3, 2001 Letter Agreement shall be deemed satisfied in full.

   2.2 With regard to the responsibility for SONICblue's obligations as of January 3, 2001, the following provisions apply.

PWSP 00001.18

2.2.1   SONICblue acknowledges and agrees that it is solely responsible for any obligations that were not part of the "Graphics Chip Business" (herein "GCB") as that term is defined in the Amended and Restated Investment Agreement dated as of August 28, 2000 (herein "Investment Agreement") transferred to JV, including, without limitation, non-GCB products and parts.

2.2.2   SONICblue acknowledges and agrees that SONICblue shall be solely responsible for claims related to or arising out of any obligation owed by SONICblue before closing as of January 3, 2001 to the following third parties: (a) Concentrix, (b) Hypa Creative, (c) NASSDA, (d) Safeco Credit Company, Inc. and/or its predecessor in interest, Fleet Leasing ("Safeco"), (e) Print, Inc., (f) ISE Labs, Inc. (aka IQL, Digital Testing Services, "ISE Labs"),  and/or (g) Agilent Financial Services.

    2.2.2.1 In addition to the foregoing, SONICblue further acknowledges and agrees that SONICblue shall be solely responsible for any and all additional claims related to or arising out of SONICblue's GCB that existed as of closing on January 3, 2001 and that did not result from SONICblue's purchase of inventory, assets or services for the GCB; however, this provision expressly excludes any obligations identified in paragraph 2.2.3, which obligations are the sole responsibility of JV.

2.2.3   The VIA Parties acknowledge and agree that JV shall be solely responsible for any and all claims related to or arising out of all contractual obligations of SONICblue's GCB as of closing on January 3, 2001 to the following third parties: (a) Cadence; (b) Simplex; (c) Phoenix; (d) Mentor; (e) Innoveda; (g) Ultima , and (h) the lease obligations on the SONICblue and Orlando offices..

    2.2.3.1 In addition to the foregoing, the VIA Parties further acknowledge and agree that JV shall be solely responsible for any and all claims related to or arising out of the accounts payables of SONICblue's GCB that existed as of closing on January 3, 2001 and that resulted from SONICblue's purchase of inventory, assets or services for the GCB; however, this provision expressly excludes any obligations identified in paragraph 2.2.2, which obligations remain the sole responsibility of SONICblue.

2.2.4   SONICblue, on behalf of itself and subsidiaries and affiliates, represents and warrants that it is not aware of any obligations of the GCB that were not disclosed in the schedules to the Investment Agreement and General Assignment, Assumption and Bill of Sale dated January 3, 2001 (herein "Bill of Sale").

2.3     With regard to claims based on GCB products delivered on or prior to January 3, 2001, the following provisions shall apply: [PROPOSED LANGUAGE TO BE FORWARDED SEPARATELY]

2.4     SONICblue acknowledges and agrees that the entries for "Diamond Intercompany" and "Compaq Credits" as identified in the Accounts Receivable category of the Closing Balance Sheet should be and are "$0.00."

2.5     The Parties agree that the sentences of section 2.5 of the Investment Agreement (from "Promptly thereafter . . ." through ". . .Outside Auditor.") shall be deleted and of no force and effect.

2.6     Within two business days of receipt of the Payment, each Party shall file a request for dismissal with prejudice of any pending action or arbitration against the other Parties, and serve such request upon the other Parties.

2.7     Concurrent with transfer to SONICblue of the Loan proceeds (less the Payment), SONICblue shall execute and deliver to the VIA Parties the following:

   2.7.1     Any and all intellectual property transfer documents, including, without limitation, copyright, patent, patent application and trademark assignments, required under the Investment Agreement and related transaction documents, including the Bill of Sale. If necessary to complete a transfer, SONICblue shall execute name change documents so to change the name of "S3 Incorporated" or "S3 Inc." to "SONICblue Incorporated."

   2.7.2     All original issued patents, trademarks, copyrights and assignments or transfers thereof for such property transferred to JV at closing and listed in Schedule 3.14(a)(ii) to the Investment Agreement, and all patent, trademark and copyright files in SONICblue's possession which are related to such property, as well as documents in SONICblue's possession evidencing the use of each of said trademarks and reduction to practice of each of said patents.

   2.7.3     Written consent to the assignment to S3G of all SONICblue's rights and interests of any nature in or pursuant to any license agreements with Cadence, Simplex, Phoenix, Mentor, Innoveda and Ultima, as well as lease agreements for the Washington and Orlando offices. (JV and/or S3G shall be responsible for obtaining the consent of the licensors to such assignments.)

   2.7.4     The employee files of the Enumerated Employees and Subject Employees, as those terms are defined in the Investment Agreement.

   2.7.5     The documents identified in Section 5.14 of the Investment Agreement.

PWSP 00001.20

2.7.6   The final reports concerning the inventory transferred to JV on January 3, 2001.

2.7.7   Confirmation that Arcus Data Security has transferred ownership of all original data tapes in its possession, custody or control to JV's account.

2.7.8   Executed customer and vendor NDAs in SONICblue's possession related to assets transferred to S3G pursuant to the Investment Agreement.

2.7.9   NDAs and/or confidentiality agreements executed by any person ever employed by SONICblue as a part of the GCB and who worked in connection with product lines transferred to JV pursuant to the Investment Agreement

2.8   SONICblue represents and warrants that it has paid all compensation, including patent bonuses, owed to all current or former employees or independent contractors of SONICblue who were, directly or indirectly, part of the GCB.

2.9   SONICblue shall not represent to third parties that the JV is responsible in any manner for any products that are not a part of the GCB as defined in the Investment Agreement or do not relate to any assets transferred to JV at Closing.

2.10   SONICblue herein authorizes SONICblue's auditors, Ernst & Young, to provide the VIA Parties at their expense a signed copy of Ernst & Young's audit report for inclusion in a Registration Statement to be filed by VIA under the Securities Act of 1933, and to provide the VIA Parties at their expense with a comfort letter prepared in accordance with the Statement on Auditing Standards No. 72, Letters for Underwriters and Certain Other Requesting Parties.

