# EXHIBIT 43

ORIGINAL

1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT (SBN 105430)
2  JOSHUA D. MORSE (SBN 211050)
   601 South Figueroa Street, Suite 3300
3  Los Angeles, California 90017
   Telephone: (213) 694-1200
4  Fax: (213) 694-1234

5  Counsel for Portside Growth & Opportunity
   Fund, Smithfield Fiduciary LLC, and
6  Citadel Equity Fund Ltd.

7

8              UNITED STATES BANKRUPTCY COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11  In re                          )  Case No. 03-51775-MM
                                    )
12  SONICBLUE INCORPORATED, a       )  Chapter 11
    Delaware Corporation, et al.,[1] )
13                                  )  (Jointly Administered)
                                    )
14         Debtors.                 )  **STIPULATION PROVIDING RELIEF FROM**
                                    )  **THE AUTOMATIC STAY TO SENIOR**
15                                  )  **NOTEHOLDERS; ORDER THEREON**
                                    )
16                                  )       Hearing
                                    )
17                                  )        [TBD]
                                    )
18

19        This Stipulation Providing Relief From the Automatic Stay to Senior Noteholders (the

20  "Stipulation") is entered into as of July 4, 2003, by and among SONICblue Incorporated, et al., the

21  debtors and debtors in possession herein (the "Debtors"), the Official Committee of Unsecured

22  Creditors (the "Committee"), Portside Growth & Opportunity Fund ("Portside"), Smithfield

23  Fiduciary LLC ("Smithfield"), and Citadel Equity Fund Ltd. ("Citadel," and together with Portside

24  and Smithfield, the "Senior Noteholders"), by and through their respective counsel and/or agents,

25  with reference to the following recitals:

26

27  _____

28  [1]  The Debtors include the following entities: SONICblue Incorporated, Diamond Multimedia
        Systems, Inc., ReplayTV, Inc., and Sensory Science Corporation.
    263802v11
    STIPULATION PROVIDING RELIEF FROM THE AUTOMATIC STAY TO SENIOR NOTEHOLDERS - Case No. 03-51775-MM

## RECITALS

A.    On March 21, 2003 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Chapter 11 Cases").

B.    The Debtors are continuing in possession of their property, and operating and managing their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

C.    This Court has jurisdiction over the Chapter 11 Cases pursuant to 18 U.S.C. Sections 157(b) and 1334.

D.    Together, the Senior Noteholders hold $75.0 million in principal amount of 7 ¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes") issued by debtor SONICblue Incorporated ("Sonic") pursuant to a Securities Purchase Agreement dated as of April 21, 2002, and governed by an Indenture dated as of April 22, 2002 (the "Senior Notes Indenture").

E.    The Senior Noteholders allege that immediately prior to and as of the Petition Date, the Debtors were truly and justly indebted to the Senior Noteholders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $75.0 million, in respect of the Senior Notes, plus premium, if any, accrued and unpaid interest, and other fees in accordance with the Senior Notes Indenture (collectively, the "Obligations").

F.    In connection with the issuance of the Senior Notes, the Senior Noteholders and Sonic also entered into, among other things, the Pledge and Security Agreement, dated April 22, 2002 (the "Pledge Agreement").

G.    The Senior Noteholders allege that the Obligations were, immediately prior to and as of the Petition Date, partially secured by valid, enforceable and perfected first priority lien and security interest granted by Sonic in favor of the Senior Noteholders under the Pledge Agreement (the "Prepetition Lien") in the Collateral Shares (as that term is defined in the Pledge Agreement). The Collateral Shares are 21,426,586 common shares (plus any and all common shares issued as

HENNIGAN, BE    & DORMAN LLP
LAW OFFICES
LOS ANGELES, CALIFORNIA

1    dividends on account of such Collateral Shares) in United Microelectronics Corporation ("UMC")

2    owned by Sonic, but currently held in physical certificated form in Taiwan on behalf of the Senior

3    Noteholders by their custodian, The Hong Kong and Shanghai Banking Corporation, Taipei Branch.

4    UMC is incorporated in Taiwan, the Republic of China (the "R.O.C."). According to its public

5    filings, UMC's major business activity is the dedicated full service semiconductor wafer foundry.

6    UMC's common shares trade on the Taiwan Stock Exchange (the "TSE").

7         H.     The Senior Noteholders alleged that the Debtors have no equity in their interest in the

8    Collateral Shares and that the Collateral Shares are not necessary to an effective reorganization since

9    the Debtors are in the process of liquidating their assets.

10         I.     The Senior Noteholders represent and warrant that they have taken all steps

11    necessary under applicable law to perfect the Prepetition Lien, and that the Prepetition Lien is

12    perfected as of the date hereof.

13         J.     The Committee shall have ninety (90) days from the date of entry of an order of the

14    Bankruptcy Court approving this Stipulation to commence any proceeding which objects to or

15    challenges the amount, scope, validity or priority of the Prepetition Lien.

16         K.     The Senior Noteholders have requested and the Debtors and the Committee have

17    agreed to enter into this Stipulation in order to allow the Senior Noteholders to exercise any and all

18    rights and/or remedies against the Collateral Shares provided for under the Pledge Agreement and to

19    apply the proceeds of the Collateral Shares in the manner set forth in the Pledge Agreement.

20         L.     Sonic currently maintains a brokerage account in the R.O.C. with PrimAsia (the

21    "Broker"), which, among other uses, will be used for the purpose of selling the Collateral Shares.

22         M.     The Senior Noteholders are informed by their R.O.C. counsel that United World

23    Chinese Commercial Bank (the "Bank") can be used for the purpose of facilitating settlement of the

24    proceeds of the sale of the Collateral Shares.

25         N.     The parties have requested immediate entry of this Stipulation pursuant to

26    Rule 4001(d)(3) of the Federal Rules of Bankruptcy Procedure.

27         O.     Notice of this Stipulation has been served on: (i) the Office of the United States

28    Trustee for the Northern District of California; (ii) the Committee; and (iii) any entity that filed a

HENNIGAN, BE... ...& DORMAN LLP
LA.... ...S
LOS ANGELES, CALIFORNIA

1  request for special notice pursuant to Bankruptcy Rule 2002(i). In view of the relief requested, such

2  notice constitutes sufficient notice under Bankruptcy Rule 4001 and no other notice need be given.

3      **WHEREFORE**, in consideration of the foregoing and for other good and valuable

4  consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the

5  "Parties") stipulate and agree as follows:

6      1.     The automatic stay with respect to the Collateral Shares that arose on the Petition

7  Date pursuant to Section 362(a) of the Bankruptcy Code is modified for the purpose of allowing the

8  Senior Noteholders to exercise any and all of their rights and/or remedies against the Collateral

9  Shares provided for under the Pledge Agreement. Without limiting the foregoing, the automatic

10  stay is lifted to enable the sale of the Collateral Shares in the following manner:

11      a.     Having instructed Lee and Li, its present attorneys authorized to file

12  applications and handle matters in the R.O.C. with respect to investments made by it in the

13  R.O.C made with R.O.C. Investment Commission approval under the Statute for Investment

14  by Foreign Nationals ("FIA Attorneys"), to apply to the Hsin Chu Science Based Industrial

15  Park Administration of the R.O.C. for approval under the Statute for Investments by Foreign

16  Nationals to sell the Collateral Shares through the facilities of the TSE and having received

17  such approval, Sonic shall instruct its FIA Attorneys at Lee and Li as its agent in the R.O.C.

18  to execute any and all other documents and instruments necessary or appropriate to assist in

19  the sale of the Collateral Shares by the Broker, with the proceeds of such sale(s) to be settled

20  through the Bank as set forth below.

21      b.     The parties shall execute such documents as are necessary to remove the

22  pledge endorsement on the Collateral Shares so as to permit sale thereof through the

23  facilities of the TSE.

24      c.     Sonic shall issue an instruction in the form attached hereto as Exhibit A to its

25  FIA Attorneys at Lee and Li to:

26      i.     deposit the Collateral Shares into Sonic's Taiwan Securities Central

27  Depositary Account held through the Broker (the "TSCD Account"); and

28

HENNIGAN, BEN & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

ii.    to withdraw and remit funds from the account with the Bank as and when instructed to do so by the person authorized under paragraph 2(d), below, which instruction its FIA Attorneys at Lee and Li shall acknowledge to indicate its agreement to comply therewith.

d.    Sonic shall execute the powers of attorney/authorities in the forms attached hereto as <u>Exhibit B</u> to fully and irrevocably empower Portside and <u>only</u> Portside to:

i.    instruct the Broker to sell the Collateral Shares in equal installments over five (5) consecutive trading days, commencing at the direction of Portside with the Broker having a Volume Weighted Average Price order on the Collateral Shares;

ii.    direct that the New Taiwan Dollars net proceeds of each sale be delivered to the Bank;

iii.    instruct its FIA Attorneys at Lee and Li to execute all documents required under R.O.C. foreign exchange regulations or by the Bank for conversion of such New Taiwan Dollars into US Dollars; and

iv.    instruct its FIA Attorneys at Lee and Li to instruct the Bank to remit by wire transfer one-third of such US Dollars to the account of each Senior Noteholder listed on <u>Exhibit C</u> hereto.

e.    Sonic shall execute the documentation attached hereto as <u>Exhibit D</u> to assign to the Senior Noteholders all rights of Sonic with respect to the TSCD Account and the account at the Bank.

f.    Until such time as the Collateral Shares are sold, Sonic shall limit its utilization of the Bank and/or the Broker for any other transaction so that Sonic shall not:

i.    sell any of its common shares of UMC through the Broker on the same day(s) as the Collateral Shares are being sold pursuant to paragraph 1(d)(i) above; or

ii.    deposit, or authorize the deposit of, any proceeds from the sale of any of its common shares of UMC with the Bank while any proceeds from the sale(s) of the Collateral Shares are in the possession of the Bank.

HENNIGAN, BEN & DORMAN LLP
LAW—118
LOS ANGELES, CALIFORNIA

2.   The net proceeds realized by the Senior Noteholders upon the sale of the Collateral Shares (after deducting all costs (including foreign legal fees of the FIA Attorneys at Lee & Li (solely with respect to carrying out the instructions provided for in this Stipulation) and the Senior Noteholders' counsel in the R.O.C), commissions, and any and all other charges associated with such sale(s)) shall be applied in the manner set forth in the Pledge Agreement.

3.   The Senior Noteholders acknowledge that Sonic is allowing the Senior Noteholders to use Sonic's account at the Broker for the sale of the Collateral Shares and for the distribution of the proceeds of the sale of the Collateral Shares for the convenience of and as an accommodation to the Senior Noteholders. The Senior Noteholders further acknowledge that nothing herein shall make the Debtors liable for any fraud, malfeasance, error or action taken by the Broker with respect to the Collateral Shares or the sale of the Collateral Shares.

4.   This Stipulation shall take effect and be fully enforceable immediately upon entry.

DATED: July 9, 2003

PILLSBURY WINTHROP LLP
650 Town Center Drive, Seventh Floor
Costa Mesa, CA 95054

By: _____
        Craig A. Barbarosh

Reorganization Counsel for
Debtor and Debtor in Possession

DATED: July __, 2003

LEVENE, NEALE, BENDER, RANKIN &
BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067

By: _____
        Ron Bender

Attorneys for the Official Committee of
Unsecured Creditors

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

263802\v11

-6-

STIPULATION PROVIDING RELIEF FROM THE AUTOMATIC STAY TO SENIOR NOTEHOLDERS - Case No. 03-51775-MM

1  2. The net proceeds realized by the Senior Noteholders upon the sale of the Collateral

2 Shares (after deducting all costs (including foreign legal fees of the FIA Attorneys at Lee & Li

3 (solely with respect to carrying out the instructions provided for in this Stipulation) and the Senior

4 Noteholders' counsel in the R.O.C), commissions, and any and all other charges associated with

5 such sale(s)) shall be applied in the manner set forth in the Pledge Agreement.

6  3. The Senior Noteholders acknowledge that Sonic is allowing the Senior Noteholders

7 to use Sonic's account at the Broker for the sale of the Collateral Shares and for the distribution of

8 the proceeds of the sale of the Collateral Shares for the convenience of and as an accommodation to

9 the Senior Noteholders.  The Senior Noteholders further acknowledge that nothing herein shall

10 make the Debtors liable for any fraud, malfeasance, error or action taken by the Broker with respect

11 to the Collateral Shares or the sale of the Collateral Shares.

12  4. This Stipulation shall take effect and be fully enforceable immediately upon entry.

13 DATED: July __, 2003  PILLSBURY WINTHROP LLP
650 Town Center Drive, Seventh Floor
14  Costa Mesa, CA 95054

15

16  By: _____
  Craig A. Barbarosh
17

18  Reorganization Counsel for
Debtor and Debtor in Possession

19 DATED: July 7, 2003  LEVENE, NEALE, BENDER, RANKIN &
BRILL L.L.P.
20  1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067
21

22  By: _____
23  Ron Bender

24  Attorneys for the Official Committee of
Unsecured Creditors
25

26

27

28

263802\v11  -6-

Hennigan, Bennett & Dorman llp

JUL 1 4 2003

1   DATED: July 9, 2003

2

3

4   By: _____
          for  Bruce Bennett

5

6

7

8

9                          **ORDER**

10      Based upon the foregoing Stipulation and good cause appearing therefore, it is SO

11   ORDERED.

12   DATED: July 16, 2003

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street, Suite 3300
Los Angeles, CA 90017

Counsel for Portside Growth & Opportunity Fund,
Smithfield Fiduciary LLC, and
Citadel Equity Fund Ltd.

HONORABLE MARILYN MORGAN
UNITED STATES BANKRUPTCY JUDGE

263802\w11                          -7-

STIPULATION PROVIDING RELIEF FROM THE AUTOMATIC STAY TO SENIOR NOTEHOLDERS - Case No. 03-51775-MM

EXHIBIT A

**INSTRUCTION**

To: Mr. Y. D. Deng of Lee & Li

Reference is made to that certain Stipulation Providing Relief from the Automatic Stay to Senior Noteholders, dated _____, entered into with respect to In re SONICblue Incorporated (Case No. 03-51775-MM) before the United States Bankruptcy Court for the Northern District of California, a copy of which is attached hereto ("Stipulation"). All capitalized terms used herein are used as defined in the Stipulation.

We hereby instruct you to:

(i)     deposit the Collateral Shares into the TSCD Account;

(ii)    to withdraw and remit funds from the account with the Bank as and when instructed to do so by Portside Growth & Opportunity Fund; and

(iii)   to execute any and all other documents necessary or appropriate to assist in the sale of the Collateral Shares by the Broker as contemplated by Section 1(a) of the Stipulation.

**SONICBLUE INCORPORATED**

By: _____
        Date: _____, 2003

**ACKNOWLEDGED AND AGREED**

**LEE & LI**

By: _____
        Date: _____, 2003

[rv\shw's sec\C:\Documents and Settings\morse]\Local Settings\Temporary Internet
Files\OLK7\Instruction-clean.docD:\CC\CONTR\instruction-clean.doc]

Exhibit A
Page 8

<u>EXHIBIT B</u>

## <u>POWER OF ATTORNEY</u>

SONICblue Incorporated, a corporation organized and existing under the laws of Delaware, United States of America ("USA") (the "Company"), does hereby irrevocably constitute and appoint Portside Growth & Opportunity Fund ("Portside") and each of its agents and representatives, acting alone as the Company's agents with full power of substitution and revocation, to:

1.    instruct PrimAsia ("the Broker") to sell the Collateral Shares (as that term is defined in the Pledge and Security Agreement dated April 22, 2002) in equal installments over five (5) consecutive trading days, commencing at the direction of Portside with the Broker having a Volume Weighted Average Price Order on the Collateral Shares;

2.    direct that the New Taiwan Dollars net proceeds of each sale be delivered to United World Chinese Commercial Bank ("the Bank");

3.    instruct Lee and Li, the Company's attorneys authorized to file application and handle matters in Taiwan, the Republic of China (the "R.O.C.") with respect to investment made by the Company in the R.O.C. made with R.O.C. Investment Commission approval under the Statute for Investment by Foreign Nationals ("FIA Attorneys"), to execute all documents required under R.O.C. foreign exchange regulations or by the Bank for conversion of such New Taiwan Dollars into US Dollars; and

4.    instruct the Company's FIA Attorneys to instruct the Bank to remit by wire transfer such US Dollars to the accounts of Portside, Smithfield Fiduciary LCC, and Citadel Equity Fund Ltd.

IN WITNESS WHEREOF, the Company has caused this Power of Attorney to be executed on this __ day of _____, 2003.

SONICBLUE INCORPORATED

By: _____
    Name:
    Title:

(*NOTARIZATION)
(*CONSULARIZATION)

## EXHIBIT C

**Citadel Equity Fund Ltd.**
The Bank of New York
ABA # 021-000-018
Swift: IRVTUS3N
FFC: Citadel Equity Fund Ltd.
A/C: 8900472545

**Smithfield Fiduciary LLC**
Citibank, N.A.
ABA #: 021000089
A/C: Bear, Stearns Securities Corp.
A/C#: 09253186
FBO: Smithfield Fiduciary LLC
A/C#: 102-25642-2

**Portside Growth & Opportunity Fund**
Citibank
ABA # 021 000 089
A/C: Bear Stearns Securities Corp.
A/C# 0925-3186
FFC: Portside Growth and Opportunity Fund
A/C# 102-24978

## ASSIGNMENT

**THIS ASSIGNMENT** (the "Assignment") is made as of this _____ day of _____, 2003 by SONICblue Incorporated (the "Assignor") in favor of Portside Growth & Opportunity Fund ("Portside") Smithfield Fiduciary LLC ("Smithfield"), and Citadel Equity Fund Ltd. ("Citadel", and together with Portside and Smithfield, the "Assignees").

### WITNESSETH:

**WHEREAS**, on March 21, 2003, the Assignor filed voluntary petition for relief under chapter 11 of the United States Code in the United States Bankruptcy Court for the Northern District of California, San Jose Division.

**WHEREAS**, the Assignees hold $75.0 million in principal amount of 7 $^{3}/_{4}$% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes") issued by the Assignor pursuant to a Securities Purchase Agreement, dated as of April 21, 2002, and governed by an Indenture dated as of April 22, 2002. In connection with the issuance of the Senior Notes, the Assignees and the Assignor have also entered into, among other things, the Pledge and Security Agreement, dated April 22, 2002 (the "Pledge Agreement").

**WHEREAS**, pursuant to the terms of the Pledge Agreement, the Assignor's obligations to the Assignees were partially secured by the Prepetition Lien in the Collateral Shares.

**WHEREAS**, the Assignees desire to exercise any and all rights and/or remedies against the Collateral Shares provided for under the Pledge Agreement and to apply the proceeds of the Collateral Shares in the manner set forth in the Pledge Agreement.

**WHEREAS**, the parties hereto have entered into certain Stipulation Providing Relief from the Automatic Stay to Senior Noteholders, dated _____, with respect to the foregoing ("Stipulation").

**NOW, THEREFORE**, it is agreed as follows:

## ARTICLE 1   DEFINITIONS.

Unless otherwise expressly defined herein, all defined terms used hereinabove and hereinbelow are used as defined in the Stipulation.

## ARTICLE 2   ASSIGNMENT.

(a)  The Assignor hereby assigns to the Assignees, and their successors and assigns, all of the Assignor's rights to receive

proceeds of the sale of the Collateral Shares, including but not limited to all of its rights provided for under the brokerage agreement, dated _____, entered into between the Assignor and the Broker as well as all rights of the Assignor under any and all agreements entered into between the Assignor and the Bank with respect to the proceeds of the sale of the Collateral Shares.

(b)  The Assignor agrees that the Assignees may (i) use the Assignor's account at the Broker for the sale of the Collateral Shares and for the distribution of the proceeds of the sale of the Collateral Shares; and (ii) use the Assignor's account at the Bank for the settlement/exchange of the proceeds of the sale of the Collateral Shares.

(c)  Until such time as the Collateral Shares are sold, the Assignor shall limit its utilization of the Bank and/or the Broker for any other transaction so that the Assignor shall not: (i) sell any of its common shares of UMC through the Broker on the same day(s) as the Collateral Shares are being sold pursuant to paragraph 1(d)(i) of the Stipulation; or (ii) deposit, or authorize the deposit of, any proceeds from the sale of any of its common shares of UMC with the Bank while any proceeds from the sale(s) of the Collateral Shares are in the possession of the Bank.

**ARTICLE 3  <u>NOTICE TO THE BROKER AND THE BANK</u>.**

Promptly upon execution of this Assignment, the Assignor shall serve a written notice of the Assignment on the Broker and the Bank. The Assignees shall notify the Assignor when the sale of the Collateral Shares has been completed.

**ARTICLE 4  <u>EXECUTION OF ADDITIONAL DOCUMENTS</u>.**

The Assignor undertakers to execute further documents and instruments as may be reasonably required by the Assignees to carry out the Assignment.

**ARTICLE 5  <u>GOVERNING LAW/JURISDICTION</u>.**

This Assignment shall be governed by and construed in accordance with the laws of the Republic of China.

**ARTICLE 6  <u>COUNTERPARTS</u>.**

This Assignment may be executed in any number of counterparts, each of which, when fully executed, will be considered an original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment as of the date first written above.

THE ASSIGNOR:                          SONICBLUE INCORPORATED


                                       By: _____
                                           Name:
                                           Title:



THE ASSIGNEES:                         PORTSIDE GROWTH & OPPORTUNITY FUND


                                       By: _____
                                           Name:
                                           Title:



                                       SMITHFIELD FIDUCIARY LLC


                                       By: _____
                                           Name:
                                           Title:



                                       CITADEL EQUITY FUND LTD.


