# EXHIBIT 47

1

```
 1              UNITED STATES BANKRUPTCY COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  (SAN JOSE DIVISION)

 4

 5   In re:

 6   SONIC BLUE, INC.,              Case No. 03-51775-MM
                                    Thru      03-51778-MM
 7                                  (Jointly Administered)

 8                                  Chapter 11

 9                                  San Jose, California
                                    March 19, 2007
10                                  10:35 a.m.
                Debtor.
11   _____/

12

13                  TRANSCRIPT OF PROCEEDINGS
        a) AMENDED MOTION TO DISQUALIFY PILLSBURY, WINTHROP,
14    SHAW, PITTMAN, LLP, TO VACATE EMPLOYMENT ORDER, AND FOR
     DISGORGEMENT OF ATTORNEY'S FEES BY UNITED STATES TRUSTEE
15        b) JOINDER IN MOTION BY UNITED STATES TRUSTEE
                  BY SONIC BLUE CLAIMS, LLC
16       c) JOINDER IN MOTION BY RIVERSIDE CONTRACTING, LLC
                  AND RIVERSIDE CLAIMS, LLC
17        d) OPPOSITION TO MOTION BY PILLSBURY, WINTHROP,
                    SHAW, PITTMAN, LLP
18    e) REPLY TO OPPOSITION TO U.S. TRUSTEE'S MOTION TO
        DISQUALIFY PILLSBURY BY SONIC BLUE CLAIMS, LLC
19   f) RESPONSE TO SONIC BLUE CLAIMS LLC'S REPLY TO OPPOSITION
     BY PORTSIDE GROWTH & OPPORTUNITY FUND, SMITHFIELD
20        FIDUCIARY, LLC, AND CITADEL EQUITY FUND, LTD.
       g) AMENDED MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE
21                     BY U.S. TRUSTEE
              h) JOINDER IN MOTION FOR APPOINTMENT OF
22            CHAPTER 11 TRUSTEE BY MAXTOR CORP.
             i) OPPOSITION TO MOTION BY DEBTOR
23        j) AMENDED MOTION TO CONVERT TO CHAPTER 7
                  BY SONIC BLUE CLAIMS, LLC
24     k) LIMITED RESPONSE TO MOTION TO CONVERT, APPOINT
     CHAPTER 11 TRUSTEE AND/OR DISQUALIFY DEBTOR'S COUNSEL
25                BY VIA TECHNOLOGIES, INC.
```

2

1 l) RESPONSE TO MOTION TO CONVERT BY PORTSIDE GROWTH &
 OPPORTUNITY FUND, SMITHFIELD FIDUCIARY, LLC, AND
2  CITADEL EQUITY FUND, LTD.
 m) RESPONSE TO (g) MOTION FOR APPOINTMENT OF
3 CHAPTER 11 TRUSTEE AND (i) MOTION TO CONVERT TO
 CHAPTER 7 BY OFFICIAL COMMITTEE OF CREDITORS
4  HOLDING UNSECURED CLAIMS
 n) RESPONSE TO MOTION TO CONVERT TO CHAPTER 7
5  BY SONIC BLUE CLAIMS, LLC

6

7  BEFORE THE HONORABLE MARILYN MORGAN
  UNITED STATES BANKRUPTCY JUDGE

8

9 APPEARANCES:

10

For the Creditors'  LEVENE, NEALE, BENDER, RANKIN
11 Committee:  & BRILL, LLP
  BY: RON BENDER, ESQ.
12   CRAIG RANKIN, ESQ.
  10250 Constellation Boulevard.
13  Suite 1700
  Los Angeles, California 90067

14

15

16 For Riverside  MURRAY & MURRAY
 Contracting:  BY: ROBERT A. FRANKLIN, ESQ.
17  19400 Stevens Creek Boulevard,
  Suite 200
18  Cupertino, California 95014

19

20 For Pillsbury:  PILLSBURY, WINTHROP, SHAW &
  PITTMAN
21  BY: THOMAS V. LORAN, III, ESQ.
   CRAIG BARBAROSH, ESQ.
22  50 Fremont Street
  San Francisco, California 94105

23

24

25

3

```
1   APPEARANCES (CONTINUED)

2
    For Pillsbury:              HOWARD, RICE, NEMEROVSKI, CANADY,
3                               FALK & RABKIN, PC
                                BY: BERNARD BURK, ESQ.
4                               Three Embarcadero Center, 7ᵗʰ Floor
                                San Francisco, California 94111
5

6
    Proposed Special            JEFFER, MANGELS, BUTLER & MARMARO
7   Counsel for the Debtor:     BY: RICHARD A. ROGAN, ESQ.
                                Two Embarcadero Center, 5ᵗʰ Floor
8                               San Francisco, California 94111

9

10  For Maxtor Corporation:     BIALSON, BERGEN & SCHWAB
                                BY: PATRICK M. COSTELLO, ESQ.
11                              2600 El Camino Read, Suite 300
                                Palo Alto, California 94306
12

13

14  For the U.S. Trustee:       OFFICE OF THE U.S. TRUSTEE
                                BY: NANETTE DUMAS, ESQ.
15                                  EDWINA DOWELL, ESQ.
                                    SHANNON MOUNGER, ESQ.
16                              280 South First Street #268
                                San Jose, California 95113
17

18
    Special Litigation          O'MELVENY & MYERS, LLP
19  Counsel for Debtor:         BY: MATT POWERS, ESQ.
                                Embarcadero Center West
20                              275 Battery Street, Suite 2600
                                San Francisco, California 94111
21

22

23

24

25
```

4

```
 1  APPEARANCES (CONTINUED):

 2
    For Sonic Blue claims:    McGRANE GREENFIELD, LLP
 3                            BY: BERNARD S. GREENFIELD, ESQ.
                              40 South Market Street, 7th Floor
 4                            San Jose, California 95113

 5                                       -and-

 6                            STUTMAN, TREISTER & GLATT
                              BY: K. JOHN SHAFFER, ESQ.
 7                               FRANK A. MEROLA, ESQ.
                              1901 Avenue of the Starts,
 8                            12th Floor
                              Los Angeles, California 90067
 9

10  For the senior          HENNIGAN, BENNETT & DORMAN
    note holders:            BY: BRUCE BENNETT, ESQ.
11                           865 South Figueroa Street,
                             Suite 2900
12                           Los Angeles, California 90017

13
    For Via Technologies:    PACHULSKI, STANG, ZIEHL, YOUNG,
14                           JONES & WEINTRAUB
                             HENRY KEVANE, ESQ.
15

16  For LSI and             LAW OFFICES OF McNUTT and
    Hayne Capital            LITTENEKER
17                           BY: SCOTT H. McNUTT, ESQ.
                             188 The Embarcadero #800
18                           San Francisco, California 94105

19
    Court Recorder:          LUPE BARRON
20                           UNITED STATES BANKRUPTCY COURT
                             280 South First Street
21                           San Jose, California 95113

22
    Transcription Service:   Jo McCall
23                           Electronic Court
                             Recording/Transcribing
24                           2868 E. Clifton Court
                             Gilbert, Arizona 85297
25                           Telephone: (480) 361-3790
```

5

PROCEEDINGS

1

2  March 19, 2007                              10:35 a.m.

3                          ---oOo—

4          THE CLERK: All rise.  This is the United States

5  Bankruptcy Court for the Northern District of California.

6  The court is now in session.

7          THE COURT: Good morning.

8          ALL COUNSEL: Good morning, Your Honor.

9          THE CLERK: Item 1, Sonic Blue, Incorporated.

10          THE COURT: Could we have your appearances,

11  please.

12          MS. DUMAS: Good morning, Your Honor, Nanette

13  Dumas for the U.S. Trustee.  In the courtroom with me is

14  the assistant U.S. Trustee Edwina Dowell, Shannon Mounger

15  another attorney in our office, and Patricia Vargas, one of

16  our paralegals.

17          MR. RANKIN: Good morning, Your Honor, Craig

18  Rankin from Levene, Neale, Bender, Rankin and Brill on

19  behalf of the Committee.  Also with me in court is Ron

20  Bender.

21          MR. LORAN: Good morning, Your Honor, Thomas Loran

22  appearing today with my partner, Craig Barbarosh, on behalf

23  of my firm, Pillsbury, Winthrop, Shaw & Pittman.  And I'd

24  like to introduce the Court to our co-counsel, one of our

25  counsel, Bernie Burk from the Howard Rice firm.

6

1          MR. BURK: Good morning, Your Honor, Bernard Burk

2    from Howard Rice.  Also present for Pillsbury Winthrop

3    today is John Grenville (Phonetic) who's here as a

4    representative of the firm and its management to make sure

5    that the Court's wishes are fully carried out in these

6    difficult circumstances.

7          THE COURT: Okay.  Good morning, Mr. Burk.

8          MR. ROGAN: Good morning, Your Honor, Richard

9    Rogan of Jeffer, Mangels, Butler & Marmaro, proposed

10   special counsel for the Debtor.

11         MR. POWERS: Good morning, Your Honor, Matt Powers

12   of O'Melveny & Myers, special litigation counsel for the

13   Debtor.

14         MR. FRANKLIN: Good morning, Your Honor, Robert

15   Franklin of Murray & Murray appearing on behalf of

16   creditor, Riverside Claims and Riverside Contracting.

17         MR. COSTELLO: Good morning, Your Honor, Patrick

18   Costello on behalf of Maxtor Corporation.

19         MR. BENNETT: Good morning, Your Honor, Bruce

20   Bennett of Hennigan, Bennett & Dorman on behalf of the

21   senior note holders.

22         MR. GREENFIELD: Good morning, Your Honor, Bernard

23   Greenfield for SBC.

24         MR. SHAFFER: Good morning, Your Honor, John

25   Shaffer and Frank Merola for SBC.  Thank you.

1          THE COURT: Okay.  Good morning.

2          MR. KEVANE: Good morning, Your Honor, Henry

3    Kevane, Pachulski, Stang, Ziehl, Young, Jones & Weintraub

4    for Via Technologies.

5          MR. McNUTT: Good morning, Your Honor, Scott

6    McNutt appearing on behalf of two creditors, LSI and Hayne

7    (Phonetic) Capital.  Thank you, Your Honor.

8          THE COURT: Okay.  Well, good morning to all of

9    you.  These are very serious matters that we have before

10   the Court this morning and so to focus your comments, let

11   me just say a few things.  First of all, I have read all

12   the motions and the replies and the declarations and the

13   supplemental replies.  In order to focus you, I don't want

14   to go into the issue of disgorgement today, and I'm going

15   to give you what I consider to be a very tentative ruling.

16   I want you to understand that I want to hear your argument.

17   This is not a final ruling.  This is simply to help focus

18   you.

19          My intent now, having read all of the pleadings

20   and thought about this is that I will appoint a Chapter 11

21   trustee in this case, but that should not discourage you

22   from whatever argument you want to make.  As I indicated,

23   your argument is very important to me today.

24          So with that, I think it is the U.S. Trustee's

25   motion to appoint a trustee, but it may be necessary for

8

1   you to reply and perhaps for us to hear those people who

2   would be on the other side, and I'm wondering if Pillsbury

3   would like to be heard first.

4        (Static noise.)

5            I don't know what the static is going on.  Does

6   anyone have a cell phone?

7            THE CLERK: Tell your cell phones completely off,

8   not vibrate, completely off.  Thank you.

9            MR. BURK: Good morning, Your Honor, and thank

10  you.  The current circumstances have put Pillsbury in a

11  difficult position because with the accusations against it

12  and the effort to disqualify, the firm has not been able to

13  confer with its client or advise its client, the Debtor, or

14  the Debtors, about what their preferences might be or what

15  would be appropriate in terms of responding to the requests

16  for relief that are before the Court today.

17           Mr. Smith who is present here today has been

18  seeking counsel and has only recently been able to retain

19  counsel.  And in the meantime, on the difficult issues of

20  what the Debtors' position would be on a trustee, what the

21  Debtors' position would be on disqualification, on what the

22  Debtors' position would be on retaining Pillsbury as

23  Debtors' counsel in a general counsel capacity or any other

24  more limited capacity.  We simply have not been able to

25  speak with the firm's client.

1          Pillsbury, as the Debtors' counsel, I believe is

2    not appropriately in a position to take a position on the

3    appointment of a Chapter 11 trustee.  It's really not

4    Debtors' counsel's role to have a substantive position on

5    that.  There are issues regarding Pillsbury's continuing

6    role in the case that I am eager to address with the Court

7    and I defer to the Court as to when and in what order those

8    should be addressed, since the Court is focusing right now

9    on the Trustee issue.  So I'd like some guidance on that.

10          THE COURT: No.  I don't know what issues you have

11    in mind.  But feel free; you have the podium now.

12          MR. BURKE: Well, thank you very much.  There's

13    been quite a lot of harsh words that have been addressed to

14    Pillsbury in recent weeks regarding what it may or may not

15    have done, and one of the things I'd like to do, if the

16    Court will indulge me for a short time, is to address some

17    of the more inflammatory allegations that have been made

18    about Pillsbury's conduct and to hopefully clear the air a

19    little bit.  I know that the Court has seen and has

20    reviewed the papers that Pillsbury has prepared and

21    filed --

22        (Static noise.)

23          THE COURT: All right.  Let's stop a minute.

24          MR. BURK: You know, I'm sorry.  I may have

25    something in my bag that may be is -- not the first time

10

1  you're going to hear that morning.

2          There are two very serious allegations that have

3  been leveled against Pillsbury, and I'd like to deal with

4  each of those because they bear on the motion to disqualify

5  the firm and they also raise some very serious issues that

6  the Court I'm sure is deeply concerned about.

7          The two most serious allegations are that

8  Pillsbury knowingly manipulated claims and objections in

9  this case with the purpose of minimizing its own exposure

10  to a claim made by the senior note holders based on

11  Pillsbury's opinion in the pre-petition financing

12  transaction by which the senior note holders acquired what

13  became the claims in this case.

14          And the other allegation that has been made is

15  that Pillsbury deliberately concealed the note holders'

16  claim from the Court.  There is a very substantial body of

17  evidence that has been accumulated and submitted to the

18  Court by the Pillsbury firm and that I know the Court is

19  now familiar with, that deals with those allegations, and I

20  will submit respectfully, dispels them absolutely.

21          Regarding the alleged manipulation of claims and

22  objections, the claim we are talking about here is the note

23  holders' claim that because of an opinion that Pillsbury

24  gave in the transaction that contained the scribner's error

25  that inadvertently made a bankruptcy disclaimer apply to

11

 1  only one paragraph and not another, that these

 2  sophisticated investors somehow believed that their notes

 3  would be enforceable despite the existence of a bankruptcy.

 4  It's an absurd claim for a variety of reasons, but the

 5  merits of the claim are not before the Court today, and I'm

 6  not going to tax the Court unless the Court has questions

 7  about those merits.

 8          The point is that once the claim was asserted,

 9  there were issues that needed to be addressed, and again,

10  the allegation that has been made is that Pillsbury went

11  easy on the note holders or affected the way in which they

12  handled the note holders' claims because of their concern

13  that they would have liability on this opinion that was

14  delivered to the note holders.

15          The evidence is now in front of the Court.  There

16  is an objection or there shortly will be filed an objection

17  to the note holders' claims that's based on so-called

18  original issue discount issues, that is, that the original

19  financing transaction and the notes contain concealed

20  interest that had not yet accrued that shouldn't be part of

21  their claim in the case.  It's a multi-million dollar

22  issue, and what the evidence shows is that it was Pillsbury

23  that recognized the issue.  It was Pillsbury that developed

24  the issue legally --

25          (Static noise.)

12

1          THE COURT: Sorry.  It's not like us to have all

2     this feedback.

3          MR. BURK: I know I didn't do that one.

4          It was Pillsbury that recognized this issue.  It

5     was Pillsbury that developed this issue legally and

6     factually at tremendous effort, including the use of

7     experts, with legal research, with factual development of

8     the value of these original issue discount cases, and it

9     was Pillsbury that directly asserted the original issue

10    discount defenses to the note holders.  If Pillsbury had

11    been inclined to protect itself against exposure to the

12    note holders, then it had plenty of opportunity to downplay

13    or ignore those issues.  They're subtle and complicated and

14    creative issues, and if Pillsbury had not brought them to

15    the fore, there is every possibility they never would have

16    been raised.  But instead what Pillsbury did was to develop

17    them fully and then present them adversarially to the note

18    holders as potential objections and invite them to

19    negotiate.

20         And it was then, and only then, and only then for

21    the very first time, that the note holders asserted this

22    claim based on the opinion, directly and defensively, as a

23    result of what Pillsbury did.  So the notion that what

24    Pillsbury did was to downplay or to take a dive on the

25    original issue of discount defenses as a way of avoiding

13

1  their own liability, there's absolutely no evidence that

2  can support that proposition.

3       There's also an allegation about a second claim.

4  The Court is looking troubled.  Is there a question?

5       THE COURT: No.

6       MR. BURK: Okay.

7       THE COURT: I'm sorry.  When I focus and I'm

8  concentrating, I have a wrinkled brow.

9    (Laughter.)

10      MR. BURK: I apologize.  There's a second set of

11 claims regarding a different claim in the case, the claim

12 based on the Via settlement, and here, the claim is that

13 Pillsbury was somehow complicit in the manipulation of the

14 priority of that claim, again as a result of a –– as a

15 means of avoiding liability or exposure on this opinion

16 that they had delivered to the note holders, because the

17 priority of the Via settlement affected how much the note

18 holders would recover.  Again, the evidence is now before

19 the Court, and there is no basis on which the claim can

20 responsibly be made.

21      And it's important to keep in mind that the very

22 first time that this claim regarding the opinions raised is

23 on August 24th, 2006, by a telephone call from Mr. Bennett

24 to Mr. Barbarosh.  It's followed up soon after in September

25 by a letter.  And what the evidence shows is that the

14

 1   priority of the Via settlement was resolved in the

 2   settlement negotiations and decided, and you don't have to

 3   simply take the word of the lawyers who are involved.  You

 4   have been given draft settlement documentation that

 5   addresses these issues, well before the 24th of August,

 6   2006.

 7          In fact, it's back in 2005 when priority is

 8   explicitly discussed, and it is agreed that the claim that

 9   Via will have is a general unsecured claim.  And there's

10   later discussion specifically dealing with a potential

11   ambiguity in the senior note holders' indenture that

12   perhaps can be read to give Via full priority, and that is

13   specifically negotiated out -- again, all before the issue

14   on the opinion is ever raised and Pillsbury ever has any

15   motive to manipulate anything.

16          Now, Via was in a position to enjoy the benefit

17   of the increased priority.  They would have made more

18   money.  What Via consciously did, with full knowledge of

19   the relevant facts, was that they agreed to a non-priority

20   claim, and that's not surprising because in fact the

21   undisputed extrinsic evidence about the potential priority

22   that that settlement would have is that the only priority

23   that the indenture, the senior note holder indenture gives

24   is priority to a new money loan that was under discussion

25   at the time the indenture was executed and eventually never

15

1   got made.

2           So, Via was given a choice; they could fight for

3   a higher priority for their claim and they could litigate a

4   case based on extrinsic evidence that was going to blow

5   that claim to bits so they could do what they sensibly did,

6   which was, knowing exactly what the score was and what

7   their entitlements were.  They agreed to a general

8   unsecured claim and they did so months and months prior to

9   the time that Pillsbury had any knowledge that there was a

10  claim based on its opinion and was going to be an issue.

11          The evidence also shows, and you have been

12  provided declarations from the relevant professionals at

13  Pillsbury that the litigators handling the Via matter

14  didn't even know that there was an opinion issued to the

15  senior note holders.  And for that matter, the bankruptcy

16  lawyers didn't either, let alone that it contained some

17  scribner's error that twisted out of context could possibly

18  provide some basis for the claim.

19          So as to the claims regarding manipulation,

20  alleged manipulation of claims as a matter of self-

21  preservation or self-service -- again, the evidence is now

22  in front of the Court, and the Court knows what it needs to

23  know to evaluate those claims -- those assertions

24  appropriately.

25          Regarding the alleged concealment of the claim

1   once it was asserted, again in August of 2006, I want to

2   start by making something very clear, and Pillsbury wants

3   there to be no mistake because I think that in some of the

4   papers, there's been a less than entirely charitable

5   interpretation of their position.  When the senior note

6   holders raised the claim, based on the opinion, regardless

7   of its merits, it was at that time, necessary under

8   Bankruptcy Rule 2004 (sic) for Pillsbury to file a

9   supplemental disclosure.  They failed to do so promptly.

10  That was a failure in their obligations to the Court.

11  Pillsbury has apologized to the Court and to the United

12  States Trustee in its papers.  Mr. Grenville,

13  representative of the Pillsbury firm and Pillsbury's

14  management today is here to say again, as am I, that they

15  deeply, deeply regret their failure to attend to their

16  obligations under the Bankruptcy Rules.

17          But to say that this was part of a program of

18  deliberate concealment is completely unfair and is

19  ungrounded in the evidence.  In point of fact, while

20  Pillsbury did fail to do what they needed to do under the

21  Rules at the time that the claim was raised, they promptly

22  made the claim and the conflict that it created known, and

23  they took action to deal with it.  Specifically, within

24  days of the time that this claim was first asserted --

25          (Static noise.)

17

1          It must be me.

2          THE COURT: No, I think maybe the sound system

3    isn't used to having so many people in the courtroom.  That

4    would be my guess.

5          (Laughter.)

6          MR. BURK: Well, it was just on my blackberry this

7    time.

8          Within days of the time that that claim is first

9    asserted, the Pillsbury firm contacts the Creditors'

10   Committee's counsel, fully informs them of all of the

11   details of the claim and its purported basis, and hands off

12   the entire matter and all of its files and all of the

13   handling of the senior note holders' claim and the junior

14   note holders' claim, because it could be affected by this

15   as well, to the Creditors' Committee.  Now, those are not

16   furtive gestures, and they're not behavior that can in any

17   way be considered consistent with concealment.

18          There are people who have suggested that -- that

19   the handoff to the Creditors' Committee was some kind of

20   elaborate conspiracy that included the Creditors' Committee

21   and its counsel, because the senior note holders sit on the

22   Committee, and again, that needs to be dismissed as simply

23   a mean-spirited speculation.  And the Court is fully

24   familiar with the fact that in virtually every Chapter 11

25   case, the Creditors' Committee must evaluate and deal with

1   them as counsel; it must evaluate and deal with claims

2   against the interests of and sometimes directly against

3   members of the Committee.

4        There are standard ways that that situation is

5   dealt with.  Mr. Bender, I believe, is going to tell you

6   that they were dealt with in that way here, and from the

7   standpoint of the Debtors' counsel, the only question here

8   is, was it the appropriate thing to do when faced with a

9   conflict of interest for Pillsbury to hand off the matter

10  to the Creditors' Committee for the Creditors' Committee to

11  decide.  Should our counsel handle this with recusal of the

12  interested members of the Committee?  Should other conflict

13  counsel be located?  We don't know.  But the suggestion

14  that there is some conspiracy among the professionals to

15  hide this or to manipulate it, again there is simply no

16  evidence that that's true.  What happened here is what

17  happened in Chapter 11 cases in this court all over the

18  country every single day, which is Debtors' counsel had a

19  conflict, handed it off to the Creditors' Committee, and

20  they did what they usually do.

21        So what happened?  Well, what happened was the

22  kind of thing that shouldn't happen but unfortunately

23  occasionally does, the failure to file a supplemental

24  disclosure.  Why wasn't it filed?  It was an inadvertent

25  oversight.  The professional who was responsible believed

19

1  that he had seen to having it prepared and filed.  It

2  turned out it wasn't filed, and he failed to follow up, and

3  at this point, all Pillsbury can say is that it was an

4  inadvertent failure, and that they apologize.

5          There's again the suggestion that because the

6  conflict is mentioned in other filings at the time when the

7  disclosure -- the supplemental disclosure wasn't

8  particularly in connection with the disclosure statement

9  related to the pending Plan, that this was again part of an

10  effort to conceal things in plain sight.  Again, there's

11  just no evidence that that's true.  What you actually have

12  is more evidence that Pillsbury wasn't trying to hide

13  anything from anybody.  They mentioned the conflict and the

14  handoff to the Creditors' Committee in papers that were

15  filed with this court in the Disclosure Statement and the

16  amended Disclosure Statement, and contrary to some

17  assertions that these were an effort to bury something in a

18  lengthy document, specifically culled the issue out in a

19  brief pleading relating to the amended Disclosure Statement

20  that was filed on January the 19th.

21          Now are those a substitute for the supplemental

22  disclosure that the firm was supposed to file?  Absolutely

23  not.  What they show is that there was an inadvertent error

24  in failing to file that supplemental disclosure and that

25  Pillsbury wasn't attempting to hide anything from anybody.

20

1          So, that brings us to the question of when this

2     disclosure should have been made.  Certainly I represented

3     to the Court, and I think everyone agrees, by the time that

4     the senior note holders' claim is made on the 24th of

5     August, 2006, there is a need to disclose this claim and

6     the potential conflicts that it creates so that everyone is

7     informed and people can take appropriate action.  It's been

8     suggested by the U.S. Trustee and by other creditors that

9     the existence of this potential claim should have been

10    disclosed at the outset of this case in Pillsbury's

11    employment application back in April of 2003.

12          Now, there again, the evidence is now before the

13    Court, that that conclusion is again unsupportable on what

14    we know about the facts and what we know about the law.

15    There is no evidence that anyone at Pillsbury was actually

16    aware of this latent alleged defect in an opinion in a

17    large financing transaction that was one of many financing

18    transactions that was in an enormous room full of papers

19    relating to Sonic Blue.  There is no evidence that anyone

20    reasonably should have been aware of that strange drafting

21    glitch on the sixth page of an opinion buried in a

22    complicated financing transaction that was one of many.

23          Pillsbury, I think the Court knows, was the

24    Debtors' general counsel for 14 years prior to the filing

25    of this bankruptcy case.  They had represented the Debtor

21

1   in all aspects of their business, at least ten mergers and

2   acquisitions, securities, corporate governance, licensing,

3   intellectual property, employment issues, benefits.  All of

4   the things that lawyers do for clients were done for this

5   set of companies.  This was one of the largest clients of

6   Pillsbury's Silicon office and the files that were

7   generated in the course of 14 years of representation would

8   fill at least an entire room.

9          There were scores and scores of matters, scores

10  and scores of feet of files, and under those circumstances,

11  what Pillsbury did is what -- and the Court has expert

12  declarations from Professor Rappaport, who is present here

13  today if the Court has questions for her,  and actually

14  we're eager to make her available as a resource to the

15  Court if the Court feels the need -- what Pillsbury did is

16  what every law firm in similar circumstances with any kind

17  of history pre-petition with the Debtor does, which is to

18  disclose generally and by category what they did.  They

19  disclosed briefly but broadly that they had been general

20  counsel to the Debtor in financing and a variety of other

21  kinds of transactions, indicating clearly that anyone who

22  had had substantial dealings with the Debtor had had

23  substantial dealings with Pillsbury on behalf of the

24  Debtor.

25          So, what more could we do?  It's inconceivable

22

1    that the law could require -- law firms don't; courts don't

2    expect, and United States Trustees don't expect that twig

3    by twig and branch by branch and trunk and trunk, this

4    gigantic pre-petition forest of prior representations would

5    be disclosed in detail in an employment application.   The

6    Court would be swamped with a tidal wave of useless details

7    and would not be able to do what it needs to do, which is

8    to see what the salient issues are, to determine whether it

9    is appropriate for these professional to serve this estate.

10              Now it's also been suggested that there's

11   something magic about this transaction because it involves

12   a lot of dollars or because it was relatively close in time

13   to the filing of the bankruptcy.  Again, besides the fact

14   that there's no coherent standard that could be teased out

15   of that as to what, behind the veil of ignorance, before

16   any of this happened, and we have the benefit of 20-20

17   hindsight, that you could know, oh, wait, it's this one

18   transaction of many substantial transactions, many of which

19   occurred in the 12 months prior to the bankruptcy or the

20   six months prior to the bankruptcy or the 18 months prior

21   to the bankruptcy, that you could know that this one was

22   going to turn out to be anything other than a creditor's

23   claim which would have some issues with it just like any

24   other one.

25              And even if you focused on this transaction and

23

1  the six, eight, ten, twelve feet of paper and multiple

2  drafts of indentures and debentures and all of the back and

3  forth that led to a 75 million dollar financing with all of

4  the complicated documentation, that somebody, a bankruptcy

5  lawyer, preparing a disclosure in the brief hours before a

6  Chapter 11 filing and the set of first-day motions that has

7  to come out, could say, oh my Gosh, I found on page 6 a

8  strange latent defect that somebody might some day claim is

9  going to turn into a claim which could affect the way in

10  which -- it's inconceivable.

11          What is the appropriate disclosure that Pillsbury

12  should have made, I submit respectfully is exactly the

13  disclosure in 2003 that they did make to the Court and that

14  any other rule will put the Court in a position where what

15  it receives will be overwhelming and useless in future

16  cases.

17          The Court, I suggest, needs to consider, as it

18  considers what kind of disclosure at the outset of a case

19  must be provided, must be provided on pain of subsequent

20  disqualification, must be provided on pain of subsequent

21  disgorgement of fees -- and those are the issues before the

22  Court today -- it's a standard that can't routinely

23  disqualify counsel that had knowledge and experience with

24  debtors.  Those are of value in a bankruptcy case, and they

25  were of value in this bankruptcy case because whatever you

24

1   may say about the failure of disclosure, that Pillsbury

2   accomplished -- they've accomplished tremendous things in

3   this case for the benefit of this estate and its creditors,

4   and the Court is on record as having appreciated all of the

5   things that it did with the benefit of its background and

6   knowledge about this Debtor.

7           We want to encourage counsel who are

8   appropriately disinterested -- and that's important --

9   counsel who do have that background and knowledge, we want

10  to encourage them, not discourage or deter them, from

11  making application to serve estates and to serve them well

12  and efficiently as before this unfortunate event Pillsbury

13  did in this case.

14          It's not -- there should not be a standard that's

15  articulated here that suggests that hundreds of hours of

16  pointless self-examination of rooms full of files on the

17  part of the bankruptcy lawyers at Pillsbury and the hours

18  before those first-day motions has to be brought before the

19  Court or that the Court should be getting scores of pages

20  of useless details that it has to comb through in order to

21  make an appropriate examination of what estate counsel

22  ought to be doing.

23          And that kind of effort is not the sort of effort

24  that the Court or the U.S. Trustee has time for and it's

25  not the sort of activity that they ought to be engaging in.

1  It interferes rather than enhances the critical job that

2  both the Court and the U.S. Trustee have in supervising and

3  approving and watching over the estate's professionals.

4          This brings us to the truly difficult question of

5  what do we do with Pillsbury now?  It's difficult for a

6  number of reasons, not the least of which of course is that

7  because of the allegations as I mentioned at the outset,

8  the firm has not been able to confer with its client.  It

9  does have a client and it has professional duties to that

10 client.  Mr. Rogan is here today representing the Debtors,

11 but he was retained I believe in the last 48 or 72 hours,

12 and we have not had the benefit of any close consultation

13 with Mr. Smith to learn what the Debtors' preferences are

14 about what, if anything, Pillsbury's continuing role should

15 be in the case.  I believe that Mr. Rogan will have

16 something to say about that now, but the reason the Court

17 has not seen a filing from the Debtor is that Pillsbury

18 couldn't make one, and Mr. Smith only found counsel in time

19 to attend the hearing and has not been able to make his

20 wishes known to the Court in writing.

21          That being said, if one were to ask Pillsbury

22 what Pillsbury's views are, it is that in point of fact, a

23 great deal of what the firm set out to accomplish and that

24 the Debtor needed to accomplish has at this point been

25 accomplished.  The assets have been sold.  There is a draft

26

1   Disclosure Statement and Plan on file which the Creditors'

2   Committee is a co-proponent of and is fully capable of

3   carrying forward to the next step if this case continues as

4   a Chapter 11, which I believe the Court is currently

5   inclined to see it do.

6          There are claims and objections that need to be

7   handled, and the Creditors' Committee and other counsel,

8   either before or after confirmation of a Plan can handle

9   those.  Of all of the things that Pillsbury originally

10  undertook to do, the only unfinished business to which it

11  would bring irreplaceable, perhaps special expertise, is

12  the constellation of avoiding powers litigation that they

13  undertook.  There's about a hundred of those cases, most of

14  which are finished, but a few of which are not.  And rather

15  than having new counsel step in on those, we would suggest

16  that the estate would benefit, Pillsbury would benefit, as

17  serving as at least special counsel, qualified under

18  Section 327(e) to handle and complete that particular piece

19  of this case.

20         Now obviously the conflicts and difficulties that

21  have been raised have nothing to do with those preference

22  cases.  They're completely unrelated, and as a result, I

23  think Pillsbury is qualified.  But the more difficult

24  question, should Pillsbury consider -- continue as the

25  Debtors' general counsel?  The answer is, I believe that

1  all of the concerns that have been raised have been

2  addressed in Pillsbury's paper and have been -- I've now

3  related to the Court.

4          We would like to be guided by the preferences of

5  our client and by the preferences of the Court.  If the

6  Court feels that it is inappropriate for Pillsbury to

7  continue as the Debtors' general counsel, if the Court is

8  concerned about distraction and making this into a side

9  show, Pillsbury is prepared to do what is best for the

10 estates and what is best for the process and to step aside.

11 They're also prepared to serve in whatever capacity their

12 client and the Court would like them to.  They wish to

13 be -- they would like to hear from you about that.

14          The -- I'm sorry, I've lost my place.

15          THE COURT: That's all right.

16          MR. BURK: That's so embarrassing.

17          THE COURT: No, it's not embarrassing because

18 you're talking from your heart, and I appreciate the

19 difficult situation that Pillsbury has been in, in this

20 situation.  You may proceed, Mr. Burk.

21          MR. BURK: Thank you.  I appreciate the Court's

22 attention.

23          THE COURT: Thank you.  Let me ask, before you

24 speak, Ms. Dumas, is there anyone else who wishes to be

25 heard on this issue?  I think there probably are a number

1  of people who wish to be heard.

2          MR. ROGAN: I certainly do, Your Honor.  Good

3  morning, Your Honor.  Richard Rogan appearing as proposed

4  special counsel for the Debtor.

5          I was contacted on Thursday to see if I could

6  represent the Debtor with respect to these motions.  I do

7  want the Court to know and everyone here that my partner

8  Barry Freeman is the father of William Freeman, one of the

9  attorneys for Pillsbury.  That was not the contact that was

10  made, but given the context that brings us here together, I

11  want to make sure everybody is well aware of that and that

12  has of course been disclosed in our 327(e) application.

13          Your Honor, here is, from the standpoint of the

14  Debtor, what struck me when I read these papers, was the

15  complete lack of any allegation, let alone evidence, let

16  alone anything substantive, as to what the Debtor and the

17  person who's the responsible individual, Mr. Smith, had

18  done wrong.  Typically in a case where someone seeks

19  conversion or appointment of a trustee for cause, one would

20  find allegations of fraud or mismanagement or gross

21  mismanagement, the items that are culled out in 1104(a)(1).

22          What do we have here?  What we have here is

23  somebody who's been involved intimately in this case from

24  the beginning, a case that had a few million dollars on

25  hand when it started, and today has over 80 million

1  dollars, somebody who spent a good deal of time making

2  certain that the records of this company in all of its

3  disparate parts are available when needed for counsel or

4  for anyone else to move the case forward for the benefit of

5  creditors.

6       The second thing that struck me about the papers

7  that I read was that what I thought we have here is really

8  an argument among various classes of creditors.  They

9  really want, what it boils down to, reading the papers for

10  the first time, they want a second bite at the apple.  They

11  want someone else to look to, to address the claims issues.

12  That's not the reason to appoint a Chapter 11 trustee.

13       When I looked at the moving papers, I thought,

14  first off, the original moving papers filed by the U.S.

15  Trustee's Office don't even mention the Debtor.  It's all

16  about what Pillsbury did.  We get to the amended motion

17  that's filed subsequently, and there we have first off, an

18  allegation, well, Mr. Smith, the responsible individual,

19  was part time.  Now, let's face it, a Chapter 11 trustee is

20  not going to be full time on this case and probably

21  shouldn't be going forward.

22       Then we have an argument that there's no Board

23  remaining and therefore Mr. Smith has no one to go to.  But

24  of course a Chapter 11 trustee would be in precisely the

25  same circumstances.  Then we have the argument about

30

1   tainted and conflicts that may have arisen here.  Now that

2   certainly is not something that Mr. Smith should be charged

3   with.  In fact, the argument here is that Mr. Smith was

4   unaware of the conflict, and he had some sort of

5   responsibility to make certain that Pillsbury followed the

6   rules of bankruptcy procedure.

7           But we don't have any authority for the prospect

8   that the responsible individual, a lay person, is supposed

9   to tell counsel how to follow the rules of bankruptcy

10  procedure.  And of course there is no such authority.  It's

11  simply not a reasonable way to proceed in any case.  We

12  then move into looking at some of the practicalities that

13  we have here that are raised by the U.S. Trustee such as

14  the cost of bringing in a new trustee and one of the

15  arguments is well, Mr. Smith is still available.  He can

16  still continue to do the job.  He can continue to show up

17  and help out and do all those things.  Well, Mr. Smith is a

18  very responsible person.

19          I have had the opportunity to speak with him for

20  a few hours, not very much, in the past few days.  I can

21  tell you that Mr. Smith is very concerned about this.  He

22  put his heart and soul into this project.  He doesn't like

23  the fact that somebody has made serious allegations against

24  his character, because that is of course what a motion to

25  appoint a Chapter 11 trustee for cause is all about.  It's

1  a character assassination.  And Mr. Smith doesn't like it

2  one bit, and he's not about to continue to act in that

3  process against people who have made what amount to

4  specious allegations against him.

5       He certainly will discharge whatever duties he

6  has as an outgoing responsible individual, should the Court

7  grant the motion to convert the case or should the Court

8  grant the motion to appoint a Chapter 11 trustee, and he'll

9  do that willingly as he's supposed to do.  But Mr. Smith

10  does have a day job and would like to frankly move on to

11  something else once this job is completely done.

12       Finally, I noted in looking at the reply brief

13  that the U.S. Trustee filed, it was absolutely silent again

14  about Mr. Smith.  It's as if he didn't exist.  It's silent

15  about what the Debtor did, absolutely nothing in it.  And

16  so, Your Honor, it makes me wonder what this is all about.

17  Certainly we can't have a case converted for cause when

18  there isn't any cause.  All we have is the bare allegation

19  of it.

20       So then we go on to, maybe it's 1104(a)(2), maybe

21  it's the best interest of creditors that we ought to look

22  at here.  So what are the facts that address the best

23  interest of creditors?  Well, some of the creditors don't

24  like the Debtor in Possession because the Debtor in

25  Possession has objected to their claims because there are

32

1    different competing groups of creditors, each of whom are

2    competing for the same pie, and they each want to have more

3    of that pie. But that's every case. And of course we know

4    that simply the objection of a creditor to moving forward

5    in the case, objection to -- or rather a response from a

6    creditor that the Chapter 11 trustee should not object to a

7    claim is hardly grounds to appoint a trustee.

8         In this case, we have a serious problem that Mr.

9    Smith is the man who has the ability to bring out the

10   records that are absolutely critical to completing claim

11   objection proceedings and probably to address some of the

12   avoidance actions that remain undone in this case. If Mr.

13   Smith is not available, it will hardly be in the best

14   interest of creditors, and I think the complete lack of any

15   substantive allegation by any of these parties behind me

16   today about Mr. Smith, there's absolutely nothing about his

17   character, tells the tale here.

18        The truth of the matter is that Mr. Smith is

19   somebody who's done a good job. It's in the best interest

20   of creditors to allow him to continue the job and to finish

21   this matter up appropriately.

22        With respect to whether Pillsbury should

23   consider -- should continue as Mr. Smith's counsel, Mr.

24   Smith certainly would prefer to have Pillsbury continue

25   because of the long history in the case. We are at the end

33

1  of the case; we're not at the beginning of the case.

2  Pillsbury has done substantial work, has certainly been

3  involved with Mr. Smith hand and glove throughout the

4  proceedings to get to where we are today.

5          The real issue remaining in the case of course is

6  to prepare a Disclosure Statement that can be approved and

7  that acceptably discloses what a Disclosure Statement

8  should in a case like this, which frankly gets down to

9  being a pot Plan, when we get to the end of this.  And

10  writing the Plan is not a very difficult matter.  The

11  Creditors' Committee has been involved of course with the

12  Debtor, and they are a co-proponent of the Disclosure

13  Statement and Plan, at least the ones that have been

14  proposed so far.  But the fact is of course that the Debtor

15  has to have corporate counsel.  The Debtor prefers to

16  continue with Pillsbury, but would understand if that isn't

17  the final decision here.

18          Thank you, Your honor.

19          THE COURT: Okay.  Thank you, Mr. Rogan.

20          Mr. Rankin?

21          MR. RANKIN: Thank you, Your Honor.  The Committee

22  has learned today about special counsel for the Debtor.

23  The Committee has been actively seeking to see what the

24  Debtors' position is because absent a position from the

25  Debtor, the Committee would be in favor of having a Chapter

34

1   11 trustee appointed today, so we could get to the job of

2   winding up this case.  It's almost completed.  The Plan and

3   Disclosure Statement are drafted.  Frankly, there's more

4   deletions than additions that would be required to finish

5   it, and we've had a number of meetings with all of our

6   Committee members who are very active now.  No noise for a

7   long time, then lots of noise.  And we've had -- you know

8   we met without the senior note holders' counsel because the

9   Committee's position is that our firm should be retained

10  doing the claims objections to the senior note holders

11  because we've done all the work and are prepared, and then

12  the next day -- and we had that meeting without the senior

13  note holders because the next day they filed a pleading

14  with the Court saying they prefer that we not do it because

15  in light of all the allegations, perhaps somebody

16  independent should do it.  That speaks volumes about the

17  integrity of the process that's been conducted by the

18  Committee.

19          Their first preference as said in the pleading is

20  for Pillsbury to stay in until an investigation can be

21  completed if it can be completed quickly, if there's any

22  possibility that the Court would allow Pillsbury to stay

23  in.  If there's not, then we'd rather see a Chapter 11

24  trustee and work with that person because all things being

25  equal, we'd rather have that Plan be one that's jointly

35

1  proposed and not in conjunction with a Chapter 11 trustee

2  if one is going to be appointed.

3       I mean we're happy to hear from Mr. Smith.  This

4  is the first we've heard from Mr. Smith about this today,

5  that he wants to stay in and keep his job.  He gave us some

6  indication of that, but not through counsel.  He's been

7  extremely cooperative and helpful to us in all matters.

8  We've had no problems with him at all.  And he understands

9  where we are in this case, so the Committee's preference,

10  if Pillsbury wants to stay in, if the Court is comfortable

11  with them staying in while this investigation gets

12  completed, to whatever the Court requires, is that we do

13  that first and if the Court finds that there's not grounds

14  to disqualify them, then we complete the process.

15       If the Court is inclined not to keep them in,

16  frankly, we'd rather have a Chapter 11 trustee so we can

17  get to work and get this wound up now.

18            THE COURT: Thank you.

19            MR. RANKIN: Thank you.

20            THE COURT: Mr. Bennett?

21            MR. BENNETT: Good morning, Your Honor.

22            THE COURT: Good morning.

23            MR. BENNETT: Believe it or not, this is the first

24  time I've ever addressed you in this case.  I'm sorry about

25  the circumstances.

36

1         THE COURT: But you all have been an important

2    player in the background.

3         MR. BENNETT: Yes, and a couple of things about

4    that, maybe to start.  First of all, the senior note

5    holders are the largest creditors in this case, period, end

6    of story.  Whether their claims are reduced for the maximum

7    amount of original issue discount that the Debtors ever

8    disclosed in their pre-petition filings or not, we're still

9    the largest creditors.  Each one individually would be tied

10   for first place.

11        You may be referring to the contention by SB

12   Claims that the senior note holders were involved in the

13   Intel/Via litigation.  You better believe we were.  We have

14   standing to object to those claims directly.  We absolutely

15   have the right to participate, and when we participated, we

16   participated to make sure that truth came out.

17        THE COURT: You have standing.  Let's talk about.

18   That.  Tell me why you think you had standing to

19   participate.

20        MR. BENNETT: We could have objected to the claims

21   ourselves.  We had the absolute right to object to both

22   sets of claims.  We could have started our own separate

23   proceedings, and when we signed the protective orders, by

24   the way, we didn't sign as members of the Creditors'

25   Committee; we signed as bondholders separately.  We had

37

1  separate interests as creditors in this case like every

2  other creditor, and we're entitled to be there.

3           THE COURT: I don't think that you could have had

4  standing without Court permission; is that correct?

5           MR. BENNETT: No, that's not correct.  Every party

6  in interest has the right to object to a claim.  This is

7  not an STN issue.  Every party in interest -- I don't have

8  the reference with me right now, but that's what the law

9  is; has been forever.  This is not an STN case.

10          THE COURT: Proceed.

11          MR. BENNETT: Okay.  First of all, someone needs

12  to say this about Pillsbury besides Pillsbury.  From my

13  perspective in this case, they have been spirited,

14  aggressive, responsible and sometimes aggravating

15  adversaries.  We've never seen them any differently.

16  That's the way they have been.

17          Also on the issues of recusal, the senior note

18  holders have never participated in any Committee vote

19  relating to an issue in which the senior note holders had a

20  distinct interest, and recently as a result of these

21  allegations, solely out of an abundance of caution, we

22  didn't vote on anything even though we thought that we

23  might have a legitimate right to vote alongside the

24  creditors because we are after all the largest creditors in

25  the case.

38

1        I'm now going to descend into some grubby

2   details.  It is absolutely true that SB Claims has been

3   effective in stirring things up.  I think I agree with

4   Pillsbury, and I agree with Mr. Smith's counsel, that when

5   it comes to actually marshaling facts and law in support of

6   the stirring up and of the allegations, they have fallen

7   considerably shorter, and I'm just going to pick a few

8   examples today, not to take too much time.  But I think we

9   do have to plunge into the details so that the Court knows

10  exactly what's before it.  What is before it now is a

11  dangerous mix of unsupported allegations and a few little

12  pieces of fact, and a bunch of misread cases and a few

13  little quotes that really are there.

14       So why don't I start with the authority, and it

15  might actually be useful for someone to take a look at the

16  cases with me because the citation of the authority in

17  their brief, particularly in their reply brief, is just

18  terrible.  The first place I want to go is to the pillar of

19  the authority that suggests that the Committee and/or the

20  senior note holders acted at all inappropriately in

21  connection with the disclosure matters of this case.  And

22  the pillar for that -- and they spend a couple of pages on

23  it -- is CF Holding Corp. at 164 BR 799.  And they have a

24  quote in the text where they cite from the opinion and they

25  cite it at 164 BR 808, and it's a very general statement,

1  and it suggests that all professionals, all estate

2  fiduciaries have fiduciary duties and everyone therefore

3  has a responsibility to file professional disclosures, not

4  just for themselves but for everybody else.

5        And then they extend that say, well, not only

6  professionals have it but Committees have it, and then not

7  only Committees have it but senior note holders have it.

8  Well, it's very instructive to take a look at that case and

9  see what it really says, because the judge in Connecticut,

10  Krachevsky (Phonetic) I think is the way you pronounce his

11  name, is actually a very good judge.  I've been before him.

12  There's a paragraph that at least on my print is in after

13  capital C, and I think the page reference is the very same

14  page that the quotation came from, and it is the source of

15  the authority that the court seized upon in saying that

16  Weil Gotschall (Phonetic), counsel for the debtor, not

17  counsel for a Committee, had a disclosure obligation with

18  respect to the Cooper firm which also by the way was a

19  professional for the debtor, not a professional for the

20  Committee.  So they were lying on the same side.

21        And what did that judge really say?  Well that

22  judge read Bankruptcy Code Section 326(d) which says:

23              "If a trustee were to replace the debtors in

24              these cases, Code Section 326(d) would require

25              the court to deny compensation to the trustee, if

40

1          the trustee failed to make diligent inquiry into

2          facts that would permit denial of allowance."

3    That's what 326(d) says.  It's a duty of the trustee.  And

4    what the judge in Connecticut then decided was that since

5    Weil Gotschall represented the debtor in possession who was

6    the trustee, he was going to apply 326(d) to them.

7          326(d) does not apply to a Committee.  326(d)

8    does not apply to Committee counsel.  326(d) applies to no

9    one but a trustee and the debtor in possession.  That's

10   what the law is.  That's what the Connecticut judge found.

11         Now we might be able to have lots of debates

12   about 326(d), but I'm having a lot of trouble with the

13   brief that cites this Connecticut case, the CF Holdings

14   case for the proposition that there is a general duty that

15   goes beyond the debtor and to all the other professionals

16   in the case and to the Committee and to some of the

17   creditors based upon a case that says nothing of the sort.

18         That's not the only one.  Let's go to Perez.

19   Let's read a description of Perez, because that's a Ninth

20   Circuit case and ought to be very important to this Court.

21   What does Perez really say?  Let's first start with what

22   they say Perez says.  The bottom of page 3 of their reply

23   brief:

24          "Fiduciaries in a Chapter 11 case have an

25          affirmative duty to bring to the attention of the

41

1          court and creditors material issues whether or

2          not anyone else has raised them."

3  No <u>CF</u>, no e.g., the citation for this is <u>Everett versus

4  Perez</u>, <u>In re Perez</u>, 30 F3d, 1209, jump site to 1213.  And

5  this is really cute.  He goes on and says -- oh, he goes on

6  in parens,

7          "<u>Holding</u>, the debtors in possession and trustees

8          have a responsibility to raise certain issues,

9          and the court itself must pass on those issues

10          whether or not they're specifically put in

11          dispute."

12 <u>Perez</u> of course is an easy case to read because it's a

13 Judge Kazinsky (Phonetic) case and he writes really well

14 and this was a debtor failing to disclose the terms and

15 conditions of its financial condition.  It does not having

16 anything to do with fiduciaries.  It has to do with a

17 debtor's failing to disclose basic financial information.

18 The word "fiduciaries," I can't find it at the jump or any

19 other place where I read the case.

20          And then the third case that they cite is a

21 little bit above <u>Perez</u>, and that's the <u>Westmoreland Human

22 Opportunities</u> case.  Again, these aren't buried in the

23 stream.  These are the lead cases cited for their

24 propositions without any signals whatsoever.  Here's the

25 sentence that's followed by the cite:

42

1          "Three note holder Committee members who

2          voluntarily chose to be members of the Official

3          Committee in this case, also owe a fiduciary duty

4          to the creditors whose interest they represent.

5          <u>Westmoreland Human Opportunities</u>."

6   What does the <u>Westmoreland</u> case talk about?  The

7   <u>Westmoreland</u> case talks about the failure of a Committee

8   member to disclose to the Committee that the Committee

9   member was making a deal with property that might or might

10  not be -- or making a deal about property that might or

11  might not be property of the estate.  <u>Westmoreland</u> has

12  nothing to do with a disclosure obligation on the whole.

13          So just with respect to this part, it is

14  exceedingly important at times like this for a court to dig

15  into the facts and the law as it really is, not the facts

16  and the law as it's advertised because although I think

17  this Court believes that SB Claims has performed an

18  important function in bringing something to the attention

19  of the Court that the Court is interested in, and they may

20  well have done that, they're actually doing something else

21  now.  I think the U.S. Trustee has picked up on what are

22  the relevant concerns and considerations with respect to

23  the disqualification issue, but the effort to paint the

24  entire population of this case as a bunch of bad guys

25  requiring the appointment of a trustee, which is I gather

43

1 the cause that they're really seizing on here, there's no

2 authority for many of the duties that they would impose on

3 many people, and there is nothing wrong with the conduct of

4 every lawyer in this case concerning how things were done

5 to get to the point where the case is today.

6        Okay.  I said I'd talk about law and I'd talk

7 about facts.  Let's talk about facts.  Again, the reply,

8 the one I couldn't get a chance to write about, be very

9 suspicious, Your Honor, of cases that end without

10 citations –- excuse me –- of sentences that end without

11 citations.  Their reply brief is full of them.  Back to

12 things about the three note holder Committee members.

13 There's an allegation:

14        "They (it's the three note holders) have known

15        for more than a year (open paren) [and perhaps

16        far longer] that their claim was likely going to

17        be subject to an original issue discount

18        objection and that the Pillsbury firm was

19        expending a considerable amount of time and money

20        researching that issue."

21 That's a factual contention.  You'd expect a citation for

22 the record at this point.  There is nothing.  It's because

23 it's not true.  When it's before Your Honor, you'll see

24 evidence about why it's not true.  And then the conclusion:

25        "Yet instead of bringing the Pillsbury conflicts

44

1              to the attention of the Court and creditors

2              promptly, the three note holder Committee members

3              waited until Pillsbury was on the verge of filing

4              an objection more than four years into this

5              case."

6    There are factual assertions in that sentence.  There is no

7    citation to the record.  The sentence is not true.

8              I could go on and on, but my favorite one is

9    their chart.  They like it so much and they think it's so

10   important that they put it into both of their briefs.  And

11   the chart I'm referring to is this one.  I'm sure Your

12   Honor saw it.  Why they took so much time to make this

13   chart and put in a brief, they thought it was really

14   important; didn't they?  They wanted to create an

15   impression with this chart, that this has been a situation

16   of creeping disclosure, and that there was more disclosure

17   coming.  Why is it important for it to be creeping

18   disclosure?  Because their rhetoric was, was that there

19   were secrets that they uncovered because there was a

20   problem for months and months and months.

21             Well, let's critically evaluate this chart and

22   see what it really shows as opposed to what they wanted

23   Your Honor to take away from it, and I'm taking a look in

24   particular at the fourth column.  And if Your Honor has it

25   in front of you, it would be really useful I think to look

45

1  at it.

2          THE COURT: I don't have it in front of me, but

3  that's okay, I remember it pretty clearly.

4          MR. BENNETT: Okay.  The columns are different.

5  In the first three columns, the term "senior notes" had

6  previously been defined in a disclosure statement, and

7  accordingly the words, when they begin -- to take the third

8  column as an example:

9              "Until recently, counsel to the Debtors was in

10             charge of analyzing the senior notes' claims.

11             (Capitals, Senior Notes' Claims)."

12         Senior notes claims are defined someplace else in

13  the Disclosure Statement and there's disclosure of who

14  holds them.  There's disclosure of what their original

15  principal amount is.  There's disclosure of the documents

16  that evidence them.

17         Now, in this column with the fine type, where do

18  they start?  I'll read this first sentence, which is more

19  than a third of the column.

20             "Portside Growth and Opportunity Fund Limited,

21             Smithfield Fiduciary, LLC, Citadel Equity Fund,

22             Limited, collectively the senior note holders,

23             are holders of the 7-3/4 percent senior secured

24             convertible debentures due 2005. (Open paren)

25             [the senior notes] The Debtor scheduled the claim

46

1              of the senior note holders for in excess of 77

2              million dollars, and each of the three senior

3              note holders filed its own Proof of Claim in

4              unspecified amounts relating to the senior

5              notes."

6   What they've basically done is they've taken material in

7   the Pillsbury disclosure that has nothing to do with the

8   Pillsbury disclosure but just sets the table and makes the

9   definition and plowed it into their big column.  You cross

10  that out and you cross out the other definitions that they

11  create in their box, and the disclosure in the Pillsbury

12  disclosure reads almost exactly like the disclosure that

13  was in the Disclosure Statement, beginning in December 15,

14  '06 and also in December -- I think it says December 18,'07

15  but I think it's a mistype.  I think this one was January

16  of '07.

17         So the point here, I do think Pillsbury -- I do

18  think every piece of evidence as opposed to rhetoric before

19  you is that Pillsbury made an innocent mistake, that the

20  Disclosure Statement disclosures, which by the way, were

21  there before SB Claims showed up in your courtroom, so was

22  the wool pulled over their eyes at all?  No.  It may have

23  beeb a misfit but it was there.  It's the same as the

24  disclosure that would satisfy someone if it had been made

25  back in September -- I'd say September 5th which was when

47

1   the letter was drafted -- so Your Honor, we have a problem.

2   We have a three-month problem.  We do not have a six-month

3   problem.  And the disclosure was essentially the same

4   throughout.  But again, this is kind of a consumer

5   protection discussion.  When you read their papers, there

6   are lots of allegations that sound really interesting,

7   really sinister, really pretty, and there's just depictions

8   of data in a way that's intended to inflame.

9           When you dig down and look at what facts have

10  actually be established, and what the law really is, what

11  you are left with is a law firm that made an innocent

12  mistake.  What the Court should do about that is something

13  that frankly is not my issue, and Your Honor has left it

14  for another day.  But focusing on, is there wrongdoing by

15  the Committee?  Is there a failure to disclose by the

16  Committee?  Is there a failure to do anything by the senior

17  note holders?  Were the senior note holders too active as

18  attorneys in this case?  The answers to those questions are

19  no, based upon the record before you.  And before I get off

20  the reply, I will find the statutory reference that gives

21  us absolute, unquestioned, standing to object to claims.

22          THE COURT: Please do that.  Thank you.

23          MR. BENNETT: That won't be a problem.  Thank you,

24  Your Honor.

25          THE COURT: Okay.  Mr. Shaffer?

48

1              MR. SHAFFER: Thank you, Your Honor.  Excuse my

2    hobbling here.

3              THE COURT: No crutches today.

4              MR. SHAFFER: No.  We're making some improvement.

5    Your Honor, this is obviously a very serious point in this

6    case, and we do take this matter very seriously, and we

7    take what we have said to this Court very seriously.  I'm

8    not quite sure where to start, but I think I want to start

9    with the word "candor," because I think the word candor is

10   a very important part of the word "fiduciary."  No one is

11   going to dispute in this courtroom that the debtor in

12   possession is a fiduciary.  No one is going to dispute that

13   the debtor in possession's counsel is a fiduciary.  No one

14   I think is disputing that the Creditors' Committee is a

15   fiduciary, and while I heard Mr. Bennett's arguments, I

16   respectfully disagree.  I believe Creditors' Committee

17   members individually owe fiduciary duties.  That's why they

18   can be sued themselves if they violate those duties.

19   Otherwise we wouldn't have all these releases in these

20   Plans releasing Creditors' Committee members.

21              So in fact, Your Honor, I believe that all of

22   those parties are fiduciaries, and the first thing -- now,

23   the creditors' side, the fiduciary duty doesn't extend as

24   far.  The debtor in possession is a fiduciary to all

25   participants in the bankruptcy case, creditors,

49

1  shareholders, what have you.  The Creditors' Committee only

2  owes a fiduciary duty to its constituents, but in this

3  case, that is the entire body of the unsecured creditors

4  and including those creditors who are here today supporting

5  a trustee motion, Maxtor, Riverside, SBC.  I believe LSI

6  and Haynes have now joined in, in that, either through e-

7  mails to the U.S. Trustee or through their pleadings.

8           It's those parties that were owed a fiduciary

9  duty.  Now let's go back to last summer, August 24th, which

10 everyone agrees is the date that a phone call was made to

11 counsel for Pillsbury informing them, Pillsbury alleges,

12 for the very first time, that there was a conflict of

13 interest with respect to their objecting to the senior note

14 holders' claims.  Now let's go in context then.  As Mr.

15 Bennett has correctly noted, the senior note holders,

16 individually, whether or not their claims are objected to,

17 are the three largest creditors in the case.

18           Pillsbury, at that time, was already conflicted

19 from dealing with Intel, as you will remember, which was

20 the at that time the biggest issue in the case.  So now as

21 of August 24th, 2006, we will assume for a moment now that

22 that's the first time Pillsbury knew about it, Pillsbury

23 was faced with the situation of having a disabling conflict

24 of interest, vis-a-vis, Intel, and a disabling conflict of

25 interest vis-a-vis the three largest unsecured creditors in

50

1    the case.  That's a very serious problem for Pillsbury.

2    Now what did Pillsbury do about that?  Well, we are told

3    that they transferred that authority to the Unsecured

4    Creditors' Committee.  Well, Your Honor, that doesn't give

5    the other creditors of this case a lot of comfort because

6    we have now seen through the declarations from Mr. Bender

7    and others that through that time, there were effectively

8    only five active members of the Creditors' Committee.

9    There were the three senior note holders who participated

10   through Mr. Bennett's firm, and there were two other

11   creditors who actually were related to each other, the

12   Maxahisha (Phonetic) entities, that were both represented

13   by a lawyer up in Seattle.

14          So this was the Creditors' Committee.  Presumably

15   when the Creditors' Committee got their invoices approved

16   by the Committee, which I hope they did, before they

17   submitted them to this Court, it would have been three

18   senior note holders approving it and two other members.  I

19   think a lot of creditors would have had a lot of concern

20   had that issue been fully raised before the Court at that

21   time about that transfer.  But let's get to that in a

22   moment.  Let's talk about Pillsbury's actions.

23          Now what did Pillsbury do after August 24th.  We

24   were told they transferred the authority to the Creditors'

25   Committee.  But did they tell this Court about the

51

1   conflict?  The answer is, absolutely not.  They did not say

2   anything about the conflict until a little snippet in a

3   Disclosure Statement on December 15th, which I say really

4   wasn't any disclosure at all.

5          Now what did they do in the interim though?

6   Well, they came before Your Honor twice, once asking for

7   reconsideration of a prior denial of their fees and they

8   also filed another fee application, and, Your Honor, if I

9   may approach, I will give you a couple of relevant pages

10  from that fee application, and those who would like, I can

11  pass it around.  I made 12 copies, and so if people could

12  please share.

13          THE COURT: Thank you.

14          MR. SHAFFER: Thank you.  I almost forgot the

15  Judge.  Your Honor, this is Pillsbury's eighth interim

16  application for compensation, filed with this Court on

17  October 18th, 2006.  So this is now a month and a half,

18  almost two months, after this conflict that we are told by

19  Pillsbury first came out, undisputably first came to

20  Pillsbury's awareness.  And what was requested in this

21  application?  Well, among other things, the time incurred

22  by Pillsbury working on the OID objection.  Now, Your

23  Honor, you will see on Page 19 that's where that's

24  described.  You'll see halfway down the page a single-

25  spaced paragraph saying "Senior and Junior Notes."  And if

52

1  Your Honor wants a chance to look at it for a moment, I'll

2  pause.

3         THE COURT: M-hm.

4     (Pause.)

5         MR. SHAFFER: Your Honor, this does say in the

6  last sentence that the matter was turned over to the

7  Creditors' Committee for prosecution.  It doesn't say why.

8  It doesn't say anything about a conflict, an opinion

9  letter, a threat of indemnity, a threat of suit for

10 negligent misrepresentation.  It doesn't say anything about

11 that.  And as Your Honor knows, lots of things had been

12 turned over to the Creditors' Committee in this case.  Part

13 of the preference actions, I believe there was some

14 arrangement between Pillsbury and Creditors' Committee

15 counsel about dividing that up.  It was approved by the

16 Court.  The Plan and Disclosure Statement, primary

17 drafting, we are told was done by Mr. Bender.  So there

18 were lots of tasks in this case that were shared between

19 Pillsbury and the Creditors' Committee.

20         So Your Honor, I fully would respect the fact

21 that the Court seeing this or frankly anybody seeing this

22 wouldn't have any idea at all that there was a conflict of

23 interest under here.  So this is a non-disclosure.  But

24 what's more troubling about this to me, Your Honor, this

25 isn't an inadvertent non-disclosure, Your Honor.  Somebody

53

1   wrote this paragraph in detail, knowing full well at that

2   time about a letter written by the Hennigan Bennett firm

3   received less than two months before that -- Your Honor,

4   you've read that letter.  Whether you agree with it on the

5   merits or don't agree with it, it burns in your mind.  It

6   is a strong forceful letter.  And even Pillsbury has

7   admitted that while they believe the letter was completely

8   without merit, even they admit that there was, in their

9   words, a scribner's error, so that there was an issue here,

10  even if they think the issue was one they would win on.

11          How could Pillsbury have submitted this fee

12  application requesting fees for time relating to a matter

13  on which they had a disabling conflict of interest and not

14  tell Your Honor that fact?  How could that be inadvertent,

15  Your Honor?  I have attached to the back of this, Your

16  Honor, two declarations that were filed with the Pillsbury

17  fee application, one by William Freeman of Pillsbury in

18  support of the application and the other by Marcus Smith,

19  the responsible individual.  These individuals presumably

20  reviewed this application.  William Freeman knew about the

21  conflict.  I hope Marcus Smith knew about the conflict.  We

22  really haven't gotten much detail on that issue yet, but

23  I'll get to that in a little bit.  How could they submit

24  this, Your Honor?

25          I don't -- I'm not enjoying this, but I just

54

1  don't understand it.  And then, Your Honor, we go to

2  December and the Disclosure Statement.  And as Mr. Bennett

3  has introduced and I appreciate him doing so, the chart --

4  I kind of like the chart myself, but the chart shows us in

5  my view a real effort to hide the ball, because somebody --

6  it wasn't -- when they got to that point in the Disclosure

7  Statement where they had to mention what was going on,

8  somebody had to think about it.  It wasn't simply a matter

9  of -- inadvertence, let's talk about inadvertence for a

10  moment.

11           Inadvertence is, I draft the disclosure pleading

12  and it accidentally gets stuck to the back of some other

13  pleadings.  I thought I had sent it down to the court, and

14  I find it six months later in the bottom of a drawer.

15  That's inadvertence.  But inadvertence isn't when I

16  consciously make a decision to disclose or not to disclose

17  something, and I do it in a particular way that's wrong.

18  That's not inadvertence.  That's a mistake, but it's not an

19  inadvertent mistake.

20           What they wrote on December 12th, 2006 in the

21  Disclosure Statement, this is on page 7 of our reply brief,

22  and so since the Court doesn't have it directly in front of

23  it, I'll just read it.

24           "Until recently, the Debtors were in charge of

25           analyzing the senior note claims.  However, as a

55

1                    result of a conflict that has been asserted by

2                    the senior note holders with respect to counsel

3                    to the Debtor, the Creditors' Committee is now in

4                    charge of analyzing the senior note claims."

5    This is the first public disclosure -- I put quotes around

6    that word -- that there was any problem at all.  This is

7    December 15th, more than three months after the letter.  It

8    is on page 22 of the single-spaced Disclosure Statement.

9    It is not in any way something where you'd expect to find a

10   gem about a professional disclosure.  It doesn't say

11   anything about a pre-petition opinion letter.  It doesn't

12   say anything about overt threats of suit for

13   indemnification for professional negligence.  It doesn't

14   even mention the fact that the three note holders, senior

15   note holders, are members of the Creditors' Committee.  In

16   fact you can go through that Disclosure Statement from

17   front to back and it doesn't even say who's on the

18   Creditors' Committee, let alone the fact that at that time,

19   per Mr. Bender's declaration, the three members were the

20   effective majority of a five-member Committee.  It had

21   other members; they just weren't showing up.

22           So, Your Honor, now after the fact, they could

23   say well, the note holders were recused.  We put up an

24   information-blocking wall, whatever else.  And maybe they

25   did.  Maybe they didn't.  I don't know.  But I know that

56

1  when you're going to do something like that, you go to the

2  Court first, and you say, Your Honor, we have a situation

3  here, and here's how we're going to try to solve it.  Is

4  this okay?  Do any creditors have a problem with this?

5  Does the U.S. Trustee have a problem with that?  That

6  wasn't what was done here.  No rational person picking up

7  this Disclosure Statement could have filtered through all

8  of this and come to that conclusion.

9        Now, Riverside Claims, one of the larger holders,

10  not on the Committee in this case, did read this Disclosure

11  Statement and raised the question and said, well, what's

12  this about?  And what we got back was a slightly added-to

13  version of this disclosure.  It still said until recently,

14  counsel to the Debtors was in charge of analyzing the

15  senior note claims.  Then it said, here's the new language:

16        "As a result of the senior note holders'

17         contention that counsel to the Debtors had pre-

18         petition issues to the senior note holders, an

19         unqualified legal opinion that the senior notes

20         were enforceable against the Debtors in

21         accordance with their terms, counsel to the

22         Debtors requested the Creditors' Committee to

23         assume the role of analyzing the senior note

24         claims."

25  That is the additional disclosure that was put in, in

1  January, a month later, only in response to the fact that a

2  creditor objected, and somebody said, well, there was an

3  accompanying pleading.  Well, actually all the accompanying

4  pleading said was, we fixed it as shown in the Disclosure

5  Statement.

6          It didn't add any additional information than

7  what I've just read there.  So now we finally have at least

8  a disclosure another month later that there was an opinion

9  letter, but there's still nothing that says, and by the

10  way, they made an overt threat to counsel, to the debtor in

11  possession, to sue them for indemnity and for professional

12  negligence.  I guess it was negligent misrepresentation and

13  negligence.

14          It's still not disclosed there.  Nor is there any

15  disclosure again of the fact that the three note holders

16  are indeed members of this Creditors' Committee.  And it

17  still says "until recently," and I would say that come mid

18  January, this issue which we all know at least dated back

19  to the previous summer, to August, it wasn't even recent

20  anymore at that point.

21          Your Honor, you didn't learn about this issue

22  until I filed a pleading attaching the letter, which I had

23  gotten the previous Friday night in discovery.  It's not

24  inadvertent, Your Honor.  There were too many

25  opportunities, too many intervening circumstances where

58

1   there was disclosure of related issues, the Pillsbury fee

2   application, the first version of the Disclosure Statement,

3   the second version of the Disclosure Statement.  At some

4   point, very experienced lawyers at a very large and

5   reputable national firm had to have thought, Geez, maybe we

6   haven't disclosed everything here.

7          It just doesn't make sense, Your Honor.  And

8   unfortunately, Your Honor, bankruptcy business is slow

9   right now.  It's slow for big Chapter 11 firms and for

10  smaller Chapter 11 firms.  This is a big piece of business.

11  It is hard to lose this big piece of business.  And I think

12  the facts seem to indicate that Pillsbury really wanted to

13  hang on to this big piece of business.  And it's

14  unfortunate, but it's what it looks like happened here.

15  But, Your Honor, that's just half the story, because I am

16  very troubled that it took my client filing this letter to

17  start this dialogue.

18         We know that the Creditors' Committee knew about

19  this letter.  Three of its members sent the letter.

20  Creditors' Committee counsel has admitted in his

21  declaration that they were informed of this at least at the

22  time of the actual letter in September, if not before in

23  August, and they watch the docket like anybody else.  They

24  would know whether or not Pillsbury disclosed this.

25  Pillsbury obviously didn't disclose it.

59

1          Now, Your Honor, as a bankruptcy professional,

2     I'm certainly not eager to be promoting a rule that says

3     that bankruptcy professionals have to be tattle-tailing on

4     other bankruptcy professionals.  But at the same time, Your

5     Honor, no one can dispute that the Creditors' Committee was

6     a fiduciary to the creditors of this case and we had a

7     circumstance, come August, if not sooner, of last year,

8     where the counsel for the debtor in possession had a

9     disabling conflict of interest and was not disclosing it to

10    this Court.

11         It was the responsibility of another fiduciary in

12    this case to let the Court know.  You cannot as a fiduciary

13    just hide your eyes and see no evil.  That's not a

14    fiduciary.  That's a spectator.  You have a responsibility

15    as a fiduciary, in exchange for getting paid by the estate,

16    in exchange for having access to information that other

17    creditors don't have, in exchange for having the ability to

18    participate in every hearing on every motion and be heard

19    and to stand up and claim that you are the official

20    representative of the creditors -- you have a fiduciary

21    responsibility that doesn't come for free.  And if you're

22    going to stand up in front of the Court and say, on behalf

23    of the creditors, I say as follows, you best be

24    representing the creditors, and that includes letting them

25    know when something is wrong.

1          But it wasn't just that the Creditors' Committee

2   stood mute; it wasn't just that no one said anything from

3   September till December; it's that when we finally got this

4   Disclosure Statement on December 15th, it was signed by the

5   Creditors' Committee and Pillsbury jointly.  And that

6   really troubles me, Your Honor, because at that point, you

7   had fiduciaries supposedly on both sides, watch dogs of

8   each other, jointly not disclosing what the creditors

9   deserve to know.

10          This conflict did not go away simply because the

11  claim objection was transferred from Pillsbury to Levene,

12  Neale, Bender.  The conflict did not go away.  First of

13  all, we have the whole issue of whether or not a Creditors'

14  Committee should really be in charge of objecting to its

15  three largest members' claims.  Now, it is true many issues

16  are transferred over to Creditors' Committees when the

17  debtor has a conflict.  I'm not aware of any circumstance

18  where the debtor had a conflict and the Creditors'

19  Committee had a conflict and yet you transferred something

20  over to the Creditors' Committee.  And this is an odd duck,

21  to say the least.

22          But, Your Honor, it just -- at this point, the

23  fiduciary should have let everybody know what was going on.

24  Now, Your Honor, let's go back to Pillsbury before August

25  24th.  Now Pillsbury says we didn't know about this letter,

61

1   didn't know anything about this letter.  Well, Your Honor,

2   Pillsbury as a firm knew about this letter.  Pillsbury

3   drafted this opinion letter.  And members of a firm are

4   charged with the conflicts of other members of the firm.

5   Now, perhaps that's a harsh rule, but it is the rule.  And

6   when you think about it, Your Honor, it makes good sense.

7   How did Pillsbury get this debtor representation?  Was it

8   referred to them?  No.  It was a long-term client of

9   Pillsbury that kept the bankruptcy within the Pillsbury

10  firm.  Nothing inherently wrong with that.  Nothing per se

11  wrong with that.

12       But, Your Honor, here is that business advantage,

13  if you will, that Pillsbury has, the ability to send its

14  own clients to its own bankruptcy department, carries with

15  it a price, the fact that what the firm did for that client

16  before the inter-office referral can taint what Pillsbury

17  does going forward.  Pillsbury obviously could have sent

18  this case to a different firm and wouldn't have had that

19  problem.  They chose to keep it in-house, and as a result,

20  they were responsible for whatever conflicts that might

21  have existed beforehand, based upon their prior

22  representation.

23       Same way that large full-service firms market

24  themselves as, well, look, we've got litigation; we've got

25  corporate; we've got tax; we've got all of this.  And

62

1  that's great.  But with that comes the price of additional

2  conflicts, and a large firm cannot say, well, Geez, we're

3  so large we can't police ourselves.  Well, maybe they're

4  too large then.  You can't use the business advantage of

5  being a large multi-service firm without accepting the

6  additional responsibility of it.

7       Now, in this case, Your Honor, we've heard –- in

8  fact in Professor Rappaport's declaration, she talks about

9  the rush of filing for Chapter 11.  Well, as the U.S.

10  Trustee will show us in a little bit, this wasn't a rush

11  filing for Chapter 11.  Mr. Barbarosh was on a retainer

12  agreement with this company in October of 2002.  They

13  didn't file until March of 2003, so the fact that somebody

14  might have been preparing first-day pleadings late at night

15  and maybe they were, but there's no excuse for it.

16       Mr. Cavallo, the person who we all believe

17  actually drafted or at least supervised the drafting of

18  this opinion letter, since he was on the notice on this

19  credit agreement, was cc'd on that retainer letter.  He

20  knew what was going on.  They have to sit down and talk to

21  each other about this.  And the fact that they didn't –-

22  now maybe this is –- I question inadvertence highly after

23  August 24th, maybe it was inadvertence back then, but the

24  result under the case law really isn't any different.

25  Pillsbury had a disabling conflict of interest going back

63

1 | to the beginning of the case.

2 | Now, you've heard up here, well, people shouldn't

3 | have to disclose everything. Disclosures would become

4 | meaningless. Well, Pillsbury was great at disclosing

5 | everything. Your Honor, if you go back and look at their

6 | six or seven supplemental disclosures, you'll see them

7 | representing people who are owed $346. So, you know, when

8 | it comes time to disclose very de minimis things, they were

9 | very good at it. The thing that really mattered though,

10 | the fact that they had a disabling conflict of interest

11 | with the three largest creditors in the case somehow got

12 | overlooked.

13 | And, Your Honor, even the bankruptcy issue is

14 | something of a red herring. Let's just assume for a moment

15 | that the pre-petition opinion letter was drafted correctly,

16 | which it wasn't, but let's assume for a moment it was, and

17 | the bankruptcy exception was good as gold. There's still a

18 | problem, because Pillsbury still opined as to the validity

19 | of the claims outside of bankruptcy, non-bankruptcy issues.

20 | As you go back and look at the declarations and the

21 | Pillsbury time records that have been filed, you'll see

22 | that Pillsbury was also investigating a usury issue, not a

23 | bankruptcy issue, vis-a-vis the senior note holders'

24 | claims. So scribner's error or no scribner's error, there

25 | was still a conflict, vis-a-vis this opinion letter.

64

1          It had to be disclosed.  I agree that Pillsbury

2    didn't have to list all 14 years, every project they did,

3    but they had to list what they did vis-a-vis the three

4    largest creditors in a case that was filed less than a year

5    later when there was an obligation, a contractual

6    obligation, between Pillsbury and those creditors relating

7    to this case.  Rule 2014 says disclose all connections.

8    Now maybe the literal language of Rule 2014 is extreme, but

9    I will tell Your Honor the rules committee about five years

10   ago went about the process of trying to amend Rule 2014 to

11   take out "all connections," to say maybe it's all material

12   connections or connections that would likely give rise to a

13   conflict of interest.

14          Well, let me tell you, Your Honor, we were

15   pummeled in our efforts to try to do that by Professor Todd

16   Zawecki (Phonetic), by Judge Edith Jones, and others who

17   were concerned at that time that even existing Rule 2014

18   wasn't doing enough to police the bankruptcy racket as they

19   call it.

20          Your Honor, I have been -- and I believe, Your

21   Honor, Professor Rapucky (Phonetic) was up here a few weeks

22   ago, and he's certainly a critic of much of what goes on in

23   this Bankruptcy Court, and I find myself arguing with him

24   from time to time, but, Your Honor, the privilege of the

25   Chapter 11 process that we work in, and it's very unique to

65

1  have a debtor in possession; it is a unique system.  There

2  are some countries that are toying with it, but no country

3  has done what the United States has done with a debtor in

4  possession.

5          It is a very unique and precious process that I

6  value dearly, but it has very harsh critics, as Your Honor

7  knows, people like Lynn Rapucky, people like Todd Zawecki,

8  who think that what's going on in Bankruptcy Court isn't

9  right, that there are secret deals, that professionals just

10  look out for each other and not for the estate.  And, Your

11  Honor, the best way to fight those people is to make clear

12  that that is not the way it works, that if you are a

13  Chapter 11 professional, you have to disclose, and if you

14  are another professional employed at the expense of the

15  estate, such as representing the Creditors' Committee and

16  you see wrongdoing, you have to call it out.  You can't

17  wait two years later until it ends up in some article that

18  Professor Rapucky wrote about.  It's got to happen in court

19  during the case.

20          We have got to police ourselves in Bankruptcy

21  Court or somebody else is going to do it for us.  It's very

22  important that we protect the integrity of this process,

23  and it troubles me to see pleadings filed by fiduciaries

24  saying, they didn't think they had any obligation to tell

25  you.  I think that's wrong.  I think they had every

66

1   obligation to tell you.

2          And Mr. Bennett went through the cases I cited,

3   well, the fact that CF Holdings involved the debtor's

4   counsel's obligation to disclose as opposed to the

5   Creditors' Committee, that's a distinction without a

6   difference.  Vis-a-vis the unsecured creditors, the

7   Creditors' Committee counsel owes the same fiduciary duties

8   as the debtor's counsel.  There is no difference.

9          In terms of Perez, what Perez held was when a

10  debtor proposed a plan of reorganization that was

11  inherently non-confirmable and somebody missed the issue,

12  and they raise it for the first time on appeal, and the

13  debtor in possession says, that's a waiver; you didn't

14  raise it, the Ninth Circuit said wait a minute, bankruptcy

15  is a fiduciary process.  There are times when the

16  fiduciaries have to stand up and identify the problems

17  themselves.  Now I will acknowledge it didn't involve this

18  particular case because I have never seen a case like the

19  one we're standing in today, but, Your Honor, the message

20  is the same.  The fiduciaries in the bankruptcy case have

21  to police themselves or the system just won't work.

22          Now, Your Honor, finally -- and I know I've taken

23  a lot of time here -- I want to talk about -- Your Honor, a

24  trustee is needed in this case.  We have moved to convert

25  this case to Chapter 7, and I still believe Chapter 7 is

1  the best, but I'm also respectful of the views of many

2  other creditors represented here today who would like to

3  see Chapter 11, I think principally because they don't want

4  to reopen the bar date.  They know that that would add

5  additional time.  I'm not sure, Your Honor, at the end of

6  the day that's going to change things much.  I think one

7  way or another this is going to take some time to get this

8  all sorted out.  I'm just being honest.

9          But either way, Your Honor, a trustee is needed,

10 and it's needed now.  We have a situation where the

11 Creditors' Committee has not fulfilled its fiduciary

12 duties.  Debtor's counsel has not fulfilled its fiduciary

13 duties, and with all respect to Mr. Smith, I'm just not

14 sure we really have a debtor in this case.  We have no

15 employees.  We have no customers.  We have no operating

16 business.  We have a single individual who is an officer, a

17 senior officer of another company, who's part-timing over

18 here.  He's not operating under a bond.  He's not going to

19 be back in front of you again in another case if he messes

20 things up, like a Chapter 7 trustee will.  He just does not

21 have the experience and the knowledge dealing with Chapter

22 11 professionals to police this.

23          As I said at the last hearing, Your Honor, what

24 was missing here is a client, and, Your Honor, I am

25 troubled because I don't know when Mr. Smith first learned

68

1  about this conflict, because if he learned about it last

2  August or September, why is Jeffer Mangels showing up

3  today?  Did Pillsbury not advise him to go get independent

4  counsel last August or September?

5          And by the way, Your Honor, the application was

6  filed after 5:00 p.m. Friday night before a Monday morning

7  hearing.  We knew about this –- this hearing was set with

8  the agreement of all the parties over a month ago, and this

9  is not a new issue.  I'm very troubled by that.  I am

10 extremely troubled by the statement, which was really a

11 threat, that if a trustee is appointed, Mr. Smith doesn't

12 want to play with us anymore.  You know, Your Honor, if we

13 fall for that, then we're just –- we can't fall for that,

14 Your Honor, because then we are just setting a very sick

15 message out to the world about what standard of conduct and

16 how you can come into Bankruptcy Court and make a threat.

17 That's just not right.

18          Your Honor, we need a trustee in this case and we

19 need one right now.  And there's one other thing about Mr.

20 Smith, and I don't know what the merits of a lawsuit are,

21 but, you know, Mr. Smith is being sued by a group of

22 creditors in this case on the grounds that the issuance of

23 the notes to the senior note holders was fraudulent and a

24 breach of duty.  Now I don't know about the merits of that

25 case.  Some day we may find out about the merits of the

69

1  case.  I'm sure their position is, it's totally frivolous

2  because everything I argue is totally frivolous they tell

3  me.

4        But it doesn't matter.  Why wasn't it disclosed

5  in the Disclosure Statement?  It's not anywhere in there.

6  How could you not disclose the fact that the future

7  responsible individual is subject to a suit, even if you're

8  then going to follow it with a paragraph that says, it's

9  totally meritless for 16 reasons.  How could you still not

10 disclose it?  Mr. Smith signed that Disclosure Statement.

11 And, Your Honor, when Pillsbury sought compensation

12 opposing a subpoena in that case, they never told you that

13 Mr. Smith was a defendant.

14       Now maybe I suppose if you looked at the docket

15 and you looked at the full name of the case, you'd see Mr.

16 Smith on there, but this is not hide the ball; this is not

17 connect the dots.  This is a rule of disclosure here, Your

18 Honor.  So I have serious questions about Mr. Smith's

19 participation in this lack of disclosure.

20       And so, Your Honor, unless there's anything else

21 you need of me, I think I've said my piece.  Thank you.

22       THE COURT: Thank you, Mr. Shaffer.

23       Okay.  Is there anyone who would like to be heard

24 before I turn the podium to Ms. Dumas?  Ms. Dumas.

25       MS. DUMAS: Your Honor, I was going to ask the

1  Court if I could have a five-minute break just to confer

2  with co-counsel.

3          THE COURT: That's fine.  We'll take a very short

4  recess and then we'll see how many people want to be heard

5  after Ms. Dumas before we conclude for the day.  So I don't

6  know whether we'll take a lunch break or not or whether

7  we'll work through the lunch break is what I'm trying to

8  say.

9          Well take a short recess.

10      (Whereupon, a recess is taken at 12:09 p.m., and the

11  Court is reconvened at 12:25 p.m.)

12          THE CLERK: All rise.

13          THE COURT: Please be seated.  Okay, Ms. Dumas?

14          MS. DUMAS: Good morning, Your Honor, Nanette

15  Dumas for the U.S. Trustee.

16          Your Honor, I would just like to refocus the

17  Court's attention on a very brief nexus of all of the

18  undisputed facts that we actually all know of in this case

19  that form the underlying evidentiary foundation for both

20  the U.S. Trustee's motion to appoint a Chapter 11 trustee

21  and the U.S. Trustee's motion to have Pillsbury

22  disqualified as Debtors' counsel.

23          And just very quickly, those facts are as

24  follows: In April of 2002, SonicBlue and three hedge funds

25  that are referred to in this Court as the senior note

71

1  holders entered into an indenture.  Pillsbury, SonicBlue's

2  counsel, issued an opinion letter in April of 2002 in

3  connection with the indenture.

4          Six months later, Pillsbury and SonicBlue entered

5  into a retainer agreement in contemplation of the filing of

6  a Chapter 11 case.  In March of 2003, SonicBlue and certain

7  affiliates did file for Chapter 11 protection.  Shortly

8  thereafter in due course, Pillsbury filed its 327

9  application for employment and its Rule 2014 statement.

10          For the next three years in the case, from the

11  time period of May 2003 to May 2006, Pillsbury filed six

12  supplemental 2014 statements, and each and every time in

13  those statements, Pillsbury stated that it was aware that

14  it had an ongoing duty to disclose potential and actual

15  conflicts as and when they arose.

16          In late August of 2006, the senior note holders

17  made demand on Pillsbury verbally, followed up by the

18  September 5th letter from the senior note holders' counsel

19  to Pillsbury's managing partner.  The next day, Pillsbury

20  formally transferred the claims objection file regarding

21  the objection to claims of the senior note holders to

22  Committee counsel and ceased working on that matter.

23          At that time, Pillsbury did not file their Rule

24  2014 supplemental statement.  Six months later, on March

25  5th, 2007, Pillsbury finally filed their supplemental Rule

72

1    2014 statement.

2        Those are the facts that we are basing both of

3    our motions on.  That is the universe of what we know.

4    Now, Mr. Burk stated in his argument that the evidence is

5    now before the Court and the Court knows everything there

6    is to know.  Well, I don't agree with that at all.  I think

7    there is much that remains unknown, but I think that the

8    facts that I just recited to the Court are sufficient for

9    the Court to grant the disqualification motion.  And I'll

10   deal with that first since Mr. Burk addressed that first.

11   I'll just try to deal with the issues in the order in which

12   they were presented to the Court.

13       Your Honor, basically Pillsbury's opposition to

14   the disqualification motion is Pillsbury's investigation of

15   itself.  There is much that we don't know about what has

16   transpired in this case, and maybe there's a big story here

17   and maybe there isn't.  The U.S. Trustee has no

18   preconceived ideas of where this is all headed.  But in

19   order to insure the integrity of the system, the U.S.

20   Trustee believes that a full investigation is needed, just

21   to clear the air and make sure that there is no taint.

22       Based on the -- based on the assertion of the

23   conflict of interest in late August or at least September

24   of 2006, and the fact that Pillsbury failed to disclose the

25   conflict, the U.S. Trustee believes that that is the basis

73

1   for disqualification of Pillsbury without more.  As to

2   duties that Pillsbury may have had, going back to the

3   beginning of the case, having to do with the April 2002

4   letter, that is a subject for another day when more facts

5   are known.

6          At this point, there just simply is not enough

7   evidence, Your Honor.  But the facts that we do know I

8   believe are very damaging to Pillsbury, and I'll just

9   highlight two of the facts that I recited.  The first one

10  is that Pillsbury clearly knew that it had a duty to

11  disclose because it had a really good track record of

12  disclosure, six times in a three-year period, they filed

13  supplemental disclosures.  But then when it came time to

14  disclose the really big conflict, that's when they either

15  by mistake or by design, that's when they failed to do so.

16         The other thing I think that is very damaging to

17  Pillsbury is that they clearly knew that they had a problem

18  because they transferred the file to Committee counsel,

19  after the delivery of the letter from the managing partner

20  of Pillsbury.  Now Pillsbury has tried to put a good spin

21  on these facts and make it seem as if this shows that they

22  were trying to disclose it; they just forgot to file the

23  Rule 2014 statement.  Your Honor, in the U.S. Trustee's

24  view, that's just not enough.  Pillsbury had a duty;

25  Pillsbury failed in its duty, and I think Pillsbury's

74

1  actions speak louder than words.

2           However, even if Pillsbury's failure to file that

3  Rule 2014 statement was inadvertent, even if it was

4  inadvertent, Your Honor, binding Ninth Circuit case law,

5  the <u>Park Elana</u> (Phonetic) case, the Ninth Circuit has said,

6  and I'll quote:

7                "Even a negligent or inadvertent failure to

8                disclose fully relevant information may result in

9                a denial of all requested fees."

10  Now that's a disgorgement case, not a disqualification

11  case, but even if it was inadvertent, Your Honor, it's kind

12  of a strict liability standard and the reason is obvious

13  because otherwise if professionals fail to disclose and

14  then got caught later on, and if the failure was

15  deliberate, all they would have to say is, oh, we forgot;

16  it was inadvertent.  Please don't make us disgorge, Your

17  Honor.  It was a mistake.  We'll never do it again.  That's

18  why it is a very, very strict, very harsh standard, because

19  it has to be applied all across the board to all

20  professionals in all instances.

21           Your Honor, as we've said, we think we're right

22  at the beginning of the process, and I think another

23  creditor, Riverside, has said the same thing in its

24  joinder.  We believe we're right at the beginning of a

25  process of finding out what or what didn't happen in this

75

1  case.  Many allegations have been made.  They're all

2  swirling around.  It's kind of a soup to nuts thing right

3  now.  In order to really put all of this to rest, the U.S.

4  Trustee believes that the best thing for this case is the

5  immediate appointment of a Chapter 11 trustee.

6        Now, Your Honor, we did not file a reply brief on

7  our trustee motion.  We filed the reply brief that Mr.

8  Rogan was referring to that had to do with our

9  disqualification motion.  We were waiting to see an

10  opposition, and our reply would have been due Friday.  We

11  didn't see an opposition on Thursday so we didn't feel that

12  we had anything to reply to, so we didn't think it was fair

13  for us to put additional arguments in the record.  That's

14  why we did not file a reply.  But I will just summarize our

15  arguments for appointment of a Chapter 11 trustee.  We did

16  not just plead under (a)(1); we pled under 1104(a)(1) and

17  (a)(2).  1104(a)(1) has to do with cause; 1104(a)(2) is the

18  best interest of creditors.

19        We believe, Your Honor, either way you look at

20  it, you could make findings based on cause, findings based

21  on best interest of creditors.  Either or both, they all

22  work here for the following reasons: Over the past several

23  years, it does appear, and we're not assassinating anybody

24  character here, but it just does appear that the law firm

25  and not the client has increasingly been running this case.

76

 1  There seems to be a kind of a power vacuum between attorney

 2  and client.

 3        Now as Mr. Rogan points out, there's much that we

 4  don't know, and that's -- I agree; there's much that we

 5  don't know.  That's because Pillsbury and the client

 6  control that information.  The U.S. Trustee, the Court and

 7  all the parties in this courtroom, except for Pillsbury and

 8  the Debtor, have just been getting little crumbs of

 9  information pursuant to the discovery process that Mr.

10  Bender started back in late January.  So, yes, there's a

11  lot that's unknown, but what we do know, is that again, in

12  late August or at least September, this conflict was

13  asserted.  The files were transferred and why didn't the

14  Debtor at some point in that time frame, through Mr. Smith,

15  do something to bring that to somebody's attention?

16        Secondly, Your Honor, this case is in kind of a

17  state of gridlock right now.  The creditors are very riled

18  up.  I will say there's a high level of acrimony.  I would

19  say it's fair to say there's a loss of creditor confidence.

20  These are all good reason to appoint a Chapter 11 trustee.

21  The credibility of current counsel has been severely

22  damaged.

23        All of the creditors, except for the Committee,

24  whose first choice still seems to be keeping Pillsbury on,

25  but all of the other creditors who have voiced an opinion

77

1  have either said they would like the case converted, or

2  they would prefer a Chapter 11 trustee be appointed.

3         Your Honor, you asked a question at the last

4  hearing about the cost of multiple trustees, the potential

5  cost, pursuant to Rule 2009(c)(2), the U.S. Trustee has the

6  discretion in a jointly administered case to appoint one or

7  several so we would be appointing one so that we wouldn't

8  have a multiplicity and duplicative efforts by multiple

9  trustees and multiple professionals.  We would not want to

10  see that happen.

11         What we'd really like to see happen, Your Honor,

12  is to just bring back some calm to this case, to bring in

13  an outside party who has no ties to anybody in this case,

14  who has no connections with anybody in this case, somebody

15  who will regain the trust of everyone in this case, who

16  will act as an honest broker and do a full and fair

17  investigation with no preconceived ideas about who's good

18  and who's bad and, you know, whether there's a conspiracy

19  or not.  We want that person just to gather the facts,

20  weigh the facts, and just do as fair and accurate and

21  responsible of a job as possible, to find out just what

22  we're looking at here, because we really don't know what we

23  don't know at this point.

24         Why the U.S. Trustee believes that a Chapter 11

25  trustee is probably the better choice over conversion, the

78

1    U.S. Trustee would like to see someone step in and take

2    over and really be the client, and we are not certain

3    whether this has happened over the last four years,

4    especially in the latter days of this case.  We want a

5    trustee who will be the client, who will direct counsel

6    what to do and not simply be a rubber stamp for counsel.

7         Through the Chapter 11 process, the U.S. Trustee

8    can talk to creditors, find out what qualifications they're

9    looking for in a trustee, and go anywhere in the country

10   and hire anybody as if the U.S. Trustee were doing a search

11   for a CEO of a big company, find somebody –- it gives the

12   U.S. Trustee the flexibility to search and find just the

13   right person for the job.

14        THE COURT: And you're saying that in Chapter 7

15   you don't have that flexibility.

16        MS. DUMAS: In Chapter 7, Your Honor, pursuant to

17   Sections 321 and 701, the U.S. Trustee is limited to a

18   panel trustee either on this panel or in adjacent judicial

19   districts.  So it's a much smaller talent pool, not that

20   there might not be somebody in that pool that would be

21   suitable, but there's just a much wider range of choices.

22   And similarly, going back to my point about finding an

23   outsider, it's –- again, if you have a larger pool, you

24   have a better chance of finding a person who doesn't have

25   those connections.  And I'm talking even about just

79

1    personal connections, people who went to law school

2    together or their kids go to each other's birthday parties

3    or -- there cannot be any taint of cronism as this process

4    moves forward.

5         A Chapter 11 trustee always has the flexibility

6    of being able to move for conversion to Chapter 7 when it

7    gets to that point, so by appointing a Chapter 11 trustee

8    now, you kind of have both options still on the table.

9    You're not just limited to staying in Chapter 11.  As I

10   believe Riverside pointed out, and maybe Maxtor did too, in

11   their joinders, the Plan and Disclosure Statement can be

12   amended or redrafted to tailor the Plan provisions to allow

13   distributions to go out very soon to creditors whose claims

14   are not in dispute, and there are many creditors whose

15   claims are liquidated as I understand.  I'm not sure what

16   the numbers are, but as long as a reserve is held for the

17   disputed claims, at least those creditors that have claims

18   could get paid right away.

19        Now, that could also happen in rare instances in

20   a 7.  You could have interim distributions.  It's not

21   completely unheard of to do that in a 7.  However, another

22   thing that the Plan process would do and we would really

23   urge this if the case remains in Chapter 11, the Court

24   could have jurisdiction post-confirmation, in reviewing

25   professional fees.  Now in a 7, it usually happens all at

80

1  the end of the case.  There's one big huge fee app that

2  gets filed by the estate professionals, and it's much

3  harder to review it at the end of the day.  Although you do

4  have the benefit of hindsight at that point to see what's

5  been accomplished, at the same time it's a lot of time

6  entries; it's a lot of paper; and to have an ongoing

7  periodic review of professional fees, post-confirmation, as

8  the investigation proceeds, as objections to claims are

9  being prosecuted, et cetera, the U.S. Trustee believes

10 that's a better way to do it.

11       And finally, if there were to be a trustee

12 election, which may well happen in this case, if there's a

13 Chapter 11 trustee, rule 2007.1(b)(3)(A) requires the

14 elected Chapter 11 trustee to file a verified statement

15 disclosing all of his or her connections with the

16 Debtor/creditors, U.S. Trustee, the Court, parties in

17 interest, et cetera.  But in a Chapter 7 election context,

18 Rule 2003 does not require that same verified statement.

19       And, Your Honor, because of all of these

20 allegations that have been made and all of the -- just this

21 kind of poisonous atmosphere and the doubts that have

22 started to pervade everybody's minds regarding this case,

23 the U.S. Trustee believes that it would be helpful to have

24 the trustee, even if there's a trustee election, have that

25 elected trustee disclose everything, so nobody could say

81

1    afterwards, well, they got rid of one set of people and

2    then they replaced them with somebody else who was an

3    insider or got there for the wrong reasons.

4            So in summary, Your Honor, the practicalities for

5    all of the practical reasons for appointing a Chapter 11

6    trustee, plus all of the kind of policy reasons, having to

7    do with the integrity of the system, the U.S. Trustee

8    believes that at this time, it would be better to have a

9    Chapter 11 trustee rather than a Chapter 7 trustee.

10            And I'm prepared to respond to any questions the

11    Court might have.

12            THE COURT: No, I think you've covered it.  Thank

13    you very much, Ms. Dumas.

14            MS. DUMAS: Thank you, Your Honor.

15            THE COURT: Okay.  Let me find out, now that -- I

16    think that everyone who wishes to be heard has been heard

17    one time.  Is there anyone else who wants to be heard for

18    the first time?

19            MR. COSTELLO: Your Honor, I do.  Patrick Costello

20    on behalf of Maxtor.  I'll be very brief.  I think the

21    arguments in support of -- and first, Maxtor is here only

22    on the motion for the appointment of a trustee, not the

23    other disqualification motion -- but I believe the

24    arguments in favor of appointing a Chapter 11 trustee have

25    been well presented.  I certainly don't have to restate

82

1    them or reiterate them.  I just wanted to state for the

2    record that Maxtor is in support of the appointment of a

3    trustee.

4              THE COURT: I saw your declaration.  Thank you,

5    Mr. Costello.  Is there anyone else who would like to be

6    heard for the first time?

7              Okay.  Now, I want to find out how many people

8    would like to respond to what has been said today.  Mr.

9    Rogan, Mr. Burk, Mr. Bennett, Mr. Rankin, four people, can

10   you all give me some idea of your time estimates?  Mr.

11   Rankin?

12             MR. RANKIN: Three minutes.

13             THE COURT: Mr. Bennett?

14             MR. BENNETT: It'll probably last just while I

15   give you some statutory references.

16             THE COURT: I found it.  Don't worry.

17             Mr. Burk?

18             MR. BURK: Five to seven.

19             THE COURT: Okay.  Mr. Rogan?

20             MR. ROGAN: About three to five minutes.

21             THE COURT: Okay.  Then --

22             MS. DUMAS: I'll reserve time to respond?  Thank

23   you, Your Honor.

24             THE COURT: That's fine.  Okay.  Then I would

25   suggest that we can go ahead without a lunch recess.  Who

83

1  would wish to be heard first?  Mr. Rankin?

2         MR. RANKIN: Thank you.  The grounds for what's

3  before the Court is very important.  I think that Ms. Dumas

4  gave a very eloquent explanation of what's before the Court

5  and what would be the appropriate grounds from the

6  Committee's perspective if the Court is going to appoint a

7  Chapter 11, those would be the grounds, that there was a

8  failure to disclose by Pillsbury for too long a period of

9  time, but there were so many comments made about grounds

10 and about case law, it's very important to respond to what

11 Mr. Shaffer said.  Some of the things he said just weren't

12 accurate.  This is very important.

13        There's no case law that says that a Committee

14 counsel has the obligation to report somebody else's

15 conflict.  That said, there isn't a question in the world

16 that had we as Committee counsel or any Committee member

17 been aware that Pillsbury didn't make their supplemental

18 disclosure, I mean I wish we had notice because I'll tell

19 you what we would have done.  We would have called Craig;

20 we would have e-mailed Craig and said, hey, where's your

21 supplemental disclosure?

22        And they would have filed it because there would

23 be no incentive for them not to.  I mean it's going to go

24 where it's going to go, but he said there was wrongdoing

25 going on; we didn't report -- there wasn't wrongdoing going

84

1    on that we didn't report.  The wrongdoing would have been

2    to file a claim objection against somebody they had a

3    conflict with.  They told us there was a conflict, that

4    this thing came to their awareness, and they transferred

5    the files to us.  From the Committee's perspective, that

6    ended whatever wrongdoing could have occurred.  The point

7    is, without -- the grounds for a trustee would be the

8    failure to disclosure.  There isn't any lack of honesty or

9    forthrightness that the Committee has ever propounded.

10   There's the case law that he cites that there's a duty to

11   disclose by the Committee counsel, the Committee members,

12   that doesn't exist.

13          With respect to the Committee taking on the

14   claims objections, he claims that there are some obligation

15   to come and tell the Court that we're going to be suing our

16   own Committee member.  That's not true.  In fact, their

17   firm is suing Committee members in a Hawaiian case.  It's

18   not the law that that's required.  My point only is that

19   candor is completely required.  We are absolutely -- we

20   have been honest and forthright in this case.  The

21   Committee has acted appropriately in all matters with

22   respect to this case.  We one hundred percent want to do

23   what's in the interest of creditors.  If all the creditors

24   support the appointment of a Chapter 11 trustee today, then

25   so does the Committee if that's the Court's preference.

85

1          THE COURT: This case is not about your firm right

2    now.  So you can move on.

3          MR. RANKIN: Okay.

4          THE COURT: Thank you.

5          MR. ROGAN: Your Honor, I waited through some of

6    the speeches to see whether or not someone was going to

7    talk about Mr. Smith, and the comments were interesting to

8    me.  They echoed some of the comments that the U.S. Trustee

9    put in her moving papers.  There was some kind of a vacuum

10   here, that there wasn't a client.  They must have forgotten

11   what the case was like when Mr. Smith first took on the

12   role of responsible individual, when there was about five

13   million dollars in the estate.  They must have forgotten

14   what's happened for all those years where there's now 80

15   million dollars in the estate, and where Mr. Smith has been

16   actively and intimately involved in this matter for years

17   and years and years.

18          In fact, Your Honor, again, we go through the --

19   counsel here says we're under both (a)(1) and (a)(2), cause

20   and also best interest of the creditors.  So where's the

21   evidence about fraud?  There isn't any.  Where's the

22   evidence about dishonesty?  There isn't any.  Where's the

23   evidence about incompetence?  There's isn't any.  Where's

24   the evidence about gross mismanagement of the affairs?

25   There isn't any of that either.  There's no evidence of

86

1  cause whatsoever alleged against Mr. Smith.  Heaven knows

2  let alone proven.  In fact, they want him to continue.

3  They want him to keep on the payroll and continue to help

4  move the case forward.

5       So we would respectfully ask that the Court deny

6  this motion with respect to 1104(a)(1).  There simply is no

7  evidence to support it.

8       With respect to the best interest of creditors

9  test under 1104(a)(2), again, let's take a look at what's

10 happened here and we're worried about the integrity of the

11 process here, and when was it that Mr. Smith learned about

12 these matters?  All of a sudden, it's the lay person who

13 has now the obligation to determine that his attorneys

14 should have followed one of the bankruptcy rules of

15 procedure.  There's no case law to support that.  There's

16 not even a good argument to support that as we all know.

17      Mr. Smith did not have this obligation.  Mr.

18 Smith did not have the obligation to determine whether or

19 not Mr. Bennett's letter and Mr. Bennett's demand which

20 there's no evidence that he even knew about it for months.

21 There's no evidence whatsoever to support that Mr. Smith,

22 who is the embodiment of this Debtor, has done a single

23 thing wrong or has done anything other than do what he's

24 supposed to do, make certain that his attorneys are moving

25 forward to bring the case to fruition, making certain that

1    a Disclosure Statement gets filed and produced and

2    proposed, and the comments be made to it.  That's all that

3    Mr. Smith is supposed to do at this stage of the case.

4            But to suggest that there's some sort of a power

5    vacuum or heaven forbid, to suggest that there's no client

6    here, that's just rhetoric.  The evidence is very, very

7    clearly to the contrary in this case.  We urge the Court to

8    think carefully about the evidence and to rule

9    appropriately to deny the motion.

10           Thank you, Your Honor.

11           MR. BURK:  I think, Your Honor, we come back to

12   the question of what to do about the Pillsbury Winthrop

13   firm.  I want to take just a brief moment to respond to a

14   couple of things that Ms. Dumas and Mr. Shaffer said, both

15   of which I think illustrate the difficulties of the Court's

16   choice.  Ms. Dumas is advocating that Pillsbury be

17   disqualified, I assume in all respects and for all

18   purposes.  For reasons that in an odd way illustrate the

19   things that Pillsbury did right here, Pillsbury is

20   criticized for knowing it had a duty to disclose.  You bet

21   they knew they had a duty disclose.

22           Pillsbury is criticized for recognizing that they

23   had a discloseable conflict and showing they recognized it

24   by taking some of the actions necessary to address it.  You

25   bet they recognized the problem, and you bet they took

88

1   action.  The one thing they didn't do was to file that

2   supplemental disclosure.  They didn't file that

3   supplemental disclosure because they made a mistake and the

4   partner in charge, who is crestfallen about it, assumed

5   that the filing was made and so when Mr. Shaffer comes to

6   criticize the other incomplete disclosures that he says

7   were not sufficient, it is in the context -- these are made

8   in the context of Pillsbury having believed, incorrectly,

9   just that they made a mistake and they believed incorrectly

10  that they had made a full supplemental disclosure and put

11  the Court and the creditors fully on notice, and in that

12  context, in those pleadings, they said what they said.  But

13  this is not about conspiracies; it's not about concealment;

14  it's not about hiding the ball and creeping disclosures.

15  People who get paid to look at the world through dirty

16  windows profit when they see a dirty world.  And this world

17  is not a dirty world; it's a world in which human beings

18  make human error, and that's what happened here.

19       Now, what do we do about the fact that Pillsbury

20  absolutely made an error?  The Court has the discretion to

21  do what it sees fit, and Pillsbury has stood up and said in

22  their papers and again today that they will be guided by

23  the Court's preference.  They believe, given what they have

24  accomplished and what is needed for the best interest of

25  the estate and to accomplish the tasks that need to be

89

1   accomplished in this case, that there are a few remaining

2   tasks that it might be proper under the Bankruptcy Code and

3   the Rules, proper ethically, proper morally, for them to

4   complete.  And they offer to do that.

5          But guided by the preference of their client who

6   seems would prefer to have them stay and guided by the

7   preferences of the Court, they're prepared to do whatever

8   is right.  What we don't want to see happen is for this

9   issue to become a side show and a distraction.  If the

10  Court feels it has enough facts to rule on the issues --

11  the Court said it did not want to hear about disgorgement

12  and Ms. Dumas mentioned it, I'm going to spend only about

13  20 seconds on that in about a minute.

14         The Court has enough in front of it I think to

15  address those issues.  If the Court orders an

16  investigation, of course Pillsbury will cooperate and will

17  cooperate completely, and they will cooperate completely

18  whether or not they remain counsel in this case in some

19  larger or smaller role.

20         In terms of what the creditors want, there's been

21  a lot of talk about what the creditors want as far as a

22  trustee goes.  Other than the position of the claims buyers

23  and the U.S. Trustee, I don't believe that any of the

24  creditors have taken a position on advocating Pillsbury's

25  disqualification.  And the issue -- the Court has the

90

1   discretion to do what it thinks is right here, and I would

2   suggest to the Court that what it should be considering,

3   what we'd like you to offer us guidance about, and again,

4   we are willing to accept any request for resignation in a

5   larger or smaller capacity if the Court prefers, what we'd

6   like the Court to consider is what's best for this estate;

7   where can Pillsbury be helpful or can Pillsbury be helpful

8   by not continuing, and where can Pillsbury be helpful by

9   continuing if such a role exists.

10          Now, a few of the comments that Mr. Shaffer made,

11  we would now I think address the question about what

12  happens now as a result of what happened in 2006 and this

13  year.  Mr. Shaffer had a lot to say about what should have

14  happened back in 2003, all of which I have to, with all

15  respect to Mr. Shaffer, say is patently unrealistic.  The

16  suggestion that because Pillsbury as an institution knew it

17  had written an opinion means that that opinion should have

18  been prominently disclosed in an employment application for

19  a bankruptcy as one of dozens of transactions where there

20  was a latent defect in a document that nobody recognized

21  four years later might some day turn into a claim, is

22  absurd.

23          If Mr. Shaffer is suggesting that every debtor's

24  counsel who has a pre-petition relationship and gave an

25  opinion is disqualified, then everybody who ever did a

91

 1 | financing for the debtor is disqualified as debtor's
 2 | counsel.  Opinions are not routinely disqualified.
 3 | Professor Rappaport is here in the courtroom, and she is
 4 | prepared to testify about what the standard practice is all
 5 | over the country and certainly Your Honor is fully familiar
 6 | with what the standard practice is in this court.

 7 | Opinions are not routinely disqualified –- not
 8 | routinely disqualifying, excuse me, nor are they routinely
 9 | disclosed.  Why?  Because most of the time they don't
10 | matter, and they would be useless clutter.  In this
11 | particular case, again with the magic of 20-20 hindsight,
12 | four years after the fact, out of many, many financing
13 | transactions, mergers and acquisitions that Pillsbury did,
14 | many of which involved opinions that have never set foot in
15 | this courtroom and will never be mentioned anywhere, this
16 | one is a problem.

17 | Should that have been known in 2003?  Of course
18 | not.  Did anyone actually know it?  They've told you under
19 | penalty of perjury they didn't.  So when the Court
20 | considers what the rule ought to be, what sorts of things
21 | at the beginning of the case when you don't know where
22 | things are going, when you can't imagine what if any latent
23 | defects in your work over years may exist or may be claimed
24 | to exist, what are you supposed to do in telling the Court
25 | about what you've done and who you are.  That's the

92

1  question posed to you.

2          With respect to disgorgement, I'm going to say

3  only one thing, which is, that I think Ms. Dumas over-

4  promises the Park Elena case.  As is laid out in

5  Pillsbury's briefing, and a lot of attention was paid to

6  briefing that law with great care, there is no authority

7  for the proposition that fees ought to be disgorged for a

8  period of time prior to when the disclosure obligation

9  arose.  And ethically, morally, legally, that makes sense.

10  The punishment should fit the crime.  When a disclosure

11  obligation arises and disclosure fails, then disgorgement

12  or fee forfeiture is a penalty that may be imposed during

13  the period when the obligation wasn't seen to.

14          When a disclosure obligation arises three and a

15  half years into a case, forfeiting fees for the previous

16  three and a half years when no wrongdoing was committed is

17  disproportionate and not supported by the case law.  Now, I

18  think the Court has before it the facts necessary to deal

19  with that issue if it wishes to today, but going forward

20  with respect to any investigation or further obligation, we

21  want to be clear that any penalty regarding fees has to be

22  calibrated to the obligations, the disclosure obligations,

23  that weren't complied with.  And it is simply not the case,

24  the Park Elena or any other authority of which we're aware

25  would give the Court sweeping authority to forfeit

93

1   everything for -- to forfeit the entire river for a misstep

2   in midstream.

3           With that, unless the Court has questions for me

4   or for Mr. Grenville on behalf of the firm, I will submit

5   it.  Thank you.

6           THE COURT: Thank you, Mr. Burk.

7           Mr. Bennett?

8           MR. BENNETT: Well, I'm glad you found the

9   statutory reference.  I guess I was lucky to speak.  I was

10  at Judge Ryan's retirement dinner, and I had to speak.

11  Many of the speakers made age jokes.  I didn't and it's a

12  good thing because I can't believe I didn't remember

13  502(a).  But in any event, there's actually two places.

14  One of the things I wanted to make clear is 502(a) not only

15  talks about parties in interest, it even talks about people

16  who aren't parties in interest, in some circumstances can

17  object to claims.  Just if you want your record to be

18  complete, Rule 3008 also says that when reconsidering an

19  order allowing a claim, that's also a wide open function.

20  This is -- there's no monopoly.

21          THE COURT: Thank you, Mr. Bennett.

22          MR. BENNETT: Okay.  But I think we learn

23  something there.  I mean you've got a lot of papers that

24  have been written with the clear intent to whip this thing

25  up.  When we were here last, Your Honor and Mr. Shaffer

1  both exchanged the words "train wreck."  For some reason,

2  someone wants a train wreck here, and I don't quite know

3  what it is yet.  Some day maybe we'll find out.

4       I did want to point out to Your Honor something

5  else that's been revealed by the record.  There's been

6  other claims trading involving SB claims during this period

7  of time.  Now it's also during a period of time where Mr.

8  Shaffer had access to extra information.  I think he said

9  in his remarks that he's had piles of discovery, so I think

10  that one of the things that we do need to do -- Your Honor

11  made a warning to everyone about not destroying any

12  documents that are potentially relevant -- just in case

13  there was any ambiguity and there was actually a slight

14  ambiguity last time you said that, and I think it also has

15  to apply to Mr. Shaffer and his clients because I think

16  there is something going on here, and I think the discovery

17  is going to need to go both ways.

18       Where does this leave us?  I said at the time of

19  the hearing that we would tell you what we thought ought to

20  happen in this case.  We want an end to this case.  If

21  people want to take shots at us, they're free to take shots

22  at us.  We are free to defend.  We will continue to be

23  active participants in this case within the bounds of law.

24  We will represent our clients adequately.

25       I don't want anyone saying that someone was

95

1  pulling their punches in a fight with me.  The best way to

2  get there is to have someone new.  I took enormous comfort

3  in Ms. Dumas' remarks that she's going to conduct a

4  national search and she's going to find someone that has no

5  connection whatsoever with anyone in this case because one

6  of the pieces of correspondence that was given to me

7  actually by Via but was written by Mr. McGrane over there

8  was the suggestion that what they really wanted was to get

9  Mr. McNutt to be the trustee to clean up the case.  And of

10 course, he's got a few connections with their side of it.

11         So we find ourselves reluctantly, because we

12 think at the end of the day, there will be increased

13 expense supporting the appointment of a Chapter 11 trustee,

14 unlike the rest of the members of the Committee, we find

15 ourselves desirous very much of having a true national

16 stature person involved to take a look at what people have

17 done, what everyone has done and to try to figure out

18 what's really going on in this case.  And we will

19 completely cooperate with whoever is appointed, just as we

20 cooperated with Mr. Bender.

21         If you have any questions, I'd be happy to answer

22 them.

23         THE COURT: No questions.  Thank you.

24         MR. BENNETT: Thank you.

25         THE COURT: All right.  Is there anyone else who

1  wishes to be heard?

2          MS. DUMAS: Just a couple points, Your Honor, very

3  quickly.  You know, Mr. Rogan's statements all started out

4  with Mr. Smith this and Mr. Smith that.  I just want to

5  clarify whether Mr. Rogan is representing Mr. Smith

6  personally or the Debtor.  You know, we are not casting any

7  aspersions on Mr. Smith.  We simply don't know what we

8  don't know at this point.

9          I do believe that Mr. Rogan said Mr. Smith didn't

10  know about Pillsbury's failure to disclose.  If that's what

11  he said and if that is true, I think it's a problem and I

12  think it supports a finding of cause for appointment of a

13  Chapter 11 trustee.

14          The disgorgement issue that Mr. Burk briefly

15  discussed, we recommended in our reply brief on the

16  disqualification issue that the Court reserve this issue as

17  the Court has indicated that it will do.  Mr. Burk said the

18  penalty has to be calibrated.  Absolutely, Your Honor.  I

19  think even, you know, it's a matter of the Court's wide

20  discretion, but I know that this Court would want to

21  properly exercise that discretion and simply again, we

22  don't know what we don't know.  There's a lot yet to be

23  told of this story and maybe it will all come to nothing

24  and maybe it'll be something big, and we'll just have to

25  wait and see.

97

1          If a trustee is appointed and the trustee can

2   file a full report about all the issues that have been

3   raised, then at that point it might be a good time to tee

4   up the disgorgement issue, an not until then.

5          Finally, Mr. Burk again was mentioning that it

6   was a mistake on the part of Pillsbury in not filing the

7   Rule 2014 supplemental disclosure in September of 2006.

8   But the fact remains they did wait six months, and I'm not

9   sure why they waited so long, and maybe they would like to

10  address that, but I just can't understand why then when

11  people really started talking about it and it really

12  started to become a big thing, they waited six months.

13  They waited until March 5th.  They got the letter on

14  September 5th.  They waited till March 5th of 2007.

15         So they kind of have created this situation in

16  which they find themselves.  Nobody is happy about the

17  situation, least of all the U.S. Trustee, but Pillsbury

18  unfortunately, by its omission, by its failure, did create

19  this situation.  Mr. Burk said this is not a dirty world.

20  Well, we just don't know.  Maybe it is; maybe it isn't, you

21  know.  I guess we'll find out.

22         But the fact that people are thinking that it

23  might be a dirty world is because this one omission by

24  Pillsbury causes everybody to view everything in this case

25  in a light that is very suspicious and wondering about

98

1   people's motives.  And this is where all of this doubt and
2   all of these allegations are coming from.  So again, I
3   think the best thing is to have somebody from the outside
4   come in, take over, investigate, and hopefully put all of
5   these doubts to rest in due course.

6               Thank you, Your Honor.

7               THE COURT: Thank you, Ms. Dumas.

8               Last chance?  Anybody else want to be heard?

9               No one is coming forward.

10              I'm going to treat this matter as submitted.  I
11  expect to rule promptly within the next few days.    Thank
12  you.

13              ALL COUNSEL: Thank you, Your Honor.

14              THE CLERK: All rise.

15          (Whereupon, the proceedings are concluded at 1:06
16  p.m.)

17

18

19

20

21

22

23

24

25

99

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7          I certify that the foregoing is a correct

8    transcript from the digital sound recording of the

9    proceedings in the above-entitled matter.

10

11   DATED: March 29, 2007

12

13                           By:___/s/ Jo McCall_____

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 48

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   CRAIG A. BARBAROSH  #160224
2  650 Town Center Drive
   Seventh Floor
3  Costa Mesa, CA 92626
   Telephone: (714) 436-6800
4  Facsimile: (714) 436-2800

5  PILLSBURY WINTHROP SHAW PITTMAN LLP
   THOMAS V. LORAN III #95255
6  ALBERT J. BORO, JR.  #126657
   ANA N. DAMONTE  #215504
7  JASON A. CATZ  #224205
   50 Fremont Street
8  Post Office Box 7880
   San Francisco, CA  94120-7880
9  Telephone: (415) 983-1000
   Facsimile: (415) 983-1200
10 Email: thomas.loran@pillsburylaw.com
        albert.boro@pillsburylaw.com
11       ana.damonte@pillsburylaw.com
        jason.catz@pillsburylaw.com
12
   Attorneys for Debtors and
13 Debtors-In-Possession

14              UNITED STATES BANKRUPTCY COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                    SAN JOSE DIVISION

17 | IN RE: | ) | Case No. 03-51775 |
   | | ) | |
18 | SONICblue Incorporated, et al., | ) | CHAPTER 11 Case |
   | | ) | |
19 | Debtors and Debtors-In-Possession | ) | |
   | | ) | |
20 | _____ | ) | |
   | | ) | |
21 | SONICblue Incorporated, | ) | Adv. Proc. No. 04-5556 |
   | | ) | |
22 | Plaintiff, | ) | OBJECTION OF DEBTOR |
   | | ) | SONICblue INCORPORATED TO |
23 | vs. | ) | DUPLICATE PROOFS OF CLAIM |
   | | ) | OF VIA TECHNOLOGIES, INC. |
24 | VIA Technologies, Inc.; S3 Graphics Co., | ) | AND S3 GRAPHICS CO., LTD. |
   | Ltd.; and S3 Graphics, Inc., | ) | AND DEBTOR'S SECOND |
25 | | ) | AMENDED ADVERSARY |
   | Defendants. | ) | COMPLAINT FOR |
26 | | ) | AFFIRMATIVE RELIEF |
   | | ) | |
27 | _____ | ) | |

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1    Debtor-in-Possession SONICblue Incorporated ("SONICblue") hereby objects to

2  the duplicate claims of VIA Technologies, Inc. and S3 Graphics Co., Ltd. (collectively,

3  "Claimants") filed herein on or about July 17, 2003 and, joining its objection with a request

4  for affirmative relief against Claimants, SONICblue alleges as follows:

5

6                          JURISDICTION AND VENUE

7    1.    Pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure, this

8  objection to claims and request for affirmative relief initiates an adversary proceeding.  The

9  above-entitled United States Bankruptcy Court has jurisdiction over the subject matter of

10 this adversary proceeding pursuant to 28 U.S.C. § 1334, and the adversary proceeding

11 arises in a case under Title 11 of the United States Code pending before the Court.  The

12 subject case is the reorganization case of SONICblue under Chapter 11 of the Bankruptcy

13 Code.  The case is titled In re: SONICblue Incorporated, Case No. 03-51775, and is

14 pending before the United States Bankruptcy Court for the Northern District of California,

15 San Jose Division.  This adversary proceeding is a core proceeding under  28 U.S.C. § 157.

16 Venue of the adversary proceeding in this judicial district is proper in accordance with

17 28 U.S.C. § 1409.

18                                PARTIES

19    2.    SONICblue is a corporation organized and existing under the laws of the

20 State of Delaware and is the plaintiff in this adversary proceeding.

21    3.    SONICblue is informed and believes and on that basis alleges that defendant

22 VIA Technologies, Inc. ("VIA") is a corporation organized and existing under the laws of

23 the Republic of China.

24    4.    SONICblue is informed and believes and on that basis alleges that defendant

25 S3 Graphics Co., Ltd. (the "Joint Venture" or "JV") is a corporation organized and existing

26 under the laws of the Cayman Islands.

27

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1    5.    SONICblue is informed and believes and on that basis alleges that defendant

2  S3 Graphics, Inc. ("JV Sub") is a corporation organized and existing under the laws of the

3  State of Delaware and is a wholly-owned subsidiary of the Joint Venture.

4

5    <u>BACKGROUND FACTS</u>

6    <u>Formation of the Amended Investment Agreement</u>

7    6.    In or about April 2000, VIA and SONICblue entered into a written

8  agreement (the "Original Investment Agreement"), whereby the parties agreed, among

9  other things, to form a corporate JV to which SONICblue would contribute specified assets

10  of its computer graphics chip business (the "Graphics Chip Business"), in return for which

11  SONICblue would receive at closing all of the issued and outstanding Class A Common

12  Shares of JV capital stock and a payment of $79,875,000 less certain deductions (at least

13  half of such payment had to be paid in cash), and a secured promissory note for three

14  additional installment payments of $79,875,000 each (at least half of each such payment

15  had to be paid in cash), which were due on each of the first three anniversaries of the

16  closing.  VIA was to contribute to JV the $319,500,000 for it to make these four payments

17  to SONICblue, and VIA would receive at closing all of the issued and outstanding Class B

18  Common Shares of JV capital stock.

19    7.    Notwithstanding formation of the Original Investment Agreement, at the eve

20  of the closing, VIA informed SONICblue that due to alleged Taiwanese cash export

21  restrictions, VIA could not perform its cash payment obligations under the Original

22  Investment Agreement.  As a result, the closing of the transactions contemplated by such

23  agreement never occurred.

24    8.    On or about August 28, 2000, VIA and SONICblue entered into a written

25  agreement styled Amended and Restated Investment Agreement (the "Amended Investment

26  Agreement").  At the time of entering the Amended Investment Agreement through the

27  time immediately prior to the closing of the transactions contemplated by the Amended

28

1   Investment Agreement (the "Closing"), VIA beneficially owned more than 14% of the

2   voting securities of SONICblue,

3        9.      Pursuant to the Amended Investment Agreement and the JV Transaction

4   Agreements (as that term is defined in the Amended Investment Agreement), VIA and

5   SONICblue agreed, among other things, that they would form JV, that after its formation

6   JV would become a party to the Amended Investment Agreement and that SONICblue

7   would contribute designated assets, defined in the Amended Investment Agreement as the

8   "Graphics Chip Business Assets," to JV at the Closing.  In return for contributing the

9   Graphics Chip Business Assets, SONICblue would receive $208,000,000 in cash or

10  SONICblue shares, or any combination thereof, and VIA agreed to contribute that

11  consideration to JV for payment to SONICblue.  The Amended Investment Agreement

12  further provided that for purposes of this payment the SONICblue shares would be valued

13  at $16 per share.  By the time of the Closing, SONICblue shares had declined to about $5

14  per share, and VIA elected to pay the consideration owed SONICblue entirely in

15  SONICblue shares; thus, SONICblue received at the Closing consideration in the form of

16  its own shares having a value of only approximately $65 million.

17       10.     At the time of entering into the Amended Investment Agreement,

18  SONICblue, as owner, and VIA, as manager, entered into a written agreement styled S3

19  Incorporated Management Agreement, effective as of August 28, 2000 (the "Management

20  Agreement"), pursuant to which VIA agreed, subject to SONICblue's overall supervision

21  and retained right of control, to manage the Graphics Chip Business until the Closing, but

22  through such time, SONICblue would continue to be the sole owner of the Graphics Chip

23  Business.

24       11.     After formation of the Amended Investment Agreement, VIA managed the

25  Graphics Chip Business pursuant to the Management Agreement.  By virtue of such

26  management and the information made available to VIA concerning the Graphics Chip

27  Business during the extensive due diligence undertaken by VIA in connection with the

28  Original Investment Agreement and the Amended Investment Agreement for a period in

1   excess of a year, VIA at the Closing was on notice of both the actual and ordinary course of

2   the Graphics Chip Business in all respects relevant to the Amended Investment Agreement

3   and the JV Transaction Agreements.

4

5      <u>Formation of the Joint Venture Agreement and the Post-Closing Conduct of the Graphics</u>

6         <u>Chip Business by VIA in Breach of the Amended Investment Agreement</u>

7      12.    On the date set for the Closing (January 3, 2001) and in accordance with the

8   Amended Investment Agreement, SONICblue and its wholly-owned subsidiary Sonica3,

9   Inc., a Delaware corporation, entered into a written joint venture agreement with VIA,

10   dated as of January 3, 2001 (the "Joint Venture Agreement"), for the purpose of forming

11   JV.  Pursuant to section 2.1 of the Joint Venture Agreement, JV executed the Joint Venture

12   Agreement and the Amended Investment Agreement, and, as of the Closing, became a party

13   to those agreements.

14      13.    In accordance with the Amended Investment Agreement and as a condition

15   precedent to SONICblue's contribution of the Graphics Chip Business Assets to JV, VIA at

16   the Closing made, executed and delivered to SONICblue a written guaranty, dated as of

17   January 3, 2001 (the "Guaranty"), pursuant to which VIA absolutely, unconditionally and

18   irrevocably guaranteed the full and prompt payment or performance when due of the

19   Assumed Liabilities (as that term is defined in the Amended Investment Agreement) and all

20   reasonable costs and expenses of enforcing the Guaranty, including without limitation

21   reasonable attorneys' fees (collectively, the "Guaranteed Obligations").  In section 2.3 of

22   the Guaranty, VIA agreed that "[t]his Guaranty shall in all respects be a continuing,

23   absolute, unconditional and irrevocable guaranty of payment, and shall remain in full force

24   and effect until all Guaranteed Obligations have been paid or performed in full."

25      14.    On the date set for the Closing, VIA, SONICblue and JV entered into a

26   number of written amendments to the Amended Investment Agreement in the form of

27   so-called side letters dated January 3, 2001 (the "Side Letters"), and VIA refused to effect

28   the Closing unless the parties agreed to carve-out certain claims by VIA and JV against

1  SONICblue that, if sustained, would have the effect of further reducing the consideration

2  paid by VIA and JV under the Amended Investment Agreement.  One of the Side Letters

3  addressed such claims and related disagreements between the parties concerning certain

4  purported assets and liabilities related to SONICblue and/or the Graphics Chip Business,

5  and included the Damage Cap (defined hereinafter) and provided a mechanism for

6  arbitration (the "Arbitration Side Letter").

7       15.    Simultaneously with the parties' entering into the Side Letters, the Closing

8  occurred on January 3, 2001.

9       16.    SONICblue is informed and believes and on that basis alleges that as of the

10  Closing, JV formed JV Sub, a domestic corporation, to conduct and operate in the United

11  States of America the business of the Joint Venture, which was a foreign corporation

12  organized and existing under the laws of the Cayman Islands.

13      17.    SONICblue is informed and believes and on that basis alleges that at all

14  times material as alleged herein, each defendant was the agent, servant and/or employee of

15  each of the remaining defendants, and acted within the purpose, scope and course of said

16  agency, service and employment, with the express and/or implied knowledge, permission

17  and consent of the remaining defendants, and each of them, and each of said defendants

18  ratified and approved the acts of the other defendants.

19

20                                    The Intel Lawsuit

21      18.    Intel filed suit in Delaware federal court (the "Intel Lawsuit") on or about

22  September 7, 2001 against, among others, VIA and JV Sub, alleging their infringement of

23  Intel patents in the operation of the Graphics Chip Business.  Intel did not name SONICblue

24  as a defendant in the Intel Lawsuit.  The Intel Lawsuit against VIA and its affiliates

25  (including JV Sub) was later transferred and refiled by Intel in the federal court for the

26  Northern District of California.

27      19.    VIA and Intel settled the Intel Lawsuit in or about early April 2003

28  immediately following the commencement of this Bankruptcy case.  SONICblue has

1    attempted to obtain information about the terms of the settlement from the parties thereto,

2    but they refused to provide SONICblue with a copy of the settlement agreement resolving

3    the Intel Lawsuit and only recently made that agreement available for inspection (but not

4    copying) by representatives of SONICblue after being ordered to do so by the Court in this

5    Bankruptcy case.

6

7                              THE DUPLICATE CLAIMS

8         20.    On or about on or about July 17, 2003, Claimants filed duplicate Proofs of

9    Claim (the "Duplicate Claims") that purport to encompass nineteen separately numbered

10   claims set forth in the Attachment to Proof of Claim attached to each of the Duplicate

11   Claims.

12        21.    As set forth below, the Duplicate Claims are unenforceable against

13   SONICblue and the estate and against the property of SONICblue and the estate, and there

14   is no factual or legal basis for the allowance of the Duplicate Claims against SONICblue.

15   In fact, as hereinafter alleged, the Claimants are in material breach of their obligations to

16   SONICblue under the Amended Investment Agreement, the Management Agreement and

17   the Joint Venture Agreement.  Accordingly, the Duplicate Claims should be disallowed in

18   their entirety and affirmative relief should be granted in favor of SONICblue and against

19   VIA, JV and JV Sub.

20

21            GROUNDS OF OBJECTION TO THE DUPLICATE CLAIMS

22        22.    SONICblue generally objects to each of the Duplicate Claims pursuant to

23   Bankruptcy Code section 502(b)(1), on the following grounds:

24            a.    Allowance of the Duplicate Claims is barred by the equitable

25        doctrine of unclean hands.

26            b.    Claimants may not recover for any alleged breach by SONICblue of

27        the Amended Investment Agreement or the Arbitration Side Letter due to

28

10880868v1                        - 7 -            Objection of Debtor to Claims of VIA and S3
                                                   Graphics, Ltd. & Debtor's Second Amended
                                                   Adversary Complaint

1  Claimants' prior, continuing and material breaches of the Amended Investment

2  Agreement and the Joint Venture Agreement.

3        c.      Prior to the Closing Date of January 3, 2001, VIA managed and

4  operated the Graphics Chip Business pursuant to the Management Agreement.

5  Many of the damages alleged in the Duplicate Claims concern matters for which

6  VIA, as manager of the Graphics Chip Business, bears responsibility in whole or in

7  part, that Claimants ratified and to which VIA consented. Allowance of the

8  Duplicate Claims is therefore barred based on the doctrines of consent and

9  ratification.

10        d.      Allowance of the Duplicate Claims is barred in whole or in part

11  pursuant to the provisions of Bankruptcy Code section 502(e).

12        e.      SONICblue's actions, insofar as they constitute the exercise of

13  reasonable business judgment by an interested person through reasonable and proper

14  means and in the ordinary course of its business, are justified and privileged and

15  cannot form the basis for any liability to Claimants.

16        f.      Allowance of the Duplicate Claims is barred by the equitable

17  doctrine of waiver.

18        g.      Allowance of the Duplicate Claims is barred by the equitable

19  doctrine of laches.

20        h.      Allowance of the Duplicate Claims is barred by the equitable

21  doctrine of unjust enrichment.

22        i.      Allowance of the Duplicate Claims is barred by the equitable

23  doctrine of estoppel.

24        j.      SONICblue avers that if either of Claimants has suffered any damage

25  or loss, which SONICblue denies, it has failed to take reasonable steps to mitigate

26  the same, if any there is.

27        k.      SONICblue avers that if either of Claimants has suffered any damage

28  or loss, which SONICblue denies, such damage or loss is subject to the cap of

$5,554,544 for the maximum amount of SONICblue's liability for certain items, as specified in the Arbitration Side Letter (the "Damage Cap"), or is an offset or credit against other purported damages of Claimants in accordance with the terms of the Arbitration Side Letter.

l.     By filing the Duplicate Claims, Claimants seek a double recovery for the selfsame alleged losses.  Accordingly, if any of the nineteen enumerated claims set forth in the Duplicate Claims is allowed in whole or in part (notwithstanding this Objection), any such claim should be allowed but once and in favor of both Claimants, jointly and severally.

m.     SONICblue avers that if any of the nineteen enumerated claims set forth in the Duplicate Claims is allowed in whole or in part (notwithstanding this Objection), any such claim is subject to offset and/or recoupment by SONICblue in an amount at least equal thereto based on the claims alleged below in the Adversary Complaint.

23.     SONICblue specifically objects to each of the purported enumerated claims of the Duplicate Claims on the following grounds:

a.     Claim No. 1:  The "Overdue Payables Claim"

Pursuant to section 5.4(d) of the Amended Investment Agreement, SONICblue agreed "not [to] delay payment of any trade payables or other obligations other than in the ordinary course of business" prior to the Closing Date.  The "Overdue Payables Claim" is premised on the erroneous theory that SONICblue covenanted in the Amended Investment Agreement that prior to the Closing, it would pay all trade payables and other obligations of the Graphics Chip Business when and as they became due.  In truth and in fact, as Claimants are, and at all relevant times were, aware, SONICblue had not historically paid, and was not paying at the time of the formation of the Amended Investment Agreement, all such trade payables timely.  Rather, the ordinary course of business for the Graphics Chip Business was for SONICblue to pay such payables after the date on which payment was due.  Through VIA's due diligence in connection with the Original Investment Agreement

1   and the Amended Investment Agreement and in its operation of the Graphics Chip Business

2   pursuant to the Management Agreement, VIA at the Closing was on notice of and ratified

3   both the actual and ordinary course of the Graphics Chip Business with respect to the

4   payment of trade payables.  Accordingly, the alleged failure of SONICblue prior to the

5   Closing to pay such payables when and as they became due does not constitute a breach of

6   the Amended Investment Agreement.

7        In addition, Claimants have failed to allege that either of them paid any creditor of

8   any trade payable or other obligation of the Graphics Chip Business that Claimants contend

9   SONICblue failed to pay in the ordinary course of business prior to the Closing Date.

10       SONICblue further avers that if either of Claimants has suffered any damage or loss

11  related to the subject matter of this claim, which SONICblue denies, such damage or loss is

12  subject to the Damage Cap, which limits the maximum amount of SONICblue's liability to

13  the Claimants.

14       SONICblue denies that Claimants have sustained damages in any amount or at all

15  by reason of any act or omission on the part of SONICblue related to the subject matter of

16  this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

17  SONICblue on account of this claim.

18       For these reasons, the "Overdue Payables Claim" should be disallowed, in whole or

19  in part, pursuant to Bankruptcy Code section 502(b)(1).

20

21       b.    Claim No. 2:  The "Discounted Receivables Claim"

22       Pursuant to section 5.4(a) and (r) of the Amended Investment Agreement,

23  SONICblue promised that prior to the Closing Date, it would "carry on the Graphics Chip

24  Business in the ordinary course and in substantially the same manner as [t]heretofore

25  conducted" and that it would "not make any material changes in policies or practices

26  relating to selling practices, returns, discounts or other terms of sale or accounting

27  therefor . . . ."  The "Discounted Receivables Claim" is premised on the erroneous theory

28  that SONICblue covenanted in the Amended Investment Agreement that it would not offer

1    early or prompt payment discounts to customers of the Graphics Chip Business prior to the

2    Closing Date.  In truth and in fact, as Claimants are, and at all relevant times were, aware,

3    the ordinary course of business for the Graphics Chip Business was for SONICblue to offer

4    early or prompt payment discounts to customers.  Through VIA's due diligence in

5    connection with the Original Investment Agreement and the Amended Investment

6    Agreement and in its operation of the Graphics Chip Business pursuant to the Management

7    Agreement, VIA at the Closing was on notice of and ratified both the actual and ordinary

8    course of the Graphics Chip Business with respect to such early or prompt payment

9    discounts to customers.  Accordingly, the alleged extension by SONICblue of such early or

10    prompt payment discounts to customers prior to the Closing does not constitute a breach of

11    the Amended Investment Agreement.

12        In addition, Claimants have failed to allege that but for the alleged offers of early or

13    prompt payment discounts to customers of the Graphics Chip Business prior to the Closing

14    Date, such customers would have in fact made payments on their accounts on or after the

15    Closing Date.

16        SONICblue further avers that if either of Claimants has suffered any damage or loss

17    related to the subject matter of this claim, which SONICblue denies, such damage or loss is

18    subject to the Damage Cap, which limits the maximum amount of SONICblue's liability to

19    the Claimants.

20        SONICblue denies that Claimants have sustained damages in any amount or at all

21    by reason of any act or omission on the part of SONICblue related to the subject matter of

22    this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

23    SONICblue on account of this claim.

24        For these reasons, the "Overdue Payables Claim" should be disallowed, in whole or

25    in part, pursuant to Bankruptcy Code section 502(b)(1).

26

27

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1        c.      Claim No. 3:  The "Wrong Bonded Parts Claim"

2        Claimants allege that under paragraph 1 of the Arbitration Side Letter, SONICblue

3   agreed that it would retain, and JV would not assume, the liabilities associated with the item

4   on Exhibit A to the Arbitration Side Letter described as "$1,840,796.44 Wrong Bonded

5   Parts."  In support of the Duplicate Claims, Claimants allege that "SONICblue has breached

6   its obligations [under paragraph 1 of the Arbitration Side Letter] by not assuming the

7   liabilities for 'Wrong Bonded Parts.'"  Claimants do not allege, however, that either of

8   them has paid any amount to any third party for any of the liabilities that SONICblue

9   allegedly agreed to assume that are associated with the Wrong Bonded Parts and thus have

10  failed to allege facts establishing any compensable damages.

11       SONICblue further avers that if either of Claimants has suffered any damage or loss

12  related to the subject matter of this claim, which SONICblue denies, such damage or loss is

13  subject to the Damage Cap, which limits the maximum amount of SONICblue's liability to

14  the Claimants.

15       SONICblue denies that Claimants have sustained damages in any amount or at all

16  by reason of any act or omission on the part of SONICblue related to the subject matter of

17  this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

18  SONICblue on account of this claim.

19       For this reason, the "Wrong Bonded Parts Claim" should be disallowed, in whole or

20  in part, pursuant to Bankruptcy Code section 502(b)(1).

21

22       d.      Claim No. 4:  The "Non-Inventory Expenses Claim"

23       Claimants allege that under paragraph 3 of the Arbitration Side Letter, SONICblue

24  agreed that it would retain, and JV would not assume, half of the liability associated with

25  the item on Exhibit A to the Arbitration Side Letter described as "$1,251,975 Non

26  Inventory Expenses."  The item described as "$1,251,975 Non Inventory Expenses" relates

27  to liabilities for commissions and marketing development funds applicable to sales of

28  products manufactured by the Graphics Chip Business.  In support of their proofs of claim,

1    Claimants allege that "SONICblue has breached [paragraph] 3 of the Arbitration Side Letter

2    by not assuming the $625,988 in liabilities for non-inventory expenses." Claimants

3    nowhere allege, however, that either of them has paid any amounts to any third party for

4    any of the liabilities that SONICblue allegedly agreed to assume that are associated with

5    Non Inventory Expenses and thus have failed to allege facts establishing any compensable

6    damages.

7          SONICblue denies that Claimants have sustained damages in any amount or at all

8    by reason of any act or omission on the part of SONICblue related to the subject matter of

9    this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

10   SONICblue on account of this claim.

11         For this reason, the "Non-Inventory Expenses Claim" should be disallowed, in

12   whole or in part, pursuant to Bankruptcy Code section 502(b)(1).

13

14         e.      Claim No. 5:  The "RMA Credit Claim"

15         Pursuant to section 5.4(d) of the Amended Investment Agreement, SONICblue

16   agreed "not [to] delay payment of any trade payables or other obligations other than in the

17   ordinary course of business" prior to the Closing Date.  The "RMA Credit Claim" is

18   premised on the erroneous theory that SONICblue covenanted in the Amended Investment

19   Agreement that prior to the Closing Date, it would not book return merchandise

20   adjustments ("RMAs") as "credits" offsetting accounts receivable owed by the customers in

21   whose favor the RMAs were booked.  In truth and in fact, as Claimants are, and at all

22   relevant times were, aware, SONICblue, in accordance with generally accepted accounting

23   principles, had historically booked, and was booking at the time of the formation of the

24   Amended Investment Agreement, such RMAs as "credits" offsetting accounts receivable

25   related to the Graphics Chip Business.  Through VIA's due diligence in connection with the

26   Original Investment Agreement and the Amended Investment Agreement and in its

27   operation of the Graphics Chip Business pursuant to the Management Agreement, VIA at

28   the Closing was on notice of and ratified both the actual and ordinary course of the

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1    Graphics Chip Business with respect to the accounting for RMAs.  Moreover, insofar as

2    any inventory was returned by customers to SONICblue (resulting in the creation of RMAs)

3    and such inventory was resalable, the reduction in the amount of account receivable assets

4    of the Graphics Chip Business should have been offset by a corresponding increase in the

5    value of the inventory of the Graphics Chip Business.  Accordingly, the booking of RMAs

6    prior to the Closing as "credits" offsetting accounts receivable of the Graphics Chip

7    Business does not constitute a breach of the Amended Investment Agreement.

8           SONICblue further avers that if either of Claimants has suffered any damage or loss

9    related to the subject matter of this claim, which SONICblue denies, such damage or loss is

10   subject to the Damage Cap, which limits the maximum amount of SONICblue's liability to

11   the Claimants.

12          SONICblue denies that Claimants have sustained damages in any amount or at all

13   by reason of any act or omission on the part of SONICblue related to the subject matter of

14   this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

15   SONICblue on account of this claim.

16          For these reasons, the "RMA Credit Claim" should be disallowed, in whole or in

17   part, pursuant to Bankruptcy Code section 502(b)(1).

18

19          f.     Claim No. 6:  The "Unapproved Purchase Claim"

20          This purported claim is premature and does not represent a justiciable controversy

21   but rather seeks an advisory opinion, which this Court lacks subject matter jurisdiction to

22   provide.

23          Through VIA's due diligence in connection with the Original Investment

24   Agreement and the Amended Investment Agreement and in its operation of the Graphics

25   Chip Business pursuant to the Management Agreement, VIA at the Closing was on notice

26   of and ratified the purchase that is the subject of the "Unapproved Purchase Claim."

27

28

10880868v1                           - 14 -             Objection of Debtor to Claims of VIA and S3
                                                        Graphics, Ltd. & Debtor's Second Amended
                                                        Adversary Complaint

1    Moreover, Claimants nowhere allege that either of them has paid any amount on

2    account of the challenged purchase order and thus have failed to allege facts establishing

3    any compensable damages.

4    SONICblue denies that Claimants have sustained damages in any amount or at all

5    by reason of any act or omission on the part of SONICblue related to the subject matter of

6    this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

7    SONICblue on account of this claim.

8    For these reasons, the "Unapproved Purchase Claim" should be disallowed, in

9    whole or in part, pursuant to Bankruptcy Code section 502(b)(1).

10

11    g.    Claim No. 7:  The "Contributed Assets Claim"

12    Pursuant to sections 2.2(b) and 3.10 of the Amended Investment Agreement,

13    SONICblue agreed to contribute certain designated assets of the Graphics Chip Business,

14    defined in the Amended Investment Agreement as the "Graphics Chip Business Assets," to

15    JV on the Closing Date.  The Graphics Chip Business Assets included, among other things,

16    the Contributed Assets, which term is defined in the Amended Investment Agreement as

17    "all of the assets held by or used in the Graphics Chip Business designated by [SONICblue]

18    and VIA to be contributed on the Closing Date to JV" and purportedly listed on

19    Schedule 3.10 to the Amended Investment Agreement.  The "Contributed Assets Claim" is

20    premised on the erroneous theory that SONICblue failed to deliver to JV assets held by or

21    used in the Graphics Chip Business, as supposedly evidenced by alleged discrepancies

22    between Schedule 3.10 and the list of Contributed Assets in Schedule A to the General

23    Assignment, Assumption and Bill of Sale, between SONICblue and JV, dated as of

24    January 3, 2001 (the "Assignment").  In truth and in fact, as Claimants are, and at all

25    relevant times were, aware, SONICblue delivered, and JV took control of, all of the assets

26    held by or used in the Graphics Chip Business, although certain of those assets Claimants

27    elected to abandon when relocating the Graphics Chip Business following the Closing.

28    Through VIA's due diligence in connection with the Original Investment Agreement and

- 15 -

1  the Amended Investment Agreement and in its operation of the Graphics Chip Business

2  pursuant to the Management Agreement, prior to the Closing VIA was on notice of the

3  assets held by or used in the Graphics Chip Business, and was aware that certain assets

4  allegedly included on Schedule 3.10 were not held by or used in the Graphics Chip

5  Business and were not intended by the parties to be transferred to JV at the Closing.

6  Accordingly, the alleged failure by SONICblue to deliver certain of the assets allegedly

7  included on Schedule 3.10 does not constitute a breach of the Amended Investment

8  Agreement.

9          SONICblue avers that it had no obligation to transfer to JV certain of the assets

10  allegedly included on Schedule 3.10, or its full performance of that obligation was

11  impossible or impracticable or was waived or excused by Claimants, for several reasons,

12  including, but not limited to the following:

13          •       As was known and understood by both SONICblue and Claimants,

14      certain assets held by or used in the Graphics Chip Business were replacements or

15      substitutes for certain assets included in Schedule 3.10 that, prior to the Closing,

16      were no longer Contributed Assets because they were not being held by or used in

17      the Graphics Chip Business; and

18          •       As was known and understood by both SONICblue and Claimants,

19      Schedule 3.10 includes certain assets that were not part of the Contributed Assets,

20      and thus SONICblue had no obligation to contribute those assets to JV because the

21      asset was a leasehold improvement or fixture that could not be transferred to JV at

22      the Closing, or was abandoned by JV, due to Claimants' decision after the formation

23      of the Amended Investment Agreement not to operate the Graphics Chip Business at

24      the leasehold from which SONICblue conducted such operations.

25          SONICblue avers that due to mutual mistake, or to unilateral mistake on the part of

26  SONICblue of which Claimants were aware or had reason to know of, Schedule 3.10

27  includes certain asset that were not held by or used in the Graphics Chip Business, or were

28  used by the Graphics Chip Business as part of the use of the leased premises but were not

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1  severable from those leased premises, and thus not intended by the parties to be assets

2  contributed to JV by SONICblue or contributed only as part and parcel of the right to

3  sublease the leased premises, and, accordingly, SONICblue is excused from a purported

4  obligation to deliver such assets at this time, and the Court should reform Schedule 3.10 to

5  reflect the mutual intent of the parties only to transfer to JV the assets held by or used in the

6  Graphics Chip Business and that were not part of the subleased premises abandoned by JV

7  or were not being jointly used with SONICblue while JV was located at the subleased

8  premises.

9       In accordance with sections 2.5 and 5.16 of the Amended Investment Agreement,

10  SONICblue avers that it timely prepared and delivered the Closing Balance Sheet to

11  Claimants after the Closing Date.  The sole remedy under the Amended Investment

12  Agreement for any claimed variance between the actual value of the Contributed Assets and

13  their value as reflected in the Closing Balance Sheet was an audit thereof that JV was to

14  cause to be undertaken pursuant to section 2.5 of the Amended Investment Agreement.

15  SONICblue is informed and believes and on that basis alleges that JV failed,

16  notwithstanding SONICblue's timely delivery to it of the Closing Balance Sheet, to cause

17  the Closing Balance Sheet to be audited in accordance with the provisions of section 2.5.

18  Such failure by Claimants to avail themselves of the remedy provided in the Amended

19  Investment Agreement for any alleged shortfall in the Contributed Assets transferred to JV

20  at the Closing precludes them from asserting a claim for such an alleged shortfall in this

21  case.

22       SONICblue further avers that if either of Claimants has suffered any damage or loss

23  related to the subject matter of this claim, which SONICblue denies, such damage or loss is

24  offset by, and a credit against, any amount awarded pursuant to a claim that is subject to the

25  Arbitration Side Letter.

26       SONICblue further avers that, insofar as VIA's and JV's claims for the Contributed

27  Assets are based on the historical acquisition costs of all or certain of those assets, then

28  Claimants' damages claims are overstated because the historical acquisition cost does not

1  reflect the fair market value of the assets at Closing, and further Claimants have suffered no

2  damages, or at most nominal damages, for those Graphics Chip Business Assets that were

3  old assets that had been depreciated to zero dollars ($0) in value on SONICblue's books.

4      SONICblue denies that Claimants have sustained damages in any amount or at all

5  by reason of any act or omission on the part of SONICblue related to the subject matter of

6  this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

7  SONICblue on account of this claim.

8      For these reasons, the "Contributed Assets Claim" should be disallowed, in whole or

9  in part, pursuant to Bankruptcy Code section 502(b)(1).

10

11      h.      Claim No. 8:  Conversion of Accounts Receivable Transferred to JV at

12              Closing

13      At the Closing, pursuant to (i) subsections (b) and (e) of section 2.2 of the Amended

14  Investment Agreement, (ii) the Assignment and (iii) paragraph 5 of the Arbitration Side

15  Letter, certain accounts receivable of the Graphics Chip Business (the "Accounts

16  Receivable") were transferred from SONICblue to JV, and JV assumed certain liabilities of

17  the Graphics Chip Business (the "Assumed Liabilities").  Pursuant to sections 8.3 and 8.4

18  of the Amended Investment Agreement, VIA and JV each agreed to indemnify SONICblue

19  for any failure by JV to pay, when due, any of the Assumed Liabilities.

20      Following the Closing, SONICblue opened a separate bank account in which it

21  deposited payments (the "Funds") received by SONICblue after January 3, 2001 that might

22  have included the proceeds of Accounts Receivable.  SONICblue did not solicit any such

23  payments on or after the Closing, and any communications by SONICblue to its customers

24  before that date were in the ordinary course of business.  After the Closing, SONICblue

25  learned that Claimants had disavowed, and informed certain customers of the Graphics

26  Chip Business that JV would not pay, perform and discharge when due, certain of the

27  Assumed Liabilities.  SONICblue promptly notified Claimants of its objection to their

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1   repudiation of their obligations under the Amended Investment Agreement and the

2   Assignment but was unable to resolve this matter with Claimants.

3        Claimants' refusal to promptly pay, perform and discharge all of the Assumed

4   Liabilities when due violated their obligations under the Amended Investment Agreement,

5   the Assignment and the Arbitration Side Letter.  Claimants' communications to past or

6   present customers of SONICblue disavowing JV's obligation to pay Assumed Liabilities

7   owed to those vendors injured SONICblue's name and reputation in the business

8   community, and improperly interfered with SONICblue's business relationships in

9   derogation of JV's and VIA's contractual obligations to SONICblue.  In order to mitigate

10  such injury to SONICblue and the unpaid vendors, SONICblue exercised its right of setoff

11  against the Funds, and paid certain of the Assumed Liabilities to the vendors that JV had

12  failed and refused to pay.  Claimants' prior breach of their contractual obligations to pay the

13  Assumed Liabilities excused SONICblue's performance of its obligation to deliver the

14  Funds and gave rise to a right of setoff against the Funds; and thus, SONICblue's conduct

15  alleged by Claimants does not constitute a breach of the Amended Investment Agreement

16  or other agreements with VIA and JV.

17       SONICblue denies that Claimants have sustained damages in any amount or at all

18  by reason of any act or omission on the part of SONICblue related to the subject matter of

19  this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

20  SONICblue on account of this claim.

21       For these reasons, this claim should be disallowed, in whole or in part, pursuant to

22  Bankruptcy Code section 502(b)(1).

23

24       i.    Claim No. 9:  Failure to Pay Pre-Closing Employee Liabilities

25       Claimants allege that SONICblue failed to pay unspecified "employee liabilities"

26  that accrued at some unspecified time prior to the Closing.  In the two and one-half years

27  between the Closing and the filing of the Duplicate Claims, Claimants never made demand

28  on SONICblue for payment of any such alleged liabilities, and SONICblue denies that it

- 19 -

1   had any obligation under the Amended Investment Agreement or otherwise to pay such

2   alleged liabilities, if there are any.

3       Through VIA's due diligence in connection with the Original Investment

4   Agreement and the Amended Investment Agreement and in its operation of the Graphics

5   Chip Business pursuant to the Management Agreement, VIA at the Closing was on notice

6   of and ratified SONICblue's non-payment of such alleged liabilities, if any there are.

7       SONICblue denies that Claimants have sustained damages in any amount or at all

8   by reason of any act or omission on the part of SONICblue related to the subject matter of

9   this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

10  SONICblue on account of this claim.

11      For these reasons, this claim should be disallowed, in whole or in part, pursuant to

12  Bankruptcy Code section 502(b)(1).

13

14      j.    <u>Claim Nos. 10-17:  Claims based on Alleged Non-Financial Breaches of the</u>

15      <u>Amended Investment Agreement</u>

16      The relief available for claim allowance pursuant to Bankruptcy Code section 502

17  does not include a decree of specific performance or other, similar equitable relief.  This

18  Court therefore lacks subject matter jurisdiction to order specific performance of the

19  Amended Investment Agreement as requested by Claimants.

20      Each of these claims is premature and does not represent a justiciable controversy,

21  but rather seeks an advisory opinion, which this Court lacks subject matter jurisdiction to

22  provide.

23      SONICblue has not materially failed to perform its contractual obligations regarding

24  assignment or transfer to Claimants of data, information and property of the Graphics Chip

25  Business, and in response to these purported claims, SONICblue further avers as follows:

26      •    That Claimants' prior breaches of their obligations under the Amended

27  Investment Agreement and other agreements with SONICblue, including, but not

28  limited to, Claimants' failure to pay the Assumed Liabilities, excused SONICblue's

1   performance of its obligations, if any existed beyond those performed by

2   SONICblue, to comply with Claimants' requests, if any, to execute assignments or

3   transfer data, information and property of the Graphics Chip Business;

4   •   That SONICblue has no obligation under the Amended Investment

5   Agreement, the JV Transaction Agreements or otherwise to provide Claimants with

6   a list of licenses, and Claimants have never, in any event, made demand upon

7   SONICblue to provide them with such a list;

8   •   That Claimants have made various demands upon SONICblue to

9   execute additional documents related to the recordation of assignment of trademarks

10   and to turn over data tapes (in addition to the data tapes already delivered to

11   Claimants), and said demands are without legal or factual basis and SONICblue is

12   privileged to refuse such demands;

13   •   That although SONICblue informed Claimants that due to the

14   employees' privacy interests, SONICblue was unable to deliver original employee

15   files to Claimants, SONICblue never refused any request by either of Claimants to

16   copy employee files of former SONICblue employees whose employment was to be

17   transferred to JV in connection with the sale of the Graphics Chip Business pursuant

18   to the Amended Investment Agreement; and

19   •   That SONICblue has no obligation under the Amended Investment

20   Agreement, the JV Transaction Agreements or otherwise to provide Claimants with

21   customer and vendor NDAs, that any attempted transfer of any such NDAs by

22   SONICblue to JV would be impractical and potentially legally ineffective, that

23   SONICblue advised Claimants of the foregoing facts and encouraged Claimants to

24   enter into new NDAs with any third parties as to whom such agreements were

25   necessary or appropriate with reference to the ongoing operations of the Graphics

26   Chip Business, and that Claimants' failure, upon information and belief, to pursue

27   or enter into new NDAs with such third parties precludes any recovery by either of

28   them against SONICblue related to customer and vendor NDAs.

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1  SONICblue denies that Claimants have sustained damages in any amount or at all

2  by reason of any act or omission on the part of SONICblue related to the subject matter of

3  these claims, and further denies that plaintiffs are entitled to any relief whatsoever from

4  SONICblue on account of these claims.

5  For these reasons, each of these claims should be disallowed, in whole or in part,

6  pursuant to Bankruptcy Code section 502(b)(1).

7

8  k.    Claim No. 18:  Claim for Liquidated Damages based on Section 5.6 of the

9  Amended Investment Agreement

10  This claim is premature and does not represent a justiciable controversy, but rather

11  seeks an advisory opinion, which this Court lacks subject matter jurisdiction to provide.

12  The liquidated damages that Claimants seek to recover represent an illegal and

13  unenforceable penalty.

14  JV has not been "Enjoined from Utilizing the Intel License," as that phrase is

15  defined in the Amended Investment Agreement, and therefore an express condition

16  precedent thereunder to Claimants' recovery of liquidated damages has not occurred.

17  SONICblue is informed and believes and on that basis alleges that it has fully

18  performed its obligations under the Intel License, that SONICblue has not materially

19  breached the Intel License and that Intel has enjoyed, and continues to enjoy, the benefits of

20  SONICblue's performance thereunder.  Insofar as JV at some point in the future may be

21  unable to operate under the Intel License, such inability will not have been proximately

22  caused by SONICblue, but instead will have been proximately caused by the acts and

23  omissions of Claimants, which precede any alleged material breach by SONICblue of the

24  Amended Investment Agreement and/or the Joint Venture Agreement or any acts or

25  omissions by SONICblue that allegedly give rise to grounds for termination of the Intel

26  License.

27  Any damages that Claimants may have sustained, the existence of which damages

28  SONICblue disputes and denies, are not proximately related to any conduct of SONICblue

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1  but, upon information and belief, are due to a supervening cause, namely, Claimants' acts

2  and omissions, and VIA's settlement, in bad faith, of litigation with Intel following the

3  filing of this Bankruptcy case in breach of the fiduciary duties it owed to SONICblue.  Such

4  supervening causation precludes Claimants, or either of them, from any recovery against

5  SONICblue related to the Intel License because any damages sustained, the existence of

6  which damages SONICblue disputes and denies, are due to Claimants' own acts and

7  omissions and their failure to make reasonable efforts to mitigate their damages, if any.

8          The liquidated damages that Claimants seek to recover are so unreasonably

9  disproportionate to any actual damages Claimants may have sustained, the existence of

10  which damages SONICblue disputes and denies, that such liquidated damages are

11  unenforceable and void as against public policy.

12          The liquidated damages that Claimants seek to recover are unconscionable and are

13  unenforceable and void as against public policy due to VIA's exercise of its unfairly

14  disproportionate bargaining power enjoyed over SONICblue, at the time that the parties

15  entered the Amended Investment Agreement and at the time of the Closing, arising from

16  inter alia SONICblue's, reasonably and foreseeably, changing its position when it entered

17  the Original Investment Agreement and from VIA's subsequent refusal, without good

18  cause, to complete the closing of the Original Investment Agreement.

19          The liquidated damages that Claimants seek to recover also are unconscionable and

20  are unenforceable and void as against public policy due to the fact that the form of the

21  consideration that Claimants paid to SONICblue did not augment the assets of SONICblue

22  available for the payment of SONICblue's creditors in that such consideration was in the

23  form of SONICblue's own shares and not cash.

24          The liquidated damages that Claimants seek to recover are so disproportionate to the

25  value of the consideration paid to SONICblue (and, in fact, the requested amount of up to

26  $70 million in liquidated damages exceeds even the value of SONICblue's stock returned to

27  SONICblue at the Closing), that they were not a reasonable estimate at the time of

28  contracting of the probable damages that VIA and JV would likely suffer in the event of a

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

1    loss of the Intel License, and are unenforceable and are unconscionable and void as against

2    public policy.

3         SONICblue denies that Claimants have sustained damages in any amount or at all

4    by reason of any act or omission on the part of SONICblue related to the subject matter of

5    this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

6    SONICblue on account of this claim.

7         For these reasons, this claim should be disallowed, in whole or in part, pursuant to

8    Bankruptcy Code section 502(b)(1).

9

10         l.     <u>Claim No. 19:  Claim of a Future, Unspecified Breach</u>

11         This claim is premature and does not represent a justiciable controversy, but rather

12    seeks an advisory opinion, which this Court lacks subject matter jurisdiction to provide.

13         SONICblue denies that Claimants have sustained damages in any amount or at all

14    by reason of any act or omission on the part of SONICblue related to the subject matter of

15    this claim, and further denies that plaintiffs are entitled to any relief whatsoever from

16    SONICblue on account of this claim.

17    For these reasons, this claim should be disallowed, in whole or in part, pursuant to

18    Bankruptcy Code section 502(b)(1).

19

20    <u>ADVERSARY COMPLAINT FOR AFFIRMATIVE RELIEF</u>

21    <u>First Claim for Relief</u>

22    (Breach of Contract – Amended Investment Agreement – Against VIA and JV)

23         24.    SONICblue realleges and incorporates by reference herein as if fully set

24    forth the allegations of paragraphs 1 to 23 hereof, as well as each and every other allegation

25    contained in each other Claim for Relief in this Adversary Complaint.

26         25.    SONICblue alleges as a First Claim for Relief – Breach of Contract –

27    Amended Investment Agreement – against VIA and JV.

28

26.     As herein alleged, VIA and JV are parties to the written Amended Investment Agreement, as amended by the Side Letters, entered into with SONICblue, and the transaction documents entered by the parties at the Closing to implement the Amended Investment Agreement, including but not limited to the Assignment and other instruments of assignment, conveyance and transfer, in which VIA and JV promised certain performance, undertook duties and obligations and made covenants, all for the benefit of SONICblue.

27.     SONICblue has performed all covenants, conditions and promises on its part to be performed under the Amended Investment Agreement, as amended by the Side Letters, and the Assignment and other instruments of assignment, conveyance and transfer, except as prevented by defendants or excused.

28.     VIA and/or JV breached the Amended Investment Agreement, as amended by the Side Letters, and the Assignment by their acts and omissions, including, but not limited to, the following:

a.     By failing and refusing to pay the Assumed Liabilities (as that term is defined in the Amended Investment Agreement);

b.     By failing and refusing to pay the liabilities of the Graphics Chip Business after the Closing in accordance with the terms of the Amended Investment Agreement, the Arbitration Side Letter and the Assignment;

c.     Upon information and belief, by operating the Graphics Chip Business in a manner in derogation of the rights of SONICblue under the Amended Investment Agreement and the agreements among the parties entered pursuant to it;

d.     By failing and refusing to pay rent for their sublease of premises from SONICblue;

e.     By incurring debts and obligations for their benefit and the benefit of the Graphics Chip Business after the Closing using SONICblue's credit without SONICblue's authorization or consent; and

1        f.    By conducting the Graphics Chip Business pursuant to the Management

2    Agreement in such a way prior to the Closing as to cause SONICblue's performance

3    obligations under the Amended Investment Agreement to be materially more

4    burdensome and onerous.

5        29.    As a proximate result of such breaches of the Amended Investment

6    Agreement, SONICblue has suffered damages in an amount according to proof.

7

8    Second Claim for Relief

9    (Express Indemnity – Amended Investment Agreement – Against VIA and JV)

10        30.    SONICblue realleges and incorporates by reference herein as if fully set

11    forth the allegations of paragraphs 1 to 29 hereof, as well as each and every other allegation

12    contained in each other Claim for Relief in this Adversary Complaint.

13        31.    SONICblue alleges as a Second Claim for Relief – Express Indemnity –

14    Amended Investment Agreement – against VIA and JV.

15        32.    Pursuant to sections 8.3 and 8.4 of the Amended Investment Agreement,

16    VIA and JV each agreed to "indemnify and hold harmless" SONICblue (and its respective

17    directors, officers and affiliates and their respective successors and permitted assigns)

18    "from and against any and all Damages" which an indemnified party may sustain, suffer or

19    incur directly or indirectly and which result from any breach by VIA or JV of any covenant

20    or agreement made by it in the Amended Investment Agreement or in any agreement or

21    instrument executed and delivered by it pursuant thereto, including any failure by JV to

22    pay, when due, any of the Assumed Liabilities.  The Amended Investment Agreement

23    defines "Damages" in section 8.2 as "any and all losses, obligations, deficiencies, liabilities,

24    claims, damages, costs and expenses (including without limitation the amount of any

25    settlement of any claim subject of this indemnification and all reasonable legal and other

26    expenses incurred in connection with the investigation, prosecution or defense of any

27    matter indemnified pursuant hereto)."

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

33.    SONICblue has performed all covenants, conditions and promises on its part to be performed under the Amended Investment Agreement, as amended by the Side Letters, except as prevented by defendants or excused.

34.    VIA and JV have breached this duty to indemnify SONICblue by, among other things, failing and refusing to indemnify and hold harmless SONICblue from the Assumed Liabilities.

35.    SONICblue has incurred directly or indirectly Damages that are covered by this indemnification obligation of VIA and JV, including, but not limited to, payments on account of the Assumed Liabilities, and attorneys' fees and expenses related thereto and/or to VIA's and JV's breaches of certain covenants or agreements made by them in the Amended Investment Agreement or in any agreement or instrument executed or delivered by them pursuant thereto, as alleged herein.

36.    By virtue of the express indemnity obligation owed by VIA and JV, SONICblue has suffered damages in an amount according to proof.

<u>Third Claim for Relief</u>

(Breach of Contract – Guaranty – Against VIA)

37.    SONICblue realleges and incorporates by reference herein as if fully set forth the allegations of paragraphs 1 to 36 hereof, as well as each and every other allegation contained in each other Claim for Relief in this Adversary Complaint.

38.    SONICblue alleges as a Third Claim for Relief – Breach of Contract – Guaranty – against VIA.

39.    Pursuant to the Guaranty, VIA agreed to pay and perform fully and promptly all of the Assumed Liabilities when due.

40.    SONICblue has performed all covenants, conditions and promises on its part to be performed under the Guaranty, except as prevented by defendants or excused.

41.    VIA breached the Guaranty by failing to pay and perform the Assumed Liabilities and other Guaranteed Obligations.

- 27 -

1    42.    As a proximate result of such breach of the Guaranty, SONICblue has

2    suffered damages in an amount according to proof.

3

4    <u>Fourth Claim for Relief</u>

5    (Breach of Contract – Joint Venture Agreement – Against VIA and JV)

6    43.    SONICblue realleges and incorporates by reference herein as if fully set

7    forth the allegations of paragraphs 1 to 42 hereof, as well as each and every other allegation

8    contained in each other Claim for Relief in this Adversary Complaint.

9    44.    SONICblue alleges as a Fourth Claim for Relief – Breach of Contract –Joint

10   Venture Agreement – against VIA and JV.

11   45.    As herein alleged, VIA and JV are parties to the written Joint Venture

12   Agreement entered into with SONICblue, in which they promised certain performance,

13   undertook duties and obligations and made covenants, all for the benefit of SONICblue.

14   46.    SONICblue has performed all covenants, conditions and promises on its part

15   to be performed under the Joint Venture Agreement, except as prevented by defendants or

16   excused.

17   47.    SONICblue is informed and believes and on that basis alleges that VIA and

18   JV breached their obligations under the Joint Venture Agreement by their acts and

19   omissions, including, but not limited to, the following:

20       a.    By failing and refusing to pay the Assumed Liabilities (as that term is

21       defined in the Amended Investment Agreement);

22       b.    By failing and refusing to pay liabilities incurred by the Graphics Chip

23       Business after the Closing, with the result that SONICblue had pay such liabilities;

24       c.    Upon information and belief, by operating the Graphics Chip Business in a

25       manner in derogation of the rights of SONICblue under the Joint Venture

26       Agreement; and

27

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

d.      By incurring debts and obligations for their benefit and the benefit of the

Graphics Chip Business after the Closing using SONICblue's credit without

SONICblue's authorization or consent.

48.      As a proximate result of such breach of the Joint Venture Agreement,

SONICblue has suffered damages in an amount according to proof.


Fifth Claim for Relief

(Accounting – Joint Venture Agreement – Against VIA, JV and JV Sub)

49.      SONICblue realleges and incorporates by reference herein as if fully set

forth the allegations of paragraphs 1 to 49 hereof, as well as each and every other allegation

contained in each other Claim for Relief in this Adversary Complaint.

50.      SONICblue alleges as a Fifth Claim for Relief – Accounting – Joint Venture

Agreement – against VIA, JV and JV Sub.

51.      By virtue of the co-venturer relationship created by the Joint Venture

Agreement, VIA and JV owed fiduciary duties to SONICblue in the handling of  moneys

and other Graphics Chip Business Assets that were placed under the control of JV pursuant

to the Amended Investment Agreement and Joint Venture Agreement and to protect and

care for the interests of SONICblue in the Joint Venture.

52.      Pursuant to the Joint Venture Agreement, VIA and JV agreed that JV would

pay SONICblue $100 million in cash in each of fiscal years 2001 and 2002 (the

"Profit-Based Earn Out") if JV earned annual net operating income (before income taxes,

extraordinary transactions and non-recurring items) in excess of $500 million in each of

such fiscal years determined in accordance with GAAP, such payment to be made within 10

business days following the release of JV's audited financial statements for such fiscal

years.

53.      JV failed to provide to SONICblue its annual financial statements, prepared

in accordance with GAAP, for fiscal years 2001 and 2002.

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

54.    SONICblue is informed and believes and on that basis alleges that VIA, JV and JV Sub have possession, custody and/or control of the records and bank accounts related to the Graphics Chip Business, the review of which would provide information needed to determine SONICblue's entitlement to payment of the Profit-Based Earn Out.

55.    SONICblue alleges that its entitlement to payment of the Profit-Based Earn Out cannot be ascertained, at least in part, without an accounting by VIA, JV and JV Sub of the annual net operating income (before income taxes, extraordinary transactions and non-recurring items) earned in fiscal years 2001 and 2002 related to the Graphics Chip Business, and the Court should order such an accounting.

<u>Sixth Claim for Relief</u>

(Breach of Implied Contract – Against VIA, JV and JV Sub)

56.    SONICblue realleges and incorporates by reference herein as if fully set forth the allegations of paragraphs 1 to 55 hereof, as well as each and every other allegation contained in each other Claim for Relief in this Adversary Complaint.

57.    SONICblue alleges as a Sixth Claim for Relief – Breach of Implied Contract – against VIA, JV and JV Sub.

58.    SONICblue is informed and believes and thereon alleges that following the Closing, VIA, JV and JV Sub used property and services of SONICblue and incurred liabilities to third parties on the accounts of SONICblue in the operations of the Graphics Chip Business, knowing that usually compensation is owed for the use of such property and services and the incurring of liabilities to third parties on the accounts of another, and knowing further that SONICblue intended to be compensated for such use.

59.    SONICblue is informed and believes and thereon alleges that defendants benefited from their use of SONICblue's property and services and its accounts.

60.    Such course of conduct by VIA, JV and JV Sub formed the basis of an implied contract between SONICblue, on the one hand, and VIA, JV and JV Sub, on the other hand, that the latter parties would pay SONICblue for the reasonable value of the

1  property and services of SONICblue that they used and for the liabilities to third parties that

2  they incurred on SONICblue's account.

3      61.    SONICblue has demanded payment from defendants for the use of its

4  property, services and accounts.

5      62.    SONICblue has performed all covenants, conditions and promises on its part

6  to be performed under such implied contract, except as prevented by defendants or excused.

7      63.    VIA, JV and JV Sub breached such implied contract by failing and refusing

8  to pay for the reasonable value of the property and services of SONICblue that they used

9  and for the liabilities to third parties that they incurred on its accounts.

10      64.    As a proximate result of such breach, SONICblue has suffered damages in

11  an amount according to proof.

12

13  Seventh Claim for Relief

14  (Common Counts – Against VIA, JV and JV Sub)

15      65.    SONICblue realleges and incorporates by reference herein as if fully set

16  forth the allegations of paragraphs 1 to 64 hereof, as well as each and every other allegation

17  contained in each other Claim for Relief in this Adversary Complaint.

18      66.    SONICblue alleges as a Seventh Claim for Relief – Common Counts –

19  against VIA, JV and JV Sub.

20      67.    SONICblue is informed and believes and thereon alleges that following the

21  Closing, VIA, JV and JV Sub used property and services of SONICblue and incurred

22  liabilities to third parties on the accounts of SONICblue in the operations of the Graphics

23  Chip Business, and money is now due and owing to SONICblue from defendants on

24  account of their use of SONICblue's property, services and accounts, and in equity and

25  good conscience should be paid over to SONICblue.

26      68.    SONICblue has had an open book account for money due and owing it from

27  the defendants because an account was stated in writing between it and defendants, and

28  such open book account evidences that defendants were and are indebted to it.

69.     SONICblue has demanded payment from defendants for this open book account, but defendants have not paid this sum to SONICblue.

70.     SONICblue has suffered damages in an amount according to proof.

Eighth Claim for Relief

(Unjust Enrichment – Against VIA, JV and JV Sub)

71.     SONICblue realleges and incorporates by reference herein as if fully set forth the allegations of paragraphs 1 to 70 hereof, as well as each and every other allegation contained in each other Claim for Relief in this Adversary Complaint.

72.     SONICblue alleges as an Eighth Claim for Relief – Unjust Enrichment – against VIA, JV and JV Sub.

73.     SONICblue is informed and believes and thereon alleges that following the Closing, VIA, JV and JV Sub used property and services of SONICblue and incurred liabilities to third parties on the accounts of SONICblue in the operations of the Graphics Chip Business, knowing that SONICblue intended to be compensated for such use.

74.     Defendants benefited from their use of SONICblue's property and services and its accounts.

75.     In equity and good conscience, defendants should be required to make restitution to SONICblue, in an amount according to proof, for property and benefits received, retained or appropriated from SONICblue to prevent defendants from being unjustly benefited and to prevent SONICblue from unjustly suffering loss.

Ninth Claim for Relief

(Breach of Fiduciary Duty – Against VIA)

76.     SONICblue realleges and incorporates by reference herein as if fully set forth the allegations of paragraphs 1 to 75 hereof, as well as each and every other allegation contained in each other Claim for Relief in this Adversary Complaint.

1    77.    SONICblue alleges as a Ninth Claim for Relief – Breach of Fiduciary Duty –

2    against VIA.

3    78.    Pursuant to the Joint Venture Agreement, VIA owed fiduciary duties to its

4    co-venturer SONICblue in relation to the Joint Venture and the operation of the Graphics

5    Chip Business.

6    79.    SONICblue is informed and believes and on that basis alleges that after the

7    Closing and beginning at a time not yet known to SONICblue, VIA breached its fiduciary

8    duties owed to SONICblue, by its acts and omissions, including but not limited to, incurring

9    debts and obligations for its own benefit and the benefit of JV and JV Sub but imposing

10   those obligations upon SONICblue and causing JV and JV Sub to operate the Graphics

11   Chip Business in a manner in derogation of the rights of SONICblue as a joint venturer, all

12   as alleged herein.

13   80.    SONICblue is informed and believes and on that basis alleges that VIA

14   further breached its fiduciary duties to SONICblue through its conduct in entering into the

15   settlement of the Intel Lawsuit in that, substantially contemporaneous with the

16   commencement of this bankruptcy case, VIA caused or permitted the settlement of the Intel

17   Lawsuit not to include JV, JV Sub, and/or the products of JV and JV Sub on terms

18   comparable to those negotiated with Intel for VIA and other of its affiliates (or, in the

19   alternative, included JV, JV Sub, and/or the products of JV and JV Sub on less favorable

20   terms).  On information and belief, VIA engaged in such wrongful conduct to further its

21   claim that liquidated damages should be awarded against SONICblue and in favor of VIA

22   and JV pursuant to the Amended Investment Agreement.

23   81.    As a proximate result of VIA's breach of fiduciary duties, SONICblue has

24   suffered damages in an amount according to proof.

25   82.    In engaging in the conduct alleged herein, VIA acted with oppression, fraud

26   and malice, and SONICblue is therefore entitled to punitive damages in an amount

27   according to proof.

28

- 33 -    Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

Tenth Claim for Relief

(Equitable Subordination – Against VIA and JV)

83.    SONICblue realleges and incorporates by reference herein as if fully set forth the allegations of paragraphs 1 to 82 hereof, as well as each and every other allegation contained in each other Claim for Relief in this Adversary Complaint.

84.    SONICblue alleges as a Tenth Claim for Relief – Equitable Subordination – against VIA and JV.

85.    The consideration paid by VIA to SONICblue in connection with the formation of the Amended Investment Agreement was entirely SONICblue securities that had retained less than one-third of their value as of the date of the Closing as compared to the nominal value of such securities at the time of the formation of the Amended Investment Agreement.  VIA and JV thus paid no cash to SONICblue in connection with the formation of the Joint Venture, but acquired thereby a contractual claim for recovery of up to $70 million in liquidated damages to be paid in cash.

86.    Under subparagraph (E) of paragraph (31), an "insider" includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor."  SONICblue is informed and believes and on that basis alleges that each of VIA and JV is, and was during the operation of the Joint Venture, an "insider" of SONICblue within the meaning of paragraph (31) of Bankruptcy Code section 101 for at least the following reasons:

    a.    JV is an "affiliate" of SONICblue within the meaning of paragraph (2)(B) of Bankruptcy Code section 101, in that JV is a "corporation 20 percent or more of whose outstanding voting securities are . . . controlled . . . by the debtor."  Hence, JV is an "insider" of SONICblue as defined in subparagraph (E) of paragraph (31).  JV is also an "insider" of SONICblue within the meaning of subparagraph (B)(iv) of paragraph (31), in that JV is in substance a "partnership in which the debtor is a general partner."

    b.    VIA is and was a co-joint venturer of SONICblue in relation to the Joint Venture and controls 48% of the voting securities of JV.  VIA, like

1    SONICblue, therefore is an "insider" of JV, which is an affiliate of SONICblue.  As

2    such, VIA is an "insider" of SONICblue within the meaning of subparagraph (E) of

3    paragraph (31), in that VIA is an insider of an affiliate of SONICblue.  VIA is also

4    an "insider" of SONICblue within the meaning of subparagraph (B)(v) of

5    paragraph (31), in that VIA is in substance a "general partner of the debtor" with

6    reference to JV.

7          87.     SONICblue is further informed and believes and on that basis alleges that,

8    substantially contemporaneous with the commencement of this bankruptcy case, VIA and

9    JV (acting directly or indirectly through its wholly owned subsidiary JV Sub), through their

10   acts and omissions, engaged in inequitable and gross misconduct, and acted in concert to

11   cause VIA to violate VIA's fiduciary duties owed to SONICblue as its co-venturer in JV by

12   causing or permitting the settlement of the Intel Lawsuit not to include JV, JV Sub, and/or

13   the products of JV and JV Sub on terms comparable to those negotiated with Intel for VIA

14   and other of its affiliates (or, in the alternative, included JV, JV Sub, and/or the products of

15   JV and JV Sub on less favorable terms).  On information and belief, VIA and JV engaged

16   in such wrongful conduct to further VIA's and JV's claims that liquidated damages should

17   be awarded against SONICblue and in their favor pursuant to the Amended Investment

18   Agreement.

19         88.     SONICblue is informed and believes and on that basis alleges that VIA's

20   and JV's inequitable and gross misconduct alleged herein resulted in injury to SONICblue

21   and its creditors or conferred an unfair advantage upon VIA and JV.

22         89.     Equitable subordination of VIA's and JV's claims for liquidated damages

23   would not be inconsistent with the Bankruptcy Code.

24         90.     For the foregoing reasons, the claims of VIA and JV against SONICblue for

25   liquidated damages under the Amended Investment Agreement should be equitably

26   subordinated to the other claims in the SONICblue bankruptcy.

27

28

<u>Eleventh Claim for Relief</u>

(Aiding and Abetting Breach of Fiduciary Duty – Against JV and JV Sub)

91.    SONICblue realleges and incorporates by reference herein as if fully set forth the allegations of paragraphs 1 to 90 hereof.

92.    SONICblue alleges as an Eleventh Claim for Relief – Aiding and Abetting Breach of Fiduciary Duty – against JV and JV Sub.

93.    JV and JV Sub have, and at all relevant times have had, knowledge of VIA's fiduciary duties owed to its joint venturer SONICblue, and VIA's breach thereof, by virtue of, among other things, JV's having acknowledged and adopted in writing the Joint Venture Agreement, and the corporate interrelationships existing among VIA, JV and JV Sub, including their having the same Chief Executive Officer, their having certain common directors, JV Sub being a wholly owned subsidiary of JV, and their all being "affiliates" and "insiders" of SONICblue (within the meaning of the paragraph (2) and paragraph (31), respectively, of Bankruptcy Code section 101).

94.    JV and JV Sub knowingly participated and assisted in VIA's breaches of fiduciary duties owed to SONICblue by their acts and omissions, including, but not limited to, (a) their acceptance and utilization of realty, goods and services, such as leaseholds and facilities, telecommunication services, skilled labor services, and manufacturing inputs and materials, that they knew VIA improperly obtained from SONICblue in breach of its fiduciary duties owed to SONICblue and for which they also failed and refused to pay, and (b) their operation of the Graphics Chip Business, with the participation of VIA, in a manner in derogation of the rights of SONICblue as a joint venturer of VIA.

95.    As a proximate result of JV and JV Sub's aiding and abetting VIA's breach of fiduciary duties, SONICblue has suffered damages in an amount according to proof.

96.    In engaging in the conduct alleged herein, JV and JV Sub acted with oppression, fraud and malice, and SONICblue is therefore entitled to punitive damages according to proof.

1

## PRAYER FOR RELIEF

2    WHEREFORE, SONICblue prays for judgment in its favor and against each of

3  VIA, JV and JV Sub as follows:

4    a.    That Claimants take nothing by virtue of the Duplicate Claims, and that the

5    Duplicate Claims be denied in their entirety;

6    b.    That SONICblue be awarded the following relief against each of VIA, JV

7    and JV Sub on the Adversary Complaint:

8        i.    For an accounting by VIA, JV and JV Sub of the annual net

9  operating income (before income taxes, extraordinary transactions and

10  non-recurring items) earned in fiscal years 2001 and 2002 related to the Graphics

11  Chip Business;

12        ii.    For equitable subordination of the claims of VIA and JV for

13  liquidated damages under the Amended Investment Agreement;

14        iii.    For compensatory damages in an amount according to proof;

15        iv.    For an award of restitution in an amount according to proof,

16        v.    For punitive damages in an amount according to proof; and

17        vi.    For prejudgment interest as allowed by law;

18    c.    For SONICblue's costs of suit and reasonable attorneys' fees to the extent

19    permitted by law; and

20

21

22

23

24

25

26

27

28

1    d.      For such other and further relief as the Court may deem just and proper.

2    Dated:  July 15, 2005.

3                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                     CRAIG A. BARBAROSH
4                                    650 Town Center Drive
                                     Seventh Floor
5                                    Costa Mesa, CA 92626

6                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
7                                    THOMAS V. LORAN III
                                     ALBERT J. BORO, JR.
8                                    ANA N. DAMONTE
                                     JASON A. CATZ
9                                    50 Fremont Street
                                     Post Office Box 7880
10                                   San Francisco, CA  94120-7880

11

12

13                                   By  /s/ Ana N. Damonte (215504)
                                        _____

14                                   Attorneys for Debtor-in-Possession
                                     SONICblue Incorporated
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Objection of Debtor to Claims of VIA and S3
Graphics, Ltd. & Debtor's Second Amended
Adversary Complaint

EXHIBIT 49

1  SUZZANNE S. UHLAND (CA Bar No. 136852)
   DAVID R. EBERHART (CA Bar No. 195474)
2  AUSTIN K. BARRON (CA Bar No. 204452)
   O'MELVENY & MYERS LLP
3  Embarcadero Center West
   275 Battery Street
4  San Francisco, CA  94111-3305
   Telephone    (415) 984-8700
5  Facsimile:    (415) 984-8701

6  Special Litigation Counsel to
   Debtors and Debtors in Possession
7
   PILLSBURY WINTHROP SHAW PITTMAN LLP
8  THOMAS V. LORAN III  #95255
   ALBERT J. BORO, JR.  #126657
9  ANA N. DAMONTE  #215504
   JASON A. CATZ #224205
10 50 Fremont Street
   Post Office Box 7880
11 San Francisco, CA  94120-7880
   Telephone: (415) 983-1000
12 Facsimile: (415) 983-1200

13 Attorneys for Debtors and Debtors-In-Possession

14

15              UNITED STATES BANKRUPTCY COURT FOR

16              THE NORTHERN DISTRICT OF CALIFORNIA

17                     SAN JOSE DIVISION

18

19
   In re                              Case No. 03-51775 MSJ
20
   SONICblue Inc., *et al.*           Chapter 11
21                                    (jointly administered)
                       Debtors and Debtors
22                     in Possession.      **EX PARTE APPLICATION TO FILE
                                           DEBTORS' MOTION FOR APPROVAL
23                                         OF SETTLEMENT OF VIA AND
                                           INTEL LITIGATION UNDER SEAL**
24
                                       No hearing required
25

26

27

28

LA3:1123656.1                              APPLICATION TO FILE DEBTORS' MOTION TO
                                           APPROVE SETTLEMENT UNDER SEAL

1    SONICblue Inc., a Delaware corporation ("SONICblue"), and its affiliated debtors

2    as debtors and debtors-in-possession in the above captioned cases (collectively, the

3    "Debtors"), hereby apply (the "Application") on an ex parte basis, pursuant to Bankruptcy

4    Local Rule 1001-2(a)(63), incorporating Civil Local Rule 79-5, to file under seal their

5    motion (the "Motion") to approve a settlement agreement by and among SONICblue, Intel

6    Corporation ("Intel"), VIA Technologies, Inc. ("VIA"), S3 Graphics Co. Ltd. ("S3G

7    Co."), S3 Graphics, Inc. ("S3G Inc.") and S3-VIA, Inc. ("S3-VIA"), a fully executed copy

8    of which is attached as Exhibit B to the Motion (the "Settlement Agreement"), as well as

9    supporting documents filed contemporaneously therewith, as well as all additional briefs,

10   replies or further papers filed in support thereof.

11                                    **I.**

12                              **INTRODUCTION**

13       By their Motion, the Debtors seek an order pursuant to Federal Rule of Bankruptcy

14   Procedure 9019 authorizing and approving the Debtors' entry into and performance under

15   the Settlement Agreement.

16       The Debtors make the Motion on several grounds.  The Settlement Agreement is

17   the final result of protracted, complex, multi-party negotiations that have spanned more

18   than a year, settling multiple litigation disputes that commenced more than three years

19   ago.  The matters disposed of by the Settlement Agreement are the most contentious and

20   uncertain matters facing the Debtors in administering their estates, and with their

21   resolution the Debtors will be free to file and consummate a chapter 11 plan offering

22   creditors a reasonable degree of certainty as to the outcome of the case.  The Settlement

23   Agreement substantially reduces potentially massive claims, avoids the significant time,

24   expense and uncertainty involved in litigating the disputes, does not impose material

25   future obligations upon the Debtors or their successors, and has the support of the

26   Creditors' Committee and other major creditor constituencies.  For all these reasons, and

27   as set forth in more detail in the Motion, the Settlement Agreement should be approved.

28       Because of the strict nature of the Protective Orders entered in this case and the

APPLICATION TO FILE DEBTORS' MOTION TO
APPROVE SETTLEMENT UNDER SEAL

highly confidential nature of the matters addressed in the Motion and the Settlement

Agreement, the Debtors present this Application and seek to file the Motion under seal.

Intel has previously asserted that the Cross-License Agreement – an integral part of the

Settlement Agreement – and its terms must be treated as confidential in these proceedings.

The Cross-License Agreement and its terms, as well as the parties' rights and duties

thereunder and pertaining thereto, are discussed extensively in the Motion and in the

Settlement Agreement.  Substantially all of the supporting declarations and exhibits are

also filed with discussion of confidential information, and the Debtors anticipate that

much if not all of the matters addressed should further briefing be required will also

involve information asserted to be confidential.

Because the confidential information is pervasive in the Motion and the Settlement

Agreement, the Debtors request authorization to file under seal the entire Motion, as well

as the supporting declarations and exhibits thereto, including the Settlement Agreement

itself, and any later briefs, replies and supporting documentation, and to serve the

unredacted versions only upon Intel, VIA, the Official Committee of Unsecured Creditors

and the U.S. Trustee.  To preserve the confidential nature of the information that the

Debtors must discuss in these documents, the Debtors also request authorization to serve

upon all other parties entitled to notice in these cases only a notice of the Motion and

supporting declarations, which notice shall further inform these parties of this

Application.  The Debtors further seek an Order determining that service in accordance

with the preceding sentence complies with all applicable notice requirements and that no

further notice or service of the Motion is required.

## II.

## APPLICABLE AUTHORITY

The relief requested herein is authorized by Bankruptcy Local Rule 1001-2(a)(63),

incorporating Civil Local Rule 79-5.  Civil Local Rule 79-5(d) provides "Counsel seeking

to file a document or thing under seal, which is not authorized by statute or rule to be so

filed, may file a motion under Civil L.R. 7-10 [pertaining to ex parte applications] and

1    lodge the document or thing with the Clerk in a manner which conforms with Civil L.R.

2    79-5(c).  If, pursuant to referral by the Clerk or motion of a party, the Court orders that a

3    lodged document be filed under seal, the Clerk shall file the lodged document under seal.

4    Otherwise, the lodged document shall be returned to the submitting party and the

5    document shall not be placed in the file."  Civil Local Rule 79-5(d).

6        The Bankruptcy Code and Federal Rules of Bankruptcy Procedure also authorize

7    the relief requested herein.  Federal Rule of Bankruptcy Procedure 9018 provides in

8    pertinent part:

9        On motion or on its own initiative, with or without notice, the
     court may make any order which justice requires (1) to protect
10       the estate or any entity in respect of a trade secret or other
     confidential research, development, or commercial
11       information…

12   Fed. R. Bankr. Proc. 9018.  In addition, Bankruptcy Code Section 107(b) provides that,

13   "on request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's

14   own motion, the bankruptcy court may (1) protect an entity with respect to a trade secret

15   or confidential research, development or commercial information…."  11 U.S.C. § 107(b).

16       The confidential information that the Debtors seek to file under seal contains

17   sensitive information relating to VIA's, Intel's and the Debtors' business and litigation

18   dealings and is or may be subject to the terms of the Protective Order.  The Debtors

19   respectfully submit that the Motion, supporting declarations and other papers requested to

20   be filed under seal also constitute information that is subject to protection pursuant to

21   Bankruptcy Code Section 107(b) and Federal Rule of Bankruptcy Procedure 9018.

**III.**

**CONCLUSION**

24       Based on the foregoing, the Debtors respectfully request that the Court enter an

25   Order (1) authorizing the Debtors to file an unredacted version of the Motion, supporting

26   documents and any reply documents under seal; (2) authorizing the Debtors to serve

27   unredacted versions of the foregoing documents only upon VIA, Intel, the Official

28   Committee of Unsecured Creditors and the U.S. Trustee; (3) authorizing the Debtors to

1  serve notice only of the foregoing documents upon other parties in interest;

2  (4) determining that the foregoing service is adequate under the circumstances and that no

3  further notice or service of the documents is required; and (5) granting such other and

4  further relief as may be just and appropriate.

5  Dated:      October 6, 2006                    O'MELVENY & MYERS LLP

6

7                                                 By:    /s Austin K. Barron
                                                       Austin K. Barron
8                                                 Special Litigation Counsel for Debtors and
                                                 Debtors In Possession
9

10                                                PILLSBURY WINTHROP SHAW
                                                 PITTMAN LLP
11

12                                                By:    /s Thomas V. Loran III
                                                       Thomas V. Loran III
13                                                Attorneys for Debtors and Debtors-In-
                                                 Possession
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 50

Entered on Docket
October 11, 2006

GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1   SUZZANNE S. UHLAND (CA Bar No. 136852)
    DAVID R. EBERHART (CA Bar No. 195474)
2   AUSTIN K. BARRON (CA Bar No. 204452)
    O'MELVENY & MYERS LLP
3   Embarcadero Center West
    275 Battery Street
4   San Francisco, CA  94111-3305
    Telephone    (415) 984-8700
5   Facsimile:    (415) 984-8701

6   Special Litigation Counsel to
    Debtors and Debtors in Possession
7
    PILLSBURY WINTHROP SHAW PITTMAN LLP
8   THOMAS V. LORAN III #95255
    ALBERT J. BORO, JR. #126657
9   ANA N. DAMONTE #215504
    JASON A. CATZ #224205
10  50 Fremont Street
    Post Office Box 7880
11  San Francisco, CA  94120-7880
    Telephone: (415) 983-1000
12  Facsimile: (415) 983-1200

13  Attorneys for Debtors and Debtors-In-Possession

14

15               UNITED STATES BANKRUPTCY COURT FOR

16               THE NORTHERN DISTRICT OF CALIFORNIA

17                        SAN JOSE DIVISION

18

19  In re                          Case No. 03-51775 MSJ

20  SONICblue Inc., *et al.*        Chapter 11
                                    (jointly administered)
21
              Debtors and Debtors   **[PROPOSED] ORDER APPROVING**
22            in Possession.        **EX PARTE APPLICATION TO FILE**
                                    **DEBTORS' MOTION FOR APPROVAL**
23                                  **OF SETTLEMENT OF VIA AND**
                                    **INTEL LITIGATION UNDER SEAL**
24

25

26

27

28

LA3:1123637.1                        ORDER ON APPLICATION TO FILE MOTION TO
                                     APPROVE SETTLEMENT UNDER SEAL

1    The Court, having considered and reviewed the ex parte application (the

2  "Application") of O'Melveny & Myers LLP ("O'Melveny"), special litigation counsel to

3  SONICblue Inc., a Delaware corporation ("SONICblue"), and its affiliated debtors as

4  debtors and debtors-in-possession in the above captioned cases (collectively, the

5  "Debtors"), pursuant to Bankruptcy Local Rule 1001-2(a)(63), incorporating Civil Local

6  Rule 79-5, to file under seal their motion (the "Motion") to approve a settlement

7  agreement by and among SONICblue, Intel Corporation ("Intel"), VIA Technologies, Inc.

8  ("VIA"), S3 Graphics Co. Ltd. ("S3G Co."), S3 Graphics, Inc. ("S3G Inc.") and S3-VIA,

9  Inc. ("S3-VIA"), a fully executed copy of which is attached as Exhibit B to the Motion

10  (the "Settlement Agreement"), as well as supporting documents filed contemporaneously

11  therewith, as well as all additional briefs, replies or further papers filed in support thereof;

12  and having determined that no notice of the Application is required pursuant to Federal

13  Rule of Bankruptcy Procedure 9018 and that good cause exists for granting the relief

14  requested in the Application,

15  **IT IS HEREBY ORDERED** that:

16    1.    The Application is granted.

17    2.    The Motion and supporting documents filed contemporaneously therewith,

18  as well as all additional briefs, replies or further papers filed in support thereof, shall be

19  filed under seal.

20    3.    Unredacted copies of such documents shall be served only upon VIA, Intel

21  and the Official Committee of Unsecured Creditors and the U.S. Trustee.

22    4.    Service of such documents upon all other parties entitled to notice in these

23  cases shall consist only of notice of the filing under seal and of such service upon Intel,

24  the Official Committee of Unsecured Creditors and the U.S. Trustee.

25    5.    Service in accordance with the foregoing complies with all applicable notice

26  requirements and that no further notice or service is required.

27                    **END OF ORDER**

28

LA3:1123657.1                                ORDER ON APPLICATION TO FILE MOTION TO
                                            APPROVE SETTLEMENT UNDER SEAL

1

Service List

2   Suzzanne S. Uhland
    David R. Eberhart
3   Austin K. Barron
    O'Melveny & Myers LLP
4   Embarcadero Center West
    275 Battery Street
5   San Francisco, CA  94111-3305

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER APPROVING APPLICATION TO FILE
DEBTORS' MOTION TO COMPEL UNDER SEAL

1   SUZANNE S. UHLAND (CA Bar No. 136852)
    DAVID R. EBERHART (CA Bar No. 195474)
2   AUSTIN K. BARRON (CA Bar No. 204452)
    O'MELVENY & MYERS LLP
3   Embarcadero Center West
    275 Battery Street
4   San Francisco, CA  94111-3305
    Telephone    (415) 984-8700
5   Facsimile:    (415) 984-8701

6   Special Litigation Counsel to
    Debtors and Debtors in Possession
7
    PILLSBURY WINTHROP SHAW PITTMAN LLP
8   THOMAS V. LORAN III #95255
    ALBERT J. BORO, JR.  #126657
9   ANA N. DAMONTE  #215504
    JASON A. CATZ  #224205
10  50 Fremont Street
    Post Office Box 7880
11  San Francisco, CA  94120-7880
    Telephone: (415) 983-1000
12  Facsimile: (415) 983-1200

13  Attorneys for Debtors and Debtors-In-Possession

14

15                  UNITED STATES BANKRUPTCY COURT FOR

16              THE NORTHERN DISTRICT OF CALIFORNIA

17                       SAN JOSE DIVISION

18

19  In re                              Case No. 03-51775 MSJ

20  SONICblue Inc., *et al.*           Chapter 11
                                       (jointly administered)
21              Debtors and Debtors
22              in Possession.         **PROOF OF SERVICE**

23

24

25                                     No hearing required

26

27

28

    LA3:1123677.1                                  PROOF OF SERVICE

1    **PROOF OF SERVICE BY MAIL**

2       I am a citizen of the United States and employed in Los Angeles County,

3    California, at the office of a member of the bar of this Court at whose direction this

4    service was made. I am over the age of eighteen years and not a party to the within

5    action. I am a resident of or employed in the county where the service described below

6    occurred. My business address is 400 South Hope Street, Los Angeles, California 90071-

7    2899. I am readily familiar with this firm's practice for collection and processing of

8    correspondence for mailing with the United States Postal Service. In the ordinary course

9    of business, correspondence collected from me would be processed on the same day, with

10   postage thereon fully prepaid and placed for deposit that day with the United States Postal

11   Service. On **October 6, 2006,** I served the following:

12   1.  **DEBTORS' MOTION FOR APPROVAL OF SETTLEMENT
       OF VIA AND INTEL LITIGATION**
13

14   2.  **MEMORANDUM OF POINTS AND AUTHORITIES IN
       SUPPORT OF DEBTORS' MOTION FOR APPROVAL OF
       SETTLEMENT OF VIA AND INTEL LITIGATION**
15

16   3.  **DECLARATION OF MARCUS SMITH IN SUPPORT OF
       DEBTORS' MOTION FOR APPROVAL OF SETTLEMENT
       OF VIA AND INTEL LITIGATION**
17

18   4.  **EX PARTE APPLICATION TO FILE DEBTORS' MOTION
       FOR APPROVAL OF SETTLEMENT OF VIA AND INTEL
       LITIGATION UNDER SEAL**
19

20   5.  **[PROPOSED] ORDER APPROVING EX PARTE
       APPLICATION TO FILE DEBTORS' MOTION FOR
       APPROVAL OF SETTLEMENT OF VIA AND INTEL
       LITIGATION UNDER SEAL**
21

22   6.  **NOTICE OF DEBTORS' MOTION FOR APPROVAL OF
       SETTLEMENT OF VIA AND INTEL LITIGATION**
23

     by putting a true and correct copy thereof in a sealed envelope, with postage fully prepaid,
24
     and placing the envelope for collection and mailing today with the United States Postal
25
     Service in accordance with the firm's ordinary business practices, addressed as follows:
26

27

28

1

2   Official Committee of Unsecured Creditors        Steven J. Johnson, Esq.
    c/o Craig M. Rankin, Esq.                        Gibson, Dunn & Crutcher LLP
3   Levene, Neale, Bender, Rankin & Brill            1881 Page Mill Road
    1801 Avenue of the Stars, Suite 1120             Palo Alto, CA  94304
4   Los Angeles, CA  90067

5
    Nanette Dumas, Esq.                              Henry C. Kevane, Esq.
6   Office of the U.S. Trustee                       Pachulski, Stang, Ziehl, Young,
    280 South First Street, Room 268                   Jones & Weintraub
7   San Jose, CA  95113                              150 California Street, 15th Floor
                                                     San Francisco, CA  94111
8

9   Suzzanne S. Uhland, Esq.
    David R. Eberhart, Esq.
10  Austin K. Barron, Esq.
11  O'Melveny & Myers LLP
    Embarcadero Center West
12  275 Battery Street
    San Francisco, CA  94111-3305
13

14           I declare under penalty of perjury under the laws of the United States that

15  the above is true and correct.  Executed on **October 6, 2006**, at Los Angeles, California.

16

17

18

19                                          Rose A. Jauregui

20

21

22

23

24

25

26

27

28

LA3:1123677.1                              -2-                        PROOF OF SERVICE

# EXHIBIT 51

PILLSBURY WINTHROP SHAW PITTMAN LLP
THOMAS V. LORAN III  #95255
CRAIG A. BARBAROSH  #160224
ALBERT J. BORO, JR.  #126657
WILLIAM B. FREEMAN  #137276
ANA N. DAMONTE  #215504
JASON A. CATZ  #224205
50 Fremont Street
Post Office Box 7880
San Francisco, CA  94120-7880
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

Attorneys for Debtors and Debtors-In-Possession

SUZZANNE S. UHLAND (CA Bar No. 136852)
DAVID R. EBERHART (CA Bar No. 195474)
AUSTIN K. BARRON (CA Bar No. 204452)
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA  94111-3305
Telephone     (415) 984-8700
Facsimile:     (415) 984-8701

Special Litigation Counsel for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br>Debtors and Debtors-in-Possession. | Chapter 11 Cases<br><br>Case Nos. 03-51775 through 51778 MJS<br><br>[Jointly Administered]<br><br>NOTICE OF DEBTORS' MOTION FOR APPROVAL OF SETTLEMENT OF VIA AND INTEL LITIGATION<br><br>Date:     October 27, 2006<br>Time:    11:00 a.m.<br>Place:    Courtroom 3070<br>            280 South First Street<br>            San Jose, CA 95113<br><br>Hon. Marilyn Morgan |

To The United States Bankruptcy Court, The Office of the United States Trustee, and all other

parties entitled to notice pursuant to the Court's Order establishing notice procedures:

PLEASE TAKE NOTICE THAT on October 27, 2006 at 11:00 a.m., or as soon thereafter

as counsel may be heard before the Honorable Marilyn Morgan in Courtroom 3070 of the San Jose

Division of the United States Bankruptcy Court for the Northern District of California, which is

located at United States Courthouse, 280 South First Street, San Jose, California, debtors and

debtors-in-possession SONICBLUE INCORPORATED ("SONICblue"), DIAMOND

MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC., and SENSORY SCIENCE

CORPORATION (collectively, the "Debtors") will move the Court, pursuant to Bankruptcy Code

section 363 and Rule 9019 of the Federal Rules of Bankruptcy Procedure, for an order in the above

entitled cases as follows:

1.     Approving a settlement of the following matters:

a.     The adversary proceeding entitled SONICblue Incorporated v. VIA

Technologies, Inc.; S3 Graphics Co., Ltd.; and S3 Graphics, Inc., N.D. Cal. Adv. Case

No. 04–5556 (the "Adversary Proceeding")

b.     The Debtors' objection, set forth in the Adversary Proceeding, to the

duplicate proofs of claim (the "VIA Claims") filed by VIA and **JV** (collectively, the

"Claimants") asserting nineteen separately numbered claims asserting damages totaling

$105,190,812.20;

c.     Intel's renewed motion seeking relief from the automatic stay [Docket No.

788];

d.     The Debtors' motion to assume executory contract [Docket No. 1092]; and

e.     Such other matters and disputes as are set forth in proposed form of

settlement agreement (the "Proposed Settlement Agreement") and proposed form of order

approving the proposed settlement (the "Proposed Approval Order"); and

2.     Awarding such other and further relief as the Court may deem just and proper.

1  PLEASE TAKE FURTHER NOTICE that the proposed settlement includes the following

2  terms and conditions:

3       a.     The Adversary Proceeding will be dismissed;

4       b.     The Claimants will receive an allowed general unsecured claim against

5  SONICblue in the amount of $12,500,000 and the two VIA Claims will be disallowed;

6       c.     SONICblue will transfer any interest it continues to own in the Graphics

7  Chip Business to JV or its designee.  Such transfer contemplates that SONICblue will (i)

8  execute the documents necessary or appropriate to assign the relevant remaining graphics

9  chip patents and trademarks, and (ii) deliver all Graphics Chip Business patent files,

10  trademark files, employee files, licensing documents, and non-disclosure agreements to JV

11  or its designee, to the extent such can be located after a reasonable search.  The Proposed

12  Settlement Agreement also provides JV with reasonable access to other Graphic Chip

13  Business files, including, under certain conditions, the data tapes used in the Graphics Chip

14  Business;

15       d.     The Proposed Settlement Agreement provides that SONICblue will pay the

16  first $50,000 of attorneys' fees and costs incurred in the process of responding to Claimants'

17  further requests for review of documents and data tapes, but that Claimants will pay all such

18  expenses over and above the first $50,000;

19       e.     Debtors shall undertake certain protective measures to protect certain

20  confidential information that may be in the Debtors' files and, subject to applicable law,

21  certain parties will be entitled to the return or destruction of such confidential information;

22       f.     Intel's renewed motion seeking relief from the automatic stay [Docket No.

23  788] will be dismissed;

24       g.     The Debtors' motion to assume executory contract [Docket No. 1092] will

25  be dismissed; and

26       h.     The parties will exchange (as part of the Proposed Settlement Agreement)

27  substantially complete mutual releases.

28  PLEASE TAKE FURTHER NOTICE that the foregoing is only a summary and partial

description of the terms and conditions of the proposed settlement, the full terms of which are set forth in the Proposed Settlement Agreement and the Proposed Approval Order.  Some of the terms of the proposed settlement are or may be subject to a confidentiality agreement and order and are therefore not specified in this notice, and contemporaneously herewith the Debtors have filed a request to file the Motion and all supporting papers, including the Proposed Settlement Agreement, under seal.

PLEASE TAKE FURTHER NOTICE that a motion for approval of the proposed settlement ("Motion"), the Proposed Settlement Agreement and the Proposed Approval Order, a memorandum of points and authorities in support of the Motion ("Memorandum"), and declaration of Marcus Smith in support of the Motion ("Declaration") have been filed under seal with the Bankruptcy Court.  Parties in interest who wish to review the Motion, Proposed Settlement Agreement, Proposed Approval Order, Memorandum and/or Declaration ("Motion Papers") may contact counsel for the Debtors listed on the first page of this notice for a redacted copy of the Motion Papers.

PLEASE TAKE FURTHER NOTICE that Rule 9014-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of California prescribes the procedures to be followed for objecting to the Motion.  If you contest the Motion and the relief requested therein, you must follow the procedures outlined in Local Rule 9014-1.  In particular, but without limitation, any opposition to the Motion or the requested relief shall, no less than five days before the scheduled hearing date, (i) be filed with the Clerk of the United States Bankruptcy Court, Room 3035, 280 South First Street, San Jose, California 95113, together with any declarations and memoranda of law you wish to present in support of your position and (ii) be served on counsel for Debtors, Thomas V. Loran III, Pillsbury Winthrop Shaw Pittman LLP, Post Office Box 7880, San Francisco, CA  94120-7880.[1]

---

[1]    Any party requesting a hearing on this Motion should be aware of the Court's electronic filing procedures.

1    PLEASE TAKE FURTHER NOTICE that this notice of Motion is being served on all

2  creditors and parties in interest entitled to such notice pursuant to the Court's order limiting notice

3  entered on or about April 2, 2003.

4    PLEASE TAKE FURTHER NOTICE that the Motion is based upon this notice of Motion,

5  the Motion, Memorandum, Declaration, the entire record in this case, the statements, arguments

6  and representations of counsel to be made at the hearing on the motion, if any, and any other

7  evidence properly presented to the Court.

8    Dated:  October 6, 2006.

9                                   PILLSBURY WINTHROP SHAW PITTMAN LLP

10

11                                  By:_____*Thomas V. Loran III*_____
                                            Thomas V. Loran III
12                                  Attorneys for Debtors and Debtors-In-Possession

13

14                                  O'MELVENY & MYERS LLP

15

16                                  By:_____*Austin K. Barron*_____
                                            Austin K. Barron
                                    Special Litigation Counsel for
17                                  Debtors and Debtors-In-Possession

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 52

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   THOMAS V. LORAN III #95255
2  CRAIG A. BARBAROSH #160224
   ALBERT J. BORO, JR. #126657
3  WILLIAM B. FREEMAN #137276
   ANA N. DAMONTE # 215504
4  JASON A. CATZ #224205
   50 Fremont Street
5  San Francisco, CA  94120-7880
   Telephone: (415) 983-1000
6  Facsimile: (415) 983-1200
   Attorneys for Debtors and Debtors-In-Possession
7
   SUZZANNE S. UHLAND (CA Bar No. 136852).
8  DAVID R. EBERHART (CA Bar No. 195474)
   AUSTIN K. BARRON (CA Bar No. 204452)
9  O'MELVENY & MYERS LLP
   Embarcadero Center West
10 275 Battery Street
   San Francisco, CA  94111-3305
11 Telephone: (415) 984-8700
   Facsimile: (415) 984-8701
12 Special Litigation Counsel for Debtors and Debtors-In-Possession

13
                    UNITED STATES BANKRUPTCY COURT
14
                    NORTHERN DISTRICT OF CALIFORNIA
15
                           SAN JOSE DIVISION
16

17 IN RE:                              Case No. 03-51775

18 SONICBLUE INCORPORATED, a           CHAPTER 11 Cases
   Delaware corporation, DIAMOND
19 MULTIMEDIA SYSTEMS, INC., a         (Case Nos. 03-51775 through 03-51778 MM)
   Delaware corporation, REPLAYTV, INC., a   (Jointly Administered)
20 Delaware corporation, and SENSORY
   SCIENCE CORPORATION, a Delaware     **NOTICE OF FILING OF REDACTED**
21 corporation,                        **COPY OF MEMORANDUM OF POINTS**
                                       **AND AUTHORITIES IN SUPPORT OF**
22                                     **DEBTORS' MOTION FOR APPROVAL**
                                       **OF SETTLEMENT OF VIA AND INTEL**
23          Debtors and Debtors-in-Possession.   **LITIGATION**

24 _____     Hon. Marilyn Morgan

25

26

27

28

1        Debtors and debtors-in-possession <u>SONICBLUE INCORPORATED</u>, <u>DIAMOND</u>

2   <u>MULTIMEDIA SYSTEMS, INC.</u>, <u>REPLAYTV, INC.</u>, and <u>SENSORY SCIENCE</u>

3   <u>CORPORATION</u> (collectively, the "Debtors") hereby file this redacted copy of the

4   *Memorandum of Points and Authorities in Support of Debtors' Motion for Approval of*

5   *Settlement of VIA and Intel Litigation* ("Memorandum of Points and Authorities"), attached

6   hereto as **Exhibit A**, filed with the Court under seal on October 10, 2006 in support of the

7   *Debtors' Motion for Approval of Settlement of VIA and Intel Litigation* ("Motion").

8        In the Notice of Motion filed with the Court on October 12, 2006, the Debtors offered

9   to provide redacted copies of the motion papers if requested by parties in interest.  No such

10  request was made prior to the hearing.  The Court entered an order approving the settlement of

11  the VIA and Intel litigation on October 31, 2006, and the related adversary proceeding (adv.

12  proc. no. 04-5556) was dismissed with prejudice on December 14, 2006.   Prior to the hearing

13  on the Motion, the Debtors had begun preparing a redacted Memorandum of Points and

14  Authorities but had not prepared redacted versions of the other papers supporting the Motion

15  because no request was received.

16       A request has now been made by a non-party for redacted Motion papers.  The Debtors

17  are filing with the Court this redacted Memorandum of Points and Authorities to make it

18  available in the public record, but the Debtors do not presently intend to prepare redacted

19  copies of the other pleadings in support of the Motion since the related adversary proceeding

20  has been dismissed with prejudice.

21

22  Dated:  December 22, 2006            PILLSBURY WINTHROP SHAW PITTMAN LLP

23

24                                       By:_____/s/  Ana N. Damonte (215504)_____
                                              Ana N. Damonte
25                                            Attorneys for Debtors and Debtors-In-
                                              Possession
26

27

28

# EXHIBIT A

1 | PILLSBURY WINTHROP SHAW PITTMAN LLP
THOMAS V. LORAN III  #95255
2 | ALBERT J. BORO, JR.  #126657
CRAIG A. BARBAROSH  #160224
3 | WILLIAM B. FREEMAN  #137276
ANA N. DAMONTE  #215504
4 | JASON A. CATZ  #224205
50 Fremont Street
5 | Post Office Box 7880
San Francisco, CA  94120-7880
6 | Telephone: (415) 983-1000
Facsimile: (415) 983-1200
7 |
Attorneys for Debtors and Debtors-In-Possession
8 |
SUZZANNE S. UHLAND (CA Bar No. 136852)
9 | DAVID R. EBERHART (CA Bar No. 195474)
AUSTIN K. BARRON (CA Bar No. 204452)
10 | O'MELVENY & MYERS LLP
Embarcadero Center West
11 | 275 Battery Street
San Francisco, CA  94111-3305
12 | Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701
13 |
Special Litigation Counsel for Debtors and Debtors in Possession
14 |

15 |               UNITED STATES BANKRUPTCY COURT
16 |               NORTHERN DISTRICT OF CALIFORNIA
17 |                    SAN JOSE DIVISION

18 | IN RE:                              | Chapter 11 Cases
19 | SONICBLUE INCORPORATED, a           | Case Nos. 03-51775
Delaware corporation, DIAMOND            | through 51778 MJS
20 | MULTIMEDIA SYSTEMS, INC., a         |
Delaware corporation, REPLAYTV,          | [Jointly Administered]
21 | INC., a Delaware corporation, and   |
SENSORY SCIENCE                          | MEMORANDUM OF POINTS AND
22 | CORPORATION, a Delaware             | AUTHORITIES IN SUPPORT OF
corporation,                             | DEBTORS' MOTION FOR APPROVAL
23 |                                     | OF SETTLEMENT OF VIA AND INTEL
Debtors and Debtors-in-Possession.       | LITIGATION
24 |                                     |
                                         | Date: October 27, 2006
25 |                                     | Time: 11:00 a.m.
                                         | Place: Courtroom 3070
26 |                                     |         280 South First Street
                                         |         San Jose, CA 95113
27 |                                     |
                                         | Hon. Marilyn Morgan
28 |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION. ............................................................................................ 1

II.    FACTUAL BACKGROUND. ............................................................................ 2

    A.    Pre-Bankruptcy Business. ..................................................................... 2

    B.    Pre-Bankruptcy Transactions With VIA. ............................................. 2

    C.    The Bankruptcy Petitions. ..................................................................... 4

    D.    The Intel-VIA Disputes. ........................................................................ 4

    E.    The Intel Litigation. ............................................................................... 4

    F.    VIA's Claims Against SONICblue. ....................................................... 7

        1.    Claim Nos. 1 and 2. ..................................................................... 7

        2.    Claim Nos. 3-17 and 19. .............................................................. 7

        3.    Claims No 18. – Claim for Liquidated Damages Based Upon the Intel License. ................................................................................... 8

    G.    SONICblue's Adversary Complaint Against VIA. ............................... 8

    H.    Settlement Negotiations. ...................................................................... 10

    I.    The Settlement Agreement. .................................................................. 12

III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND IN THE BEST INTERESTS OF THE ESTATES. ................................................................... 14

    A.    Standard for Approval of Compromises. .............................................. 14

    B.    Application Of The *A&C Properties* Standards To The Settlement Agreement. ............................................................................................ 15

        1.    Probability of Success. .............................................................. 15

        2.    Difficulty of Collection. ............................................................ 18

        3.    Complexity, Expense and Delay of Litigation. ......................... 18

        4.    Creditors' Interests and Views. ................................................. 22

    C.    Overall Assessment of the Settlement Agreement. .............................. 22

IV.    CONCLUSION. ............................................................................................. 23

TABLE OF AUTHORITIES

Page(s)

CASES

Cosoff v. Rodman (In re W.T. Grant Co.),
      699 F.2d 599 (2d Cir. 1983), cert. denied, 464 U.S. 822 (1983)..........................................14

In re A & C Properties,
      784 F.2d 1377 (9th Cir. 1986) cert. denied, 479 U.S. 854 (1986).....................................14

In re Lee Way Holding Co.,
      120 B.R. 881 (Bankr. S.D. Ohio 1990) ...............................................................................15

In re Louise's, Inc.,
      211 B.R. 798 (D. Del. 1997) ................................................................................................14

In re Walsh Const. Inc.,
      669 F.2d 1325 (9th Cir. 1982) .............................................................................................14

Newman v. Stein,
      464 F.2d 689 (2d Cir. 1972), cert. denied sub nom., Benson v. Newman, 409
      U.S. 1039 (1973) ..................................................................................................................14

RULES AND REGULATIONS

Federal Rules of Bankruptcy Procedure
      Rule 7015.............................................................................................................................8

Federal Rules of Bankruptcy Procedure
      Rule 9019(a) ......................................................................................................................14

Federal Rules of Civil Procedure
      Rule 15(a) ...........................................................................................................................8

1   Debtors and debtors-in-possession <u>SONICBLUE INCORPORATED</u> ("SONICblue"),

2   <u>DIAMOND MULTIMEDIA SYSTEMS, INC.</u>, <u>REPLAYTV, INC.</u>, and <u>SENSORY SCIENCE</u>

3   <u>CORPORATION</u> (collectively, the "Debtors") submit this memorandum of points and authorities

4   in support of their motion in the above captioned cases for an order (the "Settlement Agreement")

5   approving the proposed settlement of multiple disputes between and among SONICblue, Intel

6   Corporation ("Intel"), VIA Technologies, Inc. ("VIA"), S3 Graphics Co. Ltd. ("S3G Co."), S3

7   Graphics, Inc. ("S3G Inc.") and S3-VIA, Inc. pursuant to a "Settlement Agreement" in

8   substantially the form attached as Exhibit B to the motion filed herewith.

9   I.    INTRODUCTION.

10       The Settlement Agreement is the final result of protracted, complex, multi-party

11   negotiations that have spanned more than a year, settling multiple litigation disputes that

12   commenced more than three years ago.  Under the Settlement Agreement, Intel and VIA release

13   the Debtors from any further claims they may have against the estate.  In return VIA would receive

14   a general unsecured claim against SONICblue equal to $12.5 million, a claim currently estimated

15   to result in net payment to them of around $4 million. ████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████

18       To date, litigation among SONICblue, VIA and Intel has resulted in attorneys fees and costs

19   to SONICblue in excess of $2.2 million.  It is anticipated that litigating these cases through trial

20   would cost the bankruptcy estate at least another $2 million.  The Settlement Agreement avoids

21   these additional substantial litigation costs and eliminates the risk to the estate from potential

22   adverse judgments.

23       The matters disposed of by the Settlement Agreement are the most contentious and

24   uncertain matters facing the Debtors in administering their estates, and with their resolution the

25   Debtors will be free to file and consummate a chapter 11 plan offering creditors a reasonable

26   degree of certainty as to the outcome of the case.  The Settlement Agreement substantially reduces

27   potentially massive claims, avoids the significant time, expense and uncertainty involved in

28   litigating the disputes, does not impose material future obligations upon the Debtors or their

1  successors, and has the support of the Creditors' Committee and other major creditor

2  constituencies. For all these reasons, and as set forth in more detail below, the Settlement

3  Agreement should be approved.

4  II.    FACTUAL BACKGROUND.

5      A.    Pre-Bankruptcy Business.

6      Before filing their Chapter 11 cases, the Debtors were engaged in the manufacturing,

7  marketing and sale of consumer electronics products.

8      B.    Pre-Bankruptcy Transactions With VIA.

9      In or about April 2000, VIA and SONICblue entered into a written agreement (the

10 "Original Investment Agreement") whereby the parties agreed, among other things, to form S3G

11 Co. (S3 Graphics Co., Ltd.), a corporate joint venture to which SONICblue would contribute

12 specified assets of its computer graphics chip business (the "Graphics Chip Business"). In return,

13 SONICblue would receive at closing all of the issued and outstanding Class A Common Shares of

14 S3G Co. capital stock and a payment of $79,875,000 less certain deductions, and a secured three-

15 year promissory note for $239,625,000. VIA was to contribute to S3G Co. the $319,500,000

16 necessary for it to make the payments to SONICblue, and VIA would receive at closing all of the

17 issued and outstanding Class B Common Shares of S3G Co. capital stock.

18     At the eve of the closing of the transaction, VIA informed SONICblue that due to alleged

19 Taiwanese cash export restrictions, VIA could not perform its cash payment obligations under the

20 Original Investment Agreement. As a result, the transaction did not close as contemplated.

21     On or about August 28, 2000, VIA and SONICblue entered into a written agreement styled

22 Amended and Restated Investment Agreement (the "Amended Investment Agreement"). Pursuant

23 to the Amended Investment Agreement and related agreements, [1] VIA and SONICblue agreed,

24 _____

25 [1] SONICblue and VIA entered into numerous other documents to consummate the transaction. For example, at the time of entering into the Amended Investment Agreement, SONICblue, as owner, and VIA, as manager, entered into a written agreement styled S3

26 Incorporated Management Agreement, effective as of August 28, 2000 (the "Management Agreement"), pursuant to which VIA agreed to manage the Graphics Chip Business until the

27 closing, but through such time, SONICblue would continue to be the sole owner of the Graphics Chip Business. After formation of the Amended Investment Agreement, VIA managed the

28                                                              (continued...)

among other things, that they would form S3G Co., that after its formation S3G Co. would become a party to the Amended Investment Agreement and that SONICblue would contribute designated assets, defined in the Amended Investment Agreement as the "Graphics Chip Business Assets," to S3G Co. at the closing. In return for contributing the Graphics Chip Business Assets, SONICblue would receive $208,000,000 in cash or SONICblue shares, or any combination thereof, and VIA agreed to contribute that consideration to S3G Co. for payment to SONICblue. The Amended Investment Agreement further provided that for purposes of this payment the SONICblue shares would be valued at $16 per share. By the time of the closing, SONICblue shares had declined to about $5 per share, and VIA elected to pay the consideration owed SONICblue entirely in SONICblue shares, which at the time had a market value of only about $65 million.

On January 3, 2001, and in accordance with their Amended Investment Agreement, SONICblue (and its wholly-owned subsidiary Sonica3, Inc.) entered into a written joint venture agreement with VIA (the "Joint Venture Agreement") for the purpose of forming S3G Co.

On the date set for the closing, VIA, SONICblue and S3G Co. entered into a number of written amendments to the Amended Investment Agreement in the form of so-called side letters dated January 3, 2001 (the "Side Letters"). One of the Side Letters addressed claims and disagreements between the parties concerning certain purported assets and liabilities related to SONICblue and/or the Graphics Chip Business, and included a Damage Cap (defined hereinafter) and provided a mechanism for arbitration (the "Arbitration Side Letter"). Simultaneously with the parties' entering into the Joint Venture Agreement, Side Letters, and certain other closing date agreements, the closing occurred on January 3, 2001 (the "Closing").

---

(...continued)
Graphics Chip Business pursuant to the Management Agreement. Similarly, in accordance with the Amended Investment Agreement and as a condition precedent to SONICblue's contribution of the Graphics Chip Business Assets to S3G Co., VIA at the closing made, executed and delivered to SONICblue a written guaranty, dated as of January 3, 2001 (the "Guaranty"), pursuant to which VIA absolutely, unconditionally and irrevocably guaranteed the full and prompt payment or performance when due of the Assumed Liabilities (as that term is defined in the Amended Investment Agreement) and all reasonable costs and expenses of enforcing the Guaranty.

C.    The Bankruptcy Petitions.

On March 21, 2003 (the "Petition Date"), each of the Debtors commenced a Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. Following the Petition Date, the Debtors liquidated their business operations and most of their tangible and intangible assets, other than avoidance actions. The Debtors have also commenced the process of objecting to claims and recovering avoidable transfers. Currently, the Debtors are holding approximately $78.6 million in cash (exclusive of over $3 million in avoidance action recoveries), and over $290,000,000 in claims have been disallowed or subordinated.

D.    The Intel-VIA Disputes.

Prior to the commencement of these bankruptcy cases, Intel and VIA were adverse parties in a number of patent infringement lawsuits worldwide. In connection therewith, Intel filed a civil suit in Delaware federal court (the "Intel Lawsuit") on or about September 7, 2001 against VIA and S3G Inc., among others, alleging their infringement of Intel patents in the operation of the Graphics Chip Business following the Closing. Intel did not name SONICblue as a defendant in the Intel Lawsuit, which was later transferred and re-filed by Intel in the Northern District of California.

In early April 2004, shortly after the Debtors commenced these bankruptcy cases, Intel and VIA settled and dismissed their lawsuits against one another pursuant to an undisclosed settlement agreement (the "Intel-VIA Settlement Agreement"). At the same time, Intel also dismissed its lawsuits against S3G Co., albeit without prejudice. The Intel-VIA Settlement Agreement was not filed with any court, nor are its terms otherwise publicly available. ███████████████████████████████████████████████████████████████████████████████

E.    The Intel Litigation.

Prior to the commencement of these bankruptcy cases, Debtor SONICblue – then known as S3 Inc. – and Intel were party to a patent cross license agreement dated as of December 16, 1998 (the "Intel License"). ███████████████████████████████████████████████████████████████

1   On or about June 6, 2003, Intel filed a motion seeking relief from the automatic stay (the

2   "Stay Motion") to permit it to terminate the Intel License, relying on Ninth Circuit precedent

3   holding that patent cross licenses are typically non-assumable and non-assignable in bankruptcy.

4   Through their special litigation counsel,[2] the Debtors opposed the Stay Motion, arguing that the

5   relief requested would significantly and unjustifiably extend the Ninth Circuit's holdings beyond

6   their original scope.  The Debtors also noted that termination of the Intel License could trigger up

7   to $70 million in liquidated damages to VIA arising under the Amended Investment Agreement

8   (see Section II.F below), and given that Intel had not shown any irreparable harm arising from

9   being held to its original bargain the balance of equities did not favor granting Intel the relief it

10  sought.

11  On or about July 30, 2003, in light of Intel's and VIA's reluctance to participate in the

12  discovery propounded by the Debtors, the Court denied the Stay Motion without prejudice to

13  Intel's right to renew the motion after November 30, 2003, strongly suggesting that the parties

14  engage in relevant discovery during that time.  After the Court initially denied the Stay Motion, the

15  Debtors, Intel and VIA entered into a bitter and protracted discovery battle that continued for more

16  than a year.

17  On May 13, 2004, Intel renewed the Stay Motion, again seeking relief from the automatic

18  stay to terminate the Intel License.

19

20

21

22

23  _____

    [2]   Because of the intellectual property issues at stake in the Stay Motion, the resolution of
24  which could potentially have a material and substantial impact on the administration of the estates,
    as well as the fact that the Debtors' general bankruptcy counsel, Pillsbury Winthrop LLP
25  ("Pillsbury"), had conflicts concerns with Intel, the Debtors applied for an order from this Court for
    the appointment of O'Melveny as special litigation counsel to represent the Debtors with respect to
26  the Stay Motion and related matters.  O'Melveny was selected not only for its general knowledge
    and expertise in intellectual property and bankruptcy matters, but also because it had represented
27  debtor SONICblue in the original negotiation and documentation of the Cross License Agreement
    and therefore possessed a significant degree of institutional knowledge.  The Debtors' application
28  was approved by order of this Court dated July 25, 2003.



1

2

3                                The Debtors again opposed the Stay Motion,

4 renewing their arguments and noting Intel's and VIA's continued recalcitrance concerning the

5 discovery propounded by the Debtors. These discovery disputes were partially resolved when the

6 Debtors were forced to file a motion to compel production against Intel and VIA, which was

7 ultimately resolved several months later by the entry of a protective order that permitted limited

8 access to the Intel-VIA Settlement Agreement.

9            On December 17, 2004, armed in part with information obtained during the year and

10 one-half discovery battle with Intel and VIA, SONICblue filed a motion (the "Assumption

11 Motion") seeking to assume the Intel License

12

13

14

15

16

17

18

19                             These matters raised highly contentious factual and legal disputes, all of

20 which were complicated by the fact that the Debtors had since liquidated their assets and ceased

21 operating as a going concern.

22           Given the significant overlap in law and subject matter and the highly contentious nature of

23 the proceedings, the two Motions were placed on parallel briefing and discovery tracks, with each

24 party's opposition to the other's Motion due simultaneously. The parties continued their discovery

25 disputes following that time up until the time they began negotiating the Settlement Agreement,

26 whereupon the filing dates were repeatedly tolled in an effort to minimize expenditure of further

27 litigation costs.

28

F.    VIA's Claims Against SONICblue.

On or about July 17, 2003, VIA and S3G Co. (collectively, the "Claimants") filed duplicate proofs of claim (the "VIA Claims") that asserted nineteen separately numbered claims. At the time, Claimants asserted damages totaling $105,190,812.20. The following is a brief description of the nineteen claims asserted in the VIA Claims, as well as a discussion of the Intel disputes embodied in the Stay Motion and the Assumption Motion.

1.    Claim Nos. 1 and 2.

Claimants acknowledged that their first two claims – the "Overdue Payables Claims" and the "Discounted Receivables Claims" – were subject to a "possible" Damage Cap of $5,554,544.00. The Overdue Payables Claim is premised on the theory that SONICblue agreed it would pay all trade payables and other obligations of the Graphics Chip Business when and as they became due in the ordinary course of business and in accordance with SONICblue's historic practices. The Discounted Receivables Claim alleged that SONICblue promised not to offer early or prompt payment discounts to customers of the Graphics Chip Business prior to the January 3, 2001 closing. Claimants alleged that SONICblue failed to pay $11,198,560.00 in overdue payables and had discounted $2,220,621.35 in receivables. Because of the Damage Cap applicable to these claims, SONICblue contended, Claimants could not recover more than $5,554,544.00 on account of these claims.

2.    Claim Nos. 3-17 and 19.

Claimants also asserted a variety of economic and non-economic claims against SONICblue. Among their many purported claims, Claimants sought $1,840,796.74 for liabilities owed to third party vendors (the "Wrong Bonded Parts Claim"), $625,988 for non-inventory expenses, $1,139,680.08 for an allegedly improper credit for returned merchandise (the "RMA Credit Claim"), $423,300 for entering the GCB into an unapproved purchase order (the "Unapproved Purchase Claim"), $12,686,270.45 for failing to transfer certain assets after the Closing (the "Contributed Assets Claim"), $12,837,595.93 for conversion of certain accounts receivables, and $82,637.00 for failure to pay certain employee liabilities. The total damages sought by Claimants on these claims was $29,636,268.20.

1    VIA also asserted several non-economic claims.  These claims are premised on

2 SONICblue's alleged failure to execute certain patent assignments or assign certain trademarks.

3 Claimants also alleged that SONICblue failed to deliver certain intellectual property files, turn over

4 information on the transfer of licenses, provide audited financial statements, provide certain

5 employee files, turn over certain data tapes, and deliver certain other documents.

6    Claimants also asserted a claim for an alleged unspecified "further breach" of the Amended

7 Investment Agreement by SONICblue for which Debtors have no estimate of damages.

8    3.    Claims No 18. – Claim for Liquidated Damages Based Upon the Intel License.

9    Finally, Claimants asserted a claim for liquidated damages in the event S3G Co. was

10 enjoined from utilizing the Intel License at any time within five years of the Closing.  Though S3G

11 Co. had not been enjoined from utilizing the Intel License at the time the VIA Claims were filed,

12 Intel had objected to S3G Co.'s continuing use of the license and had filed the Stay Motion to lift

13 the bankruptcy stay so that it could terminate the Intel License.  Given the risk that Intel might

14 prevail on its Stay Motion, Claimants asserted a sizable claim in anticipation of being enjoined

15 from utilizing the license. The Amended Investment Agreement provided that Claimants could

16 receive up to $191,780.82 in liquidated damages for each day it was enjoined from using the

17 license.  The Intel License Claim was subject to a maximum damage cap of $70 million.

18    G.    SONICblue's Adversary Complaint Against VIA.

19    On July 15, 2005, SONICblue filed its second amended adversary complaint (the

20 "Adversary Complaint") against VIA, S3G Co. and S3G Inc. objecting to the VIA Claims and

21 asserting eleven affirmative claims for relief.[3]  SONICblue filed its Amended Adversary Complaint

22 on April 28, 2005.

23 _____

24 [3]    SONICblue filed its initial objections and adversary complaint on December 21, 2004 and
filed a first amended adversary complaint on April 28, 2005, as of right pursuant to Rule 15(a) of

25 the Federal Rules of Civil Procedure (made applicable by Rule 7015 of the Federal Rules of
Bankruptcy Procedure).  Claimants and S3G Inc. filed a motion to dismiss on May 9, 2005 against

26 the breach of fiduciary duty and aiding and abetting claims alleged in the first amended adversary
complaint.  On June 24, 2005, the Court denied VIA's motion to dismiss the breach of fiduciary

27 claim but granted S3G Co. and S3G Inc.'s motion to dismiss the aiding and abetting claim and
gave SONICblue leave to amend.  SONICblue filed the Adversary Complaint – its second

28 amended adversary complaint – on July 15, 2005. VIA, S3G Co. and S3G Inc. answered the
(continued...)

1    By way of the Adversary Complaint, SONICblue vigorously opposed each of Claimants'

2 nineteen claims. SONICblue objected to the Overdue Payables Claim and Discounted Receivables

3 Claim on the grounds, among others, that the ordinary course of business for the Graphics Chip

4 Business was to not pay trade payables as soon as they came due and that it was typical to offer

5 customers discounts for early or prompt payment. Likewise, SONICblue opposed several other

6 claims, including the Wrong Bonded Parts Claim, Non-Inventory Expense Claim, RMA Credit

7 Claim, Unapproved Purchase Claim and the claim for failure to pay certain employee liabilities

8 because, among other reasons, Claimants had not alleged that they paid any money or suffered any

9 actual losses for the expenses and credits asserted in those claims.

10    SONICblue further objected to the sizable Contributed Assets Claim because that claim

11 should be subject to the Damage Cap in the Arbitration Side Letter and because S3G Co. took

12 control of all the assets held by or used by the Graphics Chip Business after the Closing, though it

13 abandoned many of the assets in dispute when it relocated the Graphics Chip Business to a new

14 facility. SONICblue likewise objected to the sizable claim for conversion of accounts receivable.

15 SONICblue did not solicit any payments from customers after the Closing. However, after

16 learning that Claimants were refusing to pay all of its Assumed Liabilities to several vendors, to the

17 injury of SONICblue's reputation and business, SONICblue exercised its right to offset the

18 amounts Claimants owed on the Assumed Liabilities by retaining the Accounts Receivables that

19 came in to SONICblue.

20    SONICblue also vigorously objected to the claim for liquidated damages under the Intel

21 License. S3G Co. had not been enjoined from utilizing the Intel License when it filed its claim and

22 Intel continued to enjoy the benefits of SONICblue's performance under the license. Moreover,

23 the liquidated damages Claimants sought were unconscionable and disproportionate to any actual

24 damages suffered. The $70,000,000 sought exceeded the value of the consideration SONICblue

25 received at the Closing.

26    _____

27 (...continued)
complaint, and VIA and S3G Co. also filed counterclaims reasserting the claims set forth in their
28 proof of claims.

1    SONICblue's Adversary Complaint also asserted eleven affirmative claims for relief.

2    SONICblue's claims against VIA and S3G Co. include claims for breach of contract (for violating

3    the terms of both the Amended Investment Agreement and the Joint Venture Agreement), express

4    indemnity and equitable subordination. The Adversary Complaint also included an additional

5    claim against VIA only for its breach of the Guaranty and for breach of fiduciary duty arising from

6    the duty VIA owed SONICblue as a joint venturer under the Joint Venture Agreement.

7        SONICblue also asserted claims against VIA, S3G Co. and S3G Inc. These claims

8    included causes of action for an accounting, breach of implied contract, unjust enrichment and a

9    common count for use of SONICblue's goods and services. The common count and unjust

10   enrichment claim centered on the defendants' use of SONICblue's goods, services and facilities to

11   operate S3G Co. after the Closing, without compensation to SONICblue. Finally, SONICblue also

12   asserted a claim against S3G Co. and S3G Inc. for aiding and abetting a breach of fiduciary duty.

13       SONICblue's allegations focused on defendants' failure to meet their obligations under the

14   Joint Venture Agreement and the Amended Investment Agreement. Moreover, it also sought

15   damages according to proof compensating SONICblue for defendants' acceptance and utilization

16   of SONICblue's realty, goods and services, such as leaseholds and facilities, telecommunications

17   services, skilled labor services, and manufacturing inputs and materials. The Adversary Complaint

18   alleged that defendants operated the Graphic Chip Business in a manner in derogation of

19   SONICblue's rights as a joint venturer of S3G Co. The Adversary Complaint sought recovery of

20   damages according to proof and discovery in support of SONICblue's damages claims had just

21   been initiated at the time of the parties' reaching agreement as to the settlement terms in September

22   of 2005 (as discussed below).

23       H.    Settlement Negotiations.

24       Settlement negotiations between SONICblue and the Claimants began in earnest over a year

25   ago, in July 2005, while the Debtor had been having separate talks with Intel significantly before

26   that. SONICblue's discussions with the Claimants and Intel lasted several months and included

27   multiple in-person negotiation sessions. During those negotiations, the parties made significant

28   progress toward settlement and, in September 2005, SONICblue and the Claimants reached

1  agreement in principle by finalizing a term sheet for a settlement that would resolve most of their

2  respective claims, and full three-way discussions began shortly thereafter.

3       Given the unique interrelated nature of the parties' claims and positions, negotiation of the

4  Settlement Agreement was extremely complicated.  One of the most significant disputed issues

5  involved resolving the Intel related claims.  The Claimants' liquidated damages claim with respect

6  to the Intel License was the largest claim against the estate, and though the Debtors had substantive

7  defenses to that claim, there remained significant potential for Intel to successfully terminate the

8  Intel License and thus trigger some claim for liquidated or actual damages. ■■■■■■

9  ■■■■■■■■■■■■■■■■■■■■■■■■■■

10 ■■■■■■■■■■■■■  Similarly, any settlement with Intel could only be negotiated

11 in the shadow of its effects on the Claimants' claims and arguments, and of course a separate

12 settlement with either of Intel or VIA would only lead to protracted litigation with the other.  Thus

13 a simple two party settlement was for the most part unavailable, or at least inadvisable, and both

14 Intel's and VIA's participation in drafting and negotiating the Settlement Agreement was necessary

15 to bring the overall, three-way settlement to fruition.

16      For this reason the Intel-Debtor settlement negotiations and the VIA-Debtor settlement

17 negotiations proceeded on parallel and simultaneous tracks, with Special Litigation Counsel for the

18 Debtors (the O'Melveny firm) handling the intellectual property issues and releases, and the

19 Debtors' general bankruptcy counsel (the Pillsbury firm) handling the negotiations with VIA

20 concerning consummation of the transfer of the Graphics Chip Business Assets to S3G Co.

21 Following the formation of the conditional settlement-in-principle on a term sheet basis, the

22 negotiations to document the parties' agreements continued for several months ■■■■■■

23 ■■■■■■■■■■■■■■■■■■■■■■■■■■

24 ■■■■■■■■■■■■■■■■■■■■■■■■■■

25 ■■■■■■■■■■■■■  As throughout the process, these negotiations were

26 complicated by the three-party nature of the settlement process, with the Debtors not only

27 representing their own interests but often having to play mediator for disputes between Intel and

28 VIA.  As the Court will note from its reading of the Settlement Agreement, the terms of the

1  Settlement Agreement are incredibly complicated and prolix, and virtually every sentence of the

2  Settlement Agreement was the subject of active, at times contentious, negotiations.

3     I.     The Settlement Agreement.

4        Under the Settlement Agreement, VIA and S3G Co. will be permitted a single, general

5  unsecured claim against SONICblue in the amount of $12.5 million, and the $105 million VIA

6  Claims will be disallowed. In addition, SONICblue will transfer any interest it continues to own in

7  the Graphics Chip Business to S3G Co. or its designee. Transfer of the Graphics Chip Business

8  contemplates that SONICblue will execute the documents necessary or appropriate to assign the

9  relevant remaining graphics chip patents and trademarks. Transfer of the Graphics Chip Business

10  also contemplates SONICblue's delivery of all Graphics Chip Business patent files, trademark

11  files, employee files, licensing documents, and non-disclosure agreements to S3G Co. or its

12  designee, to the extent such can be located after a reasonable search. The agreement also provides

13  S3G Co. with reasonable access to other Graphic Chip Business files, including, under certain

14  conditions, the data tapes used in the Graphics Chip Business.

15        Although the debtor is under no obligation under the Settlement Agreement to preserve

16  records for the benefit of VIA or S3G Co., the Settlement Agreement nevertheless contemplates

17  that VIA and S3G Co. will likely continue to have access to SONICblue's documents and other

18  records, including data tapes, until at least January 1, 2008, and thereafter until the documents and

19  records are destroyed pursuant to a Bankruptcy Court order to be requested in the future. The

20  Debtors anticipated that providing access to documents and data tapes could substantially burden

21  the estates, due to the potential cost of pre-reviewing the documents and data tapes to avoid

22  inappropriate disclosure of privileged and confidential information. The Settlement Agreement

23  therefore provides that SONICblue will pay the first $50,000 of attorneys' fees and costs incurred

24  prior to January 1, 2008 in the process of responding to further requests for review of documents

25  and data tapes, but that VIA and S3G Co. will pay all such expenses over and above the first

26  $50,000.

27        With respect to Intel, the Settlement Agreement requires that ██████████████████

28  ████████████████████████████████████████████████████████████████



6    In addition, Intel will withdraw the Stay

7    Motion, and the Debtors will withdraw the Assumption Motion.

8    Finally, the parties each exchanged substantially complete mutual releases. Specifically,

9    the SONICblue and each of VIA and the S3G Co. entities, for themselves and certain related

10    parties and individuals such as subsidiaries and employees, exchanged mutual general releases for

11    all matters arising before the effective date of the Settlement Agreement.



22    The foregoing is only a summary and brief description of the terms and conditions of the

23    settlement agreement, the full terms of which are set forth in the Settlement Agreement attached

24    hereto as Exhibit B. The Settlement Agreement has been fully executed by all the parties, and the

25    Debtors do not contemplate any further modifications thereto.

26    As discussed below, the Debtors believe the Settlement Agreement is fair, reasonable and

27    in the best interests of the Debtors and their estates, and should be approved forthwith.

28

III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND IN THE BEST

INTERESTS OF THE ESTATES.

A.    Standard for Approval of Compromises.

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides the procedure for

approval of settlements in bankruptcy cases:

> On motion of the trustee and after notice and a hearing, the court may
> approve a compromise or settlement. Notice shall be given to
> creditors, the United States Trustee, the debtor and indenture trustees
> as provided in Rule 2002 and to any other entity as the court may
> direct.

Fed. R. Bankr. P. 9019(a).

The standard for approval of a settlement is well-settled in this Circuit. This Court must

find that an proposed settlement is "fair, reasonable and in the best interest of the estate." In re

Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997). In determining the reasonableness and adequacy

of a proposed settlement agreement, the court must consider: (a) the probability of success in the

litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the

complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attending it; and (d) the paramount interest of the creditors and a proper deference to their

reasonable views. In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986) cert. denied, 479

U.S. 854 (1986).

A bankruptcy court need not conduct an exhaustive investigation into the validity of the

merits of the claims sought to be compromised. In re Walsh Const. Inc., 669 F.2d 1325, 1328 (9th

Cir. 1982). "In undertaking an examination of the settlement, we emphasize that this responsibility

of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but

rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the

range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir.

1983), cert. denied, 464 U.S. 822 (1983) (quoting, Newman v. Stein, 464 F.2d 689, 693 (2d Cir.

1972), cert. denied sub nom., Benson v. Newman, 409 U.S. 1039 (1973)).

The Ninth Circuit has recognized that "[t]he bankruptcy court has great latitude in

approving compromise agreements." In re A & C Properties, 784 F.2d at 1380-81. It is well

1   established that compromises are favored in bankruptcy. In re Lee Way Holding Co., 120 B.R.

2   881, 891 (Bankr. S.D. Ohio 1990).

3       B.   Application Of The A&C Properties Standards To The Settlement Agreement.

4       The Debtors believe each of the elements identified in A & C Properties are satisfied with

5   respect to the Settlement Agreement.

6       1.   Probability of Success.

7       During the course of the litigation, SONICblue succeeded at significantly reducing

8   Claimants' likely recovery on the VIA Claims. As a result, the $105 million in claims would likely

9   have been reduced to less than $30 million. The following is a brief discussion of the current status

10  of the nineteen claims that comprise the VIA Claims.

11      a.   Claim Nos. 1 and 2.

12      As noted above, the Overdue Payables Claim is premised on the theory that SONICblue

13  agreed it would pay all trade payables and other obligations of the Graphics Chip Business when

14  and as they became due, and the Discounted Receivables Claim alleged that SONICblue promised

15  not to offer early or prompt payment discounts to customers of the Graphics Chip Business prior to

16  the January 3, 2001 closing. While subject to the Damage Cap of $5,554,544.00, Claimants

17  asserted more than $13 million worth of liabilities for the Overdue Payables Claim and the

18  Discounted Receivables Claim. As described above, SONICblue objected that it had no liability

19  for these claims because it only handled those expenses and awarded those discounts in the

20  ordinary course of its business. To prevail in its objections, SONICblue would need to present

21  historical evidence demonstrating how it usually conducted itself in the ordinary course of its

22  business with respect to payables and discounted receivables. In any event, SONICblue would

23  have had to successfully oppose nearly $8 million worth of alleged liabilities for those claims

24  before any reduction of exposure below the Damages Cap on these claims could be expected.

25      b.   Claim Nos. 3-17 and 19 – Economic claims.

26      These other non-Intel related claims total $29,636,268.20.

27      The over $12 million claim for conversion of accounts receivables relates to money that

28  SONICblue did in fact keep, though it did so to offset payments made by SONICblue for assumed

liabilities SONICblue contended S3G Co. refused to pay. Though SONICblue is confident that it was right to hold the receivables, there is a risk that Claimants could prove that SONICblue should not have paid those allegedly assumed liabilities and that Claimants should have a claim against SONICblue for the amount of money it offset.

The $12,686,270.45 Contributed Asset Claim was, SONICblue believes, greatly inflated by Claimants' inclusion of assets which have little or no value, or which they chose to leave behind. SONICblue also objected that this claim was subject to the Damage Cap. However, the size of this claim is quite large and Claimants would only need to prove liability for some of the assets for Claimants to have a claim in a very significant sum.

Most of the other $4.5 million worth of non-Intel related claims (Wrong Bonded Parts Claim, inventory expenses claim, RMA Credit Claim, Unapproved Purchase Claim and employee liabilities claim) would require SONICblue to establish that some of these claims are subject to the Damage Cap and/or that it had no liability for these claims because Claimants did not actually allege that they paid any amount to any third parties for these liabilities. SONICblue also objected to the RMA Credit Claim on the basis that the returned merchandise credits in question were handled as SONICblue usually treated them in the ordinary course of its business. Like Claim Nos. 1 and 2, SONICblue would have not only had to defend the circumstances of each credit, it would also have to prove how it conducted itself in the ordinary course of its business.

Given the age of the claims, difficulty in finding documents and other evidence stored in thousands of boxes, and the limited availability of witnesses after many years, there is risk that Claimants could prevail on some of these claims.

        c.     <u>Claim Nos. 3-17 and 19 – Non-economic claims.</u>

The Claimants' non-economic claims are premised on SONICblue's alleged failure to execute certain patent assignments or assign certain trademarks and alleged failure to deliver certain intellectual property files, turn over information on the transfer of licenses, provide audited financial statements, provide certain employee files, turn over certain data tapes, and deliver certain other documents.

1    Debtors believed that the equities of Claimants' non-economic claims were fairly strong –

2    the failure of the parties to effectuate some of the intellectual property transfers to S3G Co.

3    following the Closing having been occasioned primarily as a result of the complete breakdown in

4    the business relationship between VIA and SONICblue in the weeks immediately thereafter.

5    SONICblue's principal defenses to the non-economic claims were technical and procedural, the

6    principal one being that this Court lacked jurisdiction to enter any order other than for the

7    adjudication of the amount, if any, of damages recoverable on the non-economic claims.

8         d.    Claim No 18. – Claim Based Upon the Intel License.

9    By reason of this prolonged litigation among the parties, Claimants' case for liquidated

10   damages in the event S3G Co. was enjoined from utilizing the Intel License within five years of the

11   Closing (on January 3, 2001) had been substantially diminished as of the time of the settlement

12   agreement-in-principle reached between the parties in September 2005. Nevertheless, as of that

13   time, Claimants still had a potential claim for liquidated damages of $70 million.

14   Due to the protracted negotiations between the parties following the conditional settlement

15   reached last year between VIA and SONICblue, the estate's theoretical exposure to Claimants on

16   Claim No. 18 was substantially reduced (but for the parties' having reached an

17   agreement-in-principle, subject to the finalization of a settlement between the Debtors and Intel

18   acceptable to Claimants). Specifically, Claimants have not to date as yet been enjoined from using

19   the Intel License. SONICblue's position has been that, beginning January 3, 2006, Claimants'

20   potential $70 million claim for liquidated damages was reduced by $191,780.82 for each day that

21   S3G Co. was not enjoined from using the license. VIA contends, however, that without regard to

22   whether the settlement-in-principle would estop the Debtors from asserting that the liquidated

23   damages claim was thereafter being reduced, it had as yet unalleged claims for actual, rather than

24   liquidated damages, that would preclude the Debtors from avoiding the claim associated with the

25   Intel License as of January 3, 2007.

26        e.    The Stay Motion and the Assumption Motion.

27   The Stay Motion and the Assumption Motion have both been pending since 2004. In light

28   of the progress the parties were making on settlement, the briefing deadlines on these Motions,

1  initially set for June 22, 2005, have been repeatedly pushed back by SONICblue and Intel in an

2  effort to minimize the incursion of additional attorneys' fees.

3          2.      Difficulty of Collection.

4          The Debtors believe that successful assertion of SONICblue's counterclaims against the

5  Claimants would provide offsets to Claimants' claimed damages, but would not likely result in an

6  affirmative recovery. As such, the difficulty of collection is not a relevant factor in assessing the

7  Settlement Agreement.

8          3.      Complexity, Expense and Delay of Litigation.

9                  a.      VIA Claims.

10         The agreements and negotiations at the center of the VIA Claims occurred more than five

11 years ago. Almost immediately after the Closing, the parties were at loggerheads. The events most

12 relevant to the litigation occurred in the months leading up to and following the January 3, 2001

13 Closing. SONICblue has been in bankruptcy for more than three of the five years since the

14 Closing. None[4] of the employees whose testimony would be necessary to defend the Claimants'

15 claims (or to pursue SONICblue's counterclaims) is still employed by SONICblue, and only a few

16 of such former employees are in reasonably close contact with the Debtors. The memories of those

17 on all sides of the litigation have diminished over time. The Debtors believe this loss of

18 "institutional memory" will seriously complicate, and make more expensive, the process of

19 litigating the VIA Claims and SONICblue's counterclaims.

20         Also, many of the documents necessary to evaluate fully many claims involved in the

21 Adversary Proceeding are in storage and located among thousands of boxes of the Debtors' other

22 records. (The Debtors' record index is over 100 pages long.) The difficulty inherent in

23 identifying, locating, and reviewing relevant stored records material presents significant and

24 expensive discovery hurdles for both SONICblue and the Claimants. Discovery has been, and

25 necessarily would continue to be, a long and expensive process.

26

27 [4]     Marcus Smith, the Responsible Officer and Chief Financial Officer of SONICblue, was not

28 employed by SONICblue until approximately August 2001.

1    Regrettably, the Debtors lost access to most of their computerized records with the

2  conversion of Debtors' accounting software from an Oracle-based program to "Great Plains"

3  software in August 2002.  Virtually all of the Debtors' payment and receivables data from before

4  the conversion is no longer accessible via computer.  Hence, the Debtors would have to develop

5  their defenses to the Claimants' claims and SONICblue's counterclaims from paper records,

6  presumably without the assistance of employees who participated in the creation of the records.

7  Thus, the lack of access to computerized accounting records combined with the challenge of

8  finding relevant paper records among thousands of boxes of records could be expected to increase

9  the cost, delay and uncertainty of litigating the Claimants' and SONICblue's respective claims.

10    Moreover, the parties' claims and defenses are by their nature wide-ranging and complex.

11  SONICblue's primary objection to the Overdue Payables Claim and the Discounted Receivables

12  Claim, for example, was that SONICblue delayed payment of certain expenses and provided

13  certain customer discounts as it always had in the ordinary course of business.  To defend

14  successfully against these claims, SONICblue would need documentation and testimonial evidence

15  on the precise expenses for which Claimants sought payment, and extensive evidence of

16  SONICblue's historical activity with respect to payables and receivables.  Without such evidence,

17  it could not demonstrate what its ordinary course of business was and how its behavior in late 2000

18  and early 2001 was consistent with its history.

19    Likewise, the claim for conversion of the accounts receivables would be difficult for the

20  parties to prove or disprove.  SONICblue claims that it only held the receivables to off-set expenses

21  to venders S3G Co. refused to pay (to SONICblue's detriment); SONICblue will need to provide a

22  precise accounting of the money it kept and what expenses it paid for S3G Co.  It would also need

23  discovery from S3G Co. about the vendors it failed to pay during that time and why it chose not to

24  pay them.

25    The sizable Contributed Assets claim is equally complex and detail-intensive.  The list of

26  assets comprising this $12 million claim is lengthy.  The task of identifying which assets S3G Co.

27  took with it and which it left behind is extremely difficult.  Witnesses can not recall what happened

28  to the various assets on Claimants' list, so this claim would require analysis of SONICblue

1   documents and inventories to see if any of the assets can be found. Moreover, many of the assets

2   had significantly depreciated by the time Claimants abandoned them. A great deal of the litigation

3   over this claim would revolve around the value of the assets on their lengthy list.

4         Deciding all of Claimants' and SONICblue's respective claims would require the litigation

5   of more than thirty (30) separate claims – nineteen (19) claims by VIA and S3G Co. and another

6   eleven (11) claims by SONICblue (as alleged in its Adversary Complaint). For the most part, these

7   claims are all very different and will require different strategies, defenses and avenues of

8   discovery. Because the claims are so broad and varied, litigating them is sure to be an expensive

9   and time consuming process.

10        So far, litigation of the VIA Claims and the disputes with Intel (which were necessary to

11  minimize the VIA Claims) has cost the Debtors more than $2.2 million, including fees and costs

12  not yet submitted to the Court for approval. (This amount is comprised of over $1,500,000 for

13  O'Melveny & Meyers LLP and over $700,000 for Pillsbury Winthrop Shaw Pittman LLP.) The

14  Debtors believe that the amount of fees and costs that would be incurred to bring the matter to a

15  fully litigated conclusion would likely exceed an additional $2 million. As such, the Settlement

16  Agreement represents a substantial cost savings to the Debtors' estates.

17        Moreover, litigating this case would necessarily delay the conclusion of the bankruptcy

18  process for a substantial period of time. In the absence of a settlement, the Debtors theoretically

19  still could propose and seek confirmation of a liquidating plan of reorganization in the near future,

20  but any such plan of reorganization necessarily would have to create a reserve for payment of the

21  Claimants' claims in connection with making distributions to the Debtors' other creditors. This

22  reserve would presumably be the subject of litigation itself unless the Debtors agreed to reserve as

23  though the Claimants had a $100 million potential claim, in which case fully 25% of the Debtors

24  assets would have to be reserved for payment of the Claimants' claims. In addition, the Debtors

25  would likely be unable to dispose of the patents, trademarks and documents related to the Graphics

26  Chip Business until such time as all the VIA Claims had been resolved. Thus, while the Debtors

27  could proceed with a plan, these Graphics Chip Business assets could not be liquidated and the

28  funds reserved for payment of any successful VIA Claims would not become available for

1    distribution to creditors until the VIA Claims and SONICblue's counterclaims had been tried and

2    any appeals resolved, which clearly could be a number of years.

3          b.    Intel Claims.

4          The Assumption Motion and the Stay Motion both raise significant and difficult questions

5    of law and fact, the litigation of which has already been highly contentious.  Determination of the

6    Motions first would require resolution of various and somewhat inconsistent law

7

8

9

10

11

12

13

14                                          Investigation and litigation of all of these factual matters

15    would be significantly complicated by the fact that the Debtors had since liquidated their assets and

16    ceased operating as a going concern.  Although the Debtors believe they had the better arguments

17    on many of these positions, it is clear that Intel is a highly capable and devoted litigant.  Thus, even

18    if the Debtors were successful at the trial level, the appeals that could and likely would be pursued

19    would present a significant if not insurmountable hurdle in finalizing the administration of the

20    estate in anything approaching a reasonable timeline.

21          It must be noted that, in and of itself, the litigation with Intel is of little impact to the estate.

22    The Debtors are not operating, have no intent to recommence operations and have already sold and

23    transferred the intellectual property that would be subject to the license to Intel.

24

25

26                                          However, the litigation with Intel was and continues to be of paramount importance

27    because of its impact on the VIA Claims – specifically, the termination of the Intel License would

28    have given the Claimants a prima facie claim for $70 million in liquidated damages.  And, although

1  Claimants' liquidated damages claim is now significantly reduced, there is still the possibility that

2  Intel could initiate further litigation against Claimants and SONICblue related to S3G Co.'s use of

3  the Intel License.  That possibility has already complicated this litigation and its settlement

4  discussions.  It is undeniable that it would continue to complicate further litigation among the

5  parties, and supports approval of the Settlement Agreement.

6          4.    Creditors' Interests and Views.

7          Counsel to the Creditors' Committee and other representative constituencies, including

8  Bruce Bennett, Ron Bender and Craig Rankin, have all been kept on notice by counsel for the

9  Debtors of the progress of the negotiations between the Debtors, VIA, and Intel.  Debtors' counsel

10  believes that the Creditors' Committee and all other constituents who have been informed of the

11  progress of the negotiations fully support approval of the Settlement Agreement.

12         Moreover, the Debtors believe that the general creditor body is anxious for a distribution in

13  these cases.  The few creditors outside the Creditors' Committee who appear to be actively

14  following these cases appear pleased that the litigation with VIA and Intel is nearly resolved.  The

15  creditors appear mostly interested in expediting their distributions, a sentiment the Debtors

16  understand and believe further supports approval of the Settlement Agreement.

17         C.    Overall Assessment of the Settlement Agreement.

18         SONICblue believes it would prevail on most of the VIA Claims and SONICblue's

19  counterclaims, particularly those relating to Claimants' use of SONICblue facilities and property

20  without compensation to SONICblue.  However, the Claimants would not have to prevail on many

21  of their claims to secure an allowed claim well in excess of the $12.5 million claim that they will

22  be allowed under the Settlement Agreement.  As described above, VIA Claims Nos. 1 and 2 could

23  easily reach the $5.55 million damages cap, and there are multiple risk areas in connection with the

24  economic component of VIA Claims Nos. 3-17 and 19 – which exceed $29 million on their face.

25  The Debtors believe that capping their liability to the Claimants at the specified amount is a

26  significant benefit.

27         With respect to the non-economic component of the VIA Claims Nos. 3-17, the Debtors

28  believe their positions are well-taken, but the value of the Graphics Chip Business assets that

1    Debtors will transfer to the Claimants under the Settlement Agreement are not that substantial

2    while they remain subject to the Claimants' claims. It would be years before the Debtors could sell

3    these assets to other parties, and it is unknown whether these assets would have significant value at

4    that time.

5         Finally, the Settlement Agreement eliminates further litigation with Intel and any litigation

6    or potential liability to VIA in connection with VIA Claim No. 18 regarding the impact of the

7    Debtors' bankruptcy cases and Intel's Stay Motion on the value of the Intel License.

8         Overall, in light of the substantial savings in litigation costs, reduction of the VIA Claims

9    from over $105 million to $12.5 million, elimination of the litigation with Intel, and ability to

10   proceed promptly with distributions under a confirmed plan, the Debtors believe that immediate

11   approval of the Settlement Agreement is in the best interests of their estates.

12   IV.    <u>CONCLUSION</u>.

13        For the foregoing reasons, the Debtors respectfully request that this Court enter an order

14   approving the Settlement Agreement substantially in the form attached to the Motion as Exhibit A.

15        Dated: October 6, 2006.

16                  PILLSBURY WINTHROP SHAW PITTMAN LLP

17

18                  By:    /s    *Thomas V. Loran III*
                          Thomas V. Loran III

19                  Attorneys for Debtors and Debtors-In-Possession

20

21                  O'MELVENY & MYERS LLP

22                  By:    /s    *Austin K. Barron*
                          Austin K. Barron

23                  Special Litigation Counsel for

24                  Debtors and Debtors-In-Possession

25

26

27

28

# EXHIBIT 53

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN MORGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 03-51775-MM |
| | ) Case No. 03-51776-MM |
| | ) Case No. 03-51777-MM |
| SONICBLUE INCORPORATED; | ) Case No. 03-51778-MM |
| DIAMOND MULTIMEDIA SYSTEMS, INC.; | ) Chapter 11 |
| REPLAYTV, INC.; SENSORY SCIENCE | ) (Jointly Administered) |
| CORPORATION, | ) |
| | ) |
| Debtors. | ) Tuesday, January 23, 2007 |
| | ) San Jose, California |

Hearing on approval of disclosure
statement filed jointly by debtor
and the Official Unsecured Creditors
Committee; and
Joint motion for order:  1) Approving
disclosure statement; 2) Approving
plan solicitation and notice
procedures; 3) Appointing balloting
agent; 4) Approving voting procedures;
and 5) Establishing confirmation
deadlines and procedures, by debtor
and the Official Committee of
Creditors Holding Unsecured Claims


<u>Appearances</u>:

For Debtors:                    Pillsbury Winthrop Shaw Pittman, LLP
                                By:  William Freeman, Esq.
                                650 Town Center Drive, Seventh Floor
                                Costa Mesa, California  92626-7122

For the Creditors'             Levene Neale Bender Rankin & Brill, LLP
Committee:                      By:  Ron Bender, Esq.
                                Craig M. Rankin, Esq., (via telephone)
                                10250 Constellation Boulevard
                                Suite 1700
                                Los Angeles, California  90067


Appearances continued on next page.

2

Appearances continued:

| | |
|---|---|
| For Creditors Riverside Claims and Riverside Contracting: | Murray & Murray<br>By:  Robert A. Franklin, Esq.<br>19400 Stevens Creek Boulevard, Suite 200<br>Cupertino, California  95014-2548 |
| For Dan Grotenhuis: | Dan Grotenhuis, *pro per* |
| For Creditor Argo Partners: | McNutt & Litteneker<br>By:  Scott H. McNutt, Esq.<br>188 The Embarcadero, Suite 800<br>San Francisco, California  94105 |
| For the U.S. Trustee: | United States Trustee, Region 17<br>United States Department of Justice<br>Nanette Dumas, Attorney<br>280 South First Street, Room 268<br>San Jose, California  95113 |
| For the Senior Noteholders (via telephone): | Hennigan, Bennett & Dorman<br>By:  Bruce Bennett, Esq.<br>865 S. Figueroa Street, Suite 2900<br>Los Angeles, California  90017 |
| Digital Court Recorder: | United States Bankruptcy Court<br>Clerk of the Court<br>Jackie Jarvis<br>280 South First Street, Room 3035<br>San Jose, California  95113<br>(408) 535-5023 |
| Certified Electronic Transcriber: | Palmer Reporting Services<br>P. O. Box 30727<br>Stockton, California  95213-0727 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Disclosure Statement and Joint Motion                                    3

1    Tuesday, January 23, 2007                    11:08 o'clock a.m.

2                        P R O C E E D I N G S

3            THE CLERK:  Item 2, Sonic Blue, Incorporated.

4            MR. FREEMAN:  Good morning, Your Honor.  William

5    Freeman, F-r-e-e-m-a-n, Pillsbury, Winthrop, Shaw and Pittman,

6    on behalf of the debtors.

7            MS. DUMAS:  Good morning, Your Honor.  Nanette Dumas

8    for the U.S. Trustee.

9            MR. FRANKLIN:  Good morning, Your Honor.  Robert

10   Franklin of Murray and Murray on behalf on creditors Riverside

11   Claims and Riverside Contracting.

12           MR. BENDER:  Good morning, Your Honor.  Ron Bender,

13   Levene, Neale, Bender, Rankin and Brill, appearing on behalf of

14   the Creditors' Committee.

15           MR. GROTENHUIS:  Good morning, Your Honor.  Dan

16   Grotenhuis representing myself.

17           THE COURT:  I'm sorry.  I didn't get your name.

18           MR. GROTENHUIS:  Dan Grotenhuis.

19           THE COURT:  Thank you.

20           MR. McNUTT:  Your Honor, Scott McNutt, appearing on

21   behalf of Argo Partners, an objecting creditor.

22           THE COURT:  Okay.  Good morning to all of you.

23           [COUNSEL]:  Good morning, Your Honor.

24           THE COURT:  Okay.  Well, you're all aware of the

25   objections that have been filed.  I take them very seri- — I'm

Disclosure Statement and Joint Motion                                    4

1   sorry.  We have a telephonic?  Let's have the telephonic

2   appearances.

3           MR. RANKIN:  Good morning, Your Honor.  It's Craig

4   Rankin also on behalf of the Creditors' Committee.

5           MR. BENNETT:  Good morning, Your Honor.  Bruce Bennett

6   of Hennigan, Bennett and Dorman, on behalf of the senior

7   noteholders.

8           THE COURT:  Okay.  As I was saying I take the

9   objections of very seriously because they go to the issue of the

10  integrity of the system.  The debtor and the Committee have not

11  had the opportunity to respond.  Do you wish to be heard?

12          MR. BENDER:  We do, Your Honor.  Would you like me

13  here or at the podium?

14          THE COURT:  You know, I've always told people you're

15  more effective at the podium, but if you choose to remain seated

16  it's your choice.

17          MR. RANKIN:  Please go to the podium, Ron.

18      (Laughter.)

19          MR. BENDER:  Your Honor, thank you.

20          Your Honor, we received the Riverside objection last

21  week and attempted to make all of their changes to the

22  disclosure statement.  I received, just before leaving my home

23  this morning for the airport, the supplement that Riverside

24  filed saying that they still want additional disclosure

25  regarding the Intel situation and they would like to have the

Disclosure Statement and Joint Motion                                    5

1    identities of the committee members added to the disclosure

2    statement.  The latter, of course, —

3              THE COURT:  Tell me about the constitution of the

4    committee.  How many members —

5              MR. BENDER:  Who the members are?

6              THE COURT:  Yeah, how many members do you have on the

7    committee?

8              MR. BENDER:  I believe there were nine originally.

9    And one, Maxtor, dropped out a couple of years ago.  The other

10   eight remain.

11             THE COURT:  And who are these people?

12             MR. BENDER:  The five largest consist of Mr. Bennett's

13   three clients, which are the senior noteholders, —

14             THE COURT:  Um-hum.

15             MR. BENDER:  — each with the face amount of their

16   notes of $25 million and then all the complexities that go with

17   that.  But they're the three largest, clearly.

18             The next two largest who I believe are each owed, by

19   memory, something in the five to ten-million-dollar range, are

20   two Japanese electronics companies, both of whom are represented

21   by Perkins Coie with the primary lawyer being Bruce McIntyre in

22   Seattle who's a very active committee member for both creditors.

23             The other three are different, different trade

24   creditors.  I don't recall the names offhand.  There's Amax.

25             THE COURT:  You work with these people for four years

1  and you don't remember their names?

2          MR. BENDER:  Because those last three have, generally

3  speaking, asked me to give them advice, and they would respond

4  if they disagree, which is rare, and they're — I believe at

5  least one is overseas.  So the other three take a very inactive

6  role in the Committee.

7          The main — the main actors on the Committee are the

8  three notehold- — the three senior noteholders and Mr.

9  McIntyre's clients over the past couple of years.

10          THE COURT:  Okay.  Thank you.

11          MR. BENDER:  And, of course, Your Honor, there hasn't

12  been that much in terms of Committee involvement.  Most of the

13  bankruptcy case, since the sales have concluded, have resolved

14  around claim objections, which Committee members are relying on

15  counsel for.  And my firm and the Pillsbury firm split that work

16  up.  The preference actions, which they're relying on, which our

17  firm split up.  And then the Via-Intel settle- — the Via-Intel

18  litigation, which the Committee was not a litigant to, so — and

19  only really became involved at all at the very, very end, which

20  I'm happy to go over as part of my response to the objections.

21          THE COURT:  Okay.

22          MR. BENDER:  So that's the reason.  It's not one of

23  these cases where we have weekly calls, or something.

24          THE COURT:  Okay.

25          MR. BENDER:  If I can explain what I understand to be

1    the issues with respect to the Intel — I'm not the most

2    knowledgeable person, but I've made a big effort the last 24, 48

3    hours to become knowledgeable — is the following.  And I do want

4    to preface to say that:  You'll never have from my firm an

5    objection to including language in a disclosure statement.

6          So I have no doubt that if there's language people

7    want to put into a disclosure statement, we will put that in.

8    And certainly we take the integrity of the system very

9    seriously, too.  And I've drafted on the airplane proposed

10   language which, of course, I don't mean to shove on anybody, but

11   we take this very seriously.

12         But, fundamentally speaking, what you had here was

13   this:  In 2002 Bruce Bennett's clients provide senior notes to

14   the company with the face amount of $75 million.  And what is

15   absolutely routine in the whole bondholder world is that at the

16   company's request the bondholders subordinate to certain types

17   of claims.

18         And the reason they do that is because the company's

19   worried that without that subordination provision the company's

20   not going to be able to go out and get trade credit or other

21   types of funding.  And that's just routine.  It's in every bond

22   deal I've ever seen, particularly with respect to trade credit.

23   Otherwise, trade creditors wouldn't provide trade credit to

24   businesses.

25         There's language in the subordination provision that

1  identifies a number of different types of claims to whom the

2  senior noteholders have subordinated.

3          And one of the languages is set forth in both the

4  objection filed by Riverside as well as the objection filed by

5  Argo Partners, which describes the subordination as, in quotes,

6  all indebtedness of the company due and owing to Via

7  Technologies, Inc. in an aggregate principal amount not to

8  exceed $15 million.  That's what it says.

9          Now what I'm told — obviously we weren't around at the

10  time, it's a couple years before the bankruptcy filing — was

11  that that provision — I'm told it by Marcus Smith, the principal

12  of the debtor who was, I understand, the chief financial officer

13  at the time, as well as I'm told it by Mr. Bennett, who was

14  representing the noteholders at the time, that that provision

15  was intended to subordinate to Via in the event that Via

16  actually — excuse me — provided funding to the company, which

17  there's no ambiguity that Via never provided any of that

18  funding.

19          And — then in the bankruptcy filing — and Via,

20  together with — we call it JV, their JV partner, filed two

21  identical proofs of claim against the estate, each for $105

22  million, all related to the whole Intel license deal.

23          There's nothing in their claims that have anything to

24  do with the type of, quote, senior indebtedness to whom the

25  senior noteholders would have subordinated.

Disclosure Statement and Joint Motion                     9

1          Now Your Honor knows how complex that litigation was

2    with respect to how that case was staffed.  Because of a

3    conflict that the Pillsbury firm had with respect to the Intel

4    side of things, the debtor employed the O'Melveny firm to work

5    in conjunction with the Pillsbury firm in that litigation with

6    the O'Melveny firm essentially taking the Intel side of the

7    litigation and Pillsbury taking the Via side of the litigation,

8    but working in tandem.

9          The Creditors' Committee was not a party to that

10   litigation.  And there were so many complicated confidentiality

11   agreements that the Committee wasn't even privy to the top-level

12   of confidentiality.

13         So all I would do and Mr. Rankin would do is we would

14   periodically call primarily the O'Melveny lawyers, we knew

15   Suzzanne Uhland, to get updates from her.  We would occasionally

16   get updates from the Pillsbury lawyers, but our main source of

17   information really was from the O'Melveny lawyers.  And we would

18   stay as involved as we could within the whole confidentiality

19   complexities, then keep the Committee involved.

20         We saw that as our limited role, which is why our fees

21   with respect to that litigation are minuscule compared to the

22   fees in the case.

23         What we were advised by the two counsels, but

24   O'Melveny was our primary counsel, was that the estate was

25   extremely vulnerable, particularly with respect to a

1  $70-million-liquidated-damages provision that Via was going to

2  have against the estate if the Intel license situation wasn't

3  resolved and that the estate was unable, under Catapult and

4  what-have-you, to effectively assume or assume and assign that

5  Intel license.

6        So we were advised, the Creditors' Committee was

7  advised by debtors' counsel, but primarily O'Melveny, but by

8  both debtors' counsel, that the estate was very vulnerable on at

9  least $70 million of the $105-million claim.

10        We thought, based upon advice from counsel, that there

11  was exposure for the other $35 million but much more limited.

12        So we were advised — and when I say "we," the

13  Committee, because in this regard I was essentially a client —

14  we were advised that really we were likely to lose on at least

15  the $70-million part.

16        It's uncomfortable to put something like that, of

17  course, in a pleading in a disclosure statement.  That's what we

18  were advised.  I just want to make sure this is full disclosure

19  of what happened.

20        Anyway, after months of this going on, the Committee

21  concluded that any settlement with respect to Via getting an

22  allowed claim of $25 million or less was a very favorable deal

23  for the estate.

24        So the Committee, through us, advised debtors' counsel

25  that if they could settle that litigation where Intel went away,

1   JV went away, and Via obtained a claim of not more than $25

2   million, the debtors had the Committee support to agree to that

3   settlement.  Of course, anything else less than $25 million, the

4   Committee would view as much better.  There was never any

5   discussion at any time about this idea of senior indebtedness.

6          The next thing that happened with respect to the

7   Committee is that we were told a settlement had been reached

8   orally, and the settlement would involve Intel going away,

9   essentially, the license being transferred back to Intel; JV

10  agreeing that it had no claims; and Via agreeing to an allowed

11  general unsecured claim of twelve and a half million dollars,

12  half of what the Committee had authorized the debtors to settle

13  at.

14         So the Committee was happy, viewing that as a

15  phenomenal result, both in terms of taking a claim that we were

16  being — was likely to result in at least 70 million and

17  eliminating what was clearly going to be millions of dollars in

18  legal fees.

19         THE COURT:  Basically you weren't aware of the issue?

20         MR. BENDER:  Correct, correct.

21         We — the next thing that happened with respect to the

22  Committee is the Committee was actually provided with the full

23  settlement agreement.  And, of course, we asked the debtors:

24  Please don't sign it until you've walked the Committee through

25  the settlement agreement.

1          The debtors' lawyers walked the Committee through the

2    settlement agreement.  It's a very complicated agreement, but we

3    understood it.  We were happy with it, and —

4          THE COURT:  At that point did you understand —

5          MR. BENDER:  No.

6          THE COURT:  No.  All right.

7          MR. BENDER:  Okay.

8          So we have the 9019 motion before Your Honor.  It gets

9    approved.  It's a go.  The plan and disclosure statement, the

10   original drafts of the plan and disclosure statement were

11   prepared by the Pillsbury firm, I think, three years ago.

12         And the reason why they've remained in standstill is

13   because of one issue only, and that is if we're going to

14   substantively consolidate these estates, that has to happen

15   before or at the time of plan confirmation.

16         We couldn't responsibly recommend to the Court or the

17   creditors that substantive consolidation made sense unless and

18   until the Via-Intel litigation was solved, because had such a

19   huge claim been allowed to one debtor or to another debtor, it

20   arguably would have been unfair as complicated substantive

21   consolidation wouldn't have been if — or not substantively

22   consolidating would have been to make that decision.  That's why

23   the plan just stood in abeyance for — literally for three years.

24         Once — as soon as the Via-Intel settlement was

25   approved by Your Honor, I think about three months ago, I

Disclosure Statement and Joint Motion                    13

1    personally became the primary person for this estate in the

2    drafting of the plan and disclosure statement.  And there have

3    been —

4              THE COURT:  So you're saying that even at the time

5    that the agreement was approved, the Committee was not aware of

6    this provision?

7              MR. BENDER:  Not aware, or focused, or any of the

8    like.

9              Now I don't want to mislead the Court.  It's my

10   responsibility to read a document.  The document does say that

11   Via agrees that its claim is not senior indebtedness, but I

12   would have no reason to focus on it being an important point.

13             THE COURT:  Right.

14             MR. BENDER:  We draft the plan and disclosure

15   statement extensively.  It was a lot of work, as Your Honor

16   knows, working with debtors' counsel, working with others who

17   were — we knew of being interested at the time, filed the plan

18   and disclosure statement.

19             The first we heard of this issue was in the Riverside

20   objection.  We looked — we looked into it.  The fundamental

21   premise, if we get rid of all in the nastiness in pleadings

22   which I like to avoid — I don't draft pleadings that way — the

23   fundamental premise, as I understand it, that's being raised by

24   Riverside and Argo is the following.  And it's very important

25   that everybody understands exactly what's going on.

1        If the twelve — the twelve-and-a-half-million-dollar

2  settlement is a fabulous deal.  I don't think anybody could

3  disagree with that if they understand the facts.  And if we need

4  to supplement the disclosure statement to say that the

5  proponents believe that the likely result of litigation would

6  have been $X$, which is kind of an uncomfortable thing to (skip on

7  CD), that's why we think this is a great deal.  We can do that.

8        If the twelve-and-a-half-million-dollar claim, in and

9  of itself, if all or any portion of that is senior indebtedness,

10  all that does is benefit Via to the harm of the senior

11  noteholders.  It doesn't benefit any other creditors.  It's the

12  same claim against the estate.

13        The argument that Riverside and Argo are making, which

14  in theory would be true, is that they're saying that because

15  this estate looks like it's going to be about a 33-percent

16  recovery to unsecured creditors, that Via with a twelve-and-a-

17  half-million-dollar claim is likely to get around $4 million,

18  let's say.

19        What they're saying is that what the estates should

20  have done, in retrospect, is persuade Via to have agreed to a

21  settlement not of a twelve-and-a-half-million-dollar general

22  unsecured claim, which was not senior indebtedness, but rather a

23  roller claim all the way to down to around a third of a claim

24  that would have been senior indebtedness on the theory that Via

25  should have been economically neutral, and then the estate would

Disclosure Statement and Joint Motion                           15

1    have had less claims against it.  So —

2            THE COURT:  Well, it's like you've got a couple of

3    different pocketbooks in this estate.  There's one pocketbook

4    for the senior indebtedness and one pocketbook for general

5    unsecured creditors.

6            MR. BENDER:  Right.

7            THE COURT:  And, as I understand it, the settlement

8    takes the money from the general unsecured creditors' —

9            MR. BENDER:  No.

10           THE COURT:  — pocketbook.  Am I wrong?

11           MR. BENDER:  Not completely —

12           THE COURT:  Then help me understand it.

13           MR. BENDER:  Not completely wrong.

14           THE COURT:  Then help me understand it.

15           MR. BENDER:  Okay.  I want to say two things.

16           First of all, there's not two different pots of money.

17           THE COURT:  Okay.

18           MR. BENDER:  So that fundamental premise is not

19   correct.  The senior noteholders are general unsecured claims,

20   just like everybody else.

21           The only benefit that the senior noteholders have that

22   the other unsecured creditors have is just the following:  A

23   number of years before the senior notes were issued, there were

24   junior notes that were issued to the tune of around a hundred

25   million dollars.  The junior note [sic] and the trustee is

1   represented by Sheppard Mullin in Los Angeles, David McCarty.

2   He's taken a very active role in this case, relatively speaking.

3           The Pachulski firm represents the junior bondholders

4   themselves.  When SonicBlue was having all of its financial

5   problems in 2001 and 2002, in order to induce the senior

6   noteholders to advance their money to the estate, the junior

7   noteholders subordinated to the senior noteholders.

8           THE COURT:  Um-hum.

9           MR. BENDER:  So what happens in this case, just the

10  simple numbers, is — and these aren't going to be the right

11  claim amounts, because there's all these objections, but we just

12  use simple numbers — if — if the junior noteholders are at $99

13  million and the senior noteholders are at $75 million, and it's

14  a 33-percent case, the senior noteholders will get $25 million;

15  the junior noteholders will get $33 million, except, because of

16  the subordination agreement, the junior noteholders have to take

17  their $33 million and give it to the senior noteholders.  So the

18  junior noteholders will get zero and the senior noteholders,

19  under this hypothetical, will get $58 million.

20          THE COURT:  That's exactly what I understand.

21          MR. BENDER:  The other — the other creditors —

22          THE COURT:  Now run it — run it through as if the Via

23  settlement was being paid at senior indebtedness.

24          MR. BENDER:  Perfect.

25          THE COURT:  Okay.

1        MR. BENDER:  Okay.  If, if the Via settlement was

2   exactly like it is, except that the settlement amount was the

3   same, twelve and a half million dollars, and that twelve-and-a-

4   half-million-dollar claim, instead of being acknowledged by Via

5   not to be senior indebtedness was, instead, senior indebtedness,

6   then what would happen is that the money that — that the senior

7   noteholders would get would otherwise be subordinated to Via,

8   which means that, just like before the juniors transferred to

9   the seniors, now the seniors would transfer to Via.

10        It would zero impact on the other unsecured creditors.

11   Via would still have a twelve-and-a-half-million-dollar claim.

12   The senior noteholders would still have whatever claim they

13   have.  The other unsecured creditors would have zero benefit

14   from the twelve-and-a-half-million-dollar Via claim —

15        THE COURT:  All right.  So —

16        MR. BENDER:  — being the senior indebtedness.

17        THE COURT:  So Via gets paid how much?

18        MR. BENDER:  Via will get, —

19        THE COURT:  It would be —

20        MR. BENDER:  — as a twelve-and-a-half-million-dollar

21   creditor, the same percentage everyone else will get, —

22        THE COURT:  Okay.  So —

23        MR. BENDER:  — but the senior noteholders would have

24   to pay over to Via the difference between a hundred cents on the

25   dollar —

Disclosure Statement and Joint Motion                    18

1          THE COURT:  So Via would —

2          MR. BENDER:  — and whatever Via would get.

3          THE COURT:  So Via would get twelve and a half

4   million?

5          MR. BENDER:  Correct.  Thirty —

6          THE COURT:  And then —

7          MR. BENDER:  — 33 percent from the estate and 67

8   percent from the senior noteholders.

9          THE COURT:  Okay.  And then how much do the seniors

10  get?

11         MR. BENDER:  The senior noteholders — you mean in real

12  dollars?

13         THE COURT:  In real dollars.

14         MR. BENDER:  If their claims were 75 million —

15         THE COURT:  They have a $75-million claim —

16         MR. BENDER:  — they would get 25 million —

17         THE COURT:  — less —

18         MR. BENDER:  — less —

19         THE COURT:  — twelve and a half million?

20         MR. BENDER:  No.  Because Via would get a third of its

21  twelve and a half million from the estate, and then about eight

22  million or so.

23         THE COURT:  Okay.  So they get 25 million less —

24         MR. BENDER:  No, Your Honor.

25         THE COURT:  — eight million?

1          MR. BENDER:  No, no.  If Via was owed twelve and a

2    half million —

3          THE COURT:  Um-hum.

4          MR. BENDER:  — of senior indebtedness, —

5          THE COURT:  Um-hum.

6          MR. BENDER:  — and the senior noteholders were owed 75

7    million general unsecured claim, —

8          THE COURT:  Um-hum.

9          MR. BENDER:  — and it was a 33-cent case, —

10         THE COURT:  Um-hum.

11         MR. BENDER:  — the senior noteholders would get $25

12   million, one-third of 75 million.  Via would get one-third of

13   twelve and a half million, approximately a fourth and a third

14   million.

15         Then the senior noteholders would have to pay over to

16   Via the difference between twelve and a half million and four

17   and a third million.

18         THE COURT:  So they're coughing up $8 million to Via.

19         MR. BENDER:  If it was senior indebtedness.

20         THE COURT:  Right.  And so then Via is getting twelve

21   and a half million, —

22         MR. BENDER:  Correct.

23         THE COURT:  — and the seniors at that point are

24   getting 17 million.

25         MR. BENDER:  Correct.

Disclosure Statement and Joint Motion                    20

1          THE COURT:  Okay.  Now —

2          MR. BENDER:  You're getting — you're exactly right.

3      Now —

4          THE COURT:  Now you've got the junior noteholders, and

5  their money is going in to the seniors, —

6          MR. BENDER:  Correct.

7          THE COURT:  — and so they're getting how much from

8  that?

9          MR. BENDER:  Under this hypothetical where the juniors

10  are owed 99 million?

11          THE COURT:  Hypothetical.

12          MR. BENDER:  They would owe 33 million over to the

13  senior noteholders.

14          THE COURT:  So basically it's an $8 million difference

15  for the senior noteholders.

16          MR. BENDER:  The difference between — the difference

17  between Via having a 12.5 million general unsecured claim and

18  having a 12.5 million senior indebtedness claim is exactly what

19  you just said, on the 33-cent case.

20          THE COURT:  Okay.  And you're saying that the general

21  unsecured creditors are going to get —

22          MR. BENDER:  Let's say — 33 percent, let's say.

23          THE COURT:  Okay.

24          MR. BENDER:  So — so —

25          THE COURT:  Where does the extra $8 million —

1        MR. BENDER:  It —

2        THE COURT:  It just came from the —

3        MR. [SPEAKER]:  One from the other.

4        MR. BENDER:  The senior noteholders.

5        THE COURT:  — senior noteholders.

6        MR. BENDER:  Correct.

7        THE COURT:  Okay.

8        MR. BENDER:  Now here is the crux, here is the crux of

9   the argument.  I respect the argument they're making, but let me

10  make sure we're all clear on the facts.  What Argo and Riverside

11  are saying is that if Via agreed, as part of an overall

12  settlement, to a twelve-and-a-half-million-dollar general

13  unsecured claim and acknowledged that that claim was not senior

14  indebtedness and knew that the estate was looking at around a

15  33-percent distribution — I don't know if Via knew that at the

16  time or not, because we hadn't filed the claim yet; nobody from

17  Via called me.  And we're the ones retaining the claims' chart

18  and what happened.  But that's neither here nor there.

19        Let's assume those facts, —

20        THE COURT:  Okay.

21        MR. BENDER:  — that Via had agreed to a twelve-and-a-

22  half-million-dollar settlement, that Via acknowledged that

23  twelve-and-a-half-million-dollar claim was not senior

24  indebtedness but rather just a general unsecured claim and knew

25  that it was a 33-cent case, and they were looking at getting

Disclosure Statement and Joint Motion                    22

1    four and a third million, so we stay consistent with the

2    numbers.  Let's assume those facts.

3           What Argo Partners and Riverside are saying now, if I

4    understand it correctly, is that the estate, the debtors who

5    were negotiating that settlement, should have said to Via:  Hey,

6    Via, if you're willing to take a twelve-and-a-half-million-

7    dollar general unsecured claim, why don't you instead take a $5

8    million senior indebtedness claim, or a $6 million senior

9    indebtedness claim, or any number which is less than twelve and

10   a half million but more than four and a third?

11          That way you'll get exactly the same that you think

12   you're going to get with a twelve-and-a-half-million-dollar

13   general unsecured claim, but you will result in the overall pool

14   of general unsecured creditors being less and, therefore,

15   advantaging the Argo Partners and the Riversides of the world.

16          The problem with that analysis is that it assumes a

17   whole bunch of facts which I'm told were not possible, which are

18   that there wasn't any basis to give Via a senior indebtedness

19   claim —

20          THE COURT:  Whoa, whoa, whoa.  First of all, I don't

21   see that it really has an advantage for Argo or Riverside under

22   the scenarios that we have just laid out.

23          MR. BENDER:  Where — where there —

24          THE COURT:  They still get one-third of their claims

25   paid.

1        MR. BENDER:  Here's where there would have been an

2    advantage, just so we're — make sure we're all crystal clear on

3    all the facts.

4        THE COURT:  Right.

5        MR. BENDER:  If, if in this theoretical world the

6    estate could have persuaded Via, let's just say, to obtain a $6

7    million senior indebtedness claim instead of a

8    twelve-and-a-half-million-dollar general unsecured claim, if

9    that was possible, right, then the total pool of general

10   unsecured claims would be six and a half million dollars less,

11   because now Via would be paid as a $6 million creditor, not as a

12   twelve and a half.

13       So there would be six and a half million less

14   unsecured creditors.  So instead of the case being a 33-cent

15   distribution, it would have been a thirty-three-and-a-half-cent

16   distribution, or a 34-cent distribution, whatever the change

17   would have been.

18       There would have been an incremental benefit to

19   general unsecured creditors like Riverside or Argo.  It would be

20   nominal, because there's so much debt in this case.  But there

21   would have been some teeny benefit to them.  They're not

22   incorrect about that.

23       Where they're incorrect is that they're operating

24   under the assumption, which I'm told are incorrect facts, which

25   are that the estate had the ability to persuade Via to accept a

1  lower claim than have it be called magically "senior

2  indebtedness," even though, we are told, that Via never raised

3  during any of the litigation or negotiations that it had a

4  senior indebtedness claim, that there was any basis for them to

5  have a senior indebtedness claim, or that the senior noteholders

6  would have agreed.

7          So it's easy to just say, well, if you had this other

8  type of settlement, the estate would have been better off.  But

9  you have to have had the opportunity you've had for another

10  settlement.  And what we're being told is that that opportunity

11  didn't exist.

12          Ironically, ironically here how did the — how did that

13  parenthetical where Via acknowledged that it wasn't senior

14  indebtedness even getting to the settlement document?  It was —

15  it was put in there by the Pillsbury lawyers, not by Bruce

16  Bennett.

17          And why, why did the Pillsbury lawyers put it in?

18  Because the Pillsbury lawyers realized that, hey, you know what,

19  just to be crystal clear — and Pillsbury was SonicBlue's lawyers

20  all the way from inception.  So they were the lawyers during the

21  junior notes, the senior notes, et cetera — the Pillsbury

22  lawyers said:  You know what?  We don't want to have an

23  ambiguity later where the estate has to incur a bunch of fees of

24  litigation between Via and the senior noteholders whether this

25  is or isn't senior indebtedness, because it doesn't impact upon

Disclosure Statement and Joint Motion                          25

1   the estate.  It only impacts upon — on Via and the senior

2   noteholders.  So everybody's suspicions that the senior

3   noteholders are somehow controlling this case is wrong.  Then —

4          THE COURT:  Well, but — I mean you've — you've said

5   that it does impact general unsecureds.  It may be minutiae, but

6   it has an impact.

7          MR. BENDER:  If, if the settlement, if the settlement

8   that Argo and Riverside wished had occurred was available, but

9   we're told it was not.  So we can sit here today and say, you

10  know, hold disclosure statement hearing.  Right?

11         We're willing to disclose anything.  I put together

12  three pages of handwriting.  I don't know if anybody wants me to

13  read it on the record.  I'll read it on the record.

14         THE COURT:  The problem is that you don't have

15  knowledge.  That's what the problem is.

16         MR. BENDER:  I don't have knowledge about which part?

17         THE COURT:  About the Via settlement.  So really what

18  you probably have to do is allow discovery to take place.

19         MR. BENDER:  That's completely fine.

20         But I ask — I ask the following question:  The last

21  thing you'll ever have with my firm in as counsel is trying to

22  block people from having information.  I've never in my entire

23  career fought with somebody about you want me to disclose this,

24  we'll put it in.

25         THE COURT:  I'm not accusing you of that.

1          MR. BENDER:  Good.

2          THE COURT:  All right.

3          MR. BENDER:  But — but here's — I do want to point — I

4    do want to point this out.  And — and I think this is important.

5    I like to understand what's the other side trying to achieve.

6          I had never heard of Argo Partners being involved in

7    this case until almost midnight last night when I got that ECF

8    thing on my computer and I just happened to be awake.  They've

9    never, as far as I know, appeared in this case or have been

10   buying claims.

11         The first that I ever heard from Riverside was when

12   they were objecting to the continuous plan exclusivity

13   stipulations that the debtors and the Committee want to enter

14   into because they, understandably, wanted a plan filed as

15   quickly as possible because they want to get their money as

16   quickly as possible.

17         I personally went through great efforts during this

18   whole holiday season to make sure that we got them up, because

19   that's what's significant for us, because what — somebody else

20   is going to file a claim in this case, to get a plan on file

21   December 15th so we could —

22         THE COURT:  It's upsetting to you that somebody has

23   raised an issue that the Committee didn't consider, but they

24   have?

25         MR. BENDER:  Your Honor, but that's — that's not my

Disclosure Statement and Joint Motion                    27

1    point.

2            THE COURT:   Okay.

3            MR. BENDER:   My point — my point is the following.   I

4    don't mean to interrupt.

5            My point is this —   We can delay this whole case, put

6    it on hold, et cetera, while they do their discovery.   My point

7    is this:   A very complex settlement was approved before Your

8    Honor months ago with a final order.

9            It would be insane to try and undo that settlement.   I

10   don't think that's what they want to accomplish.   And if they

11   wanted to accomplish that, that would really make no sense.

12           So my question is this:   So they — go do your

13   discovery, but let's assume the worst for this conversation.

14   Let's assume that Via says:   You know what, if someone had just

15   asked us, yeah, we would have agreed to a lower claim.   If you

16   could have gone before Judge Morgan and gotten a court order

17   that said it was senior indebtedness — let's assume Via says

18   that, because if Via doesn't say that there's nothing to talk

19   about.

20           Let's assume Via says that.   Well, then, what do we

21   do?   There's nothing to do.   I mean we have a — we have a pot of

22   a lot of money.   We're anxious to get it to creditors.   We've

23   gone through a lot to get a plan and disclosure statement filed

24   as quickly as we can.   We amended the plan to make sure — at

25   Riverside's request, really — that unsecured creditors —

Disclosure Statement and Joint Motion                    28

1          THE COURT:  There are always remedies.  We don't need

2   to get into them now, but there are always remedies.  So don't

3   worry about that.

4          MR. BENDER:  As long as everybody understands that

5   discovery equates to delay.  And if that's the result they want,

6   I think — Mr. Bennett doesn't want that result.  He can speak

7   for his own clients.  But the debtor is in a liquidating case.

8          The Committee members like Riverside and Argo would

9   like to see their money come to them as soon as possible.  If

10  the case is delayed, they, like Argo and Riverside, will get

11  their money later than sooner.

12          If — if a delay is what is necessary — I'd be sort of

13  surprised if that's the result Riverside and Argo want, because

14  that's totally adverse to their interest and totally adverse to

15  what Riverside's been telling us for months.  And to me

16  discovery equates to delay but, you know, Your Honor will decide

17  what makes sense.

18          THE COURT:  Thank you.

19          Who else wishes to be heard?

20          Mr. Bennett, you've stood up.

21          MR. BENNETT:  Yes, yes.  Yes, Your Honor.

22          THE COURT:  Oh, I'm sorry.  Excuse me.  Mr. Freeman

23  stood up.

24          MR. FREEMAN:  I think one minute.

25          MR. BENNETT:  Well, unless I — I just want to put

1   myself on the list, Your Honor, but it can wait until everyone

2   in the courtroom is finished.

3           THE COURT:  Okay.  Mr. Freeman will be heard next.

4           MR. FREEMAN:  Thank you.  And briefly, because I think

5   Mr. Bender, on behalf of the Committee, you know, made things

6   very clear, and I — in light of where the Court seemed to

7   indicate that they should have their opportunity to do

8   discovery.  And obviously the debtor has no stake in this.

9   We've deferred to our Creditors' Committee.  We have run

10  everything by them.  We have a responsible officer that is — the

11  firm has never represented the noteholders.

12          The responsible officer is doing his very best.  And

13  everything that's — even controversial — is run by the

14  Creditors' Committee and — and run by this Court.

15          I'll submit to the Court that — and I was not

16  personally involved in the Via-Intel litigation, as Tom Moran

17  from our office was the primary attorney doing that, so I can't

18  tell you what we filed that time.

19          I do know, and I think discovery will bear out, the

20  fact that there never was — typically in these senior indentures

21  or any indenture there is carve-outs for senior indebtedness.

22  It usually means funded loans or trade payables, the ability to

23  get additional moneys.  Via never made a loan.

24          I think the discovery, if that's what it takes, will

25  bear out there never was a Via loan.  There was a whole lot of

1    disputes regarding a joint venture and Via claims and duplicate

2    claims and, therefore, the settlement — I don't know if they

3    even contemplated it.  And it was — no good deed goes unpunished

4    — in the very latest rounds of the disclosure statement to make

5    absolutely clear so that we don't have excessive litigation

6    discovery, Nell Walker (phonetic) from her office said, Oh, —

7    and just so there's no mistake or anyone could read otherwise,

8    the settle- — the general — the twelve-and-a-half-million-

9    dollar general unsecured claim is exactly that.  It's not senior

10   debt.

11            It was to clarify so that they're — certainly not to

12   hide anything, because why would you hide something that has

13   already, you know, been there.  It was to make it abundantly

14   clear to creditors.  Well, of course, that started a firestorm.

15            Your Honor, I'll step down.  If there's going to be

16   discovery, if there's going to be inquiries, hopefully we can do

17   it.  And I would ask the attorneys to take the personal attacks,

18   particularly the last minute, out of this.  There's nothing to

19   gain from our firm.  There's nothing to gain from the

20   responsible officer.  And I don't believe there's anything to

21   gain from anybody, either to mislead them or to structure

22   something around them or other unsecured creditors.

23            So let's work expeditiously, if that's the case, and

24   collegiately to get the results that are needed and get the plan

25   confirmed.

1          THE COURT:  Let me hear from Mr. Bennett now.

2          MR. FREEMAN:  Thank you.

3          THE COURT:  Thank you.

4          MR. BENNETT:  Good morning, Your Honor.  First of all,

5     let me apologize for not being able to appear in person today.

6     I didn't realize that a small fire was growing in this case, and

7     I had other commitments today that kept me in Los Angeles.  It

8     sounds like I'll be appearing in person going forward.

9          First of all, Mr. Bender, so far as he told you the

10    story, told it to you exactly accurately, as I understand it.

11    And I couldn't hear everything Your Honor said.  And I don't

12    have a problem if people want to take discovery to verify what

13    was represented is, in fact, true.

14          I would hope that the disclosure statement could go

15    out and with whatever disclosure people want, all — everyone's

16    contentions can be in it.  And the discovery can take place

17    between now and a confirmation hearing, because what I think

18    Your Honor is presented with is really a confirmation objection.

19          THE COURT:  No, I'm sorry.  I think that they're

20    entitled to full discovery here.  And so I'm not going to put

21    them on a short leash.

22          MR. BENNETT:  And I guess then we'll do it now, and

23    then maybe it will be less aggravation when we actually go to

24    confirmation.

25          But I do think — let me just add a couple of other

1   facts that will, in fact, be revealed in discovery, because it's

2   not as if this is the first investigation into this matter.

3           The senior noteholders, of course, looked at it.  And

4   I understand Via looked at it, too.  And in addition to

5   everything Mr. Bender said, Your Honor should know that at the

6   time that the senior noteholders were negotiating to purchase

7   the senior notes and it was a time when the debtor was already

8   in — having some difficulties — I don't think was in extreme

9   financial distress — the debtor was simultaneously negotiating

10  with Via for a loan.  And that was going to be a $15 million

11  loan.

12          So the pocket that was inserted into the indenture —

13  sometimes people call these things "baskets"; sometimes they

14  call these things "pockets" — was not just for a theoretical Via

15  loan; it was for a particular Via loan, which was then being

16  discussed between Via and the debtors.

17          And, as Mr. Bender and Freeman both pointed out, for

18  whatever reason — and here's where my knowledge — and Via never

19  made that loan.  The — the litigation that was before Your Honor

20  for so long, and that was the obstacle for resolving this case

21  for so long, ultimately boiled down to a damage claim against

22  the company by Via as a result of the failure of an intellectual

23  property license that Via was counting on in connection with the

24  operations of the joint venture.  That's what it is.  It's a

25  litigation damage claim.  It's not a claim for borrowed money.

1   It's not trade debt.  It's not indebtedness.

2          So I — if there — if there has to be an investigation,

3   that's fine.  But what people are going to find is that this was

4   not regarded as a close call by the senior lenders — by the

5   senior noteholders.

6          The Via claim, as articulated to the Court and as

7   ultimately negotiated, was never anything resembling

8   indebtedness that was intended to be within the scope of

9   anything in the senior noteholder documentation.

10          But here's the important point:  In fact, Via didn't

11   think so, either.  So, you know, if you're asking Via:  Did Via

12   want to mount an attack against the senior noteholders to try to

13   establish that a particular claim was senior indebtedness, they

14   looked at that question.  They said, "No."

15          And while Via is — you know, it's a really big

16   company.  They're repre- — they were represented for most of

17   this by Henry Kevane, who is not exactly a shrinking violet.

18          This — this issue has been tossed about, thought

19   about, consciously thought about by everyone who was on any side

20   of it.  And they decided there was nothing there.

21          And now you have a third party, which I think Mr.

22   Bender's right, can't even incidentally benefit because Via was

23   holding a huge club over this estate, a hundred-million-dollar

24   claim that many people, separate from it, who looked at it

25   really hard thought they were dealing with a $70 problem, and

Disclosure Statement and Joint Motion                    34

1    they think a $12 million settlement should have been a $6

2    million settlement to something like that.  I don't think Mr.

3    Kevane would ever have agreed.

4              But that is the full story, and I think that's

5    rounding out parts that Mr. Bender might not have known.  And —

6    and we ought to have all the disclosure in the world about this,

7    but there's just nothing here.

8              THE COURT:  Thank you, Mr. Bennett.

9              Okay.  Is there anyone else on this side who wishes to

10   be heard?

11             Mr. Grotenhuis, do you wish to be heard?

12             MR. GROTENHUIS:  Yes, Your Honor.

13             I have a very small interest here, but I've been

14   trying to buy an asset from one of the parties, either the

15   creditors or the estate for a hundred thousand dollars.  It's

16   the shell.  And it's any governmental claims that nobody wants.

17             I'm under the impression these assets will not be

18   monetized or not planning to be monetized or sold.  I have

19   offered to pay the attorney's cost to even look at the deal or

20   to have a discussion with me that I might have the opportunity

21   to mitigate any opposition or any concerns to this offer.

22             I have sent out numerous emails and — to everybody I

23   think might respond to me.  No one — no one's responded to me,

24   so I'm asking you who might I speak to regarding this issue that

25   would be able to discuss the — their concern.

1          THE COURT:  Well, first of all, it's really not before

2    us today.  But the attorneys at this table should be able to

3    talk with you.  And when you get them eyeball to eyeball, I'm

4    sure that they'll be helpful.

5          MR. GROTENHUIS:  Fantastic.

6          THE COURT:  Okay.

7          MR. GROTENHUIS:  Thank you.

8          THE COURT:  Good luck to you, sir.

9          MR. BENDER:  Your Honor, since we're just on the

10   point, I do want to point out as one of the changes we made to

11   the disclosure statement, we do disclose the proposal made by

12   Mr. Grotenhuis and why the estate didn't think it made sense to

13   accept.

14         THE COURT:  Okay.

15         MR. BENDER:  Whatever that's worth.

16         THE COURT:  That's fine.  And — but now you can meet

17   him face to face and have a discussion.

18         Okay.  Ms. Dumas.

19         MS. DUMAS:  Your Honor, I thought — I'm not really on

20   one side or the other, but I thought I would take this

21   opportunity to speak.

22         My — my suggestion before the hearing was just perhaps

23   to try to shortcircuit some kind of long, drawn-out discovery.

24   And I don't know if the parties on this side of the court would

25   be satisfied with this, but my suggestion was that Mr. Bennett,

1  Mr. Bender, Marcus Smith of the debtor, and whoever was counsel

2  for Via — I'm sorry — the name was Henry Ko- — Kovane

3  (phonetic).

4          THE COURT:  Kevane.

5          MS. DUMAS:  — would all put declarations into the

6  record stating under penalty of perjury that Via never had

7  senior indebtedness, because when you look at the indenture

8  agreement and juxtapose it with the settlement, I can see why it

9  looks like there was a nefarious plot.  And I understand what

10 everybody's explanations are, but there's still this appearance

11 that there's a taint.

12         So I don't know if just going that route would be

13 enough to satisfy everybody, but that was my suggestion.

14         THE COURT:  Thank you.

15         Okay.  Mr. Franklin and Mr. McNutt, I'm somewhat

16 inclined to take a recess at this point to allow you to decide

17 whether you want to do discovery and, if so, to what extent;

18 whether it can be done informally, and then resume after you

19 have had — having taken all of this information in, have a clear

20 position of what your wishes are.

21         So we'll take a short recess.  When you are ready to

22 resume, please let Mrs. McGowan know.

23         [COUNSEL]:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. RANKIN:  Your Honor, I couldn't hear when the

1  recess was to.

2         THE COURT:  Whenever they tell us they're ready.

3         MR. RANKIN:  Okay.

4         THE COURT:  Okay, thank you.

5         THE CLERK:  All rise.

6      (Recess taken from 11:46 a.m. to 12:20 p.m.)

7         THE CLERK:  All rise.

8         THE COURT:  Please be seated.

9         MR. McNUTT:  Your Honor, could I confess that I desire

10  to say my piece first because I'm facing a certain amount of

11  quiet desperation here.  I'm supposed to be in Pasadena at four

12  o'clock to speak on behalf of the incoming Chief Judge in the

13  Central District.  And if I don't show up, I'm a dead man.

14         THE COURT:  I understand.

15         MR. RANKIN:  But here's what I see.  There's a reason

16  there are disclosure requirements.  Perhaps the reason for that

17  is people get notice of things early and often small problems

18  don't turn into big problems.

19         I know a lot of the people involved in this case.  Mr.

20  Bennett is commonly described, to my knowledge, as one of the

21  smartest lawyers in America.  We have two of the largest firms

22  in America involved working for the debtor.  And we have Mr.

23  Rankin's firm, which is very well regarded as a creditors'

24  committee firm.

25         Collectively, a situation developed where a provision

1   was thrown in, as it said, at the last moment because nobody

2   cared, which theoretically provided a potential $15 benefit to

3   the three largest creditors on the Creditors' Committee.

4           And when they came to bring a 9019 motion, any

5   first-year law student would have been told to put that in

6   20-point type with a border around it and then explain why it

7   was irrelevant, because disclosed that would set off fireworks.

8           Today we've heard a lot of arguments on the merits.

9   Was it — was it — was the subordination provision subject to

10  parole evidence?  Could — if I had gone to trial, could it have

11  proved this or that.  On the other hand, maybe the way these

12  documents work, you just enforce them as they're written.

13  That's been my experience with trust indentures, although I'm

14  sure there are contrary arguments.

15          If the Court were — and what I have seen from the

16  outside is this was not disclosed in the 9019 motion; it was not

17  disclosed in the settlement agreement, not with any — not with

18  any emphasis; and it was not disclosed in the disclosure

19  statement.

20          And when there were efforts made by people, including

21  me, to get copies of the redacted settlement agreement, it was

22  very hard and required many weeks of struggle.  In fact, I never

23  got it.  Mr. McGrainy (phonetic), who is a more forceful

24  character, he managed to get it.  I could never find the right

25  key.  And I was told a lot of things, and it will take me a long

1    time to explain that.

2            So what happens?  Do we take discovery?  Well, if we

3    take discovery, if we get 60 days to take discovery, between

4    Levene, Levene, Neale and Bender; Pillsbury Winthrop; and

5    O'Melveny and Myers I suspect I'll get 40,000 pages of

6    documents.

7            Because — my client has a relatively small position —

8    they have a significant pool of assets to draw on to defend what

9    they've already done.  That's just the position we're in.

10           I would suggest another alternative would be to hire

11   an examiner, an examiner especially if she had some experience

12   in trust indentures and this area of law.  She could come in and

13   if she got hit with 30,000 pages of documents, she could come to

14   Your Honor and say:  They're making it difficult.  And Your

15   Honor would be much more respectful of that since an independent

16   person would not be speaking to you in a purely adversarial way.

17           I'm willing.  There is nothing wrong that went on

18   here.  However, the way in which all this came about and the

19   difficulty so far of digging it out does not support that in my

20   mind.  And that's what bothers me.  Thank you, Your Honor.

21           THE COURT:  Okay.  Thank you.  You're free to go.

22           MR. McNUTT:  Thank you.

23           THE COURT:  Mr. Franklin.

24           MR. FRANKLIN:  Just a couple of comments, Your Honor.

25           First, Riverside is, indeed, anxious to get paid, but

1    it is also very interested in the integrity of the system and is

2    also concerned with a lack of disclosure in this case.

3         And the explanations that are provided here today

4    simply, you know, just don't ring true in light of, you know,

5    the unambiguous language of the senior indenture.

6         They say that the indenture was — strike that — the

7    senior indebtedness — Via was limited to a loan that was never

8    made, but the express terms of the indenture says all

9    indebtedness of the company due and owing to Via Technologies.

10        It would be very easy to draft language that limits

11   the amount of the senior indebtedness to a loan.  In fact, they

12   — they issued definitions in the senior indenture calling others

13   subject to the senior indebtedness qualified lenders.

14        Secondly, they contend that it doesn't apply to trade

15   debt, but there's exclusion language in the senior indenture

16   which excludes from the definition of senior indebtedness other

17   than the Via indebtedness for trade indebtedness and services

18   incurred in the ordinary course of business.

19        This — and this is what Riverside doesn't understand.

20   That's pretty darn clear that the senior priority was not

21   limited to this loan as has been explained before Your Honor

22   today.

23        We would echo Argo's request for a examiner.  I think

24   that might be appropriate.  We can work on, you know, the scope

25   of the assignment for the examiner.  But in light of, you know,

Disclosure Statement and Joint Motion                    41

1  counsel's concerns about, you know, personal attacks and the

2  adversarial nature of it, perhaps it's better for an independent

3  examiner to come in and make a report to Your Honor and we would

4  abide by that.  So that's our suggestion.

5           THE COURT:  Okay.  Ms. Dumas, what's your view?

6           MS. DUMAS:  Well, Your Honor, I spoke to the parties,

7  and I said:  Okay, what do you think of my idea of the

8  declarations?

9           They said:  The problem is we don't get to

10  cross-examine.

11          I said:  Okay, why don't you depose all of these

12  people?  Would that be enough?

13          Well, no, because there still would be more documents,

14  and we don't trust them, and... basically there's a lack of

15  trust.  That's — that's kind of the bottom line.

16          And also, as Mr. McNutt said to the Court, he also

17  said to me outside:  I don't believe that if I ask for documents

18  that I wouldn't be just inundated with documents.

19          Now, in fairness, Mr. Bender and Mr. Freeman said:

20  We'll let you see anything you want to see.  But the feeling is

21  that they would just be inundated with too much information and

22  wouldn't — it would become a very expensive process to sift

23  through that.

24          So I don't know where that — that leaves us.  I — I

25  think that it would easier and faster to just have these parties

Disclosure Statement and Joint Motion                    42

1    do it themselves.  But if they're not going to believe what

2    people say under oath and if they're not going to trust that

3    their requests for documents are going to be responsive, it just

4    seems like a really extreme remedy to have an examiner, but if

5    that's — if that's what everybody thinks is necessary, then I

6    guess we have to do it.

7            THE COURT:  What do you mean?  It's not "what

8    everybody thinks is necessary."  You've heard two requests for

9    an examiner.  And I'm asking for your independent view.

10           MS. DUMAS:  My view is if they thought that they could

11   do it, they — they should do it themselves.

12           THE COURT:  "...they"?

13           MS. DUMAS:  That Riverside and Argo, that they're the

14   ones that raised the issue, —

15           THE COURT:  Well, they don't think they can do it.

16           MS. DUMAS:  — and they don't think they can do it, so

17   I — you know, where does that leave us?  I guess they want an

18   examiner, and perhaps the debtor and —

19           THE COURT:  Do you want time to think about it?

20           MS. DUMAS:  I suppose.  Maybe there's something that I

21   could look at, or people that I could talk to that could get

22   some —

23           THE COURT:  I doubt it.  I doubt that, to tell you the

24   truth.

25           Ms. Gerston, did you wish to be heard on any of these

1    issues?

2              MS. GERSTON:  No, Your Honor.  I just wanted to

3    monitor the proceedings on behalf of creditor claims.  I just

4    had to give Mr. McNutt the directions to the taxicab stand.

5              THE COURT:  Okay.  Mr. Bender, do you wish to be

6    heard?

7              MR. BENDER:  Yes, Your Honor.

8              As I explained to Mr. McNutt and to Mr. Franklin

9    outside, my firm is counsel to the Creditors' Committee.  We're

10   theoretically representing the same entities.  I mean we're —

11   we're here to maximum the recovery to unsecured creditors as

12   quickly as possible.

13             THE COURT:  You feel capable to pursue these issues,

14   don't you?

15             MR. BENDER:  Absolutely, but I do — I do want to come

16   back and — it's unfortunate Mr. McNutt had to leave, but he had

17   to leave.

18             Mr. McNutt has never called me or emailed me, ever.

19   So this idea that he spent weeks trying to get information just

20   is factually untrue.

21             THE COURT:  Okay.

22             MR. BENDER:  I've been counsel for the Committee the

23   whole time.  I asked him outside:  Why don't you ever call me?

24   This — I asked him — I asked him how much — how much claims does

25   Argo Partners hold.

Disclosure Statement and Joint Motion                    44

1          Argo Partners is a claims trader.  Argo Partners and

2   Riverside — not to disparage claim traders —

3          THE COURT:  No.

4          MR. BENDER:  — they send out their solicitation

5   letters on every one of my cases.

6          I asked Mr. McNutt, "How much claims does your client

7   hold?"

8          And he said, "I don't know.  Around $200,000."

9          THE COURT:  Um-hum.

10         MR. BENDER:  Okay.  Mr. Franklin says his clients hold

11  nine to ten million dollars in claims.

12         THE COURT:  Listen, I don't care.  You know, one of

13  the beauties about being a judge is that I don't — to me it's

14  the legal issues that are interesting, and I don't need to worry

15  about dollar amount.

16         You're looking at this pragmatically, that they're not

17  owed a lot of money.  But the truth is we're going to have to

18  find some answers here.  I think that you and your firm are

19  quite competent to get the answers.

20         And my suggestion is that we don't do an examiner, but

21  we ask that you perhaps depose or — I think probably depose is

22  the best thing — the counsel representing the entities in the

23  adversary and make sure that you are comfortable with the facts

24  underlying, and then submit a declaration to the Court.  It

25  might have to be under seal; I don't know.

1          But see if you can then communicate with the parties,

2    satisfy yourself and satisfy the Court that you've gotten

3    answers that are sufficient to make the Committee comfortable

4    that its interests were served.

5          MR. BENDER:  And I appreciate that, and I'm happy to

6    do it.  I do — so we don't leave here with ambiguity — I do want

7    to make sure that I'm clear, because I think it's a very narrow

8    scope.  I only see two issues here.  And I think I can get every

9    single one of these through voluntary declarations, except

10   possibly Via, and I won't know until I ask.  And that is —

11         THE COURT:  The problem with voluntary — well, so long

12   as they're under oath.  Okay.

13         MR. BENDER:  Declarations under penalty of perjury,

14   absolutely.  And — and the issues are just the following simple

15   things.  And that is:  Does Via believe that it had any

16   entitlement to senior indebtedness?

17         And, secondarily, would Via — and I don't know that

18   this is relevant — but would Via have agreed to a settlement of

19   a lesser number, because what Mr. McNutt said, and then left,

20   was that — and then it sounded like Mr. Franklin kind of echoed

21   it — was that, in their opinion, in reading the senior bond

22   indenture agreement they seemed to think that there may have

23   been arguments for Via to have had a right to contend that it's

24   claiming senior indebtedness, but I want to make sure —  this is

25   so crystal clear and important — that if all that happened was

Disclosure Statement and Joint Motion                    46

1    that that claim was deemed senior indebtedness, that'd be zero

2    economic benefit to anybody else.

3              THE COURT:  You know, Via might not have even

4    researched the issue, because it was doing the pragmatic thing.

5              MR. BENDER:  Right.

6              THE COURT:  Okay?

7              MR. BENDER:  Right.

8              THE COURT:  So I'm not sure that that is going to

9    really answer the question.

10             MR. BENDER:  Well, do you — because — because if I'm

11   going to do this — and I'm absolutely happy to do it — it seems

12   to me that the issues are:  Does Via believe it had senior

13   indebtedness?  Does Via — would Via have agreed to a different

14   settlement?  What else — what else — what other issues?  I mean

15   I've been looking for Mr. Franklin to tell me.

16             THE COURT:  Mr. Freeman.

17             MR. FREEMAN:  I have one, because — because as the

18   debtor, it's just so troubled — the debtor has — has no axe to

19   grind.  I think what we're really getting at is the question for

20   Via:  Was there some conspiracy, hidden agreement, agenda,

21   reason that you did your claim that way, or did you have some

22   secret deal with the senior noteholders?

23             That, I think, is the allegation and that we've all

24   covered it up, but isn't that really — the essence was — was,

25   you know, was Via looking at the merits and all the discovery?

1       THE COURT:  You know, you all have satisfied me that

2   the attorneys present in the room have not participated in any

3   cover-up.  Okay.  I'm very comfortable with that.  But the ones

4   that — I mean the real issue is:  What were the motivations

5   behind the settlement agreement as it was structured?

6       MR. BENDER:  That's fine, Your Honor.  I understand

7   what you're looking for.

8       THE COURT:  Yeah, yeah.

9       MR. BENDER:  I do want to point out, because we're not

10   in an adversary proceeding, if Via doesn't voluntarily appear

11   for a deposition I'm going to have to file a 2004 motion.  But

12   I'm happy to take on this role.

13       THE COURT:  Yeah.

14       MR. BENDER:  Absolutely.  I'll do this.

15       THE COURT:  I think it is appropriately your role.

16   And it's too bad that all of this has come out at this late date

17   in proceeding on the disclosure statement and plan.  On the

18   other hand, this case has been pending for a number of years,

19   and I think that these are significant issues that affect the

20   integrity of the system that deserve full inquiry.

21       MR. BENDER:  Can I ask the following question, and Mr.

22   McNutt's not here, but of Mr. Franklin:  Is there any reason why

23   we couldn't — and I don't know if we have a continued hearing or

24   not — is there any reason why, since I know Mr. Franklin's

25   clients from this and many other cases want to get their money

1    as quickly as possible, as do all the other unsecured creditors,

2    that we couldn't see if we can come up with an insertion into

3    the disclosure statement of as much language as it takes to get

4    Mr. Franklin's clients satisfied —

5              THE COURT:  No, it's not — at this point it's not Mr.

6    Franklin's clients; it's the Court.

7              MR. BENDER:  And what I was — and then maybe language

8    that works for everybody, especially the Court, that would also

9    disclose the efforts that my firm will be undertaking and still

10   go forward with disseminating a disclosure statement, because at

11   the end of the day here —

12             THE COURT:  No, because I'm going to tell you I think

13   that, if you find out adverse information, you're going to have

14   to totally restructure, perhaps, your plan and disclosure

15   statement.

16             MR. BENDER:  But — that's fine.  And I don't mind.  I

17   just want to make sure that if we're going to delay the case,

18   because the —

19             THE COURT:  Right.

20             MR. BENDER:  — distribution difference to unsecured

21   creditors of something nefarious being found out is still

22   completely *de minimis*.

23             THE COURT:  You're assuming that we're not going to

24   consider equitable subordination.  Okay.  You have to — there

25   are — there are many remedies that are broad out there and

Disclosure Statement and Joint Motion                         49

1   far-reaching, depending upon what you learn.

2           MR. BENDER:  Okay.

3           THE COURT:  Okay.

4           MR. BENDER:  So you would like to, what, then just

5   continue this disclosure statement hearing for a while?

6           THE COURT:  Yeah.  Let's continue this — I have

7   another calendar.  February 15th at eleven o'clock?

8           Am I right?

9           THE CLERK:  Yes.

10          MR. FREEMAN:  Could you repeat that, Your Honor?  I

11  didn't hear you.

12          THE COURT:  February 15th at eleven o'clock.

13          MR. BENDER:  Your Honor, I think I'm out — I think I

14  have a court hearing at 11:30.

15          Your Honor, I have a plan confirmation in San Diego.

16  Is it — could we pick a different date, please?

17          THE COURT:  Yes.  How about February 13th?

18          Mrs. McGowan, does that look good — open right now?

19      (Court and Clerk confer on the record.)

20          MR. BENDER:  I was actually thinking about a little

21  later, just to make sure there's time to do something here.

22          THE COURT:  You know I go into a four-day trial the

23  following week.  So that wipes out the full week.  It looks like

24  — how about February 26th?

25          MR. BENDER:  That would be my choice.

Disclosure Statement and Joint Motion                    50

1          THE COURT:  Okay.  February 26th.  We can make it

2   eleven o'clock or at 1:30.  Does anyone care?

3          MR. FREEMAN:  I'd prefer eleven o'clock, Your Honor.

4          THE COURT:  Eleven o'clock on February 26, having

5   heard nothing further.

6          Mrs. McGowan, you still show that date as a good date?

7          THE CLERK:  Yes, Your Honor.

8          THE COURT:  Okay.  I would appreciate hearing some

9   sort of status report from you, whether you're actually going

10  forward, so that we can keep this thing as much on track as

11  possible.

12         MR. BENDER:  You would like that orally or in writing?

13         THE COURT:  No, I think — I'd say probably in writing

14  so that you have a full record.  And let's say by the 19th, if

15  possible.

16         Anything further?

17         MR. BENDER:  No, Your Honor.  Is there any — any

18  additional notice that you would like given, or it's official

19  everyone's in court who needs — who needs notice.

20         THE COURT:  I don't think we need additional notice.

21         [COUNSEL]:  Thank you, Your Honor.

22         THE COURT:  Very well.

23         [COUNSEL]:  Thank you very much.

24         THE COURT:  Thank you.

25         [COUNSEL]:  Thank you, Your Honor.

1          THE COURT:  We're adjourned.

2          THE CLERK:  All rise.

3     (The hearing was adjourned at 12:38 o'clock p.m.)

4                        —o0o—

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State of California                )
                                   )    SS.
County of San Joaquin             )


        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber through the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated February 7, 2007

EXHIBIT 54

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    CRAIG A. BARBAROSH California Bar No. 160224
2   WILLIAM B. FREEMAN California Bar No. 137276
    MATTHEW S. WALKER California Bar No. 101470
3   650 Town Center Drive, 7th Floor
    Costa Mesa, CA  92626-7122
4   Telephone: (714) 436-6800
    Facsimile: (714) 436-2800
5
    Attorneys for Debtors and Debtors-In-Possession
6
    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
7   RON BENDER California Bar No. 143364
    CRAIG M. RANKIN California Bar. No. 169844
8   TODD M. ARNOLD California Bar No. 221868
    10250 Constellation Blvd., Suite 1700
9   Los Angeles, CA  90067
    Telephone: (310) 229-1234
10  Facsimile: (310) 229-1244

11  Attorneys for the Official Committee of Creditors
    Holding Unsecured Claims
12
                    UNITED STATES BANKRUPTCY COURT
13                  NORTHERN DISTRICT OF CALIFORNIA
                           SAN JOSE DIVISION
14
15  IN RE:                                    Case No. 03-51775 MM

16  SONICBLUE INCORPORATED, a                 Chapter 11 Cases
    Delaware corporation, DIAMOND
17  MULTIMEDIA SYSTEMS, INC., a               (Case Numbers 03-51775 through
    Delaware corporation, REPLAYTV,            03-51778)
    INC., a Delaware corporation, and
18  SENSORY SCIENCE                           (Jointly Administered)
    CORPORATION, a Delaware
19  corporation,                              DISCLOSURE STATEMENT
                                              DESCRIBING LIQUIDATING PLAN
20                     Debtors.               OF REORGANIZATION DATED AS
                                              OF DECEMBER 15, 2006 PROPOSED
21                                            JOINTLY BY DEBTORS AND
                                              CREDITORS' COMMITTEE
22
                                              Disclosure Statement Hearing:
23                                            Date:  January 18, 2007
                                              Time: 11:00 a.m.
24                                            Dept:  Courtroom 3070
                                                     280 South First St.
25                                                   San Jose, CA 95113

26                                            Hon. Marilyn Morgan

27

28

# Table of Contents

**Page**

EXHIBIT LIST ................................................................................................................ i
INTRODUCTION ........................................................................................................... ii
DISCLAIMER ................................................................................................................ iii
IRS CIRCULAR 230 NOTICE ...................................................................................... iv
ARTICLE I OVERVIEW OF THE PLAN ..................................................................... 1
A. Plan Structure. ........................................................................................................... 1
B. Summary of Classification and Treatment of Claims and Interests Under the Plan ... 1
ARTICLE II PLAN VOTING PROCEDURES AND REQUIREMENTS ...................... 4
A. Notice to Holders of Claims and Interests. ................................................................ 4
B. Holders of Claims In Classes 3, 4, 5 and 6 are Entitled to Vote on the Plan. ........... 4
C. Voting Procedures. ..................................................................................................... 5
ARTICLE III DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESSES ... 5
A. The Debtors. ............................................................................................................... 5
B. The Debtors' Other Affiliates. ................................................................................... 6
C. Products. ..................................................................................................................... 6
1.   Rio Digital Audio Players. .................................................................................... 6
2.   Go-Video Products ............................................................................................... 6
3.   ReplayTV products. .............................................................................................. 6
D. Sales, Marketing and Distribution. ............................................................................ 7
E. Asset Sales and Acquisitions. .................................................................................... 7
F. UMC Stock. ................................................................................................................ 8
G. Patents. ....................................................................................................................... 8
H. Petition Date Capital Structure. ................................................................................. 8
ARTICLE IV PRE-BANKRUPTCY EVENTS ............................................................. 9
A. The Debtors' Continuing Losses. .............................................................................. 9
B. Copyright Litigation. ................................................................................................. 10
C. Retention Of Financial Advisor. ................................................................................ 10
D. Restructuring Alternatives. ......................................................................................... 10
E. Asset Valuation. ......................................................................................................... 11
F. Pre-Petition Marketing of the Debtors' Product Lines. ............................................. 11
ARTICLE V ................................................................................................................... 12
THE DEBTORS' CHAPTER 11 CASES ...................................................................... 12
A. The Bankruptcy Petitions. ......................................................................................... 12
B. First Day Orders. ........................................................................................................ 12
C. Cash Collateral. .......................................................................................................... 12
D. Retention Of Professionals. ....................................................................................... 12
E. The Creditors' Committee. ......................................................................................... 13
F. Sale of Substantially All of the Debtors' Assets ....................................................... 14
1.   Sale of the Rio, ReplayTV and Go-Video Product Lines. .................................... 14
2.   U.K. Affiliate Participation in the Rio Product Line Sale. .................................... 14
3.   Patent Sales. .......................................................................................................... 15
4.   Modem and Computer Inventory Sales. ................................................................ 15
5.   Post-Petition Date UMC Stock Sales. ................................................................... 16
6.   Payment of Certain Secured Claims. ..................................................................... 16
7.   Funds Held. ........................................................................................................... 16
G. Employee Matters. ..................................................................................................... 17
1.   Employees. ............................................................................................................ 17
2.   Employee Retention and Incentive Plans. ............................................................. 18
3.   The Debtors' Retirement Plans. ............................................................................ 19
H. Claims Process and Bar Dates. .................................................................................. 19
1.   Schedules and Statements. .................................................................................... 19

2.      Previously Established Claims Bar Dates.............................................................. 19
3.      Claims Objections and Subordination. .................................................................. 20
4.      Claim Issues Involving the Junior Noteholders and the Senior Noteholders. ..................... 21
I. Post-Petition Date Litigation.......................................................................................... 23
1.      VIA Litigation. ................................................................................................. 23
2.      Avoidance Actions............................................................................................. 23
ARTICLE VI THE PLAN OF REORGANIZATION................................................................. 24
A. Introduction. .............................................................................................................. 24
B. General Plan Description. ............................................................................................. 25
C. Substantive Consolidation. ........................................................................................... 25
D. The Plan's Reallocation Provisions. ................................................................................ 27
E. Other Procedural Issues Concerning Subordination and Seniority of Claims. ......................... 28
F. Classification and Treatment of Claims............................................................................ 28
1.      Class 1 - Secured Claims. .................................................................................... 29
2.      Class 2 – Other Priority Claims. ........................................................................... 29
3.      Class 3 – Senior Notes Claims. ............................................................................. 30
4.      Class 4 - General Unsecured Claims. ...................................................................... 30
5.      Class 5 - Junior Notes Claims. .............................................................................. 31
6.      Class 6 - Convenience Class Claims. ...................................................................... 32
7.      Class 7 – Subordinated Unsecured Claims. .............................................................. 32
8.      Class 8 – Interests. ............................................................................................. 32
G. Treatment of Unclassified Administrative and Priority Tax Claims. ...................................... 33
1.      Definition of Administrative Claims. ..................................................................... 33
2.      Treatment of Administrative Claims other than Professional Fees. ................................. 33
3.      Amount of Administrative Claims other than Professional Fees..................................... 33
4.      Statutory Fees. .................................................................................................. 34
5.      Treatment of Professional Fees. ............................................................................ 34
6.      Amount of Professional Fees. ............................................................................... 34
7.      Amount and Treatment of Priority Tax Claims. ........................................................ 37
H. Effect of Confirmation of the Plan. ................................................................................ 37
1.      Vesting of Assets in the Reorganized Debtor. ........................................................... 37
2.      Authority to Effectuate the Plan. ........................................................................... 37
3.      The Non-Debtor Subsidiaries. .............................................................................. 37
4.      Dissolution of the Creditors' Committee; Formation of the Plan Oversight
Committee................................................................................................................... 37
1.      Principals of the Reorganized Debtor. ..................................................................... 38
2.      Funding of the Plan............................................................................................ 39
3.      The Rights of Action........................................................................................... 39
4.      Post-Effective Date Expenses and Professional Fees. ................................................. 39
5.      Limitation of Liability for the Reorganized Debtor and the Plan Oversight
Committee................................................................................................................... 40
ARTICLE VII CLAIMS RESOLUTION AND DISTRIBUTIONS ............................................. 40
A. Late Claims Void. ....................................................................................................... 40
B. Prosecution of Objections to Claims............................................................................... 40
C. Estimation of Claims.................................................................................................... 41
D. Allowed and Disputed Claims. ...................................................................................... 41
E. Provisions Regarding Distributions. ............................................................................... 41
1.      No Distributions on Disputed or Disallowed Claims. ................................................. 41
ARTICLE VIII INJUNCTION, EXCULPATION AND INDEMNIFICATION ........................ 45
A. Discharge. ................................................................................................................. 45
B. Injunction. ................................................................................................................. 45
C. Exculpation and Limitation of Liability. .......................................................................... 45
D. Indemnification........................................................................................................... 46
ARTICLE IX OTHER PLAN EFFECTUATION MATTERS ................................................... 46
A. Executory Contracts and Unexpired Leases. ..................................................................... 46

1.    Rejection of Executory Contracts and Unexpired Leases.....................46
2.    Rejection Damage Claims Bar Date and Resolution. ..........................46
B. Conditions Precedent. ...............................................................................47
1.    Conditions Precedent to the Effective Date of the Plan. ....................47
2.    Waiver of Conditions. .........................................................................47
C. Retention of Jurisdiction. ..........................................................................47
D. Modification of Plan. ................................................................................47
E. Revocation or Withdrawal. ......................................................................47
F. Terms of Existing Injunctions or Stays.....................................................47
G. Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities. ..............47
H. Section 1146 Exception. ...........................................................................48
I. Severability. ..............................................................................................48
J. Governing Law. ........................................................................................48
K. Notices. ....................................................................................................48
L. Closing of Cases. .....................................................................................48
M.    Continuing Viability of Other Orders/Agreements.......................49
ARTICLE X CONFIRMATION OF THE PLAN .....................................................49
A. Confirmation Hearing ..............................................................................49
B. Requirements for Confirmation of the Plan..............................................49
1.    Fair and Equitable Test. .....................................................................49
2.    Feasibility. ...........................................................................................50
3.    "Best Interests" Test. ..........................................................................50
ARTICLE XI FINANCIAL INFORMATION ..........................................................51
ARTICLE XII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN ..........................................................................................................51
A. Liquidation Under Chapter 7. ...................................................................51
B. Alternative Chapter 11 Plan. .....................................................................51
ARTICLE XIII CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ........................................................................................................................52
ARTICLE XIV CONCLUSION AND RECOMMENDATION.................................52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DISCLOSURE STATEMENT FOR
LIQUIDATING PLAN OF REORGANIZATION

1

**EXHIBIT LIST**

2     Exhibit "A"     Joint Liquidating Plan of Reorganization

3     Exhibit "B"     Corporate Structure Chart

4     Exhibit "C"     A list of all known Claims that were included in the Schedules or were
asserted in proofs of claim to which no objection has been filed to date, but as to which an objection

5     may be filed by the Debtors and/or the Creditors' Committee (or by the Reorganized Debtor or the
Plan Oversight Committee after the Effective Date) as the Debtors and the Creditors' Committee are

6     continuing with their investigation of Claims.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISCLOSURE STATEMENT FOR
LIQUIDATING PLAN OF REORGANIZATION

1

2
## INTRODUCTION

3
    This disclosure statement ("Disclosure Statement") is being furnished jointly by SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, Chapter 11 Debtors in the above-captioned jointly administered Chapter 11 Cases (collectively, the "Debtors"), and the OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS (the "Creditors' Committee"), in connection with the Debtors' and Creditors' Committee's solicitation of votes to confirm the Joint Liquidating Plan of Reorganization Dated as of December 15, 2006 (the "Plan") Proposed jointly by the Debtors and the Creditors' Committee (collectively, the "Proponents"). A copy of the Plan is attached hereto as Exhibit "A".[1]

8
    This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition operating and financial history, the reasons for their Chapter 11 bankruptcy filings, and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

12
    By an order entered on _____, 2007, the Bankruptcy Court has: (a) approved this Disclosure Statement as containing "adequate information" in accordance with Bankruptcy Code Section 1125 to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (b) authorized use of this Disclosure Statement in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and Bankruptcy Code Section 1125. In voting on the Plan, Holders of Claims entitled to vote on the Plan should not rely on any information other than that contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

19
    Pursuant to the provisions of the Bankruptcy Code, only certain classes of Claims are entitled to vote on the Plan. If you are entitled to vote to accept or reject the Plan, a "Ballot" and pre-addressed envelope for the return of the Ballot are enclosed. If you are a creditor in Classes 3, 4, 5 and 6 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, please contact the Balloting Agent designated in Section II.C. of this Disclosure Statement.[2]

22
    THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.

23

---

24
[1] All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan. To the extent of any inconsistency between the definitions in the Plan and herein, the definitions in the Plan shall govern.

[2] Creditors in Classes 1 and 2 are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan. Creditors and Interest Holders in Classes 7 and 8, which receive nothing under the Plan, are deemed to have rejected the Plan and are therefore not entitled to vote on the Plan.

28

DISCLOSURE STATEMENT FOR
LIQUIDATING PLAN OF REORGANIZATION

1

**DISCLAIMER**

2

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN (AS SUBSEQUENTLY AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW). THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

3

4

5

6

7

ANY PARTY WHO DOES NOT OBJECT TO THE DISCLOSURE STATEMENT IS NOT DEEMED TO WAIVE ANY RIGHTS TO OBJECT TO THE CONFIRMATION OF THE PLAN ON ANY BASIS OTHER THAN LACK OF ADEQUATE DISCLOSURE UNDER BANKRUPTCY CODE SECTION 1125.

8

9

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS TO THE PLAN.

10

11

12

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE PROPONENTS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE PROPONENTS, WHO ARE UNABLE TO WARRANT OR REPRESENT THAT THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY AND IN THEIR ENTIRETY AND, WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

13

14

15

16

17

18

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST ANY OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

19

20

21

22

23

24

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

25

26

27

28

DISCLOSURE STATEMENT FOR
LIQUIDATING PLAN OF REORGANIZATION

1

2     IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF
THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF

3  THE PLAN SHALL CONTROL.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS
DISCLOSURE STATEMENT ARE FORWARD LOOKING FORECASTS AND ARE  BASED

4  UPON CERTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE
THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

5

**IRS CIRCULAR 230 NOTICE**

6

7     TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS
AND INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL
TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS

8  NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF
CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE

9  IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION
IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN

10  AND OTHER MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND
INTERESTS    SHOULD    SEEK    ADVICE    BASED    ON    THEIR    PARTICULAR

11  CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISCLOSURE STATEMENT FOR
LIQUIDATING PLAN OF REORGANIZATION

# ARTICLE I
# OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan, which is attached hereto as Exhibit "A." For a more detailed description of the terms and provisions of the Plan, see Article VI. below, entitled "The Plan of Reorganization."

**A.    Plan Structure.**

The Plan is a plan of liquidation for the Debtors.  Substantially all of the Debtors' Assets have already been sold and reduced to Cash.  To the extent any of the Debtors' Assets have not been liquidated by the Effective Date, such assets will be liquidated by the Reorganized Debtor. The Reorganized Debtor will distribute the Debtors' Cash and the proceeds of the Debtors' Assets (net of expenses) to Creditors holding Allowed Claims according to the terms of the Plan, which is consistent with the priority distribution set forth in the Bankruptcy Code.

The Plan provides for the substantive consolidation of the Debtors.  "Substantive Consolidation" refers to a process of combining multiple debtors into one legal entity and then treating them as a single entity.  As such, on the Effective Date: (a) all Assets and liabilities of the Debtors shall be merged or treated as though they were merged into and with the Assets and liabilities of each other Debtor; (b) all Inter-Company Claims shall be eliminated and extinguished, and no distributions shall be made under the Plan on account of any Inter-Company Claims; (c) any Claims against two or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim; and (d) all Allowed Claims against the Debtors shall be satisfied from the Assets of the single consolidated estate of the Reorganized Debtor.

The Plan will become effective on the Effective Date, which shall be the first business day which is at least eleven days following the date the Bankruptcy Court enters the Plan Confirmation Order, unless there is a stay in effect, in which case the Effective Date shall be the first business day after the stay is no longer in effect with respect to the Plan Confirmation Order.  The Proponents estimate that the Effective Date will be on or around March 31, 2007.  Reference is made to Section IX.B. of this Disclosure Statement for a discussion of conditions to the Effective Date.

Initial distributions under the Plan will commence shortly after the Effective Date, but it is estimated that most Creditors entitled to a distribution will not receive a distribution until approximately two to three months after the Effective Date.

**B.    Summary of Classification and Treatment of Claims and Interests Under the Plan**

The Plan classifies all pre-petition Claims against and Interests in the Debtors into separate Classes, except for Administrative Claims and Priority Tax Claims, which are not classified pursuant to the Bankruptcy Code.  The following chart identifies the classified and unclassified Claims specified in the Plan, estimates the amount of unclassified and classified Claims, and summarizes the treatment of the classified and unclassified Claims under the Plan.

It should be noted that the estimated amounts of Claims are based on the Debtors' schedules, Claims filed, and the outcome of any objections which have been filed to Disputed Claims.  However, not all objections to Disputed Claims have been filed or completed, and there still remain some pending Preference Actions, the outcome of which will likely have some impact upon the ultimate amount of Allowed Claims.  As a result, for certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or be materially less than the estimated

amounts shown in the chart that follows.  The Debtors have not yet fully analyzed all proofs of Claim filed in the Chapter 11 Cases.  Estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated.

For certain Classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimate amount of Allowed Claims in each Class.  Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes 3 through 5 will actually be realized by the Holders of Allowed Claims in such Classes.  A more detailed description of the Claims and Interests in each Class and the treatment of such Claims and Interests is set forth in Article VI below.

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: $1,830,500 (excluding the contingency fees and expenses owing on account of the pursuit of Avoidance Actions) plus an additional approximately $1,000,000 of Professional Fees which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed Proj. Rec. 100% | Non-voting class |
| N/A | Priority Tax Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $180,000 Proj. Rec.: 100% | Non-voting class |
| 1 | Secured Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $380,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |
| 2 | Other Priority Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $30,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |
| 3 | Senior Notes Claims | Cash equal to Pro Rata Share of Net Remaining Assets plus Cash equal to the payment that would otherwise be owing to Class 5 on account of the Junior Notes Claims which instead will be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Est. Amt: Approx. $47 million (see explanation below) Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Entitled to vote (impaired) |
| 4 | General Unsecured Claims Not Included in Any Other Class | Cash equal to Pro-Rata Share of Net Remaining Assets | Est. Amt.: Approx. $86 million Proj. Rec.: Approx. 33% | Entitled to vote (impaired) |
| 5 | Junior Notes Claims | Cash equal to Pro-Rata Share of Net Remaining Assets, except that the full amount of the payment that would otherwise be made to Class 5 on account of the Junior Notes Claims will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Est. Amt.: $103 million Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Entitled to vote (impaired) |
| 6 | Convenience Class | Cash equal to 50% of Allowed Claim with a maximum payment of $1,250. Members of this Class will include all holders of Allowed Unsecured Claims which are $2,500 or less, plus all holders of Allowed Unsecured Claims which are greater than $2,500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $2,500 to participate in this Class | Est. Amt.: Approx. $375,000 Proj. Rec. 50% (except for holders of Allowed Unsecured Claims which are greater than $2,500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $2,500 to participate in this Class) | Entitled to vote (impaired) |
| 7 | Subordinated Unsecured Claims | No distribution | Est. Amt.: $14.6 million Proj. Rec. 0% | Not entitled to vote (deemed to reject) |
| 8 | Interests | No distribution | Est. Amt.: $N/A Proj. Rec. 0% | Not entitled to vote (deemed to reject) |

THE PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE GREATEST AND QUICKEST RECOVERY POSSIBLE FOR HOLDERS OF ALLOWED CLAIMS AND THUS <u>STRONGLY</u> <u>RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

## ARTICLE II
## PLAN VOTING PROCEDURES AND REQUIREMENTS

**A.      Notice to Holders of Claims and Interests.**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.   THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BE BINDING ON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN, AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.   THUS, THE PROPONENTS ENCOURAGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN AND ANY EXHIBITS THERETO ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.   No solicitation of votes for the Plan may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Plan other than the information contained herein.

**B.      Holders of Claims In Classes 3, 4, 5 and 6 are Entitled to Vote on the Plan.**

Subject to the provisions of the order approving this Disclosure Statement, any Holder of a Claim against the Debtors in Classes 3, 4, 5 and 6 shall be entitled to vote to accept or reject the Plan if: (i) such Holder's Claim has been included by the Debtors in the Schedules as undisputed, non-contingent and liquidated in an amount more than $0.00, or (ii) such Holder has filed a proof of claim on or before the applicable Bar Date; unless such Claim is the subject of a pending objection or has been entirely Disallowed by an order of the Bankruptcy Court.

Unless otherwise permitted, the Holder of any Disputed Claim is not entitled to vote with respect to such Disputed Claim unless the Bankruptcy Court temporarily allows such Disputed Claim for the purpose of voting to accept or reject the Plan.   The Debtors may stipulate with some Holders of Disputed Claims for provisional allowance of their Claims for voting purposes. Alternatively, the Holder of a Disputed Claim may seek a Bankruptcy Court order provisionally allowing such Holder's Claim for voting purposes prior to the Confirmation Hearing or such earlier date as may be established by the Bankruptcy Court.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

All known Holders of Claims entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement.   If you are a Creditor in Class 3, 4, 5 or 6 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any of the Exhibits hereto, the Plan

or the voting procedures in respect thereof, please contact the Balloting Agent designated below.

**C.      Voting Procedures.**

After carefully reviewing this Disclosure Statement and the Exhibits hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it either by overnight courier or regular mail to the Balloting Agent at the address specified in the ballot and below.  Holders of Claims in Classes entitled to vote should read the Ballot carefully and follow the instructions contained therein.   BALLOTS SUBMITTED TO THE BALLOTING AGENT BY FAX OR OTHER ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED AND WILL BE VOID.

Please vote and return your ballot to the Balloting Agent at the following address:

If by U.S. Mail:                           If by Overnight Carrier or Hand-delivery:

SONICblue, Inc., et. al.                   SONICblue, Inc., et. al.

co/ JPMorgan Bankruptcy                    co/ JPMorgan Bankruptcy

and Settlement Services                    and Settlement Services

P.O. Box 56636                             8475 Western Way, Suite 110
Jacksonville, FL 32241-6636                Jacksonville, FL 32256

FOR YOUR VOTE TO COUNT, YOUR BALLOT MUST ACTUALLY BE <u>RECEIVED</u> BY THE BALLOTING AGENT DESIGNATED ABOVE AT THE SPECIFIED ADDRESS NO LATER THAN 5:00 P.M. PREVAILING EASTERN TIME ON _____, 2007.

IF YOU MUST RETURN YOUR BALLOT TO A TRUSTEE, BANK, BROKER OR AGENT, YOU MUST RETURN YOUR BALLOT TO IT IN SUFFICIENT TIME FOR IT TO PROCESS THE BALLOT AND RETURN IT TO THE BALLOTING AGENT BY THE VOTING DEADLINE.

To obtain additional ballots, you may contact the Balloting Agent at the addresses specified above.   You may also obtain copies of the Plan, this Disclosure Statement and other plan documents at: http://www.administar.net/SonicBlue.

The Proponents believe that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all Holders of Claims and the Debtors' estates.

**ARTICLE III**
**DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESSES**

**A.      The Debtors.**

Debtor SONICblue Incorporated ("<u>SONICblue</u>") was incorporated as S3 Incorporated ("<u>S3</u>") on January 9, 1989 as a Delaware corporation, and changed its name to SONICblue Incorporated in November, 2000.  For more than ten (10) years prior to the transfer in January, 2001 of its graphics chips business to S3 Graphics Co., Ltd., SONICblue's primary business was to supply graphics and multimedia accelerator subsystems for personal computers, or PCs.

Debtor ReplayTV, Inc. ("<u>ReplayTV</u>") is a wholly-owned subsidiary of SONICblue. SONICblue completed the acquisition of ReplayTV, Inc., a developer of personal television technology, on August 1, 2001.

Debtor Sensory Science Corporation ("<u>Sensory Science</u>") is a wholly-owned subsidiary of SONICblue.  SONICblue completed the acquisition of Sensory Science, a developer of consumer electronics products, including dual deck videocassette player/recorders and DVD players, on

June 27, 2001.

Debtor Diamond Multimedia Systems Inc. ("<u>Diamond</u>") has been a wholly-owned subsidiary of SONICblue since September, 1999. Diamond was an established PC original equipment manufacturer and retail provider of communications and home networking solutions, PC graphics and audio add-in boards and digital audio players.

**B.    The Debtors' Other Affiliates.**

The four Debtors directly or indirectly owned thirty-one (31) subsidiaries on the March 21, 2003 Petition Date. A chart illustrating the Debtors' corporate structure as of the Petition Date is attached hereto as Exhibit "B". The Debtors believe that none of their subsidiaries is actively doing business at this time. At least one of the Debtors' foreign subsidiaries, Diamond Multimedia Systems, Limited, is in the process of winding up its business. Other subsidiaries are dormant.

Four of the Debtors' subsidiaries conveyed some of their assets in sales approved by the Bankruptcy Court. These sales are discussed in Section V.F., below. Except for the subsidiaries referenced above, it is unknown whether any of the Debtors' subsidiaries have remaining assets which exceed their liabilities, but the Debtors believe that any such value would not be significant.

**C.    Products.**

Prior to the financial problems that led to these bankruptcy filings, the Debtors and their affiliates were leaders in the design, development and marketing of products in the converging Internet, digital media, entertainment and consumer electronics markets. The Debtors, with their affiliates, developed and marketed the following three (3) primary consumer electronic product lines:

**1.    Rio Digital Audio Players.**

SONICblue introduced the industry's first portable MP3 player in 1998. SONICblue's Rio portable digital audio players allowed users to enjoy high quality audio in the most common compressed digital audio formats, including compact disc, MP3 and Windows Media Audio (WMA). SONICblue's portable Rio players included the flash memory based Rio 600 and Rio 800, Rio One; the CD based RioVolt SP90, RioVolt SP100 and RioVolt SP250, and the hard drive based RioRiot, which allowed users to store up to 20 gigabytes of digital audio. In addition to its portable players, SONICblue offered the Rio Central, a home stereo component that allowed users to play and store up to 40 gigabytes of digital music, write or "burn" CDs with stored digital audio tracks and load digital audio onto portable Rio players. SONICblue also marketed and sold a variety of Rio product accessories. The assets that comprised the Rio product line are referred to as the "<u>Rio Product Line</u>."

**2.    Go-Video Products.**

SONICblue's Go-Video products included dual deck VCRs and integrated DVD/VCRs. The Go-Video DVR4000, an integrated DVD/VCR, allowed users to watch a DVD while recording a television program, without the need or space for two separate components. SONICblue held patents related to dual deck technology and licensed this technology to other manufacturers for inclusion in their consumer devices. In addition to its Go-Video dual deck and integrated products, SONICblue introduced the Go-Video DVP850, a stand alone DVD player, and the Go-Video DHT7100, an "all in one" home theater system. The assets that comprised the Go-Video product line are referred to as the "<u>Go-Video Product Line</u>."

**3.    ReplayTV products.**

SONICblue designed, developed, and marketed DVR products and services under the ReplayTV brand. ReplayTV offered several different DVR products, including the top of the line ReplayTV 5000 DVR, which connected to a home network and a broadband Internet connection, allowing users to view recorded programming content stored on another networked ReplayTV 5000 device in their own home. SONICblue also licensed its ReplayTV technology and software to other companies seeking to implement DVR solutions. The assets that comprised the ReplayTV

product line are referred to as the "ReplayTV Product Line."

In addition, the Debtors developed and marketed analog modems under the Supra/Diamond brand name.

**D.    Sales, Marketing and Distribution.**

The Debtors and their affiliates sold their products directly to retailers, mass merchants and other resellers and through independent domestic and international distributors.  They also sold retail products in the United States through e-commerce web sites, including their own on-line e-store, mail order catalogs and national reseller organizations.  Headquartered in Santa Clara, California, the Debtors and their subsidiaries had sales, marketing, customer care and technical facilities in several locations including Arizona, Japan and the United Kingdom.

A majority of the Debtors' trade receivables resulted from sales to retailers in the consumer electronics industry.  The Debtors primarily sold their products in the United States and to a lesser extent in Europe and Asia.  Prior to the transfer in January, 2001 of its graphics chips business and the shutdown of its graphics boards business in August, 2000, a significant percentage of SONICblue's sales were to international original equipment manufacturers.

The Debtors utilized an international network of independent electronics assembly subcontractors, principally located in Asia, to assemble and test their products.  The Debtors generally procured hardware products on a turnkey basis from subcontract-manufacturing suppliers.  The Debtors packaged certain of the assembled products received from subcontractors with software, manuals and additional hardware components, placing such materials in retail packaging for the retail and mass-merchant channel.

**E.    Asset Sales and Acquisitions.**

In September, 1999, SONICblue made a significant strategic shift by merging with Diamond.  This merger began SONICblue's transition to a multi-faceted consumer electronics designer, manufacturer and seller.  SONICblue's acquisitions and divestitures are described below.

- SONICblue acquired Diamond in September, 1999.  Prior to closing the acquisition, SONICblue made loans to Diamond, apparently to fund Diamond's operations pending the merger, in the total amount of $20 million.  These loans were secured by a valid and perfected security interests in most or all of Diamond's assets.

- In October 1999, SONICblue caused RioPort, Inc. (formerly RioPort.com, Inc.), a wholly owned subsidiary of SONICblue, to sell shares of its preferred stock to third party investors.  RioPort was developing an integrated platform for acquiring, managing and experiencing music and spoken audio programming from the Internet.  As a result, SONICblue retained a minority investment in RioPort.

- In November 1999, SONICblue established a corporate joint venture, S3-VIA, Inc. ("S3-VIA"), with VIA Technologies, Inc. ("VIA") to bring high-performance integrated graphics and core logic chip sets to the volume original equipment manufacturer desktop and notebook personal computer markets.  S3-VIA had exclusive access to both companies' technology and distribution rights for certain products.  In the fourth quarter of 2001, SONICblue terminated its participation in S3-VIA.

- In August 2000, SONICblue shut down its Diamond branded graphics add-in board business.

- In November 2000, SONICblue acquired United Kingdom digital audio equipment manufacturer, Empeg Limited, at a total purchase price of $3.0 million.

- In January 2001, SONICblue completed the transfer of its graphics chips net assets, other than its shares of common stock of S3-VIA, to S3 Graphics Co., Ltd., a joint venture between VIA and a subsidiary of SONICblue.

- In March 2001, SONICblue completed the sale to ATI Technologies, Inc. of its

-7-

professional graphics division, based in Starnberg, Germany, which produced the Fire GL line of graphics accelerators. Under the terms of the asset purchase agreement, SONICblue received $7.9 million in cash through December 31, 2001, and was eligible to receive further financial consideration.

- On June 27, 2001, SONICblue completed the acquisition of Sensory Science. Prior to closing the acquisition, SONICblue made loans to Sensory Science in the amount of $9.75 million. These loans were secured by valid and perfected security interests in most or all of Sensory Science's assets.

- On August 1, 2001, SONICblue completed the acquisition of ReplayTV, Inc. Prior to closing the acquisition, SONICblue made loans to ReplayTV in the amount of $20 million. These loans were secured by valid and perfected security interests in most or all of ReplayTV's assets.

**F.    UMC Stock.**

In 1995, SONICblue (then S3) entered into a joint venture with United Microelectronics Corporation ("UMC") to build United Semiconductor Corporation ("USC"), a semiconductor manufacturing facility in Taiwan, R.O.C. In January, 2000, USC merged with UMC and, as a result of the merger, SONICblue received approximately 252 million UMC shares in exchange for its USC shares. Thereafter, SONICblue received numerous stock dividends of UMC stock. SONICblue later sold much of its UMC stock to fund the Debtors' cash flow shortfalls. As of the Petition Date, SONICblue held 75,010,073 UMC shares, which traded on the Taiwan Stock Exchange. Approximately 24.6 million of those shares were pledged as security for repayment of the Senior Notes.

**G.    Patents.**

SONICblue filed patent applications for its technology and built a patent portfolio through acquisitions, including patent purchases and cross-licenses as well as through its acquisition of the other Debtors. As of the Petition Date, the Debtors and three of their affiliates, Micronics Computers, Inc., Binar Graphics, Inc. and Frontpath, Inc., owned approximately 100 graphics patents and patent applications, in addition to other patents.

**H.    Petition Date Capital Structure.**

As of the Petition Date, the Debtors' debt structure, as reflected in their consolidated financial records, included the following:

- Approximately $5.9 million owing on a revolving loan facility (the "Congress Facility") provided by Congress Financial Corporation (Western) ("Congress"), which was secured by a blanket security interest in substantially all assets of both Sensory Science and non-debtor subsidiary California Audio Labs, LLC, and was also guaranteed by SONICblue on an unsecured basis.

- Approximately $78.2 million in principal and accrued interest[3] due on the 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes"). As noted, on the Petition Date, the Senior Notes were secured by a pledge of approximately 24.6 million shares of UMC stock.

- Approximately $106.1 million in principal and interest due on the 5-¾% Convertible Subordinated Notes due 2003 (the "Junior Notes"). The Junior Notes are contractually subordinated to the Senior Notes and certain other obligations.

---

[3]  The principal and interest amounts stated for the Senior and Junior Notes include certain original issue discount. As such, the Proponents believe that the actual Allowed Amounts of these Claims will likely be less as set forth in the discussion of this issue below.

- Miscellaneous trade, litigation and other payable Claims in an aggregate amount estimated to be in the range of $80 million to $100 million.

## ARTICLE IV
## PRE-BANKRUPTCY EVENTS

**A.    The Debtors' Continuing Losses.**

During the three years preceding the Petition Date, SONICblue transitioned from a semiconductor company to a consumer electronics company, in part through its acquisitions of Diamond, Sensory Science and ReplayTV.  To fund its acquisitions and working capital needs during this period, SONICblue liquidated approximately 273.6 million shares of UMC stock and raised debt financing to fund its operations.

During that time, SONICblue's operating results were negatively impacted by its need to spend considerable time, effort and resources integrating its various acquisitions.  Moreover, since its evolution into a consumer electronics company, various industry-wide issues adversely impacted SONICblue, including (i) the general economic downturn, including the fourth quarter of 2002 and the 2002-2003 holiday season, which were among the worst selling seasons in recent history for all retail goods, but especially consumer electronics; (ii) increased competition; (iii) slower than expected rate of adoption of digital video recorders (ReplayTV); (iv) significant pricing pressures on several of its products (including DVD players) due to increased competition; and (v) the West Coast dock strike during the latter part of 2002, which limited product availability and eroded profit margins by forcing SONICblue to air freight its ReplayTV, home theater solutions products, and other high-end products.  Also in 2002, SONICblue had severely limited Rio product availability during the middle of the year due to, among other things, delays in completing development of new Rio products.

The Debtors experienced significant operating losses largely related to the development of ReplayTV products.  SONICblue funded these losses, in part, through the liquidation of UMC shares.  Although ReplayTV gained some momentum in the fourth quarter of 2002 with the introduction of its 5000 series product, in part by gaining market share in the fourth quarter of 2002 relative to its primary competitor, TiVo, in the stand-alone DVR segment of the market, achievement of necessary price points for mass consumer adoption came at the expense of increased hardware subsidies.  Although market awareness and demand for DVR products was growing, such growth was slower than previously anticipated.

With respect to the Rio/Go-Video Product Lines, general commoditization of the audio (Rio) and video (Go-Video) segments of the Debtors' business resulted in decreased margins and increased need to innovate (i.e., spend research and development funds) to differentiate itself in the marketplace.  Although the MP3 player market (Rio) continued to grow, the Debtors experienced certain execution issues impacting product availability and thus limiting gross profits.  Finally, although Go-Video was a mature product line that was attempting to stabilize its margins and generate positive cash flows, it existed in an increasingly competitive market.

Through the latter part of 2002 and continuing through the commencement of the Chapter 11 Cases, the Debtors pursued several operational initiatives to address industry and company-specific issues, including facility consolidation, headcount reductions and modifying their business model for low margin products, such as basic standalone DVD players, by transitioning to a "channel licensing" business model.  However, notwithstanding these restructuring efforts, the Debtors remained substantially over-leveraged and capital constrained, and their operations continued to be cash flow negative.

As a result of these negative impacts, from 1999 through 2001, the Debtors reported operating losses of approximately $721 million.  Preliminary 2002 financial results indicated the Debtors' EBITDA for fiscal year 2002 was approximately negative $50 million.  As a result of this financial condition, it was projected pre-petition that the Debtors would only have sufficient liquidity to fund their operations through the end of April, 2003.

The Debtors' substantial debt burden and negative cash flow limited their liquidity and ability to fully exploit all available growth opportunities. The Debtors expected to experience substantial negative cash flow through 2003, and it was uncertain when or if the Debtors' operations might turn free cash flow positive. Moreover, the medium to long-term outlook for the Debtors' product lines was speculative, particularly with ReplayTV, which operated in an early-stage market, and likely would continue to require significant ongoing investment.

In addition, due to the payment priority provisions in the Senior Note Indenture, the Senior Notes were due to mature thirty (30) days before the Junior Notes matured on October 1, 2003. The Debtors projected that they would have insufficient cash to pay the Congress Facility or the Junior and Senior Notes. As a result of these problems, management concluded that it was necessary to explore restructuring alternatives.

**B.    Copyright Litigation.**

In late 2001, a number of entertainment industry entities ("Copyright Plaintiffs") commenced litigation against the Debtors, which litigation was subsequently consolidated in the litigation entitled Paramount Pictures Corporation, et al. v. ReplayTV, Inc., et al., Case No. CV 01-09358 FMC (Ex), in the United States District Court for the Central District of California (the "Copyright Litigation").

In the Copyright Litigation, the Copyright Plaintiffs sought injunctive and declaratory relief with respect to the DVR products formerly marketed and sold by the Debtors as part of the Debtors' ReplayTV product line. The Copyright Litigation represented another impediment to a successful turnaround of the Debtors' business operations, and was another factor in the Debtors' decision to file bankruptcies.

**C.    Retention Of Financial Advisor.**

In September, 2002, the Debtors engaged Houlihan Lokey Howard & Zukin Capital ("Houlihan"), an international financial advisor and investment banker, as the Debtors' financial consultant. Houlihan is experienced in providing financial advice to distressed companies, and is one of the leading investment firms providing distressed M&A services. Houlihan was engaged for the purpose of exploring various restructuring options, including a sale of substantially all of the Debtors' operating assets. Through a team composed of six professionals and led by Peter S. Fishman of Houlihan's San Francisco office, Houlihan advised the Debtors on a number of financial restructuring issues.

**D.    Restructuring Alternatives.**

Houlihan was charged with, among other things, identifying and analyzing strategic alternatives available to the Debtors. During the period from September, 2002 to November 2002, Houlihan and the Debtors considered the following primary strategic alternatives in light of the Debtors' business plan, valuation estimates and short-term liquidity needs:

a.    A sale of control of the Debtors to a "new value" investor who would provide sufficient financing to address the funding gap in the Debtors' business plan, simultaneously with a de-leveraging transaction;

b.    A complete stand-alone de-leveraging of the Debtors' balance sheet by equitizing the Senior Notes and the Junior Notes;

c.    A sale of the Debtors' operating assets in one or more transactions under Bankruptcy Code Section 363;

d.    A restructure around one or more of the Debtors' product lines through a simultaneous divesture of selected business units in a Section 363 bankruptcy sale coupled with a de-leveraging of the balance sheet; and

e.    An immediate liquidation of the Debtors and a distribution of the proceeds to creditors.

In light of (i) the Debtors' continued losses, (ii) the losses and negative cash flow projected by the Debtors for 2003, (iii) the early stage of the Debtors' ReplayTV product, which had already consumed significant capital and would likely require significantly more before it became profitable, (iv) the lack of visibility in the Debtors' business plan or when it might turn cash flow positive, and (v) how much more capital they might consume in order to reach that point, the Debtors determined in consultation with Houlihan that a sale of the Debtors' business units as a going concern provided the strategic alternative most likely to maximize value to the Debtors and their creditors.

**E.      Asset Valuation.**

The Debtors' product lines and UMC stock constituted substantially all of the Debtors' business operations and related assets as of the Petition Date.  Houlihan determined that the net liquidation value of the Debtors' product lines (excluding the UMC shares) ranged from approximately $20.7 million to $29 million.

**F.      Pre-Petition Marketing of the Debtors' Product Lines.**

The Debtors conducted an extensive pre-petition marketing effort in order to maximize the going-concern value of their business units.  Commencing in November, 2002, the Debtors instructed Houlihan to pursue potential acquirers for the Debtors' three product lines.  Houlihan immediately began working with the Debtors to develop detailed offering memoranda on each of the Debtors' three product lines, describing, in detail, the history of the Debtors and each of the product lines, the market for the Debtors' products and competition, as well as the Debtors' projections for future performance.  In addition, Houlihan worked closely with the Debtors during this period to develop a list of approximately 200 potential buyers, 64 of which were strategic buyers in the U.S. and overseas, and 136 of which were financial buyers, many of whom were drawn from Houlihan's proprietary data base of financial buyers who have closed, or indicated an interest in pursuing, similar distressed transactions.

Following the January, 2003 Las Vegas Consumer Electronics Show, Houlihan distributed to those entities on the buyer list a "teaser memorandum," designed to stimulate interest, which described the opportunity and provided non-confidential information about the Debtors' product lines.  Teasers were followed up by an intensive calling effort by Houlihan aimed at determining interest from the buyer list, and motivating interested parties to execute a confidentiality agreement and review the offering memoranda prepared by Houlihan.  A total of 56 potential buyers executed confidentiality agreements and reviewed the offering memoranda. Several of these parties engaged in further due diligence, through on-site presentations prepared by Houlihan and the Debtors, viewing the special on-line management presentation prepared by Houlihan and the Debtors posted on the Internet for confidential review by parties with coded access privileges, and reviewing additional documentary materials developed by the Debtors and Houlihan.

The Debtors and Houlihan set February 14, 2003, as the deadline date for interested parties to submit initial, non-binding indications of interest in order for the Debtors and Houlihan to determine which interested parties should be allowed to undertake further, detailed due diligence and submit a final bid to be considered by the Debtors as a stalking horse bid.  Ten parties submitted such indications of interest, and several of them were allowed to conduct further due diligence.  Further due diligence was arranged by Houlihan, and included additional management presentations, as well as access to an actual data room, and a "virtual data room" established on the Internet by Houlihan, and, like the special on-line management presentation, accessible on a confidential basis only by parties with coded access privileges.

Seven final bids were ultimately submitted.  The Debtors negotiated a non-binding letter of intent with an affiliate of D&M Holdings, Inc. ("D&M"), pursuant to which D&M had the ability to execute an asset purchase agreement for the sale of the ReplayTV and Rio Product Lines by March 31, 2003.  However, D&M did not execute an asset purchase agreement by March 31, 2003. In addition, on March 20, 2003, the Debtors and Opta Systems, LLC ("Opta") executed an asset purchase agreement for the sale of the Go-Video product line.

-11-

# ARTICLE V

## SIGNIFICANT EVENTS DURING

## THE DEBTORS' CHAPTER 11 CASES

**A.      The Bankruptcy Petitions.**

On March 21, 2003 (the "<u>Petition Date</u>"), each of the Debtors commenced a Chapter 11 case (collectively, the "<u>Chapter 11 Cases</u>") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtors' Chapter 11 Cases were procedurally consolidated for administrative purposes.

**B.      First Day Orders**

On the Petition Date, the Debtors filed numerous, customary "first day motions," which were largely granted after various hearings before the Bankruptcy Court on March 25, 2003 and thereafter.   The first day orders included, <u>inter alia</u>: (a) an order prohibiting utilities from discontinuing service and providing procedures for establishing adequate assurance of payment; (b) an order approving joint administration of the Debtors' Chapter 11 Cases; (c) an order authorizing the Debtors to continue their cash management system; (d) an order allowing payment of certain critical vendors' pre-petition Claims; (e) an order authorizing payment of certain pre-petition wages and benefits; (f) an order establishing lists and procedures for giving notice in the Chapter 11 Cases; (g) an order authorizing payment of sales and use taxes in the ordinary course of business; (h) an order authorizing rejection of unexpired leases of nonresidential real property; and (i) an order appointing Bank One, N.A., now known as JP Morgan Trust Company, as "<u>Claims Administrator</u>".

**C.      Cash Collateral.**

At the outset of the Chapter 11 Cases, the Debtors projected a severe cash shortfall during the period leading up to the sale of their businesses. It was of paramount importance to the estates that the Debtors had sufficient cash to maintain existing operations until their businesses could be sold. During this period, the Debtors had virtually no collections from retailers, which expressed concerns over the Debtors' ability to continue to ship products. In order to meet continuing cash flow needs, the Debtors negotiated a cash collateral stipulation with Congress. The Debtors were able to continue operations through the use of cash collateral pursuant to this stipulation.

**D.      Retention Of Professionals.**

To assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors employed, with authorization from the Bankruptcy Court, Pillsbury Winthrop Shaw Pittman LLP, fka Pillsbury Winthrop LLP, ("<u>Pillsbury</u>") as their bankruptcy counsel.

The Debtors also employed, as discussed above, Houlihan to assist in the liquidation of the Debtors' three product line business units. Prior to the Petition Date, the Debtors agreed to compensate Houlihan for its services by paying a monthly fee of $135,000, reimbursing certain expenses and providing certain indemnification. In addition, the Debtors agreed to pay Houlihan a "Transaction Fee" of $2 million upon the closing of a sale of all or substantially all of the Debtors ' assets.   After negotiations with the Creditors' Committee, Houlihan agreed to eliminate the monthly fee (retaining payments made up to that time) and to reduce the Transaction Fee to a minimum of $1 million, increasing to $1,550,000 if the gross assets sale consideration was between $40 million and $52.5 million.  On April 17, 2003, the Bankruptcy Court approved Houlihan's employment, as so modified, effective as of the Petition Date.

In addition, the Bankruptcy Court approved the Debtors' employment of Fenwick & West ("<u>Fenwick</u>") as special counsel for the sale of certain graphics patents.  The Debtors retained Fenwick to market the graphics patents because of Fenwick's expertise and experience relating to the Debtors' graphics patents and because Fenwick agreed to a contingent fee that was less than the Debtors had paid to patent brokers in prior patent sales.  Under the Bankruptcy Court's order

authorizing the Debtors to employ Fenwick, the Debtors agreed to pay Fenwick 10% of the first $1 million of net sales revenue, 20% of the second $1 million of net revenue, and 30% of the third million of net revenue.

Also, by an order entered August 29, 2005, the Bankruptcy Court granted a joint application by the Proponents to employ Grobstein, Horwath & Company LLP ("GHC") as accounting and litigation consultants.  Among other things, GHC was authorized to assist the Proponents in the process of evaluating and objecting to Claims and prosecuting the Preference Actions, including providing accounting expertise and expert testimony; providing tax and financial analysis concerning a plan of reorganization; and providing accounting and financial advisory assistance as necessary to the Debtors and the Creditors' Committee.

The Debtors employed the accounting firm of Davis & Associates as accountant and taxation consultant and advisor to the Debtors.

The Debtors employed Syzygy Consulting Group as employment and compensation consultant and advisor.

The Debtors employed O'Melveny & Myers LLP as special counsel for the subject matters relating to Intel Corporation and VIA.

The Debtors employed the Taiwanese law firm of Ding & Ding Law Offices as special Taiwanese securities counsel to assist the Debtors in connection with the sale of the Debtors' remaining UMC Stock.

Finally, as instructed by the Bankruptcy Court, Stuart, Maue, Mitchell & James, Ltd. was employed by the estates as a fee auditor.

**E.      The Creditors' Committee.**

On the Petition Date, the U.S. Trustee appointed the Creditors' Committee to represent the interests of SONICblue's unsecured creditors in the Chapter 11 Cases.  The U.S. Trustee amended the appointment on April 3, 2003 to enlarge the Creditors' Committee.  Following the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of these Chapter 11 Cases.  The Debtors have kept the Creditors' Committee informed about the Debtors' operations and have sought the concurrence of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses.  The Creditors' Committee has, through its professionals, participated actively, together with the Debtors' management and professionals, in, among other things, the Debtors' operations, the product line sales, and litigation involving the Debtors.  The Debtors and their respective professionals have consulted with the Creditors' Committee and its professionals in connection with the negotiation of the Plan with the goal of achieving a consensual joint plan and, as a result of such cooperation, the Debtors and the Committee are co-Proponents of the Plan.

With the approval of the Bankruptcy Court, the Creditors' Committee retained the firm of Levene, Neale, Bender, Rankin & Brill L.L.P. as bankruptcy counsel to assist and represent the Creditors' Committee in performing its duties in these cases.

Pursuant to a stipulated order between the Debtors and the Creditors' Committee, the Creditors' Committee retained its own financial advisor, Alliant Partners ("Alliant"), to monitor and assist Houlihan and advise the Creditors' Committee with respect to the sales of the Debtors' product lines.  Pursuant to the stipulated order, Alliant was paid a $35,000 retainer, and was entitled to a success fee if (i) Alliant brought a qualified bidder to any of the product line sales, (ii) such qualified bidder submitted an overbid at the sales hearing, and (iii) the total consideration exceeded $42.5 million.  Pursuant to the stipulated order, Alliant earned and was paid a success fee of $62,000 beyond the $35,000 retainer.

The Creditors' Committee also employed the law firm of Krieg, Keller, Sloan, Reilley & Roman LLP as special intellectual property litigation counsel.

Finally, the Creditors' Committee employed the Taiwanese law firm of J&J Attorneys At

1  Law as special counsel to assist the Creditors' Committee to analyze and evaluate the optimal
2  method, means and timing of disposition of the Debtors' remaining UMC stock, and to assist the
   estates in their Preference Action against ATLM.

3  **F.    Sale of Substantially All of the Debtors' Assets.**

   **1.    Sale of the Rio, ReplayTV and Go-Video Product Lines.**

4          On the Petition Date, the Debtors filed a "Sales Procedures Motion" with the Bankruptcy
5  Court seeking an order establishing notice and bidding procedures for the sale of the Debtors'
   primary product lines, and for an order authorizing the assumption and assignment or rejection of
6  certain executory contracts and unexpired leases in connection with such sales.  The Debtors also
   filed a motion requesting the Bankruptcy Court to hear the matter on shortened notice.  The
7  Bankruptcy Court heard and granted the Sales Procedures Motion on March 25, 2003.

8          The Bankruptcy Court hearing on the Debtors' motion to sell the Go-Video product line to
   Opta, subject to overbidding, was held on April 4, 2003.  Opta was the successful buyer at the
9  hearing, and the sale closed on April 18, 2003.  Opta paid SONICblue approximately $6.2 million
   as the purchase price calculated at the time of closing.  Thereafter, a dispute arose concerning
10 certain post-closing adjustments to the purchase price, the allocation of post-closing payments
   received from vendors, and the assumption of liabilities under the asset purchase agreement.  To
11 resolve such dispute, SONICblue paid Opta approximately $1.3 million pursuant to a stipulation
   approved by the Bankruptcy Court.

12         The Debtors' Rio and ReplayTV product lines were scheduled for sale on April 15, 2003.
   Because D&M did not execute an asset purchase agreement by March 31, 2003, the Bankruptcy
13 Court conducted an auction sale of the Rio and ReplayTV product line assets on April 15, 2003
   without the benefit of a "stalking horse" bidder.  The Rio and ReplayTV product lines were
14 ultimately sold for $36.2 million to Digital Networks North America, Inc. ("DNNA"), an affiliate
   of D&M.  The sale closed on April 25, 2003.

15         **2.    U.K. Affiliate Participation in the Rio Product Line Sale.**

16         In order to consummate the Rio Product Line sale to DNNA, the Debtors requested that a
   United Kingdom subsidiary of Diamond, Diamond Multimedia Systems Limited ("DMSL"),
17 transfer (i) certain assets directly to DNNA, and (ii) certain other intellectual property rights
   directly to SONICblue, which were then transferred to DNNA.  These DMSL assets and
18 intellectual property are referred to as the "U.K. Assets."  DMSL complied with the request.

19         In April, 2005, DMSL was in the process of winding down its operations in anticipation of
   a dissolution, and requested allowance and payment of an administrative claim in the amount of
20 $300,000 for the value of the U.K. Assets.  The Debtors agreed that the U.K. Assets had a value of
   at least $300,000 at the time of transfer.  Moreover, because the U.K. Assets represented a
21 significant part of the intellectual property component of the Rio Product Line, it is likely that
   DNNA would not have been willing to purchase the Rio Product Line without being able to obtain
22 the U.K. Assets, at least not at the $18.2 million purchase price.  Although the Debtors believed
   that the U.K. Assets had a value of at least $300,000, DMSL did not seek an administrative claim
23 in excess of that amount, as DMSL was winding down and would not likely require additional
   amounts in the course of its dissolution.

24         On April 11, 2005, the Debtors and DMSL entered into a stipulation, subject to Bankruptcy
   Court approval, pursuant to which they agreed that DMSL would have an allowed administrative
25 claim in the amount of $300,000, without prejudice to DMSL's right to seek an additional
   administrative claim in the future, and that the agreed administrative claim would be paid within
26 ten days of the date when a Bankruptcy Court order approving the stipulation became a final order.
   The order was entered on June 14, 2005, and the agreed administrative claim was paid thereafter
27 on a timely basis.

28

-14-

As of the filing of this Disclosure Statement, the DMSL liquidation appears to be proceeding and it appears unlikely DMSL will assert additional Administrative Claims against any of the Debtors.

**3.     Patent Sales.**

After the closing of the sales of the Debtors' three primary product lines, which sales included certain intellectual property relating to the product lines, the Debtors either directly or through subsidiaries continued to own approximately 100 graphics patents and pending patent applications (the "Patents").

The Debtors believed that the Patents could be sold for $1-2 million, but the Debtors did not have the necessary expertise to market the Patents. The Debtors retained Fenwick as their special counsel for the sale of the Patents. Fenwick, which served as the Debtors' intellectual property counsel prior to the Petition Date, was chosen for its familiarity with the Patents and the related documentation, and its ability to identify potential purchasers and market the Patents to those purchasers.

Several of the Patents were owned by the following subsidiaries of the Debtors who were not in bankruptcy: Micronics Computers, Inc., ("Micronics"), Frontpath, Inc., ("Frontpath") and Binar Graphics, Inc., ("Binar Graphics") (collectively, the "Seller Subsidiaries"). Of a total of 67 groups (or "Lots") of related Patents, Micronics owned seven Lots, Binar Graphics owned three Lots, and Frontpath owned one Lot.

The Debtors determined that it likely would be more advantageous to include the Patents owned by the Seller Subsidiaries in the sale, even though there would be some expenses incurred in enabling the Seller Subsidiaries to convey their Patents. The Debtors identified all secured claims against and tax obligations owing by the Seller Subsidiaries. The Debtors then sought approval in the Patent sale procedures motion to pay these secured claims and tax obligations, in an amount expected to be less than $10,000, as part of the process of selling all of the Patents. The motion to approve the Patent sale bidding procedures also anticipated that the process of dissolving the Seller Subsidiaries would cost an additional amount approximating $25,000. The motion was granted, and all secured and tax claims against the Seller Subsidiaries were satisfied as authorized.

Initially, the Patents were marketed via an "on-line" auction conducted by Fenwick. The high bid from the on-line auction was $518,000. On September 6, 2003, the Patents were sold at an auction sale conducted by the Bankruptcy Court to Trepton Research Group for the sum of $1,970,000. The Patent sale closed on October 9, 2003.

**4.     Modem and Computer Inventory Sales.**

As of the Petition Date, the Debtors held a small amount of computer component inventory with America II Electronics, Inc. ("America II") for sale on a consignment basis. After negotiations with America II and a third party, E-Electronics Corporation ("E-Electronics"), the Debtors sought Bankruptcy Court approval of a sale of the component inventory with America II as the stalking horse bidder. E-Electronics was the successful overbidder at a sale hearing held on December 5, 2003, at a purchase price of $157,000. Subsequent to the sale, a dispute arose between the parties based on America II's failure to allow E-Electronics access to remove the inventory. America II filed a motion to vacate the sale order, which alleged generally that the sale pleadings did not contemplate that any party other than America II would be entitled to enter America II's premises to remove the inventory, and the sale order was subsequently vacated at a hearing held on February 13, 2004. At that same hearing, the Bankruptcy Court reopened bidding on the computer component inventory, and the successful overbidder was America II, with a purchase price of $300,000. As part of the Bankruptcy Court's ruling approving that sale, the balance of the America II bid in excess of the previous E-Electronics bid was paid to E-Electronics.

The modem assets were offered for sale pursuant to a Bankruptcy Court conducted auction on June 6, 2003. The modem assets were sold to Best Data Products for approximately $634,000.

-15-

### 5. Post-Petition Date UMC Stock Sales.

On the Petition Date, SONICblue owned 75,010,073 UMC shares.  The UMC stock was subject to sale restrictions that lapsed as to approximately 50 million shares of the UMC Stock on July 10, 2003, and as to the balance of the UMC stock on January 10, 2004.

The Senior Noteholders held a lien on 24,640,573 shares of the UMC stock as of the Petition Date.  In July, 2003, the Debtors, the Creditors' Committee and the Senior Noteholders stipulated to an order granting the Senior Noteholders relief from the automatic stay with respect to their UMC stock collateral.   The stipulation was approved by an order entered on July 17, 2003.  The Senior Noteholders sold 24,640,573 shares of the UMC stock from on or about August 1, 2003 to on or about August 15, 2003.

On July 28, 2003, UMC declared a stock dividend entitling SONICblue to 3,007,903 additional UMC shares.  A proportional amount of the stock dividend, 988,087 shares, became subject to the Senior Noteholders' liens.   By an order entered on October 24, 2003, the Bankruptcy Court approved a stipulation between the Debtors, the Creditors' Committee and the Senior Noteholders granting the Senior Noteholders relief from the automatic stay with respect to this additional UMC stock.[4]   The Senior Noteholders sold all of their remaining UMC stock collateral in or about October, 2003.

The Senior Noteholders have advised that they received a net of $17,358,515.13 from the sale of their UMC stock collateral, which has been credited to the Senior Noteholders' Claims.

During mid and latter-2003, the UMC stock appreciated substantially in value.  The Debtors, in consultation with the Creditors' Committee, evaluated various methods for realizing this appreciation, including conversion of the UMC stock into American Depository Receipts ("ADRs"), short-selling the UMC stock, and the sale of the UMC stock on the Taiwan Stock Exchange.  Ultimately, due to the expense, difficulty and risk of the ADRs conversion process and short sales, the Creditors' Committee and the Debtors jointly decided in September, 2003 to sell the unencumbered, unrestricted UMC stock.  The Debtors and the Creditors' Committee applied to the Bankruptcy Court for, and received, permission to sell all of the estates' UMC stock.  The Debtors liquidated 27,203,816 UMC shares in October, 2003, realizing net proceeds of approximately $24.4 million.  In February, 2004, after the final transfer restrictions lapsed, the Debtors liquidated their remaining UMC stock holdings.  The Debtors realized net proceeds of approximately $21.5 million from the sale of the remaining 25.185 million shares of stock.

### 6. Payment of Certain Secured Claims.

In connection with securing Bankruptcy Court approval of the product line sales, the Debtors received permission to pay Congress' and other Claims secured by those assets.  Accordingly, the Debtors paid Congress approximately $5.9 million in full satisfaction of its fully secured Claim.  In addition, as noted, the Debtors and the Creditors' Committee stipulated to allow the Senior Noteholders to liquidate their UMC collateral stock, which liquidation resulted in a partial payment of the Senior Noteholders' Claims as described above.

### 7. Funds Held.

As of December 1, 2006, the Debtors are holding approximately $78 million in funds, exclusive of recoveries from Preference Actions (discussed below).

---

[4]  In connection with securing possession of the stock dividend, the Debtors' paid certain taxes, including on the portion of the stock dividend securing the Senior Noteholders' Claims.  The Debtors have reserved their right to recover the taxes paid on the Senior Noteholders' portion of the stock dividend.  Proceedings to recover such sum may proceed either prior to or after the Effective Date.

## G.     Employee Matters.

### 1.     Employees.

As of the Petition Date, SONICblue employed approximately 197 persons (the "Employees") and utilized the services of approximately 31 independent contractors. None of the Debtors other than SONICblue had any employees on the Petition Date or during the year preceding the Petition Date. The Employees all worked in the Debtors' domestic operations, and included both salaried and hourly employees. Of the Employees, 83 worked in the areas of technology, research and design, and engineering. None of SONICblue's Employees were represented by a labor union or were subject to a collective bargaining agreement.

Most of SONICblue's Employees were hired by Opta and DNNA in 2003. Since then, SONICblue has had no employees. Marcus Smith, the Debtors' former Chief Financial Officer, and Nanci Salvucci, the Debtors' former Controller, continue to provide assistance to the Debtors on a part-time, consulting basis in accordance with stipulations between them, the Debtors and the Creditors' Committee which have been approved by the Bankruptcy Court. Marcus Smith is the Debtors' Bankruptcy Court-appointed Responsible Individual.

Pursuant to a Stipulation entered into between Marcus Smith, the Debtors and the Creditors' Committee, Marcus Smith will remain employed by the Debtors as their Chief Financial Officer and Responsible Individual through December 31, 2006 unless he voluntary quits or is involuntarily terminated by the Debtors for "cause". "Cause" shall mean that he has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Debtors or their bankruptcy estates, with any such dispute to be resolved by the Bankruptcy Court. Marcus Smith's employment by the Debtors may extend beyond December 31, 2006 only with the mutual consent of the Debtors, the Creditors' Committee and Marcus Smith. Under the stipulation, Marcus Smith works on an hourly basis for the Debtors, as needed depending upon the work required of him during the week, but in no event is he be paid for less than eight hours of work per week. He is compensated on an hourly basis at the rate of $250 per hour, and he receives health, vision and dental insurance. His employment responsibilities include those which he has performed in the past for the Debtors and those which are regularly performed by a Chief Financial Officer and "Responsible Individual" in his position. In addition to his other job responsibilities, through the duration of his employment by the Debtors, he is required to assist the Debtors and Nanci Salvucci, as needed, to (i) maintain the Debtors' books and records, (ii) prepare the Debtors' monthly reports for filing with the Office of the United States Trustee, (iii) prepare all other reports (with the assistance of counsel as needed) required by the Bankruptcy Court and/or the Office of the United States Trustee, (iv) assist the Debtors and/or the Creditors' Committee with objecting to Claims, including analyzing proofs of claims filed by Creditors and providing the Debtors and/or the Creditors' Committee with the data and documents, to the extent available, to enable them to file objections to objectionable Claims, and (v) providing the Debtors and/or the Creditors' Committee with the information and documents, to the extent available, necessary for them to file and prosecute Rights of Action.

Similarly, pursuant to a Stipulation entered into between Nanci Salvucci, the Debtors and the Creditors' Committee, Nanci Salvucci will remain employed by the Debtors as their Controller through December 31, 2006 unless she voluntary quits or is involuntarily terminated by the Debtors for "cause". "Cause" shall mean that she has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Debtors or their bankruptcy estates, with any such dispute to be resolved by the Bankruptcy Court. Nanci Salvucci's employment by the Debtors may extend beyond December 31, 2006 only with the mutual consent of the Debtors, the Creditors' Committee and Nanci Salvucci. Under the stipulation, Nanci Salvucci works on an hourly basis for the Debtors, as needed depending upon the work required of her during the week. She is compensated on an hourly basis at the rate of $175 per hour, and she receives health and dental insurance. Her employment responsibilities include those which she has performed in the past for the Debtors and those which are regularly performed by a Controller in her position.

In addition to her other job responsibilities, through the duration of Nanci Salvucci's employment by the Debtors, she is responsible for (i) maintaining the Debtors' books and records, (ii) preparing the Debtors' monthly reports for filing with the Office of the United States Trustee, (iii) preparing all other reports (with the assistance of counsel as needed) required by the Bankruptcy Court and/or the Office of the United States Trustee, (iv) assisting the Debtors and/or the Creditors' Committee with objecting to Claims, including analyzing proofs of claims filed by Creditors and providing the Debtors and/or the Creditors' Committee with the data and documents, to the extent available, to enable them to file objections to objectionable Claims, and (v) providing the Debtors and/or the Creditors' Committee with the information and documents, to the extent available, necessary for them to file and prosecute Rights of Action.

### 2. Employee Retention and Incentive Plans.

In November, 2002, realizing that a bankruptcy filing was likely in the near future, and understanding the impact that a bankruptcy filing can have on employee morale, productivity and retention, SONICblue engaged Syzygy Consulting Group ("Syzygy") to assess the need for and develop key employee retention programs. The Debtors believed their ability to maintain their business operations pending a sale, and to achieve the greatest possible selling price, was dependent on the continued employment, active participation, and dedication of several key employees. SONICblue adopted a Key Employee Retention Bonus Plan ("KERP") and a Performance Based Employee Retention Bonus Plan ("PBRB", and with the KERP, the "Retention Plans") on March 13, 2003.

After the Petition Date, the Debtors presented and explained the Retention Plans to the Creditors' Committee and other interested parties. In those discussions, the Debtors and the Creditors' Committee engaged in extensive negotiations regarding the Retention Plans, severance benefits and the Debtors' "Paid Time Off" ("PTO") program. The result of these discussions was the "Stipulated Order Approving Payment Of Accrued Paid Time Off (PTO) And Severance And Payment Of Retention Bonuses". Under this "Incentive Stipulation", the Debtors' PTO and KERP plans were partially and conditionally assumed and partially rejected, and the PBRB was rejected.

The Incentive Stipulation served the purpose of key employee retention by conditioning all benefits on the continued service of the Debtors' "Top 5 Employees" through consummation of sales of the Debtors' business units and by basing most of the proposed benefits on the amount realized in sales of the business units. Under the Incentive Stipulation, a SONICblue employee received PTO and severance benefits upon termination of his/her employment, except where the employee was offered employment on similar terms by Opta or DNNA. The total PTO and severance benefits were equal to the amount entitled to priority under the Bankruptcy Code, plus the Employees shared an additional $250,000, which amount increased to $2,500,000 if product line asset sales and receivable collections generated more than $40 million. In addition, the Incentive Stipulation carried over the pre-petition KERP Plan, but limited it to $250,000, or $500,000 if product line asset sales and receivable collections were $40 million or more. As a condition of receiving these benefits, certain of the Debtors' former officers were required to waive certain Claims against the Debtors and their estates.[5] After negotiating the Incentive Stipulation, the Debtors sought and obtained Bankruptcy Court approval of the Incentive Stipulation.

As a result of the sale of the Debtors' product lines and other assets, as noted, all of SONICblue's Employees have been released or hired by DNNA or Opta, and the benefits due under the Incentive Stipulation have been paid. As such, all or most of the Debtors' liability for

---

[5]  The details of the incentive plan are set forth in the Incentive Stipulation, which is on file with the Bankruptcy Court. The description set forth herein is informational only, and should not be considered limiting or binding on the Debtors or the Creditors' Committee.

priority pre-petition Employee Claims has been satisfied.

### 3.    The Debtors' Retirement Plans.

As of the Petition Date, SONICblue maintained three retirement plans for its employees: (1) the SONICblue Incorporated Executive Deferred Compensation Plan (the "Executive Plan"); (2) the Diamond Multimedia Systems, Inc. 401(k) Plan (the "Diamond Plan"); and (3) the SONICblue Incorporated 401(k) Savings Plan (the "SONICblue Plan"). As of the Petition Date, the Diamond Plan had already been terminated, a favorable IRS determination letter approving the termination had been issued, and SONICblue had been distributing the plan assets to the participants.

Pursuant to the cessation of its business operations, SONICblue requested and obtained Bankruptcy Court authorization to terminate its remaining retirement plans. In accordance with the Bankruptcy Court's order: (a) the account balances from the Executive Plan were made available for distribution to the creditors of SONICblue; (b) the funds remaining in the Diamond Plan, consisting of accrued interest on plan funds that had not yet been allocated to participant accounts, were allocated and distributed; and (c) the SONICblue Plan was terminated, a favorable determination letter was obtained from the IRS, and distributions to the participants of their account balances has commenced. The SONICblue Plan will continue to prepare and file annual reports pending completion of the distribution process.

### H.    Claims Process and Bar Dates.

### 1.    Schedules and Statements.

On March 25, 2003, the Debtors filed their respective schedules of assets and liabilities, ("Schedules") and statements of financial affairs with the Bankruptcy Court. On May 7, 2003, the Debtors filed amended Schedules and statements of financial affairs to correct and clarify certain information included in, or omitted from, the original Schedules and statements. All references to the Debtors' Schedules shall mean the Schedules as amended from time to time.

SONICblue's Schedules included hundreds of employee wage, vacation pay and severance Claims totaling over $1.7 million. As a result of the three product line sales and payments under the Incentive Stipulation, all or nearly all of SONICblue's liability for unpaid wages and severance and vacation benefits was satisfied or eliminated. As such, on February 9, 2006, SONICblue amended its Schedule E to eliminate the scheduled wage and employment related Claims. In the course of amending Schedule E, the Debtors' counsel contacted a number of scheduled tax claimants and verified that the claimants either did not contend that the scheduled taxes were due and owing or that the scheduled liability overstated the actual amount due. The results of these discussions with tax claimants are reflected in reduced tax Claim amounts set forth in amended Schedule E.

### 2.    Previously Established Claims Bar Dates.

### (a)    Unsecured Claims Bar Date.

On March 29, 2003, the Bankruptcy Court gave notice to creditors and parties in interest that July 22, 2003 (the "Unsecured Claims Bar Date") had been established as the deadline for filing non-governmental proofs of claim against the Debtors. In addition, on June 25, 2003, the Claims Administrator sent a "Notice of Deadline to File Proofs of Claim" (the "Second Bar Date Notice") to a portion of the creditor matrix; and, on June 30, 2003, the Claims Administrator sent the Second Bar Date Notice to the balance of creditors and interested parties.

As a result of the two bar date notices, all creditors (excluding governmental entities, Administrative Claim Holders and Holders of Claims arising after the Petition Date) were required to file proofs of claim no later than the Unsecured Claims Bar Date or be barred from asserting any Claim and from voting upon or receiving any distributions under the Plan. Proofs of claim were not required to be filed at that time by: (i) any party who had previously filed a proof of Claim with the Bankruptcy Court, or (ii) any party whose Claim was listed on the Debtors' Schedules in a

liquidated amount and not designated as "contingent" or "disputed."

**(b)**         **Rejection Claim Bar Date.**

In connection with the Bankruptcy Court's orders approving the Debtors' sales of the Rio, ReplayTV and Go-Video Product Lines, certain executory contracts and unexpires leases were rejected by the Debtors by notices sent to counterparties to such executory contracts and unexpired leases and filed on April 23, 2003 (in connection with the Go-Video sale), June 17, 2003 (in connection with the Rio and ReplayTV sales), and July 23, 2003 (in connection with the Rio and ReplyTV sales). The Second Bar Date Notice provides that Claims arising from the rejection of an executory contract or unexpired lease must be filed by the later of (i) the Unsecured Claims Bar Date or (ii) the time set by the Bankruptcy Court in the order approving the Debtors' rejection of such executory contract or unexpired lease. The Debtors believe that all claims arising from executory contracts or unexpired leases rejected by the April 23, 2003 and June 17, 2003 notices would have been subject to the Unsecured Claims Bar Date**.** On June 27, 2003, the Debtors filed their motion seeking to assume and reject certain additional executory contracts, which was approved by Bankruptcy Court order entered on August 1, 2003. On October 14, 2003, the Debtors filed a motion seeking to assume and reject certain additional executory contracts and to set a bar date for Claims arising from the rejection of such executory contracts and unexpired leases (the "October 2003 Rejection Motion"). On November 13, 2003, the Bankruptcy Court entered its order approving the October 2003 Rejection Motion. On March 5, 2004, the Debtors filed a motion to reject additional executory contracts and unexpired leases (the "March 2004 Rejection Motion"), which was approved by Bankruptcy Court order entered on May 25, 2004, and an initial bar date of August 2, 2004 (60 days after notice was sent) was set for Claims arising from the rejection of executory contracts and unexpired leases pursuant to the October 2003 Rejection Motion and the March 2004 Rejection Motion. On July 2, 2004, the Debtors filed a motion to reject additional executory contracts and unexpired leases (the "July 2004 Rejection Motion"), which was approved by Bankruptcy Court order entered on July 29, 2004, and a bar date of September 12, 2006 (60 days after notice was sent) was set for Claims arising from the rejection of executory contracts and unexpired leases pursuant to the July 2004 Rejection Motion.

**3.**     **Claims Objections and Subordination.**

During the course of the Chapter 11 Cases, not less than 750 Claims totaling more than $331 million were filed against the Debtors. Many of these Claims duplicated scheduled liabilities. However, more than half of the filed Claims did not duplicate scheduled liabilities, and many of these Claims: (i) are not substantiated by the Debtors' books and records, which are believed to accurately set forth the Debtors' debts and obligations; (ii) duplicate other filed Claims; (iii) are lacking in proper documentation; (iv) were not timely filed; (v) assert priority or secured status without a proper basis; and/or (vi) were filed by parties who received avoidable transfers. The Bankruptcy Code authorizes the Debtors, the Creditors' Committee or any other party in interest to object to Claims on all these grounds, as well as any other justifiable grounds.

The Debtors and the Creditors' Committee have each filed and litigated a substantial number of objections to Claims. The Debtors focused on larger Claims requiring a more detailed knowledge of the Debtors' business affairs, whereas the Creditors' Committee focused on smaller Claims and filing omnibus objections. The Debtors and the Creditors' Committee filed not less than 25 Claims objections and motions to subordinate Claims. In addition, the Creditors' Committee has filed three omnibus Claims objections. As a result of these efforts, more than $290 million in Claims have been disallowed or subordinated.

In addition, as discussed below in connection with the Preference Actions, the Debtors and the Creditors' Committee have addressed and litigated objections to Claims in connection with the Preference Actions, which process is still ongoing.

The Proponents anticipate that they will continue the Claims objection process up to the Effective Date, at which time the process will be taken over by the Reorganized Debtor and/or the Plan Oversight Committee. Other than with respect to possible objections to the Junior Notes Claims and the Senior Notes Claims as described immediately below, nearly all of the more significant Claims objections have been filed. Set forth in Exhibit "C" hereto is a list of all known Claims that were included in the Schedules or were asserted in filed proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Debtors and/or the Creditors' Committee (or by the Reorganized Debtor and/or the Plan Oversight Committee after the Effective Date) as the Debtors and the Creditors' Committee are continuing with their investigation of Claims. Exhibit "C" is being provided for notification purposes only. It is possible that the Debtors, the Creditors' Committee, the Reorganized Debtor, the Plan Oversight Committee or some other party in interest may file an objection to a Claim which is not included in Exhibit "C". The fact that a claim is not included in Exhibit "C" is without prejudice to the rights of any party in interest to file any objection to a Claim. These Claims are in addition to the Claims which are held by parties who are the subject of a pending Avoidance Action (and whose Claims are therefore disputed until the Avoidance Action is resolved), and the Claims of the Junior Noteholders and the Senior Noteholders which are addressed below. Claim holders (whether or not identified in Exhibit "C") should not rely on the fact that no objection has to date been filed to their Claim in voting on whether to accept or reject the Plan. Claim holders (whether or not identified in Exhibit "C") should make their decision on whether to vote to accept or reject the Plan independent from the fact that an objection may still be filed to their Claim.

**4.      Claim Issues Involving the Junior Noteholders and the Senior Noteholders.**

In 1996, Junior Notes were issued in the aggregate original principal amount of $103.5 million. The Junior Notes and associated rights were sold for $100.3 million. As a result, there was a discrepancy of approximately $3.2 million between the face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes. The Junior Notes Indenture Trustee filed a proof of claim against the Debtors in the amount of $106.1 million, which the Junior Notes Indenture Trustee contends does not include any post-Petition Date interest.

Under the Bankruptcy Code, interest that is not matured as of the petition date is disallowed under Section 502(b)(2). The Proponents believe that the original issue discount on the Junior Notes, which is the difference between the face amount of the Junior Notes and the actual price paid for them, is considered unmatured interest and is to be disallowed under Section 502(b)(2) of the Bankruptcy Code to the extent that it has not been amortized as of the Petition Date.

Until recently, the Debtors were in charge of analyzing the Junior Notes Claims. However, as a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing the Junior Notes Claims. The Creditors' Committee has only performed a preliminary analysis of this issue. Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can be reached, the Creditors' Committee will likely be filing an objection to the Junior Notes Claims based upon the unamortized portion of the approximately $3.2 million discrepancy between the face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes. In addition, the Creditors' Committee believes that the Junior Noteholders may have received additional consideration in exchange for their payment of $100.3 million (i.e., beyond the issuance of the Junior Notes), such as stock conversion rights, which may serve to further reduce the appropriate Allowed Amount of the Junior Notes Claims. As described more below in the Plan summary treatment of Class 5 Claims (i.e., the Junior Notes Claims), for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are

assuming that the Junior Notes Claims will be Allowed in the amount of $103 million. However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor (after the Effective Date) or any other party in interest to file an objection to the Claims of the Junior Noteholders contending that the Allowed Amount of the Junior Notes Claims should be less than $103 million.

In 2002, Senior Notes in the aggregate original principal amount of $75 million (which also had certain stock conversion rights) plus 7.5 million warrants for SONICblue stock and options to purchase 21,426,586 shares of UMC stock were sold as "Investments" in a private placement to three investors, who are classified under the Plan as Class 3 Claims. This investment package was sold for an aggregate net price of $62.25 million. The UMC stock was also pledged as security for the Senior Notes. The Debtors scheduled the Claim of the Senior Notes Indenture for in excess of $77 million, and each of the three Senior Noteholders filed its own proofs of Claim in unspecified amounts relating to the Senior Notes. The Senior Noteholders never exercised any of their stock conversion rights and never exercised any of their warrants. However, during the course of the Chapter 11 Cases, the Senior Noteholders received approximately $17.4 million from the proceeds of the UMC stock that collateralized the Senior Notes. The receipt of the sale proceeds of the UMC stock serves to reduce the Allowed Claims of the Senior Noteholders.

As with the Junior Notes, the Proponents believe that an original issue discount also exists with respect to the Senior Notes, which would warrant some reduction in the amount of the Allowed Claims of the Senior Noteholders. As with the Junior Notes, until recently, the Debtors were in charge of analyzing the Senior Notes Claims. However, as a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing the Senior Notes Claims. The Creditors' Committee has only performed a preliminary analysis of this issue. Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can be reached, the Creditors' Committee will likely be filing an objection to the Senior Notes Claims based upon the unamortized portion of the approximately $12.75 million discrepancy between the face amount of the Senior Notes and the amount of money actually paid by the Senior Notes Holders for the Senior Notes. In addition, as described above, the Creditors' Committee believes that the Senior Noteholders may have received additional consideration in exchange for their payment of $62.25 million (i.e., beyond the issuance of the Senior Notes), which may serve to further reduce the appropriate Allowed Amount of the Senior Notes Claims.

The Creditors' Committee is working with GHC to analyze the Junior Notes Claims and the Senior Notes Claims, and attempt to arrive at a mutually agreeable discount of the Junior Notes Claims and the Senior Notes Claims without the expense and time delay that would be associated with litigating these disputes. Preliminarily, GHC believes that a substantial portion of the Senior Notes Claims constitutes unamortized original issue discount, which may constitute disallowable unmatured interest. GHC believes that the percentage discount for the Junior Notes Claims may be substantially lower because substantially more amortization of the original issue discount occurred with the longer passage of time since the issuance of the Junior Notes back in 1996.

As described more below in the Plan summary treatment of Class 3 Claims (i.e., the Senior Notes Claims), for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Senior Notes Claims will be Allowed in the amount of $47 million. However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor (after the Effective Date) or any other party in interest to file an objection to the Claims of the Senior Notes Holders contending that the Allowed Amount of the Senior Notes Claims should be less than $47 million.

The Bankruptcy Court shall retain jurisdiction over these estates following the Effective Date to adjudicate any objections filed to the Senior Notes Claims and/or the Junior Notes Claim, regardless of whether such objections were filed by the Creditors' Committee prior to the Effective

1    Date and continued by the Plan Oversight Committee after the Effective Date, or whether such objections are first filed by the Plan Oversight Committee or the Reorganized Debtor after the

2    Effective Date.

3    **I.    Post-Petition Date Litigation.**

**1.    VIA Litigation.**

4    VIA Technologies, Inc. ("<u>VIA</u>") and S3 Graphics Co., Ltd. ("<u>JV</u>") filed duplicate $105

5    million proofs of claim allegedly arising out of an August 28, 2000 Amended Investment Agreement between SONICblue and VIA and other related agreements.  VIA and JV alleged that SONICblue breached the Amended Investment Agreement and related agreements by, among

6    other things, not paying certain accounts payable, offering non-ordinary-course discounts to accelerate collection of receivables, not contributing certain assets to JV, and retaining payments

7    received for certain accounts receivable that allegedly were owed to JV.  Approximately $27 million of these claims were subject to a $5.5 million damages cap.  VIA and JV also claimed that

8    JV may be enjoined from using an intellectual property license between SONICblue and Intel Corporation ("<u>Intel</u>") and that JV was therefore entitled to damages under the Amended

9    Investment Agreement in an amount of up to $70 million.  The Claims were based upon breach of contract and related causes of action and involved very complex facts.

10

11    In December, 2004, the Debtors commenced litigation (the "<u>VIA Litigation</u>") by filing a complaint against VIA, JV and S3 Graphics, Inc. ("<u>JV Sub</u>") for affirmative relief and objecting to the aforementioned Claims and asserting numerous counterclaims.  The VIA Litigation was

12    vigorously disputed and protracted, and the Debtors incurred more than $2 million in legal expenses in the VIA Litigation and related matters.

13    The VIA Litigation and the other litigation matters between the Debtors and Intel were

14    settled pursuant to an order entered after a Bankruptcy Court hearing on October 27, 2005.  Under the settlement, among other things, VIA and JV received a $12.5 million general unsecured claim

15    against SONICblue and the two $105 million duplicate claims were disallowed.  In addition, among other things, SONICblue agreed to and has commenced the process of transferring the

16    intellectual property and records and files relating to its graphic chips business to JV or its designee.  The Proponents believe that this was an extremely favorable result for the Debtors'

17    estates.

18    The Debtors and the Creditors' Committee jointly decided that Plan confirmation could not proceed until the VIA Litigation was resolved, which is the primary reason for the delay between

19    the Petition Date and the filing of the Plan and this Disclosure Statement.  Among other things, confirmation of a plan to the VIA settlement would have resulted in the Debtors' rejection of

20    certain contracts with VIA that would likely have given VIA the right to claim certain liquidated damages. Thus, by deferring proposing a plan of reorganization, the Proponents minimized VIA's

21    potential claims against the Debtors' estates.  The settlement of the VIA Litigation and the other litigation matters between the Debtors and Intel was therefore monumentally significant towards

22    the ability of the Debtors and the Creditors' Committee to bring these Chapter 11 Cases to conclusion.

23    **2.    Avoidance Actions.**

24    The Bankruptcy Code authorizes a debtor-in-possession or trustee to seek avoidance and recovery of "preferential" and "fraudulent" transfers.  Generally, a preferential transfer is a transfer

25    made during the ninety (90) days preceding commencement of a bankruptcy case on account of an existing debt that enables a creditor to receive more than it would have received in a liquidation

26    case.  Where the transfer is to an "insider", the ninety-day period is extended to one year.  Here, because the Debtors will not be paying most classes of Claims in full, a transfer during the

27    preference period to any party whose Claim, absent such payment, would have been included in Classes 3-6 would enable such creditor to receive more than it would have received in a liquidation

28

case.  A "fraudulent" transfer under the Bankruptcy Code is generally described as a transfer made for less than reasonably equivalent value.

During the ninety days preceding the Petition Date, the Debtors made approximately 982 transfers totaling approximately $63.1 million to approximately 348 recipients.  The vast majority of these transfers were on account of antecedent debt.

Between March 11, 2005 and March 20, 2005, the Debtors and the Creditors' Committee filed approximately 208 preference and fraudulent conveyance avoidance and recovery actions (including one un-filed claim where the defendant executed a tolling agreement, and later settled without the need for litigation, collectively, the "Preference Actions".)  Prior to the commencement of the Preference Actions, the Creditors' Committee and the Debtors negotiated with their counsel a contingent fee arrangement that was approved by a Bankruptcy Court order entered on March 4, 2005.  Under this arrangement, the Proponents' attorneys' fees in the Preference Actions is a contingent fee (to be split and paid evenly to PW and LNBRB except for some possible disparities due to conflicts) (i) based upon the amount recovered from the defendants, plus (ii) an amount equal to the distributions that would be received on 27% of the Claims disallowed in the Preference Actions.

Most defendants in the Preference Actions asserted defenses, including that they had provided new value and/or that the transfers they had received were paid in the ordinary course of business, and therefore not recoverable or avoidable.

As of December 1, 2006, in the Preference Actions: (a) more than 145 of the Preference Actions have been settled, litigated to a judgment or dismissed; (b) defendants have agreed to pay at least $6 million to the Debtors as settlements, including amounts to be collected from defendants' Claim distributions; and (c) more than $9 million in Claims have been disallowed.

## ARTICLE VI
## THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR A FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, REGARDLESS OF WHETHER SUCH CLAIM HOLDERS AND INTEREST HOLDERS VOTED ON THE PLAN AND, IF THEY VOTED ON THE PLAN, WHETHER THEY VOTED TO ACCEPT OR REJECT THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.    Introduction.

In general, a Chapter 11 plan:  (i) divides claims and equity interests into separate classes; (ii) specifies the Property that each class is to receive under the plan; and (iii) contains other provisions necessary to the reorganization or liquidation of the debtor.  Under the Bankruptcy

Code, Claims and "equity interests" (or "Interests") are classified rather than "creditors" and "shareholders." For purposes of this Disclosure Statement, the term "Holder" refers to the Holder of a Claim or Interest.

**B.    General Plan Description.**

The Plan is a liquidating plan. All or nearly all of the Debtors' Assets have been liquidated. In the event that any non-Cash Assets remain as of the Effective Date, the Reorganized Debtor will proceed to liquidate all such non-Cash Assets. The Reorganized Debtor will continue with the prosecution of any disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Debtors but which have not been liquidated to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Reorganized Debtor and such Claims objections for this purpose, regardless of whether such Claims objections were commenced prior to or subsequent to the Effective Date. Similarly, the Reorganized Debtor will continue with the prosecution of any Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Debtors but which have not been resolved to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Reorganized Debtor and the Avoidance Actions for this purpose, regardless of whether such Avoidance Actions were commenced prior to or subsequent to the Effective Date.

On the Effective Date, the Creditors' Committee will become a post-confirmation Creditors' Committee, referred to herein as the "Plan Oversight Committee", whose role it will be to, among other things, monitor and oversee the actions of the Reorganized Debtor, and in the case of more significant events, approve the actions of the Reorganized Debtor. In addition, the Plan Oversight Committee will continue with the prosecution of any disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Creditors' Committee but which have not been liquidated to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and such Claims objections for this purpose, regardless of whether such Claims objections were commenced prior to or subsequent to the Effective Date. Similarly, the Plan Oversight Committee will continue with the prosecution of any Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Creditors' Committee but which have not been resolved to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and the Avoidance Actions for this purpose, regardless of whether such Avoidance Actions were commenced prior to or subsequent to the Effective Date. Finally, both the Reorganized Debtor and the Plan Oversight Committee shall have standing and authority to commence any objections to Claims after the Effective Date which they deem appropriate which were not commenced prior to the Effective Date.

The Reorganized Debtor will distribute the net proceeds of the Avoidance Actions and the Debtors' other Assets to Holders of Allowed Claims according to the priorities established in the Plan.

**C.    Substantive Consolidation.**

The Plan is premised upon the substantive consolidation of the Debtors' estates for the purposes of voting on, confirmation of, and distributions under the Plan. Substantive consolidation is an equitable remedy that a court may apply in cases involving affiliated entities. As contrasted with procedural consolidation, substantive consolidation affects the substantive rights and obligations of Creditors and the Debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the Debtors. Consequently, a Creditor of one of the substantively consolidated Debtors will be treated as a Creditor of the substantively consolidated group of Debtors subsumed within the Reorganized Debtor, and issues of individual corporate ownership of Property and individual corporate liability on obligations are ignored. As a result, a Creditor who contends that it has the same Claim against more than one of the Debtors will, following the Effective Date, be deemed to have only one such Claim against the Reorganized Debtor.

The Plan constitutes a motion for an order substantively consolidating the Debtors. As such, on the Plan Effective Date: (a) all Assets and liabilities of the Debtors shall be merged or treated as though they were merged into and with the Assets and liabilities of each other Debtor; (b) all inter-company Claims shall be eliminated and extinguished, and no distributions shall be made under the Plan on account of any inter-company Claims; (c) any Claims against two or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim; and (d) all Allowed Claims against the Debtors shall be satisfied from the Assets of the single consolidated estate of the Reorganized Debtor.

The Proponents believe that substantive consolidation of the Debtors under the Plan is appropriate under the circumstances because the Debtors were largely operated as a single economic unit. Among other things: (i) the Debtors shared the same officers and directors; (ii) only SONICblue had employees – the other Debtors functioned through SONICblue's employees; (iii) the Debtors reported their finances on a consolidated basis, except Sensory Science, which reported on a consolidated basis with the other Debtors and separately to comply with loan covenants; (iv) only two Debtors had bank accounts that were actively used during the year preceding the Petition Date – and checks drawn on both accounts identified SONICblue as the payor; (v) the Debtors filed consolidated tax returns; and (vi) the Debtors transferred and commingled Assets between and among themselves regardless of ownership of the Assets. Although Sensory Science did assert individual ownership of some Assets, substantial amounts of inventory, accounts receivable and funds were routinely conveyed between SONICblue and Sensory Science without full tracking of inter-company obligations. In addition, SONICblue and Sensory Science would pay expenses incurred with respect to each other's operations and products, but reimbursement often was either not paid or was not designed or intended to be fully compensatory.

Moreover, the Proponents believe substantive consolidation is prudent and efficient in that it would be exceptionally difficult and extraordinarily expensive, if not impossible, to unravel the Debtors' financial affairs to segregate their respective Assets and liabilities. Because funds and Assets were transferred between the Debtors without regard to corporate formalities or ownership, an extensive unwinding process would be required to determine who owned which Assets and to establish inter-company obligations. Because the Debtors did not track all inter-company transfers, identifying the various inter-company transfers would require record reconstruction on a massive scale. Disentangling the Debtors' affairs would have to be performed primarily by third party professionals as the Debtors have no more employees. The Proponents believe this process would be extremely expensive and would substantially delay distributions in these Chapter 11 Cases without any guarantee of (or even realistically possible) reliable results.

In addition, absent substantive consolidation of the Debtors, it would be necessary to address the validity of the loans made by SONICblue to the other Debtors prior to acquiring same. SONICblue loaned $20 million to each of Diamond and ReplayTV and $9.75 million to Sensory Science (the "Inter-company Loans"). These Inter-company Loans appear to have been properly documented and, as noted, they were secured by virtually all of the assets of each of the borrower-Debtors. No principal or interest payments have been paid on these Inter-company Loans since they were made. If the Inter-company Loans were held valid, SONICblue would presumably be entitled to most of the proceeds of sale of the other Debtors' Assets due to SONICblue's security interest. In any event, to the limited extent there were unencumbered assets (primarily, Avoidance Action recoveries by Sensory Science and proceeds of unencumbered registered copyrights), SONICblue would be able to assert the unpaid portion of its Inter-company Loan, if held valid, as an unsecured claim in the other Debtors' cases. On the other hand, creditors of the other Debtors might assert that the Inter-company Loans are not valid on the grounds, inter alia, that the Inter-company Loans were forgiven or waived in the process of SONICblue acquiring the other Debtors. Absent substantive consolidation, the Proponents believe expensive and protracted litigation concerning the validity of these Inter Company loans would be inevitable.

-26-

1

2        The Proponents believe that substantively consolidating the Debtors would benefit all Creditors by eliminating the substantial cost and significant delay that would result from (a) reconstructing all pre-petition transactions between the Debtors, (b) allocating Assets and liabilities between the various Debtors, and (c) litigating the accuracy of these processes, the validity of the Inter-company Loans and a number of other issues.  The Proponents believe the cost savings and value of expedited distribution would be substantially more beneficial to Creditors than any change in distributions that might result from an expensive, protracted and possibly futile process of Asset and liability allocation and litigation.

3

4

5    **D.**    **The Plan's Reallocation Provisions.**

6        The Plan gives effect to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture (the "Indentures") according to their terms.  Bankruptcy Code Section 510(a) expressly provides that contractual subordination provisions are enforceable in bankruptcy to the extent enforceable under applicable non-bankruptcy law.  The Plan will give effect to the Subordination Provisions by re-allocating the distributions that would have been paid to Creditors absent the Subordination Provisions to Creditors benefiting from the Subordination Provisions. However, nothing in the Plan precludes any party from enforcing its rights under the Subordination Provisions outside the bankruptcy context, subject to the provisions in the Indentures, including, without limitation, any concerning the effect of a court order approving reallocations under the Subordination Provisions.

7

8

9

10

11        Under the Subordination Provisions of the two Indentures, the parties entitled to priority are not limited to recovering the Allowed Amounts of their Claims.  Under bankruptcy law generally, an unsecured or under-secured creditor is not entitled to collect post-petition interest. Under the two Indentures, however, the parties benefiting from the Subordination Provisions are entitled to collect all principal and interest owing under the prioritized obligations, including post-petition interest.  As such, under the Plan, the creditors benefiting from the Subordination Provisions are entitled to receive up to the "Subordination Payment Amount" of their Claims, which amount is defined as the amount of a Claim entitled to priority under one or both Indentures, even though the Subordination Payment Amount may exceed the amount due on account of the Claim as Allowed under bankruptcy law.  Typically, the Subordination Payment Amount includes all principal and interest (including post-petition interest) due on account of a Claim, but the applicable Indenture(s) may impose limitations on the amount entitled to priority.

12

13

14

15

16

17

18        The distinction between the Allowed Amount of a Claim and the Subordination Payment Amount is primarily of importance to the Senior and Junior Noteholders.  As discussed above, for purposes of estimating distributions to be made under the Plan, the Proponents have assumed an Allowed Claim of $47 million in favor of the Senior Noteholders; whereas the Debtors calculate the Subordination Payment Amount of the Senior Noteholders' Claims to be approximately $84 million on March 11, 2007, based on the Senior Noteholders' recovery from the prior UMC stock sales described herein.  Absent the Subordination Provisions, the Proponents would project a significant distribution on account of the Junior Notes.  However, the Proponents believe that all distributions which would otherwise have been paid to the Junior Noteholders (i.e., Class 5) if not for the Subordination Provisions will be reallocated and paid to the Senior Noteholders (i.e., Class 3) in accordance with the Subordination Provisions.

19

20

21

22

23        The Senior Noteholders contend that they are entitled to receive all distributions which would otherwise have been paid to the Junior Noteholders if not for the Subordination Provisions until the Junior Noteholders have been paid the full Subordination Payment Amount, which is not expected to occur.  As a result, the Senior Noteholders contend that the Junior Noteholders are not entitled to receive any distribution from the Reorganized Debtor as all such distributions which otherwise would have been paid to the Junior Noteholders are instead required to be paid to the Senior Noteholders pursuant to the Subordination Provisions.  In the event the Junior Noteholders disagree with this contention, the Junior Noteholders must file an objection to this provision of the Plan with the Bankruptcy Court not later than fifteen days prior to the Plan confirmation hearing, and include with such objection all evidence in support of such contention.  The Junior

24

25

26

27

28

Noteholders are required to serve any such objection upon counsel to the Debtors, counsel to the Creditors' Committee, and counsel to the Senior Noteholders.  The failure of the Junior Noteholders to file any such timely objection to this provision of the Plan will be deemed to constitute the consent by the Junior Noteholders to this Plan provision.  To the extent that any such objection requires a modification to the Plan, any such modification to the Plan will be deemed to constitute an immaterial modification to the Plan, which will not require the resolicitation of any voting on the Plan.

**E.    Other Procedural Issues Concerning Subordination and Seniority of Claims.**

The Proponents are not aware of any Claims which are entitled to any priority over the Senior Noteholders' Claims.  As a result, any Claim holder who contends that it is entitled to priority over the Senior Noteholders' Claims must file an objection to this provision of the Plan with the Bankruptcy Court not later than fifteen days prior to the Plan confirmation hearing and include with such objection all evidence in support of such contention of priority.  Any such Claim holder is required to serve any such objection upon counsel to the Debtors, counsel to the Creditors' Committee, and counsel to the Senior Noteholders.  The failure of any Claim holder to file any such timely objection to this provision of the Plan will be deemed to constitute an acknowledgement by such Claim holder that it is not entitled to any priority over the Senior Noteholders' Claims.  To the extent that any such objection requires a modification to the Plan, any such modification to the Plan will be deemed to constitute an immaterial modification to the Plan, which will not require the resolicitation of any voting on the Plan.

**F.    Classification and Treatment of Claims.**

Bankruptcy Code Section 1122 provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to Section 1123(a)(1), are not to be classified).  The Proponents also are required, under Section 1122, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Proponents' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Proponents intend, to the extent permitted by the Bankruptcy Code and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Class.  Thus, the value of the Property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Proponents believe that the consideration, if any, provided under the Plan to the Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the

-28-

Debtors' Assets. In view of the deemed rejection by Classes 7 and 8, however, and the possible rejection of the Plan by other voting Classes, the Proponents will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Bankruptcy Code Section 1129(b) permits confirmation of a Chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired Classes of Claims and Interests. See Section X.B. of this Disclosure Statement for a further description of this issue. Although the Proponents believe that the Plan can be confirmed under Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

Subject to the foregoing, the following describes the classification and treatment of classified Claims and Interests under the Plan. As described above, pursuant to the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan.

**1.    Class 1 - Secured Claims.**

(a)    Classification: This Class consists of Allowed Claims secured by valid and perfected liens and/or security interests against the Debtors' Assets, to the extent of the value of the Holder's interest in the Debtors' Assets.

(b)    Treatment: Each Holder of a Class 1 Allowed Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Secured Claim equal to the Allowed Amount of such Class 1 Allowed Claim.

(c)    Estimated Amount of Claims: There are approximately twenty-seven (27) scheduled Claims or filed proofs of Claim in this Class totaling approximately $91.975 million. However, most of these Claims relate to the Senior Notes which are no longer secured as a result of the prior sale and payment of the UMC Stock, which served as their collateral. In addition, a number of these Claims are objectionable or have been paid, and the Proponents intend to have the Claims withdrawn or file objections to these Claims before the Effective Date. The Proponents estimate that after withdrawal or reclassification of objectionable claims and/or litigation of such objectons, the total amount of Allowed Secured Claims will be not more than approximately $380,000.

(d)    Projected distributions: The Proponents anticipate that all Class 1 Allowed Claims will be satisfied in full under the Plan.

(e)    Voting: Claims in this Class are not impaired and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject the Plan.

**2.    Class 2 – Other Priority Claims.**

(a)    Classification: This Class consists of all Unsecured Priority Claims specified under Bankruptcy Code Section 507(a), but excluding Priority Tax Claims and Administrative Claims.

(b)    Treatment: Each Holder of a Class 2 Allowed Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Priority Claim equal to the Allowed Amount of such Class 2 Allowed Claim.

(c)    Estimated Amount of Claims: There are approximately fifteen (15) Claims in this Class totaling approximately $302,000. Many of these Claims are general unsecured Claims that have incorrectly asserted priority status. The Proponents intend to seek voluntary reclassification of these Claims or to file objections thereto. The Proponents estimate that after reclassifying such Disputed Claims and litigation of other appropriate objections, the total amount of Allowed Claims in this Class will be approximately $30,000.

(d)    Projected distributions: The Proponents anticipate that all Class 2 Allowed Claims will be satisfied in full under the Plan.

-29-

(e)    Voting:  Claims in this Class are not impaired, and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject the Plan.

3.    **Class 3 – Senior Notes Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims arising out of the Senior Notes (the 7¾% Senior Secured Subordinated Convertible Debentures due 2005), which consists of all Claims of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.

(b)    Treatment:  Each Holder of a Class 3 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets on the same percentage basis as Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims. In addition, pursuant to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture, the entire distribution of the Net Remaining Assets that would otherwise be made to the Holders of Class 5 Allowed Claims on account of the Junior Notes Claims shall instead be paid directly to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(c)    Estimated Amount of Claims:  There are three known Holders of Class 3 Claims consisting of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.  As described above, before any original issue discount or attribution of value to the items received by the Senior Notes Holders or features of the Senior Notes, the Class 3 Claims would have been in the amount of approximately $60 million after credit is provided for the approximately $17.4 million of proceeds received by the Senior Note Holders from the sale of the UMC stock that collateralized the Senior Notes.  Solely for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Senior Notes Claims will be Allowed in the amount of $47 million.  However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor or any other party in interest to file an objection to the Senior Notes Claims contending that the Allowed Amount of the Senior Notes Claims should be less than $47 million.

(d)    Projected distributions:  The Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims.  As further set forth above, the Proponents are preliminarily estimating a likely distribution of approximately 33% to holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims, taking into account all of the assumptions set forth herein.  Assuming total Class 3 Allowed Claims of $47 million, the Proponents estimate that Holders of Class 3 Allowed Claims will receive a total of approximately $15,510,000 before taking into account the payment to the Holders of Class 3 Allowed Claims that would otherwise be made to the Holders of Class 5 Allowed Claims if not for the Subordination Provisions.  Assuming total Class 5 Allowed Claims of $103 million, the Proponents estimate that an additional approximately $33,990,000 that would otherwise be paid to the Holders of Class 5 Allowed Claims if not for the Subordination Provisions will be paid to the Holders of Class 3 Allowed Claims.  Using these assumptions, the Proponents believe that Holders of Class 3 Allowed Claims may receive a total distribution from the Reorganized Debtor which exceeds the amount of their Class 3 Allowed Claims, but this is acceptable pursuant to the Subordination Provisions, to which original issue discount concepts do not apply.

(e)    Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

4.    **Class 4 - General Unsecured Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims (including deficiency Claims) other than Administrative Claims, Priority Tax Claims and Claims in Classes 2, 3, 5, 6 and 7.

(b)    Treatment:  Along with Holders of Class 3 Allowed Claims and Holders of Class 5 Allowed Claims, each Holder of a Class 4 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets.

(c)    Estimated Amount of Claims:  As of December 15, 2006, there are a total of approximately $42.8 million of Class 4 Claims that the Bankruptcy Court has, or the Debtor and the Creditors' Committee have, determined are or should be Allowed.  In addition, there are a total of approximately $74.9 million of additional Class 4 Claims that are (i) subject to pending Claim objections or Preference Actions, (ii) subject to continuing investigation by the Debtors' and/or the Creditors' Committee and may be objected to in the future, or (iii) likely to be eliminated upon Substantive Consolidation of the Debtors (the "Unsettled Claims").  Much of the remaining Class 4 Unsettled Claims are asserted by Claim holders who are the subject of pending Preference Actions, and many of the previous settlements of Preference Actions included a waiver of all or a significant portion of the Unsecured Claims which were otherwise asserted by the defendant to the relevant Preference Action.  The Proponents estimate that the ultimate total amount of Class 4 Allowed Claims will be approximately $86 million.  However, this figure is just an estimate.  The ultimate actual total amount of Class 4 Allowed Claims could be higher or lower than $86 million.

(d)    Projected distributions:  As described above, the Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims.  Based upon all of the assumptions contained in this Disclosure Statement, including that the ultimate total amount of Class 4 Allowed Claims will be approximately $86 million, the Proponents are preliminarily estimating a likely distribution of approximately 33% to holders of Class 4 Allowed Claims.

(e)    Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**5.    Class 5 - Junior Notes Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims arising out of the Junior Notes (the 5-¾% Convertible Subordinated Notes due 2003), including, without limitation, all Claims of U.S. Bank, N.A.

(b)    Treatment:  Along with Holders of Class 3 Allowed Claims and Holders of Class 4 Allowed Claims, each Holder of a Class 5 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets, which payment, pursuant to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture, will actually be paid directly to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(c)    Estimated Amount of Claims:  U.S. Bank, N.A. is the only known Holder of a Class 5 Claim.  This Holder filed a proof of Claim in the amount of $106.1 million.  This Claim may be partially Disputed.  Solely for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Junior Notes Claims will be Allowed in the amount of $103 million.  However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders.  It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor or any other party in interest to file an objection to the Junior Notes Claims contending that the Allowed Amount of the Junior Notes Claims should be less than $103 million.

(d)    Projected distributions:  As described above, the Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims.  Based upon all of the assumptions contained in this Disclosure Statement, including that the ultimate total amount of Class 5 Allowed Claims will be approximately $103 million, the Proponents are preliminarily estimating a likely distribution of approximately 33% to Holders of Class 5 Allowed Claims. Assuming total Class 5 Allowed Claims of $103 million, the Proponents estimate that the Holders of Class 5 Allowed Claims would have been paid the total sum of $33,990,000 if not for

the Subordination Provisions.  However, as a result of the Subordination Provisions, the entire sum that would otherwise have been owing to the Holders of Class 5 Allowed Claims will instead be paid to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(e)     Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**6.     Class 6 – Convenience Class Claims.**

(a)     Classification:  This Class is comprised of all Claims that would otherwise be Class 4 Claims but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $2,500; or (b) such Claim is in an amount greater than $2,500, but the Holder of such Claim has elected to have such Claim treated in its entirety as a Class 6 Convenience Class Claim in the amount of $2,500 by so indicating on the Ballot submitted to vote such Claim.

(b)     Treatment:  Each Holder of a Class 6 Allowed Claim shall receive Cash within ninety days following the later of the Effective Date and the date of Allowance of such Class 6 Allowed Claim equal to 50% of the Allowed Amount of such Class 6 Allowed Claim; provided, however, that under any circumstance the maximum Cash distribution to a Class 6 Claim Holder shall be $1,250.

(c)     Estimated Amount of Claims:  There are over 450 Claims in this Class totaling approximately $301,000.  In addition, the Proponents estimate that twenty (20) to forty (40) Creditors with Class 4 Allowed Claims exceeding $2,500 may opt to reduce their Claims to $2,500 and participate in the Class 6 Convenience Class to expedite receipt of their distributions. As such, the Proponents are estimating that the ultimate amount of Claims in this Class will be approximately $375,000.

(d)     Projected distributions:  Each Holder of a Class 6 Allowed Claim will receive a single distribution equal to the lesser of fifty percent (50%) of such Holder's Class 6 Allowed Claim or $1,250.

(e)     Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**7.     Class 7 – Subordinated Unsecured Claims.**

(a)     Classification:  This Class consists of all Claims: (i) that have been or are subject to subordination under Bankruptcy Code Section 510(b), including, without limitation, all Claims identified in Schedule 1 to the Plan and which are not expressly included in any other Class; and (ii) all Claims described in any other Bankruptcy Code provision that subordinates Claims.

(b)     Treatment:  Holders of Allowed Class 7 Claims will receive no distributions on account of their Class 7 Claims.

(c)     Estimated Amount of Claims:  Seven (7) Claims, comprising approximately $14.6 million, have previously been subordinated pursuant to Bankruptcy Court order.  Exhibit "C" identifies any additional claims that the Proponents may seek to have subordinated.

(d)     Projected distributions:   Holders of Class 7 Claims will receive no distributions on account of their Class 7 Claims.

(e)     Voting:  Claims in this Class are deemed to have rejected the Plan and, as such, Holders of Allowed Claims in this Class are not entitled to vote to accept or reject the Plan.

**8.     Class 8 – Interests.**

(a)     Classification:  This Class consists of all Interests in any of the Debtors and any rights and Claims related thereto, including, but not limited to, all stock, equities, securities, warrants, conversion rights, options and other legal and contractual rights to acquire stock.

  (b) <u>Treatment</u>:  Holders of Interests will not receive or retain any Property or distributions under the Plan on account of such Interests.  Holders of Interests will have no power or role in the administration of the Reorganized Debtor.  On the Effective Date, all such power shall be vested in the Reorganized Debtor and the Plan Oversight Committee in accordance with the terms of the Plan.

  (c) <u>Projected distributions</u>:  Interest Holders will receive no distributions on account of their Interests.

  (d) <u>Voting</u>:  Holders of Interests are deemed to have rejected the Plan and, as such, are not entitled to vote to accept or reject the Plan.

**G. Treatment of Unclassified Administrative and Priority Tax Claims.**

  **1. Definition of Administrative Claims.**

  An "<u>Administrative Claim</u>" is defined in the Plan as a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under Bankruptcy Code Sections 503, 507(a)(2) or 1114(e)(2) including, but not limited to, (i) any actual and necessary post-Petition Date cost or expense of preserving the Debtors' respective estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any post-Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation and reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under Bankruptcy Code Sections 328, 330(a) or 331, and (v) any fees or charges assessed against the Debtors' respective estates under Section 1930 of the title 28 of the United States Code.

  **2. Treatment of Administrative Claims other than Professional Fees.**

  Holders of Administrative Claims other than Professional Fees that have not been paid as of the Effective Date must File a request for payment of such Administrative Claims with the Bankruptcy Court and serve the same upon the Reorganized Debtor and the Plan Oversight Committee no later than forty-five (45) days after the Effective Date (the "<u>Administrative Bar Date</u>").  If an Administrative Claim that has not been paid as of the Effective Date is not timely Filed by the Administrative Bar Date, then such Administrative Claim shall be deemed not Allowed and shall be forever barred and not enforceable against any of the Debtors, the Assets, or the Reorganized Debtor.

  Any objection to a timely filed Administrative Claim must be filed within the later of (i) ninety (90) days after the date such Administrative Claim is Filed and properly served, or (ii) ninety (90) days after the Effective Date.  The Reorganized Debtor and/or the Plan Oversight Committee shall have the right to seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Administrative Claim.  The Reorganized Debtor shall have the right to pay any timely filed Administrative Claim if both the Reorganized Debtor and the Plan Oversight Committee agree that neither has an objection to such Administrative Claim.  Otherwise, the Reorganized Debtor shall pay any timely filed Administrative Claim only after the deadline to file an objection to such Administrative Claim has passed with no objection having been filed, or the Administrative Claim is allowed by Final Order of the Bankruptcy Court.

  **3. Amount of Administrative Claims other than Professional Fees.**

  The Proponents believe that there are less than $35,000 of unpaid Administrative Claims other than Professional Fees and regular recurring expenses of the Debtors' estates.

  Regular recurring administrative expenses, other than Professional Fees, primarily consist of consulting fees for Nanci Salvucci and Marcus Smith, transfer agent fees and charges, Bowne (printers who file 8-Ks) fees, the Claims Administrator's fees, storage expenses for the Debtors' records, Delaware taxes, U.S. Trustee fees, and expenses of the Debtors' payroll service, ADP,

Inc.  These regular recurring administrative expenses approximate $35,000 to $50,000 on a monthly basis and are generally paid within 30 days of becoming due.

**4.     Statutory Fees**

All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.  Payments required after the Effective Date shall be made as required by statute and shall be paid by the Reorganized Debtor.

**5.     Treatment of Professional Fees.**

All Professional Fees which have been Allowed prior to the Effective Date but which have not been paid by the Effective Date shall be paid on the Effective Date.

Except (i) as otherwise provided by Bankruptcy Court order for a specific Professional, and (ii) any Professional Fees for the Debtors' and/or Creditors' Committee's counsel arising out of or earned in connection with the Preference Actions or Avoidance Actions, any Professional requesting Professional Fees for services rendered prior to the Effective Date must file and serve an application for final allowance of compensation and reimbursement of expenses no later than ninety (90) days after the Effective Date.  Professionals who do not file such requests by such date shall be forever barred from seeking payment for such Professional Fees, but shall not be required to disgorge any fees or expenses which were previously paid to such Professional pursuant to Bankruptcy Court order.   Professional Fees incurred before the Effective Date (including Professional Fees incurred in connection with pursuit of the Preference Actions and/or Avoidance Actions) will only be paid after they have been approved pursuant to Bankruptcy Court order. Professional Fees incurred after the Effective Date (including Professional Fees incurred in connection with pursuit of the Preference Actions and/or Avoidance Actions) may be paid by the Reorganized Debtor in the ordinary course of business without any further Bankruptcy Court order.

**6.     Amount of Professional Fees.**

During the course of the Chapter 11 Cases, the various Professionals applied for payment of Professional Fees multiple times.   The following chart shows (i) the names of all of the Professionals employed during the Chapter 11 Cases; (ii) the total amount of fees and expenses that the Professionals have incurred through September 30, 2006; and (iii) the projected amount of additional fees and expenses the Professionals expect to incur through the Effective Date (excluding any fees or expenses relating to the Preference Actions or the Avoidance Actions, which, as set forth above, are being pursued on a contingency basis).

| PROFESSIONAL'S NAME | TOTAL AMOUNT OF FEES AND EXPENSES INCURRED FOR SERVICES RENDERED THROUGH SEPTEMBER 30, 2006 AND PAID | PROJECTED AMOUNT OF ADDITIONAL FEES AND EXPENSES TO BE INCURRED THROUGH THE EFFECTIVE DATE (EXCLUDING ANY FEES OR EXPENSES RELATING TO THE PRFERENCE ACTIONS OR THE AVOIDANCE ACTIONS) |
|---|---|---|
| Pillsbury Winthrop Shaw Pittman LLP ("PW")<br><br>Counsel to the Debtors | $4,490,382, not including $511,000 of fees and expenses which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet | $600,000 |

| PROFESSIONAL'S NAME | TOTAL AMOUNT OF FEES AND EXPENSES INCURRED FOR SERVICES RENDERED THROUGH SEPTEMBER 30, 2006 AND PAID | PROJECTED AMOUNT OF ADDITIONAL FEES AND EXPENSES TO BE INCURRED THROUGH THE EFFECTIVE DATE (EXCLUDING ANY FEES OR EXPENSES RELATING TO THE PRFERENCE ACTIONS OR THE AVOIDANCE ACTIONS) |
|---|---|---|
| | allowed or disallowed | |
| Davis & Associates Accountant and Tax Consultant and Advisor to the Debtors | $0 | $0 |
| Perisho Tombor Loomis & Ramirez 401(K) Plan Auditors for the Debtors | $43,444 | $16,000 |
| Syzygy Consulting Group<br><br>Employment and Compensation Consultant and Advisor to the Debtors | $14,345 | $0 |
| Ding & Ding Law Offices<br><br>Special Taiwanese Securities Counsel to the Debtors | $17,747 | $0 |
| Fenwick & West Special Counsel to the Debtors | $535,696 | $0 |
| O'Melveny & Myers LLP<br><br>Special Counsel to the Debtors | $1,111,682, not including $476,435 of fees and expenses which have been (i) deferred for decision, (ii) or not yet allowed or disallowed | $350,000 |
| Houlihan Lokey Howard & Zukin Capital<br><br>Financial Consultant to the Debtors | $1,000,000 | $0 |
| Stuart, Maue, Mitchell & James, Ltd.<br><br>Fee Auditor to the Debtors' Estates | $41,694 | $25,500 |
| Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB")<br><br>Counsel to the Creditors' Committee | $1,281,048 not including fees and expenses which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed | $500,000 |

-35-

| PROFESSIONAL'S NAME | TOTAL AMOUNT OF FEES AND EXPENSES INCURRED FOR SERVICES RENDERED THROUGH SEPTEMBER 30, 2006 AND PAID | PROJECTED AMOUNT OF ADDITIONAL FEES AND EXPENSES TO BE INCURRED THROUGH THE EFFECTIVE DATE (EXCLUDING ANY FEES OR EXPENSES RELATING TO THE PRFERENCE ACTIONS OR THE AVOIDANCE ACTIONS) |
|---|---|---|
| Alliant Partners<br><br>Financial Advisor to the Creditors' Committee | $97,000 | $0 |
| Grobstein, Horwath & Company LLP<br><br>Accounting and Litigation Consultants to the Debtors and the Creditors' Committee | $187,998 | $250,000 |
| Krieg, Keller, Sloan, Reilley & Roman LLP<br><br>Special Intellectual Property Litigation Counsel to the Creditors' Committee | $227,822 | $50,000 |
| J&J Attorneys At Law<br><br>Special Taiwanese Securities Counsel to the Creditors' Committee | $6,792 | $4,000 |
|  |  |  |
| **TOTAL** | $9,055,650, not including fees and expenses which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed | $1,795,500 |

It is extremely difficult to project future Professional Fees, especially where as here there is pending or contemplated litigation, primarily pertaining to outstanding objections to Claims. The projected amounts set forth above are just the best estimates available to the Proponents at the time of the preparation of this Disclosure Statement. As such, the actual additional Professional Fees incurred by the Professionals through the Effective Date may turn out to be more or less than the projected amounts described above. As described above, all Professional Fees incurred prior to the Effective Date must be approved and Allowed by the Bankruptcy Court before they may be paid.

The current recoveries from the pursuit of Preference Actions are estimated at more than $6 million. The Proponents estimate that the current anticipated Professional Fees earned from the prosecution of such Preference Actions will be less than $3 million (which Professional Fees will increase if the recoveries from the pursuit of Preference Actions). The Proponents therefore believe that the total Professional Fees paid from the prosecution of Preference Actions, including

Professional Fees earned from the reduction of Allowed Claims, will be less than the gross recoveries obtained from the pursuit of Preference Actions. As a result, the Proponents anticipate that their results obtained from the pursuit of Preference Actions will result in an increase in the distributions that will be made to Holders of Allowed Claims, both by contributing a net recovery to the Assets of the Reorganized Debtor's estate and reducing the total amount of Allowed Claims.

### 7. Amount and Treatment of Priority Tax Claims.

Each Holder of an Allowed Priority Tax Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Priority Tax Claim equal to the Allowed Amount of such Priority Tax Claim. Approximately twenty-two (22) proofs of Priority Tax Claims have been filed in an aggregate amount of approximately $180,000. Any Priority Tax Claims the Proponents intend to object to are identified in Exhibit "C".

### H. Effect of Confirmation of the Plan.

#### 1. Vesting of Assets in the Reorganized Debtor.

On the Effective Date, all Assets of the Debtors and their estates shall vest as one consolidated legal entity in the Reorganized Debtor. Such Assets shall include, but not be limited to, all Cash and the Rights of Action. The Assets shall be managed and used for the sole purposes of carrying out and effectuating the distributions provided for in the Plan.

#### 2. Authority to Effectuate the Plan.

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without further approval or order from the Bankruptcy Court. The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to carry out the Plan and to effectuate the distributions provided for under the Plan, subject to the provisions of the Plan. The Reorganized Debtor is expressly authorized to sell or dispose of any and all Assets and to pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court, subject to the provisions of the Plan; provided, however, that any sale, settlement, distribution or transaction where the amount received, paid or distributed exceeds $100,000 shall be subject to the approval of the Plan Oversight Committee or the approval of the Bankruptcy Court.

#### 3. The Non-Debtor Subsidiaries.

The Plan will have no effect on the Debtors' subsidiaries other than the Debtors.

The Plan requires the Reorganized Debtor to wind up and dissolve the Seller Subsidiaries. This requirement is consistent with the premises of the Patent Sale motion, and is believed to be advisable in light of the sale of the Seller Subsidiaries' Patents in the Patent Sale. As noted herein, at the time of the Patent Sale, the Debtors identified all known secured and tax claims against the Seller Subsidiaries and satisfied those claims. The Debtors believe that there are no significant, if any, remaining claims against any of the Seller Subsidiaries.

Notwithstanding the foregoing, the Reorganized Debtor will be authorized to operate any subsidiaries (including subsidiaries of subsidiaries) to the extent that the Reorganized Debtor believes there is value to be garnered for the Reorganized Debtor's estate for doing so, after consultation with and input from the Plan Oversight Committee. The Reorganized Debtor will also be authorized to wind up and/or dissolve any of the Debtors' other subsidiaries (including subsidiaries of subsidiaries) as determined by the Reorganized Debtor, in its reasonable discretion, after consultation with and input from the Plan Oversight Committee.

#### 4. Dissolution of the Creditors' Committee; Formation of the Plan Oversight Committee.

On the Effective Date, the Creditors' Committee will be deemed dissolved and its members will be released and discharged from all further duties and obligations arising from or related to the Chapter 11 Cases.

On the Effective Date, the Plan Oversight Committee shall be deemed created.  The Plan Oversight Committee shall be comprised of all members of the Creditors' Committee except those who elect not to serve on the Plan Oversight Committee.  The Plan Oversight Committee shall monitor all aspects of the Reorganized Debtor's activities, including without limitation: liquidation of the Assets; prosecution, settlement and abandonment of Rights of Action; prosecution and resolution of objections and other disputes pertaining to Claims; and distribution of the Debtors' Assets to Creditors in accordance with the provisions of the Plan.

As described above, the Plan Oversight Committee will continue with the prosecution of any disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Creditors' Committee but which have not been liquidated to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and such Claims objections for this purpose, regardless of whether such Claims objections were commenced prior to or subsequent to the Effective Date.  Similarly, the Plan Oversight Committee will continue with the prosecution of any Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Creditors' Committee but which have not been resolved to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and the Avoidance Actions for this purpose, regardless of whether such Avoidance Actions were commenced prior to or subsequent to the Effective Date.  Finally, along with the Reorganized Debtor, the Plan Oversight Committee shall have standing and authority to commence any objections to Claims after the Effective Date which the Plan Oversight Committee deems appropriate which were not commenced prior to the Effective Date.

Entities who served as Professionals to the Creditors' Committee prior to the Effective Date shall also serve as Professionals to the Plan Oversight Committee and shall be compensated from the Reorganized Debtor's estate for all fees and expenses incurred after the Effective Date without the need for any further order of the Bankruptcy Court on the same terms and conditions as such counsel was employed and compensated prior to the Effective Date (including the contingency fee sharing arrangement with Debtors' counsel with respect to the prosecution of Avoidance Actions).  Any vote of the Plan Oversight Committee shall be made by a majority of those members of the Plan Oversight Committee who elect to participate in the vote.  The Plan Oversight Committee shall be deemed dissolved upon the entry of the Final Decree.

I.    **Implementation and Means of Execution of the Plan.**

1.    **Principals of the Reorganized Debtor.**

The Proponents currently anticipate that Marcus Smith will be employed by the Reorganized Debtor as its Chief Financial Officer and Responsible Individual through the entry of a Final Decree closing the Chapter 11 Cases unless he voluntary quits or is involuntarily terminated by the Plan Oversight Committee for "cause".  "Cause" shall mean that he has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Reorganized Debtor or the bankruptcy estate, with any such dispute to be resolved by the Bankruptcy Court.  Consistent with the terms of his current employment with the Debtors, Marcus Smith will work on an hourly basis for the Reorganized Debtor, as needed depending upon the work required of him during the week, but in no event is he to be paid for less than eight hours of work per week.  He will continue to be compensated on an hourly basis at the rate of $250 per hour (with any future increase to be subject to the approval of the Bankruptcy Court), and he will continue to receive health, vision and dental insurance.  His employment responsibilities will remain the same as those described above.  If Marcus Smith quits or is involuntarily terminated, a replacement will be selected by the Plan Oversight Committee subject to the approval of the Bankruptcy Court.

The Proponents also currently anticipate that Nanci Salvucci will be employed by the Reorganized Debtor as its Controller through the entry of a Final Decree closing the Chapter 11 Cases unless she voluntary quits or is involuntarily terminated by the Plan Oversight Committee for "cause".  "Cause" shall mean that she has been found to have committed gross negligence or has

acted fraudulently and/or maliciously with respect to the Reorganized Debtor or the bankruptcy estate, with any such dispute to be resolved by the Bankruptcy Court. Consistent with the terms of her current employment with the Debtors, Nanci Salvucci will work on an hourly basis for the Reorganized Debtor, as needed depending upon the work required of her. She will continue to be compensated on an hourly basis at the rate of $175 per hour (with any future increase to be subject to the approval of the Bankruptcy Court), and she will continue to receive health and dental insurance. Her employment responsibilities will remain the same as those described above. If Nanci Salvucci quits or is involuntarily terminated, a replacement may be selected by the Plan Oversight Committee subject to the approval of the Bankruptcy Court.

**2.    Funding of the Plan.**

The Plan shall be funded with the Assets, including the Cash, and the net recovery (after payment of all fees and expenses, including fees and expenses of the Professionals) from the pursuit of the Rights of Action and the proceeds thereof.

**3.    The Rights of Action.**

Those Rights of Action which were commenced by the Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Plan Oversight Committee (which shall have legal standing to do so) until all such Rights of Action have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). Those Rights of Action which were commenced by the Debtors prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Reorganized Debtor until all such Rights of Action have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). The terms of compensation for counsel shall remain the same as the Bankruptcy Court previously approved. The Bankruptcy Court shall retain jurisdiction over all such pending Rights of Action following the Effective Date. Any settlement of any pending Rights of Action shall continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.

The Reorganized Debtor shall be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, any and all Rights of Action which were not commenced prior to the Effective Date. The Bankruptcy Court shall retain jurisdiction over all such Rights of Action which are commenced after the Effective Date.

The Reorganized Debtor may, but shall not be required to, set-off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any Rights of Action the Reorganized Debtor may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Reorganized Debtor of any such Rights of Action, set-off or recoupment which the Reorganized Debtor may have against such Holder.

Nothing in this Disclosure Statement, the Plan, the Plan Confirmation Order or any other order or document shall constitute or be deemed to constitute a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors and/or the Creditors' Committee had prior to the Effective Date. On the Effective Date, all such claims, causes of action, rights and defenses shall be deemed transferred and conveyed to the Reorganized Debtor and the Plan Oversight Committee as successors in interest.

**4.    Post-Effective Date Expenses and Professional Fees.**

Subject to the provisions of the Plan, all reasonable fees for services rendered and expenses, including Professional Fees, incurred after the Effective Date by counsel to the Plan Oversight Committee and counsel to the Reorganized Debtor shall be paid by the Reorganized Debtor on a timely basis without any further order of the Bankruptcy Court.

**5.  Limitation of Liability for the Reorganized Debtor and the Plan Oversight Committee.**

Subject to any applicable law, neither the Reorganized Debtor, its employees, the Plan Oversight Committee nor any of their members, employees, professionals or agents will be liable for any action or omission in such capacity, while acting in good faith and in the exercise of reasonable judgment.  Neither the Reorganized Debtor, its employees, the Plan Oversight Committee nor any of their members, employees, professionals or agents will be liable for activities relating to administration of the Plan in any event except for gross negligence, fraud or willful misconduct.

**6.  Dissolution of the Debtors and the Reorganized Debtor.**

Upon the entry of the Final Decree, each of the Debtors and the Reorganized Debtor shall be deemed dissolved without any further action required on the part of the Debtors, the shareholders of the Debtors, the officers or directors of the Debtors, the Reorganized Debtor or the Plan Oversight Committee.

**7.  Corporate Action.**

Each of the matters provided for under this Plan involving any corporate action to be taken or required by any Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by stockholders, officers or directors of any of the Debtors.

**ARTICLE VII**
**CLAIMS RESOLUTION AND DISTRIBUTIONS**

**A.  Late Claims Void.**

Unless otherwise expressly ordered by the Bankruptcy Court or otherwise provided by the Plan, any Claim filed after the applicable Claims Bar Date shall be void and of no force or effect, and shall receive no distributions under the Plan.

**B.  Prosecution of Objections to Claims.**

Those Claim objections which were commenced by the Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Plan Oversight Committee (which shall have legal standing to do so) until all such Claim objections have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders).  Those Claim objections which were commenced by the Debtors prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Reorganized Debtor until all such Claim objections have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). Counsel shall be compensated for post-Effective Date Claim objections work on an hourly basis in accordance with standard billing practices, and shall be paid by the Reorganized Debtor in the ordinary course of business without any further order of the Bankruptcy Court.  The Bankruptcy Court shall retain jurisdiction over all such pending Claim objections following the Effective Date. Any settlement of any pending Claim objections shall continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.

Both the Plan Oversight Committee and the Reorganized Debtor shall be authorized and empowered, and have legal standing, to pursue and prosecute, to settle, or to decline to pursue, any and all Claim objections which were not commenced prior to the Effective Date.  The Bankruptcy Court shall retain jurisdiction over all such Claim objections which are commenced after the Effective Date.

Nothing in this Disclosure Statement, the Plan, the Plan Confirmation Order or any other order or document shall constitute or be deemed to constitute a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors and/or the Creditors' Committee had prior to the Effective Date. On the Effective Date, all such claims, causes of action, rights and defenses shall be deemed transferred and conveyed to the Reorganized Debtor and the Plan Oversight Committee as the successor in interest.

On March 14, 2006, the Bankruptcy Court entered an order ("Claim Order") entitled "Order Granting Motion Waiving Notice of Claim Settlements". The Claim Order authorized the Debtors or the Creditors' Committee to settle Claim disputes without notice to Creditors so long as the Creditors' Committee and the Debtors, or their respective counsel, both sign a written settlement agreement or stipulation. The terms of the Claim Order shall be applicable to the Reorganized Debtor and the Plan Oversight Committee for Claim settlements reached after the Effective Date.

**C.    Estimation of Claims.**

The Reorganized Debtor or the Plan Oversight Committee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtors, the Creditors' Committee or any other party in interest previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction over the Debtors' estates and these Chapter 11 Cases to estimate any Claim at any time prior to the entry of a Final Decree closing these Chapter 11 Cases. In the event that the Bankruptcy Court estimates any Claim, that estimated amount will constitute either the Allowed amount of such Claim (for Plan voting, Plan distribution or both) or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount is not binding for Plan distribution purposes, the Reorganized Debtor and/or the Plan Oversight Committee may elect to pursue any supplemental ruling of the Bankruptcy Court, including any supplemental objection to the Claim, in connection with Plan distribution purposes.

**D.    Allowed and Disputed Claims.**

A Claim shall be deemed Allowed if either (i) such Claim is listed in the Debtors' Schedules (as most recently amended) as liquidated, undisputed and non-contingent, and no objection has been filed to such Claim, or (ii) the Holder of such Claim has filed a proof of such Claim on or before the applicable Claims Bar Date; provided, however, that no objection to such Claim has been filed and no motion has been filed to estimate or subordinate such Claim. A Claim which is subject to an objection or a motion for estimation or subordination which has not been Allowed or Disallowed by a Final Order shall be deemed Disputed until resolved by Final Order. All Claims that are not Allowed or Disputed are deemed Disallowed. No Claim shall be deemed Allowed by virtue of the Plan and/or confirmation of the Plan.

**E.    Provisions Regarding Distributions.**

**1.    No Distributions on Disputed or Disallowed Claims.**

If any Claim is a Disputed Claim, no distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. No distributions under the Plan shall be made on account of a Claim that has been Disallowed.

**2.    Distributions on Account of Allowed Secured Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 1 Allowed Claim (i.e., Allowed Secured Claim) equal to the Allowed Amount of such Class 1 Allowed Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Secured Claim.

**3.    Distributions on Account of Allowed Priority Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 2 Allowed Claim (i.e., Allowed Priority Claim) equal to the Allowed Amount of such Class 2 Allowed Claim, and the

Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Priority Claim.

**4.    Distributions on Account of Allowed Priority Tax Claims.**

The Reorganized Debtor shall pay Cash to each Holder of an Allowed Priority Tax Claim equal to the amount of such Allowed Priority Tax Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Priority Tax Claim.

**5.    Distributions on Account of Allowed Administrative Claims.**

The Reorganized Debtor shall pay Cash to each Holder of an Allowed Administrative Claim equal to the amount of such Allowed Administrative Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Administrative Claim.

**6.    Distributions on Account of Allowed Convenience Class Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 6 Allowed Claim (i.e., Convenience Class Claim) equal to 50% of the amount of such Class 6 Allowed Claim (provided that no such distribution may under any circumstance exceed $1,250), and the Reorganized Debtor shall make such payment within ninety days following the later of the Effective Date and the date of Allowance of such Convenience Class Claim.

**7.    Distributions to Holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims.**

Within ninety days following the Effective Date, the Reorganized Debtor shall distribute all of the Net Remaining Assets which are left after the Reorganized Debtor has made all of the payments described above and established and funded the Estate Reserve (defined below) to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims on a Pro-Rata Share basis, subject to the Subordination Provisions. In the event that at the time funds are distributed to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims any Disputed Claims exist or any Claims exist which are held by defendants in Preference Actions, the Reorganized Debtor shall make an interim distribution (the "Interim Distribution") to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims within ninety days following the Effective Date, and then make a final distribution after all such Disputed Claims and Preference Actions are resolved to Final Order, and the Reorganized Debtor is ready to proceed with seeking the entry of a Final Decree closing these Chapter 11 Cases. For purposes of computing the amount of the Interim Distribution, the Reorganized Debtor shall treat all Disputed Claims as Allowed Claims in the amounts asserted by the Claim Holder, and the Reorganized Debtor shall assume that all Claims which are held by defendants in Preference Actions will ultimately become Allowed Claims in the amounts asserted. The Reorganized Debtor shall pay into a segregated account (the "Creditor Account") the amount of money that would otherwise have been paid to the holders of Disputed Claims had they not been Disputed, and to holders of Claims who are the defendants in Preference Actions if not for the existence of the Preference Actions. Once any such Disputed Claims or Claims of defendants in Preference Actions become resolved to Final Order, the Reorganized Debtor will make a distribution to each such Claim Holder from the funds in the Creditor Account in the same percentage amount that was made earlier to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims.

**8.    Estate Reserve.**

Until such time as a Final Decree is entered by the Bankruptcy Court closing these Chapter 11 Cases, the Reorganized Debtor shall establish and maintain at all times an adequate reserve ("Estate Reserve") to fund the payments required to be made under the Plan on account of Class 1 Allowed Claims, Class 2 Allowed Claims, Class 6 Allowed Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United

States Trustee, as well as to enable the Reorganized Debtor to pay all post-Effective Date fees and expenses incurred or to be incurred by professionals employed by the Reorganized Debtor or the Plan Oversight Committee through the closing of these Chapter 11 Cases and entry of a Final Decree. The amounts of the Estate Reserve shall be determined by the Reorganized Debtor in its sole and absolute discretion after consultation with and input from the Plan Oversight Committee. Any dispute over the appropriate amount of money to be maintained in the Estate Reserve shall be resolved by the Bankruptcy Court following notice and a hearing. Neither the Reorganized Debtor nor the Plan Oversight Committee shall have any liability in the event any Estate Reserve proves to be inadequate unless such inadequacy was the result of gross negligence, recklessness or willful malfeasance. All recoveries obtained from the pursuit of Avoidance Actions shall remain in a segregated account(s) until the Bankruptcy Court has ruled upon the fee application of the professionals employed in these Chapter 11 Cases to pursue such Avoidance Actions and such professionals have been paid their Allowed fees and expenses out of such recoveries, except for post-Effective Date fees and expenses incurred in the pursuit of Avoidance Actions which may be paid without further Bankruptcy Court order.

**9.    Effectuation of Distributions.**

The Reorganized Debtor shall serve as the disbursing agent and shall make all distributions in accordance with the terms of the Plan. All distributions shall be made without any requirement for bond or surety with respect thereto. The making of the distributions under this Plan shall be part of the job responsibilities of Marcus Smith and Nanci Salvucci.

**10.    Distributions on Later-Allowed Claims.**

In the event a Disputed Claim becomes an Allowed Claim (in whole or in part), then as soon as reasonably practicable after entry of a Final Order allowing such Claim, the Reorganized Debtor shall make a distribution to the Holder of such Claim in an amount equal to the distribution the Holder of such Claim would have received if the Holder's Claim had been Allowed in such amount on the Effective Date. No Holder of a Disputed Claim shall be entitled to or receive any post-Petition Date or post-Effective Date interest or other accruals of any kind based upon the delay in receipt of the payment.

**11.    Manner of Payments**

All payments to be made by the Reorganized Debtor shall be in the form of Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank.

**12.    Delivery of Distributions**

Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under the Plan, distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by a different address set forth in a timely filed proof of claim filed by such Holder or if the Reorganized Debtor has been notified in writing of a change of address.

**13.    Undeliverable Distributions**

(a)    <u>Holding of Undeliverable Distributions</u>:  If any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtor is notified, in writing, of such Holder's then-current address. Undeliverable distributions shall remain in the possession of the Reorganized Debtor until such time as a distribution becomes deliverable. All Holders ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind based upon the delay in receipt. Nothing in the Plan requires the Reorganized Debtor to locate the Holder of an Allowed Claim.

(b)    <u>Uncashed Checks</u>.  The Reorganized Debtor shall have no obligation to locate the Holder of an Allowed Claim that does not cash any check representing a distribution payment. With respect to any check representing a distribution that has not been cashed for a period of

-43-

three (3) months from the date of mailing of such check to the Creditor, the Reorganized Debtor may, in the Reorganized Debtor's sole discretion: (a) stop payment on such check, (b) treat the distribution as undeliverable, and/or (c) refuse to re-issue any such check if the Reorganized Debtor determines that reissuing such check may adversely affect the distribution to any other Creditor or if re-issuing such check may cause the Reorganized Debtor to incur expense or inconvenience that is unwarranted in light of the amount of the distribution.

(c)     <u>Failure to Claim Undeliverable Distributions</u>:  The Reorganized Debtor may from time to time file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been attempted and have been returned as undeliverable as of the date thereof.  Any Holder of a Claim identified in such list that does not assert its rights pursuant to the Plan to receive a distribution within two (2) months from and after the filing of such list shall not be entitled to any distributions under the Plan and shall be forever barred from asserting any such Claim against the Debtors, the Reorganized Debtor or the Plan Oversight Committee.  In such case, any consideration held for distribution on account of such Claim shall revert to the Reorganized Debtor for distribution to other Creditors or payment of expenses in accordance with the terms of the Plan.  Notwithstanding the foregoing, the Reorganized Debtor may in the Reorganized Debtor's sole discretion pay distributions to a Holder of a Claim where distributions to the Holder had previously been determined to be undeliverable.

(d)     <u>Fractional Amounts</u>:  Payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

## 14.     Compliance with Tax Requirements/Allocation

To the extent applicable, the Reorganized Debtor in making distributions under the Plan shall comply with all tax withholding and reporting requirements imposed by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Reorganized Debtor may withhold the distributions due to any Holder of an Allowed Claim until such time as such Holder provides to the Reorganized Debtor the necessary information to comply with any withholding requirements of any governmental unit.  Any Property so withheld will then be paid by the Reorganized Debtor to the appropriate authority.  If the Holder of an Allowed Claim fails to provide to the Reorganized Debtor the information necessary to comply with any withholding requirements of any governmental unit within sixty days after the date of first notification by the Reorganized Debtor to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's distributions shall be treated as undeliverable.  For tax purposes, distributions received in respect of an Allowed Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest.

## 15.     Set-Offs.

The Reorganized Debtor, as successor to the Debtors, may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set-off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim or thereafter), the claims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Allowed Claim.  The Holder of a Claim may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set off any Allowed Claim such Holder possesses against any claim, rights or causes of action of any nature that the Reorganized Debtor, as successor to the Debtors, may hold against such Holder.  Neither the failure to effect such a set-off nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtor or such Holders of any such Claims, rights and causes of action that such parties may possess under Bankruptcy Code Section 553.

# ARTICLE VIII
## INJUNCTION, EXCULPATION AND INDEMNIFICATION

**A.    Discharge.**

Consistent with Bankruptcy Code Section 1141(d)(3), the Plan does not grant the Debtors a discharge.  Notwithstanding the foregoing, except as otherwise provided in the Plan: (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of such Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; and (2) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtor or any of their Assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan.

**B.    Injunction.**

Except as otherwise expressly provided in the Plan, all Entities who have held, hold or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their estates, or the Reorganized Debtor; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, or the Reorganized Debtor; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their estates, or the Reorganized Debtor and/or against the Property or interests in Property of any of the foregoing; and (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Debtors or against the Property of the Debtors, their estates, or the Reorganized Debtor with respect to any such Claim or Interest; provided that nothing contained in the Plan or the Plan Confirmation Order shall prohibit or restrain the prosecution of any actions or controversies against the Debtors' present or former directors and officers or Holders of Interests based on acts, events or omissions occurring before the Petition Date.  With respect to all such Claims or Rights of Action, all Entities shall be and are permanently enjoined from commencing or continuing any such matter except in the Bankruptcy Court, and the Bankruptcy Court shall retain exclusive jurisdiction over all such matters.

**C.    Exculpation and Limitation of Liability.**

None of the Debtors, the Reorganized Debtor, the Creditors' Committee or the Plan Oversight Committee, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys or other professionals, shall have or incur any liability to any Holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, including, without limitation, administration of the Chapter 11 Cases, any sale of Assets of the Debtors, the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the Property to be distributed under the Plan, except for their fraud, gross negligence or willful misconduct, and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in the Chapter 11 Cases and under the Plan.

Notwithstanding any other provision of the Plan, no Holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any of the Debtors, the Reorganized Debtor, the Creditors' Committee, the Plan Oversight Committee, or any of their respective present or former members, officers, directors, employees, advisors or attorneys or other professionals, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing the Plan, the

consummation of the Plan, the confirmation of the Plan, or the administration of the Plan or the Property to be distributed under the Plan, except to the extent such right of action arises from any such party's fraud, gross negligence or willful misconduct.

**D.    Indemnification.**

The Reorganized Debtor shall indemnify and hold harmless (i) the Creditors' Committee, (ii) the Debtors, (iii) the Plan Oversight Committee, (iv) all members of any of the foregoing, and (v) all professionals retained by any of the foregoing (collectively, the "Indemnified Parties") from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Debtors or the implementation or administration of the Plan, if the Indemnified Parties acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Debtors, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

The Reorganized Debtor shall also indemnify each Entity exculpated pursuant to the provisions described above against, hold each such Entity harmless from, and reimburse each such Entity for, any and all losses, costs, expenses (including attorneys' fees and expenses), liabilities and damages sustained by such Entity arising from any liability described above.

**ARTICLE IX**
**OTHER PLAN EFFECTUATION MATTERS**

**A.    Executory Contracts and Unexpired Leases.**

**1.    Rejection of Executory Contracts and Unexpired Leases.**

Any pre-petition executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, or which has not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtors on the Effective Date or as otherwise agreed upon by the parties.  The entry of the Plan Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to Bankruptcy Code Sections 365(a) and 1123, effective as of the Effective Date of the Plan.

**2.    Rejection Damage Claims Bar Date and Resolution.**

Claims, if any, arising out of the rejection of executory contracts or unexpired leases rejected as of the Effective Date pursuant to the Plan must be filed and served on counsel to the Reorganized Debtor and counsel to the Plan Oversight Committee pursuant to the procedures specified in the Plan Confirmation Order no later than thirty (30) days after the Effective Date (the "Final Rejection Claims Bar Date").  Claims arising out of the rejection of executory contracts or unexpired leases rejected as of a date prior to the Effective Date must be filed and served not later than the deadline, if any, established in the order approving rejection of such executory contract or unexpired lease or other court order establishing a bar date for rejection Claims ("Applicable Rejection Claims Bar Date") or, if there is no such Applicable Rejection Claims Bar Date, by the Final Rejection Claims Bar Date.  Claims arising out of rejection of executory contracts or unexpired leases that are the subject of a motion to assume pending on the Effective Date must be filed within thirty (30) days after entry of an order either rejecting such executory contract or unexpired lease or denying such motion to assume such executory contract or unexpired lease. Any Claim not filed within such times will be forever barred from assertion against the Debtors, the Reorganized Debtor, their estates, their respective successors or their respective properties. Unless otherwise ordered by the Bankruptcy Court prior to the Confirmation Date, or such later date as shall be ordered by the Bankruptcy Court prior to the Confirmation Date, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Class 4 Claims under the Plan.

**B.    Conditions Precedent.**

     **1.    Conditions Precedent to the Effective Date of the Plan.**

     The Effective Date shall be the date all of the following conditions precedent are satisfied:

     (a)    <u>Plan Confirmation Order</u>:  The Plan Confirmation Order shall be in form and substance acceptable to the Proponents and, except as otherwise agreed by the Proponents, be a Final Order in full force and effect that shall not have been stayed or reversed; and

     (b)    <u>Execution of Documents; Other Actions</u>: All other actions and documents determined by the Proponents to be necessary to implement the Plan shall have been effected or executed.

     **2.    Waiver of Conditions.**

     The Plan specifically authorizes the Proponents to waive the requirement that the Plan Confirmation Order be a Final Order prior to the Plan becoming effective, but the Proponents may not waive the requirement of an entered Bankruptcy Court order confirming the Plan that has not been stayed or reversed.  Any waiver of a condition precedent to the Effective Date may be effected at any time, in writing, without notice or leave or order of the Bankruptcy Court.

**C.    Retention of Jurisdiction.**

     The Plan provides for a broad retention of jurisdiction by the Bankruptcy Court including, without limitation, the following: (i) interpretation, implementation and enforcement of the Plan, and any contracts, instruments, releases, transactions and other agreements or documents created in connection therewith; (ii) determination of any and all motions, adversary proceedings (including Rights of Action), applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor, the Plan Oversight Committee, or any other party in interest after the Effective Date (to the extent such venue is selected by the moving party); (iii) to hear and determine any objections to Claims or motions for estimation or subordination thereof; (iv) to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146; (v) to hear and determine any matters that may arise in connection with the sales of the Debtors' Assets or any order of the Bankruptcy Court with respect thereto; and (vi) to hear and determine any actions or controversies by or against the Debtors, the Reorganized Debtor, the Creditors' Committee, or the Plan Oversight Committee.

**D.    Modification of Plan.**

     The Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time.

**E.    Revocation or Withdrawal.**

     The Plan may be revoked or withdrawn by the Proponents prior to the Confirmation Date, in which case the Plan shall be deemed null and void.  In such event, nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any claims by the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

**F.    Terms of Existing Injunctions or Stays.**

     Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and thereafter shall be deemed annulled without any action being taken by any party.

**G.    Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities.**

     On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, certificates and other documents evidencing Claims against or Interests in any of the

Debtors shall be canceled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order or rule.  On the Effective Date, any Indenture relating to any of the foregoing, including the Junior Note Indenture and the Senior Note Indenture, shall be deemed canceled as permitted by Bankruptcy Code Section 1123(a)(5)(F); provided, however, that the Indentures shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee and/or the Junior Note Indenture Trustee to make any distributions to be made on account of the Indentures.

**H.     Section 1146 Exception.**

Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer, or exchange of any security under the Plan, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

**I.     Severability.**

The provisions of the Plan shall not be severable unless such severance is agreed to by the Proponents and such severance would constitute a permissible modification of the Plan pursuant to Bankruptcy Code Section 1127.

**J.     Governing Law.**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of California.

**K.     Notices.**

All notices, requests and demands to or upon the Debtors or the Creditors' Committee to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following, addressed as follows or to such other addresses as may be filed with the Bankruptcy Court and served on the following parties.

To:

**On behalf of the Debtors:**

Matthew S. Walker, Esq.
Pillsbury Winthrop Shaw Pittman LLP
12255 El Camino Real, Suite 300
San Diego, CA  92130
Telephone: (619) 234-5000
Facsimile:  (858) 509-4010


**On behalf of the Creditors' Committee:**

Ron Bender, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Blvd, Suite 1700
Los Angeles, CA  90067
Tel: (310) 229-1234
Fax: (310) 229-1244


**L.     Closing of Cases.**

The Reorganized Debtor shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any

applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

**M.    Continuing Viability of Other Orders/Agreements.**

Except to the extent expressly modified by the Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the Debtors and their creditors shall continue in full force and effect.

**ARTICLE X**
**CONFIRMATION OF THE PLAN**

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

**A.    Confirmation Hearing**

Bankruptcy Code Section 1121(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  By order of the Bankruptcy Court, the Plan confirmation hearing has been scheduled for [_____,] 2007 at [__:00 _.m.] (prevailing Pacific Time) before the Hon. Marilyn Morgan in the United States Bankruptcy Court for the Northern District of California, Courtroom 3070, 280 South First Street, San Jose, California.  The Plan confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Plan confirmation hearing or any adjournment thereof.

**B.    Requirements for Confirmation of the Plan.**

At the Plan confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code Section 1129 are met.  Among the requirements for confirmation are that the Plan: (a) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of Holders of Claims and Interests impaired under the Plan.

**1.    Fair and Equitable Test.**

The Proponents will seek to confirm the Plan notwithstanding the nonacceptance or deemed nonacceptance of the Plan by any impaired Class of Claims.  To obtain such confirmation, the Proponents must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class.  A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting class, and if no Class receives more than it is entitled to receive for its Claims or Interests.  The Proponents believe that the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims and Interests, as follows:

(a)    Secured Claims: Either the Plan must provide: (i) for the Holders of such Claims to retain the liens securing such Claims, whether the Property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims, and each Holder of a Claim receives deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such Holder's interest in the estate's interest in such Property; (ii) for the sale of any Property that is subject to the liens securing such Claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such Holders of the indubitable equivalent of such Claims.

(b)    Unsecured Claims:   Either (i) each Holder of an impaired unsecured Claim receives or retains under the Plan Property of a value equal to the amount of its Allowed Claim, or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any Property under the Plan.

(c)    Interests:  Either (i) each Interest Holder will receive or retain under the Plan Property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock, or (ii) the Holders of Interests that are junior to the Interests will not receive any Property under the Plan.

THE PROPONENTS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN).    ACCORDINGLY, THE PROPONENTS WILL DEMONSTRATE AT THE PLAN CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129(b) AS TO ANY NON-ACCEPTING CLASS.

### 2.    Feasibility.

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor other than as set forth in such plan.  The Plan contemplates that all Assets of the Debtors which have not otherwise been disposed of will ultimately be disposed of and all proceeds of the Assets will be distributed to Creditors pursuant to the terms of the Plan.  Since no further financial reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement.

### 3.    "Best Interests" Test.

The Bankruptcy Code requires that with respect to each impaired Class of Claims and Interests that has not accepted the Plan, Holders of Claims or Interests in each such Class receive or retain under the Plan Property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would have received or retained if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  The Proponents believe that Holders of Claims will receive at least as much under the Plan as they would receive in Chapter 7 liquidation cases, and that this test is therefore satisfied.

All or nearly all of the Debtors' Assets have already been liquidated.  As such, it is unlikely that conversion of the Debtors' Chapter 11 Cases to Chapter 7 liquidations would materially affect the overall amount or value of the Debtors' Assets.  However, the Proponents believe that conversion of the Chapter 11 Cases to Chapter 7 liquidations would adversely affect the value of the distributions that Holders of Allowed Claims would receive for multiple reasons.  First, the Debtors' costs of liquidation under Chapter 7 would include the fees payable to trustees in bankruptcy and their professionals.  Bankruptcy Code Section 326(a) prescribes the fees payable to a Chapter 7 trustee and limits the amount to approximately 3% of all assets distributed in a case.  In these Chapter 11 Cases, the total trustees' fees could exceed $2.5 million.  Also, because there are four Debtors, four trustees would likely be appointed if the Chapter 11 Cases were converted to Chapter 7 liquidation cases; in contrast, the Plan contemplates one Reorganized Debtor.  The Proponents believe that the fees attributable to the Reorganized Debtor will be substantially less than the statutory fees due four Chapter 7 trustees.

In addition, each of the Chapter 7 trustees would be entitled to employ counsel and accountants to assist the trustees in administering their respective estates.    Although the Reorganized Debtor and the Plan Oversight Committee will each be able to employ professionals, four Chapter 7 trustees are likely to hire four law firms and, potentially, four accounting firms, at least double the number of professionals contemplated by the Plan.  All such professionals would need to overcome a significant learning curve in light of the relatively complex set of facts and their lack of any history with or knowledge of the Chapter 11 Cases.  The professionals who will be employed by the Reorganized Debtor and the Plan Oversight Committee will be the same as those which represented the Debtors and the Creditors' Committee.   In this regard, counsel for the Reorganized Debtor and counsel for the Plan Oversight Committee will be working cooperatively as they have to date and are extremely familiar with the facts of the Chapter 11 Cases, whereas the attorneys and accountants employed by four Chapter 7 trustees would be obligated to advance the interests of each trustee's estate and that estate's creditors.

Moreover, the Proponents believe that conversion of the Chapter 11 Cases to Chapter 7 liquidation cases would forfeit, or at least substantially delay, the benefits resulting from substantive consolidation of the Debtors' estates and the ultimate distribution to be made to Claim Holders under the Plan. As discussed above, substantive consolidation of the Debtors' estates will avoid potentially years of expensive and possibly fruitless litigation concerning allocation of Assets and liabilities among the four Debtors, and substantially expedite distributions in these Chapter 11 Cases. While four Chapter 7 trustees could seek substantive consolidation of their estates, they would be unlikely to pursue such a remedy until after a substantial evaluation period. This delay would adversely impact the value of the ultimate distributions to Creditors, both as a result of increased costs of administration of the Chapter 7 liquidation cases and the negative impact delay will have on the present value of the distributions.

Finally, the Plan provides a mechanism for implementing the Subordination Provisions in the two Indentures. Under the Plan, these provisions are given effect because the Plan specifies both the mechanism for implementing the Subordination Provisions and identifies the recipients of reallocated distributions. In the context of Chapter 7 liquidation cases, SONICblue's Chapter 7 trustee might not believe she/he has the right to decide who benefits from the Subordination Provisions, and may determine that prudence and safety require the trustee to deposit funds that would otherwise be distributed to Holders of Allowed Claims into an interpleader action. Thus, a significant portion of the distributions in these Chapter 11 Cases would be further delayed pending resolution of this additional layer of litigation.

Thus, overall, the Proponents believe that the Plan provides: (a) a far less expensive method than Chapter 7 of distributing the Debtors' Assets because it avoids payment of fees to four Chapter 7 trustees and four sets of new and unfamiliar professionals employed by the trustees; and (b) a much more expedited method for distributing the Debtors' Assets because it avoids potentially years of analysis, discussions and likely litigation between and among four Chapter 7 trustees. In addition, it would be highly inefficient for a new third party to take over the Claims objections process or the pursuit of Avoidance Actions.

## ARTICLE XI
## FINANCIAL INFORMATION

The Debtors have filed Statements of Financial Affairs and Schedules of Assets and Liabilities with the Bankruptcy Court as required by the Bankruptcy Code, some of which documents have been amended as described above. As debtors-in-possession, the Debtors have filed monthly operating reports required by the United States Trustee's operating guidelines. This financial information may be examined in the Bankruptcy Court Clerk's Office.

## ARTICLE XII
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include: (a) development of an alternative plan of liquidation; or (b) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

**A.      Liquidation Under Chapter 7.**

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, in which case trustees would be elected or appointed to liquidate any remaining Assets of the Debtors for distribution to Creditors. As stated, the Proponents believe that conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code would result in diminished distributions to Creditors, due to the increased costs of administration in Chapter 7 proceedings, and substantial delay in the distribution to Creditors relative to the Plan.

**B.      Alternative Chapter 11 Plan.**

If the Plan is not confirmed, the Debtors, the Creditors' Committee, or any of the parties in interest could attempt to formulate a different Chapter 11 plan. However, the Bankruptcy Code

-51-

and the Indentures substantially limit the options available to the proponent of a liquidating plan. As such, the Debtors do not believe there is a feasible, more favorable alternative to the Plan.

## ARTICLE XIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Interests. The Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Interests as a result of the confirmation of the Plan. All Holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

## ARTICLE XIV
## CONCLUSION AND RECOMMENDATION

The Debtors and the Creditors' Committee believe that the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 3, 4, 5, and 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth above so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [_____,] 2007.

Dated: December 15, 2006

Respectfully Submitted:

By:    /s/ Marcus Smith
       Marcus Smith
       Debtors' Responsible Individual

By:    /s/ William B. Freeman
       Pillsbury Winthrop Shaw Pittman LLP
       Attorneys for Debtors and Debtors-In-
       Possession and Co-Plan Proponent

By:    /s/ Ron Bender
       Levene, Neale, Bender, Rankin & Brill L.L.P.
       Attorneys for the Official Committee of
       Creditors Holding Unsecured Claims and
       Co-Plan Proponent

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    CRAIG A. BARBAROSH California Bar No. 160224
2   WILLIAM B. FREEMAN California Bar No. 137276
    MATTHEW S. WALKER California Bar No. 101470
3   650 Town Center Drive, 7th Floor
    Costa Mesa, CA 92626-7122
4   Telephone: (714) 436-6800
    Facsimile: (714) 436-2800
5
    Attorneys for Debtors and Debtors-In-Possession
6
    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
7   RON BENDER California Bar No. 143364
    CRAIG M. RANKIN California Bar. No. 169844
8   TODD M. ARNOLD California Bar No. 221868
    10250 Constellation Blvd., Suite 1700
9   Los Angeles, CA 90067
    Telephone: (310) 229-1234
10  Facsimile: (310) 229-1244

11  Attorneys for the Official Committee of Creditors
    Holding Unsecured Claims
12
                 UNITED STATES BANKRUPTCY COURT
13                NORTHERN DISTRICT OF CALIFORNIA
                        SAN JOSE DIVISION
14
    IN RE:                              Case No. 03-51775 MM
15
    SONICBLUE INCORPORATED, a           Chapter 11 Cases
16  Delaware corporation, DIAMOND
    MULTIMEDIA SYSTEMS, INC., a         (Case Numbers 03-51775 through
17  Delaware corporation, REPLAYTV,     03-51778)
    INC., a Delaware corporation, and   (Jointly Administered)
18  SENSORY SCIENCE
    CORPORATION, a Delaware
19  corporation,                        LIQUIDATING PLAN OF
                                        REORGANIZATION DATED AS OF
20              Debtors.                DECEMBER 15, 2006 PROPOSED
                                        JOINTLY BY DEBTORS AND
21                                      CREDITORS' COMMITTEE

22                                      Plan Confirmation Hearing:
                                        Date: [To Be Scheduled]
23                                      Time: [To Be Scheduled]
                                        Dept: Courtroom 3070
24                                            280 South First St.
                                              San Jose, CA 95113
25
                                        Hon. Marilyn Morgan
26

27
                                        EXHIBIT A
28

                                        LIQUIDATING PLAN OF REORGANIZATION
                                        PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

# Table of Contents

**Page**

LIQUIDATING PLAN OF REORGANIZATION DATED AS OF DECEMBER 15, 2006 PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE ........................................................................................ 0
INTRODUCTION ........................................................................................ 1
ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW ........................... 1
    A.   Defined Terms. ........................................................................... 1
    B.   Rules of Interpretation, Computation of Time and Governing Law. ........................... 6
ARTICLE II SUBSTANTIVE CONSOLIDATION AND CANCELLATION OF INTER-COMPANY CLAIMS ............................................. 7
ARTICLE III TREATMENT OF UNCLASSIFIED ADMINISTRATIVE AND PRIORITY TAX CLAMS .................................................. 7
    A.   Introduction. ............................................................................... 7
    B.   Administrative Claims. ............................................................... 7
    C.   Statutory Fees. ............................................................................ 8
    D.   Professional Fees. ....................................................................... 8
    E.   Priority Tax Claims. .................................................................... 8
ARTICLE IV CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ..................................................... 8
    A.   Introduction. ............................................................................... 8
    B.   Summary of Classes and Voting Rights. .................................... 9
    C.   Reallocation Provisions. ........................................................... 11
    D.   Classification and Treatment of Claims. ................................... 13
ARTICLE V ACCEPTANCE OR REJECTION OF THIS PLAN; CRAMDOWN ........... 17
    A.   Voting Classes. ......................................................................... 17
    B.   Ballot Instructions. ................................................................... 17
    C.   Cramdown. ............................................................................... 17
ARTICLE VI .......................................................................................... 17
EFFECT OF CONFIRMATION OF THIS PLAN ................................. 17
ARTICLE VIII CLAIMS RESOLUTION AND DISTRIBUTIONS ................... 20
    A.   Late Claims Void. ..................................................................... 20
    B.   Prosecution of Objections to Claims. ....................................... 20
    C.   Estimation of Claims. ............................................................... 21
    D.   Allowed and Disputed Claims. ................................................. 21
    E.   Provisions Regarding Distributions. .......................................... 22
ARTICLE VII INJUNCTION, EXCULPATION AND INDEMNIFICATION ........... 25
    A.   Discharge. ................................................................................. 25
    B.   Injunction. ................................................................................. 26
    C.   Exculpation and Limitation of Liability. ................................... 26
    D.   Indemnification. ........................................................................ 26
ARTICLE VIII ........................................................................................ 27
OTHER PLAN EFFECTUATION MATTERS ..................................... 27
    A.   Executory Contracts and Unexpired Leases. ............................ 27
    B.   Conditions Precedent. ............................................................... 27
    C.   Retention of Jurisdiction. .......................................................... 28
    D.   Modification of this Plan. .......................................................... 29
    E.   Revocation or Withdrawal. ........................................................ 29
    F.   Terms of Existing Injunctions or Stays. .................................... 29
    G.   Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities. ......................................................................... 30

-i-       LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

H.   Section 1146 Exception. ................................................................. 30
I.   Severability. ................................................................................... 30
J.   Governing Law. .............................................................................. 30
K.   Notices. .......................................................................................... 30
L.   Closing of Cases. ........................................................................... 31
M.   Continuing Viability of Other Orders/Agreements. ....................... 31
ARTICLE IX MISCELLANEOUS PROVISIONS ............................................. 31
A.   Waiver of Final Order. ................................................................... 31
B.   Business Days. ................................................................................ 31
C.   No Attorneys' Fees. ........................................................................ 31
D.   No Injunctive Relief. ...................................................................... 31
E.   Operations Between the Confirmation Date and the Effective Date. ....... 31
F.   Approval of Agreements. ................................................................ 31
G.   No Admissions or Waivers. ............................................................ 31
H.   Section Headings. ........................................................................... 32
I.   Continuing Viability of Other Orders/Agreements. ....................... 32
ARTICLE X CONCLUSION AND RECOMMENDATION .............................. 32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-ii-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

**INTRODUCTION**

This Liquidating Plan of Reorganization Dated as of December 15, 2006 is proposed jointly pursuant to 11 U.S.C. §§ 1121 et. seq. by SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, the debtors and debtors in possession in these jointly administered Chapter 11 Cases (collectively, the "Debtors"), and the OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS of SONICblue (the "Creditors' Committee").

Reference is made to the Disclosure Statement accompanying this Plan for a discussion of the Debtors' history, business, results of operations, historical financial information, properties, a summary and analysis of this Plan, and certain related matters. The Debtors and the Creditors' Committee (collectively, the "Proponents") are joint proponents of this Plan within the meaning of Bankruptcy Code Section 1129.

ALL CREDITORS OF THE DEBTORS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE SECTION 1127, BANKRUPTCY RULE 3019 AND IN THIS PLAN, THE PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN AT ANY TIME PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

Capitalized terms herein shall have the meanings set forth in Section I.A., below.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

**A.    Defined Terms.**

(a)    As used in this Plan, the following terms have the meanings specified below, which meanings are equally applicable to both the singular and plural forms of the terms defined:

Administrative Bar Date:  The Bar Date for Administrative Claims specified in Section III.B. of this Plan.

Administrative Claim: Any Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under Bankruptcy Code Sections 503, 507(a)(2) or 1114(e)(2) including, but not limited to, (i) any actual and necessary post-Petition Date cost or expense of preserving the Debtors' respective estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any post-Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation and reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under Bankruptcy Code Sections 328, 330(a) or 331, and (v) any fees or charges assessed against the Debtors' respective estates under Section 1930 of the title 28 of the United States Code

Allowance: Entry of a Final Order wholly or partly allowing a Claim or Interest.

Allowed:  With respect to any Claim: (a) a Claim that is not a Disputed Claim and either (i) such Claim has been scheduled by the Debtors in their Schedules as most recently amended as undisputed, non-contingent and liquidated; and/or (ii) a proof of claim has been filed by the applicable Bar Date or has otherwise been deemed timely filed under applicable

-1-      LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

law; or (b) has been Allowed by a Final Order. Nothing in this definition or this Plan limits the rights of the Debtors, the Creditors' Committee, the Reorganized Debtor or the Plan Oversight Committee to object to or seek subordination or estimation of an Allowed Claim within the time periods specified under applicable law or an order of the Bankruptcy Court. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom (a) all payments made on or after the Petition Date on account of such Claim, and (b) an amount equal to the amount of any claim which the Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to Bankruptcy Code Section 553.

Allowed Amount: Where a Claim or Interest is Allowed, the amount in which such Claim or Interest has been Allowed, as determined under this Plan, the Bankruptcy Code and the Bankruptcy Rules.

Allowed Claim: A Claim that is Allowed.

Allowed Interest: An Interest that is Allowed.

Assets: Any and all real and personal Property of the Debtors of any kind or nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual Property rights, claims, Rights of Action and any other general intangibles, and all proceeds and products of the foregoing, including, without limitation, all Property of the Debtors' estates pursuant to Bankruptcy Code Section 541.

Avoidance Actions: Any and all claims and causes of action which the Debtors, a trustee, debtor-in-possession, the estate, the Creditor's Committee or other appropriate party in interest has asserted or may assert under Bankruptcy Code Sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a), including the Debtors' rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted. The Avoidance Actions include but are not limited to the Preference Actions.

Ballot: The ballot accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote on this Plan may indicate their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

Bankruptcy Code: Title 11 of the United States Code, as amended, as applicable to the Chapter 11 Cases.

Bankruptcy Court: The United States Bankruptcy Court for the Northern District of California (San Jose Division).

Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases and any Local Rules of the Bankruptcy Court.

Bar Date: The Unsecured Claims Bar Date, the Administrative Bar Date, and the Rejection Claim Bar Date, as applicable.

Business Day: Any day which is not a Saturday, Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006, or a day on which banking institutions in the State of California are authorized or obligated by law, executive order or governmental decree to be closed.

Cash:  Cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments and obligations of the United States of America or instrumentalities thereof.

Chapter 11 Cases:  The cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court, being jointly administered under Case Nos. 03-51775 through 03-51778.

Claim:  Any right to payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, including, without limitation, any claim against any of the Debtors as defined in Bankruptcy Code Section 101(5).

Class:  A category of Holders of Claims or Interests as set forth in Article IV of this Plan.

Confirmation Date:  The date upon which the Plan Confirmation Order is entered by the Bankruptcy Court in its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

Convenience Class Claims:  Claims that would otherwise be Claims in Class 4, but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $2,500.00; or (b) such Claim is in an amount greater than $2,500.00 but the Holder of such Claim has elected to have such Claim be treated in its entirety as a Class 6 Claim in the amount of $2,500.00 by so indicating on the Ballot submitted to vote such Claim.

Creditor:  Any Entity that is the Holder of any Claim against any of the Debtors.

Creditors' Committee:  The Official Committee of Creditors Holding Unsecured Claims appointed in SONICblue's Chapter 11 Case pursuant to Bankruptcy Code Section 1102 on or about March 21, 2003, which appointment was amended on or about April 3, 2003.

Debtors or Debtors-in-Possession:  SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, the debtors in the Chapter 11 Cases.

Disallowed:  Any Claim or Interest, or portion thereof, which: (a) has been withdrawn, in whole or in part; or (b) is scheduled by the Debtors in their Schedules as most recently amended as contingent, disputed or unliquidated and the Holder of such Claim or Interest has not filed a proof of Claim or Interest by the applicable Bar Date; or (c) has been Disallowed, in whole or in part, by Final Order of a court of competent jurisdiction.  In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance or withdrawal.

Disallowed Claim:  A Claim, or any portion thereof, that is Disallowed.

Disclosure Statement:  The disclosure statement for this Plan approved by the Bankruptcy Court.

Disputed:  Any Claim or Interest as to which the Debtors, the Creditors' Committee, the Reorganized Debtor, or any other party in interest has, within the time permitted under applicable law, interposed an objection or request for estimation or subordination or is otherwise disputed by the Debtors, the Creditors' Committee, the Reorganized Debtor, or any other party in interest with standing in accordance with applicable law, which objection, request for estimation or subordination or dispute has not been withdrawn or determined by a Final Order.

-3-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

1     Effective Date:  The date that this Plan becomes effective, which date will be the
first business day which is at least eleven days following the date of entry of the Plan
2  Confirmation Order, assuming there has been no order entered staying the effectiveness of
the Plan Confirmation Order.  If there has been an order entered staying the effectiveness of
3  the Plan Confirmation Order, the Effective Date shall be the first business day after the stay
is no longer in effect with respect to the Plan Confirmation Order.

4     Entity:  An entity as defined in Bankruptcy Code Section 101(15), including, but not
limited to, an individual, corporation, partnership or governmental unit.
5

     File:   Duly filing a document, notice, claim, pleading or other paper with the
6  Bankruptcy Court, including service of such document, notice, claim, pleading or other
paper as prescribed by this Plan and/or the Bankruptcy Rules.

7     Final Decree:  The decree contemplated under Bankruptcy Rule 3022.

8     Final Order:  An order, ruling, or judgment, the operation or effect of a judgment or
other decree issued and entered by the Bankruptcy Court or by any state or other federal
9  court or other court of competent jurisdiction which has not been reversed, vacated, stayed,
modified or amended and as to which: (a) the time to appeal or petition for review,
10  rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition
for review, rehearing, certiorari, reargument or retrial is pending; or (b) any appeal or
11  petition for review, rehearing, certiorari, reargument or retrial has been finally decided and
no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be
12  taken or granted.

13     Holder:  An Entity holding an Interest or Claim.

     Impaired:  A Claim or Class of Claims that is impaired within the meaning of
14  Bankruptcy Code Section 1124.

15     Indentures:  The Junior Note Indenture and the Senior Note Indenture.

     Inter-Company Claims:  Any Claim held by any of the Debtors against any other
16  Debtor.

17     Interest:  Any equity interest in one or more of the Debtors, including, but not
limited to, all issued, unissued, authorized or outstanding shares or stock, together with any
18  warrants, options or contract rights to purchase or acquire such interests at anytime.

     Junior Noteholders:  The Holders of Junior Notes whose Claims are classified in
19  Class 5.

20     Junior Notes:  The 5-¾% Convertible Subordinated Notes due 2003.

     Junior Notes Claims:  The Claims of the Holders of the Junior Notes.
21
     Junior Notes Indenture:  The indenture agreement pertaining to the Junior Notes.

22     Lien:  Any charge against or interest in Property to secure payment or performance
of a claim, debt or obligation.

23     Net Remaining Assets:   Means all Assets of these estates remaining after (i)
payment in full of all Allowed Administrative Claims, all Allowed Priority Tax Claims, and
24  all Allowed Claims in Classes 1, 2 and 6; (ii) payment in full of all fees owing to the Clerk
of the Bankruptcy Court, and fees owing to the United States Trustee; (iii) payment of all
25  post-Effective Date fees and expenses incurred or to be incurred by professionals employed
by the Reorganized Debtor or the Plan Oversight Committee through the closing of these
26  Chapter 11 Cases and entry of a Final Decree; and (iv) funding of the Estate Reserve.

27     Noteholder Claims:  The Claims of Noteholders.

     Noteholders:   Junior Noteholders, Senior Noteholders, and the Indenture Trustee
28

                              -4-     LIQUIDATING PLAN OF REORGANIZATION
                                      PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

1    under the Junior Note Indenture.

2      Petition Date: March 21, 2003.

3      Plan: This Liquidating Plan of Reorganization Dated as of December 15, 2006 proposed jointly by the Debtors and the Creditors' Committee, including all exhibits, appendices, schedules and annexes, if any, attached hereto, as submitted by the Proponents,

4    as such Plan may be altered, amended, supplemented or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Plan

5    Confirmation Order and the terms and conditions of this Plan.

6      Plan Confirmation Order: The order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code Section 1129.

7      Plan Oversight Committee: The successor to the Creditors' Committee created on the Effective Date in accordance with the terms of this Plan.

8

9      Preference Actions: The approximately 208 preference and fraudulent conveyance avoidance and recovery actions, including one un-filed claim where the defendant executed a tolling agreement and later settled without the need for litigation, commenced by the

10    Debtors and Creditors' Committee in or around March, 2005.

11      Priority Claims: Those Claims afforded priority under Bankruptcy Code Sections 507(a) and (b), excluding Administrative Claims and Priority Tax Claims.

12      Priority Tax Claims: Those Claims afforded priority under Bankruptcy Code Section 507(a)(8).

13      Professional: An Entity: (a) employed in the Chapter 11 Cases prior to the Effective Date pursuant to a Final Order in accordance with Bankruptcy Code Sections 327, 328

14    and/or 1103; or (b) employed by the Reorganized Debtor and/or the Plan Overnight Committee after the Effective Date.

15      Professional Fees: Fees and expenses incurred by a Professional.

16      Property: All Assets or property of the Debtors' respective estates of any nature whatsoever, real or personal, tangible or intangible, including, but not limited to, contract

17    rights, accounts and Rights of Action, previously or now owned by the Debtors, or acquired by the Debtors' respective estates, as defined in Bankruptcy Code Section 541.

18      Pro-Rata Share: For the Holder of any Claim in any of Classes 3, 4 or 5, the Holder's Allowed Claim divided by the total amount of all Allowed Claims in that Class.

19

20      Reorganized Debtor: The Debtors, collectively, as a substantively consolidated legal entity, on and after the Effective Date.

21      Rights of Action: All actions, causes of action, suits, rights of action, counterclaims, cross-claims, rights of setoff, debts, dues, sums of money, accounts,

22    reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments arising under any theory of law or

23    equity, including, without limitation, the Bankruptcy Code, all claims against Holders of Claims and/or Interests, parties having dealings, relationships or transactions with or related

24    to the Debtors, any party named or identified in the Schedules or any pleadings filed in the Chapter 11 Cases (including, but not limited to, officers and directors of the Debtors), in

25    each case held by or in favor of any of the Debtors or their estates whether or not commenced as of the Effective Date. The Rights of Action also include, but are not limited

26    to, the Avoidance Actions and the Preference Actions.

27      Schedules: The Debtors' schedules of assets and liabilities, statements of financial affairs, and such other schedules filed with the Bankruptcy Court by the Debtors in accordance with Bankruptcy Code Section 521, the Official Bankruptcy Forms, and the

28    Bankruptcy Rules, as amended from time to time.

1    Secured Claim: Any Claim arising before the Petition Date that is: (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable
2    under applicable law on Property in which any of the Debtors has an interest and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or
3    (b) subject to setoff under Bankruptcy Code Section 553; provided, however, with respect to both (a) and (b), only to the extent of each such Debtor's interest in the value of the
4    assets or Property securing any such Claim or the amount subject to setoff, as the case may be.

5    Senior Notes: The 7¾% Secured Senior Subordinated Convertible Debentures due 2005.
6

     Senior Notes Claims: The Claims of the Holders of the Senior Notes.
7
     Senior Notes Indenture: The indenture agreement pertaining to the Senior Notes.

8    Senior Noteholders:  Holders of Senior Notes, whose Claims are classified in Class 3.

9    Subordination Payment Amount: The amount of a Claim entitled to priority under an indenture.
10
     Subordination Provisions: The subordination provisions in the Indentures, including,
11   without limitation, the subordination provisions in Article IV and any applicable definitions in Article I of the Junior Note Indenture and the subordination provisions in Article IV and
12   any applicable definitions in Article I of the Senior Note Indenture.

13   Unsecured Claim: Any Claim that is classified in any of Class 3, 4, 5, 6, or 7, but only to the extent such Claim is not a Secured Claim.

14   Unsecured Claims Bar Date: The July 22, 2003 Bar Date pertaining to unsecured claims established by the Bankruptcy Court.

15   U.S. Trustee: The United States Trustee for the Northern District of California.

16   (b)    Other Definitions: Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in this Plan but that is defined in the
17   Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code. Unless otherwise specified, all section, schedule or exhibit references in this Plan are to the
18   respective section in, article of, or schedule or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto,"
19   "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

20   **B.    Rules of Interpretation, Computation of Time and Governing Law.**

21   (a)    For purposes of this Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and
22   the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender; (b) any reference in this Plan
23   to a contract, instrument, release, Indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be
24   substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or exhibit filed, or to be filed, shall mean such
25   document or exhibit, as it may have been or may be amended, modified or supplemented; (d) captions and headings to articles and sections are inserted for convenience of reference
26   only and are not intended to be a part of or to affect the interpretation of this Plan; (e) the rules of construction set forth in Bankruptcy Code Section 102 shall apply; and (f) any term
27   used in capitalized form in this Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in
28   the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

-6-        LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

(b)    In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(c)    Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California.

(d)    To the extent of any inconsistency between the terms of the Plan Confirmation Order and the terms of this Plan or any other document or agreement submitted, prepared or approved in connection with this Plan, the Plan Confirmation Order shall prevail. To the extent of any inconsistency between the terms of this Plan and any other document or agreement submitted, prepared or approved in connection with this Plan, this Plan shall prevail.

## ARTICLE II
## SUBSTANTIVE CONSOLIDATION AND
## CANCELLATION OF INTER-COMPANY CLAIMS

On the Effective Date, the Chapter 11 Cases, the Debtors and their estates shall be deemed to be substantively consolidated for all purposes, including, without limitation, voting and distributions under this Plan. The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Reorganized Debtor and shall be entitled to distributions under this Plan only with respect to such single Claim. While the substantive consolidation shall legally occur on the Effective Date, the substantive consolidation shall be deemed effective as of the Petition Date. As such, on the Effective Date: (a) all Assets and liabilities of the Debtors shall be merged or treated as though they were merged into and with the Assets and liabilities of each other Debtor; (b) all Inter-Company Claims shall be eliminated and extinguished, and no distributions shall be made under this Plan on account of any Inter-Company Claims; (c) any Claims against two or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under this Plan only with respect to such single Claim; and (d) all Allowed Claims against the Debtors shall be satisfied from the Assets of the single consolidated estate of the Reorganized Debtor.

## ARTICLE III
## TREATMENT OF UNCLASSIFIED ADMINISTRATIVE
## AND PRIORITY TAX CLAMS

**A.    Introduction.**

Certain types of Claims are not placed into voting Classes pursuant to the Bankruptcy Code. These unclassified, non-voting Claims and their treatment are described in this Article III.

**B.    Administrative Claims.**

**1.    Administrative Claims other than Professional Fees.**

Holders of Administrative Claims other than Professional Fees that have not been paid as of the Effective Date must File a request for payment of such Administrative Claims with the Bankruptcy Court and serve the same upon the Reorganized Debtor and the Plan Oversight Committee no later than forty-five (45) days after the Effective Date (the "Administrative Bar Date"). If an Administrative Claim that has not been paid as of the Effective Date is not timely Filed by the Administrative Bar Date, then such Administrative Claim shall be deemed not Allowed and shall be forever barred and not enforceable against

LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

1    any of the Debtors, the Assets, or the Reorganized Debtor.

2    Any objection to a timely filed Administrative Claim must be filed within the later of (i) ninety (90) days after the date such Administrative Claim is Filed and properly served, or (ii) ninety (90) days after the Effective Date. The Reorganized Debtor and/or the Plan Oversight Committee shall have the right to seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Administrative Claim. The Reorganized Debtor shall have the right to pay any timely filed Administrative Claim if both the Reorganized Debtor and the Plan Oversight Committee agree that neither has an objection to such Administrative Claim. Otherwise, the Reorganized Debtor shall pay any timely filed Administrative Claim only after the deadline to file an objection to such Administrative Claim has passed with no objection having been filed, or the Administrative Claim is allowed by Final Order of the Bankruptcy Court.

**C.    Statutory Fees.**

All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date. Payments required after the Effective Date shall be made as required by statute and shall be paid by the Reorganized Debtor.

**D.    Professional Fees.**

All Professional Fees which have been Allowed prior to the Effective Date but which have not been paid by the Effective Date shall be paid on the Effective Date.

Except (i) as otherwise provided by Bankruptcy Court order for a specific Professional, and (ii) any Professional Fees for the Debtors' and/or Creditors' Committee's counsel arising out of or earned in connection with the Preference Actions or Avoidance Actions, any Professional requesting Professional Fees for services rendered prior to the Effective Date must file and serve an application for final allowance of compensation and reimbursement of expenses no later than ninety (90) days after the Effective Date. Professionals who do not file such requests by such date shall be forever barred from seeking payment for such Professional Fees, but shall not be required to disgorge any fees or expenses which were previously paid to such Professional pursuant to Bankruptcy Court order. Professional Fees incurred before the Effective Date (including Professional Fees incurred in connection with pursuit of the Preference Actions and/or Avoidance Actions) will only be paid after they have been approved pursuant to Bankruptcy Court order. Professional Fees incurred after the Effective Date (including Professional Fees incurred in connection with pursuit of the Preference Actions and/or Avoidance Actions) may be paid by the Reorganized Debtor in the ordinary course of business without any further Bankruptcy Court order.

**E.    Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Priority Tax Claim equal to the Allowed Amount of such Priority Tax Claim.

**ARTICLE IV**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND INTERESTS**

**A.    Introduction.**

Pursuant to Bankruptcy Code Sections 1122 and 1123(a)(1), this Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to Section 1123(a)(1), are not to be classified). This Plan further classifies Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class. A Claim or Interest shall be deemed classified in a

-8-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classes and Voting Rights.**

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Proponents believe that the consideration, if any, provided under this Plan to the Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' Assets.

The following chart identifies the classified Claims specified in this Plan, estimates the amount of Claims in each Class, and summarizes the treatment of the classified Claims under this Plan.

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: $1,830,500 (excluding the contingency fees and expenses owing on account of the pursuit of Avoidance Actions) plus an additional approximately $1,000,000 of Professional Fees which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed Proj. Rec. 100% | Non-voting class |
| N/A | Priority Tax Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $180,000 Proj. Rec.: 100% | Non-voting class |
| 1 | Secured Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $380,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |
| 2 | Other Priority Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $30,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |

LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

| 3 | Senior Notes Claims | Cash equal to Pro Rata Share of Net Remaining Assets plus Cash equal to the payment that would otherwise be owing to Class 5 on account of the Junior Notes Claims which instead will be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Est. Amt.: Approx. $47 million (see explanation below) Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Entitled to vote (impaired) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-10-

LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

| | | | | |
|---|---|---|---|---|
| 4 | General Unsecured Claims Not Included in Any Other Class | Cash equal to Pro-Rata Share of Net Remaining Assets | Est. Amt.: Approx. $86 million<br>Proj. Rec.: Approx. 33% | Entitled to vote (impaired) |
| 5 | Junior Notes Claims | Cash equal to Pro-Rata Share of Net Remaining Assets, except that the full amount of the payment that would otherwise be made to Class 5 on account of the Junior Notes Claims will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Est. Amt.: $103 million<br>Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Entitled to vote (impaired) |
| 6 | Convenience Class | Cash equal to 50% of Allowed Claim with a maximum payment of $1,250. Members of this Class will include all holders of Allowed Unsecured Claims which are $2,500 or less, plus all holders of Allowed Unsecured Claims which are greater than $2,500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $2,500 to participate in this Class | Est. Amt.: Approx. $375,000<br>Proj. Rec. 50% (except for holders of Allowed Unsecured Claims which are greater than $2,500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $2,500 to participate in this Class) | Entitled to vote (impaired) |
| 7 | Subordinated Unsecured Claims | No distribution | Est. Amt.: $14.6 million<br>Proj. Rec. 0% | Not entitled to vote (deemed to reject) |
| 8 | Interests | No distribution | Est. Amt.: $N/A<br>Proj. Rec. 0% | Not entitled to vote (deemed to reject) |

## C.   Reallocation Provisions.

This Plan gives effect to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture (the "Indentures") according to their terms. Bankruptcy Code Section 510(a) expressly provides that contractual subordination provisions are enforceable in bankruptcy to the extent enforceable under applicable non-bankruptcy law. This Plan will give effect to the Subordination Provisions by re-allocating the distributions that would have been paid to Creditors absent the Subordination Provisions to Creditors benefiting from the Subordination Provisions. However, nothing in this Plan precludes any party from enforcing its rights under the Subordination Provisions outside the bankruptcy context, subject to the provisions in the Indentures, including, without limitation, any concerning the effect of a court order approving reallocations under the Subordination Provisions.

Under the Subordination Provisions of the two Indentures, the parties entitled to priority are not limited to recovering the Allowed Amounts of their Claims.   Under bankruptcy law generally, an unsecured or under-secured creditor is not entitled to collect post-petition interest. Under the two Indentures, however, the parties benefiting from the Subordination Provisions are entitled to collect all principal and interest owing under the prioritized obligations, including post-petition interest.   As such, under this Plan, the creditors benefiting from the Subordination Provisions are entitled to receive up to the "Subordination Payment Amount" of their Claims, which amount is defined as the amount of a Claim entitled to priority under one or both Indentures, even though the Subordination

-11-   LIQUIDATING PLAN OF REORGANIZATION<br>
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

Payment Amount may exceed the amount due on account of the Claim as Allowed under bankruptcy law. Typically, the Subordination Payment Amount includes all principal and interest (including post-petition interest) due on account of a Claim, but the applicable Indenture(s) may impose limitations on the amount entitled to priority.

The distinction between the Allowed Amount of a Claim and the Subordination Payment Amount is primarily of importance to the Senior and Junior Noteholders. As discussed above, for purposes of estimating distributions to be made under this Plan, the Proponents have assumed an Allowed Claim of $47 million in favor of the Senior Noteholders; whereas the Debtors calculate the Subordination Payment Amount of the Senior Noteholders' Claims to be approximately $84 million on March 11, 2007, subject to adjustment based on the Senior Noteholders' recovery from prior UMC stock sales described in the Disclosure Statement. Absent the Subordination Provisions, the Proponents would project a significant distribution on account of the Junior Notes. However, the Proponents believe that all distributions which would otherwise have been paid to the Junior Noteholders (i.e., Class 5) if not for the Subordination Provisions will be reallocated and paid to the Senior Noteholders (i.e., Class 3) in accordance with the Subordination Provisions.

The Senior Noteholders contend that they are entitled to receive all distributions which would otherwise have been paid to the Junior Noteholders if not for the Subordination Provisions until the Senior Noteholders have been paid the full Subordination Payment Amount, which is not expected to occur. As a result, the Senior Noteholders contend that the Junior Noteholders are not entitled to receive any distribution from the Reorganized Debtor as all such distributions which otherwise would have been paid to the Junior Noteholders are instead required to be paid to the Senior Noteholders pursuant to the Subordination Provisions. In the event the Junior Noteholders disagree with this contention, the Junior Noteholders must file an objection to this provision of this Plan with the Bankruptcy Court not later than fifteen days prior to the Plan confirmation hearing, and include with such objection all evidence in support of such contention. The Junior Noteholders are required to serve any such objection upon counsel to the Debtors, counsel to the Creditors' Committee, and counsel to the Senior Noteholders. The failure of the Junior Noteholders to file any such timely objection to this provision of this Plan will be deemed to constitute the consent by the Junior Noteholders to this Plan provision. To the extent that any such objection requires a modification to this Plan, any such modification to this Plan will be deemed to constitute an immaterial modification to this Plan, which will not require the resolicitation of any voting on this Plan.

**2.    Other Procedural Issues Concerning Subordination and Seniority of Claims.**

The Proponents are not aware of any Claims which are entitled to any priority over the Senior Noteholders' Claims. As a result, any Claim holder who contends that it is entitled to priority over the Senior Noteholders' Claims must file an objection to this provision of this Plan with the Bankruptcy Court not later than fifteen days prior to the Plan confirmation hearing and include with such objection all evidence in support of such contention of priority. Any such Claim holder is required to serve any such objection upon counsel to the Debtors, counsel to the Creditors' Committee, and counsel to the Senior Noteholders. The failure of any Claim holder to file any such timely objection to this provision of this Plan will be deemed to constitute an acknowledgement by such Claim holder that it is not entitled to any priority over the Senior Noteholders' Claims. To the extent that any such objection requires a modification to this Plan, any such modification to this Plan will be deemed to constitute an immaterial modification to this Plan, which will not require the resolicitation of any voting on this Plan.

-12-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

**D.     Classification and Treatment of Claims.**

      **1.     Class 1 - Secured Claims.**

          (a)     Classification:  This Class consists of Allowed Claims secured by valid and perfected Liens and/or security interests against the Debtors' Assets, to the extent of the value of the Holder's interest in the Debtors' Assets.

          (b)     Treatment:  Each Holder of a Class 1 Allowed Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Secured Claim equal to the Allowed Amount of such Class 1 Allowed Claim.

          (c)     Estimated Amount of Claims:  There are approximately twenty-seven (27) scheduled Claims or filed proofs of Claim in this Class totaling approximately $91.975 million.  However, most of these Claims relate to the Senior Notes which are no longer secured as a result of the prior sale and payment of the UMC Stock which served as their collateral.  In addition, a number of these Claims are objectionable or have been paid, and the Proponents intend to have the Claims withdrawn or file objections to these Claims before the Effective Date.  The Proponents estimate that after withdrawal or reclassification of objectionable claims and/or litigation of such objectons, the total amount of Allowed Secured Claims will be not more than approximately $380,000.

          (d)     Projected distributions:  The Proponents anticipate that all Class 1 Allowed Claims will be satisfied in full under this Plan.

          (e)     Voting:  Claims in this Class are not impaired and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject this Plan.

      **2.     Class 2 – Other Priority Claims.**

          (a)     Classification:  This Class consists of all Unsecured Priority Claims specified under Bankruptcy Code Section 507(a), but excluding Priority Tax Claims and Administrative Claims.

          (b)     Treatment:  Each Holder of a Class 2 Allowed Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Priority Claim equal to the Allowed Amount of such Class 2 Allowed Claim.

          (c)     Estimated Amount of Claims:  There are approximately fifteen (15) Claims in this Class totaling approximately $302,000.  Many of these Claims are general unsecured Claims that have incorrectly asserted priority status.  The Proponents intend to seek voluntary reclassification of these Claims or to file objections thereto.  The Proponents estimate that after reclassifying such Disputed Claims and litigation of other appropriate objections, the total amount of Allowed Claims in this Class will be approximately $30,000.

          (d)     Projected distributions:  The Proponents anticipate that all Class 2 Allowed Claims will be satisfied in full under this Plan.

          (e)     Voting:  Claims in this Class are not impaired, and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject this Plan.

      **3.     Class 3 – Senior Notes Claims.**

          (a)     Classification:  This Class consists of all Unsecured Claims arising out of the Senior Notes (the 7¾% Senior Secured Subordinated Convertible Debentures due 2005), which consists of all Claims of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.

          (b)     Treatment:  Each Holder of a Class 3 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets on the same percentage basis as Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims.  In addition, pursuant to the "Subordination Provisions" in the Junior Note

-13-     LIQUIDATING PLAN OF REORGANIZATION<br>PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

Indenture and Senior Note Indenture, the entire distribution of the Net Remaining Assets that would otherwise be made to the Holders of Class 5 Allowed Claims on account of the Junior Notes Claims shall instead be paid directly to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(c)    Estimated Amount of Claims:    There are three known Holders of Class 3 Claims consisting of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.    Before any original issue discount or attribution of value to the items received by the Senior Notes Holders or features of the Senior Notes, the Class 3 Claims would have been in the amount of approximately $60 million after credit is provided for the approximately $17.4 million of proceeds received by the Senior Note Holders from the sale of the UMC stock that collateralized the Senior Notes.    Solely for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Senior Notes Claims will be Allowed in the amount of $47 million.    However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders.    It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor or any other party in interest to file an objection to the Senior Notes Claims contending that the Allowed Amount of the Senior Notes Claims should be less than $47 million.

(d)    Projected distributions:    The Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims.    As further set forth above, the Proponents are preliminarily estimating a likely distribution of approximately 33% to holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims, taking into account all of the assumptions set forth herein and in the Disclosure Statement.    Assuming total Class 3 Allowed Claims of $47 million, the Proponents estimate that Holders of Class 3 Allowed Claims will receive a total of approximately $15,510,000 before taking into account the payment to the Holders of Class 3 Allowed Claims that would otherwise be made to the Holders of Class 5 Allowed Claims if not for the Subordination Provisions.    Assuming total Class 5 Allowed Claims of $103 million, the Proponents estimate that an additional approximately $33,990,000 that would otherwise be paid to the Holders of Class 5 Allowed Claims if not for the Subordination Provisions will be paid to the Holders of Class 3 Allowed Claims.    Using these assumptions, the Proponents believe that Holders of Class 3 Allowed Claims may receive a total distribution from the Reorganized Debtor which exceeds the amount of their Class 3 Allowed Claims, but this is acceptable pursuant to the Subordination Provisions, to which original issue discount concepts do not apply.

(e)    Voting:    Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

**4.    Class 4 - General Unsecured Claims.**

(a)    Classification:    This Class consists of all Unsecured Claims (including deficiency Claims) other than Administrative Claims, Priority Tax Claims and Claims in Classes 2, 3, 5, 6 and 7.

(b)    Treatment:    Along with Holders of Class 3 Allowed Claims and Holders of Class 5 Allowed Claims, each Holder of a Class 4 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets.

(c)    Estimated Amount of Claims:    As of December 15, 2006, there are a total of approximately $42.8 million of Class 4 Allowed Claims.    In addition, there are a total of approximately $74.9 million of additional Class 4 Claims that are (i) subject to pending Claim objections or Preference Actions, (ii) subject to continuing investigation by the Debtors' and/or the Creditors' Committee and may be objected to in the future, or (iii) likely to be eliminated upon Substantive Consolidation of the Debtors (the "Unsettled

-14-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

Claims"). Much of the remaining Class 4 Unsettled Claims are asserted by Claim holders who are the subject of pending Preference Actions, and many of the previous settlements of Preference Actions included a waiver of all or a significant portion of the Unsecured Claims which were otherwise asserted by the defendant to the relevant Preference Action. The Proponents estimate that the ultimate total amount of Class 4 Allowed Claims will be approximately $86 million. However, this figure is just an estimate. The ultimate actual total amount of Class 4 Allowed Claims could be higher or lower than $86 million.

(d)     Projected distributions:  As described above, the Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims. Based upon all of the assumptions contained herein and in the Disclosure Statement, including that the ultimate total amount of Class 4 Allowed Claims will be approximately $86 million, the Proponents are preliminarily estimating a likely distribution of approximately 33% to holders of Class 4 Allowed Claims.

(e)     Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

**5.     Class 5 – Junior Notes Claims.**

(a)     Classification:  This Class consists of all Unsecured Claims arising out of the Junior Notes (the 5-¾% Convertible Subordinated Notes due 2003), including, without limitation, all Claims of U.S. Bank, N.A.

(b)     Treatment:  Along with Holders of Class 3 Allowed Claims and Holders of Class 4 Allowed Claims, each Holder of a Class 5 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets, which payment, pursuant to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture, will actually be paid directly to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(c)     Estimated Amount of Claims:  U.S. Bank, N.A. is the only known Holder of a Class 5 Claim. This Holder filed a proof of Claim in the amount of $106.1 million. This Claim may be partially Disputed. Solely for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Junior Notes Claims will be Allowed in the amount of $103 million. However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor or any other party in interest to file an objection to the Junior Notes Claims contending that the Allowed Amount of the Junior Notes Claims should be less than $103 million.

(d)     Projected distributions:  As described above, the Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims. Based upon all of the assumptions contained herein and in the Disclosure Statement, including that the ultimate total amount of Class 5 Allowed Claims will be approximately $103 million, the Proponents are preliminarily estimating a likely distribution of approximately 33% to Holders of Class 5 Allowed Claims. Assuming total Class 5 Allowed Claims of $103 million, the Proponents estimate that the Holders of Class 5 Allowed Claims would have been paid the total sum of $33,990,000 if not for the Subordination Provisions. However, as a result of the Subordination Provisions, the entire sum that would otherwise have been owing to the Holders of Class 5 Allowed Claims will instead be paid to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(e)     Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

1

**6.    Class 6 - Convenience Class Claims.**

2

3

4

(a)    Classification:  This Class is comprised of all Claims that would otherwise be Class 4 Claims but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $2,500; or (b) such Claim is in an amount greater than $2,500, but the Holder of such Claim has elected to have such Claim treated in its entirety as a Class 6 Convenience Class Claim in the amount of $2,500 by so indicating on the Ballot submitted to vote such Claim.

5

6

7

(b)    Treatment:  Each Holder of a Class 6 Allowed Claim shall receive Cash within ninety days following the later of the Effective Date and the date of Allowance of such Class 6 Allowed Claim equal to 50% of the Allowed Amount of such Class 6 Allowed Claim; provided, however, that under any circumstance the maximum Cash distribution to a Class 6 Claim Holder shall be $1,250.

8

9

10

(c)    Estimated Amount of Claims:  There are over 450 Claims in this Class totaling approximately $301,000.  In addition, the Proponents estimate that twenty (20) to forty (40) Creditors with Class 4 Allowed Claims exceeding $2,500 may opt to reduce their Claims to $2,500 and participate in the Class 6 Convenience Class to expedite receipt of their distributions.  As such, the Proponents are estimating that the ultimate amount of Claims in this Class will be approximately $375,000.

11

12

(d)    Projected distributions:  Each Holder of a Class 6 Allowed Claim will receive a single distribution equal to the lesser of fifty percent (50%) of such Holder's Class 6 Allowed Claim or $1,250.

13

(e)    Voting:  Claims in this Class are impaired and Holders of Allowed Claims in this Class are entitled to vote to accept or reject this Plan.

14

**7.    Class 7 - Subordinated Unsecured Claims.**

15

16

17

(a)    Classification:  This Class consists of all Claims: (i) that have been or are subject to subordination under Bankruptcy Code Section 510(b), including, without limitation, all Claims identified in Schedule 1 to this Plan and which are not expressly included in any other Class; and (ii) all Claims described in any other Bankruptcy Code provision that subordinates Claims.

18

(b)    Treatment:  Holders of Allowed Class 7 Claims will receive no distributions on account of their Class 7 Claims.

19

20

(c)    Estimated Amount of Claims:    Seven (7) Claims, comprising approximately $14.6 million, have previously been subordinated pursuant to Bankruptcy Court order.  Exhibit "C" identifies any additional claims that the Proponents may seek to have subordinated.

21

(d)    Projected distributions:  Holders of Class 7 Claims will receive no distributions on account of their Class 7 Claims.

22

23

(e)    Voting:  Claims in this Class are deemed to have rejected this Plan and, as such, Holders of Allowed Claims in this Class are not entitled to vote to accept or reject this Plan.

24

**8.    Class 8 – Interests.**

25

26

(a)    Classification:  This Class consists of all Interests in any of the Debtors and any rights and Claims related thereto, including, but not limited to, all stock, equities, securities, warrants, conversion rights, options and other legal and contractual rights to acquire stock.

27

28

(b)    Treatment:  Holders of Interests will not receive or retain any Property or distributions under this Plan on account of such Interests. Holders of Interests will have no power or role in the administration of the Reorganized Debtor.  On the

Effective Date, all such power shall be vested in the Reorganized Debtor and the Plan Oversight Committee in accordance with the terms of this Plan.

(c)    Projected distributions:  Interest Holders will receive no distributions on account of their Interests.

(d)    Voting:  Holders of Interests are deemed to have rejected this Plan and, as such, are not entitled to vote to accept or reject this Plan.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF THIS PLAN; CRAMDOWN

**A.    Voting Classes.**

Except as otherwise provided by the Bankruptcy Code or the Bankruptcy Rules or order of the Bankruptcy Court, each Holder of a Claim in Classes 3, 4, 5 and 6 shall be entitled to vote to accept or reject this Plan; and only those votes cast timely by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Class acceptance and to confirm this Plan. Holders of Claims in Classes 1 and 2 are not impaired and are therefore not entitled to vote on this Plan.  Holders of Claims or Interests in Classes 7 and 8 are conclusively deemed to have rejected this Plan and are therefore not entitled to vote on this Plan.

**B.    Ballot Instructions.**

To have its vote count towards Plan confirmation, each Holder of a Claim entitled to vote on this Plan is required to complete and timely return a Ballot to the Voting Agent, which will compile the votes so received.  All questions as to the validity, form, and eligibility (including time of receipt) of Ballots will be resolved by the Bankruptcy Court upon application or at the Plan confirmation hearing.

**C.    Cramdown.**

If all applicable requirements for confirmation of this Plan are met as set forth in Bankruptcy Code Sections 1129(a)(1) through (13), except subsection (8) thereof, the Proponents intend to request that the Bankruptcy Court confirm this Plan in accordance with Bankruptcy Code Section 1129(b), notwithstanding the failure to satisfy the requirements of Section 1129(a)(8), on the basis that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims that is impaired under, and has not accepted, this Plan.

## ARTICLE VI
## EFFECT OF CONFIRMATION OF THIS PLAN

**A.    Vesting of Assets in the Reorganized Debtor.**

On the Effective Date, all Assets of the Debtors and their estates shall vest as one consolidated legal entity in the Reorganized Debtor.  Such Assets shall include, but not be limited to, all Cash and the Rights of Action.  The Assets shall be managed and used for the sole purposes of carrying out and effectuating the distributions provided for in this Plan.

**B.    Authority to Effectuate this Plan.**

Upon the Effective Date, all matters provided under this Plan shall be deemed to be authorized and approved without further approval or order from the Bankruptcy Court.  The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to carry out this Plan and to effectuate the distributions provided for under this Plan, subject to the provisions of this Plan.  The Reorganized Debtor is expressly authorized to sell or dispose of any and all Assets and to pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court, subject to the provisions of this Plan; provided,

-17-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

1    however, that any sale, settlement, distribution or transaction where the amount received,
     paid or distributed exceeds $100,000 shall be subject to the approval of the Plan Oversight
2    Committee or the approval of the Bankruptcy Court.

3    **C.    The Non-Debtor Subsidiaries.**

         This Plan will have no effect on the Debtors' subsidiaries other than the Debtors.
4    The Reorganized Debtor shall wind up and dissolve the Seller Subsidiaries.
     Notwithstanding the foregoing, the Reorganized Debtor is authorized to operate any
5    subsidiaries (including subsidiaries of subsidiaries) to the extent that the Reorganized
     Debtor believes there is value to be garnered for the Reorganized Debtor's estate for doing
6    so, after consultation with and input from the Plan Oversight Committee. The Reorganized
     Debtor will also be authorized to wind up and/or dissolve any of the Debtors' other
7    subsidiaries (including subsidiaries of subsidiaries) as determined by the Reorganized
     Debtor, in its reasonable discretion, after consultation with and input from the Plan
8    Oversight Committee.

9    **D.    Dissolution of the Creditors' Committee; Formation of the Plan Oversight
     Committee.**

10        On the Effective Date, the Creditors' Committee will be deemed dissolved and its
     members will be released and discharged from all further duties and obligations arising
11   from or related to the Chapter 11 Cases.

12        On the Effective Date, the Plan Oversight Committee shall be deemed created. The
     Plan Oversight Committee shall be comprised of all members of the Creditors' Committee
13   except those who elect not to serve on the Plan Oversight Committee. The Plan Oversight
     Committee shall monitor all aspects of the Reorganized Debtor's activities, including
14   without limitation: liquidation of the Assets; prosecution, settlement and abandonment of
     Rights of Action; prosecution and resolution of objections and other disputes pertaining to
15   Claims; and distribution of the Debtors' Assets to Creditors in accordance with the
     provisions of this Plan.

16        As described above, the Plan Oversight Committee will continue with the
     prosecution of any disputed, contingent or unliquidated Claims which have been objected to
17   prior to the Effective Date by the Creditors' Committee but which have not been liquidated
     to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over
18   the Plan Oversight Committee and such Claims objections for this purpose, regardless of
     whether such Claims objections were commenced prior to or subsequent to the Effective
19   Date. Similarly, the Plan Oversight Committee will continue with the prosecution of any
     Avoidance Actions, including Preference Actions, which were commenced prior to the
20   Effective Date by the Creditors' Committee but which have not been resolved to Final Order
     by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan
21   Oversight Committee and the Avoidance Actions for this purpose, regardless of whether
     such Avoidance Actions were commenced prior to or subsequent to the Effective Date.
22   Finally, along with the Reorganized Debtor, the Plan Oversight Committee shall have
     standing and authority to commence any objections to Claims after the Effective Date
23   which the Plan Oversight Committee deems appropriate which were not commenced prior
     to the Effective Date.

24        Entities who served as Professionals to the Creditors' Committee prior to the
     Effective Date shall also serve as Professionals to the Plan Oversight Committee and shall
25   be compensated from the Reorganized Debtor's estate for all fees and expenses incurred
     after the Effective Date without the need for any further order of the Bankruptcy Court on
26   the same terms and conditions as such counsel was employed and compensated prior to the
     Effective Date (including the contingency fee sharing arrangement with Debtors' counsel
27   with respect to the prosecution of Avoidance Actions). Any vote of the Plan Oversight
28   Committee shall be made by a majority of those members of the Plan Oversight Committee

                              -18-          LIQUIDATING PLAN OF REORGANIZATION
                                     PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

1 who elect to participate in the vote. The Plan Oversight Committee shall be deemed dissolved upon the entry of the Final Decree.

2

## ARTICLE VII

3

## IMPLEMENTATION AND MEANS OF EXECUTION OF THIS PLAN

### A. Principals of the Reorganized Debtor.

4

5 Marcus Smith shall be employed by the Reorganized Debtor as its Chief Financial Officer and Responsible Individual through the entry of a Final Decree closing the Chapter 11 Cases unless he voluntary quits or is involuntarily terminated by the Plan Oversight

6 Committee for "cause". "Cause" shall mean that he has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Reorganized

7 Debtor or the bankruptcy estate, with any such dispute to be resolved by the Bankruptcy Court. The terms of Marcus Smith's employment by the Reorganized Debtor shall be

8 consistent with the terms of his current employment with the Debtors. If Marcus Smith quits or is involuntarily terminated, a replacement will be selected by the Plan Oversight

9 Committee subject to the approval of the Bankruptcy Court.

10 Nanci Salvucci shall be employed by the Reorganized Debtor as its Controller through the entry of a Final Decree closing the Chapter 11 Cases unless she voluntary quits

11 or is involuntarily terminated by the Plan Oversight Committee for "cause". "Cause" shall mean that she has been found to have committed gross negligence or has acted fraudulently

12 and/or maliciously with respect to the Reorganized Debtor or the bankruptcy estate, with any such dispute to be resolved by the Bankruptcy Court. The terms of Nanci Salvucci's

13 employment by the Reorganized Debtor shall be consistent with the terms of her current employment with the Debtors. If Nanci Salvucci quits or is involuntarily terminated, a

14 replacement may be selected by the Plan Oversight Committee subject to the approval of the Bankruptcy Court.

15 ### B. Funding of this Plan.

16 This Plan shall be funded with the Assets, including the Cash, and the net recovery (after payment of all fees and expenses, including fees and expenses of the Professionals)

17 from the pursuit of the Rights of Action and the proceeds thereof.

### C. The Rights of Action.

18

19 Those Rights of Action which were commenced by the Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Plan Oversight Committee (which

20 shall have legal standing to do so) until all such Rights of Action have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate

21 orders). Those Rights of Action which were commenced by the Debtors prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall

22 continue to be prosecuted (with the same counsel) by the Reorganized Debtor until all such Rights of Action have been resolved to Final Order, whether through settlement or

23 Bankruptcy Court order (as well as any appellate orders). The terms of compensation for counsel shall remain the same as the Bankruptcy Court previously approved. The

24 Bankruptcy Court shall retain jurisdiction over all such pending Rights of Action following the Effective Date. Any settlement of any pending Rights of Action shall continue to be

25 subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.

26 The Reorganized Debtor shall be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, any and all Rights of Action which were not

27 commenced prior to the Effective Date. The Bankruptcy Court shall retain jurisdiction over all such Rights of Action which are commenced after the Effective Date.

28

The Reorganized Debtor may, but shall not be required to, set-off against any Claim and the distributions to be made pursuant to this Plan in respect of such Claim, any Rights of Action the Reorganized Debtor may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Reorganized Debtor of any such Rights of Action, set-off or recoupment which the Reorganized Debtor may have against such Holder.

Nothing in the Disclosure Statement, this Plan, the Plan Confirmation Order or any other order or document shall constitute or be deemed to constitute a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors and/or the Creditors' Committee had prior to the Effective Date. On the Effective Date, all such claims, causes of action, rights and defenses shall be deemed transferred and conveyed to the Reorganized Debtor and the Plan Oversight Committee as successors in interest.

**D.    Post-Effective Date Expenses and Professional Fees.**

Subject to the provisions of this Plan, all reasonable fees for services rendered and expenses, including Professional Fees, incurred after the Effective Date by counsel to the Plan Oversight Committee and counsel to the Reorganized Debtor shall be paid by the Reorganized Debtor on a timely basis without any further order of the Bankruptcy Court.

**E.    Limitation of Liability for the Reorganized Debtor and the Plan Oversight Committee.**

Subject to any applicable law, neither the Reorganized Debtor, its employees, the Plan Oversight Committee nor any of their members, employees, professionals or agents will be liable for any action or omission in such capacity, while acting in good faith and in the exercise of reasonable judgment. Neither the Reorganized Debtor, its employees, the Plan Oversight Committee nor any of their members, employees, professionals or agents will be liable for activities relating to administration of this Plan in any event except for gross negligence, fraud or willful misconduct.

**F.    Dissolution of the Debtors and the Reorganized Debtor.**

Upon the entry of the Final Decree, each of the Debtors and the Reorganized Debtor shall be deemed dissolved without any further action required on the part of the Debtors, the shareholders of the Debtors, the officers or directors of the Debtors, the Reorganized Debtor or the Plan Oversight Committee.

**G.    Corporate Action.**

Each of the matters provided for under this Plan involving any corporate action to be taken or required by any Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by stockholders, officers or directors of any of the Debtors.

## ARTICLE VIII
## CLAIMS RESOLUTION AND DISTRIBUTIONS

**A.    Late Claims Void.**

Unless otherwise expressly ordered by the Bankruptcy Court or otherwise provided by this Plan, any Claim filed after the applicable Claims Bar Date shall be void and of no force or effect, and shall receive no distributions under this Plan.

**B.    Prosecution of Objections to Claims.**

Those Claim objections which were commenced by the Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Plan Oversight Committee (which

-20-                LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

shall have legal standing to do so) until all such Claim objections have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). Those Claim objections which were commenced by the Debtors prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel) by the Reorganized Debtor until all such Claim objections have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). Counsel shall be compensated for post-Effective Date Claim objections work on an hourly basis in accordance with standard billing practices, and shall be paid by the Reorganized Debtor in the ordinary course of business without any further order of the Bankruptcy Court. The Bankruptcy Court shall retain jurisdiction over all such pending Claim objections following the Effective Date. Any settlement of any pending Claim objections shall continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.

Both the Plan Oversight Committee and the Reorganized Debtor shall be authorized and empowered, and have legal standing, to pursue and prosecute, to settle, or to decline to pursue, any and all Claim objections which were not commenced prior to the Effective Date. The Bankruptcy Court shall retain jurisdiction over all such Claim objections which are commenced after the Effective Date.

Nothing in the Disclosure Statement, this Plan, the Plan Confirmation Order or any other order or document shall constitute or be deemed to constitute a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors and/or the Creditors' Committee had prior to the Effective Date. On the Effective Date, all such claims, causes of action, rights and defenses shall be deemed transferred and conveyed to the Reorganized Debtor and the Plan Oversight Committee as the successor in interest.

On March 14, 2006, the Bankruptcy Court entered an order ("Claim Order") entitled "Order Granting Motion Waiving Notice of Claim Settlements". The Claim Order authorized the Debtors or the Creditors' Committee to settle Claim disputes without notice to Creditors so long as the Creditors' Committee and the Debtors, or their respective counsel, both sign a written settlement agreement or stipulation. The terms of the Claim Order shall be applicable to the Reorganized Debtor and the Plan Oversight Committee for Claim settlements reached after the Effective Date.

**C.    Estimation of Claims.**

The Reorganized Debtor or the Plan Oversight Committee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtors, the Creditors' Committee or any other party in interest previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction over the Debtors' estates and these Chapter 11 Cases to estimate any Claim at any time prior to the entry of a Final Decree closing these Chapter 11 Cases. In the event that the Bankruptcy Court estimates any Claim, that estimated amount will constitute either the Allowed amount of such Claim (for Plan voting, Plan distribution or both) or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount is not binding for Plan distribution purposes, the Reorganized Debtor and/or the Plan Oversight Committee may elect to pursue any supplemental ruling of the Bankruptcy Court, including any supplemental objection to the Claim, in connection with Plan distribution purposes.

**D.    Allowed and Disputed Claims.**

A Claim shall be deemed Allowed if either (i) such Claim is listed in the Debtors' Schedules (as most recently amended) as liquidated, undisputed and non-contingent, and no objection has been filed to such Claim, or (ii) the Holder of such Claim has filed a proof of

1  such Claim on or before the applicable Bar Date; provided, however, that no objection to
   such Claim has been filed and no motion has been filed to estimate or subordinate such
2  Claim.   A Claim which is subject to an objection or a motion for estimation or
   subordination which has not been Allowed or Disallowed by a Final Order shall be deemed
3  Disputed until resolved by Final Order. All Claims that are not Allowed or Disputed are
   deemed Disallowed. No Claim shall be deemed Allowed by virtue of this Plan and/or
4  confirmation of this Plan.

**E.    Provisions Regarding Distributions.**

**1.    No Distributions on Disputed or Disallowed Claims.**

If any Claim is a Disputed Claim, no distribution provided under this Plan shall be
made on account of such Claim unless and until such Disputed Claim becomes an Allowed
Claim. No distributions under this Plan shall be made on account of a Claim that has been
Disallowed.

**2.    Distributions on Account of Allowed Secured Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 1 Allowed Claim
(i.e., Allowed Secured Claim)  equal to the Allowed Amount of such Class 1 Allowed
Claim, and the Reorganized Debtor shall make such payment on the later of the Effective
Date and the date of Allowance of such Secured Claim.

**3.    Distributions on Account of Allowed Priority Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 2 Allowed Claim
(i.e., Allowed Priority Claim)  equal to the Allowed Amount of such Class 2 Allowed
Claim, and the Reorganized Debtor shall make such payment on the later of the Effective
Date and the date of Allowance of such Priority Claim.

**4.    Distributions on Account of Allowed Priority Tax Claims.**

The Reorganized Debtor shall pay Cash to each Holder of an Allowed Priority Tax
Claim equal to the amount of such Allowed Priority Tax Claim, and the Reorganized
Debtor shall make such payment on the later of the Effective Date and the date of
Allowance of such Priority Tax Claim.

**5.    Distributions on Account of Allowed Administrative Claims.**

The Reorganized Debtor shall pay Cash to each Holder of an Allowed
Administrative Claim equal to the amount of such Allowed Administrative Claim, and the
Reorganized Debtor shall make such payment on the later of the Effective Date and the date
of Allowance of such Administrative Claim.

**6.    Distributions on Account of Allowed Convenience Class Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 6 Allowed Claim
(i.e., Convenience Class Claim) equal to 50% of the amount of such Class 6 Allowed Claim
(provided that no such distribution may under any circumstance exceed $1,250), and the
Reorganized Debtor shall make such payment within ninety days following the later of the
Effective Date and the date of Allowance of such Convenience Class Claim.

**7.    Distributions to Holders of Class 3 Allowed Claims, Class 4 Allowed
Claims and Class 5 Allowed Claims.**

Within ninety days following the Effective Date, the Reorganized Debtor shall
distribute all of the Net Remaining Assets which are left after the Reorganized Debtor has
made all of the payments described above and established and funded the Estate Reserve
(defined below) to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims
and Holders of Class 5 Allowed Claims on a Pro-Rata Share basis, subject to the
Subordination Provisions. In the event that at the time funds are distributed to Holders of

Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims any Disputed Claims exist or any Claims exist which are held by defendants in Preference Actions, the Reorganized Debtor shall make an interim distribution (the "Interim Distribution") to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims within ninety days following the Effective Date, and then make a final distribution after all such Disputed Claims and Preference Actions are resolved to Final Order, and the Reorganized Debtor is ready to proceed with seeking the entry of a Final Decree closing these Chapter 11 Cases. For purposes of computing the amount of the Interim Distribution, the Reorganized Debtor shall treat all Disputed Claims as Allowed Claims in the amounts asserted by the Claim Holder, and the Reorganized Debtor shall assume that all Claims which are held by defendants in Preference Actions will ultimately become Allowed Claims in the amounts asserted. The Reorganized Debtor shall pay into a segregated account (the "Creditor Account") the amount of money that would otherwise have been paid to the holders of Disputed Claims had they not been Disputed, and to holders of Claims who are the defendants in Preference Actions if not for the existence of the Preference Actions. Once any such Disputed Claims or Claims of defendants in Preference Actions become resolved to Final Order, the Reorganized Debtor will make a distribution to each such Claim Holder from the funds in the Creditor Account in the same percentage amount that was made earlier to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims.

### 8. Estate Reserve.

Until such time as a Final Decree is entered by the Bankruptcy Court closing these Chapter 11 Cases, the Reorganized Debtor shall establish and maintain at all times an adequate reserve ("Estate Reserve") to fund the payments required to be made under this Plan on account of Class 1 Allowed Claims, Class 2 Allowed Claims, Class 6 Allowed Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Reorganized Debtor to pay all post-Effective Date fees and expenses incurred or to be incurred by professionals employed by the Reorganized Debtor or the Plan Oversight Committee through the closing of these Chapter 11 Cases and entry of a Final Decree. The amounts of the Estate Reserve shall be determined by the Reorganized Debtor in its sole and absolute discretion after consultation with and input from the Plan Oversight Committee. Any dispute over the appropriate amount of money to be maintained in the Estate Reserve shall be resolved by the Bankruptcy Court following notice and a hearing. Neither the Reorganized Debtor nor the Plan Oversight Committee shall have any liability in the event any Estate Reserve proves to be inadequate unless such inadequacy was the result of gross negligence, recklessness or willful malfeasance. All recoveries obtained from the pursuit of Avoidance Actions shall remain in a segregated account(s) until the Bankruptcy Court has ruled upon the fee application of the professionals employed in these Chapter 11 Cases to pursue such Avoidance Actions and such professionals have been paid their Allowed fees and expenses out of such recoveries, except for post-Effective Date fees and expenses incurred in the pursuit of Avoidance Actions which may be paid without further Bankruptcy Court order.

### 9. Effectuation of Distributions.

The Reorganized Debtor shall serve as the disbursing agent and shall make all distributions in accordance with the terms of this Plan. All distributions shall be made without any requirement for bond or surety with respect thereto. The making of the distributions under this Plan shall be part of the job responsibilities of Marcus Smith and Nanci Salvucci.

### 10.    Distributions on Later-Allowed Claims.

In the event a Disputed Claim becomes an Allowed Claim (in whole or in part), then as soon as reasonably practicable after entry of a Final Order allowing such Claim, the Reorganized Debtor shall make a distribution to the Holder of such Claim in an amount equal to the distribution the Holder of such Claim would have received if the Holder's Claim had been Allowed in such amount on the Effective Date.  No Holder of a Disputed Claim shall be entitled to or receive any post-Petition Date or post-Effective Date interest or other accruals of any kind based upon the delay in receipt of the payment.

### 11.    Manner of Payments

All payments to be made by the Reorganized Debtor shall be in the form of Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 12.    Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under this Plan, distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by a different address set forth in a timely filed proof of claim filed by such Holder or if the Reorganized Debtor has been notified in writing of a change of address.

### 13.    Undeliverable Distributions.

(a)    Holding of Undeliverable Distributions:  If any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtor is notified, in writing, of such Holder's then-current address.  Undeliverable distributions shall remain in the possession of the Reorganized Debtor until such time as a distribution becomes deliverable. All Holders ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind based upon the delay in receipt. Nothing in this Plan requires the Reorganized Debtor to locate the Holder of an Allowed Claim.

(b)    Uncashed Checks.  The Reorganized Debtor shall have no obligation to locate the Holder of an Allowed Claim that does not cash any check representing a distribution payment.  With respect to any check representing a distribution that has not been cashed for a period of three (3) months from the date of mailing of such check to the Creditor, the Reorganized Debtor may, in the Reorganized Debtor's sole discretion: (a) stop payment on such check, (b) treat the distribution as undeliverable, and/or (c) refuse to re-issue any such check if the Reorganized Debtor determines that reissuing such check may adversely affect the distribution to any other Creditor or if re-issuing such check may cause the Reorganized Debtor to incur expense or inconvenience that is unwarranted in light of the amount of the distribution.

(c)    Failure to Claim Undeliverable Distributions:  The Reorganized Debtor may from time to time file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been attempted and have been returned as undeliverable as of the date thereof.  Any Holder of a Claim identified in such list that does not assert its rights pursuant to this Plan to receive a distribution within two (2) months from and after the filing of such list shall not be entitled to any distributions under this Plan and shall be forever barred from asserting any such Claim against the Debtors, the Reorganized Debtor or the Plan Oversight Committee. In such case, any consideration held for distribution on account of such Claim shall revert to the Reorganized Debtor for distribution to other Creditors or payment of expenses in accordance with the terms of this Plan.  Notwithstanding the foregoing, the Reorganized Debtor may in the Reorganized

1  Debtor's sole discretion pay distributions to a Holder of a Claim where distributions to the Holder had previously been determined to be undeliverable.

2          (d)    Fractional Amounts:  Payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

### 14.    Compliance with Tax Requirements/Allocation

To the extent applicable, the Reorganized Debtor in making distributions under this Plan shall comply with all tax withholding and reporting requirements imposed by any governmental unit, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  The Reorganized Debtor may withhold the distributions due to any Holder of an Allowed Claim until such time as such Holder provides to the Reorganized Debtor the necessary information to comply with any withholding requirements of any governmental unit.  Any Property so withheld will then be paid by the Reorganized Debtor to the appropriate authority.  If the Holder of an Allowed Claim fails to provide to the Reorganized Debtor the information necessary to comply with any withholding requirements of any governmental unit within sixty days after the date of first notification by the Reorganized Debtor to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's distributions shall be treated as undeliverable.  For tax purposes, distributions received in respect of an Allowed Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest.

### 15.    Set-Offs.

The Reorganized Debtor, as successor to the Debtors, may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set-off against any Allowed Claim and the distributions to be made pursuant to this Plan on account thereof (before any distribution is made on account of such Claim or thereafter), the claims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Allowed Claim.  The Holder of a Claim may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set off any Allowed Claim such Holder possesses against any claim, rights or causes of action of any nature that the Reorganized Debtor, as successor to the Debtors, may hold against such Holder.  Neither the failure to effect such a set-off nor the allowance of any Claim under this Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtor or such Holders of any such Claims, rights and causes of action that such parties may possess under Bankruptcy Code Section 553.

### ARTICLE VII
### INJUNCTION, EXCULPATION AND INDEMNIFICATION

### A.    Discharge.

Consistent with Bankruptcy Code Section 1141(d)(3), this Plan does not grant the Debtors a discharge.  Notwithstanding the foregoing, except as otherwise provided in this Plan: (1) the rights afforded in this Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of such Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; and (2) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtor or any of their Assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in this Plan.

LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

**B.     Injunction.**

Except as otherwise expressly provided in this Plan, all Entities who have held, hold or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their estates, or the Reorganized Debtor; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, or the Reorganized Debtor; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their estates, or the Reorganized Debtor and/or against the Property or interests in Property of any of the foregoing; and (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Debtors or against the Property of the Debtors, their estates, or the Reorganized Debtor with respect to any such Claim or Interest; provided that nothing contained in this Plan or the Plan Confirmation Order shall prohibit or restrain the prosecution of any actions, claims or controversies involving or relating to the Debtors' present or former directors and officers or Holders of Interests based on acts, events or omissions occurring before the Petition Date.  With respect to all such Claims or Rights of Action, all Entities shall be and are permanently enjoined from commencing or continuing any such matter except in the Bankruptcy Court, and the Bankruptcy Court shall retain exclusive jurisdiction over all such matters.

**C.     Exculpation and Limitation of Liability.**

None of the Debtors, the Reorganized Debtor, the Creditors' Committee or the Plan Oversight Committee, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys or other professionals, shall have or incur any liability to any Holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, including, without limitation, administration of the Chapter 11 Cases, any sale of Assets of the Debtors, the formulation, negotiation or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the Property to be distributed under this Plan, except for their fraud, gross negligence or willful misconduct, and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in the Chapter 11 Cases and under this Plan.

Notwithstanding any other provision of this Plan, no Holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any of the Debtors, the Reorganized Debtor, the Creditors' Committee, the Plan Oversight Committee, or any of their respective present or former members, officers, directors, employees, advisors or attorneys or other professionals, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing this Plan, the consummation of this Plan, the confirmation of this Plan, or the administration of this Plan or the Property to be distributed under this Plan, except to the extent such right of action arises from any such party's fraud, gross negligence or willful misconduct.

**D.     Indemnification.**

The Reorganized Debtor shall indemnify and hold harmless (i) the Creditors' Committee, (ii) the Debtors, (iii) the Plan Oversight Committee, (iv) all members of any of the foregoing, (v) the Debtors' and Reorganized Debtor's employees and consultants, and (vi) all professionals retained by any of the foregoing (collectively, the "Indemnified Parties") from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees and costs, arising

-26-          LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Debtors or the implementation or administration of this Plan, if the Indemnified Parties acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Debtors, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

The Reorganized Debtor shall also indemnify each Entity exculpated pursuant to the provisions described above against, hold each such Entity harmless from, and reimburse each such Entity for, any and all losses, costs, expenses (including attorneys' fees and expenses), liabilities and damages sustained by such Entity arising from any liability described above.

## ARTICLE VIII

### OTHER PLAN EFFECTUATION MATTERS

**A.     Executory Contracts and Unexpired Leases.**

    **1.     Rejection of Executory Contracts and Unexpired Leases.**

Any pre-petition executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, or which has not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtors on the Effective Date or as otherwise agreed upon by the parties.  The entry of the Plan Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to Bankruptcy Code Sections 365(a) and 1123, effective as of the Effective Date of this Plan.

    **2.     Rejection Damage Claims Bar Date and Resolution.**

Claims, if any, arising out of the rejection of executory contracts or unexpired leases rejected as of the Effective Date pursuant to this Plan must be filed and served on counsel to the Reorganized Debtor and counsel to the Plan Oversight Committee pursuant to the procedures specified in the Plan Confirmation Order no later than thirty (30) days after the Effective Date (the "Final Rejection Claims Bar Date").  Claims arising out of the rejection of executory contracts or unexpired leases rejected as of a date prior to the Effective Date must be filed and served not later than the deadline, if any, established in the order approving rejection of such executory contract or unexpired lease or other court order establishing a bar date for rejection Claims ("Applicable Rejection Claims Bar Date") or, if there is no such Applicable Rejection Claims Bar Date, by the Final Rejection Claims Bar Date.  Claims arising out of rejection of executory contracts or unexpired leases that are the subject of a motion to assume pending on the Effective Date must be filed within thirty (30) days after entry of an order either rejecting such executory contract or unexpired lease or denying such motion to assume such executory contract or unexpired lease.  Any Claim not filed within such times will be forever barred from assertion against the Debtors, the Reorganized Debtor, their estates, their respective successors or their respective properties.  Unless otherwise ordered by the Bankruptcy Court prior to the Confirmation Date, or such later date as shall be ordered by the Bankruptcy Court prior to the Confirmation Date, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Class 4 Claims under this Plan.

**B.     Conditions Precedent.**

    **1.     Conditions Precedent to Effective Date of this Plan.**

The Effective Date shall be the date all of the following conditions precedent are satisfied:

    a.     Plan Confirmation Order:  The Plan Confirmation Order shall be in form and substance acceptable to the Proponents and, except as otherwise agreed by the

Proponents, be a Final Order in full force and effect that shall not have been stayed or reversed; and

b. Execution of Documents; Other Actions: All other actions and documents determined by the Proponents to be necessary to implement this Plan shall have been effected or executed.

**2. Waiver of Conditions.**

This Plan specifically authorizes the Proponents to waive the requirement that the Plan Confirmation Order be a Final Order prior to this Plan becoming effective, but the Proponents may not waive the requirement of an entered Bankruptcy Court order confirming this Plan that has not been stayed or reversed. Any waiver of a condition precedent to the Effective Date may be effected at any time, in writing, without notice or leave or order of the Bankruptcy Court.

**C. Retention of Jurisdiction.**

Except as provided in this Plan, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code or arising in or related to the Chapter 11 Cases and this Plan. The Bankruptcy Court shall also have exclusive jurisdiction:

(a) to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any of the Debtors was or is a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(b) to enter such orders as may be necessary or appropriate to implement, interpret or enforce the provisions of this Plan and any contracts, instruments, transactions and other agreements or documents created in connection with this Plan;

(c) to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Reorganized Debtor after the Effective Date (to the extent such venue is selected by the Reorganized Debtor);

(d) to ensure that distributions to Holders of Allowed Claims are accomplished as provided in this Plan;

(e) to hear and determine any timely objections to Priority Claims, Priority Tax Claims, Administrative Claims or to other proofs of Claims and Interests filed both before and after the Effective Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, reduce, modify, determine, liquidate, classify, estimate, subordinate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

(f) to enter and implement such orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

(g) to issue orders in aid of execution of this Plan;

(h) to consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Plan Confirmation Order;

(i) to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals prior to the Effective Date;

(j)    to hear and determine disputes arising in connection with or relating to this Plan, the interpretation, implementation or enforcement of this Plan, or the extent of any Entity's obligations incurred in connection with or released under this Plan;

(k)    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation or enforcement of this Plan;

(l)    to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Plan Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Disclosure Statement;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146;

(n)    to hear any other matter or for any purpose specified in the Plan Confirmation Order that is not inconsistent with the Bankruptcy Code, including the allowance or disallowance and classification of late-filed proofs of claim in accordance with Bankruptcy Rule 9006(b);

(o)    to enter a Final Decree closing the Chapter 11 Cases;

(p)    to hear and determine any matters that may arise in connection with the sales of the Debtors' Assets or any order of the Bankruptcy Court with respect thereto;

(q)    to hear and determine any actions or controversies by or against the Reorganized Debtor or the Plan Oversight Committee; and

(r)    to hear and determine any matter relating to or arising out of any action or act taken or omission in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including, without limitation, any act or omission taken or to be taken in connection with the Chapter 11 Cases commenced against any party in the Chapter 11 Cases, including, without limitation, the Debtors, the Creditors' Committee, the Reorganized Debtor, the Plan Oversight Committee, and their respective current and former directors and officers, members, agents, advisors, attorneys, advisors and other Professionals.

**D.    Modification of this Plan.**

The Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan at any time.

**E.    Revocation or Withdrawal.**

This Plan may be revoked or withdrawn by the Proponents prior to the Confirmation Date, in which case this Plan shall be deemed null and void.  In such event, nothing contained herein or in this Plan shall be deemed to constitute a waiver or release of any claims by the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

**F.    Terms of Existing Injunctions or Stays.**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and thereafter shall be deemed annulled without any action being taken by any party.

**G.    Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities.**

On the Effective Date, except to the extent provided otherwise in this Plan, all notes, instruments, certificates and other documents evidencing Claims against or Interests in any of the Debtors shall be canceled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order or rule.  On the Effective Date, any Indenture relating to any of the foregoing, including the Junior Note Indenture and the Senior Note Indenture, shall be deemed canceled as permitted by Bankruptcy Code Section 1123(a)(5)(F); provided, however, that the Indentures shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee and/or the Junior Note Indenture Trustee to make any distributions to be made on account of the Indentures.

**H.    Section 1146 Exception.**

Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer, or exchange of any security under this Plan, or the making or delivery of an instrument of transfer under this Plan, may not be taxed under any law imposing a stamp tax or similar tax.

**I.    Severability.**

The provisions of this Plan shall not be severable unless such severance is agreed to by the Proponents and such severance would constitute a permissible modification of this Plan pursuant to Bankruptcy Code Section 1127.

**J.    Governing Law.**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of California.

**K.    Notices.**

All notices, requests and demands to or upon the Debtors or the Creditors' Committee to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided in this Plan, shall be deemed to have been duly given or made when actually delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following, addressed as follows or to such other addresses as may be filed with the Bankruptcy Court and served on the following parties.

To:

**On behalf of the Debtors:**

Matthew S. Walker, Esq.
Pillsbury Winthrop Shaw Pittman LLP
12255 El Camino Real, Suite 300
San Diego, CA  92130
Telephone: (619) 234-5000
Facsimile:  (858) 509-4010

**On behalf of the Creditors' Committee:**

Ron Bender, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Blvd, Suite 1700
Los Angeles, CA  90067
Tel: (310) 229-1234
Fax: (310) 229-1244

-30-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

**L.    Closing of Cases.**

The Reorganized Debtor shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

**M.    Continuing Viability of Other Orders/Agreements.**

Except to the extent expressly modified by this Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the Debtors and their creditors shall continue in full force and effect.

### ARTICLE IX
### MISCELLANEOUS PROVISIONS

**A.    Waiver of Final Order.**

Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the Debtors with the written consent of the Creditors' Committee or, after the Effective Date, the Reorganized Debtor with the consent of the Plan Oversight Committee. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

**B.    Business Days.**

If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**C.    No Attorneys' Fees.**

No attorneys' fees will be paid by the Debtors with respect to any Claim or Interest except as expressly specified herein or Allowed by a Final Order of the Bankruptcy Court.

**D.    No Injunctive Relief.**

No Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**E.    Operations Between the Confirmation Date and the Effective Date.**

The Debtors shall continue to operate as debtors-in-possession, subject to the supervision of the Bankruptcy Court, during the period from the Confirmation Date through and until the Effective Date.

**F.    Approval of Agreements.**

The solicitation of votes on this Plan shall be deemed a solicitation of the Holders of Allowed Claims and Interests for the approval of all other agreements and transactions contemplated by this Plan. Entry of the Plan Confirmation Order shall constitute approval of such agreement and transactions and the Plan Confirmation Order shall so provide.

**G.    No Admissions or Waivers.**

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

-31-    LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

**H.    Section Headings.**

The section headings contained in this Plan are for reference purposes only and shall not affect the meaning or interpretation of this Plan.

**I.    Continuing Viability of Other Orders/Agreements.**

Except to the extent expressly modified by this Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between Creditors or between the Debtors and their Creditors shall continue in full force and effect.

## ARTICLE X
## CONCLUSION AND RECOMMENDATION

The Debtors and the Creditors' Committee believe that this Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 3, 4, 5, and 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth in the Disclosure Statement and on the ballot so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [_____,] 2007.

Dated: December 15, 2006

Respectfully Submitted:

By:    /s/ Marcus Smith
       Marcus Smith
       Debtors' Responsible Individual

By:    /s/ William B. Freeman
       Pillsbury Winthrop Shaw Pittman LLP
       Attorneys for Debtors and Debtors-In-
       Possession and Co-Plan Proponent

By:    /s/ Ron Bender
       Levene, Neale, Bender, Rankin & Brill L.L.P.
       Attorneys for the Official Committee of
       Creditors Holding Unsecured Claims and
       Co-Plan Proponent

LIQUIDATING PLAN OF REORGANIZATION
PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE

## SCHEDULE 1

## CLAIMS INCLUDED IN CLASS 7 – SUBORDINATED CLAIMS

**Claims Subordinated Under Bankruptcy Code Section 510(b)**

E-Services Private Sub LLC;

Grey Ventures, Inc.,

William Morris Agency, Inc.

The Interpublic Group of Companies, Inc.

S3, Inc. Litigation Plaintiffs

**Chart 1**



SONICblue Incorporated
a Delaware corporation

**SONICblue International Limited**
100%
a Bermuda corporation
*confirmed*

2% → **S3 Asia Pacific Limited**
98%
a Hong Kong corporation
*confirmed*

**Diamond Multimedia Systems, Inc.**
100%
a Delaware corporation
*confirmed*
see Chart 4

**frontpath, Inc.**
100%
a Delaware corporation
*confirmed*

**ReplayTV, Inc.**
100%
a Delaware corporation
*confirmed*

**S3 Ventures, Ltd.**
100%
a Cayman Islands corporation
*confirmed*
see Chart 3

**Sensory Science Corporation**
a Delaware corporation
*confirmed*
see Chart 5

**Sonica3, Inc.**
100%
a Delaware corporation
*confirmed*
see Chart 2

**S3 Japan, K.K.**
100%
a Japan corporation
*confirmed*

**SONICblue Singapore Pte Ltd.**
100%
a Singapore corporation
*confirmed*

**S3 International**
(Dormant)
100%
a Cayman Islands corporation
*confirmed*

**Sonic Blue Holdings (PTY), Ltd.**
100%
a South African corporation
(not clear if name change from Calla-Lily Investments (PTY) Limited was ever effected)
*confirmed*

**Sonicblue Holdings LLC**
a Delaware limited liability company
*confirmed*
See Chart 6

* All shaded entities are in bankruptcy. All other entities are not.

60313603v1



**Chart 2**



**Sonica3, Inc.**

a Delaware corporation

50%

**S3 Graphics Co., Ltd.**

a Cayman Islands corporation

a 50% joint venture
(0.1% economic interest)

(the other 50% is owned by
VIA Technologies, Inc. (48%)
with a 99.4% economic
interest and Wallvision (2%)
with a 0.5% economic interest)

100%

**S3 Graphics, Inc.**

a Delaware corporation

*confirmed*

60313603v1

Chart 3



**S3 Ventures, Ltd.**

a Cayman Islands
corporation

50.1%

**S3 – VIA, Inc.**

a 50.1% joint venture*

(other 49.9% owned by
VIA Technologies, Inc.)

*SBLU is in process of
terminating the JV

*confirmed*

60013609v1

**Chart 4**



603136l03v1

**Chart 5**



**Sensory Science Corporation**

a Delaware corporation

100%

99%

**Go-Video Productions, Inc.**

a Delaware corporation

*confirmed*

1%

**California Audio Labs, LLC**

a California limited liability company

*confirmed*

60313603v1

**Chart 6**

---

**Sonic Blue Holdings (PTY) Ltd.**
a South Africa corporation

--------------------------------

**Sonicblue Holdings LLC**

a Delaware limited liability company

(South Africa treaty provides for one corp. to be
both foreign and domestic)

100%

**Sonic Holdings LLC**

a Delaware limited liability company

*confirmed*

60313603v1

94

**Other Entities:**

**Diamond Multimedia Systems, Inc., a California corporation, was merged up into Diamond Multimedia Systems, Inc., a Delaware corporation.**

**RioPort, Inc. (formerly RioPort.com, Inc.), a Delaware corporation, was previously a wholly owned subsidiary of Diamond Multimedia Systems, Inc. Over time Diamond decreased its stock ownership in RioPort, Inc. and in October 2002, eCast, Inc. acquired RioPort, Inc. SONICblue, through its ownership of Diamond, now holds approximately 2% of eCast's outstanding stock.**

**Empeg Limited was merged into Diamond Multimedia Services Co. Ltd.**

**DigitalCast, Inc. name was changed to RioPort, Inc., a Korean corporation.**

**S3 International Limited, a Bermuda corporation, changed its name to SONICblue International Limited.**

**S3 Singapore Pte Ltd., a Singapore corporation, changed its name to SONICblue Singapore Pte Ltd.**

**Supra Corporation is in the process of changing its name to SONICblue GmbH and SPEA Software AG will become a wholly owned subsidiary of SONICblue GmbH.**

**S3 Europe Ltd. was dissolved.**

60313603v1

95

**[TO BE FILED AND SERVED PRIOR TO THE HEARING ON THE
DISCLOSURE STATEMENT]**

**EXHIBIT "C"**

EXHIBIT C

EXHIBIT 55

1 | ROBERT A. FRANKLIN (091653)
STEPHANIE KAIN FERRILL (207003)
2 | MURRAY & MURRAY
A Professional Corporation
3 | 19400 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014-2548
4 | (650) 852-9000; (408) 907-9200
(650) 852-9200 facsimile
5 | rfranklin@murraylaw.com
sferrill@murraylaw.com
6 |
Attorneys for Riverside Contracting, LLC and
7 | Riverside Claims, LLC

8

9 | UNITED STATES BANKRUPTCY COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN JOSE DIVISION

12 | In Re

13 | SONICBLUE INCORPORATED, A DELAWARE
CORPORATION, DIAMOND MULTIMEDIA        Case No. 03-51775 MM
14 | SYSTEMS, INC., A DELAWARE              Chapter 11
CORPORATION, REPLAYTV, INC., A
15 | DELAWARE CORPORATION, AND SENSORY      Date:    January 18, 2007
SCIENCE CORPORATION, A DELAWARE        Time:    11:00 a.m.
16 | CORPORATION,                          Place:   280 So. First St., Rm. 3070
San Jose, CA
17 |                 DEBTORS,              Judge:   Hon. Marilyn Morgan

18

19

20 | **OBJECTION TO JOINT DISCLOSURE STATEMENT**

21 |      Creditors Riverside Contracting LLC and Riverside Claims LLC (collectively

22 | "Riverside") presents its objections to the Joint Disclosure Statement filed by the Debtors and the

23 | Official Committee of Unsecured Creditors (collectively the "Proponents") as follows:

24 |      1.    Timing of Distributions.    At page 1, Section A and again at page 42, the

25 | Proponents state that Creditors[1] entitled to a distribution will not receive a distribution until

26 | approximately 2 to 3 months after the Effective Date. The Proponents have obtained 13

27 | _____

28 | [1] Terms not otherwise defined in this Objection have the meaning ascribed to them in the Joint
Disclosure Statement.

1   extensions of time to preserve exclusivity contending, among other things, that they needed to

2   resolve ongoing litigation and claims objections over the past 3 years. The Disclosure Statement

3   provides no reason why a distribution cannot be made earlier than 3 months after the Effective

4   Date. Further, the Proponents appear to anticipate one interim distribution and one final

5   distribution at the close of the case but do not explain why more distributions cannot be made

6   based on the then available and non-reserved cash remaining.

7       2.   <u>Taxes Paid on Behalf of the Senior Noteholders</u>. In footnote 4 on page 16, the

8   Proponents disclose that the Debtors paid certain taxes, including taxes on the portion of the stock

9   dividend securing the Senior Noteholders' Claims. The Proponents also state that the Debtors

10  have "reserved their right" to recover the taxes paid on the Senior Noteholders' portion of the

11  stock dividend. However, there is no disclosure as to the amount of taxes that were paid by the

12  Debtors nor is there any explanation as to why the Debtors have not begun proceedings earlier to

13  recover these taxes. Indeed, the Disclosure Statement does not equivocally indicate that the

14  Debtors will even institute such proceedings.

15      3.   <u>Intercreditor Issues</u>. At pages 21 to 23 of the Disclosure Statement, the Proponents

16  discuss claim issues involving the Junior Noteholders and the Senior Noteholders. The

17  Proponents note that as a result of a conflict that has been asserted by the Senior Noteholders with

18  respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing the

19  validity of both senior notes claims and the junior notes claims. The Proponents should

20  disclosure the nature of the conflict asserted by the Senior Noteholders with respect to counsel to

21  the Debtors.

22      Additionally, Riverside is informed and believes that the three holders of the Senior Notes

23  are all members of the Creditors Committee[2]. The Proponents should disclose whether they

24  believe that a conflict exists for the Creditors Committee to be now in charge of analyzing the

25  Senior Noteholder Claims where the Creditors Committee is made up, in substantial part, by the

26  holders of those claims. The Disclosure Statement states that a substantial portion of the Senior

27  

28  [2] Given the responsibility of the Plan Oversight Committee, its members should be specifically
    identified in the Disclosure Statement.

1    Noteholder Claims constitutes unamortized original issue discount, which may constitute

2    disallowable unmatured interest.   Given that a reduction in the allowed amount of the Senior

3    Noteholder Claims will redound to the benefit of the Class 4 creditors, the potential for conflict is

4    apparent.   Further, the Senior Noteholders, all of whom are members of the Creditors Committee,

5    have absolutely no incentive to reduce the allowed amount of the Junior Noteholder Claims.

6    Who is providing independent advice to the Class 4 creditors in this regard?

7          4.    Senior Noteholder Claims:    Given  the  estimate  set  forth  in  the  Disclosure

8    Statement that the Senior Noteholders may receive a total distribution from the Reorganized

9    Debtor which exceeds the amount of their allowed claims, it is incumbent on the Proponents to

10    disclose how it is possible to receive more than the amount of an allowed claim and not violate

11    the Bankruptcy Code.   Further, the Eighth Interim Application of Pillsbury Winthrop Shaw

12    Pittman filed on October 18, 2006 (Docket No. 1966) states that a significant amount of time was

13    spent analyzing usury and potential fraudulent conveyance issues with regard to the Senior Notes.

14    However, there is no discussion of those potential theories in the Disclosure Statement.   In fact,

15    the Fee Application states that the matters have been turned over to the Creditors Committee for

16    prosecution, further highlighting the conflict issue (see Eighth Interim Application at pg. 19).

17          5.    Subordination and Seniority of Claims.    On page 28, the Proponents claim that

18    they are not aware of any Claims which are entitled to priority over the Senior Noteholder

19    Claims, but provide that any Claim holder who contends that it is entitled to priority over the

20    Senior Noteholders' Claims must file an objection to this provision of the Plan not later than

21    fifteen days prior to the Plan confirmation hearing and in the event of any such successful

22    objection requiring a modification to the Plan, any such modification will be deemed to be an

23    immaterial modification.   Riverside has reviewed the Form 8-K filed with the Securities and

24    Exchange Commission on April 22, 2002 regarding the issuance of the Senior Notes.   It appears

25    that in section 4.1 of the Indenture, the payment to the Senior Noteholders is subordinate to the

26    "Senior Indebtedness".   Included within the definition of the "Senior Indebtedness" is "all

27    indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal

28    amount not to exceed $15,000,000." (Excerpts from the Indenture attached to the Form 8-K are

1  attached hereto as Exhibit "A". The Proponents should disclose why this provision does not give

2  rise to a claim with priority over the Senior Noteholders or why they were unaware of it. The

3  Proponents should also disclose the purpose of this provision of the Plan and why it is necessary

4  to determine any such modification is immaterial in advance of knowing the substance or the

5  necessity of the modification.

6      6.    Projected Professional Fees.  On page 35 through 36, the Proponents discuss the

7  total amount of fees and expenses incurred and paid through September 30, 2006, and the

8  projected amount of additional fees and expenses to be incurred through the Effective Date.

9  While the Disclosure Statement discloses the amounts of fees incurred which have been deferred

10  for decision, denied without prejudice or not yet allowed or disallowed, such amounts are not

11  disclosed for the Levine, Neal, Bender, Rankin and Brill LLP ("LNBR&B") firm.  Further,

12  LNBR&B's fees through the Effective Date are projected to be almost 40% of those earned

13  during the first 3 and ¾ years of this case.  The Disclosure Statement should explain why these

14  fees appear to increase so dramatically.

15     Similarly, while Grobstein, Horwarth & Company have been paid the total of $187,998.00

16  through September 30, 2006, they are projected to incur an additional $250,000.00 through the

17  Effective Date.  The Proponents should explain why those fees are projected to be over 130% of

18  those earned to date.

19     7.    Preference Action Fees.  At pages 36 to 37, the Proponents discuss amounts of

20  professional fees earned from the prosecution of the preference actions.  They estimate that the

21  current fees earned will be less than $3 million while recoveries are estimated at more than $6

22  million.  The Disclosure Statement should set forth the contingent fee arrangement approved by

23  the Court and discuss why fees appear to be 50% of the recoveries in the case.

24     Riverside reserves the right to supplement this objection prior to the hearing on the

25  Disclosure Statement.

26  //

27  //

28  //

RAF:pt
K:\Riverside\PI\DS ObjV6.DOC                    -4-

1        WHEREFORE, Riverside prays that the Court condition approval of the Joint Disclosure

2    Statement on the additional disclosures proposed herein and grant such other and further relief as

3    may be just and proper.

4    January 11, 2007                    MURRAY & MURRAY,
                                   A Professional Corporation

                           By:   *Robert A. Franklin*
                             Robert A. Franklin
                             Attorneys for Riverside Contracting, LLC and
                             Riverside Claims, LLC

1  ROBERT A. FRANKLIN (091653)
   STEPHANIE KAIN FERRILL (207003)
2  MURRAY & MURRAY
   A Professional Corporation
3  19400 Stevens Creek Boulevard, Suite 200
   Cupertino, CA 95014-2548
4  (650) 852-9000; (408) 907-9200
   (650) 852-9200 facsimile
5  rfranklin@murraylaw.com
   sferrill@murraylaw.com
6
   Attorneys for Riverside Contracting, LLC and
7  Riverside Claims, LLC

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  In Re

13  SONICBLUE INCORPORATED, A DELAWARE          Case No. 03-51775 MM
    CORPORATION, DIAMOND MULTIMEDIA            Chapter 11
14  SYSTEMS, INC., A DELAWARE
    CORPORATION, REPLAYTV, INC., A            Date:    January 18, 2007
15  DELAWARE CORPORATION, AND SENSORY         Time:    11:00 a.m.
    SCIENCE CORPORATION, A DELAWARE           Place:   280 So. First St., Rm. 3070
16  CORPORATION,                                       San Jose, CA
                                              Judge:   Hon. Marilyn Morgan
17            DEBTORS,

18

19

20                         EXHIBIT "A" TO

21           OBJECTION TO JOINT DISCLOSURE STATEMENT

22

23

24

25

26

27

28

**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report: April 22, 2002**
(Date of earliest event reported)

## SONICBLUE INCORPORATED

(Exact name of registrant as specified in its charter)

| **Delaware** | **0-21126** | **77-0204341** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2841 Mission College Boulevard, Santa Clara, California 95054**
(Address of principal executive offices)      (Zip Code)

Registrant's telephone number, including area code: **(408) 588-8000**

Powered By EDGAR ONLINE      © 2003.  EDGAR Online, Inc.

<u>TABLE OF CONTENTS</u>

<u>Item 5. Other Events.</u>
<u>Item 7. Financial Statements and Exhibits.</u>
<u>SIGNATURE</u>
<u>INDEX TO EXHIBITS</u>
<u>EXHIBIT 4.1</u>
<u>EXHIBIT 4.2</u>
<u>EXHIBIT 4.3</u>
<u>EXHIBIT 4.4</u>
<u>EXHIBIT 99.1</u>
<u>EXHIBIT 99.2</u>
<u>EXHIBIT 99.3</u>
<u>EXHIBIT 99.4</u>

**Table of Contents**

Item 5. Other Events.

On April 21, 2002, SONICblue Incorporated ("Registrant"), a Delaware corporation, entered into an agreement to sell $75 million aggregate principal amount of its 7 3/4% Secured Senior Subordinated Convertible Debentures due 2005 ("Debentures") and to issue 7,500,000 warrants ("Warrants") in a private placement to three institutional investors. The Securities Purchase Agreement and Indenture, along with the form of the Debenture and Warrant are attached hereto as Exhibits 99.1, 4.1, 4.2 and 4.3, respectively. The maturity date of the Debentures is September 1, 2005. The sale of the Debentures and Warrants resulted in gross proceeds to the Registrant, prior to the exercise of the Warrants, of approximately $62.25 million. The sale of the Debentures closed on April 22, 2002. The Debentures are convertible into the Registrant's common stock at a conversion price of $19.22 per share, subject to standard anti-dilution adjustments. The Registrant may, at its option, pay up to 50% of the interest payments on the Debentures in shares of the Registrant's common stock ("Interest Shares"). The Warrants are fully vested and exercisable at any time until April 22, 2007 at an exercise price of $3.39 per share, subject to standard anti-dilution adjustments.

Pursuant to the terms of the Registration Rights Agreement attached hereto as Exhibit 4.4, the Company is obligated to file with the Securities and Exchange Commission a registration statement on Form S-3 under the Securities Act of 1933, as amended, to register for resale the shares of common stock of the Company issuable upon conversion of the Debentures, exercise of the Warrants and issuance of the Interest Shares.

The obligations of the Company will be secured on July 17, 2002 by a pledge of 21,426,586 shares of United Microelectronics Corporation ("UMC Shares"). The Pledge and Security Agreement is attached hereto as Exhibit 99.2. The institutional investors will also have an option to purchase the UMC Shares from and after July 17, 2002. The Option Agreement is attached hereto as Exhibit 99.3.

Item 7. Financial Statements and Exhibits.

(c) Exhibits.

| | |
|---|---|
| 4.1 | Indenture, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 4.2 | Form of Debenture. |
| 4.3 | Form of Warrant. |
| 4.4 | Registration Rights Agreement, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.1 | Securities Purchase Agreement, dated as of April 21, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.2 | Pledge and Security Agreement, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.3 | Option Agreement, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.4 | Press Release dated April 23, 2002. |

2

Powered By EDGAR Online    © 2003. EDGAR Online, Inc.

Table of Contents

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: April 22, 2002.

SONICBLUE INCORPORATED
By          /s/ Marcus Smith
            Marcus Smith
            Secretary

Powered By EDGAR    © 2003.  EDGAR Online, Inc.

Table of Contents

## INDEX TO EXHIBITS

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 4.2 | Form of Debenture. |
| 4.3 | Form of Warrant. |
| 4.4 | Registration Rights Agreement, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.1 | Securities Purchase Agreement, dated as of April 21, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.2 | Pledge and Security Agreement, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.3 | Option Agreement, dated as of April 22, 2002, among the Registrant, Portside Growth & Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. |
| 99.4 | Press Release dated April 23, 2002. |

EXHIBIT 4A

EXECUTION VERSION

SONICBLUE INCORPORATED

AND

THE INITIAL PURCHASERS OF 7-3/4% SECURED SENIOR SUBORDINATED
CONVERTIBLE DEBENTURES DUE 2005

INDENTURE

DATED AS OF APRIL 22, 2002

7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2005

THIS INDENTURE, dated as of April 22, 2002, is entered into by and between SONICBLUE INCORPORATED, a Delaware corporation (the "Company"), and the Initial Purchasers of Debentures identified on the signature pages hereto.

## WITNESSETH:

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issue of its 7-3/4% Secured Senior Subordinated Debentures due 2005 (the "Debentures"), in an aggregate principal amount of $75,000,000 and, to provide the terms and conditions upon which the Debentures are to be issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, all acts and things necessary to make the Debentures, when executed and delivered by the Company to the Debenture holders, the valid, binding and legal obligations of the Company, and to constitute these presents a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issue hereunder of the Debentures have in all respects been duly authorized.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Debentures are, and are to be, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Debentures by the holders thereof, the Company covenants and agrees with the Initial Purchasers and all holders of Debentures, as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.1 Definitions. The terms defined in this Section 1.1 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.1. All other terms used in this Indenture, which are defined in the Securities Act (except as herein otherwise expressly provided or unless the context otherwise requires) shall have the meanings assigned to such terms in said Securities Act as in force at the date of execution of this Indenture. The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other Subdivision. The terms defined in this Article include the plural as well as the singular.

"1996 Indenture" means the Indenture dated as of September 12, 1996 between the Company and State Street Bank and Trust Company of California, N.A., as trustee, pursuant to which the Subordinated Notes were issued.

"Affiliate" of any specified person shall mean any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control," when used with respect to any specified person means the power to direct or cause the direction of the management and policies

of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"All Cash Interest Option" has the meaning specified in Section 2.3(b).

"beneficial owner" shall be determined in accordance with Rule 13d-3 and 13d-5, as in effect on the date of the original execution of this Indenture, promulgated by the Commission pursuant to the Exchange Act.

"Board of Directors" shall mean the Board of Directors of the Company or a committee of such Board duly authorized to act for it hereunder. "Board Resolution" shall mean a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to each Debenture holder.

"Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which the banking institutions in The City of New York are authorized or obligated by law or executive order to close or be closed.

"Cap Allocation Amount" shall have the meaning specified in Section 15.8.

"Change of Control" means an event or series of events as a result of which (i) any person or group is or becomes the beneficial owner of shares representing more than 50% of the combined voting power of the then outstanding securities entitled to vote generally in elections of directors of the Company (the "Voting Stock"), (ii) the Company consolidates with or merges into any other corporation, or conveys, transfers or leases all or substantially all of its assets to any person, or any other corporation merges into the Company, and, in the case of any such transaction, the outstanding common stock of the Company is changed or exchanged into or for other assets or securities as a result, unless the stockholders of the Company immediately before such transaction own, directly or indirectly immediately following such transaction, at least a majority of the combined voting power of the outstanding voting securities of the corporation resulting from such transaction in substantially the same proportion as their ownership of the Voting Stock immediately before such transaction, or (iii) any time Continuing Directors do not

© 2003. EDGAR Online, Inc.

"Partial Restructuring" shall have the meaning specified in
Section 8.2.

"Partial Restructuring Notice" shall have the meaning specified in Section 8.2.

"Partial Restructuring Option" shall have the meaning specified in Section 8.2.

"Partial Restructuring Option Exercise Notice" shall have the meaning specified in Section 8.2.

"Pledge Agreement" has the meaning specified in Section 4.6.

"Person" or "person" shall, except as to references in Article XIV, mean a corporation, an association, a partnership, a limited liability company, an individual, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

5

"person" or "group", for purposes of Article XIV only, shall include any syndicate or group which would be deemed to be a "person" under Section 13(d)(3) and 14(d) of the Exchange Act as in effect on the date of the original execution of this Indenture;

"Predecessor Debenture" of any particular Debenture shall mean every previous Debenture evidencing all or a portion of the same debt as that evidenced by such particular Debenture; and, for the purposes of this definition, any Debenture delivered under Section 2.5(b) in lieu of a lost, destroyed or stolen Debenture shall be deemed to evidence the same debt as the lost, destroyed or stolen Debenture that it replaces.

"Purchase Agreement" shall mean the Securities Purchase Agreement dated as of April 19, 2002 by and among the Company and the Initial Purchasers.

"Purchased Shares" shall have the meaning specified in Section 13.5(f).

"Record Date" shall have the meaning specified in Section 13.5(g)(4).

"Reference Period" shall have the meaning specified in Section 13.5(d).

"Registration Rights Agreement" shall mean that certain registration rights agreement between the Company and the Initial Purchasers relating to the filing of a registration statement covering the resale of the
(i) shares of Common Stock issuable upon conversion of the Debentures; (ii) Interest Shares and (iii) shares of Common Stock issuable upon exercise of the Warrants to purchase Common Stock issued to the Initial Purchasers pursuant to the Purchase Agreement.

"Registrable Securities" has the meaning specified in the Registration Rights Agreement.

"Registration Statement" has the meaning specified in the Registration Rights Agreement.

"Repurchase Price" has the meaning specified in Section 14.1.

"Securities" shall have the meaning specified in Section 13.5(d).

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Default Notice" has the meaning specified in Section 4.2.

"Senior Indebtedness" shall mean the principal of, premium, if any, interest on (including any interest accruing after the filing of a petition by or against the Company under any bankruptcy law, whether or not allowed as a claim after such filing in any proceeding under such bankruptcy law) and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture or thereafter incurred or created:

6

Each such notice of redemption shall specify the aggregate principal amount of Debentures to be redeemed, the date fixed for redemption, the redemption price at which Debentures are to be redeemed, the place or places of payment, that payment will be made upon presentation and surrender of such Debentures, that interest accrued to, but excluding, the date fixed for redemption will be paid as specified in said notice, and that on and after said date interest thereon or on the portion thereof to be redeemed will cease to accrue unless the Company fails to make such redemption, in which case interest shall continue to accrue as provided in Section 2.3(a) and principal and interest shall continue to be payable in accordance with the terms hereof. Such notice shall also state the current Conversion Price and the date on which the right to convert such Debentures or portions thereof into Common Stock will expire. If fewer than all the Debentures are to be redeemed, the notice of redemption shall identify the Debentures to be redeemed. In case any Debenture is to be redeemed in part only, the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that on and after the date fixed for redemption, upon surrender of such Debenture, a new Debenture or Debentures in principal amount equal to the unredeemed portion thereof will be issued.

On or prior to the redemption date specified in the notice of redemption given as provided in this Section, the Company will pay in immediately available funds to an account designated on the Schedule of Buyers attached hereto (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment) an amount of money sufficient to redeem on the redemption date all the Debentures (or portions thereof) so called for redemption (other than those theretofore surrendered for conversion into Common Stock) at the redemption price provided above, together with accrued interest to, but excluding, the date fixed for redemption; provided that if such payment is made on the redemption date it must be received by the holder by 10:00 a.m. New York City time, on such date.

Notwithstanding anything herein to the contrary, any redemption effected by the Company pursuant to this Section 3.2 shall be made, on a pro rata basis, among all holders of Debentures.

If any Debenture selected for partial redemption is converted in part after such selection, the converted portion of such Debenture shall be deemed (so far as may be) to be the portion to be selected for redemption. The Debentures (or portions thereof) so selected shall be deemed duly selected for redemption for all purposes hereof, notwithstanding that any such Debenture is converted as a whole or in part before the delivery of the notice of redemption. If any Debenture is to be redeemed in part only, a new Debenture or Debentures in principal amount equal to the unredeemed principal portion thereof shall be issued.

Upon any redemption of less than all Debentures, the Company may (but need not) treat as outstanding any Debentures surrendered for conversion during the period of fifteen (15) days next preceding the delivery of a notice of redemption and may (but need not) treat as not outstanding any Debenture delivered during such period in exchange for the unconverted portion of any Debenture converted in part during such period.

12

SECTION 3.3 Payment of Debentures Called for Redemption. If notice of redemption has been given as above provided, the Debentures or portion of Debentures with respect to which such notice has been given shall, unless converted into Common Stock pursuant to the terms hereof, become due and payable on the date and at the place or places stated in such notice at the applicable redemption price, together with interest accrued to, but excluding, the date fixed for redemption, and on and after said date interest on the Debentures or portion of Debentures so called for redemption shall cease to accrue and such Debentures shall cease after the close of business on the Business Day next preceding the date fixed for redemption to be convertible into Common Stock and to be entitled to any benefit or security under this Indenture. On presentation and surrender of such Debentures at a place of payment in said notice specified, the said Debentures or the specified portions thereof to be redeemed shall be paid and redeemed by the Company at the applicable redemption price, together with interest accrued thereon to, but excluding, the date fixed for redemption; provided that, if the applicable redemption date is an interest payment date, the semi-annual payment of interest becoming due on such date shall be payable to the holders of such Debentures registered as such on the relevant record date subject to the terms and provisions of Section 2.3 hereof.

Upon presentation of any Debenture redeemed in part only, the Company shall execute and deliver to the holder thereof, at the expense of the Company, a new Debenture or Debentures, of authorized denominations, in principal amount equal to the unredeemed portion of the Debentures so presented.

**ARTICLE IV**

**SUBORDINATION OF DEBENTURES**

SECTION 4.1 Agreement of Subordination. The Company covenants and agrees, and each holder of Debentures issued hereunder by its acceptance thereof likewise covenants and agrees, that all Debentures shall be issued subject to the provisions of this Article IV; and each person holding any Debenture, whether upon original issue or upon transfer, assignment or exchange thereof, accepts and agrees to be bound by such provisions.

The payment of the principal of, premium, if any, and interest on all Debentures (including, but not limited to, the redemption price or repurchase price with respect to the Debentures to be redeemed or repurchased, as provided in this Indenture) issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right of payment to the prior payment in full of all Senior

Powered By EDGAR Online    © 2003.  EDGAR Online, Inc.

Indebtedness, whether outstanding at the date of this Indenture or hereafter incurred.

The Company and the holders of Debentures agree that the Debentures constitute "Senior Indebtedness" under the 1996 Indenture and that the holders of Debentures are entitled to the rights and benefits of a holder of "Senior Indebtedness" under the 1996 Indenture.

No provision of this Article IV shall prevent the occurrence of any default or Event of Default hereunder.

13

SECTION 4.2 Payments to Debenture Holders. In the event and during the continuation of any default in the payment of principal, premium, interest or any other payment due on any Senior Indebtedness (or, in the case of Senior Indebtedness for which there is a period of grace, in the event of such a default that continues beyond the period of grace, if any, specified in the instrument or lease evidencing such Senior Indebtedness), then, unless and until such default shall have been cured or waived or shall have ceased to exist, no payment shall be made by the Company with respect to the principal of, or premium, if any, or interest on, the Debentures (including, but not limited to, the redemption price or repurchase price with respect to the Debentures to be redeemed or repurchased, as provided in this Indenture).

In the event (i) any event of default with respect to any Senior Indebtedness shall have occurred and be continuing which permits the holders of such Senior Indebtedness (or a trustee or other representative on behalf of the holders thereof) to declare such Senior Indebtedness due and payable prior to the date on which it would otherwise have become due and payable, upon written notice thereof to the Company and each holder of Debentures by any holders of Senior Indebtedness to which such event of default relates (or a trustee or other representative on behalf of the holders thereof) (a "Senior Default Notice"), unless and until such event of default shall have been cured or waived or shall have ceased to exist and such acceleration shall have been rescinded or annulled, or (ii) any judicial proceeding shall be pending with respect to any such event of default, then no payment shall be made by the Company, directly or indirectly, with respect to principal of, premium, if any, or interest on the Debentures, provided, however, that clause (i) of this paragraph shall not prevent the making of any such payment for more than 179 days after a Senior Default Notice shall have been received by each holder of Debentures unless the Senior Indebtedness in respect of which such event of default exists has been declared due and payable in its entirety, in which case no such payment may be made until such acceleration has been rescinded or annulled or such Senior Indebtedness has been paid in full. Notwithstanding the foregoing, no event of default which existed or was continuing on the date of any Senior Default Notice shall be made the basis for the giving of a second Senior Default Notice; and, provided, further, that only one such Senior Default Notice may be given during any period of 360 consecutive days, regardless of the number of defaults with respect to Senior Indebtedness during such 360-day period. Notwithstanding the foregoing, the Company may make and the holders of Debentures may receive and apply any payment in respect of the Debentures (for principal, and premium, if any, or interest) if such payment was made prior to the occurrence of any of the contingencies specified in clauses (i) and (ii) above. In addition, nothing in this paragraph shall prevent the Company from making or the holders of Debentures from receiving or applying any payment in connection with the redemption of the Debentures if the first publication of notice of redemption (whether by mail or otherwise in accordance with this Indenture) has been made prior to the occurrence of any of the contingencies specified in clauses (i) and (ii) above.

Upon any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings (other than as permitted in Article XI), all amounts due or to become due upon all Senior Indebtedness shall first be paid in full, or payment thereof provided for in money in accordance with its terms, before any payment is made on account of the principal (and premium, if any) or interest on the

14

Debentures; and upon any such dissolution or winding-up or liquidation or reorganization or bankruptcy, insolvency, receivership or other proceedings, any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the holders of the Debentures under this Indenture would be entitled, except for the provision of this Article IV, shall (except as aforesaid) be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, or by the holders of the Debentures under this Indenture if received by them, directly to the holders of Senior Indebtedness (pro rata to such holders on the basis of the respective amounts of Senior Indebtedness held by such holders, or as otherwise required by law or a court order) or their respective representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, to the extent necessary to pay all Senior Indebtedness in full after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness, before any payment or distribution is made to the holders of the Debentures under this Indenture.

In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities (including, without limitation, by way of setoff or otherwise), prohibited by the foregoing, shall be received by any holders of the Debentures before all Senior Indebtedness is paid in full, or provision is made for such payment in accordance with its terms, such payment or distribution shall be held by the recipient or recipients in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness or their respective representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, as calculated by the Company, for application to the payment of all Senior Indebtedness remaining unpaid to the extent necessary to pay all Senior Indebtedness in full in accordance with its terms, after giving effect to any concurrent payment or distribution (or provision therefor) to or for the holders of

Powered By EDGAR Online     © 2003. EDGAR Online, Inc.

For purposes of this Article IV, the words "cash, property or securities" shall not be deemed to include shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated (at least to the extent provided in this Article IV with respect to the Debentures) to the payment of all Senior Indebtedness which may at the time be outstanding; provided that (i) the Senior Indebtedness is assumed by the new corporation, if any, resulting from such reorganization or adjustment and

(ii) the rights of the holders of Senior Indebtedness (other than leases which are not assumed by the Company or by the new corporation, as the case may be) are not, without the consent of such holders, altered by such reorganization or readjustment. The consolidation of the Company with, or the merger of the Company into, another corporation or the liquidation or dissolution of the Company following the conveyance or transfer of all or substantially all its property to another corporation upon the terms and conditions provided for in Article XI shall not be deemed a dissolution, winding-up, liquidation or reorganization for the purposes of this Section 4.2 if such other corporation shall, as a part of such consolidation, merger, conveyance or transfer, comply with the conditions stated in Article XI. This Section 4.2 shall be subject to the further provisions of Section 4.5.

15

SECTION 4.3 Subrogation of Debentures. Subject to the payment in full of all Senior Indebtedness, the rights of the holders of the Debentures shall be subrogated to the extent of the payments or distributions made to the holders of such Senior Indebtedness pursuant to the provisions of this Article IV to the rights of the holders of Senior Indebtedness to receive payments or distributions of cash, property or securities of the Company applicable to the Senior Indebtedness until the principal of (and premium, if any) and interest on the Debentures shall be paid in full; and, for the purposes of such subrogation, no payments or distributions to the holders of the Senior Indebtedness of any cash, property or securities to which the holders of the Debentures would be entitled except for the provisions of this Article IV, and no payment over pursuant to the provisions of this Article IV, to or for the benefit of the holders of Senior Indebtedness by holders of the Debentures, shall, as between the Company, its creditors other than holders of Senior Indebtedness, and the holders of the Debentures, be deemed to be a payment by the Company to or on account of the Senior Indebtedness; and no payments or distributions of cash, property or securities to or for the benefit of the holders of the Debentures pursuant to the subrogation provisions of this Article IV, which would otherwise have been paid to the holders of Senior Indebtedness shall be deemed to be a payment by the Company to or for the account of the Debentures. It is understood that the provisions of this Article IV are and are intended solely for the purposes of defining the relative rights of the holders of the Debentures, on the one hand, and the holders of the Senior Indebtedness, on the other hand.

Nothing contained in this Article IV or elsewhere in this Indenture or in the Debentures is intended to or shall impair, as among the Company, its creditors other than the holders of Senior Indebtedness, and the holders of the Debentures, the obligation of the Company, which is absolute and unconditional, to pay to the holders of the Debentures the principal of (and premium, if any) and interest on the Debentures as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the holders of the Debentures and creditors of the Company other than the holders of the Senior Indebtedness, nor shall anything herein or therein prevent any holder of any Debenture from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, subject to the rights, if any, under this Article IV of the holders of Senior Indebtedness in respect of cash, property or securities of the Company received upon the exercise of any such remedy.

Upon any payment or distribution of assets of the Company referred to in this Article IV, the holders of the Debentures shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such bankruptcy, dissolution, winding-up, liquidation or reorganization proceedings are pending, or a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, delivered to the holders of the Debentures, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article IV.

SECTION 4.4 Notice to Debenture Holders. The Company shall give prompt written notice in the form of an Officers' Certificate to each holder of Debentures of any fact known to the Company which would prohibit the making of any payment of monies in respect of the Debentures pursuant to the provisions of this Article IV. Notwithstanding the provisions of

16

this Article IV or any other provision of this Indenture, no holder of Debentures shall be charged with knowledge of the existence of any default or event of default with respect to any Senior Indebtedness or of any other facts which would prohibit the making of any payment of monies in respect of the Debentures pursuant to the provisions of this Article IV, unless and until such holder of Debenture(s) shall have received written notice thereof from the Company (in the form of an Officers' Certificate) or a holder or holders of Senior Indebtedness or from any trustee thereof who shall have been certified by the Company or otherwise established to the reasonable satisfaction of the Debenture holder to be such holder or trustee; and before the receipt of any such written notice, the holders of Debentures shall be entitled in all respects to assume that no such facts exist. Nothing contained in this Section 4.4 shall limit the right of the holders of Senior Indebtedness to recover payments as contemplated by Section 4.2.

Notwithstanding anything to the contrary hereinbefore set forth, nothing shall prevent (a) any payment by the Company to the Debenture holders of amounts in connection with a redemption of Debentures if (i) notice of such redemption has been given pursuant to Section 3.2 prior to the receipt by the Debenture holders of written notice under this Section 4.4, and (ii) such notice of redemption is given not earlier than sixty

(60) days before the redemption date or (b) any payment by the Company to the Debenture holders of amounts in connection with a repurchase of Debentures if (i) notice of such repurchase has been given pursuant to Article XIV prior to the receipt by the Debenture holders of written notice under this Section 4.4 and (ii) such notice of repurchase is given not earlier than forty (40) days before the repurchase date.

SECTION 4.5 No Impairment of Subordination. No right of any present or future holder of any Senior Indebtedness to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof which any such holder may have or otherwise be charged with.

SECTION 4.6 Certain Conversions Deemed Payment. For the purposes of this Article only, (1) the issuance and delivery of junior securities upon conversion of Debentures in accordance with Article XIII or in respect of payments of interest pursuant to Section 2.3 hereof and the pledge, issuance and delivery of common shares of United Microelectronics Corporation, a corporation duly organized and validly existing under the laws of the Republic of China and having its principal place of business at 300 No. 3, Li-hsin Rd. II, Science-Based Industrial Park, Hsinchu, Taiwan, R.O.C. ("UMC") pursuant to the Pledge and Security Agreement dated the date hereof among the Company and the Initial Purchasers (the "Pledge Agreement") shall not be deemed to constitute a payment or distribution on account of the principal of (or premium, if any) or interest on Debentures or on account of the purchase or other acquisition of Debentures, and (2) the payment, issuance or delivery of cash (except in satisfaction of fractional shares pursuant to Section 13.3), property or securities (other than junior securities) upon conversion of a Debenture shall be deemed to constitute payment on account of the principal of such Debenture. For the purposes of this Section, the term "junior securities" means (a) shares of any capital stock of any class of the Company and (b) securities of the Company which are subordinated in right of payment to all Senior Indebtedness which may be outstanding at the time of issuance or delivery of such securities to substantially the same extent as, or to a greater extent than, the Debentures are so subordinated and provided in this

17

Article. Nothing contained in this Article or elsewhere in this Indenture or in the Debentures is intended to or shall impair, as among the Company, its creditors other than holders of Senior Indebtedness and the holders of the Debentures, the right, which is absolute and unconditional, of the holder of any Debenture to convert such Debenture in accordance with Article XIII.

SECTION 4.7 No Impairment to Rights to Collateral.
Notwithstanding anything to the contrary in this Article IV or otherwise in this Indenture, nothing shall impair, delay, limit or prohibit any holder of Debentures from exercising or enforcing any rights or remedies available to such holder under the Pledge Agreement (and without notice to any holder of Senior Indebtedness), whether or not otherwise prohibited by this Indenture and whether or not such exercise or enforcement occurs in connection with any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings, and no holder of Debentures shall have any obligation to hold, set aside or pay over to or for the benefit of any of the Company or any holder of Senior Indebtedness any of the collateral secured under the Pledge Agreement or proceeds therefrom.

## ARTICLE V

## PARTICULAR COVENANTS OF THE COMPANY

SECTION 5.1 Payment of Principal, Premium and Interest. The Company covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and premium, if any, and interest on each of the Debentures at the places, at the respective times and in the manner provided herein and in the Debentures. Each installment of interest on the Debentures due on any semi-annual interest payment date shall be paid (a) by wire transfer in immediately available funds in accordance with the wire transfer instructions designated on the Schedule of Buyers attached hereto (as the same may be changed by delivery of written instructions by such holder to the Company at least two Business Days prior to the date of such payment) and (b) in the case of interest payments made in Interest Shares, in shares of Common Stock, as provided in Section 2.3(b).

SECTION 5.2 Deliveries. In all instances under this Indenture, the Debentures may be surrendered for registration of transfer or exchange or for presentation for payment or for conversion, redemption or repurchase and notices and demands to or upon the Company in respect of the Debentures and this Indenture may be served to the Company in accordance with the notice provisions of Section 15.3.

SECTION 5.3 Existence. Subject to Article XI, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

SECTION 5.4 Stay, Extension and Usury Laws. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of (and premium, if any) or interest on the Debentures as contemplated herein,

18

Powered By EDGAR Online
© 2003. EDGAR Online, Inc.

# EXHIBIT 56

1   ROBERT A. FRANKLIN (091653)
    STEPHANIE KAIN FERRILL (207003)
2   MURRAY & MURRAY
    A Professional Corporation
3   19400 Stevens Creek Boulevard, Suite 200
    Cupertino, CA  95014-2548
4   (650) 852-9000; (408) 907-9200
    (650) 852-9200 facsimile
5   rfranklin@murraylaw.com
    sferrill@murraylaw.com
6
    Attorneys for Riverside Contracting, LLC and
7   Riverside Claims, LLC

8                UNITED STATES BANKRUPTCY COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN JOSE DIVISION
11

12  In Re

13  SONICBLUE INCORPORATED, A DELAWARE          Case No.  03-51775 MM
    CORPORATION, DIAMOND MULTIMEDIA            Chapter 11
14  SYSTEMS, INC., A DELAWARE
    CORPORATION, REPLAYTV, INC., A             Date:       January 23, 2007
15  DELAWARE CORPORATION, AND SENSORY          Time:       11:00 a.m.
    SCIENCE CORPORATION, A DELAWARE            Place:      280 So. First St., Rm. 3070
16  CORPORATION,                                           San Jose, CA
                                               Judge:      Hon. Marilyn Morgan
17                      DEBTORS,

18

19

20       __SUPPLEMENTAL OBJECTION TO JOINT DISCLOSURE STATEMENT__

21       Creditors  Riverside  Contracting  LLC  and  Riverside  Claims  LLC  (collectively

22  "Riverside")  present  this  supplemental  objection  to  the  Joint  Disclosure  Statement  (the

23  "Disclosure Statement") filed by the Debtors and the Official Committee of Unsecured Creditors

24  (collectively the "Proponents") as follows:

25       Most of Riverside's initial objections to the Disclosure Statement have been addressed in

26  the  amended  Disclosure  Statement  (the  "Amended  Disclosure  Statement").    However,  the

27  Amended Disclosure Statement is still defective because it does not contain adequate information

28

1   relating to the Via settlement, and the concomitant impact of the Via settlement on the rights of

2   Class 4 claimants.  Without such information, creditors cannot make an intelligent and informed

3   decision as to whether to accept or reject the Plan.

4        In its initial objection, Riverside noted that section 4.1 of the Senior Indenture

5   subordinates any payment to the Senior Noteholders to "Senior Indebtedness".   "Senior

6   Indebtedness" is defined to include "all indebtedness of the Company due and owing to Via

7   Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000."[1]   In an effort to

8   resolve the lack of disclosure, Riverside requested additional disclosure to clarify the apparent

9   conflict between this language and the statement that the Proponents were unaware of any claims

10  with priority over the Senior Noteholders.  In the Amended Disclosure Statement the Proponents

11  only parenthetically address the issue with the terse statement that Via agreed that the Proof of

12  Claim amount did not constitute "Senior Indebtedness" (Article V – Section I 1).

13       In response to this inadequate modification, Riverside made further inquiry into the Via

14  settlement and, in particular, the waiver by Via of its rights under the subordination provision.

15  The explanation provided thus far has not satisfied Riverside of its concern regarding the lack of

16  adequate disclosure of the Via settlement.   Until the facts surrounding the Via settlement are

17  clear, the Disclosure Statement cannot be approved because it fails to meet the adequate

18  disclosure protections of Section 1125 of the Bankruptcy Code.

19       Furthermore, there was no disclosure whatsoever of this release in the papers provided to

20  creditors in connection with approval of the Via settlement.  Indeed, upon information and belief,

21  even the non-redacted Court filings did not mention this aspect of the settlement.  It was only

22  disclosed, obscurely, in a careful review of the actual Via settlement agreement. This particular

23  provision has the direct effect of permitting the Senior Noteholders to wrongfully retain

24  approximately $10 million that otherwise would flow to Via.   Surely, given the unambiguous

25  language of the Senior Indenture Via did not waive this right out of the goodness of its heart.

26  Therefore, disclosure needs to be made of the consideration that flowed to Via in exchange for

---

27  [1] In reviewing its Objection, Riverside has discovered that it inadvertently omitted the pages of
28  the Senior Indenture defining "Senior Indebtedness".  It has therefore reproduced such language
    as an Appendix to this Supplemental Objection below.

this release.  Alternatively, if Via was content to receive a $4 million cash payout (the estimated

distribution on a $12.5mm allowed claim), why wasn't the claim allowed at that amount and the

unambiguous language of the subordination be given effect?  The parenthetical language that has

been inserted into the amended Disclosure Statement that "Via agreed" is clearly insufficient.  At

a minimum, much more disclosure of the facts surrounding the waiver of this release is necessary

before the creditors can be asked to vote for or against any Plan.

Finally, even though this information was previously requested, the Amended Disclosure

Statement still does not disclose the current members of the Creditors Committee nor the

members who will serve on the Plan Oversight Committee.  Their identities must be disclosed.

## **CONCLUSION**

For the foregoing reasons, Riverside respectfully submits that the Amended Disclosure

Statement fails to meet the applicable standard for "adequate information" under Section 1125 of

the Bankruptcy Code, and respectfully requests that the Court deny approval of the proposed

Amended Disclosure Statement.

## **RESERVATION OF RIGHTS**

Riverside reserves the right to further supplement this Objection and raise any and all

objections to the approval of the Amended Disclosure Statement. Riverside further reserves the

right to make further motions or take any action in the case regarding these matters pending

receipt of additional information, including the right to make any and all objections to the

confirmation of the Plan in the event the Amended Disclosure Statement is approved.


January 22, 2007                              MURRAY & MURRAY,
                                              A Professional Corporation


                                              By:    *Robert A. Franklin*
                                                  Robert A. Franklin
                                                  Attorneys for Riverside Contracting, LLC and
                                                  Riverside Claims, LLC

1

APPENDIX

2

3    "Senior Indebtedness" shall mean the principal of, premium, if any, interest on (including any interest accruing after the filing of a petition by or against the Company under any bankruptcy law, whether or not allowed as a claim after such filing in any proceeding under such bankruptcy law) and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture or thereafter incurred or created:

4

5    (a) All indebtedness of the Company for monies borrowed (i) from banks, trust companies, insurance companies, equipment leasing companies or other financial institutions that in the ordinary course of business make loans (each, a "Qualified Lender"), including without limitation, all indebtedness represented by the Congress Facility or (ii) as evidenced by debt securities that are not exercisable or convertible into or exchangeable for capital stock of the Company and that are sold in a registered public offering or in one or more transactions in connection with resales of such debt securities pursuant to Rule 144A under the Securities Act;

6

7

8

9    (b) All indebtedness of the Company due and owing with respect to letters of credit (including, but not limited to, reimbursement obligations with respect thereto) issued by Qualified Lenders;

10    (c) All indebtedness or other obligations of the Company due and owing with respect to interest rate and currency swap agreements, cap, floor and collar agreements, currency spot and forward contracts and other similar agreements and arrangements entered into with Qualified Lenders;

11

12    (d) All indebtedness consisting of commitment or standby fees due and payable to Qualified Lenders with respect to credit facilities or letters of credit available to the Company;

13

14    (e) All obligations of the Company under leases required or permitted to be capitalized under generally accepted accounting principles and entered into with Qualified Lenders;

15    (f) All indebtedness or obligations of others of the kinds described in any of the preceding clauses (a), (b), (c), (d) or (e) due or owing to Qualified Lenders assumed by or guaranteed in any manner by the Company or in effect guaranteed (directly or indirectly) by the Company through an agreement to purchase, contingent or otherwise, and all obligations of the Company under any such guarantee or other arrangements;

16

17

18    (g) All indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "Via Indebtedness"); and

19

20    (h) All renewals, extensions, refunds, deferrals, amendments or modifications of indebtedness or obligations of the kinds described in any of the preceding clauses (a), (b), (c), (d), (e) or (f) above entered into with Qualified Lenders and, in the case of (g) above, subject to the $15,000,000 limitation set forth therein; unless in the case of any particular indebtedness, obligation, renewal, extension, refunding, amendment, modification or supplement, the instrument or other document creating or evidencing the same or the assumption or guarantee of the same expressly provides that such Indebtedness, obligation, renewal, extension, refunding, amendment, modification or supplement is subordinate to, or is not superior to, or is pari passu with, the Debentures; provided that "Senior Indebtedness" shall not include (i) any indebtedness of any kind of the Company to any Subsidiary, (ii) indebtedness, other than the Via Indebtedness, for trade payables or constituting the deferred purchase price of assets or services incurred in the ordinary course of business, (iii) indebtedness of the Company evidenced by the Debentures, which shall rank equally and ratably with each other and (iv) Subordinated Indebtedness, including, without limitation, the Subordinated Notes.

21

22

23

24

25

26

27

28