# EXHIBIT 58

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
RON BENDER California Bar No. 143364
CRAIG M. RANKIN California Bar. No. 169844
TODD M. ARNOLD California Bar No. 221868
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for the Official Committee of Creditors
Holding Unsecured Claims

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, AND SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br><br>               Debtors. | Case No. 03-51775 MM<br><br>Chapter 11 Cases<br><br>(Case Nos. 03-51775 through 03-51778 MM) (Jointly Administered)<br><br>SUBMISSION OF PRELIMINARY STATUS REPORT AND REQUEST FOR CONTINUANCE OF DEADLINE FOR SUBMISSION OF FINAL STATUS REPORT AND OF DISCLOSURE STATEMENT HEARING<br><br>Date:   February 26, 2007<br>Time:  11:00 a.m.<br>Place:  Courtroom 3070<br>         280 South First Street<br>         San Jose, CA 95113<br><br>         Hon. Marilyn Morgan |

Counsel to the Official Committee of Creditors Holding Unsecured Claims in the above referenced cases (the "Committee") hereby files this Preliminary Status Report and Request for Continuance as follows:

I.

BACKGROUND

An initial disclosure statement hearing was held on January 23, 2007 in these cases in connection with a joint plan of reorganization and disclosure statement filed by the Debtors and the Committee in December, 2006.  These chapter 11 cases were commenced in March, 2003, nearly four years ago.  Even though all or nearly all of the Debtors' assets were sold shortly after the chapter 11 filings, the Debtors and the Committee both agreed that a plan of reorganization and disclosure statement could not sensibly be filed until the Debtors' pending litigation with, among others, VIA Technologies, Inc. ("VIA") and Intel Corporation ("Intel") was resolved.  The reason for this was that both VIA and a seemingly related entity known as S3 Graphics Co., Ltd. ("S3") filed similar, if not identical, proofs of claim against the Debtors in which they asserted general unsecured claims against the Debtors of more than $200 million in the aggregate for "breach of contract".

The breach of contract claims filed by VIA and S3 appear to have arisen out of an agreement dated August 28, 2000 and titled "Amended Investment Agreement" between SONICBLUE INCORPORATED and VIA and other related agreements.  VIA and S3 alleged that SONICBLUE INCORPORATED breached the Amended Investment Agreement and related agreements by, among other things, not paying certain accounts payable, offering non-ordinary-course discounts to accelerate collection of receivables, not contributing certain assets to a related joint venture, and retaining payments received for certain accounts receivable that allegedly were owed to the joint venture.  VIA and S3 also claimed that the joint venture might be enjoined from using an intellectual property license between SONICBLUE INCORPORATED and Intel and that, if it was so enjoined, the joint venture was entitled to liquidated damages under the Amended Investment Agreement in the amount of $70 million.  A copy of the Amended Investment Agreement (which is already on file with the Bankruptcy Court) is attached hereto as Exhibit "1".  Much of the claims which were asserted by VIA and S3 appear to have arisen primarily as a result of the provisions of

Section 5.6 of the Amended Investment Agreement.

The Debtors and the Committee jointly determined that plan confirmation should not be attempted until the VIA/Intel litigation was resolved. Among other things, confirmation of a plan prior to such a resolution might have resulted in the Debtors' rejection of the Intel intellectual property license which would have given rise to the $70 million liquidated damage provision described above. Further, for a variety of reasons which are set forth in the disclosure statement, both the Debtors and the Committee concluded that a substantive consolidation of the four Debtors was the only sensible outcome for these estates. However, since substantive consolidation cannot occur after plan confirmation, and can only occur prior to or concurrently with plan confirmation, and given that it appeared that both VIA and S3 may have had claims against less than all four of the Debtors, the Debtors and the Committee jointly concluded that the VIA/Intel litigation had to be concluded before it made sense for these estates to proceed with seeking to confirm a plan of reorganization which would seek to substantively consolidate the Debtors' four estates.

Because of a conflict that Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP ("PW"), had with Intel, the Debtors employed the law firm of O'Melveny & Myers LLP ("OMM") as special litigation counsel to work in conjunction with PW in connection with the claims litigation with VIA and S3, as well as dealing with the related licensing dispute with Intel.

As a result of extensive protective orders and confidentiality agreements in that litigation, the Committee was not a party to any of the key confidential settlement discussions that ensued or otherwise. The Committee only received periodic and very general status reports on the litigation from PW and OMM. However, to the Committee's knowledge, nothing particularly substantive was occurring towards settling the litigation until the middle part of 2006. The Committee was advised in mid-late 2006 that a settlement agreement had been reached in principle in which VIA and S3 would collectively receive one, general unsecured claim between them in the amount of $12.5 million and that the dispute with Intel over the Intel license was resolved in connection with this settlement agreement. The settlement terms and risks and costs of litigation were presented to the Committee by counsel to the Debtors (primarily by Ms. Suzzanne Uhland, Esq. of OMM). Counsel

3

to the Debtors opined that the settlement was an excellent deal for the Debtors' estates, particularly given the exhorbitant costs of litigating the matters to trial, and the significant risk of VIA and/or S3 obtaining a much larger allowed claim against the estates, primarily involving the $70 million liquidated damage provision alluded to above.  The Committee agreed that the settlement which had been reached was favorable to the estates, and the Committee supported the settlement.  The settlement cleared the way for the estates to proceed with filing and seeking to confirm a plan of reorganization, to enable the funds in these estates (which total nearly $80 million of unencumbered cash) to be distributed to creditors in the fastest manner possible.

Counsel for the Committee was provided with the VIA/S3 settlement agreement after it had been completed.  Counsel for the Committee was not privy to the settlement discussions which resulted in the final settlement and when counsel for the Committee was first provided with a draft of the VIA/S3 settlement agreement, it was presented as essentially a final document which had been thoroughly negotiated by all of the parties.  The VIA/S3 settlement agreement is somewhat complex, and counsel to the Debtors walked counsel to the Committee through the VIA/S3 settlement agreement after the VIA/S3 settlement agreement had been provided to counsel to the Committee. No discussion occurred at any time regarding any "Senior Indebtedness" provision in a Senior Note Indenture involving the Debtors and VIA (discussed more below), and counsel for the Committee was unaware at that time of the existence of any such provision in the Senior Note Indenture or any connection that may have existed between any such provision in the Senior Note Indenture and the VIA/S3 settlement agreement.

The VIA/S3 settlement agreement was approved by the Bankruptcy Court at a hearing in October, 2006.  Once the VIA/S3 settlement agreement was approved by the Bankruptcy Court, counsel to the Committee (primarily Ron Bender) took the lead role in preparing a joint plan of reorganization and disclosure statement.  PW had provided drafts of a plan of reorganization and disclosure statement to counsel to the Committee some time before then, but the Committee concluded that substantial revisions to those documents were required.  In December, 2006, the Committee and the Debtors finalized the terms of their joint plan of reorganization and disclosure statement and filed them with the Bankruptcy Court.  As set forth above, an initial disclosure

statement hearing was held on January 23, 2007.

It was only through an objection to the disclosure statement filed by Riverside Contracting, LLC and Riverside Claims, LLC (collectively, "Riverside") shortly before the disclosure statement hearing that counsel to the Committee first learned of the "Senior Indebtedness" issue involving VIA in the Senior Note Indenture.

The issue pertains to a Senior Note Indenture issued by SONICBLUE INCORPORATED in 2002 in favor of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. relating to a total of $75 million of Senior Notes (divided equally among these three entities). Each of these three entities are members of the Committee. As is typical in indenture agreements, the Senior Noteholders subordinated their claims to a number of different types of claims. One such subordination is in favor of VIA and provides for the Senior Noteholders to subordinate their claims in favor of "all indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "VIA Indebtedness")."

The word "Indebtedness" is a defined term in the Senior Note Indenture and is defined as "having the meaning specified in Section 7.1(e)" [of the Senior Note Indenture]. Section 7.1 of the Senior Note Indenture is entitled "Events of Default". Section 7.1(e) of the Senior Note Indenture reads as follows:

> Failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of indebtedness, which term as used herein means obligations (other than the Debentures or non-recourse obligations) of, or guaranteed or assume by, the Company, or any Significant Subsidiary, for borrowed money or evidenced by bonds, debentures, notes or other similar instruments ("Indebtedness") in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures.

The defined term "Indebtedness" has as its first letter an upper case "I". The word "indebtedness" used in the subordination provision involving VIA has as its first letter a lower case "i".

1    Because of PW's intimate familiarity with the Debtors (given that PW has served as general
2    counsel to the Debtors since the Debtors' inception), the Debtors and the Committee agreed that
3    counsel to the Committee would handle the easier and more routine claims objections, and counsel
4    for the Debtors (PW) would handle the more substantive and complex claims objections.  Two of the
5    substantive and complex claims objections that PW was handling from the outset was the analysis of
6    and, if appropriate, objection to the claims of the Senior Noteholders (as well as the approximately
7    $100 million claims of the Junior Noteholders which pertain to the Junior Notes issued by the
8    Debtors in 1996).  The Junior Noteholders subordinated their claims to the Senior Noteholders when
9    the Senior Noteholders obtained the Senior Notes in 2002.

10    In or around late August, 2006 or early September, 2006, after PW had made certain claim
11    demands upon the Senior Noteholders, the Senior Noteholders asserted that PW had a conflict in
12    terms of prosecuting any objection to the claims of the Senior Noteholders.  The asserted conflict
13    stems from an opinion letter that PW issued in favor of the Senior Noteholders in 2002 at the time of
14    the issuance of the Senior Notes.  The Senior Noteholders also informed PW that the Senior
15    Noteholders intended to hold PW liable to the extent the Senior Noteholders are not paid in full.

16    Immediately after the Senior Noteholders asserted their conflict against PW, PW transferred
17    all of its work files regarding work that PW had done in connection with analyzing the claims of the
18    Senior Noteholders and the Junior Noteholders to counsel to the Committee, Levene, Neale, Bender,
19    Rankin & Brill L.L.P. ("LNBRB").  Since then, LNBRB has spent an enormous amount of time,
20    working in conjunction with the accounting firm of Grobstein, Horwath & Company LLP, to
21    analyze the claims of the Senior Noteholders and the Junior Noteholders and to formulate an
22    objection-to-claims strategy.  The issues involving both the Senior Noteholders and the Junior
23    Noteholders are complex and involve significant claims.  Settlement at this time appears unlikely,
24    and LNBRB anticipates filing objections to the claims of both the Senior Noteholders and the Junior
25    Noteholders in the near future.  LNBRB is in the process of preparing those objections at this time.

26    Shortly before the disclosure statement hearing on January 23, 2007, two groups of claims
27    buyers known as Riverside (represented by Robert Franklin of Murray & Murray) and Argo Partners
28    (represented by Scott McNutt of McNutt & Litteneker) filed objections to the disclosure statement in

which they allege a conspiracy or other wrongdoing between PW and the Senior Noteholders regarding the VIA/S3 settlement agreement. Pursuant to the VIA/S3 settlement agreement, VIA and S3 jointly obtained one general unsecured claim in the amount of $12.5 million, with VIA and S3 to have the right to allocate the claim between them as they desire. In the VIA/S3 settlement agreement, VIA agreed that none of this $12.5 million general unsecured claim would constitute "Senior Indebtedness" under the Senior Note Indenture.

Riverside and Argo Partners contend that the Senior Noteholders and PW conspired to achieve this result in order to maximize the ultimate recovery that the Senior Noteholders receive in these cases, and thereby minimize any exposure that PW has to the Senior Noteholders resulting from the PW opinion letter described above which PW issued in favor of the Senior Noteholders.

Under the plan and disclosure statement, the Debtors and the Committee are projecting an estimated cash recovery to general unsecured creditors of approximately 33%. This would mean that VIA and S3 can jointly expect to receive a total cash distribution of approximately $4,125,000 from these estates on account of the $12.5 million general unsecured claim that they jointly received from the VIA/S3 settlement agreement.

II.

SUMMARY OF ISSUES BEFORE THE COURT

Mr. Bender understands the arguments which have been espoused by Riverside and Argo Partners to be summarized as follows:

1.      Riverside and Argo Partners contend that if VIA and S3 were willing to agree to accept one general unsecured claim in the amount of $12.5 million under the VIA/S3 settlement agreement, which VIA agreed would not constitute "Senior Indebtedness" under the Senior Note Indenture, in a case where general unsecured creditors are projected to receive approximately 33% of the amount of their claims (amounting to $4,125,000 to VIA and S3), then VIA and S3 should have been willing instead to agree to receive an allowed general unsecured claim of less than $12.5 million if VIA did not waive the right to argue that its allowed claim did constitute "Senior Indebtedness" under the Senior Note Indenture. The logic behind this argument is that any such "Senior Indebtedness" claim (in favor of VIA) would have ultimately been paid 100% because the

Senior Noteholders would have been required to pay over to VIA any shortfall that VIA received from the Debtors' estates.

2. Riverside and Argo Partners further contend that the Senior Noteholders received a significant benefit from the VIA/S3 settlement agreement by VIA agreeing that none of the $12.5 million claim would constitute "Senior Indebtedness" under the Senior Note Indenture without the Senior Noteholders having paid any consideration to the Debtors' estates for receipt of this alleged significant benefit.

3. Riverside and Argo Partners further contend that either the Senior Noteholders should have paid consideration to the Debtors' estates for receipt of this alleged significant benefit and/or counsel to the Debtors should have been able to persuade VIA and S3 to agree to an allowed claim of less than $12.5 million with VIA retaining the right to contend that its allowed claim did constitute "Senior Indebtedness" under the Senior Note Indenture.

III.

THE EXAMINATION ASSIGNMENT PROVIDED TO MR. BENDER BY THE BANKRUPTCY COURT AND THE STATUS OF THAT EXAMINATION

Following the conclusion of the disclosure statement hearing on January 23, 2007, the Bankruptcy Court ordered Mr. Bender to perform an investigation of these matters and to file a report with the Bankruptcy Court by February 19, 2007. The Bankruptcy Court also continued the disclosure statement hearing to February 26, 2007 at 11:00 a.m.

Mr. Bender concluded that in connection with this investigation, Mr. Bender needed to take the depositions of, and obtain documents from, at least the following five people:

1. Bruce Bennett, Esq. of Hennigan Bennett & Dorman, who is serving as counsel to the Senior Noteholders.

2. Suzzanne S. Uhland, Esq. of O'Melveny & Myers LLP, who served as co-counsel with PW in connection with the VIA/Intel litigation.

3. Thomas V. Loran, III, Esq. and/or Albert J. Boro, Jr., Esq. of PW, who served as the lead PW litigators in the VIA/Intel litigation, as well as the attorneys at PW who have the most knowledge regarding the other matters discussed above.

1     4.     Marcus Smith, who is serving as the Debtors' current chief financial officer.

2     5.     The person at VIA who has the most knowledge (i.e., the "PMK") regarding the

3     VIA/S3 settlement agreement.

4           On January 25 and 26, Mr. Bender sent a letter to each of the foregoing in an effort to obtain

5     their consent to appear for deposition and to produce documents voluntarily without having the

6     estates go through the burden and expense of preparing and serving formal deposition notices,

7     document requests and subpoenas.  In connection with those efforts, Mr. Bender offered to travel to

8     the location that would be most convenient to the deponents and to work flexibly with the deponents'

9     work schedules to minimize the impact on the deponents' respective work schedules.  Mr. Bender

10    also worked closely in conjunction with Mr. Franklin (counsel to Riverside) and with Mr. McNutt

11    (then counsel to Argo Partners), as well as with Ms. Dumas (counsel to the OUST) to keep them

12    fully apprised of all developments as well as to make sure that the document request also included

13    all documents that they wished to have produced.  Mr. Bender has made clear that he will provide

14    copies of all documents produced to counsel to Riverside, counsel to Argo Partners and counsel to

15    the OUST, and that they are all welcome to attend and participate in all depositions.

16          The following is a summary of the status of those efforts:

17    1.     Bruce Bennett, Esq. of Hennigan Bennett & Dorman, who is serving as counsel to the

18    Senior Noteholders.

19          Mr. Bennett and his counsel in this matter (Michael Swartz) have been extremely cooperative

20    from the outset.  A deposition of Mr. Bennett was scheduled to be held on Monday, February 12,

21    2007, at 1:30 p.m., at Mr. Bennett's office in Los Angeles.  In accordance with Mr. Bender's request,

22    Mr. Bennett (through Mr. Swartz) produced responsive documents to Mr. Bender by email on

23    February 8, 2007.  However, accompanying the document production is a letter from Mr. Swartz to

24    Mr. Bender in which Mr. Swartz indicates that many of the documents he has produced are subject

25    to a confidentiality agreement resulting from the VIA/Intel litigation which prohibits Mr. Bender

26    from sharing those documents with others who are not parties to the confidentiality agreement.

27    From Mr. Bender's review of the documents in question, it appears to Mr. Bender that he should be

28    able to turn over all documents to all parties in interest.  Mr. Bender intends to file a motion with the

9

1   Bankruptcy Court requesting authority to turn over copies of all such documents to other parties in
2   interest, including, Riverside, Argo Partners and the OUST.   After consultation with counsel to
3   Riverside and Argo Partners, the decision was made to postpone Mr. Bennett's deposition scheduled
4   for February 12, 2007 until Mr. Bender obtains an order from the Bankruptcy Court regarding the
5   confidentiality issue.   Otherwise, the parties will find themselves in a situation where Mr. Bender
6   has at his disposal more documents than the other parties in interest at the time of the deposition.

7       2.   <u>Suzanne S. Uhland, Esq. of O'Melveny & Myers LLP, who served as co-counsel</u>
8   <u>with PW in connection with the VIA/Intel litigation</u>.

9       Ms. Uhland was initially not responsive to Mr. Bender's request for her to appear voluntary
10  for deposition and to produce documents.   Ms. Uhland ultimately became cooperative and attributed
11  her initial lack of responsiveness to a very busy work schedule and to internal obstacles at OMM.
12  Ms. Uhland ultimately agreed to appear voluntarily for deposition and to produce documents, but
13  she requested Mr. Bender to provide her with a formal deposition notice, document request and
14  subpoena, which she agreed to accept service of personally by over-night mail.   Mr. Bender
15  proceeded to provide Ms. Uhland with a formal deposition notice, document request and subpoena.
16  A deposition of Ms. Uhland is currently scheduled to be held on Wednesday, February 14, 2007, at
17  1:30 p.m., at Ms. Uhland's office in San Francisco.   Ms. Uhland's document request is due to be
18  provided on February 12, 2007.   Mr. Bender was recently advised by Matt Powers, Esq. of OMM
19  that OMM will be providing Mr. Bender with documents in response to Mr. Bender's document
20  request at Mr. Bender's office on February 12, 2007.   However, Mr. Powers has made clear that as is
21  the case with the documents produced by Mr. Bennett, Mr. Bender does not have the authority to
22  provide copies of those documents which are subject to the VIA/Intel confidentiality agreement to
23  any person or entity who is not a party to the confidentiality agreement unless the prior permission
24  of the Bankruptcy Court is obtained.   In addition, it appears that it is OMM's position that Ms.
25  Uhland cannot testify at a deposition to matters which are subject to the confidentiality agreement if
26  there are people present at the deposition who are not subject to the confidentiality agreement unless
27  the prior permission of the Bankruptcy Court is obtained.   As a result of the foregoing, while a final
28  decision will not be made until Mr. Bender receives the documents from OMM, as is the case with

1   Mr. Bennett, it appears that it would be premature for Mr. Bender to proceed with Ms. Uhland's

2   deposition until Mr. Bender files his motion with the Bankruptcy Court regarding the confidentiality

3   issue, and the Bankruptcy Court makes a ruling on that motion.

4           3.      Thomas V. Loran, III, Esq. and/or Albert J. Boro, Jr., Esq. of PW, who served as the

5   lead PW litigators in the VIA/Intel litigation, as well as other attorneys at PW who have the most

6   knowledge regarding the subject matters at issue.

7           PW has been extremely cooperative from the outset.  PW has designated Mr. Boro as the

8   PMK for PW for all matters, and a deposition of Mr. Boro is currently scheduled to be held on

9   Friday, February 16, 2007, at 10:00 a.m., at Mr. Boro's office in San Francisco.  In accordance with

10  Mr. Bender's request, Mr. Boro is required to produce responsive documents to Mr. Bender by

11  February 14, 2007.  Until Mr. Bender receives the response to the document request, Mr. Bender

12  will not know whether the same confidentiality issues will arise as set forth above with respect to the

13  documents to be produced by Mr. Boro, or whether issues of attorney-client privilege will come into

14  effect.  Mr. Bender has already made clear to PW that it does not appear to Mr. Bender that Mr.

15  Boro could be the PMK for all of the key subject matters at hand.  While Mr. Boro may be the PMK

16  with knowledge regarding the VIA/Intel litigation and the ultimate settlement agreement with

17  VIA/S3, it does not appear that as a litigator at PW, Mr. Boro could be the PMK at PW regarding the

18  "Senior Indebtedness" issue related to the Senior Note Indenture or the conflict issue that the Senior

19  Noteholders have asserted against PW related to the opinion letter that PW issued in favor of the

20  Senior Noteholders in connection with the Senior Note Indenture.  It would appear that the PMK at

21  PW for those matters would need to be corporate/business lawyers at PW who represented the

22  Debtors in connection with the Senior Note Indenture as well as the PW opinion letter issued to the

23  Senior Noteholders.  Moreover, Matt Walker, who is a bankruptcy attorney at PW, previously sent

24  an email to Mr. Bender in which Mr. Walker acknowledged that he is the person who suggested

25  inserting the language into the VIA/S3 settlement agreement in which VIA agreed that none of the

26  $12.5 million claim granted to VIA and S3 under the VIA/S3 settlement agreement would be

27  "Senior Indebtedness" under the Senior Note Indenture.  Mr. Walker indicated that his primary

28  motivation for doing so was to avoid having the estates spend money litigating about this issue later.

1    Since the burden is on PW to designate the PMK for the subject matters at issue, it is Mr. Bender's

2    current intention to proceed with Mr. Boro's deposition as scheduled and then, in consultation with

3    counsel for Riverside, Argo Partners and the OUST, determine which additional PW depositions

4    should be taken.  However, as set forth below, a newly formed entity in which Argo Partners is a

5    member has already noticed its own deposition of a different attorney at PW.

6        4.    Marcus Smith, who is serving as the Debtors' current chief financial officer.

7        Mr. Smith has been extremely cooperative from the outset.  A deposition of Mr. Smith was

8    scheduled to be held on Tuesday, February 13, 2007, at 8:00 a.m., at the PW office in Palo Alto.  In

9    accordance with Mr. Bender's request, Mr. Smith was required to produce responsive documents to

10   Mr. Bender by February 9, 2007.  On February 9, 2007, Mr. Bender received a number of documents

11   from Mr. Boro at PW, who claimed PW was delivering such documents on behalf of and as counsel

12   to Mr. Smith.  In connection with that document production, PW appears to have not turned over

13   certain documents, and has redacted certain documents, on the basis of attorney-client privilege.  Mr.

14   Bender provided copies of all of the documents produced by Mr. Smith to all of the other parties in

15   interest.  Mr. Bender sent an email to Mr. Boro at the end of the day on February 9, 2007 requesting

16   confirmation as to whether the documents produced constitute a complete response to Mr. Bender's

17   document production request of Mr. Smith because Mr. Boro had previously indicated that he would

18   be providing Mr. Bender with documents on a "rolling basis".  In addition, given (i) the sensitivity

19   of the matters at hand and the investigation that Mr. Bender is performing, (ii) the fact that these are

20   liquidating estates, and (iii) the fact that any attorney-client privilege being asserted would pass to a

21   chapter 11 trustee if one was appointed, Mr. Bender has requested PW and Mr. Smith to reconsider

22   the position they have taken with respect to attorney-client privilege and waive that privilege for

23   purposes of producing all relevant documents.  Mr. Bender has also indicted to Mr. Boro that if PW

24   and Mr. Smith elect not to waive that privilege, then PW and Mr. Smith must provide to Mr. Bender

25   a privilege log which identifies, among other things, all documents that have not been turned over on

26   a privilege basis, and the basis for the privilege asserted.  After consulting with Riverside and Argo

27   Partners, all of the parties concluded that until Mr. Bender receives such a privilege log and the

28   privilege issue is resolved, it would be premature to proceed with the deposition of Mr. Smith.  As a

1    result, the parties have decided to postpone Mr. Smith's deposition which had been scheduled to

2    proceed on February 13, 2007 until these matters are resolved.

3              5.      The person at VIA who has the most knowledge regarding the VIA/S3 settlement

4    agreement.

