# EXHIBIT 59

1

1     UNITED STATES BANKRUPTCY COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3     (SAN JOSE DIVISION)

4

5   In re:

6   SONIC BLUE, INC.,                    Case No. 03-51775-MM

7                                        Chapter 11

8                                        San Jose, California
                                         February 15, 2007
9                                        3:39 p.m.
              Debtor.
10   _____/

11

12

13                  TRANSCRIPT OF PROCEEDINGS
         a) MOTION FOR AUTHORITY TO DISCLOSE CONFIDENTIAL
14    INFORMATION TO PEOPLE WHO ARE NOT PARTIES TO THE
             VIA/INTEL CONFIDENTIALITY AGREEMENT BY
15   OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS
            b) RESPONSE BY VIA TECHNOLOGIES, INC.

16

17            BEFORE THE HONORABLE MARILYN MORGAN
                UNITED STATES BANKRUPTCY JUDGE

18

19   APPEARANCES:

20
     For the Creditors'          LEVENE, NEALE, BENDER, RANKIN
21   Committee:                   & BRILL, LLP
                                  BY: RON BENDER, ESQ.
22                                10250 Constellation Boulevard.
                                  Suite 1700
23                                Los Angeles, California 90067

24

25

2

```
 1   APPEARANCES (CONTINUED):

 2

 3   For Riverside            MURRAY & MURRAY
     Contracting:            BY: ROBERT A. FRANKLIN, ESQ.
 4                            19400 Stevens Creek Boulevard,
                              Suite 200
 5                            Cupertino, California 95014

 6

 7   For the Debtor:          PILLSBURY, WINTHROP, SHAW &
                              PITTMAN
 8                            BY: THOMAS V. LORAN, III, ESQ.
                                  ALBERT BORO, ESQ.
 9                                WILLIAM FREEMAN, ESQ.
                              50 Fremont Street
10                            San Francisco, California 94105

11

12   For Intel Corporation:   GIBSON, DUNN & CRUTCHER, LLP
                              BY: STEVEN JAMES JOHNSON, ESQ.
13                            1881 Page Mill Road
                              Palo Alto, California 94304
14

15
     For Maxtor Corporation:  BIALSON, BERGEN & SCHWAB
16                            BY: THOMAS M. GAA, ESQ.
                              2600 El Camino Read, Suite 300
17                            Palo Alto, California 94306

18

19   For the U.S. Trustee:    OFFICE OF THE U.S. TRUSTEE
                              BY: NANETTE DUMAS, ESQ.
20                            280 South First Street #268
                              San Jose, California 95113
21

22
     Special Litigation       O'MELVENY & MYERS, LLP
23   Counsel for Debtor:      BY: MATT POWERS, ESQ.
                              Embarcadero Center West
24                            275 Battery Street, Suite 2600
                              San Francisco, California 94111
25
```

```
1   APPEARANCES (CONTINUED):

2   Special Litigation          SUZZANE S. UHLAND, ESQ.
    Counsel for Debtor:         (APPEARING TELEPHONICALLY)
3

4
    For Sonic Blue claims:      McGRANE GREENFIELD, LLP
5                               BY: BERNARD S. GREENFIELD, ESQ.
                                40 South Market Street, 7th Floor
6                               San Jose, California 95113

7                                          -and-

8                               STUTMAN, TREISTER & GLATT
                                BY: K. JOHN SHAFFER, ESQ.
9                               1901 Avenue of the Starts,
                                12th Floor
10                              Los Angeles, California 90067

11

12  For the senior             HENNIGAN, BENNETT & DORMAN
    note holders:              BY: BRUCE BENNETT, ESQ.
13                              865 South Figueroa Street,
                                Suite 2900
14                              Los Angeles, California 90017

15

16  For Via Technologies:       HENRY KEVANE, ESQ.
                                         -and-
17                              COLLEEN BAL, ESQ.

18                              (APPEARING TELEPHONICALLY)

19
    Court Recorder:             JACKIE JARVIS
20                              UNITED STATES BANKRUPTCY COURT
                                280 South First Street
21                              San Jose, California 95113

22
    Transcription Service:      Jo McCall
23                              Electronic Court
                                Recording/Transcribing
24                              2868 E. Clifton Court
                                Gilbert, Arizona 85297
25                              Telephone: (480) 361-3790
```

4

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | P R O C E E D I N G S                                              |
| 2  | February 15, 2007                          3:39 p.m.              |
| 3  | ---oOo—                                                            |
| 4  | THE CLERK: All rise.                                               |
| 5  | THE COURT: Please be seated.                                       |
| 6  | THE CLERK: Item 1, <u>Sonic Blue.</u>                              |
| 7  | THE COURT: Your appearances, please.                               |
| 8  | MR. BENDER: Good afternoon, Your Honor, Ron                        |
| 9  | Bender of Levene, Neale, Bender, Rankin & Brill appearing          |
| 10 | on behalf of the Creditors' Committee and I suppose myself.        |
| 11 | MR. FRANKLIN: Robert Franklin of Murray & Murray.                  |
| 12 | I'm here on behalf of Riverside Contracting.                       |
| 13 | MR. LORAN: Good afternoon, Your Honor, Thomas                      |
| 14 | Loran, Pillsbury, Winthrop, Shaw & Pittman.  With me here          |
| 15 | are my partners, Al Boro and Bill Freeman, appearing on            |
| 16 | behalf of the Debtor.                                              |
| 17 | MR. JOHNSON: Good afternoon, Your Honor, Steven                    |
| 18 | Johnson with Gibson, Dunn & Crutcher, appearing on behalf          |
| 19 | of Intel Corporation.                                              |
| 20 | MR. GAA: Good afternoon, Your Honor, Tom Gaa on                    |
| 21 | behalf of Maxtor Corporation, Bialson, Bergen & Schwab.            |
| 22 | MS. DUMAS: Good afternoon, Your Honor, Nanette                     |
| 23 | Dumas for the U.S. Trustee.                                        |
| 24 | MR. POWERS: Good afternoon, Your Honor, Matt                       |
| 25 | Powers of O'Melveny & Myers, special litigation counsel for       |

1  the Debtor.

2          MR. GREENFIELD: Bernard Greenfield for Sonic Blue

3  claims, Your Honor.

4          MR. BENNETT: Bruce Bennett, a member of Hennigan,

5  Bennett & Dorman on behalf of the senior note holders.

6  Good afternoon.

7          THE COURT: Good afternoon.

8          MR. SHAFFER: And, Your Honor, if you'll excuse me

9  for making my appearance here, John Shaffer of Stutman,

10  Treister & Glatt on behalf of Sonic Blue claims.

11          THE COURT: I see you with your crutches.

12          MR. SHAFFER: Thank you, Your Honor.

13          MR. KEVANE: And on the phone, Your Honor?

14          THE COURT: And we have telephonic appearances,

15  yes.

16          MR. KEVANE: Henry Kevane with Pachulski, Stang,

17  Ziehl, Young, Jones & Weintraub appearing for VIA

18  Technologies.

19          MS. BAL: Also on the phone, this is Colleen Bal

20  also appearing for VIA Technologies.

21          MS. UHLAND: And also on the phone, this is

22  Suzzane Uhland of O'Melveny & Myers, special litigation

23  counsel for the Debtor.

24          THE COURT: Okay.  Well, good afternoon to all of

25  you.  Before we get started, let me just say that the one

6

1    thought that has stuck in my mind since I started reading

2    your pleadings is that this is truly a train wreck.  I have

3    read all of the pleadings that have been filed at least

4    once, most of them twice.

5            I don't want to see any posturing today.  I don't

6    want to see any recriminations.  I expect that the Court

7    will probably not be making decisions today.  What I would

8    like to do is have a discussion among professionals about

9    how we're going to proceed on a going-forward basis.  There

10   is at least one motion for the appointment of a trustee.

11   That may or may not be the best way to proceed, I don't

12   know.  I would like your thoughts as to whether we should

13   also consider simultaneously having a motion to disqualify

14   Pillsbury.

15           Let me turn it over to you for your thoughts.

16           MR. BENDER: Your Honor, if I could just be heard

17   briefly on the motion that I actually filed because I

18   believe that it's uncontested.

19           THE COURT: Your motion is not going forward

20   because we do not know at this point who is going to be

21   conducting discovery.  Let me say also one of the things

22   that I think that the U.S. Trustee is going to have to

23   consider is whether the Committee should be reconstituted.

24           MS. DUMAS: And, Your Honor, just on the prior

25   point that you made about the motion to disqualify

7

1   Pillsbury, our office will be filing a motion to disqualify

2   Pillsbury, either Friday or next Tuesday, but in the very

3   near future.

4          THE COURT: Okay.  Who wants to -- do you all want

5   to recess?  Now that I've told you what I want to do today,

6   you may want to discuss that with me not present.  We can

7   take a recess or I can ask for your thoughts.

8          MR. LORAN: We're prepared to proceed, Your Honor.

9          THE COURT: Okay.  Who would like to start?  The

10  U.S. Trustee has brought a motion to appoint a trustee.

11  Let me just say that there may be some benefits in

12  proceeding in that way because you can avoid any assertions

13  of privilege.  It may be that the Court is going to take

14  very seriously a motion to disqualify Pillsbury.

15         A case that I want to bring to your attention is

16  In re Dye -- I'm sorry, In re AFI Holding, Inc; Dye versus

17  Brown, which is a Bankruptcy Appellate Panel decision.  You

18  can find it at 355 B.R. 139.  One of the good things that

19  it does is it walks through the standard in the Ninth

20  Circuit for disqualification, and we do use a totality of

21  the circumstances test now.

22         I'm going to tell you truthfully I have a hard

23  time when I review that standard imagining any set of

24  arguments that Pillsbury would use to avoid

25  disqualification.  And it may be that you all will decide

8

```
 1  voluntarily to withdraw.
 2            MR. LORAN: May I be heard on that, Your Honor?
 3            THE COURT: Yes.
 4            MR. LORAN: Thank you, Your Honor, for sharing
 5  your preliminary thoughts about this, and I'm mindful of
 6  Your Honor's admonition at the outset about the tenor of
 7  this discussion, which we take very, very seriously, as
 8  Your Honor I'm sure is aware.
 9            I just wanted to say, Your Honor, that we have
10  not had an opportunity to put forward to Your Honor a
11  version of events that we're prepared at this moment to
12  provide.
13            THE COURT: All right.  I so understand that, and
14  that's why I'm telling you that we're not going to make any
15  decisions today.  We're just going to talk about procedures
16  that we might use.
17            MR. LORAN: Okay.  Well, I just want the Court to
18  be aware of essentially two things, and it's frivolous
19  claim heaped upon frivolous claim.  I'm not posturing,
20  but --
21            THE COURT: It may be.  I read with great interest
22  your opinion letter.  And I read the letter where you were
23  asked to indemnify, and I read your response of last week.
24  It may be a frivolous claim, nonetheless, I think that when
25  you go through the standards, it should have been
```

9

1   disclosed.  It was perhaps a potential claim undisclosed --

2   excuse me -- a potential conflict that was undisclosed; now

3   I think you are in a position of having an actual conflict,

4   undisclosed.

5            MR. LORAN: Well, we disclosed at the outset the

6   extensive work that we had done for the Debtor pre-

7   petition, including, among other things, the issuance of

8   the debentures to the senior note holders.  So we believe

9   that the disclosure of our work pre-petition was

10  sufficient.  I appreciate that this claim came in, Your

11  Honor.  We just don't -- have never thought that our

12  opinion letter could be reasonably interpreted to mean that

13  if there was a bankruptcy, that there would be no adverse

14  consequences, much less --

15           THE COURT: You know, it may not have been a

16  reasonable interpretation.  It may have only been a

17  potential conflict then.  But once you got that letter, I

18  think you had an actual conflict, and it calls into

19  question your motivation on so many things since then.

20           MR. LORAN: Okay.  Well, can I address just the

21  other point that I wanted to address, which is the

22  underlying claim about the senior indebtedness.  And, Your

23  Honor, I'll just represent to the Court as the person

24  involved in the settlement negotiations with my partner,

25  Mr. Boro, for many months, that the term that is the

10

1   problem for the objecting creditors in terms of their

2   strategy to try to profit from the VIA settlement and by

3   the claim at a low amount and try to make it a larger

4   claim, is --

5            THE COURT: You're getting into language that I

6   don't really find helpful.

7            MR. LORAN: Okay.  Well, excuse me.  I'm just

8   trying to say, Your Honor, that the language in the

9   settlement agreement that is the subject of discussion was

10  language that was put into the draft of the agreement and

11  finalized in the draft of the agreement months before the

12  bondholder claim came in.  Moreover, VIA, given the full

13  opportunity to consider whether or not this was senior

14  indebtedness, the negotiation all along just being the

15  amount of the general unsecured claim --

16           THE COURT: I have to interrupt.  We're really no

17  longer talking about the settlement agreement.

18           MR. LORAN: Okay.

19           THE COURT: We really have gone way beyond that in

20  the last 24 hours.

21           MR. LORAN: Okay.  Well, then, I've said what I --

22  I was trying to say what I had hoped to say, Your Honor,

23  and I'll abide the outcome of further discussion and we'll

24  hopefully have a chance to speak then before the afternoon

25  is over.

11

1        THE COURT: Once again, I want to talk about

2  procedures about how we're going to go forward, not about

3  who's right and who's wrong.

4        MR. BENDER: Your Honor, if I may make a

5  suggestion, and I thought your suggestion about going

6  outside was okay, but I don't know that we could reach an

7  agreement in any sort of meaningful time with this many

8  people.

9        THE COURT: Right.

10       MR. BENDER: And that's the following: at least

11  the way I had intended on proceeding with the assignment

12  that you gave me was not to view myself as anything

13  special, and I've done everything possible I thought to

14  include everybody.  The way I envision the depositions

15  proceeding, and I thought I had everybody's agreement on

16  that, that we are all there; anyone can ask whatever

17  questions they want.  The status of where I'm at right now,

18  if I can explain to the Court, because that's what I just

19  intended to have been a simple motion, is that I've

20  received documents now from four of the relevant parties

21  and I'm told -- and Mr. Kevane is on the phone, that I'll

22  be receiving the VIA documents shortly.

23       So they're as follows: I received documents from

24  Mr. Bennett that I'm told is a complete production of the

25  documents requested and I turned over to all the parties

1  all documents which were not potentially confidential, and

2  have kept, pending Your Honor's ruling, those that are.

3       I received documents from Marcus Smith, and I

4  turned over copies of all of them to all parties.  I have

5  in my office right now one full box of documents from the

6  O'Melveny firm and two full boxes of documents that I have

7  from the Pillsbury firm, which I'm told are complete

8  responses to the document production requests, and I'm told

9  by Mr. Kevane that I will be receiving a complete document

10 production request from VIA.  So what I have worked out, I

11 think to everybody's satisfaction with respect to VIA and

12 Intel is a way in which I can turn over what amounts to

13 really all relevant documents to all parties.

14       THE COURT: I think basically you're going to have

15 to put everything on hold.  I don't think we're going to be

16 going forward with discovery until we know who is going to

17 be representing the Debtor and if the Creditors' Committee

18 is reconstituted, you may no longer be representing the

19 Committee, Mr. Bender; I don't know.

20       Let me just say that I think it's unfortunate

21 that I asked you to undertake this task, that I put you in

22 a lose-lose situation, and I'm sorry for that.  The problem

23 is I think you're known by the company you keep, and the

24 people that you serve, and you're serving a Committee that

25 is now viewed as having significant conflicts.  So I think

13

1   that you're in the unfortunate position of not being the

2   right man for this job.

3           MR. BENDER: Your Honor, I appreciate that.  I'm

4   not sure then what you're asking us to respond to then.

5           THE COURT: Okay.  I think I'm going to talk to

6   you all about timing, how critical it is that we hear this

7   motion.  I frankly am not necessarily inclined to grant an

8   order shorting time, because I don't want to do things in a

9   knee-jerk fashion, and I think that Pillsbury deserves the

10  time to determine what kind of response to file.  I think

11  that we all ought to think through, is it best to proceed

12  as we are.  Should Pillsbury stay in place or should there

13  be a trustee?  I don't know.

14          So really we're talking about timing for a

15  hearing on that kind of a motion.  The U.S. Trustee asked

16  that I shorten time.  The reason for shortening time is, I

17  suppose, so that this case could be back on track quickly.

18  But all assets have been liquidated.  I don't know that any

19  important decisions are being made right now.  Certainly

20  creditors would like to receive money, but I don't know

21  that there's any other urgency in going forward

22  immediately, but I wanted to hear your thoughts.

23          MR. KEVANE: Your Honor, Henry Kevane for VIA.

24          THE COURT: Yes, sir.

25          MR. KEVANE: I don't believe there is any urgency

14

1  and since this trustee subject has just come up suddenly, I

2  think it's something that our client would like some time

3  to consider.  We're somewhat of an innocent bystander here,

4  caught up in all these events, and there may be possibly

5  less disruptive ways of dealing with the alleged conflict

6  that Pillsbury has, that may not entail the appointment of

7  a trustee and the restarting of this case.

8          THE COURT: You see, I don't know if we're talking

9  about one trustee or four trustees, and that's a serious

10  concern that I have in this case, because four trustees

11  would certainly slow down the process, and that's why it

12  may be better in the end for the estate to bring in new

13  counsel representing the Debtor.

14          MR. KEVANE: And that's something that was on my

15  mind, Your Honor, again, Henry Kevane for VIA, is that the

16  O'Melveny firm has been involved in the case, and they're

17  perfectly capable, I think, of seeing it to the end.  The

18  Plan has been drafted.  The Disclosure Statement has been

19  drafted.  At this point, there's no augmentation of assets

20  that can occur in this case.  There's only diminution.

21  There are no operations; there are no employees.  It's all

22  about wrapping this thing up, and our view, seeing this

23  happen more quickly is better, and that's why we'd like

24  some time to consider whether or not a trustee would be

25  conducive to that or whether some other less disruptive

1 | alternative might be helpful.

2 |         THE COURT: Okay.  I certainly don't disagree with

3 | any of the statements that you've made.  Mr. Shaffer, do

4 | you wish to be heard?

5 |         MR. SHAFFER: Very briefly, Your Honor.  The point

6 | that Mr. Kevane made is factually correct.  There are no

7 | employees really, no operations.  That is the reason, in

8 | our view, that a trustee is essential here, because

9 | Pillsbury has essentially been acting without a client

10 | through this case.  There is a single person who is the

11 | responsible person, who has another job, who manages this

12 | case on a part-time basis, is not an experienced

13 | reorganization person and is really -- is simply a

14 | carryover.  What was missing in this case, Your Honor, was

15 | a client.  One of the things that keeps professionals in

16 | line, in direction, is a client.

17 |         THE COURT: That's true.

18 |         MR. SHAFFER: And a trustee would be a client.  To

19 | put in another law firm is just to put in another client

20 | list law firm.  As I think we said in our papers, the

21 | checks and balances of the Chapter 11 process are one of

22 | the reasons why it's able to work, the Creditors' Committee

23 | looking after what the Debtor is doing; the clients looking

24 | after what the professionals are doing.  What I think we

25 | had in this case was a failure of the checks and balances

1   and I think only a trustee can bring that back.

2          THE COURT: Do you think we need one trustee or

3   four?

4          MR. SHAFFER: Well, Your Honor, it may be

5   premature for that because I don't see at least at this

6   time there having been a problem with the fact that there

7   was only one counsel for the debtor in possession.  I don't

8   think that that -- at least not yet, now we may as more

9   things come out in connection with this trustee motion,

10  discover there are some conflict issues, and I know that

11  there are substantive consolidation issues.  It may be that

12  sub groups of committees -- of a committee need to be in

13  charge of those issues.  I would not immediately say that

14  four trustees are necessary, no more than anyone was saying

15  that four Pillsbury's were necessary.  But I do think one

16  trustee is essential.  I think we -- Your Honor, we weren't

17  even looking for this.

18         THE COURT: I know.

19         MR. SHAFFER: This wasn't even our issue.

20         THE COURT: Nobody was looking for this.

21         MR. SHAFFER: So, Your Honor, we would ask for the

22  appointment of a trustee, and we would ask for it on --

23  shortened notice may be too short, but we would like it to

24  be prompt.  With all of that being said, obviously the

25  Pillsbury firm is going to respond, and we would like to

17

1  have an opportunity to look at that response, to

2  potentially take discovery if people are submitting

3  declarations.

4          THE COURT: Right.

5          MR. SHAFFER: So I do think we need to be on some

6  reasonable amount of notice here.  Thank you, Your Honor.

7          THE COURT: Mr. Franklin?

8          MR. FRANKLIN: Your Honor, Riverside believes that

9  one trustee should be appointed at this point.  We concur

10 with Mr. Shaffer's comments in the sense that if indeed --

11 in the event the trustee comes in and believes that other

12 trustees are appropriate, we can re-address that at that

13 point.  There didn't appear to be any objection to the

14 substantive consolidation that was set forth in the

15 original Plan and Disclosure Statement, and Riverside as

16 the holder of ten million dollars in claims and as somewhat

17 representative of that class of unsecured creditors,

18 believes that it's really important that these creditors

19 get paid in a timely manner.

20          They've been waiting for over years in this case,

21 and it just seems to Riverside at this point that a trustee

22 is the best way to proceed.  The trustee can proceed with

23 the investigation and at the same time look at the Plan

24 that's already been filed, tweak it if necessary, and then

25 proceed with however he or she deems appropriate.  So

1   that's how Riverside sees it.

2           THE COURT: Ms. Dumas?  I don't know what the

3   position of the U.S. Trustee is.  I know you filed a motion

4   for the appointment of a trustee, but I don't know whether

5   you had considered the issue of whether, under your

6   regulations, you're able to only appoint one trustee.

7           MS. DUMAS: You know, that's a good question, Your

8   Honor, and I actually had not considered it.  I guess

9   initially I would start with one but think carefully about

10  whether there are conflicts between the estates, and this

11  is a question that sort of arose early, in the early days

12  of the case.

13          THE COURT: I just don't know whether there's any

14  flexibility within your system, and that was one of my

15  concerns.

16          MS. DUMAS: Right, because the cases haven't been

17  substantively consolidated yet.  But I'll really have to

18  think that over, but I would go ahead and say, if there

19  have to be four, then so be it.  I do think we do need

20  somebody or some person or persons to come in and take

21  over.  I was going to use the phrase "train wreck," but you

22  said it before I could, Your Honor.

23          THE COURT: We give Mr. Shaffer the credit for

24  that phrase.

25          MS. DUMAS: Yes, that's right.  And if it's --

19

1  whether it's one or four, we will push those people hard to

2  make sure that there's not a delay in getting money out to

3  the creditors.  We would make sure -- our office will make

4  sure this case doesn't get bogged down --

5        THE COURT: I'm just not sure if you have four

6  trustees, maybe one law firm is better, and I think -- I

7  just throw this out to you all for consideration, which way

8  you want to --

9        MS. DUMAS: We did make our motion in the

10 alternative so that if there weren't a trustee, we did move

11 for an examiner because I think it's critical that the

12 investigation continue and that it be expanded to find out

13 the details of what happened with Pillsbury.  And I'm sure

14 Pillsbury will want to put something on the record, but I

15 think there should be an independent neutral person

16 investigating what Pillsbury knew when they knew it, what

17 kind of conflicts check did they do when they got into this

18 case.

19       THE COURT: Well, that's on the assumption that

20 Pillsbury decides it wants to stay in the case.

21       You may decide that you don't want to stay in the

22 case, I don't know.  Okay.  Nobody has really thrown out a

23 date.  When would you like to hear this motion?

24       MR. LORAN: Your Honor, may I just ask, it sounds

25 as if there are going to be two motions, a motion to

1  disqualify and a motion for appointment of a trustee.

2  THE COURT: I'm not sure.  You know, I've thrown

3  that out as something for people to consider.  I think that

4  what I'm hearing from the people who have spoken is that

5  they would prefer the method of a trustee, but they don't

6  know the answer to the question of whether we would have to

7  have four trustees.

8  MR. LORAN: I thought I heard the U.S. Trustee

9  mention that she intends to file such a motion shortly, and

10  it was based on that statement that I was hopeful that we

11  could just have the scheduling of those two motions, if

12  there are two.

13  THE COURT: If there are going to be any motions,

14  I'm going to have them all put on the same date.

15  MR. LORAN: Thank you, Your Honor.

16  THE COURT: If we're talking about a trustee,

17  disqualification, or examiner, whatever we're talking

18  about, is going to be at one time.

19  MR. LORAN: Okay.  That was my only point, Your

20  Honor.  Thank you.

21  THE COURT: Okay.  So would someone like to throw

22  out a date?

23  MR. KEVANE: Your Honor, Henry Kevane again.  At

24  the risk of sounding glib, since I'm technically still on a

25  sabbatical, I would suggest a date after February 26th when

1  I return.

2         THE COURT: Okay.  I don't think you need to worry

3  about that.  I think we'll at least go after February 26th.

4         MR. KEVANE: Thank you, Your Honor.

5         THE COURT: Ms. Dumas, what date do you have in

6  mind?

7         MR. SHAFFER: Your Honor, at the risk of

8  interrupting, I'm sorry, it may make more sense since the

9  next logical step is going to be Pillsbury responding to

10 things, assuming that the trustee gets her motion on file

11 by Tuesday, so the question is, how much time would

12 Pillsbury like to respond, and then if we maybe just work

13 in that direction.

14         THE COURT: Okay Let's do that.

15         MR. LORAN: Could we have three weeks, Your Honor?

16         THE COURT: To file your response.

17         MR. LORAN: Yes, Your Honor.

18         THE COURT: So you're talking about a hearing in

19 about a month?  Is that what you all are thinking?  Let's

20 look at that and see.

21         MR. SHAFFER: That may be a little further out

22 than some of the creditors were thinking.

23         THE COURT: You know, it may be where I'm

24 comfortable though.  Mrs. McGowan, when do we -- how many

25 trials do we have in that week of March 19th?

22

1           THE CLERK: Okay.

2           THE COURT:  I would like to put you during the

3  week of March 19th.  Oh, Mrs. McGowan, did I cross that week

4  off for other reasons?

5           THE CLERK: Let me check.  No.

6           THE COURT: Okay.

7           THE CLERK: March 19th.

8           MR. SHAFFER: Your Honor, due to national

9  bankruptcy conference meetings, the only two days I would

10  be available that week would be the 19th and the 20th.

11           THE COURT: You know, looking at my calendar, here

12  are the choices that you all have.  We can have an all-day

13  hearing on the 12th or the 19th or the 20th.

14           MS. DUMAS: I'm going to vote for the 12th, but I'm

15  probably in the minority.

16           THE COURT: That would be my third choice.

17           MR. LORAN: Your Honor, the 19th and the 20th we

18  would prefer, and we could do either one.

19           MR. POWERS: Your Honor, I have a conflict on the

20  12th so --

21           THE COURT: Okay.

22           MR. POWERS: Your Honor, to the extent our firm is

23  going to be involved, the 19th works better for us.

24           MR. SHAFFER: I would suggest the 19th as well,

25  just in case it needs to carry over.

23

1          THE COURT: Okay.  So we'll set this for the 19th.

2    I'd like to start the hearing in the morning in case we

3    have to go into the afternoon.  I'd like to start it at

4    10:30.  So if anybody wants to file any motions, that is

5    going to be the Sonic Blue date for any motions.  10:30 on

6    March 19th.

7          MR. SHAFFER: And, Your Honor, working back from

8    that if we could establish deadlines for Pillsbury to file

9    and for replies to that?

10          THE COURT: Okay.  We would use our normal four

11    weeks, two weeks, and one week schedule.

12          MS. DUMAS: Your Honor, could I request the Court

13    to shorten time on my disqualification motion if I get it

14    in on Tuesday.

15          THE COURT: Yes.  That's fine.

16          MS. DUMAS: Thank you, Your Honor, because Monday

17    is a holiday.

18          THE COURT: Everyone is on notice.

19          MS. DUMAS: Okay.

20          THE COURT: Okay.  Are there any other procedural

21    aspects that we should discuss?

22          MR. SHAFFER: Your Honor, given that there are

23    documents now in the possession of Mr. Bender, although I

24    don't think his investigation as originally constituted

25    should go forward now, I would at least like to be able to

1  get those documents, first starting with the non-

2  confidential ones, which there should be no issue about

3  since they're currently in his possession now, he should

4  just distribute copies of those.

5          THE COURT: Okay.  Do you have any problems with

6  that, Mr. Bender?

7          MR. BENDER: Your Honor, that's what I was

8  attempting to address before.  I certainly don't have any

9  problem with it.  The issue is that we were not involved in

10 the litigation.  So what I need to have happen is I need

11 for somebody who understands what is or isn't confidential

12 to go through a lot of documents with me to identify them,

13 and I understand from Intel's counsel that they are not

14 interested in spending the time because they're not funded

15 by the estate, and I think Mr. Kevane feels the same way,

16 plus I don't have the VIA documents yet.  So the only

17 logical person in my mind would be Mr. Powers who --

18         THE COURT: Alternatively, Mr. Shaffer could agree

19 that he would be subject to the same confidentiality

20 agreements.  No?

21         MR. BENDER: No, because Intel won't agree with

22 that.  We've already tried.  That was -- our first goal was

23 suggesting to involve everybody as part of the protective

24 order.  Intel won't agree, so my suggestion -- I don't

25 think it would be a lot of time in terms of days -- Mr.

25

1   Powers tells me that he understands the issue well enough.

2   I believe that Intel has already walked through with Mr.

3   Boro what parts of the settlement agreement need to be

4   redacted, which I don't think are relevant to what the

5   investigation is, so as things stand right now, I have

6   three boxes of documents, one from O'Melveny, two from the

7   Pillsbury firm, and a relatively small pile from Mr.

8   Bennett, and I don't if Mr. Kevane could say when I'll be

9   getting the VIA documents.

10         My suggestion to the Court is that we get my

11  motion granted because I think it's unopposed, in terms of

12  how we would deal with the confidentiality issues.  And

13  it's pretty much well laid out.  As far as VIA is

14  concerned, VIA has laid out in Mr. Kevane's pleading what

15  the procedure would be, which is completely acceptable to

16  me.

17         THE COURT: Okay.  Does anyone wish to be heard on

18  this?

19         MR. POWERS: Yes, Your Honor.  Sorry, Your Honor,

20  Matt Powers from O'Melveny & Myers, special litigation

21  counsel for the Debtor.  There's actually several different

22  confidentiality problems, and I thought we had reached an

23  agreement with Mr. Bender and potentially with Intel's

24  counsel that would have addressed all of them.  And

25  actually, there are so many confidentiality orders in this

26

1    case that it made my head spin a little bit.  I actually

2    prepared a diagram that I'm happy to share with the Court,

3    if the Court would like.

4           THE COURT: I would love to see your diagram.  I

5    always like diagrams.

6           MR. POWERS: Your Honor, there are, as you can see

7    from the diagram, a couple of different issues.  One is the

8    protection of Intel and VIA's confidential information,

9    some of which is in the documents that we had and have

10   provided to Mr. Bender already.  The other is there's a

11   joint defense group that was formed as part of a common

12   interest privilege and there was a joint defense agreement

13   signed that allowed certain parties, the Creditors'

14   Committee, the bondholders, to communicate as they were

15   negotiating with Intel and VIA.

16          And actually I think we had come up with a

17   solution which would enable the objecting creditors to get

18   access to all this information that we've produced so far,

19   which would be to simply extend the joint defense group to

20   include them, have them treat the documents as

21   confidential, and then as long as Intel and VIA's concerns

22   are satisfied, they can have everything we've given to Mr.

23   Bender.

24          THE COURT: Was that agreeable to Intel?

25          MR. JOHNSON: Maybe.

27

1          THE COURT: Maybe not?

2          MR. JOHNSON: Steve Johnson on behalf of Intel.

3    There are even levels of confidentiality within the various

4    protective orders that the Court has entered, including

5    outside counsel's eyes only, and there was an extremely

6    high level of confidentiality with respect to an earlier

7    Intel/VIA settlement agreement and particularly the

8    information in that agreement.  What Intel is unclear on is

9    whether any of that would be part of the documents that are

10   proposed for collection and production to these third

11   parties, and so from Intel's point of view, what we are

12   seeking is simply an opportunity to be able to review

13   documents and redact documents before they're produced to

14   third parties that are not parties to the confidentiality

15   agreement.

16          We've worked with Mr. Boro from Pillsbury with

17   respect to their production to Mr. Bender to redact

18   documents before those were produced, but there are other

19   documents that Mr. Bender has that have not been redacted,

20   and from Intel's point of view would need to be redacted.

21          THE COURT: How much time will that take?

22          MR. JOHNSON: We at Intel have already provided

23   our comments and a settlement agreement in redacted form

24   with redactions acceptable to Intel, which has been applied

25   to all the earlier drafts of the settlement agreement, so I

28

1  think that would just need to be applied to these other

2  documents, and we would need to be satisfied with no other

3  documents in there.

4          THE COURT: So you want to review what is in

5  there, and how much time will that take?

6          MR. JOHNSON: I don't know what the volume of

7  documents is.

8          THE COURT: I heard two boxes and a small stack.

9          MR. BENDER: Three boxes, Your Honor.

10         THE COURT: I'm sorry, three.

11         MR. BORO: And, Your Honor, in our boxes there is

12 a -- three searchable CD's that contain 15,000 pages.

13 Those have been rendered searchable, so the review should

14 be relatively easy, but there is a total of 19,000 pages

15 that Pillsbury has produced.

16         THE CLERK: Counsel, may I have your name for the

17 record?

18         MR. BORO: Yes, Al Boro.

19         MR. JOHNSON: From Intel's point of view, since

20 we're not a stakeholder in any of this, I don't believe, we

21 think it would be most appropriate if one of the firms

22 involved in the redacting would simply review that.

23         THE COURT: Okay.  I want to know how much time

24 it's going to take to do this.

25         MR. JOHNSON: It would take very little time for

29

1   us to review redacted copies.  It would take a much longer

2   time if we had to review unredacted documents and redact

3   them ourselves.

4          THE COURT: Okay.  Mr. Powers, do you have a

5   comment on this?

6          MR. POWERS: A brief comment, Your Honor.  There

7   are many, many copies of drafts of the settlement agreement

8   that were produced to Mr. Bender, at least from our firm.

9   I am also concerned that we not hand everything over to

10  Intel because I'm concerned that would waive the joint

11  defense privilege with respect to Intel.  I'm wondering if

12  there's some solution we could come up where either my firm

13  or Mr. Bender's firm could use a template document from

14  Intel that would tell us which provisions in the settlement

15  agreement they view as confidential.

16         Those provisions shouldn't be anything that the

17  objecting creditors care about, and I don't know if they've

18  actually had access to the final version of the settlement

19  agreement in any event, so they ought to be able to tell

20  what provisions those are.  We might be able to work out a

21  situation where we could review that material, not waive

22  the joint defense privilege, and then provide the redacted

23  copies consistent with Intel's redaction template to the

24  objecting creditors.

25         THE COURT: Okay.  Mr. Johnson, is that

30

1  acceptable?

2          MR. JOHNSON: Yes, it is, Your Honor.  In fact

3  we've provided such a template to Mr. Boro.

4          THE COURT: Okay.  So that sounds like we're on

5  our way to a solution.  Mr. Shaffer?

6          MR. SHAFFER: Your Honor, after having heard all

7  this, I think we're okay actually without seeing these

8  documents at this point.

9      (Laughter.)

10          You know, the unfortunate thing is because we

11  don't know if Pillsbury is going to be here.  We don't know

12  if the Levene Bender firm is going to be here anymore.  If

13  a trustee or a new committee counsel comes in, they're

14  going to have to do it again --

15          THE COURT: Right.

16          MR. SHAFFER:  -- because of the sensitivity

17  issues here.

18          THE COURT: Right.

19          MR. SHAFFER: And so we're just going through the

20  wheel twice.  So my suggestion -- and I say this

21  reluctantly, is that I think the investigation must end.

22  It may be that we may need to take some of our own

23  discovery with respect to the pending trustee motion and

24  the Pillsbury motion.  I'm not saying we will or we won't.

25  It's obvious we want to see their declarations and see if

31

1  somebody needs to be cross-examined, but in terms of the

2  current investigation, maybe everything should just be put

3  on hold.

4          What I would ask the Court to do and it should be

5  self-evident is that now that we are in a discovery type

6  mode, that everybody should be admonished of course to

7  preserve all documents so that wherever we go in this case,

8  the record will be safe.

9          THE COURT: Okay.  Is that understood by everyone?

10          ALL COUNSEL: Yes, Your Honor.

11          THE COURT: Okay.  Are there any other issues that

12  we need to discuss?  Yes, sir.

13          MR. SHAFFER: Mr. McGrane has reminded me, we had

14  noticed two of our own depositions in connection with this

15  investigation and they will be off now as a result of what

16  I said.

17          THE COURT: Ms. Dumas?

18          MS. DUMAS: Your Honor, one concern.  I spoke to

19  the acting U.S. Trustee last night about this case, and one

20  concern that she had was just what is the situation of the

21  cash in the estate.  She wanted to make sure that the cash

22  is preserved, the assets of the estate don't go anywhere

23  while we wait to see what is going to happen with the

24  trustee motion, the Pillsbury firm, et cetera.  So I would

25  request that --

32

1        THE COURT: I don't think that we have a problem

2   with that kind of dishonesty and I'm not concerned about

3   that.  I can understand why the acting U.S. Trustee would,

4   but I don't know that I need to remind people that they

5   have responsibility -- the Debtor, frankly, no

6   representative of the Debtor is here other than counsel,

7   and I'm not really personally concerned about that.  But

8   you've heard the acting U.S. Trustee's concern.

9        MS. DUMAS: It's in the record, so, thank you,

10  Your Honor.

11        THE COURT: Okay.  Anything further?  There's a

12  lot of talent in this room.  I hope that you will use it

13  well.  Thank you.

14        ALL COUNSEL: Thank you, Your Honor.

15        THE CLERK: All rise.

16      (Whereupon, the proceedings are concluded at 4:15

17  p.m.)

18

19

20

21

22

23

24

25

33

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6           I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10   DATED: February 28, 2007

11

12                        By:    /s/ Jo McCall

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 60

1

1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN JOSE DIVISION)

4

5    In re:

6    SONIC BLUE, INC.,                Case No. 03-51775-MM
                                      Thru      03-51778-MM
7                                     (Jointly Administered)

8                                     Chapter 11

9                                     San Jose, California
                                      May 4, 2007
10                                    10:20 a.m.
              Debtor.
11   _____/

12

13                    TRANSCRIPT OF PROCEEDINGS
        a) MOTION FOR CLARIFICATION, OR IN THE ALTERNATIVE,
14       FOR LEAVE TO FILE A MOTION FOR RECONSIDERATION
         BY PORTSIDE GROWTH & OPPORTUNITY FUND, SMITHFIELD
15       FIDUCIARY, LLC, AND CITADEL EQUITY FUND, LTD.
          b) AMENDED OPPOSITION BY SONIC BLUE CLAIMS, LLC

16

17
                  BEFORE THE HONORABLE MARILYN MORGAN
18                 UNITED STATES BANKRUPTCY JUDGE

19
     APPEARANCES:
20

21   For the Creditors'          LEVENE, NEALE, BENDER, RANKIN
     Committee:                   & BRILL, LLP
22                                BY: RON BENDER, ESQ.
                                  10250 Constellation Boulevard.
23                                Suite 1700
                                  Los Angeles, California 90067
24
                                  (APPEARING TELEPHONICALLY)
25

2

```
1    APPEARANCES (CONTINUED):

2

3
     For Pillsbury:            HOWARD, RICE, NEMEROVSKI, CANADY,
4                              FALK & RABKIN, PC
                               BY: BERNARD BURK, ESQ.
5                              Three Embarcadero Center, 7th Floor
                               San Francisco, California 94111
6

7
     Proposed Counsel          FRIEDMAN, DUMAS & SPRINGWATER, LLP
8    for Trustee:              BY CECILY A. DUMAS, ESQ.
                               150 Spear Street, Suite 1600
9                              San Francisco, California 94105

10                                       -and-

11                             ALSTON & BIRD, LLP
                               BY: GRANT T. STEIN, ESQ.
12                             One Atlantic Center
                               1201 West Peachtree Street
13                             Atlanta, Georgia 30309

14

15
     For the U.S. Trustee:     OFFICE OF THE U.S. TRUSTEE
16                             BY: NANETTE DUMAS, ESQ.
                               280 South First Street #268
17                             San Jose, California 95113

18

19   For SB Claims:            STUTMAN, TREISTER & GLATT
                               BY: K. JOHN SHAFFER, ESQ.
20                             1901 Avenue of the Stars,
                               12th Floor
21                             Los Angeles, California 90067

22
     For the senior            HENNIGAN, BENNETT & DORMAN
23   note holders:             BY: BRUCE BENNETT, ESQ.
                               865 South Figueroa Street,
24                             Suite 2900
                               Los Angeles, California 90017
25
```

3

```
1   APPEARANCES (CONTINUED):

2

3   Also Present:           DENNIS CONNOLLY, Trustee

4

5   Court Recorder:         LUPE BARRON
                            UNITED STATES BANKRUPTCY COURT
6                           280 South First Street
                            San Jose, California 95113
7

8

9   Transcription Service:  Jo McCall
                            Electronic Court
10                          Recording/Transcribing
                            2868 E. Clifton Court
11                          Gilbert, Arizona 85297
                            Telephone: (480) 361-3790
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              P R O C E E D I N G S
 2   May 4, 2007                          10:20 a.m.
 3                      ---oOo—
 4           THE CLERK: Item 11, Sonic Blue, Incorporated.
 5           THE COURT: Nobody is eager to come forward to
 6   make appearances.
 7       (Laughter.)
 8           MR. BENNETT: Good morning, Your Honor, Bruce
 9   Bennett of Hennigan, Bennett & Dorman on behalf of the note
10   holders.
11           THE COURT: Good morning.
12           MR. BURK: Good morning, Your Honor, Bernard Burk
13   from Howard Rice for Pillsbury Winthrop.
14           THE COURT: Mr. Burk.
15           MS. CECILY DUMAS: Good morning, Your Honor,
16   Cecily Dumas, Friedman, Dumas & Springwater.  We're the
17   proposed local counsel for the Chapter 11 Trustee.
18           THE COURT: Good morning.
19           MS. CECILY DUMAS: Good morning.  Also here with
20   me -- and if it please the Court, I'd like to introduce Mr.
21   Grant Stein of the firm of Alston & Bird in Atlanta, the
22   trustee's proposed lead counsel.  We filed Mr. Stein's pro
23   hac application.  We have not yet received an order.
24           MR. STEIN: Good morning, Your Honor, Grant Stein,
25   associated in the case.
```

5

1          THE COURT: Okay.  Welcome to our court, Mr.

2   Stein.

3          MR. STEIN: Thank you, Your Honor.

4          MR. SHAFFER: Good morning, Your Honor, John

5   Shaffer of Stutman, Treister & Glatt for SB Claims.

6          THE COURT: Good morning.

7          MS. NANETTE DUMAS: Good morning, Your Honor,

8   Nanette Dumas for the U.S. Trustee.

9          MS. CECILY DUMAS: My apologies, also in the court

10  is Mr. Dennis Connolly, the Chapter 11 Trustee.

11         MR. CONNOLLY: Good morning, Your Honor.  It's

12  nice to be here.

13         THE COURT: Good morning, Mr. Connolly, and

14  welcome to our court to you.

15         MR. CONNOLLY: Thank you very much.  I appreciate

16  it.

17         THE COURT: We have a telephonic appearance I

18  understand.

19         MR. BENDER: Yes, Your Honor, good morning.  This

20  is Ron Bender, Levene, Neale, Bender, Rankin and Brill

21  appearing on behalf of the Creditors' Committee.

22         THE COURT: Okay.  Good morning, Mr. Bender.

23         Mr. Bennett, this is your motion.

24         MR. BENNETT: Yes, it is, Your Honor.

25         The matter has been fairly extensively briefed,

6

 1  and so I will be -- I will probably be very brief in my

 2  oral remarks.

 3          First of all, I want to deal with the pleading

 4  that was styled as the response to the reply, actually that

 5  was filed by Pillsbury, which was of course filed out of

 6  order and out of time.  But first, I think to help put

 7  things in context, I've prepared a time line.  I'd like to

 8  hand a couple of copies up to the Court and to counsel and

 9  to the trustee and certainly to his counsel.

10          And, Your Honor, the reason I did this is

11  because, what I gather the principal purpose of the

12  response to the reply was, was to set forth a time line of

13  events based upon the record as it sits today.  Now in

14  context, we all know that this is kind of at the beginning

15  of the process rather than the end of the process, but if

16  people are going to talk about what the record is as of

17  today, they might as well get it right.  And what is shown

18  on the time line, in addition to excerpts from the Burrough

19  (Phonetic) declaration, which are accurately shown in the

20  right-hand column, is whether or not the particular event

21  managed to make it into SB Claims' time line.

22          And I only really want to make two comments on

23  this.  First of all, the very first box, August 11th, 2005,

24  the first box is of course where the Creditors Committee

25  tells everyone involved in these negotiations what their

7

1  requirements for a settlement are, and according to Mr.

2  Burrough's declaration, they were willing to live with any

3  settlement of the VS/S3G Claims of 25 million dollars or

4  less.

5       This happens at the beginning of the process, not

6  at the end of the process, and the essential allegation as

7  I understand it that made its way in some respects into

8  Your Honor's order on the trustee motion –- or opinion on

9  the trustee motion –- is that the note holders used their

10  position on the Committee to accomplish something.  That

11  allegation relates to events that occurred in September of

12  2005, and the allegation is that somehow the note holders

13  were controlling the Committee and making it do something

14  that the Committee didn't want to do.

15       But the fact is –- at least the record today,

16  which is the record we're of course dealing with, is that

17  the Committee had signed off on a settlement at vastly

18  different terms than were acceptable to the note holders,

19  and they had done it long before the period began when the

20  assertion is that the note holders, rather than speaking

21  for themselves, which they're of course always entitled to

22  do, that they were somehow using the Committee mechanism to

23  help themselves out.

24       The second is a bit more problematic, and I turn

25  Your Honor's attention to the second page and the second

8

1  box after April and early May 2006, and you'll see the

2  sentence that starts, "Our reason."  Are you with me, Your

3  Honor?

4          THE COURT: Yes.

5          MR. BENNETT: Okay.  To fully understand this

6  point, you actually have to have this response to the reply

7  in front of you, and the response to the reply that I'm

8  referring to would be on page 7.  I don't know if Your

9  Honor has it with you.  I'll read it slowly so that you can

10  follow this.  Here's exactly what the pleading filed by

11  Mr. Shaffer says:

12          According to Mr. Burrough, (quote, open bracket,

13  little o - closed bracket n-e.), "so one reason for doing

14  so was that the parties had agreed that defendant's claim

15  was not senior."

16          Your Honor, they've misquoted the declaration.

17  Now ordinarily, one might think that the substitution of

18  the word "one" for the word "our" was an innocent

19  typographical error and we would leave it at that, but what

20  Mr. Shaffer does with the misquote is quite remarkable.  It

21  is the launching board for still another accusation.

22  Here's the accusation.  It follows the sentence where the

23  misquote is, open paren:

24          "(We are left to wonder what the, quote 'other

25          reasons', closed quote, for adding this language

9

1        were."

2 Well, there is no quote, "other reasons," closed quote,

3 anywhere in this Mr. Burrough's declaration, and there's no

4 suggestion that there were other reasons anywhere in that

5 declaration.  So we not only have a misquote at the front

6 end of this, we have an effort to launch still another

7 unfounded allegation based upon the misquote.

8        I'm not going to get into the rest of the merits

9 of the motion in detail, unless I have to on reply, because

10 I think we're dealing with a core issue here that's more

11 important than anything else.  And the core issue is where

12 we are today and where we're going in this case.  We filed

13 the motion mainly because we truly do not believe that the

14 Court intended to make findings on any of the points that

15 we point to in the motion or to otherwise preordain the

16 results of the investigation that the trustee hasn't even

17 started to perform yet.

18        If something doesn't change with the order,

19 what's going to happen is the trustee is going to start

20 this investigation with parties asserting that certain

21 issues have already been decided or that his investigation

22 has to be performed in such a way to reach particular

23 results.  And I don't think that's what this Court

24 intended.  What I think this Court intended, what I think

25 this process needs is a trustee's investigation that starts

10

1    absolutely on a clean slate.

2         If there's no difference among anyone in this

3    courtroom on this point, the motion should be granted.  And

4    we should be starting with an order and opinion appointing

5    a trustee that does not preordain any results, that is not

6    based upon perceptions of allegations as opposed to actual

7    facts.  If the parties disagree with that and believe that

8    the record already shows something, well then we ought to

9    have findings that actually comport with what the record

10   already shows.  And for reasons that I think we've pointed

11   out very clearly in our papers, right now the Court's

12   opinion is not consonant with what the record assembled

13   today actually shows.

14        I'm available to answer any questions you might

15   have.

16        THE COURT: I understand your views.  Is there

17   anyone else who wishes to be heard?

18        MR. SHAFFER: Your Honor, if I may be, just for a

19   moment.

20        Your Honor, Mr. Bennett is absolutely correct.  I

21   did misread that and misquote it, and I am tremendously

22   embarrassed by that.  That's inexcusable, and I apologize.

23   I apologize to Mr. Bennett.  I apologize to everyone.  I'm

24   very sorry.  As the Court knows, there's been an awful lot

25   of paper in this thing, and things have been moving very

11

1  fast, and this is one thing where my eyes may have deceived

2  my mind.

3          Nonetheless, Your Honor, and with that and --

4  that is embarrassing.  Your Honor, there are, however, some

5  essential issues that we do need to address here.  Your

6  Honor, there's been statements by both Pillsbury and by the

7  note holders that this Court essentially didn't find

8  anything.  This Court appointed a Chapter 11 trustee, which

9  is a rather unusual event, and the statute requires this

10  Court to make findings in support of what this Court did.

11  So to say that this Court didn't make any findings doesn't

12  make any sense at all.  Your Honor made plenty of findings.

13          How, without question, there are many, many, many

14  more issues that need to be explored in the case, and that

15  is why you've ordered the appointment of a trustee, and

16  that's why the U.S. Trustee's office appointed such a

17  competent trustee to do that.  But that doesn't mean that

18  the Court hasn't already made some findings.  This Court

19  disqualified the law firm and appointed a Chapter 11

20  trustee, and I think that if someone took this up on

21  appeal, the Appellate Court would be very surprised to find

22  out that Your Honor made no findings in doing that.

23          But, Your Honor, the essential element here and

24  what seems to be being missed even by the note holders'

25  time line, is what this Court found, which was that there

12

1    was an appearance that the note holders used their position

2    on the Committee to advance their own interests without

3    revealing their hidden agenda.  That is the part of the

4    sentences that the note holders would like to have removed,

5    and I would like to present to the Court, if I may, the

6    January 23rd, 2007 transcript, which is already in the

7    record.  And, Your Honor, since I don't have my own copy

8    with me, I'll have to do this with memory and hopefully

9    I'll do a little bit better than I did on this pleading.

10            Your Honor, I was very surprised and troubled as

11   I read the note holders' reply brief, particularly as I got

12   to the last page where it seemed it questioned the

13   declaration that Mr. Bender had filed with regard to what

14   the Committee knew about the subordination issue.  On the

15   last page of the note holders' reply, it says:

16            "The Bender declaration does not say that, quote,

17            'Committee counsel was not informed at the time

18            that the proposed settlement would have the

19            effect of releasing the bondholders from any

20            obligation they might have to Via on account of

21            the senior debt in this issue.' "

22            And it goes on to say after some citations:

23            "In fact Mr. Bender does not state that he was

24            unaware of the issue.  Rather, he carefully

25            states that, quote, 'it was only through an

13

1          objection to the disclosure statement,' closed

2          quote, that Levene Neale, quote, 'first learned

3          of any possible controversy.' "

4   "Any possible controversy" being highlighted here,

5   involving the senior indebtedness issue related to Via in

6   the senior note indenture.

7          Your Honor, in fact, at the January 23rd hearing,

8   which I missed because I had the pleasure of having surgery

9   that day on my ankle, you will recall, Your Honor, that

10  that is when this issue first came up before the Court

11  based on the pleadings of Riverside and Argyle (Phonetic).

12  And Your Honor will also remember that that hearing ended

13  with you authorizing Levene Neale to go forward with an

14  investigation in lieu of an examiner.

15         And you did that, Your Honor, based upon, I

16  believe –- but Your Honor will be the only one that can

17  tell us what you really intended and so I will obviously

18  defer to you –- but I believe you did that in part upon the

19  representations that were made to you by Mr. Bender, which

20  are entirely consistent, I may add, with Mr. Bender's

21  declaration.

22         On page 11 of the transcript in front of you, on

23  lines 4 and 5, Mr. Bender stated to the Court, again

24  consistent with his declaration, there was never any

25  discussion at any time about this idea of senior

14

1  indebtedness.  And you wanted to clarify that, I believe,

2  because that was an important point to you, so later on in

3  that same page, on line 19, the Court says:

4          "Basically you weren't aware of the issue."

5  And Mr. Bender said,

6          "Correct.  Correct."

7  And there was some more discussion.  I think on page 12,

8  you tried to ask the question again, but it's hard to tell

9  from the transcript, but on page 13 at line 4, you said:

10          "So, you're saying that even at the time that the

11          agreement was approved, the Committee was not

12          aware of this provision."

13  The Committee, not Mr. Bender, the Committee, and the

14  answer was by Mr. Bender:

15          "Not aware or focused or any of the like."

16  Again, consistent with Mr. Bender's declaration.

17          Later on in the hearing, Your Honor -- Mr.

18  Bennett appeared by phone, counsel for the note holders --

19  on page 31, line 9:

20          "First of all, Mr. Bender, so far as he has told

21          you the story told it to you exactly accurately,

22          as I understand it."

23  And I couldn't hear everything Your Honor said, and I don't

24  have a problem if people want to take discovery to verify

25  what was represented is in fact true, and then Mr. Bennett

15

1  did go on to add some other details but eventually ending

2  with the statement on page 34, line 4:

3          "But that is the whole story, and I think that's

4          rounding out the parts that Mr. Bender might not

5          have known, and we ought to have all the

6          disclosure in the world about this, but there's

7          just nothing here."

8  Your Honor, based upon that transcript, and look -- and the

9  trustee is going to investigate that, there will be

10 depositions; there will be final findings -- but based upon

11 that transcript, this Court could reasonably conclude at

12 least the appearance -- the appearance -- that the note

13 holders used their position on the Committee to forward

14 their hidden agenda.  We know based upon Mr. Burrough's

15 declaration that the note holders contacted Mr. Burrough

16 saying that no matter how that claim is allocated, it can't

17 be senior indebtedness under the indenture.  We won't

18 support it, and the note holders in their own reply brief

19 told us that they insisted that that be the case.

20         And indeed as you saw in my time line, after that

21 phone call, within a couple of days, some additional

22 language was added.  It didn't specifically say the senior

23 indebtedness issue, and we can -- the trustee I'm sure will

24 ask why it was vague, the addition, and yet it did seem to

25 cover the point.

1          But very quickly after that, Your Honor, the

2   Committee, of which the note holders controlled three of

3   the five active seats at the time, approved this deal.  And

4   the question, Your Honor, the question that the trustee

5   will have to investigate is, if in fact there was

6   disclosure to the rest of the Committee by the three note

7   holders who had asked for and got this additional privilege

8   in the agreement, was there disclosure to the rest of the

9   Committee when they voted on this or otherwise approved

10  this transaction?  Was there disclosure to Mr. Bender; was

11  there disclosure to the Committee members?

12          And Your Honor has not made a final finding on

13  that, and I'm not saying Your Honor has, and I don't think

14  Your Honor thinks Your Honor has either.  But what Your

15  Honor has said is there is the appearance that this might

16  have occurred.  And I believe that indeed there is the

17  appearance, Your Honor, and that the trustee will get to

18  the truth.

19          Thank you, Your Honor, that's all I have to add

20  unless there's anything else you need from me.

21          THE COURT: No, thank you, Mr. Shaffer.

22          Is there anyone else who wishes to be heard

23  before we hear again from Mr. Bennett?  Ms. Dumas?

24          MS. NANETTE DUMAS: Just very, very briefly, Your

25  Honor.  I concur that the Court did not make any

17

1  affirmative findings regarding this whole issue of whether

2  or not the senior note holders used their position to their

3  own advantage.  That remains to be seen, and I think just

4  the whole fact that we're having this hearing today shows

5  how badly a trustee was needed in this case, and I'm so

6  glad we've got one appointed, and it's going to move

7  forward.

8          But I did not understand the Court's opinion to

9  be making factual findings on that specific issue, so I

10  don't think that any clarification is needed, because I

11  think the Court said that the note holders may have used

12  their position, and the Court couched it all in

13  hypothetical language, yet at the same time, there's enough

14  in the record to show that that is one fair interpretation

15  of the facts that are known at this point.  However,

16  obviously further investigation is needed to get at the

17  truth.

18          Thank you, Your Honor.

19          THE COURT: Thank you, Ms. Dumas.

20          Mr. Burk, do you wish to be heard?

21          MR. BURK: Other than to observe, Your Honor, at

22  this point that everyone seems to be saying that they don't

23  understand the Court to have conclusively determined

24  factually any of the issues on which it raised concerns in

25  its opinion, so that we have a rare and beautiful moment of

18

1   harmony in this case, I have nothing to add.

2           MR. BENNETT: Your Honor --

3           THE COURT: I'm not sure that we are at harmony?

4       (Laughter.)

5           Thank you.    Mr. Bennett?

6           MR. BENNETT: Well, first of all, let's make sure

7   we're on the right place in the map.  I don't think the

8   note holders said in any of their papers, and I don't think

9   I said here today that there were no findings made.  If you

10  go back and remember where we were, we had motions filed by

11  the U.S. Trustee.  We also had a motion filed by SB Claims.

12  That one was denied.

13          The U.S. Trustee's motions were not grounded on

14  any of these things.  They weren't grounded on what the

15  investment agreement said; they weren't grounded on note

16  holder conduct; they were grounded on some fairly

17  straightforward technical arguments about disclosures to

18  this Court by lawyers before it.

19          So all of this stuff wasn't in the motions that

20  this Court actually heard and granted, and they are

21  extensions of the facts that the pleadings that this Court

22  considered and relied upon.

23          THE COURT: There's a great deal of posturing

24  going on.

25          MR. BENNETT: I suppose that's right, Your Honor,

19

1   and I frankly think we do need a posture-free zone, so

2   let's talk about some other things that were just said.

3   Everyone wants to focus on Mr. Bender, but Mr. Bender

4   wasn't there.  Mr. Burrough's declaration says that Ann

5   Wells and Ann Kerns (Phonetic) were on the phone calls

6   where this was discussed.  There are other lawyers noted in

7   our opposition from the Levene, Neale, Bender firm who were

8   there.  There's another one that we managed to leave out

9   that I stumbled on when I was preparing for argument,

10  Monica Kim (Phonetic) who filed pleadings relating to this

11  matter, and it turns out -- I think I'm correct -- in that

12  Ann Wells is no longer with the Levene, Neale, Bender firm.

13  I think Monica Kim still is.

14          So this idea that this somehow happened in

15  secret, and because Mr. Bender didn't know, nobody knew,

16  when their lawyers were at all the relevant meetings and

17  billing, as we've indicated in our papers, more than a

18  hundred thousand dollars, is a very slender reed to support

19  any finding at all about what Committee counsel knew.  I'm

20  sure we're going to find Ms. Wells; I'm sure we're going to

21  find Ms. Kim; I'm sure we're going to find that fee

22  application, and we're going to know what Committee counsel

23  knew.

24          It defies belief, frankly, that if SB Claims

25  figured all of this out, if O'Melveny & Myers figure it

20

1  out, if Pillsbury Madison -- I'm sorry, Pillsbury Winthrop

2  now -- figured it out, and my firm figured it out, I can't

3  imagine how it can be that the Levene Neale firm, with all

4  of the time and all of the energy spent in this case,

5  didn't figure everything out.  If that's what they say at

6  the end of this process, I suppose we'll have to figure out

7  what that means.  It doesn't mean the note holders did

8  anything wrong.

9        I am very happy that Mr. Shaffer has modified the

10  rhetoric, and now we're talking about an appearance as

11  opposed to the reality of any wrongful conduct.  Your Honor

12  will note that's a considerable change on their part, and

13  it is welcome.  He knows he can't sustain the former, and

14  he's struggling to still sustain something.

15        Your Honor shouldn't be swept up in this.  You've

16  appointed a very qualified trustee who's going to conduct

17  an investigation and look at everything.  He should not

18  have before him targets that he's supposed to hit.  He

19  should have a clean slate.

20        I think that's enough for now.  I think we do

21  need a clean slate, particularly on these points, which

22  were not raised by the U.S. Trustee in the motions that

23  were granted at all.

24        Thank you, Your Honor.

25        THE COURT: Is there anyone else who wishes to be

21

1  heard?

2         You all will note that I am a fan of Abraham

3  Lincoln, and Abraham Lincoln always chose his words very

4  carefully.  I think particularly in this situation, it's

5  incumbent on me to choose my words very carefully.  For

6  that reason, I intend to issue a written ruling.

7         Thank you.

8         ALL COUNSEL: Thank you, Your Honor.

9      (Whereupon, the proceedings are concluded at 11:44

10 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7          I certify that the foregoing is a correct

8   transcript from the digital sound recording of the

9   proceedings in the above-entitled matter.

10

11  DATED: May 19, 2007

12

13                          By:    /s/ Jo McCall

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 61

1  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   RON BENDER California Bar No. 143364
2  CRAIG M. RANKIN California Bar. No. 169844
   TODD M. ARNOLD California Bar No. 221868
3  10250 Constellation Blvd., Suite 1700
   Los Angeles, CA  90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5

6  Attorneys for the Official Committee of Creditors
   Holding Unsecured Claims
7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12 | IN RE:                                | Case No. 03-51775 MM
   |                                        |
13 | SONICBLUE INCORPORATED, a              | Chapter 11 Cases
   | Delaware corporation, DIAMOND          |
14 | MULTIMEDIA SYSTEMS, INC., a            | (Case Nos. 03-51775 through 03-51778 MM)
   | Delaware corporation, REPLAYTV, INC., a| (Jointly Administered)
15 | Delaware corporation, AND SENSORY      |
   | SCIENCE CORPORATION, a Delaware        | REPLY TO SONICBLUE CLAIMS, LLC'S
16 | corporation,                           | RESPONSE TO PRELIMINARY STATUS
   |                                        | REPORT
17 |                                        |
18 |                                        | Date:   February 26, 2007
   |              Debtors.                  | Time:   11:00 a.m.
19 |                                        | Place:  Courtroom 3070
   |                                        |         280 South First Street
20 |                                        |         San Jose, CA 95113
   |                                        |
21 |                                        |
22 |                                        |         Hon. Marilyn Morgan

23

24

25

26

27

28

                                  1

1    Counsel to the Official Committee of Creditors Holding Unsecured Claims in the above

2    referenced cases (the "Committee") hereby files this Reply to the Response filed by SonicBlue

3    Claims, LLC ("SBC") to the Preliminary Status Report filed in this matter.

4    While Mr. Bender completely agrees that a thorough investigation into the actual facts which

5    transpired here is extremely important, and Mr. Bender has taken his investigative assignment role

6    as assigned to him by the Bankruptcy Court extremely seriously and intends to complete that

7    investigation as quickly and as thoroughly as possible, let's be clear about the transparent motivation

8    of SBC, because SBC cares about one thing and one thing only.  That is, SBC is a claims trader

9    whose sole desire is to purchase the $12.5 million claim held jointly by VIA and S3 and then to

10    litigate with the Senior Noteholders over whether some or all of that $12.5 million claim is "Senior

11    Indebtedness" under the Senior Note Indenture, in the hope of making a profit from its efforts.  That

12    is SBC's motivation.

13    SBC's sole current economic interest in these cases is the result of an assignment of

14    approximately $160,000 of general unsecured claims (amounting to less than one-tenth of one

15    percent of the total general unsecured debt in these cases) that SBC just recently acquired from Argo

16    Partners, a well known claims trader, who presumably acquired these claims over time in the

17    ordinary course of its claims trading business.  SBC is a newly formed entity owned 50% by Argo

18    Partners and 50% by Ferry Claims, which is Mr. McGrane's client.  The motivations of Ferry Claims

19    and of Mr. McGrane become even more clear given that Mr. McGrane (counsel for Ferry Claims)

20    was the sole declarant to the objection that Argo Partners filed to the disclosure statement the day

21    before the disclosure statement hearing and in that declaration Mr. McGrane acknowledged that

22    Ferry Claims had no economic interest in these cases at that time.  Mr. McGrane subsequently

23    acknowledged to Mr. Bender that while Scott McNutt was listed on the pleading filed by Argo

24    Partners as counsel to Argo Partners, Mr. McGrane (who at that time was not representing any party

25    in interest in these cases and was representing only Ferry Claims whose sole interest was in

26    purchasing the $12.5 million VIA/S3 claim) actually drafted the pleading filed by Mr. McNutt in

27    response to the disclosure statement.

28    So while Mr. McGrane (who until now has played absolutely no role in these cases other

2

than to attempt to purchase the $12.5 million claim of VIA and S3) is quick to accuse everyone else in these cases of wrongdoing, it clear that his sole motivation in these cases is to assist SBC to purchase the $12.5 million VIA/S3 claim for as little money as possible in the hope of making as much profit as possible litigating with the Senior Noteholders.  While there is certainly nothing wrong with trying to make money, the motivations of the parties in these cases are important, particularly since Mr. McGrane is so quick to question the motivations of all other parties in these cases.

The purpose behind Mr. Bender's decision to file the Preliminary Status Report was to provide the Bankruptcy Court with a full update of the issues at hand, the current status of Mr. Bender's investigation, and the bases for the need to continue the date by which the Final Report is due to be filed and the date the continued disclosure statement is held.  Mr. Bender was requested to seek such a continuance by Ms. Dumas (counsel to the Office of the United States Trustee) and by Mr. Merola (co-counsel to SBC).

Mr. McGrane's contention that Mr. Bender's investigation has "gone nowhere" and his criticism's of Mr. Bender's efforts are completely outrageous, insulting and factually false.  Since the conclusion of the disclosure statement hearing on January 23, 2007, Mr. Bender has made the investigation that he was ordered to perform by the Bankruptcy Court the primary focus of his work day, and Mr. Bender has gone through great lengths to make sure that **all** parties in interest in these cases (including Mr. McGrane) have been kept fully informed of all developments.  In just the approximately three weeks that have passed since the disclosure statement hearing, Mr. Bender has accomplished the following:

1.    Mr. Bender noticed counsel for the Senior Noteholders (Bruce Bennett) for deposition for a date and time that worked for everybody and obtained a complete document production response from Mr. Bennett.  Mr. Bender immediately provided to all other parties (including Mr. McGrane) copies of all documents produced by Mr. Bennett which were not subject to the confidentiality agreement signed in connection with the VIA/Intel litigation, and Mr. Bender identified and described for all parties all of those documents which are or may be subject to the confidentiality agreement.  In order to enable Mr. Bender to turn over all of the documents which are

or may be subject to the confidentiality agreement to all parties (including Mr. McGrane), Mr. Bender filed a motion with the Bankruptcy Court requesting authority to do so.  At Mr. Bender's request, the Bankruptcy Court has scheduled the hearing on essentially an emergency basis to be held on February 15, 2007, at 3:30 p.m..  With the consent of **all** parties, including SBC and Mr. McGrane, Mr. Bender continued the deposition of Mr. Bennett to take place after the Bankruptcy Court makes a ruling on Mr. Bender's motion to turn over all confidential documents to all parties.

        2.      Mr. Bender noticed the Debtors' chief financial officer, Marcus Smith, for deposition for a date and time that worked for everybody and obtained a complete document request response from Mr. Smith (with the exception of documents which are the subject of the attorney-client privilege).  Mr. Bender immediately provided to all other parties (including Mr. McGrane) copies of all documents produced by Mr. Smith.  Mr. Bender has also requested the PW firm and Mr. Smith to waive the attorney-client privilege for these purposes.  Mr. Bender has also demanded that the PW firm and Mr. Smith provide Mr. Bender with a privilege log if they are not going to waive the attorney-client privilege identifying which documents have been withheld or redacted on the basis of attorney-client privilege and why the privilege applies.  With the consent of **all** parties, including SBC and Mr. McGrane, Mr. Bender continued the deposition of Mr. Smith to take place after a decision is made by PW and Mr. Smith as to whether to waive the attorney-client privilege or after they provide the privilege log to Mr. Bender if they decide not to waive the attorney-client privilege.

        3.      Mr. Bender noticed special litigation counsel for the Debtors (Suzzanne Uhland of O'Melveny & Myers) for deposition for a date and time that worked for everybody and obtained a complete document production response from Ms. Uhland.  At Ms. Uhland's insistence, Mr. Bender prepared a formal notice of deposition, document request and subpoena which Mr. Bender served upon Ms. Uhland.  Since all or nearly all of the documents produced by Ms. Uhland (consisting of an entire banker's box of documents) are or may be the subject of the confidentiality agreement signed in connection with the VIA/Intel litigation, and given that the Bankruptcy Court hearing on Mr. Bender's motion for authority to provide copies of all such documents to other parties in interest is scheduled to be held on February 15, 2007, Mr. Bender's intention is to provide copies of all such documents to all parties (including Mr. McGrane) immediately after receiving Bankruptcy Court

authority to do so.  Since Mr. Bender was not authorized by Ms. Uhland to turn over such documents to other parties who are not a party to the VIA/Intel confidentiality agreement without the prior permission of the Bankruptcy Court, and since Ms. Uhland indicated that she would not be willing to testify at deposition in the presence of other people who are not a party to the VIA/Intel confidentiality agreement without the prior permission of the Bankruptcy Court, with the consent of **all** parties, including SBC and Mr. McGrane, Mr. Bender continued the deposition of Ms. Uhland to take place after the Bankruptcy Court rules on Mr. Bender's motion to provide copies of all confidential documents to all parties and permits Ms. Uhland to testify to these matters in the presence of other people who are not parties to the VIA/Intel confidentiality agreement.

4.     Mr. Bender noticed the person most knowledgeable (the "PMK") for VIA for deposition for a date and time that worked for everybody.  Because of VIA's unwillingness to cooperate on a voluntary and informal basis, Mr. Bender was forced to prepare a formal notice of deposition, document request and subpoena which Mr. Bender served upon VIA's agent for service of process located in Fremont, California.  VIA has since filed an objection to Mr. Bender's deposition notice.  While counsel for VIA has indicated that VIA will produce the PMK (who is currently residing and working in Taiwan) for deposition and provide a response to Mr. Bender's document request, no such timetable has been provided to date by VIA's counsel.  If Mr. Bender does not obtain VIA's consent to appear for deposition and produce documents in a timely manner, Mr. Bender will be forced to file a motion to compel VIA to do so with the Bankruptcy Court.

5.     Mr. Bender noticed the PMK at the PW law firm for deposition for a date and time that worked for everybody and, on February 14, 2007 (the date of this pleading), obtained a complete document production response from PW, excepting documents (or having documents partially redacted) on the basis of attorney-client privilege.  These documents consist of two entire banker's boxes.  Mr. Bender is in the process of providing to all other parties (including Mr. McGrane) copies of all such documents produced by PW, but this is going to involve a significant photocopying and delivery job.  PW has identified Al Boro as the PMK to testify to all matters for PW.  Mr. Bender has already made clear to PW that it does not appear to Mr. Bender that Mr. Boro (a litigator at PW) could be the PMK for all matters.  However, the burden is on PW to produce who

1   PW believes is the PMK.  Mr. Bender has make clear to all parties, including to PW and to Mr.

2   McGrane, that following the completion of Mr. Bender's deposition of Mr. Boro, Mr. Bender and all

3   of the other parties in interest in these cases can decide whether to proceed with taking the

4   depositions of other PW attorneys.  Mr. Boro's deposition is currently scheduled for February 16,

5   2007.  However, given (i) the magnitude of the documents which have been produced by PW on

6   February 14, 2007 (which is just two days before the scheduled deposition date), (ii) the still

7   outstanding issue involving attorney-client privilege, and (iii) the fact that the parties in these cases,

8   including Mr. Bender, will be attending the Bankruptcy Court hearing during the afternoon of

9   February 15, 2007 on Mr. Bender's motion for authority to turn over confidential documents to all

10  parties instead of preparing for Mr. Boro's deposition, Mr. Bender believes that it would make sense

11  to continue Mr. Boro's deposition until all parties (including Mr. Bender) have had an adequate

12  opportunity to review PW's voluminous response to Mr. Bender's document production request.  Mr.

13  Bender assumes that all parties (including Mr. McGrane) will agree with this conclusion.

14          In addition to all of the foregoing, Mr. Bender has spent an enormous amount of time

15  communicating with all of the parties in interest in these cases, including Mr. McGrane, keeping

16  them fully informed of all matters.  The accusation made by Mr. McGrane that Mr. Bender has

17  "accomplished nothing" and is attempting to "bury the concerns raised by SBC's predecessor-in-

18  interest Argo Partners, Inc." could not be further from the truth.  It should also be noted that as set

19  forth above, these so-called "concerns" raised by Argo Partners, Inc. were actually drafted by Mr.

20  McGrane at a time when his client (Ferry Claims) had absolutely no economic interest in these

21  cases.

22          It should also be noted that **before** Mr. Bender submitted his document production request to

23  the five parties described above, Mr. Bender obtained the consent of all of the parties in interest

24  (which at the time included Riverside, Argo Partners and the OUST), and included in that document

25  production request all of the documents sought by all of those parties.  At no time has any party in

26  these cases (including Mr. McGrane) told Mr. Bender that his document production request was not

27  adequate or should be supplemented or amended.

28          It should also be noted that at the disclosure statement hearing held on January 23, 2007, it

6

1    was the position of the Office of the United States Trustee (expressed through Ms. Dumas) that if

2    VIA acknowledged that it knowingly waived any right to contend that any of the $12.5 million claim

3    that VIA and S3 received under the VIA/S3 settlement agreement was entitled to "Senior

4    Indebtedness" under the Senior Note Indenture, and if VIA acknowledged that it did so because VIA

5    did not believe that any of the $12.5 million claim was entitled to "Senior Indebtedness" under the

6    Senior Note Indenture, that Mr. Bender's investigation should end right there.  VIA's counsel has

7    made crystal clear to Mr. Bender that this was in fact the case - meaning that VIA's counsel has

8    acknowledged that VIA knowingly waived any right to contend that any of the $12.5 million claim

9    that VIA and S3 received under the VIA/S3 settlement agreement was entitled to "Senior

10   Indebtedness" under the Senior Note Indenture, and that VIA did so because VIA did not believe

11   that any of the $12.5 million claim was entitled to "Senior Indebtedness" under the Senior Note

12   Indenture.  However, SBC (and seemingly in particular Mr. McGrane) does not like that result

13   because it might negatively impact upon the value of the $12.5 million claim that SBC's seeks to

14   purchase.

15            It should be noted that Mr. McGrane on his own, without any consultation or prior

16   notification to Mr. Bender, proceeded to notice for deposition Mr. Del Calvo of PW for February 19,

17   2007 because it is Mr. Del Calvo who is listed in the Senior Note Indenture as the lawyer at PW for

18   notice purposes.  Mr. Bender was copied with a letter today by PW to Mr. McGrane advising that

19   Mr. Del Calvo will not be appearing for deposition on February 19, 2007 because that is a national

20   holiday.  The point here is that Mr. McGrane claims to have done so because he did not believe that

21   Mr. Bender was noticing the correct people for deposition to determine what Mr. McGrane

22   contended was the "key issue", which was the "intent of the parties" in connection with the "Senior

23   Indebtedness" provision of the Senior Note Indenture dealing with VIA.  Now the only party who

24   could have benefited from that provision (VIA) has made clear that it did not believe that the

25   provision applied to the $12.5 million claim that VIA and S3 obtained from the VIA/Intel settlement.

26   Since it is not the answer that Mr. McGrane wants because it presumably weakens the value of the

27   $12.5 million claim that Mr. McGrane's client wishes to buy, Mr. McGrane has seemingly chosen to

28   disregard that information and instead attack Mr. Bender personally and Mr. Bender's investigative

7

1  efforts, which in actuality have been as substantial and as thorough as could have been possible

2  under the circumstances and timing of these cases.

3      In Mr. Bender's Preliminary Status Report, Mr. Bender submitted what Mr. Bender believes

4  to be the issues at hand and the objective facts.  It is Mr. Bender's intention to complete a thorough

5  investigation of all of the subject matters at hand, and to include all parties in interest, including Mr.

6  McGrane in all aspects of that investigation.  Once completed, it is Mr. Bender's intention to file a

7  complete and thorough Final Status Report with the Bankruptcy Court, one which would include

8  copies of all relevant documents.

9      While Mr. Bender fully intends to examine the role played by PW, the Senior Noteholders

10 and others, if any, in the inclusion in the VIA/Intel settlement agreement of the waiver by VIA of

11 any right to contend that some or all of the $12.5 million claim was entitled to "Senior Indebtedness"

12 status under the Senior Note Indenture, and to report all of those finding to the Bankruptcy Court

13 and to others, it is Mr. Bender's understanding from speaking with counsel to the OUST (Ms.

14 Dumas) that the OUST will take action against PW if the OUST concludes that doing so is

15 appropriate.

16     Finally, it should be noted that as set forth in SBC's Response to Mr. Bender's Preliminary

17 Status Report, SBC has offered to purchase the $12.5 million claim held by VIA and S3 by paying

18 $4 million to VIA and $250,000 to the Debtors' estates at the closing, and to share in any upside

19 subsequently obtained by SBC in its pursuit of "Senior Indebtedness" litigation with the Senior

20 Noteholders, with 50% of the upside to be paid to SBC, 30% of the upside to be paid to VIA, and

21 20% of the upside to be paid to the Debtors' estates.  "Upside" will be all money obtained by SBC

22 from the Debtors' estates on account of its $12.5 million claim plus any money obtained by SBC

23 from its pursuit of "Senior Indebtedness" litigation with the Senior Noteholders after SBC has been

24 repaid its $4.25 million (without interest) and all legal fees and expenses incurred by SBC.  Thus far,

25 Mr. Bender has discussed this offer at length with counsel to VIA, counsel to Riverside (Bob

26 Franklin), counsel to the two most active members of the Committee who are not part of the Senior

27 Noteholders (Matsushita Kotobuki Electronics Sales of America LLC and Matsushita Kotobuki

28 Electronics Industries, Inc. - both of whom are represented by Bruce MacIntyre of Perkins Coie) and

1   counsel to the OUST (Ms. Dumas).  Mr. Bender understands that this proposal is acceptable to VIA

2   and that drafts of the agreement are being circulated at this time.  Mr. Bender has already told

3   counsel to VIA and counsel to SBC that this proposal is also acceptable to Riverside and to Mr.

4   MacIntyre's two clients (and therefore will likely be acceptable to the entire Committee excluding

5   the Senior Noteholders who would be recused from any vote), subject to the following conditions:

6       1.    The original offer made by SBC would have required the Bankruptcy Court to delete

7   the provision of the VIA/Intel settlement agreement in which VIA waived its right to contend that

8   any of the $12.5 million is entitled to "Senior Indebtedness" under the Senior Note Indenture (which

9   SBC referred to as "blue-lining") even if all parties to the VIA/Intel settlement agreement did not

10  agree to this modification to the settlement agreement.  The only party who might not sign the

11  modification would be Intel.  Mr. Bender made clear to the other parties that he was concerned about

12  whether the Bankruptcy Court has the authority to modify or delete a provision of a settlement

13  agreement without the consent of all parties to the settlement agreement, regardless of whether the

14  provision which is deleted does or does not affect a party to the settlement agreement who does not

15  agree to the modification.  This concern of Mr. Bender's appears to have been eliminated because

16  counsel to VIA has advised Mr. Bender that VIA will not proceed with the amendment to the

17  VIA/Intel settlement agreement unless all parties to the VIA/Intel settlement agreement (including

18  Intel) agree to the amendment.

19      2.    Counsel to VIA has inquired as to whether discovery of VIA will be proceeding even

20  if an agreement is reached on the amendment to the VIA/Intel settlement agreement.   After

21  discussing the matter with a number of parties, including counsel to Riverside and counsel to the

22  OUST, Mr. Bender has told counsel to VIA that the answer is "yes" - meaning that the discovery of

23  VIA must proceed notwithstanding an agreement being reached on an amendment to the VIA/Intel

24  settlement agreement.  Other than with respect to documents dealing with proprietary or intellectual

25  property issues for VIA and/or Intel (which are excluded from Mr. Bender's motion scheduled to be

26  heard on February 15, 2007, at 3:30 p.m.), Mr. Bender has advised counsel to VIA that Mr. Bender

27  is still insisting on proceeding with a deposition of the VIA PMK and on obtaining a response to Mr.

28  Bender's document production request from VIA as soon as possible, regardless of whether an

agreement is reached on an amendment to the VIA/Intel settlement agreement.

3.     Mr. Bender has advised counsel to VIA and counsel to SBC that it is Mr. Bender's understanding from his conversations with counsel to Riverside (Bob Franklin) that it is Riverside's position that this discovery of VIA (including a deposition of the VIA PMK and receipt of the VIA documents) must be completed before Bankruptcy Court approval of the amendment to the VIA/Intel settlement agreement occurs. As a result, Mr. Bender has advised counsel to VIA and counsel to SBC that the parties will either need to delay the execution of the amendment to the VIA/Intel settlement agreement until the discovery of VIA is completed, or condition Bankruptcy Court approval of the amendment to the VIA/Intel settlement agreement upon completion of the discovery of VIA, with Riverside to reserve the right to object to the amendment of the VIA/Intel settlement agreement depending upon the information obtained from the discovery of VIA.

4.     From Mr. Bender's discussions with Bruce Bennett (counsel to the Senior Noteholders) on the subject, it is Mr. Bender's understanding that the Senior Noteholders do **not** object to the elimination of the "Senior Indebtedness" waiver by VIA from the VIA/Intel settlement agreement, as the Senior Noteholders recognize and agree that the Senior Noteholders received possible consideration resulting from that waiver without paying any consideration for the waiver. However, it is also Mr. Bender's understanding that if the "Senior Indebteness" waiver by VIA is eliminated from the VIA/Intel settlement agreement, Mr. Bennett contends that the Senior Noteholders are entitled to be told how the $12.5 million claim is being allocated between VIA and S3 and the basis for that allocation. Mr. Bender has advised counsel to VIA and counsel to SBC of Mr. Bennett's position in this regard. Counsel to VIA and counsel to SBC have told Mr. Bender that they disagree with Mr. Bennett's position on this issue. Mr. Bender has made clear to counsel to VIA and counsel to SBC that this is a dispute between them and the Senior Noteholders, not involving the estates, one which presumably will have to be resolved by the Bankruptcy Court if and

when the motion is filed before the Bankruptcy Court for approval of the modification to the VIA/Intel settlement agreement. However, given that the simple filing of a notice of appeal to the Bankruptcy Court order approving the modification to the VIA/Intel settlement (whether by the Senior Noteholders or any other party) will cause the agreement to modify the VIA/Intel settlement agreement to become null and void on its face unless the parties agree to the contrary, Mr. Bender has encouraged counsel to VIA and counsel to SBC to attempt to reach an agreement with the Senior Noteholders on the manner in which the $12.5 million claim is allocated, recognizing that if no such agreement can be reached, then the Bankruptcy Court will need to resolve the issue if and when the motion is filed before the Bankruptcy Court for approval of the modification to the VIA/Intel settlement agreement.

5. Finally, Mr. Bender communicated three additional points on behalf of Mr. MacIntyre (who as described above serves as counsel to the two most active members of the Committee who are not part of the Senior Noteholders - Matsushita Kotobuki Electronics Sales of America LLC and Matsushita Kotobuki Electronics Industries, Inc.). First and foremost, the most important thing to Mr. MacIntyre's clients is that a plan of reorganization get confirmed and unsecured creditors receive their money as quickly as possible. Second, from his understanding of the risks to the estates that were posed by the VIA/Intel litigation (both in terms of the continued incurrence of legal fees and expenses by Debtors' counsel, the delay that would have been caused by continued litigation, and the magnitude of the claims that were asserted against the estates by VIA and S3), Mr. MacIntyre's clients do not want anything to occur which would jeopardize the existing settlement agreement which is in place which would result in reopening the VIA/Intel litigation. Third and finally, Mr. MacIntyre's clients contend that if they knew at the time of the VIA/Intel settlement what they know now (regarding the waiver by VIA of any "Senior Indebtedness" rights), his clients would have likely been opposed to a settlement with VIA and Intel which would have

11

been conditioned upon the ability of the Debtors to obtain a finding by the Bankruptcy Court that the claim awarded to VIA (which would needed to have been less than $12.5 million) was entitled to "Senior Indebtedness" status, which would have needed to have occurred over the objection of the Senior Noteholders, subjecting the estates to the time, risk and expense of the estates seeking such a ruling by the Bankruptcy Court.

Dated:  February 14, 2007          LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.


By: _____/s/Ron Bender_____
                Ron Bender
        Attorneys for the Official Committee of
        Creditors Holding Unsecured Claims

EXHIBIT 62

1    PILLSBURY WINTHROP SHAW PITTMAN LLP
     CRAIG A. BARBAROSH California Bar No. 160224
2    WILLIAM B. FREEMAN California Bar No. 137276
     650 Town Center Drive, 7th Floor
3    Costa Mesa, CA  92626-7122
     Telephone: (714) 436-6800
4    Facsimile: (714) 436-2800

5    Attorneys for Debtors and Debtors-In-Possession

6    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
     RON BENDER California Bar No. 143364
7    CRAIG M. RANKIN California Bar. No. 169844
     TODD M. ARNOLD California Bar No. 221868
8    10250 Constellation Blvd., Suite 1700
     Los Angeles, CA  90067
9    Telephone: (310) 229-1234
     Facsimile: (310) 229-1244
10
     Attorneys for the Official Committee of Creditors
11   Holding Unsecured Claims

12
                    UNITED STATES BANKRUPTCY COURT
13                  NORTHERN DISTRICT OF CALIFORNIA
                            SAN JOSE DIVISION
14
     IN RE:                                    Case No. 03-51775
15
     SONICBLUE INCORPORATED, a                 CHAPTER 11 Cases
16   Delaware corporation, DIAMOND
     MULTIMEDIA SYSTEMS, INC., a               (Case Nos. 03-51775 through 03-51778 MM)
17   Delaware corporation, REPLAYTV, INC., a   (Jointly Administered)
     Delaware corporation, AND SENSORY
18   SCIENCE CORPORATION, a Delaware           SUBMISSION OF REDLINED VERSION
     corporation,                             OF DISCLOSURE STATEMENT
19                                             DESCRIBING FIRST AMENDED
                                               LIQUIDATING PLAN OF
20                                             REORGANIZATION DATED AS OF
                                               JANUARY 18, 2007 PROPOSED JOINTLY
                Debtors and Debtors-in-Possession.   BY DEBTORS AND CREDITORS'
21                                             COMMITTEE

22
                                               Date:    January 23, 2007
23                                             Time:    11:00 a.m.
                                               Place:   Courtroom 3070
24                                                      280 South First Street
                                                        San Jose, CA 95113
25
                                               Hon. Marilyn Morgan
26

27

28

1

2    SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC.,

3    REPLAYTV, INC. and SENSORY SCIENCE CORPORATION (collectively, the

4    "Debtors") and the OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED

5    CLAIMS ("Creditors Committee") hereby submit as Exhibit "1" hereto a redlined version

6    of the "Disclosure Statement Describing First Amended Liquidating Plan of Reorganization

7    Dated As of January 18, 2007 Proposed Jointly By Debtors and Creditors' Committee" (the

8    "Amended Disclosure Statement") (Without Exhibits).  The Amended Disclosure Statement

9    attached hereto as Exhibit "1" is redlined to indicate changes made to the Disclosure

10   Statement filed by the Debtors and the Creditors Committee with the Court on or about

11   December 15, 2006.

12

13   Dated:  January 18, 2007            PILLSBURY WINTHROP SHAW PITTMAN LLP

14

15

16                                      By: _____*/s/William B. Freeman*_____ _____
                                             William B. Freeman
17                                       Attorneys for Debtors and Debtors-In-Possession

18   Dated:  January 18, 2007            LEVENE, NEALE, BENDER, RANKIN & BRILL
                                         L.L.P.
19

20

21                                      By: _____*/s/Ron Bender*_____
                                             Ron Bender
22                                       Attorneys for Creditors' Committee

23

24

25

26

27

28

PILLSBURY WINTHROP SHAW PITTMAN LLP
CRAIG A. BARBAROSH California Bar No. 160224
WILLIAM B. FREEMAN California Bar No. 137276
MATTHEW S. WALKER California Bar No. 101470
650 Town Center Drive, 7th Floor
Costa Mesa, CA  92626-7122
Telephone: (714) 436-6800
Facsimile: (714) 436-2800
Attorneys for Debtors and Debtors-In-Possession

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
RON BENDER California Bar No. 143364
CRAIG M. RANKIN California Bar. No. 169844
TODD M. ARNOLD California Bar No. 221868
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for the Official Committee of Creditors
Holding Unsecured Claims

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation,<br><br>          Debtors. | Case No. 03-51775 MM<br><br>Chapter 11 Cases<br><br>(Case Numbers 03-51775 through 03-51778)<br>(Jointly Administered)<br><br>DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION DATED AS OF ~~DECEMBER 15, 2006~~JANUARY 18, 2007 PROPOSED JOINTLY BY DEBTORS AND CREDITORS' COMMITTEE<br><br><u>Disclosure Statement Hearing</u>:<br>Date:  January 23, 2007<br>Time:  11:00 a.m.<br>Dept:  Courtroom 3070<br>       280 South First St.<br>       San Jose, CA 95113<br>Hon. Marilyn Morgan |

## EXHIBIT "1"

**Table of Contents**

                                                                                                    Page

EXHIBIT LIST .................................................................................................................... i
INTRODUCTION ................................................................................................................ ii
DISCLAIMER ..................................................................................................................... iii
IRS CIRCULAR 230 NOTICE ........................................................................................... iv
ARTICLE I OVERVIEW OF THE PLAN ......................................................................... ~~1~~5
A. Plan Structure ................................................................................................................. ~~1~~5
B. Summary of Classification and Treatment of Claims and Interests Under the Plan ............... ~~1~~5
ARTICLE II PLAN VOTING PROCEDURES AND REQUIREMENTS ................................ ~~4~~9
A. Notice to Holders of Claims and Interests ...................................................................... ~~4~~9
B. Holders of Claims In Classes 3, ~~4, 5~~4 and 6 are Entitled to Vote on the Plan ..................... ~~4~~9
C. Voting Procedures ........................................................................................................... ~~5~~10
ARTICLE III DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESSES ........... ~~5~~10
A. The Debtors .................................................................................................................... ~~5~~10
B. The Debtors' Other Affiliates ........................................................................................ ~~6~~11
C. Products .......................................................................................................................... ~~6~~11
1.    Rio Digital Audio Players ...................................................................................... ~~6~~11
2.    Go-Video Products ................................................................................................ ~~6~~11
3.    ReplayTV products ................................................................................................ ~~6~~12
D. Sales, Marketing and Distribution ................................................................................. ~~7~~12
E. Asset Sales and Acquisitions ......................................................................................... ~~7~~12
F. UMC Stock ..................................................................................................................... ~~8~~13
G. Patents ............................................................................................................................ ~~8~~13
H. Petition Date Capital Structure ...................................................................................... ~~8~~13
ARTICLE IV PRE-BANKRUPTCY EVENTS ................................................................... ~~9~~14
A. The Debtors' Continuing Losses .................................................................................... ~~9~~14
B. Copyright Litigation ....................................................................................................... ~~10~~15
C. Retention Of Financial Advisor ..................................................................................... ~~10~~15
D. Restructuring Alternatives ............................................................................................. ~~10~~15
E. Asset Valuation .............................................................................................................. ~~11~~16
F. Pre-Petition Marketing of the Debtors' Product Lines ................................................... ~~11~~16
ARTICLE V ...................................................................................................................... ~~12~~17
THE DEBTORS' CHAPTER 11 CASES ............................................................................ ~~12~~17
A. The Bankruptcy Petitions .............................................................................................. ~~12~~17
B. First Day Orders ............................................................................................................. ~~12~~17
C. Cash Collateral ............................................................................................................... ~~12~~17
D. Retention Of Professionals ............................................................................................ ~~12~~18
E. The Creditors' Committee .............................................................................................. ~~13~~19
F. Sale of Substantially All of the Debtors' Assets ............................................................ ~~14~~19
1.    Sale of the Rio, ReplayTV and Go-Video Product Lines ....................................... ~~14~~19
2.    U.K. Affiliate Participation in the Rio Product Line Sale ...................................... ~~14~~20
3.    Patent Sales ........................................................................................................... ~~15~~20
4.    Modem and Computer Inventory Sales .................................................................. ~~15~~21
5.    Post-Petition Date UMC Stock Sales .................................................................... ~~16~~21
~~6.~~7.    Payment of Certain Secured Claims ................................................................. ~~16~~22
~~7.~~8.    Funds Held ....................................................................................................... ~~16~~23
G. Employee Matters .......................................................................................................... ~~17~~23
1.    Employees ............................................................................................................. ~~17~~23
2.    Employee Retention and Incentive Plans .............................................................. ~~18~~24
3.    The Debtors' Retirement Plans .............................................................................. ~~19~~25
H. Claims Process and Bar Dates ....................................................................................... ~~19~~25
1.    Schedules and Statements ..................................................................................... ~~19~~25

DISCLAIMER STATEMENT ~~FOR~~DESCRIBING FIRST
                                     AMENDED LIQUIDATING PLAN OF REORGANIZATION

2.    Previously Established Claims Bar Dates..........................................................~~19~~25
3.    Claims Objections and Subordination. ............................................................~~20~~26
4.    Claim Issues Involving the Junior Noteholders and the Senior Noteholders. ................~~21~~27
I.  Post-Petition Date Litigation.........................................................................~~23~~29
1.    VIA Litigation. ..........................................................................................~~23~~29
2.    Avoidance Actions......................................................................................~~23~~30
ARTICLE VI THE PLAN OF REORGANIZATION ....................................................~~24~~31
A.  Introduction. .............................................................................................~~24~~31
B.  General Plan Description. ............................................................................~~25~~31
C.  Substantive Consolidation. ..........................................................................~~25~~32
D.  The Plan's Reallocation Provisions. ...............................................................~~27~~34
E.  Other Procedural Issues Concerning Subordination and Seniority of Claims. ....................~~28~~36
F.  Classification and Treatment of Claims. ...........................................................~~28~~36
1.    Class 1 - Secured Claims. .............................................................................~~29~~37
2.    Class 2 – Other Priority Claims. ....................................................................~~29~~37
3.    Class 3 – Senior Notes Claims. ......................................................................~~30~~38
4.    Class 4 - General Unsecured Claims. ...............................................................~~30~~39
5.    Class 5 - Junior Notes Claims. ......................................................................~~31~~40
6.    Class 6 – Convenience Class Claims. ...............................................................~~32~~40
7.    Class 7 – Subordinated Unsecured Claims. ........................................................~~32~~41
8.    Class 8 – Interests. .....................................................................................~~32~~41
G.  Treatment of Unclassified Administrative and Priority Tax Claims. ...............................~~33~~42
1.    Definition of Administrative Claims. ...............................................................~~33~~42
2.    Treatment of Administrative Claims other than Professional Fees. ...............................~~33~~42
3.    Amount of Administrative Claims other than Professional Fees......................................~~33~~42
4.    Statutory Fees. ..........................................................................................~~34~~43
5.    Treatment of Professional Fees. .....................................................................~~34~~43
6.    Amount of Professional Fees. ........................................................................~~34~~43
7.    Amount and Treatment of Priority Tax Claims. ..................................................~~37~~46
H.  Effect of Confirmation of the Plan. ................................................................~~37~~46
1.    Vesting of Assets in the Reorganized Debtor. ...................................................~~37~~46
2.    Authority to Effectuate the Plan. ...................................................................~~37~~47
3.    The Non-Debtor Subsidiaries. ......................................................................~~37~~47
4.    Dissolution of the Creditors' Committee; Formation of the Plan Oversight
Committee...................................................................................................~~37~~47
5.    Termination of the Debtors' Public Entities on the Effective Date..................................... 48
1.    Principals of the Reorganized Debtor. ............................................................~~38~~49
2.    Funding of the Plan. ...................................................................................~~39~~49
3.    The Rights of Action. .................................................................................~~39~~49
4.    Post-Effective Date ~~Expenses and Professional Fees.39~~Employment of Professionals By the Plan Oversi
5.    Limitation of Liability for the Reorganized Debtor and the Plan Oversight
Committee...................................................................................................~~40~~51
ARTICLE VII CLAIMS RESOLUTION AND DISTRIBUTIONS ....................................~~40~~52
A.  Late Claims Void. .....................................................................................~~40~~52
B.  Prosecution of Objections to Claims...............................................................~~40~~52
C.  Estimation of Claims. .................................................................................~~41~~52
D.  Allowed and Disputed Claims. ......................................................................~~41~~53
E.  Provisions Regarding Distributions. ...............................................................~~41~~53
1.    No Distributions on Disputed or Disallowed Claims. ...........................................~~41~~53
ARTICLE VIII INJUNCTION, EXCULPATION AND INDEMNIFICATION ...................~~45~~57
A.  Discharge. ...............................................................................................~~45~~57
B.  Injunction. ...............................................................................................~~45~~57
C.  Exculpation and Limitation of Liability. ..........................................................~~45~~58
D.  Indemnification. ........................................................................................~~46~~58
ARTICLE IX OTHER PLAN EFFECTUATION MATTERS ............................................~~46~~58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A. Executory Contracts and Unexpired Leases. .............................................. ~~46~~58
1.    Rejection of Executory Contracts and Unexpired Leases ..................... ~~46~~58
2.    Rejection Damage Claims Bar Date and Resolution. ............................ ~~46~~59
B. Conditions Precedent. .............................................................................. ~~47~~59
1.    Conditions Precedent to the Effective Date of the Plan. ....................... ~~47~~59
2.    Waiver of Conditions. ............................................................................ ~~47~~59
C. Retention of Jurisdiction. .......................................................................... ~~47~~59
D. Modification of Plan. ................................................................................ ~~47~~60
E. Revocation or Withdrawal. ....................................................................... ~~47~~60
F. Terms of Existing Injunctions or Stays. .................................................... ~~47~~60
G. Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities. ........... ~~47~~60
H. Section 1146 Exception. ........................................................................... ~~48~~60
I.  Severability. ............................................................................................. ~~48~~60
J.  Governing Law. ........................................................................................ ~~48~~61
K. Notices. .................................................................................................... ~~48~~61
L. Closing of Cases. ...................................................................................... ~~48~~61
M.    Continuing Viability of Other Orders/Agreements ............................. ~~49~~61
ARTICLE X CONFIRMATION OF THE PLAN ......................................... ~~49~~62
A. Confirmation Hearing ............................................................................... ~~49~~62
B. Requirements for Confirmation of the Plan. .............................................. ~~49~~62
1.    Fair and Equitable Test. ......................................................................... ~~49~~62
2.    Feasibility. .............................................................................................. ~~50~~63
3.    "Best Interests" Test. ............................................................................. ~~50~~63
ARTICLE XI FINANCIAL INFORMATION ............................................... ~~51~~64
ARTICLE XII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........ ~~51~~64
A. Liquidation Under Chapter 7. .................................................................... ~~51~~64
B. Alternative Chapter 11 Plan. ..................................................................... ~~51~~65
ARTICLE XIII CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................ ~~52~~65
ARTICLE XIV CONCLUSION AND RECOMMENDATION ...................... ~~52~~65

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT LIST**

Exhibit "A"    First Amended Joint Liquidating Plan of Reorganization

Exhibit "B"    Corporate Structure Chart

Exhibit "C"    A list of all known Claims that were included in the Schedules or were asserted in proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Debtors and/or the Creditors' Committee (or by the Reorganized Debtor or the Plan Oversight Committee after the Effective Date) as the Debtors and the Creditors' Committee are continuing with their investigation of Claims. This list does not include Claims held by any of the defendants in Avoidance Actions.

## INTRODUCTION

This disclosure statement ("Disclosure Statement") is being furnished jointly by SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, Chapter 11 Debtors in the above-captioned jointly administered Chapter 11 Cases (collectively, the "Debtors"), and the OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS (the "Creditors' Committee"), in connection with the Debtors' and Creditors' Committee's solicitation of votes to confirm the First Amended Joint Liquidating Plan of Reorganization Dated as of December 15, 2006January 18, 2007 (the "Plan") Proposed jointly by the Debtors and the Creditors' Committee (collectively, the "Proponents").  A copy of the Plan is attached hereto as Exhibit "A".[1]

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition operating and financial history, the reasons for their Chapter 11 bankruptcy filings, and significant events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By an order entered on _____, 2007, the Bankruptcy Court has: (a) approved this Disclosure Statement as containing "adequate information" in accordance with Bankruptcy Code Section 1125 to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (b) authorized use of this Disclosure Statement in connection with the solicitation of votes with respect to the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and Bankruptcy Code Section 1125.  In voting on the Plan, Holders of Claims entitled to vote on the Plan should not rely on any information other than that contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only certain classes of Claims are entitled to vote on the Plan.  If you are entitled to vote to accept or reject the Plan, a "Ballot" and pre-addressed envelope for the return of the Ballot are enclosed.  If you are a creditor in Classes 3,

---

[1] All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  To the extent of any inconsistency between the definitions in the Plan and herein, the definitions in the Plan shall govern.

4, 54 and 6 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, please contact the Balloting Agent designated in Section II.C. of this Disclosure Statement.[2]

THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.

---

[2] Creditors in Classes 1 and 2 are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.  Creditors and Interest Holders in Classes 5, 7 and 8, which receive nothing under the Plan, are deemed to have rejected the Plan and are therefore not entitled to vote on the Plan.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN (AS SUBSEQUENTLY AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW).  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ANY PARTY WHO DOES NOT OBJECT TO THE DISCLOSURE STATEMENT IS NOT DEEMED TO WAIVE ANY RIGHTS TO OBJECT TO THE CONFIRMATION OF THE PLAN ON ANY BASIS OTHER THAN LACK OF ADEQUATE DISCLOSURE UNDER BANKRUPTCY CODE SECTION 1125.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS TO THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE PROPONENTS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE PROPONENTS, WHO ARE UNABLE TO WARRANT OR REPRESENT THAT THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.  HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY AND IN THEIR ENTIRETY AND, WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE ~~SECURITIES AND EXCHANGE COMMISSION ("SEC")~~ SEC, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST ANY OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

1

2       IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF

3   THE PLAN SHALL CONTROL.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING FORECASTS AND ARE  BASED

4   UPON CERTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

5   **IRS CIRCULAR 230 NOTICE**

6       TO ENSURE  COMPLIANCE  WITH  <u>IRS CIRCULAR 230</u>, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL

7   TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF

8   CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION

9   IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND OTHER MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND

10  INTERESTS   SHOULD   SEEK   ADVICE   BASED   ON   THEIR   PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ARTICLE I
# OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan, which is attached hereto as Exhibit "A." For a more detailed description of the terms and provisions of the Plan, see Article VI. below, entitled "The Plan of Reorganization."

**A.    Plan Structure.**

The Plan is a plan of liquidation for the Debtors.  Substantially all of the Debtors' Assets have already been sold and reduced to Cash.  To the extent any of the Debtors' Assets have not been liquidated by the Effective Date, such assets will be liquidated by the Reorganized Debtor.  The Reorganized Debtor will distribute the Debtors' Cash and the proceeds of the Debtors' Assets (net of expenses) to Creditors holding Allowed Claims according to the terms of the Plan, which is consistent with the priority distribution set forth in the Bankruptcy Code.

The Plan provides for the substantive consolidation of the Debtors.  "Substantive Consolidation" refers to a process of combining multiple debtors into one legal entity and then treating them as a single entity.  As such, on the Effective Date: (a) all Assets and liabilities of the Debtors shall be merged or treated as though they were merged into and with the Assets and liabilities of each other Debtor; (b) all Inter-Company Claims shall be eliminated and extinguished, and no distributions shall be made under the Plan on account of any Inter-Company Claims; (c) any Claims against two or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim; and (d) all Allowed Claims against the Debtors shall be satisfied from the Assets of the single consolidated estate of the Reorganized Debtor.

The Plan will become effective on the Effective Date, which shall be the first business day which is at least eleven days following the date the Bankruptcy Court enters the Plan Confirmation Order, unless there is a stay in effect, in which case the Effective Date shall be the first business day after the stay is no longer in effect with respect to the Plan Confirmation Order.  The Proponents estimate that the Effective Date will be on or around March 31, 2007. Reference is made to Section IX.B. of this Disclosure Statement for a discussion of conditions to the Effective Date.

Initial distributions under the Plan will commence shortly after the Effective Date, but it is estimated that most Creditors entitled to a distribution will not receive a distribution until approximately two to three months after the Effective Date.

**B.    Summary of Classification and Treatment of Claims and Interests Under the Plan**

The Plan classifies all pre-petition Claims against and Interests in the Debtors into separate Classes, except for Administrative Claims and Priority Tax Claims, which are not classified pursuant to the Bankruptcy Code.  The following chart identifies the classified and unclassified Claims specified in the Plan, estimates the amount of unclassified and classified Claims, and summarizes the treatment of the classified and unclassified Claims under the Plan.

It should be noted that the estimated amounts of Claims are based on the Debtors' schedules, Claims filed, and the outcome of any objections which have been filed to Disputed Claims.  However, not all objections to Disputed Claims have been filed or completed, and

there still remain some pending Preference Actions, the outcome of which will likely have some impact upon the ultimate amount of Allowed Claims. As a result, for certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or be materially less than the estimated amounts shown in the chart that follows. The Debtors have not yet fully analyzed all proofs of Claim filed in the Chapter 11 Cases. Estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated.

For certain Classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimate amount of Allowed Claims in each Class. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes 3 through 5 will actually be realized by the Holders of Allowed Claims in such Classes. A more detailed description of the Claims and Interests in each Class and the treatment of such Claims and Interests is set forth in Article VI below.

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: $1,830,500 (excluding the contingency fees and expenses owing on account of the pursuit of Avoidance Actions) plus an additional approximately $1,000,000 of Professional Fees which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed Proj. Rec. 100% | Non-voting class |
| N/A | Priority Tax Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $146,000 Proj. Rec.: 100% | Non-voting class |
| 1 | Secured Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $380,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |
| 2 | Other Priority Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $30,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| 3 | Senior Notes Claims | Cash equal to Pro Rata Share of Net Remaining Assets plus Cash equal to the payment that would otherwise be owing to Class 5 on account of the Junior Notes Claims which instead will be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions. If and when Class 3 has recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims shall thereafter be paid to the Junior Notes Indenture Trustee for distribution to holders of record of the Junior Notes as of the Effective Date after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture. | Est. Amt.: Approx. $47 million (see explanation below) Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions. If and when Class 3 has recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims shall thereafter be paid to the Junior Notes Indenture Trustee for distribution to holders of record of the Junior Notes as of the Effective Date after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture. | Entitled to vote (impaired) |

Est. Amt: $1,830,500 (excluding the contingency fees and expenses owing on account of the pursuit of Avoidance Actions) plus an additional approximately $1,000,000 of Professional Fees which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed
Proj. Rec. 100%

| N/A | Administrative Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | | Non-voting class |
|---|---|---|---|---|
| N/A | Priority Tax Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $180,000 Proj. Rec.: 100% | Non-voting class |
| 1 | Secured Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $380,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |
| 2 | Other Priority Claims | Full payment in Cash on the later of the Effective Date or when allowed by the Bankruptcy Court | Est. Amt: Approx. $30,000 Proj. Rec.: 100% | Not entitled to vote (unimpaired) |
| 3 | Senior Notes Claims | Cash equal to Pro Rata Share of Net Remaining Assets plus Cash equal to the payment that would otherwise be owing to Class 5 on account of the Junior Notes Claims which instead will be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Est. Amt: Approx. $47 million (see explanation below) Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions | Entitled to vote (impaired) |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| 4 | General Unsecured Claims Not Included in Any Other Class | Cash equal to Pro-Rata Share of Net Remaining Assets | Est. Amt: Approx. $86 million Proj. Rec.: Approx. 33% | Entitled to vote (impaired) |
| 5 | Junior Notes Claims | Cash equal to Pro-Rata Share of Net Remaining Assets, except that the full amount of the payment that would otherwise be made to Class 5 on account of the Junior Notes Claims will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions. If and when Class 3 has recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims shall thereafter be paid to the Junior Notes Indenture Trustee for distribution to holders of record of the Junior Notes as of the Effective Date after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and | Est. Amt: $103 million Proj. Rec.: Identical percentage recovery as for Class 4 (estimated at 33%), except that the full payment that would otherwise be made to Class 5 will instead be paid to the Holders of Class 3 Allowed Claims pursuant to the Subordination Provisions, subject to that set forth in the column to the immediate left of this column and as otherwise set forth in the Plan. | Entitled Not entitled to vote (impaired)(deemed to reject) |

| | | | | |
|---|---|---|---|---|
| | | | | expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture. |
| 6 | Convenience Class | Cash equal to 50% of Allowed Claim with a maximum payment of $1,250.250. Members of this Class will include all holders of Allowed Unsecured Claims which are $2,500500 or less, plus all holders of Allowed Unsecured Claims which are greater than $2,500500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $2,500500 to participate in this Class | Est. Amt.: Approx. $375,00075,000 Proj. Rec. 50% (except for holders of Allowed Unsecured Claims which are greater than $2,500500 but who voluntarily agree to reduce the amount of their Allowed Unsecured Claim to $2,500500 to participate in this Class) | Entitled to vote (impaired) |
| 7 | Subordinated Unsecured Claims | No distribution | Est. Amt.: $14.6 million Proj. Rec. 0% | Not entitled to vote (deemed to reject) |
| 8 | Interests | No distribution | Est. Amt.: $N/A Proj. Rec. 0% | Not entitled to vote (deemed to reject) |

-10-    DISCLOSURE STATEMENT FOR DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

THE PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE GREATEST AND QUICKEST RECOVERY POSSIBLE FOR HOLDERS OF ALLOWED CLAIMS AND THUS <u>STRONGLY</u> <u>RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

**ARTICLE II**
**PLAN VOTING PROCEDURES AND REQUIREMENTS**

**A.    Notice to Holders of Claims and Interests.**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BE BINDING ON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN, AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, THE PROPONENTS ENCOURAGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN AND ANY EXHIBITS THERETO ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  No solicitation of votes for the Plan may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Plan other than the information contained herein.

**B.    Holders of Claims In Classes 3, ~~4, 5~~4 and 6 are Entitled to Vote on the Plan.**

Subject to the provisions of the order approving this Disclosure Statement, any Holder of a Claim against the Debtors in Classes 3, ~~4, 5~~4 and 6 shall be entitled to vote to accept or reject the Plan if: (i) such Holder's Claim has been included by the Debtors in the Schedules as undisputed, non-contingent and liquidated in an amount more than $0.00, or (ii) such Holder has filed a proof of claim on or before the applicable Bar Date; unless such Claim is the subject of a pending objection or has been entirely Disallowed by an order of the Bankruptcy Court.

Unless otherwise permitted, the Holder of any Disputed Claim is not entitled to vote with respect to such Disputed Claim unless the Bankruptcy Court temporarily allows such Disputed Claim for the purpose of voting to accept or reject the Plan.  The Debtors may stipulate with some Holders of Disputed Claims for provisional allowance of their Claims for voting purposes.  Alternatively, the Holder of a Disputed Claim may seek a Bankruptcy Court order provisionally allowing such Holder's Claim for voting purposes prior to the Confirmation Hearing or such earlier date as may be established by the Bankruptcy Court.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

All known Holders of Claims entitled to vote on the Plan have been sent a Ballot

together with this Disclosure Statement.  If you are a Creditor in Class 3, 4, 54 or 6 and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any of the Exhibits hereto, the Plan or the voting procedures in respect thereof, please contact the Balloting Agent designated below.

**C.    Voting Procedures.**

After carefully reviewing this Disclosure Statement and the Exhibits hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it either by overnight courier or regular mail to the Balloting Agent at the address specified in the ballot and below.  Holders of Claims in Classes entitled to vote should read the Ballot carefully and follow the instructions contained therein.  BALLOTS SUBMITTED TO THE BALLOTING AGENT BY FAX OR OTHER ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED AND WILL BE VOID.

Please vote and return your ballot to the Balloting Agent at the following address:

If by U.S. Mail:                          If by Overnight Carrier or Hand-delivery:

SONICblue, Inc., et. al.                  SONICblue, Inc., et. al.

co/ JPMorgan Bankruptcy                   co/ JPMorgan Bankruptcy

and Settlement Services                   and Settlement Services

P.O. Box 56636                            8475 Western Way, Suite 110
Jacksonville, FL 32241-6636               Jacksonville, FL 32256


FOR YOUR VOTE TO COUNT, YOUR BALLOT MUST ACTUALLY BE RECEIVED BY THE BALLOTING AGENT DESIGNATED ABOVE AT THE SPECIFIED ADDRESS NO LATER THAN 5:00 P.M. PREVAILING EASTERN TIME ON _____ _____, 2007.

IF YOU MUST RETURN YOUR BALLOT TO A TRUSTEE, BANK, BROKER OR AGENT, YOU MUST RETURN YOUR BALLOT TO IT IN SUFFICIENT TIME FOR IT TO PROCESS THE BALLOT AND RETURN IT TO THE BALLOTING AGENT BY THE VOTING DEADLINE.


To obtain additional ballots, you may contact the Balloting Agent at the addresses specified above.  You may also obtain copies of the Plan, this Disclosure Statement and other plan documents at: http://www.administar.net/SonicBlue.

The Proponents believe that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all Holders of Claims and the Debtors' estates.

**ARTICLE III**
**DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESSES**

**A.    The Debtors.**

Debtor SONICblue Incorporated ("SONICblue") was incorporated as S3 Incorporated ("S3") on January 9, 1989 as a Delaware corporation, and changed its name to SONICblue Incorporated in November, 2000.  For more than ten (10) years prior to the transfer in January, 2001 of its graphics chips business to S3 Graphics Co., Ltd., SONICblue's primary business

was to supply graphics and multimedia accelerator subsystems for personal computers, or PCs.

Debtor ReplayTV, Inc. ("ReplayTV") is a wholly-owned subsidiary of SONICblue. SONICblue completed the acquisition of ReplayTV, Inc., a developer of personal television technology, on August 1, 2001.

Debtor Sensory Science Corporation ("Sensory Science") is a wholly-owned subsidiary of SONICblue. SONICblue completed the acquisition of Sensory Science, a developer of consumer electronics products, including dual deck videocassette player/recorders and DVD players, on June 27, 2001.

Debtor Diamond Multimedia Systems Inc. ("Diamond") has been a wholly-owned subsidiary of SONICblue since September, 1999. Diamond was an established PC original equipment manufacturer and retail provider of communications and home networking solutions, PC graphics and audio add-in boards and digital audio players.

**B.    The Debtors' Other Affiliates.**

The four Debtors directly or indirectly owned thirty-one (31) subsidiaries on the March 21, 2003 Petition Date. A chart illustrating the Debtors' corporate structure as of the Petition Date is attached hereto as Exhibit "B". The Debtors believe that none of their subsidiaries is actively doing business at this time. At least one of the Debtors' foreign subsidiaries, Diamond Multimedia Systems, Limited, is in the process of winding up its business. Other subsidiaries are dormant.

Four of the Debtors' subsidiaries conveyed some of their assets in sales approved by the Bankruptcy Court. These sales are discussed in Section V.F., below. Except for the subsidiaries referenced above, it is unknown whether any of the Debtors' subsidiaries have remaining assets which exceed their liabilities, but the Debtors believe that any such value would not be significant.

**C.    Products.**

Prior to the financial problems that led to these bankruptcy filings, the Debtors and their affiliates were leaders in the design, development and marketing of products in the converging Internet, digital media, entertainment and consumer electronics markets. The Debtors, with their affiliates, developed and marketed the following three (3) primary consumer electronic product lines:

**1.    Rio Digital Audio Players.**

SONICblue introduced the industry's first portable MP3 player in 1998. SONICblue's Rio portable digital audio players allowed users to enjoy high quality audio in the most common compressed digital audio formats, including compact disc, MP3 and Windows Media Audio (WMA). SONICblue's portable Rio players included the flash memory based Rio 600 and Rio 800, Rio One; the CD based RioVolt SP90, RioVolt SP100 and RioVolt SP250, and the hard drive based RioRiot, which allowed users to store up to 20 gigabytes of digital audio. In addition to its portable players, SONICblue offered the Rio Central, a home stereo component that allowed users to play and store up to 40 gigabytes of digital music, write or "burn" CDs with stored digital audio tracks and load digital audio onto portable Rio players. SONICblue also marketed and sold a variety of Rio product accessories. The assets that comprised the Rio product line are referred to as the "Rio Product Line."

**2.    Go-Video Products.**

SONICblue's Go-Video products included dual deck VCRs and integrated DVD/VCRs. The Go-Video DVR4000, an integrated DVD/VCR, allowed users to watch a DVD while recording a television program, without the need or space for two separate components. SONICblue held patents related to dual deck technology and licensed this technology to other manufacturers for inclusion in their consumer devices. In addition to its Go-Video dual deck

DISCLOSURE STATEMENT FOR DESCRIBING FIRST
AMENDED LIQUIDATING PLAN OF REORGANIZATION

and integrated products, SONICblue introduced the Go-Video DVP850, a stand alone DVD player, and the Go-Video DHT7100, an "all in one" home theater system. The assets that comprised the Go-Video product line are referred to as the "<u>Go-Video Product Line</u>."

### 3. ReplayTV products.

SONICblue designed, developed, and marketed DVR products and services under the ReplayTV brand. ReplayTV offered several different DVR products, including the top of the line ReplayTV 5000 DVR, which connected to a home network and a broadband Internet connection, allowing users to view recorded programming content stored on another networked ReplayTV 5000 device in their own home. SONICblue also licensed its ReplayTV technology and software to other companies seeking to implement DVR solutions. The assets that comprised the ReplayTV product line are referred to as the "<u>ReplayTV Product Line</u>."

In addition, the Debtors developed and marketed analog modems under the Supra/Diamond brand name.

### D.    Sales, Marketing and Distribution.

The Debtors and their affiliates sold their products directly to retailers, mass merchants and other resellers and through independent domestic and international distributors. They also sold retail products in the United States through e-commerce web sites, including their own on-line e-store, mail order catalogs and national reseller organizations. Headquartered in Santa Clara, California, the Debtors and their subsidiaries had sales, marketing, customer care and technical facilities in several locations including Arizona, Japan and the United Kingdom.

A majority of the Debtors' trade receivables resulted from sales to retailers in the consumer electronics industry. The Debtors primarily sold their products in the United States and to a lesser extent in Europe and Asia. Prior to the transfer in January, 2001 of its graphics chips business and the shutdown of its graphics boards business in August, 2000, a significant percentage of SONICblue's sales were to international original equipment manufacturers.

The Debtors utilized an international network of independent electronics assembly subcontractors, principally located in Asia, to assemble and test their products. The Debtors generally procured hardware products on a turnkey basis from subcontract-manufacturing suppliers. The Debtors packaged certain of the assembled products received from subcontractors with software, manuals and additional hardware components, placing such materials in retail packaging for the retail and mass-merchant channel.

### E.    Asset Sales and Acquisitions.

In September, 1999, SONICblue made a significant strategic shift by merging with Diamond. This merger began SONICblue's transition to a multi-faceted consumer electronics designer, manufacturer and seller. SONICblue's acquisitions and divestitures are described below.

• SONICblue acquired Diamond in September, 1999. Prior to closing the acquisition, SONICblue made loans to Diamond, apparently to fund Diamond's operations pending the merger, in the total amount of $20 million. These loans were secured by a valid and perfected security interests in most or all of Diamond's assets.

• In October 1999, SONICblue caused RioPort, Inc. (formerly RioPort.com, Inc.), a wholly owned subsidiary of SONICblue, to sell shares of its preferred stock to third party investors. RioPort was developing an integrated platform for acquiring, managing and experiencing music and spoken audio programming from the Internet. As a result, SONICblue retained a minority investment in RioPort.

• In November 1999, SONICblue established a corporate joint venture, S3-VIA, Inc. ("<u>S3-VIA</u>"), with VIA Technologies, Inc. ("<u>VIA</u>") to bring high-performance integrated graphics and core logic chip sets to the volume original equipment manufacturer

desktop and notebook personal computer markets. S3-VIA had exclusive access to both companies' technology and distribution rights for certain products. In the fourth quarter of 2001, SONICblue terminated its participation in S3-VIA.

- In August 2000, SONICblue shut down its Diamond branded graphics add-in board business.

- In November 2000, SONICblue acquired United Kingdom digital audio equipment manufacturer, Empeg Limited, at a total purchase price of $3.0 million.

- In January 2001, SONICblue completed the transfer of its graphics chips net assets, other than its shares of common stock of S3-VIA, to S3 Graphics Co., Ltd., a joint venture between VIA and a subsidiary of SONICblue.

- In March 2001, SONICblue completed the sale to ATI Technologies, Inc. of its professional graphics division, based in Starnberg, Germany, which produced the Fire GL line of graphics accelerators. Under the terms of the asset purchase agreement, SONICblue received $7.9 million in cash through December 31, 2001, and was eligible to receive further financial consideration.

- On June 27, 2001, SONICblue completed the acquisition of Sensory Science. Prior to closing the acquisition, SONICblue made loans to Sensory Science in the amount of $9.75 million. These loans were secured by valid and perfected security interests in most or all of Sensory Science's assets.

- On August 1, 2001, SONICblue completed the acquisition of ReplayTV, Inc. Prior to closing the acquisition, SONICblue made loans to ReplayTV in the amount of $20 million. These loans were secured by valid and perfected security interests in most or all of ReplayTV's assets.

**F.     UMC Stock.**

In 1995, SONICblue (then S3) entered into a joint venture with United Microelectronics Corporation ("UMC") to build United Semiconductor Corporation ("USC"), a semiconductor manufacturing facility in Taiwan, R.O.C. In January, 2000, USC merged with UMC and, as a result of the merger, SONICblue received approximately 252 million UMC shares in exchange for its USC shares. Thereafter, SONICblue received numerous stock dividends of UMC stock. SONICblue later sold much of its UMC stock to fund the Debtors' cash flow shortfalls. As of the Petition Date, SONICblue held 75,010,073 UMC shares, which traded on the Taiwan Stock Exchange. Approximately 24.6 million of those shares were pledged as security for repayment of the Senior Notes.

**G.     Patents.**

SONICblue filed patent applications for its technology and built a patent portfolio through acquisitions, including patent purchases and cross-licenses as well as through its acquisition of the other Debtors. As of the Petition Date, the Debtors and three of their affiliates, Micronics Computers, Inc., Binar Graphics, Inc. and Frontpath, Inc., owned approximately 100 graphics patents and patent applications, in addition to other patents.

**H.     Petition Date Capital Structure.**

As of the Petition Date, the Debtors' debt structure, as reflected in their consolidated financial records, included the following:

- Approximately $5.9 million owing on a revolving loan facility (the "Congress Facility") provided by Congress Financial Corporation (Western) ("Congress"), which was secured by a blanket security interest in substantially all assets of both Sensory Science and non-debtor subsidiary California Audio Labs, LLC, and was also guaranteed by SONICblue on an unsecured basis.

-15-     DISCLOSURE STATEMENT ~~FOR~~ DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

- Approximately $78.2 million in principal and accrued interest[3] due on the 7¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes"). As noted, on the Petition Date, the Senior Notes were secured by a pledge of approximately 24.6 million shares of UMC stock.

- Approximately $106.1 million in principal and interest due on the 5-¾% Convertible Subordinated Notes due 2003 (the "Junior Notes"). The Junior Notes are contractually subordinated to the Senior Notes and certain other obligations.

- Miscellaneous trade, litigation and other payable Claims in an aggregate amount estimated to be in the range of $80 million to $100 million.

## ARTICLE IV
## PRE-BANKRUPTCY EVENTS

**A.    The Debtors' Continuing Losses.**

During the three years preceding the Petition Date, SONICblue transitioned from a semiconductor company to a consumer electronics company, in part through its acquisitions of Diamond, Sensory Science and ReplayTV. To fund its acquisitions and working capital needs during this period, SONICblue liquidated approximately 273.6 million shares of UMC stock and raised debt financing to fund its operations.

During that time, SONICblue's operating results were negatively impacted by its need to spend considerable time, effort and resources integrating its various acquisitions. Moreover, since its evolution into a consumer electronics company, various industry-wide issues adversely impacted SONICblue, including (i) the general economic downturn, including the fourth quarter of 2002 and the 2002-2003 holiday season, which were among the worst selling seasons in recent history for all retail goods, but especially consumer electronics; (ii) increased competition; (iii) slower than expected rate of adoption of digital video recorders (ReplayTV); (iv) significant pricing pressures on several of its products (including DVD players) due to increased competition; and (v) the West Coast dock strike during the latter part of 2002, which limited product availability and eroded profit margins by forcing SONICblue to air freight its ReplayTV, home theater solutions products, and other high-end products. Also in 2002, SONICblue had severely limited Rio product availability during the middle of the year due to, among other things, delays in completing development of new Rio products.

The Debtors experienced significant operating losses largely related to the development of ReplayTV products. SONICblue funded these losses, in part, through the liquidation of UMC shares. Although ReplayTV gained some momentum in the fourth quarter of 2002 with the introduction of its 5000 series product, in part by gaining market share in the fourth quarter of 2002 relative to its primary competitor, TiVo, in the stand-alone DVR segment of the market, achievement of necessary price points for mass consumer adoption came at the expense of increased hardware subsidies. Although market awareness and demand for DVR products was growing, such growth was slower than previously anticipated.

With respect to the Rio/Go-Video Product Lines, general commoditization of the audio (Rio) and video (Go-Video) segments of the Debtors' business resulted in decreased margins and increased need to innovate (i.e., spend research and development funds) to differentiate itself in the marketplace. Although the MP3 player market (Rio) continued to grow, the Debtors experienced certain execution issues impacting product availability and thus limiting gross profits. Finally, although Go-Video was a mature product line that was attempting to

---

[3]    The principal and interest amounts stated for the Senior and Junior Notes include certain original issue discount. As such, the Proponents believe that the actual Allowed Amounts of these Claims will likely be less as set forth in the discussion of this issue below.

stabilize its margins and generate positive cash flows, it existed in an increasingly competitive market.

Through the latter part of 2002 and continuing through the commencement of the Chapter 11 Cases, the Debtors pursued several operational initiatives to address industry and company-specific issues, including facility consolidation, headcount reductions and modifying their business model for low margin products, such as basic standalone DVD players, by transitioning to a "channel licensing" business model. However, notwithstanding these restructuring efforts, the Debtors remained substantially over-leveraged and capital constrained, and their operations continued to be cash flow negative.

As a result of these negative impacts, from 1999 through 2001, the Debtors reported operating losses of approximately $721 million. Preliminary 2002 financial results indicated the Debtors' EBITDA for fiscal year 2002 was approximately negative $50 million. As a result of this financial condition, it was projected pre-petition that the Debtors would only have sufficient liquidity to fund their operations through the end of April, 2003.

The Debtors' substantial debt burden and negative cash flow limited their liquidity and ability to fully exploit all available growth opportunities. The Debtors expected to experience substantial negative cash flow through 2003, and it was uncertain when or if the Debtors' operations might turn free cash flow positive. Moreover, the medium to long-term outlook for the Debtors' product lines was speculative, particularly with ReplayTV, which operated in an early-stage market, and likely would continue to require significant ongoing investment.

In addition, due to the payment priority provisions in the Senior Note Indenture, the Senior Notes were due to mature thirty (30) days before the Junior Notes matured on October 1, 2003. The Debtors projected that they would have insufficient cash to pay the Congress Facility or the Junior and Senior Notes. As a result of these problems, management concluded that it was necessary to explore restructuring alternatives.

**B.    Copyright Litigation.**

In late 2001, a number of entertainment industry entities ("Copyright Plaintiffs") commenced litigation against the Debtors, which litigation was subsequently consolidated in the litigation entitled Paramount Pictures Corporation, et al. v. ReplayTV, Inc., et al., Case No. CV 01-09358 FMC (Ex), in the United States District Court for the Central District of California (the "Copyright Litigation").

In the Copyright Litigation, the Copyright Plaintiffs sought injunctive and declaratory relief with respect to the DVR products formerly marketed and sold by the Debtors as part of the Debtors' ReplayTV product line. The Copyright Litigation represented another impediment to a successful turnaround of the Debtors' business operations, and was another factor in the Debtors' decision to file bankruptcies.

**C.    Retention Of Financial Advisor.**

In September, 2002, the Debtors engaged Houlihan Lokey Howard & Zukin Capital ("Houlihan"), an international financial advisor and investment banker, as the Debtors' financial consultant. Houlihan is experienced in providing financial advice to distressed companies, and is one of the leading investment firms providing distressed M&A services. Houlihan was engaged for the purpose of exploring various restructuring options, including a sale of substantially all of the Debtors' operating assets. Through a team composed of six professionals and led by Peter S. Fishman of Houlihan's San Francisco office, Houlihan advised the Debtors on a number of financial restructuring issues.

**D.    Restructuring Alternatives.**

Houlihan was charged with, among other things, identifying and analyzing strategic alternatives available to the Debtors. During the period from September, 2002 to November

2002, Houlihan and the Debtors considered the following primary strategic alternatives in light of the Debtors' business plan, valuation estimates and short-term liquidity needs:

      a.    A sale of control of the Debtors to a "new value" investor who would provide sufficient financing to address the funding gap in the Debtors' business plan, simultaneously with a de-leveraging transaction;

      b.    A complete stand-alone de-leveraging of the Debtors' balance sheet by equitizing the Senior Notes and the Junior Notes;

      c.    A sale of the Debtors' operating assets in one or more transactions under Bankruptcy Code Section 363;

      d.    A restructure around one or more of the Debtors' product lines through a simultaneous divesture of selected business units in a Section 363 bankruptcy sale coupled with a de-leveraging of the balance sheet; and

      e.    An immediate liquidation of the Debtors and a distribution of the proceeds to creditors.

In light of (i) the Debtors' continued losses, (ii) the losses and negative cash flow projected by the Debtors for 2003, (iii) the early stage of the Debtors' ReplayTV product, which had already consumed significant capital and would likely require significantly more before it became profitable, (iv) the lack of visibility in the Debtors' business plan or when it might turn cash flow positive, and (v) how much more capital they might consume in order to reach that point, the Debtors determined in consultation with Houlihan that a sale of the Debtors' business units as a going concern provided the strategic alternative most likely to maximize value to the Debtors and their creditors.

**E.**    **Asset Valuation.**

The Debtors' product lines and UMC stock constituted substantially all of the Debtors' business operations and related assets as of the Petition Date. Houlihan determined that the net liquidation value of the Debtors' product lines (excluding the UMC shares) ranged from approximately $20.7 million to $29 million.

**F.**    **Pre-Petition Marketing of the Debtors' Product Lines.**

The Debtors conducted an extensive pre-petition marketing effort in order to maximize the going-concern value of their business units. Commencing in November, 2002, the Debtors instructed Houlihan to pursue potential acquirers for the Debtors' three product lines. Houlihan immediately began working with the Debtors to develop detailed offering memoranda on each of the Debtors' three product lines, describing, in detail, the history of the Debtors and each of the product lines, the market for the Debtors' products and competition, as well as the Debtors' projections for future performance. In addition, Houlihan worked closely with the Debtors during this period to develop a list of approximately 200 potential buyers, 64 of which were strategic buyers in the U.S. and overseas, and 136 of which were financial buyers, many of whom were drawn from Houlihan's proprietary data base of financial buyers who have closed, or indicated an interest in pursuing, similar distressed transactions.

Following the January, 2003 Las Vegas Consumer Electronics Show, Houlihan distributed to those entities on the buyer list a "teaser memorandum," designed to stimulate interest, which described the opportunity and provided non-confidential information about the Debtors' product lines. Teasers were followed up by an intensive calling effort by Houlihan aimed at determining interest from the buyer list, and motivating interested parties to execute a confidentiality agreement and review the offering memoranda prepared by Houlihan. A total of 56 potential buyers executed confidentiality agreements and reviewed the offering memoranda. Several of these parties engaged in further due diligence, through on-site presentations prepared by Houlihan and the Debtors, viewing the special on-line management presentation prepared by

-18-    DISCLOSURE STATEMENT ~~FOR~~DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

1  Houlihan and the Debtors posted on the Internet for confidential review by parties with coded access privileges, and reviewing additional documentary materials developed by the Debtors and Houlihan.

2

3  The Debtors and Houlihan set February 14, 2003, as the deadline date for interested parties to submit initial, non-binding indications of interest in order for the Debtors and Houlihan to determine which interested parties should be allowed to undertake further, detailed due diligence and submit a final bid to be considered by the Debtors as a stalking horse bid. Ten parties submitted such indications of interest, and several of them were allowed to conduct further due diligence. Further due diligence was arranged by Houlihan, and included additional management presentations, as well as access to an actual data room, and a "virtual data room" established on the Internet by Houlihan, and, like the special on-line management presentation, accessible on a confidential basis only by parties with coded access privileges.

4

5

6

7  Seven final bids were ultimately submitted. The Debtors negotiated a non-binding letter of intent with an affiliate of D&M Holdings, Inc. ("<u>D&M</u>"), pursuant to which D&M had the ability to execute an asset purchase agreement for the sale of the ReplayTV and Rio Product Lines by March 31, 2003. However, D&M did not execute an asset purchase agreement by March 31, 2003. In addition, on March 20, 2003, the Debtors and Opta Systems, LLC ("<u>Opta</u>") executed an asset purchase agreement for the sale of the Go-Video product line.

8

9

10                          **ARTICLE V**

11               **SIGNIFICANT EVENTS DURING**

12            **THE DEBTORS' CHAPTER 11 CASES**

**A.    The Bankruptcy Petitions.**

13

14  On March 21, 2003 (the "<u>Petition Date</u>"), each of the Debtors commenced a Chapter 11 case (collectively, the "<u>Chapter 11 Cases</u>") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtors' Chapter 11 Cases were procedurally consolidated for administrative purposes.

15

16  **B.    First Day Orders**

On the Petition Date, the Debtors filed numerous, customary "first day motions," which were largely granted after various hearings before the Bankruptcy Court on March 25, 2003 and thereafter. The first day orders included, <u>inter alia</u>: (a) an order prohibiting utilities from discontinuing service and providing procedures for establishing adequate assurance of payment; (b) an order approving joint administration of the Debtors' Chapter 11 Cases; (c) an order authorizing the Debtors to continue their cash management system; (d) an order allowing payment of certain critical vendors' pre-petition Claims; (e) an order authorizing payment of certain pre-petition wages and benefits; (f) an order establishing lists and procedures for giving notice in the Chapter 11 Cases; (g) an order authorizing payment of sales and use taxes in the ordinary course of business; (h) an order authorizing rejection of unexpired leases of nonresidential real property; and (i) an order appointing Bank One, N.A., now known as JP Morgan Trust Company, as "<u>Claims Administrator</u>".

17

18

19

20

21

22

**C.    Cash Collateral.**

23

24  At the outset of the Chapter 11 Cases, the Debtors projected a severe cash shortfall during the period leading up to the sale of their businesses. It was of paramount importance to the estates that the Debtors had sufficient cash to maintain existing operations until their businesses could be sold. During this period, the Debtors had virtually no collections from retailers, which expressed concerns over the Debtors' ability to continue to ship products. In order to meet continuing cash flow needs, the Debtors negotiated a cash collateral stipulation with Congress. The Debtors were able to continue operations through the use of cash collateral pursuant to this stipulation.

25

26

27

28

**D.      Retention Of Professionals.**

To assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors employed, with authorization from the Bankruptcy Court, Pillsbury Winthrop Shaw Pittman LLP, fka Pillsbury Winthrop LLP, ("Pillsbury") as their bankruptcy counsel.

The Debtors also employed, as discussed above, Houlihan to assist in the liquidation of the Debtors' three product line business units. Prior to the Petition Date, the Debtors agreed to compensate Houlihan for its services by paying a monthly fee of $135,000, reimbursing certain expenses and providing certain indemnification. In addition, the Debtors agreed to pay Houlihan a "Transaction Fee" of $2 million upon the closing of a sale of all or substantially all of the Debtors ' assets. After negotiations with the Creditors' Committee, Houlihan agreed to eliminate the monthly fee (retaining payments made up to that time) and to reduce the Transaction Fee to a minimum of $1 million, increasing to $1,550,000 if the gross assets sale consideration was between $40 million and $52.5 million. On April 17, 2003, the Bankruptcy Court approved Houlihan's employment, as so modified, effective as of the Petition Date.

In addition, the Bankruptcy Court approved the Debtors' employment of Fenwick & West ("Fenwick") as special counsel for the sale of certain graphics patents. The Debtors retained Fenwick to market the graphics patents because of Fenwick's expertise and experience relating to the Debtors' graphics patents and because Fenwick agreed to a contingent fee that was less than the Debtors had paid to patent brokers in prior patent sales. Under the Bankruptcy Court's order authorizing the Debtors to employ Fenwick, the Debtors agreed to pay Fenwick 10% of the first $1 million of net sales revenue, 20% of the second $1 million of net revenue, and 30% of the third million of net revenue.

Also, by an order entered August 29, 2005, the Bankruptcy Court granted a joint application by the Proponents to employ Grobstein, Horwath & Company LLP ("GHC") as accounting and litigation consultants. Among other things, GHC was authorized to assist the Proponents in the process of evaluating and objecting to Claims and prosecuting the Preference Actions, including providing accounting expertise and expert testimony; providing tax and financial analysis concerning a plan of reorganization; and providing accounting and financial advisory assistance as necessary to the Debtors and the Creditors' Committee.

The Debtors employed the accounting firm of Davis & Associates as accountant and taxation consultant and advisor to the Debtors.

The Debtors employed Syzygy Consulting Group as employment and compensation consultant and advisor.

The Debtors employed O'Melveny & Myers LLP as special counsel for the subject matters relating to Intel Corporation and VIA.

The Debtors employed the Taiwanese law firm of Ding & Ding Law Offices as special Taiwanese securities counsel to assist the Debtors in connection with the sale of the Debtors' remaining UMC Stock.

The Debtors and the Creditors' Committee employed Perisho Tombor Ramirez Filler & Brown PC ("PTRF&B") to audit the Debtors' 401(k) plan for the year 2003, pursuant to Bankruptcy Court order entered on June 4, 2004. PTRF&B was paid for such services pursuant to a Bankruptcy Court order entered on May 13, 2005. In addition, the Debtors and the Creditors' Committee employed PTRF&B to audit the Debtors' 401(k) plan for years 2004 and 2005, pursuant to Bankruptcy Court order entered on November 22, 2005, and were paid for such services pursuant to an order entered on November 13, 2006. The Debtors have advised the Creditors' Committee that they intend to apply in early 2007 for entry of a Bankruptcy Court order authorizing the retention and employment of PTRF&B as the Debtors' 401(k) plan auditors for calendar year 2006 (and 2007, if necessary). The Creditors' Committee currently

contends that this is not an expense that should be borne by the Debtors' bankruptcy estates.

Finally, as instructed by the Bankruptcy Court, Stuart, Maue, Mitchell & James, Ltd. was employed by the estates as a fee auditor.

**E.    The Creditors' Committee.**

On the Petition Date, the U.S. Trustee appointed the Creditors' Committee to represent the interests of SONICblue's unsecured creditors in the Chapter 11 Cases.  The U.S. Trustee amended the appointment on April 3, 2003 to enlarge the Creditors' Committee.  Following the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of these Chapter 11 Cases.  The Debtors have kept the Creditors' Committee informed about the Debtors' operations and have sought the concurrence of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses.  The Creditors' Committee has, through its professionals, participated actively, together with the Debtors' management and professionals, in, among other things, the Debtors' operations, the product line sales, and litigation involving the Debtors.  The Debtors and their respective professionals have consulted with the Creditors' Committee and its professionals in connection with the negotiation of the Plan with the goal of achieving a consensual joint plan and, as a result of such cooperation, the Debtors and the Committee are co-Proponents of the Plan.

With the approval of the Bankruptcy Court, the Creditors' Committee retained the firm of Levene, Neale, Bender, Rankin & Brill L.L.P. as bankruptcy counsel to assist and represent the Creditors' Committee in performing its duties in these cases.

Pursuant to a stipulated order between the Debtors and the Creditors' Committee, the Creditors' Committee retained its own financial advisor, Alliant Partners ("Alliant"), to monitor and assist Houlihan and advise the Creditors' Committee with respect to the sales of the Debtors' product lines.  Pursuant to the stipulated order, Alliant was paid a $35,000 retainer, and was entitled to a success fee if (i) Alliant brought a qualified bidder to any of the product line sales, (ii) such qualified bidder submitted an overbid at the sales hearing, and (iii) the total consideration exceeded $42.5 million.  Pursuant to the stipulated order, Alliant earned and was paid a success fee of $62,000 beyond the $35,000 retainer.

The Creditors' Committee also employed the law firm of Krieg, Keller, Sloan, Reilley & Roman LLP as special intellectual property litigation counsel.

Finally, the Creditors' Committee employed the Taiwanese law firm of J&J Attorneys At Law as special counsel to assist the Creditors' Committee to analyze and evaluate the optimal method, means and timing of disposition of the Debtors' remaining UMC stock, and to assist the estates in their Preference Action against ATLM.

**F.    Sale of Substantially All of the Debtors' Assets.**

**1.    Sale of the Rio, ReplayTV and Go-Video Product Lines.**

On the Petition Date, the Debtors filed a "Sales Procedures Motion" with the Bankruptcy Court seeking an order establishing notice and bidding procedures for the sale of the Debtors' primary product lines, and for an order authorizing the assumption and assignment or rejection of certain executory contracts and unexpired leases in connection with such sales.  The Debtors also filed a motion requesting the Bankruptcy Court to hear the matter on shortened notice.  The Bankruptcy Court heard and granted the Sales Procedures Motion on March 25, 2003.

The Bankruptcy Court hearing on the Debtors' motion to sell the Go-Video product line to Opta, subject to overbidding, was held on April 4, 2003.  Opta was the successful buyer at the hearing, and the sale closed on April 18, 2003.  Opta paid SONICblue approximately $6.2 million as the purchase price calculated at the time of closing.  Thereafter, a dispute arose

concerning certain post-closing adjustments to the purchase price, the allocation of post-closing payments received from vendors, and the assumption of liabilities under the asset purchase agreement. To resolve such dispute, SONICblue paid Opta approximately $1.3 million pursuant to a stipulation approved by the Bankruptcy Court.

The Debtors' Rio and ReplayTV product lines were scheduled for sale on April 15, 2003. Because D&M did not execute an asset purchase agreement by March 31, 2003, the Bankruptcy Court conducted an auction sale of the Rio and ReplayTV product line assets on April 15, 2003 without the benefit of a "stalking horse" bidder. The Rio and ReplayTV product lines were ultimately sold for $36.2 million to Digital Networks North America, Inc. ("DNNA"), an affiliate of D&M. The sale closed on April 25, 2003.

**2.      U.K. Affiliate Participation in the Rio Product Line Sale.**

In order to consummate the Rio Product Line sale to DNNA, the Debtors requested that a United Kingdom subsidiary of Diamond, Diamond Multimedia Systems Limited ("DMSL"), transfer (i) certain assets directly to DNNA, and (ii) certain other intellectual property rights directly to SONICblue, which were then transferred to DNNA. These DMSL assets and intellectual property are referred to as the "U.K. Assets." DMSL complied with the request.

In April, 2005, DMSL was in the process of winding down its operations in anticipation of a dissolution, and requested allowance and payment of an administrative claim in the amount of $300,000 for the value of the U.K. Assets. The Debtors agreed that the U.K. Assets had a value of at least $300,000 at the time of transfer. Moreover, because the U.K. Assets represented a significant part of the intellectual property component of the Rio Product Line, it is likely that DNNA would not have been willing to purchase the Rio Product Line without being able to obtain the U.K. Assets, at least not at the $18.2 million purchase price. Although the Debtors believed that the U.K. Assets had a value of at least $300,000, DMSL did not seek an administrative claim in excess of that amount, as DMSL was winding down and would not likely require additional amounts in the course of its dissolution.

On April 11, 2005, the Debtors and DMSL entered into a stipulation, subject to Bankruptcy Court approval, pursuant to which they agreed that DMSL would have an allowed administrative claim in the amount of $300,000, without prejudice to DMSL's right to seek an additional administrative claim in the future, and that the agreed administrative claim would be paid within ten days of the date when a Bankruptcy Court order approving the stipulation became a final order. The order was entered on June 14, 2005, and the agreed administrative claim was paid thereafter on a timely basis.

As of the filing of this Disclosure Statement, the DMSL liquidation appears to be proceeding and it appears unlikely DMSL will assert additional Administrative Claims against any of the Debtors.

**3.      Patent Sales.**

After the closing of the sales of the Debtors' three primary product lines, which sales included certain intellectual property relating to the product lines, the Debtors either directly or through subsidiaries continued to own approximately 100 graphics patents and pending patent applications (the "Patents").

The Debtors believed that the Patents could be sold for $1-2 million, but the Debtors did not have the necessary expertise to market the Patents. The Debtors retained Fenwick as their special counsel for the sale of the Patents. Fenwick, which served as the Debtors' intellectual property counsel prior to the Petition Date, was chosen for its familiarity with the Patents and the related documentation, and its ability to identify potential purchasers and market the Patents to those purchasers.

Several of the Patents were owned by the following subsidiaries of the Debtors who were not in bankruptcy: Micronics Computers, Inc., ("Micronics"), Frontpath, Inc.,

("Frontpath") and Binar Graphics, Inc., ("Binar Graphics") (collectively, the "Seller Subsidiaries").  Of a total of 67 groups (or "Lots") of related Patents, Micronics owned seven Lots, Binar Graphics owned three Lots, and Frontpath owned one Lot.

The Debtors determined that it likely would be more advantageous to include the Patents owned by the Seller Subsidiaries in the sale, even though there would be some expenses incurred in enabling the Seller Subsidiaries to convey their Patents.  The Debtors identified all secured claims against and tax obligations owing by the Seller Subsidiaries.  The Debtors then sought approval in the Patent sale procedures motion to pay these secured claims and tax obligations, in an amount expected to be less than $10,000, as part of the process of selling all of the Patents.  The motion to approve the Patent sale bidding procedures also anticipated that the process of dissolving the Seller Subsidiaries would cost an additional amount approximating $25,000.  The motion was granted, and all secured and tax claims against the Seller Subsidiaries were satisfied as authorized.

Initially, the Patents were marketed via an "on-line" auction conducted by Fenwick.  The high bid from the on-line auction was $518,000.  On September 6, 2003, the Patents were sold at an auction sale conducted by the Bankruptcy Court to Trepton Research Group for the sum of $1,970,000.  The Patent sale closed on October 9, 2003.

**4.    Modem and Computer Inventory Sales.**

As of the Petition Date, the Debtors held a small amount of computer component inventory with America II Electronics, Inc. ("America II") for sale on a consignment basis.  After negotiations with America II and a third party, E-Electronics Corporation ("E-Electronics"), the Debtors sought Bankruptcy Court approval of a sale of the component inventory with America II as the stalking horse bidder.  E-Electronics was the successful overbidder at a sale hearing held on December 5, 2003, at a purchase price of $157,000.  Subsequent to the sale, a dispute arose between the parties based on America II's failure to allow E-Electronics access to remove the inventory.  America II filed a motion to vacate the sale order, which alleged generally that the sale pleadings did not contemplate that any party other than America II would be entitled to enter America II's premises to remove the inventory, and the sale order was subsequently vacated at a hearing held on February 13, 2004.  At that same hearing, the Bankruptcy Court reopened bidding on the computer component inventory, and the successful overbidder was America II, with a purchase price of $300,000.  As part of the Bankruptcy Court's ruling approving that sale, the balance of the America II bid in excess of the previous E-Electronics bid was paid to E-Electronics.

The modem assets were offered for sale pursuant to a Bankruptcy Court conducted auction on June 6, 2003.  The modem assets were sold to Best Data Products for approximately $634,000.

**5.    Post-Petition Date UMC Stock Sales.**

On the Petition Date, SONICblue owned 75,010,073 UMC shares.  The UMC stock was subject to sale restrictions that lapsed as to approximately 50 million shares of the UMC Stock on July 10, 2003, and as to the balance of the UMC stock on January 10, 2004.

The Senior Noteholders held a lien on 24,640,573 shares of the UMC stock as of the Petition Date.  In July, 2003, the Debtors, the Creditors' Committee and the Senior Noteholders stipulated to an order granting the Senior Noteholders relief from the automatic stay with respect to their UMC stock collateral.   The stipulation was approved by an order entered on July 17, 2003.  The Senior Noteholders sold 24,640,573 shares of the UMC stock from on or about August 1, 2003 to on or about August 15, 2003.

On July 28, 2003, UMC declared a stock dividend entitling SONICblue to 3,007,903 additional UMC shares.  A proportional amount of the stock dividend, 988,087 shares, became subject to the Senior Noteholders' liens.   By an order entered on October 24, 2003, the

DISCLOSURE STATEMENT ~~FOR~~DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

Bankruptcy Court approved a stipulation between the Debtors, the Creditors' Committee and the Senior Noteholders granting the Senior Noteholders relief from the automatic stay with respect to this additional UMC stock.[4] The Senior Noteholders sold all of their remaining UMC stock collateral in or about October, 2003.

The Senior Noteholders have advised that they received a net of $~~17,358,515.13~~17,313,671.13 from the sale of their UMC stock collateral (after payment of related costs of $44,844), which has been credited to the Senior ~~Noteholders'~~Notes Claims.

During mid and latter-2003, the UMC stock appreciated substantially in value. The Debtors, in consultation with the Creditors' Committee, evaluated various methods for realizing this appreciation, including conversion of the UMC stock into American Depository Receipts ("ADRs"), short-selling the UMC stock, and the sale of the UMC stock on the Taiwan Stock Exchange. Ultimately, due to the expense, difficulty and risk of the ADRs conversion process and short sales, the Creditors' Committee and the Debtors jointly decided in September, 2003 to sell the unencumbered, unrestricted UMC stock. The Debtors and the Creditors' Committee applied to the Bankruptcy Court for, and received, permission to sell all of the estates' UMC stock. The Debtors liquidated 27,203,816 UMC shares in October, 2003, realizing net proceeds of approximately $24.4 million. In February, 2004, after the final transfer restrictions lapsed, the Debtors liquidated their remaining UMC stock holdings. The Debtors realized net proceeds of approximately $21.5 million from the sale of the remaining 25.185 million shares of stock.

**6.      Proposed Sale of Epic Technology Stock.**

The Debtors are currently in negotiations with a proposed buyer regarding a sale of the Debtors' stock interests in Epic Technologies, Inc. and anticipate filing pleadings by January 31, 2007 seeking Bankruptcy Court approval of such sale for the purchase price of $12,000, subject to overbid.

**~~6.~~7.  Payment of Certain Secured Claims.**

In connection with securing Bankruptcy Court approval of the product line sales, the Debtors received permission to pay Congress' and other Claims secured by those assets. Accordingly, the Debtors paid Congress approximately $5.9 million in full satisfaction of its

---

[4] In connection with securing possession of the UMC shares that became unrestricted in July, 2003 and the July, 2003 stock dividend of 3,007,903 additional UMC shares, the Debtors' paid certain taxes~~, including on the~~ (in the amount of approximately $56,430), which were required to be paid in order to have the UMC shares released, including taxes on the approximately 1/3 portion of the stock dividend which was delivered to the Senior Noteholders as part of the collateral securing the Senior Noteholders' Claims. The Debtors have reserved their right to recover from the Senior Noteholders the taxes paid on the Senior Noteholders' portion of the ~~stock dividend~~UMC stock dividend (which amounts to less than $20,000), since the Senior Noteholders received the benefit of the stock dividend without having paid the related taxes. Proceedings to recover such sum may proceed either prior to or after the Effective Date. The Proponents anticipate that if an overall settlement agreement is reached with the Senior Noteholders over the current dispute involving the Senior Notes Claims (which is more fully described below), such settlement agreement will resolve any issue involving reimbursement to the Debtors for the taxes paid to obtain a release of the UMC stock dividend referenced herein. Any recovery from the Senior Noteholders of such taxes paid for their benefit would result in increasing the amount of their Class 3 Claims. This factor would need to be taken into account in determining whether pursuing recovery from the Senior Noteholders of such taxes would be economically worthwhile.

fully secured Claim.  In addition, as noted, the Debtors and the Creditors' Committee stipulated to allow the Senior Noteholders to liquidate their UMC collateral stock, which liquidation resulted in a partial payment of the Senior ~~Noteholders'~~ Notes Claims as described above.

### ~~7.~~ 8.  Funds Held.

As of December 1, 2006, the Debtors are holding approximately $78 million in funds, exclusive of recoveries from Preference Actions (discussed below).

## G.    Employee Matters.

### 1.    Employees.

As of the Petition Date, SONICblue employed approximately 197 persons (the "Employees") and utilized the services of approximately 31 independent contractors.  None of the Debtors other than SONICblue had any employees on the Petition Date or during the year preceding the Petition Date.  The Employees all worked in the Debtors' domestic operations, and included both salaried and hourly employees.  Of the Employees, 83 worked in the areas of technology, research and design, and engineering.  None of SONICblue's Employees were represented by a labor union or were subject to a collective bargaining agreement.

Most of SONICblue's Employees were hired by Opta and DNNA in 2003.  Since then, SONICblue has had no employees.  Marcus Smith, the Debtors' former Chief Financial Officer, and Nanci Salvucci, the Debtors' former Controller, continue to provide assistance to the Debtors on a part-time, consulting basis in accordance with stipulations between them, the Debtors and the Creditors' Committee which have been approved by the Bankruptcy Court. Marcus Smith is the Debtors' Bankruptcy Court-appointed Responsible Individual.

Pursuant to a Stipulation entered into between Marcus Smith, the Debtors and the Creditors' Committee, Marcus Smith will remain employed by the Debtors as their Chief Financial Officer and Responsible Individual through December 31, 2006 unless he voluntary quits or is involuntarily terminated by the Debtors for "cause".  "Cause" shall mean that he has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Debtors or their bankruptcy estates, with any such dispute to be resolved by the Bankruptcy Court.  Marcus Smith's employment by the Debtors may extend beyond December 31, 2006 only with the mutual consent of the Debtors, the Creditors' Committee and Marcus Smith.  Under the stipulation, Marcus Smith works on an hourly basis for the Debtors, as needed depending upon the work required of him during the week, but in no event is he be paid for less than eight hours of work per week.  He is compensated on an hourly basis at the rate of $250 per hour, and he receives health, vision and dental insurance.  His employment responsibilities include those which he has performed in the past for the Debtors and those which are regularly performed by a Chief Financial Officer and "Responsible Individual" in his position.  In addition to his other job responsibilities, through the duration of his employment by the Debtors, he is required to assist the Debtors and Nanci Salvucci, as needed, to (i) maintain the Debtors' books and records, (ii) prepare the Debtors' monthly reports for filing with the Office of the United States Trustee, (iii) prepare all other reports (with the assistance of counsel as needed) required by the Bankruptcy Court and/or the Office of the United States Trustee, (iv) assist the Debtors and/or the Creditors' Committee with objecting to Claims, including analyzing proofs of claims filed by Creditors and providing the Debtors and/or the Creditors' Committee with the data and documents, to the extent available, to enable them to file objections to objectionable Claims, and (v) providing the Debtors and/or the Creditors' Committee with the information and documents, to the extent available, necessary for them to file and prosecute Rights of Action.

Similarly, pursuant to a Stipulation entered into between Nanci Salvucci, the Debtors and the Creditors' Committee, Nanci Salvucci will remain employed by the Debtors as their Controller through December 31, 2006 unless she voluntary quits or is involuntarily terminated by the Debtors for "cause".  "Cause" shall mean that she has been found to have committed

gross negligence or has acted fraudulently and/or maliciously with respect to the Debtors or their bankruptcy estates, with any such dispute to be resolved by the Bankruptcy Court. Nanci Salvucci's employment by the Debtors may extend beyond December 31, 2006 only with the mutual consent of the Debtors, the Creditors' Committee and Nanci Salvucci. Under the stipulation, Nanci Salvucci works on an hourly basis for the Debtors, as needed depending upon the work required of her during the week. She is compensated on an hourly basis at the rate of $175 per hour, and she receives health and dental insurance. Her employment responsibilities include those which she has performed in the past for the Debtors and those which are regularly performed by a Controller in her position.

In addition to her other job responsibilities, through the duration of Nanci Salvucci's employment by the Debtors, she is responsible for (i) maintaining the Debtors' books and records, (ii) preparing the Debtors' monthly reports for filing with the Office of the United States Trustee, (iii) preparing all other reports (with the assistance of counsel as needed) required by the Bankruptcy Court and/or the Office of the United States Trustee, (iv) assisting the Debtors and/or the Creditors' Committee with objecting to Claims, including analyzing proofs of claims filed by Creditors and providing the Debtors and/or the Creditors' Committee with the data and documents, to the extent available, to enable them to file objections to objectionable Claims, and (v) providing the Debtors and/or the Creditors' Committee with the information and documents, to the extent available, necessary for them to file and prosecute Rights of Action.

### 2. Employee Retention and Incentive Plans.

In November, 2002, realizing that a bankruptcy filing was likely in the near future, and understanding the impact that a bankruptcy filing can have on employee morale, productivity and retention, SONICblue engaged Syzygy Consulting Group ("Syzygy") to assess the need for and develop key employee retention programs. The Debtors believed their ability to maintain their business operations pending a sale, and to achieve the greatest possible selling price, was dependent on the continued employment, active participation, and dedication of several key employees. SONICblue adopted a Key Employee Retention Bonus Plan ("KERP") and a Performance Based Employee Retention Bonus Plan ("PBRB", and with the KERP, the "Retention Plans") on March 13, 2003.

After the Petition Date, the Debtors presented and explained the Retention Plans to the Creditors' Committee and other interested parties. In those discussions, the Debtors and the Creditors' Committee engaged in extensive negotiations regarding the Retention Plans, severance benefits and the Debtors' "Paid Time Off" ("PTO") program. The result of these discussions was the "Stipulated Order Approving Payment Of Accrued Paid Time Off (PTO) And Severance And Payment Of Retention Bonuses". Under this "Incentive Stipulation", the Debtors' PTO and KERP plans were partially and conditionally assumed and partially rejected, and the PBRB was rejected.

The Incentive Stipulation served the purpose of key employee retention by conditioning all benefits on the continued service of the Debtors' "Top 5 Employees" through consummation of sales of the Debtors' business units and by basing most of the proposed benefits on the amount realized in sales of the business units. Under the Incentive Stipulation, a SONICblue employee received PTO and severance benefits upon termination of his/her employment, except where the employee was offered employment on similar terms by Opta or DNNA. The total PTO and severance benefits were equal to the amount entitled to priority under the Bankruptcy Code, plus the Employees shared an additional $250,000, which amount increased to $2,500,000 if product line asset sales and receivable collections generated more than $40 million. In addition, the Incentive Stipulation carried over the pre-petition KERP Plan, but limited it to $250,000, or $500,000 if product line asset sales and receivable collections were $40 million or more. As a condition of receiving these benefits, certain of the Debtors' former

officers were required to waive certain Claims against the Debtors and their estates.[5] After negotiating the Incentive Stipulation, the Debtors sought and obtained Bankruptcy Court approval of the Incentive Stipulation.

As a result of the sale of the Debtors' product lines and other assets, as noted, all of SONICblue's Employees have been released or hired by DNNA or Opta, and the benefits due under the Incentive Stipulation have been paid. As such, all or most of the Debtors' liability for priority pre-petition Employee Claims has been satisfied.

### 3. The Debtors' Retirement Plans.

As of the Petition Date, SONICblue maintained three retirement plans for its employees: (1) the SONICblue Incorporated Executive Deferred Compensation Plan (the "Executive Plan"); (2) the Diamond Multimedia Systems, Inc. 401(k) Plan (the "Diamond Plan"); and (3) the SONICblue Incorporated 401(k) Savings Plan (the "SONICblue Plan"). As of the Petition Date, the Diamond Plan had already been terminated, a favorable IRS determination letter approving the termination had been issued, and SONICblue had been distributing the plan assets to the participants.

Pursuant to the cessation of its business operations, SONICblue requested and obtained Bankruptcy Court authorization to terminate its remaining retirement plans. In accordance with the Bankruptcy Court's order: (a) the account balances from the Executive Plan were made available for distribution to the creditors of SONICblue; (b) the funds remaining in the Diamond Plan, consisting of accrued interest on plan funds that had not yet been allocated to participant accounts, were allocated and distributed; and (c) the SONICblue Plan was terminated, a favorable determination letter was obtained from the IRS, and distributions to the participants of their account balances has commenced. The SONICblue Plan will continue to prepare and file annual reports pending completion of the distribution process.

### H. Claims Process and Bar Dates.

#### 1. Schedules and Statements.

On March 25, 2003, the Debtors filed their respective schedules of assets and liabilities, ("Schedules") and statements of financial affairs with the Bankruptcy Court. On May 7, 2003, the Debtors filed amended Schedules and statements of financial affairs to correct and clarify certain information included in, or omitted from, the original Schedules and statements. All references to the Debtors' Schedules shall mean the Schedules as amended from time to time.

SONICblue's Schedules included hundreds of employee wage, vacation pay and severance Claims totaling over $1.7 million. As a result of the three product line sales and payments under the Incentive Stipulation, all or nearly all of SONICblue's liability for unpaid wages and severance and vacation benefits was satisfied or eliminated. As such, on February 9, 2006, SONICblue amended its Schedule E to eliminate the scheduled wage and employment related Claims. In the course of amending Schedule E, the Debtors' counsel contacted a number of scheduled tax claimants and verified that the claimants either did not contend that the scheduled taxes were due and owing or that the scheduled liability overstated the actual amount due. The results of these discussions with tax claimants are reflected in reduced tax Claim amounts set forth in amended Schedule E.

#### 2. Previously Established Claims Bar Dates.

##### (a) Unsecured Claims Bar Date.

---

[5] The details of the incentive plan are set forth in the Incentive Stipulation, which is on file with the Bankruptcy Court. The description set forth herein is informational only, and should not be considered limiting or binding on the Debtors or the Creditors' Committee.

On March 29, 2003, the Bankruptcy Court gave notice to creditors and parties in interest that July 22, 2003 (the "Unsecured Claims Bar Date") had been established as the deadline for filing non-governmental proofs of claim against the Debtors. In addition, on June 25, 2003, the Claims Administrator sent a "Notice of Deadline to File Proofs of Claim" (the "Second Bar Date Notice") to a portion of the creditor matrix; and, on June 30, 2003, the Claims Administrator sent the Second Bar Date Notice to the balance of creditors and interested parties.

As a result of the two bar date notices, all creditors (excluding governmental entities, Administrative Claim Holders and Holders of Claims arising after the Petition Date) were required to file proofs of claim no later than the Unsecured Claims Bar Date or be barred from asserting any Claim and from voting upon or receiving any distributions under the Plan. Proofs of claim were not required to be filed at that time by: (i) any party who had previously filed a proof of Claim with the Bankruptcy Court, or (ii) any party whose Claim was listed on the Debtors' Schedules in a liquidated amount and not designated as "contingent" or "disputed."

**(b)    Rejection Claim Bar Date.**

In connection with the Bankruptcy Court's orders approving the Debtors' sales of the Rio, ReplayTV and Go-Video Product Lines, certain executory contracts and unexpires leases were rejected by the Debtors by notices sent to counterparties to such executory contracts and unexpired leases and filed on April 23, 2003 (in connection with the Go-Video sale), June 17, 2003 (in connection with the Rio and ReplayTV sales), and July 23, 2003 (in connection with the Rio and ReplyTV sales). The Second Bar Date Notice provides that Claims arising from the rejection of an executory contract or unexpired lease must be filed by the later of (i) the Unsecured Claims Bar Date or (ii) the time set by the Bankruptcy Court in the order approving the Debtors' rejection of such executory contract or unexpired lease. The Debtors believe that all claims arising from executory contracts or unexpired leases rejected by the April 23, 2003 and June 17, 2003 notices would have been subject to the Unsecured Claims Bar Date. On June 27, 2003, the Debtors filed their motion seeking to assume and reject certain additional executory contracts, which was approved by Bankruptcy Court order entered on August 1, 2003. On October 14, 2003, the Debtors filed a motion seeking to assume and reject certain additional executory contracts and to set a bar date for Claims arising from the rejection of such executory contracts and unexpired leases (the "October 2003 Rejection Motion"). On November 13, 2003, the Bankruptcy Court entered its order approving the October 2003 Rejection Motion. On March 5, 2004, the Debtors filed a motion to reject additional executory contracts and unexpired leases (the "March 2004 Rejection Motion"), which was approved by Bankruptcy Court order entered on May 25, 2004, and an initial bar date of August 2, 2004 (60 days after notice was sent) was set for Claims arising from the rejection of executory contracts and unexpired leases pursuant to the October 2003 Rejection Motion and the March 2004 Rejection Motion. On July 2, 2004, the Debtors filed a motion to reject additional executory contracts and unexpired leases (the "July 2004 Rejection Motion"), which was approved by Bankruptcy Court order entered on July 29, 2004, and a bar date of September 12, 2006 (60 days after notice was sent) was set for Claims arising from the rejection of executory contracts and unexpired leases pursuant to the July 2004 Rejection Motion.

**3.    Claims Objections and Subordination.**

During the course of the Chapter 11 Cases, not less than 750 Claims totaling more than $331 million were filed against the Debtors. Many of these Claims duplicated scheduled liabilities. However, more than half of the filed Claims did not duplicate scheduled liabilities,

and many of these Claims: (i) are not substantiated by the Debtors' books and records, which are believed to accurately set forth the Debtors' debts and obligations; (ii) duplicate other filed Claims; (iii) are lacking in proper documentation; (iv) were not timely filed; (v) assert priority or secured status without a proper basis; and/or (vi) were filed by parties who received avoidable transfers. The Bankruptcy Code authorizes the Debtors, the Creditors' Committee or any other party in interest to object to Claims on all these grounds, as well as any other justifiable grounds.

The Debtors and the Creditors' Committee have each filed and litigated a substantial number of objections to Claims. The Debtors focused on larger Claims requiring a more detailed knowledge of the Debtors' business affairs, whereas the Creditors' Committee focused on smaller Claims and filing omnibus objections. The Debtors and the Creditors' Committee filed not less than 25 Claims objections and motions to subordinate Claims. In addition, the Creditors' Committee has filed three omnibus Claims objections. As a result of these efforts, more than $290 million in Claims have been disallowed or subordinated.

In addition, as discussed below in connection with the Preference Actions, the Debtors and the Creditors' Committee have addressed and litigated objections to Claims in connection with the Preference Actions, which process is still ongoing.

The Proponents anticipate that they will continue the Claims objection process up to the Effective Date, at which time the process will be taken over by the Reorganized Debtor and/or the Plan Oversight Committee. Other than with respect to possible objections to the Junior Notes Claims and the Senior Notes Claims as described immediately below, nearly all of the more significant Claims objections have been filed. Set forth in Exhibit "C" hereto is a list of all known Claims that were included in the Schedules or were asserted in filed proofs of claim to which no objection has been filed to date, but as to which an objection may be filed by the Debtors and/or the Creditors' Committee (or by the Reorganized Debtor and/or the Plan Oversight Committee after the Effective Date) as the Debtors and the Creditors' Committee are continuing with their investigation of Claims. Exhibit "C" is being provided for notification purposes only. It is possible that the Debtors, the Creditors' Committee, the Reorganized Debtor, the Plan Oversight Committee or some other party in interest may file an objection to a Claim which is not included in Exhibit "C". The fact that a claim is not included in Exhibit "C" is without prejudice to the rights of any party in interest to file any objection to a Claim. These Claims are in addition to the Claims which are held by parties who are the subject of a pending Avoidance Action (and whose Claims are therefore disputed until the Avoidance Action is resolved), and the Claims of the Junior Noteholders and the Senior Noteholders which are addressed below. Claim holders (whether or not identified in Exhibit "C") should not rely on the fact that no objection has to date been filed to their Claim in voting on whether to accept or reject the Plan. Claim holders (whether or not identified in Exhibit "C") should make their decision on whether to vote to accept or reject the Plan independent from the fact that an objection may still be filed to their Claim.

**4.    Claim Issues Involving the Junior Noteholders and the Senior Noteholders.**

In 1996, Junior Notes were issued in the aggregate original principal amount of $103.5 million. The Junior Notes and associated rights were sold for $100.3 million. As a result, there was a discrepancy of approximately $3.2 million between the face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes. The Junior Notes Indenture Trustee filed a proof of claim against the Debtors in the amount of $106.1 million, which the Junior Notes Indenture Trustee contends does not include any post-Petition Date interest.

Under the Bankruptcy Code, interest that is not matured as of the petition date is disallowed under Section 502(b)(2). The Proponents believe that the original issue discount on the Junior Notes, which is the difference between the face amount of the Junior Notes and the actual price paid for them, is considered unmatured interest and is to be disallowed under

1   Section 502(b)(2) of the Bankruptcy Code to the extent that it has not been amortized as of the Petition Date.

2       Until recently, counsel to the Debtors werewas in charge of analyzing the Junior Notes Claims. However, asAs a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors,' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee is now in chargeto assume the role of analyzing the Junior Notes Claims.  The Creditors' Committee has only performed a preliminary analysis of this issue.  Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can be reached, the Creditors' Committee will likely be filing an objection to the Junior Notes Claims based upon the unamortized portion of the approximately $3.2 million discrepancy between the face amount of the Junior Notes and the amount of money actually paid by the Junior Noteholders for the Junior Notes.  In addition, the Creditors' Committee believes that the Junior Noteholders may have received additional consideration in exchange for their payment of $100.3 million (i.e., beyond the issuance of the Junior Notes), such as stock conversion rights, which may serve to further reduce the appropriate Allowed Amount of the Junior Notes Claims.  As described more below in the Plan summary treatment of Class 5 Claims (i.e., the Junior Notes Claims), for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Junior Notes Claims will be Allowed in the amount of $103 million.  However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders.  It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor (after the Effective Date) or any other party in interest to file an objection to the Claims of the Junior Noteholders contending that the Allowed Amount of the Junior Notes Claims should be less than $103 million.

        In 2002, Senior Notes in the aggregate original principal amount of $75 million (which also had certain stock conversion rights) plus 7.5 million warrants for SONICblue stock and options to purchase 21,426,586 shares of UMC stock were sold as "Investments" in a private placement to three investors, who are classified under the Plan as Class 3 Claims.  In addition, the documents provided that a condition to the closing of this transaction was the issuance of options to purchase 21,426,586 shares of UMC stock.  This investment package was sold for an aggregate net price of $62.25 million.  The UMC stock was also pledged as security for the Senior Notes.  The Debtors scheduled the Claim of the Senior Notes Indenture for in excess of $77 million, and each of the three Senior Noteholders filed its own proofs of Claim in unspecified amounts relating to the Senior Notes.  The Senior Noteholders never exercised any of their stock conversion rights and never exercised any of their warrants.  However, during the course of the Chapter 11 Cases, the Senior Noteholders received approximately $17.4 million from the proceeds of the UMC stock that collateralized the Senior Notes.  The receipt of the sale proceeds of the UMC stock serves to reduce the Allowed Claims of the Senior Noteholders.

        As with the Junior Notes, the Proponents believe that an original issue discount also exists with respect to the Senior Notes, which would warrant some reduction in the amount of the Allowed Claims of the Senior Noteholders.  As with the Junior Notes, until recently, counsel to the Debtors werewas in charge of analyzing the Senior Notes Claims.  However, asAs a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors,' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee is now in chargeto assume the role of analyzing the Senior Notes Claims.  The Creditors' Committee has only performed a preliminary analysis of this issue.  Based upon this preliminary analysis, the Creditors' Committee believes that unless an amicable resolution can

28

-30-    DISCLOSURE STATEMENT FORDESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

be reached, the Creditors' Committee will likely be filing an objection to the Senior Notes Claims based upon the unamortized portion of the approximately $12.75 million discrepancy between the face amount of the Senior Notes and the amount of money actually paid by the Senior ~~Notes Holders~~Noteholders for the Senior Notes.  In addition, as described above, the Creditors' Committee believes that the Senior Noteholders may have received additional consideration in exchange for their payment of $62.25 million (i.e., beyond the issuance of the Senior Notes), which may serve to further reduce the appropriate Allowed Amount of the Senior Notes Claims.

The Creditors' Committee is working with GHC to analyze the Junior Notes Claims and the Senior Notes Claims, and attempt to arrive at a mutually agreeable discount of the Junior Notes Claims and the Senior Notes Claims without the expense and time delay that would be associated with litigating these disputes.  Preliminarily, GHC believes that a substantial portion of the Senior Notes Claims constitutes unamortized original issue discount, which may constitute disallowable unmatured interest.  GHC believes that the percentage discount for the Junior Notes Claims may be substantially lower because substantially more amortization of the original issue discount occurred with the longer passage of time since the issuance of the Junior Notes back in 1996.

As described more below in the Plan summary treatment of Class 3 Claims (i.e., the Senior Notes Claims), for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Senior Notes Claims will be Allowed in the amount of $47 million.  However, this assumption is being made <u>solely</u> to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders.  It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor (after the Effective Date) or any other party in interest to file an objection to the Claims of the Senior ~~Notes Holders~~Noteholders contending that the Allowed Amount of the Senior Notes Claims should be less than $47 million.

<u>No Holders of Junior Notes Claims are members of the Creditors' Committee.  Three Holders of Senior Notes are members of the Creditors' Committee.  However, all three Holders of Senior Notes are completely recused from any matter involving any decision making involving the analysis of the Junior Notes Claims and the Senior Notes Claims, as well as the prosecution by the Creditors' Committee of any objections to the Junior Notes Claims and the Senior Notes Claims.  Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") is representing and advising the Creditors' Committee (with the Senior Noteholders recused) in connection with the analysis and prosecution of any objection to the Junior Notes Claims and the Senior Notes Claims.</u>

The Bankruptcy Court shall retain jurisdiction over these estates following the Effective Date to <u>approve any settlement relating to the Senior Notes Claims and/or the Junior Notes Claims (with any such approval to come after notice and a hearing before the Bankruptcy Court), and to</u> adjudicate any objections filed to the Senior Notes Claims and/or the Junior Notes ~~Claim~~Claims, regardless of whether such <u>settlement was proposed or such</u> objections were filed by the Creditors' Committee prior to the Effective Date and continued by the Plan Oversight Committee after the Effective Date, or whether such<u> settlement is proposed or</u> objections are first filed by the Plan Oversight Committee or the Reorganized Debtor after the Effective Date.

**I.**    **Post-Petition Date Litigation.**

**1.**    **VIA Litigation.**

VIA Technologies, Inc. ("<u>VIA</u>") and S3 Graphics Co., Ltd. ("<u>JV</u>") filed duplicate $105 million proofs of claim allegedly arising out of an August 28, 2000 Amended Investment Agreement between SONICblue and VIA and other related agreements.  VIA and JV alleged that SONICblue breached the Amended Investment Agreement and related agreements by,

among other things, not paying certain accounts payable, offering non-ordinary-course discounts to accelerate collection of receivables, not contributing certain assets to JV, and retaining payments received for certain accounts receivable that allegedly were owed to JV. Approximately $27 million of these claims were subject to a $5.5 million damages cap. VIA and JV also claimed that JV may be enjoined from using an intellectual property license between SONICblue and Intel Corporation ("Intel") and that JV was therefore entitled to damages under the Amended Investment Agreement in an amount of up to $70 million. The Claims were based upon breach of contract and related causes of action and involved very complex facts.

In December, 2004, the Debtors commenced litigation (the "VIA Litigation") by filing a complaint against VIA, JV and S3 Graphics, Inc. ("JV Sub") for affirmative relief and objecting to the aforementioned Claims and asserting numerous counterclaims. The VIA Litigation was vigorously disputed and protracted, and the Debtors incurred more than $2 million in legal expenses in the VIA Litigation and related matters.

The VIA Litigation and the other litigation matters between the Debtors and Intel were settled pursuant to an order entered after a Bankruptcy Court hearing on October 27, 2005. Under the settlement, among other things, VIA and JV received a $12.5 million general unsecured claim against SONICblue (which Via agreed is not senior indebtedness under the documentation evidencing the Senior Notes), and the two $105 million duplicate claims were disallowed. In addition, among other things, SONICblue agreed to and has commenced the process of transferring the intellectual property and records and files relating to its graphic chips business to JV or its designee. The Proponents believe that this was an extremely favorable result for the Debtors' estates.

The Debtors and the Creditors' Committee jointly decided that Plan confirmation could not proceed until the VIA Litigation was resolved, which is the primary reason for the delay between the Petition Date and the filing of the Plan and this Disclosure Statement. Among other things, confirmation of a plan to the VIA settlement would have resulted in the Debtors' rejection of certain contracts with VIA that would likely have given VIA the right to claim certain liquidated damages. Thus, by deferring proposing a plan of reorganization, the Proponents minimized VIA's potential claims against the Debtors' estates. The settlement of the VIA Litigation and the other litigation matters between the Debtors and Intel was therefore monumentally significant towards the ability of the Debtors and the Creditors' Committee to bring these Chapter 11 Cases to conclusion.

## 2.    Avoidance Actions.

The Bankruptcy Code authorizes a debtor-in-possession or trustee to seek avoidance and recovery of "preferential" and "fraudulent" transfers. Generally, a preferential transfer is a transfer made during the ninety (90) days preceding commencement of a bankruptcy case on account of an existing debt that enables a creditor to receive more than it would have received in a liquidation case. Where the transfer is to an "insider", the ninety-day period is extended to one year. Here, because the Debtors will not be paying most classes of Claims in full, a transfer during the preference period to any party whose Claim, absent such payment, would have been included in Classes 3-6 would enable such creditor to receive more than it would have received in a liquidation case. A "fraudulent" transfer under the Bankruptcy Code is generally described as a transfer made for less than reasonably equivalent value.

During the ninety days preceding the Petition Date, the Debtors made approximately 982 transfers totaling approximately $63.1 million to approximately 348 recipients. The vast majority of these transfers were on account of antecedent debt.

Between March 11, 2005 and March 20, 2005, the Debtors and the Creditors' Committee filed approximately 208 preference and fraudulent conveyance avoidance and recovery actions   (including one un-filed claim where the defendant executed a tolling

agreement, and later settled without the need for litigation, collectively, the "Preference Actions".)  Prior to the commencement of the Preference Actions, the Creditors' Committee and the Debtors negotiated with their counsel a contingent fee arrangement that was approved by a Bankruptcy Court order entered on March 4, 2005.  Under this arrangement, the Proponents' attorneys' fees in the Preference Actions is a contingent fee (to be split and paid evenly to PW and LNBRB except for some possible disparities due to conflicts) (i) based upon the amount recovered from the defendants, plus (ii) an amount equal to the distributions that would be received on 27% of the Claims disallowed in the Preference Actions.

Most defendants in the Preference Actions asserted defenses, including that they had provided new value and/or that the transfers they had received were paid in the ordinary course of business, and therefore not recoverable or avoidable.

As of December 1, 2006, in the Preference Actions: (a) more than 145 of the Preference Actions have been settled, litigated to a judgment or dismissed; (b) defendants have agreed to pay at least $6 million to the Debtors as settlements, including amounts to be collected from defendants' Claim distributions; and (c) ~~more than~~approximately $~~9~~10 million in Claims have thus far been disallowed.

## ARTICLE VI
## THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR A FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, REGARDLESS OF WHETHER SUCH CLAIM HOLDERS AND INTEREST HOLDERS VOTED ON THE PLAN AND, IF THEY VOTED ON THE PLAN, WHETHER THEY VOTED TO ACCEPT OR REJECT THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**A.    Introduction.**

In general, a Chapter 11 plan:  (i) divides claims and equity interests into separate classes; (ii) specifies the Property that each class is to receive under the plan; and (iii) contains other provisions necessary to the reorganization or liquidation of the debtor.  Under the Bankruptcy Code, Claims and "equity interests" (or "Interests") are classified rather than "creditors" and "shareholders."  For purposes of this Disclosure Statement, the term "Holder" refers to the Holder of a Claim or Interest.

**B.    General Plan Description.**

The Plan is a liquidating plan. All or nearly all of the Debtors' Assets have been liquidated. In the event that any non-Cash Assets remain as of the Effective Date, the Reorganized Debtor will proceed to liquidate all such non-Cash Assets. The Reorganized Debtor will continue with the prosecution of any disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Debtors but which have not been liquidated to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Reorganized Debtor and such Claims objections for this purpose, regardless of whether such Claims objections were commenced prior to or subsequent to the Effective Date. Similarly, the Reorganized Debtor will continue with the prosecution of any Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Debtors but which have not been resolved to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Reorganized Debtor and the Avoidance Actions for this purpose, regardless of whether such Avoidance Actions were commenced prior to or subsequent to the Effective Date.

On the Effective Date, the Creditors' Committee will become a post-confirmation Creditors' Committee, referred to herein as the "Plan Oversight Committee", whose role it will be to, among other things, monitor and oversee the actions of the Reorganized Debtor, and in the case of more significant events, approve the actions of the Reorganized Debtor. In addition, the Plan Oversight Committee will continue with the prosecution of any disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Creditors' Committee but which have not been liquidated to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and such Claims objections for this purpose, regardless of whether such Claims objections were commenced prior to or subsequent to the Effective Date. Similarly, the Plan Oversight Committee will continue with the prosecution of any Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Creditors' Committee but which have not been resolved to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and the Avoidance Actions for this purpose, regardless of whether such Avoidance Actions were commenced prior to or subsequent to the Effective Date. Finally, both the Reorganized Debtor and the Plan Oversight Committee shall have standing and authority to commence any objections to Claims after the Effective Date which they deem appropriate which were not commenced prior to the Effective Date.

The Reorganized Debtor will distribute the net proceeds of the Avoidance Actions and the Debtors' other Assets to Holders of Allowed Claims according to the priorities established in the Plan.

**C.    Substantive Consolidation.**

The Plan is premised upon the substantive consolidation of the Debtors' estates for the purposes of voting on, confirmation of, and distributions under the Plan. Substantive consolidation is an equitable remedy that a court may apply in cases involving affiliated entities. As contrasted with procedural consolidation, substantive consolidation affects the substantive rights and obligations of Creditors and the Debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the Debtors. Consequently, a Creditor of one of the substantively consolidated Debtors will be treated as a Creditor of the substantively consolidated group of Debtors subsumed within the Reorganized Debtor, and issues of individual corporate ownership of Property and individual corporate liability on obligations are ignored. As a result, a Creditor who contends that it has the same Claim against more than one of the Debtors will, following the Effective Date, be deemed to have only one such Claim against the Reorganized Debtor.

The Plan constitutes a motion for an order substantively consolidating the Debtors. As such, on the Plan Effective Date: (a) all Assets and liabilities of the Debtors shall be merged or

treated as though they were merged into and with the Assets and liabilities of each other Debtor; (b) all inter-company Claims shall be eliminated and extinguished, and no distributions shall be made under the Plan on account of any inter-company Claims; (c) any Claims against two or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim; and (d) all Allowed Claims against the Debtors shall be satisfied from the Assets of the single consolidated estate of the Reorganized Debtor.

The Proponents believe that substantive consolidation of the Debtors under the Plan is appropriate and necessary under the circumstances because the Debtors were ~~largely~~essentially operated as a single economic unit. Among other things: (i) the Debtors shared the same officers and directors; (ii) only SONICblue had employees – the other Debtors functioned through SONICblue's employees; (iii) the Debtors reported their finances on a consolidated basis, except Sensory Science, which reported on a consolidated basis with the other Debtors and separately to comply with loan covenants; (iv) only two Debtors had bank accounts that were actively used during the year preceding the Petition Date – and checks drawn on both accounts identified SONICblue as the payor; (v) the Debtors filed consolidated tax returns; and (vi) the Debtors transferred and commingled Assets between and among themselves regardless of ownership of the Assets. Although Sensory Science did assert individual ownership of some Assets, substantial amounts of inventory, accounts receivable and funds were routinely conveyed between SONICblue and Sensory Science without full tracking of inter-company obligations. In addition, SONICblue and Sensory Science would pay expenses incurred with respect to each other's operations and products, but reimbursement often was either not paid or was not designed or intended to be fully compensatory.

Practically speaking, the Debtors operated as one substantively consolidated entity. Diamond and ReplayTV did not create or maintain any separate financial statements. They did not have any of their own employees. They did not file separate tax returns. They did not order any separate product or materials or manufacture any product. All of this was done by SONICblue. In all respects, SONICblue treated Diamond and ReplayTV simply as separate product lines, not as separate legal entities. SONICblue is the legal entity that purchased and paid for all materials and products used by Diamond and ReplayTV, and SONICblue paid all the expenses of Diamond and ReplayTV, with no reimbursement from Diamond and ReplayTV to SONICblue and no separate accounting or expense or overhead allocation. There was no tracking whatsoever of separate expenses. Diamond and ReplayTV fundamentally did not pay any of their own expenses as all such expenses were paid by SONICblue and there was no attribution or allocation of expenses to Diamond or ReplayTV. It would essentially be impossible to retroactively create separate financial statements for Diamond and ReplayTV, and any effort to do so would cost the estates millions of dollars with results that would be speculative and unreliable.

Sensory Science differed because of a pre-existing loan facility that Sensory Science had with Congress Financial which was secured by Sensory Science's assets and guaranteed by SONICblue. To comply with the Congress Financial loan facility, separate financial statements were generally maintained for Sensory Science solely to satisfy a requirement of Congress Financial. However, practically, Sensory Science was not operated as a stand alone entity. As with Diamond and ReplayTV, SONICblue operated with Sensory Science as one substantively consolidated entity, and SONICblue treated Sensory Science simply as a separate product line, not as a separate legal entity. Sensory Science did not have any of its own employees. SONICBlue paid much of the expenses of Sensory Science, and Sensory Science paid much of the expenses of SONICBlue, without accurate tracking of inter-company advances, and with incomplete accounting and expense and overhead allocation. While some inter-company debts were recorded, not all inter-company transfers and obligations were recorded, as there was never any intent on the part of either Sensory Science or SONICblue that either company would ever repay the other. As such, the recorded inter-company obligations are neither accurate nor

an approximation of what SONICblue and Sensory Science might owe each other if separating their financing was attempted. The Debtors believe that any effort to attempt to retroactively create accurate separate financial statements for Sensory Science would be extremely expensive, with results that would be speculative and unreliable.

The Proponents believe that the substantive consolidation of their estates is the only practical alternative available to these estates. Moreover, the Proponents believe that substantive consolidation is prudent and efficient in that it would be exceptionally difficult and extraordinarily expensive, if not impossible, to unravel the Debtors' financial affairs to segregate their respective Assets and liabilities. Because funds and Assets were transferred between the Debtors without regard to corporate formalities or ownership, an extensive unwinding process would be required to determine who owned which Assets and to establish inter-company obligations. Because the Debtors did not track all inter-company transfers, identifying the various inter-company transfers would require record reconstruction on a massive scale. Disentangling the Debtors' affairs would have to be performed primarily by third party professionals as the Debtors have no more employees. The Proponents believe this process would be extremely expensive (costing millions of dollars) and would substantially delay distributions in these Chapter 11 Cases without any guarantee of (or even realistically possible) reliable results.

In addition, absent substantive consolidation of the Debtors, it would be necessary to address the validity of the loans made by SONICblue to the other Debtors prior to acquiring same. SONICblue loaned $20 million to each of Diamond and ReplayTV and $9.75 million to Sensory Science (the "Inter-company Loans"). These Inter-company Loans appear to have been properly documented and, as noted, they were secured by virtually all of the assets of each of the borrower-Debtors. No principal or interest payments have been paid on these Inter-company Loans since they were made. If the Inter-company Loans were held valid, SONICblue would presumably be entitled to most of the proceeds of sale of the other Debtors' Assets due to SONICblue's security interest. In any event, to the limited extent there were unencumbered assets (primarily, Avoidance Action recoveries by Sensory Science and proceeds of unencumbered registered copyrights), SONICblue would be able to assert the unpaid portion of its Inter-company Loan, if held valid, as an unsecured claim in the other Debtors' cases. On the other hand, creditors of the other Debtors might assert that the Inter-company Loans are not valid on the grounds, inter alia, that the Inter-company Loans were forgiven or waived in the process of SONICblue acquiring the other Debtors. Absent substantive consolidation, the Proponents believe expensive and protracted litigation concerning the validity of these Inter Company loans would be inevitable.

The Proponents believe that substantively consolidating the Debtors would benefit all Creditors by eliminating the substantial cost and significant delay that would result from (a) reconstructing all pre-petition transactions between the Debtors, (b) allocating Assets and liabilities between the various Debtors, and (c) litigating the accuracy of these processes, the validity of the Inter-company Loans and a number of other issues. The Proponents believe the cost savings and value of expedited distribution would be substantially more beneficial to Creditors than any change in distributions that might result from an expensive, protracted and possibly futile process of Asset and liability allocation and litigation.

## D.    The Plan's Reallocation Provisions.

The Plan gives effect to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture (the "Indentures") according to their terms. Bankruptcy Code Section 510(a) expressly provides that contractual subordination provisions are enforceable in bankruptcy to the extent enforceable under applicable non-bankruptcy law. The Plan will give effect to the Subordination Provisions by re-allocating the distributions that would have been paid to Creditors absent the Subordination Provisions to Creditors benefiting from the Subordination Provisions. However, nothing in the Plan precludes any party from enforcing its

1  ~~rights under the Subordination Provisions outside the bankruptcy context, subject to the provisions in the Indentures, including, without limitation, any concerning the effect of a court order approving reallocations under the Subordination Provisions.~~

2

3  Under the Subordination Provisions of the two Indentures, the parties entitled to priority are not limited to recovering the Allowed Amounts of their Claims. Under bankruptcy law generally, an unsecured or under-secured creditor is not entitled to collect post-petition interest. Under the two Indentures, however, the parties benefiting from the Subordination Provisions are entitled to collect all principal and interest owing under the prioritized obligations, including post-petition interest. As such, under the Plan, the creditors benefiting from the Subordination Provisions are entitled to receive up to the "<u>Subordination Payment Amount</u>" of their Claims, which amount is defined as the amount of a Claim entitled to priority under one or both Indentures, even though the Subordination Payment Amount may exceed the amount due on account of the Claim as Allowed under bankruptcy law. Typically, the Subordination Payment Amount includes all principal and interest (including post-petition interest) due on account of a Claim, <u>and any other obligations owed by the Debtors to the Holders of senior indebtedness,</u> but the applicable Indenture(s) may impose limitations on the amount entitled to priority.

4

5

6

7

8

9  The distinction between the Allowed Amount of a Claim and the Subordination Payment Amount is primarily of importance to the Senior and Junior Noteholders. As discussed above, for purposes of estimating distributions to be made under the Plan, the Proponents have assumed an Allowed Claim of $47 million in favor of the Senior Noteholders; whereas the Debtors calculate the Subordination Payment Amount of the Senior ~~Noteholders'~~<u>Notes</u> Claims to be approximately $84 million on March 11, 2007, based on the Senior Noteholders' recovery from the prior UMC stock sales described herein. Absent the Subordination Provisions, the Proponents would project a significant distribution on account of the Junior Notes. However, the Proponents believe that all distributions which would otherwise have been paid to the Junior Noteholders (i.e., Class 5) if not for the Subordination Provisions will be reallocated and paid to the Senior Noteholders (i.e., Class 3) in accordance with the Subordination Provisions.

10

11

12

13

14

15  The Senior Noteholders contend that they are entitled to receive all distributions which would otherwise have been paid to the Junior Noteholders if not for the Subordination Provisions until the Junior Noteholders have been paid the full Subordination Payment Amount, which is not expected to occur. As a result, the Senior Noteholders contend that the Junior Noteholders are not entitled to receive any distribution from the Reorganized Debtor as all such distributions which otherwise would have been paid to the Junior Noteholders are instead required to be paid to the Senior Noteholders pursuant to the Subordination Provisions. ~~In the event the Junior~~

16

17

18

19

20  <u>The Proponents understand that the Senior Noteholders and the Junior Notes Indenture Trustee agree that once the Senior Noteholders receive the Subordination Payment Amount (which is not expected to occur), all remaining distributions, if any, made on account of Class 3 Allowed Claims and/or Class 5 Allowed Claims shall be paid to the Junior Notes Indenture Trustee in respect of the Junior Notes for distribution in accordance with the Junior Note Indenture. As a result, if and when Class 3 has recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims shall thereafter be paid to the Junior Notes Indenture Trustee for distribution to holders of record of the Junior Notes as of the Effective Date after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture.</u>

21

22

23

24

25

26  <u>The Proponents further understand that the Junior Notes Indenture Trustee contends that all payments made on account of Class 5 Allowed Claims (even up to the Subordination</u>

27

28

Payment Amount) should be made to the Junior Notes Indenture Trustee, who would then pay over all such funds to the Holders of Class 3 Allowed Claims after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture.  The Proponents further understand that the Senior Noteholders disagree with this contention, the Junior Noteholders must file an objection to this provision of the Plan made by the Junior Notes Indenture Trustee.

If the Junior Noteholders and/or the Junior Notes Indenture Trustee contend that any payments made on account of Class 5 Allowed Claims (up to the Subordination Payment Amount) should be paid to anyone other than the Holders of Class 3 Allowed Claims, they must file an objection with the Bankruptcy Court not later than fifteenten days prior to the Plan confirmation hearing, and include with such objection all evidence in support of any such contention.  The Junior NoteholdersThey are required to serve any such objection upon counsel to the Debtors, counsel to the Creditors' Committee, and counsel to the Senior Noteholders.  TheTheir failure of the Junior Noteholders to file any such timely objection to this provision of the Plan will be deemed to constitute thetheir consent byto the Junior Noteholders to this Plan provision providing for all payments made on account of Class 5 Allowed Claims (up to the Subordination Payment Amount) to be paid to the Holders of Class 3 Allowed Claims.  To the extent that any such objection requires a modification to the Plan, any such modification to the Plan will be deemed to constitute an immaterial modification to the Plan, which will not require the resolicitation of any voting on the Plan.  The Bankruptcy Court shall be the only forum with jurisdiction to resolve any disputes between or among the Senior Noteholders and the Junior Noteholders and/or the Junior Notes Indenture Trustee, subject to the parties' appellate rights with respect to any Bankruptcy Court order.  The Bankruptcy Court shall retain jurisdiction over the Senior Noteholders, the Junior Noteholders and the Junior Notes Indenture Trustee to resolve any such disputes.

**E.　　Other Procedural Issues Concerning Subordination and Seniority of Claims.**

The Proponents are not aware of any Claims which are entitled to any priority over the Senior Noteholders'Notes Claims.  As a result, any Claim holder who contends that it is entitled to priority over the Senior Noteholders'Notes Claims must file an objection to this provision of the Plan with the Bankruptcy Court not later than fifteenten days prior to the Plan confirmation hearing and include with such objection all evidence in support of such contention of priority. Any such Claim holder is required to serve any such objection upon counsel to the Debtors, counsel to the Creditors' Committee, and counsel to the Senior Noteholders.  The failure of any Claim holder to file any such timely objection to this provision of the Plan will be deemed to constitute an acknowledgement by such Claim holder that it is not entitled to any priority over the Senior Noteholders'Notes Claims.   To the extent that any such objection requires a modification to the Plan, any such modification to the Plan will be deemed to constitute an immaterial modification to the Plan, which will not require the resolicitation of any voting on the Plan.  The Bankruptcy Court shall be the only forum with jurisdiction to resolve any disputes involving such priority issues.

**F.　　Classification and Treatment of Claims.**

Bankruptcy Code Section 1122 provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to Section 1123(a)(1), are not to be classified).  The Proponents also are required, under Section 1122, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Proponents believe that the Plan has classified all Claims and Interests in

compliance with the provisions of Section 1122 and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Proponents' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Proponents intend, to the extent permitted by the Bankruptcy Code and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Class. Thus, the value of the Property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Proponents believe that the consideration, if any, provided under the Plan to the Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' Assets. In view of the deemed rejection by Classes 7 and 8, however, and the possible rejection of the Plan by other voting Classes, the Proponents will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Bankruptcy Code Section 1129(b) permits confirmation of a Chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired Classes of Claims and Interests. See Section X.B. of this Disclosure Statement for a further description of this issue. Although the Proponents believe that the Plan can be confirmed under Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

Subject to the foregoing, the following describes the classification and treatment of classified Claims and Interests under the Plan. As described above, pursuant to the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan.

**1.      Class 1 - Secured Claims.**

(a)      <u>Classification</u>: This Class consists of Allowed Claims secured by valid and perfected liens and/or security interests against the Debtors' Assets, to the extent of the value of the Holder's interest in the Debtors' Assets.

(b)      <u>Treatment</u>: Each Holder of a Class 1 Allowed Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Secured Claim equal to the Allowed Amount of such Class 1 Allowed Claim.

(c)      <u>Estimated Amount of Claims</u>: There are approximately twenty-seven (27) scheduled Claims or filed proofs of Claim in this Class totaling approximately $91.975 million. However, most of these Claims relate to the Senior Notes which are no longer secured as a result of the prior sale and payment of the UMC Stock, which served as their collateral. In addition, a number of these Claims are objectionable or have been paid, and the Proponents intend to have the Claims withdrawn or file objections to these Claims before the Effective Date. The Proponents estimate that after withdrawal or reclassification of objectionable claims

and/or litigation of such objectons, the total amount of Allowed Secured Claims will be not more than approximately $380,000.

(d)  Projected distributions:  The Proponents anticipate that all Class 1 Allowed Claims will be satisfied in full under the Plan.

(e)  Voting:  Claims in this Class are not impaired, and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject the Plan.

**2.  Class 2 – Other Priority Claims.**

(a)  Classification:  This Class consists of all Unsecured Priority Claims specified under Bankruptcy Code Section 507(a), but excluding Priority Tax Claims and Administrative Claims.

(b)  Treatment:  Each Holder of a Class 2 Allowed Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Priority Claim equal to the Allowed Amount of such Class 2 Allowed Claim.

(c)  Estimated Amount of Claims:  There are approximately fifteen (15) Claims in this Class totaling approximately $302,000.  Many of these Claims are general unsecured Claims that have incorrectly asserted priority status.  The Proponents intend to seek voluntary reclassification of these Claims or to file objections thereto.  The Proponents estimate that after reclassifying such Disputed Claims and litigation of other appropriate objections, the total amount of Allowed Claims in this Class will be approximately $30,000.

(d)  Projected distributions:  The Proponents anticipate that all Class 2 Allowed Claims will be satisfied in full under the Plan.

(e)  Voting:  Claims in this Class are not impaired, and Holders of Allowed Claims in this Class are therefore not entitled to vote to accept or reject the Plan.

**3.  Class 3 – Senior Notes Claims.**

(a)  Classification:  This Class consists of all Unsecured Claims arising out of the Senior Notes (the 7¾% Senior Secured Subordinated Convertible Debentures due 2005) or documentation related to the Senior Notes, which consists of all Claims of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. which are based upon, arise out of, or are related to the Senior Notes.

(b)  Treatment:  Each Holder of a Class 3 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets on the same percentage basis as Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims. In addition, pursuant to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture, the entire distribution of the Net Remaining Assets that would otherwise be made to the Holders of Class 5 Allowed Claims on account of the Junior Notes Claims shall instead be paid directly to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis. The timing of payments is described below in Article VII, Section E.7.  If and when Class 3 has recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims shall thereafter be paid to the Junior Notes Indenture Trustee for distribution to holders of record of the Junior Notes as of the Effective Date after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture.

(c)  Estimated Amount of Claims:  There are three known Holders of Class 3 Claims consisting of Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd.  As described above, before any original issue discount or attribution

of value to the items received by the Senior ~~Notes Holders~~Noteholders or features of the Senior Notes, the Class 3 Claims would have been in the amount of approximately $60 million after credit is provided for the approximately $17.4 million of proceeds received by the Senior Note Holders from the sale of the UMC stock that collateralized the Senior Notes. Solely for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Senior Notes Claims will be Allowed in the amount of $47 million. However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders. It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor or any other party in interest to file an objection to the Senior Notes Claims contending that the Allowed Amount of the Senior Notes Claims should be less than $47 million.

(d)    Projected distributions:  The Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims. As further set forth above, the Proponents are preliminarily estimating a likely distribution of approximately 33% to holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims, taking into account all of the assumptions set forth herein. Assuming total Class 3 Allowed Claims of $47 million, the Proponents estimate that Holders of Class 3 Allowed Claims will receive a total of approximately $15,510,000 before taking into account the payment to the Holders of Class 3 Allowed Claims that would otherwise be made to the Holders of Class 5 Allowed Claims if not for the Subordination Provisions. Assuming total Class 5 Allowed Claims of $103 million, the Proponents estimate that an additional approximately $33,990,000 that would otherwise be paid to the Holders of Class 5 Allowed Claims if not for the Subordination Provisions will be paid to the Holders of Class 3 Allowed Claims. Using these assumptions, the Proponents believe that Holders of Class 3 Allowed Claims may receive a total distribution from the Reorganized Debtor which exceeds the amount of their Class 3 Allowed Claims, but this is acceptable pursuant to the Subordination Provisions, to which original issue discount concepts do not apply.

(e)    Voting:  Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**4.    Class 4 - General Unsecured Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims (including deficiency Claims) other than Administrative Claims, Priority Tax Claims and Claims in Classes 2, 3, 5, 6 and 7.

(b)    Treatment:  Along with Holders of Class 3 Allowed Claims and Holders of Class 5 Allowed Claims, each Holder of a Class 4 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets.  The timing of payments is described below in Article VII, Section E.7.

(c)    Estimated Amount of Claims:  As of December 15, 2006, there are a total of approximately $42.8 million of Class 4 Claims that the Bankruptcy Court has, or the Debtor and the Creditors' Committee have, determined are or should be Allowed. In addition, there are a total of approximately $74.9 million of additional Class 4 Claims that are (i) subject to pending Claim objections or Preference Actions, (ii) subject to continuing investigation by the Debtors' and/or the Creditors' Committee and may be objected to in the future, or (iii) likely to be eliminated upon Substantive Consolidation of the Debtors (the "Unsettled Claims"). Much of the remaining Class 4 Unsettled Claims are asserted by Claim holders who are the subject of pending Preference Actions, and many of the previous settlements of Preference Actions included a waiver of all or a significant portion of the Unsecured Claims which were otherwise asserted by the defendant to the relevant Preference Action. The Proponents estimate that the ultimate total amount of Class 4 Allowed Claims will be approximately $86 million. However,

this figure is just an estimate.  The ultimate actual total amount of Class 4 Allowed Claims could be higher or lower than $86 million.

(d)    Projected distributions:  As described above, the Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims. Based upon all of the assumptions contained in this Disclosure Statement, including that the ultimate total amount of Class 4 Allowed Claims will be approximately $86 million, the Proponents are preliminarily estimating a likely distribution of approximately 33% to holders of Class 4 Allowed Claims.

(e)    Voting:  Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**5.    Class 5 - Junior Notes Claims.**

(a)    Classification:  This Class consists of all Unsecured Claims arising out of the Junior Notes (the 5-¾% Convertible Subordinated Notes due 2003), including, without limitation, all Claims of U.S. Bank, N.A.

(b)    Treatment:  Along with Holders of Class 3 Allowed Claims and Holders of Class 4 Allowed Claims, each Holder of a Class 5 Allowed Claim shall receive a Cash payment equal to such Holder's Pro-Rata Share of the Net Remaining Assets, which payment, pursuant to the "Subordination Provisions" in the Junior Note Indenture and Senior Note Indenture, will actually be paid directly to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.  The timing of payments is described below in Article VII, Section E.7.  If and when Class 3 has recovered (whether by distributions under the Plan or otherwise) an aggregate amount equal to the Subordination Payment Amount, all further distributions on account of the Class 3 and Class 5 Allowed Claims shall thereafter be paid to the Junior Notes Indenture Trustee for distribution to holders of record of the Junior Notes as of the Effective Date after payment or reserving therefrom for compensation, expenses, disbursements, advances and indemnification of the Junior Notes Indenture Trustee (including the fees and expenses of its counsel) secured by its charging lien under Section 8.6 of, or to which it is otherwise entitled pursuant to, the Junior Notes Indenture.

(c)    Estimated Amount of Claims:  U.S. Bank, N.A. is the only known Holder of a Class 5 Claim.  This Holder filed a proof of Claim in the amount of $106.1 million. This Claim may be partially Disputed.   Solely for purposes of projecting an estimated distribution to Unsecured Claim Holders, the Proponents are assuming that the Junior Notes Claims will be Allowed in the amount of $103 million.  However, this assumption is being made solely to enable the Proponents to provide an estimated distribution to Unsecured Claim Holders.  It is without prejudice to the ability of the Debtors, the Creditors' Committee, the Reorganized Debtor or any other party in interest to file an objection to the Junior Notes Claims contending that the Allowed Amount of the Junior Notes Claims should be less than $103 million.

(d)    Projected distributions:  As described above, the Proponents estimate that there will be approximately $77 million of Net Remaining Assets available for distribution to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims. Based upon all of the assumptions contained in this Disclosure Statement, including that the ultimate total amount of Class 5 Allowed Claims will be approximately $103 million, the Proponents are preliminarily estimating a likely distribution of approximately 33% to Holders of Class 5 Allowed Claims. Assuming total Class 5 Allowed Claims of $103 million, the Proponents estimate that the Holders of Class 5 Allowed Claims would have been paid the total sum of $33,990,000 if not for the Subordination Provisions.  However, as a result of the Subordination Provisions, the Proponents anticipate that the entire sum that would otherwise

have been owing to the Holders of Class 5 Allowed Claims will instead be paid to the Holders of Class 3 Allowed Claims on a Pro-Rata Share basis.

(e)    Voting:  Claims in this Class are ~~and~~but are deemed to have rejected the Plan.  As such, Holders of Allowed Claims in this Class are not entitled to vote to accept or reject the Plan.   Nevertheless, Holders of Allowed Claims in this Class will be served with a copy of the Plan, this Disclosure Statement and related notices.

**6.**    **Class 6 – Convenience Class Claims.**

(a)    Classification:   This Class is comprised of all Claims that would otherwise be Class 4 Claims but as to which one of the following applies: (a) such Claim is in an amount equal to or less than $~~2,500~~500; or (b) such Claim is in an amount greater than $~~2,500,~~500, but the Holder of such Claim has elected to have such Claim treated in its entirety as a Class 6 Convenience Class Claim in the amount of $~~2,500~~500 by so indicating on the Ballot submitted to vote such Claim.

(b)    Treatment:  Each Holder of a Class 6 Allowed Claim shall receive Cash within ~~ninety~~thirty days following the later of the Effective Date and the date of Allowance of such Class 6 Allowed Claim equal to 50% of the Allowed Amount of such Class 6 Allowed Claim; provided, however, that under any circumstance the maximum Cash distribution to a Class 6 Claim Holder shall be $~~1,250.~~250.

(c)    Estimated Amount of Claims:   There are over ~~450~~275 Claims in this Class totaling approximately $~~301,000.  In addition, the Proponents estimate that twenty (20) to forty (40)~~57,000.   Taking into account Creditors with Class 4 Allowed Claims exceeding $~~2,500  may~~500 who opt to reduce their Claims to $~~2,500~~500 and participate in the Class 6 Convenience Class to expedite receipt of their distributions~~.  As such~~, the Proponents are estimating that the ultimate amount of Claims in this Class will be approximately $~~375,000.~~75,000.

(d)    Projected distributions:  Each Holder of a Class 6 Allowed Claim will receive a single distribution equal to the lesser of fifty percent (50%) of such Holder's Class 6 Allowed Claim or $~~1,250.~~250.

(e)    Voting:   Claims in this Class are impaired, and Holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

**7.**    **Class 7 – Subordinated Unsecured Claims.**

(a)    Classification:  This Class consists of all Claims: (i) that have been or are subject to subordination under Bankruptcy Code Section 510(b), including, without limitation, all Claims identified in Schedule 1 to the Plan and which are not expressly included in any other Class; and (ii) all Claims described in any other Bankruptcy Code provision that subordinates Claims.

(b)    Treatment:   Holders of Allowed Class 7 Claims will receive no distributions on account of their Class 7 Claims.

(c)    Estimated Amount of Claims:   Seven (7) Claims, comprising approximately $14.6 million, have previously been subordinated pursuant to Bankruptcy Court order.  Exhibit "C" identifies any additional claims that the Proponents may seek to have subordinated.

(d)    Projected distributions:   Holders of Class 7 Claims will receive no distributions on account of their Class 7 Claims.

(e)    Voting:   Claims in this Class are impaired but are deemed to have rejected the Plan ~~and, as.~~  As such, Holders of Allowed Claims in this Class are not entitled to vote to accept or reject the Plan.

**8.    Class 8 – Interests.**

(a)    <u>Classification</u>:  This Class consists of all Interests in any of the Debtors and any rights and Claims related thereto, including, but not limited to, all stock, equities, securities, warrants, conversion rights, options and other legal and contractual rights to acquire stock.

(b)    <u>Treatment</u>:  Holders of Interests will not receive or retain any Property or distributions under the Plan on account of such Interests.  Holders of Interests will have no power or role in the administration of the Reorganized Debtor.  On the Effective Date, all such power shall be vested in the Reorganized Debtor and the Plan Oversight Committee in accordance with the terms of the Plan.  On the Effective Date, any and all equity interests in the Debtors, including, but not limited to, all common stock, preferred stock, stock options, warrants, etc., and any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any other right, contractual or otherwise, to acquire any such ownership interest (collectively, "Equity Interests") will be deemed cancelled and extinguished and of no further force or effect, without the need for the Debtors or the holders of the Equity Interests to take any further action.

(c)    <u>Projected distributions</u>:  Interest Holders will receive no distributions on account of their Interests.

(d)    <u>Voting</u>:  Holders of Interests are impaired but are deemed to have rejected the Plan and, as.  As such, Holders of Interests are not entitled to vote to accept or reject the Plan.

**G.    Treatment of Unclassified Administrative and Priority Tax Claims.**

**1.    Definition of Administrative Claims.**

An "<u>Administrative Claim</u>" is defined in the Plan as a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under Bankruptcy Code Sections 503, 507(a)(2) or 1114(e)(2) including, but not limited to, (i) any actual and necessary post-Petition Date cost or expense of preserving the Debtors' respective estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any post-Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation and reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under Bankruptcy Code Sections 328, 330(a) or 331, and (v) any fees or charges assessed against the Debtors' respective estates under Section 1930 of the title 28 of the United States Code.

**2.    Treatment of Administrative Claims other than Professional Fees.**

Holders of Administrative Claims other than Professional Fees that have not been paid as of the Effective Date must File a request for payment of such Administrative Claims with the Bankruptcy Court and serve the same upon the Reorganized Debtor and the Plan Oversight Committee no later than forty-five (45) days after the Effective Date (the "<u>Administrative Bar Date</u>").  If an Administrative Claim that has not been paid as of the Effective Date is not timely Filed by the Administrative Bar Date, then such Administrative Claim shall be deemed not Allowed and shall be forever barred and not enforceable against any of the Debtors, the Assets, or the Reorganized Debtor.

Any objection to a timely filed Administrative Claim must be filed within the later of (i) ninety (90) days after the date such Administrative Claim is Filed and properly served, or (ii) ninety (90) days after the Effective Date.  The Reorganized Debtor and/or the Plan Oversight Committee shall have the right to seek an extension from the Bankruptcy Court of the time to File an objection to a timely filed Administrative Claim.  The Reorganized Debtor shall have

the right to pay any timely filed Administrative Claim if both the Reorganized Debtor and the Plan Oversight Committee agree that neither has an objection to such Administrative Claim. Otherwise, the Reorganized Debtor shall pay any timely filed Administrative Claim only after the deadline to file an objection to such Administrative Claim has passed with no objection having been filed, or the Administrative Claim is allowed by Final Order of the Bankruptcy Court.

**3.      Amount of Administrative Claims other than Professional Fees.**

The Proponents believe that there are less than $35,000 of unpaid Administrative Claims other than Professional Fees and regular recurring expenses of the Debtors' estates.

Regular recurring administrative expenses, other than Professional Fees, primarily consist of consulting fees for Nanci Salvucci and Marcus Smith, transfer agent fees and charges, Bowne (printers who file 8-Ks) fees, the Claims Administrator's fees, storage expenses for the Debtors' records, Delaware taxes, U.S. Trustee fees, and expenses of the Debtors' payroll service, ADP, Inc. These regular recurring administrative expenses approximate $35,000 to $50,000 on a monthly basis and are generally paid within 30 days of becoming due.

**4.      Statutory Fees**

All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date. Payments required after the Effective Date shall be made as required by statute and shall be paid by the Reorganized Debtor.

**5.      Treatment of Professional Fees.**

All Professional Fees which have been Allowed prior to the Effective Date but which have not been paid by the Effective Date shall be paid on the Effective Date.

Except (i) as otherwise provided by Bankruptcy Court order for a specific Professional, and (ii) any Professional Fees for the Debtors' and/or Creditors' Committee's counsel arising out of or earned in connection with the Preference Actions or Avoidance Actions, any Professional requesting Professional Fees for services rendered prior to the Effective Date must file and serve an application for final allowance of compensation and reimbursement of expenses no later than ninety (90) days after the Effective Date. Professionals who do not file such requests by such date shall be forever barred from seeking payment for such Professional Fees, but shall not be required to disgorge any fees or expenses which were previously paid to such Professional pursuant to Bankruptcy Court order. Professional Fees incurred before the Effective Date (including Professional Fees incurred in connection with pursuit of the Preference Actions and/or Avoidance Actions) will only be paid after they have been approved pursuant to Bankruptcy Court order. Professional Fees incurred after the Effective Date (including Professional Fees incurred in connection with pursuit of the Preference Actions and/or Avoidance Actions) may be paid by the Reorganized Debtor in the ordinary course of business without any further Bankruptcy Court order.

**6.      Amount of Professional Fees.**

During the course of the Chapter 11 Cases, the various Professionals applied for payment of Professional Fees multiple times. The following chart shows (i) the names of all of the Professionals employed during the Chapter 11 Cases; (ii) the total amount of fees and expenses that the Professionals have incurred through September 30, 2006; and (iii) the projected amount of additional fees and expenses the Professionals expect to incur through the Effective Date (excluding any fees or expenses relating to the Preference Actions or the Avoidance Actions, which, as set forth above, are being pursued on a contingency basis).

| PROFESSIONAL'S NAME | TOTAL AMOUNT OF FEES AND EXPENSES INCURRED FOR SERVICES RENDERED THROUGH SEPTEMBER 30, 2006 AND PAID | PROJECTED AMOUNT OF ADDITIONAL FEES AND EXPENSES TO BE INCURRED THROUGH THE EFFECTIVE DATE (EXCLUDING ANY FEES OR EXPENSES RELATING TO THE PRFERENCE ACTIONS OR THE AVOIDANCE ACTIONS) |
|---|---|---|
| Pillsbury Winthrop Shaw Pittman LLP ("PW") Counsel to the Debtors | $4,490,382, not including $511,000 of fees and expenses which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed | $600,000 |
| Davis & Associates Accountant and Tax Consultant and Advisor to the Debtors | $0 | $0 |
| Perisho Tombor Loomis & Ramirez 401(K) Plan Auditors for the Debtors | $43,444 | $16,000 |
| Syzygy Consulting Group Employment and Compensation Consultant and Advisor to the Debtors | $14,345 | $0 |
| Ding & Ding Law Offices Special Taiwanese Securities Counsel to the Debtors | $17,747 | $0 |
| Fenwick & West Special Counsel to the Debtors | $535,696 | $0 |
| O'Melveny & Myers LLP Special Counsel to the Debtors | $1,111,682, not including $476,435 of fees and expenses which have been (i) deferred for decision, (ii) or not yet allowed or disallowed | $350,000 |
| Houlihan Lokey Howard & Zukin Capital Financial Consultant to the Debtors | $1,000,000 | $0 |
| Stuart, Maue, Mitchell & James, Ltd. Fee Auditor to the Debtors' Estates | $41,694 | $25,500 |

-46-    DISCLOSURE STATEMENT FOR DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

| PROFESSIONAL'S NAME | TOTAL AMOUNT OF FEES AND EXPENSES INCURRED FOR SERVICES RENDERED THROUGH SEPTEMBER 30, 2006 AND PAID | PROJECTED AMOUNT OF ADDITIONAL FEES AND EXPENSES TO BE INCURRED THROUGH THE EFFECTIVE DATE (EXCLUDING ANY FEES OR EXPENSES RELATING TO THE PRFERENCE ACTIONS OR THE AVOIDANCE ACTIONS) |
|---|---|---|
| Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") Counsel to the Creditors' Committee | $1,281,048 not including fees and expenses which have been (i) deferred for decision (amounting to approximately $90,225), (ii) denied without prejudice, or (iii) not yet allowed or disallowed | $500,000 |
| Alliant Partners Financial Advisor to the Creditors' Committee | $97,000 | $0 |
| Grobstein, Horwath & Company LLP ("GHC") Accounting and Litigation Consultants to the Debtors and the Creditors' Committee | $187,998 | $250,000 |
| Krieg, Keller, Sloan, Reilley & Roman LLP Special Intellectual Property Litigation Counsel to the Creditors' Committee | $227,822 | $50,000 |
| J&J Attorneys At Law Special Taiwanese Securities Counsel to the Creditors' Committee | $6,792 | $4,000 |
| | | |
| **TOTAL** | $9,055,650, not including fees and expenses which have been (i) deferred for decision, (ii) denied without prejudice, or (iii) not yet allowed or disallowed | $1,795,500 |

It is extremely difficult to project future Professional Fees, especially where as here there is pending or contemplated litigation, primarily pertaining to outstanding objections to Claims. The projected amounts set forth above are just the best estimates available to the

Proponents at the time of the preparation of this Disclosure Statement. As such, the actual additional Professional Fees incurred by the Professionals through the Effective Date may turn out to be more or less than the projected amounts described above. As described above, all Professional Fees incurred prior to the Effective Date must be approved and Allowed by the Bankruptcy Court before they may be paid. There are two primary reasons why the fees and expenses of LNBRB after September 30, 2006 are projected to be higher, on a monthly basis, than LNBRB's fees and expenses were prior to September 30, 2006. First, LNBRB has played a primary role (together with PW) in connection with the entire Plan confirmation process, including, but not limited to, formulating and drafting the Plan and the Disclosure Statement and seeking Bankruptcy Court approval of them. Second, as described above, LNBRB has taken over from PW the role of analyzing and prosecuting any objection to the Junior Notes Claims and the Senior Notes Claims, which involves a significant amount of money and complex legal issues and analyses. There are three primary reasons why the fees and expenses of GHC after September 30, 2006 are projected to be higher, on a monthly basis, than GHC's fees and expenses were prior to September 30, 2006. First, GHC performed an extensive analysis of the Debtors' prior business operations and accounting and record keeping to assist the Proponents in their analyses and evaluation of whether it was appropriate for the Debtors to be substantively consolidated. Second, GHC is actively working in conjunction with LNBRB in connection with the analysis and prosecution of any objection to the Junior Notes Claims and the Senior Notes Claims. Third, GHC will be preparing consolidated tax returns for the Debtors.

The current recoveries from the pursuit of Preference Actions are estimated at more than $6 million plus the disallowance of more than $10 million of Claims. The Proponents estimate that the current anticipated Professional Fees earned from the prosecution of such Preference Actions will be less than $3 million (which Professional Fees will increase if the recoveries from the pursuit of Preference Actions). The Proponents therefore believe that the total Professional Fees paid from the prosecution of Preference Actions, including Professional Fees earned from the reduction of Allowed Claims, will be less than the gross recoveries obtained from increases). These Professional Fees are based on: (a) the actual recoveries from the Preference Actions multiplied by a decreasing sliding scale between 35% and 15% of the amount recovered[6]; plus (b) 27% of the amounts that would have been distributed on Claims disallowed from the Preference Actions; plus (c) an analysis fee of $75 for each file of each transferee of potentially avoidable preferential transfers; plus (d) all reasonable actual third-party expenses incurred in the pursuit of Preference Actions. As a result, the Proponents anticipate, including, but not limited to, filing fees, Bankruptcy Court costs, depositions costs, service costs, travel expenses, witness fees, photocopying, and postage charges. Accordingly, the Proponents believe that their results obtained from the pursuit of Preference Actions will result in ana significant increase in the distributions that will be made to Holders of Allowed Claims, both by contributing a net recovery to the Assets of the Reorganized Debtor's estate and by reducing the total amount of Allowed Claims.

**7.    Amount and Treatment of Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim shall receive Cash on the later of the Effective Date and the date of Allowance of such Priority Tax Claim equal to the Allowed Amount of such Priority Tax Claim. Approximately twenty-two (22) proofs of Priority Tax

---

[6] The contingency formula is 35% of the first $50,000 recovered; 25% of the next $50,000 recovered; 20% of the next $200,000 recovered; and 15% of all recoveries in excess of $300,000, with these percentages to remain unchanged if the recoveries are received after a judgment is obtained; except that the overall contingency fee may not exceed 27% of the total amount of Preference Action recoveries. The foregoing contingency fee percentages are to be computed on a per-defendant basis, not on a per-preferential transfer basis.

Claims have been filed in an aggregate amount of approximately $180,000. Any Priority Tax Claims the Proponents intend to object to are identified in Exhibit "C". The Proponents estimate that the ultimate amount of Allowed Priority Tax Claims will be approximately $146,000.

**H.    Effect of Confirmation of the Plan.**

    **1.    Vesting of Assets in the Reorganized Debtor.**

On the Effective Date, all Assets of the Debtors and their estates shall vest as one consolidated legal entity in the Reorganized Debtor. Such Assets shall include, but not be limited to, all Cash and the Rights of Action. The Assets shall be managed and used for the sole purposes of carrying out and effectuating the distributions provided for in the Plan.

    **2.    Authority to Effectuate the Plan.**

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without further approval or order from the Bankruptcy Court. The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to carry out the Plan and to effectuate the distributions provided for under the Plan, subject to the provisions of the Plan. The Reorganized Debtor is expressly authorized to sell or dispose of any and all Assets and to pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court, subject to the provisions of the Plan; provided, however, that any sale, settlement, distribution or transaction where the amount received, paid or distributed exceeds $100,000 shall be subject to the approval of the Plan Oversight Committee or the approval of the Bankruptcy Court.

    **3.    The Non-Debtor Subsidiaries.**

The Except as set forth below, the Plan will have no effect on the Debtors' subsidiaries other than the Debtors.

The Plan requires the Reorganized Debtor to wind up and dissolve the Seller Subsidiaries. This requirement is consistent with the premises of the Patent Sale motion, and is believed to be advisable in light of the sale of the Seller Subsidiaries' Patents in the Patent Sale. As noted herein, at the time of the Patent Sale, the Debtors identified all known secured and tax claims against the Seller Subsidiaries and satisfied those claims. The Debtors believe that there are no significant, if any, remaining claims against any of the Seller Subsidiaries.

Notwithstanding the foregoing, the Reorganized Debtor will be authorized to operate any subsidiaries (including subsidiaries of subsidiaries) to the extent that the Reorganized Debtor believes there is value to be garnered for the Reorganized Debtor's estate for doing so, after consultation with and input from the Plan Oversight Committee. The Reorganized Debtor will also be authorized to wind up and/or dissolve any of the Debtors' other subsidiaries (including subsidiaries of subsidiaries) as determined by the Reorganized Debtor, in its reasonable discretion, after consultation with and input from the Plan Oversight Committee.

    **4.    Dissolution of the Creditors' Committee; Formation of the Plan Oversight Committee.**

On the Effective Date, the Creditors' Committee will be deemed dissolved and its members will be released and discharged from all further duties and obligations arising from or related to the Chapter 11 Cases.

On the Effective Date, the Plan Oversight Committee shall be deemed created. The Plan Oversight Committee shall be comprised of all members of the Creditors' Committee except those who elect not to serve on the Plan Oversight Committee. The Plan Oversight Committee shall monitor all aspects of the Reorganized Debtor's activities, including without limitation: liquidation of the Assets; prosecution, settlement and abandonment of Rights of

Action; prosecution and resolution of objections and other disputes pertaining to Claims; and distribution of the Debtors' Assets to Creditors in accordance with the provisions of the Plan.

As described above, the Plan Oversight Committee will continue with the prosecution of any disputed, contingent or unliquidated Claims which have been objected to prior to the Effective Date by the Creditors' Committee but which had not been liquidated to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and such Claims objections for this purpose, regardless of whether such Claims objections were commenced prior to or subsequent to the Effective Date. Similarly, the Plan Oversight Committee will continue with the prosecution of any Avoidance Actions, including Preference Actions, which were commenced prior to the Effective Date by the Creditors' Committee but which have not been resolved to Final Order by the Effective Date, and the Bankruptcy Court will retain jurisdiction over the Plan Oversight Committee and the Avoidance Actions for this purpose, regardless of whether such Avoidance Actions were commenced prior to or subsequent to the Effective Date. Finally, along with the Reorganized Debtor, the Plan Oversight Committee shall have standing and authority to commence any objections to Claims after the Effective Date which the Plan Oversight Committee deems appropriate which were not commenced prior to the Effective Date.

~~Entities who served as~~ Professionals ~~to~~representing the Creditors' Committee prior to the Effective Date ~~shall also serve~~on matters which involved contingency fee arrangements (including Avoidance Actions and objections to Claims which were joined with Avoidance Actions) which were not completed or resolved to Final Order prior to the Effective Date shall, in the capacity as Professionals to the Plan Oversight Committee ~~and~~, complete such matters (including the prosecution of Avoidance Actions and objections to Claims which were joined with Avoidance Actions) after the Effective Date. Such Professionals shall be compensated from the Reorganized Debtor's estate for all fees and expenses incurred ~~after the Effective Date~~by such Professionals after the Effective Date in accordance with their contingency fee arrangements which were previously approved by the Bankruptcy Court without the need for any further order of the Bankruptcy Court ~~on the same terms and conditions as such counsel was employed and compensated prior to the Effective Date (including the contingency fee sharing arrangement with Debtors' counsel with respect to the prosecution of Avoidance Actions).~~.

In addition, LNBRB shall represent the Plan Oversight Committee in connection with the analysis and prosecution of any objections to the claims of the Senior Noteholders and/or the Junior Noteholders unless the members of the Plan Oversight Committee who are not Senior Noteholders elect to have alternative counsel represent the Plan Oversight Committee for these purposes. LNBRB (or such other counsel) shall be compensated from the Reorganized Debtor's estate on a timely basis for all fees and expenses incurred after the Effective Date with respect to such legal work provided to the Plan Oversight Committee without the need for any further order of the Bankruptcy Court.

Any and all other Professionals employed by the Plan Oversight Committee shall be selected by the Plan Oversight Committee and shall be compensated from the Reorganized Debtor's estate on a timely basis for all fees and expenses incurred by such Professionals after the Effective Date without the need for any further order of the Bankruptcy Court in accordance with employment terms agreed to by the Plan Oversight Committee.

Except as set forth above, any vote of the Plan Oversight Committee shall be made by a majority of those members of the Plan Oversight Committee who elect to participate in the vote. The Plan Oversight Committee shall be deemed dissolved upon the entry of the Final Decree.

**5.    Termination of the Debtors' Public Entities on the Effective Date.**

On the Effective Date, the Debtors shall cease to exist as public companies. Unless the

-50-    DISCLOSURE STATEMENT ~~FOR~~DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

Proponents reach an agreement with a third-party to acquire some or all the Equity Interests prior to the Plan confirmation hearing (in which case the Proponents will file a modification to the Plan with the Bankruptcy Court)[7], on the Effective Date, any and all Equity Interests in the Debtors will be deemed cancelled and extinguished and of no further force or effect, without the need for the Debtors or the holders of the Equity Interests to take any further action. On the Effective Date, the Debtors (and the Reorganized Debtor) shall be relieved of any further securities related reporting obligations to the SEC or otherwise, and the Debtors (and the Reorganized Debtor) shall not be required to file any further documents or papers with the SEC or otherwise regarding any further securities related matters. Provided Marcus Smith is serving as the Responsible Individual to the Reorganized Debtor, then notwithstanding anything contained in the Plan or this Disclosure Statement to the contrary, Marcus Smith will be permitted to cause the Reorganized Debtor to retain counsel of his choice to represent the Reorganized Debtor with respect to any document that would be filed with the SEC.

**I.      Implementation and Means of Execution of the Plan.**

      **1.      Principals of the Reorganized Debtor.**

The Proponents currently anticipate that Marcus Smith will be employed by the Reorganized Debtor as its Chief Financial Officer and Responsible Individual through the entry of a Final Decree closing the Chapter 11 Cases unless he voluntary quits or is involuntarily terminated by the Plan Oversight Committee for "cause". "Cause" shall mean that he has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Reorganized Debtor or the bankruptcy estate, with any such dispute to be resolved by the Bankruptcy Court. Consistent with the terms of his current employment with the Debtors, Marcus Smith will work on an hourly basis for the Reorganized Debtor, as needed depending upon the work required of him during the week, but in no event is he to be paid for less than eight hours of work per week. He will continue to be compensated on an hourly basis at the rate of $250 per hour (with any future increase to be subject to the approval of the Bankruptcy Court), and he will continue to receive health, vision and dental insurance. His employment responsibilities will remain the same as those described above. If Marcus Smith quits or is involuntarily terminated, a replacement will be selected by the Plan Oversight Committee subject to the approval of the Bankruptcy Court.

The Proponents also currently anticipate that Nanci Salvucci will be employed by the Reorganized Debtor as its Controller through the entry of a Final Decree closing the Chapter 11 Cases unless she voluntary quits or is involuntarily terminated by the Plan Oversight Committee for "cause". "Cause" shall mean that she has been found to have committed gross negligence or has acted fraudulently and/or maliciously with respect to the Reorganized Debtor or the bankruptcy estate, with any such dispute to be resolved by the Bankruptcy Court. Consistent with the terms of her current employment with the Debtors, Nanci Salvucci will work on an hourly basis for the Reorganized Debtor, as needed depending upon the work required of her. She will continue to be compensated on an hourly basis at the rate of $175 per hour (with any future increase to be subject to the approval of the Bankruptcy Court), and she will continue to receive health and dental insurance. Her employment responsibilities will remain the same as those described above. If Nanci Salvucci quits or is involuntarily terminated, a replacement may be selected by the Plan Oversight Committee subject to the approval of the Bankruptcy Court.

---

[7] The Proponents have received an offer from a third party to acquire 95% of the Equity Interests for the cash sum of $50,000. The Proponents believe that the complexities involved in effectuating this transaction, including the need to create an independent legal entity to complete the administration of these estates, such as a liquidating trust, would result in a cost to these estates of excess of $50,000. As a result, the Proponents have not accepted this offer.

**2.    Funding of the Plan.**

The Plan shall be funded with the Assets, including the Cash, and the net recovery (after payment of all fees and expenses, including fees and expenses of the Professionals) from the pursuit of the Rights of Action and the proceeds thereof.

**3.    The Rights of Action.**

Those Rights of Action which were commenced by the Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel for matters involving contingency fee arrangements and with counsel selected by the Plan Oversight Committee for matters not involving contingency fee arrangements) by the Plan Oversight Committee (which shall have legal standing to do so) until all such Rights of Action have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders).

Those Rights of Action which were commenced by the Debtors prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted (with the same counsel for matters involving contingency fee arrangements and with counsel selected by the Reorganized Debtor and approved by the Plan Oversight Committee for matters not involving contingency fee arrangements) by the Reorganized Debtor until all such Rights of Action have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). The terms of compensation for ~~counsel~~matters involving contingency fee arrangements shall remain the same as the Bankruptcy Court previously approved. The terms of compensation for all other matters shall be as decided between the respective professionals and the Plan Oversight Committee (for professionals employed by the Plan Oversight Committee), and shall be as decided between the respective professionals and the Reorganized Debtor, subject to the approval of the Plan Oversight Committee (for professionals employed by the Reorganized Debtor).

The Bankruptcy Court shall retain jurisdiction over all such pending Rights of Action following the Effective Date. Any settlement of any pending Rights of Action shall continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.

The Reorganized Debtor shall be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, any and all Rights of Action which were not commenced prior to the Effective Date. The Bankruptcy Court shall retain jurisdiction over all such Rights of Action which are commenced after the Effective Date.

The Reorganized Debtor may, but shall not be required to, set-off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any Rights of Action the Reorganized Debtor may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Reorganized Debtor of any such Rights of Action, set-off or recoupment which the Reorganized Debtor may have against such Holder.

~~Nothing~~Except as expressly provided in the Plan, nothing in this Disclosure Statement, the Plan, the Plan Confirmation Order or any other order or document shall constitute or be deemed to constitute a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors ~~and/or,~~ the Creditors' Committee or any other party in interest, including the Junior Notes Indenture Trustee or the Senior Noteholders, or any of them, had prior to the Effective Date. On the Effective Date, all such claims, causes of action, rights and defenses held by the Debtors and the Creditors' Committee shall be deemed transferred and conveyed to the Reorganized Debtor and the Plan Oversight Committee as successors in interest.

**4. Post-Effective Date ~~Expenses and Professional Fees~~Employment of Professionals By the Plan Oversight Committee and/or the Reorganized Debtor and Payment of Fees and Expenses Incurred By Such Professionals.**

~~Subject to the provisions of the Plan, all reasonable fees for services rendered and expenses, including Professional Fees, incurred after the Effective Date by counsel to the Plan Oversight Committee and counsel to the Reorganized Debtor shall be paid by the Reorganized Debtor on a timely basis without any further order of the Bankruptcy Court.~~

**i. Professionals Representing the Plan Oversight Committee.**

Professionals representing the Creditors' Committee prior to the Effective Date on matters which involved contingency fee arrangements (including Avoidance Actions and objections to Claims which were joined with Avoidance Actions) which were not completed or resolved to Final Order prior to the Effective Date shall, in the capacity as Professionals to the Plan Oversight Committee, complete such matters (including the prosecution of Avoidance Actions and objections to Claims which were joined with Avoidance Actions) after the Effective Date. Such Professionals shall be compensated from the Reorganized Debtor's estate for all fees and expenses incurred by such Professionals after the Effective Date in accordance with their contingency fee arrangements which were previously approved by the Bankruptcy Court without the need for any further order of the Bankruptcy Court. In addition, LNBRB shall represent the Plan Oversight Committee in connection with the analysis and prosecution of any objections to the claims of the Senior Noteholders and/or the Junior Noteholders unless the members of the Plan Oversight Committee who are not Senior Noteholders elect to have alternative counsel represent the Plan Oversight Committee for these purposes. LNBRB (or such other counsel) shall be compensated from the Reorganized Debtor's estate on a timely basis for all fees and expenses incurred after the Effective Date with respect to such legal work provided to the Plan Oversight Committee without the need for any further order of the Bankruptcy Court. Any and all other Professionals employed by the Plan Oversight Committee shall be selected by the Plan Oversight Committee and shall be compensated from the Reorganized Debtor's estate on a timely basis for all fees and expenses incurred by such Professionals after the Effective Date without the need for any further order of the Bankruptcy Court in accordance with employment terms agreed to by the Plan Oversight Committee.

**ii. Professionals Representing the Reorganized Debtor.**

Professionals representing the Debtors prior to the Effective Date on matters which involved contingency fee arrangements (including Avoidance Actions and objections to Claims which were joined with Avoidance Actions) which were not completed or resolved to Final Order prior to the Effective Date shall, in the capacity as Professionals to the Reorganized Debtor, complete such matters (including the prosecution of Avoidance Actions and objections to Claims which were joined with Avoidance Actions) after the Effective Date. Such Professionals shall be compensated from the Reorganized Debtor's estate for all fees and expenses incurred by such Professionals after the Effective Date in accordance with their contingency fee arrangements which were previously approved by the Bankruptcy Court without the need for any further order of the Bankruptcy Court. Any and all other Professionals employed by the Reorganized Debtor shall be selected by the Reorganized Debtor and approved by the Plan Oversight Committee and shall be compensated from the Reorganized Debtor's estate on a timely basis for all fees and expenses incurred by such Professionals after the Effective Date without the need for any further order of the Bankruptcy Court in accordance with employment terms agreed to by the Reorganized Debtor and the Plan Oversight Committee.

**5. Limitation of Liability for the Reorganized Debtor and the Plan Oversight Committee.**

Subject to any applicable law, neither the Reorganized Debtor, its employees, the Plan

Oversight Committee nor any of their members, employees, professionals or agents will be liable for any action or omission in such capacity, while acting in good faith and in the exercise of reasonable judgment. Neither the Reorganized Debtor, its employees, the Plan Oversight Committee nor any of their members, employees, professionals or agents will be liable for activities relating to administration of the Plan in any event except for gross negligence, fraud or willful misconduct.

6. **Dissolution of the Debtors and the Reorganized Debtor.**

Upon the entry of the Final Decree, each of the Debtors and the Reorganized Debtor shall be deemed dissolved without any further action required on the part of the Debtors, the shareholders of the Debtors, the officers or directors of the Debtors, the Reorganized Debtor or the Plan Oversight Committee.

7. **Corporate Action.**

Each of the matters provided for under ~~this~~the Plan involving any corporate action to be taken or required by any Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by stockholders, officers or directors of any of the Debtors.

**ARTICLE VII**
**CLAIMS RESOLUTION AND DISTRIBUTIONS**

**A.    Late Claims Void.**

Unless otherwise expressly ordered by the Bankruptcy Court or otherwise provided by the Plan, any Claim filed after the applicable Claims Bar Date shall be void and of no force or effect, and shall receive no distributions under the Plan.

**B.    Prosecution of Objections to Claims.**

Those Claim objections which were commenced by the Creditors' Committee prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted ~~(with the same counsel)~~ by the Plan Oversight Committee (which shall have legal standing to do so) until all such Claim objections have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders). Those Claim objections which were commenced by the Debtors prior to the Effective Date but which are not resolved to Final Order by the Effective Date shall continue to be prosecuted ~~(with the same counsel)~~ by the Reorganized Debtor until all such Claim objections have been resolved to Final Order, whether through settlement or Bankruptcy Court order (as well as any appellate orders).

Counsel representing the Plan Oversight Committee and/or the Reorganized Debtor shall be compensated for post-Effective Date Claim objections work on an hourly basis in accordance with standard billing practices, and shall be paid by the Reorganized Debtor in the ordinary course of business without any further order of the Bankruptcy Court. The Bankruptcy Court shall retain jurisdiction over all such pending Claim objections following the Effective Date. ~~Any~~Except as set forth below with respect to the Claim Order, any settlement of any ~~pending~~ Claim objections, whether initiated before or after the Effective Date, shall continue to be subject to the approval of the Bankruptcy Court even if such settlements are finalized after the Effective Date.

Both the Plan Oversight Committee and the Reorganized Debtor shall be authorized and empowered, and have legal standing, to pursue and prosecute, to settle, or to decline to pursue, any and all Claim objections which were not commenced prior to the Effective Date. The Bankruptcy Court shall retain jurisdiction over all such Claim objections which are commenced after the Effective Date.

Nothing in this Disclosure Statement, the Plan, the Plan Confirmation Order or any

other order or document shall constitute or be deemed to constitute a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors and/or the Creditors' Committee had prior to the Effective Date.  On the Effective Date, all such claims, causes of action, rights and defenses shall be deemed transferred and conveyed to the Reorganized Debtor and the Plan Oversight Committee as the successor in interest.

On March 14, 2006, the Bankruptcy Court entered an order ("Claim Order") entitled "Order Granting Motion Waiving Notice of Claim Settlements".  The Claim Order authorized the Debtors or the Creditors' Committee to settle Claim disputes without notice to Creditors so long as the Creditors' Committee and the Debtors, or their respective counsel, both sign a written settlement agreement or stipulation.  The terms of the Claim Order shall be applicable to the Reorganized Debtor and the Plan Oversight Committee for Claim settlements reached after the Effective Date.

**C.    Estimation of Claims.**

The Reorganized Debtor or the Plan Oversight Committee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtors, the Creditors' Committee or any other party in interest, including the Junior Notes Indenture Trustee and the Senior Noteholders, or any of them, previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction over the Debtors' estates and these Chapter 11 Cases to estimate any Claim at any time prior to the entry of a Final Decree closing these Chapter 11 Cases.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount will constitute either the Allowed amount of such Claim (for Plan voting, Plan distribution or both) or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount is not binding for Plan distribution purposes, the Reorganized Debtor and/or, the Plan Oversight Committee or any other party in interest, including the Junior Notes Indenture Trustee and the Senior Noteholders, or any of them, may elect to pursue any supplemental ruling of the Bankruptcy Court, including any supplemental objection to the Claim, in connection with Plan distribution purposes.

**D.    Allowed and Disputed Claims.**

A Claim shall be deemed Allowed if either (i) such Claim is listed in the Debtors' Schedules (as most recently amended) as liquidated, undisputed and non-contingent, and no objection has been filed to such Claim, or (ii) the Holder of such Claim has filed a proof of such Claim on or before the applicable Claims Bar Date; provided, however, that no objection to such Claim has been filed and no motion has been filed to estimate or subordinate such Claim.  A Claim which is subject to an objection or a motion for estimation or subordination which has not been Allowed or Disallowed by a Final Order shall be deemed Disputed until resolved by Final Order.  All Claims that are not Allowed or Disputed are deemed Disallowed.  No Claim shall be deemed Allowed by virtue of the Plan and/or confirmation of the Plan.

**E.    Provisions Regarding Distributions.**

**1.    No Distributions on Disputed or Disallowed Claims.**

If any Claim is a Disputed Claim, no distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim, unless a portion of the Claim which is Disputed is not Disputed, in which case that portion of the Claim which is not Disputed shall be treated as an Allowed Claim for distribution purposes.  Once a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall receive a distribution in the manner described below.  No distributions under the Plan shall be made on account of a ClaimClaims that has have been Disallowed.

**2.    Distributions on Account of Allowed Secured Claims.**

The Reorganized Debtor shall pay Cash to each Holder of a Class 1 Allowed Claim (i.e., Allowed Secured Claim) equal to the Allowed Amount of such Class 1 Allowed Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Secured Claim.

### 3. Distributions on Account of Allowed Priority Claims.

The Reorganized Debtor shall pay Cash to each Holder of a Class 2 Allowed Claim (i.e., Allowed Priority Claim) equal to the Allowed Amount of such Class 2 Allowed Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Priority Claim.

### 4. Distributions on Account of Allowed Priority Tax Claims.

The Reorganized Debtor shall pay Cash to each Holder of an Allowed Priority Tax Claim equal to the amount of such Allowed Priority Tax Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Priority Tax Claim.

### 5. Distributions on Account of Allowed Administrative Claims.

The Reorganized Debtor shall pay Cash to each Holder of an Allowed Administrative Claim equal to the amount of such Allowed Administrative Claim, and the Reorganized Debtor shall make such payment on the later of the Effective Date and the date of Allowance of such Administrative Claim.

### 6. Distributions on Account of Allowed Convenience Class Claims.

The Reorganized Debtor shall pay Cash to each Holder of a Class 6 Allowed Claim (i.e., Convenience Class Claim) equal to 50% of the amount of such Class 6 Allowed Claim (provided that no such distribution may under any circumstance exceed $1,250), and the Reorganized Debtor shall make such payment within ninety days following the later of the Effective Date and the date of Allowance of such Convenience Class Claim.

### 7. Distributions to Holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims.

Within ninety days following the Effective Date, the Reorganized Debtor shall distribute all of the Net Remaining Assets which are left after the Reorganized Debtor has made all of the payments described above and established and funded the Estate Reserve (defined below) to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims on a Pro Rata Share basis, subject to the Subordination Provisions. In the event that at the time funds are distributed to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims any Disputed Claims exist or any Claims exist which are held by defendants in Preference Actions, the Reorganized Debtor shall make an interim distribution (the "Interim Distribution") to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims within ninety days following the Effective Date, and then make a final distribution after all such Disputed Claims and Preference Actions are resolved to Final Order, and the Reorganized Debtor is ready to proceed with seeking the entry of a Final Decree closing these Chapter 11 Cases. For purposes of computing the amount of the Interim Distribution, the Reorganized Debtor shall treat all Disputed Claims as Allowed Claims in the amounts asserted by the Claim Holder, and the Reorganized Debtor shall assume that all Claims which are held by defendants in Preference Actions will ultimately become Allowed Claims in the amounts asserted. The Reorganized Debtor shall pay into a segregated account (the "Creditor Account") the amount of money that would otherwise have been paid to the holders of Disputed Claims had they not been Disputed, and to holders of Claims who are the defendants in Preference Actions if not for the existence of the Preference Actions. Once any such Disputed Claims or Claims of defendants in Preference Actions become resolved to Final Order, the Reorganized Debtor will

make a distribution to each such Claim Holder from the funds in the Creditor Account in the same percentage amount that was made earlier to Holders of Class 3 Allowed Claims, Holders of Class 4 Allowed Claims and Holders of Class 5 Allowed Claims.

Within thirty days after the Effective Date, an initial distribution (the "Initial Unsecured Creditor Distribution") will be made to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims (which payment shall be actually paid to the Holders of Class 3 Allowed Claims as described above, except to the extent provided in Sections IV(D)(3)(b) and IV(D)(5)(b) of the Plan). In computing the amount of the Initial Unsecured Creditor Distribution, the Reorganized Debtor shall retain sufficient funds (defined below as the "Estate Reserve") to fund the payments required to be made under the Plan on account of Class 1 Allowed Claims, Class 2 Allowed Claims, Class 6 Allowed Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Reorganized Debtor to pay all post-Effective Date fees and expenses, including, without limitation, fees and expenses incurred or to be incurred by professionals employed by the Reorganized Debtor and/or the Plan Oversight Committee through the closing of these Chapter 11 Cases and entry of a Final Decree. In computing the percentage distribution to be made to each holder of a Class 3 Allowed Claim, Class 4 Allowed Claim and Class 5 Allowed Claim, all Disputed Claims shall be computed as if they are Allowed Claims in the amounts asserted by the Claim Holders, and all defendants in Avoidance Actions shall be considered to have Class 4 Allowed Claims in the amounts sought to be recovered from such defendants. As soon as possible after the holder of a Disputed Claim obtains a Class 3 Allowed Claim, a Class 4 Allowed Claim or a Class 5 Allowed Claim, such Claim Holder shall receive a distribution equal to the amount that such Claim Holder would have received at the time the Initial Unsecured Creditor Distribution was made if such Claim Holder had such Allowed Claim at the time of the Initial Unsecured Creditor Distribution. As soon as possible after the defendant in an Avoidance Action obtains a Class 4 Allowed Claim as a result of money paid to the Debtors from such Avoidance Action or as part of any settlement which is approved by the Bankruptcy Court, such defendant shall receive a distribution equal to the amount that such defendant would have received at the time the Initial Unsecured Creditor Distribution was made if such defendant had such a Class 4 Allowed Claim at the time of the Initial Unsecured Creditor Distribution. If at the time of the Initial Unsecured Creditor Distribution, a Creditor (including, but not limited to, a Senior Noteholder or a Junior Noteholder) holds a Class 3 Claim, Class 4 Claim or Class 5 Claim which is only partially Disputed, then such Creditor shall receive an initial distribution on account of the undisputed portion of its Claim, with the disputed portion of its Claim treated in the manner described above. Any dispute over whether there is an undisputed portion of any such Claim, or the extent of any undisputed portion of any such Claim, shall be resolved by the Bankruptcy Court. A final distribution (the "Final Unsecured Creditor Distribution") will be made to the holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims (which payment shall be actually paid to the Holders of Class 3 Allowed Claims as described above, except to the extent provided in Sections IV(D)(3)(b) and IV(D)(5)(b) of the Plan) within thirty days after (i) all Class 1 Allowed Claims, Class 2 Allowed Claims, Class 6 Allowed Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, fees to the United States Trustee, and post-Effective Date fees and expenses incurred by professionals employed by the Reorganized Debtor or the Plan Oversight Committee have been paid in full, (ii) all Disputed Claims have been resolved to Final Order, and (iii) all Avoidance Actions have been resolved to Final Order, provided that the Reorganized Debtor shall retain sufficient funds to enable the Reorganized Debtor to obtain entry of a Final Decree. The Reorganized Debtor, with input and consent from the Plan Oversight Committee, shall have the right to make further interim distributions to holders of Class 3 Allowed Claims, Class 4 Allowed Claims and Class 5 Allowed Claims after the Initial Unsecured Creditor Distribution and before the Final Unsecured Creditor Distribution provided the Reorganized Debtor, with input and consent from the Plan Oversight Committee, concludes that doing so is in the best

interests of the Debtors' estates.

### 8.    Estate Reserve.

Until such time as a Final Decree is entered by the Bankruptcy Court closing these Chapter 11 Cases, the Reorganized Debtor shall establish and maintain at all times an adequate reserve ("Estate Reserve") to fund the payments required to be made under the Plan on account of Class 1 Allowed Claims, Class 2 Allowed Claims, Class 6 Allowed Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Reorganized Debtor to pay all post-Effective Date fees and expenses, including, without limitation, those incurred or to be incurred by professionals employed by the Reorganized Debtor or the Plan Oversight Committee through the closing of these Chapter 11 Cases and entry of a Final Decree. The amounts of the Estate Reserve shall be determined by the Reorganized Debtor in its sole and absolute discretion after consultation with and input from the Plan Oversight Committee. Any dispute over the appropriate amount of money to be maintained in the Estate Reserve shall be resolved by the Bankruptcy Court following notice and a hearing. Neither the Reorganized Debtor nor the Plan Oversight Committee shall have any liability in the event any Estate Reserve proves to be inadequate unless such inadequacy was the result of gross negligence, recklessness or willful malfeasance. All recoveries obtained from the pursuit of Avoidance Actions shall remain in a segregated account(s) until the Bankruptcy Court has ruled upon the fee application of the professionals employed in these Chapter 11 Cases to pursue such Avoidance Actions and such professionals have been paid their Allowed fees and expenses out of such recoveries, except for post-Effective Date fees and expenses incurred in the pursuit of Avoidance Actions which may be paid without further Bankruptcy Court order.

### 9.    Effectuation of Distributions.

The Reorganized Debtor shall serve as the disbursing agent and shall make all distributions in accordance with the terms of the Plan. All distributions shall be made without any requirement for bond or surety with respect thereto. The making of the distributions under this the Plan shall be part of the job responsibilities of Marcus Smith and Nanci Salvucci.

### 10.    Distributions on Later-Allowed Claims.

In the event a Disputed Claim becomes an Allowed Claim (in whole or in part), then as soon as reasonably practicable after entry of a Final Order allowing such Claim, the Reorganized Debtor shall make a distribution to the Holder of such Claim in an amount equal to the distribution the Holder of such Claim would have received if the Holder's Claim had been Allowed in such amount on the Effective Date. No Holder of a Disputed Claim shall be entitled to or receive any post-Petition Date or post-Effective Date interest or other accruals of any kind based upon the delay in receipt of the payment.

### 11.    Manner of Payments

All payments to be made by the Reorganized Debtor shall be in the form of Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 12.    Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under the Plan, distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by a different address set forth in a timely filed proof of claim filed by such Holder or if the Reorganized Debtor has been notified in writing of a change of address.

### 13.    Undeliverable Distributions.

(a)    Holding of Undeliverable Distributions: If any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such

Holder unless and until the Reorganized Debtor is notified, in writing, of such Holder's then-current address.  Undeliverable distributions shall remain in the possession of the Reorganized Debtor until such time as a distribution becomes deliverable.  All Holders ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind based upon the delay in receipt.  Nothing in the Plan requires the Reorganized Debtor to locate the Holder of an Allowed Claim.

(b)  <u>Uncashed Checks</u>.  The Reorganized Debtor shall have no obligation to locate the Holder of an Allowed Claim that does not cash any check representing a distribution payment.  With respect to any check representing a distribution that has not been cashed for a period of three (3) months from the date of mailing of such check to the Creditor, the Reorganized Debtor may, in the Reorganized Debtor's sole discretion: (a) stop payment on such check, (b) treat the distribution as undeliverable, and/or (c) refuse to re-issue any such check if the Reorganized Debtor determines that reissuing such check may adversely affect the distribution to any other Creditor or if re-issuing such check may cause the Reorganized Debtor to incur expense or inconvenience that is unwarranted in light of the amount of the distribution.

(c)  <u>Failure to Claim Undeliverable Distributions</u>:  The Reorganized Debtor may from time to time file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been attempted and have been returned as undeliverable as of the date thereof.  Any Holder of a Claim identified in such list that does not assert its rights pursuant to the Plan to receive a distribution within two (2) months from and after the filing of such list shall not be entitled to any distributions under the Plan and shall be forever barred from asserting any such Claim against the Debtors, the Reorganized Debtor or the Plan Oversight Committee.  In such case, any consideration held for distribution on account of such Claim shall revert to the Reorganized Debtor for distribution to other Creditors or payment of expenses in accordance with the terms of the Plan.  Notwithstanding the foregoing, the Reorganized Debtor may in the Reorganized Debtor's sole discretion pay distributions to a Holder of a Claim where distributions to the Holder had previously been determined to be undeliverable.

(d)  <u>Fractional Amounts</u>:  Payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

**14.    Compliance with Tax Requirements/Allocation**

To the extent applicable, the Reorganized Debtor in making distributions under the Plan shall comply with all tax withholding and reporting requirements imposed by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.[8]  The Reorganized Debtor may withhold the distributions due to any Holder of an

---

[8] The same entity that offered to acquire 95% of the Equity Interests for the cash sum of $50,000 has also offered $50,000 cash to the Debtors to acquire the right to pursue miscellaneous claims currently owned by the Debtors against government agencies that have not been pursued by the Debtors, including various tax attributes to the extent they exist.  These claims would include such as net operating loss carryforwards, tax credit carryforwards, capital loss carryovers and refunds related to or arising from prior payments for state, local, foreign or federal income, sales or excise taxes and fees.  The Proponents are analyzing this offer, in consultation with GHC.  If the Proponents ultimately reach an agreement to sell such tax claims, the Proponents will either modify the Plan to provide for that sale or will file a separate asset sale motion before the Bankruptcy Court.

Allowed Claim until such time as such Holder provides to the Reorganized Debtor the necessary information to comply with any withholding requirements of any governmental unit. Any Property so withheld will then be paid by the Reorganized Debtor to the appropriate authority.  If the Holder of an Allowed Claim fails to provide to the Reorganized Debtor the information necessary to comply with any withholding requirements of any governmental unit within sixty days after the date of first notification by the Reorganized Debtor to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's distributions shall be treated as undeliverable.  For tax purposes, distributions received in respect of an Allowed Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest.

### 15.  Set-Offs.

The Reorganized Debtor, as successor to the Debtors, may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set-off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim or thereafter), the claims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Allowed Claim.  The Holder of a Claim may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, set off any Allowed Claim such Holder possesses against any claim, rights or causes of action of any nature that the Reorganized Debtor, as successor to the Debtors, may hold against such Holder.  Neither the failure to effect such a set-off nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtor or such Holders of any such Claims, rights and causes of action that such parties may possess under Bankruptcy Code Section 553.

### ARTICLE VIII
### INJUNCTION, EXCULPATION AND INDEMNIFICATION

**A.    Discharge.**

Consistent with Bankruptcy Code Section 1141(d)(3), the Plan does not grant the Debtors a discharge.  Notwithstanding the foregoing, except as otherwise provided in the Plan: (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of such Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; and (2) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtor or any of their Assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan.

**B.    Injunction.**

Except as otherwise expressly provided in the Plan, all Entities who have held, hold or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their estates, or the Reorganized Debtor; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, or the Reorganized Debtor; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their estates, or the Reorganized Debtor and/or against the Property or interests in Property of any of the foregoing; and (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Debtors or against the Property of the Debtors, their estates, or the Reorganized Debtor with respect to any such Claim or Interest; provided that nothing contained in the Plan or the Plan Confirmation Order shall prohibit or restrain the prosecution of any actions or controversies against the Debtors' present or former directors and officers or Holders of Interests based on acts, events or omissions occurring before the Petition Date.  With

respect to all such Claims or Rights of Action, all Entities shall be and are permanently enjoined from commencing or continuing any such matter except in the Bankruptcy Court, and the Bankruptcy Court shall retain exclusive jurisdiction over all such matters.

**C.    Exculpation and Limitation of Liability.**

None of the Debtors, the Reorganized Debtor, the Creditors' Committee, the Junior Notes Indenture Trustee, the Senior Noteholders, or the Plan Oversight Committee, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys or other professionals, shall have or incur any liability to ~~any Holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns~~the Debtors' bankruptcy estates for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, including, without limitation, administration of the Chapter 11 Cases, any sale of Assets of the Debtors, the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the Property to be distributed under the Plan, except for their fraud, gross negligence or willful misconduct, and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in the Chapter 11 Cases and under the Plan.

~~Notwithstanding any other provision of the Plan, no Holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any of the Debtors, the Reorganized Debtor, the Creditors' Committee, the Plan Oversight Committee, or any of their respective present or former members, officers, directors, employees, advisors or attorneys or other professionals, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing the Plan, the consummation of the Plan, the confirmation of the Plan, or the administration of the Plan or the Property to be distributed under the Plan, except to the extent such right of action arises from any such party's fraud, gross negligence or willful misconduct.~~

**D.    Indemnification.**

The Reorganized Debtor shall indemnify and hold harmless (i) the Creditors' Committee, (ii) the Debtors, (iii) the Plan Oversight Committee, (iv) all officers, employees, consultants and members of any of the foregoing, ~~and~~ (v) the Debtors' and Reorganized Debtor's employees and consultants, and (vi) all professionals retained by any of the foregoing (collectively, the "Indemnified Parties") from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the ~~Debtors or the implementation or administration of the Plan~~matters identified in the foregoing paragraph (i.e., Article XIII, Section C of this Disclosure Statement), if the Indemnified Parties acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Debtors~~, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful~~ and/or the Debtors' estates.   The Reorganized Debtor shall also indemnify each Entity exculpated pursuant to the provisions described above against, hold each such Entity harmless from, and reimburse each such Entity for, any and all losses, costs, expenses (including attorneys' fees and expenses), liabilities and damages sustained by such Entity arising from any liability described above.

**ARTICLE IX**
**OTHER PLAN EFFECTUATION MATTERS**

**A.    Executory Contracts and Unexpired Leases.**

    **1.    Rejection of Executory Contracts and Unexpired Leases.**

Any pre-petition executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, or which has not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtors on the Effective Date or as otherwise agreed upon by the parties.  The entry of the Plan Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to Bankruptcy Code Sections 365(a) and 1123, effective as of the Effective Date of the Plan.

    **2.    Rejection Damage Claims Bar Date and Resolution.**

Claims, if any, arising out of the rejection of executory contracts or unexpired leases rejected as of the Effective Date pursuant to the Plan must be filed and served on counsel to the Reorganized Debtor and counsel to the Plan Oversight Committee pursuant to the procedures specified in the Plan Confirmation Order no later than thirty (30) days after the Effective Date (the "Final Rejection Claims Bar Date").  Claims arising out of the rejection of executory contracts or unexpired leases rejected as of a date prior to the Effective Date must be filed and served not later than the deadline, if any, established in the order approving rejection of such executory contract or unexpired lease or other court order establishing a bar date for rejection Claims ("Applicable Rejection Claims Bar Date") or, if there is no such Applicable Rejection Claims Bar Date, by the Final Rejection Claims Bar Date.  Claims arising out of rejection of executory contracts or unexpired leases that are the subject of a motion to assume pending on the Effective Date must be filed within thirty (30) days after entry of an order either rejecting such executory contract or unexpired lease or denying such motion to assume such executory contract or unexpired lease.  Any Claim not filed within such times will be forever barred from assertion against the Debtors, the Reorganized Debtor, their estates, their respective successors or their respective properties.  Unless otherwise ordered by the Bankruptcy Court prior to the Confirmation Date, or such later date as shall be ordered by the Bankruptcy Court prior to the Confirmation Date, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Class 4 Claims under the Plan.

**B.    Conditions Precedent.**

    **1.    Conditions Precedent to the Effective Date of the Plan.**

The Effective Date shall be the date all of the following conditions precedent are satisfied:

        (a)    Plan Confirmation Order:  The Plan Confirmation Order shall be in form and substance acceptable to the Proponents and, except as otherwise agreed by the Proponents, be a Final Order in full force and effect that shall not have been stayed or reversed; and

        (b)    Execution of Documents; Other Actions:  All other actions and documents determined by the Proponents to be necessary to implement the Plan shall have been effected or executed.

    **2.    Waiver of Conditions.**

The Plan specifically authorizes the Proponents to waive the requirement that the Plan Confirmation Order be a Final Order prior to the Plan becoming effective, but the Proponents may not waive the requirement of an entered Bankruptcy Court order confirming the Plan that has not been stayed or reversed.  Any waiver of a condition precedent to the Effective Date may be effected at any time, in writing, without notice or leave or order of the Bankruptcy Court.

**C.    Retention of Jurisdiction.**

The Plan provides for a broad retention of jurisdiction by the Bankruptcy Court including, without limitation, the following: (i) interpretation, implementation and enforcement of the Plan, and any contracts, instruments, releases, transactions and other agreements or documents created in connection therewith; (ii) determination of any and all motions, adversary proceedings (including Rights of Action), applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor, the Plan Oversight Committee, or any other party in interest after the Effective Date (to the extent such venue is selected by the moving party); (iii) to hear and determine any objections to Claims or motions for estimation or subordination thereof; (iv) to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146; (v) to hear and determine any matters that may arise in connection with the sales of the Debtors' Assets or any order of the Bankruptcy Court with respect thereto; and (vi) to hear and determine any actions or controversies by or against the Debtors, the Reorganized Debtor, the Creditors' Committee, or the Plan Oversight Committee.

**D.    Modification of Plan.**

The Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time.

**E.    Revocation or Withdrawal.**

The Plan may be revoked or withdrawn by the Proponents prior to the Confirmation Date, in which case the Plan shall be deemed null and void.  In such event, nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any claims by the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

**F.    Terms of Existing Injunctions or Stays.**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and thereafter shall be deemed annulled without any action being taken by any party.

**G.    Cancellation of Notes, Instruments, Debentures, Indentures and Equity Securities.**

~~On~~Subject to that set forth below, on the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, certificates and other documents evidencing Claims against or Interests in any of the Debtors shall be canceled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order or rule.  On the Effective Date, any Indenture relating to any of the foregoing, including the Junior ~~Note~~Notes Indenture and the Senior ~~Note~~Notes Indenture, shall be deemed canceled as permitted by Bankruptcy Code Section 1123(a)(5)(F); provided, however, that the Indentures shall continue in effect solely for the purposes of allowing the Senior ~~Note Indenture Trustee~~Noteholders and/or the Junior ~~Note~~Notes Indenture Trustee to make any distributions to be made on account of the Indentures.  Notwithstanding any of the foregoing, all charging lien rights of the Junior Notes Indenture Trustee are preserved and survive Plan confirmation, and provided further that nothing in the Plan shall eliminate, impair or otherwise affect any charging lien of the Senior Noteholders or the Junior Notes Indenture Trustee under the Senior Notes Indenture or the Junior Notes Indenture to secure all pre-Effective Date and post-Effective Date amounts provided for therein.  From and after the Effective Date, neither the Senior Noteholders nor the Junior Notes Indenture Trustee shall have any obligations under the Senior Notes Indenture or the Junior Notes Indenture other than to make distributions.  The Bankruptcy Court shall be the only forum with jurisdiction to resolve any disputes between or among the Senior Noteholders and the Junior

DISCLOSURE STATEMENT ~~FOR~~DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

1  Notes Indenture Trustee, subject to the parties' appellate rights with respect to any Bankruptcy Court order.  The Bankruptcy Court shall retain jurisdiction over the Senior Noteholders and the Junior Notes Indenture Trustee to resolve any dispute which is commenced but not completed to
2  Final Order before the Effective Date, or which is commenced after the Effective Date.

3  **H.    Section 1146 Exception.**

Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer, or exchange of any
4  security under the Plan, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

5  **I.    Severability.**

6  The provisions of the Plan shall not be severable unless such severance is agreed to by the Proponents and such severance would constitute a permissible modification of the Plan
7  pursuant to Bankruptcy Code Section 1127.

8  **J.    Governing Law.**

Except to the extent that other federal law is applicable, or to the extent that an exhibit
9  hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the
10  extent not inconsistent therewith, the laws of the State of California.

11  **K.    Notices.**

All notices, requests and demands to or upon the Debtors or the Creditors' Committee to
12  be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually
13  delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following, addressed as follows or to such other addresses as may be filed
14  with the Bankruptcy Court and served on the following parties.

15  To:

**On behalf of the Debtors:**

16  Matthew S. Walker, Esq.
17  Pillsbury Winthrop Shaw Pittman LLP
12255 El Camino Real, Suite 300
18  San Diego, CA  92130
Telephone: (619) 234-5000
19  Facsimile:  (858) 509-4010

20  **On behalf of the Creditors' Committee:**

21  Ron Bender, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
22  10250 Constellation Blvd, Suite 1700
Los Angeles, CA  90067
23  ~~Tel~~Telephone: (310) 229-1234
Fax: (310) 229-1244

24  **On behalf of Senior Noteholders:**

25
Bruce Bennett, Esq.
26  Hennigan Bennett & Dorman LLP
865 South Figueroa Street, Suite 2900
27  Los Angeles, CA 90017

28

Telephone: (213) 694-1200
Facsimile: (213) 694-1234

**L.    Closing of Cases.**

The Reorganized Debtor shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

**M.    Continuing Viability of Other Orders/Agreements.**

Except to the extent expressly modified by the Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the Debtors and their creditors shall continue in full force and effect.

**ARTICLE X
CONFIRMATION OF THE PLAN**

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

**A.    Confirmation Hearing**

Bankruptcy Code Section 1121(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  By order of the Bankruptcy Court, the Plan confirmation hearing has been scheduled for [_____,] 2007 at [__:00 _.m.] (prevailing Pacific Time) before the Hon. Marilyn Morgan in the United States Bankruptcy Court for the Northern District of California, Courtroom 3070, 280 South First Street, San Jose, California.  The Plan confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Plan confirmation hearing or any adjournment thereof.

**B.    Requirements for Confirmation of the Plan.**

At the Plan confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code Section 1129 are met.  Among the requirements for confirmation are that the Plan: (a) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of Holders of Claims and Interests impaired under the Plan.

**1.    Fair and Equitable Test.**

The Proponents will seek to confirm the Plan notwithstanding the nonacceptance or deemed nonacceptance of the Plan by any impaired Class of Claims.   To obtain such confirmation, the Proponents must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class.  A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting class, and if no Class receives more than it is entitled to receive for its Claims or Interests.   The Proponents believe that the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims and Interests, as follows:

(a)    Secured Claims: Either the Plan must provide: (i) for the Holders of such Claims to retain the liens securing such Claims, whether the Property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims, and each Holder of a Claim receives deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the

DISCLOSURE STATEMENT ~~FOR~~DESCRIBING FIRST AMENDED LIQUIDATING PLAN OF REORGANIZATION

value of such Holder's interest in the estate's interest in such Property; (ii) for the sale of any Property that is subject to the liens securing such Claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such Holders of the indubitable equivalent of such Claims.

(b)     Unsecured Claims:     Either (i) each Holder of an impaired unsecured Claim receives or retains under the Plan Property of a value equal to the amount of its Allowed Claim, or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any Property under the Plan.

(c)     Interests:  Either (i) each Interest Holder will receive or retain under the Plan Property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock, or (ii) the Holders of Interests that are junior to the Interests will not receive any Property under the Plan.

THE PROPONENTS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN).  ACCORDINGLY, THE PROPONENTS WILL DEMONSTRATE AT THE PLAN CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129(b) AS TO ANY NON-ACCEPTING CLASS.

**2.     Feasibility.**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor other than as set forth in such plan.  The Plan contemplates that all Assets of the Debtors which have not otherwise been disposed of will ultimately be disposed of and all proceeds of the Assets will be distributed to Creditors pursuant to the terms of the Plan.  Since no further financial reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement.

**3.     "Best Interests" Test.**

The Bankruptcy Code requires that with respect to each impaired Class of Claims and Interests that has not accepted the Plan, Holders of Claims or Interests in each such Class receive or retain under the Plan Property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would have received or retained if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  The Proponents believe that Holders of Claims will receive at least as much under the Plan as they would receive in Chapter 7 liquidation cases, and that this test is therefore satisfied.

All or nearly all of the Debtors' Assets have already been liquidated.  As such, it is unlikely that conversion of the Debtors' Chapter 11 Cases to Chapter 7 liquidations would materially affect the overall amount or value of the Debtors' Assets.  However, the Proponents believe that conversion of the Chapter 11 Cases to Chapter 7 liquidations would adversely affect the value of the distributions that Holders of Allowed Claims would receive for multiple reasons.  First, the Debtors' costs of liquidation under Chapter 7 would include the fees payable to trustees in bankruptcy and their professionals.  Bankruptcy Code Section 326(a) prescribes the fees payable to a Chapter 7 trustee and limits the amount to approximately 3% of all assets distributed in a case.  In these Chapter 11 Cases, the total trustees' fees could exceed $2.5 million.  Also, because there are four Debtors, four trustees would likely be appointed if the Chapter 11 Cases were converted to Chapter 7 liquidation cases; in contrast, the Plan contemplates one Reorganized Debtor.  The Proponents believe that the fees attriuable to the Reorganized Debtor will be substantially less than the statutory fees due four Chapter 7 trustees.

In addition, each of the Chapter 7 trustees would be entitled to employ counsel and

accountants to assist the trustees in administering their respective estates. Although the Reorganized Debtor and the Plan Oversight Committee will each be able to employ professionals, four Chapter 7 trustees are likely to hire four law firms and, potentially, four accounting firms, at least double the number of professionals contemplated by the Plan. All such professionals would need to overcome a significant learning curve in light of the relatively complex set of facts and their lack of any history with or knowledge of the Chapter 11 Cases. The professionals who will be employed by the Reorganized Debtor and the Plan Oversight Committee will be the same as those which represented the Debtors and the Creditors' Committee. In this regard, counsel for the Reorganized Debtor and counsel for the Plan Oversight Committee will be working cooperatively as they have to date and are extremely familiar with the facts of the Chapter 11 Cases, whereas the attorneys and accountants employed by four Chapter 7 trustees would be obligated to advance the interests of each trustee's estate and that estate's creditors.

Moreover, the Proponents believe that conversion of the Chapter 11 Cases to Chapter 7 liquidation cases would forfeit, or at least substantially delay, the benefits resulting from substantive consolidation of the Debtors' estates and the ultimate distribution to be made to Claim Holders under the Plan. As discussed above, substantive consolidation of the Debtors' estates will avoid potentially years of expensive and possibly fruitless litigation concerning allocation of Assets and liabilities among the four Debtors, and substantially expedite distributions in these Chapter 11 Cases. While four Chapter 7 trustees could seek substantive consolidation of their estates, they would be unlikely to pursue such a remedy until after a substantial evaluation period. This delay would adversely impact the value of the ultimate distributions to Creditors, both as a result of increased costs of administration of the Chapter 7 liquidation cases and the negative impact delay will have on the present value of the distributions.

Finally, the Plan provides a mechanism for implementing the Subordination Provisions in the two Indentures. Under the Plan, these provisions are given effect because the Plan specifies both the mechanism for implementing the Subordination Provisions and identifies the recipients of reallocated distributions. In the context of Chapter 7 liquidation cases, SONICblue's Chapter 7 trustee might not believe she/he has the right to decide who benefits from the Subordination Provisions, and may determine that prudence and safety require the trustee to deposit funds that would otherwise be distributed to Holders of Allowed Claims into an interpleader action. Thus, a significant portion of the distributions in these Chapter 11 Cases would be further delayed pending resolution of this additional layer of litigation.

Thus, overall, the Proponents believe that the Plan provides: (a) a far less expensive method than Chapter 7 of distributing the Debtors' Assets because it avoids payment of fees to four Chapter 7 trustees and four sets of new and unfamiliar professionals employed by the trustees; and (b) a much more expedited method for distributing the Debtors' Assets because it avoids potentially years of analysis, discussions and likely litigation between and among four Chapter 7 trustees. In addition, it would be highly inefficient for a new third party to take over the Claims objections process or the pursuit of Avoidance Actions.

**ARTICLE XI**
**FINANCIAL INFORMATION**

The Debtors have filed Statements of Financial Affairs and Schedules of Assets and Liabilities with the Bankruptcy Court as required by the Bankruptcy Code, some of which documents have been amended as described above. As debtors-in-possession, the Debtors have filed monthly operating reports required by the United States Trustee's operating guidelines. This financial information may be examined in the Bankruptcy Court Clerk's Office.

## ARTICLE XII
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include: (a) development of an alternative plan of liquidation; or (b) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

**A.    Liquidation Under Chapter 7.**

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, in which case trustees would be elected or appointed to liquidate any remaining Assets of the Debtors for distribution to Creditors.  As stated, the Proponents believe that conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code would result in diminished distributions to Creditors, due to the increased costs of administration in Chapter 7 proceedings, and substantial delay in the distribution to Creditors relative to the Plan.

**B.    Alternative Chapter 11 Plan.**

If the Plan is not confirmed, the Debtors, the Creditors' Committee, or any of the parties in interest could attempt to formulate a different Chapter 11 plan.  However, the Bankruptcy Code and the Indentures substantially limit the options available to the proponent of a liquidating plan.  As such, the Debtors do not believe there is a feasible, more favorable alternative to the Plan.

## ARTICLE XIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Interests.  The Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Interests as a result of the confirmation of the Plan.  All Holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan.   THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

## ARTICLE XIV
## CONCLUSION AND RECOMMENDATION

The Debtors and the Creditors' Committee believe that the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims in Classes 3, ~~4, 5,~~ 4 and 6  to vote to accept the Plan and to evidence such acceptance by returning their ballots to the Balloting Agent at the address set forth above so that they will actually be received on or before 4:00 p.m., prevailing Pacific Time, on [_____~~;~~]̣ 2007.

Dated: ~~December 15, 2006~~January 18, 2007

Respectfully Submitted:

By:    _/s/ Marcus Smith_____
          Marcus Smith
          Debtors' Responsible Individual

By:    /s/ William B. Freeman
       Pillsbury Winthrop Shaw Pittman LLP
       Attorneys for Debtors and Debtors-In-
       Possession and Co-Plan Proponent

By:    /s/ Ron Bender
       Levene, Neale, Bender, Rankin & Brill L.L.P.
       Attorneys for the Official Committee of
       Creditors Holding Unsecured Claims and
       Co-Plan Proponent

Document comparison done by Workshare DeltaView on Thursday, January 18, 2007 11:36:45 AM

| Input: | |
|---|---|
| Document 1 | file://G:/-CASES/S-U/S/SonicBlue/Pleadings/DisclosureStatement6.DOC |
| Document 2 | file://G:/-CASES/S-U/S/SonicBlue/Pleadings/DisclosureStatement15FINAL.doc |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 386 |
| Deletions | 285 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 679 |

EXHIBIT 63

1  ROBERT A. GREENFIELD (039648)
2  FRANK A. MEROLA (136934)
   K. JOHN SHAFFER (153729)
3  STUTMAN, TREISTER & GLATT PC
   1901 Avenue of the Stars, 12th Floor
4  Los Angeles, CA 90067
   Telephone:    (310) 228-5600
5  Facsimile:    (310) 228-5788

6
   WILLIAM McGRANE (057767)
7  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
8  40 South Market Street, 7th Floor
9  San Jose, CA 95113
   Telephone:    (408) 995-5600
10 Facsimile:    (408) 995-0308

11 Counsel for SonicBlue Claims LLC

12              UNITED STATES BANKRUPTCY COURT
13              NORTHERN DISTRICT OF CALIFORNIA
                     SAN JOSE DIVISION
14

15 In re:                               | Case No. 03-51775
                                        | Chapter 11; (Case Nos. 03-51775 through 03-
16 SONICBLUE INCORPORATED,              | 51778 MM) (Jointly Administered)
   a Delaware corporation;
17 DIAMOND MULTIMEDIA                   | SUPPLEMENT TO MOTION TO MODIFY
   SYSTEMS, INC., a Delaware            | AND/OR VACATE IN PART ORDER
18 corporation; REPLAYTV, INC., a       | APPROVING VIA SETTLEMENT BASED
   Delaware corporation, and            | UPON FRAUD ON THE COURT DUE TO
19 SENSORY SCIENCE                      | COUNSEL'S FAILURE TO DISCLOSE A
   CORPORATION, a Delaware              | MATERIAL CONFLICT OF INTEREST
20 corporation,                         | [DOCKET 2548]; DISCOVERY OF NEW,
21                                       | UNDISCLOSED PILLSBURY CONFLICT
          Debtors
22                                       | Date:        December 7, 2007
23                                       | Time:        11:00 a.m.
                                         | Location:  Courtroom 3070
24                                       |             280 South First Street
                                         |             San Jose, CA  95113
25

1

26 SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
   SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
   DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
                     UNDISCLOSED PILLSBURY CONFLICT

1    More evidence of Pillsbury's failure to disclose its conflicts of interest has

2    come to light through recent discovery – evidence that further supports the relief

3    requested in the Motion to Modify and/or Vacate in Part Order Approving VIA

4    Settlement Based Upon Fraud on the Court due to Counsel's Failure to Disclose a

5    Material Conflict of Interest (the "Fraud on the Court Motion") [Docket No. 2548]

6    filed by SonicBlue Claims LLC ("SB Claims").

7    Since filing the Fraud on the Court Motion, SB Claims has learned that

8    Pillsbury entered into a Tolling Agreement with Marcus Smith (the Debtors'

9    "Responsible Individual" while Pillsbury served as counsel for the Debtors) and

10    four other directors of the Debtors (together with Mr. Smith, the "Directors and

11    Officers").[1] The Tolling Agreement apparently arose out of claims by the

12    Directors and Officers that Pillsbury was responsible for a denial of coverage of

13    directors and officers insurance coverage ("D&O Insurance"), and that "disputes

14    have arisen as to whether Pillsbury is liable to the Directors for damages that may

15    have been incurred by Directors as a result of the Coverage Denial." The Tolling

16    Agreement was dated August 18, 2006, just a week before the 2002 Noteholders

17    made their own threats to sue Pillsbury, and less than two months before Pillsbury

18    filed the Debtors' motion to approve the VIA Settlement Order and the purported

19    waiver of VIA's Senior Indebtedness status contained therein (the "Purported

20    Waiver Language").

21    Two of the Debtors' D&O Insurance carriers – Admiral Insurance and Old

22    Republic Insurance – commenced an adversary proceeding in this Court seeking a

23    declaration that, among other things, the D&O Insurance policies should be

---

24

25    [1]    A copy of the Tolling Agreement is attached to the accompanying Declaration of K. John Shaffer ("Shaffer Declaration") as Exhibit "1".

26

2

SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
UNDISCLOSED PILLSBURY CONFLICT

466329v2

1   rescinded.[2] The basis for the rescission was the Debtors' failure to disclose

2   threatening letters written on behalf of the 2002 Noteholders and the deeply

3   subordinated, 1996 Noteholders,[3] which asserted that the Directors and Officers

4   had breached their fiduciary duties.

5        Pillsbury was well aware that the 2002 Noteholders also had made direct

6   threats of suit against the Directors and Officers. As written by Bruce Bennett,

7   counsel to the 2002 Noteholders, to a Pillsbury partner:

8        The deterioration in the Senior Noteholder's prospects for
         recovery on their claims is a direct and foreseeable consequence of
9        **actions taken by SONICblue's directors and officers which
         breach fiduciary duties to SONICblue's creditors** and which
10       deepen SONICblue's insolvency. Thus, **each of SONICblue's
         directors and officers are liable to the Senior Noteholders for the
11       full amount of the deterioration in SONICblue's financial
         condition that has occurred to date and any continuing
12       diminution in creditors' ultimate recovery** from SONICblue that
         results from any further delay in the liquidation of the consumer
13       electronics business.

14  Bennett Letter to Pillsbury partner, Craig A. Barbarosh, dated January 15, 2003, at

15  3 (emphasis added); *see also* Bennett Letter to Barbarosh and the Debtors' General

16  Counsel, David Gershon, dated November 14, 2002, at 5 ("**Sonic's officers and**

17  **directors have breached their fiduciary duties to creditors and cannot allow**

18  ────────────

19  [2] Admiral Insurance Company and Old Republic Insurance Company
        commenced their adversary proceeding to determine that they had no
20      obligation to provide insurance coverage for the Directors' and Officers'
        alleged breaches of fiduciary duty on December 23, 2005. *See* Adversary
21      Proceeding No. 05-05624 ("D&O Insurance Coverage Adversary").

22  [3] The 1996 Noteholders are the holders of the 5-3/4% Convertible Subordinated
        Notes Due 2003 issued by the Debtors in 1996. The 1996 Noteholders
23      commenced an action in the California Superior Court against, among others,
        the Directors and Officers on April 21, 2005, alleging breach of fiduciary duty
24      in connection with the Directors' and Officers' role in the Debtors' issuance of
        the 2002 Notes. The Directors and Officers removed the action to this Court
25      on June 14, 2005. *See WM Trust High Yield Fund, et al. v. Potashner, et al.*,
        Adversary Proceeding No. 05-05338 (the "1996 Noteholders' Action").

26                                                3
    SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
       SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
      DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
                        UNDISCLOSED PILLSBURY CONFLICT

1   **Sonic's insolvency to deepen.**" (bold in original)); *id.* (alleging that the Directors

2   and Officers had acted "[i]n complete disregard of their fiduciary duties to the

3   Company and its creditors," and that their "utter disregard for fiduciary obligations

4   support a claim by the Senior Noteholders for damages incurred by the Company's

5   deepening insolvency").[4]

6           Moreover, Pillsbury was aware that the D&O Insurance carriers' refusal of

7   coverage was based in part upon the Debtors' failure to timely disclose to the

8   carriers Mr. Bennett's threatening letters on behalf of the 2002 Noteholders.  As

9   set forth in the insurers' adversary complaint:

10          SONICblue and the Directors and Officers, *prior to the inception of*
            *the [D&O Insurance] Policy,* were well aware of an ongoing five-
11          month legal dispute with counsel for the 7-3/4% Secured Debenture
            Holders [the 2002 Noteholders] and the 5-3/4% Noteholders, in
12          which SONICblue's Directors and Officers were expressly advised
            in writing: "[SONICblue's] officers and directors have breached
13          their fiduciary duties to creditors."

14   *See* Insurers' Declaratory Relief Complaint [Docket No. 1, Adversary Proceeding

15   No. 05-05624] at page 5 (emphasis in original; quoting Mr. Bennett's November

16   14, 2002 letter at 5).  The D&O Insurance carriers sought determinations that:

17          No coverage, therefore, is available to the [Directors and Officers]
            under the Primary Policy [and the Excess Policy] for the claims set
18          forth in the January 15, 2003 letter [Mr. Bennett's second letter to
            Mr. Barbarosh], or claims related thereto, including the Noteholder
19          Lawsuit.

20   Insurers' Declaratory Relief Complaint at page 30; *see also* Insurers' Declaratory

21   Relief Complaint at pages 27 and 28 (seeking full rescission of the D&O

22   _____

23   [4]  Copies of the 2002 Noteholders' threatening letters were attached as Exhibits 7
        and 9 to the Complaint for Declaratory Judgment filed by Admiral Insurance
24      Company and Old Republic Insurance Company in the D&O Insurance
        Coverage Adversary (the "Insurers' Declaratory Relief Complaint").  For the
25      Court's convenience, copies of these letters also are attached to the
        accompanying Shaffer Declaration as Exhibit "2".

                                                4

26   _____
     SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
     SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
     DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
     UNDISCLOSED PILLSBURY CONFLICT

1    Insurance policies on the grounds that the Debtors concealed, among other things,

2    Mr. Bennett's November 14, 2002 and January 15, 2003 letters).[5]

3          To the extent that the Directors and Officers had claims against Pillsbury

4    due to Pillsbury's failure to preserve the D&O Insurance, Pillsbury concurrently

5    had an incentive to minimize any chance that the Directors and Officers might be

6    sued.  Just as Pillsbury had an incentive to minimize claims by the 2002

7    Noteholders against it on account of the April, 2002 Opinion Letter[6], Pillsbury

8    similarly had an incentive to minimize claims by the 2002 Noteholders against the

9    Directors and Officers, who in turn might sue Pillsbury over the D&O Insurance.

10         As soon as Pillsbury became aware of the Directors' and Officers' claims

11   against it, Pillsbury immediately should have disclosed to this Court and creditors

12   its conflict of interest vis-à-vis the Directors and Officers.  Certainly, Pillsbury

13   should have done so no later than the execution of the August 18, 2006 Tolling

14   Agreement.  Moreover, Pillsbury should not have taken any action on behalf of the

15   estate that could reduce the chances that Pillsbury could get sued.  That included

16   seeking approval of the undisclosed waiver of the 2002 Noteholders' "Senior

17   Indebtedness" obligations, because (i) that would reduce the chances that the 2002

18   _____

19   [5]  The reference to the "Noteholders Lawsuit" is to the 1996 Noteholders' Action.
     However, the relief requested in the Insurers' Declaratory Relief Complaint
20   was not limited solely to the 1996 Noteholders' Action, and it in fact sought to
     exclude "from coverage all claims that the Insureds failed to disclose as part of
21   the Policy Applications, and all claims that relate thereto (including *but not
     limited to* the Noteholder Lawsuit)."  Insurers' Declaratory Relief Complaint at
22   page 31.  Moreover, as noted above, the insurers expressly sought to exclude
     from coverage any claims relating to Mr. Bennett's January 15, 2003 letter on
23   behalf of the 2002 Noteholders.

24   [6]  The Opinion Letter is the April, 2002 opinion that Pillsbury gave in favor of
     the 2002 Noteholders, a copy of which (along with the 2002 Noteholders'
25   threats to sue Pillsbury) is attached to the Fraud on the Court Motion as Exhibit
     2.

     5

26   SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
     SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
     DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
     UNDISCLOSED PILLSBURY CONFLICT

1   Noteholders would sue Pillsbury directly on account of the Opinion Letter (as set

2   forth in the Fraud on the Court Motion), and (ii) it also would reduce the chances

3   that the 2002 Noteholders would sue the Directors and Officers to make up for any

4   deficiency they suffered in this case, who in turn could sue Pillsbury pursuant to

5   the Tolling Agreement.

6        Pillsbury, however, did not disclose the Tolling Agreement in August 2006,

7   or at any time before the VIA Settlement was approved. ***Indeed, Pillsbury never***

8   ***disclosed the Tolling Agreement, even after the Opinion Letter had come to***

9   ***light.***

10        SB Claims brought the Opinion Letter to this Court's attention on February

11   14, 2007.  Nearly three weeks later (March 5, 2007), Pillsbury attorney William

12   Freeman filed the ***Eighth Supplemental*** disclosure in connection with Pillsbury's

13   retention in this case.[7]  Mr. Freeman disclosed the Opinion Letter and the 2002

14   Noteholders' threats of suit, as well as Pillsbury's unrelated representation of three

15   other creditors of the estates.  He did not, however, make any mention whatsoever

16   of the Tolling Agreement.  Instead, he represented to this Court on behalf of

17   Pillsbury:

18        Except as disclosed herein, in the Application, and in the previous
           supplemental declarations, to my knowledge the Firm, and its
19        partners, counsel, and associates, do not have any connection with
           the Debtors, creditors, any other party in interest, their respective
20        attorneys and accountants, or with the United States Trustee for this
           region.  Except as disclosed herein and in the previous supplemental
21        declarations, to my knowledge the Firm does not hold or represent
           an interest adverse to the Debtors and their respective estates as to
22        the matter in which the Firm is to be employed.

23   [7]   Eighth Supplemental Declaration in Support of Application for Order Pursuant
24       to Bankruptcy Code section 327(a) Authorizing the Employment and Retention
       of Pillsbury Winthrop LLP as General Insolvency Counsel to the Debtors filed
25       March 5, 2007 [Docket No. 2180] ("Freeman Eighth Supplemental
       Declaration").

26   SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
UNDISCLOSED PILLSBURY CONFLICT

466329v2

1   Freeman Eighth Supplemental Declaration at ¶ 7.[8]

2           There can be no reasoned dispute that the Directors' and Officers' assertions

3   of claims against Pillsbury constituted a "connection with . . . any other party in

4   interest."  There can also be no reasoned dispute that, as with the Opinion Letter

5   and the 2002 Noteholders' threats of suit, the Tolling Agreement should have been

6   disclosed immediately to this Court – in August 2006 (or whenever earlier the

7   Directors and Officers may have first asserted claims against Pillsbury).

8           Instead of disclosing the Tolling Agreement, however, Pillsbury concealed

9   it from the Court.  On the same day that the Freeman Eighth Supplemental

10  Declaration was filed, Mr. Freeman also filed a different Declaration in opposition

11  to Pillsbury's disqualification.[9]  In it, he testified that "I have been involved in the

12  representation of the Debtors throughout these bankruptcy cases, and I am one of

13  the attorneys at Pillsbury with principal responsibility for these cases."  Freeman

14  Disqualification Declaration at ¶ 1.  If, in fact, Mr. Freeman was "one of the

---

[8]  Both the Eighth Supplemental Freeman Declaration and various of his prior Declarations filed with the Court advised that "[t]he Firm will continue to monitor its relationship with the creditors and other parties in interest in these cases and, as it discovers additional information requiring disclosure, will promptly supplement this application with any appropriate disclosures." Eighth Supplemental Freeman Declaration at ¶ 9; *see also, e.g.*, Seventh Supplemental Declaration in Support of Application for Order Pursuant to Bankruptcy Code Section 327(a) [etc.] filed June 5, 2006 [Docket No. 1827] at ¶ 9; Sixth Supplemental Declaration in Support of Application for Order Pursuant to Bankruptcy Code Section 327(a) [etc.] filed November 4, 2005 [Docket No. 1599] at ¶ 9; Fifth Supplemental Declaration in Support of Application for Order Pursuant to Bankruptcy Code Section 327(a) [etc.] filed July 25, 2005 [Docket No. 1516] at ¶ 9; Fourth Supplemental Declaration in Support of Application for Order Pursuant to Bankruptcy Code Section 327(a) [etc.] filed July 13, 2005 [Docket No. 1497] at ¶ 9; Third Supplemental Declaration in Support of Application for Order Pursuant to Bankruptcy Code Section 327(a) [etc.] filed April 20, 2005 [Docket No. 1408] at ¶ 10.

[9]  Declaration of William B. Freeman filed March 5, 2007 [Docket No. 2182] ("Freeman Disqualification Declaration").

SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW, UNDISCLOSED PILLSBURY CONFLICT

466329v2

1  attorneys at Pillsbury with principal responsibility for these cases," he surely

2  would have known that the Directors and Officers had asserted claims against his

3  own firm, and that his firm had entered into a Tolling Agreement with them.

4      Moreover, even if Mr. Freeman somehow did not know about the Tolling

5  Agreement, others at Pillsbury who supervised the filing of Mr. Freeman's

6  Declarations certainly did.  The Tolling Agreement was executed personally by

7  Mr. John Grenfell, whom Pillsbury has described as the firm's "claims counsel" in

8  connection with this matter.  Mr. Grenfell was directly involved in the filing of

9  Pillsbury's March 5, 2007 pleadings, including Mr. Freeman's declarations.

10  Moreover, Mr. Grenfell was in Court on March 19, 2007, when this Court

11  considered whether Pillsbury should be disqualified.  As stated by counsel for

12  Pillsbury at that hearing:

13      Also present for Pillsbury Winthrop today is John Grenville
       (Phonetic) who's here as a representative of the firm and its
14      management to make sure that the Court's wishes are fully carried
       out in these difficult circumstances.
15

16  March 19, 2007 Hearing Transcript [Docket No. 2226] at 6.[10]  Counsel for

17  Pillsbury further represented:

18      When the senior note holders raised the claim, based on the opinion,
       regardless of its merits, it was at that time, necessary under
19      Bankruptcy Rule 2004 (sic) for Pillsbury to file a supplemental
       disclosure.  They failed to do so promptly.  That was a failure in
20      their obligations to the Court.  Pillsbury has apologized to the Court
       and to the United States Trustee in its papers. Mr. Grenville,
21      representative of the Pillsbury firm and Pillsbury's management
       today is here to say again, as am I, that they deeply, deeply regret
22      their failure to attend to their obligations under the Bankruptcy
       Rules.
23

24  _____

25  [10]  A copy of the pages of the March 19, 2007 Hearing Transcript that refer to Mr.
       Grenfell are attached to the Shaffer Declaration as Exhibit "4".
                                        8
26  _____
    SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
    SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
    DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
                    UNDISCLOSED PILLSBURY CONFLICT

1    March 19, 2007 Hearing Transcript at 16; *see also id.* at 93 (asking the Court if it

2    had any questions for Mr. Grenfell).

3           The fact is that this Court was led to believe that Pillsbury had fully

4    disclosed all of its conflicts by the March 19, 2007 hearing.  The Eighth

5    Supplemental Freeman Declaration said as much, and Mr. Grenfell's "apology" to

6    the Court also said as much.  In fact, all the time Pillsbury was concealing another

7    material conflict of interest, and another reason why Pillsbury had every incentive

8    to see that any party who threatened to sue Pillsbury got taken care of in the

9    bankruptcy case.

10          This Court's approval of the purported waiver of VIA's Senior Indebtedness

11   status was a direct result of fraud on this Court.  The law firm that creditors and

12   this Court expected to represent the interests of the estate, was instead hopelessly

13   conflicted by threats of suit against it.

14                              **CONCLUSION**

15          Pillsbury filed the motion to approve the VIA settlement at a time when it

16   was operating under disabling, undisclosed conflicts of interest.  As set forth in the

17   Fraud on the Court Motion, SB Claims respectfully requests that this Court enter

18   an order granting partial relief from the Settlement Order, so as to remove any

19   taint created by Pillsbury's undisclosed conflicts of interest.  The undisclosed,

20   Purported Waiver Language should no longer have the benefit of this Court's

21   approval.

22   DATED:  November 13, 2007          STUTMAN, TREISTER & GLATT P.C.
                                        McGRANE GREENFIELD LLP

23

24                                      By_____

25                                      K. John Shaffer

26   SUPPLEMENT TO MOTION TO MODIFY AND/OR VACATE IN PART ORDER APPROVING VIA
     SETTLEMENT BASED UPON FRAUD ON THE COURT DUE TO COUNSEL'S FAILURE TO
     DISCLOSE A MATERIAL CONFLICT OF INTEREST [DOCKET 2548]; DISCOVERY OF NEW,
     UNDISCLOSED PILLSBURY CONFLICT

466329v2

1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
3  STUTMAN, TREISTER & GLATT PC
   1901 Avenue of the Stars, 12th Floor
4  Los Angeles, CA 90067
   Telephone:   (310) 228-5600
5  Facsimile:   (310) 228-5788

6
   WILLIAM McGRANE (057767)
7  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
8  40 South Market Street, 7th Floor
   San Jose, CA 95113
9  Telephone:   (408) 995-5600
10 Facsimile:   (408) 995-0308

11 Counsel for SonicBlue Claims LLC

12              UNITED STATES BANKRUPTCY COURT
13              NORTHERN DISTRICT OF CALIFORNIA
                       SAN JOSE DIVISION
14

| | |
|---|---|
| 15    In re: | Case No. 03-51775 |
| | Chapter 11; (Case Nos. 03-51775 through 03- |
| 16    SONICBLUE INCORPORATED, | 51778 MM) (Jointly Administered) |
|    a Delaware corporation; | |
| 17    DIAMOND MULTIMEDIA | DECLARATION OF K. JOHN SHAFFER |
|    SYSTEMS, INC., a Delaware | IN SUPPORT OF SUPPLEMENT TO |
| 18    corporation; REPLAYTV, INC., a | MOTION TO MODIFY AND/OR VACATE |
|    Delaware corporation, and | IN PART ORDER APPROVING VIA |
| 19    SENSORY SCIENCE | SETTLEMENT BASED UPON FRAUD ON |
| 20    CORPORATION, a Delaware | THE COURT DUE TO COUNSEL'S |
|    corporation, | FAILURE TO DISCLOSE A MATERIAL |
| 21 | CONFLICT OF INTEREST |
|    Debtors | |
| 22 | Date:        December 7, 2007 |
| 23 | Time:        11:00 a.m. |
| | Location:  Courtroom 3070 |
| 24 | 280 South First Street |
| | San Jose, CA  95113 |
| 25 | |

1

26 DECLARATION OF K. JOHN SHAFFER IN SUPPORT OF SUPPLEMENT TO MOTION TO MODIFY
   AND/OR VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON
   THE COURT DUE TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF
   INTEREST

1    K. John Shaffer declares:

2    1.    I have personal knowledge of the facts stated herein and could testify

3    competently thereto if called upon to do so.

4    2.    Attached as Exhibit "1" is a copy of a "Tolling Agreement", which I

5    received in electronic form from counsel for the chapter 11 trustee in this case on

6    November 5, 2007, and which I am informed and believe was obtained by the

7    trustee from Pillsbury's files through discovery.

8    3.    Attached as Exhibit "2" are copies of letters that were attached as

9    Exhibits 7 and 9, respectively, to the Complaint for Declaratory Judgment filed by

10    Admiral Insurance Company and Old Republic Insurance Company on December

11    23, 2005, commencing Adversary Proceeding No. 05-05624. I obtained these

12    copies by downloading them from the Court's PACER system.

13    4.    Attached as Exhibit "3" is a copy of the "Eighth Supplemental

14    Declaration in Support of Application for Order Pursuant to Bankruptcy Code

15    section 327(a) Authorizing the Employment and Retention of Pillsbury Winthrop

16    LLP as General Insolvency Counsel to the Debtors" filed March 5, 2007. I

17    obtained this copy by downloading it from the Court's PACER system.

18    5.    Attached as Exhibit "4" is are copies of selected pages from the

19    transcript of this Court's hearing dated March 19, 2007. I have verified that these

20    pages are the same as those available on the Court's PACER system.

21    I declare under penalty of perjury under the laws of the State of California

22    that the foregoing is true and correct and that this declaration was executed on

23    November 12, 2007, at Los Angeles, California.

24    _____

      K. John Shaffer

25

26    _____2_____
    DECLARATION OF K. JOHN SHAFFER IN SUPPORT OF SUPPLEMENT TO MOTION TO MODIFY
    AND/OR VACATE IN PART ORDER APPROVING VIA SETTLEMENT BASED UPON FRAUD ON
    THE COURT DUE TO COUNSEL'S FAILURE TO DISCLOSE A MATERIAL CONFLICT OF
    INTEREST

# EXHIBIT 1

## TOLLING AGREEMENT

This Tolling Agreement ("Agreement"), dated August 18 2006 (the "Effective Date"), is entered into by and between Marcus Smith, Terry N. Holdt, Edward Esber, Robert P. Lee, and James T. Schraith (the "Directors") and Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). The parties hereto are sometimes individually referred to herein as "Party" and collectively referred to as the "Parties."

WHEREAS, Pillsbury represented SONICblue, Inc. ("SONICblue") in connection with various matters;

WHEREAS, the Directors were all officers or directors of SONICblue during the time of such representation;

WHEREAS, the Directors were sued on April 21, 2005, for, among other things, allegedly breaching their fiduciary duties to purchasers of certain SONICblue convertible debentures and for constructive fraud ("Noteholder Litigation");

WHEREAS, the Directors sought insurance coverage for the Noteholder Litigation from SONICblue's Directors' and Officers' insurance carriers, Admiral Insurance Company ("Admiral") and Old Republic Insurance Company ("Old Republic"), which have asserted that coverage is not afforded for the claim (the "Coverage Denial");.

WHEREAS, disputes have arisen as to whether Pillsbury is liable to the Directors for damages that may have been incurred by the Directors as a result of the Coverage Denial (the "Dispute");

In consideration of the mutual covenants set forth herein and for good and valuable consideration, IT IS HEREBY AGREED THAT:

1

19889\1023370.2

PW-Tr0000002

1.      As of the Effective Date, and in accordance with the terms of this Agreement, the Parties hereby agree to toll and suspend any applicable legal or equitable statutes of limitations, statutes of repose, doctrines of laches, or periods of limitations which have not expired relating to any claims between the Parties relating to the Dispute. The Parties, however, do not waive their rights as to any periods of time that elapsed prior to the Effective Date as against any applicable legal or equitable statutes of limitations, statute of repose or period of limitations which a Party may choose to assert with respect to any claim relating to the Dispute. Any statute of limitation, statute of repose, doctrines of laches, or period of limitation is tolled and suspended from the Effective Date until any Party terminates the Agreement pursuant to Paragraph 3 below. To the extent any legal or equitable statutes of limitations, statutes of repose, doctrines of laches, or periods of limitations already expired before the Effective Date, and which apply to any alleged claim relating to the Dispute that any Party might assert, this Agreement does not waive or otherwise affect any Party's ability to assert such statutes or periods.

2.      Any legal or equitable statute of limitations, statute of repose, doctrines of laches, or period of limitation applicable to the Dispute, and which had not expired as of the Effective Date, shall recommence running upon the termination of this Agreement.

3.      Any Party may terminate this Agreement by giving the other Parties written notice of termination at least sixty (60) calendar days prior to the effective date of termination. Any written notice of termination shall be addressed and served by facsimile and mail as follows:

Notice to Directors
Farella Braun + Martel LLP
Attn: Mary E. McCutcheon and John D. Green
235 Montgomery Street
San Francisco, CA 94104
Fax:  (415) 954-4400

Notice to Pillsbury
Pillsbury Winthrop Shaw Pittman LLP
John M. Grenfell
50 Fremont Street
San Francisco, CA 94105
Fax:  (415) 983-1200

2

19889\1023370.2

PW-Tr0000003

4.    This Agreement shall in no way operate as an admission of liability or responsibility on the part of any Party.

5.    Entering into this Agreement shall not be considered evidence of a lack of due diligence or due care by any Party.

6.    This Agreement contains the entire understanding between the Parties, and no other statement, promise, or inducement made by any of the Parties concerning the subject matter of this Agreement shall be valid or binding. This Agreement may not be altered, amended, modified or otherwise changed in any respect except by writing executed by an authorized representative of each of the Parties.

7.    This Agreement shall governed by, and construed in accordance with, the laws of the State of California, without regard to that state's choice-of-law rules.

8.    Each undersigned representative of the Parties represents and warrants that he or she is fully authorized to enter into this Agreement and to bind the Party he or she represents.

9.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same original.

DATED: August __, 2006          FARELLA BRAUN + MARTEL LLP


By: _____
                John D. Green
Attorneys for Marcus Smith, Terry N. Holdt,
Edward Esber, Robert P. Lee, and James T. Schraith

DATED: August 18 2006          PILLSBURY WINTHROP SHAW PITTMAN LLP

3

19889\1023370.2

PW-Tr0000004

4.      This Agreement shall in no way operate as an admission of liability or responsibility on the part of any Party.

5.      Entering into this Agreement shall not be considered evidence of a lack of due diligence or due care by any Party.

6.      This Agreement contains the entire understanding between the Parties, and no other statement, promise, or inducement made by any of the Parties concerning the subject matter of this Agreement shall be valid or binding.  This Agreement may not be altered, amended, modified or otherwise changed in any respect except by writing executed by an authorized representative of each of the Parties.

7.      This Agreement shall governed by, and construed in accordance with, the laws of the State of California, without regard to that state's choice-of-law rules.

8.      Each undersigned representative of the Parties represents and warrants that he or she is fully authorized to enter into this Agreement and to bind the Party he or she represents.

9.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same original.

DATED: August 18 2006            FARELLA BRAUN + MARTEL LLP


                                 By: _____
                                        John D. Green
                                 Attorneys for Marcus Smith, Terry N. Holdt,
                                 Edward Esber, Robert P. Lee, and James T. Schrath

DATED: August 18 2006            PILLSBURY WINTHROP SHAW PITTMAN LLP

3

PW-Tr0000005

By: _____
John M. Grenfell

Partner

19889\1023370.2

PW-Tr0000006

# EXHIBIT 2

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

601 SOUTH FIGUEROA STREET
SUITE 3300
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 694-1200
FACSIMILE (213) 694-1234

DIRECT PHONE (213) 694-1018
BENNETTB@HBDLAWYERS.COM

November 14, 2002

**VIA FACSIMILE AND FEDERAL EXPRESS**

Craig A. Barbarosh, Esq.                    David Gershon, Esq.
Pillsbury Winthrop LLP                       General Counsel
650 Town Center Drive, Seventh Floor         SONICblue Incorporated
Costa Mesa, CA 92626                         2841 Mission College Boulevard
                                             Santa Clara, CA 95054

           Re:    **SONICblue Incorporated**

Gentlemen:

        This firm represents Portside Growth and Opportunity Fund, Ltd. ("Ramius"), Smithfield Fiduciary LLC ("Smithfield") and Citadel Equity Fund Ltd. ("Citadel", and together with Ramius and Smithfield, the "Senior Noteholders"), holders of the 7 ¾% Secured Senior Subordinated Convertible Debentures due 2005 (the "Senior Notes") issued by SONICblue Incorporated ("Sonic" or the "Company"), under an Indenture (the "Indenture") dated as of April 22, 2002.

        The Senior Noteholders are concerned about the continued operation of the Company's operating businesses (specifically the Rio, Go-Video and ReplayTV product lines, collectively, the "Consumer Electronics Businesses") in light of the Company's recent financial results, the anticipated performance of such product lines and the sale of the Company's shares (the "UMC Shares") in United Microelectronics Corporation ("UMC") to raise funds to make additional investments into the Consumer Electronics Businesses. Continuing the operations of the Consumer Electronics Businesses using proceeds generated from sales of UMC Shares is deepening Sonic's insolvency. That the directors and officers are permitting this to occur breaches their fiduciary duties to Sonic and Sonic's creditors.

        The Company's recently reported financial results for the quarter ended September 30, 2002, showed a significant decrease in gross profit margin to 6.5% from a gross profit margin of 21% for the prior quarter. These recent financial results reflect significant deterioration in the performance of the Consumer Electronics Businesses and reflect that the Company is insolvent or in the vicinity of insolvency. But, even a substantial increase in gross margin will not alter this result. Sonic has publicly forecasted for the quarter ending

HENNIGAN, BENNET & DORMAN LLP

SONICblue Incorporated
November 14, 2002
Page 2

December 31, 2002, a gross profit margin "in the lower double digits", revenues "in the mid $70 million range" and "operating expenses for the quarter . . . in the $17 to $18 million range." Based upon these figures, Sonic publicly stated that it expects operating losses ranging from $8 million to $11 million for the current quarter. To "have sufficient liquidity . . . to meet [the Company's] expected operating results during the fourth quarter", the Company indicated that it will continue to liquidate valuable assets - in particular, the UMC Shares.

Monday's conference call among members of this firm, Bradley Scher of Ocean Ridge Capital Advisors (the Senior Noteholders' financial advisor), the Company's legal (Pillsbury Winthrop LLP) and financial advisors (Houlihan Lokey Howard & Zukin Capital ("Houlihan")) only intensified the Senior Noteholders' concerns. The Company's legal and financial advisors did not identify any reasonably achievable scenario under which the Company will generate sufficient cash flow to operate the Consumer Electronic Businesses, while meeting its obligations to the Senior Noteholders and/or to all of the Company's creditors. As opposed to presenting facts demonstrating that the Consumer Electronics Businesses would improve, the presentation showed that the continued operation of the Consumer Electronic Businesses only will result in further operating losses. Against this backdrop, Houlihan's contention that the Company's problem is that it is simply overleveraged is misguided. The Senior Noteholders are unaware of any business plan for the Consumer Electronics Businesses which provides even a prospect of an operating profit, much less the generation of cash sufficient to retire Sonic's debts as they become due.

The Senior Noteholders are therefore troubled by the Company's prior sales of UMC Shares to finance the failing Consumer Electronics Businesses and the Company's plans to liquidate additional UMC Shares in order to make additional investments to fund the Consumer Electronics Businesses' future working capital needs. The Senior Noteholders were particularly distressed to learn that neither the Company nor Houlihan had performed any analysis of UMC's business prospects prior to deciding to sell UMC Shares.

Sonic's current holdings of UMC Shares represent in excess of 41% of the Company's tangible assets, down from 52% just prior to the Senior Noteholders' investment in the Company. During the first nine months of 2002, the Company sold 23 million UMC Shares for proceeds of $38.9 million. The proceeds appear to have been used to partially fund over $60 million in operating losses during that same period. The Senior Noteholders do not understand how the Company can decide to reduce its ownership interest in UMC and use those proceeds to make additional investments in the Consumer Electronics Businesses without investigating and understanding the business prospects of UMC and comparing the same with the business prospects of each of the Consumer Electronics Businesses. Unless the expected value of a proposed incremental investment in particular Consumer Electronics Businesses exceeds the expected value of the UMC Shares that Sonic would sell to make such incremental investment, Sonic must not sell any UMC Shares.

HENNIGAN, BENNE   & DORMAN LLP

SONICblue Incorporated
November 14, 2002
Page 3

Without having thoroughly analyzed UMC's business prospects, Sonic's officers and directors have no reasonable basis to conclude that the continued liquidation of UMC Shares maximizes the value of the Company for the benefit of its creditors. Among other things, the Senior Noteholders will hold the Company's officers and directors responsible for the value of all UMC Shares sold to facilitate imprudent additional investments in the Consumer Electronics Businesses, including any subsequent increase in the value of UMC Shares that are sold.[1]

I.    **Sonic is clearly in the vicinity of insolvency; and indeed, by many measures, it is already insolvent.**

The Company is insolvent or in the vicinity of insolvency, as those terms are defined by Delaware law. Whether an entity is in the vicinity of insolvency is measured by the risk that creditors will not be paid, In re Ben Franklin Retail Stores, Inc., 225 B.R. 646, 654-55 (N.D. Ill. 1998), and where the applicable facts and circumstances reveal that the Delaware corporation is said to be "playing with the creditors' money." Hechinger Investment Company of Delaware v. Fleet Retail Finance Group, 274 B.R. 71, 89 (D. Del. 2002). That risk is already manifest, as shown by several alternative measures.

First, as described above, the Company's reported financial results for the quarter ended September 30, 2002, evidence a company whose business model generates insufficient cash flow to fund its obligations when they become due. Notwithstanding the Company's 43% improvement in year over year sales, Sonic's gross profit declined by 38% over this same period resulting in only $5 million of gross profit. Sonic's gross profit for the most recent quarter was dwarfed by the Company's $30.3 million in operating expenses. The most recent quarter's operating expenses already reflect dramatic cuts, reducing the potential for future improvement through additional cost savings. Thus, Sonic's operations, prior to any debt payments, continue to require significant cash infusions.

Since Sonic's own public statements concerning the future performance of the Consumer Electronics Businesses anticipate losses for the foreseeable future, the continued operation of these businesses will only deepen the Company's insolvency. The Company's forecasts rely on a projected doubling of gross profit margins for the current quarter. Even assuming the gross profit margin is within the guidance range, the Company still fails to generate an operating profit. Obviously, any shortfall in the gross profit margin actually realized this quarter will only deepen Sonic's anticipated losses and further deplete the Company's assets. In addition, as discussed above, the Company's public statements regarding its forecasts have not included even a general description of any scenario under which the Company becomes profitable and meets its obligations to creditors.

---

[1]    It goes without saying that the Senior Noteholders reserve all of their claims and rights with respect to the careless and inappropriate sales of UMC Shares that have already occurred.

HENNIGAN, BENNE   & DORMAN LLP

SONICblue Incorporated
November 14, 2002
Page 4


Second, Sonic's liquidity position highlights the extent of its current financial difficulties. Assuming Sonic generates, as management has indicated publicly that it expects to generate, losses in the current quarter, such losses, excluding working capital adjustments, will likely consume more cash than the cash on hand as of September 30, 2002. Sonic has no alternative financing sources that do not involve the liquidation of the Company's valuable assets with which to fund the losses associated with the Consumer Electronics Businesses. A default on its debt obligations would seem to unavoidably follow.

Finally, the Company is currently balance sheet insolvent after appropriate adjustments are made to the carrying value of Sonic's intangible assets and to the methodology adopted by the Company to amortize the original issue discount ("OID") on the Senior Notes. Sonic's balance sheet as of September 30, 2002, reflects Goodwill and Intangible Assets of $124.5 million. Based on the deterioration in the Company's operations, the carrying value as of September 30, 2002, is far in excess of the fair market value of these assets. As a practical matter, the Company's basis for amortizing the OID associated with the Senior Notes understates the actual amount of those liabilities. The Company apparently continues to base the amortization of the Senior Notes' OID on the Senior Notes' stated maturity date. However, based on current circumstances, the stated maturity date is irrelevant. The Senior Notes have a payment priority over the 5 ¾% Convertible Subordinated Notes due October 1, 2003, which effectively changes the maturity date of the Senior Notes to on or about that same date. A calculation of the current amount of unamortized OID related to the Senior Notes based on an October 1, 2003, effective maturity date results in an increase in liabilities of tens of millions of dollars, far in excess of the Company's balance sheet equity as of September 30, 2002.

In any event, based on the Company's publicly disclosed forecasts, Sonic's balance sheet equity will be negative as of December 31, 2002, whether or not the adjustments discussed above are taken into account.

Based on the foregoing, it is evident to us and should be evident to the Company's officers and directors that Sonic, at a minimum, has been and continues to operate in the vicinity of insolvency, if it is not already insolvent. Thus, Sonic's officers and directors owe fiduciary duties to its creditors, including the Senior Noteholders. In re Buckhead America Corp., 178 B.R. 956, 968 (D. Del. 1994) ("where a corporation is operating in the vicinity of insolvency, a Board of Directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise, including the corporation's creditors"); Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 WL 277613, *2 (Del. Ch. 1991). Sonic's officers and directors cannot continue to disregard the interests of its creditors while dissipating corporate assets.


226417\v9

HENNIGAN, BENNET & DORMAN LLP

SONICblue Incorporated
November 14, 2002
Page 5

II.     **Sonic's officers and directors have breached their fiduciary duties to creditors and cannot allow Sonic's insolvency to deepen.**

In complete disregard of their fiduciary duties to the Company and its creditors, Sonic's officers and directors continue to aggravate the Company's insolvency by artificially extending the life of the Consumer Electronics Businesses through the sale of UMC Shares. This practice dissipates corporate assets to the detriment of the Company's creditors, including the Senior Noteholders. Such financial deterioration of the Company and utter disregard for fiduciary obligations support a claim by the Senior Noteholders for damages incurred by the Company's deepening insolvency. See, e.g., Official Committee Of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 349-51 (3rd Cir. 2001) (recognizing that the dissipation of corporate assets can be "averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat . . ."); Schacht v. Brown, 711 F.2d 1343, 1350 (7th Cir. 1983) (" . . . the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses."); In re Flagship Healthcare, Inc., 269 B.R. 721, 728 n.4 (Bankr. S.D. Fla. 2001) ("To utilize judicial/artistic license, the Debtor's situation was not like an individual who sits in the rain all day and simply cannot get more wet. It is more akin to a boxer with one black eye who, despite being injured, might still persevere and win the fight. If that boxer (the debtor) winds up losing the fight and landing in the hospital (bankruptcy court), a doctor (judge) might find that it was the additional injuries (deepening insolvency) which put him there.").

Because equity interest holders are clearly out of the money, any assets consumed by the Company detriment Sonic's creditors. Further, incremental investments in presently unsuccessful Consumer Electronics Businesses seem unlikely to generate a positive return. The only potential beneficiaries from continuing the high-risk investment of additional assets into the Consumer Electronics Businesses are shareholders and management. Neither of these constituents bear any of the risks associated with this "business plan." This strategy equates to using creditors' assets to gamble and cannot realistically be expected to benefit the Company or its creditors.

In light of the dire financial situation currently facing the Company, the Senior Noteholders request that Sonic immediately cease all non-self sustaining operations, including any of the Consumer Electronic Businesses that do not operate on a stand alone basis. This is the only business strategy that will preserve the Company's few remaining valuable assets, including the UMC Shares. In addition, there should be no additional sales of UMC Shares unless a thorough and detailed analysis demonstrates that such sales are consistent with the Company's officers and directors fiduciary duties to the Company's creditors. Finally and most importantly, as it appears already that the Company will not be able to pay its debts as they become due next year, the Company should immediately engage in meaningful discussions with its creditors,

HENNIGAN, BENNET & DORMAN LLP

SONICblue Incorporated
November 14, 2002
Page 6

particularly its senior creditors, in order to pursue and develop a responsible resolution of the issues raised in this letter.

We respectfully request that you immediately transmit copies of this letter to each of the Company's officers and directors. We hope and expect that they will begin performing their fiduciary duties to the Company and its creditors. Their failure to do so will constitute a separate breach of the fiduciary duties owed to the Company and its constituents.

Sincerely,

Bruce Bennett

BB/jdm

cc:    Mr. Jeffrey M. Solomon
       Mr. Adam J. Chill
       Mr. Kenneth A. Simpler

226417\v9

# HENNIGAN, BENNETT & DORMAN LLP

### LAWYERS

601 SOUTH FIGUEROA STREET

SUITE 3300

LOS ANGELES, CALIFORNIA 90017

TELEPHONE (213) 694-1200
FACSIMILE (213) 694-1234

DIRECT PHONE (213) 694-1013
BENNETTB@HBDLAWYERS.COM

January 15, 2003

**VIA FACSIMILE**

Craig A. Barbarosh, Esq.
Pillsbury Winthrop LLP
650 Town Center Drive, Seventh Floor
Costa Mesa, CA 92626

>       Re:    SONICblue Incorporated

Dear Craig:

Yesterday, I heard a report on a telephone conversation between the financial advisors for the Company and the Senior Noteholders. Based on that conversation, it appears that SONICblue's operating results for the fourth quarter of 2002 were disappointing, at best. In addition, and notwithstanding the continuing bad news from SONICblue's consumer electronic businesses, SONICblue continues to further diminish its assets by selling its interests in UMC to fund the cash requirements of these failing businesses. We understand that SONICblue sold additional UMC shares near the end of the year for a sale price of approximately $5 million. But even after that asset sale, it was reported that SONICblue's cash position remains marginal.

Our clients' respective financial advisors also discussed the current status of the Company's efforts to sell its consumer electronics businesses. Mr. Fishman advised Mr. Scher that the potential purchaser of the consumer electronics businesses that the Company believed would be interested in making a preemptive (meaning high) bid for the consumer electronics businesses in December recently submitted a bid described as not a lot better than the results the Company would expect and has projected would be realized in an immediate liquidation of the Company's assets.

The Company's plan to proceed with an extended sale process intended to attract a purchaser of the consumer electronics businesses as a going concern was based upon the assumptions that (i) a going concern sale would generate much higher prices for the Company's assets than an immediate liquidation; and (ii) the extended going concern sale process would proceed without any significant diminution in the value of the Company's assets resulting from operating losses incurred during that sale process. It now appears that both of these crucial assumptions are incorrect. Accordingly, the only reasonable course of action for SONICblue's board of directors is to immediately cease all operations and liquidate the Company's assets without further delay. Any other asset disposition plan subjects the Senior Noteholders and the

HENNIGAN, BENNETT & DORMAN LLP

Craig A. Barbarosh, Esq.
January 15, 2003
Page 2

Company's other creditors to the nearly certain prospect that the aggregate value of the Company's assets will continue to decline.[1]

Apart from the foregoing, although we received some information yesterday and more is promised to follow today, even though the Company started its sale process a month ago the Senior Noteholders have not seen even drafts of the basic sale materials, such as letters directed to potential purchasers and information memoranda for each of the Company's business units-- all of which were to be prepared and circulated to the Senior Noteholders by now. And, the Senior Noteholders are a bit puzzled by the Company's recent announcement that it is hiring additional senior personnel and promoting others. Is this consistent with the Company's representations to the Senior Noteholders that it is focused on implementing a prompt sale process? For these reasons, it is not even clear to the Senior Noteholders that the Company could actually achieve the benchmarks it established for the now demonstrably unreasonable sale process that it was planning to implement at the end of last year.

SONICblue's officers and directors can no longer continue to operate SONICblue's consumer electronics businesses using funds obtained by liquidating SONICblue's interests in UMC. The Company has admitted that SONICblue is insolvent or, at a minimum, in the vicinity of insolvency as those terms are defined by Delaware law and that the Company cannot be successfully operated as a going concern. Consequently, whether or not an event of default has yet occurred under the Senior Notes, the Company and each of its officers and directors have fiduciary duties to creditors, including the Senior Noteholders, as well as legal duties to avoid deepening SONICblue's insolvency. Continuing to operate the consumer electronics businesses

---

[1]    We should note that the Senior Noteholders have always believed that the Company's original projections of the difference between (i) the net proceeds available following an immediately commenced liquidation process and (ii) the net proceeds available following the extended sale process envisaged by the Company, overstated the potential benefit of the longer process. In addition, the Senior Noteholders also believed that the Company and its managers failed to adequately appreciate that a potential outcome of the Company's strategy was a desperate liquidation process conducted following a protracted and unsuccessful going concern sale process during which time the assets of the company would further deteriorate or be used to fund struggling operations. Finally, the Company's original sale projections also showed that the primary beneficiaries of the extended sale process sponsored by the Company are particular general unsecured creditors whose claims are projected to be assumed and paid in full by a going concern purchaser and not creditors generally.

Together these observations were more than sufficient to cause any responsible manager of the Company's assets to reconsider the wisdom of attempting a lengthy sale process for its failing businesses. When considered together with the recent developments summarized above, they demonstrate that the further implementation of the Company's original sale process is totally irresponsible.

# HENNIGAN, BENNETT & DORMAN LLP

Craig A. Barbarosh, Esq.
January 15, 2003
Page 3

is diminishing SONICblue's assets. These operations are also deepening SONICblue's insolvency and, therefore, continuously lowering the value of the Senior Noteholder's potential recovery in respect of their claims against SONICblue.

The deterioration in the Senior Noteholder's prospects for recovery on their claims is a direct and foreseeable consequence of actions taken by SONICblue's directors and officers which breach fiduciary duties to SONICblue's creditors and which deepen SONICblue's insolvency. Thus, each of SONICblue's directors and officers are liable to the Senior Noteholders for the full amount of the deterioration in SONICblue's financial condition that has occurred to date and any continuing diminution in creditors' ultimate recovery from SONICblue that results from any further delay in the liquidation of the consumer electronics businesses.

I would also like to take the opportunity to respond again, this time somewhat more formally, to your letter dated December 19, 2002. That letter states that SONICblue will not provide the Senior Noteholders with additional collateral for claims arising under the Senior Notes.

First, that an event of default may not yet have occurred does not give SONICblue liberty to subject the Senior Noteholders to ever increasing risks without appropriate compensation. Doing so violates the Company's and its directors' and officers' fiduciary duties to the Senior Noteholders. Thus, the Senior Noteholders cannot understand the Company's unwillingness to engage in a constructive dialogue with the Senior Noteholders with a view to providing the Senior Noteholders with additional collateral, which would protect them against the ramifications of an extended sale process embarked upon by the Company that will lead only to additional losses rather than benefits. If it would improve the prospects for a dialogue with the Company, the Senior Noteholders would be willing to consider arrangements that provide them with additional collateral, but limits their ability to resort to such collateral to circumstances where their recovery is adversely impacted by disappointing results realized in the Company's sale process.

Second, granting additional collateral to the Senior Noteholders to protect them from this risk does not prejudice the Company's junior lenders. Such lenders' claims are subordinated to the claims of the Senior Noteholders in any event. They will not benefit from value inherent in any of the Company's assets unless and until the Senior Noteholders claims are paid in full, with interest.

While parties not subordinated to the Senior Noteholders claims might, in other circumstances, argue that any grant of additional security to the Senior Noteholders unfairly prioritizes such claims, the Company cannot, in this instance, be sincerely concerned about criticism of such alleged preferences from the legacy trade creditors. SONICblue has already systematically preferred trade creditors over the Senior Noteholders by making tens of millions of dollars in payments to them while the Company was insolvent. The Company has also made plain to the Senior Noteholders its plans to continue to make such payments during the sales

## HENNIGAN, BENNETT & DORMAN LLP

Craig A. Barbarosh, Esq.
January 15, 2003
Page 4

process it has undertaken in amounts that may aggregate as much as $10 million each quarter. These payments diminish the Company's assets, deepen its insolvency and reduce the distribution available to satisfy claims of the Senior Noteholders. In the absence of steps which assure that all creditors are treated equally, these preferential payments must cease immediately. In any event, granting the Senior Noteholders additional collateral will merely prevent them from falling behind as a result of the Company's preferential payments to other *pari passu* creditors and insure that the Board of SONICblue treats all creditors fairly.

Third, as I advised you during our telephone conversations, the Senior Noteholders are willing to provide the Company with good and valuable consideration in exchange for satisfactory additional collateralization and other arrangements intended to mitigate incremental risks now confronting the Senior Noteholders.

For all of the foregoing reasons, the Senior Noteholders respectfully suggest that the Company reconsider its position concerning the granting of additional collateral to the Senior Noteholders for their claims under the Senior Notes.

The Senior Noteholders reiterate all of the concerns set forth in their letter dated November 14, 2002, and respectfully advise that SONICblue cease its sales of interests in UMC to support its failing consumer electronics businesses and that SONICblue's directors and officers take immediate action to prevent the continuing deterioration in SONICblue's assets and the deepening of SONICblue's insolvency. If you have any questions or if you are interested in commencing a dialogue with the Senior Noteholders concerning the matters discussed herein, please contact me. In the meantime, kindly forward a copy of this letter to each director of the Company.

Very truly yours,

Bruce Bennett

BB/jdm

cc:    Mr. Jeffrey M. Solomon
       Mr. Adam J. Chill
       Mr. Kenneth A. Simpler

250860\v6

# EXHIBIT 3

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    CRAIG A. BARBAROSH  #160224
2   WILLIAM B. FREEMAN  #137276
    MARK D. HOULE  #194861
3   650 Town Center Drive, 7th Floor
    Costa Mesa, CA  92626-7122
4   Telephone: (714) 436-6800
    Facsimile:  (714) 436-2800

5

6   Attorneys for Debtors and Debtors-In-Possession

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                SAN JOSE DIVISION

11

| | |
|---|---|
| IN RE: | Chapter 11 cases |
| SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, | Case Nos. 03-51775 through 03-51778 MJS<br><br>[Jointly Administered]<br><br>EIGHTH SUPPLEMENTAL DECLARATION IN SUPPORT OF APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTION 327(a) AUTHORIZING THE EMPLOYMENT AND RETENTION OF PILLSBURY WINTHROP LLP AS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS |
| Debtors and Debtors-in-Possession. | [No Hearing Required] |

1    DECLARATION OF WILLIAM B. FREEMAN

2    I, WILLIAM B. FREEMAN, hereby declare and state as follows:

3    1.    I am an attorney with and partner of the law firm of Pillsbury Winthrop

4 Shaw Pittman LLP ("Pillsbury" or the "Firm"), and am authorized to make this declaration

5 on behalf of the Firm.  The Firm is general insolvency counsel to SONICblue Incorporated,

6 a Delaware corporation, Diamond Multimedia Systems, Inc., a Delaware corporation,

7 ReplayTV, Inc., a Delaware corporation, and Sensory Science Corporation, a Delaware

8 corporation (collectively, the "Debtors").  In such capacity, and except as otherwise

9 indicated herein, I have personal knowledge of the facts set forth below, and if called as a

10 witness I could and would competently testify to the matters set forth in this declaration.

11    2.    I hereby submit this eighth supplemental declaration in connection with the

12 Debtors' previously approved Application For Order Pursuant To Bankruptcy Code Section

13 327(a) Authorizing The Employment And Retention Of Pillsbury Winthrop LLP As

14 General Insolvency Counsel To The Debtors ("Application").  Pillsbury previously

15 submitted a supplemental declaration on or about May 30, 2003, a second supplemental

16 declaration on or about January 23, 2004, a third supplemental declaration on or about April

17 12, 2005, a fourth supplemental declaration on or about July 13, 2005, a fifth supplemental

18 declaration on or about July 27, 2005, a sixth supplemental declaration on or about

19 November 4, 2005, and a seventh supplemental declaration on or about June 5, 2006.

20    3.    The Firm has been engaged as the Debtors' corporate and litigation counsel

21 since approximately 1989.  During that time, the Firm has provided legal representation to

22 the Debtors in a variety of areas, including corporate and securities matters, mergers and

23 acquisitions, litigation, and intellectual property matters.  The Firm has been working with

24 the Debtors in connection with their restructuring since approximately October 25, 2002,

25 when the Firm was retained to provide advice concerning the restructuring of the Debtors'

26 liabilities and business operations.  On or about April 24, 2003, this Court approved the

27 Firm's employment as general insolvency counsel for the Debtors, subsequently modified

28 by further order of this Court in March 2005.

600261216v1                            - 2 —                EIGHTH SUPPLEMENTAL DECLARATION
                                                            REGARDING APPLICATION TO EMPLOY

1    4.    As discussed below, I, the Firm, and certain of its partners, counsel, and

2    associates may have in the past represented, and may presently and likely in the future will

3    represent creditors or stockholders of the Debtors in matters unrelated to these Chapter 11

4    Cases.

5    5.    Since the time of approval of the Firm's employment in this case and the last

6    supplemental declaration filed with this Court on or about May 31, 2006, I have become

7    aware of additional matters which require supplemental disclosure to this Court. To the

8    best of my knowledge, the Firm's relationships with these entities are as follows:

9    a.    Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary

10    LLC and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders"), are holders of

11    the 7¾% Senior Secured Subordinated Convertible Debentures due 2005 (the "Senior

12    Notes"). The Debtors scheduled the claim of the Senior Noteholders for in excess of $77

13    million, and each of the three Senior Noteholders filed its own proofs of claim in

14    unspecified amounts related to the Senior Notes. In connection with its Application, the

15    Firm previously disclosed its substantial pre-petition representation of the Debtors,

16    including for corporate and securities matters. As part of that representation, the Firm

17    represented SONICblue in issuing the Senior Notes. As is typical in such financing

18    transactions, the Firm issued a legal opinion to the Senior Noteholders. Pursuant to letter

19    dated September 5, 2006, counsel to the Senior Noteholders sought indemnity from the

20    Firm related to the Senior Notes (the "Demand"). The Firm has rejected the Demand and

21    declined to provide any indemnity to the Senior Noteholders, and immediately upon receipt

22    of the Demand the Firm informed counsel for the Creditors' Committee of the Demand and

23    turned over the analysis of all issues regarding the allowance of the Senior Noteholders'

24    claims to the Committee. No lawyer in the firm who handled the financing transaction was

25    involved in the firm's analysis regarding the Senior Noteholders' claims. Whether the

26    Demand creates any disabling conflict or renders the Firm not "disinterested" is presently

27    before the Court on motions filed by the U.S. Trustee.

28

600261216v1                                    - 3 —
                                                          EIGHTH SUPPLEMENTAL DECLARATION
                                                          REGARDING APPLICATION TO EMPLOY

1          b.      Exxon Mobil Corporation.  Exxon Mobile/GECC has been scheduled

2    in these cases with an undisputed general unsecured claim of $44.  The Firm represents or

3    has represented Exxon Mobil Corporation, which may be related to Exxon Mobile/GECC,

4    in matters unrelated to the Debtors or these cases.

5          c.      Tech Data Corporation.  Tech Data (Schwiez) AG was scheduled

6    with a general unsecured claim of $2,604.00.  Tech Data GMBH & Co. OHG filed a proof

7    of claim in these cases in the amount of $70,850.77.  The Firm represents or has

8    represented Tech Data Corporation, which may be related to Tech Data (Schweiz) and/or

9    Tech Data GMBH & Co. OHG, in matters unrelated to the Debtors or these cases.

10         d.      Kaiser Permanente.  Kaiser Permanente was scheduled with a general

11   unsecured claim of $20,982.09.  Kaiser's claim is undisputed except for a Section 502(d)

12   objection included in the Creditors' Committee's preference avoidance action against

13   Kaiser Permanente and Kaiser Foundation Health Plan, Inc., which case is still pending.

14   Effective March 5, 2007, the Firm employed a paralegal, Jennifer Erlwein, who, at her prior

15   firm, Epstein Becker & Green PC, provided client legal services to Kaiser Permanente in

16   matters unrelated to the Debtors or these cases.  Ms. Erlwein will have no involvement in

17   the SONICblue cases as an employee of the Firm.

18        6.       If there is a dispute with any present or past client of the Firm in matters

19   related to the Debtors or these cases requiring litigation or other action, counsel to the

20   Creditors' Committee or another firm will handle such action.

21        7.       Except as disclosed herein, in the Application, and in the previous

22   supplemental declarations, to my knowledge the Firm, and its partners, counsel, and

23   associates, do not have any connection with the Debtors, creditors, any other party in

24   interest, their respective attorneys and accountants, or with the United States Trustee for

25   this region.  Except as disclosed herein and in the Application and the previous

26   supplemental declarations, to my knowledge the Firm does not hold or represent an interest

27   adverse to the Debtors and their respective estates as to the matter in which the Firm is to be

28   employed.  Further, to the best of my knowledge, none of the entities identified above was

EIGHTH SUPPLEMENTAL DECLARATION
REGARDING APPLICATION TO EMPLOY

1    responsible for more than one percent (1%) of the Firm's annual revenue for the most

2    recent year.

3         8.     The foregoing constitutes an eighth supplemental statement of the Firm

4    pursuant to Sections 327 and 504 of the Bankruptcy Code and Rule 2014(a) of the Federal

5    Rules of Bankruptcy Procedure.

6         9.     The Firm has referred the matter described in paragraph 5(a) above to

7    counsel for the Creditors' Committee.  In the event that an actual conflict arises with any of

8    the entities described in paragraph 5(b), (c) or (d) above, or any other entity, as a result of

9    the Firm's representation of the Debtors herein, the Firm will either (a) obtain written

10   waivers from both parties, or (b) will not represent either party, and the Debtors will seek

11   this Court's permission to engage special counsel in connection with such matters, if

12   necessary.  The Firm will continue to monitor its relationship with the creditors and other

13   parties in interest in these cases and, as it discovers additional information requiring

14   disclosure, will promptly supplement this application with any appropriate disclosures.

15        I declare under penalty of perjury under the laws of the United States of America

16   that the foregoing is true and correct.

17        Executed this 5th day of March 2007, at Los Angeles, California.

18

19

20                             */s/ William B. Freeman*
                           William B. Freeman

21

22

23

24

25

26

27

28

600261216v1            – 5 –                    EIGHTH SUPPLEMENTAL DECLARATION
                                            REGARDING APPLICATION TO EMPLOY

# EXHIBIT 4

1

1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN JOSE DIVISION)

4

5    In re:

6    SONIC BLUE, INC.,                    Case No. 03-51775-MM
                                          Thru      03-51778-MM
7                                         (Jointly Administered)

8                                         Chapter 11

9                                         San Jose, California
                                          March 19, 2007
10                                        10:35 a.m.
             Debtor.
11    _____/

12

13                TRANSCRIPT OF PROCEEDINGS
        a) AMENDED MOTION TO DISQUALIFY PILLSBURY, WINTHROP,
14    SHAW, PITTMAN, LLP, TO VACATE EMPLOYMENT ORDER, AND FOR
      DISGORGEMENT OF ATTORNEY'S FEES BY UNITED STATES TRUSTEE
15          b) JOINDER IN MOTION BY UNITED STATES TRUSTEE
                    BY SONIC BLUE CLAIMS, LLC
16        c) JOINDER IN MOTION BY RIVERSIDE CONTRACTING, LLC
                    AND RIVERSIDE CLAIMS, LLC
17          d) OPPOSITION TO MOTION BY PILLSBURY, WINTHROP,
                        SHAW, PITTMAN, LLP
18        e) REPLY TO OPPOSITION TO U.S. TRUSTEE'S MOTION TO
            DISQUALIFY PILLSBURY BY SONIC BLUE CLAIMS, LLC
19    f) RESPONSE TO SONIC BLUE CLAIMS LLC'S REPLY TO OPPOSITION
         BY PORTSIDE GROWTH & OPPORTUNITY FUND, SMITHFIELD
20          FIDUCIARY, LLC, AND CITADEL EQUITY FUND, LTD.
         g) AMENDED MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE
21                        BY U.S. TRUSTEE
            h) JOINDER IN MOTION FOR APPOINTMENT OF
22          CHAPTER 11 TRUSTEE BY MAXTOR CORP.
                i) OPPOSITION TO MOTION BY DEBTOR
23          j) AMENDED MOTION TO CONVERT TO CHAPTER 7
                    BY SONIC BLUE CLAIMS, LLC
24    k) LIMITED RESPONSE TO MOTION TO CONVERT, APPOINT
      CHAPTER 11 TRUSTEE AND/OR DISQUALIFY DEBTOR'S COUNSEL
25                  BY VIA TECHNOLOGIES, INC.

2

```
1    l) RESPONSE TO MOTION TO CONVERT BY PORTSIDE GROWTH &
        OPPORTUNITY FUND, SMITHFIELD FIDUCIARY, LLC, AND
2                    CITADEL EQUITY FUND, LTD.
        m) RESPONSE TO (g) MOTION FOR APPOINTMENT OF
3    CHAPTER 11 TRUSTEE AND (i) MOTION TO CONVERT TO
        CHAPTER 7 BY OFFICIAL COMMITTEE OF CREDITORS
4                HOLDING UNSECURED CLAIMS
        n) RESPONSE TO MOTION TO CONVERT TO CHAPTER 7
5                BY SONIC BLUE CLAIMS, LLC

6

7            BEFORE THE HONORABLE MARILYN MORGAN
                UNITED STATES BANKRUPTCY JUDGE
8

9    APPEARANCES:

10
     For the Creditors'        LEVENE, NEALE, BENDER, RANKIN
11   Committee:                & BRILL, LLP
                               BY: RON BENDER, ESQ.
12                                  CRAIG RANKIN, ESQ.
                               10250 Constellation Boulevard.
13                             Suite 1700
                               Los Angeles, California 90067
14

15

16   For Riverside            MURRAY & MURRAY
     Contracting:             BY: ROBERT A. FRANKLIN, ESQ.
17                            19400 Stevens Creek Boulevard,
                              Suite 200
18                            Cupertino, California 95014

19

20   For Pillsbury:           PILLSBURY, WINTHROP, SHAW &
                              PITTMAN
21                            BY: THOMAS V. LORAN, III, ESQ.
                                   CRAIG BARBAROSH, ESQ.
22                            50 Fremont Street
                              San Francisco, California 94105
23

24

25
```

3

```
1  APPEARANCES (CONTINUED)

2
   For Pillsbury:          HOWARD, RICE, NEMEROVSKI, CANADY,
3                          FALK & RABKIN, PC
                           BY: BERNARD BURK, ESQ.
4                          Three Embarcadero Center, 7th Floor
                           San Francisco, California 94111
5

6
   Proposed Special        JEFFER, MANGELS, BUTLER & MARMARO
7  Counsel for the Debtor:  BY: RICHARD A. ROGAN, ESQ.
                            Two Embarcadero Center, 5th Floor
8                           San Francisco, California 94111

9

10 For Maxtor Corporation:  BIALSON, BERGEN & SCHWAB
                            BY: PATRICK M. COSTELLO, ESQ.
11                          2600 El Camino Read, Suite 300
                            Palo Alto, California 94306
12

13

14 For the U.S. Trustee:    OFFICE OF THE U.S. TRUSTEE
                            BY: NANETTE DUMAS, ESQ.
15                              EDWINA DOWELL, ESQ.
                                SHANNON MOUNGER, ESQ.
16                          280 South First Street #268
                            San Jose, California 95113
17

18
   Special Litigation       O'MELVENY & MYERS, LLP
19 Counsel for Debtor:      BY: MATT POWERS, ESQ.
                            Embarcadero Center West
20                          275 Battery Street, Suite 2600
                            San Francisco, California 94111
21

22

23

24

25
```

4

```
 1  APPEARANCES (CONTINUED):

 2

 3  For Sonic Blue claims:      McGRANE GREENFIELD, LLP
                                BY: BERNARD S. GREENFIELD, ESQ.
                                40 South Market Street, 7th Floor
 4                              San Jose, California 95113

 5                                         -and-

 6                              STUTMAN, TREISTER & GLATT
                                BY: K. JOHN SHAFFER, ESQ.
 7                                  FRANK A. MEROLA, ESQ.
                                1901 Avenue of the Starts,
 8                              12th Floor
                                Los Angeles, California 90067

 9

10  For the senior              HENNIGAN, BENNETT & DORMAN
    note holders:               BY: BRUCE BENNETT, ESQ.
11                              865 South Figueroa Street,
                                Suite 2900
12                              Los Angeles, California 90017

13

    For Via Technologies:       PACHULSKI, STANG, ZIEHL, YOUNG,
14                              JONES & WEINTRAUB
                                HENRY KEVANE, ESQ.
15

16  For LSI and                 LAW OFFICES OF McNUTT and
    Hayne Capital               LITTENEKER
17                              BY: SCOTT H. McNUTT, ESQ.
                                188 The Embarcadero #800
18                              San Francisco, California 94105

19
    Court Recorder:             LUPE BARRON
20                              UNITED STATES BANKRUPTCY COURT
                                280 South First Street
21                              San Jose, California 95113

22
    Transcription Service:      Jo McCall
23                              Electronic Court
                                Recording/Transcribing
24                              2868 E. Clifton Court
                                Gilbert, Arizona 85297
25                              Telephone: (480) 361-3790
```

6

1        MR. BURK: Good morning, Your Honor, Bernard Burk

2  from Howard Rice.  Also present for Pillsbury Winthrop

3  today is John Grenville (Phonetic) who's here as a

4  representative of the firm and its management to make sure

5  that the Court's wishes are fully carried out in these

6  difficult circumstances.

7        THE COURT: Okay.  Good morning, Mr. Burk.

8        MR. ROGAN: Good morning, Your Honor, Richard

9  Rogan of Jeffer, Mangels, Butler & Marmaro, proposed

10  special counsel for the Debtor.

11       MR. POWERS: Good morning, Your Honor, Matt Powers

12  of O'Melveny & Myers, special litigation counsel for the

13  Debtor.

14       MR. FRANKLIN: Good morning, Your Honor, Robert

15  Franklin of Murray & Murray appearing on behalf of

16  creditor, Riverside Claims and Riverside Contracting.

17       MR. COSTELLO: Good morning, Your Honor, Patrick

18  Costello on behalf of Maxtor Corporation.

19       MR. BENNETT: Good morning, Your Honor, Bruce

20  Bennett of Hennigan, Bennett & Dorman on behalf of the

21  senior note holders.

22       MR. GREENFIELD: Good morning, Your Honor, Bernard

23  Greenfield for SBC.

24       MR. SHAFFER: Good morning, Your Honor, John

25  Shaffer and Frank Merola for SBC.  Thank you.

16

1  once it was asserted, again in August of 2006, I want to

2  start by making something very clear, and Pillsbury wants

3  there to be no mistake because I think that in some of the

4  papers, there's been a less than entirely charitable

5  interpretation of their position.  When the senior note

6  holders raised the claim, based on the opinion, regardless

7  of its merits, it was at that time, necessary under

8  Bankruptcy Rule 2004 (sic) for Pillsbury to file a

9  supplemental disclosure.  They failed to do so promptly.

10  That was a failure in their obligations to the Court.

11  Pillsbury has apologized to the Court and to the United

12  States Trustee in its papers.  Mr. Grenville,

13  representative of the Pillsbury firm and Pillsbury's

14  management today is here to say again, as am I, that they

15  deeply, deeply regret their failure to attend to their

16  obligations under the Bankruptcy Rules.

17       But to say that this was part of a program of

18  deliberate concealment is completely unfair and is

19  ungrounded in the evidence.  In point of fact, while

20  Pillsbury did fail to do what they needed to do under the

21  Rules at the time that the claim was raised, they promptly

22  made the claim and the conflict that it created known, and

23  they took action to deal with it.  Specifically, within

24  days of the time that this claim was first asserted --

25       (Static noise.)

1 | everything for -- to forfeit the entire river for a misstep
2 | in midstream.
3 |         With that, unless the Court has questions for me
4 | or for Mr. Grenville on behalf of the firm, I will submit
5 | it.  Thank you.
6 |         THE COURT: Thank you, Mr. Burk.
7 |         Mr. Bennett?
8 |         MR. BENNETT: Well, I'm glad you found the
9 | statutory reference.  I guess I was lucky to speak.  I was
10 | at Judge Ryan's retirement dinner, and I had to speak.
11 | Many of the speakers made age jokes.  I didn't and it's a
12 | good thing because I can't believe I didn't remember
13 | 502(a).  But in any event, there's actually two places.
14 | One of the things I wanted to make clear is 502(a) not only
15 | talks about parties in interest, it even talks about people
16 | who aren't parties in interest, in some circumstances can
17 | object to claims.  Just if you want your record to be
18 | complete, Rule 3008 also says that when reconsidering an
19 | order allowing a claim, that's also a wide open function.
20 | This is -- there's no monopoly.
21 |         THE COURT: Thank you, Mr. Bennett.
22 |         MR. BENNETT: Okay.  But I think we learn
23 | something there.  I mean you've got a lot of papers that
24 | have been written with the clear intent to whip this thing
25 | up.  When we were here last, Your Honor and Mr. Shaffer

# EXHIBIT 64

OCT 09 2003

GIBSON, DUNN & CRUTCHER LLP
DAVID KENNEDY, SBN 105884
STEVEN J. JOHNSON, SBN 121568
DESMOND CUSSEN, SBN 154936
One Montgomery Street, 31st Floor
San Francisco, California 94104-4505
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

Attorneys for INTEL CORPORATION

FILED

03 OCT 17 AM 10: 45

FILED

U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA
SAN JOSE. CA. OCT 09 2003

CLERK
United States Bankruptcy Court
San Jose, California

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

In re

SONICblue, Inc., *et al.*

Debtors

CHAPTER 11

CASE NOS. 03-51775 through 51778 MM

**STIPULATED PROTECTIVE ORDER**

### STIPULATION

WHEREAS, Intel Corporation filed a Motion for Relief from the Automatic Stay To Terminate License Agreement With The Debtor According To Its Terms (the "Motion"), which was denied without prejudice to Intel renewing the Motion after November 30, 2003;

WHEREAS, Debtor SONICblue, Inc. ("Debtor") served subpoenas *duces tecum* on Intel Corporation and VIA Technologies, Inc. (the "Responding Parties") seeking discovery in connection with the Motion or any litigation in the within SONICblue bankruptcy case related to the subject matter of the Motion;

WHEREAS, Debtor and the Responding Parties seek to maintain the confidentiality of any confidential information that the Responding Parties or other third parties have agreed to disclose in their responses to such subpoenas or otherwise agree to disclose in response to discovery requests in

1  connection with the Motion or any litigation in the within SONICblue bankruptcy case related to the

2  subject matter of the Motion;

3        WHEREAS, in order to protect the confidentiality of confidential information disclosed by

4  the Responding Parties or other third parties in connection with the Motion, or any litigation in the

5  within SONICblue bankruptcy case related to the subject matter of the Motion, it is hereby stipulated

6  by and between Debtor (and its Special Counsel), the Responding Parties, and the Official Committee

7  of Unsecured Creditors (and its counsel), by and through their attorneys, and pursuant to the Court's

8  authority, it is hereby ORDERED, as follows:

9        **1.**    **Designation of "Confidential Outside Counsel's Eyes Only" and "Confidential**

10  **Information."**  Any party or non-party may designate as "Confidential Outside Counsel's Eyes

11  Only" or "Confidential" any document or response to discovery which that party or non-party

12  considers in good faith to contain information involving trade secrets, confidential business or

13  financial information, or information otherwise subject to a legally protected right of privacy under

14  California or federal law.  To designate a document or other material as Confidential Outside

15  Counsel's Eyes Only or Confidential, Responding Parties, a party, or counsel for a party shall stamp

16  the document or other material with the phrase "CONFIDENTIAL OUTSIDE COUNSEL'S EYES

17  ONLY PURSUANT TO PROTECTIVE ORDER" or "CONFIDENTIAL PURSUANT TO

18  PROTECTIVE ORDER," as the case may be.  The "Confidential Outside Counsel's Eyes Only"

19  designation shall be used in good faith and only for particularly sensitive materials, such as trade

20  secrets and other highly sensitive proprietary and business confidential information.  The less

21  restrictive "Confidential" designation shall be used for other confidential business or financial

22  information or information otherwise subject to a legally protected right of privacy under California

23  or federal law.  In lieu of marking the originals, the copies that are produced or exchanged may be

24  marked.  Where a document consists of more than one page, the first page and each page on which

25  Confidential Outside Counsel's Eyes Only or Confidential Information appears shall be so

26  designated.

27        **2.**    **Nondisclosure of Confidential Outside Counsel's Eyes Only Information or**

28  **Confidential Information**.  Except with the prior written consent of the party originally designating

Gibson, Dunn &
Crutcher LLP

2

1  a document as Confidential Outside Counsel's Eyes Only Pursuant To Protective Order or

2  Confidential Pursuant To Protective Order, or as hereinafter provided under this Order, no document

3  or information designated as "Confidential Outside Counsel's Eyes Only" (hereinbefore and after

4  referred to as "Confidential Outside Counsel's Eyes Only Information") shall be shown to anyone

5  other than: (1) up to five designated attorneys from the law firm of O'Melveny & Myers LLP, Special

6  Counsel to SONICblue, Inc.; (2) up to three designated attorneys from the law firm of Levene, Neale,

7  Bender, Rankin & Brill LLP, attorneys for the Official Committee of Unsecured Creditors; (3) up to

8  five designated attorneys from the law firm of Krieg, Keller, Sloan, Reilley & Roman LLP, Special

9  Counsel for the Official Committee of Unsecured Creditors; (4) up to three designated attorneys from

10  the law firm of Gibson, Dunn & Crutcher LLP, outside counsel for Intel Corporation, (5) up to three

11  designated attorneys from the law firm of Heller Ehrman White & McAuliffe, and up to three

12  designated attorneys from the law firm of Wilson Sonsini Goodrich & Rosati, both outside counsel

13  for Via; (6) up to two designated attorneys from the law firm of Hennigan, Bennett & Dorman LLP,

14  counsel for the Senior Debtholders; (7) administrative and clerical employees of (1), (2), (3), (4), (5)

15  and (6); (8) any authors of the Confidential Outside Counsel's Eyes Only Information or persons who

16  received the Confidential Outside Counsel's Eyes Only Information in the ordinary course of business

17  prior to the filing of the Motion; (9) the Court and court personnel, consistent with the provisions for

18  filing Court materials under seal as set forth in paragraph 5 of this Order; and (10) Court reporters

19  and any persons involved in recording deposition testimony in connection with the Motion, or any

20  litigation related to the subject matter of the Motion, provided that such persons have first executed a

21  copy of Exhibit A. No documents or information designated as "Confidential Pursuant To Protective

22  Order" (hereinbefore and after referred to as "Confidential Information") may be disclosed to any

23  person other than "Qualified Persons" as described in Paragraph 3 below. Persons who, by virtue of

24  their interest in the Motion or any related litigation in the within SONICblue bankruptcy case and

25  consistent with the procedures provided under this Order, have knowledge of Confidential Outside

26  Counsel's Eyes Only or Confidential Information, shall not disclose or permit the disclosure of it or

27  of any information obtained, derived, compiled, or ascertained therefrom, to any person who is not

28  entitled to receive such information under this Order. Confidential Outside Counsel's Eyes Only

1  Information and Confidential Information shall be used solely for the purposes of supporting or

2  opposing the Motion or in litigation in the within SONICblue bankruptcy case related to the subject

3  matter of the Motion, and shall not be used for any other purpose; provided, however, that (a) the

4  party or non-party from whom Confidential Outside Counsel's Eyes Only Information or Confidential

5  Information originates may use its own Confidential Outside Counsel's Eyes Only Information or

6  Confidential Information for any purpose, subject to the terms of any other confidentiality

7  agreements that they may be subject to; and (b) the viewing of Confidential Outside Counsel's Eyes

8  Only Information or Confidential Information shall not be deemed to create an attorney-client,

9  fiduciary, or similar relationship between the viewing attorney and the party producing such

10  information.  Nothing in this Order shall restrict any attorney of record from rendering advice to the

11  attorney's client in connection with the Motion or any litigation related to the subject matter of the

12  Motion and, in the course thereof, relying upon an examination of "Confidential Outside Counsel's

13  Eyes Only" or "Confidential" material; provided, however, that the attorney shall not disclose the

14  content of such material.

15      3.      **Permissible Disclosures.**  Except as otherwise provided in paragraph 2 above,

16  documents or information designated as Confidential Pursuant To Protective Order shall not be

17  disclosed to any person other than the following (hereinbefore and after "Qualified Persons") and

18  only to the extent necessary for this litigation:

19          (a)      Special outside counsel of record to the Debtor, counsel and special counsel for

20  the Official Committee of Unsecured Creditors, counsel for the Senior Debtholders, outside counsel

21  for Intel, outside counsel for Via, and members and employees of their respective law firms to whom

22  Confidential Information reasonably needs to be disclosed for the purposes of supporting or opposing

23  the Motion, or prosecuting or defending litigation in the within SONICblue bankruptcy case related

24  to the subject matter of the Motion, only;

25          (b)      Parties who are making or opposing the Motion, or who are parties in litigation

26  in the within SONICblue bankruptcy case related to the subject matter of the Motion, who have first

27  executed a copy of Exhibit A, including present and former officers, directors, in-house counsel,

28  paralegals, and employees of such parties;

on, Dunn &
acher LLP

4

STIPULATED PROTECTIVE ORDER

1          (c)       Professional photocopy or document services who first execute a copy of

2  Exhibit A;

3          (d)       Consultants or expert witnesses retained for the purpose of supporting or

4  opposing the Motion, or retained in litigation in the within SONICblue bankruptcy case relating to

5  the subject matter of the Motion, provided that each such person shall execute a copy of Exhibit A

6  before being shown or given any Confidential Information;

7          (e)       Any authors of the Confidential Information or persons who received the

8  Confidential Information in the ordinary course of business prior to the filing of the Motion;

9          (f)       The Court and court personnel, consistent with the provisions for filing Court

10  materials under seal as set forth in paragraph 5 of this Order;

11          (g)       Court reporters and any persons involved in recording deposition testimony in

12  connection with the Motion or litigation in the within SONICblue bankruptcy case relating to the

13  subject matter of the Motion, provided that such persons have first executed a copy of Exhibit A;

14          (h)       Percipient witnesses and attorneys for witnesses at depositions in connection

15  with the Motion or litigation in the within SONICblue bankruptcy case relating to the subject matter

16  of the Motion, pursuant to the procedures set forth in paragraph 4; provided that such persons have

17  first executed a copy of Exhibit A.  Confidential Information may be disclosed to a witness who will

18  not sign the certification only if such disclosure is necessary for the prosecution or defense of the

19  Motion or litigation in the within SONICblue bankruptcy case relating to the subject matter of the

20  Motion and the party opposing disclosure is first given an opportunity to object to such disclosure

21  pursuant to the procedures set forth in paragraph 4 of this Order.

22      **4.**     **Challenges to Confidential Outside Counsel's Eyes Only or Confidential**

23  **Designation and Disclosure.**

24          (a)       If a party (or aggrieved entity permitted by the Court to intervene for such

25  purpose) contends that any material is not entitled to Confidential Outside Counsel's Eyes Only or

26  Confidential treatment, such party may at any time give written notice to the party or non-party who

27  designated the material, specifically identifying the challenged material.  The producing party (or

28  non-party), by its counsel, shall respond in writing within ten business days of receipt of the written

1    request, or within such other period of time as may be designated by the order of the Court or

2    agreement of the parties. If the producing party refuses to remove the Confidential Outside Counsel's

3    Eyes Only or Confidential designations, its written response shall state the reasons for this refusal.

4    Notwithstanding the foregoing, failure to provide a timely written response shall be deemed a refusal

5    of the request. If the producing party fails to respond to a request or refuses to remove the

6    Confidential Outside Counsel's Eyes Only or Confidential designation, any party may file a motion

7    with the Court for a ruling that a document stamped as such is not entitled to such status and

8    protection, but only after following the procedure set forth in subparagraph 4(c) below. If such

9    motion is made, the parties shall fully comply with the terms of this Order with respect to the

10   Confidential Outside Counsel's Eyes Only Information or Confidential Information at issue, unless

11   and until the party who claims that the material is Confidential Outside Counsel's Eyes Only

12   Information or Confidential Information withdraws such designation in writing, or the Court rules

13   that the material is not entitled to such protection.

14            (b)    Prior to disclosure of any Confidential Information to a percipient witness of

15   any party who has refused to execute a copy of Exhibit A, or to a consultant or expert, counsel for the

16   party proposing disclosure shall provide the other party written notification of the intent to make such

17   disclosure, including the person to whom disclosure is proposed, the c.v. of that person, a list of

18   companies for which the person is working or consulting, a list of the documents or other

19   Confidential Information proposed to be disclosed. The opposing party shall have five business days

20   from the date of such notification in which to object to the proposed disclosure. If such an objection

21   is made, the Confidential Information shall not be disclosed as proposed until the dispute has been

22   resolved in accordance with subparagraph (c) below. In the event that the party proposing disclosure

23   first learns at a deposition of the witness' refusal to execute Exhibit A, the parties shall recess the

24   deposition to meet and confer in good faith to resolve any dispute. In the event that the parties cannot

25   resolve the dispute, the parties shall seek intervention from the Court via a telephonic hearing and the

26   deposition shall resume immediately thereafter.

27

28

Gibson, Dunn &
Crutcher LLP

6

STIPULATED PROTECTIVE ORDER

1       (c)     If any dispute arises in connection with this Protective Order, the parties shall

2  first meet and confer in good faith to resolve the dispute.  If the parties are unable to informally

3  resolve the dispute, any party may bring the dispute before the Court for resolution.

4       **5.**      **Confidential Information in Depositions.**

5       (a)     A party or non-party may designate information disclosed during a deposition

6  or in response to discovery requests as Confidential Outside Counsel's Eyes Only Information or

7  Confidential Information by so indicating in said responses or on the record at the deposition and

8  requesting the preparation of a separate transcript of such material.  Additionally, a party or non-party

9  may designate in writing, within twenty (20) days after receipt of said responses or of the deposition

10  transcript for which the designation is proposed, that specific pages of the transcript and/or specific

11  responses be treated as Confidential Outside Counsel's Eyes Only Information or Confidential

12  Information.  Counsel for all parties shall be responsible for marking all previously unmarked copies

13  of the designated material in their possession or control "CONFIDENTIAL OUTSIDE COUNSEL'S

14  EYES ONLY PURSUANT TO PROTECTIVE ORDER" or "CONFIDENTIAL PURSUANT TO

15  PROTECTIVE ORDER," as appropriate.

16       (b)     No Confidential Outside Counsel's Eyes Only Information or Confidential

17  Information shall be disclosed during any deposition to any witness and/or attorney not entitled to

18  access to such information under this Order, unless such witness and/or attorney first executes a copy

19  of Exhibit A.  If such witness and/or attorney refuses to execute a copy of Exhibit A, and any of the

20  Responding Parties object to the disclosure of Confidential Outside Counsel's Eyes Only Information

21  or Confidential Information to that witness and/or attorney, Confidential Outside Counsel's Eyes

22  Only Information or Confidential Information shall not be disclosed to that witness and/or attorney

23  until the dispute has been resolved.

24       (c)     If a person other than the witness and his or her attorney is present at a

25  deposition at which Confidential Outside Counsel's Eyes Only Information or Confidential

26  Information is to be elicited or disclosed, and such person is not entitled to access to such information

27  under the terms of this Order, that person shall not be permitted to be present while Confidential

28

Gibson, Dunn &
Crutcher LLP

7

1    Outside Counsel's Eyes Only Information or Confidential Information is elicited or disclosed during

2    the deposition.

3            **6.**    **Filing of Documents Under Seal.**  Any party intending to submit Confidential

4    Outside Counsel's Eyes Only Information or Confidential Information in connection with motions or

5    other filings with the Court shall first comply with relevant Court rules and seek all Court orders

6    required to have such Confidential Outside Counsel's Eyes Only Information or Confidential

7    Information filed under seal.  Copies of any pleading, brief, or other document containing

8    Confidential Information which is served on opposing counsel shall be delivered in a sealed envelope

9    stamped "CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER" and shall be treated in

10   accordance with the provisions of this Protective Order.

11           **7.**    **Subpoena by Other Courts or Agencies.**  If at any time any Confidential Outside

12   Counsel's Eyes Only or Confidential Information governed by this Order is subpoenaed by a court,

13   administrative or legislative body, or by any other person or entity purporting to have authority to

14   require the production of such information, the party to whom the subpoena is directed shall

15   immediately give written notice thereof to any person who has designated such information as

16   Confidential Outside Counsel's Eyes Only or Confidential Information.  After receipt of the notice

17   specified under this paragraph, the party seeking to maintain confidentiality shall have the sole

18   responsibility for obtaining any order it believes necessary to prevent disclosure of Confidential

19   Outside Counsel's Eyes Only or Confidential Information.  Unless a court orders otherwise, the party

20   to whom the subpoena is directed shall not produce any Confidential Outside Counsel's Eyes Only or

21   Confidential Information until the party seeking to maintain confidentiality has had an opportunity to

22   seek an appropriate order.  If the party seeking to maintain confidentiality does not move for a

23   protective order within the time allowed for production by the subpoena (or within such time as a

24   court may direct or as may be agreed upon between the designating person and the subpoenaing

25   party), or give written notice of such motion to the subpoenaing party and the person to whom the

26   subpoena is directed, the party to whom the subpoena or other request is directed may commence

27   production in response thereto.  The party to whom the subpoena is directed shall not produce any

28   Confidential Outside Counsel's Eyes Only or Confidential Information while a motion for a

Gibson, Dunn &
Crutcher LLP

STIPULATED PROTECTIVE ORDER

1   protective order brought pursuant to this paragraph is pending, or while any appeal from or request

2   for appellate review of such motion is pending, unless ordered by a court to do so.

3       **8.    Inadvertent Disclosure**.

4           (a)    If Responding Parties inadvertently produce Confidential Outside Counsel's

5   Eyes Only or Confidential Information without marking it as such, it may be disclosed to others until

6   the receiving party becomes aware of the error.  As soon as the receiving party becomes aware of the

7   inadvertent production, the information must be treated as if it had been timely designated under this

8   Protective Order, and the receiving party must endeavor in good faith to obtain all copies of the

9   document which it distributed or disclosed to persons not authorized to access such information by

10  paragraphs 2 and 3 above, as well as copies made by such persons.

11          (b)    If Confidential Outside Counsel's Eyes Only or Confidential Information or

12  documents, properly marked as such, are disclosed, through inadvertence or otherwise, in

13  contravention of the terms of this Order, counsel for the party who made the disclosure shall use their

14  best efforts to bind the person or persons to whom Confidential Outside Counsel's Eyes Only or

15  Confidential Information is disclosed to this Protective Order by requesting that such person execute

16  a copy of Exhibit A.  Counsel shall also immediately inform opposing counsel of the disclosure and

17  surrounding circumstances.  In the event anyone shall violate or threaten to violate any terms of this

18  Protective Order, the parties agree that the aggrieved party may immediately apply to obtain

19  injunctive relief against any such person, and in the event the aggrieved party shall do so, the

20  responding person, subject to the provisions of this Protective Order, shall not employ as a defense

21  thereto the claim that the aggrieved party possesses an adequate remedy at law.  The parties and any

22  other persons subject to the terms of this Protective Order agree that the Court shall retain jurisdiction

23  over them for the purpose of enforcing this Protective Order.

24          (c)    If a Responding Party inadvertently produce a document that it later discovers

25  or in good faith asserts to be a privileged document, the production of that document shall not be

26  deemed to constitute the waiver of any applicable privileges.  In such circumstances, the producing

27  party shall immediately notify the receiving party of the inadvertent production, and request the

28  return or confirmed destruction of the privileged materials.  Within five (5) business days of

1  receiving such notification, the receiving party shall return or confirm destruction of all such

2  materials, including any summaries thereof.  Such return or confirmation of destruction shall not

3  preclude the receiving party from seeking to compel production of the materials for the reasons other

4  than the inadvertent production and shall not constitute an admission by the receiving party that the

5  materials were, in fact, privileged in any way.

6      **9.**    **Modification Permitted**.  Nothing in this Order shall prevent any person from

7  seeking modification of this Order or from objecting to discovery that it believes to be otherwise

8  improper.

9      **10.**    **Responsibility of Attorneys**.  The attorneys of record are responsible for employing

10  reasonable measures, consistent with this Order, to control duplication of, access to, and distribution

11  of copies of Confidential Information.

12      **11.**    **Reservation of Rights**.  Nothing contained in this Order and no actions taken

13  pursuant to this Order shall prejudice the right of any party to contest the alleged relevancy,

14  admissibility, or discoverability of the confidential documents and information sought. Nothing

15  contained in this Order and no actions taken pursuant to this Order shall prejudice in any way the

16  rights of any Responding  Party or other third party to petition the Court for a further protective order

17  relating to any purportedly confidential information.  This stipulation and Order shall not operate as

18  an admission by any party that the restrictions and procedures set forth herein constitute or do not

19  constitute adequate protection for any particular information.

20      **12.**    **No Contract.**  This stipulation is for the Court's consideration and approval as an

21  Order.  It shall not be construed to create a contract between the parties or between the parties and

22  their respective counsel.

23      **13.**    **Return of Confidential Information.**  Within thirty (30) days of the final conclusion

24  or decision on the Motion and any litigation related to the subject matter of the Motion (including any

25  appeal), all parties to whom Confidential Outside Counsel's Eyes Only or Confidential Information

26  has been disclosed shall return such Confidential Outside Counsel's Eyes Only or Confidential

27  Information to the producing party, including all copies.

28

Gibson, Dunn &
Crutcher LLP

STIPULATED PROTECTIVE ORDER

1    **Retention of Jurisdiction To Enforce Protective Order.**  The obligations created by this Protective

2    Order shall survive the termination of these proceedings unless otherwise modified by the Court.  The

3    Court shall retain jurisdiction, even after termination of the proceeding to enforce this Protective

4    Order and to make such amendments and modifications to this Order as may be appropriate.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

bson, Dunn &
.rutcher LLP

11

STIPULATED PROTECTIVE ORDER

1

2   DATED: _October 3_, 2003          GIBSON, DUNN & CRUTCHER, LLP

3

4                                     By: _____

5                                          Steven J. Johnson
                                         Attorneys for INTEL CORPORATION

6   DATED: _____, 2003    LEVENE, NEALE, BENDER, RANKIN & BRILL
                                      LLP
7

8                                     By: _____

9                                          Monica Y. Kim

10                                    Attorneys for The Official Committee of
                                         Unsecured Creditors
11  DATED: _____, 2003    KREIG, KELLER, SLOAN, REILLEY & ROMAN
                                      LLP
12

13                                    By: _____

14                                         Christopher T. Holland
                                      Special Counsel for The Official Committee of
15                                         Unsecured Creditors
16  DATED: _____, 2003    HENNIGAN, BENNETT & DORMAN LLP

17

18                                    By: _____

19                                         Bruce Bennett
                                      Attorneys for the Senior Debtholders
20  DATED: _____, 2003    O'MELVENY & MYERS LLP

21

22                                    By: _____

23                                         David R. Eberhart
                                      Special Counsel to SONICblue, Inc.
24  DATED: _____, 2003    WILSON, SONSINI, GOODRICH & ROSATI

25

26                                    By: _____

27

28                                         Maura Rees
                                      Attorneys for VIA Technologies, Inc.

Gibson, Dunn &
Crutcher LLP

                                    12

STIPULATED PROTECTIVE ORDER

FROM                                                        (WED)OCT  8 2003 16  7/ST. 16:36/NO. 6330119576 P  2

1

2    DATED:_____, 2003          GIBSON, DUNN & CRUTCHER, LLP

3

4                                          By:_____
                                                    Steven J. Johnson
5                                          Attorneys for INTEL CORPORATION

6    DATED:____10|8_____, 2003            LEVENE, NEALE, BENDER, RANKIN & BRILL
                                           LLP
7

8                                          By: _Monica h_____

9                                                   Monica Y. Kim

10                                         Attorneys for The Official Committee of
                                                    Unsecured Creditors
11   DATED:_____, 2003          KREIG, KELLER, SLOAN, REILLEY & ROMAN
                                           LLP
12

13                                         By:_____

14                                                  Christopher T. Holland
                                           Special Counsel for The Official Committee of
15                                                  Unsecured Creditors

16   DATED:_____, 2003          HENNIGAN, BENNETT & DORMAN LLP

17

18                                         By:_____

19                                                    Bruce Bennett
                                           Attorneys for the Senior Debtholders
20   DATED:_____, 2003          O'MELVENY & MYERS LLP

21

22                                         By:_____

23                                                  David R. Eberhart
                                           Special Counsel to SONICblue, Inc.
24   DATED:_____, 2003          WILSON, SONSINI, GOODRICH & ROSATI

25

26                                         By:_____

27

28                                                    Maura Rees
                                           Attorneys for VIA Technologies, Inc.

Gibson, Dunn &
Nutcher LLP

STIPULATED PROTECTIVE ORDER

Oct. 8. 2003 5:40PM GIBSON DUNN CRUTCHER           NO. 4427   P. 3

Oct-08-2003  10:56am   From-KRIEG KELLER SLOAN REILLEY ROMAN LLP      4152498333      T-697   P.002/002   F-692

| | |
|---|---|
| DATED:_____, 2003 | **GIBSON, DUNN & CRUTCHER, LLP** |
| | By:_____ |
| | Steven J. Johnson |
| | Attorneys for INTEL CORPORATION |
| DATED:_____, 2003 | **LEVENE, NEALE, BENDER, RANKIN & BRILL LLP** |
| | By:_____ |
| | Monica Y. Kim |
| | Attorneys for The Official Committee of Unsecured Creditors |
| DATED: October 8, 2003 | **KREIG, KELLER, SLOAN, REILLEY & ROMAN LLP** |
| | By:_____ |
| | Christopher T. Holland |
| | Special Counsel for The Official Committee of Unsecured Creditors |
| DATED:_____, 2003 | **HENNIGAN, BENNETT & DORMAN LLP** |
| | By:_____ |
| | Bruce Bennett |
| | Attorneys for the Senior Debtholders |
| DATED:_____, 2003 | **O'MELVENY & MYERS LLP** |
| | By:_____ |
| | David R. Eberhart |
| | Special Counsel to SONICblue, Inc. |
| DATED:_____, 2003 | **WILSON, SONSINI, GOODRICH & ROSATI** |
| | By:_____ |
| | Maura Rees |
| | Attorneys for VIA Technologies, Inc. |

Gibson, Dunn &
Crutcher LLP

STIPULATED PROTECTIVE ORDER

12

1

2    DATED:_____, 2003          GIBSON, DUNN & CRUTCHER, LLP

3

4                                         By:_____
                                                  Steven J. Johnson
5                                              Attorneys for INTEL CORPORATION

6    DATED:_____, 2003          LEVENE, NEALE, BENDER, RANKIN & BRILL
                                           LLP
7

8                                         By:_____
9                                                 Monica Y. Kim

10                                         Attorneys for The Official Committee of
                                                  Unsecured Creditors
11   DATED:_____, 2003          KREIG, KELLER, SLOAN, REILLEY & ROMAN
                                           LLP
12

13                                        By:_____
14                                                Christopher T. Holland
                                           Special Counsel for The Official Committee of
15                                                Unsecured Creditors
16   DATED: October 6, 2003                HENNIGAN, BENNETT & DORMAN LLP

17                                        By:_____
18                                              for   Bruce Bennett
19                                             Attorneys for the Senior Debtholders
     DATED:_____, 2003          O'MELVENY & MYERS LLP
20

21                                        By:_____
22

23                                                David R. Eberhart
                                             Special Counsel to SONICblue, Inc.
24   DATED:_____, 2003          WILSON, SONSINI, GOODRICH & ROSATI

25

26                                        By:_____
27

28                                                   Maura Rees
                                             Attorneys for VIA Technologies, Inc.

                                          12

bson, Dunn &
utcher LLP

1

2  DATED:_____, 2003          GIBSON, DUNN & CRUTCHER, LLP

3

4                                        By:_____
                                              Steven J. Johnson
5                                          Attorneys for INTEL CORPORATION

6  DATED:_____, 2003          LEVENE, NEALE, BENDER, RANKIN & BRILL
                                         LLP
7

8                                        By:_____
                                              Monica Y. Kim
9

10                                       Attorneys for The Official Committee of
                                             Unsecured Creditors
11  DATED:_____, 2003          KREIG, KELLER, SLOAN, REILLEY & ROMAN
                                         LLP
12

13                                       By:_____
14                                          Christopher T. Holland
                                          Special Counsel for The Official Committee of
15                                             Unsecured Creditors
16  DATED:_____, 2003          HENNIGAN, BENNETT & DORMAN LLP

17

18                                       By:_____
                                              Bruce Bennett
19                                         Attorneys for the Senior Debtholders
   DATED: _Oct 2_____, 2003           O'MELVENY & MYERS LLP
20

21                                       By:_____

22

23                                          David R. Eberhart
                                          Special Counsel to SONICblue, Inc.
24  DATED:_____, 2003          WILSON, SONSINI, GOODRICH & ROSATI

25

26                                       By:_____

27

28                                          Maura Rees
                                          Attorneys for VIA Technologies, Inc.

                                         12

STIPULATED PROTECTIVE ORDER

Gibson, Dunn &
Crutcher LLP

DATED:_____, 2003        GIBSON, DUNN & CRUTCHER, LLP


By:_____
            Steven J. Johnson
       Attorneys for INTEL CORPORATION

DATED:_____, 2003        LEVENE, NEALE, BENDER, RANKIN & BRILL
                                    LLP


By:_____
            Monica Y. Kim

       Attorneys for The Official Committee of
               Unsecured Creditors

DATED:_____, 2003        KREIG, KELLER, SLOAN, REILLEY & ROMAN
                                    LLP


By:_____
          Christopher T. Holland
    Special Counsel for The Official Committee of
              Unsecured Creditors

DATED:_____, 2003        HENNIGAN, BENNETT & DORMAN LLP


By:_____
             Bruce Bennett
      Attorneys for the Senior Debtholders

DATED:_____, 2003        O'MELVENY & MYERS LLP


By:_____


           David R. Eberhart
     Special Counsel to SONICblue, Inc.

DATED: _October 3___, 2003         WILSON, SONSINI, GOODRICH & ROSATI


By:_____


             Maura Rees
      Attorneys for VIA Technologies, Inc.

STIPULATED PROTECTIVE ORDER

1

2

## ORDER

3        Based on the foregoing Stipulation, and good cause appearing,

4        IT IS SO ORDERED.

5

6    Dated:  OCT 1 7 2003 _____    _____

7                                              United States Bankruptcy Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED PROTECTIVE ORDER

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

**Case No. C 03-51175 through 51778 MM**

**DECLARATION OF _____ CONFIRMING**
**COMPLIANCE WITH THE PROTECTIVE ORDER IN** *In Re SONICblue, Inc., et al.,*
**U.S. Bankruptcy Court, Northern District of California, Case No. C 03-51175 through**
**51778 MM**

I, _____, declare the following:

1.    I have read and understand the Protective Order (the "Protective Order") entered in the matter entitled *In re SONICblue, Inc., et al.*, U.S. Bankruptcy Court for the Northern District of California, Case No. C 03-51175 through 51778 MM, and I agree to be bound by its terms.

2.    I consent to the jurisdiction of the Court with respect to any actions of any kind whatsoever relative to the enforcement of the Protective Order, recognizing that in doing so I subject myself to the full powers of the Court, including the power of imposing sanctions for contempt.

3.    My address is _____

_____

_____

My telephone number is _____.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _____ day of _____, 200__, at _____ State of

_____.

_____
[signature]

45051845_1.DOC

Gibson, Dunn &
Crutcher LLP

STIPULATED PROTECTIVE ORDER

EXHIBIT 65

1   HENNIGAN, BENNETT & DORMAN LLP
    BRUCE BENNETT  (SBN 105430)
2   THOMAS B. WATSON  (SBN 181546)
    JOSHUA M. MESTER  (SBN 194783)
3   865 South Figueroa Street, Suite 2900
    Los Angeles, California 90017
4   Telephone      (213) 694-1200
    Facsimile      (213) 694-1234
5
6   Counsel for Portside Growth & Opportunity Fund, Smithfield
    Fiduciary LLC, and Citadel Equity Fund Ltd.
7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  In re                                    )  Case Nos.  03-51775 MM
                                             )
12  SONICBLUE INCORPORATED, a Delaware       )  Chapter 11
    corporation; DIAMOND MULTIMEDIA          )
13  SYSTEMS, INC., a Delaware corporation;   )  (Case Nos.  03-51775; 03-51776, 03-51777 and
    REPLAYTV, INC., a Delaware corporation;  )  03-51778 MM Cases)
14  and SENSORY SCIENCE CORPORATION,         )  (Jointly Administered)
    a Delaware corporation                   )
15                                           )
            Debtors and Debtors-in-Possession. )  **REPLY BRIEF IN SUPPORT OF MOTION**
16                                           )  **FOR CLARIFICATION, OR IN THE**
                                             )  **ALTERNATIVE, FOR LEAVE TO FILE A**
17                                           )  **MOTION FOR RECONSIDERATION**
                                             )
18                                           )  **[Declaration of Joshua M. Mester filed**
                                             )  **herewith]**
19                                           )
                                             )  Date:      May 4, 2007
20                                           )  Time:      11:00 a.m.
                                             )  Location:  Courtroom 3070
21                                           )             280 South First Street
                                             )             San Jose, CA 95113
22                                           )  Judge:     Hon. Marilyn Morgan
23  ─────────────────────────────────────── )

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................... 1

II.     ARGUMENT ......................................................................................... 2

        A.      The Language In The Opinion Regarding Payment Of Liquidated
                Damages Should Be Clarified. ......................................................... 2

        B.      The Language In The Opinion Regarding The Senior Noteholders
                Should Be Clarified. ........................................................................ 6

                1.      The Evidence Does Not Support SB Claims' Position. ...................... 6

                2.      The Court Should Reject SB Claims' Proposed
                        "Clarifications." ...................................................................... 12

III.    CONCLUSION .................................................................................... 13

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Carr v. Yokohama Specie Bank, Ltd.*,
  200 F.2d 251 (9th Cir. 1952) ................................................................................4

*Delaney v. Alexander*
  *(In re Delaney)*,
  29 F.3d 516 (9th Cir. 1994) ................................................................................12

*In re Mayhew*,
  223 B.R. 849 (D.R.I. 1998) ................................................................................12

*In re Sweet Transfer & Storage, Inc.*,
  896 F.2d 1189 (9th Cir. 1990) ................................................................................12

*Law Debenture Trust Co. v. Kaiser Aluminum Corp.*
  *(In re Kaiser Aluminum Corp.)*,
  339 B.R. 91 (D. Del. 2006) ................................................................................10

*Nuelsen v. Sorensen*,
  293 F.2d 454 (9th Cir. 1961) ................................................................................4

**Other Authorities**

9-52 Moore's Federal Practice - Civil § 52.15 ................................................................................4

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

REPLY BRIEF IN SUPPORT OF MOTION FOR CLARIFICATION

## I.    INTRODUCTION

SB Claims' Opposition confirms the need for clarification.  SB Claims does mischief with the Court's Opinion, wrongly asserting that the Opinion decided factual issues regarding the proper interpretation of Section 5.6 of the Investment Agreement among SonicBlue, VIA and S3 Graphics Co, Ltd.[1] and the Senior Noteholders' participation in this case.  In reality, the Court's comments on these issues were, at most, peripheral to the motions that were before the Court – the motion to appoint a trustee and the motion to disqualify Pillsbury – and were not necessary to the Court's decision or supported by any evidence.  Respectfully, we do not believe that the Court intended to *decide* these issues, rather than simply identifying them.  These issues should be left to be addressed in the newly appointed Trustee's investigation and in any future litigation concerning the claims asserted by S3G and VIA.  The Opposition thus bears out the Senior Noteholders' concerns about the potential for the Opinion to be misconstrued and demonstrates the need for clarification.

Clarification is particularly appropriate because there is apparent agreement about a central fact on which the Motion for Clarification is based.  SB Claims admits, as it must, that: "S3 was required to actually pay the liquidated damages *to the joint venture, S3G,* under each of Articles 5.6(a) through (c) – *the Investment Agreement states that 'S3 shall pay JV.' "*[2] Opposition, at p. 6.  Although SB Claims buries this admission among new accusations – accusations that are not true or supported by the evidence – that the Senior Noteholders have somehow misled the Court in their Motion for Clarification, SB Claims cannot deny that liquidated damages are payable only to the joint venture, not to the joint venture *and* VIA. Therefore, the following statement in the Opinion is not accurate, and more importantly, unsupported by any evidence, and should be clarified to delete the reference to VIA highlighted below:

---

[1] This is called the "Joint Venture Agreement" in the Opinion, and hereinafter, we adopt the Court's terminology.

[2] As the Court will recall, "S3G" is a reference to "S3 Graphics Co, Ltd.," the joint venture formed by VIA and SonicBlue pursuant to the Joint Venture Agreement.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    The rights to use Intel's graphics patents were so important that the
2    joint venture agreement included a liquidated damages clause at article
     5.6 entitling the joint venture ~~and VIA each~~ to damages of up to $70
3    million if the joint venture were ever enjoined from using the Intel
     cross-license.

4    Opinion at p. 2, lines 24-27 (emphasis added).  Deleting the reference to VIA will prevent

5    SB Claims from contending that the Opinion established that VIA itself could properly have

6    asserted the claim when the evidence is to the contrary.

7    The Opinion should also be clarified to delete references that could be misconstrued as

8    finding that the Senior Noteholders used their position on the Creditors' Committee to insert

9    themselves into the VIA settlement negotiations or that they had a "hidden agenda."  The Senior

10   Noteholders' participation was open to all others involved in these negotiations, was noted in the

11   record of this case, and was entirely proper.  The Senior Noteholders acted to protect their interests

12   and had every right to be concerned with improper allocation of the claim in the Intel/VIA/S3G

13   Settlement Agreement.

14   SB Claims also contends, falsely, that the Senior Noteholders' membership on the

15   Committee was hidden despite multiple court filings.  SB Claims does not argue that it was

16   ignorant of these filings.  Nor could it, since the filings are available electronically at any time to

17   SB Claims or, indeed, to anyone with internet access.  The very public nature of the filings

18   contradicts the interpretation of the Opinion that SB Claims espouses.  Accordingly, the Opinion

19   should be deleted to correct any such misimpression.

20   We do not seek definitive resolution of these issues.  We are confident that any

21   investigation will establish that the Senior Noteholders acted properly and did not hide in the

22   "shadows."  But those are questions for another day.  By this Motion – a Motion that is not opposed

23   by any of the parties interested in the Opinion other than SB Claims – we are merely seeking to

24   avoid any misuse of the Court's Opinion.

25   **II.    ARGUMENT**

26   **A.    The Language In The Opinion Regarding Payment Of Liquidated Damages**

27   **Should Be Clarified.**

28   The most important sentence in the Opposition is as follows:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1             **It is true that S3 was required to actually pay the liquidated damages**

2             **to the joint venture, S3G, under each of Articles 5.6(a) through (c) –**
           ***the Investment Agreement states that "S3 shall pay JV."***

3  Opposition, at p. 6 (emphasis added).  This admission confirms what the Joint Venture Agreement

4  actually says, over and over again.  Joint Venture Agreement, §§ 5.6(a), 5.6(b), 5.6(c).  All

5  liquidated damage claims created in the Joint Venture Agreement run to the JV and not to VIA.

6  This admission also confirms that there is nothing inaccurate, let alone misleading, about the

7  Motion for Clarification.  It is accurate in all respects.

8         SB Claims asserts that the Motion for Clarification improperly omitted critical language

9  concerning VIA's claims.  The omitted language was supplied in the exhibit to the Motion, but

10  most importantly, that language *supports* the Senior Noteholders' point that all liquidated damages

11  claims flow to the Joint Venture.  In particular, the language identified by SB Claims states:

12             ***The following liquidated damages shall apply to compensate JV and***

13             ***VIA for any and all losses they may suffer as a result thereof,*** subject
           to the Maximum Damage Cap set forth in Article 9 below, ***and such***

14             ***liquidated damages shall be VIA's and JV's sole and exclusive***
           ***remedy against S3 [now known as SonicBlue] for any and all***

15             ***damages and claims relating to the matters set forth in this section***
           ***5.6(a).***  S3 shall be entitled to first setoff any amount owing to JV or

16             VIA under this Section against any amounts due S3 pursuant to
           Section 8.3 and 8.4 and such amount shall be credited against such

17             payment otherwise due by S3 or any royalty payments made by S3. . .

18  Joint Venture Agreement, § 5.6(a) (emphasis added).

19         This language establishes that even if VIA otherwise might been able to assert its own claim

20  as a result of any defect in S3G's ability to exploit the Intel technology license, it can no longer do

21  so.  Its "sole and exclusive remedy" for any damages is the liquidated damages that SB Claims

22  acknowledges are ***specifically and unambiguously payable to S3G alone***.  Joint Venture

23  Agreement, § 5.6(a); Opposition, at p. 6.[3]  In other words, the language that SB Claims argues is

24  omitted actually limits VIA's remedies; it does not create or expand those remedies.

25         The reason that a liquidated damages remedy running directly to VIA might have been

26  relevant, of course, is that only "VIA Indebtedness" is eligible to become Senior Indebtedness

27   

28  [3] It makes sense that only the Joint Venture could recover damages.  Only the Joint Venture was
granted any right to use Intel licensed technology by SonicBlue.

REPLY BRIEF IN SUPPORT OF MOTION FOR CLARIFICATION

1    under the terms of the Senior Note Indenture.  But since the explicit terms of the Investment

2    Agreement provide liquidated damages exclusively to the Joint Venture, and ***not*** to VIA, such an

3    issue could not arise.  Moreover, the Senior Note Indenture expressly defines "Senior

4    Indebtedness," "Indebtedness" and "indebtedness" to exclude contract damages claims, which a

5    liquidated damages remedy plainly would be.  Indenture dated as of April 22, 2002, at p. 6-7, § 1.1;

6    p. 21, § 7.1(e).[4]  Finally, as the Court noted, evidence in the record indicates that the term "VIA

7    Indebtedness" in the Senior Indenture refers to a specific loan never funded.  Opinion, at p. 8.

8    There is no evidence in the record, and certainly none is cited in the Opposition, that supports any

9    contrary conclusion.

10          Accordingly, the Court should amend the relevant portion of the Opinion as follows:

12          The rights to use Intel's graphics patents were so important that the
             joint venture agreement included a liquidated damages clause at article
13          5.6 entitling the joint venture ~~and VIA each~~ to damages of up to
             $70 million if the joint venture were ever enjoined from using the Intel
14          cross-license.

15    Opinion, at p. 2, lines 24-27.[5]  Although the current record amply supports a determination that

16    only the Joint Venture could assert liquidated damage claims against SonicBlue, the Senior

17    Noteholders do not request that the Court make such finding at this time.[6]  Findings should be made

18    after the Trustee completes his investigation and all parties have had an opportunity to introduce

19    relevant evidence and be heard on any relief that might be requested by any party in interest.

20          SB Claims' Opposition also makes other observations that are not relevant to the Motion for

_____

22    [4] A copy of the Indenture is Exhibit B to the Damonte Declaration, attached to the Opposition of
      Pillsbury to the Motion to Disqualify (Docket # 2182).

24    [5] *Nuelsen v. Sorensen*, 293 F.2d 454, 459 (9th Cir. 1961) (findings of fact only required on
      "essential allegations" of a decision); 9-52 Moore's Federal Practice - Civil § 52.15 (same); *Carr v.
25    Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952) (factual findings that are not
      required for a court's decision are unnecessary).

26    [6] SB Claims' proposed changes to page 2 of the Opinion are grossly misleading in that they ignore
27    the fact that VIA specifically agreed that the sole and exclusive remedy for damage if the Joint
      Venture were ever enjoined from using the cross-license was a liquidated damage claim specifically
      payable to the JV.  No modification of the Opinion which fails to include this crucial fact will be
28    accurate.

Hennigan, Bennett & Dorman llp
LAWYERS
LOS ANGELES, CALIFORNIA

- 4 -

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Clarification and, if anything, highlight the need for these issues to be addressed fully in litigation

2    over the claims rather than in cursory fashion here.

3        SB Claims alleges that "the debtor's economic interest in S3G is a mere one-tenth-of-one-

4    percent (0.1%), while VIA is entitled to more than 99% of S3G's economic value" and that

5    therefore there is no material difference to SonicBlue between granting a liquidated damage claim

6    to the Joint Venture and granting such a claim to VIA.  Opposition, at p. 3.  SB Claims apparently

7    asserts that its economic interest analysis somehow trumps the express language of the Joint

8    Venture Agreement.  That, of course, is not how contractual obligations work when owed to

9    distinct corporate entities.

10        Moreover, the economic interests in S3G were more complex than just the equity interests

11   issued by S3G.  SonicBlue's interests in S3G also included a contractual participation in the profits

12   of S3G.  As Exhibit 2 to SB Claims' own Opposition explains:  "Pursuant to the Joint Venture

13   Agreement, dated as of January 3, 20001, [sic] (the "Joint Venture Agreement") between

14   SONICblue, Sonica3, Inc. and VIA, SONICblue will also receive earn-out payments if the new

15   venture meets certain aggressive profitability goals."  And, in this chapter 11 case, SonicBlue

16   sought an accounting of the annual net operating income (before income taxes, extraordinary

17   transactions and nonrecurring items) earned in Fiscal Years 2001 and 2002 related to the graphics

18   chip business.  Objection of Debtor SonicBlue, Inc., to Duplicate Proofs of Claim of VIA

19   Technologies, Inc., and S3 Graphics Co., Ltd., and Debtor's Second Amended Adversary

20   Complaint for Affirmative Relief (Fifth Claim for Relief), *SONICblue, Incorporated v. VIA*

21   *Technologies, Inc.; S3 Graphics Co., Ltd.; and S3 Graphics, Inc.*, Adversary Proceeding

22   No. 04-5556, Docket # 42, at pp. 29-30.

23        Additionally, as the Joint Venture Agreement points out, it was expected that SonicBlue

24   would be a creditor of S3G and indeed, on the Petition Date, it was.  *See id.*, at pp. 24-33.

25        Finally, the Class A shares that SB Claims derides as nearly valueless were not so regarded

26   by either Sonica3, Inc. (a SonicBlue wholly owned subsidiary) or VIA when they entered into their

27   Option Agreement.  As described in the same Form 8-K attached to the Opposition as Exhibit 2:

28

- 5 -

1

> In connection with the closing, Sonica3 and VIA entered into a Class A Shares Option Agreement, dated as of January 3, 2001 (the "Option Agreement"), pursuant to which Sonica3 granted to VIA an option to purchase 100 million shares of Class A Common Stock of the JV (the "Class A Shares") for an aggregate purchase price of *$10 million* (the "Purchase Price") at any time until exercised in full. The Option Agreement also provides that Sonica3 may require VIA to purchase from Sonica3 all of the Class A Shares in exchange for the Purchase Price at any time after the occurrence of certain events.

2

3

4

5

6

7 SonicBlue Form 8-K, Filed January 18, 2001, at p. 2 (Attached as Ex. 2 to the Opposition)

8 (emphasis added). The Option Agreement also provides, among other things, that SonicBlue's

9 subsidiary, Sonica3, could compel VIA to purchase Sonica3's Class A shares in the joint venture in

10 the event that "(c) SonicBlue has paid liquidated damages *to JV* (whether by setoff or otherwise)

11 pursuant to Section 5.6 of the Investment Agreement." Class A Shares Option Agreemen, at p. 1.[7]

12 SB Claims asserts that there are other provisions of the Joint Venture Agreement apart from

13 Section 5.6 that were the basis for additional claims that were asserted in duplicate by VIA and the

14 JV. We do not disagree. But this Court's Opinion does not characterize the ownership of claims

15 arising under other articles of the Joint Venture Agreement, and the proper ownership of any claim

16 is not implicated by the current motion.

17 **B.     The Language In The Opinion Regarding The Senior Noteholders Should Be**

18 **Clarified.**

19 **1.     The Evidence Does Not Support SB Claims' Position.**

20 After what must have been a thorough search of the evidence before the Court and the

21 record in this case, SB Claims has found two quotations it contends prove that the Senior

22 Noteholders used their positions as Committee members to monitor the VIA claim objection, that

23 they operated in the "shadows," or that they had a hidden agenda. Neither of the statements relied

24 upon SB Claims support any part of these allegations.

25

26

27 [7] The Class A Shares Option Agreement between Sonica3, Inc., and VIA Technologies, Inc., dated June 3, 2001, is Exhibit 99.3 to the same SonicBlue, Inc., 8-K filing referred to in the Opposition, only some pages of which were included in Exhibit 2. A full copy of the 8-K is attached to the Mester Declaration filed herewith.

28

REPLY BRIEF IN SUPPORT OF MOTION FOR CLARIFICATION

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    In his Declaration, Mr. Boro stated:

2        I believed that our client Mr. Smith had a good sense of what
         settlement amount with VIA would be acceptable to the members of
3        the Creditors' Committee, with the possible exception of the Senior
         Noteholders who seemed to communicate exclusively through Mr.
4        Bennett. I believed that the Senior Noteholders might object to a
         settlement with Defendants, threatening the prospects of Court
5        approval of a proposed settlement of the VIA Adversary Proceeding,
         unless their agreement to the proposed settlement terms was obtained.
6

7    Boro Declaration, at ¶ 11, quoted in the Opposition, at p. 10, lns. 8-12.

8        Mr. Boro's statement confirms that the fact that the Senior Noteholders served on the

9    Committee was known by all of the participants in the Intel and VIA negotiations. It also confirms

10   that the Senior Noteholders did not participate in those negotiations as members of the Committee.

11   Indeed, Mr. Boro understood the position of Committee members other than the Senior

12   Noteholders (because Committee counsel participated in the negotiations) and that the position of

13   the Senior Noteholders might be different. Importantly, Mr. Boro also understood that the Senior

14   Noteholders themselves (not through the Committee) might object to a settlement of the VIA and

15   S3G claims. Mr. Boro did not state that the Senior Noteholders would use their position **on the**

16   **Committee** to cause the Committee to object to a settlement.

17       Thus the first quote offered by SB Claims does not demonstrate that the Senior Noteholders

18   used their position on the Committee to participate in the negotiations with VIA and S3G, or that

19   the Senior Noteholders exerted control over the Committee's decision on whether or not to settle

20   with VIA and/or S3G or on the terms of settlement with either of them. The quote also does not

21   support any suggestion that the participation of the Senior Noteholders or their counsel was in the

22   "shadows" but rather shows the opposite – that their participation was well known and understood.

23       Other portions of the Boro Declaration referenced by SB Claims show that multiple

24   attorneys represented the Committee and a separate attorney represented the three Noteholders

25   **individually**. Boro Declaration, at ¶ 10 (identifying participation in a telephone conference

26   concerning the Intel/VIA settlement as including "Ann Wells, of the law firm of Levene, Neal,

27   Bender, Rankin & Brill LLP ('Levene'), which is counsel to the Creditors' Committee, Ann

28   Kearns, Special I.P. counsel to the Creditors Committee, and Bruce Bennett, attorney for three

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   investors") Thus, it was clear to Mr. Boro that the Creditors' Committee was represented by at

2   least two law firms, including Levene Neale, and that Bruce Bennett did not represent the

3   Committee – he represented "three investors." SB Claims' references to the Boro Declaration – the

4   only evidence noted in the Opposition – do not support SB Claims' assertion that the Senior

5   Noteholders acted *as* the Committee or *on behalf of* the Committee.

6       The quotation labeled "more troubling" by SB Claims also provides no support for

7   statements in the Opinion suggesting that the Senior Noteholders used their position on the

8   Committee to participate in negotiations, acted in "shadows" or had a "hidden agenda." As stated

9   by Mr. Boro,

10          On September 20 [2005], we learned that the Senior Noteholders were
            willing to support a settlement that included a $12.5 million allowed
11          claim for Defendants [VIA and S3G], provided that the settlement
            included certain terms, including that Defendants' allowed claim be
12          neither senior nor junior to any other general unsecured claim.

13  Boro Declaration, at ¶ 17, cited in the Opposition, at p. 10.

14      SB Claims' statement that "it was only after VIA capitulated to the Noteholders' demand

15  that the Creditors' Committee (which the Noteholders effectively controlled) approved the

16  settlement on September 27, 2005" is simply false. SB Claims contends that its allegation is

17  supported by paragraph 18 of the Boro Declaration. But paragraph 11 of the Boro Declaration

18  reveals the actual facts: In August 2005, Boro "understood that the attorneys for the Creditors'

19  Committee viewed a settlement that resulted in an Allowed Claim to VIA of less than $25 million

20  as an acceptable compromise to move forward with resolving the bankruptcy." Boro Declaration,

21  at ¶ 11. Mr. Boro does not mention that any strings or conditions were attached to this

22  authorization. *Id.* An understanding reached in August 2005 plainly predates communications had

23  on September 20, 2005. *See also* Opinion, at p. 7, lns. 11-15.

24      Thus, it was after the Committee had supported any settlement involving an Allowed Claim

25  of less than $25 million that the Senior Noteholders separately discussed the settlement that would

26  be acceptable to them in their individual capacities. In summary, the only evidence in the record

27  shows that the Senior Noteholders acted on their own behalf, not on behalf of the Committee; that

28  the Senior Noteholders did not cause the Committee or its counsel to take any position in the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   VIA/S3G negotiations, including positions that would benefit the Senior Noteholders; and that the

2   Debtors understood that the Senior Noteholders were represented separately from the Committee.

3   Such evidence does not support any contrary conclusions.

4       Finally, we address SB Claims' allegation "that the Noteholders apparently failed to

5   mention the priority issue to other members of the Committee, or to Committee counsel." That

6   statement is not supported by any evidence at all. That Mr. Bender may not have been personally

7   aware of what he described as the "controversy involving the 'Senior Indebtedness issue'" seems

8   not quite on point as Mr. Boro identifies Anne Wells of Levene Neale and Anne Kearns of Krieg,

9   Keller, Sloan, Reilley, & Roman LLP, as the actual attorneys who represented the Committee in the

10  VIA/S3G claim negotiations.[8] In truth, there is nothing in the record at all about what Ms. Wells or

11  Ms. Kearns knew or did not know about the ownership of the claims asserted in duplicate by VIA

12  and S3G and the Senior Noteholders' interest in assuring that the ownership of that Claim was not

13  confused for an improper purpose. Surely the attorneys for the Committee learned something about

14  these issues as just Ms. Wells and Ms. Kearns together billed more than $100,000 to the estates for

15  their efforts in connection with this matter.[9]

16      SB Claims asserts that "if the Noteholders honestly believed there was a 'meaningful

17  difference' between S3G having a claim, and VIA having a claim, then why did the Noteholders

18  support approval of the VIA/Intel/SonicBlue Settlement Agreement which gave VIA the sole and

19  absolute right to allocate its $12.5 million allowed claim between VIA and S3G?" Opposition, at

20  p. 7. This misstates the facts.

21      The Senior Noteholders did object to granting VIA the sole and absolute right to allocate its

22  _____

23  [8] Boro Declaration, at ¶¶ 10 & 18. The Boro Declaration at ¶ 18 also cites Mr. Rankin from Levene
    Neale and Mr. Holland from Krieg Keller as being involved in these matters.

24

25  [9] We compiled the amount of these fees by reviewing the time entries for Ms. Wells and Ms. Kearns
    that appear directly related to the matters in issue here, excluding the time entries for other
26  Committee counsel (among others, Mr. Bender, Mr. Rankin, Mr. Arnold, Ms. Voorhies and
    Mr. Holland also worked on these matters). Since there are numerous other entries for Ms. Wells
27  and Ms. Kearns that may relate to these matters but for which the description is insufficient, the
    actual amount must be greater and may be substantially greater. *See* Interim Applications for
28  Approval of Fees filed by Levene Neale and Krieg Keller (Docket #s 1160, 1209, 1211, 1540, 1573,
    1739, 1940, 1969).

Hennigan, Bennett & Dorman llp
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    $12.5 million allowed claim (the "Settlement Allowed Claim") between VIA and S3G, particularly

2    if the terms of the Settlement Agreement might leave ambiguity that would unfairly affect the

3    Senior Noteholders' rights.  There were two reasons for this.  First, the Joint Venture Agreement

4    provides that all of SonicBlue's performance obligations run to the JV.  Moreover, as set forth

5    above, the Joint Venture Agreement expressly provides that any liquidated damages are payable

6    only to the Joint Venture.  The Senior Noteholders viewed imprecision about the ownership of

7    claims as possibly an effort to convert claims properly owned by the Joint Venture into claims

8    owned by VIA and then assert those claims as Senior Indebtedness under the Senior Note

9    Indenture.  Accordingly, when the Senior Noteholders first saw VIA's effort to allocate the

10   Settlement Allowed Claim between VIA and S3G in its discretion, the Senior Noteholders were not

11   supportive, and insisted that, no matter how VIA allocated the Settlement Allowed Claim, it must

12   not be characterized as Senior Indebtedness.  And the Senior Noteholders did so, because, under the

13   transactional facts fully known to everyone, the Settlement Allowed Claim would not constitute

14   Senior Indebtedness.

15        It is also not correct to suggest that the Senior Noteholders supported the settlement with

16   VIA and S3G.  All the Senior Noteholders did was address a problem with the form of proposed

17   settlement that adversely affected their interests and that, if not addressed, would have resulted in

18   an objection to the proposed settlement.

19        The assertion by SB Claims that the Senior Noteholders did not have the right to participate

20   in the settlement of the VIA claim is flatly wrong and the sole case cited, *Law Debenture Trust Co.*

21   *v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 95 (D. Del. 2006), fails to

22   support the proposition it is cited for.

23        *Law Debenture Trust* stands for the (unremarkable) proposition that a Bankruptcy Court can

24   approve a settlement of a claim objection even if a creditor objects, and that a creditor's ability to

25   object to a claim can be stayed in appropriate cases.  The court did not preclude or even disapprove

26   of creditor involvement in settlement negotiations related to a claim objection.  To the contrary, the

27   opinion rejects an objection to the participation by "Senior Noteholders" in settlement negotiations

28   on a PBGC claim even though PBGC and the Senior Noteholders at one time had agreed to support

- 10 -

1    a plan specifying the treatment of each other's claims.  Here, even if the Debtors could have ignored

2    the position of the Senior Noteholders, they chose not to, as was eminently sensible.

3         SB Claims is also apparently a proponent of a view that persons having interests or

4    positions that they do not like should be excluded from the adjudication and negotiation of

5    important matters in bankruptcy cases.  This is, of course, not the law.  And it would conflict with

6    the efficient administration of cases.  Uniformly, Bankruptcy Courts encourage full participation by

7    all parties having any interest in a particular dispute in order that settlements involve all parties, be

8    as broad and as inclusive as possible ***and, therefore, attract fewer objections***.

9         Further, SB Claims' attempts to minimize the information contained in the public files in

10   this case are misplaced.  As set forth in the Motion for Clarification, the fact that the Senior

11   Noteholders were members of the Committee is a matter of public record disclosed by two filings

12   by the United States Trustee and filings by Committee counsel.  These filings have always been

13   available to anyone interested in looking for them.  Here, the record does not reveal a single party

14   in interest that did not actually know that the Senior Noteholders were members of the Committee.

15   The composition of the Committee is properly disclosed – actually and constructively available to

16   all – in the official papers appointing it, including the official disclosure by the United States

17   Trustee.

18        To reasonably qualified professionals, the files in this case are readily and rapidly available.

19   This Court's CM/ECF Interim Operating Order became effective July 1, 2003, and the docket of

20   this case has been available electronically since that time.  Anyone can access the electronic docket

21   and search for the latest pleading filed by the United States Trustee appointing or reconstituting a

22   Committee.  Even before the bankruptcy docket was moved online, the records in a case were

23   regarded as the first source one should consult for information about a bankruptcy case.  Today,

24   pleadings entered on the Court's docket can be located and downloaded in minutes, sometimes in

25   seconds.  This is true irrespective of when any particular pleading was filed with the Court.  The

26   process is even more rapid if the searcher has some idea of the title of the pleading sought – a

27   search for "creditors' committee" would suffice here.

28        Counsel also has a duty to monitor the docket.  *Delaney v. Alexander (In re Delaney)*,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   29 F.3d 516, 518 (9th Cir. 1994) ("Parties have an affirmative duty to 'monitor the dockets to

2   inform themselves of the entry of orders they may wish to appeal.'"), quoting *In re Sweet Transfer*

3   *& Storage, Inc.*, 896 F.2d 1189, 1193 (9th Cir. 1990); *In re Mayhew*, 223 B.R. 849, 856 (D.R.I.

4   1998) ("it is the duty of an attorney to monitor the docket and to keep him – or herself apprised of

5   developments in a case.").

> **2.     The Court Should Reject SB Claims' Proposed "Clarifications."**

7          Although SB Claims did not move to clarify or reconsider the Opinion, SB Claims proposes

8   its own "clarifications."  But the changes that SB Claims proposes are not supported by the record

9   and in actuality distort what the Boro Declaration actually says:

10  • The Boro Declaration does not say that "debtor's counsel thought of the

11     Bondholders during the negotiations as 'members of the Creditors' Committee'"

12     as SB Claims proposes.  Rather, it just states the fact that the Senior Noteholders

13     were "members of the Creditors' Committee."  Boro Declaration, at ¶ 10.

14  • The Boro Declaration does not say that "it was the Bondholders who first raised

15     the 'Senior Indebtedness' issue, and that the Bondholders insisted that VIA waive

16     any right to 'Senior Indebtedness' status as a condition to the Bondholders'

17     support of a settlement" as SB Claims proposes.  Instead, Mr. Boro recalls that the

18     issue first arose ***in August 2005***, before the Senior Noteholders raised the issue as

19     he states "at both the August and September 2005 settlement meetings, the parties

20     discussed that Defendants' allowed claim would be give the same priority as other

21     general unsecured claims, in no greater or lesser priority, and that it would

22     ultimately result in an expected payment to Defendants of about 25 to 28 cents on

23     the dollar."  Boro Declaration, at ¶ 15.  And Mr. Boro states that, ***on***

24     ***September 20, 2005***, he "learned that the Senior Noteholders were willing to

25     support a settlement that included a $12.5 million allowed claim for Defendants,

26     provided that the settlement included certain terms, including that Defendants'

27     allowed claim be neither senior nor junior to any other general unsecured claim."

28     Boro Declaration, at ¶ 17.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

- SB Claims fails to note that the Committee's initial approval of the VIA settlement was communicated in August 2005 and not on September 27, 2005, and that this occurred prior to any suggestion by the Senior Noteholders that the proper classification of any VIA or S3G claims should be addressed.

- The Bender Declaration does not say that the "Committee counsel was not informed at that time that the proposed settlement would have the effect of releasing the Bondholders from any obligation they might have to VIA on account of the 'Senior Indebtedness' issue." *See* Opposition, at p. 11, ftnt. 20 (citing Bender Declaration, at ¶¶ 17 and 43). In fact, Mr. Bender does not state that he was unaware of the issue. Rather, he carefully states that "[i]t was only through an objection to the disclosure statement" that Levene Neale "first learned of ***any possible controversy*** involving the 'Senior Indebtedness' issue related to VIA in the Senior Note Indenture" (¶ 17) (emphasis added). Most importantly, the record reflects that counsel other than Mr. Bender apparently took the lead for the Committee on these issues. *See* Boro Declaration, at ¶¶ 10 & 18 (citing involvement of Anne Wells of Levene Neale and Anne Kearns of Krieg Keller).

For the foregoing reasons, the language that SB Claims would add to the Opinion is not accurate and, more importantly for present purposes, not supported by the testimony upon which SB Claims relies. There is no basis to add it to the Opinion.

## III.    CONCLUSION

This Court should not accept SB Claims' invitation to prejudge matters that were not established by evidence put in the record in connection with the trustee motion or the disqualification motion, or that were not necessary to the decision of those motions. And the Opinion should not contain statements that appear to decide such issues. These issues should be left for resolution in the Trustee's investigation and in any future litigation concerning the claims asserted by S3G and VIA.

Accordingly, and as set forth above, the Senior Noteholders respectfully request that the Court grant relief as follows:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1.    Either (i) confirm and clarify that the following statement was included only in the context of identifying parties' contentions and not to make any factual determinations; or (ii) delete the words "*and VIA* each" as follows:

> The rights to use Intel's graphics patents were so important that the joint venture agreement included a liquidated damages clause at article 5.6 entitling the joint venture ~~*and VIA each*~~ to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-license.

Opinion, at p. 2, lines 24-27 (emphasis added).

2.    Either (i) confirm and clarify that the following statements were included only in the context of identifying various parties' contentions and not to make any factual determinations; or (ii) delete these statements:

> Because the bondholders appear to have used their position on the committee to insert themselves into the settlement negotiations without revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body. Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not known. In fact, as Bennett noted, he had never personally appeared in court until March 19, 2007. During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was not generally known to this court or the creditor body that the three senior bondholders were serving on the committee.

Opinion, at p. 17, lines 9-17.

DATED: April 27, 2007

HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017


By:    */s/ Bruce Bennett*
          Bruce Bennett
Counsel for Portside Growth & Opportunity
Fund, Smithfield Fiduciary LLC, and Citadel
Equity Fund Ltd.

EXHIBIT 66

1   HENNIGAN, BENNETT & DORMAN LLP
    J. MICHAEL HENNIGAN (SBN 59491)
2   JOSHUA M. MESTER  (SBN 194783)
    865 South Figueroa Street, Suite 2900
3   Los Angeles, California 90017
    Telephone     (213) 694-1200
4   Facsimile     (213) 694-1234

5   Counsel for Portside Growth & Opportunity Fund, Smithfield
    Fiduciary LLC, and Citadel Equity Fund Ltd.

6

7                UNITED STATES BANKRUPTCY COURT

8                NORTHERN DISTRICT OF CALIFORNIA

9                     SAN JOSE DIVISION

10  In re                                )  Case No.  03-51775 MM
                                         )
11  SONICBLUE INCORPORATED, a Delaware   )  Chapter 11
    corporation; DIAMOND MULTIMEDIA      )
12  SYSTEMS, INC., a Delaware corporation;)
    REPLAYTV, INC., a Delaware corporation;)  (Case Nos.  03-51775; 03-51776, 03-51777 and
13  and SENSORY SCIENCE CORPORATION,     )  03-51778 MM (Jointly Administered)
    a Delaware corporation               )
14                                       )
                                         )  **APPELLANTS' DESIGNATION OF ITEMS**
15       Debtors and Debtors in Possession. )  **TO BE INCLUDED IN THE RECORD ON**
                                         )  **APPEAL AND STATEMENT OF ISSUES**
16                                       )  **ON APPEAL**
                                         )
17  _____)

18

19          Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, Appellants Portside

20  Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively,

21  the "**Senior Noteholders**" or the "**Appellants**"), holders of the 7 3/4 % Senior Subordinated

22  Debentures Due 2005 issued by the above-captioned Debtor and Debtor in Possession SonicBlue

23  Incorporated, hereby designate the following items to be included in the record of their appeal from

24  the Memorandum Decision and Order on Motion to Appoint a Chapter 11 Trustee, Motion to

25  Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP and for

26  Disgorgement of Attorneys' Fees (the "**First Order**," Docket No. 2220), entered on March 26, 2007

27  in the above-captioned proceeding by the Honorable Marilyn Morgan, United States Bankruptcy

28  Judge, and the related Memorandum Decision and Order on Motion of the Senior Noteholders for

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Clarification, or in the Alternative, Reconsideration (the "**Order Denying Clarification**," Docket

No. 2279) , entered on May 4, 2007:

| Filing Date/ Entry Date | Docket No. | Document[1] |
|---|---|---|
| 03/21/03 | 26 | Appointment of Committee of Unsecured Creditors |
| 03/24/03 | 28 | Declaration of Bruce Bennett in Support of Debtors' Emergency Motion for Order (1) Establishing Notice, Sales, and Bidding Procedures For Sale of Substantially all of the Debrtors' Operating Assets Free and Clear of all Liens, Claims and Encumbrances; (2) Authorizing the Assumption and Assignment, or Rejection of Certain Executory Contracts and Unexpired Leases in Connection with Asset Sale; and (3) Setting Hearing on Sale of Assets on Shortened Notice |
| 03/28/03 | 43 | Notice of Appearance and Request for Notices and Services of Papers |
| 03/31/03 | 63 | Application of the Official Committee of Unsecured Creditors to Employ Levene, Neale, bender, Rankin & Brill L.L.P. as Bankruptcy Counsel |
| 03/31/03 | 64 | Declaration of Ron Bender, Esq., in Support of Application of Official Committee of Unsecured Creditors to Employ Levene, Neale, Bender, Rankin & Brill L.L.P. as Bankruptcy Counsel |
| 04/07/03 | 119 | First Amended Appointment of Committee of Unsecured Creditors |
| 07/14/03 | 334 | Stipulation Providing Relief from the Automatic Stay to Senior Noteholders, Filed 7/14/03, with attached order entered 7/16/03 |
| 10/06/03 | 528 | Second Amended Appointment of Committee of Unsecured Creditors |
| 10/17/03 | 529 | Stipulated Protective Order |
| 10/27/03 | 545 | Stipulation Providing Relief from Automatic Stay to Senior Noteholders, Filed 10/16/03, with attached order entered 10/27/03 |
| 12/15/06 | 2047 | Disclosure Statement for Liquidating Plan of Reorganization Dated as of December 15, 2006 |

---

[1] Designations are intended to include all attachments, declarations, and other documents accompanying the pleading listed.

DESIGNATION OF RECORD AND STATEMENT OF ISSUES ON APPEAL

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Filing Date/ Entry Date | Docket No. | Document[1] |
|---|---|---|
| 12/15/06 | 2048 | Liquidating Plan of Reorganization Dated as of December 15, 2006 Proposed Jointly by Debtors and Creditors' Committee |
| 01/11/07 | 2091 | Objection to Joint Disclosure Statement |
| 01/18/07 | 2103 | First Amended Disclosure Statement Describing First Amended Liquidating Plan of Reorganization Dated as of January 18, 2007 Proposed Jointly by Debtors and Creditors' Committee (Redlined) |
| 01/18/07 | 2104 | First Amended Liquidating Plan of Reorganization Dated as of January 18, 2007 Proposed Jointly by Debtors and Creditors' Committee (Redlined) |
| 01/19/07 | 2107 | Debtors and Creditors' Committee's Response to Riverside's Objection to Disclosure Statement Describing Liquidating Plan of Reorganization Proposed Jointly by Debtors and Creditors' Committee |
| 01/22/07 | 2115 | Supplemental Objection to Joint Disclosure Statement |
| 01/22/07 | 2116 | Objection To Proposed Disclosure Statement Dated January 18, 2007 |
| 01/23/07 | 2117 | Supplemental Brief Regarding Economic Value of 2006 Giveaway |
| 02/12/07 | 2136 | Transcript of Hearing Held on January 23, 2007 re Approval of Disclosure Statement |
| 02/12/07 | 2138 | Submission of Preliminary Status Report and Request for Continuance of Deadline for Submission of Final Status Report and of Disclosure Statement and attached Declarations |
| 02/12/07 | 2139 | Application for Order Shortening Time for Hearing on Motion for Authority to Disclose Confidential Information to People Who Are Not Parties to the Via/Intel Confidentiality Agreement |
| 02/12/07 | 2140 | Motion for Authority to Disclose Confidential Information to People who are not Parties to the Via/Intel Confidentiality Agreement |
| 02/13/07 | 2144 | Sonicblue Claims LLC's Response to Preliminary Status Report Re: Creditors' Committee Counsels' Investigation Into 2006 Giveaway |
| 02/14/07 | 2146 | Sonicblue Claims LLC's Supplemental Response to Preliminary Status Report |

DESIGNATION OF RECORD AND STATEMENT OF ISSUES ON APPEAL

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Filing Date/<br>Entry Date | Docket<br>No. | Document[1] |
|---|---|---|
| 02/14/07 | 2149 | Response of Via Technologies to Committee Motion for Authority to Disclose Confidential Information |
| 02/14/07 | 2150 | Reply to Sonicblue Claims LLC's Response to Preliminary Status Report |
| 02/15/07 | 2153 | Motion to Appoint Trustee Chapter 11 Trustee, or in the Alternative Motion to Appoint Examiner |
| 02/20/07 | 2163 | Motion By United States Trustee to Disqualify Pillsbury Winthrop Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees |
| 02/27/07 | 2168 | Amended Motion of United States Trustee for Appointment of Chapter 11 Trustee |
| 02/27/07 | 2171 | Sonicblue Claims LLC's Motion to Convert Case to Chapter 7 |
| 02/28/07 | 2173 | Amended Sonicblue Claims LLC's Motion to Convert Case to Chapter 7 |
| 03/01/07 | 2175 | Sonicblue Claims LLC's Joinder in Motion by United States Trustee to Disqualify Pillsbury Winthorp Shaw Pittman LLP, to Vacate Employment Order, and for Disgorgement of Attorneys' Fees |
| 03/01/07 | 2176 | Transcript of Hearing Held on February 15, 2007 re a) Motion for Authority to Disclose Confidential Information to People Who are Not Parties to the VIA/Intel Confidentiality Agreement by Official Committee of Creditors Holding Unsecured Claims; b) Response by VIA Technologies, Inc.. |
| 03/05/07 | 2180 | Eighth Supplemental Declaration of William B. Freeman in Support of Application for Order Pursuant to Bankruptcy Code Section 327(a) Authorizing the Employment and Retention of Pillsbury Winthrop LLP as General Insolvency Counsel to the Debtors |
| 03/05/07 | 2181 | Response to Motion to Convert Chapter 11 Case to a Case Under Chapter 7 |
| 03/05/07 | 2182 | Opposition of Pillsbury Winthrop Shaw Pittman LLP to U.S. Trustee's Motion to Disqualify Pillsbury, Vacate Employment Order, and Require Disgorgement of Attorneys' Fees and attached Declaration |

DESIGNATION OF RECORD AND STATEMENT OF ISSUES ON APPEAL

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Filing Date/ Entry Date | Docket No. | Document[1] |
|---|---|---|
| 03/05/07 | 2184 | Response of the Official Committee of Creditors Holding Secured Claims to (1) the Motion by the Office of the United States Trustee Seeking the Appointment of a Chapter 11 Trustee and (2) the Motion by SBC Seeking to Convert These Chapter 11 Cases to Chapter 7 |
| 03/05/07 | 2185 | Declaration of Ron Bender, Esq. in Response of the Official Committee of Creditors Holding Secured Claims to (1) the Motion by the Office of the United States Trustee Seeking the Appointment of a Chapter 11 Trustee and (2) the Motion by SBC Seeking to Convert These Chapter 11 Cases to Chapter 7 |
| 03/07/07 | 2188 | Notice of Transfer of Claim from CD LIT Digital To Argo Partners |
| 03/08/07 | 2190 | Sonicblue Claims LLC's Reply to Opposition to the US Trustee's Motion to Disqualify Pillsbury |
| 03/12/07 | 2195 | Joinder in Amended Motion of United States Trustee for Appointment of Chapter 11 Trustee |
| 03/12/07 | 2198 | Limited Response of Via Technologies to Pending Motions to Convert, Appoint Chapter 11 Trustee and/or Disqualify Debtor's Counsel |
| 03/12/07 | 2199 | Sonicblue Claims LLC's Reply to Responses of the Creditors' Committee and Noteholders to Motion to Convert to Chapter |
| 03/12/07 | 2200 | Reply by United States Trustee to Opposition of Pillsbury Winthrop Shaw Pittman LLP to U.S. Trustee's Motion to Disqualify Pillsbury, Vacate Employment Order, and Require Disgorgement of Attorneys' Fees |
| 03/12/07 | 2202 | Response by Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. to Sonicblue Claims LLC's Reply to Opposition to the U.S. Trustee's Motion to Disqualify Pillsbury |
| 03/13/07 | 2204 | Joinder to United States Trustee's Motion for Appointment of Chapter 11 Trustee |
| 03/16/07 | 2213 | Declaration of Nanette Dumas in Support of Amended Motion by U. S. Trustee for Appointment of Chapter 11 Trustee |
| 03/26/07 | 2220 | Memorandum Decision and Order on Motion to Appoint Chapter 11 Trustee, Motion to Convert Case, and Motion to Disqualify Pillsbury Winthrop Shaw Pittman LLP and for Disgorgement of Attorneys' Fees |

DESIGNATION OF RECORD AND STATEMENT OF ISSUES ON APPEAL

| Filing Date/ Entry Date | Docket No. | Document[1] |
|---|---|---|
| 03/29/07 | 2226 | Transcript of Hearing Held on March 19, 2007 |
| 04/04/07 | 2231 | Motion for Clarification, or in the Alternative, Leave to File a Motion for Reconsideration; Memorandum of Points and Authorities |
| 04/20/07 | 2248 | Amended SonicBlue Claims LLC's Opposition to Senior Noteholders' Alternative Motions for Clarification or Reconsideration of March 26 Memorandum Opinion |
| 04/27/07 | 2263 | Reply of Pillsbury Winthrop Shaw Pittman LLP to Claims Traders' Opposition to Motion for Clarification |
| 04/27/07 | 2265 | Reply Brief in Support of Motion for Clarification, or in the Alternative, for Leave to File a Motion for Reconsideration |
| 04/27/07 | 2266 | Declaration of Joshua M. Mester in Support of Reply Brief in Support of Motion for Clarification, or in the Alternative, for Leave to File a Motion for Reconsideration |
| 05/01/07 | 2268 | Response to Reply of Pillsbury Winthrop Shaw Pittman LLP |
| 05/04/07 | 2279 | Memorandum Decision and Order on Motion of Senior Noteholders for Clarification, or in the Alternative, Reconsideration |
| 05/11/07 | 2292 | Notice of Appeal |
| 05/11/07 | 2293 | Statement of Election |
| 05/14/07 | 2296 | Transmittal of Record on Appeal to District Court |
| 05/19/07 | 2303 | Transcript of Hearing Held on May 4, 2007, re a) Motion for Clarification, or in the Alternative, for Leave to File a Motion for Reconsideration by Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund, Ltd.; b) Amended Opposition by Sonic Blue Claims, LLC |

## ADVERSARY DOCKET – ADV. NO. 04-05556

| | | |
|---|---|---|
| 12/21/04 | 1 | Complaint by SONICBlue against VIA Technologies, *et al*. |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## STATEMENT OF ISSUES ON APPEAL[2]

1.    Did the Bankruptcy Court make factual or legal errors in determining that VIA has a claim (let alone a claim that might qualify as "Senior Indebtedness" under the applicable indenture) against debtor SonicBlue relating to the loss of use of technology by a joint venture in which VIA is a member where the relevant contract provides that the "sole and exclusive" remedy for loss of use of the technology is liquidated damages payable directly to the joint venture (and not VIA)?

2.    Did the Bankruptcy Court make factual or legal errors in describing the role of the Senior Noteholders and their counsel (as well as the role of various other involved professionals) in settlement negotiations and the bankruptcy case?  Subparts of this issue include:

a.    Did the Court err in finding that the Senior Noteholders' participation on the Official Committee of Unsecured Creditors was "not generally known to this court or the creditor body"?

b.    Did the Court err in finding that the Senior Noteholders used their position on the Committee to "insert themselves into settlement negotiations" regarding the VIA claim?

c.    Did the Court err in finding that the Senior Noteholders and their counsel "operated in the shadows" and appeared to have "concealed" their interest in assuring that VIA and S3G's claims were not misrepresented as Senior Indebtedness?

d.    Did the Court err in finding that the Senior Noteholders' counsel did not cooperate or "volunteer" information relevant to an investigation by Committee counsel regarding the settlement?

Dated:  May 21, 2007

Respectfully submitted,

HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017


By:  _____/s/ J. MichaelHennigan_____
            J. Michael Hennigan
Counsel for Portside Growth & Opportunity
Fund, Smithfield Fiduciary LLC, and Citadel
Equity Fund Ltd.

---

[2] Terms not otherwise defined have the meanings given to them in the Bankruptcy Court's First Order and Order Denying Clarification.

EXHIBIT 67

1 | HENNIGAN, BENNETT & DORMAN LLP
BRUCE BENNETT  (SBN 105430)
2 | THOMAS B. WATSON  (SBN 181546
JOSHUA M. MESTER  (SBN 194783)
3 | 865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
4 | Telephone      (213) 694-1200
Facsimile      (213) 694-1234
5 |
6 | Counsel for Portside Growth & Opportunity Fund, Smithfield
Fiduciary LLC, and Citadel Equity Fund Ltd.

7

8 | UNITED STATES BANKRUPTCY COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN JOSE DIVISION

11 | In re                                                    ) Case Nos.  03-51775, 03-51776, 03-51777 and
                                                                 ) 03-51778 MM
12 | SONICBLUE INCORPORATED, a Delaware         )
corporation; DIAMOND MULTIMEDIA             ) Chapter 11 Cases, Jointly Administered
13 | SYSTEMS, INC., a Delaware corporation;      )
REPLAYTV, INC., a Delaware corporation;     )
14 | and SENSORY SCIENCE CORPORATION,       ) **RESPONSE BY PORTSIDE GROWTH &**
a Delaware corporation                                   ) **OPPORTUNITY FUND, SMITHFIELD**
15 |                                                              ) **FIDUCIARY LLC, AND CITADEL**
          Debtors and Debtors-in-Possession.       ) **EQUITY FUND LTD. TO SONICBLUE**
16 |                                                              ) **CLAIMS LLC'S REPLY TO OPPOSITION**
                                                                 ) **TO THE U.S. TRUSTEE'S MOTION TO**
17 |                                                              ) **DISQUALIFY PILLSBURY**
                                                                 )
18 |                                                              ) Judge:       Hon. Marilyn Morgan
                                                                 ) Date:         March 19, 2007
19 |                                                              ) Time:        10:30 a.m.
                                                                 ) Location:    Courtroom 3070
20 |                                                              )                  180 South First Street
                                                                 )                  San Jose, CA 95113
21 |                                                              )
                                           _____)
22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    This pleading is filed by the holders of SonicBlue's 7 ¾ % Senior Subordinated Debentures

2    Due 2005 (the "Senior Notes") in response to "SonicBlue Claims LLC's Reply to Opposition to the

3    US Trustee's Motion to Disqualify Pillsbury" (the "SB Claims Reply").

4    SB Claims supports the US Trustee's Motion to Disqualify Pillsbury based on Pillsbury's

5    nondisclosure of a conflict with certain creditors of the estate, namely the Senior Noteholders.

6    However, SB Claims makes additional allegations against other parties here – extraneous to the

7    issue of whether Pillsbury should be disqualified – that are neither accurate nor supported by law.

8    The Senior Noteholders responded to many of these allegations in their Opposition to the Motion to

9    Appoint a Chapter 7 Trustee (the "Opposition").  In this brief, the Senior Noteholders respond only

10   to certain new allegations made in the SB Claims Reply and other issues not previously addressed.

11   **I.    The Recognition That The Duplicate Claims Asserted By VIA And S3 Graphics Co.,**
12   **Ltd., Do Not Constitute Senior Indebtedness Was, And Is, Proper.**

13   There was no misconduct in connection with the agreement that the claims allowed in the

14   Intel/VIA settlement are not Senior Indebtedness under the Senior Note Indenture.  The parties

15   properly recognized that none of the duplicate claims asserted by VIA and S3G constituted Senior

16   Indebtedness under the Senior Note Indenture because, among other reasons, all of the claims

17   asserted by both VIA and S3G, are actually owned by S3G.  The settlement merely recognizes the

18   existing, and not previously disputed, rights of the parties.

19   SB Claims' argument that Pillsbury should have tried to extort something from the Senior

20   Noteholders in exchange for properly clarifying that, if S3G's claims against SonicBlue were

21   transformed into VIA claims, they should not be Senior Indebtedness is misguided and flawed.

22   First, at the time that the Intel/VIA settlement was negotiated, all involved parties

23   (including VIA) agreed that the claims asserted by VIA and S3G did not constitute Senior

24   Indebtedness because (a) all of the claims asserted in duplicate by S3G and VIA were in fact owned

25   by S3G and no claims of S3G are even referred to in the definition of Senior Indebtedness, and (b)

26   even if any of the claims asserted by S3G and VIA were owned by VIA, none of these claims

27   constituted "indebtedness" or "Indebtedness" based upon both the language contained in the Senior

28   Note Indenture (which SB Claims has mischaracterized) and the intent of all of the parties to the

-1-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  Senior Note Indenture.

2      Second, if the Senior Noteholders were confronted with a threat by SonicBlue (or anyone

3  else) to submit a proposed Intel/VIA settlement to the Bankruptcy Court that mischaracterized the

4  ownership of S3G's claims against the estate, the Senior Noteholders would not have paid anyone

5  off.  Instead, the Senior Noteholders would have objected to the proposed settlement.  In response to

6  such an objection, the proposed settlement would have been amended to award the allowed claim to

7  the proper party or the Bankruptcy Court would not have approved it.  That all parties involved in

8  the Intel/VIA settlement understood these facts and did not attempt groundless extortion or foment

9  needless litigation is not objectionable conduct; in fact, it is the conduct this Court should encourage

10  and expect.

11      Similarly, the Senior Noteholders will object to any subsequent effort to amend the

12  Intel/VIA settlement agreement in a manner that allows S3G and/or VIA to allocate the allowed

13  claims between them without regard to the actual ownership of the rights settled in the Intel/Via

14  settlement but eliminates the term which ensures that such a right will not prejudice third parties.

15  Any such amendment should be seen for what it is: an unlawful effort to convert a claim of one

16  creditor into a claim of another.  We know of no authority that would permit parties to accomplish

17  this result under the guise of a settlement or a modified settlement, and no court should

18  countenance it.[1]

19  **II.    The Senior Noteholders' Claims Against Pillsbury Are Not Frivolous.**

20

21      Notwithstanding Pillsbury's assertion, the letter sent on behalf of the Senior Noteholders by

22  their counsel Mr. Swartz to Pillsbury is not "frivolous."  Although this will be adjudicated

23  elsewhere, the letter correctly sets out Pillsbury's negligence and negligent misrepresentation,

24  among other things.

25

26  _____

27  [1]     Moreover, no characterization of the claims allowed in the Intel/VIA settlement agreement is

28  binding on any person or entity that is not a party to it.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

The fact that the Swartz letter is not "frivolous" is confirmed by the US Trustee's Motion:

> The UST takes no position on whether PW does in fact have an obligation to indemnify the Senior Noteholders or on whether PW might be liable to the Senior Noteholders for any shortfall in their recovery on their debentures. ***But the plain language of the April 22, 2002 PW opinion letter does not lend itself to the ready conclusion that the claims [of the] Senior Noteholders can be dismissed out of hand.***

Amended Motion of United States Trustee for Appointment of Chapter 11 Trustee, p. 9, n.1 (emphasis added).

## III.    Conclusion.

The Senior Noteholders are continuing to review papers filed in response to the several pending motions and evaluate the facts pertaining to the motions before commenting on the relief that ought to be granted.  The Senior Noteholders' position on the relief that should be granted in response to the motions set for hearing on March 19, 2007, will be presented to the Court at the hearing.


 DATED:  March 12, 2007                    HENNIGAN, BENNETT & DORMAN LLP
                                           865 South Figueroa Street, Suite 2900
                                           Los Angeles, California 90017


                                           By:   /s/ Joshua M. Mester
                                                    Joshua M. Mester
                                           Counsel for Portside Growth & Opportunity
                                           Fund, Smithfield Fiduciary LLC, and Citadel
                                           Equity Fund Ltd.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA