1    ROBERT A. GREENFIELD (039648)
     FRANK A. MEROLA (136934)
2    K. JOHN SHAFFER (153729)
3    STUTMAN, TREISTER & GLATT PC
     1901 Avenue of the Stars, 12th Floor
4    Los Angeles, CA 90067
     Telephone:    (310) 228-5600
5    Facsimile:    (310) 228-5788

6    WILLIAM McGRANE (057767)
7    BERNARD S. GREENFIELD (066017)
     McGRANE GREENFIELD LLP
8    40 South Market Street, 7th Floor
     San Jose, CA 95113
9    Telephone:    (408) 995-5600
     Facsimile:    (408) 995-0308
10

11   Counsel for SonicBlue Claims LLC

12                 UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
13                    SAN JOSE DIVISION

14   PORTSIDE GROWTH & OPPORTUNITY       Case No. C-07-02553 RMW
     FUND, et al.,
15
                                         OPPOSITION TO CROSS-MOTION FOR
16            Appellants,                LIMITED STAY OF PROCEEDINGS

17            vs.

18   OFFICIAL COMMITTEE OF
     UNSECURED CREDITORS, et al.,
19
              Appellees.
20
     (Appeal from In re SONICblue,
21   Incorporated, et al., Bankr. N.D. Cal. (San
     Jose), No. 03-51775 MM)
22

23

24

25

26

27

0

466944v1

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   SUMMARY OF ARGUMENT.................................................................... 5

    A.   The Stay Motion is untimely............................................................... 5

    B.   The Stay Motion is before the wrong Court. ..................................... 5

    C.   The Stay Motion is without merit. ...................................................... 6

    D.   The Bankruptcy Court Does Not Lack Jurisdiction............................ 8

III.  BACKGROUND AND STATEMENT OF FACTS ................................... 8

    A.   The Events Leading To The Bankruptcy Court's Decisions. .............. 8
        1.   Introduction. ............................................................................. 8
        2.   Pillsbury's Undisclosed Conflict Of Interest Vis-à-vis The Noteholders. .......... 9
        3.   The Purported Waiver Of The Noteholders' "Senior Indebtedness" Liabilities. ........................................................................... 12
        4.   The Proceedings Leading Up To The March 26 And May 4 Decisions. .......... 15

    B.   The Bankruptcy Court's March 26 Decision. ..................................... 21

    C.   The Noteholder's Reconsideration Motion And The Court's May 4 Decision............................................................................................. 23

    D.   The Committee Reconstitution Motion. ............................................. 25

    E.   The Ongoing Discovery And Litigation In The Bankruptcy Court....... 27
        1.   The Deepening Undisclosed Pillsbury Conflicts Of Interest............ 27
        2.   The Mounting Evidence On The Senior Indebtedness Issue............ 29

IV.   ARGUMENT ............................................................................................. 30

    A.   The Stay Motion Is Untimely. ............................................................ 30

    B.   The Stay Motion Is Before The Wrong Court. .................................... 32

    C.   The Noteholders Have Failed To Demonstrate A Basis For A Stay Pending Appeal. .................................................................................. 33
        1.   There Is No Likelihood Of Success On The Merits. ....................... 33
        2.   The Noteholders Will Not Suffer Irreparable Harm........................ 36
        3.   A Stay Will Harm Other Parties In This Case................................. 37
        4.   The Public Interest Will Not Be Served By Granted A Stay............ 38

i

1

D.  The Noteholders' Contention That The Bankruptcy Court Lacks Jurisdiction
To Proceed With The Litigation Is Without Merit..................................................38

V.    CONCLUSION ..........................................................................................40

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Baron Financial Corp. v. Natanzon*, 2007 U.S. Dist. LEXIS 63848 *57
(D. Md. March 21, 2007) ..................................................................................35, 36

*Dressler v. The Seeley Co. (In re Silberkraus)*, 336 F.3d 864 (9th Cir. 2003) ................38

*Ho v. Dai Hwa Electronics (In re Ho)*, 265 B.R. 603 (9th Cir. B.A.P. 2001) ..............6, 32

*In re Cajun Electric Power Cooperative, Inc.*, 230 B.R. 693
(Bankr. M.D. La. 1999) ..........................................................................................35

*In re Caldor, Inc.*, 193 B.R. 165 (Bankr. S.D.N.Y. 1996) ................................................20

*In re County of Orange*, 179 B.R. 195 (Bankr. C.D. Cal. 1995)......................................25

*In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427 (Bankr. E.D. Va. 2001) .............25

*In re Mesta Machine Co.*, 67 B.R. 151 (Bankr. W.D. Pa. 1986)......................................20

*In re Microboard Processing, Inc.*, 95 B.R. 283 (Bankr. D. Conn. 1989) ........................20

*In re Plaza Hotel Corp.*, 111 B.R. 882 (Bankr. E.D. Cal.)................................................11

*In re Sung Hi Lim*, 7 B.R. 319 (Bankr. D. Haw. 1980) ....................................................33

*In re Wade*, 115 B.R. 222 (9th Cir. B.A.P. 1990), *aff'd* 948 F.2d 1122     (9th Cir.
1991)........................................................................................................................39

*Matter of Advisory Comm. Of Major Funding Corp.*, 109 F.3d 219     (5th Cir.
1997)........................................................................................................................25

*Neary v. Padilla (in re Padilla)*, 222 F.3d 1184 (9th Cir. 2000)................................38, 39

*Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839 (E.D. Cal. 2006)...................................6, 33

*Rains v. Flinn (In re Rains)*, 428 F.3d 893 (9th Cir. 2005) ..............................................39

*Silicon Valley Bank v. Pon (In re Pon)*, 1994 U.S. Dist. LEXIS 2559     (N.D. Cal.
March 1 1994) ........................................................................................................33

*Sullivan Central Plaza I, Ltd. v. BancBoston Real Estate Capital Corp. (In re Sullivan
Central Plaza I, Ltd.)*, 935 F.2d 723 (5th Cir. 1991).......................................39, 40

*Texas Commerce Bank v. Licht (In re Pengo Indus.)*, 962 F.2d 543     (5th Cir.
1992)..........................................................................................................................9

**Statutes**

11 U.S.C. § 1125(a) ...........................................................................................................19

11 U.S.C. §§ 1104(c) & 1106(b) .......................................................................................17

11 U.S.C. §502(b)(2) ...........................................................................................................9

28 U.S.C. § 455 ..................................................................................................................33

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

iii

466944v1

| | |
|---|---|
| 1 | **Rules** |
| 2 | Bankruptcy Rule 2014(a) .................................................................................... 11 |
| 3 | Bankruptcy Rule 5004 ......................................................................................... 33 |
| | Bankruptcy Rule 8005(a) .................................................................................6, 32 |
| 4 | Bankruptcy Rule 8011(c) ..................................................................................5, 30 |
| 5 | Local Bankr. Rule 9014-1(c)(2) ......................................................................... 37 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |

**Rules**
Bankruptcy Rule 2014(a) .................................................................................... 11
Bankruptcy Rule 5004 ......................................................................................... 33
Bankruptcy Rule 8005(a) .................................................................................6, 32
Bankruptcy Rule 8011(c) ..................................................................................5, 30
Local Bankr. Rule 9014-1(c)(2) ......................................................................... 37

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

# I.    INTRODUCTION

SonicBlue Claims LLC ("SB Claims") opposes the Cross-Motion For Limited Stay Of Proceedings ("Stay Motion") filed by appellants Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. ("Noteholders").  The Noteholders seek to stay litigation in the Bankruptcy Court that may determine, among other things, (i) whether the Debtors' former bankruptcy counsel committed fraud on the Court by continuing to serve as counsel for the bankruptcy estate in the face of material, undisclosed conflicts of interest, and (ii) whether the Noteholders themselves engaged in inequitable conduct by, among other things, using their self-described "controlling" position in the bankruptcy to obtain unfair (and undisclosed) benefits for themselves. These issues need to be resolved as soon as possible in the Bankruptcy Court, so that the administration of this case can be completed and creditors paid.

The Bankruptcy Court found that cause existed to appoint a chapter 11 trustee based upon numerous – and substantial – concerns that arose regarding how the case had been run since it was filed in 2003.[1]  Most significantly, the Court held that counsel for the bankruptcy estates – Pillsbury Winthrop Shaw Pittman ("Pillsbury") – had failed to disclose a material conflict of interest vis-à-vis the Noteholders.  Unbeknownst to the Court and creditors generally, the Noteholders had threaten to sue Pillsbury unless the Noteholders' claims received "full payment" in the bankruptcy case.  This placed Pillsbury in direct conflict with the largest group of creditors in the case.  The disqualification of Pillsbury and the appointment of a trustee were supported by the United States Trustee, SB Claims, and various other creditors who had lost all confidence in how the case had been administered by Pillsbury, the Debtors, and the Creditors' Committee ("Committee"), the latter which the Noteholders then controlled.

---

[1]   Memorandum Decision And Order On Motion To Appoint A Chapter 11 Trustee, Motion To Convert Case, And Motion To Disqualify Pillsbury Winthrop Shaw Pittman LLP And For Disgorgement Of Attorneys' Fees [Bk. Docket No. 2220] (the "March 26 Decision").

1

1    Although the primary focus of the Bankruptcy Court's decision was Pillsbury's

2  misconduct, the Court also noted the ***appearance*** of possible misconduct and

3  irregularities by other parties (including the Noteholders), which the Court detailed in its

4  March 26 Decision.[2]  The Court noted, for example, materially inconsistent

5  representations that the Noteholders and Committee counsel were making to the Court.

6  Mr. Bender (counsel for the Committee and a material source of the Noteholders'

7  "evidence" in their Stay Motion) made inconsistent statements regarding the Committee's

8  role in negotiating and documenting the settlement among the Debtors, Intel Corporation,

9  and VIA Technologies ("VIA/Intel Settlement").  Mr. Bennett (counsel for the

10  Noteholders) also made inconsistent statements about the Committee's role, first insisting

11  that Mr. Bender "told it to [the Court] exactly accurately," and then later claiming that

12  Mr. Bender's explanation "defies belief, frankly."  *See* pp. 21-22, *infra*.  It appeared that

13  something may be seriously amiss in this chapter 11 case.

14    Beyond disqualifying Pillsbury, the Bankruptcy Court did not purport to

15  adjudicate the merits of any of the particular allegations that had been made. Rather, the

16  Court concluded that, as a whole, the situation had resulted in "the complete breakdown

17  of creditor confidence." March 26 Decision at 1:25.  The Court further held that "the

18  appointment of a chapter 11 trustee is necessary to restore creditor confidence in the

19  bankruptcy system and to assure that there is no lingering taint from [Pillsbury's]

20  representation of the debtor." *Id.* at 16:7-10.

21    The Noteholders did not challenge the result reached by the Bankruptcy Court.  In

22  fact, they "look[ed] forward to a thorough and objective investigation conducted by a

23  truly disinterested and independent trustee."[3]  Nonetheless, they moved for

24  _____

25  [2]  *See id.* at 12:19 – 13:12 (noting counsel's inconsistent statements); *id.* at 16:9 – 21
26  (noting that Debtors' CFO worked "part-time at best" and failed to disclose
   Pillsbury's conflict and a breach of fiduciary duty action against him).

27  [3]  Noteholders' Motion For Clarification, Or In The Alternative, Leave To File A
   Motion For Reconsideration [Bk. Docket No. 2231] at 1.

2

466044v1

1    reconsideration, specifically asking the Court to expunge various statements from its

2    decision, which the Noteholders suggested could be used against them in future litigation.

