1  ROBERT A. GREENFIELD (039648)
   FRANK A. MEROLA (136934)
2  K. JOHN SHAFFER (153729)
3  STUTMAN, TREISTER & GLATT PC
   1901 Avenue of the Stars, 12th Floor
4  Los Angeles, CA 90067
   Telephone:    (310) 228-5600
5  Facsimile:    (310) 228-5788

6  WILLIAM McGRANE (057767)
7  BERNARD S. GREENFIELD (066017)
   McGRANE GREENFIELD LLP
8  40 South Market Street, 7th Floor
   San Jose, CA 95113
9  Telephone:    (408) 995-5600
   Facsimile:    (408) 995-0308
10

11 Counsel for SonicBlue Claims LLC

12              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
13                  SAN JOSE DIVISION

14 PORTSIDE GROWTH & OPPORTUNITY          Case No. C-07-02553 RMW
   FUND, et al.,
15

16          Appellants,

17              vs.                       DECLARATION OF K. JOHN SHAFFER
                                          RE OPPOSITION TO CROSS-MOTION
18 OFFICIAL COMMITTEE OF                  FOR LIMITED STAY OF PROCEEDINGS
   UNSECURED CREDITORS, et al.,
19

20          Appellees.

21 (Appeal from In re SONICblue,
   Incorporated, et al., Bankr. N.D. Cal. (San
22 Jose), No. 03-51775 MM)

23

24

25

26

27

                              1

466956v1

1    K. John Shaffer declares:

2        1.     I have personal knowledge of the facts stated herein and could testify

3    competently thereto if called upon to do so.

4        2.     I am counsel for SonicBlue Claims, LLC ("SB Claims"), a creditor in the

5    chapter 11 cases from which this appeal arises, Bankr. N.D. Cal. (San Jose), No. 03-

6    51775 MM (jointly administered).

7        3.     As counsel for SB Claims, I have received, both directly and through the

8    chapter 11 trustee, numerous documents produced in ongoing discovery in the

9    Bankruptcy Court.  I have personally reviewed many of these documents.

10        4.     Attached hereto as Exhibit 1 is an April 17, 2002 email between attorneys

11    Brad Kohn and David Meredith of Pillsbury Winthrop (now Pillsbury Winthrop Shaw

12    Pittman ("Pillsbury")) describing "Things we need to confirm we have the flexibility to

13    do in the Indenture – or need to tell [Debtors] what the limits are."  I am informed and

14    believe that this document was produced by Pillsbury during the ongoing discovery, and

15    it has bates number PW-TR-E-089446.

16        5.     Attached hereto as Exhibit 2 is a September 23, 2002 Memorandum from

17    Pillsbury attorney David Meredith to Pillsbury attorney Craig Barbarosh titled

18    "SONICblue: Material Terms of Secured Senior Subordinated Convertible Debentures

19    due 2005."  I am informed and believe that this document was produced by Pillsbury

20    during the ongoing discovery, and it has bates numbers PW-TR-E-049886 through PW-

21    TR-E-049892.

22        6.     Attached hereto as Exhibit 3 are selected pages of a document titled

23    "Presentation to the Holders of 7 ¾% Secured Senior Subordinated Convertible

24    Debentures due 2005, December 3, 2002."  I am informed and believe that this document

25    was produced by counsel for the Noteholders during the ongoing discovery, and it has

26    bates numbers HBD0002051, HBD0002052, and HBD0002110.[1]

27    _____
    [1]   The Noteholders are Portside Growth & Opportunity Fund, Smithfield Fiduciary
    LLC, and Citadel Equity Fund Ltd.    2

1       7.     Attached hereto as Exhibit 4 are selected pages of a document titled

2    "Presentation to the Holders of 7 ¾% Secured Senior Subordinated Convertible

3    Debentures due 2005, February 4, 2003." I am informed and believe that this document

4    was produced by Pillsbury during the ongoing discovery, and it has bates numbers PW-

5    TR-E-051355, TR-E-051356, and TR-E-051387.

6       8.     Attached hereto as Exhibit 5 are selected pages of a document titled

7    "Presentation to Advisors to Holders of 5 ¾% Convertible Subordinated Notes due 2003,

8    February 20, 2003." I am informed and believe that this document was produced by

9    Pillsbury during the ongoing discovery, and it has bates numbers PW-TR-E-174775, TR-

10    E-174776, and PW-TR-E-174807.

11       9.     Attached hereto as Exhibit 6 are selected pages of a document titled

12    "Presentation to Pillsbury Winthrop LLP, Legal Advisors to SONICblue Inc." I am

13    informed and believe that this document was produced by Pillsbury during the ongoing

14    discovery, and it has bates numbers PW-TR-E-174346, PW-TR-E-174347, and PW-TR-

15    E-174390.

16       10.    Attached hereto as Exhibit 7 is a September 23, 2003 email from Marcus

17    Smith, Chief Financial Officer of the Debtors, to Matthew Walker (a Pillsbury attorney)

18    and various other persons whom I am informed and believe were employed by, or

19    otherwise represented the interests of, the Noteholders. I am informed and believe that

20    this document was produced by one of the Noteholders, Portside, during the ongoing

21    discovery, and it has bates number POR-0006201. The second page of the document was

22    produced in excel spread sheet form, and accordingly does not have a bates number

23    stamped on it. I believe, however, that it is intended to be bates number POR-0006202.

24       11.    Attached hereto as Exhibit 8 is a September 24, 2003 email from Marcus

25    Smith to Jeffrey Smith, whom I believe represented the interests of one of the

26    Noteholders. I am informed and believe that this document was produced by one of the

27    Noteholders, Portside, during the ongoing discovery, and it has bates number POR-

DECLARATION OF K. JOHN SHAFFER RE OPPOSITION TO CROSS-MOTION FOR
LIMITED STAY OF PROCEEDINGS

466956v1

1    0006206.

2        12.        Attached hereto as Exhibit 9 is an February 13, 2004 email from Matthew

3    Walker (a Pillsbury attorney) to, among others, Ron Bender (then counsel for the

4    Creditors' Committee in the bankruptcy cases).  The email forwarded a document titled

5    "Disclosure Statement for Joint Liquidating Plan of Reorganization," selected pages of

6    which also are included in Exhibit 9.  I am informed and believe that this document was

7    produced by Pillsbury during the ongoing discovery, and it has bates numbers PW-TR-E-

8    148794 through PW-TR-E-148796, PW-TR-E-148828, PW-TR-E-148835, and PW-TR-

9    E-148836.

10        I declare under penalty of perjury under the laws of the State of California that the

11    foregoing is true and correct and that this declaration was executed on November 30,

12    2007, at Los Angeles, California.

