1  STROOCK & STROOCK & LAVAN LLP
Lewis Kruger (admitted *pro hac vice*)
2  Kenneth Pasquale (admitted *pro hac vice*)
180 Maiden Lane
3  New York, New York 10038
Telephone: (212) 806-5400
4  Facsimile: (212) 806-6006

5  STROOCK & STROOCK & LAVAN LLP
Alan Z. Yudkowsky (State Bar No. 194994)
6  2029 Century Park East, Suite 1800
Los Angeles, California 90067
7  Telephone: (310) 556-5800
Facsimile: (310) 556-5959

8

9  Counsel for Portside Growth & Opportunity Fund,
Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd.

10  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Van C. Durrer II (State Bar No. 226693)
11  Glenn Walter (State Bar No. 220015)
300 South Grand Avenue, Suite 3400
12  Los Angeles, California 90071
Telephone: (213) 687-5000
13  Facsimile: (213) 687-5600

14  Counsel for Citadel Equity Fund Ltd.

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                   SAN JOSE DIVISION

18  - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :  Case No. C-07-02553 RMW
19                                                  :
    In re                                           :  (Related to Case No. CV 07-06025-RMW)
20                                                  :
    SONICBLUE INCORPORATED, a Delaware              :  **DECLARATION OF LEWIS KRUGER**
21  corporation; DIAMOND MULTIMEDIA                 :  **IN SUPPORT OF SENIOR**
    SYSTEMS, INC., a Delaware corporation;          :  **NOTEHOLDERS' OMNIBUS REPLY**
22  REPLAYTV, INC., a Delaware corporation;         :  **TO RESPONSES TO CROSS-MOTION**
    and SENSORY SCIENCE CORPORATION, a              :  **FOR LIMITED STAY**
23  Delaware corporation,                           :
                                                    :  Date:   January 11, 2008
24         Debtors and Debtors in Possession.       :  Time:   9:00 a.m.
                                                    :  Place:  Courtroom 6, 4th Floor
25                                                  :  Judge:  Hon. Ronald M. Whyte
    - - - - - - - - - - - - - - - - - - - - - - - - x
26

27

28

LEWIS KRUGER hereby declares:

1.    I am a member of Stroock & Stroock & Lavan LLP, counsel to Portside Growth & Opportunity Fund, Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders") in these bankruptcy cases. I am admitted *pro hac vice* to appear before this Court in these cases.

2.    I have personal knowledge of the matters set forth below and, if called to testify, I could and would testify competently thereto.

3.    On December 4, 2007, in the main bankruptcy case pending before the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), Case No. 03-51775, Grant T. Stein, counsel to the Chapter 11 Trustee, filed a Third Supplemental Declaration in Connection with the Employment of Alston & Bird LLP as Counsel to Dennis J. Connolly, the Chapter 11 Trustee [Docket No. 2614] (the "Stein Declaration"). A true and correct copy of the Stein Declaration is attached hereto as Exhibit A.

4.    On December 7, 2007, I appeared before the Bankruptcy Court at the hearing on the Senior Noteholders' Motion for Continuance of Motions for Partial Modification of Settlement Order or, in the Alternative, Limited Stay of Proceedings [Docket No. 2561]. A true and correct copy of the transcript of this hearing [Docket No. 2652] is attached hereto as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 17, 2007, at New York, New York.

_____
Lewis Kruger

# EXHIBIT A

Cecily A. Dumas
FRIEDMAN DUMAS & SPRINGWATER LLP
150 Spear Street, Suite 1600
San Francisco, CA 94105
Telephone: (415) 834-3800
Fax: (415) 843-1044
cdumas@friedumspring.com

Grant T. Stein, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Fax: (404) 881-7777
grant.stein@alston.com
*Attorneys for Dennis J. Connolly in His Capacity
as Chapter 11 Trustee for Sonicblue Incorporated, et al.*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Cases |
| SONICBLUE INCORPORATED, a Delaware corporation, DIAMOND MULTIMEDIA SYSTEMS, INC., a Delaware corporation, REPLAYTV, INC., a Delaware corporation, and SENSORY SCIENCE CORPORATION, a Delaware corporation, | Case Nos.: 03-51775 through 03-51778<br><br>Jointly Administered<br><br>**THIRD SUPPLEMENTAL DECLARATION IN CONNECTION WITH THE EMPLOYMENT OF ALSTON & BIRD LLP AS COUNSEL TO DENNIS J. CONNOLLY, THE CHAPTER 11 TRUSTEE** |
| Debtors and Debtors-in-Possession. | |
| | Honorable Marilyn Morgan |

I, Grant T. Stein, state the following under penalty of perjury:

1.    I am a partner with the law firm of Alston & Bird LLP ("A&B") and in that capacity, I have personal knowledge with respect to the matters set out herein. I have read the Application for an Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Retention of Alston & Bird LLP as Counsel to Dennis J. Connolly, the Chapter 11 Trustee (the "Application"), approved by this Court by an Order entered on June 21, 2007, the First

1   Supplemental Affidavit and Second Supplemental Affidavit in Connection with the

2   Employment of Alston & Bird LLP as Counsel to Dennis J. Connolly, the Chapter 11 Trustee,

3   and submit this Third Supplemental Declaration in support thereof.[1]

4       2.    A&B and Dennis J. Connolly as Chapter 11 Trustee (the "Chapter 11 Trustee")

5   have the following additional connections to the Debtors and these Chapter 11 cases:

6       a.  On November 13, 2007, in correspondence from William McGrane ("Mr.

7          McGrane"), co-counsel to SonicBlue Claims LLC ("SB Claims"), Mr. McGrane

8          questioned the conduct of the Chapter 11 Trustee in these bankruptcy cases which

9          has been adverse to SB Claims' positions and requests on certain occasions, and

10         requested that the Chapter 11 Trustee resign as the court-appointed Chapter 11

11         trustee. A true and correct copy of this and related correspondence is attached as

12         an Exhibit hereto.

13       b.  On November 16, 2007, the Chapter 11 Trustee communicated that he declined

14         Mr. McGrane's request to resign as the court-appointed Chapter 11 trustee. A true

15         and correct copy of this and related correspondence is attached as an Exhibit

16         hereto.

17       c.  On the early evening of November 27, 2007, I returned a phone call from K. John

18         Shaffer ("Mr. Shaffer"), co-counsel to SB Claims. Mr. Shaffer raised several

19         issues during the call.

20       d. Mr. Shaffer began our call by asking about our local counsel's recent calls to him.

21         I acknowledged that the Trustee knew that they had talked about a settlement

22         meeting, that the Trustee thought that a global settlement was a good idea, and that

23         the issue for the Trustee was when to schedule the meeting. We then discussed

24         timing on scheduling a settlement meeting with all parties given the existing

25         deposition and hearing schedule.

26       e.  Mr. Shaffer noted that he believed it was essential to send a very strong message to

27

---

[1]   Any capitalized terms not defined herein shall have the meaning attributed to them in the Application.

28

2    THIRD SUPPLEMENTAL DECLARATION IN CONNECTION
WITH THE EMPLOYMENT OF ALSTON & BIRD LLP

1    the 2002 Noteholders through united action by the Committee, SB Claims, and the

2    Trustee.

3    f.    Mr. Shaffer said that his client wanted the Trustee to file a very forceful pleading

4          on the following Monday in opposition to the 2002 Noteholders' attempt to stay

5          SB Claims' Motion to Modify the VIA Settlement Order based on the undisclosed

6          conflicts and connections of the Pillsbury Winthrop firm.  The motion to stay was

7          set to be heard before Judge Morgan on December 7, 2007.

8    g.    Mr. Shaffer said that there was not full agreement within his client representatives

9          as to what should occur going forward.  I interpreted that to mean going forward

10         with respect to the Trustee.  He said that there had been harsh words recently, and

11         that Bill McGrane and the Trustee were both difficult clients, and maybe they were

12         too much alike instead of being too different.

13   h.    Mr. Shaffer said that certain positions had not hardened on his side and that if the

14         Trustee would take a strong position and send a clear message of being aligned

15         with his client consistent with the change in the case represented by the new

16         creditors' committee, pleadings would not have to be filed and certain actions

17         could be avoided.   It was clear to me by this that he was referring to Bill

18         McGrane's recent emails and letters to Mr. Connolly in which Mr. McGrane

19         openly stated that he would seek to have Mr. Connolly removed as Trustee, and

20         also to probable objections to the pending interim compensation request filed by

21         Alston & Bird as counsel to the Trustee.  See the Exhibits attached hereto.

22   i.    The call continued and Mr. Shaffer addressed a few additional points.

23   j.    I said at different points that I had heard him and would communicate his various

24         requests to my client and would get back to him.

25   k.    After the conclusion of the call I reported what had been said to me to the Trustee,

26         and subsequently reported it to the acting United States Trustee.

27   3.   No other or further connections with these Debtors or these cases, other than those

3    THIRD SUPPLEMENTAL DECLARATION IN CONNECTION
     WITH THE EMPLOYMENT OF ALSTON & BIRD LLP

1    that have previously been disclosed and disclosed herein, are known at this time.  A&B will

2    continue to consider connections to creditors and other parties in interest and will file

3    additional disclosures as necessary.

4         Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

5    United States that the foregoing is true and correct and that this declaration was executed on

6    December 4, 2007 at Atlanta, Georgia.

7

8         /s/ Grant T. Stein
          GRANT T. STEIN
9         Georgia Bar No. 677835

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4        THIRD SUPPLEMENTAL DECLARATION IN CONNECTION
         WITH THE EMPLOYMENT OF ALSTON & BIRD LLP

# McGRANE GREENFIELD LLP

Attorneys at Law

Please reply to:
**William McGrane**
San Francisco Office

Direct E-mail:
wmcgrane@mcgranegreenfield.com

In Association With
**BERLINER COHEN**
San Jose • Merced

**SAN FRANCISCO OFFICE**
One Ferry Building
Suite 220
San Francisco, CA 94111
Phone: (415) 283-1776
Fax:　(415) 283-1777

**SAN JOSE OFFICE**
40 South Market Street
Seventh Floor
San Jose, CA 95113
Phone: (408) 995-5600
Fax:　(408) 995-0308

November 13, 2007

(Via E-mail w/encls.)
Dennis Connolly, Esq.
Alston & Bird LLP
1201 Peachtree Street
Atlanta, GA 30309

　　　**RE:　In Re SonicBlue Inc.**

Dear Dennis:

　　　This responds to your e-mail to John Shaffer dated October 11, 2007 at 2:03 PM

(the "October 11 e-mail" [Exhibit 1]).

　　　In the October 11 e-mail you correctly recited that I, acting on behalf of SonicBlue

Claims, LLC ("SB Claims"), have previously indicated that one equitable solution to the

abuse of the estate perpetrated in late 2006 by a combination of the Pillsbury Winthrop

law firm and the 2002 Noteholders would be for SB Claims to grant the estate a

"participatory interest in any recovery" SB Claims may achieve from the estate, in

exchange for a voluntary deletion of the improperly obtained waiver language.

　　　While this suggestion was made to you immediately upon my first meeting with

you and Grant Stein last spring, and repeated at every in-person meeting we have ever had

– 2 –                              November 13, 2007

since then, the October 11 e-mail was your first formal response and, as you must know, it was a very unsatisfactory response at that.

Before proceeding any further, there is something I wish to make clear. SB Claims is most concerned about your prior efforts as Chapter 11 trustee in this case to prevent SB Claims' discovery; your prior opposition as Chapter 11 trustee in this case to the appointment of a legitimate creditors' committee; and your prior dealings as Chapter 11 trustee in this case with the Pillsbury Winthrop law firm, specifically including your voluntarily allowing that law firm to withhold all internal documents they generated after February 15, 2007, and, most seriously troubling of all, your conduct as Chapter 11 trustee in this case in not immediately reporting the Pillsbury Winthrop law firm's additional undisclosed conflict that is evidenced by our filing earlier today of a "Supplement to Motion etc." [Docket #2558] to either Judge Morgan or the general creditor community.

The October 11 e-mail's demand for an indemnity by SB Claims as the price for your allowing SB Claims the privilege of giving the bankruptcy estate a part of SB Claims' upside is yet another example of your very odd conduct as the Chapter 11 trustee in this case, particularly since a share in SB Claims' upside is potentially worth millions of dollars to the bankruptcy estate in light of the documents we have now received— despite your inexplicable efforts to keep them from us until ordered to do so by Judge

– 3 –                          November 13, 2007

Morgan—that show there really is no doubt the VIA Indebtedness was indeed Senior

Indebtedness (see, e.g., Exhibit 2).

    While we would still like to make a settlement with the bankruptcy estate that

would allow the estate to participate in SB Claims' upside, we do not wish to further

attempt to reach any such a settlement with you, given that our many serious questions as

to your prior conduct as Chapter 11 trustee in this case make us most reluctant to grant

you a partcipatory interest in SB Claims' upside when your true motivations are so hard to

decipher here.

    Rather, please consider our response to the October 11 e-mail to be a request that

you immediately resign as Chapter 11 trustee in this case so as to facilitate settlement

negotiations between SB Claims and the bankruptcy estate as well as to bring some

transparency to the overall administration of this bankruptcy case.

                         Sincerely,

                         William McGrane

Cc:  Nanette Dumas, Esq. (via e-mail w/encls.)
     Grant Stein, Esq. (via e-mail w/encls.)
     Bernard Burk, Esq. (via e-mail w/encls.)
     Lewis Kruger, Esq. (via e-mail w/encls.)
     Scott McNutt, Esq. (via e-mail w/encls.)
     Matthew Gold, Esq. (via e-mail w/encls.)
     John Shaffer, Esq. (via e-mail w/encls.)