2.11   Upon written request of JV, SONICblue shall undertake commercially reasonable efforts to produce for interview any current SONICblue or S3 Incorporated employee identified as an "inventor" or "author" for any patent or copyright transferred to JV and listed in Schedule 3.14(a)(ii) of the Investment Agreement.

2.12   The Parties agree that Section 5.13 of the Investment Agreement shall be modified as follows: [PROPOSED LANGUAGE TO BE FORWARDED SEPARATELY]

2.13   Except for their right to enforce the terms of the Investment Agreement, as amended, and any agreements executed pursuant thereto (including, without limitation, the JV Transaction Agreements, the Transaction Agreements, this Agreement and the Loan agreement), upon payment of the Loan proceeds to SONICblue (net of the Payment withheld by VIA), the Parties shall be deemed to have released each other as follows:

2.13.1  SONICblue, on behalf of itself and each of its past, present and future
employees, officers, directors, shareholders, principals, parents,
subsidiaries, affiliates, agents, attorneys, representatives, predecessors-in-
interest, successors-in-interest, assignors, and assignees, hereby covenants
not to sue, and acknowledges complete satisfaction of, and hereby
releases, absolves, and discharges the VIA Parties, and each of them,
together with their respective past, present, and future affiliated
corporations, subsidiaries, parents, employees, officers, directors,
shareholders, accountants, adjusters, agents, attorneys, assignors,
assignees, and successors- or predecessors-in-interest, from any and all of
the claims, whether now known or unknown, suspected or unsuspected,
arising under or related to: (1) the Sublease between SONICblue and S3G
dated as of January 5, 2001; (2) the VIA Parties' failure to pay rent,
property taxes, clean-up, repairs, remediation, or any other expenses of
any kind related to the occupancy and/or vacancy of the building located
at 2841 Mission College Blvd. in Santa Clara, California; (3) payroll
expenses actually incurred or claimed by SONICblue between January 3,
2001 and the date of this Settlement Agreement for employees or
independent contractors who have rendered services for any of the VIA
Parties at any time since January 3, 2001; (4) legal fees or costs associated
with any current or former SONICblue employees or independent
contractors who have rendered services for any of the VIA Parties since
January 3, 2001 through the date hereof; (5) the grant or exercise of stock
options by any current or former S3G employee or independent contractor;
(6) any claim arising under or related to the operations of any of
SONICblue's offices beyond January 3, 2001; (7) the lawsuits filed
against SONICblue by UMC, Safeco, Agilent and Siliconware, including,
without limitation, for any indemnity obligations, attorneys' fees and
costs, or liability arising under or related to those lawsuits and the facts at
issue therein; and (8) the Closing Balance Sheet or paragraph 2.5 of the
Investment Agreement.

2.13.2  The VIA Parties, and each of them, on behalf of themselves and their past,
present and future employees, officers, directors, shareholders, principals,
parents, subsidiaries, affiliates, agents, attorneys, representatives,
predecessors-in-interest, successors-in-interest, assignors, and assignees,
hereby covenant not to sue, and acknowledge complete satisfaction of, and
hereby release, absolve and discharge SONICblue, together with its
respective past, present, and future affiliated corporations, subsidiaries,
parents, employees, officers, directors, shareholders, accountants,
adjusters, agents, attorneys, assignors, assignees, and successors- or
predecessors-in-interest, from any and all claims, now known or unknown,
suspected or unsuspected, arising under or related to: (1)Section 5.4(d) of
the Investment Agreement; (2) SONICblue's collection of receivables or
performance of other obligations under Section 5.4 of the Investment
Agreement; (3) SONICblue's receipt or disposition of funds received from

PWSP 00001.22

third parties in payment for accounts receivable transferred to the VIA Parties; (4) SONICblue's listing or failure to list assets on the Fixed Asset list dated February 2000 or Fixed Asset list dated December 2000; (5) SONICblue's non-payment or late payment of any obligations of the GCB, excepting those being expressly assumed by SONICblue herein; (6) SONICblue's delay in executing any inventory report, audit, intellectual property transfer or any other documents requested by the VIA Parties or required by the Investment Agreement or the Transaction Agreements prior to the date of this Settlement Agreement; (7) SONICblue's failure to transfer (or delay in transferring) assets listed on the December 20, 2000 fixed asset list when JV moved its Graphics Chip Business from SONICblue's facilities, or SONICblue's failure to transfer (or delay in transferring) to any of the VIA Parties any assets of the Graphics Chip Business which should have been transferred pursuant to the Investment Agreement or the Transaction Agreements or any bill or sale or title transfer documents; (8) the Safeco Action; and (9) the Closing Balance Sheet or paragraph 2.5 of the Investment Agreement.

2.13.3  All Parties, and each of them, warrant, represent, and agree that each of them is fully aware of the provisions of California Civil Code Section 1542, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." All Parties, and each of them, voluntarily waive the provisions of California Civil Code Section 1542, and any other similar law, as to the claims released by each of them herein.

3.   Additional Terms

3.1   Each Party shall bear its own attorneys' fees and costs with regard to the negotiation of this Agreement and the Loan.

3.2   This Agreement may be modified only by a written amendment signed in counterparts by all Parties.

3.3   The Parties agree not to disclose the terms of this Agreement to any third party other than their corporate parent, directors, officers, auditors, accountants, tax preparers, taxing authorities, and attorneys, or except as required by law.

3.4   This Agreement is an integrated agreement containing the entire understanding among the Parties regarding the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises have been made or relied upon by the Parties regarding this Agreement.

PWSP 00001.23

3.5    This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assignees.

3.6    Each person who executes this Agreement on behalf of a corporation, partnership, joint venture, unincorporated association, or any other entity represents that he or she has the authority of said entity to do so.