                                       By: _____
                                           Name:
                                           Title:

# DECLARATION OF SERVICE

I am over the age of eighteen years and not a party to the within action. My business address is Hennigan, Bennett & Dorman LLP, 601 South Figueroa Street, Suite 3300, Los Angeles, California 90017.

On July 11, 2003, I served the following pleading:

**STIPULATION PROVIDING RELIEF FROM THE AUTOMATIC STAY TO SENIOR NOTEHOLDERS; ORDER THEREON**

on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, with first-class postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as follows:

I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in an affidavit.

I declare that I am employed in an office of a member of the bar of this Court, at whose direction the within service was made. I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

EXECUTED on July 11, 2003, at Los Angeles, California.

Kevin Floyd, Declarant

## Official Committees

Oscar Garza, Esq.
Gibson Dunn & Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA 92614

Ron Bender, Esq.
Levene, Neale, Bender, Rankin &
Brill
1801 Avenue of the Stars
Suite 1120
Los Angeles, CA 90067

Lillian Stenfeldt, Esq.
Gray Cary
1755 Embarcadero Road
Palo Alto, CA 94303

Jim Coggburn
Maxtor Corporation
500 McCarthy Blvd.
Milpitas, CA 95035

William Sweeney
Maxtor Corporation
2452 Clover Basin Drive
Longmont, CO 80503

Toshiyuki Miyake
Matsushita Kotobuki Electronics
Sales of America, LLC
700 No. Hayden Island Drive
Suite 200
Portland, OR 97217

Koichi Kishimoto
Matsushita Kotobuki Electronics
Industries, Ltd.
247 Fukutake, Saijo
Ehime, Japan
793-8510

Bruce MacIntyre, Esq.
Dax J. Hansen, Esq.
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101

Adam J. Chill
Highbridge Capital Management,
LLC
9 West 57th Street
27th Floor
New York, NY 10019

Jeffrey Smith
Ramius Capital Group, LLC
666 Third Avenue
26th Floor
New York, NY 10017

Kenneth A. Simpler
Citadel Investment Group, LLC
225 W. Washington Street
9th Floor
Chicago, IL 60606

Gregg Colburn
Citadel Investment Group, LLC
225 W. Washington Street
9th Floor
Chicago, IL 60606

Bruce Bennett, Esq.
Joshua Morse, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street
Suite 3300
Los Angeles, CA 90017

Alan Cormier, Esq.
Michael F. Zullas, Esq.
Manufacturers' Service Ltd.
300 Baker Avenue
Suite 106
Concord, MA 01742

Richard Zermani
Hale & Dorr LLP
60 State Street
Boston, MA 02109

Diana Chan
A-Max Technology Company, Ltd.
12/F Remington Centre
23 Hung To Road
Kwun Tong, Kowloon
Hong Kong

Nels Nelsen
Alliant Partners
435 Tasso Street
3rd Floor
Palo Alto, CA 94301

Peter Fishman, Esq.
Houlihan Lokey Howard & Zukin
Capital
One Sansome Street
CitiCorp Center
San Francisco, CA 94101

60311228v1

**SECURED**

Bankers/Softech/Mid-States
4201 Lake Cook Road
Northbrook, IL  60062

C3 Sales, Inc.
10914 Roaring Brook Lane
Houston, TX  77024

Citadel Investment Group, LLC
225 West Washington Street
Chicago, IL  60606

Congress Financial Corporation (Western)
251 So. Lake Avenue, Suite 900
Pasadena, CA  91101

Employment Development Department
1500 - 11th Street
P.O. Box 826880
Sacramento, CA  95814

Finova Capital Corporation
1060 First Avenue
King of Prussia, PA  19406

Flextronics Internation USA, Inc.
2090 Fortune Drive
San Jose, CA  95131

Hewlett-Packard Company Financing
20 Perimeter Summit Blvd.
Atlanta, GA  30319

Highbridge Capital Management, LLC
9 West 57th Street, 27th Floor
New York, NY  10017

Kevin Zeidan
Vice President
Comerica Bank - California
One Market Plaza
Spear Street Tower, Suite 1830
San Francisco, CA  94105

Jonathan Neil & Associates, Inc.
c/o Glasberg, Pollak & Associates
425 California Street, Suite 825
San Francisco, CA  94104

Lucent Technologies, Inc.
Attn:  Legal Department
600 Mountain Avenue
Murray Hill, NJ  07974

Manufacturers' Services Limited
300 Baker Avenue
Concord, MA  01742

Multiple Zones International, Inc.
520 So. El Camino Real, Suite 318
San Mateo, CA  94402

Newcourt Communications Finance Corp.
2 Gatehall Drive
Parsippany, NJ  07054

Newcourt Financial Technology
1830 West Airfield Drive
DFW Airport, TX  75261

Pacific NW Properties Ltd Partnership
9665 S.W. Allen Blvd., Suite 115
Beaverton, OR  97005

Ramius Capital Group, LLC
666 Third Avenue, 26th Floor
New York, NY  10017

Safeco Credit Company, Inc.
10865 Willows Road NE
Suite E-3
Redmond, WA  98052

Sanwa Bank of California
220 Almaden Blvd.
San Jose, CA  95113

Silicon Valley Bank
3000 Lakeside Drive
Santa Clara, CA  95054

Skyline Capital Associates, LLC
217 Sunset Court
Pacifica, CA  94044

Telogy, Inc.
3885 Bohannan Drive
Menlo Park, CA  94025

## ALLEGED LIENHOLDERS

AT&T Capital Corporation
Instrument & Data Services
1830 W. Airfield Drive
DFW Airport, TX 75261

Quail Creek Bank NA
12202 North May Street
Oklahoma City, OK 73120

Red Lion Hotels Inc.
755 Crossover Lane
Memphis, TN 38117

Safeco Credit Company, Inc.
Safeco Plaza S-4
Seattle, WA 98185

Round Rock Independent School District
c/o Brian E. Brown, Esq.
Linebarger, Goggan, Blair, Sampson & Pena
1949 South I.H. 35
P.O. Box 17428
Austin, TX 78760

Round Rock Independent School District
c/o Nelda Wells Spears
Assessor and Collector of Taxes
County of Travis
1010 Lovaca
Austin, TX 78701

County of Santa Clara
Tax Collector
70 West Hedding Street
San Jose, CA 95110

County Tax Assessor, GA
Clerk of the Court
Gwinnett Superior Court
Real Estate Division
75 Langley Drive
Lawrenceville, GA 30045

County Tax Assessor, GA
Gwinnett Assessor's Office
75 Langley Drive
Lawrenceville, GA 30045

Richardson Independent School District
c/o Randall L. Shepherd, Esq.
Law Offices of Robert E. Luna P.C.
4411 N. Central Expressway
Dallas, TX 75205

Richardson Independent School District
Attn: Mia Martin, General Counsel
400 South Greenville Avenue
Richardson, TX 75081

West Virginia State Tax Department
1001 Lee Street
Charleston, West Virginia 25321

Valerie Gulla, an infant by G/A/L, Charlotte Gulla
229 S. Chester Pike
Glenolden, PA 19036

Valerie Gulla, an infant by G/A/L, Charlotte Gulla
59 New Briar Lane
Clifton, NJ 07012

Lucent Technologies Inc.
600 Mountain Avenue
Murray Hill
Berkeley Heights, NJ 07974

Raymond Leasing Corporation
Corporate Headquarters
8-20 South Canal Street
Greene, NY 13778

Digital Commerce Corporation
c/o Alan Krenek
Agent for Service of Process
575 Herndon Parkway, Suite 300
Herndon, VA 20170

Florida Department of Revenue
Bankruptcy Department
Doyle E. Carlton Bldg.
501 S. Calhoun Street, Room 343
Tallahassee, FL 32399-0100

Arlana Stewart
670 W. Tenaya Avenue
Clovis, CA 93612-5729

Citicorp Vendor Finance, Inc.
700 East Gate Drive, Suite 400
Park Ridge, NJ 08054

Citicorp Vendor Finance, Inc.
c/o Corporation Service Company Which Will Do
Business in California as CSC – Lawyers Incorporating
Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833

Jonathan Neil & Associates, Inc.
c/o Glassberg, Pollak & Associates
44 Montgomery Street, Suite 1660
San Francisco, CA 94104

Falcon Advisors, Inc.
c/o Craig B. Florence, Esq.
Gardere, Wynne & Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

S3 Incorporated
1801 Mission College Blvd.
Santa Clara, CA 95052-8058

Joseph Kincaid
Swanson, Martin & Bell
Counsel for Raymond Leading
1 IBM Plaza, Suite 28900
330 N. Wabash
Chicago, IL 60611

60314835v1

## Financial/Banks

Bank One
Attn: Eugene O'Connor
Legal Dept. – AZ1-1314
201 North Central Avenue
Phoenix, AZ 85004

Kevin Zeidan
Vice President
Comerica Bank – California
One Market Plaza
Spear Street Tower, Suite 1830
San Francisco, CA 94105

Credit Suisse First Boston
Attn: Legal Department
600 California Street, 20th Floor
San Francisco, CA 94108

Merrill Lynch
Attn: Legal Department
101 California Street, Suite 1400
San Francisco, CA 94111

USB PaineWebber
Attn: Legal Department
One North Wacker Drive, Suite 2500
Chicago, IL 60606

Wells Fargo
Attn: Legal Department
Commercial Banking MAC S4101-251
100 West Washington
Phoenix, AZ 85003

Wells Fargo
Attn: Legal Department
121 Park Plaza
3rd Floor
San Jose, CA 95113

60317891v1

## ALL NON-DEBTOR PARTIES TO THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Phonetel Communications, Inc.
The Sinclair Building,
Attn: Daniel Henderson
512 Main St., Ste. 601
Fort Worth, Texas 76102

Duet GP d/b/a "pressplay"
28 West 44th St., 6th Fl.
New York, NY 10036

Anthony G. Matthews
10403 McClemont Ave.
Tujunga, CA 91042

COE & Associates
8115 SW Nimbus Ave, Bldg 11
Beaverton, OR 97008

Lienau Associates, Inc.
9693 K Gerwig Ln
Columbia, MD 21046

MJ Daniels
1000 Beltline Road, Suite 200
Carrollton, TX 25006

Select Sales Inc.
7750 W. 78th St
Bloomington, MN 55439-2520

Equitable Life Assurance Society of the U.S.
1290 Avenue of the Americas
New York, NY 10104

Mantague LLC
1290 Avenue of the Americas
New York, NY 10104

Reed Elsevier, Inc.
275 Washington St.
Newton, MA 02158-1630

Silicon Valley Properties, LLC
13155 Noel Road, Suite 2400
Dallas, TX 75240-5090

Penn Station, LLC
1000 Roscomare Rd
Los Angeles, CA 90077

Parigest
34 Rue de la Federation
Paris XVe, France

Yong-Ik Lee
Hyundai Apartment 108-204
433 Apkujung-dong
Kangnam-ku, Seoul

Han-Seung Lee
Hyundai Apartment 202-1106
23-3 Chungdam-dong
Kangnam-ku, Seoul

Han-Lim Lee
Hyundai Apartment 108-204
433 Apkujung-dong
Kangnam-ku, Seoul

Young-Wook Lee
Hanyang Apartment 81-502
510 Apukujung-dong
Kangnam-ku, Seoul

Suk-Huan Lee
Nokwon Hanshin Apartment 102-702
60-7 Jamwon-dong
Seocho-ku, Seoul

Shimizu Fudosan KK
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Zwischen Der Gewerb-und Technologiepark St.
Ingbert GmbH
Kastanienweg 15
D.66369 St Ingbert
Germany
Hans Finn
33672 Blue Lantern St., Unit 5
Dana Point, CA 92629

Hans Finn
1120 Columbus Ave.
San Francisco, CA 94133-1738

Walter Nunn
NW Maple Ave.
Lawton, OK 73507

60324705v1

Selectron Global Services, Inc.
7225 SW Bonita Rd
Portland, OR 97224

Wells Fargo
Attn: Legal Department
420 Montgomery St.
San Francisco, CA 94109

Microsoft
Attn: Legal Department
One Microsoft Way
Redmond, WA 98052-6399

Raymond Leasing Corporation
P.O. Box 10870
Newark, NJ 07193-0870

CEBus Industry Council, Inc.
4405 Massachusetts Ave
Indianapolis, IN 46218

Chip Level Designs
N8, Scarborough Dr.
Lake Oswego, OR 97304

Diva Marketing, LLC
425 NW 18th Ave, Ste. 1
Portland, OR 97209

E.C. Solutions
673 Meridan Rd
Waterbury, CT 06705

Troy White
112 Shelly Ln
Huntsville, AL 35810

Craye Hall
106 Calvert Rd
Lacey Springs, AL 35754

Router Ware
c/o Wind River
500 Wind River Way
Alameda, CA 94501

Kerbango, Inc.
c/o 3Com Corp
Attn: Legal Department
5500 Great American Pkwy
Santa Clara, CA 95052-8145

Mindvision Incorporated. Mindvision, Inc.
5901 N. 58th Street
Lincoln, NE 58507

General DataComm, Inc.
6 Rubber Ave
Nagatick, CT 06770

Monster Cable Products, Inc.
455 Valley Dr.
Brisbane, CA 94005

Advanced Micro Devices, Inc.
One AMD Place
P.O. Box 3453
Sunnyvale, CA 94088

Conexant Systems, Inc.
4311 Jamboree Rd
Newport Beach, CA 92660

Epigram, Inc.
870 W. Maude Ave
Sunnyvale, CA 94086

Home Phone Line Networking Alliance, Inc.
2694 Bishop Dr., Ste 275
San Ramon, CA 94583

Rockwell Semiconductor Systems, Inc.
4311 Jamboree
Newport Beach, CA 92660

Standard Microsystems Corp.
80 Arkay Dr
Hauppauge, NY 11788

United States Software Corporation
c/o Lantronics
15353 Barranca Pkwy
Irvine, CA 92618

Winportal Technologies, Inc.
1430 San Raymundo Rd
Hillsborough, CA 94010

OEM, Inc.
1555 SE Crystal Lake Dr.
P.O. Box 1205
Corvallis, OR 97339-1205

Arista Records, Inc.
6 West 57th St.
New York, NY 10019

60324705v1

DataPlay, Inc.
2580 55th St.
Boulder, CO  80301

SFT Technologies
Cukrova 14
811 08 Bratislava
Slovenska republika

Jeff Backes
3048 Sierra Road
San Jose, CA 95132

ATLM Taiwan Inc.
13FG, No. 99, Sec. 1
Nan Kan Road Lu Chu Shiang Toa Yuan
Hsien 338 Taiwan Republic of China

Alcatel USA Marketing, Inc.
1000 Coit Rd
Plano, TX  75075

Reigncom Ltd.
4th Floor, Dara B/D
1637-5 Seocho-Dong
Seoul, Korea  137-070

Symbios Logic, Inc.
4420 Arrow West Dr.
Colorado Springs, CO  80907

Not Limited, Inc.
500 Allerton St., Ste 102
Redwood City, CA  94063

Intertrust Technologies Corporation
Attn:  General Counsel
460 Oakmead Pkwy
Sunnyvale, CA  94086

Pericom Networks, Inc.
13000 Weston Pkwy, Ste. 105
Cary, NC  27513

Boston Acoustics
300 Jubilee Dr.
Peabody, MA  01961

Jabil Global Services
4601 Cromwell Ave
Memphis, TN  38118

Dell Products L.P.
One Dell Way
Round Rock, TX  78682

WindRiver
201 Moffet Park Dr.
Sunnyvale, CA  94089-1322

Exodus Communications, Inc.
2831 Mission College Blvd.
Santa Clara, CA  95054-1838

Entertainment America of TN, Inc.
Attn:  Ernestine Patton GM
6960 Eastgate Blvd
Lebanon, TN  37090

Visionary Management Technologies, Inc.
2107 North First Street, Suite 360
San Jose, CA 95131

Resond2, Inc.
207 NW West Park Ave
Portland, OR  97209

Sony Electronics Inc.
16450 W. Bernardo Dr.
San Diego, CA  92127

Executive Search Services
3000 Sand Hill Rd
Building 2, Ste 175
Menlo Park, CA  94025

Updata Capital
11600 Sunrise Valley Dr., Ste 450
Reston, VA  20191

DecisionOne Corporation
50 E Swedesford Rd
Frazer, PA  19355

Showtime Networks Inc.
1633 Broadway
New York, NY  10019

Colossal Pictures
2800 3rd St
San Francisco, CA  94102

Adelphia
1 N. Main St.
Couderport, PA  16915

Gotuit Video, Inc.
300 Brickstone Square
Andover, MA  01810

3

60324705v1

A&R Partners, Inc.
201 Baldwin Avenue
San Mateo, CA 94401

The Price Co. and Costco Wholesale Corp.
999 Lake Drive
Issaquah, WA 98027

WebSideStory, Inc.
10182 Telesis Court, 6th Floor
San Diego, CA 92121

PortalPlayer
3255 Scott Blvd., Building 1
Santa Clara, CA 95054

EMG
Digital Transmission Licensing Administrator, LLC
Attn: Stephen P. Balogh, Acting President
c/o Intel Corporation
2200 Mission College Blvd.
Santa Clara, CA 95052

Cybersource
1295 Charleston Road
Mountain View, CA 94043-1307

Verisign
Customer Service
1350 Charleston Road
Mountain View, CA 94043-1307

Island Data Corporation
5780 Fleet Street, Suite 200
Carlsbad, CA 92008

Print Inc.
5110 Carillon Point
Kirkland, WA 98033

Cor-O-Van
901 16th Street
San Francisco, Ca 94107

4

## U.S. Trustee and Regulatory Agencies

Office of the U.S. Trustee
Nanette Dumas, Esq.
280 South First Street, Room 268
San Jose, CA  95113

Internal Revenue Service
Special Procedure Section - Bankruptcy
55 South Market Street
HQ6600
San Jose, CA  95113

The Nasdaq Stock Market
P.O. Box 7777-W9740
Philadelphia, PA 19175-9740

Securities and Exchange Commission
Sarah Moyed, Bankruptcy Unit
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA  90036

# Special Notice

Scott P. Cooper, Esq.
Mark Zohn, Esq.
Mary Rose, Esq.
Proskauer Rose LLP
2049 Century Park East
Suite 3200
Los Angeles, CA 90067

Suzzanne Uhland, Esq.
Alan Rader, Esq.
Austin K. Barron, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

Bruce G. MacIntyre, Esq.
Perkins Coie LLP
1201 Third Avenue
40th Floor
Seattle, WA 98101

Philip P. Bogosian
Thought Communications, Inc.
20 Great Oaks Boulevard
Suite 130
San Jose, CA 95119

Desmond J. Cussen, Esq.
Gibson Dunn & Crutcher, LLP
One Montgomery Street
Suite 3100
San Francisco, CA 94104

Ron M. Oliner, Esq.
Buchalter Nemer Fields &
Younger
333 Market Street
25th Floor
San Francisco, CA 94105

Carm Adimando
Opta Systems
47 Cherry Gate Lane
Trumbull, CT 06611

George Belfield
Greenberg Traurig LLP
2450 Colorado Avenue
Suite 400 East
Santa Monica, CA 90404

Dilip Ghelani
Fidelity Investments
2300 Litton Lane
Client Services ECM
Hebron, KY 41048

John David Wilburn, Esq.
McGuirewoods LLP
1750 Tysons Boulevard
Suite 1800
McLean, VA 22102

Richard H. Cross, Jr., Esq.
Law Offices of Richard H.
Cross, Jr. LLC
1201 North Orange Street
Suite 610
Wilmington, DE 19801

William Webb Farrer, Esq.
Law Offices of Richard H.
Cross, Jr. LLC
300 Montgomery Street
Suite 600
San Francisco, CA 94104

Gratian Joseph
Skyline Capital Associates LLC
217 Sunset Court
Pacifica, CA 94044

Rodger M. Landau
McDermott, Will & Emery
2049 Century Park East
34th Floor
Los Angeles, CA 90067

Krishna Rangarajan
CRT Capital Group LLC
262 Harbar Drive
Stamford, CT 06902

Seolwan Koo
Samsung Electronics Co., Ltd.
21st Fl., Samsung Main
Bldg. 250, 2-Ka, Taepyung-Ro,
Chung-Ku
Seoul
Korea
100-742

Robert D. Hansen, Esq.
99 Almaden Boulevard
8th Floor
San Jose, CA 95113

Richard M. Pachulski, Esq.
Pachulski Stang Ziehl Young &
Jones
10100 Santa Monica Blvd.
Suite 1100
Los Angeles, CA 90067

Scott Emmons
State Street
725 South Figueroa
Suite 3100
Los Angeles, CA 90017

Bruce Bennett, Esq.
Joshua D. Morse, Esq.
James Johnston, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street
Suite 3300
Los Angeles, CA 90017

Eleazer Klein, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Robert J. Brantman, Esq.
Katten Muchin Zavis Rosenman
525 West Monroe Street
Suite 1600
Chicago, IL 60661

Richard Chow
Millennium Technology
Ventures
350 Park Avenue
10th Floor
New York, NY 10022

Peter Gilhuly, Esq.
Latham & Watkins
633 West Fifth Street
Suite 4000
Los Angeles, CA 90071

1

60311227v1

Stuart West
TiVo
2160 Gold Street
P.O. Box 2160
Alviso, CA 95002

Robert H. Heath
Thomson Inc.
3332 Washington Street
San Francisco, CA 94118

Vernon Back, Esq.
Thomson Inc.
10330 North Meridian Street
Indianapolis, IN 46290

Anthony Wood
Roku LLC
399 Sherman Avenue
Suite 12
Palo Alto, CA 94306

Roku LLC
Cooley Godward LLP
One Maritime Plaza
20th Floor
San Francisco, CA 94111-3580