5              Mr. Bender was advised that Henry C. Kevane, Esq. of the law firm of Pachulski, Stang,

6    Ziehl, Young, Jones & Weintraub ("PSZYJW") served as counsel to VIA during the VIA/Intel

7    litigation and the VIA/S3 settlement.  Mr. Bender has not had any prior contact or communication

8    with Mr. Kevane.  On January 25, 2007, Mr. Bender sent a letter to Mr. Kevane requesting that the

9    VIA PMK agree to appear for deposition and produce documents voluntarily to assist Mr. Bender in

10   his investigative process.  After receiving no response to the letter, Mr. Bender followed up with a

11   phone call to Mr. Kevane at which time Mr. Bender learned that Mr. Kevane is on a sabbatical in

12   Africa, not returning until late February or early March.  Ken Brown of PSZYJW returned Mr.

13   Bender's phone call and advised that no other attorney at PSZYJW was able to assist Mr. Bender in

14   this matter and that if Mr. Bender wished to proceed with discovery against VIA he needed to

15   proceed with formal rules of discovery.  As a result, Mr. Bender proceeded to prepare a deposition

16   notice, document request and subpoena, and served the foregoing on VIA's agent for service of

17   process located in Fremont, California, noticing the PMK at VIA for deposition for February 9,

18   2007.   Subsequent to this occurring, Mr. Brown of PSZYJW called Mr. Bender to advise that

19   PSZYJW would be representing VIA in this matter.  Mr. Brown further advised Mr. Bender that Mr.

20   Brown first needs to determine the identity of the person who would be the PMK at VIA to testify to

21   the matters at hand.  Mr. Brown further advised Mr. Bender that the PMK at VIA works and resides

22   in Taiwan and arrangements would need to be made for that person to come to California to be

23   deposed.  Mr. Brown made clear to Mr. Bender that the PMK at VIA would not be available to

24   appear at the noticed deposition for February 9, 2007 and that VIA would not be able to produce the

25   required documents by February 7, 2007 as Mr. Bender requested in the VIA document request.  Mr.

26   Brown did advise Mr. Bender that he was working diligently to attempt to make the VIA PMK

27   available for deposition the week of February 12-16.  However, as of the date of this Preliminary

28   Report (February 12), Mr. Brown has not committed to a date for the deposition of the VIA PMK to

1   be taken or for the date for the production of the requested documents.  Moreover, on February 7,

2   2007, PSZYJW served Mr. Bender with a response and objection by VIA to the deposition notice,

3   document request and subpoena.  As a result, the issue of when the VIA PMK will appear for

4   deposition and when VIA will comply with the document request is unclear, and it is unclear

5   whether this will occur without the need for the involvement of the Bankruptcy Court.

6                                      IV.

7           THE CONCURRENT EXAMINATIONS BEING CONDUCTED

8                    BY BILL MCGRANE

9        On Monday, February 5, 2007, Mr. Bender was advised by John K. Shaffer, Esq. that he and

10  Frank Merola, Esq. of the Stutman, Treister and & Glatt law firm had been retained by a newly

11  formed entity known as SonicBlue Claims LLC ("SBC").  Mr. Shaffer advised Mr. Bender that SBC

12  is the assignee of the approximately $160,000 of unsecured claims which were previously held by

13  Argo Partners.  Mr. Shaffer further advised that Argo Partners and an entity known as Ferry Claims

14  are each 50% members of SBC.  Mr. Bender is not aware of the connection between Argo Partners

15  and Ferry Claims or the consideration paid by Ferry Claims for its acquisition of 50% of SBC.  In

16  the objection that Argo Partners filed to the joint disclosure statement, the sole declarant to that

17  objection was William McGrane, who signed that declaration in his capacity as counsel to Ferry

18  Claims, who Mr. McGrane acknowledged was not at that time a party in interest in the Debtors'

19  cases but who had an interest in purchasing VIA's claims against the Debtors.

20        Given that $160,000 of unsecured claims amounts to less than one-tenth of one percent of the

21  total unsecured debt in these cases, and that as a result SBC appeared to have very little economic

22  stake in the outcome of any of the matters that Mr. Bender is investigating, Mr. Bender was curious

23  as to why such a relatively small unsecured creditor would be willing to incur the expense of

24  employing the Stutman firm for this matter.  As a result, Mr. Bender sent an email to Mr. Shaffer

25  inquiring as to SBC's motivation in these cases.  Mr. Shaffer responded by advising that SBC was

26  interested in acquiring other large claims in these cases, including potentially the $12.5 million

27  unsecured claim held jointly by VIA and S3.  In that response, Mr. Shaffer indicated that SBC is

28  prepared to offer jointly to the Debtors' estates and to VIA $5 million cash for the $12.5 million

1    claim, which SBC computes as a significant premium over what VIA and S3 would be projected to

2    receive in these cases on account of the $12.5 million claim if the projected 33% distribution to

3    general unsecured creditors proves accurate.  Mr. Shaffer indicated that the "excess cash" that SBC

4    would be offering above what SBC considers to the actual, fair market value of the $12.5 million

5    claim could be shared between VIA/S3 and the Debtors' estates in whatever manner they see fit.  Mr.

6    Shaffer made clear that SBC's offer would be contingent upon the Bankruptcy Court "blue

7    penciling" (which Mr. Bender understands to mean deleting) the provision of the VIA/S3 settlement

8    agreement in which VIA agreed that none of the $12.5 million claim would be "Senior

9    Indebtedness" under the Senior Note Indenture.  Mr. Bender has already advised counsel to both

10   SBC and VIA that the Committee would support such a purchase of the $12.5 million claim held by

11   VIA and S3 provided that the Debtors' estates and therefore all general unsecured creditors received

12   a significant benefit from this transaction, rather than just VIA and S3 receiving all of the benefits.

13        Once Mr. Bender learned that Mr. Shaffer and Mr. Merola had been retained by SBC and

14   that Mr. McNutt was no longer involved in this process, Mr. Bender has made every effort to work

15   collaboratively with Mr. Shaffer and Mr. Merola and to keep them fully informed on and involved

16   with all matters.

17        On February 7, 2007, Mr. Bender learned for the first time that McGrane Greenfield LLP

18   (with William McGrane, Esq. serving as counsel) is serving as co-counsel with the Stutman firm in

19   the representation of SBC.  Mr. Bender was somewhat surprised to learn that without any prior

20   discussion with Mr. Bender on the matter, Mr. McGrane proceeded to serve his own deposition

21   notice and document request upon Jorge Del Calvo, Esq. and upon John J. Todd.  Mr. Del Calvo is

22   the attorney at PW who is listed in the notice provision of the Senior Note Indenture and is

23   presumably the attorney at PW who represented the Debtors in connection with the Senior Note

24   Indenture (and presumably the PW opinion letter that was issued to the Senior Noteholders).  Mr.

25   Todd is the person who executed the Senior Note Indenture on behalf of SONICBLUE

26   INCORPORATED as its Chief Operating Officer.

27        The reason provided by Mr. McGrane as to why he proceeded with discovery on his own

28   when he presumably was aware that Mr. Bender was, in accordance with the instruction of the

1    Bankruptcy Court, conducting the same discovery with the full and complete involvement of the

2    OUST, Mr. Franklin (counsel to Riverside) and Mr. Shaffer and Mr. Merola (the only counsel to

3    SBC that Mr. Bender was aware of) is that Mr. McGrane claimed that he was not satisfied that the

4    right people are necessarily being asked to testify on the key issue of what was intended by the term

5    "Senior Indebtedness" in favor of VIA in the Senior Note Indentures and that he was availing

6    himself of the right to take discovery in that regard.  Mr. Bender immediately made clear to Mr.

7    McGrane that Mr. Bender fully intended to conduct all such discovery and to do so in conjunction

8    with all relevant parties in interest.  Mr. Bender further made clear to Mr. McGrane that as set forth

9    above, Mr. Boro was only intended to be the first PW witness to be deposed, and not necessarily the

10   last one, and that the decision as to whether to depose additional PW attorneys would be made by all

11   relevant parties in interest.

12        Since that time, Mr. Bender has been working cooperatively and collaboratively with Mr.

13   McGrane, as well as with Mr. Shaffer, Mr. Merola, Mr. Franklin and Ms. Dumas, in connection with

14   this discovery and investigative process, and Mr. Bender assumes that this level of cooperation and

15   collaboration will continue.

16        Pursuant to Mr. McGrane's deposition notices, Mr. McGrane has noticed Mr. Del Calvo for

17   deposition on February 19, 2007, at 10:00 a.m., at Mr. McGrane's office, and Mr. Todd for February

18   26, 2007, at 10:00 a.m., at Mr. McGrane's office.  Mr. Bender does not know the status of those

19   depositions because Mr. Bender has not been a participant to that discovery, and Mr. Bender has not

20   been provided with any further information regarding those depositions beyond being served with

21   the original deposition notices.  Mr. Bender assumes that Mr. McGrane will share with Mr. Bender

22   all responses provided by Mr. Todd and Mr. Del Calvo to Mr. McGrane's deposition notices and

23   document production requests, just as Mr. Bender will be doing with Mr. McGrane.

24                                              V.

25               THE KEY ISSUES THAT NEED TO BE DECIDED BY THE BANKRUPTCY

26                            COURT IN MR. BENDER'S VIEW

27        1.    In Mr. Bender's view, the first and foremost issue for the Bankruptcy Court to decide

28   is whether it would have been possible for the Debtors to settle the VIA/Intel litigation in a manner

1   in which VIA and S3 would have received an allowed general unsecured claim of less than the $12.5
2   million that VIA and S3 did receive under the Bankruptcy Court approved VIA/S3 settlement
3   agreement.  The reason why Mr. Bender views this as the critical issue here is because for the
4   reasons set forth above, if all that happened differently in the settlement process is that VIA and S3
5   obtained the same $12.5 million general unsecured claim against the Debtors' estates as they
6   currently have but the provision in which VIA agreed that none of the $12.5 million claim would
7   constitute "Senior Indebtedness" under the Senior Note Indenture was not included, the Debtors'
8   estates would still have a $12.5 million general unsecured claim which would share pro rata in the
9   distribution from these estates.  If VIA then chose to pursue "Senior Indebtedness" litigation with the
10  Senior Noteholders over the "Senior Indebtedness" provision of the Senior Note Indenture, that
11  would be litigation solely between VIA and the Senior Noteholders to which the Debtors would not
12  have been a party and to which the Debtors' bankruptcy estates would not have been effected by the
13  outcome.

14          The only way the Debtors' bankruptcy estates (and thereby other general unsecured creditors)
15  would have benefited from a different settlement is if VIA and S3 had agreed to receive an allowed
16  general unsecured claim against the Debtors of less than $12.5 million.  If that occurred, there would
17  be less allowed general unsecured claims sharing in the distribution in these cases, which, in turn,
18  would have benefited the holders of all other allowed general unsecured claims.

19          Mr. Bender assumes that if VIA and S3 were requiring as part of the settlement that they
20  receive an allowed general unsecured claim against the Debtors in the amount of $12.5 million,
21  which VIA agreed would not constitute "Senior Indebtedness" under the Senior Note Indenture, the
22  only way that VIA and S3 would have agreed to accept an allowed general unsecured claim against
23  the Debtors of less than $12.5 million would have been if VIA believed that some or all of its
24  allowed general unsecured claim would constitute "Senior Indebtedness" under the Senior Note
25  Indenture, or if a Bankruptcy Court order could have been obtained as part of the settlement
26  agreement process in which the Bankruptcy Court made a finding that some or all of the allowed
27  claim of VIA was "Senior Indebtedness" under the Senior Note Indenture.

28          While formal discovery will need to be taken for the parties to understand the details of what

actually happened, VIA's counsel has already orally confirmed to Mr. Bender that after the $12.5 million allowed general unsecured claim was agreed upon, VIA was asked to waive its right to contend that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture.  VIA's counsel has further orally confirmed to Mr. Bender that VIA knowingly agreed to this waiver because VIA did not believe that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture or that VIA was waiving anything of value to VIA.

No explanation has thus far been provided to Mr. Bender as to who came up with the idea of requesting VIA to waive any right to contend that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture or why that request was made of VIA other than Mr. Walker of PW who claims to have done so for the reasons set forth above.

2.    Riverside and Argo Partners (now SBC) contend that the Senior Noteholders had an incentive to cause VIA to agree to this waiver to avoid the expense and risk of subsequent litigation with VIA over whether some or all of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture.  Formal discovery will need to be taken for Mr. Bender to determine whether the Senior Noteholders played any role in causing VIA to agree to this waiver and, if they did, whether the Senior Noteholders did anything wrong in doing so.

3.    Riverside and Argo Partners (now SBC) also contend that PW had an incentive to cause VIA to agree to this waiver to eliminate any risk of VIA engaging in subsequent litigation with the Senior Noteholders over whether some or all of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture because if VIA was successful in any such litigation, it would reduce the ultimate recovery in these cases by the Senior Noteholders and thereby increase PW's exposure to the Senior Noteholders resulting from the PW opinion letter described above. Formal discovery will need to be taken for Mr. Bender to determine whether PW played any role in causing VIA to agree to this waiver beyond Mr. Walker's contention above, and, if PW did, whether PW did anything wrong in doing so.

4.    In Mr. Bender's view, there would need to have been two preconditions in order for these estates to have been harmed by VIA's agreement to waive any right to contend that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture.    The first

precondition is that VIA and S3 would need to have agreed to accept under the VIA/S3 settlement agreement an allowed general unsecured claim against the Debtors of less than $12.5 million. The second precondition is that either (i) VIA would need to have assumed the risk that following Bankruptcy Court approval of the VIA/S3 settlement, VIA would be successful in contending that some or all of that lesser claim would constitute "Senior Indebtedness" under the Senior Note Indenture, or (ii) the Debtors would need to have been able to persuade the Bankruptcy Court to approve a VIA/S3 settlement in which the Bankruptcy Court ordered that some or all of the allowed general unsecured claim granted to VIA and S3 did in fact constitute "Senior Indebtedness" under the Senior Note Indenture, which presumably would have had to occur over the vigorous objection of the Senior Noteholders.

5.     From Mr. Bender's conversations with VIA's counsel, Mr. Bender does not believe that it would have been possible for the Debtors to have persuaded VIA and S3 to have agreed to accept an allowed general unsecured claim of less than $12.5 million and then to have assumed the risk that following Bankruptcy Court approval of the VIA/S3 settlement, VIA would later be successful in contending that some or all of that lesser claim would constitute "Senior Indebtedness" under the Senior Note Indenture.

6.     In summary, it appears to Mr. Bender that the following key questions need to be answered:

i.     Why did the Debtors not request VIA and S3 to agree to an allowed general unsecured claim of less than $12.5 million with some or all of that claim to constitute "Senior Indebtedness" under the Senior Note Indenture pursuant to an order of the Bankruptcy Court and/or why did the Debtors not seek to obtain consideration from the Senior Noteholders for a waiver of these rights by VIA? Was it because the Debtors did not believe that VIA and S3 would have agreed to such a lesser claim? Was it because the Debtors did not believe that they would be successful in persuading the Bankruptcy Court to find that some or all of that lesser claim constituted "Senior Indebtedness" under the Senior Note Indenture over the objection of the Senior Noteholders and that incurring the cost and risk associated with such litigation would not have been a prudent exercise? Was it because the Debtors did not think to do so? Was it because PW was

1 trying to minimize its exposure to the Senior Noteholders resulting from the PW opinion letter?
2 Was it because the Senior Noteholders were able to influence the decision making process and
3 actions by PW because of the threats made by the Senior Noteholders to PW resulting from the PW
4 opinion letter?

5        ii.     Mr. Bender does not believe that the questions posed immediately above can be
6 answered until formal discovery and a thorough investigation have been completed, and it is that
7 discovery and investigation that Mr. Bender (working in close conjunction with Mr. Franklin, Mr.
8 Shaffer, Mr. Merola, Mr. McGrane and Ms. Dumas) is currently conducting.

9        iii.    Even after formal discovery has been taken and facts have been ascertained, there
10 will still remain a key legal question that will need to be answered by the Bankruptcy Court.  That
11 key legal question is whether the Bankruptcy Court would have been willing to find that some or all
12 of the claim allowed in favor of VIA and S3 under the VIA/S3 settlement agreement was "Senior
13 Indebtedness" under the Senior Note Indenture.  That legal question would presumably require
14 significant litigation and require the Bankruptcy Court to, among other things, (i) interpret the
15 meaning of the relevant "Senior Indebtedness" provisions of the Senior Note Indenture, (ii)
16 determine whether to accept parole evidence (e.g., the intention of the parties under the Senior Note
17 Indenture), and (iii) interpret the meaning of the parole evidence if admitted.

18        7.     Continuing with this logic path, the next key issue before the Bankruptcy Court is the
19 appropriate ramifications of the outcome of the investigation addressed immediately above if the
20 Bankruptcy Court determines that one or more parties engaged in wrongdoing to the detriment of
21 these estates.  If the Bankruptcy Court concludes that it would not have been reasonably possible for
22 VIA and S3 to have obtained an allowed general unsecured claim of less than $12.5 million which
23 constituted "Senior Indebtedness" under the Senior Note Indenture (either because VIA and S3
24 would not have agreed to such a smaller claim or because the Bankruptcy Court concludes that
25 granting such a "Senior Indebtedness" claim over the objection of the Senior Noteholders would not
26 have been possible), it seems to Mr. Bender that this matter is concluded.  If, on the other hand, the
27 Bankruptcy Court concludes that it would have been reasonably possible for VIA and S3 to have
28 obtained an allowed general unsecured claim of less than $12.5 million which constituted "Senior

Indebtedness" under the Senior Note Indenture (which as described above would have required VIA and S3 to have agreed to such a smaller claim and the Bankruptcy Court to have granted such a "Senior Indebtedness" claim over the objection of the Senior Noteholders), then the Bankruptcy Court will need to decide what to do about that conclusion. There are a number of possibilities and Mr. Bender believes that it would be premature to discuss them in this Preliminary Report.

8.    Finally, Mr. Bender understands that SBC and VIA/S3 are currently engaged in negotiations regarding SBC's possible purchase of the $12.5 million general unsecured claim held jointly by VIA and S3 in a manner that would be beneficial to all general unsecured creditors. All of the parties are in agreement that any such transaction would need to be subject to the approval of the Bankruptcy Court following a noticed hearing. Mr. Bender cannot opine on the likelihood of such a result at this time because those negotiations are on going and have not yet been concluded. If such an agreement is reached and approved by the Bankruptcy Court, it may be that this would result in an end to Mr. Bender's investigation, enabling the Debtors and the Committee to proceed with their plan of reorganization and disclosure statement process.[1]

VI.

THE CURRENT TIMING OF THE ISSUES AT HAND AND THE NEED TO CONTINUE THE DATE BY WHICH MR. BENDER'S FINAL REPORT IS DUE TO BE FILED WITH THE BANKRUPTCY COURT AND THE NEED TO CONTINUE THE DISCLOSURE STATEMENT HEARING

Given that (1) Mr. Bender has received certain documents produced by Mr. Bennett which Mr. Bender is unable to share with others until the confidentiality issues addressed above are resolved; (2) Mr. Bender expects to receive documents on February 12, 2007 from OMM and will be unable to share many of them with others until the confidentiality issues addressed above are

---

[1] It should be noted that it appears that any such transaction will be subject to the elimination from the VIA/S3 settlement agreement the provision in which VIA agreed that none of the $12.5 million claim would constitute "Senior Indebtedness" under the Senior Note Indenture. Such a modification to the VIA/S3 settlement agreement would either require the consent of all parties to the VIA/S3 settlement agreement or require the Bankruptcy Court to be willing to delete this provision from the VIA/S3 settlement agreement on its own without the consent of all of the parties to the VIA/S3 settlement agreement.

resolved; (3) at least Ms. Uhland appears to be taking the position that she cannot testify to matters which are subject to the confidentiality issues addressed above in the presence of parties who are not subject to the confidentiality agreement unless the Bankruptcy Court authorizes her to do so; (4) PW has not turned over certain documents and has redacted others on the basis of attorney-client privilege as discussed above; (5) VIA has not yet agreed to make the VIA PMK available for deposition or to produce the documents requested by Mr. Bender, and VIA has filed an objection to the deposition; (6) Mr. Bender's deposition of Mr. Boro is not scheduled to take place until February 16, 2007 and it appears that additional depositions of PW attorneys may be necessary; and (7) Mr. McGrane has noticed his own depositions of Mr. Del Calvo for February 19, 2007 and Mr. Todd for February 26, 2007 (the same date and time as the currently scheduled continued disclosure statement hearing), it will not be possible for Mr. Bender to complete or to file a final report with the Bankruptcy Court by February 19, 2007 (as currently ordered by the Bankruptcy Court).

Moreover, in light of the indication given by the Bankruptcy Court at the initial disclosure statement hearing that the Bankruptcy Court would like for this investigation to be completed before the Bankruptcy Court approves the disclosure statement, it appears that proceeding with the currently scheduled continued disclosure statement hearing on February 26, 2007 would be premature. Mr. Bender has consulted with Mr. Merola, Mr. Franklin, Mr. McGrane, Mr. Shaffer and with Ms. Dumas and all parties are in agreement that additional time is necessary for Mr. Bender to complete and to file a final report with the Bankruptcy Court, and that it would be premature to proceed at this time with a continued disclosure statement hearing.[2]

As a result of the foregoing, Mr. Bender suggests and requests the Bankruptcy Court to continue the deadline for Mr. Bender to complete and file a final report with the Bankruptcy Court by 30-60 days, and to continue the currently scheduled disclosure statement hearing for 30-60 days.

---

[2] Concurrently with filing this Preliminary Report, Mr. Bender is filing a motion with the Bankruptcy Court requesting Bankruptcy Court authority for Mr. Bender to provide copies of all documents which may be subject to the previous confidentiality agreement to all relevant parties, and to authorize the various deponents to testify to matters which may be subject to the previous confidentiality agreement notwithstanding the presence of parties at the deposition who are not subject to the confidentiality agreement. It does not appear that Mr. Bender's investigation can realistically be concluded, or even proceed in a meaningful manner, unless and until the Bankruptcy Court makes a ruling on Mr. Bender's motion in this regard.

The appropriate length of any such continuance will, in part, be dependent upon the timing of the hearing on the motion being filed by Mr. Bender regarding the confidentiality issues.

Dated:  February 12, 2007                    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.


By: _____*/s/Ron Bender*_____
                              Ron Bender
                    Attorneys for the Official Committee of
                    Creditors Holding Unsecured Claims

```
<DOCUMENT>
<TYPE>EX-2.1
<SEQUENCE>2
<FILENAME>f68612ex2-1.txt
<DESCRIPTION>EXHIBIT 2.1
<TEXT>

<PAGE>    1
```

EXHIBIT 2.1

AMENDED AND RESTATED INVESTMENT AGREEMENT

AMONG

S3 INCORPORATED

VIA TECHNOLOGIES, INC.

AND

JV

DATED AS OF AUGUST 28, 2000

```
<PAGE>    2
```

TABLE OF CONTENTS

```
<TABLE>
<CAPTION>


<S>
```

ARTICLE 1. DEFINITIONS.............................................................

ARTICLE 2. ACTIONS TO BE TAKEN AT THE CLOSING.....................................
    2.1    The Closing..................................................
    2.2    Actions at Closing...........................................
    2.3    Instruments of Conveyance and Transfer, etc..................
    2.4    Further Assurances...........................................
    2.5    Post-Closing Audit...........................................

ARTICLE 3. REPRESENTATIONS AND WARRANTIES OF S3...................................
    3.1    Authorization, etc...........................................
    3.2    Corporate Status.............................................
    3.3    Employee Options.............................................
    3.4    No Conflicts, etc............................................
    3.5    S3 Financial Statements......................................
    3.6    Taxes........................................................
    3.7    Litigation...................................................
    3.8    Compliance with Laws; Governmental Approvals and Consents....
    3.9    Operation of the Graphics Chip Business......................
    3.10   Graphics Chip Business Assets................................
    3.11   Contracts....................................................



HBD 0184
Confidential

3.12    Territorial Restrictions.............................................
3.13    Inventories.........................................................
3.14    Intellectual Property...............................................
3.15    Employees, Labor Matters, etc.......................................
3.16    Rebates.............................................................
3.17    Brokers, Finders, etc...............................................
3.18    Real Property.......................................................
3.19    Environmental Matters...............................................
3.20    Accounts Receivable.................................................
3.21    Purchase for Investment.............................................
3.22    Disclosure..........................................................

ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF VIA............................

4.1    Authorization, etc...................................................
4.2    No Conflicts, etc....................................................
4.3    Brokers, Finders, etc................................................
4.4    Purchase for Investment..............................................
4.5    Disclosure...........................................................
</TABLE>


                                    -i-


<PAGE>   3

<TABLE>
<S>
ARTICLE 5. COVENANTS.......................................................

5.1    Access and Information...............................................
5.2    Confidentiality......................................................
5.3    Public Announcements.................................................
5.4    Conduct of Graphics Chip Business....................................
5.5    Commercially Reasonable Efforts......................................
5.6    Intel License........................................................
5.7    Filings..............................................................
5.8    Expenses.............................................................
5.9    Stamp Taxes, Duties, etc.............................................
5.10   Required Notices.....................................................
5.11   Insurance............................................................
5.12   Employee Matters.....................................................
5.13   Option Obligations...................................................
5.14   Historically Audited Financial Statements of Graphics Chip Business..
5.15   Monthly Financial Statements.........................................
5.16   Closing Balance Sheet................................................
5.17   Intentionally Deleted................................................
5.18   Updated S3 Schedules.................................................
5.19   Retention Plan.......................................................
5.20   Rights Agreement.....................................................
5.21   Investor Rights Agreement............................................
5.22   Additional Capital Assets............................................
5.23   Covenant Not to Sue..................................................
5.24   Insurance............................................................