3          The Court sought to dispel the Noteholders' concerns, making clear that:

4          the words and findings of my Memorandum Decision of March 26, 2007 were
             carefully selected to respond to the issues then before the court, which were
5          whether to appoint a chapter 11 trustee pursuant to [Bankruptcy Code] § 1104,
             whether to convert the case to chapter 7, and whether to disqualify counsel for
6          the debtor. ***The findings made in support or denial of those motions must be
             understood in context.***

7

8    Memorandum Decision And Order On Motion Of Senior Noteholders For Clarification,

9    Or In The Alternative, Reconsideration ("May 4 Decision") at 1:20-24 (emphasis added).

10   The Court reaffirmed this point for the Noteholders at the next hearing in the case:

11         I want to make plain that I don't feel that I have predetermined any of the
             issues that are going to come before us. I want to say that the issues that I
12         ruled on previously arose in a different context. And you'll have since then
             and will be in the future conducting discovery, so that you will be able to
13         more fully flush out those issues for the future hearings that we'll have.[4]

14         The Bankruptcy Court was not willing, however, to expunge from its written

15   opinions every mention of the appearance of possible wrongdoing by the Noteholders.

16   The Court recognized that there remained serious, unanswered questions, as exemplified

17   by the conflicting statements being made by counsel. May 4 Decision at 3:5-20. The

18   Court did not purport to resolve those questions, but rather made clear that those

19   unanswered questions were among the many reasons why she concluded that creditors

20   had lost confidence in the system, and that the appointment of a trustee might help to

21   restore creditor confidence. The unanswered questions would be further explored by the

22   trustee and other parties as the case progressed. Thus, the Court's observations were

23   intended to be, and in fact were, interlocutory. Nonetheless, the Noteholders appealed.

24         The Noteholders availed themselves of the Bankruptcy Court's continuing

25   jurisdiction over the resolution of the unanswered questions for more than six months

26   following the May 4 Decision. Never once – until now – did they suggest that the

27

---

[4]   Transcript of June 14, 2007 Hearing at 23-24 [Bk. Docket No. 2375].

3

466944v1

1    litigation should be stayed pending their appeal, or that the Bankruptcy Court somehow

2    lacked jurisdiction over any "relief based on the facts alleged to exist as of May 4,

3    2007."[5]  The Noteholders were perfectly content to litigate in the Bankruptcy Court – that

4    is, until the Court ruled against them on various issues.  Having litigated and lost in the

5    Bankruptcy Court, the Noteholders reversed course and began asserting that there should

6    have been no more litigation in the Bankruptcy Court in the first place.

7         The Noteholders also are undoubtedly very concerned about what the ongoing

8    litigation in the Bankruptcy Court is revealing.  The circumstances surrounding

9    Pillsbury's undisclosed conflicts of interest have gone from bad to worse.  SB Claims has

10   discovered that, in addition to Pillsbury's failure to disclose the Noteholders' threats to

11   sue the firm, Pillsbury also failed to disclose that the Debtors' directors and officers had

12   threatened to sue Pillsbury, and that Pillsbury entered into an undisclosed Tolling

13   Agreement with them just one week before the Noteholders made their own threats.  The

14   claims arose from a denial of insurance coverage which was based, in part, upon the

15   failure to disclose threats that the Noteholders had made to sue the directors and officers.

16        Similarly, the documents produced since the May 4 Decision directly contradict

17   many of the Noteholders' assertions.  Among other things, they show that, but for the

18   undisclosed waiver of the Noteholders' subordination under the VIA/Intel Settlement

19   Agreement, the Debtors, Pillsbury, and even the Noteholders themselves all understood

20   that VIA's litigation claims could, in fact, be treated as senior in priority to the

21   Noteholders.  Thus, the Noteholders' assertion that "under the transactional facts fully

22   known to everyone, the VIA/S3G Allowed Claim would not constitute Senior

23   Indebtedness" is, in fact, patently false.  Stay Memorandum at 8:19-20.

24

25   _____

26   [5]  Memorandum Of Points And Authorities In Support Of Senior Noteholders'
     Opposition To Motion To Dismiss Appeal And Cross-Motion For Limited Stay Of
27   Proceedings And/Or To Withdraw Reference Of Chapter 11 Cases ("Stay
     Memorandum") at 28:7-8.

4

466944v1

1    The Noteholders' Stay Motion and their motion to withdraw the reference from

2    the Bankruptcy Court are nothing more than forum shopping in the extreme.  Now

3    dissatisfied with their results in the Bankruptcy Court, the Noteholders are seeking to

4    divest that Court of jurisdiction based upon outrageous and wholly unsubstantiated

5    allegations that the "Noteholders have had no opportunity to be heard," and that

6    continued litigation in the Bankruptcy Court will not "ensure they have the opportunity to

7    present a full and accurate picture regarding their conduct."  Stay Memorandum at 3:21-

8    24; Notice Of Motion And Motion To Withdraw Reference [Bk. Docket No. 2569].

9           II.    SUMMARY OF ARGUMENT

10    **A.    The Stay Motion is untimely.**  The Noteholders have appealed from

11    decisions that were entered more than *six and eight months ago*, respectively.  During

12    the intervening months, the Noteholders have fully participated in litigation in the

13    Bankruptcy Court, including (a) filing and arguing substantive motions, (b) answering the

14    Complaint in the litigation that they now seek to stay, (c) fully participating in discovery,

15    and (d) appearing at no less than six hearings in the Bankruptcy Court, including hearings

16    involving the very matters that the Noteholders now contend should be stayed.  At no

17    time prior to the filing of this Stay Motion have the Noteholders ever suggested that their

18    appeal affected the Bankruptcy Court's jurisdiction, or that proceedings should be stayed

19    in the Bankruptcy Court pending the resolution of this appeal.

20           Bankruptcy Rule 8011(c) provides that "A motion for a stay or other emergency

21    relief may be denied if not presented promptly."  The Noteholders have been anything

22    but prompt.  In fact, what they have done is litigated in the Bankruptcy Court for months,

23    seeking substantive relief (including a dismissal of all claims against them).  It was only

24    when the Bankruptcy Court ruled against the Noteholders that they decided to ask this

25    Court to stay further proceedings against them in the Bankruptcy Court.

26    **B.    The Stay Motion is before the wrong Court.**  Bankruptcy Rule

27    8005(a) requires that a stay motion be presented first to the Bankruptcy Court, unless one

1    can "show why the relief … was not obtained from the bankruptcy judge."  The

2    Noteholders fail to provide any reasons, other than that they "are not optimistic that" the

3    Court would grant them a stay.  Stay Memorandum at 28:6.  The Noteholders also

4    suggest that the Bankruptcy Court lacks jurisdiction to enter a stay, an assertion that is

5    patently incorrect.  *See Ho v. Dai Hwa Electronics (In re Ho)*, 265 B.R. 603, 605 (9th

6    Cir. B.A.P. 2001).

7         **C.**     **The Stay Motion is without merit.**  To obtain a stay, the Noteholders

8    must prove: (1) a likelihood of success on the merits of their appeal; (2) they will suffer

9    irreparable harm if a stay is not granted; (3) other parties in the bankruptcy case will not

10    be substantially harmed by a stay; ***and*** (4) the public interest will be served by a stay.

11    This test is in the conjunctive – all four factors must be satisfied.  *See, e.g., Ohanian v.*

12    *Irwin (In re Irwin)*, 338 B.R. 839, 843 (E.D. Cal. 2006).  The Noteholders, however, have

13    not demonstrated that ***any*** of these factors exist.

14         **(1) There is no likelihood of success on the merits.**  The Noteholders are

15    attempting to appeal what are at most findings of "appearances" of improprieties made in

16    the context of whether a chapter 11 trustee should be appointed.  The Bankruptcy Court

17    has made clear that the appearances were noted for this context only, and that they will

18    not be binding in other contexts in this case.  As such, there is nothing for the

19    Noteholders to appeal.  The appeal should be dismissed for the reasons already stated by

20    the chapter 11 trustee.  Moreover, even if there were appellate jurisdiction over the

21    Bankruptcy Court's findings, those findings should be affirmed in their entirety.  There is

22    ample evidence in the record upon which the Court properly concluded that serious

23    unanswered questions existed with respect to the Noteholders' conduct.

24         **(2) The Noteholders will not suffer irreparable harm if a stay is not granted.**

25    The crux of the Stay Motion (and of the Noteholders' underlying appeal) is that the

26    Bankruptcy Court's statements vis-à-vis the Noteholders "could potentially serve as the

27    basis for collateral estoppel in subsequent litigation," Stay Memorandum at 3:12-13, and

6

1    that "to date, the … Noteholders have had no opportunity to be heard." *Id.* at 3:21-22.

2    The Bankruptcy Court, however, made clear that it has not "predetermined any of the

3    issues that are going to come before us," and that the appearances the Court noted "arose

4    in a different context." The Court further made clear that the Noteholders "will be able to

5    more fully flush out those issues for the future hearings that we'll have." Transcript of

6    June 14, 2007 Hearing at 23-24. Any fair reading of the Bankruptcy Court's decisions

7    shows that the Court did not "hold" that the Noteholders had engaged in any wrongdoing.

8    Rather, the Court noted the ***appearances*** of ***possible*** wrongdoing, which appearances

9    contributed to a "breakdown in creditor confidence," and which should be explored

10   further by the trustee and other interested parties.

11       The Noteholders falsely assert that the Bankruptcy Court used its findings from

12   the March 26 Decision to collaterally estop them from opposing the motion to

13   reconstitute the Committee. Stay Memorandum at 23:9-28. What the Court did,

14   however, was simply rely upon ***evidence*** that was already in the record – evidence which

15   the Noteholders failed to rebut. Moreover, the "findings" that the Noteholders cite – that

16   they knew about Pillsbury's conflict of interest and their potential subordination to VIA –

17   are not subject to any dispute. Finally, the Noteholders should not be heard now on this

18   issue, since: (i) they did not file any objection to the underlying motion, and (ii) the

19   Noteholders never appealed the order reconstituting the Committee.

20       **(3) A stay will harm the other parties in this case.** Creditors in this bankruptcy

21   case have waited more than four years to be paid. It is essential that the process that the

22   Bankruptcy Court commenced last spring continue toward a timely resolution, and that

23   the numerous unanswered questions raised in the March 26 and May 4 Decisions be

24   answered as expeditiously as possible. If the Noteholders are unhappy with those

25   answers, they can seek redress in this Court at that time. In the meantime, however, the

26   hundreds of other creditors in this case deserve to know whether, in fact, anyone did (or

27   did not) engage in any wrongdoing, and to have any wrongdoing put right. A stay will

466944v1

1   only further erode creditor confidence in the entire bankruptcy process.

2   **(4) The public interest will not be served by granting the stay.**  At least one of the

3   issues on which the Noteholders seek to stay further litigation is whether Pillsbury

4   committed a fraud on the Court by failing to disclose its multiple conflicts of interest.

5   This is a matter of great importance.  Creditors deserve to know as soon as possible

6   whether anyone has attempted to misuse the judicial system, as well as the full nature and

7   extent of that misuse.  Staying proceedings on this issue would do nothing to restore

8   confidence, but rather would leave very serious and troubling questions lingering.  If no

9   fraud was committed, then the Bankruptcy Court should be permitted to make that

10   determination forthwith.  If, however, there was a fraud on the court (as SB Claims'

11   respectfully submits there was), then this must be corrected without delay.

12   **D.     The Bankruptcy Court Does Not Lack Jurisdiction.**  There is no

13   merit to the Noteholders' assertion that, because of their appeal, the Bankruptcy Court

14   now lacks jurisdiction over all "facts alleged to exist as of May 4, 2007."  Stay

15   Memorandum at 28:7-8.  The prudential rule that an appeal divests the trial court of

16   jurisdiction is not nearly as broad as the Noteholders contend, and it does not apply to

17   what were, in effect, interlocutory findings by the Court.  The Noteholders' overly broad

18   construction of the rule, if accepted, would bring the chapter 11 process to a halt, simply

19   on the basis of an appeal from certain findings of "appearances" that the Bankruptcy

20   Court made clear were limited to a very specific context, and that are subject to further

21   consideration.