13

14                                                    _____
                                                      K. John Shaffer
15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF K. JOHN SHAFFER RE OPPOSITION TO CROSS-MOTION FOR
LIMITED STAY OF PROCEEDINGS

# EXHIBIT 1

**From:**       Kohn, Brad D.
**Sent:**       Wednesday, April 17, 2002 9:59 PM
**To:**         Meredith, David
**Cc:**         Kohn, Brad D.
**Subject:**    Things we need to confirm we have the flexibility to do in the Indenture -- or need to tell SBLU what the limits are

Dave,
On one of the calls with Ian and Marcus Smith and David Gershon this afternoon, Ian Shea raised six quasi-new concerns or items that SBLU wants to understand and hopefully achieve in the Indenture:

- Confirm that SBLU could still acquire other companies by paying cash for some or all of those target companies assets or stock without violating covenants in Indenture;
- Confirm that SBLU could, if it made sense, repurchase some of SBLU's shares in the open market or through private purchases without violating covenants in Indenture;
- What sort of restrictions/flexibility SBLU has in restructuring or repaying Congress Financial;
- Short of redemption of the Debentures, is there any way of getting free of the restrictive covenants (I told him that I didn't think so -- not really any defeasance mechanisms or face amount outstanding minimum amounts where covenants go away or are loosened;
- Need to have any potential cash paid (or shares issued, less relevant in Indenture) to Via Technologies, Inc. in connection with settlement of SBLU's dispute with VIA to effectively be treated as Senior Indebtedness.

Just wanted to make sure I didn't forget to touch base with you on this.  We will need to be able to walk Ian through these points tomorrow.

Thanks for all your help David,
Brad

Bradley D. Kohn
Pillsbury Winthrop LLP
2550 Hanover Street
Palo Alto, CA 94304
phone: 650.233.4514
general fax: 650.233.4545
desktop fax: 866.743.4828
e-mail: bkohn@pillsburywinthrop.com
Internet: www.pillsburywinthrop.com

PW-TR-E-089446

# EXHIBIT 2



**PILLSBURY WINTHROP** LLP

ONE BATTERY PARK PLAZA  NEW YORK, NY  10004-1490  212.858.1000  F: 212.858.1500

**MEMORANDUM**

To:  Craig Barbarosh

From: David Meredith

Date: September 23, 2002

C/M#:  -

Re:  SONICblue: Material Terms of Secured Senior Subordinated Convertible Debentures due 2005

The sale of the above-captioned securities (the "**Debentures**") of SONICblue, Inc. (the "**Company**") and accompanying warrants resulted in gross proceeds to the Company, prior to the exercise of the accompanying warrants, of approximately $62.25 million. The face amount of the Debentures is $75 million. Here follows a narrative description, followed by some bullet point summaries of interest payments, redemption, subordination, covenants, defaults and remedies, restructurings, conversion and repurchase (put) rights.

The indenture (the "**Indenture**") for the Debentures  does not restrict the issuance of senior debt, but limits pari passu debt to $25MM. Section 5.7 of the Indenture states that neither the Company or any party on its behalf shall redeem, defease, repurchase, repay or make any payments in respect of, by payment of cash or marketable securities (whether by way of open market purchases, tender offers, private transactions or otherwise) all or any portion of Subordinated Indebtedness, which includes the Convertible Subordinated Notes due 2003 (the "**Convertible Notes**") of the Company, whether by way of payment in respect of principal of (or premium, if any) or interest on, such debt, except that the Company may pay in cash scheduled interest payments in accordance with the original documentation governing such debt. The Company is also prohibited from announcing or effecting the redemption of all or any portion of the Convertible Notes until not less than 30 days following redemption of all the Debentures. Basically, the Debenture holders did not want anyone (either the Company or anyone else on the Company's behalf) to pay off the Convertible Notes before repurchasing or repaying the Debentures.

Section 8.1 of the Indenture allows the Company to compel the Debenture holders to participate in a complete restructuring of the Convertible Notes, and, in a partial restructuring of the Convertible Notes (Section 8.2 of the Indenture), the Debenture holders have the option to

PW-TR-E-049886

participate and receive the same consideration as the holders of Convertible Notes (including consideration received by holders of Convertible Notes in prior rounds of restructurings that the Debenture holders did not originally participate in); in any event, following each restructuring of Convertible Notes, the Debentures must continue to have the benefit of the subordination provisions vis-a-vis the Convertible Notes, and must be paid in full prior to the Convertible Notes. The effect that the investors were trying to achieve is to force the Company to repurchase or repay the Debentures in full before ever paying off or restructuring the Convertible Notes, which thus potentially raises the cost of redemption or restructuring of the Convertible Notes by the par value of the Debentures.

The following summarizes the material terms of the Debentures:

<u>Interest Payments (Section 2.3(b) of the Indenture)</u>

- Generally, the Company has the right to pay in kind ("PIK") up to 50% of each interest payment in the form of shares of its common stock (the "Common Stock") if the Company gives written notice the Debenture holder at least five days prior to the applicable interest date;

- PIK shares at any interest payment date are capped at 200,000 shares;

- PIK shares are priced at 95% of the average closing price of Common Stock on Nasdaq for the five trading days ending on the third trading day prior to the applicable interest payment;

- PIK shares cannot be made in payment if they would result in the Debenture holder being the beneficial owner of more than 9.99% of the number of shares of outstanding Common Stock;

- PIK shares cannot be issued if the issuance would cause the Company to exceed the maximum number of shares of Common Stock that may be issued under Nasdaq's rules without requiring a shareholder vote;

- No PIK if on the applicable interest payment date or at any date within 10 trading days prior to the applicable interest payment date (i) there is a default or event of default or (ii) the Company's resale registration statement for the Debenture holders to sell Common Stock is not effective.

<u>Redemption (Article III of the Indenture)</u>

- Redemption of the Debentures may be made on a pro rata basis among all Debenture holders at any time and from time to time at par upon notice at least 20 days and not more than 60 days prior to the date fixed for redemption;

- For any Debenture that is converted in part after selection for redemption, the converted part shall be deemed the part selected for redemption.