**From:** Connolly, Dennis [mailto:Dennis.Connolly@alston.com]
**Sent:** Thu 10/11/2007 2:03 PM
**To:** Shaffer, K. John
**Cc:** Stein, Grant; Cecily Dumas
**Subject:** SONICblue

John:

I wanted to follow-up on our discussion of a few days ago relative to the proposals that you and Bill McGrane have made to me in respect of the VIA/Intel/debtors settlement agreement. As I understand that proposal, SBC, as assignee of certain rights held by VIA, would propose to grant to the estates a participation interest in any recovery in respect of the so-called "senior indebtedness provision" under the 2002 note indenture in the event and to the extent that, SBC would prevail in whatever litigation it may prosecute against the holders of the 2002 notes. As we have discussed, I believe there are a number of issues implicated by that proposal, not the least of which is the potential harm to the estate by virtue of any potential modification to the order authorizing the settlement between VIA, Intel and the debtors. SBC is contractually precluded from seeking any modification of the settlement agreement in respect of this one provision. It is not at all clear that SBC has the power to modify this provision, as opposed to VIA. Moreover, I am not aware of any inquiry on your part of Intel relative to its position on this issue. As I have indicated on a number of occasions, one of my primary considerations is to avoid any potential harm to the bankruptcy estates. That being said, one issue I raised with you during our last discussion was the prospect for an indemnity by SBC for and in respect of any damages that the may arise by virtue of proceeding with your proposal. You did not respond to that inquiry and I have not heard back from you since that conversation on this subject. I presume given your silence, SBC is not inclined to proceed with such an indemnity. Moreover, obviously, any such agreement (were an agreement to be reached between the parties) would be subject to due diligence including, but not limited to, confirmation that SBC could make "good" on any such indemnity.

If SBC is no longer interested in these discussions, please let me know. If SBC is interested in these discussions, please let me know that as well, but please also note that protection of the rights of the estate are paramount in my mind. Thank you in advance for your attention to these matters.

*Dennis J. Connolly*
Alston & Bird LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404-881-7269 office
404-253-8554 fax
dennis.connolly@alston.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 disclosure:  To ensure compliance with requirements imposed by the

NOTICE:  This e-mail message and all attachments transmitted with it
may contain legally privileged and confidential information intended
solely for the use of the addressee.  If the reader of this message is not
the intended recipient, you are hereby notified that any reading,
dissemination, distribution, copying, or other use of this message or its
attachments is strictly prohibited.  If you have received this message in
error, please notify the sender immediately by telephone
(404-881-7000) or by electronic mail (postmaster@alston.com), and
delete this message and all copies and backups thereof.  Thank you.

# EXHIBIT 2

REDACTED

| | |
|---|---|
| **From:** | Aaron, Noelle |
| **Sent:** | Thursday, April 18, 2002 8:28 PM |
| **To:** | 'Mendelson, Robyn'; 'ishea@sonicblue.com'; 'msmith@sonicblue.com'; 'dgershon@sonicblue.com'; 'jtodd@sonicblue.com'; 'jsmith@ramius.com'; 'ranscher@ramius.com'; 'adamc@hcmny.com'; 'bmiloski@gkm.com'; 'jphillips@gkm.com'; 'dstetson@gkm.com'; 'dzoretic@gkm.com'; 'jsovcik@gkm.com'; 'yddeng@leeandli.com'; 'rusvectp@ms2.hinet.net'; 'aris@hcmny.com'; 'Klein, Eleazer'; 'Goldstein, Robert'; 'Director, Brett' |
| **Cc:** | Meredith, David; Kohn, Bradley D. |
| **Subject:** | FW: Fax From:  "212 858 1500" |
| | |
| **Attachments:** | NetMoves Internet Document |



M03504140210910
08000.pdf (1 MB...

                    Ladies and Gentlemen:

On behalf of David Meredith and Brad Kohn, transmitted herewith please find our comments
to the Indenture. Please call if any questions.

Regards,
Noelle Aaron

-----Original Message-----
From: NetMoves Inbound [mailto:support@netmoves.com]
Sent: Thursday, April 18, 2002 7:48 PM
To: Aaron, Noelle
Subject: Fax From: "212 858 1500"


Thank you for using FaxCourier, the inbound fax service from NetMoves.

Attached is a 35 page fax that you received on Fri Apr 19 2002 02:48 GMT.

1

**PWSP 01928**

18 APR 2002 22:45 FR PILLSBURY WINTHROP NY2 858 1500 TO 918667430981     P.01

SRZ DRAFT 4/18/02
4:00 PM EST
PW 4/18/02

### SONICBLUE INCORPORATED

### AND

### THE INITIAL PURCHASERS OF 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2003

### INDENTURE

### DATED AS OF APRIL ̶19, 2002

### 7-3/4% SECURED SENIOR SUBORDINATED CONVERTIBLE DEBENTURES DUE 2003

1     DeltaView comparison of iManage://NYDMS1/NEWYORK/9213905/5 and iManage://NYDMS1/NEWYORK/9213905/7. Performed on 04/18/02.

PWSP 01929

18 APR 2002 22:41 FR PILLSBURY WINTHROP NY2 656 1500 TO 918601450501    P.00

*[handwritten top annotation:]* (or (ii) as evidenced by securities sold in a registered public offering or in one or more transactions in connection with resales of such securities pursuant to Rule 144A under the Securities Act

**SRZ DRAFT 4/18/02**
**4:00 PM EST** (6)

"Senior Indebtedness" shall mean the principal of, premium, if any, interest on (including any interest accruing after the filing of a petition by or against the Company under any bankruptcy law, whether or not allowed as a claim after such filing in any proceeding under such bankruptcy law) and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture or thereafter incurred or created:

*[handwritten left margin:]* Need the ability to raise debt in registered or 144A deals

(a) All ~~indebtedness~~ **Indebtedness** of the Company for monies borrowed from banks, trust companies, insurance companies, equipment leasing companies or other financial institutions that in the ordinary course of business make loans (each, a "Qualified Lender"), including without limitation, all ~~indebtedness~~ **Indebtedness** represented by the Congress Facility; *[handwritten: stet V/c here L/c]*

(b) All ~~indebtedness~~ **Indebtedness** of the Company due and owing with respect to letters of credit (including, but not limited to, reimbursement obligations with respect *L/c* thereto) issued by Qualified Lenders; *[handwritten: These should be lowercase b/c they are not within the definition of "Indebtedness" but rather]*

(c) All ~~indebtedness~~ **Indebtedness** or other obligations of the Company due and owing with respect to interest rate and currency swap agreements, cap, floor and collar agreements, currency spot and forward contracts and other similar agreements and arrangements entered into with Qualified Lenders; *[handwritten: L/c are types listed for defining Senior]*

(d) All ~~indebtedness~~ **Indebtedness** consisting of commitment or standby fees due and payable to Qualified Lenders with respect to credit facilities or letters of credit available to the Company; *[handwritten: L/c Indebtedness]*

(e) All obligations of the Company under leases required or permitted to be capitalized under generally accepted accounting principles and entered into with Qualified Lenders;

(f) All ~~indebtedness~~ **Indebtedness** or obligations of others of the kinds described in any of the preceding clauses (a), (b), (c), (d) or (e) **due or owing to Qualified Lenders** assumed by or guaranteed in any manner by the Company or in effect guaranteed (directly or indirectly) by the Company through an agreement to purchase, contingent or otherwise, and all obligations of the Company under any such guarantee or other arrangements; ~~and~~ *[handwritten: L/c]*

(g) All **Indebtedness of the Company due and owing to [Via] in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency or composite currency (the "Via Indebtedness"); and**

(h) All renewals, extensions, refunds, deferrals, amendments or modifications of ~~indebtedness~~ **Indebtedness** or obligations of the kinds described in any of the preceding clauses (a), (b), (c) (d), (e) or (f) **above** *[handwritten: or (g)]* entered into with Qualified Lenders; unless in the case of any particular ~~indebtedness~~ **Indebtedness**, obligation, renewal, extension, refunding, amendment, modification or supplement, the instrument or other document creating or evidencing the same or the assumption or guarantee of the same expressly provides that such ~~indebtedness~~ **Indebtedness**, obligation, renewal, extension, amendment, modification or supplement is subordinate to, or is not superior to, or is pari passu with, the Debentures; provided that "Senior Indebtedness" shall not include (i) any indebtedness of any kind of the Company to any *[handwritten: L/c  L/c  L/c]*

7    DeltaView comparison of iManage://NYDMS1/NEWYORK/9213905/5 and iManage://NYDMS1/NEWYORK/9213905/7. Performed on 04/18/02.

**PWSP 01934**

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

Dennis J. Connolly                  Direct Dial: 404-881-7269          E-mail: dennis.connolly@alston.com

November 16, 2007

*Via Email*

William McGrane, Esq.
McGrane Greenfield LLP
One Ferry Building, Suite 220
San Francisco, CA  94111

>    Re:    *In re SonicBlue, Inc. and its Affiliates*

Dear Bill:

I am in receipt of your letter dated November 13, 2007.  Your request to me to resign to enable you and your company, SB Claims, to have someone more to your liking with whom to reach a settlement of SB Claims issues in the case is not a legitimate basis for me to resign, nor is there any other reason for me to resign, and I do not plan to do so.  I would be pleased, however, for you to consider the current posture of the case and the issues being presented, conclude the discovery you need to take, and then for you to sit down with me, the reconstituted creditors' committee, and the 2002 Noteholders to work through the issues that exist between and among this group.

In respect of the discussion of the indemnity that occurred with Mr. Shaffer and as referenced in my email of October 11, 2007 to Mr. Shaffer, the indemnity (as explained in detail in that email) was intended to protect the bankruptcy estates from the potential downside of litigation.  Although you believe that your litigation claim against the senior noteholders is a viable claim, your proposal does create significant litigation risks for the estate and does create the potential for significant additional delay of the administration of these bankruptcy cases.  Thus, an indemnity is an entirely appropriate proposal to put on the table.  Moreover, I note that VIA raised the same issue when it conveyed a portion of its claim to SB Claims in April of this year.  Under Section 16 of the Claim Transfer Agreement, there are cross-indemnities between the parties which are particularly aimed at the breach by SB Claims of the obligation not to take any steps to alter or amend the underlying settlement agreement.  I also would note that Mr. Bender came to a similar conclusion and referenced a similar need for some protection for the estates in the context of a similar proposal you made to the creditors' committee prior to my appointment.  While Mr. Bender's actions in this case are under review, his point on this issue was appropriate.

William McGrane, Esq.
November 16, 2007
Page 2

In your letter you mention several "concerns." I have the following responses:

- The Trustee's efforts in coordinating and sequencing discovery and allowing the Trustee to proceed with that discovery were, in my judgment, in the best interest of the estates. Obviously, the Court thought otherwise and requested that the parties coordinate discovery. Since that time, SB Claims has benefited enormously from the Chapter 11 Trustee's efforts as SB Claims has obtained hundreds of thousands of pages of documents (including the very documents you reference in your letter), all at precious little cost to SB Claims. Moreover, the Chapter 11 Trustee determined to waive, on a limited basis, the attorney-client privilege so as to allow this information to be available to all creditors and parties interest, including SB Claims. I have done what I can to expedite discovery and provide transparency and the purpose behind that is to get SB Claims lawsuit to trial by late February as the Court has indicated is possible.

- The position with respect to appointment of a reconstituted creditors' committee was simple – to the extent that the plan process proceeded, the committee was unnecessary. I had talked with other creditors and the U.S. Trustee who agreed with me in the context of the plan that SB Claims derailed as part of its litigation strategy, delaying for months a distribution to unsecured creditors, including SB Claims.

- With respect to my "prior dealings" as Chapter 11 Trustee with the Pillsbury Winthrop law firm, Mr. Stein has previously explained to your counsel, there was absolutely no "deal" or consent on my part "allowing" Pillsbury Winthrop to withhold documents generated after February 15, 2007, and the final formal discovery effort is part of what we are locking down in the joint discovery plan the parties have put together. My investigation as Chapter 11 Trustee has proceeded in the manner and in the sequence I deems appropriate and there is absolutely no impediment to any discovery being taken by SB Claims of Pillsbury Winthrop for any relevant time period. Indeed, without requesting any *quid pro quo* from you, the Chapter 11 Trustee has created a situation where SB Claims has a substantial benefit that few litigants have – the limited waiver of the attorney-client privilege so as to allow SB Claims to inquire as to the advice given by Pillsbury Winthrop and O'Melveny & Myers to the debtors in the relevant time periods.

- With respect to the alleged duty to "immediately report" the failure by Pillsbury Winthrop to disclose the tolling agreement with the directors of the debtors, you have not identified the source for any such duty nor have you identified any reason for this to be disclosed at this point in time as Pillsbury Winthrop is no longer counsel for the debtors and my investigation of Pillsbury Winthrop's conduct is continuing. Obviously, this will be among many of the issues that will be addressed by this Chapter 11 Trustee in respect of the fees of Pillsbury Winthrop and any affirmative claims the estates may assert. There is no need to otherwise interfere with the Chapter 11 Trustee's investigation by the release of this information on a seriatim

William McGrane, Esq.
November 16, 2007
Page 3

basis every time I find an important fact, or potentially important fact, in my investigation. Moreover, in ignorance you have stated that this issue was not "reported." This issue was raised by me months ago with representatives of the Office of the U. S. Trustee. The fact that it was not somehow reported to you, so that you could use it in connection with your parochial pecuniary interest in these cases is of absolutely no consequence to the administration of these cases.

My duties in this case run to the estate and to creditors, and your interests run to you and SB Claims to maximize your own personal economic interest on a claim SB Claims bought for $4 million. Those duties and interests obviously diverge. To a significant extent, your interests have had a negative impact on the administration of the bankruptcy cases. Accordingly, as I note above, I would ask that you conclude the discovery you need to take, and then sit down with me, the creditors' committee, and the 2002 Noteholders to work through the issues that exist between and among this group. I have been charged by the Court to conduct an impartial, independent investigation and to administer these estates and I intend to fulfill that charge to the best of my abilities, including addressing the Pillsbury Winthrop and Levene Neale issues at the appropriate time.