3.7    Each of the Parties hereto has had the benefit of counsel of its own choice, has reviewed the terms and provisions of this Agreement with said counsel, and has knowingly and voluntarily, without duress, executed this Agreement.

3.8    It is acknowledged that all Parties to this Agreement participated in drafting it. Therefore, the language of this Agreement shall not be construed against any Party hereto as the drafter.

3.9    Each of the Parties hereto represents that it has not, prior to the effective date of this Agreement, assigned to any other person or entity any of the rights sought to be extinguished by the releases given herein.

3.10   This Agreement may be executed in multiple original counterparts and shall become effective on the date that all Parties have signed a counterpart. One original Agreement signed by the Parties is to be delivered to the VIA Parties, and one original Agreement signed by the Parties is to be delivered to SONICblue.

3.11   This Agreement between the Parties shall be governed by and construed in accordance with California law. Any and all disputes related to or arising under (a) this Agreement, (b) the Investment Agreement, (c) the Joint Venture Agreement or (d) the JV itself shall be submitted to binding arbitration before a single-arbitrator from the JAMS panel.  Any and all such arbitrations shall proceed under the then-current rules of JAMS and shall take place in the County of Santa Clara, California.

3.12   This Agreement effects the settlement of claims which are denied and contested. Nothing in this Agreement shall be construed to be an admission by any Party to it. Each Party to this Agreement denies any liability in connection with any claim and intends hereby solely to avoid litigation and buy its peace. This Agreement shall not be used in any way as evidence against any Party to it, except in an action for the enforcement of this Agreement.

3.13   The headings and titles of the various sections of this Agreement are intended solely for convenience of reference and are not intended to define, limit, explain, expand, modify or place any construction on any of the provisions of this Agreement.

PWSP 00001.24

3.14    In the event any provision of this Agreement is found to be invalid or unenforceable, the remainder of the agreement shall be enforced in a manner best calculated to effect the Parties' intent as expressed herein.

3.15    Notices shall be provided pursuant to the Notice provision of the Investment Agreement.

3.16    This Agreement is made in connection with, and amends, the Investment Agreement. Except as expressly amended or clarified herein, the Transaction Agreements, and each of them, shall remain in full force and effect. To the extent there is an inconsistency between the language of this Settlement Agreement and any of the Transaction Agreements, this Settlement Agreement shall prevail.

IN WITNESS THEREOF, the Parties, by their duly authorized representatives, affix their signatures hereto:

Dated: March _____, 2002                    VIA Technologies, Inc.


By: _____
        (Signature)


Print name: _____

Title: _____

S3 Graphics Co., Ltd.


By: _____
        (Signature)


Print name: _____

Title: _____

S3 Graphics Inc.

By: _____
       (Signature)

Print name: _____

Title: _____

Dated:  March ____, 2002

SONICblue Incorporated

By: _____
       (Signature)

Print name: _____

Title: _____

C:\TEMP\SHORT FORM SETTLEMENT AGREEMENT.doc
(17010.0007)

PWSP 00001.26

<table>
<tr><td>

**Draft of<br>March 15, 2001**

</td><td>

L O A N   A N D   S E C U R I T Y   A G R E E M E N T

</td></tr>
</table>

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is made this ___ day of _____, 2002 (the "Effective Date"), by and between SONICblue Incorporated, a corporation organized in the State of Delaware, United States of America ("U.S."), formerly known as S3 Incorporated ("Borrower"), having its principal place of business and chief executive office at 2841 Mission College Blvd., Santa Clara, California 95054, and VIA Technologies, Inc., a corporation organized under the laws of the Republic of China ("Lender"), having its chief executive office at 8F, No. 533 Chung-Cheng Road, Hsing-Tien, Taipei, Taiwan, Republic of China.

This Agreement is entered into in connection with Lender's loan to Borrower of U.S.$15,000,000 (the "Loan").

In addition to the Collateral described below, the Loan is also secured by shares of common stock of United Microelectronics Corporation, a corporation organized under the laws of the Republic of China ("UMC"), pursuant to the terms of a Share Pledge Agreement between Borrower and Lender dated the Effective Date (the "Pledge Agreement"). Borrower's obligations under the Pledge Agreement are also secured by promissory notes in the original principal amount of U.S.$15,000,000 (the "Notes"). Because the shares of UMC intended to be pledged under the Pledge Agreement are restricted securities under the laws of the Republic of China ("ROC"), and are held by the Taiwan Securities Central Depository Co., Ltd., (the "Central Depository"), Borrower's duties and obligations under the Pledge Agreement are further assured pursuant to the terms of an agreement among Borrower, Lender and UMC (the "UMC Agreement"). Under the UMC Agreement, UMC has agreed that upon the release of the pledged shares of UMC from the custody of the Central Depository, such shares will be deposited in Lender's account with the Central Depository according to the terms and conditions of the Pledge Agreement.

Simultaneously with the execution of this Agreement, Borrower, on the one hand, and Lender, S3 Graphics Co., Ltd., a corporation organized under the laws of the Cayman Islands ("S3G") and S3 Graphics, Inc., a Delaware corporation, on the other hand, have entered into a Settlement Agreement and Mutual Release (the "Settlement Agreement").

Lender is willing to provide the Loan to Borrower subject to certain terms and conditions described below.

Lender and Borrower agree as follows:

A.    **Definitions.**

1.    **"Accounts Receivable Schedule."** Accounts Receivable Schedule means a schedule setting forth a description of each of Borrower's accounts receivables, the aging of the accounts receivables, accounts receivables for which a reserve has been established and the amount of the reserve.

2.    **"Affiliate."** Affiliate means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For purposes of this definition, "control" as applied to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract, or otherwise.

3.    **"Business Day."** Business Day means any day other than Saturday, Sunday or a legal holiday in the U.S.