Mark W. Wasserman, Esq.
Reed Smith
3110 Fairview Park Drive
Suite 1400
Falls Church, VA

Rick B. Antonoff, Esq.
Clifford E. Neimeth, Esq.
Greenberg Traurig, LLP
200 Park Avenue
MetLife Bldg.
New York, NY 10166

Daniel Clivner, Esq.
Simpson Thatcher & Bartlett
10 Universal City Plaza
Suite 1850
Los Angeles, CA 91608

Kenneth S. Ziman, Esq.
Simpson Thatcher & Bartlett
425 Lexington Avenue
New York, NY 10017

Jeffery E. Ostrow, Esq.
Simpson Thatcher & Bartlett
3330 Hillview Avenue
Palo Alto, CA 94304

Robert H. Trust, Esq.
Simpson Thatcher & Bartlett
425 Lexington Avenue
New York, NY 10017

Jim Andrews
Andrews Air Corporation
50 Tanforan Avenue
South San Francisco, CA 94080

Bernard S. Greenfield
McGrane, Greenfield, Hannon
& Harrington LLP
40 South Market Street, Second
Floor
San Jose, CA 95113

Corporate Software, Ltd.
Attn: Tomohisa Inoue
Business Support Department
2-5-8 Higashishinagawa
Shinagawa-Ku
Tokyo, Japan
140-0002

Equity Security Holder Pro Se
Adam P. Friedman
c/o. Wolff & Samson PC
One Boland Drive
West Orange, NJ 07052

R. Robin Lai
IT&T Technologies, Inc.
P.O. Box 3670
Fullerton, CA 92834

Michael Burke, Esq.
Nutter McClennen & Fish LLP
World Trade Center
155 Seaport Blvd.
Boston, MA 02210

David C. Jones
Assistant Vice President
BCIA New England Holdings
One Boston Place, Suite 2100
Boston, MA 02108-4406

Ira P. Rothken, Esq.
Rothken Law Firm
1050 Northgate Drive
Suite 520
San Rafael, CA 94903

Richard Adler
Winston & Strawn
101 California Street
San Francisco, CA 984114

D. Bruce Prout, Esq.
Christie, Parker & Hale, L.L.P.
350 West Colorado Boulevard
Suite 350
Pasadena, CA 91105

Emmett Stanton
Fenwick & West
801 California Street
Mountain View, CA 94041-
2014

Laurence Pulgram and Market
Porter
Fenwick & West – San
Francisco
275 Battery Street
San Francisco, CA 94111

Legal Department
IBM Corporation
Mail Stop 119
One Northcastle Drive
Armonk, NY 10504

Robert Rotstein, Rodger M.
Lanu
McDermott Will & Emery
34th Floor
2049 Century Park East
Los Angeles, CA 90067

Tapio Arimo and Per-Ake Stahl
Nokia Inc.
545 Wisman Road
Mountain View, CA 94043-
2172

Cooper, Zohn & Rose
Proskauer Rose LLP
Suite 2300
2049 Century Park East
Los Angeles, CA 90067-3125

Karen Tillman, Esq.
RadioShack Corporation
100 Throckmorton Street, Suite
1700
Fort Worth, TX 76102

Sarah D. Moyed
Bankruptcy Counsel
Pacific Regional Office
11th Floor
5670 Wilshire Boulevard
Los Angeles, CA 90036

2

Susan K. Ross, Esq.
Rodriguez, O'Donnel, Ross,
Fuerest, Gonzalez & Williams
5777 W. Century Boulevard
Suite 520
Los Angeles, CA 90045-5629

Peter T. Steinberg, Esq.
Steinberg, Nutter & Brent
501 Colorado Avenue
Suite 300
Santa Monica, CA 90401

Christopher Alliotts, Esq.
IT&T Limited, IT&T
Technologies, Inc. and Arise
Solutions
Murray & Murray
19330 Steven Creek Boulevard
Cupertino, CA 95014

Preferred Packaging
c/o Don C. Fletcher, Esq.
The Cavanagh Law Firm
1850 N. Central Avenue
Suite 2400
Phoenix, AZ 85004

Patricia S. Mar
Morrison & Foerster LLP
425 Market Street
33rd Floor
San Francisco, CA 94105

Cindy A. Cohn, Esq.
Fred von Lohmann, Esq.
Gwenith A. Hinze, Esq.
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dion W. Hayes, Esq.
Joseph S. Sheerin, Esq.
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219

Riverside Claims
Attn: Neil Herskowitz
2109 Broadway, Suite 206
New York, NY 10023

Norman E. MacKay, Esq.
Germino, MacKay, Runte &
McDonald
2500 El Camino Real, Suite 210
Palo Alto, CA 94306-1791

Jason McFall
Simpson Thacher & Bartlett
10 Universal City Plaza, Suite
1850
Los Angeles, CA 91608

Suzanne M. Smith, Esq.
Heller Ehrman White &
McAuliffe LLP
333 Bush Street
San Francisco, CA 94104-2878

Lori Robertson and David
Aelvoet
Linebarger Goggan Blair &
Sampson
P.O. Box 17428
1949 South IH 35 (7841)
Austin, TX 78760

Mr. Sherman Wan
Via Technologies, Inc.
940 Mission Court
Fremont, CA 94539-8202

Mike C. Buckley
Todd C. Toral
Reed Smith Crosby Heafey LLP
1999 Harrison Street
Oakland, CA 94612

Robert C. Shenfeld
Reed Smith Crosby Heafey LLP
355 South Grand Avenue
Los Angeles, CA 90071

Citicapital Commercial Leasing
Corporation
c/o Roger L. Efremsky, Esq.
Law Offices of Efremsky &
Nagel
5776 Stoneridge Mall Road
Suite 360
Pleasanton, CA 94588

3

60311227v1

EXHIBIT 44

# ORIGINAL

1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT (SBN 105430)
2  JOSHUA D. MORSE (SBN 211050)
   601 South Figueroa Street, Suite 3300
3  Los Angeles, California 90017
   Telephone: (213) 694-1200
4  Fax: (213) 694-1234

5  Counsel for Portside Growth & Opportunity
   Fund, Smithfield Fiduciary LLC, and
6  Citadel Equity Fund Ltd.



FILED

OCT 1 6 2003

7

8              UNITED STATES BANKRUPTCY COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11  In re                         )  Case No. 03-51775-MM
                                  )
12  SONICBLUE INCORPORATED, a     )  Chapter 11
    Delaware Corporation, et al.,¹ )
13                                )  (Jointly Administered)
           Debtors.               )
14                                )  **STIPULATION PROVIDING RELIEF FROM**
                                  )  **THE AUTOMATIC STAY TO SENIOR**
15                                )  **NOTEHOLDERS; ORDER THEREON**
                                  )
16                                )  Hearing
                                  )
17                                )  [None Requested]
                                  )
18

19       This Stipulation Providing Relief From the Automatic Stay to Senior Noteholders (the

20  "Stipulation") is entered into as of October 14 2003, by and among SONICblue Incorporated, et al.,

21  the debtors and debtors in possession herein (the "Debtors"), the Official Committee of Unsecured

22  Creditors (the "Committee"), Portside Growth & Opportunity Fund ("Portside"), Smithfield

23  Fiduciary LLC ("Smithfield"), and Citadel Equity Fund Ltd. ("Citadel," and together with Portside

24  and Smithfield, the "Senior Noteholders"), by and through their respective counsel and/or agents,

25  with reference to the following recitals:

26

27  _____

28  ¹  The Debtors include the following entities: SONICblue Incorporated, Diamond Multimedia
       Systems, Inc., ReplayTV, Inc., and Sensory Science Corporation.

315188v5

**RECITALS**

A.    On March 21, 2003 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Chapter 11 Cases").

B.    The Debtors are continuing in possession of their property, and operating and managing their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

C.    This Court has jurisdiction over the Chapter 11 Cases pursuant to 18 U.S.C. Sections 157(b) and 1334.

D.    Together, the Senior Noteholders hold $75.0 million in principal amount of 7 ¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes") issued by debtor SONICblue Incorporated ("Sonic") pursuant to a Securities Purchase Agreement dated as of April 21, 2002, and governed by an Indenture dated as of April 22, 2002 (the "Senior Notes Indenture").

E.    The Senior Noteholders allege that immediately prior to and as of the Petition Date, the Debtors were truly and justly indebted to the Senior Noteholders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $75.0 million, in respect of the Senior Notes, plus premium, if any, accrued and unpaid interest, and other fees in accordance with the Senior Notes Indenture (collectively, the "Obligations").

F.    In connection with the issuance of the Senior Notes, the Senior Noteholders and Sonic also entered into, among other things, the Pledge and Security Agreement, dated April 22, 2002 (the "Pledge Agreement").

G.    The Senior Noteholders allege that the Obligations were, immediately prior to and as of the Petition Date, partially secured by a valid, enforceable and perfected first priority lien and security interest granted by Sonic in favor of the Senior Noteholders under the Pledge Agreement (the "Prepetition Lien") in the Collateral Shares (as that term is defined in the Pledge Agreement). The Collateral Shares include (a) 21,426,586 common shares (the "Initial Shares") in United

315188\v5    -2-

STIPULATION PROVIDING RELIEF FROM THE AUTOMATIC STAY TO SENIOR NOTEHOLDERS - Case No. 03-51775-MM

HENNIGAN, BEN & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  Microelectronics Corporation ("UMC"), which were the subject of the "Stipulation Providing Relief

2  From The Automatic Stay To Senior Noteholders; Order Thereon" [docket # 334] (the "Initial

3  Stipulation"); (b) as provided under the definition of Collateral Shares in the Pledge

4  Agreement, 3,213,987 common shares in UMC issued by UMC on the Initial Shares as a 15% stock

5  dividend in August 2002 (the "2002 Dividend Shares"), which also were the subject of the Initial

6  Stipulation and (c) as provided under the definition of Collateral Shares in the Pledge

7  Agreement, 988,087 common shares of UMC issued by UMC on the Initial Shares and the 2002

8  Dividend Shares as a 4.01% stock dividend in August 2003 (the "2003 Dividend Shares").[2]

9          H.      Pursuant to the terms of the Initial Stipulation, the Senior Noteholders previously

10  sold the Initial Shares and the 2002 Dividend Shares. Because of the timing of UMC's issuance of

11  the 2003 Dividend Shares, the 2003 Dividend Shares were not included in the sale transactions

12  authorized under the Initial Stipulation.

13          I.      UMC is incorporated in Taiwan, the Republic of China (the "R.O.C."). According to

14  its public filings, UMC's major business activity is the dedicated full service semiconductor wafer

15  foundry. UMC's common shares trade on the Taiwan Stock Exchange (the "TSE").

16          J.      The Senior Noteholders alleged that the Debtors have no equity in their interest in

17  the 2003 Dividend Shares and that the 2003 Dividend Shares are not necessary to an effective

18  reorganization since the Debtors are in the process of liquidating their assets.

19          K.      The Senior Noteholders represent and warrant that they had taken all steps necessary

20  under applicable law to perfect the Prepetition Lien.

21

22

23

24

---

25  [2]  The Pledge Agreement defines "Collateral Shares" to mean " . . . collectively 21,426,586
    UMC Shares owned by the Pledgor subject to any adjustment for any stock split, stock
26  dividend, recapitalization, stock combination or similar transaction after the date of this
    Agreement, and including, with respect to each such Collateral Share, the right to receive, all
27  other dividends and distributions (whether in cash, securities or otherwise) thereon and all
    other rights and interests currently existing with respect thereto, or otherwise vested in or
28  granted to the owner or holder of such Collateral Shares from and after the date of this
    Agreement." Pledge Agreement at 2 (emphasis added).

L.     The Committee shall have ninety (90) days from the date of entry of an order of the Bankruptcy Court approving this Stipulation to commence any proceeding which objects to or challenges the amount, scope, validity or priority of the Prepetition Lien.

M.     Pursuant to the "Order Authorizing Sale of Stock in United Microelectronics Corporation" [docket # 470] (the "<u>Order</u>"), the Debtors have satisfied the required dividend tax on the 2003 Dividend Shares. The distribution of proceeds to the Senior Noteholders from the sale of the 2003 Dividend Shares authorized hereunder is subject to the reservation of rights contained in the Order.

N.     The Senior Noteholders have requested and the Debtors and the Committee have agreed to enter into this Stipulation in order to allow the Senior Noteholders to exercise any and all rights and/or remedies against the 2003 Dividend Shares provided for under the Pledge Agreement and to apply the proceeds of the 2003 Dividend Shares in the manner set forth in the Pledge Agreement.

O.     Sonic currently maintains a brokerage account in the R.O.C. with PrimAsia (the "<u>Broker</u>"), which, among other uses, will be used for the purpose of selling the 2003 Dividend Shares.

P.     The Senior Noteholders are informed by their R.O.C. counsel that United World Chinese Commercial Bank (the "<u>Bank</u>") can be used for the purpose of facilitating settlement of the proceeds of the sale of the 2003 Dividend Shares.

Q.     The parties have requested immediate entry of this Stipulation pursuant to Rule 4001(d)(3) of the Federal Rules of Bankruptcy Procedure.

R.     Notice of this Stipulation has been served on: (i) the Office of the United States Trustee for the Northern District of California; (ii) the Committee; and (iii) any entity that filed a request for special notice pursuant to Bankruptcy Rule 2002(i). In view of the relief requested, such notice constitutes sufficient notice under Bankruptcy Rule 4001 and no other notice need be given.

**WHEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "<u>Parties</u>") stipulate and agree as follows:

HENNIGAN, BENI, & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BEN & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1.    The automatic stay with respect to the 2003 Dividend Shares that arose on the Petition Date pursuant to Section 362(a) of the Bankruptcy Code is modified for the purpose of allowing the Senior Noteholders to exercise any and all of their rights and/or remedies against the 2003 Dividend Shares provided for under the Pledge Agreement. Without limiting the foregoing, the automatic stay is lifted to enable the sale of the 2003 Dividend Shares in the following manner:

a.    Having instructed Lee and Li, its present attorneys authorized to file applications and handle matters in the R.O.C. with respect to investments made by it in the R.O.C made with R.O.C. Investment Commission approval under the Statute for Investment by Foreign Nationals ("FIA Attorneys"), to apply to the Hsin Chu Science Based Industrial Park Administration of the R.O.C. for approvals under the Statute for Investments by Foreign Nationals to (i) receive; and (ii) then sell the 2003 Dividend Shares through the facilities of the TSE (the "FIA Approvals").

b.    The parties shall execute such documents, if any, as are necessary to take delivery of the 2003 Dividend Shares so as to permit sale thereof through the facilities of the TSE.

c.    Sonic shall issue an instruction in the form attached hereto as Exhibit A to its FIA Attorneys at Lee and Li to, upon receipt of the FIA Approvals:

i.    deliver payment to UMC of the required dividend tax on the 2003 Dividend Shares (to the extent such has not then previously been delivered);

ii.    deposit the 2003 Dividend Shares into Sonic's Taiwan Securities Central Depositary Account held through the Broker (the "TSCD Account"); and

iii.    withdraw and remit funds from the account with the Bank as and when instructed to do so by the person authorized under paragraph 2(d), below, which instruction its FIA Attorneys at Lee and Li shall acknowledge to indicate its agreement to comply therewith.

d.    Sonic shall execute the powers of attorney/authorities in the forms attached hereto as Exhibit B to fully and irrevocably empower Portside and only Portside to:

315188\w5

-5-

1     i.  instruct the Broker to sell the 2003 Dividend Shares during a single

2 trading day, commencing at the direction of Portside with the Broker having a

3 Volume Weighted Average Price order on the 2003 Dividend Shares;

4     ii.  direct that the New Taiwan Dollars net proceeds of each sale be

5 delivered to the Bank;

6     iii.  instruct its FIA Attorneys at Lee and Li to execute all documents

7 required under R.O.C. foreign exchange regulations or by the Bank for conversion of

8 such New Taiwan Dollars into US Dollars; and

9     iv.  instruct its FIA Attorneys at Lee and Li to instruct the Bank to remit

10 by wire transfer one-third of such US Dollars to the account of each Senior

11 Noteholder listed on <u>Exhibit C</u> hereto.

12   e.  Sonic shall execute the documentation attached hereto as <u>Exhibit D</u> to assign

13 to the Senior Noteholders all rights of Sonic with respect to the TSCD Account and the

14 account at the Bank.

15   f.  Until such time as the 2003 Dividend Shares are sold, Sonic shall limit its

16 utilization of the Bank and/or the Broker for any other transaction so that Sonic shall not:

17     i.  sell any of its common shares of UMC through the Broker on the

18 same day(s) as the 2003 Dividend Shares are being sold pursuant to paragraph 1(d)(i)

19 above; or

20     ii.  deposit, or authorize the deposit of, any proceeds from the sale of any

21 of its common shares of UMC with the Bank while any proceeds from the sale(s) of

22 the 2003 Dividend Shares are in the possession of the Bank.

23   2.  The net proceeds realized by the Senior Noteholders upon the sale of the 2003

24 Dividend Shares (after deducting all costs (including foreign legal fees of the FIA Attorneys at Lee

25 & Li (solely with respect to carrying out the instructions provided for in this Stipulation) and the

26 Senior Noteholders' counsel in the R.O.C), commissions, and any and all other charges associated

27 with such sale(s)) shall be applied in the manner set forth in the Pledge Agreement.

28

HENNIGAN, BENN, & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

3.    The Senior Noteholders acknowledge that Sonic is allowing the Senior Noteholders to use Sonic's account at the Broker for the sale of the 2003 Dividend Shares and for the distribution of the proceeds of the sale of the 2003 Dividend Shares for the convenience of and as an accommodation to the Senior Noteholders. The Senior Noteholders further acknowledge that nothing herein shall make the Debtors liable for any fraud, malfeasance, error or action taken by the Broker with respect to the 2003 Dividend Shares or the sale of the 2003 Dividend Shares.

4.    This Stipulation shall take effect and be fully enforceable immediately upon entry.

DATED:  October 14, 2003

PILLSBURY WINTHROP LLP
650 Town Center Drive, Seventh Floor
Costa Mesa, CA 95054

By: _____
            Craig A. Barbarosh

Reorganization Counsel for
Debtor and Debtor in Possession

DATED:  October ___, 2003

LEVENE, NEALE, BENDER, RANKIN &
BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067

By: _____
            Ron Bender

Attorneys for the Official Committee of
Unsecured Creditors

DATED:  October ___, 2003

HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street, Suite 3300
Los Angeles, CA 90017

By: _____
            Bruce Bennett

Counsel for Portside Growth & Opportunity Fund,
Smithfield Fiduciary LLC, and
Citadel Equity Fund Ltd.

Hennigan, Bennett & Dorman llp
largain
los angeles, california

3.    The Senior Noteholders acknowledge that Sonic is allowing the Senior Noteholders to use Sonic's account at the Broker for the sale of the 2003 Dividend Shares and for the distribution of the proceeds of the sale of the 2003 Dividend Shares for the convenience of and as an accommodation to the Senior Noteholders. The Senior Noteholders further acknowledge that nothing herein shall make the Debtors liable for any fraud, malfeasance, error or action taken by the Broker with respect to the 2003 Dividend Shares or the sale of the 2003 Dividend Shares.

4.    This Stipulation shall take effect and be fully enforceable immediately upon entry.

DATED: October __, 2003

PILLSBURY WINTHROP LLP
650 Town Center Drive, Seventh Floor
Costa Mesa, CA 95054

By: _____
        Craig A. Barbarosh

Reorganization Counsel for
Debtor and Debtor in Possession

DATED: October __, 2003

LEVENE, NEALE, BENDER, RANKIN &
BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067

By: _____
        Ron Bender

Attorneys for the Official Committee of
Unsecured Creditors

DATED: October __, 2003

HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street, Suite 3300
Los Angeles, CA 90017

By: _____
        Bruce Bennett

Counsel for Portside Growth & Opportunity Fund,
Smithfield Fiduciary LLC, and
Citadel Equity Fund Ltd.

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

3.     The Senior Noteholders acknowledge that Sonic is allowing the Senior Noteholders to use Sonic's account at the Broker for the sale of the 2003 Dividend Shares and for the distribution of the proceeds of the sale of the 2003 Dividend Shares for the convenience of and as an accommodation to the Senior Noteholders.  The Senior Noteholders further acknowledge that nothing herein shall make the Debtors liable for any fraud, malfeasance, error or action taken by the Broker with respect to the 2003 Dividend Shares or the sale of the 2003 Dividend Shares.

4.     This Stipulation shall take effect and be fully enforceable immediately upon entry.

DATED:  October___, 2003

PILLSBURY WINTHROP LLP
650 Town Center Drive, Seventh Floor
Costa Mesa, CA 95054


By: _____
            Craig A. Barbarosh

Reorganization Counsel for
Debtor and Debtor in Possession

DATED:  October ___, 2003

LEVENE, NEALE, BENDER, RANKIN &
BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067


By: _____
            Ron Bender

Attorneys for the Official Committee of
Unsecured Creditors

DATED:  October 15, 2003

HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street, Suite 3300
Los Angeles, CA 90017


By: _____
      for      Bruce Bennett

Counsel for Portside Growth & Opportunity Fund,
Smithfield Fiduciary LLC, and
Citadel Equity Fund Ltd.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

RCT 16 2003

1  **ORDER**

2      Based upon the foregoing Stipulation and good cause appearing therefore, it is SO

3  ORDERED.

4  DATED: _Oct 27 2003_

5

6  HONORABLE MARILYN MORGAN
    UNITED STATES BANKRUPTCY JUDGE

7

8  FILED

9  03 OCT 27 AM 11:05

10 U.S. BANKRUPTCY COURT
    NORTHERN DIST. OF CA.
    SAN JOSE, CA.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BEN, & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

315188v5

-8-

EXHIBIT A

**INSTRUCTION**

To: Mr. Y. D. Deng of Lee & Li

Reference is made to that certain Stipulation Providing Relief from the Automatic Stay to Senior Noteholders, dated October __, 2003, entered into with respect to In re SONICblue Incorporated (Case No. 03-51775-MM) before the United States Bankruptcy Court for the Northern District of California, a copy of which is attached hereto ("Stipulation"). All capitalized terms used herein are used as defined in the Stipulation.