ARTICLE 6. CONDITIONS TO CLOSING...........................................

6.1    Conditions to the Obligations of VIA.................................
6.2    Conditions to the Obligations of S3..................................

HBD 0185
Confidential

ARTICLE 7. TERMINATION..................................................

    7.1    Bases for Termination.................................................
    7.2    Effect of Termination................................................
    7.3    Failure to Close; Escrow.............................................

ARTICLE 8. INDEMNIFICATION, CONTRIBUTION AND SURVIVAL....................

    8.1    Survival of Representations and Warranties...........................
    8.2    Indemnification by S3................................................
    8.3    Indemnification by VIA...............................................
    8.4    Indemnification by JV................................................
    8.5    Claims...............................................................
    8.6    Limitation of Liabilities............................................
&lt;/TABLE&gt;


-ii-

&lt;PAGE&gt;    4

&lt;TABLE&gt;
&lt;S&gt;

ARTICLE 9. MAXIMUM DAMAGES CAP..........................................

ARTICLE 10. MISCELLANEOUS...............................................

    10.1    Amendments and Waivers..............................................
    10.2    Notices.............................................................
    10.3    Assignment..........................................................
    10.4    Governing Law.......................................................
    10.5    Section and Other Headings..........................................
    10.6    Counterparts........................................................
    10.7    Entire Agreement....................................................
    10.8    Severability........................................................
    10.9    Benefits Only to Parties............................................
&lt;/TABLE&gt;


&lt;TABLE&gt;
&lt;CAPTION&gt;
EXHIBITS
--------
&lt;S&gt;                              &lt;C&gt;
Exhibit 1                      Class A Shares Option Agreement
Exhibit 4                      Joint Venture Agreement
Exhibit 5                      Non-Competition Agreement
Exhibit 8                      Intellectual Property Cross License Agreement
Exhibit 9                      S3 Warrant and Amended and Restated Investor Rights Agreeme
Exhibit 10                     Guaranty
Exhibit 11                     Trademark License Agreement
Exhibit 12                     Employees and Consultants bound by the Proprietary Rights a
                               Information Agreement
Exhibit 13                     Form of S3 Counsel's Opinion
Exhibit 14                     Escrow Agreement
Exhibit 15                     Management Agreement
Exhibit 16                     Release
&lt;/TABLE&gt;

&lt;TABLE&gt;

HBD 0186
Confidential

```
<CAPTION>
SCHEDULES
---------
<S>                          <C>
Schedule A                   Assumed Liabilities
Schedule B                   Additional Disclosure Schedule
Schedule 3.3                 S3 Stock Options
Schedule 3.4                 Consents (S3)
Schedule 3.5(c)              February 27, 2000 Balance Sheet
Schedule 3.6                 Taxes
Schedule 3.7                 Litigation
Schedule 3.8                 Compliance with Laws
Schedule 3.9                 Business Operations not through S3, the S3 Subsidiaries or
                             division or Affiliate
Schedule 3.10                Contributed Assets
Schedule 3.11(a)             Graphics Chip Business Contracts
Schedule 3.11(a)(i)          Employment Contracts
</TABLE>
```

-iii-

```
<PAGE>   5

<TABLE>
<S>                          <C>
Schedule 3.11(a)(ii)         Asset Purchase Agreements, Other Acquisition or Divestiture
                             Agreements
Schedule 3.11(a)(iii)        Brokerage or Finders Agreements
Schedule 3.11(a)(iv)(i)      Major Suppliers During 1999
Schedule 3.11(a)(iv)(ii)     Major Customers During 1999
Schedule 3.11(a)(v)          Leases of Personal Property
Schedule 3.11(a)(vi)         Other Material Contracts
Schedule 3.11(b)(i)          Contracts Designated For Assignment
Schedule 3.11(b)(ii)         Excluded Licenses
Schedule 3.11(d)             Defaults
Schedule 3.11(e)             Outstanding Powers of Attorney
Schedule 3.12                Territorial Restrictions
Schedule 3.13                Inventories
Schedule 3.14(a)(i)          Intellectual Property Assets
Schedule 3.14(a)(ii)         Contributed Intellectual Property
Schedule 3.14(c)(i)          Intellectual Property Licensed or Sublicensed to S3 or the
                             Subsidiaries
Schedule 3.14(c)(ii)         Intellectual Property Licensed or Sublicensed by S3 or the
                             Subsidiaries
Schedule 3.15                Employee Matters
Schedule 3.16                Rebates
Schedule 3.19(a)             Compliance with Environmental Laws
Schedule 3.19(b)             Notices of Violation or Non-Compliance with Environmental L
Schedule 3.20                Accounts Receivable (Graphics Chip Business)
Schedule 4.2                 Consents (VIA)
Schedule 5.22                Additional Capital Assets
</TABLE>
```

-iv-

```
<PAGE>   6
```

AMENDED AND RESTATED INVESTMENT AGREEMENT

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt        6/24/03

HBD 0187
Confidential

This Amended and Restated Investment Agreement, dated as of August 28, 2000, by and among S3 Incorporated, a corporation organized under the laws of the State of Delaware ("S3") and VIA Technologies, Inc., a corporation organized under the laws of Taiwan ("VIA").

W I T N E S S E T H:

WHEREAS, S3 and VIA desire to form a corporate joint venture ("JV") for the purpose of manufacturing and distributing graphics products and conducting related research and development activities; and

WHEREAS, the Parties desire to provide for the transfer from S3 to JV of certain assets comprising certain of the assets used by S3 in its graphics chip products business, in exchange for JV stock and the transfer by VIA or its designee of cash and/or S3 stock to JV in exchange for JV stock; and

WHEREAS, on April 10, 2000, S3 and VIA entered into an Investment Agreement (the "Investment Agreement") which memorialized their agreements and obligations with regard to the above-described transactions; and

WHEREAS, circumstances have changed since the Parties executed the Investment Agreement and the Parties now wish to amend and restate their agreements and obligations on the terms set forth herein;

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements herein contained, the Parties hereto hereby agree that the Investment Agreement shall be amended and restated as follows:

ARTICLE 1.

DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Additional Capital Assets" has the meaning set forth in Section 5.22.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such other Person; provided, however, that for purposes of this Agreement JV shall not be deemed to be an Affiliate of or controlled by any of the Parties, and provided, further, that neither S3 nor VIA should be deemed to be an Affiliate of the other.

"Agreement" means this Amended and Restated Investment Agreement, as it may be amended from time to time pursuant to Section 10.1 hereof, and the Exhibits and Schedules listed in the table of contents hereto.

-1-

<PAGE>    7

"Additional Disclosure Schedules" means the schedules attached hereto which contains material amendments or modification to the Schedules and Exhibits to the Investment Agreement, in the form delivered by S3 to VIA pursuant to Section 6.1(h) of the Investment Agreement.

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt        6/24/03

HBD 0188
Confidential

"Applicable Law" means all applicable provisions of all (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"Assumed Liabilities" means the liabilities for inventory purchases and other items agreed to by the Parties only, and described in Schedule A hereto.

"Class A Shares Option Agreement" means the Class A Shares Option Agreement between JV and S3 to be executed and delivered on the Closing Date, in the form attached hereto as Exhibit 1.

"Closing" has the meaning set forth in Section 2.1.

"Closing Balance Sheet" means the balance sheet of the Graphics Chip Business as of the Closing Date which shall be prepared in the same manner, and include the same classes of assets and liabilities as the February 27, 2000 Balance Sheet.

"Closing Date" has the meaning set forth in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Consent" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including but not limited to any Governmental Authority.

"Contracts" has the meaning set forth in Section 3.11(b).

"Contributed Assets" means the assets described in Schedule 3.10 along with such other assets as the Parties may mutually agree, together with the proceeds of all insurance on such assets plus an amount equal to any applicable deductible or retention amount in the event of a casualty.

"Contributed Intellectual Property" has the meaning set forth in Section 3.14(a).

"Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), when used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

-2-

<PAGE>   8

"Encumbrance" means any mortgage, deed of trust, lien, pledge, easement, hypothecation, assignment, security interest or any other encumbrance or restriction of any type whatsoever.

"Environmental Law" means any federal, state, local or foreign law, statute, ordinance, rule, regulation, code, license, permit, authorization, approval, consent, legal doctrine, order, judgment, decree, injunction, requirement or agreement with any governmental entity relating to (x) the protection, preservation or restoration of the environment (including, without

HBD 0189
Confidential

limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource) or to human health or safety or (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances, in each case as amended and as in effect on the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agreement" means the escrow agreement attached hereto as Exhibit 14.

"Escrow Assets" has the meaning set forth in Section 7.3.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Licenses" has been the meaning set forth in Section 3.11(b).

"February 27, 2000 Balance Sheet" means the balance sheet representing only the accounts that pertain to Graphics Chip Business prepared by S3, a copy of which is attached hereto as Schedule 3.5(c).

"Force Majeure" means: acts of God; earthquakes; fires; natural disasters; explosions; declared public states of emergency due to acts of public enemy, riots, civil commotion and insurrection; or any other similar catastrophic casualty, occurrence, condition, event or circumstance not reasonably within the excused Party's control and which could not have been anticipated and avoided by reasonable measures.

"GAAP" means generally accepted accounting principles as in effect in the United States applicable to the financial statements of a corporation with one or more classes of its securities registered under the Exchange Act.

"Governmental Approval" means any Consent of, with or to any Governmental Authority.

"Governmental Authority" means any nation or government, state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including, without limitation, any government authority, agency, department, board, commission or instrumentality of the United States or Taiwan, any State of the United States or any political subdivision thereof or of Taiwan and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization to which any such functions of government have been delegated in respect of such functions.

-3-

<PAGE>   9

"Graphics Chip Business" shall mean S3's current business which involves the development, design, and manufacture of discrete graphics chips or discrete graphics chips integrated with core logic. Notwithstanding anything to the contrary herein, the Graphics Chip Business shall not include S3's board or add-in card business even though the products of such business contain graphics chips or provide graphics functionality to their users or S3's professional graphics business (e.g., the FireGL graphics board product line) which S3 conducts through its professional graphics divisions.

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0190
Confidential

"Graphics Chip Business Assets" means the Contributed Assets, the Contributed Intellectual Property and any transferred Contracts.

"Guaranty" means that undertaking by VIA to be dated as of the Closing Date in the form attached hereto as Exhibit 10.

"Hazardous Substance" means any substance presently or hereafter listed, defined, designated or classified as hazardous, toxic, radioactive or dangerous, or otherwise regulated, under any Environmental Law. Hazardous Substance includes any substance to which exposure is regulated by any Government Authority or any Environmental Law including, without limitation, any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial substance or petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos or asbestos containing material, urea formaldehyde foam insulation, lead or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Information" means all information (whether written or oral) furnished (whether before or after the date hereof) by any of the Parties or any of its Representatives to any other Party hereto or its Representatives and all analyses, compilations, forecasts, studies or other documents prepared by a Party or its Representatives in connection with its review of the transactions contemplated hereby which contain or reflect any such information, excluding information which (i) is or becomes publicly available other than as a result of disclosure by the receiving Party or its Representatives or (ii) is or becomes available to the receiving Party on a non-confidential basis from a source (other than a Party or its Representatives) which, to the best of the receiving Party's knowledge after due inquiry, is not prohibited from disclosing such information to the receiving Party by a legal, contractual or fiduciary obligation.

"Intel License" means the Intellectual Cross License Agreement, dated December 16, 1998, between Intel Corporation and S3.

"Intellectual Property" means any and all United States and foreign: (i) patents (including design patents, industrial designs and utility models) and patent applications (including docketed patent disclosures awaiting filing, reissues, divisions, continuations-in-part and extensions), patent disclosures awaiting filing determination, inventions and improvements thereto; (ii) trademarks, service marks, trade names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof, together with the goodwill associated therewith and symbolized thereby; (iii) copyrights (including software) and

-4-

<PAGE>   10

registrations thereof; (iv) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications and confidential business information; (v) mask work and other semiconductor chip rights and registrations thereof; (vi) intellectual property rights similar to any of the foregoing; and (vii) copies and tangible embodiments thereof (in whatever form or medium, including electronic media).

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt    6/24/03

HBD 0191
Confidential

"Intellectual Property Assets" has the meaning set forth in Section 3.14(a).

"Intellectual Property Cross License Agreement" means the Cross License Agreement, to be dated as of the Closing Date, between S3 and JV in the form attached hereto as Exhibit 8.

"Intellectual Property Licenses" has the meaning set forth in Section 3.14(c).

"IRS" means the United States Internal Revenue Service.

"Joint Venture Agreement" means the Joint Venture Agreement, to be dated as of the Closing Date, between S3 and VIA in the form attached hereto as Exhibit 4.

"JV Transaction Agreements" means the Joint Venture Agreement, the Guaranty, the Non-Competition Agreement, the Intellectual Property Cross License Agreement, the Trademark License Agreement, the Class A Shares Option Agreement, the Release, the S3 Warrant and the Escrow Agreement.

"Leased Real Properties" means the premises located at 2841 Mission Collage Boulevard, Santa Clara, CA 95054, and any other premises which the parties mutually agree shall be subleased at the Closing.

"Leases" means the leases for the Leased Real Properties, pursuant to which S3 is the lessee.

"Management Agreement" means the Management Agreement of even date herewith between S3 and VIA in the form attached hereto as Exhibit 15.

"Material Adverse Effect" means a material adverse change in the value, condition or utility of the Graphics Chip Business Assets taken as a whole; provided, however, that the following shall not be taken into account in determining whether there has been or could or would be a "Material Adverse Effect:" (i) any change which occurs as a result of the announcement of this Agreement or the pendency of the transactions contemplated hereby, involving the loss of employees and customers, delay or cancellation of orders or the lack of or delay in availability of materials from suppliers, (ii) any change which occurs as a result of any action or failure to act by VIA pursuant to the Management Agreement (iii) any litigation brought or threatened against S3, VIA or JV, which does not result in the entry of injunctive relief, (iv) any action or order by the Government of Taiwan or any state or political subdivision thereof made or issued in connection with this Agreement or the transactions contemplated hereby (v) any change relating to the economy of the United States in general or the economies in which the Graphics Chip Business operates or the personal computer industry in general and not specifically related to the Graphics Chip Business, and (vi) any change that occurs as a result

-5-

<PAGE>   11

of failure to sublease to JV the premises located at 2841 Mission College Boulevard, Santa Clara, California 95054. Without limiting the generality of the foregoing definition, termination of the Intel License prior to the Closing Date shall constitute a Material Adverse Effect.

"Monthly Financial Statements" has the meaning set forth in Section

HBD 0192
Confidential

5.15.

"Non-Competition Agreement" means the Non-Competition Agreement between S3 and JV, to be executed and delivered on the Closing Date, in the form attached hereto as Exhibit 5.

"Parties" means S3 and VIA and JV (when it becomes a party hereto), and their respective successors and permitted assigns.

"Permitted Encumbrance" means (i) any Encumbrance for Taxes (other than income taxes) either not yet due and payable or being contested in good faith by appropriate proceedings and for which adequate reserves have been provided; (ii) mechanic's, materialmen's, workmen's, warehousemen's and other similar Encumbrances incurred in the ordinary course of business with respect to obligations which are not past due or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided; (iii) a lien securing any Assumed Liability; and (iv) such liens, minor imperfections of title, easements on real property or leasehold estates as do not materially impair the value of the Graphics Chip Business Assets, the Excluded Licenses, or the operation of the Graphics Chip Business.

"Person" means an individual, corporation, partnership, limited liability company, trust, unincorporated organization or other entity or a government or any agency or political subdivision thereof.

"Release" means the Release in the form attached hereto as Exhibit 16.

"Representatives" means all of the directors, officers, employees, Affiliates and other representatives (including, without limitation, financial advisors, attorneys and accountants) or agents of a Person.

"S3 Subsidiaries" means S3 International Ltd., S3 Ventures, Ltd. and S3 -- VIA, Inc.

"S3 Warrant" shall mean that certain warrant to purchase 2,000,000 shares of S3 Common Stock at $10.00 per share, in the form attached hereto as Exhibit 9.

"Scheduled Closing Date" has the meaning set forth in Section 2.1.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Subleases" means those subleases between S3, as sublessor, and JV, as sublessee, to be executed and delivered on the Closing Date with respect to the Leased Real Properties.

-6-

<PAGE>   12

"Subsidiaries" means each corporation or other Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing at least 50% of the outstanding voting stock or other equity interests.

"Tax" or "Taxes" means (i) any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and

HBD 0193
Confidential

33

liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise, stamp and property taxes and customs duties, (ii) all interest, penalties and additions imposed with respect to such amounts, and (iii) any obligations to any Tax authority or other Governmental Authority under Treasury Regulations 1.1502-6 (or any comparable provision of the laws of any state, local or foreign jurisdiction), or under any agreements or arrangements with any other Person, with respect to amounts described in clauses (i) and (ii), including any liability for Taxes of a predecessor entity.

"Tax Return" means any and all federal, state and local and foreign returns, estimates, information statements and reports relating to Taxes.

"Third Party Claim" means any claim made by any third party which is to be the basis for a claim for indemnification hereunder.

"Trademark License Agreement" means the Trademark License Agreement between S3 and JV to be executed and delivered on the Closing Date, with respect to the S3 trademark, in the form attached hereto as Exhibit 11.

"Transfer," when used as a verb, means to sell, pledge, assign, encumber, dispose of or otherwise transfer, or, when used as a noun, means a sale, pledge, assignment, encumbrance, disposition, or other transfer.

"Transferred Employees" has the meaning set forth in Section 3.15.

ARTICLE 2.

ACTIONS TO BE TAKEN AT THE CLOSING

2.1 The Closing. The closing of the transactions provided for in this Article 2 (herein called the "Closing") shall take place at the offices of Heller Ehrman White & McAuliffe LLP, 525 University Avenue, Palo Alto, CA, at 2:00 p.m., local time, on January 3, 2001: provided, that (a) if the Closing has not occurred by January 3, 2001 and the delay is due to events (other than Force Majeure) not within the control of S3 or VIA, then the Closing shall take place on January 10, 2001, (b) if the Closing has not occurred by January 3, 2001 and the delay is due exclusively to an event constituting Force Majeure and arising from any act or failure to act by the government of Taiwan or any agency, committee or subdivision thereof, including, without limitation, any act, order or injunction against (or failure to approve, where such approval is legally required to accomplish) the transfer of funds or property pursuant to, or the consummation of any other action contemplated by, this Agreement, then the Closing shall take place as soon as practicable after the cessation of such event, but in no event later than January 17, 2001, or (c) if the Closing has not occurred by January 3, 2001 and the delay is due

-7-

<PAGE>  13

exclusively to an event constituting Force Majeure of a type other than the type described in clause (b) above, then the Closing shall take place as soon as practicable after the cessation of such event, but in no event later than January 31, 2001. The date on which the Closing is to occur under this Section 2.1 is referred to in this Agreement as the "Scheduled Closing Date." The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

HBD 0194
Confidential

2.2 Actions at Closing. At the Closing, subject to the terms and conditions of this Agreement, the applicable Parties hereby agree to take the following actions in the following order, all of which shall be deemed to occur simultaneously:

(a) Concurrent with the Closing, the parties shall form JV and cause it to become a party to this Agreement.

(b) S3 and the S3 Subsidiaries shall transfer to JV all of their right, title and interest in and to the Contributed Assets, the Contributed Intellectual Property and the Contracts (to the extent such are assignable or consent to such assignment has been obtained).

(c) VIA, or its designee, shall deliver to JV $208,000,000 payable in cash or shares of S3 common stock or any linear combination thereof. For purposes of this Section 2.2(c), each share of S3 common stock shall be valued at $16.00.

(d) JV shall deliver to S3 $208,000,000 payable in the same form contributed by VIA pursuant to Section 2.2(c).

(e) JV shall assume the Assumed Liabilities.

(f) JV shall deliver certificates representing 100,000,000 shares of JV Class A common stock to S3 or its designee.

(g) JV shall deliver certificates representing 30,000,000 shares of JV Class B common stock to VIA or its designee.

(h) JV shall deliver certificates representing 200,000 shares of JV Class C common stock to a person or entity to be identified by VIA.

(i) S3, VIA and JV shall each execute and deliver the JV Transaction Agreements to which each of them is a party.

(j) S3 shall deliver the Release.

2.3 Instruments of Conveyance and Transfer, etc. At the Closing, the applicable Parties will deliver the following documents:

(a) S3 will deliver to JV such bills of sale, endorsements, certificates and instruments of assignment, conveyance and transfer reasonably satisfactory in form and substance to JV as shall be necessary to vest in JV or any Subsidiary designated by JV good and marketable title to

-8-

<PAGE>    14

the Contributed Assets, in each case, free and clear of any Encumbrances, except Permitted Encumbrances.

(b) If VIA, or its designee, delivers S3 shares pursuant to Section 2.2(c), VIA or its designee will deliver appropriate stock certificates representing such S3 shares registered in the name of JV or S3 stock certificates endorsed in blank or with standard blank stock powers affixed thereto free and clear of any Encumbrances, except Permitted Encumbrances.

HBD 0195
Confidential

(c) JV will deliver to S3 such instruments of assumption as shall be reasonably satisfactory in form and substance to the Parties as shall be necessary for JV to assume the Assumed Liabilities.

2.4 Further Assurances. If at any time at or after the Closing any Party shall consider or be advised that any further instruments of conveyance and transfer, assignments, assumptions or assurances in law or any other things are necessary, desirable or proper to vest, perfect or confirm in JV, of record or otherwise, the title to any assets, properties or rights acquired or to be acquired by reason of, or as a result of, the transfers to be effected at the Closing, or to vest, perfect or confirm in S3, of record or otherwise, the security interests and liens to be effected at Closing, or to perfect or confirm the assumption by JV of the liabilities or obligations to be assumed by it at the Closing, each of the Parties agrees to execute and deliver all such deeds, instruments, assignments, assumptions and assurances in law and to do all things necessary, desirable or proper to vest, perfect or confirm title to the applicable assets, properties or rights or to confirm the assumption of the applicable liabilities and otherwise to carry out the purposes of this Agreement.

2.5 Post-Closing Audit. Within two weeks after the Closing Date, S3 shall prepare and deliver the Closing Balance Sheet of the Graphics Chip Business. The Closing Balance Sheet shall be prepared in accordance with GAAP applied on a consistent basis and shall exclude any re-evaluation or re-adjustment as a result of the transactions contemplated by this Agreement. Promptly thereafter, JV shall cause the Closing Balance Sheet to be audited by a "Big Five" accounting firm other than Deloitte & Touche, LLP or Ernst & Young (the "Outside Auditor"). Within 60 days thereafter, the Outside Auditor shall deliver an audited balance sheet, together with the notes thereto and the report of the Outside Auditor thereon, to VIA and S3. In the event that the net value of the accounts receivable, inventories and prepaid items relating to inventories contributed by S3 to JV, and the Assumed Liabilities (other than those additional liabilities assumed by VIA pursuant to Section 5.22), reflected in the audited balance sheet prepared in accordance with GAAP applied on a consistent basis varies by more than $500,000 from the net value of such assets and liabilities reflected on the Closing Balance Sheet prepared by S3, the entire excess, if any shall be paid to S3 by VIA and the entire deficiency, if any, shall be paid to JV by S3 within 48 hours of the determination of such excess or deficiency by the Outside Auditor.

-9-

<PAGE>    15

ARTICLE 3.

REPRESENTATIONS AND WARRANTIES OF S3

S3 represents and warrants to VIA as follows:

3.1 Authorization, etc. S3 has the corporate power and authority to execute and deliver this Agreement and the JV Transaction Agreements to which it will be a party, to perform fully its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by S3 of this Agreement and the JV Transaction Agreements to which it will be a party, and the consummation of the transactions contemplated hereby and thereby, have been, and on the Closing Date the execution and delivery by S3 of this Agreement and the JV Transaction Agreements to which it will be a party and the consummation of the transactions contemplated hereby and thereby will

HBD 0196
Confidential

36

have been, duly authorized by all requisite corporate action of S3. S3 has duly
executed and delivered this Agreement, and on the Closing Date S3 will have duly
executed and delivered the JV Transaction Agreements to which it will be a
party. This Agreement is, and on the Closing Date each JV Transaction Agreement
to which S3 is a party will be, legal, valid and binding obligations of S3,
enforceable against it in accordance with its respective terms except as may be
limited by bankruptcy, insolvency, reorganization and similar Applicable Laws
affecting creditors generally and by the availability of equitable remedies.
Neither the execution and delivery of this Agreement or the JV Transaction
Agreements, nor the consummation of the transactions contemplated hereby or
thereby, is required to be approved by the stockholders of S3. The factual
assumptions recited by S3's counsel in the opinion attached hereto as Exhibit 13
are true and correct in all material respects.