22   **III.    BACKGROUND AND STATEMENT OF FACTS**

23   **A.     The Events Leading To The Bankruptcy Court's Decisions.**

24   **1.     Introduction.**

25   The Noteholders' "Statement Of Facts" devotes pages to issues that have not yet

26   been fully litigated in the Bankruptcy Court, and which the Bankruptcy Court has not

27   purported to resolve in any final sense.  There is a simple reason for that – the

8

1   Noteholders' appeal does not come before this Court at the end of a full trial on the

2   merits.  Rather, the appeal involves two decisions of the Bankruptcy Court that *began* an

3   investigatory and discovery process that is still ongoing in the Bankruptcy Court.  Thus,

4   while the Court's decision to appoint a trustee may itself be "final," many of the

5   underlying issues that the Court observed – but did not resolve – in connection with

6   appointing a trustee are still very much interlocutory.

7        As did the Bankruptcy Court, SB Claims presents its Statement of Facts in the

8   context in which this appeal arose.

9   **2.      Pillsbury's Undisclosed Conflict Of Interest Vis-à-vis The
            Noteholders.**

10

11        Pillsbury's conflict was based upon an Opinion Letter that Pillsbury had issued in

12   favor of the Noteholders prior to the Debtors' bankruptcy, in which Pillsbury represented

13   that the Noteholders' claims against the Debtors were valid and enforceable.[6]  Although

14   Pillsbury disputes whether the Opinion Letter applies in the bankruptcy context, the

15   Noteholders have (and continue to) vigorously assert that it does.

16        During the bankruptcy case, material questions arose about the validity and

17   enforceability of the Noteholders' claims, including whether they were usurious, whether

18   they could be avoided as "fraudulent conveyances," and whether a substantial portion of

19   the claims could be disallowed as unmatured "original issue discount" ("OID"), which

20   must be disallowed under Bankruptcy Code section 502(b)(2).[7]  The chapter 11 trustee

21   has since determined that between approximately $37 million and $45 million of the

22   Noteholders' claims must be disallowed as unamortized OID, a very material amount

23   _____

24   [6]   The Opinion Letter is included in Exhibit 2 to the Declaration Of K. John Shaffer
           In Support Of SonicBlue Claims, LLC's Supplemental Response To Preliminary

25         Status Report ("Shaffer February 14 Declaration") [Bk. Docket No. 2146].

26   [7]   OID exists when a creditor loans to the debtor less than the full face amount of the

27         note issued by the debtor.  Under 11 U.S.C. §502(b)(2), OID that has not amortized as
           of the bankruptcy is disallowed as unmatured interest *See, e.g., Texas Commerce
           Bank v. Licht (In re Pengo Indus.)*, 962 F.2d 543, 546 (5th Cir. 1992).

9

466944v1

1    considering that the total face amount of the Noteholders' obligations is $75 million. *See*

2    Objection Of The Chapter 11 Trustee To The Claims Of Portside Growth And

3    Opportunity Fund, Ltd., Smithfield Fiduciary LLC And Citadel Equity Fund, Ltd. [Bk.

4    Docket No. 2559] at 18:7-20.

5          When Pillsbury informed the Noteholders that the Debtor might have to object to

6    their claims, the Noteholders' response was to demand that Pillsbury indemnify them,

7    and to threaten Pillsbury itself with suit. Counsel for the Noteholders wrote in a letter to

8    the managing partner of Pillsbury:

9          It appears that the [Noteholders] may have to litigate their claims against
      SONICblue to enforce the terms of the Debenture and to overcome

10          SONICblue's erroneous assertion of the Bankruptcy Code issue. Accordingly,
      *we ask that Pillsbury Winthrop agree to indemnify the [Noteholders] as they*

11          *seek to enforce the agreement that Pillsbury Winthrop previously represented*
      *was enforceable. Please let us know promptly whether Pillsbury Winthrop*

12          *will provide the requested indemnity.*

13          *If we are unable to obtain SONICblue's payment of the full principal amount,*
      *the [Noteholders] intend to pursue claims for, perhaps among other things,*

14          *negligent misrepresentation and negligence against Pillsbury Winthrop in*
      *connection with the April 22, 2002 Opinion Letter.* (emphasis added)[8]

15

16          The Noteholders' threats of suit and demands of indemnification were not

17    disclosed to the Bankruptcy Court or creditors generally. Rather, they were made

18    privately to Pillsbury, which then promptly turned over all responsibility for objecting to

19    the Noteholders' claims to the Committee. At the time, the Committee was controlled by

20    the Noteholders themselves, who held three of the five active seats on the Committee.

21    Thus, based upon the Noteholders' threats to sue Pillsbury, the Noteholders managed to

22    get the responsibility for objecting to their own claims transferred to the Committee that

23    they controlled.

24    _____

25    [8]    *See* Shaffer February 14 Declaration at Exhibit 2. This letter was preceded by an

26        August 24, 2006 telephone call from lead counsel for the Noteholders, Mr. Bennett,
    to the partner in charge of Pillsbury's bankruptcy department, conveying the same

27        message. *See* Declaration of Craig A. Barbarosh Re Motion For Appointment Of
    Trustee And Motion To Disqualify Pillsbury Winthrop Shaw Pittman LLP [Bk.
    Docket No. 2182] at ¶ 11,

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1    Rather than disclosing the conflict of interest, Pillsbury went to the Bankruptcy

2    Court and requested payment for the fees it had incurred in connection with analyzing the

3    Noteholders' claims.[9]  Indeed, nearly four months passed before there was even a hint

4    that some form of "conflict" might exist, when a brief reference was made deep within

5    more than eighty pages of single spaced Plan documents.[10]  The true facts regarding

6    Pillsbury's conflict, however, were not revealed until nearly *six months* after the conflict

7    arose, when SB Claims obtained a copy of the Noteholders' threatening letter to Pillsbury

8    and promptly submitted it to the Court.[11]  During this time, neither Pillsbury, the

9    Committee, nor the Noteholders did anything to advise the Court and creditors as to the

10   full magnitude of Pillsbury's conflict.  Indeed, the potential conflict should have been

11   disclosed at the commencement of the bankruptcy case (in 2003), since Bankruptcy Rule

12   2014(a) requires bankruptcy professionals to disclose "all of the person's connections

13   with . . . creditors [and] any other party in interest . . . ."  As the Court held, the "Rule

14   2014 disclosure requirements are strictly enforced," and "[e]state professionals must

15   make full, candid and complete disclosures of all facts affecting their eligibility for

16   employment."  March 26 Decision at 15:26 – 16-4 (citing *In re Plaza Hotel Corp.*, 111

17   B.R. 882, 883 (Bankr. E.D. Cal.), *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990)).

18   ///

19   ///

20   ///

21

22   _____

23   [9]  *See* Eighth Interim Application Of Pillsbury Winthrop Shaw Pittman LLP [etc.] [Bk.
24        Docket No. 1966] at 19:10-19.

25   [10] *See* Disclosure Statement Describing Liquidating Plan Of Reorganization Dated As
          Of December 15, 2006 Proposed Jointly By Debtors And Creditors' Committee [Bk.
26        Docket No. 2047] at 22:11-13, and Liquidating Plan Of Reorganization Dated As Of
          December 15, 2006 Proposed Jointly By Debtors And Creditors' Committee [Bk.
27        Docket No. 2048].

     [11] Shaffer February 14 Declaration, Exhibit 2 [Bk. Docket No. 2146].

466944v1

3.    **The Purported Waiver Of The Noteholders' "Senior Indebtedness" Liabilities.**

Approximately 45 days *after* the Noteholders first threatened to sue Pillsbury, Pillsbury submitted to the Bankruptcy Court a motion to approve the VIA/Intel Settlement and related pleadings (the "Settlement Pleadings").[12] The Settlement Pleadings (and a copy of the Settlement Agreement itself) were filed under seal, on the basis of the "highly confidential nature of the matters addressed in the Motion and the Settlement Agreement." Shaffer February 14 Declaration, Ex. 2 [Bk. Docket No. 2146].

The sealed Settlement Agreement included the following sentence on page 5 of a 26-page, single spaced agreement (in section III.3): "Claimants and Debtor agree that the [$12.5 million Allowed Claim that VIA received under the agreement] is not, and shall not be treated as, 'Senior Indebtedness' under the terms of Debtor's Indenture, dated as of April 22, 2002, for the 7-3/4% Secured Senior Subordinated Convertible Debentures due 2005" (the "Purported Waiver Language").[13] No explanation of the significance of this language was provided to the Court or creditors, and in fact it only appeared in the Settlement Agreement itself, which was filed under seal. However, it is now clear that the Purported Waiver Language was intended to relieve the Noteholders from their subordination to VIA under an April, 2002 Indenture, which provided that the Noteholders are "subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness," and that "Senior Indebtedness" includes:

---

[12] The motion, supporting memorandum, and Declaration of Marcus Smith were filed as Bk. Docket Nos. 1952, 1953, and 1954, respectively.

[13] A redacted copy of the Settlement Agreement was finally filed with the Court on February 16, 2007, after SB Claims had submitted the evidence it had discovered regarding Pillsbury's conflict. *See* Notice Of Filing Of: (I) Redacted Copy Of Debtor's Motion For Approval Of Settlement Of VIA And Intel Litigation; (II) Declaration Of Marcus Smith In Support Of Debtors' Motion For Approval Of Settlement Of VIA And Intel Litigation; (III) Redacted Copy Of Executed Settlement Agreement [Bk. Docket No. 2158].

12

466944v1

1   All indebtedness of the Company due and owing to Via Technologies, Inc.
    in an aggregate principal amount not to exceed $15,000,000 . . . [plus
2   interest thereon].[14]

3       In other words, VIA's indebtedness would have to be paid in full in the

4   bankruptcy case before the Noteholders could receive any distributions. Because the

5   Debtors unquestionably are insolvent, this provision has the potential of costing the

6   Noteholders millions of dollars in distributions.

7       None of the Settlement Pleadings disclosed in any way that: (i) the Noteholders

8   might be subordinated to claims held by VIA, (ii) any such subordination purportedly

9   would be waived under the Settlement Agreement, (iii) the Noteholders conditioned their

10  support of the settlement on the waiver, (iv) the Noteholders controlled the Committee,

11  which was supporting approval of the settlement, and (v) the Noteholders had threatened

12  Pillsbury with suit if they were unable to obtain payment in full. Indeed, none of these

13  facts were disclosed to the Bankruptcy Court or creditors generally at any time before the

14  Court was asked to approve the VIA/Intel Settlement. The Bankruptcy Court granted the

15  relief requested in the Settlement Pleadings on October 31, 2006 [Bk. Docket No. 1981].

16      The Noteholders insist that Purported Waiver Language was negotiated before the

17  Noteholders' indemnification demands turned into a real conflict. Indeed, the Court did

18  not hold otherwise. However, as with every other issue that the Noteholders are

19  attempting to appeal, the Court made clear that the issue was not yet resolved.

20      That said, there was certainly sufficient evidence before the Bankruptcy Court to

21  give it some real concern – enough concern to want to have the matter investigated

22  further by a trustee and other interested parties. The evidence shows, for example, that

23  the Noteholders were granted special access to confidential, attorney/client documents

24  regarding the Debtors' own analyses of VIA's potential claims. Declaration of Pillsbury

25  _____

26  [14]  A copy of the Indenture Dated as of April 22, 2002 between SONICblue Incorporated
27        and the Initial Purchasers of 7-3/4% Secured Senior Subordinated Convertible
          Debentures Due 2005 is attached as Exhibit B to the Declaration of Ana N. Damonte
          [Bk. Docket No. 2182]. The quoted provisions are at pages 6, 7, and 13.

13

466944v1

1    attorney Albert J. Boro ("Boro Declaration") [Bk. Docket No. 2182] at Ex. 1. It further

2    shows that Pillsbury was very concerned that the Noteholders could use their controlling

3    position on the Committee to block any settlement that was not to their liking:

> I believed that our client . . . had a good sense of what settlement amount with
> VIA would be acceptable to the members of the Creditors' Committee, with
> the possible exception of the Senior Noteholders who seemed to communicate
> exclusively through Mr. Bennett. I believed that the Senior Noteholders
> might object to a settlement with [VIA], threatening the prospects of Court
> approval of a proposed settlement of the VIA Adversary Proceeding, unless
> their agreement to the proposed settlement terms was obtained.