300030607v1

<u>Subordination (Article IV of the Indenture)</u>

- Payments of principal, premium (if any) and interest on the Debentures, including redemption payments, are "subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness, whether outstanding at the date of [the] Indenture or thereafter incurred";

- "Senior Indebtedness" (see definitions section of Indenture) contains a lengthy list of items and includes

  - post-petition interest;

  - indebtedness for money borrowed, letters of credit and capital leases from banks, trust companies, insurance companies, equipment leasing companies or other financial institutions that in the ordinary course of business make loans (each a "Qualified Lender");

  - the Second Amended and Restated Loan and Security Agreement with Congress Financial Corporation as amended and modified from time to time;

  - debt securities that are not exercisable or convertible into or exchangeable for capital stock of the Company sold in public offerings or 144A offerings;

  - interest rate derivatives, currency swap agreements and currency spot and forward contracts;

  - obligations of the foregoing kind owed to Qualified Lenders and assumed or guaranteed by the Company;

  - debt owed by the Company to Via Technologies in an aggregate principal amount not to exceed $15MM; and

  - all renewals, extensions, refunds, deferrals, amendments or modifications of the foregoing with Qualified Lenders (unless then made expressly pari passu or subordinate to the Debentures);

- "Senior Indebtedness" expressly excludes debt of any kind of the Company to any Subsidiary, debt (other than to Via Technologies as described above) for trade payables or constituting the deferred purchase price of assets or services in the ordinary course of business and subordinated indebtedness, including the Convertible Subordinated Notes due 2003 (the "Convertible Notes");

- The Debentures constitute "Senior Indebtedness" under the Indenture for the Convertible Notes;

- In case of an event of default under Senior Indebtedness that allows the holder of such debt to declare it due any payable prior to the date it would otherwise be

300030607v1

PW-TR-E-049888

payable, payments in respect of the Debentures can be blocked for up to 179 days and payment on the Debentures shall not be made after acceleration of the Senior Indebtedness unless the acceleration has been rescinded or the Senior Indebtedness has been "paid in full";

- Only one default notice in respect of Senior Indebtedness may be given during any period of 360 consecutive days;

- Cash, property or securities turned over to Debenture holders prior to payment in full of the Senior Indebtedness must be held for the benefit of the latter, but "cash, property or securities" shall not be deemed to include shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated to the Senior Indebtedness to the same extent as provided for the Debentures to be subordinated;

- Consolidation of the Company with, or the merger of the Company into, another corporation or the liquidation or dissolution of the Company following the conveyance or transfer of all or substantially all of its property shall not be deemed a dissolution, winding-up, liquidation or reorganization if such other corporation complies with the conditions of the Debentures' Indenture;

- Issuance and delivery of junior securities upon conversion of the Debentures in accordance with their Indenture and the pledge, issuance and delivery of shares of UMC shall not be deemed to constitute a payment or distribution on account of the principal of (or premium, if any) or interest on Debentures;

- Nothing in the subordination provisions shall impair the rights of Debenture holders to UMC shares as collateral for the Debentures.

Covenants (Sections 5.7 and 5.8 of the Indenture)

- Generally, neither the Company nor any subsidiary of the Company, nor anyone acting on their behalf (including any agent, broker, dealer, etc.) may redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or marketable securities, (i) all or any portion of "Subordinated Indebtedness" or (ii) any capital stock of the Company including "dividends or distributions" thereon, except that payments pursuant to the stockholders' rights plan as in effect at the date of the Indenture are permissible);

- None of the foregoing persons shall "announce or effect any redemption of all or any portion of the [Convertible] Notes" until not less than 30 days following redemption of all Debentures or other payment in full of the Debentures;

- So long as no default or event of default has occurred and is continuing:

300030607v1

- the Company may pay in cash scheduled interest payments on Subordinated Indebtedness or preferred stock pursuant to its original documentation at an annual rate not exceeding 15% on the principal amount of such debt or stated value of such preferred stock;

- Stock repurchases of Common Stock held by employees, consultants or directors of the Company are allowed if required by the plan pursuant to which the stock was originally issued, limited in an aggregate amount to $1MM in any 12-month period;

- The Company may issue Common Stock or warrants to purchase Common Stock to holders of the Convertible Notes in connection with a "Complete Restructuring" or "Partial Restructuring" as described in Sections 8.1 and 8.2 of the Indenture.

- Anti-layering covenant in Section 5.8 of the Indenture prohibits the Company and its subsidiaries from issuing debt that is both subordinate or junior to any Senior Indebtedness and senior to or pari passu with the Debentures, except that the Company may issue not more than $25MM of debt that is pari passu with the Debentures.

### Defaults and Remedies (Article VII of the Indenture)

- (Section 7.1(e)) Failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of indebtedness for borrowed money or evidenced by bonds, debentures, notes or similar instruments in an amount in excess of $15MM and such failure has continued for 30 days after written notice to the Company by any Debenture holder;

- (Section 7.1(f)) Default by the Company or any Significant Subsidiary that results in acceleration of debt in an amount in excess of $15MM without such debt being discharged or such acceleration being cured, waived, rescinded or annulled for a period of 30 days after written notice to the Company by any Debenture holder;

- (Section 7.1(k)) Failure by the Company or any Significant Subsidiary to make any payment when due and payable, including any applicable grace period, in respect of debt, other than Senior Indebtedness, in an amount in excess of $10MM and such failure shall have continued for 30 days after written notice to the Company by any Debenture holder;

- (Section 7.1(l)) Failure by the Company to make any payment when due and payable, including any applicable grace period, in respect of any Convertible Notes;

PW-TR-E-049890

- Holders of not less than a majority in aggregate principal amount of Debentures then outstanding by notice in writing to the Company may declare the principal of and premium, if any, on all Debentures and accrued interest to be due and payable immediately (a majority may also waive all defaults and rescind acceleration).

<u>Restructurings (Article VIII of the Indenture)</u>

- (Section 8.1 – Complete Restructurings) This is a drag-along. Upon the first time, and only the first time, that the Company restructures all, but not less than all, of the Convertible Notes , the Company can require the Debenture holders to enter into a supplemental indenture to conform the terms of the Debentures to those of the restructured Convertible Notes, and the Debenture holders will receive a pro rata portion of the consideration paid to holders of Convertible Notes (the Debenture holders might have intended that the drag-along applies only upon the first restructuring if it is also a full restructuring, i.e., there would be no drag along if the Company restructured 20% of the Convertible Notes and then subsequently restructured 100% of the Convertible Notes);

  - Debenture holders get the right to continue to participate in all future full or partial restructurings of the Convertible Notes on the same basis as the "Partial Restructurings" described below;

  - Even after the Complete Restructuring, (i) the Debentures must have a maturity date on the earlier of September 1, 2005 or at least 30 days prior to the maturity date of the Convertible Notes and (ii) the Convertible Notes must remain subordinated to the Debentures;

- (Section 8.2 – Partial Restructurings) This is a tag-along. Upon a restructuring of less than all of the Convertible Notes, each Debenture holder has the right to restructure a portion of its Debentures that is equal to the proportion of original Convertible Notes being restructured, on the same basis as the Convertible Notes are being restructured and to receive the same consideration as holders of Convertible Notes;

  - After each Partial Restructuring, each Debenture holder has the right to elect to receive the benefits of all prior Partial Restructurings, i.e., modifications on the same terms and conditions and receipt of the same consideration offered in prior rounds of restructurings;

  - After each Partial Restructuring, (i) the Debentures must have a maturity date on the earlier of September 1, 2005 or at least 30 days prior to the maturity date of the Convertible Notes and (ii) the Convertible Notes must remain subordinated to the Debentures.