Very truly yours,

Dennis J. Connolly

DJC:br
cc:    Nanette Dumas, Esq. (via email)
       Grant Stein, Esq. (via email)
       Bernard Burk, Esq. (via email)
       Lewis Kruger, Esq. (via email)
       Scott McNutt, Esq. (via email)
       John Shaffer, Esq. (via email)

# McGRANE GREENFIELD LLP

Attorneys at Law

Please reply to:
**William McGrane**
San Francisco Office

Direct E-mail:
wmcgrane@mcgranegreenfield.com

In Association With
**BERLINER COHEN**
San Jose • Merced

**SAN FRANCISCO OFFICE**
One Ferry Building
Suite 220
San Francisco, CA 94111
Phone: (415) 283-1776
Fax: (415) 283-1777

**SAN JOSE OFFICE**
40 South Market Street
Seventh Floor
San Jose, CA 95113
Phone: (408) 995-5600
Fax: (408) 995-0308

November 16, 2007

(Via E-mail)
Dennis Connolly, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

RE:   **In Re SonicBlue, Inc.**

Dear Dennis:

I am quite disappointed by your response of earlier today, which in my view shows your complete lack of appreciation of (to use your phrase) the "current posture of the case and the issues being presented."

SB Claims first exposed the wrongdoing that permeated this chapter 11 case more than nine months ago. Without SB Claims' efforts – done at its own risk and expense, and against the vociferous objections of Pillsbury, the Creditors' Committee, and the 2002 Noteholders – this wrongdoing not only would have not been exposed, but the wrongdoing also would have resulted in tens of millions in dollars in estate funds being paid to professionals and other so-called fiduciaries who were not entitled to that consideration.

– 2 –                            November 16, 2007

SB Claims sincerely hoped and expected that the appointment of a trustee would help to right the terrible wrongs that were done to the integrity of the bankruptcy process in this case.  Let me be the first to say that, as to that issue, we appear to have been horribly mistaken.

Since your appointment in April (nearly seven months ago), you have undertaken a strategy in this case for which there is simply no legitimate explanation:

    *       You opposed the reconstitution of the former Creditors' Committee, notwithstanding its complete and utter failure to protect the creditors' interests in connection with Pillsbury's misconduct and the undisclosed, purported waiver of the 2002 Noteholders' "Senior Indebtedness" obligations.  Even after the Court expressed serious concerns to you at the September 5 hearing about "Who's protecting the trade creditors?", you filed a meaningless non-position statement that still questioned the need for an independent voice to represent the creditors.

    *       You proposed a Plan and Disclosure Statement that, on its face, would have permitted more than $26 million in cash to be distributed to the 2002 Noteholders *before* the resolution of any claims that the estate may have against the 2002 Noteholders for, among other things, their participation on the former Creditors' Committee.[1]  When this

---

[1]     The only condition to that distribution under your proposed Plan was the resolution of the original issue discount ("OID") issue with respect to the *1996 Noteholders'* claims, an essentially meaningless condition given that the 1996 Noteholders had no economic

– 3 –                    November 16, 2007

concern was raised by our counsel, John Shaffer, your counsel, Mr. Stein, told Mr. Shaffer

that you did not believe that the estate had any claims against the 2002 Noteholders.

Either that statement was a lie, or it shows a fundamental failure in your ability to

comprehend the facts of this case.

\*        You claim in your letter of earlier today that SB Claims "derailed" your

proposed Plan. That, too, appears to show that you simply do not comprehend this case.

SB Claims did not in any way oppose you going forward with your Plan, provided that

you corrected your Plan to prevent the distribution of more than $26 million to the 2002

Noteholders until all claims against them were resolved (whether claims on behalf of the

estate or SB Claims' rights under the 2002 Indenture). I must remind you that SB Claims

made this same requested to your counsel in June, within days following your circulation

of a draft of the Plan, and repeated this request on numerous times in July and August.

You, however, did nothing to respond to SB Claims' well-founded concerns until after SB

Claims was forced to file an objection. Even then, your proposed "compromise" (which

was negotiated with the 2002 Noteholders and then presented to SB Claims as a "take it

or leave it" proposition) still would have permitted the 2002 Noteholders to receive nearly

$18 million dollars in payments *before* the resolution of any claims against them.

---

interest in opposing a reduction in their claim, and there is no real dispute as to the
amount of OID relating to the 1996 Noteholders' claims anyway.

– 4 –                                November 16, 2007

      \*     Your counsel made an agreement with Pillsbury under which that firm did

not have to produce documents created after February 15, 2007, notwithstanding

Pillsbury's continued employment by the estate through March 26, 2007, and the

significant events that occurred during that period. Your counsel now claims that he

"inadvertently" forgot to tell Mr. Shaffer about that agreement when Mr. Shaffer

specifically asked whether there were any agreements limiting the scope of Pillsbury's

production. Pillsbury, however, was quite able to produce correspondence reflecting that

arrangement. Your contention now that "there was absolutely no 'deal' or consent on my

part 'allowing' Pillsbury Winthrop to withhold documents generated after February 15,

2007" is directly contradicted by correspondence from Pillsbury's counsel, Mr. Burk, who

just six days ago again referred to "the Feb. 15 production cutoff previously agreed with

the Trustee." Your agreement has, among other things, delayed the ongoing discovery,

since Pillsbury is now required (based upon our subpoena) to re-review its documents

from the post February 15 period.

      \*     You took months to agree to a limited waiver of the attorney-client privilege

with respect to evidence of the misconduct in this case, and then only did so in order to

avoid further embarrassment when SB Claims would have sought that relief over your

objection.

– 5 –                                November 16, 2007

  *  When SB Claims asked to participate in the informal discovery you

commenced in May, you refused, notwithstanding the fact that now SB Claims is finally

receiving the same documents that you had received months ago.

  *  When SB Claims tried to take its own discovery, you moved for an

extraordinary, blanket protective order, which not surprisingly was supported by Pillsbury

and the 2002 Noteholders – the very parties whose misconduct would be sheltered by

such an order. The Court recognized that the relief you sought was not in the best

interests of the estate and denied it.

  *  When SB Claims tried to pursue its rights in the Adversary Proceeding, you

moved to stay it, except with respect to the 2002 Noteholders' efforts to dismiss that

litigation altogether (again, relief that not surprisingly was fully supported by the 2002

Noteholders). You withdrew your stay motion only after the Court made clear that it

would not accept your efforts to block SB Claims' legitimate pursuit of its rights.

  *  You and your counsel are now taking the position that your "investigation"

cannot effectively proceed during the pendency of SB Claims' own Adversary Proceeding,

and that the Adversary Proceeding has delayed the completion of your "investigation"

until after the trial of the present SB Claims adversary proceeding against the 2002

Noteholders. Among other things, it has become clear that you do not intend to notice

any more discovery, but simply will "tag along" with your own Rule 2004 examinations if

and when the parties to the Adversary Proceeding schedule their own. That is directly

– 6 –                              November 16, 2007

contrary to what the Court made clear it wanted to see happen.  The Court made clear that

it wanted your investigation to occur concurrently with the Adversary Proceeding, and not

to be sequenced after it was done.  The Court also made clear that it did not want the

completion of your investigation to be delayed.

   *  You have from the inception of this case treated as if it were another

"Enron", in which your firm prepared a multi-hundred page report at a cost of more than

$90 million.  Rather than simply resolve those issues that are capable of being resolved

now, you appear dead set on preparing your own "report" before accomplishing anything

of substance.  When the Court told you that it did not want such a "report" before SB

Claims could litigate its claims, you simply decided that you would delay doing your

report until after SB Claims finished its litigation.  As the Court already has told you,

however, this is not Enron.  This is a liquidating estate with less in total asset value than

your firm's bills in Enron.

   *  There is simply no reason why you have not already moved for the full

disgorgement of Pillsbury's fees.  Frankly, there was sufficient basis to do so last

February, when SB Claims discovered Pillsbury's material, undisclosed conflict.  SB

Claims' recent discovery of the undisclosed Tolling Agreement (which you apparently

have known about for some time) further reinforces that fact.  The estate does not need

you to complete another Enron-style report before you move to disgorge Pillsbury's fees.

– 7 –                                      November 16, 2007

It should be done now, so the funds can be safely within the estate, and then distributed to

creditors as soon as possible.

    \*    In regard to the Pillsbury fee issue, it is ironic that you would ask SB

Claims for an indemnity with respect to any agreement that might be made with respect to

the Senior Indebtedness issue.  Have you not considered your own responsibility to the

estate by delaying the recovery of more than $4,500,000 in fees paid to Pillsbury?  In light

of the mounting evidence of Pillsbury's misconduct, we find your continued delay in

seeking to recover those funds inexplicable.  We realize that a quick victory against

Pillsbury would be far less lucrative for your firm than first drafting another Enron-style

report, but the interests of the estate demand the former, not the latter.  Really, Dennis, do

you seriously think that your admittedly taking no action (other than merely telling certain

unspecified "representatives of the Office of the United States Trustee" about what is set

forth in Docket #2558)—thus jeopardizing the collectability of a potential $4,500,000+

asset of the estate—can possibly be justified here?  If so, please be advised that SB

Claims does not agree with you on that score, and that SB Claims again requests you

resign given your, at best, poor judgment as Chapter 11 trustee of this case.

    As to SB Claims' offer to share a portion of its litigation recovery with the estate,

as you undoubtedly know, there is no contractual bar to SB Claims' seeking to overturn

VIA's prior waiver of its senior status.  Pretending there is such a bar and then quoting the

now-disgraced Ron Bender as justification for your demand for indemnity from SB

– 8 –                          November 16, 2007

Claims is just one obfuscation piled on another. Is it really your intention to insult our

intelligence at every turn here? That is certainly the impression you are giving me.

Next, it is entirely reprehensible for you to stoop to the same kind of baseless

claims made by the now-disgraced Ron Bender to the effect that SB Claims is somehow

disqualified from challenging your improper actions because it is only acting out of its

own "personal economic interests". If nothing else, and with a $600,000+ fee application

on file (which SB Claims certainly intends to hotly contest), the same thing can easily be

said of Alston & Bird LLP. Frankly, it was SB Claims acting in its own "personal

economic interests" that exposed the misconduct in this case in the first place. In contrast

your exercise of your own "personal economic interests" has not been as beneficial to the

estate.

Based on your performance so far, SB Claims, which holds approximately

$13,000,000 in claims, will certainly not support any Plan of Reorganization where you

are named as Plan Administrator, and SB Claims hopes that will also be the position of

the many other unsecured creditors whom it believes are dissatisfied with your

administration of this case. To my mind the best present course of action for all

concerned is for the Reconstituted Creditors' Committee to immediately propose a Plan of

Reorganization – naming someone other than you as Plan Administrator – and making

distributions to creditors as soon as possible.

– 9 –                        November 16, 2007

The bottom line here is that SB Claims considers your appointment as the Chapter 11 trustee in this case a terrible error in judgment by a highly politicized Executive Office of the United States Trustee. Be advised that SB Claims intends to attempt to have that mistake corrected to the extent it can do so, for its sake and for the sake of all the other parties in interest in this case. Please govern yourself accordingly.

Very truly yours,

McGRANE GREENFIELD LLP

William McGrane

cc:    Nanette Dumas, Esq. (via e-mail)
       Grant Stein, Esq. (via e-mail)
       Bernard Burk, Esq. (via e-mail)
       Lewis Kruger, Esq. (via e-mail)
       Scott McNutt, Esq. (via e-mail)
       Matthew Gold, Esq. (via e-mail)
       John Shaffer, Esq. (via e-mail)

From: Connolly, Dennis
Sent: Friday, November 16, 2007 8:17 PM
Cc: 'Nanette.Dumas@usdoj.gov'; Stein, Grant; 'bburk@howardrice.com'; 'lkruger@strook.com'; 'smcnutt@ml-sf.com'; 'KJShaffer@Stutman.com'; 'WMcGrane@mcgranegreenfield.com'
Subject: Re: In re SonicBlue

I disagree with every point in your letter. I will respond on Monday.

--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Matthew Sepuya <msepuya@mcgranegreenfield.com>
To: Connolly, Dennis
CC: Nanette.Dumas@usdoj.gov <Nanette.Dumas@usdoj.gov>; Stein, Grant; bburk@howardrice.com <bburk@howardrice.com>; lkruger@strook.com <lkruger@strook.com>; smcnutt@ml-sf.com <smcnutt@ml-sf.com>; Matthew Gold (matthew@argopartners.com) <matthew@argopartners.net>; Shaffer, K. John <KJShaffer@Stutman.com>; William McGrane <WMcGrane@mcgranegreenfield.com>
Sent: Fri Nov 16 19:52:24 2007
Subject: In re SonicBlue




McGrane, Greenfield, LLP

        Matthew Sepuya, Case Clerk



One Ferry Building, Suite 220
San Francisco, California 94111
(415) 283-1776 Fax (415) 283-1777
E-mail: msepuya@mcgranegreenfield.com <mailto:msepuya@mcgranegreenfield.com>
Internet: www.mcgranegreenfield.com <http://www.mcgranegreenfield.com>




Pursuant to the request of William McGrane please find the attached letter concerning the above entitled matter. Thank you.

1

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document.