4.    **"Collateral."** The Collateral shall consist of all of the personal property of Borrower, wherever located, and now owned or hereafter acquired including:

   (i)      Accounts;

   (ii)     Chattel paper;

   (iii)    Inventory;

   (iv)    Equipment;

   (v)     Instruments, including promissory notes;

   (vi)    Investment property;

   (vii)   Documents;

   (viii)  Deposit Accounts;

   (ix)    Letter-of-credit right;

   (x)     General intangibles;

   (xi)    Supporting obligations; and

   (xii)   To the extent not listed above as original collateral, proceeds and products of the foregoing.

5.    **"Inventory Schedule."** Inventory Schedule means a schedule describing (i) the type and quantity of Borrower's Inventory, (ii) the cost and age of such Inventory by type, and (iii) reserves for obsolescence.

6.    "**Obligations.**" This Agreement secures the following:

2

  (i)  Borrower's obligations under the Loan, the Pledge Agreement, and the UMC Agreement;

  (ii)  all of Borrower's other present and future obligations to Lender;

  (iii)  the repayment of (a) any amounts that Lender may advance or spend for the maintenance or preservation of the Collateral, and (b) any other expenditures that Lender may make under the provisions of this Agreement or for the benefit of Borrower;

  (iv)  all amounts owed under any modifications, renewals or extensions of any of the foregoing obligations; and

  (v)  any of the foregoing that arises after the filing of a petition by or against Borrower under the U.S. Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under U.S. Bankruptcy Code § 362 or otherwise.

7. **"Person."** Person means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

8. **"Registration Rights Agreement."** Registration Rights Agreement means the agreement between Lender and Borrower, whereby Borrower agrees to register sufficient shares of Borrower's Common Stock to permit conversion of the Principal Amount (as defined below) and all interest that will accrue thereon, into Borrower's Common Stock.

9. **"UCC."** Any term used in the U.S. Uniform Commercial Code ("UCC") and not defined in this Agreement has the meaning given to the term in the UCC.

B. **Grant of Security Interest.**

Borrower grants a security interest in the Collateral to Lender to secure the payment or performance of the Obligations.

C. **Perfection of Security Interests.**

1. **Filing of financing statement**.  Borrower authorizes Lender to file a financing statement in the U.S. (the "Financing Statement") describing the Collateral.

2. **Possession.**  Borrower shall have possession of the Collateral, except where expressly otherwise provided in this Agreement.

3

(i)    If the [financial ratio - to be determined] is less than [value], Lender has the right to take possession of certain Collateral, and Borrower will cooperate with Lender and give Lender immediate possession of the Collateral.

(ii)    If the [financial ratio - to be determined] is less than [value], where Collateral is in the possession of a third party, Borrower will join with Lender in notifying the third party of Lender's security interest and immediately obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Lender.

3.    **Control.**  If the [financial ratio] is less than [value], Lender has the right to take control of certain Collateral, and Borrower will cooperate with Lender in obtaining immediate control with respect to Collateral consisting of:

(i)    Deposit Accounts;

(ii)    Investment Property;

(iii)    Letter-of-credit rights; and

(iv)    Electronic chattel paper.

D.    **Post-Closing Covenants and Rights Concerning the Collateral.**

1.    **Inspection.**  The parties to this Agreement may inspect any Collateral in the other party's possession, at any time upon reasonable notice.

2.    **Personal Property.**  The Collateral shall remain personal property at all times.  Borrower shall not affix any of the Collateral to any real property in any manner which would change its nature from that of personal property to real property or to a fixture.

3.    **Lender's Collection Rights.**  Lender shall have the right at any time to enforce Borrower's rights against the account debtors and obligors.

4.    **Limitations on Obligations Concerning Maintenance of Collateral.**

(i)    **Risk of Loss.**  Borrower has the risk of loss of the Collateral.

(ii)    **No Collection Obligation.**  Lender has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

5.    **No Disposition of Collateral.**  Lender does not authorize, and Borrower agrees not to:

(i)    make any sales or leases of any of the Collateral;

(ii)    license any of the Collateral; or

4

(iii)   grant any other security interest in any of the Collateral.

6.   **Purchase Money Security Interests.** To the extent Borrower uses the Loan to purchase Collateral, Borrower's repayment of the Loan shall apply on a "first-in-first-out" basis so that the portion of the Loan used to purchase a particular item of Collateral shall be paid in the chronological order the Borrower purchased the Collateral.

E.   **The Loan and Terms of Payment.**

1.   **The Loan.** Subject to all of the terms and conditions of this Agreement, the Pledge Agreement, the UMC Agreement, and the Settlement Agreement, Lender will loan Borrower U.S.$15,000,000 (the "Principal Amount").

Lender shall immediately deduct from the Principal Amount, such amount that is owed by Borrower to S3G as agreed upon by the parties in the Settlement Agreement (the "Settlement Amount"), and Lender shall transfer such Settlement Amount to S3G.

2.   **Interest.** The Loan will bear interest at an annual rate of prime plus 2% [___%] as announced by [name of bank]. If Borrower fails to comply with the registration requirements under the Registration Rights Agreement, the interest rate on the Loan will increase to an annual rate of prime plus __% as announced by [name of bank]. In the event any interest paid on this Loan is deemed to be in excess of the legal maximum rate, then that portion of the interest payment representing an amount in excess of the legal maximum will be deemed a payment of principal and applied against the Principal Amount. Interest shall be computed on the basis of 365 days for the actual number of days elapsed. Borrower promises to pay interest on the Principal Amount, quarterly in arrears, from and after the Effective Date, on the first Business Day of each March, June, September and December after the Effective Date.

3.   **Payments.** Subject to the conversion of all or part of the Principal Amount and accrued interest into Common Stock of the Borrower under this Agreement, Borrower promises to pay the aggregate unpaid Principal Amount under this Loan which shall become due and payable on _____ __, 2003 (the "Repayment Date") [one year from Execution Date], together with accrued and unpaid interest. At any time prior to the Repayment Date, Borrower may prepay all or part of the Principal Amount, with accrued interest to the date of such prepayment without premium or penalty. All payments under this Loan shall be made in lawful currency of the U.S. at Lender's chief executive office, or by wire transfer to Lender's account in Taiwan, ROC.