We hereby instruct you, upon receipt of the FIA Approvals:

(i)    to deliver to UMC payment of the required dividend tax on the Additional Collateral Shares (to the extent such has not been previously delivered);

(ii)   to deposit the 2003 Dividend Shares into the TSCD Account;

(iii)  to withdraw and remit funds from the account with the Bank as and when instructed to do so by Portside Growth & Opportunity Fund; and

(iv)   to execute any and all other documents necessary or appropriate to assist in the sale of the Collateral Shares by the Broker as contemplated by Section 1(a) of the Stipulation.

SONICBLUE INCORPORATED

By: _____

Date: _____, 2003

ACKNOWLEDGED AND AGREED

LEE & LI

By: _____

Date: _____, 2003

329022v1

### POWER OF ATTORNEY

SONICblue Incorporated, a corporation organized and existing under the laws of Delaware, United States of America ("USA") (the "Company"), does hereby irrevocably constitute and appoint Portside Growth & Opportunity Fund ("Portside") and each of its agents and representatives, acting alone as the Company's agents with full power of substitution and revocation, to:

1.  instruct PrimAsia ("the Broker") to sell the 2003 Dividend Shares (as that term is defined in that certain Stipulation Providing Relief from the Automatic Stay to Senior Debt Holders, dated October __, 2003, entered into In re SONICblue Incorporated (Case No.: 03-35775-mn) before the United States Bankruptcy Court for the Northern District of California) during a single trading day, commencing at the direction of Portside with the Broker having a Volume Weighted Average Price Order on the 2003 Dividend Shares;

2.  direct that the New Taiwan Dollars net proceeds of each sale be delivered to United World Chinese Commercial Bank ("the Bank");

3.  instruct Lee and Li, the Company's attorneys authorized to file application and handle matters in Taiwan, the Republic of China (the "R.O.C.") with respect to investment made by the Company in the R.O.C. made with R.O.C. Investment Commission approval under the Statute for Investment by Foreign Nationals ("FIA Attorneys"), to execute all documents required under R.O.C. foreign exchange regulations or by the Bank for conversion of such New Taiwan Dollars into US Dollars; and

4.  instruct the Company's FIA Attorneys to instruct the Bank to remit by wire transfer such US Dollars to the accounts of Portside, Smithfield Fiduciary LCC, and Citadel Equity Fund Ltd.

IN WITNESS WHEREOF, the Company has caused this Power of Attorney to be executed on this ___ day of _____, 2003.

SONICBLUE INCORPORATED

By: _____
    Name:
    Title:

::ODMA\PCDOCS\HBDDOCS\329019\1

## EXHIBIT C

**Citadel Equity Fund Ltd.**
The Bank of New York
ABA # 021-000-018
Swift: IRVTUS3N
FFC: Citadel Equity Fund Ltd.
A/C: 8900472545

**Smithfield Fiduciary LLC**
Citibank, N.A.
ABA #: 021000089
A/C: Bear, Stearns Securities Corp.
A/C#: 09253186
FBO: Smithfield Fiduciary LLC
A/C#: 102-25642-2

**Portside Growth & Opportunity Fund**
Citibank
ABA # 021 000 089
A/C: Bear Stearns Securities Corp.
A/C# 0925-3186
FFC: Portside Growth and Opportunity Fund
A/C# 102-24978

295403\w1

EXHIBIT D

## ASSIGNMENT

THIS ASSIGNMENT (the "Assignment") is made as of this _____ day of _____, 2003 by SONICblue Incorporated (the "Assignor") in favor of Portside Growth & Opportunity Fund ("Portside") Smithfield Fiduciary LLC ("Smithfield"), and Citadel Equity Fund Ltd. ("Citadel", and together with Portside and Smithfield, the "Assignees").

## WITNESSETH:

WHEREAS, on March 21, 2003, the Assignor filed voluntary petition for relief under chapter 11 of the United States Code in the United States Bankruptcy Court for the Northern District of California, San Jose Division.

WHEREAS, the Assignees hold $75.0 million in principal amount of 7 $3/4$% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes") issued by the Assignor pursuant to a Securities Purchase Agreement, dated as of April 21, 2002, and governed by an Indenture dated as of April 22, 2002. In connection with the issuance of the Senior Notes, the Assignees and the Assignor have also entered into, among other things, the Pledge and Security Agreement, dated April 22, 2002 (the "Pledge Agreement").

WHEREAS, pursuant to the terms of the Pledge Agreement, the Assignor's obligations to the Assignees were partially secured by the Prepetition Lien in the 2003 Dividend Shares (as defined in the Stipulation).

WHEREAS, the Assignees desire to exercise any and all rights and/or remedies against the 2003 Dividend Shares provided for under the Pledge Agreement and to apply the proceeds of the 2003 Dividend Shares in the manner set forth in the Pledge Agreement.

WHEREAS, the parties hereto have entered into certain Stipulation Providing Relief from the Automatic Stay to Senior Noteholders, dated October __, 2003, with respect to the foregoing ("Stipulation").

NOW, THEREFORE, it is agreed as follows:

## ARTICLE 1  DEFINITIONS.

Unless otherwise expressly defined herein, all defined terms used hereinabove and hereinbelow are used as defined in the Stipulation.

329025\w1

## ARTICLE 2  ASSIGNMENT.

(a)  The Assignor hereby assigns to the Assignees, and their successors and assigns, all of the Assignor's rights to receive proceeds of the sale of the 2003 Dividend Shares, including but not limited to all of its rights provided for under the brokerage agreement, dated _____, entered into between the Assignor and the Broker as well as all rights of the Assignor under any and all agreements entered into between the Assignor and the Bank with respect to the proceeds of the sale of the 2003 Dividend Shares.

(b)  The Assignor agrees that the Assignees may (i) use the Assignor's account at the Broker for the sale of the 2003 Dividend Shares and for the distribution of the proceeds of the sale of the 2003 Dividend Shares; and (ii) use the Assignor's account at the Bank for the settlement/exchange of the proceeds of the sale of the 2003 Dividend Shares.

(c)  Until such time as the 2003 Dividend Shares are sold, the Assignor shall limit its utilization of the Bank and/or the Broker for any other transaction so that the Assignor shall not: (i) sell any of its common shares of UMC through the Broker on the same day(s) as the 2003 Dividend Shares are being sold pursuant to paragraph 1(d)(i) of the Stipulation; or (ii) deposit, or authorize the deposit of, any proceeds from the sale of any of its common shares of UMC with the Bank while any proceeds from the sale(s) of the 2003 Dividend Shares are in the possession of the Bank.

## ARTICLE 3  NOTICE TO THE BROKER AND THE BANK.

Promptly upon execution of this Assignment, the Assignor shall serve a written notice of the Assignment on the Broker and the Bank. The Assignees shall notify the Assignor when the sale of the 2003 Dividend Shares has been completed.

## ARTICLE 4  EXECUTION OF ADDITIONAL DOCUMENTS.

The Assignor undertakers to execute further documents and instruments as may be reasonably required by the Assignees to carry out the Assignment.

## ARTICLE 5  GOVERNING LAW/JURISDICTION.

This Assignment shall be governed by and construed in accordance with the laws of the Republic of China.

## ARTICLE 6  COUNTERPARTS.

This Assignment may be executed in any number of counterparts, each of which, when fully executed, will be considered an original.

329025v1                  - 2 -

**IN WITNESS WHEREOF,** the parties hereto have executed this Assignment as of the date first written above.

THE ASSIGNOR:                    SONICBLUE INCORPORATED


                                 By: _____
                                     Name: _____
                                     Title: _____



THE ASSIGNEES:                   PORTSIDE GROWTH & OPPORTUNITY FUND


                                 By: _____
                                     Name: _____
                                     Title: _____



                                 SMITHFIELD FIDUCIARY LLC


                                 By: _____
                                     Name: _____
                                     Title: _____



                                 CITADEL EQUITY FUND LTD.


                                 By: _____
                                     Name: _____
                                     Title: _____


329025\w1                    - 3 -

**DECLARATION OF SERVICE**

I am over the age of eighteen years and not a party to the within action. My business address is Hennigan, Bennett & Dorman LLP, 601 South Figueroa Street, Suite 3300, Los Angeles, California 90017.

On October 15, 2003, I served the following pleading:

**STIPULATION PROVIDING RELIEF FROM THE AUTOMATIC STAY TO SENIOR NOTEHOLDERS; ORDER THEREON**

on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, with first-class postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as follows:

See attached service list.

I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in an affidavit.

I declare that I am employed in an office of a member of the bar of this Court, at whose direction the within service was made. I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

EXECUTED on October 15, 2003, at Los Angeles, California.

_____
Kevin Floyd, Declarant

## U.S. TRUSTEE AND REGULATORY AGENCIES

Office of the U.S. Trustee
Nanette Dumas, Esq.
280 South First Street, Room 268
San Jose, CA  95113

Internal Revenue Service
Special Procedure Section - Bankruptcy
55 South Market Street
HQ6600
San Jose, CA  95113

The Nasdaq Stock Market
P.O. Box 7777-W9740
Philadelphia, PA 19175-9740

Securities and Exchange Commission
Sarah Moyed, Bankruptcy Unit
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA  90036

## ALL NON-DEBTOR PARTIES TO THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Phonetel Communications, Inc.
The Sinclair Building,
Attn: Daniel Henderson
512 Main St., Ste. 601
Fort Worth, Texas 76102

Duet GP d/b/a "pressplay"
28 West 44th St., 6th Fl.
New York, NY 10036

COE & Associates
8115 SW Nimbus Ave, Bldg 11
Beaverton, OR 97008

Lienau Associates, Inc.
9693 K Gerwig Ln
Columbia, MD 21046

MJ Daniels
1000 Beltline Road, Suite 200
Carrollton, TX 25006

Select Sales Inc.
7750 W. 78th St
Bloomington, MN 55439-2520

Equitable Life Assurance Society of the U.S.
1290 Avenue of the Americas
New York, NY 10104

Reed Elsevier, Inc.
275 Washington St.
Newton, MA 02158-1630

Silicon Valley Properties, LLC
13155 Noel Road, Suite 2400
Dallas, TX 75240-5090

Penn Station, LLC
1000 Roscomare Rd
Los Angeles, CA 90077

Parigest
34 Rue de la Federation
Paris XVe, France

Yong-Ik Lee
Hyundai Apartment 108-204
433 Apkujung-dong
Kangnam-ku, Seoul

Han-Seung Lee
Hyundai Apartment 202-1106
23-3 Chungdam-dong
Kangnam-ku, Seoul

Han-Lim Lee
Hyundai Apartment 108-204
433 Apkujung-dong
Kangnam-ku, Seoul

Young-Wook Lee
Hanyang Apartment 81-502
510 Apukujung-dong
Kangnam-ku, Seoul

Suk-Huan Lee
Nokwon Hanshin Apartment 102-702
60-7 Jamwon-dong
Seocho-ku, Seoul

Zwischen Der Gewerb-und Technologiepark St.
Ingbert GmbH
Kastanienweg 15
D.66369 St Ingbert
Germany

Walter Nunn
NW Maple Ave.
Lawton, OK 73507

Selectron Global Services, Inc.
7225 SW Bonita Rd
Portland, OR 97224

Wells Fargo
Attn: Legal Department
420 Montgomery St.
San Francisco, CA 94109

Microsoft
Attn: Legal Department
One Microsoft Way
Redmond, WA 98052-6399

Raymond Leasing Corporation
P.O. Box 10870
Newark, NJ 07193-0870

Chip Level Designs
N8, Scarborough Dr.
Lake Oswego, OR 97304

E.C. Solutions
673 Meridan Rd
Waterbury, CT 06705

Troy White
190 Beaver Dam Rd
Toney, AL 35773

Craye Hall
106 Calvert Rd
Lacey Springs, AL 35754

Router Ware
c/o Wind River
500 Wind River Way
Alameda, CA 94501

Kerbango, Inc.
c/o 3Com Corp
Attn: Legal Department
5500 Great American Pkwy
Santa Clara, CA 95052-8145

Mindvision Incorporated. Mindvision, Inc.
5901 N. 58th Street
Lincoln, NE 58507

General DataComm, Inc.
6 Rubber Ave
Nagatick, CT 06770

Monster Cable Products, Inc.
455 Valley Dr.
Brisbane, CA 94005

Advanced Micro Devices, Inc.
One AMD Place
P.O. Box 3453
Sunnyvale, CA 94088

Conexant Systems, Inc.
4311 Jamboree Rd
Newport Beach, CA 92660

Home Phone Line Networking Alliance, Inc.
2694 Bishop Dr., Ste 275
San Ramon, CA 94583

Rockwell Semiconductor Systems, Inc.
4311 Jamboree
Newport Beach, CA 92660

Standard Microsystems Corp.
80 Arkay Dr
Hauppauge, NY 11788

United States Software Corporation
c/o Lantronics
15353 Barranca Pkwy
Irvine, CA 92618

Winportal Technologies, Inc.
1430 San Raymundo Rd
Hillsborough, CA 94010

OEM, Inc.
1555 SE Crystal Lake Dr.
P.O. Box 1205
Corvallis, OR 97339-1205

Arista Records, Inc.
6 West 57th St.
New York, NY 10019

DataPlay, Inc.
2580 55th St.
Boulder, CO 80301

SFT Technologies
Cukrova 14
811 08 Bratislava
Slovenska republika

Jeff Backes
3048 Sierra Road
San Jose, CA 95132

ATLM Taiwan Inc.
13FG, No. 99, Sec. 1
Nan Kan Road Lu Chu Shiang Toa Yuan
Hsien 338 Taiwan Republic of China

Alcatel USA Marketing, Inc.
1000 Coit Rd
Plano, TX 75075

Reigncom Ltd.
4th Floor, Dara B/D
1637-5 Seocho-Dong
Seoul, Korea 137-070

Symbios Logic, Inc.
4420 Arrow West Dr.
Colorado Springs, CO 80907

Boston Acoustics
300 Jubilee Dr.
Peabody, MA 01961

Jabil Global Services
4601 Cromwell Ave
Memphis, TN 38118

Dell Products L.P.
One Dell Way
Round Rock, TX 78682

WindRiver
201 Moffet Park Dr.
Sunnyvale, CA 94089-1322

Exodus Communications, Inc.
2831 Mission College Blvd.
Santa Clara, CA 95054-1838

Entertainment America of TN, Inc.
Attn: Ernestine Patton GM
6960 Eastgate Blvd
Lebanon, TN 37090

Resond2, Inc.
207 NW West Park Ave
Portland, OR 97209

Sony Electronics Inc.
16450 W. Bernardo Dr.
San Diego, CA 92127

DecisionOne Corporation
50 E Swedesford Rd
Frazer, PA 19355

Showtime Networks Inc.
1633 Broadway
New York, NY 10019

Colossal Pictures
2800 3rd St
San Francisco, CA 94102

Adelphia
1 N. Main St.
Couderport, PA 16915

Gotuit Video, Inc.
300 Brickstone Square
Andover, MA 01810

A&R Partners, Inc.
201 Baldwin Avenue
San Mateo, CA 94401

The Price Co. and Costco Wholesale Corp.
999 Lake Drive
Issaquah, WA 98027

WebSideStory, Inc.
10182 Telesis Court, 6th Floor
San Diego, CA 92121

PortalPlayer
3255 Scott Blvd., Building 1
Santa Clara, CA 95054

EMG
Digital Transmission Licensing Administrator, LLC
Attn: Stephen P. Balogh, Acting President
c/o Intel Corporation
2200 Mission College Blvd.
Santa Clara, CA 95052

Cybersource
1295 Charleston Road
Mountain View, CA 94043-1307

Verisign
Customer Service
1350 Charleston Road
Mountain View, CA 94043-1307

Island Data Corporation
2011 Palomar Airport Road, Suite 300
Carlsbad, CA 92009

Cor-O-Van
901 16th Street
San Francisco, Ca 94107

# FINANCIAL/BANKS

Bank One
Attn: Eugene O'Connor
Legal Dept. – AZ1-1314
201 North Central Avenue
Phoenix, AZ 85004

Kevin Zeidan
Vice President
Comerica Bank – California
One Market Plaza
Spear Street Tower, Suite 1830
San Francisco, CA 94105

Credit Suisse First Boston
Attn: Legal Department
600 California Street, 20th Floor
San Francisco, CA 94108

Merrill Lynch
Attn: Legal Department
101 California Street, Suite 1400
San Francisco, CA 94111

USB PaineWebber
Attn: Legal Department
One North Wacker Drive, Suite 2500
Chicago, IL 60606

Wells Fargo
Attn: Legal Department
Commercial Banking MAC S4101-251
100 West Washington
Phoenix, AZ 85003

Wells Fargo
Attn: Legal Department
121 Park Plaza
3rd Floor
San Jose, CA 95113

# ALLEGED LIENHOLDERS

Quail Creek Bank NA
12202 North May Street
Oklahoma City, OK 73120

Red Lion Hotels Inc.
755 Crossover Lane
Memphis, TN 38117

Safeco Credit Company, Inc.
Safeco Plaza S-4
Seattle, WA 98185

Round Rock Independent School District
c/o Brian E. Brown, Esq.
Linebarger, Goggan, Blair, Sampson & Pena
1949 South I.H. 35
P.O. Box 17428
Austin, TX 78760

Round Rock Independent School District
c/o Nelda Wells Spears
Assessor and Collector of Taxes
County of Travis
1010 Lovaca
Austin, TX 78701

County of Santa Clara
Tax Collector
70 West Hedding Street
San Jose, CA 95110

County Tax Assessor, GA
Clerk of the Court
Gwinnett Superior Court
Real Estate Division
75 Langley Drive
Lawrenceville, GA 30045

*County Tax Assessor, GA*
Gwinnett Assessor's Office
75 Langley Drive
Lawrenceville, GA 30045

Richardson Independent School District
c/o Randall L. Shepherd, Esq.
Law Offices of Robert E. Luna P.C.
4411 N. Central Expressway
Dallas, TX 75205

Richardson Independent School District
Attn:  Mia Martin, General Counsel
400 South Greenville Avenue
Richardson, TX 75081

West Virginia State Tax Department
1001 Lee Street
Charleston, West Virginia 25321

Valerie Gulla, an infant by G/A/L, Charlotte Gulla
1511 Glen Ave.
Folcroft, PA 19032

Valerie Gulla, an infant by G/A/L, Charlotte Gulla
59 New Briar Lane
Clifton, NJ 07012

Lucent Technologies Inc.
600 Mountain Avenue
Murray Hill
Berkeley Heights, NJ  07974

Raymond Leasing Corporation
Corporate Headquarters
8-20 South Canal Street
Greene, NY 13778

Florida Department of Revenue
Bankruptcy Department
Doyle E. Carlton Bldg.
501 S. Calhoun Street, Room 343
Tallahassee, FL 32399-0100

Arlana Stewart
670 W. Tenaya Avenue
Clovis, CA 93612-5729

Citicorp Vendor Finance, Inc.
*700 East Gate Drive, Suite 400*
Park Ridge, NJ 08054

Citicorp Vendor Finance, Inc.
c/o Corporation Service Company Which Will Do
Business in California as CSC – Lawyers Incorporating
Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833

Jonathan Neil & Associates, Inc.
c/o Glassberg, Pollak & Associates
425 California Street, Suite 850
San Francisco, CA 94104

Falcon Advisors, Inc.
c/o Craig B. Florence, Esq.
Gardere, Wynne & Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

S3 Incorporated
1801 Mission College Blvd.
Santa Clara, CA 95052-8058

Joseph Kincaid
Swanson, Martin & Bell
Counsel for Raymond Leading
1 IBM Plaza, Suite 28900
330 N. Wabash
Chicago, IL 60611

# SECURED

Bankers/Softech/Mid-States
4201 Lake Cook Road
Northbrook, IL  60062

Citadel Investment Group, LLC
225 West Washington Street
Chicago, IL  60606

Congress Financial Corporation (Western)
251 So. Lake Avenue, Suite 900
Pasadena, CA  91101

Employment Development Department
1500 - 11th Street
P.O. Box 826880
Sacramento, CA  95814

Finova Capital Corporation
1060 First Avenue
King of Prussia, PA  19406

Flextronics Internation USA, Inc.
2090 Fortune Drive
San Jose, CA  95131

Hewlett-Packard Company Financing
20 Perimeter Summit Blvd.
Atlanta, GA  30319

Highbridge Capital Management, LLC
9 West 57th Street, 27th Floor
New York, NY  10017

Kevin Zeidan
Vice President
Comerica Bank - California
One Market Plaza
Spear Street Tower, Suite 1830
San Francisco, CA  94105

Jonathan Neil & Associates, Inc.
c/o Glasberg, Pollak & Associates
425 California Street, Suite 825
San Francisco, CA  94104

Lucent Technologies, Inc.
Attn:  Legal Department
600 Mountain Avenue
Murray Hill, NJ  07974

Manufacturers' Services Limited
300 Baker Avenue
Concord, MA  01742

Multiple Zones International, Inc.
520 So. El Camino Real, Suite 318
San Mateo, CA  94402

Newcourt Communications Finance Corp.
2 Gatehall Drive
Parsippany, NJ  07054

Newcourt Financial Technology
1830 West Airfield Drive
DFW Airport, TX  75261

Pacific NW Properties Ltd Partnership
9665 S.W. Allen Blvd., Suite 115
Beaverton, OR  97005