3.2 Corporate Status.

(a) S3 and the S3 Subsidiaries are corporations duly organized, validly
existing and in good standing under the laws of the jurisdiction of their
incorporation with full corporate power and authority to carry on the Graphics
Chip Business and to own or lease and to operate the properties necessary to the
operation of the Graphics Chip Business as and in the places where such business
is conducted and such properties are owned, leased or operated.

(b) S3 and the S3 Subsidiaries are duly qualified or licensed to do
business in each of the jurisdictions in which the operation of the Graphics
Chip Business or the character of the properties owned, leased or operated by it
in connection with the Graphics Chip Business makes such qualification or
licensing necessary, and where the failure to do so would not have a Material
Adverse Effect.

(c) S3 has delivered to VIA complete and correct copies of the
certificate of incorporation and by-laws or other organizational documents of S3
and each of its Subsidiaries, in each case as amended and in effect on the date
hereof. Neither S3 nor the S3 Subsidiaries are in violation of any of the
provisions of its certificate of incorporation or by-laws or other
organizational documents.

-10-

<PAGE>   16

(d) To S3's knowledge, S3 is not in violation of any order of any
Governmental Authority or any Applicable Law to which S3 or the S3 Subsidiaries
or any of their properties or assets utilized primarily in the Graphics Chip
Business are subject. To S3's knowledge, S3 has obtained all licenses, permits
and other authorizations and has taken all action required by Applicable Law in
connection with the Graphics Chip Business as now conducted.

3.3 Employee Options. Stock options granted by S3 pursuant to S3's 1989
Stock Option Plan (the "S3 Option Plan") are referred to in this Agreement as
"S3 Stock Options." Schedule 3.3, as amended by the Additional Disclosure
Schedule (hereafter "Schedule 3.3"), sets forth the following information with
respect to each S3 Stock Option outstanding as of the date of this Agreement:
(i) the name of the optionee; (ii) the particular plan pursuant to which such S3
Stock Option was granted; (iii) the number of shares of common stock subject to
such S3 Stock Option; (iv) the exercise price of such S3 Stock Option; (v) the
vesting schedule of such S3 Stock Option and whether such vesting accelerates on
a change of control of S3, as defined in S3 Option Plan; (vi) the date on which
such S3 Stock Option was granted; and (vii) the date on which such S3 Stock

HBD 0197
Confidential

Option expires. S3 has made available to VIA accurate and complete copies of the S3 Option Plan and the forms of all agreements evidencing S3 Stock Options. All shares of common stock subject to issuance as aforesaid, upon issuance on the terms and conditions specified in the instrument pursuant to which they are issuable, would be duly authorized, validly issued, fully paid and nonassessable. Except as designated in Schedule 3.3, there are no commitments or agreements of any character to which S3 is bound obligating S3 to accelerate the vesting of any S3 Stock Option as a result of the transactions contemplated by this Agreement.

3.4 No Conflicts, etc. The execution, delivery and performance by S3 of this Agreement and each JV Transaction Agreement to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not, except as would not materially impair the ability of S3 to perform obligations hereunder and under the JV Transaction Agreements, conflict with or result in a violation of or a default under (with or without the giving of notice or the lapse of time or both), create in any other Person a right or claim of termination, amendment, modification (including without limitation the commencement of any royalty or other payment obligation on behalf of S3), acceleration or cancellation of, or result in the creation of any Encumbrance (or any obligation to create any Encumbrance) upon any of the Graphics Chip Business Assets under, (i) any Applicable Law applicable to S3 or the Graphics Chip Business Assets, (ii) the certificate of incorporation or by-laws or other organizational documents of S3 and the S3 Subsidiaries, or (iii) except as set forth in Schedule 3.4, any contract, agreement, intellectual property license or instrument to which S3 or the S3 Subsidiaries may be bound or affected and which is included or used in the Graphics Chip Business or the Graphics Chip Business Assets to be transferred to JV. Except as specified in Schedule 3.4, to S3's knowledge, no Governmental Approval or other Consent of any party is required to be obtained or made by S3 in connection with the execution and delivery of this Agreement or the JV Transaction Agreements or the consummation of the transactions contemplated hereby or thereby.

3.5 S3 Financial Statements.

(a) Each of the consolidated financial statements (including, in each case, any related notes thereto) for the last three fiscal years delivered to VIA (the "S3 Financials"), (i) was

-11-

<PAGE>   17

prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and (ii) fairly presented the consolidated financial condition of S3 and its Subsidiaries as at the respective dates thereof and the consolidated results of S3's operations and cash flows for the periods indicated.

(b) The historical audited financial statements of the Graphics Chip Business, when prepared and delivered to JV pursuant to Section 5.14, shall be true and correct as of the date thereof, be prepared in accordance with GAAP applied on a consistent basis and fairly present the financial condition of the Graphics Chip Business as at December 31, 1999, 1998 and 1997 and the results of its operations and its cash flow for the years then ended.

(c) The February 27, 2000 Balance Sheet when prepared and delivered to VIA is true and correct in all material respects as of the date thereof, was prepared in accordance with GAAP applied on a consistent basis and fairly

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt       6/24/03

HBD 0198
Confidential

presents the financial condition of the Graphics Chip Business as of the date thereof.

(d) The Closing Balance Sheet, when prepared and delivered to VIA, shall be true and correct in all material respects, be prepared in accordance with GAAP applied on a consistent basis and fairly presents the Graphics Chip Business Assets and the Additional Capital Assets as of the date thereof.

3.6 Taxes.

(a) S3 and the S3 Subsidiaries have timely filed all material Tax Returns required to be filed by them, which Tax Returns are true, correct and complete in all significant respects, and have paid (or S3 has paid on behalf of the S3 Subsidiaries) all Taxes required to be paid as shown on such Tax Returns.

(b) Except for Taxes described on Schedule 3.6, S3 has paid all Taxes assessed or asserted to be due by any Governmental Authority.

(c) There is no Encumbrance for Taxes upon any Graphics Chip Business Asset, other than liens for Taxes not yet due and payable.

(d) S3 has provided to VIA correct and complete copies of all notices and communications from any Governmental Authorities related to Taxes of or on the Graphics Chip Business, the Graphics Chip Business Assets, the Contributed Intellectual Property, and the Contracts.

(e) Except as provided to VIA in writing, there are no Tax-allocation, Tax-sharing or indemnification agreements related to or binding on the Graphics Chip Business or the Graphics Chip Business Assets.

(f) Except as provided to VIA in writing, there is no contract, agreement, plan or arrangement covering any employee of the Graphics Chip Business that could give rise to the payment of any amount that would not be deductible under Section 280G, 404, or 162(m) of the Code.

-12-

<PAGE>    18

3.7 Litigation. Except as set forth in Schedule 3.7, as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.7"), to S3's knowledge, there is no action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending against or relating to the Graphics Chip Business Assets, the Excluded Licenses, or the Graphics Chip Business, or against or relating to the transactions contemplated by this Agreement or the JV Transaction Agreements. Neither VIA nor JV shall assume S3's obligations under any ongoing litigation, whether or not related to the Graphics Chip Business. Except as set forth in such Schedule 3.7, to the knowledge of S3, no liability under any citations, fines or penalties has been asserted against S3 or the S3 Subsidiaries since January 1, 1995 under any Environmental Law with respect to the Leased Real Properties. Neither S3 nor the S3 Subsidiaries nor any of the Graphics Chip Business Assets are subject, or in default under any order, writ, judgment, injunction or decree of any court, tribunal, arbitration panel or any government department, commission, board, agency or instrumentality, domestic or foreign with respect to the Graphics Chip Business.

3.8 Compliance with Laws; Governmental Approvals and Consents. Except as

HBD 0199
Confidential

disclosed in Schedule 3.8, to the knowledge of S3, the Graphics Chip Business Assets are being used and operated in compliance with Applicable Law applicable to the Graphics Chip Business.

3.9 Operation of the Graphics Chip Business. Except as disclosed in Schedule 3.9, S3 has conducted the Graphics Chip Business only through S3 and the S3 Subsidiaries and not through any other divisions or any other Affiliate of S3.

3.10 Graphics Chip Business Assets. Schedule 3.10, sets forth a true and complete list of all of the assets held by or used in the Graphics Chip Business designated by S3 and VIA to be contributed on the Closing Date to JV (the "Contributed Assets"). On the Closing Date, S3 and the S3 Subsidiaries will have good title to or a valid leasehold interest in or license to all of the assets comprising the Graphics Chip Business Assets, including, without limitation, the Contributed Assets, the Leased Real Property, and the Contributed Intellectual Property, in each case free and clear of any and all Encumbrances other than Permitted Encumbrances. Except for the Graphics Chip Business Assets, the Intellectual Property Assets and the Intellectual Property Licenses, there are no material assets or properties used in the operation of the Graphics Chip Business as currently conducted. Except as set forth herein and as disclosed to VIA during due diligence, S3 has no knowledge of any facts, events or circumstances relating to or affecting the Graphics Chip Business, the Graphics Chip Business Assets, or the Excluded Licenses which has since February 27, 2000 or could, individually or in the aggregate, result in a Material Adverse Effect. Except as disclosed to VIA during due diligence, the tangible personal property assets used in the Graphics Chip Business are in good repair and operating condition (subject to normal wear and tear).

3.11 Contracts.

(a) Schedule 3.11(a) as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.11(a)"), and Schedules 3.14(c)(i), as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.14(c)(i)"), and Schedule 3.14(c)(ii) contain a complete and correct list of all agreements and contracts (whether written or oral) of the types described below relating to the

-13-

Graphics Chip Business, to which S3 or the S3 Subsidiaries are a party and are bound or materially affected or to which S3 or the S3 Subsidiaries are a party or by which they are bound in connection with the Graphics Chip Business:

(i) employment contracts concerning Transferred Employees, whether written or oral, consulting agency, collective bargaining or other similar contracts and agreements under which current or future obligations exist relating to or for the benefit of Transferred Employees;

(ii) asset purchase agreements and other acquisition or divestiture agreements (other than agreements for sales of inventory in the ordinary course of business) and any agreements relating to the sale, lease or disposal of any capital assets in the amount of $100,000 or more;

(iii) brokerage or finder's agreements;

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt    6/24/03

HBD 0200
Confidential

(iv) orders and other contracts for the purchase or sale of materials, supplies, products or services under which current or future obligations exist, including (i) the names and addresses of all suppliers from which S3 ordered raw materials, supplies, merchandise and other goods and services with an aggregate purchase price for each such supplier of $100,000 or more during the twelve-month period ended December 31, 1999 and the amount for which each supplier invoiced S3 during such period and (ii) the names and addresses of all customers of S3 that ordered goods and services of $100,000 or more during the twelve-month period ended December 31, 1999 and the amount for which each such customer was invoiced during such period;

(v) lease agreements providing for the leasing of personal property primarily used in, or held for use primarily in connection with, the Graphics Chip Business; and

(vi) any other contracts, agreements or commitments that are material to the Graphics Chip Business.

(b) Schedule 3.11(b)(i) as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.11(b)(i)") sets forth a list of the contracts and agreements which have been designated by S3 for assignment to JV on the Closing Date (the "Contracts"). A number of these Contracts require third party consents for assignment. Within 30 days after the Closing Date, JV shall designate which of the Contracts it wishes to have assigned to JV; provided, however, that JV shall accept assignment of the Contracts specified in Schedule 3.11(b)(i) with an asterisk (*). Schedule 3.11(b)(ii) (hereafter "Schedule 3.11(b)(ii)"), sets forth a list of certain of the contracts, licenses and agreements which have not been designated for assignment to JV on the Closing Date (the "Excluded Licenses") and which are related to the Graphics Chip Business. While S3 shall undertake good faith efforts to request and obtain any consents necessary to such assignments, there can be no assurance that such consents can be obtained or that it will be able to assign any or all of the Contracts that require such consent. S3 shall undertake commercially reasonable efforts to maintain the Excluded Licenses in full force and effect; provided, however,

-14-

<PAGE>   20

that subject to Section 5.6, nothing herein shall limit or affect S3's right to enter into a merger or other similar transaction or to modify or amend said Excluded Licenses in a manner that S3 believes is in the best interests of its stockholders.

(c) S3 has made available to VIA complete and correct copies of all written Contracts, together with all amendments thereto, and accurate descriptions of all material terms of all oral Contracts, set forth or required to be set forth in Schedules 3.11(a) and 3.11(b)(i).

(d) Except where the failure would result in a Material Adverse Effect, all Contracts are in full force and effect and enforceable against S3 and the S3 Subsidiaries, and against each other party thereto. No party has declared an event of default under any Contract, and no such event or condition exists that, after notice or lapse of time or both, would constitute a violation, breach or event of default thereunder on the part of S3 or to the knowledge of S3, any other party thereto except as set forth in Schedule 3.11(d). To S3's knowledge, there is no fact, event or circumstance that will materially impair the ability of S3 to perform its obligations under this Agreement and the JV Transaction

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0201
Confidential

Agreements.

(e) Except as set forth in Schedule 3.11(e), S3 does not have outstanding any power of attorney that relates to the operation of the Graphics Chip Business or the Graphics Chip Business Assets.

3.12 Territorial Restrictions. Except as set forth in Schedule 3.12, neither S3 nor the S3 Subsidiaries is a party to any agreement placing a territorial restriction on the use of the Graphics Chip Business Assets.

3.13 Inventories.

(a) All of the inventories of raw materials, supplies, work in process, finished products, spare parts, replacement and component parts included in the Contributed Assets are of good, usable and merchantable quality in all material respects and except as set forth in Schedule 3.13, as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.13"), do not include obsolete or discontinued items.

(b) All such inventories are of such quality as to meet the quality control standards of S3 and any applicable governmental quality control standards.

(c) All such inventories that are finished goods are saleable as current inventories at the current prices thereof in the ordinary course of business.

(d) All such inventories are recorded on the books of S3 at the lower of cost or market value determined in accordance with GAAP.

(e) Schedule 3.13 lists the locations of all such inventories.

3.14 Intellectual Property.

(a) Title. Schedule 3.14(a)(i) sets forth a list of all the Intellectual Property that is related to, used in or held for use in connection with, or is material to the operation of, the

-15-

<PAGE>   21

Graphics Chip Business (the "Intellectual Property Assets"). Schedule 3.14(a)(ii), sets forth the Intellectual Property Assets which are owned by S3 and which S3 will Transfer to JV on the Closing Date (the "Contributed Intellectual Property"). Except as disclosed on Schedules 3.14(a)(i), (ii) to S3's knowledge, the Intellectual Property Assets are free and clear of all Encumbrances except Permitted Encumbrances.

(b) No Infringement. To the knowledge of S3, neither the conduct nor products of the Graphics Chip Business nor the Graphics Chip Business Assets infringe or otherwise conflict with any rights of any Person, none of the Graphics Chip Business Assets is being infringed by any Person, and there is no patent or patent application or trademark or trademark application that interferes with the Graphics Chip Business Assets or has a Material Adverse Effect.

(c) Licensing Arrangements. Schedule 3.14(c)(i) designates all agreements or contracts pursuant to which any other Person has licensed or sublicensed to S3 or the S3 Subsidiaries any Intellectual Property Assets, or

HBD 0202
Confidential

otherwise knowingly permitted S3's or the S3 Subsidiaries' use of such Intellectual Property Assets (through non-assertion, settlement or similar agreements relating to the Graphics Chips Business) (the "Intellectual Property Licenses"). Schedule 3.14(c)(ii) designates all agreements or arrangements pursuant to which S3 or the S3 Subsidiaries have licensed or sublicensed to any other Person any Intellectual Property Assets relating to the Graphics Chips Business, or otherwise knowingly permitted such Person's use of such Intellectual Property Assets relating to the Graphics Chips Business (through non-assertion, settlement or similar agreements). Except as set forth in such Schedules 3.14(c)(i), as amended by the Additional Disclosure Schedules (hereafter "Schedule 3.14(c)(i)"), and 3.14(c)(ii), to the knowledge of S3, the Intellectual Property Licenses relating to the Graphics Chips Business (x) are in full force and effect in accordance with their terms and no default exists thereunder by S3 or its Subsidiaries or to the knowledge of S3, by any other party thereto, and (y) are free and clear of all Encumbrances. S3 or the S3 Subsidiaries have made available to VIA true and complete copies of all Intellectual Property Licenses relating to the Graphics Chips Business (including amendments, supplements, renewals, waivers and other modifications), which are set forth on such Schedules 3.14(c)(i) and 3.14(c)(ii).

(d) No Intellectual Property Litigation. To the knowledge of S3, there are no claims that any default exists under any agreement or arrangement pertaining to the Contributed Intellectual Property, or the Excluded Licenses except as set forth on Schedule 3.7, as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.7"). Except as set forth on such Schedule 3.7, none of the Contributed Intellectual Property, or the Excluded Licenses is subject to any outstanding order, ruling, decree, judgment or stipulation by or with any court, arbitrator, or administrative agency.

(e) Due Registration, etc. To S3's knowledge, S3 has taken all such necessary or desirable actions to ensure that the patents and trademarks owned by S3 and included in the Contributed Intellectual Property or to be subject to the Intellectual Property Cross License Agreement have been duly registered under any Applicable Laws in the appropriate filing offices, and, to S3's knowledge, such registrations were issued on the basis of applications that were true and correct as of their dates, and are in full force and effect.

-16-

<PAGE>  22

(f) Protection of Intellectual Property. Exhibit 12, as amended by the Additional Disclosure Schedule (hereafter "Exhibit 12"), sets forth a true and complete list of all employees and consultants of S3's Graphics Chip Business who are bound by a form of proprietary rights and information agreement with S3 (the "Proprietary Rights and Information Agreement"). It has been S3's policy and practice to obtain a Proprietary Rights and Information Agreement from each employee and consultant of the Graphics Chip Business during the thirty-six (36) months prior to this Agreement. S3 has delivered to VIA complete and correct copies of such Proprietary Rights and Information Agreements. To the knowledge of S3, none of such confidential proprietary rights have been used, distributed or otherwise commercially exploited under circumstances which have caused the loss of any patent, trademark, copyright or trade secret used in the Graphics Chip Business.

3.15 Employees, Labor Matters, etc. Schedule 3.15, as amended by the Additional Disclosure Schedule (hereafter "Schedule 3.15"), which shall be CONFIDENTIAL and sealed, sets forth the following information with respect to each person designated by S3 and VIA as an employee to be transferred to JV on

HBD 0203
Confidential

or immediately after the Closing Date (the "Transferred Employees"): (i) the name of the employee; (ii) the position of the employee; (iii) the compensation rate of the employee; and (iv) any obligation of S3 or the S3 Subsidiaries to pay or compensate any of said employees for bonuses, retention or sick or other paid time off. Except as set forth in Schedule 3.15, S3 is not a party to or bound by any collective bargaining agreement and there are no labor unions or other organizations representing, purporting to represent or attempting to represent any Transferred Employee. Since January 1, 1995, there has not occurred or been threatened any material strike, slowdown, picketing, work stoppage, concerted refusal to work overtime or other similar labor activity with respect to any employees employed by S3 in connection with the Graphics Chip Business. To S3's knowledge, there are no material labor disputes currently subject to any grievance procedure, arbitration or litigation and there is no representation petition pending or threatened with respect to any Transferred Employee other than those listed on such Schedule 3.15. To its knowledge, S3 has not received any written notice of, or is otherwise aware of, any federal, foreign, state or local administrative proceeding (excluding workers compensation proceedings) with respect to any Transferred Employee.

    3.16 Rebates. Except as listed on Schedule 3.16, S3 has not entered into, or offered to enter into, any agreement, contract, commitment or other arrangement (whether written or oral) pursuant to which S3 is obligated, with respect to the Graphics Chip Business Assets, to make any rebates, discounts, promotional allowances or similar payments or arrangements, including without limitation returns of S3 Graphics Chip Business products or merchandise, with the ten largest customers of S3 (based on 1999 purchases) ("Rebate Obligations"). Neither S3 nor JV shall, without their respective consent, assume any liability for any other rebates. All Rebate Obligations are reflected in the S3's historical financial statements and in the February 27, 2000 Balance Sheet, and will be reflected in the Closing Balance Sheet.

    3.17 Brokers, Finders, etc. All negotiations relating to this Agreement and the JV Transaction Agreements, and the transactions contemplated hereby and thereby, have been carried on without the participation of any Person acting on behalf of S3 or Affiliates of S3 in such manner as to give rise to any valid claim against VIA for any brokerage or finder's commission, fee or similar compensation, or for any bonus payable by VIA to any officer,

                                        -17-
<PAGE>  23

director, employee, agent or sales representative of or consultant to S3 upon consummation of the transactions contemplated hereby or thereby.

    3.18 Real Property.

    (a) Leases. S3 has made available to VIA correct and complete copies of the Leases. The Leases are legal, valid, binding, enforceable, and in full force and effect, except as may be limited by bankruptcy, insolvency, reorganization and similar Applicable Laws affecting creditors generally and by the availability of equitable remedies. To the knowledge of S3, no party is in default, violation or breach in any material respect under the Leases, and no event has occurred and is continuing that constitutes or, with notice or the lapse of time or both, would constitute a default, violation or breach in any respect under the Leases. Each Lease grants the tenant under the Lease the exclusive right to use and occupy the premises demised thereunder. Either S3 or the S3 Subsidiaries enjoy peaceful and undisturbed possession under the Leases for the Leased Real Properties.

    http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0204
Confidential

(b) No Proceedings. To S3's knowledge, there are no eminent domain or other similar proceedings pending or affecting any portion of any of the Leased Real Properties. There is no writ, injunction, decree, order or judgment outstanding, nor any action, claim, suit or proceeding, pending or, to the knowledge of S3, threatened, relating to the ownership, lease, use, occupancy or operation by any Person of any of the Leased Real Properties.

3.19 Environmental Matters.

(a) Except as set forth on Schedule 3.19(a), with respect to the Graphics Chip Business Assets and the Leased Real Property, S3 is and on the Closing Date will be in compliance in all material respects with all applicable Environmental Laws, except for violations that would not individually or in the aggregate have a Material Adverse Effect. To the knowledge of S3, there is no pending civil or criminal litigation, notice of violation or non-compliance of administrative proceedings relating to Environmental Laws involving S3 or the S3 Subsidiaries other than litigation, notices of violation, or administrative proceedings which would not reasonably be expected, if adversely decided, to have individually or in the aggregate a Material Adverse Effect.

(b) Except as set forth on Schedule 3.19(b), neither S3 nor the S3 Subsidiaries have received any notice, nor does S3 have knowledge of (i) any violation of or non-compliance with any Environmental Law or any other law, statute, rule, or regulation regarding Hazardous Substances on, at, under or associated with the Leased Real Property or (ii) the actual institution or pendency of any suit, action, claim, proceeding or investigation by any Governmental Authority relating to or associated with any Leased Real Property or (iii) any actual or threatened request or demand by any Governmental Authority or third party for or relating to the investigation or removal of Hazardous Substances from any Leased Real Property or any part thereof other than violations, suits, actions, claims, proceedings, investigations or requests which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

-18-

<PAGE>   24

(c) To the knowledge of S3, there is no condition existing on or associated with the Graphics Chip Business Assets or any Leased Real Property which could reasonably be expected to give rise to the assertion of a claim, relating to or associated with any release of Hazardous Substances or other materials on, at, under or from the Graphics Chip Business Assets or any Leased Real Property by any private individuals or Governmental Authority for cleanup of such Hazardous Substances or materials or for damages associated therewith including for alleged exposure thereto, including, but not limited to, claims involving allegations of personal injury and/or property damage.

3.20 Accounts Receivable. Schedule 3.20, sets forth a true and complete list of all accounts receivable of the Graphics Chip Business as of the date hereof, along with an "aging" of all such accounts. At the Closing Date, all of the accounts receivable included in the Graphics Chip Business Assets will be (i) valid and binding obligations of the party owing thereunder, (ii) current in accordance with their payment terms and not older than 60 days from the date of original invoice, and (iii) to S3's knowledge, not subject to setoff or equitable defenses against S3 or other assignors. Except as set forth in Schedule 3.20, S3 has no knowledge that any of the accounts receivable are uncollectible.

HBD 0205
Confidential

3.21 Purchase for Investment. S3 or its designee is acquiring the shares of JV Class A common stock solely for investment, with no present intention to resell such shares. S3 hereby acknowledges that the shares of JV Class A common stock have not been registered pursuant to Applicable Law and may not be transferred in the absence of such registration or an exemption therefrom, and that the stock certificates representing the shares issued to S3 will bear a restrictive legend to the foregoing effect.

3.22 Disclosure. To the knowledge of S3, no representation or warranty by S3 contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of S3 to VIA or its representatives in connection herewith (other than the Monthly Financial Statements) or pursuant hereto contains any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading. S3 has provided VIA with all material information relating to the Graphics Chip Business Assets, the Excluded Licenses, and the Intellectual Property Assets subject to the Intellectual Property Cross License Agreement, and the operation of the Graphics Chip Business.

ARTICLE 4.