8   Boro Declaration at ¶ 11. In other words, Mr. Boro knew that, unless he managed to get

9   the Noteholders to agree to a settlement with VIA, they would be able to use their control

10   of the Committee to try to block approval of the settlement.

11      The evidence further shows that on September 16, 2005, VIA and the Debtors

12   reached an agreement on a $12.5 million claim in the bankruptcy case. Boro Declaration

13   at ¶ 16. Notwithstanding this agreement, however, the Debtors could not commit to the

14   settlement because the Noteholders were not giving their consent. *Id.* at ¶ 17. Finally, on

15   September 20, 2005, the Noteholders said they would agree to the $12.5 million claim,

16   but only on the condition that VIA agree that its claims were "neither senior nor junior"

17   to any other claim – effectively waiving any right that VIA might have to assert seniority

18   under the terms of the 2002 Indenture. *Id.*

19      As noted, there was no disclosure to creditors of the fact that the Noteholders

20   were able to use their position in the case (including control of the Committee and access

21   to the Debtors' confidential litigation materials) to obtain a benefit that potentially was

22   worth $15 million or more. The only "disclosure" was a single sentence in the 26-page,

23   single spaced settlement agreement itself, filed under seal, and with no explanation

24   whatsoever to the Court of its significance.

25      The existence of the Purported Waiver Language in the VIA/Intel Settlement was

26   not discovered until January, 2007, when creditors started asking questions about the Plan

27   and Disclosure Statement that the Debtors and the Noteholder-controlled Committee had

1    filed in December. *See* Bk. Docket Nos. 2047 & 2048. Many questions were raised,

2    including: (i) did the Noteholders use their position on the Committee to obtain an unfair

3    advantage for themselves, (ii) if VIA was, in fact, willing to accept a general unsecured

4    claim of $12.5 million (worth approximately $4 million in actual dollars based upon

5    expected distributions in the case, *see* Boro Declaration at ¶ 15), would VIA have

6    accepted a smaller claim in exchange for retaining its seniority rights vis-à-vis the

7    Noteholders, (iii) was VIA told the truth when told that the "purpose" of the "Senior

8    Indebtedness" provision in the Indenture was limited to a loan that VIA never actually

9    made to the Debtors, *see* Boro Declaration at ¶ 20, and (iv) did the fact that Pillsbury was

10   operating under an undisclosed conflict of interest in any way affect the way it handled

11   the approval of the VIA/Intel Settlement (regardless of whether the part of the

12   negotiations affecting the Purported Waiver Language may have been "completed"

13   before the Noteholders threatened to sue Pillsbury).

14        The Bankruptcy Court did not purport to resolve ***any*** of these questions in its

15   March 26 and May 4 Decisions. Rather, it noted that the issues had been raised, and that

16   they could and should be explored through further investigation and discovery. There is

17   no question that the Court was greatly troubled by the lack of disclosure, but even the

18   Noteholders now admit that "it would be foolish to dispute that this settlement term

19   should have been affirmatively disclosed." Stay Memorandum at 2:11-12.

20        **4.    The Proceedings Leading Up To The March 26 And May 4 Decisions.**

21        In January, 2007, creditors raised what at first appeared to be some rather

22   straightforward questions about the proposed Plan and Disclosure Statement that had

23   been jointly filed by the Debtors and the Noteholder-controlled Committee.[15] Among

24   other things, they questioned the vague reference in the Disclosure Statement to a

25   _____

26   [15]  Riverside Contracting filed its Objection To Joint Disclosure Statement (the
         "Riverside Objection") on January 11, 2007 [Bk. Docket No. 2091], and filed its

27       Supplemental Objection on January 22, 2007 [Bk. Docket No. 2115]. Argo Partners,
         which is now a member of SB Claims, also filed objections to the Disclosure
         Statement on January 22 and 23, 2007 [Bk. Docket Nos. 2116 & 2117].

1  "conflict" that had been asserted against Debtors' counsel. They also questioned why

2  responsibility for investigating and objecting to the Noteholders' claims had been handed

3  over to the Committee. Riverside Objection at 2:15 – 3:6. Questions also were raised

4  regarding the Noteholders' treatment under the Plan, *id.* at 3:17 – 4:5, and in particular

5  why the Debtors and the Committee asserted that they were not aware of any claims –

6  such as VIA's – that were senior to the Noteholders.[16]

7       In response to these questions, the Debtors and the Committee proposed to add

8  some language to the Disclosure Statement stating that the "conflict" involved a "legal

9  opinion" that Pillsbury had provided to the Noteholders.[17] No one disclosed, however,

10 the fact that the Noteholders had made direct threats of suit against Pillsbury.

11      The Debtors and the Committee also represented that there was no issue regarding

12 VIA's seniority to the Noteholders. They claimed that the "Senior Indebtedness"

13 provisions were not intended to apply to anything other than a loan that VIA once was

14 considering making to the Debtors, but never made. In any event, they said, VIA waived

15 its right to assert "Senior Indebtedness" status in connection with the VIA/Intel

16 Settlement. The latter point was news to everyone, since none of the notices and other

17 pleadings filed in connection with the Court's VIA/Intel Settlement made any mention of

18 the fact that, as part of the settlement, the Noteholders (and, as it turned out, controlling

19 members of the Committee) were obtaining an undisclosed benefit that would release any

20 obligation they had to pay VIA up to $15 million, plus interest.

21      The first hearing on the adequacy of the Disclosure Statement occurred on

22 January 23, 2007. [Transcript at Bk. Docket No. 2136]. At that hearing, counsel for the

23 Committee (Mr. Bender), the Noteholders (Mr. Bennett), and the Debtors (Pillsbury) all

24 urged the Court to overrule the objections to the Disclosure Statement, and to press

25 ───────────────────

26 [16]  December 15 Disclosure Statement at 28:5-6.

27 [17]  Debtors' And Creditors' Committee's Response To Riverside's Objection To
      Disclosure Statement Describing Liquidating Plan Of Reorganization Proposed
      Jointly By Debtors And Creditors' Committee [Bk. Docket No. 2107].

───────────────────

1    forward with their approval.  The Court, however, was already beginning to sense that

2    something was very wrong.  Among other things, the Court learned for the first time that

3    the full "Committee" had ceased functioning years before, and that the only participants

4    were the three Noteholders and two related Matsushita entities.  *Id.* at 6:2-10.

5         As the hearing progressed, the Bankruptcy Court made clear that "I think that

6    these are significant issues that affect the integrity of the system and deserve full

7    inquiry."  *Id.* at 47:19-20.  The Court considered appointing an independent examiner to

8    investigate the matter.  *See* 11 U.S.C. §§ 1104(c) & 1106(b).  However, based upon

9    counsels' representations at the hearing (including Mr. Bender's statement that he knew

10   absolutely nothing about the VIA "Senior Indebtedness" issue until just a few days before

11   the hearing), the Court concluded that "you all have satisfied me that the attorneys

12   present in the room have not participated in any cover-up."  *Id.* at 47:1-3.  The Court thus

13   put Committee counsel – Mr. Bender – in charge of investigating both the VIA "Senior

14   Indebtedness" issue and Pillsbury's conflict of interest.

15        On February 12, 2007, Mr. Bender filed with the Bankruptcy Court his

16   Submission Of Preliminary Status Report And Request For Continuance Of Deadline For

17   Submission Of Final Status Report And Of Disclosure Statement Hearing ("Preliminary

18   Status Report") [Bk. Docket No. 2138], along with his accompanying Declaration.  The

19   Noteholders cite extensively to the Preliminary Status Report and Mr. Bender's

20   Declaration, contending that they vindicate the Noteholders' position, and show that there

21   was no basis for the Bankruptcy Court to even supect the "appearance" of any

22   wrongdoing by the Noteholders.

23        The Preliminary Status Report and Bender Declaration were, at best, a sham.  At

24   the time Mr. Bender submitted his report, he was fully aware of the Noteholders' threat to

25   sue Pillsbury if they did not receive "full payment" in the bankruptcy.  Any responsible

26   attorney would know that, at a minimum, this threat needed to be disclosed to the Court

27   and creditors generally.  Moreover, it is simply beyond dispute that the threat created an

466944v1

1    actual conflict of interest vis-à-vis the Noteholders, and that Pillsbury's failure to disclose

2    it was grounds for their immediate disqualification in the case. Indeed, no one – not even

3    the Noteholders – is challenging the Court's decision to disqualify Pillsbury.

4         The Preliminary Status Report, however, said nothing about Pillsbury's conflict

5    vis-à-vis the Noteholders. Rather, all the report said about Pillsbury was how it had been

6    "extremely cooperative" with Mr. Bender's "investigation" – the same exact language

7    that Mr. Bender used to describe the Debtors' and the Noteholders' participation in his

8    "investigation." Preliminary Status Report at 11:3. It, of course, is not surprising that

9    Pillsbury and the Noteholders would be "cooperative," given that Mr. Bender was

10   concealing the full extent of the conflict between Pillsbury and the Noteholders. In any

11   event, however, Mr. Bender's statement simply was not true.

12        When Mr. Bender made his "extremely cooperative" statement, not a single

13   witness had been deposed, and very few documents – mostly copies of highly redacted

14   drafts of VIA/Intel Settlement Agreement – had been produced. Moreover, while Mr.

15   Bender was representing to the Court that the parties had been "extremely cooperative,"

16   he was privately complaining behind their backs to SB Claims that, among other things,

17   Pillsbury was (i) delaying his investigation by refusing to produce for deposition the

18   attorneys who were responsible for actually drafting and negotiating the "Senior

19   Indebtedness" language, instead offering for deposition someone who had, by everyone's

20   admission, at best second hand knowledge of the matter, and (ii) making various claims

21   of privilege that were preventing access to the necessary documents and witnesses.[18]

22        The Noteholders' role in this process was similarly indefensible. The Noteholders

23   fully participated in the January 23 hearing at which Mr. Bender was tasked with

24   investigating the circumstances surrounding the purported waiver of VIA's "Senior

25   Indebtedness" status vis-à-vis the Noteholders. The Noteholders knew that Mr. Bender

26

27   [18] *See* Exhibits 1 and 2 to SonicBlue Claims, LLC's Response To Preliminary Status Report Re: Creditors' Committee Counsels' Investigation Into 2006 Giveaway and Declaration of William McGrane in support thereof [Bankr. Docket No. 2144].

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1    was given that task based upon his representation to the Court that he knew nothing about

2    the "Senior Indebtedness" issue until a few days earlier.  Transcript of January 23, 2007

3    Hearing [Bk. Docket No. 2136] at 13:4-8.  Indeed, Noteholders' counsel represented to

4    the Court that Mr. Bender's version of the facts was "told to [the Court] exactly

5    accurately, as I understand it . . . ."  *Id.* at 31:9-10.  When the Noteholders decided they

6    did not like the course of events, however, they completely changed their story, arguing

7    that "[i]t defies belief" that Mr. Bender did not know about the "Senior Indebtedness"

8    issue long before then.  Transcript of May 4, 2007 Hearing [Bk. Docket No. 2303] at

9    19:14 – 20:7.

10          Moreover, the Noteholders fully knew when they authorized the Committee to file

11    the Disclosure Statement, and again at the January 23, 2007 hearing, that no disclosure

12    had been made of the Noteholders' threats of suit against Pillsbury.  The Noteholders'

13    position on this issue was simple – not our problem.  According to the Noteholders, "We

14    know of no statute, rule, case law or other authority which imposes an obligation on any

15    creditor, whether or not a member of an official creditors committee, to disclose the

16    existence of a conflict between it and an estate professional."  Response To Motion To

17    Convert [etc.] [Bk. Docket No. 2181] at 4:17-19.  The Noteholders, however, were the

18    controlling members of the Committee that filed the Disclosure Statement.  Under

19    Bankruptcy Code section 1125, the Disclosure Statement was ***required*** to contain

20    "adequate information," which includes "information of a kind, and in sufficient detail"

21    to enable a creditor "to make an informed judgment about the plan."  11 U.S.C.