PW-TR-E-049891

Conversion (Article XIII of the Indenture)

- Debenture holders have the right at any time and from time to time prior to the Maturity Date to have Debentures converted into Common Stock;

- The conversion price is $19.22, subject to adjustment as follows:

    - proportionate adjustment for stock splits or combinations, and for dividends or distributions payable in Common Stock;

    - weighted average anti-dilution adjustment only if rights or warrants to all holders of Common Stock entitling them (for a period expiring within 45 days) to subscribe for shares of Common Stock at less than the market price for the 10 trading days immediately preceding the record date (the "**Current Market Price**", cf. the defined term for details);

    - appropriately adjusted to subtract the value of any other distribution of securities to all holders of Common Stock if such securities are not otherwise also reserved for issuance to Debenture holders;

    - adjustment if cash payments, by dividend or otherwise, are made to holders of Common Stock, including any amounts paid in the course of a tender offer by the Company or any of its subsidiaries in the preceding 12 months, exceed 10% of the Current Market Price;

    - adjustment if tender offers concluded with 12 months of each other result in a premium of at least 10% over the Current Market Price being paid to tendering stockholders.

Repurchase Rights (Article IV of the Indenture)

- Upon a "Change of Control" (person or group acquires at least 50% of the voting power, continuing directors do not constitute a majority of the board or consolidation or merger results in stockholders having less than a majority of voting power in survivor, except no change of control if common stock trades at least 105% of conversion price of Debentures in 10 trading days following the transaction or at least 90% of consideration is exchange traded shares into which Debentures become convertible) or a termination of trading, each Debenture holder has the right to require the Company to repurchase its Debentures at par;

- Under some circumstances, the Company may elect to pay the repurchase price in shares of Common Stock, valued at 95% of the average of closing prices for five consecutive trading days ending on the third trading day prior to repurchase.

PW-TR-E-049892

# EXHIBIT 3





# SONIC|blue™
## the edge of entertainment

# Presentation to the Holders of 7 ¾% Secured Senior Subordinated Convertible Debentures due 2005

### *December 3, 2002*

**Confidential**

 

HBD0002(



# Statement of Limiting Conditions

The content and analyses contained herein are the property of Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") and may not be copied or distributed without the express consent of Houlihan Lokey. By your receipt and review of these materials, you agree to be bound by the terms of this Statement of Limiting Conditions.

The financial information contained herein (both historical and projected) has been prepared by SONICblue Inc. ("SONICblue" or the "Company") and Houlihan Lokey has relied on the accuracy thereof. Certain financial information is preliminary in nature and subject to adjustments. **In addition, Houlihan Lokey has not completed its due diligence process. Houlihan Lokey has developed these materials on an expedited basis, including our preliminary thoughts on the restructuring issues and alternatives.** Houlihan Lokey makes no representations as to the accuracy or completeness of the financial information contained herein and expressly disclaims any liability associated therewith. As financial advisor to the Company, Houlihan Lokey has relied on the truth, accuracy and completeness of the representations of current management and counsel and disclaims all liability for any misrepresentation or omissions that may be contained herein based on such statements. Any analyses contained herein (as well as any suggestions or recommendations contained herein and/or derived from the content of this Presentation) are preliminary in nature and subject to reconsideration and modification. This Presentation shall in no way be considered a solicitation to any party to participate or support a particular course of action or transaction.

HBD0002(



# Strategic Alternatives – Liquidation Recoveries

($ in millions)

| | Face Value | Low $130 | - | High $150 |
|---|---|---|---|---|
| **Preliminary Liquidation Value** | | | | |
| *Estimated Creditor Recoveries (%)* | | | | |
| Congress Facility | $32 | 100% | | 100% |
| Priority Claims [1] | 15 | 100% | | 100% |
| Via Technologies, Inc. - *Senior Component* [2] | 15 | 100% | | 100% |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 | 75 | 50% | | 60% |
| 5 3/4% Convertible Subordinated Notes due 2003 | 103 | 0% | | 0% |
| Trade Payables, Litigation Claims and Other Liabilities | 140 | 20% | | 25% |

Note: Does not include effect of potential structurally senior trade claims at Sensory Science and ReplayTV subsidiaries.
(1)  In a liquidation scenario, there could be a substantial "consumer layaway" priority claims relating to subscribers who have
      pre-paid for the lifetime service.
(2)  In a bankruptcy scenario, Via is likely to have a very substantial liquidated damages claim (approximately $50 million),
      $15 million of which would rank senior to the 2005 Notes.

60

HBD00021

# EXHIBIT 4



# SONIC|blue™
## the edge of entertainment

# Presentation to the Holders of 7 3/4% Secured Senior Subordinated Convertible Debentures due 2005

## February 4, 2003

*Confidential*




PW-TR-E-051355

# Statement of Limiting Conditions

The content and analyses contained herein are the property of Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") and may not be copied or distributed without the express consent of Houlihan Lokey. By your receipt and review of these materials, you agree to be bound by the terms of this Statement of Limiting Conditions.

The financial information contained herein (both historical and projected) has been prepared by SONICblue Inc. ("SONICblue" or the "Company") and Houlihan Lokey has relied on the accuracy thereof. Certain financial information is preliminary in nature and subject to adjustments. Houlihan Lokey makes no representations as to the accuracy or completeness of the financial information contained herein and expressly disclaims any liability associated therewith. As financial advisor to the Company, Houlihan Lokey has relied on the truth, accuracy and completeness of the representations of current management and counsel and disclaims all liability for any misrepresentation or omissions that may be contained herein based on such statements. Any analyses contained herein (as well as any suggestions or recommendations contained herein and/or derived from the content of this Presentation) are preliminary in nature and subject to reconsideration and modification. This Presentation shall in no way be considered a solicitation to any party to participate or support a particular course of action or transaction.