**From:** William McGrane [mailto:WMcGrane@mcgranegreenfield.com]
**Sent:** Saturday, November 17, 2007 1:13 AM
**To:** Connolly, Dennis
**Cc:** Nanette.Dumas@usdoj.gov; Stein, Grant; bburk@howardrice.com; lkruger@strook.com; smcnutt@ml-sf.com; KJShaffer@Stutman.com; Bernard Greenfield
**Subject:** RE: In re SonicBlue

Dear Dennis:
Is it really necessary to continue this debate by letter? Let's simply say I want you out, and you want to stay, and let the general creditor community, whom you are asking to pay millions to have you stay, and the judge, whom you have deceived by your deliberate silence, decide what should become of you.
Of course, should you choose, supposedly at creditors' expense (thugh subject, as you should always remember, to both our objection and ruling by the court) to continue to fence with us by continued correspondence, we will continue to engage you, point by point, word by word, inch by inch, as you are quite wrong and we are quite right, as you know, all to well. Have a nice weekend.
Bill McGrane


-----Original Message-----
From: Connolly, Dennis [mailto:Dennis.Connolly@alston.com]
Sent: Fri 11/16/2007 5:16 PM
Cc: Nanette.Dumas@usdoj.gov; Stein, Grant; bburk@howardrice.com; lkruger@strook.com; smcnutt@ml-sf.com; KJShaffer@Stutman.com; William McGrane
Subject: Re: In re SonicBlue

I disagree with every point in your letter. I will respond on Monday.

--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Matthew Sepuya <msepuya@mcgranegreenfield.com>
To: Connolly, Dennis
CC: Nanette.Dumas@usdoj.gov <Nanette.Dumas@usdoj.gov>; Stein, Grant; bburk@howardrice.com <bburk@howardrice.com>; lkruger@strook.com <lkruger@strook.com>; smcnutt@ml-sf.com <smcnutt@ml-sf.com>; Matthew Gold (matthew@argopartners.com) <matthew@argopartners.net>; Shaffer, K. John <KJShaffer@Stutman.com>; William McGrane <WMcGrane@mcgranegreenfield.com>
Sent: Fri Nov 16 19:52:24 2007
Subject: In re SonicBlue



McGrane, Greenfield, LLP

    Matthew Sepuya, Case Clerk


One Ferry Building, Suite 220
San Francisco, California 94111
(415) 283-1776 Fax (415) 283-1777
E-mail: msepuya@mcgranegreenfield.com <mailto:msepuya@mcgranegreenfield.com>

Internet: www.mcgranegreenfield.com <http://www.mcgranegreenfield.com>

Pursuant to the request of William McGrane please find the attached letter concerning the above entitled matter.  Thank you.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or
copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document.

*******************************************************
IRS Circular 230 disclosure:  To ensure compliance with requirements imposed by the IRS and other taxing authorities, we inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

_____

NOTICE:  This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee.  If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately by telephone (404-881-7000) or by electronic mail (postmaster@alston.com), and delete this message and all copies and backups thereof.  Thank you.

_____

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN MORGAN, JUDGE


| | |
|---|---|
| In Re: | ) Case No. 03-51775-MM |
| | ) Case No. 03-51776-MM |
| | ) Case No. 03-51777-MM |
| SONICBLUE INCORPORATED; | ) Case No. 03-51778-MM |
| DIAMOND MULTIMEDIA SYSTEMS, INC.; | ) Chapter 11 |
| REPLAYTV, INC.; SENSORY SCIENCE | ) (Jointly Administered) |
| CORPORATION, | ) |
| | ) |
| Debtors. | ) Friday, December 7, 2007 |
| | ) San Jose, California |

Hearing on:

    China Export and Credit Insurance Corporation's motion for
order allowing late-filed claim;

    Portside Growth and Opportunity Fund and others' motion for
continuance of motions for partial modification of settlment
order or, in the alternative, limited stay of proceedings;
and

    Scheduling.


<u>Appearances</u>:

| | |
|---|---|
| For China Export and<br>and Credit Insurance<br>Corporation: | Nicole M. Ossi, Esq.<br>Terra Law LLP<br>177 Park Avenue, Third Floor<br>San Jose, California  95113 |
| For Chapter 11 Trustee<br>and Dennis J. Connolly: | Grant T. Stein, Esq.<br>Alston & Bird LLP<br>1201 West Peachtree Street<br>Atlanta, Georgia  30309-3424 |
| | Cecily A. Dumas, Esq.<br>Friedman, Dumas & Springwater<br>150 Spear Street, Suite 1600<br>San Francisco, California  94104 |

Appearances continued on next page.

2

Appearances continued:

```
For Portside Growth and    Lewis Kruger, Esq.
Opportunity Fund:          Kenneth Pasquale, Esq. (via telephone)
                           Stroock, Stroock & Lavan LLP
                           180 Maiden Lane
                           New York, New York  10038


For Citadel Equity         Glenn S. Walker, Esq.
Fund:                      Skadden Arps Slate Meagher & Flom LLP
                           300 South Grand Avenue, Suite 3400
                           Los Angeles, California  90071


For Creditor US Bank       David R. Weinstein, Esq.
National Association       Weinstein Weiss & Ordubegian, LLP
(via telephone):           1925 Century Park East, Suite 1150
                           Los Angeles, California  90067


For the Proposed           Scott H. McNutt, Esq.
Reconstituted Creditors'   Michael A. Sweet, Esq.
Committee:                 McNutt Law Group
                           188 The Embarcadero, Suite 800
                           San Francisco, California  94105


From the U.S.              Nanette Dumas, Attorney
Trustee:                   United States Trustee, Region 17
                           United States Department of Justice
                           280 South First Street, Room 268
                           San Jose, California  95113


For SonicBlue Claims       Frank A. Merola, Esq. (via telephone)
LLC:                       K. John Shaffer, Esq.
                           Stutman Treister & Glatt, P.C.
                           1901 Avenue of the Stars, Twelfth Floor
                           Los Angeles, California  90067-6013


                           William McGrane, Esq.
                           McGrane Greenfield
                           1 Ferry Building, Suite 220
                           San Francisco, California  94111


For Pillsbury Winthrop:    Bernard A. Burk, Esq.
                           Howard Rice Nemerovski Canady Falk &
                            Rabkin
                           Three Embarcadero Center, Seventh Floor
                           San Francisco, California  94111-4024
```

Appearances continued on next page.

3

Appearances continued:

For Citadel Equity          Glenn S. Walter, Esq.
Fund:                       Skadden, Arps, Slate, Meagher & Flom LLP
                            300 South Grand Avenue
                            Los Angeles, California  90071-3144


For Creditor Riverside      John Murray, Esq.
Claims (via telephone):     Murray & Murray, P.C.
                            19400 Stevens Creek Boulevard, Suite 200
                            Cupertino, California  95014-2548



Digital Court               United States Bankruptcy Court
Recorder:                   Erin Coyle
                            280 South First Street, Room 3035
                            San Jose, California  95113
                            (408) 535-5005



















Certified Electronic        Palmer Reporting Services
Transcriber:                1948 Diamond Oak Way
                            Manteca, California  95336-9124



            Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

*Motion for Order Allowing Late-Filed Claim*                                    4

1   Friday, December 7, 2007                    11:26 o'clock a.m.

2                          P R O C E E D I N G S

3          THE CLERK:  Item 6, SonicBlue Incorporated.

4          THE COURT:  You know, before you all come up and make

5   your appearances, let's just start with item a on calendar.  Are

6   the attorneys present on item a?

7          MS. OSSI:  Yes.

8          THE COURT:  Let's see if we can take care of that

9   matter first.

10         MS. OSSI:  Good morning, Your Honor.  Nicole Ossi

11  appearing on behalf of Creditor China Export and Credit

12  Insurance Corporation.

13         MS. CECILY DUMAS:  Good morning, Your Honor.  Cecily

14  Dumas appearing on behalf of the Chapter 11 Trustee.

15         THE COURT:  Okay.  Good morning to both of you.

16         MS. CECILY DUMAS:  Thank you.

17         THE COURT:  Anything further for the record?

18         MS. CECILY DUMAS:  Well, we have — we have a

19  settlement of the motion.

20         THE COURT:  Okay.

21         MS. CECILY DUMAS:  But we have not been able to

22  consummate it, and will do so at the earliest possible time.

23  The reason we haven't been able to consummate it is because the

24  — the settlement also involves dismissal of a preference action

25  brought against the defendants.

*Motion for Order Allowing Late-Filed Claim*                    5

1          THE COURT:  Okay.

2          MS. CECILY DUMAS:  And the status of the plaintiff of

3    the preference action, which was the old Creditors' Committee is

4    still in limbo.  As soon as we obtain authority to effect that

5    compromise, we will — we will bring it to the Court.

6          THE COURT:  Okay.  Is that acceptable to you to

7    continue this?

8          MS. OSSI:  Yes, Your Honor.

9          THE COURT:  Okay.  How long?

10          MS. CECILY DUMAS:  We had — we had hoped the status of

11    the proper party to pursue preferences would have been resolved

12    long ago.  The trustee filed an application to have my firm, his

13    counsel, pursue the preference actions.  That motion was

14    objected to by the old Creditors' Committee, and the

15    Reconstituted Creditors' Committee counsel has not had an

16    opportunity yet to develop a position.

17          THE COURT:  Should I move this out 60 days?

18          MS. CECILY DUMAS:  Thank you, Your Honor.

19          THE COURT:  Okay.  So — and hopefully no creditor

20    appearance will be required.  How about...  I think I'll go

21    ahead and move you to March 7th at eleven o'clock.  And, as I

22    say, if you're able to work that out in advance of the hearing,

23    then maybe no further appearance will be required.

24          MS. CECILY DUMAS:  Thank you very much, Your Honor.

25          THE COURT:  Okay.

1          MS. OSSI:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Okay.  Now let's take appearances for the remaining

4    matters on calendar for SonicBlue.

5          MR. KRUGER:  Good morning, Your Honor.  Excuse me.

6    Lewis Kruger for Portside and the senior noteholders.  Without

7    being rude, Your Honor I'm going to need to leave court at one

8    o'clock this afternoon.  Hopefully this hearing will be over by

9    then, by my partner Ken Pasquale is on the phone and he will

10   continue if I'm not — if I'm not able to.

11         THE COURT:  Okay.  Thank you, Mr. Kruger.

12         MR. PASQUALE:  Good morning, Your Honor.

13         THE COURT:  Good morning, Mr. Pasquale.

14         MR. WALTER:  Glenn Walter for Citadel Equity Fund.

15         THE COURT:  Good morning, Mr. Walter.

16         MR. WALTER:  Good morning, Your Honor.

17         MS. CECILY DUMAS:  Good morning, Your Honor.  Cecily

18   Dumas appearing for the Chapter 11 Trustee.

19         THE COURT:  Ms. Dumas.

20         MR. SHAFFER:  Good morning, Your Honor.  John Shaffer

21   of Stutman Treister and Glatt for SB Claims.  I believe on the

22   phone is my partner Frank Merola.

23         MR. MEROLA:  Yes, Your Honor.  Thank you.

24         THE COURT:  Good morning, Mr. Merola.

25         MR. MCGRANE:  William McGrane from McGrane Greenfield,

*Motion for Continuance of Motions*                                    7

1   Your Honor.

2        THE COURT:  Mr. McGrane.

3        MR. STEIN:  Grant Stein of Alston and Bird on behalf

4   of the trustee.  Good morning, Judge.

5        THE COURT:  Good morning, Mr. Stein.

6        MS. NANETTE DUMAS:  Nanette Dumas for the U.S.

7   Trustee.

8        MR. MCNUTT:  Your Honor, Scott McNutt and Michael

9   Sweet, McNutt Law Group, on behalf of the Proposed Reconstituted

10  Creditors' Committee.

11       THE COURT:  Good morning, Mr. McNutt.

12       MR. BURK:  Good morning, Your Honor.  Bernard Burk for

13  Pillsbury Winthrop.

14       THE COURT:  And, Mr. Burk, good morning to you.

15       Okay.

16       MR. WEINSTEIN:  If I may, Your Honor, telephonically?

17       THE COURT:  Yes.  We have a number of additional

18  telephonic appearances.

19       MR. WEINSTEIN:  Excuse me.  David Weinstein,

20  Weinstein, Weiss and Ordubegian for the 1996 indenture trustee.

21       THE COURT:  Good morning, Mr. Weinstein.

22       MR. WEINSTEIN:  Good morning.

23       THE COURT:  Do we have Mr. Franklin on the line?

24       MR. MURRAY:  Good morning, Your Honor.  John Murray

25  with Murray and Murray for Riverside Claims.

*Motion for Continuance of Motions*                                    8

1          THE COURT:  Okay.  Good morning, Mr. Murray.

2          I believe that's all the telephonic appearances.

3          Okay.  That brings us to item c on the Court's

4     calendar.  Mr. Kruger.

5          MR. KRUGER:  Thank you, Your Honor.  We should begin

6     in a way by noting that today is not only the sixty-sixth

7     anniversary of the Pearl Harbor attack but it's also for me the

8     forty-eighth anniversary of my admission to the Bar.  So they

9     both coincide.  And I'm always — I'm always reminded of it

10    because the other one sort of keeps it in front of me.

11         I realize that's probably more years at the Bar than

12    maybe some of those who are involved in this proceeding.

13         THE COURT:  Forty-eight years.  Congratulations.

14         MR. KRUGER:  Thank you.

15         THE COURT:  What a wonderful thing to be able to

16    explain.

17         MR. KRUGER:  What I have learned in the course of the

18    48 years, if I've learned anything about the process of the law,

19    is to be very respectful of the facts and not to be persuaded by

20    allegations and innuendo.  And I think what we've had in this

21    case is a lot of allegation and a lot of innuendo.  What we've

22    not had is a full factual presentation yet.  And that's in the

23    process of going forward now with:  A number of depositions, I

24    think four so far, held; lots of document discovery; at least a

25    dozen more depositions, and I may be wrong because the list to

1  me seems to grow daily, but a goodly number of depositions yet

2  to come in this month, many in the month of January.