5

4.    **Conversion of Loan.**  At any time after the issuance of the Loan pursuant to this Agreement, Lender may, in its sole discretion, voluntarily convert all or part of the principal and accrued but unpaid interest on this Loan into a whole number of shares of Borrower's Common Stock, par value \$.0001, ("Borrower Common Stock").  The number of shares received upon conversion shall be equal to the amount of principal and accrued but unpaid interest on this Loan to be converted, divided by the average closing price of Borrower's Common Stock as reported on the NASDAQ National Market for the 5 trading days immediately prior to the execution of this Agreement (the "Conversion Price") (subject to adjustment for any consolidations, combinations, stock distributions, stock splits or similar events), multiplied by 1.15.  A conversion shall be effective on the date Lender delivers written notice of conversion (the "Conversion Notice") to Borrower, which notice shall state the amount of principal and interest to be converted and the name(s) in which the shares of Borrower Common Stock shall be registered on the Borrower's books. Within 3 Business Days after receipt of a Conversion Notice, Borrower shall (a) deliver to Lender a notice indicating the amount of principal and accrued interest, if any, which is not being converted into Borrower Common Stock, (b) deliver to the person(s) specified in the Conversion Notice certificate(s) representing the shares of Borrower Common Stock issuable upon such conversion and (c) pay Lender cash in lieu of any fractional share of Borrower Common Stock otherwise issuable upon such conversion.

Notwithstanding the foregoing, in the event that conversion of all or a portion of the Loan into Borrower's Common Stock shall exceed 19.9% of the number of shares of Common Stock issued and outstanding at the time of conversion, Borrower will:

(i)    issue to Lender only such number of shares of Common Stock as equals 19.9% of the total number of shares of Common Stock issued and outstanding at the time of conversion (the "Current Shares"); and

(ii)    comply with the provisions of Section I.8. to obtain stockholder approval of the issuance of such additional shares of Common Stock issuable upon conversion of the Loan that exceed 19.9% of the number of shares of Common Stock issued and outstanding at the time of conversion (the "Remaining Shares").

Borrower will not be entitled to vote the Current Shares in connection with the stockholder proposal to approve the issuance of the Remaining Shares.  In the event that Borrower's stockholders do not approve the issuance of the Remaining Shares, in Lender's sole discretion, Lender will be entitled to either:

6

(i)    receive the value of such Remaining Shares in U.S. dollars based upon the value of the Remaining Shares on the date of the Conversion Notice, tendered within 3 Business Days of the annual stockholders' meeting; or

(ii)    declare the Loan in default under <u>Section J.5.</u> of this Agreement, and all remaining principal and interest not converted into Borrower's Common Stock will be immediately due and payable.

5.    **Adjustments to Conversion Price.**

(i)    **Adjustments for Dividends, Splits, Subdivisions, Combinations, or Consolidation of Common Stock**. In the event the outstanding shares of Borrower's Common Stock shall be increased by a stock dividend payable in Common Stock, stock split, subdivision, or other similar transaction occurring after the execution of this Agreement into a greater number of shares of Common Stock, the Conversion Price then in effect shall, concurrently with the effectiveness of such event, be decreased in proportion to the percentage increase in the outstanding number of shares of Borrower's Common Stock. In the event the outstanding shares of Common Stock shall be decreased by reverse stock split, combination, consolidation, or other similar transaction occurring after the execution of this Agreement into a lesser number of shares of Common Stock, the Conversion Price then in effect shall, concurrently with the effectiveness of such event, be increased in proportion to the percentage decrease in the outstanding number of shares of Borrower's Common Stock.

(ii)    **Adjustments for Other Distributions**. In the event Borrower at any time or from time to time makes, or fixes a record date for the determination of holders of Common Stock entitled to receive, any distribution payable in securities of Borrower other than shares of Common Stock and other than as otherwise adjusted in this <u>Section E.5.</u>, then and in each such event provision shall be made so that Lender shall receive upon conversion thereof, in addition to the number of shares of Common Stock receivable thereupon, the amount of securities of Borrower which it would have received had the Loan been converted into Common Stock on the date of such event and had Lender thereafter, during the period from the date of such event to and including the date of conversion, retained such securities receivable by it as aforesaid during such period, subject to all other adjustments called for during such period under this <u>Section E.5.</u> with respect to the rights under the Loan.

(iii)    **Adjustments for Reclassification, Exchange and Substitution**. If the Common Stock issuable upon conversion of the Loan shall be changed

7

into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification, or otherwise (other than a subdivision or combination of shares provided for above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization or reclassification, be proportionately adjusted such that the Loan shall be convertible into, in lieu of the number of shares of Common Stock which Lender would otherwise have been entitled to receive, a number of shares of such other class or classes of stock equivalent to the number of shares of Common Stock that would have been subject to receipt upon conversion of the Loan immediately before that change.

6.  **Registration Rights Agreement.**  The Borrower Common Stock has not been registered under the Securities Act of 1933, as amended, and shall be subject to the terms and conditions of the Registration Rights Agreement executed simultaneously with this Agreement, in the form attached hereto as Exhibit A.

7.  **Hart-Scott-Rodino Act.**  Borrower hereby acknowledges that Lender's conversion of the Loan into Borrower's Common Stock may subject Borrower and Lender to the filing requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") and that Lender may be prevented from converting this Loan until the expiration or early termination of all waiting periods imposed by the HSR Act.  Borrower and Lender each hereby covenant that it will use reasonable commercial efforts to effect promptly all necessary or appropriate registrations, filings and submissions that may be required pursuant to the HSR Act in connection with the conversion of the Loan.