Ramius Capital Group, LLC
666 Third Avenue, 26th Floor
New York, NY  10017

Sanwa Bank of California
220 Almaden Blvd.
San Jose, CA  95113

Skyline Capital Associates, LLC
217 Sunset Court
Pacifica, CA  94044

## OFFICIAL COMMITTEES

Oscar Garza, Esq.
Gibson Dunn & Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA 92614

Ron Bender, Esq.
Levene, Neale, Bender, Rankin &
Brill
1801 Avenue of the Stars
Suite 1120
Los Angeles, CA 90067

Lillian Stenfeldt, Esq.
Gray Cary
1755 Embarcadero Road
Palo Alto, CA 94303

Jim Coggburn
Maxtor Corporation
500 McCarthy Blvd.
Milpitas, CA 95035

William Sweeney
Maxtor Corporation
2452 Clover Basin Drive
Longmont, CO 80503

Toshiyuki Miyake
Matsushita Kotobuki Electronics
Sales of America, LLC
700 No. Hayden Island Drive
Suite 200
Portland, OR 97217

Koichi Kishimoto
Matsushita Kotobuki Electronics
Industries, Ltd.
247 Fukutake, Saijo
Ehime, Japan
793-8510

Bruce MacIntyre, Esq.
Dax J. Hansen, Esq.
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101

Adam J. Chill
Highbridge Capital Mgmt., LLC
9 West 57th Street
27th Floor
New York, NY 10019

Jeffrey Smith
Ramius Capital Group, LLC
666 Third Avenue, 26th Floor
New York, NY 10017

Kenneth A. Simpler
Citadel Investment Group, LLC
225 W. Washington Street
9th Floor
Chicago, IL 60606

Gregg Colburn
Citadel Investment Group, LLC
225 W. Washington Street
9th Floor
Chicago, IL 60606

Bruce Bennett, Esq.
Joshua Morse, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street, Suite 3300
Los Angeles, CA 90017

Alan Cormier, Esq.
Michael F. Zullas, Esq.
Mamufacturers' Service Ltd.
300 Baker Avenue, Suite 106
Concord, MA 01742

Richard Zermani
Hale & Dorr LLP
60 State Street
Boston, MA 02109

Diana Chan
A-Max Technology Company, Ltd.
12/F Remington Centre
23 Hung To Road
Kwun Tong, Kowloon
Hong Kong

Nels Nelsen
Alliant Partners
435 Tasso Street, 3rd Floor
Palo Alto, CA 94301

Peter Fishman, Esq.
Houlihan Lokey Howard & Zukin
Capital
One Sansome Street
CitiCorp Center
San Francisco, CA 94101

## Special Notice

Scott P. Cooper, Esq.
Mark Zohn, Esq.
Mary Rose, Esq.
Proskauer Rose LLP
2049 Century Park East
Suite 3200
Los Angeles, CA 90067

Suzzanne Uhland, Esq.
Alan Rader, Esq.
Austin K. Barron, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

Bruce G. MacIntyre, Esq.
Perkins Coie LLP
1201 Third Avenue
40th Floor
Seattle, WA 98101

Philip P. Bogosian
Thought Communications, Inc.
20 Great Oaks Boulevard
Suite 130
San Jose, CA 95119

Desmond J. Cussen, Esq.
Gibson Dunn & Crutcher, LLP
One Montgomery Street
Suite 3100
San Francisco, CA 94104

Ron M. Oliner, Esq.
Buchalter Nemer Fields &
Younger
333 Market Street
25th Floor
San Francisco, CA 94105

Carm Adimando
Opta Systems
47 Cherry Gate Lane
Trumbull, CT 06611

George Belfield
Greenberg Traurig LLP
2450 Colorado Avenue
Suite 400 East
Santa Monica, CA 90404

Dilip Ghelani
Fidelity Investments
2300 Litton Lane
Client Services ECM
Hebron, KY 41048

John David Wilburn, Esq.
McGuirewoods LLP
1750 Tysons Boulevard
Suite 1800
McLean, VA 22102

William Webb Farrer, Esq.
Law Offices of Richard H.
Cross, Jr. LLC
300 Montgomery Street
Suite 600
San Francisco, CA 94104

Gratian Joseph
Skyline Capital Associates LLC
217 Sunset Court
Pacifica, CA 94044

Rodger M. Landau
McDermott, Will & Emery
2049 Century Park East
34th Floor
Los Angeles, CA 90067

Krishna Rangarajan
CRT Capital Group LLC
262 Harbar Drive
Stamford, CT 06902

Seolwan Koo
Samsung Electronics Co., Ltd.
21st Fl., Samsung Main
Bldg. 250, 2-Ka, Taepyung-Ro,
Chung-Ku
Seoul
Korea
100-742

Robert D. Hansen, Esq.
99 Almaden Boulevard
8th Floor
San Jose, CA 95113

Richard M. Pachulski, Esq.
Pachulski Stang Ziehl Young &
Jones
10100 Santa Monica Blvd.
Suite 1100
Los Angeles, CA 90067

Bruce Bennett, Esq.
Joshua D. Morse, Esq.
James Johnston, Esq.
Hennigan Bennett & Dorman
601 So. Figueroa Street
Suite 3300
Los Angeles, CA 90017

Eleazer Klein, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Robert J. Brantman, Esq.
Katten Muchin Zavis Rosenman
525 West Monroe Street
Suite 1600
Chicago, IL 60661

Richard Chow
Millennium Technology
Ventures
350 Park Avenue
10th Floor
New York, NY 10022

Peter Gilhuly, Esq.
Latham & Watkins
633 West Fifth Street
Suite 4000
Los Angeles, CA 90071

Stuart West
TiVo
2160 Gold Street
P.O. Box 2160
Alviso, CA 95002

Robert H. Heath
Thomson Inc.
3332 Washington Street
San Francisco, CA 94118

Vernon Back, Esq.
Thomson Inc.
10330 North Meridian Street
Indianapolis, IN 46290

Anthony Wood
Roku LLC
399 Sherman Ave., Suite 12
Palo Alto, CA 94306

Roku LLC
Cooley Godward LLP
One Maritime Plaza
20th Floor
San Francisco, CA 94111-3580

Mark W. Wasserman, Esq.
Reed Smith
3110 Fairview Park Drive
Suite 1400
Falls Church, VA 22042

Rick B. Antonoff, Esq.
Clifford E. Neimeth, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166

Daniel Clivner, Esq.
Simpson Thatcher & Bartlett
10 Universal City Plaza
Suite 1850
Los Angeles, CA 91608

Kenneth S. Ziman, Esq.
Simpson Thatcher & Bartlett
425 Lexington Avenue
New York, NY 10017

Jeffery E. Ostrow, Esq.
Simpson Thatcher & Bartlett
3330 Hillview Avenue
Palo Alto, CA 94304

Robert H. Trust, Esq.
Simpson Thatcher & Bartlett
425 Lexington Avenue
New York, NY 10017

Jim Andrews
Andrews Air Corporation
50 Tanforan Avenue
South San Francisco, CA 94080

Bernard S. Greenfield
McGrane, Greenfield, Hannon
& Harrington LLP
40 South Market Street, 2nd Fl.
San Jose, CA 95113

Equity Security Holder Pro Se
Adam P. Friedman
c/o. Wolff & Samson PC
One Boland Drive
West Orange, NJ 07052

R. Robin Lai
IT&T Technologies, Inc.
P.O. Box 3670
Fullerton, CA 92834

Michael Burke, Esq.
Nutter McClennen & Fish LLP
World Trade Center
155 Seaport Blvd.
Boston, MA 02210

David C. Jones
Assistant Vice President
BCIA New England Holdings
One Boston Place, Suite 2100
Boston, MA 02108-4406

Ira P. Rothken, Esq.
Rothken Law Firm
1050 Northgate Drive
Suite 520
San Rafael, CA 94903

Richard Adler
Winston & Strawn
101 California Street
San Francisco, CA 984114

D. Bruce Prout, Esq.
Christie, Parker & Hale, L.L.P.
350 W. Colorado Blvd., Ste. 350
Pasadena, CA 91105

Emmett Stanton
Fenwick & West
801 California Street
Mountain View, CA 94041-
2014

Laurence Pulgram and Market
Porter
Fenwick & West – San
Francisco
275 Battery Street
San Francisco, CA 94111

Legal Department
IBM Corporation
Mail Stop 119
One Northcastle Drive
Armonk, NY 10504

Robert Rotstein, Rodger M.
Lanu
McDermott Will & Emery
34th Floor
2049 Century Park East
Los Angeles, CA 90067

Tapio Arimo and Per-Ake Stahl
Nokia Inc.
545 Wisman Road
Mountain View, CA 94043-
2172

Cooper, Zohn & Rose
Proskauer Rose LLP
Suite 2300
2049 Century Park East
Los Angeles, CA 90067-3125

Karen Tillman, Esq.
RadioShack Corporation
100 Throckmorton Street,
Suite 1700
Fort Worth, TX 76102

Sarah D. Moyed
Bankruptcy Counsel
Pacific Regional Office
11th Floor
5670 Wilshire Boulevard
Los Angeles, CA 90036

Susan K. Ross, Esq.
Rodriguez, O'Donnel, Ross,
Fuerest, Gonzalez & Williams
5777 W. Century Boulevard
Suite 520
Los Angeles, CA 90045-5629

Peter T. Steinberg, Esq.
Steinberg, Nutter & Brent
501 Colorado Avenue
Suite 300
Santa Monica, CA 90401

Christopher Alliotts, Esq.
IT&T Limited, IT&T
Technologies, Inc. and Arise
Solutions
Murray & Murray
19330 Steven Creek Boulevard
Cupertino, CA 95014

Preferred Packaging
c/o Don C. Fletcher, Esq.
The Cavanagh Law Firm
1850 N. Central Avenue
Suite 2400
Phoenix, AZ 85004

Patricia S. Mar
Morrison & Foerster LLP
425 Market Street
33rd Floor
San Francisco, CA 94105

Cindy A. Cohn, Esq.
Fred von Lohmann, Esq.
Gwenith A. Hinze, Esq.
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dion W. Hayes, Esq.
Joseph S. Sheerin, Esq.
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219

Riverside Claims
Attn: Neil Herskowitz
2109 Broadway, Suite 206
New York, NY 10023

Norman E. MacKay, Esq.
Germino, MacKay, Runte &
McDonald
2500 El Camino Real, Suite 210
Palo Alto, CA 94306-1791

Jason McFall
Simpson Thacher & Bartlett
10 Universal City Plaza, #1850
Los Angeles, CA 91608

Suzanne M. Smith, Esq.
Heller Ehrman White &
McAuliffe LLP
333 Bush Street
San Francisco, CA 94104-2878

Lori Robertson & David Aelvoet
Linebarger Goggan Blair &
Sampson
P.O. Box 17428
1949 South IH 35 (7841)
Austin, TX 78760

Mr. Sherman Wan
Via Technologies, Inc.
940 Mission Court
Fremont, CA 94539-8202

Mike C. Buckley
Todd C. Toral
Reed Smith Crosby Heafey LLP
1999 Harrison Street
Oakland, CA 94612

Robert C. Shenfeld
Reed Smith Crosby Heafey LLP
355 South Grand Avenue
Los Angeles, CA 90071

Citicapital Commercial Leasing
Corporation
c/o Roger L. Efremsky, Esq.
Law Offices of Efremsky &
Nagel
5776 Stoneridge Mall Road
Suite 360
Pleasanton, CA 94588

EXHIBIT 45

1  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   RON BENDER California Bar No. 143364
2  CRAIG M. RANKIN California Bar. No. 169844
   TODD M. ARNOLD California Bar No. 221868
3  10250 Constellation Blvd., Suite 1700
   Los Angeles, CA  90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5
6  Attorneys for the Official Committee of Creditors
   Holding Unsecured Claims
7
8                UNITED STATES BANKRUPTCY COURT
9                NORTHERN DISTRICT OF CALIFORNIA
10                     SAN JOSE DIVISION
11

| | |
|---|---|
| IN RE: | Case No. 03-51775 MM |
| SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, AND SENSORY SCIENCE CORPORATION, a Delaware corporation, | Chapter 11 Cases (Case Nos. 03-51775 through 03-51778 MM) (Jointly Administered) DECLARATION OF RON BENDER, ESQ. IN RESPONSE OF THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS TO (1) THE MOTION BY THE OFFICE OF THE UNITED STATES TRUSTEE SEEKING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE AND (2) THE MOTION BY SBC SEEKING TO CONVERT THESE CHAPTER 11 CASES TO CHAPTER 7 |
| Debtors. | Date:   March 19, 2007 Time:   10:30 a.m. Place:   Courtroom 3070              280 South First Street              San Jose, CA 95113              Hon. Marilyn Morgan |

1

I, Ron Bender, Esq., hereby declare as follows:

1.      I am a partner of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), bankruptcy counsel to the Official Committee of Unsecured Creditors (the "Committee") in the above-referenced Chapter 11 bankruptcy cases.

2.      I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

3.      I make this Declaration in support of the Response filed by the Committee to the (1) motion filed by the Office of the United States Trustee (the "OUST") seeking the appointment of a Chapter 11 trustee and (2) the motion filed by claims trader SBC seeking the conversion of these Chapter 11 cases to Chapter 7.

4.      As I understand it, the fundamental basis for the OUST's motion for the appointment of a Chapter 11 trustee is the alleged failure of general counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP ("PW"), to identify specifically in its original employment application a potential conflict between PW and the three Senior Noteholders resulting from an opinion letter that PW issued in favor of the three Senior Noteholders in 2002 at the time of the issuance of the $75 million of Senior Notes ($25 million per Senior Noteholder) by SONICBLUE INCORPORATED ("SB") in favor of the three Senior Noteholders, and PW's failure to identify the actual conflict asserted by the three Senior Noteholders in late August or early September, 2006 (presumably pursuant to Bankruptcy Rule 2014) in response to an objection that PW was in the process of prosecuting to the claims of the Senior Noteholders.  PW has advised me that PW and the Debtors will be addressing these issues in response to the OUST's motion for the appointment of a Chapter 11 trustee.  The Committee will file a reply to any such response, if the Committee deems it appropriate to do so, after the Committee has had a chance to review and analyze any such response.

5.      SBC has filed a motion seeking to convert these Chapter 11 cases to Chapter 7.  Counsel to SBC has advised me that SBC is a newly formed entity which holds approximately $160,000 of general unsecured claims.  During the course of the investigation that I was conducting in accordance with the Court's instructions to me, I sent an email on February 5, 2007 to Mr. Shaffer and Mr. Merola inquiring as to SBC's actual motivation in these cases since I found it odd that

creditors with such small claims and so little dollars at stake would hire out-of-town counsel of their high caliber to represent them. Mr. Shaffer sent me an email back on that same day acknowledging that SBC's motivation in these cases was to attempt to purchase the $12.5 million claim which is currently held jointly by VIA/S3 and to attempt to seek to take advantage of the "Senior Indebtedness" provision in the Senior Note Indenture. That email exchange is attached hereto as Exhibit "1". Over the following approximately nine days, SBC attempted to reach an agreement with the Committee and VIA/S3 which would involve SBC's purchase of the $12.5 million claim in a manner which would benefit the Debtors' estates provided that, among other things, the "Senior Indebtedness" agreement by VIA/S3 was stricken from the VIA/S3 settlement agreement by the Court. After I consulted with Mr. MacIntyre (who is serving as counsel to the only two Committee members other than the three Senior Noteholders who were at that time still active on the Committee) and with Mr. Franklin (who is serving as counsel to Riverside), I sent a lengthy email to Mr. Shaffer indicating that I believed that the Committee (with the Senior Noteholders recused) and Riverside would support such a transaction. I received an email from Mr. McGrane on February 14, 2007 advising that SBC was no longer interested in proceeding with that transaction. When I inquired of Mr. Shaffer the reason for SBC's change of heart, Mr. Shaffer responded that conditions imposed by VIA/S3 had changed SBC's analysis of the benefits of the transaction for SBC.

6.    I believe that the Committee and LNBRB have at all times throughout these cases acted properly and fulfilled their role to act in the best interests of general unsecured creditors. It is the intention of the Committee and LNBRB to continue to do so. I believe that the actual facts and evidence in these cases will show that the results achieved in these cases for the general unsecured creditors have been excellent, and LNBRB, PW, and O'Melveny & Myers LLP ("OMM") all played a significant role in the positive results which have been achieved thus far for these estates. There is nearly $80 million of unencumbered cash (after all or nearly all secured debt has been paid) available to be distributed to unsecured creditors. The impediment to the ability of these estates to distribute those funds to unsecured creditors (i.e., the Debtors' previous outstanding litigation with VIA, S3 and Intel) has now been resolved, and the Committee believes that creditors, who have waited four years to receive their money, deserve to receive their money as soon as possible.

7.    The Committee would like to have, and requests the Court to insure that, two things occur in these cases.  One, that general unsecured creditors receive as much money as possible, as soon as possible.  Two, that an investigation be undertaken by a completely independent, neutral third party to (i) ascertain the real facts of what has actually transpired in these cases, (ii) determine whether there was any wrongdoing by any party, and (iii) make a recommendation to the Court as to what action to take against any party who committed any such wrongdoing.

8.    The Committee believes that there are a number of options available to these estates to enable these two goals to be met.  Provided that these two goals are met, the Committee is open-minded as to how best to get there, recognizing that the Committee has certain views and preferences in this regard as more fully described below.

9.    These chapter 11 cases were commenced in March, 2003, nearly four years ago. Even though all or nearly all of the Debtors' assets were sold shortly after the chapter 11 filings, the Debtors and the Committee both agreed that a plan of reorganization and disclosure statement could not sensibly be filed until the Debtors' pending litigation with, among others, VIA Technologies, Inc. ("VIA") and Intel Corporation ("Intel") was resolved.  The reason for this was that both VIA and S3 Graphics Co., Ltd. ("S3"), the joint venture formed by SB and VIA pursuant to the Amended Investment Agreement more fully described below, filed similar, if not identical, proofs of claim against the Debtors in which they asserted general unsecured claims against the Debtors of more than $200 million in the aggregate for "breach of contract".

10.    The breach of contract claims filed by VIA and S3 appear to have arisen out of an agreement dated August 28, 2000 and titled "Amended Investment Agreement" among SB, VIA and S3 and other related agreements.  VIA and S3 alleged that SB breached the Amended Investment Agreement and related agreements by, among other things, not paying certain accounts payable, offering non-ordinary-course discounts to accelerate collection of receivables that were or ought to have been contributed to S3, not contributing certain assets to S3, and retaining payments received for certain accounts receivable that allegedly were owed to S3.  VIA and S3 also claimed that S3 might be enjoined from using an intellectual property license between SB and Intel and that, if it was so enjoined, S3 was entitled to liquidated damages under the Amended Investment Agreement

in the amount of $70 million.

11.     The Debtors and the Committee jointly determined that plan confirmation should not be attempted until the VIA/Intel litigation was resolved.  Among other things, confirmation of a plan prior to such a resolution would likely have resulted in the Debtors' rejection of the Intel intellectual property license which would have given rise to the $70 million liquidated damage provision described above.  Further, for a variety of reasons which are set forth in the disclosure statement, both the Debtors and the Committee concluded that a substantive consolidation of the four Debtors was the only sensible outcome for these estates.  However, since substantive consolidation cannot occur after plan confirmation, and can only occur prior to or concurrently with plan confirmation, and given that it appeared that both VIA and/or S3 may have had claims against less than all four of the Debtors, the Debtors and the Committee jointly concluded that the VIA/Intel litigation had to be concluded before it made sense for these estates to proceed with seeking to confirm a plan of reorganization which would seek to substantively consolidate the Debtors' four estates.

12.     The delay attendant to resolving the VIA/S3 claims was the sole reason as to why the Debtors and the Committee delayed proceeding with a plan of reorganization and disclosure statement.  I believe that was the only responsible thing for the Debtors and the Committee to do.  Any contention to the contrary would be false and would be based on something other than the actual facts or evidence.

13.     Because of a conflict that PW had with Intel, the Debtors employed the law firm of O'Melveny & Myers LLP ("OMM") as special litigation counsel to work in conjunction with PW in connection with the VIA/S3 claims litigation, as well as dealing with the related licensing dispute with Intel.  While counsel to the Debtors (primarily Ms. Uhland of OMM) would periodically provide general status reports to LNBRB (primarily to Mr. Rankin and Ms. Wells who were the partners at LNBRB principally in charge of dealing with the VIA/S3/Intel litigation) and communicate with LNBRB, and did obtain the authority of the Committee (whose active participants at that time were the three Senior Noteholders and the two Matsushita entities) to settle

with VIA/S3 by giving them an allowed general unsecured claim of not more than $25 million, to the best of my knowledge, LNBRB was not a party to <u>any</u> of the confidential settlement discussions that ensued, and LNBRB was not provided with <u>any</u> drafts of the actual VIA/S3 settlement agreement.[1]  To the best of my knowledge, the only document that was provided to LNBRB before the final VIA/S3 settlement agreement was provided to LNBRB in October, 2006 was one unexecuted draft of a term sheet provided to LNBRB in or around September, 2005 (i.e., approximately one year prior to the final VIA/S3 settlement agreement).  To the best of my knowledge, LNBRB therefore did not enjoy the benefit of seeing drafts of the actual VIA/S3 settlement agreement (and it turns out there were many of them), each of which would be red-lined against the prior version so changes could be readily viewed and analyzed.