REPRESENTATIONS AND WARRANTIES OF VIA

VIA represents and warrants to S3 as follows:

4.1 Authorization, etc.

(a) VIA has the corporate power and authority to execute and deliver the JV Transaction Agreements to which it will be a party, to perform fully its obligations thereunder, and to consummate the transactions contemplated thereby. The execution and delivery by VIA of this Agreement and the consummation of the transactions contemplated hereby have been, and

-19-

<PAGE>   25

on the Closing Date the execution and delivery by VIA of the JV Transaction Agreements to which it will be a party and the consummation of the transactions contemplated thereby will have been, duly authorized by all requisite corporate action of VIA. VIA has duly executed and delivered this Agreement and on the Closing Date will have duly executed and delivered the other JV Transaction Agreements to which it will be a party. This Agreement is, and on the Closing Date each JV Transaction Agreement to which VIA is a party will be, a legal, valid and binding obligation of VIA enforceable against it in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization and similar Applicable Laws affecting creditors generally and by the availability of equitable remedies. Neither the execution and delivery of this Agreement or the JV Transaction Agreements, nor the consummation of the transactions contemplated hereby or thereby, is required to be approved by the stockholders of S3. The factual assumptions recited by S3's counsel in the opinion attached hereto as Exhibit 13 are true and correct in all material respects.

(b) VIA is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, with full corporate power and authority to carry on its businesses.

HBD 0206
Confidential

4.2 No Conflicts, etc. The execution, delivery and performance by VIA of this Agreement and each JV Transaction Agreement and the Guaranty to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in a violation of or a default under (with or without the giving of notice or the lapse of time or both), create in any other Person a right or claim of termination, amendment, modification, acceleration or cancellation of, or result in the creation of any Encumbrance (or any obligation to create any Encumbrance) upon any of the properties or assets of VIA under (i) any Applicable Law, applicable to VIA or any of the properties or assets of VIA, (ii) the certificate of incorporation or by-laws or other organizational documents of VIA or (iii) except as set forth in Schedule 4.2, any contract, agreement or other instrument to which VIA is a party or by which VIA or any of its properties or assets may be bound or affected (except, in the case of clause (iii) for violations or defaults that, individually and in the aggregate, would not have a material adverse effect on the properties, businesses, or results of operations of VIA as currently conducted and would not materially impair the ability of VIA to perform its obligations hereunder and under the JV Transaction Agreements and the Guaranty to which it is a party). Except for approvals under the HSR Act, no Governmental Approval, or other Consent of any party is required to be obtained or made by VIA in connection with the execution and delivery of this Agreement or the JV Transaction Agreements or the Guaranty or the consummation of the transactions contemplated hereby or thereby.

4.3 Brokers, Finders, etc. All negotiations relating to this Agreement, the other JV Transaction Agreements and the transactions contemplated hereby and thereby have been carried on without the participation of any Person acting on behalf of VIA or Affiliates of VIA in such manner as to give rise to any valid claim against S3 for any broker's or finder's or similar fee or commission.

4.4 Purchase for Investment. VIA or its designee is acquiring the shares of JV Class B common stock, and the S3 Warrant solely for investment, with no present intention to resell such shares or warrant. VIA understands and represents that the person or entity to be

-20-

<PAGE>   26

identified by VIA as the recipient of the JV Class C common stock will hold said shares solely for investment and has no present intention to resell such shares. VIA hereby acknowledges that the shares of JV Class B common stock, JV Class C common stock and the S3 common stock underlying the S3 Warrant have not been registered pursuant to Applicable Law and may not be transferred in the absence of such registration or an exemption therefrom, and that the stock certificates representing the shares issued to VIA will bear a restrictive legend to the foregoing effect.

4.5 Disclosure. To the knowledge of VIA, no representation or warranty by VIA contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of VIA to S3 or its representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading.

ARTICLE 5.

COVENANTS

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt        6/24/03

HBD 0207
Confidential

5.1 Access and Information. From the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with the terms hereof, S3 and Persons acting on its behalf will (and its respective accountants, counsel, consultants, employees and agents will) give VIA, its accountants, counsel, consultants, employees and agents, full access (except as to privileged communications) during normal business hours to, and furnish them with all documents, records, work papers and information with respect to, all of the Graphics Chip Business Assets and the properties, assets, books, contracts, commitments, reports and records relating to S3's Graphics Chip Business, as VIA shall from time to time reasonably request. In addition, S3 and Persons acting on its behalf will permit VIA, and its accountants, counsel, consultants, employees and agents, reasonable access (except as to privileged communications) to such personnel of S3's Graphics Chip Business and Persons acting on its behalf during normal business hours as may be necessary or useful to VIA in its review of the Graphics Chip Business Assets and business affairs of S3's Graphics Chip Business and the above-mentioned documents, records and information. S3 will keep VIA reasonably informed as to the affairs of S3's Graphics Chip Business through meetings conducted at least every two weeks from the date hereof to the Closing Date.

5.2 Confidentiality. It is hereby agreed that, except as otherwise expressly provided herein:

(a) Each Party and its Representatives (i) will keep all Information confidential and will not (except as required by Applicable Law, regulation or legal process, and only after compliance with paragraph (c) below), without the prior written consent of the affected Parties hereto, disclose any Information in any manner whatsoever, and (ii) will not use any Information other than in connection with the transactions contemplated hereby; provided, however, that a Party may reveal the Information to its Representatives (x) who need to know the Information for the purpose of evaluating the transactions contemplated hereby, (y) who are informed by such Party of the confidential nature of the Information and (z) who agree to act in accordance

-21-

<PAGE>    27

with the terms hereof. Each Party will cause its Representatives to observe the terms hereof and will be responsible for any breach hereof by any of its Representatives.

(b) Each Party and its Representatives will not (except as required by Applicable Law or stock exchange regulation, and only after compliance with paragraph (c) below), without the prior written consent of the affected Parties, disclose to any Person the fact that the Information exists or has been made available, that such Party is considering the transactions contemplated hereby or any other similar transactions or that discussions or negotiations are taking or have taken place concerning the transactions contemplated hereby or any term, condition or other fact relating to the transactions contemplated hereby or such discussions or negotiations, including, without limitation, the status thereof.

(c) In the event that a Party or its Representatives is requested pursuant to, or required by, Applicable Law to disclose any of the Information to a third party, it will notify the other Parties hereto who are affected thereby promptly so that they may seek a protective order or other appropriate remedy or, in their sole discretion, waive compliance with the terms hereof. In the event that no such protective order or other remedy is obtained, or that such Party waives compliance with the terms hereof, the other Party will furnish

HBD 0208
Confidential

only that portion of the Information which it is advised by counsel is legally required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

(d) If this Agreement is terminated, at any time thereafter upon the request of a Party or any of its Representatives, the other Parties will either (i) promptly destroy all copies of the written Information in their or their Representatives' possession and confirm such destruction to the requesting Party in writing or (ii) promptly deliver to the requesting Party, at its expense, all copies of the written Information in its or its Representatives' possession. Any oral Information will continue to be subject to the terms hereof.

5.3 Public Announcements. Except as required by Applicable Law or stock exchange regulation applicable to the Parties, the Parties shall not, and shall not permit any Person acting on their behalf to, make any public announcement in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other Party.

5.4 Conduct of Graphics Chip Business. On and after the date hereof and until the Closing Date, except as expressly permitted or required by this Agreement or as otherwise expressly permitted by VIA in writing (after the date hereof), S3 and each of the S3 Subsidiaries will, with respect to the Graphics Chip Business, make commercially reasonable efforts to:

(a) carry on the Graphics Chip Business in the ordinary course and in substantially the same manner as heretofore conducted;

(b) preserve intact its present business organization, maintain its properties in good operating condition and repair, and preserve its relationship with customers, suppliers and others having business dealings with it;

(c) not terminate, other than for cause, the Transferred Employees;

-22-

<PAGE>    28

(d) not delay payment of any trade payables or other obligations other than in the ordinary course of business;

(e) maintain all of the Graphics Chip Business Assets in good repair, working order and operating condition subject only to ordinary wear and tear;

(f) keep in full force and effect insurance comparable in amount and scope of coverage to insurance now carried by it in connection with the Graphics Chip Business;

(g) maintain its books of account and records of its business in the usual, regular and ordinary manner consistent with past policies and practice, and not change such policies or practices;

(h) comply in all material respects with all Applicable Laws applicable to the Graphics Chip Business;

(i) not make any material Tax elections with respect to the Graphics Chip Business that would be binding on JV or VIA after the Closing Date;

(j) maintain its good standing in its jurisdiction of incorporation and in the jurisdictions in which it is qualified to do and does operate its

HBD 0209
Confidential

Graphics Chip Business as a foreign corporation and to maintain or obtain all Governmental Approvals and other Consents necessary for, or otherwise material to, the Graphics Chip Business;

(k) promptly advise VIA in writing of any event, circumstance, occurrence, fact, condition, change, development or effect that, individually or in the aggregate, could, to the knowledge of S3, reasonably be expected to have or result in a Material Adverse Effect or would cause a breach of this Section 5.4;

(l) perform in all material respects all of its obligations under all Contracts;

(m) not enter into any agreement, commitment or other transaction in connection with or relating to the Graphics Chip Business or make any capital expenditures or capital additions or improvements for or in the Graphics Chip Business or amend, modify or terminate any existing Contract entered into in connection with or relating to the Graphics Chip Business other than in the ordinary course of business and involving an expenditure of less than $100,000 (other than purchases of goods in the ordinary course of business), or enter into any agreement or commitment in connection with or relating to the Graphics Chip Business that, pursuant to its terms, is not cancelable without penalty on notice of 30 days' or less from the end of the first month following the Closing Date; provided, however, that S3 may purchase capital equipment or assets which would otherwise require VIA's consent pursuant to this Section 5.4(m) and retain such capital equipment or goods after the Closing, in which case such capital equipment or assets shall not be included within the definition of Contributed Assets and any accounts payable related to such purchaser(s) shall not be included within the definition of Assumed Liabilities;

(n) not pay or commit to pay any bonus, other incentive compensation, change of control or similar compensation to any Transferred Employee, or grant or commit to grant to any

-23-

<PAGE>   29

Transferred Employee, any other increase in or additional compensation in any form except as consistent with past practice;

(o) not enter into, institute, adopt or amend or commit to enter into, institute, adopt or amend any employment, consulting, retention, change of control, collective bargaining, bonus or other incentive compensation, profit-sharing, health or other welfare, stock option or other equity, pension, retirement, vacation, severance, deferred compensation or other employment, compensation or benefit plan, policy, agreement, trust, fund or arrangement in respect of or for the benefit of any officer, director, employee, sales representative, agent, consultant (whether or not legally binding) in connection with the Transferred Employees, agents or consultants;

(p) not mortgage, pledge or otherwise cause or suffer any Encumbrance to attach to any of the Graphics Chip Business Assets that would interfere with JV's use thereof or rights therein;

(q) not sell any Graphics Chip Business Assets with a value in excess of $25,000 in each case or $500,000 in the aggregate, other than inventory in the ordinary course of business;

HBD 0210
Confidential

(r) not make any material changes in policies or practices relating to selling practices, returns, discounts or other terms of sale or accounting therefor or in policies of employment relating to the Graphics Chip Business;

(s) except with respect to N-Vidia, not transfer or grant any rights under, or enter into any settlement regarding the breach or infringement of, any Contributed Intellectual Property, or amend or modify any existing rights with respect to any of the Contributed Intellectual Property, which would or could affect any rights necessary to JV's utilization of such Contributed Intellectual Property;

(t) replenish the inventories and supplies of the Graphics Chip Business in a normal and customary manner consistent with its prior practice and prudent business practices prevailing in the industry, and not make any purchase commitment for the Graphics Chip Business in excess of the normal, ordinary and usual requirements of its business or at any price or upon terms and conditions more onerous than those consistent with prior practices and customary in the industry, and, other than in the ordinary course of business, not make any change in its selling, pricing, or advertising practices in the Graphics Chip Business inconsistent with its prior practice and prudent business practices prevailing in the industry;

(u) except with respect to N-Vidia or in the Side Letters, not institute, settle or agree to settle any litigation, action or proceeding in connection with, or relating to, the Graphics Chip Business or any Graphics Chip Business Assets, before any court or governmental body other than in the ordinary course of business consistent with prior practices but not in any case involving amounts in excess of $200,000 or the deprivation of any rights which JV would or could have under such assets or licenses; and

(v) not resolve or commit to effect any act in contravention of any of the provisions of this Section 5.4.

-24-

<PAGE>    30

If S3 believes that it will be unable to perform the obligations set forth in this Section 5.4 or that it must modify its business practices in a manner inconsistent with this Section 5.4, then S3 shall so notify VIA in writing. VIA shall have 10 business days within which to advise S3 with regard to such matter and to consent or object to S3's proposed action or respond to the situation which is the subject of the notice. If VIA does not respond to S3 within such 10-day period, then VIA shall be deemed to have consented to S3's proposed action or response, if any. Nothing in this Section 5.4 or this Agreement or the Transaction Agreements shall limit or affect S3's right to enter into a merger or similar transaction involving S3 as a whole or to sell the assets of its Spea subsidiary or division or the assets of its Diamond, Number 9 or other add-in card or board business (to the extent not specifically identified in the Schedules hereto as being transferred to JV.

5.5 Commercially Reasonable Efforts.

(a) Subject to the terms and conditions herein provided, S3 and VIA each hereby covenants to the other that it shall use its commercially reasonable efforts to take or cause to be taken as promptly as practicable all actions necessary or desirable on its part to permit the consummation of the transactions contemplated by this Agreement. S3 will use commercially reasonable efforts to obtain all Consents, waivers and clearances of all third parties

HBD 0211
Confidential

51

necessary to consummate and make effective the transactions contemplated by this Agreement. If any Consent is required to assign any Contract at the Closing, S3 may, after it has used commercially reasonable efforts to obtain such Consent or a Waiver on or before the Closing, either continue to use its commercially reasonable efforts after the Closing to cause that Contract to be assigned to JV, or take commercially reasonable efforts (so long as permitted by law and not in violation of the Contract in question) to assure that the rights and obligations of S3 under such Contract shall be preserved for the benefit of JV and to facilitate receipt of the consideration to be received by S3 in and under any such Contract with respect to performance rendered or amounts that otherwise accrue after the Closing, which consideration S3 shall hold in trust for the benefit of, and upon request of JV, shall deliver to JV. If S3 elects pursuant to the preceding sentence to retain any Contract and preserve the benefits thereof for JV, S3 shall take all legal action requested by JV to segregate or otherwise secure for JV any cash or other assets received under or by virtue of such Contract or Contracts after the Closing. To the extent that any of the Contributed Assets are not capable of being validly assigned or transferred without the Consent or waiver of the other Party thereto or the issuer thereof, or if such assignment or transfer would constitute a breach thereof or a violation of any Applicable Law, this Agreement shall not constitute an assignment or transfer thereof.

(b) From the date hereof until the earlier of (i) the termination of this Agreement pursuant to Article 7 hereof and (ii) the Closing Date, S3 will not and will instruct its directors, officers, employees, Representatives, investment bankers, agents and Affiliates not to, directly or indirectly, (i) solicit or encourage submission of, any proposals or offers by any person, entity or group (other than VIA and its Affiliates, agents and Representatives), or (ii) participate in any discussions or negotiations with, or (iii) disclose any information concerning the Graphics Chip Business to or afford any access to the properties, books or records of the Graphics Chip Business, other than in the context of the sale of S3 as a whole or any other portion of its business or (iv) enter into any agreement or understanding with, any Person other than VIA and its Affiliates, agents and Representatives, in connection with any Acquisition Proposal, as

<PAGE>   31

defined herein. S3 will immediately cease any and all existing activities, discussions or negotiations with any parties conducted heretofore with respect to any of the foregoing. S3 will (i) notify VIA as promptly as practicable if any inquiry or proposal is made or any information or access is requested in connection with an Acquisition Proposal or potential Acquisition Proposal and (ii) as promptly as practicable, notify VIA of the significant terms and conditions of any such Acquisition Proposal. In addition, from and after the date hereof until the earlier of (i) the termination of this Agreement pursuant to Article 7 and (ii) the Closing Date, S3 will not and will instruct its directors, officers, employees, Representatives, investment bankers, agents and Affiliates not to, directly or indirectly, make or authorize any public statement, recommendation or solicitation in support of any Acquisition Proposal made by any Person other than VIA. For the purposes of this Agreement, the term "Acquisition Proposal" shall mean any proposal or offer relating to any transaction, regardless of form, relating to S3's Graphics Chip Business or the Graphics Chip Business Assets, and the Excluded Licenses, other than transactions which involve the acquisition of S3 as a whole or any other portion of its business; provided, however, that nothing herein shall prohibit S3's Board of Directors from taking and disclosing to S3 stockholders a position with

HBD 0212
Confidential

respect to any tender offer pursuant to Rules 14d-9 and 14e-2 promulgated under the Exchange Act. Nothing herein shall prohibit VIA from seeking injunctive or other equitable relief for any breach of this Section 5.5(b).

(c) In the event (i) S3 breaches the provisions of Section 5.5(b), or (ii) S3, prior to the Closing Date, engages in transactions or conduct of the type described in Section 5.5(b) which results in the termination of the Intel License prior to the Closing Date and if, as a result of either (i) or (ii), the transactions contemplated by this Agreement are not consummated in accordance with this Agreement, S3 shall, within 48 hours of VIA's demand, pay VIA a break-up fee of $12 million which shall fully and completely compensate VIA for costs and expenses incurred in connection with VIA's due diligence investigation, the preparation of documents in connection with the transactions contemplated by this Agreement and any other matters contemplated by this Agreement. Except for injunctive or other equitable relief which VIA may seek to enforce the provisions of Section 5.5(b), the break-up fee shall be VIA's sole and exclusive remedy for any claims, losses or damages arising out of or relating to a failure to consummate the transactions contemplated by this Agreement for the reasons set forth in this Section 5.5(c).

5.6 Intel License.

(a) If JV is Enjoined from Utilizing the Intel License (as defined in Section 5.6(h) below), because on or after the Closing Date S3 (i) engaged in transactions or conduct effecting a "Merge" (sic) or "Change of Control" of S3 (as those terms are defined in Section 6 of the Intel License) (other than entering into or consummating the transactions contemplated by this Agreement and the JV Transaction Agreements), or (ii) affirmatively engaged in acts or conduct whether by commission or omission (other than entering into or consummating the transactions contemplated by this Agreement and the JV Transaction Agreements or entering into a settlement agreement with Intel), then the following liquidated damages shall apply to compensate JV and VIA for any and all losses they may suffer as a result thereof, subject to the Maximum Damage Cap set forth in Article 9 below, and such liquidated damages shall be VIA's and JV's sole and exclusive remedy against S3 for any and all damages and claims relating to the matters set forth in this Section 5.6 (a). S3 shall be entitled to first setoff any amount owing to JV or VIA under this Section against any amounts due S3 pursuant to Section 8.3 or 8.4 and such

-26-

<PAGE>  32

amount shall be credited against such payment otherwise due by S3 or any royalty payments made by S3 pursuant to Section 5.6(e).

(i) If JV is Enjoined from Utilizing the Intel License Agreement commencing during the first 5 years following the Closing Date, then following the conclusion of said period, for each day of such 365 day period that occurred during the 5-year period following the Closing Date, S3 shall pay JV $191,780.82, within 30 days of written demand by JV, as liquidated damages; and

(ii) If such 365 day period commences or ends during the sixth year following the Closing Date, then following the conclusion of said 365 day period, for each day of such 365 day period that occurred during the sixth year following the Closing Date, S3 shall pay JV $123,287.67, within 30 days of written demand by JV, as liquidated damages.

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt        6/24/03

HBD 0213
Confidential

(b) If during the first 5 years after the Closing Date (i) S3 entered into a settlement agreement with Intel such that JV can no longer operate under the Intel License, then the following liquidated damages shall apply to compensate JV and VIA for any and all losses they may suffer as a result thereof, subject to the Maximum Damage Cap set forth in Article 9 below, and such liquidated damages shall be VIA's and JV's sole and exclusive remedy against S3 for any and all damages and claims relating to the matters set forth in this Section 5.6 (b). S3 shall be entitled to first setoff any amount owing to JV or VIA under this Section against any amounts due S3 pursuant to Section 8.3 or 8.4 and such amount shall be credited against such payment otherwise due by S3 or any royalty payments made by S3 pursuant to Section 5.6(e).

(i) If as a result of entering into a settlement agreement with Intel, S3 loses the Intel License, then S3 shall pay JV $35 million within 30 days after the date that S3 enters into such settlement agreement, provided, that S3 may setoff against up to $35 million of such payment, 50% of any damages or other payments that S3 is required to pay to Intel as consideration for such settlement.

(ii) If S3 does not lose the Intel License as a result of entering into a settlement agreement with Intel, then: (A) if such settlement is a Settlement With Release (as defined below), S3 shall pay JV $45 Million within 30 days after the date that S3 enters into such settlement agreement, provided, however, S3 may setoff against up to $35 million of such payment 50% of any damages or other payments, after the first $20 million of such damages or other payments that S3 is required to pay to Intel as consideration for such settlement, or (B) if such settlement is not a Settlement With Release, S3 shall pay JV $70 million within 30 days after the date that S3 enters into such settlement.

For purposes hereof, a Settlement With Release means that a settlement by S3 with Intel provides a release through the settlement date for all past manufacture and/or distribution of JV's products (including the inventory purchased from S3). For purposes of clauses (i) and (ii), JV's share of "damages or other payments that S3 is required to pay to Intel as consideration for such settlement" shall only apply in a Settlement With Release, and in such instance only to such damages or other payments related to the transactions contemplated hereby (including the

-27-

<PAGE>    33

transfer of the Graphics Business Assets to JV), JV's products (including the inventory purchased from S3), or any action or omission by JV, VIA or any Affiliate thereof, and shall not include pre-payment of royalties for JV products after such date. Liquidated damages under this Section 5.6(b) shall be paid by S3 as of the later of 30 days after: (i) the date of S3's settlement with Intel, or (ii) the fourth anniversary of the Closing.

(c) If JV is Enjoined from Utilizing the Intel License (as defined in Section 5.6(h) below) because of the acts or omissions of either or both of the parties prior to, or associated with, entering into or consummating the transactions contemplated by this Agreement and the JV Transaction Agreements (the "Transaction-Related Acts or Omissions"), then the following liquidated damages shall apply to compensate JV and VIA for any and all losses they may suffer as a result thereof, subject to the Maximum Damage Cap set forth in Article 9 below, and such liquidated damages shall be VIA's and JV's sole and

HBD 0214
Confidential

exclusive remedy against S3 for any and all damages and claims relating to the matters set forth in this Section 5.6(c):

(i) If such 365 day period commences or ends during the first 5 years following the Closing Date, then following the conclusion of said 365 day period, for each day of such 365 day period that occurred during the 5 year period following the Closing Date, S3 shall pay JV $95,895.41 within 30 days of written demand by JV, as liquidated damages; and

(ii) No liquidated damages will be due under this Section 5.6(c) with respect to days outside the five (5) year period that commences on the Closing Date.

(d) Notwithstanding anything to the contrary herein, in no event shall VIA or JV be entitled to any damages (liquidated or otherwise) as set forth in this Section 5.6 if, on or after the Closing Date or prior to the effective date of any act or omission which would otherwise give rise to S3's liability pursuant to Section 5.6(a), (b) or (c), the Intel License terminates or ceases to cover the manufacture, sale or use by JV as a Subsidiary of S3 or otherwise of any products in the Graphics Chip Business, or (ii) JV is Enjoined from Utilizing the Intel License, due, in either (i) or (ii) to an act or omission by JV or VIA (other than the Transaction-Related Acts or Omissions that are subject to Section 5.6(c) above, provided that such Transaction-Related Acts or Omissions are undertaken in good faith).

(e) If, on or after the Closing Date, S3 engages in transactions or other affirmative conduct which causes the Intel License to become royalty bearing pursuant to Section 6.7 of the Intel License, then the Parties agree (i) to allocate the Revenue Cap (as defined in the Intel License) equally between S3 and JV and (ii) that S3 shall be responsible for the payment of royalties due under the Intel License on account of the operations of the Graphics Chip Business conducted by JV after the Closing until such time as the maximum amount available under the Maximum Damage Cap set forth in Article 9 is exhausted and JV shall be responsible thereafter and shall pay S3 in cash for the royalties related to the operations of the Graphics Chip Business by JV prior to the due date to Intel. S3 may setoff any royalty amounts owed on account of the Graphics Chip Business, pursuant to this Section 5.6(e), against amounts owed to S3 by JV or VIA under the Guaranty or Sections 8.3 or 8.4 hereof. Notwithstanding the foregoing, if S3's

-28-

<PAGE>   34

revenue from operations that is subject to the Revenue Cap is less than its 50% allocation, then S3 shall reallocate any unused portion to JV.

(f) JV hereby agrees in writing to be subject to the terms, conditions and obligations of the Intel License, to the extent necessary to derive any benefits therefrom.