22    § 1125(a).  The Noteholders cannot reasonably claim that their threats to sue Pillsbury

23    unless they received "full payment" in the bankruptcy case were not relevant

24    considerations for deciding whether to support the plan that the Noteholder-controlled

25    Committee jointly filed with the Debtors and their counsel, Pillsbury.

26          As Committee members, the Noteholders owed fiduciary duties to creditors,

27    including the duty of undivided loyalty to provide impartial service in the interests of the

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1   creditors that they represent.  *See* March 26 Decision at 17:6-9 (citing *In re Caldor, Inc.*,

2   193 B.R. 165, 169 (Bankr. S.D.N.Y. 1996); *In re Microboard Processing, Inc.*, 95 B.R.

3   283, 284 (Bankr. D. Conn. 1989); *In re Mesta Machine Co.*, 67 B.R. 151, 156 (Bankr.

4   W.D. Pa. 1986)).  This is particularly so given that, as a group (and acting through their

5   joint counsel) the Noteholders effectively controlled the Committee's decision making.

6   Even assuming arguendo that, as individual creditors, the Noteholders did not have any

7   responsibility to notify the Court of the depth of Pillsbury's conflict, as a group they had

8   a responsibility to ensure that the Committee did – particularly once the Court and

9   creditors demanded more information about the conflict.

10        Neither Pillsbury, nor the Committee, nor Mr. Bender, nor the Noteholders came

11   forward with information regarding the Noteholders' threats and demands against

12   Pillsbury.  Rather, it was SB Claims that filed the relevant information with the

13   Bankruptcy Court, after receiving it through discovery.[19]

14        Following this revelation, the United States Trustee promptly filed a motion to

15   disqualify Pillsbury as Debtors' counsel, and seeking disgorgement of the more than $4

16   million in fees that Pillsbury had been paid.[20]  The United States Trustee also filed a

17   motion to appoint a chapter 11 trustee,[21] while SB Claims moved to convert the case to a

18   chapter 7.[22]  The motions were heard on March 19, 2007.

19

20

21

22   _____

23   [19]  *See* SonicBlue Claims, LLC's Supplemental Response To Preliminary Status Report
        and Exhibit 2 to Declaration of K. John Shaffer [Bk. Docket No. 2150] .

24   [20]  Motion By United States Trustee To Disqualify Pillsbury Winthrop Shaw Pittman
25        [etc.] [Bk. Docket No. 2163].

26   [21]  Amended Motion Of United States Trustee For Appointment Of Chapter 11 Trustee
        [Bk. Docket No. 2168].

27   [22]  [Amended] SonicBlue Claims, LLC's Motion To Convert To Chapter 7 [Bk. Docket
        No. 2173].

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1    **B.**    **The Bankruptcy Court's March 26 Decision.**

2        The Bankruptcy Court's March 26 Decision disqualified Pillsbury and ordered

3    that the United States Trustee appoint a chapter 11 trustee.  The Court also denied SB

4    Claims' request to convert the case to a chapter 7.

5        The Bankruptcy Court did not conclude that the Noteholders had acted

6    improperly with respect to foregoing.  Rather, the Court determined that there were

7    sufficient questions raised so as to warrant further investigation and the appointment of a

8    chapter 11 trustee.  According to the Court, "it is *not clear at this junction* whether

9    [Committee counsel's] handing of the objections of the [Noteholders] was an actual

10   conflict of interest . . . ."  March 26 Decision at 18:7-9 (emphasis added).  The

11   Bankruptcy Court further noted that:

12       A committee controlled by the three [Noteholders] hired [Committee
         counsel] and, of course, has the continuing ability to fire [Committee
13       counsel].  If not an actual conflict, these facts certainly *raise questions*
         regarding [counsel's] suitability to vigorously pursue the claims objections
14       on behalf of the estate.

15   March 26 Decision at 18:14-17 (emphasis added).

16       The Court also was very concerned about significant inconsistencies in the

17   representations being made by counsel.  For example, Mr. Bender, counsel for the

18   Noteholder-controlled Committee, made grossly inconsistent statements to the Court

19   regarding the Committee's role in negotiating and documenting the VIA/Intel Settlement.

20   When seeking payment of more than $100,000 for his firm's services in connection with

21   negotiating the settlement, Mr. Bender represented to the Court that his firm *"played a*

22   *material role in negotiating and documenting the settlement."*[23]  When, however, the

23   Court asked Mr. Bender just three months later why he failed to disclose to the Court

24   provisions in the VIA/Intel Settlement that were highly favorable to the Noteholders

25

26   _____

27   [23]  March 26 Decision at 13:10 (quoting from the Seventh Interim Application Of
         Levene, Neale, Bender, Rankin & Brill L.L.P. For Approval Of Fees [etc.] [Bk.
         Docket No. 1969] at 3 (emphasis added)).

466944v1

1   (specifically, the provisions that purported to waive the Noteholders' "Senior

2   Indebtedness" obligations to VIA under a 2002 Indenture), Mr. Bender insisted that the

3   Committee was "not aware" of the provisions, and that *his firm "was not a party to __any__*

4   *of the confidential settlement discussions that ensued, and [counsel] was not provided*

5   *with __any__ drafts of the actual VIA/S3 settlement agreement."* [24]

6        Moreover, Mr. Bennett, counsel for the Noteholders, confirmed Mr. Bender's

7   contention at the January 23, 2007 hearing that the Committee was not aware of the

8   special, undisclosed benefits provided to the Noteholders under the VIA/Intel Settlement

9   Agreement.  The transcript shows:

| | |
|---|---|
| THE COURT: | So you're saying that even at the time that the agreement was approved, the Committee was not aware of this provision? |
| MR. BENDER: | Not aware, or focused, or any of the like |

* * *

| | |
|---|---|
| MR. BENNETT: | . . . Mr. Bender, so far as he told you the story, told it to you *exactly accurately*, as I understand it. . . . . (emphasis added)[25] |

15       Mr. Bennett later changed his story, insisting that Committee counsel knew about

16  the purported waiver of the "Senior Indebtedness" provision all along:

| | |
|---|---|
| MR. BENNETT: | So this idea that this somehow happened in secret, and because Mr. Bender didn't know, nobody knew, when their lawyers were at all the relevant meetings and billing, as we've indicated in our papers, more than a hundred thousand dollars, is a very slender reed to support any finding at all about what Committee counsel knew. . . . It *defies belief*, frankly, that ... the Levene Neale firm, with all of the time and all of the energy spent in this case, didn't figure it out.  If that's what they say at the end of this process, I suppose we'll have to figure out what that means . . . . . (emphasis added)[26] |

_____

[24]  *See* May 4 Decision at 3:11-14 (referring to Transcript of January 23, 2007 Hearing [Bk. Docket No. 2136] at 13:4-8), and Declaration Of Ron Bender, Esq. In Response Of The Official Committee [etc.] [Bk. Docket No. 2185] ("Bender Declaration") at 6:2-4 (underlining original, other emphasis added).

[25]  Transcript of January 23, 2007 Hearing [Bk. Docket No. 2136] at 13:4-8 & 31:9-10.

[26]  Transcript of May 4, 2007 Hearing [Bk. Docket No. 2303] at 19:14 – 20:7.

22

466944v1

1    The Bankruptcy Court had other, material concerns about the conduct of the case.

2    Among other things, the Court was concerned that the Debtors and the Committee failed

3    to disclose the fact that the proposed "Chief Financial Officer and Responsible

4    Individual" under their joint Plan, Marcus Smith, was a defendant in an action for breach

5    of fiduciary duty in connection with his role in the Noteholders' financing.  March 26

6    Decision at 6:5-16, 12:8-9.[27]

7    Finally, based upon the evidence presented, the Court was quite correct to note

8    that "the bondholders appear to have used their position on the committee to interest

9    themselves into the settlement negotiations without revealing a hidden agenda," namely,

10    their desire to avoid liability on account of the VIA "Senior Indebtedness" provisions in

11    the Indenture.  *See* March 26 Decision at 17:9-11.  However, as with the rest of the

12    "findings" that the Noteholders seek to appeal, the Court did not say that the Noteholders

13    *did* do these things, only that there was a sufficient appearance of those things as to

14    warrant a chapter 11 trustee.

15    **C.    The Noteholder's Reconsideration Motion And The Court's**
       **May 4 Decision.**
16

17    The Noteholders responded to the March 26 Decision by filing a "Motion For

18    Clarification," in which they stated:

19           The [Noteholders] do not challenge the result reached in the Opinion.
             Indeed, the [Noteholders] welcome the addition of an additional officer who is
20           completely disinterested and not connected with any party.  And the
             [Noteholders] look forward to a thorough and objective investigation conducted
21           by a truly disinterested and independent trustee.

22           Rather, the [Noteholders] respectfully bring this motion for the sole
             purpose of requesting clarification or reconsideration of certain statements in
23    _____

24    [27]   Indeed, the Noteholders themselves had accused Mr. Smith of breaching his fiduciary
25           duties.  Just prior to the commencement of the bankruptcy case, counsel for the
             Noteholders had written to Pillsbury and the Debtors' general counsel that "Sonic's
26           officers and directors [which included Mr. Smith] have breached their fiduciary duties
             to creditors," that they had acted "[i]n complete disregard of their fiduciary duties to
27           the Company and its creditors," and that they had acted with "utter disregard for
             fiduciary obligations."  *See* Complaint for Declaratory Judgment, Adv. Pro. No. 05-
             05624, at Exhibit 7, page 5.

1    the Opinion, which could be misconstrued as suggesting that the Court made
     certain factual findings or conclusions unnecessary to the decision of the
2    motions before the Court and unsupported by the record.[28]

3         In denying the Noteholders' motion, the Bankruptcy Court made clear that their

4    concerns were unfounded.   The Court opened its decision with:

5         Let there be no doubt that the words and findings of my Memorandum Decision
          of March 26, 2007 were carefully selected to respond to the issues then before
6         the court, which were whether to appoint a chapter 11 trustee pursuant to
          [Bankruptcy Code] § 1104, whether to convert the case to chapter 7, and
7         whether to disqualify counsel for the debtor. *The findings made in support or
          denial of those motions must be understood in context.*
8

9    May 4 Decision at 1:20-24 (emphasis added).  The Court reaffirmed this point for the

10   Noteholders at the next hearing in the case, held on June 14, 2007:

11        I want to make plain that I don't feel that I have predetermined any of the issues
          that are going to come before us.  I want to say that the issues that I ruled on
12        previously arose in a different context.  And you'll have since then and will be
          in the future conducting discovery, so that you will be able to more fully flush
13        out those issues for the future hearings that we'll have.  Transcript of June 14,
          2007 Hearing at 23-24.
14

15        The Bankruptcy Court was not willing, however, to expunge from its written

16   opinions every mention of the appearance of possible wrongdoing by the Noteholders.

17   The Court recognized that there remained serious, unanswered questions, as exemplified

18   by the conflicting statements being made by counsel. *See* May 4 Decision at 3:5-20.  As

19   in its March 26 Decision, the Court did not purport to resolve those unanswered

20   questions.  Rather, the Court made clear that those unanswered questions were among the

21   many reasons why she concluded that creditors had lost confidence in the system, and

22   that the appointment of a trustee might help to restore creditor confidence.

23        The Bankruptcy Court ended its May 4 Decision in the same manner in which it

24   began – with a reminder that, beyond ordering the appointment of a trustee and

25   disqualifying Pillsbury, the Court had not purported to resolve any issue in the case:

26   _____

27   [28]   Motion For Clarification, Or In The Alternative, Leave To File A Motion For
            Reconsideration [Bk. Docket No. 2231] at 1:8-15.