PW-TR-E-051356

# Liquidation Analyses (Continued)

## *Liquidation Recovery Analysis as of February 28, 2002*

| Estimated Distributable Proceeds for SONICblue Creditors | Face Value | Worst Case | Best Case |
|---|---|---|---|
| | | $93.9 | $111.0 |
| **Secured and Priority Recoveries ($)** | | | |
| Congress Facility | $19.7 | $19.7 | $19.7 |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 - Secured Component [1] | 15.3 | 15.3 | 15.3 |
| ATLM (Contract Manufacturer) | 7.3 | 7.3 | 7.3 |
| Professional and Bankruptcy Administrative Fees | 4.0 | 4.0 | 4.0 |
| Priority Claims [2] | 14.2 | 14.2 | 14.2 |
| **Distributable Value for General Unsecured Creditors** | | 33.5 | 50.5 |
| **General Unsecured Creditor Recoveries ($)** | | | |
| Via Technologies, Inc. - Senior Component [3] | 15.0 | 15.0 | 15.0 |
| 7 3/4% Sr. Sec. Sub. Conv. Notes due 2005 - Unsecured Component | 62.6 | 2.6 | 11.5 |
| 5 3/4% Convertible Subordinated Notes due 2003 | 105.8 | 0.0 | 0.0 |
| Trade Payables, Litigation Claims and Other Liabilities | 165.6 | 15.9 | 24.0 |
| *Total General Unsecured Claims* | 349.0 | 33.5 | 50.5 |
| **Creditor Recoveries (%)** | | | |
| Congress Facility | $19.7 | 100.0% | 100.0% |
| Priority and Professional Claims | 18.2 | 100.0% | 100.0% |
| Via Technologies, Inc - Senior Component | 15.0 | 100.0% | 100.0% |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 | 77.9 | 23.0% | 34.4% |
| 5 3/4% Convertible Subordinated Notes due 2003 | 105.8 | 0.0% | 0.0% |
| Trade Payables, Litigation Claims and Other Liabilities | 165.6 | 9.6% | 14.5% |

Note: Liquidation analysis presented on consolidated basis.  Assumes face value of claim equals midpoint of the range presented on the liquidation analysis.
(1) Represents the market value of 24.6 million UMC shares (collateral for the 2005 Notes) as of January 28, 2003.
(2) Represents potential priority claims (including "consumer lay-away claims" and accrued payroll).
(3) Represents portion of the Via Technologies, Inc. ("Via") claim that is senior in right of payment to the 2005 Notes.  The
    balance of Via's claim is included in "Trade Payables, Litigation Claims and Other Liabilities."

PW-TR-E-051387

# EXHIBIT 5

# SONIC|blue™
### the edge of entertainment

## Presentation to Advisors to Holders of 5 3/4% Convertible Subordinated Notes due 2003

### February 20, 2003

*Confidential*









# Statement of Limiting Conditions

The content and analyses contained herein are the property of Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") and may not be copied or distributed without the express consent of Houlihan Lokey, and are subject to the terms of the Confidentiality Agreement you have entered into with the Company (as defined below). By your receipt and review of these materials, you agree to be bound by the terms of this Statement of Limiting Conditions.

The financial information contained herein (both historical and projected) has been prepared by SONICblue Inc. ("SONICblue" or the "Company") and Houlihan Lokey has relied on the accuracy thereof. Certain financial information is preliminary in nature and subject to adjustments. Houlihan Lokey makes no representations as to the accuracy or completeness of the financial information contained herein and expressly disclaims any liability associated therewith. As financial advisor to the Company, Houlihan Lokey has relied on the truth, accuracy and completeness of the representations of current management and counsel and disclaims all liability for any misrepresentation or omissions that may be contained herein based on such statements. Any analyses contained herein (as well as any suggestions or recommendations contained herein and/or derived from the content of this Presentation) are preliminary in nature and subject to reconsideration and modification. This Presentation shall in no way be considered a solicitation to any party to participate or support a particular course of action or transaction.

PW-TR-E-174776

# Projected M&A Transaction Recoveries

## Illustrative Recovery Analysis

| | Face Value | $80 | $70 | $60 | $50 | $40 |
|---|---|---|---|---|---|---|
| Transaction Value Range (3 Business Units) | | $80 | $70 | $60 | $50 | $40 |
| Less: Estimated Transaction Costs (1) | | (2) | (2) | (2) | (2) | (2) |
| Add: UMC Share Value (1) | | 49 | 49 | 49 | 49 | 49 |
| **Total Distributable Value** | | **$127** | **$113** | **$107** | **$97** | **$87** |
| | | | | | | |
| **Secured and Priority Recoveries ($)** | | | | | | |
| Congress Facility | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 |
| ATLM | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 - *Secured Component* (2) | 15.3 | 15.3 | 15.3 | 15.3 | 15.3 | 15.3 |
| Priority Claims (3) | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 |
| **Distributable Value for General Unsecured Creditors** | | **$99.4** | **$89.4** | **$79.4** | **$69.4** | **$59.4** |
| | | | | | | |
| **Unsecured Creditor Recoveries ($)** | | | | | | |
| Congress Facility - *Unsecured Component* | - | - | - | - | - | - |
| Via Technologies, Inc. - *Senior Component* (4) | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| 7 3/4% Sr. Sec. Sub. Conv. Notes due 2005 - *Unsecured Component* | 63.6 | 41.6 | 35.9 | 30.2 | 24.5 | 18.8 |
| 5 3/4% Convertible Subordinated Notes due 2003 | 106.8 | - | - | - | - | - |
| Trade Payables, Litigation and Other Liabilities | 140.1 | 42.8 | 38.5 | 34.2 | 29.9 | 25.6 |
| *Total General Unsecured Claims* | $325.5 | $99.4 | $89.4 | $79.4 | $69.4 | $59.4 |

**Creditor Recoveries (%)**

| | $80 | $70 | $60 | $50 | $40 |
|---|---|---|---|---|---|
| Congress | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Via Technologies, Inc. - *Senior Component* | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 | 72.1% | 64.9% | 57.7% | 50.4% | 43.2% |
| 5 3/4% Convertible Subordinated Notes due 2003 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Trade Payables, Litigation and Other Liabilities | 30.5% | 27.5% | 24.4% | 21.3% | 18.2% |

*Note: Analysis assumes an April 30, 2003 closing date. Face value of claims estimated to be as of April 30, 2003; represents midpoint of claims.*
*(1) Value of remaining UMC shares as of April 30, 2003; net of $3 million UMC dividend tax; based on January 28, 2003 closing price ($0.63).*
*(2) Represents the market value of 24.6 million UMC shares (collateral for the 2005 Notes) as of January 28, 2003.*
*(3) Represents potential priority claims (including accrued employee compensation and UMC gains taxes).*
*(4) Represents portion of the Via Technologies, Inc. ("Via") claim that is senior in right of payment to the 2005 Notes.*

PW-TR-E-174807

# EXHIBIT 6

Attorney-Client Privilege

# Presentation to Pillsbury Winthrop LLP, Legal Advisors to SONICblue Inc.

NOVEMBER 19, 2002

*Confidential*

Houlihan Lokey Howard & Zukin Capital
Investment Bankers
1930 Century Park West
Los Angeles, California 90067
310-553-8871
www.hlhz.com

Los Angeles     New York     Chicago     San Francisco     Washington D.C.     Minneapolis     Dallas     Atlanta     London

PW-TR-E-174346



Houlihan Lokey Howard & Zukin Capital

SONIC|blue

## STATEMENT OF LIMITING CONDITIONS

The content and analyses contained herein are the property of Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") and may not be copied or distributed without the express consent of Houlihan Lokey. By your receipt and review of these materials, you agree to be bound by the terms of this Statement of Limiting Conditions.