3          And the purpose of our motion seeking to continue the

4  matter that's now on before the Court now scheduled for February

5  8th, namely the SB Claims' motion, to set aside a portion of the

6  Court's order with respect to the Via settlement, is not one

7  that I believe should be heard by this Court until such time as

8  the discovery is complete.  It is also very much related to the

9  adversary proceeding that has already been brought by SB Claims

10 and in light of that it would make sense, to me at least, that

11 both of those should be heard simultaneously.  There's no reason

12 for them to be heard separately.

13         And I recognize that perhaps SB Claims has decided to

14 change its content and its tactic by moving forward this motion

15 now to set aside a portion of the Via settlement quarter.  And

16 it does so on the basis that Pillsbury may or may not have done

17 some improper and perhaps they have, and I don't know the answer

18 to that.  They have their own counsel who I'm sure will address

19 that issue themselves and certainly is not the subject of

20 today's hearing.  Today's hearing subject is only whether or not

21 there ought to be a continuance.

22         And with respect to that, I think the reason that

23 SonicBlue Claims has sought to get around the problem of

24 awaiting the outcome of the evidentiary process is because,

25 quite frankly, the depositions have not been coming out in

1   support of the views that they have previously taken.

2          Just by way of example, Mr. Kevane at his deposition,

3   counsel for Via, acknowledged that Via knowingly gave up what

4   might have been otherwise a senior claim or at least that's what

5   one might allege, but they knowingly gave that up.

6          Secondly, the documents that created the Via

7   settlement were all done essentially with respect to this issue

8   in June of 2006, prior to the indemnity note sent to Pillsbury

9   on behalf of the senior noteholders by Mr. Bennett.  He sent

10  that note almost three months later.

11          So the factual content has changed I think, and for

12  that reason SonicBlue Claims would like to make an end-run

13  around the process and get what is now really sort of a motion

14  for partial summary judgment before Your Honor.  It does seem to

15  me that that's not an appropriate way for this process to

16  proceed.  It ought to proceed with a full investigation by the

17  U.S. Trustee, which Your Honor has — pardon me — by the Chapter

18  11 trustee, which Your Honor has ordered, and by the completion

19  of the discovery that is now ongoing and that all the parties

20  are participants in.

21          It is certainly not the senior noteholders' desire to

22  delay the process, delay the trial, delay the discovery.  We are

23  happy to see the discovery take place.  We are eager to get to a

24  day of trial because we believe that we will be supported in the

25  conclusions of this Court with respect to the actions of the

1    senior noteholders and their counsel at the time.  There is no

2    reason to think otherwise, and we're not seeking a delay.

3           THE COURT:  How much longer do you need to complete

4    your discovery?

5           MR. KRUGER:  Well, Your Honor, it's hard to know.  My

6    guess is, based on everything I know, that it's not just our

7    discovery, it's the discovery that SonicBlue Claims has brought

8    on as well, as well as the Chapter 11 trustee.  My guess would

9    be that absent something unusual, all discovery ought to be

10   completed some time towards the end of January.  If that were

11   indeed the case, then perhaps — I'm not sure that February 8th

12   is the right day because my guess is that when all of this is

13   done there will be motions for summary judgment made by the

14   various parties and that perhaps after that a trial date would

15   be established.  But I believe that discovery will be completed

16   and others who were a part of that process here may have their

17   own view about that, but I would think it will be, in the main,

18   completed by the end of January.  So —

19           THE COURT:  We're not talking about very long, are we?

20           MR. KRUGER:  No, we're not.  So another reason why I

21   think that the continuance that we've asked for makes sense, as

22   I said, it's now on this motion, the motion of SonicBlue Claims

23   with respect to the partial modification of the Court's order is

24   now on for February 8th.  They have indicated they'd like to

25   have that moved up.  I do believe, as I said before, that I

1  think both it and the adversary proceeding ought to be heard and

2  tried together.  The factual content is the same.  The

3  allegations that are made are largely overlapping.

4        They have originally said that there was a fiduciary

5  breach by the senior noteholders and their counsel.  They point

6  to fiduciary breaches perhaps by Pillsbury.  All of that, it

7  seems to me, is part of what they've always put together, and

8  now they've broken out this piece in order to try to get a

9  quicker resolution before the completion of the discovery

10  process.  I don't think there's any reason for that to take

11  place.

12        At the very least, it seems to me that just for

13  judicial economy we ought to have all of this going on

14  simultaneously.

15        I don't know that I have a lot more to say about this,

16  Your Honor.  It just seems to me to make eminently good sense to

17  just simply keep things where they are.  And perhaps if the

18  Court thought it appropriate, maybe we have a conference or a

19  status conference in the latter part of January just to see

20  where we all are.  I think that was the recommendation of the

21  Chapter 11 trustee in his papers, that there ought to be maybe a

22  conference at some point to see where we are at the completion

23  of discovery.  That may make perhaps the most sense, but I

24  really do think, as I said, my underlying point is that I think

25  it all ought to be tried together, whenever that is.  But it

1    certainly ought to be at the conclusion of the evidentiary

2    process.

3            Beyond that, Your Honor, I think all the rest is

4    restating everything that's been in the various papers.  And God

5    knows we have produced enough papers in this case on all sides

6    to, I think, fell a forest.  Hopefully we can find some way to

7    stop that by having that all take place simultaneously, when

8    everybody is in full command of all of the facts, such as they

9    may be and such as they will be run through the discovery

10   process.  Thank you, Your Honor.

11           THE COURT:  Thank you, Mr. Kruger.

12           Mr. Shaffer.

13           MR. SHAFFER:  Thank you, Your Honor.  I just wanted —

14   would like to put this motion into a little bit of context for a

15   moment, if I can, first of all.  One thing that Mr. Kruger did

16   not mention but I believe the Court is aware of is that there is

17   a motion to stay not only the present motion, the

18   fraud-on-the-Court motion, but the entire adversary proceeding,

19   which has now been scheduled for January 11th in the District

20   Court.

21           THE COURT:  Well, Mr. Kruger asked me in his papers to

22   stay this matter also, but he didn't address it in his remarks.

23   So I don't know —

24           MR. KRUGER:  I'm happy to do so, Your Honor, if you'd

25   like.

1          THE COURT:  Are you still proceeding on that aspect of

2    your motion?

3          MR. KRUGER:  Yes.  Yes, we are, Your Honor.

4          THE COURT:  Okay.

5          MR. SHAFFER:  Well, Your Honor, so in that regard the

6    Court is — as Your Honor knows, the normal procedure under Rule

7    8005 is to address motions to stay first to this Court and the

8    District Court.  To the extent it wishes to entertain that

9    motion, usually looks to this Court for this guidance on those

10   issues.  And so I would anticipate that the Court has that

11   consideration in mind.

12         There is also a motion to withdraw the reference that

13   is pending now, and Mr. Kruger has not asked this Court to stay

14   matters based upon that.  And he has, however, asked the

15   District Court to stay proceedings in this Court based upon

16   that.  But, again, whatever this Court ultimately decides today

17   I suspect will be informed somewhat by what ultimately the

18   District Court will be seeing on January 11th.

19         THE COURT:  You know the District Court's going to do

20   whatever it's going to do and we're just going to proceed.

21         MR. SHAFFER:  Well, the District Court is going to do

22   whatever it's going to do, but the law is very clear, Your

23   Honor, that the District Court is to give discretion to this

24   Court in terms of its views as to how to manage its calendar on

25   a stay.  And I think the District Court will be most interested

1   in understanding this Court's views on those issues.

2          Your Honor, when we filed — well, let me even step

3   back a little bit further.  As Your Honor knows, the trustee was

4   appointed, I believe, April 17th, commenced his own informal

5   discovery in May, which we did ask to be a part of and were

6   politely declined to participate in.

7          We commenced our own adversary proceeding, which the

8   trustee and the noteholder sought to stay.  We tried to bring

9   some discovery, which the noteholders and the trustee sought to

10  stay.  And ultimately, Your Honor, we reached what we thought

11  was a resolution as to the discovery process, to work together

12  to come up with a discovery plan.  And that was — that process

13  started in September.  It still is not complete in terms of

14  completing a discovery plan.

15         But, Your Honor, what had happened since that time,

16  and I know the trustees — Mr. Stein is here and he will

17  undoubtedly have a different take on it than I do, and I respect

18  that.  But, Your Honor, what has happened instead is almost a

19  reversal of what was going on last summer.  Instead of a

20  sequencing where the trustee was going to do his investigation,

21  come up with his report, and then parties were going to

22  litigate, we — we have a circumstance now where the trustee has

23  told people that the SonicBlue Claims' noteholders trial will go

24  forward and be completed before his investigation is completed.

25  And I think all we've managed to do is shift around the deck

1   choose on the *Titanic*.

2          Your Honor, I don't look to the trustee, my client

3   does not look to the trustee to make our case for us.  As Your

4   Honor has already noted, SonicBlue Claims is somewhat capable of

5   taking care of itself.  But at the same time, Your Honor, when

6   the trustee is aware of relevant facts, critical facts, and

7   those facts are not being communicated, instead what we get are

8   status reports that really say virtually nothing and a

9   disclosure statement which we were within days of going to

10  hearing on which said, as it now turns out, very little compared

11  to what we've learned, for example, with the new Pillsbury

12  conflict, it's very difficult, Your Honor, for private parties

13  to litigate, because we don't know what we're getting.

14         And to give an example, an example we cited in our

15  papers, we received approximately 2,000 pages of Pillsbury

16  documents, which Mr. Burk has told us many times was a great

17  deal of work to put together.  But it wasn't until I spent a few

18  weeks reading all of them, that I realized they all stopped on

19  February 15th, 2007.  And when I asked I was told:  Well, that's

20  because Mr. Burk says it was an agreement.  Mr. Stein says it

21  was just a temporary understanding, or something to that effect.

22  But whatever it was it wasn't communicated to us.

23         So we spent — first of all, we had a document

24  production which in my view was not sufficient to begin with.

25  But then we were presented with it and went through it, not

1    knowing that what we were looking at wasn't complete.  And the

2    justifications for not producing after February 15th, in our

3    view, were simply without merit.

4          Your Honor, under those circumstances the combination

5    of the trustee saying that his investigation was going to

6    proceed to some outside date beyond our litigation,

7    circumstances where we felt that we were fighting — you know,

8    basically fighting with Jell-O; and, frankly, Your Honor, taking

9    to heart comments that this Court had made that some of the

10   issues in this case just aren't as complex as everyone wants to

11   make them, we went ahead and filed the fraud-on-the-Court

12   motion.  In our view it's a very simple motion.  And the facts,

13   while there are many, many, many, many facts yet to learn in

14   this case, I don't dispute that for a moment, but the facts upon

15   which our fraud-on-the-Court motion are based are, in our view,

16   already in the record and absolutely undisputed.

17         And what Mr. Kruger did not do when he came here

18   moving for a stay was provide you with evidence, even disputed

19   evidence, refuting any single one of the facts that are set

20   forth in our motion.  There is no dispute that Pillsbury had a

21   conflict.  There is no dispute that the conflict was not

22   disclosed.  There is no dispute that whether or not in fact the

23   Via claim was or wasn't senior, it was an issue that was

24   important to the noteholder, because they admit in their own

25   papers they insisted on the provision.  It is not disputed that

1    the noteholders were threatening to sue Pillsbury.  Under that

2    state of facts, no matter what else you assume, there was

3    absolutely no reason why Pillsbury should have proceeded with a

4    motion that had an undisclosed benefit for the noteholders.

5         And they can talk about, well, that provision of the

6    agreement was negotiated in June before the threat was made.

7    For purposes of today I will stipulate that, but the motion

8    wasn't filed before the demand was made.  The settlement

9    agreement wasn't signed before the demand was made.  And the

10   decision, whether it was conscious or unconscious not to

11   disclose the via waiver, was not made before the threat was

12   made.

13        And what the courts have told us, Your Honor, for

14   example the Supreme Court and Justice Douglas in the *Woods*

15   decision is that it is not for us to inquire — inquire as to the

16   motivations of a conflicted professional.  Rather, when a

17   professional is conflicted, they must stop.  And the sanction

18   for that is the invalidity of what has happened, because that is

19   what protects the integrity of the bankruptcy system.

20        I have absolutely no doubt, Your Honor, that every

21   Pillsbury witness will testify in their deposition that they

22   were not influenced by the conflict when they acted.  But it is

23   for that reason that the courts have told us to ignore

24   motivation.  Fraud on the court is based upon the existence of

25   an undisclosed conflict.

1          And, Your Honor, I'll circle back around.  I respect

2    the situation that the Court is in.  This is undoubtedly one of

3    the most difficult cases that the Court has had to face.  This

4    is probably one of the most difficult cases pending in the

5    United States right now, in light of what has happened here,

6    that members of the Bar are involved.  And it's obvious — the

7    Court is obviously under a microscope, and I think the Court

8    understands that, and I respect that, not the least of which

9    that there are pending District Court decisions.

10          I respect the fact that the Court would like to have a

11   full record before it decides issues.  I respect the fact that

12   the Court would like to have parties to have an opportunity to

13   take discovery if they claim they need discovery.  And, Your

14   Honor, for those reasons we're not pushing to have this motion

15   go forward in December now, although we had scheduled it for

16   today.  We scheduled it 37 days ago on issues that really aren't

17   a surprise to anybody.  But nonetheless, Your Honor, we

18   understand that and we would be willing to have this hearing in

19   January.

20          But, Your Honor, I think it requires a commitment by

21   the parties, including the trustee, that the investigation of

22   what Pillsbury did in this case is simply a matter of common

23   interest of the trustee, of SonicBlue Claims, of the

24   Reconstituted Creditors' Committee, it is a matter of common

25   need to find out what happened here.