8.  **Defaults.**  Lender is entitled to the benefits of the terms and conditions of this Agreement, and is entitled to the rights in the Collateral.  Upon the occurrence of any Event of Default specified in this Agreement, the entire principal and unpaid balance and all accrued interest shall immediately become due and payable without diligence, demand, presentment, protest or notice of any kind.

9.  **Waiver and Amendment**.  Any provision of this Loan may be amended, waived or modified only upon the written consent of the Lender.

F.  **Conditions Precedent to Disbursement of the Loan.**

The obligation of Lender to disburse the Principal Amount is subject to the fulfillment, to the satisfaction of Lender and its counsel, of each of the following conditions on or before the Effective Date:

8

1.    All other documents and legal matters in connection with the transactions contemplated by the Settlement Agreement, the Pledge Agreement, the UMC Agreement, and this Agreement shall have been delivered or executed or recorded and shall be in form and substance satisfactory to Lender and its counsel.

2.    Borrower has delivered to Lender and S3G audited financial statements of the Graphics Chip Business (as that term is defined in the Amended and Restated Investment Agreement among Borrower, Lender and S3G, dated August 28, 2000) as conducted by Borrower for the three fiscal years ending December 31, 2000.

3.    Borrower has delivered to Lender certified copies of resolutions adopted by Borrower's Board of Directors certifying that Borrower has taken all actions necessary to cause the Rights Agreement dated as of May 14, 1997, between the Borrower and The First National Bank of Boston, as rights agent (the "Rights Agreement"), to be amended to (a) render the Rights Agreement inapplicable to this Agreement, the conversion of the Loan into Borrower Common Stock and the other transactions contemplated by this Agreement, and (b) ensure that (x) none of Lender or any other Affiliate (as defined in the Rights Agreement) or Associate (as defined in the Rights Agreement) of Lender is an Acquiring Person (as defined in the Rights Agreement) pursuant to the Rights Agreement and (y) a Distribution Date or a Stock Acquisition Date (as such terms are defined in the Rights Agreement) does not occur, in the case of clauses (x) and (y), solely by reason of the execution of this Agreement or the conversion of the Loan into Borrower Common Stock or the other transactions contemplated by this Agreement.

4.    Borrower has delivered to Lender an Inventory Schedule, no older than 5 Business Days prior to the Effective Date.

5.    Borrower has delivered to Lender an Accounts Receivable Schedule, no older than 5 Business Days prior to the Effective Date.

6.    The representations and warranties contained in this Agreement, including those incorporated by reference, shall be true and correct in all respects on and as of the date of the Loan as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

7.    No Event of Default (as defined below) or event which with the giving of notice or passage of time would constitute an Event of Default shall have occurred and be continuing on the date of the Loan, nor shall either result from the making thereof.

9

8.   No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the making of such advance shall have been issued and remain in force by any governmental authority against Borrower, Lender, or any of their Affiliates.

9.   Borrower has delivered a Secretary's Certificate, dated as of the Effective Date, certifying as to the accuracy of copies of (i) the Certificate of Incorporation of the Borrower, (ii) the Bylaws of the Borrower, and (iii) resolutions of the Board of Directors authorizing the execution, delivery and performance of this Agreement and the other related Documents (defined below), and certifying as to the names and true signatures of the officers of the Borrower authorized to execute this Agreement, the other related Documents, and the certificates to be delivered pursuant to this Agreement.

10.  Borrower has delivered an Officer's Certificate, dated as of the Effective Date, stating that the conditions specified in this Section F have been fully satisfied or waived by Lender.

G.   **Term of Agreement.**

1.   **Term.**  This Agreement shall become effective upon the execution and delivery hereof by Borrower and Lender and shall continue in full force and effect until all Obligations have been fully and finally discharged or the entire Loan amount has been converted into Borrower's Common Stock at which time this Agreement will terminate.

2.   **Effect of Termination.**  Upon an Event of Default, but not later than the Repayment Date, all Obligations immediately shall become due and payable without notice or demand.  No termination of this Agreement, however, shall relieve or discharge Borrower or Borrower's duties, Obligations, or covenants under the Pledge Agreement and the UMC Agreement.  Lender's continuing security interest in the Collateral shall remain in effect until all Obligations have been fully and finally discharged.

H.   **Borrower's Representations and Warranties.**

Borrower warrants and represents that:

1.   **Corporate Power and Authority.**  Borrower has the corporate power and authority to enter into and perform this Agreement, the Pledge Agreement, the UMC Agreement, the Registration Rights Agreement and related instruments (collectively, the "Documents") and to execute all documents

PWSP 00001.36

and perform all other acts as may be necessary to perform all of Borrower's obligations under the Documents.

2.   **Due Authorization.**  Each of the Documents has been duly authorized by all necessary corporate action on the part of Borrower and has been duly executed and delivered by Borrower.

3.   **Valid and Binding Obligation.**  Each of the Documents is a valid and binding obligation of Borrower enforceable in accordance with its respective terms.

4.   **No Approvals or Consents.**  No approval or consent not previously obtained by any person or entity is necessary in connection with the execution of the Documents by Borrower or the performance of Borrower's obligations under the Documents.  The consummation of the transactions contemplated by the Documents does not and will not violate any statute, law, ordinance or regulation.

5.   **No Violation of Other Obligations.**  Neither the Documents nor anything provided to be done under the Documents violates or shall violate, or shall cause the acceleration of any debt or obligation of Borrower under, any contract, document, understanding, agreement or instrument to which Borrower is a party or by which it may be bound.

6.   **Title to and transfer of Collateral.**  Borrower has rights in or the power to transfer the Collateral and its title to the Collateral is free of all adverse claims, liens, security interests and restrictions on transfer or pledge except as created by this Agreement and the Pledge Agreement, and except as set forth on Exhibit B (the "Permitted Liens").

7.   **Location of Collateral.**  All collateral consisting of goods is located solely in the following States: _____, _____, and _____ (the "Collateral States").