14.     To the best of my knowledge, LNBRB was only first provided with a final version of the VIA/S3 settlement agreement in or around October, 2006 just days before it was filed with the Court.  To the best of my knowledge, that was the first time LNBRB had ever seen any draft or version of the final VIA/S3 settlement agreement.  Because the VIA/S3 settlement agreement was lengthy and complex and because LNBRB had not seen any prior drafts of the VIA/S3 settlement agreement, Mr. Rankin requested counsel to the Debtors to participate in a conference call with LNBRB to walk LNBRB through the VIA/S3 settlement agreement.  That conference call took place on October 4, 2006, and both Mr. Rankin and Mr. Bender participated in that conference call.  Ms. Uhland of OMM was the primary person who walked LNBRB through the terms of the VIA/S3 settlement agreement.

15.     Fundamentally, Ms. Uhland explained that the VIA/S3 settlement agreement resulted in VIA and S3 being granted one, allowed general unsecured claim between them in the amount of $12.5 million and that the dispute with Intel over the Intel license was resolved through the VIA/S3 settlement agreement at no cost to the estates.  Based upon the significant risks to the estates of VIA

---

[1] According to my review of documents produced during my Court ordered examination, counsel to the Senior Noteholders, Mr. Bennett, was periodically provided with a draft of the actual settlement agreement as requested.

and/or S3 obtaining allowed general unsecured claims of well in excess of $12.5 million (as just the liquidated damages provision alone could have resulted in general unsecured claims of approximately $70 million) and what would have been exorbitant costs of litigating the VIA/S3 and Intel matters to trial (estimated to be more than $2 million of actual cash), Ms. Uhland opined that the settlement was an excellent deal for the Debtors' estates.  No discussion occurred at any time during that conference call on October 4, 2006 (or at any time prior or subsequent thereto to the best of my knowledge) regarding the "Senior Indebtedness" agreement by VIA in the VIA/S3 settlement agreement (which is discussed more below).  After years of litigation and delays, the settlement cleared the way for the estates to proceed with filing and seeking to confirm a plan of reorganization, to enable the funds in these estates (which total nearly $80 million of unencumbered cash) to be distributed to creditors in the fastest manner possible.

16.    The VIA/S3 settlement agreement was approved by the Court at a hearing held in October, 2006.  Once the VIA/S3 settlement agreement was approved by the Court, I took the lead role in preparing a joint plan of reorganization and disclosure statement.  PW had provided drafts of a plan of reorganization and disclosure statement to LNBRB some time before then, but we concluded that substantial revisions to those documents were required.  In December, 2006, the Committee and the Debtors finalized the terms of their joint plan of reorganization and disclosure statement and filed them with the Court.  An initial disclosure statement hearing was held on January 23, 2007.

17.    It was only through an objection to the disclosure statement filed by Riverside Contracting, LLC and Riverside Claims, LLC (collectively, "Riverside") shortly before the disclosure statement hearing held on January 23, 2007 that LNBRB first learned of any possible controversy involving the "Senior Indebtedness" issue related to VIA in the Senior Note Indenture.

18.    The issue pertains to a Senior Note Indenture issued by SB in 2002 in favor of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders") relating to a total of $75 million of Senior Notes (divided equally among the three Senior Noteholders, each of whom is a member of the Committee).  As is

typical in indenture agreements, the Senior Noteholders subordinated their claims to a number of different types of claims.  One such subordination is in favor of VIA and provides for the Senior Noteholders to subordinate their claims in favor of "all indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "VIA Indebtedness")."

19.    Because of PW's intimate familiarity with the Debtors (given that PW has served as general counsel to the Debtors since the Debtors' inception), the Debtors and the Committee agreed that counsel to the Committee would handle the easier and more routine claims objections, and counsel for the Debtors (PW) would handle the more substantive and complex claims objections.  Included in this category of complex claims were the claims of the Senior Noteholders and the approximately $100 million claims of the Junior Noteholders which pertain to the Junior Notes issued by the Debtors in or around 1996.  The Junior Noteholders subordinated their claims to the Senior Noteholders when the Senior Noteholders obtained the Senior Notes in 2002.

20.    In or around late August, 2006 or early September, 2006, after PW had made certain claim demands upon the Senior Noteholders, the Senior Noteholders asserted that PW had a conflict in terms of prosecuting any objection to the claims of the Senior Noteholders.  The asserted conflict stems from an opinion letter that PW issued in favor of the Senior Noteholders in 2002 at the time of the issuance of the Senior Notes.

21.    Immediately after the Senior Noteholders asserted their conflict against PW, PW transferred all of its work files regarding work that PW had done in connection with analyzing the claims of the Senior Noteholders and the Junior Noteholders to LNBRB.  Since then, LNBRB has spent an enormous amount of time, working in close conjunction with the accounting firm of Grobstein, Horwath & Company LLP ("GHC"), to analyze the claims of the Senior Noteholders and the Junior Noteholders and to formulate an objection-to-claims strategy.  The issues involving both the Senior Noteholders and the Junior Noteholders are complex and involve significant claims.  LNBRB and GHC have completed their analysis, which they have shared with the non-Senior Noteholders Committee members.  LNBRB is ready, willing and able to file and prosecute these claims objections.  However, with the consent of the non-Senior Noteholders Committee members,

LNBRB will not file those claims objections until the Court makes a determination as to how these cases should best proceed. The non-Senior Noteholders Committee members advised LNBRB that it is acceptable to the non-Senior Noteholders for LNBRB to file and prosecute those claims objections, and while there would clearly be an inefficiency of new counsel starting from scratch, it is also acceptable to the non-Senior Noteholders Committee members for new counsel, an examiner or a trustee to file and prosecute those claims objections if the Court deems that appropriate. To be crystal clear on this point, LNBRB has absolutely no reservation at all regarding its ability to prosecute such claims objections, and LNBRB had fully intended to file and prosecute such claims objections since the time that LNBRB learned of the conflict with PW. Obviously, if the Court deems it appropriate for a firm other than LNBRB to prosecute such claims, LNBRB will share all of its files and work product, and cooperate fully with new counsel to minimize the impact of having new counsel for this purpose.

22. Once the conflict was asserted by the Senior Noteholders, PW did the right thing in transferring its work files to LNBRB, and LNBRB did the right thing in vigorously analyzing and preparing objections to those claims (without any involvement or interference by the Senior Noteholders), all with the intent to maximize the value of these estates for the benefit of creditors. SBC's contention that this was all a "ploy" to get work to LNBRB is complete and utter nonsense.

23. At the commencement of these cases, the OUST formed the Committee comprised of the following eight members:

Matsushita Kotobuki Electronics Sales of America LLC
Matsushita Kotobuki Electronics Industries, Inc.
Smithfield Fiduciary LLC
Portside Growth and Opportunity Fund
Citadal Equity Fund, Ltd.
A-Max Technology Co. Ltd.
Manufacturers' Services Limited
Maxtor Corporation

24. All eight members of the Committee played a very active role in these cases during much of 2003 while the sales of the Debtors' assets were taking place as well as other important matters. On September 17, 2003, Maxtor Corporation withdrew from the Committee. On October

6, 2003, the OUST added Baltrans Logistics Inc. ("Baltrans") to the Committee in the place of Maxtor Corporation. Baltrans never played an active role on the Committee.

25.    For the next approximately three years, these cases involved the following three primary activities: (1) the Debtors' pursuit of the VIA/S3 claims litigation and related litigation with Intel; (2) the objections to claims pursued by the Debtors and the Committee; and (3) the preference actions which, with the consent of the Committee and approval of the Court, were split up and divided between PW and LNBRB although all analysis of settlements or dismissals of preference actions was done jointly by PW and LNBRB.

26.    The record of the Court will reflect that the legal work performed by LNBRB and by PW in connection with the claims objections and preference actions in these cases was excellent and that the results achieved were extremely favorable for these estates. LNBRB and PW filed numerous claims objections, which have resulted in the appropriate disallowance of millions of dollars of claims which were asserted against the Debtors. These figures do not include the objections which will be filed to the claims of the Senior Noteholders and the Junior Noteholders (which LNBRB believes is likely to result in a further significant reduction in the amounts of the allowed claims). Thus far, more than 145 preference actions have been settled, litigated to judgment or dismissed, resulting in agreements by preference defendants to pay at least $6 million to the Debtors as settlements, including amounts to be collected from defendants' distributions to be received from these estates, and the disallowance of approximately $10 million of claims.[2]

27.    By the time the VIA/S3 settlement agreement was finalized, nearly 3.5 years had transpired since the commencement of these Chapter 11 cases. By then, Manufacturers' Services Limited ("MSL") had been sold, and the general counsel at MSL who had taken an active role on the Committee during the early periods of these cases went into private practice and was not employed

---

[2] PW allocated the preference actions between LNBRB and PW. LNBRB was assigned 113 possible preference actions. Of those, there are 31 which remain "open", broken down as follows: 5 are in default and LNBRB is in the process of seeking default judgments; 19 are in various levels of settlement discussions, discovery, or trial mode (including summary judgment); and 7 have settled and have settlement motions pending or to be filed.

1   by the buyer of MSL, and A-Max Technology Co. Ltd. ("A-Max") ceased to participate in these

2   cases.  However, both the three Senior Noteholders (Smithfield Fiduciary LLC, Portside Growth and

3   Opportunity Fund, and Citadal Equity Fund, Ltd.), all of whom are represented by Bruce Bennett,

4   Esq. of Hennigan Bennett & Dorman, and the two Matsushita companies, both of whom are

5   represented by Bruce MacIntyre, Esq. of Perkins Coie, have played a relatively active role in these

6   cases since inception.

7         28.     SBC asserts that LNBRB had an obligation to disclose PW's conflict to the Court and

8   to the OUST.  First, LNBRB had no legal duty to file any such disclosure document and SBC has

9   not provided any legal authority for its proposition.  Any conflict that existed with respect to the PW

10  opinion letter was <u>not</u> LNBRB's conflict; it was PW's conflict.  LNBRB fully discharged its duty

11  with respect to the conflict by making sure that the claims of the Senior Noteholders and the Junior

12  Noteholders were being properly analyzed and objected to.  PW has advised me that it will respond

13  to the allegations made against it in its own pleading, but the Committee believes that PW did a

14  substantial amount of work regarding proposed objections to the Senior Noteholders' claims, and,

15  immediately after Mr. Bennett informed PW that he believed PW had a conflict regarding his

16  clients' claims, PW notified LNBRB, and PW transferred its work-files to LNBRB.  The Committee

17  believes that all of these actions are completely inconsistent with anyone trying to hide a conflict of

18  interest, and there was no prejudice to these estates from the existence of such conflict.  Neither PW

19  nor the Senior Noteholders have had any involvement with the process undertaken by LNBRB and

20  GHC to analyze and prosecute objections to the Senior Noteholders' claims since the time the

21  conflict was asserted by the Senior Noteholders against PW.  LNBRB, with the assistance of GHC,

22  has done its job and is fully ready to prosecute the claims objections.  As soon as the Court sees the

23  massive amount of work that has been done by LNBRB and GHC in this regard, and LNBRB's and

24  GHC's recommendations as to how best to proceed, there will be no question that LNBRB fully and

25  appropriately discharged its duties and protected these estates.

26        29.     Second, as a practical matter, LNBRB assumed that PW would file whatever

27  additional disclosure documents were required under the law which LNBRB had understood PW had

28  done on numerous occasions throughout the pendency of these cases.  There was nothing special

11

about this conflict because any potential harm to the estates had been immediately remedied by PW when PW transferred the task of objecting to the Senior Noteholders' claims to LNBRB.  Further, LNBRB had no reason to believe that PW had been acting inappropriately because PW in fact prepared and intended to prosecute claims objections against the Senior Noteholders.  It was not as though PW had recommended that no objections to the Senior Noteholders' claims be filed.  The point is that while LNBRB expected PW to file appropriate disclosure documents with the Court, LNBRB was not suspicious or concerned that PW would not file such disclosure documents.  PW will need to explain why it did not file any additional disclosure documents with the Court, but the Committee does not believe that PW engaged in any intentional wrongdoing as the objective facts do not support that conclusion.

30.    Third, LNBRB and PW did disclose the PW conflict in the joint disclosure statement which was filed long before any issue regarding the VIA "Senior Indebtedness" issue was raised or brought to LNBRB's attention by any party - the conflict was not hidden and was going to be disclosed to every creditor of these cases through the disclosure statement.  The contention made by SBC that LNBRB and PW attempted to "bury" the PW conflict issue is complete and utter nonsense. The moment PW learned of the conflict, PW advised LNBRB and transferred over to LNBRB all of PW's work files related to the objections to the claims of the Senior Noteholders and the Junior Noteholders.  The initial disclosure statement was jointly filed by the Debtors and the Committee before any allegation was raised or made regarding the VIA "Senior Indebtedness" issue.  Any attempt by SBC to link the PW conflict issue and the VIA "Senior Indebtedness" issue is complete fabrication and simply ignores the timeline of what actually transpired in these cases.

31.    Even though I believe that Mr. MacIntyre is absolutely qualified to make decisions on behalf of the Committee on matters which require the recusal of the Senior Noteholders, since the recent issues have arisen, I have made a maximum effort to increase the number of Committee members who would take an active role in these cases.  I was able to locate and make contact with Todd Melendy, who is in-house counsel for Celestica, which is the company which purchased MSL. Mr. Melendy advised me that he is an experienced attorney and has agreed to take an active role on the Committee (and has recently taken an active role on the Committee) as the representative of

1   MSL.  I have also recently made contact with Jim Henry, Jr. of Baltrans who until now had never

2   taken any active role on the Committee but who indicated a willingness to participate on the

3   Committee.  I also requested and encouraged both Riverside and VIA to join the Committee given

4   their current active participation in these cases and the relatively large size of their claims (with

5   Riverside advising that it is holding claims aggregating approximately $10 million and VIA along

6   with S3 holding a claim of $12.5 million), but both of them declined.   A-Max has not been

7   responsive.

8          32.    On Tuesday, February 27, 2007, the Committee had a lengthy conference call to

9   discuss the matters at hand, and all seven Committee representatives addressed above attended.

10   There have also been a number of email exchanges and telephone conversations that have followed,

11   including an additional lengthy conference call on Friday, March 2, 2007 at which six Committee

12   representatives attended (Baltrans did not participate), followed by a further conference call on

13   Monday, March 5, 2007 at which six Committee representatives attended (Baltrans did not

14   participate).  The three Senior Noteholders did not participate in the conference calls when issues

15   involving them were discussed, and the three Senior Noteholders recused themselves from any

16   decisions that the Committee ultimately made on how best for these Chapter 11 cases to proceed.

17   The conclusions of the non-Senior Noteholders Committee members for dealing with the current

18   situation facing these estates is addressed below.

19          33.    From the outset of its incredibly hostile involvement in these cases, SBC has

20   concocted a completely unsubstantiated and factually unsupported theory of an alleged "conspiracy"

21   between PW and the Senior Noteholders (which SBC has now decided the Committee and LNBRB

22   were part of) regarding the VIA/S3 settlement agreement and the agreement by VIA and S3 that

23   none of the $12.5 million general unsecured claim granted to VIA/S3 under the settlement

24   agreement was entitled to "Senior Indebtedness" status under the Senior Note Indenture.  I believe

25   that SBC's conspiratorial theories are completely ridiculous and are driven by the fact that SBC's

26   motivation in these cases (by SBC's own admission) is to purchase the VIA/S3 claim at a substantial

27   discount for SBC's own personal benefit.  I do not believe that SBC came along in these cases

28   looking to help these estates.  I believe that SBC came along because SBC, its counsel, or both

13

1   appear to be in the business of scouring public records involving bond indenture agreements with the

2   intention of purchasing claims that may have rights to senior indebtedness status under an indenture

3   or otherwise and then seeking to make a profit by pursuing a senior indebtedness theory.

4        34.    I am advised by counsel to VIA/S3 that SBC's predecessor (Ferry) had been

5   attempting to purchase the VIA/S3 claim at a significant discount with the intention of suing the

6   Senior Noteholders on a "Senior Indebtedness" theory in an attempt to make a profit for months

7   before SBC surfaced in these cases.  In fact, during the examination that I had conducted pursuant to

8   an order of the Court, I learned from counsel to VIA/S3 that SBC or SBC's predecessor (Ferry)

9   attempted to "sell" for $1 million of cash to VIA/S3 "information" that they told counsel to VIA/S3

10  was worth "millions" to VIA/S3.  Counsel to VIA/S3 advised me that when he inquired as to

11  whether this so called "information" related to a "Senior Indebtedness" theory which VIA/S3 already

12  knew about, counsel to SBC's predecessor responded that it did.

13       35.    I believe that what SBC is seemingly so upset about now is the fact that I was told

14  repeatedly by counsel to VIA/S3 that VIA/S3 knowingly clarified that its claim would not have any

15  "Senior Indebtedness" status in the VIA/S3 settlement agreement because VIA/S3 agreed with all of

16  the other parties who looked at and analyzed the issue that the reference to such "Senior

17  Indebtedness" status in the Senior Note Indenture related to a $15 million loan which the Debtors

18  were negotiating with VIA in 2002 at the time of the issuance of the Senior Note Indenture, which

19  $15 million loan VIA never made to the Debtors.  This truthful information provided to me by

20  counsel to VIA/S3, and my truthful report of my findings to the Court, apparently doomed SBC's

21  hopes of obtaining an easy multi-million profit on SBC's purchase of the VIA/S3 claim.  It is quite

22  ironic that just days before I filed my preliminary report Mr. McGrane sent me an email in which

23  Mr. McGrane told me how "sincerely impressed" Mr. McGrane was with my investigative efforts

24  (see the email from Mr. McGrane attached hereto as Exhibit "2").  It apparently was only after Mr.

25  McGrane was unhappy with my truthful findings and conclusions that these unbelievably nasty

26  attacks by SBC against LNBRB have occurred.

27       36.    From the outset, SBC's pleadings have never had any merit and have never been

28  based on any actual facts.  They have always simply constituted SBC's efforts to manipulate the

14

bankruptcy system and attempt to direct the outcome of these cases to SBC's advantage or to assist SBC in its ongoing efforts to attempt to purchase claims from unsuspecting creditors in the hope of SBC making a big profit from doing so.  Attached hereto as Exhibit "3" is a letter dated November 22, 2006 (approximately one month before the initial disclosure statement was filed in these cases and nearly two months before SBC's predecessor Ferry Claims surfaced in these cases), which I obtained from counsel to VIA/S3, in which Mr. McGrane sent a letter directly to VIA on behalf of Ferry Claims ("Ferry") offering to purchase VIA's claim at 35 cents on the dollar.  I believe that this letter is of monumental significance given all of the accusations that Ferry and SBC have made about others.  In that letter, Ferry seeks to persuade VIA into selling a claim that Ferry obviously believed was worth 100 cents on the dollar due to what Ferry believed were "Senior Indebtedness" rights in favor of VIA without disclosing any of that to VIA.  To the contrary, Ferry tries to scare VIA by making the unsubstantiated allegation that PW has somehow "wastefully administered" these cases.  Ferry further tells VIA that Ferry is offering 10 cents more on the dollar than unsecured claims were then allegedly selling for because of Ferry's alleged "belief" that its intended counsel, Scott McNutt, "has had great success in similar cases in cleansing wastefully administered Chapter 11 cases of administrative inefficiencies such as those being practiced here by PW".  Ferry made these statements to VIA when Ferry knew full well that the only reason Ferry sought to purchase VIA's claim and was willing to pay an alleged premium of 10 cents over the then trading price is because Ferry thought (but did not disclose) that it could turn around and sue the Senior Noteholders on a "Senior Indebtedness" theory and make a profit of 65 cents (equating to a profit of 200%).

37.    It is now completely transparent that at some point in time between November 22, 2006, when Ferry made its first offer to purchase VIA's claims, and January 23, 2007, the date of the initial disclosure statement hearing, Ferry learned that VIA/S3 had agreed that none of the $12.5 million claim that VIA/S3 obtained under the settlement agreement was "Senior Indebtedness" under the Senior Note Indenture.  Recognizing that this agreement by VIA/S3 had thwarted Ferry's and SBC's secret and undisclosed game plan, Ferry/SBC came up with a new strategy in an effort to sabotage these cases and try to obtain the removal from the VIA/S3 settlement agreement of this voluntary agreement by VIA/S3.  Ferry/SBC have tried numerous angles to achieve their goals,

15

ranging from alleging conspiracies, accusing the estates of a "giveaway", accusing the estates of a lack of disclosure, etc., all of which are completely without any factual or evidentiary foundation. Ferry/SBC have also tried every angle imaginable to attempt to concoct a theory under which the VIA/S3 claim should actually be held only by VIA (since S3 never had any "Senior Indebtedness" rights under the Senior Note Indenture) when it is clear that S3 was principally (and possibly solely) the party who presumably would ever have been entitled to obtain an allowed claim against SB pursuant to the terms of the Amended Investment Agreement had the claims dispute between VIA/S3 and SB not settled.

38.     The Committee is concerned that SBC is continuing to attempt to buy claims of other unknowing creditors without disclosing the facts that SBC knows about these cases and SBC's attempts to manipulate these cases and direct the outcome of these cases for SBC's own personal benefit.  Attached hereto as Exhibit "4" is the relevant page of a January, 2007 invoice for the claims agent in these cases.  In that page of the invoice, the Court will note that nearly three hours of the claims agent's time (paid for by these estates) was spent dealing with Mr. McGrane's request for claims information.  I have marked the relevant time entries with brackets on the right side of the page.  This is highly relevant given that in January, 2007 Mr. McGrane admitted in his own declaration filed under penalty of perjury that Mr. McGrane was not representing any party in interest at that time.  Why would Mr. McGrane be in direct communication with the claims agent in these cases at a time when he was representing no party in interest in these cases?  Did Mr. McGrane ever disclose any of this information to the Court when viciously attacking all of the other parties in interest?