(g) S3, VIA or JV, as the case may be, shall, at its sole cost and expense use commercially reasonable efforts to defend any claim or cause of action for damages, rescission or other legal or equitable relief brought against it arising from or relating to the transactions contemplated by this Agreement or the Intel License which could impair JV's utilization thereof. Each party shall provide the other parties notice of any such claim or cause of action within 5 business days after the disclosing party's receipt of notice thereof. S3 shall consult with JV and VIA concerning the joint defense of such

HBD 0215
Confidential

55

claim or action, all subject to the terms of a mutually agreeable joint defense and confidentiality agreement to be agreed upon by S3, VIA and JV. After making a payment under Section 5.6(a), 5.6(b) or 5.6(c), S3 will have no further liability or obligation under this Section 5.6.

(h) "Enjoined from Utilizing the Intel License" shall mean that: (i) a court has entered an order holding, or S3 has entered into a written agreement with Intel agreeing that, the Intel License does not cover the manufacture, sale or use by JV as a subsidiary of S3 or otherwise, of any products in the Graphics Chip Business or (ii) a court has, at the request of Intel, entered an order enjoining the sale by JV of such products including without limitation any importation bans thereon, provided, that if S3 appeals such order described in (i) or (ii) of this Section 5.6(h), JV shall only be deemed to have been "Enjoined from Utilizing the Intel License" if such order is maintained for a contiguous 365 day period beginning after the Closing Date, or if the order is stayed or dropped and within 30 days thereafter the order is reinstated, then if the old and new orders are maintained for a cumulative period of 365 days excluding the intervening period, then the "Enjoined from Utilizing the Intel License" event shall be deemed to be effective for purposes of determining S3's payment obligations hereunder on the last day of such 365 day period.

(i) In no event shall S3 be required to make more than 1 payment pursuant to Section 5.6(a), 5.6(b) or 5.6(c), whether JV is Enjoined from Utilizing the Intel License more than once during the 5 year period referenced therein or otherwise, nor shall S3 after making a single payment under any of Section 5.6(a), 5.6(b) or 5.6(c) be required to make any further payments under any of Section 5.6(a), 5.6(b) or 5.6(c) under any circumstances; if S3 makes a payment under any clause of Section 5.6(b), it cannot be required to make any payment under any other clause of that Section. Any payment due under Section 5.6(a), 5.6(b) or 5.6(c) shall be net of any royalty payments made by S3 (except those paid to S3 by JV) under Section 5.6(e).

(j) Except as set forth in this Section 5.6, S3 and its Affiliates shall use commercially reasonable efforts to maintain and keep in full force and effect the Excluded Licenses and to secure for the benefit of JV all such Licenses to the extent permitted therein, and shall not Transfer any of the Excluded Licenses other than in connection with a merger or consolidation of S3 or the sale of all or substantially all of its assets, as a whole, or a sale of any division or line of business of S3.

-29-

<PAGE>   35

5.7 Filings. The Parties shall use their respective best efforts to promptly take all such action as may be necessary under United States federal, state and other laws applicable to or necessary for the consummation of the transactions contemplated hereby, and will file and, if appropriate, use their best efforts to have declared effective or approved all documents and notifications with all governmental or regulatory authorities that it deems necessary or appropriate for the consummation of the transactions contemplated hereby, including all filings necessary under the HSR Act and the Exxon-Florio Amendment to Section 721 of the Defense Production Act of 1950. If either Party fails to file any necessary amendments to its current HSR application that are necessary to reflect this Agreement on or before a date two weeks after the date of this Agreement, then such defaulting Party shall promptly pay on demand $5 million to the other Party.

5.8 Expenses. Except as otherwise provided herein, all costs and

HBD 0216
Confidential

expenses incurred in connection with this Agreement and the transactions contemplated hereby (including fees and disbursements of financial advisors, accountants and attorneys) shall be paid (i) by S3, if such costs or expenses are incurred by or on behalf of S3 (and such costs and expenses shall not be considered Assumed Liabilities if incurred by S3), and (ii) by VIA, if such costs or expenses are incurred by or on behalf of VIA.

5.9 Stamp Taxes, Duties, etc. All sales, transfer, filing, recordation and similar taxes and fees (including all real estate transfer taxes and conveyance and recording fees, if any), and all stamp taxes, registration taxes, duties or other similar charges arising from or associated with the transactions contemplated hereby shall be borne by JV. The parties agree to reasonably cooperate with each other in good faith to minimize any such taxes or fees.

5.10 Required Notices. At all times prior to the Closing Date, S3 and VIA shall promptly, upon obtaining knowledge thereof, give written notice to each other of (i) any facts or circumstances or the occurrence of any event or the failure of any event to occur, which will, or could reasonably be expected to, result in (x) a Material Adverse Effect, (y) a material adverse effect on such person's or any of its Affiliates' ability to consummate the transactions contemplated hereby or to satisfy its obligations hereunder, or (z) a material breach of any representation or warranty made by such person or any of its Affiliates in this Agreement, (ii) any failure by such person or any of its Affiliates to comply in all material respects with any covenant, condition or agreement contained in this Agreement, (iii) any material complaints, investigations, proceedings or hearings of any Governmental Authority or agency with respect to this Agreement, S3, the Contributed Assets or the transactions contemplated hereby, and (iv) any institution or threat of institution of any litigation or similar action with respect to this Agreement, S3, the Contributed Assets or the consummation of the transactions contemplated hereby.

5.11 Insurance. S3 shall keep all insurance policies currently insuring the Contributed Assets or substantially equivalent insurance policies in full force and effect up to the Closing Date and S3 shall pay all premiums in respect thereto covering all periods up to and including the Closing Date. S3 shall assign to JV all its assignable rights and claims under all insurance policies of S3. To the extent that any claim that S3 has or may have pursuant to such insurance policies is not assignable, JV and S3 shall cooperate to pursue such claim and all amounts recovered by S3 pursuant to such policies shall immediately be paid to JV.

-30-

<PAGE>    36

5.12 Employee Matters. From and after the Closing Date, JV shall provide Transferred Employees comparable employment at the same base compensation rate and with generally similar responsibilities as applicable to such Transferred Employees immediately prior to the Closing Date. JV shall establish employment policies and procedures substantially similar to those in effect at S3 as of the date of this Agreement and shall establish substantially similar welfare benefit plans for such employees.

5.13 Option Obligations. If, after the Closing Date, a Transferred Employee exercises a stock option to purchase S3 common stock, then, within 5 business days of such exercise, JV shall pay S3 the difference between the exercise price of such stock option held by the Transferred Employee and a price per share equal to the lowest closing price for S3 common stock on the Nasdaq National Market during the 5 business days preceding the date of this Agreement.

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0217
Confidential

5.14 Historically Audited Financial Statements of Graphics Chip Business. On or before a date which is 90 days from the Closing Date, S3 shall, at its sole cost and expense, deliver to JV audited financial statements of the Graphics Chip Business as conducted by S3 for its last three fiscal years, along with the unqualified audit report of Ernst & Young LLP thereon.

5.15 Monthly Financial Statements. Within 15 days following each month end between the date of this Agreement and the Closing Date, S3 shall prepare and deliver to VIA unaudited financial statements of the Graphics Chip Business as of the month then ended.

5.16 Closing Balance Sheet. S3 shall prepare and deliver a Closing Balance Sheet to JV within 14 days after the Closing Date, prepared in accordance with GAAP applied on a consistent basis, reflecting only the Graphics Chip Business Assets and the Assumed Liabilities and Additional Capital Assets (if any).

5.17 Intentionally Deleted.


-31-

<PAGE>    37

5.18 Updated S3 Schedules. S3 shall prepare and deliver to VIA updated Schedules under this Agreement 4 business days prior to the Closing Date (the "Updated S3 Schedules") and shall cooperate with the Outside Auditor in taking a physical inventory on or before the Closing Date.

5.19 Retention Plan. VIA shall adopt and implement a retention plan applicable to Transferred Employees only and shall be responsible for the costs of such plan; provided, that if the Closing does not occur solely as a result of action or inaction by S3, then S3 shall promptly reimburse VIA for all such costs up to a maximum amount of $8,000,000.

5.20 Rights Agreement. The S3 Rights Agreement dated as of May 14, 1997 between the First National Bank of Boston and S3 (the "Rights Agreement") shall be amended if VIA at any time after the Closing ceases to hold S3 stock representing at least 15% of all voting interests in S3 to delete the effect of the amendment referenced in the next sentence. On or before the Closing, the Board of Directors of S3 shall take, or cause to be taken, all requisite corporate action to insure that VIA shall not, by virtue of its acquisition of shares of S3 at the Closing pursuant to the Warrant, become an "Acquiring Person" as defined in S3's Rights Agreement, dated as of May 14, 1997, between S3 and The First National Bank of Boston (the "Rights Agreement"), and that no "Distribution Date" as defined in such agreement, shall occur, or be deemed to have occurred, by virtue of the foregoing acquisition of shares by VIA.

5.21 Investor Rights Agreement. The Amended and Restated Investor Rights Agreement, dated February 18, 2000, between S3 and VIA shall be further amended and restated to include the shares of S3 Common Stock purchased by VIA upon exercise of the S3 Warrant.

5.22 Additional Capital Assets. Schedule 5.21 sets forth a list of capital assets with respect to which S3 has placed an order to purchase but has not yet received delivery. Schedule 5.21 shall be amended prior to the Closing Date to add any other assets whose purchase is approved by VIA pursuant to Section 5.4(m). On or before the Closing Date, VIA will designate those assets listed on Schedule 5.21, which shall become additional Contributed Assets

HBD 0218
Confidential

("Additional Capital Assets"). S3 shall retain any such assets which VIA has not designated as Contributed Assets. If S3 has received delivery of an Additional Capital Asset, the liability relating to that asset, if any, shall be assumed by JV on the Closing Date as an Assumed Liability. If S3 has not received delivery of an Additional Capital Asset, it shall transfer its rights and obligations under the applicable contract or purchase order to JV at Closing.

5.23 Covenant Not to Sue. From and after the date of this Agreement until the earlier of either (a) termination of this Agreement by either party or (b) January 30, 2001, S3 will not, on behalf of itself, or in cooperation or participation with any other person, firm, entity, corporation, institute, or government agency, file, refile, or in any manner participate in or prosecute any claim, charge, grievance, complaint, or action of any sort against any party to the Release before any local, state or federal court, arbitrator, administrative agency, board or tribunal concerning any matter arising out of or in connection with the failure to close the transactions contemplated by the Investment Agreement, dated as of April 10, 2000, between VIA and S3, and the exhibits and schedules thereto, including without limitation the application submitted by VIA to the government of Taiwan in connection with said Investment Agreement and VIA's failure to obtain the Taiwanese government's approval of such application.

-32-

<PAGE>   38

5.24 Insurance. S3 will file and diligently prosecute claims for loss of Contributed Assets due to fire, theft or other casualty covered by insurance maintained by S3.

ARTICLE 6.

CONDITIONS TO CLOSING

6.1 Conditions to the Obligations of VIA. The obligations of VIA under this Agreement shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, unless waived as provided in Section 10.1:

(a) Representations, Warranties and Agreements. All representations and warranties made herein by S3 shall be true and correct in all respects on the date hereof and (except as contemplated hereby) at and as of the Closing Date with the same effect as though made at and as of such date, except to the extent due to the acts or failure to act by VIA (without the concurrence of S3) pursuant to the Management Agreement, and S3 shall have performed in all respects all covenants and agreements required by this Agreement and the other JV Transaction Agreements to be performed by it at or prior to the Closing Date except for such changes in the representations and warranties, and failure of performance, that individually or in the aggregate do not have a Material Adverse Effect on the Graphics Chip Assets, as of the Closing Date. VIA shall have received from S3 certificates, dated the Closing Date and signed by authorized officers of S3, to the foregoing effect.

(b) Authorizations, Approvals and Consents. The mandatory waiting period under the HSR Act (including any extension thereof) shall have expired, the approval of VIA's Board of Directors and S3's Board of Directors shall have been received, and the authorizations, approvals, consents and other items required in connection with the execution and delivery of this Agreement and the other JV Transaction Agreements or the consummation of the transactions contemplated hereby or thereby shall have been obtained.

HBD 0219
Confidential

(c) No Injunction, etc. Consummation of the transactions contemplated hereby shall not have been restrained, enjoined or otherwise prohibited by any Applicable Law, including any order, injunction, degree or judgment of any Governmental Authority. No Governmental Authority shall have determined any Applicable Law to make illegal the consummation of the transactions contemplated hereby or by the other JV Transaction Agreements.

(d) Execution of JV Transaction Agreements. The JV Transaction Agreements shall have been executed and delivered by all Parties thereto (other than VIA) and shall be in full force and effect.

(e) Opinion of Counsel to S3. VIA shall have received an opinion or opinions, dated as of the Closing Date, from counsel to S3 substantially in the form attached hereto as Exhibit 13.

(f) Updated S3 Schedules. VIA shall have received the Updated S3 Schedules and the changes reflected therein from the original S3 Schedules delivered upon the signing of this Agreement shall not constitute a Material Adverse Effect.

-33-

<PAGE>   39

6.2 Conditions to the Obligations of S3. The obligations of S3 under this Agreement shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, unless waived as provided in Section 10.1:

(a) Representations, Warranties and Agreements. All representations and warranties made herein by VIA shall be true and correct in all respects on the date hereof and (except as contemplated hereby) at and as of the Closing Date, with the same effect as though made at and as of such date, and VIA shall have performed in all respects all covenants and agreements required by this Agreement and the other JV Transaction Agreements to be performed by it at or prior to the Closing Date. S3 shall have received from VIA certificates, dated the Closing Date and signed by authorized officers of S3, to the foregoing effect. S3 shall have received from VIA certificates, dated the Closing Date and signed by authorized officers of S3 to the effect all representations and warranties made herein by VIA shall be true and correct in all material respects on the Closing Date.

(b) Authorization, Approvals and Consents. The mandatory waiting period under the HSR Act (including any extensions thereof) shall have expired, the approval of S3's Board of Directors shall have been received and the authorizations, approvals, consents and other items required in connection with the execution and delivery of this Agreement and the other JV Transaction Agreements or the consummation of the transactions contemplated hereby or thereby shall have been obtained.

(c) No Injunction, etc. Consummation of the transactions contemplated hereby shall not have been restrained, enjoined or otherwise prohibited by any Applicable Law, including any order, injunction, degree or judgment of any Governmental Authority. No Governmental Authority shall have determined any Applicable Law to make illegal the consummation of the transactions contemplated hereby or by the other JV Transaction Agreements.

(d) Execution of JV Transaction Agreements. The JV Transaction Agreements shall have been executed and delivered by all Parties thereto (other

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0220
Confidential

than S3) and shall be in full force and effect.

## ARTICLE 7.

### TERMINATION

7.1 Bases for Termination. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of S3 and VIA;

(b) by either S3 or VIA, if the Closing shall not have occurred by the Scheduled Closing Date or such later date as S3 and VIA shall agree in writing, otherwise than on account of a breach of this Agreement by the terminating Party;

(c) by VIA, if there has been a material breach of any representation, warranty, covenant or agreement on the part of S3 giving rise to or resulting in a Material Adverse Effect;

-34-

<PAGE>   40

(d) by either S3 or VIA, if a Governmental Authority (other than the government of Taiwan or any agency or committee or subdivision thereof) shall have issued an order, decree or ruling or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Closing or any of the transactions contemplated hereby or by the JV Transaction Agreements, which order, decree or ruling is final and non-appealable;

(e) by either S3 or VIA, if S3 is required to pay a break-up fee pursuant to Section 5.5(c).

7.2 Effect of Termination. Any termination of this Agreement under Article 7 will be effective immediately upon the delivery of written notice of the terminating Party to the other parties hereto. Upon any termination of this Agreement by either S3 or VIA as provided in Section 7.1, this Agreement shall forthwith become null and void ab initio and there shall be no liability or obligation on the part of S3 or VIA or their respective Affiliates, officers, directors or employees and except that the provisions of Section 5.2, 5.3, 5.5(c), 5.8, 5.9 and 7.2 shall survive any termination of this Agreement.

7.3 Failure to Close; Escrow. If the Closing shall not have occurred by January 3, 2001, and if the failure to close is due solely as a result of action taken or inaction by S3, where, but for such action or inaction, the Closing would have occurred, then S3 shall pay VIA $20,000,000. Such amount shall be paid on the termination of this Agreement. If the Closing shall not have occurred by the Scheduled Closing Date, and if the failure to close is not solely due to action or inaction taken by S3, VIA shall immediately pay S3 either $60,000,000 in cash or 6,000,000 shares of S3 common stock or any linear combination thereof. As security for such payment, concurrent with the execution of this Agreement, VIA shall execute the Escrow Agreement and shall deliver to S3 or its agent for deposit into escrow $60,000,000 in cash or 6,000,000 shares of S3 common stock or any linear combination thereof (the "Escrow Assets"). The payment provided by Section 5.7 and the payments provided in this Section 7.3 shall constitute the sole and exclusive remedy of any Party for damages

HBD 0221
Confidential

resulting from the failure to timely file a HSR application under Section 5.7 and the failure to close under this Section 7.3.

<div align="center">ARTICLE 8.</div>

<div align="center">INDEMNIFICATION, CONTRIBUTION AND SURVIVAL</div>

8.1 Survival of Representations and Warranties. The representations and warranties of S3 and VIA set forth in this Agreement or in any certificate delivered by either of them pursuant to this Agreement, except those set forth in Sections 3.6 and 3.19 which shall survive for the appropriate statute of limitations, shall survive the Closing Date and the consummation of the transactions contemplated hereby for a period of 1 year after the Closing Date and will then and thereupon terminate. No claim shall be made by any Person by virtue of or arising out of or resulting from or relating to the breach of any such representation or warranty unless written notice of such claim shall have been given on or prior to the date on which such representation or warranty shall expire, in which event each such representation and warranty shall, solely with respect to such claim and all other claims arising out of the same specific facts or circumstances, survive until such claims are resolved and all obligations with respect thereto are satisfied. All covenants and agreements of the Parties herein shall survive the Closing without any limitation.

<div align="center">-35-</div>

<PAGE>    41

The Parties agree that any amounts owing by S3 on account of, or as a result of, a breach of any of its representations or warranties shall be first setoff against amounts owed by JV under this Agreement, or by VIA under the Guaranty, VIA agrees that such setoff by S3 against amounts owed by JV and VIA shall satisfy any obligation owing by S3 to JV or VIA as a result of such breach.

8.2 Indemnification by S3. S3 hereby agrees to indemnify and hold harmless VIA and JV (and each of their respective directors, officers and Affiliates and their respective successors and permitted assigns) from and against any and all losses, obligations, deficiencies, liabilities, claims, damages, costs and expenses (including without limitation the amount of any settlement of any claim subject of this indemnification and all reasonable legal and other expenses incurred in connection with the investigation, prosecution or defense of any matter indemnified pursuant hereto) (collectively, "Damages") which any such indemnified Party may sustain, suffer or incur directly or indirectly and which result from, arise out of, are caused by or relate to (a) the breach by S3 of any representation, warranty, covenant or agreement made by it in this Agreement or in any agreement or instrument executed and delivered by it pursuant hereto (b) any liability, whether absolute or contingent, arising out of or related to the ownership or to the operation of the Graphics Chip Business prior to the Closing Date and not included in the Assumed Liabilities or (c) any liability arising under the Warner Act as it may apply to the transactions contemplated by this Agreement and the JV Transaction Agreements and S3's termination of any of its employees; provided, however that any breach or liability arising from acts or failure to act by VIA pursuant to the Management Agreement, and any liability arising from the termination of employment of any Transferred Employee subsequent to the Closing, is not subject to this clause (c).

8.3 Indemnification by VIA. VIA hereby agrees to indemnify and hold harmless S3 and JV (and each of their respective directors, officers and Affiliates and their respective successors and permitted assigns) from and

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt        6/24/03

HBD 0222
Confidential

against any and all Damages which any such indemnified Party may sustain, suffer
or incur directly or indirectly and which result from any breach by VIA of any
representation, warranty, covenant or agreement made by it in this Agreement or
in any agreement or instrument executed and delivered by it pursuant hereto and
any failure by JV to pay, when due, any of the Assumed Liabilities.

8.4 Indemnification by JV. JV hereby agrees to indemnify and hold
harmless S3 and VIA (and each of their respective directors, officers and
Affiliates and their respective successors and permitted assigns) from and
against any and all Damages which any such indemnified Party may sustain, suffer
or incur directly or indirectly and which result from any breach by JV of any
representation, warranty, covenant or agreement made by it in this Agreement or
in any agreement or instrument executed and delivered by JV pursuant hereto,
including, without limitation, any failure by JV to pay, when due, any of the
Assumed Liabilities.

8.5 Claims. Any claim for indemnity under Section 8.2, 8.3 or 8.4 hereof
shall be made by written notice from the indemnified Party to the indemnifying
Party specifying in reasonable detail the basis of the claim. When an
indemnified Party seeking indemnification under Section 8.2, 8.3 or 8.4 receives
notice of any Third Party Claims which is to be the basis for a claim for
indemnification hereunder, the indemnified Party shall give written notice
within a reasonable period thereof to the indemnifying Party reasonably
indicating (to the extent

-36-

<PAGE>   42

known) the nature of such claims and the basis thereof. Any failure by the
indemnified Party to provide such notice shall not affect the indemnifying
Party's obligations hereunder, except to the extent of any material liability
caused by such delay. Upon notice from the indemnified Party, the indemnifying
Party may, but shall not be required to, assume the defense of any such Third
Party Claim, including its compromise or settlement, and the indemnifying Party
shall pay all reasonable costs and expenses thereof and shall be fully
responsible for the outcome thereof; provided, however, that the indemnifying
Party may not settle or compromise any Third Party Claim without the indemnified
Party's prior written consent (which consent shall not be unreasonably
withheld). The indemnifying Party shall give written notice to the indemnified
Party as to its intention to assume the defense of any such Third Party Claim
within ten (10) business days after the date of receipt of the indemnified
Party's notice in respect of such Third Party Claim. If an indemnifying Party
does not, within ten (10) business days after the indemnified Party's notice is
given, give written notice to the indemnified Party of its assumption of the
defense of the Third Party Claim, the indemnifying Party shall be deemed to have
waived its rights to control the defense thereof. If the indemnified Party
assumes the defense of any Third Party Claim because of the failure of the
indemnifying Party to do so in accordance with this Section 8.5, the
indemnifying Party shall pay all reasonable costs and expenses of such defense
and shall be fully responsible for the outcome thereof. The indemnifying Party
shall have no liability with respect to any compromise or settlement thereof
effected without its prior written consent (which consent shall not be
unreasonably withheld).

8.6 Limitation of Liabilities. Neither S3, nor JV nor VIA shall be
obligated to provide indemnification under Sections 8.2, 8.3 or 8.4,
respectively, unless the aggregate amount of all claims for which any Party is
liable under Section 8.2, 8.3 or 8.4, respectively, exceeds $500,000, in which

HBD 0223
Confidential

case such Party shall be liable for all such amounts. Further, the Parties agree that the aggregate maximum liability of S3 or VIA, as the case may be, from or on account of a breach of representations and warranties or on an account of any indemnification obligations arising under Sections 8.2 (excepting 8.2(b) and 8.2(c)), 8.3 and 8.4 shall be capped at $30 million, provided, however, that such cap shall not apply to any liability arising from any failure by VIA or JV to discharge or pay the Assumed Liabilities, when due. Notwithstanding anything to the contrary herein, such limit shall not apply to, and be exclusive of, VIA or JV's obligations to S3 pursuant to Section 5.13(a) hereof. In the case of S3, any obligation arising under Sections 5.6(a) through (c), 5.6(e) and 8.2 shall first be satisfied through setoff against amounts owed by JV or VIA to S3 under Section 8.3 or 8.4 hereof. In the case of VIA or JV, any obligation under Section 8.3 or 8.4 hereof, as the case may be, shall first be satisfied through setoff against amounts owed to JV or VIA by S3 under Sections 5.6(a) through (c), 5.6(e) and Section 8.2.

## ARTICLE 9.

### MAXIMUM DAMAGES CAP

The Parties agree that the total liability of S3 on the one hand (including its aggregate payment obligations under Sections 2.5, 5.6, 5.8, 5.13(b), and Article 8) and JV and VIA, on the other hand, on account of any breach of this Agreement or of the JV Transaction Agreements, of whatever kind or nature and for whatever reason, shall be limited to a maximum amount of $70 million; provided, however, that with respect to VIA's and JV's liability to S3 such limit

-37-

<PAGE>   43

shall not apply to, and shall be exclusive of, (i) any amounts owed under Sections 2.2(c) and (d) of this Agreement or the Guaranty, or (ii) any amounts owed or liability incurred by JV to S3 pursuant to Section 5.13 of this Agreement, or (iii) any amounts payable by JV under Section 5.6(e), or (iv) any amounts owed by VIA or JV to S3 under Section 8.3 or 8.4 or otherwise as a consequence of JV's or VIA's failure to pay or discharge the Assumed Liabilities, when due. The Parties further agree that S3's obligation to pay certain royalties, pursuant to Section 5.6(e), shall be limited to and capped at an amount equal to the difference between $70 million less (i) any amounts theretofore set off by S3 against the amounts owing by JV to S3 under this Agreement, pursuant to the terms of this Agreement, and (ii) any amounts theretofore paid in cash by S3 to JV or VIA pursuant to Sections 5.6(a) through (c); provided, however, that there shall not be any duplication for such setoffs and any such payment made directly by S3 to JV or VIA. None of the Parties' obligations under Section 5.7 or 7.3 shall be subject to this Article 9.