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

1          At the hearing on this motion, much emphasis was placed on who knew
       what when, posturing for the benefit of the trustee, and putting spin on a bad
2      situation. However, it is incumbent on all interested parties not to lose sight of
       the big issues necessary to move this case forward: what to do about the fact
3      that there was no meaningful disclosure of the effect of VIA's waiver of
       priority, and how to revise the disclosure statement and plan in order to provide
4      a reasonably prompt distribution to creditors. There will be time later to focus
       attention on the conduct of the attorneys and fiduciaries involved.

5

6   May 4 Decision at 4:6-12. Thus, the issue whether fiduciaries engaged in any

7   misconduct was not resolved by either the March 26 or the May 4 Decision. Rather, the

8   Court made clear that these issues would be addressed at a later time.

9   **D.     The Committee Reconstitution Motion.**

10          SB Claims filed a motion to reconstitute the membership of the Committee on

11   June 11, 2007. The reason was simple – "the function of a creditors' committee is to act

12   as a watchdog on behalf of the larger body of creditors which it represents." *Matter of*

13   *Advisory Comm. Of Major Funding Corp.*, 109 F.3d 219, 224 (5th Cir. 1997).

14   Committee members owe a fiduciary duty to the creditors they represent. *See, e.g., In re*

15   *Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr. E.D. Va. 2001); *In re*

16   *County of Orange*, 179 B.R. 195, 202-03 (Bankr. C.D. Cal. 1995) (holding that one

17   becomes a committee member "with the understanding that it has a fiduciary duty of

18   undivided loyalty and impartial service to all creditors").[29]

19          The existing Committee was not fulfilling its duties. The uncontroverted

20   evidence in the record was that, of the eight creditors that the United States Trustee had

21   appointed to the Committee, three were not even bothering to participate. Those

22   members could not, *per se*, be fulfilling their fiduciary duties by not showing up.

23          As to the other five members, three were the Noteholders, participating through

24   their joint counsel. Thus, the Noteholders held an effective majority of the positions on

25   _____

26   [29]  *See* Motion For Order (1) Directing United States Trustee To Change The
       Membership Of Official Committee Of Creditors Holding Unsecured Claims, Or (2)
27     Directing The Appointment Of A New Trade Creditor Committee [Bk. Docket No.
       2341].

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1    the Committee. The Committee, however, is supposed to represent the interests of *all*

2    creditors, and thus a Committee dominated by the Noteholders could not properly

3    perform its functions.

4            The hearing on SB Claims' motion was originally set for August 3, 2007. The

5    hearing, however, was continued twice to allow interested parties more time to respond.

6    The motion eventually drew numerous responses. The Committee itself and the United

7    States Trustee opposed the motion, while three individual creditors (who, along with SB

8    Claims, collectively held $24 million in claims) supported the requested relief.[30] The

9    Noteholders, however, did not file any pleadings in response to the motion.

10           The Bankruptcy Court began the hearing by recognizing that, given the number of

11   creditors who had lost faith in the existing Committee, it simply could no longer perform

12   its statutory role. Transcript of September 20, 2007 Hearing [Bk. Docket No. 2505] at

13   8:24 – 10:24. In the words of the Court, the existing Committee had become a "lame

14   duck." *Id.* at 9:24.

15           Counsel for the Noteholders – who until this point had taken no position on the

16   motion – then addressed the Court, stating:

17           we took it to heart, that Your Honor had not predetermined issues in this case.
             And maybe it's my naivete or inability to parse this so finely, but from where I
18           sit, it seems like the Court has predetermined issues today. *Id.* at 27:2-6.

19   Once again, the Court made clear, "I can assure you that's not true." *Id.* at 27:8.

20           In concluding that the Committee needed to be reconstituted, the Court did indeed

21   refer to a number of the same facts that it referred to in its March 26 Decision. The facts,

22   however, were simply undisputable, including that (i) the Committee knew the full extent

23   of Pillsbury's conflict of interest, but did not fully disclose it to the Court and creditors,

24   (ii) the Committee took over the task of objecting to the Noteholders' claims, but did not

25   disclose that the Noteholders comprised a majority of the Committee, and (iii) the

26   Committee had either failed to identify the purported waiver of VIA's Senior

27   _____

[30]   *See* Bk. Docket Nos. 2462, 2465, 2470, 2472, 2473, and 2476.

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1

1    Indebtedness status (as Committee counsel contended), or knew about it (as Noteholder

2    counsel contended), but failed to disclose it. *Id.* at 50-51. The Court did ***not*** reach these

3    conclusions because it believed it was bound by the March 26 Decision. Rather, the

4    Court reached these conclusions based on the undisputed facts in the record – facts which

5    the Noteholders could have, but did not, try to refute by timely filing an opposition and/or

6    declarations prior to the hearing.

7         The Bankruptcy Court entered its order directing the United States Trustee to

8    reconstitute the Committee on October 5, 2007.[31] The U.S. Trustee appointed a new, six

9    member Reconstituted Committee on October 23, 2007 [Bk. Docket No. 2539]. The

10   Noteholders did not appeal the Court's order.

11   **E.    The Ongoing Discovery And Litigation In The Bankruptcy**
12   **Court.**

13        The Bankruptcy Court disqualified Pillsbury and directed the appointment of a

14   chapter 11 trustee in order to ***begin*** the discovery and investigation of all of the facts, not

15   to end it. Indeed, what has been discovered since that time shows that what the

16   Bankruptcy Court and creditors suspected as of the entry of the March 26 and May 4

17   Decisions was just the tip of the iceberg. Although these facts were not in the record at

18   the time the Bankruptcy Court entered its March 26 and May 4 Decisions, SB Claims

19   respectfully submits that they are significant in understanding the importance of

20   permitting the process that is currently going on in the Bankruptcy Court to continue.

21   Moreover, they shed great light on why the Noteholders are seeking to stay the

22   Bankruptcy Court and to divest it of any further jurisdiction over this matter.

23        **1.    The Deepening Undisclosed Pillsbury Conflicts Of Interest.**

24        When Pillsbury was caught having failed to disclose the Noteholders' threats

25   against it, the firm presented a contrite façade to the Court. Pillsbury filed a

26   _____

27   [31]   Order Granting Motion For Order (1) Directing United States Trustee To Change The
        Membership Of Official Committee Of Creditors [etc.] [Bk. Docket No. 2510].

466944v1

1   supplemental declaration purporting to disclose all of the firm's remaining, undisclosed

2   conflicts and connections with creditors.[32]  Pillsbury represented to the Court and

3   creditors that "the Firm, and its partners, counsel, and associates, do not have any

4   connection with the Debtors, creditors, [and] any other party in interest . . . ," other than

5   those which it already had disclosed.[33]

6        SB Claims has since discovered that Pillsbury entered into an undisclosed Tolling

7   Agreement with various directors and officers of the Debtors.[34]  The Tolling Agreement

8   arose out of allegations that Pillsbury was responsible for a denial of D&O insurance

9   coverage, and that "disputes have arisen as to whether Pillsbury is liable to the Directors

10  for damages that may have been incurred by Directors as a result of the Coverage

11  Denial."  The coverage denial was based in part upon the Debtors' failure to disclose

12  threats that the Noteholders had made to sue the directors and officers, and the denial

13  included, among other things, any claims that related to the Noteholders' threats to sue

14  the directors and officers.[35]

15       The Tolling Agreement was entered into just one week before the Noteholders

16  made their own threats to sue Pillsbury, and less than two months before Pillsbury filed

17  the Debtors' motion to approve the VIA/Intel Settlement and the purported release of the

18  Noteholders' "Senior Indebtedness" obligations.  As with the Noteholders' threats of suit,

19  Pillsbury wholly failed to disclose the conflict to the Court and creditors.

20

21  _____

22  [32]  Eighth Supplemental Declaration In Support Of Application For Order Pursuant To
      Bankruptcy Code Section 327(a) Authorizing The Employment And Retention of

23    Pillsbury Winthrop LLP [etc.] [Bk. Docket No. 2180].

24  [33]  *Id.* at ¶ 7.

25  [34]  The Tolling Agreement is attached as Exhibit 1 to the Declaration Of K. John Shaffer
      In Support Of Supplement To Motion To Modify And/Or Vacate In Part Order

26    Approving VIA Settlement Based Upon Fraud On The Court Due To Counsel's
      Failure To Disclose A Material Conflict Of Interest [Bk. Docket No. 2558].

27  [35]  *See* Declaratory Relief Complaint, Adv. Proceeding No. 05-05624, Docket No. 1, at
      pages 5 & 30 and Exhibits 7 & 9.

28

466044v1

1    **2.    The Mounting Evidence On The Senior Indebtedness Issue.**

2    The Noteholders have argued to this Court – just as they did in the Bankruptcy

3    Court below – that "everyone knew" that their claim was not subordinated to VIA's. The

4    documents produced through discovery, however, show a very different reality. What

5    they show is that the Debtors, Pillsbury, and even the Noteholders themselves believed

6    that the Noteholders' claims could, in fact, be subordinated to VIA. Indeed, this was the

7    case until the Noteholders insisted that VIA's claim not be treated as senior as their price

8    for agreeing to the VIA/Intel Settlement (and for not using their majority position on the

9    Committee to block the settlement). Among the evidence discovered to date:

10   *    When the Debtors negotiated the 2002 Indenture with the Noteholders, they
        bargained "to have any potential cash paid . . . to Via Technologies, Inc. in
11       connection with settlement of [Debtors'] dispute with VIA to effectively be treated as
        "Senior Indebtedness." *See* accompanying Declaration of K. Shaffer Declaration
12      ("Shaffer Declaration") Exhibit 1.

13   *    A Pillsbury attorney who was actively involved in negotiating and drafting the 2002
        Indenture explained that "Senior Indebtedness" included all "debt owed by the
14      Company to Via Technologies in an aggregate principal amount not to exceed
        $15MM." Shaffer Declaration Exhibit 2. No reference was made to a loan that VIA
15      never actually made.

16   *    The Debtors' financial advisor made clear that "In a bankruptcy scenario, Via is
        likely to have a very substantial liquidated damages claim (approximately $50
17      million), *$15 million of which would rank senior to the 2005 Notes*" held by the
        Noteholders. Shaffer Declaration Exhibit 3. "The 2005 *Notes are subordinated to*
18      *the VIA litigation claim* (up to $15 million) …" *Id.* Exhibit 6; *see id.* Exhibits 4 & 5.

19   *    The Debtors' own management treated the VIA claim as "Senior Indebtedness,"
        preparing an "Estimated Recovery Analysis" that assumed either (1) a *"$5.0 million*
20      *Via claim, all of which is senior to the 2005 Notes,"* or (2) a *"$62.5 million Via*
        *claim, of which $15.0 million is senior to the 2005 Notes*."[36]
21

22   *    Pillsbury treated VIA's litigation claim as "Senior Indebtedness" in *unfiled* drafts of
        the Disclosure Statement. Shaffer Declaration Exhibit 9. When the Disclosure
23      Statement was filed with the Court, however, any disclosure of VIA's possible
        seniority was eliminated.

24

25   _____

26   [36]   *See* "Estimate Recovery Analysis (9/22/03), which was sent to the Noteholders on
27      September 23, 2003 (emphasis in original, Shaffer Declaration Exhibit 7). Mr. Smith
        further explained that "Via . . . receives a piece of the 05 allocation" that would
        otherwise be paid to the Noteholders. *See* Shaffer Declaration Exhibit 8).

1    Thus, the discovery process that the Bankruptcy Court set into motion with its decisions

2    is, in fact, already resulting in the discovery of material new evidence.

3                              **IV.    ARGUMENT**

4    **A.    The Stay Motion Is Untimely.**

5            Bankruptcy Rule 8011(c) makes clear that "A motion for a stay, or for other

6    emergency relief may be denied if not presented promptly." The Noteholders have been

7    anything but prompt.