The financial information contained herein (both historical and projected) has been prepared by SONICblue Inc. ("SONICblue" or the "Company") and Houlihan Lokey has relied on the accuracy thereof. Certain financial information is preliminary in nature and subject to adjustments. **In addition, Houlihan Lokey has not completed its due diligence process. In light of the scheduling of the board meeting, Houlihan Lokey has developed these materials on an expedited basis, including our preliminary thoughts on the restructuring issues and alternatives.** Houlihan Lokey makes no representations as to the accuracy or completeness of the financial information contained herein and expressly disclaims any liability associated therewith. As financial advisor to the Company, Houlihan Lokey has relied on the truth, accuracy and completeness of the representations of current management and counsel and disclaims all liability for any misrepresentation or omissions that may be contained herein based on such statements. Any analyses contained herein (as well as any suggestions or recommendations contained herein and/or derived from the content of this Presentation) are preliminary in nature and subject to reconsideration and modification. This Presentation shall in no way be considered a solicitation to any party to participate or support a particular course of action or transaction.

PW-TR-E-174347



Houlihan Lokey Howard & Zukin Capital

**SONIC|blue**

41

# Strategic Alternatives

## OTHER CONSIDERATIONS

❖ Priority of Claims – Any restructuring plan will have to incorporate and resolve the various inter-creditor relationships including:

- ◆ Subordination of 2003 Notes – The 2003 Notes are subordinated in right of payment to the 2005 Notes. Accordingly, the consent of the 2005 Noteholders is required prior to consummating any restructuring transaction where cash is a component of the consideration provided to the 2003 Noteholders.

- ◆ The 2003 Noteholders have already assailed the propriety of the issuance of the 2005 Notes, and will likely seek to invalidate the subordination provisions of that issue through a variety of legal theories.

- ◆ Subordination of 2005 Notes – The 2005 Notes are subordinated to the VIA litigation claim (up to $15 million) and Congress' deficiency claim, if any, from Sensory Science.

❖ Noteholder Concentration – There is a high degree of concentration amongst Noteholders that could facilitate negotiations regarding restructuring alternatives. The 2005 Notes are only held by three holders (in equal amounts). Additionally, four Noteholders hold, in the aggregate, approximately 50% of the 2003 Notes.[7]

❖ High Growth Plan – The Company's business model, characterized by historical operating losses and significant projected growth, presents an atypical restructuring scenario. As a result, it will likely be challenging to convince Noteholders and other creditors to effectively invest their potentially liquid recoveries in the reorganized enterprise.

❖ Paramount Litigation – The Paramount Litigation against ReplayTV poses a significant "feasibility" risk with respect to any restructuring around ReplayTV. It is unlikely that the bankruptcy process will facilitate or expedite a resolution of the injunctive relief sought in this litigation.

---

[7] *According to publicly available information as of November 16, 2002.*

# EXHIBIT 7

**From:** "Marcus Smith" <msmith@sonicblue.com>
**To:** "Jeffrey Smith" <jsmith@ramius.com>; "Colburn, Gregg" <Gregg.Colburn@citadelgroup.com>;
adam.chill@hcmny.com; rb@lnbrb.com; "Walker, Matthew S."
<matthew.walker@PillsburyWinthrop.com>
**Subject:** Recovery Analysis-Confidential
**Date:** 09/23/2003 23:12:27 UTC


Attached is an updated draft recovery analysis. I essentially updated the prior
recovery analysis completed by Houlihan Lokey. This does not include updated data
for general unsecured claims, as that analysis is still in process. This recovery
analysis also excludes the $16.4M already realized by the 05 Noteholders from the
sale of their collateral (thus the total recovery for the 05s is greater than that
shown in the summary by 5-7%).

Marcus


Marcus Smith
Chief Financial Officer
SONICblue, Inc.
2600 San Tomas Expressway
Santa Clara, CA 95051
(408) 565-7147 office
(408) 562-8721 fax
msmith@sonicblue.com

POR-0006201

# SONICblue Inc.

*Estimated Recovery Analysis (9/22/03)*                                    *($ in millions)*

*Scenario 1:  Assumes $5.0 million Via claim, all of which is senior to 2005 Notes.*
*Scenario 2:  Assumes $62.5 million Via claim, of which $15.0 million is senior to 2005 Notes.*

| | Scenario 1 | | Scenario 2 | |
|---|---|---|---|---|
| Adjusted Cash Balance [(1)] | | $31.3 | | $31.3 |
| Add: Estimated Value of Residual Assets [(2)] | | 3.2 | | 3.2 |
| Add: UMC Share Value [(3)] | | 42.4 | | 42.4 |
| **Total Distributable Value** | | **$76.9** | | **$76.9** |
| | **Face Value** | | **Face Value** | |
| *Secured and Priority Recoveries ($)* | | | | |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 - *Secured Component* [(4)] | $0.8 | $0.8 | $0.8 | $0.8 |
| Priority Claims [(5)] | 1.9 | 1.9 | 1.9 | 1.9 |
| **Distributable Value for General Unsecured Creditors** | | **74.2** | | **74.2** |
| *Unsecured Creditor Recoveries ($)* | | | | |
| Via Technologies, Inc. - *Senior Component* [(6)] | 5.0 | 5.0 | 15.0 | 15.0 |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 - *Unsecured Component* [(7)] | 61.0 | 46.7 | 61.0 | 29.4 |
| 5 3/4% Convertible Subordinated Notes due 2003 | 106.1 | - | 106.1 | - |
| Trade Payables, Litigation and Other Liabilities | 75.0 | 22.5 | 122.5 | 29.8 |
| *Total General Unsecured Claims* | $247.1 | $74.2 | $304.6 | $74.2 |

| Creditor Recoveries (%) | Scenario 1 | Scenario 2 |
|---|---|---|
| Priority Claims | 100.0% | 100.0% |
| Via Technologies, Inc. - *Senior Component* | 100.0% | 100.0% |
| 7 3/4% Sr. Secured Sub. Conv. Notes due 2005 | 76.8% | 48.8% |
| 5 3/4% Convertible Subordinated Notes due 2003 | 0.0% | 0.0% |
| Trade Payables, Litigation and Other Liabilities | 30.0% | 24.4% |