1          Now my client has specific, as the trustee says,

2     parochial reasons for wanting to know what happened here.  But

3     just because my client has its own parochial interest does not

4     mean that the estate does not have an equally vital interest in

5     knowing as soon as possible what happened here.

6          Frankly, Your Honor, I know Pillsbury has denied doing

7     anything wrong, just as they denied, I believe, Mr. Moran's

8     comment on February 15th was a frivolous claim on top of a

9     frivolous claim — I hope I quoted that correctly.  But, Your

10    Honor, it's appalling.

11         The Creditors' Committee has filed a motion to compel

12    Pillsbury to disgorge on an interim basis which motion is now

13    scheduled for December 18th.  No one at this point has asked to

14    stay that motion.  I do not want delay if there is delay with

15    respect to our fraud-on-the-Court motion to also be used as an

16    excuse to delay what I think is an essential remedy now for the

17    estate, to bring that money back in, if nothing else on an

18    interim basis to protect those funds.

19         The Court should recall that in addition to the fact

20    that the estate has what I would now say the least very

21    coverable claims to recover over $4 million from Pillsbury in

22    fees they paid, but also potential damage claims for malpractice

23    and beyond.

24         Moreover Your Honor will recall that the noteholders

25    themselves have asserted what mathematically turns out to be

1    between 13 and $15 million in claims against the Pillsbury firm,

2    based upon the opinion letter.

3            I have grave concerns, Your Honor, about allowing

4    funds to remain in the Pillsbury firm through the conclusion of

5    an investigation that we're not sure when it's going to end and

6    the conclusion of litigation that is yet to begin from the

7    standpoint of the trustee.  I don't understand why the

8    Reconstituted Creditors' Committee had to bring the motion they

9    brought.

10            Mr. Connolly in his letter to Mr. McGrane said that

11   the trustee knew about that issue for months.  He used the

12   phrase "months."  They — the trustee says he had no duty to tell

13   us.  I'm not sure that 707 says that.  Now 707 I will admit says

14   that we have to make — if we make inquiry the trustee has to

15   tell us.  But I don't think I have to play a game of 20

16   questions to find out something so shocking as this, but rather

17   to get it in a pile of documents.  I believe based upon the

18   chronology that the trustee knew about this when his disclosure

19   statement was pending.

20            And I understand that the trustee had a vision at the

21   beginning of this case, because the trustee told you the vision,

22   that it was going to be a full investigation, finish a report,

23   and then we'll reach conclusions about how we litigate.  I

24   understand that that was — the trustee told us, but my

25   understanding was that this Court, at least I thought, Your

*Motion for Continuance of Motions*                                    22

1   Honor, and I respectfully — if I'm wrong, I apologize, but I

2   thought, Your Honor, after we went through the trouble with the

3   stay motion, with the protective order motion, that — with the

4   comments of the Court that, you know, 'Respectfully, Mr. Stein,

5   this is not Enron,' but we got over that and that we weren't

6   going to wait until we finished the investigation of everything

7   before we started doing things that were necessary to complete

8   the case.

9           And this unbelievably shocking discovery about

10  Pillsbury, in my view, compelled immediate action.  We are

11  deposing Pillsbury witness — we have already started deposing

12  one, the deposition's not complete.  We're trying to depose

13  others.  Mr. Burk has said a couple of them won't be available

14  until the middle of January.

15          Your Honor, we would have started taking some of those

16  depositions a lot sooner had we known that what happened in this

17  Court on March 19th was — was a fraud.  And I don't say that

18  lightly.

19          So, Your Honor, I understand that our motion kind of

20  messed up the order of things, perhaps, for people a little bit.

21  But the order needed messing up.  And I am — I will tell you,

22  Your Honor, I am — I am heartened by the fact that since we did

23  this, the trustee has noticed multiple 2004 examinations.  I am

24  — that does encourage me.  But I think this motion is important

25  because of what it's done and because of what it will continue

*Motion for Continuance of Motions*                                    23

1    to do.

2           As Mr. Stein said in his email recorded, well, your

3    Rule 60 motion does change things.  It did.  And I don't want it

4    indefinitely stayed to just regress back to where we were.

5           Anyway, Your Honor, I apologize for going on so long.

6           THE COURT:  You've covered a lot of territory.

7           MR. SHAFFER:  Yes.

8           THE COURT:  And I think it's appropriate and I

9    appreciate seeing a broader view of the case, so I thank you for

10   that, but you have covered a lot of territory.

11          MR. SHAFFER:  I understand that, Your Honor.  And

12   unless the Court has any further questions, I will —

13          THE COURT:  That's fine.

14          MR. SHAFFER:  — take leave.  Thank you.

15          THE COURT:  Mr. Kruger.

16          MR. KRUGER:  Just very briefly, Your Honor.  I'm

17   delighted that Mr. Shaffer does everything with such aplomb and

18   such great presentations, but the reality of it is —

19          THE COURT:  Mr. Kruger, —

20          MR. KRUGER:  Well, —

21          THE COURT:  — as do you.

22          MR. KRUGER:  Well, thank you.

23       (Laughter.)

24          MR. KRUGER:  But I look at what he's had to say.

25   This, I believe, is a hearing about a motion for continuance of

1    his motion.  It is nothing more than that.  It's not about

2    Pillsbury, what they did, what they didn't do.  If I understand

3    his motion, it doesn't seek any relief against Pillsbury.  It

4    only seeks relief against the senior noteholders.

5          And we mustn't forget that although he pretends in a

6    way to be the representative of the great unwashed, everybody in

7    the case, the estate, everybody else, but the reality of it is

8    he represents a couple of hedge funds who are eager to get some

9    money from my clients.  That's what this is all about.  It's

10   about, you know, and to put it crudely:  Greed and avarice.

11   It's not about justice and the American way or truth.  He may

12   pretend and put it all together in that package because it's

13   convenient, but the reality of it is that that's not what this

14   is about.

15         THE COURT:  Well, that's left to me, isn't it?

16         MR. KRUGER:  Yes, it certainly is.  Thank you, Your

17   Honor.

18         THE COURT:  Okay.  Is there anyone who wishes to be

19   heard with respect to item c on the calendar, the motion for

20   continuance?

21         I don't know whether you want to reserve your comments

22   for scheduling, Mr. Stein, or whether you want to be heard on

23   this specific motion.

24         MR. STEIN:  Actually, Your Honor, I'm going to step up

25   to the podium.  With respect to this specific motion and of

1  course some comments with respect to the other issues that were

2  raised, the trustee's position is there should not be a stay.

3  That's point one.

4          The trustee's position is that there should be a

5  scheduling conference in January as discovery moves forward so

6  that the degree of overlap between the issues raised in the Rule

7  60 motion and the adversary proceeding, are they overlapping the

8  way it appears that they are, is it in fact appropriate for them

9  to be consolidated and tried together, let's figure that out in

10  early January.

11          Now I think, I don't have it on my calendar, that we

12  had as conference scheduled for the 17th of January, although

13  right now that's — I'm not sure that that's right, but we

14  actually have Mr. Bender scheduled for deposition that day.

15  That doesn't mean that people can't participate in a discovery

16  conference telephonically, but those are the —

17          THE COURT:  Ms. McGowan, do we have something

18  scheduled for January 17th?  I don't — I'm not aware of that.

19          THE CLERK:  No.  But we have some on December 17th.

20          THE COURT:  December 17th.

21          MR. STEIN:  I'm obviously wrong, but the idea is some

22  time in the first earlier part of January, because discovery is

23  going to be moving forward, there is scheduled right now, as we

24  work together on the joint discovery to come up with our

25  scheduling, we've got Mr. Bender; Mr. Rankin; Mr. Goldstein —

*Motion for Continuance of Motions* 26

1   who worked for the Schulte Roth firm, still does, and was one of

2   the drafters of the indenture; representative of SonicBlue

3   Claims; Mr. Lee and Mr. Wan (phonetics), who were the folks with

4   Via who were around back in 2001 and 2002 when the indenture was

5   done, although not involved in that, but involved with the Via

6   loan, and then involved with Mr. Kevane back in — again in 2005

7   and 2006 when the deal was done.  They're scheduled.

8         You've got the Pillsbury people scheduled.  You've got

9   O'Melveny witnesses that need to get scheduled.  Senior

10  noteholder representatives.  Mr. Bennett that's going to be

11  scheduled.  So far Mr. Todd, who was a business person at

12  Pillsbury who was involved in a high level of oversight in

13  connection with the indenture back in 2002.  Mr. Cohn who was a

14  Pillsbury lawyer who was involved in the drafting of the

15  indenture in 2002 and on through some issues that occurred early

16  in the bankruptcy.  Mr. Kevane and Mr. Boro, a Pillsbury lawyer

17  have also been taken so far.

18        THE COURT:  When do you think you're going to complete

19  discovery?

20        MR. STEIN:  I anticipate that, as was said here, that

21  some time in January, as we get into early February that folks

22  are working together, we've got a master calendar, that we're

23  doing what has to be done to get everyone identified and put I

24  place to move forward.  And that brings me to the other issue,

25  and I am going to respond if the Court will allow me.

1        You got to look at how we got where we got.  We

2   started in May 17th, the trustee, with informal discovery,

3   always intending to move forward subsequently to formal

4   discovery.  We got into September.  Instead of the trustee

5   acting alone it became a joint-discovery effort.

6        Then we come to October 15, when the trustee is

7   allowed at that point, the Court authorized us to waive

8   privilege and literally, immediately, even before the order was

9   entered, the documents that had privilege issues with them, the

10  O'Melveny documents, the Pillsbury documents was returned over

11  to sobs, what we had — literally, as indicated, hundreds of

12  thousands of pages of documents.

13        In connection with that, effort had to be made to look

14  at those, and then the discovery process gets started.  Now our

15  view at that time, the trustee's view was the sobs' issue in

16  getting the adversary tried was preeminent and we were going to

17  backburner the issues with Pillsbury.  Didn't mean we stopped

18  investigating those.  It's just that the idea was get the

19  adversary tried first and we will finish our investigation.  We

20  said we were going to get it done in the first quarter.

21        And one of the things I want to point out, we're not

22  planning to file an Enron report.  We're planning to file

23  pleadings.  There are pleadings relating to Pillsbury, pleadings

24  relating to the senior noteholders — in addition to what's

25  already been done vis-a-vis the objection on the OID basis

1  that's been filed and is scheduled for status conference ten

2  days from today.  But you've got pleadings, and that will also

3  address Levene, Neale.  That's the plan.  It's not just to do a

4  report, it's to actually take what we've looked at, the facts

5  we've uncovered, make determinations, and ad- —

6        THE COURT:  I'm glad to hear that.

7        MR. STEIN:  Okay.  Well, and — and we thought that

8  that was —

9        THE COURT:  Right.

10       MR. STEIN:  We thought that's what we were supposed to

11  do, and that's the plan and that is in process, because there's

12  a lot of documents that you can be looking at and putting that

13  in place while we're still taking depositions in Rule 2004

14  exams.

15        But the point that I want to make is nothing prompted

16  us to start sending out Rule 2004 notices.  We had stepped aside

17  to let SonicBlue Claims put its case on a fast track.  And, as

18  it became appropriate, when certain things weren't being

19  scheduled that we wanted to make sure were scheduled, we in

20  connection with, in connection with the discovery plan that's in

21  front of Your Honor in ten days, if the discovery plan isn't

22  approved we then needed to have 2004 motions filed, because that

23  discovery plan that we've been working on since — well, since

24  September identified and authorized Rule 2004 examinations,

25  where all we'd have to do is send out subpoenas instead of

1  filing motions and getting orders because there's been some

2  issues about whether there really is full agreement and whether

3  that discovery plan should apply to the Rule 60 motion, we said:

4  Look, we just got to file our 2004s.  Nothing prompted that

5  except common sense, the Rule 60 motion did not prompt that.

6           As you move forward, — I've got three other brief

7  points to make.  Point number one, with regard to the tolling

8  agreement.  Absolutely, that's something the trustee's been

9  aware of for quite a while.  And all you had to do was take a

10  look at the D&O litigation that was filed, which is what led us

11  to go ahead and investigate, ask for, and obtain a copy of the

12  tolling agreement.

13          But every time the trustee finds something that's

14  significant, the trustee's not going to file a pleading and say,

15  'Hey, look what we got, look what we found.'  We're doing an

16  investigation to cover the full panoply of facts, to make sure

17  that we get that in the context of an investigation, to make

18  conclusions, and to not seriatim every time something comes in

19  that's good turn that over.  In fact we were asked —

20          THE COURT:  Good or bad.  Okay.

21          MR. STEIN:  Well, Freudian slip.

22          Every time we find an interesting document or a

23  significant document — but that's the point.  And, in fact, in

24  our discussions after we turned what we had over to SonicBlue

25  Claims, the discussions were:  Can we have a communication with

1  you about significant documents that you found.  And the answer

2  was:  No, we can't do that.  Because for us to have a

3  communication with SonicBlue Claims every time we find something

4  that's interesting with regard to the senior noteholders or

5  Pillsbury, we're going to have communications with the others

6  every time we find something interesting with respect to

7  SonicBlue Claims, that's not our view of how to be independent.

8  And we wanted — we'll look at it, we'll call our own shots the

9  way we see it and so will others.  But we're not joining with

10 anyone, except with respect to the Creditors' Committee, because

11 where we are with the Creditors' Committee right now is we've

12 been discussing with the committee plan issues.

13         We're working on trying to be able to move that

14 forward.  We've been discussing how to get that going and how to

15 get settlement issues going, okay.  That's our discussions with

16 the committee.  We think that that can be very fruitful.  The

17 constituencies are the same.