8.   **Location, State of Incorporation, and Name of Borrower.**  Borrower's:

   (i)    chief executive office is located in the State of California;

   (ii)   state of incorporation is the state of Delaware; and

   (iii)  exact legal name is as set forth in the first paragraph of this Agreement.

I.   **Borrower's Covenants**.

Borrower will do all of the following:

1.   **Compliance with Settlement Agreement**.  Borrower agrees to perform all obligations under the Settlement Agreement.

11

2.    **Monthly Unaudited Financial Statements.** Borrower agrees to deliver to Lender, monthly unaudited balance sheets and income statements, 15 calendar days after the close of each accounting month.

3.    **Inventory; Returns.** Borrower will keep all Inventory in good and marketable condition, free from material defects. Returns and allowances between Borrower and its account debtors will follow Borrower's customary practices as they exist at execution of this Agreement. Borrower must immediately notify Lender of all returns, recoveries, disputes and claims, that involve more than $250,000. Borrower will deliver to Lender an updated Inventory Schedule for the period ending June 30, 2002, September 30, 2002, December 31, 2002 and March 31, 2003, 15 calendar days after the end of such period.

4.    **Accounts Receivable Schedule.** Borrower will deliver to Lender an updated Accounts Receivable Schedule for the period ending June 30, 2002, September 30, 2002, December 31, 2002 and March 31, 2003, 15 calendar days after the end of such period.

5.    **Continuing Existence, Location, and Name of Borrower.** Until the Obligations are paid in full, Borrower agrees that it will:

    (i)    preserve its corporate existence and not, in one transaction or a series of related transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets;

    (ii)   not change the state where it is located; and

    (iii)  not change its corporate name without providing Lender with 30 days' prior written notice.

6.    **Notice of Events of Default.** Borrower agrees to notify Lender within 2 Business Days of any default or Event of Default under this Agreement, the Pledge Agreement or the UMC Agreement.

7.    **Reservation of Adequate Shares.** Borrower agrees to reserve an adequate number of shares of Borrower's Common Stock for issuance upon the conversion of the Principal Amount and all interest that will accrue thereon. In addition, Borrower will list such shares for quotation on the NASDAQ National Market.

8.    **Stockholder Approval.** Borrower agrees to include in Borrower's next annual meeting of stockholders to be held in May 2002, a proposal seeking stockholder approval of the issuance of any Remaining Shares in connection with the conversion of this Loan. In addition to taking all such actions necessary to include such proposal, Borrower will:

12

       (i)     recommend that the stockholders approve the issuance of the Remaining Shares; and

       (ii)    use its best efforts to obtain stockholder approval of the Remaining Shares.

J.    **Events of Default.**

The occurrence of any of the following shall, at the option of Lender, constitute an event of default (each, an "Event of Default") under this Agreement and all Obligations shall immediately become due and payable without diligence, demand, presentment, protest or notice of any kind.

    1.    Borrower fails to pay any portion of the Obligations under this Agreement, whether of principal or interest (including any interest which, but for the provisions of the U.S. Bankruptcy Code, would have accrued on such amounts) when due and payable or when declared due and payable; *provided however*, that no Event of Default will occur under this Section J.1. with respect to any interest payment unless Borrower fails to make the interest payment within 3 Business Days of the payment due date. If Borrower fails to make any interest payment within 3 Business Days of the payment due date, Lender may proceed with all its rights and remedies under this Agreement.

    2.    Borrower's failure to comply with any of the provisions, conditions, covenants, or agreements in, or the incorrectness of any representation or warranty contained in this Agreement or in any of the other Obligations; *provided however*, that no Event of Default shall occur under this Section J.2. unless Lender shall have given Borrower notice of the default, and allowed Borrower to cure such default within 3 Business Days of having received such notice. If Borrower fails to cure the default to Lender's satisfaction, determined in good faith, within 3 Business Days of having received notice of the default, Lender may proceed with all its rights and remedies under this Agreement.

    3.    Borrower's failure to comply with any of the provisions, conditions, covenants, or agreements in, or the incorrectness of any representation or guaranty contained in the Pledge Agreement, the UMC Agreement, or the Settlement Agreement.

    4.    If there is a material impairment of the prospect of repayment of any portion of the Obligations owing to Lender or a material impairment of priority of Lender's security interest in the Collateral; *provided however*, that no Event of Default shall occur under this Section J.4. unless Lender shall have given

13

Borrower notice of the default, and allowed Borrower to cure such default within 3 Business Days of having received such notice. If Borrower fails to cure the default to Lender's satisfaction, determined in good faith, within 3 Business Days of having received notice of the default, Lender may proceed with all its rights and remedies under this Agreement.

5. Borrower's failure to obtain stockholders approval of the issuance of any Remaining Shares at the May 2002 annual meeting of stockholders.

6. Transfer or disposition of any of the Collateral or any interest in the Collateral, except as expressly permitted by this Agreement.

7. Attachment, execution, or levy on any of the Collateral in an amount equal to or exceeding $10,000; *provided however*, that no Event of Default shall occur under this Section J.7. unless 15 Business Days shall have passed from the date of attachment, execution or levy on any of the Collateral and such attachment, execution or levy still exists upon the expiration of the 15 Business Days.

8. Borrower voluntarily or involuntarily becoming subject to any proceeding under (a) the U.S. Bankruptcy Code or (b) any similar remedy under U.S. state statutory or common law.

9. Borrower shall fail to comply with, any federal, state or local (a) hazardous waste or environmental law, (b) asset forfeiture or similar law which can result in the forfeiture of property, or (c) other law, and where noncompliance may have any significant effect on the Collateral.

10. Borrower shall become subject to any administrative or judicial proceeding under any federal, state or local (a) hazardous waste or environmental law, (b) asset forfeiture or similar law which can result in the forfeiture of property, or (c) other law, and such proceeding may have any significant effect on the Collateral.