39.     At the conclusion of the disclosure statement hearing on January 23, 2007, the Court ordered me to conduct an examination into the facts of what actually transpired.  During the approximately three weeks which transpired thereafter until the Court halted my efforts, I conducted a very thorough examination in which I reviewed thousands of pages of documents produced by OMM, PW, Mr. Smith and Mr. Bennett.  I also conducted countless interviews of relevant parties and was in the process of taking numerous depositions when the issue of a protective order regarding confidentiality arose and, at a hearing held on February 15, 2007 on my motion for authority to turn

1   over confidential documents to others (including SBC) so that they too could take an active role in

2   the investigation, the Court halted my investigation.

3        40.    During that investigation, I discovered the following facts (all of which will become

4   immediately known to whoever becomes the independent party to conduct and complete the

5   investigation):

6            i.    There were numerous drafts of term sheets and settlement agreements which

7   culminated in the final version of the VIA/S3 settlement agreement.

8            ii.    In September, 2005 (nearly one year before the final VIA/S3 settlement

9   agreement was signed), VIA/S3 and the Debtors reached an agreement for VIA and S3 to receive

10  one allowed general unsecured claim in the amount of $12.5 million.  It took approximately one full

11  year to finalize the written VIA/S3 settlement agreement and to incorporate in the Intel part of the

12  settlement agreement.

13           iii.    The first version of the VIA/S3 settlement agreement which includes the

14  agreement by VIA and S3 that none of the $12.5 million general unsecured claim would be treated

15  as "Senior Indebtedness" under the Senior Note Indenture appears to be in a version of the VIA/S3

16  settlement agreement prepared and circulated by OMM on May 12, 2006.

17           iv.    It is clear that OMM, PW, Marcus Smith on behalf of the Debtors and VIA/S3

18  were all fully aware of this so-called "Senior Indebtedness" agreement by VIA/S3, and it is crystal

19  clear that they all (including VIA/S3) analyzed the situation and concluded that VIA/S3 was not

20  entitled to any "Senior Indebtedness" claim.  Counsel to VIA/S3 has repeatedly confirmed to me that

21  VIA/S3 knowingly agreed to this waiver when VIA/S3 was requested to do so (initially by Ms.

22  Uhland of OMM) because VIA/S3 analyzed their "Senior Indebtedness" rights under the Senior

23  Note Indenture and concluded that they had no value to VIA/S3.

24           v.    It is clear that OMM played a substantial role, if not the key role, in

25  negotiating and documenting the VIA/S3 settlement agreement, as well as in preparing the pleadings

26  which were filed with the Court for approval of the VIA/S3 settlement agreement in which no

27  mention was made of the "Senior Indebtedness" agreement by VIA/S3.  OMM was not under any

28  influence from the Senior Noteholders that the Committee is aware of and had no reason to help the

1    Senior Noteholders as SBC contends was the case for PW.

2          vi.    While only OMM can explain why (i) the "Senior Indebtedness" agreement

3    made its way into the VIA/S3 settlement agreement, (ii) the "Senior Indebtedness" agreement did

4    not rise to a level of significance to require disclosure of it in the pleadings filed jointly by PW and

5    OMM for approval of the VIA/S3 settlement, and (iii) the "Senior Indebtedness" agreement did not

6    rise to a level of significance to require disclosure of it to Committee counsel during the walk-

7    through of the VIA/S3 settlement agreement conducted by Debtors' counsel (principally by Ms.

8    Uhland), or in any prior conversations that Ms. Uhland had with LNBRB, there is no evidence to

9    support any contention that there was a three-way conspiracy among the Senior Noteholders, PW

10   and OMM to "give away" an asset of these estates as SBC contends occurred.[3]

11         vii.    That PW continued with its investigation and intention to prosecute an

12   objection to the claims of the Senior Noteholders (which is what gave rise to the ultimate assertion

13   of conflict by the Senior Noteholders in the first place) for a period of more than three months _after_

14   the VIA/S3 "Senior Indebtedness" agreement made its way into the language of the VIA/S3

15   settlement agreement is an objective fact which is completely inconsistent with SBC's contention

16   that PW orchestrated the VIA/S3 "Senior Indebtedness" agreement to help maximize the recovery by

17   the Senior Noteholders from these estates and thereby reduce any exposure that PW had to the

18   Senior Noteholders on account of the PW opinion letter.

19         viii.   By any objective standard, the VIA/S3 settlement agreement was an

20   absolutely excellent result for these estates, and PW and OMM deserve significant credit for

21   obtaining this result for the estates.  As has now been repeatedly stated, the VIA/S3 settlement

22   agreement enabled these estates to conclude litigation that would have significantly delayed the

23   conclusion of these cases, cost these estates millions of dollars of legal fees and expenses to take to

24   trial (with possible appeals to follow thereafter), and eliminated a very significant risk of these

25   estates being saddled with allowed claims in favor of VIA and/or S3 which could have been many

26   _____

27   [3] While SBC appears not to include OMM as a subject of its numerous attacks, it is crystal clear
     (based upon OMM's extensive involvement and key role in these matters) that no conspiracy could
28   have occurred without OMM's knowledge, consent and involvement.

1   multiples of the $12.5 million settlement amount.

2           ix.   Finally, absolutely no evidence whatsoever has ever been presented to the

3   Court or otherwise (perhaps because no such evidence exists) that these estates were harmed in any

4   manner whatsoever as a result of S3's and VIA's completely voluntary agreement that their claim

5   did not constitute "Senior Indebtedness".  All of SBC's contentions to the contrary are completely

6   false.  The <u>only</u> entity who was possibly harmed by the VIA/S3 "Senior Indebtedness" agreement

7   was SBC who was attempting to induce VIA and S3 to sell to SBC's predecessor Ferry the VIA/S3

8   claim without telling VIA/S3 about SBC's belief that VIA had rights to assert "Senior Indebtedness"

9   status under the Senior Note Indenture and in fact making misrepresentations to VIA about SBC's

10  reasons for wanting to purchase the VIA/S3 claim as set forth in Exhibit "3" hereto.

11          x.    Had the VIA/S3 settlement agreement been finalized in the exact same

12  manner as it was without the VIA/S3 "Senior Indebtedness" agreement, SBC would simply have

13  proceeded with its purchase of the VIA/S3 claim without providing any consideration to these

14  estates because SBC would have had no reason to provide these estates with any such consideration.

15  These estates would have undoubtedly been dragged into litigation (as a third party or percipient

16  witness) that SBC would then have initiated against the Senior Noteholders, which would have

17  caused these estates to have incurred unnecessary legal fees and expenses with no benefit to these

18  estates.

19          xi.   In bad faith and with no basis in fact or in law, SBC (and Ferry before it) has

20  recklessly filed pleading after pleading in which SBC (and Ferry before it) has incoherently rambled

21  on and on about an alleged "give away" and alleged conspiracy by these estates with respect to the

22  VIA/S3 "Senior Indebtedness" agreement, when absolutely none of SBC's allegations are true and

23  without SBC having ever disclosed its true motivations.

24      41.   Now grasping at straws, SBC contends that the Committee and LNBRB should have

25  been the ones to bring the VIA "Senior Indebtedness" issue to the attention of the Court.  That is

26  completely ridiculous.  PW and OMM, who had been dealing with the VIA/S3 settlement agreement

27  for more than one year, did not think that the VIA "Senior Indebtedness" issue rose to the level of

28  significance even to mention it in the 9019 pleadings that they filed, in any of their oral

1   conversations with LNBRB, or in their walk-through of the VIA/S3 settlement agreement with

2   LNBRB.  To the best of my knowledge, LNBRB was first provided with the VIA/S3 settlement

3   agreement only after it was finalized and just days before it was filed with the Court.

4       42.    Any contention that it was somehow the responsibility of LNBRB in a matter of only

5   days to piece together a "Senior Indebtedness" provision contained in a lengthy VIA/S3 settlement

6   agreement (which was never mentioned by or discussed with OMM or PW) with a short phrase

7   contained in a lengthy Senior Note Indenture which was entered into by the Debtors more than four

8   years earlier is completely preposterous.

9       43.    What mattered to LNBRB was that the VIA/S3 settlement agreement was a good deal

10  for these estates, that the claim given to VIA/S3 under the VIA/S3 settlement agreement was not

11  entitled to administrative or priority status against the estates, and that the claim would be treated as

12  a general unsecured claim.  To the best of my knowledge, Mr. Rankin made sure of this during his

13  periodic conversations with counsel to the Debtors during the settlement and drafting process,

14  particularly with Ms. Uhland.  Even if LNBRB had hypothetically been a party to all of the

15  settlement discussions, had seen prior drafts of the VIA/S3 settlement agreement, and had been

16  made aware of the "Senior Indebtedness" agreement by VIA/S3, why would that have mattered to

17  the Committee?  The Committee would have simply concluded that all of the parties involved in

18  these intense negotiations (with the Debtors represented by two highly qualified and skilled law

19  firms who incurred millions of dollars of fees in the litigation, and VIA/S3 represented by a highly

20  qualified and skilled law firm) agreed on a point (that none of the $12.5 million claim being granted

21  to VIA/S3 was entitled to any "Senior Indebtedness" status in the Senior Note Indenture) which was

22  not relevant to these estates.  Of course, in hindsight, had LNBRB been aware of any connection

23  between the "Senior Indebtedness" agreement by VIA/S3 in the VIA/S3 settlement agreement, and

24  the VIA "Senior Indebtedness" language in the Senior Note Indenture, LNBRB would have

25  requested PW and OMM to disclose this fact in the motion they prepared for approval of the VIA/S3

26  settlement agreement.

27      44.    SBC and its predecessor Ferry have now wasted thousands of dollars and countless

28  hours of the resources of these estates and the Court's time making baseless and wildly unfounded

allegations (including even filing a pleading entitled "giveaway" where they attempted to compute some alleged loss to these estates), all while SBC has an insignificant amount of money invested in these cases or financial risk, and all while SBC is attempting to manipulate the bankruptcy system for its own personal economic benefit.  It is now clear that these estates suffered no economic harm whatsoever resulting from the agreement by VIA/S3 that none of the $12.5 million claim they obtained under the VIA/S3 settlement agreement was entitled to "Senior Indebtedness" status in the Senior Note Indenture, and no amount of pleadings filed by SBC to the contrary will change that.  It should not be taken lightly that SBC has changed its strategy from originally filing bombastic pleadings alleging a "give away" by these estates and conspiracy of the parties (which everybody now knows not to be true) to simply attacking the other parties in these cases on an individual basis, all with the same goal, which is too manipulate the bankruptcy system for its own personal benefit. It should also not be taken lightly that SBC (with a grand total of only approximately $40,000 invested in these cases) has taken such an incredibly active (and vicious) role in these cases, including having filed numerous pleadings and having three senior partners attend just the hearing on February 15, 2007.

45.    The bottom line is that the Committee is extremely pleased with the results of the VIA/S3 settlement agreement, as any objective party would be, and the Committee most definitely does not want anything to occur which would reopen the Debtors' litigation with VIA, S3 or Intel. The "Senior Indebtedness" issue had no impact on the estates or on general unsecured creditors. Whether VIA/S3 had "Senior Indebtedness" rights under the Senior Note Indenture or not was a matter solely between VIA/S3 and the Senior Noteholders.  Nobody can dispute that VIA/S3 were not well represented by a highly experienced and sophisticated attorney (Henry Kevane) at an extremely well regarded law firm (Pachulski, Stang, et. al.).  It became crystal clear during my numerous conversations with Mr. Kevane and Mr. Weintraub (another highly experienced and sophisticated attorney and name partner at Pachulski, Stang, et. al.) during my investigation that VIA/S3 and their counsel were completely aware of the "Senior Indebtedness" issue and knew exactly what they were agreeing to in the VIA/S3 settlement, and this goes back months to when SBC's counsel attempted to "sell" this "Senior Indebtedness" information to counsel to VIA/S3.  Mr.

1   McGrane's assumption made in his email to Mr. Franklin and me of February 12, 2007 (attached

2   hereto as Exhibit "5") that Mr. Kevane "foolishly" said "yes sir" when he agreed to the "Senior

3   Indebtedness" provision of the VIA/S3 settlement agreement for which Mr. McGrane had assumed

4   that Mr. Weintraub has "taken [Mr. Kevane] to the woodshed" is 100% factually false.  It simply

5   represents one more example of how SBC decided what the facts were (or what SBC wanted them to

6   be), and misrepresented those facts to the Court and all other parties, before SBC bothered to inquire

7   as to the actual facts.  SBC could have simply interviewed Mr. Kevane or Mr. Weintraub, just as I

8   did, before blazing into this Court with vicious pleadings filled with wild accusations which have

9   now proven to be untrue.  It is a classic example of "shoot first and ask questions later".

10          46.    Certainly if VIA's counsel thought that the Debtors (or the Senior Noteholders) were

11  seeking improper concessions from VIA/S3 as part of the VIA/S3 settlement they could have (and

12  presumably would have) informed LNBRB and the non-Senior Noteholder Committee members.

13  The fact is they never did.  VIA/S3 were also well aware of the fact that the "Senior Indebtedness"

14  issue was not mentioned or pointed out in the pleadings prepared and filed by the Debtors in support

15  of the VIA/S3 settlement agreement.  If VIA/S3 thought that this was somehow improper, they could

16  have advised the Court, LNBRB and the non-Senior Noteholder Committee members, but VIA/S3

17  did not do so.

18          47.    The only rational explanation for what transpired is that all of the parties involved

19  (OMM, PW and VIA/S3) knowingly agreed to the "Senior Indebtedness" provision in the VIA/S3

20  settlement agreement because they all analyzed the situation and concluded that the $12.5 million

21  claim obtained by VIA/S3 in the VIA/S3 settlement agreement was the not the type of indebtedness

22  contemplated in the Senior Note Indenture.  Rather, that language contemplated a loan from VIA to

23  the Debtors being negotiated in 2002 which VIA never made to the Debtors.  All of this is entirely

24  consistent with my findings obtained from my investigation.  The alternative explanation requires

25  OMM, PW and the Senior Noteholders to have engaged in a massive conspiracy to defraud these

26  estates (even though no connection whatsoever has been shown between OMM and the Senior

27  Noteholders), and for VIA and its highly experienced and sophisticated counsel to have been

28  "fooled" into agreeing to the "Senior Indebtedness" agreement in the VIA/S3 settlement agreement.

1   While the Committee does wish for an independent examination to be conducted of what actually

2   transpired, the Committee believes that this second possible explanation is nonsensical and not

3   consistent with the evidence or actual facts of what transpired.

4       48.     As described above, the Committee would like to see two things occur in these cases.

5   One, to make sure that general unsecured creditors receive as much money as possible, as soon as

6   possible.   Two, to make sure that an investigation be undertaken by a completely independent,

7   neutral third party to (i) ascertain the real facts of what has actually transpired in these cases, (ii)

8   determine whether there was any wrongdoing by any party, and (iii) make a recommendation to the

9   Court as to what action to take against any party who committed any such wrongdoing.

10      49.     The Committee[4] believes that there are four realistic options available for these cases.

11          i.      PW could remain on as the Debtors' bankruptcy counsel, while an

12  independent examiner conducts the examination described above.

13          ii.     The Debtors could hire well regarded replacement bankruptcy counsel who

14  could represent the Debtors and conduct the examination described above, or who could represent

15  the Debtors with an independent examiner to conduct the examination described above.

16          iii.    A Chapter 11 trustee could be appointed.

17          iv.     The Chapter 11 cases could be converted to Chapter 7.

18      50.     The following is an exploration of the Committee's views as to the pros and cons of

19  each of these four options and the Committee's preferred course of action (listed in order starting

20  with the Committee's first choice and ending with the Committee's last choice).

21      51.     PW remaining on as Debtors' bankruptcy counsel while an independent examiner

22  conducts the examination described above.

23      51.a.   Notwithstanding all of the allegations made against PW in the various pleadings

24  which have been filed with the Court and after taking into account the result of the extensive

25  examination conducted by me during a period of three weeks before that examination was halted, the

26  _____

27  [4] The balance of this pleading expresses just the views of the three active non-Senior Noteholders
    Committee members (the two Matsushita entities and MSL) because the Senior Noteholders were
28  recused from any voting on these matters.

23

1   Committee is not aware of any intentional wrongdoing by PW in these cases or any harm which has

2   befallen these estates as a result of any action (or inaction) taken by PW.  When all of the vitriolic

3   language is removed, the only wrongdoing that the Committee is currently aware of is PW's failure

4   to disclose its potential conflict with the Senior Noteholders regarding the PW opinion letter in

5   connection with PW's original employment application, and PW's failure to file a supplemental

6   disclosure regarding its actual conflict with the Senior Noteholders which arose in late August or

7   early September, 2006.  The Committee assumes that this lack of disclosure was not intentional on

8   PW's part, and will be addressed in PW's own pleading.  The Committee makes this assumption in

9   large part because continuing well after the "Senior Indebtedness" issue became finalized in the

10  VIA/S3 settlement agreement PW was actively preparing objections to the Senior Noteholders'

11  claims and would, in fact, have filed such objections if not for the conflict asserted by the Senior

12  Noteholders.

13      51.b.   The Committee believes that given (i) PW's immense and unique knowledge of the

14  Debtors and these estates, (ii) the fact that the Court can address what ramifications, if any, should

15  be implemented against PW at the appropriate time, and (iii) that any and all appropriate actions can

16  be taken in these cases with PW remaining on as the Debtors' bankruptcy counsel, the removal of

17  PW from these cases at this time (if PW is willing to remain on as counsel to the Debtors which the

18  Committee understands is the situation) would be detrimental to these estates.  The Committee's first

19  choice is to have PW remain on as the Debtors' bankruptcy counsel and for the Court to appoint an

20  examiner to conduct an investigation of the events which have transpired.  The Committee believes

21  that any other alternative will result in a significant additional expense to these estates and a

22  significant delay in the ultimate distribution of funds to creditors and dilution in their ultimate

23  recovery.

24      51.c.   General unsecured creditors have now waited nearly four years to receive their

25  money.  Other than the Senior Noteholders, no creditors of these estates have been accused of any

26  wrongdoing.  The Committee believes that there is no reason for these innocent creditors not to

27  receive as much of their money as soon as possible. The Committee believes that the best course of

28  action for these estates would be for the Committee (with the Senior Noteholders recused from this

24

entire process) to proceed with the confirmation of a unilateral plan of reorganization (meaning that the Debtors and PW would be removed from the plan of reorganization process).  Both Mr. MacIntyre and Mr. Melendy have agreed to take an active role in this process on behalf of their three clients to serve as the representatives of the Committee in this regard, and the Committee would continue to welcome the addition of any other significant claim holders who are interested in joining the Committee and who do not have any conflict of interest.  Mr. MacIntyre's and Mr. Melendy's three clients hold allowed claims of more than $12 million and have a significant and vested interest in making sure that creditors receive as much money as possible as quickly as possible.  Both Mr. MacIntyre and Mr. Melendy are highly experienced attorneys, and Mr. MacIntyre is a highly experienced bankruptcy attorney who has been involved with these cases from the outset.

51.d.   The Committee proposes that the plan of reorganization currently on file with the Court be modified in three significant ways.  First, the Debtors would be removed as a co-proponent of the plan, and PW would be removed from the plan process all together.  Second, the plan would provide for no distribution of funds to be paid to the Senior Noteholders at this time (either on account of the Senior Notes or on account of the Junior Notes).  Instead, any distribution to the Senior Noteholders would be delayed until the completion of an investigation to be undertaken by an independent examiner and the Court's determination as to how best to proceed following the recommendations of the examiner.  The Committee has computed that if an appropriate reserve was established to take into account the amount of remaining outstanding claims which have been asserted by the Senior Noteholders (approximately $60 million) and the amount of claims which have been asserted by the Junior Noteholders (approximately $100 million), an immediate distribution of approximately 25% could be made immediately following plan confirmation to the approximately $86 million of other allowed general unsecured claims (which would include the claims held by Riverside and VIA) all of whom would otherwise be innocent victims of the significant delays that would be attendant to any other outcome.  This would result in the immediate distribution of approximately $21.5 million to the holders of the $86 million of allowed general unsecured (excluding the claims of the Senior Noteholders and the Junior Noteholders).  Third, any language in the plan relating to releases or exculpations would be removed.

51.e.    The plan and disclosure statement are essentially completed.  The only modifications needed would be to amend the plan and disclosure statement to provide for the 25% distribution, and to amend the disclosure statement to provide for a current status of these cases, including all of the allegations made by all of the parties.  The Committee has nothing to hide and full disclosure of all relevant facts would be made, with general unsecured creditors to have the right to vote on the plan.  Mr. MacIntyre and Mr. Melendy believe that other unsecured creditors will conclude (like their clients have) that receipt of an immediate 25% distribution with the hope of receiving more in the future is an optimal result for the creditors of these estates.

51.f.    Under this option, an examiner would be immediately appointed by the Court.  Following the completion by the examiner of his/her findings and recommendations, the Court can best decide how to proceed.  There are numerous options available for enabling actions to be taken against any parties who may have conducted any wrongdoing (if any such wrongdoing is found to have occurred) without causing all of the hundreds of creditors other than the Senior Noteholders and the Junior Noteholders to incur unnecessary delay.  Once the claims of the Senior Noteholders and the Junior Noteholders become liquidated to final order, a final distribution of the remaining funds in these estates would be made to all creditors.[5]

52.    <u>Hiring Replacement Counsel</u>.  If there was well regarded replacement bankruptcy counsel who was familiar with these cases, the Committee believes that this option would result in the least amount of expense and the quickest resolution of these cases other than PW remaining on as counsel to the Debtors.  However, it appears that the only possible option in this regard (OMM), which was brought up by VIA as a possible alternative at the Court hearing held on February 15, 2007, is not a viable option because OMM has advised me that OMM could not satisfy the conditions of Section 327(a) necessary for OMM to become general bankruptcy counsel to the Debtors and therefore would decline any request to become employed as replacement bankruptcy

---

[5] It should be noted that LNBRB offered to Mr. MacIntyre and Mr. Melendy to resign as counsel to the Committee if the they believed doing so would be beneficial to the Committee and these estates, and both Mr. MacIntyre and Mr. Melendy requested LNBRB to remain on as counsel to the Committee.

counsel to the Debtors. Given that the Committee believes that any trustee will likely retain Marcus Smith as an employee of the Debtors due to his unique history and background with the Debtors, knowledge of the facts, and location and substance of the Debtors' books and records, the Committee still believes that the employment of new well regarded replacement bankruptcy counsel would result in substantially less expense to the estates and allow for the quickest resolution of these cases, regardless of whether that counsel or an examiner performed the investigation.