## ARTICLE 10.

### MISCELLANEOUS

10.1 Amendments and Waivers. This Agreement may be amended or modified in whole or in part at any time prior to the Closing by an instrument in writing executed by each of the Parties in the same manner as this Agreement. In addition, any Party may, at its option, by an instrument in writing executed in the same manner as this Agreement, waive or extend the time for the fulfillment of any or all of the conditions herein contained to which its obligations

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt        6/24/03

HBD 0224
Confidential

hereunder are subject. No failure by any Party to take any action with respect to a breach of this Agreement or a default by another Party shall constitute a waiver of the former Party's right to enforce any provision of this Agreement or to take action with respect to such breach or default or any subsequent breach or default. Waiver by any Party of any breach or failure to comply with any provision of this Agreement by another Party shall not be construed as, or constitute, a continuing waiver of such provisions, or a waiver of any other breach of or failure to comply with any other provisions of this Agreement.

10.2 Notices. All notices, requests, consents, demands, instructions, approvals and other communications hereunder shall be delivered to all parties hereto, shall be in writing and shall be validly given, made or served, if delivered personally or sent by mail, recognized courier service, telex or telefax (confirmed by mail or recognized courier service in the case of telefaxes), and shall be deemed effective when actually received, as follows (or as designated in writing by any Party from time to time):

If to S3, to:

S3 Incorporated
2841 Mission College Blvd.
Santa Clara, California 95054
Attention:  President
Fax:  (408) 588-8050

-38-

<PAGE>   44

With copies to:

Pillsbury Madison & Sutro LLP
2550 Hanover Street
Palo Alto, California 94304
Attention:  Jorge A. Del Calvo, Esq.
Fax:  (650) 233-4545

If to VIA, to:

VIA Technologies, Inc.
8F, No. 553 Chung-Cheng Road
Hsing-Tien, Taipei
Taiwan
Attention:  President
Telecopier:  886-2-2218-7970

With copies to:

Heller Ehrman White & McAuliffe LLP
525 University Avenue
Palo Alto, California 94301-1900
Attention:  Sarah A. O'Dowd, Esq.
Fax:  (415) 324-0638

If to JV, to:

JV
2841 Mission College Blvd.
Santa Clara, California 95054

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0225
Confidential

Attention:  President
Fax:  (408) 588-8050

With copies to:

Heller Ehrman White & McAuliffe LLP
525 University Avenue
Palo Alto, California 94301-1900
Attention:  Sarah A. O'Dowd, Esq.
Fax:  (415) 324-0638

10.3 Assignment. Except as otherwise expressly provided herein, none of the Parties shall assign this Agreement or any rights, benefits or obligations hereunder without the prior written consent of the other Parties. Any attempt to so assign or delegate any of the foregoing without such consent shall be void.

10.4 Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware. For purposes of any action or proceeding

-39-

<PAGE>    45

involving this Agreement, JV hereby expressly submits to the jurisdiction of all federal and state courts located in the State of California and consents to be served with any process or paper by registered mail or by personal service within or without the State of California.

10.5 Section and Other Headings. Headings of the articles, sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

10.6 Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and each fully executed counterpart shall be deemed an original.

10.7 Entire Agreement. This Agreement (including the Schedules hereto) and the other JV Transaction Agreements constitute the entire and only agreement between the Parties relating to the subject matter hereof. Any and all prior arrangements, representations, promises, understandings and conditions in connection with said matter and any representations, promises or conditions not expressly incorporated herein or expressly made a part hereof shall not be binding upon any Party.

10.8 Severability. In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable, such illegality, invalidity or unenforceability shall not affect any other provisions of this Agreement.

10.9 Benefits Only to Parties. Other than as set forth in Article 8 hereof, nothing expressed by or mentioned in this Agreement is intended or shall be construed to give any Person other than the Parties and JV and their respective successors or assigns any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the Parties and JV and their respective successors and assigns and for the benefit of no other Person.

http://www.sec.gov/Archives/edgar/data/850519/000095014901000068/f68612ex2-1.txt          6/24/03

HBD 0226
Confidential

-40-

<PAGE>    46

        IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be
duly executed on its behalf by one of its officers thereunto duly authorized,
all as of the date and year first above written.

                                        S3 Incorporated


                                        By:    /s/ Ken Potashner
                                               --------------------------------
                                        Name: Ken Potashner
                                        Title: Chief Executive Officer


                                        VIA Technologies, Inc.


                                        By:    /s/ Wen-Chi Chen
                                               --------------------------------
                                        Name: Wen-Chi Chen
                                        Title: President and Chief Executive
                                               Officer


                                        JV


                                        By:    --------------------------------
                                        Name:
                                        Title:

-41-

</TEXT>
</DOCUMENT>

HBD 0227
Confidential

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
RON BENDER California Bar No. 143364
CRAIG M. RANKIN California Bar. No. 169844
TODD M. ARNOLD California Bar No. 221868
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for the Official Committee of Creditors
Holding Unsecured Claims

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, AND SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br><br>Debtors. | Case No. 03-51775 MM<br><br>Chapter 11 Cases<br><br>(Case Nos. 03-51775 through 03-51778 MM) (Jointly Administered)<br><br>DECLARATION OF RON BENDER, ESQ. IN SUPPORT OF HIS SUBMISSION OF PRELIMINARY STATUS REPORT AND REQUEST FOR CONTINUANCE OF DEADLINE FOR SUBMISSION OF FINAL STATUS REPORT AND OF DISCLOSURE STATEMENT HEARING<br><br>Date:   February 26, 2007<br>Time:   11:00 a.m.<br>Place:   Courtroom 3070<br>         280 South First Street<br>         San Jose, CA 95113<br><br>         Hon. Marilyn Morgan |

1

I, Ron Bender, Esq., hereby declare as follows:

1.      I am a partner of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), bankruptcy counsel to the Official Committee of Unsecured Creditors (the "Committee") in the above-referenced Chapter 11 bankruptcy cases.

2.      I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

3.      I make this Declaration in support of my Preliminary Status Report and Request for Continuance filed concurrently herewith.

4.      An initial disclosure statement hearing was held on January 23, 2007 in these cases in connection with a joint plan of reorganization and disclosure statement filed by the Debtors and the Committee in December, 2006.  These chapter 11 cases were commenced in March, 2003, nearly four years ago.  Even though all or nearly all of the Debtors' assets were sold shortly after the chapter 11 filings, the Debtors and the Committee both agreed that a plan of reorganization and disclosure statement could not sensibly be filed until the Debtors' pending litigation with, among others, VIA Technologies, Inc. ("VIA") and Intel Corporation ("Intel") was resolved.  The reason for this was that both VIA and a seemingly related entity known as S3 Graphics Co., Ltd. ("S3") filed similar, if not identical, proofs of claim against the Debtors in which they asserted general unsecured claims against the Debtors of more than $200 million in the aggregate for "breach of contract".

5.      The breach of contract claims filed by VIA and S3 appear to have arisen out of an agreement dated August 28, 2000 and titled "Amended Investment Agreement" between SONICBLUE INCORPORATED and VIA and other related agreements.  VIA and S3 alleged that SONICBLUE INCORPORATED breached the Amended Investment Agreement and related agreements by, among other things, not paying certain accounts payable, offering non-ordinary-course discounts to accelerate collection of receivables, not contributing certain assets to a related joint venture, and retaining payments received for certain accounts receivable that allegedly were owed to the joint venture.  VIA and S3 also claimed that the joint venture might be enjoined from using an intellectual property license between SONICBLUE INCORPORATED and Intel and that, if it was so enjoined, the joint venture was entitled to liquidated damages under the Amended

Investment Agreement in the amount of $70 million.  A copy of the Amended Investment Agreement (which is already on file with the Bankruptcy Court) is attached as Exhibit "1" to the Motion.  It is my understanding that much of the claims which were asserted by VIA and S3 appear to have arisen primarily as a result of the provisions of Section 5.6 of the Amended Investment Agreement.

6.    The Debtors and the Committee jointly determined that plan confirmation should not be attempted until the VIA/Intel litigation was resolved.  Among other things, confirmation of a plan prior to such a resolution might have resulted in the Debtors' rejection of the Intel intellectual property license which would have given rise to the $70 million liquidated damage provision described above.  Further, for a variety of reasons which are set forth in the disclosure statement, both the Debtors and the Committee concluded that a substantive consolidation of the four Debtors was the only sensible outcome for these estates.  However, since substantive consolidation cannot occur after plan confirmation, and can only occur prior to or concurrently with plan confirmation, and given that it appeared that both VIA and S3 may have had claims against less than all four of the Debtors, the Debtors and the Committee jointly concluded that the VIA/Intel litigation had to be concluded before it made sense for these estates to proceed with seeking to confirm a plan of reorganization which would seek to substantively consolidate the Debtors' four estates.

7.    Because of a conflict that Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP ("PW"), had with Intel, the Debtors employed the law firm of O'Melveny & Myers LLP ("OMM") as special litigation counsel to work in conjunction with PW in connection with the claims litigation with VIA and S3, as well as dealing with the related licensing dispute with Intel.

8.    As a result of extensive protective orders and confidentiality agreements in that litigation, the Committee was not a party to any of the key confidential settlement discussions that ensued or otherwise.  The Committee only received periodic and very general status reports on the litigation from PW and OMM.  However, to the Committee's knowledge, nothing particularly substantive was occurring towards settling the litigation until the middle part of 2006.  The Committee was advised in mid-late 2006 that a settlement agreement had been reached in principle

in which VIA and S3 would collectively receive one, general unsecured claim between them in the amount of $12.5 million and that the dispute with Intel over the Intel license was resolved in connection with this settlement agreement. The settlement terms and risks and costs of litigation were presented to the Committee by counsel to the Debtors (primarily by Ms. Suzzanne Uhland, Esq. of OMM). Counsel to the Debtors opined that the settlement was an excellent deal for the Debtors' estates, particularly given the exhorbitant costs of litigating the matters to trial, and the significant risk of VIA and/or S3 obtaining a much larger allowed claim against the estates, primarily involving the $70 million liquidated damage provision alluded to above. The Committee agreed that the settlement which had been reached was favorable to the estates, and the Committee supported the settlement. The settlement cleared the way for the estates to proceed with filing and seeking to confirm a plan of reorganization, to enable the funds in these estates (which total nearly $80 million of unencumbered cash) to be distributed to creditors in the fastest manner possible.

9.     We were provided with the VIA/S3 settlement agreement after it had been completed. We were not not privy to the settlement discussions which resulted in the final settlement and when we were first provided with a draft of the VIA/S3 settlement agreement, it was presented as essentially a final document which had been thoroughly negotiated by all of the parties. The VIA/S3 settlement agreement is somewhat complex, and counsel to the Debtors walked us through the VIA/S3 settlement agreement after the VIA/S3 settlement agreement had been provided to us. No discussion occurred at any time regarding any "Senior Indebtedness" provision in a Senior Note Indenture involving the Debtors and VIA (discussed more below), and we were unaware at that time of the existence of any such provision in the Senior Note Indenture or any connection that may have existed between any such provision in the Senior Note Indenture and the VIA/S3 settlement agreement.

10.     The VIA/S3 settlement agreement was approved by the Bankruptcy Court at a hearing in October, 2006. Once the VIA/S3 settlement agreement was approved by the Bankruptcy Court, I personally took the lead role in preparing a joint plan of reorganization and disclosure statement. PW had provided drafts of a plan of reorganization and disclosure statement to us some time before then, but the Committee concluded that substantial revisions to those documents were

required.  In December, 2006, the Committee and the Debtors finalized the terms of their joint plan of reorganization and disclosure statement and filed them with the Bankruptcy Court.  As set forth above, an initial disclosure statement hearing was held on January 23, 2007.

11.    It was only through an objection to the disclosure statement filed by Riverside Contracting, LLC and Riverside Claims, LLC (collectively, "Riverside") shortly before the disclosure statement hearing that we first learned of the "Senior Indebtedness" issue involving VIA in the Senior Note Indenture.

12.    The issue pertains to a Senior Note Indenture issued by SONICBLUE INCORPORATED in 2002 in favor of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. relating to a total of $75 million of Senior Notes (divided equally among these three entities).  Each of these three entities are members of the Committee.  As is typical in indenture agreements, the Senior Noteholders subordinated their claims to a number of different types of claims.  One such subordination is in favor of VIA and provides for the Senior Noteholders to subordinate their claims in favor of "all indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "VIA Indebtedness")."

13.    From my review of the Senior Note Indenture, the word "Indebtedness" is a defined term in the Senior Note Indenture and is defined as "having the meaning specified in Section 7.1(e)" [of the Senior Note Indenture].  Section 7.1 of the Senior Note Indenture is entitled "Events of Default".  Section 7.1(e) of the Senior Note Indenture reads as follows:

> Failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of indebtedness, which term as used herein means obligations (other than the Debentures or non-recourse obligations) of, or guaranteed or assume by, the Company, or any Significant Subsidiary, for borrowed money or evidenced by bonds, debentures, notes or other similar instruments ("Indebtedness") in an amount in excess of $15,000,000 or the equivalent thereof in any other currency or composite currency and such failure shall have continued for thirty (30) days after written notice thereof shall have been given to the Company by any holder of Debentures.

14.     The defined term "Indebtedness" has as its first letter an upper case "I".  The word "indebtedness" used in the subordination provision involving VIA has as its first letter a lower case "i".

15.     Because of PW's intimate familiarity with the Debtors (given that PW has served as general counsel to the Debtors since the Debtors' inception), the Debtors and the Committee agreed that we would handle the easier and more routine claims objections, and counsel for the Debtors (PW) would handle the more substantive and complex claims objections.  Two of the substantive and complex claims objections that PW was handling from the outset was the analysis of and, if appropriate, objection to the claims of the Senior Noteholders (as well as the approximately $100 million claims of the Junior Noteholders which pertain to the Junior Notes issued by the Debtors in 1996).  The Junior Noteholders subordinated their claims to the Senior Noteholders when the Senior Noteholders obtained the Senior Notes in 2002.

16.     In or around late August, 2006 or early September, 2006, after PW had made certain claim demands upon the Senior Noteholders, the Senior Noteholders asserted that PW had a conflict in terms of prosecuting any objection to the claims of the Senior Noteholders.  The asserted conflict stems from an opinion letter that PW issued in favor of the Senior Noteholders in 2002 at the time of the issuance of the Senior Notes.  Counsel to the Senior Noteholders (Bruce Bennett) advised me that he also informed PW that the Senior Noteholders intended to hold PW liable to the extent the Senior Noteholders are not paid in full.

17.     Immediately after the Senior Noteholders asserted their conflict against PW, PW transferred all of its work files regarding work that PW had done in connection with analyzing the claims of the Senior Noteholders and the Junior Noteholders to LNBRB.  Since then, LNBRB has spent an enormous amount of time, working in conjunction with the accounting firm of Grobstein, Horwath & Company LLP, to analyze the claims of the Senior Noteholders and the Junior Noteholders and to formulate an objection-to-claims strategy.  The issues involving both the Senior Noteholders and the Junior Noteholders are complex and involve significant claims.  Settlement at this time appears unlikely, and LNBRB anticipates filing objections to the claims of both the Senior Noteholders and the Junior Noteholders in the near future.  LNBRB is in the process of preparing

6

1    those objections at this time.

2        18.    Shortly before the disclosure statement hearing on January 23, 2007, two groups of

3    claims buyers known as Riverside (represented by Robert Franklin of Murray & Murray) and Argo

4    Partners (represented by Scott McNutt of McNutt & Litteneker) filed objections to the disclosure

5    statement in which they allege a conspiracy or other wrongdoing between PW and the Senior

6    Noteholders regarding the VIA/S3 settlement agreement.    Pursuant to the VIA/S3 settlement

7    agreement, VIA and S3 jointly obtained one general unsecured claim in the amount of $12.5 million,

8    with VIA and S3 to have the right to allocate the claim between them as they desire.    In the VIA/S3

9    settlement agreement, VIA agreed that none of this $12.5 million general unsecured claim would

10   constitute "Senior Indebtedness" under the Senior Note Indenture.

11       19.    Riverside and Argo Partners contend that the Senior Noteholders and PW conspired

12   to achieve this result in order to maximize the ultimate recovery that the Senior Noteholders receive

13   in these cases, and thereby minimize any exposure that PW has to the Senior Noteholders resulting

14   from the PW opinion letter described above which PW issued in favor of the Senior Noteholders.

15       20.    Under the plan and disclosure statement, the Debtors and the Committee are

16   projecting an estimated cash recovery to general unsecured creditors of approximately 33%.

17   Provided this 33% estimated figure proves to be correct, VIA and S3 would receive a total cash

18   distribution of approximately $4,125,000 from these estates on account of the $12.5 million general

19   unsecured claim that they jointly received from the VIA/S3 settlement agreement.

20       21.    I understand the arguments which have been espoused by Riverside and Argo

21   Partners to be summarized as follows:

22           i.    Riverside and Argo Partners contend that if VIA and S3 were willing to agree

23   to accept one general unsecured claim in the amount of $12.5 million under the VIA/S3 settlement

24   agreement, which VIA agreed would not constitute "Senior Indebtedness" under the Senior Note

25   Indenture, in a case where general unsecured creditors are projected to receive approximately 33%

26   of the amount of their claims (amounting to $4,125,000 to VIA and S3), then VIA and S3 should

27   have been willing instead to agree to receive an allowed general unsecured claim of less than $12.5

28   million if VIA did not waive the right to argue that its allowed claim did constitute "Senior

                                        7

1  Indebtedness" under the Senior Note Indenture.  The logic behind this argument is that any such
2  "Senior Indebtedness" claim (in favor of VIA) would have ultimately been paid 100% because the
3  Senior Noteholders would have been required to pay over to VIA any shortfall that VIA received
4  from the Debtors' estates.

5          ii.    Riverside and Argo Partners further contend that the Senior Noteholders
6  received a significant benefit from the VIA/S3 settlement agreement by VIA agreeing that none of
7  the $12.5 million claim would constitute "Senior Indebtedness" under the Senior Note Indenture
8  without the Senior Noteholders having paid any consideration to the Debtors' estates for receipt of
9  this alleged significant benefit.

10         iii.   Riverside and Argo Partners further contend that either the Senior
11 Noteholders should have paid consideration to the Debtors' estates for receipt of this alleged
12 significant benefit and/or counsel to the Debtors should have been able to persuade VIA and S3 to
13 agree to an allowed claim of less than $12.5 million with VIA retaining the right to contend that its
14 allowed claim did constitute "Senior Indebtedness" under the Senior Note Indenture.

15         22.    Following the conclusion of the disclosure statement hearing on January 23, 2007, the
16 Bankruptcy Court ordered me to perform an investigation of these matters and to file a report with
17 the Bankruptcy Court by February 19, 2007.  The Bankruptcy Court also continued the disclosure
18 statement hearing to February 26, 2007 at 11:00 a.m.

19         23.    I concluded that in connection with my investigation, I needed to take the depositions
20 of, and obtain documents from, at least the following five people:

21         i.     Bruce Bennett, Esq. of Hennigan Bennett & Dorman, who is serving as
22 counsel to the Senior Noteholders.

23         ii.    Suzanne S. Uhland, Esq. of O'Melveny & Myers LLP, who served as co-
24 counsel with PW in connection with the VIA/Intel litigation.

25         iii.   Thomas V. Loran, III, Esq. and/or Albert J. Boro, Jr., Esq. of PW, who served
26 as the lead PW litigators in the VIA/Intel litigation, as well as the attorneys at PW who have the
27 most knowledge regarding the other matters discussed above.

28         iv.    Marcus Smith, who is serving as the Debtors' current chief financial officer.

v.    The person at VIA who has the most knowledge (i.e., the "PMK") regarding the VIA/S3 settlement agreement.

24.    On January 25 and 26, I sent a letter to each of the foregoing in an effort to obtain their consent to appear for deposition and to produce documents voluntarily without having the estates go through the burden and expense of preparing and serving formal deposition notices, document requests and subpoenas.  In connection with those efforts, offered to travel to the location that would be most convenient to the deponents and to work flexibly with the deponents' work schedules to minimize the impact on the deponents' respective work schedules.  I also worked closely in conjunction with Mr. Franklin (counsel to Riverside) and with Mr. McNutt (then counsel to Argo Partners), as well as with Ms. Dumas (counsel to the OUST) to keep them fully apprised of all developments as well as to make sure that the document request also included all documents that they wished to have produced.  I made clear that I would provide copies of all documents produced to counsel to Riverside, counsel to Argo Partners and counsel to the OUST, and that they are all welcome to attend and participate in all depositions.

25.    The following is a summary of the status of those efforts:

i.    Bruce Bennett, Esq. of Hennigan Bennett & Dorman, who is serving as counsel to the Senior Noteholders.

Mr. Bennett and his counsel in this matter (Michael Swartz) have been extremely cooperative from the outset.  A deposition of Mr. Bennett was scheduled to be held on Monday, February 12, 2007, at 1:30 p.m., at Mr. Bennett's office in Los Angeles.  In accordance with my request, Mr. Bennett (through Mr. Swartz) produced responsive documents to me by email on February 8, 2007.  However, accompanying the document production is a letter from Mr. Swartz to me in which Mr. Swartz indicates that many of the documents he has produced are subject to a confidentiality agreement resulting from the VIA/Intel litigation which prohibits me from sharing those documents with others who are not parties to the confidentiality agreement.  From my review of the documents in question, it appears to me that I should be able to turn over all documents to all parties in interest.  I have advised the parties that I intend to file a motion with the Bankruptcy Court requesting authority to turn over copies of all such documents to other parties in interest, including, Riverside,

1   Argo Partners and the OUST.  After consultation with counsel to Riverside and Argo Partners, the

2   decision was made to postpone Mr. Bennett's deposition scheduled for February 12, 2007 until I

3   obtain an order from the Bankruptcy Court regarding the confidentiality issue.  Otherwise, the

4   parties will find themselves in a situation where I have at my disposal more documents than the

5   other parties in interest at the time of the deposition.

6                     ii.     Suzzanne S. Uhland, Esq. of O'Melveny & Myers LLP, who served as co-

7   counsel with PW in connection with the VIA/Intel litigation.

8           Ms. Uhland was initially not responsive to my request for her to appear voluntary for

9   deposition and to produce documents.  Ms. Uhland ultimately became cooperative and attributed her

10  initial lack of responsiveness to a very busy work schedule and to internal obstacles at OMM.  Ms.

11  Uhland ultimately agreed to appear voluntarily for deposition and to produce documents, but she

12  requested me to provide her with a formal deposition notice, document request and subpoena, which

13  she agreed to accept service of personally by over-night mail.  I proceeded to provide Ms. Uhland

14  with a formal deposition notice, document request and subpoena.  A deposition of Ms. Uhland is

15  currently scheduled to be held on Wednesday, February 14, 2007, at 1:30 p.m., at Ms. Uhland's

16  office in San Francisco.  Ms. Uhland's document request is due to be provided on February 12, 2007.

17  I was recently advised by Matt Powers, Esq. of OMM that OMM will be providing me with

18  documents in response to my document request at my office on February 12, 2007.  However, Mr.

19  Powers has made clear that as is the case with the documents produced by Mr. Bennett, I do not

20  have the authority to provide copies of those documents which are subject to the VIA/Intel

21  confidentiality agreement to any person or entity who is not a party to the confidentiality agreement

22  unless the prior permission of the Bankruptcy Court is obtained.  In addition, it appears that it is

23  OMM's position that Ms. Uhland cannot testify at a deposition to matters which are subject to the

24  confidentiality agreement if there are people present at the deposition who are not subject to the

25  confidentiality agreement unless the prior permission of the Bankruptcy Court is obtained.  As a

26  result of the foregoing, while a final decision will not be made until I receive the documents from

27  OMM, as is the case with Mr. Bennett, it appears that it would be premature for me to proceed with

28  Ms. Uhland's deposition until I file my motion with the Bankruptcy Court regarding the

10

1    confidentiality issue, and the Bankruptcy Court makes a ruling on that motion.

2                iii.    Thomas V. Loran, III, Esq. and/or Albert J. Boro, Jr., Esq. of PW, who served

3    as the lead PW litigators in the VIA/Intel litigation, as well as other attorneys at PW who have the

4    most knowledge regarding the subject matters at issue.

5        PW has been extremely cooperative from the outset.  PW has designated Mr. Boro as the

6    PMK for PW for all matters, and a deposition of Mr. Boro is currently scheduled to be held on

7    Friday, February 16, 2007, at 10:00 a.m., at Mr. Boro's office in San Francisco.  In accordance with

8    my request, Mr. Boro is required to produce responsive documents to me by February 14, 2007.