8            The Bankruptcy Court entered its Trustee Order on March 26, 2007, more than

9    eight months ago. The Court denied the Noteholders' motion for reconsideration on May

10   4, 2007, more than six months ago. Since that time, the Noteholders have fully

11   participated in the bankruptcy proceedings without any suggestion that those proceedings

12   should be stayed pending the resolution of their appeal. Among other things, the

13   Noteholders (i) moved to dismiss SB Claims' Adversary Proceeding on July 11, 2007,[37]

14   (ii) replied in support of their motion to dismiss on September 17, 2007, (iii) fully

15   participated in the September 27, 2007 hearing on the motion to dismiss,[38] and

16   (iv) answered the complaint in the Adversary Proceeding on October 12, 2007.[39] Never

17   once did the Noteholders suggest that the Bankruptcy Court somehow lacked jurisdiction

18   over the Adversary Proceeding, or that the Noteholders' appeal had to be resolved before

19   the Adversary Proceeding could proceed. To the contrary, it was the Noteholders who

20   pursued a substantive motion to dismiss, and they were perfectly happy to have the

21   Bankruptcy Court consider that motion (so long as she ruled in their favor).

22           Moreover, the Noteholders fully participated in other proceedings in the

23   Bankruptcy Court which affected matters that they now say the Bankruptcy Court lacked

24   _____

25   [37]   Defendants' Motion To Dismiss, Adv. Pro. 07-05082, Docket No. 12.

26   [38]   *See* Transcript of September 27, 2007 Hearing, Adv. Pro. 07-05082, Docket No. 51.

27   [39]   Defendants' Answer To Complaint For Equitable Subordination, To Determine Adv.
         Pro. 07-05082, Docket No. 52.

466944v1

1  jurisdiction over.  For example, the Noteholders (a) filed their own motion to allow their

2  counsel to become parties to a pre-existing protective order, contending that "[i]n light of

3  the process now being agreed upon by the Trustee, SB Claims and the 2002 Noteholders

4  for joint discovery, it is essential that all parties have access to the same documents and

5  information ....",[40] and (b) actively participating in the hearing to reconstitute the Official

6  Committee of Unsecured Creditors, vigorously opposing the Bankruptcy Court's

7  decision.[41]  Indeed, the Noteholders appeared through their counsel at no less than six

8  hearings before the Bankruptcy Court between June 14, 2007 and November 1, 2007.

9  Never once, however, did the Noteholders suggest that the Bankruptcy Court's

10  jurisdiction was limited in any way based upon the pendency of their appeal.

11        Finally, it is significant that the Noteholders did, for a time, support a stay of the

12  Adversary Proceeding, but for a very different reason than that articulated in their present

13  Stay Motion.  On July 30, 2007, the Chapter 11 Trustee filed a motion to intervene as a

14  party in the Adversary Proceeding.[42]  The intervention motion also requested a limited

15  stay of the Adversary Proceeding, but only after resolution of the Noteholders' motion to

16  dismiss, so that the chapter 11 trustee could conclude his own investigation in the

17  Bankruptcy Court before discovery commenced in the Adversary Proceeding.  The

18  Noteholders filed a response in support of the chapter 11 trustee's stay request on August

19  31, 2007, but no where in that pleading did the Noteholders even mention the pendency

20  of their appeal, let alone suggest that the Bankruptcy Court lacked jurisdiction over the

21

22  —————————————

23  [40]  Cross Motion To Modify October 17, 2003 Stipulated Protective Order filed
      September 19, 2007, Bk. Docket No. 2479.

24  [41]  *See* Transcripts of Hearings held June 14, 2007 (Bk. Docket No. 2375), September 5,
25      2007 (Bk. Docket No. 2501), September 20, 2007 (Bk. Docket No. 2505), September
        27, 2007 (Bk. Docket No. 2511), October 15, 2007 (Bk. Docket No. 2530), and
26      November 1, 2007 (Bk. Docket No. 2557).

27  [42]  Chapter 11 Trustee's Motion (1) For Entry Of An Order Authorizing Intervention
      And (2) To Stay The Adversary Proceeding Pending The Conclusion Of The
      Trustee's Investigation, Adv. Pro. 07-05082, Docket No. 21.

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v.1

1    Adversary Proceeding.[43]  The chapter 11 trustee withdrew his intervention motion and

2    stay request on September 11, 2007, following the Bankruptcy Court's order that the

3    parties (including the Noteholders, SB Claims, and the chapter 11 trustee) to develop a

4    "Joint Discovery Plan" for the Adversary Proceeding and the chapter 11 trustee's

5    ongoing investigation.[44]  The Noteholders did not pursue this stay request in the

6    Bankruptcy Court.

7    **B.    The Stay Motion Is Before The Wrong Court.**

8         Bankruptcy Rule 8005(a) requires that a stay motion be presented first to the

9    Bankruptcy Court, unless the movant can "show why the relief … was not obtained from

10   the bankruptcy judge."  The Noteholders fail to provide any reasons, other than that they

11   "are not optimistic that" the Bankruptcy Court would grant them a stay.  Stay

12   Memorandum at 28:6.  The Noteholders also suggest that the Bankruptcy Court lacks

13   jurisdiction to enter a stay, an assertion that is patently incorrect.  *See Ho v. Dai Hwa*

14   *Electronics (In re Ho)*, 265 B.R. 603, 605 (9th Cir. B.A.P. 2001) (rejecting argument that

15   bankruptcy court lacked jurisdiction to enter a stay once a notice of appeal was filed, and

16   directing that "Appellant should proceed with the pending motion for stay pending appeal

17   in the bankruptcy court before seeking a stay from the" appellate court).

18        At bottom, the Noteholders' Stay Motion and accompanying motion to withdraw

19   the reference are nothing more than thinly disguised motions to recuse the Honorable

20   Marilyn Morgan, who has presided over this chapter 11 case since its inception in 2003.

21   The Noteholders had no objection to Judge Morgan's administration of this case when

22   things were going their way.  For years, the Noteholders controlled an effective majority

23   _____

24   [43]  Defendants' Memorandum In Reply To Plaintiff's Opposition To Chapter 11
25   Trustee's Motion To Stay The Adversary Proceeding Pending The Conclusion Of
     The Trustee's Investigation, And In Support Of The Trustee's Motion, Adv. Pro. 07-
26   05082, Docket No. 37.

27   [44]  Chapter 11 Trustee's Withdrawal Of Motion (1) For Entry Of An Order Authorizing
     Intervention And (2) To Stay The Adversary Proceeding Pending The Conclusion Of
     The Trustee's Investigation, Adv. Pro. 07-05082, Docket No. 37.

32

466944v1

1    of the Committee, and through that position had the ability to influence the direction of

2    the bankruptcy case in ways that no other creditor could.  Only now, when questions have

3    been raised about some of their conduct, do the Noteholders assert that "to date, the …

4    Noteholders have had no opportunity to be heard."  Stay Memorandum at 3:21-22.  If the

5    Noteholders have a question about Judge Morgan's ability to preside over the chapter 11

6    case impartially, then the Noteholders should first raise the issue with her, as 28 U.S.C.

7    § 455 and Bankruptcy Rule 5004 contemplate.  SB Claims is respectfully confident that,

8    once again, Judge Morgan will make clear to the Noteholders that "the words and

9    findings of my Memorandum Decision of March 26, 2007 were carefully selected to

10   respond to the issues then before the court," and that she has not "predetermined any of

11   the issues that are going to come before us."  May 4 Decision at 1:20-21; Transcript of

12   June 14, 2007 Hearing at 23-24.

13   **C.     The Noteholders Have Failed To Demonstrate A Basis For A**
         **Stay Pending Appeal.**
14

15          In order to obtain a stay pending appeal, the Noteholders must prove: (1) a

16   likelihood of success on the merits of their appeal; (2) they will suffer irreparable harm if

17   a stay is not granted; (3) other parties in the bankruptcy case will not be substantially

18   harmed by the stay; ***and*** (4) the public interest will be served by granting the stay.  The

19   test is in the conjunctive, and thus courts in this Circuit have held that ***all*** four criteria

20   must be satisfied before a stay will be issued.  *See, e.g., Ohanian v. Irwin (In re Irwin),*

21   338 B.R. 839, 843 (E.D. Cal. 2006) ("Movants's failure to satisfy one prong of the

22   standard for granting a stay pending appeal dooms the motion."); *Silicon Valley Bank v.*

23   *Pon (In re Pon),* 1994 U.S. Dist. LEXIS 2559 *6 (N.D. Cal. March 1 1994); *In re Sung*

24   *Hi Lim,* 7 B.R. 319, 321 (Bankr. D. Haw. 1980).  The Noteholders have not demonstrated

25   that ***any*** of these factors exist.

26   **1.     There Is No Likelihood Of Success On The Merits.**

27          The crux of the Noteholders' appeal is that, in connection with ordering the

---

33

1    appointment of a chapter 11 trustee and disqualifying Pillsbury, the Bankruptcy Court

2    made certain, allegedly erroneous "findings" that could be used against them in future

3    litigation. There are two fundamental problems with the Noteholders' contentions. First,

4    the Bankruptcy Court's "findings" have not and will not be used against them in

5    subsequent litigation. Second, even if the Bankruptcy Court's "findings" did have some

6    preclusive effect, they were in fact entirely accurate and supported by the record.

7         The Bankruptcy Court repeatedly has made clear to the Noteholders that its

8    March 26 and May 4 Decisions were entered in the context of determining whether a

9    chapter 11 trustee should be appointed. The Bankruptcy Court was very careful to

10   qualify its statements about the Noteholders in this way, repeatedly using limiting

11   language such as "may have," "appear," and "raise questions."[45] And, when the

12   Noteholders raised concerns in their motion for reconsideration that the Court had made

13   findings that would preclude them from defending themselves in future litigation, the

14   Court made absolutely clear that its findings were "carefully selected to respond to the

15   issues then before the court," and that "[t]he findings made in support or denial of those

16   motions must be understood in that context." May 4, 2007 Decision at 1:20-24. The

17   issue before the Court was not whether the Noteholders did anything wrong, but rather

18   whether the interests of creditors would best be served by the appointment of a trustee.

19        The Court's decision raises many questions about the conduct of various

20   fidcuciaries in the bankruptcy case, including the Noteholders. Other than the

21   disqualification of Pillsbury, however, the decisions do not purport either to resolve or to

22   _____

23   [45]  See, e.g., March 26 Decision at 16:27-28 ( "the facts indicate at least the *appearance of impropriety by the committee*" which the Noteholders controlled (emphasis

24   added)); *id.* at 17:9-11 ("the [Noteholders] *appear* to have used their position on the committee to insert themselves into the settlement negotiations without revealing a

25   hidden agenda," and "the *may have* breached their fiduciary duty to the unsecured creditor body" (emphasis added)); *id.* at 18:16-17 (noting that the three Noteholders'

26   control of the Creditors' Committee "certainly *raise[s] questions* regarding [Committee counsel's] suitability to vigorously pursue" objections to the validity of

27   the Noteholders' claims (emphasis added)); *id.* at 18:7-8 ("*It is not clear at this juncture* whether [Creditors' Committee counsel's] handing of the objections of the [Noteholders' claims] was an actual conflict of interest ...." (emphasis added)).

1    remedy any of those questions. Rather, the Court concluded that the combined weight of

2    all of those unanswered questions had resulted in a "breakdown of creditor confidence,"

3    as well as the need for further investigation and discovery.