*(1) Represents current unrestricted cash balance less accounts receivable collected on behalf of Opta Systems and D&M, the Opt asettlement amount, remaining wind down costs, accrued and projected professional fees and post petition accounts payable.*
*(2) Represents estimated values for semiconductor patents, Exodus bankruptcy recovery and merchant account recovery.*
*(3) Value of remaining UMC shares as of Sept 22, 2003; net of UMC dividend tax; based on Sept 22, 2003 closing price ($0.85 per share).*
*(4) Represents the market value of 1.0 million UMC shares (purported collateral for the 2005 Notes).*
*(5) Represents estimated UMC gains taxes owed to the state of California for UMC sales in 2004. Gains on 2003 sales are estimated to be completely offset by 2003 operating losses and/or losses related to the sale of businesses. Federal gains taxes on 2004 UMC sales are assumed offset by NOL carryforwards.*
*(6) Represents portion of the Via Technologies, Inc. ("Via") claim that is senior in right of payment to the 2005 Notes pursuant to the terms of the 2005 Notes indenture.*
*(7) Excludes the $16.4 million recovery previously realized by the Sr Noteholders from the sale of the 24.6 million UMC shares collateralizing the notes.*

# EXHIBIT 8

From: "Marcus Smith" <msmith@sonicblue.com>
To: "Jeffrey Smith" <jsmith@ramius.com>
Subject: RE: Recovery Analysis-Confidential
Date: 09/24/2003 14:14:05 UTC

Jeff:♂Row 50 is mainly used for calculation purposes. It represents the amount of
proceeds each class would get if the distribution was strictly made on a pro rata
basis. The 05s then receive the 03 allocation and Via also receives a piece of the
05 allocation. The estimated final net allocation is shown on row 25.

2003 is the due date for the $103M subordinated notes outstanding.

Let me know if you have any further questions
Marcus
-----Original Message-----♂From: Jeffrey Smith [mailto:jsmith@ramius.com]♂Sent:
Tuesday, September 23, 2003 6:05 PM♂To: Marcus Smith♂Subject: RE: Recovery
Analysis-Confidential♂♂
Marcus,
I'm not really sure how to read this.

In row 25 the analysis says the 2005 holders will get between 29mm and 46mm for
the unsecured piece.

Then row 50 says the 2005 holders will get between 14.9 and 18.3 mm for the
unsecured piece.  Can you clarify?

There is also a line item Notes due 2003, is that supposed to be 2008?

Looking forward to the clarification.

Thanks,

Jeff


-----Original Message-----♂From: Marcus Smith [mailto:msmith@sonicblue.com]♂Sent:
Tuesday, September 23, 2003 7:12 PM♂To: Jeffrey Smith; Colburn, Gregg;
adam.chill@hcmny.com; rb@lnbrb.com; Walker, Matthew S.♂Subject: Recovery Analysis-
Confidential

Attached is an updated draft recovery analysis. I essentially updated the prior
recovery analysis completed by Houlihan Lokey. This does not include updated data
for general unsecured claims, as that analysis is still in process. This recovery
analysis also excludes the $16.4M already realized by the 05 Noteholders from the
sale of their collateral (thus the total recovery for the 05s is greater than that
shown in the summary by 5-7%).

Marcus

Marcus Smith ♂Chief Financial Officer ♂SONICblue, Inc. ♂2600 San Tomas Expressway
♂Santa Clara, CA 95051 ♂(408) 565-7147 office ♂(408) 562-8721 fax
♂msmith@sonicblue.com

POR-0006206

# EXHIBIT 9

| | |
|---|---|
| **From:** | Walker, Matthew S. |
| **Sent:** | Friday, February 13, 2004 5:37 PM |
| **To:** | Ron Bender |
| **Cc:** | Barbarosh, Craig A.; Hodges, Sue J. |
| **Subject:** | SONICblue - Disclosure Statement |

**Attachments:**     SAN_DIEGO_50185941_4.DOC

Dear Ron:

Attached please find a draft disclosure statement. We look forward to your comments.

I understand from Craig that you have had discussions regarding whether it would be better to utilize a creditor trust to make distributions or to keep one of the Debtors, presumably SONICblue, in place during the distribution process. After much consideration, we are leaning toward a creditor trust. Although there is some nominal expense in preparing a creditor trust agreement, using a creditor trust also avoids substantial work and attendant expense in maintaining SONICblue post-confirmation, which expenses we believe will exceed those incurred in creating the trust.

Among other things, as a public company, SONICblue would have to keep up with SEC reporting post-confirmation, until we went through the process of de-registering the company. In addition, we would presumably have to cancel SONICblue's stock as part of the Plan, and then re-issue one or more shares for post-petition operations; and we would need to fulfill corporate governance requirements, such as holding meetings, preparing minutes, and paying corporate tax. Finally, I suspect, but have not checked, that we would need to have multiple officers and directors. Hopefully, they would not require D&O insurance.

All in, it seems far easier and cheaper to create a creditor trust. Again, we look forward to your comments as soon as possible. Let's continue to work together to finalize the disclosure statement so it can be filed at the earliest possible time.

Regards,

Matt Walker



SAN_DIEGO_50185
941_4.DOC (303 ...

**Matthew S. Walker**
**Pillsbury Winthrop LLP**
101 W. Broadway 18th floor
San Diego, California 92101
Office Phone: (619) 544-3168
Direct Fax: (619) 819-4276

1

PW-TR-E-148794

Cell Phone: (619) 807-8993
E-mail: matthew.walker@pillsburywinthrop.com

2

PW-TR-E-148795

1 PILLSBURY WINTHROP LLP
   CRAIG A. BARBAROSH California Bar No. 160224
2 SUE J. HODGES California Bar No. 137080
   MATTHEW S. WALKER California Bar No. 101470
3 650 Town Center Drive, 7th Floor
   Costa Mesa, CA 92626-7122
4 Telephone: (714) 436-6800
   Facsimile: (714) 436-2800
5
6 Attorneys for Debtors and Debtors-In-Possession
7 LEVENE, NEALE, BENDER,
   RANKIN & BRILL LLP
8 RON BENDER California Bar No. 143364
   CRAIG M. RANKIN California Bar. No. 169844
9 1801 Avenue of the Stars, Suite 1120
   Los Angeles, CA 90067
10 Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
11
12 Attorneys for the Official Committee of Creditors
   Holding Unsecured Claims
13
14                    UNITED STATES BANKRUPTCY COURT
15                    NORTHERN DISTRICT OF CALIFORNIA
16                              SAN JOSE DIVISION
17
18 IN RE:                                    Chapter 11 Cases
19 SONICBLUE INCORPORATED, a                 Case Nos. 03-51775
   Delaware corporation, DIAMOND             through 51778 MJS
20 MULTIMEDIA SYSTEMS, INC., a
   Delaware corporation, REPLAYTV,           [Jointly Administered]
21 INC., a Delaware corporation, and
   SENSORY SCIENCE                           DISCLOSURE STATEMENT FOR
22 CORPORATION, a Delaware                   JOINT LIQUIDATING PLAN OF
   corporation,                              REORGANIZATION
23
24 Debtors and Debtors-in-Possession.        Date:
                                             Time:
25                                           Dept:
26                                           Hon. Marilyn Morgan
27
28
   50185941v4                    -1-        DISCLOSURE STATEMENT FOR JOINT
                                            LIQUIDATING PLAN OF REORGANIZATION