18         We as trustee, Mr. Connolly acts in the best interests

19 of the estate.  The unsecured creditors, the Creditors'

20 Committee, our actions on behalf of the estate and the

21 committee's actions on behalf of unsecured creditors, those

22 should be in alignment.  And we're working to ensure that that's

23 the case.

24         Now will that come to fruition that a plan gets filed?

25 Originally back in September we were asked to hold off until we

*Motion for Continuance of Motions*                                    31

1   got further along in the investigation to see how what we found

2   would impact and benefit unsecured creditors.  We're further

3   along and we plan to work with the committee to move down that

4   path which will let us do all the things that we're talking

5   about.

6        I could go on and on and on.  There were a lot of

7   things said in the pleading that at some point I'm sure I'll get

8   a chance to address.  But coming back to the issue here today,

9   should a stay be granted?  No.  Senior noteholders shouldn't get

10  a stay.

11       We would ask, though, that the issue of the degree of

12  overlap and whether the Rule 60 motion as to Pillsbury should be

13  consolidated with the adversary, let discovery develop a little

14  bit more.  We've addressed the competing issues briefly in our

15  pleading and make a determination on that some time — our

16  recommendation is some time in earlier January, early to

17  mid-January.  And then parties can roll on and go from there.

18  Thank you, Judge.

19       THE COURT:  Thank you, Mr. Stein.

20       Before I come back to you, Mr. Shaffer, Mr. McNutt,

21  did you wish to be heard?

22       MR. MCNUTT:  Thank you, Your Honor.  Remarkable —

23  remarkable case.  Amazing case.  Not seen anything like it.

24  It's an honor to be listening to such excellent lawyers.  Never

25  have so many lawyers done so much for such a small case.

*Motion for Continuance of Motions* 32

1    We've been hired by the Reconstituted Creditors'

2  Committee, subject to the Court's approval.  We're trying to

3  move this case along.  I can only offer general comments.

4    In general, this is a case where I think the Band-Aid

5  has to be ripped off as quickly as possible and various pieces

6  will come to Earth where they come to Earth.  The more time

7  lawyers have to conduct discovery the more time they need.  It's

8  just a general rule, as far as I can tell.

9    Whether a few more weeks will help, if that never

10 hurts anybody, that's fine.  But the Creditors' Committee is

11 determined to move forward, circulate a plan in a week or two,

12 try to get people to sign up on it, try to build some consensus.

13 Leave marginal issues marginal.  Make sure that assets are

14 realized.  Make sure that litigation rights are not lost in any

15 way, but always with the focus moving it along toward

16 confirmation, toward distribution.  That's what we're here for.

17    And the committee would particularly like to get the

18 Court's support in not — not letting this dog be wagged by so

19 many tails.  It's been a long time and this should be able to

20 move forward, even with all this going on in the background.

21 Thank you, Your Honor.

22    THE COURT:  Okay.  Mr. Burk.

23    MR. BURK:  Your Honor, we raised specifically some

24 discovery timing issues and I want to know where the Court would

25 like to fit them into the discussion today.

1          THE COURT:  I haven't forgotten about you.

2          MR. BURK:  I understand.

3          THE COURT:  And we've gone way far afield from the

4   motion that is pending before the Court, but I want to come back

5   to the timing of discovery.  We'll come back to that after I

6   rule.

7          MR. BURK:  That's fine, Your Honor.

8          THE COURT:  Okay.

9          MR. BURK:  Then some very strong words were used

10  before with respect to — I'm sorry.  Let me come forward for one

11  moment.  Some very strong words were used earlier today with

12  respect to accusations that were made about my client.  I am

13  deeply concerned that the Court not prejudge those issues.

14          From the very beginning of the difficulties that

15  Pillsbury Winthrop has had in this case, the Court has taken

16  great care to make sure the decisions are made on the basis of

17  appropriate information and on the basis of a full record.  The

18  Court has exerted great effort to control these proceedings to

19  ensure the parties have their due process rights.

20          It is easy to swing around vituperative epithets that

21  have to do with people's purportedly bad intent, and it's a lot

22  harder to prove those things.

23          The — the merits of the various motions that are

24  before the Court are not before the Court today.  And I am not

25  going to take the Court's time today to explain those — those

1    things.  But, rest assured, the Court will hear from Pillsbury

2    and will hear fully about all of those issues.

3          The issues before the Court today are scheduling.  And

4    I want to, if I may, please, presume to remind the Court about

5    its wise desire to make sure that it handles serious accusations

6    and substantial claims on the full record and not in an Alice in

7    Wonderland fashion, like the Queen of Hearts who shouted at the

8    tea party:  "Sentence first, verdict afterwards."  That's not

9    want way things are supposed to work and they have never, in my

10   experience, worked that way in this Court, not in this case or

11   any other case I've had here.

12         And so with that, with the Court's permission, I will

13   defer further comment, but the words that were used were so

14   strong and are of such grave concern both to me and to the good

15   people that I represent, that I really felt I had to say that

16   much.  And if the Court has questions, I would answer them, but

17   that's all I need to say for now.

18         THE COURT:  Okay.  I appreciate your perspective.

19   Thank you, Mr. Burk.

20         Okay.  We've gone way far afield from the motion

21   that's before the Court.  Is there anyone else who wishes to be

22   heard?  Mr. Shaffer.

23         MR. SHAFFER:  Your Honor, I'll be — I'll be extremely

24   brief in respect to Mr. Kruger's schedule, among other things.

25         Your Honor, I obviously don't agree with a number of

1    things Mr. Stein said, but I was heartened by the reference to

2    the trustee working with the Reconstituted Committee towards

3    working towards a plan.  I think that's a very encouraging

4    development.

5              I do believe, Your Honor, however that, yes, Mr. Stein

6    need not have me on speed dial every time something interesting

7    pops up, but there are some things of such great magnitude, Your

8    Honor, that I believe both the Court and the parties need to

9    know, because it affects how the litigation is conducted.

10             For example, as we noted and we'll get to scheduling

11   in just a second, Pillsbury has made an assertion of privilege

12   for communications post-February 15th.  If it turns out in fact

13   that there was a fraud in this Court on March 19th, which this

14   Court has not determined — and Mr. Burk is correct — but if it

15   turns out, that may affect the claim of privilege.

16             The existence of this tolling agreement obviously is a

17   very material relevant factor in that.

18             And on the issue of — on the issue of scheduling, Your

19   Honor, if I — oh, one other thing.  I do want to — Mr. Burk is

20   absolutely right that this Court has not prejudged anything.

21   And I would ask this Court for the assistance of the District

22   Court, respectfully I ask this Court to reiterate that point

23   once again, because concerns have been raised in the stay and

24   withdrawal motion by Mr. Kruger on that issue and I think he and

25   I can debate that, but there's only one person in the world who

*The Ruling of the Court* 36

1    can answer that.  And I think the District Court would be — it

2    would be beneficial for the District Court, for this Court to

3    reiterate its views on that issue before the Court addresses it

4    itself.

5            On the issue of scheduling, Your Honor, if I may

6    introduce that now very quickly, we are trying to take

7    depositions of Pillsbury people as soon as possible because of —

8            THE COURT:  Let's not talk about scheduling yet.

9            MR. SHAFFER:  Okay.

10           THE COURT:  Let's come back to scheduling in —

11           MR. SHAFFER:  Okay, Your Honor.

12           THE COURT:  — two weeks.

13           MR. SHAFFER:  Thank you, Your Honor.

14           THE COURT:  Okay.  Okay.  With respect to the motion

15   for a stay, is there anyone else who wishes to be heard?

16       (No audible response.)

17           THE COURT:  Let me just review my notes for a minute

18   and see if I can respond.

19       (Pause in the proceedings.)

20                      THE RULING OF THE COURT

21           THE COURT:  Okay.  Well, let me just say that I learn

22   new facts in this case every time you all are before me.  And so

23   I certainly don't feel that I've prejudged the case and that it

24   is valuable.  As you proceed with discovery and as you bring new

25   facts before me, I am very receptive to learn what really

1    happened in this case.

2         Preliminarily, with respect to the motion for a stay I

3    want to point out that the motion before me asks me to continue

4    or stay the hearing of two motions:  SB Claims' motion for

5    partial relief from the order granting the debtor's motion for

6    approval of the settlement of the Via-Intel litigation and,

7    secondly, SB Claims' motion to modify or vacate in part the

8    order approving the Via settlement based upon fraud on the Court

9    due to Pillsbury's failure to disclose a conflict of interest.

10        Only that latter motion which you all have called the

11   fraud-on-the-Court motion, Docket Entry Number 2548, has been

12   noticed for hearing.  As a result, that's the only motion that

13   I'm going to address today.  Any issues that surround the

14   continuance of the motion for partial release — relief from the

15   settlement, which is Docket Number 2545, should be raised if and

16   when that motion is set for a hearing.

17        So turning to the senior noteholders' request to

18   continue or stay the hearing on the fraud-on-the-Court motion,

19   I've given a great deal of thought to the arguments presented by

20   all of the parties, but after careful consideration I have

21   concluded that neither a continuance pending discovery nor a

22   stay pending appeal is appropriate.

23        First, the record before me fails to demonstrate that

24   the ongoing discovery is necessarily relevant to the issues

25   raised in the fraud-on-the-Court motion.  Rather, it's related

1    to issues in the adversary proceeding between the noteholders

2    and SB Claims or to the trustee's investigation into whether

3    Pillsbury should be required to disgorge fees.

4          Further, as SB Claims ably points out, the basic facts

5    surrounding Pillsbury's failure to disclose a conflict of

6    interest are already part of the record before me.  Now it may

7    be that additional discovery can dispute the record that is

8    existing, but the basic facts are in the record.

9          It's not apparent from anything you all have said that

10   any further discovery is needed to proceed to hearing on this

11   fraud-on-the-Court motion.  So, as a result, it would be

12   inappropriate to use my discretionary powers under Section 105

13   of the Code to continue the hearing of this motion pending the

14   completion of further discovery.

15         Similarly, the senior noteholders have failed to

16   establish a basis for staying the hearing pending resolution of

17   the appeals pending before Judge White.  An appellant seeking a

18   discretionary stay under Bankruptcy Rule 8005 must establish

19   four factors.  You all are familiar with them.  I'm not going to

20   recite them or the cases.  But the cases demonstrate that the

21   courts in this district recognize that the party moving for a

22   stay has the burden of proving each of the four elements.  The

23   failure to meet any one of them results in the denial of the

24   motion.

25         Here, the senior noteholders have failed to establish

*The Ruling of the Court*                                          39

1   that they're likely to succeed on the merits of their appeal.

2   They merely urge that I made erroneous factual findings in my

3   earlier decision regarding Pillsbury's disqualification as

4   debtor's counsel, but yet they failed to make any specific

5   argument regarding any finding that they rely on to support this

6   contention.

7           Further, for the reasons that were explained in my

8   denial of the noteholders' motion for clarification, I don't

9   believe that any findings that they've challenged to date which

10  delete with the appearance of impropriety were erroneous.

11          While that alone would be enough to deny the motion

12  for a stay, it's also apparent that the imposition of a stay is

13  likely to further delay the prompt resolution of the adversary

14  proceeding as well as the administration of the case as a whole.

15  As I've previously indicated, this case is already over four

16  years old without any distribution to creditors.  Those

17  creditors are entitled to a prompt resolution of this case and

18  further delay is likely to cause them substantial harm.  Delay

19  is also likely to hurt the public interest in the efficient

20  administration of bankruptcy cases.

21          For all of these reasons, the motion to continue or

22  stay the hearing related to SBC — SB Claims' motion to modify

23  and/or vacate in part the order the order approving the Via

24  settlement based upon fraud-on-the-Court due to counsel's

25  failure to disclose a material conflict of interest is denied.

1          So now that brings us back to the scheduling issues,

2     and you all have expressed your views, but I am willing to talk

3     more about your views on this.

4          Mr. Shaffer, in particular you did not like that

5     February 8th date.  And let me say also that my staff put you on

6     February 8th because that's normally where a law-and-motion

7     matter would go.  You all, though, are the exception.  You're

8     not a normal case, and I am very open to specially setting a

9     matter as significant as this.

10         On the other hand, I want to keep in mind the fact

11    that I've heard you say that discovery won't really be complete

12    until the end of January, and it's not very long.

13         MR. SHAFFER:  Your Honor, having heard all the

14    arguments today and understanding where, among many things —

15    many things, where the Court is, we will stay with the February

16    8th hearing date.

17         THE COURT:  Okay.

18         MR. SHAFFER:  I would ask Your Honor, though, when we

19    talk about the scheduling, there is a significant issue with the

20    Pillsbury privilege that needs to be resolved.  I would — I will

21    be candid.  Mr. Burk and our side haven't fully met and

22    conferred in perhaps the traditional Northern District of

23    California sense of the word.  But I think it's quite clear that

24    we're going to reach an impasse on some very fundamental issues

25    about how the attorney-client privilege applies.

1          THE COURT:  Okay.  Before you go any further.

2          MR. SHAFFER:  Yeah.

3          THE COURT:  February 8th is a law-and-motion calendar.

4          MR. SHAFFER:  Okay.  Yes.

5          THE COURT:  And you all do distract me from my other

6    work that I have to do.  I have all day open on February 7th.  I

7    also have open the afternoon of February 8th.

8          MR. SHAFFER:  Let's do February 7th, Your Honor, if

9    that's okay.

10         MR. PASQUALE:  Your Honor, this is — I'm sorry, Your

11   Honor.  It's Ken Pasquale.  May I be heard for a moment?

12         THE COURT:  Yes, sir.

13         MR. PASQUALE:  I just wanted to mention, although I'll

14   need to confer with others on my side of the case, but I do

15   expect that this will be an evidentiary hearing.

16         THE COURT:  Okay.

17         MR. SHAFFER:  All the more reason to have the whole

18   day available.