K. **Default Costs.**

Should an Event of Default occur, Borrower will pay to Lender all costs reasonably incurred by the Lender for the purpose of enforcing its rights hereunder, including:

1. Costs of foreclosure;

2. Costs of obtaining money damages; and

3. A reasonable fee for the services of an attorney employed by Lender for any purpose related to this Agreement, the Pledge Agreement, the UMC Agreement, or the Obligations, including consultation, drafting documents,

14

> sending notices or instituting, prosecuting or defending litigation or arbitration.

L.   **Remedies Upon Default.**

1.   **General**.  Upon any Event of Default, Lender may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any Obligations then owing, whether by acceleration or otherwise.

2.   **Concurrent Remedies**.  Upon an Event of Default, the Lender shall have the right to pursue any of the following remedies separately, successively, or simultaneously:

   (i)   File suit and obtain judgment, and, in conjunction with any action, Lender may seek any ancillary remedies provided by law, including levy of attachment and garnishment.

   (ii)   Take possession of any Collateral if not already in its possession without demand and without legal process.  Upon Lender's demand, Borrower will assemble and make the Collateral available to the Lender as they direct.  Borrower grants to Lender the right, for this purpose, to enter into or on any premises where Collateral may be located.

   (iii)   Without taking possession, sell, lease or otherwise dispose of the Collateral at public or private sale in accordance with the UCC.

M.   **Foreclosure Procedures.**

1.   **No Waiver**.  No delay or omission by the Lender to exercise any right or remedy accruing upon any Event of Default shall (a) impair any right or remedy, (b) waive any default or operate as an acquiescence to the Event of Default, or (c) affect any subsequent default of the same or of a different nature.

2.   **Notices**.  Lender shall give Borrower such notice of any private or public sale as may be required by the UCC.

3.   **Condition of Collateral.**  Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.

4.   **No Obligation to Pursue Others**.  Lender has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Lender may release, modify or waive any collateral provided by any other person to secure any of the Obligations, all without affecting

15

Lender's rights against Borrower. Borrower waives any right it may have to require Lender to pursue any third person for any of the Obligations.

5.  **Compliance With Laws**. Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

6.  **Warranties.** Lender may sell the Collateral without giving any warranties as to the Collateral. Lender may specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

7.  **Sales on Credit**. If the Lender sells any of the Collateral upon credit, Borrower will be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the Purchaser. In the event the purchaser fails to pay for the Collateral, Lender may resell the Collateral and Borrower shall be credited with the proceeds of the sale.

8.  **Purchases by Lender**. In the event Lender purchases any of the Collateral being sold, Lender may pay for the Collateral by crediting some or all of the Obligations of the Borrower.

9.  **No Marshaling.** Lender has no obligation to marshal any assets in favor of Borrower, or against or in payment of:

    (i)    the Loan,

    (ii)   any of the other Obligations, or

    (iii)  any other obligation owed to Lender by Borrower or any other person.

N.  **Miscellaneous**.

1.  **Assignment**.

    (i)    **Binds Assignees**. This Agreement shall bind and shall inure to the benefit of the heirs, legatees, executors, administrators, successors, and assigns of Lender and shall bind all persons who become bound as a Borrower to this Agreement.

    (ii)   **No Assignments by Borrower**. Lender does not consent to any assignment by Borrower except as expressly provided in this Agreement.

    (iii)  **Lender Assignments.** Lender may assign its right or interest under this Agreement to an Affiliate of Lender. Lender will notify Borrower 3 Business Days prior to any such assignment. If an assignment is made,

PWSP 00001.42

Borrower will render performance under this Agreement to the assignee. Borrower waives and will not assert against any assignee any claims, defenses, or setoffs which Borrower could assert against Lender except defenses which cannot be waived.

2.   **Severability**. Should any provision of this Agreement be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction, that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provisions of this Agreement.

3.   **Notices**. Any notices, requests, consents, demands, instructions, or other communications required by this Agreement shall be in writing and shall be validly given, made or served, if delivered personally or sent by mail, recognized courier service, telex or telefax (confirmed by mail or recognized courier service in the case of telefaxes), or sent through the Internet, and shall be deemed effective when actually received.

If to Borrower:

SONICblue Incorporated
2841 Mission College Blvd.
Santa Clara, California 95054
Attn: Ken Potashner, Chief Executive Officer
Telephone:
Facsimile: (408) 588-8050
e-mail: KPotashner@sonciblue.com

With copies to:

Pillsbury Winthop LLP
250 Hanover Street
Palo Alto, California 94304
Attn: Jorge Del Calvo, Esq.
Telephone:
Facsimile: (650) 233-4545
e-mail:

If to Lender:

VIA Technologies, Inc.
8F, No. 533 Chung-Cheng Road,
Hsing-Tien,

17                PWSP 00001.43

Taipei, Taiwan
Republic of China
Attn: Wen-Chi Chen, President
Telephone:
Facsimile:
e-mail:

With copies to:

Heller Ehrman White & McAuliffe
601 S. Figueroa Street
40th Floor
Los Angeles, California 90017
Attn: Steven O. Weise, Esq.
Telephone: (213) 244-7831
Facsimile: (213) 614-1868
e-mail: sweise@hewm.com

and:

VIA Technologies, Inc.
440 Mission Ct.
Suite 220
Fremont, California 94539
Attn: Sherman Wan, Esq.
Telephone: (510) 687-4629
Facsimile:
e-mail: ShermanWan@via-cyrix.com

4.     **Headings**.  Section headings used this Agreement are for convenience only. They are not a part of this Agreement and shall not be used in construing it.

5.     **Governing Law and Jurisdictions**.  This Agreement is being executed and delivered and shall be governed and construed in accordance with the laws of California.  Any disputes arising out of this Agreement shall be submitted to the non-exclusive jurisdiction of any state or federal court located in Santa Clara County, California, U.S.

6.     **English Language.**  This Agreement is in English only and no Chinese translation of this Agreement shall be of any force or effect and shall be for convenience only.

18