53.     A Chapter 11 trustee.

53.a.   The Committee recognizes that both the OUST and others have raised questions or doubts about permitting Marcus Smith to continue as the key representative of the "client". So although the Committee has had only positive experiences with Mr. Smith who has always been responsive to the needs of the Committee, if the Court is not inclined to permit the implementation of the Committee's first choice, the Committee believes that the next best option is to have a Chapter 11 trustee put in place. If a trustee is to be appointed, the Committee believes unsecured creditors would be much better off with the appointment of a Chapter 11 trustee (as the OUST has requested) as opposed to conversion of these Chapter 11 cases to Chapter 7 (as only SBC has requested). The Committee believes that the Chapter 11 vehicle would provide the trustee with more options and more flexibility, including the ability to proceed with the filing and confirmation of a plan of reorganization, which generally results in a much quicker distribution of funds to creditors than a Chapter 7. For example, if a Chapter 11 trustee wishes to make a distribution to creditors but reserve funds pending the trustee's analysis of the claims of the Senior Noteholders and the Junior Noteholders, a Chapter 11 plan of reorganization could easily provide the Chapter 11 trustee with the vehicle to do so. It is not clear whether a Chapter 7 trustee could make any interim distribution to creditors, or make an interim distribution to some creditors while reserving funds with regard to others. Also, notwithstanding all of the baseless accusations made by SBC, the members of the Committee (all six of the currently active ones) would like to have a continuing role in these cases and believe that they can be helpful and add value.

53.b.   Other than to perform the investigation (and decide what actions, if any, should be taken as a result of the findings and conclusions), object to the claims of the Senior Noteholders and

the Junior Noteholders, and complete the remaining limited other claims objections and preference actions, there is not much left to do in these cases in order to bring these cases to a prompt conclusion. A plan of reorganization and a disclosure statement have already been drafted. They only need to be updated regarding the events described herein.

53.c.    Unlike SBC, which was only formed several weeks ago and has only approximately $40,000 invested in its purchased claims, the real creditors of these estates (including those holding approximately $86 million of claims excluding the claims of the Senior Noteholders and the Junior Noteholders) have waited more than four years to be paid and thought that once the VIA/S3 settlement was consummated, payment was imminent. Creditors deserve to receive their distribution from these estates as quickly as possible, and the Committee believes that a Chapter 11 trustee is likely the second best way for this best to occur (after the Committee's first choice described above).

53.d.    The Court raised the question at the hearing on February 15, 2007 as to whether one Chapter 11 trustee was sufficient or whether four Chapter 11 trustees were needed (if the Court decided to appoint a Chapter 11 trustee). For all of the reasons set forth in the disclosure statement, it is clear to the Committee that the four Debtors really acted like one company and that the substantive consolidation of the four Debtors is inevitable and the only realistic and sensible result. Nobody objected to that provision in the plan of reorganization and disclosure statement that the Debtors and the Committee filed with the Court. The Committee therefore has no doubt that if the Court decides to appoint a Chapter 11 trustee; one Chapter 11 trustee is sufficient and can ably handle the tasks at hand. Moreover, if it is later determined (by the Court, the Chapter 11 trustee, the OUST, or anybody else) that additional Chapter 11 trustees are warranted, the Court could always appoint such additional Chapter 11 trustees at that time. The Committee is not aware of anyone who disagrees with this point. If the Court decides to appoint a Chapter 11 trustee, the Committee is hopeful that the Chapter 11 trustee would work with the Committee towards the confirmation of an immediate plan of reorganization and interim distribution (of 25% or some other amount) to the approximately $86 million of allowed general unsecured claims who are not Senior Noteholders or Junior Noteholders.

/ / /

54.    <u>Conversion of these Chapter 11 cases to Chapter 7</u>.    For the reasons addressed immediately above, the Committee believes that the conversion of these Chapter 11 cases to Chapter 7 is the least desirable result.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of March, 2007, at Los Angeles, California.

<u>  /s/ *Ron Bender, Esq.*</u>
RON BENDER, ESQ.

**RB**

| | |
|---|---|
| From: | Shaffer, K. John [KJShaffer@Stutman.com] |
| Sent: | Monday, February 05, 2007 2:11 PM |
| To: | RB; Merola, Frank A. |
| Cc: | CMR; Todd M. Arnold; rfranklin@murraylaw.com; Nanette.Dumas@usdoj.gov; wweintraub@pszyjw.com |
| Subject: | SonicBlue |

Ron:

Since the question of "motivation" has come up, I thought it best to copy the US Trustee's office and counsel for Riverside and Via.

Stutman has been retained by SonicBlue Claims LLC ("SBC"), a Delaware LLC that was formed last Friday and that is the assignee of Argo's approximately $160,000 in claims in the SonicBlue chapter 11 case. Argo and Ferry Claims each are 50% members of SBC. In addition to SBC's current position, SBC is interested in acquiring other large claims in the case, including potentially the Via claim.

With respect to the Via claim, SBC is prepared to offer jointly to the estate and Via $5 million cash, which would be a substantial premium over its value if one assumes, as you do, a 33% distribution in the case (33% of $12.5 million equals $4.17 million). This is particularly so given the "present value" of distributions that may take place over many months or years, which is why claims are trading for significantly less than 33 cents on the dollar at this time. The excess cash SBC would be offering above the actual, fair market value of the Via claim could be shared between Via and the estate in whatever manner they see fit. This offer would be contingent upon the Court "blue penciling" the undisclosed release language, which we are confident that the Court can, and should, do given that (1) it was undisclosed, (2) it was a special benefit for 3 Committee members, and (3) the Committee members gave no valid consideration for the release. In other words, SBC is so confident that the Via claim is "Senior Indebtedness" that it is willing to pay more than $1 million more than fair market value for the claim, to incur all costs of litigation on its own, and to allow the estate (and Via), to receive a substantial cash benefit from the transaction.

That is SBC's motivation.

---

From: RB [mailto:RB@lnbrb.com]
Sent: Monday, February 05, 2007 11:18 AM
To: Shaffer, K. John; Merola, Frank A.
Cc: CMR; Todd M. Arnold; RB
Subject: RE: SonicBlue

John and Frank, as part of my fact finding mission, and particularly given your clients' contentions of conflicts of interest, I would like to know what your clients' motivation is in this entire process. At the prior hearing, Scott McNutt acknowledged that Argo Partners has less than $200,000 of claims, which would be less than one tenth of one percent of the debt in this case. As a result of this, your clients do not stand to receive any meaningful economic benefit from any of the outcomes at stake here. For example, if VIA had agreed to a senior indebtedness claim of $5 million and the estate was successful in obtaining bankruptcy court approval of that settlement over the objection of the senior noteholders, that would have reduced the total unsecured debt in this case by $7.5 million (as the difference between $12.5 million and $5 million). On the assumption that this is a 33%

1



case, that would have translated into approximately $2.5 million of additional cash being made available to general unsecured creditors. While that sum is clearly significant, your clients would benefit less than $2,500 from that result. That would certainly not economically justify hiring lawyers of your caliber or cost. When I couple that with the comments that Scott McNutt made to me on my flight back to LA after the hearing which he was on, with the fact that the sole declarant to your clients' objection to the disclosure statement was from an entirely different claims trader (Farry) who acknowledged that it had no economic interest in these cases but was interested in purchasing VIA's claims, I am inquiring as to whether there is something going on here which is not transparent. Please advise. Thanks. Ron Bender.


On a separate note, I also want you to know that I suggested to Bob Franklin today again that given the size of Riverside's claims, Riverside should be added to the Creditors' Committee, which is something that I would encourage the OUST to do. I assume that is something your clients would like given the comments made in John's email. Bob told me that he would check with Riverside and get back to me.


******************************************************************
This Internet e-mail contains confidential information
which is intended only for the addressee and which may
be privileged under applicable law.  Do not read, copy
or disseminate it if you are not the addressee.  If you
have received this message in error, please notify the
sender immediately and delete it.  Thank you.
******************************************************************

## RB

| | |
|---|---|
| **From:** | William McGrane [WMcGrane@mcgranegreenfield.com] |
| **Sent:** | Friday, February 09, 2007 9:36 AM |
| **To:** | Robert A. Franklin; RB; Nanette.Dumas@usdoj.gov; JShaffer@Stutman.com; fmerola@stutman.com |
| **Cc:** | CMR; Todd M. Arnold |
| **Subject:** | RE: SonicBlue |

One other thought though. And that is, since what Bennett was doing here was voluntary anyway, for us (SBLLC) to notice him up formally and SDT documents showing his catalyst status to allow the court to subordinate him equitably under 510(c) (among his possible punishments if he's done what one might/must assume he has done to get the wonderful-for-the-bondholders/terrible-for-the-estate result he almost got away with here, all with no disclosure to anyone outside his charmed circle of PW and Via (and here, Ron, don't take offense, as I'm not including you in the charmed circle and instead assuming he pulled the wool over your Committees' eyes, not that you, Craig or your firm willing participants, as I am sincerely impressed by your conduct of this investigation).

Unless there is a good reason not to do this, I am instructing Frank to notice Bruce's depo with a SDT asap.

-----Original Message-----
From: Robert A. Franklin [mailto:rfranklin@MURRAYLAW.com]
Sent: Fri 2/9/2007 9:24 AM
To: William McGrane; RB; Nanette.Dumas@usdoj.gov; JShaffer@Stutman.com; fmerola@stutman.com
Cc: CMR; Todd M. Arnold
Subject: RE: SonicBlue

I agree.

From: William McGrane [mailto:WMcGrane@mcgranegreenfield.com]
Sent: Friday, February 09, 2007 9:19 AM
To: RB; Robert A. Franklin; Nanette.Dumas@usdoj.gov;
JShaffer@Stutman.com; fmerola@stutman.com
Cc: CMR; Todd M. Arnold
Subject: RE: SonicBlue

OK by me.

-----Original Message-----
From: RB [mailto:RB@lnbrb.com]
Sent: Fri 2/9/2007 9:14 AM
To: William McGrane; Robert A. Franklin; Nanette.Dumas@usdoj.gov;
JShaffer@Stutman.com; fmerola@stutman.com
Cc: CMR; Todd M. Arnold; RB
Subject: RE: SonicBlue

I agree with proceeding before Judge Morgan but before incurring estate expense in doing so (and to enable me to explain to Judge Morgan was is at issue), I need for Mr. Swartz to explain to me which documents he contends are subject to the confidentiality agreement because it is clear to me that many of them are not and at least with respect to those, I want to send copies to all of you immediately.

3/3/2007

32



# McGRANE GREENFIELD LLP

Attorneys at Law

Please reply to:
William McGrane
San Francisco Office

Direct E-mail:
wmcgrane@mcgranegreenfield.com

In Association With
**BERLINER COHEN**
San Jose • Merced

**SAN FRANCISCO OFFICE**
One Ferry Building
Suite 220
San Francisco, CA 94111
Phone:  (415) 283-1776
Fax:     (415) 283-1777

**SAN JOSE OFFICE**
40 South Market Street
Seventh Floor
San Jose, CA 95113
Phone:  (408) 995-5600
Fax:     (408) 995-0308

November 22, 2006

(Via E-mail)
Mow-Sung Ding
Ding & Ding
10th Floor
563 Chung Hsiao East Road
Section 4
Taipei, Taiwan
Republic of China

**RE:   Ferry Claims, LLC's Proposed Acquisition of Via Claim (the "Via Allowed Claim") as Presently Filed in *In Re Sonicblue Incorporated*, United States Bankruptcy Court for the Northern District of California (San Jose Division) Case Nos. 03-51775 through 03-51778 (Jointly Administered) (the "Sonicblue Bankruptcy Case").**

Dear Mow-Sung:

As local Taiwanese counsel for Ferry Claims, LLC ("Ferry"), I am writing to ask you to use your contacts within Via Technologies, Inc. ("Via"), a Taiwanese corporation headquartered in Taipei, Taiwan, Republic of China, where you also maintain your law offices, so as to arrange a meeting in Taipei between representatives of Via and my client, Mr. Paul Locklin, a representative of Ferry, in order to discuss a possible sale of the Via



33

– 2 –                                    November 22, 2006

Allowed Claim in the face amount of $12,500,000 U.S. to Ferry for cash in the amount of

$4,375,000 U.S. or 35 cents on the dollar.

By way of explanation to Via, Ferry is a hedge fund specializing in acquisition of

very large bankruptcy claims. Its co-managers are Robert Imhoff and Paul Locklin, both

of whom are very high net worth individuals, i.e., both each have a personal net worth in

excess of $40,000,000. As a consequence of their position as principals, Ferry has the

immediate liquidity necessary to close this proposed transaction with Via on very short

notice.

Claims are presently trading in the mid-20 cents on the dollar range in the

Sonicblue Bankruptcy Case. Ferry is willing to pay an approximate 10 cents on the dollar

premium to acquire a large position in Sonicblue Bankruptcy case in the belief that its

planned employment of one Scott McNutt, Esq. of McNutt & Litteneker LLP, a United

States bankruptcy lawyer who has had great success in similar cases in cleansing

wastefully administered Chapter 11 cases of administrative inefficiencies such as those

being practiced here by the debtor's counsel, Pillsbury Winthrop et. al., will enable Ferry

to ultimately make a substantial profit, despite a higher than average sourcing cost in

acquiring the Via Allowed Claim. There is great risk in this, of course, as well as very

substantial additional legal expense, but this is the business Ferry is in.

– 3 –                              November 22, 2006

As I have explained to you over the phone, I have a long standing business

relationship with Bill Weintraub, a New York City based senior partner at Pachulski Stang

et. al., Via's U.S. law firm in charge of the Sonicblue Bankruptcy Case. I have repeatedly

discussed this offer with Bill and Scott has discussed the matter with Bill's San Francisco

partner, Hank Kevane. Bill, in particular, can also vouch for my personal *bona fides* to

Via.

Let me know if a meeting can be arranged. Feel free to send this letter along to

Via as part of any presentation in Mandarin you may want to otherwise make of the main

points of this letter. Hope to see you again soon.

Very truly yours,

McGRANE GREENFIELD LLP

William McGrane

Cc: Paul Locklin (via e-mail)
     Robert Imhoff (via e-mail)
     William Weintraub, Esq. (via e-mail)
     Henry Kevane, Esq. (via e-mail)
     Scott McNutt, Esq. (via e-mail)

## Client-Employee-Task-Detail Report

*January 2007*                                                                                    **Hours**

**Sonic Blue**

**Deborah VanSchoor**

| | | | | |
|---|---|---|---|---|
| Claims Processing 01/01-31/07 | | | | |
| 3 | All - Manage objections, orders, stipulations, withdrawals, and assignments | Arizona Dept. of Revenue | 11 - Thursday | 0.50 |
| | | | | 15.75 |
| Response to Inquires 01/01-31/07 | | | | |
| 4 | All - Phone conferences, emails and meetings with client, advisors, vendors, and staff | Phone conversation with Matt - discussion on duplicate claims | 11 - Thursday | 0.50 |
| | | | | 0.50 |
| Claims Processing 01/01-31/07 | | | | |
| 3 | All - Manage objections, orders, stipulations, withdrawals, and assignments | Work through orders and tie with claims | 12 - Friday | 4.00 |
| 12 | All - Respond to inquiries | Phone conversations with Bill McGrane | 12 - Friday | 0.50 |
| 1 | All - Data management/database maintenance for imports, exports, and system modifications | Review Claims registers alpha & numeric and send to Bill McGrane | 12 - Friday | 0.50 |
| 3 | All - Manage objections, orders, stipulations, withdrawals, and assignments | Manage transfers of claims | 15 - Monday | 0.50 |
| | | | | 5.50 |
| Response to Inquires 01/01-31/07 | | | | |
| 4 | All - Phone conferences, emails and meetings with client, advisors, vendors, and staff | McGrane request, conversations, emails | 15 - Monday | 0.75 |
| 4 | All - Phone conferences, emails and meetings with client, advisors, vendors, and staff | Provide McGrane with PDF documents | 15 - Monday | 0.25 |
| | | | | 1.00 |
| Administrative 01/01-31/07 | | | | |
| 4 | All - Phone conferences, emails and meetings with client, advisors, vendors, and staff | POC/Schedule comparisons | 16 - Tuesday | 1.25 |
| 4 | All - Phone conferences, emails and meetings with client, advisors, vendors, and staff | McGrane emails | 16 - Tuesday | 0.75 |
| | | | | 2.00 |
| Response to Inquires 01/01-31/07 | | | | |
| 4 | All - Phone conferences, emails and meetings with client, advisors, vendors, and staff | Respond to email requests | 18 - Thursday | 1.25 |
| | | | | 1.25 |

3

EXHIBIT "4"

## RB

| | |
|---|---|
| **From:** | William McGrane [WMcGrane@mcgranegreenfield.com] |
| **Sent:** | Monday, February 12, 2007 3:01 PM |
| **To:** | Robert A. Franklin; RB |
| **Cc:** | jshaffer@stutman.com; Matthew Gold; Elliot Herskowitz |
| **Subject:** | RE: There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you? |

We think they had nothing to do with sticking the language in the Indenture and knew nothing about its intent or even its existence as a result, at least until somebody asked Henry Kevane for a release and he foolishly said "yes sir". For which Bill W. has no doubt taken him to the woodshed.

On the other point, regardless of the waiver, you can't do any sort of a voluntary make up deal without them as of now. All you could do would be forget about any voluntary settlement and instead seek to subordinate them under 510(c), and that's far fetched as far as they (as opposed to bennett's clients) go. All your rights against Bennett's clients and PW and OMM are preserved, so we think this is a good deal, Bob, as long as nobody gets greedy.

---

**From:** Robert A. Franklin [mailto:rfranklin@MURRAYLAW.com]
**Sent:** Monday, February 12, 2007 2:50 PM
**To:** William McGrane; RB
**Cc:** jshaffer@stutman.com; Matthew Gold; Elliot Herskowitz
**Subject:** RE: There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you?

I had understood from our call that Bill would be circulating a proposal for comments. In addition to our other comments on the call, we note that providing Via with an upside on a claim it never thought it had would appear to dilute and even prejudice the effect of their testimony on the issue. It would be similar to an expert testifying on issues whose compensation is dependent upon a percentage of the recovery. Do you have any insight as to what Via's testimony is going to be?

---

**From:** William McGrane [mailto:WMcGrane@mcgranegreenfield.com]
**Sent:** Friday, February 09, 2007 1:26 PM
**To:** RB; Robert A. Franklin
**Cc:** jshaffer@stutman.com; Matthew Gold
**Subject:** RE: There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you?

I'm working on Bob as we speak. Also how about Korean Import/Export.

---

**From:** RB [mailto:RB@lnbrb.com]
**Sent:** Friday, February 09, 2007 1:08 PM
**To:** William McGrane; rfranklin@murraylaw.com
**Cc:** jshaffer@stutman.com; Matthew Gold
**Subject:** RE: There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you?


EXHIBIT "S"

3/4/2007

Bill, it was I who suggested adding Riverside to the Committee.  Given the size of Riverside's claims, Bob Franklin's bankruptcy acumen, and Bob Franklin's knowledge of these cases, I believed and continue to believe that adding Riverside to the Committee would be a positive development for these cases.  However, as John Shaffer indicated, Riverside has thus far indicated that it is not interested in joining the Committee.  RB

---

**From:** William McGrane [mailto:WMcGrane@mcgranegreenfield.com]
**Sent:** Friday, February 09, 2007 12:15 PM
**To:** RB; rfranklin@murraylaw.com
**Cc:** jshaffer@stutman.com; Matthew Gold
**Subject:** RE: There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you?

Waiting to hear from Bob Franklin.  Will call Bob.  What happened to putting Riverside on the CC, which could use new blood in any case?  IMHO.

---

**From:** RB [mailto:RB@lnbrb.com]
**Sent:** Friday, February 09, 2007 11:57 AM
**To:** William McGrane; rfranklin@murraylaw.com
**Cc:** jshaffer@stutman.com; Matthew Gold
**Subject:** RE: There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you?

If necessary, I will make myself available at 1:00 p.m.  However, 2:00 p.m. would be better for me.  Please let me know.  Thanks.  RB

---

**From:** William McGrane [mailto:WMcGrane@mcgranegreenfield.com]
**Sent:** Friday, February 09, 2007 11:58 AM
**To:** rfranklin@murraylaw.com; RB
**Cc:** jshaffer@stutman.com; Matthew Gold
**Subject:** There is now something to discuss. Would a 1:00 PM conference call with me and John Shaffer work for the two of you?

## McGrane Greenfield LLP                              **William McGrane, Partner**

In Association With
Berliner Cohen
                                                One Ferry Building, Suite 220
                                                San Francisco, California 94111
                                                (415) 283-1776 Fax (415) 283-1777
                                                E-mail: wmcgrane@mcgranegreenfield.com
                                                Internet: www.mcgranegreenfield.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this

3/4/2007