9    Until I receive the response to the document request, I will not know whether the same

10   confidentiality issues will arise as set forth above with respect to the documents to be produced by

11   Mr. Boro, or whether issues of attorney-client privilege will come into effect.  I have already made

12   clear to PW that it does not appear to me that Mr. Boro could be the PMK for all of the key subject

13   matters at hand.  While Mr. Boro may be the PMK with knowledge regarding the VIA/Intel

14   litigation and the ultimate settlement agreement with VIA/S3, it does not appear that as a litigator at

15   PW, Mr. Boro could be the PMK at PW regarding the "Senior Indebtedness" issue related to the

16   Senior Note Indenture or the conflict issue that the Senior Noteholders have asserted against PW

17   related to the opinion letter that PW issued in favor of the Senior Noteholders in connection with the

18   Senior Note Indenture.  It would appear that the PMK at PW for those matters would need to be

19   corporate/business lawyers at PW who represented the Debtors in connection with the Senior Note

20   Indenture as well as the PW opinion letter issued to the Senior Noteholders.  Moreover, Matt

21   Walker, who is a bankruptcy attorney at PW, previously sent an email to me in which Mr. Walker

22   acknowledged that he is the person who suggested inserting the language into the VIA/S3 settlement

23   agreement in which VIA agreed that none of the $12.5 million claim granted to VIA and S3 under

24   the VIA/S3 settlement agreement would be "Senior Indebtedness" under the Senior Note Indenture.

25   Mr. Walker indicated that his primary motivation for doing so was to avoid having the estates spend

26   money litigating about this issue later.  Since the burden is on PW to designate the PMK for the

27   subject matters at issue, it is my current intention to proceed with Mr. Boro's deposition as scheduled

28   and then, in consultation with counsel for Riverside, Argo Partners and the OUST, determine which

1   additional PW depositions should be taken.  However, as set forth below, a newly formed entity in

2   which Argo Partners is a member has already noticed its own deposition of a different attorney at

3   PW.

4                    iv.    Marcus Smith, who is serving as the Debtors' current chief financial officer.

5        Mr. Smith has been extremely cooperative from the outset.  A deposition of Mr. Smith was

6   scheduled to be held on Tuesday, February 13, 2007, at 8:00 a.m., at the PW office in Palo Alto.  In

7   accordance with my request, Mr. Smith was required to produce responsive documents to me by

8   February 9, 2007.  On February 9, 2007, I received a number of documents from Mr. Boro at PW,

9   who claimed PW was delivering such documents on behalf of and as counsel to Mr. Smith.  In

10  connection with that document production, PW appears to have not turned over certain documents,

11  and has redacted certain documents, on the basis of attorney-client privilege.  I provided copies of all

12  of the documents produced by Mr. Smith to all of the other parties in interest.  I sent an email to Mr.

13  Boro at the end of the day on February 9, 2007 requesting confirmation as to whether the documents

14  produced constitute a complete response to my document production request of Mr. Smith because

15  Mr. Boro had previously indicated that he would be providing Mr. Bender with documents on a

16  "rolling basis".  In addition, given (i) the sensitivity of the matters at hand and the investigation that

17  I am performing, (ii) the fact that these are liquidating estates, and (iii) the fact that any attorney-

18  client privilege being asserted would pass to a chapter 11 trustee if one was appointed, I have

19  requested PW and Mr. Smith to reconsider the position they have taken with respect to attorney-

20  client privilege and waive that privilege for purposes of producing all relevant documents.  I have

21  also indicted to Mr. Boro that if PW and Mr. Smith elect not to waive that privilege, then PW and

22  Mr. Smith must provide to me a privilege log which identifies, among other things, all documents

23  that have not been turned over on a privilege basis, and the basis for the privilege asserted.  After

24  consulting with Riverside and Argo Partners, all of the parties concluded that until I receive such a

25  privilege log and the privilege issue is resolved, it would be premature to proceed with the

26  deposition of Mr. Smith.  As a result, the parties have decided to postpone Mr. Smith's deposition

27  which had been scheduled to proceed on February 13, 2007 until these matters are resolved.

28                    v.    The person at VIA who has the most knowledge regarding the VIA/S3

                                                    12

1  settlement agreement.

2         I was advised that Henry C. Kevane, Esq. of the law firm of Pachulski, Stang, Ziehl, Young,

3  Jones & Weintraub ("PSZYJW") served as counsel to VIA during the VIA/Intel litigation and the

4  VIA/S3 settlement.  I have not had any prior contact or communication with Mr. Kevane.  On

5  January 25, 2007, I sent a letter to Mr. Kevane requesting that the VIA PMK agree to appear for

6  deposition and produce documents voluntarily to assist me in my investigative process.  After

7  receiving no response to the letter, I followed up with a phone call to Mr. Kevane at which time I

8  learned that Mr. Kevane is on a sabbatical in Africa, not returning until late February or early

9  March.  Ken Brown of PSZYJW returned my phone call and advised that no other attorney at

10 PSZYJW was able to assist me in this matter and that if I wished to proceed with discovery against

11 VIA I needed to proceed with formal rules of discovery.  As a result, I proceeded to prepare a

12 deposition notice, document request and subpoena, and served the foregoing on VIA's agent for

13 service of process located in Fremont, California, noticing the PMK at VIA for deposition for

14 February 9, 2007.  Subsequent to this occurring, Mr. Brown of PSZYJW called me to advise that

15 PSZYJW would be representing VIA in this matter.  Mr. Brown further advised me that Mr. Brown

16 first needs to determine the identity of the person who would be the PMK at VIA to testify to the

17 matters at hand.  Mr. Brown further advised me that the PMK at VIA works and resides in Taiwan

18 and arrangements would need to be made for that person to come to California to be deposed.  Mr.

19 Brown made clear to me that the PMK at VIA would not be available to appear at the noticed

20 deposition for February 9, 2007 and that VIA would not be able to produce the required documents

21 by February 7, 2007 as I requested in the VIA document request.  Mr. Brown did advise me that he

22 was working diligently to attempt to make the VIA PMK available for deposition the week of

23 February 12-16.  However, as of the date of the Preliminary Report (February 12), Mr. Brown has

24 not committed to a date for the deposition of the VIA PMK to be taken or for the date for the

25 production of the requested documents.  Moreover, on February 7, 2007, PSZYJW served me with a

26 response and objection by VIA to the deposition notice, document request and subpoena.  As a

27 result, the issue of when the VIA PMK will appear for deposition and when VIA will comply with

28 the document request is unclear, and it is unclear whether this will occur without the need for the

1    involvement of the Bankruptcy Court.

2        26.    On Monday, February 5, 2007, I was advised by John K. Shaffer, Esq. that he and

3    Frank Merola, Esq. of the Stutman, Treister and & Glatt law firm had been retained by a newly

4    formed entity known as SonicBlue Claims LLC ("SBC").  Mr. Shaffer advised me that SBC is the

5    assignee of the approximately $160,000 of unsecured claims which were previously held by Argo

6    Partners.  Mr. Shaffer further advised that Argo Partners and an entity known as Ferry Claims are

7    each 50% members of SBC.  I am not aware of the connection between Argo Partners and Ferry

8    Claims or the consideration paid by Ferry Claims for its acquisition of 50% of SBC.  In the objection

9    that Argo Partners filed to the joint disclosure statement, the sole declarant to that objection was

10   William McGrane, who signed that declaration in his capacity as counsel to Ferry Claims, who Mr.

11   McGrane acknowledged was not at that time a party in interest in the Debtors' cases but who had an

12   interest in purchasing VIA's claims against the Debtors.

13       27.    Given that $160,000 of unsecured claims amounts to less than one-tenth of one

14   percent of the total unsecured debt in these cases, and that as a result SBC appeared to have very

15   little economic stake in the outcome of any of the matters that I was investigating, I was curious as

16   to why such a relatively small unsecured creditor would be willing to incur the expense of

17   employing the Stutman firm for this matter.  As a result, I sent an email to Mr. Shaffer inquiring as

18   to SBC's motivation in these cases.  Mr. Shaffer responded by advising that SBC was interested in

19   acquiring other large claims in these cases, including potentially the $12.5 million unsecured claim

20   held jointly by VIA and S3.  In that response, Mr. Shaffer indicated that SBC is prepared to offer

21   jointly to the Debtors' estates and to VIA $5 million cash for the $12.5 million claim, which SBC

22   computes as a significant premium over what VIA and S3 would be projected to receive in these

23   cases on account of the $12.5 million claim if the projected 33% distribution to general unsecured

24   creditors proves accurate.  Mr. Shaffer indicated that the "excess cash" that SBC would be offering

25   above what SBC considers to the actual, fair market value of the $12.5 million claim could be shared

26   between VIA/S3 and the Debtors' estates in whatever manner they see fit.  Mr. Shaffer made clear

27   that SBC's offer would be contingent upon the Bankruptcy Court "blue penciling" (which I

28   understand to mean deleting) the provision of the VIA/S3 settlement agreement in which VIA

agreed that none of the $12.5 million claim would be "Senior Indebtedness" under the Senior Note Indenture.  I have already advised counsel to both SBC and VIA that the Committee would support such a purchase of the $12.5 million claim held by VIA and S3 provided that the Debtors' estates and therefore all general unsecured creditors received a significant benefit from this transaction, rather than just VIA and S3 receiving all of the benefits.

28.     Once I learned that Mr. Shaffer and Mr. Merola had been retained by SBC and that Mr. McNutt was no longer involved in this process, I have made every effort to work collaboratively with Mr. Shaffer and Mr. Merola and to keep them fully informed on and involved with on all matters.

29.     On February 7, 2007, I learned for the first time that McGrane Greenfield LLP (with William McGrane, Esq. serving as counsel) is serving as co-counsel with the Stutman firm in the representation of SBC.  I was somewhat surprised to learn that without any prior discussion with me on the matter, Mr. McGrane proceeded to serve his own deposition notice and document request upon Jorge Del Calvo, Esq. and upon John J. Todd.  Mr. Del Calvo is the attorney at PW who is listed in the notice provision of the Senior Note Indenture and is presumably the attorney at PW who represented the Debtors in connection with the Senior Note Indenture (and presumably the PW opinion letter that was issued to the Senior Noteholders).  Mr. Todd is the person who executed the Senior Note Indenture on behalf of SONICBLUE INCORPORATED as its Chief Operating Officer.

30.     The reason provided by Mr. McGrane as to why he proceeded with discovery on his own when he presumably was aware that I was, in accordance with the instruction of the Bankruptcy Court, conducting the same discovery with the full and complete involvement of the OUST, Mr. Franklin (counsel to Riverside) and Mr. Shaffer and Mr. Merola (the only counsel to SBC that I was aware of) is that Mr. McGrane claimed that he was not satisfied that the right people are necessarily being asked to testify on the key issue of what was intended by the term "Senior Indebtedness" in favor of VIA in the Senior Note Indentures and that he was availing himself of the right to take discovery in that regard.  I immediately made clear to Mr. McGrane that I fully intended to conduct all such discovery and to do so in conjunction with all relevant parties in interest.  I further made clear to Mr. McGrane that as set forth above, Mr. Boro was only intended to be the first PW witness

15

to be deposed, and not necessarily the last one, and that the decision as to whether to depose additional PW attorneys would be made by all relevant parties in interest.

31.    Since that time, I have been working cooperatively and collaboratively with Mr. McGrane, as well as with Mr. Shaffer, Mr. Merola, Mr. Franklin and Ms. Dumas, in connection with this discovery and investigative process, and I assume that this level of cooperation and collaboration will continue.

32.    Pursuant to Mr. McGrane's deposition notices, Mr. McGrane has noticed Mr. Del Calvo for deposition on February 19, 2007, at 10:00 a.m., at Mr. McGrane's office, and Mr. Todd for February 26, 2007, at 10:00 a.m., at Mr. McGrane's office.  I do not know the status of those depositions because I have not been a participant to that discovery, and I have not been provided with any further information regarding those depositions beyond being served with the original deposition notices.  I assume that Mr. McGrane will share with me all responses provided by Mr. Todd and Mr. Del Calvo to Mr. McGrane's deposition notices and document production requests, just as I will be doing with Mr. McGrane.

33.    In my view, the first and foremost issue for the Bankruptcy Court to decide is whether it would have been possible for the Debtors to settle the VIA/Intel litigation in a manner in which VIA and S3 would have received an allowed general unsecured claim of less than the $12.5 million that VIA and S3 did receive under the Bankruptcy Court approved VIA/S3 settlement agreement.  The reason why I view this as the critical issue here is because for the reasons set forth above, if all that happened differently in the settlement process is that VIA and S3 obtained the same $12.5 million general unsecured claim against the Debtors' estates as they currently have but the provision in which VIA agreed that none of the $12.5 million claim would constitute "Senior Indebtedness" under the Senior Note Indenture was not included, the Debtors' estates would still have a $12.5 million general unsecured claim which would share pro rata in the distribution from these estates.  If VIA then chose to pursue "Senior Indebtedness" litigation with the Senior Noteholders over the "Senior Indebtedness" provision of the Senior Note Indenture, that would be litigation solely between VIA and the Senior Noteholders to which the Debtors would not have been a party and to which the Debtors' bankruptcy estates would not have been effected by the outcome.

34.     The only way the Debtors' bankruptcy estates (and thereby other general unsecured creditors) would have benefited from a different settlement is if VIA and S3 had agreed to receive an allowed general unsecured claim against the Debtors of less than $12.5 million.  If that occurred, there would be less allowed general unsecured claims sharing in the distribution in these cases, which, in turn, would have benefited the holders of all other allowed general unsecured claims.

35.     I assume that if VIA and S3 were requiring as part of the settlement that they receive an allowed general unsecured claim against the Debtors in the amount of $12.5 million, which VIA agreed would not constitute "Senior Indebtedness" under the Senior Note Indenture, the only way that VIA and S3 would have agreed to accept an allowed general unsecured claim against the Debtors of less than $12.5 million would have been if VIA believed that some or all of its allowed general unsecured claim would constitute "Senior Indebtedness" under the Senior Note Indenture, or if a Bankruptcy Court order could have been obtained as part of the settlement agreement process in which the Bankruptcy Court made a finding that some or all of the allowed claim of VIA was "Senior Indebtedness" under the Senior Note Indenture.

36.     While formal discovery will need to be taken for the parties to understand the details of what actually happened, VIA's counsel (Ken Brown) has already orally confirmed to me (based upon a conversation that he had with Mr. Kevane who Mr. Brown was able to reach) that after the $12.5 million allowed general unsecured claim was agreed upon, VIA was asked to waive its right to contend that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture.  VIA's counsel (Ken Brown) has further orally confirmed to me that VIA knowingly agreed to this waiver because VIA did not believe that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture or that VIA was waiving anything of value to VIA.

37.     No explanation has thus far been provided to me as to who came up with the idea of requesting VIA to waive any right to contend that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture or why that request was made of VIA other than Mr. Walker of PW who claims to have done so for the reasons set forth above.

38.     Riverside and Argo Partners (now SBC) contend that the Senior Noteholders had an incentive to cause VIA to agree to this waiver to avoid the expense and risk of subsequent litigation

17

with VIA over whether some or all of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture. Formal discovery will need to be taken for me to determine whether the Senior Noteholders played any role in causing VIA to agree to this waiver and, if they did, whether the Senior Noteholders did anything wrong in doing so.

39.    Riverside and Argo Partners (now SBC) also contend that PW had an incentive to cause VIA to agree to this waiver to eliminate any risk of VIA engaging in subsequent litigation with the Senior Noteholders over whether some or all of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture because if VIA was successful in any such litigation, it would reduce the ultimate recovery in these cases by the Senior Noteholders and thereby increase PW's exposure to the Senior Noteholders resulting from the PW opinion letter described above. Formal discovery will need to be taken for me to determine whether PW played any role in causing VIA to agree to this waiver beyond Mr. Walker's contention above, and, if PW did, whether PW did anything wrong in doing so.

40.    In my view, there would need to have been two preconditions in order for these estates to have been harmed by VIA's agreement to waive any right to contend that any of the $12.5 million claim was "Senior Indebtedness" under the Senior Note Indenture. The first precondition is that VIA and S3 would need to have agreed to accept under the VIA/S3 settlement agreement an allowed general unsecured claim against the Debtors of less than $12.5 million. The second precondition is that either (i) VIA would need to have assumed the risk that following Bankruptcy Court approval of the VIA/S3 settlement, VIA would be successful in contending that some or all of that lesser claim would constitute "Senior Indebtedness" under the Senior Note Indenture, or (ii) the Debtors would need to have been able to persuade the Bankruptcy Court to approve a VIA/S3 settlement in which the Bankruptcy Court ordered that some or all of the allowed general unsecured claim granted to VIA and S3 did in fact constitute "Senior Indebtedness" under the Senior Note Indenture, which presumably would have had to occur over the vigorous objection of the Senior Noteholders.

41.    From my conversations with VIA's counsel (Ken Brown), I do not believe that it would have been possible for the Debtors to have persuaded VIA and S3 to have agreed to accept an

allowed general unsecured claim of less than $12.5 million and then to have assumed the risk that following Bankruptcy Court approval of the VIA/S3 settlement, VIA would later be successful in contending that some or all of that lesser claim would constitute "Senior Indebtedness" under the Senior Note Indenture.

42.     In summary, it appears to me that the following key questions need to be answered:

i.     Why did the Debtors not request VIA and S3 to agree to an allowed general unsecured claim of less than $12.5 million with some or all of that claim to constitute "Senior Indebtedness" under the Senior Note Indenture pursuant to an order of the Bankruptcy Court and/or why did the Debtors not seek to obtain consideration from the Senior Noteholders for a waiver of these rights by VIA?  Was it because the Debtors did not believe that VIA and S3 would have agreed to such a lesser claim?  Was it because the Debtors did not believe that they would be successful in persuading the Bankruptcy Court to find that some or all of that lesser claim constituted "Senior Indebtedness" under the Senior Note Indenture over the objection of the Senior Noteholders and that incurring the cost and risk associated with such litigation would not have been a prudent exercise?  Was it because the Debtors did not think to do so?  Was it because PW was trying to minimize its exposure to the Senior Noteholders resulting from the PW opinion letter?  Was it because the Senior Noteholders were able to influence the decision making process and actions by PW because of the threats made by the Senior Noteholders to PW resulting from the PW opinion letter?

ii.     I do not believe that the questions posed immediately above can be answered until formal discovery and a thorough investigation have been completed, and it is that discovery and investigation that I (working in close conjunction with Mr. Franklin, Mr. Shaffer, Mr. Merola, Mr. McGrane and Ms. Dumas) am currently conducting.

iii.     Even after formal discovery has been taken and facts have been ascertained, there will still remain a key legal question that will need to be answered by the Bankruptcy Court.  That key legal question is whether the Bankruptcy Court would have been willing to find that some or all of the claim allowed in favor of VIA and S3 under the VIA/S3 settlement agreement was "Senior Indebtedness" under the Senior Note Indenture.  That legal question would presumably

1    require significant litigation and require the Bankruptcy Court to, among other things, (i) interpret

2    the meaning of the relevant "Senior Indebtedness" provisions of the Senior Note Indenture, (ii)

3    determine whether to accept parole evidence (e.g., the intention of the parties under the Senior Note

4    Indenture), and (iii) interpret the meaning of the parole evidence if admitted.

5            iv.      Continuing with this logic path, the next key issue before the Bankruptcy

6    Court is the appropriate ramifications of the outcome of the investigation addressed immediately

7    above if the Bankruptcy Court determines that one or more parties engaged in wrongdoing to the

8    detriment of these estates.  If the Bankruptcy Court concludes that it would not have been reasonably

9    possible for VIA and S3 to have obtained an allowed general unsecured claim of less than $12.5

10   million which constituted "Senior Indebtedness" under the Senior Note Indenture (either because

11   VIA and S3 would not have agreed to such a smaller claim or because the Bankruptcy Court

12   concludes that granting such a "Senior Indebtedness" claim over the objection of the Senior

13   Noteholders would not have been possible), it seems to me that this matter is concluded.  If, on the

14   other hand, the Bankruptcy Court concludes that it would have been reasonably possible for VIA

15   and S3 to have obtained an allowed general unsecured claim of less than $12.5 million which

16   constituted "Senior Indebtedness" under the Senior Note Indenture (which as described above would

17   have required VIA and S3 to have agreed to such a smaller claim and the Bankruptcy Court to have

18   granted such a "Senior Indebtedness" claim over the objection of the Senior Noteholders), then the

19   Bankruptcy Court will need to decide what to do about that conclusion.  There are a number of

20   possibilities and I believe that it would be premature to discuss them in this Preliminary Report.

21           v.      Finally, I understand that SBC and VIA/S3 are currently engaged in

22   negotiations regarding SBC's possible purchase of the $12.5 million general unsecured claim held

23   jointly by VIA and S3 in a manner that would be beneficial to all general unsecured creditors.  All of

24   the parties are in agreement that any such transaction would need to be subject to the approval of the

25   Bankruptcy Court following a noticed hearing.  I cannot opine on the likelihood of such a result at

26   this time because those negotiations are on going and have not yet been concluded.  If such an

27   agreement is reached and approved by the Bankruptcy Court, it may be that this would result in an

28   end to my investigation, enabling the Debtors and the Committee to proceed with their plan of

1    reorganization and disclosure statement process.[1]

2        43.    Given that (1) I have received certain documents produced by Mr. Bennett which I

3    am unable to share with others until the confidentiality issues addressed above are resolved; (2) I

4    expect to receive documents on February 12, 2007 from OMM and will be unable to share many of

5    them with others until the confidentiality issues addressed above are resolved; (3) at least Ms.

6    Uhland appears to be taking the position that she cannot testify to matters which are subject to the

7    confidentiality issues addressed above in the presence of parties who are not subject to the

8    confidentiality agreement unless the Bankruptcy Court authorizes her to do so; (4) PW has not

9    turned over certain documents and has redacted others on the basis of attorney-client privilege as

10    discussed above; (5) VIA has not yet agreed to make the VIA PMK available for deposition or to

11    produce the documents requested by me, and VIA has filed an objection to the deposition; (6) my

12    deposition of Mr. Boro is not scheduled to take place until February 16, 2007 and it appears that

13    additional depositions of PW attorneys may be necessary; and (7) Mr. McGrane has noticed his own

14    depositions of Mr. Del Calvo for February 19, 2007 and Mr. Todd for February 26, 2007 (the same

15    date and time as the currently scheduled continued disclosure statement hearing), it will not be

16    possible for me to complete or to file a final report with the Bankruptcy Court by February 19, 2007

17    (as currently ordered by the Bankruptcy Court).

18        44.    Moreover, in light of the indication given by the Bankruptcy Court at the initial

19    disclosure statement hearing that the Bankruptcy Court would like for this investigation to be

20    completed before the Bankruptcy Court approves the disclosure statement, it appears that proceeding

21    with the currently scheduled continued disclosure statement hearing on February 26, 2007 would be

22    premature.  I have consulted with Mr. Merola, Mr. Franklin, Mr. McGrane, Mr. Shaffer and with

23    Ms. Dumas and all parties are in agreement that additional time is necessary for me to complete and

24

25    ---

    [1] It should be noted that it appears that any such transaction will be subject to the elimination from the

26    VIA/S3 settlement agreement the provision in which VIA agreed that none of the $12.5 million claim would
constitute "Senior Indebtedness" under the Senior Note Indenture.  Such a modification to the VIA/S3

27    settlement agreement would either require the consent of all parties to the VIA/S3 settlement agreement or
require the Bankruptcy Court to be willing to delete this provision from the VIA/S3 settlement agreement on

28    its own without the consent of all of the parties to the VIA/S3 settlement agreement.

1  to file a final report with the Bankruptcy Court, and that it would be premature to proceed at this

2  time with a continued disclosure statement hearing.[2]

3       45.    As a result of the foregoing, I suggest and request the Bankruptcy Court to continue

4  the deadline for me to complete and file a final report with the Bankruptcy Court by 30-60 days, and

5  to continue the currently scheduled disclosure statement hearing for 30-60 days.  The appropriate

6  length of any such continuance will, in part, be dependent upon the timing of the hearing on my

7  motion regarding the confidentiality issues.

8      I declare under penalty of perjury that the foregoing is true and correct.

9      Executed this 12th day of February, 2007, at Los Angeles, California.

11            /s/ *Ron Bender, Esq.*

12           RON BENDER, ESQ.

---

25  [2] Concurrently with filing the Preliminary Report, I am filing a motion with the Bankruptcy Court requesting

26  Bankruptcy Court authority for me to provide copies of all documents which may be subject to the previous confidentiality agreement to all relevant parties, and to authorize the various deponents to testify to matters which may be subject to the previous confidentiality agreement notwithstanding the presence of parties at the

27  deposition who are not subject to the confidentiality agreement.  It does not appear that my investigation can realistically be concluded, or even proceed in a meaningful manner, unless and until the Bankruptcy Court

28  makes a ruling on my motion in this regard.