4         Case law further supports the Bankruptcy Court's assurances that its findings

5    were limited to the context of appointing a chapter 11 trustee. *See, e.g., Baron Financial*

6    *Corp. v. Natanzon*, 2007 U.S. Dist. LEXIS 63848 *57 n.37 (D. Md. March 21, 2007)

7    (holding that a finding that a trustee should be appointed because debtor's manager failed

8    to maximize profits "is not equivalent to a determination that [the manager] personally

9    failed to use his best efforts to maximize [the debtor's] profitability" in a subsequent suit

10   against the manager for damages); *In re Cajun Electric Power Cooperative, Inc.*, 230

11   B.R. 693, 703-04 (Bankr. M.D. La. 1999) (holding that a determination in connection

12   with the appointment of a trustee that the appointment would not affect the debtor's right

13   to "assume" performance under a contract is not collateral estoppel against the

14   contracting party to later claim that the trustee cannot assume the contract).

15        In *Baron Financial*, the bankruptcy court appointed a chapter 11 trustee based

16   upon allegations that the debtor's manager ("Natanzon") had "failed to operate [the

17   debtor] in the ordinary course of business, failed to maximize [the debtor's] profitability,

18   and, most particularly, failed to exercise fairness and good faith in his conduct toward" an

19   investor ("Baron"). 2007 U.S. Dist. LEXIS 63848 at *57. Baron subsequently sued

20   Natanzon and attempted to rely upon the bankruptcy court's findings regarding

21   Natanzon's management of the debtor as collateral estoppel. The District Court rejected

22   Baron's argument, holding that "a finding that a trustee should be appointed is not

23   equivalent to a determination that Mr. Natanzon personally failed to use his best efforts to

24   maximize [the debtor's] profitability." *Id.* at *57 n.37 (internal quotations omitted).

25   "Section 1104(a) of the U.S. Bankruptcy Code enumerates several bases on which a

26   trustee may be appointed, including 'fraud, dishonesty, incompetence or gross

27   mismanagement of the affairs by the debtor by current management." *Id.* "[N]either [the

35

1    Bankruptcy Court's] statements at the hearing nor the actual appointment Order . . .

2    indicates on what exact basis he made his decision." *Id.*

3         As in *Baron Financial*, the Bankruptcy Court in this case did not expressly state

4    which factor was, or was not, in itself sufficient to justify the appointment of a chapter 11

5    trustee. Indeed, what the Court made clear was that it was the disqualification of

6    Pillsbury, combined with the appearances and allegations of numerous other possible

7    improprieties, that caused the Court to conclude that appointment of a chapter 11 trustee

8    would be in the best interests of the estate and creditors. As noted, however, the

9    Bankruptcy Court made absolutely clear that, other than disqualifying Pillsbury, it was

10   not adjudicating the existence or nonexistence of any other actual wrongdoing – the

11   Court was simply making clear that there were enough appearances and allegations so as

12   to warrant the appointment of a trustee and the commencement of a full investigatory

13   process involving the trustee and all of the parties.

14        Finally, even if there were appellate jurisdiction over the Bankruptcy Court's

15   findings, those findings should be affirmed in their entirety. As set forth herein, there is

16   ample evidence in the record upon which the Court properly concluded that serious

17   unanswered questions existed with respect to the Noteholders' conduct.

18       **2.**     **The Noteholders Will Not Suffer Irreparable Harm.**

19        The Noteholders assert that the Bankruptcy Court's statements vis-à-vis the

20   Noteholders "could potentially serve as the basis for collateral estoppel in subsequent

21   litigation," Stay Memorandum at 3:12-13, and that "to date, the ... Noteholders have had

22   no opportunity to be heard." *Id.* at 3:21-22. Nothing could be further from the truth. The

23   Bankruptcy Court has made clear that the Court has not "predetermined any of the issues

24   that are going to come before us," and that the appearances the Court noted "arose in a

25   different context." The Court further made clear that the Noteholders "will be able to

26   more fully flush out those issues for the future hearings that we'll have." Transcript of

27   June 14, 2007 Hearing at 23-24. Moreover, any fair reading of the Bankruptcy Court's

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v.1

1  March 26 and May 4 Decisions shows that the Court did not "hold" or "find" that the

2  Noteholders had engaged in any wrongdoing. Rather, the Court noted the *appearances*

3  of *possible* wrongdoing by the Noteholders and their former counsel, which appearances

4  contributed to a "breakdown in creditor confidence," and which should be explored

5  further by the trustee and other interested parties.

6  The Noteholders falsely assert that the Bankruptcy Court used its findings from

7  the March 26 Decision to collaterally estop them from opposing the motion to

8  reconstitute the Committee. Stay Memorandum at 23:9-28. What the Court did in that

9  instance was simply rely upon *evidence* that was already in the record – evidence which

10  the Noteholders failed to rebut. Moreover, the "findings" that the Noteholders cite – that

11  they knew about Pillsbury's conflict of interest and their potential subordination to VIA –

12  are not subject to any dispute. Finally, the Noteholders should not be heard now on this

13  issue, since: (i) they did not file any objection to the motion, but rather simply stood up in

14  Court and voiced their objections long after the deadline had expired,[46] and (ii) the order

15  reconstituting the Committee was entered nearly two months ago, but the Noteholders

16  never appealed from it.[47]

17  **3.    A Stay Will Harm Other Parties In This Case.**

18  Creditors in this bankruptcy case have waited more than four years to be paid. It

19  is essential that the process that the Bankruptcy Court commenced last spring continue

20  toward a timely resolution, and that the numerous unanswered questions raised in the

21  March 26 and May 4 Decisions be answered as expeditiously as possible. If the

22  Noteholders are unhappy with those answers, once they are determined, they can seek

23

24  [46]  *See* Local Bankr. Rule 9014-1(c)(2). The Noteholders' failure to file a timely
    objection is particularly egregious given that SB Claims filed its motion to

25  reconstitute the Committee on June 11, 2007 [Bk. Docket No. 2341], and continued
    the hearing on the motion various times to accommodate the parties.

26  [47]  *See* Order Granting Motion For Order (1) Directing United States Trustee To Change

27  The Membership Of Official Committee Of Creditors Holding Unsecured Claims, Or
    (2) Directing The Appointment Of A New Trade Creditor Committee [Bankr. Docket
    No. 2510] entered October 5, 2007.

37

466944.1

1   redress in this Court at that time.  In the meantime, however, the hundreds of other

2   creditors in this case deserve to know whether, in fact, Pillsbury, the Noteholders, or

3   anyone else did (or did not) engage in any wrongdoing, and to have any wrongdoing put

4   right.  A stay – which conceivably could last through a lengthy Ninth Circuit appeal as

5   well – will do nothing to move the case along, and will only further erode creditor

6   confidence in the entire bankruptcy process.

7       **4.**      **The Public Interest Will Not Be Served By Granted A Stay.**

8       Creditors deserve to know as soon as possible whether Pillsbury, or anyone else,

9   has attempted to misuse the judicial system, as well as the full nature and extent of that

10  misuse.  Staying proceedings on this issue would do nothing to restore confidence, but

11  rather would leave very serious and troubling questions lingering.  If no wrongdoing was

12  committed, then the Bankruptcy Court should be permitted to make that determination

13  forthwith.  If, however, there was wrongdoing in this case, then this must be corrected

14  without delay.

15  **D.    The Noteholders' Contention That The Bankruptcy Court Lacks**
       **Jurisdiction To Proceed With The Litigation Is Without Merit.**
16

17      There Noteholders assert that, because of their appeal, the Bankruptcy Court now

18  lacks jurisdiction over all "facts alleged to exist as of May 4, 2007."   Stay Memorandum

19  at 28:7-8.  The Noteholders' assertion is based upon the principle that "the filing of a

20  notice of appeal generally divests the trial court of jurisdiction."  *Dressler v. The Seeley*

21  *Co. (In re Silberkraus)*, 336 F.3d 864, 869 (9th Cir. 2003).  The principle, however, is

22  limited to those situations in which there has been a "final adjudication" of rights, and in

23  which the exact same issues are before both the trial court and the appellate court.  *Neary*

24  *v. Padilla (in re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000) (holding that an appeal

25  divests the lower court of jurisdiction only with respect to "***final adjudication*** of the

26  substantial rights ***directly involved*** in the appeal" (emphasis added)).

27      In this case, although the Bankruptcy Court's holding that a trustee be appointed

                                          38

1   may be a "final judgment," the Noteholders are not appealing that holding. Rather, they

2   are appealing specific findings of "appearances" that the Bankruptcy Court made clear

3   have not been finally adjudicated, and that are subject to further litigation in that Court.

4   Accordingly, what the Noteholders are seeking to appeal are interlocutory findings. The

5   general principle that an appeal divests the trial court of jurisdiction does not apply to

6   interlocutory matters. *Rains v. Flinn (In re Rains)*, 428 F.3d 893, 903-04 (9th Cir. 2005).

7         Moreover, the pendency of an appeal does not prevent the trial court from

8   considering issues that may be similar to those in the appeal, or even that are "closely

9   related to the issues involved" in the appeal. *In re Wade*, 115 B.R. 222, 230 (9th Cir.

10   B.A.P. 1990), *aff'd* 948 F.2d 1122 (9th Cir. 1991). The Ninth Circuit has made clear that

11   the issues must be "directly involved in the appeal." *Padilla*, 222 F.3d at 1190. In this

12   case, the issue that the Noteholders seek to appeal is whether the Bankruptcy Court erred

13   in making certain findings of "appearances" in the context of a motion to appoint a

14   chapter 11 trustee. By the express terms of the Bankruptcy Court's decisions (as well as

15   the Court's subsequent assurances), the Court's findings have no application whatsoever

16   in any other context. Accordingly, the Noteholders' appeal does not implicate any issues

17   that are currently before the Bankruptcy Court – the Bankruptcy Court already has

18   ordered the appointment of a chapter 11 trustee, and no one is seeking reconsideration of

19   that order.

20         The Noteholders' assertion that an appeal divests of the Bankruptcy Court of

21   jurisdiction over any "fact alleged to exist" as of the time of the Court's decision would

22   wreak havoc on the bankruptcy system. In essence, the Noteholders propose:

23        the broad rule that a bankruptcy court may not consider any request which either
           directly or indirectly touches upon the issues involved in a pending appeal and
24        may not do anything which has any impact on the order on appeal.

25   *Sullivan Central Plaza I, Ltd. v. BancBoston Real Estate Capital Corp. (In re Sullivan*

26   *Central Plaza I, Ltd.)*, 935 F.2d 723, 727 (5th Cir. 1991). Such a broad rule, however:

27        would severely hamper the bankruptcy court's ability to administer its cases in a
           timely manner. Parties could tie up proceedings for long periods of time while

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

1   their various appeals wound their way through three levels of appellate review.

2   *Id.* (holding that a debtor's appeal of an order granting a creditor relief from the

3   automatic stay did not divest the Bankruptcy Court of jurisdiction over the creditor's

4   motion to convert the case to a chapter 7 liquidation).

5       Bankruptcy cases almost never involve a single litigation.  Rather, they involve a

6   multitude of contested matters and adversary proceedings.  The same facts may relate to

7   any number of these.  It would be an incredible disruption to the bankruptcy process if a

8   single appeal would have the effect of divesting the Bankruptcy Court of jurisdiction over

9   any other matter that conceivably could involve some of the same facts.

10      Finally, it is significant that the Noteholders did not object to the Bankruptcy

11  Court's jurisdiction for more than six months following the entry of the May 4 Decision.

12  To the contrary, the sought substantive relief in the Bankruptcy Court, including a motion

13  to dismiss SB Claim's adversary proceeding against them.  The Noteholders thus had no

14  problems with the Bankruptcy Court's jurisdiction when they thought they might obtain

15  substantive relief.  Their concern only arose when the Bankruptcy Court ruled against

16  them.

17                      **V.      CONCLUSION**

18

19      The Noteholders' Stay Motion should be denied.

20  DATED:  November 30, 2007            STUTMAN, TREISTER & GLATT P.C.
                                         McGRANE GREENFIELD LLP

21

22                                       By:_____/s/ K. John Shaffer_____
                                              K. John Shaffer

23

24

25

26

27

OPPOSITION TO CROSS-MOTION FOR LIMITED STAY OF PROCEEDINGS

466944v1