PW-TR-E-148796

I.    **Asserted Or Contemplated Litigation.**

    1.    **VIA Claims.**

        VIA and S3 Graphics Co., Ltd. ("JV") filed similar proofs of claim arising out of an August 28, 2000 Amended Investment Agreement between SONICblue and VIA, as well as other related agreements.  VIA and JV allege that SONICblue breached the Amended Investment Agreement and related agreements by, among other things, not paying certain accounts payable, offering non-ordinary-course discounts to accelerate collection of receivables, not contributing certain assets to JV, and retaining payments received for certain accounts receivable that allegedly were owed to JV.  Some of these claims are subject to an arbitration agreement and damages cap of approximately $5.5 million, and the total nominal value of these claims is approximately $27.1 million.  VIA and JV also claim that JV may be enjoined from using the license between SONICblue and Intel, and that JV is therefore entitled to liquidated damages of up to a total of $70 million under the Amended Investment Agreement.

        SONICblue believes it has defenses to VIA's and JV's claims.  SONICblue also believes that it has counterclaims for damages against VIA and JV arising out of the conduct of each, including breaches of the various agreements among the parties.

        The Debtors anticipate they will file an objection to VIA's and JV's claims as part of an adversary proceeding asserting SONICblue's counter-claims, unless in the event ongoing discussions result in a settlement.

    2.    **E-Services Litigation.**

        On November 16, 2001, E-Services Investments Private Sub L.L.C., Grey Ventures, Inc., William Morris Agency, Inc., and the Interpublic Group of Companies, Inc. (collectively, the "E-Services Plaintiffs"), filed a petition for appraisal against ReplayTV in the Court of Chancery of the State of Delaware seeking appraisal of their shares of ReplayTV preferred stock and payment of the alleged "fair value" thereof in connection with the acquisition of ReplayTV by SONICblue.  The E-Services Plaintiffs

PW-TR-E-148828

1  consolidating the Debtors would benefit all creditors by eliminating the cost and delay of

2  the process of reconstructing all pre-petition transactions between the Debtors, allocating

3  assets and liabilities, and litigating the accuracy of this process as well as the validity of

4  SONICblue's loans to the other Debtors.  The Debtors and Creditors' Committee believe

5  the cost savings and expedited distribution would be more beneficial to creditors than any

6  change in distributions that might result from an expensive, protracted and possibly futile

7  process of asset and liability allocation and litigation.

8  **D.    Subordination Provisions.**

9       The Debtors' Plan gives effect to the subordination provisions in the Indentures

10  according to their terms.  Bankruptcy Code Section 510(a) expressly provides that

11  contractual subordination provisions are enforceable in bankruptcy to the extent

12  enforceable under applicable non-bankruptcy law.  The Plan will give effect to the

13  subordination provisions by re-allocating the distributions that would have been paid to

14  creditors absent the subordination provisions to the creditors benefiting from the

15  subordination provisions.

16       Because there are two subordination agreements, the reallocation process will

17  occur at multiple levels.  Initially, the Trustee will determine the distribution due to each

18  Creditor holding an unsecured Claim, which would include Creditors with Claims in

19  Classes 3, 4, 5, 6 and 7.[4]  Then, the Trustee will reallocate the distributions that would

20  have been paid to the Holders of Claims based on the Junior Notes (Class 7 Claims) to the

21  parties entitled to priority over the Junior Notes pursuant to the subordination provisions

22  of the Junior Note Indenture (Class 3 Claims and Class 5 Claims, if any).  Such

23  reallocations shall be made on a pro-rata basis.  Next, the Trustee will reallocate those

24  distributions that would have been paid to the Holders of Claims based on the Senior

25  Notes (Class 4 Claims) (including amounts reallocated to Senior Noteholders from Junior

26  ――――――――――――――

27  [4] Nothing in this discussion of is intended to limit the provisions of the Plan or this
     Disclosure Statement concerning distribution procedures or concerning creation of
28   reserves for Disputed Claims.

PW-TR-E-148835

1  Noteholders) to the parties entitled to priority over the Senior Notes pursuant to the

2  subordination provisions of the Senior Note Indenture (Class 3 Claims).

3          The subordination provisions of the Senior Note Indenture and Junior Note

4  Indenture each identify several types of claims with priority.  Although the subordination

5  provisions in the Junior Note Indenture are not identical to the subordination provisions in

6  the Senior Note Indenture, the Debtors and Creditors' Committee are unaware of any

7  creditors entitled to priority under the Junior Note Indenture that are not also entitled to

8  priority under the Senior Note Indenture.  As such, the Debtors and Creditors' Committee

9  believe that there are no creditors in Class 5.  [TO BE VERIFIED].  All creditors whom

10  the Debtors and Creditors' Committee believe to have priority over the Senior

11  Noteholders are included in Class 3 and identified in Exhibit "E" to this Disclosure

12  Statement.  The largest potential claim in Class 3 is the claim of VIA, which, if Allowed,

13  has priority up to $15 million plus interest (including post-petition interest).

14  E.        **Classification and Treatment of Claims.**

15          1.        **Class 1 - Secured Claims.**

16                  (a)        Classification:

17          This Class consists of Holders of Allowed Claims secured by valid and perfected

18  liens and/or security interests in the Debtors' Assets.

19                  (b)        Treatment:

20          Unless the Holder of an Allowed Class 1 Claim agrees to different treatment, each

21  Holder of an Allowed Class 1 Claim shall receive, on the later of the Effective Date and

22  the date of allowance of such claim, at the option of the Debtors: (i) the return of such

23  Assets of the Debtors in which such creditor holds a security interest; or (ii) the Allowed

24  amount of such creditor's secured Claim, determined pursuant to Bankruptcy Court

25  Section 506, in Cash, plus interest from and after the Effective Date on the Allowed

26

27

28

50185941v4                              -41-                    DISCLOSURE STATEMENT FOR JOINT
                                                                LIQUIDATING PLAN OF REORGANIZATION

PW-TR-E-148836