19         MR. [SPEAKER]:  And we have the afternoon on the 8th

20   if we need it.

21         MR. SHAFFER:  Yeah.  Oh, could we start in the morning

22   on February 7th then, Your Honor?

23         THE COURT:  Yes, we could.

24         MR. SHAFFER:  Right.  You know, I'm saying this and

25   not looking at my calendar.  Okay.

1      (Counsel confer off record.)

2          MR. SHAFFER:  Oh, yeah.  Okay.  Mr. McGrane suggested

3  also if we could just at least preserve the afternoon on the 8th

4  in the event that there is any —

5          THE COURT:  Um-hum.

6          MR. SHAFFER:  — carryover.  Thank you, Your Honor.

7          But I would like to, with Mr. Burk's concurrence, try

8  to schedule as soon as possible, as soon as he believes he can

9  brief and we can brief, and I would like to think that the

10 trustee may also wish to brief issues of the Pillsbury

11 privilege.

12         THE COURT:  Okay.  Now let's talk about all of the

13 things that we would need to deal with in order to prepare for a

14 hearing on February 7th.  And I'm hearing you say that you

15 expect that we're going to have some — some motion practice.

16         MR. SHAFFER:  Yeah, I believe that's correct.

17         THE COURT:  Mr. Burk.

18         MR. BURK:  I'm a little at a loss as to —

19         THE COURT:  You're at a loss here.

20         MR. BURK:  — where to begin.

21         THE COURT:  Okay.

22         MR. BURK:  On — the paper that we filed dealt with

23 what Mr. Shaffer charitably described as a failure to meet and

24 confer in the Northern District fashion regarding the scheduling

25 of three depositions on — that was the unilateral selection and

1   jamming of three dates.  And I didn't put it in my papers, but I

2   was actually told by opposing counsel that after we made

3   specific proposals — that, by the way, are completely consistent

4   with the schedule that's been discussed today — I was told I

5   would be gotten back to.  And instead what happened was

6   unannounced process servers visited my clients.  That is not the

7   way we practice here, and I take very strong exception to it.

8   And I felt it was essential to bring it to the Court's attention

9   so it does not happen again.

10          THE COURT:  I'm going to agree with you, Mr. Burk.

11  Let me just say that I think all the lawyers that are operating

12  in this case are operating under significant stress and that it

13  appears that there have been some misunderstandings.

14          I don't except there to be any game-playing in the

15  case.  If you have difficulty with respect to scheduling, please

16  contact my chambers.

17          MR. BURK:  Thank you, Your Honor and I appreciate the

18  Court's comments.

19          Now with respect to privilege, it is very likely that

20  there will be disagreements about privilege.  The position that

21  Pillsbury has taken, just so we are clear, is not accurately

22  characterized in the papers that are before you.

23          At the time that Pillsbury was accused of malfeasance

24  and was sought to be disqualified, both inside counsel at

25  Pillsbury and outside counsel were working.  It is not

1   Pillsbury's position that any conversation between any Pillsbury

2   lawyer and any other Pillsbury lawyer at any time regarding the

3   subject matter of this case or regarding the subject matter of

4   the disqualification motion or the accusations against the

5   Pillsbury firm is privileged.

6          What is privileged is Pillsbury's right, like any

7   other person or entity in the United States of America, to

8   consult with counsel about serious accusations and misconduct

9   that were leveled against it.  And it is as to communications

10  with inhouse counsel and outside counsel that Pillsbury asserts

11  the privilege.

12         THE COURT:  Okay.  What I want to know is this:  Do we

13  need to set a hearing for any disputes with respect to privilege

14  and, if so, when she we is the it?

15         MR. BURK:  Well, Your Honor, it may be that that is a

16  little premature and we may — it may be appropriate to have a

17  conference call with the Court —

18         THE COURT:  I thought I'd give you a tentative date.

19         MR. BURK:  That's fine.  I point out simply that

20  there's been effectively no meeting and conferring.  I received

21  a letter while I was in St. Louis on a deposition that began

22  meeting and conferring, and that was, I believe, a day ago or

23  two days ago.  So the issues aren't joined.  They aren't even

24  defined.  Does that mean we won't absolutely work towards

25  getting this, you know, up and before the Court?  Absolutely we

1   will.  Of course we will.

2          THE COURT:  Let me just throw out some dates so that

3   you all know what would be most convenient for me.

4          MR. BURK:  May I sit down?

5          THE COURT:  Sure.

6          MR. BURK:  Thank you.

7          THE COURT:  If we're going to have any discovery

8   disputes, my preference is that we hear them on Monday, January

9   7th; Monday, January 14th; Tuesday, January 22nd; 23rd; or 24th;

10  or Monday, January 28th.

11         MR. BURK:  Could you say those again, please?

12         THE COURT:  Okay.  January 7th, 14th, 22nd, 23rd,

13  24th, and 28th.  All of those dates are days where I can deal

14  with any potential discovery disputes.

15         MR. STEIN:  Your Honor, I'm going to suggest with your

16  permission that this issue that Mr. Shaffer raised, which is an

17  issue that the trustee's on this side of the room on, if you

18  will, is — is an issue that should be set on January 7th.  And

19  the reason for that is because of the timing of the upcoming

20  Pillsbury depositions, which will be a little bit later in

21  January, should be addressed before those examinations rather

22  than after.

23         THE COURT:  I want to be able to streamline this

24  process and not have to redo.

25         MR. STEIN:  Yeah.  That gives us, even with Christmas,

1  it's a month to have discussions, get briefing into you, and

2  move it along.  There's —

3          THE COURT:  You know, that will be my first day back

4  in the office for a week, but that's all right.

5          MR. STEIN:  Well, and that means the government —

6          THE COURT:  Still, it will be the afternoon of the

7  7th.

8          MR. STEIN:  Okay.

9          MR. MEROLA:  Your Honor, this is Frank Merola.  If I

10  could be heard?

11          THE COURT:  Mr. Merola.

12          MR. MEROLA:  I am on the same page as — as Mr. Stein

13  on the scheduling, although I would be so bold to ask Your Honor

14  if there was a date available before your vacation so that

15  however this gets resolved, we could have the resolution of the

16  supplemental document production and everyone could have those

17  documents before the depositions commence.  I don't want to be

18  in the situation where, Your Honor, where you get a favorable

19  result and that means we get a large quantity of additional

20  documents on the eve of a crucial deposition.

21          THE COURT:  You can also have available December 27th

22  and December 28th.

23          MR. BURK:  It's my understanding that virtually

24  everybody in this case is going to be away from the 23rd of

25  December through the 1st or 2nd of January.  And, in fact, even

1    at December — I'm sorry — a January 7th hearing date puts

2    Pillsbury's opposition brief when everybody's off on vacation —

3                THE COURT:  And we already have scheduled December

4    17th.  I'm just telling you what's open on my calendar.

5                MR. BURK:  And I'm —

6                MR. MEROLA:  I would prefer the December 17th date,

7    Your Honor.

8                THE COURT:  Well, you already have a hearing at two

9    o'clock on —

10               MR. MEROLA:  If we could put this issue on for that

11   date, Your Honor.  Today's only the 7th.  We could meet and

12   confer today, and we have ten days for any briefing.

13               THE COURT:  Mr. Burk.

14               MR. BURK:  It seems to me that the privilege issues

15   that we are going to be addressing are going to — as all

16   privilege issues are — are going to be context and fact based.

17   There is — the privilege log for the period February 15th

18   through March 26th, as to which I want to be clear Pillsbury is

19   not, I repeat, not withholding every document Pillsbury created

20   during that time, but there are a great many internal

21   communications, you can imagine, about the accusations that were

22   flying around at that time.

23               There are several thousand of those documents that are

24   — as to which there will be a claim of privilege.  There will be

25   deposition questions as to which there may be claims of

1    privilege.  I'm not sure that we — I am open to discussing how

2    to do this so that the Court is able to make an informed

3    decision and guide the parties going forward.  Providing ten

4    days to talk in the abstract about this in the absence of

5    specific context seems to me —

6          THE COURT:  You know, it may be that on December 17th

7    we decide that we don't know yet that we're going to have a

8    problem and we continue everything over to January 7.

9          MR. BURK:  I'm —

10         THE COURT:  I would like you to try to see if we can

11   focus on what issues you all are in disagreement.

12         MR. MEROLA:  That is — let us define and narrow the

13   issues, Your Honor, for the 17th, —

14         THE COURT:  Okay.

15         MR. MEROLA:  — please.

16         MR. BURK:  I — that —

17         THE COURT:  Does that work for you, Mr. Burk?

18         MR. BURK:  Yeah.  I'm stuttering.  I apologize.  On

19   the understanding that this may turn out to be a more

20   substantial undertaking that gets — that requires more context,

21   in the context of specific documents, a privilege log,

22   deposition questions, and that kind of record, or more briefing

23   on what is actually a set of complex issues regarding the

24   privilege that lawyers have with respect to themselves, which is

25   a difficult issue, Your Honor.  I warn you.

1          Making efforts to define and be able to discuss those

2     issues on the 17th, understanding that we may not be able to

3     reach meaningful conclusions by then is absolutely fine and we

4     will certainly do what we can, everything we can to help —

5          THE COURT:  Thank you, Mr. Burk.  I appreciate that.

6          Okay.  Let's talk about any — is there anything else

7     we need to discuss with respect to scheduling?

8          MR. BURK:  Yes.  I'm sorry.  We still don't have

9     resolution about the dates with my three clients.

10          THE COURT:  You had proposed what dates, January...

11          MR. BURK:  For Mr. Greenfield, the 21st of December.

12          THE COURT:  December 21st.

13          MR. BURK:  For Mr. Freeman, the 15th of January, which

14     was last I checked an open date on the calendar.

15          And for — Mr. Barbarosh is away, but I am trying to

16     get a date for him.

17          THE COURT:  Is that a sabbatical that he's on?

18          MR. BURK:  It is in the nature of a sabbatical, yes,

19     Your Honor.  And the date — the 18th specifically is a date when

20     he's traveling.

21          MR. SHAFFER:  Your Honor, if I can make things easier

22     for Mr. Burk a little bit.  In light — we had told Mr. Burk that

23     this hearing would inform us as to how to proceed.  I think at

24     this point we would like to sit down with Mr. Burk between now

25     and the 17th and see if we could work out a schedule.  We will

*Scheduling Issues*                                                                    50

1    not take depositions between now and the 17th.  I think that

2    makes the most —

3              MR. BURK:  Excuse me.

4              THE COURT:  Your courtesy is appreciated.  Thank you

5    very much.

6              MR. BURK:  The Court will pardon me for being

7    explicit, but could I have a representation from counsel that

8    the subpoenas have been withdrawn?

9              MR. MCGRANE:  I'm the guilty party, Your Honor, and I

10   will represent to Mr. Burk that we will not haunt his house

11   anymore.  We're not going to take Mr. Greenfield on the 21st.

12   It's too early.  We need his documents, above all.

13             THE COURT:  Okay.

14             MR. SHAFFER:  The other thing I would ask, and I

15   cannot compel Mr. Burk to do this, but if there is a

16   supplemental disclosure that Pillsbury is going to be filing

17   under Rule 2014 in light of this, it certainly would help inform

18   the parties if they do that sooner rather than later.

19             MR. BURK:  Two or three separate things.  First of

20   all, Pillsbury's no longer counsel to the estate.  It is my

21   understanding, and I'm prepared to be corrected, that they would

22   not have obligations under the 2014 anymore.

23             The issues before the Court today are what happened

24   back then and what should have been done, why what happened

25   happened, and what should have been done.  But I don't believe

*Scheduling Issues*                                                      51

1    that there's a Rule 2014 issue anymore.

2            MR. MEROLA:  Mr. Burk, with due respect, it's a 9011

3    issue, that there's a false statement made to the Court with Mr.

4    Grainfield sitting in the courtroom that you need to correct.

5            MR. BURK:  Well, that's, I believe, the subject  of

6    the debate that we're going to have on the merits.  And I — the

7    temptation to leap ahead to the merits is very great, but I'm

8    sure we're all going to try to restrain ourselves.  So I don't

9    believe there is a Rule 2014 issue.

10           I appreciate what counsel just said.  And, again, I'm

11   sorry to be so ridiculously literal, but I don't believe I got

12   an answer to my question about the subpoenas themselves.

13           MR. MCGRANE:  Oh, they're withdrawn.

14           MR. SHAFFER:  The subpoenas are withdrawn.

15           THE COURT:  Thank you.

16           MR. SHAFFER:  No ambiguity.

17           MR. BURK:  Thank you.

18           MR. SHAFFER:  Thank you.

19           MR. BURK:  I appreciate that.  And I'm sorry I had to

20   be so literal about it.

21           MR. SHAFFER:  It's okay, Mr. Burk.

22           MR. MCGRANE:  They weren't served correctly anyway.

23           MR. BURK:  So were there any other questions for me?

24   I may have left something out.  I'm not sure.

25           THE COURT:  I'm not aware of anything you've left out.

1          Okay.

2      (Counsel confer off record.)

3          THE COURT:  Yes.

4          MR. SHAFFER:  Without saying anything further, I

5     disagree with Mr. Burk's interpretation of 2014.  We'll deal

6     with that when we have to.

7          THE COURT:  Okay.  Thank you all for your continuing

8     courtesy.  I wish you well in your scheduling and I will see you

9     on December 17th.  We're adjourned.

10         [COUNSEL]:  Thank you, Your Honor.

11         THE CLERK:  All rise.

12     (The hearing was adjourned at 12:34 o'clock p.m.)

13                              —o0o—

14

15

16

17

18

19

20

21

22

23

24

25

State of California          )
                             )    SS.
County of San Joaquin        )


        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber through the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated December 11, 2007